```
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE


                                  . Chapter 11
IN RE:                            .
                                  . Case No. 20-12836(JTD)
CRED INC., et al,                 .
                                  .
                                  . 824 Market Street
                     Debtors.     . Wilmington, Delaware 19801
                                  .
. . . . . . . . . . . . . . . . . Tuesday, November 10, 2020


     TRANSCRIPT OF TELEPHONIC HEARING RE:  FIRST-DAY MOTIONS
             BEFORE THE HONORABLE JOHN T. DORSEY
                UNITED STATES BANKRUPTCY JUDGE
```

APPEARANCES VIA TELEPHONE:

For the Debtors:              Scott D. Cousins, Esq.
                              Patrick Stewart, Esq.
                              COUSINS LAW, LLC

                              James T. Grogan, Esq.
                              Alexander Bongartz, Esq.
                              Derek Cash, Esq.
                              Broocks (Mack) Wilson, Esq.
                              PAUL HASTINGS, LLP

For the U.S. Trustee:         Joseph J. McMahon, Jr., Esq.
                              John Schanne, Esq.
                              OFFICE OF THE U.S. TRUSTEE

(Appearances Continued)

Audio Operator:               Electronically Recorded
                              by CourtCall/Jason Spencer, ECRO

Transcription Company:        Reliable
                              1007 N. Orange Street
                              Wilmington, Delaware 19801
                              (302)654-8080
                              Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA TELEPHONE:   (Continued)


Also Appearing:              Edward Weisfelner, Esq.
                             BROWN RUDNICK, LLP

                             Daniel Schatt
                             Joe Podulka
                             CRED, INC.

                             Cory A. Hendrix, *Pro Se*

                             Charlie Lee, *Pro Se*

                             Pablo Bonjour
                             MACCO RESTRUCTURING GROUP, LLP

                             Nellwyn Voorhies
                             DONLIN, RECANO & COMPANY, INC.

                             Grant Lyon
                             ARETE CAPITAL PARTNERS, LLC

INDEX

|                                                      | Page |
|------------------------------------------------------|------|
| INTRODUCTORY REMARKS BY MR. GROGAN                   | 7    |
| JOINT ADMINISTRATION                                 | 21   |
| RETENTION OF DONLIN AS CLAIMS AND NOTICING AGENT     | 22   |
| CASH MANAGEMENT                                       | 24   |
| WAGES AND BENEFITS                                   | 27   |
| INSURANCE                                             | 29   |
| STAY ENFORCEMENT                                     | 30   |
| CONSOLIDATED LISTS/EMAIL SERVICE, PERSONAL INFO.     | 35   |

| WITNESS           | DIRECT | CROSS | REDIRECT | RECROSS |
|-------------------|--------|-------|----------|---------|
| FOR THE DEBTOR    |        |       |          |         |
| DANIEL SCHATT     | 19     | 46    |          |         |

| EXHIBIT                | EVID. |
|------------------------|-------|
| McManigle Declaration  | 18    |
| Schatt Declaration     | 18    |
| Voorhies Declaration   | 23    |

1          (Proceedings commence at 3:00 p.m.)

2               THE OPERATOR:  The recording has begun.  We are now

3     live.

4               THE COURT:  Thank you.  Good afternoon, everyone.

5     This is Judge Dorsey.  We're on the record in Cred, Inc.,

6     Case Number 20-12836.  I will go ahead and turn it over to

7     debtors' counsel to run the agenda.

8               MR. COUSINS:  Good morning, Your Honor -- or good

9     afternoon, Your Honor.  It's Scott Cousins.  Can you hear me

10    okay?

11              THE COURT:  You're a little muffled.

12              MR. COUSINS:  I'll pick up, Your Honor.  Good

13    afternoon, Your Honor.  Scott Cousins on behalf of the

14    debtors.

15              First of all, I'd like to thank the Court for

16    finding the time available to have the first-day hearing.

17    And second of all, I'd like to introduce our -- my co-counsel

18    James Grogan and Alexander Bongartz, who I both believe are

19    on and who are going to walk the Court through a presentation

20    and then the requests that we have with respect to the first-

21    days.

22              We've made considerable progress, I think, with the

23    U.S. Trustee, but we certainly wouldn't want to leave the

24    Court out.  We do have an issue on one form of order that

25    we'll likely need to address with the Court.

1              THE COURT:  Okay.  Thank you.

2              Before we begin -- I don't know where your co-

3      counsel is, Mr. Cousins.  But see a lot of people in the

4      waiting room on Zoom with unrecognizable names.  We have a

5      policy that, if you are not on CourtCall and we can't

6      identify who you are from your name, we do not allow entry

7      into the Zoom meetings because of some disruptions that have

8      occurred in the past.  So, if you're trying to get in and you

9      want to participate, you need to change your name to your

10     full name, so that we can identify you from the CourtCall

11     list.

12             And with that, Mr. Cousins, who is going to be

13     speaking for the debtors?

14             MR. COUSINS:  It will either be Alex or James.  I

15     only see Alex, but I --

16             MR. GROGAN:  Mr. Cousins, can you hear me?

17             MR. COUSINS:  Oh, James is there.

18             MR. GROGAN:  This is James Grogan.

19             MR. COUSINS:  Yep.

20             MR. GROGAN:  Yeah.  Good morning -- or good

21     afternoon, Your Honor.  James Grogan.

22             THE COURT:  I can't --

23             MR. GROGAN:  I am a --

24             THE COURT:  I can't see who's speaking.  Where are

25     you?

1      MR. GROGAN:  So I am -- for some reason, I have a

2  number ending in 8679.  And I apologize, I don't know how to

3  convert that to a name.

4      THE COURT:  If you hover -- well, you shouldn't

5  have gotten into the call.  But be that as it may, if you

6  hover over your -- mouse over your video --

7      MR. GROGAN:  Yeah.

8      THE COURT:  -- in the upper-right corner, there's

9  three dots.  If you click that, it will give you the option

10  to change your name.

11    (Pause in proceedings)

12      MR. GROGAN:  I apologize, Your Honor, I'm --

13      THE COURT:  Well, we can do that for the next time.

14  But next time --

15      MR. GROGAN:  Yeah, I'll --

16      THE COURT:  -- you'll have to or --

17      MR. GROGAN:  I'll take --

18      THE COURT:  -- you won't get in.

19      MR. GROGAN:  I'll take the remedial course on Zoom

20  between now and then.

21      THE COURT:  All right.

22      MR. GROGAN:  So, Your Honor, again, we appreciate

23  you making time for us today.  We did have a --

24      THE COURT:  Somebody changed your name; it now says

25  "James Grogan."

1          MR. GROGAN:  Oh, wonderful.  The magic of the

2     internet.

3          Your Honor, we have a short presentation, as

4     basically our opening statement.  Mr. Wilson is going to

5     share his screen.

6          THE COURT:  Okay.

7          MR. GROGAN:  Thank you, Your Honor.  Thank you,

8     Mack.  So we can go to the first page.

9          At the beginning here, I'd just like to introduce

10    the Court to some of the key players in the case.  First all

11    -- first of all, we have our management team, which consists

12    of Dan Schatt and Joe Podulka.  Dan and Joe are both -- have

13    both been in the industry for a long time, working in --

14    primarily in financial technology.  Mr. Schatt is the Chief

15    Executive Officer and co-founder of the -- of Cred, and Mr.

16    Podulka is the Chief Financial Officer.  Mr. Podulka also is

17    a former lawyer and was -- previously practiced at Bryan

18    Cave.

19         Next page.  On this page, Your Honor, we see the

20    key restructuring professionals that we have brought onto the

21    case in the case -- really, the last week.  We're all

22    relatively new to this situation, but we're getting up to

23    speed quickly.

24         At the top there is Grant Lyon.  Grant is on the

25    CourtCall with us today.  Mr. Lyon is co-founder of Arete

1   Capital Partners, and has 30 years experience in the

2   restructuring industry.  He has also sat on more than 20

3   boards of directors for both private and public companies.

4   And Mr. Lyon is the company's independent director, and he

5   will also serve as the sole member of the board's

6   restructuring committee during the pendency of the Chapter 11

7   cases.

8            Down below Mr. Lyon, we have our financial --

9   proposed financial advisor Macco Restructuring Group.  Macco

10  is led by Mr. Drew McManigle.  Mr. McManigle has almost 30

11  years of restructuring experience, as well, and has served in

12  a number of fiduciary rules in Chapter 11 cases, such as

13  liquidating trustee, Chapter 11 Trustee, independent

14  director, and chief restructuring officer, among other

15  engagements.

16           Lastly on this list, we have our proposed claims

17  and noticing agent and administrative agent Donlin Recano,

18  and their retention application will be put on today.

19           We can go to the next page.  Next page, please.

20           So what is Cred?  Cred is a financial services

21  business that specializes in the exchange and investment of

22  cryptocurrencies.  They have approximately 6,500 customers.

