**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CRED INC., *et al.*[1], | Case No. 20-12836 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: Dec. 9, 2020 at 2:00 p.m. (ET)**<br>**Obj. Deadline: Dec. 2, 2020 at 4:00 p.m. (ET)** |

**MOTION OF KRZYSZTOF MAJDAK AND PHILIPPE GODINEA FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. § 1112(b) (I) DISMISSING THE CASES; (II) CONVERTING THE CASES TO A CHAPTER 7 LIQUIDATION; OR (III) APPOINTING A CHAPTER 11 TRUSTEE**

Krzysztof Majdak and Philippe Godinea (the "Moving Creditors"), by and through their undersigned counsel, hereby file this motion (the "Motion") for entry of an order pursuant to section 1112(b) of title 11 of the United States Code (the "Bankruptcy Code") directing that these Chapter 11 cases be (i) dismissed; (ii) converted to cases under Chapter 7 of the Bankruptcy Code; or alternatively (iii) for the appointment of a Chapter 11 trustee. The Motion is based on facts set forth in the November 9, 2020 declaration of Debtors' Chief Executive Officer Daniel Schatt in support of Debtors' Chapter 11 petitions and first day motions ("Schatt Decl.," Docket No. 12) and the November 9, 2020 declaration of Drew McManigle ("McManigle Decl.," Docket No. 16), as well as testimony given at the first day hearing on November 10, 2020. In support of the Motion, the Moving Creditors respectfully state as follows:

[1]The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

## PRELIMINARY STATEMENT

1. This is a bankruptcy case involving a cryptocurrency financial platform that is rife with fraud and deception on "Madoff" level proportions. Moving Creditors are two of approximately 6,000 customers of Debtors who invested their savings in the form of cryptocurrencies, many of whom have lost their life savings through Debtors' investment platform.

2. Time is of the essence. There is cause to dismiss or convert these cases from cases under Chapter 11 to cases under Chapter 7 because the Debtors have grossly mismanaged the estates, and there is no reasonable likelihood of rehabilitation all while the estates are being depleted on a daily basis. In the alternative, Moving Creditors seek the immediate appointment of a Chapter 11 trustee with expertise in hunting down their stolen cryptocurrency.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4. Venue of this proceeding and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The statutory basis for the relief requested herein is sections 1112(b) of the Bankruptcy Code.

## ARGUMENT

6. Section 1112(b) of the Bankruptcy Code provides as follows:

> "…on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, upon cause…"

11 U.S.C. § 1112(b)(1) (emphasis added).

7. Among the grounds that constitute cause are a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" 11 U.S.C. § 1112(b)(4)(A).

8. Another cause for converting the case is "gross mismanagement of the estate" 11 U.S.C. § 1112(b)(4)(B).

**A. Based on publicly available information, the Moving Creditors find both "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."**

9. Both prongs of section 1112(b)(4)(A) of the Bankruptcy Code are met in these cases. First, there is a continuing loss or diminution of the estates. According to Debtors' pro-forma balance sheet as of the Petition Date, and despite having been formed two years ago in 2018, there is a shortfall of assets to liabilities of over $68 million. (McManigle Decl., Appendix "B" attached thereto).

10. The shortfall is likely to be well over $100 million dollars. The footnotes to the balance sheet are both cryptic and euphemistic. Whereas the Debtors purport to possess $14.709 million in crypto-currency, the accompanying footnote warns that the currencies held are "illiquid." *Id.* Publicly available information reveals that these tokens may be worthless. In fact, Moving Creditors' counsel has received correspondence from ex-employees of Cred that this $14.709 million number is fictitious.

11. Under "loans under management," the $39.074 million receivable is accompanied with a footnote that this line comprises of a single loan made to moKredit, "an insider owned entity, which has not yet paid any outstanding principal." Worse, "the account balance may be partially or completely uncollectible." *Id.*

12. Assuming that these two items are worthless – the "illiquid" crypto-currency, together with the potentially "uncollectible" insider loan - there are only $14 million in assets to repay $136.499 million in liabilities, or approximately 10% of the outstanding liabilities

i. Continuing Loss or Diminution to the Estate.

13. The values of the Debtors' estates are diminishing every day and there are no prospects of curbing the losses because there is no viable business. The Debtors are being run by professionals with no expertise in cryptocurrency and, in addition to incurring three sets of professionals' fees; Debtors' counsel, the independent director, and the Chief Restructuring Officer, the Debtors are proposing to pay monthly employees' salaries in excess of $300,000. However, as is clear from the declarations submitted, the only party with significant knowledge about the Debtors' operations is Mr. Schatt, the very person who is responsible for the Debtors' demise.

