# EXHIBIT A

## LOAN AND SECURITY AGREEMENT

### (crypto-secured business purpose lending)

**Introduction.**

This Loan and Security Agreement (this "**Agreement**"), with the Effective Date set forth below is entered into by and among the Borrower identified below and **CRED (US) LLC**, a Delaware limited liability company (the "**Lender**").  Borrower and Lender agree to the following terms and conditions:

**1.    LINE OF CREDIT.**

   **1.1    Line of Credit Amount.**

   **(a)**    During the availability period described below, Lender will provide a line of credit to the Borrower (the "**Line of Credit**"). The amount of the Line of Credit (the "**Commitment**") is set forth below.

   **(b)**    This is a revolving line of credit. During the availability period, the Borrower may repay principal amounts and reborrow them.

   **(c)**    The Borrower may request advances under the Line of Credit (each such advance made by Lender hereunder, an "**Advance**"). The specific details of each Advance including all Advances made by Lender prior to the date hereof, are set forth on **Schedule A** hereto as the same is updated from time to time (the "**Schedule of Advances**").   Lender will deliver to Borrower a Draw Certificate in the form attached hereto as **Exhibit A** following each request for an Advance confirming the details of such Advance.

   **(d)**    The Borrower agrees not to permit the principal balance outstanding to exceed the Commitment. If the Borrower exceeds this limit, the Borrower will immediately pay the excess to Lender upon Lender's demand.

   **1.2    Availability Period.** The Line of Credit is available until the Expiration Date set forth below or such earlier date as the availability may terminate as provided in this Agreement. The availability period for this Line of Credit will be considered renewed if and only if Lender has sent Borrower a written notice of renewal for the Line of Credit (the "**Renewal Notice**"). If this Line of Credit is renewed, it will continue to be subject to all the terms and conditions set forth in this Agreement except as modified by the Renewal Notice. If this Line of Credit is renewed, the term "Expiration Date" means the date set forth in the Renewal Notice as the Expiration Date. The same process for renewal will apply to any subsequent renewal of this Line of Credit. A renewal fee may be charged at Lender's option. The amount of the renewal fee will be specified in the Renewal Notice. If this Line of Credit is not renewed, Lender in its sole discretion may allow the outstanding balance to be repaid in installments over a term specified by Lender at the time. Borrower specifically understands that the interest rate applicable to the Line of Credit may be increased upon term-out and that the new interest rate will apply to the entire outstanding principal balance due hereunder. A transaction fee may be charged at Lender's option. If so, the amount will be specified in the term-out notice.

**1.3    Repayment Terms.** Borrower must repay in full any principal and interest accrued on an Advance in accord with the terms set forth in the Draw Certificate or as otherwise agreed in writing by Lender and Borrower.  Borrower must also make payments of interest on a monthly basis if instructed by Lender, by no later than three business days after the end of the month, regardless of whether the otherwise-stated terms of an Advance specify a later or different interest payment date.  All payments must be made in full and no withholdings or deductions for any purpose are permitted, including any withholding or deduction for tax reasons.

**1.4    Prepayments.** Borrower may prepay principal in full or in part at any time without the payment of a prepayment fee or premium. The prepayment may be applied to the most remote payment of principal due under this Agreement or in such other manner as determined by Lender.

**1.5    Interest Rate.** The interest rate on an Advance will be, for each month, quarter, year or other period that the Advance is outstanding, a rate per year equal to the Interest Rate specified below.

## 2.    COLLATERAL.

**2.1    The Security**. Borrower hereby assigns and grants, and causes to be assigned and granted, grants to Lender a security interest in the following described Collateral now owned or hereafter acquired by Borrower. The word "**Collateral**" as used in this Agreement means all of Borrower's right, title and interest in and to the following, whether now owned or hereafter acquired and whether now existing or hereafter coming into existence:

    **(a)**    the fiat currencies, cryptocurrencies and other digital assets identified in notices, emails, texts, screenshots and confirmations displayed or delivered to Borrower by Lender or on Lender's behalf as intended to be pledged to Lender (such communications and information collectively, "**Confirmations**"), regardless of whether those fiat currencies, cryptocurrencies and other digital assets are deemed to be commodities, currency, money, securities, securities entitlements or any other type or category of property or asset;

    **(b)**    the digital wallet, card, deposit account(s), commodities account(s) and securities account(s) specified in Confirmations (collectively, the "**Collateral Account**") and all funds, monies, securities, security entitlements and other financial assets and other property from time to time held therein or credited thereto, and any successor or replacement wallet or account;

    **(c)**    all additions to and substitutions for any of the foregoing (including, without limitation, any securities, security entitlements, instruments or other property delivered or pledged hereunder) (such additions and substitutions, the "**Additions and Substitutions**");

    **(d)**    all present and future renewals, replacements, income, cash and noncash proceeds, earnings, increases, and substitutions from or for the Collateral of every kind and nature, including without limitation all payments, interest, profits, distributions, benefits, rights, options, warrants, dividends, stock dividends, stock splits, stock rights, regulatory dividends, subscriptions, monies, claims for money due and to become due, proceeds of any insurance on the Collateral, shares of stock of different par value or no par value issued in substitution or exchange for shares included in the Collateral, and all other property Borrower is entitled to receive on account of such Collateral, including accounts, documents, instruments, chattel paper, and general intangibles whether now accrued or hereafter accruing (collectively, "**Income and Proceeds**"); and

(e)     all of Borrower's property related to the Collateral (however owned if owned by more than one person or entity), whether or not in Lender's possession or in the possession of a third party subject to Lender's control, whether existing now or later and whether tangible or intangible in character, including all books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer software necessary to process such memory ("**Books and Records**").

