1
2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

3       .   Chapter 11
IN RE:                           .
4       .   Case No. 20-12836 (JTD)
CRED INC., *et al.*,             .
5       .   Courtroom No. 5
        .   824 North Market Street
6       .   Wilmington, Delaware 19801
        .
7                     Debtors.    .   November 25, 2020
. . . . . . . . . . . . . . . . .   11:00 A.M.

8
TRANSCRIPT OF HEARING
9           BEFORE THE HONORABLE JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE
10

APPEARANCES:
11

12   For the Debtors:        Scott Cousins, Esquire
COUSINS LAW LLC
13                          1521 Concord Pike
Wilmington, Delaware 19803
14
- and -
15
James Grogan, Esquire
16                          PAUL HASTINGS LLP
600 Travis Street
17                          Houston, Texas 77002

18
Audio Operator:         Felicia Morton
19

Transcription Company:  Reliable
20                          1007 N. Orange Street
Wilmington, Delaware 19801
21                          (302)654-8080
Email:  gmatthews@reliable-co.com
22

Proceedings recorded by electronic sound recording, transcript
23   produced by transcription service.

24

25

APPEARANCES (Continued):

For Jaime Shiller:        Jeffrey Waxman, Esquire
                          MORRIS JAMES LLP
                          500 Delaware Avenue
                          Wilmington, Delaware 19801

                          - and -

                          David Silver, Esquire
                          SILVER MILLER
                          11780 W Sample Road
                          Coral Springs, Florida 33065

INDEX

#1) Emergency Motion of Jaime Shiller, Takashi Yanagi, Wu Chi King, Joseph Richardson, Thomas Calvert, Clint Cowen, Robin Houck, Todd Wiseman, Matthew Dixon, Jonatan Ashurov, Daniel Becker, Teppei Miyauchi, Jean Vacca, Xian Su, And Emmanuel Beaufils To Compel The Debtors To Make Demand Of Certain Cryptocurrency Exchanges To Freeze The Transfer Of Certain Accounts That May Hold The Debtors' Assets [Docket No. 75 – Filed November 23, 2020].

**Ruling: 22**

1     (Proceedings commenced at 11:01 a.m.)

2          THE COURT:  Thank you.  Good morning, everyone.

3  This is Judge Dorsey. We're on the record in Cred Inc., case

4  number 20-12836.

5          This was an emergency motion filed by certain

6  creditors of the estate, but I'd like to hear from debtors'

7  counsel first, please.

8          MR. COUSINS:  Good morning, Your Honor.  It's

9  Scott Cousins.  I'm sorry.  I'm in the mountains in Western

10 PA so I hope the court can hear me.

11         THE COURT:  I can hear you.  Thank you.

12         MR. COUSINS:  Thank you.

13         My co-counsel, James Grogan, is going to make the

14 presentation for the debtors.

15         THE COURT:  Okay.

16         MR. GROGAN:  Good morning, Your Honor.  It's James

17 Grogan on behalf of Cred Inc. and its affiliated debtors.

18         THE COURT:  Go ahead, Mr. Grogan.

19         MR. GROGAN:  Thank you, Your Honor.

20         Your Honor, as you know, Mr. Cousins and I have

21 been doing this a long time.  We take our fiduciary

22 responsibilities incredibly seriously.  I thank everybody

23 that's working for the debtors, which includes not only Mr.

24 Cousin's firm and Paul Hastings LLP, but also our

25 restructuring advisors, MACCO; our new engaged investment

1  banker Teneo.  We're all working around the clock to try to

2  maximize value here.

3          We think that, at this point, the case is heading

4  in a good direction. We're actually marketing the assets.

5  We've proposed bidding procedures. We want to move this case

6  along quickly.  I actually I'm going to try to get a plan on

7  file before the end of the year.

8          You know, the case I think will proceed better if,

9  you know, parties who have ideas on how to maximize value

10 coordinate with us, dialogue with us.  My phone is always

11 one.  I don't have any planned vacations.  I'm happy to talk

12 to anybody who has an idea on how to help this case succeed.

