## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CRED INC., *et al.*[1],<br><br>Debtors. | Chapter 11<br>Case No. 20-12836 (JTD)<br>(Jointly Administered)<br>**Re: D.I. 62** |

**DECLARATION OF DANIYAL INAMULLAH IN SUPPORT OF KRZYSZTOF MAJDAK AND PHILIPPE GODINEAU'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §1112(B)(I) DISMISSING THE CASES; (II) CONVERTING THE CASES TO A CHAPTER 7 LIQUIDATION; OR (III) APPOINTING A CHAPTER 11 TRUSTEE**

I, Daniyal Inamullah, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

1.      I am a Chartered Financial Analyst (CFA) charterholder with an MBA degree from the University of Houston, C.T Bauer College of Business. I also was trained at Ernst & Young, an accounting firm, in Valuation and Business Modelling for Transaction Advisory Services.  Subsequently, I continued my training as an Associate at the investment banking firm of Houlihan Lokey.

2.      Starting in January 2020, I was hired by Debtor Cred Inc ("Cred", formerly Cred LLC) as Vice President.  I was subsequently promoted to Head of Capital Markets.  Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein and, if called upon to testify, I could and would testify to those facts.

---

[1]The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

3.      As Head of Capital Markets at Cred, my role was to oversee due diligence of investment opportunities and set our investment policies via recommendations to the Investment Committee.   My job was to ensure that the Debtor generated the necessary returns so that Cred could attract additional creditors as an alternative lending platform.  Pursuant to my position, I expected to gain intimate knowledge of Cred's financial position and processes.

4.      From the beginning of my employment, I noted that Cred lacked fundamental best practices for lending platforms, as evidenced by its investment in moKredit and its lack of due diligence processes for asset management partners.  From the outset, I expressed my concerns to Chief Executive Officer Daniel Schatt, Chief Financial Officer Joe Podulka, Chief Capital Officer James Alexander, and the General Counsel.

5.      I left Cred on November 6, 2020 after submitting my letter of resignation two weeks prior. The circumstances leading to my notice include (i) my doubts over Cred's ability to restore a healthy asset to liability ratio, (ii) excessive cash burn relative to corporate assets and (iii) the lack of relevant disclosures to old and new customers joining the platform.

6.      Cred's main offering was CredEarn, a banking product which allowed customers to loan their cryptocurrency assets to Cred, earning a fixed return of up to 12% on their investment.  Each customer had their own account wherein they would deposit their crypto-currency to a wallet controlled by Cred.

7.      Although most CredEarn customers had access to an online portal where they could track their "account" balances, Cred made no separation between customer (lender) "accounts" and general corporate funds.   This meant that customer funds were used to pay general expenses like salaries, rent and overhead.

8.      Early on, Cred mismatched the assets and liabilities between its customer "accounts", which were tracked by customers in crypto denominations like Bitcoin and Ethereum, and the investments of these funds, which were often denominated in U.S. dollars. Highly leveraged derivatives instruments were utilized to hedge against price exposures.

*moKredit Loan*

9.      One of the biggest items on Cred's balance sheet was a $39 million loan to a Chinese entity called moKredit, which was created by a Cred founder Lu Hua.   Despite the capital markets team's and general counsel's repeated attempts to gather further details from Schatt about this loan, these requests were consistently put off with statements like "Lu [Hua] is putting it together."

10.      After the March 12, 2020 collapse in the price of Bitcoin, Cred requested a return of $10 million in principal from moKredit, which was not received within the required 30 day timeframe to avoid a default.

11.      I am certain that had CredEarn customers known their assets were to be lent to an insider entity and ultimately secured by uncollateralized loans to Chinese gamers, most would not have lent money to Cred.

12.      Due to the hemorrhaging of customer funds under Cred's management, punctuated by (i) a big hit to Cred's balance sheet in March 2020, (ii) lack of principal repayments or follow through on the repayment plan created by moKredit, and (iii) the subsequent rise in Bitcoin's value, Cred may have been insolvent as early as Summer 2020. At that moment, no reasonable person could believe that Cred would ever be able to recoup its massive losses to meet its growing liabilities.

*Association with fraudulent individuals*

13.    Cred's insolvency became apparent to me around the Summer of 2020, when Cred could not raise additional funds,.  At that time, a fraudulent investment manager was discovered to have stolen 800 Bitcoin, moKredit failed to follow through on their principal repayment plan and the rise in cryptocurrency prices accelerated Cred's asset to liability gap.

