IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CRED INC., *et al.*,<br><br>Debtors. | Chapter 11<br>Case No. 20-12836 (JTD)<br>Jointly Administered |

**RESPONSE OF JAMES ALEXANDER TO THE
MOTION OF KRZYSZTOF MAJDAK AND PHILIPPE GODINEA
FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. § 1112(b)
(I) DISMISSING THE CASES; (II) CONVERTING THE CASES TO A
CHAPTER 7 LIQUIDATION; OR (III) APPOINTING A CHAPTER 11 TRUSTEE**

James Alexander ("Alexander") respectfully responds to the motion (the "Motion")[1] of Krzysztof Majdak and Philippe Godinea (the "Movants") pursuant to 11 U.S.C. § 1112(b) seeking dismissal, conversion or the appointment of a Chapter 11 trustee in these cases.

## INTRODUCTION

1. Alexander is the sole rightful director of debtor Cred Capital, Inc. ("Cred Capital") which is the Debtor at case 20-12838.

2. Alexander anticipates filing his own motion to dismiss the Cred Capital case because the bankruptcy filing was not authorized by Cred Capital's rightful board of directors or sole voting shareholder.

3. Alexander joins Movants in the request to dismiss the Cred Capital case. To the extent the Court determines that dismissal of the Cred Capital case is not appropriate at this time, Alexander joins the request of Movants for the appointment of a Chapter 11 trustee subject to Alexander's right to seek dismissal at a later date.

---

[1] ECF 62

4.      Alexander also joins Movant's request to convert the other cases to Chapter 7 or to appoint a Chapter 11 trustee in those cases.

5.      Alexander objects to the conversion of the Cred Capital case to chapter 7. To the extent the Court converts the Cred Capital case to chapter 7, Alexander respectfully requests the conversion be subject to Alexander's right to seek dismissal of the case in the future.

## BACKGROUND

6.      Alexander's principal role in this case is as the sole, valid director of Cred Capital and the holder of a voting proxy from Cred Capital's sole, valid voting shareholder.

7.      Daniel Schatt ("Schatt") and Joseph Podulka ("Podulka") (collectively, the "Disputed Directors") claim that they are the directors of Cred Capital. But, as explained in this response, they are not.

8.      Although, from Alexander's perspective, the issues primarily deal with narrow questions of corporate governance and Cred Capital's lack of corporate authority to file the bankruptcy petition, the Debtors have made the larger question about whether Alexander is to blame for the Debtors' financial collapse.[2]

9.      Debtors filed an adversary proceeding against Alexander[3] and blame him for the collapse.[4] Debtors claim the collapse was caused by Alexander's alleged defalcation of $3.75 million.[5] Alexander denies any defalcation or misconduct and will testify under oath concerning this matter.

---

[2] ECF 12, paragraph 18
[3] Case number 20-51006
[4] ECF 12, paragraph 18
[5] ECF 12

10. In contrast, Movants, third-party creditors, do not appear to blame the Debtors' downfall on a relatively small[6] alleged defalcation by Alexander. Movants assert there are much bigger problems with the Debtors which they characterize as a fraud perpetuated by Debtors in "Madoff" level proportions.[7]

11. In their motion to convert, the Movants point out that the alleged shortfall in this case is likely to exceed $100 million.[8] Movants characterize Debtors' operations as an "unlicensed hedge fund" in which customers loaned cryptocurrency to the Debtors who used the assets to try to generate a return on investment.[9] Movants assert $14.7 million in cryptocurrency listed on the Debtors' balance sheet may be "fictitious."[10] Movants highlight that the Debtors' first day declaration indicates that a $39 million receivable owed by an insider owned entity may be uncollectible.[11] The Movants also point out that the Debtors apparently lost $10 million to an "outside fraudster."[12]

12. Ultimately, the Movants conclude: "Judging from the facts given, it seems likely, if not certain, that Debtors' operations tipped into the realm of all Ponzi Schemes, whereby Debtors would use new investor money to pay redemptions owed to prior investors."[13]

