**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | )     Chapter 11 |
| CRED INC., et al.[1] | )     Case No. 20-12836 (JTD) |
| | )     (Jointly Administered) |
| Debtors. | )     **Docket No. 62** |

**PARTIAL JOINDER OF JAMIE SHILLER, TAKASHI YANAGI, WU CHI KING,
JOSEPH RICHARDSON, THOMAS CALVERT, CLINT COWEN, ROBIN HOUCK,
TODD WISEMAN, MATTHEW DIXON, JONATAN ASHUROV, DANIEL BECKER,
TEPPEI MIYAUCHI, JEAN VACCA, XIAN SU, AND ERIC SCHURMAN TO MOTION
TO DISMISS THE BANKRUPTCY CASES, CONVERT THE CASES TO CHAPTER 7,
OR APPOINT A CHAPTER 11 TRUSTEE**

Jamie Shiller, Takashi Yanagi, Wu Chi King, Joseph Richardson, Thomas Calvert, Clint

Cowen, Robin Houck, Todd Wiseman, Matthew Dixon, Jonatan Ashurov, Daniel Becker, Teppei

Miyauchi, Jean Vacca, Xian Su, and Eric Schurman (collectively, the "Movants"), hereby file this

partial joinder (the "Partial Joinder") to the motion of Krzysztof Majdak and Philippe Godinea for

entry of an order pursuant to section 1112(b) of title 11 of the United States Code (the "Bankruptcy

Code") directing that these Chapter 11 cases be (i) dismissed; (ii) converted to cases under Chapter

7 of the Bankruptcy Code; or alternatively (iii) for the appointment of a Chapter 11 trustee [Docket

No. 62] (the "Motion to Dismiss") and in support of the Partial Joinder, the Movants respectfully

state as follows:

**JURISDICTION AND VENUE**

1.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

2.      Venue of this proceeding and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The Movants are claimants who had transferred to the Debtors certain bitcoin with a collective value in excess of present value over $65,000,000 USD.  Each of the Movants has standing to be heard pursuant to 11 U.S.C. § 1109(b).

4.      An official committee of unsecured creditors has not yet been appointed in these cases.

## BACKGROUND

5.      The Debtors according to mycred.io website purported to be a financial platform comparable to a bank. Among other things, Cred claimed:

    a.  You don't have to sell your crypto to cash in on it

    b.  Pledge digital assets you're holding with our partners, including Bitcoin.com, Klever or Bitbuy.

    c.  Cred pays interest monthly in crypto, stablecoin or fiat. **After 6 months, your crypto is returned to you.**



6.      In the months immediately prior to November 2020, the Debtors continued to hold themselves out to potential investors such as the Movants as being a secure investment facility. What investors such as the Movants did not know (and could not have known) is that the Debtors had been defrauded of more than $10 mil. of bitcoin and allowed an insider to steal additional bitcoin.  At the same time, the Debtors had lost more than $68 million more, either through gross mismanagement, malfeasance, or some other, perhaps more sinister means.

7.      In September 2020, as the Debtors continued to attempt to raise new funds, they never disclosed to potential investors that the Debtors were in significant financial peril.  At the same time, the Debtors dropped the following provision from their form of investment contracts:

> 44 Financial Information. All financial and other information that has been or will be supplied to the Lender is sufficiently complete to give the Lender accurate knowledge of the Borrower's financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to the Lender, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of the Borrower.

8.      On November 7, 2020, the above-captioned debtors (the "Debtors") each filed voluntary bankruptcy petitions thereby initiating the above-referenced bankruptcy cases (the "Chapter 11 Cases").  No official committee has yet been appointed by the Office of the United States Trustee.

9.      On November 8, 2020, the Debtors filed the declaration of the Debtors' co-founder and Chief Executive Officer of Cred Inc., Daniel Schatt, in support of Debtors' Chapter 11 petitions and first day motions (the "Schatt Declaration") [Docket No. 12]. In the Schatt Declaration, Mr. Schatt stated the reason for the filing of these cases was a confluence of events, including:

a.  In March 2020, the former Chief Capital Officer, James Alexander, failed to appropriately issue new securities for the Debtors, which resulted in Cred Capital never receiving certain capital;

b.  In a series of transactions in February and April 2020, the Debtors' former Chief Capital Officer, James Alexander, directed the transfer of a total of 800 bitcoin to an entity.

c.  In July 2020, the Debtors discovered that Mr. Alexander had absconded with $3 million of bitcoin that had been loaned to the Debtors;

d.  In July 2010, the Debtors discovered the theft of 800 bitcoin worth over $10 million of bitcoin by an imposter hired by the Debtors; and

e.   Costs devoted to litigating against Mr. Alexander.

