**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CRED INC., *et al.*, | ) Case No. 20-12836 (JTD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) **Hearing Date: Dec. 9, 2020 at 2:00 p.m. (ET)** |
| | ) **Obj. Deadline: Dec. 2, 2020 at 4:00 p.m. (ET)** |
| | ) **RE: Docket No. 62** |

**DEBTORS' OBJECTION TO MOTION OF KZYSZTOF MAJDAK AND PHILIPPE GODINEA FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. § 1112(b) (I) DISMISSING THE CASES; (II) CONVERTING THE CASES TO A CHAPTER 7 LIQUIDATION; OR (III) APPOINTING A CHAPTER 11 TRUSTEE**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................... 1

BACKGROUND ........................................................................................................ 4

    I.      Chapter 11 Cases........................................................................................ 4

    II.     Background on Cryptocurrencies ........................................................ 6

    III.    The Debtors' Business Model ............................................................... 6

    IV.    Cryptocurrency Losses at JST................................................................ 7

ARGUMENT.............................................................................................................. 8

    I.      There Is No Basis to Dismiss or Convert These Chapter 11 Cases to Chapter 7 ................................................................................................. 8

    II.     There Is No Basis for the Appointment of a Trustee under Section 1104..................................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Carolin Corp. v. Miller*,
 886 F.2d 693 (4th Cir. 1989) ...................................................................................9

*In re Celeritas Techs., LLC*,
 446 B.R. 514 (Bankr. D. Kan. 2011) .......................................................................17

*In re Colorado-Ute Elec. Ass'n, Inc.*,
 120 B.R. 164 (Bankr. D. Colo. 1990) ......................................................................17

*In re Congaree Triton Acquisitions, LLC*,
 492 B.R. 843 (Bankr. D.S.C. 2012) .........................................................................14

*In re Creech*,
 538 B.R. 245 (Bankr. E.D.N.C. 2015) ...............................................................11, 14

*In re Dark Horse Tavern*,
 189 B.R. 576 (Bankr. N.D.N.Y. 1995) ......................................................................9

*In re Fisher & Son, Inc.*,
 70 B.R. 7 (Bankr. S.D. Ohio 1986) ..........................................................................17

*In re Gabriel Techs. Corp.*,
 No. BR 13-30340DM, 2013 WL 2318581 (Bankr. N.D. Cal. May 28, 2013) ........11

*In re GPA Tech. Consultants, Inc.*,
 106 B.R. 139 (Bankr. S.D. Ohio 1989) ......................................................................9

*In re La Sherene, Inc.*,
 3 B.R. 169 (Bankr. N.D. Ga. 1980) .....................................................................17, 18

*In re Landmark Atl. Hess Farm, LLC*,
 448 B.R. 707 (Bankr. D. Md. 2011) .........................................................................11

*In re Mako, Inc.*,
 102 B.R. 809 (Bankr. E.D. Okla. 1988) ...................................................................17

*In re McTiernan*,
 519 B.R. 860 (Bankr. D. Wy. 2014) ..........................................................................9

*In re Nicholson Holdings, Inc.*,
 497 B.R. 430 (Bankr. E.D. Pa. 2013) .......................................................................14

*In re R & S St. Rose Lenders, LLC*,
  2016 WL 3536533 (Bankr. D. Nev. May 18, 2016) ................................................................9

*In re Rent-Rite Super Kegs West Ltd.*,
  484 B.R. 799 (Bankr. D. Colo. 2012) ...................................................................................14

*In re Smith*,
  77 B.R. 496 (Bankr. E.D. Pa. 1987) .......................................................................................9

*In re Sundale, Ltd.*,
  400 B.R. 890 (Bankr. S.D. Fla. 2009) ...................................................................................17

*In re TMT Procurement Corp.*,
  534 B.R. 912 (Bankr. S.D. Tex. 2015) ..................................................................................11

*In re U.S. Commc'ns of Westchester, Inc.*,
  123 B.R. 491 (Bankr. S.D.N.Y. 1991) ..................................................................................17

*In re Unique Tool & Manufacturing Co.*,
  2019 WL 5589085 (Bankr. N.D. Ohio Oct. 25, 2019) ..........................................................14

*In re Vaughan*,
  No. 11–10–10759, 2013 WL 2244285 (Bankr. D.N.M. May 21, 2013) .................................12

*Matter of Warwick Park, Inc.*,
  100 B.R. 179 (Bankr. D. Del. 1989) .....................................................................................17

**Statutes**

11 U.S.C. Ch. 11 ................................................................................................ *passim*

11 U.S.C. § 542 ...............................................................................................................16

11 U.S.C. § 1104 ..................................................................................................3, 16, 17

11 U.S.C. § 1104(a) ........................................................................................................16

11 U.S.C. § 1107(a) ..........................................................................................................4

11 U.S.C. § 1108 ...............................................................................................................4

11 U.S.C. § 1112 ........................................................................................................9, 16

11 U.S.C. § 1112(b) .................................................................................................3, 8, 9

11 U.S.C. § 1112(b)(4)(A) .................................................................................................9

11 U.S.C. § 1112(b)(4)(B) .................................................................................................9

5 Norton Bankr. L. & Prac. 3d § 103:7............................................................................................9

**Other Authorities**

Fed. R. Bankr. P. 1015(b) ...............................................................................................................4

Local Rule 1015-1............................................................................................................................4

TO THE HONORABLE BANKRUPTCY JUDGE JOHN T. DORSEY:

Cred Inc. ("Cred") and its affiliated debtors and debtors in possession (the "Debtors") object (the "Objection") to the *Motion of Kzysztof Majdak and Philippe Godinea for Entry of an Order Pursuant to 11 U.S.C. § 1112(b) (I) Dismissing the Cases; (II) Converting the Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 11 Trustee* [Docket No. 62] (the "Motion").

