<u>**Exhibit C**</u>

**Bonjour Declaration**

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF PABLO BONJOUR IN SUPPORT OF DEBTORS' OBJECTION
TO MOTION OF KRZYSZTOF MAJDAK AND PHILIPPE GODINEA FOR ENTRY OF
AN ORDER PURSUANT TO 11 U.S.C. § 1112(b) (I) DISMISSING THE CASES; (II)
CONVERTING THE CASES TO A CHAPTER 7 LIQUIDATION; OR (III)
<u>APPOINTING A CHAPTER 11 TRUSTEE</u>**

I, Pablo Bonjour, hereby declare under penalty of perjury as follows:

1.      I submit this declaration (the "<u>Declaration</u>") in support of *Debtors' Objection to Motion of Krzysztof Majdak and Philippe Godinea for Entry of an Order Pursuant to 11 U.S.C. § 1112(b) (I) Dismissing the Cases; (II) Converting the Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 11 Trustee* (the "<u>Objection</u>"),[2] filed in opposition to the *Motion Of Krzysztof Majdak and Philippe Godinea for Entry of an Order Pursuant to 11 U.S.C. § 1112(b) (I) Dismissing the Cases; (II) Converting The Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 11 Trustee* (the "<u>Motion</u>").

2.      I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

[2]     Capitalized terms used but not otherwise defined in this Declaration have the meanings set forth in the Objection.

3.      In preparing this Declaration, I have relied upon preliminary key balance sheet data, available 2020 balance sheet data through September 30, 2020, and forecasted income statements through December 31, 2020, all provided by the Debtors' executives, including MACCO's review of information to develop the debtor's pro-forma balance sheet and development of a rotating 13-week cash flow budget.  Financials are currently in process of being updated by the Debtors, and figures presented may be materially revised pending additional investigation by MACCO.

4.      Except as otherwise indicated herein, all facts set forth in this Declaration (a) are based on my personal knowledge and/or information supplied to me by others at the Debtors and the Debtors' professionals, (b) were learned from my review of relevant documents, or (c) are my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.

5.      The opinions and conclusions expressed herein are subject to change based on additional data, facts and information that may be received subsequent to the date of this report including, among other things, additional data, facts and information that becomes available in the public domain or that is made available by the Debtors or other parties in interest during discovery or otherwise.  In addition, it is possible that I may be asked at a future date to review and respond to a report or declaration issued by other parties in interest related to the confirmation of the plan.

I.      **Qualifications**

6.      I am a managing director at MACCO Restructuring Group, LLC ("MACCO"), an interim management and financial advisory firm employing 17 professionals, based in Houston, Texas and having offices in New York, New York, Denver, Colorado and Wilmington, Delaware and website with address of (www.macco.group).  MACCO regularly provides interim executive

leadership, financial advisory and fiduciary services to businesses across a vast array of industries who find themselves in financial and operational distress.  MACCO also serves as a financial or restructuring advisor to lenders, creditors, and creditor groups.

7.      I have consulted for more than 1,000 U.S. and international clients throughout my career, including Shell International Exploration & Production, Inc.  My experience extends across a variety of industries including oil & gas, healthcare, consumer products, construction, investment banking, food and pharmaceutical manufacturing, distribution, transportation, heavy equipment and hospitality.

8.      Prior to joining MACCO, I worked for investment banking firms Oppenheimer & Co. and Lehman Brothers, and I formed and led Southcoast Management Group as their CEO and Executive Director for over 12 years.  I received my bachelors of business administration and finance degree from the University of Houston.

9.      I have developed and led financial strategies designed to direct and manage overall performance to meet or exceed P&L and productivity objectives, have consulted for and/or written over one thousand business plans, lead and/or co-led operations and company liquidations, chapter 11 and chapter 7 engagements, including as financial advisor for a chapter 7 Trustee and Turnaround management services.  From 1991 through 2009 I held at different times various licenses including the FINRA Series 7, 63, 65 financial licenses, General Securities Principal (Series 24) FINRA approval equivalent, and NFA Series 3 and Series 30 financial licenses and actively managed clients' accounts.  I owned and operated my own introducing brokerage firm including operating a branch office for the FCM (Futures Commission Merchant) U.S. Securities and Futures Corp and operated a FINRA registered Broker-Dealer.

10.     In addition to many years of stocks and commodities trading and management experience, I have knowledge and experience in doing all the things necessary to create and mine a cryptocurrency and to trademark it, including applying for an IFE (International Financial Entity) license through Puerto Rico to establish a bank that would specialize in cryptocurrency banking services until COVID-19 paused our application. The principal goal of IFEs is to attract United States and foreign investors to Puerto Rico. The IFE Act authorizes the proposed entity to engage in specific banking and financial activity in Puerto Rico (Authorized IFE Activities) with non-residents of Puerto Rico. International Financial Entities (IFEs) are licensed and regulated by the Office of the Commissioner of Financial Institutions pursuant to Act No. 273 of September 25, 2012, as amended (the IFE Act) and Regulation No. 5653.

