**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CRED INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-12836 (JTD)<br><br>(Jointly Administered)<br><br>Hearing Date: Dec. 9, 2020 at 2:00 p.m. (ET)<br>Obj. Deadline: Dec. 2, 2020 at 4:00 p.m. (ET)<br>RE: Docket Nos. 89 & 91 |

**OBJECTION OF DEBTORS TO MOTION OF UPGRADEYA INVESTMENTS, LLC FOR RELIEF FROM STAY UNDER BANKRUPTCY CODE SECTION 362**

TO THE HONORABLE BANKRUPTCY JUDGE JOHN T. DORSEY:

Cred Inc. ("Cred") and its affiliated debtors and debtors in possession (the "Debtors") object (the "Objection") to the *Motion of UpgradeYa Investments, LLC for Relief from Stay Under Bankruptcy Code Section 362* [Docket No. 89] (the "Motion"). In support of this Objection, the Debtors rely on the Declaration of Pablo Bonjour (the "Bonjour Declaration") submitted herewith as **Exhibit A** and incorporated herein by reference, and respectfully state as follows:

**PRELIMINARY STATEMENT**

1. UpgradeYa Investments LLC ("UpgradeYa") is an unsecured creditor of Debtor Cred (US) LLC "CredBorrow") seeking to collect the 478.17 bitcoin it believes it would be owed outside of the bankruptcy process.

2. UpgradeYa fails to meet its burden of establishing "cause" to lift the automatic say, and should not be granted leave to seek relief in another forum. As an initial matter,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

UpgradeYa cannot demonstrate that it has any interest in the 478.17 bitcoin it seeks to recover, or any reason why it should be afforded special treatment and allowed to pursue remedies outside this forum while every other creditor is required to proceed in bankruptcy court. Moreover, to the extent UpgradeYa seeks to establish an interest in the Debtors' property or recover property from the Debtors, it is required to file an adversary proceeding under Bankruptcy Rule 7001, and it has not done so. UpgradeYa cannot circumvent the requirements for an adversary proceeding by filing a lift stay motion on 14 days' notice.

        3.      Second, UpgradeYa's assertion that the "Collateral" in question – 478.17 bitcoin – is not property of the Debtors' estates is incorrect as a legal and factual matter. UpgradeYa transferred the bitcoin to CredBorrow without restriction, and CredBorrow utilized the bitcoin in the operation of its business. CredBorrow had no duty to segregate these bitcoin for UpgradeYa's benefit. To the contrary, there are no restrictions on CredBorrow's use of the bitcoin, and UpgradeYa is nothing more than an unsecured contract creditor whose claims are subject to the automatic stay.

        4.      Third, UpgradeYa has not met its burden of establishing that it has a properly perfected security interest in the bitcoin that would entitle it to obtain stay relief to foreclose upon or recover the bitcoin in question. As set forth herein, ownership of the bitcoin was transferred to CredBorrow. But even if the Court were to conclude otherwise, at best UpgradeYa would have an unperfected and unenforceable lien on the bitcoin, such that stay relief is not warranted. Moreover, CredBorrow currently holds only 89 bitcoin, the current value of which is approximately $1.2 million -- a figure that is substantially less than the $2 million UpgradeYa owes to CredBorrow."

5. Last, as UpgradeYa concedes in the Motion, UpgradeYa received a preferential transfer on August 13, 2020, when CredBorrow transferred 53.1200475 bitcoin to UpgradeYa. As result, until UpgradeYa returns this preferential transfer, UpgradeYa's claims are disallowed by operation of Bankruptcy Code section 502(d).[2]

6. As a result, UpgradeYa is not entitled to relief from the automatic stay, and the Motion must be denied.

## BACKGROUND

**I.    Overview of Bitcoin**

7. Bitcoin is the world's most popular cryptocurrency and is used both as a medium of exchange and for investment purposes.

8. One of the reason for bitcoin's, and many other cryptocurrencies' popularity is that transactions are both transparent and anonymous. Each bitcoin is registered to a certain address, which is identifiable to the world by a public key. The owner of the address also owns the bitcoin at the address. Ownership of the address is determined by whomever holds the private key to the address, i.e. a specific number or passcode that is required to exercise control of the bitcoin located at the address. As far as an e-wallet user is concerned, all bitcoin are fungible and there is nothing unique or individually identifiable about the bitcoin in his e-wallet. Consequently, if an e-wallet user deposits bitcoin from multiple sources into an e-wallet, there is no way to distinguish any bitcoin from another bitcoin. In the ordinary course of business, Cred deposited bitcoin from multiple sources into its e-wallets and, as a result, cannot ascertain the original source of any bitcoin it currently holds in an e-wallet.

