**<u>Exhibit A</u>**
**Bonjour Declaration**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
| | ) | |
| Debtors.[1] | ) | |
| | ) | |

**DECLARATION OF PABLO BONJOUR IN SUPPORT OF DEBTORS' OBJECTION**
**TO MOTION OF UPGRADEYA INVESTMENTS, LLC FOR RELIEF <u>FROM STAY</u>**
**<u>UNDER BANKRUPTCY CODE SECTION 362</u>**

I, Pablo Bonjour, declare and state under penalty of perjury as follows:

1.        I submit this declaration (the "<u>Declaration</u>") in support of *Debtors' Objection to Motion of UpgradeYa Investments, LLC for Relief from Stay Under Bankruptcy Code Section 362* (the "<u>Objection</u>"),[2] filed in opposition to the *Motion of UpgradeYa Investments, LLC for Relief from Stay Under Bankruptcy Code Section 362* (the "<u>Motion</u>").

2.        I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

3.        Except as otherwise indicated herein, all facts set forth in this Declaration (a) are based on my personal knowledge and/or information supplied to me by others at the Debtors and the Debtors' professionals, (b) were learned from my review of relevant

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

[2]    Capitalized terms used but not otherwise defined in this Declaration have the meanings set forth in the Objection.

documents, or (c) are my opinion based upon my experience and knowledge of the Debtors'
operations and financial condition.

4.       The opinions and conclusions expressed herein are subject to change based on
additional data, facts and information that may be received subsequent to the date of this report
including, among other things, additional data, facts and information that becomes available in
the public domain or that is made available by the Debtors or other parties in interest during
discovery or otherwise.  In addition, it is possible that I may be asked at a future date to review
and respond to a report or declaration issued by other parties in interest related to the
confirmation of the plan.

## I.       <u>Cryptocurrency</u>

5.       A cryptocurrency, like bitcoin, which is the most popular cryptocurrency in the
world, is a digital currency created and stored electronically in blockchain.  A cryptocurrency
uses encryption techniques to control the creation of monetary units and to verify the transfer of
funds.

6.       Cryptocurrency is widely held as an "alternative" investment and also as a
medium of exchange.

7.       One of the reasons for bitcoin's and many other cryptocurrencies' popularity is
that transactions are both transparent and anonymous.  Each bitcoin is registered to a certain
address, which is also identifiable to the world by a public key.  The owner of the address also
owns the bitcoin at the address.  Ownership of the address is determined by whomever holds the
private key to the address, i.e. a specific number or passcode that is required to exercise control
of the bitcoin located at the address.

8.      That said, as far as an e-wallet user is concerned, all bitcoin are fungible and there is nothing unique or individually identifiable about the bitcoin in his e-wallet.  Consequently, if an e-wallet user deposits bitcoin from multiple sources into an e-wallet, there is no way to distinguish any bitcoin from another bitcoin.  In the ordinary course of business, Cred deposited bitcoin from multiple sources into its e-wallets and, as a result, cannot ascertain the original source of any bitcoin it currently holds in an e-wallet.

9.      To transfer bitcoin, the holder of an address's private key sends the bitcoin located at the specific address to another address.  The owner of the private key at the new address is now the record owner of the bitcoin.  Because each transfer is publicly recorded, each bitcoin in circulation can be located at the record owner's address by any person at any point in time.

10.      Bitcoin ownership can also be completely anonymous.  As mentioned above, the holder of an address' private key owns all the bitcoin at the address.  Usually, the only person with knowledge of the private key is the owner of the address, and thus no one else - no bank, no government, no counter-party – necessarily knows *who* owns the address.  So while the specific address location of all bitcoin in circulation is publicly available, the identity of the owner of the address is rarely identifiable.

11.      For various reasons, including the technical complexity of private keys, many owners of bitcoin utilize an e-wallet to hold their bitcoin.  In most cases, as far as an e-wallet user is concerned, all bitcoin are fungible and there is nothing unique or individually identifiable about the bitcoin in a user's e-wallet.

12.      During 2020, cryptocurrency prices were especially volatile, largely as a result of the financial crisis brought on by the COVID-19 pandemic.  For example, in February 2020, the

price of bitcoin (the most popular and established cryptocurrency) traded at approximately

$10,000 per bitcoin.  In March 2020—largely as a result of the COVID-19 pandemic—bitcoin

prices dropped below $5,000 per bitcoin.  Bitcoin prices then recovered steadily through the

summer of 2020 to more than $13,000 by the end of October.  Since then, bitcoin prices have

continued to rise, reaching over $19,000 by the end of November 2020.

