## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CRED INC., *et al.*, | Case No.:  20-12836 (JTD) |
| Debtors.[1] | Jointly Administered |
| | **Ref. Nos. 62, 65, 89, 91, 97, 109, 113 & 116** |

### UPGRADEYA INVESTMENTS, LLC'S (I) REPLY TO OBJECTION OF DEBTORS TO MOTION OF UPGRADEYA INVESTMENTS, LLC FOR RELIEF FROM STAY UNDER BANKRUPTCY CODE SECTION 362 AND (II) LIMITED JOINDER IN THE MOTION FOR AN ORDER CONVERTING THE CHAPTER 11 CASES TO CHAPTER 7

UpgradeYa Investments, LLC ("UpgradeYa"), by and through its undersigned counsel, submits this reply (the "Reply") to the Debtors' objection [D.I. 116] (the "RFS Objection") to the *Motion of UpgradeYa Investments, LLC for Relief from Stay Under Bankruptcy Code Section 362* [D.I. 89] (the "RFS Motion")[2] and hereby partially joins in the *Motion of Krzysztof Majdak and Philippe Godinea for Entry of an Order Pursuant to Section 1112(b) (I) Dismissing the Cases; (II) Converting the Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 7 Trustee* [D.I. 62] (the "Motion to Convert").  In further support of the RFS Motion and this Reply, UpgradeYa filed contemporaneously herewith the *Supplemental Declaration of Marc Parrish in Support of the Motion of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362* (the "Supplemental Parrish Declaration" and together with the Parrish Declaration [D.I. 91], the "Parrish Declarations") and respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

[2] Terms utilized but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

## PRELIMINARY STATEMENT

The Debtors' RFS Objection is nothing more than a self-serving, post-hoc attempt to recast their business model and revise previous statements about lending products they offered to obscure their willful mismanagement, misconduct and misappropriation of CredBorrow borrowers' property, including UpgradeYa's Collateral.  Instead of acknowledging their malfeasance, the Debtors seek to justify their misconduct and perpetuate their bad acts – some of which appear to have been taken postpetition and may be ongoing to this day – by advancing the absurd position that the Collateral UpgradeYa pledged to secure a prepetition loan by the Debtors is property of the Debtors' estates and that they had the unfettered right to use such Collateral as they wished (including selling it) despite the express language of the Agreement and applicable law to the contrary.  To validate their misdeeds, the Debtors ask this Court to warp fundamental financial principals – namely that lenders obtain all rights (including ownership rights) in collateral pledged to secure a loan.

UpgradeYa's request for relief from the automatic stay should be granted.  As the evidence submitted in connection with the RFS Motion and this Reply demonstrates, the Collateral is not property of the Debtors' estates and the Debtors (by their own admission) have misappropriated the Collateral, thus providing ample cause to permit UpgradeYa to pursue the return of its Collateral from third parties that may be in possession of it and/or from applicable insurance proceeds.  Not only will the Debtors' estates and their creditors not be harmed by the Court granting relief from the automatic stay for UpgradeYa to chase after its own property, but the Debtors and all parties in interest will benefit from any mitigation of damages UpgradeYa is able to achieve through the recovery of its Collateral or the value thereof from non-debtor sources. Accordingly, for the reasons set forth in the RFS Motion and herein, the Debtors' RFS Objection should be overruled and the automatic stay should be lifted to permit UpgradeYa to seek to recover

its property from third parties and any applicable insurance proceeds.

Additionally, as explained below, in light of the continuing loss of property, gross mismanagement and incompetence demonstrated both pre- and postpetition by the Debtors, UpgradeYa hereby joins in the requests made upon this Court by numerous creditors to convert these Chapter 11 cases to cases under Chapter 7.   The efficient liquidation of the Debtors' estates and distribution of proceeds to creditors must be performed by an independent, neutral Chapter 7 Trustee, for the benefit of the Debtors' creditors and victims, without the phalanx of expensive, redundant professionals proposed to be retained in these cases at the expense of parties who already have suffered tremendous economic harm as a result of the Debtors' misdeeds.

### EXPLANATION OF THE CREDBORROW PROGRAM

1.      As explained in the First Day Declaration and the RFS Motion, the Debtors have two distinct product lines: CredEarn and CredBorrow.  *See*, First Day Declaration, ¶ 9 (explaining that "[i]n addition to its investment services [under the CredEarn program], the Debtors also provide lending services to certain customers" under the CredBorrow program.)  While it may be convenient for the Debtors to gloss over (or ignore) the differences between these two programs, the differences in these products are important to understand.

2.      Under the CredBorrow program, the Debtors, in their capacity as a lender, extended loans to their customers, in their capacity as borrowers; these loans were secured by cryptocurrency the customer/borrowers pledged as collateral to secure the repayment of the loans.  *See*, Agreement, §§ 1.1, 2.1.  In theory, the CredBorrow program should operate like a traditional securitized loan, with the loan secured by the borrower's cryptocurrency.

