## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| CRED INC., *et al.*,[1] | : | |
| | : | |
| | : | Case No. 20-12836 (JTD) |
| Debtors. | : | (Jointly Administered) |
| | : | |

## MOTION OF THE UNITED STATES TRUSTEE FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF A TRUSTEE, OR IN THE ALTERNATIVE, (I) DIRECTING THE APPOINTMENT OF AN EXAMINER, OR (II) CONVERTING THE CASES TO CHAPTER 7 CASES

Andrew R. Vara, United States Trustee for Region Three and Nine (the "U.S. Trustee"), through his counsel, files this Motion (the "Motion") for the entry of an order directing the appointment of a trustee pursuant to 11 U.S.C. §1104(a)(1, 2) and 1104(e). Alternatively, the U.S. Trustee requests the appointment of an examiner pursuant to 11 U.S.C. § 1104(c), or an order converting the cases to cases under Chapter 7 pursuant to 11 U.S.C. § 1112(b)(1). In support thereof, the U.S. Trustee respectfully represents as follows:

### INTRODUCTION

1.      This Court has jurisdiction over the above-captioned cases pursuant to 28 U.S.C. § 1334.  This Court is authorized to hear and determine the Motion pursuant to 28 U.S.C. § 157(a, b), and the amended standing order of reference issued by the United States District Court for the District of Delaware dated February 29, 2012.  Venue of the cases is proper in this District pursuant to 28 U.S.C. § 1408(1).

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

2.      Under 28 U.S.C. § 586, the U.S. Trustee is generally charged with monitoring the federal bankruptcy system. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").  Specifically, the U.S. Trustee is charged with "monitoring the progress of cases under title 11 and taking such actions as the United States trustee deems to be appropriate to prevent undue delay in such progress." 28 U.S.C. § 586(a)(3)(G).

3.      The U.S. Trustee has standing to be heard with respect to the Motion pursuant to 11 U.S.C. § 307.

## PRELIMINARY STATEMENT

4.      The above-captioned debtors ("Cred" or the "Debtors") are owned by Daniel Schatt (50%) and Lu Hua (50%).  Based upon information and belief, Hua also controls moKredit, a Chinese consumer lending platform which is in the business of providing microcredit to Chinese borrowers at substantial interest rates.  In his "first day declaration" (the "First Day Declaration") [D.I. 12], Mr. Schatt goes to great lengths to portray the Debtors' bankruptcy filings as the result of alleged misdeeds by James Alexander, Cred's former Chief Capital Officer.  First Day Decl. ¶¶ 18-29.  Those allegations in the First Day Declaration reflect disarray within the Debtors' business operations and prepetition failures of management, but the failures are more extensive than that. Additional negative events that Cred brought upon itself during 2020 include:  a failed hedging strategy which cost the Debtors millions; the evaporation of an approximately $6.2 million investment in Quanta Coin which resulted from faulty diligence; and an enormous ($39 million)

debt due from its affiliate, moKredit, the product of a relationship that was fraught with negative potential from the start.  Present management misinformed creditors and investors, who were led to believe that the Debtors were in good financial health even after the onset of the Debtors' liquidity issues.

5.      An impartial, independent trustee is needed in these cases to:

(i)      investigate various claims and causes of action related to the Debtors' descent into bankruptcy and to prosecute the same;

(ii)     resolve issues of corporate governance;

(iii)    analyze and determine the nature and priority of the claims, rights and interests possessed by the Debtors' creditors, investors and partners to protect same and

(iv)    pursue collection of the moKredit receivable and either reorganize or liquidate other assets and/or business operations of the various estates.

