# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* : : CRED INC., *et al.*,[1] : : Debtors. : : | Chapter 11 Case No. 20-12836 (JTD) (Jointly Administered) |

## DECLARATION OF DANIYAL INAMULLAH IN SUPPORT OF MOTION OF THE UNITED STATES TRUSTEE FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF A TRUSTEE, OR IN THE ALTERNATIVE, (I) DIRECTING THE APPOINTMENT OF AN EXAMINER, OR (II) CONVERTING THE CASES TO CHAPTER 7 CASES

Daniyal Inamullah declares:

1. I was previously employed by Cred Inc. as Vice President of Capital Markets from January 2020 through April 2020, and as Head of Capital Markets from April 2020 through November 2020. I recently became employed as the Chief Investment Officer for Sarson Funds, an independent provider of blockchain technology and cryptocurrency marketing and educational services focusing on the financial professional community and their clients which is headquartered in Indianapolis, IN.

2. As Head of Capital Markets at Cred, my role was to oversee due diligence of investment opportunities and set our investment policies via recommendations to the Investment Committee. My job was to ensure that the Debtors generated the necessary returns so that Cred could attract additional creditors as an alternative lending platform. Pursuant to my position, I expected to gain intimate knowledge of Cred's financial position and processes.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

3. I hold an Associate of Arts Degree from Oxford College at Emory University (2007), a Bachelor of the Arts degree from Emory University (Economics; Business Policy Focus) (2009), and a Master of Business Administration degree from the University of Houston's C.T. Bauer College of Business (2014).

4. I am a Chartered Financial Analyst (CFA) charterholder. I was trained at Ernst & Young, an accounting firm, in Valuation and Business Modelling for Transaction Advisory Services. Subsequently, I continued my training as an Associate at the investment banking firm of Houlihan Lokey.

5. I submit this declaration pursuant to 28 U.S.C. § 1746 in support of the motion of the United States Trustee for entry of an order directing the appointment of a trustee or, alternatively, for entry of an order directing the appointment of an examiner or (ii) converting the above-captioned cases to cases under chapter 7 (the "Inamullah Declaration"). Except as otherwise indicated herein, all facts set forth in this Inamullah Declaration are based on my personal knowledge. I am over the age of 18. If called upon to testify, I could and would testify competently to the facts set forth herein.

*Liquidation of Hedging Positions in March 2020*

6. I previously reviewed Mr. Schatt's declaration in support of the Debtors' "first day" motions [D.I. 12] and concluded that it does not adequately describe certain events which had a substantially greater impact on Cred's survival than the events leading to the company's dispute with James Alexander, Cred's former Chief Capital Officer, described in paragraphs 22 to 29 therein.

7. The true source of the losses to Cred stem from liquidations from being in leveraged long positions back in March (specifically, March 12-13 when markets were extremely volatile).

8. Assuming that Cred received Bitcoin as part of the CredEarn program, the following would be a typical, subsequent series of transactions by Cred from inception through March 2020, using a $100 transaction as an example:

   a. Receive $100 in our Bitcoin wallet;
   b. Sell $80 for cash and send the cash to MoKredit ("MoKred"); and
   c. Use the remaining $20 to lever long with futures contracts (paying an implied hedging cost of ~10% and using sufficient leverage for the $20 to cover the price exposure on the $80, implying a leverage ratio of 4-5x).

9. Continuing with the example in the preceding paragraph, a "good" trade would have:

   a. Cred receiving regular interest from MoKred;
   b. Cred being able to unwind the hedges on the trading platforms;
   c. Cred being able to buy the same number of Bitcoin units that were borrowed; and then
   d. Cred returning the interest + principal back to the customer.

10. In March 2020, Cred had about 800 Bitcoin ("BTC") used to hedge exposures of approximately 5,500 BTC with derivatives contracts on exchanges such as BitMex and OkEx. Ultimately, due to the sudden increased downside volatility associated with Covid, Bitcoin prices fell approximately 50% overnight. This led to the liquidation of 800 BTC on exchanges. Initially, the trade did not do too much damage to the balance sheet, given that the liabilities (which were in Bitcoin) were also reduced.

11. For example, if someone contributed $100 of Bitcoin at a price of $10,000/BTC, the decline reduced the total liabilities exposure to roughly $50 (assuming a 50% decline in the $/Bitcoin price against the United States Dollar). However, as Bitcoin began to recover, Cred was unable to get liquidity to "close-out" the short trade by buying Bitcoin again. The reason for this was that most of the cash liquidity was tied up at MoKred – and MoKred was unable to repay principal in March 2020.

12. Cred was essentially caught in a liquidity trap, and Bitcoin price appreciation after the precipitous drop increased the spread between assets and liabilities. As BTC prices increased,

the value of the liabilities increased as well. Cred was unable to make up the gap given there were no assets to lever long to cover the short Bitcoin exposures. This circumstance led to a liability in the excess of $50 million over the next few months as Bitcoin prices increased from approximately $5,000/BTC in March to $19,000/BTC at the end of November.

13. The asset-to-liability ratios were documented to Cred's Investment Committee over the next several months, with specific requests for financial information related to MoKred, asset impairment analyses and solvency opinions. Dan Schatt (Cred's co-founder and Chief Executive Officer) and Joe Podulka (Cred's Chief Financial Officer) rejected both requests or insisted on delaying the process.

*MoKred Liquidity*

14. The MoKred borrowing arrangement with Cred was facilitated by the executive team at Cred's inception (back in 2018). After the March volatility and liquidity issues in China, Dan Schatt and Lu Hua indicated that the Chinese regulators were allowing borrowers to extend principal repayments indefinitely. Cred requested a $10 million principal repayment on March 14th (to provide Cred with liquidity in response to the March 2020 BTC price drop), which MoKred was unable to comply with.

