## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Cred Inc., *et al.*, [1] | ) | Case No. 20-12836 (JTD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF UPGRADEYA INVESTMENTS, LLC FOR RELIEF FROM STAY UNDER BANKRUPTCY CODE SECTION 362

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 bankruptcy cases (the "Chapter 11 Cases") of Cred Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") hereby submits this objection (the "Objection") to the *Motion of UpgradeYa Investments, LLC for Relief From Stay Under Bankruptcy Code Section 362* [Docket No. 89] (the "Motion").  In support of this Objection, the Committee relies on the *Declaration of Pamela A. Clegg in Support of the Objection of the Official Committee of Unsecured Creditors to Motion of UpgradeYa Investments, LLC for Relief From Stay Under Bankruptcy Code Section 362*, attached hereto as **Exhibit A** (the "Clegg Declaration"), and the *Declaration of Pablo Bonjour in Support of the Objection of the Official Committee of Unsecured Creditors to Motion of UpgradeYa Investments, LLC for Relief From Stay Under Bankruptcy Code Section 362*, attached hereto as **Exhibit B** (the "Bonjour Declaration" and, together with the Clegg Declaration, the "Declarations"), and respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

## PRELIMINARY STATEMENT[2]

1.    The Motion must be denied because Movant's Collateral (as defined below) is property of the Debtors' estates and Movant cannot prove otherwise.

2.    All of the Collateral was transferred into e-wallets in the Debtors' name.[3]  Movant has failed to meet its burden that the Collateral is not property of the Debtors' estates.  Assuming arguendo that Movant relies on a trust theory for recovery of its Collateral (notably the Motion does not use the word "trust" anywhere), Movant has equally failed to meet its burden proving that a trust relationship exists.

3.    Moreover, even if a trust relationship existed, the Debtors have commingled the Collateral and Movant cannot trace the Collateral.  Under established Third Circuit law, Movant has the burden to identify and trace the Collateral.  Movant cannot (and has not even attempted to) trace the Collateral.  When tracing is not possible, courts in the Third Circuit often apply the Lowest Intermediate Balance test (the "LIBT") to determine if trust assets can be recovered.  Unfortunately for Movant, all of the e-wallets into which Movant deposited the Collateral currently have a zero Bitcoin ("BTC") balance.  For that reason, Movant cannot recover anything under the LIBT.  Movant has nothing more than a general unsecured claim.

4.    Finally, Movant conveniently ignores that more than 6,500 other creditors are in the same position as Movant.  That is, 6,500 other creditors transferred BTC and other

---

[2] In the interest of advancing these Chapter 11 Cases forward and accommodating the Movant's desire to have the Motion heard expeditiously, the Committee sought only a brief adjournment of the Motion and a corresponding extension to the Committee's objection deadline, which the Court granted.  The Committee's analysis of the Motion will continue through the hearing date on December 17, 2020.  Notably, a deposition of Marc Parrish is scheduled on December 16, 2020, which is two days after the Committee's objection deadline.  As such, the Committee reserves the right to supplement this Objection prior to or at the hearing.

[3] In the cryptocurrency space, ownership of an e-wallet address is determined by whoever holds the private key to such address.  Consequently, ownership of the cryptocurrency within an e-wallet is considered to be the property of the holder of the e-wallet address' private key.  This concept is referred to by those in the space as "not your keys, not your coins."

cryptocurrency to the Debtors, presumably with the same expectation as Movant that their cryptocurrency would be returned to them.  As these creditors have now to come to learn, a mere fraction of that cryptocurrency appears to remain in the Debtors' possession.  Practically all of this cryptocurrency has been commingled and transferred many times since the initial transfer from the Debtors' customers, making it impossible to know if the BTC in the Debtors' possession includes any BTC that was transferred to the Debtors by customers (through investment or pledge).  Movant has not demonstrated why it should be entitled to a priority distribution ahead of other creditors who are similarly situated.  Movant should be treated like all other allowed unsecured claim holders under a plan of liquidation.[4]

> 5.    For these reasons, the Motion should be denied.

