## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Cred Inc., *et al.*, [1] | ) | Case No. 20-12836 (JTD) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket Nos. 62, 103, 107, 126 132, and 152** |
|  | ) |  |

_____

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OMNIBUS OBJECTION TO MOTIONS SEEKING CONVERSION, DISMISSAL, AND APPOINTMENT OF A CHAPTER 11 TRUSTEE

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 bankruptcy cases (the "Chapter 11 Cases") of Cred Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") hereby submits this omnibus objection and response (the "Objection") to the following pleadings:

- *Motion of Krzysztof Majdak and Philippe Godinea for Entry of an Order Pursuant to 11 U.S.C. § 1112(B) (I) Dismissing the Cases; (II) Converting the Cases to a Chapter 7 Liquidation; Or (III) Appointing a Chapter 11 Trustee* [Docket No. 62] (the "Majdak Motion");

- *Response of James Alexander to the Motion of Krzysztof Majdak and Philippe Godinea for Entry of an Order Pursuant to 11 U.S.C. § 1112(B) (I) Dismissing the Cases; (II) Converting the Cases to a Chapter 7 Liquidation; Or (III) Appointing a Chapter 11 Trustee* [Docket No. 103] (the "Alexander Response");

- *Partial Joinder of Jamie Shiller, Takashi Yanagi, Wu Chi King, Joseph Richardson, Thomas Calvert, Clint Cowen, Robin Houck, Todd Wiseman, Matthew Dixon, Jonatan Ashurov, Daniel Becker, Teppei Miyauchi, Jean Vacca, Xian Su, and Eric Schurman to Motion to Dismiss the Bankruptcy Cases, Convert the Cases to Chapter 7, or Appoint a Chapter 11 Trustee* [Docket No. 107] (the "Shiller Joinder");

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

- *UpgradeYa Investments, LLC's (I) Reply to Objection of Debtors to Motion of UpgradeYa Investments, LLC for Relief From Stay Under Bankruptcy Code Section 362 and (II) Limited Joinder in the Motion for an Order Converting the Chapter 11 Cases to Chapter 7* [Docket No. 126] (the "UpgradeYa Joinder");

- *Motion of the United States Trustee for Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases* [Docket No. 133] (the "UST Motion"); and

- *Motion of James Alexander to Dismiss the Cred Capital, Inc. Case* [Docket No 152] (the "Alexander Motion").[2]

## PRELIMINARY STATEMENT[3]

1.      The Motions should be denied because all of the concerns raised therein are either (i) addressed by the following actions taken by the Debtors and the Committee shortly after the Committee's appointment or (ii) irrelevant to the applicable legal standard.

2.      First, the Committee demanded that the Debtors immediately remove Daniel Schatt as a director and CEO and Joe Podulko as CFO.  Within 24 hours after that request, Mr. Schatt resigned from the board, the Debtors removed Mr. Schatt as CEO, and the Debtors terminated Mr. Podulko.

3.      As of today, the only individuals with managerial oversight of the Debtors are independent professionals, including an independent director and a chief restructuring officer.  In the short period of time since the Committee's appointment, these professionals have demonstrated their ability to remain independent and fully cooperate with the Committee's investigations.

---

[2] The motions are referred to collectively as the "Motions," the parties submitting the Motions are referred to collectively as the "Movants"

[3] In the interest of advancing these Chapter 11 Cases forward and accommodating the Movants' desire to have the Motions heard expeditiously, the Committee sought only a brief adjournment of the Motions and a corresponding extension to the Committee's objection deadline, which the Court granted.  The Committee's analysis of the Motions will continue through the hearing date on December 17, 2020.  As such, the Committee reserves the right to supplement this Objection prior to or at the hearing.

4.      Second, the Committee began negotiations with the Debtors regarding a Plan Support Agreement (the "PSA") that lays the groundwork for plan confirmation.  The Committee anticipates that the PSA will be executed and filed in advance of the December 17 hearing.  Importantly, the PSA (i) sets forth plan and sale milestones, culminating in plan confirmation occurring no later than March 17, 2021, (ii) establishes a budget for the Debtors and all estate professionals, as well as weekly financial reporting obligations for the Debtors, and (iii) obligates the Debtors to fully cooperate with the Committee in connection with its investigations, including an agreement that the Debtors will consent to derivative standing for specific causes of action that the Committee believes are time sensitive.

5.      The Committee represents approximately 6,500 unsecured creditors in these Chapter 11 Cases, all of whom want control over their destiny.  Notably, these are the *only* creditors in these Chapter 11 Cases.  The Committee is comprised of highly sophisticated individuals who have a deep understanding of cryptocurrency and blockchain technology more generally.  Suffice to say, the Committee, and not a chapter 7 or 11 trustee, is best suited to evaluate and investigate the issues and claims in these Chapter 11 Cases.  Indeed, it is only the Committee that has the expertise and economic interest necessary to do so.

6.      Installing a trustee with an entirely new slate of professionals at this stage would be a waste of limited estate resources and would accomplish nothing.  The Debtors have effectively shut down their operations.  All that remains is to run a sale process and confirm a plan of liquidation, which will be accomplished within the next 90 days and will require the Debtors' participation.  The Debtors' independent professionals, together with appropriate oversight from the Committee, are in the best position to accomplish those objectives.

7.      The concerns raised by the U.S. Trustee have been addressed by the Debtors' and Committee's actions since the Petition Date.  Likewise, all of the concerns raised by the other Movants have been addressed, and their Motions are either vindictive or self-serving.

