**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CRED INC., *et al.*, | ) Case No. 20-12836 (JTD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) **Hearing Date: Dec. 17, 2020 at 11:00 a.m. (ET)** |
| | ) |
| | ) **RE: Docket No. 62, 109, 133** |

**DEBTORS' (A) OBJECTION TO MOTION OF THE UNITED STATES TRUSTEE FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF A TRUSTEE, OR IN THE ALTERNATIVE, (I) DIRECTING THE APPOINTMENT OF AN EXAMINER, OR (II) CONVERTING THE CASES TO CHAPTER 7 CASES AND (B) SUPPLEMENT TO OBJECTION TO MOTION OF KZYSZTOF MAJDAK AND PHILIPPE GODINEA FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. § 1112(b) (I) DISMISSING THE CASES; (II) CONVERTING THE CASES TO A CHAPTER 7 LIQUIDATION; OR (III) <u>APPOINTING A CHAPTER 11 TRUSTEE</u>**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................. 1

OBJECTION...................................................................................................................... 4

A.     The Debtors' New Leadership Team.............................................................. 4

B.     Plan Support Agreement with the Committee ................................................. 5

C.     Debtors Are Investigating Causes of Action Related to the Debtors' Descent into Bankruptcy and, Upon Appointment of a Liquidation Trustee under a Chapter 11 Plan, such Causes of Action Will Be Pursued for the Benefit of these Estates................. 8

D.     Debtors Are Seeking to Collect moKredit Receivable and Are Marketing Their Business for Sale................................................................................................ 12

E.     Debtors Are Analyzing Nature and Priority of Claims, Rights, and Interests Possessed by Debtors' Creditors, Investors, and Partners ............................... 13

F.     Prepetition Corporate Governance Issues Are No Basis to Appoint a Chapter 11 Trustee or Convert these Chapter 11 Cases to Cases under Chapter 7........................... 14

G.     Daniyal Inamullah's Testimony Demonstrates That Any Purported Irregularities at Cred Resulted From the Poor Investment Decisions of Cred's Capital Markets Team, Which Was Led By James Alexander and Daniyal Inamullah........................... 15

H.     Appointment of Examiner................................................................................. 21

CONCLUSION.................................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chamberlain v. Stanziale (In re Chamberlain)*,
  545 B.R. 827 (D. Del. 2016) ................................................................................... 11

*In re Delaware & Hudson Ry. Co.*,
  124 B.R. 169 (D. Del. 1991) ................................................................................... 11

*Dai-Ichi v. Montgomery (In re Montgomery Ward Holding Corp.),*
  242 B.R. 147 (D. Del. 1999) ................................................................................... 11

**Statutes**

11 U.S.C. Ch. 5 ................................................................................................................ 6

11 U.S.C. § 363(b) ......................................................................................................... 11

11 U.S.C. § 502(b) ......................................................................................................... 10

11 U.S.C. § 1104(a)(1) ............................................................................................ 1, 2, 5

11 U.S.C. § 1104(a)(2) .................................................................................................... 8

11 U.S.C. § 1112(b)(4)(A) .............................................................................................. 4

11 U.S.C. § 1112(b)(4)(B) .............................................................................................. 4

**Other Authorities**

Local Rule 3017-2 ........................................................................................................... 6

TO THE HONORABLE BANKRUPTCY JUDGE JOHN T. DORSEY:

Cred Inc. ("Cred") and its affiliated debtors and debtors in possession (the "Debtors") object (the "Objection") to the *Motion of the United States Trustee for Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases* [Docket No. 133] (the "U.S. Trustee Motion") and supplement their prior objection [Docket No. 109] (the "Prior Objection")[2] to the *Motion of Krzysztof Majdak and Philippe Godinea for Entry of an Order Pursuant to 11 U.S.C.§ 1112(b) (I) Dismissing the Cases; (II) Converting the Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 11 Trustee* [Docket No. 62] (the "Madjak/Godinea Motion" and, together with the U.S. Trustee Motion, the "Motions"), including the joinders thereto [Docket Nos. 107 and 126].[3]  The Debtors incorporate by reference the Prior Objection, including the declarations attached to the Prior Objection.  In support of this Objection, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      There is no basis to appoint a chapter 11 trustee or convert these chapter 11 cases to cases under chapter 7.  First, the Motions do not (and cannot) allege that the Debtors' current management has committed fraud, is dishonest or incompetent, or grossly mismanages the affairs of the Debtors.  *See* 11 U.S.C. § 1104(a)(1).  In fact, the Debtors are under new management led by an Independent Director, Mr. Grant Lyon, and a Chief Restructuring Officer, Mr. Matthew Foster, who provide objective, disinterested guidance to the estates.  Moreover, the former Chief

---

[2]     Capitalized terms used but not otherwise defined in this Objection have the meanings set forth in the Prior Objection.

[3]     On December 8, 2020, Mr. James Alexander filed a motion seeking dismissal of the chapter 11 case of Cred Capital, Inc. [Docket No. 152] (the "Alexander Motion").  The hearing on the Alexander Motion has been scheduled for January 6, 2021 and the deadline to object is December 30, 2020.  The Debtors will object to the Alexander Motion in due course, and reserve all their rights in this regard.

Executive Officer, Mr. Daniel Schatt, and the former Chief Financial Officer, Mr. Joseph

Podulka, no longer hold any position as officer, director, or manager with the Debtors.[4]  Thus,

regardless of the accusations that may have been levelled against Mr. Schatt and Mr. Podulka,

they are no longer part of the Debtors' current management, and, accordingly, any alleged past

misconduct on their part cannot form the basis for the appointment of a chapter 11 trustee.

