UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE

                                    . Chapter 11
IN RE:                              .
                                    . Case No. 20-12836(JTD)
CRED INC., et al,                   .
                                    .
                                    . 824 Market Street
                    Debtors.        . Wilmington, Delaware 19801
                                    .
. . . . . . . . . . . . . . . . . . Thursday, December 17, 2020

        TRANSCRIPT OF TELEPHONIC HEARING RE:  SECOND-DAY MOTIONS
                BEFORE THE HONORABLE JOHN T. DORSEY
                    UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA TELEPHONE:

For the Debtors:              Scott D. Cousins, Esq.
                              Drew McManigle, Esq.
                              COUSINS LAW, LLC

                              James T. Grogan, Esq.
                              G. Alexander Bongartz, Esq.
                              Broocks (Mack) Wilson, Esq.
                              Derek Cash, Esq.
                              D. Scott Carlton, Esq.
                              Pedro A. Jimenez, Esq.
                              Bryant Lin, Esq.
                              Avi E. Luft, Esq.
                              Austin M. Prouty, Esq.
                              PAUL HASTINGS, LLP

                              Paul E. Harner, Esq.
                              Vincent J. Marriott, Esq.
                              BALLARD SPAHR, LLP

(Appearances Continued)

Audio Operator:               Electronically Recorded
                              by CourtCall/Jason Spencer, ECRO

Transcription Company:        Reliable
                              1007 N. Orange Street
                              Wilmington, Delaware 19801
                              (302)654-8080
                              Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA TELEPHONE:   (Continued)

For the U.S. Trustee:          Joseph J. McMahon, Jr., Esq.
                               Juliet Sarkessian, Esq.
                               John Schanne, Esq.
                               OFFICE OF THE U.S. TRUSTEE

For the Official Committee
of Unsecured Creditors:        Darren Azman, Esq.
                               Joseph Evans, Esq.
                               David Hurst, Esq.
                               Gregg A. Steinman, Esq.
                               Timothy W. Walsh, Esq.
                               MCDERMOTT, WILL & EMERY, LLP

For Daniyal Inamullah:         Mark Billion, Esq.
                               MARK BILLION LAW

For Thomas Airhart:            Hollace T. Cohen, Esq.
                               Carl Neff, Esq.
                               FISHER BROYLES, LLP

For Daniel Schatt:             Donna L. Culver, Esq.
                               MORRIS, NICHOLS, ARSHT
                                & TUNNELL, LLP

For Ryan Skeers:               David L. Gay, Esq.
                               CARLTON FIELDS, PA

For James Alexander:           Geoffrey Grivner, Esq.
                               Mark Pfeiffer, Esq.
                               BUCHANAN, INGERSOLL & ROONEY, PC

For James Schregardus:         Patrick A. Jackson, Esq.
                               FAEGRE, DRINKER, BIDDLE
                                & REATH, LLP

For Upgradeya Investments,
LLC:                           Adam G. Landis, Esq.
                               Marc Parrish, Esq.
                               Matthew K. Pierce, Esq.
                               LANDIS, RATH & COBB, LLP

For the United States:         Leah V. Lerman, Esq.
                               U.S. DEPARTMENT OF JUSTICE -
                                CIVIL DIVISION

(Appearances Continued)

```
APPEARANCES VIA TELEPHONE:   (Continued)

For Jaime Shiller, et al:   Jason S. Levin, Esq.
                            Eric J. Monzo, Esq.
                            MORRIS JAMES, LLP

                            David Silver, Esq.
                            SILVER MILLER

For Krzysztof Majdak and
Philippe Godinea:           Zhao Liu, Esq.
                            THE ROSNER LAW GROUP, LLC

                            Joseph E. Sarachek, Esq.
                            THE SARACHEK LAW FIRM

For Maple Partners, LLC:    Mark Minuti, Esq.
                            SAUL, EWING, ARNSTEIN & LEHR, LLP

Also Appearing:             Matthew K. Foster
                            CRED, INC.

                            Pamela Clegg

                            Mark Friedler

                            Daniyal Inamullah

                            Joshua Segall

                            Christopher Wu

                            Pablo Bonjour
                            MACCO RESTRUCTURING GROUP, LLP

                            Grant Lyon
                            ARETE CAPITAL PARTNERS, LLC
```

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE U.S. TRUSTEE | | | | |
| Daniyal Inamullah | 12 | 81 | | |
| | | 108 | | |
| | | 115 | | |
| FOR THE DEBTORS | | | | |
| Gary G. Lyon | 126 | 134 | | |

| EXHIBIT | EVID. |
|---|---|
| U.S. Trustee 1 through 5 | 57 |
| U.S. Trustee 7 | 57 |
| U.S. Trustee 8 | 57 |
| U.S. Trustee 10 | 58 |
| U.S. Trustee 11 | 123 |
| Creditors Committee 2 | 105 |
| Debtors' 1 | 132 |
| Debtors' 2 | 133 |
| Debtors' 18 | 129 |

| DECLARATIONS | |
|---|---|
| Daniyal Inamullah | 107 |
| Gary Grant Lyon | 125 |

1      (Proceedings commence at 11:05 a.m.)

2           THE OPERATOR:  Thank you, Your Honor.  Recording

3      has begun and we are now live.

4           THE COURT:  Thank you.  Good morning, everyone.

5      This is Judge Dorsey.  We're on the record in Cred, Inc.,

6      Case Number 20-12836.

7           Frankly, I don't know where to even start with the

8      agenda for today, given all the various motions that have

9      been filed.  We'll go ahead and turn it over to debtors'

10     counsel for now.

11          MR. COUSINS:  Good morning, Your Honor.  Scott

12     Cousins.  Can you hear me okay?

13          THE COURT:  I can.  Thank you.

14          MR. COUSINS:  Just -- I know the Court doesn't have

15     a lot of time, and I know Mr. Hurst wants to make a brief

16     introduction to the committee counsel.  I think the parties

17     have all agreed that the motions to dismiss/convert trustee

18     would go first (indiscernible)

19          THE COURT:  Hold on, Mr. Cousins.

20          There's somebody speaking who does not have their

21     phone muted.  Please mute your phone if you're not speaking.

22     Thank you.

23          Go ahead, Mr. Cousins.

24          MR. COUSINS:  Thank you, Your Honor.  I know that -

25     - I think all the parties agree that that that's the gating

1     item before we get to the other -- or if we get to the other

2     first-day -- or second-day pleadings.

3          But I did want to -- and it is Mr. Hurst, who

4     wanted to make introductions for the recently formed

5     committee.

6          THE COURT:  All right.  Mr. Hurts, go ahead.

7          MR. HURTS:  Good morning, Your Honor.  It's nice to

8     see you.  For the record, David Hurts from McDermott, Will &

9     Emery, representing the Official Committee of Unsecured

10    Creditors in these cases.

11         Your Honor, just before the hearing got underway, I

12    wanted to introduce my colleagues who will be presenting

13    evidence today and also presenting argument.  They are all on

14    video.  It's Tim Walsh, Darren Azman, Joseph Evans, and Greg

15    Steinman.  All of these individuals have been admitted *pro*

16    *hac vice* in these cases, Your Honor.

17         With that, I'll turn it back over to Mr. Cousins.

18         THE COURT:  Mr. Cousins?

19         MR. COUSINS:  Thank you, Your Honor.  I think we're

20    ready to start.  In the debtors' view, we've made a lot of

21    progress, but obviously, the Court is going to hear some

22    testimony.  So I'll yield to either Mr. McMahon or Mr.

23    Sarachek.  I'm not sure who is going first.

24         THE COURT:  All right.  Before you do that, I've

25    noticed there's a number of people in the waiting room trying

1    to get into the Zoom meeting.  We do not allow people into

2    the Zoom meeting unless they use their proper name and we can

3    compare it to the CourtCall sheet, so that we know that these

4    are people who actually are interested in this proceeding and

5    not those who are trying to disrupt it.  We've had some

6    people gain access to these meetings and cause disruption.

7    So we're not going to let you in unless you're using a proper

8    name.  Thank you.

9             All right.  Go ahead.  Where are we now?

10            MR. COUSINS:  Mr. McMahon or Mr. Sarachek.

11            THE COURT:  Well, you can only speak one at a time.

12            MR. SARACHEK:  This is --

13            THE COURT:  Who's going first?

14            MR. SARACHEK:  This is Joe Sarachek.  I'd like to

15    yield to Mr. McMahon.

16            THE COURT:  Mr. Sarachek, are you an attorney?

17            MR. SARACHEK:  I am, and I'm admitted *pro hac vice*.

18    I am on with my colleague Zachary Mazur, and in addition,

19    local counsel from Mr. Rosner's -- the Rosner group is on, as

20    well.

21            THE COURT:  All right.  Just for your future

22    reference, I do require attorneys appearing before me, even

23    if it's by Zoom, to appear in proper courtroom attire.  So,

24    next time --

25            MR. SARACHEK:  Oh, okay.

1          THE COURT:  -- please wear a suit and tie.

2          MR. SARACHEK:  Sorry about that, Your Honor.  We

3  had a massive snowstorm, and I spent this morning digging

4  out.

5          THE COURT:  So did I.

6          MR. SARACHEK:  But -- yeah.

7          THE COURT:  And I'm here in my robe --

8          MR. SARACHEK:  Okay.

9          THE COURT:  -- and a tie and shirt.

10          MR. SARACHEK:  Okay.  Absolutely, Your Honor.

11          THE COURT:  Thank you.

12          Mr. McMahon?

13          MR. MCMAHON:  Your Honor, good morning.  Joseph

14  McMahon for Andy -- Andrew Vera -- excuse me -- the United

15  States Trustee for Region 3.

16          Your Honor, yesterday we filed a notice of

17  witnesses.  We indicated that we have two witnesses in

18  connection with our motion for our case-in-chief.  Your

19  Honor, earlier today, in the wake of a conversation that was

20  held last night, we (indiscernible) the motion to quash the

21  subpoena that we had issued, and the witness' counsel, Mr.

22  Dan Schatt, had accepted with respect to his appearance.

23          So, to review, for a moment, we took -- we issued

24  the subpoena last Friday.  Mr. Schatt accepted service of

25  both, and Mr. Schatt appeared at the deposition on Monday

1    that we had scheduled.  We have that deposition transcript,

2    it arrived in our hands at about six or seven o'clock last

3    night, it was late.  And based upon the circumstances where

4    the motion to quash has been filed with respect to personal

5    jurisdiction, Mr. Schatt is a California resident.

6            I -- in order to, I guess, you know, address this

7    issue, while we, you know, believe that there may be, I

8    guess, arguments as to why Mr. Schatt is connected with the

9    (indiscernible) we believe that, under the circumstances,

10   that it's appropriate to deem Mr. Schatt an unavailable

11   witness and to offer his transcript, his deposition

12   transcript, into evidence.

13           THE COURT:  Well, I'm certainly --

14           MR. MCMAHON:  So that would --

15           THE COURT:  -- willing -- go ahead, Mr. McMahon, I

16   didn't mean to cut you off.

17           MR. MCMAHON:  Excuse me, Your Honor.  So the other

18   witness, Mr. Inamullah, is on the line and prepared to

19   testify.  We would like to offer some direct testimony by Mr.

20   Inamullah in support of our motion to kind of give the Court

21   a -- like an understanding as to what it is we're talking

22   about that incorporates some of what we learned over the past

23   three or four days of discovery, and that would be our plan

24   for today.

25           THE COURT:  All right.  Well, certainly, we'll

1    allow you to use the deposition transcript if Mr. Schatt is

2    refusing to appear.  I will say that I'm surprised he's not

3    willing to appear voluntarily to testify before me, so that I

4    can judge his credibility, and that's going to be a factor

5    for today.

6              MR. MCMAHON:  Thank you.

7              THE COURT:  But go ahead, Mr. McMahon.

8              MR. MCMAHON:  Thank you.

9              THE COURT:  Call your first witness.

10             MR. MCMAHON:  Thank you, Your Honor.  The United

11   States Trustee called Daniyal Inamullah to the stand.

12             MR. BILLION:  Your Honor, Mark Billion.

13             THE COURT:  Mr. Inamullah.

14             MR. BILLION:  Before we begin, I represent Mr.

15   Inamullah.  I have not yet been let in.  I'm on the phone

16   with your chambers, who's trying to help me.  But I'd ask I

17   be let in before his testimony begins.

18             THE COURT:  Are you using your proper name on the

19   wait -- on your Zoom, Mr. Billion?

20             MR. BILLION:  I believe so.  I clicked the meeting

21   to go ahead, and I'm registered through Zoom under Mark

22   Billion, so it should be.

23             THE COURT:  All I see is a "Mark."  Is that you?

24             MR. MCMAHON:  I -- okay.  That is me, in fact.  I'm

25   not sure what the problem is.  If you let him, I will update

1    it.  I know how to do it once I'm in.

2              THE COURT:  All right.  I will update -- oh, well,

3    no.  Let's see.  Now that just changed.  Hold on.  Nope, now

4    I don't see a Mark at all.  Did --

5              MR. BILLION:  Well, I --

6              THE COURT:  Unless somebody let you in.

7              MR. BILLION:  I am in, so thank you, Your Honor.

8              THE COURT:  Okay.

9         (Participants speak simultaneously)

10             THE COURT:  Hold on.  Hold on, hold on, hold on.

11   We've got too many people trying to talk at the same time.

12   We're on the motion to convert or to appoint a Chapter 11

13   Trustee filed by the United States Trustee.  Is that right?

14             MR. MCMAHON:  Correct.

15             THE COURT:  All right.  So, at this point, I'm

16   going to hear from Mr. McMahon.  If you want to make an

17   opening, Mr. McMahon, you can do so, or you can call your

18   first witness, and we'll go from there.

19             MR. MCMAHON:  Your Honor, we prefer to call our

20   first witness.

21             THE COURT:  All right.  So let's go to the witness.

22   And what's -- I'm sorry.  What's the witness' name again?  I

23   --

24             MR. MCMAHON:  Mr. Daniyal Inamullah.  His

25   declaration --

1         THE COURT:  Mr. Inamullah --

2         MR. MCMAHON:  -- is attached --

3         THE COURT:  Mr. Inamullah, are you on Zoom?

4         THE WITNESS:  Yes, sir.  Yes, Your Honor.

5         THE COURT:  I cannot see you.  Where are you?  All

6    right.  Can you -- Mr. Inamullah, can you -- there we go.

7    All right.  Now we have you highlighted.  All right.  Mr.

8    Inamullah, could you please raise your right hand, state your

9    full name for the record and spell your last name?

10        THE WITNESS:  Daniyal (indiscernible) Mohammed

11   Inamullah, last name is spelled I-n-a-m-u-l-l-a-h.

12        THE COURT:  Okay.

13   DANIYAL INAMULLAH, WITNESS FOR THE U.S. TRUSTEE, SWORN

14        THE COURT:  Thank you.  (Indiscernible)

15        MR. MCMAHON:  Mr. Inamullah -- thank you.

16                    DIRECT EXAMINATION

17   BY MR. MCMAHON:

18   Q    Mr. Inamullah, good morning.

19   A    Good morning.

20   Q    There are several topics discussed in your declaration,

21   but before we get there, I want to give the Court an overview

22   of the debtors' business.  But first, how long were you

23   employed with Cred?

24   A    I was employed from December 18th, 2019 to November 6th

25   of 2020.

1   Q    And what positions did you hold during that period?

2   A    Vice President of Capital Markets and Head of Capital

3   Markets.

4   Q    And were you employed by Cred, Inc., Cred Capital, or

5   other debtors?

6   A    From -- from the beginning to approximately April of

7   2020, I was employed by Cred, LLC, which is now Cred, Inc.

8   From April to July of 2020, I was employed by Cred Capital.

9   And then, after July, I was employed once again by Cred, Inc.

10  Q    Okay.  What does the term "investment committee" mean to

11  you?

12  A    Excuse me.  The investment committee was a group of

13  individuals at Cred whose role it was to essentially oversee

14  the yield generating and investment activities of the firm.

15  Q    And when you started working with the debtors, who was

16  on the investment committee?

17  A    Initially -- excuse me-- there were five, six

18  individuals.  So it would have been Jim Alexander, Dan

19  Schatt, Joe Podulka, Heidi Nguyen, Bali Ying (phonetic), and

20  myself.

21  Q    Okay.  And could you give the Court the respective

22  titles of those persons that you just named?

23  A    Yes, of course.  Dan Schatt, CEO, Chief Executive

24  Officer.  Mr. Podulka was Chief Financial Officer.  I was VP

25  of Capital Markets.  James Alexander was Chief Capital

1   Officer.  Heidi was, I believe a senior operations person; I

2   don't remember her exact title.  Bali is -- was I think a

3   junior accountant.

4   Q    And did the composition --

5   A    (Indiscernible) I forgot.  At a point in time, Dan

6   Wheeler, who was our general counsel, was also a part of the

7   investment committee meetings.

8   Q    Okay.  Did the composition of the investment committee

9   change over the time of your employment?

10  A    Yes.

11  Q    How so?

12  A    There were -- it was very ad hoc, so there wasn't

13  necessarily specific processes and procedures that were

14  outlined in some sort of governance document.  So, you know,

15  starting off the year, I think it was mostly individuals that

16  worked closely to the investment side that were a part of the

17  team.  And then, over the year, as we added more persons in

18  the capital market team -- for example, myself and another

19  junior associate -- the previous individuals that were on

20  were sort of leg go, given they had no specific expertise in

21  the area, and other individuals were sort of added to the

22  meeting.  But it was -- it was, as I mentioned, very ad hoc,

23  and there wasn't a very specific process for additions or

24  subtractions for that committee.

25  Q    This investment committee was not a board committee,

1   correct?

2   A    Do you mean board of directors?

3   Q    Correct.

4   A    No, not (indiscernible)

5   Q    I see.  And --

6   A    There wasn't oversight by the board of directors.

7   Q    And the work product that the committee generated, was

8   it given to a particular person at Cred or used for a

9   particular purpose?

10  A    The work product -- specifically, for every meeting that

11  we held, there was an investment committee minutes document

12  that was updated to essentially provide information as to

13  what was discussed, proposed, and accepted during those

14  meetings.

15       At times, there were also proposals that were made

16  directly to the investment committee, and so that would be a

17  separate document that would be produced, whether it's a

18  proposal or an assessment, what not, which would be delivered

19  via email, typically.

20  Q    I want to change the topic to a discussion of Cred's

21  products.  What is CredEarn?

22  A    CredEarn was a program where customers would pledge,

23  essentially, their assets to Cred in exchange for notes,

24  which paid a stated interest rate.  And it functioned very

25  much so like a certificate of deposit at a bank, where there

1   was a date of maturity -- excuse me -- date of maturity and

2   stated interest rate.  I'm just going to get my glass of

3   water.  Sorry.

4   Q    All right.  So, when Cred received customer funds vis

5   CredEarn, what did it do with them?

6   A    So there was a -- essentially, there was two routes

7   where the funds would be sent.  There was either the lending

8   route, so there were a few lending arrangements such as the

9   CredBorrow program; moKredit, which was, you know, an

10  external consumer loan portfolio.  And then the second venue

11  would be in asset management.  So there was, you know, a

12  couple -- a couple of asset managers that we would -- who we

13  would allocate the funds to.

14  Q    Okay.  So the customers, when they came to Cred, would

15  they -- I guess they would place either fiat currency, U.S.

16  Dollars, or cryptocurrency with Cred.  Is that correct?

17  A    That -- that's correct.  Typically, from -- typically,

18  it wasn't fiat.  It would be a digital asset that represented

19  the instrument.  But for all intents and purposes, that's

20  correct.

21  Q    All right.  And just so the record is clear, when we use

22  the term "fiat currency," what does it mean to you?

23  A    It means dollars, you know, dollars that are starting or

24  emanating from a bank account, which would be transferred via

25  ACH, wire, or check, you know, to our institution.

1   Q    And at the end of the investment term, what were Cred's

2   obligations to the customer?

3   A    To return the same number of units plus the interest

4   payment, if there was one, of the bullet interest payment, if

5   it was due, at maturity.

6   Q    So when you say "units," sir, you're meaning units of

7   cryptocurrency.

8   A    Yes.  I guess you could sort of relate that

9   (indiscernible) because it was with the same units of dollars

10  that would be returned, or the same number of units of

11  crypto; for example, Bitcoin, which may or may not have a --

12  the same dollar equivalent value that it had at origination

13  of that contract.

