1
                    UNITED STATES BANKRUPTCY COURT
2                          DISTRICT OF DELAWARE

3                                     .   Chapter 11
     IN RE:                           .
4                                     .   Case No. 20-12836 (JTD)
     CRED INC., *et al.*,             .
5                                     .   Courtroom No. 5
                                      .   824 North Market Street
6                                     .   Wilmington, Delaware 19801
                                      .
7                         Debtors.    .   December 18, 2020
     . . . . . . . . . . . . . . . . .    9:30 A.M.
8
             TRANSCRIPT OF TELEPHONIC SECOND DAY HEARING
9               BEFORE THE HONORABLE JOHN T. DORSEY
                   UNITED STATES BANKRUPTCY JUDGE
10

11   TELEPHONIC APPEARANCES:

12   For the Debtors:        Scott Cousins, Esquire
                             COUSINS LAW LLC
13                           Brandywine Plaza West
                             1521 Concord Pike, Suite 301
14                           Wilmington, Delaware 19803

15                           - and -

16                           James Grogan, Esquire
                             Mack Wilson, Esquire
17                           PAUL HASTINGS LLP
                             600 Travis Street, Fifty-Eight Floor
18                           Houston, Texas 77002

19
     Audio Operator:         Jason Spencer
20
     Transcription Company:  Reliable
21                           1007 N. Orange Street
                             Wilmington, Delaware 19801
22                           (302)654-8080
                             Email:  gmatthews@reliable-co.com
23

24   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
25

TELEPHONIC APPEARANCES (Continued):

For the Debtors:           G. Alexander Bongartz, Esquire
                           Derek Cash, Esquire
                           PAUL HASTINGS LLP
                           200 Park Avenue
                           New York, New York 10166

                           - and -

                           Austin Prouty, Esquire
                           PAUL HASTINGS LLP
                           1117 S. California Avenue
                           Palo Alto, California 94304

For Jaime Shiller:         David Silver, Esquire
                           SILVER MILLER
                           11780 W Sample Road
                           Coral Springs, Florida 33065

For the U.S. Trustee:      Hannah McCollum, Esquire
                           Joseph McMahon, Jr., Esquire
                           John Schanne, Esquire
                           UNITED STATES DEPARTMENT OF JUSTICE
                           OFFICE OF THE UNITED STATES TRUSTEE
                           844 King Street, Suite 2207
                           Lock Box 35
                           Wilmington, Delaware 19801

For UpgradeYa:             Matthew Pierce, Esquire
                           LANDIS, RATH & COBB LLP
                           919 Market Street, Suite 1800
                           Wilmington, Delaware 19801

For Krzysztof Majdak,      Joseph Sarachek, Esquire
and Philippe Godineau:     THE SARACHEK LAW FIRM
                           101 Park Avenue, 27th Floor
                           New York, New York 10178

For the Committee:         Joseph Evans, Esquire
                           Timothy Walsh, Esquire
                           Darren Azman, Esquire
                           MCDERMOTT WILL & EMERY LLP
                           340 Madison Avenue
                           New York, New York 10173

TELEPHONIC APPEARANCES (Continued):

For Thomas Arehart:        Hollace Cohen, Esquire
                           Carl Neff, Esquire
                           FISHERBROYLES LLP
                           445 Park Avenue, Ninth Floor
                           New York, New York 10022

For Maple Partners LLC:    Lucian Murley, Esquire
                           SAUL EWING ARNSTEIN & LEHR LLP
                           1201 North Market Street, Suite 2300
                           Wilmington, Delaware 19801

1  MATTERS GOING FORWARD:

2  **Cash Management.**  Motion to Debtors to (A) Continue to Operate
   their Cash Management System, (B) Honor Certain Prepetition
3  Obligations Related Thereto, (C) Maintain Existing Business
   Forms, and (D) Continue to Perform Intercompany Transactions;
4  (II) Granting Administrative Expense Status to Post Petition
   Intercompany Balances; (III) Waiving Requirements of Section
5  345(b) of the Bankruptcy Code; and (IV) Granting Related
   Relief [Docket No. 7, 11/08/20]

6
   **Ruling:  Order Entered**
7
   **Employee Wages.**  Motion of Debtors for Entry of Interim and
8  Final Orders (I) Authorizing Debtors to (A) Pay Employee
   Obligations and (B) Continue Employee Benefit Programs, and
9  (II) Granting Related Relief [Docket No. 11, 11/08/20]

10  **Ruling:  Order Entered**

11  **Motion to Extend.**  Debtors' Motion for Entry of Order
    Extending Time to File Schedules and Statements of Financial
12  Affairs [Docket No. 67, 11/18/20]

13  **Ruling:  Order Entered**

14  **Bar Date Motion.**  Motion of Debtors, Pursuant to Bankruptcy
    Code Sections 105(a), 502, and 503 and Bankruptcy Rule 2002,
15  for Entry of an Order (I) Fixing Deadline for Filing Proofs of
    Claim and (II) Approving Form and Manner of Notice Thereof
16  [Docket No. 52, 11/17/20]

17  **Ruling:  128**

18  **Bid Procedures Motion.**  Debtors' Motion for Entry of Orders
    (I) (A) Approving Bidding Procedures, (B) Scheduling an
19  Auction and Sale Hearing and Approving Form and Manner of
    Notice Thereof, and (C) Approving Assumption and Assignment
20  Procedures and Form and Manner of Notice Thereof; and (II)
    Authorizing (A) the Sale(s), Free and Clear of all Liens,
21  Claims, Interests, and Encumbrances, and (B) Assumption and
    Assignment of Executory Contracts and Unexpired Leases [Docket
22  No. 65, 11/18/20]

23  **Ruling:  Order Entered**

24  **MACCO Retention Application.**  Debtors' Application for Entry
    of an Order Authorizing Employment and Retention of MACCO
25  Restructuring Group LLC as Financial Advisor for Debtors,
    Effective Nunc Pro Tunc to Petition Date [Docket No. 57,
    11/17/20]

**Ruling:  Order Entered**

**Teneo Retention Application.**  Debtors' Application for Entry of an Order Authorizing Employment and Retention of Teneo Capital LLC as Investment Banker for Debtors, Effective Nunc Pro Tunc to November 16, 2020 [Docket No. 63, 11/18/20]

**Ruling:  Order Entered**

**Paul Hastings Retention Application.**  Debtors' Application for Entry of an Order Authorizing Employment and Retention of Paul Hastings LLP as Counsel to Debtors, Effective as of Petition Date [Docket No. 64, 11/18/20]

**Ruling:  Taken Under Advisement**

**Sonoran Capital Retention Application.**  Debtors' Motion for Entry of an Order (I) Authorizing Employment and Retention of Sonoran Capital Advisors, LLC to Provide Debtors a Chief Restructuring Officers and Certain Additional Personnel and (II) Designating Matthew Foster as Debtors' Chief Restructuring Officer [Docket No. 95, 12/1/20]

**Ruling:  Taken Under Advisement**

**Creditor List.**  Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to File a Consolidated List of Debtors' 30 Largest Unsecured Creditors, (II) Authorizing Debtors to Serve Certain Parties by E-Mail, (III) Authorizing Debtors to Redact or Withhold Publication of Certain Personal Identification Information, and (IV) Granting Related Relief [Docket No. 6, 11/08/20]

**Motion to Seal.**  Motion to File Under Seal Certain Confidential Information Pursuant to Order (I) Authorizing Debtors to File A Consolidated List of Debtors 30 Largest Unsecured Creditors, (II) Authorizing Debtors to Serve Certain Parties by E-Mail, (III) Authorizing Debtors to Redact or Withhold Publication of Certain Personal Identification Information On An Interim Basis, And (IV) Granting Related Relief [Docket No. 61, 11/18/20]

**Ruling:  Orders Entered**

**Motion to Convert.**  Motion of Krzysztof Majdak and Philippe Godineau for Entry of an Order Pursuant to 11 U.S.C. § 1112(b) (I) Dismissing the Cases; (II) Converting the Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 11 Trustee [Docket No. 62, 11/18/20]

**Ruling:  94**

DEBTORS' WITNESS(s)

**CHRISTOPHER WU**

      Direct examination by Mr. Grogan      10

      Cross-examination by Mr. McMahon     15

      Cross-examination by Mr. Sarachek    15

      Cross-examination by Mr. Peirce      22

      Redirect examination by Mr. Grogan   24


**PABLO BONJOUR**

      Direct examination by Mr. Grogan      26

      Cross-examination by Mr. McMahon     36

      Cross-examination by Mr. Sarachek    41

      Cross-examination by Mr. Pierce      43

      Cross-examination by Mr. Silver      51

      Redirect examination by Mr. Grogan   54

**MATTHEW FOSTER**

      Direct examination by Mr. Grogan      57

      Cross-examination by Mr. McMahon     61

      Cross-examination by Mr. Pierce      63

      Redirect examination by Mr. Grogan   65

      Redirect examination by Mr. Cousins   66


EXHIBITS:                          ID   Rec'd

Declaration of Daniel Schatt              10

Declaration of Christopher Wu             15

1   Declaration of Pablo Bonjour                          35

2   Debtor's Exhibit 38 - Thirteen Week Cash Forecast     41

3   Declaration of Matthew Foster                         56

4   Declaration of Joshua Segall                          106

5   Declaration of Mark Friedler                          106

6   Trustee's Exhibit - Alexander Motion to Dismiss       144
                       Alexander Complaint

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 9:34 a.m.)

2          OPERATOR:   The record has begun and we are now

3   live.

4          THE COURT:   Thank you.

5          Good morning, everyone.   This is Judge Dorsey.

6   We're on the record in Cred, Inc.; Case No. 20-12836.

7          Before we begin this morning, I just want to let

8   everybody know that we have until noon today and then I will

9   have to stop.   So, we will get as far as we can today.

10  Hopefully we can get through, at least, the current motions

11  we have been talking about; the motions to convert or to

12  appoint a Chapter 11 Trustee.

13         Also, a reminder for people in the waiting room,

14  you have to use your proper name and it has to be able to be

15  compared to the CourtCall sheet or we do not let you in, in

16  order to avoid people trying to gain access to disrupt the

17  proceedings.

18         Also, we have fifty-one people on the call, on the

19  Zoom today.   So, if you want to be heard on an issue please

20  us the raise your hand function on Zoom which you can access

21  by clicking on "Participants" on the bottom of the Zoom

22  screen, it brings up the dialog box and one of the options is

23  "Raise Your Hand" and then I can identify who wants to speak.

24  It also moves you to the top left corner of my screen so it

25  makes it easier for me to identify who is talking.

1          So with that, yesterday we were in the middle of

2    the debtor's case in chief.  I believe we finished the

3    examination of Mr. Lyon.  And I will go ahead and turn it

4    over to Mr. Grogan.  Are you going to handle the next

5    witness?

6          MR. GROGAN:  Yes, Your Honor.  Thank you very

7    much.  James Grogan from Paul Hastings on behalf of the

8    debtors for the record.

9          Your Honor, before we call the first witness I did

10   want to let the court know that overnight we reached

11   agreement with the U.S. Trustee on how to proceed with Mr.

12   Schatt's testimony.

13          First, I do apologize that we were unable to get

14   him to testify live; that is on us, and I just apologize to

15   the court.  I'm sorry that happened.

16          The accommodation we have reached is that we're

17   going to submit his deposition transcript in full.  I think

18   that Mr. McMahon was okay with that. I will let him respond.

19          THE COURT:  Mr. McMahon?

20          MR. MCMAHON:  Your Honor, good morning.  Joseph

21   McMahon for the United States Trustee.

22          That is acceptable to the U.S. Trustee, Your

23   Honor.

24          THE COURT:  Okay.  So, I will admit the deposition

25   transcript of Mr. Schatt in its entirety.  What was the

1  exhibit number for that one, Mr. McMahon?

2           MR. MCMAHON:  One moment, Your Honor.  I believe

3  it was -- it's Exhibit U.S. Trustee 18, Your Honor.

4           THE COURT:  All right.  U.S.T. Exhibit 18 is

5  admitted.

6       (Declaration of Daniel Schatt, received into evidence)

7           MR. MCMAHON:  Thank you, Your Honor.

8           MR. GROGAN:  Thank you, Your Honor.

9           Your Honor, our first live witness, then, will be

10 Christopher Wu from Teneo.

11          THE COURT:  Okay.  Mr. Wu, are you on Zoom?

12          MR. WU:  Yes, I am.

13          THE COURT:  There we go.  Mr. Wu, can you place

14 your -- raise your right hand and state your full name for

15 the record, and spell your last name please.

16          MR. WU:  My name is Christopher Wu.  My last name

17 is spelled W-U.

18            CHRISTOPHER WU, DEBTOR WITNESS, SWORN

19          THE COURT:  Mr. Grogan, you may proceed.

20          MR. GROGAN:  Thank you.

21                      DIRECT EXAMINATON

22 BY MR. GROGAN:

23 Q    Mr. Wu, can you tell the court, you know, where you

24 work and what your experience is?

25 A    My name is Chris Wu.  I serve as president and senior

1   managing director of Teneo Capital.  And I run the

2   restructuring group at my firm.  I have been in my capacity

3   at Teneo for the last four years.  I have been an investment

4   banker for twenty-five years.  The first six years of my

5   career were with JPMorgan in the M&A group.  And the last

6   nineteen were focused on distress and restructuring

7   investment banking.  For fourteen years I worked at a mid-

8   market boutique by the name of Carl Marks where I served as

9   co-manager and member of the management committee of Carl

10  Marks Advisors before coming to Teneo four years ago.

11  Q     Thank you.

12        How many Section 363 sales have you run, if you have an

13  estimate?

14  A     Well, I personally managed over a hundred restructuring

15  engagements of which about half, around fifty, have been in-

16  court 363 sales or plan sales on behalf of both debtors and

17  creditors.  On behalf of debtors I have certainly run over

18  twenty.

19  Q     And have you handled DIP financings, post-petition

20  financings?

21  A     I have.  I have originated and structured numerous DIP

22  financings; too many for me to recall.

23  Q     I understand.

24        So what was the -- can you tell the court a little bit

25  about the purpose of your engagement in this case?

1   A      Yes.  I was engaged in order to market the debtor's

2   business as a going concern and canvass the market for

3   strategic interest principally.  Working with me on this

4   engagement are some colleagues from my firm; notably, experts

5   in FinTech as well as a subject matter expert in crypto.  And

6   we have solicited interest from a variety of different spaces

7   including crypto, as well as FinTech, as well as asset

8   managers and brokerages in order to elicit interests for

9   credit as a going concern.  I was also engaged in order to

10  obtain DIP financing as well as exit financing.

11  Q      Thank you.

12         How is the asset sale process going?  Have you started

13  and where does it stand currently?

14  A      So we were retained by the debtor's mid-November and it

15  became clear to me, personally, immediately that this was an

16  urgent situation in which we needed to run a very expedited

17  sale process for a variety of different reasons.

18         So, you know, within my own field of experience I can

19  certainly testify that we're running a more expedited process

20  then I can recall in my career.  That being said, there were

21  already four companies that had solicited Cred as we were

22  being retained and we immediately engaged with those four

23  parties.  And we were in the market, maybe a week, soliciting

24  other interests.

25         So, you know, in my view we had a fairly active process

1  of interested parties.  We had reached out to over eighty

2  parties of whom twelve have signed non-disclosure engagements

3  and we are -- we have a data room in which bidders are

4  actively involved in.  And, you know, obviously, the deadline

5  to submit an offer to serve as a stalking horse is fairly

6  imminent.  It's early in the new year.  So, we are actively

7  in a stalking horse identification/selection process.

8  Q      Thank you.

9         What do you think the appointment of a trustee would be

10 on that process?

11 A      In my opinion the appointment of a Chapter 11 Trustee

12 would delay things.  It's hard to predict, but I would think

13 that a Chapter 11 Trustee would still want to, you know, reap

14 whatever benefits we may produce as a result of the sale

15 process in any case.  So, we would want to continue with that

16 process, but it would be up to, obviously, the trustee to

17 determine the best course of action at that point in time.

18 Q      And you testified earlier that you're running an

19 expedited process here.  Why is that?

20 A      Well I have had some experience with FinTech

21 (indiscernible).  I have had some experience with people

22 intensive, IP intensive businesses.  And it's important to

23 hold the business together in order to attract interest as a

24 going concern.  You know, in my own view strategic bidders

25 (indiscernible) this on or create such a platform on its own

1  it would take time, money and knowledge.

2      So, I think that is part of what we are marketing in

3  addition to a framework of operating in the United States

4  with licenses (indiscernible) operating framework to learn

5  crypto which is still (indiscernible) industry.  And the

6  utility, clearly, of learning crypto.  A lot of investors are

7  very much of a buying mentality.  So, getting it done in

8  crypto is still viewed as an important function as the market

9  develops.

10  Q    Has the -- are prospective bidders aware of the motions

11  that are pending to appoint a trustee?

12  A    Certainly the bidders and certainly the lenders most

13  certainly are aware.  I have not asked everyone if they are

14  watching the courtroom proceedings, but I have been asked on

15  many of them, you know, what, in my opinion, is happening.

16  And they are observing these proceedings.  In some cases I

17  believe it's led to some delay in terms of galvanizing their

18  activity.

19      I sense that there is a little bit of wait and see

20  approach in some of the comments by other witnesses have not

21  necessarily been helpful to the process.

22          MR. GROGAN:  Thank you, Mr. Wu.

23          Your Honor, that is all the questions I have for

24  Mr. Wu in terms of live testimony.  I also would like to move

25  to introduce his declaration which was filed at Docket No.

1  109-4

2         THE COURT:  Is there any objection?

3      (No verbal response)

4         THE COURT:  Okay.  It's admitted without

5  objection.

6      (Declaration of Christopher Wu, received into evidence)

7         MR. GROGAN:  I will yield the witness.

8         THE COURT:  Mr. McMahon, any cross?

9         MR. MCMAHON:  Very briefly, Your Honor.

10                      CROSS EXAMINATION

11  BY MR. MCMAHON:

12  Q    Mr. Wu, good morning.

13      The Chapter 11 Trustee, if appointed, would have the

14  option of continuing the sale process, correct?

15  A    I think that would be up to the Chapter 11 Trustee.

16  Certainly, we would avail ourselves to the extent that our

17  services are needed and deemed relevant for the debtors.

18         MR. MCMAHON:  No further questions, Your Honor.

19         THE COURT:  Thank you, Mr. McMahon.

20         Mr. Sarachek, any cross?

21         MR. SARACHEK:  Yes.

22                      CROSS EXAMINATION

23  BY MR. SARACHEK:

24  Q    Mr. Wu, good morning.

25      Are you familiar with Celsius, BlockFi, and Genesis?

1  A     I'm familiar with them.

2  Q     How does this debtor -- are they competitors to this

3  debtor?

4           MR. GROGAN:  Objection; outside the scope of

5  direct.

6           THE COURT:  Overruled.   You can answer, Mr. Wu.

7           THE WITNESS:  I am certainly not an expert in each

8  of those companies, so I am not qualified to comment on the

9  nature of those companies and how they engage business.  My

10 general understanding is that there are most certainly areas

11 of overlap with the debtors.

12 BY MR. SARACHEK:

13 Q     What is the unique IP that this debtor has that

14 Celsius, BlockFi, and Genesis don't have?

15 A     I think that is also out of the scope of my expertise

16 and I'm not in a position to differentiate business models.

17 You know, I do think that there are elements of the business

18 that are interesting to such party, but beyond that I really

19 can't speculate as to what would be in such party's -- you

20 know, what is in their mind.

21 Q     You're running the sale process, correct?

22 A     Correct.

23 Q     What are you marketing then?

24 A     Well, we're marketing approximately (indiscernible)

25 employees.  Seven or eight of them are in the engineering

1  functions and technical functions.  Several of them are in

2  the product and operations.  As I testified earlier there is,

3  you know, a scope of operations in which the lender lends

4  crypto, has the license to lend in three states.  They have

5  customers that are over 100,000.  They have KYC

6  (indiscernible).  They have a number of active users and they

7  have their own future of in terms of utility tokens.  So, it

8  certainly was a leader in crypto lending amongst a handful of

9  companies.  And (indiscernible).

10 Q    But the debtor isn't lending now, right?

11 A    The debtor is not lending now.

12 Q    So there is really no -- you said one of the things

13 you're marketing is these licenses which, presumably, require

14 state approval and there is no ongoing lending operations

15 going on right now, correct?

16 A    Correct.

17 Q    Are any of the parties that you are talking to

18 creditors of the debtor?

19 A    Not to my knowledge, but even if they were I wouldn't

20 be in a position to disclose that.

21       MR. SARACHEK:  I do think it's relevant, Your

22 Honor.

23 BY MR. SARACHEK:

24 Q    Are any of the parties that you're talking to insiders

25 of the debtor?

1        (No verbal response)

2   Q    Do you know what the word "insider" means?

3   A    Yes, I do.  I'll go with the same response which is the

4   truth.  Not to my knowledge, but even if they were I wouldn't

5   be in a position to disclose that to you.

6            MR. SARACHEK:  Your Honor, I think it's relevant.

7            THE COURT:  I think what Mr. Wu is saying is he's

8   not aware whether any of them are insiders or whether any of

9   them are competitors, but he is not in a position -- even if

10  he did know that they were he's not in a position to disclose

11  who they are because its confidential at this time because

12  they're trying to market the company.  We don't want to

13  disclose who the potential bidders are publicly.

14  BY MR. SARACHEK:

15  Q    Mr. Wu, have you worked with Chapter 11 Trustees

16  before?

17  A    I have not.

18  Q    Do you have any reason to believe that a Chapter 11

19  Trustee wouldn't do what's in the best interest of the

20  debtor?

21  A    I don't, but my knowledge isn't based on personal

22  experience.  As I just said I have not worked with a Chapter

23  11 Trustee.

24  Q    Are you aware with respect to Cred Capital that James

25  Alexander has raised the issue that the assets of Cred

1  Capital are not the debtors and that the debtor did not have

2  authority to file?

3          MR. GROGAN:  Objection, Your Honor; outside the

4  scope of direct.

5          THE COURT:  Overruled.

6          MR. EVANS:  This is Joe Evans from the committee.

7  Objection; hearsay, Your Honor.

8          THE COURT:  I don't see how there is any hearsay.

9  He's asking him if he has knowledge of it.

10         Go ahead, Mr. Wu, you can answer.

11         THE WITNESS:  All right.  Can you repeat the

12  question, Mr. Sarachek?

13  BY MR. SARACHEK:

14  Q    Sure, Mr. Wu.

15       Are you aware that James Alexander has raised in court

16  pleadings, in filings, that Cred Capital -- that the debtor

17  did not have authority -- the debtor's directors did not have

18  authority to file Cred Capital and, thus, those assets,

19  arguably, are not property of the estate if the court so

20  rules?

21  A    I'm aware of the issue.

22  Q    Have any parties -- have any prospective buyers raised

23  this issue to you as a reason that the debtor's assets might

24  be less?

25  A    No, none have.

1  Q    Are you aware of the fraud allegations that have been

2  raised by the debtor in the bankruptcy case?

3  A    I'm aware.

4  Q    Have any parties raised the fraud issues to you with

5  respect to the lending licenses?

6  A    None have.

7  Q    I'm sorry?

8  A    None have.

9  Q    Are you aware of the motion filed by UpgradeYa with

10 respect to the Bitcoin collateral that they assert is their

11 property?

