```
 1                UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF DELAWARE
 2

 3                                 .   Chapter 11
    IN RE:                         .
 4                                 .   Case No. 20-12836 (JTD)
    CRED INC., et al.,             .
 5                                 .   Courtroom No. 5
                                   .   824 North Market Street
 6                                 .   Wilmington, Delaware 19801
                                   .
 7                  Debtors.       .   January 6, 2021
    . . . . . . . . . . . . . . .      10:00 A.M.
 8
                 TRANSCRIPT OF TELEPHONIC HEARING
 9           BEFORE THE HONORABLE JOHN T. DORSEY
                UNITED STATES BANKRUPTCY JUDGE
10

11  APPEARANCES:

12  For the Debtors:          Scott Cousins, Esquire
                              COUSINS LAW LLC
13                            1521 Concord Pike
                              Wilmington, Delaware 19803
14
                              - and -
15
                              James Grogan, Esquire
16                            PAUL HASTINGS LLP
                              600 Travis Street
17                            Houston, Texas 77002

18                            - and -

19                            Pedro Jiminez, Esquire
                              Avram Luft, Esquire
20                            Austin Prouty, Esquire
                              200 Park Avenue
21                            New York, New York

22
    Audio Operator:          Jason Spencer
23
    Transcription Company:   Reliable
24                            1007 N. Orange Street
                              Wilmington, Delaware 19801
25                            (302)654-8080
                              Email:  gmatthews@reliable-co.com
```

1   Proceedings recorded by electronic sound recording,
2   transcript produced by transcription service.

3

4   APPEARANCES (Continued):

5
    For Official Committee of
6   Unsecured Creditors:        Darren Azman, Esquire
                                Joseph Evans, Esquire
7                               MCDERMOTT WILL & EMERY LLP
                                340 Madison Avenue
8                               New York, New York 10173

9   For UpgradeYa:              Kim Brown, Esquire
                                LANDIS RATH & COBB
10                              919 Market Street
                                Wilmington, Delaware 19801
11

12  For U.S. Trustee:           Joseph McMahon, Esquire
                                OFFICE OF UNITED STATES TRUSTEE
13                              844 King Street
                                Wilmington, Delaware 19801
14

15  For James Alexander:        Mark Pfeiffer, Esquire
                                BUCHANAN INGERSOLL ROONEY
                                50 S. 16th Street
16                              Philadelphia, Pennsylvania 19102

17

18

19

20

21

22

23

24

25

1

## INDEX

2

3   #3) Status Conference, Complaint for Turnover Pursuant to
Bankruptcy Code Section 542 [Adv. Docket No. 1, 11/18/20].

4   #4) Debtors' Application for Entry of an Order Authorizing
Employment and Retention of Paul Hastings LLP as Counsel to
5   Debtors, Effective as of Petition Date [Docket No. 64,
11/18/20].

6

7   **Ruling: 10**

8   #5) Motion of UpgradeYa Investments, LLC for Relief from Stay
Under Bankruptcy Code Section 362 [Docket No. 89, 11/25/20].

9

**Ruling: Taken under Advisement**

10

11   UPGRADEYA'S WITNESS(s)

12         **MARCUS PARRISH**

13         Cross Examination by Mr. Luft          34

14         Cross Examination by Mr. Evans         80

15         Redirect Examination by Ms. Brown      106

16

17         **PABLO BONJOUR**

18         Cross Examination by Ms. Brown         134

19         Redirect Examination by Mr. Luft       148

20

21         **PAMELA CLEGG**

22         Direct Examination by Mr. Evans        152

23

24

25

| EXHIBITS | I.D. | REC'D |
|---|---|---|
| Y-1   Declaration of Marc Parrish | | 32 |
| Y-3   Declaration of Marc Parrish | | 32 |
| Y-A   Exhibit A, Attachment to Exhibit Y1 | | 37 |
| C-17  Telegram from March Parrish | | 93 |
| C-12  Attachment to Parrish Declaration | | 97 |
| C12(a) Attachment to Exhibit C-12 | | 99 |
| Y-8   Email | | 119 |
| Y-6   Email Message | | 128 |
| Declaration of Pamela Clegg | | 150 |

1      (Proceedings commenced at 10:05 a.m.)

2          THE COURT:  Good morning, everyone.  This is Judge

3   Dorsey. We're on the record in Cred Inc., case number 20-

4   12836, adversary proceeding 20-51006.

5          I'll go ahead and turn it over to debtors' counsel

6   to run the agenda.

7          MR. COUSINS:  Good morning, Your Honor. Scott

8   Cousins on behalf of the debtors.

9          Before we get started, I think Mr. Grogan wants to

10  make a brief presentation, followed by Mr. Azman for the

11  committee.

12         THE COURT:  Okay.  Mr. Grogan.

13         MR. GROGAN:  Thank you, Your Honor.  Good morning.

14  James Grogan from Paul Hastings on behalf of Cred Inc. and

15  its debtor subsidiaries.

16         Your Honor, I just want to give the court a quick

17  status update on the progress of the case, where we're

18  headed, and then we can head into the motions and other

19  matters on the docket.

20         As Your Honor may have noticed, we were able to

21  file our proposed combined plan and disclosure statement

22  before the end of the year.  Those were combined plan and

23  disclosure statement was filed at Docket Number 301,

24  solicitation motion was filed at Docket Number 303.

25         We are on track to present that plan to Your Honor

1   and exit Chapter 11, tentatively by the end of March.  At the

2   same time, we have been in active negotiations with a

3   potential stalking horse bidder. We are cautiously optimistic

4   that we will be able to get to an APA with that bidder within

5   the next week, with an anticipated closing of the asset sale

6   by March 31, and proceeds to the estate of more than $2

7   million dollars.

8          We are also in negotiations with a perspective

9   post-petition financing lender.  Importantly, the lender is

10  not only contemplating giving us post-petition debtor-in-

11  possession financing but also a combination of DIP financing

12  and exit financing which would fund, at least, in part, the

13  activities of the liquidation trustee if the plan is

14  confirmed and a liquidation trust is formed.

15         Your Honor, we think we're making good progress

16  and the case is moving efficiently. We're working with the

17  committee on key case issues, working very cooperatively, and

18  we anticipate that we will be able to successfully complete

19  the case in a relatively short amount of time.

20         With that, unless Your Honor has any questions, I

21  think the first contested matter was the Paul Hastings'

22  application which was carried over from the prior hearing.

23  But I think Mr. Azman from McDermott Will & Emery, the

24  committee counsel, may want to make a brief opening statement

25  as well.

1        THE COURT:  All right, Mr. Azman, go ahead.

2        MR. AZMAN:  Hi, Your Honor.  Good morning.  Darren

3   Azman, McDermott Will & Emery proposed counsel to the

4   committee.

5        Your Honor, before we get underway, we wanted to

6   provide just two very brief status updates on the case.

7        First, the committee has said all along that there

8   is a path forward in this case, and that path forward is

9   confirming a plan with a liquidating trust as quickly as

10  possible.  To that end, as Mr. Grogan noted, the debtors

11  filed a plan of disclosure statement on December 31st and the

12  goal is to confirm a plan in March.

13       One concern we have, and we just wanted to note

14  for the court, is that while Your Honor made a decision

15  around three weeks ago to appoint an examiner, we still don't

16  have an examiner.  So, we do hope that it happens soon.

17       Second, we want the court to be aware that give

18  the nature of certain of the estate's assets and causes of

19  action, the committee has taken, and is going to continue to

20  take, certain steps to prevent the dissipation of assets.  In

21  particular, Your Honor, this includes crypto tracing efforts,

22  as well as putting crypto exchanges on notice to freeze

23  digital wallets that may hold the debtors fraudulently

24  transferred cryptocurrency.

25       So that's all I have for the status update, Your

1  Honor.  Thank you.

2            THE COURT:  And what seems to be the holdup on

3  selecting the examiner?

4            MR. MCMAHON:  Your Honor, good morning.  It's

5  Joseph McMahon for the United States Trustee's office.

6            Your Honor, we've been in contact with the

7  examiner candidate.  The examiner candidate is in the final

8  position of putting together the verified statement that is

9  going to be appended to the application.  And we anticipate

10  submitting that as early as later today.

11            The application will have some information

12  regarding the process, along with the verified statement of

13  proposed form of order.  And that can be considered without

14  the court typically, without a further order.  So that's

15  where we're at with respect to the process.

16            We spent the better part of last week conducting

17  interviews with respect to same, and we do have a proposed

18  candidate.

19            THE COURT:  Thank you, Mr. McMahon.

20            MR. MCMAHON:  Thank you.

21            THE COURT:  All right.  So, are we ready to go

22  forward with the agenda?

23            MR. GROGAN:  Yes, Your Honor.

24            THE COURT:  Mr. Cousins and Mr. Grogan are both

25  trying to talk at the same time.

1          MR. COUSINS:  Your Honor, it's -- if I can start

2   and then we'll hand it off, Your Honor.

3          Scott Cousins on behalf of the debtors.

4          I do know there are two matters that are

5   continued, including our motion for approval of the plan

6   support agreement.

7          The second agenda item number one, the motion of

8   James Alexander to dismiss is coupled with number three, the

9   adversary matter.  And we just wanted to, you know, Mr.

10  Pfeiffer and I had a productive conversation yesterday about

11  the adversary and we wanted to give you an update, coupled

12  with the motion to dismiss.

13         We've taken no discovery and it's kind of a gating

14  item for the procedural posture. We didn't get an agreement

15  from Mr. Alexander to accept service of the complaint until a

16  couple of days ago.  We are going to talk with Mr. Pfeiffer

17  about an expedited discovery schedule.  So, we're not in a

18  position to file a pretrial order.

19         We think that the two items need to go together,

20  the motion to dismiss the case by Mr. Alexander along with

21  the turnover complaint, but we are working productively to

22  come up with an expedited schedule as there are two

23  witnesses, Mr. Alexander and Wheeler who is the debtors'

24  formal general counsel which raises several other issues.

25         But, at some point, I imagine, that we and Mr.

1 | Pfeiffer can come up with a consensual discovery path and
2 | then we'll be back before Your Honor on February 3rd,
3 | presumably on both motions.

4 | THE COURT:  All right.

5 | MR. COUSINS:  Unless Mr. Pfeiffer has something
6 | bad with that, Your Honor, that takes us to agenda item
7 | number four which is, as Mr. Grogan noted.

8 | Last month, Your Honor, I think, the court wanted
9 | to review some additional declarations from Mr. Grogan, and
10 | we just put it on the agenda to see if the court had any
11 | further questions or whether we can address those now.

12 | THE COURT:  All right, well I'm actually going to
13 | give you my ruling on that motion.  Let me ask Mr. Pfeiffer
14 | first if he has any comment based on your overview of the
15 | litigation part of it.

16 | MR. PFEIFFER:  Your Honor, no.  No comments based
17 | upon Mr. Cousins' comments.

18 | THE COURT:  Okay.  All right then with that, I
19 | will go ahead and give you my ruling on the retention of Paul
20 | Hastings.

21 | The U.S. Trustee's objected to the retention of
22 | Paul Hastings as counsel for the debtors in these bankruptcy
23 | cases.  For the reasons I'm about to discuss, the objection
24 | is overruled and I will approve Paul Hastings' retention.

25 | The trustee's objection is based upon his belief

1  that Paul Hastings' disclosures, pursuant to Bankruptcy Rule

2  2014, were inadequate, thereby disqualifying the firm from

3  representing the debtors and, two, that Paul Hastings has an

4  interest adverse to the debtors that precludes it from its

5  retention, pursuant to Bankruptcy Code Section 327(a).

6        I disagree.

7        Bankruptcy Rule 2014 requires that attorneys

8  seeking employment under Section 327 of the Bankruptcy Code

9  state that are, "connections with the debtors, creditors, and

10 any other party in interest, their respective attorneys and

11 accountants, the United States Trustee or any person employed

12 in the office of the United States Trustee."

13       The disclosure requirement is meant to ensure that

14 all relevant connections have been brought to light and are

15 not onerous as to require the party to raise with the court

16 every imaginable conflict which may occur in a bankruptcy.

17       In the event an applicant fails to disclose a

18 connection, I can consider whether there was any conscious

19 effort to conceal.  See Magnum Asset Management Corp. vs.

20 Paul Hastings 346 B.R. 84 at 89, District of Delaware 2006

21 and Exco Res vs. Milbank 203 U.S. District Lexis 1442 at 14

22 Southern District of New York 2003.

23       I find that Paul Hastings' initial disclosures

24 were sufficient to put the court, the Trustee and any other

25 interested party on notice and that there were connections

1  between Paul Hastings and the debtors' prepetition that were

2  unrelated to the bankruptcy filing, and that Paul Hastings

3  also represented Uphold, a creditor of the debtor, regarding

4  prepetition matters.

5           Indeed, the disclosures were sufficient to allow

6  the Trustee to make additional inquiries to address his

7  questions and those inquiries were responded to quickly and

8  voluntarily by Paul Hastings prior to the approval of its

9  retention.

10          Therefore, I find the disclosures were adequate.

11 It may have been a far different matter if Paul Hastings had

12 not disclosed at all its prepetition representations of the

13 debtors and Uphold, but that is not the case here.

14          Therefore, I also conclude that there was no

15 conscience intent to conceal any connections on the part of

16 Paul Hastings.

17          Next, the Trustee also argues that Paul Hastings

18 is disqualified from representing the debtors because the

19 firm holds an interest adverse to the debtors in violation of

20 Bankruptcy Code Section 327(a).

21          This is so the Trustee argues because, one, Paul

22 Hastings represented the debtors' prepetition in certain

23 corporate governance and litigation matters; two, a creditor

24 of the debtors, Uphold is a client of the firm and; three,

25 Paul Hastings allegedly received a preferential transfer.

1        Thus, the Trustee asserts that Paul Hastings holds

2   a material adverse interest to the debtors' estates or

3   creditors.  Once again, I disagree with the Trustee's

4   position.

5        The Third Circuit has held that while a bankruptcy

6   court must disqualify a professional in the event there is an

7   actual conflict of interest, it has discretion when it comes

8   to potential conflicts and cannot deny retention where there

9   is a mere appearance of conflict.  See In Re Marvel

10  Entertainment 14 F.3d 463 at 476 Third Circuit 1998.

11       The Trustee's first argument is that Paul Hastings

12  represented debtors' prepetition in connection with a

13  convertible note's offering and provided advice relating to

14  debtors' corporate governance that could affect the validity

15  of the debtors' bankruptcy filing.

16       The Trustee concludes, therefore, the advice

17  provided by Paul Hastings to the debtors' prepetition could

18  become an issue in connection with litigation over the notes

19  offering and the validity of the debtors' bankruptcy filing.

20       This is mere speculation on the part of the

21  Trustee and there's no evidence in the record to support the

22  assertion.  Absent some specific factual basis to claim an

23  actual conflict exists, I cannot merely assume that one does.

24  That's Magnum Asset Management Corp vs. Paul Hastings 346

25  B.R. at 88.

1          Nothing in the record suggests that the advice

2    provided by Paul Hastings was done for any purpose that would

3    not help maximize value for the debtors' estates.  Therefore,

4    I find that there is no conflict with Paul Hastings'

5    representations of the debtors.

6          Next, the Trustee argues that Paul Hastings is

7    disqualified because it also represented and continues to

8    represent Uphold, a creditor of the debtors, in connection

9    with matters unrelated to the debtors.

10         The record reflects that Paul Hastings represented

11   Uphold and debtors jointly for a brief period of time in

12   connection with certain prepetition litigation brought by a

13   third party.  Debtors were subsequently dropped from that

14   lawsuit.  Paul Hastings also continues to represent Uphold in

15   other matters unrelated to the debtors.

16         Paul Hastings provided a copy of its engagement

17   agreement with Uphold that contains a perspective waiver that

18   allows Paul Hastings to represent parties adverse to Uphold

19   unless it is substantially related to a matter in which Paul

20   Hastings represented Uphold.

21         There's no evidence in the record to suggest that

22   any representation of Uphold is substantially related to Paul

23   Hastings' representation of the debtors in these bankruptcy

24   cases.

25         Paul Hastings has indicated that out of an

1  abundance of caution it will refer any matters involving

2  Uphold to debtors' co-counsel, Cousins Law, and it has

3  established appropriate ethical laws to ensure that it does

4  not receive any confidential information relating to Uphold

5  and so to prevent any of the debtors' confidential

6  information from being conveyed to Uphold.

7          Significantly, Uphold has not raised any issues of

8  conflict and has itself retained separate counsel to

9  represent it in connection with the bankruptcy.  Based on the

10  record, therefore, I find that there is no actual or, at this

11  time, potential conflict of interest preventing debtors from

12  -- from Paul Hastings from representing the debtors in this

13  case.

14          Finally, the Trustee argued that Paul Hastings was

15  not disinterested because it received payments from the

16  debtors' prepetition that could be considered preferential in

17  violation of the Third Circuit's Opinion in Pillowtex 304

18  F.3d 246 at 255 Third Circuit 2002.

19          In order to avoid the potential issue, Paul

20  Hastings has agreed to credit $313,330.40, the aggregate

21  amount of Paul Hastings August 25 and September 14, 2020

22  invoices being challenged by the Trustee for a total of

23  $349,477.26, minus the amount of the retainer Paul Hastings

24  held as of the petition date in amount of $36,146.86, to the

25  debtors' retainer and to waive prepetition fees in the amount

1  of $313,330.40.

2         As a result, the debtors retainer account will

3  hold $349,477.26 to be applied to future fees, if approved by

4  the court.  These actions make any argument that the Trustee

5  may have regarding those transfers moot.

6         Therefore, I will approve the debtors' motion to

7  retain Paul Hastings as bankruptcy counsel, subject to the

8  changes made to the proposed order made by the debtor at the

9  request of the United States Trustee.

10         Are there any questions?

11     (No verbal response)

12         THE COURT:  Okay.  With that, we can move to the

13  next agenda item.

14         MR. COUSINS:  Your Honor, Scott Cousins again.

15  The last matter is the UpgradeYa motion for relief from the

16  automatic stay and I'll turn that over to Landis Rath & Cobb.

17         THE COURT:  All right.

18         MS. BROWN:  Thank you, Mr. Cousins.

19         Good morning, Your Honor.  Kim Brown --

20         THE COURT:  Good morning.

21         MS. BROWN:  -- Landis Rath & Cobb, appearing today

22  on behalf of the movant UpgradeYa Investments, LLC.  And

23  we're here on this motion for relief from the automatic stay.

24         While my colleague, Matt Pierce, had been at the

25  last several days of hearing and had planned to handle

1  today's argument, he's actually out on paternity leave and so

2  you're stuck with me.

3           THE COURT:  And I'm better for it.  I imagine I'm

4  better for it, Ms. Brown.

5           MS. BROWN:  Well, I will take that as a compliment

6  if you say it had intended to be.

7           And joining me this morning is my partner, Adam

8  Landis; my colleague Nick Jenner; and the managing member of

9  UpgradeYa Investments, LLC, Marc Parrish.

10          As I mentioned, Your Honor, we're here today on

11 UpgradeYa's motion seeking modification of the automatic

12 stay.  As some preliminary background, when UpgradeYa filed

13 this motion, it was our understanding, or, at least, hope

14 that the debtors were still holding UpgradeYa's collateral.

15          And that belief wasn't unfounded because on

16 November 10th, after the bankruptcy filing, the debtors

17 informed UpgradeYa in writing that Cred was holding 478.17

18 bitcoin as collateral on the loan it made to UpgradeYa, and

19 this would have been the full amount of the collateral that

20 UpgradeYa had anticipated and had expected that the debtors

21 would be holding.

22          When the motion was initially filed, UpgradeYa

23 wanted to enforce its rights under the CredBorrow agreement.

24 They wanted to repay the loan in full which would have

25 injected much needed cash into these bankruptcy estates, and

1   then have its collateral return to us.

2           However, given the various statements made in the

3   first day declaration, particular in paragraphs eighteen

4   through twenty-nine and thirty-two through thirty-four that

5   the debtors' bankruptcy filing was precipitated by, among

6   other things, a series of malfeasance and the theft of

7   millions of dollars' worth of bitcoin that was allegedly

8   perpetrated by the debtors' chief capital officer and an

9   imposter.

10          UpgradeYa also requested relief from the stay to

11  pursue claims against third parties and applicable insurance

12  policies just in case its collateral was, in fact, no longer

13  in the debtors' possession.

14          And then after the motion, we learned from the

15  debtors that they no longer had UpgradeYa's collateral, that

16  they were supposed to be holding to secure Cred's loan to

17  UpgradeYa.

18          Then the debtors' represented that they had 160

19  bitcoins.  Apparently, though, at the time, the debtors filed

20  their objection to the relief from stay motion, that number

21  had dropped again to 89 bitcoins.  And the debtors were

22  losing bitcoin by the day or they simply just had no handle

23  on what bitcoin they had in their possession.

24          So since filing this motion, the relief that

25  UpgradeYa is seeking has evolved accordingly to adapt to what

1   is a horrible situation for my client.  First, they received

2   silence from the debtors, then conflicting information, and

3   now it faces a stark reality that the debtors (indiscernible)

4   UpgradeYa's collateral is completely gone.

5           Your Honor, UpgradeYa is not seeking extraordinary

6   relief here.  It's merely seeking, out of an abundance of

7   caution, relief from the automatic stay to recover damages

8   from nondebtor third parties for the direct harm such

9   nondebtor cause UpgradeYa.

10          Ordinarily, parties such as UpgradeYa would not

11  need to seek stay relief to pursue their direct claims

12  against nondebtor third parties.  However, we understood that

13  at the November 25th hearing, Your Honor provided guidance to

14  parties, like UpgradeYa, that if they wished to take action

15  against third party intermediary custodians or exchanges,

16  they needed to seek relief from the automatic stay.  Because

17  the debtors have, rightfully or wrongly, asserted a property

18  interest in the bitcoin held by such intermediaries.

19          Plus, when the debtors informed UpgradeYa that it

20  was no longer holding its collateral, it believed it prudent

21  to continue to seek relief from the stay to pursue its direct

22  claims against nondebtor third parties.

23          Your Honor, UpgradeYa submits that the estates

24  will suffer no harm if this relief is granted.  In fact, the

25  estates could benefit from this relief because if UpgradeYa

1   is successful in its efforts to recover damages from third

2   parties related to its collateral, the claim mitigates the

3   damages and claims that UpgradeYa will assert and be able to

4   collect from the debtors and their estates.

5            The debtors oppose UpgradeYa's motion by

6   presenting a postdoc narrative to explain their

7   misappropriation of the assets pledged as collateral, gross

8   mismanagement, and operating a business that appears to have

9   been nothing short of a fraudulent Ponzi Scheme.

10           Filing these bankruptcy cases does not give the

11  debtors an opportunity to rewrite history or recast this loan

12  transaction with UpgradeYa into something its not.  Let's be

13  clear right now, Cred loaned $2 million dollars to UpgradeYa

14  and UpgradeYa pledged assets which was its bitcoin as

15  collateral by giving the debtors a security interest in that

16  bitcoin.  The debtors were granted nothing more than a

17  security interest under the CredBorrow agreement.

18           This is a bear possessory interest with terms

19  governed by California law in an agreement.  It's not

20  ownership interest or the ability to do whatever they plan,

21  as the debtors and the committee will argue.  Because the

22  debtors failed to fulfill their obligation to preserve the

23  collateral as required by California law and converted it by

24  their own admission for their own use, comingled it, or

25  whatever else the debtors did with it, simply to not make it

1  property of the debtors' estate.

2          And what the committee would like the court to do

3  is bless the debtors' conversion of UpgradeYa's property and

4  allow the estates to profit from the debtors' bad act.

5  Notably in support of their objection, the debtors have

6  presented only conclusory statements that are not supported

7  by any competent evidence.

8          Similarly, neither the debtors nor the committee

9  point to any contractual language that indicates that debtors

10 have or, at least, had anything more than a bear possessory

11 interest in UpgradeYa's collateral.  Notwithstanding an

12 integration clause in the CredBorrow agreement, the debtors

13 and the committee will argue that the court should consider

14 communications and other facts outside of the four corners of

15 the document.

16         The terms of the CredBorrow agreement are not

17 ambiguous.  And this would be impermissible parol evidence.

18         Now the committee focuses on the debtors'

19 comingling of bitcoins to argue that notwithstanding the

20 debtors' conversion of UpgradeYa's bitcoin, UpgradeYa lost

21 its interest in the property in which the debtors possessed

22 nothing more than a security interest.  And that UpgradeYa

23 should be precluded from pursuing its direct claim against

24 nondebtor third parties who were involved with UpgradeYa's

25 bitcoin transaction.

1          However, the committee ignores that these parties

2  may have damaged UpgradeYa directly.  And that as such

3  UpgradeYa has every right to pursue these claims and causes

4  of action against them.  And we'll discuss in detail during

5  argument, the debtors' conversion and comingling of converted

6  property does not magically strip UpgradeYa of its property

7  rights or transform directly that it has against nondebtor

8  third parties for the direct harms they cause UpgradeYa to

9  derivative claims of the debtors' estates.

10         And notwithstanding the debtors and the

11 committee's assertions to the contrary, the evidence we

12 presented today will show that in April 2020, Cred and

13 UpgradeYa entered into a security and loan agreement whereby

14 Cred extended a $2 million dollar line of credit to

15 UpgradeYa.  Under the CredBorrow agreement, Cred was granted

16 a security interest in the bitcoin that UpgradeYa had put up

17 as collateral, would have had a value of approximately two

18 times the line of credit.  And this is to secure the

19 repayment of the loan.

20         And the debtors have nothing more than a security

21 interest that may or may not have been perfected in this

22 collateral.  The debtors did not and do not have the right to

23 sell or otherwise dispose of the collateral except in an

24 event of default.  And no default has occurred here.

25         And the debtors have misappropriated the

1 | collateral and are no longer in possession of it as required
2 | by the agreement and applicable law.  Frankly, Your Honor, we
3 | don't know what the debtors did with UpgradeYa's collateral,
4 | but that's beside the point.  Is collateral pledged to secure
5 | a loan?  It was never property of the debtors' estates.  And
6 | their comingling or conversion of it didn't make it so.

7 | Your Honor, what I propose is that we move into
8 | presentation of the evidence.  And unless Your Honor would
9 | like to proceed differently, I'll put on UpgradeYa's
10 | evidentiary record and then cede the virtual podium to the
11 | debtors and the committee to present their evidence,
12 | reserving rights to call any necessary rebuttal witnesses.
13 | After the presentation of evidence, I suggest that we then
14 | proceed with argument on the motion.

15 | THE COURT:  Thank you, Ms. Brown.

16 | Let me hear from, since you gave an opening, let
17 | me hear from debtors' counsel.

18 | MR. JIMINEZ:  Thank you, Your Honor.  Pedro
19 | Jiminez of Paul Hastings on behalf of the debtors.  Can you
20 | hear me okay?

21 | THE COURT:  I can.  Thank you.

22 | MR. JIMINEZ:  Thank you, Your Honor.

23 | Your Honor, I don't think anyone, including the
24 | debtors, disputes that UpgradeYa transferred bitcoin to the
25 | debtors to cash collateralize the loan that it was taking off

1  from the debtors.

2        Where I do think that we diverge from UpgradeYa is

3  that the facts you're going to hear today, Your Honor, is

4  that UpgradeYa has no property to recover from the debtors,

5  other than a claim for the value of the bitcoin that it

6  transferred to the debtors.

7        And then as you heard from Ms. Brown what the

8  movant appears to want to do now is to convert the motion for

9  stay relief into a blank check to pursue undisclosed causes

10  of action against undisclosed parties.

11        Specifically, Your Honor, you're going to hear

12  today from the debtors' witness, Mr. Pablo Bonjour of MACCO

13  Restructuring Group who will testify that bitcoin like cash

14  is fungible.

