UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| CRED INC., *et al.*, | ) ) | Case No. 20-12836 (JTD) |
| Debtors.[1] | ) ) ) | Re: Docket No. 296 |

**DECLARATION OF DANIEL SCHATT IN SUPPORT OF DEBTORS' OBJECTION TO MOTION OF JAMES ALEXANDER TO DISMISS THE CRED CAPITAL, INC. CASE**

I, Daniel Schatt, declare and state under penalty of perjury as follows:

1. I submit this declaration (the "Declaration") in support of the *Debtors' Objection to Motion of James Alexander to Dismiss the Cred Capital, Inc. Case* (the "Objection").[2]

2. I am the co-founder and former Chief Executive Officer of Debtor Cred Inc. ("Cred"). At all times since the formation of Cred until I resigned on December 2, 2020, I was Cred's CEO. Subsequent to my resignation as CEO on December 2, 2020, I continued to advise Cred on its chapter 11 sale process until January 15, 2021.

3. I am over the age of 18 and am familiar with the matters herein, and if called upon to testify, I could and would testify competently to the facts set forth herein.

4. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge or my review of relevant documents.

**Cred Capital's Formation**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Objection.

5. Cred hired James Alexander to serve as Chief Capital Officer of Cred on August 1, 2018. Mr. Alexander was hired as a senior officer of Cred and, in accepting Cred's offer, Mr. Alexander agreed to "not engage in any other employment, occupation, consulting or other business activity directly related to the business in which [Cred] is […] involved […] nor will you engage in any other activities that conflict with your obligations at [Cred]." **See Exhibit A.**

6. In or around January, 2020 I authorized the formation of Cred Capital, Inc. ("Cred Capital") to expand Cred's securitization business and asset management business. In my role as CEO, I designated Mr. Alexander to set up Cred Capital because Mr. Alexander would be the Cred employee most involved in Cred Capital's activities, including marketing and selling financial products to investors under the name "Cred Capital."

7. I informed Mr. Alexander that Cred Capital was to be bound by the traditional parent-subsidiary relationship with Cred and have a typical governance framework, with the parent owning and controlling the subsidiary's stock and having control over the board and the subsidiary. We had already created several entities, including Cred Merchant Services and Cred Puerto Rico that were all standard parent/subsidiary structures. We also discussed Cred Capital operating on a "cost" basis in which all funds would roll up to the parent, Cred. I never, verbally or in writing, directed or agreed that Cred Capital be set up with Mr. Alexander as the sole director or with Cred having no voting rights.

8. In mid-March 2020, I had a conversation with Dan Wheeler, Cred's General Counsel and a senior Cred officer, where he stated I should seek outside counsel in regards to the setting up of Cred Capital because he was conflicted. I was perplexed by this, as Mr. Wheeler had previously set up Cred's other subsidiaries and had never raised a conflict.

9. I subsequently wrote an e-mail to Cred's officers – Mr. Wheeler, Mr. Alexander, and Joseph Podulka, Cred's Chief Financial Officer – where I asked Mr. Wheeler to clarify why he would be conflicted. Mr. Wheeler wrote back that he'd be conflicted because he would be a shareholder and director of Cred Capital. I was again confused because I had previously indicated to Mr. Alexander that Cred employees would not receive shares in Cred Capital, because no employee of Cred and its subsidiaries were granted equity and Cred Capital would not be organized any differently. *See* **Exhibit B.**

10. I then called Mr. Alexander to discuss Cred Capital's proposed governance. We agreed that Cred Capital would only have two shareholders – Cred and an outside investor – and that no Cred employees would hold shares in Cred Capital. We further agreed that Cred Capital would be governed by a three-person board of directors, consisting of an outside investor, and Mr. Podulka and Mr. Alexander acting as the two Cred representatives on the board. This agreement was set forth in an e-mail sent by Mr. Alexander to myself, Mr. Podulka, and Mr. Wheeler, on March 15, 2020. *See id.*

11. Although Cred had never sourced outside financing for a subsidiary, Mr. Alexander convinced me it made sense for Cred Capital because it reduced the funding burden on Cred, avoiding exhaustion of Cred's resources, and would also bolster the credibility of Cred Capital for its eventual marketing of products to third-party purchasers. Mr. Alexander also explained to me that Cred Capital was always free to buy out these investors at a premium at a later date, and as such their investment represented nothing more than the equivalent of a potential high interest loan that Cred had the choice to exercise. Given that any investor would have a minority interest to Cred and would have a minority position on the board, I considered this financing arrangement to be low risk.

12. Mr. Alexander originally stated that he envisioned finding up to $1 million of financing for Cred Capital, but by March 15, 2020, the goal was to find between $150,000 and $500,000 of outside investment. *See id.*

13. The only outside "investor" Mr. Alexander allegedly sourced was represented to Cred to be an Iraqi businessman named Zobar Agha. I asked Mr. Alexander more than once whether I could meet Mr. Agha, but never received an opportunity to do so. To date, neither I, nor anyone else to my knowledge at Cred other than Mr. Alexander has ever communicated with Mr. Agha.

14. In late March 2020, I received several documents for Cred to sign as part of Cred Capital's formation. One was an "Asset Management Agreement" between Cred and Cred Capital, under which agreement Cred Capital was supposed to provide asset management services to Cred. The other was a "Contribution Agreement," which provided for Cred's acquisition of Class B shares in Cred Capital.

