1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

3   IN RE:                          .  Chapter 11
                                    .  Case No. 20-12836 (JTD)
4   CRED INC., *et al.,*            .
                                    .  (Jointly Administered)
5                                   .
                                    .  Courtroom
6                                   .  824 Market Street
            Debtors.               .  Wilmington, Delaware 19801
7                                   .
                                    .  Wednesday, February 3, 2021
8   . . . . . . . . . . . . . . .  1:00 p.m.

9           TRANSCRIPT OF HYBRID TELEPHONIC/ZOOM HEARING
              BEFORE THE HONORABLE JOHN T. DORSEY
10                UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12  For the Debtors:          Scott D. Cousins, Esquire
                              COUSINS LAW, LLC
13                            Brandywine Plaza West
                              1521 Concord Pike
14                            Suite 301
                              Wilmington, Delaware 19803
15
                              -and-
16
                              James T. Grogan, Esquire
17                            PAUL HASTINGS, LLP
                              600 Travis Street
18                            58th Floor
                              Houston, Texas 77002
19
    (APPEARANCES CONTINUED)
20  Electronically
    Recorded By:              Jason Spencer, ECRO
21
    Transcription Service:    Reliable
22                            1007 N. Orange Street
                              Wilmington, Delaware 19801
23                            Telephone: (302) 654-8080
                              E-Mail:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording:
25  transcript produced by transcription service.

1 | <u>APPEARANCES (CONTINUED)</u>:

2 | For the Debtors:            Scott C. Shelley, Esquire
                                Avi Luft, Esquire
3 |                            PAUL HASTINGS, LLP
                                200 Park Avenue
4 |                            New York, New York 10166

5 |
   | For the Trustee:            James J. McMahon Jr., Esquire
6 |                            UNITED STATES DEPARTMENT OF JUSTICE
                                OFFICE OF THE UNITED STATES TRUSTEE
7 |                            844 King Street
                                Suite 2207, Lockbox 35
8 |                            Wilmington, Delaware 19801

9 |
   | For the Official
10 | Committee of Unsecured
   | Creditors:                 Darren Azman, Esquire
11 |                            David Hurst, Esquire
                                MCDERMOTT WILL & EMERY, LLP
12 |                            340 Madison Avenue
                                New York, New York 10173

13 |

14 | For Robert J. Stark:        Andrew M. Carty, Esquire
                                BROWN RUDNICK, LLP
15 |                            Seven Times Square
                                New York, New York 10036

16 |

17 | For James Alexander:        Mark Pfeiffer, Esquire
                                BUCHANAN INGERSOLL & ROONEY
18 |                            700 Alexander Park
                                Suite 300
19 |                            Princeton, New Jersey 08540-6347

20 |

21 |

22 |

23 |

24 |

25 |

1                              INDEX

2   ADVERSARY MATTERS:                                    PAGE

3   Agenda
    Item 3:   Status Conference, Complaint for Turnover    4
4             Pursuant to Bankruptcy Code Section 542
              [Adv. Docket No. 1, 11/18/20]
5

6   CONTESTED MATTERS GOING FORWARD

7   Agenda
    Item 4:   Motion of James Alexander to Dismiss the    12
8             Cred Capital, Inc. Case [Docket No. 152,
              12/08/20]
9

10  Court's ruling                                        37

    Agenda
11  Item 5:   Debtors' Motion Pursuant to Bankruptcy      39
              Code Sections 363(b) and 105(a) for
12            Authorization to Enter Into and Perform
              Under a Plan Support Agreement Term Sheet
13            [Docket No. 279, 12/23/20]

14  Court's ruling                                        50

15  Transcriptionist's Certificate                        52

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commenced at 1:00 p.m.)

2            THE COURT:  Good afternoon.  Can everyone hear me

3  okay?  No?  Yes?

4            MR. COUSINS:  Yes, Your Honor.

5            THE COURT:  Okay.  This is Judge Dorsey; we're on

6  the record in Cred Inc., Case Number 20-12836.

7            I will go ahead and turn it over to debtors'

8  counsel to run the agenda.

9            MR. COUSINS:  Good afternoon, Your Honor, Scott

10  Cousins on behalf of the debtors.

11            I know the Court just signed the order with

12  respect to the certification of counsel with UpgradeYa, so --

13  and we have also on the agenda continued our motion with

14  respect to the sale.

15            So that takes us to agenda item number 3, the

16  status conference with respect to the James Alexander

17  turnover complaint, and I believe Mr. Luft from Paul Hastings

18  is going to be handling that.

19            THE COURT:  Okay.  Mr. Luft?

20            MR. LUFT:  Good afternoon, Your Honor.

21            By way of status conference, I wanted to let you

22  know that Mr. Alexander this past week has filed an answer;

23  we will be proceeding with that action.  I believe that Mr.

24  Azman for the creditors committee has some comments with

25  regard to it and I would just turn it over to him.

1            THE COURT:  All right.

2            MR. AZMAN:  Thank you.  Good afternoon, Your

3    Honor, Darren Azman, McDermott Will & Emery, counsel to the

4    committee.

5            Your Honor, as we speak right now, the committee

6    is in the process of filing two motions in this adversary

7    proceeding, and we're going to ask that Your Honor schedule a

8    hearing on these motions on an emergency basis.  The first is

9    just a procedural motion for the committee to intervene in

10   the adversary proceeding.  At some point later today, we

11   expect that the debtors are going to submit a stipulation to

12   the Court under certification of counsel.  That includes all

13   the relevant parties: the United States Trustee, debtors'

14   counsel, committee counsel, and the examiner's counsel.

15           The stipulation will grant the committee

16   derivative standing to pursue certain causes of action,

17   including this adversary proceeding against Mr. Alexander.

18   We weren't sure when that stipulation would be filed or when

19   the Court might have an opportunity to enter it, so out of an

20   abundance of caution, we thought it was prudent to file a

21   motion to intervene.  I doubt there will be any objection to

22   that, but we wanted to be safe and get that on file.

23           Your Honor, the more substantive motion that we

24   are filing seeks emergency injunctive relief against Mr.

25   Alexander.  The filing of this motion was driven by a very

1 troubling report that we received from the committee's

2 crypto-tracing consultants over the last week.

3          In short, Your Honor, it appears that Mr.

4 Alexander has transferred millions of dollars of the debtors'

5 crypto currency around two weeks ago in violation of a

6 temporary restraining order and a preliminary injunction that

7 was issued against Mr. Alexander last summer by a California

8 state court that specifically said that Mr. Alexander is not

9 to transfer the debtors' crypto currency that he is holding.

10 And, Your Honor, this is the same crypto currency that is the

11 subject of the turnover action.

12          This matter is obviously not on for today's

13 hearing, but, again, I wanted to provide a brief overview

14 because we would like to request an emergency hearing on both

15 of the motions as soon as possible, so that we can prevent

16 any further dissipation of the debtors' assets and we thought

17 the status conference was a good time to do that.

18          And, Your Honor, one more note.  After the filings

19 are complete, which, you know, I expect will be within the

20 next hour or so, we will serve the papers on Mr. Alexander's

21 counsel and other parties in the adversary proceeding by

22 email and overnight delivery, and they'll of course receive

23 an ECF notification on that.

24          THE COURT:  What's the status of the action in

25 California?  Which action are we talking about?

1         MR. AZMAN:  Yeah, that's a great question.  I

2  might defer to the folks at Paul Hastings.  There are

3  multiple actions in California.  There is one action which is

4  making its way over to Your Honor's court, I believe that

5  that is the action -- yes, that is the action in which this

6  temporary restraining order and preliminary injunction was

7  entered.  So that was entered by the California court, it was

8  removed to the federal bankruptcy court in California, and

9  there is a transfer motion pending, as I understand it, that

10  is to be heard in about two to three weeks by the bankruptcy

11  court out there to transfer it over here.  And that's the

12  difficulty we have by not really having a great court to go

13  to for this relief right now.

