```
 1                     UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3  IN RE:                          .  Chapter 11
                                    .  Case No.: 20-12836 (JTD)
 4  CRED INC., et al.,              .
                                    .  (Jointly Administered)
 5
                   Debtors.         .
 6                                  .
    . . . . . . . . . . . . . . . . .
 7                                  .
    CRED INC., CRED CAPITAL,        .
 8  INC.,                           .  Adversary Proceeding No.:
    and CRED (US) LLC,              .  20-51006 (JTD)
 9                                  .
                   Plaintiffs,      .
10                                  .
    v.                              .
11                                  .  Courtroom
    JAMES ALEXANDER,                .  824 Market Street
12                                  .  Wilmington, Delaware 19801
                   Defendant.       .
13                                  .  Wednesday, February 10, 2021
    . . . . . . . . . . . . . . . . .  3:01 p.m.
14


15
                 TRANSCRIPT OF HYBRID TELEPHONIC/ZOOM HEARING
16               BEFORE THE HONORABLE JOHN T. DORSEY
                    UNITED STATES BANKRUPTCY JUDGE
17


18


19


20  Electronically
    Recorded By:              Jason Spencer, ECRO
21
    Transcription Service:    Reliable
22                            1007 N. Orange Street
                              Wilmington, Delaware 19801
23                            Telephone: (302) 654-8080
                              E-Mail:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording:
25  transcript produced by transcription service.
```

1  APPEARANCES (CONTINUED):

2  For the Debtors:              Scott D. Cousins, Esquire
                                 COUSINS LAW, LLC
3                                1521 Concord Pike
                                 Suite 301
4                                Wilmington, Delaware 19803

5                                -and-

6                                Avi Luft, Esquire
                                 PAUL HASTINGS, LLP
7                                200 Park Avenue
                                 New York, New York 10166

8
   For the Official
9  Committee of Unsecured
   Creditors:                    Joseph B. Evans, Esquire
10                               Timothy W. Walsh, Esquire
                                 MCDERMOTT WILL & EMERY, LLP
11                               340 Madison Avenue
                                 New York, New York 10173

12

13 For James Alexander:          Mark Pfeiffer, Esquire
                                 BUCHANAN INGERSOLL & ROONEY
14                               700 Alexander Park
                                 Suite 300
15                               Princeton, New Jersey 08540-6347

16                               -and-

17                               David B. Golubchik, Esquire
                                 LEVENE, NEALE, BENDER, YOO
18                                 & BRILL, LLP
                                 10250 Constellation Boulevard
19                               Suite 1700
                                 Los Angeles, California 90067

20

21

22

23

24

25

1                                   INDEX

2  MOTIONS:                                                    PAGE

3  Agenda
   Item 1:    Status Conference: Emergency Motion of the        4
4             Official Committee of Unsecured Creditors for
              Entry of an Order Granting (I) Temporary
5             Restraining Order and Preliminary Injunction
              Against James Alexander and (II) Related Relief
6             [Adv. Docket No. 6, 2/03/21]

7

8  Transcriptionist's Certificate                              23

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commenced at 3:01 p.m.)

2              THE COURT:  Good afternoon, can everyone hear me.

3              COUNSEL:  Yes, Your Honor.

4              THE COURT:  All right.  This is Judge Dorsey.

5      We're on the record in Cred, Inc., Case Number 20-12836.

6      This is a status conference requested by debtors.  I'll go

7      ahead and turn it over to debtor's counsel.

8              MR. COUSINS:  Your Honor, Scott Cousins on behalf

9      of the debtors.  I want to thank the Court for scheduling

10     this.

11             I think the committee and Mr. Evans is going to

12     provide an update.  I also understand Mr. Alexander's

13     bankruptcy counsel is on the call, too.

14             THE COURT:  Okay.  Go ahead, Mr. Evans.

15             MR. EVANS:  Good afternoon, Your Honor.

16             Joseph Evans, McDermott Will & Emery, on behalf of

17     the committee.  We wanted this status conference to update

18     you on the status of the emergency order that Your Honor

19     issued on Friday, just to tell you where we are and there was

20     just a recent filing in this case just a few minutes ago, so

21     you might know why we're here.

22             What has happened or transpired since Friday with

23     this, Mr. Alexander was required to provide all of the Cred

24     cryptocurrency to the debtors 30 minutes after the hearing.

