## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| CRED INC., *et al.*,[1] | : | |
| | : | Case No. 20-12836 (JTD) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | **Re: D.I. 380, 533** |
| | : | |
| | : | **Obj. Deadline: March 1, 2021 at 4:00 P.M. ET** |

## OBJECTION OF THE UNITED STATES TRUSTEE TO THE FIRST AMENDED COMBINED JOINT PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT OF CRED INC. AND ITS SUBSIDIARIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

In support of his objection to the first amended combined joint plan (the "<u>Plan</u>") of liquidation and disclosure statement of Cred Inc. and its subsidiaries (the "<u>Debtors</u>" or "<u>Cred</u>") under chapter 11 of the Bankruptcy Code [D.I. 380, 533], Andrew R. Vara, United States Trustee for Regions Three and Nine ("<u>U.S. Trustee</u>"), through his counsel, avers:

## INTRODUCTION

1.      This Court has jurisdiction over the above-captioned cases pursuant to 28 U.S.C. § 1334. This Court is authorized to hear and determine whether the Plan should be confirmed pursuant to 28 U.S.C. § 157(a, b), and the amended standing order of reference issued by the United States District Court for the District of Delaware dated February 29, 2012. Venue of the cases is proper in this District pursuant to 28 U.S.C. § 1408(1).

2.      Under 28 U.S.C. § 586, the U.S. Trustee is generally charged with monitoring the federal bankruptcy system. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

*Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest

standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco*

*D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as

a "watchdog").  Specifically, the U.S. Trustee is charged with "monitoring plans and disclosure

statements filed in cases under chapter 11 of title 11 and filing with the court, in connection with

hearings under sections 1125 and 1128 of such title, comments with respect to such plans and

disclosure statements."  28 U.S.C. § 586(a)(3)(B).

3.    The U.S. Trustee has standing to be heard with respect to confirmation of the Plan

pursuant to 11 U.S.C. § 307.

## GROUNDS/BASES FOR OBJECTION

*Completion of Examination*

4.    The confirmation process should enable the completion and submission of the

Examiner's investigative report and provide relief to the Examiner in that regard.  The U.S. Trustee

reserves the right to supplement this objection pending the filing of the Examiner's report.


*Overbroad Compromise Language*

5.    Sections 12.2 and 17.1 of the Plan indicate that the Debtors are proposing to settle

a host of disputes.  The Plan does not specifically detail or identify any disputes which are being

settled thereunder, yet the document purports to incorporate the settlement of such disputes

pursuant to Federal Rule of Bankruptcy Procedure 9019.  The settlement of claims by a debtor

under Bankruptcy Rule 9019 should be limited solely to those parties who have expressly entered

into a settlement agreement.  Bankruptcy Code section 1123(b)(3) allows a debtor to settle claims

it has against others, but not claims against the debtor.  Claims against a debtor are subject to the standards of Code sections 1129 and 1141.

6.      Bankruptcy Rule 9019 reads in pertinent part: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  The standard for approval of a settlement is subject to the sound discretion of the court guided by the following criteria as set forth in *In re Martin*, 91 F. 3d 389 (3rd Cir. 1996):  "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." 91 F.3d at 393 (citations omitted).

7.      Code section 1123(b)(3)(A) allows for a plan to: "…provide for -- the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  However, the converse is not true; section 1123(b)(3)(A) does not permit a debtor to settle claims against it.

8.      In denying confirmation, Judge Walsh observed in *In re Nutritional Sourcing Corporation*, 398 B.R. 816 (Bankr. D. Del. 2008): "When evaluating a settlement provided for under a plan of reorganization, 'the Bankruptcy Court must determine that a proposed compromise forming part of a reorganization plan is fair and equitable.'"  398 B.R. at 832.  *Accord In re New Century TRS Holdings*, 390 B.R. 140 (Bankr. D. Del. 2008); *In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004).

