## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related to Docket No. 542** |
| | ) | |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF BUCHANAN INGERSOLL & ROONEY TO WITHDRAW AS ATTORNEYS OF RECORD FOR JAMES ALEXANDER

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 bankruptcy cases (the "Chapter 11 Cases") of Cred Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") hereby submits this objection (the "Objection") to the *Motion to Withdraw as Counsel* [Docket No. 542] (the "Motion to Withdraw")[2] filed by Buchanan Ingersoll & Rooney PC ("Buchanan Ingersoll"). In support of this Objection, the Committee respectfully states as follows:

1.     The Motion to Withdraw should be denied because Buchanan Ingersoll's continued representation of James Alexander is necessary to facilitate Alexander's compliance with the *Order Approving The Emergency Motion Of The Official Committee Of Unsecured Creditors For Entry Of An Order Granting (I) A Temporary Restraining Order And Preliminary Injunction Against James Alexander And (II) Related Relief. In re Cred Inc.*, et al., No. 20-

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

[2]     Buchanan Ingersoll has consented to extending the objection deadline to the Motion to Withdraw to Monday, March 15 at 5:00 P.M. (prevailing Eastern time).

12836, Adv. Proc. No. 20-51006 (the "Adversary Proceeding"), D.I. 19 (Bankr. D. Del. Feb. 5, 2021) (the "Emergency Order").

2.      Buchanan Ingersoll filed a notice of appearance to represent Alexander on December 2, 2020, and since that time, has continuously represented Alexander in opposition to the Debtors' and the Committee's efforts to recover assets of the Debtors' estates and confirm a chapter 11 plan.  *See* Docket Nos. 101, 152, 407, 428, 440, 500, 526, 569, Adversary Proceeding, D.I. 4, 13, 27, 30, 34.  Buchanan Ingersoll has represented Alexander in both the main case and the Adversary Proceeding.

3.      Two days before Cred fired Alexander, Alexander caused a significant, unauthorized amount of Cred's cryptocurrency to be transferred to him.  Specifically, on June 24, 2020, Alexander asked Daniyal Inamullah, a Cred employee, to transfer 224.98993 Bitcoin (the "Cred Bitcoin") and $204,567 United States Dollar Coin (USDC) (the "Cred USDC" and, together with the Cred Bitcoin, the "Cred Cryptocurrency"), to digital addresses Alexander controls.  Adversary Proceeding, D.I. 1 (the "Adversary Complaint"), at ¶ 35.

4.      Subsequently, on July 15, 2020, the Debtors commenced an action against Alexander in California state court (the "California Court") captioned *Cred Inc. (f/k/a Cred LLC) and Cred Capital, Inc. v. James Alexander*, 20-CIV-02915 (the "California Action"), asserting causes of action for *inter alia* conversion and return of the Cred Cryptocurrency and requesting declaratory and injunctive relief.  *See id.*, ¶ 42.  On July 17, 2020, the Debtors applied *ex parte* for a TRO against Alexander.  The California Court issued a temporary restraining order (the "California TRO") freezing the Cred Cryptocurrency and forbidding Alexander from making any transfers thereof.  *See* Emergency Motion (as defined herein), ¶¶ 25–27.  On August 13, 2020, the California Court held a preliminary injunction hearing, extended the TRO during the

pendency of the action, and ordered Alexander to not transfer any of the Cred Cryptocurrency (the "California PI" and, together with the California TRO, the "California Freeze Orders"). *See id.*

5.      As set forth in detail in the *Emergency Motion Of The Official Committee Of Unsecured Creditors For Entry Of An Order Granting (I) A Temporary Restraining Order And Preliminary Injunction Against James Alexander And (II) Related Relief*, Adversary Proceeding, D.I. 6 (the "Emergency Motion"), the Committee discovered that on January 15 and 16, 2021, Alexander violated the California Freeze Orders by surreptitiously transferring and liquidating 100 BTC of the Cred Cryptocurrency.  Alexander has since admitted that he executed the 100 BTC transfers and that he knew these transfers were in violation of the California Freeze Orders. *See* Deposition of James Alexander, dated Feb. 9, 2021 (the "Alexander Dep. Tr."), at 106.[3]

6.      On February 5, 2021, this Court granted the Emergency Motion, stated that it was "time for Alexander to start answering some difficult questions," *see* Hearing Transcript, dated Feb. 5, 2021 (the "Feb. 5 Hr. Tr.") at 23, and ordered Alexander to *inter alia*:

   a.   "submit a declaration by sometime today that lays out exactly what he has, when he got it, how he got it, where it was transferred to, how it was liquidated, where the liquidated funds are located", *Id*. at 24;

   b.   "sit for a deposition and let the parties examine him", *Id.*;

   c.   "turn over whatever he says he has to the debtors", *Id.*;

   d.   "address the differences between the 225 Bitcoin that Ms. Clegg has been able to trace, that was transferred from Cred Capital to Mr. Alexander, and his assertion that he only took possession of 150 Bitcoin.  I want to know, well, how – what's the basis for that distinct difference between the two", *Id.* at 33;

---

[3]     The relevant portions of the deposition transcript are attached hereto as **Exhibit A**.

e.    "provide an explanation for each of the transfers subsequent to the initial transfer of all the Bitcoin, as well as an explanation for why he liquidated the Bitcoin and where that money is located", *Id.* at 35; and

f.    provide "expedited discovery on all of his personal assets", *Id.* at 40.

