## EXHIBIT A

Deposition Transcript

1      IN THE UNITED STATES BANKRUPTCY COURT
2           FOR THE DISTRICT OF DELAWARE
3
     _____
4    In re:                        )
5    CRED INC., et al.,            )
6              Debtors.            )
7    _____)
8    CRED INC., CRED CAPITAL,      )
9    INC., and CRED(US)LLC,        )
10             Plaintiffs,         )
11        V.                       )Case No. 20-12836(JTD)
12   JAMES ALEXANDER,              )
13             Defendant.          )
     _____)
14
15    VIDEOTAPED REMOTE DEPOSITION OF JAMES ALEXANDER
16      Deponent testifying from Los Angeles, California
17             Tuesday, February 9, 2021
18                    Volume I
19
20   Stenographically Reported By:
21   Melissa M. Villagran, RPR
22   CSR No. 12543
23   Job No. 4455511
24
25   PAGES 1 - 137

Page 1

| | |
|---|---|
| 1  A  I moved it anyway because I was<br>2  incapacitated, and I was, you know, in fear of --<br>3  I -- I thought I was dying, and I didn't want to<br>4  leave a hardware wallet inaccessible to where those<br>5  assets couldn't be accessed.             02:58:46<br>6  Q  Uh-huh.<br>7     And you never -- you never asked anybody to<br>8  reach out to the debtors on this issue, did you?<br>9  A  I did not.  I was incapacitated, as I said.<br>10 Q  Uh-huh.                      02:58:59<br>11    And on January 17, 2021, you executed an<br>12 additional 50 Bitcoin transaction, didn't you?<br>13 A  That -- that's -- that's -- yes, that's<br>14 right.<br>15 Q  Okay.                       02:59:07<br>16    And on both of those days, when you executed<br>17 the transaction, you knew that that was in violation<br>18 of the Court's order, right?<br>19 A  I did, yes.<br>20 Q  Okay.                       02:59:16<br>21    And you did it anyway?<br>22 A  I did it because I was incapacitated, and I<br>23 wanted to make these assets more accessible.<br>24 Q  So what did you do with those assets after<br>25 they went into your Bitcoin account -- after they  02:59:28<br>Page 106 | 1  Q  Okay.<br>2     So your testimony is you were incapacitated,<br>3  you executed two transactions of 50 Bitcoin each,<br>4  and when you realized what happened, you transferred<br>5  them back to the Ledger wallet?           03:01:05<br>6     That's what you are saying?<br>7  A  That is correct.<br>8     MR. GRIVNER:  Objection to form.<br>9     MR. EVANS:  Okay.<br>10    Let's open up the Ledger Live operations    03:01:10<br>11 wallet, Sam.  And the exhibit letter, if you could.<br>12    COURT REPORTER:  Mr. Evans, if you could just<br>13 slow down a little bit.  You get talking pretty fast<br>14 sometimes.  It's hard to understand you.<br>15    MR. EVANS:  Sure.                 03:01:30<br>16    MR. ASHWORTH:  This is going to be Exhibit I,<br>17 Joe.<br>18    (Exhibit I was marked for<br>19    identification and is attached<br>20    hereto.)                     03:01:38<br>21 BY MR. EVANS:<br>22 Q  So this is Exhibit I.  This is the Ledger<br>23 Live operations document that was provided to us by<br>24 you concerning your Ledger wallets.<br>25    MR. EVANS:  So if you would go to Line    03:01:48<br>Page 108 |
| 1  went into your Coinbase account?  Apologies.<br>2  A  In both cases on the 16th and 17th, they were<br>3  liquidated for dollars.  And when -- when I became<br>4  aware of those transactions and I sweeped the assets<br>5  back to the hardware wallet where they were -- where  02:59:46<br>6  they were supposed to be, and then transferred them<br>7  subsequently to the debtor.<br>8  Q  Let -- let -- let's take that in pieces.<br>9     What do you mean, when you became aware of<br>10 the transactions?                   03:00:02<br>11 A  Well, I was incapacitated, as I said, and so<br>12 I -- I -- I -- when I got better and I -- I didn't<br>13 think I was dying, I stopped the transfer of assets<br>14 from the Ledger wallet to the Coinbase account and<br>15 eventually reversed that transaction, put the assets  03:00:24<br>16 back on the hardware wallet where they -- where --<br>17 where they were supposed to be.<br>18 Q  Okay.<br>19    So when you became aware, you're saying you<br>20 don't remember transferring the January -- doing --  03:00:38<br>21 executing the January 16th and January 17th Bitcoin<br>22 transactions?<br>23 A  I was -- I was completely incapacitated.<br>24 I -- that's all I can tell you.  And in the -- you<br>25 know, in my delirium, that seemed to make sense.   03:00:50<br>Page 107 | 1  Item 66, Sam.  You might want to highlight that.<br>2  BY MR. EVANS:<br>3  Q  Line Item 66 is a January 16th, 2021 Bitcoin<br>4  transaction, 50.00014 Bitcoin.<br>5     Do you see that?                 03:02:04<br>6  A  Yes.<br>7  Q  Okay.<br>8     And January 17th, the next day, is the<br>9  Bitcoin transaction 50.00027.<br>10    Do you see that?                 03:02:15<br>11 A  Uh-huh.  Yes.<br>12 Q  Okay.<br>13    And are those the two transactions that you<br>14 were talking about where you were incapacitated and<br>15 you don't remember doing?              03:02:24<br>16 A  Yes.  I scheduled those transactions, and<br>17 they were executed, yes.<br>18 Q  Okay.<br>19    So this is your digital wallet.  You said<br>20 you -- you placed them all back into your digital    03:02:30<br>21 wallet.  So where is that?<br>22 A  No.  I transferred the -- I don't see that on<br>23 here.  Why -- where are the dates?  Dates -- the<br>24 dates seem like they are out of order here.  I -- is<br>25 there any way to sort this by date?         03:03:07<br>Page 109 |

