# EXHIBIT G

**February 9, 2021 Deposition Excerpts**

1        IN THE UNITED STATES BANKRUPTCY COURT
2            FOR THE DISTRICT OF DELAWARE
3
   _____
4  In re:                          )
5  CRED INC., et al.,              )
6           Debtors.               )
7  _____)
8  CRED INC., CRED CAPITAL,        )
9  INC., and CRED(US)LLC,          )
10           Plaintiffs,            )
11      V.                          )Case No. 20-12836(JTD)
12  JAMES ALEXANDER,                )
13           Defendant.             )
   _____)
14
15   VIDEOTAPED REMOTE DEPOSITION OF JAMES ALEXANDER
16     Deponent testifying from Los Angeles, California
17              Tuesday, February 9, 2021
18                     Volume I
19
20  Stenographically Reported By:
21  Melissa M. Villagran, RPR
22  CSR No. 12543
23  Job No. 4455511
24
25  PAGES 1 - 137

Page 1

| | |
|---|---|
| 1  Q  Which ones?<br>2  A  So you want to start over?<br>3     There's -- there's Libra Credit, which was a<br>4  former company or was precursor company to Cred LLC.<br>5     And then there was Cyber Quantum, which is a   12:34:14<br>6  Singapore company.  So maybe the confusion is in<br>7  that PTE at the end, which I understand is a<br>8  designation for -- local designation Singapore.<br>9  Maybe that's the confusion.<br>10    I -- I -- I believe I mentioned two entities.   12:34:30<br>11 And the third being an entity Cred LLC that became<br>12 Cred LLC from Libra Credit.<br>13  Q  When you were hired by Cred LLC, what was<br>14 your job title?<br>15  A  I don't recall.                        12:34:49<br>16  Q  You don't recall your job title at Cred?<br>17  A  No, I don't.  That was from 2018, right?<br>18  Q  You were hired in August of 2018.  You don't<br>19 recall what was your title was?<br>20  A  I -- I don't -- I don't know exactly what it   12:35:11<br>21 was.  I would have to check back.<br>22  Q  Were you the chief capital officer of Cred?<br>23  A  I -- I was eventually, yes.  My title became<br>24 chief capital officer of Cred.  I don't -- I don't<br>25 know if that -- I don't recall if that changed   12:35:30<br>Page 26 | 1  Q  What does financial services mean?<br>2  A  A provision of financial services.<br>3  Q  James, were you in charge of cryptocurrency<br>4  trading?<br>5  A  Sorry.  Can you repeat the question, please?  12:36:52<br>6  Q  Did you have any involvement in<br>7  cryptocurrency trading at Cred?<br>8  A  What do you mean by "involvement"?<br>9  Q  James, can you answer the question?  What was<br>10 your job at Cred?  What did you do?  It's not a   12:37:14<br>11 difficult question.  This is not a trick.  What was<br>12 your job at Cred?  What were you -- what did you<br>13 have to do every day?<br>14  A  I provided financial services.<br>15  Q  That's not an answer, James.            12:37:24<br>16  A  That's the best answer I can give you based<br>17 on the question.<br>18  Q  Okay.<br>19    At Cred, what was your involvement with<br>20 cryptocurrency?                          12:37:36<br>21  A  Cred, the nature of Cred's business included<br>22 cryptocurrency.<br>23  Q  And what were your responsibilities?<br>24  A  My responsibilities at Cred?<br>25  Q  Yes.                                12:37:48<br>Page 28 |
| 1  during my tenure there.<br>2  Q  And what were your duties and<br>3  responsibilities at Cred?<br>4  A  Can you be more specific?<br>5  Q  What was your job at Cred?           12:35:40<br>6  A  Eventually, chief capital officer.<br>7  Q  As chief capital officer, what did you have<br>8  to do?<br>9  A  Financial services.<br>10  Q  What were your day-to-day responsibilities?  12:35:54<br>11  A  Financial services.<br>12  Q  What does financial services mean to you in<br>13 the context of your job at Cred?<br>14  A  Providing financial services.<br>15  Q  James, what were your responsibilities at   12:36:13<br>16 Cred?<br>17  A  Financial services, quite broadly.  That<br>18 was -- that's my best answer.  Unless you can<br>19 clarify more specifically.  It's -- I --<br>20    (Speaking simultaneously.)              12:36:27<br>21 BY MR. EVANS:<br>22  Q  James, this was your job.  What did you do<br>23 every day?<br>24  A  It was a -- a broad agreement to provide<br>25 financial services, as I've said.           12:36:38<br>Page 27 | 1  A  Chief capital officer.<br>2  Q  That was your role.<br>3     What were your responsibilities as chief<br>4  capital officer?<br>5  A  Providing financial services.          12:38:01<br>6  Q  What were those financial services that you<br>7  were providing?<br>8  A  Providing financial services.<br>9  Q  Is that your complete answer, James?<br>10  A  Yes.                                12:38:25<br>11  Q  You understand you are here under a Court<br>12 order, right?  You understand that?<br>13  A  Yes.<br>14  Q  And there was an emergency application<br>15 brought and a Court order issued based on the fact   12:38:30<br>16 that millions of dollars of cryptocurrency were<br>17 moved by you on January 16th and January 17th, and<br>18 that's why we're here.<br>19    Do you understand that?<br>20    MR. GRIVNER:  And I'm going to note for the   12:38:40<br>21 record that what -- we are here today to discuss, as<br>22 Judge Dorsey ordered, a deposition regarding those<br>23 transfers.<br>24    And I'll certainly allow background<br>25 questions, but we want to limit -- the -- the -- the   12:38:53<br>Page 29 |

**Page 30**

1  scope of today's deposition is limited to those
2  transfers -- assets that were transferred from Cred
3  Capital at that time.
4      You can certainly answer these questions, but
5  at some point in time, we have to focus on the --    12:39:08
6  the issues which Judge Dorsey ordered us -- this
7  deposition to -- to relate to today.
8      MR. EVANS: Geoffrey, the -- the Court
9  ordered the deposition based on the transfers that
10 Alexander made, all his personal assets, everything    12:39:24
11 he did at Cred, all -- everything in relation to the
12 transfers that he made at Cred.
13     I mean, the Court says it's time for
14 Mr. Alexander to start answering some difficult
15 questions and do so in a way that gives the parties    12:39:35
16 and the Court the ability to understand what's going
17 on here.
18     And I asked Mr. Alexander, "What was your job
19 at Cred?" He says, "financial services," and
20 refuses to answer.    12:39:47
21     Okay?
22     MR. GRIVNER: And -- and I'm -- I'm
23 instructing him to answer that question to the best
24 of his ability.
25     MR. EVANS: Thank you.    12:39:53

**Page 31**

1  BY MR. EVANS:
2  Q  Mr Alexander, let's try it again.
3     What was your job --
4  A  The only way to answer that question is by
5  having access to my employment agreement, which    12:39:58
6  has -- should have an attachment discussing my job
7  description. I don't have access to that.
8  Q  James, you worked at Cred for two years. You
9  transferred millions of dollars of cryptocurrency
10 from Cred. You were involved with trading and    12:40:13
11 strategy and hedging, and you were on the investment
12 committee, and we all know this. It's not a secret.
13    So just answer the question. What were your
14 job responsibilities at Cred?
15 A  I can't answer that without having my job    12:40:27
16 description in front of me. I don't have access to
17 it. You have access to those records. I -- if you
18 could provide the employment agreement with the job
19 description, I would be happy to review it to
20 confirm or add any detail to what my exact role    12:40:40
21 and -- and day-to-day functions were.
22 Q  Okay. So, James, your testimony today is
23 that for two years you worked at Cred, but you
24 cannot remember a single thing that you did at Cred?
25 Is that what you are saying?    12:40:55

**Page 32**

1  A  No. I am saying that I provided financial
2  services, and that to answer your question, we need
3  to reference the job description in my employment
4  agreement.
5  Q  I'm asking you for your recollection, James.    12:41:09
6  You worked there for two years. What were your job
7  responsibilities at Cred?
8  A  I -- I can't provide you with a more precise
9  answer from what I've provided.
10    MR. EVANS: Can we go off the record for a    12:41:21
11 second?
12    COURT REPORTER: All counsel in agreement?
13    MR. GRIVNER: Yes.
14    MR. LUFT: Sure.
15    THE VIDEOGRAPHER: Stand by, please. This    12:41:33
16 marks the end of Media No. 3. Going off the record
17 at 12:41 p.m. Pacific.
18    (Recess.)
19    THE VIDEOGRAPHER: We are back on the record
20 at 12:48 p.m. Pacific, and this marks the beginning    12:48:31
21 of Media No. 4 in the deposition of James Alexander.
22    You may proceed, Counsel.
23 BY MR. EVANS:
24 Q  Mr. Alexander, what were your job
25 responsibilities at Cred?    12:48:43

