**EXHIBIT J**

**February 16, 2021 Hearing Transcript (California Bankruptcy Court)**

1            UNITED STATES BANKRUPTCY COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                      --oOo--

4  In Re:                    )  Case No. 1:21-bk-10214-MB
                             )
5  JAMES ALEXANDER,          )  Chapter 11
                             )
6          Debtor.           )  Woodland Hills, California
   _____  )  Tuesday, February 16, 2021
7                               2:30 p.m.

8                               CRED INC., ET AL., AND THE
                                OFFICIAL COMMITTEE OF
9                               UNSECURED CREDITORS OF CRED
                                INC., ET AL.'S JOINT EMERGENCY
10                              OMNIBUS MOTION FOR (1) RELIEF
                                FROM THE AUTOMATIC STAY AND (2)
11                              TRANSFER OF VENUE

12            TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE MARTIN R. BARASH
13            UNITED STATES BANKRUPTCY JUDGE

14 APPEARANCES:

15 For the Debtor:            DAVID B. GOLUBCHIK, ESQ.
                             Levene, Neale, Bender, Yoo
16                             & Brill, LLP
                             10250 Constellation Boulevard
17                           Suite 1700
                             Los Angeles, California 90067
18                           (310) 229-1234

19 For Gregory K. Jones:      GREGORY K. JONES, ESQ.
                             Stradling, Yocca, Carlson
20                             & Rauth
                             10100 Santa Monica Boulevard
21                           Suite 1400
                             Los Angeles, California 90067
22                           (424) 214-7044

23

24

   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

ii

```
 1  APPEARANCES:  (cont'd.)

 2  For the United States              RUSSELL S. CLEMENTSON, ESQ.
       Trustee:                        KENNETH M. MISKEN, ESQ.
 3                                      Office of the United States
                                          Trustee
 4                                      915 Wilshire Boulevard
                                        Suite 1850
 5                                      Los Angeles, California 90017
                                        (213) 894-4505
 6

 7  For the Official Committee         GREGORY R. JONES, ESQ.
       of Unsecured Creditors:         McDermott, Will & Emery
 8                                      2049 Century Park East
                                        Suite 3200
 9                                      Los Angeles, California 90067
                                        (310) 284-6140
10
                                        DARREN AZMAN, ESQ.
11                                      TIMOTHY W. WALSH, ESQ.
                                        JOSEPH B. EVANS, ESQ.
12                                      McDermott, Will & Emery
                                        340 Madison Avenue
13                                      New York, New York 10173
                                        (212) 547-5873
14
                                        GREGG A. STEINMAN, ESQ.
15                                      McDermott, Will & Emery
                                        333 Southeast Second Avenue
16                                      Suite 4500
                                        Miami, Florida 33131
17                                      (305) 329-4473

18  For Cred, Inc.:                    JUSTIN E. RAWLINS, ESQ.
                                        SCOTT CARLTON, ESQ.
19                                      Paul Hastings, LLP
                                        515 South Flower Street
20                                      Twenty-Fifth Floor
                                        Los Angeles, California 90071
21                                      (213) 683-6130

22                                      JAMES T. GROGAN III, ESQ.
                                        CASEY W. DOHERTY, JR., ESQ.
23                                      Paul Hastings, LLP
                                        600 Travis Street
24                                      Fifty-Eighth Floor
                                        Houston, Texas 77002
25                                      (713) 860-7338
```

iii

1 APPEARANCES:  (cont'd.)

2 For Cred, Inc.:                    AVRAM E. LUFT, ESQ.
                                     Paul Hastings, LLP
3                                    200 Park Avenue
                                     New York, New York 10166
4                                    (212) 318-6079

5                                    ANDREW M. CARTY, ESQ.
                                     Brown Rudnick
6                                    Seven Times Square
                                     New York, New York 10036
7                                    (212) 209-4959

8 Court Recorder:                    Ana Gasparian
                                     United States Bankruptcy Court
9                                    21041 Burbank Boulevard
                                     Woodland Hills, California
10                                    91367

11 Transcriber:                      Briggs Reporting Company, Inc.
                                     2160 Fletcher Parkway
12                                   Suite 209
                                     El Cajon, California 92020
13                                   (310) 410-4151

14

15

16

17

18

19

20

21

22

23

24

25

iv

1                          I N D E X

2 WITNESSES                DIRECT   CROSS   REDIRECT   RECROSS

3 (None.)

4

5 EXHIBITS                          IDENTIFIED      RECEIVED

6 A    Documents                        16            --
  thru
7 J

8 K    Declaration of Alexander          6            --

9 L    Documents                        16            --
  thru
10 N

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*

1

1  WOODLAND HILLS CALIFORNIA TUESDAY FEBRUARY 16, 2021  2:30 PM

2                          --oOo--

3       (Call to order of the Court.)

4            THE COURT:  All right.  Good afternoon.  We're

5  back on the record.  Today is February 16, 2021, and this is

6  our 2:30 calendar.  This is a specially set matter, set on

7  shortened time, in the -- hold on -- oops, lost my screen --

8  in the case of James Alexander.

9            Just a reminder, since a lot of you are new to my

10  virtual courtroom.  These hearings are being conducted using

11  Zoom audio and video technology.  I'm in the courtroom,

12  along with the court staff, but no one else is here.

13            The courtroom deputy is maintaining an audio

14  recording, just as if we were in court together like old

15  times a year and a half ago, and that should be the only

16  recording being made.  Any other recording of these

17  proceedings, audio, video, any imaging, screenshots, et

18  cetera, is strictly prohibited and enjoined, punishable by

19  contempt.  So don't do it.

20            All right.  Let me take appearances.  I'm going to

21  call on you.  I'm going to go through people I can see

22  first, and then we'll check and make sure there aren't any

23  audio-only participants.

24            Let me start with counsel for the Debtor, Mr.

25  Golubchik.

2

1        MR. GOLUBCHIK:  Good afternoon, your Honor.  David

2   Golubchik, Levene, Neale, Bender, Yoo and Brill, for the

3   Debtor, for both counts.

4        THE COURT:  All right.  Gregory Kent Jones.

5        MR. G.K. JONES:  Good afternoon, your Honor.

6   Gregory Kent Jones in the Subchapter 5 proceeding.

7        THE COURT:  Okay.  Thank you.  Did you know there

8   was another Greg Jones in the world?

9        MR. G.K. JONES:  I assumed there was, but I didn't

10  know until I (indiscernible).

11       THE COURT:  Yes.  That's pretty --

12       MR. G.K. JONES:  (Indiscernible.)

13       THE COURT:  Okay.  All right.  Okay.  Let's see.

14  Mr. Clementson.

15       MR. CLEMENTSON:  Good afternoon, your Honor.

16  Russell Clementson appearing for the U.S. Trustee.  Also

17  with me is Ken Misken, Assistant U.S. Trustee for Woodland

18  Hills.

19       THE COURT:  Very good.  I see Mr. Misken's square,

20  so I know he's with us.

21       Okay.  All right.  Let me see.  Let's have the

22  other Greg Jones.

23       MR. G.R. JONES:  Good afternoon, your Honor.

24  Gregory R. Jones of McDermott, Will and Emery, here on

25  behalf of the Official Committee of Unsecured Creditors of

1  Cred, Inc.  Also with me are my partners, Darren Azman and

2  Tim Walsh.

3          THE COURT:  Very good.  Thank you.

4          Now, I understand that some of you have a pro hac

5  pending, and you're welcome to argue today.  It's not a big

6  deal, but please make sure, one, you get your check to the

7  District Court, and, number two, that you lodge an order.

8  That's how we know to sign one, is when you lodge it.  So

9  we'll be looking out for those.

10          Mr. Rawlins.

11          MR. RAWLINS:  Yes.  Good morning, your Honor.

12  Justin Rawlins on behalf of the Debtor, Cred, Inc., and with

13  me are my partner James Grogan and my colleague Casey

14  Doherty.

15          THE COURT:  Very good.  Thank you.  Good at least

16  to hear your voice.

17          All right.  Let's see.  Who else would like to

18  make an appearance?  Mr. Luft?

19          MR. LUFT:  Good afternoon, your Honor.  I am with

20  Mr. Rawlins of Paul Hastings on behalf of Cred and the

21  Debtor.

22          THE COURT:  Okay.

23          MR. LUFT:  (Indiscernible), your Honor, that Matt

24  Foster, our Chief Restructuring Officer of Cred, is also on

25  the line with us.

4

1          THE COURT:  Okay.  Very good.

2          Let's see.  Mr. Steinman, did you want to make an

3  appearance?

4          MR. STEINMAN:  Good afternoon, your Honor.  Gregg

5  Steinman on behalf of the Unsecured Creditors' Committee.

6          THE COURT:  Very good.

7          Let's see.  Mr. Carty.

8          MR. CARTY:  Good afternoon, your Honor.  Andrew

9  Carty from Brown Rudnick.  We represent the examiner

10  appointed in the Cred, Inc., Chapter 11 cases, so we're here

11  sort of observing.  I don't have a pro hac on file, and I

12  don't expect to have anything to contribute to the hearing.

13  Of course, if your Honor wants to hear from us, I'd be happy

14  to do so.

15          THE COURT:  Okay. All right.  That's fine.  If

16  there are other hearings, though, and you think you're going

17  to say something, you know, put in a pro hac, and if not,

18  I'll just treat you as a member of the public.  All right.

19          MR. CARTY:  Will do, your Honor.

20          THE COURT:  And a friend of the Court.  I

21  appreciate the invitation for information.

22          Let's see.  Mr. Evans.

23          MR. EVANS:  Good afternoon, your Honor.  I am also

24  from McDermott, Will and Emery, representing the Official

25  Committee of Unsecured Creditors.

5

1      THE COURT:  Got it.  Okay.

2      Let's see.  Mr. Carlton.

3      MR. CARLTON:  Yes, your Honor.  Scott Carlson,

4  also with Paul Hastings, on behalf of Cred, Inc.

5      THE COURT:  Okay.  Is there anyone that didn't

6  make an appearance, or someone didn't make your appearance

7  for you, that I'm overlooking?  Anyone?

8    (No response.)

9      THE COURT:  Okay.  I see a Ms. Jurak (phonetic),

10  but she covered her camera, so I assume she's just

11  observing, as anybody is welcome to do.  All right.  Good.

12      MR. GOLUBCHIK:  Your Honor, this is David

13  Golubchik.  Before we begin, can I make a public apology to

14  the other Greg Jones?  When I initially saw him, I think I

15  made a comment to the effect of "There goes the

16  neighborhood," thinking I was talking to the Greg Jones that

17  I have known for many years.  So, Greg R. Jones, I

18  apologize.

19      MR. G.R. JONES:  Apology accepted, Mr. Golubchik.

20      THE COURT:  Okay.  All right.  Thanks.  I

21  appreciate the expression of professional good will.

