**<u>Exhibit C</u>**

**February 5, 2021 Hearing Transcript**

```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE

                                  . Chapter 11
IN RE:                            .
                                  . Case No. 20-12863(JTD)
CRED INC., et al,                 .
                                  .
                                  . 824 Market Street
                   Debtors.   . Wilmington, Delaware 19801
                                  .
. . . . . . . . . . . . . . . . Friday, February 5, 2021
CRED INC., CRED CAPITAL,          .
INC., and CRED (US) LLC,          . Adv. Proc. No. 20-51006(JTD)
                                  .
        vs.                       .
                                  .
JAMES ALEXANDER.                  .
. . . . . . . . . . . . . . . .
```

         TRANSCRIPT OF ZOOM HEARING RE:  EMERGENCY MOTIONS OF THE
             OFFICIAL COMMITTEE OF UNSECURED CREDITORS
                 BEFORE THE HONORABLE JOHN T. DORSEY
                   UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA TELEPHONE:

For the Debtors:            Scott D. Cousins, Esq.
                            COUSINS LAW, LLC

                            James T. Grogan, Esq.
                            Broocks (Mack) Wilson, Esq.
                            Avi E. Luft, Esq.
                            PAUL HASTINGS, LLP

For the U.S. Trustee:       Joseph J. McMahon, Jr., Esq.
                            OFFICE OF THE U.S. TRUSTEE

(Appearances Continued)

Audio Operator:             Electronically Recorded
                            by Jason Spencer, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA TELEPHONE:   (Continued)

For the Official Committee
of Unsecured Creditors:        Timothy W. Walsh, Esq.
                               Joseph Evans, Esq.
                               David Hurst, Esq.
                               Darren Azman, Esq.
                               MCDERMOTT, WILL & EMERY, LLP


For Upgradeya Investments,
LLC:                           Adam G. Landis, Esq.
                               LANDIS, RATH & COBB, LLP


For Daniel Wheeler:            Marc Greenwald, Esq.
                               QUINN, EMANUEL, URQUHART
                                & SULLIVAN, LLP


For the Examiner Robert
J. Stark:                      Gregory Taylor, Esq.
                               ASHBY & GEDDES, PA

                               Andrew Carty, Esq.
                               BROWN RUDNICK, LLP


For the United States:         Augustus Curtis, Esq.
                               U.S. DEPARTMENT OF JUSTICE -
                                CIVIL DIVISION


For James Alexander:           Mark Pfeiffer, Esq.
                               Kody Sparks, Esq.
                               BUCHANAN, INGERSOLL & ROONEY, PC


Also Appearing:                Julius Hudec, *Pro Se*

                               Daniyal Inamullah, *Pro Se*

                               Pamela Clegg, Esq.
                               CIPHER TRACE

                               Jeffrey Kaplan
                               "BCAS"

                               Uday Gorrepati
                               "ABI PROJECT"

                               Daniel Gill
                               BLOOMBERG LAW

                               Vince Sullivan
                               LAW360


(Appearances Continued)

APPEARANCES VIA ZOOM:   (Continued)

Also Appearing:                 Becky Yerak
                                WALL STREET JOURNAL

                                Laura Haney
                                U.S. BANKRUPTCY COURT - DISTRICT
                                 OF DELAWARE

INDEX

                                                                    Page

ARGUMENT                                                               5

COURT DECISION                                                        24

1    (Proceedings commence at 10:01 a.m.)

2         THE COURT:  Good morning.  Can everyone hear me

3    okay?

4         UNIDENTIFIED:  Yes, sir.

5         THE COURT:  All right.  This is Judge Dorsey.  We

6    are on the record in Cred, Inc., Case Number 20-51006, the

7    adversary proceeding.  This is the time the Court set aside

8    for a hearing on the committee's motion to intervene in the

9    adversary proceeding and a motion for temporary restraining

10   order and preliminary injunction.

11        So let me turn it over to -- and I will tell the

12   parties I have read all of the pleadings and the

13   declarations, including the response filed by Mr. Alexander.

14   So keep that in mind when making comments.

15        Mister -- let's see.  Committee's counsel, who's

16   speaking for the committee?

17        MR. EVANS:  This is Joseph Evans, Your Honor, from

18   McDermott, Will & Emery, for the committee.

19        THE COURT:  All right.

20        MR. EVANS:  Good morning.

21        THE COURT:  Go ahead, Mr. Evans.

22        MR. EVANS:  Your Honor, we brought this witness

23   because our expert witness Pamela Clegg identified to

24   transactions on January 16th and January 17th, 2021, executed

25   by Mr. Alexander, in which Bitcoin that was directly

1   traceable to Cred that was in Alexander's possession was

2   transferred.  That's a total U.S. Dollar amount of 1.832

3   million.  And that was in violation of a California temporary

4   restraining order and preliminary injunction.

5          As Your Honor said, you've read the papers.  But we

6   just received the declaration this morning -- or a response

7   this morning from Mr. Alexander, where, apparently, he agreed

8   to post certain of the cryptocurrency into escrow, where

9   we're happy about that.  The response wasn't clear as to what

10  "the cryptocurrency" is.  He was originally transferring 225

11  -- or 224.98993 Bitcoin and 204,557 in U.S. Dollar coin,

12  which is a one-to-one for U.S. Dollars.  And so the total net

13  value now is 8.474 million.

14         So, if Mr. Alexander is intending to

15  (indiscernible) in escrow $8.474 million worth of Bitcoin or

16  equivalent currency, then we have no issue.  It wasn't clear

17  from the response if that's what his intentions are.  But I'd

18  like to know what "the cryptocurrency" means when Alexander

19  is agreeing to post.

20         And I understand that they have requested more

21  briefing time for a sanctions motion.  We don't have an

22  objection to that.  And that's where we stand.

23         THE COURT:  All right.  So everybody understands,

24  on the motion for sanctions for violating the California

25  State Court's order, I don't think I have jurisdiction to do

1    that.  I think that's pretty black-letter law, that I cannot

2    impose sanctions for someone violating another Court's order.

3    So I think, if you want sanctions for violating that order,

4    you're going to have to go back to the State Court to get

5    those.

6         But let me ask Mr. Pfeiffer.  What is the Bitcoin

7    that you agreeing -- your client is agreeing to transfer into

8    the escrow account?

9         MR. PFEIFFER:  Yes, Your Honor.  Mark Pfeiffer,

10   Buchanan, Ingersoll & Rooney, on behalf of Mr. Alexander.

11        If I first may address the motion to intervene, my

12   client does -- is not opposing the motion to intervene.

