## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>CRED INC., *et al.*,<br><br>Debtors.[1] | ) Chapter 11<br>)<br>) Case No. 20-12836 (JTD)<br>)<br>) (Jointly Administered)<br>)<br>)<br>) |

## EMERGENCY MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR WITHDRAWAL OF THE REFERENCE WITH RESPECT TO THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER (I) HOLDING JAMES ALEXANDER IN CONTEMPT OF COURT AND (II) ISSUING A BENCH WARRANT FOR THE ARREST AND DETENTION OF JAMES ALEXANDER

The Official Committee of Unsecured Creditors (the "Committee") of Cred Inc., *et al.* (the "Debtors") hereby submits this emergency motion (the "Withdrawal Motion"), pursuant to 28 U.S.C. § 157(d), Rule 5011 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 5011-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order by the United States District Court for the District of Delaware (the "District Court"), substantially in the form of the proposed order attached hereto as **Exhibit A**, withdrawing the reference with respect to the *Motion of the Official Committee of Unsecured Creditors for an Order (I) Holding James Alexander in Contempt of Court and (II) Issuing a Bench Warrant for the Arrest and Detention of James Alexander* [Bankr. Docket No. 643] (the "Contempt Motion"). In support of the Withdrawal Motion, the Committee respectfully states as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

## PRELIMINARY STATEMENT

1.      This matter arises from the Contempt Motion filed by the Committee in the
United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), which
seeks an order: (i) holding James Alexander ("<u>Alexander</u>") in contempt of court for failing to
comply with the Bankruptcy Court's *Order Approving the Emergency Motion of the Official
Committee of Unsecured Creditors for Entry of an Order Granting (I) Temporary Restraining
Order and Preliminary Injunction Against James Alexander and (II) Related Relief* (the
"<u>Emergency Order</u>"); and (ii) issuing a bench warrant for Alexander's arrest and detention until
he complies with the Emergency Order.[2]

2.      Given (i) the substantial question as to whether the Bankruptcy Court, as an
Article I court, has authority to impose incarceration as a coercive sanction and (ii) the
complexity of the matter in light of recent findings that Alexander may be a fugitive in the
United Kingdom,[3] the Bankruptcy Court instructed the Committee to file this Withdrawal
Motion so that the Contempt Motion could be heard by the District Court.[4]  Moreover,

---

[2]     *See* Bankr. Docket No. 486.

[3]     On January 8, 2021, the Bankruptcy Court approved the appointment of Robert J. Stark (the "<u>Examiner</u>"), as the
Examiner in the Debtors' cases.  *See* Bankr. Docket No. 338.  On March 8, 2021, the Examiner filed his report.
*See* Bankr. Docket No. 605 (the "<u>Examiner's Report</u>").  The Examiner's Report contained a series of findings
concerning Alexander's past, including that he used a series of different names, had been convicted in the
United Kingdom, and had escaped from a prison in England.  *See* Bankr. Docket No. 338, at 11 ("Mr.
Alexander was convicted on December 3, 2007 in the United Kingdom for crimes related to illegal money
transfers, for which he was sentenced to three years and four months in prison to be served at HMP Ford Prison
in West Sussex, England.  At the time of his incarceration, there was a prison break at this facility. Mr.
Alexander has been identified by the UK government as a fugitive."), 89-90 ("On December 3, 2007, Alexander
was convicted in the United Kingdom for crimes related to illegal money transfers. He was sentenced to three
years and four months in prison to be served at HMP Ford Prison in West Sussex, England. On October 15,
2008, while serving his sentence, there was a prison break at the HMP Ford Prison. It appears that Alexander is
a fugitive in the United Kingdom.") (internal citations omitted).

[4]     *See* March 17, 2021 Hr'r Tr. at 14:4-11 ("On the contempt motion, because it is asking for Mr. Alexander's
incarceration, there are serious questions about whether or not a bankruptcy court as an Article [I] court has the
authority to do that.  And to avoid those issues and also because . . . if Mr. Alexander is in fact a fugitive from
the U.K., it resulted in further criminal allegations against him, then I think it's important that this by heard by
the district court and not by me.").  The March 17, 2021 Hr'r Tr. is attached hereto as **Exhibit B**.

considerations of judicial economy support withdrawing the reference because: (i) there is a pending appeal in the District Court of the Emergency Order; and (ii) if the Bankruptcy Court does not have authority to enter an order on the Contempt Motion, then the District Court will ultimately be asked to review the Bankruptcy Court's findings of fact and conclusions of law and issue a ruling on the Contempt Motion.[5]  Thus, judicial economy supports withdrawing the reference.  For these reasons, "cause" exists for the District Court to withdraw the reference.

3.        Additionally, the Committee respectively requests that the Withdrawal Motion be heard on an emergency basis.  The Emergency Order directed Alexander to immediately turnover the Debtors' estates' assets in his possession, including cryptocurrency, provide expedited discovery, and sit for a deposition.[6]  Alexander has not fully complied with these obligations.  Moreover, Alexander has shown that he will not hesitate to take defensive measures when his feet get close to the fire.[7]  On multiple occasions, Alexander transferred and/or liquidated the Debtors' assets in direct response to pleadings being filed against him (including withdrawing $60,000 in cash and storing it in the trunk of his car).[8]

4.        The need for Alexander to produce discovery is similarly urgent.  Alexander's improper transactions involved the transfer of cryptocurrency, which is very difficult to track and

---

[5]    *See* Docket Nos. 526 & 529.

[6]    *See* Feb. 5, 2021 Hr'g Tr. at 24:12-17; 33:17-22; 34:24- 35:6; 37:1-5; 31:4-5 attached hereto as **Exhibit C**.

[7]    For example: (i) shortly after a complaint was filed against Alexander by the Debtors in California state court, Alexander transferred and liquidated Debtor assets, *id*. at 80:8-13; (ii) shortly after the Committee filed the *Emergency Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting (I) Temporary Restraining Order and Preliminary Injunction Against James Alexander and (II) Related Relief* (the "Emergency Motion") in the adversary proceeding captioned *Cred Inc., Cred Capital, Inc., and Cred (U.S.) LLC v. Alexander*, Case No. 20-12836 (JTD), Docket No. 6 (Bankr. D. Del.) (the "Adversary Proceeding"), Alexander withdrew $170,000 in cash, storing $60,000 of which in the trunk of his car, *see* Bankr. Docket No. 645-7 at 42:12-50:7; and (iii) Alexander had a bankruptcy petition prepared in advance of a Bankruptcy Court-ordered deposition, which he then filed during a five-minute break in the deposition to end his questioning.  *See id*. at 119:4-11.

[8]    *Id*. at 42:12-50:7.

trace.  Accordingly, there is a justifiable concern that a delay in adjudication of this Withdrawal

Motion (and subsequently, the Contempt Motion) may result in Alexander's (or a third-party

transferee's) depletion or transfer of the Debtors' assets, which would cause irreparable harm.

## JURISDICTION

5.     The District Court has jurisdiction over this Motion pursuant to 28 U.S.C.

§ 1334(b).

6.     Venue in the District Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.     The statutory and legal predicates for the relief sought herein are 28 U.S.C.

§ 157(d), Bankruptcy Rule 5011, and Local Rule 5011-1.

## STATEMENT OF FACTS

**A.     Summary Background**

**(1)     The Chapter 11 Cases**

8.     On November 7, 2020, the Debtors commenced the above-captioned chapter 11

cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the

Bankruptcy Code in the Bankruptcy Court.

9.     On December 3, 2020, the Office of the United States Trustee appointed the

Committee.[9]

10.     On March 8, 2021, the Examiner filed the Examiner's Report, which contained a

series of findings concerning Alexander's past, including that he used a series of different names,

had been convicted in the United Kingdom, and had escaped from a prison in England.[10]

---

[9]     Bankr. Docket No. 120.

[10]     *See supra*, n. 3.

(2)    **The Emergency Motion**

11.    Alexander was employed as the Debtors' Chief Capital Officer from August 27, 2018 until his termination on June 26, 2020.[11]  Two days before Alexander's termination, Alexander caused a significant amount of the Debtors' assets (the "Assets") to be transferred to him without authorization.[12]

12.    On July 15, 2020, the Debtors commenced an action against Alexander in California state court to, among other things, recover the Assets.[13]  In that action, the California court issued two orders (the "California Freeze Orders") freezing the Assets and forbidding Alexander from making any transfers thereof.[14]

13.    On January 16, 2021 and January 17, 2021, Alexander violated the California Freeze Orders by transferring the Assets.[15]

14.    As a result, on February 3, 2021, the Committee filed the Emergency Motion, which sought a temporary restraining order: (i) restraining Alexander from executing further transactions involving the Assets; (ii) directing Alexander to immediately transfer the Assets into escrow; and (iii) directing Alexander to produce expedited discovery to develop further information related to the Assets and Alexander's personal finances.[16]

15.    On February 5, 2021, the Bankruptcy Court held an emergency hearing, granted the Emergency Motion, and directed Alexander to provide to the Debtors and the Committee:

---

[11]    *See* Adv. Pro. Docket No. 1, ¶¶ 15, 22-24, 32.

[12]    *See id.* at ¶ 35.

[13]    *See* Bankr. Docket No. 645-3.

[14]    *See* Bankr. Docket Nos. 645-1-2.

[15]    *See* Adv. Pro. Docket No. 8, ¶ 15, Ex. B.

[16]    Adv. Pro. Docket No. 6.

(i) certain of the Assets within 30 minutes after the hearing concluded; (ii) all cash proceeds from the liquidation of the Assets by close of business the day of the hearing; (iii) a detailed declaration by 4:00 p.m. describing all of the transfers of the Assets and any other assets of the Debtors that were in Alexander's possession; (iv) an explanation of the reasons for each of these transactions; (v) discovery on all of the transactions relating to the Debtors by February 8, 2021; (vi) discovery on all of Alexander's personal assets by February 10, 2021; and (vii) a deposition with the Debtors and the Committee.[17]

16.     As set forth in the Contempt Motion, Alexander did not comply with the Emergency Order.[18]

### (3)     The Contempt Motion

17.     As a result of Alexander's noncompliance, on March 15, 2021, the Committee filed the Contempt Motion, which seeks entry of an order: (i) finding Alexander in contempt for failing to comply with the Emergency Order; and (ii) issuing a bench warrant for Alexander's arrest and detention until he complies.[19]

18.     On March 17, 2021, the Bankruptcy Court held a status conference with respect to the Contempt Motion.  At the March 17 status conference, the Bankruptcy Court instructed the Committee to file a motion to withdraw the reference because the Contempt Motion "is asking for Mr. Alexander's incarceration, [and] there are serious questions about whether or not a bankruptcy court as an Article [I] court has the authority to do that.  And to avoid those issues and also because . . . if Mr. Alexander is in fact a fugitive from the U.K., it resulted in further

---

[17]     *See* Ex. C at 24:12-17; 33:17-22; 34:24- 35:6; 37:1-5; 31:4-5.

[18]     *See* Contempt Motion, ¶¶ 27-64.

[19]     *Id.*, ¶ 69.

criminal allegations against him, then I think it's important that this by heard by the district court and not by me.[20]

> **(4)    Alexander's Appeals**

19.    Alexander appealed two Bankruptcy Court orders,[21] and those appeals are pending in the District Court (collectively, the "Alexander Appeals").  Specifically, on February 19, 2021, Alexander appealed the: (i) Emergency Order; and (ii) *Order Denying the Motion of James Alexander to Dismiss the Cred Capital, Inc. Case* (the "Dismissal Order").[22]

20.    On March 8, 2021, Alexander filed designations of records and statements of issues on appeal in both Alexander Appeals.[23]

## RELIEF REQUESTED

21.    By this Motion, the Committee respectfully requests that the District Court withdraw the reference from the Bankruptcy Court with respect to the Contempt Motion.

## BASIS FOR RELIEF

22.    Bankruptcy courts derive their jurisdiction from the district court's referral of bankruptcy matters pursuant to 28 U.S.C. 157(a), which states that "[e]ach district court may provide that . . . any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district."  Indeed, the District Court has referred such proceedings to the Bankruptcy Court pursuant to the *Amended Standing Order of Reference*, entered by the District Court on February 9, 2012.

---

[20]    *See* Ex. B at 14:4-11.

[21]    *See* Bankr. Docket Nos. 526 & 529.

[22]    *See* Bankr. Docket No. 487.

[23]    *See* Bankr. Docket Nos. 607 & 609.

