## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CRED INC., *et al.*, | ) Case No. 20-12836 (JTD) |
|  | ) |
| Debtors.[1] | ) (Jointly Administered) |
|  | ) |
|  | ) **Requested Hr'g Date: 3/17/21 at 2:00 p.m. (ET)** |
|  | ) **Requested Obj. Deadline: At the hearing** |

### EMERGENCY MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER (I) HOLDING JAMES ALEXANDER IN CONTEMPT OF COURT AND (II) ISSUING A BENCH WARRANT FOR THE ARREST AND DETENTION OF JAMES ALEXANDER

The Official Committee of Unsecured Creditors (the "Committee") of Cred Inc., *et al.*

(the "Debtors") hereby submits this motion (the "Motion"), pursuant to section 105(a) of title 11

of the United States Code (the "Bankruptcy Code"), Rule 37(b) of the Federal Rules of Civil

Procedure, as made applicable to this proceeding by Rule 7037(b) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), Bankruptcy Rule 9020, and Rule 9013-1 of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware, for entry of an order, substantially in the form of the proposed order

attached hereto as **Exhibit A**: (i) finding James Alexander in contempt for violating the *Order*

*Approving the Emergency Motion of the Official Committee of Unsecured Creditors for Entry of*

*an Order Granting (I) Temporary Restraining Order and Preliminary Injunction Against James*

*Alexander and (II) Related Relief* [Docket No. 486] (the "Emergency Order"); and (ii) issuing an

appropriate remedy to compel Alexander to comply with the Emergency Order, including issuing

a bench warrant for Alexander's arrest and detention until he complies.  In support of the

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification
number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred
Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East
Third Avenue, Suite 200, San Mateo, California 94401.

Motion, the Committee submits the *Declaration of Joseph B. Evans* (the "Evans Declaration"), filed contemporaneously herewith.  In further support of the Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Escaping from prison, using multiple identities,[2] misappropriating assets, violating injunctions,[3] withdrawing $170,000 in cash and checks hours after the Committee filed the Emergency Motion,[4] committing perjury, and refusing to comply with this Court's Emergency Order.  These are just a few examples of Alexander's transgressions prior to and during these Chapter 11 Cases.  It is now clear that swift and harsh justice is the only remedy that will compel Alexander to comply with the Emergency Order.

2.      The Emergency Order directed Alexander to immediately turnover estate assets, provide expedited discovery, and sit for a deposition.[5]

3.      Alexander has led the Debtors and the Committee down an obstacle course to avoid complying with the Emergency Order.  Such obstacles include: (i) ridiculous excuses about why he could not turnover estate assets; (ii) submitting a bare bones nine-paragraph declaration that failed to address questions posed by the Court and failing to submit a revised

---

[2] On January 8, 2021, the Court approved the appointment of Robert J. Stark (the "Examiner"), as the Examiner in the Debtors' cases.  *See* Docket No. 338.  On March 8, 2021, the Examiner filed his report.  *See* Docket No. 605 (the "Examiner's Report").  The Examiner's Report contained a series of findings concerning Alexander's past, including that he used a series of different names, had been convicted in the United Kingdom, and had escaped from a prison in England.  *See* Docket No. 338, at 11 ("Mr. Alexander was convicted on December 3, 2007 in the United Kingdom for crimes related to illegal money transfers, for which he was sentenced to three years and four months in prison to be served at HMP Ford Prison in West Sussex, England.  At the time of his incarceration, there was a prison break at this facility. Mr. Alexander has been identified by the UK government as a fugitive."), 89-90 ("On December 3, 2007, Alexander was convicted in the United Kingdom for crimes related to illegal money transfers. He was sentenced to three years and four months in prison to be served at HMP Ford Prison in West Sussex, England. On October 15, 2008, while serving his sentence, there was a prison break at the HMP Ford Prison. It appears that Alexander is a fugitive in the United Kingdom.") (internal citations omitted).
[3] Evans Decl., Ex. G at 105:20-106:19
[4] *Id*. at 42:12-50:7.
[5] *See id*., Ex. D.

declaration; (iii) producing limited and incomplete discovery; (iv) failing to produce any discovery concerning his personal assets despite being ordered by the Court to do so; (v) after admitting that he withdrew $170,000 from a "dedicated" Cred Inc. ("Cred") account after the filing of the Emergency Motion and that $60,000 of it was held in cash in the trunk of his car, refusing to turnover the cash to the Debtors; and (vi) engaging in obstructive and evasive behavior at his deposition, including seeking a five-minute break during which he filed for personal bankruptcy and then refused to continue with the deposition.

4.      The latest obstacle (Alexander's bankruptcy filing) forced the Debtors and the Committee to seek stay relief in the United States Bankruptcy Court for the Central District of California (the "California Bankruptcy Court") to enforce the Emergency Order.  Although the California Bankruptcy Court granted such relief effective immediately, Alexander's malfeasance continued.  To date, there are identifiable assets Alexander has not turned over or accounted for. Additionally, Alexander has yet to produce any further discovery or a revised declaration, which has hindered the Committee's ability to identify and locate additional assets that may be property of the Debtors' estates.  Without this information, the Committee is unable to investigate the whereabouts of the unaccounted for assets.

5.      More than five weeks have passed since this Court entered the Emergency Order. Since then, the Committee has repeatedly requested that Alexander comply with the Emergency Order, but to no avail.  The Committee now has no choice but to seek a finding of civil contempt.

6.      The Court should impose sanctions on Alexander to coerce his compliance with the Emergency Order.  However, based on Alexander's pattern of conduct and the present circumstances, monetary sanctions will not be sufficient to coerce Alexander's compliance.  The Debtors already have claims against Alexander far in excess of what is likely to be recoverable

from Alexander.  Indeed, Alexander recently filed for personal bankruptcy and listed

approximately $2,000,000 in assets.[6]  Even absent a finding of civil contempt, the Debtors have

claims against Alexander in excess of that amount.  Unrecoverable fines simply will not coerce

Alexander to comply with the Emergency Order.  Moreover, Alexander likely would not face

any immediate adverse consequences from fines because the automatic stay applicable in

Alexander's personal bankruptcy case may hinder collection efforts.

       7.     The only conceivable sanction that would coerce Alexander to comply with the

Emergency Order is for this Court to issue a warrant for Alexander's detention and arrest.

Although Bankruptcy Courts do not maintain criminal jurisdiction, incarceration as a sanction

for civil contempt is appropriate under Bankruptcy Code section 105(a) when (i) it is unlikely

that monetary sanctions would improve the likelihood of compliance and (ii) there has been a

pattern of noncompliance.  Alexander's pattern of misconduct demonstrates that monetary

sanctions are not enough to coerce him to comply with the Emergency Order.  Accordingly and

for the reasons stated herein, incarceration of Alexander is appropriate.

## JURISDICTION AND VENUE

       8.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334, and the *Amended Standing Order of Reference* from the United States District Court for

the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the

meaning of 28 U.S.C. § 157(b)(2).  In accordance with Local Rule 9013-1(f) the Committee

confirms its consent to the entry of a final order by the Court in connection with this Motion to

the extent that it is later determined that the Court, absent consent of the parties, cannot enter

---

[6] As set forth herein, Alexander's personal bankruptcy schedules reflect approximately $2 million in assets, which Alexander asserts are exempt and/or subject to liens.  Thus, monetary sanctions are likely uncollectable.

final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.      Venue in this Court is proper pursuant to <u>28 U.S.C. §§ 1408</u> and <u>1409</u>.

10.     The statutory predicates for the relief sought herein are Bankruptcy Code section 105(a) and Bankruptcy Rule 7037(b).

## STATEMENT OF FACTS

**A.      Background**

**(1)      The Chapter 11 Cases**

11.     On November 7, 2020, the Debtors commenced the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

12.     On November 18, 2020, the Debtors commenced an adversary proceeding against Alexander seeking turnover of the Cred Cryptocurrency (as defined below) and other Debtor property in his possession.  *See Cred Inc., Cred Capital, Inc., and Cred (U.S.) LLC v. Alexander*, Case No. 20-12836 (JTD), <u>Docket No. 1</u> (Bankr. D. Del.) (the "<u>Adversary Proceeding</u>").

