**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>CRED INC., *et al.*,<br><br>　　　　　　　Debtors.[1] | Chapter 11<br><br>Case No. 20-12836 (JTD)<br><br>(Jointly Administered)<br><br>Hearing Date: April 21, 2021, at 10:00 a.m. (ET)<br>Obj. Deadline: April 9, 2021, at 4:00 p.m. (ET) |

**AMENDED APPLICATION OF INVICTUS GLOBAL MANAGEMENT, LLC
FOR ALLOWANCE AND PAYMENT OF FEES PURSUANT TO
BANKRUPTCY CODE SECTIONS 503(b)(1)(A), 503(b)(3)(D) AND 503(b)(4)**

Invictus Global Management, LLC ("Invictus") submits this amended request (the "Application") for entry of an agreed order, substantially in the form attached as **Exhibit A** (the "Order"), approving allowance of compensation for services rendered by Invictus attorneys, Katten Muchin Rosenman LLP ("Katten"), and Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols"), in the amount of $96,266 and $4,251.75, respectively, as administrative expenses incurred in making a substantial contribution in the above-captioned chapter 11 cases (the "Chapter 11 Cases") or pursuant to section 503(b)(1)(A). Invictus has conferred with the Debtors about this Application and the Debtors have agreed to the relief sought herein. In support of the Application, Invictus respectfully (i) submits the declaration of the Debtors' independent director, Grant Lyon, attached as **Exhibit B** hereto (the "Lyon Declaration"), and (ii) represents as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

**Preliminary Statement**

1.  Invictus submits this Application because pursuant to section 503(b) of the Bankruptcy Code Invictus made a substantial contribution to these Chapter 11 Cases or in the alternative is otherwise entitled to an administrative claim.  Invictus was the Debtors' source of DIP financing during the Chapter 11 Cases and having such financing option in place was integral to ensuring that if the Debtors' liquidity issues were not addressed through the value of their cryptocurrency assets or collections efforts, such financing option would have ensured the administrative solvency and ability of the Debtors to exit chapter 11.

2.  As set forth in the Debtors' first day declaration, the Chapter 11 Cases were commenced due to a liquidity crisis resulting from, among other things, the theft of 800 bitcoin by an imposter, the misappropriation of 225 bitcoin and other assets by a former insider, and uncertainty associated with the collection of certain accounts receivables.  What's more, the Debtors' liquid assets – bitcoin and other popular forms of cryptocurrency – have volatility risk. Due to such uncertainty, risk and other liquidity concerns, the Debtors sought debtor-in-possession financing from various third parties.  Ultimately, the Debtors received one viable offer to provide postpetition financing, and it was from Invictus.

3.  The Debtors believed it was imperative, given the ongoing risks to the liquidity and administrative solvency of the estates, that they fully negotiate and have definitive documentation in place during the Chapter 11 Cases to ensure that there would be no concerns with having adequate liquidity to fund the Chapter 11 Cases and eventually emerge.  As stated in the Lyon Declaration, Invictus's agreement to provide DIP financing to the Debtors protected the Debtors against the very real economic downside that existed at all times during these Chapter 11 Cases. The downside specifically included the extreme volatility of the Debtors' primary asset – cryptocurrency including Bitcoin – and the potential that certain sources of revenue from

outstanding accounts receivable and causes of action might require an extended amount of time to monetize. In the event that any of these issues developed, the Debtors needed the liquidity protection that could be provided by the fully documented DIP financing, which would have been funded by Invictus.

4. As the Lyon Declaration sets forth, the Debtors' business platform and underlying assets are inherently volatile, and this coupled with the difficulties faced by the company during the prepetition period led to a significantly destabilized platform for the Debtors leading up to and during a large part of the Chapter 11 Cases. This is why the Debtors' advisors sought out DIP financing from a third party that would be willing to provide liquidity to the Debtors and ensure that neither volatility in pricing of the Debtors' cryptocurrency assets nor uncertain collection efforts would lead to administratively insolvent estates.

5. After Invictus and the Debtors agreed to a DIP financing term sheet on December 30, 2020, the parties engaged in good-faith, arms-length discussions and document negotiations, which ultimately led to a fully negotiated DIP financing including a Debtor in Possession Term Loan Promissory Note and a related DIP financing order (the "<u>DIP Financing</u>").

