# **EXHIBIT A**

Proposed Redacted Objection

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related to Docket No. 686** |
| | ) | |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO AMENDED APPLICATION OF INVICTUS GLOBAL MANAGEMENT, LLC FOR ALLOWANCE AND PAYMENT OF FEES PURSUANT TO BANKRUPTCY CODE SECTIONS 503(b)(1)(A), 503(b)(3)(D) AND 503(b)(4)

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 bankruptcy cases (the "Chapter 11 Cases") of Cred Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") hereby submits this objection (the "Objection") to the *Amended Application of Invictus Global Management, LLC for Allowance and Payment of Fees Pursuant to Bankruptcy Code Sections 503(b)(1)(A), 503(b)(3)(D) and 503(b)(4)* [Docket No. 686] (the "Application") filed by Invictus Global Management, LLC ("Invictus"). In support of this Objection, the Committee hereby submits the *Declaration of Matthew Dundon in Support of the Objection of the Official Committee of Unsecured Creditors to the Amended Application of Invictus Global Management, LLC for Allowance and Payment of Fees Pursuant to Bankruptcy Code Sections 503(b)(1)(A), 503(b)(3)(D) and 503(b)(4)* (the "Dundon Declaration"), attached hereto as **Exhibit A**, and respectfully states as follows:

---

[1]   The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

## PRELIMINARY STATEMENT

1.      The Application must be denied because (i) Invictus lacks standing to assert a substantial contribution claim, (ii) Invictus did not make a substantial contribution to these Chapter 11 Cases, and (iii) Invictus did not provide an actual benefit to the Debtors that is compensable under section 503(b)(1)(A).

2.      Section 503(b)(3)(D) sets forth a narrow list of enumerated parties who may seek a substantial contribution claim: (i) a creditor, (ii) an indenture trustee, (iii) an equity security holder, and (iv) an unofficial creditors' committee or equity committee. *See Lebron v. Mechem Financial Inc.*, 27 F.3d 937, 943 (3d Cir. 1994) ("Under § 503(b)(3)(D), four categories of persons may apply for reimbursement of expenses . . . ."). Invictus is not one of the enumerated parties. Invictus does not claim to be one of the enumerated parties. Indeed, Invictus explicitly states that it "at no time[] held any claims against the Debtors and was not a prepetition creditor or interest holder." Application, ¶ 34. For this reason alone, the substantial contribution claim has no merit and must be denied.

3.      Invictus also did not make any contribution (let alone a *substantial* contribution) or provide any benefit to the Debtors or these Chapter 11 Cases. Almost immediately after the Committee learned that the Debtors were pursuing debtor in possession financing, the Committee made clear its opposition to *any* likely form of DIP financing. The Committee communicated this position in writing and orally to the Debtors on multiple occasions. *See* **Exhibit C**. Had the Debtors actually filed a motion seeking approval of DIP financing, the Committee would have objected because no DIP financing has ever been needed in these Chapter 11 Cases. And in any event, as set forth in the Dundon Declaration, the economic terms

of the DIP financing proposed by Invictus were unacceptable. *See Dundon Declaration*, ¶¶ 10–11.

4.      Invictus would have this Court create a new rule with far-reaching consequences. That is, any entity, even those not enumerated in section 503(b)(3)(D), that expends money on negotiating a *potential* postpetition contract with a debtor that does not ultimately come to fruition is entitled to a substantial contribution claim. This of course is an absurd result and contrary to the Bankruptcy Code and established Third Circuit precedent. It makes no difference whether the Debtor had a term sheet "in their back pocket" to be used if necessary (which, in any case, the Committee disputes). At bottom, Invictus complains of the same risk that any other putative DIP lender, 363 buyer, or other party undertakes when negotiating with a chapter 11 debtor (or any other counterparty for that matter). And the costs associated with that risk are (or at least should be) baked into a party's cost of doing business. Some deals will be consummated while others will not. There are costs in finding out the answer.

5.      Lastly, the Committee expresses its disappointment that the Debtors did not discuss their affirmative support of the Application with the Committee prior to its filing. It is puzzling how the Debtors could, under any facts, view their affirmative support of the Application as appropriate. At a minimum, if the Debtors genuinely believe that Invictus has a valid claim, they could have simply not filed an objection to the Application. Instead, the Debtors filed a declaration in support of the Application and apparently disclosed confidential information to Invictus (such as the fact that only one person (Invictus) submitted a term sheet for DIP financing) to help bolster Invictus' arguments.

6.      For all of the forgoing reasons, and as discussed in more detail below, the Application must be denied.

## INVICTUS DOES NOT HAVE STANDING TO ASSERT A SUBSTANTIAL CONTRIBUTION CLAIM

7.      Bankruptcy Code section 503(b)(3)(D) makes clear that only certain enumerated parties have standing to assert a substantial contribution claim. "[S]ection 503(b)(3) is strictly construed to keep administrative expenses at a minimum." *In re RS Legacy Corp.*, No.15-10198, 2016 Bankr. LEXIS 854, at *11 (Bankr. D. Del. Mar. 17, 2016); *In re Columbia Gas Sys.*, 224 B.R. 540, 548 (Bankr. D. Del. 1998).

8.      Accordingly, neither the Third Circuit Court of Appeals nor any other court within the Third Circuit has held that a non-enumerated party can assert a substantial contribution claim. To the contrary, the Third Circuit has reaffirmed the narrow contours of section 503(b)(3)(D). "Under § 503(b)(3)(D), four categories of persons may apply for reimbursement of expenses: (1) creditors, (2) indenture trustees, (3) equity security holders, and (4) creditor and equity holder committees other than official committee."[2] *Lebron*, 27 F.3d at 943; *see also In re Energy Future Holdings Corp.*, 588 B.R. 371, 388 (Bankr. D. Del. 2018) (holding that claimant, who was allegedly a "creditor through one of its subsidiaries" did not have standing to pursue a substantial contribution claim because it was not a creditor, as defined by the Bankruptcy Code).

---

[2]     Invictus asserts that the Third Circuit in *Lebron* stated in dicta that "other interested parties may be able to assert a claim for substantial contribution." Application, ¶ 23. The Committee is familiar with *Lebron* but cannot find any statement by the Third Circuit (dicta or otherwise) in support of Invictus' argument (and Invictus does not cite to any such language). The Third Circuit in *Lebron* merely states that "[m]ost activities of an interested party that contribute to the estate will also, of course, benefit that party to some degree, and that existence of that self-interest cannot in and of itself preclude reimbursement." *Lebron*, 27 F.3d at 944. In other words, mere self-interest is not a barrier to reimbursement—hardly an endorsement of the broad reading of Bankruptcy Code section 503(b)(3)(D) that Invictus claims.

9.      Other courts around the country have correctly reached the same conclusion. *See, e.g.*, *In re Nilhan Developers, LLC*, 620 B.R. 385, 406 (Bankr. N.D. Ga. 2020) (concluding that applicant lacked standing to bring substantial contribution claim because it was not one of the enumerated entities); *In re First Baldwin Bancshares, Inc.*, No. 13-00563, 2013 Bankr. LEXIS 2200, at \*6 (Bankr. S.D. Al. May 30, 2013) ("the statute is very specific about the type of entity that may file substantial contribution claims under § 503(b)(3)(D). One must be an enumerated party to be compensated."); *In re American Preferred Prescription*, 194 B.R. 721, 728 (Bankr. E.D.N.Y. 1996) ("the Marcus Firm is not a creditor of the Debtor, and does not have standing to bring the instant fee application under sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code"); *In re S.N.A. Nut Co.*, 186 B.R. 98, 106 (Bankr. N.D. Il. 1995) ("Alimenta is not one of the entities described in 11 U.S.C. § 503(b)(3)(D) which has standing to bring an administrative expense claim incurred by making a substantial contribution to the case.").

10.     Invictus argues that the term "including" in Bankruptcy Code section 503(b) supports an expansive reading of its subsections. This argument has been advanced and repeatedly rejected in bankruptcy courts across the country. *See In re Concepts Am., Inc.*, No. 14-34232, 2021 Bankr. LEXIS 504, at \*10 (Bankr. N.D. Il. Mar. 2, 2021) ("The statutorily defined contours of a substantial contribution claim are described in § 503(b)(3)(D). Allowing creditors recourse to the general language of § 503(b) ignores the specific solution Congress designed. In the context of § 503(b)(3)(D), the general authorization provided by the expansive term 'including' is limited by the specific authorization of the phrase.") (internal citations omitted); *Healthtrio, Inc. v. Scruggs*, 599 B.R. 119, 132 (Bankr. D. Co. 2019); *In re Mirant Corp.*, No. 03-46590, 2014 Bankr. LEXIS 139, at \*17 (Bankr. N.D. Tx. Jan. 14, 2014); *First Baldwin*, 2013 Bankr. LEXIS 2200, at \*5.

11.     Invictus relies on *In re Energy Future Holdings Corp.*, No. 19-3492, 2021 U.S. App. LEXIS 7400, at *23–24 (3d Cir. Mar. 15, 2021) ("EFH"), and argues that *EFH* "supports the argument that Invictus should be entitled to recover under sections 503(b)(3)(D) and (b)(4) given the expansive view of administrative claims that the Third Circuit endorsed." Application, ¶ 47. As discussed in detail below, *EFH does not* endorse a broad reading of administrative expense claims. Furthermore, *EFH* addressed the applicable standard on a motion to dismiss an administrative expense claim under Bankruptcy Code section 503(b)(1)(A) and has no bearing on the class of claimants authorized by Bankruptcy Code section 503(b)(3)(D).

12.     Bankruptcy Code section 503(b)(3)(D) grants only enumerated entities standing to assert substantial contribution claims. Invictus does not claim to be one of the enumerated entities. Instead, Invictus admits that it is not—"[Invictus] at no time[] held any claims against the Debtors and was not a prepetition creditor or interest holder." Application, ¶ 34. Accordingly, by its own admission, Invictus does not have standing to assert a substantial contribution claim.

### INVICTUS HAS NOT MADE A SUBSTANTIAL CONTRIBUTION TO THESE CHAPTER 11 CASES

13.     When evaluating a substantial contribution claim, "the applicable test is whether the efforts of applicant resulted in an actual demonstrable benefit to the debtor's estate and the creditors." *Lebron*, 27 F.3d at 944 (quoting *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988)). "Inherent in the term 'substantial' is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests. Creditors are presumed to be acting in their own interests until they satisfy the court that their efforts have transcended self-protection." *Id.* (internal citations omitted). "A well-developed body of case law teaches that the sort of contribution that reaches the substantial threshold is exceedingly narrow." *RS Legacy Corp.*, 2016 Bankr. LEXIS 854, at *12.

14.     "By its terms, section 503(b)(3)(D) unequivocally mandates results. . . [S]ection 503(b)(3)(D) requires a post hoc analysis of the actual benefit conferred to the case." *Id.* at 18. These results must "foster and enhance . . . the progress of the reorganization." *Lebron*, 27 F.3d at 944 (quoting *Pierson & Gaylen v. Creel & Atwood (In re Consol. Bancshares, Inc.)*, 785 F.2d 1249, 1253 (5th Cir. 1986)). The movant must also "show a 'causal connection' between the service and the contribution." *In re Worldwide Direct*, 334 B.R. 112, 121–22 (Bankr. D. Del. 2005) (quoting *In re Granite Partners, L.P.*, 213 B.R. 440, 447 (Bankr. S.D.N.Y. 1997)).

15.     In evaluating substantial contribution claims, courts generally consider (i) "whether the services were rendered solely to benefit the client or to benefit all parties in the case," (ii) "whether the services provided direct, significant, and demonstrable benefit to the estate," and (iii) "whether the services were duplicative of services rendered by attorneys for the committee, the committees themselves, or the debtor and its attorneys." *In re Buckhead Am. Corp.*, 161 B.R. 11, 15 (Bankr. D. Del. 1993).

## A.   <u>INVICTUS DID NOT INTEND TO BENEFIT THE DEBTORS' ESTATES.</u>

16.     "[T]he purpose of § 503(b)(3)(D) is to encourage activities that will benefit the estate as a whole, and in line with the twin objectives of § 503(b)(3)(D), substantial contribution should be applied in a manner that excludes reimbursement in connection with activities of creditors and other interested parties which are designed primarily to serve their own interests." *Lebron*, 27 F.3d at 944.

17.     Where a party acts primarily in its own interest and the benefit conferred upon the estate is merely incidental, a substantial contribution motion must fail. *In re Geriatrics Nursing Home*, 195 B.R. 34, 38 (Bankr. D.N.J. 1996) (citing *Lebron*, 27 F.3d at 944) ("notwithstanding the actual and demonstrable benefit conferred upon creditors, Health Resources was acting

primarily in its own interest, and thus the benefit conferred upon the estate was merely incidental . . . [and the] substantial contribution motion must ultimately fail.").

18.     This element first assumes that the party seeking a substantial contribution has an incentive to provide a substantial contribution. For example, a creditor or an unofficial committee has an economic interest in the outcome of the case, and thus has an incentive to provide a substantial contribution. As noted above, Invictus admits that it has no economic interest in these Chapter 11 Cases. It is not a creditor. Rather, Invictus is a for-profit investment fund that was trying to generate a profitable return by lending money to the Debtors. It follows that Invictus was acting "primarily in its own interest." Any benefit to the Debtors (to the extent there was a benefit) was indirect.

