**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors.[1] | ) | |
| | ) | **Hearing Date: April 21, 2021, at 10:00 a.m. (ET)** |

**REPLY TO OBJECTIONS TO AMENDED APPLICATION OF INVICTUS GLOBAL MANAGEMENT, LLC FOR ALLOWANCE AND PAYMENT OF FEES PURSUANT TO BANKRUPTCY CODE SECTIONS 503(b)(1)(A), 503(b)(3)(D) AND 503(b)(4)**

Invictus Global Management, LLC ("Invictus") submits this reply (the "Reply") to the

*Objection of the Official Committee of Unsecured Creditors* ("Committee") *to Amended*

*Application of Invictus Global Management, LLC for Allowance and Payment of Fees Pursuant*

*to Bankruptcy Code Sections 503(b)(1)(A), 503(b)(3)D) and 503(b)(4)* [D.I. 704] ("Committee

Objection") and *the Objection of the United States Trustee to Amended Application of Invictus*

*Global Management, LLC for Allowance and Payment of Fees Pursuant to Bankruptcy Code*

*Sections 503(b)(1)(A), 503(b)(3)D) and 503(b)(4)* [D.I. 701] ("UST Objection" and together with

the Committee Objection, the "Objections").[2]  In response to the Objections,[3] Invictus represents

as follows:

**Preliminary Statement**

1.      It is uncontested that the Debtors induced Invictus to provide available capital on a

postpetition basis.  Having such capital available provided the Debtors with the direct and actual

---

[1]    The Debtors in these chapter 11 cases, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

[2]    Invictus submits, and incorporated herein by reference, the declaration of Cindy Chen Delano in further support of the Application attached as **Exhibit A** ("Delano Declaration").

[3]    Capitalized terms not otherwise defined in the Reply shall have the meaning ascribed to them in the Application.

benefit of (i) protecting the estates from administrative insolvency and (ii) flexibility to pursue all reorganization avenues in connection with maximizing recoveries for the estates. The Lyon Declaration (submitted by the Debtors' independent director) is not mentioned by the Objections and fully supports approving the payment of administrative expense claims to Invictus's counsel under either section 503(b)(1)(A) or sections 503(b)(3)(D) and 503(b)(4).

2.      The Lyon Declaration states that "the Debtors required access to postpetition financing to ensure they were able to preserve the value of their estates and maximize recoveries to all of the Debtors' creditors. Invictus's agreement to provide DIP Financing protected the Debtors against uncertainty in the collection of outstanding receivables and the downside risk in the cryptocurrency market that existed at all times during these Chapter 11 Cases." Lyon Declaration ¶ 5.

3.      Per the Lyon Declaration, "finding postpetition financing was difficult but deemed necessary in light of, among other things, prepetition business issues and liquidity concerns that were ever present during the Chapter 11 Cases given the uncertainty associated with collection efforts and the volatility of cryptocurrency[.]" Id. at ¶ 6. "These risks prompted the Debtors to determine that having financing available to the Debtors through Invictus was essential to protecting the Debtors' estates during the balance of the Chapter 11 Cases . . . ." Id. at ¶ 9. "The postpetition financing that Invictus was willing and able to provide mitigated the significant risk that the Debtors would be unable to preserve and maximize the value of their estates and administer these chapter 11 cases." Id. at ¶ 10. Finally, "it was essential that the Debtors have DIP Financing available to them from Invictus during the Chapter 11 Cases to ensure that the Debtors would not face administrative insolvency . . . ." Id. at ¶ 12. There can be no stronger corroboration of the need, value, and benefit that Invictus provided to these estates than a declaration from the Debtors'

independent director.   The Debtors are charged with maximizing value for their estates and ensuring that any risk of administrative insolvency (i.e., protecting the Debtors' estates) is mitigated by any reasonable means possible.

4.      The Debtors induced Invictus (the only party willing to provide DIP financing) to commit $4 million of capital so that Debtors would have the ability to access such capital.  As the Lyon Declaration states, the Debtors had very real concerns of whether they could conduct their postpetition business and wanted the protection postpetition financing would afford.

