# **EXHIBIT C**

## **DIP Financing Documentation**

PH Draft 01/31/21
Privileged & Confidential
Attorney Work Product

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Hearing Date: Feb. 23, 2021, at 1:00 p.m. (ET)** |
|  | ) | **Obj. Deadline: Feb. 16, 2021, at 4:00 p.m. (ET)** |
|  | ) |  |

### MOTION OF DEBTORS SEEKING ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) MODIFYING AUTOMATIC STAY, AND (III) GRANTING RELATED RELIEF

Cred Inc. ("Cred") and its affiliated debtors and debtors in possession (collectively, the "Debtors") submit this motion (the "DIP Motion") for entry of an order, substantially in the form attached as **Exhibit A** (the "DIP Order"), approving the Debtors' entry into the DIP Facility (as defined below).  In support of the DIP Motion, the Debtors submit the declaration of Matthew K. Foster (the "Foster Declaration"), attached as **Exhibit B**, and the declaration of Christopher K. Wu (the "Wu Declaration"), attached as **Exhibit C**.  In further support of this the DIP Motion, the Debtors respectfully state, as follows:

### Preliminary Statement

1.     The Debtors need postpetition financing to run these chapter 11 cases in a manner designed to preserve the value of the Debtors' estates and maximize recoveries for all stakeholders. Accordingly, the Debtors seek authorization to obtain up to $4 million in senior secured postpetition financing from a third-party lender with no prior connection to the Debtors that will

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

be used to, among other things, fund the administration of the Debtors' chapter 11 cases including payment of administrative claims and expenses.  Without the liquidity provided by the DIP Facility, the Debtors will be required to monetize their cryptocurrency assets in a manner and timing that could materially diminish the value of the Debtors' estates.

2.     For these reasons, and for the reasons set forth below and in the Foster and Wu Declarations, the Debtors firmly believe that the DIP Facility will maximize value for the Debtors' stakeholders and is in the exercise of the Debtors' sound business judgment.  Accordingly, the Debtors respectfully request that the Court approve the DIP Motion, enter the proposed DIP Order and authorize the Debtors' entry into the DIP Facility.

**<u>Relief Requested</u>**

3.     The Debtors seek entry of the DIP Order:

a.     authorizing the Debtors to obtain up to $4,000,000.00 (the "<u>DIP Commitment</u>") in senior secured post-petition convertible financing on a superpriority basis (the "<u>DIP Facility</u>") pursuant to (and in accordance with the terms of) that certain *Debtor In Possession Senior Secured Delayed Draw Term Loan Promissory Note and Subsidiary Debtors Guarantee*, by and among the Debtors, as borrowers and guarantors, Alter Domus (US) LLC, as agent (in such capacity, together with its successors and assigns in such capacity, the "<u>DIP Agent</u>") and the lenders from time to time party thereto (each a "<u>DIP Lender</u>" and collectively, the "<u>DIP Lenders</u>" and, together with the DIP Agent, the "<u>DIP Parties</u>"), on the terms and conditions substantially in the form attached as **<u>Exhibit 1</u>** to the DIP Order (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, the "<u>DIP Loan Agreement</u>," and the DIP Loan Agreement, together with any other related agreements, security agreements, pledge agreements or documents, including the Agent Fee Letter (as defined in the DIP Loan Agreement), the DIP Order, collectively, the "<u>DIP Loan Documents</u>"), which DIP Facility is made available as one or more term loans in an amount not to exceed $4,000,000.00 in the aggregate  (each, a "<u>DIP Loan</u>" and collectively, the "<u>DIP Loans</u>") to the Debtor upon entry of the DIP Order and satisfaction of the other conditions set forth in the DIP Loan Documents;

b.     authorizing the Debtors to enter into the DIP Loan Agreement and the other DIP Loan Documents and to take such other and further acts as may be required in connection with the DIP Loan Documents;

c.      authorizing the Debtors to pay all amounts, obligations, and liabilities owing or payable to the DIP Parties pursuant to the DIP Loan Documents to the extent constituting obligations of any kind under the DIP Loan Documents (such obligations, the "<u>DIP Obligations</u>");

d.      authorizing the Debtors, immediately upon entry of the DIP Order, to use proceeds of the DIP Loans as expressly provided in the DIP Loan Documents and solely in accordance with the DIP Order and the applicable Approved Budget (as defined below) (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) to: (A) pay costs, premiums, fees, and expenses related to the above-captioned chapter 11 cases ( the "<u>Cases</u>") and in connection with the DIP Facility, including the fees, costs and expenses associated with the negotiation, execution and performance of the DIP Facility; (B) provide financing for working capital and for other general corporate purposes of the Debtors, in each case in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents); and (C) pay the fees and expenses of the Debtors arising from or relating to the prosecution of claims and causes of action against certain parties, including fees and expenses of professionals;

e.      granting and approving superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1) and 507(b) of the Bankruptcy Code, to the DIP Agent, for the benefit of itself and the other DIP Parties, in respect of all DIP Obligations, subject only to the Carve-Out (as defined below);

f.      granting the DIP Parties valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined below) in all DIP Collateral[2] to secure the DIP Obligations;

---

[2]   "**DIP Collateral**" shall include all prepetition and postpetition property, assets, and interests in property and assets of the Debtors and their Estates, of any kind or nature, now existing or hereafter acquired, arising or created, and wherever located, including, without limitation, all real and personal property, tangible, intangible and/or mixed property, accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), fixtures, instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), equity interests, securities, all other investment property, commercial tort claims, general intangibles (including cryptocurrency (to the extent it is considered a general intangible or other form of property, asset or interest) and all other payment intangibles), the Debtors' right and interest under any permits or licenses issued by any governmental entity (to the fullest extent allowed under applicable state and/or local law), money, deposit accounts (and all amounts on deposit therein from time to time), patents, trademarks, other intellectual property, licenses of any intellectual property, any other contract rights or rights to the payment of money, books and records, all supporting obligations, any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time, any and all causes of action asserted pursuant to adversary proceedings, turnover actions and/or other proceedings, and all proceeds, rents, products, accessions to, replacements for and substitutions of any of the foregoing, and any and all proceeds of Avoidance Actions (as defined in the DIP Loan Agreement).

g.  modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Order and the other DIP Loan Documents;

h.  waiving the Debtors' ability to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code;

i.  providing for immediate effectiveness of the DIP Order by waiving any applicable stay (including under Bankruptcy Rule 6004); and

j.  granting related relief.

### Jurisdiction, Venue, and Statutory Bases

4.  This is a core proceeding under 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with the DIP Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

5.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.  The bases for the relief requested herein are sections 105, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2.

### Concise Statements Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2

7.  The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrowers** <br> Bankruptcy Rule 4001(c)(1)(B) | Cred Inc. <br><br> *See* DIP Order, DIP Loan Agreement. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Cred (US) LLC, Cred Capital, Inc., Cred Merchant Solutions LLC, and Cred (Puerto Rico) LLC *See* DIP Order, DIP Loan Agreement. |
| **DIP Financing Lender** Bankruptcy Rule 4001(c)(1)(B) | Invictus Special Situations Master I, L.P. *See* DIP Loan Agreement, Schedule 1(a). |
| **Use of DIP Financing Facility** Local Rule 4001-2(a)(ii) | The proceeds of the DIP Loans will be used to (i) fund general corporate needs of the Debtors, including without limitation working capital and other needs, (ii) pay costs and expenses arising from or relating to the administration of the Cases and (iii) pay the fees and expenses of the Debtors arising from or relating to the prosecution of claims and causes of action against certain parties, including fees and expenses of professionals. *See* DIP Order; DIP Loan Agreement. |
| **Term** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The DIP Facility shall mature on the earlier of (such earlier date, the "DIP Maturity Date") (i) six months after the entry of the DIP Order (the "Stated DIP Maturity Date"), (ii) the date the Court orders the conversion of any of the Cases to a liquidation under chapter 7 of the Bankruptcy Code or the dismissal of any of the Cases, (iii) the acceleration of the DIP Loans and termination of the DIP Lenders commitment to make the DIP Loans, including, without limitation, as a result of the occurrence of an Event of Default (as defined below), and (iv) the substantial consummation of a plan filed in the Cases that is confirmed pursuant to an order of the Court. *See* DIP Loan Agreement § 18. |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The DIP Lenders agree to provide the Borrower with Term Loans in an aggregate principal amount not to exceed $4,000,000.00 (the "Maximum Amount"). *See* DIP Order § 2.1(a); DIP Loan Agreement § 1(a). |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The DIP Lenders' willingness to make the DIP Loans is conditioned upon, among other things:<br><br>a. Cred having paid any amount then payable under the DIP Facility.<br>b. The Debtors having delivered corporate resolutions, incumbency certificates and similar documents, in form and substance satisfactory to the DIP Lenders.<br>c. The Debtors shall not have delivered a lien search dated as of a date no earlier than thirty (30) days prior to the Petition Date and in form and substance acceptable to the DIP Lenders, in their discretion.<br>d. Any representation or warranty by the Debtors contained in the DIP Loan Documents shall be correct in all material respects as of such date, except to the extent that such representation or warranty expressly relates to an earlier date.<br>e. The Court having entered the DIP Order and the DIP Order shall have not been stayed, vacated, reversed, modified or amended without the DIP Lenders' consent in their sole discretion.<br>f. The DIP Order's conditions precedent having been satisfied by the Debtors or waived by the DIP Lenders.<br>g. Except as occasioned by the Cases and the actions, proceedings, investigations and other matters related thereto or arising therefrom (including any actions taken in accordance with the Approved Budget, the |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | DIP Loan Agreement, or the DIP Order), any event or circumstance having a Material Adverse Effect (as defined in the DIP Loan Agreement) shall not have occurred. |
| | h.  Any Default (as defined in the DIP Loan Agreement) or Event of Default shall not have occurred and be continuing. |
| | i.  After giving effect to any DIP Loan, the outstanding principal amount of all DIP Loans shall not exceed the Maximum Amount. |
| | j.  The DIP Lenders shall have received the Approved Budget in accordance with the DIP Loan Documents and the Final Financing Order. |
| | k.  The Debtors shall have not have filed any pleadings with the Court that is not in form and substance reasonably acceptable to the Agent and DIP Lenders in their discretion. |
| | l.  Cred shall have delivered a Borrowing Request as pursuant to the DIP Loan Agreement. |
| | m.  The DIP Agent shall have received, prior to closing, all documentation and other information about the Debtors that it reasonably determines is required by regulatory authorities under applicable "know your customer" and anti-money laundering laws. |
| | n.  Cred shall have delivered evidence satisfactory to the DIP Lender that it maintains cryptocurrency having a fair market value of no less than Four Million Dollars ($4,000,000) (as determined in the good faith discretion of Cred) in Cred's sub-wallet at Fireblocks (the "Fireblocks Sub-Wallet"). |
| | o.  The Court shall have not entered any orders in form and substance unacceptable to the DIP Lenders in their sole discretion. |
| | *See* DIP Loan Agreement § 2. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | •  The DIP Loans under the DIP Facility shall bear interest at a rate equal to 15.00% per annum if the payments are made in cash, and at a rate equal to 20.00% per annum if the Debtors elect to make interest payments in kind.<br><br>•  While an event of default under the DIP Loan Documents has occurred and is continuing, at the election of the DIP Lender, the DIP Loans will bear interest at a rate equal to the interest rate applicable to the DIP Loans plus 5.00%.<br><br>*See* DIP Loan Agreement § 4(a) and (d). |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | <u>Agent Fees.</u>   The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable and in the amounts and at the times separately agreed upon between the Borrower and Administrative Agent.<br><br><u>Put Option Premium.</u>  Upon entry of the DIP Order, and subject to an initial draw under the DIP Facility, DIP Lenders shall earn a put option premium equal to $350,000.00 (the "<u>Put Option Premium</u>"), which amount, at Borrower's election on three (3) Business Days (or such shorter period reasonably acceptable to the DIP Agent) prior notice, shall be (i) payable in cash upon entry of the DIP Order or (ii) paid in kind through the issuance of additional DIP Loans.  DIP Loans comprised of the Put Option Premium shall not count as against the Maximum Amount and shall be paid on the DIP Maturity Date.<br><br><u>Early Termination Premium.</u>   If the Debtors have not elected to exercise the Conversion Option (as defined in the DIP Loan Agreement), but instead repay the DIP Loans (or any portion thereof) at any time prior to the Stated Maturity Date, in addition to repaying the principal of and any and all accrued and unpaid interest and other obligations outstanding with respect to the DIP Loans so repaid, the Debtors shall pay the DIP Agent, for the benefit of the DIP Lenders, an early termination premium (the "<u>Early Termination Premium</u>") in an amount equal to 7.5% of the |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | undrawn Commitment amount at the time of such repayment by the Debtors had such DIP Loans remained outstanding through the Stated Maturity Date.<br><br>*See* DIP Loan Agreement § 8. |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The use of borrowings under the DIP Facility shall be in accordance with a budget, which was previously delivered to and approved by the DIP Lenders and which shall provide a thirteen (13) week forecast of projected receipts, disbursements, net cash flow, liquidity, loans, and availability for the 13 week period following the date of delivery (the "<u>Approved Budget</u>").<br><br>*See* DIP Order § 3.9; DIP Loan Agreement § 18. |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(ii) | Debtors shall be permitted to operate in accordance with the Budget, subject to Permitted Variances. "<u>Permitted Variance</u>" means a variance up to 15% between the actual disbursements for the applicable four (4) week period and the "Total Operating Disbursements" line item as set forth in the Approved Budget for the same period; *provided*, that the fees and costs of estate professionals shall be excluded for determining any variance.<br><br>*See* DIP Loan Agreement § 14(g). |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(ii)<br><br>**Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The occurrence of any one or more of following events shall constitute an "**Event of Default**" under the DIP Loan Agreement:<br><br>a.  Non-payment of any DIP Obligations due under the DIP Loan Documents.<br><br>b.  Failure to: (i) obtain entry of the DIP Order within twenty-five days of the filing of the DIP Motion; (ii) either (a) obtain entry of orders approving the Disclosure Statement and scheduling a hearing on the Plan (as defined in the DIP Loan Agreement) and setting an objection deadline with respect thereto, or (b) seek interim approval of a combined Plan and Disclosure Statement under Local Rule 3017-2, and schedule a combined hearing on final approval of the Disclosure Statement and confirmation of the Plan by January 29, 2021; (iii) obtain confirmation of the Plan and approval of the Debtors' motion to sell (the "<u>Sale Motion</u>"),[3] if applicable, by March 15, 2021; and (iv) have the Effective Date occur by March 31, 2021.<br><br>c.  A default under any negative covenant.<br><br>d.  A default by a guarantor.<br><br>e.  Failure to maintain the Fireblocks Sub-Wallet;<br><br>f.  Failure to comply with the Approved Budget;<br><br>g.  Not curing within five (5) business days a failure to: (i) deliver to the DIP Agent each of the reports and items required under the DIP Loan Documents; (ii) allow the DIP Agent or DIP Lenders to audit the Debtors' books and records upon reasonable advance notice; (iii) comply with applicable law; (iv) pay taxes; (v) maintain the DIP Collateral; and (vi) preserve and maintain its |

---

[3]  *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing and Approving Form and Manner of Notice Thereof, and (C) Approving Assumption and Assignment Procedures and Form and Manner of Notice Thereof; and (II) Authorizing (A) the Sale(s), Free and Clear of All Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. 65].

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | existence and all of its rights, privileges and franchises necessary or desirable to the conduct of its business, except to the extent contemplated by the Approved Budget, the Sale Motion, or the DIP Order. |
| | h. Not curing within ten (10) days any other failure to comply with the DIP Loan Documents. |
| | i. Defaults on any indebtedness in excess of $100,000.00, except as occasioned by the Cases. |
| | j. The making of representations and warranties that are incorrect in a material respect when made or deemed made. |
| | k. The filing of a motion by the Debtors to: (i) obtain financing under section 364 of the Bankruptcy Code from anyone other than the DIP Lenders, unless the proceeds of such financing would be used to indefeasibly repay in full the DIP Loans; (ii) to grant any lien senior to the DIP Liens, unless the proceeds of any financing secured by such liens would be used to indefeasibly repay in full the DIP Loans; or (iii) authorizing any other actions adverse to the DIP Agent and/or the DIP Lenders rights and remedies under the DIP Loan Agreement or their interests in the DIP Collateral. |
| | l. Proposal or support of a plan, or entry of an order confirming a plan, in the Cases that does not contain a provision for the termination of the DIP Lenders' commitment to make DIP Loans and the DIP Obligations repayment in full on or before the Effective Date or the election of the Exit Term Sheet. |
| | m. The filing of any motion by the Debtors seeking a claim under section 506(c) of the Bankruptcy Code against the DIP Collateral. |
| | n. The sale of all or substantially all of the Debtors' assets that does not provide for the indefeasible satisfaction of the DIP Obligations and termination of the DIP Lenders' commitment without the DIP Agent and DIP Lenders' consent; provided that an order approving the Sale Motion shall not constitute an Event of Default. |
| | o. Occurrence of any postpetition judgments, liabilities, or events that could be reasonably be expected to have a Material Adverse Effect. |
| | p. Appointment of a chapter 11 bankruptcy trustee or examiner with expanded powers to operate or manage the financial affairs, business, or liquidation of the Debtors, excluding any chapter 11 examiner already appointed in the Cases. |
| | q. Dismissal or conversion of the Cases to chapter 7 cases. |
| | r. The entry of an order in the Cases avoiding or requiring repayment of any portion of the payments made on account of the DIP Loan Documents. |
| | s. The entry of an order in the Cases granting any other super-priority administrative claim or lien equal to or superior to that granted to the DIP Agent (other than any such lien granted by the DIP Order), unless (i) consented to by the DIP Agent and DIP Lenders in their sole discretion or (ii) the DIP Obligations are indefeasibly paid in full in cash and the DIP Lenders' commitment to make DIP Loans are terminated. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | t. The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Agent) to execute upon or enforce a lien on the DIP Collateral, except with respect to Permitted Prior Liens (defined below) in an aggregate amount not to exceed $100,000.00. |
| | u. The DIP Order is stayed, amended, reversed, vacated, modified, or otherwise is no longer in full force and effect, without the prior written consent of the DIP Lenders. |
| | v. Commencement of any suit or action against the DIP Agent or any DIP Lender by or on behalf of (i) the Company or any other Credit Party or (ii) any official committee in the Cases, in each case, that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or lien of DIP Lenders or recovering any amounts paid or payable to the Agent or DIP Lenders, and, if such suit or action is commenced by any Person other than the Company, officer, or employee of the Company, such suit or action shall not have been dismissed or stayed within 10 days after service thereof on the DIP Agent or any DIP Lender, as applicable, and, if stayed, such stay shall have been lifted |
| | w. Breach of any terms of the DIP Order. |
| | x. A variance in excess of a Permitted Variance. |
| | y. Termination or modification of the Binding Plan Support Agreement Term Sheet without consent of the DIP Lenders.[4] |
| | z. Termination of the Debtors' exclusive right to file and solicit a plan set forth in section 1121 of the Bankruptcy Code. |
| | aa. Seeking to limit or prevent the DIP Lenders from exercising their credit bid rights in connection with the sale of any assets of the Debtors. |
| | bb. Seeking relief under the Bankruptcy Code that would restrict or impair the rights and remedies of the DIP Agent and/or the DIP Lender. |
| | *See* DIP Order § 3.4; DIP Loan Agreement § 16. |
| **Carve-Out** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(i)(F) | The DIP Order provides a "Carve-Out" of certain statutory fees and allowed professional fees incurred by the Debtors' estates (the "Carve-Out"), and does not discriminate between the Debtors' professionals and the professionals retained by the Official Committee of Unsecured Creditors. *See* DIP Order § 3.11. |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(l)(B)(i) Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | DIP Superpriority Claims.  Subject to the Carve-Out, the DIP Agent, for the benefit of itself and the DIP Lenders, shall have and is hereby granted, effective as of the Petition Date, an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of one or more of these Cases, on account of the DIP Obligations, with priority over any and all obligations, liabilities and indebtedness of the Debtors or their Estates, and over any and all administrative expenses and other claims against the Debtors or their Estates, in each |

---

[4]  *See Debtors' Motion Pursuant to Bankruptcy Code Sections 363(b) and 105(a) for Authorization to Enter Into and Perform Under a Plan Support Agreement* [Docket No. 279].

