**<u>EXHIBIT A</u>**

**(Proposed Redacted Compendium- Volume I)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CRED INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 20-12836 (JTD)<br><br>(Jointly Administered) |

## COMPENDIUM OF EXHIBITS TO REPORT OF ROBERT J. STARK, EXAMINER

### VOLUME I

**BROWN RUDNICK LLP**
Andrew M. Carty
Michael W. Reining
Tiffany B. Lietz
Seven Times Square
New York, NY 10036
212-209-4800
acarty@brownrudnick.com
mreining@brownrudnick.com
tlietz@brownrudnick.com

Stephen R. Cook
2211 Michelson Drive, 7th Floor
Irvine, CA 92612
949-752-7100
scook@brownrudnick.com

E. Patrick Gilman
601 Thirteenth Street NW, Suite 600
Washington, DC 20005
202-536-1730
pgilman@brownrudnick.com

**ASHBY & GEDDES, P.A.**
Gregory A. Taylor (DE Bar No. 4008)
Katharina Earle (DE Bar No. 6348)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
gtaylor@ashbygeddes.com
kearle@ashbygeddes.com

**ANKURA CONSULTING GROUP, LLC**
Vikram Kapoor
485 Lexington Avenue, 10th Floor
New York, NY 10017
212-818-1555
vikram.kapoor@ankura.com

**Dated: March 8, 2021**

**Index of Exhibits to Report of Robert J. Stark, Examiner**

| Description | Exhibit No. |
|---|---|
| Decl. of Daniel Schatt in Supp. of Debtors' Chapter 11 Pet. and First Day Mot. (ECF No. 12) | 1 |
| Base Prospectus, Jan. 30, 2020 | 2 |
| moKredit Inc. Overview Report, Aug. 7, 2019 | 3 |
| Videotaped Dep. of Dan Schatt, Dec. 14, 2020 | 4 |
| Loan and Security Agreement between moKredit Inc., and Cred LLC, Dec. 27, 2018 | 5 |
| Decl. of Daniyal Inamullah in Supp. of Mot. of the United States Trustee for Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases (ECF No. 133) | 6 |
| Cyber Quantum Pte. Ltd. Unaudited Financial Statements, 2018 | 7 |
| Cyber Quantum Pte. Ltd. Directors' Resolutions, 2018 | 8 |
| Videotaped Dep. of Daniyal Inamullah, Dec. 8, 2020 | 9 |
| Emails exchanged between H. Ng, K. Wong, D. Schatt and InnReg representative regarding JST onboarding process, Dec. 7–20, 2018 | 10 |
| Email from J. Alexander to K. Wong, Jan. 22, 2019 | 11 |
| Email from D. Granet to L. Hua, copying in Messrs. J. Alexander, K. Wong, S. Zhang and S. Freeman, Jan. 14, 2019 | 12 |
| JST Systems Invoice, Jan. 22, 2019 | 13 |
| Sarson Funds Fact Card: Fifth Khagan | 14 |
| Sarson Funds Fact Card: AX Momentum | 15 |
| Employment Offer Letter for J. Alexander | 16 |
| Mot. of UpgradeYa Investment, LLC for Relief from Stay Under Bankruptcy Code Section 362 (ECF No. 89) | 17 |
| Nathan DiCamillo, *Here's What Happened at Crypto Lender Cred's Latest Bankruptcy Hearing*, CoinDesk, Dec. 18, 2020 | 18 |
| Laurence Fletcher, *Crypto hedge funds struggle to recover from 'bloodbath'*, *Fin. Times*, May 20, 2020 | 19 |
| 100 Acre Ventures Form ADV, May 15, 2020 | 20 |
| Decl. of Joe Podulka in Supp. of Debtors' Obj. to Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF No. 441) | 21 |
| First Amended Complaint, *Alexander v. Schatt*, No. 20-CIV-02728 (Cal. Super. Ct. Oct. 15, 2020) | 22 |
| Verified First Amended Complaint, *Cred v. Alexander*, No. 20-CIV-02915 (Cal. Super. Ct. Aug. 14, 2020) | 23 |
| Decl. of Daniel F. Wheeler RE Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF No. 386) | 24 |
| Cred Inc. Update for the Creditors Committee, Dec. 14, 2020 | 25 |
| Decl. of Grant Lyon in Supp. of Debtors' Obj. to Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF No. 433) | 26 |

| Description | Exhibit No. |
|---|---|
| United States Trustee Mot. For Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases (ECF No. 133) | 27 |
| Order Den. in Part, and Granting in Part, the Trustee/Examiner Mot. (ECF No. 281) | 28 |
| App. of the United States Trustee for Order Approving Appointment of Examiner (ECF No. 330) | 29 |
| Order Approving Appointment of Examiner (ECF No. 338) | 30 |
| Notice of Filing of Proposed Scope, Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Start, as Examiner (ECF No. 376) | 31 |
| Order Approving Examiner's Proposed Scope, Work Plan, and Budget for Investigation (ECF No. 431) | 32 |
| Notice of Filing of Proposed Amend. to Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Stark, as Examiner (ECF No. 552) | 33 |
| Cred LLC and Subsidiary Financial Statements, 2018 | 34 |
| CredEarn CredBorrow Information Sheet | 35 |
| Standard CredBorrow Multi-Tranche Credit Agreement | 36 |
| moKredit Tranche Agreement No. 29, May 1, 2019 | 37 |
| CredEarn Process and Asset Flow | 38 |
| Email from J. Alexander to K. Wong, Feb. 12, 2019 | 39 |
| Enhanced Yield Agreement for CredEarn Customers | 40 |
| Chat log between S. Zhang and T. Perez, Aug. 28, 2019 | 41 |
| Email chain between A. Khakoo, H. Ha, D. Inamullah, and M. Zhang, June 30, 2020 | 42 |
| Fireblocks License Agreement, Feb. 21, 2020 | 43 |
| Cred Investment Committee Meeting Minutes | 44 |
| Email from S. Hwang to J. Podulka, Nov. 12, 2020 | 45 |
| Schedule of Advances | 46 |
| Email from J. Podulka to F. Cottrell and A. Khakoo, Nov. 18, 2020 | 47 |
| Cred LLC General Ledger, 2020 | 48 |
| Cred Financial Statements, 2019 | 49 |
| Email from J. Podulka to H. Moore and E. Rye, May 21, 2020 | 50 |
| Lockton Summary of Insurance, 2020–2021 | 51 |
| Hartford Business Owners Policy, Oct. 1, 2020 | 52 |
| Hartford Workers' Compensation and Employers' Liability Busines Insurance Policy, Nov. 30, 2020 | 53 |
| Certificate of Liability Insurance, Nov. 11, 2020 | 54 |
| Axis Insurance Policy | 55 |
| Validus Errors and Omissions Policy Declarations | 56 |
| Validus Directors and Officers Policy Declarations | 57 |
| Euclid Financial Excess Insurance Policy | 58 |
| Email from M. Zhang to M. Parrish, June 24, 2020 | 59 |
| Screenshot of Cred website discussing insurance policies | 60 |