23  These customers are global.  They sit in -- they live in

24  countries all around the world.  I think, at last count, we

25  have customers in approximately 140 countries.

1          The way that the company has historically earned

2     money is it invests the -- well, let's start at the

3     beginning.  Customers will come to Cred to set up an account

4     and place their cryptocurrency with Cred for reinvestment in

5     a variety of transactions.

6          The debtors, in turn, pay a -- what is essentially

7     an interest rate on the amount of cryptocurrency that is

8     placed in the account.  The cryptocurrency can then be loaned

9     or reinvested with asset managers.  We have some U.S. based

10    asset managers.  And in addition, we, up until the end of

11    2019, had made a number of loans of cryptocurrency to a

12    Chinese based cryptocurrency business called "moKredit,"

13    which you will hear some about, and which was mentioned in

14    the first-day declarations.

15         MoKredit is owned by a -- one of the other co-

16    founders.  You'll see his name at the top of Page 4 in the

17    presentation.  The gentleman's name is Lu Hua.  Lu is also a

18    former Paypal executive, and he is the sole owner of moKredit

19    and 50 percent owner of Cred.

20         Currently -- well, we'll get to the -- why don't we

21    skip down to the next page, Mack?

22         So let's talk about the corporate structure a

23    little bit.  So the parent company is called "Cred, Inc."

24    Cred, Inc., in turn, owns four subsidiaries:  Cred (US), LLC;

25    Cred Capital, Inc.; Cred Merchant Solutions, LLC; and Cred

1  Puerto Rico, LLC.

2          At the current time, the only one of -- the only

3  entities in the corporate chain that have existing operations

4  are Cred, Inc. and Cred (US) LLC.

5          Cred Capital will be a bit of a major part of the

6  case going forward because this was the entity that was

7  formed in March 2020, around the time that a new executive

8  was brought on board named James Alexander.  And Mr.

9  Alexander was tasked with setting this business up in order

10  to sell securities products.  Needless to say, that project

11  did not go according to plan, and there were a number of

12  difficulties that arose shortly after we engaged in that

13  particular business endeavor.  But in -- to some extent, that

14  is -- it's one of the leading causes of the reason we're in

15  Chapter 11 today.

16          Cred Merchant Solutions was formed in 2019, to

17  facilitate the purchase of crypto assets.  It has no business

18  and no assets at this time.  Similarly, Cred Puerto Rico, LLC

19  was formed in March of 2020, but has not yet begun conducting

20  any business.

21          We can go to the next page.

22          So what are our liabilities?  We have very little

23  funded debt.  In fact, you know, other than potential claims

24  for setoff, the debtors have no secured debt.  We do have 2.6

25  million of convertible notes that were issued a couple of

months ago, and those were done through a private placement.
A very small number of holders have the convertible notes
that pay 3 percent interest per year and mature in 2024.

The vast majority of the liabilities here are
liabilities related to customers.  The market value of the
cryptocurrency that has been invested with the debtors is
currently around 140 million.  The book value is quite a bit
lower.  Book -- the book value would represent the value of
the cryptocurrency at the time of investment.

But the value, particularly of bitcoin -- which is
the largest cryptocurrency on earth -- has been going up
significantly in the past few months.  And up until the
petition date, as a result of the increase in value of
bitcoin as against the U.S. dollar, our customer liabilities
mushroomed by, you know, around 30 percent just in October
alone.  That's another reason why the company has found
itself in significant distress because, in order to return
bitcoin, it would have to go into the market, buy new bitcoin
-- which is currently priced much higher than it was when it
was first deposited -- and that has created a liquidity
shortfall.

We also have ordinary course trade debt of
approximately 1 million.  The Court may have noticed that we
recently filed a motion to reject two real property leases.
Those claims, I would expect, are in the neighborhood of

1   about $250,000.  And then the balance of the trade debt would

2   be business partners with whom we engage in trading

3   transactions and cryptocurrency and similar type vendors.

4           We can go to the next page.

5           Your Honor, this is a pro forma balance sheet.  I'd

6   like to give the Court a sense of, you know, what do we have

7   and what do we owe.  So the company, most of its assets are

8   currently in cryptocurrency.  You'll see there's a line item

9   two down on the cash and cash equivalents section that says

10  "cryptocurrency."  That 14.709 million in cryptocurrency

11  consists of a combination of different assets.  Some of it is

12  bitcoin, that's about two and a half million.  But also, a

13  lot of is other forms of cryptocurrency, which may not be as

14  liquid and easily sellable as bitcoin.

15          For example, the company actually maintains its own

16  cryptocurrency, which is called "Libra."  The company has

17  been trying to establish a market for Libra, but we're not

18  there yet.  And so some of the Libra "tokens" -- they're

19  called -- are part of our assets, but to date, that's been

20  somewhat illiquid, although it is possible that demand may

21  increase for that particular currency.

22          We also have some other third-party

23  cryptocurrencies, which do not trade in large volumes every

24  day; and are, therefore, more challenging to sell than

25  bitcoin.  Bitcoin is, you know, much more liquid.  The market

1  is huge and can -- it can be easily liquidated for U.S.

2  dollars, if need be.  We also have about 47,000 in cash and

3  489,000 in frozen cryptocurrency.  So the total cash and cash

4  equivalents are 15.245 million.

5          Then we have loans and assets under management that

6  we are servicing.  The assets under management are primarily

7  cryptocurrency assets that have been placed with other

8  providers, who then reinvest those currencies in derivatives

9  transactions or through loans of their own.  Currently, we

10  only invest in U.S. -- we only place assets under management

11  with other U.S. based entities.

12          We also have 39,074,000 in outstanding loans that

13  we issued in cryptocurrency.  And this consists entirely of

14  loans that were made in 2019 to moKredit.  moKredit is

15  repaying those loans, in part.  But for several months, due

16  to liquidity constraints of moKredit, they have only been

17  paying interest.  And that has also contributed to the

18  liquidity strain on Cred.

19          We also have outstanding loans that we made in U.S.

20  dollars to customers, and those are outstanding in an amount

21  of $9.8 million.  So, on those transactions, customers would

22  transfer cryptocurrency to Cred.  Cred would then give the

23  customer a line of credit and allow the customer to draw

24  loans for U.S. dollar advances.  And there are $9.8 million

25  outstanding, which are -- you know, may be repaid or may be

1   held back through setoff issues that we have going forward.

2          On the other side, we have the borrowed capital,

3   show the customer deposits.  This is the book value of the

4   customer deposits, 114,000,635.  We also have cryptocurrency

5   that we've taken as collateral in connection with making

6   loans to our customers; that's 20.8 million.  So the total

7   borrowed capital is currently 135.5 million.  And so total

8   liabilities of, you know, just under $140 million.

9          We can go to the next slide.

10          Your Honor, Page 8 shows how assets and cash move

11   around the company's financial systems.  We have two banks:

12   Silvergate Bank and Metropolitan Commercial Bank.  Silvergate

13   is a bank that specializes in the conversion of

14   cryptocurrency into cash.  It is directly linked to our

15   Fireblocks account.  Fireblocks is a -- essentially, a

16   clearinghouse for cryptocurrency, where we maintain an e-

17   wallet with our cryptocurrency assets.  That is also where

18   the customers make their -- transfer the funds for us to then

19   reinvest.  Metropolitan Commercial Bank handles all of the

20   A/P, the payroll, and also would be the source of any loans

21   that we issue back to the customers on the lines of credit.

22          In the light-brown boxes, you'll see there's three

23   linked accounts that Silvergate Bank is tied to.  Those are

24   the asset management companies that we're currently using:

25   100 Acre -- it's a little hard to read -- Sarson, and Releez

1    Limited (phonetic).  And so those are the -- those are the

2    asset management structures that we currently have.

3            We can go to the next slide.

4            So why is Cred here?  It's been -- as I mentioned

5    previously, much of the problems that we have relate to

6    disputes and controversies surrounding the employment of our

7    chief capital -- former Chief Capital Officer.  Mr. Alexander

8    was tasked with setting up a company called Cred Capital,

9    which is one of the debtors.  That entity -- that endeavor

10   was anticipated to help us establish some additional lending

11   capability.

12           We capitalized it.  At some point, we learned that

13   Mr. Alexander had actually transferred much of the assets

14   that were contributed to Cred Capital to his own personal e-

15   wallet.  When that was discovered, Mr. Alexander's employment

16   was terminated.  The company has also sued Mr. Alexander in

17   State Court, and there is currently a temporary restraining

18   order, which has frozen the 225 remaining bitcoin in Mr.