14. As stated, Debtors hired Paul Hastings LLP to pursue the instant Chapter 11 filing, at undisclosed cost. In conjunction with that filing, Debtors have retained Drew McManigle of MACCO Restructuring Group LLC ("MACCO") as a financial advisor. (Schatt Decl. ¶ 39). Mr. McManigle is compensated at $600 per hour, in addition to the fees charged by other professionals at MACCO (McManigle Decl. ¶ 10).

15. Debtors have also hired Grant Lyon to its board to head up a new "Restructuring Committee," at undisclosed cost. (Schatt Decl. ¶ 39).

16. Debtors have also moved this Court for permission to meet ongoing payroll obligations that run approximate $300,000 per month. (Docket no. ¶¶ 15, 17). Debtors spend an additional $50,000 per month on employee benefits, including medical coverage. *Id.* ¶ 30.

17. It is unclear what benefit this team of employees will aggregate for the estates, especially because the Debtors' business is currently not operational (Debtors are no longer

borrowing or issuing loans). Debtors have moved to reject the lease for their main office, as all employees have been working remotely. (Docket no. 4 ¶ 10)

ii. <u>Debtors have no prospect of rehabilitation; these cases are best pursued by a trustee.</u>

18. Despite this prodigious team of qualified professionals, the cost of which could easily deplete the entirety of Debtors' assets over the course of a few months, there is no chance that the Debtors will be rehabilitated. Debtors' "business" seems to have been nothing more than an efficient platform for dissipating victims' cryptocurrency holdings and/or transferring their value to insider's pockets.

19. Given the negative publicity and the unlikely prospect for anyone to ever invest their crypto assets with Debtors in the near future, it is clear that the business has no viable future. If there is any value in the online platform that Debtors created, that value can be realized in an asset sale over the course of a Chapter 7 liquidation.

20. The basis for the Debtors' business model is predicated on trust and requires cryptocurrency investors to believe that the Debtors will hold their property and generate a return on that property. Therefore, the Debtors' business is not viable. No reasonable investor would provide these Debtors and these bankruptcy professionals with their cryptocurrency, particularly since Mr. Schatt and Mr. Hua, the principals of the Debtors, failed miserably in its execution. "The Third Circuit has given some guidelines as to when enough is enough. Where the debtor has no cash flow and no source of income and where the claims against the property of the debtor exceed the property's value, a debtor has not demonstrated a reasonable likelihood of rehabilitation and dismissal may be appropriate." *In re 865 Centennial Ave. Assocs. Ltd. Pshp.*, 200 B.R. 800, 810 (Bankr. D.N.J. 1996) (citations omitted).

**B. Moving Creditors can show that Debtors have grossly mismanaged the estate.**

21. Debtors' business consists in running what they call a "financial technology platform through which customers transfer cryptocurrency to the Debtors—generally through a loan agreement or financing agreement. The Debtors then utilize such cryptocurrency in a variety of investment strategies involving third-part asset managers." (Schatt Decl. ¶ 6).

22. In sum, the Debtors ran an unlicensed hedge fund. Debtors' "customers" loaned their cryptocurrency to Debtors, who used them to (try) to generate a return, hopefully in excess of the interest owed to the customers.

23. Troublingly, and central to Debtors' financial troubles, Debtors seem to have mingled their "customer" account loans with regular corporate assets. The customer loans were, essentially, issued as unsecured notes. Confusingly, Debtors state that they have only $2.6 million in unsecured debt, making reference to "convertible notes." (Schatt Decl. ¶ 15). In fact, most of the roughly $144.6 million in "customer deposits" (McManigle Decl., Appendix "B" attached thereto) are also issued in the form of unsecured notes.

24. What is striking here is the speed and gross incompetence with which Debtors dissipated their customer's loaned crypto assets, whether through unsecured ill-judged loans to insider entities, poorly timed investments, and/or outright fraud.

25. Early on, in 2019, Debtors "invested most of their cryptocurrency assets with moKredit." (Schatt Decl. ¶ 19). These loans now total over $39 million, which is not being repaid. *Id.* MoKredit, it turns out, is an entity formed by one of Debtors' principals, insider Lu Hua. *Id.* n. 4.