Confirmations sent by Lender or on Lender's behalf regarding the number, type and timing of the transfer of Collateral to Lender's control or possession, and the details of the digital wallet or other account in which Lender or its designated agent or custodian holds the Collateral, are dispositive and controlling for all purposes, absent a definitive, non-appealable court ruling to the contrary.

2.2     **The Indebtedness.** The obligations secured by this Agreement are the payment and performance of (a) all present and future Indebtedness (as defined below) of Borrower to Lender; (b) all obligations of Borrower and rights of Lender under this Agreement; and (c) all present and future debts, obligations and liabilities of Borrower to Lender of any kind or nature.

"**Indebtedness**" is used in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of Borrower, now or hereafter existing, absolute or contingent, liquidated or unliquidated, determined or undetermined, voluntary or involuntary, including under any swap, derivative or other arrangement, or other similar transaction or arrangement, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable. "Indebtedness" secured by the Collateral of Borrower does not include obligations arising under any Swap to which it is not party if, and to the extent that, all or a portion of the guaranty by Borrower to Lender of, or the grant by such Borrower of a security interest to Lender to secure, such Swap, would violate the Commodity Exchange Act (7 U.S.C., Sec. 1. et. seq.) by virtue of Borrower's failure to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time such guaranty or grant of such security interest becomes effective with respect to such Swap.

2.3     **Borrower Covenants.** Borrower represents, covenants and warrants that unless compliance is waived by Lender in writing:

(a)     Borrower agrees: (i) to indemnify Lender against all losses, claims, demands, liabilities and expenses of every kind caused by any Collateral; (ii) to permit Lender to exercise its rights under this Agreement; (iii) to execute and deliver such documents as Lender deems necessary to create, perfect and continue the security interests contemplated by this Agreement; (iv) not to change its name, and as applicable, its chief executive office, or the jurisdiction in which it is organized and/or registered or its business structure without giving Lender at least 30 days prior written notice; (v) not to change the places where the Borrower keeps any Collateral or the Borrower's Books and Records concerning the Collateral without giving Lender prior written notice of the address to which the Borrower is moving same; and (vi) to cooperate with Lender in perfecting all security interests granted by this Agreement and in obtaining such agreements from third parties as Lender deems necessary, proper or convenient in connection with the preservation, perfection or enforcement of any of its rights under this Agreement.

    **(b)**    Borrower agrees with regard to the Collateral, unless Lender agrees otherwise in writing: (i) that Lender is authorized to file financing statements in the name of Borrower to perfect Lender's security interest in the Collateral; (ii) that Lender is authorized to notify any account debtors, any buyers of the Collateral, any Borrower Customers or any other persons of Lender's interest in the Collateral, (iii) where applicable, to operate the Collateral in accordance with all applicable statutes, rules and regulations relating to the use and control of the Collateral, and not to use any Collateral for any unlawful purpose or in any way that would void any insurance required to be carried; (iv) not to remove the Collateral from the Borrower's premises except in the ordinary course of Borrower's business; (v) to pay when due all license fees, registration fees and other charges in connection with any Collateral; (vi) not to permit any lien on the Collateral, including without limitation, liens arising from repairs to or storage of the Collateral, except in favor of Lender; (vii) not to sell, hypothecate or dispose of, nor permit the transfer by operation of law of, any Collateral or any interest in the Collateral, except sales of inventory to buyers in the ordinary course of Borrower's business; (viii) to permit Lender to inspect the Collateral at any time; (ix) to keep, in accordance with generally accepted accounting principles, complete and accurate Books and Records regarding all the Collateral, and to permit Lender to inspect the same and make copies at any reasonable time; (x) if requested by Lender, to receive and use reasonable diligence to collect the Collateral consisting of accounts and other rights to payment and proceeds, in trust and as the property of Lender, and to immediately endorse as appropriate and deliver such Collateral to Lender daily in the exact form in which they are received together with a collection report in form satisfactory to Lender; (xi) not to commingle the Collateral, or collections with respect to the Collateral, with other property; (xii) to give only normal allowances and credits and to advise Lender thereof immediately in writing if they affect any rights to payment or proceeds in any material respect; (xiii) from time to time, when requested by Lender, to prepare and deliver a schedule of all the Collateral subject to this Agreement and to assign in writing and deliver to Lender all accounts, contracts, leases and other chattel paper, instruments, and documents; (xiv) in the event Lender elects to receive payments or rights to payment or proceeds hereunder, to pay all expenses incurred by Lender, including expenses of accounting, correspondence, collection efforts, reporting to account or contract debtors, filing, recording, record keeping and other expenses; and (xv) to provide any service and do any other acts which may be necessary to maintain, preserve and protect all the Collateral and, as appropriate and applicable, to keep all the Collateral in good and saleable condition, to deal with the Collateral in accordance with the standards and practices adhered to generally by users and manufacturers of like property, and to keep all the Collateral free and clear of all defenses, rights of offset and counterclaims.

    **(c)**    If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading, Borrower must immediately deliver such document to Lender, together with any necessary endorsements.