13         Here, we, you know, we didn't see what the movants

14 wanted until after they had filed it.  Nevertheless, we met

15 and conferred with them within a day.  And we have put

16 together a letter which we think is appropriate to notify the

17 exchanges, not only that are on their list, but a couple of

18 additional ones that we're aware of that may have relevant

19 information.  And we're going to send that out immediately.

20         So we think that that addresses the concerns

21 raised by the movants.  From a process perspective, I think

22 it could have been handled better, but I want everybody to

23 know that we are working as hard as we possibly can to make

24 this case succeed.

25         Thank you, Your Honor.

1        THE COURT:  Thank you, Mr. Grogan.

2        Let me hear from the movants, please.

3        MR. WAXMAN:  Good morning, Your Honor.  May I

4   please the court, Jeff Waxman of Morris James on behalf of

5   now eighteen creditors with total claims against the debtors

6   totaling more than $60 million dollars.

7        Together with me a today's hearing is David Silver

8   of Silver Miller.  Mr. Silver has been admitted *pro hac vice*.

9        First, Your Honor, I would like to thank Your

10  Honor for granting the motion to shorten to consider the

11  underlying motion for the preservation of the estate assets

12  and, by extension, the creditors assets because this is an

13  extremely time sensitive issue.

14        Second, since the filing of the underlying motion,

15  counsel for the movants has sent information to the debtors.

16  As counsel stated, the parties did confer with respect the

17  motion.  And we gave the movants the opportunity to ask about

18  the information that we provided to them, with respect to the

19  accounts at issue and the amounts at issue.

20        During that call, the debtors agreed that there

21  would be minimal expense and downside to sending the demand

22  letters that put the exchanges on notice and we sent the

23  debtors our proposed form of demand letter in Word format so

24  that they could easily change it.  And we had expected that

25  this would be a short hearing after which the debtors would

1  preserve all of the debtors' assets and everybody could start

2  their holiday weekend early.

3         We were, therefore, surprised, frankly, to have

4  reviewed the debtors' four-plus page response this morning in

5  which they said, among other things, that the motion was

6  "unsubstantiated and unwarranted."  And to propose that they

7  send a letter that preserves just a fraction of the

8  cryptocurrency at issue.

9         So, unfortunately, this will not be a five-minute

10  hearing, Your Honor.

11         Just to back up.

12         These are one of the first and, sadly, likely, the

13  largest cryptocurrency related business to declare

14  bankruptcy, at least, thus far.  And, therefore, there are

15  aspects in this case that this court and, likely, regular

16  bankruptcy practitioners such as myself hadn't had a chance

17  to address yet.

18         To the extent that the court has questions about

19  cryptocurrency or the technical nature, Mr. Silver is much

20  more capable of addressing those questions than I am.

21         But, in essence, Cred was supposed to be a lending

22  platform and, per their website, the lenders pledge that

23  their digital assets to Cred offered competitive interest

24  rates to lenders and Cred claimed that they would, and this

25  is a quote, "hold onto your crypto while we put it to work

1  for you."

2         And as we've now learned, this was simply not the

3  case.  Just my clients and, again, eighteen as of this

4  morning, had lost over 3500 bitcoin and other assets

5  presently valued at over $67 million dollars in less than a

6  year.

7         Let me repeat that because it's inconsistent with

8  the pleadings filed by the debtors in this court.

9         Again, over 3500 bitcoins valued at over $67

10 million dollars.  Therefore, we've taken the extraordinary

11 step to identify where our client's stolen bitcoins are.

12        Thankfully, based on the blockchain technology

13 which, again, Mr. Silver can explain in much more greater

14 detail than I, we've identified twenty-one exchanges and

15 nineteen private wallet addresses, containing our client's

16 stolen bitcoin.

17        Because bitcoin, unlike U.S. dollars, can be moved

18 instantaneously and in large amounts, it's critical to

19 protect my client's personal assets and/or assets of the

20 estates to provide notice to potential third-parties who are

21 holding those assets.