14.    Cred needed to generate new accounts because funds from fresh customer lending were used to repay older obligations to prior customers.   In fact, revenue channels available to repay loan principal and interest to lenders were reduced on a monthly basis as Cred needed to pull assets from income generating sources to meet upcoming redemptions.

15.    From July to September 2020, the company raised the rate of return on customer loans in an attempt to attract fresh capital, even as broader U.S. market interest rates were declining. The decisions around how to set customer lending returns were made by Cred's investment committee and were based solely on Cred's ability to raise more capital and to compete against Cred's main competitors.

***CredBorrow and Cred's Use of Customer Collateral***

16.    Another product that Cred offered was to loan money to customers who "pledged" their cryptocurrency assets to Cred as collateral.   Under this CredBorrow program, customers would transfer their digital assets to Cred and be able to borrow money against that collateral.

17.    Rather than maintain the collateral intact in a wallet, Cred used this collateral to pay normal business expenses, fund the loan by selling the collateral, invest, and pay redemptions to prior CredEarn customers.

***Misleading Post-petition Financial Reporting***

18.     I have reviewed the balance sheet titled "Cred, Inc. and its affiliates Pro-Forma Assets and Liabilities as of: November 7, 2020" provided as an Exhibit to the November 9, 2020 Declaration of Drew McManigle on behalf of the Debtors.  (the "Balance Sheet," Decl. of Drew McManigle, App. "B" attached thereto, Docket no. 16).

19.     According to the Balance Sheet footnotes, "all items presented herein have been subject to mark-to-market adjustments as of the Petition Date (November 7, 2020)" and "...Pro-Forma Assets and Liabilities were derived from preliminary key balance sheet data provided by Debtors' executives..." *Id.*

20.     Based on my knowledge of Cred's financial situation when I left the company in November 2020, the Balance Sheet contains clearly false and/or misleading entries, to wit:

     *a.*     In the Asset column, the Balance Sheet makes reference to $14.709 million in "Crypto-Currency".  *Id.*   The accompanying footnote explains that this entry "[i]ncludes $964K of LibraToken, $8.5MM of TAP and $2.7MM of Universal Protocol Token which are considered illiquid crypto-currencies."  *Id.* at n. 2.   In fact, these digital assets were nearly worthless at the time of the bankruptcy filing given the limited exchange liquidity.  The impact of this was illustrated in the following weeks after when each of the assets fell significantly in value.

     *b.*     The entry "5) Cred issued Loans", in the Asset column, consists entirely of the abovementioned loan to insider owned moKredit.   Here, the accompanying footnote makes due note that moKredit "has not yet paid any outstanding principal" and that "the account balance may be partially or completely uncollectible."  *Id.* at n. 5.  However, the Balance Sheet is misleading

in that it does not mention that the moKredit loan was in default since April 2020 and that the loan is not secured by any liquid collateral. No impairment adjustments were ever applied to the balance of the loan, despite the claim that the amounts may be 'completely uncollectible'.

      *c.*      In the Asset column, the item "Customer loans," valued at $9.808 million, is misleading, even with the accompanying footnote.  *Id.* at n. 6.  These customer loans were made by Cred against those customer-borrower's pledge of cryptocurrency as collateral, as it appears in the Liabilities column under "Customer Collateral" of $20.880 million.    The Balance Sheet does not mention that Cred did not properly maintain the customer collateral and therefore has no hope of ever recovering on the customer loans.

      *d.*      Taken together, the misrepresentations and omissions around the worthless crypto-currency ($14.709 million), the uncollectible loan to moKredit ($39.074 million) and the uncollectible Customer loans ($9.808 million) mean that there may be an additional $63.591 million that is unavailable to the Debtor's bankruptcy estate.

21.     It is my opinion that Cred has no chance of undergoing a successful reorganization or sale of its business as an ongoing concern because lending is a business based on trust and cryptocurrency expertise.   Based on my extensive knowledge of the crypto space, Cred's competitors do not need to pay for its financial platform (they already have their own platforms) nor their customers.

22.     I have reviewed Krzysztof Majdak and Philippe Godineau's Motion for Entry of an Order Pursuant to 11 U.S.C. §1112(b)(i) Dismissing the Cases; (ii) Converting the Cases to a

Chapter 7 Liquidation; or (iii) Appointing a Chapter 11 Trustee [Dkt. no. 62], and found the facts

stated therein to be true and correct to the best of my knowledge.


Dated: December 1, 2020
Denver, Colorado

_____*/s/ Daniyal Inamullah*_____
            DANIYAL INAMULLAH