13. At some point, the Court may need to decide whether the Debtors' were operating a Ponzi scheme and whether the Debtors' claims about Alexander are accurate and if Alexander's

---

[6] Small in comparison to the $100 million plus deficiency in these cases.
[7] ECF 62, paragraph 1; Alexander does not agree the dollar value is comparable to the *Madoff* case.
[8] ECF 62, paragraph 10
[9] ECF 62, paragraph 22
[10] ECF 62, paragraph 10
[11] ECF 62, paragraph 11; see also ECF 16, page 15 of 15, footnote 5
[12] ECF 62, paragraph 26
[13] ECF 62, paragraph 31

conduct caused the financial collapse.[14] However, the Court does not need to decide these issues in connection with the current Motion with respect to Cred Capital. The Cred Capital case should be dismissed because it was not authorized by the sole legitimate director of Cred Capital or by Cred Capital's sole voting shareholder.

### The Formation of Cred Capital

14. Given that Debtors blame their financial collapse on Alexander's conduct with respect to Cred Capital, and not on the Ponzi scheme alleged by Movants, one might assume Cred Capital was a well-established business which was central to the Debtors' operations. It was not. Cred Capital is actually a newly formed entity, without substantial operations, which was capitalized by non-debtor funds.

15. Cred Capital was formed on March 10, 2020 by a paralegal from the Chicago office of Bryan Cave[15] named Rebecca Floren (the "Sole Incorporator").[16]

### The Sole Incorporator Appoints Alexander as the Sole Director

16. On April 16, 2020, the Sole Incorporator signed a written consent, dated as of March 10, 2020[17], appointing Alexander as the sole director of Cred Capital.[18] Pursuant to the written consent, the Sole Incorporator assigned all of the Sole Incorporator's rights, responsibilities and duties as incorporator to Alexander.[19]

---

[14] Apparently, a number of the Debtors' former employees also dispute the Debtors' assertions. See, https://www.coindesk.com/bad-loans-bad-bets-bad-blood-how-crypto-lender-cred-really-went-bankrupt
[15] Exhibit 2. The law firm's Chicago address is listed as the address of the incorporator in the certificate of incorporation.
[16] Exhibit 2
[17] The metadata for the PDF files shows it was created on April 16, 2020.
[18] Exhibit 3
[19] Exhibit 3

### The Voting and Non-Voting Classes of Stock

17. The Certificate of Incorporation established two classes of common stock: Series "A" and Series "B".[20] The Series "A" shareholders are the only shareholders with voting rights.[21] The Series "B" shareholders have no voting rights.[22]

18. The Certificate of Incorporation for Cred Capital provides that the board of directors is elected by the Series "A" shareholders.[23]

### Series "A" Voting Stock is Issued

19. On April 1, 2020, Cred Capital issued series "A" preferred stock to third party investor, Zobar Agha (the "Voting Shareholder"), pursuant to a stock purchase agreement whereby the Voting Shareholder committed $1 million to capitalize Cred Capital, with amounts and timing of draws determined at the sole discretion of Alexander.[24] The series "A" preferred stock was the only voting stock issued by Cred Capital[25] and the Voting Shareholder was the only shareholder entitled to vote pursuant to the certificate of incorporation.[26]

### Series "B" Non-Voting Stock is Issued

20. Pursuant to a contribution agreement dated as of March 16, 2020, Cred Capital issued fifty percent (50%) of the Series "B" non-voting stock to Cred, Inc.[27]

21. The contribution agreement required Cred, Inc. to contribute $2 million of cash or in-kind assets, the combination and timing of draws determined at the sole discretion of Alexander,

---

[20] Exhibit 2
[21] Exhibit 2
[22] Exhibit 2
[23] Exhibit 2
[24] Exhibit 4
[25] Exhibit 2, article 2
[26] Exhibit 2
[27] Exhibit 5

over a two-year period to capitalize Cred Capital. In addition, Cred, Inc. executed an asset management agreement[28] between Cred Capital and Cred, Inc., which gave Cred Capital exclusive right to manage Cred Inc. assets over a two-year period.[29]

22. The contribution agreement provided the failure of Cred, Inc. to make any portion of the $2 million contribution would result in the proportionate forfeiture of the stock.[30]

23. Cred, Inc. did not make any of the capital contribution required by the contribution agreement.

24. The contribution agreement[31] and asset management agreement[32] between Cred Capital and Cred, Inc. were both electronically signed by Schatt on behalf of Cred, LLC. Schatt is one of the Disputed Directors and the chief executive of the Debtors except for Cred Capital.