10.     It appears that a number of the representations in the Schatt Declaration may have been inaccurate, or at best, a selective recitation of facts.  Among other things, the Movants understand:

a.  The $1 million of ordinary trade debt referenced in Paragraph 17 in the Schatt Declaration likely relates to liability associated with JST Capital that resulted from having millions liquidated as a result of market volatility in Mid-March, but Cred never disclosed this specific loss (as well as others that occurred during 2019), and such loss is even greater than the James Alexander and Quantcoin

situations, combined.  The Movants believe that this loss evidences the Debtors' gross mismanagement.

b.  There were material losses caused by the Debtors hiring and entrusting a fraudulent asset manager and by the alleged theft by the Debtors' former Chief Capital Officer, James Alexander, referenced in Paragraph 18 of the Schatt Declaration, but the Debtors' CEO and CFO both sat on the investment committee, and they could have stopped the misappropriation of the Debtors' digital assets.

c.  In Paragraph 18 of his declaration, Mr. Schatt fails to include that hundreds of BTC and ETH were liquidated as a result of leverage, which then left them net short on the loan portfolio.  Further, the Debtors also requested significant funds back from MoKred (which is not mentioned), that they could not fulfill. The "trade payable" is related to this item, but it is never discussed in detail.  This obligation is not a "normal" trade liability of the Debtors.

d.  In Paragraph 22 of his declaration, Mr. Schatt stated that "Mr. Alexander assigned only Class B, non-voting shares to Cred, and assigned Class A voting shares to a purported third-party 'investor' who purported to give Mr. Alexander a proxy to control the vote on the Class A voting shares." In actuality, both Mr. Schatt and Mr. Hua signed investment agreements to facilitate this arrangement.

e.  Mr. Hua signed an agreement to use the 300 BTC as an equity contribution to Cred Capital. There was never an agreement signed between Mr. Hua and Cred LLC as to the initial purpose of the 300 BTC and the assets were initially used as intended. Cred LLC separately directed Cred Capital to provide assets in order to pay interest payments using customer assets for Mr. Hua's 300 BTC personal loan – an extreme conflict of interest. These documents are public in the current litigation between Cred and James Alexander.

f.  Paragraph 29 of the Schatt Declaration does not adequately or accurately explain the segregation of customer assets from corporate assets. Although the loan documents purport that all CredEarn programs are "Corporate Assets" the structure functions exactly like a bank without a lender of last resort. If Cred were to segregate "corporate assets" from "client assets," it is clear that "client assets" were being used for redemptions, operating expenses, legal expenses, bankruptcy expenses, etc. New equity capital that was being brought on should not have been used for liquidity purposes in the first place, as the plans for the new capital was to expand the business into other products.

g.  Paragraph 30 of the Schatt Declaration is inaccurate.  There was never a renegotiated repayment schedule that was agreed to by Cred's investment committee.  MoKred essentially was given a long leash by the CEO to send back what it wanted.  Given the lack of financial reporting demanded by Cred ,

the default related to the March 2020 request for principal, and the opaqueness of the business relationship (which was clearly a conflict of interest given the economic relationships and lack of financial controls), a liquidity situation was inevitable. Cred could have executed its rights as a senior lender to recover assets as soon as possible.  Requests were made consistently to the investment committee and were rejected by the CEO.

h.  The $13 million loss addressed in Paragraph 36 of the Schatt Declaration could have been potentially absorbed by the company's balance sheet.  The true reason for the Debtors' massive "short position" was the frequent use of highly leveraged hedges that were liquidated during periods of greater market volatility. Assuming the losses only total the "missing" $13 million, even a 50% increase in prices should have presented a hole of only $20 million, not the more than $90 million of potential losses presented by Debtors.  The idea that this was only related to the fraudulent event and James Alexander is not accurate. Upon information and belief, the Debtors refused to perform a solvency analysis despite multiple requests.