In support of this Objection, the Debtors submit the declarations of Grant Lyon (the "Lyon Declaration"), Matthew Foster (the "Foster Declaration"), Pablo Bonjour (the "Bonjour Declaration"), and Christopher Wu (the "Wu Declaration"), which are attached as **Exhibit A**, **Exhibit B**, **Exhibit C**, and **Exhibit D**, respectively, and which are incorporated by reference into this Objection.  In further support of this Objection, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      During the first month of these cases, the Debtors and their professionals have taken comprehensive steps to preserve and marshal assets of the estates for the benefit of the Debtors' creditors.  These steps include preparing for the sale of the Debtors' business, filing an action against a former executive who absconded with more than $3 million worth of the Debtors' bitcoin, working with law enforcement in an attempt to secure the return of $10 million in stolen bitcoin, and conducting a thorough investigation of what other steps can be taken to maximize value of the Debtors' creditors, including, for example, claims for the return of preferential transfers.

2.      Moreover, the Debtors have assembled an independent, experienced management and restructuring team, which will aggressively investigate potential claims and pursue recoveries for the benefit of creditors.  Of particular note, Grant Lyon was appointed as the independent director or manager (as applicable) for each of the Debtors.  In addition, on

November 30, 2020, the Debtors hired Sonoran Capital Advisors, LLC to provide a Chief

Restructuring Officer to the Debtors and designated Matthew K. Foster as the Debtors' Chief

Restructuring Officer.  Mr. Lyon and Mr. Foster provide independent oversight over, among

other things, the Debtors' sale process, efforts to obtain DIP financing, and the investigation into

potential causes of action and other assets.  In addition, Mr. Foster is in charge of operational

controls over the Debtors, including requiring his approval on the Debtors' cash expenditures,

working with the Debtors' professionals to prepare schedules and statements, reviewing and

reconciling accounting records, working with the Debtors' investment banker, Teneo Capital

LLC ("Teneo") on the marketing and sale process, and ensuring the Debtors' compliance with

U.S. Trustee requirements.  Mr. Lyon and Mr. Foster are frequently asked to take on fiduciary

roles (like chapter 11 trustee, liquidating trustee, plan administrator, independent directors, or

CRO), including with respect to bankruptcy cases in the District of Delaware.

       3.      Importantly, the Debtors are focused on a two-step process seeking to (a) sell their

business as a going concern and (b) distribute the proceeds of any sale(s) to their creditors in

accordance with a liquidating plan.  That plan would provide that the Debtors' causes of action

be transferred to a liquidating trust that would pursue such causes of action for the benefit of the

Debtors' creditors.  The sale process must proceed as expeditiously as possible given the

Debtors' need to preserve their business to maximize the value of any sale, the risk that the

Debtors' current competitive advantages in the platform technology will erode over time, and the

risk that highly talented employees are heavily recruited.  Indeed, the Debtors' approach is likely

to result in distributions on a much shorter timeline with more value realized than if these cases

were converted to chapter 7 or a chapter 11 trustee were appointed.

4.      Despite the Debtors' substantial progress in a short time period to execute on a value-maximizing transaction, Movants ask that this Court dismiss[2] or convert these chapter 11 cases to cases under chapter 7 or, in the alternative, appoint a chapter 11 trustee under section 1104 of the Bankruptcy Code.  The Movants fail to meet the very high standard against which such motions are measured, and the Motion should be denied.

5.      Movants failed to show that there is a "substantial or continuing loss or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."  For one, numerous courts have observed that the prospect of a liquidating plan is not sufficient to show a lack of rehabilitation for purposes of section 1112(b) of the Bankruptcy Code.  In any event, the liquidating plan, when viewed in conjunction with the contemplated sale, is part of the overall efforts to rehabilitate the Debtors' business through a sale of that business to a new owner.  Nor is there a substantial or continuing loss or diminution to the estates.  As discussed in more detail below, the Debtors and their professionals have undertaken numerous cost-saving measures as well as various steps to ensure that the Debtors' assets are protected and preserved, including the Debtors' online platform, so that they can be marketed and sold.  Moreover, contrary to Movants' assertion, the accrual of professional fees does not qualify as the requisite loss for purposes of section 1112(b).  Indeed, the Debtors are accruing professional fees in order to pursue a value maximizing sale process to allow the Debtors to emerge from chapter 11 as expeditiously as possible and professional fees are likewise incurred when trustees are appointed. The Debtors' professionals also have the relevant experience—both as it concerns chapter 11 and the cryptocurrency space—to guide the Debtors through the chapter 11 process.  Furthermore,

---

[2]      Although Movants include dismissal in the title of the Motion, they say nothing about dismissal thereafter and thus it is unclear whether this remedy is actually being sought.

Movants' description of the Debtors' balance sheet is flawed, as they ignore various sources of value potentially worth tens of millions of dollars, including litigation claims and niche cryptocurrency positions that require more skill to monetize.  It is unreasonable to suggest (as Movants do) that these assets are "worthless."