## II.     Background on Cryptocurrencies

11.     A cryptocurrency is a digital currency created and stored electronically on the blockchain.  A cryptocurrency uses encryption techniques to control the creation of monetary units and to verify the transfer of funds.  A particular unit of cryptocurrency does not have any unique markers or identifiers.

12.     During 2020, cryptocurrency prices were especially volatile, largely as a result of the financial crisis brought on by the COVID-19 pandemic.  For example, in February 2020, the price of bitcoin (the most popular and established cryptocurrency) traded at approximately $10,000 per bitcoin.  In March 2020—largely as a result of the COVID-19 pandemic—bitcoin prices dropped below $5,000 per bitcoin.  Bitcoin prices then recovered steadily through the summer of 2020 to more than $13,000 by the end of October.  Since then, bitcoin prices have continued to rise, reaching over $19,000 by the end of November 2020.

13.     Despite the fact that cryptocurrencies are widely held as an alternative asset class, the cryptocurrency market is largely unregulated.

III.    **The Debtors' Business Model**

14.    The Debtors operate a financial technology platform through which customers transfer cryptocurrency to the Debtors-generally through a loan agreement or financing agreement.  The Debtors then utilize such cryptocurrency in a variety of investment strategies involving third-party asset managers or lenders.  These investments could take the form of (a) the Debtors directly providing the cryptocurrencies to asset managers or (b) the Debtors converting cryptocurrencies into other cryptocurrencies or fiat currencies and providing the resulting proceeds to asset managers or lenders.

15.    The Debtors earn revenue through the returns generated by their investments, as well as through interest on lines of credit extended to certain of the Debtors' customers in connection with the loans and financings referenced above.  The Debtors used several different asset managers and lenders to obtain returns on customers' cryptocurrencies, including Sarson (asset manager), 100 Acre Ventures (asset manager), and numerous others, including Reliz LTD (Blockfills), JST (trading services provider), Elevar Finance (lender), and moKredit (lender).

16.    Generally, customers who transfer their cryptocurrency to the Debtors are entitled to receive their principal and interest back in the form of the cryptocurrency they initially transferred to the Debtors.  Because the Debtors' business model is premised on generating a return for their customers by investing the deposited cryptocurrencies with asset managers, the Debtors generally do not themselves hold significant amounts of cryptocurrency.  When customers terminate their accounts with the Debtors, the Debtors generally have to withdraw cryptocurrency from asset managers or purchase new cryptocurrency in the open market at then-prevailing prices in order to pay back the customers.  As a result, the Debtors bear the risk of price increases between the time of the initial deposit and the withdrawal.

## IV.    Transactions with JST

17.    At the beginning of 2020, the Debtors held substantial "long" futures positions of bitcoin and other cryptocurrencies with JST Capital, LLC ("JST").  The Debtors' positions included cryptocurrencies held on margin.  When cryptocurrency prices dropped more than 40% in March 2020, the margin connected with the bitcoin futures position was eliminated, leaving Cred short bitcoin.  While the Debtors, their CRO, and MACCO continue to analyze the extent and financial impact of the resulting losses,[3] it is abundantly clear that these losses were significant, and, based on a preliminary review of a JST risk exposure report, the net dollar amount of the Debtors' exposure with JST was negative $25 million as of March 17, 2020. These trades had a material negative effect on the Debtors' liquidity because, in the absence of restoring bitcoin hedges and as cryptocurrency prices recovered in the summer and fall of 2020, the Debtors were forced to acquire new cryptocurrencies at substantially higher prices.

18.    Following the losses at JST, the Debtors attempted to recover principal from other asset managers, including moKredit.[4]  While moKredit continued to make interest payments, it was only in a position to return $300,000 of principal in April and May 2020.  moKredit renegotiated a repayment schedule in the aftermath of the economic crisis triggered by the COVID-19 pandemic.  Currently, moKredit is making interest payments in the amount of approximately $582,000 per month.

---

[3]    The Debtors and their advisors are actively investigating this trade and have requested additional information from JST in order to analyze the trades at issue and determine the exact nature and extent of the Debtors' losses at JST.  Although JST has indicated that it is willing to provide at least some of the information, JST has not yet provided all the information necessary for that analysis to be done.

[4]    As detailed in the First Day Declaration, in the early stages of the Debtors' operations in 2019, the Debtors invested most of their cryptocurrency assets with moKredit.  Loans to moKredit generally earned interest of approximately 15% to 24% per annum.  As of the Petition Date, approximately $39 million in loans to moKredit.

V.     **Movants' Statements Regarding the Debtors' Losses Are Not Correct**

19.     Upon MACCO's initial review, it believes the shortfall to be less than the
Movants stated estimate, however, this aspect continues to be analysed.

20.     Movants' assertion that the $14.709 million in cryptocurrencies held by the
Debtors are "worthless" or "fictitious" is not accurate.  Approximately $2.5 million of these
cryptocurrencies are liquid and can be readily converted into cash.