---

[2] 11 U.S. § 502(d). The Debtors intend to commence an adversary proceeding to recover the bitcoin transferred to UpgradeYa within 90 days of the November 9, 2020 petition date (the "Petition Date").

9. To transfer bitcoin, the holder of an address's private key sends the bitcoin located at the specific address to another address. The owner of the private key at the new address is now the record owner of the bitcoin. Because each transfer of bitcoin from one address to another is publicly recorded, each bitcoin in circulation can be located at the record owner's address by any person at any point in time.

10. Bitcoin ownership can also be completely anonymous. As mentioned above, the holder of an address' private key owns all the bitcoin at the address. Usually, the only person with knowledge of the private key is the owner of the address, and thus no one else - no bank, no government, no counter-party – necessarily knows *who* owns the address. So while the specific address location of all bitcoin in circulation is publicly available, the identity of the owner of the address is rarely identifiable.

11. For various reasons, including the technical complexity of private keys, many owners of bitcoin utilize an e-wallet to hold their bitcoin. The function of an e-wallet is basically three-fold: 1) to store private keys so the owner of the bitcoin can easily access the bitcoin, 2) to provide users with a platform that easily manages and transfers bitcoin, and 3) to protect private keys from being stolen. In most cases, as far as an e-wallet user is concerned, all bitcoin are fungible and there is nothing unique or individually identifiable about the bitcoin in a user's e-wallet. Consequently, if an e-wallet user deposits bitcoin from multiple sources into an e-wallet, there is no way to distinguish any bitcoin from another bitcoin. In the ordinary course of business, Cred deposited bitcoin from multiple sources into its e-wallets and, as a result, cannot ascertain the original source of any bitcoin it currently holds in an e-wallet.

## II. The Debtors' Relationship with UpgradeYa

12. On April 20, 2020, Debtor Cred (US) LLC ("CredBorrow") agreed to extend a secured line of credit of up to $2 million in U.S. dollars ("USD") to UpgradeYa under a Loan and Security Agreement ("Agreement").[3] The line of credit was to be secured by bitcoin worth twice as much as the amount of USD UpgradeYa owed CredBorrow under the line of credit.[4] Significantly, CredBorrow is the secured party under the Agreement.[5] UpgradeYa was not granted a security interest in any property.[6] Further, although the Agreement defines any "digital wallet" holding the bitcoin collateral as a "Collateral Account," nothing in the Agreement requires such accounts to be segregated or subject to any restrictions.[7]

13. Moreover, the Agreement does not oblige CredBorrow to separately hold the bitcoin deposited by UpgradeYa as an agent or trustee of the bitcoin, nor does it create any bailment agreement or restrict in any way CredBorrow's use of the bitcoin.[8] Indeed, the Agreement imposes no duties on CredBorrow in respect of the bitcoin, and instead grants CredBorrow authority "(c) to release or substitute collateral," "(j) to make withdrawals from and to close deposit accounts or other accounts with any financial institution, wherever located, into which proceeds may have been deposited, and to apply funds so withdrawn to payment of the Indebtedness", and "(k) to do all acts and things and execute all documents in the name of

---

[3] *See* D.I. 91-1 at 19.
[4] *Id.* at 19.
[5] *Id.* at 3, § 2.1.
[6] *See id.*
[7] *See id.* at 3, § 2.1(b).
[8] *See id.*

Borrower or otherwise, deemed by Lender as necessary, proper and convenient in connection with the preservation, perfection or enforcement of its rights."[9]

14. On April 30, 2020, UpgradeYa drew the entire line of credit and deposited more than 530 bitcoin in e-wallets maintained by the Debtors with Fireblocks, Inc. ("Fireblocks").[10] Once UpgradeYa transferred the bitcoin to the Debtors' Fireblocks e-wallets, the bitcoin was in the sole possession of the Debtors because only the Debtors owned the private keys to their e-wallets. Accordingly, UpgradeYa could no longer access or utilize the deposited bitcoin for any purposes.