II.    **The Debtors Use of Cryptocurrency**

13.    The Debtors operate a financial technology platform through which customers

transfer cryptocurrency to the Debtors generally through a loan agreement or financing

agreement.  The Debtors then utilize such cryptocurrency in a variety of investment strategies

involving third-party asset managers or lenders.  These investments could take the form of (a)

the Debtors directly providing the cryptocurrencies to asset managers or (b) the Debtors

converting cryptocurrencies into other cryptocurrencies or fiat currencies and providing the

resulting proceeds to asset managers or lenders.

14.    The Debtors earn revenue through the returns generated by their investments,

as well as through interest on lines of credit extended to certain of the Debtors' customers in

connection with the loans and financings referenced above.  The Debtors used several different

asset managers and lenders to obtain returns on customers' cryptocurrencies, including Sarson

(asset manager), 100 Acre Ventures (asset manager), and numerous others, including Reliz

LTD (Blockfills), JST (trading services provider), Elevar Finance (lender), and moKredit

(lender).

15.    When the Debtors receive cryptocurrency from larger, institutional customers,

under both the CredBorrow and the CredEarn programs, the Debtors would provide the

customer with the information of the Debtors' e-wallets maintained at Fireblocks, Inc.

("Fireblocks") to deposit cryptocurrency into.

16.     Once the Debtors receive the cryptocurrency into their Fireblocks e-wallets,
the depositor no longer has access or control over the deposited cryptocurrency.  Additionally,
the deposited cryptocurrency is undistinguishable by the Debtors from the other
cryptocurrencies held in the Debtors' Fireblocks accounts.  The Fireblocks interface does not
segregate a Debtors' e-wallets or provide each bitcoin's address of public key.  It only provides
the total amount of cryptocurrency in a customer's account.

17.     Because the Debtors invest the cryptocurrencies deposited with them to earn a
return, the Debtors try and maintain only as much cryptocurrency as they need for current
operations.  Thus, the Debtors usually quickly either invest the cryptocurrency they receive
with third-party asset managers, or liquidate it into fiat currency to be invested with third-party
asset managers. As a result, the Debtors rarely hold significant amounts of cryptocurrency.

18.     For example, the Debtors currently hold approximately 89 bitcoin in their
possession.

19.     When the Debtors transfer cryptocurrency to their third-party asset managers,
they lose control of the cryptocurrency and have no means to access it.

20.     To the extent the Debtors are required to distribute cryptocurrencies to third
parties, they do so by either transferring cryptocurrency in their possession or purchasing and
selling cryptocurrency on the open market at prevailing market prices.  Since cryptocurrency is
a fungible asset, the Debtors customers are not harmed by the Debtors' practices so long as they
maintain sufficient liquidity to meet customer demands.

21.      When the Debtors need to make withdrawals from their accounts with their third-party asset managers, there is no guarantee that the Debtors third-party asset managers return the same cryptocurrency the Debtors invested with the third-party asset managers. Indeed, it would be highly unlikely that the Debtors get back the same bitcoin due to the fact that the bitcoin has entered the stream of commerce and is fungible.

22.      Moreover, it is extremely difficult, if not impossible, for the Debtors to differentiate whether cryptocurrency returned from asset manages is a product of a certain customers' cryptocurrency.  The Debtors keep close track of the performance of their investments, they do not maintain ledgers tracking the use of the specific cryptocurrency customers deposit with them because cryptocurrency, like USD, are fungible.  Accordingly, there is little to no chance that the specific cryptocurrency transferred by a customer to the Debtors could be recovered, or that it could be traced amongst the Debtors' current assets.

23.      I have reviewed the Motion for Relief from Stay filed by UpgradeYa. I am informed that the Debtors' have conducted a search of public records and have not been able to locate any UCC financing statement filed by UpgradeYa with the State of California or Delaware.

24.      My understanding is that was an arms' length commercial financing transaction where the Debtors loaned US dollars to UpgradeYa, and in exchange UpgradeYa loaned provided bitcoin to the Debtors.  The Debtors were not restricted from using the bitcoin transferred by UpgradeYa and did not agree to store those bitcoin in a secure vault for future return.  In any event, the Debtors do not currently hold 478.17 bitcoin for the benefit of UpgradeYaAs a practical matter, the Debtors currently hold approximately 89 bitcoin, which as

of the Petition Date was worth about $1.2 million, which is less than the $2 million UpgradeYa

owes the Debtors.

Executed on: December 2, 2020
Houston, Texas

/s/
Pablo Bonjour
Managing Director of
Sonoran Capital Advisors, LLC