3.      By contrast, under the CredEarn program, customers would lend their cryptocurrency to the Debtors and the Debtors would then invest such cryptocurrency.   In exchange, CredEarn customers would be paid interest on the cryptocurrency they loaned to the

Debtors.  Importantly, and distinct from the CredBorrow program, CredEarn customers authorized

and understood that the Debtors would utilize their cryptocurrency in investments.

4.        While the Debtors may try to blur the lines between the CredEarn and CredBorrow

programs to justify their misappropriation of the collateral pledged to secure loans under the

CredBorrow program, as explained in the RFS Motion and herein, UpgradeYa (and presumably

other CredBorrow customers) never relinquished their ownership interest in their collateral.  Under

the CredBorrow program, the Debtors have at most a security interest in the collateral they held as

security for the loans they advanced.  To perfect their security interest in the collateral they held,

the Debtors were required to file UCC-1 financing statements in appropriate jurisdictions which,

upon information and belief, the Debtors failed to do with respect to UpgradeYa's Collateral.

## **REPLY**

**A.**      ***UpgradeYa's Collateral Is Not Property of the Debtors' Estates***

5.        The Debtors argue, erroneously, that "the bitcoin UpgradeYa deposited with

CredBorrow became CredBorrow's property at the time it was placed in the Debtors' e-wallets,

and became property of the estate when CredBorrow filed bankruptcy."  Objection, ¶ 27.  There is

no reasonable interpretation of the Agreement (or California law)[3] that supports the Debtors'

assertion that UpgradeYa relinquished its ownership interest in its Collateral when such Collateral

was deposited in the Collateral Accounts.  There is, however, ample factual and legal support to

conclude that the Collateral belonged at all times to UpgradeYa.

6.        As an initial matter, the Debtors are the lenders under the Agreement and, therefore,

it was the ***Debtors*** who are the party that was granted and needed to perfect their security interest

in the Collateral – not UpgradeYa.  The Debtors' assertion that "the Agreement does not grant

---

[3] The Agreement is governed by the laws of California.  Agreement, § 9.1.

UpgradeYa any liens or security interest in any of the Debtors' assets – including the 478.17 bitcoin [UpgradeYa] will be owed upon repayment of the $2 million" is illogical.  Objection, ¶ 35. By the Debtors' own admission, "CredBorrow is the secured party under the Agreement" with a security interest in the Collateral UpgradeYa deposited in the Collateral Accounts.  Objection, ¶ 12.  On the one hand, the Debtors claim to have a perfected security interest in the Collateral to secure the Line of Credit and, on the other, they assert that the Collateral is their property.  The Debtors cannot have it both ways.

7.      From the outset of the CredBorrow transaction with UpgradeYa, the Debtors represented that the Collateral would be maintained in segregated e-wallets.  Supplemental Parrish Declaration, ¶ 2.  On April 10, 2020, Cred informed UpgradeYa that once the Agreement was executed "[Cred] will begin creating new wallets for the transfers [of the Collateral]."  Email from Ka Zhang (Michael), Senior Wealth Associate at Cred, to Marc Parrish, Managing Member of UpgradeYa (April 10, 2020, 11:16 p.m. EST) attached to the Supplemental Parrish Declaration as **Exhibit 1**.  Relatedly, the Agreement provides that "[c]onfirmations sent by Lender or on Lender's behalf regarding…the details of the digital wallet or other account in which Lender or its designated agent or custodian ***holds*** the Collateral, are dispositive and controlling for all purposes" highlighting that the Collateral was merely being held by the Debtors.  Agreement, § 2.1 (emphasis added).  On April 23, 2020, Cred provided this confirmation stating "[t]he attached reports all of the deposits that have been made to ***your*** collateral wallets to date."  *See* Email from Xavier Rashotsky, Senior Manager, Operations at Cred, to Marc Parrish, Managing Member of UpgradeYa (April 23, 2020, 9:05 p.m. EST) attached to the Supplemental Parrish Declaration as **Exhibit 2** (emphasis added).  Troublingly, the Debtors now admit that "CredBorrow has utilized the bitcoin UpgradeYa transferred to it in the ordinary course of its business affairs, free and clear of any

restrictions." Objection, ¶ 27. As the secured party, the Debtors have a legal obligation to "use reasonable care in the custody and preservation of collateral in the secured party's possession." CAL. COM. CODE § 9207(a). To brazenly state that "the Agreement does not oblige CredBorrow to separately hold the bitcoin deposited by UpgradeYa as an agent or trustee of the bitcoin, nor does it create any bailment agreement or restrict in any way CredBorrow's use of the bitcoin" is nothing short of an admission of the fraud that the Debtors have carried out and seemingly are continuing to justify and perpetrate postpetition. *See*, RFS Objection, ⁋ 13.