6.      Stated simply, positive results in these cases will be driven by whether the Debtors' estates are successful at prosecuting and collecting on claims and causes of action against moKredit and a host of additional entities, including potentially the Debtors' management and any insurance policies.  Hua is an equity security holder of both the Debtors and moKredit and, as such, the Debtors' management should not be put in a conflicted position vis-à-vis the moKredit receivable when the Debtors' creditors and investors are facing significant losses.  An impartial, independent fiduciary should be appointed to ensure that the Debtors vigorously pursue any and all potential recoveries for the Debtors' creditors and investors whom they purport to serve, and to provide fair, impartial information regarding the Debtors' current financial affairs and business operations, including the status of cryptocurrency holdings and various parties in interest's rights

3

and obligations with respect to such.  If the Court should determine that appointment of a chapter 11 trustee is not appropriate, the U.S. Trustee respectfully requests that Court direct the appointment of an examiner to independently investigate the circumstances surrounding the Debtors' marketing, the mismanaged investment of their creditors' cryptocurrency and, by extension, whether colorable claims and causes of action exist to remedy losses suffered by the various creditors and investors both during the initial stages of the pandemic and thereafter.  In the alternative, the U.S. Trustee respectfully submits that conversion to Chapter 7 is appropriate, so that a disinterested Chapter 7 trustee can expeditiously and efficiently administer the Debtors' estates and restore trust in the fairness and integrity of these bankruptcy cases.

## **BACKGROUND**

7.      On November 7, 2020 (the "Petition Date"), the Debtors filed the voluntary petitions which initiated the above-captioned cases.

8.      Schatt's declaration in support of the Debtors' "first day" filings (the "First Day Declaration") [D.I. 12] indicated that the Debtors were incorporated in May 2018 and launched with its first partner in early 2019.  First Day Decl. ¶ 11.

9.      Schatt describes the Debtors' business in the following terms:

> The Debtors operate a financial technology platform through which customers transfer cryptocurrency to the Debtors—generally through a loan agreement or financing agreement.  The Debtors then utilize such cryptocurrency in a variety of investment strategies involving third-party asset managers. The Debtors earn revenue through the the the [sic] returns generated through their investments, as well as through interest on lines of credit extended to certain of the Debtors' customers in connection with the loans and financings referenced above.

> In general, the Debtors have two types of customers: (a) retail investors who transfer (via a pledge or loan) their cryptocurrency to the Debtors through certain e-wallet partners and (b) high net worth individuals who transfer (via a pledge or loan) their cryptocurrency directly to the Debtors. Approximately half of the

4

Debtors' business is generated through e-wallet services that partner with the Debtors. E-wallets are platforms through which end-users (which may be individuals or companies) manage and store their cryptocurrency.

As mentioned above, after receipt of cryptocurrency from a customer, the Debtors work with outside asset managers who focus on investment strategies that are expected to generate a return for the Debtors. These strategies include writing out-of-the-money covered calls and arbitrage strategies. In general, the Debtors seek strategies that generate a consistent return while minimizing risk of loss.

In addition to its investment services, the Debtors also provide lending services to certain customers. These borrowing services are limited to domestic customers.

First Day Decl. ¶¶ 4-7 (footnote omitted).

10.    Attached to this Motion is a declaration (**Exhibit A**) of Daniyal Inamullah, a former

employee of the Debtors.  According to Mr. Inamullah:

- In March 2020, Cred took a substantial loss in connection with the liquidation of certain hedges.  As part of their hedging efforts, Cred placed 800 bitcoin on margin and levered 4-6x. These assets were subsequently liquidated as BTC prices sharply fell about 50% overnight.  Cred ultimately took a substantial loss when it was unable to "close-out" its short trade by buying bitcoin again. The reason for this was that most of the cash liquidity was tied up at MoKredit.

- In February and April 2020, Cred made an investment in Quanta Coin.  Quanta Coin was reportedly set up to generate yield on investors' bitcoin, primarily through the use of derivatives.  Cred invested $6.2 million in Quanta Coin, totaling 800 BTC.  When Cred attempted to redeem the position in August 2020, it discovered that the investment manager to which it had lent the funds had "disappeared," together with the investment.

- MoKredit is a Shanghai-based consumer lending platform owned by Mr. Hua.  MoKredit, in turn, used the funds to offer microcredit to Chinese borrowers at substantial interest rates.  MoKredit collected a 20-point spread, and Cred would give its customers 10% (if they locked up their funds for six months) and keep the remaining 10% as revenue.  The loans were two-week-term microloans for less than $200 each. Cred's warehouse line of credit to Hua had a 30- to 60-day call provision, meaning the lender was allowed to demand full repayment within a month or two, depending on the portion of the line.