15. An undocumented repayment plan was agreed to bilaterally between Dan Schatt and Lu Hua, despite Cred's Capital Markets team recommendation to exercise senior lender rights over moKred's assets or at least agree upon a final date for repayment for the full balance of the loan. This was documented in an internal memo submitted to Cred Inc. by Cred Capital, Inc. named "Liquidity Analysis and Recommendations" during April 2020.

16. The 'revised plan' called for a few hundred thousand to be repaid in May and June, and $4 million for July and August. No payment above $400k was ever made and MoKred cut off principal payments in October.

17. It is important to note that no moKred financial reports were made available to the Capital Markets team at Cred, despite numerous requests to Dan Schatt, Joe Podulka, and the MoKred team. Cred's team was provided two (2) short phone calls with spare details on the current financial situation, and the promise that MoKred's equity investors would be able to help.

*Quanta Coin*

18. Quanta Coin ("QC") was an investment that was made early February (with a follow-on investment in April) that turned out to be a fraudulent investment manager.

19. Richard Chapman, QC's "portfolio manager," initially met with the Cred team at the Consensus conference back in May 2019. Since then, they kept in touch and began a formal diligence process in November. James Alexander claims there was a third party hired by Cred to help with the diligence.

20. QC claimed to run a derivatives-based strategy with a goal of returning 20-30% per year. James Alexander met Richard during a Europe trip on February 2nd, 2020. On February 3rd, an investment of approximately 400 BTC was made.

21. The relationship was managed by an imposter Scott Foster of Kingdom Trust ("KT"), a digital asset custodian. It is important to note that Scott Foster is a real person that worked for KT, but this email address was slightly off. The domain read "KingdomStrust.com" instead of Kingdomtrust.com." The imposter Scott Foster made himself responsible for reporting and answering any questions for us regarding Cred's relationship with QC.

22. During August 2020, after the six-month "lock up" period ended, Cred requested a redemption of $2 million from QC to rebalance the portfolio. After the redemption request, follow-up emails to the imposter Scott Foster were returned, as the domain name was unregistered.

23. Cred immediately alerted the FBI upon discovery of the fraud, which started an investigation to trace and redeem the funds from the imposter.

*Equity Investment Round / Solvency Request*

24. Towards the end of April 2020, Cred Capital recommended a course of action to wind up operations as soon as possible if Cred was unable to bring in equity capital or receive liquidity back from MoKred by June 30, 2020. Although angrily rejected by Dan Schatt and Joe Podulka, it was a potential way to avoid significantly more losses down the road. The document was authored by the general counsel of Cred (Dan Wheeler), James Alexander and myself.

25. Dan Schatt pursued equity investments furiously from a wide variety of investors but was unable to close by June 30. However, he kept indicating that the company was close to an investor and that they would help Cred get out of the liquidity situation.

26. Cred was ultimately able to close Dragonfly Capital ("DC"), but the information provided to DC was not available to the Cred team and managed primarily by Dan Schatt and Joe Podulka. It is important to note that financial information on the balance sheet was provided only through March 30 (which reflected a positive shareholder's equity balance).

27. When asked about how trading losses and gains were calculated, the accounting team indicated that only gains were being captured on each rolling profit & loss statement, and losses were sheltered on the balance sheet by being marked to each CredEarn program's inception, giving the artificial impression of profitable operations. For example, if Bitcoin's price was increasing, then performance related to long position was reflected on the P&L; however, no corresponding adjustments were made on the liability side of the balance sheet until a program reached maturity. No impairment of MoKred assets, impairment of other credit-based lending allocations or any illiquid crypto held was ever reflected.

*James Alexander Situation / "Stolen Funds"*

28. James Alexander was brought on at Cred to be the Chief Capital Officer, being solely responsible for investments and risk management. Over time, Cred realized that there needed to be a firewall between Cred's lending entity and the asset management piece of their operations.

29. The executive team decided to create a registered investment advisor, or "RIA," named Cred Capital. To fund the new entity, the idea was that Cred would provide some initial capital (roughly $2 million in kind) and Cred Capital would begin an external fundraising process lead by James Alexander.

30. Cred Capital was initially assumed to be an independent business before Cred claimed it would be operating as a wholly owned subsidiary. To consummate this firewall, an Asset Management Agreement and Investment Agreement were signed by Dan Schatt.

31. To maintain independence, the idea was to create non-voting shares for Cred and Cred's beneficial owners (the "B Shares" noted in the court documents). Lu Hua contributed 300 BTC directly to Cred Capital, with a signed investment agreement for the non-voting B Shares. The funds that Cred claims that James "stole" from Cred were assets that Cred Capital owned, not customer assets that were a part of the CredEarn or CredBorrow programs. These assets were also segregated in a separate custodial account to ensure they were not commingled with Cred assets. Some of these assets were also deployed to begin operations, such as hiring an accountant and other consultants.

32. There was also a third investor (Zobar Agha from Turkey) that invested in the A shares (with full voting rights), and then gave voter proxy to James Alexander. Zobar never consummated the transfer of funds.

33. James Alexander requested the assets to be moved to another account for the benefit of the Cred Capital entity, using the signed Asset Management and Investment Agreements as justification for being able to move assets at his discretion.

34. I have reviewed the facts stated in the Motion and believe that they are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 4, 2020
Denver, Colorado

_____
Daniyal Inamullah