## BACKGROUND

**A.    The Debtors' Practice of Commingling BTC**

> 6.    The Debtors primarily offered two services to its customers: "CredEarn" and "CredBorrow."  See, *Declaration of Daniel Schatt in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 12], ¶ 9.  Under CredEarn, customers transferred cryptocurrency to the Debtors with the expectation that the Debtors would invest the cryptocurrency and provide customers with returns on investment.  *Id.*  Under CredBorrow, the Debtors provided lines of credit to customers, who in turn pledged cryptocurrency to the Debtors as collateral.  *Id.*

---

[4] The Debtors and the Committee have formulated a path forward in these Chapter 11 Cases, as embodied in a Plan Support Agreement that will be executed and filed shortly.  That path is supported by the entity with the greatest collective financial stake in these Chapter 11 Cases—the Committee.

7.       Under both programs, the Debtors regularly commingled the cryptocurrency received with other customers' cryptocurrency and the Debtors' holdings.[5]  Notably, UpgradeYa Investments, LLC ("Movant") does not dispute that the Debtors engaged in commingling.  *See* Docket No. 126, ¶ 14 (citing Inamullah Dec., ¶ 17).

**B.       The Debtors' Relationship with Movant**

8.       On April 20, 2020, Debtor Cred (US) LLC ("Cred") and Movant entered into that certain Loan and Security Agreement (the "Agreement"), pursuant to which Cred provided Movant with a $2 million revolving line of credit and, in exchange, Movant pledged and transferred (the "BTC Transfer") approximately 531 BTC (the "Collateral") to the Debtors.  *See* Docket No. 91-1.  In addition to the BTC Transfer, Movant granted the Debtors a security interest in the 531 BTC.  *Id.*  The Agreement is governed by California state law.

9.       The Debtors maintain e-wallets at various online platforms that store, transfer, and issue digital assets, including, among others, with Fireblocks, Inc. ("Fireblocks").  *See* Bonjour Dec., ¶ 4.

---

[5] *See Declaration of Pablo Bonjour in Support of Objection of Debtors to Motion of UpgradeYa Investments, LLC for Relief from Stay Under Bankruptcy Code Section 362* [Docket No. 113-1] (the "Debtor Declaration"), ¶ 16 ("Once the Debtors receive the cryptocurrency into their Fireblocks e-wallets . . . the deposited cryptocurrency is undistinguishable . . . from the other cryptocurrencies held in the Debtors' Fireblock accounts."); *id.* at ¶ 17 (upon receiving bitcoin deposits "the Debtors usually quickly either invest the cryptocurrency they receive with third-party asset managers, or liquidate it. . . ."); *id.* at ¶ 21 ("When the Debtors need to make withdrawals from their accounts with their third-party asset managers, there is no guarantee that the Debtors third-party asset managers return the same cryptocurrency the Debtors invested with the third-party asset managers."); *id.* at ¶ 22 ("The Debtors keep close track of the performance of their investments, they do not maintain ledgers tracking the use of the specific cryptocurrency customers deposit with them because cryptocurrency, like USD, are fungible. Accordingly, there is little to no chance that the specific cryptocurrency transferred by a customer to the Debtors could be recovered, or that it could be traced amongst the Debtors' current assets."); *see also Declaration of Daniyal Inamullah in Support of Krzysztof Majdak and Philippe Godineau's Motion for Entry of an Order Pursuant to 11 U.S.C. § 1112(B)(I) Dismissing the Cases; (II) Converting the Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 11 Trustee* [Docket No. 97] (the "Inamullah Declaration"), ¶ 7 ("Cred made no separation between customer (lender) 'accounts' and general corporate funds. This meant that customer funds were used to pay general expenses like salaries, rent and overhead."); *id.* at 17 ("Rather than maintain the collateral intact in a wallet, Cred used this collateral to pay normal business expenses, fund the loan by selling the collateral, invest, and pay redemptions to prior CredEarn customers."); *see also* Bonjour Dec., ¶¶ 9-26.