8.      For these reasons and those set forth below, the Motions should be denied.

## BACKGROUND

### A.    General Case Background

9.      On November 7, 2020 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases by filing voluntary petitions under chapter 11 of title 11 of the U.S. Code (the "Bankruptcy Code").

10.     The Debtors are operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

11.     On December 3, 2020, the Office of the United States Trustee (the "U.S. Trustee") appointed the Committee in the Chapter 11 Cases.  [Docket No. 120].  One day later, the U.S. Trustee filed the UST Motion.

### B.    The Plan Support Agreement

12.     The Committee's singular, overarching goal is to exit these Chapter 11 Cases as quickly as possible to reduce professional fees and begin recovery efforts for the more than 6,500 customers of the Debtors, many of whom lost their life savings as a result of the Debtors' pre-petition actions.  Shortly after the Committee's appointment, the Committee and the Debtors began negotiating the PSA, which the parties expect to execute and file with this Court in advance of the hearing.  The PSA generally provides as follows:

- **Milestones**: The PSA contains customary milestones for the Debtors' sale and plan process, culminating in a sale closing and plan confirmation occurring no later than March 17, 2021.

- **Sale of Assets and Cryptocurrency**: The Debtors will not, without Committee consent, sell any of the Debtors' cryptocurrency holdings or material assets. The Debtors' going concern sale efforts will terminate, which includes termination of the Debtors' investment banker, no later than January 15, 2020.

- **Budget and Reporting**: The Debtors' cash expenditures, including for professional fees, will be subject to (and limited by) a 13-week budget commencing immediately. The budget must be reviewed and approved by the Committee.

- **Derivative Standing**: The Debtors will cooperate with the Committee, including the production of documents, in connection with the Committee's investigation of claims and causes of action that the Debtors and their estates could potentially assert against any party. The Debtors consent, subject to Bankruptcy Court approval, to the Committee having derivative standing to pursue all causes of action against any current or prior insider, affiliate, or employee of any Debtor. Upon reasonable request by the Committee, the Debtors will grant the Committee derivative standing, subject to Court approval, to pursue any other cause of action on behalf of the Debtors' estates that the Committee in good faith, and after consultation with the Debtors, believes must be pursued prior to the plan's effective date because of exigent circumstances, but only if the Debtors' estates have sufficient funds to pursue such cause of action. The Debtors will also consult with the Committee before asserting any cause of action and will not settle any cause of action without the Committee's consent.

- **Liquidation Trust**: Immediately upon confirmation of the plan, a Cred Liquidation Trust will be established, and all of the Debtors' causes of action will be transferred thereto.

- **Governance Issues**: Daniel Schatt and Joseph Podulka shall not serve in any capacity with the Debtors, including, without limitation, as an officer, board member, or employee, except that Daniel Schatt may remain employed by the Debtors as an "at will" employee with a monthly salary of $10,000 through no later than January 15, 2020 in order to assist with the Debtors' going concern sale process. To the extent the Debtors desire to retain either individual in any other capacity, such retention shall be subject to the Committee's prior written consent, and only for the specific purpose requested and authorized.

13.    The PSA empowers the Committee to carefully vet every decision made by the Debtors prior to confirmation of the plan to ensure that the Debtors are discharging their fiduciary obligations. If the Debtors fail to conduct these Chapter 11 Cases in accordance with the PSA, the Committee can and will, on its own motion, seek appropriate relief from the Court.

*See* 11 U.S.C. § 1103(c)(4) (authorizing committees to "request the appointment of a trustee or examiner under section 1104 of this title").

## OBJECTION

14.     The Debtors are subject to oversight from the U.S. Trustee, the Committee, and the Court.  The terms memorialized in the PSA represent the best, and perhaps only, opportunity for unsecured creditors to obtain a meaningful recovery in these Chapter 11 Cases.  *See In re Duratech Indus., Inc.*, 241 B.R. 291, 296 (Bankr. E.D.N.Y. 1999) (noting that "the central purpose of a bankruptcy case [is] to maximize the distribution of assets or plan payments to unsecured creditors.").  The relief requested by the Movants is not only imprudent from a practical standpoint, but more importantly, the Movants have failed to satisfy their heavy burden of demonstrating that the relief is warranted.

**A.     Cause Does Not Exist to Convert the Chapter 11 Cases**

15.     Bankruptcy Code section 1112(b) authorizes a bankruptcy court to convert a chapter 11 case to a case under chapter 7 "for cause."  11 U.S.C. § 1112(b)(1).  The Movants have not demonstrated that causes exists, and each Motion fails for the same reason. Specifically, the Movants focus only on the Debtors' *prepetition* conduct.  The conversion inquiry, however, must focus only on *postpetition* conduct.

16.     Examples of "cause" in section 1112(b)(4) refer only to harm to the "estate."  *See* 11 U.S.C. § 1112(b)(4) ("diminution of the *estate*," "mismanagement of the *estate*," "failure to maintain appropriate insurance that poses a risk to the *estate*") (emphasis added).  An "estate" does not exist until *after* the petition date.  11 U.S.C. § 541(a) ("The commencement of a case under section 301, 302, or 303 of this title creates an estate"); *Universal Bonding Ins. Co. v. Gittens & Sprinkle Enters., Inc.*, 960 F.2d 366, 371 (3d Cir. 1992) ("The filing of a bankruptcy

petition creates an estate in bankruptcy"); 4 Collier on Bankruptcy ¶ 503.06 (16th ed. 2019)

("The earliest a bankruptcy estate exists is on the petition date").