      2.      Second, the appointment of a chapter 11 trustee would also clearly not be in the

best interest of creditors or the Debtors' estates.  11 U.S.C. § 1104(a)(1).  In fact, the Debtors

have entered into a plan support agreement[5] (the "PSA") with the recently appointed official

committee of unsecured creditors (the "Committee"), which agreement reflects a comprehensive

deal to, among other things, (a) pursue a sale of the Debtors' business as a going concern, (b)

investigate (and, if appropriate, prosecute) potential Debtor causes of action, and (c) seek

confirmation of a liquidating plan on an expedited timeframe.[6]  In other words, the true

economic stakeholders in these chapter 11 cases—*i.e.*, unsecured creditors (represented by the

Committee, as their fiduciary)—**support** the Debtors remaining in possession in order to pursue a

sale process followed by confirmation of a liquidating plan.  Indeed, the Debtors believe that

they have a realistic shot at a successful restructuring if they are given the time they need to

execute on that restructuring.

---

[4]    The Debtors recently (a) removed Daniel Schatt as Chief Executive Officer (although he remains an employee, but not in an officer capacity) and (b) terminated the employment of their Chief Financial Officer, Mr. Joe Podulka.  Moreover, both Mr. Schatt and Mr. Podulka have resigned from all director or manager positions (as applicable).

[5]    The execution version of the PSA is attached as **Exhibit A**.  The Debtors and the Committee anticipate filing a joint motion in the near future seeking Court approval of the PSA.

[6]    To be clear, even prior to the appointment of the Committee, the Debtors had been working diligently on a sale process to sell their business as a going concern, to be followed by confirmation of a liquidating plan that would provide for the establishment of a liquidation trust that would pursue Debtor causes of action for the benefit of the Debtors' creditors.

3.     Further, even if one ignores the new reality that the Debtors are under new management and, instead, focuses solely on allegations of prepetition misconduct by former management, it is quite clear now that movants' basic story—*i.e.*, that former management orchestrated a massive fraud or Ponzi scheme—does not hold up under scrutiny.  If anything, the record substantiates what the Debtors have been saying all along, namely that two former, rogue employees (who were given oversight over the Debtors' investment decisions) are responsible for much of the damage done to the Debtors.

4.     In particular, both Motions heavily rely on certain "irregularities" alleged by Mr. Daniyal Inamullah, the former V.P. and Head of Capital Markets at Cred, and former head of Capital Markets at Cred Capital.[7]  As Mr. Inamullah's deposition[8] reveals, however, none of the aforementioned irregularities reflect any nefarious activities at the Debtors.  Instead, Mr. Inamullah all but conceded that these issues stemmed from investment decisions of Cred's Capital Markets team, which Mr. Inamullah led from April 2020 until he resigned on November 6, 2020 (*i.e.*, the day before the Petition Date).  But even if any wrongdoing had been committed by former officers or directors of the Debtors—which would necessarily include Mr. Inamullah, given his role on Cred's Investment Committee and as the head of Capital Markets—the Debtors' estates are now led by new management that has no connection to the Debtors' prepetition operations.

5.     Further, there is no basis to convert these chapter 11 cases to cases under chapter 7, for all the reasons already set forth in the Prior Objection.  Indeed, the recent changes in

---

[7]     These purported irregularities included Cred's losses in connection with certain hedges involving 800 Bitcoin in March 2020, Cred's investments with a fraudulent investment manager who had pretended to be involved with Quantcoin, and Cred's inability to call back $10 million in loans made to moKredit.

[8]     A copy of the transcript of the deposition of Daniyal Inamullah ("Inamullah Dep.") is attached as **Exhibit B**.

management and the Debtors' agreement with the Committee on a comprehensive restructuring transaction further undercut any argument that conversion to chapter 7 is warranted. There simply is no "gross mismanagement" of the Debtors' estates, *i.e.*, **after** the Petition Date. 11 U.S.C. § 1112(b)(4)(B). Nor is there any basis to conclude that there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," which is further substantiated by the Debtors' entry into the PSA with the Committee. 11 U.S.C. § 1112(b)(4)(A).

6.      Accordingly, for the reasons set forth in the Prior Objection and as further detailed below, the Debtors submit that the Court does not have the requisite predicates for the appointment of a chapter 11 trustee or a chapter 7 trustee.[9] The Motions should be denied.

## OBJECTION

7.      The Debtors have already detailed in their Prior Objection the various reasons as to why these chapter 11 cases should not be dismissed or converted to cases under chapter 7, and why no chapter 11 trustee should be appointed.[10] The Debtors file this Objection to (a) update the Court regarding recent developments, including changes in the Debtors' management team and entry into the PSA with the Committee, and (b) respond to certain additional arguments made by the U.S. Trustee in its Motion. Finally, the Debtors also provide a brief summary of the deposition of Mr. Inamullah—the supposed "star witness" in support of the Motions—in order to dispel certain misconceptions underlying the Motions.

---

[9]   As detailed below, the Debtors do not oppose, in principle, the appointment of an examiner. However, in light of the appointment of the Committee and given the cost of conducting two investigations, the Debtors submit that the appointment of an examiner would provide little, if any, benefit to these estates.

[10]   As noted, the Prior Objection is incorporated into this Objection.

A.    **The Debtors' New Leadership Team**

8.    As the Debtors noted in their Prior Objection, the Debtors are now led by an

Independent Director, Mr. Grant Lyon, and a Chief Restructuring Officer, Mr. Matthew Foster,

who provide objective, disinterested guidance to the estates.  Since the filing of the Prior

Objection on December 2, 2020, a number of additional changes to management have occurred:

- Mr. Daniel Schatt has resigned as a director or manager (as applicable) for all Debtors;

- The Debtors have removed Mr. Schatt as Chief Executive Officer (although he remains an employee, but not in an officer capacity);

- The Debtors' board has removed Mr. Joseph Podulka from his position as Chief Financial Officer and his employment was subsequently terminated;

- Mr. Podulka has been replaced by Mr. Scott Wiley (an employee of Sonoran Capital Advisors, LLC) as interim Chief Financial Officer.