14  Q    All right.  Now CredBorrow, what is that product?

15  A    CredBorrow was a collateralized loan product, where Cred

16  would take on collateral in the form of cryptocurrency.

17  Primarily, it was Bitcoin, Ethereum, or XRP.  And we would

18  lend against that on an over-collateralized basis.

19  Q    All right.  So I just want to parse that out.  So the --

20  would customer deposit cryptocurrency with Cred?

21  A    Yes.

22  Q    All right.  And in exchange, would the customer get a

23  line of credit tied to the cryptocurrency deposited?

24  A    Yes.

25  Q    And then --

1   A    (Indiscernible)

2   Q    And then what Cred would do is invest the

3   cryptocurrency.  Is that accurate?

4   A    That's correct.  We would -- we would utilize the

5   collateral for investment purposes.

6   Q    And at the end of the loan term or obligation, would pay

7   back the customer its units.

8   A    Yes, we would return the collateral to the customer

9   after we received the loan repayment.

10  Q    Okay.  What percentage of Cred's business did the

11  CredEarn product account for while you were employed there?

12  And if the change -- if the answer varies over time, you can

13  just give a range of percentage.

14  A    Would you -- would you mean that question in relation to

15  CredBorrow, given those were the two primary (indiscernible)

16  Q    Why don't we give -- get the percentages as a percentage

17  of the overall business and then as opposed to each other?

18  A    Sure.  I mean, those were the -- the two products that -

19  - that we had and generated, essentially, you know, 100

20  percent of the revenue of the firm.  So CredEarn, my guess

21  would anywhere between 80 to 90 percent, so a substantial

22  piece of the revenue.  And then CredBorrow would be the

23  remaining amount.

24  Q    Okay.  And both of those products were in place in 2020.

25  Do you know when they originated, in terms of the time?

1  A    I -- I would assume at inception of the firm.  That was

2  -- the first product that we had launched -- I believe that

3  was back in 2018 -- was CredBorrow, and then there was a

4  pivot made to CredEarn.  I'm not sure exactly the timing for

5  that, you know, given it was back in 2018.

6  Q    Now you indicated that, in certain instances, Cred took

7  the cryptocurrency and liquidated it into a fiat currency,

8  correct?

9  A    Correct, or -- or fiat equivalent.

10  Q    All right.  And so -- but the outstanding obligation to

11  return cryptocurrency to the customer remained, correct?

12  A    Yes.  I mean, we had a -- essentially a security

13  interest in the underlying collateral.  We -- we never owned

14  that -- that specific collateral.

15  Q    In light of the way its business was arranged, did the

16  debtors need to protect themselves against the rising price

17  of cryptocurrency?

18  A    For a specific strategy, yes, that would be the case,

19  where we had a unique risk for a rise in cryptocurrency

20  prices.  For example, if we ever translated cryptocurrency

21  price exposure into dollar price exposure, then we were

22  essentially short the crypto that was brought onto our

23  platform, which was (indiscernible) some sort of hedging

24  process to reduce our -- our exposure on what side.

25  Q    So what did the debtors do, in terms of a range of

1   options, to protect themselves?

2   A    For the upside, primarily their -- the company utilized

3   leverage derivatives.  So there's either futures contracts,

4   very much similar to those that exist for commodity markets,

5   like in oil and gas.  And then there was also a product

6   labeled a "perpetual agreement" or a "perpetual contract,"

7   which is essentially a futures contract without a maturity

8   date.  So those were the primary two methods to hedge the

9   upside risk.

10  Q    And were those contracts purchased or placed on

11  exchanges?

12  A    Yes.  Back -- originally, there -- yes, they would be

13  placed on derivatives exchanges.  That's correct.

14  Q    Who was responsible for managing hedging at Cred?

15  A    So, back in 2019, when the hedging process, I believe,

16  started, there was a consultant that was brought on that

17  would execute trades and recommend trades, as well.  And --

18  and that company's name was JST Capital.  And Cred,

19  essentially, had given them a mandate to manage and consult

20  on -- on the hedges, given the strategy that we had selected.

21  Q    All right.  Was that strategy reviewed and approved by

22  Mr. Dan Schatt and -- the Chief Executive Officer and Mr.

23  Podulka, the Chief Financial Officer?

24  A    I don't know for certain.  That contract was executed

25  prior to my start.  But I would assume that they all would

1   have approved or at least discussed it in the investment

2   committee.  But I'm not a hundred percent on that, who had

3   actually reviewed those.

4   Q    With respect to the time that you were there, certainly

5   Mr. Schatt and Mr. Podulka were receiving reports regrading

6   the hedging situation, had the ability to step in and direct

7   that to the extent they needed to.

8   A    That's correct.  We received a daily report on the value

9   of the hedges directly from JST, so there was, you know, a

10  mark-to-mark that we received every single day that contained

11  all of the position values.

12  Q    Now your -- in your declaration, you reference a fairly

13  steep drop in the price of Bitcoin in mid March of 2020.  In

14  the wake of that, what were the debtors' liquidity

15  challenges?

16  A    So, in -- on March 12th, there was, I would say a

17  precipitous drop in -- well, not only cryptocurrency prices,

18  but -- but prices across the board, in general markets, due

19  to the COVID situation just starting out.  And the

20  positioning (indiscernible) was that were (indiscernible)

21  long, you know, roughly 5,000 Bitcoin with approximately, I

22  believe, 800 Bitcoin on margin for -- for that specific

23  strategy.  And that strategy was purely for, not necessarily

24  alpha generation, but to hedge assets that we had sent to

25  moKredit in the form of dollars.

1    And so, if you look at the strategy and back up a little

2    bit, just to kind of outline how it would be structured, if

3    we had received $100 in Bitcoin, we initially would sell

4    approximately $80, and translate that into dollars or dollar

5    equivalents net to moKredit for yield generation.  The

6    remaining amount would be then to margin, to hedge the rest

7    of the exposure of the $80 on the upside.  And so, in order

8    to do so, we would require leverage anywhere between four to

9    seven times, based on where the markets were.  And what ended

10   up happening was that, you know, leverage at such ratios also

11   increases your risk on the downside because, although your

12   gains are magnified, you also magnify your losses on the way

13   down.

14       And so, since crypto fell so suddenly, we had actually

15   placed stock orders along the way to sell out (indiscernible)

16   I think Bitcoin fell from around seventy-five to 8,000 to

17   5,000 in a matter of hours.  And as we sold the assets on the

18   way down, we had actually benefitted in the short term

19   because we were, essentially, short crypto at the time

20   because we were at long dollar exposures.

21       The issue happened where, once we were short and we had

22   executed that strategy, the only source of liquidity to close

23   out those positions and reestablish our hedges on the upside

24   was moKredit because all the other asset managers were

25   presumably under a lockup period for -- for the next, you

know, couple of months.  And we sent a request to gain access

to some of the principal that we had sent.  I think that

amount was $10 million on that original request.  That amount

would have gone into reestablish -- reestablishing our

hedging program on the upside.  But moKredit was unable to

provide that principal back to Cred to reestablish those

hedges.

     And so the issue became that we were essentially naked,

short all those assets that essentially were -- were

liquidated.  So we were -- were never able to reestablish

those hedges.

Q    So, in terms of -- just to give the Court a size of what

that looked like in the second half of March.  If we were to

attach a U.S. Dollar figure to that, how big was the hole

you're talking about?

A    So it's -- it's a hole that was developed over time.

And so, if you think about -- if you think about just

strictly numbers, in terms of the assets that we had,

quote/unquote, "lost" on margin, you know, it was 800 Bitcoin

that was on margin.  And so, if you multiply that by prices

at the time, which was let's call it 5,000 on that specific

day for Bitcoin, then that was approximately, you know, 4

million or so.

     And -- but that amount was used to hedge the price

exposure of roughly 5,000 to 5,500, I believe, Bitcoin.  And

1    so, while we were flat from a balance sheet perspective at

2    the end of the month, we -- we were still short, on the

3    upside, for thousands of dollars -- or thousands of Bitcoin.

4    But on a balance sheet perspective, it didn't really -- it

5    didn't really get reflected in the P&L until much later in

6    the year, like the summer, when crypto started

7    (indiscernible)

8              MR. MCMAHON:  Okay.  I'm going to ask Mr. Schanne

9    or the person with the control of screen share to put Exhibit

10   U.S. Trustee 3 up.

11        (Pause in proceedings)

12             MR. PROUTY:  Your Honor, just in order to screen-

13   share, the deputy let us know that we just have to request

14   screen-sharing permission in order to do so.  Right now, it

15   says I'm disabled from it.

16             THE COURT:  And who is seeking it?

17             MR. PROUTY:  That would be Austin Prouty of Paul

18   Hastings.

19             THE COURT:  Mr. Spencer should be in the process of

20   giving you co-host rights so that you'll be able to do that.

21             MR. PROUTY:  Thank you, Your Honor.

22        (Pause in proceedings)

23             MR. PROUTY:  Is that visible, Exhibit 3?

24             THE WITNESS:  Yes, I --

25             THE COURT:  Let's see if you can make it bigger.

1          MR. MCMAHON:  Can the witness see the document?

2          THE WITNESS:  Yes, sir.

3    BY MR. MCMAHON:

4    Q    All right.  Sir, can you tell me what that document is?

5    A    This was a draft document, I believe it was an initial

6    version that was sent to -- to the investment committee for

7    review.  This is one of -- I believe there was a second

8    version that was circulated later on by our general counsel.

9    But this document essentially outlines an overview of what

10   happened during the -- what we call the "March flash crash,"

11   which was the -- the drop in prices.  And then we stated

12   certain recommendations to try to strengthen the balance

13   sheet over the next few months.

14         MR. MCMAHON:  Okay.  Can we go down to the bottom

15   of the first page of that document?

16         (Pause in proceedings)

17   BY MR. MCMAHON:

18   Q    Do you see the reference to "JST"?

19   A    Yes, sir.

20   Q    Is that the same, I guess, entity that you were just

21   discussing with respect the margin call that you referenced

22   in your prior testimony?

23   A    Yes, that's correct.  Well, the margin call -- so there

24   was two different elements to this.  One is that they were

25   helping structure some of the futures contracts, which I just

1    discussed before.  And then, second, there were also swap

2    agreements that were in place with JST.  So there was two

3    separate, sort of threads that -- of the relationship that we

4    had with them.

5              MR. MCMAHON:  I'm going to ask that Exhibit U.S.

6    Trustee 3 be taken down and U.S. Trustee 2 be posted.

7         (Pause in proceedings)

8    BY MR. MCMAHON:

9    Q    Mr. Inamullah, can you see the exhibit?

10   A    Yes, sir.

11   Q    Okay.  Can you tell me what Exhibit U.S. Trustee 2 is?

12   A    This document, the top part is essentially our -- a

13   statement of our liabilities versus our assets on that

14   particular day of March 17th.  And the bottom case -- at the

15   -- labeled the P&L breakdown, is the list report that we

16   received from JST on a daily basis.

17   Q    And let's start with the left-hand column.

18        But first, before I get there, the addressees on the

19   email, can you read them off please?

20   A    D.inamullah@mycred.io, which was myself; Dan Schatt,

21   dan@mycred.io; Joe Podulka, joe@mycred.io; James Alexander,

22   james.alexander@mycred.io; and Sally Jeng (phonetic),

23   sally@mycred.io.

24   Q    And those four individuals were all individuals that you

25   referenced in your prior testimony as being members of the

1    investment committee, correct?

2    A    Yes, sir.

3    Q    Is this an investment committee email?

4    A    It was sent to members of the investment committee.

5    There wasn't necessarily -- I don't know how I would have

6    differentiated an email to the IC or investment committee.

7    Typically, going forward on certain cases, I guess I would

8    add that in the subject line, like "investment committee

9    memo" or something to that effect.  But yes, these are all --

10   this is an email to members of the investment committee.

11   Q    Understood.

12        Let's talk about the lefthand column.  If I could just

13   walk through what each of those are.  Principal additions, is

14   that the amounts that are received from customers?

15   A    That is correct, yes.

16   Q    All right.  The JST loan, can you describe what that is?

17   A    There was -- I apologize.  I'm sorry because there was -

18   - there was one of two things, and I forgot if we had broken

19   it out.  But -- so there was -- there was two relationships

20   that we had with JST, and the timing is something that I just

21   don't remember exactly.

22        But one of them was they had loaned out assets to

23   purchase bonds for the moKredit securitization back in

24   January.  And there was a second loan, which was essentially

25   the swap contracts that I had just discussed before, where we

1   would send the cryptocurrency assets, and they would send us

2   cash.  And then we would send -- so, essentially, it was a --

3   it was a loan, where we would send them assets and then

4   borrow on an over-collateralized basis.

5        So I -- I forgot which one exactly this one is.  I think

6   these -- these are related to the swaps.  And the other piece

7   of the loan that JST made for the moKredit securitization

8   would have been made in -- in the luxe line item.

9   Q    All right.  The allocation email -- excuse -- strike

10  that.

11       The allocation column -- excuse me.  Could you walk

12  through --

13  A    Uh-huh.

14  Q    -- what each of those items are?

15  A    Yes.  So the allocations, in a nutshell, were just -- is

16  where we had (indiscernible) once we had received them from

17  customers.  The loan to moKredit were dollar loans that had

18  been sent to moKredit for the purpose of consumer loan

19  financing.  Elevar Finance was another lender -- or is

20  another lender on the debtors' platform, and they primarily

21  invest in also consumer loans, as well as (indiscernible)

22  receivables.  Drawbridge Lending is the company's full name;

23  Drawbridge should be one word there.  That company is an

24  asset manager based out of Chicago that ran a covered call

25  strategy.  Cryptolab Capital was another asset manager that

1   ran a medium frequency-based strategy, a derivative strategy

2   against Bitcoin, primarily.  Quanta Capital (indiscernible) 0

3   Fund was our allocation to Quanta Capital, which we had

4   assumed was an asset manager that also used a similar

5   strategy to Cryptolab these are the assets that we had spent

6   for the purposes of hedging, primary, and that's the inside

7   exposure on primarily which was moKredit and Elovan Finance

8   loans.  And then Fireblocks is a custodian, where we have

9   other discretionary assets.

10  Q    The columns amount and market value, what do they

11  denote?

12  A    So, for the top piece on the deposit section, the

13  principal additions, for example, of the notes, the dollar

14  equivalent value at inception of the contract, whereas the

15  market value would be the dollar equivalent value on, I

16  assume, the day that these reports were produce.  And then --

17  so that will apply to the JST loan, as well as Luxe.  And the

18  loan to moKredit, everything else on here -- everything else

19  on here is presumably the same.  So it would be assets that

20  we had essentially allocated to the different position, and

21  so we would mark the amounts based on the program start dates

22  and the market value, based on the (indiscernible)

23  essentially.

24  Q    And the market value column, was that your calculation

25  or did you get that number from somewhere?

1    A     That was an internal calculation, yes.

2    Q     Did you do it?

3    A     I -- I probably did.  I mean, it would be a process, it

4    would go to (indiscernible) market cap, or just, you know, a

5    very open venue, where -- where they had prices for Bitcoin,

6    Ethereum, and all the other assets, and just -- copy, paste -

7    - copy and paste the market value data from there.  So I

8    presumably did, I did it quite often.  I'm just not sure, in

9    this particular case, if I did it or not.

10   Q     That would explain some things on the grid.  I'm

11   interested in the moKredit line, where it goes from 40 to 30.

12   And I guess my question is:  That suggests to me that some

13   type of discount or impairment is being applied.  Can you

14   tell me anything about that?

15   A     It doesn't reflect a discount to the value of the

16   principal or the loan that we had made.  This would be

17   reflecting the market value that we allocated to moKredit.

18   So, for example, let's -- well, in that same example of the

19   $100 of Bitcoin, let's say I sent that $80 to moKredit, and

20   the $80 of Bitcoin would essentially be allocated to this

21   moKredit loan.  So, in this case where crypto prices had

22   fell, the dollar value of the original contribution would be

23   lower than the amount that we actually sent them, which would

24   make sense, given that we were short, essentially, those

25   dollars that we had sent to moKredit.

1    Q    Okay.  Now you're familiar with moKredit, correct?

2    A    Yes.

3    Q    What is moKredit?

4    A    moKredit was a consumer loan company based out of, I

5    believe Hong Kong and China.  And they're essentially, you

6    know, short-term, high-interest loans for, from my

7    understanding, gamers and other consumer loan products.

8    Q    Who owned moKredit or who owns it?

9    A    From my understanding Lu Hua owned it.  I don't know the

10   exact capital structure for that entity, though.

11   Q    And is this the same Mr. Hua who is a 50 percent equity

12   holder of the debtor?

13   A    Yes, sir.

14   Q    With the other half of the debtor being owned by Mr.

15   Schatt, correct?

16   A    Yes, sir.

17   Q    After you arrived at Cred and got familiar with its

18   investment portfolio, do you have concerns with the

19   portfolio's diversification?

20   A    Yes.  One of the reasons I was originally brought on

21   board was to help diversify the asset managers on the

22   platform.  And so back in, I believe, towards the end of

23   2019, Cred had adopted something called an "all weather

24   approach," which is where (indiscernible) we have four to

25   four diversified type of allocations where we would send our

1    assets.  And the goal was, essentially, to -- over the course

2    of 2020, to hit those benchmarks the best we could.  And what

3    I mean by "benchmarks" is just the percentage allocation

4    within each one of those buckets.

5    Q    And do I understand, say, you know, diversification of

6    the portfolio, was diversification away from moKredit one of

7    the key objectives?

8    A    Yes, sir.

9         MR. MCMAHON:  I'm going to ask that screen share

10   post U.S. Trustee Exhibit 1.

11        (Pause in proceedings)

12   BY MR. MCMAHON:

13   Q    Mr. Inamullah, do you recognize what that document is?

14   A    Yes.

15   Q    Okay.  What is the Luxembourg entity referenced on

16   Exhibit U.S. Trustee 1?

17   A    The Luxembourg entity is a vehicle, it was based out of

18   Luxembourg, that I believe Cred or some of Cred's executive

19   team had essentially acquired out of bankruptcy.  And the

20   intent was to leverage something called a Dutch

21   (indiscernible) foundation structure, in order to issue a

22   bond.  And so this particular document relates to an offering

23   of -- it's essentially issued notes related to moKredit.

24   Q    Did the debtors put this document together?

25   A    Yes.  As you can see at the bottom, it says the arranger

Inamullah - Direct

1    was Cred, LLC, but you know, we had (indiscernible)

2    documents.

3    Q    Okay.  So, if I understand correctly, Cred is trying to

4    limit its exposure to the moKredit receivable, so it's

5    effectively selling participation pieces in the loan.  Would

6    that be a fair characterization?

7    A    Correct.  It was a -- it was the process of risk

8    transfer from Cred's balance sheet to an investor.  That's

9    correct.

10   Q    Okay.  Could we take a look at Page 8 of the PDF,

11   numbered Page 4?

12        (Pause in proceedings)

13   Q    I'm going to give you a moment, sir.  I just want you to

14   review the paragraph titled "Generally."

15   A    Okay.

16   Q    You can let me know when you're done.

17   A    Yes, sir, I've reviewed it.

18   Q    Okay.  So is this the paragraph where Cred disclosed the

19   structure and status of the moKredit obligation to the

20   prospective buyers of the participation pieces?

21   A    Yes.  I believe there was also some charts

22   (indiscernible) in this document, which outlined the global

23   structure or how everything was sort of put together.  But

24   this is (indiscernible) a pretty specific overview of the --

25   of the project, essentially.

1    Q    All right.  So focusing attention on the sentence

2    beginning, "The loan and security agreement grants a security

3    interest."  Can you read that?

4    A        "The loan and security agreement grants a security

5    interest to the lender in the assets of the borrower, which

6    would include the shares of HK Company and also grants a

7    security interest to the lender in the assets of HK Company,

8    which would include the equity interests of the WL entity,

9    although the security interests and such equity interests

10   have not been registered at state administration of market

11   regulation; thus, not perfected, nor is it approved by the

12   Chinese State Administration or Foreign Exchange to ensure

13   enforceability of receiving value of the sale of those equity

14   interests upon borrower default."

15       Do you want me to keep reading?

16   Q    If you would, the next sentence further.

17   A        "Further, as the moKredit receives are not pledged,

18   so Cred cannot, upon default, recover from the moKredit

19   receivables."