12 A    I have not reviewed their motion.  So, I am not

13 specifically informed.

14 Q    So you are not aware that collateral -- that the debtor

15 is asserting may not be theirs?

16 A    I have no idea --

17         MR. GROGAN:  Objection. It misstates -- excuse me.

18 Objection; misstates his earlier testimony.

19         THE COURT:  Sustained.

20 BY MR. SARACHEK:

21 Q    How will effect a sale, Mr. Wu, if UpgradeYa is

22 successful in their lift stay motion?

23         MR. GROGAN:  Objection; lack of foundation.

24         THE WITNESS:  I told you --

25         THE COURT:  Hold on, Mr. Wu.  Don't respond.  You

1    have an objection from your counsel.

2            Mr. Grogan?

3            MR. GROGAN:  Objection; lack of foundation, Your

4    Honor.

5            THE COURT:  Sustained.

6    BY MR. SARACHEK:

7    Q    Mr. Wu, are you aware that UpgradeYa has asserted an

8    interest in Bitcoin that is in the debtor's possession?

9    A    I actually wasn't.  So, I'm repeating my answer again.

10   Q    Are the parties that you're talking to proposing to buy

11   all assets of the debtor including any Bitcoin or other

12   cryptocurrencies that the debtor has in its wallets?

13   A    I'm not in a positon to disclose that to you.

14           MR. SARACHEK:  No further questions, Your Honor.

15           THE COURT:  Thank you.

16           Redirect, Mr. Grogan?

17           MR. GROGAN:  Thank you, Your Honor.

18           MR. PIERCE:  Your Honor, I have --

19           THE COURT:  Hold on a second.

20           MR. PIERCE:  Your Honor, Matthew Pierce with

21   Landis, Rath & Cobb on behalf of UpgradeYa.

22           We have a few cross examination questions for Mr.

23   Wu if we may.

24           THE COURT:  Do they relate to your motion to lift

25   the stay or to the motions that are currently pending before

1  me?

2          MR. PIERCE:  The motions that are currently

3  pending as UpgradeYa joined in the U.S. Trustee and the

4  movants Chapter 7 conversion motion.

5          THE COURT:  All right.  Go ahead.

6                    CROSS EXAMINATION

7  BY MR. PIERCE:

8  Q     Mr. Wu, the sale doesn't contemplate continuation of

9  past business of the debtors, correct?

10 A     The marketing is the platform in terms of past business

11 practices or go-forward business practices, that would be up

12 to the discretion of the bidder.

13 Q     And if you're selling a platform that could be sold

14 through a Chapter 7 process, correct?

15 A     Anything can be sold through a Chapter 7 process.

16 Q     And are you --

17 A     (Indiscernible) --

18 Q     -- the debtors need to sell any --

19          THE COURT:  Hold on.  He wasn't finished

20 answering.

21          Go ahead, Mr. Wu.

22          THE WITNESS:  I said anything can be sold through

23 a Chapter 7 process if there's a (indiscernible) values or

24 outcomes.

25 BY MR. PIERCE:

1   Q      But it is possible that they could be sold through a

2   Chapter 7 process?

3   A      Of course.

4   Q      And are you seeking to sell any of UpgradeYa's assets

5   or claims against the estate?

6   A      As I testified before I haven't read your client's

7   motion, so I am not familiar with the nature of UpgradeYa's

8   claims.

9   Q      And are the debtors -- sorry, continue.

10  A      It hasn't come up.

11  Q      And just to clarify, are the debtors marketing any

12  claims against the estate?

13  A      The debtor's assets certainly are available.  You know,

14  principally, we are focused on marketing the platform, but as

15  I mentioned before we are also soliciting interest for

16  financing as well.

17  Q      I just want to clarify, is it your testimony that the

18  estate could be or is marketing the estate's affirmative

19  claims against third parties?

20  A      No.  Obviously, our job as debtor's representatives are

21  to maximize value for the estate/

22  Q      Which means that --

23  A      So --

24  Q      -- it could include claims that the estate has against

25  third parties, correct?

1   A     They may or may not.  (Indiscernible) in the process to

2   determine that.

3   Q     And are any of the targets of those potential claims

4   prospective purchasers in the debtor's sale process?

5   A     Not that I'm aware of, but, again, even if I was I

6   wouldn't be in a position to disclose that.

7   Q     But they could be, correct?

8   A     Anything is possible.

9         MR. PIERCE:  Your Honor, I don't have any further

10  questions.

11        Just one point that I would like to clarify for

12  the record before I cede the virtual podium is that Mr.

13  Sarachek does not represent UpgradeYa.  We are counsel to

14  UpgradeYa and his testimony was not coordinated in any way --

15  his questioning was not coordinated in any way with

16  UpgradeYa.  I just wanted to clarify that for the record.

17        With that, Your Honor, I'd cede the virtual

18  podium.

19        THE COURT:  All right.  Mr. Grogan, any redirect?

20        MR. GROGAN:  Yes, Your Honor, very quickly.

21                    REDIRECT EXAMINATION

22  BY MR. GROGAN:

23  Q     Mr. Wu, are you currently negotiating with Daniel

24  Schatt to sell the business to Mr. Schatt?

25  A     I am not.

1 Q     Are you currently negotiating with Lu Hua, H-U-A, to

2 sell the business to Mr. Hua?

3 A     I am not.

4 Q     Are you currently negotiating with Mr. Daniyal

5 Inamullah to sell the business to Mr. Inamullah?

6 A     No.

7 Q     Are you currently negotiating with Mr. James Alexander

8 to sell the business to Mr. Alexander?

9 A     No.

10 Q     In your experience would you expect to get a better

11 value in Chapter 11 then Chapter 7 for these assets?

12 A     I would.  I would expect so.

13         MR. GROGAN:  Your Honor, no further questions.

14         THE COURT:  Thank you.

15         Mr. Wu, you are excused.  You may step down from

16 the virtual witness stand.

17     (Witness excused)

18         THE COURT:  Mr. Grogan, your next witness.

19         MR. GROGAN:  Thank you, Your Honor.

20         Your Honor, I call Pablo Bonjour to the witness

21 stand.

22         THE COURT:  Mr. Bonjour, do you want to take --

23 are you on the Zoom?  I see you there, yes.  Can we --

24         MR. BONJOUR:  Yes.  Can you hear me okay, Judge?

25         THE COURT:  I can.  Mr. Bonjour, would you please

1  raise your right hand, state your full name for the record

2  and spell your last.

3          MR. BOUNJOUR:  My name is Pablo Bonjour.  Last

4  name is spelled B-O-N-J-O-U-R.

5              PABLO BONJOUR, DEBTOR WITNESS, SWORN

6          THE COURT:  Mr. Grogan?

7          MR. GROGAN:  Thank you.

8                      DIRECT EXAMINATION

9  BY MR. GROGAN:

10 Q    Mr. Bonjour, can you tell the court where you work and

11 what your job description is?

12 A    Sure.  So I am a managing director at MACCO

13 Restructuring Group.  We are an interim management services

14 company.  We specialize in financial advisory services

15 primarily to middle market companies who find themselves in

16 either a combination of financial or operational distress.

17 Q    And how long have you been working in the distressed

18 restructuring space?

19 A    So I've got about thirty years of business experience,

20 half of that is in investment banking. I was at Oppenheimer,

21 Lehman Brothers.  At one time I owned my own propriety

22 interest and brokerage firm, that was (indiscernible) FTC

23 Brokerage Operation.  The other half has been in consulting,

24 starting off with advising commodities companies, turning

25 them around eventually led me to Chapter 11's, liquidations,

1 and Chapter 7's.

2 Q    And have you worked with cryptocurrency before?

3 A    I have, yes.  So, I also owned a business called

4 SouthCoast Management Group.  I was (indiscernible) at the

5 time; however, for about the ten years that I ran that

6 company we had multiple clients who engaged us in consulting

7 for Bitcoin.  We had a client out of Canada that was

8 installing or trying to win contracts through Canada to

9 implement, essentially, Bitcoin ATM machines at airports.

10    About three years ago I took over a company called

11 American Financial Holdings that owns or developed its own

12 cryptocurrency.  We trademarked it.  And with that entity I

13 have applied for an international financial entity license

14 through Puerto Rico and that's currently through the second

15 half -- there's two parts to that process.  I'm at the tail

16 end of the first half of that.

17 Q    So what have you been doing for the debtor since the

18 case was filed?

19 A    So the first thing that we did is we got in there and,

20 you know, obviously, wanted to understand the business model,

21 interviewed everybody, looked at the financials.  To

22 summarize what we have been doing we built a thirteen week

23 cash-flow model.  We have developed the first draft of the

24 schedules and statements.  We have also been working on MR's

25 this week, they're almost done.  We attended the IDI

1  interview.  We testified there.  When the CRO was appointed

2  we also transitioned all the information that we had learned

3  over to him, also to the independent director, Grant Lyon.

4  Q    So is it fair to say that at this point you have a

5  somewhat of an understanding of Cred's financial condition?

6  A    Yes.  We have -- so we have a pretty good thirteen week

7  forecast that outlines everything fairly accurately.  We also

8  have a good understanding of where the assets or what assets

9  they have right now.

10 Q    And have you done any investigations into the

11 prepetition financial status of the debtor?

12 A    Yes.  With regard to that, so when we went into a

13 company we were waiting for them to give us their financials.

14 After a couple of weeks of delays we actually asked for

15 access to their online systems which they, you know, gave to

16 us.  We then realized at that point that the company had not

17 reconciled their books throughout the year.  They had

18 actually taken all their transactions and booked them to sub-

19 ledgers, and they did not run it up through their internal

20 accounting system.

21      So, the debtor continues to reconcile their books.  We

22 have helped them with that.  We're not reconciling it for

23 them.  What we're doing is helping them to characterize

24 transactions properly.  We then hand it over to them.  They

25 review it and then they certify that it's accurate under

1  penalty of perjury.

2  Q      And who are you working wiht on that process?

3  A      The lead on that, at our firm, is Paul Maniscalco.

4  He's an MD with twenty-five years of experience as a CPA.

5  He's a forensic accountant.  And we have three or four other

6  people on our team.  And they coordinated that effort with

7  the controller at Cred, two or three of their staff, and the

8  CFO, and COO.

9  Q      And who is the current CFO at Cred?

10  A      The current CFO is Scott Wiley who was recently

11  appointed after Joe Podulka, the previous Cred CFO, was let

12  go.  He is with Scott (indiscernible) Capital.

13  Q      And have you investigated any of the prepetition

14  cryptocurrency trades that the company engaged in?

15  A      Yes.  So, one of the biggest challenges that we had

16  here is really kind of a lack of information.  So, part of

17  our process was to request as much information, try to find

18  as much as possible.  So, that was a big part of our efforts.

19      I was able to get their 2019 trades and also some of

20  the trades for January, February, March.  And we have been

21  contacted with JSP-Systems on a weekly basis and they are

22  moments away from delivering to us the most important

23  documents that we have been asking for and have been working

24  with us for the last two weeks which is all the

25  (indiscernible) which kind of show exactly what went into JSP

1 and what went out of JSP because there was, kind of, a

2 triangular relationship between Cred, JSP, MoCredit and those

3 three.

4 Q    You heard Mr. Inamullah testify yesterday, didn't you?

5 A    Yes.

6 Q    Can you tell the court what your views are on the JST

7 trade and the financial impact it had on the debtor's balance

8 sheet?

9 A    Sure.  Yeah, so this is kind of a -- I mean there are a

10 lot of things going on here.  This is kind of the crux of the

11 case and the part that for whatever reason most people have a

12 difficult understanding.  So, I just want to give a really

13 brief background as to the business model and then what

14 happened in March.

15     So, in summary throughout 2019 Cred, essentially, would

16 take in Cryptocurrency from their customers Bitcoin,

17 (indiscernible), et cetera, and what they would do is, in

18 turn, take that crypto and either send it directly to an

19 asset manager or more than likely what they did instead is

20 they actually sold it first, about seventy, eighty percent of

21 it, they converted it to fiat USD and they sent it to their

22 primary lender at the time which was MoCredit.  MoCredit was

23 paying them sixteen percent rate of interest.

24     So, that was pretty much their business model for most

25 of 2019 as they went into 2020.  It was really during 2020

1   where they started to expand with other asset managers.  The

2   problem comes in is that while that strategy worked out

3   pretty well for them in 2019 and beginning of 2020, the issue

4   came in that when they would sell their crypto, about

5   seventy, eighty percent of it, they would keep the other

6   twenty or thirty percent and they would use that portion to

7   buy future's contracts to hedge against that sale.

8        So to give you an example is they brought in one

9   Bitcoin from a customer, they would then buy the equivalent

10  of one Bitcoin future's contract.  It's a simplistic way to

11  explain it.  And as long as they did that then, you know,

12  when Bitcoin prices went up or down it would have been tandem

13  with it.  So, they were able to, kind of, hedge any potential

14  liability risk.

15       The problem came in, in March.  So from about February

16  15th to mid-March the price of Bitcoin and other

17  cryptocurrencies, which follows suit, dropped from 10,000 to

18  5,000.  And when it did that the hedges that (indiscernible)

19  through JST, the future's contracts, was essentially

20  protecting them.  They got calls that they were, essentially,

21  sold out of those positions.

22       Conversely, they also ate up the equity that they were

23  using to actually buy those future's contracts.  So,

24  effectively, as of March 17th, 2020 Cred was, effectively,

25  short crypto.  In other words they owed their customers back

1  cryptocurrency and they didn't have the other side, the

2  future's contracts to hedge against.  The price had gone up.

3  So, they are, essentially, making the market and based on

4  your report that we have seen from JST on March 17th, 2020.

5  They were, effectively, according to JST, short the market

6  approximately $25 million dollars' worth of cryptocurrency.

7  Q     Did Cred take steps following that to implement new

8  hedges?

9  A     So the first thing that they tried to do is they

10 reached out to MoCredit and MoCredit at the time  had, you

11 know, a substantial bulk of their assets that they

12 transferred and they were getting paid sixteen percent rate

13 of interest approximately.  And it was at that time that

14 MoCredit announced that because they're a Chinese company,

15 they make micro loans to Chinese gamers, and they actually

16 experienced the COVID-19 virus a few months before the United

17 States, that the Chinese regulators had, essentially,

18 provided to Chinese citizens and other businesses the, I

19 guess, more or less temporary reprieve from having to pay

20 back loans and no interest.  Some of that was short term,

21 some of that was supposed to go through 2020.

22      So that was the reason for, at least what Lu Hua

23 claimed at the time as to why he couldn't return any

24 principal.  There is some truth to that.  I mean we haven't

25 verified that.  We have done a little bit of research.  Yes,

1  that was kind of the case in China, but we don't know that

2  much about MoCredit.  What Lu Hua did instead is he sent over

3  300 Bitcoin, I believe, on March 14th.  And so that was, kind

4  of, his contribution to try to help Cred.

5  Q    And do you know what happened with that 300 Bitcoin?

6  A    So it looked like internally Cred Capital may have

7  spent about seventy-five of it, sixty-five or seventy-five

8  Bitcoin and then the remaining 225 Bitcoin was sent to James

9  Alexander and he took it to, I guess, one of his own wallets

10  or somewhere else; I'm not sure where it went, but it left

11  the Cred eco system.

12  Q    And do you know what Cred did with James Alexander

13  after that?

14  A    I believe they fired him and they engaged in litigation

15  to try to get that Bitcoin back.

16  Q    And are you familiar with a company called Quantocoin?

17  A    Yes.  So there is a legitimate company out there called

18  Quantocoin and at some point, I believe, either during 2019

19  or early 2020, I'm not sure when, Cred opened an account with

20  what they thought was Quant Coin or Quantocoin.  And they

21  sent them 800 Bitcoin.  And they had that relationship for

22  about six months.

23      Quantocoin would send them monthly statements showing

24  them here's your 800 Bitcoin, it's now worth 817 Bitcoin.

25  So, you are making money.  When they needed money they

1   reached out to that entity and the emails began to bounce at

2   that point when they were requesting principal back.  After a

3   couple of weeks of not getting a response they reached out to

4   Quantocoin and it was then that they realized that they had

5   actually given the 800 Bitcoin to, effectively, an imposter

6   because they had never heard of Cred and the imposter

7   actually once of the legitimate employees names as their

8   name.  So at that point I believe they realized that that 800

9   Bitcoin was gone and they never had it.

10  Q    And are you able to roughly quantify the financial

11  impact of the losses of the hedges, the transfer of the

12  Bitcoin to James Alexander and the loss of the 800 Bitcoin to

13  the fake Quantocoin on the company's balance sheet?

14  A    Yes.  So -- well, yeah, I mean if we take the current

15  price -- is it okay if I use a calculator?

16  Q    Sure.

17  A    Okay.  So the 800 Bitcoin today would be worth 18

18  million.  The biggest one, of course, is the JST conversion.

19  The problem there is that when they converted that crypto and

20  sent to MoCredit we know there's $39 million at MoCredit that

21  they received, at least, in US dollar or stablecoin.

22       So, the price range when they converted that was around

23  3,500 Bitcoin to about 8 or 9,000 Bitcoin.  So, if you take a

24  multiple of that, it may be twofold that exposure liability

25  cap would be probably $60, $70 or $80 million which is

1 probably one of the biggest liability caps.  The 300 Bitcoin

2 would be worth almost 7 million.

3 Q    Okay.  These -- is there anything in that set of facts,

4 though, other than the fact that Mr. Alexander

5 misappropriated assets that is nefarious or, you know,

6 outside the scope of normal business activity?

7 A    Your saying not including the 800 Quantocoin?

8 Q    Well let me rephrase it.

9 A    Okay.

10 Q    Was the JST trade an ordinary business decision by the

11 company to effectuate?

12 A    Yes.

13 Q    And in your experience is it possible for companies to

14 be defrauded by imposters who steal from them?

15 A    Yes.

16         MR. GROGAN:  Your Honor, I'd like to move, at this

17 point, for the introduction of Mr. Bonjour's declaration into

18 evidence.  It was filed on the docket at No. 109-3.

19         THE COURT:  Any objection?

20     (No verbal response)

21         THE COURT:  Its admitted without objection.

22     (Declaration of Pablo Bonjour, received into evidence)

23         MR. GROGAN:  Your Honor, I have no further

24 questions for Mr. Bonjour.

25         THE COURT:  Thank you.

1          Mr. McMahon?

2               MR. MCMAHON:  Thank you, Your Honor.

3                          CROSS EXAMINATION

4    BY MR. MCMAHON:

5    Q    Mr. Bonjour, good morning.

6    A    Good morning.

7               MR. MCMAHON:  Could we pull-up Debtor Exhibit 38?

8               MR. PROUTY:  Your Honor, this is Austin Prouty

9    with Paul Hastings.  Can I request screen sharing permission?

10              THE COURT:  Yes, we will get that for you.

11              MR. PROUTY:  Thank you, Your Honor.

12   BY MR. MCMAHON:

13   Q    Mr. Bonjour, did your firm prepare this thirteen week

14   cash forecast?

15   A    Yes, we did.

16   Q    Okay.  Could we scroll down to the actual sheet?

17        Thank you.  And I don't know if there is a way to make

18   those numbers a bit bigger.

19        All right.  Mr. Bonjour, I just have some questions

20   regarding this for you.

21   A    Sure.

22   Q    First, the term in-flows as opposed to income is used

23   on this exhibit.  Can you tell me why?

24   A    Well the in-flows we wanted to capture knowing that we

25   were going to get in turn of capital and that the business

1  was technically not an operation.  We wanted to properly

2  quantify any incoming either revenue or money of inflows.

3  Q    Okay.  And if we go to -- I want to take a look at the

4  in-flows column for a second.

5  A    Sure.

6  Q    The term "asset management redemption" what does that

7  mean?

8  A    Where are you seeing that?  Which line?

9  Q    Line Number 1 under in-flows.

10 A    Oh, okay.  So, these are the asset managers that are

11 returning or due to return cryptocurrency and/or fiat

12 currency back to Cred.

13 Q    So, we're talking about assets that were estate

14 property as of the petition date being returned to the

15 debtor's control?

16 A    Yes.  Correct.

17 Q    All right.  And the line that's labeled cryptocurrency

18 conversions in (purchased).  Can you explain to the court

19 what that line means?

20 A    One second.  Cryptocurrency conversions?

21 Q    Correct.

22 A    Okay.  Can we come back to that one?

23 Q    I guess.  Sure.

24 A    I don't want to give the wrong answer.  I know from a

25 10,000 foot level, but I don't want to guess.  So, if we can

1  keep going I will -- when it comes I will give you the

2  answer.

3  Q    Okay.  But if we go to the totals column all the way on

4  the right of the screen, basically, the debtor's source of

5  operating during these bankruptcy cases primarily comes from

6  those conversions, correct, as a primary matter?

7  A    Yes.  Correct.

8  Q    And then, you know, the asset management redemptions

9  are also a big category, but they are the third largest in

10  that range.  Then if we take a look for the --

11  A    Yes, I'm sorry.  Go ahead.

12  Q    The third largest category for the inflows is the

13  interest earned from MoCredit and Elivar [phonetic].  Those

14  are loan repayments, right?

15  A    Correct.  Those are interest payments on MoCredit and

16  Elivar.

17  Q    And they're subject to, I guess, customary commercial

18  risk, right?

19  A    Correct.

20  Q    I mean the estates have already, I guess, indicated to

21  Mr. Hua that there is a potential for litigation involving

22  MoCredit, correct?

23  A    Correct.

24  Q    And there's a possibility to Mr. Hua, basically, stops

25  paying interest, correct?

1  A      That's a possibility.

2  Q      Let's take a look at the in-flows -- strike that.

3         I want to take a look at the operating disbursement

4  Lines 5, 6 and 7.

5  A      Okay.

6  Q      Now would it be fair to say, sir, that these lines,

7  basically, reflect the cost of maintaining the platform?

8  A      Yes.  Correct.

9  Q      Okay.  And they're projected out as if the debtors will

10 be carrying the platform through March 5th, correct?

11 A      Yes.

12 Q      All right.  And if they were to do that, sir, if I

13 understand correctly the -- its $1,955,040 figure there would

14 be the cost of doing so, correct?

15 A      Yes.  I mean I can't really see it, but I'm taking your

16 word for it.

17 Q      Okay.

18 A      That sounds about right.

19 Q      So let's now go to the professional fees --

20 A      Okay.

21 Q      -- section.

22 A      Okay.

23 Q      So, first, your firm put together these numbers?

24 A      Yes.

25 Q      All right.  And is there a series of like, I guess,

1  assumptions -- strike that.

2      Let me ask a first question.  Do they include both the

3  debtors and the professional -- and the committee's

4  professionals?

5  A    I believe they do.

6  Q    Okay.  And with respect to that, the numbers that are

7  here, if we go all the way over to the right you see the

8  number at the end there it's projected the professional fees

9  will be $5,587,081, correct?

10 A    Yes, that is correct.

11 Q    And is there any, like, from the next section down

12 which is the accruals, are there any accruals that are not

13 reflected in that number?

14 A    Let me take a look.  In the professional fees?

15 Q    Correct.

16 A    So if we're looking at the total I think that is the

17 final total is the $6.5.

18 Q    Correct.  Yes.

19 A    There are no accruals.

20 Q    So when we get to the ending cash-flow at the end of

21 this thirteen week forecast how much cash do the debtors

22 anticipate having at the end of the thirteen week process?