15        The debtors' business lines of CredBorrow and Cred

16  earned, the debtors received bitcoins from literally

17  thousands of customers who deposited bitcoins into the

18  debtors' e-wallets where all of the bitcoin was comingled and

19  then transferred by the debtors to third party asset managers

20  or lenders for investments or loans.

21        Mr. Bonjour is also going to testify that with

22  regard to the bitcoin that movant transferred to the debtors,

23  all of that bitcoin was comingled with other bitcoin

24  transferred to the debtors by their customers and further

25  transferred to third party asset managers utilized by the

1  debtors.

2           Finally, Mr. Bonjour is going to testify that the

3  e-wallets into which movant transferred the bitcoin have a

4  zero balance.

5           Your Honor, you're also going to hear from the

6  movant's sole managing member, Mr. Parrish.  Mr. Parrish

7  previously testified in his deposition that the loan

8  transaction that UpgradeYa entered into with the debtors was

9  structured no different than what I just described.

10          The movant transferred 531 bitcoins to the debtors

11 at e-wallets maintained by the debtors to cash collateralize

12 the loan movant was obtaining from the debtor in the amount

13 of two million.

14          Mr. Parrish also testified at his deposition that

15 he knew that the debtors' business model was to move and

16 consolidate bitcoin received from customers and invest that

17 bitcoin to earn and yield.

18          Mr. Parrish also testified that there was no

19 escrow, (indiscernible), trust or other control agreement

20 which strengthen the use of the bitcoin by the debtors or

21 otherwise requiring that the debtors keep the bitcoin

22 received from the movant segregated from other bitcoin that

23 it received from its thousands of customers.

24          Your Honor, I will reserve the closing argument

25 the legal implication of the structure.  But suffice it to

1  say the debtors believe that the bitcoin received from its

2  thousands of customers, including movants, under this

3  structure (indiscernible) property of the estate following

4  the bankruptcy filing, and Your Honor, that begs the question

5  of what stay relief is needed since there's absolutely no

6  property of movant to recover.

7            THE COURT:  Thank you, Mr. Jiminez.

8            MR. JIMINEZ:  Thank you.

9            THE COURT:  Who is going to speak on behalf of the

10  committee?

11            MR. AZMAN:  Hi, Your Honor.  It's Darren Azman

12  again, McDermott Will & Emery, proposed counsel to the

13  committee.

14            Your Honor, contrary to what you just heard from

15  Ms. Brown, the debtors comingling of UpgradeYa's bitcoins

16  did, in fact, make that bitcoin property of the estate.

17            The third Circuit has laid out the law very

18  clearly, and they did so in the Strategic Technologies case;

19  that's one that's cited in our objection.  And the Third

20  Circuit said as follows,

21            "When funds are comingled and a Trust recipient

22  claims a right in those funds a claimant must make two

23  showings.  One, demonstrate that the trust relationship and

24  its legal source exists and; two, identify and trace the

25  trust funds, if they are comingled."

1          And this is the key quote, Your Honor.  Because

2   the claimant could not sufficiently identify its funds in the

3   comingled account, all of the funds are presumed to be part

4   of the bankruptcy estate.

5          Your Honor, what you'll hear in testimony today,

6   including, by the way, from UpgradeYa's own witness, is that

7   they cannot satisfy the tracing requirement.

8          Your Honor, we think the motion can be denied for

9   more a simple reason too.  That is the movant has not even

10  attempted to satisfy its burdens.

11          Nonetheless, the committee felt it was important

12  for two reasons to submit the extensive briefing and evidence

13  that we did, as well as the evidence that you'll hear today.

14          First, Your Honor, this case and this motion

15  involved novel issues, as I'm sure the court has learned very

16  early on in the case.  So, we wanted to make sure that Your

17  Honor has the full picture of UpgradeYa's claim and has the

18  ability to see all of the arguments due to conclusion.

19          Second, we thought that this was a good

20  opportunity to make clear to all of Cred's customers that

21  this is not how the bankruptcy process works.  While we

22  understand a desire to try to cut the line ahead of other

23  creditors, that violates the fundamental tenets of

24  bankruptcy.

25          There are 6500 other people out there who lost a

1    lot of money, and just like UpgradeYa.  They are out there

2    looking at this motion and, believe me, Your Honor, there are

3    a lot of creditors all over the world who are reading every

4    single pleading in this case and talking about this case in

5    various forums.

6           They see this motion and the think, wow; this

7    looks like an incredibly unfair process.  Whoever gets to the

8    courthouse steps first wins.

9           Your Honor, we want to make sure that the entire

10   creditor body feels that they are being heard and that we are

11   here to ensure that an orderly and fair process is being run

12   for the benefit of all creditors.

13          Your Honor, I think it's telling how quickly

14   UpgradeYa has moved off of the primary form of relief that it

15   was seeking, the return of bitcoin from the debtors.  The

16   evidence and testimony now reflect that there was never any

17   basis for the relief sought in the motion.  And UpgradeYa

18   knew that very well when it filed the motion.

19          We will hear today very clearly from UpgradeYa's

20   witness, as well as the committee's witnesses is that

21   UpgradeYa's bitcoin was comingled.  There is no longer any

22   dispute about that.  The bitcoin that was transferred by

23   UpgradeYa became property of the debtors' estates when it was

24   comingled.

25          And so, it doesn't matter whether UpgradeYa is

1   seeking the return of bitcoin from the debtors, which its no

2   longer pursuing, or whether UpgradeYa is seeking to pursue

3   third parties.  Any claim that's related to damage or loss of

4   that bitcoin that was transferred to Cred, which again became

5   property of the debtors' estates after the comingling, is

6   necessarily an estate cause of action.  It was the debtors'

7   property.

8        There is no way around that.  UpgradeYa has not

9   provided the court or the committee, despite repeated

10  requests, a single example of a direct cause of action that

11  it could bring against third parties.  And that's because

12  UpgradeYa has no direct claims.  They are estate causes of

13  action.

14       Your Honor, I'll also note for the court that

15  around two weeks ago, we asked UpgradeYa to withdraw its

16  motion because of the continued accrual of fees by the

17  debtors and the committee's professionals where we think is

18  the motion that has absolutely no merit.  And, obviously,

19  they did not do that and so we're here today.

20       Your Honor, for the same reason that UpgradeYa

21  quickly (indiscernible) request for return of its bitcoin,

22  the court must also deny the remaining relief that UpgradeYa

23  still seeks.  Thank you.

24       THE COURT:  Thank you, Mr. Azman.

25       Mr. McMahon, any opening comments?  I saw you had

1   submitted some exhibits, Mr. McMahon, are you taking a

2   position on this motion?

3           MR. MCMAHON:  Your Honor, good morning.

4           We did not submit any exhibits in connection with

5   this particular motion, Your Honor.  We are monitoring the

6   evidentiary presentation.

7           THE COURT:  Okay.  I had a binder of exhibits that

8   included from the Trustee, but it must be some, put in there

9   that were unrelated to this motion.

10          All right.  Anyone else wish to make an opening?

11          All right, Ms. Brown, back to you for your

12  evidentiary presentation.

13          MS. BROWN:  Thank you, Your Honor.

14          First, Your Honor, given the interrelated fact, I

15  would ask that the court take notice of the declaration of

16  Mr. Inamullah at Docket Number 97 in connection with the

17  conversion motion.

18          THE COURT:  Well, I think we would have to move it

19  into evidence again because there may be parties on the phone

20  now who were not on the phone when his declaration was

21  originally admitted, so is there any objection to the

22  admission of Mr. Inamullah's declaration?

23          MR. LUFT:  Yes, Your Honor.  Avi Luft on behalf of

24  the debtor.

25          I'm not aware that Mr. Inamullah is here with us

1  today.  And I don't believe his examination at the prior

2  hearing or his declaration was subject to cross-examination

3  on any issue related to UpgradeYa nor did he submit it in

4  connection with their motion, nor did they note in their

5  motion that Mr. Inamullah's testimony was something that they

6  would be relying upon.

7           THE COURT:  Ms. Brown.

8           MR. EVAN:  Mr. Evan from the committee.  Your

9  Honor, we join in that objection, Mr. Inamullah's deposition.

10  Mr. Inamullah's declaration was not submitted in connection

11  with their motion and he's not here today.  So for the same

12  reasons we join.

13           THE COURT:  Okay.  Ms. Brown.

14           MS. BROWN:  Your Honor, UpgradeYa -- yep.

15  UpgradeYa, I was only intending to rely on Mr. Inamullah's

16  declaration with regard to a single paragraph where he

17  explained that in connection with the CredBorrow program

18  instead of maintaining the collateral, the debtors used it

19  for their own purposes.

20           I believe we'll have sufficient other evidence on

21  this point so I'll withdraw my request.

22           THE COURT:  All right.  The declaration is not

23  admitted into evidence.

24           MS. BROWN:  Your Honor, I'd like to move the

25  declaration of Mr. Marc Parrish that was filed on the docket

1    at number 91 into evidence.  And this is marked as UpgradeYa

2    Exhibit 1 in the exhibits that were provided to chambers this

3    morning.

4                    THE COURT:  Is there any objection?

5                    UNIDENTIFIED SPEAKER:  (indiscernible), Your

6    Honor.

7                    THE COURT:  All right.  It's admitted without

8    objection.

9         (UpgradeYa's Exhibit Number 1, Declaration of Marc

10   Parrish, received into evidence)

11                   MS. BROWN:  Thank you.

12                   And, Your Honor, I would also like to move a

13   supplemental declaration that Mr. Parrish provided that is on

14   the docket at number 128, and it's marked as UpgradeYa

15   Exhibit Number 3.

16                   And I'll just note that Mr. Parrish is available

17   for cross-examination on both of those declarations.

18                   THE COURT:  Is there any objection?

19                   UNIDENTIFIED SPEAKER:  No, Your Honor, objection.

20                   THE COURT:  Exhibit three is admitted without

21   objection.

22        (UpgradeYa's Exhibit Number 3, Declaration of Marc

23   Parrish, received into evidence)

24                   MS. BROWN:  Your Honor, at this time I think it

25   might make sense to allow any party who wished to cross-

1   examine Mr. Parrish to do so.

2           THE COURT:  You don't have any supplemental direct

3   examination?

4           MS. BROWN:  I may have some supplemental redirect,

5   but it will be depending on what occurs during the cross.

6           THE COURT:  All right.  Does anyone wish to cross-

7   examine Mr. Parrish?

8           MR. LUFT:  Yes, Your Honor.  Avi Luft on behalf of

9   the debtor.

10          THE COURT:  Okay.  Mr. Parrish, are you on the

11  phone?

12          MR. PARRISH:  Yes, Your Honor.  This is Marcus

13  Parrish.  Can you hear okay?

14          THE COURT:  Let me spotlight you for everyone.

15          Mr. Parrish, would you raise your right hand,

16  please, state your full name for the record and spell your

17  last name?

18          MR. PARRISH:  It's Marcus William Parrish; P-A-R-

19  R-I-S-H.

20           MARCUS WILLIAM PARRISH, WITNESS, SWORN

21          THE WITNESS:  Yes, I do.

22          THE COURT:  Thank you.  You may lower your hand.

23          Mr. Luft, you may proceed.

24          MR. LUFT:  Thank you, Your Honor.

25                       CROSS EXAMINATION

1  BY MR. LUFT:

2  Q    Good morning, Mr. Parrish, and Happy New Year.

3  A    Good morning.  Happy New Year to you too.

4  Q    Mr. Parrish, you and I met previously for your

5  deposition so I just want to go over some of this stuff that

6  we talked about previously, nothing repetitive, but we have

7  to do it for the court.  Okay?

8  A    Okay.

9  Q    Great.

10      Mr. Parrish, you're the managing member of UpgradeYa

11 Investments, correct?

12 A    Yes, that is correct.

13 Q    And on behalf of UpgradeYa Investments, you did all of

14 UpgradeYa Investments' due diligent on Cred, correct?

15 A    Yes.

16 Q    And on behalf of UpgradeYa Investments, you had every

17 conversation that was had with Cred, correct?

18 A    Yes.

19 Q    And any communication between Cred and UpgradeYa

20 Investments would have been with you, correct?

21 A    Yes, that's correct.

22 Q    And it was you who discussed the terms of any

23 transaction UpgradeYa Investments was entering into with

24 Cred?

25 A    Yes.

1  Q     And you're the only person from UpgradeYa Investments

2  who reviewed any contracts that were entered into between

3  Cred and UpgradeYa Investments, correct?

4  A     Yes, that's correct.

5  Q     And on behalf of UpgradeYa Investments, it was you who

6  entered into the transaction at issue with CredBorrow,

7  correct?

8  A     Yes, that's correct.

9  Q     Okay.  Now you communicated with Cred through email?

10 A     Yes.

11 Q     Through phone calls?

12 A     Yes.

13 Q     And through a messaging service called Telegram Chat,

14 correct?

15 A     Yes.

16 Q     And nothing Cred ever told you on the phone differed

17 from what they told you in writing through emails and

18 Telegram Chats, correct?

19 A     Yes, I would say there was consistency that crossed

20 email, phone calls and Telegram Chat, yes.  I certainly don't

21 remember all of it.

22 Q     Okay.  Now UpgradeYa Investments entered into a

23 transaction with Cred under its CredBorrow program on April

24 20th, 2020, correct?

25 A     Yes, yes.  If you're saying that's the date then that

1  sounds right.

2  Q    If it's helpful we can bring up your declaration which

3  I believe was just marked as UpgradeYa Exhibit 1 and if you

4  look at paragraph two, if you want to just refresh your

5  recollection on the date.

6        MR. PROUTY:  Your Honor, this is Austin Prouty of

7  Paul Hastings.  Can I just request screensharing privileges?

8        THE COURT:  Yes.

9  BY MR. LUFT:

10  A    Did you say Exhibit 1 of UpgradeYa Exhibit?

11  Q    It was just marked as Exhibit 1.  It would have been

12  marked -- we had it marked on our list as Debtors 22, but I

13  think it was just entered into evidence as Exhibit 1, if I

14  heard the numbers correctly.

15       And if we just pull up paragraph two.

16       Mr. Parrish, do you see the date there?

17  A    Yes, and I agree that it was April 20th.

18  Q    Terrific.  Okay.

19        MR. LUFT:  We can take that down, Austin.  Thank

20  you.

21  BY MR. LUFT:

22  Q    And the agreement you entered into on behalf of

23  UpgradeYa Investments with Cred was codified in the loan and

24  security agreement, correct?

25  A    Yes.  The CredBorrow agreement was the loan for the

1  secured loan secured agreement, yes.

2  Q    And you attached that as Exhibit A to your declaration

3  which has been marked as Exhibit 1?

4  A    Yes, it was attached as exhibit.

5        MR. LUFT:  Okay.  I'm not sure if Ms. Brown

6  intended to move all the exhibits in or just your

7  declaration.  If it hasn't been moved in then I'm happy to

8  enter it into evidence separately.

9        MS. BROWN:  I had intended to move his

10  declaration, including all the exhibits attached thereto.

11        THE COURT:  It's admitted.

12    (UpgradeYa's Exhibit A to declaration, received into

13  evidence)

14        MS. BROWN:  Thank you.

15  BY MR. LUFT:

16  Q    Now, Mr. Parrish, under the CredBorrow program, Cred

17  would provide customers U.S. dollars lines of credit and the

18  customer would pledge cryptocurrency collateral back to Cred,

19  correct?

20  A    Yes, that's correct.

21  Q    And the agreement reached with UpgradeYa provided for

22  UpgradeYa Investments to receive a $2 million dollar line of

23  credit, correct?

24  A    Yes, UpgradeYa received a $2 million dollar line of

25  credit.

1   Q     And on April 30th, 2020 UpgradeYa Investments
2   immediately drew down the entire $2 million dollar line of
3   credit, correct?
4   A     Yeah after providing the collateral, then UpgradeYa
5   drew down the two million, that's correct.
6   Q     Right.  And UpgradeYa Investments transferred Cred
7   pledge collateral of 531.300, and then it goes on, bitcoin,
8   correct?
9   A     Yes at the time it was close to $4 million dollars as
10  well as a (indiscernible).
11  Q     Now if we can look at Exhibit A to your declaration
12  which is Exhibit 1 which is the loan security agreement.
13         MR. LUFT:  Austin, if we can bring up page 17.
14  Just the signature page.  There we go.
15  BY MR. LUFT:
16  Q     Mr. Parrish, is that your signature?
17  A     Yes, that is my signature.
18  Q     And you had an opportunity to review the full agreement
19  before you signed it?
20  A     Yes, I did.
21  Q     And you agree this is the only agreement that governs
22  the terms between UpgradeYa Investment transactions with Cred
23  regarding the CredBorrow agreement?
24  A     Yes, that's correct.
25  Q     Now, Mr. Parrish, nothing in the loan and security

1  agreement provides for the segregation of collateral from

2  other Cred assets, correct?

3  A    Well if there's not going to be segregation, I think is

4  what you're saying, my understanding it's possible but it

5  would still have to be secured.

6  Q    Mr. Parrish, I just want you to answer my question.

7  Nothing in the agreement provides for the segregation of the

8  collateral from other Cred assets, correct?

9  A    Well because this agreement requires security, I don't

10  think that's correct.

11  Q    Okay.  Mr. Parrish, do you recall I took your

12  deposition?

13  A    Yes.

14  Q    Do you recall that you were put under oath and you

15  swore to tell the truth, the whole truth and nothing but the

16  truth?

17  A    Absolutely, yes.

18  Q    And do you recall I asked you from the outset that if

19  any question I asked you when it is unclear you would let me

20  know?

21  A    Yes.

22  Q    And do you recall we had an agreement that if you

23  didn't tell me something was unclear then we would both agree

24  that we would presume that my question was clear and you

25  understood it?

1  A      Absolutely, yes.  I did (indiscernible) during that

2  deposition to provide (indiscernible).

3  Q      Good.  Okay.

4          MR. LUFT:  If we can show Mr. Parrish page 164 of

5  his deposition, specifically lines 15 through 22?

6  BY MR. LUFT:

7  Q      Just take a look at that and then I'll ask you my

8  question.

9          MR. PROUTY:  Avi, can you provide me with that

10  page cite again?

11          MR. LUFT:  Sure, page 164, lines 15 through 22.

12  BY MR. LUFT:

13  Q      Now, Mr. Parrish, in connection when I asked you about

14  this agreement, do you see that I asked you and if you turn

15  to Section 2.3 borrow covenants.

16      "Actually before I do that, do that, sir, you would

17  agree with me that nothing in this agreement, whether it's in

18  Section 2.1 or anywhere else provides for the segregation of

19  the collateral from other Cred assets, correct?"

20      And you answered,

21      "Correct."

22  Q      Do you see that?

23  A      Yes, I see that.

24  Q      I read that correctly, right?

25  A      Yes, I see that, yes.

1  Q     Okay.  And nothing in the loan and security agreement

2  provides that Cred may not comingle collateral with its

3  assets, correct?

4  A     Correct.  Yeah (indiscernible) segregated or non-

5  segregated is thought to be secured but that's

6  (indiscernible) on that.  I think that agreement with the

7  deposition --

8  Q     Mr. Parrish, you would agree with me that nothing in

9  the agreement provides that Cred may not comingle the

10 collateral with any of its assets, correct?

11 A     Correct.  As long as it's secured it can be comingled.

12 Q     There's nothing in the agreement that says as long as

13 it's secured it can be comingled, correct, Mr. Parrish?

14 A     Well the agreement doesn't have to be secured.  That

15 was my understanding with the agreement.  It's

16 (indiscernible) had to be secured.

17 Q     And, Mr. Parrish, when you signed the agreement you

18 understood that Cred could create a yield using the

19 collateral, correct?

20 A     Yes, I understood they could create, yes, as long as it

21 was secured.

22 Q     And agreeing to the terms of the loan and security

23 agreement you never told Cred that you wanted any special

24 provisions in the agreement limiting how they could earn a

25 yield on the collateral, correct?

1  A      That's correct.  My focus was to make sure it was

2  secured.  I wasn't concerned with how they ran their

3  business, you know, inside and out.

4            THE COURT:  Can we take down the deposition,

5  please?  Thank you.

6  BY MR. LUFT:

7  Q      So to be clear, Mr. Parrish, there is no provision in

8  the -- you asked for no provision in the agreement limiting

9  how Cred could earn a yield on the collateral, period, right?

10 A      I did not ask for any provisions in the agreement at

11 all related to anything.  The agreement was fine as presented

12 from Cred.

13 Q      And when you made the decision not to limit, seek any

14 limiting on how Cred could earn a yield, you were aware that

15 it was their intention to use your collateral to earn a yield

16 for Cred?

17 A      I was aware they could earn a yield and I understood

18 that.  They could only do that as long as the collateral was

19 secure.

20 Q      That's not what it says in the agreement, correct, Mr.

21 Parrish?  Nowhere in the agreement says that they could only

22 earn a yield so long as it is secured.  You cannot point me

23 to any provision that says that and you did not ask for it?

24 A      I'm just telling you what I understood that I was

25 getting into.  I'm not -- I had to hire lawyers to understand

1 exactly the language of the agreement.  I'm not a lawyer

2 here.  I understood that I, what I loaned had to be secured.

3 So what they could do with it was really their business.  I

4 was just ensuring -- my goal in the arrangement was to make

5 sure it was secure.

6 Q    Okay.  Mr. Parrish, you mentioned hiring lawyers to

7 understand the agreement.  You hired no lawyer to help you

8 understand this agreement when you signed it, correct?

9 A    That's correct.

10 Q    So no lawyer told you that that's what the agreement

11 meant when you signed it, correct?

12 A    That's correct.

13 Q    And you knew you had the ability to hire a lawyer?

14 A    Yes.  I (indiscernible) hire a lawyer who is after

15 post-petition when I tried to understand what happened to my

16 collateral.

17 Q    And you're aware that you had the ability to propose

18 amendment to the agreement if you wished?

19 A    Yes, I'm aware of that.

20 Q    But you did not?

21 A    The agreement was signed as provided by Cred.  Yes.

22 Q    Okay.  Now, Mr. Parrish, you understood that Cred could

23 move the collateral you sent them from the wallet, the

24 initial e-wallet you transferred them too, correct?

25 A    Yes, I understood the collateral could move as long as

1  it was secured.

2  Q     Mr. Parrish, you keep adding as long as it was secured.

3  You understood that the collateral could be moved, period,

4  correct?

5  A     But not if it wasn't secured.  The whole arrangement I

6  got into was to make sure my collateral was secure.  The one

7  of two parts of why I got into the agreement.

8  Q     So, Mr. Parrish, if we can bring up your deposition

9  page 144.  Will you look at line 17 through 21?

10       Mr. Parrish, do you see I asked you the question,

11       "Cred did not say that they would be maintained in a

12  segregated wallet, correct?

13       I don't recall Cred saying that they would or would not

14  be maintained in those wallets.  I understood that the

15  collateral could move."

16       Is that fair?  Did I read that correctly?

17  A     Yeah, I'm not disagreeing with that.  It could move.

18  It's adding onto that sentence.  I understood it had to be

19  secured as well.

20  Q     And you also understood that the collateral could be

21  consolidated in another wallet, correct?

22  A     Yes, it could be consolidated as long as its secured.

23  Q     And Cred never told you that your pledge collateral

24  would be maintained in a segregated e-wallet, correct?

25  A     Correct.  There is no -- well, I believe there was some

1  email that mentioned segregated, but collateral would be

2  maintained securely is what I understood.

3  Q    I want to be very clear about this, Mr. Parrish.  Cred

4  never told you that your pledge collateral would be

5  maintained in a segregated e-wallet, correct?

6  A     That is correct.  Using the word segregated, I don't

7  believe that was said but I just want to be clear that

8  segregated and secure to me are very similar because how do

9  you know you have it if it's not to some level segregated.

10 So, I'm just stating it had to be secured.  And that's my

11 confusion around that comment versus secured.

12           THE COURT:  Can we (indiscernible)

13           UNIDENTIFIED SPEAKER:  Yes, please.

14 BY MR. PARRISH:

15 Q    So no one from Cred told you that the collateral would

16 be maintained in a segregated e-wallet, right?

17 A    Yes, that's true.  I think I just explained my

18 confusion on segregated, the word, and secure so.  It

19 certainly represented to me that it would be secured and --

20 Q    Mr. Parrish, if I --

21      Mr. Parrish, I asked you at your deposition about

22 segregated accounts many many times, correct?

23 A     Yes.

24 Q    And never once at that deposition did you ever tell me

25 that you were confused as to what the word segregated means,

1  correct?

2  A    Correct.

3  Q    Okay.

4        MR. LUFT:  If we could pull up Exhibit 3 which is

5  your supplemental declaration.  I want to look at paragraph

6  two.

7  BY MR. LUFT:

8  Q    You state in your declaration,

9        "Cred represented to UpgradeYa that the collateral

10 would be maintained in segregated e-wallets.  Specifically,

11 I was informed by Cred that once the agreement was executed,

12 Cred would establish and did establish new e-wallets to hold

13 UpgradeYa's collateral."

14       And you cite Exhibit 1 to your declaration in support

15 of that, correct?

16 A    You said -- I'm sorry.  I missed the -- you said if I

17 cited. . .

18 Q    You cite to Exhibit 1 of your declaration which is the

19 email.

20 A    Correct.

21 Q    Now as you just told us Cred never told you that it was

22 maintained your collateral in a segregated e-wallet, correct?

23 A    Correct.  They maintained that they would secure it.

24 Q    Okay.

25        MR. LUFT:  If we could pull up Exhibit 1 to your

1  supplemental declaration.

2          Austin, do you have that?

3  BY MR. LUFT:

4  Q    This is an email.

5          MR. LUFT:  Maybe make it a little bigger for Mr.

6  Parrish.

7  BY MR. LUFT:

8  Q    Now, Mr. Parrish, you would agree with me that the word

9  maintain does not appear anywhere in this email?

10 A    Yeah, I believe we looked at this during the deposition

11 that I agreed that word is not in this email.

12 Q    And I believe we also discussed that nothing in this

13 email says anything about how transfer bitcoins would be

14 maintained going forward, correct?

15 A    That is correct.  This email does not address that.

16 Q    And nowhere in this email does it say that collateral

17 would be maintained in a segregated e-wallet, correct?

18 A    That is correct.  It does not say that in this email.

19 Q    And nothing in this email says that after the transfers

20 were made to the e-wallets that the collateral would be kept

21 in those e-wallets, correct?

22 A    Correct, yes.  It does not say that in this email.

23 Q    And it does not say anywhere in this email that the e-

24 wallets would be used for anything other than the transfers

25 of the collateral, correct?

1  A      Correct.

2  Q      And it does not say that the e-wallets would hold the

3  collateral beyond the time of the transfers, correct?

4  A      Correct.

5  Q      And you also understood that the collateral could be

6  moved and consolidated into another wallet, correct?

7  A      Yes.  It could be moved and consolidated as long as it

8  lists secured.

9  Q      Okay.  Now I want to turn -- you due diligence Cred

10 before you made your investments, correct?

11 A      Correct.

12 Q      You had multiple conversations with people at Cred

13 prior to investing?

14 A      I didn't invest in Cred, but I had multiple

15 conversations.

16 Q      Before you entered into the transaction with Cred you

17 spoke to people there?

18 A      Yes.

19 Q      They answered all your questions that you had?

20 A      Yes.  Presumably my questions were answered.  I did

21 enter into an agreement.

22 Q      Well not presumably, Mr. Parrish.  There is no question

23 that you asked that they refused to answer, correct?

24 A      I don't recall any questions that I asked that were not

25 answered, but I cannot gaurantee that.  They may not have

1  answered (indiscernible), that I was okay with not having an

2  answer.  But, yes, the questions that I asked I received

3  answers that were relevant to getting into this agreement.

4  Q    And they answered your questions in writing when you

5  sent them by either telegram or email?

6  A    The requests were answered in email, in phone

7  conversations and in telegram.

8  Q    And prior to doing the transaction with Cred you also

9  reviewed their website, correct?