15. On March 31, 2020, I raised various questions and concerns regarding the financial structure of Cred Capital to Mr. Alexander, Mr. Wheeler, and Mr. Podulka in an e-mail. Among the concerns I raised was that Cred would receive shares that were referred to as Class B shares, the import of which I stated that I did not understand. *See* **Exhibit C**.

16. In his response to my email, Mr. Alexander did not address my particular questions and concerns, notably what the significance of the Class B shares were, nor raise that they were non-voting shares. Rather, Alexander merely explained that the agreements were a "compromise" to satisfy Mr. Agha, and that without this compromise we would lose the investor. *See id.* Cred's counsel, Mr. Wheeler, was copied on these correspondence but also never advised me of this information. I have subsequently learned that Mr. Wheeler was

involved in working with Mr. Alexander, and the outside counsel to create the documents at issue.

17. To my knowledge, Cred Capital never received any capital contributions or equity financing from Mr. Agha, or any other third-party investors.

18. Mr. Alexander and Mr. Wheeler offered no information and minimal transparency regarding how Cred Capital's governance structure had been set up.  Nor was I made aware by Mr. Wheeler, Mr. Alexander or anyone else that Cred Capital's corporate governance documents were materially different than what had been agreed to on March 15, 2020, notably that there would not be a three-person board on which Cred would control two seats, nor that there would be voting and non-voting shares and that all voting shares would be granted to an alleged minority outside investor.  Though I knew that outside investors were to be given shares, I was never provided with a copy of the governance documents defining the meaning of "Class B" shares, and I did not actually see a copy of such governance documents until May 2020.  Further, on the instances I approached Mr. Wheeler about Mr. Alexander and Cred Capital, Mr. Wheeler told me I could and should trust Mr. Alexander.

**Cred Capital's Post-Formation**

19. In late May 2020, Mr. Podulka informed me that Cred Capital had set up its own account with our Human Resources provider to make its own payroll and was looking for its own office space.  This concerned me because it was always my understanding and intent that Cred Capital was part of the wider integrated Cred organization.  Mr. Podulka also informed me that Cred Capital's financial and governance structure were not set up according to our original understanding.

20. On May 22, 2020, I asked Mr. Alexander via email about revisiting Cred Capital's governance and relationship with Cred, but received no reply. **See Exhibit D.**

21. On May 30, 2020, I emailed Mr. Alexander, Mr. Wheeler, Mr. Podulka, and Lu Hua – Cred's co-founder – discussing my concerns with regard to these changes to Cred Capital's corporate and financial structure and expressing surprise that Cred Capital had not been organized in accordance with earlier discussions. In response, I received the first of a flurry of emails from Mr. Wheeler warning of various "unpleasant" consequences from a potential "inter-company legal dispute" and requesting that I immediately sign a broad "mutual release waiver of legal claims for anything that may have occurred to date" before continuing further discussions with Mr. Alexander or Mr. Wheeler regarding Cred Capital's structure, despite the fact that Mr. Alexander remained Cred's Chief Capital Officer, and Mr. Wheeler remained Cred's General Counsel. Mr. Alexander e-mailed his agreement with the requirement for a release waiver of potential legal claims, stating that it was a "simple step" to continue discussions and indicating that he had signed it and I should sign it as well. I did not agree to sign the release waiver and I continued to voice my concerns that the current structure of Cred Capital did not align with our previous understanding, as set out in March. **See Exhibit E.**

22. Throughout most of June I attempted to work with Mr. Alexander to resolve the issues I had highlighted and amend Cred Capital's corporate governance documents to make them consistent with how they were intended to be filed. Mr. Alexander failed to do so and I then took action to "recover" Cred Capital for Cred. On June 22, 2020, Cred filed an Amended and Restated Certificate of Incorporation and adopted new bylaws which gave control of Cred Capital to Cred.

23. On June 23, 2020, I sent an email to Mr. Alexander and Mr. Wheeler, copying Mr. Podulka, and advising that that, despite my several attempts, Mr. Alexander had declined to engage in discussions regarding Cred Capital's structure, and had instead remained non-responsive and non-cooperative.  As such, I advised that certain changes were being made to Cred Capital's governance structure, including the curing of certain defects in its organizational documents which purported to allow Mr. Alexander to name himself as a director of Cred Capital and to carry out certain functions incidental to that role.  ***See* Exhibit F.**

24. On June 26, 2020, I terminated Mr. Alexander's employment with Cred.

25. On June 29, 2020, Podulka filed Cred Capital's Certificate of Correction with the Delaware Secretary of State to make Mr. Podulka and myself the original members of Cred Capital's Board of Directors.

26. Following these actions, on or about June 27, 2020, Daniyal Inamullah, the Vice President of Capital Markets at Cred, informed me that on the evening of June 24, 2020 Mr. Alexander instructed him to move more than 225 bitcoin and $200,000 USD coin, which is currently worth more than $7.5 million, from Cred Capital's Fireblocks account to blockchain addresses that did not belong to either Cred or Cred Capital or to any of their custodians or asset managers.  Mr. Inamullah transferred that cryptocurrency from the Debtors' Fireblocks account to the other blockchain addresses.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: January 29, 2021

*/s/ Daniel Schatt*_____
Daniel Schatt