14         THE COURT:  And what's the -- the form of the

15  motion is going to be what?

16         MR. AZMAN:  It's going to request -- it's

17  emergency injunctive relief seeking a TRO, as well as a

18  preliminary injunction.  The first form of relief that we're

19  seeking -- and, again, I'll get them to help to provide a

20  little bit of extra background here.  Mr. Alexander has

21  admitted in the California action through his answer that he

22  is essentially acting, self-acting as the steward of the

23  debtors' crypto currency that he caused to be transferred

24  improperly from the debtors before the bankruptcy filing

25  because he did not trust the debtors' officers to hold that

1  crypto currency, specifically Mr. Schatt and Mr. Podulka.

2  So, you know, as far as we're concerned and the debtors are

3  concerned, Mr. Alexander has already admitted that he is

4  holding the debtors' property, but he just doesn't want to

5  turn it over because, you know, in his mind, he does not

6  trust the debtors to hold it.

7              And so the first form of relief that we're going

8  to be asking for is that he immediately turn over those

9  assets into a third party escrow account, which would be a

10  tri-party agreement between the debtors, Mr. Alexander and an

11  escrow service that operates in the crypto space, and that

12  that money and that crypto would be held there pending the

13  outcome of the turnover action in the adversary proceeding.

14  You know, he's -- again, he's already acknowledged in

15  pleadings in that action that this is the debtors' property,

16  there is no harm to him if it's transferred to a third party

17  custodian.  So that's the first form of relief, Your Honor.

18              I'll pause here to just see if you have any

19  questions about that.

20              THE COURT:  So this is not the same crypto

21  currency that is the subject matter of the dispute about who

22  controls Cred Capital?

23              MR. AZMAN:  Well, it's intertwined with that

24  issue, right?  Because Mr. Alexander is arguing that the

25  bankruptcy case of Cred Capital was not duly authorized, and

1  so it's intertwined.  So it is the same crypto currency, but

2  Cred Capital is a debtor right now, it's jointly consolidated

3  in these cases, and, you know, he is holding the debtors'

4  assets and that is the nature of the turnover action.

5          And, given what we have now learned that happened

6  two weeks ago -- and, by the way, we also learned -- and this

7  all came to light to us, by the way, late last week.  Our

8  crypto currency-tracing consultants monitor this on a regular

9  basis and they notified us of it.  In looking at these

10  transactions, we also learned that at 3:00 a.m. Pacific time

11  on the morning of the TRO hearing in the California state

12  action he also transferred several million dollars worth of

13  crypto to other digital wallets controlled by himself.

14          And so we're still trying to get to the bottom of

15  this, but there's no question that Mr. Alexander is holding

16  the debtors' assets and has been taking -- making attempts to

17  abscond with those assets, and so that's why we're seeking

18  this emergency relief.

19          So I hope that answers Your Honor's question about

20  how this relates to the motion to dismiss.

21          THE COURT:  It does.  And when are you planning on

22  filing this motion?

23          MR. AZMAN:  My colleague Mr. Hurst is on the line

24  from our Delaware office and it is in process as we speak.

25          Mr. Hurst, do you know if the first motion has

1   been filed yet?

2          MR. HURST:  It hasn't, but, Your Honor -- this is

3   David Hurst from McDermott Will & Emery -- Your Honor, those

4   pleadings will all be filed within the next, say, 90 minutes

5   -- probably 60 minutes, but, outside, 90 minutes.

6          THE COURT:  Okay.  And it is couched as a motion

7   for a temporary restraining order?

8          MR. AZMAN:  It is, Your Honor -- oh, sorry.  There

9   is other relief -- sorry, I didn't get to the other forms of

10  relief -- I don't know if Your Honor wants to hear that.

11  We're asking for sanctions against Mr. Alexander; we're also

12  asking for the Court to enter a prejudgment writ of

13  attachment on Mr. Alexander's personal assets; and we're also

14  asking for expedited discovery, so that we can take discovery

15  of Mr. Alexander immediately to determine where all of Cred

16  Capital's crypto currency is currently residing, whether in

17  his wallets or otherwise, as well as find out all the

18  information we need about these transactions and perhaps

19  others that involve the debtors' crypto currency.

20          And by the way, the magnitude of what we're

21  talking about here, Your Honor, in the aggregate is about $8

22  million if you're looking at today's Bitcoin prices.

23          THE COURT:  All right.  Well, I'll wait to see the

24  motions, but if we have a motion for a temporary restraining

25  order, I will set that for Friday morning at 10:00 a.m.

1    MR. AZMAN:  Thank you, Your Honor.

2    THE COURT:  Mr. Pfeiffer, you raised your hand.

3    MR. PFEIFFER:  Yes, Your Honor, Mark Pfeiffer from

4  Buchanan Ingersoll & Rooney on behalf of James Alexander.

5    Obviously, I have not yet seen these motions, I

6  have not discussed the issues with my client, so I'm a little

7  bit out -- unable to respond to some of the substance, but I

8  think the Court is exactly right.  This is very much related

9  to the pending motion to dismiss and, depending on the

10  outcome of that pending motion to dismiss, if the case is

11  dismissed, the issue goes away for this Court and gets

12  resolved in another court somewhere else.

13    THE COURT:  All right.  Well, let's get to the

14  motion to dismiss.

15    MR. LUFT:  Your Honor, if I may?

16    THE COURT:  Who spoke, Mr. Luft?

17    MR. LUFT:  Mr. Luft.  Judge, just to clarify the

18  comments, the TRO and preliminary injunction, which were --

19  Mr. Azman raises as being in violation, violation of that

20  does not get resolved by this motion to dismiss one way or

21  the other and that's a separate issue, so to be clear.  While

22  it is the same crypto currency at issue, there is a pending

23  court order which the debtor had put in place in a California

24  court, which had found that there was a likelihood of

25  success.

1             THE COURT:  Understood.  Is there anything else on

2   the status conference before we move to the motion to

3   dismiss?  All right.

4             MR. HURST:  Your Honor -- excuse me, Your Honor,

5   David Hurst from McDermott Will & Emery.  You had said the

6   TRO hearing would be Friday morning at 10:00 a.m., is there a

7   particular objection deadline you would like or should it

8   just be at the hearing?

9             THE COURT:  Well, I think we're going to have to

10  do it at the hearing because it's a pretty short time and it

11  is a TRO.  So we'll do it at the hearing.

12            MR. HURST:  Okay.  Thank you, Your Honor.

13            THE COURT:  All right, the motion to dismiss.

14  I've read the papers and I think that there is a -- the

15  fundamental procedural issue here is can I decide what's

16  being asked on a motion to dismiss.

17            There's a dispute between the parties over who

18  controls this particular debtor, Cred Capital.  Mr. Alexander

19  says he controls it, the debtors say they control it.  And in

20  order to make a ruling on the motion to dismiss, you're

21  asking me to make a decision on who controls the company.

22  That is a declaratory judgment, which has to be brought by

23  adversary.

24            So I'll hear the parties on that particular issue

25  first because I don't think we can even proceed on a motion

1  to dismiss.  We need to do this by adversary if you're asking

2  me to make a determination of who controls the company.

3          Mr. Pfeiffer?

4          MR. PFEIFFER:  Yes, Your Honor, Mark Pfeiffer for

5  James Alexander.

6          The debtor comes into this court seeking relief

7  under Title 11 -- Chapter 11.  Just like any other debtor

8  comes in to the Court, they are seeking to invoke the Court's

9  jurisdiction.  There are plenty of disputes that get resolved

10 by the Court on motions in connection with motions to

11 dismiss.  This is not an adjudication of any property rights

12 of the parties; this is merely the Court's determination as

13 to whether or not this debtor was authorized to file this

14 bankruptcy case.  It is not something that requires an

15 adversary proceeding.