25     That was not done.  Mr. Alexander and through his counsel had

1 | communicated with the committee and the debtor.  There was a

2 | series of excuses about why Mr. Alexander couldn't transfer

3 | the cryptocurrency ranging from personal safety issues to

4 | health issues to, My laptop is two hours away from me and I'm

5 | in the hospital and I'm not technically sound.  I don't know

6 | how to transfer cryptocurrency.  There were excuses all day

7 | long.

8 | But, eventually, what happened was we got our

9 | cryptocurrency-tracing experts on Zoom with Mr. Alexander on

10 | a recorded Zoom call and he transferred some of the Cred

11 | cryptocurrency to the debtors, and so that night -- and your

12 | chambers were advised there was 49.99 Bitcoin transferred and

13 | 2,773,000 USDC, which is U.S. dollar coin, which is a

14 | stablecoin of cryptocurrency, that is roughly equivalent to

15 | one U.S. dollar.

16 | The issue being, Your Honor, that on January 16th

17 | and January 17th, 2020, Mr. Alexander has admittedly taken

18 | and liquidated those 100 Bitcoins, 50 each on each day.  The

19 | value of that liquidation is 3.437 million, nine hundred and

20 | fifty -- 3.437, so $3,437,956.  There's still $664,518 for

21 | the January 16th and January 17th transactions that are

22 | unaccounted for.

23 | Mr. Alexander was also required to submit a

24 | detailed declaration, pursuant to Your Honor's order.  That

25 | was supposed to come in at 4:00 p.m. on Friday.  That did not

1  come in at 4:00 p.m. on Friday.

2          What we received was a declaration on Saturday

3  that was merely nine paragraphs.  It did not provide any

4  detail as to the nature of the transactions, who was

5  executing the transactions, the transaction IDs or anything

6  else.  Just by one example, it described all of the

7  transactions from the missing 75 Bitcoin from the 225 he

8  originally received from June 24th.  The 150 he claimed he

9  had before he executed the January 16th transactions.  His

10  response was prior to the hearing in California on the TRO, I

11  liquidated 75 Bitcoins, the proceeds of which were deposited

12  to a Coinbase account.  That's all the information they

13  provided.

14          We finally obtained from counsel for Alexander,

15  certain bank records and certain Coinbase accounts and what

16  they revealed was that on February 4th, which was the day

17  after the committee filed its emergency motion, Alexander

18  apparently had went to a bank, withdrew $60,000 in cash,

19  wrote a check to himself for $10,000, and wire-transferred an

20  additional $100,000 to himself.

21          We found out during the deposition that that

22  $60,000 that he took out in cash, it was apparently sitting

23  in the trunk of his car.  I'm not sure why, but it is.

24          The committee and the debtors have asked counsel

25  for Alexander to return that money.  He didn't do so.

1        And then we proceeded to a deposition yesterday

2   afternoon.  During the deposition, we uncovered that Mr.

3   Alexander has been taking trips while using the Cred Capital

4   bank accounts.  He took a trip to Vail, Colorado, with his

5   wife.  He took a trip to Istanbul.  And on January 2020,

6   apparently, he paid for a trip to go to Switzerland.  This is

7   all using Cred Capital funds.  It's all out of a Wells Fargo

8   account that Mr. Alexander called the "dedicated account" for

9   Cred Capital funds.

10        There was a series of -- there was difficulty in

11  getting straight answers from Mr. Alexander.  He wouldn't

12  answer, for example, what his job responsibilities were.  He

13  said his job responsibilities were financial services.  He

14  said he didn't remember whether he's left the country within

15  the last six months, even though he has bank records showing

16  that he left the country on December 4th, using the company's

17  dime to do so.

18        And in keeping to your (indiscernible), he

19  admitted to the January 16th transaction that was him.  He

20  admitted that the January 17th transaction was him.  He

21  admitted that he knew that it was in violation of the

22  California temporary restraining order and PI, and he

23  admitted that he did it anyway.  And midway through the

24  deposition, we were pushing him on the big question, which

25  is -- one of the questions, which is, where is the $654,000?

1           He admitted to executing the Bitcoin transactions

2    on January 16th and January 17th and he provided us with some

3    Bitcoin and some USDC, but where's the other 654?

4           He would not answer the question.  We asked

5    multiple times.  He wouldn't ask the question, and then he

6    asked for a break.  He said, You're being mean to me.  I need

7    a break.  I have medical issues, I need a break.

8           We kept asking him questions.  Counsel asked for a

9    break.  We said, fine, take five minutes.  This question is

10   not going away.