9.      Other than an express settlement between a debtor and claimant that is subject to approval pursuant to Bankruptcy Rule 9019, Bankruptcy Code section 1141 governs a debtor's discharge.  In *In re Lower Bucks Hospital*, 471 B.R. 419 (Bankr. E.D. Pa. 2012), the court denied approval of a proposed third-party release provision in a plan where the court had previously approved a settlement agreement pursuant to Bankruptcy Rule 9019.  The non-debtor contended

that language in the approved settlement resolved the issue, but the court disagreed, holding: "Thus, the 9019 Order did not resolve with finality the treatment of the Bondholders in the Debtor's plan of reorganization.  That could be accomplished only through the plan confirmation process…" *Id.* at 457.  In *Coram Healthcare Corp.*, this Court found the standards of Bankruptcy Rule 9019 inapplicable to proposed third party releases: "… a release of claims by third parties against a non-debtor cannot be approved under the above standards."  *Coram Healthcare Corp.*, 315 B.R. at 335.  The Court also disapproved a release proposed of the debtor by the trustee, finding:  "No release of the Debtors is appropriate, since the Debtors are entitled only to the discharge provided by section 1141(d)."  315 B.R. at 337.

10.    Section 12.2 and 17.1 of the Plan should be revised to clearly indicate that the settlement standards of Bankruptcy Rule 9019 apply only to the express settlement agreements entered into between the Debtors and a settling party, and not -- as presently proposed -- to a host of undefined entities, including the entire universe of Claims and Interests.  The Debtors' discharge is governed solely by Code section 1141(d).  Moreover, throughout the Plan there are references that the proposed treatment is in "full and final satisfaction, settlement, release, and discharge of" such Claim or Interest.  Any references to "settlement" of a Claim or Interest that is not subject to a settlement that the holder has expressly approved must be removed.

*Debtor Releases Not Warranted Under Applicable Law*

11.    Plan section 18.2 provides for the Debtors, the Debtors' estates, the Liquidation Trust and the Liquidation Trustee to provide releases of all of the Released Parties, which include (per Plan § 1.113)

> the Professionals retained by the Debtors, Grant Lyon as the Debtors' independent director, Matthew Foster as the Debtors' chief restructuring officer, any other staff

4

supplied by Sonoran Capital Advisors, LLC, the Professionals retained by the Committee, and the respective agents and representatives of each of the foregoing.

12.     Pursuant to this Court's decision in *In re Tribune Company,* 464 B.R. 126 (Bankr. D. Del. 2011) (Carey, J.),  and *In re Washington Mutual, Inc.,* 442 B.R. 314 (Bankr. D. Del. 2011) (Walrath, J.), among others, the five factors set forth in In re *Zenith Elecs. Corp.,* 241 B.R. 92, 110 (Bankr. D. Del 1999) and *In re Master Mortgage Inv. Fund, Inc.,* 168 B.R. 930, 937-38 (Bankr. W. D. Mo. 1994) should be considered to determine whether, notwithstanding § 524(e) of the Code, a plan may provide for releases by debtors of non-debtor entities.  *See Tribune* 464 B.R. at 186; *Washington Mutual*, 442 B.R. at 346; *In re Spansion, Inc.*, 426 B.R. 114, 142-43, n. 47 (Bankr. D. Del 2010) (Carey, J.); *In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004) (Walrath, J). Those factors are as follows:

> a.      identity of interests between debtor and non-debtor releasee, so that a suit against the non-debtor will deplete the estate's resources (e.g., due to a debtor's indemnification of a non-debtor);
>
> b.      substantial contribution to the plan by non-debtor;
>
> c.      necessity of release to the reorganization;
>
> d.      overwhelming acceptance of plan and release by creditors; and
>
> e.      payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*Tribune* 464 B.R. at 186 (citing *Washington Mutual*, 442 B.R. at 346 (citing *Zenith,*  241 B.R. at 110)).   "The factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness."  *Tribune* 464 B.R. at 186 (citing *Washington Mutual*, 442 B.R. at 346).

13.     In the present cases, neither the Plan nor the Disclosure Statement address whether any of the *Zenith* factors are met for any of the Released Parties.  As discussed more fully below, none of the *Zenith* factors appear to be present with respect to any of the Released Parties, pending the publication of tabulation results (the fourth factor).

14.     With respect to the first *Zenith* factor, which is identity of interests between the Debtors and non-debtor releasees, the only Released Parties as to whom such factor could arguably apply are the officer(s) and director(s) of the Debtors.  However, even if such factor is present, it alone is not sufficient to justify releasing the Debtors' officer(s) and director(s).  *See Washington Mutual*, 442 B.R. at 349-350 (finding insufficient basis for the debtors' release of their directors, officers and professionals, even though one of the *Zenith* factors, identity of interest, was present) (citing *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 216 (3d Cir. 2000)).  As to the other categories of Released Parties, there has been no assertion, let alone proof, of any identity of interests between those parties and the Debtors.