Adversary Proceeding, D.I. 19.

7.    Alexander has materially failed to comply with the terms of this order. In particular, Alexander has failed to *inter alia*:

a.    Provide a comprehensive declaration describing all cryptocurrency transactions related to the Cred Cryptocurrency, the reasons for each of these transactions, the identity of the natural persons and entities which received Cred Cryptocurrency or the proceeds from the Cred Cryptocurrency, the shortfall between the Cred Cryptocurrency Alexander transferred to himself in January, 2021 compared to the amount currently in Alexander's possession, and the exact location of the Cred Cryptocurrency and the proceeds traced to any sales of Cred Cryptocurrency;

b.    Respond to interrogatories and discovery demands concerning Alexander's personal assets;

c.    Complete the deposition;

d.    Turnover all the Debtors' assets in his possession; and

e.    Produce account statements for bank accounts that Alexander owns, controls, or has signatory authority.

8.    Although Alexander provided a declaration (the "Alexander Declaration") that purported to comply with the Emergency Order, the Alexander Declaration was deficient. Instead of the detailed declaration that Alexander was required to produce, he produced a vague, nine paragraph declaration that did not account for a significant amount of the Debtors' assets.

9.    The Alexander Declaration falls well short of providing the detail about the cryptocurrency transactions and current location of Debtors' assets, as explicitly ordered by the court. In the Alexander Declaration, Alexander admits that on June 24, 2020, he received the 224.98993 Bitcoin and $204,567 in USDC of Cred Cryptocurrency. Although Alexander has

returned some cryptocurrency and cash, there is a significant amount of Cred Cryptocurrency

and the proceeds of liquidations of Cred Cryptocurrency that is still unaccounted for.  Alexander

has provided the Debtors with 49.9980892 BTC, $2,773,489.24 USDC, and $200,580.34 in fiat

currency.  The remainder is still unaccounted for because Alexander has failed to identify in the

Alexander Declaration each transaction, explain the reasons for the transaction, and identify all

parties to each transaction.  Alexander failed to explain where the Cred Cryptocurrency and

money that he took from Cred was spent, who it was sent to, why each transaction was executed,

and where the remaining cryptocurrency and cash is currently located.

10.     For example, the only explanation for the transfer and liquidation of 75 BTC on

July 17, 2020 is: "prior to the hearing in California on the Temporary Restraining Order, I

liquidated 75 Bitcoin, the proceeds of which were deposited into a Coinbase account.  In August

2020, I transferred the remaining amounts to a bank account at Wells Fargo."  Alexander

Declaration, ¶ 8.  There is no explanation as to how that money was spent, who it was transferred

to, why it was transferred, and where it is now.

11.     The need for a detailed explanation of these various transactions is even more

acute here than might ordinarily be the case because of the nature of the cryptocurrency

transactions Alexander engaged in.  Alexander traded Cred Cryptocurrency on a number of

different Coinbase accounts and also engaged in "off exchange" transactions where

cryptocurrency is traded and transferred to and from private wallets that are not associated with

any exchange.  When Alexander provided certain of the Cred Cryptocurrency back to the Debtor,

it was not held within Coinbase or another regulated cryptocurrency exchange.  Rather, that

cryptocurrency was being stored in an off-exchange wallet.  This makes transactions

significantly more difficult to track and trace and further necessitates detailed explanations of the

transactions, the reasons for the transactions, and the natural persons or entities on each side of the transaction.

12.     Similarly, based on the documents Alexander provided about the "dedicated" Cred Wells Fargo Account, Alexander continuously withdrew large amounts of cash.  Each month there were tens of thousands and sometimes hundreds of thousands of cash withdrawals from this bank account.  Alexander stated during his deposition that certain of these "cash withdrawals" were actually "checks" written to third parties.  *See* Alexander Dep. Tr., at 48. Alexander also revealed that during the deposition, $60,000 in cash was located in the trunk of his car.  *Id.* at 51.  A detailed declaration is needed to explain these large, repeated, and suspicious cash withdrawals.