```
 1     (Exhibit A was marked for
 2     identification and is attached
 3     hereto.)
 4  BY MR. EVANS:
 5  Q  Mr. Alexander, this is a bank account that       01:11:36
 6  you produced through your counsel, and the date on
 7  the top is February 7th, 2021.
 8     MR. EVANS:  Mr. Ashworth, if you would please
 9  scroll down to the next page.
10     You could stop there.                            01:11:49
11  BY MR. EVANS:
12  Q  On February 4th, 2021, the day after the
13  bankruptcy court hearing you attended, you
14  transferred to Alexander Custom Management $100,000.
15     Do you see that?                                 01:12:02
16  A  I do.
17  Q  Do you intend on returning that $100,000 to
18  the debtors?
19  A  What does that mean, returning to debtors?
20  Q  Will you return the money, Mr. Alexander?       01:12:18
21  A  To -- to whom?
22  Q  To the debtors, to Cred, to the persons that
23  you took it from.
24  A  Well, if -- I can't answer that.  I...
25  Q  It's a -- it's a simple question.  The          01:12:32
```
Page 42

```
 1  $100,000 that was in the account that is now in the
 2  account apparently held by Alexander Custom
 3  Management, are you going to provide that $100,000
 4  back to the debtor?
 5  A  I will rely on advice of counsel on what to     01:12:47
 6  do for any steps at this stage.  I -- I do not have
 7  the legal competency to determine whether I should
 8  or shouldn't be transferring funds.  So I'm doing
 9  nothing until I have advice from counsel.
10  Q  Okay.                                           01:13:04
11     And you would -- you would admit that
12  Alexander Custom Management is an account that you
13  control, right?
14  A  Can you be more specific?  Is there an
15  account number or?                                 01:13:16
16  Q  Sure.
17     There was $100,000 transferred out of this
18  account on February 4th, 2021 to an account held by
19  Alexander Custom Management.
20     The account Alexander Custom Management is     01:13:24
21  owned and controlled by you, right?
22  A  Yes.
23  Q  Okay.
24     On February 4th, 2021, there was a cash
25  withdraw of $60,000.                               01:13:35
```
Page 43

```
 1     Do you see that?
 2  A  So to clarify those dates, that's the posted
 3  date of the transaction.  That's not the date the
 4  transaction -- that's not the date of the
 5  transaction.  That's the date of the posting of the  01:13:46
 6  transaction.
 7  Q  Uh-huh.
 8  A  And postings can take many days in -- in
 9  financial services, so --
10  Q  Okay.                                           01:13:56
11     So let me make the question a little -- let
12  me make the question a little easier.
13     (Speaking simultaneously.)
14  A  -- transaction date, please.
15  Q  Okay.                                           01:14:01
16  A  If you could --
17  Q  If you took --
18  A  If you could confirm that correction --
19     COURT REPORTER:  One at a time, please.
20     THE DEPONENT:  If you could please confirm     01:14:13
21  that correction that these are the posted
22  transaction dates.
23  BY MR. EVANS:
24  Q  You took $60,000 in cash out of this account,
25  right?                                              01:14:21
```
Page 44

```
 1  A  Can you confirm that these are the posted
 2  transaction dates?  Because that's an -- that's an
 3  error in my confirmation.
 4  Q  These are your documents, Mr. Alexander.  You
 5  provided them to us.                                01:14:33
 6     I'm asking you:  Did take $60,000 out of this
 7  account?
 8  A  And I'm asking to confirm the -- the posted
 9  transaction date is what you meant when you said
10  "transaction date."                                 01:14:45
11     MR. GRIVNER:  James, I'm going to instruct
12  you to answer the question that's being asked.
13     Okay.
14     Go ahead, Joe.
15  BY MR. EVANS:                                      01:14:54
16  Q  Did you withdraw $60,000 in cash from this
17  account?
18  A  Yes.
19  Q  On which day did you withdraw $60,000 from
20  this account?                                       01:15:03
21  A  I don't recall.
22  Q  Where is that money now?
23  A  It's -- it's -- it's -- it's with me.
24  Q  Okay.
25     Is it in your house?                            01:15:14
```
Page 45