**Page 33**

1  A  You know, I -- while we were off the record,
2  I was able to pull up some documents which, you
3  know, this is -- we need to have access to a
4  substantial amount of documents to -- for me to
5  accurately answer your questions, which -- which I    12:48:58
6  want to do, but I need to have access to the
7  documents.
8     So I have a copy of my original advisory
9  agreement here. So to clarify my relationship with
10 Cyber Quantum PTE, Limited -- so I'll spell that    12:49:10
11 out. It's C-y-b-e-r. Next word Quantum,
12 Q-u-a-n-t-u-m. Next word PTE, period. LTD period.
13    So it would appear I was a consultant to
14 Cyber Quantum PTE Limited starting on the 7th of
15 July 2018, which eventually led to my employment    12:49:36
16 with Libra Credit thereafter.
17    So in this advisory agreement, there's a very
18 specific description of my role, and I can review
19 those. I'm not sure what the best way to do that
20 is. To just talk through them or provide you with    12:49:58
21 the agreements?
22 Q  I just want to know what your role was at
23 each of these companies, what were your daily
24 responsibilities?
25 A  So -- and -- and to answer your question, my    12:50:11

```
 1      (Exhibit A was marked for
 2      identification and is attached
 3      hereto.)
 4  BY MR. EVANS:
 5   Q  Mr. Alexander, this is a bank account that    01:11:36
 6  you produced through your counsel, and the date on
 7  the top is February 7th, 2021.
 8      MR. EVANS:  Mr. Ashworth, if you would please
 9  scroll down to the next page.
10      You could stop there.                         01:11:49
11  BY MR. EVANS:
12   Q  On February 4th, 2021, the day after the
13  bankruptcy court hearing you attended, you
14  transferred to Alexander Custom Management $100,000.
15      Do you see that?                              01:12:02
16   A  I do.
17   Q  Do you intend on returning that $100,000 to
18  the debtors?
19   A  What does that mean, returning to debtors?
20   Q  Will you return the money, Mr. Alexander?     01:12:18
21   A  To -- to whom?
22   Q  To the debtors, to Cred, to the persons that
23  you took it from.
24   A  Well, if -- I can't answer that.  I...
25   Q  It's a -- it's a simple question.  The        01:12:32
                                              Page 42
```

```
 1  $100,000 that was in the account that is now in the
 2  account apparently held by Alexander Custom
 3  Management, are you going to provide that $100,000
 4  back to the debtor?
 5   A  I will rely on advice of counsel on what to   01:12:47
 6  do for any steps at this stage.  I -- I do not have
 7  the legal competency to determine whether I should
 8  or shouldn't be transferring funds.  So I'm doing
 9  nothing until I have advice from counsel.
10   Q  Okay.                                         01:13:04
11      And you would -- you would admit that
12  Alexander Custom Management is an account that you
13  control, right?
14   A  Can you be more specific?  Is there an
15  account number or?                                01:13:16
16   Q  Sure.
17      There was $100,000 transferred out of this
18  account on February 4th, 2021 to an account held by
19  Alexander Custom Management.
20      The account Alexander Custom Management is    01:13:24
21  owned and controlled by you, right?
22   A  Yes.
23   Q  Okay.
24      On February 4th, 2021, there was a cash
25  withdraw of $60,000.                              01:13:35
                                              Page 43
```

```
 1   Q  Do you see that?
 2   A  So to clarify those dates, that's the posted
 3  date of the transaction.  That's not the date the
 4  transaction -- that's not the date of the
 5  transaction.  That's the date of the posting of the  01:13:46
 6  transaction.
 7   Q  Uh-huh.
 8   A  And postings can take many days in -- in
 9  financial services, so --
10   Q  Okay.                                         01:13:56
11      So let me make the question a little -- let
12  me make the question a little easier.
13      (Speaking simultaneously.)
14   A  -- transaction date, please.
15   Q  Okay.                                         01:14:01
16   A  If you could --
17   Q  If you took --
18   A  If you could confirm that correction --
19      COURT REPORTER:  One at a time, please.
20      THE DEPONENT:  If you could please confirm    01:14:13
21  that correction that these are the posted
22  transaction dates.
23  BY MR. EVANS:
24   Q  You took $60,000 in cash out of this account,
25  right?                                            01:14:21
                                              Page 44
```

```
 1   A  Can you confirm that these are the posted
 2  transaction dates?  Because that's an -- that's an
 3  error in my confirmation.
 4   Q  These are your documents, Mr. Alexander.  You
 5  provided them to us.                              01:14:33
 6      I'm asking you:  Did take $60,000 out of this
 7  account?
 8   A  And I'm asking to confirm the -- the posted
 9  transaction date is what you meant when you said
10  "transaction date."                               01:14:45
11      MR. GRIVNER:  James, I'm going to instruct
12  you to answer the question that's being asked.
13      Okay.
14      Go ahead, Joe.
15  BY MR. EVANS:                                     01:14:54
16   Q  Did you withdraw $60,000 in cash from this
17  account?
18   A  Yes.
19   Q  On which day did you withdraw $60,000 from
20  this account?                                     01:15:03
21   A  I don't recall.
22   Q  Where is that money now?
23   A  It's -- it's -- it's -- it's with me.
24   Q  Okay.
25      Is it in your house?                          01:15:14
                                              Page 45
```

1  A  No.
2  Q  Where is it?
3  A  It's -- it's kept safe.
4  Q  Where is it kept safe?
5  A  It's kept -- it's kept safe just at a       01:15:20
6  location that I will disclose after my counsel tells
7  me to.
8     MR. EVANS:  Mr. Grivner?
9     MR. GRIVNER:  James, I will instruct you to
10 answer that question where those funds currently    01:15:34
11 reside.
12    THE DEPONENT:  Okay.
13    Those are currently in my car.
14 BY MR. EVANS:
15 Q  Where is your car?                              01:15:42
16 A  My car is -- is parked at Finley Avenue.
17 Q  What's the full address?
18 A  ▇▇▇▇▇▇▇▇▇▇▇▇
19 Q  What kind of car is it?
20 A  It's a Mercedes.                                01:15:57
21 Q  When did you purchase that Mercedes?
22 A  2014.
23 Q  Okay.
24    Why did you withdraw $60,000 in cash from
25 this account?                                      01:16:08

Page 46

1  A  I -- to settle the tax liability that I have,
2  which was part of 2020 compensation.
3  Q  Okay.
4     So you were planning on paying the tax
5  authorities in cash?                              01:16:26
6  A  I was -- I was planning -- planning on paying
7  the tax authorities, yes.  I just don't know to whom
8  that check has to be made or how to hand over those
9  funds, so it seemed -- it seemed the -- the right
10 thing to do.                                      01:16:38
11 Q  The right thing to do is to pull out $60,000
12 in cash?
13 A  For a tax liability, yes, that's...
14    MR. GRIVNER:  Object to form.
15 BY MR. EVANS:                                     01:16:49
16 Q  Have you ever paid your taxes in cash before?
17 A  I have, yes, my -- my property taxes.
18 Q  Okay.
19    MR. EVANS:  If you scroll down, Mr. Ashworth
20 BY MR. EVANS:                                     01:16:55
21 Q  There's a withdrawal on February 3rd, 2021 of
22 $10,000.
23    Do you see that, Mr. Alexander?
24 A  Yes, and I believe that's a counter check.  I
25 don't believe that's cash.                        01:17:11

Page 47

1  Q  Okay.
2     The description says (as read):
3     "Withdrawal made in a branch
4     store."
5     Do you see that?                              01:17:16
6  A  Yeah.  Unfortunately, you -- those notations
7  all say withdrawal, but some, if not all, of those
8  transactions are counter checks, which is just a
9  cheaper way to transfer directly to Wells Fargo
10 accounts.                                         01:17:34
11    And those are payments to consultants, so I
12 would have to get back to you to see exactly who
13 that payment was to.
14 Q  Yeah.  Well, this was just last week.  So
15 let -- let's talk about it now.                   01:17:46
16    Who was this $10,000 for?
17 A  I don't recall.  There were a variety of
18 payments there.  It was -- it was either --
19    THE DEPONENT:  Can you scroll down?
20    MR. EVANS:  Go ahead.                          01:18:06
21    THE DEPONENT:  Yeah.  I think that's my
22 salary payment for -- for -- yeah, I think that's a
23 salary payment to me.
24 BY MR. EVANS:
25 Q  So your testimony is you took out $10,000 in  01:18:26

Page 48

1  cash to pay yourself a salary?
2  A  Well, a counter check is where -- is a -- is
3  a check.  It's not -- it -- it shows as a withdrawal
4  made in branch, but it's not physical cash.  It's --
5  it's a -- it's a -- it's a check.  It's a counter   01:18:43
6  check.
7  Q  Okay.
8     MR. EVANS:  Can you scroll up, Mr. Ashworth,
9  please?
10 BY MR. EVANS:                                     01:18:49
11 Q  Okay.
12    So the $100,000 that was transferred on
13 February 4th, the $60,000 that was withdrawn in cash
14 on February 4th, and the $10,000 that was withdrawn
15 that you say was a check written to yourself, will  01:19:03
16 you return that to the debtor?
17 A  I'll have to take counsel on that.  I can't
18 answer.
19 Q  Okay.
20    The $10,000 that you say was a cashier's      01:19:13
21 check, where is that money now?
22 A  That should have been deposited.  I'll have
23 to -- I'll have to confirm that.
24 Q  Where did you deposit it?
25 A  I would deposit it in a personal account,    01:19:34