22      Okay.  Well, let me start by saying I've read

23  everything.  I've read including the deposition transcript,

24  including the transcript where the discovery was ordered and

25  the injunctive relief was granted, and I've read the papers

6

1  filed timely, earlier today, by Mr. Golubchik on behalf of
2  his client, and, recognizing that everything is done on
3  short notice, I actually thought that Mr. Golubchik's
4  pleadings were very constructive.  What he disclosed was
5  very constructive, although that may not be the end of the
6  discussion.

7          I wanted to -- I'm going to go through some things
8  on my list of things on my mind, in no particular order.
9  Some of these are in the nature of sort of tentative.  You
10 might call it a tentative ruling or tentative thoughts, but
11 let me get all this off my chest, and, hopefully, it will
12 focus the argument that I'll hear from you all, whoever
13 wants to speak, in a few minutes.

14         First -- and don't feel the need to respond right
15 away, if you feel like this is directed to you, but I'm just
16 going to go through it all.  Okay?  A very picayune question
17 about Exhibit K to the motion.  Exhibit K purports to be a
18 declaration under penalty of perjury from Mr. Alexander, and
19 it's not signed.  Okay?  That's not -- you know, an unsigned
20 declaration, last time I checked, has a probative value of
21 zero.

22         Now, maybe there is a version of it that's signed,
23 and this is the wrong one that got uploaded as Exhibit K,
24 but I do look at that.  As an aside, I don't think it really
25 matters for purposes of today's proceedings, but, to the

7

1  extent that we have any other proceedings in this case, and
2  the folks that are not regulars here in the Central
3  District, I just want to mention one small detail.

4           We recently, in the last two years, carved back
5  our rule about signing declarations with an S slash,
6  because -- well, the "because" is a long story -- but,
7  basically, if you have a witness who is not an ECF filer, we
8  need a holographic signature.  It can be a scan, but we want
9  to see that they actually read and signed the declaration,
10  and that the initials weren't just put on there by the
11  lawyer.  I don't expect that any of you would do something
12  like that, but it happens around here, regrettably, so we do
13  have that rule.

14           All right.  One of the over-arching questions I
15  have, and I hope people will address, is precisely what is
16  it that you want the Court to approve in terms of relief
17  from stay?  If you compare the opening paragraph of the
18  motion and the closing paragraph of the motion, they're
19  different.  The prayer for relief in the opening paragraph
20  says you basically want just to continue your discovery.  By
21  the time I get to the end of the motion, it says, "Well, we
22  want to do discovery, and we want you to allow us to enforce
23  the injunction."

24           So I think that's what you're asking for, and by
25  "enforce the injunction," I think you mean allow the

8

1  Delaware Bankruptcy Court to continue to enforce its -- if

2  there's any more enforcement to be done, and that may be a

3  question, but to allow the Delaware to enforce its own order

4  directing the Debtor in this case, here in California, to

5  turn over any un-turned-over, if that's a word,

6  cryptocurrency and the proceeds thereof.

7          If you're asking for something else, tell me what

8  it is, because it's not 100 percent clear.  The order is

9  kind of a "so ordered" order, and I get that.  I read the

10 transcript.  I saw that the judge wanted you to do that,

11 because he made so many different orders.  But now I'm being

12 asked to grant relief from stay, and it matters what I'm

13 granting relief from stay for, if I grant relief from stay.

14 So you need to talk with me specifically about what you want

15 to do, because I'm not inclined to give you carte blanche to

16 do whatever.  I want to be clear on what it is you're asking

17 for an what it is I'm granting, if I grant anything.

18         Okay.  Part of the Delaware court's order is

19 directing discovery, that discovery be permitted on an

20 expedited basis.  So that's one of the requests.  That was

21 interrupted, in a sense, with this filing.  So I understand

22 one of the requests is "We want to be able to continue with

23 our discovery, notwithstanding the filing of this case," and

24 the other thing, again, I understand you to be asking is for

25 Mr. Alexander to turn over whatever he has.  "We want relief

9

1  from stay."  So that order that says, "Turn over what you
2  have that belonged to Cred" is still enforceable, but those
3  are the two concepts.  Again, I invite anybody to correct me
4  if I'm wrong.
5           My reading of the papers and the deposition is
6  that Mr. Alexander does not challenge the factual
7  proposition, and, in fact, I think he's admitted it, that he
8  received 225 bitcoin that belonged to Cred, and some other
9  currency.  I think it was about $200,000 in cryptocurrency
10 that's been variously described, but having a one-to-one
11 value with U.S. dollars.  It seems to me that, number one,
12 the Delaware Bankruptcy Court, as a general matter, ought to
13 be the one to enforce its own orders, not me, and there seem
14 like really good reasons to let the Delaware court enforced
15 its own orders.
16          The area where I would start to get concerned is
17 if the Delaware court was, at least at this stage, ordering
18 the attachment or delivery or collection of a debt as to
19 property that is not Cred's property, and, in fact, the
20 Delaware court had to same concern, and denied the request
21 that was made for something that was equivalent of a
22 pre-judgment attachment as to Mr. Alexander's property,
23 other property.  You know, there may be a dispute as to
24 where the rest of Cred's money is.  I get that, but I think
25 it's fair to led the folks that administer the estate of

10

1 Cred's case to conduct discovery to figure out where it is.

2       I'm probably not inclined at this point to

3 entertain the venue motion.  I am not persuaded that there

4 is an emergency there.  Okay?  You got me with the motion

5 you filed last week, when you said, "The money is being

6 dissipated."  I read the deposition, and, honestly, the

7 Debtor didn't sound like being forthright came easy, and

8 yes, I was dismayed to hear that there was 60 grand in the

9 trunk of a car somewhere.  All that stuff concerned me, but

10 I don't think that there is the same kind of emergency

11 regarding transfer of venue.  So I'm inclined to set a

12 continued hearing date on that, allow the parties to

13 supplement the record on a kind of a normal timetable for a

14 motion like that.

15       On the issue of -- I know this is a little bit

16 nonlinear, so I appreciate your patience.  On the issue of

17 relief from stay, obviously, everybody is working at

18 lightning speed, and especially the Debtor's counsel here,

19 who had to respond to it once it was filed, but there's

20 really no briefing on the factors that this Court is

21 supposed to consider when asked to allow a proceeding in

22 another court to go forward.  I know what they are, but it's

23 not in the briefs, and so the argument doesn't really

24 address those factors.  For those of you who are members of

25 the bankruptcy bar in New York, you'll know those factors

1  under the name Sonnax, S-O-N-N-A-X, the Sonnax factors.

2  Here, they're called the Curtis factors sometimes, also

3  recognized in a Central District case called In Re:

4  Plumberex, and some other -- it's the Ninth Circuit BAP

5  cases.

6          There's a set of factors, and I'm going to tell

7  you what they are, so that this argument can be a little

8  more focused.  Yes, you made the bad faith argument, but let

9  me tell you what my reaction to that is.  A couple days into

10  the case, it is difficult for this Court to necessarily

11  conclude that this Debtor did not file a case because he has

12  financial issues to address.  Bad faith, in our circuit and

13  most circuits, is kind of a holistic thing, right?  Yes, you

14  look at the timing.  Everybody comes in here and says, "Hey.

15  The filed bankruptcy on the eve of a foreclosure.  Bad guy."

16  And my reaction is "Well, tell me what else was going on,

17  and is there a genuine need for some kind of bankruptcy

18  relief?"

19          Yes, I mean, the deposition doesn't read well, but

20  they do have an explanation.  It's not clear to me what the

21  explanation is, and whether that was a legitimate

22  explanation, but I think that I can and should figure out

23  what parts of this dispute ought to go forward, without

24  necessarily litigating and adjudicating someone's good faith

25  on, you know, virtually no notice.

12

1        What are those factors, right?  It's a

2 discretionary question, whether to allow proceedings in

3 another jurisdiction to go forward.  I'm going to read to

4 you a little bit.  Okay?

5        I mentioned Curtis, which is the Utah case, 40

6 B.R. 795, at 799 to 800.  There's also the Plumberex case,

7 311 B.R. 551, 559 to 60 -- it's a 2004 case from this

8 Court -- and they're restated in In Re: City of San

9 Bernardino, 558 B.R. 321, from 2016, and the BAP's version

10 is called Kronemyer, at 405 B.R. 915, at 921.  That's from

11 2009.

12        All right.  Here are the factors:  whether the

13 relief will result in a partial or complete resolution of

14 the issues; two, the lack of any connection with or

15 interference with the bankruptcy case; three, whether the

16 foreign proceeding involves the Debtor as a fiduciary; four,

17 whether a specialized tribunal has been established to hear

18 the particular cause of action, and whether that tribunal

19 has the expertise to hear such cases; five, whether the

20 debtor's insurance carrier has assumed financial

21 responsibility; six, whether the action essentially involves

22 third parties, and the Debtor is only a bailee or a conduit

23 for the goods or proceeds in question; seven, whether the

24 litigation in another forum would prejudice the interests of

25 other creditors, the creditors' committee, and other

13

interested parties, presumably, in this case; nine, whether
movant's success in the foreign proceeding would result in a
judicial lien avoidable by the Debtor under Section 522(f);
10, the interests of judicial economy and the expeditious
and economical determination of litigation for the parties;
11, whether the foreign proceedings have progressed to the
point where the parties are prepared for trial;, and, 12,
the impact of the stay on the parties and the balance of
harm or balance of hurt.

It's really not -- not every factor applies in
every case, and not every factor has to be considered, but
these are the oft-cited things that I'm allowed to consider,
and should consider, if they're applicable.  They don't
necessarily require bad faith for me to decide, particularly
on, you know, almost no notice, who's the good guy and who's
the bad guy.

So, anyway, those are the factors.  I have to say
that I'm leaning towards -- after thinking about those
factors, although I would like the parties to address those
that they think are applicable, I'm leaning towards allowing
relief from stay to permit the ordered discovery to go
forward, and I'm leaning towards relief from stay to allow
the Delaware court to enforce its own order, or orders, if
you look at them as sort of a collective, to return property
of that estate.

14

1           Now, is it possible that issues might arise as
2  between, you know, who decides what is property of that
3  estate versus this estate?  I don't think I've been asked to
4  grant relief from stay to permit that yet, but I have to
5  tell you my inclination is to follow the "first to file"
6  doctrine, which is that, generally, the first court seized
7  with jurisdiction over an issue ought to be the one to go
8  forward, and it's clear that this Court -- that the Delaware
9  court, Bankruptcy Court, has quite, you know, an investment
10 in these proceedings, and ought to be the one to do that,
11 although I'm not sure I was actually asked to permit that.
12 Okay?