13        My client is agreeing to transfer all of the Cred

14   Capital cryptocurrency under his possession or control to the

15   -- to an escrow agent, pending this matter.  Right now, I

16   understand that there are 50 Bitcoin and another smaller form

17   of cryptocurrency that has fairly immaterial value, compared

18   to the Bitcoin.  But my client would transfer everything that

19   he has into an escrow agent.

20        THE COURT:  So the -- then he only has, you're

21   telling me, 50 of the 220 -- close to 225 Bitcoin that the

22   debtors allege is their property?

23        MR. PFEIFFER:  Yes, Your Honor.  Let me be

24   specific.  It is my understanding that there was only 149 and

25   change, to begin with, of Bitcoin.  And there is proceeds;

1    some of those Bitcoin have been liquidated and there are

2    proceeds.  And it is my understanding my client is agreeable

3    to transfer the proceeds of the liquidated cryptocurrency,

4    the identifiable proceeds of the cryptocurrency liquidation,

5    into the escrow agent.

6              THE COURT:  And how much is in Bitcoin and how much

7    is in liquidated form?

8              MR. PFEIFFER:  So the 50 Bitcoin, there is another

9    about -- approximately $200,000 worth of cryptocurrency.  And

10   I believe there is approximately $2.7 million in cash,

11   effectively, or proceeds.

12             THE COURT:  So it sounds like we have a difference

13   as to how much Bitcoin was originally transferred and how

14   much Bitcoin was subject to the California Court's injunction

15   to not be transferred.

16             Mr. Evans?

17             MR. LUFT:  Your Honor, may I be heard on behalf of

18   the debtor?

19             THE COURT:  Go ahead, Mr. Luft, even though you say

20   you're Mr. Grogan on your --

21             MR. LUFT:  Yeah, it looks like Me, Mr. Jimenez, and

22   Mr. Grogan all want to be Mr. Grogan this morning.  I

23   apologize for that, but you -- how could you blame us?

24             Your Honor, this is shocking.  I want to be very

25   clear about this.  The idea that every -- first of all, there

1    was 225 pieces of Bitcoin.  We have the contemporary records.

2    You've heard Mr. Inamullah's testimony about this previously

3    in the case.  There were written documents indicating how

4    much was transferred to Mr. Alexander, there's documentation.

5    So this alleged 100 pieces of Bitcoin less is completely

6    unfounded.  And we can provide all the documentation the

7    Court needs for how much it is.

8            So, quite simply, putting aside the fact that, as

9    Your Honor pointed out, Mr. Alexander was not a director of

10   Cred Capital, even under his scenario, he has stolen the

11   funds.  There is no scenario where a director gets to take

12   personal funds of a corporation, put them in their own

13   pocket, and spend them.  So, starting from day one, he has

14   acted improperly and taken it.

15           Moreover, before the California Court -- and we

16   litigated this -- at no point did Mr. Alexander ever say to

17   that Court, Your Honor, we're having a whole TRO hearing

18   about this amount of -- this 225 Bitcoin, I don't have that

19   much, I got rid of it, it's not in the account that we're

20   filing orders for.  He has been dishonest with that Court.

21           And now we're standing before you.  He went before

22   the Chancery Court -- excuse me -- before we get to you.

23   Again, he filed this motion, again, never once said I no

24   longer control these assets.

25           And then we had a whole hearing on Wednesday, where

1    I know he sat here in front of you, Your Honor, and never

2    once said, by the way, when Mr. Pfeiffer said this will all

3    get resolved and whatever else, you should all know I don't

4    hold those assets, right?  Instead, what we have gotten is

5    serial lawsuits from him, trying at every turn to fight this.

6           And I -- Your Honor should be aware he filed a new

7    lawsuit in California just the other day, purportedly against

8    Mr. Schatt, but clearly against Cred, asking for the same

9    relief Mr. Pfeiffer was in front of you the other saying,

10   saying please find that I am a proper holder of these assets.

11   Well, now I know why:  Because he spent them all or sent them

12   somewhere.  So when he says he only has 50, that means he's

13   either spent it on something, given it away.  Either way,

14   it's malfeasance.

15          To sit there and come to this Court today and say,

16   oh, I'll stick it in escrow is outrageous.  First of all, it

17   just -- escrow is gone, Your Honor.  He should turn it over

18   to the debtor.  There's no -- he doesn't even dispute that

19   they're Cred Capital's assets.  And then, to sit there and

20   say, well, I only know where 50 is, I would ask that he file

21   something today setting forth every single transfer, where it

22   is, who -- what it was for, and to whom, so that we can take

23   immediate steps with the committee to try to recover what is

24   literally millions of dollars of lost assets for the estate.

25          I cannot stress how surprised I am to find out -- I

1    knew he took it.  But the idea that he did actually -- he'd

2    go through all this and never once mention that this thing

3    we've been fighting over for months is -- are assets that

4    don't even exist anymore in his possession is highly

5    disingenuous, including his filing, to be honest, and not put

6    that in there.  I'm just shocked.

7              But I do ask, Your Honor, please, make him tell us

8    today where it is, so we can try to find these funds.

9              THE COURT:  Well, let me hear --

10             MR. EVANS:  Your Honor --

11             THE COURT:  Go ahead, Mr. Evans.

12             MR. EVANS:  No, I think the time frame is important

13   here.  You know, on July 16th, 2020, there was an order from

14   the California Court, and it precluded Alexander from

15   transferring, transmitting, using, depositing, or permitting

16   anyone else to transfer, transmit, or use any Cred and/or

17   Cred Capital digital assets in his possession, custody,

18   and/or control.  That was July 16th, 2020.

19             And what we have here, Judge, is we have Alexander

20   not even appearing here today, despite the fact that he was

21   here on Wednesday, not even being available to us to cross-

22   examine or ask questions, even though we asked counsel

23   numerous times yesterday to have their client available to

24   us.

25             He's telling us today, oh, I only have 50 Bitcoin

1    left.  This isn't something that was spent on Cred Capital

2    expenses, this isn't something that was a business expense

3    that may or may not have been done.  These were transferred

4    on January 16th and January 17th of this year, two weeks ago.

5    Pamela Clegg is here to testify, and perhaps we don't need

6    her to explain anything, but this was in her declaration,

7    Docket Number 8, which was filed in this case, and these were

8    her conclusions:

9              "For the reason discussed in detail below, it is my

10   professional opinion that:

11             "(A) On January 16th, 2021, Alexander transferred

12   50 Bitcoin that is directly traceable to Cred;

13             "(B) On January 17th, 2021, Alexander transferred

14   50 Bitcoin that is directly traceable to Cred."