23.      Because the Bankruptcy Court's jurisdiction is acquired by reference from the District Court, the District Court "may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, *for cause shown*." 28 U.S.C. 157(d) (emphasis added).  Although "cause" is not defined by the statute, the Third Circuit has articulated certain factors that should be considered, including: (i) considerations of judicial economy; (ii) promoting uniformity in bankruptcy administration; (iii) reducing forum shopping and confusion; (iv) fostering the economical use of resources; and (v) expediting the bankruptcy process.  *See In re Pruitt*, 910 F.2d 1160, 1168 (3d Cir. 1990).

24.      These factors, however, are not exhaustive.  *See In re Smalls*, No. 15-02174-CMB, 2016 WL 1639673, at *3 (W.D. Pa. Apr. 26, 2016) (stating that the *Pruitt* factors are non-exhaustive).  "Cause" has also been established when: (i) the proceeding is exceptionally complex such that the proceeding is "better served by the presumed expertise of [the district court]";[24] or (ii) where "there is a substantial question as to whether a bankruptcy judge has authority to make dispositive rulings."[25]

A.      **The Withdrawal Motion is Timely**

25.      "[A] motion to withdraw is timely if it was made as promptly as possible in light of the developments in the bankruptcy proceeding."  *Pruitt*, 910 F.2d at 1171.  The Contempt Motion was filed on March 15, 2021.  The Bankruptcy Court held a status conference on the Contempt Motion on March 17, 2021, at which the Bankruptcy Court instructed the Committee

---

[24]   S*ee In re Enron Creditors Recovery Corp.*, 410 B.R. 374, 384-85 (S.D.N.Y. 2008) (noting that there is ample authority for withdrawing the reference where a proceeding is exceptionally complex) (citing *In re Braniff Int'l Airlines, Inc.*, 159 B.R. 117, 126 (E.D.N.Y. 1993); *In re Complete Mgmt. Inc.*, No. 02 Civ. 1736, 2002 WL 31163878, at *3 (S.D.N.Y. Sept. 27, 2002); *In re Leedy Mortgage Co.*, 62 B.R. 303, 306 (E.D. Pa. 1986)).

[25]   *See In re Wisconsin Steel Corp.*, 48 B.R. 753, 767 (N.D. Ill. 1985); *see also In re Dow Corning Corp.*, 215 B.R. 526 (Bankr. E.D. Mich. 1997) (bankruptcy court recommended to district court that it withdraw the reference because the district court would be better able to make *Daubert* determinations).

to file this Withdrawal Motion.  *See* Ex. B at 14:7-11.  The Committee filed this Withdrawal

Motion on March 23, 2021, only four business days after the March 17 status conference.

Accordingly, this Withdrawal Motion is timely.

**B.      Permissive Withdrawal is Appropriate Because There is a Substantial Question of Whether the Bankruptcy Court Has the Authority to Impose Coercive Incarceration**

26.      As noted by the Bankruptcy Court, "there are serious questions about whether or

not a bankruptcy court as an Article [I] court has authority [to incarcerate Alexander]."  *See* Ex.

B at 14:4-7.  Indeed, for that reason, bankruptcy courts have deferred to their respective district

courts with regard to coercive incarceration sanctions.  *See e.g., In re Hughes*, No. 06-32726,

2007 WL 1087784, at *7, n. 1, 8 (Bankr. N.D. Tex. April 4, 2007) (noting concern as to the

bankruptcy court's Constitutional authority as a non-Article III court, to incarcerate a person for

civil contempt and thus, recommending withdrawal of the reference to the district court); *BKS*

*Properties, Inc. v. Shumate*, 271 B.R. 794, 805 (N.D. Tex. 2002) (recommending withdrawal of

reference "[t]o avoid any issue concerning constitutional authority to incarcerate a person for

civil contempt . . . ."); *In re de Kleinman*, 923 F. Supp. 24, 27 (S.D.N.Y. 1996) (upon a question

of the bankruptcy court's jurisdiction to find civil contempt and direct incarceration, the district

court heard the matter); *In re GGW Brands, LLC, et al.*, No. 13-bk-15130-SK, Docket No. 645

(Bankr. C.D. Cal. Aug. 4, 2014) (the bankruptcy court recommending withdrawal of reference to

the district court for the limited purpose of considering issuing arrest warrants for civil

contempt).[26]

---

[26]      *Contra In re 1990s Caterers Ltd.*, 531 B.R. 309, 320 (Bankr. E.D.N.Y. 2015) (bankruptcy court imposing incarceration after a finding of civil contempt); *In re Baker*, No. 15-ap-01535-BB, 2019 WL 2896137, at *1 (Bankr. C.D. Cal. April 29, 2019) (same); *In re Vaso*, 514 B.R. 416, (Bankr. D. Del. 2014) (although not imposing incarceration, noting that bankruptcy courts have the authority to do so).

27.     The concern over the Bankruptcy Court's authority is further justified by the Examiner's findings regarding Alexander potentially being a fugitive from the United Kingdom. Particularly, as stated by the Bankruptcy Court, if Alexander is a fugitive then there may be "further criminal allegations against him."[27]  *See* Ex. B at 14:7-11.

28.     Pursuant to the Contempt Motion, the Committee is seeking an order issuing a bench warrant for the arrest and detention of Alexander.  Given the substantial question of whether or not the Bankruptcy Court has the authority to issue such a ruling, "cause" exists to withdraw the reference.  *See id.* (the Bankruptcy Court stating that because of this question "it's important that this be heard by the district court . . . ."); *see also Wisconsin Steel Corp.*, 48 B.R. at 767 (finding cause to exist where "there is a substantial question as to whether a bankruptcy judge has authority to make dispositive rulings . . . ."); *see Dow Corning Corp.*, 215 B.R. at 526 (recommending that the district court withdraw the reference because the district court would be better able to make *Daubert* determinations).  For that reason, the Withdrawal Motion should be granted.

**C.     Permissive Withdrawal is Appropriate Because of the Complexity of the Circumstances**

29.     District courts are within their discretion to withdraw the reference where a proceeding "is exceptionally complex" and "would be better served by the presumed expertise of the [district court] . . . ."  *Enron Creditors Recovery Corp.*, 410 B.R. at 384-85 (noting that there is ample authority for withdrawing the reference where a proceeding is exceptionally complex) (citing *In re Braniff Int'l Airlines, Inc.*, 159 B.R. 117, 126 (E.D.N.Y. 1993); *In re Complete*

---

[27]  The Committee is not seeking any relief related to Alexander potentially being a fugitive, nor is the Committee affirmatively stating that the Examiner's findings are correct.  The relief sought by the Committee in the Contempt Motion is limited to Alexander's non-compliance with the Emergency Order.

*Mgmt. Inc.*, No. 02 Civ. 1736, 2002 WL 31163878, at *3 (S.D.N.Y. Sept. 27, 2002); *In re Leedy Mortgage Co.*, 62 B.R. 303, 306 (E.D. Pa. 1986)).

30.     In addition to the question of authority, the existence of potential criminal allegations against Alexander creates a level of complexity that is best served by the District Court.  Although the Committee is not seeking relief as to Alexander's alleged criminal past, if criminality becomes an issue with respect to the Contempt Motion, the Bankruptcy Court does not have authority to enter an appropriate order.  *See In re Vaso Active Pharmaceuticals, Inc.*, 514 B.R. 416, 421-22 (Bankr. D. Del. 2014) (noting that bankruptcy courts do not possess criminal jurisdiction).  For that reason also, "cause" exists to withdraw the reference and the Withdrawal Motion should be granted.

**D.      "Cause" Exists to Withdraw the Reference in the Interests of Judicial Economy**

31.     Judicial economy weighs in favor of granting permissive withdrawal for two reasons.

32.     *First*, Alexander has appealed the Emergency Order (and the Dismissal Order) to the District Court.  Thus, the District Court is well-versed (or soon will be) in the facts and circumstances underlying the Emergency Order.  *See In re The IT Group*, No. 05-100, 2005 WL 936992, at *2 (D. Del. Apr. 21, 2005) (withdrawing the reference when adversary proceeding concerned similar facts underlying pending district court action).  Of course, the Emergency Order and the Contempt Motion are intertwined in that the entire basis for the Contempt Motion is Alexander's noncompliance with the Emergency Order.  Accordingly, withdrawing the reference and adjudicating the Contempt Motion and the Emergency Order appeal in the same forum promotes judicial economy.

33.     *Second*, as discussed above, there is a question as to whether the Bankruptcy Court has the authority to enter an order on the Contempt Motion.  Thus, the Bankruptcy Court

would be limited to issuing findings of fact and conclusions of law, which would then have to be reviewed by the District Court in order to issue a ruling. *See Hatzel & Buehler, Inc. v. Orange & Rockland Utlis.*, 107 B.R. 34, 40 (D. Del. 1989) (finding permissive withdrawal appropriate "in light of considerations of judicial economy" when the bankruptcy court could not enter a final judgment and the district court would be forced to review the facts and proposed findings of fact and conclusions of law anyway); *see also In re NDEP Corp.*, 203 B.R. 906, 907 (D. Del. 1996) (quoting *In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir. 1993) ("district courts might reasonably conclude that 'in a given case unnecessary costs could be avoided by a single proceeding in the district court.'")).  Withdrawing the reference obviates the need for two different forums to examine the same facts and circumstances and thus, promotes judicial economy.

34.     For these reasons, considerations of judicial economy support permissive withdrawal of the Contempt Motion.

**E.     The Committee Respectfully Requests that the Withdrawal Motion be Heard on an Emergency Basis**

35.     The Committee respectfully requests that the District Court hear this Withdrawal Motion on an emergency basis because any further delay will likely result in irreparable harm for the following reasons:

36.     *First*, Alexander has demonstrated a pattern of taking defensive measures in response to pleadings filed against him, including: (i) transferring and liquidating certain of the Assets shortly after the Debtors filed a California state court action against him; (ii) withdrawing $170,000 in cash proceeds of the Assets shortly after the Emergency Motion was filed; and (iii) preparing a bankruptcy petition to be filed in the middle of a Bankruptcy Court-ordered deposition to halt the deposition.  *See supra*, n. 7.  Accordingly, the Committee is justifiably

concerned that Alexander will take similar defensive measures while the Contempt Motion (and

now the Withdrawal Motion) are pending.

37.     *Second*, the Assets in question and the transfers thereof involve cryptocurrency,

which is easily transferred and extremely difficult to trace.  To make matters worse, the nature of

the various cryptocurrency transactions present here are even more difficult to trace because

many of the transactions were "off exchange" transactions where cryptocurrency is traded

privately between parties (as opposed to through cryptocurrency exchanges).  *See* Contempt

Motion, ¶¶ 76-80.  Detailed discovery is needed to track these transactions in order to, among

other things, identify the transferees and attempt to prevent any further transfers of the Assets or

the proceeds thereof.  *Id*.  At any given moment, further transactions may be conducted, which

will make it increasingly more difficult for the Committee to recover the Assets.

38.     It has been over six weeks since the Bankruptcy Court ordered Alexander to

immediately turnover the Assets and produce expedited discovery.  Alexander has not turned

over or accounted for all of the Assets.  Nor has Alexander complied with the Committee's

discovery demands in accordance with the Emergency Order.  The Committee is already facing a

delay in the adjudication of the Contempt Motion, which was filed in the Bankruptcy Court as an

emergency motion on shortened notice, due to the necessity of filing this Withdrawal Motion.

Any further delay in adjudicating this Withdrawal Motion may result in irreparable harm by

permitting the further depletion of the Assets and potentially hindering the Committee's ability

to trace and recover the Assets.  For these reasons, the Committee respectfully requests that the

District Court hear this Withdrawal Motion on an emergency basis.

## NOTICE

39.     Notice of the Withdrawal Motion has been provided to (i) counsel to the Debtors,

(ii) the Office of the United States Trustee for the District of Delaware, (iii) counsel to Alexander

in the Chapter 11 Cases, (iv) counsel to Alexander in Alexander's personal bankruptcy case pending before the California bankruptcy court, and (v) parties that have requested notice pursuant to Local Rule 2002-1(b).  In light of the nature of the relief requested herein, the Committee submits that no other or further notice is required.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, for the reasons stated above, the Committee respectfully requests that the District Court enter an order withdrawing reference from the Bankruptcy Court with respect to the Contempt Motion.