13.     On December 3, 2020, the Office of the United States Trustee appointed the Committee.  <u>Docket No. 120</u>.

14.     On January 8, 2021, the Court approved the appointment of the Examiner.  *See* <u>Docket No. 338</u>.

15.     On March 8, 2021, the Examiner filed the Examiner's Report.

**(2)    Alexander's Employment at Cred[7]**

16.    Alexander was employed as Cred's Chief Capital Officer from August 27, 2018 to June 26, 2020.  Adv. Pro. Docket No. 1, ¶¶ 15, 32.  Alexander was terminated by Cred after it was discovered that Alexander disregarded instructions in the formation of Cred Capital, Inc., a Delaware entity that was supposed to be a subsidiary of Cred under Cred's sole controlled.  *Id.* at ¶¶ 22-24. Instead, Alexander took complete control over Cred Capital.  *Id.*

**(3)    The Cred Cryptocurrency**

17.    Two days before Cred fired Alexander, without authorization, Alexander caused a significant amount of Cred's cryptocurrency – 224.98993 Bitcoin and $204,567 United States Dollar Coin (collectively, the "Cred Cryptocurrency") – to be transferred to him.  *Id.* at ¶ 35.

18.    On July 15, 2020, the Debtors commenced an action against Alexander in California state court (the "California Court") to, among other things, recover the Cred Cryptocurrency.  Evans Decl., Ex. C (the "California Complaint").

19.    On July 16, 2020, Alexander liquidated 65 Bitcoin of the Cred Cryptocurrency by transferring those assets into his Coinbase account.  *Id.*, Ex. G at 83:16-85:2.  Alexander had previously liquidated 10 Bitcoin of the Cred Cryptocurrency in the same fashion on July 1, 2020 (the 65 Bitcoin and 10 Bitcoin collectively, the "Missing Bitcoin").

20.    On July 17, 2020, the California Court issued a temporary restraining order (the "California TRO") freezing the Cred Cryptocurrency and forbidding Alexander from making any transfers thereof.  *Id.*, Ex. A.

---

[7] For additional background regarding Alexander, the Committee respectfully refers the Court to the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting (I) A Temporary Restraining Order and Preliminary Injunction Against James Alexander and (II) Related Relief* (the "Emergency Motion").  Adv. Pro. Docket No. 6.

21.     On August 13, 2020, the California Court extended the TRO during the pendency of the action and ordered Alexander to not transfer any of the Cred Cryptocurrency.  *See* Evans Decl., Ex. B (the "California PI," and together with the California TRO, the "California Freeze Orders").  On August 27, 2020, the California Court issued the California PI.

22.     As explained below, Alexander violated the California Freeze Orders on January 16, 2021 and January 17, 2021 by transferring the Cred Cryptocurrency.

23.     The Committee retained CipherTrace, one of the world's leading cryptocurrency tracing consultants to assist the Committee's ongoing tracing efforts in connection with these cases.  Adv. Pro. Docket No. 8, ¶ 3.  As part of those efforts, CipherTrace conducts regular checks of the digital wallets holding the Cred Cryptocurrency, which, as of January 15, 2021 held 149.998 Bitcoin of Cred Cryptocurrency.  *Id.* at ¶ 11

24.     In late January 2021, CipherTrace conducted routine checks of the Alexander digital addresses, which uncovered that on January 16, 2021 and January 17, 2021, Alexander transferred 100 Bitcoin of the Cred Cryptocurrency.  *Id.* at ¶ 15, Ex. B.  Such transfers were a clear violation of the California Freeze Orders.

**B.      The Motion for TRO and Preliminary Injunction**

25.     Based on CipherTrace's findings, on February 3, 2021, the Committee filed the Emergency Motion, which sought a temporary restraining order: (i) restraining Alexander from executing further transactions with the Cred Cryptocurrency; (ii) directing Alexander to immediately transfer the Cred Cryptocurrency into escrow; and (iii) directing Alexander to produce expedited discovery to develop further information related to the Cred Cryptocurrency and Alexander's personal finances.  *See* Adv. Pro. Docket No. 6.

26.     On February 5, 2021, the Court granted the Emergency Motion and ordered Alexander to provide to the Debtors and the Committee: (i) all Cred Cryptocurrency in his

possession "within 30 minutes" after the hearing concluded; (ii) all cash in Alexander's possession related to the Debtors by close of business the day of the hearing; (iii) a detailed declaration by 4:00 p.m. describing all of the transfers of Cred Cryptocurrency and any other assets of the Debtors that were in Alexander's possession; (iv) an explanation of the reasons for each of these transactions; (v) discovery on all of the Cred Cryptocurrency transactions and fiat transactions relating to the Debtors by February 8, 2021; (vi) discovery on all of Alexander's personal assets by February 10, 2021; and (vii) to sit for a deposition with the Debtors and the Committee.  *See* Evans Decl., Ex. D.  Alexander has not complied with the Emergency Order.

## C.    Alexander's Violations of the Emergency Order

### (1)    Alexander Failed to Submit an Adequate Declaration

27.    Pursuant to the Emergency Order, Alexander was directed to submit to the Debtors and the Committee a declaration that: (i) "lays out exactly what he has, when he got it, how he got it, where it was transferred to, how it was liquidated, [and] where the liquidation funds are located," *id*. at 24:12-17; (ii)  "address[es] the differences between the 225 Bitcoin that Ms. Clegg has been able to trace, that was transferred from Cred Capital to Mr. Alexander, and his assertion that he only took possession of 150 Bitcoin," *id*. at 33:17-22; (iii) "provide an explanation for each of the transfers subsequent to the initial transfer of all the Bitcoin, as well as an explanation for why he liquidated the Bitcoin and where that money is located,"  *id*. at 34:24-35:6; and (iv) describe "who the Bitcoin or who the funds were transferred to and where they're residing, so -- not just some anonymous account number.  He has to provide full disclosure here," *id.* at 37:1-5.  The Court ordered that the declaration be submitted by 4:00 p.m. (EST) on February 5, 2021.  *Id*. at 31:4-5.

28.    Alexander did not submit a declaration until February 6, 2021, and despite the Court's specific instructions as to the declaration, Alexander submitted a declaration containing

only nine paragraphs, which did not provide any explanations of the various transactions at issue or the location of the Debtors' assets. *Id.*, Ex. L (the "Alexander Declaration").

29.     For example, the Alexander Declaration merely contained vague statements that Alexander "had 225 Bitcoin held by Cred Capital, Inc. transferred to my personal account" and then provided no explanation about what happened to that 225 Bitcoin.  *Id*., Ex. L at ¶ 2.

30.     Moreover, the Alexander Declaration merely states that "prior to the hearing in California on the Temporary Restraining Order, I liquidated 75 Bitcoin, the proceeds of which were deposited into a Coinbase account."  *Id*., Ex. L at ¶ 8.  This vague explanation does not provide the dates of the transactions, the reasons for the transactions, the parties to the transactions, the transaction IDs and digital wallet addresses, which Coinbase account the "proceeds" were transferred into, who owns and controls that Coinbase account, and where the proceeds of that 75 Bitcoin are now.   Alexander then states that "in August 2020, I transferred the ***remaining amounts*** to a bank account at Wells Fargo" without any explanation as to what the "remaining amounts" are or what happened to the rest of the proceeds of the 75 Bitcoin.  *Id*.

31.     The appendix attached to the Alexander Declaration is equally deficient.  *Id*., Ex. L at App'x 1.  It simply shows that Alexander made transfers of the Cred Cryptocurrency on January 16, 2021 and January 17, 2021, but does not show where the Cred Cryptocurrency was transferred.  Also, the appendix does not contain the transaction IDs or digital addresses.