6. However, on the doorstep of filing a motion to approve the DIP Financing, the Debtors successfully collected a significant amount of cash from third parties, and the cryptocurrency marketplace, in parallel, rocketed upward leaving the Debtors in a more secure financial position and without the need for DIP Financing as confirmation of their chapter 11 plan approached. Nonetheless, the efforts by Invictus and documented DIP financing provided a substantial contribution to the Debtors' estates by allowing the Debtors to negotiate and confirm a value maximizing chapter 11 plan for the benefit of their estates on March 11, 2021 [D.I. 629].

7. In addition to its substantial contribution, as an alternative basis for recovery, Invictus also provided an actual benefit to the Debtors' estates in connection with a postpetition transaction and is entitled to an administrative claim pursuant to section 503(b)(1)(A) of the Bankruptcy Code.

8. Accordingly, Invictus requests that the Court approve the Application and respectfully requests entry of the Order.

## Relief Requested

9. By this Motion, Invictus requests entry of the Order, pursuant to Bankruptcy Code sections 503(b)(1)(A) and/or 503(b)(3)(D) and (b)(4), allowing as administrative expenses of the Debtors' estates, $100,517.75 in fees incurred when providing services that constitute substantial contributions to the Debtors' estates or in the alternative administrative expense claims. This aggregate amount consists of $96,266 in fees incurred by Katten, and $4,251.75 in fees incurred by Morris Nichols. The $100,517.75 in fees represents a voluntary cap, as no fees incurred in connection with the preparation and submission of this Application are included.[2]

10. The Debtors have agreed to the relief requested in this Application.

## Jurisdiction, Venue, and Statutory Bases

11. This is a core proceeding under 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with the Application to the extent that it is later determined that the

---

[2] Invictus reserves the right to supplement this Application with the fees incurred in connection with preparing, submitting, and seeking approval of this Application.

Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

12. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13. The bases for the relief requested herein are sections 105 and 503 of the Bankruptcy Code, Bankruptcy Rule 2016, and Local Rule 2016-2.

## Case Background

### Chapter 11 Cases and Timeline to Confirmation

14. The Debtors commenced their Chapter 11 Cases on November 7, 2020 by filing petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. These Chapter 11 Cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure

15. On December 3, 2020, the United States Trustee for Region 3 (the "U.S. Trustee") appointed the Committee to serve in these Chapter 11 Cases [D.I. 120]. On January 7, 2021, the U.S. Trustee appointed Robert J. Stark as the Examiner in these Chapter 11 Cases [D.I. 329], and the Court approved the appointment on January 8, 2021 [D.I. 338].

16. On January 21, 2021, the Debtors filed the Combined Plan and Disclosure Statement [D.I. 380], and that same day the Court granted initial approval of the Combined Plan

and Disclosure Statement and approved the Debtors' solicitation procedures [D.I. 399]. The Combined Hearing took place on March 11, 2021.

17.     On March 11, 2021, the Court entered an order confirming the chapter 11 plan [D.I. 629].

## Background Regarding Debtors and Invictus

**Debtors and Invictus Agree on DIP Financing Term Sheet and Negotiate Definitive Documentation.**

18.     Because the Debtors did not have a prepetition lender and largely shuttered their operations prepetition, finding postpetition financing was difficult but deemed necessary in light of, among other things, prepetition business issues and liquidity concerns that were ever present during the Chapter 11 Cases given the uncertainty associated with collection efforts and the volatility of cryptocurrency.

19.     In an effort to obtain the most attractive financing terms possible, the Debtors solicited financing offers from more than 35 different lenders. From this group, the Debtors received five indications of interest and two term sheets. Based upon the Debtors' negotiations with potential lenders and the term sheets received, it was clear that the proposal for financing from Invictus represented the best available option for the Debtors. The DIP financing from Invictus was the only proposal that could meet both the potential sizing and flexibility needs of these Chapter 11 Cases and represented the best source of post-petition financing available to the Debtors.

20.     The Debtors and Invictus engaged in a kick-off call on Monday, December 14, 2020. After approximately 1 week of discussions, Invictus provided a term sheet to the Debtors. After further discussions and negotiations between the parties, a definitive term sheet was agreed upon by the Debtors and Invictus on December 30, 2021.