19.     A review of Katten Muchin Rosenman LLP's ("Katten") and Morris Nichols Arsht & Tunnel LLP's ("Morris Nichols") time entries, attached to the Application as **Exhibit C**, supports this conclusion. Practically all of the time spent by Katten and Morris Nichols personnel was dedicated to negotiating and drafting the DIP financing documents, correspondence with the Debtors' professionals regarding same, and correspondence with Invictus regarding same. It is telling that Invictus never directed Katten or Morris Nichols to consider the impact on other parties in interest in these Chapter 11 Cases. *See Leidos Eng'g, LLC v. Kior, Inc. (In re Kior, Inc.)*, 567 B.R. 451, 461 (D. Del. 2017) ("the time records reflect no consultation with other trade creditors and no attempts to negotiate with the Debtor regarding treatment of general unsecured claims"). Nor would it have made sense for Invictus to do so. Invictus was trying to generate a profitable investment for its own benefit. The work performed by Katten and Morris Nichols was solely related to the DIP financing and solely for the benefit of Invictus. *Energy Future Holdings*, 588 B.R. at 388 (denying substantial contribution claim because "the work

8

performed . . . was solely related to . . . efforts to close on the transaction in the Merger

Agreement, there was no competitive bidding process nor was any transaction consummated.").

20.    Although Invictus asserts that it "intended to assist more than their own self-

interests," this self-serving statement is woefully inadequate to overcome the contrary evidence

and the presumption that Invictus acted solely in its own self-interest. *In re Kior*, 567 B.R. at 461

("Because Leidos is presumed to be acting in its own self-interest, it was required to introduce

something more than self-serving statement regarding its involvement in the case in order to

carry its burden of demonstrating that its services provided a substantial contribution to the

estate.") (internal citations omitted). Accordingly, the Application must be denied in this regard.

*Lebron*, 27 F.3d at 944 ("in line with the twin objectives of § 503(b)(3)(D), "substantial

contribution" should be applied in a manner that <u>excludes reimbursement</u> in connection with

activities of creditors . . . which are designed <u>primarily to serve their own interests</u>.") (emphasis

added).

**B.    INVICTUS HAS NOT PROVIDED DIRECT, SIGNIFICANT, AND
DEMONSTRABLE BENEFITS TO THE ESTATES.**

21.    Invictus does not allege any actual, demonstrable, or quantifiable benefit that

inured to the Debtors' estates. Invictus does not identify any way that the Debtors' unsecured

creditors received more favorable treatment because of Invictus' fleeting involvement in these

Chapter 11 Cases. Instead, Invictus claims that its DIP financing proposal—which Invictus knew

the Committee could veto, and which the Committee made clear was highly likely to be

unacceptable once it became aware of it—somehow gave the Debtors a "soft landing,"

Application, ¶ 29, and allowed the Debtors to be "safe in the knowledge that they could access"

DIP financing, Application, ¶ 32, and otherwise sat in the Debtors' "back pocket," Application,

¶ 34. Even if true, these allegations fall far short of the strict standard required to support a substantial contribution claim.

22.     Invictus argues that unconsummated DIP facilities may constitute substantial contributions. The cases cited by Invictus for this proposition are inapplicable here. For example, in *In re FF Holdings Corp.*, the court held that "the fact that an alternative financing source was available to the Debtors increased the Debtors' bargaining leverage with other parties in the case." *In re FF Holdings Corp.*, 343 B.R. 84, 75 (D. Del. 2006). Specifically, the creditor seeking a substantial contribution claim in *FF Holdings* arranged alternative DIP financing that assisted the debtors in negotiations with their lender to obtain financing. The Court also found that the creditor "was an active participant in the negotiations leading to confirmation of the Debtors' Plan, and [the creditor] took steps to dissuade [the prepetition lender] from maintaining its objection to the plan." Invictus did none of that. Here, the Invictus proposal did not increase the Debtors' bargaining leverage in any way. Indeed, no DIP financing was ever consummated, so any theoretical leverage that was created did not ultimately benefit the estates. Aside from negotiating potential DIP financing for its own benefit, Invictus did nothing else to advance these Chapter 11 Cases. It would have been highly unusual for Invictus to do anything else given that it had, and still has, no economic interest in the outcome of these Chapter 11 Cases.

23.     Similarly, Invictus cites *In re Quiksilver, Inc.*, where the availability of an unused DIP financing proposal resulted in "meaningful improvements" and "material changes" to the financing terms that the debtors ultimately accepted. *In re Quiksilver, Inc.*, No. 15-11880, Docket No. 1006 (Bankr. D. Del. May 26, 2016), Hr'g Tr. at 53–54. Again, Invictus has not identified any leverage that was created, nor that any such leverage benefitted the estates given

that no DIP financing was ultimately consummated. Accordingly, both *FF Holdings* and

*Quiksilver* are inapposite.

24.      To the contrary, Invictus' involvement in these Chapter 11 Cases can more

accurately be construed as *affirmatively unhelpful*. The Invictus DIP financing proposal (attached

hereto as **Exhibit B**) provided economic terms that were unacceptable to the Committee, as set

forth in the Dundon Declaration. The professional fees incurred by the Debtors in negotiating the

terms of the Invictus proposal have wasted the Debtors' resources and diminished recoveries for

general unsecured creditors. *See Dundon Declaration*, ¶ 12.

<u>**INVICTUS DID NOT PROVIDE ANY BENEFIT TO THE ESTATES**</u>

25.      For many of the same reasons that Invictus did not make a substantial

contribution to these Chapter 11 Cases, Invictus also did not provide a benefit to the Debtors'

estates under Bankruptcy Code section 503(b)(1)(A). *Id.*

26.      "An administrative expense claim is entitled to priority under Section

503(b)(1)(A) if: (1) there was a postpetition transaction between the claimant and the estate, and

(2) those expenses yielded a "benefit to the estate." *Energy Future Holdings*, 2021 U.S. App.

LEXIS 7400, at *23–24 (citing *In re Women First*, 332 B.R. 115, 121 (Bankr. D. Del. 2005)). As

noted above, the claimant bears a "heavy burden" to prove that the expenses were "actual and

necessary" to "preserve the estate for the benefit of the creditors." *Id.*

27.      Far from adopting an expansive view of administrative expense claims as Invictus

claims, *EFH* simply recited well-settled law on the limited availability of administrative expense

priority and held that the claimants plausibly alleged that they satisfied the strict standard. *Id.*, at

*38.

28.     As an initial matter, there was no postpetition transaction between Invictus and the Debtors. Invictus asserts that the "Debtors expressly agreed to the post-petition DIP financing." Application, ¶ 45. However, the Lyon Declaration states only that "the parties engaged in good-faith, arms-length discussions and document negotiations, which ultimately led to a fully negotiated DIP Financing." Application, Ex. B, ¶ 8. Thus, at best, the Debtors agreed to negotiate the proposed terms of postpetition DIP financing. That of course does not result in a binding agreement. Indeed, no financing agreement or term sheet was executed by the parties. In any event, postpetition financing would have been subject to the Committee's consent and this Court's approval.

29.     Invictus further claims that the DIP financing negotiations "conferred the direct benefit of allowing sufficient time . . . to proceed with its confirmation efforts." Application, ¶ 46. These Chapter 11 Cases proceeded to successful confirmation without Invictus' proposed DIP financing (and despite the time, expense, and distraction that related negotiations consumed). As such, Invictus' actions were wholly irrelevant to the outcome in these Chapter 11 Cases. *Dundon Declaration*, ¶ 8. All that the DIP financing negotiations "allowed" was the incurrence of additional professional fees by the Debtors. *Id.*, ¶ 12.

30.     Invictus acknowledges that the analysis under Bankruptcy Code section 503(b)(1)(A) is appropriately conducted "with a hindsight-based analysis of the benefit to the estate." Application, ¶ 46. Unfortunately for Invictus, hindsight demonstrates that DIP financing was ultimately not necessary to the successful prosecution of these Chapter 11 Cases. As such, Invictus did not provide any benefit to the Debtors. "If [the DIP financing negotiations] were of no 'benefit,' [they] cannot have been 'necessary' within the meaning of § 503(b)(1)(A)." *Energy*

*Future Holdings*, 2021 U.S. App. LEXIS 7400, at *24 (citing *Matter of Whistler Energy II,*

*L.L.C.*, 931 F.3d 432, 433 (5th Cir. 2019)).

31.    Furthermore, to satisfy the heavy burden imposed by Bankruptcy Code section

503(b)(1)(A),

> [T]he benefit must be *actual*, not hypothetical. This addresses the concern that administrative claims deplete the bankruptcy estate's assets; thus, the benefit must be real in order for the claim to receive priority. The question is not whether the creditor deserves to get paid, but whether it deserves to get paid at the expense of the debtor's existing unsecured creditors. The focus is on the benefit to the estate, not the loss to the creditor. Thus, requested claims must be reasonable—as it is axiomatic that unreasonable expenses would never be necessary.

*Id.*, at *26–27.

32.    The court in *EFH* held that the claimants plausibly alleged that their work

"benefitted the estate by providing valuable information . . . that paved the way for the later . . .

deal." *Id.*, at *38. This benefit, if proven, is the "actual" benefit that is required. Likewise, all of

the cases relied on by Invictus found some *actual* benefit (increased price paid to the debtors,

increased debtors' leverage). At most, Invictus alleges a hypothetical benefit. Specifically,

Invictus alleges that if the Debtors needed financing, "they *would have* access to financing" by

way of Invictus. Application, ¶ 46 (emphasis added). In sum, Invictus argues that because the

DIP financing could be valuable in a different, hypothetical world, it should be entitled to

payment in this one. But that is not the standard. Invictus' services provided no actual benefit.

Such expenses are not reimbursable from the Debtors' estates and the pockets of thousands of

creditors who lost significant sums of money.

## THE APPLICATION IS AN IMPROPER ATTEMPT TO EXTRACT
## BREAK-UP FEES WITHOUT COURT APPROVAL

33.    If Invictus desired reimbursement of its professional fees, it should have

negotiated a break-up fee and sought the Court's approval of such protections. *Dundon*

*Declaration*, ¶ 7. That is how sophisticated parties like Invictus protect themselves. Invictus instead now asks this Court to shift its cost of doing business onto the Debtors' creditors. The Court should decline that invitation.

34.     For the foregoing reasons, the Application should be denied in its entirety with prejudice.

Dated:   Wilmington, Delaware
         April 14, 2021

<div style="margin-left:40%">

**MCDERMOTT WILL & EMERY LLP**

*/s/ David R. Hurst*
David R. Hurst (I.D. No. 3743)
1007 North Orange Street, 10th Floor
Wilmington, DE 19801
Telephone: (302) 485-3900
Facsimile: (302) 351-8711

- and -

Timothy W. Walsh (admitted *pro hac vice*)
Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
340 Madison Avenue
New York, NY 10173
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

*Counsel to the Official Committee of
Unsecured Creditors*

</div>

**EXHIBIT A**

Dundon Declaration

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |
| | ) | |

**DECLARATION OF MATTHEW DUNDON IN SUPPORT OF THE OPPOSITION OF
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE AMENDED
APPLICATION OF INVICTUS GLOBAL MANAGEMENT, LLC FOR ALLOWANCE
AND PAYMENT OF FEES PURSUANT TO BANKRUPTCY CODE SECTIONS
503(b)(1)(A), 503(b)(3)(D) AND 503(b)(4)**

I, MATTHEW DUNDON, declare under penalty of perjury as follows:

1.     I submit this declaration in support of the *Objection of the Official Committee of*

*Unsecured Creditors to the Amended Application of Invictus Global Management, LLC for*

*Allowance and Payment of Fees Pursuant to Bankruptcy Code Sections 503(b)(1)(A),*

*503(b)(3)(D) and 503(b)(4)* (the "Objection"),[2] filed contemporaneously herewith.

**I.     Qualifications of Declarant**

2.     I am a principal of Dundon Advisers LLC, a financial and investment advisory

firm founded in February 2016 and presently based in Harrison, New York ("Dundon"). Dundon

is led by Peter Hurwitz and I (Principals), Heather Barlow, Alejandro Mazier, Phillip Preis Jr.,

and Ming Shen (Managing Directors), and Revisson Bonfim, Eric Reubel and Tabish Rizvi

(Senior Directors). These leaders are complemented by a corps of part-time and/or contracted

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax
identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred
Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East
Third Avenue, San Mateo, California 94401.

[2]     Capitalized terms used but not defined herein have the definitions ascribed to such terms in the Objection.

senior advisors many of whom have decades of experience in their relevant disciplines, and by an extensive staff of mid-level and junior professionals. This team represents a diverse range of investment, restructuring, investment banking, corporate management and legal experience.

3.      I received my Bachelor's degree from the University of California at Berkeley in 1993 and my Juris Doctor from the University of Chicago Law School in 1998. I am admitted to practice law in Massachusetts and New York. Other than a brief interlude in the technology business, I practiced corporate and transactional law in New York City from August 1998 to August 2003. I commenced my career in finance in August 2003 when I became a distressed debt and reorganized equity analyst with the institutional securities brokerage firm then known as Miller Tabak Roberts Securities, LLC and now known as StoneX Credit. In June 2006, I was promoted to be the head of securities research for that firm. In the course of my work for Miller Tabak, I received the Series 7 and 23 registrations (general securities representative), Series 24 registration (general securities principal), and Series 86 and Series 87 registrations (securities analyst). Each of these registrations is presently inactive. In May 2010, I joined Pine River Capital Management, LP as a portfolio manager with responsibility for high yield and distressed credit and opportunistic equity investments. In December 2014 I joined Advent Capital Management, LLC in a similar capacity. In February 2016, I founded Dundon to support institutional and high net worth clients with illiquid and control investments. In January 2018, Dundon added a restructuring practice to its business.

4.      Since its founding with one client and no staff besides me, Dundon has grown to over 20 associated professionals, has acted as financial advisor to 47 official committees, and has acted as an investment advisor or financial advisor to other clients in more than one hundred other Chapter 11 proceeding, the foregoing including many of the largest and most complex

bankruptcies of recent years and many middle market cases. I participated to at least some extent in each of those proceedings, and was the hands-on engagement leader of many. Prior to founding Dundon, I was involved in the capacities aforementioned in hundreds more chapter 11 proceedings dating back to the 1990s.