5.      The flexibility and market leverage (e.g., the ability not to sell cryptocurrency assets on unfavorable terms) granted by available capital is a proper basis to grant an administrative expense claim.  The agreement by Invictus to provide access to postpetition capital, which the Debtors requested, also reflected a meeting of the minds.  The parties agreed upon a set of terms and then negotiated final definitive documentation for the DIP Financing, which started when the Debtors' advisors stated that an agreement had been reached.  See Delano Declaration ¶¶ 6–7; Ex. B, Debtors' Correspondence.[4]  Moreover, it is clear from the January 2021 monthly fee application submitted by Paul Hasting LLP that they were actively engaged with Invictus, in connection with documenting the agreement for DIP Financing.   See Ex. A to Monthly Application for Compensation of Paul Hastings LLP [D.I. 581], at. 47–56 (time entries describing Paul Hasting's efforts to document and finalize a DIP term note, DIP order, DIP motion, certain declarations and related matters for the DIP Financing).  This clearly reflects a viewpoint from the Debtors that securing DIP Financing was necessary and beneficial to the estates and only buttresses the evidence set forth in the Application and accompanying declarations.

---

[4]    Attached hereto as **Exhibit B** is correspondence from Debtors' counsel ("Debtors' Correspondence") to Invictus's counsel reflecting agreement on terms of DIP Financing and instruction to work together on documentation.

6.      The benefit that the Debtors obtained from securing DIP Financing, moreover, reflects the benefits derived from the efforts of Invictus and its counsel – this simply cannot be a one-way street of benefits.  Instead, it can and must be that since the advisors to the Debtors were paid for their actual and necessary services incurred in connection with the DIP Financing, then Invictus and its counsel who are providing capital plus time and effort to protect and preserve the estates must have also incurred actual and necessary costs in connection with the DIP Financing.

7.      Alternatively, Invictus provided a substantial contribution through its actual and necessary benefit to the Debtors' estates, and its advisors' legal fees should be paid under section 503(b)(4) of the Bankruptcy Code.  Under Third Circuit precedent and supporting cases from various other jurisdictions, Invictus does have standing under section 503(b)(3)(D) and a substantial contribution was made.  The UST Objection relies solely upon legal arguments, introduces no evidence, and disregards the evidence submitted by Invictus along with the Debtors' support for the Application.  The Committee Objection similarly relies upon legal argument, disregards the Lyon Declaration and the Debtors' support for the Application, and simply attempts to state that they knew better than the Debtors about how to run the Chapter 11 Cases.  None of the arguments raised in either of the Objections seriously challenges the facts and evidence submitted in the Application.

8.      The Committee's standing argument is flawed.  The Third Circuit never has expressly limited substantial contribution claims to the parties that are listed in section 503(b)(3)(D) of the Bankruptcy Code.  The Third Circuit opinions in both <u>Lebron</u> and <u>Energy Future</u> support the conclusion that a non-enumerated party may receive a substantial contribution award.  In fact, <u>Lebron</u> expressly states, "[t]he services engaged by creditors, creditor committees and other parties interested in a reorganization are presumed to be incurred for the benefit of the

engaging party and are reimbursable if, but only if, the services 'directly and materially contributed' to the reorganization." Lebron v. Mechem Fin. Inc., 27 F.3d 937, 943 (3rd Cir. 1994) (internal citations omitted) (emphasis added).

9.      The Third Circuit in In re Energy Future Holdings Corp., 990 F.3d 729, 748 (3d Cir. 2021) overturned and remanded the underlying bankruptcy court decision that the Committee relies upon in its Committee Objection.  As the Energy Future court noted in its remand, "the Bankruptcy Court is entitled to consider the equities to [the party asserting an administrative priority claim] as part of its balancing of the benefit and costs to the estate.  Energy Future, 990 F.3d at 742 n.8.