| Bankruptcy Code | Summary of Material Terms |
| --- | --- |
| | case, whether now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims of the kind specified in, ordered pursuant to or arising under, *inter alia*, sections 105, 326, 328, 330, 331, 363, 364, 365, 503, 506, 507, 546, 726, 1113, and 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed superpriority administrative claim shall be (x) for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, considered an administrative expense allowed under section 503(b) of the Bankruptcy Code and (y) payable from all prepetition and postpetition property, whether existing as of the Petition Date or thereafter acquired, of the Debtors and all proceeds thereof (including the proceeds of Avoidance Actions) (as defined in the DIP Loan Agreement) (such superpriority administrative expense claim, the "<u>DIP Superpriority Claim</u>"). <br><br> *See* DIP Order § 2.5; DIP Loan Agreement § 11(a). |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** <br> Bankruptcy Rule 4001(c)(1)(B)(vii) | <u>DIP Liens</u>.  To secure performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all amounts due under the DIP Loan Agreements of whatever kind, nature, or description, whether absolute or contingent, now existing or hereafter arising, the DIP Agent, for the benefit of itself and the DIP Lenders, shall have and is hereby granted, effective as of the Petition Date, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens on and security interests in (collectively, the "<u>DIP Liens</u>") all DIP Collateral, subject only to the Carve-Out and the following priorities: <br><br> a.  pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, non-avoidable, continuing and automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to valid, properly perfected, unavoidable and enforceable liens in existence on or as of the Petition Date or valid liens perfected (but not granted) after the Petition Date to the extent such postpetition perfection is permitted by section 546(b) of the Bankruptcy Code; <br><br> b.  pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable, continuing and automatically and fully perfected junior liens on and security interests in all DIP Collateral, that on or as of the Petition Date is subject to valid, properly perfected, unavoidable and enforceable liens in existence on or as of the Petition Date or valid liens perfected (but not granted) after the Petition Date to the extent such postpetition perfection is permitted by section 546(b) of the Bankruptcy Code (such liens and security interests in this clause (b), the "<u>Permitted Prior Liens</u>"); and <br><br> c.  pursuant to section 364(d) of the Bankruptcy Code, valid, enforceable, unavoidable automatically and fully perfected first priority senior priming liens on and security interests in all DIP Collateral. <br><br> *See* DIP Order § 2.4; DIP Loan Agreement § 11(a). |
| **Waiver/Modification of the Automatic Stay** <br> Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application, or order of the Court to the extent necessary to permit the DIP Agent (acting at the direction of the DIP Lenders) to perform any act authorized or permitted under or by virtue of this DIP Order, the DIP Loan |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | Agreement or the other DIP Loan Documents, as applicable, including, without limitation, (A) to implement the postpetition financing arrangements authorized by the DIP Order, (B) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (C) to assess, charge, collect, advance, deduct and receive payments with respect the DIP Obligations (or any portion thereof), including, without limitation, all interests, fees, costs, and expenses permitted under any of the DIP Loan Documents and apply such payments to the applicable obligations, and (D) to take any action and exercise all rights and remedies provided to it by the DIP Order, the other DIP Loan Documents or applicable law subject to the Remedies Notice Period, which requires the DIP Agent to provide five (5) business days written notice to the Debtors, the U.S. Trustee, and the Official Committee of Unsecured Creditors prior to exercising any right or remedy.<br><br>*See* DIP Order §§ 3.5 and 3.7. |
| **Releases**<br>Bankruptcy Rule 4001(c)(1)(B)(viii) | Each Debtor and its Estate, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby forever, unconditionally, permanently, and irrevocably releases, discharges, and acquits each of the DIP Parties and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Released Parties") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether known or unknown, matured or contingent, arising under, in connection with, or relating to the DIP Facility or the DIP Loan Documents, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law, including, without limitation, any right to assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security, and perfection of any of the DIP Obligations or the DIP Loan Documents and further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the DIP Obligations that the Debtors now have or may claim to have against the Released Parties, arising under, in connection with, based upon, or released to any and all acts, omissions, conduct undertaken, or events occurring prior to entry of this DIP Order.<br><br>*See* DIP Order § 3.26. |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall indemnify and hold harmless the DIP Agent and each DIP Lender and each of their respective affiliates, and each such Person's (as defined in the DIP Loan Agreement) respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under the DIP Facility and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between the DIP Agent and the DIP Lenders on the one hand and the Debtors on the other hand; *provided*, that (i) the Debtors shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from such Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction and (ii) there shall be no indemnity with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim. <br><br> *See* DIP Order § 2.3; DIP Loan Agreement § 9. |
| **506(c) Waiver** <br> Bankruptcy Rule 4001(c)(l)(B)(x) <br><br> Local Rule 4001-2(a)(i)(C) | No costs or expenses of administration which have been or may be incurred in the Cases at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of value by the DIP Agent or the DIP Lenders upon the DIP Collateral) shall be charged against the DIP Agent or the DIP Lenders, or any of the DIP Obligations or the DIP Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the affected DIP Agent or the DIP Lenders, in their respective sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder <br><br> *See* DIP Order § 3.23. |
| **Liens on Avoidance Actions** <br> Bankruptcy Rule 4001(c)(1)(B)(xi) <br><br> Local Rule 4001-2(a)(i)(D) | The proceeds of Avoidance Actions are DIP Collateral and thus are subject to DIP Liens. <br><br> *See* DIP Order §§ E(v) and 2.4. |
| **Cross-Collaterization to Prepetition Secured Parties** <br><br> Local Rule 4001-2(a)(i)(A) | Not Applicable. <br><br> The DIP Loan Documents do not grant any liens to prepetition secured creditors. |
| **Stipulations/Waivers Regarding Prepetition Liens** <br><br> Local Rule 4001-2(a)(i)(B) | Not Applicable. <br><br> The DIP Loan Documents do not stipulate to the validity, perfection, or amount of prepetition liens, or waive any claims against prepetition creditors. |
| **Roll-Up** <br><br> Local Rule 4001-2(a)(i)(E) | Not Applicable. <br><br> The DIP Loan Documents do not deem prepetition secured debt to be postpetition debt or use postpetition loans from a prepetition creditor to pay a creditor's prepetition debt. |
| **552(b)(1) Waiver** <br><br> Local Rule 4001-2(a)(i)(H) | Not Applicable. <br><br> The DIP Loan Documents do not affect the Court's power to consider the equities of the case under section 552(b)(1) of the Bankruptcy Code. |

## Background

### I.    Prepetition Indebtedness

8.    As of the Petition Date, the Debtors' liabilities totaled approximately $140 million, of which none was secured and just $2.6 million was on account of financial debt obligations.[5] The Debtors' funded debt was on account of unsecured convertible notes issued in August and September 2020.[6]

9.    The Debtors are unaware of any significant valid, perfected, and unavoidable liens on their property prior to the Petition Date or that have since been perfected under section 546(b) of the Bankruptcy Code.[7]

10.    As such, the Debtors do not believe they are priming any parties' security interest, and nothing in this DIP Motion or the DIP Order should be deemed an admission by the Debtors or any other party as to the validity, extent, or priority of any lien, or the validity or enforceability of any claim.

### II.    The Need for Access to Financing.

11.    The Debtors require access to liquidity to ensure that they are able to preserve the value of their estates and effectuate an efficient liquidation of their assets for the benefit of all parties in interest.

---

[5]    *See Declaration of Daniel Schatt In Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 12] and *Declaration of Drew McManigle, Founder and Chief Executive Officer, Macco Restructuring Group, LLC* [Docket No. 16]. *See also* **Exhibit B.**

[6]    *See* **Exhibit B.**

[7]    *Id.*

12.     As the Court is aware, the Debtors have been engaged in a process to move the Cases through chapter 11 as quickly as possible.  To that end, the Debtors have proposed to confirm a plan of liquidation by early March – just 4 months after entering chapter 11 in "free fall."[8]

13.     Although the Debtors currently generate sufficient revenue to cover their operating disbursements, they also have administrative costs arising from the Cases and will need to fund the litigation that will likely constitute most of the creditors' recovery in these Cases.[9] Accordingly, the Debtors need access to financing to ensure they are able to continue paying their debts as they come due and that creditors' interests are fully protected.[10]

14.     Without prompt postpetition financing and access to cash collateral, the Debtors will be unable to preserve and maximize the value of their estates, and administer these chapter 11 cases, causing harm to the value of the Debtors' estates to the detriment of its creditors.[11]

15.     The Debtors, in consultation with their advisors, have reviewed and analyzed the Debtors' projected cash needs and prepared a budget – a 13-week projection (as updated from time to time in accordance with the terms of the DIP Facility) outlining the Debtors' cash needs for the 13 weeks following today's date.[12]  The Debtors believe that the Approved Budget and its projections provide an accurate reflection of their funding requirements over the identified period,

---

[8]     *See First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code* Docket No. 380.

[9]     *See* **Exhibit B.**

[10]    *Id.*

[11]    *Id.*

[12]    *Id.*

will allow them to meet their obligations – including the administrative expenses of the chapter 11 cases – and are reasonable and appropriate under the circumstances.[13]

16.    The Debtors relied on these forecasts to determine the amount of postpetition financing required to administer these chapter 11 cases.[14]  The DIP Facility is critical to the Debtors' ability to confirm their plan and liquidate their assets in an efficient and orderly manner, including by providing sufficient liquidity to fund the administrative costs of these chapter 11 cases.[15]  As a result, the Debtors believe that the DIP Facility provides the Debtors sufficient liquidity to preserve their assets during the pendency of these cases.[16]

17.    Access to the DIP Facility will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates, and responsibly administer these chapter 11 cases.

### III.    Alternative Sources of Financing Are Not Readily Available.

18.    Since before the Cases' commencement, the Debtors have sought financing for the Cases.  Because the Debtors did not have a prepetition lender and largely shuttered their operations prepetition, finding postpetition financing was difficult.

19.    In an effort to obtain the most attractive financing terms possible, the Debtors solicited financing offers from more than 35 different lenders.[17]  From this group, the Debtors received five indications of interest and two term sheets.[18]  Based upon the Debtors' negotiations

---

[13]    *Id.*

[14]    *Id.*

[15]    *Id.*

[16]    *Id.*

[17]    *See* **Exhibit C.**

[18]    *Id.*

with potential lenders and the term sheets received, it was clear that the current proposal for financing represented the best available option for the Debtors.[19]  The DIP Facility was the only proposal that could meet both the sizing and flexibility needs of these Cases and thus represents the best source of post-petition financing.[20]

### Basis for Relief

I.    **The Debtors Should Be Authorized to Obtain Postpetition Financing.**

    A.    **The Debtors' Decision to Obtain DIP Financing Pursuant to the Terms in the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment.**

20.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to obtain access to the DIP Facility pursuant to the terms of the DIP Loan Documents. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor in possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.[21]

---

[19]    *Id.*

[20]    *Id.*

[21]    *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

21.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."[22]

22.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.[23]   The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.   For example, in *In re ION Media Networks, Inc.*,[24] the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.   *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.   That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

23.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arm's-length process and careful evaluation of

---

[22]    *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

[23]    *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co.* (*In re Elingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

[24]    *In re ION Media Networks, Inc.*, No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

alternatives.  Specifically, the Debtors and their advisors determined that postpetition financing will create certainty with respect to cash flows necessary for the administration of these chapter 11 cases.  The Debtors negotiated the terms of the DIP Facility in good faith, at arm's length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best financing available.  Accordingly, the Court should authorize the Debtors' to obtain access to the DIP Facility pursuant to the terms of the DIP Loan Documents, as they are a reasonable exercise of the Debtors' business judgment.

**B.    The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

24.    The Debtors propose to obtain the DIP Facility by providing security interests and liens as set forth in the DIP Loan Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lenders continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral, which includes substantially all of the Debtors' assets.

25.    The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."[25]  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

   a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

   b.    the credit transaction is necessary to preserve the assets of the estate; and

---

[25]    11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

      c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.[26]

26.     Here, the Debtors made good faith efforts to obtain financing on an unsecured basis and reasonably concluded that such financing was not available.  None of the proposals from the parties the Debtors engaged with contemplated an unsecured facility, and in fact all of the proposals received by the Debtors included the liens and superpriority claims provided for in the DIP Facility.  The Debtors thus reasonably determined that, given the current state of affairs, any further efforts to obtain unsecured financing would be futile.

27.     Further, absent the DIP Facility, which will provide certainty that the Debtors will have sufficient liquidity to administer these chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Loan Documents, are fair, reasonable, and adequate.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

28.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."[27]  As described

---

[26]   *See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

[27]   11 U.S.C. § 364(c).

above, the Debtors are unable to obtain unsecured credit. Therefore, approving superpriority claims and granting liens in favor of the DIP Lenders and is reasonable and appropriate.

29.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."[28]

30.     Here, the Debtors do not believe there is any estate property that is already subject to a lien. For the avoidance of doubt, however, the DIP Facility proposed to grant a priming lien to the DIP Lenders on any property of the estate that is encumbered. To the extent a creditor objects on the basis that the DIP Facility will prime its lien, the Debtors will work with the creditor to either obtain its consent or provide adequate protection.

### C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.

31.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.[29] Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."[30]

---

[28]     11 U.S.C. § 364(d)(1).

[29]     *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

[30]     *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section

32.     As noted above, the Debtors do not believe that alternative and superior sources of financing are reasonably available given the realities imposed by the Cases.  The Debtors are largely non-operational and plan to fund recoveries to creditors through post-confirmation litigation.  Thus, the Debtors have determined that the DIP Facility provides the best opportunity available to the Debtors under the circumstances to fund these chapter 11 cases.  Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## II.     The Scope of the Carve-Out is Appropriate.

33.     The proposed Adequate Protection is subject to the Carve-Out.  Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted.[31] The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve-Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of the Clerk of the Court or U.S. Trustee fees and professional fees of the Debtors.

## III.     The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders under the DIP Facility Term Sheet.

34.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the Agent and DIP Lenders.  It is understood and agreed by all parties, including the Debtors, that these fees are an integral component of the overall terms of the DIP Facility, and

---

364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

[31]   *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").

were required by the DIP Agent and the DIP Lenders as consideration for the extension of postpetition financing. Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Loan Documents in connection with entering into those agreements.

## IV.    The DIP Lenders Should Be Deemed Good-Faith Lenders under Section 364(e).

35.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

36.    As explained herein the terms of the DIP Facility are the result of: (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, and (b) arms'-length, good-faith negotiations between the Debtors and the DIP Agent and DIP Lenders. The Debtors submit that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Facility other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## V.    The Automatic Stay Should Be Modified on a Limited Basis.

37.    The DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to perform any act permitted under the DIP Loan Documents.  Further, the DIP Order provides that, following the occurrence of an Event of Default, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Documents, or applicable law following a five-day notice period, during which time the Debtors may seek injunctive relief.

38.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.[32]

### Waiver of Bankruptcy Rule 6004(h)

39.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

40.    The Debtors will provide notice of the DIP Motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) counsel for the Official Committee of Unsecured

---

[32]    *See, e.g.*, *In re RTI Holding Company, LLC*, No. 20-12456 (JTD) (Bankr. D. Del. Nov. 18, 2020) (providing for modification of the stay on similar terms to the DIP Order); *In re Global Eagle Entertainment Inc.*, Case No. 20-11835 (JTD) Bankr. D. Del. Aug 18, 2020) (same).  *See also, e.g., In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC,* No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

Creditors; (c) Metropolitan Commercial Bank, c/o Mark R. DeFazio, 99 Park Avenue, 4th Floor, New York, New York 10016; (d) Bank of America, N.A., c/o Brian T. Moynihan, 100 N Tyron Street, Charlotte, North Carolina 28202, and 555 California Street, 6th Floor, San Francisco, California 94104; (e) Arctos Capital Cryptoasset Credit Fund, LP, 2443 Fillmore Street #406, San Francisco, California 94115; (f) the United States Department of Justice, Attn: Leah Lerman, P.O. Box 875, Ben Franklin Station, Washington, D.C. 20044 (leah.v.lerman@usdoj.gov); (g) the United States Attorney for the District of Delaware; (h) the Attorney General of Delaware; (i) the Attorney General of California; and (j) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Order and granting the Debtors such other relief as the Court deems appropriate under the circumstances.

Dated: February [2], 2020
      Wilmington, Delaware

*/s/  DRAFT*
_____
Scott D. Cousins
**COUSINS LAW LLC**
Brandywine Plaza West
1521 Concord Pike, Suite 301
Wilmington, Delaware 19803
Telephone:    (302) 824-7081
Facsimile: :    (302) 295-0331
Email:        scott.cousins@cousins-law.com

- and -

James T. Grogan (admitted *pro hac vice*)
Mack Wilson (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
Telephone:    (713) 860-7300
Facsimile:    (713) 353-3100
Email:        jamesgrogan@paulhastings.com
                  mackwilson@paulhastings.com

- and -

Pedro A. Jimenez (admitted *pro hac vice*)
G. Alexander Bongartz (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:    (212) 318-6000
Facsimile:    (212) 319-4090
Email:        pedrojimenez@paulhastings.com
                  alexbongartz@paulhastings.com

*Co-Counsel to the Debtors*

PH Draft 01/31/21
Privileged & Confidential
Attorney Work Product

**<u>EXHIBIT A</u>**

**Proposed DIP Order**

## Exhibit 1

**Approved Budget**

## <u>EXHIBIT B</u>

**Foster Declaration**

# EXHIBIT C

**Wu Declaration**

**PH DRAFT 01/31/2021**
**ATTORNEY WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CRED INC., *et al.*[1] | ) Case No. 20-12836 (JTD) |
| | ) |
| Debtors. | ) **Re: Dkt. Nos.** |
| | ) |

**FINAL ORDER PURSUANT TO**
**11 U.S.C. §§ 105, 362, 363, 364, 503, AND 507**
**(I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED**
**SUPERPRIORITY POSTPETITION CONVERTIBLE FINANCING; (II) GRANTING**
**LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III)**
**MODIFYING THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of CRED Inc. and each of its subsidiary debtors (each

individually a "Debtor" and collectively, the "Debtors") pursuant to sections 105, 362, 363,

364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 503 and 507 of title 11 of the United States Code

(the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy

Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy Rules

(the "Local Rules") for the United States Bankruptcy Court for the District of Delaware (this

"Court"), *inter alia*, requesting, among other things:

(1) authorization for the Debtor to obtain up to $4,000,000.00 (the "DIP Commitment")

in senior secured post-petition convertible financing on a superpriority basis (the "DIP Facility")

pursuant to (and in accordance with the terms of) that certain *Debtor In Possession Senior Secured*

*Delayed Draw Term Loan Promissory Note*, by and among the Debtors, as borrower and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

guarantors, Alter Domus (US) LLC, as agent (in such capacity, together with its successors and assigns in such capacity, the "DIP Agent") and the lenders from time to time party thereto (each a "DIP Lender" and collectively, the "DIP Lenders" and, together with the DIP Agent, the "DIP Parties"), on the terms and conditions substantially in the form annexed hereto as **Exhibit A** (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, the "DIP Loan Agreement," and the DIP Loan Agreement, together with any other related agreements, security agreements, pledge agreements or documents, including the Agent Fee Letter (as defined in the DIP Loan Agreement), the Final Order (as defined below), collectively, the "DIP Loan Documents"), which DIP Facility is made available as one or more term loans in an amount not to exceed $4,000,000 in the aggregate (each a "DIP Loan" and collectively, the "DIP Loans") to the Debtors upon entry of this final order (the "Final Order") and satisfaction of the other conditions set forth in the DIP Loan Documents;

(2)      authorization for the Debtors to enter into the DIP Loan Agreement and the other DIP Loan Documents and to take such other and further acts as may be required in connection with the DIP Loan Documents;

(3)      authorization for the Debtors to pay all amounts, obligations, and liabilities owing or payable to the DIP Parties pursuant to the DIP Loan Documents to the extent constituting obligations of any kind under the DIP Loan Documents (such obligations, the "DIP Obligations");

(4)      authorization for the Debtors, immediately upon entry of this Final Order, to use proceeds of the DIP Loans as expressly provided in the DIP Loan Documents and solely in accordance with this Final Order and the applicable Approved Budget (as defined below) (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) to:  (A) pay costs, premiums, fees, and expenses related to the above-captioned chapter 11 cases ( the "Cases")

and in connection with the DIP Facility, including the fees, costs and expenses associated with the negotiation, execution and performance of the DIP Facility; (B) provide financing for working capital and for other general corporate purposes of the Debtors, in each case in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents); and (C) pay the fees and expenses of the Debtors arising from or relating to the prosecution of claims and causes of action against certain parties, including fees and expenses of professionals.

(5)     the grant and approval of superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1) and 507(b) of the Bankruptcy Code, to the DIP Agent, for the benefit of itself and the other DIP Parties, in respect of all DIP Obligations, subject only to the Carve-Out (as defined below);

(6)     granting the DIP Parties valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined below) in all DIP Collateral (as defined below) to secure the DIP Obligations, which DIP Liens shall be subject to the relative rankings and priorities set forth herein;

(7)     the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Final Order and the other DIP Loan Documents to the extent hereinafter set forth;

(8)     a waiver of the Debtors' ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any DIP Collateral;

(9)     this Court's waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Final Order; and

(10)     granting the Debtors such other and further relief as is just and proper.