| Description | Exhibit No. |
|---|---|
| Screenshot of Cred website discussing partnership with BitGo | 61 |
| Email chain between M. Zhang and T. Miyauchi, June 19, 2020 | 62 |
| Email from T. Perez to C.D., Nov. 14, 2019 | 63 |
| Email chain between M. Zhang and J.S., Apr. 15, 2020 | 64 |
| Intentionally Omitted | 65 |
| Email from D.F. to T. Perez, Nov. 8, 2020 | 66 |
| Cred Advertising and Marketing Policy | 67 |
| Email from D. Inamullah to D. Kline, July 6, 2020 | 68 |
| Intentionally Omitted | 69 |
| Email from K. Wong to L. Hua, Jan. 15, 2019 | 70 |
| Email from J. Alexander to L. Hua and K. Wong, Jan. 22, 2019 | 71 |
| Email from K. Wong to S. Zhang and J. Alexander, Feb. 4, 2019 | 72 |
| Email from K. Wong to L. Hua and D. Schatt, Feb. 13, 2019 | 73 |
| Email from K. Wong to H. Ng, J. Alexander, and S. Zhang, Feb. 14, 2019 | 74 |
| Email from J. Alexander to K. Wong, Feb. 15, 2019 | 75 |
| Intentionally Omitted | 76 |
| Email from J. Alexander to K. Wong, May 21, 2019 | 77 |
| Intentionally Omitted | 78 |
| Email from J. Alexander to L. Hua, D. Inamullah, S. Zhang, and J. Podulka, Mar. 12, 2020 | 79 |
| Contribution Agreement between L. Hua and Cred Capital, LLC, Mar. 31, 2020 | 80 |
| Email from D. Schatt to D. Wheeler, June 16, 2020 | 81 |
| Email from D. Inamullah to D. Schatt, J. Podulka, and A. Khakoo, June 29, 2020 | 82 |
| Email from J. Podulka to D. Schatt, Dec. 1, 2020 | 83 |
| Cred Near Term Liquidity Analysis, Nov. 7, 2020 | 84 |
| Email chain between J. Alexander and A. Derar, Apr. 16, 2019 | 85 |
| Email from J. Alexander to J. Bunting, Mar. 14, 2019 | 86 |
| Email chain between J. Alexander and R. Flowers, Mar. 15, 2019 | 87 |
| Email from J. Alexander to D. Davis, Mar. 14, 2019 | 88 |
| moKredit Investment Opportunity Slide Deck, Mar. 2019 | 89 |
| Cred Employee Chat Logs, Mar. 26, 2019 | 90 |
| Income Opportunities Board Minutes, Feb. 4, 2020 | 91 |
| Spreadsheet concerning W. Strong's investment | 92 |
| JST Consulting Agreement, Dec. 25, 2018 | 93 |
| Email from J. Podulka to D. Schatt, July 24, 2020 | 94 |
| Email from D. Inamullah to D. Schatt, A. Khakoo, and J. Podulka, Sept. 16, 2020 | 95 |
| Email from D. Schatt to J. Podulka, Nov. 14, 2020 | 96 |
| Email from D. Inamullah to J. Podulka and D. Schatt, July 13, 2020 | 97 |
| Email chain between J. Podulka, H. Moore, G. Estrada, S. Hwang, H. Ha, Nov. 5, 2020 | 98 |
| Cred LLC Subscription Agreement with Cambrian Systematic Strategies LP, July 29, 2020 | 99 |

| Description | Exhibit No. |
|---|---|
| Chat log between S. Zhang and J. Alexander, July 30, 2019 | 100 |
| Cambrian Systematic Strategies LP Quarterly Statement, Sept. 30, 2019 | 101 |
| Email from S. Zhang to J. Alexander, Feb. 6, 2020 | 102 |
| Redemption Confirmation, Jan. 22, 2020 | 103 |
| Metropolitan Commercial Bank Account Statement, Feb. 28, 2020 | 104 |
| Email from HC Global Fund Services to D. Schatt, Feb. 21, 2020 | 105 |
| Email from A. Khakoo to P. Collins, June 29, 2020 | 106 |
| Email from J. Podulka to D. Schatt, Aug. 8, 2020 | 107 |
| Email from J. Podulka to D. Schatt, Aug. 28, 2020 | 108 |
| Email from J. Sarson to D. Schatt, A. Khakoo, Nov. 17, 2020 | 109 |
| Email from M. Foster to J. Sarson, Jan 6, 2021 | 110 |
| Brett Arends, *Opinion: How did these 'All-Weather' portfolios weather 2020?* MarketWatch (Dec. 21, 2020) | 111 |
| Email from D. Inamullah to D. Schatt, J. Podulka, D. Wheeler and A. Khakoo, Oct. 1, 2020 | 112 |
| Liquidity Analysis Post March 2020 Flash Crash and Recommended Steps, Apr. 5, 2020 | 113 |
| Email with attachments from D. Inamullah to D. Schatt, H. Ng, J. Podulka, S. Zhang, and J. Alexander, Feb. 12, 2020 | 114 |
| Cred Asset Management Overview, Aug. 2020 | 115 |
| Intentionally Omitted | 116 |
| JST Risk Report, Feb. 28, 2020 | 117 |
| JST Risk Report, Mar. 17, 2020 | 118 |
| Email from S. Freeman to J. Alexander, H. Ng, D. Schatt, J Podulka, S. Zhang, and D. Inamullah, Mar. 12, 2020 | 119 |
| Email from J. Alexander to D. Inamullah, Mar. 18, 2020 | 120 |
| Emails between JST and Cred regarding a February invoice, Mar. 3, 2020 | 121 |
| Email from D. Inamullah to J. Podulka, D. Schatt and J. Alexander, Apr. 4, 2020 | 122 |
| Intentionally Omitted | 123 |
| Cred, Inc. Fireblocks logs | 124 |
| Email chain between J. Alexander and R. Chapman, Feb. 2, 2020 | 125 |
| Email from H. Ng to S. Foster, J. Alexander, S. Zhang, R. Chapman and L. Tabers, Feb. 5, 2020 | 126 |
| Email from R. Ortega J. Alexander, Mar. 10, 2020 | 127 |
| Email from D. Inamullah to J. Podulka and D. Schatt, July 13, 2020 | 128 |
| Quanta Capital Subscription Agreement, Feb. 4, 2020 | 129 |
| Email from J. Alexander to D. Inamullah and S. Zhang, Mar. 10, 2020 | 130 |
| Email from S. Foster to D. Inamullah, Feb. 13, 2020 | 131 |
| Transaction Log, Feb. 5, 2020 | 132 |
| Email from S. Foster to D. Inamullah, Mar. 23, 2020 | 133 |
| Kingdom Trust Investor Monthly Statement, Feb. 2020 | 134 |
| Cred Incident Investigation Report, Nov. 25, 2020 | 135 |
| Email chain between D. Inamullah and R. Chapman, Mar. 15, 2020 | 136 |