19   Alexander's e-wallet.

20           The debtors-in-possession anticipate that we will

21   be filing, later this week, an action under Section 542 for

22   turnover, so the Court learn more about that when the

23   turnover action is commenced.  But to my knowledge, the 225

24   bitcoin -- which has a current dollar-based value of 4.3

25   million -- is frozen via the order entered by the California

1    State Court.

2           Mr. Alexander was also instrumental in arranging a

3    fraudulent transaction with a company that purported to be

4    Quant coin, but was not; in fact, it was an imposter.  And as

5    a result of that fiasco, the company had 800 bitcoin actually

6    stolen, and that cost approximately 11.5 million.  So,

7    needless to say, all of this combined to put a severe strain

8    on our balance sheet.

9           We can go to the next slide.

10          At the same time that some of these activities that

11   Mr. Alexander were going on, the price of bitcoin was rising

12   significantly.  And so the company was placed in a position

13   where it was losing bitcoin to Mr. Alexander and the imposter

14   that he brought into the company's sphere of influence.  And

15   we had a rise in the cryptocurrency prices that just made it

16   impossible to go into the market, buying new bitcoin at

17   higher prices to replace the bitcoin that had been stolen or

18   taken and placed into the private e-wallet.

19          And by late October, the company realized that its

20   balance sheet was completely out of whack.  I -- Pause

21   Hastings was hired October 27th, and we immediately began the

22   process of preparing this Chapter 11 case, which was then

23   filed on November 7th.

24          Your Honor, I -- let me pause there and see if you

25   have any questions about the presentation so far.

1          THE COURT:  No.  I think it's pretty comprehensive.

2     Thank you.

3          MR. GROGAN:  You're welcome.

4          Your Honor, we can -- if we can go to the next

5     slide.

6          So we have a few first-day motions to present.

7     Fortunately, you know, because we don't have any bank debt,

8     there will not be a cash collateral motion today.  But we do

9     have other motions to present, such as joint administration,

10    our retention of the claims and noticing agent, cash

11    management, employee obligations and benefits, insurance.

12    Because we have so many foreign creditors, we thought it was

13    appropriate to have a stay enforcement motion.  And lastly,

14    we have a motion for approval to file a consolidated list of

15    creditors, conduct email service, and also redact some of the

16    names of our customers.

17         Mr. Bongartz and Mr. Wilson are going to handle the

18    presentation of the first-day motions.

19         At this point, though, I think I would like to

20    introduce into evidence two things:

21         One, our first-day declaration, filed by Mr. Drew

22    McManigle, our financial advisor.  That was filed at Docket

23    Number 16.  And the debtors move to introduce that into

24    evidence as Mr. McManigle's direct testimony.

25         THE COURT:  Is there any objection?

1    (No verbal response)

2         THE COURT:  Admitted without objection.

3    (McManigle Declaration received in evidence)

4         MR. GROGAN:  Thank you, Your Honor.

5         Second, I would move to introduce into evidence

6    Docket Number 12, which is the declaration of Daniel Schatt -

7    - S-c-h-a-t-t -- the chief financial -- the Chief Executive

8    Officer.  And I'm introducing his declaration as his direct

9    testimony.

10        THE COURT:  Any objection?

11   (No verbal response)

12        THE COURT:  Admitted without objection.

13   (Schatt Declaration received in evidence)

14        MR. GROGAN:  Thank you, Your Honor.

15        Your Honor, I do have a short additional direct for

16   Mr. Schatt.  In conversations with the U.S. Trustee's Office,

17   they requested that we put on direct evidence regarding

18   mister -- regarding some of the intercompany transactions.

19   And so I don't think this will take long, but I do have a

20   little additional direct for Mr. Schatt.

21        THE COURT:  Okay.  Mr. Schatt, do you want to raise

22   your right hand, please?  State your full name for the record

23   and spell your last name.

24        THE WITNESS:  Dan Schatt, S-c-h-a-t-t.

25   DANIEL SCHATT, WITNESS FOR THE DEBTORS, AFFIRMED

1              THE COURT:  Okay.  Thank you.  You can put your

2    hand down.

3              MR. GROGAN:  Thank you, Your Honor.

4                      DIRECT EXAMINATION

5    BY MR. GROGAN:

6    Q    Mr. Schatt, to your knowledge, does Cred, Inc. engage in

7    any intercompany cash transfers with any of its subsidiaries?

8    A    Yes, it does.

9    Q    Can you explain to the Court what those intercompany

10   transfers are?

11   A    Yes.  Cred (US) LLC receives interest payments and makes

12   interest payments and principal payments out, and those

13   payments come into Cred (US) LLC.  They are transferred then

14   to Cred, Inc.

15   Q    Thank you.

16        Can you tell the Court whether or not the -- it's

17   important to continue that intercompany relationship?

18   A    Yes, it is.  It's a critical revenue source for us.  We

19   receive interest revenues from these processes.

20   Q    Thank you.

21             MR. GROGAN:  Your Honor, I have no further

22   questions for the witness.

23             THE COURT:  Thank you.

24             Any cross-examination?

25        (No verbal response)

1          THE COURT:  Okay.  Thank you, Mr. Schatt.  You are

2     dismissed as a witness at this point.

3          (Witness excused)

4          MR. GROGAN:  Your Honor, unless anybody else wants

5     to be heard, I think we're ready to move into the first-day

6     motions.

7          THE COURT:  All right.  Why don't we go through the

8     motions and see if anybody has any questions as we go through

9     them?

10          MR. MCMAHON:  Your Honor, may I be heard briefly?

11          THE COURT:  Who's speaking?

12          MR. MCMAHON:  It's Joseph McMahon with the U.S.

13     Trustee's Office.

14          THE COURT:  Yes, Mr. McMahon.

15          MR. MCMAHON:  Your Honor, just with respect to Mr.

16     Schatt, we may be requesting his testimony in connection with

17     the contested item that's on the agenda.  The direct just

18     offered by Mr. Grogan was specific to the employee wages

19     issue.  So, with respect to his testimony, we may be just

20     asking that he further testify in connection with that item.

21          THE COURT:  Okay.  Well, let's -- we'll deal with

22     that when we get to that motion then.  How's that?  How about

23     that, Mr. McMahon?

24          MR. MCMAHON:  Thank you very much.

25          THE COURT:  Okay.

1          MR. GROGAN:  Thank you, Your Honor.

2          So I think up next is Mr. Wilson.

3          MR. WILSON:  Yes, Your Honor.  Good afternoon.

4    This is Mack Wilson on behalf of Cred, Inc. and its debtor

5    affiliates.  I'll be presenting the first part of the agenda,

6    the joint administration motion, Donlin Recano's retention

7    application, and the cash management motion, and my colleague

8    Alexander Bongartz will be present the balance of the first-

9    day motions.

10          THE COURT:  And Mr. Wilson, are you Zoom?  I don't

11    see you.

12          MR. WILSON:  I am.  I'm under Mack Wilson.

13          THE COURT:  Okay.  Oh, there you are.  Okay.  I see

14    you now.

15          MR. WILSON:  Before I get started, I did want to

16    mention that we conferred with the U.S. Trustee's Office

17    regarding the first-day motions, and I believe we were able

18    to reach resolution on most of the first-day relief, except

19    for some outstanding issues that, as Mr. McMahon mentioned,

20    will be addressed in the consolidated creditors motion.

21          So, with your permission, I'll transfer --

22    transition to the first matter on the agenda, the joint

23    administration motion at Docket Number 3.

24          THE COURT:  Yes, go ahead.

25          MR. WILSON:  Your Honor, this is a typical request

1      for joint administration of all the debtors' cases for

2      procedural purposes only, to ease the administrative burden

3      on the Court, the debtors, and the parties-in-interest.  We

4      would propose, Your Honor, that the lead case caption be for

5      the Cred, Inc. entity, which is Case Number 12 -- 20-12836.

6              The proposed form of order we submitted to chambers

7      earlier this afternoon has some changes from the proposed

8      order we submitted with the motion based upon some comments

9      from the United States Trustee's Office.  If Your Honor would

10     like, I can walk you through the changes that have been made.

11             THE COURT:  Yes.  Go ahead.  Thank you.

12             MR. WILSON:  So the previous Paragraph 6 in the

13     motion and the order that was filed with the motion regarding

14     where creditors would file proofs of claim has been struck,

15     as has previous Paragraph 8, regarding on which docket the

16     debtors would file their schedules has also been struck.

17             With those changes, Your Honor, we would

18     respectfully request the Court enter the joint administration

19     order.

20             THE COURT:  Okay.  Does anyone wish to be heard?

21         (No verbal response)

22             THE COURT:  All right.  I'm satisfied that relief

23     requested is appropriate, I will enter the order.

24             MR. WILSON:  Thank you very much, Your Honor.

25             The next item on the agenda is Donlin, Recano &

1    Company's retention application as claims and noticing agent,

2    which is at Docket Number 9.  Their engagement letter is also

3    attached to the retention application as Exhibit 1 to the

4    proposed order.

5          As you know, Your Honor, the local rules require

6    the debtors to engage a claim and -- claims and noticing

7    agent.  And after soliciting several offers, the debtors

8    selected Donlin Recano because of its competitive rates and

9    its significant experience and expertise in Chapter 11 cases

10   of this size and complexity.