26. Debtors also report a "loss" of $10 million in bitcoin through what it describes as a "fraudulent investment scheme. (Schatt Decl. ¶ 32). The sequence of events related here by

Schatt paint Debtors as a purported victim to an online "social engineering" fraud. *Id.* ¶¶ 33-35. But the fact that Debtors simply transferred $10 million of bitcoin to an alleged outside fraudster points to profound incompetence, at best, if not gross negligence. "The Debtor's inability to explain the diversion of assets is evidence, at a minimum, of its incompetence or gross mismanagement and, at the most, evidence of actual fraud." *In re PRS Ins. Gp., Inc.*, 274 B.R. 381, 387 (Bankr. D. Del. 2001).

27. The loan to moKredit, an insider controlled entity, as well as the loss of $10 million to a supposed fraud, would suggest that one of the key assets of the instant estates are causes of action that it may have against their own principals. This alone can serve as the basis for the appointment of a Chapter 7 or Chapter 11 trustee. "Since the causes of action against insiders is such a significant asset of this estate and since there are no business operations requiring current management, we conclude that the appointment of a trustee to pursue those actions is warranted and in the best interests of creditors." *PRS Ins. Gp., Inc.*, 274 B.R. at 389.

28. Central to Debtors' downfall seems to be the mismatch between liabilities to customers, which were largely denominated in bitcoin, and the held assets, which were not. Debtors addressed this mismatch with a hedge, which served to lose money in February 2020 as bitcoin prices plummeted. (Schatt Decl. ¶¶ 20-21).

29. Later, at the worst moment, Debtors seem to have left their customers crypto-denominated "accounts" unhedged, leaving them with an enormous shortfall of reserves as the price of bitcoin (and, thus, the nominal value of its customer's deposit balances) rocketed 30% in October 2020. *Id.* ¶ 36.

30. Debtors mixed purported "customer accounts" with corporate assets, effectively using depositor's money to pay for regular operating expenses.

31. Judging from the facts given, it seems likely, if not certain, that Debtors' operations tipped into the realm of all Ponzi Schemes, whereby Debtors would use new investor money to pay redemptions owed to prior investors. Tellingly, Debtors' instant filing was precipitated by the withdrawal of Debtors' "core partners." *Id*. ¶ 37. These partners are, presumably, the websites that had previously fed Debtors with investor deposits.

32. Although Debtors' Chief Executive Officer Daniel Schatt would have this Court believe that the primary cause of Debtors' bankruptcy was the money lost through the hiring of a "fraudulent asset manager… James Alexander." (Schatt Decl. ¶ 18), that is simply not the case. Alexander may have improperly taken cryptocurrency and manipulated corporate entities, but his actions suggestpervasive corporate mismanagement, confirming the need for a responsible trustee. Debtors have referenced that they have contacted law enforcement(presumably criminal), however it is not clear what stage this investigation is at and whether a broader investigation into Debtors' conduct is underway. *Id.* ¶ 35.

33. It is almost an understatement to say that Debtors "grossly mismanaged" their customers funds. It is more accurate to say that Debtors rapidly dissipated these funds over less than two years, enriching insiders in the process.

34. Finally, one of the fundamental principles of bankruptcy is full disclosure. Debtors have failed to disclose the names and addresses of almost any creditors, including the 30 largest. This looks like a concerted effort to hamstring the creditor body, inhibiting their collective recovery. Worse, these creditors may be comprised of more insiders, suggestive of further self-dealing and malfeasance. A trustee would be able to shine light on these issues.

35. Debtors have continued to plot a course for the continued dissipation of the remaining creditor funds, now through the retention of costly and unnecessary professionals. It is clear that unsecured creditors will do better in a less expensive Chapter 7 liquidation.

## CONCLUSION

For the above reasons, the Moving Creditors respectfully request that the Court enter an order either (i) converting these cases to cases under Chapter 7 of the Bankruptcy Code; (ii) dismissing these Chapter 11 cases; or (iii) appointing a Chapter 11 trustee.

Respectfully submitted,

Date: November 18, 2020
Wilmington, Delaware

**THE ROSNER LAW GROUP LLC**

*/s/ Jason A. Gibson*
Jason A. Gibson (DE 6091)
824 N. Market St., Suite 810
Wilmington, Delaware 19801
Tel: (302) 777-111
Email: gibson@teamrosner.com

and

SARACHEK LAW FIRM
Joseph E. Sarachek (admitted *pro hac vice*)
Zachary E. Mazur (admitted *pro hac vice)*
670 White Plains Road
Penthouse Fl.
Scarsdale, New York 10583
Telephone: (646) 517-5420
Facsimile: (646) 861-4950
joe@saracheklawfirm.com
zachary@saracheklawfirm.com

*Counsel to Krzysztof Majdak and Philippe Godinea*