    **2.4**    **Lender Rights.** Borrower appoints Lender its attorney in fact to perform any of the following rights, which are coupled with an interest, are irrevocable until termination of this Agreement and may be exercised from time to time by Lender's officers and employees, or any of them, whether or not Borrower is in default: (a) to perform any obligation of Borrower hereunder in Borrower's name or otherwise; (b) to release

persons liable on the Collateral and to give receipts and acquittances and compromise disputes; (c) to release or substitute security; (d) to prepare, execute, file, record or deliver notes, assignments, schedules, designation statements, financing statements, continuation statements, termination statements, statements of assignment, applications for registration or like documents to perfect, preserve or release Lender's interest in the Collateral; (e) to take cash, instruments for the payment of money and other property to which Lender is entitled; (f) to verify facts concerning the Collateral by inquiry of obligors thereon, or otherwise, in its own name or a fictitious name; (g) to endorse, collect, deliver and receive payment under instruments for the payment of money constituting or relating to the Collateral; (h) to prepare, adjust, execute, deliver and receive payment under insurance claims, and to collect and receive payment of and endorse any instrument in payment of loss or returned premiums or any other insurance refund or return, and to apply such amounts received by Lender, at Lender's sole option, toward repayment of the Indebtedness or, where appropriate, replacement of the Collateral; (i) to enter onto Borrower's premises in inspecting the Collateral; (j) to make withdrawals from and to close deposit accounts or other accounts with any financial institution, wherever located, into which proceeds may have been deposited, and to apply funds so withdrawn to payment of the Indebtedness; (j) to preserve or release the interest evidenced by chattel paper to which Lender is entitled and to endorse and deliver any evidence of title; and (k) to do all acts and things and execute all documents in the name of Borrower or otherwise, deemed by Lender as necessary, proper and convenient in connection with the preservation, perfection or enforcement of its rights.

3.    **LOAN ADMINISTRATION AND FEES.**

3.1    **Fees.** Fees will be paid by Borrower as provided on <u>Schedule B</u>.

3.2    **Collection of Payments.**

(a)    Payments will be made by debit to a deposit account, if direct debit is provided for in this Agreement or is otherwise authorized by Borrower. For payments not made by direct debit, payments will be made by mail to the address shown on applicable Borrower's statement, or by such other method as may be permitted by Lender.

(b)    Each disbursement by Lender and each payment by Borrower will be evidenced by records kept by Lender which will, absent manifest error, be conclusively presumed to be correct and accurate and constitute an account stated between Borrower and Lender.

3.3    **Borrower Instructions.**

Subject to the terms, conditions and procedures stated elsewhere in this Agreement, Lender may honor instructions for advances or repayments and any other instructions under this Agreement given by any one of the individuals Lender reasonably believes is authorized to sign loan agreements on behalf of Borrower, or any other individual(s) designated by any one of such authorized signers (each an "**Authorized Individual**"). Lender may honor any such instructions made by any one of the Authorized Individuals, whether such instructions are given in writing or by telephone, Internet and intranet websites or other means designated by Lender.

3.4    **Direct Debit with ACH Debit.**

(a)    Borrower agrees that on the due date of any amount due under this Agreement, Lender will debit the amount due from the Designated Account to pay all such sums when due.  The full amount of any deficiency will be immediately due and payable by Borrower. A voided copy of a check on the Designated Account has been, or will be, provided to Lender.

    **(b)**    Debits made by ACH will be subject to the operating rules of the National Automated Clearing House Association, as in effect from time to time.

    **(c)**    Borrower may terminate this direct debit arrangement at any time by sending written notice to Lender. If Borrower terminates this arrangement, then the principal amount outstanding under this Agreement will at the option of Lender bear interest at a rate per annum, which is one percentage point higher than the rate of interest otherwise provided under this Agreement.

    **3.5**    **Business Days.** Unless otherwise provided in this Agreement, a business day is a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the State of California. All payments and disbursements which would be due or which are received on a day, which is not a business day will be due or applied, as applicable, to the credit on the next business day.

    **3.6**    **Interest Calculation**. Except as otherwise stated in this Agreement, all interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed. Installments of principal, which are not paid when due under this Agreement will continue to bear interest until paid.

    **3.7**    **Default Rate**. Upon the occurrence of any default or after maturity or after judgment has been rendered on any obligation under this Agreement, all amounts outstanding under this Agreement, including any unpaid interest, fees, or costs, will at the option of Lender bear interest at a rate which is five percentage points higher than the rate of interest otherwise provided under this Agreement. This may result in compounding of interest. This will not constitute a waiver of any default.

## 4.    CONDITIONS.

    Before Lender is required to extend any credit to Borrower under this Agreement, it must receive any documents and other items it may reasonably require, in form and content acceptable to Lender, including any items specifically listed below.

    **4.1**    **Authorizations.** If Borrower is anything other than a natural person, evidence that the execution, delivery and performance by Borrower of this Agreement and any instrument or agreement required under this Agreement have been duly authorized.

    **4.2**    **Governing Documents.** If required by Lender, a copy of organizational documents of Borrower.

    **4.3**    **Perfection and Evidence of Priority.** Evidence that the security interests and liens in favor of Lender are valid, enforceable, properly perfected in a manner acceptable to Lender and prior to all others' rights and interests, except those Lender consents to in writing. All title documents for motor vehicles which are part of the collateral must show Lender's interest.