22        On Monday night, we sent the debtors, under

23 agreement of confidentiality, some of the tracing analysis

24 information for approximately 8500 bitcoins, processed in the

25 Cred, including approximately 3750 bitcoins, being processed

1  by five U.S. exchanges.  We're also aware that, and shared

2  with the debtors and the U.S. Trustee, that some of the

3  bitcoin was transferred after the petition date.

4         To be clear, the movant's motion was neither

5  unsubstantiated nor unwarranted.  The movants have provided

6  the debtors with an up-to-date analysis as in their

7  possession with respect to the cryptocurrency at issue.

8         By the debtors' declaration in support of their

9  first-day motion, they stated that $10 million dollars of

10 bitcoin was taken in April of 2020.  Again, as described

11 before, this number is willfully inaccurate and intended to -

12 - and we believe this is intended to mislead the court as we

13 believe that the amount is much larger.

14        My clients are considering whether to join, either

15 in whole or part, the motion previously filed by other

16 creditors joining in the motion to dismiss/convert or appoint

17 the Chapter 11 trustee that is scheduled to be heard on

18 December 9th.  Unfortunately, there's a lot of time between

19 now and December 9th at which time the bitcoin issue can be

20 easily transferred after which it's almost certainly not

21 recoverable.

22        And although the debtors have filed an action

23 against the now former insider, more than six months after

24 the act, they still have not made demand to freeze the

25 accounts that are holding where some of those assets are

1  believed to have been, or believe to be.  And from which they

2  can easily be transferred and liquidated.

3       The debtors fail to take any action until now, and

4  only after being prompted by creditors, orders on the

5  surreal.  Like the fact that the debtors would file a

6  response trying to justify an object failure to engage in

7  even that minimal effort necessary to preserve those estate

8  assets is nothing short of incredulous and constitutes

9  negligence, at best, if not objectively gross mismanagement.

10      The debtors' failure to timely act to preserve

11  those assets without being prompted should not inspire this

12  court or anybody else of the debtors' ability to manage these

13  cases going forward.

14      But, again, there's a pending motion which is

15  going to be heard on December 9th, so those issues will be

16  left for another day.

17      But while the debtors say in their response that

18  they've agreed to take actions to preserve the estate assets,

19  the fact is and as evidenced by the form of demand letter

20  that the debtors have attached as Exhibit A to the response,

21  the debtors aren't seeking to preserve all of the

22  cryptocurrency at issue.

23      This is not an evidentiary hearing but the debtors

24  have stated that all that was missing was bitcoin worth over

25  $10 million dollars.  The movants believe that there's more

1  than $5 million missing bitcoin which at current prices of

2  $19,372 per bitcoin is worth over $96.8 million dollars.  And

3  it is provided information the debtors of the process of more

4  than 8,000 bitcoins, it believes either belong directly to

5  the movants or assets of the estate.

6         The debtors' demand letter seeks to put the

7  exchanges on notice of only 800 bitcoins which is worth

8  approximately $10 million dollars; again, only 800 bitcoins

9  out of more than 5,000 bitcoins.

10         So, ultimately, even though the debtors say that

11  they're agreeable to taking reasonable measures to recover

12  assets of the estate, they aren't, Your Honor.  They aren't

13  even giving half a loaf.  This is just a thin slice.  And

14  considering the amounts at issue, the minimal cost of the

15  estate cold be the exchanges on notice of all of the bitcoin

16  at issue which, again, the movants provided to the debtors on

17  Monday night.

18         This court has to be asking itself why aren't the

19  debtors asking the exchanges and putting them on notice to

20  hold those pending further order of the court.  I know that's

21  what the creditors are asking.