25. The contribution agreement[33] and asset management agreement[34] were also signed by Alexander in his capacity as an officer of Cred Capital.

26. Pursuant to a second contribution agreement dated March 31, 2020,[35] Cred Capital issued the remaining fifty percent (50%) of the Series "B" non-voting stock to non-debtor Lu Hua ("Hua") who is a founder and insider of the Debtors. This contribution agreement was electronically signed by Alexander in his capacity as president and chief executive officer of Cred Capital. [36]

---

[28] Exhibit 6
[29] Exhibit 5
[30] Exhibit 5
[31] Exhibit 5
[32] Exhibit 6
[33] Exhibit 5
[34] Exhibit 6
[35] Exhibit 7
[36] Exhibit 7

27. The contribution agreement between Cred Capital and Hua required Hua, pursuant to a separate assignment agreement,[37] to contribute 300 bitcoin to Cred Capital which had an approximate value of around $2,000,000 at the time the agreement was executed.

28. Contrary to the position taken by the Debtors[38], the contribution agreement establishes Hua did not loan the bitcoin to the Debtors for contribution to Cred Capital.[39] Rather, Hua made a direct contribution of the 300 bitcoin to Cred Capital.[40] This is important because the Debtors made zero investment into Cred Capital and the funds remaining in Cred Capital came from Hua and not the Debtors. The Debtors' only property interest in Cred Capital is the 50% ownership of the non-voting Series "B" stock which is subject to forfeiture because Cred, Inc. has not made any of the required $2 million contribution.[41]

### Debtors' General Counsel was Involved at Every Step

29. The formation of Cred Capital was at all times overseen by the Debtors' former general counsel, Daniel Wheeler ("Wheeler"), who is a former shareholder at Bryan Cave. Specifically, while employed as general counsel for the Debtors, Wheeler reviewed, and drafted or contributed to the drafting of, the operative documents including the certificate of incorporation, the Series "A" stock purchase agreement, the Series "B" contribution agreements and the asset management agreement.

---

[37] Exhibit 8
[38] ECF 12, paragraphs 21 to 25
[39] If the Debtors file schedules pursuant to 11 U.S.C. § 521 listing Hua as a creditor for this amount, those schedules will be false.
[40] Exhibit 7
[41] Exhibit 5

### Voting Shareholder Gives Proxy to Alexander

30. Pursuant to an irrevocable proxy[42] dated April 6, 2020, the Voting Shareholder delegated his right to vote to the Alexander.

### The Falling Out Between Schatt and Alexander

31. As the Debtors' collapse, which was mostly caused by the uncollectability of the $39 million bad loan to Hua's company, became increasingly likely, there was a falling out between Schatt and Alexander. Schatt began blaming Debtors' precarious position on Alexander including the assertion that the $10 million fraud perpetrated by a third-party was Alexander's fault even though the transaction was approved by both Schatt and the appropriate committee at Cred.

32. Schatt apparently desired to improve the Debtors' liquidity and consolidated balance sheet and an easy way to do that would bring the 300 bitcoin held by Cred Capital with an approximate value of $2 million under the umbrella of the Debtors. This was a change of strategy for Schatt because the initial plan for Cred Capital was for it to be independent of the other Debtors[43] so it would not be brought down by any financial collapse of Cred, Inc.[44]

33. Debtors now claim that Alexander was assigned the job of organizing Cred Capital as if it was a ministerial task to be performed by Alexander in his capacity as an employee of the other Debtors. However, this characterization is at odds with the written correspondence between

---

[42] Exhibit 9
[43] Schatt stated in a June 3, 2020 email to Alexander "I'd like to make sure Cred Capital has its autonomy while we work to set up both companies for success." (Exhibit 9). Schatt's email also stated: "To ensure you have the autonomy you need to operate Cred Capital, we can put together a Board Approved 'Delegation of Authority' document." (Exhibit 9)
[44] Paragraph 22 of the complaint in the adversary proceeding against Alexander states Cred Capital was formed as part of a "broader corporate strategy aimed at diversifying Cred's fund allocations." This statement may be a euphemism considering the Debtors' collapsing financial position put it in much more of a survival mode than in a strategic diversification mode.