11.     On November 8, 2020, the Debtors also filed the declaration of Drew McManigle, founder and Chief Executive Officer, Macco Restructuring Group, LLC (the "McManigle Declaration") [Docket No. 16].  In his declaration, Mr. McManigle states that the Debtors have approximately $67,839,000 in assets, including loans and assets under management, and over $136,499,000 in liabilities.  See McManigle Declaration, Exhibit B.  Accordingly, even accepting that they have more than $67.8 million of assets under management, the Debtors have lost almost $70 million of value in less than two years since they were created.  It now appears that based on the information of insiders as described above, these staggering losses were hidden from both the investors and the sales team.  Further, it appears that the information contained in the McManigle Declaration was also inaccurate.

12.     As set forth in the Declaration of Daniyal Inamullah in Support of the Motion to Dismiss, as defined herein [Docket No. 97] (the "Inamullah Declaration"), one of the biggest items on Cred's balance sheet was a $39 million loan to a Chinese entity called moKredit, which was created by a Cred founder, Lu Hua.  Inamullah Declaration, ⁋ 9.

13.     Additionally, it appears that, among other things, Mr. McManigle misrepresented the value of the estates' assets as follows:

-    In the Asset column, the Balance Sheet makes reference to $14.709 million in "Crypto-Currency". *Id.* The accompanying footnote explains that this entry "[i]ncludes $964K of LibraToken, $8.5MM of TAP and $2.7MM of Universal Protocol Token which are considered illiquid crypto-currencies." *Id.* at n. 2. In fact, these digital assets were nearly worthless at the time of the bankruptcy filing given the limited exchange liquidity. The impact of this was illustrated in the following weeks after when each of the assets fell significantly in value.

-    The entry "5) Cred issued Loans", in the Asset column, consists entirely of the abovementioned loan to insider owned moKredit. Here, the accompanying footnote makes due note that moKredit "has not yet paid any outstanding principal" and that "the account balance may be partially or completely uncollectible." *Id.* at n. 5. However, the Balance Sheet is misleading in that it does not mention that the moKredit loan was in default since April 2020 and that the loan is not secured by any liquid collateral. No impairment adjustments were ever applied to the balance of the loan, despite the claim that the amounts may be 'completely uncollectible'.

-    In the Asset column, the item "Customer loans," valued at $9.808 million, is misleading, even with the accompanying footnote. *Id.* at n. 6. These customer loans were made by Cred against those customer-borrower's pledge of cryptocurrency as collateral, as it appears in the Liabilities column under "Customer Collateral" of $20.880 million. The Balance Sheet does not mention that Cred did not properly maintain the customer collateral and therefore has no hope of ever recovering on the customer loans.

-    Taken together, the misrepresentations and omissions around the worthless crypto-currency ($14.709 million), the uncollectible loan to moKredit ($39.074 million) and the uncollectible Customer loans ($9.808 million) mean that there may be an additional $63.591 million that is unavailable to the Debtor's bankruptcy estate.

Inamullah Declaration, ¶ 20.

14.     Further, in the summer of 2020, the Debtors needed to, but could not raise additional funds after the Debtors determined that a fraudulent investment manager was discovered to have stolen 800 bitcoin, and after moKredit failed to follow through on their principal repayment plan.   Cred needed this infusion of funds from fresh customer lending in order to repay older obligations to prior customers for their guaranteed 12% returns.  See Inamullah Declaration, ¶¶ 6 and

13.  Mr. Inamullah further stated that revenue channels available to repay loan principal and interest to lenders were reduced on a monthly basis as the Debtors needed to pull assets from income generating sources to meet upcoming redemptions.  Inamullah Declaration, ¶ 13.

15.     Taken together, the Debtors ultimately may turn out to have been no more than a Ponzi scheme since at least March 2020, when the company knew it was insolvent, but continued to raise money from new investors.

**The Motion to Dismiss**

16.     On November 18, 2020, Krzysztof Majdak and Philippe Godinea (the "Motion to Dismiss Claimants") filed the Motion to Dismiss, which is scheduled to be heard on December 9, 2020.  By the Motion to Dismiss, Motion to Dismiss Claimants sought three alternative forms of relief:  to dismiss the Debtors' bankruptcy cases, to convert the bankruptcy cases under Section 1112(b) of the Bankruptcy Code, or to appoint a Chapter 11 trustee pursuant to Section 1104 of the Bankruptcy Code.