6.      Movants also fail to show that there is cause for the extraordinary remedy of appointing a chapter 11 trustee based on either gross mismanagement or incompetence.  As detailed below, the Debtors' financial problems are largely the result of large and unpredictable swings in the price of cryptocurrencies that resulted from the financial crisis caused by the COVID-19 pandemic, which was further compounded by a rogue employee who stole millions of dollars from the Debtors, as well as a scam that resulted in further losses.

7.      For all these reasons, as further detailed below, the Debtors respectfully request that the Motion be denied in its entirety.

## BACKGROUND

**I.      Chapter 11 Cases**

8.      On November 7, 2020 (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

9.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b), Local Rule 1015-1, and the *Order Granting Motion of Debtors and Debtors in Possession for Order Directing Joint Administration of Their Chapter 11 Cases* [Docket No. 27].

4

10.     Both before and after the Petition Date, the Debtors have taken numerous steps to reduce operational costs, seek the return of estate property, and commence the process of selling the Debtors' business.  For example,

- In July 2020, shortly after discovering that James Alexander (the Debtors' former Chief Capital Officer) had absconded with 225 bitcoin, the Debtors commenced litigation against him in California state court, Case No. 20-CIV-02915, seeking, among other things, to prevent Mr. Alexander from any further dissipation of the Debtors' property and an award of compensatory and punitive damages.  Notably, on July 17, 2020, the California state court granted Cred and Cred Capital, Inc.'s motion for a temporary restraining order requiring the preservation of the digital assets Mr. Alexander transferred from Cred Capital, Inc.

- On November 3, 2020, Grant Lyon was appointed as independent director or manager (as applicable) for each of the Debtors, and replaced Cred's co-founder Mr. Lu Hua on the board of directors for the parent company Cred Inc.  Mr. Lyon was also appointed as the chair and sole member of the Restructuring Committee of Cred's Board of Directors.

- In the week prior to the Petition Date, the Debtors terminated the employment of nine individuals (approximately 1/3 of the Debtors' work force), in addition to multiple consultants, as their services would not be needed during the Debtors' chapter 11 cases.

- On November 8, 2020, the Debtors filed their motion to reject the Debtors' two office leases retroactive to the Petition Date, as they no longer need their office space and do not anticipate needing office space in the immediate future.  *See* Docket No. 4.

- On November 17 and 18, 2020, the Debtors filed their applications to retain, respectively, (a) MACCO Restructuring Group, LLC ("MACCO") as financial advisor to the Debtors and (b) Teneo as investment banker to the Debtors.  *See* Docket Nos. 57 and 63.

- On November 18, 2020, the Debtors commenced an adversary proceeding seeking to compel James Alexander (the Debtors' former Chief Capital Officer) to, among other things, turn over approximately $3.75 million worth of cryptocurrencies and other property that Mr. Alexander wrongfully took from the Debtors.  *See* Adv. Proc. No. 20-51006 (JTD).

- On November 18, 2020, the Debtors filed their motion seeking, among other things, entry of an order approving certain bidding procedures with respect to the sale of some or all of the Debtors' assets.  *See* Docket No. 65.

- On November 25 and 30, 2020, the Debtors served a notice of theft or conversion to cryptocurrency exchanges, requesting that the exchanges receiving the notice freeze cryptocurrency transferred to or from certain identified addresses that the Debtors have ascertained through their investigations as associated with the illicit takings of their assets. *See* Docket Nos. 99 and 100.

- On December 1, 2020, the Debtors filed their motion to retain Sonoran Capital Advisors, LLC and designate Matthew Foster as the Debtors' Chief Restructuring Officer. *See* Docket No. 95.

## II.    Background on Cryptocurrencies

11.     A cryptocurrency is a digital currency created and stored electronically on the blockchain.  A cryptocurrency uses encryption techniques to control the creation of monetary units and to verify the transfer of funds.

12.     During 2020, cryptocurrency prices were especially volatile, largely as a result of the financial crisis brought on by the COVID-19 pandemic.  For example, in February 2020, the price of bitcoin (the most popular and established cryptocurrency) traded at approximately $10,000 per bitcoin.  In March 2020—largely as a result of the COVID-19 pandemic—bitcoin prices dropped below $5,000 per bitcoin.  Bitcoin prices then recovered steadily through the summer of 2020 to more than $13,000 by the end of October.  Since then, bitcoin prices have continued to rise, reaching over $19,000 by the end of November 2020.

13.     Despite the fact that cryptocurrencies are widely held as an alternative asset class, the cryptocurrency market is largely unregulated.

## III.    The Debtors' Business Model

14.     The Debtors operate a financial technology platform through which customers transfer cryptocurrency to the Debtors—generally through a loan agreement or financing agreement.  The Debtors then utilize such cryptocurrency in a variety of investment strategies involving third-party asset managers and lenders.  These investments could take the form of (a) the Debtors directly providing the cryptocurrencies to asset managers or (b) the Debtors

converting cryptocurrencies into other cryptocurrencies or fiat currencies and providing the resulting proceeds to asset managers or lenders.

15.    The Debtors earn revenue through the returns generated by their investments, as well as through interest on lines of credit extended to certain of the Debtors' customers in connection with the loans and financings referenced above.  The Debtors utilize several different asset managers and lenders to obtain returns on customers' cryptocurrencies, including Sarson (asset manager), 100 Acre Ventures (asset manager), and numerous others, including Reliz LTD (Blockfills), JST (trading services provider), Elevar Finance (lender), and moKredit (lender).