21.     Moreover, as the footnotes to the Balance Sheet (*i.e.*, the pro forma balance sheet
as of the Petition Date prepared by MACCO relying on the information provided by the Debtors)
explain, the remaining $12.2 million in cryptocurrency is "considered illiquid" because "there is
not enough volume traded daily to enable immediate monetization of amounts held."  However,
the fact that these cryptocurrencies are illiquid does not mean that they are worthless or fictitious.
It simply means that there are additional barriers (which may require additional marketing
efforts) to converting these currencies into cash and they must be liquidated in smaller quantities
over time.

22.     While the Balance Sheet (*i.e.*, the pro forma balance sheet as of the Petition Date
prepared by MACCO relying on the information provided by the Debtors) notes that the
outstanding loan to moKredit in the amount of approximately $39 million may be "partially or
completely uncollectible," this does not mean that the Debtors will be unable to recover on their
loans to moKredit.  At this time, it would be premature to conclude that the loans to moKredit
are worthless.

23.     Movants ignore the potential millions of dollars of value that were excluded
intentionally from the asset side of the Balance Sheet (*i.e.*, the pro forma balance sheet as of the
Petition Date prepared by MACCO relying on the information provided by the Debtors).  The
Balance Sheet excludes certain potential recoveries because they are the subject of litigation,

investigation and recovery.  Among other things, the Balance Sheet excluded (1) claims against James Alexander for $3.75 million worth of stolen bitcoin and (2) claims for the return of more than $10 million in bitcoin stolen by an imposter pretending to be Quantcoin (the "Imposter") that continues to be investigated.

24.     A portion of the shortfall on the Balance Sheet is attributable to the run-up in cryptocurrency prices in the months immediately prior to the Petition Date, which translates into increase liabilities to customers.  In fact, the "Program Value", which is driven by the price at the time that the customers renew, relend/loan, or redeem their cryptocurrency, is then adjusted to reflect their new historical position price/value up or down accordingly (*i.e.*, the value of the cryptocurrencies when transferred to the Debtors or upon renewal of the underlying financing arrangement with the customer). At this time, the most recent "Program Value" calculation is approximately $99.5 million, and lower than the Debtors' liability on account of such cryptocurrency valued as of the Petition Date, namely $135.5 million.

**VI.    There Is No Continuing Loss to or Diminution of the Estates**

25.     The Debtors have taken many steps to ensure that the assets that are currently under the Debtors' control are being preserved.

26.     The Debtors' current cryptocurrency assets are protected.  The Debtors' have halted, prior to the Petition Date, any new investment activities and are closely monitoring their existing investments with assistance from their Chief Restructuring Officer and professionals. Moreover, the Debtors' cryptocurrency assets are currently held at Fireblocks, a platform that is regarded as a secure platform to store and transfer cryptocurrencies and their asset managers are all based in the United States.

27.     The Debtors have already undertaken numerous cost-saving measures, including reducing their work force by approximately 30% shortly before the Petition Date and seeking to

reject their two office leases, which are no longer necessary for the Debtors' continued operations. These measures are expected to generate savings during these chapter 11 cases, while preserving the Debtors' platform pending the contemplated sale.

28.    The Debtors, their CRO, the Debtors' independent director, and MACCO are evaluating to what extent their loans to moKredit can be recovered and have reached out to moKredit to seek informal discovery regarding, among other things, moKredit's financial condition.

29.    The Debtors are currently investigating whether there are potential preference actions that could be brought to recover further assets for the benefit of the Debtors' estates. Debtors are also investigating whether there are any other potential litigation claims that could be asserted for the benefit of their estates.

30.    Fifth, the Debtors have taken appropriate steps to preserve the value of their customer lists, including by asking that this court keep them under seal.

31.    The Motion also contains the accusation that the Debtors were wrong to comingle cryptocurrency assets with corporate assets. The Debtors are not required (whether by regulation or contract) to segregate and store cryptocurrencies transferred by customers to the Debtors. In fact, it would be impossible for the Debtors to generate a return on the cryptocurrency transferred by the customer if the Debtors had to store customer cryptocurrency and could not use such assets to invest in revenue generating products. Storage businesses typically charge their customers for storage. That is an entirely different business from the one maintained by the Debtors.

32.    Finally, Dictionary.com defines a "Ponzi scheme" as a "fraudulent investment operation that pays quick returns to initial contributors using money from subsequent

contributors rather than profit."  At the time of this declaration, and as MACCO continues their

investigation, MACCO has not yet seen any evidence that the Debtors ran a Ponzi scheme.

Movants point to no evidence that, other than as a result of the "Quantcoin" scam, the customers'

cryptocurrencies were not invested with the third-party asset managers or lenders, and

MACCO's investigation thus far has not uncovered any such evidence.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on December 2, 2020
Houston, Texas


/s/ Pablo Bonjour
Pablo Bonjour
Managing Director
MACCO Restructuring Group, LLC