15. Further, as far as the Debtors are concerned, upon receiving the more than 530 bitcoin from UpgradeYa in their e-wallets at Fireblocks, the bitcoin were completely indistinguishable from other bitcoin the Debtors held. This is because the Fireblocks interface does not segregate a customer's e-wallets or provide each bitcoin's address or public key - it only provides the total amount of bitcoin in a customer's account. Thus, from the Debtors' perspective, all of the bitcoin it received from UpgradeYa was commingled with the other bitcoin in the Debtors' Fireblocks account.

16. Under the Agreement, the only obligation CredBorrow has in relation to the bitcoin transferred by UpgradeYa is to give UpgradeYa an equivalent amount of bitcoin back upon repayment of the $2,000,000.[11] And the Agreement simply states that 531.3004746 bitcoin will be returned to UpgradeYa, it does not specify that the exact bitcoin UpgradeYa transferred to CredBorrow will be returned to UpgradeYa.[12]

---

[9]   See id. at 5, § 2.4c), (j) and (k).
[10]  See D.I. 91-2.
[11]  See id.
[12]  See id.

17. Once CredBorrow received the bitcoin from UpgradeYa, it placed the bitcoin – as well as all of the other bitcoin in its Fireblocks account at the time – with third-party asset managers who then deploy the bitcoin into the stream of commerce to protect its value, a prudent decision due to the historic volatility of bitcoin.[13] When the Debtors transfer bitcoin to their third-party asset managers, they lose control of the bitcoin and have no means to access it. Their only "asset" with their third-party asset managers is the value of their account – they have no specific rights to the bitcoin owned by their third-party asset managers.

18. Because the Debtors usually place the bitcoin[14] they receive from customers with third party asset managers, the Debtors rarely hold any significant bitcoin reserves. Moreover, when the Debtors' third-party asset managers return bitcoin to the Debtors, it is nearly impossible to differentiate whether the bitcoin is a product of one customer or another.

19. Although the Debtors kept close track of the performance of their investments, they did not maintain ledgers tracking the use of the specific bitcoin UpgradeYa deposited with them because bitcoin, like USD, are fungible. Accordingly, there is little to no chance that the specific bitcoin UpgradeYa transferred to the Debtors could be recovered today, or that it could be traced amongst the Debtors' current assets.

20. Illustrating this point, in August 2020, UpgradeYa requested, and received, a "return" of approximately 53 bitcoin from CredBorrow[15] – or 10% of its initial deposit – because

---

[13] By way of illustration, at one point in mid-February 2020, a bitcoin was valued at $10,457.03. By mid-March 2020, the value of a bitcoin had declined to $4,106.98 (a decrease of more than 60% from the mid-February high). By late-April 2020, the time of the Agreement, a bitcoin was worth $9,440.65 (a nearly 130% increase from the mid-March low).

[14] The debtors provide services to holders of many cryptocurrencies, not just bitcoin. For ease of reference, however, the remainder of the Motion will only reference bitcoin.

[15] D.I. 91-6.

bitcoin's value had made significant gains.[16] To facilitate the transaction and "return" the bitcoin to UpgradeYa, however, CredBorrow either used withdrawals from asset managers or purchased new bitcoin on the open market. Either way, the bitcoin "returned" to UpgradeYa was not the same bitcoin UpgradeYa deposited because, as noted above, the Debtors have no means of differentiating specific bitcoin from any other bitcoin, as bitcoin are fungible.

21. Following the August 13, 2020 transfer from CredBorrow to UpgradeYa, the amount of UpgradeYa's "deposit" was 478.17 bitcoin.[17] This transfer was made within 90 days of the Petition Date.

22. Thus, as of the Petition Date, UpgradeYa owed CredBorrow the $2 million outstanding on the line of credit, and UpgradeYa had, at best, a contingent, unsecured claim against CredBorrow for the 478.17 bitcoin UpgradeYa had deposited with CredBorrow (worth about $7.1 million on the petition date and more than $9.3 million at current prices). Because UpgradeYa received an avoidable transfer, its contingent, unsecured claim is disallowed until the transferred property is returned.