8.     The Debtors cannot, after misappropriating the Collateral, claim that it was their property to use freely.[4]   The Agreement expressly provides that the Debtors have merely a security interest in the Collateral. *See* Agreement, § 2.1 (UpgradeYa grants Cred "a security interest in the following described Collateral"). Courts have widely held, with respect to a vast range of personal property, that a security interest is not the same thing as legal and equitable title. *See In re Emergency Monitoring Technologies, Inc.*, 366 B.R. 476, 499 n.19 (Bankr. W.D. Pa. 2007) ("Tepsic ... possessed, by virtue of the Assignment of Accounts Receivable, at best nothing more than a security interest in accounts receivable, [] the [borrower], therefore, would have owned both legal title to, *and the equitable interest in* ... the accounts receivable") (emphasis in original); *In re Dobek*, 278 B.R. 496, 510 (Bankr. N.D. Ill. 2002) ("[T]he original [lender] is not the owner of the Motorcycle; it possessed a perfected security interest in [borrower's] property. The original [lender] was not and Bombardier is not the owner of the Motorcycle; they possessed only a perfected security interest in [borrower's] property."); *In re Richards*, 336 B.R. 722, 730 (Bankr. E.D. Va. 2004) ("The document plainly granted Rapid a security interest but did not vest legal title

---

[4] Further, there is no evidence that the Bitcoin UpgradeYa deposited in the Collateral Accounts was a "loan" as the Debtors now suggest. *See* Bonjour Declaration, ¶ 24; Supplemental Parrish Declaration, ¶ 6.

to the accounts in Rapid Funding."). Accordingly, the pledge of the Collateral under the Agreement did not transfer legal or equitable title in the Collateral to the Debtors. *See In re Transp. Design and Tech., Inc.*, 48 B.R. 635, 639 (Bankr. S.D. Cal. 1985) ("a security interest protects the secured [lender] ***against the [borrower] [later] transferring title*** to the collateral free of its interest") (emphasis added).

9.      The Debtors' bare possessory interest in the Collateral is further supported by the requirement in section 6.14 of the Agreement that UpgradeYa "***maintain*** with the Lender ***pledged (via a first priority perfected security interest)*** Collateral having a value…of at least the Initial Collateral Minimum Percentage[.]" Agreement, § 6.14 (emphasis added). Moreover, the Agreement provides that if the outstanding indebtedness owed by UpgradeYa reaches the "Liquidation Threshold percentage of the aggregate value of the Collateral," Cred may automatically sell all Collateral and apply the proceeds to the outstanding indebtedness. *Id.* These provisions are meaningless if, as the Debtors assert, the Collateral is the Debtors' property and the Debtors were free at any time to do with it as they pleased.

10.      Similarly, the Borrower's covenants in section 2.3(b) provide, among other things, that "Borrower agrees with regard to the Collateral unless Lender agrees otherwise in writing: (i) that Lender is authorized to file financing statements in the name of Borrower to ***perfect Lender's security interest in the Collateral***; [and] (ii) that Lender is authorized to notify any account debtors, any buyers of the Collateral, any Borrower Customers or any other persons of ***Lender's interest in the Collateral***…" Agreement, §2.3(b) (emphasis added). If the Collateral was in fact intended to be the property of the Debtors, the Agreement would not repeatedly discuss Cred's security interest in the Collateral and such provisions would be meaningless.

11. Moreover, contrary to the Debtors' position, the Debtors did not (and do not) have unfettered authority to use the Collateral. Supplemental Parrish Declaration, ¶ 6. Under section 2.4 of the Agreement, the Debtors' actions are strictly limited to those required to preserve, perfect or enforce **Cred's rights in its security interest in UpgradeYa's Collateral**. Neither section 2.4 nor any other provision of the Agreement grants the Debtors' unfettered rights to use the Collateral, much less misappropriate it. Assuming *arguendo* that the Debtors' interpretation of the Agreement is correct (which it is not) any provision granting such unfettered use would be void under California law. *See* CAL. CIV. CODE § 3513 ("Anyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement."). The Debtors cannot contract around Division 9 of the California Commercial Code nor the California Penal Code. *See, e.g.*, CAL. PENAL CODE § 532(a) ("Every person who knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of money, labor, or property, whether real or personal, or who causes or procures others to report falsely of his or her wealth or mercantile character, and by thus imposing upon any person obtains credit, and thereby fraudulently gets possession of money or property, or obtains the labor or service of another, is punishable in the same manner and to the same extent as for larceny of the money or property so obtained.").