- After the COVID-sparked market crash in March 2020, Cred tried to call back $10 million from moKredit, but moKredit was not able to return the funds. (The investment committee also asked several times that the full principal of the warehouse line be called, but each request was blocked by Mr. Schatt).

■ Mr. Hua told Cred that a principal extension program from the Chinese government made it difficult for him to recall the loans from borrowers. Instead, he made a deal with Cred to pay an amortization of a couple hundred grand a month along with the interest payments on the line of credit. Cred's investment committee never agreed to the renegotiated repayment schedule and moKredit was eventually unable to follow through with the promised principal repayment schedule.[2]

11.     Beyond the above irregularities as set forth by Mr. Inamullah, the Debtors have been operating for less than two years.  During that time, the Debtors took in more than $135 million in borrowed capital (in the form of what they call "customer deposits" and "customer collateral").  Cred claims to have $67.8 million of assets as of the Petition Date, including a $39 million loan receivable from moKredit.  Notwithstanding the foregoing, Cred has not provided a clear explanation for the $66 million "delta" between the asset and liability numbers.  Further, the asset to liability gap has likely grown since the bankruptcy filing, as Bitcoin has increased in value from approximately $15,000/BTC on November 6, 2020 to $19,000 on December 4, 2020.

12.     After the hedging strategy failed, the Debtors apparently continued to seek loans of crypto-currency and renewed pre-existing cryptocurrency loan arrangements, without adequately disclosing the Debtors' extraordinarily poor financial condition.  Issues include the unsecured status of some of these loans, including allegations that some creditors have rights in cryptocurrency under "pledge" agreements, as well as allegations that some creditors own outright certain cryptocurrency loaned to the Debtors.

13.     Finally, the Debtors have corporate governance issues. According to an organization chart presented by the Debtors (**Exhibit B**), Cred, Inc. is the 100% owner of Cred

---

[2]  Nathan DiCamillo, *Bad Loans, Bad Bets, Bad Blood:  How Crypto Lender Cred Really Went Bankrupt*, Coindesk (Nov. 12, 2020) (available at https://www.coindesk.com/bad-loans-bad-bets-bad-blood-how-crypto-lender-cred-really-went-bankrupt) (quoting Inamullah).

Capital.  Nonetheless, there is pending litigation in both California state court and the Delaware Court of Chancery where Cred Inc.'s ownership and control of Cred Capital is being contested. See attached **Exhibits C and D**.

### GROUNDS/BASIS FOR RELIEF

*Chapter 11 Trustee*

14.    Creditors, as well as investors, require an independent, conflict-free, experienced party investigating the financial affairs of these debtors -- someone who can determine an appropriate reorganization or liquidation strategy, free from the constraints of current management.

15.    Congress provided but one way to replace a debtor's management's control of the case with an independent fiduciary: appointment of a trustee pursuant to 11 U.S.C. § 1104(a).  The usual presumption in favor of allowing a debtor's management to remain in the case vanishes completely when management does not or cannot perform its fiduciary duties.  *See Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355 (1985) ("[T]he willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'") (*quoting Wolf v. Weinstein*, 372 U.S. 633, 651 (1963)).

16.    Whatever commonalities they share, the roles, powers and obligations of a chief restructuring officer ("CRO") and a Chapter 11 trustee are neither identical nor interchangeable. A CRO *serves* a debtor-in-possession as an executive officer, subject to the direction of its governing body, accountable to its governing body, and subject to dismissal at the will of its governing body.  A Chapter 11 trustee *administers* a debtor-out-of-possession after the Court has found cause to dispossess the debtor.  A Chapter 11 trustee *becomes* the debtor's governing body.

7

A debtor should not be permitted to use its engagement of a CRO to co-opt, undermine or defend against a motion to appoint a Chapter 11 trustee under Section 1104(a).