10.     To facilitate the BTC Transfer, the Debtors provided Movant with the addresses to thirty e-wallets (the "Collateral Wallets") maintained in the Debtors' name at Fireblocks.  *See Declaration of Marc Parrish in Support of the Motion of UpgradeYa Investments, LLC for Relief From Stay Under Bankruptcy Code Section 362* [Docket No. 91] (the "Parrish Declaration"), ¶ 3; *see also* Bonjour Dec., ¶ 6.  Between April 22, 2020 and April 27, 2020, Movant transferred 531 BTC to the Collateral Wallets in different amounts.  *Id.*  Shortly after receiving 531 BTC from Movant, the Debtors commingled the Collateral with other cryptocurrency and transferred it to either other e-wallets held by the Debtors or e-wallets held by third-parties.  *See* Bonjour Dec., ¶ 9-10; *see also* Inamullah Dec., ¶ 17.

11.     On April 30, 2020, Movant drew the full amount of the $2 million line of credit.  *See* Parrish Dec., ¶ 4.  Since then, the value of BTC has significantly increased, which increased the loan-to-value ratio above the 50% required under the Agreement.  *Id.* at ¶¶ 6-8.  In August 2020, to reduce the loan-to-value ratio, Movant requested a return of approximately 53 BTC of from the Debtors, which was transferred shortly thereafter.  *Id.* at ¶ 7.  Because of the extent that the Debtors commingled BTC, it is unlikely that the 53 BTC returned to Movant was from the initial 531 BTC.[6]

12.     Movant now wants to repay its outstanding $2 million indebtedness to the Debtors and receive the remaining Collateral (478.17 BTC) from the Debtors.  *Id.* at ¶ 13.

---

[6] Accordingly, the 53 BTC transferred to the Movant is subject to avoidance as a preference under Bankruptcy Code section 547, and Movant is not entitled to a setoff of its claims against the Debtors' estates.

## OBJECTION

### A.      The Collateral is Property of the Estate

13.     Bankruptcy Code section 541 defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. 541(a)(1).  The Third Circuit has emphasized "that Section 541(a) was intended to sweep broadly to include all kinds of property, including tangible or intangible property . . . .  The term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed."  *In re Majestic Star Casino, LLC*, 716 F.3d 736, 750 (3d Cir. 2013) (citations omitted); *see also In re Lee*, 179 B.R. 149, 156 (9th Cir. B.A.P. 1995) (a debtor's interest in property includes "possession, custody, and control."); *In re Street*, 214 B.R. 779, 780 (Bankr. W.D. Penn. 1997) (stating that section 541 "defines property of the estate broadly enough to apply to a mere possessory interest in personal property").  If an account is held in a debtor's name, transfers of funds into such account are presumptively property of the estate, and the burden is on the claimant to establish otherwise. *See In re Catholic Diocese of Wilmington, Inc.*, 432 B.R. 135, 161 n. 93 (3d Cir. 2010).  To satisfy this burden, a claimant must identify and trace such funds.  If tracing fails, then the funds are property of the debtor's estate.  *Id.* at 161.

14.     Between April 22, 2020 and April 27, 2020, Movant transferred the Collateral to the Collateral Wallets, all of which are held in the Debtors' name.  *See* Bonjour Dec., ¶ 6. Accordingly, the burden is on Movant to establish that the Collateral *is not* property of the Debtors' estates.  Movant goes to great lengths in arguing that the Collateral did not become the

Debtors' property at the time of the transfer, and that the Debtors did not have authority to sell or otherwise use the Collateral.[7]  These arguments miss the mark.[8]

15.     Even assuming that the Collateral remained Movant's property immediately after it transferred the Collateral to the Debtors, it ceased to be Movant's property as a result of the Debtors' commingling (and sweeping of the Collateral Wallets) that occurred, thereby making it impossible for Movant to satisfy its tracing burden, as set forth in more detail below.  As a result, the Collateral is property of the Debtors' estates.  *See Catholic Diocese*, 432 B.R. at 161.

16.     Because Movant cannot trace the Collateral, Movant is left with an unsecured claim.  *See In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1054 (3d Cir. 1993) (claimants' of trust funds are left with unsecured claims when tracing is precluded by commingling and amounts owed are greater than the lowest intermediate balance); *Merchs. Express Money Order Co. v. Supermarket. of Cheltenham, Inc. (In re Supermarkets of Cheltenham, Inc.),* No. 97-35661, 1999 WL 260956, at *5 (Bankr. E.D. Pa. 1999) (concluding that claimant's interest in untraced trust funds is that of an unsecured creditor).