17.     Accordingly, the "continuing loss to or diminution of the *estate*" or "gross

mismanagement of the *estate*" can only occur post-petition, when an "estate" actually exists. *See

In re SageCrest II LLC*, No. 08-50754 AHWS, 2010 WL 5372426, at *3 (Bankr. D. Conn. Dec.

22, 2010) (observing that "all of the enumerated causes in [section 1112(b)(4)] are based on *post-*

bankruptcy behavior") (emphasis in original). For this reason, courts uniformly recognize that

"cause" to convert relates only to *post-petition* misconduct. *See, e.g.*, *In re E. 81st, LLC,* No. 13-

13685, 2014 WL 4548551, at *2 n.4 (Bankr. S.D.N.Y. Mar. 17, 2014) ("Petermark's motion

focused exclusively on the Debtor's pre-petition conduct but the grounds for dismissal or

conversion concern the Debtor's post-petition actions"); *In re Creech*, 538 B.R. 245, 248-49

(Bankr. E.D.N.C. 2015) ("The circumstances indicating substantial or continuing loss or

diminution must have occurred post-petition; pre-petition events will not establish cause"); *In re

Sunnyland Farms, Inc.*, 517 B.R. 263, 267 (Bankr. D.N.M. 2014) ("The alleged gross

mismanagement must occur post-petition"); *In re Rent-Rite Super Kegs W. Ltd.*, 484 B.R. 799,

809 (Bankr. D. Colo. 2012) (pre-petition misconduct "does not constitute mismanagement of the

estate because the estate is a post-petition entity"); *In re First Assured Warranty Corp.*, 383 B.R.

502, 544 (Bankr. D. Colo. 2007) ("these allegations, if true, relate to prepetition conduct and do

not relate to the Debtor's postpetition mismanagement of the estate as is required under the clear

language of § 1112(b)"); *In re 412 Boardwalk, Inc.*, 520 B.R. 126, 136 (Bankr. M.D. Fla. 2014)

(same).

18.     "Substantial and continuing loss[es]" alone does not require conversion. Under

11 U.S.C. § 1112(b)(4)(A), conversion is only warranted if the movant can demonstrate: "[1]

substantial or continuing loss to or diminution of the estate *and* [2] the absence of a reasonable likelihood of rehabilitation" 11 U.S.C. § 1112(b)(4)(A) (emphasis added); *see also In re BH S & B Holdings, LLC*, 439 B.R. 342, 347 (Bankr. S.D.N.Y. 2010) ("It is not enough just to show continuing loss to the estate; the moving party must also show the absence of a reasonable likelihood of rehabilitation.").

### i.    <u>The Majdak Motion</u>

19.     In the Majdak Motion, the parties (the "<u>Majdak Parties</u>") allege that there is "substantial or continuing loss" of the estate and "gross mismanagement." *See* 11 U.S.C. §1112(b)(4)(A)-(B).  The Majdak Motion must fail because it does not allege (let alone prove) any misconduct that occurred after the Petition Date.

20.     The Majdak Motion recounts the Debtors' well-documented pre-petition business failings, including poor investment strategies, loans to moKredit, and the "speed and gross incompetence with which Debtors dissipated their customer's loaned crypto assets." *Majdak Motion*, at ¶ 24.  All of these acts occurred prior to the Petition Date, and the Majdak Parties do not allege any acts that occurred after the Petition Date.[4]

21.     Similarly, the Majdak Parties' assertion that "there is no chance that the Debtors will be rehabilitated" is, at best, premature, particularly in light of the PSA that will be executed and filed shortly.

22.     The Majdak Parties also argue that the Debtors' cash expenditures during the Chapter 11 Cases constitute grounds for conversion.  *Majdak Motion*, at ¶¶ 13–17).  This argument also fails.  The accrual of administrative costs alone does not establish "cause" for

---

[4] Notably, the Majdak Motion was filed on November 18, 2020, just 11 days after the Petition Date (the day the estate came into existence).

conversion. *See, e.g.*, *In re 1031 Tax Group, LLC*, 374 B.R. 78, 93 (Bankr. S.D.N.Y. 2007) ("The fact there is a continuing loss to the estate, due to the mounting administrative costs and the lack of any new business entering the estate, is insufficient to establish 'cause' within the meaning of § 1112(b)(1)."). In any event, the Debtors and the Committee have jointly addressed the Majdak Parties' concerns through the implementation of a budget under the PSA, which is subject to the Committee's review and consent. Interestingly, the alternative relief sought by the Majdak Parties (appointment of a chapter 11 trustee) would layer on even more administrative costs.

23.    For these reasons, the Majdak Motion should be denied.

**ii.    The Alexander Response**

24.    Mr. Alexander provides no legal support for his conversion argument, electing instead to parrot the factual allegations made by the Majdak Parties. For the same reasons set forth above, the relief requested in the Alexander Response should be denied.

**iii.    The Shiller Joinder**

25.    In the Shiller Joinder, the parties (the "Shiller Parties") cite the Debtors' pre-petition losses and mismanagement as grounds for conversion. *See Shiller Joinder*, at ¶ 22. As discussed above, *pre-petition* losses and mismanagement cannot constitute "cause" under section 1112(b). 7 Collier on Bankruptcy ¶ 1112.04[6][b] (16th ed. 2020) ("Since the focus is on the bankruptcy estate, the inquiry cannot include mismanagement by the debtor prior to the bankruptcy filing.").

26.    The Shiller Parties also reference a one-off, post-petition event as grounds for conversion, which the Shiller Parties label as "gross mismanagement."