9.    In short, Mr. Schatt and Mr. Podulka no longer hold any officer, director, or

manager positions with the Debtors.  Because there are no allegations fraud, dishonesty,

incompetence, or gross mismanagement against current management, there is no basis for the

appointment of a chapter 11 trustee under section 1104(a)(1) of the Bankruptcy Code.[11]

B.    **Plan Support Agreement with the Committee**

10.    Over the course of the last week, the Debtors have been working tirelessly with

the Committee to reach agreement on a comprehensive restructuring transaction.  These efforts

culminated in the PSA (a copy of which is attached to this Objection).  The PSA addresses,

among other things, (a) the sale of the Debtors' business as a going concern, (b) the investigation

---

[11]    UpgradeYa Investments, LLC ("UpgradeYa") alleges in its limited joinder in the Madjak/Godinea Motion [Docket No. 126] (the "UpgradeYa Joinder") that the Debtors attempted to deceive the Court and other parties because Mr. Pablo Bonjour noted in his declaration attached to the Debtors' objection [Docket No. 116] to UpgradeYa's lift stay motion that "UpgradeYa loaned provided bitcoin to the Debtors."  UpgradeYa Joinder ¶ 29.  However, the reference to "loaned" was a typo that was meant to be changed to "provided."  This minor mistake is hardly a basis to convert these cases to chapter 11 or appoint a chapter 11 trustee.

(and, if appropriate, prosecution) of potential Debtor causes of action, and (c) the structure of a liquidating plan.  Among other things, the PSA provides for the following:[12]

- <u>Restructuring Transaction</u>: The liquidating plan will provide for (i) distribution of the net proceeds realized from the 363 sale of certain of the Debtors' assets, (ii) (x) through the liquidation trust, the liquidation and distribution of proceeds from the claims, causes of action and avoidance actions and other assets included therein, net of any costs of liquidation or distribution, and (y) the funding of such wind-down efforts (collectively, the "<u>Restructuring Transaction</u>").

- <u>Milestones</u>:  The Restructuring Transaction will be implement in accordance with certain milestones, including:

  - No later than December 31, 2020: file motion seeking approval of the disclosure statement and solicitation materials, and entry of order approving bidding procedures for 363 sale;

  - No later than January 7, 2020: file the Debtors' schedules and statements of financial affairs;

  - No later than January 29, 2020:
    - obtain entry of an order approving the disclosure statement,
    - obtain entry of an order scheduling a hearing on the plan and objection deadline with respect thereto, or
    - seek interim approval of a combined plan and disclosure statement under Local Rule 3017-2, and schedule a combined hearing on final approval of the disclosure statement and confirmation of the plan.

  - No later than March 17, 2020: entry of an order confirming the plan and obtain entry of an order approving the 363 sale (if applicable);

  - No later than March 31, 2020: effective date of the plan.

- <u>Estate Causes of Action</u>: The Debtors will cooperate with the Committee, including the production of documents, in connection with the Committee's investigation of claims and causes of action that the Debtors and their estates could potentially assert against any party, including all causes of action arising under chapter 5 of the Bankruptcy Code (each, a "<u>Cause of Action</u>" and collectively, the "<u>Causes of Action</u>").

  - The Debtors consent, subject to Bankruptcy Court approval, to the Committee having derivative standing to pursue all Causes of Action

---

[12]    The following summary of certain terms of the PSA is qualified in its entirety by the terms of the PSA.  *See* Ex. A.

against any current or prior insider, affiliate, or employee of any Debtor. Upon reasonable request by the Committee, the Debtors will grant the Committee derivative standing, subject to Bankruptcy Court approval, to pursue any other Cause of Action on behalf of the Debtors' estates that the Committee in good faith, and after consultation with the Debtors, believes must be pursued prior to the effective date of the plan because of exigent circumstances, but only if the Debtors' estates have sufficient funds to pursue such Cause of Action.

- o   The Debtors will consult with the Committee prior to asserting or commencing any Cause of Action.  The Debtors will not commence any Cause of Action without Committee consent unless the Debtors, in good faith and in consultation with the Committee, believe such Cause of Action must be pursued prior to the effective date of the plan because of exigent circumstances, but only if the Debtors' estates have sufficient funds to pursue such Cause of Action.  If such a determination is made by the Debtors, then the Debtors and the Committee will in good faith determine whether it is appropriate to grant the Committee derivative standing to pursue such Cause of Action on behalf of the Debtors' estates.

- o   For the avoidance of doubt, the Debtors will not compromise, resolve, or settle any Cause of Action without the Committee's consent.

- o   Following confirmation of the plan, and pursuant to the plan's terms, all Causes of Action will be transferred to the liquidation trust for prosecution by the liquidation trustee.

- **Asset Sales**: The Debtors may, solely with the consent of the Committee, enter into an agreement providing for the sale of one or more material asset (defined as any asset the net sale proceeds of which are $100,000 or higher).

- o   If the Debtors have not executed a binding stalking horse agreement to sell all or substantially all of their assets on or prior to January 15, 2020, the Debtors shall terminate any sale process, which shall include the termination of Teneo Capital LLC, unless the Debtors and Committee agree that Teneo shall continue to be retained to solicit and negotiate potential exit financing to, among other things, fund the costs of litigation by the liquidation trust.

- o   Other than as permitted by an Approved Budget, the Debtors shall not, without the prior consent from the Committee, sell any of the Debtors' cryptocurrency.

- o   The Debtors shall provide the Committee's professionals, upon reasonable request to the Debtors' professionals, information concerning all sale processes.