20   Q    All right.  You can stop there, sir.

21       Is that consistent with your understanding of the

22   moKredit obligations and how they worked at Cred?

23   A    Well, when you say "how they worked at Cred," can you --

24   Q    I should be --

25   A    -- (indiscernible)

1    Q    -- more -- strike that.

2         This is -- this is the debtors' statement to its

3    potential borrowers as to how the moKredit receivable works,

4    from the debtors' perspective, and whether or not it's

5    secured, correct?

6    A    That is correct.  This is the disclosure for that

7    purpose.

8    Q    Okay.  This document is dated January of 2020.  And the

9    date of the moKredit loan that's referenced there is what?

10   A    The -- do you mean --

11   Q    In about four --

12   A    Do you mean the date of --

13   Q    -- of the moKredit obligations, whenever they were

14   entered into, was about four or five lines down.

15   A    December 27th, 2018.

16   Q    And was the Luxembourg program successful, in terms of

17   it accomplishing what Cred wanted to do?  Were there problems

18   with it?

19   A    It was not successful.  We had tried to market, roughly

20   -- I believe we had 40 million or so in exposure, and I think

21   we were only able to raise about 14 million (indiscernible)

22   in the securitizations.  And the, ultimately, you know, there

23   were issues also as the maturity of the contract where we're

24   not able to receive any principal back from moKredit, which

25   created liquidity issues, as well.

1           MR. MCMAHON:  I'm going to ask that the screen

2    sharer place Exhibit U.S. Trustee 3 on the screen.

3           (Pause in proceedings)

4           MR. MCMAHON:  I'm going to ask that that be taken

5    down.  Excuse me.

6           (Pause in proceedings)

7           MR. MCMAHON:  If we can turn to Exhibit U.S.

8    Trustee 5, please.

9           (Pause in proceedings)

10   BY MR. MCMAHON:

11   Q    Mr. Inamullah, can you see this document?

12   A    Yes, sir.

13   Q    Do you have an understanding as to who put this

14   together?

15   A    Our accounting team primarily had put this together.  So

16   this was part of a broader document called the "Cred Ledger,"

17   where all of our -- essentially, where we tracked all the

18   programs on Cred, whether it was CredEarn or CredBorrow, down

19   to the investments that -- that we had made, as well.  And so

20   all of those -- that information, this was essentially the

21   summary page.

22   Q    And for what purpose was this document used?

23   A    To help us gain an understanding for the liquidity for

24   our balance sheet, as well as project our monthly net income.

25   Q    I want to understand the color-coding for a moment.  The

1    numbers in -- it's either green or hunter green.  Can you

2    tell me what they mean?

3    A    So the green labels would have been linked to other tabs

4    in this document.  The blue numbers would have been input by

5    hand, so those are essentially what we call, you know,

6    "value-pasted" into each cell.  And then the black numbers

7    are links to numbers on the same page, on the same tab, or --

8    or calculations.  And then I believe the red numbers are just

9    another (indiscernible) are just if the numbers are negative,

10   then they flip to red in those specific cells.

11       (Pause in proceedings)

12   Q    With respect to the columns entitled "Percentage PV" and

13   Percentage MV," what does that mean?

14   A    Percentage PV is the percentage of the program value,

15   which denotes the value of the program from inception with

16   each contract.  The percentage MV would be the percentage of

17   the market value, based on today's prices.

18   Q    Okay.  Now a second ago, sir, we were just looking at a

19   marked document that had that moKredit number down around 30,

20   correct?

21   A    Yes, sir.  That's correct

22   Q    All right.  So, on this one, it's back up to 39,000.  Do

23   you have an understanding as to the reasons why that -- those

24   numbers would vary?

25   A    Yes.  That was sort of an accounting recommendation on

Inamullah - Direct

1    how we should track these assets moving forward.  I believe,

2    in this case, the difference of about $600,000 is more

3    related to a typo in our linking here because those numbers

4    should be equivalent on moKredit.

5        But essentially the way that we would have managed it

6    going forward was, unless we specifically denote an

7    illiquidity discount to any of the assets, we would mark

8    dollar loans at the dollar equivalent principal value that we

9    sent.  And the -- really, the purpose of that was to help

10   isolate assets from liabilities, so we could track and manage

11   those differences given, you know, crypto prices are quote

12   volatile.

13       So we -- we wanted to make sure that, you know -- you

14   know, because the way that we looked at everything was in a

15   like global portfolio basis, and we were managing assets

16   versus liabilities.  And so we wanted to segregate,

17   essentially, dollar values from crypto values and -- over

18   time.

19       So, ideally, what would have happened in this case is

20   that the loan to moKredit would stay at 40 million or 39

21   million (indiscernible) and the fluctuations to manage the

22   upside risk would -- would have been in some other program,

23   like hedges or something else.

24   Q    And if we -- do you know what time this report was

25   prepared?

1    A    What do you mean, like each day or something else?

2    Q    Just a --

3    A    (Indiscernible)

4    Q    A point in time at which this reflects Cred's status.

5    A    This would have been, eventually, a dynamic document.

6    So the price of cryptocurrencies would have been updated

7    dynamically on a -- you know, on a second-by-second or

8    realtime basis, given there's a price feed.  And then we

9    would make changes to principal values and so on and so forth

10   whenever there was adjustments like (indiscernible)

11   redemptions, for example.

12   Q    All right.  But my question is:  The document reflects a

13   snapshot as of a particular point in time.  Do you know what

14   point in time it is?

15   A    This particular document or -- or --

16   Q    That particular document.

17   A    Oh, I think the title shows July 1st, so I would assume

18   it would be July 1st or a few days before, when the prices

19   would have been updated in this particular case.

20   Q    Is that consistent with your understanding of Cred's

21   situation at the time?

22   A    This one seems to be about correct.  However, I believe

23   the blue numbers for the bank accounts sometimes were not

24   updated on a daily basis, so there may have been a lag in

25   that data.  But I assume they would be roughly the same.

1     Another thing -- and I don't remember the exact date

2     that we changed this around.  But a lot of our liabilities

3     were being marked at the inception value of the program, so

4     that would have been the market value.  So that top number --

5     well, in this -- in this case, it looks to be uploaded.  But

6     with the market value, the 78.8 million -- which is

7     essentially all of the additions to the (indiscernible)

8     program, would have been updated so (indiscernible) correct.

9          MR. MCMAHON:  Okay.  And could we take a look at

10    Exhibit U.S. Trustee 4?

11         UNIDENTIFIED:  Hi.  My name is Mark.  I just -- I

12    was trying to make an appointment on the website, it was kind

13    of confusing me.  Do you have a slot for two of us --

14         THE COURT:  Hello?

15         UNIDENTIFIED:  -- like early afternoon --

16         THE COURT:  Hello?

17         UNIDENTIFIED:  -- today?

18         THE COURT:  You are speaking and you are not on

19    mute, whoever you are trying to make an appointment, whoever

20    that is, mute your phone.  If I hear it again, Operator, you

21    have my permission to disconnect anybody who interrupts in

22    that fashion in the future.

23         THE OPERATOR:  Thank you, Your Honor.

24         THE COURT:  Thank you.

25    BY MR. MCMAHON:

1    Q    Exhibit U.S. Trustee 4, sir.  Can you tell me what that

2    is?

3    A    So these documents, I believe, were prepared, and this

4    would have been an adjusted market value number pertaining to

5    the value of our assets on the balance sheet.  So we would

6    have stripped out items like Luxembourg or items where we

7    thought they didn't have much value.  Like later ones, for

8    example, we stripped out the value of the (indiscernible)

9    which were on the balance sheet.

10        But this is, essentially, a document that I put together

11   that calculates the value of the outstanding assets.  And it

12   would have been calculated from that sheet that you had

13   showed me before.  I don't remember the exact adjustments

14   that I made to arrive at this particular number, but I would

15   stripped out (indiscernible) recover or (indiscernible)

16   recover those assets and meet (indiscernible) redemption

17   requests.

18   Q    So the "Investment Assets and Cash" line, does that

19   represent market value or face value or something different?

20   A    Market value.

21   Q    Okay.

22   A    Market value.

23   Q    And the Cred liability is what, sir?

24   A    So this number is -- I believe it's the CredEarn

25   programs, plus the collateral that we owe from CredBorrow,

1    which I saw as essentially a liability, given that we would

2    eventually owe that money back to our borrowers on the

3    CredBorrow program.

4    Q    All right.  And what is that -- the net number that's

5    there?

6    A    Negative $36 million.

7    Q    All right.  And the asterisk, "Liabilities are stated

8    without the Luxembourg liability," what would that number

9    have been?

10   A    That number relates to how -- I think -- I believe it

11   was roughly $14 million that was also included as an asset on

12   -- on the previous page that you had showed.

13   Q    Okay.  And --

14   A    Sorry.  On the liabilities (indiscernible) showed.

15   Apologies.

16   Q    With respect to the timing of this one, is -- does it

17   accompany exhibit -- the other exhibit that we just were

18   looking at, U.S. Trustee 5?

19   A    I'm sorry.  Maybe I missed the question.

20   Q    Sure.  At what point in time are we talking about with

21   respect to this snapshot?

22   A    It probably would have been the same day that that other

23   document was produced.  I mean, the other document was a live

24   feed in a -- in a Google Sheets document, and then this one

25   would have been calculated based on that information coming

1    off the page.

2         And now, if I remember correctly, there was a line item

3    -- sorry, I just remembered this.  There were some line

4    items, for example, net short liability or JST liability,

5    that were also represented.  You know, so some of those would

6    have been adjusted out of the assets line, which is where you

7    get the discrepancy between assets and liabilities.

8    Q    Okay.  In the wake of the flash crash, did the debtors

9    ask moKredit for money?

10   A    I believe we asked for $10 million on March 14th --

11   Q    Okay.

12   A    -- for principal.

13   Q    And is it your understanding that the debtors had the

14   right to seek redemption of principal under the moKredit loan

15   documents?

16   A    If they were in default or just in general, could we --

17   could we --

18   Q    Yeah, in --

19   A    -- ask for --

20   Q    In general.  In other words, the debtors asked for the

21   10 million.  Your understanding is that they had a right to

22   the -- to call the 10 million.

23   A    That is correct, yes.

24   Q    And what was moKredit's response to that?

25   A    That one -- so the response was given to us in

1    investment committee meetings, I believe, where essentially

2    they indicated that the Chinese regulators were unable to

3    make principal repayments because the (indiscernible) had

4    extended the time line for when borrowers could repay

5    principal back.  So they were essentially not able to acquire

6    the liquidity to meet that redemption request.

7              MR. MCMAHON:  All right.  Could we go back to

8    Exhibit U.S. Trustee dash 3?

9         (Pause in proceedings)

10             MR. MCMAHON:  And turn to the third page, please.

11   BY MR. MCMAHON:

12   Q    Sir, I'm going to call your attention to the principal

13   from moKredit bullet, the third bullet down from the middle.

14   A    Yes, sir.

15   Q    Do you see that?

16   A    Uh-huh.

17   Q    Do the numbers there accurately reflect what the

18   moKredit repayment plan, to your understanding, was?

19   A    Yes.

20   Q    All right.  We'll get beyond the suspense.  Did moKredit

21   repay those amounts as scheduled?

22   A    No.

23   Q    Oh, did they make any payments?

24   A    Yes.  I believe they made the April and May payments,

25   the principal, and I don't remember the exact amounts, but I

1   believe it was a few hundred thousand in June, July, and

2   August, as well.

3   Q    And to be clear, though, that's exclusive of moKredit's

4   regular interest obligation under the loan documents, is what

5   you're talking about.  It would have been a part of this

6   repayment plan, correct?

7   A    Correct.  It would have been in addition to the interest

8   that they owed.

9            MR. MCMAHON:  Now go down to the recommendations

10  paragraph or section at the end of that document.

11  BY MR. MCMAHON:

12  Q    I'm going to ask that you read through it, beginning

13  with the first bullet -- strike that -- the last bullet,

14  which is the second one down on Page 4.

15  A    Yes, sir.  I read through it.

16  Q    All right.  So have you reviewed that and the rest of

17  the document?

18  A    The -- the last bullet?  Yes.

19  Q    Okay.  My question is this:  The paragraph that says

20  "it's important to note the key risk."

21  A    Okay.

22  Q    All right.  This is your recommendation, correct?

23  A    This -- are you talking about the strategy

24  recommendation or the key risk?

25  A    The -- the strategy recommendation and it's important to

1    note paragraph.

2    A     Okay.  So the -- the key risk comment is based on the

3    state of affairs at (indiscernible) at the time.  It doesn't

4    necessarily relate to the specific recommended strategy.  You

5    know, even if the strategy was not recommended, that would --

6    you know, the primary risk at the time for Cred is a sharp

7    increase in cryptocurrency prices.  So that would not have

8    changed either way, with or without this recommendation.

9         The specific recommendation, the ultimate premise was

10   how do we shift as much assets as possible coming from

11   moKredit, as well as assets that are being brought on from

12   customers, to reconstitute our hedging.  And then the second

13   piece of it was we need to make a strict recommendation to

14   reduce leverage to a maximum of 3.3 times to, you know,

15   essentially shield the company from further declines in

16   cryptocurrency prices.

17   Q     At any point in -- around this time frame or thereafter,

18   did you advise Cred's senior management that the debtors

19   should be seeking more money from moKredit in order to help

20   its liquidity situation?

21   A     Yes.  I mean, my position was we should have recalled

22   the entire amount, and I believe that was the position -- I

23   believe it was the position that everyone on the investment

24   committee would have liked, to have all the assets back at

25   the time, at least -- I can only speak for myself.  But that

1   was specifically in this recommendation.  I believe it's also

2   later on.  It's, you know, whatever means we can get, let's

3   try to get as much capital back from moKredit, to the best of

4   our ability.

5   Q    And was, I guess, Mr. Schatt receptive to, you know,

6   taking a strong position versus moKredit?

7   A    I don't -- I don't know how to determine whether or not,

8   quote -- I define, quote/unquote, "strong."  But --

9   Q    Okay.

10  A    -- his --

11  Q    I'll be --

12  A    -- position was --

13  Q    -- more specific.  I'll be more specific to help you.

14  A    (Indiscernible)

15  Q    Did someone, at any point, recommend that the debtors

16  take legal action against moKredit?

17  A    Yeah, that was recommended from inception, essentially,

18  that we should at least entertain the idea of executing on

19  our lender rights to get as many assets as we can as soon as

20  possible.  I think there was sort of a -- you know, an

21  uncomfortable situation, especially on the part of Dan, just

22  because of the relationship with Lu and him being a 50

23  percent owner and sort of a longer-term friend, as well,

24  that, you know, he didn't want to essentially bully them too

25  much.

1      And you know, the story that essentially we were told

2 was, as conditions improve through the summer and towards the

3 back end of 2020, their liquidity profile will also improve,

4 and that will help us, you know, obviously get the liquidity

5 back eventually from them.  And -- and this workout plan was

6 sort of step one of that.  That was being negotiated between

7 them to essentially start making a path towards getting our

8 assets back.

9  Q    Okay.  Did you advise Cred's senior management -- whom

10 I'll define as Mr. Schatt and Podulka -- that the debtors

11 needed more information from moKredit in order to evaluate

12 the entity's financial status?

13 A    Yes, sir.

14 Q    And what was their --

15 A    I asked for (indiscernible) sorry.  Uh-huh.  Sorry.  I

16 didn't mean to cut you off.

17 Q    And what was their response?

18 A    The response was we'll request it from them.  I sent

19 numerous emails trying to find that data, you know,

20 (indiscernible) eventually get it.  We had set up calls -- or

21 Dan had set up a call with the investment committee and Lu

22 Hua to discuss the financial state, which wasn't necessarily

23 a discussion of internal financials, but more of a

24 discussions of macroeconomics at play in China, pertaining to

25 the lend -- the borrowers' situation.  But there were

1    multiple requests made to obtain financial reports, but we

2    never really received anything at all.

3    Q    All right.  After the flash crash in mid March through

4    the date you left the debtors' employ, did you ever see

5    moKredit financial statements?

6    A    Not after the securitization documents that we

7    (indiscernible) beforehand --

8    Q    All right.

9    A    -- before --

10   Q    moKredit bank records, have -- did you ever see such a

11   thing?

12   A    No.

13   Q    How about a register, like a loan tape, which showed how

14   moKredit deployed the debtors' capital?

15   A    No.

16           MR. MCMAHON:  Let's turn to Exhibit U.S. Trustee 7,

17   please.

18        (Pause in proceedings)

19   BY MR. MCMAHON:

20   Q    Mr. Inamullah, do you recognize what this document is?

21   A    Yes, sir.  This is a presentation made for equity

22   fundraising that I had started the process sometime in July -

23   - I'm sorry -- sometime probably in May, I would guess, May,

24   June.  This particular document was obviously during the

25   third quarter.

1    Q    All right.  So was this essentially a marketing document

2    in connection with the subordinated notes issuance?

3    A    Do you mean the convertible notes?

4    Q    Correct.  Excuse me.

5    A    No.  Yes, that's correct.

6            MR. MCMAHON:  All right.  Could we scroll down to

7    the next-to-last page of the document?

8        (Pause in proceedings)

9    BY MR. MCMAHON:

10   Q    Now, sir, Mr. Inamullah, I've got to ask you.  We -- you

11   know, I just want you to take a look at those numbers for, I

12   guess 2020 in particular, and answer this.  You know, we've

13   seen a lot of documents today about, you know, this -- the

14   financial status of Cred at various points in time.  Do you

15   believe that this page accurately conveys to a potential

16   investor what Cred's financial condition actually is?

17   A    No, I can't confirm the expenses, given I didn't have a

18   good understanding of the operating expenses.  But from my

19   assumption, we were certainly not operating profitably --

20   profitably through the year.  I don't know how exactly things

21   were accounted for from (indiscernible) perspective, but my

22   assumption would be no.

23   Q    All right.  Do you have an understanding as to why, in

24   light of all of the documents we've been through during our

25   time today, sir, there is not a single asset impairment

1    charge listed on this page, in light of the status of Cred's

2    assets at that point in time?

3              MR. EVANS:  This is Joe Evans from McDermott, Will

4    & Emery on behalf of the committee.  Objection.  Leading.

5              THE COURT:  Overruled

6              THE WITNESS:  I'm sorry.  Do you mind repeating the

7    question one more time?

8              MR. MCMAHON:  Sure.

9    BY MR. MCMAHON:

10   Q    Do you have an understanding as to why there is not a

11   single asset impairment charge listed on this page, in light

12   of what we've been seeing this afternoon with respect to the

13   status of Cred's assets?

14   A    No, I do not.

15             MR. MCMAHON:  I'd like to turn to Exhibit U.S.

16   Trustee 8.

17        (Pause in proceedings)

18   BY MR. MCMAHON:

19   Q    Mr. Inamullah, can you tell us what Exhibit U.S. Trustee

20   8 is?

21   A    This document is an email that Dan Schatt had sent to

22   primarily our sales team, in order to encourage, you know,

23   hitting sales goals for September of 2020.

24   Q    Okay.  I want to turn your attention to the first

25   paragraph, specifically the one beginning with, "Given the

1   number of redemptions we face this month."

2   A    Yes, sir.

3   Q    All right.  The next sentence, if you'd just read that

4   aloud.

5   A         "The next 21 days are absolutely" --

6            MR. LIN:  This is Bryant -- this is Bryant Lin for

7   debtors.  Objection.  The document speaks for itself.

8            THE COURT:  It does, but he can go ahead and read

9   if it's one sentence.  Go ahead, Mr. Inamullah.

10  BY MR. MCMAHON:

11  Q    The sentence beginning "we either," Mr. Inamullah.

12  A         "We either must pull out a great deal of our high

13  performing assets that are generating profits for the company

14  to pay for redemptions, or we bring in more money than is

15  going out."

16  Q    Okay.  So you were a recipient of this email, sir,

17  correct?

18  A    Yes, that's correct.

19  Q    All right.  Did you -- when you received it, did you

20  take that sentence to mean that there was two ways to pay for

21  redemptions, we could either eat into our assets or we can

22  bring more money in from new customers?

23  A    Yes, that's correct.

24  Q    All right.  So, to be clear then, in the wake of the

25  March flash crash, as Bitcoin value continued to rise

1    throughout the summer, did Cred continue to bring in new

2    customers through CredEarn and CredBorrow?