23 A    Whatever that number is right there.  It's hard for me

24 to see it on the -- is that 192?

25 Q    Okay.

1        MR. MCMAHON:  Thank you, Mr. Bonjour.  I have no

2  further questions.

3        To the extent that, Your Honor, Exhibit 38 is not

4  in evidence I would move for its admission.

5        THE COURT:  Any objection?

6        MR. GROGAN:  No, Your Honor.

7        THE COURT:  Its admitted without objection.

8      (Debtor's Exhibit 38, received into evidence)

9        THE COURT:  Mr. Sarachek?

10                    CROSS EXAMINATION

11  BY MR. SARACHEK:

12  Q    Good morning, Mr. Bonjour.  Just a few questions.

13       So you testified that in March of 2020 the debtors had

14  a major catastrophic event, correct?

15  A    Yes.

16  Q    How did the debtors fund their operations after March

17  of 2020?

18  A    I'm assuming they had cash on hand and other accounts,

19  other crypto as well.

20  Q    In your investigation, which you testified that you

21  have stared or are undergoing did you see that the debtors

22  were taking customer collateral to fund their operations?

23  A    Well as a general business  model they would take in

24  the cryptocurrency from all customers equally and then

25  immediately comingle that into one large omnibus account

1  which would then immediately go out to other asset managers

2  like MoCredit and the like.

3  Q    Are you familiar, Mr. Bonjour, with the Cred borrow

4  program?

5  A    I am.

6  Q    Are you aware of UpgradeYa?

7  A    I am.

8  Q    Are you aware that certain customers like UpgradeYa who

9  participated in the Cred borrow program assert that the

10  debtor is currently holding its collateral?

11  A    Yes.

12  Q    Does the debtor currently have in its possession enough

13  cryptocurrency collateral to repay all of the Cred borrow

14  lenders?

15  A    No, it does not.

16  Q    You testified that you and your team were responsible

17  for managing the debtors operations.  At the first day

18  hearing the court was provided with a number on the Bitcoin

19  that the debtors had and subsequently the court was provided

20  with a different number.  Why was that?

21  A    Okay.  So a couple of things.  First, we were not -- we

22  haven't managed anything, we're just advisors.  To your

23  second question the crypto, the amount of Bitcoin that was

24  filed on the petition date I believe was around like 90 or 94

25  Bitcoin from memory.  And subsequent to that one of the asset

1  managers on the in-flows turned back to us some of that

2  capital which came in the form of 75 additional Bitcoin

3  units.  So we actually have right now 164 Bitcoin total,

4  approximately.

5  Q    But that is less than the amount of collateral that the

6  Cred borrowers assert, right?

7  A    Right.  When you asked me that question earlier I had

8  the 164 in mind, not the lesser amount.

9  Q    Up until December 7th, 2020 Mr. Schatt, Mr. Dan Schatt

10 was CEO of the company.  What did he do in his capacity as

11 CEO?

12        MR. GROGAN:  Objection, Your Honor; lack of

13 foundation.

14        THE COURT:  Sustained.

15        MR. SARACHEK:  I have no further questions.

16        THE COURT:  Thank you.

17        Anyone else?

18        MR. PIERCE:  Your Honor, Matthew Pierce on behalf

19 of UpgradeYa.  We have a few questions.

20        THE COURT:  Go ahead, Mr. Pierce.

21                    CROSS EXAMINATION

22 BY MR. PIERCE:

23 Q    You're the financial advisor, correct?

24 A    Yes.

25 Q    And you were responsible for creating these thirteen

1  week forecasts, correct?

2  A     Yes.

3  Q     And it's your testimony here today that you understand

4  the debtor's cryptocurrency conversion in-flows from a 10,000

5  foot level, correct?

6  A     Yes.

7  Q     And you don't know -- that means you don't know what

8  the in-flows consist of, correct?

9  A     No.  I do, I just look at the total where it says total

10 in-flows.  I trust my team.

11 Q     You can't tell me today what the constituent parts of

12 those total in-flows are, correct?

13 A     I can.

14 Q     Then what do the cryptocurrency conversion in-flows

15 consist of?

16 A     Those are cryptocurrency that are, essentially, being

17 converted to generate cash-flow.

18 Q     Can we bring up Debtor's Exhibit 38 please?

19       So I would just like to put your attention to the

20 cryptocurrency conversions purchase line.  Do you see that?

21 A     Yes.

22 Q     And five minutes ago when you were testifying with Mr.

23 McMahon you couldn't tell us what that consisted of, is that

24 correct?

25 A     I wasn't sure.

1  Q    What's changed in that five minutes?

2  A    I pulled up the spreadsheet and I clicked on the cell

3  to see where it went and it went to the next -- I couldn't

4  see it on the laptop, its tiny.

5  Q    So you --

6  A    I can see the listing though.

7  Q    Did you refer to Exhibit 38 as its shown here?

8  A    I can't really see the exhibit here.  That is why I was

9  relying on Mr. McMahon to read off the numbers.  I can't see

10 it so I pulled up a like cash-flow model to refer to.

11 Q    So you weren't referring to this document, correct?

12 A    Well its almost the exact same thing.

13         MR. PIERCE:  But it's different.  You know, we're

14 going to ask that the debtors produce that, what you referred

15 to, and we're going to ask that that be introduced into

16 evidence.

17         THE COURT:  Mr. Grogan?

18         MR. GROGAN:  Your Honor, I don't think this is an

19 appropriate document request.  We have already responded to

20 all of their discovery in connection with their motion to

21 lift the stay.  And actually --

22         THE COURT:  The witness referred to a document

23 during his testimony to refresh his recollection.  So that

24 makes that document discoverable.  So I am going to order you

25 to turn it over.

1          MR. GROGAN:  Okay, Your Honor.

2    BY MR. PIERCE:

3    Q     All right.  I am going to direct your attention to week

4    thirteen and I will stay focused there and just have a few

5    questions on the numbers set out there.

6          At the end of week thirteen the debtors estimate that

7    they will have an ending cash balance of $192,088, correct?

8    A     Yes.

9    Q     And at the end of week thirteen the cash balance does

10   not reflect or is not net of the $970,000 of accrued

11   professional fees in week thirteen, correct?

12   A     Correct.

13   Q     And if I direct you towards the bottom you see the line

14   that says net liquidity?

15   A     Yes.

16   Q     And net liquidity is calculated as the ending cash

17   available plus liquid cryptocurrency asset value less post-

18   petition accrued payables, right?

19   A     Okay.  The net liquidity equals the ending cash plus

20   the liquid crypto.  That's right.

21   Q     Okay.  So we're in agreement on what net liquidity is,

22   correct?

23   A     Yes.

24   Q     Okay.  So going back to the forecast week thirteen the

25   net --

1  A     One second.  I'm sorry.  Minus the post-petition

2  payables accrued.

3  Q     Right.  So in week thirteen the debtors estimate that

4  they will have a net liquidity shortfall of $699,585,

5  correct?

6  A     Is that the number on the sheet right there?  I can't

7  really see it.

8  Q     Can we zoom in so Mr. Bonjour can see that in week

9  thirteen please?

10           UNIDENTIFIED SPEAKER:  Is that better, Mr. Pierce?

11           MR. PIERCE:  Yes, it is.

12           THE WITNESS:  And that is the liquidity, yeah.

13  BY MR. PIERCE:

14  Q     Just to make sure that I understand this, even if the

15  debtors start receiving payments from MoCredit January 2021

16  and the debtors sell all of their liquid cryptocurrency

17  assets the debtors still estimate that they are going to have

18  a liquidity shortfall of almost $700,000 by March 5th.  Is

19  that correct?

20  A     I believe that is correct.

21  Q     And this forecast is based on estimated operating

22  professional -- operating costs and professional fee costs,

23  right?

24  A     Yes.

25  Q     And those operational costs and professional fee costs

1  they could be greater than the estimates reflected in this

2  thirteen week forecast, correct?

3  A    Correct, yeah.

4  Q    And all of that has to be paid in full to confirm a

5  plan, correct?  And when I say that -- let me withdraw that

6  question and as it a different way.

7  A    Okay.

8  Q    All of the post-petition accrued professional fee

9  payments or accrued professional fee costs and post-petition

10  operating accrued payables all that has to be paid to confirm

11  a plan, correct?

12  A    Yes.

13  Q    So by March 5th it's possible that the debtor's net

14  liquidity shortfall far exceeds what is estimated in this

15  forecast, right?

16  A    That's possible. Now since you requested the one that I

17  was referring to we made some additional adjustments on that

18  one.  So when you see it, it's actually -- that negative

19  number that you have here, the negative 699, on the latest

20  one that we have is 450.

21  Q    I want to correct the testimony.  This isn't my number.

22  This is your number, correct?

23  A    Sure.   Yeah.

24  Q    This is the debtor's exhibit, correct?

25  A    Right.  We --

1  Q      And the debtor's financial advisors --

2              THE COURT:  Hold on.  Let's not talk over each

3  other.

4              Mr. Pierce, let's not talk over the witness

5  please.

6              Do you wat to finish your response?

7              THE WITNESS:  Yes.  Thank you, Your Honor.

8              As I was saying, we try to update it -- I mean we

9  update it once a week officially, but we work on it daily and

10 especially recently with the significant increase in Bitcoin

11 we see substantial increase in valuation.  So, that number

12 and a few other adjustments that we've made have reversed

13 that negative 699 number that you referenced to a positive

14 450.  So it's about a million dollars better right now.

15 BY MR. PIERCE:

16 Q    I just want to clarify, this is the debtor's document,

17 correct?

18 A      Sure.

19 Q      And this --

20 A      It's a moving part.

21 Q      -- $699,585 liquidity shortfall in week five was put

22 together by the debtors, correct?

23 A      In week thirteen you mean?

24 Q      Yes.

25 A      You said week five.

1  Q      Excuse me.

2  A      You said week five.

3  Q      Sorry.  Let me withdraw that question and ask it again.

4  A      Okay.

5  Q      In this exhibit the debtor's calculated that they will

6  have a net liquidity shortfall of $699,585 in week thirteen,

7  correct?

8  A      Yes.  That is correct.

9           MR. PIERCE:  No further questions, Your Honor.

10          THE COURT:  Thank you.

11          I see Mr. Silver has his hand up.  Mr. Silver?

12          MR. SILVER:  Yes, Your Honor.  David Silver of

13  Silver Miller.  I represent several of the individual

14  investors including Jaime Shiller.  We were the counsel who

15  did the motion to compel about a week and a half, two weeks

16  ago.

17          THE COURT:  Okay.

18          MR. SILVER:  I have very few questions for Mr.

19  Bonjour.

20          THE COURT:  Are you a party to any of the

21  currently pending motions before me?

22          MR. SILVER:  Yes.  We filed a partial joinder in

23  the motion.

24          THE COURT:  Which one?

25          MR. SILVER:  The motion to appoint the trustee

1   with Mr. Sarachek.

2              THE COURT:  All right.  Go ahead.

3                      CROSS EXAMINATION

4   BY MR. SILVER:

5   Q    Mr. Bonjour, I just want to make sure I understood.

6   You testified you did an analysis into Cred's financials,

7   correct?

8   A    Yes.

9   Q    And you spoke with and the debtor provided you all the

10  documents you requested, is that correct?

11  A    Yes and no.  So the challenge is that the debtor has

12  not properly reconciled their books throughout the year.  So,

13  what we had to work with is the terminal value on the balance

14  sheet.  So we took, you know, current bank statements.  We

15  logged in, we looked at what they had.  And then we, of

16  course, took their expenses, we looked at that and we used

17  that to put this together.

18  Q    Do you know what a transactional ID as it relates to

19  cryptocurrency is?

20  A    You're referring to the hash?

21  Q    Yes.

22  A    Yes.

23  Q    Okay.  Were you provided the transactional ID's or hash

24  for the transactions in 2019 and 2020 for the debtor?

25  A    There -- I have seen some spreadsheets that contained

1   data.  I don't know if it extends to 2019.  I have seen 2020.

2   Q    Did that data come from the data or did that data come

3   from information that was provided for the motion to compel

4   that was filed in this case?

5   A    Well the spreadsheets that I have seen are from the

6   company.

7   Q    Okay.  Have you been provided or have you looked into -

8   - has your company, as part of its analysis for Cred's

9   financial condition which you predicate your projections on,

10  done a -- have you done an investigation into where the

11  cryptocurrencies that relate to the transactional ID's for

12  Cred currently sit?

13         MR. EVANS:  Joe Evans for the committee.

14  Objection; outside the scope.

15         THE COURT:  Overruled.

16         THE WITNESS:  So, you know, we are not doing any

17  forensic analysis.  That is not our role.  Our role was as an

18  advisor.  Also, part of the challenges in their

19  reconciliation they, essentially, downloaded their

20  transactions into sub ledgers which are also not reconciled

21  through 2020 and that is what the debtor is working on as we

22  speak.

23  BY MR. SILVER:

24  Q    Well are you aware of any private wallets or any

25  wallets that are related to Cred that hold in excess of 5,000

1  Bitcoin with the present value over $110 million?

2  A     No.

3            MR. EVANS:  Objection, Your Honor.  Joe Evans from

4  the committee.  It assumes facts not in evidence.

5            THE COURT:  Overruled.

6            THE WITNESS:  No.

7  BY MR. SILVER:

8  Q     When you questioned the employees to determine Cred's

9  financial condition did you ask the individual employees

10  about wallets that were associated with Cred?

11  A     Yes.  We asked them to deliver to us any and all

12  information related to any current holdings of

13  cryptocurrency, whether liquid or non-liquid.

14  Q     But to date there has been no transactional analysis

15  done related to the transactional ID's that were provided by

16  the creditor to -- I'm sorry, provided by the debtor to you

17  to reconcile that with the actual investment of my clients

18  who invested 3,500 Bitcoin or the present value of $77

19  million?

20  A     Correct.

21            MR. SILVER:  Thank you.  That is all I have.

22            THE COURT:  Thank you.

23            Mr. Grogan, redirect?

24            MR. GROGAN:  Thank you, Your Honor.

25                      REDIRECT EXAMINATION

1  BY MR. GROGAN:

2  Q    So, I want to take you back to Exhibit 38.  Can we pull

3  that back up?

4       Mr. Bonjour, I just want to make sure the record is

5  clear.  You're testimony is that in terms of the current

6  cash-flow forecast you show a positive ending balance at the

7  end of the thirteen weeks?

8  A    Yes.

9  Q    And that's based upon an updated version of this cash-

10 flow forecast?

11           MR. EVANS:  Objection.

12           THE COURT:  Basis?

13           MR. EVANS:  Your Honor, the basis is that they are

14 questioning him on Exhibit 38 and asking about a document

15 that he referred to that has not yet been produced or is in

16 evidence about an updated cash-flow that he is referring to.

17           THE COURT:  Well he already testified to it when

18 you were cross-examining him.  So, overruled.  I mean he

19 testified to the fact that the forecast has been updated and

20 that there is now a positive cash-flow balance at the end of

21 the thirteen weeks.  He already testified to that.

22 BY MR. GROGAN:

23 Q    Mr. Bonjour, you can answer the question.

24 A    To clarify at the end of the thirteen week the ending

25 cash is -- the cash-flow is 92,000 and the ending cash is

1   192,000 on the thirteen week.

2   Q     Okay.  Thank you.

3         Mr. Bonjour, would you expect that a Chapter 11 Trustee

4   would hire professionals?

5   A     Yes.

6   Q     And so if you were doing a thirteen week cash-flow for

7   a Chapter 11 Trustee there would be a line item here for

8   professional fees?

9   A     Yes.  Correct.

10  Q     Also in terms of the cash-flow forecast here have you

11  taken into account a sale of the business at any point during

12  this thirteen weeks?

13  A     No.

14  Q     And if the business were sold what impact would that

15  have on the thirteen week cash-flow?

16  A     That would provide a tremendous amount of liquidity.

17  Q     Would it have any effect on the operating costs?

18  A     If you sold it, no.  I mean you would not increase your

19  operating costs if you sold it.  It would just be --

20  Q     Would you --

21  A     You would decrease, correct, because you're,

22  essentially -- with that sale you are transferring over,

23  fifteen to eighteen employees that currently operate that

24  platform.  So you would decrease your operating.

25  Q     Thank you.

1    A      It would almost practically go away.

2              MR. GROGAN:  Understood.  Thank you, Mr. Bonjour.

3    No further questions.

4              THE COURT:  Thank you.

5              Mr. Bonjour, you are excused. Thank you.

6              THE WITNESS:  Okay.  Thank you.

7         (Witness excused)

8              THE COURT:  Next witness, Mr. Grogan.

9              MR. GROGAN:  Thank you, Your Honor.

10             The next witness we call is Matthew Foster.

11             THE COURT:  Mr. Foster, are you on Zoom?

12             MR. FOSTER:  I am.  Can you hear me?

13             THE COURT:  I can.  Thank you.

14             Can you raise your right hand?  State your full

15   name for the record and spell your last.

16             MR. FOSTER:  Matthew Foster, F-O-S-T-E-R.

17              MATTHEW FOSTER, DEBTOR WITNESS, SWORN

18             THE COURT:  Mr. Grogan, go ahead.

19             MR. GROGAN:  Thank you, Your Honor.  Your Honor,

20   initially I would like to move to introduce Mr. Foster's

21   declaration into evidence which was filed at Docket No. 109-

22   2.

23             THE COURT:  Any objection?

24         (No verbal response)

25             THE COURT:  Its admitted without objection.

1        (Declaration of Matthew Foster, received into evidence)

2                    DIRECT EXAMINATION

3   BY MR. GROGAN:

4   Q    Mr. Foster, can you introduce yourself to the court and

5   give the court a little description of your background?

6   A    Sure.  I am -- this is Matthew Foster.  I am a managing

7   director and co-founder of Sonoran Capital Advisors, a

8   distressed advisory group.  Most recently I spend most of my

9   time as a chief restructuring officer for various debtors.

10  This is my fifth appointment as a chief restructuring officer

11  in the last two or three years, most of which end up in some

12  sort of 363 sale and a liquidating plan.  The following

13  pattern, basically, has been outlined for this debtor.

14       Before getting into restructuring, which I have done

15  since 2009, I worked for a private equity on Citizens Bank

16  which has some distressed investments.  That is where I kind

17  of cut my teeth in the distressed world.  I really got into

18  the Chapter 11 aspects starting in 2009 and, as I mentioned

19  before, formed my own firm in 2017 with a partner.

20  Q    And when did you get involved with Cred?

21  A    I was hired on November 30th.

22  Q    So in your -- so about two weeks ago, right?  What did

23  --

24  A    A little bit more than two weeks.

25  Q    What have you done in the last two weeks to get up to

1  speed?

2  A    Well we rely heavily on what MACCO has done.  They have

3  been phenomenal in getting us up to speed on everything that

4  is going on.  Most importantly, as CRO, when you get in these

5  situations particularly there are some accusations going back

6  and forth is really gain control over the assets of the

7  company, particularly bank accounts, those sorts of things,

8  and making sure that we can show to all of the constituencies

9  that there is an independent party that's been trusted by

10  courts before that knows what he's doing and could oversee

11  what is going on.

12  Q    And are you running Cred at this point?

13  A    For all intents and purposes, yes.  There is no CEO

14  anymore.  The CFO, the new CFO, obviously, reports to me and

15  overseeing this whole process, obviously, under the direction

16  of Mr. Lyon.

17  Q    Do you answer to anybody other than Mr. Lyon?

18  A    No.

19  Q    Are you familiar with the debtor's efforts to sell

20  their business?

21  A    Yes.

22  Q    And what involvement have you had in that process?

23  A    Well, obviously, we get updates from Mr. Wu and other

24  individuals at Teneo.  So, they report back to me on a

25  frequent basis and ask for insight as to my recommendations,

1  or thoughts, or any sort of proposals that I would eventually

2  make to Mr. Lyon as is typical.  And in this process I work

3  with investment bankers all the time.  They report to me and

4  we work to maximize the sale value so we can return as much

5  as we possibly can to the creditors.

6  Q     And have you seen any term sheets yet?

7  A     I have.

8  Q     And so at this point you are reviewing term sheets and

9  working through that effort?

10  A     Yes.

11  Q     Are you familiar with the plan support agreement

12  between the debtors and the committee?

13  A     I am.

14  Q     And what is your understanding of the plan support

15  agreement?

16  A     Well one of the important pieces that Mr. Lyon

17  mentioned yesterday is we understand our fiduciary duty here.

18  I understand that the unsecured creditors are out of the

19  money and that they have a committee that has been formed and

20  we're going to take their advice and thoughts very, very

21  seriously because we understand their responsibilities and

22  understand our responsibilities.  So, we wanted to work in

23  lock step with the committee to get to an outcome that

24  benefits their constituents as well as, obviously, the entire

25  estate.  And the plan support agreement is the best way to do

1  that.

2  Q    And if we're allowed to proceed with that plan support

3  agreement what kind of a plan do you anticipate proposing for

4  the debtors?

5  A    You mean as a plan in general or as in like a plan of

6  liquidation from a Chapter 11 plan prospective?

7  Q    Yeah, the latter.  What kind of a Chapter 11 plan are

8  you going to propose?

9  A    It would be a plan of liquidation or liquidating trust

10  to be appointed.  A liquidating trustee would be appointed.

11  This is, again, very -- most of the cases that I have worked

12  in ended up in the same way where we do a 363 sale, do it as

13  a going concern because that is the best way to maximize the

14  value and then if there are particularly where there are

15  causes of action like this case where they should be pursued

16  and we want to make sure that we preserve those rights from

17  the trustee.  So we will do everything we can to make sure

18  that gets handed over to whoever the trustee is.

19  Q    And are you going to have any say over who that trustee

20  is?

21  A    I don't believe so, no.

22  Q    Who is going to make that decision?

23  A    Typically it's the committee that makes the

24  recommendation. I think sometimes the debtors have some

25  recommendations, but typically it's the committee that

1  chooses that.

2  Q    And that is the case in this plan support agreement?

3  A    Yes.

4  Q    Are you aware of any current discussions between the

5  debtors and insiders of the debtor to give those insiders a

6  release?

7  A    No.

8  Q    Will you give anybody a release?

9  A    No.

10         MR. GROGAN:  Your Honor, no further questions for

11  this witness.

12         THE COURT:  Thank you.

13         Mr. McMahon?

14         MR. MCMAHON:  Very briefly, Your Honor.

15                    CROSS EXAMINATION

16  BY MR. MCMAHON:

17  Q    Mr. Foster, you testified that you managed to get up to

18  speed in a couple of weeks, correct?

19  A    It's like drinking from a firehose.  Yes, we're getting

20  there.

21  Q    And the committee was able to be appointed and get up

22  to speed as well?

23  A    Yes.  We're helping them along as well.

24  Q    And you have heard -- you know Mr. Lyon, correct?

25  A    Correct.

1  Q     And you know he's previously served as the Chapter 11

2  Trustee, correct?

3  A     Yes.

4  Q     And you are confident that, you know, Mr. Lyon is a guy

5  who can get up to speed in a situation like this pretty

6  quickly, correct?

7  A     Yes.

8  Q     So its -- the power to get up to speed, you know,

9  doesn't leave Mr. Lyon regardless of whether he is serving as

10  Chapter 11 Trustee or not, correct?

11  A     I am not sure I understand the question.

12  Q     Sure.  I mean Mr. Lyon is capable of getting up to

13  speed whether he's got his Chapter 11 Trustee hat or not,

14  correct?