10  A    Yes.  I reviewed their website I'm sure.

11  Q    And you upload it and read it, correct?

12  A    I've read some it for sure, yes.

13  Q    Okay.  Now at the time that you entered into the

14  transaction with Cred you understood Cred used bitcoin funds

15  in storage to generate a yield, correct?

16  A    Yes.  I understood they can generate a yield off of

17  bitcoin.

18  Q    And by that you understood that Cred could create

19  revenue for itself off of UpgradeYa's capital, correct?

20  A    Yes.  I would not consider yield or revenue different

21  in this case.  As long as it's secured I understood they

22  could have a way to create yield.

23  Q    And one of the ways that Cred could potentially earn a

24  yield off of UpgradeYa's collateral was to lend it to other

25  customers, correct?

1   A     I didn't know all the ways they could generate a yield

2   beyond their business model --

3   Q     But that was one of the ways you --

4           THE COURT:  Hold on Mr. Luft.  I don't think he

5   was done answering.

6           Go ahead.  You may finish your answer, Mr.

7   Parrish.

8           THE WITNESS:  Yeah.  I was just going to say as

9   long as it was secured that's the way that they ran their

10  business.  It's not my primary concern.

11          THE COURT:  Hold on Mr. Luft, before you ask

12  another question.

13          There is somebody typing.  If you are not speaking

14  please mute your phones so that we don't hear the typing.

15  Thank you.

16          MR. LUFT:  Thank you, Your Honor.

17  BY MR. LUFT:

18  Q     Mr. Parrish, you agree with me that one of the ways

19  that Cred could potentially earn revenue or yield off of

20  UpgradeYa's collateral was to lend it to other customers,

21  right?

22  A     Yeah, as long as they had a method of doing it that's

23  also secured, the collateral, I'm not -- you know, as far as

24  that being possible -- like I said, I don't know the business

25  model.

1  Q    And before investing you told us you reviewed their

2  website?

3  A    Yeah, I had uploaded it over the course of this year.

4  Q    In fact, you uploaded it prior to investing, correct?

5  A    Yes.  I would expect that I did load it back in March.

6  Q    And I believe you told me already that if something on

7  the website was incongruous what someone at Cred was telling

8  you and it bothered you, you would have raised it with Cred,

9  correct?

10 A    Yes.  I mean if there was something that bothered me

11 before getting into this agreement I think it's logical that

12 I would have raised that concern, yes.

13           MR. LUFT:  Your Honor, I'd like to show the

14 witness a document that has been marked as debtors -- marked

15 for identification as Debtor's 31, which is a copy of the

16 CredBorrow web page.

17           MS. BROWN:  Objection, Your Honor.

18           THE COURT:  Well let me bring it up on the screen

19 first so I can see what we're talking about here.

20           MS. BROWN:  Your Honor, first, the screen shots of

21 the website are inadmissible parol evidence. Your Honor,

22 under California Law, which is applicable here pursuant to

23 Section 9.1 of the agreement, a written contract supersedes

24 all prior and contemporaneous agreements concerning the same

25 subject matter.  And if the writing is intended by the

1  parties as a final expression of their agreement it cannot be

2  contradicted by parol evidence.

3          Specifically, California Code of Civil Procedure

4  Section 1856, which is titled Parol Evidence Rule, provides

5  that the terms set forth in a writing, intended by the

6  parties as a final expression of their agreement with respect

7  to the terms included therein, may not be contradicted by

8  evidence of a prior agreement or of a contemporaneous oral

9  agreement.  The CredBorrow program and the agreements that

10  UpgradeYa entered into with respect thereto has an

11  integration clause which appears at Section 9.8.

12          If it would be helpful for Your Honor I can ask

13  Mr. Prouty to bring that portion of the agreement up on the

14  screen.

15          THE COURT:  Well I don't think Mr. Luft is asking

16  him this -- about this to show that there is some change to

17  the agreement.  I think the witness testified that he was

18  unaware of what Cred did with the assets once they were

19  pledged.  He also testified that he reviewed the website and

20  this shows, to me, what they did with the assets once they

21  were pledged.

22          So I will overrule the objection.  You can use it

23  for impeachment purposes.

24          MS. BROWN:  Your Honor, I actually have a --

25          MR. LUFT:  Your Honor --

1        MS. BROWN:  -- (indiscernible) which is that the

2   debtors have not authenticated the screen shots of the

3   website as they're required to do under Federal Rule of

4   Evidence 901, which is made applicable by the Federal Rule of

5   Bankruptcy Procedure 917 that provides that all the federal

6   rules of evidence also (indiscernible).

7        To satisfy the requirements --

8        THE COURT:  I am well aware of that.  I am well

9   aware of that.

10       Let me ask, Mr. Luft, do you need to authenticate

11  this document?

12       MR. LUFT:  Your Honor, I don't believe I do.  I am

13  happy to literally pull it up from the web right now.  We're

14  trying to do this remote hearing, but if you would like to do

15  it that way and the court could take judicial notice of what

16  is currently a publicly available document on the web.  You

17  know, this has never been raised before.

18       There has never been an issue and they never

19  alerted us to this issue that they had any issue with the

20  authentication of this document despite now having almost a

21  month of notice that we were going to present it as it was on

22  our list.

23       MS. BROWN:  Well, Your Honor, we were not aware

24  whether or not they would be in a position to produce a

25  witness that has direct personal knowledge of the debtor's

1  website.  The screen shots of the website, as you can see

2  from the top left corner, are from December 15th, 2020.

3  Evidence presented from a website must reflect how the

4  website appeared at the time in question, not months later.

5  Your Honor, in the case captioned <u>Bacon v. Avis</u>

6  <u>Budget Group</u>, which can be found at 959 F.3d 590, which is a

7  recent Third Circuit opinion from April 2020, the Third

8  Circuit affirmed the District Court of New Jersey's decision

9  to exclude a declaration and website screen shots when the

10 proponents produced captured images of a website as it

11 existed months later rather than accurate copies of the

12 website as they existed on the date in question.

13 The website that the debtors are trying to show

14 here is dated from December 15th.  They have not provided

15 anyone who can authenticate that this is exactly how the

16 website appeared at the time at issue which would have been

17 when Mr. Parrish reviewed the website back in March and April

18 of 2020.

19 If it would be helpful to Your Honor I would be

20 happy to email a copy of the <u>Bacon</u> opinion to Chambers, the

21 debtors, the committee and any other interested party.

22 THE COURT:  That is not necessary.

23 Mr. Luft?

24 MR. LUFT:  Your Honor, I am happy to -- we can go

25 to the Wayback Machine.  An untimely objection I think if she

1  really want to know -- I know why she is desperate for you

2  not to -- for the witness not to see it.  I have questioned

3  him about it.  I am happy to ask him about his impression of

4  it.  What he understood at the time.  He's already testified

5  to me that he's read this website, but I can ask him about

6  it.  I can surely use it to impeach his testimony.  I don't

7  think there is any authentication issue.

8           THE COURT:  I am going to overrule the objection.

9  You can use the exhibit for impeachment purposes.

10          MR. LUFT:  Thank you, Your Honor.

11  BY MR. LUFT:

12  Q    If we could scroll down to show the portion of the

13  website that says what happens to my pledged assets.  Mr.

14  Parrish, it states,

15       "Your pledged assets are used to lend to and transact

16  with a variety of customers including retail borrowers and

17  money managers with well-established track records."

18       Do you see that?

19  A    I do see it.

20  Q    Mr. Parrish, after reviewing the website you never told

21  anyone at Cred that this statement was  inconsistent with

22  anything else Cred was telling you regarding the CredBorrow

23  program, correct?

24  A    Yes.  If I told Cred anything about this website, and I

25  don't recall telling -- asking Cred about this website.

1  Q     You never told anyone at Cred that you did not want

2  your collateral used to be lent to or transact with the other

3  customers as a method for Cred earning a yield, correct?

4  A     Correct.  This language on this website is that, I

5  think I mentioned it in my deposition, it's a bit confusing

6  to me now.  If I did read it back in March I imagine it was

7  confusing to me then.  I would have cared about it being

8  secured.  Once again, this gets into more of the business

9  model.  And as long as my collateral was secure my focus

10 wasn't what they did with it.  I just wanted to make sure it

11 was going to be there for me when I provided or when I repaid

12 the loan.

13 Q     Mr. Parrish, you never told Cred that they may not lend

14 your collateral to anyone else; meaning your bitcoin to

15 anyone else, correct?

16 A     No.  I did not modify the agreement.  So, I don't

17 recall.

18 Q     And nothing --

19 A     I don't recall specifically saying anything about

20 lending to Cred, no.

21 Q     Mr. Parrish, Cred never told you that it was going to

22 earn a yield in any other fashion other then what is stated

23 on this website, correct?

24 A     Cred never -- I don't recall the exact language that

25 Cred represented to me on how they would earn a yield.

1  Q     And you didn't ask Cred not to lend to other customers?

2  A     Did I -- I believe you just -- I don't recall asking

3  them to not lend.

4  Q     You never told --

5  A     I (indiscernible) making sure that -- I'm sorry.

6  Q     No.  Please finish, sir.  I apology.

7  A     Yeah.  I was just focused on making sure it was secure.

8  As I mentioned, that really gets into the business model of

9  Cred and that wasn't my focus.  I was concerned about the

10  security of my collateral.  I was told by Cred many times

11  that you have no worries about how your collateral is going

12  to be secured.

13        So, they made me feel very comfortable that how they

14  ran their business was fine and that the collateral be

15  secured.  So there wasn't a lot of (indiscernible) on the

16  website when I was making the decision the way it was on the

17  people that I was talking with, you know, and the

18  interactions about how the agreement I was getting into and

19  how it would work for what I wanted.

20  Q     Mr. Parrish, I want to unpack that very quickly.

21        You said you weren't -- how they ran their business was

22  how they ran their business, right?

23  A     How their business model works is not my focus.  That's

24  correct.

25

1  Q      And how they told you they run their business is that

2  they would use your collateral to earn a yield for Cred,

3  correct?

4  A      They told me if they earned a yield they will secure

5  the collateral.  It would be secured.

6  Q      Sir, I'm asking you; they told you they would use your

7  collateral to earn a yield for Cred, correct?

8  A      They could use the collateral.  I understood that they

9  could.  I didn't know that they would.  I mean they could, as

10 well, sit securely in the original e-wallet.  I mean that was

11 certainly possible as well.  I didn't know which way they

12 would use it.  I just -- like I said, I focused on the

13 security and make sure, you know, this is going to be here

14 when I -- when I repay my loan this is going to be here,

15 right.  I mean that was my focus as a customer.  That was my

16 concern.

17 Q      In fact, Mr. Parrish, when you were thinking of

18 investing, before you ever sent them one piece of bitcoin,

19 they specifically told you, right, that they would use your

20 bitcoin to generate a yield, that they would not keep it in

21 cold storage.  You recall that, right?

22 A      Well there are a couple of things.  You mentioned cold

23 storage.  Cred never represented to me that it would be kept

24 in cold storage.  That is to the point that I understood that

25

1  as long as it was secured it could be moved, it could be

2  comingled.  That was part of the understanding.

3  Q    Right.  In fact, Cred told you that they wanted to be

4  familiar with their model.  What their model was, was that

5  they typically used bitcoin funds in storage to generate

6  yield and that is part of why their rates are so competitive,

7  right?

8  A    Yeah.  That would agree with what I have been saying.

9  Typically they would do that and so they could do that.  I

10  understood that they could create a yield and once again as

11  long as it was secured.

12  Q    And they never told you that they were not -- you would

13  be an atypical situation where they would not use your

14  collateral to earn a yield for themselves, correct?

15  A    They didn't specifically say that they would not use my

16  collateral for a yield, no.  I understood they could.

17  Q    In fact, they specifically wanted you to know that that

18  was their business model, correct?

19  A    Yes.  I understood that they could use that collateral

20  to earn a yield, yes.

21  Q    Right.  And you never told Cred that there were certain

22  activities that they may not do to generate a yield using

23  UpgradeYa's pledged collateral, correct?

24  A    I was concerned about the security.  What they could do

25  is defined in the agreement.  That was my understanding at

1  the time, you know, what specifically I could do.  I couldn't

2  sacrifice the security.  So I wasn't focused on all the

3  potential ways you could secure collateral and make a yield.

4  Q    Sir, you never specifically told them that there were

5  certain activities that they may not do to generate a yield

6  with your pledged collateral, right?

7  A    Correct.  I did not instruct them to do certain things,

8  that's correct.  I did not do that.

9  Q    You didn't instruct them that there were certain things

10 they could not do either with your pledged collateral?

11 A    That's correct.  I mean I was engaged in the agreement

12 for them to do their business model while securing my

13 collateral.  I did not try to influence what that business

14 model is.

15 Q    Whatever their business model was okay with you, right?

16 A    Yes.  As long as it's secured.  As long as my

17 collateral is secured.

18 Q    And they -- and the only place they ever told you what

19 they -- you've ever seen what they would do with their

20 pledged assets was to tell you that they were going to lend

21 it to other customers, correct?  You have never seen a

22 statement saying they will do anything else with pledged

23 collateral, correct?

24 A    I'm not saying that (indiscernible).  I know it's on

25 the website. I don't recall if I read that back then or not,

1  but my focus at the time would certainly not have been on

2  that website.  It would have been on the conversations with

3  the Cred representatives and whether or not my collateral was

4  secure.

5  Q    And no one from any of your conversations, no one from

6  Cred ever told you that they were not going to lend your

7  collateral to other customers, correct?

8  A    I don't recall them saying that they're not going to

9  lend it.  They could say that they're not going to do a lot

10 of things.  I don't recall them saying all those phrases.

11 Q    Okay.  Let's turn to another subject, Mr. Parrish.

12      You would agree with me that bitcoin is fungible?

13 A    Yes.

14 Q    There is no different between UpgradeYa's bitcoin and

15 anyone else's, correct?

16 A    Well my (indiscernible) referring to that if you have

17 one bitcoin and another bitcoin that's uniquely identified

18 between the two.  Certainly if we were talking about

19 someone's bitcoin v. someone else's they would have control

20 of it.  That is a differentiating factor.

21 Q    And, Mr. Parrish, if you were to receive back an

22 equivalent amount of bitcoin to what you pledged, but that

23 was not the specific pieces of bitcoin you handed over as

24 collateral, it wouldn't make any difference to you would it?

25

1  A      When a fungible item, such as cash, is returned there

2  is no reason to worry about if it's the same dollar bill or

3  the same bitcoin.  That is correct.

4  Q      You view the bitcoin just the same as you would cash in

5  that sense?

6  A      As far as fungible actually more so.  If its cash there

7  are serial numbers and you make identifiers.  Yeah, in

8  general, they're both fungible.

9  Q      Okay.  Now the bitcoin that you transferred to Cred you

10 did it in thirty separate transactions and thirty separate e-

11 wallet addresses, correct?

12 A      Well there was sixty transactions.  Thirty were small

13 and thirty were larger.

14 Q      Okay.  That's right.  The first thirty were tests of

15 those wallets, correct?

16 A      Yeah.  They were verifying that everything setup

17 properly, but they were transactions just like

18 (indiscernible).

19 Q      And as we already talked about you knew that once the

20 bitcoin was transferred to those thirty e-wallet addresses

21 they could be moved out of those e-wallet addresses, correct?

22 A      I understood it could move as long as it was secured,

23 yes.

24 Q      Okay.  Mr. Parrish, once the bitcoin was moved from the

25 e-wallets you transferred the collateral into, into a larger

1  consolidating account comingling it with other bitcoin of

2  Cred you're not aware of any way to identify which specific

3  piece of bitcoin you transferred as collateral was

4  UpgradeYa's as opposed to being a piece of bitcoin that was

5  transferred from a different Cred customer, correct?

6  A    Yes.  In general I think it goes back to fungibility.

7  If bitcoin is put into the same address then there is nothing

8  to identify one bitcoin from another.

9  Q    Mr. Parrish, you are familiar with Blockchain Explorer?

10 A    Yes.

11 Q    And that's a publicly available website where if you

12 have an e-wallet address you could enter it in and see what

13 is in that -- how much bitcoin is in that account, correct?

14 A    Yes.  So there are several bitcoin Blockchain Explorers

15 and that is one of them.

16 Q    Mr. Parrish, as we talked about you are aware that all

17 of the collateral that you transferred to Cred in those

18 thirty e-wallets was shortly thereafter transferred into a

19 larger e-wallet account containing other bitcoin that Cred

20 held for different customers, correct?

21 A    You're asking me if I'm aware.  I certainly am aware

22 now.  That was not something that I -- after sending it I

23 knew it could move.  So, that wasn't something I focused on.

24 I knew it could move, so I focused on it being secured, and

25 Cred doing what they do in their business model, and that it

1  was just moved into another secure location.  That is

2  correct.  I am aware now because we discussed this in the

3  deposition.

4  Q    You would agree with me that once the collateral

5  UpgradeYa Investments sent over to Cred was placed into the

6  account with other Cred bitcoin there is no way to

7  distinguish which piece of bitcoin belongs to UpgradeYa v.

8  which piece of bitcoin once belonged to another customer,

9  correct?

10  A    Yeah.  That would go back to the fungibility that I

11  just described.

12  Q    And if bitcoin was transferred out of that account to a

13  third-party you would have no way of tracing whether it was

14  the bitcoin that left to go to the third-party was originally

15  bitcoin transferred from UpgradeYa or bitcoin that was

16  originally transferred from a different Cred customer,

17  correct?

18  A    Yeah, if I believe that to be true there may be some

19  more technical analysis that I am not aware of.  In that

20  sense, you know, from a customer of Cred I am concerned that

21  they secured the amount because it is fungible.  So if it

22  were moved into a larger account I would -- you know, if I

23  was going to do that I would be monitoring to make sure that

24  the amount was there.  But, of course, they may move it.  I

25  don't know if they moved it to another place that they

1  secured, you know, without being lock and step with them

2  there was no point in tracing that out.

3  Q     In fact, there is no ability to trace it, correct?

4  Once it's comingled you just can't do it, right?

5  A     Well I'm talking about the amount.  They certainly

6  secured the amount.  So, that is what I was concerned about.

7  Q     When you say the amount you mean the equivalent dollar

8  figure amount of bitcoin, not tracing the actual bitcoin,

9  correct?

10 A     Well as a customer, they're holding my collateral, I'm

11 concerned that they have the actual bitcoin amount.  I'm

12 talking about the bitcoin.

13 Q     Mr. Parrish, if the court was to lift the stay I

14 believe you stated in your declaration that you will seek

15 either to get bitcoin or US dollars equal to the amount of

16 what you believe you lost, correct?

17 A     My goal in this is to recover my loss, my collateral

18 that Cred has said that they don't have.  I'm trying to

19 recover it.

20 Q     I just want to be clear, Mr. Parrish, that can be the

21 bitcoin or that can be an equal amount of US dollars, right?

22 As you say bitcoin or something of equal value, right?

23 A     Yes.  And my understanding is it might be limited there

24 on what's possible in this structure.  My understanding is

25 that if it was going to be bitcoin it needs to come from the

1  debtors and the debtors are saying they don't have it.  So

2  from there I think it would have to be the value from the

3  non-debtor to a third-party.

4  Q    Just so we're clear, this I not a motion to seek to

5  recover the specific bitcoin that UpgradeYa Investments sent

6  to Cred, correct?

7  A    Right.  I mean my understanding, as I mentioned, is as

8  this evolved we were hoping that Cred had the bitcoin but now

9  that they don't this has evolved into recovery of the value.

10 So that is my understanding.

11 Q    What you're looking to do is pursue your claim against

12 the estate, right?

13 A    That might be confusing.  I understand the list would

14 be the pursue third-parties, non-debtor direct claims for me.

15 Q    For the amount equal to what you are seeking to

16 recover?

17 A    Yes.  Being the amount of my collateral that I have

18 lost.

19 Q    Mr. Parrish, in August of this year Cred returned some

20 of your collateral to you, correct?

21 A    That's correct.

22 Q    And they did that because you asked them to do it,

23 correct?

24 A    Yes.  I made a request to withdraw some collateral.

25

1  Q      And nothing in the agreement obligate Cred to return

2  the collateral to you prior to your repayment of the $2

3  million loan, correct?

4  A      At the time I didn't know if the agreement required

5  that.  I certainly understood as a customer that they could

6  do that.  So if they wouldn't I would have been alarmed, but

7  they did.  So I had no reason to be concerned.

8  Q      So you agree with me that nothing in the agreement

9  require them to return your collateral prior to the repayment

10 of the loan?

11 A      I -- as I said, I don't know understand -- I did not

12 understand that the agreement did or did not require them to

13 do that.  If you're saying to me that they didn't then I can

14 agree with that.  The agreement didn't do that.  I'm just

15 sharing with the court that my understanding was that they --

16 if the loan to value ratio became beyond a certain amount

17 that they would let me withdraw some of my property back

18 because it's over-valued.  There is no reason to hold more

19 then (indiscernible) to secure the loan.

20 Q      Okay.  Mr. Parrish, I don't want to belabor this.  I

21 believe you previously told me that there is nothing you are

22 aware of in the agreement that obligates them to return the

23 collateral.  Maybe they did, maybe they didn't.  Has

24 something changed?  Have you set out something else in the

25 agreement?

1  A     I am agreeing with you there.  Yeah.  I am just simply

2  saying I don't know that it's in the agreement, but I think

3  we're in agreement on that.

4  Q     Okay.  And they returned fifty-three bitcoin to you?

5  A     That's correct.

6  Q     And the approximate worth of that fifty-three bitcoin

7  that they voluntarily returned to you today is worth around

8  $1.6 million dollars?

9  A     Correct.  I think if we're going to say numbers like

10 that, the 478 that I've lost is worth about $15 million right

11 now.

12 Q     That's right.  But they voluntarily returned $1.6

13 million even though they were under no obligation to do so,

14 correct?

15 A     Certainly as a customer they represented to me that I

16 could withdraw bitcoin if it became over-valued.  As I

17 understood, they would do a margin call if it became under-

18 valued (indiscernible).

19 Q     Sir, if someone was to make the assertion that the

20 bitcoin that UpgradeYa Investments provided Cred was stolen

21 that would be false, correct?

22 A     Yes.  I recall it's in the deposition.  Certainly as it

23 relates to the agreement I sent the bitcoin.  We were in

24 agreement.  I would provide the collateral and they would

25

1 | provide a line of credit for $2 million.  That was

2 | consensual.  That was not stolen.  That is correct.

3 | Q    Sir, to be very clear, if someone was to make the

4 | assertion that the bitcoin you provided Cred was stolen that

5 | would be false, correct?

6 | A    Well I just want to be specific because I think there's

7 | two parts to this.  Once I sent the collateral that was my

8 | choice and that was the agreement, but now we don't know what

9 | happened to the collateral.  I haven't (indiscernible) what

10 | happened to the collateral.  So, I don't know if it was

11 | stolen after that in any way by Cred or by anyone else.  So

12 | my answer is yes.  I voluntarily sent the collateral, but at

13 | this point there is another side here that is a piece to that

14 | puzzle.

15 |       Does that make sense?

16 | Q    Yeah.  Sir, if we can bring up Page 86 of your

17 | deposition.

18 | A    Yes.

19 |             THE COURT:  Mr. Luft, do you know how much more

20 | you have?

21 |             MR. LUFT:  Very little, Your Honor.

22 |             THE COURT:  Okay.  We'll finish up then we'll take

23 | a break.

24 |             MR. LUFT:  Thank you, Your Honor.

25 | BY MR. LUFT:

1  Q     Take a look at Lines 8 to 13.  Do you see I ask you,

2        "And if someone was to make that assertion it would be

3  a false assertion, correct?"

4        And you answered,

5        "If someone was to make the assertion that the bitcoin

6  I provided to Cred was stolen that would be false."

7        Did I read that correctly?

8  A     Yeah.  That is exactly what I was referring to in my

9  previous statement.  In the first part of the two part -- I'm

10 sorry, I didn't mean to talk over you.

11 Q     Mr. Parrish, you are not aware of any post-petition

12 malfeasance by Cred, correct?

13            THE COURT:  Mr. Luft, you're breaking up a little

14 bit now.  I'm not sure what happened.

15            MR. LUFT:  Your Honor, my earbuds are dying.  I

16 will just charge very quickly.  I hope this is better now.

17            Your Honor, improved?

18            THE COURT:  That's better.  Thank you.

19 BY MR. LUFT:

20 Q     Mr. Parrish, to restate my question, I'm sorry if I

21 wasn't clear, you're not aware of any post-petition

22 malfeasance by Cred, correct?

23 A     No.  I don't know the post-petition malfeasance.  My

24 only concern post-petition would just be the amount of

25

1  bitcoin that was just presented to you that they held and we

2  later learned that not being held.

3  Q    Sir, you told me at your deposition that you were not

4  aware of any post-petition malfeasance, correct?

5  A    Correct.  I agree with that.  I just wanted to voice a

6  concern.  I don't know if that falls into the -- certainly in

7  the declaration (indiscernible) that that was something that

8  fell into post-petition malfeasance, but I don't really know.

9  That is concerning for sure.

10 Q    And you didn't authorize anyone to do anything or say

11 anything involving post-petition malfeasance, correct, on

12 your behalf?

13 A    No.  That was -- that's correct.

14 Q    Okay.  I want to just touch on one last thing.  I know

15 we're close to a break, but if you could just bring up

16 Exhibit H of your initial declaration.  I'm going to start at

17 the bottom of it.

18      Mr. Parrish, you recognize this document as the exhibit

19 -- what is marked as Exhibit H to your declaration, a

20 November 10th, 2020 email chain, correct?

21 A    Yes.  This looks familiar.

22 Q    Okay.  I just want to quickly walk through this.  The

23 first email in the chain, starting at the bottom, is an email

24 to you from Michael Zhang at Cred -- I'm sorry, I think I

25

1  have the wrong document here.  Let me just get to the end

2  here.

3       This is -- I apologize, Your Honor.  This is Exhibit K,

4  not H.

5       Austin, that's my mistake.  I apologize.

6       Let me now ask you, do you recognize this document that

7  is attached to your exhibit?

8  A    Yes.  I am familiar with it.

9  Q    Okay.  If you can go to the bottom, which would have

10 been the first email, right, we see a November 8th, 2020

11 email from the Cred team to UpgradeYa Investments, correct?

12 A    Correct.

13 Q    And they were letting you know about the bankruptcy

14 filing, correct?

15 A    Yes.

16 Q    All right. And in response you sent an email that same

17 day to Dan Schatt in which you stated -- he noted he was busy

18 and said,

19      "I just have one basic question.  In the Chapter 11

20 document attached where am I at for liabilities under the

21 creditors?  I have run the numbers, it's been inconclusive.

22 Or simply put, what do you have on the books as your

23 liability to me?"

24      Correct?

25 A    Correct.

1  Q      Your inquiry was in connection with the Chapter 11

2  documents you saw?

3  A      Correct.

4  Q      And what you wanted to know was --

5  A      Yeah, I --

6  Q      Let me just finish.  What you wanted to know as what

7  was your -- what was the amount of the claim or liability

8  that Cred had to UpgradeYa, correct?

9  A      Yes.  At this point I'm a little confused and I'm

10  trying to get clarity from Dan.  I looked through the

11  documents and did not see secured creditors.  It was only

12  unsecured creditors.  When I originally got into this

13  agreement I felt at the time that if a bankruptcy occurred or

14  something like this that the one thing they would be holding

15  is collateral for CredBorrow.

16         I'm learning here and based on, you know, this

17  email and the information that it looks like there's only

18  unsecured creditors. So I am just trying to understand what

19  they have for me.

20  Q      You want to know what your claim is against them,

21  correct, compared to the other -- under the creditors, right?

22  A      Correct. I read the document and saw that all there is,

23  is unsecured creditors.  I assumed that I had to be under

24  there somewhere based on the filing.

25

1  Q     Right.  And in response Mr. Schatt tells you that

2  Heidi, who is Heidi Ng [phonetic], can let you know what Cred

3  has on record for UpgradeYa Investments and that the Chapter

4  11 documents will list the top thirty creditors, right?