16          If a party were to, for example, file papers in

17 Delaware Chancery Court to change the corporate documents of

18 Ford Motor Company and then come down to the Court and file a

19 bankruptcy petition on Ford Motor Company, I don't think that

20 type of proceeding would need an adversary proceeding.  Ford

21 would be able to step up and say, Judge, this was not

22 properly authorized, these papers were not properly

23 authorized to be filed in the Delaware Secretary of State.

24 It would be a simple motion to dismiss, which is what we have

25 here.  There are no property rights that need to be

1  adjudicated in an adversary proceeding.

2          THE COURT:  Well, isn't the property right the

3  fact that Cred Capital is alleged to be a wholly owned

4  subsidiary of Cred Inc.?  And, if that is the case, there is

5  a property right.  Cred Inc. is saying that's our property,

6  you're trying to take our property away.

7          MR. PFEIFFER:  That property right does not have

8  to be adjudicated for the Court to make a determination that

9  these -- this case was not filed with proper corporate

10  authority.  The Court can look to see that the petition was

11  signed by the officer, the officer purportedly had authority

12  from two people who purport to be directors, and then the

13  Court can see how those directors got their authority.  In

14  this case, they didn't have the valid authority to file the

15  case.  There's no requirement that we adjudicate the

16  ownership of the stock at this moment.

17          THE COURT:  Well, the allegation, though, is that

18  Mr. Alexander violated his fiduciary duties, engaged in fraud

19  by incorporating the company in violation of what he was

20  directed to do by the directors and officers of Cred Inc. and

21  thereby obtaining improperly control of the company, and the

22  debtors took it back by following their procedures.

23          So that seems to me that there is a factual issue

24  that cannot be determined on a simple motion to dismiss.  I

25  need to have a full evidentiary record on who controls this

1  company.  Whether Mr. Alexander violated his fiduciary duties

2  or not, whether he engaged in fraud or not, I don't know at

3  this point.  I have to have a full evidentiary record that

4  can only be established through an adversary proceeding.

5           MR. PFEIFFER:  Your Honor, if it is of any help,

6  the parties have agreed that the matter could be submitted to

7  the Court based upon the declarations of the parties without

8  --

9           THE COURT:  Well, the motion to dismiss could be,

10  yes, but my -- I'm still going back to this goes beyond just

11  a motion to dismiss.  This goes to the heart of who controls

12  this company, whose property is it.  And if I granted the

13  motion to dismiss, it would effectively give Mr. Alexander

14  control of the company and the Bitcoin that the debtors

15  assert was stolen from the debtors.

16           MR. PFEIFFER:  Your Honor, from our perspective,

17  the corporate documents speak for themselves and the

18  implications of those corporate documents speak for

19  themselves.  The issues about violation of fiduciary duties,

20  which we deny, the issues about the intent of the parties,

21  which we deny, they are not relevant because the operative

22  documents are the filed documents themselves.  And in this

23  case, if you look at the operative documents filed with the

24  Delaware Secretary of State, this debtor -- or the two

25  directors who purported to authorize this bankruptcy filing,

1  they are not legitimate directors.

2          And it comes down to who is the legitimate

3  director based upon the corporate filings, based upon the

4  filings that are not disputed at all between the parties.

5  We're going to submit them to the Court in connection with

6  the motion to dismiss.  There's no dispute as to what the

7  operative documents say; there's no dispute that we're

8  submitting all of the operative documents.  The Court will

9  have an opportunity to look at what those documents say and

10 make determinations as to what they mean under Delaware law.

11 And authority here in this situation all deals with the

12 corporate authority under Delaware law based upon the

13 existing governing documents.

14          THE COURT:  Well, isn't that whole issue subject

15 to litigation in the Court of Chancery?

16          MR. PFEIFFER:  Yes, Your Honor.  And I believe

17 that Court of Chancery, even though I didn't handle the

18 hearing, I believe the Court of Chancery thought that it

19 should be addressed by this Court as opposed to the chancery

20 court.

21          THE COURT:  Well, I read the transcript, but let

22 me hear from debtors' counsel on this issue.

23          MR. LUFT:  Thank you, Your Honor.  So let me just

24 start with where Mr. Pfeiffer stopped.  It's interesting that

25 he brought up the chancery court because we did go to the

1 chancery court, and what the chancery court said was that, if

2 they wanted to raise this issue, they needed to come to you

3 and seek relief from the stay.  And in particular they noted

4 that because they said there was an issue of control of

5 property, the very issue Your Honor has highlighted.  The

6 notion that any of his claims can be addressed without it

7 getting to the property issue is not something the Delaware

8 Chancery Court accepted and for the same reasons I believe

9 you were getting at it, of course these issues relate to

10 that.

11          Now, there are things that are straightforward.

12 We would like to look at what the operative corporate

13 documents that are on file with the Delaware Secretary of

14 State say, they say that Mr. Lyon is the director of Cred

15 Capital, Mr. Lyon was authorized to do this.  What Mr.

16 Alexander has brought is effectively he has tried to avoid

17 bringing an adversary proceeding, but that's exactly what

18 he's hoping to do; he's hoping to challenge that.  He's

19 saying, despite what the documents say, in reality, I should

20 be named the director.

21          Now, I think if we were to go into the facts,

22 there are -- they are quite clear that that's not the case.

23 But Your Honor is right, that is a factual hearing, it should

24 have been brought as an adversary.

25          It's also correct that Mr. Alexander has

1  absolutely no standing to ask this Court just for a motion to

2  dismiss.  He is not a shareholder, he is not a creditor, he

3  has no pecuniary interest in this entity.  If I was being

4  most charitable, he is a former director.  And I think, under

5  the reality under Delaware law, he is not even that because

6  once they set those documents straight it is though he was

7  never a director in the first place because they were filed

8  mistaken.  He has no basis to assert that this company should

9  not be in bankruptcy.

10        And I do think it's relevant to note, Your Honor,

11  he doesn't even attempt to explain how it would not be in the

12  best interest of the creditors of the estate to remove Cred

13  Capital from bankruptcy.  In fact, his papers don't even

14  mention the creditors or get into the interest of an entity

15  that is plainly insolvent and inextricably intertwined with

16  the debtors.  Rather, he seems only interested in having it

17  dismissed as a means to try to get away from the turnover

18  action which is properly pending against him.

19        Now, we served his counsel with that turnover

20  action on November 19th.  He attached that action to his

21  motion to dismiss on December 8th and in fact appeared in

22  front of your Court on December 2nd noting that he was a

23  party to that action.  If he wanted to raise these arguments,

24  he could have asserted them as a defense in that adversary

25  proceeding, he could have, although inefficiently,

1   theoretically, brought a different adversary proceeding.

2   Instead, he did none of this.  He tried to jump the line by

3   filing a motion to dismiss, which he's not authorized to do

4   and which, as Your Honor noted, absolutely would require

5   getting into the facts.

6          Think about what they're saying.  While Mr.

7   Pfeiffer says just look at the documents, he's not asking you

8   to look at the documents that are currently on file with the

9   Delaware Secretary of State, he's asking you to file on the

10  documents which were found to be -- or at least were removed

11  as mistaken, and he's saying delve into those facts, think

12  about what they are.  And while I have no fear of those

13  facts, I think they're quite clear as to what happened here.

14  There is no question that that is exactly what this Court

15  would have to do.

16         So to Your Honor's question about whether an

17  adversary would be required to address this, absolutely.  I

18  do think this motion can be dismissed for lack of standing on

19  its face, though.

20         THE COURT:  Remind me, Mr. Luft, who is the

21  plaintiff in the chancery action?

22         MR. LUFT:  I believe Mr. Alexander is the

23  plaintiff in the chancery action.

24         THE COURT:  Okay.  So I could lift the stay and

25  allow that action to go forward, and that would resolve the

1  question of who controls Cred Capital.

2         MR. LUFT:  If they had sought relief from the

3  stay, I think we could argue whether that's appropriate.