11          During that break, all counsel get an email saying

12   he's filing for personal bankruptcy.  They come back on the

13   deposition line and say that counsel says that Mr. Alexander

14   is being directed to not proceed with this deposition because

15   he filed for personal bankruptcy in the Federal District of

16   California.  And so, that's where we are, Judge.  We were

17   preparing to submit the document following the deposition

18   about the various failures of Mr. Alexander to properly

19   comply with the Court's order.  You know, among other things,

20   the declaration wasn't sufficient.  They produced some bank

21   accounts, but the deposition revealed, and the documents

22   revealed, that there were other bank accounts that he had not

23   revealed to us.  On the recorded video call, Mr. Alexander

24   told us that he had one Coinbase account and only gave us

25   that information.  The next day we found out he has two

1 | Coinbase accounts that took the January 16th and January 17th
2 | transactions.

3 | And so, we were preparing to proceed with the
4 | emergency order to finish our deposition and to act in
5 | accordance with Your Honor's wishes in the order, but we
6 | wanted to raise this issue with the Court and tell you where
7 | we were.  We know Your Honor took the hearing on short
8 | notice, issued an order very quickly, so we felt we wanted to
9 | advise the Court as to where we were and to what the status
10 | is.

11 | Because as of now, Alexander is refusing to comply
12 | with the emergency order, based on the personal bankruptcy
13 | filing in the Central District of California.

14 | THE COURT:  All right.  Mr. Pfeiffer, what's going
15 | on with your client?

16 | MR. PFEIFFER:  Yes, Your Honor.  Mark Pfeiffer
17 | representing James Alexander.  I have not been retained in
18 | the California bankruptcy case and I don't represent the
19 | bankruptcy estate in California, however, on the line, but I
20 | don't believe admitted, is Mr. David Golubchik, who is
21 | bankruptcy counsel in California.

22 | My client, James Alexander filed a personal
23 | bankruptcy in the Central District of California in the
24 | middle of the deposition.  The filing, I believe, occurred on
25 | a break.  And as a result of that filing, I believe my client

1  was advised by California counsel to no longer participate in

2  that deposition.

3         My client has turned over substantial amounts of

4  funds, Your Honor:  funds in cryptocurrency; 1.9 million in

5  Bitcoin on Friday; 2.7 million in USD, which I have assumed

6  on Friday incorrectly, meant U.S. dollars.  It's actually a

7  cryptocurrency tied to the U.S. dollar.  That was turned over

8  on Friday.  Friday, in connection with the Zoom video call,

9  when the 2.7 million was turned over, Mr. Alexander shared

10  his screen with the experts who were able to walk him through

11  transferring the 2.7 million.

12         I believe the experts are of the opinion that

13  there are another 50 to $75,000 in cryptocurrency that are

14  still present, and the experts and my client collaboratively

15  tried to get that transferred on Friday night, but they were

16  unable to do that and the parties agreed that they were going

17  to revisit that issue because the imposed technical issues

18  that are beyond my grasp, Your Honor.

19         I understand the debtors pointed out the next day

20  that there, or the following day after that, that there may

21  be some cryptocurrency that is branded in the name of Cred

22  and they requested that back.  I requested a wallet for the

23  cryptocurrency to be transferred and the debtor informed me

24  that they provided the wallet.  They informed me that we

25  should probably run a test transaction to make sure that it's

1   going to the right place.  I have to coordinate that.  I

2   haven't heard from the -- I don't think the Cred brand, the

3   cryptocurrency is probably not a big issue, because I

4   understand it is valueless.

5           That said, it is probably now part of the

6   bankruptcy estate in California.  There are assets that the

7   debtors are seeking to turn over at this juncture,

8   particularly, assets out of the bank accounts, or let me be

9   more precise, a Wells Fargo account and a JPMorgan account.

10          My client wired $50,000 out of the Wells Fargo

11  account I believe yesterday, and I think there's $885

12  remaining in that account.  And my client attempted to wire

13  the full, or 80,000, which is almost the full amount of the

14  JPMorgan account, as well, but, apparently, JPMorgan held

15  some of the funds back and refused to wire them.

16          There are -- and let me back up.  Those two

17  accounts appear to be denominated in the name of Mr.

18  Alexander.  The Wells Fargo account is titled, "James

19  Alexander, dba James Alexander Cred."  I don't know the

20  implications or the legal implications as to who owns that

21  account, but it appears that, at least in argument, that the

22  bankruptcy estate in California has and set claim to it.