15.     As to the second *Zenith* factor, the Debtors have not yet identified any "substantial contribution" made to the Plan by any of the Released Parties.  An example of a substantial contribution would be if a Released Party made a lump sum payment to the Plan, thereby allowing the Debtors to make a distribution to unsecured creditors.  *See, e.g., Coram*, 315 B.R. at 335.  In *Coram*, after examination of the *Zenith* factors, this Court allowed the debtors to release noteholders who had contributed $56 million in funding to the plan, which funds allowed the debtors to repay in full all creditors other than the noteholders, as well as make a significant distribution to the debtors' shareholders.  *Id.*

6

16.    There has been no evidence to indicate that any of the Released Parties have made any cash contribution, compromised any claim they may have against the Debtors' estate, or provide any other substantial contribution to the Plan.

17.    While the Debtors' director(s), officer(s), and professionals and the Committee, its members, and the Committee's professionals may have assisted in negotiating or drafting the Plan, this Court has determined that such efforts do not qualify as the kind of contribution to the Plan that would justify a release. *Washington Mutual*, 442 B.R. at 349-50, 354, and *In re Genesis Health Ventures*, Inc., 266 B.R. 606–07 (Bankr. D. Del. 2001). In *Washington Mutual*, this Court held that there was no basis for allowing debtor releases or third party releases of the debtors' directors, officers, or professionals when "[t]he only 'contribution' made by them was in the negotiation of the Global Settlement and the Plan, [which] activities are nothing more than what is required of directors and officers of debtors in possession (for which they have received compensation and will be exculpated) . . . ." 442 B.R. at 354. The court found that, although the first *Zenith* factor may be met (identity of interests), the other four were not. The Court commented that, with respect to their post-petition activities that the directors, officers and professionals of the debtors and the Committee were receiving exculpations, which were sufficient, and releases were "unnecessary, duplicative and exceed the limits of what they are entitled to receive." *Id.* at 350.

18.    Similarly, in *In re Genesis Health Ventures, Inc.*, 266 B.R. 606–07 (Bankr. D. Del. 2001), the Court rejected Debtor releases of its officers, directors, employees and professionals, holding that:

> [T]he release of the debtors' pre-petition claims against the officers, directors, employees and professionals of the debtors is beyond the *post-petition focus* of the *PWS Holding Corporation* [228 F.3d 224 (3d Cir. 2000)] release clause. . . . As in *Zenith*, the officers and directors of the debtors no doubt made meaningful contribution to the reorganization by designing and implementing the operational

7

restructuring of the companies, and negotiating the financial restructuring with parties in interest. However, the officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of "assets" to the reorganization.

*Genesis Health,* 266 B.R. at 606–07 (emphasis added).

19.    The Third Circuit Court of Appeals came to the same conclusion in the context of examining third party releases of the Debtors' directors and officers.  *See Continental*,  203 F.3d at 215 ("[W]e have found no evidence that the non-debtor D & Os provided a critical financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release of liability").

20.    Like in *Genesis*, the Debtor Releases here are not limited to post-petition activity, as permitted by *PWS*, but also cover all prepetition activity.  As recognized by this Court in *Washington Mutual*, those of the released parties who are fiduciaries of the estate – namely the Debtors' D&Os and professionals retained in these cases – are receiving exculpations, and therefore the releases are "unnecessary, duplicative and *exceed the limits of what they are entitled to receive*" under the exculpations.  *Washington Mutual,* 442 B.R. at 350 (emphasis added).

21.    The Debtors' release of the official creditors' committee and its members was also disallowed by the Court in *Washington Mutual*.  Rather than getting a release, the Court indicated that the committee and its members could receive an exculpation with respect to role they played in bankruptcy process, as long as there was an exception for willful misconduct or gross negligence.  *Id.*  Here, the Committee and its members are included in the exculpation clause in section 18.1 of the Plan; they do not need, and should not receive, a release as well.

22.    As to the third *Zenith* factor, the U.S. Trustee leaves the Debtors to their proof as to whether the release of any of the Released Parties is necessary to the reorganization.

23.     The fourth *Zenith* factor is overwhelming acceptance of the plan and release provisions by creditors.  This information is not yet available.