13.     Similarly, there is no explanation for the transfers of 100 BTC on January 16, 2021 and January 17, 2021 and the liquidation of that Bitcoin.  The Alexander Declaration fails to explain why the Debtors have not received the full amount of the fiat currency Alexander received when he liquidated 100 BTC on January 17, 2021 and where that fiat is presently located.  The Alexander Declaration fails to explain any of the Cred Cryptocurrency transactions, cash withdrawals, or other transfers to third parties.  Accordingly, the Alexander Declaration does not even come close to complying with the Emergency Order.

14.     Buchanan Ingersoll was involved in overseeing and facilitating Alexander's attempted compliance, or lack thereof, with the Emergency Order.  Buchanan Ingersoll drafted the Alexander Declaration, submitted the Alexander Declaration to the Court, the Debtors, and the Committee, filed the *Notice of Transfer of Assets* [Docket No. 488] (the "Notice of Transfer"), provided documents to the Debtors and the Committee, and attended a multi-hour zoom call during which Alexander transferred certain cryptocurrency assets to the Debtors.

15.     During the February 9, 2021 deposition, Alexander claimed he needed a 5-minute
break for medical reasons, during which he filed an individual chapter 11 case in the United
States Bankruptcy Court, Central District of California, San Fernando Valley Division (the
"California Bankruptcy Court") captioned *In re James Alexander*, Case No. 21-10214 (MB)
(C.D. Ca. Feb. 9, 2021) (the "California Bankruptcy Case").  *See* Alexander Dep. Tr. at
119–120. Buchanan Ingersoll subsequently directed Alexander "not to answer any further
questions," stating that "in light of that [bankruptcy] filing an automatic stay is in place such that
this deposition cannot go forward."  *Id*.

16.     On February 10, 2021, the Court held a status conference (the "Status
Conference")[4] during which the Committee identified and explained the various deficiencies
with Alexander's response to the Emergency Order.  *See* Hearing Transcript, dated Feb. 10, 2021
(the "Status Conference Tr.").  Buchanan Ingersoll appeared at the Status Conference on behalf
of Alexander.  Buchanan Ingersoll defended Alexander's purported compliance to date, stating
that Alexander had already "turned over substantial amounts of funds," that the assets that
Alexander had stolen from the Debtors were now property of Alexander's estate, and that
Alexander had "attempted to wire [funds, but] JPMorgan refused to wire them."  *Id.* at 10–11.
The Court noted that "we need more information and it's unfortunate that Mr. Alexander decided
to terminate his deposition in the middle of it." *Id.* at 14.  The Court then asked "Mr. Pfeiffer and
Mr. Golubchik to talk to their client to see if he will agree to continue the discovery process in
this case" and Buchanan Ingersoll agreed to do so. *Id.* at 19.

17.     On February 12, 2021, the Committee and the Debtors jointly moved for relief
from stay in the California Bankruptcy Case to, *inter alia*, enforce the terms of the Emergency

---

[4]     The relevant portions status conference transcript are attached hereto as **Exhibit B**.

Order.  *See* California Bankruptcy Case, ECF No. 16.  On February 25, 2021, the California

Bankruptcy Court granted the Debtors and the Committee relief from stay and directed

Alexander to comply with the Emergency Order.  *See* California Bankruptcy Case, ECF No. 52.

18.     Buchanan Ingersoll has repeatedly assured the Debtors and the Committee that

Alexander was gathering information to provide to the Debtors and the Committee and otherwise

attempting to comply with the Emergency Order.  Buchanan Ingersoll provided these assurances

on numerous occasions including at the February 5, 2021 hearing on the Emergency Motion, the

February 6, 2021 Notice of Transfer [Docket No. 488] (the Notice of Transfer”), the February

10, 2021 Status Conference, and in a series of phone calls, zoom meetings, and emails to the

Committee.  *See* Notice of Transfer; Feb. 5, 2021 Hr. Tr.; Status Conference Tr.

19.     The Committee and the Debtors have been in close contact with Buchanan

Ingersoll and have sent numerous emails concerning Alexander's failure to comply with the

Emergency Order.  For example, in an email chain beginning on February 23, 2021, attached

hereto as **Exhibit C**, the Committee explained to to Buchanan Ingersoll Alexander had failed to

comply with the Emergency Order and inquired whether he would do so.  Ex. C.  On a separate

email chain, also beginning on February 23, 2021, attached hereto as **Exhibit D**, Buchanan

Ingersoll responded on March 2, 2021, stating that Alexander "is working on this now and the

information will be provided as soon as it is completed."  Ex. D.  Despite Buchanan Ingersoll's

assurance that Alexander "is working on this now," the Committee has not heard from Alexander

or Buchanan Ingersoll concerning Alexander's compliance with the Emergency Order since the

March 2, 2021 email.

20.     To date, and despite assurances from Buchanan Ingersoll that Alexander would

comply with the Emergency Order, Alexander has failed to do so.  Accordingly, Buchanan

Ingersoll's representation of Alexander has not concluded and Buchanan Ingersoll should not be permitted to withdraw at this time.