**Page 46**

1  A  No.
2  Q  Where is it?
3  A  It's -- it's kept safe.
4  Q  Where is it kept safe?
5  A  It's kept -- it's kept safe just at a      01:15:20
6  location that I will disclose after my counsel tells
7  me to.
8      MR. EVANS: Mr. Grivner?
9      MR. GRIVNER: James, I will instruct you to
10 answer that question where those funds currently      01:15:34
11 reside.
12     THE DEPONENT: Okay.
13     Those are currently in my car.
14 BY MR. EVANS:
15  Q  Where is your car?      01:15:42
16  A  My car is -- is parked at Finley Avenue.
17  Q  What's the full address?
18  A  4501 Finley Avenue.
19  Q  What kind of car is it?
20  A  It's a Mercedes.      01:15:57
21  Q  When did you purchase that Mercedes?
22  A  2014.
23  Q  Okay.
24     Why did you withdraw $60,000 in cash from
25 this account?      01:16:08

**Page 47**

1  A  I -- to settle the tax liability that I have,
2  which was part of 2020 compensation.
3  Q  Okay.
4     So you were planning on paying the tax
5  authorities in cash?      01:16:26
6  A  I was -- I was planning -- planning on paying
7  the tax authorities, yes. I just don't know to whom
8  that check has to be made or how to hand over those
9  funds, so it seemed -- it seemed the -- the right
10 thing to do.      01:16:38
11  Q  The right thing to do is to pull out $60,000
12 in cash?
13  A  For a tax liability, yes, that's...
14     MR. GRIVNER: Object to form.
15 BY MR. EVANS:      01:16:49
16  Q  Have you ever paid your taxes in cash before?
17  A  I have, yes, my -- my property taxes.
18  Q  Okay.
19     MR. EVANS: If you scroll down, Mr. Ashworth.
20 BY MR. EVANS:      01:16:55
21  Q  There's a withdrawal on February 3rd, 2021 of
22 $10,000.
23     Do you see that, Mr. Alexander?
24  A  Yes, and I believe that's a counter check. I
25 don't believe that's cash.      01:17:11