Page 49

13 (Pages 46 - 49)

Page 50

1  so...
2  Q  Okay.
3     In what personal account?
4  A  I don't know.  I will -- I will have to get
5  back to you.  Well, it would be my personal account,  01:19:40
6  so I -- I can answer that.  It would be my personal
7  account.
8  Q  Okay.
9     MR. EVANS:  Scroll up, Sam, please.
10    Scroll down.                          01:19:52
11 BY MR. EVANS:
12 Q  The $60,000 that's sitting in your car --
13    MR. GRIVNER:  Is there a question pending?
14 I'm sorry.  I'm just a little bit lost.
15    MR. ASHWORTH:  This is Sam Ashworth of    01:21:42
16 McDermott, Will & Emery for the Committee.  Joe just
17 got kicked off.  I guess the server kicked him off.
18 He should be back.  I see him now.
19    MR. GRIVNER:  Got it.
20    MR. EVANS:  I think I'm back.  Sorry about  01:21:53
21 that.
22    Can everybody hear me?
23    MR. ASHWORTH:  Joe, we lost you just at the
24 $60,000 that's in your car.
25    MR. EVANS:  Okay.                    01:22:06

Page 51

1     Are we -- are we still on the record?
2     COURT REPORTER:  Yes.
3  BY MR. EVANS:
4  Q  The question is, the $60,000 that's in your
5  car, will you drive that to your lawyer's office so   01:22:18
6  that your lawyer can provide it to the debtor?
7  A  No.  It's my intention to deposit that cash
8  to my personal account today.
9  Q  So your intention is to take the $60,000 in
10 cash and to put it in your personal account, right?  01:22:37
11 A  It is, where it will be available to -- if --
12 upon instruction, I can transfer it.  It's a little
13 to cumbersome to -- to work with cash or -- or -- or
14 checks for that matter.
15 Q  Yeah, I would agree.                 01:22:50
16    So the $60,000 in cash that you took out of
17 the Cred Capital bank account needs to be returned
18 to the debtors immediately.
19    Will you return the $60,000 in cash to the
20 debtors?                                01:23:00
21 A  I will be depositing that in my personal
22 account as soon as possible, which I intended to do
23 several days ago, but I -- I haven't been able
24 to -- to get to the bank.
25 Q  Okay.                               01:23:11

Page 52

1     So let me get this straight.  You're going to
2  take the $60,000 in cash out of the Cred Capital
3  bank account, you put that $60,000 in cash, you put
4  it in the trunk of your car.  You are then going to
5  get in your car, drive to the bank, and put the     01:23:24
6  $60,000 in cash in your personal account,
7  (unintelligible) cash moneys?
8  A  No.  The intention was always to deposit that
9  cash into my account, similar to the way I do with
10 counter checks, but I meant to do it the same day,  01:23:35
11 and it just didn't happen.
12    So I -- my intention is to deposit that
13 money, to whomever any cash is due, I -- I'm -- I
14 want to provide that cash, so -- but I'm -- I'm --
15 I'm lost now in terms of where we stand in this    01:23:54
16 legal process, so I really need to rely on counsel,
17 and I -- I -- I haven't been able to speak with
18 them.  I haven't been able to consult with them
19 since I've been buried in legal documents, frankly,
20 that I've been producing, and so --              01:24:09
21 Q  Maybe I -- maybe I can help you.  This
22 account was a Cred Capital bank account.  The funds
23 in this account that were remaining have been
24 transferred to the debtors because it's a Cred
25 Capital bank account.  The $60,000 in cash that is  01:24:22

Page 53

1  currently in the trunk of your car, those are the
2  debtors assets, and they need to be returned
3  immediately.
4  A  No.  Those are liabilities that were owed to
5  me, and so they're -- whatever the timing was and    01:24:36
6  whatever form I took those out, I believed as a sole
7  director, as I continue to believe, that I am owed
8  that compensation for tax liabilities and salary.
9  And if I want to take them out in pennies, I can
10 take them out in pennies.  And so that is my        01:24:54
11 position.
12 Q  What work did you do for Cred Capital in
13 January of 2020?
14 A  I was the sole director of Cred Capital in
15 January 2020.                          01:25:12
16 Q  What did you do every day?  What was your
17 job?
18 A  Financial services.
19 Q  Uh-huh.
20    You're aware that Cred Capital filed for    01:25:15
21 bankruptcy in November, right?
22 A  I'm not sure of the exact date.
23 Q  Okay.
24    So you're aware that in January of 2020, Cred
25 Capital had already filed for bankruptcy, right?   01:25:26

1  A  There was a filing that occurred.
2     UNIDENTIFIED SPEAKER:  I think you mean '21,
3  right, 2021?
4     MR. EVANS:  Yes, James.  Thank you.
5     THE DEPONENT:  Can you repeat the question?    01:25:44
6  BY MR. EVANS:
7  Q  You're aware that as of January 2021, Cred
8  Capital had already filed for bankruptcy, right?
9  A  Well, I contend, as I continue to contend,
10 that I'm the sole director of Cred Capital.  I -- I   01:25:55
11 believe, and this is my layman legal expertise --
12 that there has been a judgment as of last Wednesday.
13 But that's as much as I know.
14 Q  Okay.
15    So just -- just so I get a clear answer.  The   01:26:11
16 $170,000 that was transferred either to your
17 account, to cash that's held in your car, or the
18 $10,000 in a check, you're not going to return that
19 back to us today, right?
20 A  I'm taking advice from counsel on that to --   01:26:24
21 as to where the assets should be sent or if I was
22 legitimately entitled to that compensation, so...
23 Q  Uh-huh.
24 A  And I will act accordingly.  I will follow
25 instructions.  And that money will be deposited and   01:26:44

Page 54

1  available in current accounts, so that is my --
2  Q  Let me ask -- let me ask you this:  If you
3  were going to send that $60,000 in cash to a
4  personal bank account, couldn't you have wired that
5  money to another account, as opposed to pulling it   01:27:03
6  out in cash?
7  A  Was it cash or a counter check, though, that
8  we're talking about?
9  Q  Your bank records?
10    (Speaking simultaneously.)                     01:27:15
11    THE DEPONENT:  (Unintelligible.)
12 BY MR. EVANS:
13 Q  Your bank records say (as read):
14    "Withdrawal made in a branch
15    store:  $60,000."                              01:27:20
16 A  Yes.
17 Q  Okay.
18    You could have executed an account transfer,
19 right, of $60,000 to your personal account, couldn't
20 you?                                                 01:27:35
21 A  Yes.  Yes, I could have.
22 Q  Let me ask you this, then we will -- then we
23 will move on.
24    Of the $60,000 that you pulled out from this
25 bank account, how much of that is still in the trunk 01:27:42

Page 55

1  of your car?
2  A  I -- I -- I don't know exactly.  I -- I don't
3  know.  I don't know.
4  Q  So -- so -- so you spent some of it?
5  A  I -- I don't know.  I can't answer that.      01:27:59
6  I -- I would have to -- have to defer that question.
7  Apologies.
8  Q  Okay.
9     You took $60,000 out in cash a week ago, you
10 say it's in the trunk of your car, and now you can't 01:28:09
11 tell me how much of the 60,000 is still in the trunk
12 of your car?  Is that your answer?
13 A  Yes.  I'm sorry.  I -- I need to deposit it,
14 and then I'll give you the exact number of
15 what's -- what's -- when the deposit is made.       01:28:21
16 Q  Did you spend any of it, James?  Did you
17 spend any of it?
18 A  I don't recall.  Cash -- cash is fungible.
19 I -- I don't recall.
20    MR. EVANS:  Can you scroll down, Sam?         01:28:37
21    Can you stop on January 28th, 2021?
22 BY MR. EVANS:
23 A  On January 28th, 2021, there's a $350,000
24 transaction to Quinn Emanuel.
25 Q  What's that for?                              01:28:56

Page 56

1  A  I believe that's privileged, that -- that
2  entry.
3  Q  No.  Payments to law firms are not
4  privileged, so what's that transaction for?
5  A  It was for legal services.                    01:29:06
6  Q  Whose legal services?
7  A  That's for Dan Wheeler's legal services.
8  Q  Why are you paying for Dan Wheeler's legal
9  services?
10 A  He's -- he asked me to indemnify him, which I 01:29:23
11 did, and so he asked me to make that payment, which
12 I did.
13 Q  You filed a motion to dismiss the bankruptcy
14 case.
15    Do you recall that?                           01:29:36
16 A  Yes.
17 Q  And on January 21st, 2021, Mr. Wheeler
18 submitted a declaration in support of your
19 application to dismiss the bankruptcy case.
20    Do you remember that?                         01:29:53
21 A  I do not.
22 Q  Okay.
23    Are you aware that Mr. Wheeler submitted a
24 declaration in support of your bankruptcy -- of your
25 motion to dismiss the bankruptcy cases?            01:30:00