13          So those are my initial thoughts, and I should
14 also say what I'm also not inclined to do is grant relief
15 from stay to permit any sort of lien or turnover of property
16 that belongs to -- you know, that isn't part of the 225
17 bitcoin plus the other cryptocurrency that the Debtor
18 effectively has acknowledged belonged to Cred, and the
19 proceeds of that.  Right now, on an emergency basis, I can't
20 see how I could possibly tell the Delaware court not to
21 enforce its order with respect to that property, which is
22 indisputably an asset of the Chapter 11 case.

23          Okay.  I'm done, everything off my chest.  I'll
24 listen to you now, and let me hear from whoever wants to be
25 heard on behalf of the moving party.

15

1        By the way, I'll say that I did read with some

2   interest the statement that the Debtor is prepared to

3   convert his case to Chapter 7, which I think he has a right

4   to -- I think, as a matter of right, as long as he's not

5   disqualified under 302 -- no, not -- is it 302 or is it

6   1121(a)?  I've looked at so many things in the last day.

7   I'm pretty sure it's a matter of right.  So I will entertain

8   that request, and grant it as soon as I get an order.

9        So I just want to say I know about that, and I'll

10  stop there.  Go ahead.  Who's going to speak for the moving

11  party?

12       MR. AZMAN:  Your Honor, good afternoon.  This is

13  Darren Azman, McDermott, Will and Emery, on behalf of the

14  committee, Cred Chapter 11 cases.

15       By way of background, as you know, the Cred

16  Chapter 11 cases are pending before Judge Dorsey in

17  Delaware.  What you probably don't know is that the Delaware

18  court has entered an order that grants the committee

19  derivative standing to pursue claims against certain

20  individuals, and one of those individuals happens to be Mr.

21  Alexander, on behalf of the estate, and so that is why we

22  are taking the lead today, and, you know, also more

23  generally why we are involved here.

24       Your Honor, before we move into the substance of

25  the motion, I came into this hearing thinking that I would

16

1  make a recommendation on how we might want to proceed, but

2  I'm thinking maybe that's not the approach you want to take.

3  I was going to suggest that we take up the venue transfer

4  motion first, because, if you are inclined to agree with us

5  on that, you probably wouldn't need to address the list

6  (indiscernible).  You know, it would be transferred, and

7  Judge Dorsey would be hearing your tentative thoughts,

8  rulings, whatever you'd like to call them.  I think maybe it

9  makes the most sense to just go first to the list

10 (indiscernible), but however your Honor would prefer.

11         THE COURT:  Yes, I'd prefer that you do that,

12 because I'm not -- I was not persuaded that the venue

13 transfer motion is a genuine emergency.

14         MR. AZMAN:  Understood, your Honor.  That's no

15 problem at all.  So, before I begin, I would like to move

16 the admission of the exhibits that we attached to our motion

17 as Exhibits A through N, if this is the appropriate time to

18 do that, if your Honor would prefer that we wait to do that

19 later, you know, but I would like to move those into

20 evidence at some point during today's hearing.

21         THE COURT:  Okay.  Mr. Golubchik, how would you

22 like to respond to that?

23         MR. GOLUBCHIK:  I thought, for summary

24 proceedings, that's not necessary.  We have no objection,

25 other than any unsigned declarations, such as Exhibit K.

1          MR. AZMAN:  On Exhibit K, your Honor, there is a

2 signed declaration from Mr. Alexander that I believe we --

3 well, I believe we could put it up on the screen.  I'd have

4 to -- I'll let my associate tell me that we don't have it,

5 and the ability to do it this moment, but I do know that

6 there is a signed Alexander declaration.

7          THE COURT:  Okay.

8          MR. STEINMAN:  Your Honor, we have it.  We can put

9 it on the screen.

10          MR. AZMAN:  Great.

11          THE COURT:  I'm sorry.  Who is speaking?  Mr.

12 Steinman?

13          MR. STEINMAN:  (Indiscernible) Steinman.

14          THE COURT:  Okay.  We'll get back to that.  We'll

15 do that if it becomes important.  For now, I'll accept your

16 representation that you have a signed version.  Do me a

17 favor, though.  Can you e-mail it to Mr. Golubchik?

18          MR. STEINMAN:  Yes, we will certainly do that.

19          THE COURT:  Okay.  All right.

20          MR. STEINMAN:  And if --

21          THE COURT:  Well, so, just so you know, we have a

22 slightly different style of practice, but we'll get to the

23 same place.  So, usually, the documents, documentary

24 evidence in support of a motion, are attached to a

25 declaration that authenticates those documents, and there's

18

1   no requirement to formally move them into evidence.  Live

2   testimony is really a matter of discretion.  Obviously, it's

3   much more like a sort of trial procedure to, you know, ask

4   them to be moved into evidence, and that's fine, but you

5   don't need to -- typically, you don't need to do that.

6          Now, I do note that most of the things that you're

7   asking the Court to consider are things that are

8   self-authenticating, although, admittedly, in some cases,

9   it's hard to read the ECF stamp, because there are multiple

10  stamps.  The reason there's no -- there wouldn't have been

11  much of an issue with most of these is that they're just

12  pleadings from another case, and they clearly bear the stamp

13  of authenticity, or they are themselves declarations.

14         So, anyway, just so you know for next time, you

15  file your declarations with the motion -- you basically did

16  that here -- and then you authenticate the documents, and

17  then, unless somebody files an evidentiary objection -- and

18  do study up on our local rules -- then, when you get to the

19  hearing, basically, the record is created by those

20  submissions.  If there is an evidentiary objection timely

21  filed, the Court will tell you what's in and what's not.

22         So, all right.  Anyway, see, like I said, we get

23  to the same place.  I practiced for many years as one of

24  those out-of-town lawyers in Delaware, so I appreciate

25  that -- and in New York -- I appreciate that things are a

19

1 little different.

2          So we've got this issue with Exhibit K, and we can

3 talk more about that later, if it matters, and Mr. Golubchik

4 agrees that everything else is okay.  So, there, you have

5 your record.

6          MR. AZMAN:  Thank you very much, your Honor.

7          THE COURT:  Okay.

8          MR. AZMAN:  There is also a declaration that was

9 filed.  It was attached to the motion to shorten by Mr.

10 Foster.  Mr. Foster is on the line, and so we'd also want to

11 move that into evidence.

12          THE COURT:  Okay.  Mr. Golubchik, do you have any

13 objection?

14          MR. GOLUBCHIK:  Your Honor, I'm sorry.  I was

15 looking at the declaration that was sent over.  I did not

16 hear the last part about --

17          THE COURT:  So there was a declaration attached to

18 the application for an order shortening time, and Mr. Azman

19 wants to make sure that the Court can consider that

20 declaration.  I think it's part of the record already, so I

21 don't think -- I don't have a problem with that, but I'm

22 just checking with you, because you're the other side.

23          MR. GOLUBCHIK:  No problem.

24          THE COURT:  Okay.

25          MR. AZMAN:  Okay.

20

1          THE COURT:  Groovy.

2          MR. AZMAN:  Great.

3          THE COURT:  What else?

4          MR. AZMAN:  All right.  So your Honor asked an

5  important question, and is, what are we asking for?

6          THE COURT:  Yes.

7          MR. AZMAN:  We're asking for your Honor to lift

8  the stay, so that we can go back to Judge Dorsey and ask him

9  to enforce the order that he has entered, that is, the TRO

10  order, and I would say that there are two key components of

11  Judge Dorsey's order.

12          First is the requirement that Alexander turn over

13  Cred Capital's property to the Cred Debtors.  This is

14  property that he has, day in and day out, admitted he stole

15  from Cred Capital, but was supposedly safekeeping because he

16  didn't trust existing management, which, by the way, is no

17  longer with the company.  Existing management was gone a

18  week after the committee came into the case.

19          Second, your Honor, expedited discovery is what

20  Judge Dorsey ordered, so that not only can we determine what

21  assets Alexander has left, but, equally important or

22  probably more important, who he has transferred any assets

23  to, so that we can go after those third parties, and there

24  are other claims unrelated to transfers of assets that we

25  and the examiner are both looking at and investigating.

21

1          It has come to light that he is the center of

2   attention for many claims that are going to be and have been

3   brought in this case, and so it is critical that we take

4   this discovery, and that is why Judge Dorsey ordered it on

5   47 hours' notice.

6          So those are really the two rubrics of requests

7   that we have with respect to TRO, but generally the order

8   we're looking for from your Honor is lifting the stay, to

9   allow us to go to Judge Dorsey and enforce that, and we're

10  not asking your Honor to make a determination that Alexander

11  has or has not turned over all the Cred Capital property.

12         Now, he spends a lot of time in the objections

13  arguing that he's turned over everything.  You know, that's

14  not the question before your Honor.  The question is whether

15  the stay should be lifted.  If it turns out that he's turned

16  everything over that he's required to, that's great.  Judge

17  Dorsey can decide whether Alexander has complied with the

18  terms of the TRO, but it's not for Alexander or us to

19  unilaterally conclude whether he has complied.

20         I think we've made a number of compelling

21  arguments for why he has not complied, and I think we put

22  that before your Honor to give you some color and context

23  about why we're here, and, in particular, why we're here on

24  shortened notice, but that's what we're asking for.  You

25  know, more importantly, there really is no reason for us to

22

1  trust a word from Alexander.

2        Every time that we have asked him more questions,

3  we discover a new bank account that has more Cred funds in

4  it that he never told us about, or a new transfer of assets,

5  like $350,000 that he transferred to Quinn Emanuel,

6  apparently in exchange for a declaration from Cred's former

7  general counsel in support of a declaration for Alexander's

8  motion to dismiss, just a couple of examples.

9        So, you know, Alexander has never really been

10 forthcoming with us, until we caught him in a lie each time.

11 That's really the only time he's come clean and said, "Let

12 me send over those additional bank account statements," and

13 the only reason that he has provided us with responses to

14 many of our follow-up requests was under threat of us going

15 to Judge Dorsey for an emergency status conference.  I can't

16 count the number of times that we've needed to do that in

17 order to get an answer out of him.

18       So, again, we need to continue our discovery so

19 that we can make our own assessment about whether he has or

20 has not complied with the TRO.  So we believe the Court

21 should lift the stay because, as your Honor noted, we think

22 the case was filed in bad faith, which alone can satisfy

23 (indiscernible) under 362(b), but I am happy to go through

24 the Sonnax or the Curtis factors, you know, however we

25 would like to refer to them as, and I can go through them

1 right now.

2          THE COURT:  Yes, I appreciate that.  Thank you.

3          MR. AZMAN:  Yes.  And so whether the relief will

4 result in a partial or complete resolution of the issues, I

5 do think it will result in a complete resolution of the

6 issues.  The only thing at issue here is whether Alexander

7 has complied with Judge Dorsey's order, and we are asking

8 for you to lift the stay solely so that we can go and

9 enforce that order.  I mean, that's all there is to it.