15             These are expert conclusions, and Alexander's

16   response is nothing.  Okay, I'll put it in escrow now, I only

17   have 50 left.  And that's not good enough, Judge.

18             We have $8.74 million worth of crypto that has been

19   put in his possession.  We have violations of the court

20   order, which are clear, and violations two weeks ago.  And

21   this isn't some unwilling or unknowing participant.  He's

22   represented by competent counsel, he's engaged in litigation

23   (indiscernible) stayed, but he's engaged in litigation in

24   California, here.  He's been actively answering adversary

25   proceedings here, standing up in court, showing up.  And two

weeks ago, he was secretly taking money.  And the only reason
we had it is because we have a cryptocurrency tracing expert
that's tracking this stuff, right?

So I really don't understand where they come out on
this thing.  I mean, 8.74 million doesn't just disappear.
There's no dispute, 225 Bitcoin he received.  On July 16th,
he's got a court order saying you can't move it.  Two weeks
ago, 3.74 million of it gets trans -- or 1.74 million of it
gets transferred -- ah, sorry -- 3.664 million is the right
number.  Two weeks ago, that disappeared.  And now he's
saying, I don't know where it is, I don't have it, right?

And the tracing here, when you look at it and you
look at the expert report we submitted, it's not that
complicated.  There's five or six transactions, and they're
all him, and the expert concluded they're all him.

And so I don't know where we go from here, Judge.
But I agree with the debtors' counsel, there needs to be an
accounting and a full explanation of each of these
transactions.  There's only six or seven of them, Judge.  And
it's shocking to us, just like it's shocking to the debtor,
that one of the former executives of the company would be
engaged in these litigations, represented by competent
counsel, you know, participate at a bankruptcy hearing, and
then just two weeks ago, right under our noses, steal $3.664
million with no explanation.

1          I mean, he was accused of, effectively, stealing

2     this money.  And his response is, okay, well, I know the 100

3     that I just spent, you caught me, but the 50 that I still

4     have, okay, I'll put that in escrow, right?  It's simply not

5     good enough, Judge.

6          And just, when we're talking about this motion and

7     we're talking about likelihood of success and the ability to

8     win the -- the ability to win this case (indiscernible) his

9     whole defense was that, oh, this was Cred Capital's assets

10    and Cred Capital wasn't appropriately -- couldn't have

11    appropriately filed for bankruptcy because, somehow,

12    Alexander was the only person that could authorize Cred

13    Capital to file for bankruptcy.  Well, Your Honor ruled on

14    Wednesday, that theory doesn't have -- hold any water.

15         So that's why we don't really know what his defense

16    could possibly be at this point.  And we need to get the 50

17    Bitcoin he says he has in his possession, get the whatever

18    2.7 million in cash he says he has in his possession, the

19    200,000 USD, and we need to know what happened with each of

20    these transactions.

21              MR. PFEIFFER:  Your Honor, may I respond?

22              THE COURT:  Go ahead, Mr. Pfeiffer.

23              MR. PFEIFFER:  Yes, very briefly.

24         What we're agreeing to is transferring to the

25    escrow agent everything we have.  I understand that Bitcoin

1  were liquidated and converted to cash.  The identifiable cash

2  proceeds -- which I believe is a bulk, if not all of what

3  we're talking about -- will go to the escrow agent.  I know

4  of very little, if any, that was spent out of those funds.

5  It is my understanding that at least the bulk of those funds

6  that resulted from the liquidation are there.  We will

7  transfer those to the escrow agent.

8        We will provide them with information as to what

9  these transactions were, what happened with the cash.  We are

10  effectively saying to the Court that everything we have will

11  go to the escrow agent.  We will be cooperative because we

12  understand the implications of the Court's order on

13  Wednesday.  We are going to put what we have into the escrow.

14  We're good with that.

15        MR. EVANS:  Your Honor --

16        MR. LUFT:  Your Honor --

17        MR. PFEIFFER:  May I just --

18        THE COURT:  Hold on.

19        MR. EVANS:  (Indiscernible)

20        THE COURT:  Wait a minute, wait a minute.

21        Mr. Pfeiffer, were you done?

22        MR. PFEIFFER:  No.  As far as the allegation that

23  my client is filing complaints in California, that's not my

24  understanding.  My understanding was there's a pending matter

25  between my client and Mr. Schatt in California, and my client

1      filed an amendment to the complaint --

2                  THE COURT:  He filed a --

3                  MR. PFEIFFER:  -- against mister --

4                  THE COURT:  He filed a second amended complaint,

5      actually.  I've looked --

6                  MR. PFEIFFER:  Yeah.

7                  THE COURT:  -- at it.

8                  MR. PFEIFFER:  Yeah, against Mr. Schatt.  He hasn't

9      started a new lawsuit.

10                 And it's also my understanding -- and I have

11     California counsel here on the line, who can confirm; he's

12     not admitted before this Court.  But it is my understanding

13     that there was never actually a signed injunction order in

14     California.  So that's an issue that may or may not become

15     relevant at some point in time.

16                 But the bottom line is, for today, we're agreeing

17     to hand over everything we have to the escrow agent, Judge.

18                 MR. LUFT:  Your Honor --

19                 MR. PFEIFFER:  Your Honor, one question.

20                 THE COURT:  Hold on.  One at a time here.  Go

21     ahead, Mr. Evans.

22                 MR. EVANS:  Mr. Pfeiffer says that his client

23     Alexander has $2.7 million in cash proceeds from the

24     liquidation of Bitcoin, that's what he says.  On January 16th

25     and January 17th, there was a transfer of 100 Bitcoin.  The

market value of that 100 Bitcoin is $3.8 million.  If, two

weeks ago, 100 Bitcoin was sent to who knows where, but

apparently another 1.1 just disappeared, right?  So these

numbers don't make any sense.

        And the question as to whether there an order

from the California Court, I mean, it's in our papers.  On

July 17th, 2020, there was a temporary restraining order

issued by the Court; in August, there was a preliminary

injunction that extended that temporary restraining order to

the conclusion of the proceedings.  So I don't know what the

ambiguity is here, but we have two court orders that clearly

preclude Mr. Alexander from transferring Cred Capital.

        His counsel is now conceding that the

cryptocurrency that he received, they're saying is Cred

Capital property.  But the violation of the order -- and our

expert is here to testify, saying these January 16th and

January 17th transactions are directly traceable to Cred.  So

that's where we are, Judge.

        And you know, at this point, the funds just got to

be transferred to the debtor.  I mean, we're -- they just got

to be transferred to us now.  There's really no reason and no

harm -- or there's no reason to allow Alexander to hold onto

this, so he can get the benefit of an escrow agent.  His

conduct here is egregious, Judge.