Dated:  Wilmington, Delaware
      March 23, 2021

**MCDERMOTT WILL & EMERY LLP**

/s/ *David R. Hurst*
David R. Hurst (I.D. No. 3743)
The Nemours Building
1007 North Orange Street, 10th Floor
Wilmington, DE 19801
Telephone:  (302) 485-3900
Facsimile:  (302) 351-8711

-and-

Timothy W. Walsh (admitted *pro hac vice*)
Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
340 Madison Avenue
New York, NY 10173-1922
Telephone:  (212) 547-5400
Facsimile:  (212) 547-5444

*Counsel to the Official*
*Committee of Unsecured Creditors*

## Exhibit A

**Proposed Order**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | )  Chapter 11 |
| | ) |
| CRED INC., *et al.*, | )  (Jointly Administered) |
| | ) |
| Debtors.[1] | ) |
| | ) |
| | ) |

**ORDER GRANTING EMERGENCY MOTION OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS FOR WITHDRAWAL OF THE
REFERENCE WITH RESPECT TO THE MOTION OF THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS FOR AN ORDER (I) HOLDING JAMES ALEXANDER
IN CONTEMPT OF COURT AND (II) ISSUING A BENCH WARRANT FOR
THE ARREST AND DETENTION OF JAMES ALEXANDER**

Upon the *Emergency Motion of the Official Committee of Unsecured Creditors for*

*Withdrawal of the Reference With Respect to the Motion of the Official Committee of Unsecured*

*Creditors for an Order (I) Holding James Alexander in Contempt of Court and (II) Issuing a*

*Bench Warrant for the Arrest and Detention of James Alexander* (the "Withdrawal Motion"),[2]

pursuant to 28 U.S.C. § 157(d) and Bankruptcy Rule 5011(a), for entry of an order by the United

States District Court for the District of Delaware (the "Court") withdrawing the reference of the

*Motion of the Official Committee of Unsecured Creditors for an Order (I) Holding James*

*Alexander in Contempt of Court and (II) Issuing a Bench Warrant for the Arrest and Detention*

*of James Alexander* (the "Contempt Motion"); and this Court having jurisdiction to consider the

Withdrawal Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and

venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Withdrawal Motion.

having reviewed the Withdrawal Motion; and this Court having held a hearing to consider the

relief requested in the Withdrawal Motion; and this Court having determined that the legal and

factual bases set forth in the Withdrawal Motion establish just cause for the relief requested

therein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Withdrawal Motion is granted.

2.      The Contempt Motion is hereby withdrawn pursuant to 28 U.S.C. § 157(d).

3.      The Contempt Motion shall be set for hearing on _____, 2021 at [ ]:[  ] [ ].m.

4.      This Court shall retain jurisdiction to resolve any disputes arising from or related

to this Order, and to interpret, implement and enforce the provisions of this Order.

Dated:

_____
United States District Judge

## <u>Exhibit B</u>

**March 17, 2021 Hearing Transcript**

```
 1                  UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3   IN RE:                       .  Chapter 11
                                  .  Case No. 20-12836 (JTD)
 4   CRED INC., et al.,           .
                                  .  (Jointly Administered)
 5                                .
                                  .
 6                                .  824 Market Street
               Debtors.          .  Wilmington, Delaware 19801
 7                                .
                                  .  Wednesday, March 17, 2021
 8   . . . . . . . . . . . . . .  .  2:01 p.m.

 9            TRANSCRIPT OF HYBRID TELEPHONIC/ZOOM HEARING
                BEFORE THE HONORABLE JOHN T. DORSEY
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Scott D. Cousins, Esquire
                               Scott Jones, Esq.
13                             COUSINS LAW, LLC
                               Brandywine Plaza West
14                             1521 Concord Pike
                               Suite 301
15                             Wilmington, Delaware 19803

16                             -and-

17                             James T. Grogan, Esquire
                               PAUL HASTINGS, LLP
18                             600 Travis Street
                               58th Floor
19                             Houston, Texas 77002

20   (APPEARANCES CONTINUED)
     Electronically
21   Recorded By:              Jason Spencer, ECRO

22   Transcription Service:    Reliable
                               1007 N. Orange Street
23                             Wilmington, Delaware 19801
                               Telephone: (302) 654-8080
24                             E-Mail:  gmatthews@reliable-co.com

25   Proceedings recorded by electronic sound recording:
     transcript produced by transcription service.
```

1  APPEARANCES (CONTINUED):

2  For the Debtors:          Avram Luft, Esquire
                             PAUL HASTINGS, LLP
3                            200 Park Avenue
                             New York, New York 10166

4

5  For the Trustee:          James J. McMahon Jr., Esquire
                             UNITED STATES DEPARTMENT OF JUSTICE
6                            OFFICE OF THE UNITED STATES TRUSTEE
                             844 King Street
7                            Suite 2207, Lockbox 35
                             Wilmington, Delaware 19801

8

9  For the Official
   Committee of Unsecured
10 Creditors:                Darren Azman, Esquire
                             David Hurst, Esquire
11                           MCDERMOTT WILL & EMERY, LLP
                             340 Madison Avenue
12                           New York, New York 10173

13
   For Robert J. Stark:      Andrew M. Carty, Esquire
14                           BROWN RUDNICK, LLP
                             Seven Times Square
15                           New York, New York 10036

16 For James Alexander:      Mark Pfeiffer, Esquire
                             BUCHANAN INGERSOLL & ROONEY
17                           700 Alexander Park
                             Suite 300
18                           Princeton, New Jersey 08540-6347

19

20

21

22

23

24

25

3

INDEX

MATTERS GOING FORWARD:                                    PAGE

Agenda
Item 1:     Motion to Withdraw as Attorney of Record   4
            for James Alexander [Docket No. 542,
            2/23/21]


Court's ruling                                         13, 17




Transcriptionist's Certificate                         19

1           (Proceedings commenced at 2:01 p.m.)

2           THE COURT:  Good afternoon.  Can everyone hear me

3    okay?  All right.

4           This is Judge Dorsey.  We're on the record in Cred

5    Inc., Case Number 20-12836.  I'll go ahead and turn it over

6    to debtors' counsel to run the agenda.

7           MR. COUSINS:  Good afternoon, Your Honor, Scott

8    Cousins on behalf of debtors Cred Inc.

9           There are two matters on the agenda, one is a

10   status conference.  The first is Mr. Pfeiffer's motion to

11   withdraw as counsel for Mr. Alexander.

12          THE COURT:  All right.  Mr. Pfeiffer, are you on?

13          MR. PFEIFFER:  Good afternoon, Your Honor, Mike

14   Pfeiffer on behalf of Buchanan Ingersoll & Rooney in

15   connection with our firm's motion to withdraw as counsel for

16   Mr. Alexander.

17          I would like to make one correction to the motion

18   before starting, Your Honor.  We have a citation to RPC

19   1.16(a)(3) in our motion, which deals with a discharge of the

20   attorney.  That has not occurred, that is an errant citation.

21   This is a matter under RPC 1.16(b).

22          As with these types of motions, Your Honor, we've

23   alleged that there are irreconcilable differences which make

24   it difficult, if not impossible, for this firm to continue to

25   represent this debtor -- or Mr. Alexander.  In addition, Mr.

1  Alexander is in his own Chapter 7 case in California and does

2  not have the ability to continue to retain us in this matter.

3          As with these types of motions, we are available

4  if the Court has questions as to the specific reasons for the

5  withdrawal or for the termination of the relationship, and we

6  can provide those reasons to the Court in camera.

7          There has been an objection to the motion to

8  withdraw filed by the committee.  And, essentially, the

9  committee takes the position that it would be difficult for

10  this firm to withdraw at the present time because there are

11  unfinished issues with respect to the Court's order from

12  February 5th, 2021.

13          We have filed this morning -- or this afternoon,

14  not filed, but we submitted to debtors' counsel, the

15  committee, and to chambers a supplemental affidavit, and we

16  have also provided discovery in connection with what's been

17  called the Phase II discovery, which deals with the debtors'

18  personal financial information.  And as the Court could

19  imagine, because the debtor filed a Chapter 7 bankruptcy,

20  much of the information is already in the debtor's statement

21  of financial affairs and bankruptcy schedules in his personal

22  bankruptcy case.

23          With regard to the Court's order as far as

24  unfinished business, we took the Court's order very

25  seriously.  And, rightfully, you know, the Court was

1  concerned about immediately getting back bitcoin that was in

2  my client's possession that were derived from the debtors.

3  And on the day of the hearing my client turned over

4  approximately 50 bitcoin worth approximately $1.9 million at

5  the time and approximately $2.7 million in USDT, which is a

6  cryptocurrency that is tied to the United States dollar.

7         We have also provided or helped the debtor -- or

8  Mr. Alexander provide information that the Court was

9  concerned about.  If the Court recalls, there was a dispute

10 as to whether or not the debtor held 225 bitcoin or 150

11 bitcoin.  We've provided information to the debtor that 75

12 bitcoin were liquidated prepetition, and the proceeds of that

13 liquidation went into a coin-based account and ultimately

14 into Wells Fargo accounts and JPMorgan accounts.

15        We also provided information to the debtor and the

16 committee concerning a liquidation of 100 bitcoin in January

17 2021.  Again, it went into a bitcoin account and ultimately

18 into the USDT coin that was turned over to the debtor on

19 February 5th.  Some of the proceeds apparently wound up in

20 the Wells Fargo and the JPMorgan accounts.

21        We provided information concerning the JPMorgan

22 account, the Wells Fargo account, and the coin-based accounts

23 to the debtor and to the committee, and, specifically, we

24 provided what I believe are the relevant account statements

25 for those accounts.  And, ultimately, those accounts or

1  subsequently the DIP account into which those accounts flowed

2  were turned over to the debtor.

3       So, from my perspective, a large portion of the

4  Court's order from February 5th was to get the property back

5  to the debtor and get information to the debtor about the

6  transactions, and I believe that has occurred.  What has not

7  finally occurred or fully occurred is the deposition.  That

8  was still out there, that was interrupted by the debtor's

9  bankruptcy filing.  From our perspective, the debtor can sit

10  through a deposition.  Whether the debtor chooses to sit

11  through a deposition or not, that's not necessarily within

12  the control of our firm.

13       So the short of it, from our perspective, is that

14  if we get out of this case as a firm now, you know, the

15  committee and the debtor or the liquidating trustee still

16  have whatever rights they have against the debtor or against

17  Mr. Alexander.

18       I'm aware of no other material bitcoin that was

19  derived from -- or any crypto that was derived from Cred that

20  has not been turned over.  There are accountings that

21  probably need to be done and figured out, but the debtor and

22  the committee have all that information.  They probably need

23  to ask some deposition questions about it, but that can be

24  done without our firm and if the debt -- if Mr. Alexander

25  agrees to submit to a deposition.

1          But at this point, Your Honor, the continued

2  representation of Mr. Alexander by our firm is, regrettably,

3  not something that we can continue with in the scope of --

4  well, it's not something we can continue and we would request

5  that we be permitted to withdraw pursuant to RPC 1.16(b).

6          THE COURT:  Has Mr. Alexander undertaken steps to

7  obtain replacement counsel in this case?

8          MR. PFEIFFER:  Mr. Alexander has been advised that

9  he should undertake steps to retain replacement counsel.  I

10 believe he has communicated with replacement counsel, I do

11 not know if he has retained replacement counsel.

12         THE COURT:  Is Mr. Alexander's California counsel

13 on the call today?

14         MR. PFEIFFER:  If I may scroll through the list,

15 Your Honor?

16         THE COURT:  Yes.

17      (Pause)

18         THE COURT:  It doesn't appear on the list that I

19 have.

20         MR. PFEIFFER:  Your Honor, I don't see either the

21 bankruptcy lawyer or the general California counsel on the

22 list of today's hearing.

23         THE COURT:  What -- who's -- I didn't know there

24 was general California counsel.  I thought he had a

25 bankruptcy counsel in California, what's the general counsel

1   that he has?

2          MR. PFEIFFER:  Bird, Marella is the general

3   counsel or the litigation counsel handling various matters.

4   And the principal lawyer there is referenced in the

5   declaration, Thomas Reichert, who also has in his possession

6   some of the equipment that the Court instructed be turned

7   over to Mr. Reichert.

8          THE COURT:  All right.  Let me hear from UCC's

9   counsel who objected.

10         MR. AZMAN:  Good afternoon, Your Honor, Darren

11  Azman, McDermott Will & Emery, counsel to the committee.

12         Your Honor, the withdrawal motion is very much

13  tied to the contempt motion, as well as the original

14  emergency order that Your Honor entered.  The fact is, as we

15  sit here today, Mr. Alexander has not complied with the

16  order.  If it is acceptable, I think it would be beneficial

17  for us to address the contempt motion, as Mr. Pfeiffer did,

18  because it does lay the foundation for why we're asking the

19  Court to deny the withdrawal motion.  That is, once the order

20  is complied with, we have no objection to Buchanan's

21  withdrawal.  We understand the circumstances they're in right

22  now, but we're not there quite yet.

23         So, if it's acceptable, I'd like to address some

24  issues with the contempt motion.