32.     These are just a few of the many deficiencies in the Alexander Declaration.[8]   The nine paragraph declaration does not even begin to approach the level of detail that the Court ordered Alexander to provide.  *See* Evans Decl., Ex. D at 24:12-17; 33:17-22; 34:24-35:6; 37:1-

---

[8] Additionally, the Alexander Declaration is devoid of any explanation as to why Alexander was only able to transfer 49.9980892 Bitcoin and $2,773,489.24 USDC to the Debtors on February 5, 2021, as opposed to the entirety of the 225 Bitcoin.   Such transfers are discussed in greater detail below.

5 (the declaration should address "exactly what he has, when he got it, how he got it, where it was transferred to, how it was liquidated, where the liquidation funds are located . . .  the differences between the 225 Bitcoin that Ms. Clegg has been able to trace, that was transferred from Cred Capital to Mr. Alexander, and his assertion that he only took possession of 150 Bitcoin . . . an explanation for each of the transfers subsequent to the initial transfer of all the Bitcoin, as well as an explanation for why he liquidated the Bitcoin and where that money is located . . . [, and describe] "who the Bitcoin or who the funds were transferred to and where they're residing, so -- not just some anonymous account number.  He has to provide full disclosure here.").

33.    Shortly after receiving the Alexander Declaration, counsel to the Committee emailed Alexander's counsel informing him that the Alexander Declaration "is insufficient by a large margin." *Id*., Ex. R.

34.    On February 7, 2021, counsel to the Committee emailed Alexander's counsel asserting that the Alexander Declaration is in "clear violation" of the Emergency Order and provided a detailed list of reasons as to why the Alexander Declaration is "plainly insufficient". *Id*., Ex. O.  Counsel to the Committee concluded that email by demanding a revised declaration by February 8, 2021 that complied with the Emergency Order.  *Id*.  To date, Alexander has not provided a revised declaration.

**(2)    Alexander Failed to Produce All Ordered Discovery**

35.    The Emergency Order required that Alexander produce discovery as to the Cred Cryptocurrency by February 8, 2021 and discovery as to his personal assets by February 10, 2021.  *Id*., Ex. D at 32:14; 40:22-23.

36.    To date, Alexander has produced very limited discovery.  The limited discovery that has been produced included Wells Fargo bank statements from an account that was

established by Alexander for the sole purpose of holding the Debtors' assets. *Id.*, Ex. F at Response to Interrogatory Nos. 16 and 17; *see also id.*, Ex. G at 98:17-99:10 (Alexander admitting that such accounts are "dedicated" accounts containing only the Debtors' assets). Indeed, this Wells Fargo account is a business account named "James Alexander DBA James Alexander Cred." *Id.*, Ex. H.

37.     The bank statements reveal Alexander's history of using Cred's assets apparently for his personal enjoyment and other unauthorized expenses.  Specifically, Alexander used Cred Cryptocurrency proceeds: (i) to fund trips to Istanbul and Vail, Colorado in December 2020; (ii) to fund a future trip to Switzerland, paid in advance in January 2021; (iii) hundreds of thousands of dollars of cash withdrawals; (iv) the payment of a $350,000 retainer to Quinn Emmanuel Urquhart & Sullivan to fund legal defense costs for Cred's former General Counsel, Dan Wheeler, immediately before Wheeler filed a declaration in support of Alexander's motion to dismiss Cred Capital's chapter 11 case one week prior to the transfer); and (v) on February 4, 2021, one day after the Emergency Motion was filed, to (a) withdraw $60,000 in cash to store in the trunk of Alexander's car; (b) transfer $100,000 to himself; and (c) write a $10,000 check to himself; and (v) make a series of transfers to "Alexander Custom Management" and "Custom Management." *Id.*, Ex. G at 42:12-50:7; Ex. S.

38.     On February 8, 2021, counsel to the Committee emailed Alexander's counsel regarding these transactions. *Id*., Ex. S.  Alexander's counsel did not address the questions and, instead, asked that the Committee confirm receipt of wire transfers from Alexander's Wells Fargo and JP Morgan accounts. *Id*., Ex. T.  Such transfers occurred, however, there were shortfalls totaling approximately $46,000 from the amounts in the accounts reflected on the account statements and the amounts transferred. *Id*.

39.     After counsel to the Committee sent a follow up email regarding the transfers, Alexander's counsel responded stating that he was consulting with Alexander. *Id*, Ex. S. Alexander's counsel did not provide a response and, on February 9, 2021 (three hours before the February 9 deposition discussed below), counsel to the Committee again requested responses regarding Alexander's actions and additional information. *Id.* The requests were made in accordance with the Emergency Order, which required expedited discovery, and were necessary to obtain the information in advance of the deposition. Counsel to the Committee again requested the information one hour before the deposition. *Id*. The information was not provided.

40.     The limited records provided by Alexander also reveal that Alexander owns or controls other bank accounts that he has not disclosed. *Id.*, Ex. H (reflecting an initial $100 funding transfer from another Wells Fargo account); Ex. G at 103:1-104:18 (Alexander admitting that there are other bank accounts (that he has not produced) that received proceeds of the Missing Bitcoin); 104:14-16; 115:6-16 (Alexander admitting that there is a personal account (and potentially others) that will be turned over in "phase two" discovery). One such account received certain of the proceeds from Alexander's liquidation of the Missing Bitcoin. *Id*., Ex. G at 98:8-99:2. Those proceeds were then transferred to fund a new JP Morgan account opened by Alexander. *Id*., Ex. U at 10. Alexander has not provided the records from the account that initially received those proceeds.

41.     Additionally, the Wells Fargo account Alexander provided was opened in August of 2020, but he received the Cred Cryptocurrency at least three months prior. Although Alexander claims that the Wells Fargo account was a "dedicated account" for Cred Capital business expenses, Alexander was fired on June 26, 2020, and there were no legitimate operations and no business expenses for Cred Capital.

42.     It is clear Alexander has not produced a full set of bank account records, cryptocurrency exchange records, or digital wallet records.  It is also clear that Alexander was transferring hundreds of thousands of dollars to himself (including an account held by Alexander Custom Management) and other so-called "consultants."

43.     During Alexander's February 9 deposition (discussed below), Alexander admitted that he had not fully complied with his discovery obligations and that a "part two discovery" would be forthcoming.  *Id.*, Ex. G at 104:14-21.  To date, Alexander has not produced the "part two discovery," nor any further discovery as required by the Emergency Order.

### (3)    Alexander Failed to Turnover or Account for All Assets

44.     Although Alexander was required to transfer all Cred Cryptocurrency within 30 minutes of the conclusion of the hearing, he did not do so.  Instead, he provided excuse after excuse for why he could not do so.  These excuses ranged from claims that he feared for his personal safety, that he was not near a computer, that he did not know where his hard drive was located, that he had personal illness issues, that he was two hours away from where his cryptocurrency was stored, and that he was unable to technically execute these transactions because he did not know how to transfer cryptocurrency (despite being in charge of Cred's complex cryptocurrency trading and hedging strategies).

45.     It was not until the Committee demanded that Alexander join a recorded video conference with CipherTrace and the Debtors that he finally transferred the majority of the Cred Cryptocurrency that he claimed was in his possession.  Although Alexander was generally uncooperative during the video conference, on Friday, February 5, 2021, Alexander transferred

49.998 BTC and 2,773,438.24 USDC to Cred.[9]  However, this amount fell at least $664,518.29

short of the $3,437,956.53 (USD)[10] from the January 16, 2021 and January 17, 2021 transfers

that Alexander admittedly transferred and liquidated from the Cred Cryptocurrency.

46.     As discussed in greater detail below, Alexander has failed to turnover or account

for various Debtor assets.

**D.     The February 9, 2021 Deposition**

47.     Pursuant to the Emergency Order, Alexander was required to sit for a deposition

with the Debtors and the Committee, which took place on February 9, 2021.  From the outset of

the deposition, Alexander was obstructive and uncooperative.