21. This triggered a documentation phase for the Invictus Financing, which took place over a period of approximately 1 month. On January 18, 2021, in connection with preparing to file the definitive documentation, Invictus retained Morris Nichols as its local counsel, and a proposed administrative agent was selected by Invictus for purposes of administering the DIP facility. The Debtors also drafted and circulated a DIP motion, proposed budget, 2 declarations in support of such motion, and Invictus prepared a DIP Term Loan Promissory Note and DIP order, all for filing in connection with approving the DIP Financing.

22. Ultimately, after reaching the finish line with respect to definitive documentation and being on the precipice of filing the motion to approve DIP Financing, the Debtors were able to collect on various outstanding accounts receivable that had not been deemed likely sources of revenue (i.e., the Debtors hit a home run), and also benefited from a significant rise in the market value of the Debtors' cryptocurrency. This allowed the Debtors to determine that they would no longer need the liquidity that the DIP financing from Invictus would have provided. However, due to the significant benefit that the Debtors and their estates received from having DIP Financing available to them to satisfy any potential liquidity crunch, the Debtors determined that they were supportive of an application for substantial contribution by Invictus. Moreover, Invictus remains well-positioned to provide financing to the liquidation trust that will be established under the Debtors' confirmed chapter 11 plan due to the services that were provided during the Chapter 11 Cases.

## Basis for Relief Requested

23. Bankruptcy Code section 503(b)(3)(D) grants administrative expense status to claims for the "actual, necessary expenses" incurred by a creditor "in making a substantial contribution in a case under chapter 9 or 11 of this title." 11 U.S.C. § 503(b)(3)(D). The Third Circuit has not expressly held whether section 503(b(3)(D) can be expanded to other interested

parties, but in <u>Lebron v. Mechem Fin. Inc.</u>, 27 F.3d 937, 943-44 (3d Cir. 1994) did state (albeit it in dicta) that other interested parties may be able to assert a claim for substantial contribution.[3] In addition, Bankruptcy Code section 503(b)(4) allows administrative expenses for "reasonable compensation for professional services rendered by an attorney . . . of an entity whose expense is allowable" under section 503(b)(3)(D) of the Bankruptcy Code and reimbursement for "actual, necessary expenses incurred by such attorney." 11 U.S.C. § 503(b)(4).

24.     The Bankruptcy Code does not define "substantial contribution." Courts, however, have held that to prove a substantial contribution claim, a movant's efforts must "result[] in an actual and demonstrable benefit to the debtor's estate and the creditors." <u>Lebron</u>, 27 F.3d at 944 (quoting <u>Haskins v. U.S.</u>, 846 F.2d 55, 57 (10th Cir. 1988)). The movant must also "show a 'causal connection' between the service and the contribution." <u>In re Worldwide Direct</u>, 334 B.R. 112, 121–22 (Bankr. D. Del. 2005) (quoting <u>In re Granite Partners</u>, L.P., 213 B.R. 440, 47 (Bankr. S.D.N.Y. 1997)). A movant's efforts have substantially contributed to a case where they have "foster[ed] and enhance[d] . . . the progress of the reorganization." <u>Lebron</u>, 27 F.3d at 944 (quoting <u>Pierson & Gaylen v. Creel & Atwood (In re Consol. Bancshares, Inc.)</u>, 785 F.2d 1249, 1253 (5th Cir. 1986)). The Debtors were able to move their Chapter 11 Cases forward, in part, because they were secure in the knowledge that DIP financing from Invictus would shore up any liquidity concerns that the Debtors were unable to address through their cryptocurrency holdings and accounts receivable. Only after the Debtors hit a home run with respect to collecting numerous

---

[3] A recent decision in <u>In re Mountain Creek Resort, Inc.</u>, 616 B.R. 45, 49 (Bankr. D. N.J. 2020) determined as a matter of first impression that section 503(b)(3)(D) should be interpreted strictly, but that case is not binding on this Court, and a subsequent decision, discussed further herein, by the Third Circuit, <u>In re Energy Future Holdings Corp.</u>, 2021 WL 957301 (3d Cir. March 15, 2021), supports the conclusion that if the estate induced and believed it benefitted an administrative claim should be awarded. This would also separately support a conclusion that categories of eligible claimants can be viewed expansively, which is also supported by the word "including" in section 503(b) of the Bankruptcy Code.

accounts receivable that were very much in doubt and benefiting from a steep rise in the market value of cryptocurrency did they determine that the available DIP financing would not be necessary to confirming their liquidating chapter 11 plan and exiting from chapter 11.