5.      On January 27, 2020, the Court entered the *Order Authorizing the Employment and Retention of Dundon Advisers LLC as Financial Advisor to the Official Committee of Unsecured Creditors* Nunc Pro Tunc *to December 7, 2020* [Docket No. 427].

6.      I have been actively engaged in Dundon's services to the Committee, as have Messrs. Mazier, Shen, and Reubel, among other professionals.

## II.    The Application

7.      *Invictus should bear its own costs*. While the Debtors may have invited Invictus to devote significant resources, and Invictus may have in fact expended such resources, to the prospect of extending financing to the Debtors, Invictus cannot dispute that in a typical bankruptcy, *many* parties aspire to provide and are invited to negotiate DIP financing with debtors. In my experience, the vast majority do so entirely at their own cost and risk, and the few that do acquire fee and expense reimbursement rights against the estates do so almost always in compensation for the *actual commitment* of capital (such as a "stalking horse" bid), and even then only after close scrutiny from the court and other parties in interest. The relief sought in the Application is extraordinarily rare.

8.      *Lack of necessity*. At no point during the period in which Invictus incurred the expenses sought to be reimbursed in the Application did the Debtors require DIP financing because cash on hand and cash easily realizable from the sale of cryptocurrency assets always sufficed to meet all cash requirements through and including an administratively solvent exit from chapter 11. DIP financing, other than under terms of very unlikely favorability, would not

3

only have provided no actual benefit to the Debtors but would also have imposed significant

deadweight losses because of associated fees and interest incurred for no benefit.

9.      *Failure to work with the Committee.* On December 23, 2020, the Committee and

the Debtors filed the *Debtors Motion Pursuant to Bankruptcy Code Sections 363(b) and 105(a)*

*for Authorization to Enter Into and Perform Under a Plan Support Agreement Term Sheet*

[Docket No. 279] (the "PSA Motion") which expressly disclosed that the Committee had a veto

over any DIP financing and most other material transactions. This was Invictus' cue to work

directly with the Committee and its professionals regarding the terms for any potential DIP

financing. Instead the Committee first heard from Applicant regarding the DIP financing in

February 2021, and that was after the Committee took the initiative to reach out to Invictus.

10.     *Invictus should have known its efforts were futile.* DIP financing was not required

and accordingly, the Committee consistently expressed to the Debtors that such financing would

not be accepted unless such DIP financing was convenient from the perspective of liquidity,

enabled the Debtors to avoid sales of cryptocurrency to meet administrative expenses, was cheap

in terms of fees and interest, and, most importantly, had *no mark-to-market* margin call on

cryptocurrency collateral. This was tantamount to saying "no DIP financing at all" because of the

Committee's veto and because I believe neither Invictus nor any other prospective DIP financing

provider would ever consent to the low rate of interest and fees that would satisfy the Committee

or forgo a mark-to-market margin call given the Debtors' lack of any other substantial liquid

resources and the high volatility of cryptocurrency.

11.     The aversion to mark-to-market margin call features stems from the Committee's

refusal to risk a repeat of what led to these Chapter 11 Cases to begin with – a financial

counterparty foreclosing on the Debtors' cryptocurrency collateral in the face of market

volatility. *See Modified First Amended Combined Joint Plan of Liquidation and Disclosure Statement* §3.3(a) [Docket No. 619] and *Report of Robert J. Stark, Examiner* §1.C.5 [Docket No. 605]. In February 2021, when I was finally able to speak with Invictus' representatives and convey the Committee's position, it was apparent to me that Invictus had never even considered the kind of collateral arrangements that the Committee would accept. However, Invictus *should* have had such information two months before from the Debtors' representatives and *would* have had such information if its representatives had called me as soon as the PSA Motion was filed in in December. The bottom line is that as long as the Debtors had sufficient cryptocurrency to sell to meet their immediate requirements, no DIP financing was ever likely to be made, and the Applicant could have and should have known that very early in the endeavors, and therefore desisted from them without incurrence of significant expense.

12.     *Invictus brought no benefit to creditors*. While Invictus attempts to point out isolated exceptions, in my experience the vast majority of substantial contribution awards are made to parties whose efforts directly increased recoveries to one or more classes of creditors or who paved the way for others to so to increase recoveries.  Here, there has been, and will be, no DIP financing or other financing, nor any sale of any material business assets. The simple fact is that Invictus' efforts *decreased*, and continue to decrease, creditor recoveries through the time that the Debtors' and the Committee's professionals incurred in negotiating the DIP financing and responding to the Application.

13.     Taking into account the foregoing, I believe the Application should be denied.

Date: April 14, 2021

/s/ *Matthew J. Dundon*
Matthew J. Dundon
440 Mamaroneck Ave., Ste. 507
Harrison, NY 10528
mdundon@dundon.com
(914) 341-1188

# EXHIBIT B

Invictus Proposal

**PH DRAFT 1/8/2021**
**PRIVILEGED & CONFIDENTIAL**

## DEBTOR IN POSSESSION SENIOR SECURED
## DELAYED DRAW TERM LOAN PROMISSORY NOTE

$4,000,000.00                                      New York, New York
                                                   January [  ], 2021

On November 7, 2020 (the "Petition Date"), [CRED INC.], a [Delaware] corporation and each of its debtor subsidiaries (collectively, the "Company" or "Borrower") commenced chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"; and the cases commenced thereby, the "Chapter 11 Cases"). The Company (as defined herein) continues to operate its business and manage its properties as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. The Company has requested that the lenders (the "DIP Lenders") from time to time party to this Debtor in Possession Senior Secured Delayed Draw Term Loan Promissory Note (as amended, modified, or supplemented from time to time, this "Note"), make Term Loans (as defined below) from time to time evidenced by this Note, this Note being acknowledged and agreed upon by [_____], a _____, as agent (in such capacity, the "Agent"). The Borrower intends to utilize such Term Loans to (i) fund general corporate needs of the Company, including without limitation working capital and other needs, (ii) pay costs and expenses arising from or relating to the administration of the Chapter 11 Cases and (iii) pay the fees and expenses of the Company arising from or relating to the prosecution of claims and causes of action against certain parties, including fees and expenses of professionals, in each case in accordance with the Budget. Capitalized terms used herein and not otherwise defined herein shall have the meanings provided in Section 18 of this Note.

1.    Term Loans.

(a)    Subject to the terms and conditions hereof including the Agent's receipt of a Borrowing Request, the DIP Lenders agree to provide the Borrower with Term Loans in an aggregate principal amount not to exceed $4,000,000.00 on the terms, and subject to the conditions, set forth herein and in any Financing Order (the "Maximum Amount").

(b)    Initial Loan. Subject to the terms and conditions hereof, including Agent's receipt of a Borrowing Request by or before 2:00 p.m. (New York time) not less than five (5) Business Days prior to the Closing Date (or such shorter period as the Agent may agree), Agent and DIP Lenders shall make available to the Borrower Term Loans on the Closing Date in an aggregate principal amount of up to $4,000,000.00 (the "Initial Loan").

(c)    Additional Loans. At any time on or after the date of entry of the Final Order, and subject to the terms and conditions hereof, including the Agent and the DIP Lenders' receipt of a Borrowing Request, the DIP Lenders agree to provide the Borrower with one or more additional loans, each in a principal amount of not less than $1,000,000.00 (each such additional loan, an "Additional Loan" and collectively, the "Additional Loans" and, together with the Initial Loan, each, a "Term Loan" and collectively, the "Term Loans"). For the avoidance of doubt, each

Borrowing Request shall be made by the Borrower in accordance with the Budget. The Borrower may request the Additional Loans pursuant to written notice (which may be by e-mail) delivered to the Agent by or before 2:00 p.m. (New York time) three (3) Business Days prior to the proposed borrowing date (or such shorter period as the Agent may agree) substantially in the form of Exhibit B attached hereto (a "Borrowing Request").   Each DIP Lender shall provide the Term Loans in an aggregate amount equal to its Commitment set forth on Schedule 1(a) and the obligation of each DIP Lender to make the Term Loans under this Note shall be several and not joint and several.  Upon receipt of a Borrowing Request, subject to the satisfaction of the conditions set forth in Section 2 of this Note, the DIP Lenders shall simultaneously and proportionately to their Pro Rata Share of the Maximum Amount, make the proceeds of such Term Loans available to the Borrower on the applicable date of funding of such Term Loan by transferring immediately available funds equal to such proceeds to an account designated in writing by the Borrower consistent with its existing cash management system.  The Commitment of each DIP Lender shall be permanently reduced upon the making of a Term Loan in an amount equal to such Term Loans. Any principal amount of the Term Loan which is repaid or prepaid may not be reborrowed.

(d)     The Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any Borrowing Request or similar notice believed by the Agent to be genuine.  The Agent may assume that each Person executing and delivering any such notice was duly authorized, unless the responsible individual acting thereon for the Agent has actual knowledge to the contrary.

(e)     The parties hereto intend to treat this Note as an equity investment in the Company for U.S. federal, state, local and foreign income tax purposes and each agrees to take no tax position to the contrary except as required pursuant to a final determination within the meaning of section 1313 of the Internal Revenue Code (or any similar provision of other applicable law).

(f)     The Borrower shall utilize the proceeds of Term Loans to (i) fund general corporate needs of the Company, including without limitation working capital and other needs, (ii) pay costs and expenses arising from or relating to the administration of the Chapter 11 Case and (iii) pay the fees and expenses of the Company arising from or relating to the prosecution of causes of action against certain parties, including fees and expenses of professionals, in each case in accordance with the Budget, this Note, the Bankruptcy Code and the Financing Order; provided, however, no Term Loans, Cash Collateral or other cash may be used to investigate, commence or prosecute any action, proceeding or objection with respect to or related to the claims, liens or security interests of the Agent or the DIP Lender.

2.     Certain Conditions to Each Term Loan.  Except as otherwise agreed between the Borrower and DIP Lenders, no DIP Lender shall be obligated to fund any Term Loan, if, as of the date thereof:

(a)     the Borrower shall not have paid or shall not have made an arrangement for payment for any amount then payable hereunder (including the fees and expenses of counsel to the Agent) or under any other DIP Document with respect to which the Borrower has received an invoice at least two (2) Business Days prior to the proposed borrowing date;

(b)     the Company shall not have delivered corporate resolutions, incumbency certificates and similar documents prior to the Closing Date, in form and substance satisfactory to

2

the DIP Lenders with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;

       (c)     [Reserved];

       (d)     any representation or warranty by the Company contained herein or in any other DIP Document shall be untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;

       (e)     with respect to the Initial Loan, (i) the Bankruptcy Court shall not have entered the Final Order; or (ii) the Final Order shall have been stayed, vacated, reversed, modified or amended without DIP Lenders' consent in their sole discretion;

       (f)     with respect to any Additional Loan, the Final Order shall have been stayed, vacated, reversed, modified or amended without the DIP Lenders' consent in their sole discretion;

       (g)     [RESERVED];

       (h)     except as occasioned by the commencement of the Chapter 11 Case and the actions, proceedings, investigations and other matters related thereto or arising therefrom (including any actions taken in accordance with the Budget, this Note or the Financing Order), any event or circumstance having a Material Adverse Effect shall have occurred since the date hereof;

       (i)     any Default or Event of Default shall have occurred and be continuing or would result immediately after giving effect to any Term Loan;

       (j)     after giving effect to any Term Loan, the outstanding principal amount of all Term Loans would exceed the Maximum Amount;

       (k)     the DIP Lenders shall not have received and approved the Budget in accordance with this Note and the Financing Order;

       (l)     the Company shall have filed one or more pleadings with the Bankruptcy Court that directly affect the interests of the DIP Lenders and such pleadings shall not be in form and substance reasonably acceptable to the DIP Lenders in their sole discretion;

       (m)     the Company shall not have delivered a Borrowing Request as pursuant to this Note;

       (n)     the Agent shall not have received, prior to the Closing Date, all documentation and other information about the Borrower that it reasonably determines is required by regulatory authorities under applicable "know your customer" and anti-money laundering laws;

       (o)     the Borrower shall not have delivered to the Agent and the DIP Lenders, such other documentation, information, approvals, opinions, evidence and documents as any DIP Lender, through the Agent, may reasonably request prior to date hereof[PH Note to Katten: Katten

to specify required documents]; or

   (p) the Bankruptcy Court shall have entered orders that directly affect the interests of the DIP Lenders and such orders shall not be in form and substance reasonably acceptable to the DIP Lenders in their sole discretion.

   The request and acceptance by the Borrower of the proceeds of any Term Loan shall be deemed to constitute, as of the date of such request, acceptance or incurrence, (i) a representation and warranty by the Borrower that the conditions in this Section 2 have been satisfied and (ii) a reaffirmation by the Borrower of the granting and continuance of the Liens granted in favor of the Agent on behalf of the DIP Lenders, pursuant to the Financing Order.

  3. <u>Payment of Principal</u>.  FOR VALUE RECEIVED, the Borrower promises to pay to the Agent, for the benefit of the DIP Lenders, the unpaid principal amount of all Term Loans made by the DIP Lenders to the Borrower, on the Maturity Date, together with all accrued and unpaid interest, fees, expenses, premiums and other Obligations to the extent provided, without duplication, in this Note and the Financing Order.

  4. <u>Payment of Interest</u>.

   (a) Subject to the terms of this Note, the Term Loans shall bear interest on the principal amount thereof from time to time outstanding, from the date of the advance of such Term Loan until repaid, at a rate per annum equal to 15.00% per annum if the Borrower elects to make interest payments in cash or at a rate per annum equal to 20.00% per annum if the Borrower elects to make interest payments in kind.  Interest on the Term Loans shall be due and payable in arrears on each Interest Payment Date commencing with the Interest Payment Date falling on [March 31], 2021.