10.      Accordingly, Invictus requests that the Court approve the Application.

## REPLY

**A.    Invictus Entered Into a Postpetition Agreement With the Debtors and Provided Actual Benefit to Debtors' Estates**

11.      As set forth in the Application, the Lyon Declaration, and the Delano Declaration, the Debtors' induced Invictus to provide postpetition financing due to the Debtors' concerns about adequate liquidity, avoiding administrative insolvency, and maximizing recoveries for their estates.  The two parties in fact reached agreement on the terms of such postpetition financing and negotiated and structured definitive documents for the benefit of the estates including a DIP motion, term note, and DIP order.[5]  The benefit, as set forth in the Lyon Declaration, being the protection that having capital available afforded the Debtors' estates and ensured that administrative insolvency would not be an issue.  This was extremely important because the Debtors were concerned about collecting outstanding receivables and the downside risk of the

---

[5]    Attached hereto as **Exhibit C**, are copies of such documentation negotiated and drafted by and between Invictus and the Debtors.

cryptocurrency market.  These unusual facts and circumstances arose largely due to the nature of the Debtors' assets and related bad acts that occurred prepetition, which gave rise to the Debtors' pressing need to secure a financing source (of which there was only one—Invictus).

12.    The payment of such administrative expense is supported by <u>Energy Future</u>, where the Third Circuit considered whether a "claim is allowable as a claim for actual and necessary costs and expenses of preserving the Debtors' estates." <u>Energy Future</u>, 990 F.3d at 741.  As noted in <u>Energy Future</u>, Courts generally find that "[a]n administrative expense claim is entitled to priority under section 503(b)(1)(A) if: (1) there was a 'post-petition transaction between the claimant and the estate,' and (2) those expenses yielded a 'benefit to the estate.'" <u>Id.</u> (citing <u>In re Women First Healthcare, Inc.</u>, 332 B.R. 115, 121  (Bankr. D. Del. 2005)).

13.    As set forth in the Application and this Reply, the Debtors and their advisors did enter into a postpetition agreement with Invictus as they requested that Invictus commit capital and be ready, willing, and able to provide postpetition financing of up to $4 million.  This led to the parties negotiating and agreeing on definitive documentation that both parties were prepared to file.  Delano Declaration ¶ 7.  As the Third Circuit stated in <u>Energy Future</u>, postpetition transactions have included, among others, providing services during the postpetition period and bidding in connection with a sales process, which are in each case provided in connection with preserving the estate.  <u>Energy Future</u>, 990 F.3d at 741. (citing <u>In re Hechinger Inv. Co. of Delaware</u>, 298 F.3d 219, 226 (3d Cir. 2002) (defining post-petition transactions as 'services that are rendered after the commencement of the [bankruptcy] case and that are needed for the purpose of preserving the estate);  <u>In re O'Brien Envtl. Energy, Inc.</u>, 181 F.3d 527, 533 (3d Cir. 1999) ("We assume that bidding at the sale of O'Brien's assets constitutes a transaction with the debtor-in-possession for purposes of § 503(b)(1)(A)).  The Debtors expressly agreed to the terms of the

postpetition DIP financing and requested that Invictus provide its capital, time, effort, and the services that are the subject of this Application so that DIP Financing was available during the Chapter 11 Cases – in order to preserve the Debtors' estates.  This post-petition transaction occurred under a unique set of facts and circumstances, and such transaction did actually benefit the estates as the Debtors acknowledge through their support of this Application and the Lyon Declaration.  The Application (including the Lyon Declaration) sets forth numerous facts showing the actual benefit provided to the Debtors' estates.  See id. at 741–42.

14.    Having induced Invictus to participate in the DIP Financing process and make capital available, the Debtors received an actual benefit from being able to preserve their postpetition business and protect their estates.  See Lyon Declaration, ¶¶ 9–10, 12.  As set forth in Energy Future, "the concept of 'necessary costs' in the 503(b)(1)(A) context is broader than one of absolute requirement, and 'less readily calculable benefits,' such as the ability to conduct business as usual,' can qualify."  Energy Future, 990 F.3d at 742 (citations omitted).  In addition, Energy Future stated that a claimed administrative expense may include the value to an estate that was protected by such administrative expense being incurred.  Id. at 742–43.  The procurement of financing by the Debtors from Invictus allowed the Debtors to conduct their postpetition activities as usual and relatedly protected the estates, ultimately leading to maximizing recoveries for creditors through a confirmed chapter 11 plan.