147194724v7

The final hearing on the Motion having been held by this Court on February [23], 2021 (the "Final Hearing"), and upon the record made by the Debtors at the Final Hearing, including the Motion, the *Declaration of Matt Foster, Chief Restructuring Officer, In Support of Debtor's Motion Seeking Entry of a Final Order (i) Authorizing Debtor To Obtain Postpetition Financing, (ii) Authorizing the Debtors to Use Cash Collateral, (iii) Granting Liens And Providing Superpriority Administrative Expense Status, (iv) Modifying Automatic Stay, and (v) Granting Related Relief* [Docket No. ] (the "Foster Declaration"), the *Declaration of Chris Wu of Teneo in Support of Debtor's Motion Seeking Entry of a Final Order (i) Authorizing Debtor To Obtain Postpetition Financing, (ii) Authorizing the Debtors to Use Cash Collateral, (iii) Granting Liens And Providing Superpriority Administrative Expense Status, (iv) Modifying Automatic Stay, and (v) Granting Related Relief* [Docket No. ] (the "Wu Declaration"), and any other declarations filed in support of the relief requested herein; any exhibits in connection with the foregoing, and the filings and pleadings in these Cases, the Court having found that the final relief requested in the Motion is fair and reasonable and is in the best interests of the Debtors, the Debtors' estates (as defined under section 541 of the Bankruptcy Code, the "Estates"), its stakeholders and other parties in interest, and represents a sound exercise of the Debtors' business judgment and is essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets; it appearing to the Court that granting the final relief requested in the Motion is fair and reasonable and in the best interests of the Debtors and their Estates; and appropriate and adequate notice of the Motion, the final relief requested therein and the Final Hearing having been given in accordance with Bankruptcy Rule 2002 (the "Notice"); and the Notice having been served by the Debtors in accordance with Bankruptcy Rules 4001 and 9014 and the Local Rules (collectively, the "Notice Parties"); and the opportunity provided for a final hearing on the Motion was

appropriate in connection with the Motion and no other notice need be provided; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and after due deliberation sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]**

A.    <u>Petition Date</u>.   On November 7, 2020, the Debtors filed voluntary chapter 11 petitions for relief under the Bankruptcy Code commencing these chapter 11 cases (collectively, the "<u>Cases</u>").   The Debtors have continued to operate their businesses and manage their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No chapter 11 trustee has been appointed in the Cases.   On January 8, 2021, the Court approved the appointment of Robert J. Stark as Examiner in the Cases [Docket No. 338].

B.    <u>Jurisdiction and Venue</u>.   This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157 and 1334.   This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.   The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 9013 and 9014 and Local Rule 4001-2.

C.    <u>Committee Formation</u>.   An official committee of unsecured creditors was formed on December 3, 2020 under section 1102 of the Bankruptcy Code [Docket No. 120] (the "<u>Committee</u>").   No other statutory committee has been appointed in the Cases.

D.    <u>Notice</u>.   The Notice was given in the manner described in the Motion.   The Notice given by the Debtors of the Motion, the Final Hearing and the relief granted under this Final Order

---

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.   To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.   To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

147194724v7

complies with Bankruptcy Rule 4001 and the Local Rules and is sufficient under the circumstances.

E.    Findings Regarding the Postpetition Financing.

(i)    Postpetition Financing.  The Debtors have requested from each of the DIP Parties, and the DIP Parties are willing, subject to the terms of this Final Order and satisfaction of the conditions set forth in the DIP Loan Agreement, to extend the DIP Loans on the terms and conditions set forth in this Final Order and the other DIP Loan Documents, respectively.

(ii)    Need for Postpetition Financing.  The Debtors have an immediate need to obtain credit on a final basis pursuant to the DIP Facility in order to, among other things, maintain, administer and preserve their businesses and maximize the value of their assets.  Without the ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Parties, the Debtors, their Estates, and parties-in-interest would be immediately and irreparably harmed.  Accordingly, the Debtors have an immediate need to obtain the postpetition financing to, among other things, minimize the disruption of their business operations and preserve and maximize the value of the assets of the Debtors' Estates to maximize the recovery to all creditors of the Estates, and to pay the fees and expenses of the Debtors arising from or relating to the prosecution of claims and causes of action against certain parties, including fees and expenses of professionals.

(iii)    No Credit Available on More Favorable Terms.  The Debtors are unable to procure financing in the form of unsecured credit solely allowable as an administrative expense under sections 364(a), 364(b) and 503(b)(1) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense, or liens on property of the Estates not subject to a lien or secured solely by a junior lien on property of the Debtors and their Estates that is subject to a

147194724v7

lien.  The Debtors assert in the Motion, the DIP Declaration, and have demonstrated at the Final

Hearing, that it has been unable to procure the necessary financing on terms more favorable, taken

as a whole, than the financing offered by the DIP Parties pursuant to the DIP Loan Documents.  In

light of the foregoing, and considering all alternatives, the Debtors have reasonably and properly

concluded, in the exercise of their sound business judgment, that the DIP Facility represents the

best financing available to the Debtors at this time, and is in the best interests of the Debtors, their

Estates and all of their stakeholders.

   (iv) <u>Findings Regarding the Budget</u>.  The Debtors have prepared and delivered

to the DIP Parties a detailed initial budget that reflects, among other things, the Debtors'

anticipated cash receipts and anticipated disbursements for each calendar week commencing with

the week ending January 29, 2021, through and including the week ending April 2, 2021 (the

"<u>Initial Budget Period</u>").  The Debtors believe that the Initial Budget (as defined below) is

reasonable under the facts and circumstances.  The DIP Parties are relying upon the Debtors'

agreement to comply with the Initial Budget and any other Approved Budget (as defined below),

and the terms of this Final Order and the other DIP Loan Documents, in determining to enter into

the postpetition financing arrangements provided for herein.

   (v) <u>Certain Conditions to DIP Facility</u>.  The DIP Lenders' willingness to make

the DIP Loans is conditioned upon, among other things, (a) the Debtors obtaining Court approval

to enter into the DIP Loan Documents and to incur all of the obligations thereunder, and to confer

upon the DIP Parties all applicable rights, powers, and remedies thereunder in each case as

modified by this Final Order and (b) the DIP Parties being granted, as security for the prompt

payment of the DIP Facility and all other obligations of the Debtors under the DIP Loan

Documents, subject to the Carve-Out and the priorities described herein, superpriority claims,

147194724v7

perfected security interests in and liens upon the property and assets (and interests in property and assets) of the Debtors and their Estates of any kind or nature, now existing or hereafter acquired, arising or created, and wherever located, including, without limitation, valid and perfected security interests in and liens upon all of the now existing or hereafter arising or acquired assets and property constituting DIP Collateral. As used in this Final Order, "DIP Collateral" shall include all prepetition and postpetition property, assets, and interests in property and assets of the Debtors and their Estates, of any kind or nature, now existing or hereafter acquired, arising or created, and wherever located, including, without limitation, all real and personal property, tangible, intangible and/or mixed property, accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), fixtures, instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), equity interests, securities, all other investment property, commercial tort claims, general intangibles (including cryptocurrency (to the extent it is considered a general intangible or other form of property, asset or interest) and all other payment intangibles), the Debtors' right and interest under any permits or licenses issued by any governmental entity (to the fullest extent allowed under applicable state and/or local law), money, deposit accounts (and all amounts on deposit therein from time to time), patents, trademarks, other intellectual property, licenses of any intellectual property, any other contract rights or rights to the payment of money, books and records, all supporting obligations, any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time, any and all causes of action asserted pursuant to adversary proceedings, turnover actions and/or other proceedings, (except for Avoidance Actions (as defined in the DIP Loan Agreement)), the proceeds from any and all

8

Avoidance Actions, and all proceeds, rents, products, accessions to, replacements for and substitutions of any of the foregoing.

(vi)     <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>.  Any credit extended, loans made, and other financial accommodations extended to the Debtors by the DIP Parties, including, without limitation, pursuant to this Final Order, have been extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Bankruptcy Code section 364(e), and the DIP Facility, the DIP Liens and the DIP Superpriority Claim shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Final Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

F.     <u>Section 506(c)</u>.  The Debtors have agreed, as a condition to obtaining financing under the DIP Facility, that as a material inducement to the DIP Parties to agree to provide the DIP Facility, and in exchange for (a) the DIP Parties' willingness to provide the DIP Facility to the extent set forth herein, and (b) the DIP Parties' agreement to subordinate their liens and superpriority claims to the Carve-Out, each of the DIP Parties are entitled to receive a waiver of the provisions of section 506(c) of the Bankruptcy Code.

G.     <u>Good Cause</u>.  Good cause has been shown for the entry of this Final Order.  The relief requested in the Motion is necessary, essential, and appropriate and is in the best interest of and will benefit the Debtors, their creditors, and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' remaining operating businesses and on-going operations, (2) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and (3) avoid immediate and irreparable harm to the Debtors, their creditors, businesses, employees, and assets.  The

extensions of credit under the DIP Facility are fair and reasonable, reflect the Debtors' exercise of their business judgment, and are supported by reasonably equivalent value and fair consideration. The DIP Facility is the product of reasonable, arm's length, good faith negotiations between the Debtors and the DIP Parties.

H.   <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(c)(2).  Any objections that were made (to the extent such objections have not been withdrawn, waived, resolved, or settled) are hereby overruled on the merits.

I.   <u>Final Hearing</u>.  Notice of the Final Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to the U.S. Trustee, counsel to the Committee and all parties that have requested service pursuant to Bankruptcy Rule 2002 and Del. Bankr. L.R. 2002-1(b).  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and no other notice is required for the relief to be granted in this Final Order.

Based upon the foregoing, and upon the record made before the Court at the Final Hearing, and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

Section 1.   <u>Motion Approval</u>

1.1   <u>Final Approval of Motion</u>.  The Motion is granted to the extent provided in this Final Order.  Any objections to the entry of this Final Order that have not been withdrawn, waived, resolved, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.

Section 2.   <u>DIP Facility Authorization</u>

2.1   <u>Authorization of DIP Facility</u>.

10

(a)      The Debtors are hereby authorized and empowered to immediately execute and deliver the DIP Loan Documents and to incur and perform the DIP Obligations, pursuant to the terms and conditions of the DIP Loan Agreement and this Final Order, in an aggregate principal amount not to exceed $4,000,000.00.

(b)      The Debtors are hereby authorized to (i) borrow under the DIP Facility in accordance with, and for the purposes permitted by, the DIP Loan Documents, the Final Order and the Approved Budget and (ii) pay all interest, costs, fees, and other amounts and obligations accrued or accruing under the DIP Loan Agreement and other DIP Loan Documents including, without limitation, all Administration Fees, the Put Option Premium and the Early Termination Premium (as each such term is defined in the DIP Loan Agreement), all pursuant to the terms and conditions of this Final Order, the DIP Loan Agreement, and the other DIP Loan Documents.  The Approved Budget is hereby approved in all respects.  The Debtors shall use the proceeds of the DIP Facility solely in a manner consistent with the Approved Budget and the terms and conditions of the DIP Loan Documents and this Final Order.

2.2      Financing Documents.

(a)      Authorization.  The Debtors are hereby authorized and directed to enter into, execute, deliver, and perform all obligations under the DIP Loan Documents.  To the extent provided for in section 364(e) of the Bankruptcy Code, no obligation, payment, transfer, or grant of security hereunder or under the DIP Loan Documents shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable state, federal, or foreign law (including, without limitation, under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any defense, reduction, setoff, counterclaim, recoupment,

11

offset, recharacterization, subordination (whether equitable, contractual or otherwise), cross-claims, or any other challenge under the Bankruptcy Code or any applicable law, rule, or regulation by any person or entity.

(b)    Evidence of Borrowing Arrangements. The terms, conditions, and covenants set forth in the DIP Loan Documents (including, without limitation, the DIP Loan Agreement) shall be sufficient and conclusive evidence of (i) the borrowing arrangements by and among the Debtors, the DIP Agent, and the DIP Lenders, and (ii) each Debtor's assumption and adoption of, and agreement to comply with, all the terms, conditions, and covenants of the DIP Loan Agreement and the other DIP Loan Documents for all purposes, including, without limitation, to the extent applicable, the payment of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, fees, and other expenses, including, without limitation, all of the DIP Agent's and DIP Lender's closing, arranger, and administrative fees, professional fees, attorney's fees and legal expenses, as more fully set forth in the DIP Loan Documents.   Upon effectiveness thereof, the DIP Loan Documents shall evidence the DIP Obligations, which DIP Loan Documents and DIP Obligations shall be valid, binding, and enforceable against the Debtors, their Estates, and any successors thereto, including, without limitation, any trustee appointed in the Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of one or more of these Cases ("Successor Cases"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Final Order and the DIP Loan Documents.

(c)    Payment of DIP Fees and Other Expenses. Any and all fees and expenses payable pursuant to the DIP Loan Documents (collectively, any and all such fees and expenses, the "DIP Fees") are hereby approved, and the Debtors are hereby authorized and directed

147194724v7

to pay, currently in cash or as otherwise provided in the DIP Loan Documents, all reasonable and documented out-of-pocket costs, disbursements, and expenses of the DIP Agent and the DIP Lenders incurred at any time, as provided by the DIP Loan Documents and this Final Order. The DIP Fees shall not be subject to any offset, defense, claim, counterclaim, or diminution of any type, kind, or nature whatsoever.

2.3     <u>Indemnification</u>.    The Debtors are authorized to indemnify and hold harmless the DIP Agent, each DIP Lender, and, solely in their capacities as such, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (each, an "<u>Indemnified Party</u>"), in accordance with, and subject to, the DIP Loan Documents, which indemnification is hereby authorized and approved. All such unpaid indemnities of the DIP Agent and the DIP Lenders shall constitute DIP Obligations and the repayment thereof shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Final Order and the DIP Loan Documents.

2.4     <u>Postpetition Liens</u>.

(a)     <u>Postpetition DIP Lien Granting</u>.    To secure performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all DIP Obligations of the Debtors to the DIP Parties of whatever kind, nature, or description, whether absolute or contingent, now existing or hereafter arising, the DIP Agent, for the benefit of itself and the DIP Lenders, shall have and is hereby granted, effective as of the Petition Date, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security

interests in and liens (collectively, the "<u>DIP Liens</u>") upon all DIP Collateral, subject to the rankings and priorities set forth in Section 2.4(b) below.

(b)    <u>DIP Lien Priority in DIP Collateral</u>.  Subject only to the Carve-Out, the DIP Liens securing the DIP Obligations shall be, (a) pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, non-avoidable, continuing and automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to valid, properly perfected, unavoidable and enforceable liens in existence on or as of the Petition Date or valid liens perfected (but not granted) after the Petition Date to the extent such postpetition perfection is permitted by section 546(b) of the Bankruptcy Code; (b) pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable, continuing and automatically and fully perfected junior liens on and security interests in all DIP Collateral, that on or as of the Petition Date is subject to valid, properly perfected, unavoidable and enforceable liens in existence on or as of the Petition Date or valid liens perfected (but not granted) after the Petition Date to the extent such postpetition perfection is permitted by section 546(b) of the Bankruptcy Code (such liens and security interests in this clause (b), the "<u>Permitted Prior Liens</u>"); and (c) pursuant to section 364(d) of the Bankruptcy Code, valid, enforceable, unavoidable automatically and fully perfected first priority senior priming liens on and security interests in all DIP Collateral.

2.5    <u>Superpriority Administrative Expenses</u>.

(a)    Subject to the Carve-Out, the DIP Agent, for the benefit of itself and the DIP Lenders, shall have and is hereby granted, effective as of the Petition Date, an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Cases or any Successor Cases, on account of the DIP Obligations, with priority over

any and all obligations, liabilities and indebtedness of the Debtors or their Estates, and over any and all administrative expenses and other claims against the Debtors or their Estates, in each case, whether now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims of the kind specified in, ordered pursuant to or arising under, *inter alia*, sections 105, 326, 328, 330, 331, 363, 364, 365, 503, 506, 507, 546, 726, 1113, and 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed superpriority administrative claim shall be (x) for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, considered an administrative expense allowed under section 503(b) of the Bankruptcy Code and (y) payable from all prepetition and postpetition property, whether existing as of the Petition Date or thereafter acquired, of the Debtors and all proceeds thereof (including the proceeds of Avoidance Actions) (as defined in the DIP Loan Agreement) (such superpriority administrative expense claim, the "DIP Superpriority Claim").

Section 3.    Miscellaneous Postpetition Lien Perfection.

(a)    This Final Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens and the other security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including, without limitation, securities or deposit control agreements with any financial institution(s) party to a control agreement or other depository account consisting of DIP Collateral, or requirement to register liens on any certificates of title (a "Perfection Act").  Notwithstanding the foregoing, if the DIP Agent (acting at the direction of the DIP Lenders), elects for any reason to file, record, or

15

otherwise effectuate any Perfection Act, then the DIP Agent is authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or required by the DIP Loan Documents, which act or acts shall be deemed to have been accomplished as of the Petition Date notwithstanding the date and time actually accomplished, and, in such event, the subject filing or recording office is authorized to accept, file, or record any document in regard to such act in accordance with applicable law.  The DIP Agent (acting at the direction of the DIP Lenders) may choose to file, record, or present a certified copy of this Final Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Final Order in accordance with applicable law.  Should the DIP Agent (acting at the direction of the DIP Lenders) so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or perfection of the postpetition liens and security interests granted herein, including the DIP Liens, by virtue of the entry of this Final Order.

(b)     To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of any liens and security interests granted and created by this Final Order (including the DIP Liens) or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby pre-empted to the maximum extent permitted by the Bankruptcy Code, applicable federal or foreign law, and the judicial power and authority of this Court; *provided*, *however*, that nothing herein shall excuse the Debtors from payment of any local fees, if any, required in connection with such liens.  By virtue of the terms of this Final Order, to the extent that the DIP Agent has filed Uniform Commercial Code financing statements, mortgages, deeds

147194724v7

of trust, or other security or perfection documents under the name of the Debtors, such filings shall be deemed to properly perfect its liens and security interests granted and confirmed by this Final Order without further action by the DIP Agent.

(c)     Except as otherwise provided for herein, the DIP Liens and the DIP Superpriority Claim (i) shall not be made subject to or *pari passu* with (A) any lien, security interest, or claim heretofore or hereinafter granted in these Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their Estates, any trustee, or any other estate representative appointed or elected in these Cases or any Successor Cases and/or upon the dismissal of these Cases or any Successor Cases; (B) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise; and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code.

3.2     Amendments to DIP Loan Documents.  Subject to the terms and conditions of the applicable DIP Loan Documents, the Debtors and the applicable DIP Parties may make amendments, modifications, or supplements to any DIP Loan Document, and the DIP Agent and the DIP Lenders may waive any provisions in the DIP Loan Documents, without further approval of the Court; *provided* that any amendments, modifications, or supplements to any DIP Loan Documents that operate to increase the aggregate commitments, the rate of interest payable thereunder, or existing fees or add new fees thereunder (excluding, for the avoidance of doubt, any amendment, consent or waiver fee) other than as currently provided in the DIP Loan Documents (collectively, the "Material DIP Amendments"), shall be filed with the Court, and the Debtors shall provide prior written notice of the Material DIP Amendment to (i) counsel to the Committee, and (ii) the U.S. Trustee; *provided, further*, that the consent of the foregoing parties will not be

17

necessary to effectuate any such amendment, modification or supplement, except that any Material DIP Amendment subject to a timely and unresolved objection must be approved by the Court. For the avoidance of doubt, the Debtors must receive written consent as to any Material DIP Amendment from the DIP Parties prior to filing notice thereof with the Court.

      3.3    [RESERVED]

      3.4    <u>DIP Termination Events</u>. The occurrence of (i) any "Event of Default" as that term is defined in the DIP Loan Agreement; (ii) any failure to meet or satisfy any Milestone (as defined in the DIP Loan Agreement); (iii) the Maturity Date (as defined in and under the DIP Loan Agreement); (iv) any violation, breach, or default by any Debtor with respect to any of its obligations under this Final Order, or (v) prior to the payment in full in cash of all DIP Obligations, any of the following occur, any request by the Debtors to (a) obtain postpetition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code that does not provide for the repayment in full in cash of the DIP Obligations, other than as provided in this Final Order or as may be otherwise be permitted pursuant to the DIP Loan Documents; (b) challenge the application of any payments authorized by this Final Order pursuant to section 506(b) of the Bankruptcy Code; (c) propose or support any challenge by any party in interest to seek to limit or prevent the DIP Lenders from exercising their credit bid rights in connection with the sale of any assets of the Debtors; (d) seek relief under the Bankruptcy Code, including, without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would restrict or impair the (A) rights and remedies of the DIP Agent and/or the DIP Lenders against the Debtors as provided in this Final Order or any of the DIP Loan Documents or (B) exercise of such rights or remedies by the DIP Agent and/or the DIP Lenders against the Debtors in accordance with the DIP Loan Agreement or this Final Order; or (e) propose or support any

147194724v7

chapter 11 plan, or orders confirming such plan are entered, that are not conditioned upon the payment of the DIP Obligations (other than indemnities then due and payable) in full in cash or the election of the Exit Term Sheet, without the written consent of the DIP Agent and the DIP Lenders, each of (i) – (v) including (a) through (e) under sub-section (v) shall each constitute a "DIP Termination Event" hereunder, unless waived in writing by the DIP Parties, but no such waiver or consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent or any DIP Lender.