| Description | Exhibit No. |
|---|---|
| Email chain between D. Inamullah and S. Foster, May 9, 2020 | 137 |
| Email with attachments from S. Foster to A. Khakoo, June 1, 2020 | 138 |
| Email from D. Inamullah to J. Podulka, May 3, 2020 | 139 |
| Email from R. Chapman to D. Inamullah, July 16, 2020 | 140 |
| Email from S. Foster to A. Khakoo, July 29, 2020 | 141 |
| Email from S. Foster to A. Khakoo, July 30, 2020 | 142 |
| Email from A. Khakoo to D. Inamullah, Aug. 21, 2020 | 143 |
| Email from T. Kuhman to J. Podulka, Aug. 26, 2020 | 144 |
| Email from B. De Lude to D. Schatt, Dec. 8, 2020 | 145 |
| Email from T. Khuu to B. De Lude, D. Schatt, and J. Podulka, Oct. 30, 2020 | 146 |
| Email from B. De Lude to D. Inamullah, Aug. 27, 2020 | 147 |
| Email from B. De Lude to D. Inamullah, Aug. 27, 2020 | 148 |
| Email between J. Podulka and S. Ichimiya, Sept. 1, 2020 | 149 |
| Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362, Exhibit G (ECF No. 91) | 150 |
| Intentionally Omitted | 151 |
| JST Risk Report, Mar. 11, 2020 | 152 |
| Decl. of Matthew K. Foster in Support of Debtors' Objection to Motion of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF No. 434) | 153 |
| Email from S. Hwang to P. Bonjour, H. Ng, and D. Hummer, Dec. 15, 2020 | 154 |
| Chat logs between J. Alexander and D. Inamullah, June 24, 2020 | 155 |
| Employee Loan Agreement I, June 1, 2019 | 156 |
| Employee Loan Agreement II, June 1, 2019 | 157 |
| Employee Loan Agreement III, June 1, 2019 | 158 |
| Order Denying Motion of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF. No. 487) | 159 |
| Email from D. Inamullah to D. Schatt and J. Podulka, June 30, 2020 | 160 |
| Videotaped Deposition of James Alexander | 161 |
| Email from J. Evans to E. Gilman, Feb. 28, 2021 | 162 |
| Suggestion of Bankruptcy (ECF. No. 500) | 163 |
| JST Risk Report, Mar. 12, 2020 | 164 |
| Chat messages between S. Zhang, Han LNU and S. Hwang, Aug. 20, 2020 | 165 |
| Transcript of Zoom Hearing Re: Emergency Motions of the Official Committee of Unsecured Creditors, Feb. 5, 2021 | 166 |
| MN Form UCF-17-2, Order Granting Name Change, Aug. 18, 1994 | 167 |
| Letter from Andrew Selous MP, Parliamentary Under-Secretary of State for Justice, to Philip Davies MP, House of Commons, Nov. 7, 2014 | 168 |
| First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries under Chapter 11 of the Bankruptcy Code (ECF No. 380) | 169 |
| Articles of Association of moKredit, Oct. 25, 2017 | 170 |
| Note Purchase Escrow Agreement, Jan. 28, 2020 | 171 |
| Suppl. Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362 (ECF No. 128) | 172 |

| Description | Exhibit No. |
|---|---|
| Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362 (ECF No. 91) | 173 |
| Exhibit C, Decl. of Daniel Schatt in Supp. Of Def.'s Opp. To Pl.'s Mot. for Prelim. Inj., *Alexander v. Schatt*, No. 20-CIV-02728 (Cal. Super. Ct. Aug. 27, 2020) | 174 |
| Crypto-to-Fiat Process Diagram | 175 |
| UpgradeYa Loan and Security Agreement, Apr. 20, 2020 | 176 |
| Holdings Update, Oct. 11, 2020 | 177 |
| UpgradeYa Tranche 1 Closing Statement | 178 |
| Email from L. Hua to D. Schatt, J. Grogan, and M. Zuppone, Nov. 4, 2020 | 179 |
| moKredit Diligence Checklist, Feb. 11, 2019 | 180 |
| JST Cred Exposure Summary | 181 |
| Chat log between S. Zhang and T. Perez, Jul. 8, 2019 | 182 |
| Chat log between S. Zhang and T. Perez, Dec. 4, 2019 | 183 |
| Chat log between S. Zhang and J. Alexander, Feb. 14, 2020 | 184 |

Exhibit 1

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (___) |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |

### DECLARATION OF DANIEL SCHATT IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Daniel Schatt, hereby declare under penalty of perjury as follows:

1.       I am the co-founder and Chief Executive Officer of Cred Inc. ("Cred") and its chapter 11 debtor affiliates (as debtors and debtors in possession, the "Debtors"). The Debtors operate a global financial services platform serving retail and institutional clients in 183 countries. The Debtors, which are licensed lenders, utilize proprietary technology to provide business and retail credit and to allow their customers to earn a yield on more than 15 crypto and fiat currencies through their partner network. I am generally familiar with the day-to-day operations, affairs, and books and records of the Debtors.