11         Additional support for Donlin Recano's application

12   is in the form of a declaration by Ms. Nellwyn Voorhies,

13   which is attached to the application as Exhibit E.  I

14   respectfully submit her declaration be admitted.

15         THE COURT:  Any objection?

16      (No verbal response)

17         THE COURT:  It's admitted without objection.

18      (Voorhies Declaration received in evidence)

19         MR. WILSON:  Thank you, Your Honor.

20         The proposed order submitted to chambers earlier

21   this afternoon incorporates several comments we received from

22   Mr. McMahon and Mr. Schanne and is now agreed upon by the

23   debtors and the United States Trustee's Office.  If Your

24   Honor would like, I can walk you through the changes that

25   have been made to the order.

1          THE COURT:  I did see those.  That's -- no need to

2     walk through those; they're pretty straightforward.

3          MR. WILSON:  Okay.  Thank you, Your Honor.  With

4     that, we would respectfully request the Court enter the joint

5     administration order.

6          THE COURT:  (Indiscernible)

7          MR. WILSON:  Or sorry, excuse me.

8          THE COURT:  (Indiscernible)

9          MR. WILSON:  Yeah, the -- Donlin Recano's retention

10     application.

11          THE COURT:  Does anyone wish to be heard?

12        (No verbal response)

13          THE COURT:  All right.  I'm satisfied that the

14     retention of Donlin Recano is appropriate, I will enter that

15     order.

16          MR. WILSON:  Thank you, Your Honor.

17          The next item on the agenda is the debtors' motion

18     for authority to continue using their cash management system

19     and making intercompany transfers in the course of ordinary

20     business -- in the ordinary course of business, and for

21     authority to extend the time to comply with Section 345 of

22     the Bankruptcy Code.

23          The maintenance of the debtors' cash management

24     system is critical to the success of their Chapter 11 cases

25     and, as you heard from Mr. Schatt earlier, so are the

1    debtors' intercompany transfers.

2           The debtors receive interest payments from Cred

3    borrows U.S. customers [sic] into a Cred (US) LLC account,

4    and then moves those funds to Cred, Inc., to pay their bills

5    at the end of the month.  Cred, Inc. transfers $100,000 back

6    to Cred (US) LLC, and Cred (US) LLC is required to maintain a

7    minimum -- a monthly minimum balance by law.

8           Again, we conferred with the U.S. Trustee's Office

9    prior to this hearing and the proposed order submitted to

10   chambers earlier this afternoon reflects several important

11   changes that I can walk you through now, if Your Honor would

12   like.

13          THE COURT:  Yes, let's walk through those.

14          MR. WILSON:  Okay.  In Paragraph 4, language was

15   added to reflect that the debtors will maintain accurate and

16   detailed record of -- records of any intercompany transfers

17   for easy tracing.

18          Further, language was added to the order, which is

19   now Paragraph 5, indicating that each of the debtors'

20   quarterly U.S. Trustee fees will be calculated based on each

21   debtor's disbursements, regardless of which entity pays the

22   expenses.

23          There is now new language limiting the relief

24   regarding the debtors' bank account management to being

25   temporary in nature until there's a final hearing.  That was

1     in the previous Paragraph 5 of the order, now Paragraph 6.

2           Additionally, a new provision was inserted,

3     requiring the debtors to notify its banks, which are party to

4     a uniform depository agreement with the U.S. Trustee's

5     Office, that it is a debtor-in-possession within 15 days.

6           And the final change, Your Honor, is that the

7     debtors will now give the U.S. Trustee 5 days notice of any

8     changes to the cash management system, where the previous

9     proposed order had provided for 14 days notice.

10           With those changes, Your Honor, we would

11     respectfully request the Court enter the interim cash

12     management order.

13           THE COURT:  Anyone wish to be heard?

14      (No verbal response)

15           THE COURT:  I'm satisfied the requested relief is

16     appropriate, I will enter the order.

17           And we might as well go ahead and set our final

18     hearing date while we're on this one, since it requires one.

19           MR. WILSON:  Yes, Your Honor, I believe --

20           MR. COUSINS:  Your Honor, it's Scott Cousins.  Your

21     Honor, I'm sorry.  It's Scott Cousins again.

22           Your courtroom deputy gave us December 9th at 2

23     p.m. eastern --

24           THE COURT:  Okay.

25           MR. COUSINS:  -- for a hearing date.  And we can

1    insert that and then upload that to all the orders.

2              THE COURT:  Okay.  That works.  Thank you.

3              MR. COUSINS:  Uh-huh.

4              MR. WILSON:  Thank you very much, Your Honor.  I

5    will now pass the podium to my colleague Mr. Bongartz.

6              THE COURT:  Mr. Bongartz.

7              MR. BONGARTZ:  Thank you, Mack.

8              Good afternoon, Your Honor.  This is Alex Bongartz

9    of Paul Hastings on behalf of the debtors.  So I will be

10   presenting the remaining four first-day motions that are on

11   the agenda today.

12             Let me first turn to Agenda Item Number 6, which is

13   the wages and benefits motion that was filed at Docket Number

14   11.  Pursuant to the wages and benefits motion, the debtors

15   request authority to pay and honor pre-petition employee

16   compensation and related obligations, as well as employee

17   benefits, and in addition, continue on a going forward basis

18   and in the ordinary course their employee programs.

19             I'm happy to walk Your Honor through these programs

20   and individual items and address any questions you may have.

21   But I -- in a nutshell, and sort of to give Your Honor the

22   highlights, the company employs -- currently employs

23   approximately 20 full-time employees.  The month -- average

24   monthly payroll is approximately $300,000.  And as of the

25   petition date, the debtors owe approximately 75,000 to its

1    employees on account of salaries and commissions.

2           One thing to note, the payroll administrator the

3    debtors used prior to the petition date, Sequoia One,

4    terminated its relationship with the debtors shortly before

5    the petition date.  The debtors are transitioning to a new

6    payroll administrator, Zenefits, who will take over, and that

7    will be done at a cost of approximately $1,000 per month.

8           As far the payroll -- the next payroll is

9    concerned, it has already been funded to Sequoia and it is

10   expected that Sequoia will pay the payroll next Friday.  And

11   -- but because that payroll covers a portion of the pre-

12   petition period, we request authority to pay those pre-

13   petition obligations, as I mentioned earlier, in the amount

14   of approximately $75,000.

15          Again, as I said, we -- I'm happy to walk Your

16   Honor through the remaining components of the wages and

17   benefit motion, if Your Honor has any questions and -- but I

18   wanted to note that, as of the other first-day motions, we

19   have conferred with the U.S. Trustee, and the U.S. Trustee

20   has provided us with some comments, and I'm happy to walk

21   through those comments in the revised proposed order that was

22   submitted to chambers earlier this afternoon.

23          THE COURT:  Yeah, I did see those.  Thank you.

24          MR. BONGARTZ:  So shall -- would you like me to go

25   through the blackline or --

1          THE COURT:  No.

2          MR. BONGARTZ:  -- do you want me --

3          THE COURT:  No, that's not necessary.  Thank you.

4          MR. BONGARTZ:  Okay.  So we -- just to conclude, we

5   believe the relief sought is a sound exercise of the debtors'

6   business judgment, and we -- and it's justified under 105(a)

7   and 363(b) of the code.  And for obvious reasons, paying, or

8   continuing to pay its employees is necessary, in order to

9   allow the debtors to continue its operations without

10  interruption.  Accordingly, we respectfully request that the

11  Court enter the wages order, as submitted to chambers earlier

12  this afternoon.

13         THE COURT:  Does anyone wish to be heard?

14         All right.  I'm satisfied the requested relief is

15  appropriate.  I will enter that order.

16         MR. BONGARTZ:  Thank you, Your Honor.

17         So I'll be moving on now to Agenda Item 7, that's

18  the insurance motion, which was filed at Docket Number 10.

19  Pursuant to the insurance motion, the debtors request

20  authority to continue with their insurance policy in

21  accordance with the practices and procedures in effect prior

22  to the petition date, as well as renew policies or obtain

23  replacement coverage as necessary in the ordinary course.

24         The aggregate annual premium, as detailed in the

25  insurance motion, is approximately three hundred and sixty-

1     five.  Currently, the debtors do not have any premiums

2     outstanding.  However, there is a possibility that, as claims

3     are made, that the company is responsible to pay deductibles.

4     And accordingly, it is possible that some payments could be

5     made in the post-petition period that relate to the pre-

6     petition period.  And accordingly, we request authority to

7     pay such amounts as they arise.

8          And from that point, I want to note that, in part

9     of our discussion with the U.S. Trustee, we -- the debtors

10    have agreed that, for the interim period -- i.e., the period

11    until entry of a final order -- the debtors will limit the

12    aggregate amount of any such pre-petition payment to $25,000.