    **4.4**    **Payment of Fees.** Payment of all fees, expenses and other amounts due and owing to Lender. If any fee is not paid in cash, Lender may, in its discretion, treat the fee as a principal advance under this Agreement or deduct the fee from the loan proceeds.

## 5.    **REPRESENTATIONS AND WARRANTIES.**

When Borrower signs this Agreement, and until Lender is repaid in full, Borrower makes the following representations and warranties. Each request for an extension of credit constitutes a renewal of these representations and warranties as of the date of the request:

**5.1    Formation.** Borrower is duly formed and existing under the laws of the state or other jurisdiction where organized.

**5.2    Authorization.** This Agreement as amended hereby, and any instrument or agreement required under this Agreement, are within Borrower's powers, have been duly authorized, and do not conflict with any of its organizational documents.

**5.3    Good Standing.** In each state in which Borrower does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

**5.4    Financial Information.** All financial and other information that has been or will be supplied to Lender is sufficiently complete to give Lender accurate knowledge of the Borrower's financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to Lender, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of Borrower.

**5.5    Lawsuits.** There is no lawsuit, tax claim or other dispute pending or threatened against Borrower, which, if lost, would impair Borrower's financial condition or ability to repay the loan, except as have been disclosed in writing to Lender.

**5.6    Other Obligations.**    Borrower is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to Lender.

**5.1    No Claims, Defenses, Etc.**.    Borrower has no claims, counterclaims, defenses, or setoffs with respect to the Line of Credit or this Agreement as amended hereby.  The Agreement as amended hereby contains the entire understanding and agreement of Borrower and Lender in respect of the Line of Credit and supersedes all prior representations, warranties, agreements, arrangements, and understandings.

**5.3    Tax Matters.** Borrower has no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to Lender.

**5.4    No Event of Default.** There is no event, which is, or with notice or lapse of time or both would be, a default under this Agreement.

**5.5    Collateral.** All Collateral is owned by Borrower free of any title defects or any liens or interests of others, except those which have been approved by Lender in writing.

## 6.    **COVENANTS.**

Borrower agrees, so long as credit is available under this Agreement and until Lender is repaid in full:

**6.1**    **Use of Proceeds.** To use the proceeds of the Line of Credit only for business purposes.

**6.2**    **Financial Information.** To provide financial statements and other information in form and content acceptable to Lender relating to the affairs of Borrower as requested by Lender from time to time.

**6.3**    **Other Debts.** Not to have outstanding or incur any direct or contingent liabilities or lease obligations (other than those to Lender or to any affiliate of Lender), or become liable for the liabilities of others, without Lender's written consent. This does not prohibit:

    **(a)**    Acquiring goods, supplies, or merchandise on normal trade credit.

    **(b)**    Liabilities, lines of credit and leases in existence on the Effective Date (as defined below) disclosed in writing to Lender.

**6.4**    **Other Liens**. Not to create, assume, or allow any security interest or lien (including judicial liens) n property Borrower now or later owns, except:

    **(a)**    Liens and security interests in favor of Lender or any affiliate of Lender.

    **(b)**    Liens outstanding on the Effective Date (as defined below) disclosed in writing to Lender.

**6.5**    **Maintenance of Assets.**

    **(a)**    Not to sell, assign, lease, transfer or otherwise dispose of any part of the business or assets of Borrower except inventory sold in the ordinary course of business of Borrower.

    **(b)**    Not to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value, or enter into any agreement to do so.

    **(c)**    To maintain and preserve all rights, privileges, and franchises Borrower now has.

**6.6**    **Additional Negative Covenants.** Not to, without Lender's written consent:

    **(a)**    Enter into any consolidation, merger, or other combination, or become a partner in a partnership, a member of a joint venture, or a member of a limited liability company.

    **(b)**    Liquidate or dissolve Borrower's business.

**6.7**    **Notices to Lender.** To promptly notify Lender in writing of:

    **(a)**    Any event of default under this Agreement, or any event, which, with notice or lapse of time or both, would constitute an event of default.

    **(b)**    Any change in Borrower's name, legal structure, state of registration, place of business, or chief executive office if Borrower has more than one place of business.

**6.8**    **Insurance.** To maintain insurance as is usual for the business it is in.

**6.9     Compliance with Laws.** To comply with the laws (including any fictitious or trade name statute), regulations, and orders of any government body with authority over business of Borrower. Lender has no obligation to make any advance to Borrower except in compliance with all applicable laws and regulations and Borrower will fully cooperate with Lender in complying with all such applicable laws and regulations.

**6.10     Books and Records.** To maintain adequate books and records.

**6.11     Audits.** To allow Lender and its agents to inspect properties of Borrower and examine, audit, and make copies of books and records at any reasonable time. If any of the properties, books or records of Borrower are in the possession of a third party,  Borrower authorizes that third party to permit Lender or its agents to have access to perform inspections or audits and to respond to Lender's requests for information concerning such properties, books and records.

**6.12     Perfection of Liens.** To help Lender perfect and protect its security interests and liens, and reimburse it for related costs it incurs to protect its security interests and liens.