22         Based upon the debtors' failure to take any action

23  until now and based upon the proposed demand letter, which

24  again only asks for them to hold 800 bitcoin pending further

25  order of the court, the movants do not, and this court should

1  not, trust the debtors to do what they should have done more

2  than six months ago.  Accordingly, we request that instead of

3  authorizing the debtors to send the notices to the exchange,

4  this court should simply authorize the movants to send the

5  demand letters, thereby putting them on notice.

6          And if I can, I just like to respond to the

7  comments of the debtors' counsel.

8          With respect to the process, Your Honor, we don't

9  apologize for filing the motion.  It's a holiday week.  Had

10  we waited to meet and confer with the debtors, sending them

11  the information before filing a motion, we may not have had

12  this hearing until after Thanksgiving.  Everyday that goes by

13  is another day where money can be transferred from those

14  accounts, never to be recovered.

15          And while I appreciate the debtors' counsel's

16  optimism that this is a case that will move quickly, there

17  will be a successful sale, that the debtors will get a plan

18  on file as early as the end of this year, my clients don't

19  share that optimism.

20          And while that should not reflect upon the

21  debtors' professionals, none of whom I believe have done

22  anything sinister, there are significant issues that this

23  court is going to need to address on December 9.

24          In the meantime, the exchanges should be put on

25  notice and the movants, who have provided the information of

1  the debtors, that the debtors are apparently unwilling to

2  send to the exchanges, the movant should be allowed to give

3  notice.

4          Does Your Honor have any questions?

5          THE COURT:  Not at this time.

6          Let me hear a response from debtors.

7          MR. WAXMAN:  Thank you, Your Honor.

8          MR. GROGAN:  There's a lot of accusations going on

9  here which are unsupported by any evidence.  We have

10 identified about a thousand and twenty-five bitcoin that were

11 stolen.  That's all that I am aware of and we are

12 investigating whether or not there are any other stolen

13 bitcoin.  But to this notion that there's 3500 bitcoin that,

14 you know, were misappropriated or taken by somebody, I don't

15 have any evidence of that and neither do the movants.

16         If I uncover evidence, I'll be the first one to

17 bring it to the court's attention.

18         The reason this motion is unwarranted is because

19 there's no such thing as being debtors' counsel by proxy.

20 And essentially what the motion amounts to is a request for

21 an affirmative injunction against debtors' counsel to send

22 letters to random third-parties.

23         The letter that the movants drafted is largely

24 unintelligible because it doesn't even identify the

25 suspicious addresses from which illicit cryptocurrency would

1  have been transferred.

2          So we redrafted the letter.  We kept as much of

3  the language as we could.  But we redrafted the letter to

4  identify the specific addresses that the exchanges should be

5  on the lookout for.

6          What we have done is given the exchanges something

7  that is actionable.  The movant's letter is not actionable

8  because it doesn't identify anything that could be used by an

9  exchange to actually freeze funds.

10          So we think that our letter is exactly what should

11  be sent and we would request that the court deny the motion.

12          THE COURT:  Anyone else who wishes to be heard?

13          MR. SILVER:  Your Honor, this is David Silver.  If

14  I could just speak to the information that was provided in

15  the analytics, just to correct Mr. Grogan in what he said.

16          Effectively, after we were retained, Silver Miller

17  retained a consultant who did the tracing analysis.  And I

18  just want to clean up some of the numbers so that we're all

19  talking about the same thing.

20          My client lost -- invested 3500 bitcoin that's

21  worth approximately $67 million dollars.  My clients believe

22  those bitcoins belong to them because they believe this was

23  a, you know, lending program, but that's really not important

24  today.

25          But that 3500 bitcoin that's worth $67 million

1  dollars is presently missing.  It's ambiguous in a day-one

2  filing where that money is, but that money is missing.  It's

3  not in my client's possession.  They had redemption rights.

4  That money is missing.

5          What we provided from the analytics are over to

6  for every single U.S. exchange is the transactional I.D.'s

7  and the deposit addresses.  And as part of our motion what we

8  asked for was the letter to be sent and for either debtors'

9  counsel or the movants to provide the additional specific

10 information related to the 8500 bitcoins that was deposited

11 at these addresses.