Schatt and Alexander which reflect negotiations between the parties.[45] Instead of being merely a tool for the creation of Cred Capital, the parties treated Alexander as being in charge of Cred Capital which is why Schatt was negotiating with Alexander and not directing Alexander's conduct.

34. On May 31, 2020 Alexander's employment with Debtors was terminated and he assumed the role of President at Cred Capital on June 1, 2020. Cred Capital operated as an independent entity, which maintained its own capitalization from non-debtor assets, and its own bank account, employees, human resources and technology infrastructure, all under the direction of Alexander, independent of Cred Inc.

**The Unauthorized Amendments to Cred Capital's Corporate Documents**

35. Schatt then took steps to change operative corporate documents of Cred Capital to cut Alexander and the Voting Shareholder out.

36. Even though Schatt signed the Series "B" contribution agreements months earlier, Schatt claims he "discovered that Cred Capital was not organized in accordance with Cred's specifications" on or about May 30, 2020.[46] Schatt, through the Debtors, complains the Series "B" shares have no voting rights[47] yet Schatt signed the Series "B" contribution agreement on behalf of Cred, Inc.[48]

37. On June 22, 2020, Podulka filed an amended and restated certificate of incorporation[49] for Cred Capital which recited that it was "duly adopted by the board of directors of [Cred Capital] and by the stockholders of [Cred Capital] in accordance with sections 242 and

---

[45] Exhibit 10
[46] Adversary complaint, paragraph 25
[47] Adversary complaint, paragraph 25
[48] Exhibit 5
[49] Exhibit 11

9

245 of the Delaware General Corporation Law and by the written consent of the stockholders of the corporation in accordance with Section 228 of the Delaware General Corporation Law."

38. The problem is that the board of directors did not approve the amendment because Alexander was the sole director pursuant to the March 10, 2020 written consent of the Sole Incorporator.[50] The shareholders did not approve the amendment either because Alexander held the Voting Shareholder's proxy[51] and the Series B shareholders had no right to vote.[52]

39. On June 28, 2020, about a week after filing the amended and restated certificate of incorporation, Podulka signed and then filed a certificate of correction for the certificate of incorporation which added a provision to the certificate of incorporation to name the Disputed Directors as the initial directors of Cred Capital.[53]

40. To use a cliché, Podulka's filings put the cart before the horse.

41. Neither of these filings assert that there was a mistake in the original creation of Series "A" and Series "B" stock. The only asserted mistake made by the filings is that the original certificate of incorporation failed to name the Disputed Directors as directors.[54]

42. Even though no mistake was asserted in the classification of the stock, and Schatt actually signed the Series "B" contribution agreement for Cred LLC, the amended and restated certificate of incorporation, among other things, eliminated the distinction between the Series A and Series B stock.[55] The amendment also converted the Series "A" stock, which the amendment defines as the "Old Common Stock," to one (1) share of new common stock.[56] Instead of having

---

[50] Exhibit 3
[51] Exhibit 9
[52] Exhibit 2
[53] Exhibit 12
[54] Exhibit 12, paragraph 3
[55] Exhibit 11
[56] Exhibit 11

100% of the voting stock, the Voting Shareholder now has 0.1% of the new voting stock according to the Debtors. No mistake was alleged but the Disputed Directors took away the Voting Shareholder's control rights anyway. This is something directors are not permitted to do. The original certificate of incorporation required the consent of the Voting Shareholder to modify the Voting Shareholder's voting rights.[57]

43. Podulka's two filings are facially defective. The June 22, 2020 filing is premised on Podulka being a director of Cred Capital, but he was not appointed a director, according to the papers he signed and filed, until June 28, 2020.[58] The two filed documents are out of temporal order which highlights the fatal flaw that they were not appropriately authorized in the first place.