17.     In support of the Motion to Dismiss, the Motion to Dismiss Claimants filed the Inamullah Declaration, in which Mr. Inamullah stated his opinion that "Cred has no chance of undergoing a successful reorganization or sale of its business as an ongoing concern[2] because lending is a business based on trust and cryptocurrency expertise. Based on my extensive knowledge of the crypto space, Cred's competitors do not need to pay for its financial platform (they already have their own platforms) nor their customers."

---

[2]     On November 18, 2020, the Debtors filed a motion to appoint certain bidding procedures [Docket No. 65] (the "Sale Procedures Motion") by and through which they are seeking authority to enter into a process for the sale of substantially all of the Debtors' assets, or some subset thereof, culminating in a sale hearing to be held on or about February 3, 2021. The Debtors have scheduled the Sale Procedures Motion and other "first day" motions to be considered on the same date as the Motion to Dismiss.

**The Motion to Compel**

18.     On November 23, 2020, the Movants filed an emergency motion to compel the Debtors to make demand of certain cryptocurrency exchanges to freeze the transfer of certain accounts that may hold the Debtors' assets [Docket No. 75] (the "Motion to Compel"). By and through the Motion to Compel, the Movants sought to have the Debtors issue notice to and make demand that five cryptocurrency exchanges based in the United States (collectively, the "Exchanges") freeze those accounts holding the Debtors' bitcoin/cryptocurrencies pending a further determination as to ownership. As set forth in the Motion to Compel, the Movants understood that the Debtors had not taken any action - either prior to or since the Petition Date - to notify any of the Exchanges that the Debtors' bitcoin/cryptocurrencies are/were in those accounts. The purpose of the Motion to Compel was to require that the Debtors take efforts to preserve assets that could (and still can) be quickly dissipated, after which time, such cryptocurrency would likely be recoverable. The cost for such effort would be minimal and would not prejudice the estates or any other party in interest.

19.     Prior to the hearing, the undersigned counsel for the Movants conferred with counsel for the Debtors. At the conclusion of the conference, counsel for the Movants provided the Debtors, under an agreement of confidentiality, tracing analysis info for approximately 8,500 bitcoin processed by Cred, including approximately 3,750 bitcoin being processed by all of the Exchanges.[3] The Movants also provided the Debtors with a form of proposed demand letter in Word format.

---

[3]     The information provided by the Movants to the Debtors was as up-to-date as was in the Movants' possession at the time shared with the Debtors.

20.     Following the conference, the Movants understood that the Debtors would send the demand letter to each of the Exchanges to preserve all of the bitcoin held by the Exchanges.   Prior to the November 25, 2020, hearing to consider the Motion to Compel, the Debtors filed a response to the Motion to Compel [Docket No. 85] (the "Debtors Response").  In the Response, the Debtors said that they agreed that sending a letter prior to Thanksgiving would be advantageous, however the form of demand letter attached as Exhibit A to the Response sought to provide notice to only one Exchange holding only approximately 800 bitcoin, rather than the 8,500 bitcoin held by all five Exchanges.

21.     Ultimately, the Bankruptcy Court denied the Motion to Compel, because there was no evidence before the Court with respect to ownership of the 8,500 bitcoin, and denied the Movants the opportunity to provide notice even though the Debtors would not.  The Court did remind the Debtors about their fiduciary obligations to preserve the assets of the estates.  The Movants have received no confirmation that the Debtors even served the one demand letter.

**Partial Joinder in the Motion to Dismiss**

22.     The Movants agree that the Debtors have either grossly mismanaged the estates through their abject negligence, or willfully and intentional engaged in actions to defraud parties such as the Movants, both prior to and since the filing of the bankruptcy petitions.  Even putting aside the Debtors loss of more than $60,000,000 in less than two years of existence, among other things, despite having transferred 800 bitcoin in February and April 2020, and having learned about the theft in July 2020, the Debtors did nothing to alert the Exchanges to stop any further transfer of the easily liquidated and dissipated assets. Even then, the Debtors only took action – action which involved minimal costs – to put the Exchanges on notice after the Movants' filed a

motion to compel them to take action.[4]  This failure to preserve the Debtors' assets was, at a minimum, gross mismanagement.