16.    Customers who transfer their cryptocurrency to the Debtors are entitled to receive their principal back in the form of the cryptocurrency they initially transferred to the Debtors. Because the Debtors' business model is premised on generating a return for their customers by investing the deposited cryptocurrencies with asset managers, the Debtors generally do not themselves hold significant amounts of cryptocurrency.  When customers terminate their accounts with the Debtors, the Debtors generally have to purchase new cryptocurrency in the open market at then-prevailing prices in order to pay back the customers.  As a result, the Debtors bear the risk of price increases between the time of the customer's deposit and withdrawal of cryptocurrencies.

## IV.    **Transactions with JST**

17.    At the beginning of 2020, the Debtors held substantial "long" futures positions of bitcoin and other cryptocurrencies through JST Capital, LLC ("JST").  The Debtors' positions included cryptocurrencies held on margin.  When cryptocurrency prices dropped more than 40% in March 2020, the margin connected with the bitcoin futures position was eliminated, leaving Cred short bitcoin. While the Debtors, their CRO, and MACCO continue to analyze the extent and financial impact of the resulting losses, it is abundantly clear that these losses were

significant, and, based on a preliminary review of a JST risk exposure report, the net dollar amount of the Debtors' exposure with JST was negative $25 million as of March 17, 2020. These trades had a material negative effect on the Debtors' liquidity because, in the absence of restoring bitcoin hedges and as cryptocurrency prices recovered in the summer and fall of 2020, the Debtors were forced to acquire new cryptocurrencies at substantially higher prices.

18.    Following the losses at JST, the Debtors attempted to recover principal from other asset managers, including moKredit. While moKredit continued to make interest payments, it was only in a position to return $300,000 of principal in April and May 2020. moKredit renegotiated a repayment schedule in the aftermath of the economic crisis triggered by the COVID-19 pandemic. Currently, moKredit is making interest payments in the amount of approximately $582,000 per month.

## ARGUMENT

### I.    There Is No Basis to Dismiss or Convert These Chapter 11 Cases to Chapter 7

19.    Section 1112(b) of the Bankruptcy Code provides, in pertinent part, that a court shall dismiss a chapter 11 case or convert such case to a case under chapter 7 for cause. Movants argue that there is "cause" to do so here because of a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," 11 U.S.C. § 1112(b)(4)(A), and "gross mismanagement of the estate," *id*. § 1112(b)(4)(B). As detailed below, the Court should reject Movants' arguments and deny the Motion.

20.    Courts have recognized that "[c]onversion or dismissal of a Chapter 11 case is a drastic measure and the burden is on the movant to prove the relief requested is warranted and not premature."[3] Movants fail to meet this heavy burden here, especially in light of the fact that

---

[3]    *In re Dark Horse Tavern*, 189 B.R. 576, 580 (Bankr. N.D.N.Y. 1995); s*ee also Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir. 1989) ("We begin consideration of this question by observing that this power [pursuant

these chapter 11 cases are less than one month old, and given the Debtors extensive efforts to date move these cases towards a speedy and efficient resolution.

A.   Movants Fail to Show a "Substantial or Continuing Loss to or Diminution of the Estate and the Absence of a Reasonable Likelihood of Rehabilitation"

21.     As a threshold matter, even if there were a substantial or continuing loss to the Debtors' estates (which, as detailed below, there is not), Movants have failed to show that there is no reasonable likelihood of rehabilitation.  While it is true that, following consummation of the 363 sale(s), the Debtors intend to seek confirmation of a liquidating plan, the prospect of a liquidating plan is not sufficient to show a lack of rehabilitation for purposes of section 1112(b). In fact, courts have held that a liquidating plan "does **not** serve as a ground for conversion or dismissal because the submission of such a plan is proper under Chapter 11."[4]

22.     Moreover, the eventual liquidating plan should not be viewed as an isolated event, but as the necessary second step in order to distribute the proceeds from the sale of the Debtors' business.  Thus, viewed as a whole, the Debtors are seeking to rehabilitate their business through a sale of that business to a new owner.  It would be premature, at this early stage of these chapter 11 cases, to conclude that the Debtors' contemplated course of action (*i.e.*, a sale followed by a

---

to section 1112], while essential to proper administration of Code policies and implicit in the statute itself, is obviously one to be exercised with great care and caution.  Decisions denying access at the very portals of bankruptcy, before an ongoing proceeding has even begun to develop the total shape of the debtor's situation, are inherently drastic and not lightly to be made.").

[4]    *In re GPA Tech. Consultants, Inc.*, 106 B.R. 139, 142 (Bankr. S.D. Ohio 1989) (emphasis added); *see also In re R & S St. Rose Lenders, LLC*, 2016 WL 3536533, at *6 n.11 (Bankr. D. Nev. May 18, 2016) (denying the U.S. Trustee's conversion motion and disagreeing with notion that "rehabilitation" excludes liquidating plans); *In re McTiernan*, 519 B.R. 860, 866 (Bankr. D. Wy. 2014) (holding that there is "a reasonable likelihood of rehabilitation" if the "Debtor may successfully liquidate"); *In re Smith*, 77 B.R. 496, 502 (Bankr. E.D. Pa. 1987) (explaining that "liquidation is a form of rehabilitation.").  The Debtors acknowledge that there is disagreement among courts as to whether a liquidating plan can satisfy the "likelihood of rehabilitation" prong of section 1112(b)(4)(A).  *See* 5 Norton Bankr. L. & Prac. 3d § 103:7 ("Courts are divided as to whether a liquidating Chapter 11 plan serves as a ground for conversion or dismissal.  The better view is that a party in interest should not be able to forcibly convert a Chapter 11 case solely because the proposed plan is a liquidating plan, which is expressly permitted elsewhere in the Bankruptcy Code.") (internal citations omitted).