23. UpgradeYa now seeks stay relief to pursue the remaining 478.17 bitcoin the Debtors would owe it if UpgradeYa repaid all its obligations under the Agreement. However, the Debtors do not currently have the 478.17 bitcoin UpgradeYa seeks to recover held "on reserve." As set forth in the Bonjour Declaration, the Debtors currently hold approximately 89 bitcoin. *See* Bonjour Declaration, ¶ 17. Thus, to the extent the Debtors are required to "return" the bitcoin UpgradeYa deposited with the Debtors, the Debtors would purchase bitcoin on the open market at prevailing prices, rather than transferring bitcoin from a segregated account.

---

[16] The value of the 530-plus bitcoin UpgradeYa deposited with the Debtors was worth approximately $5.8 million (or almost nearly three times the $2 million outstanding under the line of credit).

[17] D.I. 91-6.

Moreover, the Debtors have more than 6500 customers and if UpgradeYa were to attempt to seize assets it would undoubtedly be taking assets that were deposited by other customers in addition to UpgradeYa.

24. Prior to the Petition Date, the Debtors performed a lien search and, as of October 28, 2020, UpgradeYa had not filed a UCC financing statement with the Delaware Secretary of State to perfect any lien on the Debtors' assets.[18]

## ARGUMENT

### I. The Bitcoin UpgradeYa Seeks to Recover is Property of the Estate

25. The scope of section 541(a) of the Bankruptcy Code, which delineates what constitutes property of a debtor's bankruptcy estate, is extremely broad.[19] It encompasses "all legal or equitable interests of the debtor,"[20] that is, "everything that the debtor owns upon filing a petition as well as any derivative rights, such as property rights the estate acquires after the case commences."[21] The only property excluded from the estate is what is specifically excepted by section 541(b) and (c)(2) of the Bankruptcy Code.[22] Section 541(b) and (c)(2) does not contain an exception for cryptocurrency or bitcoin.[23]

26. On the Petition Date, the Debtors had the sole right to possess and use all of the bitcoin in their possession. Moreover, no one could access the bitcoin in the Debtors'

---

[18] The Debtors also performed a lien search with the California Secretary of State, and as of October 2, 2020, UpgradeYa had not filed a UCC financing statement there either. Any filing after that date would constitute a further avoidable transfer.

[19] *See O'Dowd v. Trueger (In re O'Dowd)*, 233 F.3d 197, 202 (3d Cir. 2000).

[20] 11 U.S.C. § 541(a)(1).

[21] *In re O'Dowd* at 202.

[22] § 541(a)(1); *Andrus v. Glover Const. Co.*, 446 U.S. 608, 616-17 (1980) ("[w]here Congress explicitly enumerates certain exceptions […] additional exceptions are not to be implied in the absence of a contrary legislative intent."). *See also U.S. v. Whiting Pools*, 462 U.S. 198, 205 n.10 (1983) (noting the exceptions provided in section 541(b)).

[23] § 541(b); § 541(c)(2).

possession, or direct how the Debtors used the bitcoin in their possession. Clearly, the Debtors held legal and equitable title to the bitcoin in the Debtors' possession. And none of the exceptions in section 541(b) or (c)(2) apply. Consequently, the Debtors' bitcoin is property of the estate under section 541(a).

27. To be abundantly clear, the bitcoin UpgradeYa deposited with CredBorrow became CredBorrow's property at the time it was placed in the Debtors' e-wallets, and became property of the estate when CredBorrow filed bankruptcy. CredBorrow has utilized the bitcoin UpgradeYa transferred to it in the ordinary course of its business affairs, free of any restrictions.

28. The Motion attempts to argue around this obvious conclusion by alleging that the Debtors only hold rights to the bitcoin as a pledgee, and thus are holding the bitcoin on behalf of someone else. That argument is flawed, however, because the transfer of bitcoin to the Debtors' e-wallets operated as an actual transfer of ownership, not a pledge.