12. Rather, pursuant to the Agreement, the Debtors' ability to sell, use and otherwise dispose of the Collateral is contemplated only in the event of a default by UpgradeYa. *See* Agreement, §§ 7.1, 8.1; *see also SEC v. Drysdale Sec. Corp.*, 785 F.2d 38, 41-42 (2d Cir. 1985) (explaining that in a collateralized loan, the lender holds pledged collateral for security and may not sell it in the absence of default). The Agreement provides that "[the Debtors] also [have] all of the right of a secured party under the California Uniform Commercial Code, even if the

Collateral Account is not otherwise subject to the Code concerning security interests, and the parties to this Agreement agree that the provisions of the Code giving rights to a secured party are nonetheless part of this agreement."  Agreement, § 7.1(b).  Thus, for the Debtors to have legal or equitable title in the Collateral under the Agreement, they would have to foreclose on the Collateral, which first requires default or a triggering event.  CAL. COM. CODE § 9601(1) ("***After default***, a secured party has ... those rights provided by agreement of the parties") (emphasis added).  The Debtors never noticed any default and UpgradeYa is not, in fact, in default and the Debtors have not foreclosed on the Collateral.  Supplemental Parrish Declaration, ¶ 6.

**B.**     ***Cause Exists to Lift the Stay***

13.     Ample cause exists to lift the automatic stay to allow UpgradeYa to seek to recover its Collateral and/or the value thereof from third parties and any applicable insurance providers. First, as explained in the RFS Motion and above, the Collateral is not property of the Debtors' estates.  Technically, where a party seeks to recover property that is not property of the Debtors' estates from third parties, stay relief is unnecessary.  *See Charan Trading Corp. v. Uni-Marts, LLC (In re Uni-Marts, LLC)*, 399 B.R. 400, 415 (Bankr. D. Del. 2009) (explaining that "[i]n general, only the debtor is afforded the protections of the automatic stay under section 362; conversely, third-parties do not receive the protection of the automatic stay."); *see also In re Downey Fin. Corp.*, 428 B.R. 595, 609 (Bankr. D. Del 2010) (finding that due to the estate's lack of interest in the liability policy proceeds, courts typically hold that debtors do not suffer prejudice when creditors obtain stay relief to liquidate claims that are covered by such proceeds).  However, out of an abundance of caution, UpgradeYa requests relief from the stay to pursue recovery of the Collateral from third parties and/or the value thereof from any applicable insurance proceeds.

14.     Second, the Debtors essentially admit throughout the RFS Objection that instead of holding the Bitcoin (or Bitcoin of the same value) in the Collateral Accounts (or any other reserve account) as they were required to do under the Agreement and applicable California law, they stole, misappropriated, failed to protect it and/or used it for their own purposes.   On this basis alone, UpgradeYa should be granted stay relief.   *See In re Abrass*, 268 B.R. 665, 687-89 (Bankr. M.D. Fla. 2001) (granting creditor defrauded by debtor relief from stay to pursue claims outside bankruptcy to recover losses explaining that "[f]ailure to lift the stay would result in summary denial of access to this possible source of recovery.   That ground alone is sufficient to justify modification of the stay.")   Below are some of the admissions the Debtors make in the RFS Objection that evidence their misappropriation of UpgradeYa's Collateral:

- "CredBorrow utilized the bitcoin in the operation of its business." RFS Objection, ¶ 3;

- "[T]he Agreement does not oblige CredBorrow to separately hold the bitcoin deposited by UpgradeYa as an agent or trustee of the bitcoin, nor does it create any bailment agreement or restrict in any way CredBorrow's use of the bitcoin." *Id.* at ¶ 13;

- "Once CredBorrow received the bitcoin from UpgradeYa, it placed the bitcoin – as well as all of the other bitcoin in its Fireblocks account at the time – with third-party asset managers who then deploy the bitcoin into the stream of commerce…" *Id.* at ¶ 17.

- "When the Debtors transfer bitcoin to their third-party asset managers, they lose control of the bitcoin and have no means to access it." *Id.*

- "Because the Debtors usually place the bitcoin they receive from customers with third party asset managers, the Debtors rarely hold any significant bitcoin reserves." *Id.* at ¶ 18.

- "[t]he Debtors do not currently have the 478.17 bitcoin UpgradeYa seeks to recover held "on reserve."" *Id.* at ¶ 23.

- "CredBorrow has utilized the bitcoin UpgradeYa transferred to it in the ordinary course of its business affairs, free of any restrictions." *Id.* at ⁋ 27;

- "Under the Agreement, CredBorrow had broad rights in the bitcoin that it exercised *for its own benefit*, by deploying the bitcoin in commerce….CredBorrow used them as its own…." *Id.* at ⁋ 33 (emphasis added);

- "CredBorrow has unfettered use of the bitcoin, and used them to operate its business." *Id.* at ⁋ 34.

The Debtors' prepetition (and potential postpetition) misappropriation of collateral under the CredBorrow program is further evidenced by the declaration submitted by Daniyal Inamullah in support of the Motion to Convert [D.I. 97] (the "Inamullah Declaration").  In the Inamullah Declaration, the Debtors' former Head of Capital Markets explains that under the CredBorrow program "[r]ather than maintain the collateral intact in a wallet, Cred used [the] collateral to pay normal business expenses, fund the loan by selling the collateral, invest, and pay redemptions to prior CredEarn customers."  Inamullah Declaration, ⁋ 17.