17.     The Debtors have filed a motion to employ a proposed chief restructuring officer (the "CRO") (Matthew Foster) [D.I. 95], but the CRO's employment is subject to authorization from Cred Inc.'s board of directors, and the CRO is subject to direction and oversight in the performance of his duties from Cred Inc.'s board of directors.  Ex. B (Engagement Letter) at 1, Debtors' Appl. to Employ Sonoran [D.I. 95].  Schatt and Hua, as the Debtors' sole equity holders, control the Board and, ultimately, any CRO that may be employed.  Schatt and Hua are also key figures in the Debtors' demise and, by extension, would be key subjects of any investigation regarding the Debtors' prepetition entanglements.  Further, Hua's moKredit owes the Debtors $39 million.  In contrast, a duly-appointed trustee would displace the Board's control over the Debtors' estates and start from a position of independence.

18.     Similarly, the presence of Debtors' counsel, Paul Hastings, does not give the Debtors' creditors, investors and partners hope that the firm is well-positioned to assist the Debtors with an unbiased and complete investigation into the Debtors' prepetition affairs.  As noted in the disclosures accompanying the Debtors' application to employ Paul Hastings, Paul Hastings provided a range of services to the Debtors prepetition, essentially functioning as an outside general counsel.  See Ex. B (Grogan Decl.) ¶ 6, 21, Debtors' Appl. to Employ Paul Hastings [D.I. 64].  Paul Hastings has represented and currently represents the Uphold entities, who may be litigation targets and are undoubtedly adverse to the Debtors in connection with these cases.  Id. Finally, Paul Hastings represented Schatt in the Dekrypt litigation and, separately, the Alexander litigation.  Id. ¶ 21(c, d).  While the U.S. Trustee intends to further explore Paul Hastings'

prepetition services to the Debtors and parties in interest, it is readily apparent now that the firm

cannot lead an independent investigation of the Debtors' conduct prior to their bankruptcy filings.

19.    11 U.S.C. § 1104(a) states that the Bankruptcy Court shall order the appointment

of a trustee, at any time after the commencement of the case but prior to confirmation of a plan,

on request of a party in interest or the UST, and after notice and a hearing:

> (1)    for cause, including fraud, dishonesty, incompetence, or gross
> mismanagement of the affairs of the debtor by current management, either before
> or after the commencement of the case, or similar cause, but not including the
> number of holders of securities of the debtor or the amount of assets or liabilities
> of the debtor; or
>
> (2)    if such appointment is in the interests of creditors, any equity security
> holders, and other interests of the estate, without regard to the number of holders
> of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

20.    Further, section 1104(e) of the Bankruptcy Code mandates that the U.S. Trustee

move for the appointment of a trustee if there are reasonable grounds to suspect that members of

current management participated in, among other things, fraud or dishonesty in the management

of the debtor or the debtor's public financial reporting.

21.    Subsection (1) of Section 1104(a) addresses management's pre- and post-petition

misdeeds or mismanagement, while subsection (2) provides the court with "particularly wide

discretion" to appoint a trustee even absent wrongdoing or mismanagement.  *See In re Bellevue*

*Place Assocs.*, 171 B.R. 615, 623 (N.D. Ill. 1994).  Where the court finds either that cause exists

or that appointment is in the interest of the parties, an order for the appointment of a trustee is

mandatory.  *See Official Comm. Of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re*

*W.R. Grace & Co.)*, 285 B.R. 148, 158 (Bankr. D. Del. 2002).

22.     The categories enumerated in 11 U.S.C. § 1104(a)(1) "cover a wide range of conduct" and, thus, are best described as illustrative, rather than exclusive.  *See In re Marvel Entertainment Corp.*, 140 F.3d 463, 472 (3d Cir. 1998) (quoting *Committee of Dalkon Shield Claimants v. A.H. Robbins Co.*, 828 F.2d at 242).  Fraud, dishonesty, incompetence, and gross mismanagement of a debtor's business affairs are all grounds for appointment of a chapter 11 trustee under 11 U.S.C. § 1104(a)(1). *See, e.g., In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989); *In re Colby Construction Corp.*, 51 B.R. 113, 116-118 (Bankr. S.D.N.Y. 1985).  The determination of whether cause exists must be taken on a case by case basis, taking into account all relevant factors.  *Sharon Steel*, 871 F.2d at 1225.  Pre-petition conduct alone may provide the basis for a court to appoint a trustee. *See In re Rivermeadows Assocs., Ltd.*, 185 B.R. 615, 619 (Bankr. D. Wyo. 1995).