---

[7] Movant participated in the "CredBorrow" program, which is advertised by the Debtors as a program that allows borrowers to borrow cash in exchange for pledged collateral.  The Debtors marketing materials for the "CredBorrow" program include the following question and answer: "What happens to my pledged assets? Your pledged assets are used to lend to and transact with a variety of customers, including retail borrowers and money managers with well-established track records.  Cred does not lend to short-sellers."  *See Crypto Equals Credit*, mycred.io/borrow/.

[8] The Motion is also procedurally improper.  The Debtors and Movant each assert a property interest in the Collateral.  To adjudicate these competing interests, Movant must file an adversary proceeding, which it has not. *See* Fed. R. Bankr. P. 7001(1)-(2).

B.       **Movant Has Not Established a Trust Relationship**

17.      Although not expressly stated,[9] Movant appears to suggest that the Debtors and

Movant intended to form a trust relationship, with the Collateral constituting the trust *res*.[10]  To

establish a trust relationship, Movant must (i) demonstrate that a trust relationship and its legal

source exist, and (ii) identify and trace the trust *res* if it has been commingled.  *Catholic Diocese*,

432 B.R. at 147.

18.      As an initial matter, Movant has not cited any relevant authority nor provided any

evidence to demonstrate the existence of a trust relationship, rather than a debtor-creditor

relationship.[11]  *See generally Weststeyn Dairy 2, et al. v. Eades Commodities Co.*, 280 F. Supp.

2d 1044 (E.D. Cal. 2003); *see also In re Downey Financial Corp.*, 593 F. App'x. 123 (3d Cir.

2015) (applying California law); *see also In re LGI Energy Sols., Inc.*, 460 B.R. 720, 729–30

(B.A.P. 8th Cir. 2011) ("Similarly, Minnesota courts have held that '[w]here money paid to

---

[9] Movant appears to claim that it had a bailor-bailee relationship with the Debtors.  *See* Docket No. 89, ¶ 21 ("the Debtors are merely acting as bailee that have, at most, an unliquidated, contingent interest in the [Bitcoin].").  However, the Motion does not cite any applicable law describing the elements necessary to establish a bailor-bailee relationship, let alone apply such elements to the relevant facts.  California law defines a bailment as "the delivery of a thing to another for a special object or purpose, on a contract, express or implied, to confirm to the objects or purposes of the delivery which may be as various as the transactions of men."  *Windeler v. Scheers Jewelers*, 8 Cal. App. 3d 844, 850 (Cal. App. 1970) (quoting  H. *S. Crocker Co., Inc. v. McFaddin*, 148 Cal. App. 2d 639, 643 (Cal. App. 2d 1957)).  A bailment does not exist here.  Movant transferred the Collateral to the Debtors with the expectation that, upon repaying the $2 million loan, the Debtors would transfer 531 BTC (the amount of the Collateral) to Movant, but not necessarily the specific Collateral that Movant original transferred to the Debtors.  Moreover, even if a bailment exists, the bailee is held to the standard of ordinary care over the subject matter of the bailment and is not personally liable unless negligence is proven.  *Id.*  If Movant is asserting that a bailment relationship exists, then it must file a complaint that sufficiently demonstrates that the Debtors are liable for either (i) failing to uphold the standard of ordinary care or (ii) negligence.  *See Homan v. Burkhart*, 108 Cal. App. 363, 367 (Cal. App. 2d 1930) ("Whether the bailee has exercised due care is a question of fact for the jury or the court, if sitting without a jury, except in cases where but one reasonable inference can be drawn from the undisputed facts.").  Of course, if Movant successfully brings such claims, its recourse would be damages for the loss of property, which is more aptly described as a general unsecured claim.  *See id.* (noting that claims against bailors are to recover damages for the loss of property).  In other words, Movant would not recover the Collateral, just a claim for the value thereof.

[10] To the extent Movant is asserting that the parties' relationship constitutes a trust (whether express, implied, or otherwise), the Committee objects to such characterization.