27.     On November 23, 2020, approximately two weeks after the Petition Date, the Shiller Parties filed a motion to compel the Debtors to notify certain cryptocurrency exchanges about a fraudulent transfer of Bitcoin.  [Docket No 75].  Shortly thereafter, the Debtors voluntarily agreed to send a letter to the exchanges identified by Movants as well as other exchanges identified by the Debtors.  [Docket No. 85].  The Shiller Parties do not dispute this.  *Shiller Joinder*, at ¶ 20.  Nonetheless, the Shiller Parties maintain that the Debtors' initial failure to notify the cryptocurrency exchanges within the first two weeks of these Chapter 11 Cases constitutes gross mismanagement.  *Id*. at ¶ 22.

28.     Although the Debtors could have (and perhaps should have) contacted the cryptocurrency exchanges earlier, that does not rise to the requisite level of "gross mismanagement" necessary to support conversion (or appointment of a chapter 11 trustee, as discussed in more detail below).  *See* 7 Collier on Bankruptcy ¶ 1104.02[3][c][i] (16th ed. 2020) (observing that "the reference to 'gross mismanagement' represents tacit recognition that some degree of mismanagement exists in virtually every insolvency case and that mere mismanagement does not, by itself, constitute cause").

29.     This single act by the Debtors (even if it was "mismanagement"), without more, does not rise to the level of *gross* mismanagement (which the statute requires).  It is also worth noting that the Shiller Parties all but acknowledge that conversion here is improper because it is less likely to "maximize the value of the estates through a sale process" and that the chapter 7 process "will likely take significantly longer to make a distribution."  *Shiller Joinder*, at ¶ 25.

**iv.     The UpgradeYa Joinder**

30.     UpgradeYa Investments, LLC ("UpgradeYa") also requests conversion of these Chapter 11 Cases, but none of the reasons provided justify the request.  First, UpgradeYa doubts

the feasibility of completing a sale and confirming a plan.  *UpgradeYa*, at ¶ 23.  This concern has already been resolved by way of the PSA and the Committee's ongoing discussions with the Debtors regarding the sale process.

31.    Second, UpgradeYa alleges the Debtors attempted to deceive the Court and other parties, specifically pointing to a sentence in the Bonjour Declaration that states "UpgradeYa *loaned provided* bitcoin to the Debtors."  *UpgradeYa*, at ¶ 29.  UpgradeYa argues this is deceptive because the transaction was not a "loan."  Clearly, the Debtors meant to change the word "loaned" to "provided."  A typo is not grounds for conversion.

32.    Third, UpgradeYa complains that the Debtors' management has been responsible for continuing losses and mismanagement as evidenced by unaccounted for bitcoin.  *UpgradeYa*, at ¶ 31.  The Committee is already investigating these and other issues.  Moreover, the Debtors' management was replaced, and, now, given the Committee's involvement, any risk of post-petition losses has also been addressed.  UpgradeYa's request to convert and lift automatic stay are merely part of a self-serving ploy to elevate its claim above the claims of other creditors.  Its request should therefore be denied.

### v.    <u>The UST Motion</u>

33.    The U.S. Trustee requests that, if a chapter 11 trustee is not appointed, the Court instead convert the Chapter 11 Cases to chapter 7.  The U.S. Trustee's request fares no better than the other Movants' requests.  Specifically, the U.S. Trustee recites conclusory allegations, without any factual support, that there has been a continuing loss to the Debtors' estates.  *See UST Objection*, at ¶ 37.

34.    The Movants have the burden of producing *evidence* that there is "cause" for relief under section 1112(b).  *In re Reserves Resort, Spa & Counrtry Club LLC*, 2013 Bankr.

11

LEXIS 2808, at *6 (Bankr. D. Del. 2013) ("The statute thus makes conversion mandatory once a

court finds, as the Court has done here, any of the elements of 'cause.'  *The burden is on the*

*moving party to prove cause by a preponderance of the evidence*.") (emphasis added)

35.     The only evidence submitted by the U.S. Trustee and other Movants are the two

declarations of Daniyal Inamullah.  [Docket Nos. 97 and 133-1].  But Mr. Inamullah was no

longer employed by the Debtors as of November 6, 2020, one day prior to the Petition Date.  Mr.

Inamullah makes clear in his first declaration that his statements are based upon his "knowledge

of Cred's financial situation when [he] left the company."  [Docket No. 97, at ¶ 20].  Mr.

Inamullah has not and cannot provide any testimony concerning the Debtors' post-petition

conduct.

36.     The UST Motion, like the other Motions, must fail because the UST has not

presented any evidence of post-petition misconduct.  For these reasons, the Chapter 11 Cases

should not be converted to chapter 7.

**B.      Appointment of a Chapter 11 Trustee Is Not Warranted**

37.     The Movants also seek the appointment of a chapter 11 trustee.  This relief too

should be denied because the Debtors are currently managed by independent professionals and

the Committee has exercised, and will continue to exercise, rigorous oversight of the Debtors,

including through implementation of the PSA that will lead to an expedient resolution of these

Chapter 11 Cases under a confirmed plan of liquidation.  Moreover, there will be a significant

learning curve for a trustee and its counsel, financial advisor, and, potentially, investment banker.

As a result, appointment of a chapter 11 trustee at this stage would result in an unnecessary cash

drain on the Debtors' estates and a significant delay in creditor recoveries.