- <u>DIP Financing</u>: The Debtors may, solely with the consent of the Committee, enter into an agreement providing for a debtor-in-possession financing facility, provided that no such facility shall provide for the requirement of additional collateral, or acceleration of maturity, on account of any change in the value of liquid cryptocurrency property of the Debtors.  Such facility shall remain subject to the Debtors' determination of their fiduciary obligations and thereafter to approval of the Court.

  - The Debtors shall provide the Committee's professionals, upon reasonable request to the Debtors' professionals, information concerning any debtor-in-possession financing facility solicitation, negotiating, and consummation process.

- <u>Treatment of General Unsecured Claims</u>: Each holder of an allowed General Unsecured Claim (as defined in the PSA) shall receive one or more distributions equal to its share of the interests in the liquidation trust, as such distributions become available as is reasonably practicable in the reasonable discretion of the liquidation trustee.

- <u>Releases</u>: Except as expressly set forth in the definitive documents, the definitive documents shall include full customary debtor and "third party" releases from liability in favor of the Debtors' professionals, Grant Lyon as the Debtors' independent director, the Debtors' chief restructuring officer and any other temporary staff supplied by Sonoran Capital, the Committee's professionals, and each Committee member (the "<u>Released Parties</u>").  For the avoidance of doubt, no person other than the Released Parties, including any present or former insider of the Debtors, will receive a release of any kind under the plan, whether from the Debtors or otherwise.

11.     The Debtors submit that the PSA sets out a viable path for the Debtors to sell their business and distribute the proceeds from the sale as well as proceeds of other Debtor assets (including causes of action) to the Debtors' creditors, pursuant to a liquidating plan.  Given that the economic stakeholders (through the Committee) support for the contemplated Restructuring Transaction, there is no basis for the appointment of a chapter 11 trustee under section 1104(a)(2) of the Bankruptcy Code.

C. **Debtors Are Investigating Causes of Action Related to the Debtors' Descent into Bankruptcy and, Upon Appointment of a Liquidation Trustee under a Chapter 11 Plan, such Causes of Action Will Be Pursued for the Benefit of these Estates**

12.     The U.S. Trustee asserts that an impartial, independent trustee is needed to, among other things, "investigate various claims and causes of action related to the Debtors' descent into bankruptcy and to prosecute the same." U.S. Trustee Mot. ⁋ 5(i). As explained in the Prior Objection, the Debtors are investigating potential estate causes of action, which the Debtors will transfer to the liquidation trust under a chapter 11 plan, as provided for under the PSA. Moreover, in the meantime, (a) the Debtors will cooperate with the Committee regarding the Committee's investigation of potential Debtor causes of action and (b) upon reasonable request by the Committee, the Debtors will grant the Committee derivative standing to pursue any claim on behalf of the Debtors' estates that the Committee in good faith, and after consultation with the Debtors, believes must be pursued prior to the effective date of the liquidating plan (but only of the Debtors' estates have sufficient funds for the Committee to pursue such claims), all as provided for under the PSA.

13.     Nor do the Debtors have any intention of releasing prepetition management or any insiders from estate causes of action for prepetition misconduct. To the extent such causes of action exist, it will be up to the liquidation trustee to prosecute them. In fact, as detailed in the PSA, the liquidating plan would only provide for releases in favor of certain specified parties (such as the Debtors' professionals, the Independent Director, and the Chief Restructuring Officer), but not former management.

14.     Moreover, while the Debtors' investigation into the causes of these chapter 11 cases is ongoing (including the nature and extent of financial losses), several of the U.S. Trustee's assertions in this regard are inaccurate. For example, the U.S. Trustee asserts that "the Debtors took in more than $135 million in borrowed capital" and that the Debtors have "not

provided a clear explanation for the $66 million 'delta' between the asset and liability numbers."
U.S. Trustee Mot. ¶ 11.  However, as set forth in the Prior Objection, a substantial portion of the
shortfall in the Balance Sheet is attributable to the run-up in cryptocurrency prices in the months
immediately prior to the Petition Date, which translated into an increase in liabilities to
customers.  In fact, the "Program Value" of the customer positions (which is basically the value
of the cryptocurrencies at the time the cryptocurrencies were transferred to the Debtors) is
approximately $99.5 million

15.    Moreover, as detailed in the Prior Declaration, the Debtors, the Chief
Restructuring Officer, and MACCO are engaged in a thorough analysis of the extent and
financial impact of the Debtors' losses, including the losses incurred from the JST transaction in
March 2020 as a result of a 40% drop in cryptocurrency prices.  Once that analysis is completed,
the results will be, of course, disclosed to the creditors and this Court.  Furthermore, as
previously noted, the Debtors suffered substantial losses as a result of (a) the theft of 225 Bitcoin
(worth in excess of $4 million at current market prices) by the former Chief Capital Officer, Mr.
Alexander, and (b) the theft of 800 Bitcoin (worth in excess of $15 million at current market
prices) by an entity representing to be Quantcoin.  The Debtors have already taken numerous
steps to attempt to recover these cryptocurrencies, including commencing a turnover action in
this Court against Mr. Alexander, alerting law enforcement of the "Quantcoin" scam, and serving
notice of the theft or conversion on cryptocurrency exchanges at the suggestion of creditors.
While the Debtors and their professionals are continuing to analyze all of the foregoing, the
Debtors are committed to providing a clear explanation for their asset and liability numbers.

16.    Furthermore, the U.S. Trustee asserts that the "asset to liability gap has likely
grown since the bankruptcy filing, as Bitcoin has increased in value from approximately

$15,000/BTC on November 6, 2020 to $19,000 on December 4, 2020."[13]  This argument is a misstatement of the law.  Under section 502(b) of the Bankruptcy Code, the Court must determine the amount of creditor claims "in lawful currency of the United States **as of the date of the filing of the petition** . . . ."[14]  As a result, the amount of the creditors' claims against the Debtors does not change post-petition with the fluctuations in the price of cryptocurrencies; it is fixed as of the Petition Date.