3    A    Yes, sir.

4    Q    Okay.  Do you believe that was fair?

5    A    During which time period?

6    Q    Let's say beginning July 1st and thereafter.

7    A    It's really tough to determine.  The idea was -- and

8    certainly looking back, it was -- in hindsight, you know,

9    certainly not (indiscernible) on to the platform.  At the

10   time, we had this sort of shortfall and we (indiscernible)

11   equity investors that were being lined up, there would be

12   products that were being developed, and (indiscernible)

13            THE COURT:  Mr. Inamullah.  Mr. Inamullah, I'm

14   sorry, I'm going to have to interrupt you.

15            There's someone typing who doesn't have their phone

16   muted.  Operator, if you can identify who that is, disconnect

17   them from the call, please.

18            THE WITNESS:  So --

19            THE COURT:  Sorry, Mr. Inamullah.  Go ahead.

20            THE WITNESS:  No worries.  Thank you, Your Honor.

21            So, I mean, hindsight, absolutely, it was -- it was

22   unfair.  But looking back, the idea was, given -- given where

23   the market was and the new products we were about to launch -

24   - which I believe were real and actually being built and

25   developed -- the equity fundraising, as well as other senior

1    partnerships, at the time, you know, we were -- you know,

2    although it was a high-risk strategy, we felt fairly bullish

3    about bringing customers on.

4              Now we were recommending a way to figure out where

5    enough is enough.  And in my mind, that would have been

6    putting together a solvency opinion or a going concern

7    analysis from our -- from an external auditor.  But none of

8    those requests had actually gone through, ultimately.  I'm

9    sorry (indiscernible)

10             MR. MCMAHON:  (Indiscernible)

11   BY MR. MCMAHON:

12   Q    Sir, can you hear me?

13   A    Yes, sir.

14             THE COURT:  We can hear you, Mr. McMahon.  Go

15   ahead.

16             MR. MCMAHON:  Okay.  Thank you.

17   BY MR. MCMAHON:

18   Q    The question is:  Do you know whether, at a certain

19   point in time, Cred was taking, you know, the customer income

20   and, instead of investing it with a third party, it used it

21   to pay back other customers?

22   A    Yes.  So there were certainly instances where the --

23   outside of liquidating positions with asset managers, the

24   only way we could bring in to meet redemptions was what would

25   be new additions to our CredEarn platform.  And most notably,

1    I'd say probably the first instance where that really put

2    pressure on the balance sheet was the redemptions at the end

3    of June, at June 30th of 2020, where there was a significant

4    uptick in the amount of redemptions that we needed to meet.

5    Q    The next paragraph down, the phrase "manage the

6    redemptions" appears.  What is your understanding of what

7    that meant at Cred?

8    A    Manage, manage, manage.  I'm -- sorry.  Which paragraph

9    is that?  Oh, I see it.

10   Q    Managing the redemptions.

11   A    So the idea was we wanted to minimize redemptions from

12   asset managers.  One of the things that was occurring was, as

13   asset managers would redeem positions on short notice, it

14   would require unwinding positions, which we would have liked

15   to be on for 30 to 60 days, to be successful.  But once we

16   unwound the position, we would suffer a loss on trading in

17   and out of positions.  So the idea was that, if we could

18   minimize the redemptions from asset managers, we could

19   maximize profitability on our P&L, essentially.

20              MR. MCMAHON:  Can we turn to Exhibit U.S. Trustee

21   10?

22        (Pause in proceedings)

23   BY MR. MCMAHON:

24   Q    Can you -- have you had the chance to review the email,

25   Mr. Inamullah?

1    A    I -- yes, sir.  I mean, I wrote this email, so I'm

2    familiar with it.

3         (Pause in proceedings)

4    Q    All right.  This email was sent on October 23rd,

5    correct?

6    A    Yes, sir.

7    Q    So it's a couple of weeks before the debtors filed for

8    bankruptcy protection.

9         The -- as the summer went on, sir, the price of Bitcoin

10   was steadily rising.  Is that correct?

11   A    Yes, sir.

12   Q    So that, if we take a look at midway down the first

13   page, the asset and liability calculation is now at a sixty-

14   three-million-dollar delta.  That's not getting better with

15   time.

16   A    No, sir.

17            MR. EVANS:  Joe Evans from the committee.

18   Objection.  Leading.  Additionally, this document is in

19   evidence -- is this document in evidence or not?  Because

20   we're reading from the document, but it has not been

21   admitted.

22            THE COURT:  Well, we've been doing that all along.

23   I don't know why someone didn't raise that objection before.

24            But Mr. McMahon, are you moving into evidence the

25   exhibits you've been referring to?

Inamullah - Direct                                    57

1           MR. MCMAHON:  I will be, Your Honor.

2           THE COURT:  Okay.  Well, technically, you're

3     supposed to do it at the time after the witness identifies

4     the exhibit and then move into evidence before you ask him

5     questions about, but nobody raised that objection before, but

6     they have now.

7           So I'm going to -- unless there's an objection, you

8     have referred to Exhibits 1, 2, 3, 4, 5, 7, 8, and now 10.

9     Is there an objection to the introduction of any of those

10    exhibits into evidence?

11        (No verbal response)

12          THE COURT:  All right.  They're admitted without

13    objection.

14          MR. EVANS:  Your Honor?

15          THE COURT:  Please go ahead, Mr. McMahon.  Yes.

16          MR. EVANS:  Your Honor, Joe Evans from the

17    committee.  We understand that these are emails, but these

18    are emails written by Daniyal Inamullah.  We would ask that

19    the trustee lay the appropriate foundation for these to be

20    admitted.

21          THE COURT:  Well, he just did.  Mr. Inamullah just

22    said that this is an email that he wrote.  Your objection is

23    overruled.  The exhibits are admitted.

24        (U.S. Trustee Exhibits 1 through 5 received in evidence)

25        (U.S. Trustee Exhibits 7 and 8 received in evidence)

1    (U.S. Trustee Exhibit 10 received in evidence)

2              THE COURT:  Go ahead, Mr. McMahon.

3              MR. EVANS:  Understood, Your Honor.

4              MR. MCMAHON:  Thank you.

5    BY MR. MCMAHON:

6    Q    With respect to the second page of that, sir, if we

7    could take a look at it.

8    A    Uh-huh.

9    Q    Do you have an understanding as to what this analysis

10   shows?

11   A    This analysis shows, from our current position at the

12   time, in addition to potential changes (indiscernible) assets

13   we would need to bring (indiscernible) potential price

14   increases (indiscernible) for assets and liabilities ratios

15   for the balance sheet.  We were essentially backing into a

16   number, how much we would need to (indiscernible)

17   Q    Okay.  So the numbers in blue represent new assets that

18   would have to be brought in.  And can you explain to the

19   Court why -- what they are?

20   A    So, for example, I'll use the top-left as an example.

21   So, in order to take the balance sheet from the ratio

22   (indiscernible) above to a 90 percent asset-to-liability

23   ratio, that would require -- we would move $52 million in

24   assets coming in over the next year on the assumption that

25   cryptocurrency would not increase and remained flat for --

1    over '20 and '21.

2         (Indiscernible) of course, the next (indiscernible) the

3    liabilities, and the current liability on the balance sheet,

4    the new liabilities (indiscernible) on board.  And

5    (indiscernible) calculation (indiscernible) assets and

6    liability ratio.

7              THE COURT:  Mr. Inamullah, there's -- you're

8    starting to get muffled a little bit.  I don't know if you're

9    covering your microphone on your phone or something, but if

10   you can do --

11             THE WITNESS:  (Indiscernible)

12   BY MR. MCMAHON:

13   Q    All right.  With respect to -- very well.

14             MR. MCMAHON:  I want to turn to Exhibit U.S.

15   Trustee 14.  Strike that, it's 13, one, three.  Excuse me.

16        (Pause in proceedings)

17   BY MR. MCMAHON:

18   Q    Mr. Inamullah, I'll give you a second to take a look at

19   this document.

20   A    Yes, sir, I'm familiar.

21   Q    All right.  First, can you tell the Court what "Uphold"

22   is?

23   A    Uphold is a provider of certain financial services for

24   cryptocurrency.  So they namely enable customers to purchase

25   crypto on their platform.  I believe they have a debit card,

1    and they also provide a host of different, you know,

2    financial services around (indiscernible) that have

3    (indiscernible) with them (indiscernible) for example, access

4    to CredEarn through their portal.

5    Q    Okay.  And with respect to Cred, were there any Cred

6    officers that served as officers or directors of Uphold?

7    A    I believe Dan Schatt was on their board of directors.

8    Q    And do you know how long, roughly, he served in that

9    capacity?

10   A    I don't, I'm sorry.

11   Q    This particular document, have you seen it before?

12   A    Yes.

13   Q    Okay.  Can you describe for the Court briefly what

14   happened between the debtors and Uphold immediately prior to

15   the bankruptcy filing?

16   A    Yes, sir.  So there was a journalist that was asking

17   questions about potential losses that Cred had suffered, and

18   I believe they -- one of those -- they reached out to Uphold

19   -- I don't know who at Uphold -- to ask that same question,

20   if they had heard any -- heard any news about that.  And that

21   led to a conversation between Uphold and our senior

22   leadership and officers.  And that essentially culminated in

23   Uphold canceling their contract with Cred and freezing assets

24   that Cred held with Uphold, and essentially the whole

25   bankruptcy process that followed the next few weeks after.

1          MR. MCMAHON:  Your Honor, I would move for the

2    admission of Exhibit U.S. Trustee 13.

3          THE COURT:  Any objection?

4          MR. EVANS:  There's an objection from the

5    committee.  We have an objection, Your Honor.  This document

6    was not written by Daniyal Inamullah, it's written by a third

7    party, Uphold.  There's no foundation for admitting this

8    document into evidence, it's hearsay.

9          THE COURT:  Mr. McMahon?

10          MR. MCMAHON:  Your Honor, I'll withdraw the

11    request.

12          THE COURT:  All right.

13    BY MR. MCMAHON:

14    Q   With respect to legal services, sir, from your time at

15    Cred, did the debtors have a fund that they would routinely

16    go to for general corporate legal work?

17          MR. LIN:  Objection, Your Honor.  This is Bryant

18    Lin from Paul Hastings.  Relevancy.

19          THE COURT:  Mr. McMahon?

20          MR. MCMAHON:  Your Honor, we called Mr. Inamullah

21    and Mr. Schatt, in connection with both the trustee

22    application and the Paul Hastings application.  I can get

23    into this, I guess, with respect to the next item, so I'll

24    withdraw the question for right now and recall Mr. Inamullah

25    at that point, if necessary.

1          THE COURT:  Thank you.

2          MR. MCMAHON:  And I -- that concludes my

3   examination, Your Honor.

4          THE COURT:  All right.  Let's take a fifteen-minute

5   recess and we'll come back and I'll open it up.

6          Who wants to cross-examine Mr. Inamullah?

7          MR. LIN:  The debtors would like to.  This is

8   Bryant Lin from Paul Hastings.

9          THE COURT:  Anyone else?

10         MR. EVANS:  This is Joe Evans.  Joe Evans from the

11   committee will be examining Mr. Inamullah, as well.

12         THE COURT:  All right.  We'll come back and we'll

13   pick up the -- anyone else, before we go?

14      (No verbal response)

15         THE COURT:  All right.  Let's recess until 12:50.

16         MR. MCMAHON:  Thank you, Your Honor.

17         MR. SARACHEK:  Yes, Joe Sarachek.

18         THE COURT:  And Mr. Inamullah, while you are on --

19   while we're on the recess, you are not allowed to talk to

20   anybody about your testimony.  Okay?

21         THE WITNESS:  Thank you.

22         THE COURT:  Thank you.

23      (Recess taken at 12:37 p.m.)

24      (Proceedings resumed at 12:50 p.m.)

25         THE COURT:  Thank you.

1          Okay.  Mr. Lin, you wanted to cross?

2          Mr. Lin, you're muted.

3     BY MR. LIN:

4     Q    From January 2020 to November 2020, right?

5          THE COURT:  Mr. Lin, you're going to have to start

6     over, because we couldn't hear the first part of your

7     question.

8          MR. LIN:  Sure.

9     BY MR. LIN:

10    Q    You were at Cred from January 2020 to November 2020,

11    right?

12    A    Technically, December of 2019, but yes, that's correct.

13    Q    And during this time, you were the vice president of

14    capital markets from December 2019 to about April 2020,

15    right?

16    A    Correct.  Yes, sir.

17    Q    And then you became the head of capital markets from

18    April 2020 to about November 2020?

19    A    I was the head of capital markets for Cred Capital from

20    April 2020 through July 2020 and then head of capital markets

21    for Cred, Inc. from July 2020 through my departure.

22    Q    And wasn't it the capital markets' teams responsibility

23    to find profitable investments for Cred, correct?

24    A    Yes, that was one of their mandates, correct.

25    Q    And wasn't it also your specific job responsibility

1    during this time to find different investment opportunities

2    to maximize yield, to do diligence, and report that diligence

3    to the investment committee and to make proposals for these

4    investments?

5    A    To do diligence and to make proposals; yes, that's

6    correct.

7    Q    And your specific job responsibility did not include

8    monitoring redemptions, correct?

9    A    No, not per se.

10   Q    And James Alexander's job responsibility was also to

11   find new investment opportunity, conduct diligence, and

12   report that diligence to the investment committee, correct?

13   A    I never saw his job or employment agreement, so I don't

14   know for certain.  I would assume so.

15   Q    But at one point in time, wasn't James Alexander the

16   head of capital markets?

17   A    He was the chief capital officer.

18   Q    Didn't you also create the diligence process for Cred?

19   A    It depends on what you define as diligence process.

20   I created lists for diligence.  I created sort of a list for

21   the capital markets side, with respect to strategy,

22   implementation, and what we would do.

23       There were other lists that were also created by other

24   department for these things.  There was a compliance list,

25   which our compliance team handled for their part of the

1    diligence.  There was a security team that sent out their

2    questionnaire, as well.

3         But, so I was certainly part of the capital markets and

4    investment strategy piece of it.  That's correct.

5    Q    But weren't you also primarily responsible for filling

6    out this or filling out due diligence checklists at Cred?

7    A    Could you be more specific, what it means to fill out a

8    diligence checklist.

9    Q    Sure.  On December 8th and during the deposition, I

10   asked you whether or not you created a specific due diligence

11   checklist.

12        Do you remember those?

13   A    Yes, I remember.

14   Q    And I then asked you who was primarily responsible for

15   filling out this checklist.

16        Do you remember that?

17   A    Yes.

18   Q    And then you also answered that it was yourself,

19   correct?

20   A    The reason I'm asking that question is, you know,

21   filling out is, I guess, gathering data, so I was essentially

22   a point person for if there was any piece of information that

23   was missing, I would essentially be, I guess you could call

24   it the quarterback for trying to get the information request.

25   But, you know, my specific diligence that I did as a capital

1    markets person, outside of being the point person for

2    communication, was the strategy side of capital markets of

3    the investment community.

4    Q    Right.  So, you would be the quarterback, then, to

5    compile this data and then present it to the investment

6    committee, correct?

7    A    Yes, that's correct.

8    Q    And with the exception of a few weeks, right when you

9    were employed, weren't you also a member of Cred's investment

10   committee during your time at Cred?

11   A    You said during a few weeks when, I'm sorry?

12   Q    With the exception of a few weeks when you were first

13   employed at Cred, weren't you also a member of Cred's

14   investment committee during the entire time you were at Cred?

15   A    That's true.  Yes, sir.

16   Q    And isn't it also true that all investment decisions

17   made by the investment committee had to be unanimous?

18   A    Technically, there was no process and procedures, but we

19   wouldn't go through an investment unless there was unanimous

20   consent, but there's no governance document that would

21   mandate that, necessarily.  But yes, for all intents and

22   purposes, there would be unanimous consent before moving

23   forward with any investments.

24   Q    And isn't it also true that when you were at Cred, you

25   were the only one who made any investment proposals to the

1   investment committee?

2   A    Yes, after the proposals that had already been made, I

3   was the only one who had made recommendations for the

4   remainder of the year.  And the first one, I believe, was

5   servicing funds as an asset manager.

6   Q    So, if all investment committee's decisions were

7   unanimous, then doesn't that also mean that you had voted in

8   favor of all of Cred's investments that it implemented?

9   A    No, I can't vote on a decision that has been made in the

10  past.

11  Q    So, from January 2020 to November 2020, during your time

12  at Cred, if all investment committee's decisions were

13  unanimous, then wouldn't any decisions made by the investment

14  committees, you would have to vote in favor for, correct, in

15  order to make it unanimous?

16  A    Yes, for any proposals that were made to the investment

17  committee, yes.

18  Q    So, then, for any proposals that were passed during

19  January 2020 through November 2020, any proposals that passed

20  the investment committee, you had to vote in favor of,

21  correct?

22  A    Yes.  If there was a proposal that was made, then, yes,

23  we would have had to vote for it.

24  Q    When you were on the investment committee, didn't you

25  also approve of two option trades involving JST at around

1    February 2020?

2    A    Yes.

3    Q    Isn't it also true that for all of Cred's hedging

4    positions in February through March 2020, could have been

5    recalled by the investment committee at any time, correct?

6    A    I assume so.  I know JST primarily managed those hedges.

7    I don't recall, off the top of my head, if there was a

8    specific process to recall, but with respect to the actual

9    contracts, my assumption would be that they could have been

10   cancelled at any point in time.

11   Q    And at no point in time did you recommend JST -- at no

12   point in time did you recommend to the investment committee

13   that they should cancel their futures contract with JST,

14   correct?

15   A    No.

16   Q    Isn't it also true that you believe that Cred's hedges

17   against Bitcoin in place of JST had a symbiotic relationship

18   with Cred's investments with moKredit?

19   A    Yes.

20   Q    So, in a sense, then, JST or Cred's hedges of JST was

21   necessary in order to hedge against its position with

22   moKredit, right?

23   A    Yes.

24   Q    Turning your attention to U.S. Trustee Exhibit 3,

25   please.

1          MR. LIN:  Austin, if you could pull it up on the

2     screen for us, and can you go down to Page 4, please.  I

3     believe it's the last page on the (indiscernible).

4     BY MR. LIN:

5     Q     And you wrote this memorandum, correct?

6     A     Cred Capital wrote this memorandum.  I was a part of it,

7     yes.

8     Q     Did James Alexander also --

9     A     This is a draft version.

10    Sorry?

11    Q     I'm sorry, I didn't hear you.

12    Can you repeat your answer.

13    A     I said this is also a draft version, just to put that

14    out there, but, yes, I was a part of constructing this

15    document.

16    Q     Was James Alexander a part of constructing this

17    document?

18    A     Yes.

19    Q     If you look at the paragraph second from the bottom, you

20    identify that a key trade-off or you identify one of the

21    consequences of the strategy that you're recommending is that

22    Cred's allocation to Quantacoin would be increased, correct?

23    A     Yes.

24    Q     And you've made this recommendation for Cred to increase

25    its allocation in Quantacoin without having done any due

1   diligence on Quantacoin, correct?

2   A    I personally did not, that's correct.

3   Q    And after you made this recommendation, didn't Cred's

4   allocation in Quantacoin increase?

5   A    I don't think that this document -- well, this is a

6   draft document, first of all, so it was circulated.  I think

7   after this document was circulated, yes, I believe we did

8   make a recommendation or we did increase, but I think the

9   actual document was technically submitted after the fact to

10  the investment committee, so there is that timing

11  differential.  But, yes, this particular one, I believe, was

12  early April, prior to our allocation, our second allocation

13  in Quantacoin.

14  Q    But this draft memorandum was still circulated to the

15  investment committee, correct?

16  A    Yes, as a draft for review and edits, that's correct.

17  Q    Right.  And this draft was circulated to the investment

18  committee before Cred actually increased its allocation in

19  Quantacoin, correct?

20  A    I believe so.  I believe it was delivered April 2nd, if

21  my memory serves me correctly.

22  Q    And, I'm sorry, I just wanted to be clear, because I

23  think your answer may have gotten buried.

24       So, following -- so, the investment committee did end up

25  allocating more of Cred's assets in Quantacoin, correct?

1    A    Yes.

2    Q    Following this memorandum or following your

3    recommendations?

4    A    Yes.

5    Q    And isn't it also true that you helped transfer the

6    additional funds to Quantacoin?

7    A    Yes.

8    Q    And isn't it true that you transferred about 200 Bitcoin

9    to Quantacoin in or around April 2020?

10   A    I believe that's the amount.  It may have been in two

11   batches, I believe.