15  A     Yes.  It depends on the individual for sure.

16          MR. MCMAHON:  Great.  Thank you, Your Honor.  I

17  have no further questions.

18          THE COURT:  Thank you.

19          Mr. Sarachek?

20          MR. SARACHEK:  I have no questions, Your Honor.

21          THE COURT:  Okay.  Mr. Pierce?

22          MR. PIERCE:  Just a few questions, Your Honor.

23  Thank you.

24                    CROSS EXAMINATION

25  BY MR. PIERCE:

1   Q      Good morning, Mr. Foster.  How are you?

2   A      Good.  How are you?

3   Q      Good.  You testified that this is a going concern sale,

4   correct?

5   A      Correct.

6   Q      But this isn't really a going concern sale, is it?

7   A      I would argue that it is.  The reason I say that is I

8   actually -- the last case that I did in Delaware where I was

9   CRO for a drug company that had a failed cancer drug, it

10  didn't pass FDA approval, we sold the IP assets at three or

11  four times what the stalking horse bid was and there was

12  still a few employees with that company that the buyer took

13  with them.

14       So, I think it depends on your definition of going

15  concern.  So you may want to specific that, but that is based

16  on my opinion; their employees are a going concern from my

17  perspective.

18  Q      Well let me just clarify because Mr. Wu testified

19  earlier that the debtors are selling a platform.  Is that all

20  they're selling?

21  A      He also mentioned that there are employees that the

22  buyers are interested in.

23  Q      Do the debtors have any current operations today?

24  A      Well we have employees that are doing work on a day to

25  day basis including engineers, accountants.  So from that

1  perspective, yes.  It was mentioned earlier we're not out

2  making loans like the company previously was.  So, again, it

3  depends on your definition of operations.

4  Q    You can't sell people, can you?

5  A    Not exactly sure what you mean by that.

6  Q    Well the company doesn't have any operations, correct?

7  A    Again it would depend on your definition of operations.

8  I'm not trying to be difficult.  I'm trying to get where you

9  want me to go.

10  Q    So let me try to be more clear.

11  A    Okay.

12  Q    Is the debtor currently engaged in any lending

13  activity?

14  A    No.

15  Q    Are the debtors currently operating the Cred earn

16  program?

17  A    No.

18  Q    Are the debtors currently operating their Cred borrow

19  program?

20  A    No.

21       MR. PIERCE:  No further questions, Your Honor.

22       THE COURT:  Okay.  Mr. Silver, do you have any

23  questions?

24     (No verbal response)

25       THE COURT:  We lost Mr. Silver.

1         Mr. Grogan, back to you.

2         MR. GROGAN:   Thank you, Your Honor.   I have a

3 short redirect.   After my redirect, if Your Honor will permit

4 us, Mr. Cousins got disconnected briefly, but he had a couple

5 of follow-up questions for this particular witness and with

6 your permission I'd like to give him an opportunity to ask

7 those.

8         THE COURT:   All right.

9                    REDIRECT EXAMINATION

10 BY MR. GROGAN:

11 Q    Mr. Foster, when your -- in your role as a CRO is it

12 important to you to preserve jobs?

13 A    Yeah. I mean there's two reasons for that.   One is,

14 obviously, employees are part of the constituency and that is

15 why I got into this line of work because I want to save jobs.

16 The second is companies are more valuable with the employees.

17 People have value.   Their intelligence.   They add value to a

18 process.

19         So, it is my experience that selling a company as a

20 going concern with employees is the best way to maximize

21 value in these circumstances.

22 Q    Also, you heard the United States Trustee ask you a

23 couple of questions about getting up to speed.   Was MACCO an

24 important component of getting up to speed?

25 A    Absolutely. I couldn't have gotten this much

1  information this quickly without them.

2  Q    And was Paul Hastings important to you in terms of

3  getting up to speed?

4  A    Absolutely.

5        MR. GROGAN:  Your Honor, at this point I would

6  like to turn the witness over to Mr. Cousins for a brief Q&A.

7        THE COURT:  All right.  Well, Mr. Cousins is also

8  debtor's counsel.  So I am not sure of the propriety of

9  having two of the -- two lawyers on the same side asking

10  questions.  I am going to have to re-open it again for cross

11  examination.  So, I will allow it, but it's unusual.

12        Go ahead, Mr. Cousins.

13        MR. COUSINS:  Thank you, Your Honor.  Just with

14  respect to (indiscernible) there was an exhibit.

15                    REDIRECT EXAMINATION

16  BY MR. COUSINS:

17  Q    Mr. Foster, do you recall Exhibit 13 from Mr. McMahon

18  yesterday?  (Indiscernible) testimony.

19        THE COURT:  Mr. Cousins, you're very --

20        THE WITNESS:  I --

21        THE COURT:  Hold on, Mr. Foster.

22        MR. COUSINS:  I'll pick-up, Your Honor.

23        THE COURT:  That's better.  Thank you.

24        MR. COUSINS:  I'm so sorry.

25        THE COURT:  Mr. Foster heard it, but I couldn't

1  hear the question.

2          MR. COUSINS:  Let me restate it.

3  BY MR. COUSINS:

4  Q    Mr. Foster, do you recall the exhibits that Mr.

5  McMahon, Exhibit 13, showed Mr. Inamullah during his direct

6  testimony regarding the relationship with Uphold.  Do you

7  recall that?

8  A    I remember there -- is that the one that was a letter

9  of release from Uphold talking about Cred and individuals

10 there?  Is that the one you are referring to?

11 Q    Right.  It referenced their plan to sue Cred.  Do you

12 recall that now?

13 A    Yeah.

14 Q    Can you just briefly explain what is the relationship

15 between Cred and Uphold?

16 A    So there are a couple things.  One, Uphold had on their

17 platform the ability for their customers.  This is based on

18 my understanding of what I have been told.  I haven't gone

19 through and clicked the buttons myself.  Uphold had the

20 ability of their customers today we're going to go and

21 participate in this Cred program.  So they could click a

22 button, much like Mr. Inamullah said yesterday, saying we're

23 going to participate in this CD like certificate of deposit

24 like program.  So, those customers could say I'm going to use

25 Cred and those cryptocurrencies will get transferred to Cred

1   and go through the programs that have been mentioned before.

2   The other thing is that Uphold is holding assets of the

3   debtors.  So, there are various cryptocurrencies that are at

4   Uphold right now.

5   Q    And Uphold hasn't sued Cred to your knowledge, is that

6   correct?

7   A    That is correct.

8   Q    And what is the relationship now?  How would you

9   describe the relationship with respect to the tokens that are

10  owed back and forth between Cred and Uphold?

11  A    It's actually very cordial.  I have interacted with

12  their general counsel along with Mr. Cousins, you, and as

13  well as their outside counsel.  I think its BakerHostetler is

14  the name of the firm.  So we are currently in the process of

15  working on a stipulation for them to transfer those assets to

16  the debtor.

17            MR. COUSINS:  Thank you very much.  Your Honor,

18  thank you for -- I know that was unusual and I'm sorry I got

19  disconnected just immediately prior to the end of his direct.

20            THE COURT:  Thank you, Mr. Cousins.

21            Let me go back then down the cross list.  Mr.

22  McMahon, does that generate any new questions for you?

23            MR. MCMAHON:  It does not, Your Honor.

24            THE COURT:  Mr. Sarachek?

25            MR. SARACHEK:  No, Your Honor.

1          THE COURT:  Mr. Pierce?

2          MR. PIERCE:  No, Your Honor.

3          THE COURT:  And I will ask Mr. Silver again.

4          MR. SILVER:  No, Your Honor.  I'm good.  I

5   apologize for being on mute before.

6          THE COURT:  All right.  Then Mr. Foster, you are

7   excused.

8          THE WITNESS:  Thank you.

9      (Witness excused)

10         THE COURT:  Any other witnesses?

11         MR. GROGAN:  Your Honor, that is the end of the

12   debtor's testimonial presentation.

13         THE COURT:  All right.  So where are we?  Are we

14   going into closing or does anybody else have any other

15   evidence they intend to introduce?

16     (No verbal response)

17         THE COURT:  No takers on the evidence.  So I guess

18   we're going to closings.  We're already at 11:20.  How long

19   do the parties thing they will need for closings?  Mr.

20   Grogan?

21         MR. GROGAN:  Your Honor, I probably need ten

22   minutes.

23         THE COURT:  All right.  Mr. McMahon?

24         MR. MCMAHON:  About the same, Your Honor.

25         THE COURT:  Okay.  Mr. Pierce?

 1          MR. PIERCE:  About the same, Your Honor.

 2          THE COURT:  Mr. Sarachek?

 3          MR. SARACHEK:  I will be briefer then that.

 4          THE COURT:  All right.  Mr. Silver?

 5          MR. SILVER:  I am with Mr. Sarachek.  I will be

 6 briefer then that.

 7          THE COURT:  All right.  So maybe we can get done,

 8 but I do need to take a very short break because we've been

 9 going for a while now.  So let's take a five minute recess.

10 We will reconvene at 11:25.

11          MR. EVANS:  Your Honor, Joe Evans for the

12 committee.  We intend to argue as well.

13          THE COURT:  All right.  How long do you need?

14          MR. EVANS:  The same as everyone else, about ten

15 minutes or less.

16          THE COURT:  All right.  So, we're -- all right.

17 We will see if we can get it done.  We will reconvene at

18 11:25.

19      (Resume taken at 11:20 a.m.)

20      (Proceedings resumed at 11:25 a.m.)

21          THE COURT:  We'll start with the movants.  Mr.

22 McMahon.

23          MR. MCMAHON:  Your Honor, good morning.  Joseph

24 McMahon for the United States Trustee.

25          At his deposition this past Monday Dan Schatt

1  testified regarding his appointment of Grant Lyon to Cred's

2  board in November of 2020 after Lu Hua resigned as the

3  director of Cred Inc.  He indicated that it was important to

4  have a so-called "independent" director on the board.  And I

5  asked him, independent from what?  His answer was,

6  "Independent from any connection between Cred and MoCredit"

7  was his response.

8         The United States Trustee respectfully submits

9  that the record establishes that there is a basis for

10  appointing either a Chapter 11 Trustee and examiner or a

11  Chapter 7 Trustee in these cases.

12         First, the Chapter 11 Trustee.  Section 1104(a)

13  provides two basis for appointment of a Chapter 11 Trustee.

14  First, for cause under Section 1104(a)(1).  Second, if it's

15  in the interest of creditors any equity security holders or

16  other interests of the estate under Section 1104(a)(2).

17         In In Re Marvel Entertainment Group, case citation

18  140 F.3d 463, the United States Court of Appeals for the

19  Third Circuit observed that the presumption against

20  appointing a trustees is tied to two things.  First,

21  management, which brought the debtor to bankruptcy, must be

22  honest, experienced and familiar with the business.  Second,

23  there has to be a reorganization; otherwise, we don't need

24  management's operational investment.

25         I want to quote from the Third Circuit's opinion

1 with respect to this point so that the record is clear.  In

2 the usual Chapter 11 proceeding the debtor remains in

3 possession throughout reorganization because, and this is an

4 internal quote,

5        "Current management is generally best suited to

6 orchestrate the process of rehabilitation for the benefit of

7 creditors and other interests of the estate."

8        Thus, the basis for the strong presumption against

9 appointing an outside trustee is that there is often no need

10 for one.  Quote again,

11       "The debtor-in-possession is a fiduciary of the

12 creditors and as a result has an obligation to refrain from

13 acting in a manner which could damage the estate or hinder a

14 successful reorganization."

15       The strong presumption also finds its basis in the

16 debtor-in-possessions usual familiarity with the business it

17 already had been managing at the time of the bankruptcy

18 filing often making it the best party to conduct operations

19 during the reorganization.

20       In short, the Third Circuit tells us that if unfit

21 prepetition management when faced with a bankruptcy filing or

22 a trustee motion in a bankruptcy case engages in a game of

23 musical chairs and appoints shiny new current management that

24 doesn't eviscerate or forward a trustee motion.  Rather, it

25 removes the presumption that the debtor-in-possession should

1  remain in control.  What the statutory language is

2  descriptive of is the code's expectation that longstanding

3  competent and honest prepetition management is the only

4  management who gets the benefit of operating during a

5  reorganization.

6          THE COURT:  Mr. McMahon, let me ask you a

7  question.

8          MR. MCMAHON:  Sure.

9          THE COURT:  Is there any evidence that's been

10  presented to me that Mr. Lyon and the other individuals who

11  have been retained by Mr. Lyon to assist him in this case are

12  anything other than independent of Cred or MoCredit?

13          MR. MCMAHON:  Well we would argue, Your Honor,

14  that the answer is they're not independent of Mr. Schatt and

15  Mr. Hua.  I can explain.

16          THE COURT:  Is that going to be because they are

17  still the equity owners and could remove them if they choose

18  to do so?

19          MR. MCMAHON:  Correct.  And also the factual

20  record is clear as to how the current corporate structure

21  came about meaning, you know, debtor's counsel contacted Mr.

22  Lyon who then contacted Mr. Schatt.  Mr. Lyon was put into a

23  position of authority.

24          THE COURT:  I understand that, but that, in and of

25  itself, doesn't indicate that he's not independent.  I mean

1  there is no evidence that I have seen to indicate that Mr.

2  Lyon is not anything other than completely independent of the

3  debtors or anybody connected to the debtors.

4          MR. MCMAHON:  And, Your Honor, that -- the facts

5  are what they in so far as the record has been established.

6          THE COURT:  So my question then becomes if Mr.

7  Lyon is independent of the debtors and anybody connected to

8  the debtors, including the insiders of the company, what

9  would a Chapter 11 Trustee bring to the table that Mr. Lyon's

10 doesn't?

11         MR. MCMAHON:  Your Honor, again, I think we have

12 to -- its -- I think we have to -- again, the record

13 establishes that Mr. Lyon was put into place by Mr. Schatt.

14 He is subject to being removed by a vote of Mr. Hua and Mr.

15 Schatt.  The debtors -- they are the two equity shareholders

16 who are both targets of estate claims and causes of action

17 based upon the record of this motion.

18         THE COURT:  Well what if I was to include in --

19 what if I was to include in an order that Mr. Lyon cannot be

20 removed by either of the equity holders without an order of

21 this court?

22         MR. MCMAHON:  Well I think the issue is under 1104

23 the court is actually obligated with the word "shall" to

24 appoint a trustee in two circumstances where there is, you

25 know, under (a)(1) where there is cause for doing so by

1 current management.  Then second under the (b) section where

2 it's in the interest of the estates and creditors to do so.

3        Your Honor, the record yesterday with respect to

4 the prepetition activities associated with the debtor's

5 estates.  The fact that Mr. Schatt and Mr. Hua are in

6 connection with the MoCredit related issues.  I mean I can

7 get right into the, I guess, discussion of the prepetition

8 activities.

9        THE COURT:  There is no doubt in my mind that

10 there was shenanigans going on prepetition, that there was

11 mismanagement of the debtors, but we don't have a situation

12 where those people who are managing the company at that time

13 are still in charge.  The only issue is can Mr. Schatt or Mr.

14 Hua remove Mr. Lyon as the independent director.  And I am

15 saying why can't I enter an order that simply says they can't

16 do that without my permission --

17        MR. MCMAHON:  Because --

18        THE COURT:  -- instead of bringing in a whole

19 other Chapter 11 Trustee who is going to have to start all

20 over again.

21        MR. MCMAHON:  Well there is a couple of points to

22 be made there, Your Honor.

23        First, Section 1104(a) the language is mandatory.

24 It just says "shall" meaning that --

25        THE COURT:  If I find cause, but I don't know that

1  there is cause at this point because we have new management

2  and nobody has shown me that there is any mismanagement going

3  on post-petition.

4       MR. MCMAHON:  Again, Your Honor, you have in

5  addition to Section 1104(a)(1) and we would, I guess, contest

6  the suggestion that this current management, whatever the

7  professionals that have been inserted by Mr. Schatt and Mr.

8  Hua, are independent of them.  But beyond that under

9  1104(a)(2), you know, there is also grounds where it's in the

10  best interest of creditors meaning it's fairly clear that the

11  situation is such where the circumstances would warrant the

12  appointment of a trustee.

13       So, there is two basis there under Section 1104

14  and the mere fact that, you know, the professionals would

15  believe that, you know, they can sell the assets or whatever.

16  What the Chapter 11 Trustee in response to Your Honor's

17  question is going to do is going to add the independence

18  factor completely removed from the situation that, you know,

19  Mr. Lyon and the other professionals just do not have.  And

20  it's the only code based solution to a situation like the

21  factual patterns that the court has been presented with.

22       THE COURT:  Well, again, I don't think there is

23  any evidence that Mr. Lyon and the other professionals are

24  beholding to any of the insiders of this company.  So the

25  question is then you would go to 1104(a)(2) which is

1  discretionary if it's in the best interest of the creditors

2  and how could it be in the best interest of the creditors if

3  the only thing we're going to do is remove somebody who is

4  currently independent of the owners of the company and the

5  insiders of the company, and replace them with someone else

6  who is also independent of the insiders and who would have to

7  start over and delay the process.

8           MR. MCMAHON:  Your Honor, first, we are like just

9  a mere matter of days into these bankruptcy cases.  So,

10  therefore, I don't know if there is going to be like a real -

11  - I don't believe there is going to be real delay to the

12  process.  Our office can interview candidates and insert one

13  quickly in order to address the concern.

14           Beyond that, you know, with respect to the going

15  forward, Your Honor, in light of the testimony you heard with

16  respect to the prepetition shenanigans we're talking about

17  claims and causes of action.  And their claims and causes of

18  action where Mr. Schatt and Mr. Hua are going to be targets

19  with respect to them.  And with respect to this process, Your

20  Honor, again, the record is clear that Mr. Lyon was placed

21  there by the insiders who would be the subject of those

22  claims and causes of action in addition to their affiliated

23  companies.

24           So, if there is anything that would be wrong in

25  light of this record, Your Honor, it will be leaving Mr. Lyon

1   in as director and, frankly, it would be rudderless.  The

2   court under the bankruptcy code has a clear directive in

3   circumstances like this where the insiders, basically, have

4   conducted themselves in a way such that in order to ensure

5   protection of the creditors the court has to step in and

6   appoint a trustee.

7           So, it's basically from a standpoint of the way

8   the code works Mr. Schatt and Mr. Hua put Mr. Lyon there.

9   That is a positional conflict that in light of the record

10  that was developed yesterday requires someone completely

11  independent and removed from the process in order to move it

12  forward.

13          Your Honor, we've heard some testimony about the

14  sale process to a degree.  Your Honor has also heard about,

15  you know, I guess, some large numbers regarding claims and

16  causes of action the $40 million line of credit for MoCredit

17  which is outstanding.  So in terms of the value in the case

18  it certainly looks like in the longer term the claims and

19  causes of action case that needs someone independent,

20  completely independent, from Mr. Schatt and Mr. Hua in order

21  to move it forward.  That is what is required by the record

22  that was developed yesterday.

23          THE COURT:  All right.  Thank you, Mr. McMahon.

24          I'm going to move onto Mr. Sarachek.

25          MR. SARACHEK:  Your Honor, I am going to try to

1  address what you're getting at.  I do think that the

2  professionals in the case have the best intentions, but if

3  you're not going to -- and I echo Mr. McMahon's argument, but

4  if you're not going to appoint a trustee in a case where

5  after March of 2020 investor money was taken in a Ponzi like

6  manner to pay the expenses of the company, if you're not

7  going to appoint a trustee in a situation like this I'm not

8  sure that there is any situation where a trustee can't be

9  subverted by professionals.

10      What happened here, just too really address this

11  at its core, is that Mr. Schatt was the brains of this

12  operation and he only resigned because of the pressure that

13  Mr. McMahon and my motion put on him.  And he only resigned

14  post-petition on December 7th and Mr. Podulka as well.  Quite

15  frankly, it's wrong that -- and that was post-petition. It's

16  wrong for professionals to be able to subvert what Congress

17  drafted which was a provision in the bankruptcy code that

18  required the appointment of a Chapter 11 Trustee.

19      I understand the practical implications of all of

20  this, I do.  Nevertheless, and in our motion we did move for

21  a Chapter 7 Trustee, but nevertheless the bankruptcy code

22  requires the appointment of a trustee when you have post-

23  petition management and really the person who is calling the

24  shots he's the guy who signed the first day declaration.  If

25  you notice even though MACCO did submit a declaration first

1  day it was devoid -- it basically was devoid of any

2  responsibility and any recognition of the inter-workings of

3  the operations.

4        Your Honor, you have --

5        THE COURT:  Let me ask you, Mr. Sarachek, I'm

6  going back to the same thing.  We now -- Mr. Schatt is now

7  out.  We have an independent director who is running the

8  company.  We have independent professionals who are engaging

9  in a sale process.  It's nothing different then what a

10 Chapter 11 Trustee would do if I were to appoint one.  I have

11 no evidence before me that there is any post-petition

12 misconduct by the debtors.  I have no evidence before me that

13 Mr. Lyon or any of the professionals that he has retained are

14 anything other than completely independent.

15       So what is the cause that would allow me to

16 appoint a Chapter 11 Trustee?  Yes, there was prepetition

17 misconduct, but that's prepetition and that is not relevant

18 at this point because we have new management.

19       MR. SARACHEK:  Your Honor, respectfully, you do

20 have evidence that there was post-petition misconduct.  The

21 bottom line is with respect to UpgradeYa the 478 Bitcoin that

22 they reported they had in collateral on the petition date is

23 really only 160.  And presumably the debtors and its

24 professionals should know what collateral they have.

25 Furthermore --

1       THE COURT:  Well there is no evidence that that

2  occurred post-petition.  That is just the way it is now.  So

3  how did it go from 470 to 164?  I don't know.  There was no

4  evidence introduced about that.

5       MR. SARACHEK:  I believe it's in Mr. Inamullah's -

6  - well, I believe it is -- Mr. Inamullah testified also with

7  respect to the value of the supposed 14 million value that

8  the debtor reported as their collateral, their specific

9  Bitcoin, but that Bitcoin was virtually worthless.

10      THE COURT:  Again that all occurred prepetition.

11      MR. SARACHEK:  It was information that was filed,

12  you know, in the first day.  So that is post-petition.  I do

13  think that an independent trustee -- by the way, Your Honor,

14  I want to call the court attentions to the fact that the

15  largest creditors here don't sit on the creditor's committee.

16  Mr. Silver and I represent the largest creditors here.  And

17  none of them sit on the creditor's committee.

18      The bottom line is you're hearing from the largest

19  creditors that we would like the appointment of an

20  independent trustee to investigate these causes of action.

21  That is our position.

22      THE COURT:  Thank you, Mr. Sarachek.

23      I'm going to move onto Mr. Pierce.

24      MR. PIERCE:  Thank you, Your Honor.  Matthew

25  Landis with Landis, Rath & Cobb on behalf of UpgradeYa

1   Investments.

2            Your Honor, UpgradeYa joins in the conversion

3   motion on a limited basis to support the conversion from

4   these cases from Chapter 11 to Chapter 7.  I acknowledge that

5   converting these cases to Chapter 7 is a difficult decision

6   for this court to make.  It's also a very difficult decision

7   for a creditor to support conversion to Chapter 7.  Here

8   UpgradeYa along with numerous other creditors have joined in

9   that request.