5  A     Correct.  That is what was said.

6  Q     Right.  So she is going to let you know what UpgradeYa

7  Investments claim is and then you can compare that claim to

8  where it stands with regard to the top thirty creditors,

9  correct?

10  A     Yes.  That was my goal to understand where that was.

11  Q     Right.  Then you followed up with Ms. Ng in which you

12  let her know, right, that you want to know what liability

13  does Cred have on record to UpgradeYa, right, which is what

14  we just talked about, and also that you note that you would

15  like to know what the status of your collateral is, right?

16  A     Yes.  That's correct.

17  Q     And in response Ms. Ng writes to you, in the first

18  sentence, and says,

19       "Our records show that we are holding 478.170 bitcoin

20  of collateral per your loan of $2 million, and I can also

21  confirm that you are an active creditor in the program for

22  $73,171.47."

23       Right?

24  A     Yes.  That is correct.  That was from Heidi at the

25  time.

1  Q    And that was an accurate recitation of the amount of

2  your claim against Cred following the redemption of the

3  bitcoin that they had previously provided to you in August,

4  correct?

5  A    Well at the time when I received that information and

6  then tried to -- I didn't understand where I would be at on

7  the list they provided.  I was still -- it was still

8  inconclusive of where I am on that unsecured creditors list

9  top thirty which was --

10 Q    But this would have been how much your claim was and

11 then whether or not you could clearly compare it to the top

12 thirty.  She correctly told you what your claim was with

13 regard to Cred for UpgradeYa, correct?

14 A    As far as the numbers here those are correct.

15 Q    Right.  Then she proceeded to tell you we cannot

16 provide current balances at this point as we are in the

17 process of reviewing all the records in separate pre and

18 post-petition invoices.  Cred will be filing a schedule of

19 assets and liabilities.  In this document Cred will list

20 balances it believes are owed to its creditors, correct?

21 A    Correct.

22 Q    So with regard to what your outstanding collateral is

23 and where it was Ms. Ng told you very clearly she could not

24 tell you what the current balance is at this time, but they

25 would be filing a document which reflected that, correct?

1  A     Well I mean if we're going to dissect the email it's a

2  little confusing. She says she's holding it and then she says

3  she can't provide balances. And if you look at the text one

4  is what she wrote and one is copied and pasted due to the

5  assumption where the text is different.  So at this point --

6  Q     You have no idea she copied and pasted it.

7  A     I agree with --

8  Q     You have no knowledge of that.

9  A     I'm saying there was an assumption, yeah.  It looks

10 like it.

11 Q     Because she put it in big capital print so you would be

12 clear to see it, right.  That is the only thing you know is

13 different.

14 A     I'm just sharing my view of this email, that's all.  I

15 don't see (indiscernible) font.

16 Q     Okay.  Mr. Parrish, you asked what the amount of your

17 claim was and they told you it, correct?

18 A     Correct.  She told me she was holding the

19 (indiscernible) and the loan is $2 million --

20 Q     And you --

21 A     I'm sorry.

22 Q     -- asked them what the --

23        THE COURT:  Wait, wait, wait.  Mr. Luft, let him

24 finish his answer.

25        Go ahead, Mr. Parrish.

1              THE WITNESS:  Yeah.  I was just going through what

2     my understanding of the email is and what she wrote.  That

3     was the 478 BTC.  The loan for $2 million is correct.  And

4     the creditor program number was correct because the principal

5     yield interest on that program went to pay the CredBorrow

6     interest.  So that number should be lower then what I

7     originally put in.

8     BY MR. LUFT:

9     Q    And she says in explicit terms that she cannot -- that

10    Cred cannot provide current balances at that time, but they

11    would be filing a schedule of assets and liabilities which

12    would list all the balances it believes are owed to its

13    creditors, correct?

14    A    Yes.  That is said in this email.  That is correct.

15             MR. LUFT:  I have no further questions at this

16    time.

17             THE COURT:  Thank you, Mr. Luft.

18             Who else is going to cross-examine?

19             MR. EVANS:  Your Honor, Joe Evans for the

20    committee is going to cross-examine the witness.

21             THE COURT:  All right.  Anyone else?

22         (No verbal response)

23             THE COURT:  Okay.  So let's go ahead and -- we're

24    heading up on noon now.  Why don't we take -- we will combine

25    our lunchbreak here so that we can come back and hopefully

1  get through this, this afternoon.  So let's break until

2  12:30.  That will give us about a little less then forty

3  minutes.  We will come back and resume with your cross-

4  examination.

5          Mr. Parrish, you are still under oath.  You are

6  not allowed to talk to anybody during the break about your

7  testimony or review any materials relating to your testimony

8  during the break.

9          We will come back at 12:30 and we will resume.  We

10 will leave the line open so we can just jump right back in

11 when we're ready.  All right.

12          Thank you.  We are in recess until 12:30.

13     (Recess taken at 11:52 a.m.)

14     (Proceedings resumed at 12:30 p.m.)

15          OPERATOR:  Recording has begun.  We are live.

16          THE COURT:  Thank you.

17          Mr. Parrish, are you there?

18          THE WITNESS:  Yes, Your Honor.  Do you hear me?

19          THE COURT:  Yes, I can.  Thank you.

20          I will remind you, you are still under oath, Mr.

21 Parrish.

22          Mr. Evans, you may proceed with your cross.

23     (No verbal response)

24          THE COURT:  Mr. Evans?

25     (No verbal response)

1            THE COURT:  Can you all hear me?

2            UNIDENTIFIED SPEAKER:  I can hear you, Your Honor.

3            THE COURT:  Mr. Evans, can you hear me?

4        (No verbal response)

5            THE COURT:  I don't think Mr. Evans can hear me.

6   Can someone email Mr. Evans?  He might have dropped off of

7   the CourtCall.

8            Operator, do we --

9            MR. AZMAN:  Your Honor, its Darren Azman from the

10  committee.  I will -- Joe, can you hear the Judge?

11       (No verbal response)

12           MR. AZMAN:  Let me just text or call him on his

13  cell, Judge.  Sorry for the delay.

14           UNIDENTIFIED SPEAKER:  Darren, call him because

15  he's on the video.

16           MR. AZMAN:  No, I see that.  He clearly can't

17  hear.  He just chatted me.  He says he's waiting for the

18  sound to come through, but he's been allowed in so you can

19  see him.  I'm not sure if it's something on the CourtCall end

20  or…

21           THE COURT:  Operator, do we know if Mr. Evans is

22  on the call?

23           OPERATOR:  Your Honor, Mr. Evans is right there.

24  Your Honor, Mr. Evans has a live line.

25           THE COURT:  Thank you.

1          Mr. Evans, can you hear us now?

2          MR. EVANS:  I can, Judge.  Apologies.  I was in

3    the waiting room on the dial-in.  Sorry about that.

4          THE COURT:  Okay.  Go ahead.  You may proceed with

5    your cross examination.

6          MR. EVANS:  Thank you, Your Honor.

7          If I could also have access to the shared screen

8    function that would be excellent.

9          THE COURT:  Okay.  Are you going to do it yourself

10   or you have someone to do it for you?

11         MR. EVANS:  I can handle it myself.

12         THE COURT:  Okay.  I will go ahead and give you

13   shared access.

14         MR. EVANS:  Thank you, Your Honor.

15                       CROSS EXAMINATION

16   BY MR. EVANS:

17   Q    Mr. Parrish, good afternoon.

18   A    Good afternoon.

19   Q    We met once before, right, during a deposition?

20   A    Yes, that's correct.

21   Q    Okay.  And I'm going to ask you some questions today.

22   I am going to try to re-tread things that have already been

23   talked about in the interest of moving this forward, okay?

24   A    Okay.

25   Q    So you are the owner of UpgradeYa, right?

1 A     That's correct.  I had these discussions

2 (indiscernible) UpgradeYa Investments and UpgradeYa are

3 (indiscernible).

4 Q     Okay.  Let's talk about UpgradeYa Investments for now.

5 A     Okay.

6 Q     Do you own UpgradeYa Investments?

7 A     Yes.  I --

8 Q     UpgradeYa Investments is the party that entered into a

9 contract with Cred, right?

10 A     Yes, that's correct.

11 Q     Okay.  And UpgradeYa Investments is a bitcoin mining

12 company, is that right?

13 A     No.  UpgradeYa Investments entered into the agreement

14 with Cred.  UpgradeYa is a different entity.  I do own it.

15 Q     Okay.  So there is an UpgradeYa entity that is a

16 bitcoin mining company, correct?

17 A     UpgradeYa LLC is a mining company.

18 Q     Okay.  UpgradeYa LLC has been in business for how long?

19 A     I started that business in 2018.

20 Q     Okay.  And is it fair to say that you're relatively

21 familiar with Blockchain and bitcoin?

22 A     Yeah.  I have been studying this case for some time.

23 Q     Okay.  And e-wallet, e-wallet is something that is a

24 digital wallet that holds virtual currency, right?

25 A     Correct.  I agree with that.

1 Q      Okay. And wallets have addresses, is that right?

2 A      Yes.

3 Q      And so an address is a series of letters and numbers

4 that can identify a particular wallet, right?

5 A      An address is used to store digital assets.

6 Q      I'm sorry, you're breaking up a little bit.  Can you

7 repeat that?

8 A      Yeah.  A wallet -- sorry, an address -- I believe you

9 said address.  An address is used to store digital assets.

10        Is that clear enough?

11 Q      Yes. I heard you.

12        So a wallet stores digital addresses, right, and an

13 address identifies the particular wallet?

14 A      The address --

15 Q      I'm sorry.  Let me withdraw that and rephrase it.  I

16 will be more clear.

17        A digital wallet holds digital assets, right?

18 A      Correct.

19 Q      And a digital wallet has an address that can identify

20 that particular digital wallet, right?

21 A      Addresses are created from the wallet.

22 Q      Okay.  So if you have the address of a particular

23 wallet you can identify that wallet, right?

24 A      I'm not sure.  I may be misunderstanding on my part of

25 how it works.  I think the wallet could identify the address.

 1  I'm not sure you could know what address belongs to what

 2  wallet.

 3  Q    Okay.  Let me do it this way.  If you have an address

 4  and you type that address into a Blockchain Explorer would

 5  you be able to identify a particular wallet?

 6  A    If I type an address into Blockchain Explorer I can see

 7  the amounts stored and the inputs and outputs to that

 8  address.

 9  Q    Okay.  What about a transaction ID.  Every virtual

10  currency transaction has a transaction ID, isn't that right?

11  A    Yes.  The transaction ID is another thing you could

12  search for on Blockchain Explorer.

13  Q    Okay.  So if you typed in a transaction ID into a

14  Blockchain Explorer the Blockchain Explorer would show you a

15  particular transaction, right?

16  A    Yes.  That is my understanding, yes.  You could see

17  that transaction and the inputs and outputs around that

18  transaction.

19  Q    Okay.  And --

20         MS. BROWN:  Your Honor, I'd like to object with

21  respect to the Blockchain information.  This is all beyond

22  the scope of his declaration.

23         THE COURT:  Mr. Evans?

24

25

1    MR. EVANS:  Your Honor, this is in our objection

2 the failure to trace, the failure to identify non-comingled

3 bitcoins relevant to this opposition.

4    THE COURT:  (Indiscernible) --

5    MS. BROWN:  It may be --

6    THE COURT:  Mr. Evans, did you identify Mr.

7 Parrish as a witness?

8    MR. EVANS:  Did we identify Mr. Parrish as a

9 witness?  We identified him as a cross.  We were going to

10 cross him.  We didn't identify him as a witness.

11    THE COURT:  Did you cross-identify the witnesses

12 that were going to be called by any other party?

13    MR. EVANS:  We identified our own witness, but we

14 didn't cross-identify Mr. Parrish, no.

15    THE COURT:  It's beyond the scope of direct.  You

16 can't ask him the question.

17    MR. EVANS:  Okay.  Just so I understand the ruling

18 the question as just based on what he understands wallet to

19 be, what he understands transaction ID's to be, and what he

20 understands bitcoin to be.  His testimony that was on cross-

21 examination with no objection was about his understanding of

22 how this worked and whether his bitcoin was still in the

23 wallets where he initially provided them which is well within

24 the scope.

25

1    MS. BROWN:  I would assert that the initial cross

2  that was done by the debtors where they were discussing his

3  knowledge of his bitcoin was certainly within the scope of

4  his declaration; however, he does not provide any testimony

5  with respect to how Blockchain's were or how there may be

6  tracing within that. I believe that type of testimony was

7  provided in the committee's witnesses.

8    MR. EVANS:  We could get to this another way.  I

9  think we're arguing about a point that doesn't need to be

10  argued.  We can move on.

11    THE COURT:  Thank you, Mr. Evans.

12  BY MR. EVANS:

13  Q    Mr. Parrish, you said bitcoin was fungible, right?

14  A    Yes, that's correct.

15  Q    Okay.  And there is no uniqueness between one bitcoin

16  and any other bitcoin, right?

17  A    Correct.  I think Avi asked that and if I control one

18  bitcoin and you control a bitcoin there's (indiscernible)

19  there because we individually control it.  As far as one

20  bitcoin v. another bitcoin in the same wallet or the same

21  address I'm not aware of anything that uniquely identifies

22  from one between the other.  They're fungible in that regard.

23  Q    Okay.  And with respect to your claim for recovery here

24  you stated that it doesn't matter to you which bitcoin you

25  receive as long as you receive the value of your investment

1  back, correct?

2  A     Correct.  Due to the nature of bitcoin being fungible

3  if I were to receive my bitcoin back it would --

4            MS. BROWN:  Your Honor, I apologize.  I object to

5  the characterization of UpgradeYa's transaction with the

6  debtors under the CredBorrow program as an investment.  It

7  was a loan and I just ask that Mr. Evans rephrase his

8  question.  I don't think it was intentional, but --

9            THE COURT:  That was the basis of the -- we've

10 already been through this already, Mr. Evans.  Can we move

11 onto something that wasn't covered in the previous cross

12 examination at least?

13           MR. EVANS:  Yes, Your Honor.  We can.

14 BY MR. EVANS:

15 Q     You submitted a declaration in this case, right, Mr.

16 Parrish?

17 A     That is correct.

18 Q     And do you recall there were two declarations and the

19 latter one was on December 4th, 2020, right?

20 A     I don't have the dates, but if you're saying that is

21 what it is that (indiscernible).

22 Q     Okay.  One of those declarations stated that -- sorry,

23 UpgradeYa Exhibit 2, which is in evidence, Paragraph 2

24 states,

25         "From the outset of UpgradeYa's transactions with Cred

1 borrow Cred represented to UpgradeYa that the collateral

2 would be maintained in segregated e-wallets."

3        Do you remember that statement?

4            THE COURT:  Mr. Evans, just so the record is clear

5 you referred to it as Exhibit 2.  It's actually Exhibit 3.

6            MR. EVANS:  My apologies, Your Honor.

7            THE WITNESS:  Yeah.  I recall it.  We discussed it

8 earlier.

9 BY MR. EVANS:

10 Q    Okay.  And in that declaration you also stated,

11     "Based on the agreement, and representations and

12 communications made by Cred to me, it was my understanding

13 that collateral was deposited into and maintained in separate

14 segregated e-wallet accounts.  UpgradeYa provided the

15 collateral to Cred for the sole purpose of holding it as

16 collateral for the line of credit pursuant to the terms of

17 the agreement."

18        Do you recall that statement?

19 A    Correct.  That sounds to be read from the declaration.

20 Q    Okay.  Did you write that declaration yourself?

21 A    No.

22 Q    Okay.  I won't belabor it.  We looked at the website

23 previously, but you would agree with me, would you not, that

24 the website indicated that the pledged assets are used to

25 lend to and transact with a variety of customers including

1  retail borrowers and money managers with well-established

2  track records, right?

3  A    I don't agree that we looked at the website.  We looked

4  at a document.  It wasn't the website.  As far as what it

5  said I believe you said what it said at the part that Avi

6  referenced.  It sounds like the same language.

7  Q    Okay.  Just so I understand the Cred website it did say

8  your pledged assets are used to lend to and transact with a

9  variety of customers including retail borrowers and money

10 managers with well-established track records.  That is what

11 it said, right?

12 A    Your saying the website said that.  I haven't looked at

13 the website today.  We'd have to pull it up.

14 Q    Okay.  Your Honor, I'm pulling up Debtor's Exhibit 1

15 which is the Cred website, which is in evidence.

16        THE COURT:  It's not in evidence, I don't believe.

17 It was used for cross for impeachment purposes. It was not

18 admitted into evidence.

19        MR. EVANS:  Okay.  My apologies, Your Honor.  I

20 will publish to the witness a PDF snapshot of the CredBorrow

21 website for cross examination.

22        Your Honor, I'm sorry, I'm not able to share the

23 screen at the moment.

24        THE COURT:  Can you get Mr. Evans screen share,

25 please.

1  BY MR. EVANS:

2  Q    Mr. Parrish, can you see this document?

3  A    Yes, I see it.

4  Q    Okay.  And this is a snapshot of the CredBorrow website

5  that we discussed earlier today or you discussed earlier

6  today?

7  A    Okay.  We are saying this is what the website says

8  right now?

9  Q    I'm sorry.  This is -- all right.  On the bottom left-

10  hand corner it says mycred.io/borrow, right?

11  A    Yes, I do see that.

12  Q    Okay.  And you've been on the myCred website before,

13  haven't you?

14  A    I actually looked at it this morning.

15  Q    Okay.  If you scroll down to Page 3 it says,

16        "What happens to my pledged assets?"

17        Do you see that language?

18  A    Yes.  I just -- part of my confusion is we're

19  (indiscernible) a website -- I remember a hold paragraph on

20  the website this morning.  I don't see it here.

21  Q    Okay.  Mr. Parrish, I'm just asking about this website

22  right here right in front of you dated December 15th, okay,

23  that (indiscernible) bottom left-hand corner and it states,

24        "Your pledged assets are used to lend to and transact

25  with a variety of customers including retail borrowers and

1  money managers with well-established track records."

2      Do you see that language?

3  A    Yes.  I do see the language.

4  Q    Okay.  You testified previously that Cred could use the

5  money that you provided or used the bitcoin you provided to

6  make a yield, right?

7  A    As long as it was secured to use the money to make a

8  yield on that.

9  Q    Okay.  And one way that they could make a yield is by

10 lending that bitcoin to other customers, right?

11 A    As long as it's secured.  I think there is a lot of

12 ways that one could come up with how they could make a yield.

13 Q    Okay.  I'm just asking a very specific question.  When

14 you entered into this contract did you understand that Cred

15 could lend the bitcoin you provided to other customers?

16 A    I can't say a hundred percent I knew that they could

17 lend it.  I knew that they could make money off of it, you

18 know, yield.  I understood that anyway they did that it would

19 be secured.  So I think we had this earlier today, but if

20 they did make a yield off of lending then they would have to

21 be made aware it was also secured.  Whether that is possible,

22 you know, that's their business model.

23 Q    Okay.  But you understand they can make a yield, right?

24 That was the word you used, "yield."

25 A    That was the word, yes.  I understood they could make a

1  yield.

2  Q     Okay.  And you do not believe that your bitcoin was

3  sitting in some vault and would never be used by Cred, right?

4  A     Correct.  When I entered into this agreement I

5  understood the collateral could (indiscernible).  I

6  understood they could create a yield as long as it was

7  secured.

8  Q     Okay.  When you say create a yield you understood that

9  Cred could use the bitcoin you provided and make a profit off

10 of that bitcoin you provided, right?

11 A     Yeah.  I would consider that yield and profit would be

12 the same thing in this scenario, yes.

13 Q     Okay.  We took your deposition in this case, right?

14 A     That's correct.

15 Q     Okay.  And at that deposition I asked you,

16       "It was not your understanding that your virtual

17 currency would be sitting in some vault and never used,

18 right?"

19       You responded,

20       "Yeah. I am going to sound like a broken record, but I

21 understand they could make a yield on my property."

22       That is still your understanding today, isn't it?

23 A     Yes.  I got asked that several times today. I

24 understood as long as it was secured they could make a yield.

25 Q     Okay.  And you recall discussing the contract that you

1  entered into with Cred today, don't you?

2  A    Yes.  We discussed it today.

3  Q    Okay.  And in that contract nothing precluded Cred from

4  using the bitcoin you provided in any way, did it?

5           THE COURT:  Mr. Evans, I'm still waiting for you

6  to get to something we haven't already covered.  We're

7  wasting time here.  Let's move on, please.  This has already

8  been covered in the cross.

9           MR. EVANS:  Fair enough, Judge.  I will move on.

10 BY MR. EVANS:

11 Q    Mr. Parrish, who's Xavier Rachofsky [phonetic]?

12 A    He was my first contact at Cred when I was looking to -

13 - not considering Cred as a service.

14 Q    Okay.  And Xavier Rachofsky and yourself communicated

15 via telegram, right?

16 A    That is correct.  We indicated in many ways, but we

17 also communicated in telegram.

18           MR. EVANS:  Your Honor, I'd like to pull-up for

19 identification Exhibit CC-17.

20           THE COURT:  Creditor's committee exhibit?

21           MR. EVANS:  Yes, Your Honor.

22 BY MR. EVANS:

23 Q    Mr. Parrish, this is a document that you produced in

24 discovery. This is a telegram chat between yourself and Mr.

25 Xavier Rachofsky.  Do you recognize this document?

1  A      Yes.

2  Q      Okay.  And this here, Marc Parrish, these are your

3  words, these are the things that you are typing, correct?

4  A      Yes.  That looks to be accurate.

5          MR. EVANS:  Your Honor, I would like to move this

6  document into evidence?

7          THE COURT:  Any objection?

8      (No verbal response)

9          THE COURT:  It's admitted without objection.

10     (Creditor's Committee Exhibit 17, received into

11 evidence)

12 BY MR. EVANS:

13 Q      If you scroll down on the first page the name XAV,

14 that's Xavier Rachofsky, right?

15 A      Yes.  I believed at this time when I was communicating

16 I was communicating with Xavier.

17 Q      Okay.  And here you are communicating with Xavier about

18 the investment with Cred or about providing bitcoin to Cred

19 and how that was going to work, right?

20 A      He was my contact at Cred.  So, this telegram chat

21 would be in relation to UpgradeYa Investments in Cred.  That

22 is correct.

23 Q      Okay.  I want to make this a little larger.  This

24 statement right here from Xavier says,

25         "It is important for your funds to be held in a single

1  segregated cold storage for the duration of your loan.  We

2  move funds around for the purposes of our operations and, as

3  you mentioned, with multiple spends if the different

4  addresses might have to move funds."

5       Do you see that statement?

6  A    Yes.  I do see it.

7  Q    Okay.  If you go down to the next page Xavier tells

8  you,

9       "We technically use bitcoin funds in storage to

10 generate yield and this is part of why our rates are so

11 competitive."

12      Do you see that?

13 A    Yes, I do see it.

14 Q    Okay.  So when you said in your declaration -- sorry,

15 withdrawn.

16      You said in your declaration that Cred represented to

17 UpgradeYa that a credit will be maintained in segregated

18 (indiscernible), right?

19 A    Yes.  That was in the declaration.

20 Q    Okay.  And you also stated that UpgradeYa provided the

21 collateral to Cred for the sole purpose of holding it as

22 collateral for the line of credit pursuant to the terms of

23 the agreement, right?

24 A    It sounds like that's being read from the declaration.

25 Q    Okay.  And you signed the declaration on December 4th,

1  2020?

2  A      Yes.   That's correct

3  Q      Okay.   And you signed that declaration after receiving

4  the telegram chats from Xavier Rachofsky telling you that we

5  move funds around for the purposes of our operations, right?

6  A      I believe the telegram chat was in March and this is

7  December 4th.   So it was sometime after, correct.

8  Q      Okay.   And you submitted this declaration after Xavier

9  Rachofsky told you that we typically use bitcoin funds in

10  storage to generate a yield, right?

11  A      Yes.   He also mentioned, though, that it had to be

12  secured as well.

13  Q      Okay.   (Indiscernible).   You don't know where the

14  bitcoin you provided to Cred is today, right?

15  A      My bitcoin I provided to Cred -- I was told by Cred

16  that they don't have it.

17  Q      Okay.   Before you filed the motion in this case you

18  tried to look for the bitcoin, didn't you?

19  A      No.   I did not put effort into looking for the bitcoin.

20  Q      You didn't put effort into looking for the bitcoin.

21  You said that you looked up two wallets on Blockchain

22  explorer, right?

23  A      That's correct.   I did know two addresses just --

24          MS. BROWN:   Objection, Your Honor.   It's beyond

25  the scope of the direct.   We have not had any conversations

1    with respect to Blockchain.

2              THE COURT:  Overruled.

3              THE WITNESS:  I did look up two addresses.  I just

4    didn't put any effort into following where they went.  I

5    checked and saw two for zero balance.  If that makes sense.

6    I understood the collateral could move.  I had no way to know

7    if it moved to one place that Cred was securing or if it was

8    misappropriated.  So, you know, there wasn't a lot for me to

9    look at.

10   BY MR. EVANS:

11   Q    You looked at two wallets, right?

12   A    I believe the terminology there would be I looked at

13   two addresses.  Just to be clear I believe it to be two.  It

14   took like five minutes.  I pulled up on Explorer.  This is

15   all post-petition.  I decided let me check two of them,

16   there's zero, and I decided, well, there's really no value

17   here.  It was very short period of time.

18   Q    And before you filed the motion in this case you didn't

19   hire any Blockchain tracing expert to do any work for you,

20   did you?

21   A    No.  I have not hired any tracing experts.

22             MR. EVANS:  Your Honor, I'm going to mark for

23   identification Creditor Committee 12.  Creditor Committee 12

24   is a document that was attached to the declaration, but it

25   just includes the exhibit.

1  BY MR. EVANS:

2  Q    Mr. Parrish, this is your email address, right,

3  marc@UpgradeYa.com?

4  A    That is correct.

5  Q    And it's from Xavier Rachofsky from myCred, right?

6  A    That is correct.

7  Q    Okay.  And this is the document where Cred is telling

8  you that they received all your deposits and it's in the

9  wallets, right?

10 A    I'm just reading it, I'm sorry.  The asset purchase

11 says we will continue to transfer the collateral in the

12 following days.  I suggest we talk through the deposit and

13 confirm.  I believe that to be accurate.  It looks like it

14 was just some documentation of the receival of my collateral.

15           MR. EVANS:  Your Honor, I'd like to move Exhibit

16 CC-12.  A more complete copy of the document is already in

17 evidence.

18           THE COURT:  Any objection?

19      (No verbal response)

20           THE COURT:  Its admitted without objection.

21      (Creditors Committee Exhibit 12, received into

22 evidence)

23 BY MR. EVANS:

24 Q    When you deposited your bitcoin with Cred you deposited

25 your bitcoin in thirty separate wallets, is that correct?

1  A    Thirty separate addresses.  That is the way I

2  understood it.  Wallet is a little bit of a different thing

3  to me.

4  Q    Okay.  Fair enough.

5       So thirty separate addresses and there were --

6            THE COURT:  Mr. Evans, can you take down the

7  exhibit, please, if you're done with it?

8            MR. EVANS:  I'm not yet done with it, Your Honor.

9  I will be in a minute.

10            THE COURT:  All right.  Go ahead.

11  BY MR. EVANS:

12  Q    And there were sixty separate transactions, correct?

13  A    That is correct.  There were sixty transactions.  I had

14  sent thirty to each address to confirm receipt of a smaller

15  amount before sending larger amounts.

16  Q    Okay.  I'm going to pull-up what has been marked as CC-

17  12(a) which is the attachment to this email.

18       Do you recall, Mr. Parrish, receiving an Excel file

19  that contained records of your transactions in which you

20  submitted bitcoin to Cred?

21  A    Yes.  I did receive documentation of the received

22  collateral.

23  Q    And when you said that you did a quick look of two

24  wallet addresses you used this Excel file to do that, right?