4  There could be a determination as to who controls Cred

5  Capital in that way.  I do think, Your Honor, given the fact

6  that this is so intertwined with the bankruptcy and the fact

7  that the estate is -- it's, to be honest, almost impossible

8  to distinguish between what is Cred and Cred Capital.  I know

9  Your Honor didn't want to get into the facts, but if you do

10  look at the declarations filed by Mr. Lyon and by Mr. Foster,

11  they make quite clear that the funds were used

12  interchangeably, the accounts were used interchangeably.

13         I personally would be of the view that everything

14  would be best left before Your Honor, but, yes, it is

15  possible that he could have sought relief from the stay and

16  asked for that question to be resolved.

17         I will note, Your Honor, while Mr. Alexander tries

18  to portray this is a complicated Delaware corporate law

19  issue, it's not really turning on how you read a statute, the

20  facts are straightforward to the very issues that you deal

21  with all the time.  The reality is that Mr. Alexander

22  defrauded his employer who gave very clear instructions as to

23  what they wanted to have happen.  He filed papers quite to

24  the contrary and his argument now is effectively, well, the

25  papers I filed weren't mistaken because I intended to file

1  fraudulent papers.  And this is no different than if I wanted

2  to build a one-story addition on my home and I asked my

3  architect to file that, and he decided to file on his own a

4  three-story addition, the question -- those papers would

5  still be wrong, they're still mistaken, even though my

6  architect intended to file the papers.

7          I think this can easily be resolved by Your Honor,

8  but if you would want to send it back to the chancery, that

9  is another avenue.

10          THE COURT:  All right.  Is --

11          MR. AZMAN:  Your Honor, may the committee be

12  heard, if that's okay.

13          THE COURT:  Yeah, I have a quick question for the

14  examiner.  Is Mr. Stark on the call or his counsel?

15          MR. CARTY:  Your Honor, Andrew Carty is on.  I'm

16  having a little trouble with my camera, but can you hear me?

17          THE COURT:  I can.  Thank you.  Remind me whether

18  all of this issue would fall within the purview of what the

19  examiner is investigating.

20          MR. CARTY:  These issues, Your Honor, do fall

21  within the purview.  We are examining these issues.  You

22  know, we're at the still fairly early stages of the

23  examination.  I believe we're hoping to sit down with all

24  parties involved and try to, you know, get to the bottom of

25  what has transpired here, but this does fall within the ambit

1  of the examination.

2          THE COURT:  Okay.  Thank you.

3          Mr. Azman, you wanted to speak?  And I'll come

4  back to you, Mr. Pfeiffer.

5          MR. AZMAN:  Yes, thanks.  Your Honor, as is often

6  the case, the committee is in the position of evaluating

7  events that took place before the committee existed.

8  Although we weren't around at that time, Your Honor, I can

9  tell you a few things.

10         First, from everything the committee has seen, it

11  appears that Mr. Alexander is a bad actor.  And the evidence

12  suggests that Mr. Alexander was one of the persons

13  responsible for this company's failures.  That's not to say

14  that others don't share that responsibility, but Mr.

15  Alexander seems to be front and center.  And, as the Court

16  knows now, the examiner is conducting an investigation, so

17  we'll see what that report says.

18         Second, we just don't see any scenario in which

19  Mr. Alexander's version of the events is accurate.  Putting

20  aside the law for a moment, his story doesn't add up.  Under

21  his version of the truth, Cred Inc. created Cred Capital as a

22  subsidiary, funded it with 300 Bitcoin, all the while knowing

23  that Cred Inc. would have absolutely no control over that

24  subsidiary either through board seats or voting shares.  And

25  then on top of that, Cred Inc. had no problem with some

1  unknown person receiving the voting shares in Cred Capital

2  and then immediately granting Mr. Alexander a proxy to those

3  voting shares.  Your Honor, it's hard to imagine why Cred

4  Inc. would have intended to do that.

5        What is crystal clear to us is that this motion to

6  dismiss and incessant litigation that Mr. Alexander insists

7  on pursuing, which by the way includes litigation that was

8  just filed on Monday by Mr. Alexander in California that

9  appears to violate the automatic stay -- and we're looking at

10  that and we'll have to, I guess, address that with the Court

11  very soon -- but all of that litigation is designed to

12  accomplish one thing and one thing only, preventing the

13  debtors from going after Mr. Alexander for various causes of

14  action.  So we'd ask that the Court not condone this

15  fabricated story or give it any weight.

16        Now, the real important issue I want to bring to

17  Your Honor's attention, we said since our appointment that

18  the committee has one goal and one goal only in this case,

19  and that is to get a plan confirmed as timely as possible to

20  move the causes of action to a liquidation trust, stop the

21  professional fee burn and get out of bankruptcy.  That's been

22  our plan from day one.

23        Your Honor knows that we have a confirmation

24  hearing scheduled for March 9.  My concern, Your Honor -- and

25  not saying that this should drive the ship here, but my

1   concern is that if we wait for the examiner's report on this

2   issue we will not have a motion to dismiss resolved.  We will

3   have a motion to dismiss pending on March 9th and we will not

4   be able to confirm a plan.  You know, we haven't thought

5   through whether there may be some way around that, you know,

6   a few creative ideas come to mind, but none of them are great

7   outcomes.

8           And so I would just stress that the committee's

9   biggest concern with this is that we would like for this

10  matter to be resolved one way or the other as soon as

11  possible, whether in a chancery court or in this court.  And

12  I do think that there is an avenue for this Court to do that

13  today and that is with the procedural defect that Mr. Luft

14  highlighted.  I don't understand how Mr. Alexander as a, you

15  know, purported former director of Cred Capital has standing

16  for any of this.  No equity holder and no creditor is raising

17  their hand with a problem.  I've never seen a director come

18  into court and argue something like this or anything else

19  that's substantively related to the bankruptcy case.  He does

20  not have a claim against the creditor and I don't -- I just

21  don't see the standing that he has to make these arguments.

22          And so, again, I guess I would be asking the Court

23  if there's a way to make a decision on this issue on that

24  basis or another one.  The committee strongly prefers that

25  there be a decision as soon as possible so that we can

1  continue on a journey and get out of bankruptcy.

2          THE COURT:  All right.  Mr. Pfeiffer?

3          MR. PFEIFFER:  Your Honor, briefly, I'll address

4  three of the issues raised by the parties.

5          As far as standing goes, my client has alleged

6  that he is the sole duly authorized director.  He holds a

7  proxy from the sole voting shareholder.  Clearly, he has

8  standing.  The attempt to deny him of standing is effectively

9  an improper attempt by non-authorized people to unilaterally

10 change the corporate documents.

11         My client has been accused of being a bad actor in

12 this case from day one, both in this court and in the press.

13 Quite frankly, if my client is correct that he is the actual

14 sole shareholder, he is not -- or sole director, he is not

15 the bad actor here; he is the victim here.

16         And when you look at whether or not an adversary

17 proceeding is required, I know of absolutely zero cases that

18 require an adversary proceeding in connection with a motion

19 to dismiss a case, whether it be under Section 1112 or, in

20 this case more particularly, a motion to dismiss based upon a

21 failure of the debtor to have proper corporate authority to

22 file the case in the first place.  These are preliminary

23 matters that are decided on motions in courts around the

24 country.  They do not adjudicate property rights and the

25 Court does not have to adjudicate who owns the Bitcoin or any

1  other asset, or whether or not Mr. Alexander is a bad actor

2  or a good actor for preserving and protecting the assets of

3  the company that he is the director of, the sole director.

4  The Court does not have to decide this.

5         If the debtor thinks it has plans to use Bitcoins

6  and this case gets dismissed, the debtor can pursue whatever

7  plans it has, whether it be a turnover or a fraudulent

8  transfer, or the debtor can file a motion seeking -- or a

9  complaint seeking substantive consolidation.  Those are items

10  that require an adversary proceeding because they adjudicate

11  property rights.  This case, this motion is seeking a

12  determination as to whether or not this debtor on day one had

13  the authority to file the case; it is a jurisdictional issue.