23          The JPMorgan account is in the name of James

24  Alexander.  There are transactions that occurred recently out

25  of those accounts and the debtors are seeking those back.  My

1  client has not turned those over, but I believe they're

2  probably part of the bankruptcy estate, as we speak, in

3  California.

4        If the debtor -- or if my client were to turn

5  those funds over now, it may be an unauthorized post-petition

6  transaction.  That may be avoided in the bankruptcy case in

7  California.  I don't know.  I'm not advocating that one way

8  or the other, I'm just pointing out what I believe is a

9  practicality in this situation, Your Honor.  I'm not

10  advocating on behalf of the bankruptcy estate.  I'm just

11  trying to inform the Court as to the lay of the land.

12        THE COURT:  Well, I'm looking at Mr. Alexander's

13  declaration and he admits that he took 225 Bitcoin from Cred

14  Capital, which I understand had a dollar value of about $8.75

15  million.  And doing rough adding from the numbers that I've

16  heard so far about what he's turned over or what he's

17  attempted to turn over, he hasn't even reached half that

18  amount.

19        So, the big question is:  Where's the other half?

20        MR. PFEIFFER:  Your Honor, Mark Pfeiffer, again,

21  for James Alexander.

22        The 8.7 million-dollar number that they're talking

23  about is based upon today's current market value for Bitcoin.

24  I haven't done the math and I haven't done the specific

25  tracing, but there was a liquidation of that Bitcoin, 75

1  Bitcoin prepetition at substantially different values than

2  they are today.  I believe at the time it was, roughly, in

3  the $10,000 range and at last I checked, a couple days ago,

4  it was in the $38,000 range.

5        So, a large portion of the whole or the missing

6  Bitcoin may be the fact that there is a big change in the

7  market value of the Bitcoin following its liquidation.

8        MR. GOLUBCHIK:  Your Honor, maybe I can address

9  some of these numbers --

10        THE COURT:  Hold on.

11        MR. GOLUBCHIK:  Sure.

12        MR. PFEIFFER:  My understanding is the

13  liquidations occurred, ultimately got into the bank accounts

14  and we have provided the debtors and the committee with the

15  bank account statements from the time of, at least,

16  May through February 7th.  I have not been able to identify

17  any other Bitcoin that has gone somewhere else, but we did

18  provide all the bank account statements for where that money

19  ended up, to my estimation.

20        As far as the 100 Bitcoin from January, that was

21  liquidated when the price was about $34,000, to my

22  estimation, and it is now at about $38,000.  So, that's an

23  additional market-value impact on the value of this, the

24  Bitcoin, which would explain why the debtor isn't, or Mr.

25  Alexander, is unable to turn over the $8.7 million that the

1  debtor is asking.

2           MR. GOLUBCHIK:  Your Honor --

3           THE COURT:  Well, I guess the immediate issue is,

4  we need more information and it's unfortunate that Mr.

5  Alexander decided to terminate his deposition in the middle

6  of it before we could get the answers to these questions.

7           Mr. Golubchik, is your client going to agree to

8  participate in discovery so that the debtors in my case can

9  find out whether he still possesses some of their property or

10 am I going to have to send them out there to settle this

11 thing?

12          MR. GOLUBCHIK:  Your Honor, David Golubchik with

13 Levene, Neale, Bender, Yoo & Brill.

14          I am not trying to play games or push the question

15 aside; I just don't have any information.  This is too new.

16          I'll tell Your Honor, without discussing attorney-

17 client communication, what I tell all of my debtors:  every

18 single dollar and every single asset on the petition date

19 needs to be accounted for.  A debtor-in-possession account

20 will be opened.  Every dollar will be deposited, whether it's

21 in another bank account, in cash, in the trunk, in the

22 mattress, wherever it is.  So, to the extent there are

23 assets, they will go into a debtor-in-possession account.

24          As to cooperating in further discovery, I don't

25 know if it will be in connection with this adversary

1  proceeding, which (indiscernible) in light of the bankruptcy,

2  or it will be in connection, whether 2004 or 341(a) or other

3  inquiry in the Central District of California bankruptcy

4  case.

5          It is my belief, and I have not discussed with the

6  client, so I can't give you the client's position, it is my

7  belief that all of the facts are going to come out and

8  everything is going to be out there in the open through the

9  bankruptcy process.  I just can't comment on my client's

10  position, because I have not discussed it.  I found out about

11  this hearing after filing the case yesterday, so I attended,

12  to the extent the Court has any questions.  I just don't have

13  answers to those types of questions at this time.