24.     The Debtors will not be able to satisfy the fifth *Zenith* factor, which is the payment of all or substantially all of the claims of the Debtors' creditors and interest holders, based upon the record.

25.     The Debtors have the burden to establish whether the *Zenith* factors have been met as to each of the non-debtors who are the beneficiaries of the Debtor releases. Because an evidentiary predicate is necessary to approve the Debtor releases, the U.S. Trustee reserves argument on this issue until the record at the confirmation hearing is closed.

26.     Additionally, both of the proposed releases (the Debtor and third-party releases) in Plan section 18.2 are proposed to be effective on the "Confirmation Date."  While the U.S. Trustee does not believe that either release is warranted, if this Court approves either provision, neither of the proposed releases should be effective prior to the Effective Date of the Plan.

*Non-Consensual Third-Party Releases – Lack of Consent, Lack of Extraordinary Circumstances*

27.     In Plan section 18.2, the third-party releases in the Plan will be given not only by those creditors in voting classes who voted to accept the plan, but also by those claimholders who abstain from voting, are not entitled to vote, or vote to reject the Plan, unless they check the opt-out box on the ballot and return it by the Voting Deadline.  Although general unsecured creditors have the right to vote on the Plan, they may receive no distribution under the Plan.

28.     Some decisions in this District have held that third-party releases of non-debtors should be allowed only to the extent the releasing parties have given affirmative consent.  *See In*

*re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) (MJW); *In re Emerge Energy Services LP,* 19-11563 (KBO), 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019).

29.     In *Washington Mutual,* the Court held that "any third party release is effective only with respect to those who *affirmatively consent* to it by voting in favor of the Plan and not opting out of the third party releases."  442 B.R. at 355 (emphasis added).  The Court clarified that merely having an opt-out mechanism is not enough, holding that an "opt out mechanism is not sufficient to support the third party releases . . . particularly with respect to parties who do not return a ballot (*or are not entitled to vote in the first place*). *Failing to return a ballot is not a sufficient manifestation of consent* to a third party release." *Id.* (emphasis added), citing *In re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999). [2]

30.     In a recent opinion in *In re Emerge Energy Services LP*, 19-11563 (KBO), 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019), this Court ruled that consent to a third-party release "cannot be inferred by the failure of a creditor or equity holder to return a ballot or Opt-Out Form." *Id.* at *18.   The Court reached this conclusion even though the Opt-Out Forms provided conspicuous notice of how to opt-out and the implication of the failure to do so.   The Court also rejected the Debtor's argument that inferred consent from "silence" should be approved as typical, customary, and routine.  *Id.*   The Court held that it could not, "on the record before it[,] find that the failure of a creditor or equity holder to return a ballot or Opt-Out Form manifested their intent

---

[2] On October 16, 2019, in *Orchid Paper Products Co.,* Case No. 19-10729 (MFW), Judge Walrath reiterated her ruling in *Washington Mutual*, stating "I have read the *Indianapolis Downes* [sic] case and my esteemed colleagues, but I respectfully disagree with them. I think for consent you [need] an affirmative action. And we might as well do it now so we don't waste the solicitation cost." *In re Orchid Paper Products Co.*, Case No. 19-10729 (MFW), Hearing Tr. 12: 11-16, October 16, 2019.  Judge Walrath applied this standard to both the public shareholders, who were deemed to reject the plan, and to general unsecured creditors, who had the right to vote on the plan and were projected to receive some distribution.

to provide a release. Carelessness, inattentiveness, or mistake are three reasonable alternative explanations." *Id.*

31.     The Court in *Emerge* indicated further that it "has concluded that a waiver cannot be discerned through a party's silence or inaction unless specific circumstances are present." *Id.* at *18. The Court clarified that, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as such circumstances. *Id.* at *18.[3]

32.     Other decisions in this District are in accord with *Washington Mutual* and *Emerge*. *See In re Coram Healthcare Corp*., 315 B.R. 321, 335 (Bankr. D. Del. 2004) (holding that the "Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties," and that such release must be based on consent of the releasing party); *In re Exide Technologies*, 303 B.R. 48, 74 (Bankr. D. Del. 2003)(approving releases which were binding only on those creditors and equity holders who accepted the terms of the plan); *Zenith*, 241 B.R. at 111 (release provision had to be modified to permit third parties' release of non-debtors only for those creditors who voted in favor of the plan).