21.     "It is generally said of the attorney-client relationship that when an attorney is retained to conduct a legal proceeding, he enters into an entire contract to conduct the proceeding to a conclusion and he may not abandon his relation without reasonable or justifiable cause." *Malarkey v. Texaco, Inc.*, No. 81-cv-5224, 1989 U.S. Dist. LEXIS 8764, at *1 (S.D.N.Y. 1989) (denying counsel's motion to withdraw). Lawyers have a duty to complete unfinished tasks and cannot simply withdraw because the representation is no longer profitable:

> [An] attorney has certain obligations and duties to a client once representation is undertaken [that] do not evaporate because the case becomes more complicated or the work more arduous. These obligations do not evaporate because the case becomes more complicated or the work more arduous or the retainer not as profitable as first contemplated or imagined. Attorneys must never lose sight of the fact that "the profession is a branch of the administration of justice and not a mere money-getting trade." As Canon 44 of the Canons of Professional Ethics so appropriately states: "The lawyer should not throw up the unfinished task to the detriment of his client except for reasons of honor or self-respect."

*In re Egwim*, 291 B.R. 559, 574 (Bankr. N.D. Ga. 2003) (quoting *Kriegsman v. Kriegsman*, 375 A.2d 1253, 1256 (N.J. Super. App. Div. 1977)) (clarifying standards of professional conduct relating to bankruptcy representation).

22.     Courts considering whether to allow a law firm to withdraw from representation should "balance[] the interests of counsel seeking to withdraw against the interests of the court and other parties in the orderly administration of justice." *Worms v. State Corp. "Deposit Ins. Agency"*, No. 20-cv-3505, 2021 U.S. Dist. LEXIS 32590, at *8 (S.D.N.Y. Feb. 22, 2021) (affirming bankruptcy court's denial of counsel's motion to withdraw). "It is well accepted that membership in a professional bar and appearance as counsel before a court entails certain professional obligations." *Id.* at *8–9. "Even if a client steadfastly refuses to pay fees, however,

a court need not allow withdrawal on that basis when it would delay or disrupt the proceedings." *Id.* at *11.

23.    Buchanan Ingersoll has been so intimately involved in these Chapter 11 Cases that withdrawal at this time would cause severe disruption, especially because Alexander's compliance with the Emergency Order remains pending.  One of the key tasks that Alexander still must complete is to provide a detailed declaration in accordance with the Emergency Order. Buchanan Ingersoll drafted the initial Alexander Declaration and is in the best position to revise the Alexander Declaration in order to comply with the Emergency Order.  After representing Alexander through the Emergency Motion and through some partial compliance with the Emergency Order, it would significantly prejudice the Committee and the Debtors to wait for Alexander to hire new counsel to get up to speed to adequately comply with the Emergency Order.  *Malarkey*, 1989 U.S. Dist. LEXIS 8764, at *6 (denying counsel's motion to withdraw where the case was close to trial); *see also S.E.C. v. Great Am. Techs., Inc.*, No. 97-cv-10694, 2009 U.S. Dist. LEXIS 117589, at *12−13 (S.D.N.Y. Dec. 15, 2009) (denying motion to withdraw where withdrawal would compound discovery delays).

24.    If Buchanan Ingersoll is permitted to withdraw from its representation of Alexander, the Committee's already laborious efforts to recover assets of the Debtors' estate and the Courts' interest in providing a full accounting of the Debtors' assets will be significantly frustrated.  *See In re Egwim*, 291 B.R. at 576 ("courts have an interest in the proper administration of justice and in having parties before them properly represented. For this reason, courts have always limited the right of attorneys to withdraw from a case once they have appeared").  Alexander's antics have caused the Debtors to incur significant professional expenses.  Allowing Buchanan Ingersoll to withdraw before compliance with the Emergency

Order is complete will only serve to exasperate Alexander's already significant harm to the Debtors.

      25.     Accordingly, the Motion to Withdraw should be denied without prejudice to renewal upon Alexander's full compliance with the Emergency Order.

[<em>Remainder of Page Intentionally Left Blank</em>]

Dated:   Wilmington, Delaware
March 15, 2021

**MCDERMOTT WILL & EMERY LLP**

*/s/ David R. Hurst*
David R. Hurst (I.D. No. 3743)
1007 North Orange Street, 10th Floor
Wilmington, DE 19801
Telephone: (302) 485-3900
Facsimile:  (302) 351-8711

- and -

Timothy W. Walsh (admitted *pro hac vice*)
Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
340 Madison Avenue
New York, NY 10173
Telephone: (212) 547-5400
Facsimile:  (212) 547-5444

*Counsel to the Official Committee of
Unsecured Creditors*