**Page 48**

1  Q  Okay.
2     The description says (as read):
3       "Withdrawal made in a branch
4     store."
5     Do you see that?      01:17:16
6  A  Yeah. Unfortunately, you -- those notations
7  all say withdrawal, but some, if not all, of those
8  transactions are counter checks, which is just a
9  cheaper way to transfer directly to Wells Fargo
10 accounts.      01:17:34
11     And those are payments to consultants, so I
12 would have to get back to you to see exactly who
13 that payment was to.
14  Q  Yeah. Well, this was just last week. So
15 let -- let's talk about it now.      01:17:46
16     Who was this $10,000 for?
17  A  I don't recall. There were a variety of
18 payments there. It was -- it was either --
19     THE DEPONENT: Can you scroll down?
20     MR. EVANS: Go ahead.      01:18:06
21     THE DEPONENT: Yeah. I think that's my
22 salary payment for -- for -- yeah, I think that's a
23 salary payment to me.
24 BY MR. EVANS:
25  Q  So your testimony is you took out $10,000 in      01:18:26

**Page 49**

1  cash to pay yourself a salary?
2  A  Well, a counter check is where -- is a -- is
3  a check. It's not -- it -- it shows as a withdrawal
4  made in branch, but it's not physical cash. It's --
5  it's a -- it's a -- it's a check. It's a counter      01:18:43
6  check.
7  Q  Okay.
8     MR. EVANS: Can you scroll up, Mr. Ashworth,
9  please?
10 BY MR. EVANS:      01:18:49
11  Q  Okay.
12     So the $100,000 that was transferred on
13 February 4th, the $60,000 that was withdrawn in cash
14 on February 4th, and the $10,000 that was withdrawn
15 that you say was a check written to yourself, will      01:19:03
16 you return that to the debtor?
17  A  I'll have to take counsel on that. I can't
18 answer.
19  Q  Okay.
20     The $10,000 that you say was a cashier's      01:19:13
21 check, where is that money now?
22  A  That should have been deposited. I'll have
23 to -- I'll have to confirm that.
24  Q  Where did you deposit it?
25  A  I would deposit it in a personal account,      01:19:34

**Page 50**

1  so...
2  Q  Okay.
3     In what personal account?
4  A  I don't know.  I will -- I will have to get
5  back to you.  Well, it would be my personal account,    01:19:40
6  so I -- I can answer that.  It would be my personal
7  account.
8  Q  Okay.
9     MR. EVANS:  Scroll up, Sam, please.
10    Scroll down.                          01:19:52
11 BY MR. EVANS:
12 Q  The $60,000 that's sitting in your car --
13    MR. GRIVNER:  Is there a question pending?
14 I'm sorry.  I'm just a little bit lost.
15    MR. ASHWORTH:  This is Sam Ashworth of    01:21:42
16 McDermott, Will & Emery for the Committee.  Joe just
17 got kicked off.  I guess the server kicked him off.
18 He should be back.  I see him now.
19    MR. GRIVNER:  Got it.
20    MR. EVANS:  I think I'm back.  Sorry about    01:21:53
21 that.
22    Can everybody hear me?
23    MR. ASHWORTH:  Joe, we lost you just at the
24 $60,000 that's in your car.
25    MR. EVANS:  Okay.                     01:22:06

**Page 51**

1     Are we -- are we still on the record?
2     COURT REPORTER:  Yes.
3  BY MR. EVANS:
4  Q  The question is, the $60,000 that's in your
5  car, will you drive that to your lawyer's office so    01:22:18
6  that your lawyer can provide it to the debtor?
7  A  No.  It's my intention to deposit that cash
8  to my personal account today.
9  Q  So your intention is to take the $60,000 in
10 cash and to put it in your personal account, right?    01:22:37
11 A  It is, where it will be available to -- if --
12 upon instruction, I can transfer it.  It's a little
13 to cumbersome to -- to work with cash or -- or -- or
14 checks for that matter.
15 Q  Yeah, I would agree.                  01:22:50
16    So the $60,000 in cash that you took out of
17 the Cred Capital bank account needs to be returned
18 to the debtors immediately.
19    Will you return the $60,000 in cash to the
20 debtors?                                 01:23:00
21 A  I will be depositing that in my personal
22 account as soon as possible, which I intended to do
23 several days ago, but I -- I haven't been able
24 to -- to get to the bank.
25 Q  Okay.                                01:23:11