Page 57

**Page 62**

        1    (Exhibit B was marked for
        2    identification and is attached
        3    hereto.)
        4  BY MR. EVANS:
        5  Q  Mr. Alexander, do you have a trip planned to    01:35:13
        6  Switzerland?
        7  A  Yeah.  We scheduled -- we scheduled an event
        8  there in August of this year.
        9  Q  Okay.
       10     MR. EVANS:  Can you scroll down to              01:35:34
       11  January 15th, 2021 payment?
       12  BY MR. EVANS:
       13  Q  We have an $11,090 payment on January 15th,
       14  2021.  Is that for you to go to Switzerland,
       15  Mr. Alexander?                                     01:35:53
       16  A  No.  That's a prepayment that they required
       17  for the event for the Marriott Hotel in -- or the
       18  Bonvoy hotel in Geneva.
       19     So it's -- yeah, these events take many
       20  months to plan, so again, my role as the sole      01:36:10
       21  director of -- of the company, the intention was to
       22  organize a variety of -- of marketing and networking
       23  events, and this -- this is one of them that -- that
       24  is planned.
       25  Q  So you're planning on going to Switzerland to   01:36:26

**Page 63**

        1  market Cred Capital?  That's your plan?
        2  A  No.  The intention previously back in the
        3  middle of January was to go to Switzerland.  These
        4  plans need to be revisited now based on -- on these
        5  recent events.  So there's no current plans to hold  01:36:44
        6  that event.
        7  Q  When you say "based on these recent events,"
        8  what are you referring to?
        9  A  Based on the uncertainty surrounding Cred
       10  Capital and the bankruptcy and these assets and my   01:36:57
       11  personal situation.
       12  Q  On January 19th, 2021, we have a transaction
       13  $6,225.26 to Marriott Vail.
       14     Were you in Vail?
       15  A  I was, yeah, for a --                             01:37:20
       16  Q  What were you doing in Vail?
       17  A  We organized a marketing and networking event
       18  there way back in -- and I'll have to look back
       19  exactly when we organized it.
       20  Q  Okay.                                             01:37:32
       21     And what did you do in --
       22     MR. LUFT:  Who is "we"?
       23     COURT REPORTER:  What?
       24     MR. LUFT:  I misheard.  Who is -- Who is
       25  "we"?                                                01:37:41

**Page 64**

        1     THE DEPONENT:  So I have a variety of
        2  consultants that I've worked with for -- since some
        3  of them since July of last year to support the
        4  marketing and sales effort for Cred Capital.  So
        5  when I refer to "we" in that context, it's the      01:37:57
        6  marketing and sales consultants that are supporting
        7  these events.
        8     And there are supporting documents.  You
        9  know, e-mail campaigns that go out to people and --
       10  and other that promote these type of events.  But   01:38:16
       11  they are a form of business development that we
       12  pursued at Cred Capital.
       13  BY MR. EVANS:
       14  Q  You said there's a group of consultants, and
       15  you were going to go on.  Is this a ski trip?  Is   01:38:35
       16  that what this was?
       17  A  No.  This was networking and -- and marketing
       18  trip.  And the locations are -- our business relies
       19  on high-net-worth individuals, so the locations are
       20  sometimes coincidental or -- or in places where     01:38:53
       21  high-net-worth people gather.  So
       22  there's -- there's -- that's the only intention
       23  of -- of being there versus someplace else.
       24  Q  Who, other than you from Cred Capital or Cred
       25  Capital Consultants, attended the trip to Vail?     01:39:12

**Page 65**

        1  A  No others.
        2  Q  Okay.
        3     So you went yourself to Vail, right?
        4  A  Yes.
        5  Q  Did I you go with anyone else?                   01:39:20
        6  A  My wife was there also at the time.
        7  Q  Okay.
        8     So you and your wife went to Vail?  That's
        9  what happened, right?
       10  A  Yes.                                             01:39:32
       11  Q  And the $6,225.26, that was -- that was
       12  payment for hotels and travel for you and your wife,
       13  right?
       14  A  No.  That was payment for the -- my
       15  attendance at the event.                            01:39:46
       16  Q  Uh-huh.
       17  A  I believe...
       18  Q  Let me ask you this:  Did you go to Turkey on
       19  December 4th, 2020?
       20  A  I have to look back in my records.  When was    01:40:12
       21  that.
       22  Q  I can jog your memory.  You stayed at a hotel
       23  on December 4, 2020 in Istanbul?
       24  A  Oh, yes, uh-huh.
       25  Q  Yeah.                                            01:40:23

17 (Pages 62 - 65)

Page 66

1  And the Cred Capital bank account paid for
2 that trip too?
3  A  Absolutely. We're -- we have a project
4 ongoing there related to international trade finance
5 using the block chain that -- that we were trying to    01:40:32
6 get involved with.
7  Q  Let me ask you this: The -- the three trips
8 that were paid for in January and December, the trip
9 to Switzerland, the trip to Vail, and the trip to
10 Istanbul --                                             01:40:48
11  A  There's no trip to -- there's no trip to
12 Switzerland. You are mistaken. That's a prepayment
13 for a -- a future event.
14     These events are planned many months in
15 advance, so there is often prepayment required, as     01:41:12
16 in the case of Vail, as in the case of Geneva, so...
17     MR. ASHWORTH: This is Sam Ashworth again.
18 Joe just went dark, so we may have lost him. I'll
19 just ask for your patience for one more moment.
20     MR. LUFT: Let's go off the record, then.    01:41:37
21     THE VIDEOGRAPHER: Okay. We're in agreement
22 to go off record? Okay. Stand by.
23     This marks the end of Media No. 5. Going off
24 the record at 1:41 p.m.
25     (Recess.)                                    01:41:53

Page 67

1     THE VIDEOGRAPHER: We are back on the record
2 at 1:44 p.m. Pacific, and this marks the beginning
3 of Media No. 6 in the deposition of James Alexander.
4     You can proceed, Counsel.
5 BY MR. EVANS:                                           01:44:36
6  Q  Mr. Alexander, who joined you on your trip to
7 Istanbul?
8  A  Nobody.
9  Q  Okay. And who did you meet in Istanbul?
10  A  Nobody in Istanbul. I traveled to a second    01:44:48
11 city call Mersin where the -- this agricultural
12 group is based.
13  Q  Okay.
14     With respect to the prepayment of the
15 Switzerland trip, the Vail trip, and the Istanbul     01:45:05
16 trip, who authorized you to execute those
17 transactions out of the Cred Capital account?
18  A  I did in my role as sole director of the
19 company.
20     MR. EVANS: Mr. Ashworth, please pull up the   01:45:33
21 declaration of James Alexander, which was filed on
22 January 6th as Exhibit 3.
23     COURT REPORTER: Exhibit C, right?
24     MR. EVANS: C, yes.
25     ///

Page 68

1     (Exhibit C was marked for
2     identification and is attached
3     hereto.)
4     MR. ASHWORTH: Joe, just bear with me. I'm
5 having a computer issue.                                01:46:08
6     MR. EVANS: I could start with a few
7 questions while you're -- while you're working on
8 it.
9 BY MR. EVANS:
10  Q  Mr. Alexander, in June of 2020, did you      01:46:19
11 receive 225 Bitcoin from Cred?
12  A  Yes.
13  Q  Okay.
14     And who sent you that Bitcoin?
15  A  It was sent to me by Fireblocks.             01:46:34
16  Q  Who did you ask to --
17  A  And I think --
18  Q  Who did you ask to transfer the Bitcoin to
19 you?
20  A  I asked Daniyal Inamullah.                   01:46:46
21     Do you want me to spell that, or to you
22 have...
23  Q  I -- I think it's I-n-a-m-u-l-l-a-h.
24  A  Sorry. Say it again.
25     I-n-a-m-u, double l, a-h.                    01:47:03

Page 69

1  I -- I asked Daniyal Inamullah to transfer.
2  Q  And why did you ask Daniyal Inamullah to
3 transfer it to you?
4  A  Because I believed the assets were at risk,
5 and I believed I was the sole director of the         01:47:22
6 company, and that the entire actions that were taken
7 by Schatt and other executives at Cred Inc were
8 specifically an asset grab for an independent
9 company that was independently funded.
10     So I sought to put the assets in a safe place  01:47:43
11 away from the reach of -- of -- of Cred Inc.
12  Q  When you asked Mr. Inamullah to send you the
13 225 Bitcoin, did you ask him via WhatsApp?
14  A  I -- I don't recall. I don't recall.
15     (Exhibit D was marked for                    01:48:06
16     identification and is attached
17     hereto.)
18 BY MR. EVANS:
19  Q  Do you remember submitting interrogatory
20 responses just a few days ago on Saturday?          01:48:13
21  A  Uh-huh.
22     MR. GRIVNER: Object to the form.
23     COURT REPORTER: Who said that?
24     MR. GRIVNER: Mr. Grivner.
25  ///                                              01:48:38