10          THE COURT:  All right.  So, for instance, you're

11 not asking for -- you haven't, in your motion, asked me to

12 allow any enforcement against his other assets?

13          MR. AZMAN:  Correct.  Now, there may very well be

14 disputes about that, which will -- you know, if you lift the

15 stay, we'll have to argue about in front of Judge Dorsey,

16 but no, if we all agree that there is an asset that is not

17 property of the Cred Debtor's estate, whatever that may be,

18 a car -- I don't know what it might be, but no, we are not

19 asking for any relief to go after his personal assets.

20          THE COURT:  And you're not asking this Court for

21 permission to enforce a personal judgment against him?

22          MR. AZMAN:  No, we are not.

23          THE COURT:  Okay.

24          MR. AZMAN:  I think they're just -- because the

25 TRO is arguably a judgment against him, but I don't think

24

1  that's --

2           THE COURT:  Well, it's not.  It's an injunction

3  asking for, essentially, the repatriation of property of the

4  Cred estate.  Okay?  So that's how I see that.  I don't --

5  you know, if I grant anything, it's not going to be -- like

6  I said, it's not going to be carte blanche.  So, anyway, go

7  ahead.  I'm listening.  Thank you.

8           MR. AZMAN:  Understood.  No, I agree with your

9  Honor.  There's no judgment here.

10          The second issue is the lack of any connection

11 with or interference with the bankruptcy case.  You know, I

12 think this is a difficult one.  From the standpoint of we're

13 trying to get the Cred Debtor's assets back, you know, it

14 doesn't really have a connection to Mr. Alexander's

15 bankruptcy case, save for the fact -- and this really goes

16 to one of the later elements, about whether the Debtor is

17 just merely holding it as bailee or custodian, but it

18 doesn't really go to, you know, the substance of Mr.

19 Alexander's bankruptcy case, because they are not assets of

20 the estate.

21          Interference with the bankruptcy case, you know,

22 look.  We've argued that this case was filed in bad faith,

23 and so I don't know that there's going to be -- I don't know

24 whether there will be a bankruptcy case for much longer.

25 Mr. Alexander has offered to convert the case.  We might

1  have a different view on that, whether dismissal is more

2  appropriate.  I don't know, but I would argue that there's

3  going to be limited interference to the bankruptcy case,

4  because they're not his assets.

5        Whether the foreign proceeding involves the Debtor

6  as a fiduciary, I think that this is not applicable.  I

7  think the Debtor is not a fiduciary in this capacity.

8        The fourth factor is whether a specialized

9  tribunal has been established to hear the particular cause.

10  It's not necessarily a specialized tribunal, but I believe

11  that courts interpreting <u>Sonnax</u> have also interpreted this

12  factor to mean that if a court that has already been hearing

13  the case has specialized knowledge, just by virtue of it

14  being involved for some period of time, that can satisfy

15  this factor as well, and we would certainly argue that that

16  factor is satisfied here.

17        You know, Judge Dorsey has heard experts.  He has

18  qualified our cryptocurrency tracing firm, our outside

19  consultant, as an expert.  We have, you know, gone through

20  hours of hearings with Judge Dorsey about how crypto tracing

21  works, which is what, by the way, ultimately led us to find

22  out that Alexander had transferred crypto, in violation of

23  the California state order.  So there are a lot of unique

24  and specialized aspects of this case that Judge Dorsey is

25  certainly familiar with, and, look.  I don't know that these

26

1   issues have come up much in any case, bankruptcy case,

2   around the country.  So, to the extent there's an expert on

3   it, Judge Dorsey might be that at this point.

4           THE COURT:  Okay.

5           MR. AZMAN:  The fifth element is whether the

6   Debtor's insurance carrier has assumed full financial

7   responsibility.  No, slash, not applicable, really.

8           THE COURT:  Yes.

9           MR. AZMAN:  I think I would go with "not

10  applicable" on that one.

11          THE COURT:  Yes.  I think that factor comes into

12  play, I think, typically, when it's a -- you know, when

13  there's some injury, usually a personal injury, and the

14  Debtor is being asked to allow someone to sue in the

15  Debtor's name without recourse to the estate.  So I agree.

16  Go ahead.

17          MR. AZMAN:  Factor number six, whether the action

18  essentially involves third parties and the Debtor functions

19  only as a bailee or conduit for the goods or proceeds, your

20  Honor, this is probably the one that weighs most heavily in

21  favor of lifting the stay.  This is exactly what we're

22  talking about.  These are not Alexander's assets.  We are

23  not asking for relief from the stay to touch any of his

24  assets that are not property of the estate, and so, again,

25  this one weighs heavily in favor of lifting the stay.

27

1          Number seven is whether litigation in another

2    forum would prejudice the interests of other creditors, the

3    creditors' committee, and other interested parties.  I think

4    I would argue that litigation of that in this forum would be

5    highly prejudicial, because we're talking, again, about

6    asset of the Cred Debtors, and then, you know, the case is

7    pending in Delaware.

8          All the professionals are not in California,

9    except local counsel, in order to be heard before your Honor

10   today, and so I would argue to the contrary.  There is no

11   prejudice to Alexander, and there would actually be

12   prejudice to all the other litigants.  I don't think there

13   is any --

14          THE COURT:  What about the Debtor's creditors?

15          MR. AZMAN:  Well, your Honor, the Debtor's

16   creditors -- there's really only one main creditor, and it's

17   the mortgage lender, and they've got a secured interest in

18   his house.  I think there's around $900,000 outstanding on

19   the mortgage.  That's, I believe, what he told us in one of

20   the depositions.  I can't tell your Honor that I know

21   whether there's equity in the house or not.  I don't know.

22   But it's not, you know, a typical trade creditor or some

23   other type of creditor that's going to be looking to other,

24   you know, assets in the case, in all likelihood, to satisfy

25   their lien.

1          We're also in "COVID Land."  I mean, we're on the
2     dune here every day.  They could just easily appear before
3     Judge Dorsey as they might want to appear here.
4          THE COURT:  Yes.  That's sort of judicial economy
5     and convenience.  We were talking about the prong about, you
6     know, detriment to other creditors, presumably, in this
7     case.
8          MR. AZMAN:  I'm sorry, your Honor.
9          THE COURT:  That's all.
10         MR. AZMAN:  I'm sorry.  You're right, your Honor.
11    I think the argument is that this is not their property,
12    and, you know, the order that we're asking your Honor to
13    enter only goes to Cred Capital's property, and so there's
14    no circumstance in which they would have an interest in that
15    property.
16         THE COURT:  Okay.
17         MR. AZMAN:  I think I'm up to eight here, which is
18    whether the judgment claim arising from the foreign action
19    is subject to equitable subordination under Section 510(c).
20    Your Honor, I'm doing this on the fly.  I don't think this
21    one is applicable here.
22         THE COURT:  I tend to agree.
23         MR. AZMAN:  Number nine is whether movant's
24    success in the foreign proceeding would result in a judicial
25    lien avoidable by the Debtor under Section -- no, this one

29

1 is also not applicable.

2        Factor 10 is the interest of judicial economy and

3 expeditious and economical determination of litigation for

4 the parties.  Your Honor, we briefed this.  We've already

5 spoken about it.  Judge Dorsey is intimately familiar with

6 Cred Capital, and, more importantly, Alexander.

7        I mean, Alexander has filed countless pleadings in

8 that case, and not just in defense, because the Debtors took

9 some action, but he has affirmatively availed himself, or

10 tried to avail himself, of the Delaware Bankruptcy Court,

11 including filing a motion to dismiss, in which he argued

12 that he was the sole director of Cred Capital, and thus the

13 bankruptcy case should be dismissed.  Judge Dorsey ruled

14 against him, found that his corporate filings were improper.

15        So, from a judicial economy perspective, I think

16 that heavily weighs in favor of keeping with Judge Dorsey,

17 so that your Honor doesn't have to spend, you know,

18 essentially what was the last 50 to 70 days getting up to

19 speed on Alexander and all the arguments that he's been

20 making.

21        Number 11 is whether the foreign proceedings have

22 progressed to the point where the parties are prepared for

23 trial.  I'm going to lean toward not applicable here.  I

24 mean, we're only asking your Honor to allow us to enforce a

25 TRO that's already been entered.  We're not asking to go

1  beyond that at this stage.  We may very well need to come

2  back to your Honor for something more than that, but, at

3  this stage, I don't think this element is applicable.

4          Then number 12, the impact of the stay on the

5  parties and the balance of hurt.  As I think we've laid out

6  pretty clear, and I hope was apparently to your Honor, there

7  have just been so many instances where we have been burned

8  by Alexander because he has not told us the truth, or he has

9  hidden assets, or he has forced us to ask a question in the

10  most specific way possible, where we weren't going to get

11  the answer that he knew we wanted, and there is money that's

12  been flowing out the door, out of these bank accounts, since

13  we discovered this in mid-January, and I think the balance

14  of hurt heavily weighs against Alexander and in favor of

15  lifting the stay.

16          THE COURT:  And I think the deposition -- it's

17  fair to say that Mr. Alexander acknowledges making transfers

18  that he was specifically enjoined from making by the

19  California Superior Court, and I think the fact that there

20  is even money to be turned over that was not turned over

21  previously is at least -- well, I don't know all the

22  circumstances of that, but it doesn't sound like -- I'm not

23  going to get into or say anything that will prejudice

24  anybody's effort to claim it was rightful or wrongful, but

25  Judge Dorsey was pretty clear about how fast he expected the

31

1  money that was in Mr. Alexander's control be turned over,

2  you know, and it wasn't, and maybe there's an explanation

3  for that.

4          I'm just trying to be careful here.  I'm not

5  making factual findings.  But what my point is, is that I

6  understand what you're trying to do, and I understand it's

7  been frustrating, and I understand why it's been

8  frustrating.

9          MR. AZMAN:  Thank you, your Honor.

10         THE COURT:  So I get that.

11         MR. AZMAN:  So those are the 11 factors.  I don't

12  know that I have much else here, particularly having heard

13  what your Honor said at the outset.

14         THE COURT:  That's okay.  I wanted you to address

15  your argument in the paradigm of the applicable standards,

16  so that we could talk about it on that, and I wanted to go

17  beyond bad faith.  I understand, you know, your motion sort

18  of made out a prima facie case for bad faith, and Mr.

19  Alexander came back with "No, I have an explanation."

20         We could have an evidentiary hearing on that,

21  maybe not today.  I don't even know that Mr. Alexander is

22  here.  But I think it's probably more efficient to address

23  sort of the arguments to the Court's general jurisdiction,

24  probably.  We'll see.  If I'm not persuaded, or if Mr.

25  Golubchik persuades me that maybe I shouldn't do what I said

32

1  I would do at the outset, maybe we will have to take up

2  those issues, but I'm going to -- why don't I hear from him

3  now, and thank you for -- I think you did a very good job

4  responding to my, you know, 12-part factor test on the fly.