        MR. LUFT:  Your Honor --

1          MR. PFEIFFER:  Your Honor, may I respond?

2          MR. LUFT:  If I may?

3          THE COURT:  Well, let me hear from Mr. Luft first,

4     he wanted to say something.

5          MR. LUFT:  Yes, thank you, Your Honor.

6          Your Honor, it looks as though Your Honor has seen

7     the second amended complaint.

8          THE COURT:  I have, yes.

9          MR. LUFT:  If you look at the first -- what's the

10    first action he wants, he wants a declaration that he's a

11    director of Cred Capital.  Now I don't know why an action

12    against Mr. Schatt could do that.  But the fact is he's

13    asking for the exact same relief they came to the other day.

14    And in fact, if you look at all the causes of action, they

15    are all related to the idea that he is a director of Cred

16    Capital.

17         So this notion that they are not violating the stay

18    because they keep just naming Mr. Schatt, as opposed to the

19    necessary party of Cred and Cred Capital -- which has been

20    pointed out to them previously by these courts -- it's --

21    there's no question that that's what they're doing.  They're

22    trying an end run.

23         Moreover, Your Honor, I will note that the Court

24    that filed the injunction, that case has been removed to the

25    Bankruptcy Court in the Northern District of California, and

1    is in the process of being transferred to yourself.  So we

2    hope, very quickly, this will all be in front of you, in

3    terms of the injunction, and you can see it.

4            The only other thing I'd like to just touch on

5    really quickly is, you know, we have had all this litigation

6    going on.  As I pointed out, none of these facts have ever

7    come up.  In all of the papers that he's filed, he's never

8    said the money is not there or, more importantly, that's he

9    liquidated.  They act as though that's not a big deal, well,

10   we just changed it from crypto to dollars.  Your Honor, he

11   has no authority do to that.

12           And that decision, by itself, as Mr. Evans has

13   alluded to, has cost the estate millions of dollars.  When

14   one looks at the value of crypto since he stole it from the

15   company until today, it's astounding how much he's done.  The

16   only thing that gives me -- makes sense is, well, he did the

17   same thing when he was working for Cred.  That's how they

18   lost a lot of money in the first place, he made those

19   decisions.  But that -- the idea that he's not responsible

20   and liable for the additional funds that he lost by his

21   unauthorized actions to, I guess, take some of the crypt -- a

22   bunch of the crypto and change it into dollars, he's liable

23   for that, as well.

24           And I go back to what the committee sought, which

25   is not just the depositing (indiscernible) there needs to be

1  an action, an injunction put up for his other assets.  He

2  needs to make good on all this and needs to know where it is.

3  He's created an astonishing track record that he does not do

4  right when left to his own devices.  Even with a court order,

5  he has -- seems to have no problem violating it.

6        So I do ask today that, not only does he give all

7  the funds that he has to the debtor, but to the extent there

8  is a shortfall in that amount, he has to post the personal

9  collateral to the Court, so that we can have some basis to be

10  sure that we will get the funds.

11        There is no dispute at issue anymore.  He was not

12  the Director of Cred Capital, he did not have authority to do

13  this.  And at this point, Your Honor, we are literally in

14  just a free fall, trying to see how much of the assets that

15  he stole can we recover.  Starting today, please help us make

16  that happen.

17        THE COURT:  Mr. Pfeiffer, I will point out that, if

18  -- well, we now know that he did, Mr. Alexander did transfer

19  funds during the pendency of this bankruptcy case, funds that

20  were assets of the debtors.  Isn't that a violation of the

21  automatic stay, and can't I sanction your client for

22  violating the automatic stay?

23        MR. PFEIFFER:  Your Honor, I don't know the

24  particular facts and the circumstances are not -- that

25  transfer, are not before the Court or were -- haven't been

1    presented to the Court.

2          I can tell you that it is my understanding that

3    recent transfers have very good explanations and -- related

4    to pandemic-related issues that I would prefer not to divulge

5    at the moment because they involve personal health issues.

6    But if a holder of Bitcoin or crypto becomes incapacitated or

7    were to become deceased, if it is in a particular type of

8    account, that person -- nobody could actually (indiscernible)

9    or get that crypto without the right password.

10         My client experienced some issues related to the

11   pandemic, where he had to make sure that, if he were to

12   become deceased, that crypto would be available to other

13   parties, including potentially the debtor.  So there is an

14   explanation for it.  And I'm being purposely oblique because

15   it involves some personal health issues with regard to my

16   client that I would prefer not to disclose in open court, but

17   I will provide the information to the debtor.  I've already

18   disclosed some of the information to the debtor concerning

19   that situation.

20         But there's more to it than, you know, simple

21   transfers of assets post-bankruptcy.  And he didn't transfer

22   any assets to a third party, effectively transferred them to

23   himself, he retained control.  So I'm not sure that is a

24   violation of the automatic stay.

25         And the recent Chicago Parking Authority case would

1    indicate that merely holding onto them, the assets

2    themselves, post-petition would not be a violation of the

3    automatic stay.

4            MR. EVANS:  Your Honor, this is Joe Evans from the

5    committee.

6            First of all, Mr. Pfeiffer just said that Alexander

7    still has and is in possession of the Bitcoin that was

8    transferred on January 16th and January 17th.  That's 150

9    Bitcoin.  And now he's saying, okay, I can only post 50

10   Bitcoin into escrow.  That doesn't make any sense, Judge.

11           And this last-second, COVID-related excuse, you

12   know, this is -- you can't just come to court and say, well,

13   I took money, but okay, it might have something to do with

14   COVID, I don't want to tell anybody what it is, but I

15   shouldn't be held responsible.  We've been in contact with

16   counsel for Alexander for months.  They didn't contact us and

17   say, hey, here's this issue, we have a privacy issue, we want

18   to make sure that the assets are secure.  They didn't say

19   that.

20           Only when we caught them, and we caught a hundred-

21   Bitcoin transfer on January 16th and January 17th, they file

22   a declaration that says nothing about this so-called "excuse"

23   for why they transferred the money.  And then they come to

24   court and, after hearing oral argument, they say, well,

25   actually, it's a COVID issue, Judge, actually, maybe it's a

1    COVID issue and we needed to be secure.  If you want the

2    funds to be secure, if that's the goal, place them with the

3    debtor, who's hired professionals to make sure that all the

4    cryptocurrency is safe and protected and for the benefit of

5    the estate.