25         THE COURT:  All right.  I'm not going to -- I'm

1  certainly not hearing the contempt motion, but you can

2  address whatever you think is necessary --

3              MR. AZMAN:  Yeah.

4              THE COURT:  -- to deal with the withdrawal motion.

5              MR. AZMAN:  Understood.  Your Honor, the emergency

6  order that you entered was very clear about what Alexander

7  was required to do and when he was required to do it.  As I

8  said a moment ago, as we sit here right now, he has not

9  complied with that order.  Yes, he has complied in some

10  respects and that's great, but he is nowhere near satisfying

11  the obligations that you laid out very explicitly, which

12  includes turnover of assets that Alexander has admitted are

13  Cred Capital's property and, equally important, a declaration

14  and discovery on a host of issues that will allow the

15  committee and ultimately the liquidation trust to recover

16  estate property and discharge their fiduciary obligations.

17              Time and time again, Your Honor, Mr. Alexander has

18  come up with excuse after excuse.  As you know, Mr.

19  Alexander's thrilling line of excuses culminated in his

20  personal bankruptcy filing in the middle of our deposition.

21  We had informally asked Mr. Alexander to consent to lifting

22  the stay so that we could enforce Your Honor's order.

23  Perhaps unsurprisingly, he declined.  So we went out to

24  California and the judge very quickly entered an oral order

25  from the bench immediately lifting the stay for us to proceed

1  on these issues before Your Honor.

2         Since that time, since that court had lifted the

3  automatic stay, we have gotten practically nothing from

4  Alexander other than around $130,000 of cash.  But up until

5  yesterday, late afternoon, we had not received a single piece

6  of additional information that Your Honor had ordered

7  Alexander to provide, including any information regarding

8  Alexander's assets that he deems to be his personal assets,

9  but we're all very skeptical in terms of characterizing it

10 that way.

11        This needs to end and we need to execute on the

12 order that Your Honor granted us, and Mr. Alexander needs to

13 respect the law.  We're under no illusion that the relief we

14 asked for in the contempt motion is extraordinary, there's no

15 other way to put it, but at the same time we don't see that

16 there's any other relief that would coerce Alexander to

17 comply with the order.  The estate already has significant

18 claims against Alexander, we believe in excess of $50

19 million.  There's questions about whether the automatic stay

20 would preclude monetary sanctions from being issued.  So Your

21 Honor has nothing left but jail time for Mr. Alexander, in

22 our view, until he complies with the order.  So that's why we

23 asked the Court to issue a bench warrant and to take that

24 action.

25        Now, late yesterday afternoon, around 4 o'clock,

1   we did receive additional discovery from Mr. Alexander.  And

2   then shortly before today's hearing, I would say about an

3   hour ago, we received a new declaration.  We received it the

4   same time it was sent to Your Honor's chambers.  We're still

5   reviewing everything, but there are already very obvious and

6   significant deficiencies, and I'm sure that list is going to

7   grow once we finish our review.  We're happy to walk through

8   our initial issues list for why he's not complying still.

9   I'm not sure that would be a productive use of the Court's

10  time, but the point is that Mr. Alexander is going to

11  continue to be evasive in his responses until there are

12  serious consequences imposed on him for noncompliance.

13          Now, that ties directly into -- excuse me just a

14  moment -- that ties directly into Buchanan's motion to

15  withdraw because the job is not done.  They're the ones who

16  are most inured with these matters, they received whatever

17  benefit it is that they received representing Mr. Alexander

18  for the past several months in the case, and we think the

19  case law is there to support the proposition that they should

20  be -- they should continue in that representation until the

21  job is done.

22          And, you know, I think the quote from our briefing

23  on this issue is probably best:  "An attorney has certain

24  obligations and duties to apply once representation is

25  undertaken that do not evaporate because the case becomes

1  more complicated or the work more arduous.  Attorneys must

2  never lose sight of the fact that the profession is a branch

3  of the administration of justice and not a mere money-getting

4  trade."

5          Your Honor, we don't think that Buchanan should be

6  able to withdraw, the job is not done.

7          THE COURT:  Thank you, Mr. Azman.

8          Anyone else wish to be heard before I go back to

9  Mr. Pfeiffer?

10          All right.  Mr. Pfeiffer, I sympathize with your

11 position and I understand the difficult position that you are

12 in, but at this point, given the fact that we have this

13 contempt motion pending, I think it would be inadvisable for

14 me to allow you to withdraw at this time until we can see

15 where this case is going to go.  And I'll talk about the

16 contempt motion in a moment, but -- so at this point I'm

17 going to -- I'll deny the motion to withdraw without

18 prejudice to renew it again, and I will actually bring it up

19 myself in the future to see where things are.

20          And hopefully Mr. Alexander understands the

21 seriousness of the situation that he is in at this time and

22 would seek to obtain new counsel, because if the contempt

23 motion goes forward, you know, there's a risk that he could

24 end up in jail.  And if he is in fact a fugitive from the law

25 in the U.K., he could end up in serious criminal -- a

1   criminal position as well.

2            So, for those reasons, I think it's not advisable

3   for me to allow you to withdraw at this time.

4            On the contempt motion, because it is asking for

5   Mr. Alexander's incarceration, there are serious questions

6   about whether or not a bankruptcy court as an Article 3 court

7   has the authority to do that.  And to avoid those issues and

8   also because, as I said, if Mr. Alexander is in fact a

9   fugitive from the U.K., it resulted in further criminal

10  allegations against him, then I think it's important that

11  this be heard by the district court and not by me.

12           And I'd point out that Rule 9020 provides that

13  Rule 9014 governs motions for contempt, and 9014 provides

14  that a person before contempt can be entered has to be given

15  notice and an opportunity to be heard.  And the notice under

16  9014 has to be the type of notice that is provided under Rule

17  7004 for summons -- for issuance of a summons and complaint.

18           So it's certainly not something that can be done

19  off the cuff because it wasn't -- the contempt is not alleged

20  to be something that occurred in front of me, it was

21  something that occurred outside the Court's purview.  So it

22  would require a full hearing and an opportunity for Mr.

23  Alexander to be heard before any contempt could be granted.

24           So I would -- well, what you should do -- and I've

25  actually already contacted the district court to give them a

 1 | heads-up that this might be coming -- is to file a motion to
 2 | withdraw the reference to allow the contempt motion to be
 3 | heard before the district court and proceed in that manner.
 4 |       Does that -- does anybody have any questions about
 5 | that?
 6 |       MR. AZMAN:  Thank you, Your Honor.  Would Your
 7 | Honor be willing to hear that motion for the withdrawal of
 8 | the reference on shortened notice?
 9 |       THE COURT:  I think that gets heard by the
10 | district court, not by me.
11 |       MR. AZMAN:  The district court, that's right,
12 | that's right.  Okay, thank you.
13 |       THE COURT:  But, as I said, I did give the
14 | district court a heads-up that this would be coming, likely
15 | be coming.  So if it is something you want to do, I would go
16 | ahead, and make the request and make the request on an
17 | expedited fashion and see if the district court will agree to
18 | do that.
19 |       MR. JONES:  Your Honor, I'm sorry to jump in, but
20 | does your Court need to make a core/non-core determination
21 | for the benefit of the district court or can we go right to
22 | the district court.
23 |       THE COURT:  I think it can go just straight to the
24 | district court to withdraw the reference.  I don't think
25 | there's any need for me to make a determination on that, but

1   if you need to -- yeah, I don't know if this would be a core

2   or non-core matter, to be honest with you, Mr. Cousins.  I've

3   never dealt with this situation before either in practice or

4   on the bench, but --

5           MR. JONES:  Yeah, Your Honor, the only reason I

6   raise it, if I recall, there's some old case law that

7   requires Your Honor to make the core/non-core determination

8   to help the district court make a decision, but I think

9   because of the criminal overlay, I understand where the Court

10  is going.  And I'm sorry to intervene; I just want to make

11  sure this goes as quickly as possible.

12          THE COURT:  No, I understand, and it should be

13  done quickly and I think it's something that can be done

14  quickly.  If there is an issue, if the district court raises

15  a question about whether or not it's a core or non-core and

16  they need me to make a decision, I certainly would do that on

17  an expedited basis, but I don't think you need to -- in this

18  circumstance, I don't think you need to do that.  We're all

19  treading new ground here.

20          MR. JONES:  Yes.

21          THE COURT:  All right.  Anything else for today?

22          MR. AZMAN:  Not from the committee, Your Honor.

23  Thank you.

24          THE COURT:  Mr. Pfeiffer, if there is anything

25  that you think I should know that -- with regard to your

1  representation of Mr. Alexander, you can certainly submit

2  that to me in camera, and I will look at that and consider

3  that as we go forward on reconsidering your motion for

4  withdrawal later on down the road.

5      MR. PFEIFFER:  Your Honor, I appreciate that.

6  Would the Court consider just generally adjourning this

7  motion in lieu of denying it without prejudice, so that if

8  something does develop we don't have to go through the

9  process again?

10     THE COURT:  That's fine with me.  Yeah, we can do

11 that.  I'll just adjourn the motion until some undetermined

12 time in the future -- or why don't we -- hopefully, this

13 moves very quickly.  When is our next omnibus in this case?

14     MR. JONES:  Your Honor, it's April 1st, I believe.

15     THE COURT:  All right.  Why don't we -- why don't

16 you go ahead and re-notice it for April 1st, Mr. Pfeiffer,

17 and we'll consider it then --

18     MR. PFEIFFER:  We will.  Thank you, Your Honor.

19     THE COURT:  -- and we'll look at it again at the

20 next omnibus hearing.  Hopefully, by then we'll be a little

21 further down the road with the district court and we'll know

22 what's going on.  All right?

23     Is there anything else just status-wise or

24 housekeeping-wise that we can talk about as long as we're on

25 the call today?  Nothing?  Everything else is going smoothly

1  except for this one hiccup?

2          MR. AZMAN:  Your Honor, it's Darren Azman again

3  for the committee.  The only status update I think that is

4  worthwhile is we're moving towards going effective under the

5  plan.  So we're -- you know, we don't have a time frame, but

6  we're working through those issues now.  And there are some,

7  you know, unique circumstances as always in this case with

8  transferring assets from the debtors to the trust and some

9  other related issues, but that's the direction we're heading

10 in and we're hopeful to go effective soon.

11         THE COURT:  Okay.  Thank you, Mr. Azman.

12         All right.  Well, if there's nothing else for

13 today, then we are adjourned and I'll see everybody on April

14 1st.

15         COUNSEL:  Thank you, Your Honor.

16         THE COURT:  Thank you.  We're adjourned.

17      (Proceedings concluded at 2:24 p.m.)

18

19

20

21

22

23

24

25

1                         CERTIFICATION

2              I certify that the foregoing is a correct

3     transcript from the electronic sound recording of the

4     proceedings in the above-entitled matter to the best of my

5     knowledge and ability.