48.     For example, Alexander claimed he did not remember whether he had left the

country within the last six months (although his bank records that he produced reflect that he

took trips to Istanbul and Vail, Colorado (with his wife) only weeks prior, all using Cred funds),

and for 20 minutes Alexander refused to answer what his job responsibilities were at Cred except

for "financial services." *Id*., Ex. G at 65:22-66:27; 27:7-29:13.[11]

49.     Additionally, during his deposition, Alexander revealed that he has (now likely,

had) $60,000 of cash traceable to the Cred Cryptocurrency in the trunk of his car:

> Q.   You took $60,000 out in cash a week ago, you say it's in the
> trunk of your car, and now you can't tell me how much of the 60,000
> is still in the trunk of your car? Is that your answer?
> A.   Yes. I'm sorry. I -- I need to deposit it, and then I'll give you the
> exact number of what's -- what's -- when the deposit is made.

*Id.*, Ex. G at 56:9-15

---

[9] Also during the video conference, Alexander made a number of relevant admissions.  For example, Alexander
stated that he held a single Coinbase account.  As became clear from Alexander's production of records, he holds at
least two Coinbase accounts (and probably more).  *Id.*, Composite Ex. E.

[10] $3,437,956.53 (USD) represents the proceeds from Alexander's liquidation of 100 Bitcoin of the Cred
Cryptocurrency.

[11] Alexander's counsel directed him to answer the question of what his job responsibilities were.  *Id.* at 30:22-24.  It
was only after this instruction did Alexander provide an answer other than "financial services."

14

50.     Throughout the deposition, Alexander continuously asked for breaks and refused
to answer questions clearly.

51.     The deposition continued until Alexander was asked to provide the location of the
missing $664,518.29.[12]  During this line of questioning, Alexander continued his obstructive
behavior:

> Q: Okay.  So the proceeds from the January 16th and January 17th
> Bitcoin transactions were 3,437,956.53.  You provided the debtors
> with 2,773,488. Where are the additional $664,467.53?
>
> A: Yeah. This has been the subject of back-and-forth e-mails ongoing,
> and I don't – I don't have a complete answer for you today.  I believe
> it will be part of discovery part two, which -- which I -- so I would --
> I have to defer that -- I have to defer that to -- to -- believe I have to
> defer that.
>
> Q: Let me understand. There is 664,000 missing, and you are saying
> it's in your personal accounts because that's what's coming in part
> two?
>
> A: Well, I don't know. This has -- as I said, this has been the subject
> of an ongoing e-mail conversation between lawyers.  And I don't
> know the current status of that conversation, but I -- I believe we will
> get to the bottom of it when we have more -- or -- or all of the
> discovery that has up to now been asked for.  And this issue is a -- has
> been ongoing. And I am, of course, committed to delivering all the
> assets I have of the debtors, but I -- I -- I can't answer that question
> today because I just don't know where we stand.
>
> Q: Mr. Alexander, your lawyers didn't execute these transactions.
> You executed these transactions.  Where is the 664,000?
>
> A: That question remains open, and I can't answer it, as I have
> described.
>
> Q: This was just a few weeks ago. You don't remember where
> $664,467 went?
>
> A: As I said, this -- that question remains open, and as far as I know,
> it hasn't been resolved yet as to exactly what the accounting is,
> whether --for example -- whether people agree on that number, and -
> - and so I can't answer that.
>
> Q: It's not a legal question. The question is where the money is. So
> I'm not asking you to make a legal opinion or a legal determination or

---

[12] Prior to the deposition, counsel to the Committee made repeated requests to Alexander's counsel for information regarding the missing $664,518.29.  *Id.*, Ex. V.  Such information was not provided.

for counsel to have argument. I'm asking you where the money is. There is $664,467.53 missing. Where is it?

A: I can't answer that question because I don't know if the amount is correct, and I don't know what the accounting is for -- for -- for those assets.

. . .

Q: The question is, where is the $664,000?

A: I have answered the question to the best of my ability and recollection.

Q: You're not going to answer the question?

A: I have answered the question.

Q: It's -- it's a very -- it's a very specific question, and you are being very evasive. The question is, where is the missing $664,457, and your answer is "I don't remember"?

A: I will answer that question when I'm able to answer it. It remains an open question because it's being debated by counsel and others now, so . . .

*Id.*, Ex. G at 115:5-117:3.

52.     During the above questioning, Alexander requested that the parties take a five-minute break citing shortness of breath and asserting that Committee counsel, who was conducting the questioning, was not appreciating the state of Alexander's COVID recovery. *Id.*, Ex. G at 114:8-13, 118:3-6. Counsel to the Committee agreed to the five-minute break, but explained to Alexander that the answers he has to provide are not going to go away. *Id.* at 118:13-18.

53.     During the break, Alexander filed a voluntary petition for chapter 11 relief (the "Alexander Bankruptcy") in the California Bankruptcy Court.[13] When the deposition recommenced, Alexander's counsel informed the Debtors and the Committee of the Alexander

---

[13] During this break, Alexander likely violated Delaware Court of Chancery Rule 30(d)(1), which expressly places restrictions on communications between a deponent and their counsel during a deposition, including any breaks.

Bankruptcy, instructed Alexander to cease answering questions, and took the position that the automatic stay prevented the deposition from going forward. *Id.*, Ex. G at 119:4-124:7. Clearly, Alexander had prepared his chapter 11 petition in advance of the deposition, likely to be used as a defensive weapon to cease questioning.

## E.     The Stay Relief Motion

54.     On February 12, 2021, the Debtors and the Committee jointly filed an emergency motion for relief from the automatic stay to enforce the Emergency Order. *Id*., Ex. I (the "Stay Relief Motion"). On February 16, 2021, Alexander filed an opposition to the Stay Relief Motion. *See In re Alexander*, Case No. 21-10214-MB, Docket No. 23 (Bankr. C. D. Cal.).

55.     On February 16, 2021, the California Bankruptcy Court conducted an emergency hearing on the Stay Relief Motion.[14] At the emergency hearing, the California Bankruptcy Court stated that Alexander had not complied with the Emergency Order.[15] Further, the California Bankruptcy Court granted the Stay Relief Motion to immediately "un-pause" Alexander's obligations to comply with the Emergency Order.[16] "Un-pausing" the Emergency Order was particularly important to the California Bankruptcy Court as evidenced by the Court's ordering relief from the stay mid-hearing, stating that as of 4:05 p.m. (PST), the Emergency Order is "back on." *Id*, Ex. J at 61:21-22.

---

[14] The same day as the emergency hearing, Alexander spent $752.84 from the Wells Fargo bank account dedicated to Cred, which included purchases at Whole Foods, Target, Amazon, and Google. *See In re Alexander*, Case No. 21-10214-MB, Docket No. 24, Ex. C (Bankr. C.D. Cal.).

[15] *Id*., Ex. J at 52:18-22 ("[Alexander] did not comply with Judge Dorsey's order. Judge Dorsey's order was unconditional. He basically said, "Go home and transfer the cryptocurrency today, and transfer the rest by tomorrow.")

[16] Evans Decl., Ex. J at 51:5-13 ("I haven't been asked to grant relief from stay or annul the stay nunc pro tunc, so I'm not going to do that, but there's just no good reason for [the Emergency Order] that directs [Alexander] to turn everything over should be on pause. I want to un-pause it as soon as possible, and if you have issues about discovery, about [Alexander's] ability to comply, you know, the technical issues with the wallet, all that stuff may be real stuff, but I just think it's really for Judge Dorsey to sort out.").

56.     Additionally, during the emergency hearing, Alexander made an *ore tenus* motion to convert the Alexander Bankruptcy to chapter 7.  *Id*, Ex. J at 57:3-16.  However, a conversion to chapter 7 would have created another "pause" of the Emergency Order as a result of Alexander's assets being turned over to a chapter 7 trustee.  *Id*, Ex. J at 64:3-8.  The California Bankruptcy Court found this second "pause" to be impermissible and raised concerns over whether Alexander would comply with the Emergency Order prior to a conversion order being entered.[17]  To work around this issue, the California Bankruptcy Court concluded that it would not enter the conversion order until the order granting the Stay Relief Motion was entered.  *Id*, Ex. J at 68:19-23.

57.     On February 25, 2021, the California Bankruptcy Court entered the order granting the Stay Relief Motion.  *Id*., Ex. K (the "Stay Relief Order").  The Stay Relief Order grants the Committee and the Debtors relief from the automatic stay to enforce the Emergency Order.