25. The foregoing outcome could have very easily been different given the extreme volatility of cryptocurrency, which could plummet at any time in value, or if they had been unable to collect from accounts that were, at times, very much in doubt. The Debtors agreement to this Application and the Lyon Declaration support this conclusion.

26. Generally, courts consider several factors when determining whether a movant substantially contributed to the case, such as: (i) "whether the services were rendered solely to benefit the client or to benefit all parties in the case," (ii) "whether the services provided direct, significant, and demonstrable benefit to the estate," and (iii) "whether the services were duplicative of services rendered by attorneys for the committee, the committees themselves, or the debtor and its attorneys." See In re Buckhead Am. Corp., 161 B.R. 11, 15 (Bankr. D. Del. 1993) (quoting In re Jack Winter Apparel, Inc., 119 B.R. 629, 633 (E.D. Wis. 1990); see also In re Worldwide Direct, Inc. at 122.

27. The party that requests the allowance of fees and expenses as administrative claims has "to show it is entitled to reimbursement under section 503(b) by a preponderance of the evidence." In re Columbia Gas Sys., Inc., 224 B.R. 540, 548 (Bankr. D. Del. 1998); see also In re Buckhead Am. Corp., 161 B.R. at 15.

**A. Invictus's Agreement to Provide DIP Financing and the Negotiation and Development of Definitive Documentation Directly and Significantly Benefitted the Debtors' Estates.**

28. Courts in this district have recognized that providing a DIP facility that is not consummated can constitute a substantial contribution if the existence of such DIP facility benefited the Chapter 11 Cases. Clearly, that is the case here.

29. Invictus made a significant contribution to the estates by proposing the DIP Financing, and the Debtors accepting such financing. Although the Debtors did not consummate the DIP Financing, its existence provided valuable protection to the Debtors, allowing them to proceed toward confirmation of their Plan and exit strategy without worrying about the possibility of administrative insolvency. The Debtors therefore always had a soft landing with respect to liquidity and ensuring the administrative solvency of the estates while the DIP Financing was in place. That is an invaluable benefit to the estates, and one that no other party to these Chapter 11 Cases could or would provide.

30. As a result of having the Invictus Financing available to them, the Debtors were able to proceed with their Chapter 11 Cases without having their primary concern be focusing on the (i) inherent volatility of cryptocurrency (their primary asset), and (ii) likelihood of their efforts to collect revenue being successful, and instead the Debtors were able to successfully navigate to a consensual chapter 11 plan confirmation.

31. Similar types of action have been approved in other cases in this district. For example, in In re FF Holdings Corp., the Delaware district court granted a substantial contribution request where an unsecured creditor arranged alternative postpetition financing that assisted the debtors' negotiations with other parties, even though such financing was not used by the estate. 343 B.R. 84, 87 (D. Del. 2006). In FF Holdings, the unsecured creditor contended that "the fact that an alternative financing source was available to the Debtors increased the Debtors' bargaining leverage with other parties in the case." Id. at 85. The court agreed and concluded that the effort conferred a benefit to the estate, finding that the fact "[t]hat another lender was readily available to the Debtors undoubtedly assisted the Debtors in [their] negotiations with other parties." Id. at 87. A similar fact pattern occurred in In re Quicksilver, Inc., where a group of unsecured lenders

developed and proposed an alternative post-petition financing. Case No. 15-11880, D.I. 1006 (Bankr. D. Del. May 26, 2016) (BLS) (Transcript). Just like in FF Holdings, the debtors did not ultimately use the alternative financing and, just like in FF Holdings, the court found that the availability of the alternative loan substantially benefited the estate. Id. at 53–54. Specifically, the court in Quicksilver noted that the alternative financing resulted in "meaningful improvements" and "material changes" to the financing terms that the debtors ultimately accepted, and that those changes "echoed on [] through the balance of the case." Id. at 53. Both FF Holdings and Quicksilver support a finding that Invictus provided a substantial contribution to these Chapter 11 Cases.