   (b) The Borrower shall, by delivering a written notice substantially in the form of Exhibit C (a "<u>Cash/PIK Election Notice</u>") to the Agent on or prior to the Cash/PIK Election Date, elect whether interest payments for the applicable interest period shall be paid in cash (such election, the "<u>Cash Option</u>") or paid in kind and capitalized by increasing the outstanding principal amount of the Term Loans by the amount of such interest payment (such election, the "<u>PIK Option</u>"); provided that if the Borrower fails to deliver a Cash/PIK Election Notice by the Cash/PIK Election Date, the Borrower shall be deemed to have elected the PIK Option on the applicable Interest Payment Date.  If the Borrower elects the Cash Option, all interest payments with respect to the Term Loans for the applicable fiscal quarter shall be paid in cash on the applicable Interest Payment Date in accordance with Section 4(a). If the Borrower elects the PIK Option (or is deemed to elect the PIK Option), all interest payments with respect to the Term Loans for the applicable fiscal quarter shall be paid in kind at the rate of 20.00% per annum (the amount of such interest paid in kind, together with any interest thereon, collectively, the "<u>PIK Interest</u>") and capitalized by increasing the outstanding principal amount of the Term Loans by such amount on the applicable Interest Payment Date.   In the event Borrower exercises its right to pay interest in kind, such interest shall thereafter be treated for all purposes as Term Loans outstanding, including (without limitation) for determining the amount of interest thereafter accruing and due and payable.  For the avoidance of doubt, any PIK Interest shall not count as against the Maximum Amount.

(c)    All computations of fees and interest shall be made by the Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable.  Each determination by the Agent of an interest rate hereunder shall be final, binding and conclusive on the Borrower (absent manifest error).

(d)    So long as an Event of Default shall have occurred and be continuing, and at the election of the DIP Lenders, the interest rate applicable to the Term Loans shall be increased by five percentage points (5.00%) per annum above the rate of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding Term Loans shall bear interest at the Default Rate.  Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived and shall be payable upon demand.

(e)    It is the intention of the parties hereto that the Agent and each DIP Lender shall conform strictly to usury laws applicable to it. Accordingly, if the transactions contemplated hereby or by any other DIP Document would be usurious as to the Agent or any DIP Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Agent or such DIP Lender notwithstanding the other provisions of this Note), then, in that event, notwithstanding anything to the contrary in this Note or any other DIP Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to the Agent or any DIP Lender that is contracted for, taken, reserved, charged or received by the Agent or such DIP Lender under this Note or any other DIP Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by the Agent or such DIP Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full (other than contingent indemnification obligations not due and payable), refunded by the Agent or such DIP Lender, as applicable, to the Borrower).  If at any time and from time to time (x) the amount of interest payable to the Agent or any DIP Lender on any date shall be computed at the highest lawful rate applicable to the Agent or such DIP Lender pursuant to this Section 4(e) and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Agent or such DIP Lender would be less than the amount of interest payable to the Agent or such DIP Lender computed at the highest lawful rate applicable to the Agent or such DIP Lender, then the amount of interest payable to the Agent or such DIP Lender in respect of such subsequent interest computation period shall continue to be computed at the highest lawful rate applicable to the Agent or such DIP Lender until the total amount of interest payable to the Agent or such DIP Lender shall equal the total amount of interest which would have been payable to the Agent or such DIP Lender if the total amount of interest had been computed without giving effect to this Section 4(e).

(f)    If, after the date hereof, the DIP Lenders determine that (1) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any governmental authority charged with the administration thereof, or (2) compliance by any DIP Lenders or its parent bank holding company (if any) with any guideline, request, or directive of

any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on the DIP Lender's or such holding company's capital as a consequence of the DIP Lender's Term Loan hereunder to a level below that which the DIP Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration the DIP Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount reasonably deemed by the DIP Lender to be material, then the DIP Lender may notify the Borrower thereof.  Following receipt of such notice, the Borrower agrees to pay the DIP Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable promptly after presentation by the DIP Lender to the Borrower of a statement in the amount and setting forth in reasonable detail the DIP Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).  In determining such amount, the DIP Lender may use any reasonable averaging and attribution methods.

5.      Payments.  All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds to the Agent at the account as shall be designated in a written notice delivered by the Agent to the Borrower no later than 2:00 p.m. (New York time) on the date due.  Each payment made hereunder shall be credited first to interest then due and payable and the remainder of such payment shall be credited to principal, and interest shall thereupon cease to accrue upon the principal so repaid.  [For U.S. federal, state, local and foreign income tax purposes, the parties agree that each payment of principal (including any accrued but undeclared and unpaid interest) pursuant to sections 5, 6 and 7 of this Note shall be treated as a payment in redemption or liquidation of a portion of the DIP Lenders' interest in the Company and no party shall take any tax position inconsistent therewith except pursuant to a final determination pursuant to section 1313 of the Internal Revenue Code (or any similar provision of other applicable law).][PH Note to Katten: Katten to explain the intent of the note being treated as equity for tax purposes]

6.      Optional Prepayments.  Subject to the terms and conditions of the Financing Order, the Borrower shall have the right at any time and from time to time to prepay any Term Loans under this Note in whole or in part upon two (2) Business Days' written notice to the Agent received by or before 2:00 p.m. (New York time) on such date; provided that each such prepayment shall be in a minimum amount of $500,000.00.  Notice of prepayment having been given as aforesaid, the principal amount specified in such notice shall become due and payable on the prepayment date specified therein in the aggregate principal amount specified therein unless such repayment is conditioned on the receipt of any third party funds which are not received.  Any prepayment or repayment hereunder shall be accompanied by interest on the principal amount of this Note being prepaid or repaid to the date of prepayment or repayment and the applicable Early Termination Premium.

7.      Conversion Option.   The Obligations shall convert into an exit credit facility (the "Exit Facility") at the Borrower's election (the "Conversion Option"), with such election to be made on or prior to the date on which an order is entered approving the disclosure statement (the "Disclosure Statement"), and which election shall become effective and irrevocable as of the effective date (the "Effective Date") of a Chapter 11 plan  (the "Plan") confirmed by an order of

the Bankruptcy Court (the "Confirmation Order") (such Plan and Confirmation Order, together with all plan supplement documents and related documents, to be in form and substance acceptable to the DIP Lenders in their sole discretion, which shall not be unreasonably withheld).  The documentation with respect to the Exit Facility shall be in form and substance acceptable to the DIP Lenders.

8.      Fees.  Borrower shall pay to the Agent for the account of the DIP Lenders the following fees:

(a)      Administration Fees.  The Borrower shall pay to the Agent for its own account the fees provided for in the Agent Fee Letter (such fees, the "Administration Fees").

(b)      Put Option Premium. Upon entry of the Final Order, and subject to the funding of the Initial Loan, DIP Lenders shall earn a put option premium equal to $350,000.00 (the "Put Option Premium"), which amount, at Borrower's election on three (3) Business Days prior notice, shall be (i) payable in cash upon entry of the Final Order or (ii) paid in kind through the issuance of additional Term Loans.  In the event Borrower exercises its right to pay the Put Option Premium in kind, such Put Option Premium shall thereafter be treated for all purposes as a Term Loan outstanding, including (without limitation) for determining the amount of interest thereafter accruing and due and payable.  For the avoidance of doubt, Term Loans comprised of the Put Option Premium shall not count as against the Maximum Amount and shall be paid on the Maturity Date.

(c)      Early Termination Premium.  If the Borrower has not elected to exercise the Conversion Option, but instead repays the Term Loans (or any portion thereof) at any time prior to the Stated Maturity Date, in addition to repaying the principal of and any and all accrued and unpaid interest and other Obligations outstanding with respect to the Term Loans so repaid, the Borrower shall pay the Agent, for the benefit of the DIP Lenders, an early termination premium (the "Early Termination Premium") in an amount equal to 7.5% of the undrawn Commitment amount at the time of such repayment by the Borrower had such Term Loans remained outstanding through the Stated Maturity Date.

9.      Indemnity.

(a)      The Company shall indemnify and hold harmless the Agent and each DIP Lender and each of their respective affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the other DIP Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between the Agent and the DIP Lenders on the one hand and the Company on the other hand; provided, that (i) the Company shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding,

7

claim, damage, loss, liability or expense results solely from such Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction and (ii) this Section 9 shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim.  **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY DIP DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**

10.    <u>Adjustments for Withholding, Capital Adequacy Etc.</u>  All payments to the Agent by the Borrower under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges or withholdings and all related liabilities (all such taxes, duties, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "<u>Taxes</u>") imposed by the United States of America or any other nation or jurisdiction (or any political subdivision or taxing authority of either thereof), unless such Taxes are required by applicable law to be deducted or withheld.  The parties hereto agree to treat interest in this Note, as preferred stock, for federal income tax purposes, in which dividends shall not accrue or otherwise be subject to withholding unless and until such dividends are declared by the Board of Directors of the Company (the "<u>Board</u>") and paid by the Company.  If the Borrower shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note other than taxes imposed on the Agent or any DIP Lender's overall net income, then (A) if such Tax is an Indemnified Tax, the amount payable shall be increased as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) the Agent receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (B) the Borrower shall make such deductions or withholdings, and (C) the Borrower shall timely pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge or withholding on or from payments due from the Borrower (but excluding Indemnified Taxes, Excluded Taxes, and taxation on the overall net income of the DIP Lenders)), or any change therein or in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of the Agent or DIP Lenders with respect to this Note or to increase the cost to the Agent or DIP Lenders of making or maintaining amounts available under this Note, the Borrower agrees to pay to the Agent or DIP Lenders such additional amount or amounts as will compensate the Agent or DIP Lenders on an after-tax basis for such reduction or increase.

The Borrower agrees to timely pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes or similar levies (all such taxes, charges, duties and levies being referred to as "<u>Other Taxes</u>") which

8

arise from any payment made by the Borrower under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

The Borrower shall indemnify the Agent and each of the DIP Lenders for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed by any jurisdiction on amounts payable by the Borrower hereunder) paid by the Agent or any DIP Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Indemnified Taxes paid by the Agent or any DIP Lender, whether or not they were correctly or legally asserted, excluding taxes imposed on the Agent or any DIP Lender's overall net income. Payment under this indemnification shall be made upon demand. A certificate as to the amount of such Indemnified Taxes submitted to the Borrower by the Agent shall be conclusive evidence, absent manifest error, of the amount due from the Borrower to the DIP Lenders.

The Borrower shall furnish to the Agent and DIP Lenders the original or a certified copy of a receipt evidencing any payment of Taxes made by the Borrower pursuant to this Section 10 within thirty (30) days after the date of any such payment. If any Recipient becomes aware that it has received a refund of any Taxes with respect to which the Borrower has paid any amount pursuant to this Section 10, such Recipient shall pay the amount of such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest received from the relevant governmental authority with respect thereto), to the Borrower promptly after receipt thereof.

Any Recipient of a payment hereunder shall, to the extent it is legally entitled to do so, deliver to the Agent and the Borrower on or prior to the date hereof (and from time to time thereafter upon the reasonable request of the Agent or the Borrower), two properly completed and executed copies of IRS Forms W-8 or W-9 and properly completed and executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, together with such supplementary documentation as may be prescribed by applicable law to permit the Agent and the Borrower to determine the withholding or deduction (if any) required to be made. In addition, any such Recipient, if reasonably requested by the Agent or the Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Agent or the Borrower as will enable the Agent or the Borrower to determine whether or not such Recipient is subject to backup withholding or information reporting requirements. Each Recipient agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall timely update such form or certification or promptly notify the Agent or the Borrower in writing of its legal inability to do so.

11. <u>Priority of Obligations and DIP Lenders' Liens</u>.

(a)    To secure all of the Borrower's and each other Credit Party's Obligations now existing or hereafter arising, the Credit Parties hereby grant to, and create in favor of, the Agent, for the benefit of itself and the DIP Lenders, Liens on, and security interests in, all of such Credit Party's right, title and interest in and to all of the Collateral effective as of the Petition Date:, including without limitation, (i) subject to the Carve-Out, an allowed super-priority administrative expense claim against the Borrower pursuant to Section 364(c)(1) of the Bankruptcy Code, and except as set forth in the Financing Order, having a priority over any and all other claims and costs

9

and expenses of administration of any kind whatsoever, whether now existing or hereafter arising, including, without limitation, those specified in, ordered pursuant to or arising under, *inter alia*, sections 105, 326, 328, 330, 331, 363, 364, 365, 503, 506, 507, 546, 726, 1113 and/or 1114 or any other provision of the Bankruptcy Code or otherwise (whether incurred in these Chapter 11 Cases and any Successor Cases), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed superpriority administrative claim (x) shall at all times be senior to the rights of the Debtors, any successor trustee or estate representative, or any other creditor or party in interest in the Chapter 11 Cases or any Successor Cases, (y) shall be, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, and (z) shall be payable from and have recourse to all prepetition and postpetition property, whether existing as of the Petition Date or thereafter acquired (including all Avoidance Actions), of the Debtors and all proceeds thereof (including proceeds of Avoidance Actions); (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, Liens on, and security interests in, the Collateral, that are first and senior in priority to all other Liens on, and security interests in, the Collateral that was not encumbered by a valid, enforceable, properly perfected and non-avoidable Lien as of the Petition Date, subject only to the Carve-Out; and (iii) pursuant to section 364(c)(3) of the Bankruptcy Code, Liens on, and security interests in, all other Collateral, subject only to the Carve-Out and Permitted Prior Liens; and (iv) pursuant to Section 364(d) of the Bankruptcy Code, a perfected first priority priming lien on all now owned or after acquired assets of the Credit Parties (including, without limitation, property held by others and all of the outstanding shares of capital stock of the Subsidiary and any subsidiary of any of the Credit Parties) to the extent that such assets are subject to valid, perfected and non-avoidable liens in favor of third parties as of the commencement of these Chapter 11 Cases.  Except as set forth in the Financing Order, the security interests and Liens granted to the Agent hereunder shall not be (i) subject to any Lien or security interest which is avoided and preserved for the benefit of the Company's estate under Section 551 of the Bankruptcy Code, or (ii) subordinated to or made *pari passu* with any other Lien or security interest under Section 364(d) of the Bankruptcy Code or otherwise.