B.    **The Holding in <u>Lebron</u> and the Unique Facts and Circumstances of these Chapter 11 Cases Merit Approval of Administrative Expense Claims as Substantial Contribution**

15.    In Lebron v. Mechem Fin. Inc., 27 F.3d 937 (3d Cir. 1994), the Third Circuit did not hold that a substantial contribution claim under section 503(b)(3)(D) of the Bankruptcy Code may only be asserted by the entities set forth in such section.  Lebron does set forth four categories

of persons that may apply for reimbursement, but the Third Circuit did not state that such provision was expressly limited to those four categories. <u>See Lebron</u>, 27 F.3d at 943.

16.     Instead, the Third Circuit in <u>Lebron</u> made a number of findings and conclusions that support an expansive reading of section 503(b)(3)(D), beyond the four enumerated categories of persons (i.e., a creditor, indenture trustee, equity security holder, or committee representing creditors or equity security holders).    The Third Circuit stated that section 503(b)(3)(D) "liberalized the circumstances under which reimbursement was authorized . . . ." <u>Id.</u> For instance, "services engaged by creditors, creditor committees and **other parties interested** in a reorganization are presumed to be incurred for the benefit of the engaging party and are reimbursable if, but only if, the services 'directly and materially contributed' to the reorganization" <u>Id.</u> (citations omitted) (emphasis added).  The "applicable test is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors." <u>Id.</u> at 944. The Third Circuit stated that a claim under section 503(b)(3)(D) must exclude "reimbursement in connection with activities of creditors **and other interested parties** which are designed primarily to serve their own interests . . . ." <u>Id.</u> (emphasis added).  Thus, in two (2) instances, the <u>Lebron</u> court stated that section 503(b)(3)(D) may include "other interested parties" and "other parties interested" in connection with the outcome of a chapter 11 case, (<u>id.</u> at 943–44), refuting footnote 2 of the Committee Objection that nowhere does <u>Lebron</u> suggest a broader interpretation of section 503(b)(3)(D).

17.     More importantly, one of the primary holdings by the Third Circuit in <u>Lebron</u> was that expenses under section 503(b)(3)(D) incurred "in a case under chapter 9 or 11" should be viewed expansively and not constrained to the literal language.  The Third Circuit concluded that a "substantial contribution" must occur during a chapter 11 case but the activity itself need not

occur "in a case" under chapter 11. Id. at 944. Meaning that activities that took place and expenses incurred prepetition could substantially contribute to a reorganization effort. Id. In fact, the Third Circuit held that section 503(b)(3)(D) "was not intended to impose an across-the-board bar to the reimbursement of expenses incurred before the filing of the petition." Id. at 945.

18.     An important additional conclusion from the foregoing holding is that as a technical matter it is not possible for a "creditor" to take part in activities and incur expenses prepetition as the Bankruptcy Code defines a "creditor," in pertinent part, as an "entity that has a claim against the **debtor** that arose at the time of or before the order for relief concerning the **debtor**." Bankruptcy Code § 101(10)(A) (emphasis added). And a "debtor" is defined to mean a "person or municipality concerning which a case under this title has been commenced." Bankruptcy Code § 101(13). Accordingly, the Third Circuit in Lebron awarded a substantial contribution claim to a person that was **not** technically a creditor at the time it performed its prepetition activities (i.e., prior to commencement of the chapter 11 cases). Yet, the court still concluded that such activities gave rise to a substantial contribution claim when viewed after the fact. Certainly, the Third Circuit decision in Lebron supports granting a substantial contribution claim to Invictus when considering the equities and unique facts and circumstances of these Chapter 11 Cases.