3.5     Rights and Remedies upon a DIP Termination Event.   After five (5) calendar days following the delivery of a written notice to the Debtors (with copies delivered to the U.S. Trustee and the Committee) regarding the occurrence of and during the continuance of a DIP Termination Event (the "Remedies Notice Period"), the DIP Agent (acting at the direction of the DIP Lenders) shall be entitled to independently take any act or exercise any right or remedy as provided in this Final Order, any other DIP Loan Document and/or applicable law, as applicable, including, without limitation, (i) declare all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable; (ii) terminate, reduce, or restrict any commitment to extend additional credit to the Debtors to the extent any such commitment remains; (iii) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (iv) invoke the right to charge interest at the default rate under the DIP Loan Documents; (v) stop lending and/or (vi) direct the Debtors' Chief Restructuring Officer (or such other person that controls access to the Debtors' Bitcoin) to (a) liquidate in a commercially reasonable manner, or (b) turnover the key(s) to the Bitcoin held in the Fireblocks sub-wallet for the account of the DIP Lenders, in the case of (a) or (b) for distribution in accordance with the terms and priorities set

forth in this DIP Order.  For the avoidance of doubt, during the Remedies Notice Period the DIP

Agent and DIP Lenders shall have no obligation to make DIP Loans to the extent the conditions

to borrowing set forth in the DIP Loan Documents are not satisfied.

3.6     [RESERVED].

3.7     <u>Modification of Automatic Stay</u>.   The automatic stay provisions of

section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or

applicable law are hereby modified without further notice, application, or order of the Court to the

extent necessary to permit the DIP Agent (acting at the direction of the DIP Lenders) to perform

any act authorized or permitted under or by virtue of this Final Order, the DIP Loan Agreement or

the other DIP Loan Documents, as applicable, including, without limitation, (A) to implement the

postpetition financing arrangements authorized by this Final Order, (B) to take any act to create,

validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral,

(C) to assess, charge, collect, advance, deduct and receive payments with respect the DIP

Obligations (or any portion thereof), including, without limitation, all interests, fees, costs, and

expenses permitted under any of the DIP Loan Documents and apply such payments to the

applicable obligations, and (D) subject to the Remedies Notice Period, to take any action and

exercise all rights and remedies provided to it by this Final Order, the other DIP Loan Documents

or applicable law.

3.8     <u>Reporting and Access</u>.  The Debtors shall comply with all reporting and

access provisions contained in the DIP Loan Documents.

3.9     <u>Budget</u>.   The use of borrowings under the DIP Facility shall be in

accordance with and as set forth in the detailed budget for the Initial Budget Period containing,

among other things, projected cash receipts and detailed line items for operating disbursements,

147194724v7

including employee-related expenses and processing costs, and non-operating activity (including the fees and expenses of the Debtors' and the Committee's retained professionals), including any permitted variances therefrom, for such Initial Budget Period in form and substance satisfactory to, and approved by, the DIP Agent and the DIP Lenders in their sole discretion (as such budget may be modified from time to time by the Debtors in accordance with the DIP Loan Documents, the "Initial Budget" and any subsequent budget delivered by the Debtors to the DIP Agent and the DIP Lenders, in each case, to the extent approved in writing by the DIP Agent and the DIP Lenders, with such approval to not be unreasonably withheld, each an "Approved Budget"). Attached hereto as **Exhibit B** is a summary form of the Initial Budget that was approved by the DIP Agent and the DIP Lenders. The Approved Budget shall be updated by the Debtors from time to time in accordance with the DIP Loan Documents at the request of the DIP Agent and the DIP Lenders, with such approval to not be unreasonably withheld. No such updated, modified or supplemented budget shall be effective until so approved in writing by the DIP Agent and the DIP Lenders in their sole discretion, and only once so approved shall such budget be deemed the "Approved Budget"; *provided*, *however* that in the event that the DIP Agent and the DIP Lenders, on the one hand, and the Debtors, on the other hand, cannot agree as to an updated, modified or supplemented budget, the prior Approved Budget shall continue in effect for the Cases. Any Approved Budget (including the Initial Budget) shall include, among other things, detailed line items of any operating receipts and disbursements, any prepetition amounts paid pursuant to the Court's order, any chapter 11 expenses, including the amount of fees and expenses of professionals retained by the Debtors, the Committee and any other estate-retained professional (in each case, on a professional by professional basis). For the avoidance of doubt, notwithstanding anything to the contrary contained in this Final Order or the Approved Budget, in no way shall any budget

(including any Approved Budget) be construed as a cap or a limitation on the amount of fees and/or expenses of any of the DIP Parties (and none of the DIP Parties' professionals shall be subject to a budget, including any Approved Budget), nor shall the Initial Budget be construed as a cap or limitation on the amount of fees and/or expenses of any Professional Person (defined below).  A copy of any Approved Budget shall be delivered to counsel for the Committee and the U.S. Trustee.

3.10    Employee Incentive/Retention Plans.  The Debtor shall not seek (including by filing any pleading) approval of any employee incentive or retention plans (or any similar sort of retention or incentive program) without (a) the prior written consent of the DIP Agent and the DIP Lenders in their sole discretion and (b) providing to the DIP Agent and the DIP Lenders (and each's respective counsel) the (i) terms of any such incentive or retention plan or program (including copies of any materials related thereto), (ii) a list of any individuals proposed to be covered by any retention plan or program, and (iii) the aggregate amount sought to be paid under any such incentive or retention plan or program.

3.11    Carve-Out Provisions.  For purposes of this Final Order, "Carve-Out" shall mean the sum of:  (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) reasonable fees and expenses, not to exceed $50,000, incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve-Out"); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise (and only with regards to Approved Budgets following the Initial Budget, subject to and in the amounts set forth in such Approved Budget), all unpaid fees, costs, disbursements and expenses (the "Allowed Professional Fees") incurred or earned by persons or firms retained by the (a) Debtor pursuant to sections 327, 328, or

363 of the Bankruptcy Code (the "Debtor Professionals"), (b) Committee pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals"), and (c) the Examiner pursuant to section 327(e) of the Bankruptcy Code (the "Examiner Professionals"  and, together with the Debtor Professionals and Committee Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to, on or after delivery of a Carve-Out Trigger Notice (the "Pre-Trigger Carve-Out Cap"); and (iv) Allowed Professional Fees of Professional Persons, in an amount not to exceed $500,000, incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice (such date, the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap" and such amounts set forth in clauses (i) through (iv), the "Carve-Out Cap"); *provided* that nothing herein shall be construed to impair any party's ability to object to court approval of the fees, expenses, reimbursement of expenses or compensation of any Professional Person.  For purposes of the foregoing, "Carve-Out  Trigger Notice" shall mean a written notice delivered by e-mail by the DIP Agent (acting at the direction of the DIP Lenders) to the Debtors, its lead restructuring counsel, the U.S. Trustee, counsel to the Examiner, and counsel to the Committee (collectively, the "Carve-Out Trigger Notice Parties"), which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Facility, and shall describe in reasonable detail such Event of Default that is alleged to have occurred and be continuing and stating that the Post-Carve-Out Trigger Notice Cap has been invoked.  Notwithstanding anything to the contrary set forth herein, nothing herein shall be construed to (i) impair any party's ability to object to the allowance of the fees, expenses, reimbursement of expenses or compensation of any Professional

Person, or (ii) constitute a limitation on the amount of compensation or expenses that may be sought by any Professional Person or allowed by the Court (it being understood that any such amount in excess of the Carve-Out Cap shall be subordinate to and junior in right of payment to the DIP Obligations).

3.12    No Direct Obligation To Pay Allowed Professional Fees.  None of the DIP Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors  have sufficient funds to pay such compensation or reimbursement.

3.13    Limitation on the Use of DIP Loans.  No portion of the DIP Loans, the DIP Collateral or the Carve-Out may be used, directly or indirectly, in connection with:  (a) preventing, hindering or delaying any of the DIP Parties' enforcement or realization upon any of the DIP Collateral; (b) selling or otherwise disposing of DIP Collateral without the prior written consent of the DIP Agent and the DIP Lenders in their sole discretion, except as otherwise provided herein; (c) using or seeking to use any insurance proceeds constituting DIP Collateral without the prior written consent of the DIP Agent and the DIP Lenders in their sole discretion; (d) incurring any indebtedness without the prior written consent of the DIP Agent and the DIP Lenders except to the extent permitted under the DIP Loan Documents; (e) objecting to, challenging, contesting or investigating any of the DIP Obligations, the DIP Liens, the DIP Superpriority Claim, the DIP Collateral or any other claims or liens granted, held by or on behalf of the DIP Parties; (f) asserting, commencing or prosecuting any challenge, claim or cause of action whatsoever, including, without

limitation, any actions under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge any payments, against any of the DIP Parties or their respective agents, affiliates, parents, subsidiaries, representatives, partners, controlling persons, attorneys, advisors, professionals, officers, directors or employees; (g) litigating, objecting to, challenging or contesting in any manner, or raising any defenses to, the amount, validity, perfection, priority, extent or enforceability of the DIP Obligations, the DIP Liens, the DIP Superpriority Claim or any other rights or interests of any of the DIP Parties, or any other liens and/or claims granted under this Final Order and/or the other DIP Loan Documents; (h) seeking to modify or amend any of the rights granted to the DIP Parties under the DIP Loan Documents; (i) seeking to subordinate, recharacterize, disallow, or avoid the DIP Obligations; or (j) paying any amount on account of any claims arising prior to the Petition Date unless in accordance with the Approved Budget (or if not included in the Approved Budget, with the prior written consent of the DIP Agent and the DIP Lenders in their sole discretion) and such payments are approved by an order of the Court.

3.14    No Modification or Stay of this Final Order.  The DIP Agent and the DIP Lenders have acted in good faith in connection with the DIP Facility and with this Final Order, and their reliance on this Final Order is in good faith, and the DIP Agent and the DIP Lenders are entitled to the protections of Bankruptcy Code section 364(e).

3.15    Power to Waive Rights; Duties to Third Parties.

(a)    Subject to the terms of the DIP Loan Documents, the DIP Agent shall have the right (acting at the direction of the DIP Lenders) to waive any of the terms, rights, and remedies provided or acknowledged in this Final Order that are in favor of the DIP Lenders (the "DIP Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Right(s).  Any

waiver by the DIP Agent (acting on behalf of the DIP Lenders) of any DIP Lender Rights shall not be nor shall it constitute a continuing waiver unless otherwise expressly provided therein.  Any delay in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Agent or any DIP Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the DIP Agent or any DIP Lender.

      3.16    DIP and Other Expenses; Procedures for Payment of DIP Agent's and DIP Lenders' Professional Fees and Expenses.  The Debtor is authorized and directed to pay, in cash, on the terms set forth in this paragraph:  (i) all reasonable and documented fees, out-of-pocket expenses, disbursements and other charges of, and payable to, the DIP Agent and the DIP Lenders, including, without limitation, any contractual agency fees, and (ii) all reasonable and documented fees, out-of-pocket expenses, disbursement and other charges of the following professionals of the DIP Agent and the DIP Lenders (collectively, the "DIP Parties' Professionals"):  (a) Katten Muchin Rosenman LLP, as lead counsel to the DIP Parties, and (b) [Morris, Nichols, Arsht & Tunnell LLP], as co-counsel to the DIP Parties, in each case, whether incurred before, on or after the Petition Date and without further order of, or application to, the Court.  The Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Credit Agreement) all reasonable and documented fees, out-of-pocket expenses, disbursements and other charges of each of the DIP Parties and the DIP Parties' Professionals incurred prior to or on the Closing Date without the need for any such party or professional to first deliver a copy of its invoice.  When the DIP Parties and/or the DIP Parties' Professionals seek payment from the Debtors for fees, out-of-pocket expenses, disbursements and other charges incurred after the Closing Date, each such party or professional shall provide copies of its invoices (which shall not be required to contain time

entries, but shall only include a general, brief description summarizing the nature of the matters for which services were performed, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the Debtors, the U.S. Trustee and counsel for the Committee, with a copy of such invoices delivered simultaneously to the DIP Lenders and the DIP Agent.  If no written objection is received by the applicable party and/or professional in clauses (i) and/or (ii) of this section by 12:00 p.m., prevailing Eastern Time, on the date that is ten (10) calendar days after delivery of such invoice to the Debtors, the U.S. Trustee, and the Committee, such fees, out-of-pocket expenses, disbursements and other charges shall be deemed allowed in full and shall be paid promptly by the Debtors.  If a written objection to an invoice of an applicable party and/or professional in clauses (i) and/or (ii) of this section is timely made by such applicable party and/or professional, the fees, out-of-pocket expenses, disbursements and other charges contained in such invoice shall be deemed allowed and promptly paid by the Debtors in the undisputed amount of the invoice, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  For the avoidance of doubt, pending such resolution, the undisputed portion of any such invoice will be deemed allowed and the Debtors are directed to promptly pay such undisputed portion.  The DIP Parties and the DIP Parties' Professionals shall not be required to file applications or motions with, or obtain approval of, the Court for the payment of any of their fees, out-of-pocket expenses, disbursements and other charges.  Payments of any amounts set forth in this section are not subject to recharacterization, avoidance, subordination, or disgorgement.

147194724v7

3.17    No Unauthorized Disposition of Collateral.    The Debtors shall not sell, transfer, lease, encumber, use, or otherwise dispose of any portion of the DIP Collateral (including inventory), other than (i) in accordance with the bidding and sales process authorized pursuant to the *Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing and Approving Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures and Form and Manner of Notice Thereof; and (D) Granting Related Relief* [Docket No. 270], or (ii) pursuant to the terms of this Final Order or as permitted by the DIP Loan Documents or further order of the Court.

3.18    No Waiver.    The failure of the DIP Parties to seek relief or otherwise exercise their rights and remedies under the DIP Loan Documents, the DIP Facility or this Final Order, as applicable, shall not constitute a waiver of any of the DIP Parties' rights hereunder, thereunder, or otherwise.    Notwithstanding anything herein, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights of the DIP Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the DIP Parties to:  (a) request conversion of the Cases to cases under chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases; (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan; or (c) exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Parties.

3.19    Maintenance of Collateral.    Unless the DIP Parties otherwise consent in writing, until (i) the payment in full in cash of all DIP Obligations and (ii) the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility, the Debtor shall comply with the covenants contained in the DIP Loan Documents regarding the maintenance and insurance of the DIP Collateral.  To the fullest extent provided by applicable law, the DIP

147194724v7

Agent (on behalf of the DIP Lenders) shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

3.20    <u>Reservation of Rights</u>.  The terms, conditions, and provisions of this Final Order are in addition to and without prejudice to the rights of each DIP Secured Party to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Loan Documents or any other applicable agreement or law, including, without limitation, rights to seek relief from the automatic stay, to seek an injunction, to oppose the granting of any interest in the DIP Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Estate.

3.21    <u>Binding Effect</u>.

(a)    All of the provisions of this Final Order, the DIP Loan Documents, the DIP Obligations, all liens and claims granted hereunder in favor of each of the DIP Parties, and any and all rights, remedies, privileges, immunities and benefits in favor of the DIP Agent and the DIP Lenders set forth herein (without each of which the DIP Parties would not have entered into or provided funds under the DIP Loan Documents), provided or acknowledged in this Final Order, and any actions taken pursuant thereto, shall be effective and enforceable *nunc pro tunc* to the Petition Date immediately upon entry of this Final Order and not subject to any stay of execution or effectiveness (all of which are hereby waived), notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, shall continue in full force and effect, and shall survive entry of any other order or action, including, without limitation, any order which may be entered confirming

147194724v7

any chapter 11 plan providing for the refinancing, repayment, or replacement of the DIP Obligations, converting the Cases to any other chapter under the Bankruptcy Code, dismissing the Cases, approving any sale of any or all of the DIP Collateral, or vacating, terminating, reconsidering, revoking, or otherwise modifying this Final Order or any provision hereof.

(b)     No order dismissing the Cases under section 1112 or otherwise may impair the DIP Superpriority Claim and the DIP Parties' liens on and security interests in the DIP Collateral, and all other claims, liens and other claims, protections and rights granted pursuant to the terms of this Final Order, which shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations are indefeasibly paid and satisfied in full.  Notwithstanding any such dismissal, this Court shall retain jurisdiction for the purposes of enforcing all such claims, protections and rights referenced in this paragraph and otherwise in this Final Order.

(c)     Except as set forth in this Final Order, in the event this Court modifies, reverses, vacates, or stays any of the provisions of this Final Order or any of the DIP Loan Documents following the Final Hearing, such modifications, reversals, vacatur, or stays shall not affect the (i) validity, priority, or enforceability of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Agent of the effective date of such modification, reversal, vacatur, or stay, (ii) validity, priority, or enforceability of the DIP Liens and/or the DIP Superpriority Claim or (iii) rights or priorities of the DIP Agent and/or the DIP Lenders pursuant to this Final Order with respect to the DIP Collateral or any portion of the DIP Obligations, unless such authorization and the incurring of such debt is stayed pending appeal.

(d)     This Final Order shall be binding upon the Debtors and all parties in interest in the Cases, and their respective successors and assigns, including, without limitation, (i) any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy

147194724v7

case(s) of the Debtors and (ii) any liquidator, receiver, administrator, or similar such person or entity appointed in any jurisdiction or under any applicable law.  This shall also inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders and each of their respective successors and assigns.

3.22   Discharge.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or each of the DIP Parties has otherwise agreed in writing in its respective sole discretion.

3.23   Section 506(c) Waiver.  No costs or expenses of administration which have been or may be incurred in the Cases at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of value by the DIP Agent or the DIP Lenders upon the DIP Collateral) shall be charged against the DIP Agent or the DIP Lenders, or any of the DIP Obligations or the DIP Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the affected DIP Parties, in their respective sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder).

3.24   No Marshaling/Application of Proceeds.  In no event shall the DIP Agent and/or the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, and all proceeds shall be received and applied in accordance with the DIP Loan Documents.

3.25   Limits on Lender Liability.

(a)    In determining to make any loan under the DIP Loan Agreement or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Loan Documents, the DIP Agent and the DIP Lenders shall not be deemed to (i) be in control of the operations of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of the Debtors or (ii) owe any fiduciary duty to the Debtors.  Furthermore, nothing in this Final Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors and its respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

3.26    Release.  Each Debtor and its Estate, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby forever, unconditionally, permanently, and irrevocably releases, discharges, and acquits each of the DIP Parties and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Released Parties") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether known or unknown, matured or contingent, arising under, in connection with, or relating to the DIP Facility or the DIP Loan Documents, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and

147194724v7

all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law, including, without limitation, any right to assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security, and perfection of any of the DIP Obligations or the DIP Loan Documents and further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the DIP Obligations that the Debtors now have or may claim to have against the Released Parties, arising under, in connection with, based upon, or released to any and all acts, omissions, conduct undertaken, or events occurring prior to entry of this Final Order.

3.27    [RESERVED].

3.28    [RESERVED]

3.29    <u>Survival</u>.   The provisions of this Final Order, the validity, priority, and enforceability of the DIP Liens and the DIP Superpriority Claim, and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any order that may be entered (a) confirming any plan of reorganization in the Cases, (b) converting the Cases to cases under chapter 7 of the Bankruptcy Code, (c) dismissing the Cases, (d) approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Loan Documents) or (e) pursuant to which the Court abstains from hearing the Cases.   The terms and provisions of this Final Order, including the claims, liens, security interests and other protections (as applicable) granted to the DIP Agent and the DIP Lenders

147194724v7

pursuant to this Final Order, notwithstanding the entry of any such order, shall continue in the Cases, following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Final Order until in respect of the DIP Facility, all of the DIP Obligations, pursuant to the DIP Loan Documents and this Final Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms) and all commitments to extend credit under the DIP Facility are terminated.

3.30    <u>Proofs of Claim</u>.  None of the DIP Parties shall be required to file proofs of claim (or request for payment of an administrative expense) in the Cases or any subsequent cases of the Debtors under any chapter of the Bankruptcy Code.  The Debtor's stipulations in this Final Order (and the DIP Liens, the DIP Superpriority Claim and the other liens, interests, rights and protections granted to, or in favor of the DIP Parties under this Final Order and the DIP Loan Documents) shall be deemed to constitute valid, timely and properly filed proofs of claim (and requests for payment of administrative expenses) against the Debtors by the DIP Parties, without the need for any such party to file a proof of claim or request for payment of an administrative expense.  Any bar dates for filing claims (including, without limitation, an administrative expense claim) established in any order entered in the Cases or any subsequent cases shall not apply to any of the DIP Parties, and any such order shall expressly provide that the DIP Parties are exempt from complying with any such bar date and filing proofs of claim (or requests for payment of administrative expenses).  Notwithstanding anything to the contrary in this Final Order or any other order entered in the Cases or any subsequent cases, the DIP Agent (on behalf of itself and the other DIP Parties) is hereby authorized and entitled, at the direction of the DIP Lenders, but not required, to file (and amend and/or supplement, as applicable) a single, consolidated master

proof of claim (each, a "Master Proof of Claim") for any and all claims of, and obligations owed to the DIP Parties arising from or granted under the DIP Loan Documents or in respect of the DIP Obligations and/or this Final Order, as applicable, which Master Proof of Claim (x) will be filed in the Cases, and shall be deemed a valid, timely and properly filed proof of claim against the Debtors and in any of the Debtors' subsequent cases and (y) need not attach or contain any supporting documentation. Any Master Proof of Claim filed by the DIP Agent shall be deemed to be in addition to, and not in lieu of, any other proof of claim that may be filed by any other DIP Secured Party, as applicable; *provided* that, for the avoidance of doubt, no such DIP Secured Party is required to file any such proof of claim.