2.       I have over 20 years' experience working in the finance and financial technology sectors. My previous experience includes tenures with investment bank Salomon Smith Barney, financial services industry analyst firm Celent, and financial technology platform Yodlee. More recently, I served as the General Manager for Financial Innovations for PayPal from 2007 to 2013, and as the Chief Commercial Officer for Stockpile Inc. from 2013 to 2018. I hold both a Master of Business Administration degree and a Master of Internal Affairs degree from

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

CRED_EXAMINER_00000001

Columbia University. I also hold a bachelor's degree in Law and Society from the University of California, Santa Barbara. I am also the author of *Virtual Banking (Wiley 2013)*.

3.    On November 7, 2020 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court. The Debtors also filed a number of motions and applications (collectively, the "First Day Motions") in order to allow the Debtors to continue to operate in Chapter 11 with minimum disruption or loss of value. I am familiar with the contents of each of the First Day Motions and believe that the relief sought in each of the First Day Motions is necessary to ensure a successful restructuring of the Debtors.

4.    I submit this declaration in support of the First Day Motions pursuant to 28 U.S.C. § 1746 (the "First Day Declaration"). Except as otherwise indicated herein, all facts set forth in this First Day Declaration (a) are based on my personal knowledge and/or information supplied to me by others at the Debtors and the Debtors' professionals, (b) were learned from my review of relevant documents, or (c) are my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. I am over the age of 18 and authorized to submit this First Day Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

5.    This First Day Declaration is divided into six parts. Part I of this First Day Declaration describes the nature of the Debtors' business. Part II provides a brief history of the Debtors. Parts III and IV describe the Debtors' corporate and capital structures, respectively. Part V discusses the events leading up to the Debtors' chapter 11 filings. Part VI provides support for the facts underlying each of the First Day Motions.

2

CRED_EXAMINER_00000002

## Overview of the Debtors' Business

6.      The Debtors operate a financial technology platform through which customers transfer cryptocurrency to the Debtors—generally through a loan agreement or financing agreement.[2] The Debtors then utilize such cryptocurrency in a variety of investment strategies involving third-party asset managers.  The Debtors earn revenue through the the returns generated through their investments, as well as through interest on lines of credit extended to certain of the Debtors' customers in connection with the loans and financings referenced above.

7.      In general, the Debtors have two types of customers: (a) retail investors who transfer (via a pledge or loan) their cryptocurrency to the Debtors through certain e-wallet partners and (b) high net worth individuals who transfer (via a pledge or loan) their cryptocurrency directly to the Debtors.  Approximately half of the Debtors' business is generated through e-wallet services that partner with the Debtors.  E-wallets are platforms through which end-users (which may be individuals or companies) manage and store their cryptocurrency.

8.      As mentioned above, after receipt of cryptocurrency from a customer, the Debtors work with outside asset managers who focus on investment strategies that are expected to generate a return for the Debtors.  These strategies include writing out-of-the-money covered calls and arbitrage strategies.  In general, the Debtors seek strategies that generate a consistent return while minimizing risk of loss.

9.      In addition to its investment services, the Debtors also provide lending services to certain customers.   These borrowing services are limited to domestic customers.

---

[2]     Shortly before the petition date, the Debtors began using contracts to "rent" cryptocurrency from customers.  As of the filing date, rental contracts account for less than 1% of the Debtors' customer contracts.

CRED_EXAMINER_00000003

10.     The Debtors operate from California, but their customer base is located across the globe.  Among others, the Debtors have partnered with e-wallet services based in Canada and the European Union.

### Corporate Formation

11.     I founded Cred together with my business partner Lu Hua in 2018.  I met Mr. Hua during our overlapping tenure at PayPal.  Mr. Hua and I founded Cred in 2018 to give businesses and individuals an opportunity to earn a return on cryptocurrency assets and borrow against such assets.  Cred was incorporated in May 2018 and launched with its first partner in early 2019.

### Corporate Structure

12.     The Debtors consist of five entities, with Debtor Cred as the corporate parent. Mr. Hua and myself each own 50% of the equity in Cred.  Cred has four direct, wholly-owned subsidiaries:

- Debtor Cred (US) LLC handles borrowing and lending for domestic customers (while Cred handles business with international customers);

- Debtor Cred Capital was formed in March 2020 for the purpose of selling securities products;

- Debtor Cred Merchant Solutions LLC was formed in October 2019 for the purpose of facilitating the purchase of crypto assets at the physical point of sale.  However, as of the Petition Date Cred Merchant Capital has no business and no assets.

- Cred Puerto Rico LLC was formed in March 2020 for the purpose of facilitating transactions for residents in Puerto Rico.

13.     All Debtor entities, other than Cred (Puerto Rico) LLC,[3] are incorporated in Delaware and have their principal place of business in California.

---

[3]    Cred (Puerto Rico) LLC is an LLC formed under the laws of Puerto Rico.

4

CRED_EXAMINER_00000004

## Capital Structure

14.     The Debtors have not issued any secured debt.

15.     In August and September 2020, Cred issued approximately $2.6 million in unsecured convertible notes (the "Convertible Notes") through a private placement. The Convertible Notes bear interest at a rate of 3% per annum and have a stated maturity date in September 2024. As of the Petition Date, approximately $2.6 million (which includes accrued interest) remains outstanding on the Convertible Notes. Other than the Convertible Notes, the Debtors do not have any outstanding funded debt.

16.     As of the Petition Date, the Debtors' liabilities to customers were approximately $140 million. Because of the nature of the Debtors' business, the Debtors' liabilities to customers fluctuate with changes in the price of cryptocurrency.

17.     The Debtors have ordinary course trade debt of approximately $1 million.

## Events Leading to Chapter 11 Filing

18.     The Debtors' chapter 11 filings were necessitated by a confluence of events that culminated in mid-October, resulting in a significant deterioration of the Debtors' balance sheet. Of particular note, a material loss connected with the onboarding of a fraudulent asset manager by former Chief Capital Officer, James Alexander, and his misappropriation of certain Debtors' digital assets severely impaired the Debtors balance sheet and limited the ability to hedge their investments against fluctuations in the price of cryptocurrency. Additionally, significant time, attention, and legal costs had to be devoted to litigating against Mr. Alexander.