13    And I believe that is the only change to the interim

14    insurance order, based on the conversations we had with the

15    U.S. Trustee.  And with that change, we request that the

16    insurance order be entered.

17         THE COURT:  Anyone else wish to be heard?

18    (No verbal response)

19         THE COURT:  Okay.  I'm satisfied the requested

20    relief is appropriate.  I will enter that order.

21         MR. BONGARTZ:  Thank you, Your Honor.

22         Now moving on to Agenda Item 8, which is the stay

23    enforcement motion, also at Docket Number 8.

24         It's a -- the motion is fairly straightforward.  It

25    seeks entry of an order confirming the worldwide automatic

1    stay, the enforcement of -- confirming the effect of anti-

2    discrimination provisions, as well as *ipso facto* provisions

3    under the Bankruptcy Code.  We're also seeking approval of a

4    related notice, which is attached to the motion.

5         And as background, I just wanted to remind Your

6    Honor that, as Mr. Grogan had elaborated at the beginning of

7    this call, the debtors' business relationships and customer

8    base are essentially -- is essentially global and located in

9    -- around the globe.

10        We did confer with the U.S. Trustee, and we did

11   reach agreement on certain modifications to the proposed

12   order, which I'm happy to walk Your Honor through, or we can

13   -- or I'm happy just to address specific questions that Your

14   Honor has.

15        THE COURT:  Why don't we walk through the blackline

16   on this one.  There was a lot of changes on this one, so ...

17        MR. BONGARTZ:  Fair enough.  We'll do that.

18        So let's start at the beginning, Paragraph 2.  This

19   was -- just as a global comment of -- let me note that these

20   were all changes requested by the U.S. Trustee.  But -- and

21   now let's go ahead and talk about the specifics.

22        Paragraph 2 is -- just confirms that the debtor has

23   the legal status of a debtor-in-possession by operation of

24   law and effective as of the petition date.

25        Paragraph 3 says pretty much the same thing, that

1    the debtors are authorized to operate in the ordinary course,

2    as provided under Section 1108 of the Bankruptcy Code.  Both

3    these paragraphs were requested by the U.S. Trustee.

4           Paragraph -- in Paragraph 4, the U.S. Trustee has

5    requested some modifications.  I do not believe that they

6    change the substance of it, but they're -- they just make

7    clear that any limitations that may apply as to Section 362

8    obviously applies pursuant to this order, as well.

9           And the U.S. Trustee also requested that we remove

10   the parenthetical, starting with "including any division," et

11   cetera, in the middle of Paragraph 4.

12          Moving on, Subclause (b), the U.S. Trustee

13   requested the deletion of the language or the phrase "or

14   order."

15          In paragraph -- Subclause (c), the U.S. Trustee

16   also requested some clarification to the language, which,

17   from our perspective, doesn't change the substance of it.

18          And in Paragraph (g), the same thing, the U.S.

19   Trustee actually requested that the "including" phrase be

20   deleted.

21          In Paragraph 5, the U.S. Trustee requested that we

22   make certain modifications to conform the request, the --

23   sort of the relief granted, with Section 365(e)(1) of the

24   Bankruptcy Code.  There -- which I -- and obviously should

25   not be controversial.

1          And then the same thing in Paragraph 6, where,

2     again, the U.S. Trustee requested that language be conformed

3     to Section 525, the anti-discrimination provision in the

4     Bankruptcy Code.

5          If I'm moving too fast, please stop me.  I'm happy

6     to --

7          THE COURT:  No, I'm following along.

8          MR. BONGARTZ:  -- address any questions --

9          THE COURT:  You're doing fine.

10          MR. BONGARTZ:  -- (indiscernible)

11          THE COURT:  Thank you.

12          MR. BONGARTZ:  Okay.  In Paragraph 7, this is a --

13     again, a change requested by the U.S. Trustee, that any

14     translation of the form of notice attached as Exhibit 1 to

15     the proposed order be accurate.  That's obviously what we

16     would intend to do.  And then if a translation is prepared,

17     that it also be filed with the Court prior to service.  We --

18     these changes were also acceptable.

19          In Paragraph 8, this is just made -- just added to

20     make clear that this order does not alter, expand, or

21     restrict the rights and protections under applicable law.

22          Paragraph 7, the debtors had requested that the --

23     it be authorized -- or that the stay be modified so that the

24     debtors can, in their sole discretion, permit litigation or

25     contested matters commenced prior to the petition date to

1    proceed.  The U.S. Trustee requested that that paragraph be

2    deleted, and the debtors have agreed to that.

3            And the U.S. Trustee also requested that paragraph

4    -- old Paragraph 8 be deleted, which concerned the -- which,

5    arguably, is redundant, but concerns the effect of Section

6    362, which obviously will control.

7            And that is -- those are all the changes in the

8    order itself.

9            Now, as for the notice, those changes are to

10   conform to the order.  I do not believe there are any

11   substantive modifications, other -- beyond what I've already

12   covered when you walk through the proposed order.

13           THE COURT:  Okay.

14           MR. BONGARTZ:  And as I'm -- I don't know if you

15   have any questions, but we request that the Court enter the

16   proposed order as submitted to chambers this afternoon.

17           THE COURT:  I don't have any questions.

18           Does anyone wish to be heard?

19           MR. MCMAHON:  Very briefly, Your Honor.  Joseph

20   McMahon for the United States Trustee.

21           THE COURT:  Yes.

22           MR. MCMAHON:  Your Honor, with respect to this

23   order, I guess -- well, in a perfect world, we would, I

24   guess, hope that foreign creditors would perfectly understand

25   the contours of U.S. bankruptcy law, and we wouldn't need the

1    order at all.  We try to balance the concerns of a debtor

2    with communicating certain aspects of that law to the

3    creditors with the expectation that the provisions of the

4    order would track the Bankruptcy Code as is or as closely as

5    possible to it, such that there's no, you know,

6    miscommunication, or as limited understanding that's conveyed

7    to same.

8            So, with that understanding, Your Honor, again,

9    while we would, in a perfect world, not want to resort to

10   such tools, with respect to this particular matter and the

11   language, as revised, we believe that it does track the Code

12   substantially, and we do not object to its entry.

13           THE COURT:  Thank you, Mr. McMahon.

14           All right.  I'm satisfied, based on the record,

15   that the requested relief is appropriate and I will enter

16   that order.

17           MR. BONGARTZ:  Okay.  Thank you, Your Honor.

18           And now we're moving on to the last item on the

19   agenda, Agenda Item 9.  That's the motion seeking entry of an

20   order authorizing the debtors to file a consolidated list of

21   its 30 largest unsecured creditors, as well as a consolidated

22   creditor matrix.  That's the first relief requested.  And

23   then the second piece is authorizing the debtors to serve

24   certain parties by email.  And the third part of the

25   requested relief is that the debtors be authorized to redact

1    certain personal identified -- identifying information with

2    respect to its creditors.

3         Now we have conferred with the U.S. Trustee, and my

4    understanding is that, as to the first part of the relief

5    sought -- i.e., the consolidated list of creditors and the

6    consolidated list of the 30 largest unsecured creditors --

7    there is no objection.  But I understand that the U.S.

8    Trustee opposes the remaining portions of the relief

9    requested, specifically allowing the debtors to serve its

10   creditors by email, as well as the proposed redaction of name

11   and address information.

12        As to the email -- issue of email service, I would

13   reemphasize what Mr. Grogan has said at the beginning of this

14   hearing, that the debtors have more than 6,000 customers that

15   are located all around the globe.  And as a matter of fact,

16   it's -- given that the nature of the business is an online

17   cryptocurrency platform, all communications -- or virtually

18   all communications between the debtors and their customers

19   are conducted via email.  It would be -- for that reason, it

20   -- we believe that the -- it's most likely that their

21   customers will read and respond to communications, if they

22   are conducted via email, as they have been in the past.

23        Beyond that, we would also emphasize that serving

24   more than 6,000 creditors with hard copies raises a cost

25   concern, especially in light of the limited resources

1   available in this case.  And for that -- for these reasons,

2   we would request that the Court approve a modification of the

3   Bankruptcy Rule to allow for email service in this instance.

4           As to the remaining relief requested, the

5   redactions of names and addresses, I would like to note that

6   the -- as we explain in our motion, the customer contact list

7   is a valuable asset to the debtors.  They currently are

8   maintaining that list in strict confidence for -- yeah, in

9   strict confidence, and public dissemination raises concern

10  that competitors might utilize that information to obtain an

11  unfair advantage, potentially poach customers.

12          I would also like to note that several customers

13  are high-net-worth individuals, who would certainly be

14  reluctant to have their holdings be made public.