**6.13     Cooperation.** To take any action reasonably requested by Lender to carry out the intent of this Agreement.

**6.14     Maintaining Sufficient Collateral.**  Borrower must maintain with Lender pledged (via a first priority perfected security interest) Collateral having a value (measured by calculating its Fair Market Price) of at least the Initial Collateral Minimum Percentage of the outstanding Line of Credit balance plus Borrower's other outstanding obligations and liabilities to Lender (in total, the "**Outstandings**").  If Borrower's Collateral value falls below the Initial Collateral Minimum Percentage of the Outstandings, that event is referred to as a "**Valuation Event**."  (After the first Valuation Event, if it is cured, another Valuation Event will be deemed to occur only if Borrower's collateral value falls below the Ongoing Collateral Minimum Percentage of the Outstandings.)  Borrower must cure a Valuation Event within 3 business days of its occurrence by repaying a portion of the Line of Credit and/or pledging additional acceptable collateral so that the aggregate value of all collateral Borrower has validly pledged to Lender is at least the Ongoing Collateral Minimum Percentage of the Outstandings.  In Lender's sole discretion, Lender may insist that Borrower pay down the Line of Credit to cure a Valuation Event instead of pledging additional collateral.  Lender determines in its sole discretion what constitutes acceptable collateral at any given time.  Borrower's failure to timely and properly cure a Valuation Event is an Event of Default.  Borrower acknowledges that Lender will automatically sell all Collateral and apply the proceeds to Borrower's outstanding Indebtedness if that Indebtedness reaches the Liquidation Threshold percentage of the aggregate value of the Collateral as determined by Lender at the time.  Any price that Lender obtains for the Collateral in a sale triggered by a Liquidation Threshold is deemed to be reasonable and fair.

> **(a)**     The term "**Exchange Business Day**" means any day that is a trading day and a price is posted on the applicable Bloomberg United States Dollar Spot Currency page or other price quote source, as confirmed by Lender.

> **(b)**     The term "**Fair Market Price**" means the average of the closing market price for the relevant cryptocurrency on 2 consecutive Exchange Business Days, as determined by Lender.

> **(c)**     The terms "**Initial Collateral Minimum Percentage**" and "**Ongoing Collateral Minimum Percentage**" mean the percentages Lender notifies Borrower of from time to

time, based on Lender's assessment of market conditions. The initial percentage is set forth on Schedule A below.

## 7. **DEFAULT AND REMEDIES.**

**7.1** **Rights and Remedies on Default.** If an Event of Default occurs under this Agreement and is not timely cured, then Lender may exercise any one or more of the following rights and remedies in addition to any other rights and remedies Lender may have under law:

(a) Accelerate Indebtedness. Declare all Indebtedness, including any prepayment penalty which Borrower may be required to pay, immediately due and payable, without notice of any kind to Borrower.

(b) Application of Account Proceeds. Lender may apply all funds in the Collateral Account to the Indebtedness. If the Collateral Account is subject to an early withdrawal penalty, that penalty will be deducted from the Collateral Account before its application to the Indebtedness, whether the Collateral Account is with Lender or some other institution. Any excess funds remaining after application of the Collateral Account proceeds to the Indebtedness will be paid to Borrower as the interests of Borrower may appear. Borrower agrees, to the extent permitted by law, to pay any deficiency after application of the proceeds of the Collateral Account to the Indebtedness. Lender also has all of the rights of a secured party under the California Uniform Commercial Code, even if the Collateral Account is not otherwise subject to such Code concerning security interests, and the parties to this Agreement agree that the provisions of the Code giving rights to a secured party are nonetheless part of this Agreement.

(c) Sell Collateral. Sell the Collateral or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any of Lender's offices or elsewhere, for cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as Lender may deem commercially reasonable, irrespective of the impact of any such sales on the market price of the Collateral. To the maximum extent permitted by applicable law, Lender may be the purchaser of any or all of the Collateral at any such sale and will be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply all or any part of the Indebtedness as a credit on account of the purchase price of any Collateral payable at such sale. Each purchaser at any such sale will hold the property sold absolutely free from any claim or right on the part of Borrower, and Borrower hereby waives (to the extent permitted by law) all rights of redemption, stay, or appraisal that it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Borrower agrees that, to the extent notice of sale may be required by law, at least 10 calendar days' notice to Borrower of the time and place of any public sale or the time after which a private sale is to be made will constitute reasonable notification. Lender will not be obligated to make any sale of Collateral regardless of notice of sale having been given. Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. To the maximum extent permitted by law, Borrower hereby waives any claims against

Lender arising because the price at which any Collateral may have been sold at such a private sale was less than the price that might have been obtained at a public sale, even if Lender accepts the first offer received and does not offer such Collateral to more than one offeree. After the disposal of any of the Collateral, Lender may deduct all reasonable legal and other expenses and attorney's fees for protecting its interests and enforcing its remedies under this Agreement and may apply the residue of the proceeds to, or hold as a reserve against, the Indebtedness in such manner as Lender in its sole discretion may determine, and will pay the balance, if any, to Borrower or otherwise, in accordance with applicable law. If any securities held as Collateral are "restricted securities" as defined in the Rules of the Securities and Exchange Commission (such as Regulation D or Rule 144) or the rules of state securities departments under state "Blue Sky" laws, or if Borrower or any other owner of the Collateral is an affiliate of the issuer of the securities, Borrower agrees that neither Borrower, nor any member of Borrower's family, nor any other person signing this Agreement will sell or dispose of any securities of such issuer without obtaining Lender's prior written consent.