12         And this is important because this is public

13 information on the blockchain that can only be developed

14 using the transactional I.D.'s of where my clients deposited

15 the bitcoins.  And then there's analysis that goes further,

16 but we have identified the 8500 bitcoin that deposited into

17 the twenty-one exchanges.

18         We then provided debtors' counsel and the trustee

19 the specific transactional information related to 3,748

20 bitcoins, processed by Coinbase, Bittrex, Xapo, Gemini, and

21 Kraken.

22         What's also important to know is that there's a

23 separate 5100 bitcoin that is valued at near $90 million

24 dollars, presently sitting in nineteen individual private

25 wallet addresses in order for the cryptocurrency exchanges to

1   be put on notice to do their own enhanced due diligence -- we

2   haven't asked for a turnover.  We haven't asked to do

3   anything except provide notice because it's my understanding,

4   and I apologize.  I probably, am sure, have the least amount

5   of bankruptcy experience of anyone on this call.  But I've

6   been informed that I can't provide notice to the exchanges

7   outside of the bankruptcy proceeding.

8          All we want to do is provide notice to the

9   exchanges so that they, because they are essentially banks,

10  and they're under the Bank Secrecy Act, have obligations

11  between that consent and other regulatory bodies, provide

12  them the notice of these transactions.  They'll start their

13  own due diligence, their own potential reporting requirements

14  for (indiscernible) crimes and suspicious activity reports.

15         There could be no harm whatsoever based on the

16  analytics provided to date, which, to be clear, there are

17  only from my client's perspective, and I won't get into the

18  analytics and how they work and the techno geek from that

19  perspective.  But it's incredibly important to realize that

20  these exchanges all have the data and the information related

21  to clusters of Cred investors and where the crypto was

22  transferred internally.

23         My public chain analytics don't show that.  But

24  the exchanges themselves, under the Bank Secrecy Act, under

25  FinCEN and under their obligations will require and enhance

1  due diligence.  This is a no harm, no foul cost all of

2  sending an email to the exchanges, providing them the

3  information we already have.

4         We've provided it to the trustee, to the U.S.

5  exchanges.  We provided it to the debtors.  I am happy to

6  provide it to anyone else, at this point who the court feels

7  needs to see it.

8         But, again, the analytics, they are public.

9  There's no question about the validity of these transfers,

10  what was processed.  There can be no harm in my clients being

11  told where their cryptocurrency and bitcoin is today.

12         If you have any questions, I'm happy to elaborate,

13  but I wanted to clarify the numbers.

14         THE COURT:  Well, I have a question about, in

15  these exchanges, how is the bitcoin accounted for?  Is it

16  under the name of the debtors or is it under the name of the

17  individual movants in this case?

18         MR. SILVER:  So, from the analytic standpoint we

19  can trace -- I don't know who -- we can trace initial

20  deposits.  You take a bitcoin which essentially has a serial

21  number on it.   We can trace that serial number just like you

22  would trace a U.S. dollar serial number.

23         But at Coinbase, for instance, which is the

24  largest identified exchanged with process at minimum of 1,437

25  bitcoin.  My presumption is we're going to learn that Cred

1  had an account, the subsidiaries had an account, and

2  individual Cred insiders had an account.  Those are

3  suppositions I can make.  I can only provide today, to this

4  court, what the public blockchain analytics show, and all

5  that shows is a movement from my client's hand to Cred's hand

6  to the exchange's hand.

7          So, for the time being, I can't give you the

8  specific information on the names.  I can only tell you for

9  certainty how the flow of the bitcoin operated which is why

10  I'm able to tell you, for instance, that Coinbase processed

11  1,437.  At some point in time when the debtors provide the

12  full transactional history of all the bitcoins, they

13  (indiscernible) in, this analysis will change because I'll

14  have more data to use to show more movements of crypto.