44. By filing two papers with the secretary of state, the Disputed Directors attempted a *de facto* coup to gain control over Cred Capital. Prior to filing these two papers, the Disputed Directors were not directors or shareholders of Cred Capital. They did not represent any shareholders with voting rights because the Series "B" shareholders, Cred, Inc. and Hua, were not entitled to vote. And because they were not authorized to file the documents, they have no effect.

45. Simply put, unauthorized persons cannot appoint themselves directors of a company merely by filing papers with the Department of State.

46. The amendments to the corporate documents were ostensibly made pursuant to 8 *Del. C.* §108(d) which authorizes the principal of the incorporator to take action in the event the incorporator is not available. There are, at least, three problems with the Disputed Directors' invocation of section 108(d).

---

[57] Exhibit 2, article 3.3
[58] Exhibit 12

47. First, section 108(d) requires that the instrument recite the incorporator's unavailability and the reason why. But neither document filed by Podulka states the Sole Incorporator's unavailability or the reason for such purported unavailability.

48. Second, it is difficult to imagine that the Sole Incorporator, a paralegal at a large and preeminent law firm, would not be available to correct any error unless it wasn't an error and the Sole Incorporator refused to take inappropriate action requested by the Disputed Directors.

49. Third, the Sole Incorporator had already appointed the board of directors before the filings by Podulka. As a result, the Sole Incorporator, and anybody acting in place of the Sole Incorporator, lacked authority to modify the incorporation documents. Rather, that authority rested solely with Alexander as the sole member of the board of directors and the Voting Shareholder.

### The Pending Chancery Court Matter

50. Presently pending in the Chancery Court is Alexander's complaint[59] seeking, *inter alia*, a determination that Alexander is the sole director of Cred Capital and that the Disputed Directors have never been directors of Cred Capital.[60]

51. The Chancery Court halted proceedings on the complaint based on the automatic stay.

---

[59] Exhibit 1
[60] The complaint also seeks a determination any action taken by the Disputed Directors is invalid. However, Alexander does not intend to seek Chancery Court relief on this issue because that relief would implicate two issues which are probably more appropriately addressed by this Court: (1) the corporate authority of Cred Capital to file the bankruptcy petition; and (2) the stock issued by the Disputed Directors to Cred LLC.

## ANALYSIS

**A.  The Cred Capital case should be dismissed for lack of corporate authorization.**

52. The Cred Capital case must be dismissed because Cred Capital lacked valid corporate authority to file the case in the first place. A "party cannot subject an entity to bankruptcy without authority." *In re FKF Madison Park Grp. Owner, LLC*, 2011 WL 350306, at *3 (Bankr. D. Del. Jan. 31, 2011).

53. A bankruptcy court lacks subject matter jurisdiction over a bankruptcy petition filed without the required corporate authority. *In re Mid-South Business Associates, LLC*, 555 B.R. 565, 570 (Bankr. N.D. Miss. 2016) (citing *In re Delta Starr Broadcasting, L.L.C.*, 422 F. App'x 362, 368 (5th Cir. 2011)).

54. As the Supreme Court has held, "[i]f the [court] finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative but to dismiss the petition." *Price v. Gurney*, 324 U.S. 100, 106 (1945). *See also, In re Franchise Servs. of N. Am., Inc.*, 891 F.3d 198, 206-8 (5th Cir. 2018), as revised (June 14, 2018) ("If the petitioners lack authorization under state law, the bankruptcy court 'has no alternative but to dismiss the petition.' *Price*, 324 U.S. at 106, 65 S.Ct. 513. . . . Absent a duly authorized petition, the bankruptcy court has no power 'to shift the management of a corporation from one group to another, to settle intracorporate disputes, and to adjust intracorporate claims.' *Id.*"); *Hager v. Gibson*, 108 F.3d 35, 39 (4th Cir. 1997) ("[W]here a voluntary petition for bankruptcy is filed on behalf of a corporation, the bankruptcy court does not acquire jurisdiction unless those purporting to act for the corporation have authority under local law to institute the proceedings.") (citation and internal quotation marks omitted); *Keenihan v. Heritage Press, Inc.*, 19 F.3d 1255, 1258 (8th Cir. 1994) ("A person filing a voluntary bankruptcy