23.     That having been said, the Movants respectfully submit that the dismissal of the Chapter 11 Cases is not in the best interests of the Debtors, their estates, or creditors and other parties in interest.  Dismissal would simply result in the Debtors and their assets moving forward without the protection of the automatic stay.  Parties alleging that there are either creditors or bailors, including some or all of the Movants, would engage in a race to the courthouse and execution upon those assets that remain in the Debtors' possession.  Further, dismissal would also eliminate any opportunity for the estates to avoid any preferential transfers or fraudulent conveyances in one forum.  So although the Movants' agree that cause exists to dismiss the Chapter 11 cases, the Movants respectfully submit that dismissal of the Chapter 11 Cases is not in anyone's benefit.

24.     More appealing than dismissal is conversion to Chapter 7, which would result in the appointment of a fiduciary tasked with the management and liquidation of the Debtors' assets.  A Chapter 7 trustee, once appointed, can operate the Debtors' businesses for a limited period pursuant to section 721 of the Bankruptcy Code, thereby maximizing the value of the estates through the sale of the Debtors' assets.  A Chapter 7 trustee would also have fewer expenses than the estates would incur during the Chapter 11 process, including professional fees.

25.     While the option of conversion is better than dismissal, the Movants do not believe that conversion to Chapter 7 will maximize the value of the estates through a sale process.  While this process is less expensive than a Chapter 11, it will likely take significantly longer to make a

---

[4]     Although the Debtors did not send notice to any exchanges without being prompted, they did find the time to file a motion to establish procedures for interim compensation [Docket No. 54] without being prompted.

distribution in Chapter 7 than in Chapter 11, a meaningful consideration where, as here, many of the creditors are individuals who cannot afford to wait years for a distribution to be made. Taken together, the Movants respectfully submit that conversion would be better than continuing with the Debtors in possession, particularly if the Chapter 7 Trustee was permitted to operate the Debtors' business for a short period, but it is not the best remedy.

26.     The best remedy for the Debtors, their estates, and creditors would be the appointment of a Chapter 11 trustee, particularly one who has a background with fraud cases and/or cryptocurrency. The Chapter 11 trustee would be a new fiduciary of the estates, who has the trust of the creditor constituents, to make business decisions for the estates Debtors that would maximize the Debtors' estates and are consistent with his fiduciary duties. Not only would the appointment of a Chapter 11 trustee dispossess the Debtors current insiders of control of the Debtors' estates and assets, but this trust would be essential to the success of the Chapter 11 cases through a sale of the Debtors' businesses as a going concern and proposing a plan that would be likely be accepted by creditors. Given the relationship of the Debtors and their creditors, it is unlikely that a plan filed by the Debtors, particularly one seeking typical releases and exculpation of insiders, would be approved by creditors.

27.     The Movants expect that the Debtors will say that that their retention of counsel, a financial advisor and an independent director or manager will immunize them from allegations and findings of cause for appointment of a Trustee or conversion to Chapter 7. It will not. The Debtors' proposed retention will only significantly increase the costs to the estates, to the detriment of creditors.

28.     But as evidenced by the fact that the Debtors refused to serve notice on the Exchanges until the Motion to Compel was filed (and even then, the notice was less than a tenth

of the total bitcoin processed by the Debtors through those Exchanges) the current management clearly is not acting consistent with their fiduciary duty. A Chapter 11 trustee will have the requisite standing to investigate and bring claims against all insiders, including the current insiders, that the Debtors almost certainly will not bring.

## NOTICE

29.     A copy of this Joinder is being served upon (i) Motion to Dismiss Claimants, (ii) the Debtors, (ii) counsel for the Debtors (iii) the Office of the United States Trustee, and (iv) all parties having entered an appearance in these Chapter 11 cases.

## RESERVATION OF RIGHTS

30.     The Movants intend to take discovery from the Debtors promptly in connection with the Schatt Declaration, the McManigle Declaration, the Motion to Dismiss, and any other pending contested matters, and the Movants expressly reserve and preserve all rights to supplement this Joinder.

Dated: December 2, 2020

**MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Eric J. Monzo (DE Bar No. 5214)
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
Telephone: (302) 888-6800
Email: jwaxman@morrisjames.com
Email: emonzo@morrisjames.com

-and-

David C. Silver, Esquire
SILVER MILLER
11780 W Sample Road
Coral Springs, Florida 33065
Phone: (954) 516-6000

*Counsel to the Movants*

13