liquidating plan) is doomed to fail.  In fact, as detailed in the Wu Declaration, Teneo has already

reached out to over 40 strategic and financial investors, and Teneo and the Debtors have

conducted seven videoconference meetings with potential interested parties of which three had

contacted Cred on an unsolicited basis.  The marketing process is in its early stages; however, the

level of interest expressed so far is promising.[5]  Moreover, the liquidating plan would provide

not just for the distribution of the sale proceeds to the Debtors' creditors, but would establish a

liquidating trust that would pursue Debtor causes of action for the benefit of the Debtors'

creditors.  And of course, all of the foregoing would occur under the auspices of the new Chief

Restructuring Officer and Grant Lyon as independent director, and would be subject to approval

by this Court.  Indeed, the Debtors' approach is likely to result in distributions on a much shorter

timeline that would be possible if these cases were converted to chapter 7 or a chapter 11 trustee

were appointed.

23.    Furthermore, Movants have not shown that the Debtors' estates (as opposed to the

prepetition Debtors) are incurring a substantial or continuing loss.  Importantly, in analyzing this

factor, courts focus on the postpetition period.[6]

24.    <u>First</u>, the Debtors' current cryptocurrency assets are protected.  The Debtors'

halted, prior to the Petition Date, any new investment activities and are closely monitoring their

existing investments with assistance from their Chief Restructuring Officer and professionals.

---

[5]    In addition, in order to provide the Debtors with adequate liquidity to successfully emerge from chapter 11, the
Debtors are also seeking to obtain debtor in possession financing.  To date, the Debtors' investment banker has
reached out to over 10 parties who may be interested in providing debtor in possession financing.

[6]    *See, e.g.*, *In re Creech*, 538 B.R. 245, 248-49 (Bankr. E.D.N.C. 2015) ("The circumstances indicating
substantial or continuing loss or diminution must have occurred post-petition; pre-petition events will not
establish cause."); *In re Landmark Atl. Hess Farm, LLC*, 448 B.R. 707, 713-14 (Bankr. D. Md. 2011) ("The first
prong of the analysis requires the court to determine whether **post-petition**, the debtor has suffered or continued
to experience a negative cash flow, or, alternatively, declining asset values.) (emphasis added); *In re Gabriel
Techs. Corp.,* No. BR 13-30340DM, 2013 WL 2318581, at *3 (Bankr. N.D. Cal. May 28, 2013) (noting that
case was only 3 months old and that the accrual of losses would "end soon.").

Moreover, the Debtors' cryptocurrency assets are currently held at Fireblocks, a platform that is regarded as a secure platform to store and transfer cryptocurrencies and their asset managers are all based in the United States.

25.    Second, the Debtors have already undertaken numerous cost-saving measures, including reducing their work force by approximately 30% shortly before the Petition Date and seeking to reject their two office leases, which are no longer necessary for the Debtors' continued operations.  These measures are expected to generate savings during these chapter 11 cases, while preserving the Debtors' platform pending the contemplated sale.

26.    Third, contrary to Movants' assertion, the accrual of professional fees "does **not** constitute a continuing loss to the estate."[7]  Indeed, the Debtors are accruing professional fees in order to pursue a value maximizing sale process to allow the Debtors to emerge from chapter 11 as expeditiously as possible.[8]  Moreover, if these cases were converted to cases under chapter 7, the Debtors' estates would still incur substantial professional fees of the chapter 7 trustee, but without the benefit of retaining Debtors' management to preserve, among other things, the Debtors' platform pending the contemplated sale(s).

27.    Fourth, there is no basis for the Movants' assertion that the Debtors' professionals are somehow not equipped to handle these cases because they supposedly have "no expertise in cryptocurrency."  Mot. ¶ 13.  In fact, MACCO, the Debtors' financial advisor, has extensive

---

[7]    *In re TMT Procurement Corp.*, 534 B.R. 912, 920 (Bankr. S.D. Tex. 2015) (emphasis added); *see also In re Gabriel Techs. Corp.*, No. BR 13-30340DM, 2013 WL 2318581, at *3 (Bankr. N.D. Cal. May 28, 2013) ("Perhaps from an accounting perspective (profit and loss), such accruals [of professional fees] would constitute such losses.  But the accrual of liabilities are not the same as the incurring of actual out-of-pocket losses, such as the dissipation of assets that diminishes the estate").

[8]    *See In re Vaughan*, No. 11–10–10759, 2013 WL 2244285, at *7-8 (Bankr. D.N.M. May 21, 2013) (denying conversion and finding that accruing professional fees did not establish cause because, *inter alia*, "the Trustee has expended professional fees for the purpose of building up the value of future assets for the benefit of the estate.").

experience in the cryptocurrency space.  Of particular note, Pablo Bonjour, a managing director

at MACCO and one of the team leaders on this engagement, has 17 years of experience in the

financial services, including owning and operating his own brokerage firm for trading in

cryptocurrency.  Moreover, as detailed in the Wu Declaration, Teneo's marketing efforts are

being augmented by senior professionals and consultants with deep expertise and knowledge of

both financial technology companies and blockchain/cryptocurrency.  Moreover, the Teneo team

is assisted by Matt Shapiro, an independent consultant specializing in cryptocurrencies and

Senior Advisor to Teneo.  Movant also fails to recognize that converting these cases to chapter 7

would also displace current management, which means that the Debtors would lose the

experience and institutional knowledge necessary to preserve the business for a value-

maximizing going concern sale.