    A.    **UpgradeYa Transferred the Bitcoin to CredBorrow and Has No Security Interest**

29. Under both California and Delaware law, bitcoin is a "general intangible" because it is personal property and is not a(n): account, chattel paper, commercial tort claim, deposit account, document, good, instrument, investment property, letter-of-credit right, letter of credit, money, oil, gas, or other mineral before extraction.[24]

30. Under both California and Delaware law, an effective security interest in general intangibles cannot be effected through a pledge.[25] Under the applicable provisions of the Uniform Commercial Code, the only way to create a security interest in general intangibles is

---

[24] Cal. Com. Code § 9102(42); 6 Del. Code § 9-102(42).
[25] Cal. Com. Code § 9313(a); 6 Del. Code § 9-313(a).

through the filing of a financing statement.[26] However, using this form of security interest for bitcoin would not protect a lender like CredBorrow, since the counterparty granting the security interest – here, UpgradeYa – would retain the ability to transfer the bitcoin to a third party, from which recovery of the bitcoin would be difficult or impossible. A security interest in bitcoin perfected by filing would not provide the secured party with meaningful protection.

31. Thus, when UpgradeYa transferred its bitcoin to the Debtors, it did not pledge the bitcoin. Instead it transferred all legal and equitable title. The fact that the Agreement purported to call the transferred bitcoin "Collateral" is irrelevant to the analysis.[27]

### B. Even if UpgradeYa Had Been Granted a Security Interest in the Bitcoin, UpgradeYa Would Have No Enforceable Rights in That "Collateral"

32. Even if UpgradeYa is right that the bitcoin was pledged, it would not help its argument as the bitcoin would *still* be property of the estate. Under both California and Delaware law, the secured party has the right to commingle fungible collateral in its possession[28] and to use the collateral in its possession for the purpose of preserving the collateral's value.[29] Further, a secured party has the right to create a security interest in the collateral in its possession.[30]

33. The rights CredBorrow has under the Agreement to use the bitcoin are clearly more expansive than Bankruptcy Code section 541(b)(1)'s limited exception for property rights

---

[26] *See* Cal. Com. Code § 9310(a); 6 Del. Code § 9-310(a).

[27] *See* Cal. Com. Code § 9109; 6 Del. Code § 9-109. *See also* U.C.C. § 9-109, cmt. 2 ("the subjective intention of the parties with respect to the legal characterization of their transaction is irrelevant as to whether this Article applies").

[28] Cal. Com. Code § 9207(b)(3); 6 Del. Code § 9-207(b)(3).

[29] Cal. Com. Code § 9207(b)(4); 6 Del. Code § 9-207(b)(4).

[30] Cal. Com. Code § 9207(c)(3); 6 Del. Code § 9-207(c)(3).

11

that "the debtor may exercise solely for the benefit of an entity other than the debtor."[31]  Under the Agreement, CredBorrow had broad rights in the bitcoin that it exercised *for its own benefit*, by deploying the bitcoin in commerce.[32]  The bitcoin were transferred to CredBorrow's e-wallets, and CredBorrow used them as its own, consistent with the Agreement.  The bitcoin were commingled with other bitcoin, and it is not possible to trace the bitcoin UpgradeYa transferred to CredBorrow.  As a result, UpgradeYa has no enforceable rights with respect to the bitcoin.

34. For the reasons stated above, it is abundantly clear that all bitcoin in the Debtors' possession was property of the Debtors, and became property of the estate.  CredBorrow did not hold the bitcoin as an agent, bailee or fiduciary for any of its customers.  Rather, CredBorrow has unfettered use of the bitcoin, and used them to operate its business.  Any interest that UpgradeYa might have had in the bitcoin was vitiated by such use.

## II. UpgradeYa Fails to Meet Its Burden to Establish "Cause" to Lift the Stay

35. UpgradeYa is unable to establish "cause" to lift the automatic stay, as it is merely an unsecured creditor of the Debtors seeking to enforce a contingent, unliquidated prepetition claim.  Under the terms of the Agreement, the Debtors may owe UpgradeYa 478.17 bitcoin if UpgradeYa repays the $2 million it borrowed from CredBorrow.  To date, UpgradeYa has not repaid the $2 million loan, so at best the Motion is premature.  Moreover, the Agreement does not grant UpgradeYa any liens or security interest in any of the Debtors' assets – including the 478.17 bitcoin it will be owed upon repayment of the $2 million.  And, on information and belief, no liens against the Debtors were ever perfected.

---

[31] 11 U.S.C. § 541(b)(1).
[32] *See* D.I. 91-1, at 5, § 2.4(k).