15.    Further, time is of the essence for UpgradeYa to investigate and pursue recovery of the Bitcoin that it deposited in the Collateral Accounts from third parties (*i.e.*, Fireblocks and any subsequent holders).  As noted by the Debtors in the RFS Objection, the value of Bitcoin is historically volatile.  *See id.* at ⁋ 17.  As such, it is imperative that UpgradeYa immediately be granted relief from the stay to pursue the recovery of its Bitcoin and/or the value thereof.  Not only will the Debtors' estates not be prejudiced or harmed by UpgradeYa pursuing its own property, but all stakeholders will benefit from any mitigation in damages UpgradeYa can achieve.

## C.    The Debtors' Various Red-Herring Arguments Are Meritless

16.    In addition to making the baseless arguments that UpgradeYa's Collateral is property of the Debtors' estates and there is no cause to lift the automatic stay, the Debtors assert

several red-herring arguments in the RFS Objection that are meritless and should be overruled.

17.    First, the Debtors argue that "to the extent UpgradeYa seeks to establish an interest in the Debtors' property or recover property from the Debtors, it is required to file an adversary proceeding."   RFS Objection, ¶2.   However, as explained above and in the RFS Motion, UpgradeYa seeks to recover its own property (not property of the Debtors' estates).   Moreover, as the Debtors have admitted repeatedly, they misappropriated UpgradeYa's Collateral and it is no longer in their possession, as such, UpgradeYa must go after third parties and any applicable insurance proceeds to recover the Collateral and/or the value thereof.   If and when UpgradeYa seeks to sue the Debtors for their misappropriation and theft of its Collateral, the Debtors can rest assured that it will file the appropriate adversary proceeding in this Court.

18.    Second, the Debtors make the perplexing argument that UpgradeYa has failed to perfect a security interest in its *own* property.   *See* RFS Objection, ¶4.   The Debtors' assertion that "the Agreement does not grant UpgradeYa any liens or security interest in any of the Debtors' assets – including the 478.17 bitcoin [UpgradeYa] will be owed upon repayment of the $2 million" is illogical. *Id.* at ¶ 35.  By the Debtors' own admission, "CredBorrow is the secured party under the Agreement" with a security interest in the Collateral UpgradeYa deposited in the Collateral Accounts. *Id.* at ¶ 12.  As such, it is the Debtors that were required (and failed) to perfect an interest in the Collateral.

19.    Assuming *arguendo* that Bitcoin is a general intangible as asserted by the Debtors (*see* RFS Objection, ¶ 29), Bitcoin is subject to attachment and perfection rules under state law when pledged as collateral.[5]  CAL. COM. CODE § 9203(1).  Thus, under California law, a lender

---

[5] The Debtors also assert that "[u]nder both California and Delaware law, an effective security interest in general intangibles cannot be effected through a pledge."  RFS Objection, ¶ 30. In support of this position the Debtors cite to CAL. COM. CODE § 9313(a) and 6 DEL. CODE § 9-313(a).  However, these provisions deal exclusively with "perfecting a security interest in *tangible* negotiable documents, goods, instruments, money, or tangible chattel paper" – not

taking a security interest in Bitcoin as collateral must have a security agreement with the borrower sufficiently identifying the collateral. CAL. COM. CODE §§ 9108(a), 9203(a).  UpgradeYa agrees with the Debtors that to perfect a security interest in a general intangible the proper filing of a UCC-1 financing statement is required in the state where the borrower is located.  *See* CAL. COM. CODE § 9310.  To the best of UpgradeYa's knowledge, the Debtors have not filed a UCC-1 financing statement in South Carolina, where UpgradeYa is incorporated and located (nor have they filed one in California or Delaware).  Supplemental Parrish Declaration, ¶ 5.  Therefore, at best, the Debtors have an unperfected security interest in the Collateral that belongs to UpgradeYa.

20.    Lastly, the Debtors assert that UpgradeYa received a preferential transfer when Cred returned part of UpgradeYa's Collateral to it in August of 2020 and that they intend to sue UpgradeYa to have such Bitcoin returned to the Debtors' estates.  *Id.* at ¶ 5, fn. 2.  Contrary to the Debtors' opinion, according to prevailing caselaw, a debtor does not make a preferential transfer when it returns property owned by another.  *FBI Wind Down Inc. Liquidating Trust v. All Am. Poly Corp. (In re FBI Wind Down, Inc.)*, 581 B.R. 116, 130 (Bankr. D. Del. 2018) (explaining that "[a]s a condition precedent to the elements of § 547(b), any transfers that are ***not*** property of the debtors' estates are ***unavoidable***.") (emphasis added).  And, as has been well established in this jurisdiction, the mere assertion of a preference is insufficient to trigger Bankruptcy Code section 502(d).  *See, e.g., In re Lids Corp.*, 260 B.R. 680, 684 (Bankr. D. Del. 2001) (holding that "merely commencing an adversary proceeding [] is not enough to determine that [the claimant] is liable" and finding that "[t]he fact that the Debtor states that it is confident that it will be successful in the [adversary] is immaterial.  Until the Debtor obtains a judgment against [the claimant] upon which

---

general intangibles, which the Debtors assert Bitcoin is.  Moreover, neither of these provisions refer to or even mention a "pledge."