23.     In its decision in *In re Marvel Entertainment Group, Inc.*, the Third Circuit quoted the following passage approvingly in affirming the appointment of a Chapter 11 trustee:

> The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee.  And if the debtor-in-possession defaults in this respect, Section 1104(a)(1) commands that the stewardship of the reorganization effort must be turned over to an independent trustee.

*Id.* (quoting *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989)) (emphasis added).

24.     The Third Circuit in *Marvel* further stated that appointment of a trustee is mandatory if cause is found under 11 U.S.C. § 1104(a)(1), and while it is not mandatory under 11 U.S.C. § 1104(a)(2), the Third Circuit held that the district court's refusal in that case to appoint something less than a trustee was not an abuse of discretion.  *See Marvel*, 140 F.3d at 174-75.

Congress provided no other way to replace debtor's management's control of the case with an independent fiduciary other than appointment of a trustee pursuant to 11 U.S.C. § 1104(a).

25.    The hedging losses, the Quanta Coin debacle, and the failure to pursue collection of the moKredit receivable all constitute "incompetence" or "gross mismanagement" warranting appointment of a chapter 11 trustee.  *See, e.g., In re Vascular Access Centers, L.P.*, 611 B.R. 742, 764 (Bankr. E.D. Pa. 2020) ("Accordingly, courts have found cause present pursuant to § 1104(a)(1) in circumstances demonstrating conflicts of interest; misuse of assets and funds; inadequate recordkeeping and reporting; failure to file required documents; lack of adequate disclosure; lack of appropriate cost controls; transgressions related to taxes; failure to make required payments; lack of credibility and creditor confidence; and breaches of fiduciary duties."); *Oklahoma Refining Co. v. Blair (In re Oklahoma Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988) ("There are many cases holding that a history of transactions with companies affiliated with the debtor company is sufficient cause for the appointment of a trustee where the best interests of the creditors require"); *see also In re PRS Insurance Group*, 274 B.R. 381, 387 (Bankr. D. Del. 2001) (Walrath, J.) (evidence of diversion of assets, or the absence of accurate financial records, constitutes "incompetence or gross mismanagement).

26.    There are additional bases for the appointment of a trustee under 11 U.S.C. § 1104(a)(2). The Debtors' assets may include claims and causes of action against a range of entities, including current management; current management cannot be expected to exercise their fiduciary duty to the Debtors' creditors/"investors" to investigate and prosecute claims against themselves. The creditor constituencies include lenders of cryptocurrency who made their loans at various points in time, with rights to the payment of interest and the repayment of principal at various

11

points in time. Some of the creditors may have different aspects to their claims, based for example on purported pledge agreements. Additionally, the factual representations made to such creditors has created an incredible atmosphere of mistrust of the Debtors and their management. The "appointment [of a trustee] is in the interests of creditors" under 11 U.S.C. § 1104(a)(2), as their hopes for a recovery on account of their claims are tied to the impartial investigation and prosecution of claims and causes of action. *See Manufacturers and Traders Trust Co. v. Morningstar Marketplace, Ltd. (In re Morningstar Marketplace, Ltd.)*, 544 B.R. 297, 305 (Bankr. M.D. Pa. 2016) ("A court is more likely to appoint a trustee under § 1104(a)(2) when reorganization is not possible, and a Debtor's principal may be motivated to protect his own interests rather than the interests of creditors. When coupled with a lack of confidence in management, and the benefits of appointing a trustee outweigh the cost, courts often find the argument for appointment of a trustee to be compelling.") (internal citation omitted); *In re Euro-American Lodging Corp*., 365 B.R. 421, 427-28 (Bankr. S.D.N.Y. 2007) ("Where a chapter 11 debtor and its managers … suffer from material conflicts of interest, an independent trustee should be appointed" under 11 U.S.C. § 1104(a)(2)); *In re McCorhill Publ., Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) (where there are questionable inter-company financial transfers and the principals of the debtor occupy conflicting positions in the transferee companies, appointment of a trustee is warranted in the best interests of all creditors and all parties in interest to investigate the financial affairs of the debtor).