[11] Notably, the Agreement does not contain the word "trust."  *See* Docket No. 91-1.

another is not required to be segregated by the payee and held as a separate fund for the benefit

of the payor, there is no trust.'"). Thus, no trust relationship existed between Movant and the

Debtors.

## C.    Movant Has Not Traced the Collateral

19.    Even assuming that a trust relationship exists, the Motion must be denied because

Movant has not traced and identified the alleged *res*. *See In re Green Field Energy Servs.*, *Inc.*

585 B.R. 89, 105 (Bankr. D. Del. 2018) (quoting *In re Magna Ent. Corp.*, 438 B.R. 380, 395

(Bankr D. Del. 2010) ("To establish that there exists a trust, a [party] must 'identify and trace the

trust funds if they are commingled.'")); *see also Catholic Diocese*, 432 B.R. at 150 (when trust

fund funds have been commingled, claimants must meet their burden of identifying and tracing

those funds); *Columbia Gas*, 997 F.2d at 1063 (a determination that funds are held in trust does

not automatically entitle claimants to the full payment of amounts owed, instead claimants bear

the burden of identifying and tracing their trust property).

20.    When funds are commingled, a claimant does not have rights in the funds unless

the claimant: "(1) demonstrate[s] that the trust relationship and its legal source exists, and (2)

identif[ies] and trace[s] the trust funds if they are commingled." *Id.*; *see also Columbia Gas*, 997

F.2d at 1063 ("beneficiaries of trust funds bear the burden of identifying and tracing their trust

property").

21.    In instances where a trust claimant is unable to identify and trace its property that

was commingled, the Third Circuit applies the LIBT to determine the trust beneficiaries' rights

in the commingled account.  *See In re Amp'd Mobile, Inc.*, 377 B.R. 478, 489 (Bankr. D. Del.

2007); *In re Catholic Diocese of Wilmington, Inc.*, 432 B.R. at 151 (citing *In re Conn. Gen. Life*

*Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 619 (1st Cir. 1988)); *Columbia Gas*, 997 F.2d at

1063–64.  The LIBT:

> allows trust beneficiaries to assume that trust funds are withdrawn
> last from a commingled account.  However, this rule also assumes
> that withdrawn trust funds are not replenished by new or later
> deposits.  Therefore, the lowest intermediate balance in a
> commingled account represents trust funds that have never been
> dissipated and are reasonably identifiable.

*Amp'd Mobile*, 377 B.R. at 489 (citations omitted).

### i.    The Collateral Has Been Commingled

22.    As discussed above, the Collateral has been commingled.  *See* Bonjour Dec., ¶¶ 9-

26. [12]  Indeed, Movant does not contest this fact.  *See* Motion, ¶ 14 (citing Inamullah Dec., ¶ 17).

As such, Movant has the burden of tracing.  The Motion must be denied because Movant has not

provided any evidence that identifies and traces the Collateral.  In any event, as discussed below,

tracing the Collateral would be impossible.

### a.    Bitcoin Tracing[13]

23.    In most instances, it is *not* possible to identify the location of specific BTC that a

person once owned after that BTC has been commingled and transferred.  To illustrate, below

---

[12] *See* Debtor Dec., ¶ 16 ("Once the Debtors receive the cryptocurrency into their Fireblocks e-wallets . . . the deposited cryptocurrency is undistinguishable . . . from the other cryptocurrencies held in the Debtors' Fireblock accounts."); *id.* at ¶ 17 (upon receiving bitcoin deposits "the Debtors usually quickly either invest the cryptocurrency they receive with third-party asset managers, or liquidate it . . . ."); *id.* at ¶ 21 ("When the Debtors need to make withdrawals from their accounts with their third-party asset managers, there is no guarantee that the Debtors third-party asset managers return the same cryptocurrency the Debtors invested with the third-party asset managers."); *id.* at ¶ 22 ("The Debtors keep close track of the performance of their investments, they do not maintain ledgers tracking the use of the specific cryptocurrency customers deposit with them because cryptocurrency, like USD, are fungible. Accordingly, there is little to no chance that the specific cryptocurrency transferred by a customer to the Debtors could be recovered, or that it could be traced amongst the Debtors' current assets."); *see also* Inamullah Dec., ¶ 7 ("Cred made no separation between customer (lender) "accounts" and general corporate funds. This meant that customer funds were used to pay general expenses like salaries, rent and overhead."); *id.* at ¶ 17 ("Rather than maintain the collateral intact in a wallet, Cred used this collateral to pay normal business expenses, fund the loan by selling the collateral, invest, and pay redemptions to prior CredEarn customers.").