38.    The Bankruptcy Code provides for appointment of a chapter 11 trustee if:
(1) there is a showing of "cause"; (2) the appointment of a trustee would be in the interests of
creditors, equity security holders, and other interests of the estate; or (3) grounds exist to dismiss
or convert the case to chapter 7, but the appointment of a trustee is in the best interests of
creditors and the estate.  *See* 11 U.S.C. §§ 1104(a); 1112(b)(1).  As set forth above, no grounds
exist for converting the Chapter 11 Cases to chapter 7, and thus the Movants must demonstrate
either (1) that "cause" exists or (2) that appointment of a chapter 11 trustee would be in the
interest of creditors, equity holders, and other interests.

39.    The "appointment of a trustee should be the *exception*, rather than the rule" as
there is a "*strong presumption against* appointing an outside trustee."  *In re Marvel Entm't Grp.*,
140 F.3d 463, 471 (3d Cir. 1998) (quoting *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d
Cir. 1989)) (emphasis added); *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re
G-I Holdings, Inc.)*, 385 F.3d 313, 319 (3d Cir. 2004) ("heavy 'presumption' against the
appointment of an outside trustee"); *see also* 7 Collier on Bankruptcy ¶ 1104.02[b][i] (16th ed.
2019) (appointment of a trustee is an "extraordinary remedy").

40.    The party seeking appointment of a trustee has a "heavy burden of persuasion"
and "must prove the need for a trustee . . . by clear and convincing evidence."  *G-I Holdings*, 385
F.3d at 318.  "Clear and convincing" evidence must "produce[] in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be established, evidence so
clear, direct and weighty and convincing as to enable the fact finder to come to a clear
conviction, without hesitancy, of the truth of the precise facts in issue."  *Official Comm. of
Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 295 B.R. 502, 508 (D.N.J.

2003) (citing *Cruzan v. Dir. Mo. Dep't of Health*, 497 U.S. 261, 285 n.11 (1990)), *aff'd*, 385

F.3d 313 (3d Cir. 2004).

41.     Appointing a trustee is the "last resort" and is reserved only for dire situations.

*See Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (in Re W.R. Grace &*

*Co.)*, 285 B.R. 148, 158 (Bankr. D. Del. 2002) (recognizing that "appointing a trustee must be

considered a last resort").  There is no such dire situation here.

### i.     The Majdak Motion and the Alexander Response

42.     Although the Majdak Motion seeks appointment of a chapter 11 trustee, the

motion fails to cite any legal support.  Alexander joins the Majdak Parties' request but he

likewise provides no support.  Indeed, neither pleading references 11 U.S.C. section 1104, let

alone the test that must be satisfied.

43.     The only fact alleged by the Majdak Parties in support of appointing a chapter 11

trustee is that the Debtors have not yet publicly released a list of the Debtors' thirty largest

creditors.  The Majdak Parties claim that this "looks like a concerted effort to hamstring the

creditor body, inhibiting their collective recovery" and a "trustee would shed light on these

issues."  *Majdak Motion*, at ¶ 34.  As an initial matter, the Committee and its counsel find this

statement confusing.

44.     In any event, as set forth in extensive briefing that has been filed with the Court,

the Debtors' non-disclosure of creditor names was *for the benefit of creditors* (including the

Majdak Parties), many of whom have stated their preference not to be identified publicly due to

the severe and unusual risks that disclosure of customer information poses in this particular

context.  Moreover, the Committee fully supports this relief for the reasons stated in the

Committee's joinder.

45.     In short, the Majdak Parties and Alexander fail to provide "clear and convincing evidence" that a chapter 11 trustee should be appointed.

### ii.    **The Shiller Joinder**

46.     The Shiller Parties seek appointment of a chapter 11 trustee, but do not make clear whether they are seeking appointment "for cause" under section 1104(a)(1) or in the interest of creditors, equity holders, and other interests of the estate under section 1104(a)(2).  In any event, the Shiller Parties fail to satisfy either test.

47.     The Shiller Parties assert that a trustee should be appointed to "dispossess the Debtors [sic] current insiders of control of the Debtors' estates and assets."  *Shiller Joinder*, at ¶ 26.  But that has already occurred.  Shortly after the Committee's formation, the Committee demanded that the Debtors immediately remove Daniel Schatt as a director and the CEO and Joe Podulko as CFO.  Within 24 hours after that request, Mr. Schatt resigned from the board, the Debtors removed Mr. Schatt as CEO, and the Debtors terminated Mr. Podulko.  As of today, the only individuals with managerial oversight of the Debtors are independent professionals, including an independent director and a chief restructuring officer.

48.     The Shiller Parties also argue that a chapter 11 trustee is essential to the success of the Chapter 11 Cases because it would ensure that the sale and plan processes are "likely [to] be accepted by creditors."  *Id*.  It is unclear which creditors the Shiller Parties refer to (other than themselves) given that the Committee, not the Shiller Parties, is the statutory representative of the Debtors' unsecured creditors.  As is obvious from the Objection, the Committee does not support appointment of a chapter 11 trustee.  Moreover, the PSA lays out a clear, expedient path for a sale process and confirmation of a chapter 11 plan of liquidation, all of which will be

subject to significant oversight by the Committee.  Notably, the PSA also requires Committee consent in connection with any sale of the Debtors' assets.

49.    The Shiller Parties next raise concerns about releases and exculpation of insiders. This, too, is addressed in the PSA.  Specifically, no insiders will receive releases of any kind under the plan.  Putting aside the PSA, the Committee would object to any such releases.  To be clear, the Committee has already begun its investigation of the serious allegations made by various parties in these Chapter 11 Cases and intends to vigorously pursue all potential sources of recovery, including actions against insiders.