17.    The U.S. Trustee also does not provide any evidence that the Chief Restructuring Officer, Mr. Foster, is not capable of performing his duties.  Instead, the U.S. Trustee merely notes that Mr. Foster is subject to direction and oversight by Cred's board of directors.[15]  While technically true, the U.S. Trustee fails to mention at all that one of the fifty-percent shareholders on the prepetition board resigned prior to the Petition Date and was replaced by Grant Lyon, an independent restructuring professional who is neither a shareholder nor a creditor of the Debtors, despite the fact that the U.S. Trustee was aware that Mr. Lyon is on the board**.**  Since the Petition Date, Mr. Lyon has provided the estates with an independent fiduciary to oversee these cases. Moreover, Mr. Schatt is no longer serving as a director or manager for any of the Debtors, *i.e.*, Mr. Lyon is the sole director/manager.  As the sole director/manager, Mr. Lyon oversees all of the Debtors' restructuring efforts, including the actions of Mr. Foster.

18.    Mr. Lyon and Mr. Foster are entitled, at this early stage of these chapter 11 cases, to deference to their business judgment in having determined that pursuing a going concern sale represents the best possible result for creditors here.[16]

---

[13]    U.S. Trustee Mot. ¶ 11.

[14]    11 U.S.C. § 502(b) (emphasis added).

[15]    U.S. Trustee Mot. ¶ 17.

[16]    *Dai-Ichi v. Montgomery (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale, or lease of property of the estate under [section 363(b)], courts

19.     There is also no basis for the U.S. Trustee's allegation that Paul Hastings is incapable of leading an independent investigation of the Debtors' conduct prior to their bankruptcy filing.[17]  For one, while it is true that Paul Hastings provided prepetition legal advice to the Debtors, that doesn't imply that it was "essentially functioning as an outside general counsel."[18]  Indeed, as noted in Paul Hastings' separate response to the U.S. Trustee's objection to the Firm's retention, Paul Hastings was but one of a number of firms advising the Debtors.  In short, there is no evidence to support that allegation.  In fact, for much of the past year, the Debtors had their own in-house general counsel, Mr. Daniel Wheeler, and prior to being hired as general counsel, Mr. Wheeler was primary regulatory counsel to the Debtors in his position as a partner at the law firm of Bryan Cave Leighton Paisner, where Mr. Wheeler headed the FinTech practice.

20.     As for the U.S. Trustee's other allegations concerning prepetition misconduct— e.g., that the Debtors' hedging strategy failed or that the Debtors' failed to disclose their "extraordinarily poor financial condition"[19]—even if true, these allegations do not rise to the level of requiring the appointment of a chapter 11 trustee or conversion of these chapter 11 cases to cases under chapter 7.  The Debtors are not seeking releases of estate causes of action (including any claims that may exist against the Debtors' prepetition management for prepetition misconduct) and any such claims would be transferred to a liquidation trust to be preserved for the benefit of creditors.  Nor do the Debtors have any intention of seeking releases for the

---

require the debtor to show a sound business purpose justifies such actions.").  *See also Chamberlain v. Stanziale (In re Chamberlain)*, 545 B.R. 827, 844 (D. Del. 2016); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).

[17]    U.S. Trustee Mot. ¶ 18.

[18]    *Id.*

[19]    U.S. Trustee Mot. ¶ 12

Debtors' prepetition management from any claims that third parties may have against such management.

D.      **Debtors Are Seeking to Collect moKredit Receivable and Are Marketing Their Business for Sale**

21.     The U.S. Trustee also asserts that an impartial, independent trustee is needed to "pursue collection of the moKredit receivable and either reorganize or liquidate other assets and/or business operations."[20]  However, this is exactly what the Debtors are doing, as detailed in the Prior Objection.  In this regard, the U.S. Trustee's concerns seem focused almost entirely on the Debtors' ability to monetize the moKredit receivable, noting that "the Debtors' management should not be put in a conflicted position vis-à-vis the moKredit receivable when the Debtors' creditors and investors are facing significant losses."[21]  However, this concern is misplaced.  As explained in the Prior Objection, the Debtors have put in place numerous layers of independent review, including the appointment of an Independent Director, Mr. Grant Lyon, and a Chief Restructuring Officer, Mr. Matthew Foster, who are evaluating to what extent the Debtors' claims against moKredit can be recovered.  In fact, the Debtors have formally demanded that moKredit repay the outstanding principal amount, and have requested documents from moKredit as part of an ongoing investigation into moKredit.  Mr. Schatt has no involvement in these matters.

22.     Nor is there any basis for the U.S. Trustee's concern that the Debtors would not vigorously pursue any and all potential recoveries for the Debtors' creditors and investors or that they would not provide fair, impartial information regarding the Debtors' current financial affairs and business operations.  In fact, as detailed in the Prior Objection, Mr. Foster is now in charge

---

[20]    U.S. Trustee Mot. ¶ 5(iv).

[21]    U.S. Trustee Mot. ¶ 6.

of operational controls over the Debtors, including requiring his approval on the Debtors' cash expenditures, working with the Debtors' professionals to prepare schedules and statements, reviewing and reconciling accounting records, working with Teneo on the marketing and sale process, and ensuring the Debtors' compliance with U.S. Trustee requirements.

23.     Furthermore, as provided in the PSA, if the Committee reasonably concludes that certain estate causes of action should be pursued, the Debtors will consent to derivative standing to allow the Committee to pursue such causes of action, if the Debtors' estates have sufficient resources for the Committee to pursue such claims.

24.     And, finally, as the Court is aware, the Debtors have filed a motion seeking approval of bidding procedures for the sale of the Debtors' business, with the marketing process being conducted by the Debtors' investment banker, Teneo Capital LLC—all of which is consistent with the Restructuring Transaction detailed in the PSA.