12   Q    You said two batches, but they add up to 200 Bitcoin?

13   A    Yeah (indiscernible) 200 Bitcoin, that's correct.

14   Q    So, following the flash crash in March of 2020 and after

15   JST's hedges were liquidated, didn't Cred request $10 million

16   from moKredit so they could reinstall those hedges that they

17   just lost?

18   A    Yes, we did request $10 million.

19   Q    And didn't -- in your liquidity analysis memo, doesn't

20   it specifically identify the March 2020 flash crash as being

21   the principal reason why JST's hedges were liquidated?

22   A    I assume so.  I mean, it wasn't a decision by JST to

23   liquidate the positions, so I just want to make sure that's

24   clear.  These positions were on exchanges where there's a

25   specific liquidation price.

1          And so, we had essentially sent stop orders and some of

2     the orders were liquidated, as well.

3     Q    Sir, bring back your attention to Exhibit 3 and if you

4     go up to Page 1 and if you look at the third paragraph from

5     the top where it reads:

6               "As a result of the event, several financial

7     hedging instruments were liquidated.  Given the falling

8     market prices, the resulting short position on BTC has a

9     strike price of approximately 5900.  About 18 or 800 Bitcoin

10    was lost in margin."

11         You wrote this paragraph, correct?

12    A    Cred Capital wrote this paragraph, that's correct, and

13    it had been through a revision before, but yes, I was a part

14    of it.

15    Q    But who but who physically typed up this portion of the

16    memo?

17    A    I typed up the initial draft, then it was circulated to

18    Cred Capital employees.  There were edits made, and then

19    after those edits, we had circulated it with the rest of the

20    investment committee.

21    Q    So, when you write -- when you wrote down "several

22    financial hedging instruments were liquidated," giving the

23    result of the March 2020 flash crash, those -- that would

24    naturally include JST, right?

25    A    Those were oh I think you're thinking about the swaps

1    that were outstanding with JST.  The futures contracts are

2    not bilateral in nature.  They're not a bilateral

3    relationship with JST, where they're taking the other end of

4    that transaction.

5        They were bilateral swaps, which were also part of the

6    hedging program, but separate from these specific assets on

7    margin.

8    Q    Didn't Cred, following the flash crash, receive about

9    300 Bitcoin from Lu Hua?

10   A    Yes.

11   Q    And isn't it also true, had you held onto this 300

12   Bitcoin that was received from Lu Hua, that you would create

13   a natural hedge against the rise against Bitcoin's prices?

14   A    Yeah, I mean, holding the assets in Bitcoin, you mean?

15   Q    Yes, the ones that were sent from Lu Hua.

16   A    If the assets were held on the balance sheet as Bitcoin,

17   assuming we could use the amount for redeeming customers,

18   then, yes, it would help hedge against the rise in

19   cryptocurrency prices.

20   Q    But didn't you transfer this Bitcoin to an outside

21   account that James Alexander controlled?

22   A    There's a couple of links that are missing to get to

23   that end.  First is that Lu Hua signed an investment

24   agreement allocating those 300 Bitcoin to Cred Capital, which

25   is, you know, an entity at the time that was run by James

1    Alexander as president.  So, once that agreement was signed,

2    those 300 Bitcoin was transferred to a Cred Capital custodial

3    account that was operated and run by Cred Capital.

4        It was also used for Cred Capital operations.  We had

5    liquidated them out to pay for new operations, for

6    consultants, and some other items and then, eventually, those

7    assets were transferred from a Cred Capital Fireblocks

8    custodial account to an external account for Cred Capital, as

9    well.

10   Q    Yes, but didn't Lu Hua first give the 300 Bitcoin to

11   Cred and then the 300 Bitcoin then went to Cred Capital,

12   correct?

13   A    That's correct, yes.

14   Q    And Lu Hua specifically gave this 300 Bitcoin for Cred

15   Capital to invest, correct?

16   A    I don't know.  I mean, the agreement that he signed did

17   not have a specific mandate for that 300 Bitcoin, outside of

18   the purchase of equity shares.

19   Q    But he was investing in Cred Capital, right?

20   A    Yes, sir.

21   Q    Not James Alexander, correct?

22   A    Yes.  I mean, he did not give them to James Alexander;

23   he gave it to Cred Capital.

24   Q    And at the time, Cred Capital also was -- was also --

25   also had a relationship with Cred and was there to make

1   investment decisions for the benefit of Cred, correct?

2   A    Yes, sir.

3   Q    So, as a result of this transfer of 300 Bitcoin to James

4   Alexander, Cred was unable to use this Bitcoin to invest,

5   correct?

6   A    Cred, Inc. was not able to use -- yes, that's correct.

7   Cred did not have access to that 300 Bitcoin essentially.

8   Q    And you previously testified with Joe McMahon that you

9   received a securitization document from moKredit, correct?

10  A    Yeah, I believe it was one of his first exhibits.

11  Q    But isn't it also true that the securitization document

12  contained about -- and this is your estimate -- from two to

13  five pages of diligence on moKredit, which contains an

14  overview of the company, a roadmap, financial information,

15  and all other items that you'd normally find on a

16  securitization document, correct?

17  A    Yes, it did contain those documents (indiscernible).

18  Right, it did contain those pieces of information, that's

19  correct.

20  Q    And didn't you previously testify that upon reading the

21  securitization document, that you didn't -- it didn't raise

22  any red flags for you, correct?

23  A    That's correct.

24  Q    While you were at Cred Capital, didn't you and James

25  Alexander market the Luxembourg opportunity, the bond

1    offerings?

2    A    Yes.

3    Q    And this is the same Luxembourg bond opportunity that's

4    referenced in Mr. McMahon's prior exhibits, correct?

5    A    Yes, that's correct.

6    Q    And, ultimately, you said that this opportunity was

7    unsuccessful, correct?

8    A    Limited success.  We did sell some instruments, but not

9    as successful as we would have liked.

10   Q    But I thought you said during Mr. McMahon's questioning,

11   that ultimately, this was a net loss for Cred Capital,

12   correct?

13   A    I don't believe I said that.  It wouldn't have been a

14   loss for Cred Capital.

15        Cred Capital did not invest in any of the bonds.

16   Q    But it didn't really generate a lot of money, then?

17   A    It did not generate, from my understanding, any revenue

18   for Cred Capital.

19   Q    Did it generate any revenue for Cred?

20   A    It provided liquidity for Cred.  I don't -- I mean, it's

21   a question of accounting, like, how it would have been

22   accounted for, to determine if there was revenue or not, I

23   guess.  But, you know, Cred was successfully able to take

24   assets and transfer them to an investor and, theoretically,

25   we would have pocketed the interest rate spread between our

1   participation certificate and what we sold to the investors.

2   So it actually started -- it did generate net interest margin

3   for Cred, Inc.

4   Q    Didn't you testify that you believed that Cred should

5   have been shut down in June 30th, when it was unable to

6   receive liquidity from its loan from moKredit?

7   A    Yes.  The document that we've been discussing contained

8   that recommendation that Cred should, you know, begin to

9   implement, you know, unwind itself or begin a process towards

10  that degree if the liquidity situation does not improve.  And

11  one of those improvement factors that we defined was getting

12  assets back from moKredit.

13  Q    And moKredit didn't pay back its loan to Cred in full by

14  January 30th, 2020, correct?

15  A    Do you mean June?

16  Q    June, yes -- sorry -- June 30, 2020.

17  A    Just to make sure we're on the same page.

18       No, we did not receive amortization payments from, any

19  significant amounts from them.

20  Q    But in September 10th, 2020, didn't you recommend that

21  Cred, Inc. could increase its Cred (indiscernible) interest

22  rates by 3 percent of the marketing campaign?

23  A    Yes, I did.  And there were a couple of reasons why I

24  thought there was sort of a revived chance for Cred to make

25  it.  You know, one of those was we were successful in getting

assets in from investors and one of those companies is one

that I respect a tremendous amount, named Dragonfly Capital.

One of their partners, you know, is an idol of mine, so I

thought it was fantastic that we were able to get them as a

partner.  And the idea was that we could leverage their

expertise there and essentially figure out a way out of this

liquidity shortfall.

The second item was we partnered with a four-hundred-

and-fifty-billion-dollar company named Visa, and so we were

accepted into their Fast Track program.  They actually made a

PR announcement September 8th about that, and so that was

very exciting, as well.

Second is we were, in the third quarter, going to

release two products.  One of those that was communicated to

us, one of those was a buy-sell product where we would be

able to sell, you know, LBA and other tokens on our platform,

which would be a fee-generating business that could help

close the gap pretty quickly, as exhibited by, you know,

Square, and some of the other companies out in the industry.

And, finally, there was a card product that we were also

going to release, in coordination with Visa.  That would be a

fee-only product, as well.  So, the idea was as these

relationships were forming, we would be able to leverage

these different revenue channels, as well as the partnerships

that we had developed to help close the gap.  So, there was

1      sort of a renewed interest and a revival, I believe, of Cred,

2      which is what I personally didn't believe at the time.

3      Q    So, just so we're clear, then, in September 2020, then

4      you believed that Cred still had a chance to head off

5      insolvency, correct, because of all of these different

6      opportunities that you just identified, correct?

7      A    Sure.  But you have to look at it in a vacuum.  You

8      know, Cred is in a high-risk industry with, you know, high-

9      risk assets that we deal with.  So, you know, our

10     relationship like Visa, for example, is just a tremendous win

11     for any start-up organization, and so, you know, some of

12     these wins really piled on.

13         And, yeah, I personally thought that despite the

14     illiquidity situation, you know, whether it's six months or a

15     year or maybe two years, there was the potential that we

16     could, you know, essentially revive ourselves.

17     Q    And is that why in September 21, 2020, you made a

18     YouTube video for Cred saying that there was exciting

19     opportunities in the short term at Cred, correct?

20     A    Yes, these are the opportunities that I was alluding to.

21     Q    And is this also why you said in September 21, 2020,

22     that you mentioned that you looked forward to building a

23     wonderful business at Cred, correct?

24     A    Yes.

25     Q    And nowhere in the video did you mention the fact

1    that -- strike that.

2         Moving on to October 13, 2020, didn't you advise Cred,

3    via email, that the company's financials had deteriorated

4    quite a bit?

5    A    I'm sure I did, yes.  I don't remember the exact email,

6    but I've been sending updates, quite frequently, with respect

7    to the liquidity situation and the balance sheet situation,

8    as well.

9    Q    But you remember making some sort of recommendation for

10   a presentation to the investment committee that's saying that

11   there was an illiquidity situation at Cred in October 2020,

12   correct?

13   A    Yes, I'm sure I did.  I believe that's one of the

14   exhibits, as well, that was previously presented.

15   Q    And shortly thereafter, Cred had filed for Chapter 11,

16   correct?

17   A    Yes.

18   Q    And then you resigned from the company at the end of

19   October, correct?

20   A    Yes.

21   Q    And this was after Cred filed for Chapter 11, right?

22   A    Not to my knowledge, no.  I thought we filed on

23   November 7th or Cred filed on November 7th.

24   Q    But weren't -- didn't you know at the time at the end of

25   October that Cred was intending to file for Chapter 11 at

1    this time?

2    A    In the week of November, like the first week of

3    November, I was told by Dan that that would be a potential

4    income -- I'm sorry -- a potential outcome of, I guess, the

5    negotiations.  He said they were in constant communications

6    with lawyers and consultants to figure out the best path

7    forward and one of those outcomes could potentially have been

8    a Chapter 11 reorganization.  So, I didn't know for a fact.

9    I knew that it was certainly one of the outcomes, as well.

10   Q    And you were informed this before your last day at Cred,

11   correct?

12   A    Yes.

13   Q    Okay.

14            MR. LIN:  No further questions.

15            THE COURT:  Thank you, Mr. Evans, you wanted to

16   cross?

17            MR. EVANS:  Yes.  Thank you, Your Honor.

18                        CROSS-EXAMINATION

19   BY MR. EVANS:

20   Q    Good afternoon, Mr. Inamullah.

21   A    Good afternoon, Mr. Evans.

22   Q    So, I understand you were hired at Cred in December

23   2020, right?

24   A    December 2019.

25   Q    December 2019.

1         And you left Cred on November 6th, 2020; is that right?

2    A    That's right.

3    Q    Okay.  And you don't know one way or the other who

4    currently has access over Cred's bank accounts, do you?

5    A    I'm sorry, I have my daughter crying in the background.

6         Do you mind just repeating.

7    Q    You don't know one way or the other who has access over

8    Cred's bank accounts right now, do you?

9    A    Right now?  No, I have no idea.

10   Q    And right now, you don't know one way or the other who

11   has access over Cred's digital wallets containing virtual

12   currency, correct?

13   A    No, I do not.

14        Excuse me, do you mind just giving me like two minutes?

15   My daughter fell and I heard a crash in the background.

16        Do you mind if I just check it out really quick, Your

17   Honor?

18             THE COURT:  Sure.  Go ahead, Mr. Inamullah.

19             THE WITNESS:  I'll be right back.

20        (Pause)

21             THE WITNESS:  Sorry about that.  I'm back.

22             THE COURT:  Is everything okay?

23             THE WITNESS:  Yeah.  She's fine.  She just got

24   knocked down by the dog, but she's fine.  Just a little bump.

25             THE COURT:  All right.

1            Okay.  Mr. Evans, I don't know if he answered your

2     last question or if we need to go back to that one.

3            MR. EVANS:  I'll ask it again just to be clear.

4     BY MR. EVANS:

5     Q    You don't know who has access or control over Cred's

6     digital wallets containing cryptocurrency today, do you?

7     A    I do not.

8     Q    And you're familiar with the concept of a digital

9     wallet, right?

10    A    I am.

11    Q    And a digital wallet has private keys that only the

12    owner of a digital wallet can have access to, right?

13    A    Yes, sir.

14    Q    Okay.  And so, you have no knowledge sitting here today

15    about the current status of Cred's digital wallets or the

16    individuals that have access to the private keys that would

17    give them access to those digital wallets, right?

18    A    I do not.

19    Q    Okay.  And you don't know what trades Cred is executing,

20    if any, on virtual currency exchanges today, right?

21    A    I do not know what Cred, itself, is executing in trades,

22    correct.  Yes.

23    Q    And you're not aware of the work being performed or the

24    investigations being conducted by either the debtor or the

25    committee of unsecured creditors to date, right?

1    A    What do you mean by informed about the investigation?

2    I know that there is one going on, but is there a particular

3    question about it?

4    Q    Yes.  You're not aware -- for example, you're not aware

5    of what the committee is doing in terms of its investigation

6    into Cred's affairs, right?

7    A    No, I do not, outside of what's (indiscernible).

8    Q    And other than what's publicly available, you have no

9    idea what investigation is being performed at all, right?

10   A    That's correct.

11   Q    Okay.  And currently you work at Sarson Funds; is that

12   right?

13   A    Yes, sir.

14   Q    Okay.  And you're no longer employed by Cred or have any

15   knowledge of the workings at Cred post-November 6th, 2020,

16   right?

17   A    Outside of the work that Sarson Funds was tasked with, I

18   do not have any knowledge whatsoever.

19   Q    Okay.  So, I want to ask you a few questions about your

20   responsibilities at Cred.  When you began in January of 2020,

21   what was your title?

22   A    Vice president in capital markets.

23   Q    And the capital markets group, as I understand it, was

24   responsible for conducting due diligence, right?

25   A    Yes, sir.

1    Q    And the capital markets group was also responsible for

2    identifying potential investments and suggesting those

3    investments to the investment committee; is that right?

4    A    Yes, sir.

5    Q    And during your time at Cred, from January to April

6    2020, yourself and Mr. James Alexander were running the

7    capital markets group, right?

8    A    Yes, sir.

9    Q    Okay.  And there came a period when you went to Cred

10   Capital in between April and July of 2020; is that right?

11   A    That's correct.

12   Q    Okay.  And during that time period, when you were at

13   Cred Capital and not Cred LLC or Cred, Inc., your

14   responsibility was still to find investments and to recommend

15   investments to the investment committee of Cred, Inc.,

16   correct?

17   A    Yes.

18   Q    And, in fact, during April through July of 2020, you

19   participated in every investment committee meeting that

20   occurred at Cred, Inc. during that time period, right?

21   A    Yes, that's correct.

22   Q    Okay.  But on July 2020 until November 2020, you

23   returned back to Cred, Inc.; is that right?

24   A    Yes, that's correct.

25   Q    Okay.  So I understand, the investment committee is

1  responsible for reviewing the due diligence performed by the

2  capital markets group, right?

3  A    Yes.

4  Q    And the investment committee is ultimately responsible

5  for making sure that the capital markets conducted the

6  appropriate due diligence on any potential investment, right?

7  A    Yes.

8  Q    And the investment committee also must vote for and

9  approve or disapprove of a particular investment, right?

10  A    Yes.

11  Q    And, in fact, how the investment committee worked at

12  Cred, there must be unanimous consent for any investment to

13  be approved, right?

14  A    Yes.

15  Q    Okay.  So, during the time period from January 2020 to

16  November 6th, 2020, when you left Cred, every single

17  investment that Cred, Inc. made, you voted in favor of,

18  right?

19  A    Well, every single investment that Cred made, and it's

20  an interesting way to put it, because if the diligence for

21  example, for Cryptolab Capital for Quantacoin for moKredit,

22  you know, all --

23  Q    I can rephrase the question.  I'll rephrase the

24  question.

25       Every investment that was considered by the investment

1    committee, you -- that was executed by Cred, you voted in

2    favor of, right?

3    A    Yes, implicitly, because I was the one proposing those

4    investments.

5    Q    And during the time period of January 2020 till November

6    2020, whether you were at Cred, Inc., Cred LLC, or Cred

7    Capital, the only person to propose investments to the

8    investment committee was you, right?

9    A    Yes.

10   Q    Okay.  And so, I understand from your direct examination

11   that certain of the investment strategies employed by Cred

12   were ultimately unsuccessful; is that fair to say?

13   A    Yes.

14   Q    Okay.  And I believe you testified that you thought that

15   certain of the investment strategies were unsound.

16   Is that a fair characterization?

17   A    Yes.

18   Q    And you thought, in particular, that certain of the

19   margin trading conducted by Cred was too risky, correct?

20   A    Yes.

21   Q    Okay.  So, we talked about investments that were

22   approved by the investment committee, but there are also

23   certain transactions and investments Cred made that weren't

24   decided by the investment committee, right?

25   A    I'm not sure what you would be referring to.

1    Q    Let's talk about cryptocurrency trading on exchanges,

2    directly.

3    A    Yes.

4    Q    So, Cred, and, in particular, you, executed trades on

5    the cryptocurrency exchanges, correct?

6    A    That's correct.

7    Q    Okay.  And let's just talk about three of those

8    exchanges for now.  One of the exchanges that you traded on

9    was called OKEx, right?

10   A    Yes.

11   Q    And one of those exchanges was called BitMax, right?

12   A    Yes.

13   Q    And one of those exchanges is called Bittrex; is that

14   correct?

15   A    Yes.

16   Q    Okay.  And as I understand it, OKEx, BitMax, and Bittrex

17   are known as exchanges that allow customers to trade with a

18   high level of margin.

19        Is that a fair characterization?

20   A    A higher amount of leverage, yes.

21   Q    A higher line of leverage.

22        So, for example, if you have -- if you only have one

23   Bitcoin on BitMax, you can enter into a position where you

24   risk the equivalent of 100 Bitcoin, right?

25   A    Yes.

1    Q    Okay.  And that's the draw for these exchanges, right;

2    it allows customers to trade at a higher level of leverage?

3    A    Yes, it's the access to leverage, which is the draw.

4    Q    Okay.  And there's a particular type of trade offered by

5    these three exchanges called the perpetual swap, right?

6    A    Yes.

7    Q    And the perpetual swap is effectively a futures contract

8    without an expiration date, right?

9    A    That's correct.

10   Q    And it allows the customer to go long or to go short on

11   Bitcoin with no end in sight, right?

12   A    Yes.

13   Q    And the perpetual swap, offered by OKEx, BitMax, and

14   Bittrex allows customers to leverage up to 100 times of their

15   initial investment, right?

16   A    I'm not sure about Bittrex.  We didn't -- but, yeah, the

17   other two for certain, but I'm not sure if Bittrex had that

18   product time.

19        I generally don't use Bittrex for derivative trades, but

20   the other two did, yes.