10            Your Honor, quite simply, there's some cases that

11   do not belong in Chapter 11 and this is one of them.  The

12   debtors and the committee assert that to the extent cause to

13   convert existed those issues have been resolved and they

14   resolved those through extraordinary steps to justify keeping

15   these cases in Chapter 11.

16            To name a few of the steps that have been taken,

17   the chief executive officer has been removed, the chief

18   financial officer has been terminated, a chief restructuring

19   officer has been installed, an interim chief financial

20   officer has been appointed, and a professional from one of

21   the proposed advisors to the debtors has been employee of

22   that proposed professional has been installed and is acting

23   as the debtor's controller.  All of these steps have taken

24   place after the petition date.

25            I don't think it's questioned that the debtors

1 entered the Chapter 11 with serious management and governance

2 issues.  Some of those governance issues and the authority to

3 file these Chapter 11 cases on behalf of at least one of the

4 debtors has not been resolved yet.  The solution the debtors

5 have presented and the committee is to strip the company on a

6 post-petition basis to a non-operating shell and install

7 Chapter 11 professionals as employees and officers of the

8 company.

9          I don't say that as a knock on the professionals'

10 qualifications.  This is the highlight that Cred is not a

11 debtor-in-possession with a legitimate going concern to

12 operate and sell in a Chapter 11 process.

13          THE COURT:  Well the evidence that I have form the

14 witnesses, as Mr. Wu testified, they are in a sale process.

15 They have already got people who are interested in buying the

16 company on a going concern basis and is there any scenario in

17 which the creditors of this company would do better if I were

18 to convert this to a Chapter 7 and we liquidate the pieces

19 rather than selling a going concern.

20          MR. PIERCE:  Absolutely, Your Honor.  Absolutely.

21 What --

22          THE COURT:  You're seriously telling me that in

23 any circumstance a company that is liquidated in a Chapter 7

24 is going to do better than a Chapter 11 being sold as a going

25 concern?

1          MR. PIERCE:  Well to be clear I say that because

2   if you look at the proposed thirteen week cash-flow forecast,

3   yes, there will be more assets available at the end of those

4   thirteen weeks if we convert this to a Chapter 7.  The

5   debtors, what they propose and the evidence shows, is that by

6   the time we get to March 5th there will be a net liquidity

7   shortfall of $700,000.  That is after and it assumes that the

8   debtors sell all of the cryptocurrency currently in their

9   possession.

10          So what the debtors propose to this court as a go-

11  forward plan here is that they will sell all of their

12  cryptocurrency liquid assets, that they will deplete all cash

13  on hand and that there will still be a liquidity shortfall of

14  nearly $700,000 and that is based on go-forward estimates

15  that Mr. Bonjour testified and acknowledged could exceed what

16  is in that forecast.  That shortfall could be substantially

17  greater.

18          It is also dependent on the price of Bitcoin or

19  their other cryptocurrencies on any given day if the price of

20  that cryptocurrency is --

21          THE COURT:  Which is why the debtors want to sell

22  this company as quickly as possible.  If I convert this to a

23  seven and have to have a Chapter 7 Trustee appointed you

24  think this company is going to get sold quicker than it would

25  be under the current circumstances?

1          MR. PIERCE:  Well, Your Honor, if we look at the

2    Chapter 13 budget the debtors are not proposing to sell any

3    of their cryptocurrency.  They are using their cryptocurrency

4    to fund these cases and even doing that they still have a

5    shortfall.  They do not reach any scenario in which they can

6    confirm a plan.

7          THE COURT:  Well how is a Chapter 7 Trustee going

8    to sell the cryptocurrency if it belongs to other people?

9          MR. PIERCE:  Your Honor, that is a situation that

10   would have to be, you know, decided in a different context.

11   Even if we take out -- I think what Mr. Wu did not testify

12   that the debtors are seeking to sell their cryptocurrency

13   they're seeking to sell the platform.

14         THE COURT:  Exactly.  That is the Chapter 11 sale

15   process to sell the platform with the employees who know how

16   to run it as a going concern as opposed to liquidating it in

17   which case now we're having fights over, well, is it

18   someone's collateral, is it the debtor's Bitcoin, is it

19   somebody else's Bitcoin.  And it gets into a morass of how to

20   deal with that situation.  That seems more difficult to me

21   than the current process proposed by the debtors.

22         MR. PIERCE:  Your Honor, Mr. Wu testified that

23   there is no difference in selling the platform by a Chapter 7

24   Trustee or a Chapter 11.  There is not something that a

25   Chapter 7 Trustee can't do.  It sounds to me that the process

1  and sale of the assets that they're proposing is intellectual

2  property and there may be employees that go with the debtors

3  for -- that go over to a potential purchaser or not.

4  　　　　We don't know, but what we do know is that the

5  cash-flow shows under a scenario in which they sell all their

6  cryptocurrency they can't get to a confirmable plan and they

7  don't get to the liquidating trust or litigation trust that

8  they propose under the plan support agreement.  Then we end

9  up in Chapter 7 and we end up in Chapter 7 on March 5th after

10 over $6.5 million have been paid to professionals.

11 　　　　THE COURT:  All right.  I understand your

12 position. Let me move onto Mr. Silver because we have to

13 finish this up.

14 　　　　MR. SILVER:  Thank you, Your Honor.  I'll be

15 brief.

16 　　　　First, it's my client's position that Mr. Schatt

17 is not out of the company.  He's still actively involved and

18 he's still being paid $10,000 dollars a month presumably for

19 something.

20 　　　　And we request that he be put out.  He is not out.

21 We have worked with debtors' counsel and counsel for the

22 committee.  So from or perspective that answers your question

23 as to whether or not there's true independence. We don't

24 believe so, because they kept Mr. Schatt.  He's still there

25 and he's being compensated.

1          And as --

2          THE COURT:  Well, do you think a Chapter 11

3 trustee wouldn't want to keep on Mr. Schatt because he's the

4 one who knows where all this stuff is buried?  I mean he has

5 all the information -- how is a Chapter 11 trustee going to

6 come in, in a vacuum and take this company over.  He's going

7 to have to have somebody there who has the history of it.

8          MR. SILVER:  So, you're answering my own question

9 I was about to state next.

10          The problem we have with the actual independence,

11 the second part, is there's a $100 million dollars missing

12 from all these reports and analysis. And Mr. Bonjour made

13 that point.  They have not looked into -- and this is not a

14 typical bankruptcy because of the crypto assets.  So, there's

15 a hundred million dollars and no one is jumping up and down

16 on the table except for the actual creditors.

17          As Mr. Sarachek pointed out, the largest creditors

18 are not on the committee. The largest creditors of which,

19 again, my clients lost 3500 bitcoin and 12,000 each for a

20 near total value of over $90 million dollars right now.  That

21 money is missing and the people -- and this is, again, the

22 unsecured creditors committee just came in last week.  But

23 for the last six weeks when you say don't you need Mr.

24 Schatt?  The answer is no.

25          The way this forensic analysis works is very

1  simply the transactional ideas just need to be analyzed and

2  then you simply follow that.  This is no different than if

3  there were serial numbers involved.  Mr. Schatt has been --

4  alleged that Mr. Schatt is involved in some of this.

5          The insider trading between MoCredit and Cred, I

6  mean our position is that Mr. Schatt still being in the

7  company is and of itself a dispositive disqualification for

8  true independence.  And, therefore, we strongly support the

9  trustee's motion to install a trustee because we believe true

10 independence is needed.

11         It needs to be someone who is uniquely qualified

12 to actually discover where the missing cryptocurrency is.

13 That is publicly available information on the block chain.

14 It's what sets apart cryptocurrencies from U.S. dollar fiat

15 and we strongly encourage that be putting in the trustee for

16 that reason.

17         THE COURT:  Thank you, Mr. Silver.

18         Let me turn to the debtors. Who's going to do the

19 closing, Mr. Grogan, Mr. Cousins?

20         MR. GROGAN:  Yes, Your Honor.  James Grogan from

21 Paul Hastings on behalf of the debtors.

22         Your Honor, you've raised some of the points I

23 would have raised, so I think I might be able to be shorter

24 than ten minutes.

25         I think we need to just go back to the

1  (indiscernible) requirements here.  So, let's start with the

2  request to convert the case to a Chapter 7.

3          One of the requirements if you're looking at

4  1112(b)(4)(a) is the absence of a reasonable likelihood of

5  rehabilitation.  We have a plan support agreement in place

6  for a consensual plan supported by our committee.

7          I would also point out that that plan support

8  agreement immediately grants consent from the debtor to the

9  committee to control causes of action against the insiders

10  which is another reason why Mr. Lyon is independent.

11          THE COURT:  Hold on, Mr. Grogan.  Hold on, Mr.

12  Grogan, let me ask you a question.

13          So, we have a situation here according to the

14  other creditors that I've heard from that say that the

15  creditors on the creditors committee don't represent the

16  majority of the holders of the bitcoin in this case.  And

17  they are all opposed to having Mr. Lyon continue in his

18  position.  They want a Chapter 11 trustee.

19          And isn't the, you know, an irreconcilable

20  conflict between the committee or, excuse me, between

21  creditors and the debtors; doesn't that provide a basis for

22  appointing a Chapter 11 trustee?

23          MR. GROGAN:  Well, I think that actually was not

24  accurate.  Mr. Sarachek's client, I don't even think we're on

25  the top thirty list.  I don't know where he's getting that

1  information that they're the largest creditors.  They're not.

2         The members of the committee, and the committee

3  can speak up on this as well.  But I know that several of

4  them were top ten on the top thirty list, so.  I just don't

5  think that's accurate.  And there's no evidence to suggest

6  that the committee is not representing the larger creditors.

7         Putting that aside, I mean we do have a path

8  forward for a quick efficient Chapter 11 plan process which

9  is confirmable within a short amount of time.  There's also

10  as the court has already noted no evidence of gross

11  mismanagement of the estate.  There just isn't.

12         The company is being well managed currently and

13  so, there's just no statutory predicate here for conversion.

14         Second on the Chapter 11 Trustee cause that goes

15  to current management.  Again, Mr. Inamullah testified that

16  he left the company November 6th.  He has zero evidence of

17  what's going on post-petition.  There's no evidence that

18  anybody has done anything wrong since the petition date.

19         We're not here to sprinkle holy water on what the

20  debtors did prepetition.  Nobody on my side thinks that this

21  company was well run or, you know, as a model for business

22  schools.  But, you know, we are doing the right thing today.

23  We will get this company sold quickly and we will confirm a

24  plan before March.

25         So, there's just no cause here to displace Mr.

1  Lyon and Mr. Foster so that we -- and prevent them from

2  running what will be the most effective successful outcome

3  possible here for all of the unsecured creditors.

4           And with that, I'll turn it over to the committee.

5           THE COURT:  Thank you.  Let me hear from committee

6  counsel.

7           MR. WALSH:  Good morning, Your Honor. Tim Walsh

8  from (indiscernible).

9           THE COURT:  Mr. Walsh.  I thought I hear Mr.

10 Walsh.  I don't --

11          MR. WALSH:  That is correct.

12          THE COURT:  I'm having a hard time hearing you.

13 Can you get closer to your speaker or?

14          MR. WALSH:  How is that, Your Honor?

15          THE COURT:  That's better.  Thank you.

16          MR. WALSH:  So committee in this represents

17 approximately 6500 unsecured creditors, Your Honor. And on

18 the committee, I think we have the third, fourth, sixth and

19 seventh largest holders as creditors.

20          And, Your Honor, you should know that this

21 committee, and we're very lucky to have it, is a highly

22 sophisticated committee.  It's comprised of individuals with

23 a deep understanding of cryptocurrency and block chain.

24 Notably, about half of the committee members are law school

25 trained.

1          And this committee has told me they have faith in

2    the independence of both Mr. Lyons and Mr. Foster, so I think

3    the court should be aware of.

4          We believe that it's the committee and not a

5    Chapter 7 trustee or Chapter 11 trustee that's best suited to

6    investigate these claims with the debtor.  The committee has

7    (indiscernible) expertise and the financial motivations to do

8    so.  And as Your Honor points out installing a new

9    independent person at this stage of the case would only lead

10   to another layer of administration which we don't think is

11   warranted.

12         With respect to the U.S. Trustee's motion, Your

13   Honor, I'm not really sure who they're fighting for.  The

14   committee made it pretty clear in its papers, we've executed

15   a PSA.  We see a way out of this case. We see a sale process

16   that can be accomplished and we see a plan of liquidation

17   that transfers all these claims to a trust that can be

18   investigated and prosecuted by the committee. That's the way

19   out.

20         The committee does not want a trustee.  The

21   committee wants this process to go forward.  Again, I'm not

22   sure who the U.S. Trustee is fighting for at this point

23   because my constituents have made it clear, they do not

24   (indiscernible) a trustee.  They think it's a waste

25   (indiscernible).

1          THE COURT:  Mr. Walsh, you're kind of breaking up

2   a little bit.

3          MR. WALSH:  Your Honor, I think you've hit upon

4   the other points with respect to what is in evidence and what

5   is not, so I won't go through that.

6          But just for the record, the committee does not

7   want a trustee appointed in this case and wants to go forward

8   with the PSA.

9          THE COURT:  Thank you, Mr. Walsh, I appreciate it.

10          All right, we are at -- Mr. McMahon, very briefly.

11          MR. MCMAHON:  Your Honor, I just want to note for

12   the record that we also requested an examiner under 1104(c)

13   provision which is mandatory because (indiscernible) that in

14   this case. So, I just want to note that for the record.

15          THE COURT:  All right, understood.

16          Here's what we're going to do.  I have another

17   hearing -- I have a meeting and then I have a hearing.  My

18   hearing is at one o'clock.  I'm hoping it does not take more

19   than an hour. So, I'm going to -- let's reconvene at three

20   o'clock.  I'll give you my ruling on these motions that are

21   pending and we'll see how far we can get into the rest of the

22   agenda, and we'll go from there.

23          So, let's -- we'll say we're standing in recess

24   until 3:00 p.m.  All right.

25          (A Chorus of "Thank you, Your Honor")

1          THE COURT:  Thank you.

2          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

3      (Recess at 12:02 p.m.)

4      (Proceedings resumed at 3:05 p.m.)

5          THE OPERATOR:  Recordings have begun and we are

6  now live.

7          THE COURT:  Thank you.  Good afternoon, everyone.

8  This is Judge Dorsey.  We're back on the record in Cred,

9  Inc., Case Number 20-12836.

10          Before we get back into the agenda, I'll go ahead

11  and give you my ruling on the motions to convert the case to

12  Chapter 7, appoint a Chapter 11 Trustee, and/or appoint an

13  examiner.

14          Before converting a case to chapter -- a Chapter

15  11 case to Chapter 7, the Court must first determine whether

16  cause exists to do so under 1112, Subsection (b).  "Cause" is

17  defined as including a substantial or continuing loss to or

18  diminution in the estate and the absence of a reasonable

19  likelihood of rehabilitation.  See Section 1121(b)(4).

20          The conduct leading to the decision to convert

21  must be post-petition conduct.  See In Re Sagecrest II, LLC,

22  2010 WL 537246, at Page 3 (Bankr. D. Conn. 2010).

23          Here, I have no evidence before me that would show

24  the debtors are incurring any substantial or continuing loss,

25  and certainly none that relates to post-petition conduct.

1  Moreover, debtors did not present evidence -- excuse me.

2  Moreover, debtors did present evidence that they have a

3  viable path forward to a potential confirmation of a plan of

4  reorganization that can be accomplished in the very near

5  term.  Therefore, the conversion to Chapter 7 is not

6  appropriate, and I will deny that relief.

7          Appointment of a Chapter 11 Trustee is governed by

8  Section 1104 of the Code.  1104(a)(1) allows appointment for

9  cause, including fraud, dishonesty, incompetence, or gross

10 mismanagement of the affairs of the debtor by current

11 management, either before or after commencement of the case.

12 1104(a)(2) provides that appointment can be made, if it's in

13 the best interests of the creditors, equity security holders,

14 or other interests.

15          In this case -- in -- determining the existence of

16 cause is made on a case-by-case basis at the discretion of

17 the Court.  See In Re Sharon Steel, 871 F.2d 1217, at 1226

18 (3d. Cir. 1989).

19          Courts generally consider the following factors in

20 determining whether to appoint a trustee:

21          One, the trustworthiness of the debtor.

22          Two, the debtor's past and present performance and

23 prospects for the debtor's rehabilitation.

24          Three, confidence or lack thereof of the business

25 community and the creditors in the present management.

1        And four, the benefits derived by the appointment

2   of a trustee, balanced against the costs of that appointment.

3        See In Re Reserves Resorts Spa and Country Club,

4   LLC, Case Number 12-13316, nineteen -- a 2013 decision by

5   Judge Gross.

6        The evidence presented was that -- the evidence

7   presented before me in this case raises serious questions

8   about the conduct of the debtors' affairs pre-petition.

9   However, the debtor has removed the pre-petition management

10  of the company and replaced them with independent

11  professionals, including an independent member of the board

12  and the only board member, Mr. Lyons, having heard -- and

13  appointed Mr. Lyons as the only board member.

14       Having heard the testimony of Mr. Lyons and the

15  other professionals retained to run the debtors and market

16  the company for sale, I am convinced of their independence.

17  Although retained initially by prior management and equity

18  holders, no evidence was established to question that they

19  are, indeed, independent.  Moreover, the Official Committee

20  of Unsecured Creditors appointed in these cases have entered

21  into a plan support agreement setting out a valid proposal

22  for moving these cases forward.

23       Certain creditors and the U.S. Trustee, however,

24  still express reservations about allowing these independent

25  professionals to conduct the debtors' affairs, as they move

1  forward with a proposed plan.  I disagree with those

2  concerns.

3         However, I want to be perfectly clear that, if the

4  two equity security holders take any actions to either

5  replace Mr. Lyons as the independent director or try to

6  dilute his control of the board by appointing additional

7  members of the board without first seeking permission from

8  the Court, I will immediate appoint a Chapter 11 Trustee.

9  Therefore, for these reasons, I find that it would be

10 inappropriate at this time to appoint a Chapter 11 Trustee.

11        As for the appointment of an examiner, this is a

12 more difficult question.  I disagree with the UST's position

13 that the appointment of a -- of an examiner is mandatory.

14 The language of -- the language of 1104(c) provides the Court

15 with some discretion.  The Court -- it says that the Court

16 shall appoint an examiner to conduct such an investigation if

17 the -- of the debtor as is appropriate.  So the question

18 becomes:  Is it appropriate in this case?

19         The creditors' committee has taken the position

20 that they are conducting an investigation, although I will

21 note that they have just been appointed, and any

22 investigation must be in its very early stages of this case.

23 I'm also mindful of the fact that the -- some of the

24 creditors of the company are distrustful of the situation and

25 have concerns about the conduct of the previous management of

1  this company.

2          Therefore, I'm going to agree with Judge Glenn in

3  In Re Residential Capital, LLC, 474 B.R. 112, 119-120

4  (S.D.N.Y. 2012), in which he recognized that, quote:

5          "The only dispute as to whether the creditors'

6  committee should be permitted to conduct an investigation

7  without an examiner being appointment" --

8          The creditors' committee is ably represented in

9  these cases and no party questions the creditors' committee's

10 professionals' ability to competently and expeditiously

11 complete an investigation.  Nonetheless, Judge Glenn

12 determined in that case that appointment of an examiner was

13 appropriate, and I will do the same here.  I think

14 appointment of an examiner to conduct an investigation of the

15 pre-petition conduct of the debtors is appropriate.

16         And therefore, I will enter an order requiring

17 that that be done.  The parties should confer and submit an

18 appropriate form of order.

19         And in the form of order, I want to make clear, I

20 do not want any duplication of effort.  Since I'm appointing

21 an examiner to conduct an investigation, there's no need for

22 the creditors' committee to conduct a parallel investigation.

23 So I would not approve any fees associated with the

24 creditors' committee conducting that investigation.

25         Are there any questions?

1          (No verbal response)

2               THE COURT:  All right.  Let's move on to the rest

3    of the agenda.  What's next up, Mr. Cousins?

4               UNIDENTIFIED:  Your Honor --

5               MR. COUSINS:  Good afternoon, Your Honor --

6               THE COURT:  Go ahead, Mr. Cousins.

7               UNIDENTIFIED:  Your Honor --

8               THE COURT:  I hear "Your Honor."  Use the raise

9    your hand, so I can know who's talking.  I can't -- I've got

10   a screen full of faces here, I don't know who's talking.

11   Nobody.  Okay.

12              Back to you, Mr. Cousins.  Go ahead.

13              MR. COUSINS:  Thank you, Your Honor.  Good

14   afternoon.  Scott Cousins on behalf of the debtors.

15              I do have one update I wanted to inform the Court

16   because I know we've taken up a lot of time.  We've conferred

17   with UpgradeYa about their motion, which is I think the

18   second-to-last item on the agenda.  They have agreed to

19   adjourn their motion, the debtor doesn't object.

20              The next hearing we have is in connection with --

21   excuse me -- the adversary that we filed against James

22   Alexander and Alexander's motion to dismiss the case on

23   January 6th.  So, with the Court's permission, the debtors

24   would be comfortable, along with UpgradeYa, to move that

25   motion to January 6th.

1            THE COURT:  Remind me what that motion is.

2            MR. COUSINS:  That's the motion to reclaim

3   collateral that they believe that is in the possession of the

4   debtors.  That's Mr. Pierce's client.

5            THE COURT:  Okay.  Yes, we can move that to the

6   January 6th hearing.

7            MR. PIERCE:  And Your Honor --

8            MR. COUSINS:  (Indiscernible)

9            MR. PIERCE:  -- I'd just like to confirm what Mr.

10  Cousins was saying on behalf of UpgradeYa.  And this is

11  Matthew Pierce with Landis, Rath & Cobb for the record.

12           You know, given the late hour and the time that

13  the Court has spent the last two days and the evidentiary

14  issues that relate to our motion, we do not want to take any

15  more of the Court's time and try to get that heard today just

16  because of the time it will take.  So we are agreeable with

17  the debtors to adjourn that.

18           THE COURT:  Okay.  I appreciate that.  Thank you,

19  Mr. Pierce.

20           MR. COUSINS:  Your Honor, for ministerial action,

21  I think there may be some members of the debtors'

22  professionals who were waiting around for that motion.  I'm

23  not sure if they need to stick around any further, but one or

24  more might drop off with that adjourned.

25           THE COURT:  That's fine.  Anyone who does not need

1   to remain on the call may certainly drop off.

2            MR. COUSINS:  Thank you, Your Honor.

3            There are several now uncontested matters at the

4   beginning of the agenda.  We certainly understand why the

5   Court did not enter any proposed orders with respect to the

6   motion to reject the headquarters, the insurance policies

7   motion, the motion to -- the application to retain my firm,

8   the procedures for interim comp, the ordinary course

9   professionals and Donlin.

10           Your Honor, we've been working with the committee

11  and the U.S. Trustee.  We have produced blacklines, we've

12  filed them and uploaded appropriate orders.  And to my

13  understanding, Your Honor, I don't think there's any

14  objections to any of those, but I can certainly go through

15  the blacklines and the changes that we made in response to

16  the committee and (indiscernible)

17           THE COURT:  No, I did review those that are under

18  COC and CNO.  I was waiting to see what happened with the

19  motions to dismiss -- or the motion to appoint a trustee or

20  convert.  So I will go ahead and enter those orders for you.