25  A    This Excel file would have more detail than the one I

1  used.  So, no, it would not, this file.  I think its

2  reasonable to say that the addresses on here are the same

3  addresses that I referenced.

4          MR. EVANS:  Your Honor, I'd like to move this

5  attachment into evidence.  Its an attachment to the email

6  that was just admitted.

7          THE COURT:  Any objection?

8      (No verbal response)

9          THE COURT:  Its admitted without objection.

10      (Creditor Committee Exhibit 12(a), received into

11  evidence)

12  BY MR. EVANS:

13  Q    So you are aware, are you not, Mr. Parrish, that the

14  bitcoin you provided to Cred is no longer in the wallets that

15  it was initially sent to, right?

16  A    We discussed this earlier.  I have become aware of that

17  as this process has continued.

18  Q    Okay.  And you know that once a bitcoin is comingled

19  with other bitcoin in the transaction you will never be able

20  to identify a first bitcoin from any of the other bitcoins,

21  right?

22  A    Correct.  Bitcoin is fungible.  We spent some time on

23  that earlier.  So, I don't think there is a reason to say

24  what my understanding of that fungibility is again.  That's

25  correct.

1  Q     Okay.  Let's take this first transaction, for example.

2  This first transaction shows that on April 23rd, 2020 there

3  was 16.25 bitcoin transferred from UpgradYa to Cred, right?

4  A     Yes.

5  Q     And the definition of address right here this is the

6  address where the bitcoin is going to, right?

7  A     I'm sorry, my window is covering that up.  Yes.  You

8  mentioned address.  I don't have the address memorized, but

9  that looks to be, you know, where I sent it.

10  Q     Okay.  So that is the definition address 1M1G9.  Do you

11  see that?  Those are the first five numbers and letters.

12  A     Yes.  I do see that.

13  Q     Okay.  There is also a transaction ID for each

14  transaction, right?

15  A     Yes.  Any transaction, to my understanding, would have

16  a transaction ID.

17  Q     Okay.  And the transaction ID for the first transaction

18  is F2A54?

19  A     I do see that.

20        MR. EVANS:  Your Honor, I want to pull-up for

21  identification Committee Exhibit 13.

22  BY MR. EVANS:

23  Q     Mr. Parrish, you testified previously about using a

24  Blockchain Explorer, right?

25  A     That's correct.

1  Q     Okay.  Blockchain.com is one of those Blockchain

2  Explorer sites?

3  A     That is correct.

4  Q     Okay.  And in a Blockchain Explorer you can type in a

5  wallet address or a transaction ID, and it will provide you

6  information about that wallet or transaction ID, correct?

7  A     My usage of these types of explorers has been addresses

8  primarily.

9  Q     Okay.  And it would be fair to say that those and the

10 cryptocurrency industry use Blockchain Explorer on a regular

11 basis, right?

12 A     Well I think (indiscernible) on the business.  Normally

13 you have your own internal records that show where your

14 bitcoin goes. I don't know that you really need to reference

15 on explorer.  So I am not sure.

16 Q     Okay.

17 A     (Indiscernible).

18 Q     Fair enough.  You, yourself, have used Blockchain

19 Explorer before to look up different wallets or different

20 addresses, right?

21 A     Yes.  I have used Blockchain Explorer before. I don't

22 recall specifically using it for business, but I have

23 certainly used them in this scenario to check like I said.

24 (Indiscernible) I did do that.

25        MR. EVANS:  Your Honor, I will move to admit CC

1  Exhibit 13.  It's a screenshot from Blockchain Explorer.

2          MS. BROWN:  Objection, Your Honor.  First of all,

3  again, the Blockchain testimony goes outside of the direct.

4          Secondly, this website snapshot is dated from

5  December 15th.  Not only is it not the debtor's website it is

6  a third-party website.  The committee has provided no witness

7  or any means to authenticate that this is what it says it is.

8          MR. EVANS:  Your Honor, this document is dated

9  December 15th, 2020, but we're looking at historical

10 transactions from April 28th, 2020.  Mr. Parrish testified

11 extensively during his deposition about this specific

12 document.

13         Furthermore, under Federal Rule of Evidence

14 803(17) market quotations, tabulations, lists, directories,

15 or other published compilations generally used and relied

16 upon by the public or by persons in particular occupations

17 are exempt from hearsay and are admissible.  This Blockchain

18 Explorer website is one that is used among the cryptocurrency

19 industry to look up transactions and wallets every single

20 day.

21         MS. BROWN:  However, Your Honor, this is a third-

22 party website that has not been authenticated.  While it may

23 be true that a record such as that could be admissible, but

24 you still are required to provide the proper authentication

25 that this document is what you say it is.  Just because they

1  have made print-outs they have provided no one from

2  Blockchain that can verify that this is accurate from their

3  website.

4          MR. EVANS:  Your Honor, this document --

5          THE COURT:  Hold on, Mr. Evans.  This is different

6  from what was done with the other website which was for

7  impeachment purposes.  You are trying to introduce this

8  evidence as affirmative evidence in the case.  You do have to

9  authenticate it even though it might be exempt from hearsay.

10  And you do not have that.  Maybe you can establish that with

11  your witnesses, but at this point I am going to exclude the

12  exhibit.

13          MR. LUFT:  Your Honor, if I may, this is Avi Luft.

14  I do think that there is authentication under 901(a)(4) for

15  distinctive characteristics and the like.  I think that

16  (indiscernible) appearance, contents, substance, internal

17  patterns, and characteristics of the item taken together with

18  the circumstances it's reasonable to assume this is an

19  authenticated website.  I'm sure Mr. Evans can bring up the

20  current Blockchain website which would look exactly the same.

21  So, I would just --

22          MS. BROWN:  Your Honor?

23          MR. LUFT:  -- ask that --

24          MS. BROWN:  Your Honor?

25          THE COURT:  Hold on.  I've already ruled.  This is

1  out.  You can try to get it in through your witnesses if you

2  choose, but at this point it's not in evidence.

3          Go ahead.

4  BY MR. EVANS:

5  Q    Mr. Parrish, you recall during your deposition you

6  looked at a number of wallets and transactions, right?

7  A    That is correct.

8  Q    All right.  And what we found is that each wallet in

9  this UpgradeYa deposited bitcoin into had been emptied.  Is

10 that right?

11 A    Yes.  My understanding was there was zero balance.

12 Q    Okay.  And, in fact, there was zero balance as of April

13 30th, 2020, right?

14 A    I don't recall from the deposition what the date was.

15 If you're saying there is zero balance that's April 30th.  I

16 have no reason to disagree with that.

17 Q    Okay.  And you never found any wallets holding your

18 bitcoin, right?

19 A    Found wallets holding my bitcoin?  I didn't search for

20 wallets holding my bitcoin. I think (indiscernible)

21 collateral.  No, I didn't do a tracing effort or search for

22 that.  Cred was to secure that bitcoin.  So, I would ask

23 where that bitcoin is.

24 Q    Okay.  And just so I understand your testimony today

25 you're not looking for the specific bitcoin you provided to

1 | Cred, you're just looking for the value of your investment

2 | back, right?

3 | A    Right.  I think this is also something I mentioned

4 | earlier, but I will say it again.  This motion resolved and

5 | it started with looking for my bitcoin that Cred was to

6 | secure.  You know, as I learned that I was told that they

7 | don't have it then I looked at other methods to obtain value.

8 | MR. EVANS:  I have no additional questions.

9 | THE COURT:  Redirect?

10 | Well, let me ask, does anybody else want to cross

11 | first?

12 | (No verbal response)

13 | THE COURT:  All right.  Redirect, Ms. Brown?

14 | MS. BROWN:  Thank you, Your Honor.

15 | REDIRECT EXAMINATION

16 | BY MS. BROWN:

17 | Q    Mr. Parrish, prior to entering into any transactions

18 | with Cred had UpgradeYa done many transactions to borrow

19 | dollars and secure loans with bitcoin?

20 | A    No.  I had not.

21 | Q    And prior to UpgradeYa entering into any transactions

22 | with Cred how many times had you personally pledged bitcoin

23 | as collateral to secure a loan?

24 | A    Prior to Cred it had never provided a bitcoin or any

25 | digital asset for collateral, as collateral for a loan

1  personally or with a business.

2          MS. BROWN:  Mr. Prouty, can you please bring up

3  what was previously marked as Debtor's Exhibit 31?

4  BY MS. BROWN:

5  Q    Mr. Parrish, do you see the date at the top left-hand

6  corner of this page?

7  A    Yes.

8  Q    Can you tell me what that date is?

9  A    12/15/20.

10          MS. BROWN:  Mr. Prouty, can you please scroll

11  through the site so that Mr. Parrish may see the date at the

12  top of each of the pages?

13  BY MS. BROWN:

14  Q    Mr. Parrish, please let us know if you see a date that

15  is different then December 15th, 2020.

16  A    (Indiscernible) to see every page.  They all said

17  12/15/20.

18  Q    Do you know if this was the same website you may have

19  reviewed when considering whether to enter into a transaction

20  with Cred in March and April of 2020?

21  A    I had no way to know if this was the site in March.

22  Q    And what stock did you put into Cred's marketing

23  materials when making a determination as to whether to enter

24  into a transaction with Cred?

25  A    Cred's marketing was not good in general.  So, my value

1  in understanding my relationship with Cred and what I wanted

2  to enter into the agreement really focused around my

3  relationships with Xavier, Michael, and the agreement.

4  Really, just beyond that the reputation of Cred in the

5  community.

6  Q     Did you rely on the websites at any point in time when

7  you were making your decision as to whether or not to enter

8  into a transaction with Cred?

9         MR. EVANS:  Your Honor, objection.  There was an

10  objection that the website shouldn't be admissible and that

11  didn't know the date.  Now she's asking questions about that

12  same website.

13         THE COURT:  I think she's asking whether he

14  reviewed the website at some point for purposes of making a

15  determination.  So the objection is overruled.

16         You can answer.

17         THE WITNESS:  Yes.  As I stated before I know I go

18  the website.  I can't say if I read every word on it or not.

19  That is not something that I would typically value in a

20  business relationship.  You're valuing more important things

21  on the website.

22  BY MS. BROWN:

23  Q     What agreements did UpgradeYa enter into with Cred?

24  A     UpgradeYa Investments entered into two agreements with

25  the CredBorrow program and the Cred earn program.  They were

1  two agreements.  I forget the exact title of those

2  agreements.

3  Q     You can just refer to them as the CredBorrow agreement

4  and the Cred earn agreement.

5       Under the CredBorrow agreement that UpgradeYa entered

6  into with the debtor what did UpgradeYa receive from Cred?

7  A     UpgradeYa Investments received a $2 million line of

8  credit from Cred.

9  Q     What did UpgradeYa provide to Cred?

10 A     UpgradeYa provided collateral specifically 531 bitcoin,

11 approximately the amount of two times the line of credit.

12 Q     Did UpgradeYa earn a return on the bitcoin collateral

13 it provided to Cred?

14 A     No.

15 Q     Do you recall whether there is any provision in the

16 CredBorrow agreement stating that Cred would use collateral

17 to generate a yield?

18 A     No.  I don't recall anything about a yield in the

19 agreement.

20 Q     Did UpgradeYa receive any compensation for Cred's use

21 of your collateral?

22            MR. EVANS:  Objection to form.

23            MS. BROWN:  I can rephrase, Your Honor.

24            THE COURT:  Go ahead, rephrase.

25 BY MS. BROWN:

1  Q      You may answer, Mr. Parrish.

2              MR. EVANS:  I'm sorry.  I object to

3  (indiscernible).  You said you would rephrase.

4              THE COURT:  Well I had overruled the objection,

5  but why don't you ask it again, Ms. Brown, because we

6  probably lost it now.

7              MS. BROWN:  No problem.

8  BY MS. EVANS:

9  Q      Mr. Parrish, did you receive any compensation for

10 Cred's use of UpgradeYa's collateral?

11 A      No.  I understood Cred to have secure the collateral.

12 So there was nothing that I earned from the collateral.

13 Q      And you mentioned that the agreement required a loan to

14 value ratio.  Can you explain that for the court?

15 A      Yes.  So when I received my line of credit in return

16 for first sending the bitcoin collateral I was aware and

17 concerned about the ratio of that asset or bitcoin

18 particularly to the amount that was loaned.  And that is what

19 they refer to as the LTV, loan to value ratio.

20         So a fundamental question here is why am I providing

21 more value in bitcoin $4 million and receiving $2 million.

22 The answer to that, which is common in the industry, is that

23 the bitcoin has volatility.  And Cred needed enough to be

24 able to secure the $2 million within the volatility of

25 bitcoin of that asset.

1  Q      And I apologize, I think you said that.  What was the

2  ratio that UpgradeYa was required to maintain under the

3  CredBorrow agreement?

4  A      Well, I'd really have to check the numbers to know

5  exactly, but the original requirement is fifty percent LTV or

6  two times the amount.  There is a margin call if the value

7  drops below a certain amount.  So, meaning the collateral is

8  worth less then what I originally thought provided from.  At

9  some point I would be called to provide more collateral.  In

10  addition to that, if it continued to drop and I did not

11  provide more collateral it would be liquidated in what they

12  called a liquidation threshold meaning they would sell the

13  collateral because I didn't provide enough to secure the loan

14  in order to make whole on the $2 million that was

15  (indiscernible).

16  Q      Did the debtors ever make a margin call?

17  A      No.  The debtors never made a margin call.  The value

18  of bitcoin increased in general from the origination of the

19  loan in March.

20  Q      When the value increased what did UpgradeYa do?

21  A      In this agreement my understanding of my relationship

22  with Cred the -- in the (indiscernible) where bitcoin

23  increased in value then I would have the ability to withdrawn

24  the amount of collateral to keep the LTV, the loan to value

25  ratio, at a specified level.  I understood it to be a level

1  that I was comfortable with, but typically that would go

2  around with the original loan to value which was two times

3  the amount of the loan or fifty percent.

4  Q     Did UpgradeYa's collateral ever exceed the loan to

5  value ratio required under the CredBorrow agreement?

6  A     Yes.  It did.  I don't know the exact date that it did.

7  My request for withdraw happened in August.  So, it would

8  have been around that time that it sustained value that was

9  significantly more than the required LTV after origination.

10 Q     And did you request to have the loan to value ratio

11 adjusted based on the amount of collateral and the increase

12 in its value?

13 A     I requested to have some collateral withdrawn to

14 decrease the ratio to be more in line with the origination of

15 the agreement.

16 Q     And when you say withdrawn what do you mean by that?

17 A     Some of my collateral would be returned to me.

18 Q     And when you made this request what was Cred's

19 response?

20 A     Cred returned the collateral.

21 Q     Why did UpgradeYa enter into the CredBorrow agreement?

22         MR. EVANS:  Objection, Your Honor.  This is beyond

23 the scope of the cross.  She had an opportunity to do a

24 direct.

25         MS. BROWN:  Your Honor, this is not beyond the

1  scope of the cross.  The cross examinations by the debtors

2  and the committee went into a number of questions related to

3  Mr. Parrish authorizing UpgradeYa to enter into the

4  agreement.  His -- they had a question as to whether or not

5  he had a lawyer do it and review it.  They have made a number

6  of assertions as to what his understanding is in it.

7  Therefore, I think it is appropriate for Mr. Parrish to be

8  able to testify as to why UpgradeYa entered into the

9  agreement.

10         THE COURT:  The objection is overruled.

11         You can answer.

12         THE WITNESS:  UpgradeYa Investments entered into

13  the agreement for, really, two reasons.  I was looking to

14  make an investment and I needed some capital.  And the Cred

15  service provided that capital, but there was one other thing

16  I was really looking for.  I wanted to utilize my bitcoins to

17  secure that capital, but not lose my bitcoin.  So that was

18  really the two primary purposes; receive liquidity and secure

19  my bitcoin.

20         So my risk assessment here is not on losing my

21  collateral.  The collateral can be secured.  My risk

22  assessment for this, as a customer, is getting the $2 million

23  in as place where I can get it back, right.  As a customer

24  I'm looking at this -- I have to have to have a message here

25  that I have $2 million lent to me and I need to get it back

1   so I get my collateral back.

2           So the whole scheme of all this that is really my

3   focus.  Of course I wanted to make sure that Cred was

4   securing the collateral.  You know, that is the reason why

5   Cred makes sense.

6   BY MS. BROWN:

7   Q    Until the debtors advise otherwise post-petition did

8   you ever think that Cred would not have the necessary bitcoin

9   to return UpgradeYa's collateral upon repayment of the loan?

10  A    I never received any communications from Cred to

11  believe they did not have my collateral prepetition.

12  Q    Now turning to the Cred earn agreement that UpgradeYa

13  entered into with Cred, under that agreement what did

14  UpgradeYa provide to Cred?

15          MR. EVANS:  Objection, Your Honor.  There was no

16  discussion of Cred earn in the cross examination.

17          MS. BROWN:  Your Honor, the Cred earn agreement

18  and the differences between the CredBorrow and the Cred earn

19  agreement are very important.  And they fall within the

20  scope.  The debtors and the committee have made argument that

21  the bitcoin was loaned by UpgradeYa to the debtors or was

22  authorized to use or, otherwise, appropriated as they see

23  fit.  And the distinction between the Cred earn and the

24  CredBorrow program are important because under the Cred earn

25  agreement that is when customers would actually loan

1  cryptocurrency to the debtors to enable them to make

2  investments and a profit off of that.

3         THE COURT:  Well if it was that important it

4  should have been in his direct examination.  Is it in his

5  declarations?

6         MS. BROWN:  Let me pull it up.  I believe he does

7  say that he entered into the Cred earn agreement.  If you

8  just give me one second, Your Honor, I would just like to --

9         THE COURT:  Well the fact that he entered into it

10 that's different from his giving an explanation here. It is

11 outside the scope of cross examination.  They did not ask him

12 about that.  So, I will sustain the objection and you can

13 raise whatever arguments you want at the end based on his

14 declaration on those issues.

15        MS. BROWN:  Okay.  Your Honor, I will move on.

16 BY MS. BROWN:

17 Q    Mr. Parrish, prior to the bankruptcy filing did Cred

18 contact you to inform you of any issues it was experiencing?

19 A    I think a week or so before the (indiscernible) emails

20 from Cred that they were stopping, I think the wording was,

21 inflows and outflows.

22        MS. BROWN:  Mr. Prouty, can you please bring up

23 UpgradeYa's Exhibit 1 which is marked in the initial

24 declaration.  And can you please scroll to Exhibit G which is

25 the first page of that exhibit which should be Page No. 51 of

1  the PDF.  And would you mind just increasing the size of

2  that.

3              Thank you, Mr. Prouty.

4  BY MS. BROWN:

5  Q    Mr. Parrish, are you familiar with this email?

6  A    Yes.

7  Q    Can you please advise the court who it's from?

8  A    This is from Michael Zhang.  Michael Zhang was my main

9  contact most of the year.

10 Q    And can you please read the message they provided to

11 you out loud for the court?

12             THE COURT:  I can read it.  We don't need to waste

13 time.

14 BY MS. BROWN:

15 Q    Mr. Parrish, after you received this email what did you

16 do?

17 A    Well once I learned that --

18 Q    Sorry, Mr. Parrish.

19 A    Once I learned that there were some issues at Cred --

20 you know, this is fairly vague. I am not sure, you know, what

21 my situation is as a customer.  I reached out to Cred and I

22 wanted to understand if they were holding my collateral,

23 securing it properly and ultimately I really just wanted to

24 provide the $2 million back and get my collateral back

25 because it seemed that there could be an issue and I just

1  wanted to resolve the agreement.

2  Q     And what was Cred's response?

3  A     Initially, if I recall correctly, the emails tell the

4  whole story because (indiscernible), but it was -- there was

5  not much response.  There was just the public information of

6  them figuring this out and the same language we just saw.

7  Eventually I did get information as to what they were holding

8  for me.

9  Q     And when did you receive that information?  Do you

10 recall?

11 A     That -- the email, I believe, from Heidi that was

12 referenced today, I don't remember the exact date, but I

13 believe it was just after the filing, a week after the

14 filing.

15         MS. BROWN:  Mr. Prouty, can you please share

16 UpgradeYa's Exhibit 1 again?  And this time can you please

17 scroll down to Exhibit K which is Page 68 of the PDF.

18         Mr. Prouty, can you scroll down further?  You can

19 stop -- I apologize, you can stop just a little bit further.

20 BY MS. BROWN:

21 Q     I know the committee had already asked a question on

22 this, but, Mr. Parrish, you had emailed -- sorry, Mr. Prouty,

23 can you scroll a little further to the email.  Thank you.

24     Mr. Parrish, when you sent this email were you asking

25 about the status of your collateral or were you asking about

1  claims you may have against the debtor's estate?

2  A    My concern here is we, as a customer, what is my

3  situation.

4  Q    When you say "situation" what do you mean?

5  A    I am asking what -- do you have my collateral.  Can we

6  resolve this by -- ultimately that is what I am after here.

7  I just want to resolve this agreement, provide the $2 million

8  and get my collateral back.  So, I am asking what they have.

9         MS. BROWN:  Mr. Prouty, can you please scroll up

10 to Heidi's email back to Mr. Parrish?

11 BY MS. BROWN:

12 Q    Mr. Parrish -- oh, scroll a little higher.

13       Mr. Parrish, can you please read the first line out

14 loud?

15 A    "Our records show they were holding 478.17 BTC

16 collateral for your loan of $2 million, and I can also

17 confirm that you are an active creditor in the program with

18 $73,171.47."

19 Q    What did you understand it meant when the debtors told

20 you they were holding your collateral?

21 A    After reading this I had reason to believe that they,

22 at least, had the 478 BTC and the correct numbers for my

23 situation as a customer.

24 Q    Can you advise the court who is cc'd on this email?

25 A    Yes.  This is to me from Heidi and cc'd to Dan Schatt.

1  I am familiar with Dan Schatt.  I emailed him at this point,

2  the CEO of Cred at the time.

3  Q     After receiving this email did you come to learn that

4  the debtors have less bitcoin then the full amount of your

5  collateral?

6  A     So sometime later after there was no resolution between

7  me and Cred through emails.  I chose to hire lawyers to try

8  to understand what I can do.  At that point there was

9  information where I learned that they had less bitcoin in

10 that process.

11         MS. BROWN:  Mr. Prouty, can you --

12         THE WITNESS:  They --

13 BY MS. BROWN:

14 Q     I apologize.  I didn't mean to cut you off, Mr.

15 Parrish.  Please finish what you were going to say.

16 A     I just wanted to be clear.  You know, I was told that

17 they said, that the debtors said they had less bitcoin then

18 that number.  So that was a surprise to me for sure.

19         MS. BROWN:  Mr. Prouty, can you please share

20 UpgradeYa Exhibit 8.

21 BY MS. BROWN:

22 Q     Mr. Parrish, are you familiar with this email?

23 A     Yes.  That exhibit (indiscernible).

24 Q     Can you please who the top email is from?

25 A     James T. Grogan.

1  Q     And do you know what firm Mr. Grogan is associated

2  with?

3            MR. EVANS:  Your Honor, I'm going to object.  I

4  don't think Mr. Parrish has any first-person knowledge of

5  this document, he's not copied on it, he's not included on

6  it.

7            MS. BROWN:  Your Honor, under Federal Rule of

8  Evidence 801(b)(2), it is acceptable and not hearsay to admit

9  an opposing party's statement.  This statement was made in

10 Mr. Grogan's capacity as a representative of the debtors'

11 estates, and it was believed to be true; and, as such, it

12 should be admissible.

13           THE COURT:  The objection is overruled.

14           MS. BROWN:  And Your Honor, while we're on the

15 topic, can we move this into evidence, please?

16           THE COURT:  It's admitted.

17      (UpgradeYa Exhibit 8, received in evidence)

18           MS. BROWN:  Thank you, Your Honor.

19 BY MS. BROWN:

20 Q    Mr. Parrish, do you -- I apologize.  I just want to make

21 sure I got to my last question, which I believe was:  Do you

22 know what firm Mr. Grogan is associated with?

23 A     Yeah.  So, once the filings came in, I -- I'm familiar

24 with Paul Hastings, Paul Hastings has represented the debtors

25 throughout this process.

1  Q    And can you advise the Court when this email is dated?

2  A    Yes, this was --

3         THE COURT:  I can read it.

4  A    -- December --

5         THE COURT:  I can read it.  Let's kind of move on

6  here.  We're taking the whole day on one witness here.  Let's

7  try and finish this.

8  BY MS. BROWN:

9  Q    When you saw -- when you read this email, were you

10 surprised to learn that the Bitcoin had decreased from the

11 full amount of your collateral to 160?

12 A    Yeah.  I mean, this is really the first -- you know, the

13 second -- really, the second time, you know, the first time

14 directly from the -- from the debtors, and the other one from

15 Heidi -- that -- the amount of Bitcoin they're holding.  And

16 to be honest, I felt like, surely, they're holding a lot more

17 than 478.  So now this number is not only not that number,

18 but it's -- it's much (indiscernible) of that, which is

19 concerning and -- you know.

20 Q    And after learning the debtors were only holding 160

21 Bitcoin through this email, did you learn that the debtors

22 were holding even less than that?

23 A    Yes.  I believe that was the next day, I think, that

24 there was a filing that had a number between 80 and 90 BTC.

25 Q    Were you concerned about the continued post-petition

1 | drop in the amount of Bitcoin the debtors were saying they
2 | were holding?
3 | A    Absolutely.  I -- I -- I was just curious what was
4 | happening and I was trying to -- to understand what's going
5 | on here of -- obviously, as a -- posting collateral as a
6 | customer, I'm concerned about the -- about the Bitcoin that
7 | they have secured.
8 |          MS. BROWN:  Mr. Prouty, you can close the email.
9 | Thank you.
10 | BY MS. BROWN:
11 | Q    Mr. Parrish, if the drop in the amount of the Bitcoin
12 | was because the debtors lost it, stole it, misappropriated,
13 | or didn't know how much they had on hand with respect to your
14 | collateral post-petition, would you consider that to be
15 | malfeasance or theft of your property?
16 |          MR. EVANS:  Objection.  Leading.  Joe Evans for the
17 | committee.
18 |          THE COURT:  Sustained.  It's also a legal
19 | conclusion.
20 |          MS. BROWN:  Your Honor, I'll move on.
21 | BY MS. BROWN:
22 | Q    Mr. Parrish, did you review the replies that UpgradeYa
23 | submitted in connection with its motion for stay relief?
24 | A    Yes, I -- I reviewed them.
25 | Q    When you reviewed them, did you review with the

1  characterizations contained therein?

2  A    Yes.  Yes.  And just for clarity, I thought that they

3  were talking about in the replies (indiscernible)

4  investments.

5  Q    Okay.

6  A    The replies of the (indiscernible) investments I read

7  through and approved, yes.

8  Q    And you approved -- did you approve those prior to the

9  filing?

10  A    They -- those replies did not exist prior to the filing

11  -- to -- prior to the filing of the -- oh, sorry.  Sorry.  I

12  was thinking of the filing of the bankruptcy.  The filing of

13  the replies, of course, yes, I reviewed them before they were

14  filed.

15  Q    Today, are you asking the Court to allow UpgradeYa to

16  seek to recover Bitcoin or its value from the debtors?

17  A    No.

18  Q    What is UpgradeYa seeking to lift the stay to do?

19  A    I'm seeking relief to obtain the value thereof from

20  third-party, you know, nondebtor direct claims.  That's my --

21  that's my understanding of -- of what I'm trying to do here.

22  Q    Earlier, you were asked questions regarding the

23  collateral being placed in segregated e-wallet.  Do you

24  recall that testimony?

25  A    Yes.

1    MS. BROWN:  Mr. Prouty, can you please pull up

2  Upgradya Exhibit 6?

3     (Pause in proceedings)

4    MS. BROWN:  And can you please scroll to Page 6 of

5  this PDF?