14  We don't even get to an adversary proceeding unless this

15  Court has jurisdiction over the matter, and the only way the

16  Court gets jurisdiction over the matter is if the debtor is

17  properly authorized to file the case and that is done on a

18  motion -- and it could actually be done *sua sponte* because

19  it's jurisdictional.

20         MR. LUFT:  Your Honor, if I may?

21         THE COURT:  Go ahead, Mr. Luft.

22         MR. LUFT:  To be clear on a few things, in Section

23  1112 it starts off with you have to be a party in interest.

24  That does get to the fundamental question and the fact is, as

25  we've discussed, Mr. Alexander is not a party in interest

1  and, thus, may not use Section 1112 to seek dismissal.

2         As to Section 305, he makes no attempt to show

3  that he is -- that this is not in any way in the best

4  interest of the creditors.

5         Now, the other thing I just wanted to raise, Your

6  Honor, is Mr. Pfeiffer rests Mr. Alexander's argument, as

7  does Mr. Alexander, on the idea that it's so important

8  because he holds the voting proxy for the sole shareholder;

9  that is in fact not true.

10        First of all, under the legal documents pending in

11 Delaware, the only shareholder of Cred Capital is Cred.  But

12 even under Mr. Alexander's version, he says his authority

13 rests because an alleged investor named Mr. Agha Zohar (ph),

14 who no one from Cred has ever met and no one, from what we

15 can tell, Cred ever spoke to, Mr. Alexander transferred him

16 that authority.  But if you look at the declarations of Mr.

17 Schatt, Mr. Podulka, and then Mr. Foster, who has gone back

18 and checked, Mr. Agha never paid for any shares, nor does Mr.

19 Alexander assert in his declaration that Mr. Agha ever paid

20 for the shares.  And under the agreement, if he did not pay

21 for the shares, then he did not get the authority that went

22 with them, meaning he had no voting rights to transfer to Mr.

23 Alexander, nor did he have the right to name Mr. Alexander as

24 the board member.

25        So, even under Mr. Alexander's theory, he is not

1  an elected board member, nor does he have any voting

2  authority.  Rather, all he simply did was asking the

3  paralegal who incorporated the company to substitute his name

4  in for hers until there could be an election, which under his

5  -- the way devised it, there can never be an election because

6  there will never be a voting shareholder, because Mr. Agha

7  never paid for his shares.

8         To hit back on Mr. Azman's point, none of this

9  makes sense that you'd have a corporation without voting

10  shareholders, without elected board members, unless you look

11  at the one fundamental thing, which is this was all set up by

12  Mr. Alexander to control the company.  But he certainly

13  cannot assert that he has standing based on rights from Mr.

14  Agha that Mr. Agha never had to give.

15         THE COURT:  All right.  Well, it sounds like we're

16  getting into the merits of the whole thing.

17         So go ahead, Mr. Pfeiffer.  What's your argument

18  on the merits?

19         MR. PFEIFFER:  Yes, Your Honor.  On the merits,

20  you have in front of the Court a declaration of Daniel

21  Wheeler, who was the general counsel of Cred.  Mr. Wheeler's

22  declaration establishes that Mr. Wheeler was responsible for

23  the drafting of these documents and that the documents were

24  drafted precisely word-for-word as Mr. Wheeler was instructed

25  by both Mr. Alexander and Mr. Schatt, the former CEO of the

1  other debtors.  So when there's an allegation that this was

2  set up by Mr. Alexander, that flies in the face of the

3  declaration submitted by the debtors' own former general

4  counsel, Mr. Wheeler, who is a former partner of Bryan Cave.

5         The documents speak for themselves.  The emails

6  that were attached to Mr. Schatt's declaration show that Mr.

7  Schatt takes the position there were supposed to be three

8  members of the board of directors.  Assuming even Mr. Schatt

9  was correct, which we dispute, when they went to change the

10 corporate documents they did not go and get the authority of

11 those three members of the board of directors, they just

12 changed the document.

13        But the reality is that there was not supposed to

14 be three directors because Mr. Wheeler's certification, a

15 third party, Mr. Wheeler, who was general counsel for the

16 debtors, says that this corporation was set up exactly as it

17 was supposed to be set up.

18        So when they say that this is a grand scheme by

19 Mr. Alexander that is asking the Court to completely ignore

20 Mr. Wheeler's certification.  Mr. Wheeler is a member of the

21 bar of California, his certification, if it is false, could

22 subject him to sanctions and the loss of his license, and

23 that should carry some weight, Your Honor.

24        THE COURT:  Well, Mr. Wheeler's declaration only

25 says that he did what he was directed to do by whom?

1            MR. PFEIFFER:  By Schatt and Alexander, and that

2    the documents were, he uses the word, "precisely accurate,"

3    and that he read them word-for-word, I believe is what he

4    said.

5            So, when they say that Mr. Alexander stole the

6    company, that flies in the face of the certification filed by

7    a member of the bar who was the lawyer for the debtors.

8            THE COURT:  All right.  Mr. Luft?

9            MR. LUFT:  Your Honor, that is not what Mr.

10   Wheeler says.  If you look at his declaration, paragraph 2,

11   all he said was, "I was instructed and authorized by James

12   Alexander and Daniel Schatt to organize Cred Capital, Inc.,

13   and I did so as instructed and authorized with the assistance

14   of Bryan Cave."

15           He doesn't say that Mr. Schatt ever told him to do

16   it the way he wrote it, he doesn't say anything of the sort.

17   He doesn't say that the documents exactly match what Mr.

18   Schatt ever told him.

19           And since we're going here, I think it's

20   important, Your Honor, to look at two very key documents.

21           One is an Exhibit B to Mr. Schatt's declaration.

22   In it is an email chain in which Mr. Wheeler first tells Mr.

23   Schatt that despite being the general counsel, that he

24   doesn't want to perform -- he can't perform his duties

25   because he's conflicted.

1            Mr. Schatt asks him, how can you be conflicted?

2            And he tells him, well, I am going to get equity

3    in Cred Capital and I'm going to be a director.

4            Mr. Schatt is explicit, and Mr. Alexander is on

5    here and he says, no, no employee of Cred gets the equity in

6    Cred or any of its subsidiaries.  There's a conversation

7    about it, and then to be clear, it is Mr. Alexander who

8    writes to Mr. Wheeler, copying Mr. Padulka (phonetic) and Mr.

9    Schatt, I've spoken with Dan Azman and the following are the

10   action items, and he says, there'll be only two shareholders

11   initially, the investor and Cred.  The board of directors'

12   three members will include the investor, Joe, and James.

13   Three members.

14           And he says that there'll be no (indiscernible) of

15   title.  All CCI employees will continue to participate in the

16   Cred LLC profit plan, to which Mr. Schatt says, Thanks James,

17   the summary is exactly the scope.  Dan W., this should

18   completely eliminate any potential conflict of interest.

19           Now, Your Honor, if you look at Mr. Wheeler's

20   declaration, and I think it's Exhibit C, if we could put it

21   up on the screen, what it is, is a confirmation statement in

22   lieu of a director meeting.  The very next day, March 16th --

23   and we can put this up on the screen -- Mr. Alexander and Mr.

24   Wheeler filed papers with the State of Delaware, stating that

25   there'll be only one member on the board and stating and

1    contradicts and stating that Cred would give Series B shares.

2         So, despite Mr. Alexander writing to his boss the

3    day before and to Mr. Wheeler saying, Hey, there'll be two

4    investors, this will be a three-member board, Mr. Schatt

5    confirming, yeah, that's exactly what we want to do, the very

6    next day if you look at his declaration, they filed papers

7    completely to the contrary, stating the exact opposite.

8         So, far from saying that just because Mr. Wheeler

9    said that he is not a neutral, third-party advisor, if you

10   read Mr. Schatt's declaration, it's quite clear, as well as

11   the documents, that throughout all of this, when Mr. Schatt

12   was asking, what does Series B shares mean?  What does that

13   mean?