14          THE COURT:  Mr. Evans, where are we?  What are you

15  asking me to do?

16          MR. EVANS:  Well, a couple things, Judge, and I

17  just want to make sure that we all are on the same page.  The

18  value of the cryptocurrency that Mr. Alexander received, the

19  225 Bitcoin, as of today, is $10,342,738.20.  So, that's the

20  number of the Cred cryptocurrency that he received and the

21  recent transactions on January 16th and January 17th, we have

22  the transaction log which shows exactly how much he sold it

23  for and exactly how much he transferred to himself, and that

24  was $3,437,956.53.  He didn't receive that amount.  What we

25  received was $2,773,438.24.

1        So, sometime between January 16th and today,

2   $664,518 went missing.  All right.  Maybe the $60,000 that's

3   in the trunk of his car, the hundred thousand that was

4   transferred, but there's missing money with transaction

5   records that Alexander admitted on the record just yesterday

6   that he executed and didn't have any answer for this 664.

7   So, those are the numbers.

8        Again, with respect to the other cryptocurrency

9   that was in his ledger account, the reason why we couldn't

10  access the cryptocurrency in the ledger account is because

11  Mr. Alexander said he didn't know what seed words were.  Seed

12  words are a series of names -- numbers, names, you need in

13  order to access a ledger account, which is a protected log.

14  He said he didn't know what they were, never heard of them

15  before, and doesn't know what they are.

16        Our cryptocurrency expert said this makes no

17  sense.  If you opened up your account, you have one.  We

18  found out when we finally received the declaration in the

19  late night on Saturday that he did, in fact, have the seed

20  words and that's why we weren't able to access the account,

21  because he didn't give them to us.

22        So, it's not like Alexander is sitting here,

23  cooperating, and handing over everything.  It's been

24  obstruction every step of the way and only when you force him

25  to do it is when he does it.

1         So, we're sort of at a loss here, Your Honor.  And

2   I understand Mr. Golubchik's position, but the fact remains

3   that he doesn't have a position today, yet directed his

4   client during the course of the deposition to stop the

5   deposition and that he would be filing for bankruptcy.  My

6   understanding of Delaware law, Judge, is there should be no

7   consultation with the client, pending the deposition.  That

8   deposition was open.  We had four or five more hours, at

9   least, and there shouldn't have been any communication

10  whatsoever.

11        So, I don't know how a bankruptcy gets filed right

12  in the middle of the deposition, right on a break when the

13  client says, You're being inhumane.  You're asking me these

14  questions.  I need a break because of medical issues, and all

15  of a sudden, we get a bankruptcy filing.  I've never seen

16  anything like it.

17        So, that's where we are, Judge.

18        MR. LUFT:  Your Honor, if I may be heard from the

19  debtor?

20        THE COURT:  Go ahead, Mr. Luft.

21        MR. LUFT:  Everything Mr. Evans said is completely

22  correct and I have no issue in repeating any of it, but there

23  is one other piece of information to Your Honor's question

24  about where's the difference in this money that I think is

25  important to deal with.

1          As Your Honor noted, Mr. Alexander has now

2    admitted that there was 225 pieces of Bitcoin that he took;

3    notably, he had previously represented that there was only

4    150.  What we have been talking about is, what of that

5    Bitcoin still remains that we know he liquidated.

6          The other thing that has come out is that Mr.

7    Alexander, since being fired from Cred, and improperly taking

8    the funds, has been liberally spending the amounts he is

9    liquidating of the 225.  He is not claiming that the amounts

10   we have are the entire value of the liquidated price of

11   Cred's Bitcoin that he has been keeping for "safekeeping," as

12   he described it in the filings with your Court; he has been

13   spending it on a bit of which he described to Your Honor in

14   his filings and his declaration as not having substantial

15   operations, but yet seemingly spending hundreds of thousands

16   and close to potentially a million dollars on a business that

17   does not exist.

18         So, when we are looking for the shortfall, we are

19   not only looking at the amounts of money that were handed

20   over and the amounts of money that Mr. Alexander concedes

21   under oath are absolutely Cred Capital's funds, but which he

22   is refusing to turn over, we are also talking about the

23   amounts of money he has been spending on quote, unquote,

24   consultants, for marketing a company that doesn't have any

25   operations, for trips, and as he told us yesterday, for

1 salary that he has been paying himself and for potentially

2 personal tax liabilities he believes he has.