33.     Several decisions from the Southern District of New York have reached the same conclusion.  In *In re Chassix Holdings*, 533 B.R. 64 (Bankr. S.D.N.Y. 2015), the Court held that

---

[3] Although not a reported decision, Judge Owen's ruling in *Fizzics, Inc.*, Case No. 19-10545 (Bankr. D. Del.) (KBO), eliminates any argument that the *Emerge* ruling was limited to situations in which the parties deemed to give releases are to receive no distribution under the plan.  In *Fizzics,* the debtors' plan of reorganization provided for a distribution to be made to general unsecured creditors.   The third-party releases were to be deemed to be given by all holders of claims and equity interests, except for those who had timely submitted a ballot on which they opted out of such releases, or, for those who did not receive a ballot, submitted a "written notice" before the plan objection deadline. *See* First Amended Plan of Reorganization in *Fizzics*, Dkt. No. 123, § VIII.F (Dec. 16, 2019). At confirmation, the Court limited those who would be deemed to give the third-party releases to creditors who had actually voted on the plan, either to accept or reject, and did not check the opt-out box.  *See Fizzics* confirmation order, Dkt. No. 144, ¶ 8, (Jan 24, 2020).

third party releases must be limited to those who voted to accept the plan, or affirmatively elected to provide releases. Creditors in voting classes who failed to return a ballot, as well as unimpaired creditors, would not be deemed to have consented to give third party releases. *Id.* at 79-80; s*ee also In re SunEdison, Inc.*, 576 B.R. 453 (Bankr, S.D.N.Y. 2017)(holding that, under principles of New York contract law, a creditor could not be deemed to consent to third party releases merely by failing to object to the plan, even when the disclosure statement made it clear that such a consequence would result).

34.      Not all decisions from this District have required affirmative consent for third party releases. *See In re Indianapolis Downs, LLC*, 486 B. R. 286, 304-05 (Bankr. D. Del. 2013) and *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del 2010). However, in neither of those two cases did the plan propose, as this Plan does, that third party releases be given by parties who may receive little to no distribution at all under the plan, as is the situation with the general unsecured creditors in the current cases.

35.      In *In re Indianapolis Downs, LLC*, 486 B. R. 286 (Bankr. D. Del. 2013), this Court reached a different conclusion than that of *Washington Mutual* and *Emerge*, and the other cases cited above, concerning the need for affirmative consent to third party releases. In so doing, however, the Court pointed out that, in that case, unlike the present, "the third party release provision ***does not apply to any party that is deemed to reject the Plan***." *Id.* at 305 (emphasis added).

36.      In *In re Spansion, Inc.*, 426 B.R. 114 (Bankr. D. Del. 2010), the Court determined that affirmative consent to third party releases was not necessary, but only with respect to releases given by unimpaired classes, who were "being paid in full." *Id.* at 144. In fact, in *Spansion,* the Court held that non-consensual releases being deemed to be given by parties *who were not*

*receiving any distribution under the plan* did not pass muster under applicable law, and therefore,

"the proposed nonconsensual Third Party Release does not pass muster under *Continental*."  *See*

*id*. at 145, referencing *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203

(3d Cir. 2000).

37.     Requiring affirmative consent for the general unsecured creditors in these cases is

especially important because they are receiving little to no distribution under the Plan and, by

extension, little to no consideration for any releases.  The general unsecured creditors, therefore,

stand to release their claims if they have the misfortune of not receiving the opt out form in a timely

manner, or at all.

38.     Moreover, requiring an affirmative expression of consent helps to ensure there is

true consent, rather than consent assumed by silence, which could be caused by factors such as

electronic mail being wrongly addressed or other delays.  The risk of electronic mail delivery errors

should be borne by the beneficiaries of the releases, not by the Debtors' general unsecured

creditors, especially when the distribution they are projected to receive is potentially de minimis

to none.  The possibility that there might be some distribution to a creditor, no matter how small,

does not justify deeming consent to give third party releases based solely on a creditor's silence.[4]

39.     As noted above, the solicitation procedures even deem those who vote to reject the

Plan to consent to giving a third-party unless they check the opt-out box on the ballot.  To deem

consent under such circumstances is non-sensical.  As stated by the Bankruptcy Court for the

Southern District of New York in *Chassix*, as to rejecting creditors, it is "difficult to understand

why any other action should be required to show that the creditor also objected to the proposed

---

[4] Other alternative explanations for not returning a ballot or opt-out form would include that a creditor did not understand these dense, legal documents and could not afford, or otherwise did not have access to, counsel to interpret the same.