**Page 52**

1     So let me get this straight.  You're going to
2  take the $60,000 in cash out of the Cred Capital
3  bank account, you put that $60,000 in cash, you put
4  it in the trunk of your car.  You are then going to
5  get in your car, drive to the bank, and put the    01:23:24
6  $60,000 in cash in your personal account,
7  (unintelligible) cash moneys?
8  A  No.  The intention was always to deposit that
9  cash into my account, similar to the way I do with
10 counter checks, but I meant to do it the same day,    01:23:35
11 and it just didn't happen.
12    So I -- my intention is to deposit that
13 money, to whomever any cash is due, I -- I'm -- I
14 want to provide that cash, so -- but I'm -- I'm --
15 I'm lost now in terms of where we stand in this    01:23:54
16 legal process, so I really need to rely on counsel,
17 and I -- I -- I haven't been able to speak with
18 them.  I haven't been able to consult with them
19 since I've been buried in legal documents, frankly,
20 that I've been producing, and so --              01:24:09
21 Q  Maybe I -- maybe I can help you.  This
22 account was a Cred Capital bank account.  The funds
23 in this account that were remaining have been
24 transferred to the debtors because it's a Cred
25 Capital bank account.  The $60,000 in cash that is    01:24:22

**Page 53**

1  currently in the trunk of your car, those are the
2  debtors assets, and they need to be returned
3  immediately.
4  A  No.  Those are liabilities that were owed to
5  me, and so they're -- whatever the timing was and    01:24:36
6  whatever form I took those out, I believed as a sole
7  director, as I continue to believe, that I am owed
8  that compensation for tax liabilities and salary.
9  And if I want to take them out in pennies, I can
10 take them out in pennies.  And so that is my       01:24:54
11 position.
12 Q  What work did you do for Cred Capital in
13 January of 2020?
14 A  I was the sole director of Cred Capital in
15 January 2020.                              01:25:12
16 Q  What did you do every day?  What was your
17 job?
18 A  Financial services.
19 Q  Uh-huh.
20    You're aware that Cred Capital filed for    01:25:15
21 bankruptcy in November, right?
22 A  I'm not sure of the exact date.
23 Q  Okay.
24    So you're aware that in January of 2020, Cred
25 Capital had already filed for bankruptcy, right?    01:25:26