**Page 78**

1  Q  So the answer is no, right?
2  A  The answer is as I answered it.
3  Q  So you didn't ask him?
4  A  I did not ask him, no.
5  Q  Okay.  And on July 1st of 2020, you received  01:58:47
6  this 224.899 Bitcoin, right?
7  A  On which date?
8  Q  July 1st, 2020.
9  A  That's correct.
10  Q  Okay.                                  01:59:00
11      MR. EVANS:  Sam, you can take down
12  this -- this document.
13  BY MR. EVANS:
14  Q  And when you received the 225 Bitcoin, you
15  received it in one of your Ledger wallets, right?  01:59:11
16  A  Yes.
17  Q  And what's a Ledger wallet?
18  A  A Ledger wallet is a hardware wallet.
19  Q  Okay.  What does that mean?
20  A  A hardware wallet is from -- from what I  01:59:23
21  know, a more secure offline way to store assets.
22  Q  Okay.
23      So on July 1st, 2020, 225 Bitcoin was
24  transmitted to you in your Ledger wallet, and you
25  took possession of it, right?            01:59:46

**Page 79**

1  A  That's correct, yes.
2  Q  And on -- let me make sure I get these dates
3  right, but on June 26th, Cred fired you, right?
4  A  Cred purported to fire me.
5  Q  Okay.                                  02:00:09
6      There came a time when Cred sued you in
7  California State Court, right?
8  A  I don't -- I don't know what that means.  I'm
9  not a lawyer.  I know there were various legal
10  actions.  I -- I don't know what that means.  02:00:19
11  Q  Did Cred file a lawsuit against you on
12  July 16th, 2020 in San Mateo State Court?
13  A  I don't know.  I'd have to consult with
14  counsel.  I -- I -- I'm not a lawyer.
15  Q  Do you recall a Temporary Restraining Order  02:00:48
16  hearing occurring in California State Court on
17  July 16th, 2020?
18  A  I do.
19  Q  I'm sorry?
20  A  Yes.                                  02:01:02
21  Q  Okay.
22      And what happened at that court hearing on
23  July 17th, 2020?
24  A  I don't recall specifically the legal terms,
25  but can you be more specific?            02:01:15

**Page 80**

1  Q  Sure.
2      The California court ordered that you cannot
3  move Cred cryptocurrency or Cred Capital
4  cryptocurrency, correct?
5  A  I don't know.  I have to consult with counsel  02:01:28
6  if you're looking for a specific answer.
7  Q  Okay.
8      Isn't it true that the day before the
9  hearing, you had transferred 60 -- 65 Bitcoin out of
10  your wallet and another 200,000 USD coin out of your  02:01:44
11  wallet?
12  A  The former transaction I recall.  The latter
13  transaction, I do not.
14  Q  Okay.
15  A  And that former transaction was part of a  02:01:59
16  scheduled liquidation to -- to -- to continue to
17  fund working capital at Cred Capital, which was a
18  pattern that continued from the moment Cred Capital
19  received the initial equity investment through our
20  entire tenure.                          02:02:16
21      The initial capitalization of Cred Capital
22  was meant to be liquidated in a systematic way to
23  provide working capital.
24  Q  Okay.
25      Let's talk about the first transaction.  02:02:28

**Page 81**

1      MR. EVANS:  Sam, please pull up Coinbase
2  History 1.
3      And what exhibit number is this, Sam?
4      MR. ASWORTH:  This is Exhibit E, Joe.  E,
5  echo.                                   02:02:58
6  BY MR. EVANS:
7  Q  So the first transaction on this screen, a
8  July 1st, 2020 transaction of ten Bitcoin.
9      Do you see that?
10  A  Can you move a cursor or something to bring  02:03:07
11  my attention to it otherwise?
12      Yes, I see it now, uh-huh.
13  Q  Okay.
14      And do you recall this July 1st, 2020
15  transaction?                            02:03:20
16  A  Not specifically, but this is an account I
17  control, so I think we should assume that I -- I had
18  control of these accounts.
19  Q  And so just so I get it straight, you had a
20  Ledger wallet that held the 225 Bitcoin, and then  02:03:36
21  you also had this Coinbase account, right?
22  A  Yes, that's correct.
23  Q  Okay.
24      So why did you transfer ten Bitcoin from your
25  Ledger wallet to your Coinbase account on July 1st,  02:03:51

21 (Pages 78 - 81)

Veritext Legal Solutions
866 299-5127

**Page 82**

1 2020?
2  A  This was part of a systematic liquidation of
3 those original Bitcoin that were an equity
4 contribution to Cred Capital. It was initially 300.
5 And they were systematically liquidated to provide   02:04:06
6 working capital for the ongoing operations of Cred
7 Capital.
8     And its Coinbase was used to liquidate
9 because it's an exchange, not a wallet, and so it's
10 possible to actually liquidate for U.S. dollars in   02:04:20
11 this case, the -- the Bitcoin.
12  Q  So what -- what was the capital that you
13 needed? What was the expense that you needed to pay
14 for that caused you to liquidate ten Bitcoin?
15  A  Well, it was -- it's systematic the way we   02:04:39
16 liquidated, so it was establishing adequate -- what
17 I believe to be adequate working capital to operate
18 the business. So it was the ongoing expenses
19 associated with Cred Capital.
20  Q  Okay.   02:04:51
21     And this is July 1st, 2020, and you said that
22 Cred purported to fire you on June 26, 2020, right?
23  A  From -- from which entity?
24  Q  From either entity.
25  A  Well, I was terminated on May 30th from Cred   02:05:09

**Page 83**

1 Inc., and I became a full-time employee of Cred
2 Capital, Inc. on June 1st, 2020.
3     So I was purported to have been fired on that
4 date that you referenced from Cred Capital.
5  Q  Okay.   02:05:33
6  A  Which I believe -- I believed at the time and
7 I continue to believe that there was no
8 authorization by either Schatt or Podulka to fire
9 me.
10  Q  On July 16th, 2020, there was another 65   02:05:48
11 Bitcoin transaction.
12     Do you see that?
13  A  Can you hover or otherwise bring my attention
14 to it?
15  Q  It's the third transaction down the line.   02:05:59
16  A  So that was -- it -- it appears that that's
17 65 Bitcoin received into the Coinbase account.
18     Is that -- is that what you're referencing?
19  Q  Yes.
20     And that 65 Bitcoin came from your Ledger   02:06:12
21 wallet that originally received the 225 Bitcoin; is
22 that right?
23  A  On -- yeah. On July 16th, I sent 65 Bitcoin
24 from the Ledger hardware device to this Coinbase
25 account.   02:06:35

**Page 84**

1  Q  And ultimately, James, you liquidated the 65
2 Bitcoin and ten Bitcoin and sent it to where?
3  A  I sent it to a dedicated account.
4  Q  What is the dedicated -- the dedicated
5 account?   02:06:54
6  A  I don't know. I'd have to get back to you on
7 exact numbers on that.
8     So -- actually, sorry. Can I -- can I
9 correct that answer? I --
10  Q  Sure.   02:07:08
11  A  So, yeah, I need to refer to my records
12 because I don't think that initial transfer was to a
13 dedicated account, so I need to correct that. But
14 I'm going to need to get back to you on exactly
15 where the proceeds were transferred. I -- I don't   02:07:26
16 have access to that -- those account numbers or that
17 data.
18  Q  So let -- let me just understand it, that the
19 75 Bitcoin that was liquidated at Coinbase, those
20 proceeds were Cred Capital proceeds, right?   02:07:40
21  A  Those -- those were proceeds of an equity
22 investment into Cred Capital, yes. Is that what you
23 mean?
24  Q  You said you liquidated -- you liquidated
25 them to pay for operating expenses for Cred Capital,   02:08:00

**Page 85**

1 right? That's the purpose for the liquidation?
2  A  That is correct, yes.
3  Q  Okay.
4     And do you recall what date you liquidated
5 these Bitcoin?   02:08:17
6  A  I would have to refer to the transaction log.
7 I believe you have that in front of you. Is there
8 any reason to doubt that, or is there another reason
9 you are asking that question?
10  Q  Why don't we do it this way.   02:08:28
11     MR. EVANS: Sam, can you pull up as Exhibit F
12 the Temporary Injunction and Restraining Order filed
13 in San Mateo Superior Court?
14     (Exhibit F was marked for
15      identification and is attached   02:09:00
16      hereto.)
17 BY MR. EVANS:
18  Q  So, Mr. Alexander, this is a Temporary
19 Restraining Order and Preliminary Injunction that
20 was issued on July 17th by the San Mateo State   02:09:07
21 Court.
22     Do you recall this document?
23  A  I do not.
24  Q  Okay.
25     MR. EVANS: If you want to zoom in a little   02:09:14