5  So thank you.

6             Mr. Golubchik.

7             MR. AZMAN:  Thank you, and apologies that it

8  wasn't fully briefed.  You know, I know that Mr. Golubchik

9  had very limited time to respond.  We similarly moved very

10 quickly.

11            THE COURT:  I get it.  People feel a sense of

12 urgency, and I understand why.  It wasn't mean to be

13 critical, Mr. Azman.  I just want to get to the -- you know,

14 kind of get to the right place for the right reasons.

15            All right.  Mr. Golubchik, go ahead, sir.

16            MR. LUFT:  Sorry, your Honor.

17            MR. GOLUBCHIK:  Your Honor, I believe Mr. Luft is

18 trying to say something.

19            THE COURT:  Yes, Mr. Luft.

20            MR. LUFT:  Yes.  It's your Honor's prerogative

21 when, but the Debtor would like to be heard, so I'm happy to

22 speak before Mr. Golubchik or Mr. Azman (indiscernible).

23            THE COURT:  Yes, that's probably not a bad idea.

24            Mr. Golubchik, why don't you keep taking notes.

25 Mr. Luft will address the Court now.

1          MR. GOLUBCHIK:  We'll take a new sheet of paper.

2          THE COURT:  All right.  Go ahead.

3          MR. LUFT:  Thank you, and it can probably be a

4 Post-It, because I think Mr. Azman was pretty complete in

5 much of what he said, and I won't go over the factors again,

6 other than to note that, on the factor about whether the

7 person is a fiduciary in the foreign proceeding, Mr.

8 Alexander does hold himself out to be a director.  I don't

9 believe the state of Delaware agrees with him, but he

10 certainly was an officer with the company.  So I think that

11 factor -- that weighs in our favor as well.

12          Otherwise, your Honor, I really want to be fairly

13 brief about this, but I did want to hit on two things.  Your

14 Honor correctly points out right away that there is no

15 dispute in this case that (indiscernible) about who

16 (indiscernible) are.  They are Cred Capital's assets, and,

17 unfortunately, they are Cred Capital's assets, but, despite

18 multiple orders from courts not to be dissipated, have

19 continually been spent, nonstop, whether they were -- you

20 know, I gave a brief overview.

21          Prior to being a Debtor, Cred filed an action, on

22 July 15, seeking the release of freeze, the spending of the

23 225 bitcoin until it could be adjudicated.  The very next

24 day, per Mr. Alexander's declaration, he went and liquidated

25 a whole bunch of it, and then didn't say anything to the

34

1  Court, and then the Court the next day, not knowing that the

2  state of play had changed in any way, entered an order

3  saying, "Don't spend any of the assets."

4       When the Debtor filed for bankruptcy, there was

5  our stay, and then, since then, we've had Judge Dorsey's

6  order, in which he's ordered funds to be turned over, which

7  your Honor seems very well aware of, and which haven't.

8  Throughout this, Mr. Alexander has said -- and it's hard to

9  understand this if you're not enmeshed in the case, but he

10  keeps talking about how he spent it on business expenses.  I

11  just think this is an important point.

12       Cred Capital didn't disappear when Mr. Alexander

13  was fired.  Cred Capital remained a Debtor, remains part of

14  Cred.  It continued to do business every day with all the

15  people who work there.  Mr. Alexander is not one of them.

16  He didn't pay taxes.  He didn't work there.  So, when he

17  tells you that he dissipated what is now worth many millions

18  of dollars on alleged business expenses, they were clearly

19  not our business.  He was spending, knowingly, Cred

20  Capital's funds on something else.

21       Now, that makes a big difference, your Honor,

22  because, as Mr. Azman said, this isn't just a question of

23  "Well, I have some money.  I think I may have another 50,000

24  in a bank account.  If you twist my arm hard enough, I'll

25  show you.  We have very serious questions about where all

35

1  these monies go to, and while getting any clear discovery

2  out of Mr. Alexander has been painstaking, what we have

3  heard, over and over, is "Well, they went to consultants,"

4  which is about as vague a term as you can describe for where

5  this money is going.  So there really is a great urgency to

6  know exactly where those funds went, because they certainly

7  were not spent on Cred Capital's business, because he had no

8  involvement with Cred Capital.

9          Now, I've mentioned that he has repeatedly

10  violated orders, and that has led to, I think, Mr. Azman's

11  very clear comment about this lack of trust, but I want

12  to -- and we know that tactic, but I also want to highlight

13  for your Honor what I think may be happening in your

14  courtroom right now, because I don't think we're even

15  getting a straight answer right now.

16          Now, your Honor read the deposition, so I won't

17  repeat everything, but I'm sure you heard the testimony

18  about the fact that when he liquidated the 100 bitcoin

19  recently, on January 16th, he said he turned over 2.7

20  million dollars.  I'm sure you also saw the testimony which

21  showed that, in fact, he received, you know, I think,

22  364,000 -- excuse me, $364,000 -- excuse me, 2.4 million, my

23  mistake -- such that there is an over-$600,000 gap.

24          THE COURT:  Right.

25          MR. LUFT:  In his declaration, he doesn't address

36

1  where that $600,000 is, and, as you saw in the deposition,

2  he refused to say, and he said some lawyer knows, or "I have

3  to do an accounting," or some other -- and then he walked

4  out.  So there's 600,000 in his declaration.  He's not

5  saying, "I have it," and certainly, if we look at Exhibit C,

6  which is allegedly his DIP bank account, there is not

7  $600,000 in there.  There's $120,000 in there.

8          Similarly, your Honor, if you looked at the

9  deposition, you saw the very clear testimony that he, by his

10  own admission, had $170,000 in funds where the Debtor kept

11  saying, "Well, will you turn those over to us?"  Part of it

12  was the $60,000, which was colorfully in his trunk.  Then

13  there was others.  But that's 170,000, your Honor.  Again,

14  his DIP account says there's $120,000.

15          THE COURT:  Right.

16          MR. LUFT:  Even when he's giving you (sic),

17  there's $50,000 missing, and I stress this, your Honor, both

18  because the stay should be lifted -- this is exactly the

19  type of -- the feeling that Judge Dorsey had where he said,

20  "I have to do this."  But I also want to say the amount of

21  time and effort that has gone into finding these monies, the

22  painstakingly (sic) -- we get one bank account, "Hey.

23  There's money missing.  There's a line item."  "No, no, no.

24  That's absolutely everything."  Well, it's "Okay.  I have

25  another coin-based account.  Well, I have a third one.  I

37

1  have this."

2         Just a huge amount of effort that we've gone

3  through, and now Judge Dorsey has been going through, to get

4  there, to find all these funds, and, to be honest, I think

5  there's a lot more funds to be found.  We have a lot of

6  professionals in Delaware working on this.  We have an

7  examiner in Delaware working on this, and to say -- so,

8  certainly, as to lifting the stay, I think it is important,

9  and I think your Honor gets it, why we need to allow Judge

10 Dorsey to go ahead with this, but I did want to touch on the

11 transfer of the venue quickly, because I think these things

12 go hand in hand.

13        Mr. Alexander has created this mess.  It started

14 when he improperly filed a Delaware corporation in Delaware,

15 to gain hold of Cred Capital in Delaware, and I say the word

16 "improperly" because that is the word in Judge Dorsey's

17 order for how he describes what happened there.  So this is

18 intimately related to Delaware.

19        Beyond that, Mr. Alexander knows this, because he

20 filed a chancery court action in Delaware where the judge

21 said, "Sir, you'll have to seek relief from the stay."  He

22 chose not to do that.  Instead, he went to Judge Dorsey and

23 sought a motion to dismiss, again going to a Delaware court,

24 in which he assumed that he had gotten the relief from the

25 chancery court and said, "I am the director.  Put that

38

1  aside."  And then, even more so, he has joined at least one

2  other action in the Delaware court.

3         Now, there is a cost to the estate, and thus to

4  its creditors, of having to come to your court, in addition

5  to Judge Dorsey's court, and go through all these

6  complicated filings.  That's not to say that the two actions

7  are consolidated, but if this was transferred to Judge

8  Dorsey, all that learning, all the presentations and factual

9  matters and the examiner's findings, and all that work that

10  goes into it, are effectively at least consolidated in Judge

11  Dorsey's mind, so that he deals with both these issues.  It

12  is substantially more efficient.

13         Given the fact of all these things, that it would

14  be more efficient, that we have had to chase him all over

15  the place -- and, to be honest, I know your Honor fairly

16  says, "A person comes in front of me right away, and I don't

17  like to say that that's bad faith.  I want to judge it."  I

18  understand that, but we are dealing with someone who has

19  violated multiple state and federal orders, and has done so

20  to spend money, clearly, for himself.  Your Honor read the

21  record.  He's taken trips to Vail.  He's taken trips to

22  Istanbul.  And even today, in the filing --

23         THE COURT:  That's not what the deposition says,

24  Mr. Luft.  It says he prepaid for what he described as some

25  sort of work conference in Istanbul, and it was canceled

39

1 because of COVID.

2          MR. LUFT:  (Indiscernible), your Honor.

3          THE COURT:  So please be careful.

4          MR. LUFT:  I will.  I believe what he prepaid for

5 was a trip to Switzerland.

6          THE COURT:  Okay.  Well, I don't think I saw

7 evidence that he actually went to Istanbul with your money.

8          MR. LUFT:  Well, your Honor, we could --

9          THE COURT:  I get what you're getting at.  I read

10 it.  I mean, it doesn't give you a -- it doesn't -- wouldn't

11 give anybody a warm and fuzzy feeling about Mr. Alexander,

12 although I did not observe him myself.  I'm not making any

13 credibility judgments about him.

14          I think it's fair to say that many of his answers

15 were -- sound evasive, but, anyway, I don't -- it's neither

16 here nor there.  I get it.  I get that it's been difficult.

17 I get that he hasn't been as cooperative as he should be.  I

18 get that he may have done some bad things, but I'm trying to

19 figure out what to do about your motion in a very short time

20 frame.

21          MR. LUFT:  I appreciate that, your Honor, and I

22 didn't mean to quibble about what someone said one way or

23 the other, and that's completely fair.

24          THE COURT:  And if I got it wrong about Istanbul,

25 I apologize, but I distinctly remember there was questioning

40

1  about events to come.  They were described as work

2  conferences, and some of them were canceled.  So, anyway,

3  it's neither here nor there.

4          MR. LUFT:  Completely fair.  As I said, any work

5  that Mr. Alexander was paying for was not work for Cred

6  Capital, because Cred Capital is in bankruptcy, and Cred

7  Capital has been working for six months without him.  So,

8  however he describes --

9          THE COURT:  Right.  Well, he's got a contrary

10 theory, which, you know, is that he -- "Je suis l'etat,"

11 right, that he is the company, and that may be a losing

12 argument, but I don't know that I need to be the one to

13 decide that.