6        You know, I -- we can't respond to this oblique

7    reference to COVID-related issue, and that's why the client

8    transferred $3.4 million a couple of weeks ago, it just

9    doesn't make any sense.

10        And you know what, Judge?  Alexander was here two

11   days ago.  He was at the hearing two days ago, he showed up.

12   And then, once we showed him that we know that he transferred

13   this Bitcoin two weeks ago, where is he today?  We asked

14   counsel numerous times is Alexander going to be here, is

15   Alexander going to be here.  We put him on our witness list,

16   to ask him these questions, and he's not here.  And he sends

17   counsel here to say, okay, maybe it's a health issue, maybe

18   that's why.  But these sorts of excuses, they just don't

19   work.  These are millions and millions and millions of

20   dollars of other people's money.

21        THE COURT:  Well --

22        MR. PFEIFFER:  Your Honor --

23        THE COURT:  -- I agree, it is time for Mr.

24   Alexander to start answering some difficult questions and do

25   so in a way that gives the parties and the Court the ability

1    to understand what's going on here.  So I'm trying to figure

2    out how to fashion a remedy here.

3          Certainly, I'm going to enter an injunction, a TRO

4    and a preliminary injunction, ordering Mr. Alexander to turn

5    over whatever he says he has to the debtors.

6          No need for an escrow, at this point because I

7    think the -- having determined that Mr. Alexander was not the

8    Director of Cred Capital when those funds were transferred, I

9    don't think there's any question that he owns those funds.

10   They belong to the debtors and I think they need to be turned

11   over to the debtors without an escrow.

12         And we need to get answers from Mr. Alexander.  So

13   one of two ways to do this:  One, I order him to submit a

14   declaration by sometime today that lays out exactly what he

15   has, when he got it, how he got it, where it was transferred

16   to, how it was liquidated, where the liquidated funds are

17   located; or I order him to sit for a deposition and let the

18   parties examine him about those issues.

19         Let me open it up to debtors and the committee to

20   see which you would prefer.

21         MR. LUFT:  Your Honor, speaking on behalf of the

22   debtors, what I would ask -- I think, if I could take one

23   from Column A and one from Column B, I think what we need,

24   given the level of duplicity with Mr. Alexander, is I'd like

25   him to submit that declaration today, setting forth exactly

1    where it is.  And then, to the extent that we have any

2    questions with regard (indiscernible) --

3              THE COURT:  You're --

4              MR. LUFT:  -- that declaration --

5              THE COURT:  You're freezing up a little bit, Mr.

6    Luft.  I'm not sure what's happening, but now you're

7    completely frozen.

8              MR. PFEIFFER:  Your Honor, Mark Pfeiffer.

9              I think I know what he's saying, and I don't

10   necessarily disagree.  But if you'd like a declaration

11   submitted by --

12             MR. LUFT:  (Indiscernible)

13             MR. PFEIFFER:  -- by today --

14             MR. LUFT:  There seems to be --

15             THE COURT:  Oh, wait a minute.  Mr. Luft --

16             MR. LUFT:  Your Honor?

17             THE COURT:  -- I think you're back.  You froze up

18   there and we couldn't hear --

19             MR. LUFT:  Oh.

20             THE COURT:  -- what you're saying.

21             MR. LUFT:  Sorry.  I'm sure it was something

22   brilliant.  But in short, what I'd ask for, Your Honor, is

23   that mister -- given his level of duplicity, that he submit

24   that declaration today, setting out everything you just

25   explained.  And then, if there's any questions -- which I

1    think there will be, given that his lawyer has said today

2    that he claims to have only got almost 100 million less

3    Bitcoin than all of our records show -- that we then

4    immediately sit for a deposition, once we've had a chance to

5    look at it, to follow up on.

6         I think we need both, to be honest.  But the

7    starting point, I think, would be a clear declaration with at

8    least what he says -- where he says all this money is, so

9    that we can look at that, try to use our resources to

10   evaluate it, and then ask the followup questions that are

11   necessary.  I don't -- unfortunately, I don't have any faith

12   that we can just take him at his word, nor do I think it's

13   reasonable to assume that we can begin to just question him

14   without that type of foundational discovery of what it --

15   where he at least says they are.

16             MR. EVANS:  Your Honor, this is --

17             THE COURT:  Go ahead, Mr. Evans.

18             MR. EVANS:  From the committee, there's a couple of

19   things that we would like.

20        First of all, we agree with you, Judge, that all of

21   the -- all of the cryptocurrency, the proceeds of the

22   cryptocurrency that are held by Alexander, those should be

23   posted and given to the debtor immediately.  And I gather,

24   from doing a quick calculation of what Mr. Pfeiffer was

25   saying, the value of that is approximately $4.732 million,

1    based on current market prices.  I think that's about right.

2    It might be a little -- it might be a little higher than

3    that.

4              This case, this transfer case, is for $8.74 million

5    in Bitcoin.  Okay?  So there's going to be a shortfall,

6    according to what Mr. Pfeiffer says Alexander currently has

7    in his possession, versus what the recovery for the estate is

8    under the adversary action.  So we would ask that, in

9    addition to the providing of the debtors' assets to the

10   debtor, the shortfall, the difference between the value of

11   the adversary action versus what he's able to post, to be

12   placed in escrow, pending the outcome of the adversary

13   action.

14             Mr. Pfeiffer has indicated that his client is

15   liquidating Bitcoin and turning it into cash, executing a

16   transaction, using it for personal reasons, whether their

17   healthcare-related or otherwise.  The only way to ensure that

18   the estate will actually recover these funds, if we are

19   successful -- and we do believe we'll be successfully,

20   especially given the fact that Alexander's only defense to

21   the turnover actions is that these weren't debtor -- these

22   weren't estate assets because Cred Capital couldn't have

23   filed for bankruptcy without his consent.  And so that

24   defense is gone.

25             And so the only way to protect the estate here,

1    Judge, is to have the Cred cryptocurrency and the proceeds

2    transferred to the debtor immediately and to have the

3    shortfall be posted in escrow by Mr. Alexander.

4               MR. PFEIFFER:  Your Honor, may I address that?

5               THE COURT:  Go ahead, Mr. Pfeiffer.

6               MR. PFEIFFER:  Yes, Your Honor.  As far as the

7    crypto go, it's in my client's best interest and everybody's

8    clients' best interests to get that transferred and out of my

9    client's hands as soon as possible because it poses a

10   security issue, both from a personal perspective for my

11   client and to the crypto itself, now that this has been

12   fairly widely publicized and people know that my client has

13   crypto.  We will transfer that, we will work with the debtor

14   to transfer that as soon as possible.