6

7

8

9     /s/ Tracey Williams                    March 17, 2021

10    Tracey Williams, CET-914

11    Certified Court Transcriptionist

12    For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25

## **Exhibit C**

**February 5, 2021 Hearing Transcript**

```
                  UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE

                                . Chapter 11
IN RE:                          .
                                . Case No. 20-12863(JTD)
CRED INC., et al,               .
                                .
                                . 824 Market Street
                    Debtors.    . Wilmington, Delaware 19801
                                .
. . . . . . . . . . . . . . . . Friday, February 5, 2021
CRED INC., CRED CAPITAL,        .
INC., and CRED (US) LLC,        . Adv. Proc. No. 20-51006(JTD)
                                .
        vs.                     .
                                .
JAMES ALEXANDER.                .
. . . . . . . . . . . . . . . .
```

     TRANSCRIPT OF ZOOM HEARING RE:  EMERGENCY MOTIONS OF THE
           OFFICIAL COMMITTEE OF UNSECURED CREDITORS
              BEFORE THE HONORABLE JOHN T. DORSEY
                UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA TELEPHONE:

For the Debtors:            Scott D. Cousins, Esq.
                            COUSINS LAW, LLC

                            James T. Grogan, Esq.
                            Broocks (Mack) Wilson, Esq.
                            Avi E. Luft, Esq.
                            PAUL HASTINGS, LLP

For the U.S. Trustee:       Joseph J. McMahon, Jr., Esq.
                            OFFICE OF THE U.S. TRUSTEE

(Appearances Continued)

Audio Operator:             Electronically Recorded
                            by Jason Spencer, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
APPEARANCES VIA TELEPHONE:   (Continued)

For the Official Committee
of Unsecured Creditors:       Timothy W. Walsh, Esq.
                              Joseph Evans, Esq.
                              David Hurst, Esq.
                              Darren Azman, Esq.
                              MCDERMOTT, WILL & EMERY, LLP

For Upgradeya Investments,
LLC:                          Adam G. Landis, Esq.
                              LANDIS, RATH & COBB, LLP

For Daniel Wheeler:           Marc Greenwald, Esq.
                              QUINN, EMANUEL, URQUHART
                               & SULLIVAN, LLP

For the Examiner Robert
J. Stark:                     Gregory Taylor, Esq.
                              ASHBY & GEDDES, PA

                              Andrew Carty, Esq.
                              BROWN RUDNICK, LLP

For the United States:        Augustus Curtis, Esq.
                              U.S. DEPARTMENT OF JUSTICE -
                               CIVIL DIVISION

For James Alexander:          Mark Pfeiffer, Esq.
                              Kody Sparks, Esq.
                              BUCHANAN, INGERSOLL & ROONEY, PC

Also Appearing:               Julius Hudec, *Pro Se*

                              Daniyal Inamullah, *Pro Se*

                              Pamela Clegg, Esq.
                              CIPHER TRACE

                              Jeffrey Kaplan
                              "BCAS"

                              Uday Gorrepati
                              "ABI PROJECT"