## F.     Alexander's Conduct After the Emergency Hearing

58.     On February 16, 2021, counsel to the Committee emailed Alexander's counsel requesting the turnover of the remaining assets by February 17, 2021 at 5:00 p.m., which included

    a.     $170,000 that Alexander transferred to himself ($100,000), withdrew in cash ($60,000), or claims to have written as a counter-check ($10,000) on February 3, 2021 and February 4, 2021 from Alexander's Wells Fargo Account (9285);

    b.     The remainder of the proceeds of Alexander's January 16, 2021 and January 17, 2021 Bitcoin transactions ($604,751.19);

---

[17] *Id*, Ex. J at 62:8-19 (". . . if [Alexander] doesn't comply again, after you've represented that he plans to comply, at least with respect to an unspecified amount that's in the DIP account, well, I think Judge Dorsey can make an adverse inference from that.  If [Alexander] drags his feet, and doesn't remit the money until - - doesn't remit the money before I convert the case, and that creates a delay, I think it would be fair for Judge Dorsey to conclude that you client was playing games . . . .").

    c.      All cryptocurrency remaining in Alexander's Coinbase accounts held by al3xander.james@gmail.com and james@levelcapital.io, including BTC, DAI, ETH, and USDC;

    d.      $45,295.38 which remained in Alexander's JP Morgan Chase account following Alexander's transfer of $35,000 to Cred on February 8, 2021;

    e.      All remaining assets in Alexander's ledger wallet, including DAI, Aave Interest bearing DAI, Dai Stablecoin v.20, USDC, USDT, ETH, Compound;

    f.      All remaining assets that Alexander deposited with IDLE or are otherwise subject to smart contracts with IDLE;

    g.      $204,567 USDC that Alexander received on June 24, 2021;

    h.      All cash Alexander withdrew from Alexander's Wells Fargo Account (9285) since August 2020;[18]

    i.      Macbook Pro, Serial Number: SC02CLK4HMD6M;

    j.      Ipad, Serial Number: DMPZM21CLMV7; and

    k.      Samsung SSD External Drive, Serial Number: S49WNSON307389.

*Id.*, Ex. M.

59.     On February 17, 2021 at 4:01 p.m. (EST), Alexander's counsel responded stating, among other things, that:

    a.      Alexander is prepared to transfer 100% of the funds in the DIP Account established for the Alexander Bankruptcy;

    b.      There is a remaining $3,780.22 in one of Alexander's Coinbase accounts, which will be closed and the sum transferred;

    c.      Alexander is unable to cause the transfer of the remaining assets in Alexander's ledger wallet absent technical assistance, but is prepared to do so as soon as possible;

    d.      Alexander is prepared to transfer all of the assets in the "hardware wallet"; and

    e.      The Macbook Pro and Ipad will be forwarded to the Debtors.

---

[18] In addition to the $70,000 of cash withdrawals referenced *supra*, Alexander also withdrew an additional $107,410 in cash from the Wells Fargo Account (9285) since August 2020.

*Id.*, Ex. N.

60.     To date, the only turnover Alexander has made since the February 16, 2021

emergency hearing was a check for $116,225.34 from the DIP Account, despite the account

reflecting $120,782.35 as of February 16, 2021.  *See In re Alexander*, Case No. 21-10214-MB,

Docket No. 24, Ex. C (Bankr. C.D. Cal.).

**G.     The Committee's Final Efforts to Obtain Discovery Pursuant to the Emergency Order**

61.     On February 23, 2021, counsel to the Committee emailed Alexander's counsel

regarding Alexander's continued noncompliance with the Emergency Order.  *Id.*, Ex. P.  In that

correspondence, counsel to the Committee made clear that the email did not encompass the

entirety of Alexander's obligations under the Emergency Order, but requested the following

discovery as a more immediate concern by certain deadlines:

>   a.     A response to the "Phase Two" interrogatories and discovery demands concerning Alexander's personal assets no later than February 25, 2021;
>
>   b.     The production of account statements to six accounts that were included in Alexander's personal bankruptcy schedules, but had not yet been provided, by no later than February 25, 2021; and
>
>   c.     A revised Alexander Declaration by no later than February 26, 2021.

*Id.*, Ex. P.

62.     Counsel to the Committee followed up on the foregoing requests on February 25,

2021 and March 1, 2021.  *Id.*  Finally, on March 1, 2021, Alexander's counsel responded to

inform the Committee that he would be sending his response on March 2, 2021.  However, the

March 2 response simply stated that Alexander "is working on this now and the information will

be provided as soon as it is completed."  *Id.*, Ex. Q.  The Committee has not heard from

Alexander or his counsel on these issues since the March 2 correspondence.

63.     On March 14, 2021, counsel to the Committee emailed Alexander's counsel

regarding the continued noncompliance, stating:

> Despite multiple assurances from you over the past several weeks that
> your client would comply with Judge Dorsey's TRO (including the
> email below and the attached email on March 2 in which you wrote
> "My client is working on this now and the information will be
> provided as soon as it is completed."), nothing has progressed and Mr.
> Alexander has still not complied.  At this point, we have no choice
> but to seek intervention from the court and will be doing so
> shortly.  It's unfortunate that Mr. Alexander continues to cause the
> Debtors and their estates to expend additional resources on seeking
> compliance with a court order.

*Id*., Ex. P.

64.     To date, Alexander has not produced *any* further discovery.

**H.     The Examiner's Report**

65.     The Examiner's Report revealed a number of disturbing facts about Alexander.

Specifically, that: "[o]n December 3, 2007, Alexander was convicted in the United Kingdom for

crimes related to illegal money transfers. He was sentenced to three years and four months in

prison to be served at HMP Ford Prison in West Sussex, England. On October 15, 2008, while

serving his sentence, there was a prison break at the HMP Ford Prison [during which Alexander

escaped]. It appears that Alexander is a fugitive in the United Kingdom." *Id*. at 89-90.

66.     Additionally, the Examiner uncovered that James Alexander has legally changed

his name twice, which is a fact that was unknown to the Committee.  Docket No. 605, n. 5.

Indeed, the Committee specifically asked Alexander to state his full legal name and any alias or

aliases he has used.  Evans Decl., Ex. L (Interrogatory No.1).  Alexander's response only states

"James Alexander." *Id*.

67.     The Examiner's Report also identifies Alexander as a target of substantial claims

held by the Debtors, stating:

> Mr. Alexander is an important figure in the story of Cred's demise . . . . Alexander's participation/involvement in poor decisionmaking is a recurring theme, especially when evaluating particularized errors in business oversight (e.g., undisciplined diligence and asset-allocation functions) and points of loss (e.g., QuantCoin and repayment of the Luxembourg Bonds, both discussed below). At the end of his tenure with the company, and at various times thereafter, Mr. Alexander engaged in behavior that may be charitably described as aberrant.

*Id.* at 11.

68.     As suggested throughout the Examiner's Report, the Debtors likely have substantial claims against Alexander.

## RELIEF REQUESTED

69.     By this Motion, the Committee respectfully requests that the Court enter an order: (i) finding James Alexander in contempt for violating the Emergency Order; and (ii) issuing a bench warrant for the arrest and detention of Alexander until he complies with the Emergency Order.

## BASIS FOR RELIEF

70.     The Emergency Order is unambiguous. It requires Alexander to turnover the Debtors' assets, produce discovery, submit a declaration, and sit for a deposition, all by certain deadlines. To date, Alexander has substantially failed to comply with the Emergency Order. Instead, he has disregarded it, employing evasive and obstructive tactics to frustrate the Debtors and the Committee's efforts to recover property of the Debtors' estates and obtain discovery. As a result, the Committee has no alternative other than to seek a finding of civil contempt and an order issuing an arrest warrant for the detention and arrest of Alexander. Indeed, such a severe sanction is necessary to coerce Alexander's compliance with the Emergency Order.