### B    Invictus Intended to Benefit the All of the Estates' Stakeholders

32.    Throughout these Chapter 11 Cases, Invictus intended to assist more than their own self-interests. The Third Circuit recognizes that a party's motive is a significant consideration when determining whether its actions constituted a substantial contribution—if a party intends to primarily benefit the estate, his or her efforts may constitute a substantial contribution. As borne out by the actions of Invictus and as described in the Lyon Declaration, Invictus was a key element of the bankruptcy process and benefited the interests of all creditors and parties in interest, not just themselves. The proposed DIP Financing contributed to the Debtors being able to maximize recoveries for general unsecured creditors even when the Debtors' were unable to execute on a sale of their business platform, as the Debtors were safe in the knowledge that they could access such liquidity with the Court's approval if Bitcoin plummeted in value or collections efforts fell short during the Chapter 11 Cases. Accordingly, a substantial benefit was obtained by the Debtors' estates that went well beyond any benefit to the interests of Invictus.

33.    In Lebron, the Third Circuit explained how courts should consider the intention of the movant when determining whether a substantial contribution has been made under section

11

503(b)(3) of the Bankruptcy Code. Lebron, 27 F.3d at 944.[4] The movant must show that the benefit to the estate was "more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests." Id. However, the Lebron court acknowledged that "[m]ost activities of an interested party that contribute to the estate will also, of course, benefit that party to some degree, and the existence of a self-interest cannot in and of itself preclude reimbursement." Id. Therefore, compensation is authorized even where the services rendered by the attorney were primarily for its clients, if such services transcend self-protection and "were designed to benefit others who would foreseeably be interested in the estate." Id. at 946.

34.     As previously discussed, Invictus intended to provide financing during the Chapter 11 Cases in order to allow the Debtors to have sufficient liquidity and maintain administrative solvency if their liquidity sources faltered, and another component of such financing would have been to provide exit financing in connection with monetizing other potential avenues of recovery via litigation. As the Debtors have recognized, this was an inherently valuable alternative to have in their back pocket if there had been any further financial road bumps during the Chapter 11 Cases, thus benefiting interests beyond just Invictus. Invictus, at no time, held any claims against the Debtors and was not a prepetition creditor or interest holder. Although a financing would have certainly benefited its interests, its efforts were never simply about benefitting Invictus; rather, the efforts were about benefitting all parties in interest to ensure successful Chapter 11 Cases and maximizing recoveries for all creditors.

---

[4]     In other circuits, motive is irrelevant when reviewing claims under section 503(b)(3)(D). See, e.g., Hall Fin. Grp., Inc. v. DP Partners, Ltd. P'ship. (In re DP Partners Ltd. P'ship.), 106 F.3d 667, 673 (5th Cir. 1997) ("[A] creditor's motive in taking actions that benefit the estate has little relevance in the determination whether the creditor has incurred actual and necessary expenses in making a substantial contribution to a case.").

35. As set forth in the Lyon Declaration, the Debtors recognized the importance of having the availability of DIP financing in hand. This recognition is significant because "[c]orroborating testimony by a disinterested party attesting to a claimant's instrumental acts has proven to be a decisive factor in awarding compensation to activities which otherwise might not constitute a 'substantial contribution.'" In re Buckhead Am. Corp., 161 B.R. 11, 15 (Bankr. D. Del. 1993) (internal citations omitted). Unlike in Buckhead, however, the Debtors clearly recognized the contributions of Invictus by expressing their support for this Application and through the Lyon Declaration (a declaration from the Debtors' independent director). It is also important to recall that these Chapter 11 Cases were commenced in an atmosphere of significant uncertainty with respect to the cryptocurrency market's direction and relatedly whether potential accounts receivable would ever be collected. This helps explain (and as set out in the Lyon Declaration) why it was so important for the Debtors to market and secure available postpetition financing.