(b)     The priority of the Agent's Liens on the Collateral shall be consistent with clause (a) of this Section 11 and as more fully set forth in the Financing Order.

(c)     Notwithstanding anything herein to the contrary (i) all proceeds received by the Agent and the DIP Lenders from the Collateral subject to the Liens granted in this Section 11 and in each other DIP Document, including the Financing Order shall be subject to the Carve-Out, and (ii) no Person entitled to the Carve-Out shall be entitled to sell, or otherwise dispose, or seek or object to the sale or other disposition of, any Collateral.

(d)     The Company agrees that the Obligations shall constitute allowed administrative expenses in the Chapter 11 Case, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 363, 364, 365, 503, 506, 507, 546, 726, 1113 and/or 1114 of the Bankruptcy Code, except as set forth in the Financing Order.

(e)     The Agent's Liens on the Collateral and the super-priority administrative claim under Section 364(c) of the Bankruptcy Code afforded the Obligations shall, following the

occurrence and during the continuation of an Event of Default, be subject to the Carve-Out, in accordance with the Financing Order.

12.    <u>Further Assurances</u>.  The Company agrees that it shall, at its expense and upon the reasonable request of the Agent or the DIP Lenders, duly execute and deliver or cause to be duty executed and delivered, to the Agent or such DIP Lender, as the Agent or the DIP Lenders shall direct the Company such further instruments and do and cause to be done such further acts as may be necessary in the reasonable opinion of the Agent or the DIP Lenders to carry out more effectively the provisions and purposes of this Note or any other DIP Document, including, upon the written request of the Agent or the DIP Lenders and in form and substance reasonably satisfactory to the DIP Lenders, security agreements, UCC-l financing statements and other Collateral Documents confirming and perfecting the granting to the Agent, on behalf of the DIP Lenders, of the Liens (subject to the Financing Order) in the Collateral to secure the Obligations.

13.    <u>Reports and Notices</u>.  The Company shall deliver (which delivery may be made by electronic communication (including email)) to the Agent each of the reports and other items (without duplication) set forth on Schedule 13 and in the Financing Order no later than the times specified therein.

14.    <u>Affirmative Covenants</u>.

The Company agrees that:

(a)    Upon request of the Agent or the DIP Lenders, the Company will permit any officer, employee, attorney or accountant or agent of the Agent or the DIP Lenders to audit, review, make extracts from or copy, at the Company's expense, any and all corporate and financial and other books and records of the Company at all times during ordinary business hours and, in the absence of an Event of Default, upon reasonable advance notice and to discuss the Company's affairs with any of their directors, officers, employees, attorneys, or accountants.  The Company will permit the Agent, or the DIP Lenders, or any of their officers, employees, accountants, attorneys or agents, to examine and inspect any Collateral or any other property of the Company at any time during ordinary business hours and, in the absence of an Event of Default, upon reasonable prior notice. Notwithstanding the foregoing, the Company will not be required to disclose information to the Agent or the DIP Lenders (or any agent or representative thereof) that is prohibited by applicable law or is subject to attorney-client or similar privilege or constitutes attorney work product.

(b)    (i) The Company will comply with all requirements of applicable law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (ii) the Company will obtain, maintain in effect and comply with all contracts and all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted other than to the extent contemplated by the Budget, the Sale Motion or the Financing Order.

(c)    The Company will pay or discharge, when due, (i) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Company (including, without limitation, the Collateral) or upon or against the

creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, except in each case (x) where the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Company and (y) to the extent nonpayment is permitted or required by the Bankruptcy Code or this Note, (ii) all federal, state and local taxes required to be withheld by them, and (iii) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any property of the Company.

(d)     (i) The Company will keep and maintain the Collateral and all of its properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the Budget or the Financing Order, (ii) the Company will defend the Collateral against all claims or demands of all Persons (other than Permitted Encumbrances) claiming the Collateral or any interest therein, and (iii) the Company and each of its Subsidiaries will keep all Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances and other than to the extent contemplated by the Financing Order.

(e)     [RESERVED]

(f)     The Company will preserve and maintain its existence and all of its rights, privileges and franchises necessary or desirable in the conduct of its business, except to the extent contemplated by the Budget, the Sale Motion or the Financing Order.

(g)     The Company shall at all times operate its business in a manner consistent with the Budget except to the extent of any Permitted Variance.

(h)     The Company shall (i) comply with the Budget (which Budget shall be updated periodically and consistent with the terms of this Note, shall be acceptable to the DIP Lenders in their sole discretion, and subject only to a permitted deviation acceptable to the DIP Lenders in their sole discretion); and (ii) comply with any other financial covenants contained in any of the DIP Documents.

(i)     The Company agrees that it shall take all actions necessary to cause each of the following to occur (each a "Milestone" and collectively, the "Milestones"):

(i)     no later than twenty-five (25) days after the filing of the DIP Motion seeking entry of the Final Order, the Final Order approving this Note and the financing contemplated hereby shall be entered by the Bankruptcy Court;

(ii)     No later than January 29, 2021, the Debtors must either (i)(A) obtain entry of an order approving the Disclosure Statement, and (B) obtain entry of an order by the Bankruptcy Court scheduling a hearing on the Plan and setting an objection deadline with respect thereto, or (ii) seek interim approval of a combined Plan and Disclosure Statement under Local Bankruptcy Rule 3017-2, and schedule a combined hearing on final approval of the Disclosure Statement and confirmation of the Plan;

LEGAL_US_E # 153218462.4

(iii)    no later than March 17, 2021, the Confirmation Order shall have been entered by the Bankruptcy Court, and an order shall have been entered by the Bankruptcy Court approving the [In-Court Sale], as applicable;

(iv)    no later than March 31, 2021, the Effective Date shall have occurred.

15.    <u>Negative Covenants</u>.

The Company agrees that, without the prior written consent of the DIP Lenders:

(a)    The Company shall not, directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or equity interests of, or otherwise combine with or acquire, any Person.

(b)    The Company shall not create, incur, assume or permit to exist any Indebtedness, except (without duplication), to the extent not prohibited by the Financing Order, Permitted Indebtedness.

(c)    The Company shall not enter into, renew, extend or be a party to any transaction with any Affiliate, except Permitted Affiliate Transactions.

(d)    The Company shall not create, incur, assume or permit to exist any Lien on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Permitted Encumbrances or as expressly permitted by the Financing Order.

(e)    The Company will not assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person, except the endorsement of negotiable instruments by Company for the deposit or collection or similar transactions in the ordinary course of business or Permitted Indebtedness.

(f)    The Company will not convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets, whether now owned or hereinafter acquired other than the transfer, sale or disposition of assets approved by an order of the Bankruptcy Court, which order shall be in form and substance acceptable to the Agent and DIP Lenders in their sole discretion.

(g)    Except for (i) claims of employees for unpaid wages, bonuses, accrued vacation and sick leave time, business expenses and contributions to employee benefit plans for the period immediately preceding the Petition Date and prepetition severance obligations, in each case to the extent permitted to be paid by an order of the Bankruptcy Court (which order, as applicable, shall be in form and substance acceptable to the DIP Lenders in their sole discretion) and pursuant to the Budget, and (ii) payments permitted by the Financing Order and the Budget, the Company shall not make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except for other payments consented to by the DIP Lenders in writing in their sole discretion.

(h)    The Company shall not make any Investment in or to, any Person, through

LEGAL_US_E # 153218462.4

the direct or indirect lending of money, holding of securities or otherwise other than Permitted Investments.

16.    <u>Events of Default; Rights and Remedies</u>.    Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a)    The Company (i) shall fail to make any payment of principal of, or interest on, or fees owing in respect of, the Term Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse the Agent on behalf of the DIP Lenders for any expense reimbursable hereunder or under any other DIP Document within three (3) Business Days following the Agent's demands for such reimbursement or payment.

(b)    The Company shall fail to comply with any of the provisions of (i) Sections 13, 14(a), 14(b), 14(c), 14(d), or 14(f) of this Note and such failure shall remain uncured for a period of five (5) Business Days, or (ii) Sections 14(i) or 15 of this Note.

(c)    The Company shall fail to comply with any of other provision of this Note or any of the other DIP Documents (other than any provision embodied in or covered by any other clause of this Section 16) and the same (other than the provisions covered by Section 14(h)), if capable of being remedied, shall remain unremedied for ten (10) days after the earlier of the date a senior officer or the Company becomes aware of such failure and the date written notice of such default shall have been given by the Agent to the Company.

(d)    Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits the Company from complying or permits the Company not to comply, a default or breach shall occur after the Closing Date under any other agreement, document or instrument to which the Company is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness (other than the Obligations) of the Company in excess of $100,000.00 in the aggregate, or (ii) causes, or permits any holder of such Indebtedness or a trustee to cause, Indebtedness or a portion thereof in excess of $100,000.00 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

(e)    Any representation or warranty herein or in any other DIP Document or in any written statement, report, financial statement or certificate made or delivered to Agent or DIP Lenders by the Company is untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date when made or deemed made.

(f)    The Company shall bring a motion in the Chapter 11 Case:  (i) to obtain financing from any Person other than DIP Lenders under Section 364(c) or 364(d) of the Bankruptcy Code, except (x) Permitted Indebtedness, or (y) to the extent the proceeds of such

financing would be used to repay in full in cash all of the Obligations (other than contingent indemnification obligations not due and payable) under this Note; (ii) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral, except to the extent (x) such Lien secures Permitted Indebtedness and is junior and subordinate to the Liens granted in favor of the Agent, or (y) the proceeds of any such financing secured by such Lien would be used to repay in full in cash all of the Obligations under this Note; or (iii) to authorize any other action or actions adverse to the Agent or the DIP Lenders, or the Agent's and/or the DIP Lenders' rights and remedies hereunder or their interests in the Collateral.

(g)     The entry of an order in the Chapter 11 Case confirming a plan or plans of reorganization that does not contain a provision for the termination of the DIP Lenders' commitment to make Term Loans and the repayment in full in cash of all the Obligations (other than contingent indemnification obligations not due and payable) under this Note on or before the effective date of such plan or plans and that is not otherwise acceptable to the DIP Lenders in their sole discretion.

(h)     The filing of any motion by the Borrower seeking, or the entry of any order in the Chapter 11 Case in respect of, any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral.

(i)     The sale, without the Agent's and DIP Lenders' consent in their sole discretion, of all or substantially all of Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise, that does not provide for the payment in full in cash of the Obligations (other than contingent indemnification obligations not due and payable) and termination of the DIP Lenders' commitment to make Term Loans, and is not otherwise acceptable to the Agent and DIP lenders in their sole discretion; provided, that the In-Court Sale shall not constitute an Event of Default.

(j)     The occurrence of any postpetition judgments, liabilities or events that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(k)     The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, business, or reorganization of the Company, excluding the examiner that the Bankruptcy Court directed the United States Trustee to appoint on December 23, 2020 pursuant to the Order Denying in Part, and Granting in Part, the Trustee/Examiner Motions ("Examiner Order") [Docket No. 281], which directed such examiner to complete the Investigation (as defined in the Examiner Order).

(l)     The Chapter 11 Case shall be dismissed or converted from a case under chapter 11 of the Bankruptcy Code to a case under chapter 7 of the Bankruptcy Code.

(m)     The entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Note or the other DIP Documents.

15

(n)     The entry of an order in the Chapter 11 Case granting any other super-priority administrative claim or Lien equal to or superior to that granted to the Agent (other than any such claim or Lien permitted by the Financing Order), unless (i) consented to by the Agent and DIP Lenders in their sole discretion or (ii) the Obligations (other than contingent indemnification obligations not due and payable) are paid in full in cash and the DIP Lenders' commitment to make Term Loans are terminated.

(o)     The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Agent) to execute upon or enforce a Lien on any Collateral except with respect to Permitted Encumbrances arising prior to the Closing Date in an aggregate amount not to exceed $100,000.00.

(p)     The Financing Order shall be stayed, amended, modified, reversed or revoked in any respect without the DIP Lenders' prior written consent (which consent shall be in their sole discretion).

(q)     There shall commence any suit or action against the Agent or any DIP Lender by or on behalf of (i) the Company or any other Credit Party or (ii) any official committee in the Chapter 11 Case, in each case, that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of DIP Lenders or recovering any amounts paid or payable to the Agent or DIP Lenders, and, if such suit or action is commenced by any Person other than the Company, officer, or employee of the Company, such suit or action shall not have been dismissed or stayed within 10 days after service thereof on the Agent or any DIP Lender, as applicable, and, if stayed, such stay shall have been lifted.

(r)     Failure of the Company to comply with any Milestone set forth in Section 14(i).

(s)     Any provision of any DIP Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or the Company shall challenge the enforceability of any DIP Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any DIP Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any DIP Document shall cease to be a valid and perfected first priority Lien (except as otherwise permitted herein or in the Financing Order) in any of the Collateral purported to be covered thereby.

(t)     A breach by the Company of any of the material terms of the Financing Order.

(u)     A Material Adverse Deviation shall have occurred.

(v)     The Final Order shall not have been entered by the Bankruptcy Court within 35 days from the date of the DIP Motion.

(w)     The PSA is terminated or otherwise modified without the consent of the DIP Lenders.

If any Event of Default shall have occurred and be continuing, then the Agent may (as directed by the DIP Lenders), upon written notice to the Borrower and subject to the terms of the Financing Order: (i) terminate the Commitment of each DIP Lender with respect to further Term Loans; (ii) declare all or any portion of the Obligations, including all or any portion of any Term Loan, to be forthwith due and payable; (iii) revoke the Borrower's right to use Cash Collateral in which the Agent and the DIP Lenders have an interest; and (iv) exercise any rights and remedies under the DIP Documents or at law or in equity, all in accordance with the Financing Order.  Upon the occurrence and continuance of an Event of Default and the exercise by the Agent or the DIP Lenders of their rights and remedies under this Note and the other DIP Documents pursuant to clause (iv) above and subject to the Financing Order, the Company shall assist the Agent in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition.