19.     As discussed below, there are other cases that support the conclusion that section 503(b)(3)(D) should be viewed in a non-limiting fashion. It is not, as the Committee asserts (Committee Objection, ¶¶ 9–10), a one-sided view of the world when it comes to the question of whether section 503(b)(3)(D) is limited to enumerated parties, and the Committee makes no mention of the more expansive holding in Lebron.

**1.      Other Circuits and Courts have Determined that Sections 503(b) and 503(b)(3)(D) are Expansive and Standing Should be Liberally Granted**

20.      The case <u>In re S&Y Enters., LLC</u>, 480 B.R. 452 (Bankr. E.D.N.Y. 2012) is informative with respect to section 503(b)(3)(D) and holds that the enumerated categories in such section are illustrative and not exclusive for purposes of standing.  <u>S&Y Enters.</u>, 480 B.R. at 461.

21.      In <u>S&Y Enters</u>, the court stated that section 503(b) identifies certain categories of prospective applicants including the ones set forth in section 503(b)(3)(D), but the court also recognized that section 102(3) of the Bankruptcy Code indicates that the word "including" is not limiting.  <u>Id.</u> at 459 ("'the use of the word 'includes' makes nonexclusive . . . the list of nine examples of what constitutes administrative expenses in section 503(b)'") (citing Collier on Bankr., ¶ 102.04 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012) (omissions in original). The court concluded that section 503(b)'s "enumeration of categories of prospective applicants for a substantial contribution administrative expense is illustrative, not exclusive."  <u>Id.</u> at 461. Furthermore, the court stated that section 503(b)(3)(D) and various cases interpreting it find that "substantial contribution may come from numerous quarters," and it may be that an applicant's work to advance a reorganization "are of such a nature and extent" that the estate and not the applicant should bear such costs.  <u>Id.</u>  The court cautioned that a door should not be opened too widely, but stated that sometimes an estate can benefit directly from an entity's actions in a chapter 11 case, and such entity's counsel may have its fees and expenses paid by the estate as an administrative expense.  <u>Id.</u>

22.      The <u>S&Y</u> court did not minimize the burden that a party must satisfy in connection with successfully satisfying the requirements to be paid an administrative expense claim for substantial contribution, but the court also stated that the "bar for standing to seek . . . relief should be set low" because (i) the parties in section 503(b) are illustrative and not exclusive, and (ii) it is

not possible to draft a comprehensive list given the wide ranging types of third parties and entities

that could "merit an administrative expense based on a substantial contribution in a chapter 11

case." Id. at 462.  The holding in Lebron coupled with caselaw from other jurisdictions supports

a conclusion that Invictus does have standing to assert a substantial contribution claim, and the

particular facts and circumstances in these Chapter 11 Cases support awarding administrative

expense      status      to      the      fees      incurred      by      counsel      for      Invictus.

**C.    <u>Specific Assertions in the Committee's Objection are Incorrect or Distinguishable</u>**

23.     A committee does not supplant the business judgment of the Debtors, and it does

not step into the shoes of the Debtors in connection with determining whether, for example, having

financing available is needed.  A purported after-the-fact objection raised by a committee does not

mean that the Debtors' determinations are wrong or should not be approved.

24.     Invictus has the support of the Debtors and the Lyon Declaration in connection with

its request for payment of administrative expenses.  There is no evidence that contradicts the Lyon

Declaration or that changes the reality that the Debtors faced administrative solvency issues if they

were not able to collect on certain receivables and/or the value of cryptocurrency plummeted.

Thus, as spelled out in the Lyon Declaration, the need for DIP Financing from Invictus was real at

all times and valuable to the estates.  The foregoing risks were alleviated by Invictus making capital

($4 million) available to the Debtors (see Lyon Declaration ¶¶ 9–10; Delano Declaration ¶ 7) and

ultimately led to a value maximizing transaction via a confirmed chapter 11 plan.  See

*Confirmation Order* [D.I. 629].  The efforts by Invictus and its counsel were aimed at providing a

needed solution and resulting benefit to the Debtors and their estates that no other party involved

in the Chapter 11 Cases was willing or able to provide.  Lebron, 27 F.3d at 944 (stating that most

activities of an interested party that contribute to an estate will of course also benefit such party to

a degree but such self-interest does not preclude reimbursement).  It cannot seriously be argued that such services were duplicative as no other party could or would provide them.  Further, the resulting benefit that the Debtors' received—protection of the estates and the capability to continue their Chapter 11 Cases regardless of the effect that certain uncontrollable outside occurrences might have (e.g., ability to collect from third parties and the value of cryptocurrency)—was a clear and significant benefit to all parties in the cases.