3.31    No Third Party Rights.  Except as specifically provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holders, or any direct, indirect, or incidental beneficiary.

3.32    No Avoidance.  No obligations incurred or payments or other transfers made by or on behalf of the Debtors on account of the DIP Facility shall be avoidable or recoverable from the DIP Agent or the DIP Lenders under any section of the Bankruptcy Code, or any other federal, state, or other applicable law.

3.33    Reliance on Order.   All postpetition advances under the DIP Loan Documents are made in reliance on this Final Order.

3.34    Payments Free and Clear.  Any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Parties pursuant to the provisions of this Final Order or any subsequent order of this Court or the DIP Loan Documents, shall, subject to the terms of this Section 3.34, be irrevocable, received free and clear of any claims, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly

or indirectly, section 506(c) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors, and in the case of payments made or proceeds remitted after the delivery of a Carve-Out Trigger Notice, subject to the Carve-Out in all respects.

PH DRAFT 01/31/2021
ATTORNEY WORK PRODUCT
PRIVILEGED AND CONFIDENTIAL

3.35    <u>Limited Effect</u>.  In the event of a conflict between the terms and provisions of any of the other DIP Loan Documents and this Final Order, the terms and provisions of this Final Order shall govern.

3.36    <u>Headings</u>.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

3.37    <u>Bankruptcy Rules</u>.  The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

3.38    <u>General Authorization</u>.  The Debtor and the DIP Parties are authorized to take any and all actions necessary to effectuate the relief granted in this Final Order.

3.39    <u>Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Documents, any other document or any other order of the Court and of this Final Order, the provisions of this Final Order shall govern and control.

3.40    <u>Effect of this Final Order</u>.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 and 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

3.41    <u>Retention of Exclusive Jurisdiction</u>.  This Court shall retain exclusive jurisdiction and power with respect to all matters arising from or related to the implementation or interpretation of this Final Order, the DIP Loan Agreement, and the other DIP Loan Documents.

**PH DRAFT 01/31/2021**
**ATTORNEY WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

<u>**EXHIBIT A**</u>

**DIP Loan Agreement**

**PH DRAFT 1/31/2021**
**PRIVILEGED & CONFIDENTIAL**

## DEBTOR IN POSSESSION SENIOR SECURED
## DELAYED DRAW TERM LOAN PROMISSORY NOTE
## AND SUBSIDIARY DEBTOR GUARANTEE

$4,000,000.00                                                New York, New York
                                                          February [_], 2021

On November 7, 2020 (the "<u>Petition Date</u>"), CRED INC., a Delaware corporation (the "<u>Company</u>" or "<u>Borrower</u>") and each of its debtor subsidiaries (each a "<u>Guarantor</u>" and collectively, the "<u>Guarantors</u>") commenced chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"; and the cases commenced thereby, the "<u>Chapter 11 Cases</u>"). The Company continues to operate its business and manage its properties as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. The Company has requested that the lenders (the "<u>DIP Lenders</u>") from time to time party to this Debtor in Possession Senior Secured Delayed Draw Term Loan Promissory Note (as amended, modified, or supplemented from time to time, this "<u>Note</u>"), make Term Loans (as defined below) from time to time evidenced by this Note, this Note being acknowledged and agreed upon by Alter Domus (US) LLC, a Delaware limited liability company, as agent (in such capacity, the "<u>Agent</u>"). The Borrower intends to utilize such Term Loans to (i) fund general corporate needs of the Company, including without limitation working capital and other needs, (ii) pay costs and expenses arising from or relating to the administration of the Chapter 11 Cases and (iii) pay the fees and expenses of the Company arising from or relating to the prosecution of claims and causes of action against certain parties, including fees and expenses of professionals, in each case in accordance with the Budget. Capitalized terms used herein and not otherwise defined herein shall have the meanings provided in Section 18 of this Note.

1.       <u>Term Loans</u>.

(a)       Subject to the terms and conditions hereof including the Agent's receipt of a Borrowing Request (as defined below), the DIP Lenders agree to provide the Borrower with Term Loans in an aggregate principal amount not to exceed $4,000,000.00 on the terms, and subject to the conditions, set forth herein and in any Financing Order (the "<u>Maximum Amount</u>").

(b)       <u>Initial Loan</u>. The Borrower shall deliver a Borrowing Request to the Agent and Agent shall have received such Borrowing Request on the date that the Final Order is entered by the Bankruptcy Court and such borrowing shall occur three (3) Business Days (or such shorter period as the Agent may agree) after receipt of the Borrowing Request by Agent and the satisfaction or waiver by the DIP Lenders of the conditions set forth in Section 2 of this Note[1] (the "<u>Closing Date</u>") in an aggregate principal amount equal to $2,500,000 (the "<u>Initial Loan</u>"). Subject

---

[1] PH Note to Katten: Section 2 covers Final Order

to the satisfaction or waiver by DIP Lenders of the terms and conditions hereof, the Agent and DIP Lenders shall make available to the Borrower the Initial Loan on the Closing Date.

(c)     Additional Loans.  At any time on or after the date of entry of the Final Order, and subject to the terms and conditions hereof, including the Agent and the DIP Lenders' receipt of a Borrowing Request, the DIP Lenders agree to provide the Borrower with one or more additional loans, each in a principal amount of not less than $1,000,000.00 (unless the Commitment is less than $1,000,000, each such additional loan, an "Additional Loan" and collectively, the "Additional Loans" and, together with the Initial Loan, each, a "Term Loan" and collectively, the "Term Loans"). For the avoidance of doubt, each Borrowing Request shall be made by the Borrower in accordance with the Budget. The Borrower may request the Additional Loans pursuant to written notice (which may be by e-mail) delivered to the Agent by or before 2:00 p.m. (New York time) three (3) Business Days prior to the proposed borrowing date (or such shorter period as the Agent may agree) substantially in the form of Exhibit B attached hereto (a "Borrowing Request").  Each DIP Lender shall provide the Term Loans in an aggregate amount equal to its Commitment set forth on Schedule 1(a) and the obligation of each DIP Lender to make the Term Loans under this Note shall be several and not joint and several.  Upon receipt of a Borrowing Request, subject to the satisfaction of the conditions set forth in Section 2 of this Note, the DIP Lenders shall simultaneously and proportionately to their Pro Rata Share of the Maximum Amount, make the proceeds of such Term Loans available to the Borrower on the applicable date of funding of such Term Loan by transferring immediately available funds equal to such proceeds to an account designated in writing by the Borrower consistent with its existing cash management system.  The Commitment of each DIP Lender shall be permanently reduced upon the making of a Term Loan in an amount equal to such Term Loans.  Any principal amount of the Term Loan which is repaid or prepaid may not be reborrowed.

(d)     The Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any Borrowing Request or similar notice believed by the Agent to be genuine.  The Agent may assume that each Person executing and delivering any such notice was duly authorized, unless the responsible individual acting thereon for the Agent has actual knowledge to the contrary.

(e)     [Reserved.]

(f)     The Borrower shall utilize the proceeds of Term Loans to (i) fund general corporate needs of the Company, including without limitation working capital and other needs, (ii) pay costs and expenses arising from or relating to the administration of the Chapter 11 Case and (iii) pay the fees and expenses of the Company arising from or relating to the prosecution of causes of action against certain parties, including fees and expenses of professionals, in each case in accordance with the Budget, this Note, the Bankruptcy Code and the Financing Order; provided, however, no Term Loans, Cash Collateral or other cash may be used to investigate, commence or prosecute any action, proceeding or objection with respect to or related to the claims, liens or security interests of the Agent or the DIP Lender.

2.     Certain Conditions to Each Term Loan.  Except as otherwise agreed between the Borrower and DIP Lenders, no DIP Lender shall be obligated to fund any Term Loan, if, as of the date thereof:

(a)    the Borrower shall not have paid or shall not have made an arrangement for payment for any amount then payable hereunder (including the fees and expenses of counsel to the Agent) or under any other DIP Document with respect to which the Borrower has received an invoice at least two (2) Business Days prior to the proposed borrowing date;

(b)    the Credit Parties shall not have delivered corporate resolutions, incumbency certificates and similar documents prior to the Closing Date, in form and substance satisfactory to the DIP Lenders with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;

(c)    the Company shall not have delivered a lien search dated as of a date no earlier than thirty (30) days prior to the Petition Date and in form and substance acceptable to the DIP Lenders in their sole discretion;

(d)    any representation or warranty by any Credit Party contained herein or in any other DIP Document shall be untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;

(e)    with respect to the Initial Loan, (i) the Bankruptcy Court shall not have entered the Final Order; or (ii) the Final Order shall have been stayed, vacated, reversed, modified or amended without DIP Lenders' consent in their sole discretion;

(f)    with respect to any Additional Loan, the Final Order shall have been stayed, vacated, reversed, modified or amended without the DIP Lenders' consent in their sole discretion;

(g)    conditions precedent in the Final Order shall not have been satisfied by the Credit Parties or waived by the DIP Lenders;

(h)    except as occasioned by the commencement of the Chapter 11 Case and the actions, proceedings, investigations and other matters related thereto or arising therefrom (including any actions taken in accordance with the Budget, this Note or the Financing Order), any event or circumstance having a Material Adverse Effect shall have occurred since the date hereof;

(i)    any Default or Event of Default shall have occurred and be continuing or would result immediately after giving effect to any Term Loan;

(j)    after giving effect to any Term Loan, the outstanding principal amount of all Term Loans would exceed the Maximum Amount;

(k)    the DIP Lenders shall not have received and approved the Budget in accordance with this Note and the Financing Order;

(l)    any Credit Party shall have filed one or more pleadings with the Bankruptcy Court and such pleadings shall not be in form and substance reasonably acceptable to the DIP Lenders in their sole discretion which consent shall be deemed to be given if the DIP Lender does

3

not respond within two (2) Business Days of delivery of any such pleading by the Borrower to the DIP Lender pursuant to Section 13 hereof (except for emergency pleadings, which to the extent practicable will be delivered as promptly as possible prior to filing, and any such emergency pleadings shall not require the consent of any DIP Lender so long as any such emergency pleading does not directly affect any DIP Lender, the interests of such DIP Lender or the Collateral);

(m)    the Company shall not have delivered a Borrowing Request as pursuant to this Note;

(n)    the Agent shall not have received, prior to the Closing Date, all documentation and other information about the Credit Parties that it reasonably determines is required by regulatory authorities under applicable "know your customer" and anti-money laundering laws;

(o)    the Company shall not have delivered evidence satisfactory to the DIP Lender that the Company maintains crypto currency having a fair market value of no less than Four Million Dollars ($4,000,000.00) (as determined in the good faith discretion of the Borrower) in the Company's sub-wallet at Fireblocks solely for the benefit of the DIP Lender (the "Fireblocks Sub-Wallet"); or

(p)    the Bankruptcy Court shall have entered orders and such orders shall not be in form and substance reasonably acceptable to the DIP Lenders in their sole discretion.

The request and acceptance by the Borrower of the proceeds of any Term Loan shall be deemed to constitute, (x) with respect to the Initial Loan, as of the date of such acceptance or incurrence, and (y) with respect to each Additional Loan, as of the date of such request, acceptance or incurrence, in each case (i) a representation and warranty by the Borrower that the conditions in this Section 2 and under the Final Order have been satisfied and (ii) a reaffirmation by the Borrower of the granting and continuance of the Liens granted in favor of the Agent on behalf of the DIP Lenders, pursuant to the Financing Order.

3.    Payment of Principal.  FOR VALUE RECEIVED, the Borrower promises to pay to the Agent, for the benefit of the DIP Lenders, the unpaid principal amount of all Term Loans made by the DIP Lenders to the Borrower, on the Maturity Date, together with all accrued and unpaid interest, fees, expenses, premiums and other Obligations to the extent provided, without duplication, in this Note and the Financing Order.

4.    Payment of Interest.

(a)    Subject to the terms of this Note, the Term Loans shall bear interest on the principal amount thereof from time to time outstanding, from the date of the advance of such Term Loan until repaid, at a rate per annum equal to 15.00% per annum if the Borrower elects to make interest payments in cash or at a rate per annum equal to 20.00% per annum if the Borrower elects to make interest payments in kind.  Interest on the Term Loans shall be due and payable in arrears on each Interest Payment Date commencing with the Interest Payment Date

falling on [February 28], 2021.[2]

(b)     The Borrower shall, by delivering a written notice substantially in the form of Exhibit C (a "Cash/PIK Election Notice") to the Agent on or prior to the Cash/PIK Election Date, elect whether interest payments for the applicable interest period shall be paid in cash (such election, the "Cash Option") or paid in kind and capitalized by increasing the outstanding principal amount of the Term Loans by the amount of such interest payment (such election, the "PIK Option"); provided that if the Borrower fails to deliver a Cash/PIK Election Notice by the Cash/PIK Election Date, the Borrower shall be deemed to have elected the PIK Option on the applicable Interest Payment Date. If the Borrower elects the Cash Option, all interest payments with respect to the Term Loans for the applicable fiscal month shall be paid in cash on the applicable Interest Payment Date in accordance with Section 4(a). If the Borrower elects the PIK Option (or is deemed to elect the PIK Option), all interest payments with respect to the Term Loans for the applicable fiscal month shall be paid in kind at the rate of 20.00% per annum (the amount of such interest paid in kind, together with any interest thereon, collectively, the "PIK Interest") and capitalized by increasing the outstanding principal amount of the Term Loans by such amount on the applicable Interest Payment Date.   In the event Borrower exercises its right to pay interest in kind, such interest shall thereafter be treated for all purposes as Term Loans outstanding, including (without limitation) for determining the amount of interest thereafter accruing and due and payable.  For the avoidance of doubt, any PIK Interest shall not count as against the Maximum Amount.

(c)     All computations of fees and interest shall be made by the Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable.  Each determination by the Agent of an interest rate hereunder shall be final, binding and conclusive on the Borrower (absent manifest error).

(d)     So long as an Event of Default shall have occurred and be continuing, and at the election of the DIP Lenders, the interest rate applicable to the Term Loans shall be increased by five percentage points (5.00%) per annum above the rate of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding Term Loans shall bear interest at the Default Rate.  Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived and shall be payable upon demand.

(e)     It is the intention of the parties hereto that the Agent and each DIP Lender shall conform strictly to usury laws applicable to it. Accordingly, if the transactions contemplated hereby or by any other DIP Document would be usurious as to the Agent or any DIP Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Agent or such DIP Lender notwithstanding the other provisions of this Note), then, in that event, notwithstanding anything to the contrary in this Note or any other DIP Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to

---

[2] NTD: date subject to revision based on date of entry of Final Order.

the Agent or any DIP Lender that is contracted for, taken, reserved, charged or received by the Agent or such DIP Lender under this Note or any other DIP Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by the Agent or such DIP Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or such DIP Lender, as applicable, to the Borrower).  If at any time and from time to time (x) the amount of interest payable to the Agent or any DIP Lender on any date shall be computed at the highest lawful rate applicable to the Agent or such DIP Lender pursuant to this Section 4(e) and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Agent or such DIP Lender would be less than the amount of interest payable to the Agent or such DIP Lender computed at the highest lawful rate applicable to the Agent or such DIP Lender, then the amount of interest payable to the Agent or such DIP Lender in respect of such subsequent interest computation period shall continue to be computed at the highest lawful rate applicable to the Agent or such DIP Lender until the total amount of interest payable to the Agent or such DIP Lender shall equal the total amount of interest which would have been payable to the Agent or such DIP Lender if the total amount of interest had been computed without giving effect to this Section 4(e).

(f)    If, after the date hereof, the DIP Lenders determine that (1) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any governmental authority charged with the administration thereof, or (2) compliance by any DIP Lenders or its parent bank holding company (if any) with any guideline, request, or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on the DIP Lender's or such holding company's capital as a consequence of the DIP Lender's Term Loan hereunder to a level below that which the DIP Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration the DIP Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount reasonably deemed by the DIP Lender to be material, then the DIP Lender may notify the Borrower thereof.  Following receipt of such notice, the Borrower agrees to pay the DIP Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable promptly after presentation by the DIP Lender to the Borrower of a statement in the amount and setting forth in reasonable detail the DIP Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).  In determining such amount, the DIP Lender may use any reasonable averaging and attribution methods.

5.    <u>Payments</u>.  All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds to the Agent at the account as shall be designated in a written notice delivered by the Agent to the Borrower no later than 2:00 p.m. (New York time) on the date due.  Each payment made hereunder shall be credited first to interest then due and payable and the remainder of such payment shall be credited to principal, and interest shall thereupon cease to accrue upon the principal so repaid.

6.      <u>Optional Prepayments</u>.  Subject to the terms and conditions of the Financing Order, the Borrower shall have the right at any time and from time to time to prepay any Term Loans under this Note in whole or in part upon two (2) Business Days' written notice to the Agent received by or before 2:00 p.m. (New York time) on such date; <u>provided</u> that each such prepayment shall be in a minimum amount of $500,000.00.  Notice of prepayment having been given as aforesaid, the principal amount specified in such notice shall become due and payable on the prepayment date specified therein in the aggregate principal amount specified therein unless such repayment is conditioned on the receipt of any third party funds which are not received.  Any prepayment or repayment hereunder shall be accompanied by interest on the principal amount of this Note being prepaid or repaid to the date of prepayment or repayment and the applicable Early Termination Premium.

7.      <u>Conversion Option</u>.    The Obligations shall convert into an exit credit facility (the "<u>Exit Facility</u>") at the Borrower's election (the "<u>Conversion Option</u>"), with such election to be made on or prior to the occurrence of the confirmation hearing for the Plan, and which election shall become effective and irrevocable as of the effective date (the "<u>Effective Date</u>") of the Chapter 11 plan approved for solicitation by the Bankruptcy Court on January 21, 2021 (subject to nonmaterial modifications and supplementations) (the "<u>Plan</u>") confirmed by an order of the Bankruptcy Court (the "<u>Confirmation Order</u>") (such Plan and Confirmation Order, together with all plan supplement documents and related documents, to be in form and substance acceptable to the DIP Lenders in their sole discretion, which shall not be unreasonably withheld).    The documentation with respect to the Exit Facility shall be in all material respects consistent with the term sheet attached hereto as <u>Exhibit D</u> and otherwise in form and substance acceptable to the DIP Lenders.

8.      <u>Fees</u>.  Borrower shall pay to the Agent for the account of the DIP Lenders the following fees:

(a)      <u>Administration Fees</u>.  The Borrower shall pay to the Agent for its own account the fees provided for in the Agent Fee Letter (such fees, the "<u>Administration Fees</u>").

(b)      <u>Put Option Premium</u>. Upon entry of the Final Order, and subject to the funding of the Initial Loan, DIP Lenders shall earn a put option premium equal to $350,000.00 (the "<u>Put Option Premium</u>"), which amount, at Borrower's election on three (3) Business Days (or such shorter period reasonably acceptable to the Agent) prior notice, shall be (i) payable in cash upon the DIP Lenders' funding of the Initial Loan or (ii) paid in kind through the issuance of additional Term Loans.  In the event Borrower exercises its right to pay the Put Option Premium in kind, such Put Option Premium shall thereafter be treated for all purposes as a Term Loan outstanding, including (without limitation) for determining the amount of interest thereafter accruing and due and payable.  For the avoidance of doubt, Term Loans comprised of the Put Option Premium shall not count as against the Maximum Amount and shall be paid on the Maturity Date.

(c)      <u>Early Termination Premium</u>.  If the Borrower has not elected to exercise the Conversion Option, but instead repays the Term Loans (or any portion thereof) at any time prior to the Stated Maturity Date, in addition to repaying the principal of and any and all accrued and

7

unpaid interest and other Obligations outstanding with respect to the Term Loans so repaid, the Borrower shall pay the Agent, for the benefit of the DIP Lenders, an early termination premium (the "Early Termination Premium") in an amount equal to 7.5% of the undrawn Commitment amount at the time of such repayment by the Borrower had such Term Loans remained outstanding through the Stated Maturity Date.