5

CRED_EXAMINER_00000005

19.    In the early stages of its operations in 2019, the Debtors invested most of their cryptocurrency assets with moKredit[4] and dedicated a portion of their assets to hedge against crypto pricing volatility.   Loans to moKredit generally earned interest of approximately 15% to 24% per annum.  As of the Petition Date, approximately $39 million in loans to moKredit remained outstanding.  By the end of 2019, the Debtors had a positive net income and a balance sheet reflecting an asset to liability ratio of 1.2.

20.    The Debtors entered 2020 with the goal of diversifying their fund allocations.  In particular, the Debtors' leadership team decided to cease any new loans to moKredit and to allocate all new incoming funds to U.S. asset managers in the form of in-kind placements rather than in the form of U.S. stablecoin,[5] which the Debtors had initially utilized.  The decision was prompted in part by the growing COVID-19 crisis in China, as well as new regulations that reduced the income the Debtors could generate from moKredit.  In addition, placing funds in-kind with U.S. asset managers would lessen the necessity to hedge cryptocurrency, lower the Debtors' exposure to moKredit, and allow the Debtors to return funds to customers in the same form as initially transferred without additional conversion.  Cred began to execute this strategy in January and February 2020.

21.    In March 2020, as the COVID-19 crisis prompted the price of bitcoin to drop more than 50% from its February 2020 high, the Debtors found themselves without sufficient reserves to maintain some of their hedging positions, thereby leaving the Debtors short on bitcoin as prices rebounded. Mr. Hua also provided 300-bitcoin loan to Cred to assist the Debtors

---

[4]    moKredit (which was founded by Mr. Hua) provides alternative payment services to online gaming publisher sites through the provision of credit (in the form of gaming tokens) to video game enthusiasts.

[5]    Stablecoin is a type of cryptocurrency that can be pegged to value of fiat currency, commodities, or other "stable" assets as a means of reducing price volatility.

CRED_EXAMINER_00000006

with establishing new hedging positions. Notwithstanding the significant pricing volatility in March 2020, the Debtors ended the first quarter of 2020 with an asset to liability ratio around 1.0.

22.    Also in March 2020, the Debtors directed their then-Chief Capital Officer, Mr. Alexander, to incorporate Cred Capital as a Delaware entity that would be controlled by Cred for the purposes of (a) creating a vehicle that would assist the Debtors with arranging (through a Luxembourg vehicle) bond offerings for companies in need of capital and (b) oversee the Debtors' asset management strategies. However, in violation of this directive, Mr. Alexander instead tried to install himself as the sole director of Cred Capital. Moreover, rather than assigning the majority of Cred Capital's voting shares to Cred, Mr. Alexander assigned only Class B, non-voting shares to Cred, and assigned Class A voting shares to a purported third-party "investor" who purported to give Mr. Alexander a proxy to control the vote on the Class A voting shares. Notwithstanding the agreement with the purported investor, Cred Capital never received the promised capital contribution from such investor.

23.    Worse, Mr. Alexander did not use the proceeds of Mr. Hua's loan of 300 bitcoin to establish hedging positions as he had been instructed to do, but instead used a portion of the loan to make a series of vendor payments in connection with establishing Cred Capital.

24.    Upon discovery of the foregoing, the Debtors directed Mr. Alexander to take corrective action; however, despite still being an employee of the Debtors at that time, Mr. Alexander refused to comply. Thereafter, in late June 2020, Mr. Alexander was terminated as an employee and was locked out from access to the Debtors' systems. The Debtors were forced to file a corrected corporate charter for Cred Capital to regain ownership and control of Cred Capital and correct the stock ownership.

7

CRED_EXAMINER_00000007

25.     In July 2020, the Debtors also discovered that Mr. Alexander had absconded with the remaining bitcoin loaned by Mr. Hua - currently worth over $3 million - that had been intended to establish hedging positions for the Debtors, and moved the assets to a private e-wallet. Despite the Debtors' demands, Mr. Alexander has refused to return these assets to the Debtors.

26.     Shortly thereafter, the Debtors commenced litigation against Mr. Alexander in California state court seeking, among other things, injunctive relief to prevent Mr. Alexander from any further dissipation of the Debtors' property, an award of compensatory and punitive damages due to Mr. Alexander's improper and illegal conversions, breach of his employment contract, breach of implied covenant of good faith and fair dealing, and breach of employee loan agreement, among other things.[6]

27.     Litigation remains pending. Notably, on July 17, 2020, the California state court granted Cred and Cred Capital's motion for a temporary restraining order requiring the preservation of the digital assets Mr. Alexander transferred from Cred Capital. However, as a result of Mr. Alexander's actions and the pendency of litigation, Cred currently does not have access to the approximately $3 million worth of bitcoin and stable coin misappropriated by Mr. Alexander.

28.     While the Debtors' asset management strategy again delivered significant returns in July and August 2020, because of continued liquidity pressure and considerable expenses tied to the lawsuits with Mr. Alexander, the Debtors were forced to withdraw funds from asset managers prematurely.

---

[6]    Case No. 20-CIV-02915, Superior Court of the State of California; County of San Mateo, Southern Branch.

CRED_EXAMINER_00000008

29.    Mr. Alexander's conduct also negatively affected the Debtors' ability to raise outside capital.  During the summer of 2020, the Debtors sought to raise outside capital in the form of convertible notes.  This capital infusion was meant to provide the Debtors with additional liquidity and support the growth of their business.  Initially, the Debtors received commitments for more than $5 million in capital.  However, after the Debtors disclosed the lawsuit against Mr. Alexander and the irregularities connected with Mr. Alexanders' tenure as Chief Capital Officer, many investors decided not to participate.  As a result, the Debtors were only able to raise approximately $2.6 million in convertible notes.

A.    Loans to moKredit

30.    In May 2020, due to depressed financial markets in China and a downturn in its business partially attributable to the COVID-19 pandemic, moKredit renegotiated the repayment schedule for the loans extended by the Debtors.  Under the new schedule, moKredit has continued to make payment of interest with a small amount of principal repayment.  Moreover, during the summer of 2020, China began a series of more restrictive lending policies that added liquidity pressure to moKredit.  Although MoKredit continued with its interest payments to the Debtors, the absence of larger principal repayments to the Debtors reduced the Debtors' expected financial flexibility.