15          And we do recognize that this request is, perhaps,

16  not, you know, ordinary course because, you know, top 30

17  lists typically do provide the names and contact information

18  of creditors.  But I want to emphasize that the nature of the

19  relationship here is important to keep in mind.  These are

20  not trade creditors that are selling goods and services and,

21  you know, that, if their information was made public, would

22  suffer any harm.  They are just -- you know, that would be

23  very unusual.  They're in the business of selling goods and

24  services to the public.  But here, these customers are not.

25  They are not holding themselves out to the public and they

1   certainly would want to avoid negative publicity that would

2   be associated with having such information be made public.

3          Accordingly, the debtors request that the customer

4   info -- the customer list be kept confidential, and that name

5   and address information on the top 30 list, as well as the

6   creditor matrix and, ultimately, schedules be redacted.  I --

7   that's all I have for now.  Actually, we request that the

8   Court enter the order as submitted to chambers this

9   afternoon.

10          I want to note that we did incorporate some of the

11   U.S. Trustee's comments in Paragraph 2 of the proposed order,

12   which should be self-explanatory.  But just for the record,

13   the word "permanently" was deleted in para -- at the

14   beginning of Paragraph 2.

15          And at the end, the U.S. Trustee requested that the

16   creditor matrix be also provided to the Clerk's Office, which

17   is obviously -- which we'll obviously do.

18          I want to -- before I conclude, I wanted to make

19   one other comment or note.  There was an inconsistency

20   between what we had actually requested in the motion and the

21   form of proposed order that was attached to the motion.  It

22   was -- there was some language at the end of Paragraph 4,

23   which was not what the debtors intended to actually request.

24   To be clear, we request to provide email service on

25   creditors, whether or not the debtors have a physical address

1    for such creditors, again, for the reasons I stated earlier,

2    including cost concerns.

3            With that, that's -- I'm going to conclude my

4    presentation.  But I understand the U.S. Trustee will surely

5    want to be heard on this, as well.

6            THE COURT:  Well, I do have --

7            MR. BONGARTZ:  Thank you --

8            THE COURT:  -- a question --

9            MR. BONGARTZ:  -- Your Honor.

10           THE COURT:  -- before we turn to Mr. McManigle --

11   or Mr. McMahon.  What -- you have a million dollars worth of

12   ordinary trade debt.  Who are those folks?  I understand the

13   customers, you might communicate all with by email.  But who

14   are the -- who are the trade debt that you have?

15           MR. BONGARTZ:  Those are landlords and technology

16   providers.  We -- if Your Honor wants to limit the email

17   service to customers, but require the debtors to serve trade

18   creditors -- which are companies, obviously -- we can -- I

19   think that's something that could be accommodated.  The

20   primary concern behind the -- or behind the email service

21   request is the cost associated with serving the customer

22   base, as well as the fact that communications with those

23   customers is regularly conducted via email.

24           THE COURT:  Mr. McMahon?

25           MR. MCMAHON:  Your Honor, just as a preliminary

1    statement -- then I'll get to the issue of witness statement

2    -- I think we can address the email issue without testimony,

3    and this is our position, it's very simple:

4         The governing rule is Rule 9036 of the Federal

5    Rules of Bankruptcy Procedure, and they're quote explicit,

6    Your Honor.  That rule permits the Clerk or some other

7    person, as the Court or these rules -- meaning the federal

8    rules -- may direct, to send notice or serve a paper on a

9    registered user by filing it with the Court's electronic

10   filing system, or it can be sent to any other person by other

11   electronic means that the person consented to in writing,

12   period.  It then goes on to say, well, if you email it and it

13   doesn't reach them, then service or notice was not complete

14   upon filing or sending.  And further, Your Honor, you can't

15   serve a summons in that form.

16        So that's what 9036 says, Your Honor.  It's very

17   explicit, there are no exceptions or not, you know, outs.

18   And to be clear, there's also no -- the procedure is

19   expressly written consent by the affected creditor.  They

20   have to opt in to electronic mail service, in order for

21   service to be effectuated that way.  So, with respect to that

22   issue, Your Honor, from our perspective, that basically, you

23   know, concludes the matter.

24        While I understand that there is some concern

25   about, you know, using these facilities and making them avail

1    -- you know, easier, certainly, this Court has participated

2    in that by mandating that ECF users consent to email service

3    upon registration, you know, within the system in a

4    particular case, there is -- there are some entities -- and

5    in this case, Your Honor, we're talking about far-flung

6    foreign entities -- that are entitled to notice of the case,

7    the investors that they claim they have to keep confidential.

8         Your Honor, if the investors are that important to

9    this bankruptcy case, in terms of keeping them informed, I

10   note a disconnect between the idea that we're just going to

11   serve them all via email and not give them the court-mandated

12   notice and -- you know, and their position with respect to

13   sealing.

14        So, with respect to that, Your Honor, there's

15   nothing that prohibits the debtors from taking the notices

16   that they are serving via ECF and sending them to their

17   customers via email, as belt and suspenders.  Nothing

18   prohibits them from doing so.  But in terms of what the rules

19   and what the law requires, insofar as the debtors'

20   obligations, it's very clear.  Unless that creditor has

21   consented in writing, affirmatively, they're entitled to

22   paper service of a document.

23        So, with respect to costs, Your Honor, while I

24   appreciate the concern, you know, the debtors have deemed the

25   expense of -- you know, there's a number of proposed

1    professionals in these cases, to be appropriate -- I just

2    don't see why regular service to the investors, creditors is

3    the -- I guess the sticking point with respect to cost going

4    forward.

5         So the debtors are -- unfortunately, are in

6    bankruptcy, and Rule 9036 is explicit.  And our position,

7    Your Honor, is they have to play by the rule on that issue.

8         With respect to the sealing, Your Honor, I'm happy

9    to address that in a moment.  What I'd like to do is elicit a

10   little bit of testimony from Mr. Schatt.  If I could have a

11   little leeway to ask questions about the moKredit item that

12   was on the balance sheet, and then segue over into the issue

13   with respect to sealing of the customer information, I'd

14   appreciate it.  I have a limited number of questions.

15        THE COURT:  Okay.  Let's see if we can get the

16   notice issue resolved first.

17        Mr. Bongartz, what's your response?  I mean, the

18   rule says what it says.  How do we --

19        MR. BONGARTZ:  Well, I would direct Your Honor to

20   Bankruptcy Rule 2002(m), which does give the Court the

21   authority to monitor -- sorry -- modify the form and manner

22   in which notice shall be sent.  So it's not that Your Honor's

23   hands are quite as tied as the U.S. Trustee has suggested.

24        But more importantly, we think that the cost

25   concern is real.  This is not a minor endeavor to serve 6,000

1    or more customers.  And in addition to that, I do want to

2    emphasize again the fact that it's actually more likely to

3    receive a response or to receive the attention of the

4    customer if you communicate with them in the way that you

5    have communicated with them in the past.  Those would be my

6    responses.  But I understand that the U.S. Trustee disagrees

7    with us on that.

8             MR. MCMAHON:  Can I just respond briefly to that,

9    Your Honor?

10            THE COURT:  Go ahead.

11            MR. MCMAHON:  If I may.  It -- I think we have to

12   put a fine point on this.  There's what I call, you know,

13   like a limited of what we call "big case events," where

14   everyone has got to be served:  Case commencement, sale

15   motions, conversion or dismissal, confirmation.  Those are

16   where the -- what we call the "universe" gets served.

17   Another example would be something directly implicating the

18   interests of the investors.  That would require service.  So

19   we're talking about four or five categories of things.

20            And I don't mean to suggest, you know, that

21   whatever the cost of doing that is going to be negligible,

22   but we don't have a record from the debtors with respect to

23   what it would cost and what they're asking the Court to do

24   away with.

25            So I want to be clear about that, it's a limited

1    number of things.  A number of the things that occur in a

2    bankruptcy case require notice to a more limited subset of

3    entities, including entities that have affirmatively

4    requested notice via the Bankruptcy Court.  So it's not like

5    we're talking about every piece of paper that gets filed via

6    ECF with the Court.  I'll rest my argument then.  Thank you.

7             THE COURT:  All right.  Well, it does seem to make

8    sense to me that, if you've been -- if you've been

9    communicating with your customers by email, and they are

10   involved in a business like this, which involves a lot of

11   internet usage, including the transfer of bitcoin back and

12   forth, it seems to make more sense to me that they would

13   probably prefer to be served by email.

14            But why don't we do this?  I'm going to throw this

15   out as a suggestion, and let me see what you all think.  If

16   we send out a notice now to all the customers by email,

17   asking them if they will consent to service by email of all

18   further pleadings that are going to be filed in this case,

19   and see what responses we get, my guess is, if not everybody,

20   pretty much everybody is going to consent.

21            MR. BONGARTZ:  The notice that you intend to --

22   that would go out -- would that be served in -- via mail, or

23   is that by email?