    **(d)**    <u>Application of Proceeds</u>. Apply any cash which is part of the Collateral, or which is received from the collection or sale of the Collateral, to reimbursement of any expenses, including any costs for registration of securities, commissions incurred in connection with a sale, attorneys' fees and court costs, whether or not there is a lawsuit and including any fees on appeal, incurred by Lender in connection with the collection and sale of such Collateral and to the payment of the Indebtedness of Borrower to Lender, with any excess funds to be paid to Borrower as the interests of Borrower may appear. Borrower agrees, to the extent permitted by law, to pay any deficiency after application of the proceeds of the Collateral to the Indebtedness.

**7.2**    <u>**Default**</u>. Each of the following constitutes an "<u>Event of Default</u>" under this Agreement:

    **(a)**    <u>Failure to Pay</u>. Borrower fails to make a payment under this Agreement or Borrower fails to timely and properly cure a Valuation Event.

    **(b)**    <u>Covenants</u>. Any default in the performance of or compliance with any obligation, agreement or other provision contained in this Agreement (other than those specifically described as an Event of Default in this Section), and with respect to any such default that by its nature can be cured, such default continues for a period of 20 days from its occurrence.

    **(c)**    <u>Other Lender Agreements</u>**.** Any default occurs under any guaranty, subordination agreement, security agreement, deed of trust, mortgage, or other document required by or delivered in connection with this Agreement or any such document is no longer in effect, or any guarantor purports to revoke or disavow the guaranty; or any default occurs under any other agreement Borrower (or any Obligor) has with Lender or any affiliate of Lender. For purposes of this Agreement, "**Obligor**" means any guarantor, any party pledging collateral to Lender, or, if Borrower is comprised of the trustees of a trust, any trustor.

(d)    <u>Cross-default</u>**.** Any default occurs under any agreement in connection with any credit Borrower (or any Obligor) has obtained from anyone else or which Borrower (or any Obligor) or any of Borrower's related entities or affiliates has guaranteed.

(e)    <u>False Information</u>**.** Borrower or any Obligor has given Lender false or misleading information or representations.

(f)    <u>Bankruptcy/Receivers</u>. Borrower, any Obligor, or any general partner of  Borrower or of any Obligor files a bankruptcy petition, a bankruptcy petition is filed against any of the foregoing parties and such petition is not dismissed within a period of forty-five (45) days after the filing, or Borrower, any Obligor, or any general partner of Borrower or of any Obligor makes a general assignment for the benefit of creditors; or a receiver or similar official is appointed for a substantial portion of business of Borrower or any Obligor; or the business is terminated, or such Obligor is liquidated or dissolved.

(g)    <u>Lien Priority</u>. Lender fails to have an enforceable first lien (except for any prior liens to which Lender has consented in writing) on or security interest in any property given as security for this Agreement (or any guaranty).

(h)    <u>Judgments</u>**.** Any judgments or arbitration awards are entered against Borrower or any Obligor.

(i)    <u>Material Adverse Change</u>**.** A material adverse change occurs, or is reasonably likely to occur, in the business condition (financial or otherwise), operations or properties, or ability to repay the credit of Borrower or any Obligor.

(j)    <u>Government Action</u>**.** Any government authority takes action that Lender believes materially adversely affects the financial condition or ability to repay of Borrower or any Obligor.

(k)    <u>Liens</u>**.** Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

## 8.    <u>LENDER'S ADDITIONAL REMEDIES.</u>

**8.1    <u>Lender's Additional Remedies After Default</u>**. In the event of any Event of Default, Lender may also do any one or more of the following, to the extent permitted by law:

(a)    Declare any Indebtedness immediately due and payable, without notice or demand.

(b)    Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

(c)    Require Borrower to obtain Lender's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral.

**(d)**    Require Borrower to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to Lender in kind.

**(e)**    Require Borrower to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under Lender's exclusive control.

**(f)**    Give notice to others of Lender's rights in the Collateral, to enforce or forebear from enforcing the same and make extension and modification agreements.

**(g)**    Require Borrower to assemble the Collateral, including the Books and Records, and make them available to Lender at a place designated by Lender.

**(h)**    Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any equipment of Borrower, if Lender deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

**(i)**    Demand and collect any payments on and proceeds of the Collateral. In connection therewith the Borrower irrevocably authorizes Lender to endorse or sign the Borrower's name on all checks, drafts, collections, receipts and other documents, and to take possession of and open the mail addressed to the Borrower and remove therefrom any payments and proceeds of the Collateral.

**(j)**    Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to the Borrower.

**(k)**    Use or transfer any of the Borrower's rights and interests in any Intellectual Property now owned or hereafter acquired by the Borrower, if Lender deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. The Borrower agrees that any such use or transfer will be without any additional consideration to the Borrower. As used in this ***Section 8.1 (k),*** "Intellectual Property" includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which the Borrower has any right or interest, whether by ownership, license, contract or otherwise.

**(l)**    Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. The Borrower hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

**(m)**    Take such measures as Lender may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and the Borrower hereby irrevocably

constitutes and appoints Lender as the Borrower's attorney-in-fact to perform all acts and execute all documents in connection therewith.

**(n)**  Without notice or demand to the Borrower, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by Lender or any of Lender's agents or affiliates to or for the credit of the account of the Borrower or any guarantor or endorser of the Borrower's Indebtedness.

**(o)**  Exercise all rights, powers and remedies which the Borrower would have, but for this Agreement, with respect to all Collateral.