15          I can only tell you right now that my client who -

16  - and if you look at the day one filing showing the

17  information, obviously, we represent the two largest $15

18  million dollar investors, we believe, because there are no

19  names on it. We believe we represent both of those who have

20  provided their bitcoin transaction to do these analytics.

21          The analytics simply show the flow.  I can't tell

22  you what's happening inside Coinbase, but that's why it's

23  critical for Coinbase to receive knowledge because Coinbase

24  itself, as part of its analytics, they internally will know

25  who moved money within these certain accounts, and they'll do

1   their own enhanced due diligence under the regulatory

2   structure that they're required to.  And, again, to me, that

3   is a no harm, no foul doing what's best in the movant's

4   interest, not what's in the best interest of prior debtors

5   who are -- I, frankly, I don't understand how there's an

6   argument to be made that the debtors aren't aware that all of

7   the bitcoin is missing, as they have told their clients their

8   cryptocurrencies are no longer in the possession of Cred.

9        So, we have to do everything possible.  You can

10  move a $100 million dollars in bitcoins in thirty seconds or

11  less.  And as we stand here today, we don't know, with the

12  exception of the nineteen wallets, what the exchanges know.

13  But the exchanges can certainly do everything in their power

14  to help the debtor estates and the movants.

15       THE COURT:  Well, Mr. Grogan, let me ask you a

16  question.  If these bitcoins belong to these creditors and

17  are only being held by the debtors for their benefit, what

18  basis is there for me to say they're not allowed to reach out

19  to these exchanges and ask that those exchanges be frozen?

20       MR. GROGAN:  Your Honor, that's actually not the

21  case.  The bitcoin are -- it's borrowed capital between the

22  debtor and the customer.  We think its property of the

23  estate.  You know if they want to make that argument, you

24  know, they need to file a motion to that effect.

25       You know, they haven't actually sought that kind

1  of relief.  But, you know, I disagree with the premise that

2  this is their property.  It was property -- you know, it was

3  an asset that was transferred to the debtors to use in the

4  ordinary course of the debtors' business.  There have been

5  significant losses through transactions that the debtors

6  entered into with third-party asset managers.

7         I think that's largely where the bitcoin went.

8  But it's not in a debtor account anymore.  We don't even hold

9  an account with Coinbase. For example, on the list that

10  movant's counsel identified.  The only one where we currently

11  have funds on deposit is Uphold.  That's about half a million

12  dollars' worth of cryptocurrency that's being held by Uphold.

13         Uphold actually is a creditor as well.  I suspect

14  if you were to ask Uphold, you know, why are they not

15  returning the cryptocurrency that we have in our account,

16  they would say we're using it as an offset under Section 553

17  of the Bankruptcy Code.

18         But this idea that I can just send a letter to

19  every exchange demanding that they freeze every customer's

20  account on the exchange, you know, I think exposes the estate

21  to new liabilities from all of these random individuals who

22  have cryptocurrency at, for example, Coinbase.  I just can't

23  do that.

24         We're, you know, -- we're going to exponentially

25  increase the cost and difficulty of this case if we start

1  attacking every random third-party who does business with

2  Coinbase.

3            THE COURT:  All right, well the only motion I have

4  in front of me is a motion to compel the debtors to take

5  action to preserve, potentially preserve, assets of the

6  debtors' estates.  And I have no evidence in front of me as

7  to whether their assets of the debtors, whether their assets

8  of these movants or any other creditors of the debtors'

9  estate.  And that issue is not before me, and I make no

10 findings about that.

11           So, at this point, all I have is the obligation of

12 the debtors to exercise their fiduciary duties to protect the

13 assets of the debtors' estates and the debtors have indicated

14 that they intend to take steps by sending their own letter to

15 these exchange accounts asking that certain assets be frozen.

16 And that's all I can do at this point without further

17 evidence.

18           Allowing the creditors to send letters would

19 potentially require filing a motion to lift the automatic

20 stay, to allow the creditors to pursue these assets on their

21 own which, obviously, that motion is not before me and I

22 can't grant you that relief today.