petition on a corporation's behalf must be authorized to do so . . . ."); *In re S & R Grandview, LLC*, 2013 WL 5525729, at *1 (Bankr. E.D.N.C. Oct. 4, 2013) ("A bankruptcy court cannot establish jurisdiction over a petitioning entity where the individual instituting the proceeding lacks authority under state law or the corporate governing instruments.").

**B.    Schatt Did Not Have Authority to File the Cred Capital Petition**

55.    State law governs corporate authority to file petitions for relief under the Bankruptcy Code. *Price* at 106; *see also In re Nica Holdings, Inc.*, 810 F.3d 781, 789 (11th Cir. 2015); *In re Franchise Servs. of N. Am., Inc.*, 891 F.3d 198, 206-8 (5th Cir. 2018), as revised (June 14, 2018) ("State law thus determines who has the authority to file a voluntary petition on behalf of the corporation. If the petitioners lack authorization under state law, the bankruptcy court 'has no alternative but to dismiss the petition.'") (citations omitted). In this case, Delaware corporate law governs the question of authority to file because Cred Capital is a Delaware corporation.

56.    Under 8 *Del. C.* § 141(a), "[t]he business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation."

57.    Cred Capital's Certificate of incorporation (either the original or the unauthorized amendment) does not change the default rule under section 141(a). Therefore, Cred Capital's board of directors is vested with the authority to authority to file petitions for relief under the Bankruptcy Code.

58.    Because Alexander was the sole rightful director and held the voting proxy for the sole Voting Shareholder, only Alexander could authorize the bankruptcy filing by Cred Capital. That did not happen and the filing made by Schatt was ineffective. As discussed previously, the

Disputed Directors were not valid or legitimate directors and lack the authority to approve the filing of the Cred Capital bankruptcy case.

59. As a result, Cred Capital was not authorized to file the bankruptcy petition and the Cred Capital case must be dismissed.

**C.    The other cases should be converted.**

60. The Movants are correct that there is no hope for reorganization for the Debtors other than Cred Capital. Future operations are unlikely as the Debtors' have lost the confidence of investors like Movants and have lost credibility.[61] Simply put, no rational person would permit the existing management team to handle their funds.

61. Movants raise legitimate concerns of the existence of a Ponzi scheme for the non-Cred Capital Debtors.

62. There is also significant evidence that $39 million was lost to an insider. Current management repeatedly rebuffed the requests of the investment committee, which included Alexander, to address the situation.

63. As a result, it appears current management is conflicted in its dealings with the insider and a chapter 7 trustee should be appointed to make sure appropriate action is taken to avoid continuing loss to the estates.

WHEREFORE, Alexander respectfully requests:

a) dismissal of the Cred Capital case;

b) conversion of the other cases to chapter 7;

---

[61] The Debtors have failed to disclose to this Court certain material events, including at least three hacks that resulted in the loss of an estimated $3.5 million of investor assets. Additionally, the Debtors have not disclosed their lavish spending, including renting an entire private golf club to host approximately fifty investors October 22-23, at an estimated $250,000 just two weeks before filing for bankruptcy protection.

c) to the extent the Court converts the Cred Capital case to chapter 7, the conversion should be subject to Alexander's right to seek dismissal at a later time.

Respectfully submitted,

**BUCHANAN INGERSOLL & ROONEY PC**

/s/  Geoffrey G. Grivner
Geoffrey G. Grivner (#4711)
919 North Market Street, Suite 990
Wilmington, DE 19801
Telephone:  (302) 552-4200
Facsimile:   (302) 552-4295
Email: geoffrey.grivner@bipc.com

*Attorneys for James Alexander*

Dated:  December 2, 2020