28.     Finally, Movants make numerous incorrect assertion regarding the Debtors'

balance sheet attached to the First Day Declaration of Drew McManigle (the "Balance Sheet").

- Movants' assertion that the $14.709 million in cryptocurrencies held by the
  Debtors are "worthless" or "fictitious" is not accurate.  Approximately $2.5
  million of these cryptocurrencies are liquid and can be readily converted into
  cash.  Moreover, as the footnotes to the Balance Sheet explain, the remaining
  $12.2 million in cryptocurrency is "considered illiquid" because "there is not
  enough volume traded daily to enable immediate monetization of amounts held."
  However, the fact that these cryptocurrencies are illiquid does not mean that they
  are worthless or fictitious.  It simply means that there are additional barriers
  (which may require additional marketing efforts) to converting these currencies
  into cash and they must be liquidated in smaller quantities over time.

- While the Balance Sheet notes that the outstanding loan to moKredit in the
  amount of approximately $39 million may be "partially or completely
  uncollectible," this does not mean that the Debtors will be unable to recover on
  their loans to moKredit.  In fact, since the Petition Date, the Debtors have
  formally demanded that moKredit repay the outstanding principal amount and,
  moreover, have requested documents from moKredit to assess its financial
  condition and ability to repay the loans.  At this time, it would be premature to
  conclude that the loans to moKredit are worthless.

- Movants ignore the potential millions of dollars of value that were excluded intentionally from the asset side of the Balance Sheet, including (1) claims against James Alexander for $3.75 million worth of stolen bitcoin, and (2) claims for the return of more than $10 million in bitcoin stolen by an imposter pretending to be Quantcoin (the "Imposter") that continues to be investigated. Movants also ignore the potential value of the Debtors' online platform, which should be an attractive asset for prospective acquirers because it is the product of substantial technical, legal, and regulatory work and will provide a turn-key solution to bidders interested in entering into the cryptocurrency lending business.

29. The Debtors also note that a portion of the shortfall on the Balance Sheet is attributable to the run-up in cryptocurrency prices in the months immediately prior to the Petition Date, which translates into increase liabilities to customers. In fact, the "Program Value", which is driven by the price at the time that the customers renew, relend/loan or redeem their cryptocurrency, is then adjusted to reflect their new historical position price/value up or down accordingly (i.e., the value of the cryptocurrencies when transferred to the Debtors or upon renewal of the underlying financing arrangement with the customer). At this time the most recent "Program Value" calculation is approximately $99.5 million, and lower than the Debtors' liability on account of such cryptocurrency valued as of the Petition Date, namely $135.5 million.

30. In sum, Movants have not shown that there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" and, accordingly, these cases should not be dismissed or converted to chapter 7 on this basis.

B.   Movants Have Not Shown "Cause" for Conversion or Dismissal Based on "Gross Mismanagement"

31. Movants also have not shown that there is cause for conversion or dismissal based on "gross mismanagement." Importantly, for gross mismanagement to constitute grounds for

conversion or dismissal, "the alleged gross mismanagement must occur post-petition."[9]  For example, Courts have found "gross mismanagement" where a debtor in possession fails to seek court approval before taking certain actions outside the ordinary course of business, such as paying prepetition debts or incurring debt, where debtors file monthly reports without closely monitoring them, and where the business lacks effective management postpetition.[10]

32.    Because Movants have identified no postpetition actions that could constitute gross mismanagement (and indeed Movants do not purport to identify any such actions), the Motion should be denied on this ground as well.[11]  Moreover, the Debtors have put in place numerous layers of independent review and oversight to ensure that the Debtors maximize value for the benefit of their estates.  In addition to the retention of a financial advisor and an investment banker, Grant Lyon has been appointed as independent director or manager (as the case may be) for each of the Debtors.  Mr. Lyon has over 30 years of experience in corporate restructuring, expert testimony and corporate governance, and has spent many years formulating and executing business plans for a diverse range of industries at every stage of a business lifecycle.  As an independent director, Mr. Lyon is well-positioned to take an impartial look at what actions should be taken with respect to recover value for the benefit of the Debtors' estates, including with respect to the loans previously extended to moKredit.

---

[9]    *In re Unique Tool & Manufacturing Co.*, 2019 WL 5589085, at *11 (Bankr. N.D. Ohio Oct. 25, 2019).

[10]   *See In re Creech*, 538 B.R. 245, 251 (Bankr. E.D.N.C. 2015) (collecting cases); *see also In re Nicholson Holdings, Inc.*, 497 B.R. 430, 433 (Bankr. E.D. Pa. 2013) (finding "cause" where debtor used DIP facility proceeds to "buy an array of items which appear unrelated to the debtor's business"); *In re Congaree Triton Acquisitions, LLC*, 492 B.R. 843 (Bankr. D.S.C. 2012) (finding "cause" where debtor misplaced significant estate assets); *In re Rent-Rite Super Kegs West Ltd.*, 484 B.R. 799 (Bankr. D. Colo. 2012) (finding "cause" where debtor used estate assets to engage in criminal drug operations).