36.     Because UpgradeYa does not control the 478.17 bitcoin it seeks to recover, or have any means for accessing it, it is unclear the exact steps UpgradeYa intends to take to recover it.  The Motion only requests the Court "permit [] UpgradeYa to take any and all actions necessary to recover [the 478.17 bitcoin it deposited with CredBorrow] from the Debtors, any third parties, and/or […] the Debtors' applicable insurance provider".[33]

37.     As an unsecured creditor, UpgradeYa can only seek relief from the automatic stay for "cause."[34]  Whether "cause" exists to lift the automatic stay is a decision entrusted to the sound discretion of the bankruptcy court.[35]  Because section 362(d)(1) does not define "cause," courts determine what constitutes cause based on the totality of the circumstances and on a case-by-case basis.[36]  Generally speaking, courts in this district consider three factors when determining whether to lift the stay "for cause":

  i.    whether the debtor or the estate will suffer great prejudice if the action is continued;
  ii.   balancing the hardships faced by the debtors and the moving party; and
  iii.  the probability that the moving party will succeed on the merits.[37]

38.     Also, unsecured creditors are not entitled to stay relief except in "extraordinary circumstances."[38]

39.     As mentioned above, the Motion does not specify what actions UpgradeYa intends to take to recover the 478.17 bitcoin CredBorrow allegedly owes it.  Whatever those

---

[33] D.I. 89 at 12.

[34] 11 U.S.C. § 362(d)(1).

[35] *See, e.g., In re SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007).

[36] *See id.*

[37] *See, e.g., Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. Co.)*, 141 B.R. 574, 576 (Bankr. D. Del. 1992).

[38] *See In re Valley Media, Inc.*, 279 B.R. 105, 133 (Bankr. D. Del. 2002) (citing *In re Tristar Automotive Group, Inc.*, 141 B.R. 41, 44 (Bankr. S.D.N.Y. 1992) (holding that an unsecured creditor is not entitled to relief from stay unless it can establish extraordinary circumstances)); *see also In re Brown*, 311 B.R. 409, 413 (Bankr. E.D. Pa. 2006) ("Unsecured creditors are generally entitled to stay relief from an automatic stay only in extraordinary circumstances.").

actions may be, it is certain that they will require the Debtors to respond, placing an unnecessary burden on the Debtors' estates and diverting resources from the reorganization effort.

40. In addition to not specifying what further relief UpgradeYa intends to pursue, the Motion fails to articulate what "cause" there is for lifting the stay. But even if the Motion attempted to do so, it could not, as there is no "cause" to lift the stay in these cases. UpgradeYa will not suffer any special or unique harm if the stay is not lifted. Rather, like all other unsecured creditors in these cases, it will be limited to pursuing its claim against the Debtors in these proceedings.

41. In contrast, the Debtors' estates will suffer significant harm if UpgradeYa is granted relief from the stay. Forcing the Debtors to defend against UpgradeYa in a separate forum would require the Debtors to expend serious effort and resources at a critical time in these chapter 11 cases, when all their energy should be focused on the reorganization process.

42. The Debtors are currently engaged in numerous actions to recover property of the estate and maximize value.[39] The Debtors are seeking turnover of the assets misappropriated by a former officer,[40] and have continued to engage with law enforcement authorities about recovering cryptocurrency stolen from them. In addition, the Debtors recently hired Teneo as their investment banker[41] and have begun a comprehensive marketing process to sell the

---

[39] This paragraph provides a small sampling of the Debtors' efforts in these regards. The *Debtors' Objection to Motion of Kzysztof Majdak and Philippe Godinea for Entry of an Order Pursuant to 11 U.S.C. § 1112(b)(1) Dismissing These Cases; (II) Converting the Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 11 Trustee*, filed contemporaneously with this response, provides a more complete description of the Debtors' efforts so far.

[40] *See* Adv. Proc. 20-51006 (Bankr. D. Del. Nov. 18, 2020).

[41] *Debtors' Application for Entry of an Order Authorizing Employment and Retention of Teneo Capital LLC as Investment Banker for Debtors, Effective* Nunc Pro Tunc *to November 16, 2020* [D.I. 63].

business.[42] Distracting the Debtors from the chapter 11 process would cause significant harm to the Debtors' estates.