[the claimant] is liable…, section 502(d) is not applicable").

21.    As set forth above, the Collateral is not (and was not property) of the Debtors.  Nor were the Debtors' directly in possession of the Collateral as the Collateral Accounts were maintained (or at least should have been maintained) by e-wallet intermediary, Fireblocks.  Moreover,  as admitted by the Debtors "[o]nce CredBorrow received the bitcoin from UpgradeYa, it placed the bitcoin – as well as all of the other bitcoin in its Fireblocks account at the time – with third-party asset managers who then deploy the bitcoin into the stream of commerce…"  *Id.* at ¶ 17.  "A misdirection of another's goods does not repose title ownership in the party who perpetuated the misdirection.  Thusly, no voidable preferential transfer is found.  Such a possessory interest is not an interest of the debtor in property, as required under § 547(b)."  *In re Victoria Alloys, Inc.*, 261 B.R. 424, 434 (Bankr. N.D. Ohio 2001); *see also In re Hartley*, 825 F.2d 1067, 1070 (6th Cir. 1987) ("[F]unds loaned to a debtor that are earmarked for a particular creditor do not belong to the debtor because he does not control them").  "Generally, a transfer of money or property owned by a third person to a creditor of a debtor is not a preference."  5 COLLIER ON BANKRUPTCY, ¶ 547.03[2].  The subject Collateral was never a part of the Debtors' estates.  Thus, UpgradeYa's Collateral is not (and was not) part of a fund to which the Debtors' creditors could or would be able to resort.

22.    Thus, for all the reasons set forth in the RFS Motion and herein, UpgradeYa's motion for relief from the stay to pursue recovery of its Collateral or the value thereof from third parties and any applicable insurance proceeds should be granted and the Debtors' RFS Objection should be overruled.  In light of the Debtors' admissions of misappropriation of UpgradeYa's Collateral and the fact it will now need to pursue recovery from third parties, UpgradeYa has revised the proposed form of order granting the RFS Motion to remove provisions therein that are

moot (the "Revised Order").  A blackline identifying the changes to the proposed form of order originally submitted with the RFS Motion is attached hereto as **Exhibit A** and a clean copy of the Revised Order is attached hereto as **Exhibit B**.

## JOINDER IN MOTION TO CONVERT

23.     Not all cases belong in Chapter 11.  Although the Debtors are attempting to make this case appear to be a typical Chapter 11 sale or liquidation case, there is nothing here to reorganize in any real sense of the word and the circumstances presented to this Court are far from typical.  The Debtors have filed what can be considered a "placeholder" sale motion, with no stalking horse bidder, no clarity with respect to the assets they propose to sell, and not even a guess as to what potential value could be realized from any such sale.  They have failed even to attempt to justify their proposed sale timeline.  *See* Sale Motion.[6]  The Debtors have blithely claimed that they intend to file a plan of liquidation before the end of this month.  Hr'g Tr. 5:6-7, Nov. 25, 2020.  However, it is inconceivable that they can do so when pursuant to their proposed sale timeline, the Debtors will not know whether they have any bids to purchase their assets before mid-January and are still trying to find debtor-in-possession financing.  *See* Sale Motion, ¶ 11; Debtors' objection to Motion to Convert [D.I. 109], ¶ 22.  As such, it would be a waste of these estates' very limited resources for the Debtors' professionals to draft and file a plan without knowing what, if any, amounts will be available to fund such a process let alone satisfy requisite administrative claims.[7]  Despite the Debtors' professionals' efforts to keep these cases in Chapter

---

[6] The term "Sale Motion" refers to the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing and Approving Form and Manner of Notice Thereof, and (C) Approving Assumption and Assignment Procedures and Form and Manner of Notice Thereof; and (II) Authorizing (A) the Sale(s), Free and Clear of All Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases* [D.I. 65].

[7] In fact, as no budget has been filed in these cases yet, it is not known whether the Debtors are even administratively solvent as of today.

11, it simply is not appropriate under the circumstances and cause mandates the conversion of their cases to Chapter 7.

24.    Bankruptcy Code section 1112(b) provides that, on request of a party in interest, and after notice and a hearing, "the Court shall convert a case to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause." 11 U.S.C. § 1112(b)(1).  Under Bankruptcy Code section 1112(b), conversion or dismissal is mandatory upon a finding of "cause." *See* 11 U.S.C. § 1112(b)(1); *DCNC North Carolina I, LLC v. Wachovia Bank, N.A.*, 2009 WL 3209728, *6 (E.D. Pa. Oct. 5, 2009); *see also In re The Reserves Resort, Spa & Country Club LLC*, 2013 WL 3523289, *2 (Bankr. D. Del. July 12, 2013).