*Examiner*

27.     Under 11 U.S.C. § 1104(c), if the Court has not ordered the appointment of a chapter 11 trustee, this Court must direct the appointment of an examiner

to conduct such an investigation of [the Debtors] as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of [the Debtors] of or by current or former management of [the Debtors], if

(1)    such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or

(2)    [the Debtors'] fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

28.    The First Day Declaration describes the Debtors' capital structure as including funded unsecured debt in excess of the $5 million threshold of Code section 1104(c)(2). Accordingly, the appointment of an examiner under that section to investigate the affairs of the Debtors is mandatory. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500-01 (6th Cir. 1990) ("[Section 1104(c)(2)] plainly means that the bankruptcy court 'shall' order the appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds $5 million if the U.S. trustee requests one."); *In re Loral Space & Communications Ltd.,* No. 04 Civ. 8645RPP, 2004 WL 2979785, at *4, 5 (S.D.N.Y. Dec. 23, 2004) (reversing Bankruptcy Court's decision denying appointment of examiner where $5 million debt threshold under section 1104(c)(2) was met and parties seeking appointment had standing to do so); *In re UAL Corp.,* 307 B.R. 80, 83-86 (Bankr. N.D. Ill. 2004) ("best reading of the statute" is that appointment of an examiner is mandatory if the requirements of section 1104(c)(2) are satisfied); *see also In re Mechem Fin. of Ohio, Inc.*, 92 B.R. 760, 761 (Bankr. N.D. Ohio 1988); *In re The Bible Speaks*, 74 B.R. 511, 514 (Bankr. D. Mass.1987); *In re 1243 20th Street, Inc.*, 6 B.R. 683, 685 n.3 (Bankr. D.C. 1980); *In re Lenihan*, 4 B.R. 209, 211 (Bankr. D.R.I. 1980).

29.    While this Court has authority under Code section 1104(c)(2) to specify (and thereby effectively limit) the appropriate scope of an examination, the "as is appropriate" language

13

in that statutory subsection does not confer discretion upon this Court to decide whether an examiner should be appointed as a threshold matter once it is clear that the statute's monetary threshold is met. *See Loral,* 2004 WL 2979785, at *5 ("[i]t is [the bankruptcy court's] duty to fashion the role of an examiner to avoid substantial interference with the ongoing bankruptcy proceedings."); *UAL Corp.*, 307 B.R. at 85 n.2  (construing the "as is appropriate" language in section 1104(c)(2) to vest discretion in the bankruptcy court nullifies its mandate).

30.    Further, this Court should direct the appointment of an examiner under section 1104(c)(1), as such appointment would be in the best interests of the Debtors' estates, their creditors and equity security holders.  Notwithstanding the Debtors' efforts to sell substantially all of their assets, the return on such sale(s) (if such sale(s) are consummated) will pale in comparison to potential recoveries via litigation against persons responsible for the Debtors' current predicament.  The moKredit receivable alone is $39 million.  The interests of the Debtors' estates and their creditors are best served by permitting an examiner to investigate the Debtors' prepetition activities and to identify colorable claims which the estates may assert beyond the moKredit receivable.  The Debtors' financial affairs and business operations need to be reviewed by a disinterested person with clear authority to untangle the mess and provide transparency to all parties in interest.   This is all the more important where the sums at stake are almost as large as the level of distrust felt by those who dealt with the Debtors.

*Conversion*

31.    11 U.S.C. § 1112 provides in part:

(a)    The debtor may convert a case under this chapter to a case under chapter 7 of this title unless—

(1)    the debtor is not a debtor in possession;

14

(2)      the case originally was commenced as an involuntary case under this chapter; or

(3)      the case was converted to a case under this chapter other than on the debtor's request.

(b)

(1)      Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

(2)      The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—

(A)      there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B)      the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—

(i)      for which there exists a reasonable justification for the act or omission; and

(ii)      that will be cured within a reasonable period of time fixed by the court.

(3)      The court shall commence the hearing on a motion under this subsection not later than 30 days after filing of the motion, and shall decide the motion not later than 15 days after commencement of such hearing, unless the movant expressly consents to a continuance for a specific period of time or compelling circumstances prevent the court from meeting the time limits established by this paragraph.