[13] The Clegg Declaration provides additional information on Bitcoin, cryptocurrency more generally, and commingling and tracing concepts.

are examples of incoming and outgoing BTC transactions transferred into one of the Collateral

Wallets:[14]

**Illustration 1**



24.    Illustration 1 shows that on April 21, 2020, the Collateral Wallet received a

transfer of .00009942 BTC (the "Test BTC") from Movant.  *See* Bonjour Dec., ¶ 14.  The Test

BTC was sent to ensure that Movant had the correct Collateral Wallet address.  *See id.* at ¶ 9.

After successfully testing the Wallet address, on April 22, 2020 Movant transferred 27.29064974

BTC (the "Additional BTC" and, together with the Test BTC, the "April BTC") to the Collateral

Wallet.[15]  *See id.* at ¶ 15.   Illustration 2, below, shows the Additional BTC transfer.

---

[14] The Committee has not included illustrative examples here of each Collateral Wallet.  Attached to the Bonjour Declaration as **Composite Exhibit A,** however, are snapshots of each Collateral Wallet's transaction history.  The Bonjour Declaration includes a second illustrative example.  *See* Bonjour Declaration, ¶¶ 8-14.

[15] The fees associated with the above transfers are transaction fees paid when BTC is transferred.  Transaction fees are paid to the "miner" who mines the block that includes the transaction.  The fee is based on the size (in bytes) of the transaction and the age of its inputs (*i.e.*, how long ago the BTC spent was received).

**Illustration 2**



25.     On April 26, 2020, the Debtors made two transfers: (i) a transfer of .78017158 BTC to a third-party e-wallet; and (ii) a transfer of 59.26973398 BTC to another e-wallet maintained by the Debtors with Fireblocks (together, the "Outgoing Transfers"). *See id.* at ¶ 16. In order to consummate the Outgoing Transfers, the Debtors needed to commingle BTC from various e-wallets, including the April BTC. *See id.* at ¶ 17. The Outgoing Transfers can be seen in Illustration 3, below:

**Illustration 3**



26.     The BTC commingling can be seen within the black box on the <u>left-hand side</u> of Illustration 3.  The highlighted line items are the Test BTC and the Additional BTC.  *Id.* However, to make the Outgoing Transfers (seen within the black box on the <u>right-hand side</u> of Illustration 3), the Debtors commingled the April BTC with eight additional BTC e-wallets.  *Id.*

27.     Moreover, the commingling of the April BTC with the eight additional BTC merged the BTC to create the aggregate amount necessary to make the Outgoing Transfers.  *Id.* Once merged, the BTC was then redistributed through the two Outgoing Transfers.  *Id.* Because individual BTC are entirely fungible and do not contain unique characteristics, this action eliminated the ability to identify the April BTC within the Outgoing Transfers.  *Id.*; *see also* Clegg Dec. ¶ 22.  To be clear, it is still known that the April BTC: (i) is represented in portions of one of the two Outgoing Transfers; (ii) in the aggregate is contained in the 59.26973398 BTC Outgoing Transfer; (iii) makes up the entirety of the .78017158 BTC Outgoing Transfer, with the April BTC being included in the 59.26973398 BTC Outgoing Transfer; or (iv) is in some combination of the foregoing scenarios.  *See* Bonjour Dec., ¶ 18.  But, it is not possible to determine with certainty which of the scenarios occurred.  *See* Clegg Dec., ¶ 22.  In other words, the Collateral cannot be traced.