50.    Lastly, the Shiller Parties argue that a chapter 11 trustee is needed so that it would have "the requisite standing to investigate and bring claims against all insiders, including the current insiders, that the Debtors almost certainly will not bring."  *Id*. at ¶ 28.  Once again, this argument is addressed under the PSA.  Specifically, the PSA provides that the Debtors will cooperate with the Committee in its investigation of estate claims and causes of action.  The Debtors will also consent, subject to Court approval, to the Committee having derivative standing to pursue all actions against insiders and employees and, upon request, will grant the Committee derivative standing to pursue other time-sensitive causes of action.  For the foregoing reasons, none of the Shiller Parties' arguments support appointment of a chapter 11 trustee.

**iii.    The UST Motion**

51.    For many of the foregoing reasons, the U.S. Trustee also fails to establish that a chapter 11 trustee should be appointed.

**a.    The Debtors Are Managed by Independent Professionals Subject to the Committee's Oversight**

52.    The U.S. Trustee asserts that creditors "require an independent, conflict-free, experienced party [to] investigat[e] the financial affairs of these debtors—someone who can

determine an appropriate reorganization or liquidation strategy, free from the constraints of current management." *UST Motion*, at ¶ 14. The Committee agrees. The Bankruptcy Code provides for such a party—the official creditors' committee. *See* 11 U.S.C. § 1102(a)(1) (requiring the appointment of an official committee in every chapter 11 case); *see also In re Garden Ridge Corp.*, No. 04-10324 (DDS), 2005 Bankr. LEXIS 323, at *9 (Bankr. D. Del. Mar. 2, 2005) ("An official committee of unsecured creditors has a duty to represent all general unsecured creditors" and "members of an official committee owe a fiduciary duty to the committee's constituents, i.e., the entire class of general unsecured creditors."). As the Court is well aware, the Committee is tasked with the following:

- Investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

- Participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated"; and

- Perform such other services as are in the interest of those represented."

11 U.S.C. § 1103(c). The Committee has already begun its investigation and intends to pursue all potential causes of action. And as discussed above, the individuals complained of by the U.S. Trustee no longer have any managerial oversight of the Debtors. Instead, independent fiduciaries, including an independent director and chief restructuring officer, are in control, subject to significant oversight by the Committee. Simply put, there is no reason to replace one independent professional with another, particularly in a case where the Debtors are effectively not operating and the Committee opposes appointment of a chapter 11 trustee, as it does here.

### b.    Alleged Bad Acts of Pre-Petition Management Are Not "Cause"

53.    "[F]raud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by *current* management" may be cause for appointing a trustee. 11 U.S.C. § 1104(a)(1)

(emphasis added).  Although the U.S. Trustee points to certain pre-petition misconduct (which, to be clear, the Committee finds troubling), the U.S. Trustee does not cite to any acts that occurred after the Petition Date.  Moreover, prior management has been removed from positions of power, prior management no longer has access to the Debtors' assets (including, most importantly, the Debtors bank accounts and cryptocurrency holdings), and all of the Debtors' actions are being carefully scrutinized by the Committee.  *See, e.g., In re WorldCom, Inc.*, 2003 Bankr. LEXIS 2192, at *18 (Bankr. S.D.N.Y. 2003) ("[W]here current management is not implicated by a debtor's prior misdeeds, there may be no legal basis for the imposition of a trustee."); *In re Real Estate Partners, Inc.*, No. 07-13239 TA, 2007 WL 7025114, at *3 (Bankr. C.D. Cal. Nov. 20, 2007), *aff'd*, No. 07-1440 ODW, 2009 WL 3246619 (C.D. Cal. Oct. 5, 2009) ("If the fraud, dishonesty or gross incompetence can be attributed to past management only, then the Court is not compelled to appoint a trustee."); *In re Woodlawn Cmty. Dev. Corp.*, 613 B.R. 671, 684 (N.D. Ill. 2020) ("In considering whether cause exists, a court must focus on the debtor's current management, not its past management.")

54.    Judge Glenn in *In re 1031 Tax Group, LLC* focused on this very issue in holding that appointment of a trustee was not justified as a result of pre-petition acts:

> [T]he fact that the debtor's prior management might have been guilty of fraud, dishonesty, incompetence, or gross mismanagement does not necessarily provide grounds for the appointment of a trustee under § 1104(a)(1), as long as a court is satisfied that the current management is free from the taint of prior management.

374 B.R. 78, 87 (Bankr. S.D.N.Y. 2007).

55.    Similarly, although the requisite bad acts can occur "either before or after the commencement of the case," 11 U.S.C. § 1104(a)(1), "on a motion for the appointment of a trustee, the focus is on the debtor's current activities, not past misconduct."  *See In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) (citing 7 Collier on Bankruptcy ¶ 1104.02[3][c][i]

(15th ed.)).  There is no indication that the Debtors' estates are currently at risk of suffering harm given the presence of independent management.  And in any event, the U.S. Trustee has not made any allegations regarding the Debtors' postpetition conduct.

56.     Put simply, the Debtors' prior management has been dispossessed of control and replaced with independent professionals, and the Committee has had (and will continue to have) extensive involvement in and active oversight of these Chapter 11 Cases.  Where, as here, there is "an active creditors committee functioning effectively and working well with the debtors . . . there is little benefit in appointing a trustee."  *1031 Tax Grp., LLC*, 374 B.R. at 91; *see also In re Gen. Oil Distributors, Inc.*, 42 B.R. 402, 410 (Bankr. E.D.N.Y. 1984) (citing the creditors committee's opposition to the motion to appoint a trustee and "the various methods by which the committee has and will continue to supervise the management of the debtors" as factors in denying appointment of a trustee).  To the contrary, appointment of a trustee will harm creditors by reducing the role they play in these Chapter 11 Cases.