**E.**     **Debtors Are Analyzing Nature and Priority of Claims, Rights, and Interests Possessed by Debtors' Creditors, Investors, and Partners**

25.     The U.S. Trustee also asserts that an impartial, independent trustee is needed to "analyze and determine the nature and priority of the claims, rights and interests possessed by the Debtors' creditors, investors and partners to protect same."  U.S. Trustee Mot. ⁋ 5(iii).  Again, these are exactly the steps that the Debtors are undertaking, including by having filed a motion to set a bar date [Docket Nos. 52, 74].  Moreover, the issue of whether certain customers that transferred cryptocurrency to the Debtors as collateral have property rights in such cryptocurrency is currently being litigated in the context of the lift stay motion [Docket No. 89] filed by one such customer, UpgradeYa.  In fact, the Debtors are opposing any attempts by such customers to diminish the property of these estates.  Moreover, the Debtors are working cooperatively and efficiently with the Committee to analyze and resolve these issues given that

the Debtors have several CredBorrow customers, like UpgradeYa, who transferred
cryptocurrency to the Debtors prior to the Petition Date.  It is unclear what additional actions the
U.S. Trustee envisions would be taken by a chapter 7 or chapter 11 trustee in this regard.

26.     Further, the size of customer claims is the subject of ongoing analysis by the
Debtors' financial advisors, who are in the process of preparing the Debtors' schedules and
statements of financial affairs.  Ultimately, the size of customer claims will be determined
through the claims reconciliation process after customers have had the opportunity to file their
proofs of claim.

**F.    Prepetition Corporate Governance Issues Are No Basis to Appoint a Chapter 11
        Trustee or Convert these Chapter 11 Cases to Cases under Chapter 7**

27.     The U.S. Trustee further asserts that an impartial, independent trustee is needed to
"resolve issues of corporate governance" as it relates to Cred Capital, Inc. ("Cred Capital") and
related prepetition disputes with Mr. Alexander.  These concerns do not form a basis to appoint a
chapter 11 trustee or convert these chapter 11 cases to cases under chapter 7.

28.     As an initial matter, Mr. Alexander is subject to a temporary restraining order
issued by a California court for absconding with the Debtors' assets.  It is perplexing, to say the
least, why the U.S. Trustee would give any credence to the spurious allegations of Mr. Alexander
regarding corporate governance.

29.     Moreover, that corporate governance "issue," if one exists, only affects one out of
the five debtors: Cred Capital.  The U.S. Trustee does not explain how the appointment of a
trustee for Cred Capital, but not the other Debtors who are not implicated by that dispute, would
have any positive impact on these cases generally.  And the Debtors have brought an adversary
proceeding against Mr. Alexander in this Court, giving him an opportunity to raise any defenses
he may have that relate to "corporate governance."  As with many of the U.S. Trustee's

assertions, it is unclear what additional or different actions a chapter 11 or chapter 7 trustee

would take than those that are currently being undertaken by the Debtors.

**G.     Daniyal Inamullah's Testimony Demonstrates That Any Purported Irregularities at Cred Resulted From the Poor Investment Decisions of Cred's Capital Markets Team, Which Was Led By James Alexander and Daniyal Inamullah**

30.     In addition to the foregoing, the Debtors also seek to apprise the Court of a

number of key concessions made by Mr. Inamullah in his deposition on December 7, 2020 that

further undercut the relief requested in the Motions.

31.     Mr. Inamullah was hired by Cred on or around December 18, 2019 to serve as

Cred's Vice President of Capital Markets.[22]  His "specific job responsibility initially was to find

different investment opportunities to maximize yields and to do diligence and report that

diligence to the investment committee and to make proposals for these investments that [he] was

looking at to the investment committee . . . ."[23]

32.     Mr. Inamullah was also the Capital Market's team liaison with the accounting

team, and participated in calls with prospective investors.[24]  At this time, Cred's Capital Markets

team was comprised of James Alexander, as the Head of Capital Markets, and Mr. Inamullah as

the Vice President of Capital Markets.[25]

33.     In April 2020, Mr. Inamullah also became the Head of Capital Markets at Cred

Capital.[26]  There, Mr. Inamullah was also in charge of conducting due diligence on bond

underwriting, as well as to "help underwrite and sell debt products" and to market bonds.[27]

---

[22]   Inamullah Dep. 30:1–15.

[23]   *Id.* at 32:24–33:4.

[24]   *Id.* at 33:8–17.

[25]   *Id.* at 44:4–23.

[26]   *Id.* at 34:8–11.

[27]   *Id.* at 30:23–31:3, 34:19–22.

From April 2020 through his resignation on November 6, 2020, Mr. Inamullah was the Head of Capital Markets at Cred.[28]  During that time, Mr. Inamullah was also the sole member of Cred's Capital Markets team.[29]

34.    Because a key component of Mr. Inamullah's responsibilities was to make profitable investments for Cred, he was also in charge of the due diligence process for Cred.[30] This included creating a "due diligence checklist" and a template for "investment proposals" to provide to Cred's Investment Committee.[31]  Mr. Inamullah was also the primary person responsible for filling out both of these materials for the benefit of the Investment Committee's review and approval.[32]  Thus, Mr. Inamullah was also responsible for verifying the accuracy of the information provided in response to the due diligence checklist, and for discovering any information missing from these forms.[33]

35.    Despite Mr. Inamullah's attempts to distance himself from Cred's investment losses, Mr. Inamullah served on Cred's Investment Committee since in or around January 2020 until he left the Company on November 6, 2020 (*i.e.*, the day before the Petition Date).[34] Likewise, Mr. Inamullah was primarily responsible for selecting, conducting due diligence on, and presenting investment proposals to the Investment Committee.[35]  And after Mr. Inamullah made his proposal or recommendation, "there would typically need to be ***unanimous decision*** by

---

[28]    *Id.* at 34:8–14.