21   Q    Okay.  So, let's talk about OKEx.  OKEx, the person at

22   Cred that executed trades at OKEx was you, right?

23   A    Yes.

24   Q    And so, you, personally, had to log in to OKEx, right?

25   A    Yes.

1    Q    And so the some point in March of 2020, there was a 300

2    Bitcoin transaction that was placed on OKEx, right?

3    A    Correct.

4    Q    I'm sorry, I think you broke up there.

5    A    That's correct, yes.

6    Q    Okay.  And it was you, yourself, who put in that trade

7    on that exchange, right?

8    A    Yes.

9    Q    So, let's talk about the 300 Bitcoin trade at OKEx.

10        You had to go long on Bitcoin; that was your mandate,

11   right?

12   A    Yes.

13   Q    And you had to go long on Bitcoin to offset the

14   outstanding Bitcoin that Cred owes its customers, right?

15   A    Yes.

16   Q    And the reason you had to go long was because shortly

17   after receiving Bitcoin from Cred customers, they were

18   converted to fiat currency and then you owed your customers

19   back Bitcoin, but you needed to protect against a rise in

20   Bitcoin, right?

21   A    Yes.

22   Q    Okay.  So, the 300 Bitcoin transaction at OKEx, that was

23   in March of 2020?

24   A    Yes, I believe.

25   Q    Okay.  And how many Bitcoins was the 300 Bitcoin

1    transaction intended to hedge?

2    A    I'm sorry, I don't remember off the top of my head, but

3    it would have been probably three to four, max, but I don't

4    remember the exact number, to be honest.

5    Q    Okay.  Well, is a fair estimate 6,000 Bitcoin

6    outstanding at that time?

7    A    No.  We didn't lever up -- I don't remember what the

8    math is for that -- but we didn't go more than three to four

9    times, at the time.

10   Q    I'm sorry, the highest leverage was three to four times,

11   you said?

12   A    Yes, for that particular trade.

13   Q    For that particular trade.

14        So, on that particular trade, you were leveraged four

15   times; is that what you're saying?

16   A    Yeah, I don't remember the exact number, just to be

17   honest, but it was around that range.  We didn't intend for

18   it to hedge the entire amount, just given, you know, if you

19   up-leveraged that much, it's impossible, obviously.

20   Q    Okay.  Just so I understand, if it's a

21   four-times-leveraged trade, and you're going long Bitcoin, if

22   Bitcoin drops 25 percent, you're entire position is

23   liquidated; isn't that right?

24   A    That's correct.

25   Q    And so, I know you talked in your declarations and on

1    direct examination about a flash crash of 50 percent Bitcoin.

2        Do you recall that?

3    A    Yeah, it was 43 percent.  I may have been -- I may have

4    quoted the wrong number, but it was 43 percent for the flash

5    crash documents.

6    Q    Okay.  But for the 300 Bitcoin transaction with OKEx,

7    any drop in excess of about 20 percent would have liquidated

8    your entire position; isn't that right?

9    A    That's correct.

10   Q    Okay.  There was a similar trade, a larger one placed on

11   BitMax, right, in March of 2020?

12   A    There definitely could have been.  I'm sorry, I just

13   can't recall the specifics of that particular trade, but

14   there probably was a long, levered trade on BitMax, as well.

15   Q    Okay.  There was an 800 Bitcoin loss in March of 2020 in

16   a particular hedging position, wasn't there?

17   A    Oh, you're referring to that trade.  Yes, that was 800

18   Bitcoin and that was, yeah, levered long at the time.

19   Q    Okay.  And that position was levered long on BitMax,

20   wasn't it?

21   A    Yes, I think it was BitMax.  There was a few exchanges,

22   from my understanding.  If you remember the risk document

23   that Mr. McMahon had pointed out to before, that JST sent to

24   us, it actually had all the positions laid out and I believe

25   it was Huobi, BitMax, and there may have been an OKEx

1   position, as well.

2   Q    There was a combination of positions on a variety of

3   exchanges, but the point is there was a perpetual swap of 800

4   Bitcoins, right?

5   A    It would have been perps or -- which is short for

6   perpetual swaps -- or they could have also been futures

7   contracts, themselves, but with a stated maturity date.

8   Q    And those 800 Bitcoins that were used for perpetual

9   swaps, they were levered at least six to seven times is, I

10   believe, what you said, right?

11   A    Yeah.

12   Q    So, if a leveraged position like that levered long and

13   Bitcoin is six to seven times, there's a 15 percent drop in

14   Bitcoin, does your position get liquidated completely?

15   A    Yes.  However, at the time in March there was, like, a

16   further equity buffer given there were gains in that

17   position, as well.  So, I don't remember the exact map off

18   the top of my head, but the ultimate liquidation strike price

19   was around 6,000 or 5900, if I remember correctly.

20   Q    Okay.  So, a 50 percent drop in Bitcoin wasn't necessary

21   to liquidate the positions you had put on, right?

22   A    I'm sorry, I don't understand the question.

23   Q    The point is, the 800 Bitcoin perpetual swap or future

24   and 300 Bitcoin perpetual swap would have been liquidated

25   completely if Bitcoin prices were to drop 20 to 25 percent,

1   right?

2   A    Yes, that's correct.

3        Now, just to make sure, the 300 Bitcoin was spent after

4   the flash crash.  So, we were sort of at the bottom of the

5   market when we received those assets and the 800 Bitcoin was

6   already invested beforehand.

7   Q    Okay.  And you've been working in virtual currency for,

8   what, five years now?

9   A    No.  Since, I want to say at the beginning of 2018.

10  Q    Okay.  And since 2018, you would agree with me, would

11  you not, that a 25 percent drop in Bitcoin is not completely

12  out of the ordinary, right?

13  A    I agree.

14  Q    Okay.  And so, these perpetual swaps, these futures,

15  these options positions, there's not a single one that Cred

16  engaged in that you were not involved in; isn't that right?

17  A    I wouldn't characterize it as that.  I think JST was the

18  primary party responsible for managing the hedges and they

19  sent out risk reports on a daily basis.

20       Now, initially, I wasn't managing the hedging

21  relationships; that was more, you know, James and JST

22  together.  They provided a review of all the hedging

23  positions.

24       We never approved each trade on a trade-by-trade basis

25  in the investment committee.  It was more that they had

1    approved of the hedging mandate for everything in moKredit

2    (indiscernible).

3    Q    I understand that.

4         So, let me just unpack that.

5    A    Sure.

6    Q    JST is an outside, for lack of a better term, we'll call

7    them crypto fund, okay, is that fair enough?

8    A    That's fair.

9    Q    Okay.  The capital markets group, in which you and James

10   Alexander were responsible for from January and April were

11   managing relationships with your outside crypto funds; isn't

12   that right?

13   A    Yes.

14   Q    Okay.  And in your position in the capital markets

15   group, you have the ability to effect change or direct the

16   crypto fund to execute a less-risky strategy, didn't you?

17   A    I was in a position to make recommendations to do that,

18   yes.

19   Q    Okay.  And the positions that JST Capital were in, as

20   far as I understand them, there were perpetual swaps,

21   futures, and other options trades, right?

22   A    The options trades were not part of the hedging

23   strategy; those were separate.  But for hedging purposes, we

24   primarily used futures contracts and bilateral swaps.

25   Q    Okay.  For bilateral swaps, futures, and perpetual

1    swaps, Cred could have and you could have exited those

2    positions at any time, right?

3    A    The swaps, I believe, had a stated maturity date, so we

4    would have had to have waited until maturity for those, but,

5    yes, the futures contracts and the perps, we could have,

6    yeah, we could have liquidated.

7    Q    Okay.  So, the fact that JST Capital was brought on

8    before you were hired there, that doesn't mean you couldn't

9    have made a decision to exit some of those positions, right?

10   A    Yeah, I mean I could have exited those positions, that's

11   correct.

12   Q    Okay.  Let's talk about Quantacoin.

13        My understanding is that your testimony that you gave

14   previously was that the due diligence for Quantacoin was

15   conducted prior to your employment at Cred; is that fair to

16   say?

17   A    Yeah, that's fair.  At least the majority of the

18   diligence that was presumably performed.

19   Q    Okay.  So, you say, "presumably performed."

20        So, you don't know one way or the other what diligence

21   was performed?

22   A    I don't know what exact diligence was performed.  I know

23   there was a third-party that was brought on to do an

24   assessment.  I know there were multiple meetings between Cred

25   executives and Quantacoin, and I know there was a meeting in

1  February between Mr. Alexander and the supposed portfolio

2  manager.

3  Q    Okay.  And Quantacoin was an investment where Cred gave

4  away Bitcoin and it ultimately turned out to be a fraud,

5  right?

6  A    Yes.

7  Q    Okay.  And you, yourself, don't know where those Bitcoin

8  went, do you?

9  A    No.  Outside of the address that, I guess, they had sent

10  to, no, I do not.

11  Q    Okay.  And you have no indication that somebody at Cred

12  was engaged in some fraud in connection with sending Bitcoin

13  to an imposter, right?

14  A    No.  I believe once we found out the news, everyone,

15  from my opinion, was very surprised by it.

16  Q    Okay.  So, the Quantacoin deal, that was James

17  Alexander's fault?

18  A    I think it was an institutional issue that happened with

19  the diligence.  You know, again, like, I wasn't part of the

20  due diligence meetings.  I wasn't in the meeting with

21  Mr. Chapman, who was the supposed portfolio manager, so, you

22  know, first of all, I'm not going to point fingers, but it

23  was certainly an institutional error in that decision.

24  Q    So, an institutional error, but not your fault?

25  A    Yeah, I mean looking back at what had happened, you

1    know, coming on in January, I wish I had dedicated more time

2    to looking at the Quantacoin issue.  You know, at the time,

3    all the way through January, I was getting up to speed.  My

4    primary job responsibility was to look for new opportunities

5    when I got in.  I was a credit guy, so I was looking for

6    those specifically (indiscernible) Cred.

7         But, yeah, you're right, absolutely.  I should have paid

8    more attention to that specific agreement and seen all the

9    diligence that was being performed on the side.  I was not

10   asked to do that, but looking back, I wish I had.

11   Q    Okay.  Let's unpack that.  You said you're not tasked or

12   asked to do that.

13        You testified that the capital markets group is in

14   charge of due diligence on new investments; isn't that

15   correct?

16   A    That's correct.

17   Q    And you said that there was due diligence performed, you

18   think, but you're not sure what it was, prior to your

19   employment at Cred, right?

20   A    That's correct.

21   Q    Now, Quantacoin, the investment in Quantacoin wasn't

22   made until February of 2020, right?

23   A    That's correct.

24   Q    There was also a March 2020 additional investment?

25   A    March or April.  I forgot the date specifically, but,

1   yes, there was a second --

2   Q    And then there was an April investment, as well, right?

3   A    Yeah, I just know that sum total.  I forgot the exact

4   sequencing of the investment dates, but you're correct.

5   Q    Okay.  Let me just unpack this.

6        You're head of -- you're in the capital markets group,

7   so it's your responsibility to conduct due diligence, right?

8   A    Yes.

9   Q    You're on the investment committee, and so as a member

10  of the investment committee, it's your responsibility to make

11  sure that the capital markets group was conducting

12  appropriate due diligence; isn't that right?

13  A    Yes, presumably.

14  Q    Okay.  And you, as a member of the investment committee,

15  voted in favor of providing this money to Quantacoin, right?

16  A    There was never a vote that was put up.  It was more --

17  the diligence was authorized to have them as an investment

18  partner, and so, from based on what I understood of the

19  strategy, you know, the goal was obviously to diversify away

20  from moKredit and to Bitcoin benchmark investment.  So, this

21  was an approved strategy on our platform.  That's why the

22  recommendations were made to move more assets to Quantacoin.

23            MR. EVANS:  Okay.  Austin, can you please present

24  for identification, CC-6.

25  BY MR. EVANS:

1    Q    Do you recognize this document, Mr. Inamullah?

2    A    Yes.

3    Q    And this is a news article identifying certain

4    statements that you made to a media reporter, I believe it's

5    CoinDesk.

6    A    Yes.

7    Q    Okay.  And when did you make these statements to

8    CoinDesk?

9    A    It would have been probably the week or so, a week or

10   two before that publish date --

11   Q    Uh-huh.

12   A    -- we had the conversations.

13          MR. EVANS:  And can you please scroll down, Austin,

14   to Page 4 of this article.

15   BY MR. EVANS:

16   Q    The sentence that states:

17          "James certainly led the Quantacoin diligence

18   efforts, this is on him, given, that he was head of capital

19   markets at the time."

20          Those are your words, right?

21   A    Yes, sir.

22   Q    Okay.  So, it was James' fault, the Quantacoin

23   transaction?

24   A    I was speaking very informally, but, if I had -- again,

25   you know, I'd stand by my response, that it was an

1    institutional error.  There were broken checks-and-balances;

2    that's part of it, from my understanding, but certainly,

3    James was head of capital markets and led the diligence

4    efforts, which would have been leading, you know, essentially

5    quarterbacking all the information that we, the investment

6    committee would have required to make a decision.

7    Q    Okay.  This investment committee you're talking about,

8    it never has more than five members, right?

9    A    It may have had six at one point, but, around five would

10   be my guess.

11   Q    Okay.  So, you're saying that it's James' responsibility

12   to conduct the due diligence, you were on the capital markets

13   team, so it's your responsibility, too, wasn't it?

14   A    I mean that's not typically how these things work.  If

15   we're -- this was never presented in diligence to the

16   investment committee, at least while I was there.

17        You know, typically, like each person on the capital

18   markets team was responsible for their initial investments,

19   but, absolutely, if the proposal's made, then everyone would

20   have to vet those investments.  But there was no proposal

21   made --

22   Q    It says here --

23   A    -- (indiscernible) while I was there.

24   Q    -- "Dan signed off on the deal.  It went to the

25   investment committee, which was responsible for asking the

1   right questions and doing the right diligence."

2   And to the investment committee, that's you, right?

3   A    Sure, yes.

4   Q    All right.

5        MR. EVANS:  Austin, you can take down CC-6, please.

6   BY MR. EVANS:

7   Q    One of the other things you were responsible for at Cred

8   was to introduce Cred to third-party, we'll call them crypto

9   funds today, right?

10  A    Yes.

11  Q    And these crypto funds effectively take the client or

12  other virtual currency and try to make money by investing in

13  them, right?

14  A    Yes.

15  Q    And during your time at Cred, you were the only person

16  that suggested using any third-party crypto funds, right?

17  A    Yes.  And there have been certain crypto funds which had

18  been agreed to beforehand that we were moving forward with,

19  but yes, since I joined, I was the only one to make

20  recommendations for asset managers.

21  Q    And let me just step back one second.  On the Quantacoin

22  issue, there's an additional question.

23       You didn't conduct any due diligence on Quantacoin

24  between January and April of 2020, right?

25  A    I did not.

1    Q    Okay.

2            MR. EVANS:  Austin, if you could please pull up

3    Trustee Exhibit 5, which is in evidence.  Oh, you know what?

4    That's not the right exhibit.  Give me one second.  Trustee's

5    Exhibit 3.

6    BY MR. EVANS:

7    Q    This is the liquidity memo that you testified about

8    previously that you wrote with some others, right?

9    A    Yes.

10           MR. EVANS:  Okay.  Can you please scroll down to

11   Page 4, Austin.

12   BY MR. EVANS:

13   Q    And if you look here, Mr. Inamullah, it states:

14           "Given the situation, assets will be allocated to

15   more liquid positions than Cred's all-weather strategy, but

16   (indiscernible) to allocation to (indiscernible) in

17   Quantacoin will be increased given the weekly and

18   (indiscernible) liquidity profile and investment strategy."

19       You see that statement, right?

20   A    Yes, sir.

21   Q    So, you drafted this memo, suggesting allocating more

22   funds to Quantacoin, right?

23           UNIDENTIFIED:  (Indiscernible.)

24           THE COURT:  There's somebody who does not have

25   their phone muted.

1    Operator, again, you have my permission to

2  disconnect anybody who is not speaking and who is talking.

3    Go ahead.

4    THE OPERATOR:  Thank you, Your Honor.

5    THE WITNESS:  Mr. Evans, do you mind repeating the

6  question.

7    MR. EVANS:  Sure.

8  BY MR. EVANS:

9  Q    In this memo, you're recommending allocating more funds

10  to Quantacoin, right?

11  A    We are recommending, yes.

12  Q    Okay.  And this is the recommendation you're making in

13  April of 2020, right?

14  A    Yes, sir.

15  Q    Okay.  And you make this recommendation, notwithstanding

16  the fact that you just testified that you conducted

17  absolutely no due diligence from January through April of

18  2020, right?

19  A    I personally did not do any diligence, correct.

20    MR. EVANS:  Okay.  Austin, you can take down that

21  memo.

22  BY MR. EVANS:

23  Q    You signed a nondisclosure agreement with Cred, didn't

24  you?

25  A    Yes.

1    Q    Okay.  And the nondisclosure agreement generally forbids

2    you from talking to third parties about confidential

3    information about Cred, right?

4    A    Yes.

5    Q    Okay.

6         MR. EVANS:  Austin, could you please pull up CC-2.

7    BY MR. EVANS:

8    Q    CC-2 is a copy of your confidentiality and

9    non-solicitation and (indiscernible) agreement.

10   Do you recognize this document?

11   A    Yes.

12        MR. EVANS:  Your Honor, we ask to move this

13   document into evidence.  It has independent legal

14   significance.

15        THE COURT:  Any objection?

16        (No verbal response)

17        THE COURT:  It's admitted without objection.

18        (Exhibit CC-2 received into evidence)

19   BY MR. EVANS:

20   Q    I'm going to ask you a very, very specific question.

21   Notwithstanding your nondisclosure agreement, you spoke to

22   CoinDesk about the affairs of Cred, Inc., right?

23   A    Yes.

24   Q    Notwithstanding the terms of your confidentiality

25   agreement, you participated in telegram chats and discussed

1    the affairs of Cred, right?

2    A    Yes.

3    Q    Notwithstanding your nondisclosure agreement in

4    September and October of 2020, you copied and transferred

5    emails and other documents from Cred, right?

6    A    Yes.

7             MR. EVANS:  You can take down this exhibit, Austin,

8    please.  Thank you.

9             Just one moment.

10        (Pause)

11            MR. EVANS:  I have nothing further.

12            THE COURT:  Thank you.

13            Mr. McMahon, any redirect?

14            MR. MCMAHON:  No redirect, Your Honor.

15            But with respect to a housekeeping matter, at the

16   beginning, I referenced Mr. Inamullah's declaration,

17   indicating that the direct testimony was going to exemplify

18   what we had there.  I'd like to move for the admission of the

19   Inamullah declaration as a cleanup item.

20            THE COURT:  Any objection?

21            MR. HURST:  Your Honor, the debtors object.  An

22   out-of-court statement is hearsay.

23            THE COURT:  Well, he's here.  It could have been

24   used as a proffer for his direct testimony.  (Indiscernible).

25            MR. HURST:  The potential --

1          THE COURT:  I'm going to overrule the objection.

2          It's admitted.

3     (Inamullah Declaration received in evidence)

4          MR. MCMAHON:  Thank you, Your Honor.  No redirect.

5          MR. SARACHEK:  Your Honor, the debtors would like

6     to ask a few more questions.

7          UNIDENTIFIED:  Your Honor?

8          THE COURT:  No.  You had your chance for cross-

9     examination.

10          UNIDENTIFIED:  Your Honor?

11          THE COURT:  I do direct, cross, and redirect, and

12     that's it.  So, there's no recross --

13          UNIDENTIFIED:  Your Honor?

14          THE COURT:  -- especially when there was no

15     redirect.

16          UNIDENTIFIED:  Hello?

17          THE COURT:  Who keeps saying, "Your Honor"?  Who

18     talking over me?

19          MR. SARACHEK:  Your Honor, this is Joe Sarachek.  I

20     did ask to ask Mr. Inamullah some questions.

21          THE COURT:  And who are you?

22          MR. SARACHEK:  I'm sorry, this is Joe Sarachek

23     speaking.

24          THE COURT:  And who do you represent?

25          MR. SARACHEK:  I represent Krzysztof Majdak and

1   Philippe Godineau, and I am wearing a coat and tie.

2          THE COURT:  All right.  Well, I don't recall you

3   speaking up when I asked, but I'll let you go ahead and ask

4   your cross and then I'll reopen it again for Mr. McMahon if

5   he has a redirect afterwards.