21           MR. COUSINS:  Thank you very much, Your Honor.

22           And I think that brings us to Agenda Item Number

23  7, which is -- Mr. Bongartz from Paul Hastings is going to

24  handle that.

25           THE COURT:  All right. Mr. Bongartz?

1      MR. BONGARTZ:  Yes.  Good afternoon.  This is Alex

2  Bongartz of Paul Hastings.

3      So we're going to continue now with Agenda Item 7.

4  And if it pleases the Court, we would like to consider Agenda

5  Item 7 together with Agenda Item 12, which is the motion to

6  seal, which is essentially covers the same ground that is

7  left over from the motion on Agenda Item 7; i.e., the motion

8  to approve the redaction or withholding of publication of

9  certain personal identification information of the debtors'

10  customers.

11      So we -- if the -- as Your Honor will recall --

12      THE COURT:  Hold on one second --

13      MR. BONGARTZ:  -- at the first day --

14      THE COURT:  -- Mr. Bongartz.  Hold on one second.

15      I think someone else has their line open, I'm

16  getting feedback on the phone.  If you're other than Mr.

17  Bongartz, please mute your phone.  Thank you.

18      Go ahead, Mr. Bongartz.

19      MR. BONGARTZ:  Thank you.

20      As Your Honor will recall, you had granted the

21  relief as it relates to the redaction of personal

22  identification information on an interim basis at the first-

23  day hearing, that was at Docket Number 34.  And we are now

24  requesting approval of that relief on a final basis.

25      I wanted to note that we had attached to our reply

1  -- which is filed at Docket Number 187 -- a declaration of

2  Chris Wu of Teneo, and we would like to introduce that into

3  evidence in support of the motion and both -- to be clear,

4  both the motion to redact, as well as the motion to seal.

5  And that was my first request, to introduce that into

6  evidence.

7          THE COURT:  Is there any objection?

8          MR. SCHANNE:  We have a limited objection, Your

9  Honor.

10          THE COURT:  Who's speaking?  Mr. Schanne?

11          MR. SCHANNE:  Schanne.

12          THE COURT:  Schanne.

13          MR. SCHANNE:  May it please the Court, good

14  afternoon.  John Schanne, also on behalf of the Office of the

15  United States Trustee.

16          Just a limited hearsay objection to the second

17  sentence of the sixth paragraph of the Wu declaration.  And

18  that is Mr. Wu informing the Court of what potential buyers

19  are informing Mr. Wu.  If we want testimony of what the

20  buyers are saying, they need to be here to say it.

21          THE COURT:  Mr. Bongartz?

22          MR. BONGARTZ:  Well, I think the Court can take

23  notice of the fact that this is what the buyers have told Mr.

24  Wu, whether the buyer --

25          THE COURT:  How can I do that?  I can't do that,

1  take notice of it.  I mean, they've either told him or they

2  haven't.  And if he's the one telling me they told him, it's

3  hearsay.

4          MR. GROGAN:  Your Honor, James Grogan.  May I be

5  heard for just one second on this?

6          THE COURT:  Quickly.

7          MR. GROGAN:  Your Honor, Mr. Wu, I think, is an

8  expert, he's been our retained as our -- or is proposed to be

9  retained as our investment banker, and an expert can rely on

10 hearsay.

11         THE COURT:  Well, he's not testifying as an expert

12 on this motion, so I'm going to sustain the objection.

13         MR. GROGAN:  Okay.

14         MR. SCHANNE:  Thank you, Your Honor.

15    (Redacted Wu Declaration received in evidence)

16         MR. BONGARTZ:  All right.  As to the merits of the

17 motion, I think we've laid our arguments out in our reply,

18 but I'm just going to recap them briefly.

19         As Mr. Wu's declaration substantiates, the

20 customer list has value here, but it only has value as long

21 as it's not disclosed.  In fact, Mr. Wu's declaration -- as

22 for his declaration, he is attempting to sell the business as

23 a going concern, which includes the customer list.  And to

24 release or reveal the names on that list would materially

25 diminish the value of that list.

1          Now he also testified that -- or sorry, he didn't

2  testify.  In his declaration, he declared that the -- he is

3  marketing the customer lists.  I'm not going to mention what

4  the buyer said in response, but he -- it's definitely part of

5  the assets, the key assets that are being marketed for sale.

6  And in his opinion, the -- if that information were to be

7  disclosed, it would materially diminish its value.

8          I would also note that one of the key features of

9  cryptocurrency -- as is not just evidenced by Mr. Wu's

10  declaration, but it's now been repeated on multiple occasions

11  -- is that the holders of such currency, they are generally

12  anonymous.  It's certainly possible that a cryptocurrency

13  holder can raise his hand, as has happened even in this case,

14  and identify himself.  But without the customer doing so

15  voluntarily, it is generally not in the public domain who

16  holds cryptocurrency.  And to be clear, this is not just

17  limited to individuals; it is also the case for corporate

18  entities.  And I believe one evidence is -- in support of

19  that is -- we'll get to that, and the committee has

20  evidentiary support in that regard.

21          So, with that in mind, we would like to reiterate

22  our request, as we've done at the first-day hearing, that the

23  Court keep the customer names, as well as addresses,

24  confidential; that the debtors be permitted to redact

25  customer names and address information both from schedules,

1   as well as the creditors' list, and as well as -- and that

2   the claims agent be permitted to redact name and address

3   information from claims filed by customers.  That would --

4   that's it.

5              THE COURT:  All right.

6              MR. BONGARTZ:  And I understand that the committee

7   -- committee's counsel would like to be heard on this, as

8   well.

9              THE COURT:  All right.  Let me hear from the

10  committee's counsel, and then I'll go to the trustee.

11             MR. AZMAN:  Hi, Your Honor.  Good afternoon.

12  Darren Azman, McDermott, Will & Emery, counsel -- proposed

13  counsel to the committee.

14             Before I begin, we do have two declarations that

15  we submitted with our joinder, one from Mr. Segall, and the

16  second from Mr. Friedler.  And so I'd ask the Court to move

17  both of those into evidence.  Both Mr. Segall and Mr.

18  Friedler are on the line and available for cross.

19             THE COURT:  Is there any objection?

20        (No verbal response)

21             THE COURT:  Okay.  They're admitted without

22  objection.

23        (Segall Declaration received in evidence)

24        (Friedler Declaration received in evidence)

25             MR. AZMAN:  Thank you, Your Honor.

1          Your Honor, the sealing motion is of significant

2    importance to the committee, as I'm sure came through on our

3    joinder and the declarations.  This is not as simple as

4    creditors just wanting to remain anonymous, it's much more

5    than that.

6          The cryptocurrency space is one that is ripe with

7    fraud.  Of course, there's fraud everywhere today, but the

8    risk is far more acute for holders of cryptocurrency.  And I

9    think there are really three reasons for that, all of which

10   were laid out in Mr. Friedler's declaration.

11          The first is that cryptocurrency assets are ideal

12   targets for theft because it's incredibly difficult to trace

13   and can be easily liquidated.

14          Second is that cryptocurrency is decentralized.

15   There is no bank.  There are few, if any, procedural

16   safeguards that are in place to stop or unwind a fraudulent

17   transaction if it occurs.  It's not like a credit card

18   purchase, Your Honor, or a wire transfer, where, if a bank

19   suspects fraud, you're going to get a notification on your

20   phone.  Once the crypto is gone, it's gone.

21          And then third, Your Honor, for those two reasons,

22   the debtors' customers in these cases are essentially what we

23   would call "pre-qualified," in terms of being target victims

24   because they naturally hold cryptocurrency.

25          There is a -- I'll be clear, Your Honor.  There is

1  a small (indiscernible) in the case, probably around two

2  percent of the unsecured creditor pool, in terms of dollars,

3  who -- you know, for example, the convertible noteholders,

4  who probably don't fall into that bucket.  And quite frankly,

5  I don't think we have any objection to those names being made

6  public.  We're speaking only about the debtors' customers who

7  are customers are of the debtors, who naturally have held and

8  probably continue to hold cryptocurrency.

9          Your Honor, the second declaration that we

10 submitted is from Mr. Segall, who is a representative for one

11 of the committee members, Maple Partners.  The individuals

12 who formed Maple were so concerned about the risks that I

13 just outlined shortly after the bankruptcy filing -- and to

14 be clear, before the committee's appointment, but shortly

15 after the bankruptcy filing -- that they formed a new LLC to

16 hold their crypto, so that, if they were appointed to the

17 committee, and maybe for other reasons, but if their -- they

18 did not want their names to be disclosed.

19         I'm sure there are others out there who have done

20 that, but I'm sure that also a majority of the debtors' 6,500

21 creditors likely don't have the means to do that.  And I

22 think it's also noteworthy that a significant portion of the

23 debtors' customers don't even speak English, they're all over

24 the world.  So they have no idea that their names may be

25 publicized in these cases.

1           Now, Your Honor, these concerns are not only

2    coming directly from our committee members, but the unsecured

3    creditor body at large, who have been very vocal about many

4    aspects of this case online in various forums.  They are

5    scared, not just because they've lost a lot of money, but now

6    because their names may be made public.

7           Your Honor, that's all I have.  I don't want to

8    repeat the rest of the argument from our joinder.  But I

9    think that the declarations and the argument warrant

10   withholding that information.  Thank you.

11          THE COURT:  All right.  Thank you.

12          Mr. Schanne, before I come back to you, I see Mr.

13   Murley has raised his hand.  Do you want to be heard, Mr.

14   Murley?

15          MR. MURLEY:  Thank you, Your Honor.  Luke Murley

16   of Saul, Ewing, Arnstein & Lehr, on behalf of Maple Partners.

17   We are the committee member Mr. Azman referred to.  We join

18   the debtors' motion and the committee's joinder for the

19   reasons stated, and those pleadings and Mr. Azman's

20   presentation.  Thank you, Your Honor.

21          THE COURT:  All right.  Thank you.

22          Mr. Schanne.

23          MR. SCHANNE:  Thank you, Your Honor.  Again, may

24   it please the Court, John Schanne on behalf of the Office of

25   the United States Trustee.

1          Your Honor, the debtors seek authorization to

2   redact the names and all associated information identifying

3   all the debtors' creditors.  Bankruptcy process is founded on

4   principles of transparency and disclosure, limited

5   exceptions, and it's the debtors' burden to meet those

6   exceptions.

7          107(b)(1) permits the Court to protect trade

8   secrets and confidential information.  The debtors here

9   assert that the creditor list is potentially a value in

10  marketing the company.  That's no doubt accurate for many

11  businesses engaged in a 363 sale, I don't think that's

12  unique.  Notably, there's no evidence from any buyer

13  ascribing any value to that list, there's no stalking horse

14  agreement.  Should the agreement here, as postured, be

15  sufficient to satisfy (b)(1), we'll have an exception that

16  swallows the rule.

17          I think the real concern, though -- and you heard

18  it in the committee's presentation -- is privacy.  I think

19  that's the real focus here, is that people are concerned

20  about their information getting out.  And 107(c)(1) allows

21  the Bankruptcy Court to protect individuals.  (c)(1)

22  incorporates 1028(d) of Title 18, which, again, protects

23  individuals.  The plain language of neither of them apply to

24  protect entities.

25          So what are we talking about here?  We're talking

1  about individuals.  And with respect to those individuals, we

2  are sensitive to the concerns.  We understand.  The

3  Bankruptcy Rules, the local rules, they require complete

4  disclosure.  The debtors, the committee, they've offered

5  evidence that, if you identify all of that information, there

6  are real concerns there.  We're not asking for that.  We're

7  asking just for submission of the creditor names.  We have

8  not opposed redaction with respect to individuals of any

9  other identifying information, just the names.  The Friedler

10  declaration itself admits that just the names may not be

11  sufficient with respect to common names, right?

12          So we have here a hypothesis in evidence that, if

13  all of this information is provided, these bad things may

14  happen.  And we're sensitive to that and we understand that

15  and, in fact, you know, we don't oppose that.  It's just the

16  names of individuals who are looking to be disclosed.  And

17  with respect to entities, I don't believe (c)(1) applies.

18          We saw, during the trustee appointment motion

19  earlier today, disagreement between the committee and Mr.

20  Sarachek about where his creditors fall in the top 30 list.

21  Normally, that would have been easily resolved by looking on

22  the docket and seeing where they fall.  Of course, that

23  information is not available here.

24          So debtors assert that the UST has not

25  demonstrated why this information should be public, but that

1  flips the burden.  They have to demonstrate why the exception

2  applies here, to where even just the names themselves of

3  individuals cannot be disclosed.

4         So, for that reason, we respectfully request that

5  the motion be denied in its entirety with respect to

6  entities, and granted, for the most part, with respect to

7  individuals that just allow the names to be disclosed.  Thank

8  you, Your Honor.

9         THE COURT:  All right.  Thank you.

10        Mr. Bongartz, any reply?

11        MR. BONGARTZ:  Yes.  Thank you, Your Honor.

12        I wanted to just make two quick points.  This is

13 not comparable to a customer list of a, you know, run-of-the-

14 mill business.  I mean, the customer information, because of

15 the anonymity intrinsic in holding Bitcoin, is costly to

16 build.  It's costly and expensive to develop a customer

17 database because you don't know who out there holds the

18 cryptocurrency.  So that's what makes it an attractive asset

19 or may make it an attractive asset for a potential buyer.

20        The second point I wanted to make is the issue

21 with names is that it's just happenstance.  If you have a

22 common name, then maybe you're protected; and if you don't

23 have a common name, you're not.  That -- I think we should

24 apply a process that is fair to everyone.  And to just have

25 it by sheer luck that you have a common name and, you know,

1 then you're protected is not in the interest of protecting

2 customers, generally.  Thank you, Your Honor.

3          THE COURT:  Okay.  Has the list of names been

4 disclosed to the trustee?

5          MR. BONGARTZ:  I believe that it has.

6          THE COURT:  Do you have all of the information

7 about the holders of the Bitcoin, Mr. Schanne?

8          MR. SCHANNE:  Your Honor, we have been provided

9 the top 30 lists.  The schedules and statements have not been

10 prepared, so we do not have that information yet.

11          THE COURT:  All right.  And is there -- I -- it's

12 been a while since I took a look at this proposed order.  Is

13 there anything in this proposed order that provides a

14 mechanism that, if someone can come forward and have a

15 legitimate reason why they need to have access to that list,

16 they can seek to get it?

17          MR. BONGARTZ:  Yeah, that mechanism was in the

18 interim order and we've carried it over into the proposed

19 final order.

20          THE COURT:  Okay.  All right.  Then, based on the

21 evidence, I think there is at least some credible argument

22 that the creditor list -- which his, also, in this case, the

23 customer list of the -- of the debtors is -- has some

24 intrinsic value, and that disclosure of that list could

25 affect the ability of the debtors to market and sell that

1  list as a part of their going toward a plan of reorganization

2  here.

3          So I will overrule the objection, so long as the

4  U.S. Trustee is provided with all of the information

5  regarding every single one of the Bitcoin holders, and that

6  there is a mechanism in the final order that allows for

7  someone who can come forward and seek to obtain that list for

8  a legitimate purpose can do so.

9          I think the goal here is to keep this out of the

10 hands of competitors.  And so I would expect that, obviously,

11 someone -- or the competitor of the debtor and came forward

12 and said, well, we want to see the list, you're not going to

13 give it to them.  But there may be others who have a

14 legitimate reason for why they need that information.  And so

15 I want to make sure there's a way for someone who has a

16 legitimate reason to get it, can get it.

17          MR. BONGARTZ:  Yes, understood, Your Honor.  And

18 just to pinpoint the relevant paragraph, it's Paragraph 3 of

19 the proposed order.  But we'll be submitting that --

20          THE COURT:  All right.

21          MR. BONGARTZ:  -- after the hearing.

22          THE COURT:  Okay.  Yeah, please confer with the

23 U.S. Trustee and come up with an order that you can submit

24 under COC.

25          MR. AZMAN:  Thank you, Your Honor.

1          MR. BONGARTZ:  Thank you.

2          THE COURT:  Thank you.

3          MR. BONGARTZ:  Okay.  Moving on, the next item is

4   Item 8 on the agenda.  That is the cash management motion;

5   i.e., the motion to authorize the debtor to continue to

6   operate their cash management system, among other things.

7   That was Docket Number 7.  Your Honor had granted the cash

8   management order on an interim basis on November 10th.

9          We -- I am aware of two limited objections.  One

10  was filed by Jaime Schiller and other customers.  I believe

11  that that objection is moot, as a result of Your Honor's

12  ruling earlier this afternoon.  They had sought an

13  adjournment of a decision until after Your Honor had ruled on

14  the trustee motion.  But I don't -- again, in light of your

15  ruling, I don't think that objection has any -- you know,

16  it's still alive.

17          The other limited objection was filed by the U.S.

18  Trustee.  I should note that we did incorporate a series of

19  comments, informal comments, that the U.S. Trustee provided

20  to us, and we have attached a blackline to our reply at

21  Docket Number 215.  And if Your Honor would like, I can walk

22  you through those changes.  But my understanding is that

23  these changes are acceptable to the U.S. Trustee, and I don't

24  know if he has any further issues outstanding, but I believe

25  that we're in agreement on the form of order.

1        THE COURT:  Okay.  Mister --

2        MR. BONGARTZ:  And the only issue with the U.S.

3  Trustee that is remaining is whether Section 345(b) requires

4  the debtor here to essentially sell all their cryptocurrency.

5  On that point, I should -- I would like to make a few

6  comments.

7        The first one is -- and we've mentioned this in

8  our reply -- is that we do not believe that cryptocurrency

9  constitutes, quote, "estate money" for purposes of Section

10 345, so we don't believe it applies.  Cryptocurrency has been

11 held by other courts to be a commodity, not money, it's not

12 legal tender, it's not accepted as currency by the

13 Government; and so, therefore, we don't believe that 345(b)

14 applies.  But in any event, even if it does, we believe that,

15 in this instance, a waiver should be granted.

16        This is a -- cryptocurrency is the lifeblood of

17 this company.  It's comparable to the oil or other commodity

18 -- or commodities businesses.  And to require the debtors to

19 sell out -- sell down all its cryptocurrency would

20 essentially deprive it of one of its key assets.

21        I should also note that, in addition, as a result

22 of the plan support agreement that the debtors have entered

23 into with the committee, the committee has oversight over the

24 debtors' cryptocurrency positions.  The debtors have agreed t

25 provide weekly reporting.  And the committee has consent

1  rights if the debtors wanted to sell cryptocurrency beyond

2  what is permitted under the budget.  And in light of all of

3  the foregoing, we request that the Court approve the proposed

4  waiver of Section 345(b), which is in Paragraph 10 of our

5  proposed form of order.  Thank you.

6          THE COURT:  Mr. Schanne, are your objections all

7  resolved?

8          MR. MCMAHON:  Your Honor, if I may, Mr. McMahon

9  again.

10          THE COURT:  Oh, go ahead, Mr. McMahon.

11          MR. MCMAHON:  Your Honor, good afternoon.  With

12  respect to the cash management order, just one note.

13  Debtors' counsel I don't think characterized our position

14  correctly.  Because of the presence of the cryptocurrency in

15  e-wallets, which the debtors are holding, the motion turns

16  out to be a hybrid Section 345/363 motion.

17          There's risk with maintaining the position in

18  cryptocurrency.  With the understanding now that the

19  committee has been appointed since the last order was entered

20  and they are not objecting to holding the crypto, as the case

21  may be, we are okay with the revised proposed form of order

22  and we're not maintaining an objection to the motion going

23  forward.

24          THE COURT:  Okay.  Thank you, Mr. McMahon.

25          Anyone else wish to be heard?

1          MR. AZMAN:  Your Honor, it's Darren Azman again,

2  from McDermott, proposed counsel to the committee.

3          The only thing I'd add is this is an issue that we

4  are very much focused on, as Mr. Bongartz mentioned.  It's a

5  line item in the PSA and it's something that we're going to

6  be looking at even more closely over the next few days and

7  coming weeks, to determine whether there's sufficient

8  liquidity and what needs to be done with the crypto, but

9  there is no decision that's been made yet.

10          THE COURT:  Okay.  Thank you.

11          Anyone else?

12          MR. SILVER:  Your Honor, it's David Silver of

13  Silver Miller, representing Jaime Schiller.

14          As stated previously, just for the record, our

15  limited objection is mooted by the earlier decision, and we

16  withdraw it.

17          THE COURT:  Okay.  Thank you.

18          All right.  Then, based on the record presented,

19  I'm satisfied the relief requested is appropriate, including

20  the waiver of Section 345(b) in the order, and I will enter

21  that order.

22          MR. BONGARTZ:  Thank you, Your Honor.

23          Moving on to the next item on the agenda, that is

24  the employee wage motion, which is filed -- sorry, I

25  (indiscernible) -- Docket Number 11.  Again, Your Honor will

1 recall that you had granted that motion on an interim basis

2 at the November 10 first-day hearing.

3         We, again, have a limited objection by Jaime

4 Schiller and other customers.  And for the same reasons I've

5 stated earlier, I believe that that objection is mooted by

6 Your Honor's earlier ruling.

7         We have also received a number of informal

8 comments from the U.S. Trustee, which I believe we have

9 incorporated, although I don't know for certain whether the

10 U.S. Trustee is signed off on the form of order.  So I'd be

11 happy to walk Your Honor through the proposed order.

12         There's actually one point I wanted to make --

13 sorry, I just saw it in my notes -- and one change that we do

14 need to make in the form of order that was submitted.  And I

15 don't know -- I don't know if Your Honor has a copy of that

16 handy.  It was attached -- it was -- sorry.  It was filed at

17 Docket Number 214.  And this is in Paragraph 4 of that

18 proposed order, this was a -- this is a glitch that crept in

19 because we were trying to incorporate both comments we've

20 received from the committee, as well as comments we've

21 received from the U.S. Trustee.

22         I just wanted to make absolutely clear -- and

23 we'll reflect that in the draft -- in the form we'll submit

24 to chambers -- is that, if the debtors want to make any bonus

25 or incentive payments to non-insiders, or want to make bonus,

1  incentive, or severance payments to insiders, they will have

2  to come -- or we will have to come back and obtain an order

3  from this Court, and we'll have to do so on notice to

4  parties-in-interest.  I wanted to make absolutely clear we're

5  not going to move forward with that solely with the consent

6  of the committee.  We will come back to Your Honor, and we

7  will, if the chooses to make any such -- make any such

8  payments, we'll come back and seek entry of an order.

9              And obviously --

10             THE COURT:  Okay.

11             MR. BONGARTZ:  -- that is what we had agreed to

12  with the U.S. Trustee.  And I just wanted to make clear that

13  that is still the agreement and that will be reflected in the

14  form of order.

15             THE COURT:  Okay.  Thank you.

16             Mr. McMahon, are your issues resolved?

17             MR. MCMAHON:  They are, Your Honor.  No further

18  comments.

19             THE COURT:  Okay.  Thank you.

20             Anybody else wish to be heard?

21         (No verbal response)

22             THE COURT:  All right.  I'm satisfied, based on

23  the record, that the requested relief is appropriate.

24  Subject to submitting the final form of order under

25  certification of counsel, we'll get that order entered.