6     (Pause in proceedings)

7    MS. BROWN:  And can you please increase the size?

8  I've got bad eyes.  Thank you, Mr. Prouty.

9  BY MS. BROWN:

10  Q   Mr. Parrish, can you read Mr. Rishotsky's (phonetic) --

11  and this would be Xavier.  And I know that you've -- already

12  confirmed that this was a telegram chat when you were

13  discussing this with the committee and the debtors

14  previously.  But can you please read Mr. Rishotsky's

15  statement to you at Message 1750?

16  A   It says:

17    "How many deposit addresses do you need?  Is one

18  okay, so long as it is newly generated, segregated, and used

19  specifically for your collateral deposit?"

20  Q   What did you believe this meant?

21  A   I -- I understood this to mean that Xavier or Cred, more

22  specifically, would be generated segregated addresses and

23  wallets for my collateral.

24  Q   When you pledged your collateral, was it transferred

25  into segregated e-wallets?

1   A    It -- yes, it -- well, it was transferred into 30 -- 30

2   addresses created by Cred.

3   Q    Earlier, you testified that you understood Cred could

4   generate a yield of UpgradeYa's collateral.  Do you remember

5   that testimony?

6   A    Yes.

7   Q    Can you explain for the Court what you meant by that?

8   A    I'm -- I'm sorry.  Could you just repeat that, please?

9   A    Sure.

10  Q    Can you please explain for the Court what you meant by

11  you understood that the debtors could generate a yield on

12  UpgradeYa's collateral?

13  A    Well, right.  So, as long as -- now, as I've stated many

14  times today, as long as the Bitcoin was secure, I -- I didn't

15  worry too much about what their business model was.  And

16  there could be -- in my mind, there could be ways, and I

17  assumed there were ways that they could choose to use that

18  collateral and secure it and create some yield.  In that

19  situation, the collateral is secure and I'm okay, and they're

20  also creating some yield, so I would see that as a -- a win-

21  win.  And that -- that's what I believed they would do with

22  the collateral, based on the margin call and the liquidation

23  threshold and the 2X amount for volatility.  Their -- they

24  had to have the collateral and to -- be able to provide it

25  back in case I repaid the loan.  So everything represented to

1  me that -- that that's how the agree -- the arrangement would

2  work.

3         MS. BROWN:  Mr. Prouty, can you please pull back up

4  what was marked UpgradeYa Exhibit 6?  And can you please

5  scroll to the top of the second page of the PDF?

6      (Pause in proceedings)

7  BY MS. BROWN:

8  Q    Mr. Parrish, can you please read Xavier Rishodsky's full

9  message to you at 1308?

10  A         "Specifically, Bitcoin funds are in storage to

11  generate yield, and this is part of the way our rates are so

12  competitive.  We can walk through our process to ensure funds

13  and positions are secured throughout the duration of loans."

14  Q    Mr. Parrish, what did you understand this statement to

15  mean, particularly the last statement?

16  A    Right.  So what I viewed (indiscernible) secure, which

17  was -- which was the prime -- my primary goals in doing

18  business with Cred was to secure the collateral, and this is

19  a statement that -- that says exactly that.

20  Q    Now let's look a little further towards the middle of

21  the page at 1317.  Can you please read the line right above

22  the March 25th date?

23  A         "Also, proof is in the pudding, so we can provide a

24  loan agreement that matches the above, as well, after you

25  decide."

1  Q    And what did you understand that statement to mean?

2  A    We had to -- this chat, you know, based on the time, it

3  was a few minutes after.  So I would understand that the loan

4  agreement would -- would match the security of the

5  collateral, as -- as was said earlier.  You know, I mean, I

6  think that's my understanding at -- at this point.

7  Q    Now, Mr. Parrish, you previously testified that you

8  understood Cred could move or commingle UpgradeYa's Bitcoin

9  with other Bitcoin.  Do you recall that testimony?

10 A    Yes.

11 Q    Can you explain to the Court why UpgradeYa was okay with

12 this?

13 A    Yeah.  So another thing that was said a lot today is I

14 was concerned about the security of the collateral.  And Cred

15 could move the collateral or commingle the collateral, as

16 long as they secured the Bitcoin amount.  And so whether or

17 not it was all in the same account or not, I didn't see any

18 issue with that, as long as the amount was secured.  So, as -

19 - as we talked about today, that really wasn't my focus, on

20 if it was in those 30 addresses.  As I understood it, it

21 could move.

22 Q    Mr. Parrish, if you knew that Cred intended to use,

23 sell, or otherwise dispose of UpgradeYa's collateral under

24 the CredBorrow agreement, what would you have done?

25 A    Yeah.  If they -- if they could sell it (indiscernible)

1    use it any way they wanted, I -- I wouldn't -- I would never

2    enter into an agreement like that becasue, at that point,

3    it's not secure, and that would contradict the liquidation

4    threshold, the margin call, the 2X amount required in the

5    agreement.  It -- it wouldn't make sense to me.

6          MS. BROWN:  Your Honor, I have no further questions

7    for this witness at this time.

8          THE COURT:  All right.  Thank you.

9          Mr. Parrish, you are excused.

10       (Witness excused)

11         Do you have another witness, Ms. Brown?

12         MS. BROWN:  Your Honor, depending upon whether or

13   not the debtors admit Mr. Bonjour's initial declaration into

14   evidence, I may need to call him as a rebuttal witness.  But

15   I'll -- if you don't mind, I'd like to just wait to see what

16   the debtors do with their witness first.

17         THE COURT:  Well, that would be a rebuttal witness,

18   so we can deal with that when we get to it.  So are you done

19   with your case-in-chief?

20         MS. BROWN:  Yes, Your Honor.  The only other thing

21   is I would ask that the transcript, the Exhibit 6, that we

22   were just discussing, that that be admitted into evidence.

23         THE COURT:  Any objection?

24         MR. EVANS:  No, Your Honor.

25         THE COURT:  It's admitted without objection.

1        (UpgradeYa Exhibit 6, received in evidence)

2            MS. BROWN:  And Your Honor, I would also ask --

3            MR. LUFT:  Your Honor --

4            THE COURT:  Go ahead, Ms. Brown.

5            MS. BROWN:  Sorry.  I thought someone was going to

6  be speaking.

7            I would also ask that the Court take judicial

8  notice of the disclosure statement and the combined plan.

9            THE COURT:  They're part of the record, so, yes,

10  I'll take judicial notice for that.

11            MS. BROWN:  Thank you, Your Honor.  Then I have

12  nothing at this time.

13            THE COURT:  So we turn to the debtors for their

14  case.  How many witnesses do we have?  Mr. Luft?

15            MR. LUFT:  Your Honor, from the debtors, we propose

16  to just submit Mr. Bonjour's direct examination through the

17  introduction of his declaration.  I believe the creditors'

18  committee has a separate witness that they also wish to

19  introduce, so I think it will be a grand total of two, unless

20  I'm mistaken.

21            THE COURT:  Okay.  Is there any objection to the

22  admission of Mr. Bonjour's declaration?

23            MS. BROWN:  I apologize, I wasn't sure who was

24  speaking there.  But can you just clarify which of Mr.

25  Bonjour's declarations you're referring to?  Is it the one

1  that was submitted in support of the debtors' objection to

2  the lift-stay motion; the one at 116?

3        MR. LUFT:  To be clear -- and thank you for that

4  clarification, Your Honor -- Mr. Bonjour submitted a

5  declaration in support of the debtors' objection to the

6  motion.  He also submitted a declaration in support of the

7  committee's objection to the motion.  I would suggest that it

8  makes more sense to put them in both at the same time, so

9  that he'd only be crossed once.

10        THE COURT:  All right.

11        MS. BROWN:  Your Honor, I have --

12        THE COURT:  Is there any objection?

13        MS. BROWN:  I have no objection to the initial

14  declaration that was attached as a -- in support of the

15  debtors' objection to the lift-stay motion.

16        I do have an objection with respect to Mr.

17  Bonjour's second declaration that was submitted in connection

18  with the committee's objection to the lift -- to the lift-

19  stay motion.  And my reasoning for that is that we don't

20  believe that it's relevant.  As Mr. Parrish just testified,

21  the only relief we're seeking today is for -- to lift the

22  stay, so that UpgradeYa may produce -- may pursue its direct

23  claim against nondebtor third parties.  It is not seeking to

24  recover any Bitcoin from the debtors.  UpgradeYa is not

25  seeking to recover any value of that Bitcoin from the

1   debtors.

2           And the testimony within Mr. Bonjour's second

3   declaration that was attached to the committee's relates

4   entirely with respect to the debtors' or parties' ability to

5   trace Bitcoin that the debtor may or may not have had in its

6   possession.  Those issues may be relevant for other matters,

7   but those aren't before the Court today.  So, to streamline

8   (indiscernible)

9           MR. AZMAN:  Your Honor, it's Darren Azman for the

10  committee.

11          We respectfully disagree.  The notion that

12  UpgradeYa can pursue third parties is tied directly to the

13  issue of whether the Bitcoin is property of the estate.  Any

14  damages or harm that UpgradeYa suffered as a result of its

15  transfer of Bitcoin to Cred, as we've argued and will argue

16  in closing, is necessarily an action of the estate.  It's an

17  estate cause of action.  And that is derived -- you get to

18  that conclusion for the same exact reason that you get to the

19  conclusion that the Bitcoin that UpgradeYa transferred cannot

20  be recovered, and that is because it was commingled.  So any

21  claim that flows from that is an estate cause of action.  So

22  they are identical issues, and so this testimony is directly

23  relevant.

24          MS. BROWN:  Your Honor, I would --

25          THE COURT:  I'm going to --

1          MS. BROWN:  -- disagree.

2          THE COURT:  I overrule -- I'm going to over -- I'm

3   going to overrule the objection.  I'll admit both

4   declarations as his direct testimony.

5      (Bonjour Declarations received in evidence)

6          THE COURT:  And you're free to cross-examine him on

7   both of those, Ms. Brown.  Do you intend to do a cross-

8   examination?

9          MS. BROWN:  Yes, I do, Your Honor.

10          THE COURT:  All right.  Then let's take another

11   short recess, and we'll reconvene at let's say 2:15.  So

12   we'll stand in recess until 2:15.

13          UNIDENTIFIED:  Thank you, Your Honor.

14      (Recess taken at 1:53 p.m.)

15      (Proceedings resume at 2:15 p.m.)

16          THE OPERATOR:  Recording has begun and we are live.

17   Thank you.

18          THE COURT:  Thank you.  We are here and ready to

19   begin.

20          Mr. Bonjour, I see you.  Let me highlight you.

21          MS. BROWN:  Your Honor, before -- just one quick

22   housekeeping matter before Mr. Bonjour gets into his

23   testimony.

24          I know that debtors have moved both of his

25   declarations into evidence.  And with respect to the

1  declaration that was submitted in connection with the

2  committee's objection, I just wanted to clarify as to whether

3  or not they were also seeking to move the exhibits attached

4  thereto.

5          MR. EVANS:  This is Joe Evans for the committee.

6          Yes, we are seeking to admit the exhibits, along

7  with the declaration that was filed at Docket Number 190-2.

8          THE COURT:  All right.

9          MS. BROWN:  Your Honor, the exhibits to Mr.

10  Bonjour's declaration are the similar block-chain website

11  screenshots that we had previously discussed.  I understand

12  Your Honor wanted to provide them with an opportunity to

13  authenticate them.  But I just wanted to make clear on the

14  record that my objection to their authentication still

15  stands.  And I'm happy to address that whenever Your Honor

16  would prefer.

17          THE COURT:  All right.  Well, let's see if they get

18  to them.  Let me -- what is the exhibit number for the

19  declaration?

20          MS. BROWN:  Sorry, Your Honor.  So that would be --

21  committee counsel, do you want to advise which exhibit number

22  that is of yours?

23          MR. EVANS:  I'm not sure which exhibit you're

24  objecting to.

25          THE COURT:  No, I want to know which exhibit number

1   is the declaration in support of the committee's motion.

2          MR. EVANS:  Ah, it is Creditor Committee 16, one

3   six.

4          MS. BROWN:  And Your Honor, my concern is with all

5   three of the exhibits that are attached thereto, which would

6   be Exhibits A, B, and C.  And then, to the extent that the

7   declaration itself includes any of those screenshots, we

8   would also ask that those be -- not to be admitted, unless

9   the committee is able to establish their appropriate

10  authentication.

11         THE COURT:  All right.  Well (indiscernible)

12         MR. EVANS:  Your Honor, the declaration is in

13  evidence.  And in Footnote 3, 4, and 5, Mr. Bonjour testifies

14  in his declaration that these are accurate snapshots of

15  wallet accounts, so they're properly authenticated.

16         THE COURT:  All right.

17         MS. BROWN:  But --

18         THE COURT:  So they're admitted.

19         MR. EVANS:  Located on Page 3.

20         MS. BROWN:  But as mister --

21         THE COURT:  The objection is overruled, they're

22  admitted.  Let's move on.

23         Mr. Bonjour, if you'll raise your right hand,

24  please.  State your full name for the record and spell your

25  last name.

1          THE WITNESS:  Pablo Bonjour, B-o-n-j-o-u-r.

2   PABLO BONJOUR, WITNESS FOR THE DEBTORS, AFFIRMED

3          THE COURT:  Thank you.

4          Ms. Brown, you may proceed.

5                    CROSS-EXAMINATION

6   BY MS. BROWN:

7   Q    Good morning, Mr. Bonjour.

8   A    Good afternoon.

9   Q    You're currently employed by MACCO Restructuring Group,

10  LLC, correct?

11  A    Yes, correct.

12  Q    And you're a managing director with MACCO, right?

13  A    Yes.

14  Q    And MACCO is a financial advisory firm that was engaged

15  by the debtors in November of 2020.  Is that right?

16  A    Yes, correct.

17  Q    And you submitted a declaration in support of the

18  debtors' objection to UpgradeYa's motion, correct?

19  A    Yes, that is correct.

20  Q    And you didn't draft the declaration, did you?

21  A    No.  No, I did not.

22  Q    It was prepared by debtors' counsel, correct?  At least

23  with respect to the one filed in connection with the debtors'

24  objection, correct?

25  A    Yes, that's correct.

1  Q    And before it was filed, you confirmed that the

2  information in your sworn declaration was true and correct to

3  the best of your knowledge, correct?

4  A    Yes, that is correct.

5  Q    And you authorized the debtors to file your declaration

6  in advance, right?

7  A    Yes, I did.

8       MS. BROWN:  Now, Mr. Prouty, can you please bring

9  up the declaration.  I didn't see it -- and I apologize if I

10 missed it -- in the debtors' list of exhibits, the full

11 declaration, but it is included as UpgradeYa Exhibit 2.

12      MR. PROUTY:  Okay.  Give me one second.

13 UpgradeYa...

14    (Pause in proceedings)

15      MS. BROWN:  Can you please scroll down to Page 8 of

16 the PDF?  It's the last page.

17 BY MS. BROWN:

18 Q    Mr. Bonjour, below the signature line and your name, it

19 states that you're the Managing Director of Sonneran Capital

20 Advisors, LLC (phonetic).  Do you see that?

21 A    Right.  Yes.

22 Q    And you're not a managing director at Sonneran Capital

23 Advisors, are you?

24 A    No.

25 Q    And you didn't actually sign this declartion prior to it

1  being filed, did you?

2  A    There was one that I signed after this, so I caught the

3  error right afterwards.  I let one of the attorneys know.

4  They sent me a correction sheet, which I then signed by hand

5  and sent that over.  All that was done within 24 hours of

6  this, for that.

7  Q    So that was -- an amended declaration was not filed on

8  the docket, was it?

9  A    I'm -- I'm not aware if one was not.

10  Q    Well, we looked and we didn't see one, but we can move

11  on from that.

12  A    Okay.

13  Q    But --

14  A    Okay.

15  Q    But you authorized the filing of our declaration, even

16  though it wasn't correct, at least in this aspect, with

17  respect to who you were managing director of.  Isn't that

18  right?

19  A    Yes.  I noticed afterwards, correct.

20  Q    And just to be clear, everything you say in the

21  declaration you swore to be true under the penalty of

22  perjury, right?

23  A    Correct.  Sure.

24  Q    And someone told you that before you authorized the

25  filing of your direct -- of your declaration, correct?

1  A    Sure, yeah.

2  Q    Okay.  Let's now turn to Paragraph 24.

3        MS. BROWN:  Mr. Prouty, would you mind scrolling

4  up, please?  Thank you.

5  BY MS. BROWN:

6  Q    In Paragraph 24, you testified that it's your

7  understanding that UpgradeYa's transaction with Cred -- and

8  I"ll quote it:

9        "-- was an arm's length commercial financing

10 transaction where the debtors loaned U.S. Dollars to

11 UpgradeYa and, in exchange, UpgradeYa loaned/provided Bitcoin

12 ot the debtors."

13      That was your sworn testimony, correct?

14 A    Yes, correct.

15 Q    Now, before we go further into this understanding of

16 yours, I need you to clarify some timing issues for me and

17 the Court.  Okay?

18 A    Okay.

19 Q    So you just testified that you were hired by the debtors

20 in November of this year -- well, actually, at this point, it

21 was last year, correct?

22 A    Right.  2020, correct.

23 Q    And before you were hired by the debtors, you didn't

24 have any knowledge whatsoever about the specific details of

25 the various deals and transactions that the debtors were a

1  party to, correct?

2  A    Correct.

3  Q    And you didn't negotiate any of the transactions, right?

4  A    Correct.

5  Q    They were all negotiated by others well before you were

6  hired in November of 2020, correct?

7  A    Yes.

8  Q    And you weren't involved in the drafting of any of the

9  transaction documents, right?

10  A    Right.

11  Q    That all happened long before you were hired by the

12  debtors, correct?

13  A    Correct.

14  Q    And that goes for the transaction between UpgradeYa and

15  Cred, right?

16  A    Yes.

17  Q    You didn't have any involvement whatsoever in the

18  conception of that transaction, correct?

19  A    That is correct.

20  Q    And you didn't have any involvement whatsoever in the

21  negotiation of that transaction, right?

22  A    Correct.

23  Q    And you didn't have any involvement whatsoever in the

24  drafting or execution of the deal documents for that

25  transaction, right?

1          MR. EVANS:  Objection.  Asked and answered.  From

2   the committee.

3          THE COURT:  Sustained.  Let's try to not keep

4   asking the same questions over and over again.

5          MS. BROWN:  Sure.

6   BY MS. BROWN:

7   Q   Mr. Bonjour, so anything that you have to say about the

8   UpgradeYa transaction and the other documents related thereto

9   is based on your discussion with others, correct?

10          MR. LUFT:  Objection.

11  A   That is correct.

12          MR. LUFT:  Mischaracterizes his testimony.

13          THE COURT:  What was the --

14          MS. BROWN:  I'm sorry.  I didn't hear the --

15          THE COURT:  What was the objection?  Who made the

16  objection?

17          MR. LUFT:  It's Avi Luft.  It's a foundation

18  objection.  It's not -- it mischaracterizes his testimony.

19          THE COURT:  Overruled.

20  BY MS. BROWN:

21  Q   Mr. Bonjour, would you like me to repeat the question?

22  A   Yes, please.

23  Q   So anything that you have to say about the UpgradeYa

24  transaction and the documents related thereto is based on

25  your discussion with others, right?

1  A    Yes.  And I did review the -- the agreement once.

2  Q    Okay.  So it's also based on your review of the

3  agreement.  But you're not a lawyer, right?

4  A    No, I'm not.

5  Q    And you and your firm were hired to be the financial

6  advisors to Cred, correct?

7  A    That is correct.

8  Q    So your interpretation of the documents and your

9  understanding of the transaction isn't based on having

10 negotiated or drafted or commented on the underlying

11 documents, right?

12 A    Correct.

13 Q    And you said that you reviewed the CredBorrow agreement

14 between Cred and UpgradeYa, correct?

15 A    Yes.

16 Q    How many hours or minutes did you spend reviewing the

17 agreement in your position as the financial advisor to the

18 debtors?

19 A    I just read through it one time, however long that took.

20 Q    And the agreement defines Cred as the lender under the

21 CredBorrow program, correct?

22 A    Yes, that is correct.

23 Q    And UpgradeYa is defined as the borrower, right?

24 A    Yes, correct.

25 Q    And the line of credit that Cred extended to UpgradeYa

1  is secured under the agreement, correct?

2  A    Yes.

3  Q    And UpgradeYa was required to provide collateral to

4  secure the loan in the form of Bitcoin, in an amount that was

5  at least two times the loan amount, correct?

6  A    Yes, that's correct.

7  Q    And under the CredBorrow agreement, Cred was granted a

8  security interest in the collateral, right?

9       MR. AZMAN:  Objection.  Asks for a legal

10  conclusion.  Darren Azman for the committee.

11       THE COURT:  Ms. Brown --

12       MS. BROWN:  Your Honor, I can --

13       THE COURT:  -- isn't that --

14       MS. BROWN:  -- approach this --

15       THE COURT:  -- a legal conclusion?

16       MS. BROWN:  I'm asking for the contents of what the

17  agreement provides, that he has testified that he read.

18       THE COURT:  Well, that's a legal conclusion.  You

19  can ask him what maybe he understood it to mean, but that's

20  still probably a legal conclusion, but go ahead.

21       MS. BROWN:  That's fine.  I'll approach this in a

22  different way.

23       Mr. Prouty, can you please bring up what wa

24  previously marked as UpgradeYa Exhibit 1, which is Mr.

25  Parrish's [sic] initial declaration?  And can you please

1   scroll down to the first exhibit?  This would be a copy of

2   the agreement.  And particularly, can you please scroll down

3   to Section 2.1.

4   BY MS. BROWN:

5   Q    So, Mr. Bonjour, looking at Section 2.1, correct that it

6   provides that the borrower -- and I'll quote:

7           "-- hereby assigns and grants and causes to be

8   assigned and granted to lender a security interest in the

9   following described collateral."

10       Is that correct?

11          MR. AZMAN:  Objection.  Same --

12  A    Yes.

13          MR. AZMAN:  Same issue, Your Honor.  Asks for a

14  legal conclusion and the document speaks for itself.

15          THE COURT:  We really don't need --

16          MS. BROWN:  Your --

17          THE COURT:  -- to have the witness go through and

18  read the agreement.  He's not a lawyer.  You're free to argue

19  whatever you want about what the agreement says, and that's

20  for the lawyers to do, not for the witness.

21          MS. BROWN:  Your Honor, I'll move on.

22  BY MS. BROWN:

23  Q    Mr. Bonjour, the debtors maintain e-wallets with a

24  third-party intermediary, correct?

25  A    (Indiscernible)

1  Q    The debtors maintain e-wallets with a third-party

2  intermediary, correct?

3  A    "Third-party intermediary"?  What do you mean?

4  Q    Okay.  So I'll rephrase.

5       So the debtors maintained certain e-wallets with

6  Fireblocks, in connection --

7  A    Correct.

8  Q    -- with its trans --

9  A    Yes.

10  Q    And Fireblocks maintains -- or maintained the wallets

11  into which collateral was deposited, correct?

12  A    They have addresses, correct.

13  Q    Now, going back to your declartion at Paragraph 24, you

14  state that the debtors loaned U.S. Dollars to UpgradeYa; in

15  exchange, UpgradeYa loaned/provided Bitcoin to the debtors,

16  right?

17  A    Correct.

18  Q    And this was -- or is your understanding, correct?

19  A    Yes.

20  Q    Now I know you're not a lawyer and you've testified that

21  you were not involved in the negotiation of the transaction

22  or the drafting of the documents.  But since you've testified

23  in your declaration that UpgradeYa loaned Bitcoin to the

24  debtors, I've got to ask that you tell me where in the

25  agreement it says that.  And if you'd like, we can bring the

1   agreement back up, if you need to review it again.

2   A    I mean, are you asking me to read the entire contract?

3   Because I'd have to read it, if that's what you're asking --

4   Q    You said --

5   A    -- and I'm not --

6   Q    You -- I apologize.  You said in your declaration that

7   UpgradeYa --

8   A    Uh-huh.

9   Q    -- loaned Bitcoin to the debtors.  And what I'm asking

10  is where in the agreement did your understanding come from.

11  A    So that --

12          UNIDENTIFIED:  Objection.  Foundation.

13  A    That's based --

14          THE COURT:  Overruled.

15  A    Yeah.  No, so that statement was based on understanding

16  the business model of Cred at the time.  So both the CredEarn

17  and the CredBorrow program would essentially loan assets, so

18  that's where I derive that from.

19  Q    But there's nothing in the agreement that says that

20  UpgradeYa loaned Bitcoin to Cred, right?

21  A    (Indiscernible)

22          UNIDENTIFIED:  Objection.  Calls for a conclusion.

23          THE COURT:  Sustained.

24  BY MS. BROWN:

25  Q    And based on your understanding of these programs, as

1  you just testified, between what the debtors would do with

2  loaning Bitcoin, it is -- is it your understanding that,

3  under the CredBorrow program, that collateral that was -- as

4  you put -- classified as "loaned," that the customer would

5  receive interest on that?

6  A     Under the CredBorrow program?

7  A     Yes.

8  Q     No.  Under the CredBorrow program, no.

9  Q     Under the CredBorrow program, the only interest to be

10  paid is the interest paid by the borrower to Cred as its

11  position as a lender on account of a loan that was provided,

12  correct?

13  A     Yes, that is correct.

14  Q     And that would have been true for the CredBorrow

15  agreement between UpgradeYa on Cred, as well, right?

16  A     Yes.

17  Q     And other than in the event of a default by UpgradeYa,

18  the agreement does not specifically authorize Cred to sell or

19  dispose of UpgradeYa of collateral, does it?

20          MR. AZMAN:  Objection.  Calls for a legal

21  conclusion.

22          THE COURT:  Sustained.

23          MS. BROWN:  I'll move on, Your Honor.

24  BY MS. BROWN:

25  Q     Now, in connection with the CredEarn program, Cred and

1  UpgradeYa entered into a separate line of credit agreement,

2  didn't they?

3  A    Yes.

4  Q    And I'm going to show you --

5         MS. BROWN:  Mr. Prouty, would you mind, please,

6  pulling up UpgradeYa Exhibit 1?  And can you please go to

7  Page 31 of the PDF?

8  BY MS. BROWN:

9  Q    Mr. Bonjour, are you familiar with this document?

10  A    Yes.

11  Q    And under this document, Cred, LLC is the borrower under

12  this line of credit agreement, correct?

13  A    I believe that's correct.

14  Q    And UpgradeYa is the lender, right?

15  A    Yes.  Yeah.

16  Q    And the loan provided by UpgradeYa to Cred is in the

17  maximum aggregate amount of 120,000 U.S. Dollars, correct?

18  A    Yes.

19         MR. LUFT:  Your Honor, I'm going to object.  This

20  is beyond the scope of his declaration.

21         MS. BROWN:  Your Honor, in his declaration, he

22  specifically states that UpgradeYa loaned Bitcoin to Cred.

23  Under the understanding of the agreements that have been

24  entered into, the only time that Bitcoin was leant was under

25  the CredEarn program.  And I just have one more question with

 1  respect to the -- and it relates to whether Bitcoin was leant

 2  by UpgradeYa.

 3          THE COURT:  Overruled.

 4          MR. AZMAN:  Your Honor, the committee also objects

 5  and objects --

 6          THE COURT:  Overruled.

 7          MR. AZMAN:  -- grounds of relevance.  We don't see

 8  where it's going.

 9          THE COURT:  Overruled.  I'll give her leeway here.

10  Go ahead.

11          MS. BROWN:  Thank you, Your Honor.

12  BY MS. BROWN:

13  Q   Mr. Bonjour, the line of credit agreement doesn't

14  provide that any proportion of the loan to Cred is in the

15  form of Bitcoin, correct?

16          MR. LUFT:  Objection.

17  A   (Indiscernible)

18          MR. LUFT:  Calls a legal conclusion.

19          THE COURT:  Sustained.  If you want to argue about

20  the -- what the documents say, Ms. Brown, you can do that.

21  You don't need the witness to do that.

22          MS. BROWN:  I understand, Your Honor.  And I have

23  no further questions for the witness at this time --

24          THE COURT:  All right.

25          MS. BROWN:  -- but request that we have the

1  opportunity for any followup testimony on any additional

2  testimony that may be elicited.