14        And no one is telling him that it means he will

15   have no voting rights, no one is telling him that there is

16   only one director of the company, and it's going to be Mr.

17   Alexander.  Mr. Wheeler is copied on all of it, and despite

18   being the general counsel to Cred, despite taking their money

19   in a salary, he never told Mr. Schatt, Mr. Padulka any of

20   these things Your Honor.

21        So, not only can we put no weight on the fact that

22   Mr. Wheeler says that he filed the documents and he does not

23   say he filed the documents, that Mr. Schatt told him to file

24   documents, saying this.  In fact, if we look at the

25   contemporaneous documents, you can see Mr. Schatt told him

1  the opposite, then he proceeded to file documents, consistent

2  with what Mr. Alexander wanted, giving Mr. Alexander all the

3  power, the very next day.

4         And I'd note, Your Honor, Mr. Alexander and Mr.

5  Wheeler have never submitted a document or put in any

6  evidence indicating that Mr. Schatt wanted anything other

7  than a three-person board, anything other than voting rights

8  for Cred, and as Mr. Azman said, of course, they didn't,

9  because no one invests millions of dollars, has their

10 employees work on a company, has the entire be that Cred

11 Capital was supposed to run the funds from Cred earn and Cred

12 borrow and say, I'll take no rights, no responsibility, and

13 by the way, I'm fine with you giving all that authority to

14 some guy who I've never met who never invested any money, and

15 even if he did, would only invest a mere fraction of what I

16 intended to invest.

17         None of it is accurate, Your Honor.  I don't know

18 why Mr. Wheeler decided to raise his head here, but it

19 certainly doesn't confirm that Mr. Alexander's version is

20 true; in fact, it just shows that Mr. Schatt was undermine by

21 two of his four executives, Mr. Alexander and Mr. Wheeler.

22         THE COURT:  All right.  Mr. Azman --

23         MR. PFEIFFER:  Your Honor, may I respond briefly?

24         THE COURT:  Let me hear first from Mr. Azman first

25 because he's going to be supportive of the debtors' position

1  and then I'll come back to you, Mr. Pfeiffer.

2            MR. PFEIFFER:  Thank you.

3            MR. AZMAN:  Thank you, Your Honor.  I'll be brief.

4            I just have one observation for the Court and

5  maybe it's obvious.  Notably absent from any of the pleadings

6  that Mr. Alexander has filed with the Court, with any of the

7  evidence, is anything that transpired after that critical

8  email that Mr. Luft just read to the Court.  That, I think,

9  is the most damning evidence in this matter about the

10 intention of the parties.

11            And there's nothing that anyone has testified to

12 or submitted evidence on that says, oh, eight hours later, we

13 actually had a conversation in the conference room, and we

14 all decided that we were going to do something very different

15 from what we all just agreed to in an email.  And I am

16 certain that does not exist and that's why it's not in the

17 record.  But I think that's an important observation, and I

18 just wanted to note that for the Court.

19            THE COURT:  Thank you, Mr. Azman.

20            Mr. Pfeiffer?

21            MR. PFEIFFER:  Your Honor, really brief, and I'll

22 deal with more, I think, procedure than response on the

23 substance.  But the response on the substance is I think

24 Mr. Luft just hit the nail on the head when he said the

25 papers that were filed gave Mr. Alexander all the power.

1  That is something we can agree on and that is the crux of

2  this whole thing.  Mr. Alexander had the power, had the power

3  to approve or disapprove of the bankruptcy filing.

4          And because this is jurisdictional, it does not

5  need to be an adversary proceeding.  It's not 1112, because

6  1112 says that the Court in unusual circumstances, can choose

7  not to dismiss.  And 1112 talks about the best interests of

8  creditors.

9          The Price v German (phonetic) case, a Supreme

10  Court from the '40s, is very clear that the case has to be

11  dismissed and that there are no other alternatives if there

12  is no corporate authority to file the case.  And the

13  corporate authority comes from state law and the state law in

14  this case is Delaware corporate law and the actual documents

15  that were filed.

16          The amended certificate of incorporation was filed

17  by Mr. Padulka and it reflects that it was authorized by the

18  Board of Directors.  The problem is at the time of the

19  filing, the Board of Directors was Mr. Alexander, and he

20  didn't authorize it.

21          And then Richards, Layton & Finger had to come in

22  a week later and make a correction because somebody must have

23  realized that they weren't actually the directors.  So, they

24  came in and me made a correction to the corporate documents

25  by naming Mr. Schatt and Mr. Padulka as the directors, and

1   that occurred after the filing of the amended certificate of

2   incorporation.

3           From a procedural point, Judge, I understand it

4   looks like there are lots of assets going out of this case if

5   the Court dismisses the Cred Capital case.  I understand

6   that.

7           If the Court would indulge me, I would like to

8   file or provide a brief to the Court on the issue of the

9   adversary proceeding and on the substance of what you're

10  going to see in the declarations.  If we could do that, I

11  would greatly appreciate it.

12          And if we go that route, I would just ask that the

13  Court take judicial notice of a couple of small matters like

14  the bankruptcy petition and the schedules.

15          THE COURT:  No, I'm not going to allow any further

16  briefing on the issue.  It's before me.  I'm going to decide

17  it one way or the other today.

18          Mr. Azman?

19          MR. AZMAN:  You've already addressed my concern.

20  Thank you.

21          THE COURT:  All right.  I'm going to take a

22  10-minute recess and we'll come back, and I'll give you my

23  ruling.  We will reconvene at -- well, let's just reconvene

24  at two o'clock.

25          COUNSEL:  Thank you.

1          (Recess taken at 1:51 p.m.)

2          (Proceedings resumed at 2:00 p.m.)

3               THE COURT:  All right.  Can everybody hear me

4    okay?

5               COUNSEL:  Yes, Your Honor.

6               THE COURT:  Okay.  Before me is a motion to

7    dismiss the bankruptcy case as to Cred Capital.  It's based

8    on an allegation by Mr. Alexander that he is the sole

9    director of Cred Capital and he did not authorize the filing

10   of this case.

11              Mr. Alexander had the burden of proof to show that

12   he, in fact, was the sole director and had the authority to

13   file these cases.  The only evidence presented were through

14   declaration and documents that were admitted, without

15   objection, by the parties.  It made it difficult to

16   credibility of the parties because I didn't hear from any

17   witnesses testifying.

18              But Mr. Alexander, based on the record that's

19   before me, did not seem to have the authority to file the

20   incorporation papers the way he filed them, making himself

21   the sole director of the company.  There's also, I have

22   serious issues about the stock sale to Mr. Aga (phonetic).

23   It does not appear to be supported by the record and I have

24   serious concerns as to why he did not either submit a

25   declaration or appear here today to testify.

1          Whether it was a mistake or whether it was

2   intentional, the way Mr. Alexander initially filed the

3   incorporation papers, I do not have sufficient evidence to

4   determine, but it clearly was not what was intended by Cred,

5   Inc., based on the evidence that I have about what Mr.

6   Alexander was directed to do.

7          I have no evidence before me to make a

8   determination whether that initial filing was caused by fraud

9   or simply a mistake and I make no ruling on that one way or

10  the other.  But it was improper.

11         The record further reflect that when it was

12  discovered that the initial incorporation papers were filed

13  improperly, Cred, Inc. took steps to correct that filing,

14  making Mr. Schatt and Mr. Padulka the directors of the

15  company of Cred Capital and they, therefore, took proper

16  steps to file the debtors' bankruptcy proceeding, therefore,

17  I will deny the motion to dismiss.

18         Are there any questions?

19     (No verbal response)

20         MR. COUSINS:  Your Honor, we will work with Mr.

21  Alexander's counsel to get an order sent over to chambers.

22         THE COURT:  Okay.  Thank you, Mr. Cousins.

23         Do we have anything else for today, Mr. Cousins?

24         MR. COUSINS:  There's one remaining item, Your

25  Honor.  It's the motion to approve the PSA.  And I apologize,

1  because we filed a revised PSA agreement at the last minute.