3          So, these are all -- and mind you, of course, Your

4 Honor, he made sure to file this bankruptcy before he turned

5 over any information regarding his personal finances, as Your

6 Honor had ordered him to do so; noting that, in fact, Your

7 Honor did not require him to do that until yesterday.  So, he

8 waited to make sure that the filing was done right before

9 he'd hand over any of that information, as well.  So, there's

10 a huge deficit of information and that, I hope, helps the

11 Court understand not just of the money we found, but also

12 where much of the missing money is.

13          THE COURT:  Well, I think at this point, the only

14 thing I can do is to ask Mr. Pfeiffer and Mr. Golubchik to

15 talk to their client to see if he will agree to continue the

16 discovery process in this case and if he's not going to do

17 that, then I think the debtors and the committee here are

18 going to have to go out there and ask the judge in California

19 to lift the stay to allow the discovery to continue.  I don't

20 know what else I can do at this point.

21          MR. PFEIFFER:  Your Honor, I will do that.

22          THE COURT:  Okay, Mr. Pfeiffer.  Thank you.

23          UNIDENTIFIED:  Your Honor, it's --

24          MR. GOLUBCHIK:  Your Honor, it's --

25          THE COURT:  Hang on.  Let me hear from

1  Mr. Golubchik.

2          Go ahead, Mr. Golubchik.

3          MR. GOLUBCHIK:  Of course I'm going to discuss

4  with the client.  It may be a really stupid question, just

5  because I'm the last guy here, but just for my edification,

6  was there some sort of an accounting exchanged or prepared?

7  Does anybody know?

8          THE COURT:  This was all done at the last minute

9  because of a TRO, an emergency TRO that I heard last Friday,

10 when it was -- well, I'll let the parties explain.  But you

11 should talk to the debtors' and the committee's counsel here

12 and they can fill you in on how all this came about.  But

13 this has all kind of transpired just within the last, less

14 than a week.  So, there's a -- it was moving pretty quickly.

15 There was some concern that because these Bitcoin had been

16 taken that we didn't know where they were, but they clearly

17 appear to be property of the debtors' estate, here in

18 Delaware, and therefore, I ordered that they be turned over.

19         And they were in the process, through his

20 declaration that he was supposed to give and the deposition

21 he was supposed to give, and whatever documents the debtors

22 and the committee requested was supposed to result in finding

23 out what happened to that money or the Bitcoin.

24         MR. GOLUBCHIK:  I understand.

25         Your Honor, again, not knowing the substance of

1  issues here, I assume if we get to a point where there's

2  agreement, we should be able to do a relatively quick

3  stipulation in our bankruptcy case for turnover, so we don't

4  have a post-petition transfer.

5           THE COURT:  That would be terrific.  Thank you.

6           MR. WALSH:  Your Honor, if I may?  Tim Walsh, on

7  behalf of the committee.

8           I would ask counsel for Mr. Alexander if they

9  could let us know within the next hour or two if he's going

10 to consent to continuing the deposition, because if not, then

11 we'd like to get papers on file out in California.

12          MR. GOLUBCHIK:  David Golubchik.  I will try.  I

13 can't make any promises, obviously, but I will ask.

14          THE COURT:  All right.  Thank you, Mr. Golubchik.

15 That's all I can ask for is that you ask to do that.  And if

16 we have to -- if the debtors have to go out and ask for a

17 lift stay, then that's what's going to have to happen, I

18 guess.

19          Anything else for today?

20     (No verbal response)

21          THE COURT:  All right.  Well, to lighten things up

22 a little bit, at least we didn't have any cats appear on Zoom

23 this morning, this afternoon, so I appreciate that.

24          UNIDENTIFIED:  My earlier hearing had that, thank

25 you.

1       (Laughter)

2              THE COURT:  All right.  Thank you all very much.

3              Let me know if you need a further conference with

4  me.  I'll try to make myself available whenever I can.

5              COUNSEL:  Thank you, Your Honor.

6              MR. COUSINS:  Thank you, Your Honor, and to your

7  staff for making, and being available.

8              THE COURT:  Thank you, Mr. Cousins.

9              We're adjourned.

10        (Proceedings concluded at 3:28 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATION

2        I certify that the foregoing is a correct

3 transcript from the electronic sound recording of the

4 proceedings in the above-entitled matter to the best of my

5 knowledge and ability.

6

7

8

9 /s/ William J. Garling                    February 10, 2021

10 William J. Garling, CET**D-543

11 Certified Court Transcriptionist

12 For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25