13

third party releases. If (as prior cases have held) a creditor who votes in favor of a plan have implicitly endorsed and 'consented' to third party releases that are contained in that plan, then by that same logic a creditor who votes to reject a plan should also be presumed to have rejected the proposed third party releases that are set forth in the plan.  The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor."  533 B.R. at 79.

40.     Under the holding of *Washington Mutual*, *Emerge*, and the other cases cited above, the Debtors' proposed opt-out procedure for their general unsecured creditors (who may also receive no distribution) if they do not return a ballot, which, in all instances would include those who do not return a ballot or opt-out form because they never received the same.  Releases from such persons and entities are simply not consensual, and therefore should not be allowed.

41.     Moreover, section 18.2 extracts a release from entities related to Holders of Claims or Interests that were not provided an opt-out form; the proposed release also releases the

> current and former Affiliates [of Holders of Claims or Interests], and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, each in their capacity as such ….

The aforementioned entities were likely not served with notice of these proceedings, and absent evidence that the Holders of Claims or Interests are authorized to consent to a release on their behalf as agents, their silence cannot be deemed acceptance under any case law.

42.     The third-party release provision of the Plan (section 18.2) does not meet the requirements for approval of non-consensual third-party releases.  In *In re Continental Airlines*,

203 F.3d 203 (3d Cir. 2000), the Third Circuit surveyed cases from various circuits as to when, if ever, a non-consensual third- party release is permissible.  The Court acknowledged that several Circuits do not allow such non-consensual releases under any circumstances.  *See id.* at 212.  Other Circuits, the Court found, "have adopted a more flexible approach, albeit in the context of extraordinary cases," such as mass tort cases.  *See id.* at 212, *citing Securities and Exchange Commission v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992); *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.*), 843 F.2d 636, 640, 649 (2d Cir. 1988).  *See also, In re Metromedia Fiber Network, Inc.,* 416 F.3d 136, 141 (2d Cir. 2005) (third party release may be granted "only in rare cases").

43.     The Third Circuit in *Continental Airlines* ultimately determined that the proposed releases in that case, which enjoined shareholder lawsuits against debtors' directors and officers, did "not pass muster under even the most flexible test for the validity of non-debtor releases." *Continental*, 203 F.3d at 214.  Therefore, the Court determined that it "need not speculate on whether there are circumstances under which we might validate a non-consensual release that is both necessary and given in exchange for fair consideration."  *Id.* at 214, n. 11 (emphasis added). However, the Court did describe the "hallmarks of permissible non-consensual releases" to be "fairness, necessity to the reorganization, and special factual findings to support these conclusions." *Id.* at 214.

44.     The Third Circuit Court of Appeals recently referenced *Continental* in *In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126 (3d Cir. 2019), *cert. denied sub nom. ISL Loan Tr. v. Millennium Lab Holdings*, 19-1152, 2020 WL 2621797 (U.S. May 26, 2020), as one of the precedents, along with *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011), regarding nonconsensual third-party releases.  The Third Circuit indicated that these decisions "set forth

*exacting standards* that must be satisfied if such releases and injunctions are to be permitted." 945 F.3d at 139 (emphasis added).

45.     In *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001), the Court held that a clause in the plan which released claims of any creditors or equity holders against the senior lenders for any act or omission in connection with the bankruptcy cases and reorganization process required factual showings under *Continental* – that the releases were necessary for the reorganization and were given in exchange for fair consideration. *Id.* at 607. The Court elaborated that "necessity" under *Continental* requires a showing: (a) that the success of the debtors' reorganization bears a relationship to the release of the non-consensual non-debtor parties and (b) that the non-debtor parties being released from liability have provided "a critical financial contribution to the debtors' plan" in exchange for the receipt of the release. *Id.* at 607. A financial contribution is considered "critical" if without the contribution, the debtors' plan would be infeasible. *Id.* Fairness of a release is determined by examining whether non-consenting non-debtors are receiving reasonable consideration in exchange for the release. *Id.* at 608. In most instances of a release provision in a plan, this will entail examining the proposed dividend that non-consenting creditors will receive under a plan with the releases compared to what they would receive under a plan without the releases. *See id.*; *see also In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (applying same factors).