| | |
|---|---|
| 1  best of his ability given his knowledge, sitting<br>2  here today.  And it's been asked multiple times now.<br>3        THE DEPONENT:  Joe, I'm asking for a break,<br>4  and you're being really inhumane and not really<br>5  appreciating the state of my recovery, and I don't      03:13:45<br>6  appreciate it.<br>7        So I would ask that we maintain a cordial<br>8  contact here.  I am doing the best job that I can to<br>9  support you in -- in -- in -- in your efforts, and I<br>10 would appreciate that you maintain some decorum     03:14:02<br>11 and -- and respect myself and the others on this<br>12 call.<br>13       MR. EVANS:  If you want to take a break,<br>14 that's fine.  This -- this question and the answers<br>15 that you have to give us are not going to go away,    03:14:14<br>16 so if you want to take five minutes, I'm happy to<br>17 give you five minutes, but there is missing money<br>18 here, and we need to know where it is.<br>19       MR. GRIVNER:  Let's take the break that's<br>20 been requested, then.  Five minutes.              03:14:26<br>21       THE VIDEOGRAPHER:  Stand by, please,<br>22 Mr. Alexander.  This marks the end of Media No. 7.<br>23 Going off the record at 3:14 p.m.<br>24       (Recess.)<br>25       THE VIDEOGRAPHER:  We are back on the record  03:24:07<br>Page 118 | 1        I -- I am happy to confer further and consult<br>2  with Mr. Pfeiffer as well, as well as California<br>3  counsel regarding those positions.<br>4        But as of right now, I am instructing him not<br>5  to answer anything further, subject to further      03:26:12<br>6  conference regarding this change in circumstances,<br>7  yes.<br>8        MR. EVANS:  Is it your position you are<br>9  directing your client not to comply with the Court's<br>10 order to sit for this deposition and provide       03:26:30<br>11 information that is required to be provided<br>12 tomorrow?<br>13       MR. GRIVNER:  In light of his bankruptcy<br>14 filing, that is my position now.  I am happy to<br>15 engage in a further conference regarding continuing    03:26:40<br>16 this -- this deposition after all relevant attorneys<br>17 and parties confer regarding the -- the state of the<br>18 law as -- as to those issues.<br>19       I would ask that this deposition at the very<br>20 least be adjourned until such conference can occur.  03:27:00<br>21       MR. EVANS:  My request is for a -- I think<br>22 what we need to do here is have -- have a 15-minute<br>23 recess so I can confer with counsel and see how we<br>24 want to handle this.<br>25       This mid-deposition filing, it's pretty      03:27:19<br>Page 120 |
| 1  at 3:24 p.m. Pacific, and this marks the beginning<br>2  of Media No. 8 in the deposition of James Alexander.<br>3        You may proceed, Counsel.<br>4        MR. GRIVNER:  Counsel, I've just been advised<br>5  that Mr. Alexander has filed for personal         03:24:55<br>6  bankruptcy.  I'm forwarding everyone an e-mail<br>7  regarding that filing.  And that's my understanding<br>8  as to what has occurred.<br>9        Our position in light of that filing is that<br>10 an automatic stay is in place such that this       03:25:10<br>11 deposition cannot go forward in light of that.<br>12       MR. EVANS:  Where was this bankruptcy filing?<br>13       MR. GRIVNER:  I'm forwarding it right now.<br>14 It was filed, and I'll tell you, in the Central<br>15 District of California.                        03:25:28<br>16       MR. EVANS:  So it's your position that based<br>17 on this filing, it supersedes the judge's emergency<br>18 order that permits this deposition?<br>19       MR. GRIVNER:  I think an automatic stay is in<br>20 place in connection with Mr. Alexander's bankruptcy   03:25:46<br>21 filings, such that that is the case, yes.<br>22       MR. EVANS:  So are you directing your client<br>23 not to answer any more questions today?<br>24       MR. GRIVNER:  At this point, I'm directing<br>25 him not to answer any further questions.         03:25:58<br>Page 119 | 1  clearly an effort to obfuscate our fact-finding<br>2  efforts.  We know what's going on here.  And we're<br>3  asking difficult questions, and the second we do,<br>4  there's a personal bankruptcy filing to disrupt us<br>5  from doing that.                         03:27:36<br>6        And so we're going to caucus internally and<br>7  decide how to proceed.  If you are directing your<br>8  client to not comply with the Court's order, that's<br>9  on you, and we will have that accordingly.<br>10       I would ask for 15 minutes to talk among      03:27:48<br>11 counsel and to return on the record to give you our<br>12 position.<br>13       MR. GRIVNER:  Understood.<br>14       We will do the same.<br>15       MR. LUFT:  I will note that the deposition    03:27:56<br>16 remains ongoing, and as such, please don't confer<br>17 with your client.<br>18       MR. GRIVNER:  Understood.<br>19       THE VIDEOGRAPHER:  Stand by everyone, please.<br>20 I also can create breakout rooms, if you'd like.    03:28:08<br>21 I'm going to go off the record first.<br>22       MR. GRIVNER:  No need for a breakout room, at<br>23 least on our side.<br>24       THE VIDEOGRAPHER:  Thank you.<br>25       Stand by.  I'm going to go off the record.    03:28:13<br>Page 121 |

 1  Is that okay?
 2     MR. EVANS: Yes.
 3     THE VIDEOGRAPHER: Great.
 4     This marks the end of Media No. 8. Going off
 5  the record at 3:28 p.m. Pacific.          03:28:21
 6     (Recess.)
 7     THE VIDEOGRAPHER: We're back on the record
 8  at 4:00 o'clock p.m. Pacific, and this marks the
 9  beginning of Media No. 9 in the deposition of
10  James Alexander.                          04:00:46
11     You can proceed, Counsel.
12     MR. EVANS: Mr. Alexander, will you proceed
13  with this deposition?
14     MR. GRIVNER: Mr. Alexander, you can -- you
15  can answer that question to the extent you're able   04:01:01
16  to.
17     THE DEPONENT: I've been advised by counsel
18  not to continue this deposition.
19     MR. EVANS: Counsel, are -- are you advising
20  your client and directing him to not proceed with    04:01:15
21  this deposition?
22     MR. GRIVNER: Based upon my conversations
23  with Mr. Alexander's California bankruptcy attorney,
24  Mr. Golubchik, Mr. Golubchik is not advising -- is
25  advising Mr. Alexander not to continue with this    04:01:30