| | |
|---|---|
| 1  Q  It's on the top right-hand corner. It says<br>2  "▓▓▓▓6006."<br>3  A  I -- I can't answer that question, but the<br>4  question I think you're getting at is have I swept<br>5  that account or provided everything in that account   02:49:10<br>6  to the debtors, and -- and the answer to that<br>7  question is yes. I mean, I don't mean to...<br>8  Q  So on July 22nd, $500,000 comes into this<br>9  JPMorgan Chase account. Is that the proceeds of the<br>10  Coinbase transactions that we just looked at?   02:49:27<br>11  A  It is, yes.<br>12  Q  Okay.<br>13     And it doesn't appear that this credit came<br>14  from Coinbase, so where did it come from?<br>15  A  I -- I -- no. That -- I mean, as far as I   02:49:38<br>16  know, that came from Coinbase.<br>17  Q  Okay.<br>18     In the description, it says (as read):<br>19       "Fedwire credit Wells Fargo Bank:<br>20       James Alexander Sherman Oaks,   02:49:53<br>21       California."<br>22     That's your name, right? This is your<br>23  account?<br>24  A  No. I mean, as I said before, I -- I -- I<br>25  need to check my records, but my recollection is   02:50:02<br>Page 98 | 1  reviewed, the 56 Bitcoin transaction is 508,000.<br>2     Do you see that?<br>3  A  Uh-huh.<br>4  Q  After fees, it's $500,430.80?<br>5  A  Okay.   02:51:30<br>6  Q  Okay.<br>7     So where is the rest of the proceeds? You<br>8  have a $45,000 transaction, a $10,000 transaction,<br>9  another $10,000 transaction, so where is the rest of<br>10  it?   02:51:40<br>11  A  I'm not following you. Can you...<br>12  Q  On July 16th, there are four transactions at<br>13  which Bitcoin was liquidated.<br>14  A  Yeah. Joe, I -- I can't answer that. I<br>15  don't recall. I don't know.   02:51:58<br>16  Q  Okay.<br>17     So you don't know where the rest of the --<br>18  where the rest of the cash proceeds were?<br>19  A  You have all of the bank statements that you<br>20  have requested, and I will provide any documentation   02:52:03<br>21  you need, but I don't recall specifically these --<br>22  these transactions you are referencing. That's as<br>23  much as -- as I can say.<br>24  Q  You are aware that you were required to<br>25  provide all bank accounts and all bank statements   02:52:16<br>Page 100 |
| 1  that this is the account that received the initial<br>2  Coinbase transaction.<br>3     Thereafter, a dedicated account was<br>4  established, and that was subsequently used from<br>5  around August 1st onward, so...   02:50:15<br>6  Q  When you say "a dedicated account," what do<br>7  you mean?<br>8  A  I mean the Wells Fargo statements that you<br>9  showed me, the account ending 9235, which is the<br>10  James Alexander d/b/a James Alexander Cred account.   02:50:28<br>11  Q  Okay.<br>12     So what about this Wells Fargo account, the<br>13  one that put in the 500,000 here? Where did that<br>14  come from?<br>15  A  I can't comment on the description. I -- it   02:50:39<br>16  wasn't generated by me. It was generated by -- by<br>17  Morgan Stanley, and I don't know. I -- I can't<br>18  answer that. I -- I don't know.<br>19  Q  Okay.<br>20  A  I can only tell you what my recollection of   02:50:51<br>21  the series of transactions is.<br>22     MR. EVANS: Sam, can you go back to the<br>23  Coinbase records we were just looking at?<br>24  BY MR. EVANS:<br>25  Q  And if you look at these transactions we just   02:51:10<br>Page 99 | 1  that ever had Cred Capital proceeds in them, right?<br>2  A  I -- I -- I don't know the answer to that.<br>3  Q  You don't know the answer to that?<br>4     So did you provide all bank statements --<br>5  A  I have provided everything --   02:52:31<br>6  Q  -- for all accounts that are Cred Capital?<br>7  A  I have provided everything I have been asked<br>8  to provide and will be absolutely -- and will<br>9  continue to provide everything that I'm asked to<br>10  provide.   02:52:43<br>11     But I -- I can't answer your question because<br>12  I -- I don't know if it references all of the<br>13  documents that I have provided or not. But I have<br>14  provided everything that I have been asked to<br>15  provide and have been as complete -- absolutely as   02:52:55<br>16  complete as possible.<br>17  Q  Uh-huh.<br>18     MR. EVANS: Sam, please go back to the<br>19  JPMorgan Chase document, Page 8.<br>20  BY MR. EVANS:   02:53:04<br>21  Q  We have a July 22nd transaction with a Wells<br>22  Fargo bank account with your name on it.<br>23     Do you see that?<br>24  A  I do.<br>25     MR. EVANS: Sam, please pull up the Wells   02:53:36<br>Page 101 |

26 (Pages 98 - 101)

```
 1  Fargo bank statements that are provided by
 2  Mr. Alexander.
 3      MR. ASWORTH: (Simultaneous speech.)
 4      MR. EVANS: It's called "Wells Fargo Account
 5  Statements."
 6      What number -- what letter are we up to, Sam?
 7  H?
 8      MR. ASWORTH: That's correct, Joe. This is
 9  Exhibit H.
10      (Exhibit H was marked for
11      identification and is attached
12      hereto.)
13  BY MR. EVANS:
14   Q  Exhibit H.
15      This is a August -- these are a series of        02:54:23
16  bank statements you provided to your counsel. We
17  have talked about them before, the name James
18  Alexander d/b/a James Alexander Cred?
19      Do you see that?
20   A  Yes.                                             02:54:35
21      MR. EVANS: Sam, can you go to the first
22  transaction on August 11th?
23  BY MR. EVANS:
24   Q  It's a $100 deposit to open up this account?
25   A  I see that there.                                02:54:46
```
Page 102

```
 1   Q  The JPMorgan Chase transaction for $500,000
 2  was on July 22nd from an account in your name.
 3      Do you have another Wells Fargo account,
 4  James?
 5   A  Sorry. What do you mean? Besides this one?      02:54:57
 6   Q  Yes.
 7   A  I have a personal Wells Fargo account that is
 8  James Alexander and includes this James Alexander
 9  d/b/a James Alexander Cred.
10      So I -- I -- I'm not sure if that answers       02:55:18
11  your question or not, but that's...
12   Q  Did the July -- did the $500,000 July 22nd
13  transaction, did that come from your personal
14  account at Wells Fargo?
15   A  Sorry. Can you repeat that?                     02:55:30
16   Q  The July 22nd, $500,000 transaction in the
17  JPMorgan Chase account, did that come from your
18  Wells Fargo account, your personal line?
19   A  I don't -- I don't know. I've told you my
20  recollection of the transactions. You have the bank 02:55:50
21  statements here. I haven't had the benefit of
22  reviewing these. But I told you my recollection.
23  If you have the bank statements here, you'll have to
24  show me the data, and I can confirm it or not
25  confirm it, but that's...                           02:56:04
```
Page 103

```
 1   Q  Yeah. So that's not really how it works.
 2      The order was for you to provide all of the account
 3  statements and details concerning accounts that held
 4  Cred Capital assets.
 5      You have a $500,000 transaction going into      02:56:16
 6  the JPMorgan Chase account from a Wells Fargo
 7  account with your name on it.
 8   A  Yes. So I confirmed that. That's my
 9  recollection of the transactions that occurred also.
10   Q  Okay.                                           02:56:30
11      So that July 22nd transaction, that was with
12  your personal Wells Fargo account, right?
13   A  Can you pull up that statement?
14   Q  We don't have your personal statement because
15  you haven't given it to us.                         02:56:43
16   A  Oh, that's part of part two discovery. Yeah.
17  I -- I don't have the data to answer that question,
18  then.
19      MR. GRIVNER: I will note for the record that
20  that information will be provided pursuant to the   02:57:02
21  part two discovery that has been requested.
22  BY MR. EVANS:
23   Q  Did there come a time where you moved 50
24  Bitcoin on January 16th, 2021?
25   A  Yes.                                            02:57:22
```
Page 104

```
 1   Q  And why did you move 50 Bitcoin on
 2  January 16, 2021?
 3   A  I was -- I had COVID at the time, and I
 4  thought it would be prudent to move those assets
 5  onto some things more accessible, a more accessible 02:57:37
 6  device should I become incapacitated, and so that's
 7  what I did.
 8   Q  Okay.
 9      And when you said you were moving it to
10  somewhere more accessible, where did you move it?   02:57:52
11   A  I moved it to a Coinbase account.
12   Q  Okay.
13      And who has access to that Coinbase account?
14   A  Myself.
15   Q  Okay.                                           02:58:02
16      And what did you do with the 50 Bitcoin after
17  it went to the Coinbase account on January 16?
18   A  They were eventually liquidated for dollars.
19   Q  Okay.
20      And on January 16th, 2021, you were aware,      02:58:18
21  were you not, that there was a court order
22  precluding you from moving any cryptocurrency that
23  was related to Cred Capital, right?
24   A  Yes.
25   Q  And you moved it anyway?                        02:58:30
```
Page 105

27 (Pages 102 - 105)

Page 106

1  A  I moved it anyway because I was
2  incapacitated, and I was, you know, in fear of --
3  I -- I thought I was dying, and I didn't want to
4  leave a hardware wallet inaccessible to where those
5  assets couldn't be accessed.                    02:58:46
6  Q  Uh-huh.
7     And you never -- you never asked anybody to
8  reach out to the debtors on this issue, did you?
9  A  I did not. I was incapacitated, as I said.
10 Q  Uh-huh.                                      02:58:59
11    And on January 17, 2021, you executed an
12 additional 50 Bitcoin transaction, didn't you?
13 A  That -- that's -- that's -- yes, that's
14 right.
15 Q  Okay.                                        02:59:07
16    And on both of those days, when you executed
17 the transaction, you knew that that was in violation
18 of the Court's order, right?
19 A  I did, yes.
20 Q  Okay.                                        02:59:16
21    And you did it anyway?
22 A  I did it because I was incapacitated, and I
23 wanted to make these assets more accessible.
24 Q  So what did you do with those assets after
25 they went into your Bitcoin account -- after they   02:59:28