14         MR. LUFT:  I agree with your Honor.  I don't think

15 you do.  To be honest, I think Judge Dorsey has already

16 found that with regard to addressing the motion, as opposed

17 to who has the corporate responsibility and where it is.

18         Look, your Honor.  I've taken a lot of your time.

19 I want to move on from it.  I will simply just end by

20 stating I think your -- I understand what you're saying on

21 the stay.  I think you've heard our argument there.

22         With regard to the transfer, I would just say I

23 think there is an extraordinary amount of work and facts

24 that go into unraveling everything that happened with this.

25 There are significant costs to the estate, and for that

41

1  reason, and the fact that Mr. Alexander has shown a

2  proclivity to want to go to Delaware, avail himself of the

3  Delaware courts and its laws, I think it would be reasonable

4  to transfer it here.

5          THE COURT:  Okay.  Thanks.  I understand.

6          Before I go to Mr. Golubchik, is there anybody

7  else that wants to -- feels a compelling need to speak in

8  favor of the motion before he responds?

9      (No response.)

10          THE COURT:  Good.  All right.  Go ahead.

11          MR. GOLUBCHIK:  Thank you, your Honor.

12          Clearly, the history, on papers and by

13  presentation of counsel, does not look very favorable for

14  the Debtor.  The Debtor is here in a bankruptcy case, and we

15  are here on a relief from stay, slash, venue motion, on a

16  Tuesday, for a motion that was filed Friday before the long

17  hearing.  The question is, what is the emergency, and what

18  should be done or must be done at this time, pending matters

19  in the future?  I agree with the Court that venue -- there's

20  nothing for exigent circumstances to deal with a venue

21  motion right now.

22          With relief from stay, the Debtor -- and your

23  Honor correctly pointed out, the Debtor agrees that he took

24  property from Cred Capital, and that property needs to be

25  returned.  The Debtor has returned -- or his position is he

42

1   has returned substantially all of the property of Cred

2   Capital.  There are some items in the hardware wallet where

3   he, and I myself, have offered to Mr. Walsh that we'll sign

4   an assignment or stipulate so that Cred Capital has the

5   right to access it.  I understand, prior to the bankruptcy,

6   Cred Capital was unwilling to do that.  I don't know if

7   something has changed, but the Debtor is willing to turn

8   that over.

9           THE COURT:  How much is in the digital wallet?

10          MR. GOLUBCHIK:  I have no idea.

11          THE COURT:  Okay.

12          MR. GOLUBCHIK:  It was less than 200,000.  I think

13  it's 50 to 60,000, if I recall correctly, but I'm not

14  certain.  Whatever it is, 100 percent --

15          THE COURT:  Well, you say -- you said you -- catch

16  my breath, Mr. Golubchik.  I hear you saying, "We've turned

17  everything over," or what you're really saying, "We've

18  turned everything over" that your client has in his

19  possession, custody, or control, because it doesn't sound

20  like these numbers add up.

21          MR. GOLUBCHIK:  I understand, your Honor.  So I

22  will get to it.

23          THE COURT:  Okay.  So you acknowledge they don't

24  add up?

25          MR. GOLUBCHIK:  I understand.

43

1          THE COURT:  Okay.  All right.

2          MR. GOLUBCHIK:  So some coins -- and I don't know

3  cryptocurrency, but this is what I'm learning, and people

4  here can correct me if I'm wrong.  This hardware wallet,

5  which is offline, supposedly securely secured storage,

6  supposedly there's a technical issue which prevented the

7  balance of the coins or funds, whatever it is, to be

8  transferred over.  I understand that there was an all-group

9  call, including Cred Capital folks and Mr. Alexander's

10  folks, to figure out how to proceed, but the point is,

11  whatever is there belongs to Cred Capital.

12          There were funds, especially with the initial 75

13  coins that were liquidated, where payments were made.  Mr.

14  Alexander's position is, part of it was his compensation.

15  There may be -- I'm sure there's disagreement as to what he

16  is entitled to or what he spent the money on, but yes, a

17  portion of the funds were spent.

18          My point is, I understand the concern about

19  turning over the funds, and I understand what the Court

20  said, no issue, discovery to make sure that everything has

21  been turned over.  The question, and what I'm anticipating

22  is going to happen here, is we have a date with --

23          THE COURT:  I'm sorry.  There was a glitch.  Just

24  restart your sentence.  I couldn't hear you.

25          MR. GOLUBCHIK:  Okay.  Here's what I anticipate is

44

1  going to happen.  Again, no issue as to discovery, whether

2  Cred Capital's coin assets were turned over or not.  The

3  issue that I anticipate has to do with, for example, cash

4  that is in the Debtor-In-Possession account.

5        I anticipate that Cred Capital is going to take

6  the position, "These are proceeds of our cryptocurrencies,

7  so they are property of Cred Capital and must be turned

8  over."  My view as Debtor's counsel is, cash being fungible,

9  money being put together, there needs to be a determination

10 here as well as to whether, as of today, this is property of

11 the bankruptcy estate under Section 541, the funds in that

12 account.  So that needs to be determined.

13       That is part of the reason that the Debtor offered

14 to convert to a Chapter 7, which the Debtor has an absolute

15 right to do.  I understand Mr. Azman saying they disagree

16 with it, but the Debtor has the absolute right to convert.

17 Let a Chapter 7 Trustee look at it.  The point is --

18       THE COURT:  Yes, yes, but hold on one second.

19 It's a binary -- I mean, if we're just talking about --

20 we're not talking about anybody else that claims ownership

21 of the funds, and I don't know whether there's more than one

22 DIP account, or which DIP account you're talking about, or I

23 wasn't even sure, when you said the money has been deposited

24 into a DIP account, was it commingled with other money that

25 was there or not?

1          But it's sort of binary, right?  Either the money

2    is Cred's money, and is part of Cred's estate, or it's a

3    part of Mr. Alexander's estate, right?  So it's one or the

4    other, and somebody has to decide.  Number one, why should I

5    be the judge that decides?  This is already something that

6    Judge Dorsey is invested in, and, you know, he's a

7    bankruptcy judge, too.  He took the same oath that I did,

8    and has the same responsibility to the Constitution, and so

9    why shouldn't he decide, and why should there be any delay

10   occasioned by the automatic stay from letting him do that?

11   And, again, this is separate and apart from the question of

12   "Where should the Chapter 7 case be administered?"

13          MR. GOLUBCHIK:  I got it.  I understand, your

14   Honor.  Assets and funds for Judge Dorsey.  Okay.  I

15   understand what you're saying.  I'm not going to argue with

16   respect --

17          THE COURT:  I mean, just as it relates to

18   enforcing his order.  I mean, I'm not going to give more

19   relief than was requested in the motion, right?  So, for

20   instance, right now there's no pending request to proceed to

21   judgment or to enforce the judgment.  Okay?

22          MR. GOLUBCHIK:  There is no judgment.

23          THE COURT:  Right.  It's turnover, and then it's,

24   you know, "Give us the value."  You know, if the money was

25   spent, and -- well, I'm using shorthand here -- it wasn't

46

1  spent properly, and some -- and Judge Dorsey concludes that

2  there is a liability, an individual in personam liability,

3  reaching that judgment, nobody has asked me on an emergency

4  basis, nor could they sustain on an emergency basis, a

5  request like that.  Okay?  That would have to be another

6  motion, and it would have to be on, you know, regular

7  notice.

8           Now, you want a preview?

9           MR. GOLUBCHIK:  I got it.

10          THE COURT:  I mean, usually I let other -- I let

11 all sorts of courts liquidate judgments all the time and

12 reserve enforcement to this Court.  So, you know, maybe it's

13 something that is the subject of a motion or a stipulation.

14 I don't know.  It's not today.

15          MR. GOLUBCHIK:  I understand.

16          THE COURT:  Okay.

17          MR. GOLUBCHIK:  So, your Honor, relief from stay

18 to let Judge Dorsey deal with turnover and determination of

19 assets of Cred Capital or not, right?

20          THE COURT:  To enforce the turnover order, right?

21 And in terms of determining whose is what's, while that

22 wasn't exactly -- that wasn't explicit in the motion, it's

23 implicit, right, because if I say Judge Dorsey can go back

24 to what he was doing, and if these fine folks convince Judge

25 Dorsey that there's a balance in an account somewhere that

47

1 has the individual Debtor's name on it, but it's really

2 money that belongs to Cred, applying whatever rules are

3 appropriate, tracing, whatever, he has to have the ability

4 to decide that's part of the estate he has responsibility

5 over, versus the estate that I have responsibility over.

6 But I'm not -- but, at this point, I'm not being asked to

7 permit anything other than enforcement of his injunctive

8 orders and his discovery order.

9         MR. GOLUBCHIK:  I understand.  I'd like to go,

10 your Honor, to the next category that was discussed,

11 investigation of subsequent transferees of assets.

12        THE COURT:  Okay.

13        MR. GOLUBCHIK:  My understanding, such claims are

14 usurped by the bankruptcy estate, whether the Debtor or the

15 Trustee.  So it appears to me that relief from stay for Cred

16 Capital to investigate subsequent transfers appears to be

17 improper, because the standing is with the estate.

18        THE COURT:  Which estate?

19        MR. GOLUBCHIK:  This estate.  So, when the Debtor

20 filed, the Debtor's estate usurps these fraudulent

21 conveyance causes of action against third parties, whether

22 it's the Debtor or the Chapter 7 Trustee here.  So I'm

23 trying to figure out a way to make this process --

24        THE COURT:  Well, it depends, Mr. Golubchik,

25 doesn't it?  I mean, a transfer from this estate might or

48

1 might not -- well, let me back up.  A transfer out of the

2 hands of Mr. Alexander, right, it would have been, probably,

3 pre-petition, although some things may have continued

4 post-petition.  That might be a subsequent transfer as to

5 the Cred estates -- or the Cred Capital estate.  It could be

6 a subsequent transfer, right, of something recoverable

7 there.

8          It's also at least theoretically possible,

9 although it starts to get complicated, and maybe with

10 conflicting theories, that a transfer away from Mr.

11 Alexander or out of his hands is also somehow recoverable by

12 this Chapter 7 estate.  That's a mess.  Okay?  Nobody has

13 asked me to allow relief from stay so that the discovery

14 order -- so that -- I'm sorry, not the discovery -- nobody

15 has asked me permission to do anything that might affect an

16 asset of this estate, a potential asset of this estate, here

17 in Mr. Alexander's case.  All they've asked for is

18 discovery.

19          Now, your theory is they shouldn't even get

20 discovery, because that's not something they can go after,

21 but I think that's putting the cart before the horse.  I

22 mean, it seems to me that they should be able to ask

23 questions in the context of the turnover motion, as long as

24 they're within the bounds of all the rules for discovery in

25 the turnover motion, and if they're not, take that up with

1  Judge Dorsey, if it pertains to other potential causes of

2  action, or it could pertain to, potentially, adding

3  defendants to this case.