15              I understand Mr. Luft's position about the

16   declaration, and I understand that the Court ordered the

17   declaration.  I have no qualms with that.

18              I understand Mr. Luft's position that he would like

19   to provide -- or depose my client.  If I may suggest that,

20   because there are security issues with regard to the crypto,

21   that the declaration be provided, not publicly, but to both

22   Mr. Luft and the committee, so they know what it is.  And if

23   they choose to file it publicly, they can; or, if they ask me

24   to file it publicly, they can -- we can.  But I don't think

25   everybody wants the entire world to know where these assets

1    are, at the moment, until they are secured by the debtor.

2              THE COURT:  Well, I assume the -- correct me if I'm

3    wrong.  But I'm assuming whatever crypto he has could be

4    transferred immediately, without -- with just a few

5    keystrokes of the keyboard.  Am I incorrect about that?

6              UNIDENTIFIED:  That's correct, Your Honor.

7              THE COURT:  All right.  So --

8              MR. PFEIFFER:  That is my understanding, Your

9    Honor.  I've never had a Bitcoin or a crypto case before, but

10   that's my understanding.

11             THE COURT:  All right.  So I'm going to order him

12   to immediately, within the next 30 minutes after this hearing

13   is over, transfer that Bitcoin to the debtors.

14             Now the cash that he has, I'm assuming that is in a

15   bank account somewhere.  Is that right?

16             MR. PFEIFFER:  I assume that to be the case.  I

17   don't know for certain, Your Honor.

18             THE COURT:  All right.  And that can be transferred

19   through a wire transfer to the debtors' account fairly

20   quickly, so I will order that to be done, as well, by the end

21   of the day today, whatever cash that he has that he alleges

22   or that he admits is the proceeds of the cryptocurrency which

23   was taken from Cred Capital.

24             I will also order him, by the end of the day today

25   -- we'll say, actually, by -- if I was going to give a

1    deposition, Mr. Evans and Mr. Luft, would you want to take it

2    today or over the weekend or Monday?

3            MR. LUFT:  Your Honor, I think it depends if we're

4    going to see a declaration or not.  If we're going to see the

5    declaration, I'd have -- I'd like to have a chance to read it

6    and review it first.  If we're not going to get such a

7    declaration, then I guess I would confer with Mr. Evans.  I

8    personally have a deposition for three hours this afternoon,

9    but I'd be happy to sit down after that and talk to Mr.

10   Alexander then, but --

11           THE COURT:  Well, let's --

12           MR. EVANS:  Your Honor --

13           THE COURT:  There will be a declaration because I'm

14   going to order him to provide one.

15           MR. LUFT:  Terrific.

16           THE COURT:  That will be -- I'm just trying to

17   figure out the timing of it, when I should have him do that.

18   It's --

19           MR. LUFT:  If I could suggest, Your Honor, it can -

20   - whatever time it makes sense for you, I think, given Ms.

21   Clegg's involvement, and I think that there will probably be

22   questions about where this stuff went, maybe a deposition --

23   unless Mr. Evans disagrees -- on Monday then, so we have the

24   weekend -- if he can provide the details today, we have a

25   weekend to look at it -- or I'll defer to Ms. Clegg and Mr.

1    Evans how much time it would take to evaluate his responses.

2    But if that would be quick enough, then I do think time is of

3    the essence, so ...

4              THE COURT:  All right.  So we'll -- I'll order the

5    declaration to be submitted by 4 p.m. today.

6              MR. LUFT:  Thank you, Your Honor.

7              THE COURT:  It will be provided to the committee

8    and debtors' counsel.  I would also like to see it, I'd like

9    it submitted to chambers, so I can review it, as well.

10             And then, if the debtors and the committee request

11   a deposition, Mr. Alexander will sit for that deposition at

12   the committee and the debtors' time, whatever time of their

13   choosing.

14             MR. LUFT:  Thank you, Your Honor.

15             THE COURT:  I also think it's important that we get

16   some expedited discovery, document discovery, what happened

17   to these assets, where they went, how they were transferred.

18   Anything that Mr. Alexander has in writing also needs to be

19   produced on an expedited basis.

20             Mr. Pfeiffer, how quickly can your client get those

21   materials together and produced?

22             MR. PFEIFFER:  Your Honor, I had your sound cut out

23   in the last 15 seconds.

24             THE COURT:  I'm sorry.  You're fading out, too, Mr.

25   Pfeiffer.  I can barely hear you.

1             MR. PFEIFFER:  I'm sorry.  How about now?

2             THE COURT:  That's a little better, but still bad.

3 I was saying that I want expedited discovery, document

4 discovery from Mr. Alexander, as well.  So I was asking you

5 how quickly Mr. Alexander can pull together all documents

6 relating to the Bitcoin, its transfer, its liquidation, and

7 provide that to the debtors and the committee on an expedited

8 basis.  How much time do you need?

9             MR. PFEIFFER:  Probably more time than the Court is

10 willing to give.  But you know, we will provide it before

11 Monday --

12             THE COURT:  All right.

13             MR. PFEIFFER:  (Indiscernible)

14             THE COURT:  By Monday then, it should be provided.

15             I also think it might be important to have Ms.

16 Clegg involved in this, so that she can provide some guidance

17 to the parties and to me on transfers and how they happen and

18 so forth.  So I'd like her to be involved in this.  I --

19 sorry if I'm messing up your weekend, Ms. Clegg, but I think

20 it's important that you be involved in this, so I have some

21 independent expert that can give me some guidance on how all

22 of this played out.

23             MR. PFEIFFER:  Your Honor --

24             MS. CLEGG:  I'm available, Your Honor.

25             THE COURT:  Thank you.

1          I'm sorry.  Someone --

2          MR. PFEIFFER:  Your Honor --

3          THE COURT:  -- else was --

4          MR. PFEIFFER:  Yes, it's Mark Pfeiffer.  And I'm

5    sorry, your audio cut out again when you were talking about

6    the timing of the production of documents.

7          THE COURT:  You had said you could get them by

8    Monday, so --

9          MR. PFEIFFER:  Uh-huh.

10         THE COURT:  -- I was saying, yes, get them by

11   Monday.

12         MR. PFEIFFER:  And Your Honor, just so I know, so

13   that we make sure that we comply with the Court's order, the

14   declaration will be regarding the location of the

15   cryptocurrency and what happened to it and the proceeds,

16   effectively.  Is that correct?

17         THE COURT:  That's correct.  He should also address

18   the differences between the 225 Bitcoin that Ms. Clegg has

19   been able to trace, that was transferred from Cred Capital to

20   Mr. Alexander, and his assertion that he only took possession

21   of 150 Bitcoin.  I want to know, well, how -- what's the

22   basis for that distinct difference between the two.