                              Daniel Gill
                              BLOOMBERG LAW

                              Vince Sullivan
                              LAW360

(Appearances Continued)
```

APPEARANCES VIA ZOOM:  (Continued)

Also Appearing:                 Becky Yerak
                                WALL STREET JOURNAL

                                Laura Haney
                                U.S. BANKRUPTCY COURT - DISTRICT
                                 OF DELAWARE

4

INDEX

Page

ARGUMENT                                    5

COURT DECISION                              24

1          (Proceedings commence at 10:01 a.m.)

2          THE COURT:  Good morning.  Can everyone hear me

3     okay?

4          UNIDENTIFIED:  Yes, sir.

5          THE COURT:  All right.  This is Judge Dorsey.  We

6     are on the record in Cred, Inc., Case Number 20-51006, the

7     adversary proceeding.  This is the time the Court set aside

8     for a hearing on the committee's motion to intervene in the

9     adversary proceeding and a motion for temporary restraining

10    order and preliminary injunction.

11         So let me turn it over to -- and I will tell the

12    parties I have read all of the pleadings and the

13    declarations, including the response filed by Mr. Alexander.

14    So keep that in mind when making comments.

15         Mister -- let's see.  Committee's counsel, who's

16    speaking for the committee?

17         MR. EVANS:  This is Joseph Evans, Your Honor, from

18    McDermott, Will & Emery, for the committee.

19         THE COURT:  All right.

20         MR. EVANS:  Good morning.

21         THE COURT:  Go ahead, Mr. Evans.

22         MR. EVANS:  Your Honor, we brought this witness

23    because our expert witness Pamela Clegg identified to

24    transactions on January 16th and January 17th, 2021, executed

25    by Mr. Alexander, in which Bitcoin that was directly

1    traceable to Cred that was in Alexander's possession was

2    transferred.  That's a total U.S. Dollar amount of 1.832

3    million.  And that was in violation of a California temporary

4    restraining order and preliminary injunction.

5           As Your Honor said, you've read the papers.  But we

6    just received the declaration this morning -- or a response

7    this morning from Mr. Alexander, where, apparently, he agreed

8    to post certain of the cryptocurrency into escrow, where

9    we're happy about that.  The response wasn't clear as to what

10   "the cryptocurrency" is.  He was originally transferring 225

11   -- or 224.98993 Bitcoin and 204,557 in U.S. Dollar coin,

12   which is a one-to-one for U.S. Dollars.  And so the total net

13   value now is 8.474 million.

14          So, if Mr. Alexander is intending to

15   (indiscernible) in escrow $8.474 million worth of Bitcoin or

16   equivalent currency, then we have no issue.  It wasn't clear

17   from the response if that's what his intentions are.  But I'd

18   like to know what "the cryptocurrency" means when Alexander

19   is agreeing to post.

20          And I understand that they have requested more

21   briefing time for a sanctions motion.  We don't have an

22   objection to that.  And that's where we stand.

23          THE COURT:  All right.  So everybody understands,

24   on the motion for sanctions for violating the California

25   State Court's order, I don't think I have jurisdiction to do

1    that.  I think that's pretty black-letter law, that I cannot

2    impose sanctions for someone violating another Court's order.

3    So I think, if you want sanctions for violating that order,

4    you're going to have to go back to the State Court to get

5    those.

6            But let me ask Mr. Pfeiffer.  What is the Bitcoin

7    that you agreeing -- your client is agreeing to transfer into

8    the escrow account?

9            MR. PFEIFFER:  Yes, Your Honor.  Mark Pfeiffer,

10    Buchanan, Ingersoll & Rooney, on behalf of Mr. Alexander.

11            If I first may address the motion to intervene, my

12    client does -- is not opposing the motion to intervene.

13            My client is agreeing to transfer all of the Cred

14    Capital cryptocurrency under his possession or control to the

15    -- to an escrow agent, pending this matter.  Right now, I

16    understand that there are 50 Bitcoin and another smaller form

17    of cryptocurrency that has fairly immaterial value, compared

18    to the Bitcoin.  But my client would transfer everything that

19    he has into an escrow agent.

20            THE COURT:  So the -- then he only has, you're

21    telling me, 50 of the 220 -- close to 225 Bitcoin that the

22    debtors allege is their property?

23            MR. PFEIFFER:  Yes, Your Honor.  Let me be

24    specific.  It is my understanding that there was only 149 and

25    change, to begin with, of Bitcoin.  And there is proceeds;

1    some of those Bitcoin have been liquidated and there are

2    proceeds.  And it is my understanding my client is agreeable

3    to transfer the proceeds of the liquidated cryptocurrency,

4    the identifiable proceeds of the cryptocurrency liquidation,

5    into the escrow agent.

6            THE COURT:  And how much is in Bitcoin and how much

7    is in liquidated form?

8            MR. PFEIFFER:  So the 50 Bitcoin, there is another

9    about -- approximately $200,000 worth of cryptocurrency.  And

10   I believe there is approximately $2.7 million in cash,

11   effectively, or proceeds.

12           THE COURT:  So it sounds like we have a difference

13   as to how much Bitcoin was originally transferred and how

14   much Bitcoin was subject to the California Court's injunction

15   to not be transferred.

16           Mr. Evans?

17           MR. LUFT:  Your Honor, may I be heard on behalf of

18   the debtor?

19           THE COURT:  Go ahead, Mr. Luft, even though you say

20   you're Mr. Grogan on your --

21           MR. LUFT:  Yeah, it looks like Me, Mr. Jimenez, and

22   Mr. Grogan all want to be Mr. Grogan this morning.  I

23   apologize for that, but you -- how could you blame us?

24           Your Honor, this is shocking.  I want to be very

25   clear about this.  The idea that every -- first of all, there

1    was 225 pieces of Bitcoin.  We have the contemporary records.

2    You've heard Mr. Inamullah's testimony about this previously

3    in the case.  There were written documents indicating how

4    much was transferred to Mr. Alexander, there's documentation.

5    So this alleged 100 pieces of Bitcoin less is completely

6    unfounded.  And we can provide all the documentation the

7    Court needs for how much it is.

8         So, quite simply, putting aside the fact that, as

9    Your Honor pointed out, Mr. Alexander was not a director of

10   Cred Capital, even under his scenario, he has stolen the

11   funds.  There is no scenario where a director gets to take

12   personal funds of a corporation, put them in their own

13   pocket, and spend them.  So, starting from day one, he has

14   acted improperly and taken it.

15        Moreover, before the California Court -- and we

16   litigated this -- at no point did Mr. Alexander ever say to

17   that Court, Your Honor, we're having a whole TRO hearing

18   about this amount of -- this 225 Bitcoin, I don't have that

19   much, I got rid of it, it's not in the account that we're

20   filing orders for.  He has been dishonest with that Court.

21        And now we're standing before you.  He went before

22   the Chancery Court -- excuse me -- before we get to you.

23   Again, he filed this motion, again, never once said I no

24   longer control these assets.

25        And then we had a whole hearing on Wednesday, where

1    I know he sat here in front of you, Your Honor, and never

2    once said, by the way, when Mr. Pfeiffer said this will all

3    get resolved and whatever else, you should all know I don't

4    hold those assets, right?  Instead, what we have gotten is

5    serial lawsuits from him, trying at every turn to fight this.

6         And I -- Your Honor should be aware he filed a new

7    lawsuit in California just the other day, purportedly against

8    Mr. Schatt, but clearly against Cred, asking for the same

9    relief Mr. Pfeiffer was in front of you the other saying,

10   saying please find that I am a proper holder of these assets.

11   Well, now I know why:  Because he spent them all or sent them

12   somewhere.  So when he says he only has 50, that means he's

13   either spent it on something, given it away.  Either way,

14   it's malfeasance.

15        To sit there and come to this Court today and say,

16   oh, I'll stick it in escrow is outrageous.  First of all, it

17   just -- escrow is gone, Your Honor.  He should turn it over

18   to the debtor.  There's no -- he doesn't even dispute that

19   they're Cred Capital's assets.  And then, to sit there and

20   say, well, I only know where 50 is, I would ask that he file

21   something today setting forth every single transfer, where it

22   is, who -- what it was for, and to whom, so that we can take

23   immediate steps with the committee to try to recover what is

24   literally millions of dollars of lost assets for the estate.

25        I cannot stress how surprised I am to find out -- I

1    knew he took it.  But the idea that he did actually -- he'd

2    go through all this and never once mention that this thing

3    we've been fighting over for months is -- are assets that

4    don't even exist anymore in his possession is highly

5    disingenuous, including his filing, to be honest, and not put

6    that in there.  I'm just shocked.

7              But I do ask, Your Honor, please, make him tell us

8    today where it is, so we can try to find these funds.

9              THE COURT:  Well, let me hear --

10             MR. EVANS:  Your Honor --

11             THE COURT:  Go ahead, Mr. Evans.

12             MR. EVANS:  No, I think the time frame is important

13   here.  You know, on July 16th, 2020, there was an order from

14   the California Court, and it precluded Alexander from

15   transferring, transmitting, using, depositing, or permitting

16   anyone else to transfer, transmit, or use any Cred and/or

17   Cred Capital digital assets in his possession, custody,

18   and/or control.  That was July 16th, 2020.

19             And what we have here, Judge, is we have Alexander

20   not even appearing here today, despite the fact that he was

21   here on Wednesday, not even being available to us to cross-

22   examine or ask questions, even though we asked counsel

23   numerous times yesterday to have their client available to

24   us.

25             He's telling us today, oh, I only have 50 Bitcoin

1    left.  This isn't something that was spent on Cred Capital

2    expenses, this isn't something that was a business expense

3    that may or may not have been done.  These were transferred

4    on January 16th and January 17th of this year, two weeks ago.

5    Pamela Clegg is here to testify, and perhaps we don't need

6    her to explain anything, but this was in her declaration,

7    Docket Number 8, which was filed in this case, and these were

8    her conclusions:

9            "For the reason discussed in detail below, it is my

10   professional opinion that:

11           "(A) On January 16th, 2021, Alexander transferred

12   50 Bitcoin that is directly traceable to Cred;

13           "(B) On January 17th, 2021, Alexander transferred

14   50 Bitcoin that is directly traceable to Cred."

15           These are expert conclusions, and Alexander's

16   response is nothing.  Okay, I'll put it in escrow now, I only

17   have 50 left.  And that's not good enough, Judge.

18           We have $8.74 million worth of crypto that has been

19   put in his possession.  We have violations of the court

20   order, which are clear, and violations two weeks ago.  And

21   this isn't some unwilling or unknowing participant.  He's

22   represented by competent counsel, he's engaged in litigation

23   (indiscernible) stayed, but he's engaged in litigation in

24   California, here.  He's been actively answering adversary

25   proceedings here, standing up in court, showing up.  And two

1    weeks ago, he was secretly taking money.  And the only reason

2    we had it is because we have a cryptocurrency tracing expert

3    that's tracking this stuff, right?

4           So I really don't understand where they come out on

5    this thing.  I mean, 8.74 million doesn't just disappear.

6    There's no dispute, 225 Bitcoin he received.  On July 16th,

7    he's got a court order saying you can't move it.  Two weeks

8    ago, 3.74 million of it gets trans -- or 1.74 million of it

9    gets transferred -- ah, sorry -- 3.664 million is the right

10   number.  Two weeks ago, that disappeared.  And now he's

11   saying, I don't know where it is, I don't have it, right?

12          And the tracing here, when you look at it and you

13   look at the expert report we submitted, it's not that

14   complicated.  There's five or six transactions, and they're

15   all him, and the expert concluded they're all him.

16          And so I don't know where we go from here, Judge.

17   But I agree with the debtors' counsel, there needs to be an

18   accounting and a full explanation of each of these

19   transactions.  There's only six or seven of them, Judge.  And

20   it's shocking to us, just like it's shocking to the debtor,

21   that one of the former executives of the company would be

22   engaged in these litigations, represented by competent

23   counsel, you know, participate at a bankruptcy hearing, and

24   then just two weeks ago, right under our noses, steal $3.664

25   million with no explanation.

1          I mean, he was accused of, effectively, stealing

2     this money.  And his response is, okay, well, I know the 100

3     that I just spent, you caught me, but the 50 that I still

4     have, okay, I'll put that in escrow, right?  It's simply not

5     good enough, Judge.

6          And just, when we're talking about this motion and

7     we're talking about likelihood of success and the ability to

8     win the -- the ability to win this case (indiscernible) his

9     whole defense was that, oh, this was Cred Capital's assets

10    and Cred Capital wasn't appropriately -- couldn't have

11    appropriately filed for bankruptcy because, somehow,

12    Alexander was the only person that could authorize Cred

13    Capital to file for bankruptcy.  Well, Your Honor ruled on

14    Wednesday, that theory doesn't have -- hold any water.

15         So that's why we don't really know what his defense

16    could possibly be at this point.  And we need to get the 50

17    Bitcoin he says he has in his possession, get the whatever

18    2.7 million in cash he says he has in his possession, the

19    200,000 USD, and we need to know what happened with each of

20    these transactions.

21              MR. PFEIFFER:  Your Honor, may I respond?

22              THE COURT:  Go ahead, Mr. Pfeiffer.

23              MR. PFEIFFER:  Yes, very briefly.

24         What we're agreeing to is transferring to the

25    escrow agent everything we have.  I understand that Bitcoin

1   were liquidated and converted to cash.  The identifiable cash

2   proceeds -- which I believe is a bulk, if not all of what

3   we're talking about -- will go to the escrow agent.  I know

4   of very little, if any, that was spent out of those funds.

5   It is my understanding that at least the bulk of those funds

6   that resulted from the liquidation are there.  We will

7   transfer those to the escrow agent.

8           We will provide them with information as to what

9   these transactions were, what happened with the cash.  We are

10  effectively saying to the Court that everything we have will

11  go to the escrow agent.  We will be cooperative because we

12  understand the implications of the Court's order on

13  Wednesday.  We are going to put what we have into the escrow.

14  We're good with that.

15           MR. EVANS:  Your Honor --

16           MR. LUFT:  Your Honor --

17           MR. PFEIFFER:  May I just --

18           THE COURT:  Hold on.

19           MR. EVANS:  (Indiscernible)

20           THE COURT:  Wait a minute, wait a minute.

21           Mr. Pfeiffer, were you done?

22           MR. PFEIFFER:  No.  As far as the allegation that

23  my client is filing complaints in California, that's not my

24  understanding.  My understanding was there's a pending matter

25  between my client and Mr. Schatt in California, and my client

1    filed an amendment to the complaint --

2              THE COURT:  He filed a --

3              MR. PFEIFFER:  -- against mister --

4              THE COURT:  He filed a second amended complaint,

5    actually.  I've looked --

6              MR. PFEIFFER:  Yeah.

7              THE COURT:  -- at it.

8              MR. PFEIFFER:  Yeah, against Mr. Schatt.  He hasn't

9    started a new lawsuit.

10             And it's also my understanding -- and I have

11   California counsel here on the line, who can confirm; he's

12   not admitted before this Court.  But it is my understanding

13   that there was never actually a signed injunction order in

14   California.  So that's an issue that may or may not become

15   relevant at some point in time.

16             But the bottom line is, for today, we're agreeing

17   to hand over everything we have to the escrow agent, Judge.

18             MR. LUFT:  Your Honor --

19             MR. PFEIFFER:  Your Honor, one question.

20             THE COURT:  Hold on.  One at a time here.  Go

21   ahead, Mr. Evans.

22             MR. EVANS:  Mr. Pfeiffer says that his client

23   Alexander has $2.7 million in cash proceeds from the

24   liquidation of Bitcoin, that's what he says.  On January 16th

25   and January 17th, there was a transfer of 100 Bitcoin.  The

1    market value of that 100 Bitcoin is $3.8 million.  If, two

2    weeks ago, 100 Bitcoin was sent to who knows where, but

3    apparently another 1.1 just disappeared, right?  So these

4    numbers don't make any sense.

5            And the question as to whether there an order

6    from the California Court, I mean, it's in our papers.  On

7    July 17th, 2020, there was a temporary restraining order

8    issued by the Court; in August, there was a preliminary

9    injunction that extended that temporary restraining order to

10   the conclusion of the proceedings.  So I don't know what the

11   ambiguity is here, but we have two court orders that clearly

12   preclude Mr. Alexander from transferring Cred Capital.

13           His counsel is now conceding that the

14   cryptocurrency that he received, they're saying is Cred

15   Capital property.  But the violation of the order -- and our

16   expert is here to testify, saying these January 16th and