**A.     The Evidence Establishing Alexander's Civil Contempt is Clear and Convincing**

71.     To establish civil contempt in the Third Circuit, movants must establish that: (i) a valid court order existed; (ii) the contemnor had knowledge of the order; and (iii) the contemnor

22

disobeyed the order.  *See Roe v. Operation Rescue*, 919 F.2d 857, 971 (3d Cir. 1990).  Civil

contempt must be established by clear and convincing evidence.  *In re Vaso Active*

*Pharmaceuticals, Inc.*, 514 B.R. 416, 422 (Bankr. D. Del. 2014).  However, the contemnor has

the burden to introduce evidence demonstrating why the contemnor was unable to comply with

the order.  *Harris v. City of Philadelphia*, 47 F.3d 1311, 1324 (3d Cir. 1995).  The evidence must

be beyond "a mere assertion of inability" and the contemnor must show "that he has made in

good faith all reasonable efforts to comply."  *Id.*

72.     The Committee establishes each of the civil contempt elements.  The Emergency

Order was entered by this Court on February 5, 2021 following an extensive hearing on the

Emergency Motion, which Alexander filed a response to in advance of the hearing.  *See* Adv.

Pro. Docket Nos. 6, 13, 14; Docket No. 486.  Thus, satisfying the first factor.

73.     There is no question that Alexander had knowledge of the Emergency Order

because: (i) the proposed Emergency Order was circulated to Alexander's counsel, who did not

object to entry of the Emergency Order, *see* Docket No. 485; (ii) at the February 9, 2021

deposition, Alexander stated that he knew he was appearing at the deposition under a court order,

*see* Evans Decl., Ex. G at 29:11-13; (iii) Alexander submitted a declaration in support of his

response to the Stay Relief Motion, which sought stay relief to enforce the Emergency Order, *see*

*In re Alexander*, Case No. 21-10214-MB, Docket No. 24 (Bankr. C.D. Cal.); and (iv) Alexander

complied with certain of his obligations under the Emergency Order.  Thus, the second factor is

also satisfied.

74.     Finally, Alexander has failed to comply with the Emergency Order, which

requires, among other things, that Alexander: (i) submit a declaration; (ii) provide expedited

discovery regarding, among other things, the Debtors' assets, cryptocurrency in his possession,

his personal assets, and the transfers of the Debtors' assets; and (iii) turnover all of the Debtors'

assets to the Debtors.  *See* Evans Decl., Ex. K.  As discussed below, Alexander's compliance

with these requirements has been limited, at best.

### (1) Alexander Disobeyed the Emergency Order By Failing to Submit a Sufficient Declaration

75.     As discussed above, the Alexander Declaration falls well short of providing the

detail about the cryptocurrency transactions and current location of Debtors' assets. *See id.*, Ex.

D at 24:12-18; 33:12-22; 34:2-35:6.  In the Alexander Declaration, Alexander admits that on

June 24, 2020, he received the Cred Cryptocurrency.  While Alexander has returned some

cryptocurrency and cash, there is a significant amount of Cred Cryptocurrency and the proceeds

of liquidations of Cred Cryptocurrency that is still unaccounted for. Alexander has provided the

Debtors with 49.9980892 Bitcoin, $2,773,489.24 USDC, and $200,580.34 in fiat currency.  The

remainder is still unaccounted for because Alexander has failed to identify in the Alexander

Declaration each transaction, explain the reasons for the transaction, and identify all parties to

each transaction.  Alexander failed to explain where the Cred Cryptocurrency and money that he

took from Cred was spent, who it was sent to, why each transaction was executed, and where the

remaining cryptocurrency and cash is currently located.

76.     The need for a detailed explanation of these various transactions is even more

acute here than might ordinarily be the case because of the nature of the cryptocurrency

transactions Alexander engaged in.  Alexander traded Cred Cryptocurrency on a number of

different Coinbase accounts and he also engaged in "off exchange" transactions where

cryptocurrency is traded and transferred to and from private wallets that are not associated with

exchanges.  When Alexander provided certain of the Cred Cryptocurrency back to the Debtors, it

was not held within Coinbase or another regulated cryptocurrency exchange.  Rather, that

cryptocurrency was being stored in an off-exchange wallet.  This makes transactions

significantly more difficult to track and trace.  That is why detailed explanations of the

transactions, reasons for the transactions, and the natural persons or entities on each side of the

transaction is critical.

77.     Similarly, there is no explanation for the late January 2021 transfers of Cred

Cryptocurrency.  Nor is there an explanation as to why the Debtors have not received the full

amount of the fiat currency Alexander received when he liquidated 100 Bitcoin on January 17,

2021 and where that fiat is presently located.

78.     The Alexander Declaration fails to explain any of the Cred Cryptocurrency

transactions, cash withdrawals, or other transfers to third parties.  Accordingly, the Alexander

Declaration does not even come close to complying with the Emergency Order.

**(2)     Alexander Disobeyed the Emergency Order By Failing to Produce Discovery**

79.     By Alexander's own admission, the limited discovery produced to date is not

complete.  *Id.*, Ex. G at 104:14-21 (Alexander stating that there would be a "part two discovery"

forthcoming).  The Committee has continuously requested that Alexander comply with the

Emergency Order by producing the "part two discovery" concerning Alexander's personal

assets.  *Id*., Ex. P.  The "part two discovery" is particularly important to allow the Committee to

further trace Alexander's transfers of the Debtors' assets, which will assist with identifying the

location of the assets and potential third party defendants.  Even the limited discovery produced

to date has revealed that there are additional bank accounts in which the Debtors' assets have

passed through.  *See id*., Ex. G at 98:8-99:2; Ex. U at 10.  This does not even take into account

the "off exchange" transactions.

80.     Although Alexander and his counsel affirmatively responded to the Committee's

requests for additional production by stating that the discovery is forthcoming, it has now been

more than five weeks since the Emergency Order was entered and no further discovery has been produced.  This is also a violation of the Emergency Order.

> **(3)    Alexander Disobeyed the Emergency Order By Failing to Turnover or Account for Cred Assets**

81.    The Emergency Order required that Alexander turnover all of the Debtors' assets. Alexander admits that he received 224.98993 Bitcoin and $204,567 of Cred Cryptocurrency. Although he has provided the Debtors with 49.9980892 Bitcoin, $2,773,489.24 USDC, and $200,580.34 in fiat currency, since his receipt of the Cred Cryptocurrency Alexander used Cred Cryptocurrency proceeds: (i) to fund trips to Istanbul and Vail, Colorado in December 2020; (ii) to fund a future trip to Switzerland, paid in advance in January 2021; (iii) hundreds of thousands of dollars of cash withdrawals; (iv) to transfer $350,000 as a retainer to Quinn Emmanuel Urquhart & Sullivan to fund legal defense costs for Cred's former General Counsel, Dan Wheeler, immediately before Wheeler filed a declaration in support of Alexander's motion to dismiss Cred Capital's chapter 11 case one week prior to the transfer; (v) on February 4, 2021, one day after the Emergency Motion was filed, to (a) withdraw $60,000 in cash to store in the trunk of Alexander's car; (b) transfer $100,000 to himself; and (c) write a $10,000 check to himself; and (vi) to make a series of transfers to "Alexander Custom Management" and "Custom Management." *Id.*, Ex. G at 42:12-50:7; Ex. S.

82.    Additionally, Alexander continuously used funds from the "dedicated" Cred Wells Fargo account to make *de minimis* personal purchases, including spending over $700 on February 16, 2021 – the same day as the emergency hearing on the Stay Relief Motion.  Without additional discovery from Alexander, it is impossible to account for his use of Cred assets for personal expenses.  Nevertheless, it is evident that there are considerable funds that remain

unaccounted for and have not been turned over.  Alexander's failures to turnover or account for these funds also violates the Emergency Order.

83.     The foregoing establishes, by clear and convincing evidence, that the Emergency Order is valid, Alexander had knowledge of the Emergency Order, and Alexander disobeyed the Emergency Order.  Accordingly, the Court should hold Alexander in civil contempt.