36. It is also important to remember that Invictus was not acting on its own but at the behest of the Debtors and their advisors. Developing the DIP Financing was a joint effort and Invictus was moving forward in lock-step with the Debtors and at their request given the importance of ensuring a source of liquidity during the Chapter 11 Cases. Both Worldwide Direct and Columbia Gas demonstrate the importance of this fact, as both cases considered multiple and varied substantial contribution requests and allowed only those for efforts taken at the request of estate representatives. See In re Worldwide Direct, 334 B.R. at 123–24 (finding that a party's efforts in a litigation and in drafting plan provisions constituted a substantial contribution and noting that the creditors' committee had requested such efforts); In re Columbia Gas Sys., Inc., 224 B.R. 540, 554–55 (Bankr. D. Del. 1998) (in approving a substantial contribution request by

three public pension funds, the court noted that the pension funds were "invited to participate in the meetings of the equity security committee").

37. In this instance, the Debtors, among other things, requested that Invictus secure an administrative agent in connection with the DIP Financing, completed "know your customer" requirements for such administrative agent, negotiated all relevant documentation, and participated in discussions regarding a DIP budget for such financing and other related matters. All of these actions that were requested by the Debtors were taken in an effort to ensure that these Chapter 11 Cases would have a successful outcome for the benefit of the Debtors' estates and maximizing value for such estates. The Debtors' subsequent, successful case administration demonstrates the fruit of the efforts by Invictus.

    **C.    The Amounts Requested Represent the Actual and Necessary Expenses and Reasonable Compensation for Professional Fees of Invictus**

38. Invictus requests the allowance of an administrative expense claim pursuant to section 503(b)(4) of the Bankruptcy Code. Section 503(b)(4) grants administrative expense status to claims for "reasonable compensation for professional services rendered by an attorney" to a party entitled to reimbursement under section 503(b)(3)(D) of the Bankruptcy Code, "based on the time, the nature, the extent, and the value of such services, the cost of such services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney . . . ." 11 U.S.C. § 503(b)(4). As is the case for other professional fee applications, reasonable compensation for professional services rendered under section 503(b)(4) may include fees and expenses incurred in connection with the preparation of a substantial contribution application. See Quicksilver, Inc., Case No. 15-11880, D.I. 1010 (Bankr. D. Del. May 31, 2016) (BLS). Although in this instance, Invictus notes that neither Katten nor Morris Nichols have included compensation for fees incurred in connection with preparing this Application at this time.

39. The fees of Katten and Morris Nichols represent reasonable compensation for the professional services rendered to Invictus in pursuing the DIP financing, including developing, proposing, negotiating, and finalizing the Invictus DIP. Among other things, Katten and Morris Nichols (i) reviewed the filings in the Chapter 11 Cases, including the plan support agreement entered into with the Committee and various related filings including the chapter 11 plan; (ii) examined the Debtors' businesses to understand the capital and corporate structure; and (iii) worked with Invictus and the Debtors to draft and finalize a term sheet, loan agreement, DIP order, budget, DIP Motion, and related documents for the Invictus DIP.

40. In representing Invictus, Katten and Morris Nichols each maintained detailed records of the time expended by professionals and paraprofessionals in rendering services to Invictus, including services relating to the pursuit of the Invictus DIP. Such time records were generated contemporaneously by the person who rendered the services when such services were performed and are generated in the ordinary course of Katten's and Morris Nichols's respective practices. A copy of Katten's and Morris Nichols's time records incurred in connection with the Invictus DIP is included as **Exhibit C and Exhibit D** to this Application. Katten and Morris Nichols believe that the time records provide sufficient information for the Court to determine whether the hourly rates and the number of hours worked were reasonable.

41. Katten and Morris Nichols have reviewed the requirements of Local Rule 2016-2 and certifies to the best of their information, knowledge, and belief that the information provided in this Application relating to Katten and Morris Nichols's fees and expenses complies with that Rule.

42. Invictus does not request that the Court grant administrative expense status to all of the fees accrued in providing substantial contributions. Rather, in consideration of the assets

available to the Debtors and these Chapter 11 Cases, Invictus is not requesting compensation for amounts incurred in connection with the preparation and approval of this Application.