Except as otherwise provided for in this Note, the Financing Order or by applicable law, the Company waives:  (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Agent on which any the Company may in any way be liable, and hereby ratifies and confirms whatever the Agent may do in this regard; (b) all rights to notice and a hearing prior to the Agent taking possession or control of, or Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Agent to exercise any of its remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

To the extent permitted by law and subject in all respects to the terms of the Financing Order, the Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as Agent deals with similar securities and property for its own account, the Agent's duty of care with respect to Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if the Agent exercises reasonable care in the selection of the bailee or other third person, and the Agent need not otherwise preserve, protect, insure or care for any Collateral, and the Agent shall not be obligated to preserve any rights the Company may have against prior parties.

17.     <u>Reference Agreements</u>.  This Note evidences the Term Loans that may be made to Borrower from time to time in the aggregate principal amount of up to $4,000,000.00 and is issued pursuant to and entitled to the benefits of the Financing Order, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loans evidenced by this Note are made and are to be repaid.

18.     <u>Definitions</u>.  The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Agent Fee Letter" means that certain Credit Facility Agent Fee Letter, dated January [  ], 2021, between the Agent and the Borrower, regarding fees payable in connection with this Note.

"Avoidance Actions" means any claims or cause of action arising under chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code, or any other applicable law equivalents.

"Bankruptcy Code" shall have the meaning given such term in the recital to this Note.

"Bankruptcy Court" shall have the meaning given such term in the recital to this Note.

"Borrower" shall have the meaning given such term in the recital to this Note.

"Borrowing Request" shall have the meaning given such term in Section 1(c) of this Note.

"Budget" means a rolling thirteen (13) week forecast of projected receipts, disbursements, net cash flow, liquidity, loans and availability for the immediately following consecutive 13 weeks after the date of delivery, which shall be in substantially the form of the Initial Budget or otherwise in form and substance acceptable to the DIP Lenders in their sole discretion and shall be approved by the DIP Lenders in their sole discretion. The Initial Budget, which shall be in form and substance acceptable to, and approved by, the DIP Lenders in their sole discretion (the "Initial Budget") is attached hereto as Exhibit A.

"Business Day" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"Carve-Out" shall have the meaning given such term in the Financing Order.

"Cash Collateral" shall have the meaning given such term in Section 363(a) of the Bankruptcy Code.

"Cash/PIK Election Date" shall mean for any Interest Payment Date, the date that is two (2) Business Days (or such shorter period reasonably acceptable to the Agent) prior to such Interest Payment Date.

"Chapter 11 Cases" shall have the meaning given such term in the recital to this

18

Note.

"Closing Date" means the Business Day on which each of the conditions applicable to funding of the Initial Loan and listed in Section 2 of this Note shall have been satisfied or waived in a manner satisfactory to the DIP Lenders.

"Collateral" means any and all assets and property covered by the Financing Order and the other Collateral Documents and any other assets and property, real or personal, tangible or intangible, of every kind and nature, now existing or hereafter acquired, of each Credit Party. Without limiting the foregoing, the Collateral shall include all present and future property of the Company under Section 541(a) of the Bankruptcy Code (including, without limitation, all claims and causes of action of the Company against third parties, including Avoidance Actions, and the proceeds of Avoidance Actions), accounts, documents, chattel paper, commercial tort claims, deposit accounts, general intangibles (including payment intangibles and software), goods (including equipment, inventory and all accessions and attachments thereto), instruments, investment property, letter-of-credit rights, supporting obligations, copyrights (whether registered or unregistered) and all registrations and applications therefor, patents and patent applications (including all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations thereof), trademarks (and all goodwill associated with such trademarks), trade names and service marks (including all registrations and applications for any of the foregoing), money, rights to the payment of money, insurance claims and proceeds, membership interests or other equity interests in each Credit Party, and all proceeds and products thereof.

"Collateral Documents" shall mean any agreement entered into pursuant to Section 12 hereof and all similar agreements entered into granting a Lien upon property as security for payment of, the Obligations, each in form and substance acceptable to the Agent in its sole discretion, including the Financing Order.

"Commitment" means, with respect to each DIP Lender, the commitment of such DIP Lender to make its portion of the Term Loans to the Borrower in the principal amount set forth on Schedule 1(a) to this Note for each DIP Lender, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Company" shall have the meaning given to such term in the recital to this Note.

"Confirmation Order" shall have the meaning given to such term in Section 7 of this Note.

"Conversion Option" shall have the meaning given to such term in Section 7 of this Note.

"Credit Party" means the Company and each of its Subsidiaries.

"Debtor" and "Debtors" shall have the meanings given to such terms in the Financing Order.

"Default" means an event described in Section 16 which, with the giving of notice

or the lapse of time or both, would constitute an Event of Default.

"<u>Default Rate</u>" shall have the meaning given such term in Section 4(d) of this Note.

"<u>DIP Documents</u>" shall mean this Note, the Collateral Documents, the Financing Order, the Agent Fee Letter, and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of the Agent and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of the Company, or any employee of the Company, and delivered to the Agent in connection with this Note or the transactions contemplated thereby, in each case in form and substance acceptable to the Agent in its sole discretion.  Any reference in this Note or any other DIP Document to a DIP Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such DIP Document as the same may be in effect at any and all times such reference becomes operative.

"<u>DIP Lenders</u>" shall have the meaning given such term in the recital to this Note.

"<u>DIP Motion</u>" shall mean the motion filed by the Debtors seeking approval from the Bankruptcy Court for the Debtors to enter into the DIP Documents.

"<u>Disclosure Statement</u>" shall have the meaning given such term in Section 7 of this Note.

"<u>Dollars</u>" or "<u>$</u>" shall mean lawful currency of the United States of America.

"<u>Early Termination Premium</u>" shall have the meaning given to such term in Section 8  of this Note.

"<u>Effect of Bankruptcy</u>" means, with respect to any contractual obligation, contract or agreement to which a Credit Party is a party, any default or other legal consequences arising on account of the commencement or the filing of the Chapter 11 Cases (including the implementation of any stay), or the rejection of any such contractual obligation, contract or agreement with the approval of the Bankruptcy Court if required under applicable law.

"<u>Effective Date</u>" shall have the meaning given to such term in Section 7 of this Note.

"<u>Event of Default</u>" shall have the meaning given such term in Section 16 of this Note.

"<u>Excluded Taxes</u>" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any DIP Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), (b) in the case of a DIP Lender, federal withholding Taxes imposed on amounts payable to or for the account of

such DIP Lender with respect to an applicable interest in a Term Loan or Commitment pursuant to a law in effect on the date on which (i) such DIP Lender acquires such interest in the Term Loan or Commitment or (ii) such DIP Lender changes its lending office, except in each case to the extent that, pursuant to Section 10, amounts with respect to such Taxes were payable either to such DIP Lender's assignor immediately before such DIP Lender became a party hereto or to such DIP Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to provide the Borrower with the tax documentation described in Section 10 hereof and (d) any withholding Taxes imposed under FATCA.

"Exit Facility" shall have the meaning given to such term in Section 7 of this Note.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among governmental authorities and implementing such Sections of the Internal Revenue Code.

"Final Order" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing pursuant to Sections 363 and 364 of the Bankruptcy Code and Bankruptcy Rule 4001, satisfactory in form and substance to the Agent and DIP Lenders in their sole discretion, together with all extensions, modifications and amendments thereto (which extensions, modifications and/or amendments are satisfactory in form and substance to the Agent in its sole discretion), authorizing Borrower to obtain credit, incur Indebtedness, and grant Liens under this Note and/or certain financing documentation, all as set forth in such order.

"Financing Order" shall mean the Final Order.

"In-Court Sale" shall be defined as set forth in the PSA.

"Indebtedness" shall mean, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than 120 days after the date such payable was created); (c) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all capitalized lease obligations of such Person; (f) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (g) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax ownership/operating lease, off-balance sheet financing or similar financing; (h) all contingent obligations; and (i) all obligations referred to in clauses (a) through (h) of this definition of another Person secured by (or for which the holder

21

of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness (provided that, if the Person has not assumed or otherwise become liable in respect of such indebtedness, such indebtedness shall be deemed to be in an amount equal to the lesser of (A) the fair market value of the property to which such Lien relates or (B) the aggregate unpaid amount thereof).

"Indemnified Person" shall have the meaning given such term in Section 9 of this Note.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any DIP Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Internal Revenue Code" shall mean 26 U.S.C. §§ 1 *et seq*.

"Interest Payment Date" shall mean as to any Term Loan, (a) the last Business Day of each fiscal quarter to occur while such Term Loan is outstanding and (b) the date of any repayment or prepayment made in respect thereof, including the Maturity Date.

"Investment" means any investment in any Person, whether by means of acquiring or holding securities, capital contribution, loan, time deposit, advance, guarantee or otherwise

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Material Adverse Deviation" means, as of any date of determination, an adverse deviation of more than the Permitted Variance from the aggregate amount set forth in the line item of the Budget titled "Total Operating Disbursements" for the 4 week period ending on [          , 2021] and each rolling 4 week period thereafter.

"Material Adverse Effect" means a material adverse effect on (i) the ability of the Company to perform any of its payment or other material obligations under any DIP Document to which it is a party, (ii) the legality, validity or enforceability of this Note or any other DIP Document, (iii) the rights and remedies of the Agent and the DIP Lenders under any DIP Document, or (iv) the validity, perfection or priority of a Lien in favor of DIP Lenders on any of the Collateral. Notwithstanding anything to the contrary, a "Material Adverse Effect" shall not be deemed to exist as a result of the Effect of Bankruptcy or the events leading up to and resulting therefrom.

"Maturity Date" means, subject to the Borrower's exercise of the Conversion Option and the effectiveness of the Exit Facility, the earliest to occur of (i) the Stated Maturity

Date, (ii) the date the Bankruptcy Court orders the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code or the dismissal of any of the Chapter 11 Cases, (iii) the acceleration of the Term Loans and termination of the DIP Lenders commitment to make the Term Loans, including, without limitation, as a result of the occurrence of an Event of Default, and (iv) the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court.

"Maximum Amount" shall have the meaning given such term in Section 1 of this Note.

"Milestones" shall have the meaning given such term in Section 14 of this Note.

"Net Proceeds" shall mean all proceeds of any asset disposition, net of (1) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the Borrower in connection therewith (in each case, paid to non-affiliates), (2) transfer, sales, or similar taxes, and (3) amounts required to be applied to the repayment of debt secured by such assets sold and secured by a Lien that is senior to the Liens securing the Obligations under this Note.

"Note" shall have the meaning given such term in the recital to this Note.

"Obligations" shall mean all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrower to Agent or DIP Lenders, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, in all cases, arising under this Note or any of the other DIP Documents.  This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to Borrower under this Note or any of the other DIP Documents.

"Other Taxes" shall have the meaning given such term in Section 10 of this Note.

"Participant Register" shall have the meaning given such term in Section 21 of this Note.

"Payment Office" means such office or offices of the Agent as may be designated in writing from time to time by the Agent to the Borrower.

"Permitted Encumbrances" shall mean the following encumbrances:  (a) the Agent's and DIP Lenders' Liens; (b) Liens existing on the Closing Date to the extent valid, properly perfected, unavoidable and enforceable, in each case, on or as of the Closing Date or perfected after the Closing Date pursuant to section 546(b) of the Bankruptcy Code, i.e., "Permitted Prior Liens"; and (c) other Liens granted pursuant to the Financing Order (including, to the extent constituting a Lien, the Carve-Out), subject in all respects to the priorities set forth in the Financing Order.

"Permitted Affiliate Transactions" shall mean (1) transactions between and along

the Credit Parties and (2) transactions existing on the Closing Date and listed on Schedule 15(c).

"Permitted Indebtedness" shall mean: (a) current Indebtedness incurred in the ordinary course of business for inventory, supplies, equipment, services, taxes or labor, in each case, in accordance with the Budget; (b) Indebtedness arising under this Note and the other DIP Documents; (c) deferred taxes and other expenses incurred in the ordinary course of business, in accordance with the Budget; (d) any Indebtedness existing on the Closing Date, subject to the terms of the Financing Order and the Budget; (e) administrative expenses of Borrower for which the Bankruptcy Court has not directed payment, subject to the terms of the Financing Order and the Budget, and (f) Indebtedness that (i) is subordinate in right of payment and (ii) if secured, secured by Liens junior to the Liens granted in favor of the Agent, subject to the terms of the Financing Order, and (iii) is otherwise on terms and conditions reasonably acceptable to Agent and DIP Lenders.

"Permitted Investments" shall mean (1) any Investments existing on the Closing Date, (2) Investments by any Credit Party in another Credit Party, and (3) Investments in cash and cash equivalents.

"Permitted Prior Liens" shall mean certain permitted liens as expressly set forth, and defined, in the Financing Order.

"Permitted Variance" means a variance of up to [15] % between the actual disbursements for the applicable four (4) week period and the "Total Operating Disbursements" line item as set forth in the Budget for the applicable 4 week period; provided, that, the fees and costs of estate professionals shall be excluded for determining any variance.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" shall have the meaning given to such term in the recital to this Note.

"Plan" shall have the meaning given to such term in Section 7 of this Note.

"Pro Rata Share" means with respect to a DIP Lender's obligation to make Term Loans and receive payments of interest, fees and principal with respect thereto, the percentage obtained by dividing (i) such DIP Lender's Commitment by (ii) the Maximum Amount.

"PSA" means that certain plan support agreement entered into by and among the Debtors and the Official Committee of Unsecured Creditors of Cred Inc., as of December 14, 2020 and approved by the Bankruptcy Court on [          ], 2021 [Docket No. ---].