25.     There is nothing that controverts the Lyon Declaration in any way.  In fact, the Dundon Declaration supports granting the Application as it notes that the relief sought in this Application is "extraordinarily rare."  Dundon Declaration ¶ 7.  Invictus agrees that the unique facts and circumstances of the Application are rare, and there will be no flood gates opened by granting such Application.  The Debtors perceived the Committee as difficult and unlikely to be a partner in addressing administrative solvency issues, but the reality is that Debtors and their advisors took the lead in connection with finding third party financing for the Chapter 11 Cases. See *Ex. C to Committee Objection* (Debtors' counsel stating to Committee counsel that without an ability to find liquidity it is not possible to run an administratively solvent case, and the Debtors need to evaluate overall liquidity needs).  Of course, the Debtors acted reasonably and to benefit the estates by moving quickly to lock in DIP Financing, so that there would not be a fear of administrative insolvency or lack of sufficient liquidity during the Chapter 11 Cases.  At the end of the day, the Debtors did what they must, which is act in a way that benefited all constituencies and that was in the best interests of their estates—securing DIP Financing.  As with all benefits that a Debtor receives, there is an associated cost that must be paid for securing such benefit, in this case the fees incurred by counsel to Invictus.

26.    With respect to the PSA Motion it (i) was not approved by the Court until February 5, 2021 (see *Order Authorizing Debtors to Enter Into & Perform Under PSA* [D.I. 480]) and not binding on the Debtors until such order was entered, and (ii) contained a fiduciary out for the Debtors that was applicable to DIP Financing.  See *Debtors' Motion for Authorization to Enter Into & Perform Under PSA* [D.I. 279], at 10 ("Such facility shall remain subject to the Debtors' determination of their fiduciary obligations and thereafter to approval of the Court.").  Accordingly, the Debtors were always free to act as a fiduciary and in the best interests of all parties in interest both before and after entering into an agreement with Invictus.  Moreover, it is inherently reasonable and normal course for a DIP provider to negotiate with the Debtors and leave interaction with the Committee to such Debtors.

27.    Contrary to the Committee's view of the world today with the benefit of Monday morning quarterbacking, the Debtors clearly contemplated the need for DIP Financing since the application to retain Teneo Capital LLC as the Debtors' investment banker authorized them to assist the Debtors with raising DIP financing.  See *Employment & Retention Application of Teneo Capital LLC* [D.I. 63], at 3.  Further, the time entries for counsel to the Committee clearly indicate that during January 2021 they were reviewing DIP documentation, evaluating the budget, and having discussions with the Debtors regarding such DIP documentation.  And such fees were paid by the Debtors' estates.  Furthermore, as already noted, the Debtors incurred fees and expenses in connection with having DIP Financing in place for the benefit of the estates.  Invictus provided a corresponding actual and necessary benefit, which allows for payment of its legal fees as administrative expenses.

WHEREFORE, Invictus respectfully requests that the Court enter the Order and grant Invictus such other relief as the Court deems appropriate under the circumstances.

Dated: April 16, 2021
Wilmington, Delaware

**MORRIS NICHOLS ARSHT AND TUNNELL LLP**

*/s/ Nader A. Amer*_____
Curtis S. Miller (No. 4853)
Nader A. Amer (No. 6635)
1201 N. Market St., 16th Floor
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
cmiller@morrisnichols.com
namer@morrisnichols.com

- and –

**KATTEN MUCHIN ROSENMAN LLP**

Michael E. Comerford
575 Madison Avenue
New York, NY 10022-2585
Telephone: (212) 940-8800
michael.comerford@katten.com

14