9.    Indemnity.

(a)    Each Credit Party shall indemnify and hold harmless the Agent and each DIP Lender and each of their respective affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the other DIP Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between the Agent and the DIP Lenders on the one hand and any Credit Party on the other hand; provided, that (i) no Credit Party shall be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from such Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction and (ii) this Section 9 shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim. **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY DIP DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**

10.    Adjustments for Withholding, Capital Adequacy Etc.  All payments to the Agent by the Borrower under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges or withholdings and all related liabilities (all such taxes, duties, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "Taxes") imposed by the United States of America or any other nation or jurisdiction (or any political subdivision or taxing authority of either thereof), unless such Taxes are required by applicable law to be deducted or withheld.  The parties hereto agree to treat interest in this Note, as preferred stock, for federal income tax purposes, in which dividends shall not accrue or otherwise be subject to withholding unless and until such dividends are declared by the Board of Directors of the Company (the "Board") and paid by the Company.  If the Borrower shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note other than taxes imposed on the Agent or any DIP Lender's overall net income, then (A) if such Tax is an Indemnified Tax, the amount payable shall be increased as

8

may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) the Agent receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (B) the Borrower shall make such deductions or withholdings, and (C) the Borrower shall timely pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge or withholding on or from payments due from the Borrower (but excluding Indemnified Taxes, Excluded Taxes, and taxation on the overall net income of the DIP Lenders)), or any change therein or in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of the Agent or DIP Lenders with respect to this Note or to increase the cost to the Agent or DIP Lenders of making or maintaining amounts available under this Note, the Borrower agrees to pay to the Agent or DIP Lenders such additional amount or amounts as will compensate the Agent or DIP Lenders on an after-tax basis for such reduction or increase.

The Borrower agrees to timely pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes or similar levies (all such taxes, charges, duties and levies being referred to as "Other Taxes") which arise from any payment made by the Borrower under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

The Borrower shall indemnify the Agent and each of the DIP Lenders for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed by any jurisdiction on amounts payable by the Borrower hereunder) paid by the Agent or any DIP Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Indemnified Taxes paid by the Agent or any DIP Lender, whether or not they were correctly or legally asserted, excluding taxes imposed on the Agent or any DIP Lender's overall net income. Payment under this indemnification shall be made upon demand. A certificate as to the amount of such Indemnified Taxes submitted to the Borrower by the Agent shall be conclusive evidence, absent manifest error, of the amount due from the Borrower to the DIP Lenders.

The Borrower shall furnish to the Agent and DIP Lenders the original or a certified copy of a receipt evidencing any payment of Taxes made by the Borrower pursuant to this Section 10 within thirty (30) days after the date of any such payment. If any Recipient becomes aware that it has received a refund of any Taxes with respect to which the Borrower has paid any amount pursuant to this Section 10, such Recipient shall pay the amount of such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest received from the relevant governmental authority with respect thereto), to the Borrower promptly after receipt thereof.

Any Recipient of a payment hereunder shall, to the extent it is legally entitled to do so, deliver to the Agent and the Borrower on or prior to the date hereof (and from time to time

thereafter upon the reasonable request of the Agent or the Borrower), two properly completed and executed copies of IRS Forms W-8 or W-9 and properly completed and executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, together with such supplementary documentation as may be prescribed by applicable law to permit the Agent and the Borrower to determine the withholding or deduction (if any) required to be made.  In addition, any such Recipient, if reasonably requested by the Agent or the Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Agent or the Borrower as will enable the Agent or the Borrower to determine whether or not such Recipient is subject to backup withholding or information reporting requirements. Each Recipient agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall timely update such form or certification or promptly notify the Agent or the Borrower in writing of its legal inability to do so.

11.  <u>Priority of Obligations and DIP Lenders' Liens</u>.

(a)    To secure all of the Borrower's and each other Credit Party's Obligations now existing or hereafter arising, the Credit Parties hereby grant to, and create in favor of, the Agent, for the benefit of itself and the DIP Lenders, Liens on, and security interests in, all of such Credit Party's right, title and interest in and to all of the Collateral effective as of the Petition Date, including without limitation, (i) subject to the Carve-Out, an allowed super-priority administrative expense claim against the Debtors pursuant to Section 364(c)(1) of the Bankruptcy Code, and except as set forth in the Financing Order, having a priority over any and all other claims and costs and expenses of administration of any kind whatsoever, whether now existing or hereafter arising, including, without limitation, those specified in, ordered pursuant to or arising under, *inter alia*, sections 105, 326, 328, 330, 331, 363, 364, 365, 503, 506, 507, 546, 726, 1113 and/or 1114 or any other provision of the Bankruptcy Code or otherwise (whether incurred in these Chapter 11 Cases and any Successor Cases), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed superpriority administrative claim (x) shall at all times be senior to the rights of the Debtors, any successor trustee or estate representative, or any other creditor or party in interest in the Chapter 11 Cases or any Successor Cases, (y) shall be, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, and (z) shall be payable from and have recourse to all prepetition and postpetition property, whether existing as of the Petition Date or thereafter acquired (including all Avoidance Actions), of the Debtors and all proceeds thereof (including proceeds of Avoidance Actions); (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, Liens on, and security interests in, the Collateral, that are first and senior in priority to all other Liens on, and security interests in, the Collateral that was not encumbered by a valid, enforceable, properly perfected and non-avoidable Lien as of the Petition Date, subject only to the Carve-Out; and (iii) pursuant to section 364(c)(3) of the Bankruptcy Code, Liens on, and security interests in, all other Collateral, subject only to the Carve-Out and Permitted Prior Liens; and (iv) pursuant to Section 364(d) of the Bankruptcy Code, a perfected first priority priming lien on all now owned or after acquired assets of the Credit Parties (including, without limitation, property held by others and all of the outstanding shares of capital stock of the Subsidiary and any Subsidiary of any of the Credit Parties) to the extent that such assets are subject to valid, perfected and non-avoidable liens in favor of third parties as of the commencement of these Chapter 11 Cases.  Except as set forth in the Financing Order, the security

10

interests and Liens granted to the Agent hereunder shall not be (i) subject to any Lien or security interest which is avoided and preserved for the benefit of such Credit Party's estate under Section 551 of the Bankruptcy Code, or (ii) subordinated to or made *pari passu* with any other Lien or security interest under Section 364(d) of the Bankruptcy Code or otherwise.

(b)     The priority of the Agent's Liens on the Collateral shall be consistent with clause (a) of this Section 11 and as more fully set forth in the Financing Order.

(c)     Notwithstanding anything herein to the contrary (i) all proceeds received by the Agent and the DIP Lenders from the Collateral subject to the Liens granted in this Section 11 and in each other DIP Document, including the Financing Order shall be subject to the Carve-Out, and (ii) no Person entitled to the Carve-Out shall be entitled to sell, or otherwise dispose, or seek or object to the sale or other disposition of, any Collateral.

(d)     Each Credit Party agrees that the Obligations shall constitute allowed administrative expenses in the Chapter 11 Case, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 363, 364, 365, 503, 506, 507, 546, 726, 1113 and/or 1114 of the Bankruptcy Code, except as set forth in the Financing Order.

(e)     The Agent's Liens on the Collateral and the super-priority administrative claim under Section 364(c) of the Bankruptcy Code afforded the Obligations shall, following the occurrence and during the continuation of an Event of Default, be subject to the Carve-Out, in accordance with the Financing Order.

12.     <u>Further Assurances</u>.  Each Credit Party agrees that it shall, at its expense and upon the reasonable request of the Agent or the DIP Lenders, duly execute and deliver or cause to be duty executed and delivered, to the Agent or such DIP Lender, as the Agent or the DIP Lenders shall direct such Credit Party such further instruments and do and cause to be done such further acts as may be necessary in the reasonable opinion of the Agent or the DIP Lenders to carry out more effectively the provisions and purposes of this Note or any other DIP Document, including, upon the written request of the Agent or the DIP Lenders and in form and substance reasonably satisfactory to the DIP Lenders, security agreements, UCC-l financing statements and other Collateral Documents confirming and perfecting the granting to the Agent, on behalf of the DIP Lenders, of the Liens (subject to the Financing Order) in the Collateral to secure the Obligations.

13.     <u>Reports and Notices</u>.  The Company shall deliver (which delivery may be made by electronic communication (including email)) to the Agent and the DIP Lenders each of the reports and other items (without duplication) set forth on Schedule 13 and in the Financing Order no later than the times specified therein.

14.     <u>Affirmative Covenants</u>.

Each Credit Party agrees that:

(a)     Upon request of the Agent or the DIP Lenders, such Credit Party will permit

11

any officer, employee, attorney or accountant or agent of the Agent or the DIP Lenders to audit, review, make extracts from or copy, at the Company's expense, any and all corporate and financial and other books and records of such Credit Party at all times during ordinary business hours and, in the absence of an Event of Default, upon reasonable advance notice and to discuss such Credit Party's affairs with any of their directors, officers, employees, attorneys, or accountants.  Each Credit Party will permit the Agent, or the DIP Lenders, or any of their officers, employees, accountants, attorneys or agents, to examine and inspect any Collateral or any other property of such Credit Party at any time during ordinary business hours and, in the absence of an Event of Default, upon reasonable prior notice. Notwithstanding the foregoing, no Credit Party be required to disclose information to the Agent or the DIP Lenders (or any agent or representative thereof) that is prohibited by applicable law or is subject to attorney-client or similar privilege or constitutes attorney work product.

(b)     (i) Each Credit Party will comply with all requirements of applicable law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (ii) each Credit Party will obtain, maintain in effect and comply with all contracts and all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted other than to the extent contemplated by the Budget, the Sale Motion or the Financing Order.

(c)     Each Credit Party will pay or discharge, when due, (i) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of such Credit Party (including, without limitation, the Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, except in each case (x) where the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by such Credit Party and (y) to the extent nonpayment is permitted or required by the Bankruptcy Code or this Note, (ii) all federal, state and local taxes required to be withheld by them, and (iii) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any property of such Credit Party.

(d)     (i) Each Credit Party will keep and maintain the Collateral and all of its properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the Budget or the Financing Order, (ii) such Credit Party will defend the Collateral against all claims or demands of all Persons (other than Permitted Encumbrances) claiming the Collateral or any interest therein, and (iii) each Credit Party will keep all Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances and other than to the extent contemplated by the Financing Order.

(e)     The Company shall maintain at all times during the term of this Note, in a manner consistent with Section 2(o) of this Note, the Fireblocks Sub-Wallet with crypto currency having a fair market value of no less than Four Million Dollars ($4,000,000.00) (as determined in the good faith discretion of the Borrower).

(f)     Each Credit Party will preserve and maintain its existence and all of its rights, privileges and franchises necessary or desirable in the conduct of its business, except to the

12

extent contemplated by the Budget, the Sale Motion or the Financing Order.

(g)     The Company shall at all times operate its business in a manner consistent with the Budget except to the extent of any Permitted Variance.

(h)     The Company shall (i) comply with the Budget (which Budget shall be updated periodically and consistent with the terms of this Note, shall be acceptable to the DIP Lenders in their sole discretion, and subject only to a permitted deviation acceptable to the DIP Lenders in their sole discretion); and (ii) comply with any other financial covenants contained in any of the DIP Documents.

(i)     The Company agrees that it shall take all actions necessary to cause each of the following to occur (each a "Milestone" and collectively, the "Milestones"):

(i)     no later than twenty-five (25) days after the filing of the DIP Motion seeking entry of the Final Order, the Final Order approving this Note and the financing contemplated hereby shall be entered by the Bankruptcy Court;

(ii)     No later than January 29, 2021, the Debtors must either (i)(A) obtain entry of an order approving the Disclosure Statement, and (B) obtain entry of an order by the Bankruptcy Court scheduling a hearing on the Plan and setting an objection deadline with respect thereto, or (ii) seek interim approval of a combined Plan and Disclosure Statement under Local Bankruptcy Rule 3017-2, and schedule a combined hearing on final approval of the Disclosure Statement and confirmation of the Plan;

(iii)     no later than March 15, 2021, the Confirmation Order shall have been entered by the Bankruptcy Court, and an order shall have been entered by the Bankruptcy Court approving the In-Court Sale, as applicable;

(iv)     no later than March 31, 2021, the Effective Date shall have occurred.

15.     Negative Covenants.

The Company agrees that, without the prior written consent of the DIP Lenders:

(a)     The Company shall not, and shall not permit any of its Subsidiaries, directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or equity interests of, or otherwise combine with or acquire, any Person.

(b)     The Company shall not, and shall not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, except (without duplication), to the extent not prohibited by the Financing Order, Permitted Indebtedness.

(c)     The Company shall not, and shall not permit any of its Subsidiaries to, enter into, renew, extend or be a party to any transaction with any Affiliate, except Permitted Affiliate Transactions.

(d)     The Company shall not, and shall not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Lien on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Permitted Encumbrances or as expressly permitted by the Financing Order.

(e)     The Company will not, and shall not permit any of its Subsidiaries to, assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person, except the endorsement of negotiable instruments by Company for the deposit or collection or similar transactions in the ordinary course of business or Permitted Indebtedness.

(f)     The Company will not, and shall not permit any of its Subsidiaries to, convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets, whether now owned or hereinafter acquired other than (1) the transfer, sale or disposition of assets approved by an order of the Bankruptcy Court, which order shall be in form and substance acceptable to the Agent and DIP Lenders in their sole discretion, (2) pursuant to the terms of the Final Order or permitted under the Final Order, and (3) a Credit Party's sale, conversion, transfer or disposition of crypto currency or the private keys related thereto from a Credit Party's Fireblocks accounts in the ordinary course of business,  subject to the Budget (it being understood that there shall be no Permitted Variance with respect to such sale, conversion, transfer or other disposition described in this clause (3) and the Fireblocks Sub-Wallet shall be excluded from such ordinary course sale, conversion, transfer or disposition).

(g)     Except for (i) claims of employees for unpaid wages, bonuses, accrued vacation and sick leave time, business expenses and contributions to employee benefit plans for the period immediately preceding the Petition Date and prepetition severance obligations, in each case to the extent permitted to be paid by an order of the Bankruptcy Court (which order, as applicable, shall be in form and substance acceptable to the DIP Lenders in their sole discretion) and pursuant to the Budget, and (ii) payments permitted by the Financing Order and the Budget, the Company shall not, and shall not permit any of its Subsidiaries to, make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except for other payments consented to by the DIP Lenders in writing in their sole discretion.

(h)     The Company shall not, and shall not permit any of its Subsidiaries to, make any Investment in or to, any Person, through the direct or indirect lending of money, holding of securities or otherwise other than Permitted Investments.

16.     <u>Events of Default; Rights and Remedies</u>.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a)     The Company (i) shall fail to make any payment of principal of, or interest on, or fees owing in respect of, the Term Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse the Agent on behalf of the DIP Lenders for any

14

expense reimbursable hereunder or under any other DIP Document within three (3) Business Days following the Agent's demands for such reimbursement or payment.

(b)     Any Credit Party shall fail to comply with any of the provisions of (i) Sections 13, 14.   (a)    , 14(b), 14(c), 14(d), or 14(f) of this Note and such failure shall remain uncured for a period of five (5) Business Days, or (ii) Sections 14(e), 14(h), 14(i), 15 or 21 of this Note.

(c)     Any Credit Party shall fail to comply with any of other provision of this Note or any of the other DIP Documents (other than any provision embodied in or covered by any other clause of this Section 16) and the same, if capable of being remedied, shall remain unremedied for ten (10) days after the earlier of the date a senior officer or the Company becomes aware of such failure and the date written notice of such default shall have been given by the Agent to the Company.

(d)     Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits such Credit Party from complying or permits such Credit Party not to comply, a default or breach shall occur after the Closing Date under any other agreement, document or instrument to which any Credit Party is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness (other than the Obligations) of such Credit Party in excess of $100,000.00 in the aggregate, or (ii) causes, or permits any holder of such Indebtedness or a trustee to cause, Indebtedness or a portion thereof in excess of $100,000.00 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

(e)     Any representation or warranty herein or in any other DIP Document or in any written statement, report, financial statement or certificate made or delivered to Agent or DIP Lenders by any Credit Party is untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date when made or deemed made.

(f)     Any Credit Party shall bring a motion in the Chapter 11 Case:  (i) to obtain financing from any Person other than DIP Lenders under Section 364(c) or 364(d) of the Bankruptcy Code, except (x) Permitted Indebtedness, or (y) to the extent the proceeds of such financing would be used to indefeasibly repay in full in cash all of the Obligations under this Note; (ii) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral, except to the extent (x) such Lien secures Permitted Indebtedness and is junior and subordinate to the Liens granted in favor of the Agent, or (y) the proceeds of any such financing secured by such Lien would be used to indefeasibly repay in full in cash all of the Obligations under this Note; or (iii) to authorize any other action or actions adverse to the Agent or the DIP Lenders, or the Agent's and/or the DIP Lenders' rights and remedies hereunder or their interests in the Collateral.

15

(g)     The entry of an order in the Chapter 11 Case confirming a plan or plans of liquidation that does not contain a provision for the termination of the DIP Lenders' commitment to make Term Loans and the indefeasible repayment in full in cash of all the Obligations under this Note on or before the effective date of such plan or plans and that is not otherwise acceptable to the DIP Lenders in their sole discretion.

(h)     The filing of any motion by any Debtor seeking, or the entry of any order in the Chapter 11 Case in respect of, any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral.

(i)     The sale, without the Agent's and DIP Lenders' consent in their sole discretion, of all or substantially all of any Debtor's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of liquidation in the Chapter 11 Case, or otherwise, that does not provide for the indefeasible payment in full in cash of the Obligations and termination of the DIP Lenders' commitment to make Term Loans, and is not otherwise acceptable to the Agent and DIP lenders in their sole discretion; provided, that the In-Court Sale shall not constitute an Event of Default.

(j)     The occurrence of any postpetition judgments, liabilities or events that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(k)     The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, business, or liquidation of the Debtors, excluding the examiner that the Bankruptcy Court directed the United States Trustee to appoint on December 23, 2020 pursuant to the Order Denying in Part, and Granting in Part, the Trustee/Examiner Motions ("Examiner Order") [Docket No. 281], which directed such examiner to complete the Investigation (as defined in the Examiner Order).

(l)     The Chapter 11 Case shall be dismissed or converted from a case under chapter 11 of the Bankruptcy Code to a case under chapter 7 of the Bankruptcy Code.

(m)     The entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Note or the other DIP Documents.

(n)     The entry of an order in the Chapter 11 Case granting any other super-priority administrative claim or Lien equal to or superior to that granted to the Agent (other than any such claim or Lien permitted by the Financing Order), unless (i) consented to by the Agent and DIP Lenders in their sole discretion or (ii) the Obligations are indefeasibly paid in full in cash and the DIP Lenders' commitment to make Term Loans are terminated.

(o)     The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Agent) to execute upon or enforce a Lien on any Collateral except with respect to

16

Permitted Encumbrances arising prior to the Closing Date in an aggregate amount not to exceed $100,000.00.

(p)    The Financing Order shall be stayed, amended, modified, reversed or revoked in any respect without the DIP Lenders' prior written consent (which consent shall be in their sole discretion).

(q)    There shall commence any suit or action against the Agent or any DIP Lender by or on behalf of (i) the Company or any other Credit Party or (ii) any official committee in the Chapter 11 Case, in each case, that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of DIP Lenders or recovering any amounts paid or payable to the Agent or DIP Lenders, and, if such suit or action is commenced by any Person other than the Company, officer, or employee of the Company, such suit or action shall not have been dismissed or stayed within 10 days after service thereof on the Agent or any DIP Lender, as applicable, and, if stayed, such stay shall have been lifted.

(r)    Failure of the Company to comply with any Milestone set forth in Section 14(h).

(s)    Any provision of any DIP Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or any Credit Party shall challenge the enforceability of any DIP Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any DIP Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any DIP Document shall cease to be a valid and perfected first priority Lien (except as otherwise permitted herein or in the Financing Order) in any of the Collateral purported to be covered thereby.

(t)    A breach by any Credit Party of any of the terms of the Financing Order.

(u)    A Material Adverse Deviation shall have occurred.

(v)    The Final Order shall not have been entered by the Bankruptcy Court within 35 days from the date of the DIP Motion.

(w)    The PSA is terminated or otherwise modified without the consent of the DIP Lenders.

(x)    the Debtors' exclusive right to file and solicit a plan set forth in section 1121 of the Bankruptcy Code shall have terminated.

If any Event of Default shall have occurred and be continuing, then the Agent may (as directed by the DIP Lenders), upon written notice to the Borrower and subject to the terms of the Financing Order: (i) terminate the Commitment of each DIP Lender with respect to further Term Loans; (ii) declare all or any portion of the Obligations, including all or any portion of any Term Loan, to be forthwith due and payable; (iii) revoke the Borrower's right to use Cash Collateral in which the Agent and the DIP Lenders have an interest; and (iv) exercise any rights

and remedies under the DIP Documents or at law or in equity, all in accordance with the Financing Order. Upon the occurrence and continuance of an Event of Default and the exercise by the Agent or the DIP Lenders of their rights and remedies under this Note and the other DIP Documents pursuant to clause (iv) above and subject to the Financing Order, the Company shall assist the Agent in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition.

Except as otherwise provided for in this Note, the Financing Order or by applicable law, the Company and each other Credit Party waives: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Agent on which any of the Company or any other Credit Party may in any way be liable, and hereby ratifies and confirms whatever the Agent may do in this regard; (b) all rights to notice and a hearing prior to the Agent taking possession or control of, or Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Agent to exercise any of its remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

To the extent permitted by law and subject in all respects to the terms of the Financing Order, the Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as Agent deals with similar securities and property for its own account, the Agent's duty of care with respect to Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if the Agent exercises reasonable care in the selection of the bailee or other third person, and the Agent need not otherwise preserve, protect, insure or care for any Collateral, and the Agent shall not be obligated to preserve any rights any Credit Party may have against prior parties.