31.    As a result of the foregoing, a material portion of the Debtors' assets with moKredit could not be readily called back to compensate for hedging or redemptions in other parts of the Debtors' business.

B.    Theft of Bitcoin

32.    In addition to Mr. Alexander's malfeasance in connection with the formation of Cred Capital, the Debtors also suffered a loss of bitcoin (worth over $10 million as of October

9

CRED_EXAMINER_00000009

2020) as a result of a fraudulent investment scheme. Specifically, in February 2020, while still the Chief Capital Officer of the Debtors, Mr. Alexander informed the Debtors' investment committee of a potential investment opportunity with an entity that purported to be Quantcoin (the "Imposter"). Based on Mr. Alexander's representations and purported due diligence, Mr. Alexander was given permission to hire the Imposter to manage a portion of the company's bitcoin allocation.

33.    In a series of transactions in February and April 2020, Mr. Alexander directed the transfer of a total of 800 bitcoin to the Imposter. After these transfers, the Debtors were set up with an administrator purporting to be Scott Foster with Kingdom Trust. The alleged Mr. Foster provided what appeared to be performance updates to the Debtors on a monthly basis.

34.    In July 2020, the Debtors requested a withdrawal of $2 million from their account with the Imposter. Initially, it was agreed that the distribution would be made during the first week of September 2020. However, after confirmation of the withdrawal request, the Imposter stopped responding to emails from the Debtors. On August 24, 2020, the Debtors contacted Kingdom Trust to inquire as to the July monthly statement. Representatives for Kingdom Trust indicated that they had no records of any accounts for the Debtors, and noted that while Scott Foster was employed by Kingdom Trust, the contact email for Mr. Foster that had been provided to the Debtors was fake.

35.    Upon learning of the deception, the Debtors promptly contacted the pertinent law enforcement agency, which has initiated an investigation into the matter.

C.    Subsequent Developments

36.    As a result of the theft by the Imposter and the misappropriation of digital assets in connection with Mr. Alexander's actions, the Debtors have been deprived of over $13 million

CRED_EXAMINER_00000010

worth of digital assets and would-be returns which the Debtors intended to devote to improving their hedging positions.  In the absence of such hedging positions, a rapid 30% increase in the price of bitcoin during a short span in October 2020 significantly increased the Debtors' liabilities relative to their assets.

37.    Further complicating matters, negative press in connection with the theft by the Imposter, Mr. Alexander's actions, and the overall impact on the business prompted some of the Debtors' core partners to close their accounts with the Debtors.  Additional investment of outside capital also failed to materialize as a result of the legal and PR concerns associated with the Imposter.

38.    As a result of the growing liability gap, and the lack of liquidity (due to the material loss of a bitcoin connected to the above fraud and Mr. Alexander's malfeasance), the Debtors determined in late October that they should cease the inflow and outflow of all digital assets to assess their financial position and right-size their balance sheets.

39.    On October 27, 2020, the Debtors retained Paul Hastings LLP as restructuring counsel to evaluate the Debtors' strategic alternatives.  The Debtors also retained MACCO Restructuring Group LLC as financial advisor on November 4, 2020.  Furthermore, on November 3, 2020, Grant Lyon was appointed as independent director or manager (as the case may be) to replace Mr. Hua.  Mr. Lyon was also appointed as the chair and sole member of the Restructuring Committee of Cred's board of directors.  Mr. Lyon is the founder and CEO of Atera Capital, LLC.  Grant Lyon has over 30 years of experience in corporate restructuring, expert testimony and corporate governance.  Mr. Lyon has spent many years formulating and executing business plans for a diverse range of industries at every stage of a business lifecycle.

11

CRED_EXAMINER_00000011

40.     The Debtors have determined that given their financial condition, they cannot reasonably expect to recover and, accordingly, on November 7, 2020, the Debtors commenced these cases under chapter 11 of the Bankruptcy Code.  The Debtors anticipate that the breathing spell afforded by the Bankruptcy Code will allow them to determine the best path forward for their creditors, employees, customers, and other stakeholders. The Debtors will use the tools available to them under the Bankruptcy Code, including certain bankruptcy causes of action and potential asset sales under section 363 of the Bankruptcy Code to maximize value for the benefit of all stakeholders.

### First Day Motions

41.     Concurrently herewith, the Debtors have filed or will file a number of First Day Motions seeking various forms of relief designed to facilitate the transition into chapter 11.  I have reviewed each of the First Day Motions, including the exhibits thereto, and the facts stated therein are true and correct to the best of my belief with appropriate reliance on corporate officers and advisors.  I believe that the Debtors have satisfied the applicable standards for the relief requested, and that the Court's grant of the requested relief is in the best interests of the Debtors, their estates, as well as that of their creditors and other parties in interest.

42.     The relief sought in each of the First Day Motion is necessary to enable the Debtors to continue operations with minimal disruption and constitute a critical element in the successful implementation of the Debtors' effort to maximize the recovery of its creditors.  To that end, the Debtors have filed the following First Day Motions:

- *Motion of Debtors and Debtors in Possession for Order Directing Joint Administration of Their Chapter 11 Cases;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to File A Consolidated List of Debtors' 30 Largest Unsecured Creditors, (II) Authorizing Debtors to Serve Certain Parties*

12

CRED_EXAMINER_00000012

*by E-mail, (III) Authorizing Debtors to Redact or Withhold Publication of Certain Personal Identification Information, and (IV) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Insurance Policies, (B) Pay All Related Obligations, and (II) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Order (I) Restating and Enforcing Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of Bankruptcy Code, (II) Permitting Debtors to Modify Automatic Stay, (III) Approving Form and Manner of Notice, and (IV) Granting Related Relief;*

- *Debtors' Application for Entry of Order, Pursuant to 28 U.S.C. § 156(C), Authorizing Retention and Appointment of Donlin, Recano & Company, Inc. as Claims and Noticing Agent for Debtors, Nunc Pro Tunc to Petition Date; and*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions; (II) Granting Administrative Expense Status to Postpetition Intercompany Balances; (III) Waiving the Requirements of Section 345(b) of Bankruptcy Code; and (IV) Granting Related Relief.*

43.    I believe approval of the relief requested in the First Day Motions is in the best interests of all stakeholders.

44.    In addition to the First Day Motions, the Debtors are requesting relief pursuant to the following second day motion:

- *Motion of Debtors for Entry of Order Authorizing Debtors to (I) Reject Unexpired Leases of Nonresidential Real Property and (II) Abandon Property in Connection Therewith.*

13

CRED_EXAMINER_00000013

45.    I have reviewed this motion, and the facts stated therein are true and correct to the best of my belief with appropriate reliance on corporate officers and advisors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 8, 2020
San Mateo, California

/s/ Daniel Schatt

Daniel Schatt
Chief Executive Officer

14

# Exhibit 2

# FILED UNDER SEAL

# Exhibit 3

# FILED UNDER SEAL

# Exhibit 4

# FILED UNDER SEAL

# Exhibit 5

# FILED UNDER SEAL

Exhibit 6

# EXHIBIT A

CRED_EXAMINER_00000354

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| CRED INC., *et al.*,[1] | : | |
| | : | Case No. 20-12836 (JTD) |
| Debtors. | : | (Jointly Administered) |
| | : | |

**DECLARATION OF DANIYAL INAMULLAH IN SUPPORT OF MOTION OF THE
UNITED STATES TRUSTEE FOR ENTRY OF AN ORDER DIRECTING THE
APPOINTMENT OF A TRUSTEE, OR IN THE ALTERNATIVE, (I) DIRECTING THE
APPOINTMENT OF AN EXAMINER, OR (II) CONVERTING THE CASES TO
CHAPTER 7 CASES**

Daniyal Inamullah declares:

1.      I was previously employed by Cred Inc. as Vice President of Capital Markets from January 2020 through April 2020, and as Head of Capital Markets from April 2020 through November 2020.  I recently became employed as the Chief Investment Officer for Sarson Funds, an independent provider of blockchain technology and cryptocurrency marketing and educational services focusing on the financial professional community and their clients which is headquartered in Indianapolis, IN.

2.      As Head of Capital Markets at Cred, my role was to oversee due diligence of investment opportunities and set our investment policies via recommendations to the Investment Committee. My job was to ensure that the Debtors generated the necessary returns so that Cred could attract additional creditors as an alternative lending platform. Pursuant to my position, I expected to gain intimate knowledge of Cred's financial position and processes.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

CRED_EXAMINER_00000355

3.      I hold an Associate of Arts Degree from Oxford College at Emory University (2007), a Bachelor of the Arts degree from Emory University (Economics; Business Policy Focus) (2009), and a Master of Business Administration degree from the University of Houston's C.T. Bauer College of Business (2014).

4.      I am a Chartered Financial Analyst (CFA) charterholder. I was trained at Ernst & Young, an accounting firm, in Valuation and Business Modelling for Transaction Advisory Services. Subsequently, I continued my training as an Associate at the investment banking firm of Houlihan Lokey.

5.      I submit this declaration pursuant to 28 U.S.C. § 1746 in support of the motion of the United States Trustee for entry of an order directing the appointment of a trustee or, alternatively, for entry of an order directing the appointment of an examiner or (ii) converting the above-captioned cases to cases under chapter 7 (the "Inamullah Declaration"). Except as otherwise indicated herein, all facts set forth in this Inamullah Declaration are based on my personal knowledge. I am over the age of 18. If called upon to testify, I could and would testify competently to the facts set forth herein.

*Liquidation of Hedging Positions in March 2020*

6.      I previously reviewed Mr. Schatt's declaration in support of the Debtors' "first day" motions [D.I. 12] and concluded that it does not adequately describe certain events which had a substantially greater impact on Cred's survival than the events leading to the company's dispute with James Alexander, Cred's former Chief Capital Officer, described in paragraphs 22 to 29 therein.

7.      The true source of the losses to Cred stem from liquidations from being in leveraged long positions back in March (specifically, March 12-13 when markets were extremely volatile).

CRED_EXAMINER_00000356

8.    Assuming that Cred received Bitcoin as part of the CredEarn program, the following would be a typical, subsequent series of transactions by Cred from inception through March 2020, using a $100 transaction as an example:

a.  Receive $100 in our Bitcoin wallet;
b.  Sell $80 for cash and send the cash to MoKredit ("MoKred"); and
c.  Use the remaining $20 to lever long with futures contracts (paying an implied hedging cost of ~10% and using sufficient leverage for the $20 to cover the price exposure on the $80, implying a leverage ratio of 4-5x).

9.    Continuing with the example in the preceding paragraph, a "good" trade would have:

a.  Cred receiving regular interest from MoKred;
b.  Cred being able to unwind the hedges on the trading platforms;
c.  Cred being able to buy the same number of Bitcoin units that were borrowed; and then
d.  Cred returning the interest + principal back to the customer.

10.    In March 2020, Cred had about 800 Bitcoin ("BTC") used to hedge exposures of approximately 5,500 BTC with derivatives contracts on exchanges such as BitMex and OkEx. Ultimately, due to the sudden increased downside volatility associated with Covid, Bitcoin prices fell approximately 50% overnight. This led to the liquidation of 800 BTC on exchanges. Initially, the trade did not do too much damage to the balance sheet, given that the liabilities (which were in Bitcoin) were also reduced.

11.    For example, if someone contributed $100 of Bitcoin at a price of $10,000/BTC, the decline reduced the total liabilities exposure to roughly $50 (assuming a 50% decline in the $/Bitcoin price against the United States Dollar). However, as Bitcoin began to recover, Cred was unable to get liquidity to "close-out" the short trade by buying Bitcoin again. The reason for this was that most of the cash liquidity was tied up at MoKred – and MoKred was unable to repay principal in March 2020.

12.    Cred was essentially caught in a liquidity trap, and Bitcoin price appreciation after the precipitous drop increased the spread between assets and liabilities. As BTC prices increased,

CRED_EXAMINER_00000357

the value of the liabilities increased as well. Cred was unable to make up the gap given there were no assets to lever long to cover the short Bitcoin exposures. This circumstance led to a liability in the excess of $50 million over the next few months as Bitcoin prices increased from approximately $5,000/BTC in March to $19,000/BTC at the end of November.

13.     The asset-to-liability ratios were documented to Cred's Investment Committee over the next several months, with specific requests for financial information related to MoKred, asset impairment analyses and solvency opinions. Dan Schatt (Cred's co-founder and Chief Executive Officer) and Joe Podulka (Cred's Chief Financial Officer) rejected both requests or insisted on delaying the process.