24            THE COURT:  By email.  Send it by email, see what

25   kind of response we get, and we can go from there.  You may

1  have some who say they don't want it, or you may have some --

2  I mean, you could end up -- you know, some folks -- I don't

3  know who all your customers are.  There could be some folks

4  who -- you know, you're going to send them, you know, several

5  hundred pages of a plan and disclosure statement.  It might

6  not make it through their inbox because it's too big, so

7  that's something we have to --

8            MR. BONGARTZ:  Yeah --

9            THE COURT:  -- be concerned about.  But I think it

10  --

11            MR. BONGARTZ:  (Indiscernible) work-arounds.  I

12  understand claims agents frequently circulate in their emails

13  just a link that you can click on that opens up a PDF on a --

14            THE COURT:  Yes.

15            MR. BONGARTZ:  -- digital website.

16            But anyway, I do understand your point here.  So

17  would you like that notice to be somehow documented as part

18  of this order or can we do this informally?  Like how do you

19  envision this working?  I'm just trying to figure out if this

20  is -- how we can -- are going to modify this order to make

21  that -- to reflect that.

22            THE COURT:  Well, I think we can just put in the

23  form of order that, to the extent customers consent to

24  service by email, which will -- that service will be done by

25  email.  And then informally send out the email saying do you

1    consent to email service.

2            MR. BONGARTZ:  Okay.  Okay.  I think that works.

3    I'm just checking with my colleague James Grogan, but I

4    believe that that is acceptable.

5            MR. GROGAN:  Your Honor, that makes a lot of sense

6    to me, as well.  We'll make that happen.

7            THE COURT:  Okay.  Great.

8            MR. BONGARTZ:  Okay.  Thank you, Your Honor.

9            THE COURT:  All right.  And on the customers,

10   though -- or on the -- your trade creditors, I think those

11   probably need to be served by regular mail.

12           MR. BONGARTZ:  That's fine.  We'll submit a revised

13   proposed order on -- that reflects that modification.

14           THE COURT:  Okay.  Great.  Thank you.

15           All right.  So let's turn to the redaction issue.

16   Mr. Schatt, you are still under oath.  And I am going to

17   allow Mr. McMahon to ask you some questions.

18   DANIEL SCHATT, WITNESS FOR THE DEBTORS, PREVIOUSLY AFFIRMED

19                        CROSS-EXAMINATION

20   BY MR. MCMAHON:

21   Q    Mr. Schatt, good afternoon.

22   A    Good afternoon.

23           MR. MCMAHON:  For the record, this is Joseph

24   McMahon for the United States Trustee.

25   BY MR. MCMAHON:

1    Q    Mr. Schatt, in the -- your first-day declaration and

2    your presentation before the Court, there is an entity named

3    "moKredit" that's referenced in the balance sheet.  Do you

4    recall your testimony in that regard?

5    A    Correct.

6    Q    And first, what is your relationship with moKredit?

7    A    Lu Hua is the founder and CEO of moKredit.  I met Lu

8    during our overlapping tenure at Paypal.  Lu is also a 50

9    percent owner in -- in Cred.

10   Q    So, if I understand your testimony correct, Mr. Schatt,

11   you are not an officer of moKredit?

12   A    I have no connection to moKredit, in that regard.

13   Q    Okay.

14   A    That's correct.

15   Q    And are any of the debtors other insiders connected with

16   moKredit, besides the gentleman you just identified?

17   A    No, they are not.

18   Q    The $39 million worth of obligations there, does that

19   represent one loan or a series of loans?

20   A    That represents a series of loans.

21   Q    Okay.  Made over a period of time, correct?

22   A    Correct.

23   Q    And are those obligations documented?

24   A    They are.

25   Q    By written agreements?

1    A    Yes, we have written agreement with moKredit, that's

2    correct --

3    Q    They're for --

4    A    -- as well as schedules.

5    Q    For each one of the constituent loan agreements.  Is

6    that correct?

7    A    Correct.

8    Q    All right.  And to be clear, who are the debtors' board

9    of directors, who's on it?

10   A    Grant Lyon, who has over -- introduced here, over 30

11   years of restructuring experience, who is exclusively

12   responsible for negotiation with moKredit for our repayment

13   of debt and any subsequent -- any agreement that's reached.

14   Q    Are there any other directors, presently?

15   A    Myself.

16   Q    Okay.  And that constitutes the complete board, correct?

17   A    That's correct.

18   Q    Have there any -- been any board resignations within the

19   last six months?

20   A    Yes.

21   Q    Who has resigned?

22   A    Lu Hua.

23   Q    If we extend that question or the time period associated

24   with the past year, any further resignations or additions?

25   A    No.

1  Q    And to be clear, sir, you're -- the board, meaning you

2  are the one who engaged Arete and MACCO in connection with

3  these bankruptcy cases?

4  A    That's correct.

5  Q    As well as your proposed restructuring counsel that's

6  with the Court today.

7  A    That's correct.

8  Q    All right.  With respect to the customer list, just a

9  few questions.  First, do -- does the debtor have a privacy

10 policy?

11 A    Correct, yes.

12 Q    You do.

13      And do you know if it prohibits the transfer of

14 personally identifiable information, as a general matter?

15 A    It does.

16 Q    It does.  Okay.  Thank you.

17      With respect to the customer list, has it been appraised

18 within the past year?

19 A    Been appraised?  I'm sorry --

20 Q    Appraised.

21 A    (Indiscernible)

22 Q    Valued, valued.

23 A    (Indiscernible)

24 Q    Correct.

25 A    The customer list?  No, it has not.

1          MR. MCMAHON:  All right.  Your Honor, that

2     concludes my questioning.

3          THE COURT:  Okay.  Mr. Bongartz, any additional

4     questions?

5          MR. BONGARTZ:  No, Your Honor.  Thank you.

6          THE COURT:  Okay.  Thank you, Mr. Schatt.

7          THE WITNESS:  Thank you.

8        (Witness excused)

9          THE COURT:  Mr. McMahon.

10          MR. MCMAHON:  Well, Your Honor, there are a couple

11     of proffered bases for sealing the names of the individual

12     creditors.  And to be clear, Your Honor, this is a fairly

13     extraordinary circumstance because, if you take a look at the

14     top 30 list, you know, we're looking at one where there's

15     basically three entities, corporate entities, for whom

16     information is disclosed.  We don't have names, addresses,

17     emails, or anything but amounts for the other entities on the

18     consolidated list.

19          And with respect to that, Your Honor, I mean,

20     there's basically -- as Your Honor has encountered in

21     connection with seal motions -- a strong public policy in

22     favor of disclosure, and -- but that, you know, is subject to

23     certain limitations, and I think we can deal with these one

24     at a time.

25          The first is what I call the "customer list" or

1    "confidential commercial information."  Well, I think there's

2    a couple of things to note here, Your Honor.  First is that

3    the customer list itself, as Mr. Schatt just testified, is

4    subject to restriction.  Insofar as it being sold, I don't

5    know what the impact of that is in connection with the

6    bankruptcy process.  But it seems to me that the restrictions

7    have the possibility of limiting the value of that.

8         But putting that aside, the other aspect that's

9    really occurring here, Your Honor, is -- and this is

10   important -- the work that's being done by the debtors post-

11   petition is -- does not involve the further, we'll call it

12   "sale" or the core business of cryptocurrency in doing trades

13   and speculating on the same.  Basically, what this bankruptcy

14   is about is liquidating the remaining assets of the debtors.

15   So, therefore, it's not like you have a going concern going

16   forward, where there is going to be a need, I guess, protect

17   that list, insofar as its commercial value, from the debtors'

18   perspective.

19        Rather, what we're talking about is, you know, a

20   business that's basically being wound down.  And the

21   information here is -- simply is not a core asset, and

22   especially in light of the moKredit obligation, which the

23   witness has testified to.  So, you know, again, Your Honor,

24   the critical thing is we're talking about a bankruptcy

25   process that involves our office being required to form a

1   committee, based upon a top 20 or top 30 list.

2          The people who are out there -- meaning the

3   creditors themselves, Your Honor, who this process is

4   designed to serve -- have to understand who it is that's on

5   the committee or being considered for the committee and then

6   ultimately gets appointed to the committee.  I'm thinking

7   about basic things, Your Honor, like the committee formation

8   notice.

9          Are we supposed to be filing a committee formation

10   notice that tells the investors of this -- of these debtors -

11   - who, frankly, have -- I guess potentially will suffer in

12   connection with this bankruptcy case -- that the names of the

13   people on the committee are Creditor 1 through Creditor 7, or

14   something like that?  It boggles the mind that -- at least as

15   a technical matter, that that can happen.

16          When committee counsel comes before the Court and

17   files their standard retention applications, are they going

18   to be basically indicating that, you know, the members of the

19   committee are as such, you know, they're just going to number

20   the members, and the public will not know who's on the

21   committee?  It's a disconcerting level of disruption to the

22   process.