**(p)**  Receive, open and read mail addressed to the Borrower.

**(q)**  Resort to the Collateral under this Agreement, and any other collateral related to the Indebtedness, in any order.

**(r)**  Exercise any other remedies available to Lender at law or in equity.

## 9.    ENFORCING THIS AGREEMENT; MISCELLANEOUS.

**9.1    Governing Law.** Except to the extent that any law of the United States may apply, this Agreement will be governed and interpreted according to the laws of California (the "**Governing Law State**"), without regard to any choice of law, rules or principles to the contrary. Nothing in this *Section 9.1* be construed to limit or otherwise affect any rights or remedies of Lender under federal law.

**9.2    Venue and Jurisdiction.** The Borrower agrees that any action or suit against Lender arising out of or relating to this Agreement must be filed in federal court or state court located in San Francisco, California. The Borrower agrees that Lender will not be deemed to have waived its rights to enforce this *Section 9.2* by filing an action or suit against the Borrower in a venue outside of the Governing Law State. If Lender does commence an action or suit arising out of or relating to this Agreement, the Borrower agrees that the case may be filed in federal court or state court in the Governing Law State. Lender reserves the right to commence an action or suit in any other jurisdiction where the Borrower, any Guarantor, or any collateral has any presence or is located. The Borrower consents to personal jurisdiction and venue in such forum selected by Lender and waives any right to contest jurisdiction and venue and the convenience of any such forum. The provisions of this *Section 9.2* are material inducements to Lender's acceptance of this Agreement.

**9.3    Successors and Assigns.** This Agreement is binding on the Borrower's and Lender's successors and assignees. The Borrower agrees that it may not assign this Agreement without Lender's prior consent.

**9.4    Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD**

**NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS *SECTION 9.4* AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

9.5     **Severability; Waivers.** If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced. Lender retains all rights, even if it makes a loan after default. If Lender waives a default, it may enforce a later default. Any consent or waiver under this Agreement must be in writing.

9.6     **Expenses.**

(a)     The Borrower must pay to Lender immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees, expended or incurred by Lender in connection with (i) the negotiation and preparation of this Agreement and any related agreements, Lender's continued administration of this Agreement and such related agreements, and the preparation of any amendments and waivers related to this Agreement or such related agreements, (ii) filing, recording and search fees, appraisal fees, field examination fees, title report fees, and documentation fees with respect to any collateral and books and records of the Borrower or any Obligor, and (iii) costs or expenses required to be paid by the Borrower or any Obligor that are paid, incurred or advanced by Lender.

(b)     The Borrower will indemnify and hold Lender harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (i) this Agreement or any document required hereunder, (ii) any credit extended or committed by Lender to the Borrower hereunder, and (iii) any litigation or proceeding related to or arising out of this Agreement, any such document, or any such credit, including, without limitation, any act resulting from Lender complying with instructions Lender reasonably believes are made by any Authorized Individual. This *Section 9.6(b)* will survive this Agreement's termination, and will benefit Lender and its officers, employees, and agents.

(c)     The Borrower must reimburse Lender for any reasonable costs and attorneys' fees incurred by Lender in connection with (i) the enforcement or preservation of Lender's rights and remedies and/or the collection of any obligations of the Borrower which become due to Lender and in connection with any "workout" or restructuring, and (ii) the prosecution or defense of any action in any way related to this Agreement, the credit provided hereunder or any related agreements, including without limitation, any action for declaratory relief, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Lender or any other person) relating to the Borrower or any other person or entity.

9.7     **Set-Off.** Upon and after the occurrence of an event of default under this Agreement, (a) the Borrower hereby authorizes Lender, at any time and from time to time, without notice, which is hereby expressly

waived by the Borrower, and whether or not Lender has declared any credit subject hereto to be due and payable in accordance with the terms hereof, to set off against, and to appropriate and apply to the payment of, the Borrower's Indebtedness (whether matured or unmatured, fixed or contingent, liquidated or unliquidated), any and all amounts owing by Lender to the Borrower (whether payable in U.S. dollars or any other currency, whether matured or unmatured), and (b) pending any such action, to the extent necessary, to hold such amounts as collateral to secure such Indebtedness. "**Indebtedness**" includes all obligations, now or hereafter existing, of the Borrower to Lender under this Agreement and under any other agreement or instrument executed in connection with this Agreement.

**9.8    One Agreement.** THIS WRITTEN AGREEMENT AND ANY RELATED DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**9.9    Notices.** Unless otherwise provided in this Agreement or in another agreement between Lender and the Borrower, all notices required under this Agreement shall be (a) in writing (including electronic mail), (b) delivered by electronic mail or overnight courier, and (c) deemed delivered upon electronic or written acknowledgment of receipt. Notices shall be sent to the addresses set forth on the signature page to this Agreement or such other address as specified and delivered pursuant to this *Section 9.9.*

**9.10    Headings.** Article and section headings are for reference only and will not affect the interpretation or meaning of any provisions of this Agreement.

**9.11    Counterparts.** This Agreement may be executed in any number of counterparts, each of which, when so executed, will be deemed to be an original, and all of which when taken together will constitute one and the same Agreement. Delivery of an executed counterpart of this Agreement (or of any agreement or document required by this Agreement and any amendment to this Agreement) by DocuSign will be as effective as delivery of a manually executed counterpart of this Agreement.

**9.12    Further Amendments**. No provision of the Agreement may be changed, discharged, supplemented, terminated, or waived except in a writing signed by the Borrower and Lender.