23           So, at this point, all I can do is admonish the

24 debtors which I'm sure that they will do to take every step

25 possible to preserve the assets of the debtors' estates.

1          And the decision about who owns those assets

2     whether their assets that are actually missing or not, all of

3     that is going to have to wait for another day, which is

4     probably going to be December 9th when we have the motion to

5     -- what do we have a motion to convert or motion to appoint a

6     Chapter 11 trustee?  What are we doing on the 9th?

7          MR. GROGAN:  Motion to convert the case or, in the

8     alternative, appoint a Chapter 11 trustee.

9          THE COURT:  Right.  So, these issues about whether

10    the bitcoin belongs to the creditors, whether it belongs to

11    the debtors, whether the debtors are taking appropriate

12    action to protect the assets of the debtors' estates, those

13    are issues that are going to go to the question of whether or

14    not I convert or appoint a Chapter 11 trustee.  And that's

15    going to require evidence because I can't do that in a

16    vacuum.

17          So as of now, I'm going to have to deny the motion

18    and I will -- I know the debtors are going to go ahead and

19    send the letter that they are proposing.  I don't think I

20    have to enter an order compelling them to do that.  I think

21    they are doing that because they have that fiduciary

22    obligation to protect assets.

23          And that's, as of right now that's all that I know

24    that they're doing.  So, all I can do today is deny the

25    motion to compel or to deny the oral motion that was made

1 today apparently to allow the creditors to send their own

2 letter which as I said, given that the debtors are asserting

3 that these are their assets that would require a motion to

4 lift the stay and to allow that to go forward.

5        So, I don't have that motion in front of me.

6 There's no other relief that I can grant today.

7        MR. WAXMAN:  Your Honor, this is Jeff Waxman.

8 Thank you, Your Honor.  I understand your ruling.  I

9 appreciate it.

10        I just would note for the record, Your Honor, the

11 debtors' actions in order to preserve the assets of the

12 estate came only after we made demand and filed a motion that

13 they do so.  More than six months have passed since the April

14 2020 alleged theft, and no notice was ever sent out until

15 now.

16        THE COURT:  I understand that, Mr. Waxman, and

17 that may go to the question ultimately of whether or not I

18 appoint a Chapter 11 trustee, if I think the debtors are not

19 taking appropriate action to protect the assets of the

20 estate, but I don't have that evidence in front of me right

21 now.

22        MR. WAXMAN:  Understood.

23        MR. GROGAN:  Your Honor, may I be heard real

24 quick?  I just want to correct the record.

25        The theft of the 800 bitcoins was in August, not

1   April.  With respect to Mr. Alexander that was in April.

2   Prepetition, we filed the lawsuit against Mr. Alexander in

3   California Community Court and got a temporary restraining

4   order preventing him from further use of the bitcoin that he

5   took.

6           So all of what was just said is factually

7   inaccurate, but we'll -- you know, I look forward to

8   presenting our case in more fulsome detail on the 9th.

9           THE COURT:  Yes, we're going to have to because,

10  you know, these are all representations of counsel and I'm

11  going to need actually admissible evidence before I take any

12  further action.

13          All right.  Anything else before I adjourn?

14          MR. WAXMAN:  Thank you, Your Honor, for your time.

15  And, again, thank you for scheduling this on an expedited

16  basis and I wish you and everybody else on this hearing, at

17  this hearing, a happy holiday.

18          THE COURT:  Thank you. Same to everyone.  Be safe,

19  and enjoy the holiday, and I will, I guess I will see

20  everybody on the 9th.

21          We are adjourned.  Thank you.

22      (A Chorus of "Thank you, Your Honor")

23      (Proceedings conclude at 11:33 a.m.)

24

25

1                          CERTIFICATE

2

3        I certify that the foregoing is a correct transcript

4   from the electronic sound recording of the proceedings in the

5   above-entitled matter.

6
    /s/Mary Zajaczkowski              November 30, 2020
7   Mary Zajaczkowski, CET**D-531

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25