[11]   Even if prepetition gross mismanagement constituted sufficient cause to convert a chapter 11 case to chapter, the actions identified by Movants do not constitute gross mismanagement, as further detailed in Section II below.

33.     Moreover, in order to provide further independent oversight, the Debtors have determined to retain Matthew Foster (who was recommended by Mr. Lyon) as the Chief Restructuring Officer for the Debtors.  The Debtors' motion to approve the appointment of Mr. Foster is scheduled to be heard on December 17, 2020.  As detailed in the Foster Declaration, Mr. Foster has extensive experience corporate restructuring, private equity, consulting, and executive management.  His experience spans a variety of industries, primarily focusing on distressed middle-market companies.

34.     Mr. Lyon and Mr. Foster provide independent oversight over, among other things, the Debtors' sale process, efforts to obtain DIP financing, and the investigation into potential causes of action.  Furthermore, Mr. Foster is in charge of operational controls over the Debtors, including requiring his approval on the Debtors' cash expenditures, working with the Debtors' professionals to prepare schedules and statements, reviewing and reconciling accounting records, working with Teneo on the marketing and sale process, and ensuring the Debtors' compliance with U.S. Trustee requirements.  Mr. Lyon and Mr. Foster are frequently asked to take on fiduciary roles (like chapter 11 trustee, liquidating trustee, plan administrator, independent directors, or CRO), including with respect to bankruptcy cases in the District of Delaware.

35.     In addition, the Debtors and their advisors have taken numerous steps to marshal and preserve assets of the estates, including by investigating potential causes of action and, where appropriate, prosecuting such causes of action.  For example:

- the Debtors have initiated a turnover action under section 542 of the Bankruptcy Code against Mr. Alexander seeking the return of bitcoin worth approximately $3.75 million;[12]

---

[12]   This turnover action is in addition to prepetition litigation that the Debtors' commenced against Mr. Alexander in California state court

- the Debtors are cooperating with law enforcement to help secure the return of some or all of the bitcoin lost as a result of the scam perpetrated by the Imposter;

- the Debtors are evaluating to what extent their loans to moKredit can be recovered and have reached out to moKredit to seek informal discovery regarding, among other things, moKredit's financial condition;

- the Debtors have begun their investigation of potential preference claims; and

- the Debtors have taken steps to preserve the value of their customer list, including by asking that this court keep the list under seal.[13]

Of course, at this time, the investigation of potential causes of action is ongoing. However, it is important to emphasize that, regardless of the outcome of this investigation, the Debtors' causes of action will be transferred to the liquidating trust under the liquidating plan, thus ensuring that the value of such causes of action are preserved for the benefit of the Debtors' creditors.

## II.   There Is No Basis for the Appointment of a Trustee under Section 1104

36.   As an alternative to dismissing or converting a case under section 1112 of the Bankruptcy Code, Movants request that the Court appoint a trustee under section 1104(a) of the Bankruptcy Code, on the basis that there has been "gross mismanagement" or "incompetence" either before or after the commencement of these chapter 11 cases. For the reasons set forth below, this alternative relief should also be denied.

37.   The appointment of a trustee is an extraordinary remedy, and a strong presumption exists in favor of continuing a debtor-in-possession in control and management of its estate.[14] "The presumption arises from a belief that the debtor and current management are generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and

---

[13]   Movants claim that the "Debtors have failed to disclose the names and addresses of almost any creditors, including the 30 largest," is indisputably false. Mot. ¶ 34. As this Court is aware, the Court previously granted, on an interim basis, the Debtors' request to file their customer list under seal, so as to ensure that the value of that customer list is preserved. Movants (and any other parties) are free to file a motion with the Court to gain access to that list, as contemplated by the order sealing the list.

[14]   *See In re Fisher & Son, Inc.*, 70 B.R. 7, 8 (Bankr. S.D. Ohio 1986).

other interests of the estate."[15]  Moreover, the factors used to determine gross mismanagement vary depending on the facts of the case, but often include elements that "hint at fraud, in addition to negligence."[16]  Similarly, incompetence contemplates a showing of a lack of business acumen and ability.[17]

38.    Movants have failed to demonstrate that Debtors' management grossly mismanaged the Debtors or acted in an incompetent fashion.  Notwithstanding Movants' hysterical rhetoric, the Debtors did not run a Ponzi scheme.  Dictionary.com defines a "Ponzi scheme" as a "fraudulent investment operation that pays quick returns to initial contributors using money from subsequent contributors rather than profit."  At this time, MACCO has not yet seen any evidence that the Debtors ran a Ponzi scheme.  Movants point to no evidence that, other than as a result of the "Quantcoin" scam, the customers' cryptocurrencies were not invested with the third-party asset managers or lenders, and MACCO's investigation thus far has not uncovered any such evidence.

39.    Movants have also indicated that they will rely on testimony of a former employee at Cred to support their Motion, which suggests that they do not believe their own accusations.  The Court should be aware that this former employee was **directly involved in the**

---

[15]   *In re La Sherene, Inc.*, 3 B.R. 169, 174 (Bankr. N.D. Ga. 1980).