43.     Further, if stay relief is granted and UpgradeYa is somehow able to wrest more than 478.17 bitcoin away from the Debtors, such actions will deplete estate assets that would otherwise be available to the Debtors' other unsecured creditors. As mentioned above, the Debtors do not currently have the 478.17 bitcoin UpgradeYa seeks to recover held "on reserve." Furthermore, it would be fundamentally unfair to the thousands of other customers of the Debtors to let UpgradeYa jump ahead of them and seize assets, since the Debtors' assets are insufficient to satisfy in full all claims against the estates.

44.     Practically, the Debtors would be forced to purchase 478.17 bitcoin on the open market at prevailing prices – significantly depleting estate assets solely for the benefit of a single unsecured creditor. In doing so, UpgradeYa will have essentially been able to skip over the priority scheme of the Bankruptcy Code.

45.     Finally, it is noteworthy that the Debtors – as was their right – commingled all their bitcoin together.[43] Upon the commingling, the bitcoin UpgradeYa transferred to the Debtors lost whatever character it might have had as "collateral," separate and apart from the Debtors' other bitcoin.

46.     In sum, UpgradeYa's attempt to argue that its actions will not prejudice other creditors is unavailing because the fundamental premise on which it relies – that the bitcoin it deposited is not property of the estate – simply is not true.

---

[42]    *See Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing and Approving Form and Notice Thereof, and (C) Approving Assumption and Assignment Procedures and Form and Manner of Notice Thereof; and (II) Authorizing (A) the Sale(s), Free and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases* [D.I. 65].

[43]    Cal. Com. Code § 9207(b)(3); 6 Del. Code § 9-207(b)(3).

### III. The Motion is Procedurally Improper and the Issues it Raises Must Be Addressed in an Adversary Proceeding

47. The Motion improperly seeks determination of various parties' competing rights in the context of a contested matter, when in fact an adversary proceeding is required. Under Bankruptcy Rule 7001, this dispute constitutes as "a proceeding to recover money or property," and "a proceeding to determine the validity, priority, or extent of a lien or other interest in property" that requires an adversary proceeding.[44] As noted above, UpgradeYa is the recipient of a preferential transfer, which the Debtors intend to avoid and recover through an adversary proceeding. The Debtors are entitled to the important procedural protections of the Bankruptcy Rules in connection with the adjudication of these property rights.

### IV. UpgradeYa Holds No Allowed Claim

48. As UpgradeYa conceded, it received a transfer from CredBorrow during the 90 days before the Petition Date. Until UpgradeYa returns the approximately 53 bitcoin CredBorrow transferred to it on August 13, 2020, UpgradeYa's claim is disallowed, and UpgradeYa lacks standing to seek relief from the automatic stay.

### CONCLUSION

49. The Motion fails to delineate any specific cause for lifting the automatic stay, and should be denied on that basis alone. The bitcoin in question are property of the Debtors' estates, and any dispute concerning entitlement to that property must be resolved through an adversary proceeding. Moreover, as the holder of a claim that is disallowed, UpgradeYa is not entitled to any relief under the preferential transfer is returned.

50. Accordingly, the Court should deny the Motion.

---

[44] Fed. R. Bankr. P. 7001(1) and (2).

WHEREFORE, the Debtors request the Court deny the Motion and grant the Debtors such other and further relief as is just and proper.

Dated: December 2, 2020
      Wilmington, Delaware

    *Scott D. Cousins*
Scott D. Cousins (No. 3079)
**COUSINS LAW LLC**
Brandywine Plaza West
1521 Concord Pike, Suite 301
Wilmington, Delaware 19803
Telephone:   (302) 824-7081
Facsimile: :   (302) 295-0331
Email:   scott.cousins@cousins-law.com

- and -

James T. Grogan (admitted *pro hac vice*)
Mack Wilson (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
Telephone:   (713) 860-7300
Facsimile:   (713) 353-3100
Email:   jamesgrogan@paulhastings.com
         mackwilson@paulhastings.com

- and -

G. Alexander Bongartz (admitted *pro hac vice*)
Avram E. Luft (*pro hac vice* pending)
Derek Cash (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:   (212) 318-6000
Facsimile:   (212) 319-4090
Email:   alexbongartz@paulhastings.com
         aviluft@paulhastings.com
         derekcash@paulhastings.com

*Proposed Co-Counsel to the Debtors*