25.    Although "cause" is not defined, Bankruptcy Code section 1112(b)(4) provides a non-exclusive list of sixteen (16) "causes" for conversion. 11 U.S.C. § 1112(b)(4)(A)-(P); *In re Am. Capital Equip., LLC*, 688 F.3d 145, 1662 n. 10 (3d Cir. 2012) ("the listed examples of cause are not exhaustive"); *In re Mechanical Maintenance, Inc.*, 128 B.R. 382, 386 (E.D. Pa. 1991).  At least two (2) separate and independent grounds under Bankruptcy Code Section 1112(b)(4) exist here and demand conversion of these cases.  Specifically, there is both: (A) a substantial or continuing loss to or diminution of the estate and the absence of reasonable likelihood of rehabilitation and (B) gross mismanagement of the estate.  *See* 11 U.S.C. § 1112(b)(4)(A) and (B).

26.    If the movant establishes any basis for "cause," the burden then shifts to the debtor to prove it falls within the section 1112(b)(2) "unusual circumstances" exception to Bankruptcy Code section 1112(b)(1)'s mandatory conversion.  However, the Third Circuit instructs that "Courts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization." *In re Brown*, 951 F.2d 564, 572 (3d Cir.1991) (citing *In re Canal Place Ltd.*

*P'ship*, 921 F.2d 569, 577 (5th Cir.1991)); *see also In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994) ("The very purpose of § 1112(b) is to cut short [the] plan and confirmation process where it is pointless."). If cause to convert or dismiss is present, the Third Circuit has indicated that a court should then choose between conversion and dismissal based on "the best interest of creditors and the estate." *In re Am. Capital Equip., LLC*, 688 F.3d at 161.

27.     Here, it is in the best interest of creditors and the Debtors' estates to convert. At the November 25th hearing, the Court stated that "these issues about whether the Bitcoin belongs to the creditors, whether it belongs to the Debtors, whether the Debtors are taking appropriate action to protect the assets of the Debtors' estates, those are issues that are going to go to the question of whether or not I convert or appoint a Chapter 11 trustee. And that's going to require evidence because I can't do that in a vacuum." Hr'g Tr. 22:9-16, Nov. 25, 2020. UpgradeYa can provide evidence only of the Debtors' possession of the Bitcoin UpgradeYa pledged as Collateral under the CredBorrow program and the pre and postpetition malfeasance it has experienced in connection with its relationship and interactions with the Debtors. But, the evidence set forth in the RFS Motion, the Parrish Declarations, the RFS Objection, and this Reply are more than sufficient to support conversion of these Chapter 11 cases to cases under Chapter 7.

28.     As the issue of who owns the Bitcoin under the CredBorrow program has been fully explained both in the RFS Motion and above, UpgradeYa will not recount why under the facts, the Agreement and applicable law, Bitcoin held by the Debtors pursuant to such program is not (and never was) property of the Debtors. Instead, UpgradeYa will focus on the substantial and continuing loss of Bitcoin held by the Debtors postpetition and their postpetition pattern of incompetence, mismanagement and deceit.

29.      The record of these cases amply reflects the Debtors' incompetence, active deception of parties-in-interest (and the Court) or their postpetition continuation of prepetition misconduct.  In support of the Debtors' RFS Objection, the Debtors filed the *Declaration of Pablo Bonjour in Support of the Debtors' Objection to Motion of UpgradeYa Investments, LLC for Relief from the Automatic Stay Under Bankruptcy Code Section 362* [D.I. 116] (the "Bonjour Declaration").  The Bonjour Declaration is riddled with troubling issues.  First, it was not signed prior to its initial filing and was withdrawn (along with the RFS Objection), only to be filed a second time unexecuted.  *See* RFS Objection, D.I. 113 and 116.  Second, neither the RFS Objection nor the Bonjour Declaration identify who Mr. Bonjour is, what his relationship is to the Debtors and how he has any knowledge (incorrect or otherwise) about the transactions between the Debtors and UpgradeYa.  The most troubling issue, however, is Mr. Bonjour's complete misunderstanding and misleading description of the relationship between the Debtors and UpgradeYa.  Specifically, Mr. Bonjour states:

> My understanding is that was an arms' length commercial financing transaction where the Debtors loaned US dollars to UpgradeYa, and in exchange UpgradeYa *loaned* provided bitcoin to the Debtors.