(4)      For purposes of this subsection, the term "cause" includes—

(A)      substantial or continuing loss to or diminution of the estate and the absence
of a reasonable likelihood of rehabilitation[.]

32.      11 U.S.C. § 1112(b)(2)(B) indicates that, if the U.S. Trustee moves for conversion under 11 U.S.C. § 1112(b)(4)(A) and establishes "cause" for relief, there are no "unusual circumstances" that would allow this Court to refrain from converting the above-captioned case to a case under chapter 7.

33.      Through the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005), Congress eliminated this Court's discretion that was previously reflected in the appearance of the permissive word "may" in to 11 U.S.C. § 1112(b) and, through substitution of the mandatory word "shall" for "may," directed this Court to convert or dismiss the case, "whichever is in the best interests of the creditors and the estate," if "cause" is established. 7 COLLIER ON BANKRUPTCY § 1112.04(1) (15th ed. rev. 2005) (". . . as amended in 2005, section 1112(b) circumscribes the court's discretion by directing certain instances in which the court must, and must not, convert or dismiss the case."); *cf. Association of Civilian Technicians v. FLRA*, 22 F.3d 1150, 1153 (D.C. Cir. 1994) ("The word 'shall' generally indicates command that admits of no discretion on the part of the person instructed to carry out the directive.").

34.      The purpose of 11 U.S.C. § 1112(b)(4)(A) is to "preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation." *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995) (quoted in *Loop Corp. v. United States Trustee (In re Loop Corp.)*, 379 F.3d 511, 516 (8th Cir. 2004)).

35.    "Substantial or continuing loss to or diminution of the estate" is established where a debtor has continuing, negative cash flow post-petition. *See Loop Corp.*, 379 F.3d at 515-16.

36.    "Rehabilitation," as the term is used in 11 U.S.C. § 1112(b)(4)(A), means "to put back in good condition; re-establish on a sound, firm basis." 5 COLLIER ON BANKRUPTCY § 1112.03(2) (15th ed. 1980) (quoted in *In re L.S. Good & Co.*, 8 B.R. 315, 317 (Bankr. N.D. W.Va. 1980)).  To be clear, "rehabilitation" does not include or mean the ability to confirm a liquidating plan.

37.    Here, the Debtors are eating into their cash position to fund operations and the prosecution of their bankruptcy cases.  Additionally, the Debtors announced on the first day of their bankruptcy filings that they have ceased taking new loans from "investors" and, subsequently, have filed a motion to sell substantially all of their operational assets [D.I. 65].  In short, there is a continuing loss to or diminution of the estates and the absence of a reasonable likelihood of rehabilitation.  Accordingly, conversion of the cases to cases under chapter 7 is required.

38.    Notwithstanding that conversion is mandatory where the "continuing loss/absence" prong of section 1112(b)(4)(A), it is also a desirable result here.  At bottom, the size of the distribution made to general unsecured creditors in these cases will hinge on the estates' success in resolving issues among various constituencies, litigating where necessary, and taking expeditious, effective action to maximize value in the estates to the extent possible.  Given the circumstances confronting the various estates and parties in interest, the appointment of an independent and disinterested fiduciary is necessary to lead that effort.

WHEREFORE the U.S. Trustee requests that this Court enter an order (i) directing the appointment of a trustee or, alternatively, (ii) directing the appointment of an examiner or (iii) converting the cases to cases under chapter 7.

Dated: December 4, 2020
   Wilmington, Delaware

            Respectfully submitted,

            **ANDREW R. VARA**
            **UNITED STATES TRUSTEE,**
            **REGIONS 3 and 9**

            By: *_/s/ Joseph J. McMahon, Jr._*
            Joseph J. McMahon, Jr.
            Trial Attorney
            John Schanne
            Trial Attorney
            United States Department of Justice
            Office of the United States Trustee
            J. Caleb Boggs Federal Building
            844 King Street, Suite 2207, Lockbox 35
            Wilmington, DE 19801
            (302) 573-6491 (Phone)
            (302) 573-6497 (Fax)
            joseph.mcmahon@usdoj.gov
            John.schanne@usdoj.gov