28.     Gold bars can be a helpful analogy that explains the inability to trace BTC when it is commingled and transferred.  Assume that Customer 1 wants to deposit 1 gold bar into Bank's vault.  The Bank would provide Customer 1 with a vault address, and Customer 1 would initiate the transfer.  Now, the Bank's vault has 1 gold bar.  Next, Customer 2 transfers 2 gold bars to the same vault.  The Bank's vault now contains, in the aggregate, three gold bars.  By searching the vault's transaction history at this point in time, one could identify two transfers (1 gold bar and 2 gold bars), making it very easy to identify Customer 1's specific gold bar.

29.     Subsequently, assume the Bank wants to transfer a 1.5 gold bars to Asset

Manager 1 and another 1.5 gold bars to Asset Manager 2.  To complete this transaction, the Bank

melts both gold bars transferred by Customer 1 and Customer 2 (1 and 2) into liquid form,

thereby completely destroying any individually identifiable qualities.  The Bank then divides the

liquid in half, solidifies it, and distributes 1.5 gold bars to each Asset Manager.  By searching the

vault's transaction history at this point in time, one would be able to say that the gold bars from

Customer 1 and Customer 2 together make up some percentage of each Asset Manager's gold

bars.  But, it is impossible to trace with specificity Customer 1's 1 gold bars or Customer 2's 2

gold bars.  In other words, the gold is fungible.

30.     It is also worth noting that the Collateral was further commingled *after* it was

transferred out of the Collateral Wallets.  *See* Bonjour Dec., ¶¶ 19-26.  The vast majority of the

Collateral was commingled and then transferred to either an e-wallet maintained by the Debtors

with Fireblocks (the "General Debtor Wallet") or a third-party e-wallet (the "Third-Party

Wallet").  *Id.* at ¶ 19.  There have been 293 transfers either to or from the General Debtor Wallet

involving more than 2600 BTC, with only 58 such transactions made before April 21, 2020.  *See*

*id.* at ¶ 21.  Accordingly, over 200 General Debtor Wallet transactions *may* involve Movant's

Collateral.  *Id.*  And there have been 461 transfers either to or from the Third-Party Wallet

involving more than 10,800 BTC, with only 41 such transactions made before April 24, 2020.

*See id.* at ¶ 23.  Accordingly, over 400 Third-Party Wallet transactions *may* involve Movant's

Collateral.

31.     To summarize, the Debtors *always* commingled creditors' BTC, as well as the

Debtors' own BTC holdings, usually soon after receipt.  Thus, the burden is on Movant to

identify and trace the Collateral.  Movant has not attempted to satisfy, let alone satisfied, that

burden. *See In re Kulzer Roofing, Inc.,* 139 B.R. 132, 143 (Bankr. E.D. Pa. 1992) (finding that regardless of whether a trust exists, the inability to trace alleged trust funds forecloses a finding that the particular sums are the *res* of any trust).

>    ii.    **The LIBT**

32.    Under the LIBT, if commingled collateral in an account has been reduced below the level of the initial transfer, but not depleted, then the claimant is entitled to the lowest intermediate balance in the account.  The Committee's investigation of the Collateral Wallets has concluded that each presently has a zero Bitcoin balance.  *See* Bonjour Dec., ¶ 7, Composite Ex. A.  Applying the LIBT, once the Collateral Wallets' balance was reduced to zero, Movant's ability to recover BTC from the Debtors was extinguished.  Accordingly, the Motion must be denied.

**D.    Movant Improperly Seeks to Pursue Estate Claims**

33.    Movant requests relief from the automatic stay, not only to seek return of the Collateral from the Debtors, but to file claims against third-parties and the Debtors' insurance providers to recover the value of the Collateral.  As an initial matter, Movant does not need relief from the automatic stay to pursue third-parties that are in possession of Movant's property.  But as discussed above, Movant has not identified and traced the specific location of the Collateral, thereby rendering it property of the Debtors' estates.  *See Catholic Diocese*, 432 B.R. at 161. Accordingly, Movant is effectively asking the Court for a comfort order authorizing Movant to file claims to recover the *value* of the Collateral, not the Collateral itself.  Such relief is inappropriate for two reasons.