### c.     Appointing a Trustee Is Not in the Estates' Interests

57.     Under Bankruptcy Code section 1104(a)(2), a trustee may be appointed "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate."  Appointing a chapter 11 trustee in these Chapter 11 Cases would accomplish only one thing—significant and unnecessary administrative expenses.

58.     In determining whether appointment of a chapter 11 trustee is in the interests of stakeholders, courts engage in a cost-benefit analysis.  *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (court weights "the benefits derived by the appointment of a trustee, balanced against the cost of the appointment"); *In re Cardinal Indus.*, 109 B.R. 755, 766 (Bankr. S.D. Ohio 1990) (comparing "the cost of a trustee to the estate, when

compared with the benefit sought to be derived"); *In re Microwave Prods. of Am., Inc.*, 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989) (same); *see also* H.R. Rep. No. 95-595 (1977) ("may order appointment **only if** the protection afforded by a trustee is needed and the costs and expenses of a trustee would not be disproportionately higher than the value of the protection afforded.") (emphasis added).

59.     As the Third Circuit has previously recognized, there are "immense costs" associated with appointing a chapter 11 trustee.  *Cybergenics*, 330 F.3d at 577 (noting that one of the "immense costs" of a trustee's appointment is the "statutory fee (which can be substantial) to which trustees are entitled for their services.").  For all of the reasons recited in this Objection, the evidence demonstrates that the cost-benefit analysis weighs heavily against appointment of a chapter 11 trustee.  This is particularly true given that the Committee's investigation is already underway, and the Debtors have agreed in the PSA to grant the Committee derivative standing to pursue certain causes of action on the estates' behalf.  The Third Circuit has specifically cautioned against appointing a chapter 11 trustee when simply giving the committee derivative standing would suffice.  *See Cybergenics II*, 330 F.3d at 577 (describing appointment of a trustee as "too drastic a step to constitute a serious alternative to allowing derivative suits by creditors' committees"); *see also Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 285 B.R. 148, 151 (Bankr. D. Del. 2002) (rejecting motion to appoint a trustee holding that a trustee should not be appointed "if the same result can be obtained by other means" recognizing that appointing a trustee "should be the exception, rather than the rule.") (quoting *Marvel,* 140 F.3d at 471).

60.     For these reasons, appointment of a chapter 11 trustee is not in the "interests of creditors, any equity security holders, and other interests of the estate."

C.  **Appointment of an Examiner is Neither Necessary Nor Appropriate**

61.     Bankruptcy Code section 1104(c)(2) governs the appointment of an "examiner to

conduct such an investigation of the debtor *as is appropriate* . . ."  11 U.S.C. § 1104(c)(2)

(emphasis added).  An examiner is not "appropriate" in these Chapter 11 Cases.  As discussed

above, the Committee is already investigating the Debtors' affairs and will be pursuing third-

party actions.

62.     When a Committee is actively investigating and pursuing claims, there is no need

for an examiner.  *U.S. Bank Nat'l Trust Ass'n. v. Wilmington Trust Co. (In re Spansion, Inc.)*,

426 B.R. 114, 128 (Bankr. D. Del. 2010) (KJC) (finding examiner unnecessary where "the

Creditors Committee and various *ad hoc* committees have vigorously represented the interests of

unsecured creditors" and "[a]ll of the parties have had ample opportunity to conduct—and have

conducted—extensive discovery, and to investigate the Debtors"); *see also In re Shelter*

*Resources Corp.,* 35 B.R. 304, 305 (Bankr. N.D. Oh. 1983) (denying appointment of an

examiner where "[t]here [was] currently in place a Debenture Holders' Committee with powers

under Section 1103(c) of the Bankruptcy Code to carry on, if necessary, an investigation as may

be appropriate"); *In re Am. Home Mortg. Holdings, Inc*., No. 07-11047 (CSS) (Bankr. D. Del.

Oct. 31, 2007), Hr'g Tr. at 76:09-12 (ECF No. ) (rejecting mandatory interpretation of section

1104(c)(2) because financial threshold was only one part of inquiry and "the other piece of the

puzzle is that there has to be an investigation to perform that's appropriate," and denying motion

to appoint an examiner).

63.     More recent cases, which are notably absent from the UST Motion, correctly

recognize that the "as is appropriate" language indicates that it is within the Court's discretion

whether to appoint an examiner.  *See, e.g.*, *In re Residential Capital, LLC*, 474 B.R. 112, 121

21

(Bankr. S.D.N.Y. 2012) ("While section 1104(c) expresses a Congressional preference for appointment of an independent examiner to conduct a necessary investigation, the facts and circumstances of the case may permit a bankruptcy court to deny the request for appointment of an examiner even in cases with more than $5 million in fixed debts."); *see also In re Innkeepers USA Trust,* No. 10–13800 (SCC) (Bankr. S.D.N.Y. Sept. 30, 2012), Hr'g Tr. at 167:11–170:22 [Docket No. 546] (observing that a growing number of courts reject construction of section 1104(c)(2) that mandates appointment of examiner simply because $5 million threshold was exceeded if other facts do not make such appointment "appropriate").