[29]    *Id.* at 44:4–23.

[30]    *Id.* at 47:21–48:20.

[31]    *Id.*

[32]    *Id.* at 48:12–16.

[33]    *Id.* at 55:14–57:10.

[34]    *Id.* at 119:5–10.

[35]    *Id.* at 93:10–12.

the investment committee to move forward" on an investment decision.[36]  Indeed, Mr. Inamullah

claimed that "there were no investments that were recommended outside of [him].  So [he was]

the only one that made any proposals to the investment committee during [his] tenure."[37]

36.     Although Mr. Inamullah testified that (1) he was primarily responsible for

conducting due diligence on prospective investments and making investment proposals and

recommendations to the Investment Committee, (2) he was a member of the Investment

Committee which required a unanimous vote to approve of any investment proposal or

recommendation, and (3) he was the only person on the Investment Committee who made any

investment proposals or recommendations, Mr. Inamullah has also tried to distance himself from

any involvement with Cred's investments with JST, MoKredit and Quantcoin.  Mr. Inamullah's

attempts to deflect responsibility, however, ring hollow.

37.     With regard to Cred's investment losses in March 2020 due to certain hedges

Cred placed with JST, Mr. Inamullah claims that he disagreed with Cred's hedging strategy.[38]

Mr. Inamullah further claims that, when JST was originally engaged to advise the Company on

its hedging strategy, he was not a Cred employee, so that he was not responsible for Cred's

hedging decisions with JST.[39]  And yet, Mr. Inamullah also admitted that he voted on two

options trades involving JST as an Investment Committee member in or around February 2020.[40]

Mr. Inamullah further acknowledged that Cred's positions with JST could have been canceled at

any time.[41]  In fact, Mr. Inamullah even testified that he believed Cred's hedges placed with JST

---

[36]   *Id.* (emphasis added).

[37]   *Id.* at 180:3-5.

[38]   *Id.* at 120:2–15.

[39]   *Id.* at 105:3–14.

[40]   *Id.* at 119:15–22.

[41]   *Id.* at 194:24–196:7.

were ultimately necessary because of Cred's loans to moKredit.[42]  Consequently, Mr.

Inamullah's criticisms of Cred's hedging strategy in the lead-up to March 2020 are more likely

the product of hindsight—rather than any genuine criticism of Cred's strategy held at the time

these hedges were put in place.

38.    With regard to Cred's relationship with moKredit, Mr. Inamullah clarified that he

did not believe "[there was anything] nefarious going on between the actors . . . ."[43]  Rather, Mr.

Inamullah's criticisms were based on Cred's inability to collect on its loan with moKredit and his

assertion that he did not receive sufficient information from moKredit.[44]  Mr. Inamullah,

however, also noted that Cred had attempted to collect $10 million from moKredit after the

losses with JST, but was unable to do so.[45]  According to Mr. Inamullah, Mr. Schatt explained to

the Investment Committee that a "Chinese regulator had essentially given borrowers an

extension due to COVID and tapped the liquidity market, so it allowed borrowers to, essentially,

delay principal [cryptocurrency] payments indefinitely."[46]  Mr. Inamullah also admitted that he

did in fact receive diligence information regarding moKredit, that "contain[ed] an overview of

the company, road map, financial information which are all items that you would typically see on

that sort of document.  So there wasn't any huge red flags.  It just seemed like a very simple

document than what I was used to back in my banking days."[47]

39.    Mr. Inamullah explained that his concerns with Cred were not directly based on

Cred's relationships with third parties like moKredit.  Rather, he was purportedly concerned with

---

[42]  *Id.* at 109:14–111:13.

[43]  *Id.* at 133:21–134:15; *see also id.* at 136:20–22.

[44]  *See id.* at 124:19–125:1.

[45]  *Id.* at 106:3–8.

[46]  *Id.* at 107:7–11.

[47]  *Id.* at 124:21–125:1

Cred's deteriorating financial condition, and its lack of disclosure of its financial condition.[48]
According to Mr. Inamullah, Cred should have been shut down in June 30, 2020 when Cred was
unable to receive liquidity back from its loan from moKredit.[49]  Yet, after June 30, 2020, Mr.
Inamullah continued to market to, and solicit, new investors.[50]  In fact, on September 10, 2020,
Mr. Inamullah recommended to Mr. Schatt that Cred should increase its CredEarn rates by 3% as
a marketing campaign.[51]  Then, on September 21, 2020, Mr. Inamullah made a promotional
video for Cred where he claimed that there were "exciting initiatives in the short term" at Cred,
and that he "look[ed] forward to building a wonderful business as [sic] Cred."[52]  While Mr.
Inamullah claims that in "hindsight" he should not have tried to solicit new investors during this
time period, Mr. Inamullah's testimony and conduct either contradict the suggestion that Cred
was obviously insolvent, or they suggest that Mr. Inamullah is guilty of misleading his CEO
while he was the corporate officer in charge of Cred's capital markets' strategy and investments.

40.     With regard to Quantcoin, Mr. Inamullah again disclaimed any responsibility
when he transferred millions of dollars' worth of Bitcoin to an imposter pretending to be a
Quantcoin representative.[53]  Mr. Inamullah maintained that he did not conduct any due diligence
on Quantcoin, claiming that this diligence was conducted by Mr. Alexander sometime in late
2019—even though the first Quantcoin transactions occurred in February 2020, or well after Mr.
Inamullah assumed his role at Cred.[54]  Indeed, by February 2020, Mr. Inamullah served on both

---

[48]   *Id.* at 136:16–137:13.

[49]   *Id.* at 222:5–20.

[50]   *Id.* at 225:19–226:7.

[51]   *Id.* at 81:7–82:11.

[52]   *Id.* at 227:21–231:1.