6          MR. SARACHEK:  Thank you, Your Honor.

7                      CROSS-EXAMINATION

8   BY MR. SARACHEK:

9   Q    Good afternoon, Mr. Inamullah.

10         You testified that in September, I think it was, Visa, I

11   guess, entered into an arrangement with Cred; however,

12   previously, in Exhibit Document Number 97, which is the sworn

13   declaration that you submitted to this Court, you gave a

14   statement that said that due to the hemorrhaging of customer

15   funds under Cred's management, punctuated by a big hit to

16   Cred's balance sheet in March 2020, lack of principal

17   repayments or follow-through on the repayment plan created by

18   moKredit, and the subsequent rise in Bitcoin's value, Cred

19   may have been insolvent as early as the summer 2020.

20         You said, and I'm going to ask you what you meant by

21   this, you said in that declaration:

22         "At that moment, no reasonable person could believe

23   that Cred would ever be able to recoup its massive losses to

24   meet its growing liabilities."

25         So, my question is, given that that was in the summer of

1    2020 and you testified about this Visa relationship, can you

2    explain your relationship.

3         UNIDENTIFIED:  Objection, Your Honor.  This is the

4    (indiscernible) leading questions.

5         THE COURT:  I'm sorry, what's the objection?

6         UNIDENTIFIED:  Leading.

7         THE COURT:  Well, I don't think it's leading.  I

8    think he read from his declaration and he asked him what he

9    meant by it.

10        So, go ahead, Mr. Inamullah.

11        THE WITNESS:  Yes, well, I stand by (indiscernible)

12   hemorrhaging of cash and all the factors that you just

13   alluded to are correct.  The balance sheet was upside down

14   and I'm not using that as an excuse to say that, you know, we

15   were looking for any out.

16        You know, my comments (indiscernible) a real

17   liquidity issue.  We were requesting solvency opinions or

18   some sort of analysis, whether it's a, you know, whether Cred

19   was still a going-concern from a professionalized basis like

20   a third-party accounting firm or something to that effect.

21        You know, all of my comments around Visa and all

22   the items around the third quarter were certainly more hope

23   than grounded in facts, if you want to -- and that was my

24   belief at the time that, you know, maybe there is a way we

25   can turn this ship around, but certainly, the numbers did not

1    change and they kept getting worse and worse and worse over

2    time and that's what ultimately led to my departure where,

3    you know, as a result of these relationships, I just didn't

4    think we could make back our assets and get back to meet our

5    liabilities.

6           I'm not foregoing or saying anything about those

7    comments are incorrect.  They're absolutely correct and I

8    documented those very well to the investment committee on a

9    month-by-month basis.  And to believe that, you know, it was

10   wrong to continue at the time, looking back at the events

11   that transpired, all I'm just simply alluding to is in

12   September there was a glimmer of hope that had

13   (indiscernible) given the company's (indiscernible) and Visa

14   was a big win for the company, which, you know, looking

15   hindsight 20/20, you know, the numbers were way more

16   meaningful than the relationship.

17          MR. SARACHEK:  Thank you.

18   BY MR. SARACHEK:

19   Q    One -- two more questions.  In your declaration, again,

20   of December 1st, Document Number 97, you refer to

21   misrepresentations and omissions around worthless

22   cryptocurrency.  You put in there 14.709 million, the

23   uncollectible loan to moKredit and the uncollectible customer

24   loans.

25          What are you referring to when you refer to worthless

1  cryptocurrency in the sum of 14.079 million?

2  A     So, there were three tokens that Cred owned on its

3  balance sheet, which in my opinion, they're sort of

4  artificially inflating the value.  And if you look at all the

5  different input types, you know, level one through level

6  three, for example, with respect to valuation for a balance

7  sheet, level one typically refers to something with a very

8  deep, liquid market that you can rely on publicly traded

9  prices.

10  We were relying on publicly traded prices that were

11  available via websites like CoinMarketCap or CoinGecko to

12  price LVA (indiscernible) and UPT as independent tokens.  And

13  so, the reason I call them worthless is because the combined,

14  average daily traded volume was significantly low and if, at

15  any point in time, we wished to make whole on that investment

16  and actually translate that into cash, the selling pressure,

17  itself, would lead to an exponential reduction in the market

18  value of those assets.

19  So, you know, typically, people do one of two things.

20  Either they go to, you know, an OTC to figure it out for them

21  or they sell small chunks, you know, on a daily basis.

22  And I think at the time -- and I may be misquoting a

23  little bit -- but the combined trading value of all three of

24  the assets combined was somewhere between fifty and $100,000

25  on the upside, which, you know, and, obviously, you can't

1    sell significant assets for that.

2         And then the other piece of it is, after the bankruptcy

3    motion or the first day hearings -- I forgot the exact

4    legalese -- the ability to sell out of those positions is

5    incredibly more difficult, given that no one -- like, there's

6    probably a lot fewer buyers of these assets, considering the

7    situation for Cred.

8    Q    Thank you.

9         Last question.  You, in your declaration, say:

10             "It is my opinion that Cred has no chance of

11   undergoing a successful reorganization or sale of its

12   business as a going-concern because lending is a business

13   based on trust and cryptocurrency expertise.

14             Based on my expansive knowledge of the crypto

15   space, Cred's competitors do not need to pay for its

16   financial platform; they already have their own platforms,

17   nor their customers."

18        Is that your opinion still, and what do you mean by

19   that?

20             MR. GROGAN:  Objection, Your Honor.

21             The debtors object --

22             UNIDENTIFIED:  Objection, Your Honor.

23             THE COURT:  One at a time.

24             MR. GROGAN:  Your Honor, the debtors object to the

25   question because the witness has not been qualified as an

1    expert to render an opinion and this is not a lay opinion.

2              THE COURT:  And I think someone else had an

3    objection?

4              UNIDENTIFIED:  The committee joins in that

5    objection.

6              THE COURT:  All right.  Yeah, I'm going to sustain

7    that objection and I'm also going to -- Mr. Sarachek actually

8    represents parties who are also moving to either convert or

9    appoint a trustee.

10             So, I view this as direct testimony, not cross-

11   examination.  So, when Mr. Sarachek is done, I'm going to

12   reopen it for cross from the debtors and the committee.

13             Go ahead, Mr. Sarachek.  Do you have any more

14   questions?

15             MR. SARACHEK:  No.  I mean it's in his declaration,

16   Your Honor, which is Document Number 97.  But no more

17   questions, thank you.

18             THE COURT:  All right.  Does anyone wish to cross,

19   based on that testimony?

20             MR. PFEIFFER:  Your Honor, this is Mark Pfeiffer.

21   I represent James Alexander and I am from Buchanan,

22   Ingersoll & Rooney.

23             I have a question, a very brief line of questions

24   related to the cross-examination of this witness.  It relates

25   to the flow of funds from Mr. Hua to the debtors of the 300

1    Bitcoin.

2              May I inquire of this witness now?

3              MR. GROGAN:  Your Honor, James Grogan.

4              May I be heard?

5              THE COURT:  Go ahead.

6              MR. GROGAN:  Thank you, Your Honor.

7              Your Honor, we object to the standing of

8    Mr. Alexander to be heard at this proceeding.  Mr. Alexander

9    is not a creditor or a shareholder or a party in interest in

10   any way.  He is a defendant in a turnover action pending

11   before Your Honor.  That does not give him global standing to

12   be heard on any issue that comes up in the Chapter 11 case.

13             THE COURT:  Response?

14             MR. PFEIFFER:  Yes, Your Honor.  Mark Pfeiffer.

15             Mr. Alexander is the sole director of Cred Capital,

16   although, his position as the sole director is disputed.

17   Mr. Alexander is also the holder of a proxy from the sole

18   shareholder, burden shareholder of Cred Capital, although,

19   that position (indiscernible) disputed.

20             Under 1109(b), Mr. Alexander has standing and under

21   the Third Circuit's decisions in, In re Global

22   (indiscernible), he has standing.

23             This can impact Mr. Alexander's interests and there

24   is a real issue here as to whether or not Cred Capital has

25   the authority to file a bankruptcy and whether it was

1    authorized by the appropriate directors.  And it's

2    Mr. Alexander's position that it was not, because he is the

3    sole director of Cred Capital.

4            THE COURT:  All right, well, that's the subject

5    matter of a separate motion, which is not the motion that I'm

6    hearing right now.  So, I'm going to deny the request to

7    examine the witness now in connection with that motion.

8            Mr. Inamullah is subject to being recalled when we

9    get to that motion, but right now, I don't think it's

10   appropriate.

11           MR. PFEIFFER:  Understood, Your Honor.  Thank you.

12           THE COURT:  With that, I will turn it back over to

13   debtors' counsel.

14           Do you have any additional cross, based on

15   Mr. Sarachek's examination?

16           MR. LIN:  Yes, just a few more questions, Your

17   Honor.  Thank you.

18                      CROSS-EXAMINATION

19   BY MR. LIN:

20   Q    So, Mr. Inamullah, you were responsible for handling

21   investment with Cred, correct?

22   A    Yes.

23   Q    So, you were ultimately responsible for paying customer

24   redemptions, right?

25   A    Whatever do you mean by paying customer redemptions?

1    Q    Did you ever return cryptocurrency to a customer that

2    was seeking a redemption?

3    A    Yes.  I assume, at least, whether it's through our

4    operations team or through Uphold, yeah, we returned

5    (indiscernible).

6    Q    Sir, let me clarify.  I was asking of you, though, in

7    terms of, did you transfer, physically transfer

8    cryptocurrency to a customer?

9    A    I'm sure I probably did.  I don't really remember a

10   specific instance, but it's certainly possible I did.

11   Q    And you mentioned that there was an operations -- I'm

12   sorry?

13   A    I said, And likely (indiscernible).

14   Q    Okay.  But you mentioned that there's an operations

15   department and an accounting department that would handle

16   these redemptions, correct?

17   A    Yes.

18   Q    And these departments were primarily responsible for

19   customer redemptions, correct?

20   A    Well, I mean it was really ad hoc.  You have to

21   remember, like, this was a start-up company, so we moved

22   toward professionalizing that later on throughout the year,

23   but, I mean, (indiscernible) if Heidi, for example, wasn't

24   available to (indiscernible) the transfer, I may send the

25   request to transfer the funds, yes.

1    Q    But your specific job role, you testified earlier, as a

2    member of the capital markets team was handling investments,

3    maximizing the return on these investments, correct?

4    A    Yes.  I was also part of the team.  You know, it's not a

5    huge organization, so I helped out where I could.

6    Q    I'm sorry, you're breaking up for me.

7         Can you repeat the first half of that.

8    A    Yeah, I said it's not a huge organization, so I did what

9    I could to help out.

10   Q    But, again, we're talking about your primary

11   responsibility, though, right; it was primarily handling

12   investments, correct?

13   A    Yes.

14   Q    Have you ever done any tracing analysis for Cred?

15   A    No, that's not in my expertise.

16   Q    Are you able to tell one Bitcoin from another?

17   A    You can see where one Bitcoin has traveled over the

18   blockchain, so, you know, you could trace it back

19   theoretically, yes.

20   Q    And in September of 2020, and I'm referring back to the

21   marketing video that you did and also the increase in price

22   or your recommendation to increase creditor and interest

23   rates by 3 percent, the reason why you did that was because

24   you felt that there was a chance for Cred, based on its

25   relationships with these entities, like Visa, to potentially

1  head off liquidation, correct?

2  A    I think the choice (indiscernible) was more based off

3  (indiscernible) interest rates at the time.

4  Q    I'm sorry, can you say that again.

5  A    Can you hear me fine now?  I was (indiscernible).

6  Q    Yeah, that's better.  I'm sorry if it's just me, but,

7  yeah, I couldn't hear you at all.

8  A    No, no worries.

9       Sorry.  My response was that the decision to change the

10  interest rates specifically was due to competitive pressures

11  where the primary competitors to Cred were also increasing

12  their rates.

13  Q    I'm sorry, but I don't think you answered my question.

14       My question was -- maybe this is more geared toward your

15  YouTube video in late September -- the reason why you made

16  that video and said that there was exciting short-term

17  opportunities at Cred was because you believed that some of

18  these opportunities had the potential to, for Cred to avoid

19  insolvency, correct?

20  A    Yes.

21  Q    Okay.

22            MR. LIN:  No further questions.  Thank you.

23            THE COURT:  Thank you, Mr. Lin.

24            Mr. Evans?

25            MR. EVANS:  We have nothing further.

1          THE COURT:  Thank you.

2          Mr. McMahon, any redirect?

3          MR. MCMAHON:  No, Your Honor.

4          THE COURT:  All right.  Do you have any --

5    Mr. Inamullah, you are excused for now, but you are subject

6    to recall, given that there are other motions pending.

7          THE WITNESS:  Thank you, Your Honor.

8          THE COURT:  Mr. McMahon, do you have any other

9    witnesses?

10          MR. MCMAHON:  Your Honor, (indiscernible) for one

11   moment.  Being that he's subject to recall, do you want my

12   client to drop off his CourtCall and call back in or, just as

13   a procedure point, how should we handle this?

14          THE COURT:  Well, there hasn't been a request for

15   sequestering witnesses, so unless there is, he's allowed to

16   stay on if he wants to or he can leave if he wants to.  It

17   would be up to him.

18          MR. INAMULLAH:  I'm at home anyway for the rest of

19   the day, so if I'm needed -- I'd prefer to get off and if I'm

20   needed, I'm happy to jump back on (indiscernible).

21          THE COURT:  Okay.  It's up to -- there's no motion

22   to sequester, unless someone is going to make one now.

23        (No verbal response)

24          THE COURT:  And I don't hear anything, so

25   Mr. Inamullah, you can either stay on and you can turn off

1    your video and mute your phone or you can drop off and we'll

2    have Mr. Billion contact you if we need to have you testify

3    further.

4              THE WITNESS:  Thanks, Your Honor.

5              THE COURT:  All right.  Thank you.

6              All right.  Mr. McMahon -- I'm sorry -- any other

7    witnesses?

8              MR. MCMAHON:  Well, no live witnesses, Your Honor.

9              Back to the issue of Mr. Schatt.  Exhibit U.S.

10   Trustee 18 is the December 14th, 2020, deposition transcript

11   that we referenced earlier in today's hearing, and with

12   respect to that, Your Honor, I note that we issued a subpoena

13   for the deposition, which was *duces tecum* and the witness,

14   you know, was asked to produce a series of documents.  And we

15   received objections.  Not a single document was produced.  I

16   believe that's on certain pages of the deposition, Pages 25

17   and 26.  I'll note that for the record.

18             Your Honor, beyond that, we have a very short

19   judicial notice request to make and that is Document

20   Number 1 --

21             THE COURT:  Well, hold on.  Let me ask -- hold on.

22             Let me ask, first, if there's any objection to the

23   deposition?

24             MR. CARLTON:  Your Honor, this is Scott Carlton

25   from Paul Hastings on behalf of the debtor.

1          We would object to the wholesale admission of

2     Mr. Schatt's testimony.  It's a six-hour deposition, largely

3     irrelevant and/or cumulative of the facts in this proceeding.

4          We would request -- and we made this request to the

5     U.S. Trustee yesterday -- that the U.S. Trustee designate the

6     relevant portions of the transcript, allowing the parties to

7     counter-designate and submit appropriate evidentiary

8     objections to the deposition transcript.

9          We would also like to note for the record that Mr.

10    Schatt is no longer an officer or director of the debtors and

11    the debtors had no ability to control his appearance today.

12         THE COURT:  He's an employee.  Didn't I see in the

13    papers that you've retained him as an employee?

14         MR. CARLTON:  Yes, but that doesn't give us control

15    over his appearance at the deposition.

16         THE COURT:  It certainly does in my book.  You have

17    the right to compel an employee to appear at any time.  So,

18    yes, in my book, you had the opportunity and you declined to

19    do it.  You can order an employee to appear.  He's an

20    employee.

21         But we'll go ahead and do the designations,

22    Mr. McMahon.

23         MR. MCMAHON:  Understood.

24         MR. EVANS:  Your Honor, this is Joe Evans from the

25    commission.  If I could just be heard?

1          The witness here is not an unavailable witness.  I

2     mean, there's not a court-order requiring him to be here, so

3     admitting the testimony and the deposition, we think is

4     inappropriate.  There was only a subpoena issued, I believe,

5     yesterday, and so the wholesale admit is definitely, I think

6     not the right result.

7          And we'll participate in whatever process the

8     trustee plans to do, but he shouldn't be deemed an

9     unavailable witness under 804.

10         THE COURT:  He is unavailable.  It's admissible.

11         And Mr. McMahon, go ahead and designate your

12    portions, turn it over to the debtors and the committee to

13    make whatever counter-designations they want and submit it in

14    final form to the Court.

15         MR. MCMAHON:  Your Honor, with respect to that,

16    does Your Honor have a preferred timetable, with respect to

17    that?

18         THE COURT:  Well, we have to get this decided

19    before anything else happens in this case, so I would suggest

20    that the parties do that certainly before -- we're already

21    coming up on the holidays -- I would say it should be done by

22    Monday, at the latest.

23         MR. MCMAHON:  Understood, Your Honor.  Thank you.

24         With respect to the remaining documents, then, we

25    would move for the admission of Exhibit U.S. Trustee 11,

1    which is the Cred, Inc. bylaws.

2              THE COURT:  Is there any objection?

3         (No verbal response)

4              THE COURT:  Okay.  They're admitted, without

5    objection.

6         (U.S. Trustee Exhibit 11 received into evidence)

7              MR. MCMAHON:  And with respect to the judicial

8    notice request, Your Honor, the Docket Number 1, the

9    Cred, Inc. petition?

10             THE COURT:  I'll take judicial notice of anything

11   that's filed on the docket.

12             MR. MCMAHON:  Okay.  Docket Number 12, the Schatt

13   first day declaration.

14             And Docket Number 16, the McManigle declaration.

15             THE COURT:  All right.  I'll take judicial notice

16   of those, as well, and note that they were admitted into

17   evidence at the first day hearing.

18             MR. MCMAHON:  Thank you, Your Honor.

19             That concludes the U.S. Trustee's case in chief and

20   I thank Your Honor.

21             THE COURT:  All right.  Thank you.

22             All right.  Do the debtors have any witnesses?

23             MR. GROGAN:  Your Honor, James Grogan for the

24   record.

25             We do.  We have four witnesses.  The first witness

1    I'd like to call is Grant Lyon, L-y-o-n.

2                THE COURT:  Well, who are the rest of your

3    witnesses?

4                MR. GROGAN:  Your Honor, we will also call Pablo

5    Bonjour and Chris Wu, W-u, and Matthew Foster.

6                THE COURT:  All right.  We're not going to get

7    through this today because I have a sale hearing at

8    three o'clock.

9                I'm sorry, what was the last witness' last name?

10               MR. GROGAN:  Foster, F-o-s-t-e-r.

11               THE COURT:  How long do you think it's going to

12   take with Mr. Lyon, because I need to, like I said, I have a

13   three o'clock sale hearing, so ...

14               MR. GROGAN:  Your Honor, I would first like to

15   introduce his declaration, which was filed at Docket

16   Number 109-1, into evidence, and then I will have a short

17   additional direct, probably 10 minutes or less.

18               THE COURT:  All right.  Well, we're going to have

19   to be done by at least 2:50.  So, I don't know, is anybody

20   else going to cross?

21               Mr. McMahon, do you think you're going to have a

22   cross?

23               MR. MCMAHON:  Your Honor, my guess is that it would

24   be limited, if at all.

25               THE COURT:  Anybody else going to cross witness?

1          (No verbal response)

2          THE COURT:  I don't want to be in a position where

3     this witness is on cross and we have to stop for the day.

4          So, we'll go ahead and go forward, but if anybody

5     jumps up and says they want to cross him afterwards, unless

6     you've let me know now that you anticipate that you will,

7     don't ask me later.

8          So, go ahead, Mr. Grogan.  Call your witness.

9          MR. GROGAN:  Your Honor, we call Grant Lyon.

10         THE COURT:  All right.  First, any objection to the

11    admissibility of his declaration?

12         (No verbal response)

13         THE COURT:  Okay.  It's admitted, without

14    objection.

15         (Lyon Declaration received in evidence)

16         THE COURT:  Mr. Lyon, are you on Zoom?

17         MR. LYON:  Yes, sir.  My hand is up.

18         THE COURT:  I see you.  Okay.  We'll go ahead and

19    spotlight you.