1          MR. BONGARTZ:  Thank you, Your Honor.

2          So the next item on the agenda is the bar date

3  motion.  With Your Honor's permission, I would actually

4  propose that we go slightly out of order because it -- I

5  think it logically makes more sense to first consider the

6  motion to extend time to file schedules, and then we can look

7  at the bar date motion, which sort of -- which flows from

8  that.  So I would, with Your Honor's permission, jump to Item

9  17 on the agenda.

10          THE COURT:  That's fine.

11          MR. BONGARTZ:  Okay.  Thank you.

12          So I know that there has been a little bit of a --

13  you know, that there's been two motions filed, an original

14  motion and an amended motion, and then we filed a revised

15  proposed order.  This was primarily the result of learning

16  what the situation on the ground is and getting new

17  management in place.  We had initially anticipated that the

18  schedules would be completed by December, late December.

19          But in light of having to replace -- or having to

20  replace management, including putting in a new CRO, replacing

21  the CFO, and the controller going on maternity leave, and in

22  light of the vast amount of information -- as Your Honor will

23  recall, there are more than 6,000 customers -- that December

24  deadline or -- that we had initially proposed was no longer

25  feasible.

1        We had then filed an amended motion, asking to

2    push that deadline to January 22nd.  And then, after

3    discussions with the committee and after further, you know,

4    analysis of what needed to be done in order to complete the

5    schedules, we're comfortable with only asking for an

6    extension to January 7th.  So that cuts it back by 15 days

7    from what we had proposed in our amended motion.  That -- so

8    that's our current request.

9        I should also note that that date is consistent

10   with the deadline or the milestones set forth in the plan

11   support agreement with the committee, and I understand that

12   the committee supports the extension to -- the extension of

13   the deadline to January 7th.  Thank you.

14       THE COURT:  Thank you.

15       Is there anyone else who wishes to be heard?  Mr.

16   McMahon?

17       MR. MCMAHON:  Your Honor, again, good afternoon.

18   Very quickly.

19       Initially, this motion was going to be tabled

20   because, in the normal scheme of things, Your Honor, bar date

21   motions don't go out until the debtors complete this task.

22   So, in light of the revised, I guess, proposal with the

23   committee for January 7th, our office is not objecting to

24   that date now, in light of the, you know, two-week concession

25   over what was originally proposed.

 1              But I was expecting the bar date motion to be

 2    continued.  I would like to be heard on that item, Your

 3    Honor, when we get to it momentarily.

 4              THE COURT:  Okay.

 5              MR. MCMAHON:  But no objection --

 6              THE COURT:  No objection on the motion to extend

 7    the date to file schedules, though, right?

 8              MR. MCMAHON:  Correct.

 9              THE COURT:  Okay.  Thank you.

10              Anyone else?

11         (No verbal response)

12              THE COURT:  All right.  I'm satisfied that relief

13    is appropriate.  I will grant that order.

14              MR. BONGARTZ:  Thank you, Your Honor.

15              And now we -- I'm going to turn to the bar date

16    motion, which was at -- it's filed at -- it's on -- sorry --

17    it's Agenda Item 10.

18              So we are requesting that the general bar date be

19    set for February 10th.  That date is driven, in large part,

20    by the milestones under the plan support agreement.  We need

21    to have a bar date before solicitation can begin.  And it is

22    crit -- absolutely critical in this case, given the limited

23    resources available, that these cases move forward as

24    expeditiously as possible.

25              We submit that a period of 30 days, plus or minus,

1  between the date on which the schedules will be filed -- and

2  they may actually get filed sooner than January 7th, but

3  that's the outside date -- and the proposed bar date of

4  February 10 is appropriate under the circumstances.

5          But I'm -- I should also note that the committee

6  supports the bar date of February 10, and I don't -- I

7  understand the U.S. Trustee has a -- objects to the motion

8  going forward, but I'll let him present that argument.

9          THE COURT:  Okay.  Mr. McMahon?

10          MR. MCMAHON:  Very quickly, Your Honor.

11          The way things typically work in a case that

12  appears before this Court is schedules are filed, creditors

13  get to see how their claims are scheduled -- you know,

14  whether they're contingent, unliquidated, or disputed -- such

15  that, when the proof of claim bar date does come, perhaps

16  they don't have to file a proof of claim if they agree with

17  what's scheduled.

18          Second, Your Honor, it also gives the parties-in-

19  interest an opportunity to pressure-check the schedules.

20  There is a potential for abuse -- and I'm not suggesting that

21  it's going to occur here.  But sometimes, you'll have

22  situations where, you know, every creditor is marked

23  contingent, unliquidated, or disputed, and the debtors don't

24  do their diligence with respect to accurately preparing the

25  schedules.

1    What I've said to debtors' counsel is a couple of

2  things:

3    First, I'm prepared to act within 48 hours of the

4  January 7th schedules deadline to take a look at them and to

5  advise them whether or not we have any issues with respect to

6  what's been assembled.  If there are, we can contact the

7  Court and perhaps have a teleconference.  If we don't have

8  issues, Your Honor, then the bar date notice can go out

9  immediately on the heels of our making that determination.

10    So, you know, I'm going by the way, you know,

11  things are typically done.  And they things are typically

12  done do not involve the bar date notice going out in advance

13  of the schedules being filed.

14    MR. AZMAN:  Your Honor, may the committee be heard

15  briefly?

16    THE COURT:  Go ahead.

17    MR. AZMAN:  Darren Azman again for the committee.

18    What Mr. McMahon proposes would effectively extend

19  the life of these Chapter 11 cases by three to four weeks, so

20  that's another month of professional fees and U.S. Trustee

21  quarterly operating fees.

22    I hear Mr. McMahon that, in many cases -- maybe

23  most -- that's not the -- necessarily the exact order things

24  go in.  But there's nothing in the Bankruptcy Rules or the

25  Bankruptcy Code that prevents it, on the one hand.  And

1  moreover, creditors are going to have an opportunity to see

2  the schedules.  January 7th is when the schedules will be

3  filed; the bar date will be a month later.  We're just

4  talking about the notice of the bar date going out now, so

5  that we can expedite these cases.

6         And so I don't really follow Mr. McMahon's logic.

7  They will see the bar date notice.  And if they want to file

8  a proof of claim before the schedules are filed, that's up to

9  creditors.  Alternatively, they can wait until they see them

10 on January 7th.  Thank you.

11        THE COURT:  Mr. Bongartz, does the bar date notice

12 that you're proposing to send out indicate that the schedules

13 will be filed no later than January 7th?

14        MR. BONGARTZ:  I believe it does.  But if it

15 doesn't, we will make sure to add it.

16        THE COURT:  Okay.

17        MR. BONGARTZ:  When -- I think --

18        THE COURT:  Yeah.

19        MR. BONGARTZ:  -- there is a provision in there

20 that the schedules have been filed.  But I will absolutely

21 make clear that the January 7th deadline is mentioned.

22        THE COURT:  All right.  Well, I think, if we send

23 out the bar date notice with a date of -- I've lost my notes

24 here -- of February 10th for the bar date, and we've sent out

25 a notice that says a schedule will be filed by January 7th,

1   and you don't have to file your proof of claim until after

2   the schedules are filed, that should take care of the

3   situation.  Does that resolve your issue, Mr. McMahon?

4              MR. MCMAHON:  Yeah, I --

5              MR. BONGARTZ:  Your Honor, I think --

6              MR. MCMAHON:  Your Honor --

7              MR. BONGARTZ:  -- I've actually -- I should note

8   one more thing.  I believe that the way we've set this up is

9   that the notice goes out -- there will be a customized proof

10  of claim form, which will include the scheduled amounts on

11  the front page.  So what will go out to the customers will

12  inform them directly, on the proof of claim form that they

13  would -- can submit themselves, what the scheduled amount of

14  the claim is.

15             THE COURT:  Well, how are you going to do that

16  before the schedules are filed?

17        (Participants speak simultaneously)

18             THE COURT:  Hold on.  One at a time.  Mr.

19  Bongartz?

20             MR. BONGARTZ:  The way this works -- and I

21  apologize for -- if I misspoke earlier -- the notice will go

22  out after the schedules have been filed.

23             THE COURT:  So notice will go out on what, what

24  day are you proposing?

25             MR. BONGARTZ:  I think we will do this within five

1  business days after the schedules have been filed.  I think

2  there's a -- yeah, five business days.

3         THE COURT:  That puts you at January 14th.  And

4  the bar date is what?

5         MR. BONGARTZ:  February 10th.

6         THE COURT:  That's almost four weeks, Mr. McMahon.

7         MR. AZMAN:  Your Honor, may the committee be heard

8  briefly?  Because this is not consistent with -- I think this

9  is a mistake, and the committee would not support that.  Our

10 understanding, as is laid out in the -- there is no way to

11 comply with the PSA time line if that is when the bar date

12 notice is going to go out.

13        THE COURT:  All right.  So I --

14        MR. AZMAN:  I mean, there's -- I guess.  Sorry.

15 I'm sorry.  Technically, you can still comply with the time

16 line.  But the committee is concerned, there are a lot of

17 international creditors in this case who will probably need

18 more time than three to four weeks to get a proof of claim

19 in.  And we had asked the committee to push back the bar date

20 to February 10th for that purpose.

21        And so, effectively, if we're now saying the bar

22 date notices are going to go out right after the schedules

23 are filed, on or around January 7th, we basically -- we don't

24 have what we negotiated for.  And I apologize if this is a

25 mistake that wasn't -- you know, we didn't see this before we

1    came to the hearing today.  But that's not what the goal of

2    the negotiated settlement was.  We think that (indiscernible)

3    more than the three or four weeks.  And so --

4              THE COURT:  All right.

5              MR. AZMAN:  -- we would want --

6              THE COURT:  So --

7              MR. AZMAN:  -- the bar date notice to go out now.

8              THE COURT:  All right.  I think the -- I think we

9    need to continue this motion, and hopefully the parties will

10   confer and submit a form of under -- a form of order under

11   COC.  But in my view, that form of order, as long as -- if

12   the notice is going to go out now or in the next few days,

13   and it contains a description of when the bar date will be

14   and when the schedules are going to be filed, and explaining

15   that the creditor does not have to file a proof of claim

16   until after the schedules are filed, that would resolve the

17   issues that I would have with the motion.

18             So I'm going to ask the parties to -- I'm going to

19   continue this motion and let the parties confer and come back

20   to me.  If you can't resolve it, contact chambers, and we'll

21   get another hearing scheduled for you -- well, either Monday,

22   Tuesday, or Wednesday next week.

23             MR. BONGARTZ:  Thank you, Your Honor.

24             MR. AZMAN:  Thank you, Your Honor.

25             THE COURT:  All right?  Anything else for today?

1          MR. BONGARTZ:  I think we're moving on to the next

2     agenda item, and I believe that is a retention application.

3     I don't have the agenda in front of me right now, but one --

4     excuse me one second.

5          MR. GROGAN:  Your Honor, yes.  We have the

6     debtors' professionals' retention applications.

7          THE COURT:  All right.  Okay.

8          MR. GROGAN:  If Mr. Bongartz is done, I will

9     handle those.

10          THE COURT:  Are they --

11          MR. BONGARTZ:  There's one other motion that I was

12     tasked with handling, that's the bidding procedures motion.

13     I don't know if you want to take that out of sequence.  I'm

14     happy to do it either one.

15          THE COURT:  Let's go ahead and do bidding

16     procedures and then move on to retention.

17          MR. BONGARTZ:  Okay.  Okay.  So the bidding

18     procedures, that is Item Number 16 on the agenda.

19          Here, I just wanted to lay out real briefly the

20     proposed time line, which includes a January 12th deadline to

21     designate a stalking horse.  The final bid deadline would be

22     January 15.  An auction, if necessary, would be held on

23     January 18th.  The objection deadline for the sale would be

24     January 22nd, and then a sale hearing would happen in early

25     February, subject to Your Honor's availability.  We have

1 filed a blackline and a proposed order at Docket Number 225.

2         I understand that there are a couple of objections

3 that have been filed.  The first one is the limited objection

4 of Jaime Schiller and other customers.  Again, for the same

5 reasons as stated earlier, we believe that that objection is

6 mooted by Your Honor's ruling earlier today.

7         The second objection that was filed was filed by

8 Mr. Arehart.  And he had raised a concern that there were

9 certain assets that Mr. Arehart believes are his property,

10 and that there should be a provision in the proposed order

11 that precludes -- in effect, precludes the sale of his

12 alleged assets.

13         I would note that, at this point, we believe that

14 his concerns are premature.  There is no buyer lined up at

15 this time.  We don't know which contracts such buyer -- such

16 hypothetical buyer would want to assume, what cure amounts

17 would get paid.  And so there's no -- and as a result, no one

18 is currently proposing to purchase any cryptocurrency under

19 the -- a bid procedures at this time.  It is possible that

20 that may be the case.

21         But I should also note that -- and one of the

22 comments that the committee has made and that we have

23 accepted is that, if cryptocurrency is to be sold through the

24 sale process, that would require the consent of the

25 committee.

1        And my final note on this is that Mr. Arehart's

2   ability to object to the sale is when it happens.  And to the

3   extent it includes property that he believes is his property,

4   he certainly has the ability to object to that at a later

5   time.

6            THE COURT:  Thank you, mister --

7            MR. BONGARTZ:  And then the last -- the third

8   objection which I wanted to address briefly is the objection

9   -- the general objection by the U.S. Trustee.  He has raised

10  two issues, the first one is with respect to timing.  Again,

11  we believe that that is mooted by Your Honor's ruling

12  earlier.

13       So I think we can move on to the second point, and

14  that is the stalking horse protections.  We believe that we

15  have put in appropriate safeguards that should address the

16  U.S. Trustee's concerns.  There is a cap on any breakup fee

17  of three percent.  The committee's consent is required.  And

18  most certainly the U.S. Trustee's rights to object to the

19  winning bid are fully preserved.  So, to the extent that he

20  disagrees with the selection of the stalking horse as --

21  which, if he -- if that entity prevails at an auction and

22  becomes a successful bid, the U.S. Trustee can object to that

23  selection at that point, as well.

24       So, with that, we have submit -- submitted a

25  revised proposed order that does reflect a few other comments

1   from the U.S. Trustee, including the addition in Paragraph 32

2   of the appointment of an ombudsman if a sale -- if a sale

3   does go forward.  And we submit that, with these changes, the

4   bid procedures order should be entered.

5           THE COURT:  All right.  Thank you.

6           Is Mr. Arehart's counsel on the call?

7           MR. NEFF:  Yes, Your Honor.  This is Carl Neff

8   from FisherBroyles on behalf of Mr. Arehart.  And I

9   apologize, I'm not in Zoom -- oh, it looks like I'm

10  connecting right now.  I -- with me on the call is my

11  colleague Hollace Cohen of FisherBroyles, who has been

12  admitted *pro hac vice* in this action and will be addressing

13  the Court.

14          THE COURT:  Okay.  Ms. Cohen?

15      (No verbal response)

16          THE COURT:  Ms. Cohen, you're on mute.

17          MS. COHEN:  This is Hollace Cohen, Your Honor.

18  And we accept the debtors' view that the issues raised by

19  both Mr. Arehart in the limited objection and by the debtor

20  in their reply to the limited objection are premature, and

21  that -- and also, the debtors' acknowledgment that Mr.

22  Arehart will have the opportunity to object to any sale or

23  sales on or prior to the sale objection deadline, so we're

24  fine with that.

25          THE COURT:  Okay.  Thank you.  I appreciate that,

1  Ms. Cohen.

2        MS. COHEN:  Yes.

3        THE COURT:  Mr. McMahon, are the U.S. Trustee's

4  issues resolved, or do you have still have objections?

5        MR. MCMAHON:  Your Honor, I have one point to

6  raise, which is that having to do with the bid protections.

7        THE COURT:  Okay.  Go ahead.

8        MR. MCMAHON:  There's a controlling Third Circuit

9  case called environmental -- O'Brien Environmental Energy,

10 which provides that bid protections are subject to

11 administrative expense review.  We -- first, we don't have a

12 bidder here, so we'd have to know who the bidder is.  And

13 then, after notice and a hearing, once we have an agreement,

14 then we can assess whether or not that person, that stalking

15 horse is entitled to protection.

16        So -- and the case is very clear, Your Honor.

17 There are some bidders who are naturally inclined to bid, say

18 Michelin tires would theoretically buy -- you know, be a

19 bidder for Goodyear.  And therefore, you wouldn't need to

20 incentivize a bidder with bid protections.  So this entire

21 construct, we don't go along with the -- you know, what I

22 call a "putting money on the street" approach, where we --

23 you know, we basically just authorize the debtors and the

24 committee to hand out bid procedures like they're some form

25 of candy.

1         You know, this Court controls the process.  We

2    don't know who the prospective bidder is that would be

3    receiving the protections.  At that point, the issue will be

4    ripe and the Court can decide it.  That's our concern, Your

5    Honor.  Thank you.

6         THE COURT:  Well, is there anything in the order

7    that says that these bid protections will be provided to

8    anyone who bids, or is it -- because I agree with you, Mr.

9    McMahon; O'Brien does say that there is the possibility that

10   bid protections are not appropriate for certain bidders.  So

11   how can I provide providing bid protections to somebody

12   before I even know who's doing it?  Mr. Bongartz?

13        MR. BONGARTZ:  Yes, Your Honor.  We believe that

14   the -- well, the first point I should note that is that the

15   bid -- I'm sorry -- the stalking horse will be designated, so

16   we will be filing a notice.  This won't be, you know, kept in

17   secret, who the stalking horse is.

18        The second point I would note is that we're not

19   going to select or designate a stalking horse that's not

20   fully supported by the committee, so that should provide, I

21   think, an appropriate safeguard.

22        THE COURT:  Well, do we need to put anything in

23   this order, at this time, about what bid protections will be

24   provided to an as-yet-undisclosed stalking horse bidder?  Why

25   don't we just wait and see what the stalking horse bidder

1  asks for?

2         MR. BONGARTZ:  If that's Your Honor's ruling,

3  we'll -- we will accept that, of course.

4         THE COURT:  Okay.  I think that's appropriate.  I

5  don't think it's appropriate, at this point, to put into an

6  order, before we even know who the stalking horse bidder is

7  going to be, that they are entitled to bid protections.

8  That's something we can deal with once we get to the sale.

9         MR. BONGARTZ:  Okay.  We will revise the proposed

10  order accordingly and submit it under certification of

11  counsel.

12         THE COURT:  Okay.  Anyone else wish to be heard on

13  this motion?

14      (No verbal response)

15         THE COURT:  All right.  So I will wait to see the

16  revised order under COC, and once we get that, we can get it

17  entered for you.

18         MR. BONGARTZ:  Thank you.

19         THE COURT:  All right.  All right.  Mr. Grogan,

20  you were going to do the retentions?

21         MR. GROGAN:  Yes, Your Honor.  Thank you very

22  much.

23         THE COURT:  Okay.

24         MR. GROGAN:  James Grogan from Paul Hastings on

25  behalf of the debtors.

1          Your Honor, Agenda Item Number 11 is the debtors'

2  application for entry of an order authorizing the employment

3  of MACCO -- M-A-C-C-O -- Restructuring Group as financial

4  advisor.  That was supported by the declaration of Drew

5  McManigle.

6          We did have a couple of objections, neither of

7  which I think is material.

8          The first one, the U.S. Trustee had included the

9  MACCO retention application in a general objection, which I

10  believe is now moot.  Basically, the issue was we need to

11  wait and see whether a trustee is appointed before retaining

12  the advisors.

13          We also received an objection from Mr. Inamullah.

14  And I -- it was -- my interpretation of it was that he took

15  issue with the conflicts list that was -- or the parties-in-

16  interest list that was attached to the application, which

17  listed him as one of the debtors' officers.  You know, I

18  don't think we're making any rulings on that list in this

19  particular application, but I did want to note that that was

20  out there.

21          Unless the U.S. Trustee had any further comments,

22  I think this one is essentially uncontested.

23          THE COURT:  Mr. McMahon, any objections to the

24  retention?

25          MR. MCMAHON:  No, Your Honor.  The revised

1  proposed form of order is acceptable.

2          THE COURT:  All right.  Is Mr. Billion on the

3  phone?  I believe he was counsel to Mr. Inamullah.

4      (No verbal response)

5          THE COURT:  No.  Okay.  So, to the extent he still

6  had an objection, I'll overrule it and I will enter the

7  order.

8          MR. GROGAN:  Thank you, Your Honor.

9          If I might go out of order just a little bit, save

10 Teneo for last.  The next one would be the application to

11 retain Paul Hastings as counsel to the debtors.

12         Your Honor, since the application was filed at

13 Docket Number 64, we have filed two additional declarations

14 in support of -- one was filed at Docket Number 182 and the

15 second one was filed at Docket Number 233.

16         The U.S. Trustee had taken issue with several

17 items in the application.  In conferring with Mr. McMahon, I

18 believe we have resolved one of those issues at this point.

19 Mr. McMahon has objected based on Pillowtex with respect to a

20 couple of invoices that were paid prepetition.

21         To resolve that, we have agreed that we would

22 return $313,330.40 to the trust account for the debtors and

23 waive the associated prepetition fees, if we are retained by

24 the court.  As a result of that, the debtors' retainer

25 account would increase to $349,477.26.

1   However, I don't think that resolves all of the

2   issues.  The U.S. Trustee had also objected to a couple of

3   additional issues.  One was the prepetition work that Paul

4   Hastings performed for the debtors and -- let me just sort of

5   explain my interpretation and then, you know, I guess, we'll

6   hear from Mr. McMahon.

7   So our view is that this should be governed, our

8   disinterestedness, should be governed by Marvel Entertainment

9   Group, the Third Circuit decision from 1998.  It's reported

10  at 140 F.3d 463.

11  The Marvel case holds that if a professional has an

12  actual conflict, it cannot be employed.  If a professional

13  has a potential conflict, its employment is within the

14  discretion of the court.  And the court may not disqualify a

15  professional on the appearance of a conflict alone.

16  Apologies, Your Honor.  Choked up.  It was a

17  moving decision.

18  Since Marvel was decided as, you know, bankruptcy

19  court in Delaware has issued a lot of interpretative

20  decisions, one of which was relatively recent -- Art Van

21  Furniture.  Chief Judge Sontchi decided that.  That -- the

22  Art Van Decision was reported at 617 B.R. 509 B.R. Del 2020.

23  I think the situation here is relatively similar

24  to Art Van.  One of the issues that Mr. McMahon has taken

25  issue with is that we have an existing client relationship

1  with a company called Uphold.  Uphold is another

2  cryptocurrency business.

3          We are currently representing -- and we discussed

4  this in all three of the declarations I filed in support of

5  our application.

6          We represent Uphold in matters unrelated to Cred.

7  Prepetition, we had one matter that involved both Cred and

8  Uphold.  And it was a -- we agreed to advise Uphold and Cred

9  jointly on some litigation that was filed in the state of

10 Washington by a company called Decrypt Capital.  And there

11 were some additional plaintiffs related to Decrypt.

12         Our representation was very short and actually the

13 Cred entity, which was Cred (US) LLC.  It's one of the

14 subsidiary debtors here, was dropped from the case.  So a

15 debtor is no longer an actual party in that litigation.  At

16 this point, it's purely a litigation between Decrypt and

17 third parties, including Uphold, but we are not representing

18 Uphold.

19         We're not representing any of the individual

20 plaintiffs or, I should say, individual defendants.  We have

21 no role in the case at all.  And the debtors have no role in

22 the case.  Other than that, all the other representations

23 with Uphold have nothing to do with Cred.