3          THE COURT:  Well, we'll see.

4          Any redirect?

5          MR. LUFT:  Very briefly, Your Honor.  This is Avi

6  Luft.

7          THE COURT:  Go ahead, Mr. Luft.

8                    REDIRECT EXAMINATION

9  BY MR. LUFT:

10 Q    Mr. Bonjour, you were just asked a question about

11 whether UpgradeYa received interest as part of the CredBorrow

12 program, correct?

13 A    Right.

14 Q    Could you explain for the Court how the interest rate

15 that a customer such as UpgradeYa had to pay, in exchange for

16 a two-million-dollar loan was, was impacted by the fact -- by

17 the fact that they were loaning their crypto to Cred in their

18 -- in Cred's business model?

19 A    Yeah, sure.  So -- so that -- that loan or that

20 transaction was at an extremely low interest rate.  And the

21 incentive of Cred to provide a low, six percent interest loan

22 on, you know, something that's really volatile was based on

23 the fact that their business model takes in that

24 cryptocurrency that was provided by UpgradeYa, immediately

25 turns around and either sells it, converts to fiat currency,

1  sends it to an asset manager, you know, lends it out to try

2  to make, you know, a higher interest rate on that capital.

3  That's their incentive for that program.

4  Q    Thank you, Mr. Bonjoir.

5           MR. LUFT:  I don't have any further questions.

6           THE COURT:  Thank you.

7           Any other --

8           MR. AZMAN:  No questions for the committee, Your

9  Honor.

10          THE COURT:  All right.  Mr. Bonjour, you are

11 excused.  Thank you.

12          THE WITNESS:  Okay.  Thanks.

13     (Witness excused)

14          THE COURT:  Any other witnesses for the debtors?

15          MR. LUFT:  No, Your Honor, but the creditors'

16 committee, I believe, may have one.

17          THE COURT:  All right.  Mr. Evans?

18          MR. EVANS:  Your Honor, the creditors' committee

19 has one witness, it's Pamela Clegg.  She's an expert in

20 cryptocurrency tracing.  And we just wanted her here today --

21 she did submit a declaration.  But we're going to put her on

22 for a short direct to explain how crypto tracing works and

23 how UpgradeYa hasn't done it and won't be able to do it,

24 based on the fact that they were commingling transactions.

25 We can be short.  I know we've been going for a long time

1  today.  But she's here, both for a short direct and a cross-

2  examination, if the Court would like to hear her.

3          THE COURT:  Ms. Clegg, are you on video?  I see you

4  on Zoom, but you're not -- your video is not on.  There you

5  are.  All right.  Ms. Clegg -- well, first, are we going to

6  move the admission of the declaration?

7          MR. EVANS:  Yes, Your Honor.  We'd like to move

8  Creditors' Committee 19, which is the declaration of Pamela

9  Clegg and associated exhibits, into evidence.

10         THE COURT:  Is there any objection?

11         MS. BROWN:  I have no objection to the admission of

12 the declaration, Your Honor.

13         THE COURT:  Okay.  It's admitted without objection.

14      (Creditors' Committee Exhibit 19, received in evidence)

15         THE COURT:  All right.  Ms. Clegg, do you want to -

16 -

17         MR. EVANS:  And Your Honor --

18         THE COURT:  -- raise your right -- you're going to

19 do a direct, right?

20         MR. EVANS:  Yes, Your Honor.

21         THE COURT:  Mr. Evans, you're going to -- all

22 right.

23         Ms. Clegg, would you please raise your right hand?

24 State your full name for the record and spell your last name.

25         THE WITNESS:  Pamela A. Clegg, C-l-e-g-g.

1    PAMELA CLEGG, WITNESS FOR THE OFFICIAL COMMITTEE OF UNSECURED

2    CREDITORS, AFFIRMED

3              THE COURT:  Thank you.  You may lower your hand.

4              Go ahead, Mr. Evans.

5              MR. EVANS:  I will, Judge.

6              And just one thing.  I am going to get started.

7    But I wanted to advise the Court that the -- counsel for

8    UpgradeYa and counsel for the committee have discussed this

9    witness, and counsel for UpgradeYa has indicated that they

10   are not objecting to her qualifications as an expert.  We'll

11   lay a quick foundation, but I just wanted to let the Court

12   know, so it might be briefer than usual.

13             THE COURT:  Okay.

14             MS. BROWN:  That is correct, Your Honor.

15             THE COURT:  Thank you.

16             MS. BROWN:  We have no objection to her being

17   admitted as an expert.

18             THE COURT:  All right.  Is here background in her

19   declaration?

20             MR. EVANS:  It is, Your Honor.  It's in Exhibit A

21   and Exhibit B, both her CV, classes that she's taught, and

22   publications.

23             THE COURT:  All right.  So we don't need to set a

24   foundation at all.  You can jump right into your testimony,

25   Mr. Evans.

1    MR. EVANS:  Thank you, Judge.  Just to be clear, so

2  we're moving -- or applying for Ms. Clegg to be an expert,

3  qualified as an expert in this case.

4    THE COURT:  Okay.  And what field?

5    MR. EVANS:  Cryptocurrency tracing.

6    THE COURT:  Okay.  And I will admit her as an

7  expert on cryptocurrency tracing.

8    MR. EVANS:  Thank you, Your Honor.

9                  DIRECT EXAMINATION

10  BY MR. EVANS:

11  Q    Good afternoon, Ms. Clegg.  Where do you work?

12  A    I work for CipherTrace, a blockchain analytics software

13  company.

14  Q    And what does CipherTrace do?

15  A    So the main point of our business is software and

16  service -- so "SAS" -- for cryptocurrency tracing and anti

17  money laundering programs.

18  Q    Okay.  And what is "cryptocurrency tracing"?

19  A    Cryptocurrency tracing is essentially following the

20  funds of a particular cryptocurrency, whether that's Bitcoin,

21  Ethereum, or -- or one of the thousands that's out there --

22  as it moves along the blockchain, so that you can identify

23  either the destination or the providence of those particular

24  funds.

25  Q    Okay.  And why would someone hire a cryptocurrency

1  expert?

2  A    There are lots of reasons, primarily investigation.  So

3  I work hand in hand with law enforcement, both international,

4  federal, state level, to conduct cryptocurrency

5  investigations for cryptocurrency that's been used in any

6  type of crime, fraud, ransomware, money laundering; or we are

7  also hired by exchanges.  They utilize our software to be

8  able to run effective anti money laundering programs, as

9  required by the regulatory bodies to which they correspond,

10  and identify the transactions and the risks within those

11  transactions.  Additionally, we are also contracted to

12  certify providence of funds in cases like initial coin

13  offerings or other types of investments within

14  cryptocurrency.

15  Q    And when you refer to "cryptocurrency," there's a number

16  of different types of cryptocurrency, right?

17  A    That's correct.  There's --

18  Q    Okay.

19  A    It is impossible to say how many exist; it's more than a

20  thousand.  But the primary coins are generally the ones that

21  you find in the top ten, top twenty.

22  Q    Okay.  And the most popular coin, is that Bitcoin?

23  A    Correct.  Bitcoin remains the dominant cryptocurrency,

24  generally hovering around 60 percent dominance of all

25  cryptocurrency volume that we see in the cryptocurrency

1  trading market, and it's been around since 2009.

2  Q    And we can be really brief.  But what's "Bitcoin"?

3  A    So Bitcoin is a virtual currency, also called a

4  "cryptocurrency."  It's not backed by any country's central

5  bank or government.  And they are transacted in a way that's

6  digital, across a peer-to-peer network.  And that network and

7  those transactions are recorded on the blockchain, which is

8  basically a public ledger that retains those transactions and

9  can quickly identify how many unsent transactions a

10 particular address may have at any given moment.

11 Q    Okay.  So each individual Bitcoin doesn't have a serial

12 number, right?

13 A    Right.  Bitcoins are fungible.  They move in a way

14 that's similar to cash.  So Bitcoin, in the way that it

15 moves, is completely different from the way that Ethereum

16 operates.  Ethereum is what we would refer to as an "account-

17 based cryptocurrency."  Bitcoin and MyCoin and Venero

18 (phonetic) and several other cryptocurrencies are what we

19 refer to as "unspent transaction output currencies," or UTXO

20 cryptocurrencies.

21 Q    Okay.  So, just so I understand, each individual Bitcoin

22 doesn't have a specific number attributed to that particular

23 Bitcoin, right?

24 A    That's correct.  They are combined and broken down and

25 combined and broken down again over and over, so there's not

1   a particular -- it's not like a nickel that's always going to

2   be in the shape of a nickel.  They can be broken down and

3   combined into different amounts.

4   Q    Okay.  And what's a "wallet"?

5   A    A wallet is actually a device, whether

6   software/hardware.  It's a mechanism for storing a private

7   key, and the corresponding public addresses that were derived

8   from that private key.  Essentially, it's what gives a person

9   or an entity control or access or ownership of the

10  cryptocurrency that is on the blockchain.

11  Q    So is -- are Bitcoins stored in wallets; is that how it

12  works?

13  A    Technically, Bitcoin never leaves the blockchain.

14  Bitcoin and all cryptocurrency remains on the blockchain.

15  Your wallet gives you the private key, which the private key

16  gives you the ability to spend that cryptocurrency, which is

17  really what gives you ownership, right?  It's really no good

18  to you, the crypto is no good if you can't spend it, if you

19  can't move it to someone else.  And the private key that's

20  stored in your wallet is what gives you access and control

21  over those funds.

22  Q    And so the wallet -- there's an address for each wallet,

23  right -- or multiple addresses for each wallet, right?

24  A    That's correct.  The -- a private key can generate

25  almost up to a billion public addresses, and your wallet

1  stores the addresses that correspond to your private key.

2  Q    Okay.  So the private key allows you to transact the

3  Bitcoin or get access to the Bitcoin, right?

4  A    That's correct, yes.

5  Q    Okay.  And while the wallets have addresses, each

6  individual Bitcoin doesn't have any address, right?

7  A    Correct.  Each individual Bitcoin -- again, it's -- it's

8  similar to creating a bar of gold.  If I send you a Bitcoin,

9  I'm sending you a bar of gold worth one Bitcoin.  I just

10 created a bar of gold worth one Bitcoin.  You can turn around

11 and spend that bar of gold.  If you combine it with other

12 bars of gold also worth a Bitcoin, then the next transaction

13 in which you spend that will melt down all of those bars of

14 gold that were worth one Bitcoin and create a giant bar of

15 gold that's representative of the value that you just

16 created.

17 Q    Got it.  Okay.

18      So let me get this straight.  On the wallet, there's an

19 address.  So, if you have the address, you can look at the

20 wallet, right?  Is that correct?

21 A    You can look at the address.  So the address is a

22 public-facing identifier.  There are ways to cluster together

23 addresses and say that all of these addresses belong to a

24 particular wallet, but those have to be done via certain

25 holistic that we use on chain data or optioning data.

1  Without getting too technical, it depends on how the

2  addresses are used whether or not we can structure them and

3  group them all together into the same wallet.

4  Q    And when you say we can "look" at them, can anybody in

5  the public, if they have a wallet address, can they see

6  information about that wallet?

7  A    That's correct.  So a wallet address, or a specific --

8  as we refer to, a "Bitcoin address" or an "Ethereum address"

9  -- is a public-facing identifier.  It's comprised of random

10  letters and numbers.  And that represents a destination on a

11  -- on the respective cryptocurrency blockchain for that

12  address.  If it's a Bitcoin address, then that's a

13  destination on the Bitcoin blockchain.  If it's an Ethereum

14  address, then that would be a destination on the Ethereum

15  blockchain.

16  Q    And what's a "blockchain explorer"?

17  A    A blockchain explorer, essentially, gives you a user-

18  friendly way to look at the data that is contained on that

19  public blockchain.  Public blockchain exporers that -- some

20  that have been mentioned today, blockchain.com, those allow

21  anybody with access to the internet to be able to interpret

22  the data that's on the blockchain and look at maybe an

23  address that they're interested in or look at a particular

24  transaction that they're interested in.

25       There are other explorers, such as CipherTrace's, that

1   are proprietary, and those are proprietary -- it's using the

2   same data from the blockchain, but we are overlaying

3   attribution onto our data that we obtain from the blockchain,

4   which attribution is just identifying to whom those addresses

5   belong.

6   Q    So let's start with the public blockchain explorers.  If

7   one were to input an address for a wallet, what sort of

8   information would that person see?

9   A    If you had input a Bitcoin address -- we'll go with

10  Bitcoin.  If you input a Bitcoin address into blockchain.com,

11  a public (indiscernible) explorer, you would be able to see

12  the type of format that that is, that the address is.  You

13  would be able to see all of the transactions that address has

14  ever sent or received.  You would be able to see its balance,

15  which is very simply subtracting the amount of Bitcoin that

16  is sent from the amount of the Bitcoin that it's ever

17  received.  And then, subsequently, you would also be able to

18  see every single transaction that that address has been

19  involved in, whether it is -- whether it sent the transaction

20  or it received the transaction; all of those transactions

21  would be included.

22  Q    Now you said "Bitcoin address."  That -- you're

23  referring to an address for a particular wallet, right?

24  A    So, in the crypto world, we refer to an address by its

25  particular crypto, so a Bitcoin address or an Ethereum

1  address.  A wallet doesn't technically have an address, but

2  it is common usage, sometimes, to refer to those as "wallet

3  addresses," as well.

4  Q    Okay.  Just to be clear, when you say "Bitcoin address,"

5  you're not saying you can type in a Bitcoin address and get

6  to a particular individual Bitcoin, right?

7  A    A particular individual Bitcoin?  No, I can see all the

8  Bitcoin that that add -- that that wallet address has ever

9  received, and then I can see all of the Bitcoin that it has

10  sent out.

11  Q    Okay.  Got it.

12      Suppose you want to identify a particular Bitcoin and

13  where it went.  How would you do that?

14  A    We would type in -- generally, we would start with a

15  transaction ID or an address, the Bitcoin address, depending

16  on what the information is that's available.  If it's a

17  specific transaction, then I would type in the transaction

18  ID.  The transaction ID is going to show me the inputs,

19  either providence of (indiscernible) coin, the address or

20  addresses that sent that Bitcoin; and then it's going to show

21  me the outputs, which would be the beneficiaries, the

22  desitination or destinations of that Bitcoin.

23  Q    Okay.  And if you want to track where one individual

24  Bitcoin goes, how far along can you track it?

25  A    I -- I could -- I could track Bitcoin all the back to

1  the beginning, the genesis block, if it was created that far

2  bag.  However, it would have most certainly passed through

3  various types of transaction that would make it difficult, if

4  not impossible, to continue tracing and say that this is the

5  exact claim, creation of Bitcoin.

6      But ideally, if it was passed just from one address to

7  one address to one address, and never combined or commingled,

8  I could track that Bitcoin from here to the end of the

9  blockchain.

10 Q   Okay.  Let's talk about commingling.  There is something

11 called "commingling transaction," right?  What's that?

12 A   A commingling transaction is something that takes

13 multiple chunks of Bitcoin -- or we could say multiple bars

14 of gold, as I kind of used that analogy -- and it combines

15 those to create a single transaction.  And it would create a

16 single (indiscernible) transaction, but a single output on

17 the other side, if it's going to a single destination, which,

18 in most cases, for exchanges or investments, you're moving it

19 into cold storage or maybe a particular omnibus account or

20 something of that nature.

21     So it would take, let's say ten, you know,

22 (indiscernible) transaction outputs.  In this case, for our

23 analogy, it would be ten bars of gold.  And that transaction

24 would essentially melt those bars of gold down and create a

25 giant bar of gold worth ten Bitcoins, instead of ten bars

1  worth one Bitcoin.  It creates a whole new --

2  Q    Okay.  Let's --

3  A    -- transaction output.

4  Q    Okay.  Let's unpack that.  So, if you have one Bitcoin,

5  and that Bitcoin gets transferred to a wallet, and that

6  wallet has ten other Bitcoins, and then the entirety of that

7  wallet is transferred elsewhere, how would you be able to

8  tell that one original Bitcoin from the other ten that were

9  in the account?

10 A    If -- if they are all transferred out in the same

11 transaction, which would then constitute a commingling

12 transaction, then all of those get mixed together, and we can

13 no longer tell which particular Bitcoin on the other side was

14 the original Bitcoin that you're referencing.  We would only

15 be able to do a percentage and say, of the -- I think you

16 would have had 11 Bitcoin -- of these 11 Bitcoin, you know,

17 you own, you know, just under less than 10 percent of that

18 other -- of that created -- newly created output.

19 Q    Okay.  But using that example, if one Bitcoin goes into

20 a wallet and it's commingled with the ten Bitcoin that were

21 in that wallet already, and then it's sent out elsewhere, one

22 would never be able to segregate that one Bitcoin from the

23 other ten, right?

24 A    After the commingling trans -- it doesn't get commingled

25 when it's sent into the address or the -- or the wallet; it

1  gets commingled at the -- when it gets sent, the subsequent

2  transaction.

3       I'm sorry.  Can I take just a really quick break?  I

4  have a small emergency with a pet that just got out.

5            THE COURT:  Yes, go ahead.

6            THE WITNESS:  If we can take just a really quick

7  break?  Okay.  I'll be right back.

8            THE COURT:  Let's take a five-minute recess.

9            UNIDENTIFIED:  Thank you.

10      (Recess taken at 2:55 p.m.)

11      (Proceedings resume at 2:58 p.m.)

12 BY MR. EVANS:

13 Q    Sure.  So, after a commingling transaction occurs, one

14 can never segregate one Bitcoin from the other Bitcoins

15 involved in that commingling transaction, right?

16 A    That's correct.  A new output is created with the --

17 with the entire value that was sent through that transaction.

18 Q    Okay.  So, if a single wallet has a number of Bitcoin

19 transfers into it from a variety of different places, and

20 then all of that Bitcoin gets transferred out in one big

21 transaction, one would never be able to discern which Bitcoin

22 came from which place, right?

23 A    That's correct, yeah.  You essentially just took all

24 those little bars of gold that were deposited individually,

25 you melted them down and created a giant bar of gold, and so

1  now all you can really do is work off percentages.  You can't

2  go back in and figure out which piece of that bar of gold was

3  originally from, you know, Investor A or Investor B.

4          MR. EVANS:  Your Honor, I have no further

5  questions.

6          THE COURT:  Thank you.

7          Ms. Brown, cross?

8          MS. BROWN:  Okay, Your Honor.  Your Honor, I have

9  no questions for the witness at this time.  As I stated, we

10  believe the issues of tracing are irrelevant to the request

11  that's before Your Honor today, related to UpgradeYa's

12  pursuit of direct claims against nondebtor third parties.

13  But it would, however, reserve all of our rights with respect

14  to the tracing issues that have been discussed today for when

15  they do become relevant, including, but not limited to in

16  connection with any sale of assets, in connection with

17  UpgradeYa's claims that it may assert against the estates,

18  and in connection with any plan issues.

19          THE COURT:  All right.  Thank you.

20          Ms. Clegg, you are excused.  Thank you.

21      (Witness excused)

22          THE COURT:  All right.  Any other witnesses or

23  evidence of any kind?

24          MR. LUFT:  Nothing more from the debtor, Your

25  Honor.

1          THE COURT:  All right.

2          MS. BROWN:  Your Honor --

3          MR. LUFT:  (Indiscernible) argument.

4          MS. BROWN:  Your Honor?  Your Honor, just to go

5   back to the issue that we had discussed before with respect

6   to the blockchain websites that were attached to Mr.

7   Bonjour's declaration, I didn't hear and no evidence was

8   provided with respect to their authentication.  And as such,

9   we would ask that they not be admitted into evidence.

10          THE COURT:  I think I already admitted them because

11  he did have in his declaration that the -- in a footnote,

12  that they were true and correct copies of the -- of snapshots

13  of the -- of those websites, right?

14          MS. BROWN:  I apologize --

15          UNIDENTIFIED:  That's correct, Your Honor.

16  Footnote 3, 4, and 5.

17          THE COURT:  Okay.  So that objection is overruled.

18          All right.  Any other evidence or are we going into

19  argument?

20      (No verbal response)

21          THE COURT:  All right.  Ms. Brown, do you want to

22  do your closing?

23          MS. BROWN:  Sure.

24          Your Honor, in filing its motion, UpgradeYa has

25  rolled with the punches.  When it filed the motion it

1  believed, as I was told by the debtors post-petition, that

2  they were holding all of UpgradeYa's collateral.  After

3  learning that the debtors no longer had its Bitcoin, it

4  narrowed the relief that it requested and now seeks to modify

5  the automatic stay to the extent necessary to allow it to

6  pursue its direct claims it has against nondebtor third

7  parties, to recover damages for the direct harm such

8  nondebtors caused to UpgradeYa.

9              THE COURT:  What would be --

10             MS. BROWN:  Now before I address --

11             THE COURT:  What would be the -- what would be the

12 claims you would bring against these third parties?

13             MS. BROWN:  Sure, Your Honor.

14             So the claims would be related to folks such as

15 Fireblocks.  Your Honor, I think it might be helpful to think

16 of it in another way.

17             Let's say we had an escrow agreement, and the

18 escrow agent was issued false instructions, and it utilized

19 those instructions and released what it was holding for me on

20 account of the escrow.  I would have claims against both the

21 party that submitted the false escrow instructions and I

22 would have direct claims against the escrow agent for their

23 release of the funds when they shouldn't have.

24             And Your Honor, that's what happened here.  The --

25             THE COURT:  Well, let's not --

1          MS. BROWN:  There are --

2          THE COURT:  -- talk about it in hypotheticals.

3  What --

4          MS. BROWN:  Of course.

5          THE COURT:  Give me specifics from the agreement as

6  to what your basis for your claims against third parties

7  would be.

8          MS. BROWN:  Sure.

9          So, Your Honor, our basis is that custodians, such

10  as Fireblocks, under the agreement and the transaction that

11  happened with Cred, they were required to maintain the

12  collateral securely.  Our client transferred its collateral

13  to Fireblocks as an intermediary.  We don't know what

14  happened to the collateral after that.  All we do know is

15  that the debtors assert that it's gone.  If Fireblocks

16  released that collateral to somewhere else and they shouldn't

17  have, based on its relationship with our client, then we

18  would have direct claims against Fireblocks.

19          We also would have direct claims against the

20  debtors, but we're not asserting those claims.  What our

21  client is seeking to do is to go after the intermediaries,

22  such as Fireblocks, for the damages that they directly caused

23  to our client.

24          THE COURT:  Well, you still haven't answered my

25  question, which is -- you're talking in hypotheticals here.

1  So show me where in this loan and security agreement you

2  believe you have the right to go after third parties who may

3  have received the collateral that was given to the debtors in

4  connection with this loan agreement.

5           MS. BROWN:  Yes, Your Honor, that's part of the

6  issue, right?  Is that the -- what's under the loan agreement

7  does not impact whatever agreements we may have had with

8  these third parties.

9           THE COURT:  Well, I have no evidence of any

10  agreements with third parties.

11          MS. BROWN:  Your Honor, it was based upon their

12  fiduciary obligations under California law, which I'd be

13  happy to get into (indiscernible) with respect to my

14  argument.

15          THE COURT:  Well, we -- again, I don't -- what's

16  the evidence that I have that there's any fiduciary

17  relationship between UpgradeYa and firewall -- or Fireblocks?

18  Whatever the company is.

19          MS. BROWN:  Well, Your Honor, under California

20  Code, when parties provide security, they're -- collateral,

21  they're supposed to maintain it in an secure manner.  We

22  provided the collateral, it got transferred directly to

23  Fireblocks.  Fireblocks did something with it, we don't know

24  what.  And we would like to pursue whatever those direct

25  claims may be against Fireblocks or any other intermediary

1 that was there.

2          We're not seeking to pursue claims or damages

3 against the debtors' estates.  You know, we feel as if, you

4 know, we're the victim here.  You know, we've -- our client

5 pledged collateral, it was supposed to be maintained

6 securely, which I believe the evidence has demonstrated --

7          THE COURT:  Where does it --

8          MS. BROWN:  -- and (indiscernible)

9          THE COURT:  Where does it say that -- show me the

10 agreement because nobody ever showed me.  Show me an

11 agreement where it says that the collateral is to be

12 maintained separately.

13          MS. BROWN:  It does say that it's to be maintained

14 separately, Your Honor, but it does say that it's to be

15 secured.

16          THE COURT:  Where does --

17          MS. BROWN:  And --

18          THE COURT:  -- it say that?

19          MS. BROWN:  Mr. Prouty, can you please bring up

20 what's been marked as UpgradeYa Exhibit 1?

21          THE COURT:  I've got it, I've got the agreement.

22 Just show me --

23          MS. BROWN:  Sure, Your Honor.

24          THE COURT:  -- in the agreement where it is.

25          MS. BROWN:  Okay.  Let me pull up mine

1   (indiscernible) too, so I have it (indiscernible)

2        (Pause in proceedings)

3        MS. BROWN:  Okay.  So, Your Honor, in 2.1, it says

4   that the borrower assigns and grants the lender a security

5   interest in the following described collateral, and then we

6   identify the collateral.  What's supposed to -- and then it

7   says that the confirmations relate -- in Paragraph 8 -- that

8   relate to the collateral that's provided is what is meant to

9   be what's in the collateral account.  And under (b), it also

10  says that all the funds and monies held in are being held

11  from time to time in these collateral accounts.

12        We've provided evidence of the wallets, that they

13  were put into the collateral accounts.  These were the only

14  confirmations that our client received with respect to the

15  collateral and its holding of the collateral accounts.  As we

16  provided, Mr. Rishotsky had test -- had provided and informed

17  Mr. Parrish that the collateral is to be held secured

18  throughout the duration of the loan.

19        THE COURT:  All right.  So let me ask you this

20  question then.  If I give cash collateral to somebody in

21  return for the use of whatever, some project, a widget; I

22  give you cash so I can use your widget --

23        MS. BROWN:  Uh-huh.

24        THE COURT:  -- and you don't have anything in your

25  agreement that says that, when I give you that cash, you have

1  to keep it in a segregated account, and that money gets

2  commingled with other funds of the person that you are giving

3  the cash collateral to, doesn't that create a problem for

4  you?  How do you then trace those funds?  It becomes an issue

5  of tracing.

6         MS. BROWN:  But Your Honor, we think that the

7  tracing issue relates to what claims that we have against the

8  debtors' estates, which is why we reserved the rights on

9  that.

10        Inside the agreement -- and I believe it's Section

11 7.1(b) -- it incorporates the California Uniform Commercial

12 Code.  And the California Uniform Commercial Code,

13 particularly in Section 9207(a), required Cred to use

14 reasonable care in the custody and preservation of collateral

15 in the secured party's possession.

16        Nowhere in the agreement does it authorize Cred to

17 use the collateral, to make a profit off of the collateral,

18 or to do anything else with it.  The only evidence that the

19 debtors and the committee have provided is a website from

20 December 15th, 2020, where they have not been able to

21 authenticate that it's what the website actually was at the

22 time of issue, which would have been March and April of 2020.

23        They also have stated in their first-day

24 declaration and in other pleadings that, pre-petition, there

25 was fraud, theft, and all kinds of malfeasance related --

1  relating to things.  And it is very possible that, as part of

2  that, perhaps the website was changed, so that there -- so

3  there wasn't any information with respect to that.

4            THE COURT:  Yeah, but --

5            MS. BROWN:  And so --

6            THE COURT:  -- your client --

7            MS. BROWN:  -- (indiscernible)

8            THE COURT:  -- Mr. Parrish testified that he

9  understood it wasn't going to be kept segregated, that they

10  could use it to make a yield or to recognize a yield, and he

11  knew that it could be moved in order to do that.  So where --

12  I mean, you're --

13            MS. BROWN:  Yes, Your Honor.

14            THE COURT:  -- you're saying --

15            MS. BROWN:  But at --

16            THE COURT:  -- you didn't --

17            MS. BROWN:  -- all times --

18            THE COURT:  -- understand it.  But his testimony

19  was that he did understand it.