2  We've been working very hard, but that's the last item,

3  Agenda Item 5.

4        THE COURT:  Was that going forward as a status

5  conference or was that to actually approve?

6        MR. COUSINS:  It's actually bifurcated, Your

7  Honor.  There's two pieces.  The plan support agreement, and

8  then there's a separate piece that we've noticed up for the

9  February 23rd hearing on directive standing, which was

10  decided.  So, it is going forward on the approval of the

11  termsheet.  We noted that we were going to modify the

12  termsheet before the hearing and we hoped to do it yesterday,

13  but unfortunately, it didn't get done until just before the

14  hearing.

15        THE COURT:  Okay.  All right.

16        Go ahead with what we do have to approve then

17  today, Mr. Cousins, or whoever is going to present.

18        MR. GROGAN:  Good afternoon, Your Honor.  This is

19  James Grogan from Hastings on behalf of Cred.

20        Can you hear me okay?

21        THE COURT:  I can.  Go ahead, Mr. Grogan.  Thank

22  you.

23        MR. GROGAN:  Okay.  Thank you, Your Honor.

24        Okay.  So, today, we're here on approval of the

25  termsheet, which was initially filed with our motion at

1  Docket Number 279 that was filed on December 23rd.  But, Your

2  Honor, since then, we have engaged the committee in some

3  additional negotiations.  We did make some changes to the

4  plan support agreement, which was filed today at Docket

5  Number 464.  There is a redline that is available at Docket

6  Number 464-2.

7         But, essentially, the key points are that this is

8  the structure by which the debtors have formulated their plan

9  of liquidation.  This sets out the provisions that were

10 reflected in the combined plan and disclosure statement,

11 which was preliminarily approved by the Court at the last

12 hearing.

13        Here, we have agreed with the committee on a

14 budget.  That is available at 464-1.  And the budget will

15 take us through and actually beyond the currently scheduled

16 confirmation date of March 9th.

17        I would note for the Court in the budget, the

18 debtors' liquidity has significantly improved since this case

19 was filed, which is some good news in an otherwise difficult

20 case.  When we filed this case, you know, we were very

21 concerned that we might not have the liquidity we would need

22 to actually get to confirmation and now we are more than

23 adequately funded to accomplish our objective of getting the

24 plan confirmed.

25        The reasons for that are really twofold.  One is

1  the cryptocurrency assets that we have, have improved in

2  value, just due to market forces.  You know, we filed the

3  case when Bitcoin, in particular, was trading at around

4  $14,000 per Bitcoin.  I checked today and the price of

5  Bitcoin is a little over $37,000.  So, that has significantly

6  improved our liquidity.

7         Second, we have successfully monetized some of the

8  assets that were under management by the prepetition debtor

9  and that's really, you know, due to hard work by our CRO

10 Matthew Foster.  We have recovered a significant amount of

11 cryptocurrency from (indiscernible) funds, slightly more than

12 $5 million worth.  We have also recovered almost $2 million

13 of cryptocurrency from another fund called Equities First.

14        So, we are bringing assets back into the control

15 of the estate.  Those assets are going up in value and our

16 cash position actually looks very good right now.

17        Your Honor, we only drew one objection, I believe,

18 to the plan support agreement.  It was from the U.S.

19 Trustee's Office.  I think that some of those objections are

20 now mooted.  First, the U.S. Trustee had objected that the

21 original filing was incomplete because it didn't include a

22 budget.

23        As I just noted, we now have filed a budget.

24        The trustee also objected that the UCC was given

25 too much oversight, I guess, over cash usage.  You know, as

1  Your Honor knows, we only have unsecured creditors in this

2  case, so I think it's understandable that the fulcrum

3  creditor constituency would want some say over the use of

4  cash by the estate.

5            The budget is, in our view, adequate to fund the

6  estate through confirmation and we also, as part of our

7  amendments, have addressed some of the constraints that were

8  on the debtors in the original version over the use of cash

9  so that now, you know, upon notice and consultation to the

10  committee in the amended PSA, the debtors do have the ability

11  to sell, in their discretion, cryptocurrency, in order to

12  fund the professional fees that are incurred during the case.

13            And other than that, we will continue to consult

14  with the committee and work with the committee on keeping the

15  expenditures of the estate under control and I don't think

16  the budget is, in any way, overly constrictive or

17  inappropriate.

18            The trustee also had objected on the basis that

19  the plan support agreement could interfere with some of the

20  actions of the examiner and we think that we have addressed

21  that.  In particular, the PSA contemplates the granting of

22  the committee with standing to pursue causes of action

23  against insiders and also to engage in some of the crypto-

24  tracing activities that counsel to the committee described

25  earlier.

1        We have engaged the examiner in a dialogue

2    regarding that stipulation regarding standing, which is a

3    component of the plan support agreement.  We have received

4    comments from the examiner's counsel.  We have incorporated

5    those, and I believe the examiner, at this point, is signed

6    off on the terms of the derivative standing that is being

7    provided to the committee.

8        Lastly, the trustee had objected because of the

9    proposed releases that are in the plan support agreement.

10   Our view is that those are confirmation issues.  The approval

11   of the plan support agreement in no way constrains the

12   trustee's ability to object to confirmation of the plan, in

13   whole or in part, and that would not be a reason to deny

14   approval of the plan support agreement.

15       The plan support agreement merely represents an

16   agreement between the debtors and the committee to move

17   forward on a consensual restructuring, as between those two

18   constituencies.  Unless Your Honor has any additional

19   questions, my last point would be that we have not yet

20   received the committee's signature pages, however, Mr. Walsh

21   has assured me and I think he will support this on the

22   record, that the committee will be signing the plan support

23   agreement in the form that is filed, and so, we should be

24   able to submit that with the form of order if the Court

25   approves the PSA.

1           THE COURT:  Okay.

2           MR. WALSH:  Your Honor, Tim Walsh, on behalf of

3  the committee, if I may?

4           What Mr. Grogan just put on the record is

5  accurate.  This document, unfortunately, took a long time to

6  negotiate and get to its final form.  I apologize to the

7  Court and the U.S. Trustee and the other parties that it was

8  filed at the late time that it was, but it's extremely

9  important for us to move this process forward.  We will have

10  the signature either from my firm, or from a committee member

11  hopefully by the end of the day to finalize the document.

12           But we are onboard, and we are looking to Your

13  Honor to please approve it.

14           THE COURT:  Okay.  Thank you, Mr. Walsh.

15           Mr. McMahon, are your concerns resolved?

16           MR. MCMAHON:  Your Honor, they're not, and if I

17  may be heard briefly with respect to (indiscernible) --

18  Joseph McMahon for the United States.

19           First, the debtors' counsel is an advocate.  He's

20  not providing testimony on the debtors' behalf and the

21  debtors didn't, you know, propose any witnesses in connection

22  with this motion.  There's no evidence supporting the

23  debtors' decision as a matter of business judgment or

24  whatever the applicable standard is, to enter into this plan

25  support agreement.

1           A couple of points here, Your Honor.  There are --

2  the points that were raised in our objection fall into

3  categories; one, the handling of cash during the cases and

4  then second, plan terms.

5           With respect to the budget, Your Honor, the motion

6  was filed on December 23rd and six weeks later and an hour

7  before this hearing, the debtors filed a budget that was

8  identified in an exhibit in the initial filing.  I can't say

9  I've had an opportunity to really and study the budget, but I

10 wanted to note that for the record.

11          Second, the committee is playing -- the concern

12 that we have with respect to the committee and the handling

13 of cash, there's a provision in the plan support agreement as

14 it's posited before the Court, basically, where the debtor is

15 going to be restricted within a certain bandwidth of payments

16 for the budget.