46.     The *Genesis* Court found that the senior lenders had made a financial contribution to the plan, which allowed the debtors to make the 7.34% distribution to the unsecured creditors, who otherwise would be "out of the money." *Id.* at 608. Ultimately, though, the Court found that such contribution was not enough, because "even if the threshold *Continental* criteria of fairness and necessity for approval of non-consensual third-party releases were marginally satisfied by

these facts . . . . [the] financial restructuring plan under consideration here would not present the *extraordinary circumstances* required to meet even the most flexible test for third party releases." *Id.* (emphasis added).

47.    In the present cases, there is nothing in the record to indicate the presence of "extraordinary circumstances," or that that the high threshold necessary for approval of non-consensual third-party releases has been met with respect to each of the non-debtor parties that would be the recipients of these non-consensual releases.  It is hard to imagine what "critical financial contribution" to the Debtors' plan was given by the Debtors' officers, directors, shareholders, employees, and attorneys, the Debtors' non-debtor affiliates and their officers and directors, all of which are the recipients of non-consensual third-party releases.  *See* Plan § 18.2. The Third Circuit in *Continental* and this Court in *Genesis* both found that the directors and the officers of the debtors in those cases did not satisfy the requirements to be entitled to releases.  *See Continental,* 203 F.3d at 215 ("[W]e have found no evidence that the non-debtor D & Os provided a critical financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release of liability"); *Genesis*, 266 B.R. at 606–07 (in rejecting a debtor's release of its directors, officers and employees, the Court held that, "the officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' to the reorganization.").

48.    The Debtors have the burden of establishing whether the *Continental/Genesis* factors have been met for each of the non-debtor released parties who are the beneficiaries of the non-consensual third-party release, including whether the third-party releases are "both necessary

and given in exchange for *fair consideration*." *Continental,* 203 F.3d at 214, n. 11 (emphasis added).

49.     It is difficult to see what fair consideration is being provided for the non-consensual third-party releases in these cases.   The general unsecured creditors are presently slotted to receive little to nothing under the Plan.   If, under *Genesis,* a distribution of 7.34% of the claims of unsecured creditors was not sufficient to meet the *Continental* criteria, then a recovery of zero percent or the possibility of a recovery is not sufficient.

50.     The Debtors here should not be allowed the unfettered discretion to force general unsecured creditors to release non-debtors from liability, because a permanent injunction limiting the liability of non-debtor parties is a rarity that should not be considered absent a showing of "extraordinary circumstances."  *See Continental*, 203 F.3d at 212; *Tribune*, 464 B.R. at 178 (interpreting *Continental* to allow non-consensual releases only in "extraordinary cases."); *Genesis*, 266 B.R. at 608.

*Post-Confirmation, Multiple Liquidation Trustees and Two-Member Trust Advisory Board*

51.     The proposal of three (3) individuals to serve as "Liquidation Trustees," combined with the absence of a Liquidation Trust Agreement addressing how the three individuals will serve as one Liquidation Trustee, is a Plan ambiguity which needs resolution.   Additionally, the Trust Advisory Board consists of two (2) entities, and it is unclear how "tiebreaking" will function if the Board members are in disagreement.

52.     "Liquidation Trustee" is defined in Plan section 1.92 as

the Person appointed to act as trustee of the Liquidation Trust in accordance with the terms of the Combined Plan and Disclosure Statement, the Confirmation Order, and the Liquidation Trust Agreement, or any successor appointed in accordance

with the terms of the Combined Plan and Disclosure Statement and the Liquidation Trust Agreement.

53.    "Person" is defined in Plan section 1.101 as having "the meaning set forth in section 101(41) of the Bankruptcy Code."

54.    Section 101(41) of the Bankruptcy Code defines the term "person" as including "individual, partnership, and corporation …."

55.    In the Plan Supplement, three (3) individuals – Cedric de Lisser, Michael Michelin, and Christopher Moser – are proposed to serve as Liquidation Trustees.  Additionally, a proposed Liquidation Trust Agreement does not appear of record.   Accordingly, the function of a Liquidation Trustee comprised of multiple entities – for example, whether the three individuals will serve as Liquidation Trustee by committee, and what happens when one of the three proposed individuals dies, is incapacitated or unavailable – remains unclear.  Further, absent a Liquidation Trust Agreement, it is also unclear how the two-member Trust Advisory Board will resolve differences between its members.