Page 122

 1  deposition in light of the bankruptcy filing that
 2  has occurred in California.
 3     MR. LUFT: When did Mr. -- when did the
 4  bankruptcy counsel give Mr. Alexander that advice?
 5     Was it before this deposition or during it?   04:01:44
 6     MR. GRIVNER: It was during the deposition.
 7  It was during this break.
 8     MR. LUFT: So he communicated with
 9  Mr. Alexander during a pending deposition in -- in
10  Delaware; is that correct?                 04:01:51
11     MR. GRIVNER: No. The advice was provided to
12  me by Mr. Golubchik, and I have advised
13  Mr. Alexander, in light of the advice given by
14  Mr. Golubchik, to not -- not continue with this
15  deposition.                                04:02:07
16     I will further represent that I have had --
17  neither me, nor Mr. Pfeiffer, have had any
18  communications with Mr. Golubchik prior to this --
19  the communications that we had with him during this
20  break.                                     04:02:25
21     MR. AZMAN: Can you articulate --
22     MR. GRIVNER: Just so I'm clear --
23     MR. AZMAN: Can you articulate the legal
24  basis for why you are directing him not to continue
25  with the deposition specifically?          04:02:32

Page 123

 1     MR. GRIVNER: Mr. Alexander's filing of his
 2  bankruptcy petition in California.
 3     MR. AZMAN: So it is your position that the
 4  automatic stay allows Mr. Alexander to no longer sit
 5  for a deposition in other pending litigation; is    04:02:42
 6  that correct?
 7     MR. GRIVNER: That's correct.
 8     MR. AZMAN: Thank you.
 9     MR. LUFT: Okay.
10     Can I ask a couple follow-up questions just    04:02:53
11  on this?
12     MR. GRIVNER: To whom?
13     MR. LUFT: There has been approximately
14  $170,000 of Cred Capital funds that have been
15  identified during this deposition as not the        04:03:04
16  property of Mr. Alexander, but specifically the
17  property of the Cred Capital. There is a pending
18  order that those funds had to be turned over as of
19  last Friday.
20     Is Mr. Alexander refusing to turn over those   04:03:15
21  funds, despite the fact that they are Cred Capital
22  funds?
23     MR. GRIVNER: I will advise -- I will confer
24  with Mr. Alexander's team of counsel and respond
25  back to that question as soon as possible.         04:03:25

Page 124

 1     MR. LUFT: Okay.
 2     And --
 3     MR. WALSH: Well, this is Tim.
 4     What is as soon as possible?
 5     I sent the e-mail, like, an hour-and-a-half   04:03:37
 6  ago, maybe two hours ago. So what is as soon as
 7  possible?
 8     I mean, he has got $60,000 sitting in the
 9  trunk of a car. No one can think that's prudent.
10     MR. GRIVNER: I -- I understand your         04:03:49
11  position. We will respond back as soon as possible.
12  I will -- I will make every effort to respond as
13  quickly as possible after I have conferred with
14  counsel for Mr. Alexander that I was not even -- you
15  know, his -- his existence I was not even aware of   04:04:03
16  before about 35 minutes ago.
17     MR. WALSH: I appreciate that.
18     Can you give me a time frame, please? We are
19  going to contact chambers.
20     MR. GRIVNER: We -- I will give you a          04:04:19
21  time -- let me reach out to Mr. Golubchik, and I
22  will give you a time frame within the next hour.
23  And -- and I hope that -- I hope for that to be --
24  that answer to be this evening.
25     MR. LUFT: Mr. Grivner, I appreciate your      04:04:36

Page 125

32 (Pages 122 - 125)