Page 107

1  went into your Coinbase account? Apologies.
2  A  In both cases on the 16th and 17th, they were
3  liquidated for dollars. And when -- when I became
4  aware of those transactions and I sweeped the assets
5  back to the hardware wallet where they were -- where  02:59:46
6  they were supposed to be, and then transferred them
7  subsequently to the debtor.
8  Q  Let -- let -- let's take that in pieces.
9     What do you mean, when you became aware of
10 the transactions?                               03:00:02
11 A  Well, I was incapacitated, as I said, and so
12 I -- I -- I -- when I got better and I -- I didn't
13 think I was dying, I stopped the transfer of assets
14 from the Ledger wallet to the Coinbase account and
15 eventually reversed that transaction, put the assets  03:00:24
16 back on the hardware wallet where they -- where --
17 where they were supposed to be.
18 Q  Okay.
19    So when you became aware, you're saying you
20 don't remember transferring the January -- doing --  03:00:38
21 executing the January 16th and January 17th Bitcoin
22 transactions?
23 A  I was -- I was completely incapacitated.
24 I -- that's all I can tell you. And in the -- you
25 know, in my delirium, that seemed to make sense.  03:00:50

Page 108

1  Q  Okay.
2     So your testimony is you were incapacitated,
3  you executed two transactions of 50 Bitcoin each,
4  and when you realized what happened, you transferred
5  them back to the Ledger wallet?                 03:01:05
6     That's what you are saying?
7  A  That is correct.
8     MR. GRIVNER: Objection to form.
9     MR. EVANS: Okay.
10    Let's open up the Ledger Live operations     03:01:10
11 wallet, Sam. And the exhibit letter, if you could.
12    COURT REPORTER: Mr. Evans, if you could just
13 slow down a little bit. You get talking pretty fast
14 sometimes. It's hard to understand you.
15    MR. EVANS: Sure.                             03:01:30
16    MR. ASHWORTH: This is going to be Exhibit I,
17 Joe.
18    (Exhibit I was marked for
19    identification and is attached
20    hereto.)                                     03:01:38
21 BY MR. EVANS:
22 Q  So this is Exhibit I. This is the Ledger
23 Live operations document that was provided to us by
24 you concerning your Ledger wallets.
25    MR. EVANS: So if you would go to Line        03:01:48

Page 109

1  Item 66, Sam. You might want to highlight that.
2  BY MR. EVANS:
3  Q  Line Item 66 is a January 16th, 2021 Bitcoin
4  transaction, 50.00014 Bitcoin.
5     Do you see that?                             03:02:04
6  A  Yes.
7  Q  Okay.
8     And January 17th, the next day, is the
9  Bitcoin transaction 50.00027.
10    Do you see that?                             03:02:15
11 A  Uh-huh. Yes.
12 Q  Okay.
13    And are those the two transactions that you
14 were talking about where you were incapacitated and
15 you don't remember doing?                       03:02:24
16 A  Yes. I scheduled those transactions, and
17 they were executed, yes.
18 Q  Okay.
19    So this is your digital wallet. You said
20 you -- you placed them all back into your digital  03:02:30
21 wallet. So where is that?
22 A  No. I transferred the -- I don't see that on
23 here. Why -- where are the dates? Dates -- the
24 dates seem like they are out of order here. I -- is
25 there any way to sort this by date?             03:03:07

| | |
|---|---|
| 1  in the -- in the log to the exact amount?<br>2  Q  Yes.<br>3      MR. EVANS:  Sam, can you refer him to the<br>4  February 5th, 2021 transaction -- February 6th, 2021<br>5  transaction.  It's Line 51.             03:08:36<br>6  BY MR. EVANS:<br>7  Q  Do you see that line, Mr. Alexander?<br>8  A  Do you guys mind if I take another break?<br>9  Q  If you just give me, like, three questions,<br>10 we can take, like, a five-minute break.  Is that all   03:09:03<br>11 right?<br>12 A  As soon as possible.  I'm -- I'm feeling a<br>13 bit short of breath here.<br>14 Q  I'll -- I'll be -- I'll be very brief.  All<br>15 I'm asking you is, do you see this document reflects   03:09:14<br>16 that there was a 2773488 transfer of USDC to the<br>17 debtors?<br>18     Do you see that?<br>19     COURT REPORTER:  To the what?<br>20     MR. EVANS:  To the debtors.           03:09:28<br>21     THE DEPONENT:  Yes, I see that.<br>22 BY MR. EVANS:<br>23 Q  Okay.<br>24     And USDC is a reference to UCD coin, right,<br>25 Mr. Alexander?                     03:09:42<br>Page 114 | 1  the discovery that has up to now been asked for.<br>2      And this issue is a -- has been ongoing.  And<br>3  I am, of course, committed to delivering all the<br>4  assets I have of the debtors, but I -- I -- I can't<br>5  answer that question today because I just don't know   03:11:36<br>6  where we stand.<br>7  Q  Mr. Alexander, your lawyers didn't execute<br>8  these transactions.  You executed these<br>9  transactions.<br>10     Where is the 664,000?                 03:11:44<br>11 A  That question remains open, and I can't<br>12 answer it, as I have described.<br>13 Q  This was just a few weeks ago.  You don't<br>14 remember where $664,467 went?<br>15 A  As I said, this -- that question remains        03:11:58<br>16 open, and as far as I know, it hasn't been resolved<br>17 yet as to exactly what the accounting is, whether --<br>18 for example -- whether people agree on that number,<br>19 and -- and so I can't answer that.<br>20 Q  It's not a legal question.  The question is    03:12:16<br>21 where the money is.  So I'm not asking you to make a<br>22 legal opinion or a legal determination or for<br>23 counsel to have argument.  I'm asking you where the<br>24 money is.  There is $664,467.53 missing.<br>25     Where is it?                    03:12:31<br>Page 116 |
| 1  A  Yes, that's right.<br>2  Q  And each UCD coin is worth 1 USD; is that<br>3  right?<br>4  A  Approximately.<br>5  Q  Okay.                          03:09:49<br>6      So the proceeds from the January 16th and<br>7  January 17th Bitcoin transactions were 3.437956.53.<br>8  You provided the debtors with 2,773,488.<br>9      Where are the additional $664,467.53?<br>10 A  Yeah.  This has been the subject of         03:10:19<br>11 back-and-forth e-mails ongoing, and I don't -- I<br>12 don't have a complete answer for you today.<br>13     I believe it will be part of discovery part<br>14 two, which -- which I -- so I would -- I have to<br>15 defer that -- I have to defer that to -- to -- I     03:10:38<br>16 believe I have to defer that.<br>17 Q  Let me understand.  There is 664,000 missing,<br>18 and you are saying it's in your personal accounts<br>19 because that's what's coming in part two?<br>20 A  Well, I don't know.  This has -- as I said,    03:10:57<br>21 this has been the subject of an ongoing e-mail<br>22 conversation between lawyers.<br>23     And I don't know the current status of that<br>24 conversation, but I -- I believe we will get to the<br>25 bottom of it when we have more -- or -- or all of   03:11:12<br>Page 115 | 1  A  I can't answer that question because I don't<br>2  know if the amount is correct, and I don't know what<br>3  the accounting is for -- for -- for those assets.<br>4  Q  Okay.<br>5      We looked at the Coinbase records, right?     03:12:42<br>6  A  Okay.<br>7      Guys, I'm going to need a break.  This is --<br>8  you said a few questions, and now we're ten minutes<br>9  into this and --<br>10 Q  Well, you're not answering the question.  The   03:12:56<br>11 question is, where is the 664,000?<br>12 A  I have answered the question to the best of<br>13 my ability and recollection.<br>14 Q  You're not going to answer the question?<br>15 A  I have answered the question.            03:13:06<br>16 Q  It's -- it's a very -- it's a very specific<br>17 question, and you are being very evasive.<br>18     The question is, where is the missing<br>19 $664,457, and your answer is "I don't remember"?<br>20 A  I will answer that question when I'm able to    03:13:19<br>21 answer it.  It remains an open question because it's<br>22 being debated by counsel and others now, so...<br>23 Q  It's a fact question.  It's not a legal<br>24 question.  Where is the 664?<br>25     MR. GRIVNER:  And he has answered it to the   03:13:31<br>Page 117 |