4          So maybe it is.  Maybe it is fair game in that

5  proceeding, all right, again for him to decide, but none of

6  that is asking me for permission to do anything with respect

7  to any of those assets.  So I understand where you were

8  trying to go, but I think you're presupposing the answer to

9  the question of "Who does that belong to?," and I think it's

10  a little premature to do that.

11          MR. GOLUBCHIK:  All right, your Honor.

12          THE COURT:  It's just my reaction.

13          MR. GOLUBCHIK:  So, if it's discovery regarding

14  the assets of Cred Capital, I will stop there.

15          THE COURT:  Yes.  Okay.

16          MR. GOLUBCHIK:  I understand what you said, to

17  allow discovery to go forward.  There is no reason.

18          Two things.  One is, I received a letter this

19  morning that Mr. Alexander forwarded to me from his doctor

20  at Kaiser that, supposedly, he went through COVID recently,

21  and he's, according to the letter -- and I was trying to

22  figure out -- I'm on a different system for Zoom -- to

23  forward it to Mr. Steinman, but the letter basically says

24  that he's out of commission until March 3rd.  So the request

25  is, to the extent that -- and once we finish this, I'll be

50

1 able to get another system to forward it, but that's the

2 letter that I have.

3       So, to the extent that relief from stay is granted

4 and the Court wants to issue any orders or TROs, to make

5 sure nothing happens in the meantime, I just want to make

6 sure everyone is aware of that.

7       THE COURT:  Okay.  I appreciate that.  I'm

8 inclined not to meddle in that.  I have every reason to

9 believe that, if that information is, you know, properly put

10 in front of Judge Dorsey, he'll consider it, and, more

11 importantly, as eager as they are to do the discovery --

12 well, I don't want to say -- I don't want to put pressure on

13 them.  I was going to say I'm sure they would stipulate, but

14 I don't even want to say that.  It's up to them to look at

15 whatever this letter is and decide for themselves, and your

16 client has recourse with Judge Dorsey, I guess is my point.

17       I know that -- I'm not issuing any injunctive

18 relief.  I don't think I've been asked to.  I don't think

19 that's appropriate.  I know sometimes I get asked, "Judge,

20 will you, you know, slow-walk the relief from stay order so

21 these folks have a little more time to move out of their

22 house?"  I'm not going to do that here, you know, and one

23 thing I just want to add to what I've said previously.

24       You know, part of what happened as a result of the

25 filing is the automatic stay arose, and, you know,

1  technically, at the moment, Judge Dorsey's order is stayed,

2  and that order, you know, imposes duties on your client.  I

3  can't think of any reason why there should be an

4  interruption.  Okay?

5          I haven't been asked to grant relief from stay or

6  annul the stay nunc pro tunc, so I'm not going to do that,

7  but there's just no good reason for his order that directs

8  your client to turn everything over should be on pause.  I

9  want to un-pause it as soon as possible, and if you have

10 issues about discovery, about your client's ability to

11 comply, you know, the technical issues with the wallet, all

12 that stuff may be real stuff, but I just think it's really

13 for Judge Dorsey to sort out.

14         MR. GOLUBCHIK:  That's fine, your Honor.  The

15 second issue -- and, actually, I guess I have two more,

16 ending with the Chapter 7 issue.

17         THE COURT:  Yes.

18         MR. GOLUBCHIK:  The second issue is with discovery

19 to proceed outside of this bankruptcy case, because my firm

20 was not planning and doesn't intend to represent the Debtor

21 in that litigation.  Too much history.  In order for us to

22 be able to employ and retain counsel, hopefully, the

23 pre-petition counsel or, if we have to do something else,

24 our firm or otherwise, I would like to make an oral request

25 right now to allow the Debtor, from the 120,000 or so that's

52

1  on deposit, to be able to use 50,000 to fund a retainer to

2  counsel to deal with the litigation.

3          THE COURT:  To what counsel, and for what

4  litigation?

5          MR. GOLUBCHIK:  Well, that's discovery.  The

6  Debtor needs to be represented.

7          THE COURT:  Okay.  Not by you.

8          MR. GOLUBCHIK:  Hopefully, not by me.  If I cannot

9  find anyone, I may have no choice but to step in to help,

10  because I don't want to abandon someone.

11          THE COURT:  Yes.  I'm not stepping into that

12  puddle, respectfully, Mr. Golubchik.  I understand why it's

13  important to your client, and I understand why you would

14  ask, and I understand the difficulty of not having

15  representation, but this Court is not in a position to

16  entertain that sort of request.  Your client -- whether your

17  client had justification or didn't have justification,

18  again, I'm not making any findings.  Your client did not

19  comply with Judge Dorsey's order.

20          Judge Dorsey's order was unconditional.  He

21  basically said, "Go home and transfer the cryptocurrency

22  today, and transfer the rest by tomorrow."  And so I am in

23  no position to say, "Yes, I know that, but, you know, Judge

24  Barash says you can hold 50,000."  I'm not going to do that.

25  Okay?  I mean, your client is a -- I'm just not going to do

53

1 that.  And I understand the difficulty that he may be in.  I

2 just think I'm not the person to deal with that request.

3          MR. GOLUBCHIK:  I understand.  Then the final

4 question, your Honor, is, as the Debtor stated, the Debtor

5 is prepared to go to Chapter 7.

6          THE COURT:  Yes.

7          MR. GOLUBCHIK:  Is that something that the Court

8 would entertain orally right now?

9          THE COURT:  That I will, and do, frequently.  I do

10 it in Chapter 13 cases, and sometimes I do it in Chapter 11

11 cases, at a status conference, and, you know, I guess --

12 hold on a second.  Let me just --

13          MR. GOLUBCHIK:  I don't think there's any

14 restrictions for this Debtor.

15          THE COURT:  Yes, there is, but I don't think it

16 applies.

17          MR. GOLUBCHIK:  I meant -- yes, (indiscernible).

18          THE COURT:  No, that was joint cases.  Hold on.

19 I'm getting my matters mixed up today.  Right.  1112(a):

20          "The Debtor may not convert a case under

21          this chapter to a case under Chapter 7

22          of this title unless the Debtor is not a

23          Debtor-In-Possession."

24          The Debtor is clearly a Debtor-In-Possession.

25 Number two, "The case originally was commenced as an

54

1 involuntary case under this chapter," also not applicable,

2 or three, "The case was converted to a case under this

3 chapter other than on the Debtor's request."

4          So I'm going to invite you, Mr. Golubchik -- I'm

5 going to accept the request that was embedded in your

6 pleading, and I'll invite you to lodge an order, a separate

7 order, on that.  The order should recite that you made the

8 request in that pleading, Docket Number whatever, so people

9 know where to look, that we addressed it at this hearing,

10 and the Court, you know, found no cause to deny the request.

11 It's very uncontroversial, so I'm happy to do that.

12          MR. GOLUBCHIK:  All right.  Thank you, your Honor.

13          THE COURT:  All right.  Now, in terms of a form of

14 order -- well, let me give you some dates, and then we'll

15 talk about the mechanics of the order.  On the venue

16 transfer issue -- let me just work backwards, here.  What a

17 very funny calendar.

18          Okay.  The venue transfer motion I'm going to set

19 for hearing on March 23rd at 1:30.  I'm going to ask the

20 moving parties to file and serve a notice of continued

21 hearing, so that's reflected on the record.  I'm going to

22 give the moving parties until March 2nd to file any

23 supplemental briefing.

24          I mean, you know, looking at the motion, it wasn't

25 the focus of the motion.  I don't want to call it a

1 "throwaway," but it was buried at the end.  So, if you want

2 to take another stab at supplementing your discussion, and

3 putting any evidence into the record, whatever you want to

4 do, you can do that by March 2nd.

5         Then I'm going to give Mr. Golubchik until March

6 16th to file an opposition, and any reply should be filed by

7 March 19th.  Okay?  I've slightly altered the typical --

8 what would be the typical briefing schedule on a motion

9 under Local Rule 9013-1, but that's because this is, like,

10 supplemental.  All right?

11         All right.  Then, in terms of settling an order,

12 because I would like there to be an order as soon as

13 possible on the relief from stay piece, Mr. Azman, after all

14 the discussion we've had, how long will it take you to put

15 together a proposed form of order and get it to Mr.

16 Golubchik?

17         MR. AZMAN:  Very quickly.  My sense, your Honor,

18 and I haven't had a chance to connect with my colleagues or

19 the Debtor's colleagues, so this may be subject to thoughts

20 they may have, but I think this is a one-line order.  The

21 automatic stay is lifted to allow the moving parties to

22 enforce the TRO.

23         THE COURT:  Yes.  So, respectfully, I disagree

24 with you.  I understand what Judge Dorsey did under the

25 circumstances presented, but that's not how I'm going to

56

1  deal with this.  I want -- it needs to be very clear what

2  I'm granting relief from stay to permit.  I think it's --

3  I'm just -- I'm not going to do it that way.  Okay?

4          I can go over it with you, you know, to permit the

5  discovery ordered by Judge Dorsey, you know, to allow

6  enforcement of his injunction requiring X, Y, and Z to be

7  turned over.  I mean, I don't think it has to be long, but

8  it has to be specific.

9          MR. AZMAN:  Understood.  It will require some

10  time.  Our concern is that Alexander -- and I don't want to

11  dive back into the argument.  You know why I'm concerned

12  about --

13          THE COURT:  I know why you're concerned, yes.  I

14  know why you're concerned.

15          MR. AZMAN:  I understand your concern, your Honor.

16          THE COURT:  Yes.

17          MR. AZMAN:  So we will have to deal with it.

18          THE COURT:  Yes.  Okay.

19          MR. GOLUBCHIK:  Your Honor, I just ask to receive

20  a draft, so we can review and comment.

21          MR. AZMAN:  Of course.

22          THE COURT:  Yes.  So I'm suspending our local rule

23  on this, which is not designed for emergency hearings.

24  Okay?  Mr. Azman will get it to you, Mr. Golubchik.  The

25  order should include a place for you to approve as to form

1  only.  Nobody is asking you to concede anything more than

2  you've conceded today, but at least as to form.  And then,

3  when it's uploaded, that will be the signal to me that I can

4  just go ahead and sign it.

5        We do not have the certification of counsel

6  procedure that you do in Delaware.  Okay?  So we ask that

7  they actually sign off, and, Mr. Golubchik, if you have an

8  issue with the draft, what I would say to you is, you know,

9  if they don't acquiesce to any changes you request, you need

10 to file an objection within 24 hours of getting it.  Okay?

11 Because, if I get their order and it doesn't have your

12 signature on it, I'm going to go look to the docket for

13 whatever your objection is.