23         MR. PFEIFFER:  And Your Honor, with regard to the

24   scope of the deposition, would it be, I'm assuming, similar

25   to the declaration?

1          THE COURT:  Yes, exactly.

2          MR. EVANS:  Your Honor, this is Joe Evans from the

3    committee.

4          One thing, just to clarify, in the declaration, for

5    each of these transactions, we want an explanation as to the

6    reason behind each of these transactions.  If 150 Bitcoin is

7    what Mr. Alexander had, it appears, on July 17, when the

8    Court entered the temporary restraining order, but before

9    that, 75 Bitcoin had dissipated.  And so we want an

10   explanation of each transaction that relates back to the

11   crypto that Cred provided Mr. Alexander.  So that's one.

12         The -- two -- the second thing is, according to Mr.

13   Pfeiffer (indiscernible) 50 Bitcoin.  And what's not clear to

14   me is he also said that there was 100 Bitcoin that was

15   transferred, but it was effectively transferred back to

16   Alexander, transferred to an account he controls for security

17   purposes, I suppose.  And so he should be transferring 150

18   Bitcoin to the debtor today in 30 minutes, not just 50.

19         THE COURT:  Well, he's going to --

20         MR. EVANS:  And so I don't know where the

21   disconnect --

22         THE COURT:  He's going to transfer whatever Bitcoin

23   he has that's related to what was transferred to him from

24   Cred Capital and provide an explanation for why there's a

25   difference between what he alleges is the amount that was

1    transferred to him and the amount that the debtor says was

2    transferred to him.  And he should also provide an

3    explanation for each of the transfers subsequent to the

4    initial transfer of all the Bitcoin, as well as an

5    explanation for why he liquidated the Bitcoin and where that

6    money is located.

7                    MR. LUFT:  Your Honor --

8                    MR. EVANS:  Thank you, Your Honor.

9                    And then the one last -- apologies.  The one last

10   thing is, if Mr. Pfeiffer is correct and there are 50

11   Bitcoin, 200,000 in (indiscernible) coin and about 2.7

12   million in cash, that adds up to about $4.6 million.  Judge,

13   there's still 3.8 of additional funds that are the subject of

14   this adversary action.

15                   And so, given Mr. Alexander's conduct to date and

16   the risk to the estate of not recovering those proceeds, we'd

17   ask that Mr. Alexander be asked to post in escrow, pending

18   the resolution of the adversary action, the remainder, the

19   3.8 million about that is the difference between the Cred

20   assets he claims are still under the control and the Cred

21   assets that he originally received.

22                   THE COURT:  Well, I think requiring a prejudgment

23   attachment of assets is premature, at this point, until I

24   have a better understanding of what happened, how it

25   happened, and where the money is and how much is involved

1    here.  And I would want further briefing on that issue.  I

2    think that is a -- that's a big ask, to ask me to impose a

3    prejudgment attachment against somebody.  It doesn't happen

4    very often, it rarely happens in Delaware for sure.  So I'd

5    like further briefing on that issue before I took that next

6    step.

7          MR. LUFT:  Your Honor, if I may?  Just I hope this

8    would be clear that it should be covered, but given this

9    (indiscernible) secrecy in crypto, I would hope that mister -

10   - we need Mr. Alexander, in that declaration, to say who he

11   transferred the funds to, not just some anonymous account, if

12   he knows.  Presumably, he is sending money to people, he knew

13   -- he knows where it is.  We need names, so that we can

14   contact those people.  So I'd ask that to be included, as

15   well, and not to say that it's confidential and whatever else

16   they're going to say.

17          The second thing I would just note is, in addition

18   to the crypto that he took, he still holds a computer and a

19   phone that presumably holds Cred information on them, as well

20   as other -- I think it's called "coin," "U.S. Coin," or some

21   other forms of currency.  We have been talking about the

22   Bitcoin, but I don't see any distinction as to why he should

23   not turn over everything he has in his possession that he

24   took from Cred Capital.

25          THE COURT:  Well, on the first one, I agree, and

1    that's what I expected, that he would -- when he's describing

2    the transfers, he's describing who the funds were -- or who

3    the Bitcoin or who the funds were transferred to and where

4    they're currently residing, so -- and not just some anonymous

5    account number.  He has to provide full disclosure here.

6              On the second issue, remind me what it was.  I'm

7    sorry, I lost track.

8              MR. LUFT:  Quite all right.  The turnover -- we --

9    at issue in the turnover action is -- we --

10             THE COURT:  Okay.  The computer --

11             MR. LUFT:  -- (indiscernible)

12             THE COURT:  -- and the other items.

13             MR. LUFT:  (Indiscernible) whatever --

14             THE COURT:  Mr. Pfeiffer, does your client still

15   have the computer and the phone that was provided by the

16   debtors to Mr. Alexander?

17             MR. PFEIFFER:  I think there are about four or five

18   pieces of equipment listed in the complaint.  I don't think

19   my client had one of those to begin with.  I believe he has

20   the others.

21             With regard to the computer, which is the main

22   issue, I think, is -- he hasn't opened up or used that

23   computer since being terminated because it was the protocol

24   of Cred to wipe computers, you know, as soon as they're

25   powered up, following termination.  So, you know, it's just

1    sitting there.  I can talk to my client about getting it to

2    the debtor in some way, shape, or form.

3              MR. LUFT:  It's not just the computer, though, Your

4    Honor.

5              MR. PFEIFFER:  Whatever equipment it is.

6              THE COURT:  Whatever equipment he has that was

7    proved to him by the debtors should be turned over as soon as

8    possible.

9              Where is Mr. Alexander located, physically?

10             MR. PFEIFFER:  California, Your Honor.

11             THE COURT:  And where are you located, Mr.

12   Pfeiffer?  I'm sorry.

13             MR. PFEIFFER:  I'm in Philadelphia.

14             THE COURT:  And Mr. Alexander has counsel in

15   California, you mentioned Mr. Pfeiffer, who's actually on the

16   call today?

17             MR. PFEIFFER:  Yes, Mr. Thomas Reichert, who is on

18   the call right now and on the screen.

19             THE COURT:  Okay.  Then I would order Mr. Alexander

20   to turn those items over to Mr. Reichert for safekeeping

21   immediately.

22             MR. EVANS:  Your Honor, this is Joe Evans for the

23   committee.