17   January 17th transactions are directly traceable to Cred.  So

18   that's where we are, Judge.

19           And you know, at this point, the funds just got to

20   be transferred to the debtor.  I mean, we're -- they just got

21   to be transferred to us now.  There's really no reason and no

22   harm -- or there's no reason to allow Alexander to hold onto

23   this, so he can get the benefit of an escrow agent.  His

24   conduct here is egregious, Judge.

25           MR. LUFT:  Your Honor --

18

1            MR. PFEIFFER:  Your Honor, may I respond?

2            MR. LUFT:  If I may?

3            THE COURT:  Well, let me hear from Mr. Luft first,

4       he wanted to say something.

5            MR. LUFT:  Yes, thank you, Your Honor.

6            Your Honor, it looks as though Your Honor has seen

7       the second amended complaint.

8            THE COURT:  I have, yes.

9            MR. LUFT:  If you look at the first -- what's the

10      first action he wants, he wants a declaration that he's a

11      director of Cred Capital.  Now I don't know why an action

12      against Mr. Schatt could do that.  But the fact is he's

13      asking for the exact same relief they came to the other day.

14      And in fact, if you look at all the causes of action, they

15      are all related to the idea that he is a director of Cred

16      Capital.

17           So this notion that they are not violating the stay

18      because they keep just naming Mr. Schatt, as opposed to the

19      necessary party of Cred and Cred Capital -- which has been

20      pointed out to them previously by these courts -- it's --

21      there's no question that that's what they're doing.  They're

22      trying an end run.

23           Moreover, Your Honor, I will note that the Court

24      that filed the injunction, that case has been removed to the

25      Bankruptcy Court in the Northern District of California, and

1    is in the process of being transferred to yourself.  So we

2    hope, very quickly, this will all be in front of you, in

3    terms of the injunction, and you can see it.

4         The only other thing I'd like to just touch on

5    really quickly is, you know, we have had all this litigation

6    going on.  As I pointed out, none of these facts have ever

7    come up.  In all of the papers that he's filed, he's never

8    said the money is not there or, more importantly, that's he

9    liquidated.  They act as though that's not a big deal, well,

10   we just changed it from crypto to dollars.  Your Honor, he

11   has no authority do to that.

12        And that decision, by itself, as Mr. Evans has

13   alluded to, has cost the estate millions of dollars.  When

14   one looks at the value of crypto since he stole it from the

15   company until today, it's astounding how much he's done.  The

16   only thing that gives me -- makes sense is, well, he did the

17   same thing when he was working for Cred.  That's how they

18   lost a lot of money in the first place, he made those

19   decisions.  But that -- the idea that he's not responsible

20   and liable for the additional funds that he lost by his

21   unauthorized actions to, I guess, take some of the crypt -- a

22   bunch of the crypto and change it into dollars, he's liable

23   for that, as well.

24        And I go back to what the committee sought, which

25   is not just the depositing (indiscernible) there needs to be

1    an action, an injunction put up for his other assets.  He

2    needs to make good on all this and needs to know where it is.

3    He's created an astonishing track record that he does not do

4    right when left to his own devices.  Even with a court order,

5    he has -- seems to have no problem violating it.

6          So I do ask today that, not only does he give all

7    the funds that he has to the debtor, but to the extent there

8    is a shortfall in that amount, he has to post the personal

9    collateral to the Court, so that we can have some basis to be

10   sure that we will get the funds.

11         There is no dispute at issue anymore.  He was not

12   the Director of Cred Capital, he did not have authority to do

13   this.  And at this point, Your Honor, we are literally in

14   just a free fall, trying to see how much of the assets that

15   he stole can we recover.  Starting today, please help us make

16   that happen.

17         THE COURT:  Mr. Pfeiffer, I will point out that, if

18   -- well, we now know that he did, Mr. Alexander did transfer

19   funds during the pendency of this bankruptcy case, funds that

20   were assets of the debtors.  Isn't that a violation of the

21   automatic stay, and can't I sanction your client for

22   violating the automatic stay?

23         MR. PFEIFFER:  Your Honor, I don't know the

24   particular facts and the circumstances are not -- that

25   transfer, are not before the Court or were -- haven't been

1    presented to the Court.

2            I can tell you that it is my understanding that

3    recent transfers have very good explanations and -- related

4    to pandemic-related issues that I would prefer not to divulge

5    at the moment because they involve personal health issues.

6    But if a holder of Bitcoin or crypto becomes incapacitated or

7    were to become deceased, if it is in a particular type of

8    account, that person -- nobody could actually (indiscernible)

9    or get that crypto without the right password.

10           My client experienced some issues related to the

11   pandemic, where he had to make sure that, if he were to

12   become deceased, that crypto would be available to other

13   parties, including potentially the debtor.  So there is an

14   explanation for it.  And I'm being purposely oblique because

15   it involves some personal health issues with regard to my

16   client that I would prefer not to disclose in open court, but

17   I will provide the information to the debtor.  I've already

18   disclosed some of the information to the debtor concerning

19   that situation.

20           But there's more to it than, you know, simple

21   transfers of assets post-bankruptcy.  And he didn't transfer

22   any assets to a third party, effectively transferred them to

23   himself, he retained control.  So I'm not sure that is a

24   violation of the automatic stay.

25           And the recent Chicago Parking Authority case would

1    indicate that merely holding onto them, the assets

2    themselves, post-petition would not be a violation of the

3    automatic stay.

4            MR. EVANS:  Your Honor, this is Joe Evans from the

5    committee.

6            First of all, Mr. Pfeiffer just said that Alexander

7    still has and is in possession of the Bitcoin that was

8    transferred on January 16th and January 17th.  That's 150

9    Bitcoin.  And now he's saying, okay, I can only post 50

10   Bitcoin into escrow.  That doesn't make any sense, Judge.

11           And this last-second, COVID-related excuse, you

12   know, this is -- you can't just come to court and say, well,

13   I took money, but okay, it might have something to do with

14   COVID, I don't want to tell anybody what it is, but I

15   shouldn't be held responsible.  We've been in contact with

16   counsel for Alexander for months.  They didn't contact us and

17   say, hey, here's this issue, we have a privacy issue, we want

18   to make sure that the assets are secure.  They didn't say

19   that.

20           Only when we caught them, and we caught a hundred-

21   Bitcoin transfer on January 16th and January 17th, they file

22   a declaration that says nothing about this so-called "excuse"

23   for why they transferred the money.  And then they come to

24   court and, after hearing oral argument, they say, well,

25   actually, it's a COVID issue, Judge, actually, maybe it's a

1    COVID issue and we needed to be secure.  If you want the

2    funds to be secure, if that's the goal, place them with the

3    debtor, who's hired professionals to make sure that all the

4    cryptocurrency is safe and protected and for the benefit of

5    the estate.

6              You know, I -- we can't respond to this oblique

7    reference to COVID-related issue, and that's why the client

8    transferred $3.4 million a couple of weeks ago, it just

9    doesn't make any sense.

10             And you know what, Judge?  Alexander was here two

11   days ago.  He was at the hearing two days ago, he showed up.

12   And then, once we showed him that we know that he transferred

13   this Bitcoin two weeks ago, where is he today?  We asked

14   counsel numerous times is Alexander going to be here, is

15   Alexander going to be here.  We put him on our witness list,

16   to ask him these questions, and he's not here.  And he sends

17   counsel here to say, okay, maybe it's a health issue, maybe

18   that's why.  But these sorts of excuses, they just don't

19   work.  These are millions and millions and millions of

20   dollars of other people's money.

21             THE COURT:  Well --

22             MR. PFEIFFER:  Your Honor --

23             THE COURT:  -- I agree, it is time for Mr.

24   Alexander to start answering some difficult questions and do

25   so in a way that gives the parties and the Court the ability

1    to understand what's going on here.  So I'm trying to figure

2    out how to fashion a remedy here.

3         Certainly, I'm going to enter an injunction, a TRO

4    and a preliminary injunction, ordering Mr. Alexander to turn

5    over whatever he says he has to the debtors.

6         No need for an escrow, at this point because I

7    think the -- having determined that Mr. Alexander was not the

8    Director of Cred Capital when those funds were transferred, I

9    don't think there's any question that he owns those funds.

10   They belong to the debtors and I think they need to be turned

11   over to the debtors without an escrow.

12        And we need to get answers from Mr. Alexander.  So

13   one of two ways to do this:  One, I order him to submit a

14   declaration by sometime today that lays out exactly what he

15   has, when he got it, how he got it, where it was transferred

16   to, how it was liquidated, where the liquidated funds are

17   located; or I order him to sit for a deposition and let the

18   parties examine him about those issues.

19        Let me open it up to debtors and the committee to

20   see which you would prefer.

21        MR. LUFT:  Your Honor, speaking on behalf of the

22   debtors, what I would ask -- I think, if I could take one

23   from Column A and one from Column B, I think what we need,

24   given the level of duplicity with Mr. Alexander, is I'd like

25   him to submit that declaration today, setting forth exactly

1    where it is.  And then, to the extent that we have any

2    questions with regard (indiscernible) --

3              THE COURT:  You're --

4              MR. LUFT:  -- that declaration --

5              THE COURT:  You're freezing up a little bit, Mr.

6    Luft.  I'm not sure what's happening, but now you're

7    completely frozen.

8              MR. PFEIFFER:  Your Honor, Mark Pfeiffer.

9              I think I know what he's saying, and I don't

10   necessarily disagree.  But if you'd like a declaration

11   submitted by --

12             MR. LUFT:  (Indiscernible)

13             MR. PFEIFFER:  -- by today --

14             MR. LUFT:  There seems to be --

15             THE COURT:  Oh, wait a minute.  Mr. Luft --

16             MR. LUFT:  Your Honor?

17             THE COURT:  -- I think you're back.  You froze up

18   there and we couldn't hear --

19             MR. LUFT:  Oh.

20             THE COURT:  -- what you're saying.

21             MR. LUFT:  Sorry.  I'm sure it was something

22   brilliant.  But in short, what I'd ask for, Your Honor, is

23   that mister -- given his level of duplicity, that he submit

24   that declaration today, setting out everything you just

25   explained.  And then, if there's any questions -- which I

1    think there will be, given that his lawyer has said today

2    that he claims to have only got almost 100 million less

3    Bitcoin than all of our records show -- that we then

4    immediately sit for a deposition, once we've had a chance to

5    look at it, to follow up on.

6            I think we need both, to be honest.  But the

7    starting point, I think, would be a clear declaration with at

8    least what he says -- where he says all this money is, so

9    that we can look at that, try to use our resources to

10   evaluate it, and then ask the followup questions that are

11   necessary.  I don't -- unfortunately, I don't have any faith

12   that we can just take him at his word, nor do I think it's

13   reasonable to assume that we can begin to just question him

14   without that type of foundational discovery of what it --

15   where he at least says they are.

16           MR. EVANS:  Your Honor, this is --

17           THE COURT:  Go ahead, Mr. Evans.

18           MR. EVANS:  From the committee, there's a couple of

19   things that we would like.

20           First of all, we agree with you, Judge, that all of

21   the -- all of the cryptocurrency, the proceeds of the

22   cryptocurrency that are held by Alexander, those should be

23   posted and given to the debtor immediately.  And I gather,

24   from doing a quick calculation of what Mr. Pfeiffer was

25   saying, the value of that is approximately $4.732 million,

1   based on current market prices.  I think that's about right.

2   It might be a little -- it might be a little higher than

3   that.

4          This case, this transfer case, is for $8.74 million

5   in Bitcoin.  Okay?  So there's going to be a shortfall,

6   according to what Mr. Pfeiffer says Alexander currently has

7   in his possession, versus what the recovery for the estate is

8   under the adversary action.  So we would ask that, in

9   addition to the providing of the debtors' assets to the

10  debtor, the shortfall, the difference between the value of

11  the adversary action versus what he's able to post, to be

12  placed in escrow, pending the outcome of the adversary

13  action.

14         Mr. Pfeiffer has indicated that his client is

15  liquidating Bitcoin and turning it into cash, executing a

16  transaction, using it for personal reasons, whether their

17  healthcare-related or otherwise.  The only way to ensure that

18  the estate will actually recover these funds, if we are

19  successful -- and we do believe we'll be successfully,

20  especially given the fact that Alexander's only defense to

21  the turnover actions is that these weren't debtor -- these

22  weren't estate assets because Cred Capital couldn't have

23  filed for bankruptcy without his consent.  And so that

24  defense is gone.

25         And so the only way to protect the estate here,

1   Judge, is to have the Cred cryptocurrency and the proceeds

2   transferred to the debtor immediately and to have the

3   shortfall be posted in escrow by Mr. Alexander.

4            MR. PFEIFFER:  Your Honor, may I address that?

5            THE COURT:  Go ahead, Mr. Pfeiffer.

6            MR. PFEIFFER:  Yes, Your Honor.  As far as the

7   crypto go, it's in my client's best interest and everybody's

8   clients' best interests to get that transferred and out of my

9   client's hands as soon as possible because it poses a

10  security issue, both from a personal perspective for my

11  client and to the crypto itself, now that this has been

12  fairly widely publicized and people know that my client has

13  crypto.  We will transfer that, we will work with the debtor

14  to transfer that as soon as possible.

15           I understand Mr. Luft's position about the

16  declaration, and I understand that the Court ordered the

17  declaration.  I have no qualms with that.

18           I understand Mr. Luft's position that he would like

19  to provide -- or depose my client.  If I may suggest that,

20  because there are security issues with regard to the crypto,

21  that the declaration be provided, not publicly, but to both

22  Mr. Luft and the committee, so they know what it is.  And if

23  they choose to file it publicly, they can; or, if they ask me

24  to file it publicly, they can -- we can.  But I don't think

25  everybody wants the entire world to know where these assets

1   are, at the moment, until they are secured by the debtor.

2          THE COURT:  Well, I assume the -- correct me if I'm

3   wrong.  But I'm assuming whatever crypto he has could be

4   transferred immediately, without -- with just a few

5   keystrokes of the keyboard.  Am I incorrect about that?

6          UNIDENTIFIED:  That's correct, Your Honor.

7          THE COURT:  All right.  So --

8          MR. PFEIFFER:  That is my understanding, Your

9   Honor.  I've never had a Bitcoin or a crypto case before, but

10  that's my understanding.

11         THE COURT:  All right.  So I'm going to order him

12  to immediately, within the next 30 minutes after this hearing

13  is over, transfer that Bitcoin to the debtors.

14         Now the cash that he has, I'm assuming that is in a

15  bank account somewhere.  Is that right?

16         MR. PFEIFFER:  I assume that to be the case.  I

17  don't know for certain, Your Honor.

18         THE COURT:  All right.  And that can be transferred

19  through a wire transfer to the debtors' account fairly

20  quickly, so I will order that to be done, as well, by the end

21  of the day today, whatever cash that he has that he alleges

22  or that he admits is the proceeds of the cryptocurrency which

23  was taken from Cred Capital.

24         I will also order him, by the end of the day today

25  -- we'll say, actually, by -- if I was going to give a

1    deposition, Mr. Evans and Mr. Luft, would you want to take it

2    today or over the weekend or Monday?

3          MR. LUFT:  Your Honor, I think it depends if we're

4    going to see a declaration or not.  If we're going to see the

5    declaration, I'd have -- I'd like to have a chance to read it

6    and review it first.  If we're not going to get such a

7    declaration, then I guess I would confer with Mr. Evans.  I

8    personally have a deposition for three hours this afternoon,

9    but I'd be happy to sit down after that and talk to Mr.

10    Alexander then, but --

11          THE COURT:  Well, let's --

12          MR. EVANS:  Your Honor --

13          THE COURT:  There will be a declaration because I'm

14    going to order him to provide one.

15          MR. LUFT:  Terrific.

16          THE COURT:  That will be -- I'm just trying to

17    figure out the timing of it, when I should have him do that.

18    It's --

19          MR. LUFT:  If I could suggest, Your Honor, it can -

20    - whatever time it makes sense for you, I think, given Ms.