## B.     The Court Should Hold Alexander in Civil Contempt Under Bankruptcy Rule 7037(b)

84.     Bankruptcy Rule 7037(b)(1) states: "[i]f the court where the discovery is taken orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of court."  Bankruptcy Rule 7037(b)(2)(A) provides a list of potential further orders that a court may enter if an order is not obeyed.  *See* Fed. R. Bankr. P. 7037(b)(2)(A)(i)-(vii).  "For instance, a court may strike pleadings in whole or in part, stay further proceedings until the order is obeyed, dismiss the proceeding in whole or in part, render a default judgment against the disobedient party, or treat as contempt of court the failure to obey any order (that is not an order to submit to a physical or mental examination)."  *Vaso Active Pharmaceuticals*, 514 B.R. at 421.  Bankruptcy Rule 7037(b)(2)(A)'s list is non-exhaustive, however, and sanctions are "generally entrusted to the discretion" of the court.  *Clientron Corp. v. Devon IT, Inc.*, 894 F.3d 568, 580 (3d Cir. 2018).

## C.     The Court Should Hold Alexander in Civil Contempt Under Bankruptcy Code Section 105(a)

85.     Bankruptcy courts derive civil contempt authority from Bankruptcy Code section 105(a), which provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to

enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

86.     Section 105(a) "gives the court 'general equitable powers . . . insofar as those powers are applied in a manner consistent with the Code.'" *Vaso Active Pharmaceuticals*, 514 B.R. at 421 (quoting *In re Joubert*, 411 F.3d 452, 455 (3d Cir. 2005)).  Such general equitable powers are frequently used by bankruptcy courts to make civil contempt findings.  *See e.g., id.* (citing *In re Cont'l Airlines, Inc.*, 236 B.R. 318, 331 (Bankr. D. Del. 1999) *aff'd sub nom. In re Cont'l Airlines,* 90–932, 2000 WL 1425751 (D. Del. Sept. 12, 2000) *aff'd sub nom. In re Cont'l Airlines, Inc.,* 279 F.3d 226 (3d Cir. 2002); *In re Baker,* 390 B.R. 524, 531 (Bankr. D. Del. 2008) *aff'd,* 400 B.R. 136 (D. Del. 2009); *In re Anderson,* 348 B.R. 652, 661 (Bankr. D. Del. 2006); *In re WCI Communities, Inc.,* No. 08–11643, 2012 WL 1981713 (Bankr. D. Del. June 1, 2012) (Carey, J.); *Accord In re Walters,* 868 F.2d 665, 669 (4th Cir. 1989); *Matter of Terrebonne Fuel & Lube, Inc.,* 108 F.3d 609, 612 (5th Cir. 1997); *In re Skinner,* 917 F.2d 444, 447 (10th Cir. 1990); *In re Hardy,* 97 F.3d 1384, 1389 (11th Cir. 1996)).

87.     As proven herein, Alexander failed to comply with the Emergency Order by failing to turnover assets and produce discovery.  Such conduct justifies a finding of civil contempt under Bankruptcy Code section 105(a).  *See, e.g. Vaso Active Pharmaceuticals*, 514 B.R. at 426 (finding civil contempt for the violation of a court order requiring the production of discovery); *In re 1990s Caterers Ltd.*, 531 B.R. 309, 320 (finding civil contempt for the violation of a court order requiring the turnover of sale proceeds); *In re Kenny G Enterprises, LLC*, 692 F.App'x. 950, 953 (9th Cir. 2017) (finding civil contempt for the violation of a court order requiring the turnover of assets); *In re Tate*, 521 B.R. 427, 439-44 (S.D. Ga. 2014) (finding civil contempt for the violation of a court order requiring turnover of assets).

88. As discussed in detail above, the Court ordered Alexander to submit a sworn declaration answering a bevy of questions. Alexander's complete disregard for such order is a contempt of court.

**D. The Court Should Order the Incarceration of Alexander as a Coercive Sanction for His Civil Contempt**

89. Generally, a finding of civil contempt results in some form of sanction designed to coerce future compliance with a court order. In certain instances, incarceration is the only appropriate sanction to achieve compliance. *See Vaso Active Pharmaceuticals*, 514 B.R. at 426 (stating that incarceration is appropriate when the contemnor is unlikely to comply based on monetary sanctions and the contemnor has consistently failed to comply); *see also 1990s Caterers*, 531 B.R. at 320 (finding incarceration appropriate when the contemnor knowingly violated an unambiguous order to turnover sale proceeds, continuously and willfully ignored the order, and falsely testified about not possessing the subject proceeds); *Tate*, 521 B.R. at 439-44 (continuing the incarceration of a contemnor for his continued failure to fulfill obligations imposed pursuant to court order). Particularly, incarceration is appropriate when (i) monetary sanctions are unlikely to result in compliance and (ii) there has been a pattern of noncompliance with the court. *Id*. "Courts may utilize incarceration as a coercive sanction for civil contempt, so long as 'the contemnor is able to purge the contempt and obtain his release by committing an affirmative act.'" *1990s Caterers*, 531 B.R. at 319 (quoting *Int'l Union, United Mine Workers of Am. V. Bagwell*, 512 U.S. 821, 828-29 (1994)).

**(1) Monetary Sanctions are Unlikely to Result in Alexander's Compliance with the Emergency Order**

90. There are at least three reasons why monetary sanctions will not coerce Alexander to comply with the Emergency Order. Any one of them is sufficient to grant the requested relief.

91.     *First*, Alexander's bankruptcy schedules provide that Alexander has
approximately $2 million in assets.  *See In re Alexander*, Case No. 21-10214-MB, <u>Docket No. 48</u>
(Bankr. C.D. Cal.).  Alexander has asserted that all of these assets are subject to exemptions or
liens.  *Id*.  The Debtors' claims against Alexander are likely to be substantial, and thus any
additional monetary sanction is only a drop in the bucket.  Accordingly, Alexander is unlikely to
comply with the Emergency Order if his punishment for noncompliance is simply an increase of
the Debtors' already substantial claims against him.

92.     *Second*, Alexander is a chapter 7 debtor.  Thus, any monetary sanctions against
Alexander are not likely immediately collectable (even if Alexander had assets to satisfy the
sanctions).  Instead, the Debtors would have a larger claim against Alexander's estate for the
value of the monetary sanctions.  Meaning, the Committee would have to wait until distributions
are made from the Alexander Bankruptcy and are unlikely to receive the full amount of the
claim.  Additionally, the existence of the automatic stay in the Alexander Bankruptcy creates a
dangerous line for the Committee.  The Committee has obtained relief from the automatic stay in
the Alexander Bankruptcy *solely* to enforce the Emergency Order.  If Alexander's civil contempt
sanction is monetary, the Committee may have no avenues to enforce the sanction (*i.e.*, levying
on Alexander's assets) without potentially violating the automatic stay.

93.     *Third*, Alexander's history demonstrates that there are very few punishments (if
any) that will coerce him to comply with court orders.  "Mr. Alexander was convicted on
December 3, 2017 in the United Kingdom for crimes related to illegal money transfers, for which
he was sentenced to three years and four months in prison to be served at HMP Ford Prison in
West Sussex, England."  *See* <u>Docket No. 338 at 7</u>, <u>89-90</u>, <u>91</u> (internal citations omitted).  "On
October 15, 2008, while serving his sentence, there was a prison break at the HMP Ford Prison."

Examiner's Report at 90 (internal citations omitted).  "Mr. Alexander has been identified by the UK government as a fugitive."  *See* Docket No. 338 at 7, 90 (internal citations omitted).  More recently, Alexander admittedly violated the California Freeze Orders by making the January 16, 2021 and January 17, 2021 transfers.  *See* Evans Decl., Ex. G at 105:20-106:19.