**In the Alternative Invictus is Entitled to Administrative
Expense Status under Section 503(b)(1)(A)**

43. Invictus files this amended Application because of the recent third circuit opinion, In re Energy Future Holdings Corp., 2021 WL 957301 (3d Cir. March 15, 2021). The Third Circuit addressed the requirements for asserting a claim under section 503(b)(1)(A) of the Bankruptcy Code. Section 503(b) sets forth the following: "[a]fter notice and a hearing, there shall be allowed administrative expenses . . ., **including** (1)(A) the actual, necessary costs and expenses of preserving the estate . . . ." (emphasis added)

44. In Energy Future the Third Circuit considered whether a "claim is allowable as a claim for actual and necessary costs and expenses of preserving the Debtors' estates." Id at *9. Courts generally find that an administrative expense claim is entitled to priority under Section 503(b)(1)(A) "if (1) there was a 'post-petition transaction between the claimant and the estate,' and (2) those expenses yielded a 'benefit to the estate.'" Id. (citing In re Women First Healthcare, Inc., 332 B.R. 115, 121 (Bankr. D. Del 2005)). The burden lies on the applicant to demonstrate that claimed expenses should be allowed as an administrative expense. Id (citation omitted).

45. As set forth in this Application, the Debtors and their advisors requested that Invictus provide post-petition financing and agreed upon a term sheet that formed the basis for the work including the definitive documentation that the parties drafted. This solicitation of financing by the Debtors and their advisors was for the benefit of the estates. As the Third Circuit stated in Energy Future, post-petition transactions have included providing services during the post-petition period and bidding in connection with a sales process, which are provided in connection with preserving the estate. Id. The Debtors expressly agreed to the post-petition DIP financing and

16

requested that Invictus provide its capital, time, effort, and the services that are the subject of this Application so that DIP Financing was available during the Chapter 11 Cases. This post-petition transaction benefited the estates as the Debtors acknowledge through their support of this Application and accompanying declaration. The Application sets forth numerous facts showing the actual benefit (a term not defined under the Bankruptcy Code) that was provided to the Debtors' estates. Id at 10.

46. The Invictus financing was considered essential to the Debtors' estates and mitigated the real financial downside risks that the Debtors faced during the Chapter 11 Cases. This, among other things, conferred the direct benefit of allowing the Debtors sufficient time (in the face of a failed sales process) to proceed with its confirmation efforts, which were ultimately successful and maximized value. The Application is clear, as supported by the Debtors, that a benefit was actually received by the estates through the agreement to provide DIP Financing in the event that the Debtors' liquidity concerns were not otherwise solved. Among other things, if the Debtors had fallen short in connection with accounts receivable or faced diminishing value in its cryptocurrency assets, they would have had access to financing that its advisors requested, fully negotiated, drafted, and agreed to in connection with addressing liquidity concerns for the actual benefit of the estates. This is further enforced when looking at the claim with a "hindsight-based analysis of the benefit to the estate." Id at 12. The Energy Future case and the underlying facts of this Application support the conclusion that if the estate induced and believed it benefitted an administrative claim should be awarded.

47. Finally, the Energy Future case also further supports the argument that Invictus should be entitled to recover under sections 503(b)(3)(D) and (b)(4) given the expansive view of

administrative expense claims that the Third Circuit endorsed in its opinion with respect to a post-petition party in interest.

### Waiver of Bankruptcy Rule 6004(h)

48. To implement the foregoing successfully, Invictus requests that the Court enter an order providing that it has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

49. Invictus will provide notice of the Application to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel for the Official Committee of Unsecured Creditors; and (c) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002. Invictus submits that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, Invictus respectfully requests that the Court enter the Order and grant Invictus such other relief as the Court deems appropriate under the circumstances.

Dated: March 26, 2021
       Wilmington, Delaware

**MORRIS NICHOLS ARSHT AND TUNNELL LLP**

*/s/ Nader A. Amer*
Curtis S. Miller (No. 4853)
Nader A. Amer (No. 6635)
1201 N. Market St., 16th Floor
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
cmiller@morrisnichols.com
namer@morrisnichols.com

- and –

**KATTEN MUCHIN ROSENMAN LLP**

Michael E. Comerford
575 Madison Avenue
New York, NY 10022-2585
Telephone: (212) 940-8800
Facsimile: (212) 940-8776
michael.comerford@katten.com