"Recipient" means the Agent or any DIP Lender, as applicable.

"Registered Loan" shall have the meaning given such term in Section 21 of this Note.

"Required Lenders" shall mean, at any time, DIP Lenders whose aggregate Pro Rata Shares exceed 50%.

"Sale Motion" shall mean [_____].

"Stated Maturity Date" means the date that is six months after entry of the Final Order.

"Successor Case" shall have the meaning given such term in the Financing Order.

"Taxes" shall have the meaning given such term in Section 10 of this Note.

"Term Loans" shall have the meaning given such term in Section 1 of this Note.

19.   Representations and Warranties.   The Company and each of its Subsidiaries represent as follows:

(a)   the Company is duly formed and/or organized, validly existing and in good standing under the laws of their jurisdictions of incorporation or formation;

(b)   upon entry of the Financing Order, the execution and delivery of this Note and the other DIP Documents and the performance by the Company of the Company's obligations hereunder and under the other DIP Documents are within its corporate powers, has been duly authorized by all necessary corporate action of the Company, has received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable law or of the Company's corporate charter or by-laws or of any agreements binding upon or applicable to the Company or any of its properties;

(c)   the Chapter 11 Cases have been duly authorized by all necessary legal and corporate action by or on behalf of the Company and have been duly and properly commenced;

(d)   upon entry of the Financing Order, this Note and each other DIP Document is the legal, valid and binding obligation, enforceable against the Company in accordance with its terms except as limited by equitable principles relating to enforceability;

(e)   the Company has good and marketable title to, or valid leasehold interests in, all of its property and assets; none of the properties and assets of the Company are subject to any Liens other than Permitted Encumbrances;

(f)   no information contained in this Note, any of the other DIP Documents, any projections, financial statements or collateral reports or other reports from time to time delivered hereunder or any written statement furnished by or on behalf of the Company to the DIP Lenders pursuant to the terms of this Note or otherwise contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of all of the circumstances under which they were made;

(g)   the Liens granted to the Agent, on behalf of the DIP Lenders, pursuant to the Collateral Documents and the Financing Order are fully perfected Liens in and to the Collateral

25

described therein, subject, as to priority, only to Permitted Prior Liens or other Liens permitted to have such priority under the Financing Order;

(h)     except for (i) proceedings previously disclosed to the DIP Lenders by the Company, and (ii) proceedings in the Chapter 11 Cases in connection with the entry of the Financing Order, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Company, threatened against the Company before any governmental authority or before any arbitrator or panel of arbitrators that challenges the rights or powers of the Company to enter into or perform any of its obligations under the DIP Documents to which it is a party, or the validity or enforceability of any DIP Document or any action taken thereunder;

(i)     the Company is and will be at all times be the owner of the Collateral free and clear of any lien, security interest or other charge or encumbrance except for the security interest created by this Note or any other DIP Documents and the other Permitted Encumbrances;

(j)     the execution, delivery and performance of this Note and the other DIP Documents will not (immediately or with the giving of notice or passage of time, or both) violate the articles of incorporation or bylaws of the Company, or violate any law or regulation; and

(k)     except for (i) proceedings previously disclosed to the DIP Lenders by the Company, and (ii) the Chapter 11 Cases, there is no order, notice, claim, litigation, proceeding or investigation pending or threatened against or in any way affecting (x) the Company, whether or not covered by insurance, that would reasonably be expected to have a Material Adverse Effect or (y) this Note or any other DIP Document.

20.     Agent.

(a)     Appointment.  Each DIP Lender hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Note including:  (i) to receive on behalf of each DIP Lender any payment of principal of or interest on the Term Loans outstanding hereunder and all other amounts accrued hereunder for the account of the DIP Lenders and paid to the Agent, and to distribute promptly to each DIP Lender its Pro Rata Share of all payments so received; (ii) to distribute to each DIP Lender copies of all material notices and agreements received by the Agent; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Note or any other DIP Document; (v) to perform, exercise, and enforce any and all other rights and remedies of the DIP Lenders with respect to the Borrower, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Note or any other DIP Document; (vi)  to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Note or any other DIP Document; and (vii) to take such action as the Agent deems appropriate on its behalf to administer the Term Loans and the DIP Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other DIP Documents together

with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof. The provisions of this Section 20 are solely for the benefit of the Agent and the DIP Lenders, and neither the Borrower nor any other Person shall have rights as a third party beneficiary of any of such provisions.

(b)    <u>Nature of Duties</u>.  The Agent shall have no duties or responsibilities except those expressly set forth in this Note or in the other DIP Documents.

(c)    <u>Rights, Exculpation, Etc</u>.  The Agent shall not have any duties or obligations except those expressly set forth herein and in the other DIP Documents.  Without limiting the generality of the foregoing, the Agent:

(i)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)    shall not shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other DIP Documents that the Agent is required to exercise upon the written direction of the DIP Lenders; provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose it or any of its Affiliates to liability or that is contrary to any DIP Documents or applicable law; and

(iii)    except as expressly set forth herein and in the other DIP Documents, shall not have any duty to disclose or be liable for the failure to disclose, any information relating to the Borrower or any of their Affiliates that is communicated to or obtained by the Agent or any of its Affiliates in any capacity.

(iv)    the Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the DIP Lenders or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final non-appealable judgment, in connection with its duties expressly set forth herein (for the avoidance of doubt action taken or not taken by the Agent with the consent or at the request of the DIP Lenders shall not constitute gross negligence or willful misconduct). The Agent shall not be deemed to have knowledge of any Default or the event or events that give or may give rise to any Default unless and until notice describing such Default and such event or events is given to the Agent by the Borrower or any DIP Lender.

(d)    <u>Reliance</u>.  (i) The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person.  The Agent may consult with legal counsel, independent accountants and other experts selected by it with respect to all matters pertaining to this Note or any of the other DIP Documents and its duties hereunder or thereunder, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, independent accountants or experts.

<div align="center">27</div>

(ii)     The Agent shall be fully justified in failing or refusing to take any action under any DIP Document unless it shall first receive such advice or concurrence of the DIP Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the DIP Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Note or any other DIP Document in accordance with a request or consent of the DIP Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all the DIP Lenders; provided that the Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Agent to liability or that is contrary to any DIP Document or applicable law.

(e)     <u>Delegation of Duties</u>.  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other DIP Documents by or through any one or more sub agents appointed by the Agent.  The Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. Each such sub agent and the Affiliates of the Agent and each such sub agent shall be entitled to the benefits of all provisions of this Section 20 (among other relevant provisions of this Note) and (as though such sub-agents were the Agent under the DIP Documents) as if set forth in full herein with respect thereto; provided that the Agent shall not be responsible for the negligence or misconduct of any sub agents.

(f)     <u>Resignation of Agent</u>.  The Agent may at any time give notice of its resignation to the DIP Lenders and the Borrower.  Upon receipt of any such notice of resignation, the DIP Lenders shall have the right to appoint a successor, which shall be a commercial bank or financial institution reasonably acceptable to the DIP Lenders.  If no such successor Agent shall have been so appointed by the DIP Lenders and shall have accepted such appointment within thirty (30) days after notice was given, then the Agent may (but shall not be obligated to) appoint a successor Agent meeting the qualifications set forth above.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on such effective date and (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other DIP Documents and (ii) all payments, communications and determinations provided to be made by, to or through the retiring Agent shall instead be made by or to each DIP Lender directly, until such time as the DIP Lenders appoint a successor Agent as provided above.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other DIP Documents.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other DIP Documents, the provisions of this Article shall continue in effect for the benefit of such retiring Agent, its sub agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent under this Note. Upon resignation of the Agent, the fees paid to such Agent and the successor Agent shall be paid pro rata for the applicable years.

28

(g)      Non-Reliance on Agents and Other Lenders.    Each DIP Lender acknowledges that it is solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Note and the other DIP Documents and that it has, independently and without reliance upon the Agent or any other DIP Lender or any of their respective Affiliates and based on such documents and information, as it has deemed appropriate, made its own credit analysis and decision to enter into this Note.  Each DIP Lender also acknowledges that it will, independently and without reliance upon the Agent or any other DIP Lender or any of their Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to be solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Note and the other DIP Documents.

(h)      Indemnification.  To the extent that the Agent is not promptly reimbursed and indemnified by the Borrower, each DIP Lender agrees to reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Note or any of the other DIP Documents or any action taken or omitted by the Agent under this Note or any of the other DIP Documents, in proportion to each DIP Lender's Pro Rata Share (collectively, the "Indemnified Costs").  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section 20(h) applies whether any such investigation, litigation or proceeding is brought by any DIP Lender or any other Person and whether or not the Agent is a party to such investigation, litigation or proceeding.  Without prejudice to the survival of any other agreement of any DIP Lender hereunder, the agreement and obligations of each DIP Lender contained in this Section 20(h) shall survive the payment in full or principal, interest and other amounts payable hereunder and under the other DIP Documents.

(i)      Collateral Matters.

(i)      The DIP Lenders hereby irrevocably authorize the Agent, at its option and in its discretion, to release any Lien granted to or held by the Agent upon any Collateral upon cancellation of this Note and payment and satisfaction of the Term Loans and all other Obligations which have matured and which the Agent has been notified in writing are then due and payable; or constituting property being sold or disposed of in the ordinary course of the Borrower's business or otherwise in compliance with the terms of this Note and the other DIP Documents; or if approved, authorized or ratified in writing by the DIP Lenders.

(ii)      Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the DIP Lenders, each DIP Lender agrees to confirm in writing, upon request by the Agent, the authority to release Collateral conferred upon the Agent under paragraph (i)(i) above.

The Agent shall have no obligation whatsoever to any DIP Lender to assure that the Collateral exists or is owned by the Company, or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Note or any other DIP Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled

to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this section or in any other DIP Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Agent shall have no duty or liability whatsoever to any other DIP Lender, except as otherwise provided herein.

21.    <u>Miscellaneous</u>.

(a)    All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, emailed or delivered as follows:

If to Borrower:         [_____]

with electronic copies (which shall not constitute notice) to:

If to Agent:            [Alter Domus (US) LLC
                        225 W Washington St.
                        9th Floor
                        Chicago, Illinois 60606
                        Attn: CPC Agency and Legal Department
                        Email: cpcagency@alterdomus.com
                             legal@alterdomus.com

With copies to:         Morris, Nichols, Arsht & Tunnell LLP
                        120 North Market Street
                        P.O. Box 1347
                        Wilmington, Delaware 19899-1347
                        Attn: Robert J. Dehney, Esq.
                        Email: rdehney@mnat.com]

If to DIP Lender:       Invictus Global Management, LLC, as investment manager
                        for Invictus Special Situations Master I, L.P.
                        310 Comal Building A, Suite 229, Austin, TX 78702
                        Attn: Cindy Delano
                        Telephone: (512) 359-8452
                        Email: cindy@invictus-gm.com

LEGAL_US_E # 153218462.4

|              |                                           |
|--------------|-------------------------------------------|
| with electronic copies to: | Katten Muchin Rosenman LLP |
|              | 575 Madison Avenue, New York, NY 10022 |
|              | Telephone:  (212) 940-7034 |
|              | Attn:  Michael E. Comerford |
|              | Email: michael.comerford@katten.com |

All such notices and communications shall, when mailed or sent by overnight courier, be effective when deposited in the mails or delivered to the overnight courier, as the case may be, or when sent by email be effective when confirmation is received.

(b)    The Company shall reimburse the Agent and DIP Lenders for all reasonable out-of-pocket costs and expenses incurred in connection with the negotiation and preparation of the DIP Documents and the obtaining of approval of the DIP Documents by the Bankruptcy Court (including (i) the reasonable fees and expenses of outside counsel for Agent and (ii) the reasonable fees and expenses of outside counsel for the DIP Lenders, including all of their local counsel, fees for one (in the absence of any conflicts of interest) financial advisor for the Agent and the DIP Lenders, and auditors retained in connection with the DIP Documents and advice in connection therewith).  The Company agrees that, once paid, the fees or any part thereof payable to the Agent and the DIP Lenders hereunder shall not be refundable under any circumstances, regardless of whether the transactions or borrowings contemplated by the Note are consummated.  All fees payable hereunder and under the Note shall be paid in immediately available funds.  The Company agrees that the Agent may, in its sole discretion, share all or a portion of any of the fees payable pursuant to this Note with any of the DIP Lenders. Subject to the foregoing, the Company shall reimburse the Agent and DIP Lenders for all reasonable fees, costs and expenses, including the reasonable fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with:

(i)    any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the DIP Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder;

(ii)    the review of pleadings and documents related to the Chapter 11 Cases and any subsequent Chapter 7 cases (including any and all fees related to the negotiation and documentation of the Exit Facility irrespective of whether the Borrower elects the Conversion Option or the Exit Facility becomes effective), attendance at meetings related to the Chapter 11 Cases and any subsequent Chapter 7 cases, and general monitoring of the Chapter 11 Cases and any subsequent Chapter 7 cases;

(iii)    any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Agent, the Borrower or any other Person, and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the DIP Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal

31

or review thereof, in connection with a case commenced by or against Borrower or any other Person that may be obligated to the Agent by virtue of the DIP Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(iv)    any attempt to enforce any remedies of the Agent against the Borrower or any other Person that may be obligated to the Agent by virtue of any of the DIP Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(v)    any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default; and

(vi)    any efforts to (A) monitor the Term Loans or any of the other Obligations, (B) evaluate, observe or assess any of the Company or its respective affairs, (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral and (D) monitor any sales;

including, as to each of clauses (i) through (vi) above, all attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 20(b), all of which shall be payable, on demand, by the Company to the Agent on behalf of the DIP Lenders. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.  All expenses incurred by the Agent and DIP Lenders shall receive super-priority administrative expense status per Section 364 of the Bankruptcy Code (subject to the Financing Order).