17.    <u>Reference Agreements</u>. This Note evidences the Term Loans that may be made to Borrower from time to time in the aggregate principal amount of up to $4,000,000.00 and is issued pursuant to and entitled to the benefits of the Financing Order, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loans evidenced by this Note are made and are to be repaid.

18.    <u>Definitions</u>. The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"<u>Affiliate</u>" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

US_147189186v24_394977-00001 1/29/2021 10:59 AM
LEGAL_US_E # 153640760.2

"Agent Fee Letter" means that certain Credit Facility Agent Fee Letter, dated as of the date hereof, between the Agent and the Borrower, regarding fees payable in connection with this Note.

"Avoidance Actions" means any claims or cause of action arising under chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code, or any other applicable law equivalents.

"Bankruptcy Code" shall have the meaning given such term in the recital to this Note.

"Bankruptcy Court" shall have the meaning given such term in the recital to this Note.

"Borrower" shall have the meaning given such term in the recital to this Note.

"Borrowing Request" shall have the meaning given such term in Section 1(c) of this Note.

"Budget" means a rolling thirteen (13) week forecast of projected receipts, disbursements, net cash flow, liquidity, loans and availability for the immediately following consecutive 13 weeks after the date of delivery, which shall be in substantially the form of the Initial Budget or otherwise in form and substance acceptable to the DIP Lenders and shall be subject to the prior approval of the DIP Lenders, such approval not be unreasonably withheld. The initial Budget approved by the DIP Lenders (the "Initial Budget") is attached hereto as Exhibit A.

"Business Day" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"Carve-Out" shall have the meaning given such term in the Financing Order.

"Cash Collateral" shall have the meaning given such term in Section 363(a) of the Bankruptcy Code.

"Cash/PIK Election Date" shall mean for any Interest Payment Date, the date that is two (2) Business Days (or such shorter period reasonably acceptable to the Agent) prior to such Interest Payment Date.

"Chapter 11 Cases" shall have the meaning given such term in the recital to this Note.

"Closing Date" shall have the meaning given such term in Section 1(b) of this Note.

"Collateral" means any and all assets and property covered by the Financing Order and the other Collateral Documents and any other assets and property, real or personal, tangible or intangible, of every kind and nature, now existing or hereafter acquired, of each Credit Party.

Without limiting the foregoing, the Collateral shall include all present and future property of each Credit Party under Section 541(a) of the Bankruptcy Code (including, without limitation, all proceeds of Avoidance Actions), accounts, documents, chattel paper, commercial tort claims, deposit accounts, general intangibles (including payment intangibles and software), goods (including equipment, inventory and all accessions and attachments thereto), instruments, investment property, letter-of-credit rights, supporting obligations, copyrights (whether registered or unregistered) and all registrations and applications therefor, patents and patent applications (including all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations thereof), trademarks (and all goodwill associated with such trademarks), trade names and service marks (including all registrations and applications for any of the foregoing), money, rights to the payment of money, insurance claims and proceeds, membership interests or other equity interests in each Credit Party, and all proceeds and products thereof.

"Collateral Documents" shall mean any agreement entered into pursuant to Section 12 hereof and all similar agreements entered into granting a Lien upon property as security for payment of, the Obligations, each in form and substance acceptable to the Agent in its sole discretion, including the Financing Order.

"Commitment" means, with respect to each DIP Lender, the commitment of such DIP Lender to make its portion of the Term Loans to the Borrower in the principal amount set forth on Schedule 1(a) to this Note for each DIP Lender, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Company" shall have the meaning given to such term in the recital to this Note.

"Confirmation Order" shall have the meaning given to such term in Section 7 of this Note.

"Conversion Option" shall have the meaning given to such term in Section 7 of this Note.

"Credit Party" means the Company and each Guarantor.

"Debtor" and "Debtors" shall have the meanings given to such terms in the Financing Order.

"Default" means an event described in Section 16 which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning given such term in Section 4(d) of this Note.

"DIP Documents" shall mean this Note, the Collateral Documents, the Guarantee, the Financing Order, the Agent Fee Letter, and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of the Agent and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of the or any other Credit Party, or any employee of any Credit Party, and delivered to the Agent in connection with this Note or the

transactions contemplated thereby, in each case in form and substance acceptable to the Agent in its sole discretion. Any reference in this Note or any other DIP Document to a DIP Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such DIP Document as the same may be in effect at any and all times such reference becomes operative.

"<u>DIP Lenders</u>" shall have the meaning given such term in the recital to this Note.

"<u>DIP Motion</u>" shall mean the motion filed by the Debtors seeking approval from the Bankruptcy Court for the Debtors to enter into the DIP Documents.

"<u>Disclosure Statement</u>" shall mean a disclosure statement filed with respect to the Plan.

"<u>Dollars</u>" or "<u>$</u>" shall mean lawful currency of the United States of America.

"<u>Early Termination Premium</u>" shall have the meaning given to such term in Section 8. of this Note.

"<u>Effect of Bankruptcy</u>" means, with respect to any contractual obligation, contract or agreement to which a Credit Party is a party, any default or other legal consequences arising on account of the commencement or the filing of the Chapter 11 Cases (including the implementation of any stay), or the rejection of any such contractual obligation, contract or agreement with the approval of the Bankruptcy Court if required under applicable law.

"<u>Effective Date</u>" shall have the meaning given to such term in Section 7 of this Note.

"<u>Event of Default</u>" shall have the meaning given such term in Section 16 of this Note.

"<u>Excluded Taxes</u>" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any DIP Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), (b) in the case of a DIP Lender, federal withholding Taxes imposed on amounts payable to or for the account of such DIP Lender with respect to an applicable interest in a Term Loan or Commitment pursuant to a law in effect on the date on which (i) such DIP Lender acquires such interest in the Term Loan or Commitment or (ii) such DIP Lender changes its lending office, except in each case to the extent that, pursuant to Section 10, amounts with respect to such Taxes were payable either to such DIP Lender's assignor immediately before such DIP Lender became a party hereto or to such DIP Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to provide the Borrower with the tax documentation described in Section 10 hereof and (d) any withholding Taxes imposed under FATCA.

21

"Exit Facility" shall have the meaning given to such term in Section 7 of this Note.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Note  (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among governmental authorities and implementing such Sections of the Internal Revenue Code.

"Final Order" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing pursuant to Sections 363 and 364 of the Bankruptcy Code and Bankruptcy Rule 4001, satisfactory in form and substance to the Agent and DIP Lenders in their sole discretion, together with all extensions, modifications and amendments thereto (which extensions, modifications and/or amendments are satisfactory in form and substance to the Agent in its sole discretion), authorizing Debtors to obtain credit, incur Indebtedness, and grant Liens under this Note and/or certain financing documentation, all as set forth in such order.

"Financing Order" shall mean the Final Order.

"Guarantee" means the guarantee made by each Guarantor in favor of the Agent and the DIP Lenders pursuant to Section 21.

"Guaranteed Obligations" shall have the meaning given to such term in Section 21 of this Note.

"Guarantor" shall have the meaning given such term in the recital to this Note

"In-Court Sale" shall be defined as set forth in the PSA.

"Indebtedness" shall mean, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than 120 days after the date such payable was created); (c) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all capitalized lease obligations of such Person; (f) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (g) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax ownership/operating lease, off-balance sheet financing or similar financing; (h) all contingent obligations; and (i) all obligations referred to in clauses (a) through (h) of this definition of another Person secured by (or for which the holder

of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness (provided that, if the Person has not assumed or otherwise become liable in respect of such indebtedness, such indebtedness shall be deemed to be in an amount equal to the lesser of (A) the fair market value of the property to which such Lien relates or (B) the aggregate unpaid amount thereof).

"Indemnified Person" shall have the meaning given such term in Section 9 of this Note.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any DIP Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Internal Revenue Code" shall mean 26 U.S.C. §§ 1 *et seq*.

"Interest Payment Date" shall mean as to any Term Loan, (a) the last Business Day of each fiscal month to occur while such Term Loan is outstanding and (b) the date of any repayment or prepayment made in respect thereof, including the Maturity Date.

"Investment" means any investment in any Person, whether by means of acquiring or holding securities, capital contribution, loan, time deposit, advance, guarantee or otherwise

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Material Adverse Deviation" means, as of any date of determination, an adverse deviation of more than the Permitted Variance from the aggregate amount set forth in the line item of the Budget titled "Total Operating Disbursements" for the 4 week period ending on [          , 2021] and each rolling 4 week period thereafter.

"Material Adverse Effect" means a material adverse effect on (i) the ability of the Company to perform any of its payment or other material obligations under any DIP Document to which it is a party, (ii) the legality, validity or enforceability of this Note or any other DIP Document, (iii) the rights and remedies of the Agent and the DIP Lenders under any DIP Document, or (iv) the validity, perfection or priority of a Lien in favor of DIP Lenders on any of the Collateral.  Notwithstanding anything to the contrary, a "Material Adverse Effect" shall not be deemed to exist as a result of the Effect of Bankruptcy or the events leading up to and resulting therefrom.

"Maturity Date" means, subject to the Borrower's exercise of the Conversion Option and the effectiveness of the Exit Facility, the earliest to occur of (i) the Stated Maturity

Date, (ii) the date the Bankruptcy Court orders the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code or the dismissal of any of the Chapter 11 Cases, (iii) the acceleration of the Term Loans and termination of the DIP Lenders commitment to make the Term Loans, including, without limitation, as a result of the occurrence of an Event of Default, and (iv) the substantial consummation of a plan of liquidation filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court.

"Maximum Amount" shall have the meaning given such term in Section 1 of this Note.

"Milestones" shall have the meaning given such term in Section 14 of this Note.

"Note" shall have the meaning given such term in the recital to this Note.

"Obligations" shall mean all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by any Credit Party to Agent or DIP Lenders, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, in all cases, arising under this Note or any of the other DIP Documents.  This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to any Credit Party under this Note or any of the other DIP Documents.

"Other Taxes" shall have the meaning given such term in Section 10 of this Note.

"Participant Register" shall have the meaning given such term in Section 21 of this Note.

"Payment Office" means such office or offices of the Agent as may be designated in writing from time to time by the Agent to the Borrower.

"Permitted Encumbrances" shall mean the following encumbrances:  (a) the Agent's and DIP Lenders' Liens; (b) Liens existing on the Closing Date to the extent valid, properly perfected, unavoidable and enforceable, in each case, on or as of the Closing Date or perfected after the Closing Date pursuant to section 546(b) of the Bankruptcy Code, i.e., "Permitted Prior Liens"; and (c) other Liens granted pursuant to the Financing Order (including, to the extent constituting a Lien, the Carve-Out), subject in all respects to the priorities set forth in the Financing Order.

"Permitted Affiliate Transactions" shall mean (1) transactions between the Credit Parties and (2) transactions existing on the Closing Date and listed on Schedule 15(c).

"Permitted Indebtedness" shall mean:  (a) current Indebtedness incurred in the ordinary course of business for inventory, supplies, equipment, services, taxes or labor, in each case, in accordance with the Budget; (b) Indebtedness arising under this Note and the other DIP Documents; (c) deferred taxes and other expenses incurred in the ordinary course of business, in accordance with the Budget; (d) any Indebtedness existing on the Closing Date, subject to the

24

terms of the Financing Order and the Budget; (e) administrative expenses of Borrower for which the Bankruptcy Court has not directed payment, subject to the terms of the Financing Order and the Budget, and (f) Indebtedness that (i) is subordinate in right of payment and (ii) if secured, secured by Liens junior to the Liens granted in favor of the Agent, subject to the terms of the Financing Order, and (iii) is otherwise on terms and conditions reasonably acceptable to Agent and DIP Lenders.

"Permitted Investments" shall mean (1) any Investments existing on the Closing Date, (2) Investments by any Credit Party in another Credit Party, and (3) Investments in cash and cash equivalents.

"Permitted Prior Liens" shall mean certain permitted liens as expressly set forth, and defined, in the Financing Order.

"Permitted Variance" means a variance of up to fifteen percent (15%) between the actual disbursements for the applicable four (4) week period and the "Total Operating Disbursements" line item as set forth in the Budget for the applicable 4 week period; provided, that, the fees and costs of estate professionals shall be excluded for determining any variance.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" shall have the meaning given to such term in the recital to this Note.

"Plan" shall have the meaning given to such term in Section 7 of this Note.

"Pro Rata Share" means with respect to a DIP Lender's obligation to make Term Loans and receive payments of interest, fees and principal with respect thereto, the percentage obtained by dividing (i) such DIP Lender's Commitment by (ii) the Maximum Amount.

"PSA" means that certain plan support agreement entered into by and among the Debtors and the Official Committee of Unsecured Creditors of Cred Inc., as of December 14, 2020 and approved by the Bankruptcy Court on [          ],[3] 2021 [Docket No. ---].

"Recipient" means the Agent or any DIP Lender, as applicable.

"Sale Motion" shall mean the Debtors' Motion for Entry of Order (I)(A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing and Approving Form and Manner of Notice Thereof, and (C) Approving Assumption and Assignment Procedures and Form and Manner of Notice Thereof; and (II) Authorizing (A) the Sale(s) Free and Clear of All Liens, Claims, Interests, and Encumbrances, and (B) Assumption and

---

[3] NTD: to be completed once the Bankruptcy Court has entered the PSA.

Assignment of Executory Contracts and Unexpired Leases [Docket No. 65] filed November 18, 2020.

"Stated Maturity Date" means the date that is six months after entry of the Final Order.

"Successor Case" shall have the meaning given such term in the Financing Order.

"Subsidiary" of a Person means a corporation, company, partnership, joint venture, limited liability company or other business entity of which 50% or more of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person.

"Taxes" shall have the meaning given such term in Section 10 of this Note.

"Term Loans" shall have the meaning given such term in Section 1 of this Note.

19.   Representations and Warranties.  The Company and each of its Subsidiaries represent as follows:

(a)   (i) The Company has no Subsidiaries other than the Guarantors; (ii) the Guarantors have no Subsidiaries; and (iii) the Company and each Subsidiary is duly formed and/or organized, validly existing and in good standing under the laws of their jurisdictions of incorporation or formation;

(b)   upon entry of the Financing Order, the execution and delivery of this Note and the other DIP Documents and the performance by each Credit Party of such Credit Party's obligations hereunder and under the other DIP Documents are within its corporate powers, has been duly authorized by all necessary corporate action of such Credit Party, has received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable law or of such Credit Party's corporate charter or by-laws or of any agreements binding upon or applicable to such Credit Party or any of its properties;

(c)   the Chapter 11 Cases have been duly authorized by all necessary legal and corporate action by or on behalf of each Credit Party and have been duly and properly commenced;

(d)   upon entry of the Financing Order, this Note and each other DIP Document is the legal, valid and binding obligation, enforceable against each Credit Party in accordance with its terms except as limited by equitable principles relating to enforceability;

(e)   each Credit Party has good and marketable title to, or valid leasehold interests in, all of its property and assets; none of the properties and assets of such Credit Party are subject to any Liens other than Permitted Encumbrances;

(f)   no information contained in this Note, any of the other DIP Documents, any

26

projections, financial statements or collateral reports or other reports from time to time delivered hereunder or any written statement furnished by or on behalf of the Company to the DIP Lenders pursuant to the terms of this Note or otherwise contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of all of the circumstances under which they were made;

(g)    the Liens granted to the Agent, on behalf of the DIP Lenders, pursuant to the Collateral Documents and the Financing Order are fully perfected Liens in and to the Collateral described therein, subject, as to priority, only to Permitted Prior Liens or other Liens permitted to have such priority under the Financing Order;

(h)    except for (i) proceedings previously disclosed to the DIP Lenders by the Company, and (ii) proceedings in the Chapter 11 Cases in connection with the entry of the Financing Order, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Company, threatened against any Credit Party before any governmental authority or before any arbitrator or panel of arbitrators that challenges the rights or powers of such Credit Party to enter into or perform any of its obligations under the DIP Documents to which it is a party, or the validity or enforceability of any DIP Document or any action taken thereunder;

(i)    each Credit Party is and will be at all times be the owner of the Collateral free and clear of any lien, security interest or other charge or encumbrance except for the security interest created by this Note or any other DIP Documents and the other Permitted Encumbrances;

(j)    the execution, delivery and performance of this Note and the other DIP Documents will not (immediately or with the giving of notice or passage of time, or both) violate the articles of incorporation, bylaws or other organizational documents of any Credit Party, or violate any law or regulation;

(k)    except for (i) proceedings previously disclosed to the DIP Lenders by the Company, and (ii) the Chapter 11 Cases, there is no order, notice, claim, litigation, proceeding or investigation pending or threatened against or in any way affecting (x) any Credit Party, whether or not covered by insurance, that would reasonably be expected to have a Material Adverse Effect or (y) this Note or any other DIP Document; and

(l)    the Credit Parties maintain exclusive possession and control of the crypto wallets in the United States consistent with the past practices; without limiting the foregoing the Credit Parties exclusively maintain the private key for each of the Company's wallet in a manner designed to minimize the potential for loss, theft, hacking, fraud or other compromise.

20.    Agent.

(a)    Appointment. Each DIP Lender hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Note including: (i) to receive on behalf of each DIP Lender any payment of principal of or interest on the Term Loans outstanding hereunder and all other amounts accrued hereunder for the account of the DIP Lenders and paid to the Agent, and to distribute promptly to each DIP Lender its Pro Rata Share of all payments so

27

received; (ii) to distribute to each DIP Lender copies of all material notices and agreements received by the Agent; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Note or any other DIP Document; (v) to perform, exercise, and enforce any and all other rights and remedies of the DIP Lenders with respect to the Borrower, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Note or any other DIP Document; (vi) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Note or any other DIP Document; and (vii) to take such action as the Agent deems appropriate on its behalf to administer the Term Loans and the DIP Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other DIP Documents together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof. The provisions of this Section 20 are solely for the benefit of the Agent and the DIP Lenders, and neither the Borrower nor any other Person shall have rights as a third party beneficiary of any of such provisions.

(b)    <u>Nature of Duties</u>.  The Agent shall have no duties or responsibilities except those expressly set forth in this Note or in the other DIP Documents.

(c)    <u>Rights, Exculpation, Etc</u>.  The Agent shall not have any duties or obligations except those expressly set forth herein and in the other DIP Documents.  Without limiting the generality of the foregoing, the Agent:

(i)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)    shall not shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other DIP Documents that the Agent is required to exercise upon the written direction of the DIP Lenders; provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose it or any of its Affiliates to liability or that is contrary to any DIP Documents or applicable law; and

(iii)    except as expressly set forth herein and in the other DIP Documents, shall not have any duty to disclose or be liable for the failure to disclose, any information relating to the Borrower or any of their Affiliates that is communicated to or obtained by the Agent or any of its Affiliates in any capacity.

(iv)    the Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the DIP Lenders or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final non-appealable judgment, in connection with its duties expressly set forth herein (for

the avoidance of doubt action taken or not taken by the Agent with the consent or at the request of the DIP Lenders shall not constitute gross negligence or willful misconduct). The Agent shall not be deemed to have knowledge of any Default or the event or events that give or may give rise to any Default unless and until notice describing such Default and such event or events is given to the Agent by the Borrower or any DIP Lender.

(d)    Reliance. (i) The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person. The Agent may consult with legal counsel, independent accountants and other experts selected by it with respect to all matters pertaining to this Note or any of the other DIP Documents and its duties hereunder or thereunder, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, independent accountants or experts.

(ii)    The Agent shall be fully justified in failing or refusing to take any action under any DIP Document unless it shall first receive such advice or concurrence of the DIP Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the DIP Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Note or any other DIP Document in accordance with a request or consent of the DIP Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all the DIP Lenders; provided that the Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Agent to liability or that is contrary to any DIP Document or applicable law.

(e)    Delegation of Duties. The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other DIP Documents by or through any one or more sub agents appointed by the Agent. The Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. Each such sub agent and the Affiliates of the Agent and each such sub agent shall be entitled to the benefits of all provisions of this Section 20 (among other relevant provisions of this Note) and (as though such sub-agents were the Agent under the DIP Documents) as if set forth in full herein with respect thereto; provided that the Agent shall not be responsible for the negligence or misconduct of any sub agents.

(f)    Resignation of Agent. The Agent may at any time give notice of its resignation to the DIP Lenders and the Borrower. Upon receipt of any such notice of resignation, the DIP Lenders shall have the right to appoint a successor, which shall be a commercial bank or financial institution reasonably acceptable to the DIP Lenders. If no such successor Agent shall have been so appointed by the DIP Lenders and shall have accepted such appointment within thirty (30) days after notice was given, then the Agent may (but shall not be obligated to) appoint a successor Agent meeting the qualifications set forth above. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on such effective date and (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other DIP Documents and (ii) all payments, communications and

determinations provided to be made by, to or through the retiring Agent shall instead be made by or to each DIP Lender directly, until such time as the DIP Lenders appoint a successor Agent as provided above. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other DIP Documents. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Agent's resignation hereunder and under the other DIP Documents, the provisions of this Article shall continue in effect for the benefit of such retiring Agent, its sub agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent under this Note. Upon resignation of the Agent, the fees paid to such Agent and the successor Agent shall be paid pro rata for the applicable years.