*MoKred Liquidity*

14.     The MoKred borrowing arrangement with Cred was facilitated by the executive team at Cred's inception (back in 2018). After the March volatility and liquidity issues in China, Dan Schatt and Lu Hua indicated that the Chinese regulators were allowing borrowers to extend principal repayments indefinitely. Cred requested a $10 million principal repayment on March 14th (to provide Cred with liquidity in response to the March 2020 BTC price drop), which MoKred was unable to comply with.

15.     An undocumented repayment plan was agreed to bilaterally between Dan Schatt and Lu Hua, despite Cred's Capital Markets team recommendation to exercise senior lender rights over moKred's assets or at least agree upon a final date for repayment for the full balance of the loan. This was documented in an internal memo submitted to Cred Inc. by Cred Capital, Inc. named "Liquidity Analysis and Recommendations" during April 2020.

16.     The 'revised plan' called for a few hundred thousand to be repaid in May and June, and $4 million for July and August. No payment above $400k was ever made and MoKred cut off principal payments in October.

CRED_EXAMINER_00000358

17.     It is important to note that no moKred financial reports were made available to the Capital Markets team at Cred, despite numerous requests to Dan Schatt, Joe Podulka, and the MoKred team. Cred's team was provided two (2) short phone calls with spare details on the current financial situation, and the promise that MoKred's equity investors would be able to help.

*Quanta Coin*

18.     Quanta Coin ("QC") was an investment that was made early February (with a follow-on investment in April) that turned out to be a fraudulent investment manager.

19.     Richard Chapman, QC's "portfolio manager," initially met with the Cred team at the Consensus conference back in May 2019. Since then, they kept in touch and began a formal diligence process in November. James Alexander claims there was a third party hired by Cred to help with the diligence.

20.     QC claimed to run a derivatives-based strategy with a goal of returning 20-30% per year. James Alexander met Richard during a Europe trip on February 2nd, 2020. On February 3rd, an investment of approximately 400 BTC was made.

21.     The relationship was managed by an imposter Scott Foster of Kingdom Trust ("KT"), a digital asset custodian. It is important to note that Scott Foster is a real person that worked for KT, but this email address was slightly off. The domain read "KingdomStrust.com" instead of Kingdomtrust.com." The imposter Scott Foster made himself responsible for reporting and answering any questions for us regarding Cred's relationship with QC.

22.     During August 2020, after the six-month "lock up" period ended, Cred requested a redemption of $2 million from QC to rebalance the portfolio. After the redemption request, follow-up emails to the imposter Scott Foster were returned, as the domain name was unregistered.

23.     Cred immediately alerted the FBI upon discovery of the fraud, which started an investigation to trace and redeem the funds from the imposter.

*Equity Investment Round / Solvency Request*

24.    Towards the end of April 2020, Cred Capital recommended a course of action to wind up operations as soon as possible if Cred was unable to bring in equity capital or receive liquidity back from MoKred by June 30, 2020. Although angrily rejected by Dan Schatt and Joe Podulka, it was a potential way to avoid significantly more losses down the road. The document was authored by the general counsel of Cred (Dan Wheeler), James Alexander and myself.

25.    Dan Schatt pursued equity investments furiously from a wide variety of investors but was unable to close by June 30. However, he kept indicating that the company was close to an investor and that they would help Cred get out of the liquidity situation.

26.    Cred was ultimately able to close Dragonfly Capital ("DC"), but the information provided to DC was not available to the Cred team and managed primarily by Dan Schatt and Joe Podulka. It is important to note that financial information on the balance sheet was provided only through March 30 (which reflected a positive shareholder's equity balance).

27.    When asked about how trading losses and gains were calculated, the accounting team indicated that only gains were being captured on each rolling profit & loss statement, and losses were sheltered on the balance sheet by being marked to each CredEarn program's inception, giving the artificial impression of profitable operations. For example, if Bitcoin's price was increasing, then performance related to long position was reflected on the P&L; however, no corresponding adjustments were made on the liability side of the balance sheet until a program reached maturity. No impairment of MoKred assets, impairment of other credit-based lending allocations or any illiquid crypto held was ever reflected.

CRED_EXAMINER_00000360

*James Alexander Situation / "Stolen Funds"*

28.     James Alexander was brought on at Cred to be the Chief Capital Officer, being solely responsible for investments and risk management. Over time, Cred realized that there needed to be a firewall between Cred's lending entity and the asset management piece of their operations.

29.     The executive team decided to create a registered investment advisor, or "RIA," named Cred Capital. To fund the new entity, the idea was that Cred would provide some initial capital (roughly $2 million in kind) and Cred Capital would begin an external fundraising process lead by James Alexander.

30.     Cred Capital was initially assumed to be an independent business before Cred claimed it would be operating as a wholly owned subsidiary. To consummate this firewall, an Asset Management Agreement and Investment Agreement were signed by Dan Schatt.

31.     To maintain independence, the idea was to create non-voting shares for Cred and Cred's beneficial owners (the "B Shares" noted in the court documents). Lu Hua contributed 300 BTC directly to Cred Capital, with a signed investment agreement for the non-voting B Shares. The funds that Cred claims that James "stole" from Cred were assets that Cred Capital owned, not customer assets that were a part of the CredEarn or CredBorrow programs. These assets were also segregated in a separate custodial account to ensure they were not commingled with Cred assets. Some of these assets were also deployed to begin operations, such as hiring an accountant and other consultants.

32.     There was also a third investor (Zobar Agha from Turkey) that invested in the A shares (with full voting rights), and then gave voter proxy to James Alexander. Zobar never consummated the transfer of funds.

CRED_EXAMINER_00000361

33.     James Alexander requested the assets to be moved to another account for the benefit of the Cred Capital entity, using the signed Asset Management and Investment Agreements as justification for being able to move assets at his discretion.

34.     I have reviewed the facts stated in the Motion and believe that they are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 4, 2020
Denver, Colorado

_____
Daniyal Inamullah

CRED_EXAMINER_00000362

# Exhibit 7

# FILED UNDER SEAL

# Exhibit 8

# FILED UNDER SEAL

# Exhibit 9

# FILED UNDER SEAL

# Exhibit 10

# FILED UNDER SEAL