23          And then we can go further, Your Honor, and

24   indicate that, you know, with respect to things like proofs

25   of claim being filed with the Court, the entire idea that

1    they're going to be coming in and we're going to be charging

2    the claims agent with redacting each and every one of the

3    proofs of claim, addresses or other information that's put on

4    it, I guess before they get part -- made part of the claims

5    register, you know, it's -- you know, it's a lot that the

6    debtors are trying to impose upon the process.

7         So, Your Honor, insofar as a middle position with

8    respect to, you know, the matter, the -- a couple of things.

9    First, we kind of put the top 20 or top 30 list into a

10   different category; meaning that, you know, they're asking to

11   seal everything.

12        And you know, with respect to the matrix and the

13   schedules, in this instance, based upon the facts and

14   circumstances, we would object to the names being sealed, but

15   we're not going to object to the sealing of the addresses on

16   those two documents.

17        With respect to the information on the top 30 list,

18   that's a different animal entirely, Your Honor.  And we're

19   talking about the creditors' committee that will be

20   protecting the creditors' interests in connection with these

21   bankruptcy cases and the transparency concern that's

22   basically greater than, you know, I guess, your run-of-the-

23   mill creditor or party-in-interest.

24        With respect to that information, Your Honor, we

25   expect -- we would request -- excuse me -- that --

1  respectfully, that the Court deny the relief requested

2  because, basically, you know, those are the parties that are

3  going to get served is a committee is not formed.  And for

4  the reasons that I just stated, they're the -- what we call

5  the "most important" or "key group" of creditors in the case.

6       THE COURT:  Well, in terms of the -- anybody who --

7  well, first of all, I expect that the trustee's office will

8  receive all of the names and addresses of all of these folks.

9       MR. MCMAHON:  The debtors have provided as much,

10  Your Honor, and that's expected, and they're going to provide

11  the Court with that --

12       THE COURT:  Okay.

13       MR. MCMAHON:  -- information, as well.

14       THE COURT:  And I'm also -- I would also expect

15  that anyone who agrees to sit on the creditors' committee is

16  full disclosure, they have to -- they have to be disclosed.

17  It's not going to be Creditor 1, Creditor 2; it's going to be

18  their full name, address, everything that they -- they have

19  to -- if they're going to agree to serve on the committee,

20  they got to agree to disclose themselves.

21       So then the question really is -- and this goes, I

22  guess, to Mr. Bongartz.  If we disclosed -- I have, in the

23  past, allowed redactions of addresses and phone numbers,

24  contact information for creditors.  But I've never completely

25  prevented even the disclosure of their name.  So what is the

1     -- what's the position of the debtor as to how the disclosure

2     of the creditors' names, without their contact information,

3     would cause prejudice to the debtors?

4          MR. BONGARTZ:  Well, there are a couple of concerns

5     here.  The first one I mentioned earlier, is that competitors

6     might reach out and start poaching those customers.  I want

7     to note that several customers, I mean, especially on the top

8     30 list, are high-net-worth individuals.  So putting -- you

9     know, redacting the address doesn't really get you much

10    because the name is still there and folks will know who it

11    is, especially those in this space.  I mean, it's a tough

12    call, I understand that.  But the debtors do submit that this

13    is a -- this is important, sensitive information.

14         What we can do, and what we have -- you know, what

15    we can do as a potential compromise is, for those customers

16    that are not individuals, but are corporate entities, we can

17    provide the name and address.  There's less of a concern

18    there.  But for the individuals, the name is -- you might as

19    well include the address at this point.  Although, obviously,

20    you know, we certainly -- if the Court is leaning towards

21    that, we submit -- we'd ask that the addresses be redacted.

22         THE COURT:  I'm hearing other people talking in the

23    background.  Is there someone --

24         MR. BONGARTZ:  And I wanted to make -- sorry.  If

25    the U.S. Trustee wants to go ahead, please go ahead.  I'm

1    sorry.  I apologize.

2              THE COURT:  No, I was going to ask you a question.

3    If the concern is about poaching clients, what's the

4    difference between an individual and a corporate entity?

5              MR. BONGARTZ:  Well, it's one of the concerns.  The

6    other concern is that these high-net-worth individuals, they

7    do not seek out to --

8              UNIDENTIFIED:  (Indiscernible)

9              MR. BONGARTZ:  I'm sorry?

10             THE COURT:  I hear somebody talking, I don't know

11   who it is.  If you're not speaking, other than Mr. Bongartz,

12   please mute your phone.  Thank you.

13             MR. BONGARTZ:  Okay.  Thanks.

14             It is a concern about these individuals trying to

15   avoid the negative publicity of having their name out.  And I

16   -- it's just in the nature of the -- this business, the

17   underlying business of owning and investing in

18   cryptocurrencies that these individuals do not seek the

19   limelight.

20             But look, it's a -- we understand that this is an

21   out-of-the-ordinary request.  But we believe that, under the

22   circumstances here, given the nature of the business, given

23   the nature of the individuals involved, and giving the value

24   to having the customer list remain confidential, so as to

25   preserve the value of the business, we do believe that, under

1    those viewpoints, it is appropriate to keep that information

2    confidential.

3         I wanted to note one more thing, and it's not -- it

4    may have gotten lost in the back-and-forth, and that is, at

5    this time, the debtor is only requesting interim relief as to

6    this particular issue.  So, if Your Honor is inclined to punt

7    on this for a couple of weeks until the official committee is

8    appointed, we can do so, and that's how we have set up the

9    motion and the proposed orders.

10        THE COURT:  All right.  Do we have built into this

11   order a process that would allow someone who can come forward

12   and make an application with the Court to disclose the

13   individual creditors, if they can show good cause for that?

14        MR. BONGARTZ:  I do not believe that that's

15   currently in the proposed order, but we can certainly build

16   something like that into the order.

17        THE COURT:  Then why don't we do that?  And in the

18   interim -- for the interim order, we'll keep things status

19   quo, in terms of the disclosure.  It's an unusual situation

20   because your customers are also your creditors.  And because

21   of the nature of -- you know, the high-net-worth nature of

22   these individuals, who -- I have not looked at the list, I

23   don't know who they are -- it may be that they do need to be

24   protected.  So, for the interim order, we'll leave it as the

25   status quo and leave it open, when we get the creditors'

1    committee formed.

2              And Mr. McMahon, your rights are preserved to come

3    forward at the final and make the same objections again, if

4    you so choose, if this doesn't work the way I'm hoping it

5    works.  If we have this process built into the order that

6    allows for disclosure if someone can come forward and show

7    good cause, I think that might resolve my concern.

8              MR. MCMAHON:  Your Honor, thank you.  We understand

9    the Court's interim ruling.  And yes, we would like to

10   reserve to be heard at final in written form, instead of, you

11   know, verbally at the first-day hearing, with the Court's

12   permission.

13             THE COURT:  Yes.

14             MR. MCMAHON:  And thank you.

15             THE COURT:  Of course, yes.  Thank you.

16             MR. BONGARTZ:  And I want to --

17             THE COURT:  All right.

18             MR. BONGARTZ:  -- thank you from my end.  We'll be

19   submitting a revised proposed order that includes a paragraph

20   laying out the process for third parties who request release

21   or publication of the --

22             THE COURT:  Okay.

23             MR. BONGARTZ:  -- redacted information.

24             THE COURT:  All right.  Thank you.

25             I notice there are still some people waiting in the

1    -- they've been waiting the whole time in the waiting room.

2    I'm guessing they're not on CourtCall.  And I'm guessing,

3    because of the nature of this case, we may have people who

4    try to gain access to these Zoom meetings for purposes of

5    causing disruption.  So we -- you know, we're going to have

6    to be vigilant about that.

7            But if you can let your colleagues know, if they

8    want to log in, in the future, they do need to use their

9    proper name and they have to be on the CourtCall list.  We've

10   had some really bad circumstances, so ...

11           MR. BONGARTZ:  Understood.

12           THE COURT:  All right.  Okay.  Do we have anything

13   else for today?  And I'll -- for the interim order, I'll --

14   based -- you have my ruling on the interim order.  I'll wait

15   to see the uploaded changes under COC, and we'll get that

16   entered for you today.

17           MR. BONGARTZ:  Thank you.

18           MR. COUSINS:  Your Honor, this is Scott Cousins.

19   We're starting to upload some orders, and we'll work on the

20   consolidated list order and make sure Mr. McMahon sees it

21   before we submit it.

22           THE COURT:  Okay.  Great.

23           All right.  Anything else for today?

24           MR. COUSINS:  Thank you very much, Your Honor.

25           THE COURT:  All right.  Thank you all.

1          MR. BONGARTZ:  Thank you.

2          THE COURT:  We are adjourned.

3          COUNSEL:  Thank you, Your Honor.  Thank you.

4       (Proceedings concluded at 4:29 p.m.)

5                      *****

1                           CERTIFICATION

2           I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9

10   _____      November 13, 2020

11   Coleen Rand, AAERT Cert. No. 341

12   Certified Court Transcriptionist

13   For Reliable