*[Balance of page left blank.]*

This Agreement is executed as of the Effective Date.

**SIGNATURES**

**BORROWER:**

UpgradeYa Investments, LLC
_____
[*name*]

South Carolina
a _____
[*state*]

LLC
_____
[*type of entity*]

DocuSigned by:

*Marc Parrish*

By: _____
Name: Marc Parrish
Title: Owner

Notice Address:
2381 N Highway 17
Mount Pleasant, SC 29466

**LENDER:**

**CRED (US) LLC,**
a Delaware limited liability company

By:  Cred Capital, Inc., a Delaware
     corporation, its authorized agent

DocuSigned by:

By: _____
Name:  James Alexander
Title:  President

Notice Address:
Cred (US) LLC
2121 South El Camino Real, Suite 500
San Mateo, CA 94403
Attention: Dan Wheeler, GC

## SCHEDULE A

**Key terms:**

"**Commitment**" (*maximum amount of the Line of Credit*):  **$2,000,000**

"**Designated Account**" (*Borrower's account from which repayments will be made*):

> **Depository Name:**  Wells Fargo Bank
> **City, State and Zip Code:** 420 Montgomery Street, San Francisco CA 94104
> **For domestic (U.S.) wire: Wire routing transit number/ABA:** xxxxx0248
> **Account number:** xxxxxx0883
> **Routing number:**
> **Direct deposits, electronic payments:** xxxxx7766
> **Wire transfers – domestic:** xxxxx0248

"**Effective Date**":  April 20, 2020

"**Expiration Date**" (*maturity of the Line of Credit*): the date that is 12 months following the confirmed pledge of all initially-required Collateral to Lender.

"**Initial Collateral Minimum Percentage**" (*initial maximum loan-to-value ratio*): **50%**

"**Interest Rate**": **6%** per annum.  Interest will accrue based upon a 360-day year and the actual number of days elapsed and will compound on a monthly basis until all Indebtedness is indefeasibly paid in full.

"**Liquidation Threshold**" (*LTV percentage triggering sale of all Collateral*): **91%**

"**Ongoing Collateral Minimum Percentage**" (*maximum LTV following Valuation Event*): **75%**

**Advances:**

| Date | Currency | Amount | Repayment Schedule |
|------|----------|--------|--------------------|
|      |          |        | *See applicable Draw Certificate providing complete details for each Advance* |
|      |          |        |                    |
|      |          |        |                    |
|      |          |        |                    |
|      |          |        |                    |
|      |          |        |                    |
|      |          |        |                    |
|      |          |        |                    |
|      |          |        |                    |

## SCHEDULE B

### Schedule of Fees

1.    General Fees.

    a.    The Borrower agrees to pay any loan and documentation fees requested by Lender.

    b.    Waiver Fee. If Lender, at its discretion, agrees to waive or amend any terms of this Agreement, the Borrower will, at Lender's option, pay Lender a fee for each waiver or amendment in an amount advised by Lender at the time the Borrower requests the waiver or amendment. Nothing in this *Section 1(b)* implies that Lender is obligated to agree to any waiver or amendment requested by the Borrower. Lender may impose additional requirements as a condition to any waiver or amendment.

    c.    Late Fee. To the extent permitted by law, the Borrower agrees to pay a late fee in an amount not to exceed 4% of any payment that is more than 15 days late. The imposition and payment of a late fee does not constitute a waiver of Lender's rights with respect to the default.

2.    Additional Fees. The Borrower and Lender agree to pay any other fees set forth on the Schedule of Advances.

## EXHIBIT A

### FORM OF DRAW CERTIFICATE

### Draw Certificate No. _____

### Date: _____, 20__

Re:   The Loan and Security Agreement (the "**Agreement**") by and between Cred (US) LLC and Borrower.

From: Cred (US) LLC
Attn: 2121 S. El Camino Real, Suite 500
San Mateo, CA 94403

This Draw Certificate is prepared and delivered pursuant to the Agreement.  Capitalized terms used but not defined herein have the meanings given to such terms in the Agreement.

On the date of delivery set forth below, Lender delivered and posted cryptocurrency and/or fiat currency in the number and type specified below to Borrower's Digital Wallet pursuant to the Agreement.

| | |
|---|---|
| **Date of draw:** | |
| **Type and Number of Pledged Collateral** | _____ (number of tokens)<br><br>_____ (type of tokens) |
| **Date of delivery and posting of the draw proceeds to Borrower:**<br>(date on which interest begins accruing on the draw amount) | |
| **Type of cryptocurrency or fiat currency:** | [__]    cryptocurrency (type:_____)<br><br>[__]    fiat currency (type:___USD_____) |
| **Number of tokens or USD:** | [__]    _____ (number of crypto tokens)<br><br>[__]    $_____ |
| **Interest rate applicable to the draw:** | _____% |
| **Interest payment dates:** | $_____ payable on _____, 20___.<br><br>$_____ payable on _____, 20___. |

| | |
|---|---|
| | $_____ payable on _____, 20\_\_\_.<br><br>$_____ payable on _____, 20\_\_\_. |
| **Principal payment dates:** | $_____ payable on _____, 20\_\_\_.<br><br>$_____ payable on _____, 20\_\_\_.<br><br>$_____ payable on _____, 20\_\_\_.<br><br>$_____ payable on _____, 20\_\_\_. |