[16]   *In re Sundale, Ltd.,* 400 B.R. 890, 907 (Bankr. S.D. Fla. 2009) (denying appointment of trustee, despite creditors' lack of confidence in current management and debtors' underperformance compared to others in market).

[17]   *See In re Mako, Inc.,* 102 B.R. 809, 812 (Bankr. E.D. Okla. 1988).  Though there does not appear to be a uniform standard with respect to what constitutes "incompetence" for the purposes of section 1104, courts have grounds for appointment of a trustee based on incompetence where a debtor's management or board lacked relevant experience for the position, *Matter of Warwick Park, Inc.*, 100 B.R. 179, 180 (Bankr. D. Del. 1989), where management lacked financial sophistication and did not appreciate the need for additional expertise, *In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 175 (Bankr. D. Colo. 1990), where management failed to maintain financial books and records, *In re U.S. Commc'ns of Westchester, Inc.*, 123 B.R. 491, 495 (Bankr. S.D.N.Y. 1991), or where management was "unwilling or incapable" of fulfilling its fiduciary duties, *In re Celeritas Techs., LLC*, 446 B.R. 514, 520 (Bankr. D. Kan. 2011).

**transfer of bitcoin to James Alexander (the Debtors former Chief Capital Officer and current defendant in the Debtors' turnover action)**.  Moreover, this employee was responsible for the lack of due diligence and failure to adequately vet the Imposter that stole 800 bitcoin, and he was also directly responsible for sending bitcoin to the Imposter.  This employee is obviously attempting to use this bankruptcy process to shift blame and avoid his own culpability for significant harm to the Debtors' business prior to the Petition Date.

40.     At bottom, as explained above, the Debtors' financial problems began with the steep drop in cryptocurrency prices in March 2020 after the onset of the COVID-19 pandemic, resulting in substantial trading losses with JST.  Management's failure to predict the huge swings in cryptocurrency prices resulting from the COVID-19 pandemic and the related economic downturn cannot possibly be read as an indication that the Debtors were grossly mismanaged or that the Debtors' management is incompetent.[18]

41.     Movants' assertion that the Debtors comingled cryptocurrency assets with corporate assets are irrelevant.  The Debtors are not required (whether by regulation or contract) to segregate and store cryptocurrencies transferred by customers to the Debtors—nor have Movants identified any such regulatory or contractual obligation.  In fact, it would be impossible for the Debtors to generate a return on the cryptocurrency transferred by the customer if the Debtors had to store customer cryptocurrency and could not use such assets to invest in revenue generating products.  Storage businesses typically charge their customers for storage.  That is an entirely different business from the one maintained by the Debtors.

---

[18]     *See In re La Sherene, Inc.,* 3 B.R. 169, 174 (Bankr. N.D. Ga. 1980) ("Slight evidence of mismanagement in the form of imprudent or poor business decisions or use of resources are to be expected and will not alone overcome the presumption of a debtor in possession.").

42.     The Debtors have hired a highly competent and independent Chief Restructuring Officer, and an independent director has been appointed to the board.  These individuals have decades of experience in bankruptcy and restructuring.  For example, Mr. Foster has over fifteen (15) years of experience in corporate restructuring, private equity, consulting, and executive management.  His experience spans a variety of industries, primarily focusing on distressed middle-market companies.   Mr. Foster has served as Chief Restructuring Officer for, among others, an oil field services company, a public pharmaceutical company, a regional airline, a charter coach company, as well as served as Interim Chief Financial Officer for, among others, a refrigerated trucking company, a snack food manufacturer, and a technology company.

43.     Moreover, Mr. Lyon has over 30 years of experience in the financial restructuring world, having advised clients in the purchase, restructuring and divestiture of assets totalling over $35 billion.  Mr. Lyon has also sat on over 25 boards of directors of companies as an independent member and has served many times as a Chapter 11 trustee or state court receiver.

44.     Finally, contrary to Movants' assertion, there is nothing "confusing" about the description of the $2.6 million of convertible notes in Dan Schatt's First Day Declaration.  In particular, the declaration makes clear that these convertible notes are the only outstanding **funded** debt, and, moreover, in the very next sentence, the declaration addresses the outstanding liabilities to customers.  At no point do the Debtors suggest that their unsecured debt is limited to the $2.6 million of convertible notes.

## **CONCLUSION**

45.     Because Movants have failed to show that there is any basis to dismiss or convert these chapter 11 cases, or appoint a chapter 11 trustee, the Debtors respectfully submit that the Motion be denied.

WHEREFORE, the Debtors respectfully request that the Court deny the Motion.

Dated:  December 2, 2020
        Wilmington, Delaware

/s/  Scott D. Cousins
Scott D. Cousins (No. 3079)
**COUSINS LAW LLC**
Brandywine Plaza West
1521 Concord Pike, Suite 301
Wilmington, Delaware 19803
Telephone:   (302) 824-7081
Facsimile: :   (302) 295-0331
Email:      scott.cousins@cousins-law.com

- and -

James T. Grogan (admitted *pro hac vice*)
Mack Wilson (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
Telephone:   (713) 860-7300
Facsimile:   (713) 353-3100
Email:      jamesgrogan@paulhastings.com
           mackwilson@paulhastings.com

- and -

G. Alexander Bongartz (admitted *pro hac vice*)
Derek Cash (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:   (212) 318-6000
Facsimile:   (212) 319-4090
Email:      alexbongartz@paulhastings.com
           derekcash@paulhastings.com

*Proposed Co-Counsel to the Debtors*