Bonjour Declaration, ¶ 24 (emphasis added).  UpgradeYa never loaned its Bitcoin to the Debtors. The Debtors have not provided (and cannot provide) any agreement between UpgradeYa and the Debtors wherein UpgradeYa agreed to loan its Bitcoin to the Debtors.  Moreover, section 9.8 of the Agreement, specifically states:

> THIS WRITTEN AGREEMENT AND ANY RELATED DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES, THERE ARE NO

UNWRITTEN    ORAL    AGREEMENTS    BETWEEN    THE
PARTIES.[8]

The Bonjour Declaration exemplifies the Debtors' pattern of postpetition incompetence and
attempts to misguide and deceive this Court and all parties-in-interest.

30.    Additionally, the Debtors have been unable or unwilling to identify the actual
amount of Bitcoin in their possession, a seemingly basic and critical piece of information they and
creditors ought to be able to know with certainty.  Indeed, since the day after filing these Chapter
11 Cases, the Debtors have informed UpgradeYa and/or its counsel that the number of Bitcoin
they are holding has dropped (as illustrated in the chart below) from at least the 478 Bitcoin of
UpgradeYa's Collateral (not including any other Bitcoin the Debtors held) to 89 representing a
total reduction of Bitcoin in the amount of 389 (a value of approximately $7,391,000).[9]



**Amount of Bitcoin the Debtors Have Confirmed
In Writing Postpetition and Its Dramatic Decline**

---

[8] Section 9.8 is one (1) of only two (2) provisions the parties chose to emphasize in all caps – the other provision
relates to the waiver of jury trials.  *See* Agreement, §§ 9.4, 9.8.

[9] Bitcoin value estimates herein are based off of the Debtors' stated value of a Bitcoin at $19,000 as of the end of
November. Objection, ¶ 12

31.     Specifically, on November 10, 2020 (the day after the Petition Date), the Debtors confirmed in writing to UpgradeYa that "we are holding 478.170 BTC as collateral[10] for your loan of $2,000,000." *See* Parrish Declaration, **Exhibit K**.  At the November 25, 2020 hearing, the Debtors advised the Court that they had identified only 1,025 Bitcoin that were stolen and were not aware of any other Bitcoin that were "misappropriated or taken by somebody."  Hr'g Tr. at 13:8-15, Nov. 25, 2020.  Thereafter, on December 1, 2020, Debtors' counsel advised UpgradeYa's counsel that "we confirmed with the Debtors that they currently have 160 bitcoin."  *See* **Exhibit C**, Email from James T. Grogan to Kimberly A. Brown (Dec. 1, 2020, 6:29 p.m. EST).  Less than twenty-four (24) hours later, the Debtors filed the unsigned Bonjour Declaration as evidence that "the Debtors currently hold approximately 89 bitcoin in their possession."  Bonjour Declaration, ¶ 18.  Despite being directly asked what happened to all the Bitcoin, the Debtors have not explained in any filing or disclosure to this Court or to UpgradeYa or its counsel what happened to all the Bitcoin in its possession – Bitcoin that continues postpetition to dramatically diminish.  Whether the significant postpetition diminution in value of Bitcoin in the Debtors' possession was the result of the Debtors incompetence and lack of knowledge of what it possesses, willful deception or fraud, cause exists to convert these Chapter 11 cases to cases under Chapter 7.

32.     Moreover, as evidenced by the RFS Objection (discussed above), the Debtors have admitted to malfeasance based on their pre and postpetition actions and positions taken in connection with the collateral of its CredBorrow customers.  The Debtors' solution to lend credibility to these Chapter 11 cases and attempt to restore faith in the Debtors' ability to manage these cases in the best interests of their creditors and estates appears to be to add yet another

---

[10] Contradicting their current position expressed in the RFS Objection, the Debtors notably referred to the Bitcoin UpgradeYa pledged to secure its $2 million loan as "collateral."

professional, a chief restructuring officer, with potentially overlapping responsibilities and yet more expense to be borne by the estates' creditors.  However, the addition of a chief restructuring officer is insufficient to overcome the continued postpetition pattern of incompetence and misconduct of the Debtors and only serves to insulate those responsible for mismanaging the Debtors' operations pre and postpetition.

33.     Here, it is clear that conversion of these cases and the appointment of an independent Chapter 7 trustee is not only in the best interests of the Debtors' estates and their creditors, but is necessary to end the Debtors' continued misappropriation of their CredBorrow customers' property and to ensure all appropriate causes of action are pursued, including those that may exist against current management.

34.     Accordingly, UpgradeYa joins in the Motion to Convert and respectfully requests that the Court enter an order converting the Debtors' Chapter 11 cases to cases under Chapter 7.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

WHEREFORE, UpgradeYa respectfully requests that the Court (i) overrule the RFS Objection; (ii) grant the Motion and enter an order (A) lifting the automatic stay to permit UpgradeYa to take any and all actions necessary to recover its Collateral or the value thereof from third parties and any applicable insurance providers and (B) granting such other relief as the Court deems just and proper; and (iii) enter an order converting the Chapter 11 cases to Chapter 7 as soon as possible.

Dated: December 4, 2020
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Kimberly A. Brown*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

*Counsel to UpgradeYa Investments, LLC*