34.    First, the Collateral is property of the Debtors' estates because Movant fails to (and likely cannot) trace the Collateral.  *See Catholic Diocese*, 432 B.R. at 161.  Further, any

claims against third-parties to recover the *value* of the Collateral are estate claims. *Official*

*Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,* 330

F.3d 548 (3d Cir. 2003); *see also In re Davis,* 312 B.R. 681, 685 (Bankr. D. Nev. 2004) ("Absent

authorization by the bankruptcy court, the Trustee is the only party who can assert a claim for

damages on behalf of the bankruptcy estate."). If a party in interest seeks to file claims on behalf

of the Debtors, it must seek derivative standing. Movant has not done so here.[16]

35.    Second, insurance policies and the proceeds derived therefrom are property of the

Debtors' estates. *See* 11 U.S.C. § 541(a)(6) (property of the estate includes "proceeds . . . of or

from property of the estate . . . ."); *see also Acands, Inc. v. Travelers Cas. And Sur. Co.*, 435 F.

3d 252, 260 (3d Cir. 2006) ("It has long been the rule in this Circuit that insurance policies are

considered part of the property of a bankruptcy estate."). Accordingly, Movant has no property

interest in the Debtors' policies or the proceeds thereof. For these reasons, the Motion must be

denied.

**E.**    **Movant Should Not Be Awarded a Priority Claim**

36.    Movant may be correct that the Debtors misappropriated its assets,[17] but the same

can be said for the Debtors' other 6,500 customers. Movant should not be permitted to seek a

priority distribution over those similarly situated creditors. *See In re Strategic Techs., Inc.*, 142

F. App'x. 562, 566 (3d Cir. 1993) ("[W]hen one party is claiming assets that are commingled

---

[16] Even if Movant sought derivative standing, it would not prevail. Derivative standing requires: "(1) a colorable claim; (2) that the trustee unjustifiably refused to pursue the claim; and (3) permission of the bankruptcy court to initiate the action." *In re Centaur, LLC,* No. 10–10799(KJC), 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010) (citing *In re Yes! Entm't Corp.,* 316 B.R. 141, 145 (D. Del. 2004)). Not only has Movant failed to demonstrate that a colorable claim exists against third-parties, but the Debtors have not affirmatively stated any intent to not pursue estate claims.

[17] The Committee intends to fully investigate this and many other allegations that have been made by various parties against the Debtors.

with the assets of someone similarly situated, this Court has indicated a preference for *pro
rata* distribution."); *Goldberg,* 932 F.2d at 280 ("[C]ourts favor a *pro rata* distribution
of funds when such funds are claimed by creditors of like status."); *see also Columbia Gas,* 997
F.2d at 1039 ("To protect the interests of secured and unsecured creditors, beneficiaries
of trust funds bear the burden of identifying and tracing their trust property.").  For this reason
too, the Motion should be denied.

F.      **Joinder to Debtors' Objection**

        37.     To the extent the Debtors raise additional objections in the *Objection of Debtors
to Motion of UpgradeYa Investments, LLC for Relief from Stay Under Bankruptcy Code Section
362* [Docket No. 113] that are not contained herein, the Committee joins the Debtors in
requesting that the Motion is denied.

[*Remainder of page intentionally left blank*]

## **CONCLUSION**

38.    Movant has not satisfied its burden, and in many cases Movant has not even attempted to do so.  Specifically, Movant has failed to establish that: (i) a trust relationship exists; (ii) the Collateral is not property of the Debtors' estates; (iii) even if a trust relationship exists, the Collateral has not been commingled; and (iv) the Collateral is traceable even though it is commingled.  For these reasons, the Motion should be denied.

Dated:  Wilmington, Delaware
        December 14, 2020

**MCDERMOTT WILL & EMERY LLP**

*/s/ David R. Hurst*
David R. Hurst (I.D. No. 3743)
1007 North Orange Street, 4th Floor
Wilmington, DE 19801
Telephone: (302) 485-3900
Facsimile:  (302) 351-8711

- and -

Timothy W. Walsh (admitted *pro hac vice*)
Darren Azman (admitted *pro hac vice*)
340 Madison Avenue
New York, NY 10173
Telephone: (212) 547-5400
Facsimile:  (212) 547-5444

*Proposed Counsel to the Official Committee
of Unsecured Creditors*