64.     The legislative history also supports this interpretation.  *See* H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 402 (1977) ("The standards for the appointment of an examiner are the same as those for the appointment of a trustee; *the protection must be needed, and the cost and expense must not be disproportionately high*.") (emphasis added); *see also Residential Capital*, 474 B.R. at 121 ("The legislative history points to the purpose of section 1104(c).  An examiner shall be appointed to conduct an investigation 'as appropriate under the particular circumstances of the case,' but 'the protection must be needed . . .'") (quoting H.R. Rep. No. 95–595, 95th Cong.).

65.     One factor that courts consider when deciding to appoint an examiner is whether the estate's claims have been (or will be) fully investigated and whether the interests of creditors are already being vigorously represented.  *See, e.g.*, *Spansion*, 426 B.R. at 128 (denying request for examiner where the creditors committee vigorously represented the interests of unsecured creditors and all parties conducted extensive investigations into the debtors); *Residential Capital*, 474 B.R. 112, 121 (Bankr. S.D.N.Y. 2012) ("The appointment of an examiner would be inappropriate . . . if an appropriate and thorough investigation has already been conducted (or is

nearly complete) by a creditors committee . . .").  Here, the Committee is already investigating

the Debtor's affairs and the allegations made by various parties, and will likely be pursuing

causes of action derivatively in short order.  Moreover, the PSA makes clear that insiders will not

be receiving releases of any kind under a chapter 11 plan.  Simply put, the appointment of an

examiner at this time "is neither warranted nor appropriate, and would cause undue cost to the

estate, which would be harmful to the Debtors and would delay the administration" of these

Chapter 11 Cases.  *Spansion*, 426 B.R. at 128.

**D.**     **Dismissal of These Chapter 11 Cases Is Not Appropriate**

66.     Two sets of Movants—the Majdak Parties and Mr. Alexander—seek dismissal of

one or more of these Chapter 11 Cases.

67.     The Majdak Motion only mentions dismissal twice—once in the preliminary

statement (where the Majdak Parties state in conclusory fashion that there "is cause to dismiss or

convert these cases from cases under Chapter 11 to cases under Chapter 7 . . .") and then again in

the conclusion (where the Majdak Parties "request that the Court enter an order either

(i) converting these cases to cases under Chapter 7 of the Bankruptcy Code; (ii) dismissing these

Chapter 11 cases; or (iii) appointing a Chapter 11 trustee").  Aside from these two passing

references to dismissal, the Majdak Motion focuses only on conversion to chapter 7 and

appointment of a chapter 11 trustee.  As such, the Majdak Parties have not provided sufficient

grounds for dismissing these Chapter 11 Cases.

68.     As the Shiller Parties explain in their partial joinder:

> [D]ismissal of the Chapter 11 Cases is not in the best interests of the Debtors, their
> estates, or creditors and other parties in interest.  Dismissal would simply result in
> the Debtors and their assets moving forward without the protection of the automatic
> stay.  Parties alleging that [they] are either creditors or bailors, including some or
> all of the Movants, would engage in a race to the courthouse and execution upon
> those assets that remain in the Debtors' possession.  Further, dismissal would also

eliminate any opportunity for the estates to avoid any preferential transfers or fraudulent conveyances in one forum.

*Shiller Joinder*, at ¶ 23.

69.     The Committee agrees.  Dismissal of these Chapter 11 Cases would restore the Debtors to their *status quo ante*.  In other words, the same people who ran the Debtors' into the ground would presumably be back in charge, only without supervision of the Court, the Committee, the U.S. Trustee, and other parties in interest.  This result is not in the interests of anyone other than perhaps Mr. Alexander and other insiders who would in all likelihood escape liability if some or all of these Chapter 11 Cases are dismissed.

70.     As for Mr. Alexander's motion, he requests the dismissal of just one case—the case of Cred Capital, Inc. ("Cred Capital"), which is case No. 20-12836 (JTD) (the "Cred Capital Case").  His request is based on his assertion that "Cred Capital lacked valid corporate authority to file the case in the first place."  *Alexander Motion*, at ¶ 42.  Mr. Alexander believes he is "the sole valid director of Cred Capital and the holder of a voting proxy from Cred Capital's sole, valid voting shareholder."  *Id.* at ¶ 3.

71.     The Committee acknowledges that proper corporate authority is a prerequisite for filing a voluntary bankruptcy petition under chapter 11.  However, it appears that Mr. Alexander's request for dismissal is nothing more than a thinly veiled attempt to deflect attention away from his own wrongdoing, manufacture leverage in his other ongoing legal battles, and escape liability (*e.g.*, from avoidance actions that would otherwise be brought by Cred Capital against Mr. Alexander).

72.     Absent a judicial finding in favor of Mr. Alexander regarding corporate authority, dismissal of the Cred Capital Case is premature.

## CONCLUSION

WHEREFORE, based upon the foregoing, the Committee respectfully requests that the

Court deny the relief requested in the Motions.


Dated:  Wilmington, Delaware
       December 14, 2020

MCDERMOTT WILL & EMERY LLP

*/s/  David R. Hurst*
David R. Hurst (I.D. No. 3743)
1007 North Orange Street, 4th Floor
Wilmington, DE 19801
Telephone: (302) 485-3900
Facsimile:  (302) 351-8711

- and -

Timothy W. Walsh (*pro hac vice* pending)
Darren Azman (*pro hac vice* pending)
340 Madison Avenue
New York, NY 10173
Telephone: (212) 547-5400
Facsimile:  (212) 547-5444

*Proposed Counsel to the Official Committee*
*of Unsecured Creditors*