[53]   *Id.* at 152:8–10.

[54]   *Id.* at 212:1–14, 214:10–15.

Cred's Investment Committee and Capital Markets team and was thus also responsible for conducting due diligence on Cred's investments by his own admission.[55]  Moreover, Mr. Inamullah admitted that the reason he took it upon himself to create Cred's due diligence process—which he neglected to complete for Quantcoin despite the fact that Cred had transferred around 800 Bitcoin between February and April 2020—was because he believed "the[re] was the lack of that operational process that was put in place."[56]  Despite this, Mr. Inamullah failed to conduct any due diligence on any of Cred's existing asset managers, like Quantcoin, after becoming a member of Cred's Investment Committee and Capital Markets team in or around January 2020.[57]

41.    Similarly, Mr. Inamullah tried to minimize his role in transferring 225 Bitcoin from Cred to Mr. Alexander.  Even though Mr. Inamullah claims that he merely thought he was transferring Cred Capital's Bitcoin to an "[o]utside account for Cred Capital,"[58] his actions were inconsistent with the security protocol he had himself recommended to Cred.  Specifically, Mr. Inamullah had recommended to Cred that the person *initiating* the transfer of funds to an outside account be a different person from the person *authorizing* the transfer so as to minimize "potential collusion risk."[59]  However, in regard to the transfer of the 225 Bitcoin to Mr. Alexander, Mr. Inamullah initiated *and* authorized the transfer.[60]  This transfer, as well as his lack of due diligence procedures, evince Mr. Inamullah's disregard for the due diligence and security protocols that he himself designed and recommended.

---

[55]  *Id.* at 47:21–48:20.

[56]  *Id.* at 52:5-6.

[57]  *Id.* at 102:23–103:3.

[58]  *Id.* at 166:23–24.

[59]  *Id.* at 164:12.

[60]  *Id.* at 158:19–23.

42.     To make matters worse, in or around April 2020, after Bitcoin's precipitous fall in March 2020, Mr. Inamullah presented his liquidity analysis to the Investment Committee, where he recommended that Cred invest *more* assets with Quantcoin, even though Mr. Inamullah had not performed any diligence on the asset manager.[61]   Furthermore, Mr. Inamullah's recommendation noted that a key risk to his strategy was a "significant price increase of cryptocurrency."[62]   Unfortunately, Cred ultimately implemented Mr. Inamullah's recommendations by increasing its holdings with Quantcoin and experienced even further losses with the rebounding in cryptocurrency prices in or around May 2020.

43.     Consequently, Mr. Inamullah's testimony reveals that he and Mr. Alexander were basically the architects of all of the *negative* events that the U.S. Trustee identifies as the "prepetition failures of management."[63]   Mr. Inamullah's testimony thus also undermines any inference that the Debtors' former management were engaged in any prepetition fraud, dishonesty, incompetence, misconduct, or mismanagement.

**H.    <u>Appointment of Examiner</u>**

44.     As an alternative to appointing a chapter 11 trustee or converting these chapter 11 cases to cases under chapter 7, the U.S. Trustee requests the appointment of an examiner to investigate the Debtors' prepetition activities and to identify colorable claims which the estates may assert beyond the moKredit receivable.

45.     In principle, the Debtors do not oppose any such investigation (indeed, such an investigation is already underway).  However, the Debtors understand that the Committee may also wish to be heard on this matter and may wish to conduct its own investigation.  The Debtors

---

[61]   *Id.* at 216:10–217:1.

[62]   *Id.* at 116:18–117:2.

[63]   U.S. Trustee Mot. ¶ 4.

concern in this regard is the potential duplication of efforts,and the attendant costs and burdens on the Debtors' estates.  If the Committee intends to investigate the matters raised by the U.S. Trustee, then the Debtors respectfully submit that an Examiner would be duplicative and unnecessary.

## **CONCLUSION**

46.     In the end, it is unfortunate that these cases are overshadowed by "an incredible atmosphere of mistrust of the Debtors and their management."[64]  However, this mistrust is, in no small part, the result of two former, disgruntled employees (Mr. Alexander and Mr. Inamullah) making unsubstantiated and inaccurate allegations against the Debtors and its former management in an apparent effort to deflect from their own misconduct while employed by the Debtors.  This Court should not be swayed by these allegations, and, instead, should look at the numerous measures (including new management, the motion to approve a sale process, and the retention of financial advisors) the Debtors have taken to ensure that these chapter 11 cases are run in a fair and impartial manner.  Finally, the Committee supports the Debtors' proposed Restructuring Transaction, which, the Debtors' submit, will maximize value of these estates.

47.     For all these reasons, and for the reason set forth in the Prior Objection, the Debtors respectfully request that the Motions be denied.


*[Remainder of page intentionally left blank.]*

---

[64]    U.S. Trustee Mot. ¶ 26.

WHEREFORE, the Debtors respectfully request that the Court deny the Motions.

Dated:  December 14, 2020
        Wilmington, Delaware

/s/  Scott D. Cousins
Scott D. Cousins (No. 3079)
**COUSINS LAW LLC**
Brandywine Plaza West
1521 Concord Pike, Suite 301
Wilmington, Delaware 19803
Telephone:    (302) 824-7081
Facsimile: :   (302) 295-0331
Email:        scott.cousins@cousins-law.com

- and -

James T. Grogan (admitted *pro hac vice*)
Mack Wilson (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
Telephone:    (713) 860-7300
Facsimile:    (713) 353-3100
Email:        jamesgrogan@paulhastings.com
              mackwilson@paulhastings.com

- and -

G. Alexander Bongartz (admitted *pro hac vice*)
Derek Cash (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:    (212) 318-6000
Facsimile:    (212) 319-4090
Email:        alexbongartz@paulhastings.com
              derekcash@paulhastings.com

*Proposed Co-Counsel to the Debtors*