20         Okay.  Mr. Lyon, can you raise your right hand,

21    please.

22         State your full name for the record and spell your

23    last name.

24         THE WITNESS:  Gary Grant Lyon, L-y-o-n.

25         (Oath administered)

1           GARY GRANT LYON, DEBTORS' WITNESS, AFFIRMED

2          THE WITNESS:  I do.

3          THE COURT:  Thank you.  Go ahead, Mr. Grogan.

4          MR. GROGAN:  Thank you, Your Honor.

5               DIRECT EXAMINATION

6  BY MR. GROGAN:

7  Q   Mr. Lyon, can you just introduce yourself to the Court

8  and tell the Court a little bit about your background,

9  education, and work history.

10  A   Sure.  I've done restructuring for the past 30 years.  I

11  have a bachelor's in accounting and an MBA, both from Brigham

12  Young University.

13     I started work at Arthur Andersen in 1989 in their

14  restructuring practice and through my career, I have

15  testified numerous times.  I've been a Chapter 11 Trustee

16  numerous times.  I've been a State Court receiver.  I have

17  testified, I think, in over seven or eight different

18  bankruptcy jurisdictions and other Federal Court

19  jurisdictions, and I've sat on approximately 30 different

20  boards of directors, all of for companies which either, (A),

21  needed an independent director, or (B), was either going into

22  or about to come out of a restructuring.

23  Q   And what's your current relationship with Cred?

24  A   I am currently the sole board of director -- member

25  of -- sole director of the board.

1    Q    And when did you first hear of Cred?

2    A    On or around October 30th of this year.

3    Q    And prior to October 30th, had you ever met or spoken

4    with Dan Schatt?

5    A    No.

6    Q    Had you ever met or spoken with Lu Hua?

7    A    No.

8    Q    So, in your current position as sole director, what are

9    your responsibilities?

10   A    My primary responsibility right now, to oversee the

11   restructuring process with the assistance of a CRO, Mr. Matt

12   Foster, as well as other professionals, including the law

13   firm of Paul Hastings, and the accounting group of or the

14   restructuring group of MACCO --

15   Q    Are any of the pre --

16   A    -- as well --

17   Q    Oh, I'm sorry.

18             THE COURT:  I don't think he was done yet,

19   Mr. Grogan.

20             THE WITNESS:  As well as oversee the sales process

21   that we're undergoing currently.

22   BY MR. GROGAN:

23   Q    Thank you.  Are any of the pre-petition officers still

24   in their positions with the debtor?

25   A    Not as officers.  The only person that used to be an

1    officer or a director that has any connection is Mr. Schatt.

2         He has been put on the 30-day, what I'll call contract.

3    His pay has been dropped from twenty to $10,000 a month, but

4    his only service is to see if he can add value in the sales

5    process.  He has no decision-making authority, as far as the

6    company is concerned.

7    Q    I'd like to ask you a little bit about recent

8    developments.  Have you had any communications with your

9    creditor constituencies recently?

10   A    Yes, with the creditors committee and their

11   professionals.

12   Q    And tell the Court, if you would, what the substance of

13   those discussions has been.

14   A    Well, from the onset both, with counsel, yourself, and

15   other advisors, I've always taken the position in this case

16   that the creditors committee and the debtors should be hand-

17   in-hand walking through this case.  There should be no light

18   between us.

19        And I want to make sure that we can work together,

20   because at the end of the day, I think a lot of the claims,

21   causes of action that are going to be litigated, will

22   probably be litigated in a post-confirmation trust and I want

23   to make sure the creditors committee has input and

24   involvement in the activities of this case during the

25   pendency of the bankruptcy.

1          So, we have put together a PowerPoint presentation,

2     which we made earlier this week, to the creditors committee.

3     We have put together a plan support agreement, and I think

4     it's been filed with this Court, evidencing that we want to

5     work hand-in-hand with the creditors committee and its

6     professionals.

7               MR. GROGAN:  Austin, can you please upload

8     Exhibit 18, Debtors' Exhibit 18.

9     BY MR. GROGAN:

10    Q    Mr. Lyon, can you see that document?

11    A    It's a little small.  If it could be increased in size,

12    it would help.  Thank you.

13    Q    Do you recognize this document?

14    A    I do.  That's the plan support agreement that I just

15    referenced.

16              MR. GROGAN:  Okay.  Your Honor, we'd move to admit

17    it debtors' Exhibit 18 into evidence.

18              THE COURT:  Any objection?

19         (No verbal response)

20              THE COURT:  It's admitted, without objection.

21         (Debtors' Exhibit 18 received into evidence)

22    BY MR. GROGAN:

23    Q    Mr. Lyon, are any of the pre-petition officers or

24    employees getting releases under this agreement?

25    A    No.

1    Q    And that would include Mr. Inamullah, correct?

2    A    Correct.

3    Q    Are you currently investigating whether there are any

4    viable causes of action against pre-petition officers,

5    directors, or employees?

6    A    Yes.

7    Q    Can you tell the judge a little bit about your efforts

8    in regards to that investigation.

9    A    The primary effort has been to understand what happened

10   here and whether or not funds were absconded with or

11   decisions made that, in my judgment, could give rise to a

12   cause of action.

13   Q    Have you been able to reach any conclusions yet?

14   A    Well, we've been on the job for about six weeks now, so

15   I have preliminary conclusions.  I think there potentially

16   could be causes of actions against some parties, although,

17   our investigation is not finished, and I also want to

18   continue the investigation side-by-side with the creditors

19   committee.

20        Given their recent formation and selection of

21   professionals, we've discussed those issues, but we haven't

22   jointly made any efforts to investigate, other than us

23   reporting to them what we found so far.

24   Q    Okay.  And under the terms of your plan support

25   agreement with the committee, what are you proposing to do

1    with any viable causes of action that may be asserted on

2    behalf of the estates?

3    A    They would be vested in a post-confirmation litigation

4    or liquidation trust, whose members would be chosen by the

5    committee.

6    Q    And do you think the debtors have a viable path to

7    confirm that kind of a plan?

8    A    Yes.

9    Q    And do you think that they can confirm it within the

10   time frame that's established under the plan support

11   agreement?

12   A    I do, otherwise, I wouldn't have agreed to it.

13         MR. GROGAN:  Austin, could you please upload

14   Debtors' Exhibit 1.

15   BY MR. GROGAN:

16   Q    Mr. Lyon, do you recognize this document?

17   A    I do.

18         MR. GROGAN:  Austin, can we go to the bottom, to

19   the signature line.

20   BY MR. GROGAN:

21   Q    And is that your signature where it says (indiscernible)

22   Grant Lyon?

23   A    Yes, sir.

24         MR. GROGAN:  All right.  Let's scroll back up.

25         All right.  Can you leave it at Paragraph 2.

1   BY MR. GROGAN:

2   Q    Mr. Lyon, take a look at Paragraph 2.  What's your

3   understanding of what you were doing in Paragraph 2 when you

4   signed this resolution.

5   A    Appointing Mr. Matt Foster of Sonoran Capital as the CRO

6   of the debtor.

7          MR. GROGAN:  I'd like to move to introduce Debtors'

8   Exhibit 1 into evidence at this time.

9          THE COURT:  Any objection?

10       (No verbal response)

11         THE COURT:  It's admitted, without objection.

12       (Debtors' Exhibit 1 received into evidence)

13  BY MR. GROGAN:

14  Q    Mr. Lyon, can you tell the Court what responsibilities

15  you have vested in Mr. Foster.

16  A    Mr. Foster is primarily what I (indiscernible) the chief

17  restructuring officer.  He assists in the operations of the

18  debtor.  He is the custodian of numerous bank accounts and

19  wallets, crypto wallets.  He performs certain analysis at my

20  request, in terms of various causes of action or accounting

21  issues that I may have questions for.  And he would assist,

22  along with MACCO, in preparation of various documents for the

23  Court.

24  Q    Does he report directly to you?

25  A    He does.

1    Q    Does Mr. Schatt have any say over his responsibilities?

2    A    No.

3    Q    Does Mr. Hua have any say over his responsibilities?

4    A    No.  No one does but myself.

5    Q    Thank you.

6          MR. GROGAN:  Austin, can you upload Debtors'

7    Exhibit 2.

8    BY MR. GROGAN:

9    Q    Mr. Lyon, do you recognize this document?

10   A    I do.

11   Q    And what is it?

12   A    It's the removal of Mr. Schatt as the CEO of the

13   company.

14        I put him in the position of a consulting employee.

15   Q    Thank you.

16          MR. GROGAN:  Can we scroll down to the bottom.

17   BY MR. GROGAN:

18   Q    Is that your signature down on the signature line?

19   A    Yes, sir.

20          MR. GROGAN:  Your Honor, I'd move to admit Debtors'

21   Exhibit 2 into evidence.

22          THE COURT:  Any objection?

23      (No verbal response)

24          THE COURT:  It's admitted, without objection.

25      (Debtors' Exhibit 2 received into evidence)

1        MR. GROGAN:  Your Honor, that's all the questions I

2   have for this witness.

3        THE COURT:  Thank you.

4        Mr. McMahon, any cross?

5        MR. MCMAHON:  Just very briefly, Your Honor.

6                      CROSS-EXAMINATION

7   BY MR. MCMAHON:

8   Q    Mr. Lyon, good afternoon.

9        You indicated that you learned of the Cred opportunity

10  video on October 30th, correct?

11  A    On or around, yes.

12  Q    How did you learn of it?

13  A    My partner, Mr. Sean Hassle (phonetic), as I testified

14  in my deposition, received a call from Mr. Grogan.  After

15  talking with my partner Mr. Hassle, and understanding the

16  opportunity, he and I decided that I would be the better

17  partner to handle this one, at which time I got ahold of

18  Mr. Grogan.

19  Q    And who are the debtors' equity holders, as we sit here

20  today?

21  A    My understanding is Mr. Schatt owns 50 percent and

22  Mr. Hua owns the other 50 percent.

23  Q    And you've talked about your authority over the chief

24  restructuring officer.

25        Does anyone have any authority over you?

1  A    I guess, technically, per state law, the equity could

2  replace me; however, if they did, I think there would be an

3  immediate Chapter 11 Trustee placed.

4  Q    It may happen sooner.

5  A    (Indiscernible.)

6  Q    With respect to Sonoran Capital, the number of --

7  Sonoran is the firm that has been appointed as -- they're

8  supplying personnel, as to chief restructuring officer and

9  chief financial officer, correct?

10  A    Could you ask that question again.  I'm sorry.

11        They're supplying?

12  Q    Sure.  Is Sonoran Capital Partners the firm that is

13  supplying the chief restructuring officer and chief financial

14  officer to the debtors?

15  A    Correct.

16  Q    How many times have you worked with Mr. Foster or

17  Sonoran, prior to the Cred engagement?

18  A    Ten or 15 times.

19  Q    All right.  And how many of those engagements have been

20  bankruptcy engagements?

21  A    I think all but about one.

22        MR. MCMAHON:  Your Honor, that's all the questions

23  I have.

24        Thank you, Mr. Lyon.

25        THE COURT:  Thank you.

1          Mr. Lyon, I do have a question for you.  You

2     mentioned that you were going to engage in a sale process.

3     What, exactly, is going to be sold?  Is it a going-concern

4     sale?  Is it an asset sale?

5          THE WITNESS:  Yes, Your Honor.

6          It could be both.  We have engaged investment

7     bankers to perform what I'll call a going-concern sale and we

8     have received, actually, stalking horse offers in the two-

9     million-dollar range.  We may receive more.  So, in my mind,

10    there is value here as to going-concern.

11         In addition, to the extent that a bidder would like

12    to buy illiquid crypto tokens, we would entertain offers

13    there, but the primary mandate is to sell the platform with

14    associated employees and for that platform, we have received

15    stalking horse offers.

16         THE COURT:  Thank you, Mr. Lyon.  I appreciate

17    that.

18         Mr. McMahon, did that prompt any additional cross

19    for you?

20         MR. MCMAHON:  Your Honor, it does not.  Thank you.

21         THE COURT:  Okay.  Thank you.

22         Any redirect?

23         MR. GROGAN:  No, Your Honor.  Thank you.

24         THE COURT:  All right.  Thank you.

25         Mr. Lyon, you are excused.  Thank you.

1          THE WITNESS:  Thank you, Your Honor.

2   (Witness excused)

3          THE COURT:  All right.  We probably do not have

4   time for another witness today.  We can resume tomorrow

5   morning at 9:30 with the caveat that I have another hearing

6   at 1:00.

7          I don't know how long that hearing will go, but

8   we'll start at 9:30 tomorrow morning, go for as long as we

9   can before one o'clock, and then if we have to, we'll pick up

10  after that hearing.  And if we don't finish tomorrow, I'm not

11  sure what's going to happen.  We'll have to think about that.

12         So, for now, we are adjourned for the day and I

13  will see you all tomorrow morning at 9:30.

14         MR. PIERCE:  Your Honor, Matthew Pierce from Landis

15  Rath & Cobb, on behalf of Upgrade Ya Investments, LLC.

16         We have a contested motion on this agenda for

17  Upgrade Ya's lift-stay motion.  I would just like to know if

18  the Court anticipates if that motion will also be going

19  forward tomorrow, just so I can coordinate with my client and

20  the witness that we will be tendering.

21         THE COURT:  Well, it all depends on how long it

22  will take to get through -- we've got to get through this

23  one.

24         There are a number of other contested motions on.

25  I don't know what order the debtor was proposing taking those

1  motions.

2          Mr. Cousins, do you have some sense of that?

3          MR. COUSINS:  Your Honor, I think because of the

4  gating issue around the motion to dismiss and the Chapter 11

5  Trustee, that we'd revert to the agenda letter.  There are

6  five certificates of counsel and one certification of no

7  objection.  So, those, hopefully, won't take a lot of time.

8  We can walk the Court through the blackline, and then we were

9  just going to go in the order of the agenda.

10          THE COURT:  All right.  Well, we still have three

11  witnesses for the debtor for tomorrow.  I don't know whether

12  the trustee will have any rebuttal witnesses.

13          Mr. McMahon, do you think you'll have any rebuttal

14  witnesses?

15          MR. MCMAHON:  Your Honor, I'm not anticipating

16  rebuttal witnesses at this point.

17          THE COURT:  All right.  And how do we deal with --

18  we have another motion to convert or appoint a Chapter 11

19  Trustee.  How are we dealing with that?

20          MR. MCMAHON:  Your Honor --

21          MR. GROGAN:  Your Honor -- sorry, go ahead.

22          MR. MCMAHON:  Your Honor, it's Joseph McMahon.

23  I believe that's Mr. Sarachek's motion, if I'm correct.

24          THE COURT:  Yeah.  Mr. Sarachek, are you going to

25  have any witnesses, Mr. Sarachek?

1          MR. SARACHEK:  Yes, Your Honor.

2          I guess we received (audio interference).

3     Mr. Inamullah would be the witness.  I'm going to confer with

4     my team as to whether we think he's testified fully, but we

5     did have the separate declaration from him.

6          And I want to be clear that, also, to seek

7     Chapter 7 relief, so it's not a Chapter 11 Trustee.

8          THE COURT:  All right.  Well --

9          MR. SARACHEK:  But our only witness is

10    Mr. Inamullah.

11         THE COURT:  All right.  Are there any other motions

12    to convert or to appoint a Chapter 11 Trustee, other than

13    those two?  I know we still have Mr. Alexander's motion to

14    dismiss, as well.

15         UNIDENTIFIED:  Your Honor?

16         THE COURT:  Hold on.

17         What we will do on the motions to convert or

18    appoint a Chapter 11 Trustee is I will -- when we close the

19    testimony tomorrow on the trustee's motion, we will just go

20    right into any additional testimony that Mr. Sarachek has.

21         Mr. Sarachek, I would counsel you to limit it to

22    anything, in addition to what has already been presented by

23    the witnesses today and not try to plow the same ground

24    again, and hopefully we can get through that.

25         And then I will take the testimony of the debtors,

1    any witnesses the committee might have in response to the

2    trustee's motion as evidence in Mr. Sarachek's motion, unless

3    the committee or the debtors believe they would have

4    different witnesses for that motion.

5              MR. GROGAN:  Your Honor, James Grogan.

6              We do not have different witnesses, so our

7    testimony would address all issues related to the removal of

8    the debtor-in-possession.

9              THE COURT:  All right.  Thank you, Mr. Grogan.

10             Mr. Evans, are you going to have any witnesses in

11   connection with any of these motions?

12             MR. EVANS:  We have some declarations, Judge, but

13   we don't intend on putting them on live.

14             THE COURT:  All right.  Unless someone objects to

15   your declarations, I suppose.

16             Who are your declarations of?

17             UNIDENTIFIED:  Your Honor?

18             THE COURT:  Hold on.  I have a question to

19   Mr. Evans.

20             Who are the declarations?

21             MR. EVANS:  One second, Your Honor.

22             Let me correct myself, Judge.  We don't have

23   declarations for these particular motions.

24             THE COURT:  Okay.  So, it sounds like we'll be able

25   to get through -- Mr. Grogan, do you have any sense of -- are

1    your other three witnesses going to take about as long as we

2    had for Mr. Lyon?

3              MR. GROGAN:  So, I think that Mr. Bonjour and

4    Mr. Foster may be slightly longer.  I think that Mr. Wu is

5    going to be about the same length of time.  He will testify

6    primarily on the sale process.  So, I would expect the whole

7    thing to be under, maybe an hour to an hour and 15 or 20

8    minutes.

9              THE COURT:  All right.  Mr. Sarachek, to the extent

10   that you have any cross-examination of the witnesses being

11   put on by the debtors, you should do that tomorrow morning

12   when we reconvene and not wait until we address your specific

13   motion, so we can wrap up all the evidence at one time.

14             MR. PIERCE:  And, Your Honor, Matthew Pierce, on

15   behalf of Upgrade Ya.

16             Just to make clear that Upgrade Ya also, in its

17   reply to a lift-stay motion, we also joined in to the movant

18   and the United States Trustee's motion to convert to a

19   Chapter 7.  So, we may have some cross-examination of the

20   debtors' witnesses and we will have argument on the

21   conversion issue tomorrow.

22             THE COURT:  All right.  Did you have any cross of

23   Mr. Lyon?

24             MR. PIERCE:  We do not have any cross of Mr. Lyon.

25             THE COURT:  All right.  Mr. Sarachek, did you have

1    any cross of Mr. Lyon?  Mr. Sarachek?

2             MR. SARACHEK:  No, we don't have any cross for

3    Mr. Lyon.

4             And I wanted to say, Your Honor, I think if -- can

5    you hear me, Your Honor?

6             THE COURT:  I can, thank you.

7             MR. SARACHEK:  Hello?

8             THE COURT:  I can hear you.  Go ahead.

9             MR. SARACHEK:  Hello?

10            THE COURT:  I can hear you, Mr. Sarachek.

11            MR. SARACHEK:  Your Honor, I was going to say no,

12   and we will -- okay, I wanted to tell the Court that -- Your

13   Honor, I wanted to just advise the Court that we'll be

14   judicious with your time.

15            THE COURT:  All right.  Thank you.

16            MR. BILLION:  Your Honor -- I'm sorry, Your Honor.

17            THE COURT:  Who's speaking?

18            MR. BILLION:  Mark Billion for Mr. Inamullah.

19            The one request I would have, because I think

20   paying me to -- him paying me to sit on the call through

21   other witnesses is probably not expeditious for him.

22            To the extent he's going to be recalled, can I ask

23   that somebody be -- I will be available as we proceed

24   tomorrow and throughout, but if somebody could let us know,

25   that way he's not required to kind of pay for counsel to wait

1    and (indiscernible) him.

2        THE COURT:  Okay.  Mr. Cousins, can you take the

3    lead on making sure that if anyone needs to recall

4    Mr. Inamullah, that Mr. Billion is notified.

5        MR. COUSINS:  Yes, Your Honor, of course.

6        THE COURT:  Okay.  Thank you.

7        MR. BILLION:  Thanks, Your Honor.

8        THE COURT:  All right.  So, I think we have our

9    path forward for tomorrow.  So, we are adjourned until 9:30

10   tomorrow morning.  Thank you.

11       COUNSEL:  Thank you, Your Honor.

12       (Proceedings concluded at 2:53 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        <u>CERTIFICATION</u>

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9    /s/ William J. Garling                    <mark>December 18, 2020</mark>

10   William J. Garling, CET**D-543

11   Certified Court Transcriptionist

12   For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25