24         In terms of whether there is an actual conflict

25 there, there just isn't.  Uphold has a claim against Cred

1  which, as the testimony earlier today shows, is being

2  resolved.

3         Mr. Cousins, whose been handling that on behalf of

4  the debtors, ably.  Mr. Foster is in active negotiations with

5  them. As he testified earlier, we expect to be filing a

6  stipulation regarding the return of a very small amount of

7  bitcoin.  I think it's literally 2.4 bitcoin plus some

8  additional forms of cryptocurrency that was held in an

9  account with Uphold.

10         But there's no evidence that Paul Hastings is

11  anything but disinterested in what happens with Uphold in

12  this case.  Uphold, as I put in my most recent declaration,

13  represents .05 percent of Paul Hastings revenues over the

14  last twelve months.

15         This exact same situation was litigated in <u>Art Van</u>

16  <u>Furniture</u>.  And in that case, the proposed debtors' counsel,

17  which was ultimately approved for retention, had represented

18  Wells Fargo which was actually a secured lender in the case

19  and Wells Fargo represented .5 percent or ten times as much

20  of the firm's avenue revenues.

21         Nevertheless, Judge Sontchi held that there was no

22  actual conflict.  I would also add that we received

23  reciprocal waivers when the Decrypt engagement letters were

24  signed.  I have shared those with Mr. McMahon and his office.

25  And, you know, there's just no actual conflict.  There's not

1  even a potential conflict.

2          In addition, Mr. McMahon has taken issue with some

3  of the other prepetition work that we did for Cred.  In the

4  first instance, we had advised Cred on the private placement

5  convertible notes which were issued in the amount of $2.6

6  million dollars.  And nobody has raised any issues regarding

7  our advice on those private placement convertible notes.

8          One of the noteholders is actually a member of the

9  creditors committee.  In fact, it's the largest noteholder

10 and the committee does not object to our retention in this

11 case.  Nobody has ever raised a single issue regarding that

12 advice.

13         We also had advised Cred on some litigation

14 against Mr. Alexander and what we did prepetition was we

15 filed a lawsuit against Mr. Alexander in the state of

16 California to get injunctive relief after it came to light

17 that Mr. Alexander had taken 225 bitcoin as the court heard

18 earlier today.

19         Not only has nobody questioned the quality of the

20 work, as I attached the orders from the California court to

21 the declaration that we filed at Docket Number 233, the

22 California court granted both a TRO against Mr. Alexander and

23 a preliminary injunction specifically finding that Cred was

24 likely to succeed on the merits.

25         There is zero evidence that anything we did in

1  connection with that litigation was anything but flawless.

2  There are no conflicts here at all.  And so, we would request

3  that the court approve our retention.

4          Thank you very much.

5          THE COURT:  Thank you.

6          Mr. McMahon.

7          MR. MCMAHON:  Your Honor, I'll be brief.  Before I

8  begin, I would like to start with just establishing what the

9  record is, from our perspective.

10          The Grogan declaration, the supplemental

11  declaration, will be the first two items. Third, we would

12  like to submit certain of Mr. Shatt's testimony with respect

13  to Uphold, specifically that Uphold's platform was the source

14  of approximately 30 to 40 percent of the debtors' business.

15  That's part of his deposition transcript, page 116, lines 10

16  to 12.

17          Next, three U.S. Trustee exhibits relating to

18  Decrypt which were part of the exhibits that we submitted to

19  the court yesterday in connection with the hearing.  There's

20  two engagement letters, one for Cred, one for Uphold, that

21  Paul Hastings has with those respective clients.  And then,

22  separately, the Decrypt amended complaint which is the third

23  exhibit.

24          Finally, Your Honor, there are also two judicial

25  notice documents we'd like to take notice of -- the Alexander

1  motion to dismiss and the Alexander complaint; provided that

2  those are submitted or admitted in evidence, I'll proceed

3  with my argument.

4           THE COURT:  Any objection?

5           MR. GROGAN:  Well, I do object to the admission of

6  Alexander's motion if it's for the purpose of establishing

7  the truth of the matters asserted.  We disagree with it,

8  obviously.  If it's just for the purpose of establishing that

9  a motion was filed, that's fine.

10          THE COURT:  I will accept it only for that purpose

11 and the other exhibits are either admitted or I will take a

12 judicial notice of them.

13     (Trustee's Exhibit, Alexander Motion to Dismiss,

14 Alexander complaint, received into evidence)

15          MR. MCMAHON:  Thank you, Your Honor.

16          As stated in our objection, Section 327(a) of the

17 Bankruptcy Code provides that counsel to a debtor-in-

18 possession has to meet two requirements.  It can neither hold

19 nor represent an interest adverse to the estate and, second,

20 it must be a disinterested person.

21          And that definition is in the Code.  I'm not going

22 to repeat it (indiscernible) that.  It provides that -- Your

23 Honor, may I have one moment?

24          THE COURT:  Sure.

25          MR. MCMAHON:  I'm sorry.  Thank you.

1          THE COURT:  Yes, go ahead.

2     (Pause)

3          MR. MCMAHON:  I'm sorry for the interruption, Your

4 Honor.

5          THE COURT:  That's all right.

6          MR. MCMAHON:  A disinterested person is a person

7 that does not have an interest materially adverse to the

8 interest of the estate or any class of creditors or equity

9 security holders by reason of any direct or indirect

10 relationship to connection with or interest in the debtor or

11 for any other reason.

12          In our objection, we point out four areas of

13 concern.  First, the convertible note representation.

14 Second, the representation of the debtors in connection with

15 the response and in the corporate fix with respect to

16 corporate governance issues involving Cred Capital. Third,

17 the Uphold issues with respect to these cases.  And then,

18 fourth, the Pillowtex related issues.

19          I'll take each concern in turn.

20          The convertible note placement, the sheer timing

21 of same within ninety-days prior to the debtors' bankruptcy

22 filings means that the placement is going to be subject to a

23 level of scrutiny in connection with these cases, certainly

24 after the examiner has been appointed by Your Honor.

25          Next, the court for governance issues involving

1  Cred Capital.  The issue here is such where if the court

2  agrees with Alexander's view of the legal fact of the steps

3  that Cred took with Paul Hastings' counsel which allegedly

4  included a reorganization of Cred's equity structure at the

5  expense of the sole voting class of equity and Cred Capital,

6  then the bankruptcy filing by Cred Capital was not

7  authorized.

8         Next, Paul Hastings was retained by Uphold and

9  Cred in connection with the Decrypt litigation in mid-

10  September that predates Paul Hastings retention by the

11  debtors in connection with the bankruptcy which didn't occur

12  until later in October.

13         With reference to Uphold, Your Honor, Paul

14  Hastings has what we believe to be an actual conflict of

15  interest.  Paul Hastings represented to Cred and Uphold

16  entities jointly, then at the point at which the debtors

17  filed for bankruptcy protection, Your Honor is going to hear

18  about this, the past couple of days.

19         Their interest clearly diverged.  Uphold will be

20  asserting claims against the debtors in connection with these

21  bankruptcy cases and Uphold's claims against the debtors

22  stemming from the uniform protocol token offering which is

23  the subject of the litigation, the Decrypt litigation, are

24  going to be part of those claims.

25         Standing here today, Your Honor, Paul Hastings

1   cannot represent the debtor with respect to those claims.  In

2   fact, Your Honor got a flavor for it earlier today when Mr.

3   Cousins handled, you know, the Uphold related issues.  That's

4   an actual conflict of interest.  And --

5           THE COURT:  Does that resolve the issue?  I Mr.

6   Cousins can represent any claims from Uphold, can he deal

7   with those and how does that affect then the retention of

8   Paul Hastings?

9           MR. MCMAHON:  Your Honor, because it doesn't

10  change the fact that the firm, whatever they have, the actual

11  conflict of interest.  It certainly addresses the need for

12  Uphold's, I guess, ability to have un-conflicted counsel, but

13  the law firm, it doesn't address any issues with respect to

14  the law firm itself.

15          THE COURT:  Well don't we appoint conflict's

16  counsel all the time in cases when the bankruptcy counsel has

17  a conflict, we appoint a conflict counsel to deal with any

18  issues involving that particular party.

19          MR. MCMAHON:  And, Your Honor, again, that, you

20  know, understood that that does occur with respect to certain

21  types of matters.  I mean this is a situation where Mr.

22  Schatt testified that he estimates that Uphold's platform was

23  the source of approximately 30 to 40 percent of the debtors'

24  business.  Uphold and its customers are a significant part of

25  these bankruptcy cases.

1          This is not like a bit proof of claim issue.

2    Uphold has got a significant relationship with the debtors.

3          For the record, Your Honor, the proposed Pillowtex

4    resolution by Paul Hastings involved in what Mr. Grogan

5    described would resolve our issues with respect to that

6    point.

7          So, Your Honor, we view the Uphold issues here as

8    presenting an issue of actual conflict which is disqualifying

9    under the language.  But, you know, with respect to Your

10   Honor the representations of the debtors in connection with

11   the Cred Capital situation and the convertible note placement

12   while there's a potential, they are also troubling meaning

13   that, you know, because of the nature of the work that was

14   performed, they very well could become ripe at some point and

15   this court has a discretion to do something about them at

16   this juncture with respect to that.

17         So, you know, Your Honor, we raised a point about

18   Rule 2014 disclosures here.  If the court compares its

19   understanding of Paul Hastings' services before and after,

20   reading the supplemental declaration that was submitted, that

21   filing makes the U.S. Trustee's point, meaning that all of

22   the information contained in the supplement was available to

23   the firm at the time it followed its initial employment

24   application.

25         The entire point of that rule is that parties in

1  interest shouldn't have to ask for the information that was

2  provided in the supplement.

3         So, Your Honor, we believe that there are certain

4  potential conflicts in play here where the Uphold issue is

5  significant and it's different.  And for that reason, Your

6  Honor, we ask the court to deny the application.

7         THE COURT:  Mr. Grogan, any rebuttal?

8         MR. GROGAN:  Your Honor, do you want to hear from

9  me?  I think committee counsel might have wanted to be heard

10  on this as well.

11         THE COURT:  Oh okay.  Let me hear from committee's

12  counsel.

13         If you're speaking, you're on mute.

14         Committee's counsel has decided not to be heard on

15  this issue.

16         MR. WALSH:  Your Honor, it's (indiscernible)

17  again.  I need to upgrade a little bit.

18         You know, we've gone through, we've looked at the

19  objections raised by the U.S. Trustee and the responses by

20  debtors' counsel.  And just for what it's worth, Your Honor,

21  we don't see it as an impediment and it definitely hasn't

22  been an impediment, to date, with respect to the activities

23  we've been engaged in with the debtors.

24         So, we support their retention, Your Honor.

25         THE COURT:  Thank you, Mr. Walsh.

1          MR. GROGAN:  Your Honor, there cannot be an

2   imagined actual conflict. The Uphold Decrypt litigation does

3   not involve a debtor.  There is no way that we have a

4   conflict related to litigation among third parties where we

5   literally represent none of those parties.  That is what is

6   actually happening in Decrypt.  The debtor was dropped from

7   the case.  I am representing non-parties at this point of

8   that litigation.

9          With respect to the other issues with Uphold.  You

10   know, it's no different than Wells Fargo.  Wells Fargo in the

11   Art Van Furniture case was the secured lender with an all-

12   asset lien.  It was a big deal in the case.  Frankly, I don't

13   think Uphold comes anywhere close to, you know, having the

14   same status as the secured lender with an all-asset lien.

15          Sure, they may have referred some customers to us.

16   Sure, we had a small position of cryptocurrency that they

17   were holding on the petition date.  But that doesn't rise to

18   the level of an actual conflict where all the matters that we

19   have with Uphold currently as a firm have nothing to do with

20   (indiscernible).  And there is zero evidence that we have not

21   diligently and aggressively represented this company

22   throughout the Chapter 11 cases.

23          So, I think we're disinterested.  I think the

24   record shows it. We've worked around the clock to represent

25   the debtors' interest in every situation.  And, you know, as

1  a firm we sometimes defer to conflicts counsel to avoid the,

2  you know, the difficulty of dealing with your own clients in

3  bankruptcy but that's why Mr. Cousins is handling it.

4         THE COURT:  All right. Well, obviously,

5  allegations of conflicts of interest of counsel is a serious

6  issue and I want to take a little bit of time to go back and

7  look at the affidavits and the other evidence that the

8  parties have submitted, so I'm going to take it under

9  advisement.

10         Off the top of my head, at this point, I don't see

11  an actual conflict of interest, but I just want to look at it

12  again myself to make sure that I'm comfortable with that

13  before I give you a ruling, but I will do that as quickly as

14  possible.

15         MR. GROGAN:  Thank you, Your Honor.

16         Next on our agenda is the debtors' application for

17  entry of an order authorizing the retention of Teneo Capital.

18         Your Honor, we received an objection to this

19  application from the U.S. Trustee's office.  It really falls

20  into two categories.  One, the U.S. Trustee objected to the

21  tail fee.

22         Essentially, what Teneo -- the terms of Teneo's

23  application would entitle it to a transaction fee if a

24  transaction is consummated within twelve months after

25  termination.  We view this as a standard within market

1  provision.  It protects Teneo from doing a lot of work.  And

2  if for some reason this case does not work out as we hope it

3  will and a subsequent trustee takes advantage of the work

4  that they've done to line up buyers, they're entitled to some

5  benefit from that, and that's what the tail fee provides.

6          The U.S. Trustee also objected to some of the

7  disclosures.  Let me explain the situation there.

8          One of the --

9          THE COURT:  If you are -- yeah, someone is not

10 muted.  Operator, if you can identify that person, would you

11 disconnect them, please?

12         MR. GROGAN:  So one of the professionals that's

13 working on the Teneo team is a fellow named Matt Shapiro.

14         THE COURT:  Hold on one second. We still have it.

15         Operator, can you identify who that is with an

16 open line who's speaking?

17         Operator, can you hear me?

18         OPERATOR:  Yes, I can.

19         THE COURT:  Can you identify who that is and

20 disconnect them from the call?

21         OPERATOR:  I'm trying.

22         THE COURT:  Okay.  Thank you.

23         MR. GROGAN:  Thank you, Your Honor.

24         Would you like me to continue or wait?

25         THE COURT:  Let's wait a second and see if we are

1  clear of this.

2         OPERATOR:  I've identified the line.

3         THE COURT:  Okay.  Thank you, operator.  I

4  appreciate it.

5         All right, go ahead, Mr. Grogan.

6         MR. GROGAN:  Thank you.

7         So the issue is that Teneo has contracted with a

8  cryptocurrency specialist to work with the team on this

9  particular engagement.  His name is Matthew Shapiro.  He

10 works at a firm called Multicoin.  And he has a tremendous

11 amount of cryptocurrency experience which we think will be

12 invaluable in terms of identifying perspective buyers and

13 also addressing the issues that will likely come up during

14 the sale process.

15        There were connections that Teneo identified that

16 have to do with Mr. Shapiro's employment with Multicoin.

17 Those connections have been shared with the U.S. Trustee's

18 office; however, the U.S. Trustee has requested that we file

19 a supplemental declaration making these disclosures public.

20        That would be a violation of Mr. Shapiro's

21 employment agreement with Multicoin; however, he has

22 disclosed that these are -- these investors in Multicoin do

23 hold amounts that are less than one million dollars and I

24 think the U.S. Trustee has all of the information to evaluate

25 whether or not there's any concerns there.  It just comes

1  down to whether or not it would become public.

2         And on that front, you know, we just -- Mr.

3  Shapiro cannot be put into a position where he would have to

4  publish confidential information that would likely result in

5  the termination of his employment with Multicoin.

6         So, for that reason, we would request that the

7  court give us some grace on that, just given the facts that

8  we're having to deal with.  And it's not a lack of disclosure

9  to the trustee.  It's just does the public need to know who

10 investors in Multicoin happen to be.  We don't think that

11 that's necessary.

12        He has made every disclosure that he can,

13 including the fact that he has this relationship with

14 Multicoin.  It's just, you know, how deep do we have to dive.

15        We also have received some comments, informal

16 comments, to the application from the committee.  And to

17 resolve that, the form of order has been revised.

18        Teneo has agreed to modify the compensation and if

19 the sale proceeds exceed $10 million dollars, Teneo would

20 agree to credit one half of the monthly fees that they earned

21 presale, preclosing against the ten plus -- against the

22 transaction fee that they would earn on a transaction for

23 more than $10 million dollars.  If the sale proceeds are less

24 than ten million, there would be no crediting.  And I believe

25 that resolves the committee's issues.

1        With that, Your Honor, we would request that you

2   approve the retention of Teneo.

3        THE COURT:  Okay.  Let me hear from Mr. McMahon.

4        MR. MCMAHON:  Your Honor, very briefly.

5        First, the revised proposed form of order is

6   acceptable to us.

7        Second with respect to the disclosure issue, we've

8   offered to Teneo and the debtors, you know, to the option of

9   filing, proposing to file the disclosure under seal, pursuant

10  to Rule 2014, just so that what it is that is of import to

11  the disclosure requirements of the Code are filed of record.

12       So that's our key concern there just meaning that

13  it's part of the court's record.  So, if they don't want to

14  disclose it publicly, seeking to file it under seal is an

15  option.  And that's our argument.

16       Thank you.

17       THE COURT:  Mr. Grogan, any issue with filing it

18  under seal?

19       MR. GROGAN:  Yes.  Unfortunately, Mr. Shapiro was

20  unable to do that because an order sealing a document can be

21  eventually unsealed.  And he could not take that risk.

22       THE COURT:  Well, I'm not sure there's a legal

23  basis for me to say that because he is afraid it might get

24  unsealed sometime in the future, he's not obligated to

25  provide the information that's required by the Code.

1          MR. GROGAN:  Well, I don't -- I mean I know that

2    the U.S. Trustee wants this disclosure, I don't think there's

3    anything in the Code that requires it.  What we're talking

4    about are investors in Multicoin.  And Mr. Shapiro has

5    disclosed that he has an employment relationship with

6    Multicoin.  It's just, you know, do we need to go that extra

7    step of disclosing who owns Multicoin.

8          THE COURT:  Mr. McMahon, why do we have to

9    disclose who the owners of an entity are that Mr. Shapiro

10   works for?

11         MR. MCMAHON:  Because, Your Honor, the link to

12   these bankruptcy cases is that that's the connection that's

13   germane.  Like, in other words, that's the critical

14   information is to why we even need to have to the disclosure

15   in the first place.

16         So, again, you know, Rule 2014 says what it says,

17   full disclosure of connections.  And the more opaque these

18   documents get, owners, you know -- a couple of owners in my

19   employer are customers and claimants of Cred.  Well, what

20   does that really tell me?  And if you can come out and say

21   that publicly, but it tells me nothing.  It keeps me

22   guessing.

23         So, you know, all I want is an accurate statement

24   of what the connection is as part of the court's record and,

25   again, sealing is not an issue.

1          THE COURT:  Well, I think if Mr. Shapiro wants to

2   be involved, we need to have a disclosure but I'm not sure

3   that it's necessary to disclose who the principals are of an

4   entity that you work for.

5          If we were to take that to its full extent, you'd

6   have to do that in every case for every entity.  That if

7   someone says they work for IBM, do they have to disclose

8   every shareholder of IBM because they might be a creditor in

9   the case?  I don't think that's the case.

10         And I think as long as Mr. McMahon has received

11  the information that he needs to satisfy himself that there

12  is no potential connection.  And we have disclosed that he

13  works for Multicoin, I think that's sufficient at this point.

14  So, I'm not going to order him to disclose who the owners of

15  Multicoin are.

16         So with that, I'll overrule the objection then and

17  enter the order.

18         MR. GROGAN:  Thank you, Your Honor.

19         Okay.  The last retention is the motion under

20  Section 363 for engaging a chief restructuring officer, and

21  additional employees from Sonoran Capital.  This is Matt

22  Foster's firm.

23         I think that the -- Mr. McMahon can correct me if

24  I'm wrong, but I think that the only issue there was the

25  possibility of duplication of effort between Sonoran Capital

1  and MAACO. I think Mr. Foster has filed a supplemental

2  disclosure which provides additional information regarding

3  the allocation of responsibilities, as well as the disclosure

4  of any additional employees that will be working for him

5  through Sonoran Capital.

6          I'll leave it to Mr. McMahon to weigh in, but that

7  may be sufficient.

8          THE COURT:  Mr. McMahon.

9          MR. MCMAHON:  Your Honor, with respect to where

10 we're at with this, clearly, I think that -- we made a point

11 with respect to J. Alix Protocol which we kind of closely

12 guard because it provides a set of rules regarding these

13 types of retentions under 363 as to what, you know, should

14 happen.

15         Immediately before the hearing, I did, this one,

16 just because there's been such a volume of issues in

17 connection with these cases, I forwarded certain, I guess,

18 cleanup comments to the proposed order that I think would be

19 agreeable to Sonoran and would finally address our concerns

20 in full.

21         So, I don't know if debtors' counsel is willing to

22 do this, but if we could possibly adjourn that briefly with

23 the intention of submitting a revised order under

24 certification of counsel as early as Monday, that would be

25 our preferred way of handling this.

1          THE COURT:  Mr. Grogan?

2          MR. GROGAN:  You know, if we can get it resolved

3  that would be great.  I'm going to rely on Mr. Bongartz a

4  little bit.  Did you get -- Mr. Bongartz, do you have the

5  cleanup comments?

6          MR. BONGARTZ: I do.  We need to -- I just want to

7  have a chance to talk to Matt Foster and Sonoran to make sure

8  that they are acceptable for them as well, but in principle I

9  think we can get there.

10          MR. GROGAN:  Okay.  Great.

11          So, we'll adjourn that one, I guess, to January

12  6th in case we can't resolve it.

13          THE COURT:  Okay. That's fine.

14          MR. COUSINS:  Your Honor, it's Scott Cousins

15  again.  This is one heck of an agenda.  I think the two

16  motions have been addressed for Trustee examiner Chapter 11

17  trustee.

18          As we mentioned at the beginning of the

19  afternoon's hearing, UpgradeYa is pushing and the debtors are

20  in agreement, their motion until January 6th.  So, unless

21  someone else is picking up something that I missed, I think

22  that's it for today.

23          THE COURT:  All right.  Anybody else have any

24  other issues then before we adjourn?

25      (No verbal response)

1        THE COURT:  All right.  Well thank you all very

2   much.  As I said, I will -- I'm going to take a look at the

3   Paul Hastings retention issue and I'll wait to see the

4   uploaded forms of order and, otherwise, I will guess I'll see

5   everybody on January 6th for our next hearing, unless

6   something else pops up unexpectedly.

7        I'll wish everybody happy holidays and a happy New

8   Year and I'll see you in 2021.

9        UNIDENTIFIED SPEAKER:  Likewise, Your Honor. Thank

10  you.

11      (A Chorus of "Thank you, Your Honor")

12        THE COURT:  All right, we're adjourned.  Thank

13  you.

14      (Proceedings conclude at 4:45 p.m.)

15

16

17                    CERTIFICATE

18

19    I certify that the foregoing is a correct transcript

20  from the electronic sound recording of the proceedings in the

21  above-entitled matter.

22
    /s/Mary Zajaczkowski            December 21, 2020
23  Mary Zajaczkowski, CET**D-531

24
    /s/Coleen Rand                  December 21, 2020
25  Coleen Rand, AAERT Cert. No. 341