20            MS. BROWN:  That's correct.  But at all times, he

21  also understood that it would remain -- it would remain

22  secure, and that didn't happen.  And while we have claims

23  against the debtors for whatever that may be -- their breach

24  of their fiduciary obligations related to that -- we also

25  believe that UpgradeYa has claims against the other

1  fiduciaries or these intermediaries related to their failure
2  to keep the collateral secure.

3          And that's the narrow relief that we're seeking
4  today, Your Honor.  We're not trying to chase after the exact
5  Bitcoin, we're not trying to chase after anything from the
6  debtors.  UpgradeYa would just like the opportunity to go
7  after third parties for their direct claims.  And Your Honor,
8  typically, you don't need stay relief to do that.  But we
9  heard Your Honor's statements at the November 25th hearing,
10 and we wanted to make sure that we were doing everything
11 aboveboard.  And so we kept our motion on file and continued
12 to ask for stay relief, so that we can go after these third
13 parties.

14         I don't think it's relevant to whether or not we
15 should be entitled to chase those third parties if our direct
16 claim would be successful or not, but I do believe that he
17 has the opportunity to do that.  He's a victim here, he lost
18 lots and lots of money, and he deserves the opportunity to
19 try to chase those damages that he may have against other
20 third parties that are nondebtors outside of these bankruptcy
21 cases.

22         And any amounts that he's able to recover could
23 benefit the estate.  He could be in a position where he is
24 able to mitigate his damages, if he was able to recover it
25 from a third-party source, such as Fireblocks.  And if he

1  does, then that may mitigate his damages in the estate, and

2  that would be for the benefit of all creditors, Your Honor.

3             THE COURT:  Okay.  Thank you.

4             All right.  Let me hear from debtors.

5             MR. JIMENEZ:  Good afternoon, Your Honor.  Pedro

6  Jimenez of Paul Hastings on behalf of the debtors.

7             And Your Honor, before I start, I just wanted to

8  thank you for the time today.  I know that this probably took

9  longer than all of us envisioned when we started in the

10 morning, so I wanted to give Your Honor thanks for your

11 patience today.

12            And if you'll indulge me, Your Honor, I do want to

13 keep my closing short, but I do want to start with a point

14 that Ms. Brown made and kind of work backwards from there.

15 This idea that there are direct claims that UpgradeYa has

16 against third parties because there is some fiduciary duty or

17 fiduciary relationship that was created between UpgradeYa and

18 those third parties.

19            Your Honor, much like you did during Ms. Brown's

20 closing, we've asked the same questions.  We have attempted

21 to see if there was a way to resolve this motion

22 consensually, without the need of putting on all of this

23 evidence today, and we have not been able to get a straight

24 answer as to what cause of action UpgradeYa believes that it

25 has.

1          Today, for the first time, we've heard this idea

2   that there's this potential fiduciary relationship that

3   exists between Fireblocks and UpgradeYa.  Your Honor, the

4   problem with that -- and I'm not Fireblocks' counsel, so I'm

5   not arguing on their behalf.  But the problem with that, as

6   we -- as the debtor sees it -- or as the debtors see it is

7   that the accounts or the wallets into which the Bitcoin was

8   transferred were wallets that were owned and maintained by

9   the debtors, not by UpgradeYa.

10          So what this is the equivalent to is if you and I

11   enter into a loan transaction, where I said I am going to

12   lend you $100, but I want you to cash collateralize it and I

13   want you to deposit $50 in my bank account at Citibank, and

14   you went ahead and you deposited the cash collateral in my

15   bank account, and I used that money, that that somehow would

16   create a cause of action by you against Citibank.  Your

17   Honor, we don't think that that, as a matter of law, works.

18          But I think, potentially, more problematic than

19   that is, Your Honor -- and I do want to put up a

20   demonstrative that we prepared for purposes of closing, Your

21   Honor.

22          Austin, it's Debtors' Exhibit 40, if you could put

23   that up, please.

24          THE COURT:  While we're doing that, Mr. Jimenez,

25   let me ask you a question.  What's the harm in letting

1  UpgradeYa go ahead and see if they have a cause of action

2  against these third parties and just --

3          MR. JIMENEZ:  That --

4          THE COURT:  -- let them go?

5          MR. JIMENEZ:  That --

6          THE COURT:  And if they -- the case gets dismissed

7  by the Court when they sue them, what's -- what harm is there

8  to the debtors?

9          MR. JIMENEZ:  That's a fair point, Your Honor, and

10  that's exactly where I wanted to go with the demonstrative

11  because this is not an isolated situation, Your Honor.  This

12  is not a one-time UpgradeYa deposited money -- or I'm sorry -

13  - deposited Bitcoin with Fireblocks.  And it's really an

14  issue of whether UpgradeYa has a direct claim against

15  Fireblocks.  Your Honor, every single customers that the

16  debtors have, guess what?  They did, they deposited Bitcoin

17  or other cryptocurrency with Fireblocks.  And this is for

18  both CredBorrow and CredEarn programs, Your Honor.

19          So you've got over 6,000 customers who deposited

20  cryptocurrency at the debtors' wallets at Fireblocks, with an

21  understanding that the debtors' business model would be to

22  utilize that cryptocurrency in its business to try and earn a

23  yield, to -- in order to try and earn a return.  And so the

24  idea that, oh, let's go ahead and give UpgradeYa stay relief

25  to go pursue causes of action against Fireblocks, they're --

1  that's the proverbial opening up the floodgate for every
2  single customer of the debtors to go ahead and file claims
3  against Fireblocks.
4       And Your Honor, to answer your question directly:
5  So how does that harm the debtors?  Your Honor, to the extent
6  that Fireblocks had some fiduciary obligations with respect
7  to the debtors' wallets and monies that may or may not have -
8  - I'm sorry -- in cryptocurrency that may or may not have
9  been transferred out of those wallets, Your Honor, that's a
10 cause of action that the estate may have against Fireblocks.
11      So, to the extent that you want one creditor to
12 have stay relief to go after Fireblocks -- which potentially
13 could be a run on Fireblocks and causes of action -- that's
14 limiting potential estate assets that it has in potential
15 claims against Fireblocks.  This is not a UpgradeYa versus
16 Fireblocks issue.  This is does the estate have a cause of
17 action against Fireblocks.  So that's where we see the harm,
18 Your Honor, in terms of potentially going after Fireblocks.
19      Your Honor --
20      THE COURT:  Well --
21      MR. JIMENEZ:  -- with regard --
22      THE COURT:  No, hold on --
23      MR. JIMENEZ:  -- to other --
24      THE COURT:  Hold on a second.
25      MR. JIMENEZ:  Yeah.

1          THE COURT:  Fireblocks is not a -- Fireblocks is

2   not a debtor, so whoever wants to sue them can sue them.  You

3   know, there's no rush to the courthouse to --

4          MR. JIMENEZ:  If --

5          THE COURT:  -- to take the assets away from

6   Fireblocks because Fireblocks isn't in bankruptcy.  So,

7   again, I ask the question:  Even if all 6,500 customers sued

8   Fireblocks, how does that harm the debtors?

9          MR. JIMENEZ:  It harms --

10          THE COURT:  Because the debtors want to go sue

11   Fireblocks and there might not be money left over?  That's --

12   how does that rise to the level of something that I should

13   prevent from going forward?

14          MR. JIMENEZ:  Well, Your Honor -- Your Honor, the

15   way that you should view this is should I let the estate --

16   to the extent that there are causes of action that exist

17   against Fireblocks, should I let the estate pursue those

18   causes of action and capture any of that value for the

19   benefit of all creditors, or should I let one or a handful of

20   creditors try to jump the line and go after Fireblocks to

21   recover that value.  That's how we would view it.

22          And in terms of if there are claims -- and we

23   should try to figure out whether those claims exist.  I'm not

24   suggesting that we wouldn't do that as part of the debtors'

25   exercise here in these Chapter 11 cases.  They -- we will go

1  after Fireblocks, right?

2          THE COURT:  Well, so how does that -- so I allow

3  the -- UpgradeYa to go after Fireblocks and they are

4  successful and they recover the value of the Bitcoin that was

5  deposited with Fireblocks.  That eliminates their claim

6  against the estate, which reduces claims against the estate.

7  How does that --

8          MR. JIMENEZ:  Well, I --

9          THE COURT:  Again, how does that harm the estate?

10          MR. JIMENEZ:  Your Honor, the problem with that is

11  we also don't know what that means, *vis-a-vis* Fireblocks

12  against the debtors, right?  I mean, if they're going to

13  implead us into these actions because, in fact, the wallets

14  in which the cryptocurrency was deposited were the debtors'

15  wallets -- it was not any individual customer's wallet -- you

16  know, this is effectively attempting an end run around the

17  stay and going after us because we're going to end up part of

18  the action anyway.

19          THE COURT:  Well, Fireblocks wouldn't be able to

20  interplead you because they're subject to the stay, so I

21  don't think -- I don't see how that affects it.

22          MR. JIMENEZ:  But Your Honor, they would have the

23  ability to try and get relief to implead us, right?  And they

24  would also have the ability to assert a claim against us.

25  So, in terms of this eliminates claims against the debtor,

1 I'm not sure that eliminates claims against the debtors.  It

2 may let -- it may allow one creditor to do better than other

3 creditors.  But I don't think, from an estate perspective,

4 it's any better for the estate.

5          THE COURT:  All right.  Go ahead.

6          MR. JIMENEZ:  Your Honor, so let me go back to some

7 of the testimony that we heard today because, although I

8 think I now understanding what UpgradeYa is seeking, and

9 they're not taking a position that the Bitcoin that was

10 transferred somehow is still their property, I think I do

11 want to -- I do want to crystalize this point because it is

12 important.  And it's not just a, oh, it may matter upon a

13 sale of assets or a consummation of a plan.  No, I think it

14 matters for a variety of purposes, including the issue before

15 you today, Your Honor, which is:  Are there direct causes of

16 action?

17          Your Honor, what you've heard today is that

18 UpgradeYa entered into a transaction with the debtors where

19 it agreed to transfer Bitcoin to the debtors with no

20 restrictions on the debtors' ability to use that Bitcoin.

21 You heard Mr. Parrish -- who is UpgradeYa's sole managing

22 member -- acknowledge, I think several times, that it was his

23 understanding that the Bitcoin that UpgradeYa transferred

24 could be moved from the e-wallets where it was -- where they

25 were originally transferred, that the Bitcoin could be

1  consolidated with other Bitcoin, and that the debtors'

2  business model was, in fact, to use that Bitcoin to generate

3  a yield.  Your Honor, that is consistent, we submit, with the

4  agreement that governs the relationship.  There is no

5  separate trust agreement, there is no separate escrow

6  agreement or bailment agreement executed between the parties

7  that somehow limits the debtors' ability to use the Bitcoin.

8        So, Your Honor, we, the debtors, submit that what

9  was created here was, effectively, a relationship of debtor

10 and creditor, where the debtors had an obligation at the end

11 of the loan term and once the loan was repaid to return the

12 movant the same amount of Bitcoin.  And I think that that's

13 an important distinction because, as Mr. Parrish testified,

14 Bitcoin is fungible.  This is not we received a car as

15 collateral, and at the end of the loan, we had to return that

16 car.  No.  At the end of the loan, the debtors would have an

17 obligation to repay Bitcoin of the same amount to UpgradeYa.

18 So, Your Honor, we think that that disposes of the argument

19 that somehow there is an express trust or express interest in

20 the Bitcoin that the movant transferred to the debtors.

21       Your Honor, I do want to tackle one -- very

22 quickly, one other argument.  And I recognize that UpgradeYa

23 did not articulate this perfectly, but at least in several

24 places they suggested that UpgradeYa may still have a

25 remaining interest in the property through some form of

1  constructive trust.

2  Your Honor, the problem with that argument -- and

3  as Mr. Azman previewed to the Court during his opening -- is

4  that you have here a situation where all of this Bitcoin was

5  commingled, and it was not only commingled once, it was

6  commingled multiple times as it was transferred to the

7  debtors' third-party asset managers.  And as the committee's

8  expert testified, through these multiple commingling

9  transactions, there is a complete inability to trace any of

10  the Bitcoin that UpgradeYa transferred to the debtors.

11  And Your Honor, I would point the Court to two

12  decisions from the Third Circuit, which I think are on point

13  here, both the Columbia Gas decision at 997 F.2d 1039, and

14  the Lehigh v. New England Railway Company at 657 F.2d 540.

15  Your Honor, in those cases, the Third Circuit held that

16  beneficiaries lose all property rights in a commingled

17  account when the account is completely dissipated.

18  And the Third Circuit went so far as to hold, in

19  Columbia Gas, that a trust beneficiary also loses any rights

20  it may have in the property in a commingled account to the

21  extent that the account drops below the amount held in trust.

22  And I think, here, there is no argument that the wallets into

23  which the Bitcoin were initially transferred, as well as the

24  Bitcoin where the Bitcoin was commingled, that those e-

25  wallets have a zero balance as of today.

1    So, Your Honor, so where do I think that that

2 leaves us?  Your Honor, I'll end where I started in my

3 closing.  We are more than willing to work with UpgradeYa if

4 it believes it has a direct cause of action against a third

5 party.  We'd be happy to talk to them and we'd be happy to

6 try to understand that cause of action.  And it may very well

7 be that we could agree with them.

8    But the idea that they should get, effectively,

9 blank check stay relief today to pursue third parties without

10 understanding who they are and understanding whether or not

11 they are direct causes of action or whether they, in fact,

12 are attempting to assert quasi estate causes of action, Your

13 Honor, I think is improper via stay relief motion, Your

14 Honor.  So, to the extent that's what UpgradeYa is seeking,

15 the debtors believe the motion should be denied.  Thank you.

16    THE COURT:  All right.  Thank you.

17    Mr. Azman, are you speaking on behalf of the

18 committee?

19    MR. AZMAN:  I am, yes.  Good afternoon again, Your

20 Honor.  Darren Azman, McDermott, Will & Emery, for the

21 committee.

22    Your Honor, the reason that UpgradeYa is no longer

23 seeking a return of its Bitcoin is because, one, it was

24 commingled; and, two, they didn't and can't satisfy their

25 burden of tracing, unless the Bitcoin is property of the

1  estate.  I think we well established that through the course

2  of the day.

3         But to be clear, UpgradeYa didn't withdraw its

4  request for the return of Bitcoin because Cred has no Bitcoin

5  to return.  To the contrary, as UpgradeYa knows, the estate

6  does have Bitcoin.  Mr. Parrish's sudden discovery that Cred

7  does not have enough Bitcoin to return to all creditors

8  doesn't alter whether the Bitcoin is property of the estate

9  or whether claims can be brought against third parties on

10  account of that Bitcoin.

11         UpgradeYa's change in position on the relief it now

12  seeks is solely because of the commingling, which, by the

13  way, they knew very well before they filed their motion and

14  did absolutely no diligence on.  You heard that directly from

15  Mr. Parrish today.  At the time of the transaction, and

16  certainly before filing the motion, he was fully aware that

17  Cred could and would commingle his collateral and that it

18  would not be held in a segregated account.  And they did

19  absolutely no diligence on tracing efforts before filing the

20  motion.

21         Your Honor, this motion never had any merit.  We

22  sympathize with Mr. Parrish on his significant losses, but

23  that does not supplant the legal standard that must be

24  satisfied.  Again, it doesn't matter that Mr. Parrish though

25  Cred would have enough assets to return his collateral.  That

1  has no bearing on the legal analysis.

2         And by the way, there were no new facts in the

3  committee or the debtors' objection that were not known to

4  Mr. Parrish and UpgradeYa.  Perhaps what Mr. Parrish is

5  saying is that he didn't realize that the facts underlying

6  his claim do not support the relief he sought, or that he

7  didn't fully understand the legal standard; and that,

8  instead, our reply illuminated the legal analysis that he

9  should have considered before filing the motion.

10        If Mr. Parrish didn't understand the correct legal

11 standard when he filed the motion, his counsel certainly

12 should have.  And Your Honor, we submit that the motion not

13 only falls short of that legal standard, but it also

14 implicates Rule 11, given all of the admissions that you've

15 heard today.

16        I think that Your Honor understands the tracing

17 issue and Third Circuit law on this topic, so I won't spend

18 any more time on that.  But I think what Ms. Brown fails to

19 grasp is that the same exact legal analysis applies to the

20 pursuit of actions against third parties related to the

21 commingled Bitcoin.  It doesn't matter whether UpgradeYa

22 wants its Bitcoin back from the debtors or if they want to

23 sue third parties.

24        And it makes no difference what happened after

25 UpgradeYa's Bitcoin was initially received and then

1   commingled by the debtors or where it might have ended up.

2   Their Bitcoin first went through the debtors.  If they cannot

3   trace, then the collateral is property of the estate.  It

4   ceased to be UpgradeYa's property as soon as it became

5   commingled and untraceable in the debtors' hands.  So any

6   actions or inactions by third parties that resulted in damage

7   to the commingled crypto is harm to the debtors' property and

8   the debtors' estate.

9        Now UpgradeYa spent a lot of time in its brief

10  citing cases for the proposition that collateral stolen by a

11  debtor doesn't mean that it's property of the estate, and

12  that may be true.  But none of those cases involved

13  commingled collateral that cannot be identified and traced,

14  and that's the whole point.  If you can't figure out which

15  specific property is yours, then that means there are a lot

16  of other creditors who have the same exact problem as you,

17  and that's why it's property of the estate, to be distributed

18  pro rata among all creditors.

19       Your Honor, to say that UpgradeYa is pursuing or

20  wants to pursue a third party for its specific Bitcoin, its

21  collateral, or anything related to the loss of that Bitcoin

22  is a fallacy.  It is the estate and only the estate that has

23  a claim against third parties to recover Bitcoin because that

24  Bitcoin is no longer identifiable as UpgradeYa's Bitcoin.  It

25  ceased to become their property, and now the estate has a

1  claim -- has a potential claim against third parties to bring

2  that property into the -- back into the estate for ratable

3  distribution.

4        I also want to highlight again that UpgradeYa, even

5  after Your Honor's prompt, has not provided this Court -- and

6  despite our repeated requests before the hearing -- with a

7  single plausible example of a direct claim that UpgradeYa

8  could have against third parties that wouldn't otherwise

9  constitute an estate claim, and that's because no such direct

10 claims exist.  Any harm suffered by UpgradeYa was a

11 generalized harm suffered by all of Cred's creditors

12 indirectly.

13       And the escrow analogy provided by Ms. Brown is not

14 at all on point.  In an escrow relationship, there's a

15 tripartite agreement between three parties, as Your Honor

16 know.  There is no escrow agreement here; there's one

17 agreement between UpgradeYa and the debtors.  And as Paul

18 Hastings pointed out, the accounts with Fireblocks, those are

19 Cred accounts and not UpgradeYa's accounts.

20       Your Honor, if we are wrong and there truly is a

21 direct claim here, UpgradeYa is free to come back to the

22 Court and get clarity on that.  But the Court should not

23 grant prospective relief for UpgradeYa to just pursue third

24 parties and use their own judgment as to what is and is not a

25 direct claim, particularly where they can't even come up with

1 a single example.

2          Now, in terms of the debtors -- excuse me.   In

3 terms of UpgradeYa pursuing the debtors' insurers -- because

4 that is another form of relief that UpgradeYa has asked for,

5 we're still thoroughly confused.   UpgradeYa is obviously not

6 asking this Court for permission to go after the insurers to

7 recover their collateral.   The insurers don't have

8 UpgradeYa's Bitcoin.   So I'm assuming that UpgradeYa wants to

9 sue the debtors' insurers for their losses.

10          And Your Honor, these are the debtors' insurance

11 policies.   UpgradeYa is not an insured party.   And by the

12 way, the committee is already in the process of reviewing the

13 debtors' insurance policies; and, where applicable, we are

14 ensuring that those carriers are all on notice of potential

15 claims.   But once again, those are claims of the estate, and

16 the proceeds of those policies are property of the estate.

17 If there's a recovery on those policies, UpgradeYa, just like

18 every other creditor in this case, will have an opportunity

19 to share in it.   So I don't really understand what UpgradeYa

20 is asking for when they say they want to pursue insurance

21 carriers.

22          Your Honor, I'll stop there.   I skipped over a

23 number of arguments in our brief, including our very

24 technical explanation for why it's not possible for UpgradeYa

25 to trace.   I think you've heard enough of that today.   I'm

1  happy to walk through any of that.  But again, UpgradeYa has

2  not submitted any evidence of tracing, and we think that's

3  the end of the matter.

4          For those reasons, we would urge the Court to deny

5  the motion.  To do otherwise would turn this case on its

6  head, effectively enabling 6,500 creditors out there to start

7  suing third parties and usurp the estate's claims.  Thank

8  you.

9          THE COURT:  Thank you, Mr. Azman.

10         Ms. Brown, you get the final word.

11         MS. BROWN:  Thank you very much, Your Honor.

12         Your Honor, Mr. Jimenez and now Mr. Azman

13  themselves have argued that there are lots of similarly

14  situated creditors, and as such, the relief requested should

15  be denied.  First, that's irrelevant to whether UpgradeYa may

16  pursue its direct claims against nondebtor third parties.

17  But more importantly, it is very misleading.

18         Mr. Prouty, can you please bring the combined plan

19  and disclosure statement up again, which is UpgradeYa Exhibit

20  7?

21      (Pause in proceedings)

22         MS. BROWN:  And Your Honor, while we're waiting for

23  that to come up -- and Mr. Prouty, if you can go to Page 40 -

24  - these types of misleading arguments are why we've

25  repeatedly taken the time to stress the difference between

1   the CredEarn and the CredBorrow programs.  These programs had

2   very different clientele, with very different expectations,

3   with very different agreements.

4           Mr. Prouty, can you make that a little larger?

5   Sorry, it's hard to read.

6           MR. PROUTY:  Yeah, no problem.

7           MS. BROWN:  Thank you.

8           MR. PROUTY:  Is that a little better?

9           MS. BROWN:  Your Honor, I'd like to direct your

10  attention to the fourth paragraph, where the debtors

11  acknowledge and state in their disclosure statement -- which

12  was just filed a few days ago -- that the debtors are owed

13  approximately $8 million for loans under the CredBorrow

14  program, $8 million under CredBorrow.  We know that our

15  client was given a two-million-dollar loan; therefore, he

16  counts as one-quarter of the customers under the CredBorrow

17  program.  Now, while I don't know how many there are, I can

18  tell you it's not 6,500, as the debtors and the committee

19  have otherwise argued.

20          And Your Honor, Mr. Azman stated that, for some

21  reason, Mr. Parrish and we should have known that they didn't

22  have the Bitcoin and proceeded differently than when we filed

23  our motion.  But Your Honor, as we've explained and as the

24  uncontroverted testimony has shown, after the petition date,

25  the debtors emailed Mr. Parrish and specifically stated that

1 | they were holding all of his Bitcoin, and we proceeded

2 | accordingly.  We wanted to make sure we were doing everything

3 | aboveboard in these cases, particularly in light of all of

4 | the mistrust, all of the claims of fraud and dishonesty and

5 | deceit and theft that had occurred here.

6 | And in our motion, while we -- our main cause of

7 | relief that we had requested was to enforce our rights under

8 | the agreement repay our loan, get back our collateral, inject

9 | some much needed cash into these debtors' estates, that

10 | became impossible when we found out that the debtors had lied

11 | to us post-petition, and the number of Bitcoin continued and

12 | continued to drop.  And I'm sure that that's something that

13 | an examiner will look into, and we look forward to seeing

14 | what his findings will be.

15 | But Your Honor, because we've had to role with the

16 | punches, our motion also asked to go after the third parties,

17 | and that's what we seek to do here.  Mr. Azman just said that

18 | we're looking to go after the debtors' insurance policies,

19 | but that's not what you heard from Mr. Parrish.  Mr. Parrish

20 | testified that what we are seeking to do is to go after

21 | nondebtor third parties for UpgradeYa's direct claims against

22 | them for the damages and harm that they caused UpgradeYa in

23 | connection with these transactions.

24 | The committee and the debtors suggest that we

25 | should have to run our litigation strategy and what claims

1   and causes of action we intend to pursue by them prior to

2   filing a lawsuit?  That's ridiculous.  Not only should it

3   never be required because, one, the stay doesn't apply to

4   nondebtor third parties, but secondly, think of all the

5   implications related to privileges that would be

6   automatically tossed out the window because we're sharing a

7   complaint with someone that's not even public.  And it's not

8   their business to opine on what litigation we bring or

9   whether or not it will be successful.

10          If we file litigation and they review the complaint

11  -- and we would be happy to provide it to them after we file

12  it --  and they believe that there's an issue with respect to

13  the claims or causes of action that we've asserted then, we

14  can address it at that time.  But what they're seeking to do

15  is to enjoin UpgradeYa from seeking the relief that it --

16  that it's entitled to, to go after its own indirect claims.

17          And finally, Your Honor, to the extent that there

18  are concerns that any of the nondebtor third parties

19  UpgradeYa sues, like Fireblocks, may seek to add to add the

20  debtors to any such litigation, as Your Honor correctly

21  noted, those third parties would need to seek stay relief,

22  and those issues can be addressed at that time.

23          Accordingly, Your Honor, UpgradeYa submits that it

24  has demonstrated the relief it has requested today is proper

25  and respectfully requests that the Court grant its stay

1  relief motion and allow it to go after nondebtor third

2  parties for its direct claims and harms that have been

3  suffered against it.

4        THE COURT:  All right.  Well, here's what we're

5  going to do.  I need -- I want to have further briefing on

6  the question of what exactly are the third-party claims that

7  UpgradeYa believes it has and why those third-party claims

8  are not derivative claims of the debtors' estate.  So I will

9  give the UpgradeYa folks -- how much time would you like, Ms.

10 Brown?

11       MS. BROWN:  Your Honor, if we could get two weeks

12 because I know we have objections due to the combined plan

13 and disclosure statement solicitation next week.  If we could

14 get until the 21st, that would be much appreciated.

15       THE COURT:  All right.  I will give you two weeks.

16 And then I will give the debtors and the UCC until February

17 4th to file their response.  And then I will give you until

18 the 11th to file a reply.  And once I get that, I'll be able

19 to make a decision fairly quickly after that, I think.  And

20 let's limit the briefing to -- let's keep these short --  no

21 more than 20 pages.  All right?

22       MS. BROWN:  And Your Honor, just to clarify, when

23 you said "two weeks," is that to January 21st and not the

24 20th?

25       THE COURT:  You have until the 21st, yes.  And I --

1  then I gave the debtors and the committee two weeks after

2  that, to the 4th, and then a week for you for the 11th for a

3  reply.

4          MS. BROWN:  Thank you, Your Honor.

5          THE COURT:  All right.  Okay.  Anything else for

6  today?

7          MR. COUSINS:  Your Honor, it's Scott Cousins.  That

8  takes us to the end of the agenda.  Do you want us to upload

9  an order on the retention of Paul Hastings?

10         THE COURT:  Yes.  I think I did see one that had

11  been uploaded earlier that had Mr. McMahon's requested

12  changes, informal comments that I think were incorporated.

13  But just -- why don't we -- just to make sure that's been

14  done, let's redo it again and run it past Mr. McMahon and

15  submit it under COC.

16         MR. COUSINS:  Thank you, Your Honor.

17         THE COURT:  All right?  All right.  Well, thank you

18  all very much.  Have a good evening and take care of

19  yourselves out there.  We're adjourned.

20         COUNSEL:  Thank you, Your Honor.  Thank you, Your

21  Honor.

22      (Proceedings concluded at 3:42 p.m.)

23

24

25

1                              CERTIFICATE

2

3        We certify that the foregoing is a correct transcript

4   from the electronic sound recording of the proceedings in the

5   above-entitled matter.

6
    /s/Mary Zajaczkowski              January 7, 2021
7   Mary Zajaczkowski, CET**D-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25