17          We understand and we get that the committee has a

18 role to play with the oversight of cash, which its

19 constituency will ultimately benefit from, but, you know, if

20 there are timely filed or asserted administrative claims do

21 not fall neatly within that 13-week budget and the claims are

22 valid, really, the debtors and the Committee don't get to

23 dictate whether those claims get paid.  So, I think that

24 that's really a concern that has to be made clear here that

25 the Court is the ultimate arbiter of how the debtors' cash

1  gets handled.

2         Second point, Your Honor, the plan terms, we

3  specifically objected to the business judgment supporting the

4  release provisions.  We have an examiner in place and there's

5  no testimony by extension, no record supporting the benefit

6  which the debtors get from agreeing to the committee to

7  release any entities or professionals in connection with

8  these cases (indiscernible) plan.

9         At least one of those professionals, Paul

10 Hastings, himself, provided extensive prepetition services

11 and we have an examiner looking at a range of conduct

12 prepetition that were relevant to those prepared

13 (indiscernible).

14        The second plan point, Your Honor, which is an

15 amendment which was inserted into the document, admittedly,

16 it's consistent with the prior disclosure statement plan

17 filing, which is an establishment of a professional fee

18 escrow.  I don't know whether or not the funds that are going

19 to be put into that escrow are intended to be estate cash or

20 not after they are.  I don't know whether it's a reasonable

21 exercise of the debtors' business judgment to segregate cash

22 if it is being put in there primarily for the estate's -- for

23 the professionals' benefit, meaning you would be benefitting

24 a subset of the administrative claim class, that is estate

25 professionals, to the potential detriment of other

1  administrative claimants.

2          So, Your Honor, with respect to the release

3  provision and the professional fee escrow provision, Your

4  Honor, they're in the plan.  We will get to them in short

5  order in March, as scheduled, but there's a prejudgment issue

6  there in that the effect of and what this means by the debtor

7  and the committee entering into this agreement and, Your

8  Honor, with respect to the handling of cash, I think it just

9  has to be made completely clear that allowed claims, as they

10  arise in these cases, to the extent that a vendor hasn't been

11  paid and it's now budgeted, the budget is not dispositive of

12  anything insofar as this Court's oversight of the debtors'

13  cash.

14          THE COURT:  Okay.  Mr. Grogan?

15      (No verbal response)

16          THE COURT:  You're on mute, Mr. Grogan.

17          MR. GROGAN:  Can you hear me now?

18          THE COURT:  Yes, thank you.

19          MR. GROGAN:  Okay.  Your Honor, I think the U.S.

20  Trustee misunderstands the scope of the impact of this

21  agreement.  This is an agreement between the committee and

22  the debtors.

23          If a third party has an administrative expense

24  claim, there's nothing in this agreement that precludes them

25  from seeking allowance of that claim and, in fact, the plan,

1 itself, which is ultimately the document that governs this

2 plan support agreement, provides for full payment of allowed

3 administrative expenses.  So, we're not curtailing anybody in

4 this document from seeking relief from the Court or seeking

5 payment of administrative claims.

6        The funds in escrow are for the estate

7 professionals that represent the committee and the debtors,

8 but those are still estate property.  There's nothing in here

9 that relieves estate professionals from seeking allowance of

10 their fees and expenses from the Court.  We will continue to

11 file our fee applications and until they're allowed by the

12 Court, nothing gets paid; it stays within the control of the

13 debtors.

14        The other thing is that this does provide a

15 framework for us to get to a consensual plan and in that

16 sense, it facilitates the restructuring and is an important

17 part of getting this case completed in a timely and efficient

18 manner.  Your Honor, that's really the subtotal of why we're

19 doing this and what it accomplishes.

20        It is not prejudicial to third parties who are not

21 signatories to the plan support agreement.

22        THE COURT:  What about Mr. McMahon's point that

23 you haven't put on evidence to show that this is in the

24 debtors' business judgment?

25        MR. GROGAN:  Your Honor, Mr. Foster signed the

1  plan support agreement.  He is the chief restructuring

2  officer, and he has indicated his approval of this plan

3  support agreement through signing the document that we filed

4  with the motion.

5           THE COURT:  Okay.  Mr. McMahon, does that resolve

6  your issues now?

7           MR. MCMAHON:  Well, Your Honor, it doesn't.  Well,

8  it doesn't in the sense that I'll be -- I'll talk to the

9  Court.  I haven't even really (indiscernible) the version

10  that was filed today to see whether or not Mr. Foster signed

11  the version that was revised and filed with the Court.  There

12  was an original and a redline and a blackline that was filed,

13  along with the budget, and, frankly, because of the, you

14  know, the proximity to the hearing, I haven't even taken a

15  look at it.

16           But beyond that, Your Honor, with respect to the

17  business judgment issue that I did raise, the agreement has

18  nothing about what Mr. Foster did prior to basically agreeing

19  to the release provisions.  We're going to get to it in the

20  context of plan confirmation, admittedly, but, frankly, I

21  just don't get the purpose of what this document is doing.

22           Your Honor has handled, you know, dozens of

23  bankruptcy cases by now where the committee and the debtors

24  just work cooperatively to get to the joint plan, and you

25  don't even need a plan support agreement.  So, you know, I

1  dare say this is, you know -- well, I don't even know whether

2  or not this is what you'd call standard; it's very atypical

3  for, I guess, a debtor and a committee to be entering into a

4  PSA pre-confirmation, but that's beside the point.

5          You know, the fact that Mr. Foster signed the

6  agreement, really, I don't think is evidence along the lines

7  that we raised, but that's our position.

8          THE COURT:  All right.  Well, it may be unusual,

9  but I think this is an unusual case because we have -- you

10 know, when this case was originally filed before we had the

11 independent director put in place and a CRO put in place and

12 an examiner put in place, there was a lot of distrust between

13 the parties in this case, which would be my guess as to why

14 the parties thought, the debtors and the committee thought it

15 would be a good idea to put together a plan support

16 agreement.

17         So, I'm satisfied that the proposal is appropriate

18 in the context of this case and I'll overrule the objection

19 and enter the order approving the PSA.

20         MR. MCMAHON:  Your Honor, just one point of

21 clarification.  Do I just have the Court's understanding that

22 notwithstanding the debtors' and the committee's agreement

23 with -- that the (indiscernible) that nothing is prejudiced

24 (indiscernible) in connection with challenging those proposed

25 terms at confirmation?

1          THE COURT:  Absolutely.  Absolutely.

2          MR. MCMAHON:  Thank you, Your Honor.

3          THE COURT:  And I don't think that's a part of the

4  plan support agreement, is it, Mr. Grogan?

5          All third-party rights are preserved.

6          MR. GROGAN:  No, Your Honor.  All third-party

7  rights are preserved.  This is purely an agreement between

8  the committee and the debtors.

9          THE COURT:  Okay.  All right.

10          Okay.  Mr. McMahon, does that satisfy your desire

11  to have that on the record?

12          MR. MCMAHON:  It does.  Thank you, Your Honor.

13          THE COURT:  Okay.  Thank you.

14          All right.  Anything else for today?

15          MR. COUSINS:  Your Honor, just briefly, we need to

16  work on a form of order, approving the revised termsheet and

17  PSA, so we'll submit that under certification and make sure

18  that Mr. McMahon and the committee and the examiner's counsel

19  all see it before we file it.

20          THE COURT:  Okay.  Thank you, Mr. Cousins.

21          MR. COUSINS:  Thank you, Your Honor.

22          THE COURT:  All right.  If there's nothing else,

23  then, we are adjourned.  Thank you all very much.

24          COUNSEL:  Thank you, Your Honor.

25      (Proceedings concluded at 2:24 p.m.)

1

## CERTIFICATION

2          I certify that the foregoing is a correct

3  transcript from the electronic sound recording of the

4  proceedings in the above-entitled matter to the best of my

5  knowledge and ability.

6

7

8

9  /s/ William J. Garling                    February 5, 2021

10 William J. Garling, CET**D-543

11 Certified Court Transcriptionist

12 For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25