*Liability of Liquidation Trustee; Liquidation Trust's Indemnity Obligation*

56.    Plan section 12.3(k), titled "Liability of Liquidation Trustee; Indemnification," states:

> **Neither the Liquidation Trustee, the Trust Advisory Board, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, an "Exculpation Party" and collectively, the "Exculpation Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Liquidation Trust or for the act or omission of any other Exculpation Party, nor shall the Exculpation Parties be liable for any act or omission taken or**

omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed by to be conferred by the Liquidation Trust Agreement or the Combined Plan and Disclosure Statement other than for specific acts or omissions resulting from such Exculpation Party's willful misconduct, gross negligence or fraud. The Liquidation Trustee shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee and the Trust Advisory Board shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors. The Liquidation Trustee, or the Trust Advisory Board, may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Liquidation Trustee nor the Trust Advisory Board shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Liquidation Trustee or Trust Advisory Board or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or fraud. The Liquidation Trust shall indemnify and hold harmless the Exculpation Parties (in their capacity as such), from and against and in respect of all Liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidation Trust or the Combined Plan and Disclosure Statement or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or fraud. **Persons dealing or having any relationship with the Liquidation Trustee shall have recourse only to the Liquidation Trust Assets and shall look only to the Liquidation Trust Assets to satisfy any liability or other obligations incurred by the Liquidation Trustee or the Trust Advisory Board to such Person in carrying out the terms of the Liquidation Trust Agreement, and neither the Liquidation Trustee nor the Trust Advisory Board shall have any personal obligation to satisfy any such liability. The Liquidation Trustee and/or the Trust Advisory Board members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Liquidation Trust Agreement against any of them.** The Liquidation Trust shall promptly pay expenses reasonably incurred by any Exculpation Party in defending, participating in, or settling any action, proceeding or investigation in which such Exculpation Party is a party or is threatened to be made a party or otherwise is participating in connection with the Liquidation Trust Agreement or the duties, acts or omissions

of the Liquidation Trustee or otherwise in connection with the affairs of the Liquidation Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Exculpation Party hereby undertakes, and the Liquidation Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Exculpated Party is not entitled to be indemnified therefor under the Liquidation Trust Agreement. The foregoing indemnity in respect of any Exculpation Party shall survive the termination of such Exculpation Party from the capacity for which they are indemnified. (Emphasis added).

57. There are several problems with Plan section 12.3(k). Initially, the provision is objectionable because it prospectively precludes liability in advance of services being provided. Second, it is unclear what the following sentence means: "The Liquidation Trustee shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee and the Trust Advisory Board shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors." Third, the provision attempts to cement an "absolute" advice of counsel defense – meaning, if the Liquidation Trustee acts on advice of counsel with knowledge that the advice given is flawed, was given in bad faith and/or with knowledge that counsel was engaged in misconduct, it is not liable. Fourth, the Debtors propose to limit the liability of the Liquidation Trust, the Liquidation Trustee, the Trust Advisory Board and their respective members to Trust assets when, if the Trust breaches its fiduciary duty, or is found to have been grossly negligent, have engaged in willful misconduct or committed fraud, there may be no trust assets available to remedy his/her/its own misconduct.

## <u>CONCLUSION</u>

WHEREFORE the U.S. Trustee requests that this Court enter an order denying confirmation of the Plan or granting other relief consistent with this objection.

Dated: March 1, 2021                Respectfully submitted,
       Wilmington, Delaware

                                **ANDREW R. VARA**
                                **UNITED STATES TRUSTEE,**
                                **REGIONS 3 and 9**

                                By: *<u>/s/ Joseph J. McMahon, Jr.</u>*
                                Joseph J. McMahon, Jr.
                                Trial Attorney
                                John Schanne
                                Trial Attorney
                                United States Department of Justice
                                Office of the United States Trustee
                                J. Caleb Boggs Federal Building
                                844 King Street, Suite 2207, Lockbox 35
                                Wilmington, DE 19801
                                (302) 573-6491 (Phone)
                                (302) 573-6497 (Fax)
                                joseph.mcmahon@usdoj.gov
                                john.schanne@usdoj.gov