| | |
|---|---|
| 1  best of his ability given his knowledge, sitting<br>2  here today.  And it's been asked multiple times now.<br>3      THE DEPONENT:  Joe, I'm asking for a break,<br>4  and you're being really inhumane and not really<br>5  appreciating the state of my recovery, and I don't        03:13:45<br>6  appreciate it.<br>7      So I would ask that we maintain a cordial<br>8  contact here.  I am doing the best job that I can to<br>9  support you in -- in -- in -- in your efforts, and I<br>10  would appreciate that you maintain some decorum        03:14:02<br>11  and -- and respect myself and the others on this<br>12  call.<br>13      MR. EVANS:  If you want to take a break,<br>14  that's fine.  This -- this question and the answers<br>15  that you have to give us are not going to go away,        03:14:14<br>16  so if you want to take five minutes, I'm happy to<br>17  give you five minutes, but there is missing money<br>18  here, and we need to know where it is.<br>19      MR. GRIVNER:  Let's take the break that's<br>20  been requested, then.  Five minutes.        03:14:26<br>21      THE VIDEOGRAPHER:  Stand by, please,<br>22  Mr. Alexander.  This marks the end of Media No. 7.<br>23  Going off the record at 3:14 p.m.<br>24      (Recess.)<br>25      THE VIDEOGRAPHER:  We are back on the record    03:24:07<br>Page 118 | 1      I -- I am happy to confer further and consult<br>2  with Mr. Pfeiffer as well, as well as California<br>3  counsel regarding those positions.<br>4      But as of right now, I am instructing him not<br>5  to answer anything further, subject to further        03:26:12<br>6  conference regarding this change in circumstances,<br>7  yes.<br>8      MR. EVANS:  Is it your position you are<br>9  directing your client not to comply with the Court's<br>10  order to sit for this deposition and provide        03:26:30<br>11  information that is required to be provided<br>12  tomorrow?<br>13      MR. GRIVNER:  In light of his bankruptcy<br>14  filing, that is my position now.  I am happy to<br>15  engage in a further conference regarding continuing    03:26:40<br>16  this -- this deposition after all relevant attorneys<br>17  and parties confer regarding the -- the state of the<br>18  law as -- as to those issues.<br>19      I would ask that this deposition at the very<br>20  least be adjourned until such conference can occur.    03:27:00<br>21      MR. EVANS:  My request is for a -- I think<br>22  what we need to do here is have -- have a 15-minute<br>23  recess so I can confer with counsel and see how we<br>24  want to handle this.<br>25      This mid-deposition filing, it's pretty        03:27:19<br>Page 120 |
| 1  at 3:24 p.m. Pacific, and this marks the beginning<br>2  of Media No. 8 in the deposition of James Alexander.<br>3      You may proceed, Counsel.<br>4      MR. GRIVNER:  Counsel, I've just been advised<br>5  that Mr. Alexander has filed for personal        03:24:55<br>6  bankruptcy.  I'm forwarding everyone an e-mail<br>7  regarding that filing.  And that's my understanding<br>8  as to what has occurred.<br>9      Our position in light of that filing is that<br>10  an automatic stay is in place such that this        03:25:10<br>11  deposition cannot go forward in light of that.<br>12      MR. EVANS:  Where was this bankruptcy filing?<br>13      MR. GRIVNER:  I'm forwarding it right now.<br>14  It was filed, and I'll tell you, in the Central<br>15  District of California.        03:25:28<br>16      MR. EVANS:  So it's your position that based<br>17  on this filing, it supersedes the judge's emergency<br>18  order that permits this deposition?<br>19      MR. GRIVNER:  I think an automatic stay is in<br>20  place in connection with Mr. Alexander's bankruptcy    03:25:46<br>21  filings, such that that is the case, yes.<br>22      MR. EVANS:  So are you directing your client<br>23  not to answer any more questions today?<br>24      MR. GRIVNER:  At this point, I'm directing<br>25  him not to answer any further questions.        03:25:58<br>Page 119 | 1  clearly an effort to obfuscate our fact-finding<br>2  efforts.  We know what's going on here.  And we're<br>3  asking difficult questions, and the second we do,<br>4  there's a personal bankruptcy filing to disrupt us<br>5  from doing that.        03:27:36<br>6      And so we're going to caucus internally and<br>7  decide how to proceed.  If you are directing your<br>8  client to not comply with the Court's order, that's<br>9  on you, and we will have that accordingly.<br>10      I would ask for 15 minutes to talk among    03:27:48<br>11  counsel and to return on the record to give you our<br>12  position.<br>13      MR. GRIVNER:  Understood.<br>14      We will do the same.<br>15      MR. LUFT:  I will note that the deposition    03:27:56<br>16  remains ongoing, and as such, please don't confer<br>17  with your client.<br>18      MR. GRIVNER:  Understood.<br>19      THE VIDEOGRAPHER:  Stand by everyone, please.<br>20  I also can create breakout rooms, if you'd like.    03:28:08<br>21  I'm going to go off the record first.<br>22      MR. GRIVNER:  No need for a breakout room, at<br>23  least on our side.<br>24      THE VIDEOGRAPHER:  Thank you.<br>25      Stand by.  I'm going to go off the record.    03:28:13<br>Page 121 |

```
 1  Is that okay?
 2      MR. EVANS: Yes.
 3      THE VIDEOGRAPHER: Great.
 4      This marks the end of Media No. 8. Going off
 5  the record at 3:28 p.m. Pacific.        03:28:21
 6      (Recess.)
 7      THE VIDEOGRAPHER: We're back on the record
 8  at 4:00 o'clock p.m. Pacific, and this marks the
 9  beginning of Media No. 9 in the deposition of
10  James Alexander.                        04:00:46
11      You can proceed, Counsel.
12      MR. EVANS: Mr. Alexander, will you proceed
13  with this deposition?
14      MR. GRIVNER: Mr. Alexander, you can -- you
15  can answer that question to the extent you're able    04:01:01
16  to.
17      THE DEPONENT: I've been advised by counsel
18  not to continue this deposition.
19      MR. EVANS: Counsel, are -- are you advising
20  your client and directing him to not proceed with    04:01:15
21  this deposition?
22      MR. GRIVNER: Based upon my conversations
23  with Mr. Alexander's California bankruptcy attorney,
24  Mr. Golubchik, Mr. Golubchik is not advising -- is
25  advising Mr. Alexander not to continue with this    04:01:30
```
Page 122

```
 1  deposition in light of the bankruptcy filing that
 2  has occurred in California.
 3      MR. LUFT: When did Mr. -- when did the
 4  bankruptcy counsel give Mr. Alexander that advice?
 5      Was it before this deposition or during it?    04:01:44
 6      MR. GRIVNER: It was during the deposition.
 7  It was during this break.
 8      MR. LUFT: So he communicated with
 9  Mr. Alexander during a pending deposition in -- in
10  Delaware; is that correct?                04:01:51
11      MR. GRIVNER: No. The advice was provided to
12  me by Mr. Golubchik, and I have advised
13  Mr. Alexander, in light of the advice given by
14  Mr. Golubchik, to not -- not continue with this
15  deposition.                            04:02:07
16      I will further represent that I have had --
17  neither me, nor Mr. Pfeiffer, have had any
18  communications with Mr. Golubchik prior to this --
19  the communications that we had with him during this
20  break.                                04:02:25
21      MR. AZMAN: Can you articulate --
22      MR. GRIVNER: Just so I'm clear --
23      MR. AZMAN: Can you articulate the legal
24  basis for why you are directing him not to continue
25  with the deposition specifically?        04:02:32
```
Page 123

```
 1      MR. GRIVNER: Mr. Alexander's filing of his
 2  bankruptcy petition in California.
 3      MR. AZMAN: So it is your position that the
 4  automatic stay allows Mr. Alexander to no longer sit
 5  for a deposition in other pending litigation; is    04:02:42
 6  that correct?
 7      MR. GRIVNER: That's correct.
 8      MR. AZMAN: Thank you.
 9      MR. LUFT: Okay.
10      Can I ask a couple follow-up questions just    04:02:53
11  on this?
12      MR. GRIVNER: To whom?
13      MR. LUFT: There has been approximately
14  $170,000 of Cred Capital funds that have been
15  identified during this deposition as not the        04:03:04
16  property of Mr. Alexander, but specifically the
17  property of the Cred Capital. There is a pending
18  order that those funds had to be turned over as of
19  last Friday.
20      Is Mr. Alexander refusing to turn over those    04:03:15
21  funds, despite the fact that they are Cred Capital
22  funds?
23      MR. GRIVNER: I will advise -- I will confer
24  with Mr. Alexander's team of counsel and respond
25  back to that question as soon as possible.    04:03:25
```
Page 124

```
 1      MR. LUFT: Okay.
 2      And --
 3      MR. WALSH: Well, this is Tim.
 4      What is as soon as possible?
 5      I sent the e-mail, like, an hour-and-a-half    04:03:37
 6  ago, maybe two hours ago. So what is as soon as
 7  possible?
 8      I mean, he has got $60,000 sitting in the
 9  trunk of a car. No one can think that's prudent.
10      MR. GRIVNER: I -- I understand your        04:03:49
11  position. We will respond back as soon as possible.
12  I will -- I will make every effort to respond as
13  quickly as possible after I have conferred with
14  counsel for Mr. Alexander that I was not even -- you
15  know, his -- his existence I was not even aware of    04:04:03
16  before about 35 minutes ago.
17      MR. WALSH: I appreciate that.
18      Can you give me a time frame, please? We are
19  going to contact chambers.
20      MR. GRIVNER: We -- I will give you a        04:04:19
21  time -- let me reach out to Mr. Golubchik, and I
22  will give you a time frame within the next hour.
23  And -- and I hope that -- I hope for that to be --
24  that answer to be this evening.
25      MR. LUFT: Mr. Grivner, I appreciate your    04:04:36
```
Page 125

32 (Pages 122 - 125)