14        MR. GOLUBCHIK:  I understand.  So my only request

15 is to receive it in Word format, so I can do a quick

16 red-line turnaround, rather than PDF.  That complicates it.

17        THE COURT:  Okay.  I think that's a reasonable

18 request.

19        Mr. Azman, you have Microsoft Word, don't you?

20        MR. AZMAN:  I do.  I do.  We just got it last

21 week.  Mr. Walsh makes me use a typewriter, usually.

22        THE COURT:  You joke, but, you know, until about a

23 year or two ago, our Bankruptcy Appellate Panel was still

24 using WordPerfect, for reasons nobody could understand, and

25 we didn't have Microsoft Outlook anywhere in the judiciary,

58

1 in the federal judiciary.  So I don't necessarily take it

2 for granted, but I'm pleased to hear that your firm is

3 firmly in the 2020s, unlike the judiciary.

4          All right.  Anything else anybody thinks I need to

5 deal with before I go on to my very patient 3:00 o'clock

6 matter?

7          MR. AZMAN:  Thank you, your Honor.

8          THE COURT:  All right.  Thank you all.  I

9 appreciate it.

10          MR. CLEMENTSON:  Pardon me.

11          THE COURT:  I know you were in a pinch there, Mr.

12 Golubchik.  I think you did a good job, under the

13 circumstances, and I appreciate everybody's professionalism.

14          MR. AZMAN:  Your Honor, I think somebody was

15 trying to say something.  Mr. Clementson?

16          MR. GOLUBCHIK:  Mr. Clementson, your Honor.

17          MR. CLEMENTSON:  Thank you.

18          THE COURT:  Mr. Clementson.

19          MR. CLEMENTSON:  I think that maybe my mike wasn't

20 on.  One request -- I think it's consistent with Bankruptcy

21 Rule 2019 and the Debtor's oral motion to convert -- that

22 the Court order that there be no disbursements from the

23 Debtor-In-Possession bank account pending qualification of a

24 Chapter 7 Trustee.

25          THE COURT:  Okay.  Well, how does that gibe with

59

1  the preexisting duty under the Delaware order to turn it

2  over immediately?

3          MR. CLEMENTSON:  That's all fine.  My only concern

4  is that there may be some dispute as to whether or not all

5  these monies are covered by the injunction in Delaware, and

6  we would just prefer that the Chapter 7 Trustee gain control

7  over all funds, so that they not be spent on living

8  expenses, because, frankly, right now that's happening.  The

9  Debtor is spending the monies in the DIP account on living

10  expenses.

11          THE COURT:  Well, it's one thing to tell the

12  Debtor not to use the money.  It's another thing not to

13  tell -- to tell the Debtor that the Debtor can't comply with

14  a lawful order of a federal Bankruptcy Court, just happens

15  to not be this one.

16          MR. CLEMENTSON:  I appreciate that, your Honor.

17          THE COURT:  What rule did you cite?

18          MR. CLEMENTSON:  Bankruptcy Rule 2019, that

19  requires the Debtor to -- I'm sorry, 1019 -- that requires

20  the Debtor to turn over all property to a Chapter 7 Trustee

21  upon conversion, all property of the estate.

22          THE COURT:  All right.  Well, maybe I won't

23  convert the case until the Debtor has turned over the money.

24          MR. GOLUBCHIK:  I'm not following that part, your

25  Honor.

60

1          THE COURT:  What?

2          MR. GOLUBCHIK:  I'm not following that part.

3          THE COURT:  So what Mr. Clementson is saying is,

4   if you convert to Chapter 7, there's another pause, and you

5   have to turn the money over to the Chapter 7 Trustee

6   assigned to this case, the same money that you said, "We're

7   prepared to give to the -- to send to Delaware," you know,

8   subject to that request that I'm not in a position to grant.

9          MR. CLEMENTSON:  Hold on.  Your Honor, hold

10  just --

11         THE COURT:  So, if I -- I'm going to pull up the

12  rule.  Presumably, if convert the case before you've --

13  before your client has complied, at least to the extent of

14  the amount that you believe belongs to Cred, then your

15  client can't comply, because of the rule, but I need to look

16  at the rule.  Hold on.

17         MR. GOLUBCHIK:  Your Honor, I don't think we're

18  going to face that situation.  Wait.  Why can't the order

19  say a conversion, but the relief from stay still applies,

20  given (indiscernible) a conversion?

21         THE COURT:  Well, because nobody filed a motion

22  asking the Court to waive Rule 2019, if it's even waivable.

23  I mean, it's sort of this basic idea, right, like, once you

24  file your case, "Don't spend the money.  Don't give the

25  money away.  Give it to the Trustee," right?  That makes

61

1  sense in 99.9 percent of the cases.  It's just going to

2  create a hiccup here, and delay the repatriation of those

3  funds.

4        Now, you know, that doesn't waive anybody's

5  rights, doesn't waive the Chapter 7 Trustee's rights to try

6  to seek recovery of those funds later in the Delaware

7  Bankruptcy Court, but we're talking about something that

8  falls into the interstitial spaces of judicial discretion,

9  and I understand what Mr. Clementson is saying, and I don't

10 want this Debtor to not comply with a federal bankruptcy

11 rule, but I also think that if I exercise my discretion to

12 grant the conversion first, we have a problem that I don't

13 have an easy answer for.

14       MR. CLEMENTSON:  Your Honor, our main concern is

15 that the Debtor spend the money.  We're not trying to create

16 any sort of conflict between complying with the relief from

17 stay order and --

18       THE COURT:  All right.  Well, let's do this.  I

19 have the discretion to make my relief from stay order

20 applicable right now, this instant, and that should be

21 reflected in the order.  It's 4:05 p.m.  Okay?

22       It's back on.  There's no more pause to Judge

23 Dorsey's order, and the Debtor is under an obligation to

24 comply with that order, okay, which gives you plenty of time

25 before this Court gets around to lodging your conversion

62

1 order to transmit whatever he's going to transmit to the

2 folks in Delaware.

3          Is it to the Debtor or to the committee?  Who is

4 it to, exactly?

5          MR. GOLUBCHIK:  To the Debtor.

6          THE COURT:  To the Debtor.  Okay.

7          MR. GOLUBCHIK:  I'll pass that along, your Honor.

8          THE COURT:  Okay.  And, you know, if he doesn't,

9 then I -- you know, if he doesn't comply again, after you've

10 represented that he plans to comply, at least with respect

11 to an unspecified amount that's in the DIP account, well, I

12 think Judge Dorsey can make an adverse inference from that.

13          If your client drags his feet, and doesn't remit

14 the money until -- doesn't remit the money before I convert

15 the case, and that creates a delay, I think it would be fair

16 for Judge Dorsey to conclude that your client was paying

17 games, and, in any event, your client would have an absolute

18 duty to turn over what was in his account, and account for

19 it to the Trustee here.

20          MR. GOLUBCHIK:  Your Honor, I just want to make

21 something clear, and if I misspoke, I apologize.  The

22 discussion was turning over everything in the hardware

23 wallet, all the cyber-cryptocurrency.  I did not -- at least

24 nowhere in my pleadings did I have a position, nor did I

25 state that the cash is going to be turned over.

63

1        I don't know the answer to it, sitting here on

2   Zoom right now, but I did not make a representation that all

3   this cash is being turned over.  I just want to make sure,

4   and if the Court thought that's what I did as to the

5   Debtor-In-Possession account, I apologize.

6            THE COURT:  That's what I thought.

7            MR. GOLUBCHIK:  I was talking about the

8   hardware --

9            MR. AZMAN:  (Indiscernible.)

10           THE COURT:  Mr. Azman.

11           MR. AZMAN:  That's what we thought, your Honor.

12           THE COURT:  Mr. Luft, you wanted to be heard?

13           MR. LUFT:  Yes.  That's certainly what we thought,

14   and, as we just discussed, there is already -- Judge Dorsey

15   did order the turnover of the cash, not just the crypto,

16   which I know your Honor is aware of.

17           THE COURT:  No, I know.  I'm aware of the cash,

18   too.  He gave him an extra day.

19           MR. LUFT:  Right.  Right.  And there's already

20   less cash in that account since that -- than what he told us

21   just at the deposition.  The idea that there's some

22   question -- he has admitted already that those are the

23   proceeds of liquidating our crypto.  I don't think it makes

24   any difference whether he chose to put it into cash form or

25   into crypto.  Those are clearly Cred Capital's funds.

64

1          MR. GOLUBCHIK:  Your Honor, my only issue is --

2          THE COURT:  All right.  Well, maybe, if that's the

3  case, maybe I shouldn't entertain your oral motion to

4  convert the case, and just ask you to file papers, and I'll

5  get to them when I get to them.  Maybe I'll schedule a

6  hearing, and maybe I'll want to know if the money was turned

7  over before I grant that motion.  What would you prefer?

8          MR. GOLUBCHIK:  Your Honor, that's fine.  My only

9  point was that I did not want it to appear that I

10 represented that cash was being turned over in full.  So I

11 understand what you're saying.  If you prefer for me to file

12 a motion, we'll file a motion.

13         MR. LUFT:  Your Honor?

14         THE COURT:  Yes.  Go ahead, Mr. Luft.

15         MR. LUFT:  One other thing, and I just wanted to

16 pick up on what the Trustee noted.  Just looking at Exhibit

17 C of Mr. Alexander's declaration, he appears to have spent

18 $752 of these funds today.

19         THE COURT:  All right.  Well, I don't think you

20 need to file a motion, Mr. Golubchik, but I am not going to

21 convert the case until the Court has entered an order on

22 relief from stay.  Okay?

23         MR. GOLUBCHIK:  I understand.

24         THE COURT:  And the moment -- and the relief from

25 stay is effective immediately.  So your client is now

65

1  re-obligated, obligated again, not un-obligated, to comply

2  with Judge Dorsey's order, however you want to put it, and,

3  you know, come what may.

4          MR. GOLUBCHIK:  Yes.

5          THE COURT:  Okay?

6          MR. GOLUBCHIK:  Thank you.

7          THE COURT:  And so that's immediate.  We'll hash

8  out the -- you know, you guys will hash out the language.

9  Again, it doesn't need to be a treatise, but there needs to

10 be some specificity as to what I'm allowing relief to

11 permit.  Okay?

12         MR. GOLUBCHIK:  I understand.  All right.  Thank

13 you.

14         THE COURT:  Okay.  All right.  Thanks, everybody.

15 I appreciate it.

16         UNIDENTIFIED SPEAKER:  Thank you, your Honor.

17         THE COURT:  All right.  And now to 3:00 o'clock.

18     (Proceedings concluded.)

19

20         I certify that the foregoing is a correct

21 transcript from the electronic sound recording of the

22 proceedings in the above-entitled matter.

23 /s/ Holly Steinhauer          2-18-21
   Transcriber                  Date

24

25