24             And I understand Your Honor's point about the

25   prejudgment order of attachment, how you'd like more

1    briefing.  In the interim, before you can make a decision,

2    what we would like to do and what we'd request is that there

3    be a restriction on Alexander's transfer of what he claims is

4    his personal Bitcoin or personal assets.  We anticipate that

5    what we're going to receive is, well, this Bitcoin was mine,

6    this wasn't Cred Capital's, this Bitcoin was mine, it wasn't

7    Cred Capital's.  And so, until we can sort all that out,

8    Judge, we'd ask for a restriction on Alexander's transfer of

9    his cryptocurrency and other assets.

10           Mr. Pfeiffer said that the assets were liquidated

11   and some of the Bitcoin was liquidated, and Ms. Clegg is very

12   good (indiscernible) this stuff, but we're going to need to

13   understand what his position in certain of these items.  And

14   just to protect the estate, pending the determination of the

15   prejudgment attachment, we'd ask that there be an injunction

16   on Mr. Alexander for making transfers over a certain dollar

17   amount, maybe $1,000, $2,000, something like that.

18           THE COURT:  Well --

19           MR. PFEIFFER:  Your Honor --

20           THE COURT:  -- that's --

21           MR. PFEIFFER:  -- that --

22           THE COURT:  That's kind of like a prejudgment

23   attachment.  But go ahead, Mr. Pfeiffer.

24           MR. PFEIFFER:  I was going to say that's the same

25   thing, and that poses constitutional issues.

1            THE COURT:  Yeah.  Yeah, I'm not prepared to do

2    that at this time.  But I do expect that Mr. Alexander will

3    disclose -- and I'm going to order expedited discovery on all

4    of his personal assets, so that we know how much Bitcoin he

5    holds that he believes is his personal property, including

6    his -- and cash.

7            I'm going to open it up.  I'm going to let the

8    committee and the debtors submit written requests for

9    production and, if you want, interrogatories to Mr. Alexander

10   regarding his personal assets.  And I would expect that that

11   be done on an expedited basis, not 30 days, as allowed by the

12   rules.  I would expect that could be done within a week or 10

13   days.

14           MR. EVANS:  Your Honor, for the committee, we can

15   get these -- we can get these requests out either this

16   evening or first thing tomorrow.  And we'd ask that the

17   responses be submitted by no later than Wednesday.

18           THE COURT:  I'm sorry.  When did you say you would

19   get them out, Mr. Evans, today?

20           MR. EVANS:  We can get them out today or tomorrow

21   morning, but we'd ask the responses be Wednesday.

22           THE COURT:  All right.  I'll say the responses are

23   due Wednesday.  But Mr. Pfeiffer, if there -- something comes

24   up that makes that difficult to reach, I would ask that the

25   parties contact the Court and we'll have a status conference

1 over the telephone, and we'll see if you need some additional

2 time.

3            MR. PFEIFFER:  Thank you, Your Honor.

4            MR. CARTY:  Your Honor, Andrew Carty from Brown

5 Rudnick on behalf of the examiner.  May I be heard very

6 briefly?

7            THE COURT:  Go ahead, Mr. Carty.

8            MR. CARTY:  I understand that there's going to be,

9 you know, some information being provided.  I think some or

10 all of it is going to be provided under seal, and we would

11 just like to be involved in that process and provided with --

12 if there's a declaration, if there's depositions, if there's

13 document discovery, we would like to be afforded the

14 opportunity to participate in that process.

15            THE COURT:  Absolutely.

16            MR. PFEIFFER:  No objection, Your Honor.

17            THE COURT:  Yeah, absolutely.

18            MR. CARTY:  Thank you, Your Honor.

19            THE COURT:  Absolutely.  Yes.

20            Well, I'm not sure how to formulate one order.

21 I've ordered a lot of things today.  So I think what I'm

22 going to do is so order the transcript with all of my rulings

23 today.  And Mr. Luft, if you want to submit a form of order

24 that just says -- incorporates my rulings on the record

25 today.  You don't have to do them specifically; just say the

1    Court held a hearing today, made numerous rulings on the

2    record relating to various issues and, for the reasons stated

3    on the record, the record is so ordered.  And I think that

4    will -- we'll have to go with that because it will be

5    impossible to try to put together a comprehensive order on

6    this on a short period of time, especially since you have a

7    deposition this afternoon.

8              MR. LUFT:  Thank you, Your Honor.  That is,

9    honestly, very helpful.

10             THE COURT:  All right.

11             MR. EVANS:  And Judge, this is Joe Evans for the

12   committee.

13             And the two items that we were come back to you

14   with briefing on were the sanctions item and the -- sanctions

15   related to a violation of the automatic stay and, also, the

16   prejudgment order of attachment.  We'd just like to confer

17   with Mr. Pfeiffer on that and come back to you with a

18   proposed briefing schedule.  I think some of the information

19   we're going to get over the next few days might be pretty

20   helpful for those motions, so --

21             THE COURT:  Yes, that's fine.

22             MR. EVANS:  -- we'd ask for that.

23             THE COURT:  That's fine, yeah.

24             All right.  I also -- I guess I am going to grant

25   the motion to intervene.  We forgot about that one.  So you

1     can -- Mr. Evans, you can -- I think we have the form of

2     order that was attached to your motion.

3            But Mr. McMahon raised his hand.  Mr. McMahon, do

4     you have an issue about the intervention?

5            MR. MCMAHON:  No, Your Honor.  I -- jumping in.

6     And my apologies, I was monitoring the hearing.  We have the

7     same interest in the information that the examiner does, so

8     we just ask that we be included with respect to

9     communications regarding the declaration, the deposition, and

10    the like.

11           THE COURT:  Yes, absolutely.  Absolutely.

12           So, going back to the motion to intervene, I'll

13    enter the order that was submitted by the committee with your

14    motion, we'll get that entered today.

15           MR. EVANS:  Thank you, Your Honor.

16           THE COURT:  All right.  And I think that's all we

17    had for today, right?  That was enough.  It's a lot.

18           MR. EVANS:  Nothing more from the committee.

19           THE COURT:  All right.

20           MR. EVANS:  Thank you.

21           MR. LUFT:  Thank you, Your Honor.

22           THE COURT:  All right.  Thank you, everybody.  I'll

23    say "have a good weekend," but I have a feeling some people

24    aren't going to that are on the phone today.  So we're

25    adjourned.  Thank you.

44

1            COUNSEL:  Thank you, Your Honor.  Thank you, Your

2       Honor.  Same to you.

3            (Proceedings concluded at 10:55 a.m.)

4                            *****

1                    CERTIFICATION

2           I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9

10   _____          February 5, 2021

11   Coleen Rand, AAERT Cert. No. 341

12   Certified Court Transcriptionist

13   For Reliable