21    Clegg's involvement, and I think that there will probably be

22    questions about where this stuff went, maybe a deposition --

23    unless Mr. Evans disagrees -- on Monday then, so we have the

24    weekend -- if he can provide the details today, we have a

25    weekend to look at it -- or I'll defer to Ms. Clegg and Mr.

1    Evans how much time it would take to evaluate his responses.

2    But if that would be quick enough, then I do think time is of

3    the essence, so ...

4            THE COURT:  All right.  So we'll -- I'll order the

5    declaration to be submitted by 4 p.m. today.

6            MR. LUFT:  Thank you, Your Honor.

7            THE COURT:  It will be provided to the committee

8    and debtors' counsel.  I would also like to see it, I'd like

9    it submitted to chambers, so I can review it, as well.

10           And then, if the debtors and the committee request

11   a deposition, Mr. Alexander will sit for that deposition at

12   the committee and the debtors' time, whatever time of their

13   choosing.

14           MR. LUFT:  Thank you, Your Honor.

15           THE COURT:  I also think it's important that we get

16   some expedited discovery, document discovery, what happened

17   to these assets, where they went, how they were transferred.

18   Anything that Mr. Alexander has in writing also needs to be

19   produced on an expedited basis.

20           Mr. Pfeiffer, how quickly can your client get those

21   materials together and produced?

22           MR. PFEIFFER:  Your Honor, I had your sound cut out

23   in the last 15 seconds.

24           THE COURT:  I'm sorry.  You're fading out, too, Mr.

25   Pfeiffer.  I can barely hear you.

1      MR. PFEIFFER:  I'm sorry.  How about now?

2      THE COURT:  That's a little better, but still bad.

3  I was saying that I want expedited discovery, document

4  discovery from Mr. Alexander, as well.  So I was asking you

5  how quickly Mr. Alexander can pull together all documents

6  relating to the Bitcoin, its transfer, its liquidation, and

7  provide that to the debtors and the committee on an expedited

8  basis.  How much time do you need?

9      MR. PFEIFFER:  Probably more time than the Court is

10  willing to give.  But you know, we will provide it before

11  Monday --

12      THE COURT:  All right.

13      MR. PFEIFFER:  (Indiscernible)

14      THE COURT:  By Monday then, it should be provided.

15      I also think it might be important to have Ms.

16  Clegg involved in this, so that she can provide some guidance

17  to the parties and to me on transfers and how they happen and

18  so forth.  So I'd like her to be involved in this.  I --

19  sorry if I'm messing up your weekend, Ms. Clegg, but I think

20  it's important that you be involved in this, so I have some

21  independent expert that can give me some guidance on how all

22  of this played out.

23      MR. PFEIFFER:  Your Honor --

24      MS. CLEGG:  I'm available, Your Honor.

25      THE COURT:  Thank you.

33

1                    I'm sorry.  Someone --

2                    MR. PFEIFFER:  Your Honor --

3                    THE COURT:  -- else was --

4                    MR. PFEIFFER:  Yes, it's Mark Pfeiffer.  And I'm

5      sorry, your audio cut out again when you were talking about

6      the timing of the production of documents.

7                    THE COURT:  You had said you could get them by

8      Monday, so --

9                    MR. PFEIFFER:  Uh-huh.

10                   THE COURT:  -- I was saying, yes, get them by

11     Monday.

12                   MR. PFEIFFER:  And Your Honor, just so I know, so

13     that we make sure that we comply with the Court's order, the

14     declaration will be regarding the location of the

15     cryptocurrency and what happened to it and the proceeds,

16     effectively.  Is that correct?

17                   THE COURT:  That's correct.  He should also address

18     the differences between the 225 Bitcoin that Ms. Clegg has

19     been able to trace, that was transferred from Cred Capital to

20     Mr. Alexander, and his assertion that he only took possession

21     of 150 Bitcoin.  I want to know, well, how -- what's the

22     basis for that distinct difference between the two.

23                   MR. PFEIFFER:  And Your Honor, with regard to the

24     scope of the deposition, would it be, I'm assuming, similar

25     to the declaration?

1          THE COURT:  Yes, exactly.

2          MR. EVANS:  Your Honor, this is Joe Evans from the

3    committee.

4          One thing, just to clarify, in the declaration, for

5    each of these transactions, we want an explanation as to the

6    reason behind each of these transactions.  If 150 Bitcoin is

7    what Mr. Alexander had, it appears, on July 17, when the

8    Court entered the temporary restraining order, but before

9    that, 75 Bitcoin had dissipated.  And so we want an

10   explanation of each transaction that relates back to the

11   crypto that Cred provided Mr. Alexander.  So that's one.

12         The -- two -- the second thing is, according to Mr.

13   Pfeiffer (indiscernible) 50 Bitcoin.  And what's not clear to

14   me is he also said that there was 100 Bitcoin that was

15   transferred, but it was effectively transferred back to

16   Alexander, transferred to an account he controls for security

17   purposes, I suppose.  And so he should be transferring 150

18   Bitcoin to the debtor today in 30 minutes, not just 50.

19         THE COURT:  Well, he's going to --

20         MR. EVANS:  And so I don't know where the

21   disconnect --

22         THE COURT:  He's going to transfer whatever Bitcoin

23   he has that's related to what was transferred to him from

24   Cred Capital and provide an explanation for why there's a

25   difference between what he alleges is the amount that was

1    transferred to him and the amount that the debtor says was

2    transferred to him.  And he should also provide an

3    explanation for each of the transfers subsequent to the

4    initial transfer of all the Bitcoin, as well as an

5    explanation for why he liquidated the Bitcoin and where that

6    money is located.

7              MR. LUFT:  Your Honor --

8              MR. EVANS:  Thank you, Your Honor.

9              And then the one last -- apologies.  The one last

10   thing is, if Mr. Pfeiffer is correct and there are 50

11   Bitcoin, 200,000 in (indiscernible) coin and about 2.7

12   million in cash, that adds up to about $4.6 million.  Judge,

13   there's still 3.8 of additional funds that are the subject of

14   this adversary action.

15             And so, given Mr. Alexander's conduct to date and

16   the risk to the estate of not recovering those proceeds, we'd

17   ask that Mr. Alexander be asked to post in escrow, pending

18   the resolution of the adversary action, the remainder, the

19   3.8 million about that is the difference between the Cred

20   assets he claims are still under the control and the Cred

21   assets that he originally received.

22             THE COURT:  Well, I think requiring a prejudgment

23   attachment of assets is premature, at this point, until I

24   have a better understanding of what happened, how it

25   happened, and where the money is and how much is involved

1    here.  And I would want further briefing on that issue.  I

2    think that is a -- that's a big ask, to ask me to impose a

3    prejudgment attachment against somebody.  It doesn't happen

4    very often, it rarely happens in Delaware for sure.  So I'd

5    like further briefing on that issue before I took that next

6    step.

7          MR. LUFT:  Your Honor, if I may?  Just I hope this

8    would be clear that it should be covered, but given this

9    (indiscernible) secrecy in crypto, I would hope that mister -

10   - we need Mr. Alexander, in that declaration, to say who he

11   transferred the funds to, not just some anonymous account, if

12   he knows.  Presumably, he is sending money to people, he knew

13   -- he knows where it is.  We need names, so that we can

14   contact those people.  So I'd ask that to be included, as

15   well, and not to say that it's confidential and whatever else

16   they're going to say.

17         The second thing I would just note is, in addition

18   to the crypto that he took, he still holds a computer and a

19   phone that presumably holds Cred information on them, as well

20   as other -- I think it's called "coin," "U.S. Coin," or some

21   other forms of currency.  We have been talking about the

22   Bitcoin, but I don't see any distinction as to why he should

23   not turn over everything he has in his possession that he

24   took from Cred Capital.

25         THE COURT:  Well, on the first one, I agree, and

1  that's what I expected, that he would -- when he's describing

2  the transfers, he's describing who the funds were -- or who

3  the Bitcoin or who the funds were transferred to and where

4  they're currently residing, so -- and not just some anonymous

5  account number.  He has to provide full disclosure here.

6          On the second issue, remind me what it was.  I'm

7  sorry, I lost track.

8          MR. LUFT:  Quite all right.  The turnover -- we --

9  at issue in the turnover action is -- we --

10          THE COURT:  Okay.  The computer --

11          MR. LUFT:  -- (indiscernible)

12          THE COURT:  -- and the other items.

13          MR. LUFT:  (Indiscernible) whatever --

14          THE COURT:  Mr. Pfeiffer, does your client still

15  have the computer and the phone that was provided by the

16  debtors to Mr. Alexander?

17          MR. PFEIFFER:  I think there are about four or five

18  pieces of equipment listed in the complaint.  I don't think

19  my client had one of those to begin with.  I believe he has

20  the others.

21          With regard to the computer, which is the main

22  issue, I think, is -- he hasn't opened up or used that

23  computer since being terminated because it was the protocol

24  of Cred to wipe computers, you know, as soon as they're

25  powered up, following termination.  So, you know, it's just

38

1    sitting there.  I can talk to my client about getting it to

2    the debtor in some way, shape, or form.

3              MR. LUFT:  It's not just the computer, though, Your

4    Honor.

5              MR. PFEIFFER:  Whatever equipment it is.

6              THE COURT:  Whatever equipment he has that was

7    proved to him by the debtors should be turned over as soon as

8    possible.

9              Where is Mr. Alexander located, physically?

10             MR. PFEIFFER:  California, Your Honor.

11             THE COURT:  And where are you located, Mr.

12   Pfeiffer?  I'm sorry.

13             MR. PFEIFFER:  I'm in Philadelphia.

14             THE COURT:  And Mr. Alexander has counsel in

15   California, you mentioned Mr. Pfeiffer, who's actually on the

16   call today?

17             MR. PFEIFFER:  Yes, Mr. Thomas Reichert, who is on

18   the call right now and on the screen.

19             THE COURT:  Okay.  Then I would order Mr. Alexander

20   to turn those items over to Mr. Reichert for safekeeping

21   immediately.

22             MR. EVANS:  Your Honor, this is Joe Evans for the

23   committee.

24             And I understand Your Honor's point about the

25   prejudgment order of attachment, how you'd like more

1    briefing.  In the interim, before you can make a decision,

2    what we would like to do and what we'd request is that there

3    be a restriction on Alexander's transfer of what he claims is

4    his personal Bitcoin or personal assets.  We anticipate that

5    what we're going to receive is, well, this Bitcoin was mine,

6    this wasn't Cred Capital's, this Bitcoin was mine, it wasn't

7    Cred Capital's.  And so, until we can sort all that out,

8    Judge, we'd ask for a restriction on Alexander's transfer of

9    his cryptocurrency and other assets.

10          Mr. Pfeiffer said that the assets were liquidated

11   and some of the Bitcoin was liquidated, and Ms. Clegg is very

12   good (indiscernible) this stuff, but we're going to need to

13   understand what his position in certain of these items.  And

14   just to protect the estate, pending the determination of the

15   prejudgment attachment, we'd ask that there be an injunction

16   on Mr. Alexander for making transfers over a certain dollar

17   amount, maybe $1,000, $2,000, something like that.

18          THE COURT:  Well --

19          MR. PFEIFFER:  Your Honor --

20          THE COURT:  -- that's --

21          MR. PFEIFFER:  -- that --

22          THE COURT:  That's kind of like a prejudgment

23   attachment.  But go ahead, Mr. Pfeiffer.

24          MR. PFEIFFER:  I was going to say that's the same

25   thing, and that poses constitutional issues.

1          THE COURT:  Yeah.  Yeah, I'm not prepared to do

2     that at this time.  But I do expect that Mr. Alexander will

3     disclose -- and I'm going to order expedited discovery on all

4     of his personal assets, so that we know how much Bitcoin he

5     holds that he believes is his personal property, including

6     his -- and cash.

7          I'm going to open it up.  I'm going to let the

8     committee and the debtors submit written requests for

9     production and, if you want, interrogatories to Mr. Alexander

10     regarding his personal assets.  And I would expect that that

11     be done on an expedited basis, not 30 days, as allowed by the

12     rules.  I would expect that could be done within a week or 10

13     days.

14          MR. EVANS:  Your Honor, for the committee, we can

15     get these -- we can get these requests out either this

16     evening or first thing tomorrow.  And we'd ask that the

17     responses be submitted by no later than Wednesday.

18          THE COURT:  I'm sorry.  When did you say you would

19     get them out, Mr. Evans, today?

20          MR. EVANS:  We can get them out today or tomorrow

21     morning, but we'd ask the responses be Wednesday.

22          THE COURT:  All right.  I'll say the responses are

23     due Wednesday.  But Mr. Pfeiffer, if there -- something comes

24     up that makes that difficult to reach, I would ask that the

25     parties contact the Court and we'll have a status conference

1   over the telephone, and we'll see if you need some additional

2   time.

3           MR. PFEIFFER:  Thank you, Your Honor.

4           MR. CARTY:  Your Honor, Andrew Carty from Brown

5   Rudnick on behalf of the examiner.  May I be heard very

6   briefly?

7           THE COURT:  Go ahead, Mr. Carty.

8           MR. CARTY:  I understand that there's going to be,

9   you know, some information being provided.  I think some or

10  all of it is going to be provided under seal, and we would

11  just like to be involved in that process and provided with --

12  if there's a declaration, if there's depositions, if there's

13  document discovery, we would like to be afforded the

14  opportunity to participate in that process.

15          THE COURT:  Absolutely.

16          MR. PFEIFFER:  No objection, Your Honor.

17          THE COURT:  Yeah, absolutely.

18          MR. CARTY:  Thank you, Your Honor.

19          THE COURT:  Absolutely.  Yes.

20          Well, I'm not sure how to formulate one order.

21  I've ordered a lot of things today.  So I think what I'm

22  going to do is so order the transcript with all of my rulings

23  today.  And Mr. Luft, if you want to submit a form of order

24  that just says -- incorporates my rulings on the record

25  today.  You don't have to do them specifically; just say the

1  Court held a hearing today, made numerous rulings on the

2  record relating to various issues and, for the reasons stated

3  on the record, the record is so ordered.  And I think that

4  will -- we'll have to go with that because it will be

5  impossible to try to put together a comprehensive order on

6  this on a short period of time, especially since you have a

7  deposition this afternoon.

8          MR. LUFT:  Thank you, Your Honor.  That is,

9  honestly, very helpful.

10         THE COURT:  All right.

11         MR. EVANS:  And Judge, this is Joe Evans for the

12 committee.

13         And the two items that we were come back to you

14 with briefing on were the sanctions item and the -- sanctions

15 related to a violation of the automatic stay and, also, the

16 prejudgment order of attachment.  We'd just like to confer

17 with Mr. Pfeiffer on that and come back to you with a

18 proposed briefing schedule.  I think some of the information

19 we're going to get over the next few days might be pretty

20 helpful for those motions, so --

21         THE COURT:  Yes, that's fine.

22         MR. EVANS:  -- we'd ask for that.

23         THE COURT:  That's fine, yeah.

24         All right.  I also -- I guess I am going to grant

25 the motion to intervene.  We forgot about that one.  So you

1    can -- Mr. Evans, you can -- I think we have the form of

2    order that was attached to your motion.

3           But Mr. McMahon raised his hand.  Mr. McMahon, do

4    you have an issue about the intervention?

5           MR. MCMAHON:  No, Your Honor.  I -- jumping in.

6    And my apologies, I was monitoring the hearing.  We have the

7    same interest in the information that the examiner does, so

8    we just ask that we be included with respect to

9    communications regarding the declaration, the deposition, and

10   the like.

11          THE COURT:  Yes, absolutely.  Absolutely.

12          So, going back to the motion to intervene, I'll

13   enter the order that was submitted by the committee with your

14   motion, we'll get that entered today.

15          MR. EVANS:  Thank you, Your Honor.

16          THE COURT:  All right.  And I think that's all we

17   had for today, right?  That was enough.  It's a lot.

18          MR. EVANS:  Nothing more from the committee.

19          THE COURT:  All right.

20          MR. EVANS:  Thank you.

21          MR. LUFT:  Thank you, Your Honor.

22          THE COURT:  All right.  Thank you, everybody.  I'll

23   say "have a good weekend," but I have a feeling some people

24   aren't going to that are on the phone today.  So we're

25   adjourned.  Thank you.

1          COUNSEL:  Thank you, Your Honor.  Thank you, Your

2  Honor.  Same to you.

3      (Proceedings concluded at 10:55 a.m.)

4                              *****

45

1                          CERTIFICATION

2              I certify that the foregoing is a correct

3      transcript from the electronic sound recording of the

4      proceedings in the above-entitled matter to the best of my

5      knowledge and ability.

6

7

8

9

10     _____        February 5, 2021

11     Coleen Rand, AAERT Cert. No. 341

12     Certified Court Transcriptionist

13     For Reliable