94.     Alexander has also shown that he will not hesitate to take defensive measures when his feet get close to the fire.  After the California Complaint was filed, but before the California TRO hearing (only a one day difference), Alexander transferred and liquidated more than 65 Bitcoin of the Cred Cryptocurrency.  *Id*. at 80:8-13.  Additionally, shortly after the Committee filed the Emergency Motion, Alexander withdrew $170,000 in cash, storing $60,000 of which in the trunk of his car.  *Id*. at 42:12-50:7.  Finally, in advance of the Court Ordered February 9, 2021 deposition, Alexander apparently had lawyers prepare a personal bankruptcy petition which was to be filed just in case the deposition was going badly.  *Id*. at 119:4-11.  When the questioning turned to the subject of missing funds derived from recent liquidations of Cred Cryptocurrency, Alexander claimed to be "short of breath" and asked for a five-minute break, apparently to contact his lawyers, authorize a personal bankruptcy filing, and put an end to the deposition.  *Id*. at 114:8-13, 118:3-6.  Deponents of Court Ordered depositions do not get escape hatches.  This sort of gamesmanship serves no just purpose in the administration of justice.

95.     Put simply, unrecoverable monetary sanctions are unlikely to compel Alexander from complying with the Emergency Order.  Swift and severe justice is necessary here.

**(2)     Alexander Has Demonstrated a Pattern of Noncompliance**

96.     Alexander's noncompliance with this Court's ruling began thirty-one minutes after the emergency February 5 hearing.  At the hearing, the Court set a number of deadlines for Alexander to meet.  Specifically, the Court ordered Alexander to provide directly to the Debtors

and the Committee: (i) all Cred Cryptocurrency in his possession "within 30 minutes" after the hearing concluded; (ii) all cash in Alexander's possession related to the Debtors by close of business the day of the hearing; (iii) a detailed declaration by 4:00 p.m. describing all of the transfers of Cred Cryptocurrency and any other assets of the Debtors that were in Alexander's possession; (iv) an explanation of the reasons for each of these transactions; (v) discovery on all of the Cred Cryptocurrency transactions and fiat transactions relating to the Debtors by February 8, 2021; and (vi) discovery on all of Alexander's personal assets by February 10, 2021. Evans Decl., Ex. D. Alexander did not meet a single deadline. When Alexander finally executed some transfers and provided some information, they were insufficient and incomplete.

97.     The Court stated at the February 5 hearing, "it is time for Mr. Alexander to start answering some difficult questions." Evans Decl., Ex. D at 23:23-24. Consistent with that statement, the Court ordered that Alexander sit for a deposition with the Debtors and the Committee. *Id.* at 31:10-13. The Debtors and the Committee spent considerable time and estate resources preparing for the deposition, including working with CiperTrace, the Committee's expert. Midway through the deposition, Mr. Alexander put an end to the deposition by asking for a health-related break, during which time he filed for personal bankruptcy. *Id.*, Ex. G at 114:8-13, 118:3-6. These antics forced the Debtors and the Committee to expend even more time and estate resources to seek stay relief in the California Bankruptcy Court to enforce the Emergency Order. *See id.*, Ex. I. Even though the California Bankruptcy Court granted this relief and lifted the stay so that Alexander can comply with the Emergency Order, Alexander has still not complied. *See id.*, Ex. K.

**(3)     Incarceration is the Only Sanction that Will Coerce Compliance**

98.     Courts are "given wide discretion to tailor the most effective remedy to obtain compliance." *Vaso Active Pharmaceuticals*, 514 B.R. at 425. Although courts in this district

take the view that incarceration is an option of last resort, it is inconceivable that any sanction short of incarceration will coerce Alexander to comply with the Emergency Order when his behavior to date demonstrates that he will try anything to avoid compliance. *See In re Chief Exec. Officers Clubs, Inc.*, 359 B.R. 527, 534 (Bankr. S.D.N.Y. 2007) (when determining the appropriate remedy, courts must consider "the nature of the harm and the probable effect of alternative sanctions.").

99.     Courts dealing with similar individuals whose noncompliance is "overwhelming and blatant" have found incarceration to be the appropriate sanction. *See e.g.*, *1990s Caterers*, 531 B.R. at 320 (finding incarceration appropriate when the contemnor knowingly violated an unambiguous order to turnover sale proceeds, continuously and willfully ignored the order, and falsely testified about not possessing the subject proceeds); *In re Baker*, No. 15-ap-01535-BB, 2019 WL 2896137, at *1 (Bankr. C.D. Cal. April 29, 2019) (finding incarceration appropriate when the contemnor continuously failed and refused to comply with an order requiring the turnover of data and information, failed to preserve such data and information, and published defamatory information about the plaintiff); *Kenny G Enterprises*, 692 F.App'x. at 952 (affirming incarceration when it was clear that the contemnor was in possession of assets and refused to turn them over).

100.     Alexander's noncompliance with the Emergency Order is blatant.  Since entry of the Emergency Order, he has thumbed his nose at each deadline and obligation.  His conduct has made it abundantly clear that he lacks respect for the law.  It is axiomatic that this conduct will continue unless Alexander is sanctioned appropriately.  But, as discussed above, monetary sanctions (no matter how severe) will have no coercive effect on Alexander.  Thus, the Committee respectfully requests that the Court apply its broad discretion and issue a bench

warrant for the arrest and detention of Alexander until Alexander complies with the Emergency

Order.[19]

  **WHEREFORE**, the Committee respectfully requests that the Court enter an order: (i)

finding James Alexander in contempt for violating the Emergency Order; and (ii) issuing a bench

warrant for the arrest and detention of Alexander until he complies with the Emergency Order.

Dated: Wilmington, Delaware
   March 15, 2021

          **MCDERMOTT WILL & EMERY LLP**

          /s/ *David R. Hurst*
          David R. Hurst (I.D. No. 3743)
          The Nemours Building
          1007 North Orange Street, 10th Floor
          Wilmington, DE 19801
          Telephone:  (302) 485-3900
          Facsimile:  (302) 351-8711

          -and-

          Timothy W. Walsh (admitted *pro hac vice*)
          Darren Azman (admitted *pro hac vice*)
          Joseph B. Evans (admitted *pro hac vice*)
          340 Madison Avenue
          New York, NY 10173-1922
          Telephone:  (212) 547-5400
          Facsimile:  (212) 547-5444

          *Counsel to the Official*
          *Committee of Unsecured Creditors*

---

[19] Of course, Alexander can purge his contempt and be released at any time upon his compliance with the Emergency Order.

## **EXHIBIT A**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CRED INC., *et al.*, | ) Case No. 20-12836 (JTD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |

## ORDER GRANTING EMERGENCY MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER (I) HOLDING JAMES ALEXANDER IN CONTEMPT OF COURT AND (II) ISSUING A BENCH WARRANT FOR THE ARREST AND DETENTION OF JAMES ALEXANDER

Upon the motion (the "Motion"),[2] of the Official Committee of Unsecured Creditors (the "Committee") of Cred Inc., *et al.* (the "Debtors"), for entry of an order (i) finding James Alexander in contempt for violating the *Order Approving the Emergency Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting (I) Temporary Restraining Order and Preliminary Injunction Against James Alexander and (II) Related Relief* [Docket No. 486] (the "Emergency Order"); and (ii) issuing a an appropriate remedy to compel Alexander to comply with the Emergency Order, including issuing a bench warrant for Alexander's arrest and detention until he complies, pursuant to Bankruptcy Code section 105(a), Rule 37(b) of the Federal Rules of Civil Procedure, as made applicable to this proceeding by Bankruptcy Rule 7037(b), Bankruptcy Rule 9020, and Rule 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

U.S.C. §§ 157 and 1334(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and sufficient notice of the Motion was given to interested parties in accordance with the Federal Rules of Bankruptcy Procedure; and the Court having reviewed the Motion and all supporting documents thereto; and after due deliberation and sufficient cause appearing therefor, its hereby ORDERED that:

1.      The Motion is GRANTED.

2.      James Alexander is in civil contempt of this Court for his noncompliance with the Emergency Order.

3.      The Clerk of this Court shall prepare and issue a Bench Warrant for James Alexander's arrest.

4.      The United States Marshals are directed, pursuant to such Bench Warrant, to arrest James Alexander and deliver him to federal custody in the District of Delaware.

5.      James Alexander shall be coercively incarcerated until he complies with the Emergency Order.

6.      This Order shall be effective and enforceable immediately upon its entry.

7.      This Court shall retain jurisdiction with respect to any matters, claims, rights, or disputes arising from or related to the implementation of this Order.