(c)    No failure or delay on the part of the Agent or any other holder of this Note to exercise any right, power or privilege under this Note and no course of dealing between Borrower and the Agent shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Agent would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Agent to any other or further action in any circumstances without notice or demand.

(d)    Borrower and any endorser of this Note hereby consents to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence,

presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e)    If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f)    **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE BORROWER, THE AGENT AND THE DIP LENDERS HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF TUE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

(g)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Note or any DIP Document, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.

(h)    **THE BORROWER AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE AGENT, ANY DIP LENDER AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE AGENT'S/BORROWER'S RELATIONSHIP THAT IS BEING ESTABLISHED**.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims.  The Borrower and, by their acceptance of this Note, the Agent, any DIP Lender and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS NOTE**.  In the event of litigation, this provision may be filed as a written consent a trial by the court.

33

(i)     [RESERVED]

(j)     The Borrower shall not have the right to assign its obligations or liabilities under this Note without the prior written consent of the DIP Lenders in their sole discretion. The DIP Lenders may grant participations to one or more entities in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such participation (unless otherwise stated therein) the participant shall have the same rights and benefits hereunder as it would have if it were a DIP Lender hereunder.

(k)     In the event that a DIP Lender sells participations in a Registered Loan, such DIP Lender shall maintain a register for this purpose as a non-fiduciary agent of Borrower on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register"). A Registered Loan may be participated in whole or in part only by registration of such participation on the Participant Register. Any participation of such Registered Loan may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by the Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(l)     No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrower, the Agent and the DIP Lenders.

(m)     Any provision of this Note which is prohibited or unenforceable shall be ineffective to the extent such prohibition or unenforceability without invalidating the remaining provisions hereof.

(n)     This Note, the other DIP Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other DIP Document shall be binding upon the Borrower, the estates of the Borrower, and any trustee or successor in interest of the Borrower in the Chapter 11 Cases or any subsequent cases commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Note and the other DIP Documents and the Financing Order shall be binding upon, and inure to the benefit of, the successors of the Agent and the DIP Lenders and each of their respective assigns, transferees and endorsees. The Liens created by this Note, and the other DIP Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Cases or any other bankruptcy cases of the Company to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent file financing statements or otherwise perfect its security interests or Liens under applicable law.

(o)     In the event of any inconsistency between the terms and conditions of this Note and the Financing Order, the provisions of the Financing Order shall govern and control.

(p)     THIS NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

*    *    *    *    *

LEGAL_US_E # 153218462.4

IN WITNESS WHEREOF, the Borrower has caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

[CRED.], as Debtor and Debtor in Possession

By: _____
    Name:
    Title

[NEED TO ADD OTHER DEBTORS]

[DIP Promissory Note]

Acknowledged and Agreed

[ALTER DOMUS (US) LLC,] as Agent


By: _____
     Name:
     Title:


INVICTUS SPECIAL SITUATIONS MASTER I, L.P., by its investment manager
INVICTUS GLOBAL MANAGEMENT, LLC, as a DIP Lender


By: _____
     Name: Cindy Delano
     Title:  Authorized Signatory

Schedule 1(a)

DIP LENDERS AND DIP LENDER COMMITMENTS

| DIP Lender | Commitment |
|---|---|
| Invictus Special Situations Master I, L.P. | $4,000,000.00 |
| **Total** | **$4,000,000.00** |

<u>EXHIBIT A</u>

(attach Budget)

Exhibit B
(Form of Borrowing Request)

<u>Exhibit C</u>
<u>(Form of Cash/PIK Election Notice)</u>

<u>Schedule 13</u>

Deliver (which delivery may be made by electronic communication (including email)) to the Agent, items set forth below at the following times in form and substance satisfactory to the DIP Lenders in their sole discretion:

| | |
|---|---|
| on Wednesday of each week, commencing with [____], 2021, for the period ending the preceding Friday beginning with the first Friday ending a full calendar week after the Closing Date, | a weekly DIP variance report/reconciliation for the prior week and for the period from the commencement of the Initial Budget to the end of the prior week in each case (i) showing actual results for the following items: (A) operating disbursements, and (B) professional fees and expenses, noting therein variances from values set forth for such periods in both the Initial Budget and the most recent Budget and (ii) an explanation for all material variances, certified by the chief financial officer or other authorized officer of the Borrower; *however*, with respect to the disbursement details included in this report, it shall be permitted for the Borrower to provide such information in summary form, |
| on Wednesday of each week beginning with the first full calendar week after the Closing Date, | a report of the balance of all of the deposit accounts of the Company, including a breakdown of the balances of deposit accounts held at each depository institution, as of the close of business on the preceding Friday, |
| upon the request of the DIP Lenders, | a revised proposed budget (it being understood that upon written approval of such proposed budget by the DIP Lenders, in their sole discretion, such proposed budget shall become the "<u>Budget</u>") and timing changes with respect to any periods that were included in a previously delivered report and which shall be in form and substance acceptable to the DIP Lenders, |
| promptly, but in any event at least two (2) Business Days prior to filing (except for emergency motions, which shall be delivered as promptly as possible prior to filing), | drafts of all pleadings, motions, applications or financial information (including any proposed order) filed or to be filed by the Company with the Bankruptcy Court; <u>provided</u> that any such documents that are publicly available shall be deemed to have been delivered, |
| promptly, but in any event within three (3) Business Days after Borrower has knowledge of any event or condition that constitutes a Default, | notice of such event or condition and a statement of the curative action that Borrower proposes to take with respect thereto, |

| Commencing with [____], 2021, bi-weekly thereafter | (a)    participate in status update conference calls with the Agent, Debtor's counsel, [_____]; and |
| | (b)  the Company shall host a telephone call with the DIP Lenders and its professional advisors, on which the Company shall discuss material developments, issues or other items of note regarding the matters described herein, and offer the DIP Lenders and its professional advisors the opportunity to raise questions with respect thereto, and |
| upon the request of the DIP Lenders, | any other information requested relating to the financial condition of the Company or its Subsidiaries. |

**EXHIBIT C**

Communications with Debtors Regarding DIP financing

**From:**  Walsh, Timothy
**To:**  Grogan, James T.
**Cc:**  Azman, Darren; Steinman, Gregg
**Subject:**  Cred - Status Update
**Date:**  Tuesday, January 12, 2021 12:25:15 PM

James,

We wanted to reiterate and clarify the Committee's position on a few key aspects of the chapter 11 cases.  Please let us know if you would like to discuss.



2.   **DIP Financing** – For a number of reasons, the Committee believes that there is no need for the Debtors to pursue DIP financing.  Specifically, the estate has sufficient liquidity at this time, and there is no benefit to the estate encumbering all of its assets in exchange for additional liquidity.  The Committee has already communicated this position to the Debtors.

3.   **Plan Releases** – The Committee wants the Debtors to remove Section 18.2 (releases) entirely from the plan.  The Debtors and Committee will be permitted to rely on section 18.1 (exculpation) for claims regarding post-petition conduct.  The Committee will not support a

plan that contains releases for the Debtors' professionals for prepetition conduct.  To be clear, we are asking that the entire release provision be removed, which means that the Committee members are also not receiving releases (only exculpation).  We will send our comments to the plan by separate email, but we wanted to highlight this issue for you now.

Thanks,
Tim

TIMOTHY W. WALSH
Global Co-Chair of Restructuring & Insolvency
**McDermott Will & Emery LLP**  340 Madison Avenue, New York, NY 10173-1922
**Tel** +1 212 547 5873    **Mobile** +1 917 913 8011    **Email** twwalsh@mwe.com
**Biography** | **Website** | **vCard** | **Twitter** | **LinkedIn**
Coronavirus Resource Center <http://mwe.com/coronavirus>

| | |
|---|---|
| **From:** | Grogan, James T. |
| **To:** | Azman, Darren; Wilson, Mack; Walsh, Timothy; Steinman, Gregg; Hurst, David |
| **Cc:** | Jimenez, Pedro; Bongartz, Alex; hollysnow@paulhastings.com; Shin, Joyce |
| **Subject:** | RE: Draft DIP Term Loan and Final DIP Order |
| **Date:** | Tuesday, January 19, 2021 12:05:42 PM |
| **Attachments:** | image001.png |

[ **External Email** ]

Darren – as you know, the UCC has, at least until yesterday, insisted on having veto power over converting cryptocurrency to US dollars and thus the DIP is a US dollar alternative to liquidating the cryptocurrency.  But as we have explained there is no way to have it both ways – i.e. don't sell the crypto and don't borrow dollars – and still run an administratively solvent case that pays its bills when due.  In any event, we understand that the UCC has softened on the issue of selling the cryptocurrency and we will discuss internally and come back to you.  Regardless of whether we sell crypto or not we still need to evaluate our overall liquidity needs.  Thanks, James



**James Grogan | Partner**
Paul Hastings LLP | 600 Travis Street, Fifty-Eighth Floor, Houston, TX 77002 |
Direct: +1.713.860.7338 | Main: +1.713.860.7300 | Mobile: +1+917.859.2040 |
jamesgrogan@paulhastings.com | www.paulhastings.com

**From:** Azman, Darren <Dazman@mwe.com>
**Sent:** Tuesday, January 19, 2021 9:53 AM
**To:** Wilson, Mack <mackwilson@paulhastings.com>; Walsh, Timothy <Twwalsh@mwe.com>; Steinman, Gregg <Gsteinman@mwe.com>; Hurst, David <Dhurst@mwe.com>
**Cc:** Grogan, James T. <jamesgrogan@paulhastings.com>; Jimenez, Pedro <pedrojimenez@paulhastings.com>; Bongartz, Alex <alexbongartz@paulhastings.com>; Snow, Holly <hollysnow@paulhastings.com>; Shin, Joyce <joyceshin@paulhastings.com>
**Subject:** [EXT] RE: Draft DIP Term Loan and Final DIP Order

Mack,

We have said on a number of occasions that the Committee does not see any value in a DIP facility and we reiterate that position today.  As we have discussed, the Committee is comfortable with the Debtors creating a segregated account to hold amounts needed to satisfy accrued professional fees.  As such, we do not understand why the Debtors continue to spend time and money on DIP facility.  Indeed, it was our understanding the Debtors had stopped all work on negotiating a DIP facility.  If you do not agree with the Committee's position on this, please explain the Debtors' specific need for a DIP facility.

Thanks,
Darren

DARREN AZMAN
Partner
**McDermott Will & Emery LLP**  340 Madison Avenue, New York, NY 10173-1922
**Tel** +1 212 547 5615   **Mobile** +1 410 409 7591   **Email** dazman@mwe.com
Biography | Website | vCard | Twitter | LinkedIn

**From:** Wilson, Mack <mackwilson@paulhastings.com>
**Sent:** Tuesday, January 19, 2021 10:09 AM
**To:** Azman, Darren <Dazman@mwe.com>; Walsh, Timothy <Twwalsh@mwe.com>; Steinman, Gregg <Gsteinman@mwe.com>; Hurst, David <Dhurst@mwe.com>
**Cc:** Grogan, James T. <jamesgrogan@paulhastings.com>; Jimenez, Pedro <pedrojimenez@paulhastings.com>; Bongartz, Alex <alexbongartz@paulhastings.com>; hollysnow@paulhastings.com; Shin, Joyce <joyceshin@paulhastings.com>
**Subject:** RE: Draft DIP Term Loan and Final DIP Order

[ **External Email** ]

MWE Team – attached are the latest drafts of the DIP Financing Motion and the Final DIP Financing Order for the Cred debtors.

Are you available for a call this afternoon to discuss?  We are available except from 230-4 (et).

Best,
Mack

---



**Mack Wilson | Associate**
Paul Hastings LLP | 600 Travis Street, Fifty-Eighth Floor, Houston, TX 77002 |
Direct: +1.713.860.7343 | Main: +1.713.860.7300 | Cell: +1.713.320.8690 |
email | www.paulhastings.com

---

**From:** Wilson, Mack
**Sent:** Saturday, January 9, 2021 6:06 PM
**To:** 'Azman, Darren' <Dazman@mwe.com>; 'Walsh, Timothy' <Twwalsh@mwe.com>; 'Steinman, Gregg' <Gsteinman@mwe.com>; 'dhurst@mwe.com' <dhurst@mwe.com>
**Cc:** Grogan, James T. <jamesgrogan@paulhastings.com>; Jimenez, Pedro <pedrojimenez@paulhastings.com>; Bongartz, Alex <alexbongartz@paulhastings.com>; Snow, Holly <hollysnow@paulhastings.com>; Shin, Joyce <joyceshin@paulhastings.com>
**Subject:** Draft DIP Term Loan and Final DIP Order

Good Evening All –

Attached are drafts of a DIP Term Loan Promissory Note and a Final DIP Financing Order for the Cred debtors, which have also been circulated to the DIP lender's counsel.  Please note that both these documents remain subject to review and revision in all respects.

Please let us know if you have any comments or questions.  Thank you.

Best,
Mack

---



**Mack Wilson | Associate**
Paul Hastings LLP | 600 Travis Street, Fifty-Eighth Floor, Houston, TX 77002 |
Direct: +1.713.860.7343 | Main: +1.713.860.7300 | Cell: +1.713.320.8690 |
email | www.paulhastings.com

---

*********************************************************************
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments. If you reply to this message, Paul Hastings may collect personal information including your name, business name and other contact details, and IP address. For more information about Paul Hastings' information collection, privacy and security principles please click HERE. If you have any questions, please contact Privacy@paulhastings.com.


*********************************************************************
This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Our Privacy Policy explains how we may use your personal information or data and any personal information or data provided or made available to us. Thank you.
*********************************************************************
Please visit http://www.mwe.com/ for more information about our Firm.

*********************************************************************
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments. If you reply to this message, Paul Hastings may collect personal information including your name, business name and other contact details, and IP address. For more information about Paul Hastings' information collection, privacy

and security principles please click HERE. If you have any questions, please contact Privacy@paulhastings.com.