(g)     Non-Reliance on Agents and Other Lenders. Each DIP Lender acknowledges that it is solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Note and the other DIP Documents and that it has, independently and without reliance upon the Agent or any other DIP Lender or any of their respective Affiliates and based on such documents and information, as it has deemed appropriate, made its own credit analysis and decision to enter into this Note. Each DIP Lender also acknowledges that it will, independently and without reliance upon the Agent or any other DIP Lender or any of their Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to be solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Note and the other DIP Documents.

(h)     Indemnification. To the extent that the Agent is not promptly reimbursed and indemnified by the Borrower, each DIP Lender agrees to reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Note or any of the other DIP Documents or any action taken or omitted by the Agent under this Note or any of the other DIP Documents, in proportion to each DIP Lender's Pro Rata Share (collectively, the "Indemnified Costs"). In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section 20(h) applies whether any such investigation, litigation or proceeding is brought by any DIP Lender or any other Person and whether or not the Agent is a party to such investigation, litigation or proceeding. Without prejudice to the survival of any other agreement of any DIP Lender hereunder, the agreement and obligations of each DIP Lender contained in this Section 20(h) shall survive the payment in full or principal, interest and other amounts payable hereunder and under the other DIP Documents.

(i)     Collateral Matters.

(i)     The DIP Lenders hereby irrevocably authorize the Agent, at its option and in its discretion, to release any Lien granted to or held by the Agent upon any Collateral upon cancellation of this Note and payment and satisfaction of the Term Loans and all

30

other Obligations which have matured and which the Agent has been notified in writing are then due and payable; or constituting property being sold or disposed of in the ordinary course of the Borrower's business or otherwise in compliance with the terms of this Note and the other DIP Documents; or if approved, authorized or ratified in writing by the DIP Lenders.

(ii)    Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the DIP Lenders, each DIP Lender agrees to confirm in writing, upon request by the Agent, the authority to release Collateral conferred upon the Agent under paragraph (i)(i) above.

The Agent shall have no obligation whatsoever to any DIP Lender to assure that the Collateral exists or is owned by any Credit Party, or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Note or any other DIP Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this section or in any other DIP Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Agent shall have no duty or liability whatsoever to any other DIP Lender, except as otherwise provided herein.

21.    Guarantee.

(a)    Each Guarantor hereby guarantees to each DIP Lender and the Agent as hereinafter provided, as primary obligor and not as surety, the prompt payment and performance of the Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise) strictly in accordance with the terms thereof.  Each Guarantor hereby further agrees that if any of the Obligations are not paid in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise), each Guarantor will promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration or otherwise) in accordance with the terms of such extension or renewal (collectively, the "Guaranteed Obligations").

Subject to Section 21(e) and the last sentence of this Section 21(a) below, the Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which the Agent or any DIP Lender may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of any Guaranteed Obligations to be paid when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, the Guarantors will, upon demand pay, or cause to be paid, in cash, to the Agent for the ratable benefit of DIP Lenders, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations and all other Guaranteed Obligations then owed to the DIP Lenders as aforesaid.

31

Notwithstanding any provision to the contrary contained herein or in any other of the DIP Documents, the Guaranteed Obligations of each Guarantor under this Note and the other DIP Documents shall be limited to an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under applicable laws relating to fraudulent conveyance or fraudulent transfer.

(b)     The Guaranteed Obligations of each Guarantor under <u>Section 21(a)</u> are joint and several and absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the DIP Documents or any other agreement or instrument referred to therein, or any substitution, release, impairment or exchange of any other guarantee of or security for any of the Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this <u>subsection (b)</u> that the obligations of each Guarantor hereunder shall be absolute and unconditional under any and all circumstances.  Each Guarantor agrees that such Guarantor shall have no right of subrogation, indemnity, reimbursement or contribution against the Borrowers or any other Guarantor for amounts paid under this <u>Section 21</u> until the Maturity Date.  Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by law, the occurrence of any one or more of the following shall not alter or impair the liability of any Guarantor hereunder, which shall remain joint and several and absolute and unconditional as described above:

(i)     at any time or from time to time, without notice to any Guarantor, the time for any performance of or compliance with any of the Obligations shall be extended, or such performance or compliance shall be waived;

(ii)     any of the acts mentioned in any of the provisions of any of the DIP Documents or any other agreement or instrument referred to in the DIP Documents shall be done or omitted;

(iii)     the maturity of any of the Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented or amended in any respect, or any right under any of the DIP Documents or any other agreement or instrument referred to in the DIP Documents shall be waived or any other guarantee of any of the Obligations or any security therefor shall be released, impaired or exchanged in whole or in part or otherwise dealt with;

(iv)     any Lien granted to, or in favor of, the Agent or any DIP Lender or DIP Lenders as security for any of the Obligations shall fail to attach or be perfected;

(v)     any of the Obligations shall be determined to be void or voidable (including for the benefit of any creditor of any Guarantor) or shall be subordinated to the claims of any Person (including any creditor of any Guarantor); or

(vi)     any other action or inaction shall occur that might constitute a surety defense.

32

(c)        The Guaranteed Obligations of any Guarantor under this <u>Article 21</u> shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and each Guarantor agrees that it will indemnify the Agent and each DIP Lender on demand for all reasonable costs and expenses (including fees and expenses of counsel) incurred by the Agent or such DIP Lender in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.  This paragraph shall survive any termination of this Note.

(d)        Each Guarantor hereby waives, to the fullest extent permitted by law, for the benefit of the Agent and each DIP Lender:  (i) any right to require the Agent or any DIP Lender, as a condition of payment or performance by such Guarantor, to (A) proceed against the Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (B) proceed against or exhaust any security held from the Borrower, any such other guarantor or any other Person, (C) proceed against or have resort to any balance of any deposit account or credit on the books of the Agent and DIP Lenders in favor of the Borrower or any other Person, or (D) pursue any other remedy in the power of the Agent and the DIP Lenders whatsoever; (ii) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (iii) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal or any law, rule, regulation, or order of any jurisdiction affecting any term of the Guaranteed Obligations; (iv) any defense based upon the Agent's or any DIP Lender's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (v) (A) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (B) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (C) any rights to set offs, recoupments and counterclaims, and (D) promptness, diligence and any requirement that the Agent and the DIP Lenders protect, secure, perfect or insure any security interest or lien or any property subject thereto; (vi) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default under any DIP Document or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Borrower and notices of any of the matters referred to in <u>Section 21(b)</u> and any right to consent to any thereof; and (vii) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.  Each Guarantor agrees that such Guarantor shall have no right of recourse to security for the Obligations, except through the exercise of rights of subrogation to the extent permitted by <u>Section 21(b)</u>; provided, however,

Guarantor agrees that such rights shall be automatically (and without any further action) irrevocably waived and released if such security is acquired by a Person as a result of the exercise of the remedies under the DIP Documents.

(e)    Each Guarantor agrees that, to the fullest extent permitted by law, as between such Guarantor, on the one hand, and the Agent and the DIP Lenders, on the other hand, the Obligations may be declared to be forthwith due and payable as provided in Section 16 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 16) for purposes of Section 21(a) notwithstanding any stay, injunction or other prohibition preventing such declaration (or preventing the Obligations from becoming automatically due and payable) as against any other Person and that, in the event of such declaration (or the Obligations being deemed to have become automatically due and payable), the Obligations (whether or not due and payable by any other Person) shall forthwith become due and payable by each Guarantor for purposes of Section 21.  Each Guarantor acknowledges and agrees that its Guaranteed Obligations hereunder are secured in accordance with the terms of the DIP Documents and that the DIP Lenders may exercise their remedies thereunder in accordance with the terms thereof.

(f)    To the extent that any Guarantor that is a Subsidiary of the Borrower shall be required hereunder to pay any portion of any Guaranteed Obligation exceeding the greater of (a) the amount of the value actually received by such Guarantor and its Subsidiaries from the Term Loans and other Obligations and (b) the amount such Guarantor would otherwise have paid if such Guarantor had paid the aggregate amount of the Guaranteed Obligations (excluding the amount thereof repaid by the Borrowers) in the same proportion as such Guarantor's net worth on the date enforcement is sought hereunder bears to the aggregate net worth of all the Guarantors on such date, then such Guarantor shall be reimbursed by such other Guarantors for the amount of such excess, pro rata, based on the respective net worth of such other Guarantors on such date.

(g)    The guarantee in this Article 21 is an absolute and unconditional guaranty of payment and not of collection, is a continuing and irrevocable guarantee, and shall apply to all Obligations whenever arising.

22.    Miscellaneous.

(a)    All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, emailed or delivered as follows:

If to any Credit Party:    Cred Inc.
                        3 East Third Avenue
                        San Mateo, California 94401
                        Attention: Matthew K. Foster, Chief Restructuring Officer
                        Email: Mfoster@sonorancap.com

34

| | |
|---|---|
| with electronic copies (which shall not constitute notice) to: | Paul Hastings LLP<br>600Travis Street, Fifty-Eighth Floor<br>Houston, Texas 77002<br>Attention: James T. Grogan<br>Email: jamesgrogan@paulhastings.com<br><br>And<br><br>Paul Hastings LLP<br>200 Park Avenue<br>New York, New York 10166<br>Attention: Pedro A. Jimenez<br>Email: pedrojimenez@paulhastings.com |
| If to Agent: | Alter Domus (US) LLC<br>225 W Washington St.<br>9th Floor<br>Chicago, Illinois 60606<br>Attn: CPC Agency and Legal Department<br>Email: cpcagency@alterdomus.com<br>             legal@alterdomus.com |
| With copies to: | Morris, Nichols, Arsht & Tunnell LLP<br>120 North Market Street<br>P.O. Box 1347<br>Wilmington, Delaware 19899-1347<br>Attn: Curtis S. Miller, Esq.<br>Email: cmiller@mnat.com |
| If to DIP Lender: | Invictus Global Management, LLC, as investment manager for Invictus Special Situations Master I, L.P.<br>310 Comal Building A, Suite 229,<br>Austin, TX 78702<br>Attn: Cindy Delano<br>Telephone: (512) 359-8452<br>Email: cindy@invictus-gm.com |
| with electronic copies to: | Katten Muchin Rosenman LLP<br>575 Madison Avenue, New York, NY 10022<br>Telephone:  (212) 940-7034<br>Attn:  Michael E. Comerford<br>Email: michael.comerford@katten.com |

35

All such notices and communications shall, when mailed or sent by overnight courier, be effective when deposited in the mails or delivered to the overnight courier, as the case may be, or when sent by email be effective when confirmation is received.

(b)      The Company shall reimburse the Agent and DIP Lenders for all reasonable out-of-pocket costs and expenses incurred in connection with the negotiation and preparation of the DIP Documents and the obtaining of approval of the DIP Documents by the Bankruptcy Court (including (i) the reasonable fees and expenses of outside counsel for Agent and (ii) the reasonable fees and expenses of outside counsel for the DIP Lenders, including all of their local counsel, fees for one (in the absence of any conflicts of interest) financial advisor for the Agent and the DIP Lenders, and auditors retained in connection with the DIP Documents and advice in connection therewith). The Company agrees that, once paid, the fees or any part thereof payable to the Agent and the DIP Lenders hereunder shall not be refundable under any circumstances, regardless of whether the transactions or borrowings contemplated by the Note are consummated. All fees payable hereunder and under the Note shall be paid in immediately available funds. The Company agrees that the Agent may, in its sole discretion, share all or a portion of any of the fees payable pursuant to this Note with any of the DIP Lenders. Subject to the foregoing, the Company shall reimburse the Agent and DIP Lenders for all reasonable fees, costs and expenses, including the reasonable fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with:

(i)      any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the DIP Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder;

(ii)      the review of pleadings and documents related to the Chapter 11 Cases and any subsequent Chapter 7 cases (including any and all fees related to the negotiation and documentation of the Exit Facility irrespective of whether the Borrower elects the Conversion Option or the Exit Facility becomes effective), attendance at meetings related to the Chapter 11 Cases and any subsequent Chapter 7 cases, and general monitoring of the Chapter 11 Cases and any subsequent Chapter 7 cases;

(iii)      any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Agent, the Borrower or any other Person, and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the DIP Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrower or any other Person that may be obligated to the Agent by virtue of the DIP Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

US_147189186v24_394977-00001 1/29/2021 10:59 AM
LEGAL_US_E # 153640760.2

(iv)     any attempt to enforce any remedies of the Agent against the Borrower or any other Person that may be obligated to the Agent by virtue of any of the DIP Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(v)     any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default; and

(vi)     any efforts to (A) monitor the Term Loans or any of the other Obligations, (B) evaluate, observe or assess any of the Company, its Subsidiaries or their respective affairs, (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral and (D) monitor any sales;

including, as to each of clauses (i) through (vi) above, all attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 20(b), all of which shall be payable, on demand, by the Company to the Agent on behalf of the DIP Lenders. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.  All expenses incurred by the Agent and DIP Lenders shall receive super-priority administrative expense status per Section 364 of the Bankruptcy Code (subject to the Financing Order).

(c)     No failure or delay on the part of the Agent or any other holder of this Note to exercise any right, power or privilege under this Note and no course of dealing between any Credit Party and the Agent shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Agent would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Agent to any other or further action in any circumstances without notice or demand.

(d)     Borrower and any endorser of this Note hereby consents to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e)     If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining

US_147189186v24_394977-00001 1/29/2021 10:59 AM
LEGAL_US_E # 153640760.2

provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f)     **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE BORROWER, ANY OTHER CREDIT PARTY, THE AGENT AND THE DIP LENDERS HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF TUE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

(g)     Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Note or any DIP Document, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.

(h)     **THE BORROWER, EACH OTHER CREDIT PARTY AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE AGENT, ANY DIP LENDER AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE AGENT'S/BORROWER'S RELATIONSHIP THAT IS BEING ESTABLISHED**.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims.  The Borrower, each other Credit Party and, by their acceptance of this Note, the Agent, any DIP Lender and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS NOTE**.  In the event of litigation, this provision may be filed as a written consent a trial by the court.

(i)     The DIP Lender hereby represents and the Credit Parties hereby acknowledge, that the Credit Parties, on the one hand, and the DIP Lender, on the other hand, have an arm's length business relationship, and that the DIP Lender, to its knowledge, had no direct

38

business relationship with the Credit Parties prior to the Petition Date.

(j)     No Credit Party shall have the right to assign its obligations or liabilities under this Note without the prior written consent of the DIP Lenders in their sole discretion. The DIP Lenders may grant participations to one or more entities in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such participation (unless otherwise stated therein) the participant shall have the same rights and benefits hereunder as it would have if it were a DIP Lender hereunder.

(k)     In the event that a DIP Lender sells participations in a Term Loan, such DIP Lender shall maintain a register for this purpose as a non-fiduciary agent of Borrower on which it enters the name of all participants in the Term Loans held by it and the principal amount (and stated interest thereon) of the portion of the Term Loan that is the subject of the participation (the "Participant Register"). A Term Loan may be participated in whole or in part only by registration of such participation on the Participant Register. Any participation of such Term Loan may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by the Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(l)     No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrower, the Agent and the DIP Lenders.

(m)     Any provision of this Note which is prohibited or unenforceable shall be ineffective to the extent such prohibition or unenforceability without invalidating the remaining provisions hereof.

(n)     This Note, the other DIP Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other DIP Document shall be binding upon each of the estates of the Debtors, and any trustee or successor in interest of such Debtor in the Chapter 11 Cases or any subsequent cases commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Note and the other DIP Documents and the Financing Order shall be binding upon, and inure to the benefit of, the successors of the Agent and the DIP Lenders and each of their respective assigns, transferees and endorsees. The Liens created by this Note, and the other DIP Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Cases or any other bankruptcy cases of any Credit Party to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent file financing statements or otherwise perfect its security interests or Liens under applicable law.

(o)     In the event of any inconsistency between the terms and conditions of this Note and the Financing Order, the provisions of the Financing Order shall govern and control.

(p)     THIS NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

39

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

\*    \*    \*    \*    \*

US_147189186v24_394977-00001 1/29/2021 10:59 AM
LEGAL_US_E # 153640760.2

IN WITNESS WHEREOF, the Borrower and each other Credit Party has caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

| | |
|---|---|
| | CRED INC., as Borrower<br><br>By: _____<br>    Name:<br>    Title: |
| | CRED (US) LLC,<br>CRED MERCHANT SOLUTIONS LLC<br>CRED (PUERTO RICO) LLC<br>CRED Capital, Inc., each as a Guarantor<br><br>By: _____<br>    Name:<br>    Title: |
| | |

[DIP Promissory Note]

Acknowledged and Agreed

ALTER DOMUS (US) LLC, as Agent


By: _____
     Name:
     Title:



INVICTUS SPECIAL SITUATIONS MASTER I, L.P., by its investment manager
INVICTUS GLOBAL MANAGEMENT, LLC, as a DIP Lender


By: _____
     Name: Cindy Delano
     Title:  Authorized Signatory

<u>Schedule 1(a)</u>

<u>DIP LENDERS AND DIP LENDER COMMITMENTS</u>

| DIP Lender | Commitment |
|---|---|
| Invictus Special Situations Master I, L.P. | $4,000,000.00 |
| **Total** | **$4,000,000.00** |

## EXHIBIT A

(attach Budget)

Exhibit B
(Form of Borrowing Request)

Exhibit C
(Form of Cash/PIK Election Notice)

Exhibit D
(Exit Term Sheet)

<u>Schedule 13</u>

Deliver (which delivery may be made by electronic communication (including email)) to the Agent, items set forth below at the following times in form and substance satisfactory to the DIP Lenders in their sole discretion:

| | |
|---|---|
| on Wednesday of each week, commencing with [\_\_\_\_]⁴, 2021, for the period ending the preceding Friday beginning with the first Friday ending a full calendar week after the Closing Date, | a weekly DIP variance report/reconciliation for the prior week and for the period from the commencement of the Initial Budget to the end of the prior week in each case (i) showing actual results for the following items: (A) operating disbursements, and (B) professional fees and expenses, noting therein variances from values set forth for such periods in both the Initial Budget and the most recent Budget and (ii) an explanation for all material variances, certified by the chief financial officer or other authorized officer of the Borrower; *however*, with respect to the disbursement details included in this report, it shall be permitted for the Borrower to provide such information in summary form, |
| on Wednesday of each week beginning with the first full calendar week after the Closing Date, | a report of the balance of all of the deposit accounts of each Credit Party, including a breakdown of the balances of deposit accounts held at each depository institution, as of the close of business on the preceding Friday, |
| upon the request of the DIP Lenders, | a revised proposed budget (it being understood that in the event that the DIP Lenders, on the one hand, and the Debtors, on the other hand, cannot agree to an updated, modified or supplemented budget, the prior Budget shall continue in effect) and timing changes with respect to any periods that were included in a previously delivered report and which shall be in form and substance acceptable to the DIP Lenders with such approval not to be unreasonably withheld, |
| promptly, but in any event at least two (2) Business Days prior to filing (except for emergency pleadings, which to the extent practicable shall be delivered as promptly as possible prior to filing), | drafts of all pleadings, motions, applications or financial information (including any proposed order) filed or to be filed by any Credit Party with the Bankruptcy Court; <u>provided</u> that any such documents that are publicly available prior to filing shall be deemed to have been delivered, |

---

⁴ NTD: date subject to revision based on date of entry of Final Order.

| promptly, but in any event within three (3) Business Days after Borrower has knowledge of any event or condition that constitutes a Default, | notice of such event or condition and a statement of the curative action that Borrower proposes to take with respect thereto, |
|---|---|
| Commencing with [____], 2021, bi-weekly | (a)     participate in status update conference calls with the Agent and Debtor's counsel; and<br><br>(b)  the Company shall host a telephone call with the DIP Lenders and its professional advisors, on which the Company shall discuss material developments, issues or other items of note regarding the matters described herein, and offer the DIP Lenders and its professional advisors the opportunity to raise questions with respect thereto, |
| upon the request of the DIP Lenders, | any other information requested relating to the financial condition of the Company or its Subsidiaries. |

Schedule 15(c)

Permitted Affiliate Transactions

moKredit is a Hong Kong-based entity founded by Lu Hua, which provides micro-loans to online gaming publisher sites through the provision of credit (in the form of gaming tokens) to video game enthusiasts.  Mr. Hua owns 50% of the outstanding shares of stock in Cred Inc.  In 2019, the Debtors' primary revenue generating strategy involved making loans to moKredit, which, at one point, reached an aggregate amount of approximately $70 million.  As of the Petition Date, the amount of the Debtors' outstanding loans with moKredit was approximately $39 million.  As a result of losses the Debtors incurred on certain investments in March 2020, the Debtors undertook an effort to recover principal from moKredit and reestablish their hedging positions to protect against cryptocurrency price fluctuations.  However, while moKredit continued to make interest payments, moKredit maintained that it was only able to return $300,000 of principal in April and May, 2020 due to restrictions imposed by the government of China in response to the COVID-19 pandemic.  In May 2020, moKredit renegotiated its repayment schedule, whereby it would continue making approximately $582,000 per month in interest payments.