**<u>EXHIBIT B</u>**

**(Proposed Redacted Compendium- Volume II)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CRED INC., *et al.*, | Case No. 20-12836 (JTD) |
| Debtors. | (Jointly Administered) |

### COMPENDIUM OF EXHIBITS TO REPORT OF ROBERT J. STARK, EXAMINER

### VOLUME II

**BROWN RUDNICK LLP**
Andrew M. Carty
Michael W. Reining
Tiffany B. Lietz
Seven Times Square
New York, NY 10036
212-209-4800
acarty@brownrudnick.com
mreining@brownrudnick.com
tlietz@brownrudnick.com

Stephen R. Cook
2211 Michelson Drive, 7th Floor
Irvine, CA 92612
949-752-7100
scook@brownrudnick.com

E. Patrick Gilman
601 Thirteenth Street NW, Suite 600
Washington, DC 20005
202-536-1730
pgilman@brownrudnick.com

**ASHBY & GEDDES, P.A.**
Gregory A. Taylor (DE Bar No. 4008)
Katharina Earle (DE Bar No. 6348)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
gtaylor@ashbygeddes.com
kearle@ashbygeddes.com

**ANKURA CONSULTING GROUP, LLC**
Vikram Kapoor
485 Lexington Avenue, 10th Floor
New York, NY 10017
212-818-1555
vikram.kapoor@ankura.com

**Dated: March 8, 2021**

## Index of Exhibits to Report of Robert J. Stark, Examiner

| Description | Exhibit No. |
|---|---|
| Decl. of Daniel Schatt in Supp. of Debtors' Chapter 11 Pet. and First Day Mot. (ECF No. 12) | 1 |
| Base Prospectus, Jan. 30, 2020 | 2 |
| moKredit Inc. Overview Report, Aug. 7, 2019 | 3 |
| Videotaped Dep. of Dan Schatt, Dec. 14, 2020 | 4 |
| Loan and Security Agreement between moKredit Inc., and Cred LLC, Dec. 27, 2018 | 5 |
| Decl. of Daniyal Inamullah in Supp. of Mot. of the United States Trustee for Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases (ECF No. 133) | 6 |
| Cyber Quantum Pte. Ltd. Unaudited Financial Statements, 2018 | 7 |
| Cyber Quantum Pte. Ltd. Directors' Resolutions, 2018 | 8 |
| Videotaped Dep. of Daniyal Inamullah, Dec. 8, 2020 | 9 |
| Emails exchanged between H. Ng, K. Wong, D. Schatt and InnReg representative regarding JST onboarding process, Dec. 7–20, 2018 | 10 |
| Email from J. Alexander to K. Wong, Jan. 22, 2019 | 11 |
| Email from D. Granet to L. Hua, copying in Messrs. J. Alexander, K. Wong, S. Zhang and S. Freeman, Jan. 14, 2019 | 12 |
| JST Systems Invoice, Jan. 22, 2019 | 13 |
| Sarson Funds Fact Card: Fifth Khagan | 14 |
| Sarson Funds Fact Card: AX Momentum | 15 |
| Employment Offer Letter for J. Alexander | 16 |
| Mot. of UpgradeYa Investment, LLC for Relief from Stay Under Bankruptcy Code Section 362 (ECF No. 89) | 17 |
| Nathan DiCamillo, *Here's What Happened at Crypto Lender Cred's Latest Bankruptcy Hearing*, CoinDesk, Dec. 18, 2020 | 18 |
| Laurence Fletcher, *Crypto hedge funds struggle to recover from 'bloodbath'*, *Fin. Times*, May 20, 2020 | 19 |
| 100 Acre Ventures Form ADV, May 15, 2020 | 20 |
| Decl. of Joe Podulka in Supp. of Debtors' Obj. to Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF No. 441) | 21 |
| First Amended Complaint, *Alexander v. Schatt*, No. 20-CIV-02728 (Cal. Super. Ct. Oct. 15, 2020) | 22 |
| Verified First Amended Complaint, *Cred v. Alexander*, No. 20-CIV-02915 (Cal. Super. Ct. Aug. 14, 2020) | 23 |
| Decl. of Daniel F. Wheeler RE Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF No. 386) | 24 |
| Cred Inc. Update for the Creditors Committee, Dec. 14, 2020 | 25 |
| Decl. of Grant Lyon in Supp. of Debtors' Obj. to Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF No. 433) | 26 |

| Description | Exhibit No. |
|---|---|
| United States Trustee Mot. For Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases (ECF No. 133) | 27 |
| Order Den. in Part, and Granting in Part, the Trustee/Examiner Mot. (ECF No. 281) | 28 |
| App. of the United States Trustee for Order Approving Appointment of Examiner (ECF No. 330) | 29 |
| Order Approving Appointment of Examiner (ECF No. 338) | 30 |
| Notice of Filing of Proposed Scope, Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Start, as Examiner (ECF No. 376) | 31 |
| Order Approving Examiner's Proposed Scope, Work Plan, and Budget for Investigation (ECF No. 431) | 32 |
| Notice of Filing of Proposed Amend. to Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Stark, as Examiner (ECF No. 552) | 33 |
| Cred LLC and Subsidiary Financial Statements, 2018 | 34 |
| CredEarn CredBorrow Information Sheet | 35 |
| Standard CredBorrow Multi-Tranche Credit Agreement | 36 |
| moKredit Tranche Agreement No. 29, May 1, 2019 | 37 |
| CredEarn Process and Asset Flow | 38 |
| Email from J. Alexander to K. Wong, Feb. 12, 2019 | 39 |
| Enhanced Yield Agreement for CredEarn Customers | 40 |
| Chat log between S. Zhang and T. Perez, Aug. 28, 2019 | 41 |
| Email chain between A. Khakoo, H. Ha, D. Inamullah, and M. Zhang, June 30, 2020 | 42 |
| Fireblocks License Agreement, Feb. 21, 2020 | 43 |
| Cred Investment Committee Meeting Minutes | 44 |
| Email from S. Hwang to J. Podulka, Nov. 12, 2020 | 45 |
| Schedule of Advances | 46 |
| Email from J. Podulka to F. Cottrell and A. Khakoo, Nov. 18, 2020 | 47 |
| Cred LLC General Ledger, 2020 | 48 |
| Cred Financial Statements, 2019 | 49 |
| Email from J. Podulka to H. Moore and E. Rye, May 21, 2020 | 50 |
| Lockton Summary of Insurance, 2020–2021 | 51 |
| Hartford Business Owners Policy, Oct. 1, 2020 | 52 |
| Hartford Workers' Compensation and Employers' Liability Busines Insurance Policy, Nov. 30, 2020 | 53 |
| Certificate of Liability Insurance, Nov. 11, 2020 | 54 |
| Axis Insurance Policy | 55 |
| Validus Errors and Omissions Policy Declarations | 56 |
| Validus Directors and Officers Policy Declarations | 57 |
| Euclid Financial Excess Insurance Policy | 58 |
| Email from M. Zhang to M. Parrish, June 24, 2020 | 59 |
| Screenshot of Cred website discussing insurance policies | 60 |

| Description | Exhibit No. |
|---|---|
| Screenshot of Cred website discussing partnership with BitGo | 61 |
| Email chain between M. Zhang and T. Miyauchi, June 19, 2020 | 62 |
| Email from T. Perez to C.D., Nov. 14, 2019 | 63 |
| Email chain between M. Zhang and J.S., Apr. 15, 2020 | 64 |
| Intentionally Omitted | 65 |
| Email from D.F. to T. Perez, Nov. 8, 2020 | 66 |
| Cred Advertising and Marketing Policy | 67 |
| Email from D. Inamullah to D. Kline, July 6, 2020 | 68 |
| Intentionally Omitted | 69 |
| Email from K. Wong to L. Hua, Jan. 15, 2019 | 70 |
| Email from J. Alexander to L. Hua and K. Wong, Jan. 22, 2019 | 71 |
| Email from K. Wong to S. Zhang and J. Alexander, Feb. 4, 2019 | 72 |
| Email from K. Wong to L. Hua and D. Schatt, Feb. 13, 2019 | 73 |
| Email from K. Wong to H. Ng, J. Alexander, and S. Zhang, Feb. 14, 2019 | 74 |
| Email from J. Alexander to K. Wong, Feb. 15, 2019 | 75 |
| Intentionally Omitted | 76 |
| Email from J. Alexander to K. Wong, May 21, 2019 | 77 |
| Intentionally Omitted | 78 |
| Email from J. Alexander to L. Hua, D. Inamullah, S. Zhang, and J. Podulka, Mar. 12, 2020 | 79 |
| Contribution Agreement between L. Hua and Cred Capital, LLC, Mar. 31, 2020 | 80 |
| Email from D. Schatt to D. Wheeler, June 16, 2020 | 81 |
| Email from D. Inamullah to D. Schatt, J. Podulka, and A. Khakoo, June 29, 2020 | 82 |
| Email from J. Podulka to D. Schatt, Dec. 1, 2020 | 83 |
| Cred Near Term Liquidity Analysis, Nov. 7, 2020 | 84 |
| Email chain between J. Alexander and A. Derar, Apr. 16, 2019 | 85 |
| Email from J. Alexander to J. Bunting, Mar. 14, 2019 | 86 |
| Email chain between J. Alexander and R. Flowers, Mar. 15, 2019 | 87 |
| Email from J. Alexander to D. Davis, Mar. 14, 2019 | 88 |
| moKredit Investment Opportunity Slide Deck, Mar. 2019 | 89 |
| Cred Employee Chat Logs, Mar. 26, 2019 | 90 |
| Income Opportunities Board Minutes, Feb. 4, 2020 | 91 |
| Spreadsheet concerning W. Strong's investment | 92 |
| JST Consulting Agreement, Dec. 25, 2018 | 93 |
| Email from J. Podulka to D. Schatt, July 24, 2020 | 94 |
| Email from D. Inamullah to D. Schatt, A. Khakoo, and J. Podulka, Sept. 16, 2020 | 95 |
| Email from D. Schatt to J. Podulka, Nov. 14, 2020 | 96 |
| Email from D. Inamullah to J. Podulka and D. Schatt, July 13, 2020 | 97 |
| Email chain between J. Podulka, H. Moore, G. Estrada, S. Hwang, H. Ha, Nov. 5, 2020 | 98 |
| Cred LLC Subscription Agreement with Cambrian Systematic Strategies LP, July 29, 2020 | 99 |

| Description | Exhibit No. |
|---|---|
| Chat log between S. Zhang and J. Alexander, July 30, 2019 | 100 |
| Cambrian Systematic Strategies LP Quarterly Statement, Sept. 30, 2019 | 101 |
| Email from S. Zhang to J. Alexander, Feb. 6, 2020 | 102 |
| Redemption Confirmation, Jan. 22, 2020 | 103 |
| Metropolitan Commercial Bank Account Statement, Feb. 28, 2020 | 104 |
| Email from HC Global Fund Services to D. Schatt, Feb. 21, 2020 | 105 |
| Email from A. Khakoo to P. Collins, June 29, 2020 | 106 |
| Email from J. Podulka to D. Schatt, Aug. 8, 2020 | 107 |
| Email from J. Podulka to D. Schatt, Aug. 28, 2020 | 108 |
| Email from J. Sarson to D. Schatt, A. Khakoo, Nov. 17, 2020 | 109 |
| Email from M. Foster to J. Sarson, Jan 6, 2021 | 110 |
| Brett Arends, *Opinion: How did these 'All-Weather' portfolios weather 2020?* MarketWatch (Dec. 21, 2020) | 111 |
| Email from D. Inamullah to D. Schatt, J. Podulka, D. Wheeler and A. Khakoo, Oct. 1, 2020 | 112 |
| Liquidity Analysis Post March 2020 Flash Crash and Recommended Steps, Apr. 5, 2020 | 113 |
| Email with attachments from D. Inamullah to D. Schatt, H. Ng, J. Podulka, S. Zhang, and J. Alexander, Feb. 12, 2020 | 114 |
| Cred Asset Management Overview, Aug. 2020 | 115 |
| Intentionally Omitted | 116 |
| JST Risk Report, Feb. 28, 2020 | 117 |
| JST Risk Report, Mar. 17, 2020 | 118 |
| Email from S. Freeman to J. Alexander, H. Ng, D. Schatt, J Podulka, S. Zhang, and D. Inamullah, Mar. 12, 2020 | 119 |
| Email from J. Alexander to D. Inamullah, Mar. 18, 2020 | 120 |
| Emails between JST and Cred regarding a February invoice, Mar. 3, 2020 | 121 |
| Email from D. Inamullah to J. Podulka, D. Schatt and J. Alexander, Apr. 4, 2020 | 122 |
| Intentionally Omitted | 123 |
| Cred, Inc. Fireblocks logs | 124 |
| Email chain between J. Alexander and R. Chapman, Feb. 2, 2020 | 125 |
| Email from H. Ng to S. Foster, J. Alexander, S. Zhang, R. Chapman and L. Tabers, Feb. 5, 2020 | 126 |
| Email from R. Ortega J. Alexander, Mar. 10, 2020 | 127 |
| Email from D. Inamullah to J. Podulka and D. Schatt, July 13, 2020 | 128 |
| Quanta Capital Subscription Agreement, Feb. 4, 2020 | 129 |
| Email from J. Alexander to D. Inamullah and S. Zhang, Mar. 10, 2020 | 130 |
| Email from S. Foster to D. Inamullah, Feb. 13, 2020 | 131 |
| Transaction Log, Feb. 5, 2020 | 132 |
| Email from S. Foster to D. Inamullah, Mar. 23, 2020 | 133 |
| Kingdom Trust Investor Monthly Statement, Feb. 2020 | 134 |
| Cred Incident Investigation Report, Nov. 25, 2020 | 135 |
| Email chain between D. Inamullah and R. Chapman, Mar. 15, 2020 | 136 |

| Description | Exhibit No. |
|---|---|
| Email chain between D. Inamullah and S. Foster, May 9, 2020 | 137 |
| Email with attachments from S. Foster to A. Khakoo, June 1, 2020 | 138 |
| Email from D. Inamullah to J. Podulka, May 3, 2020 | 139 |
| Email from R. Chapman to D. Inamullah, July 16, 2020 | 140 |
| Email from S. Foster to A. Khakoo, July 29, 2020 | 141 |
| Email from S. Foster to A. Khakoo, July 30, 2020 | 142 |
| Email from A. Khakoo to D. Inamullah, Aug. 21, 2020 | 143 |
| Email from T. Kuhman to J. Podulka, Aug. 26, 2020 | 144 |
| Email from B. De Lude to D. Schatt, Dec. 8, 2020 | 145 |
| Email from T. Khuu to B. De Lude, D. Schatt, and J. Podulka, Oct. 30, 2020 | 146 |
| Email from B. De Lude to D. Inamullah, Aug. 27, 2020 | 147 |
| Email from B. De Lude to D. Inamullah, Aug. 27, 2020 | 148 |
| Email between J. Podulka and S. Ichimiya, Sept. 1, 2020 | 149 |
| Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362, Exhibit G (ECF No. 91) | 150 |
| Intentionally Omitted | 151 |
| JST Risk Report, Mar. 11, 2020 | 152 |
| Decl. of Matthew K. Foster in Support of Debtors' Objection to Motion of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF No. 434) | 153 |
| Email from S. Hwang to P. Bonjour, H. Ng, and D. Hummer, Dec. 15, 2020 | 154 |
| Chat logs between J. Alexander and D. Inamullah, June 24, 2020 | 155 |
| Employee Loan Agreement I, June 1, 2019 | 156 |
| Employee Loan Agreement II, June 1, 2019 | 157 |
| Employee Loan Agreement III, June 1, 2019 | 158 |
| Order Denying Motion of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF. No. 487) | 159 |
| Email from D. Inamullah to D. Schatt and J. Podulka, June 30, 2020 | 160 |
| Videotaped Deposition of James Alexander | 161 |
| Email from J. Evans to E. Gilman, Feb. 28, 2021 | 162 |
| Suggestion of Bankruptcy (ECF. No. 500) | 163 |
| JST Risk Report, Mar. 12, 2020 | 164 |
| Chat messages between S. Zhang, Han LNU and S. Hwang, Aug. 20, 2020 | 165 |
| Transcript of Zoom Hearing Re: Emergency Motions of the Official Committee of Unsecured Creditors, Feb. 5, 2021 | 166 |
| MN Form UCF-17-2, Order Granting Name Change, Aug. 18, 1994 | 167 |
| Letter from Andrew Selous MP, Parliamentary Under-Secretary of State for Justice, to Philip Davies MP, House of Commons, Nov. 7, 2014 | 168 |
| First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries under Chapter 11 of the Bankruptcy Code (ECF No. 380) | 169 |
| Articles of Association of moKredit, Oct. 25, 2017 | 170 |
| Note Purchase Escrow Agreement, Jan. 28, 2020 | 171 |
| Suppl. Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362 (ECF No. 128) | 172 |

| Description | Exhibit No. |
|---|---|
| Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362 (ECF No. 91) | 173 |
| Exhibit C, Decl. of Daniel Schatt in Supp. Of Def.'s Opp. To Pl.'s Mot. for Prelim. Inj., *Alexander v. Schatt*, No. 20-CIV-02728 (Cal. Super. Ct. Aug. 27, 2020) | 174 |
| Crypto-to-Fiat Process Diagram | 175 |
| UpgradeYa Loan and Security Agreement, Apr. 20, 2020 | 176 |
| Holdings Update, Oct. 11, 2020 | 177 |
| UpgradeYa Tranche 1 Closing Statement | 178 |
| Email from L. Hua to D. Schatt, J. Grogan, and M. Zuppone, Nov. 4, 2020 | 179 |
| moKredit Diligence Checklist, Feb. 11, 2019 | 180 |
| JST Cred Exposure Summary | 181 |
| Chat log between S. Zhang and T. Perez, Jul. 8, 2019 | 182 |
| Chat log between S. Zhang and T. Perez, Dec. 4, 2019 | 183 |
| Chat log between S. Zhang and J. Alexander, Feb. 14, 2020 | 184 |

# Exhibit 11

# FILED UNDER SEAL

# Exhibit 12

# FILED UNDER SEAL

# Exhibit 13

# FILED UNDER SEAL

# Exhibit 14

# FILED UNDER SEAL

# Exhibit 15

# FILED UNDER SEAL

# Exhibit 16

# FILED UNDER SEAL

Exhibit 17

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CRED INC., *et al.*, | Case No.: 20-12836 (JTD) |
| Debtors.[1] | (Jointly Administered) |
| | **Hearing Date: December 9, 2020 at 2:00 p.m. (ET)**<br>**Objection Deadline: December 2, 2020 at 4:00 p.m. (ET)** |

## MOTION OF UPGRADEYA INVESTMENTS, LLC FOR RELIEF
## FROM STAY UNDER BANKRUPTCY CODE SECTION 362

UpgradeYa Investments, LLC ("UpgradeYa"), by and through its undersigned counsel, respectfully requests the entry of an order granting relief from the automatic stay pursuant to section 362(d) of title 11 of chapter 11 of the United States Code 11 U.S.C. §§ 101, *et seq.* (as amended or modified, the "Bankruptcy Code"), rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to allow UpgradeYa to recover its Collateral (defined below) held by the above-captioned debtors and debtors-in-possession (the "Debtors"). In support of this motion (the "Motion"), UpgradeYa filed contemporaneously herewith the *Declaration of Marc Parrish in Support of the Motion of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362* (the "Parrish Declaration") and respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

{1311.001-W0063572.}

CRED_EXAMINER_00000710

## PRELIMINARY STATEMENT[2]

The Debtors are holding (or should be holding) 478.17 of UpgradeYa's Bitcoins valued at approximately $7.3 million as of the Petition Date. UpgradeYa pledged these Bitcoins as collateral (the "Collateral") to secure a $2 million prepetition Line of Credit issued by the Debtors that UpgradeYa has fully drawn. The Collateral, which secures UpgradeYa's obligation to repay the Line of Credit, is not property of the Debtors' estates. Instead, the Debtors are merely holding the Collateral as a bailee until the Line of Credit is paid off. UpgradeYa repeatedly has informed the Debtors that it stands ready, willing and able to repay all of the obligations outstanding under the Line of Credit in return for its Collateral. However, despite the fact UpgradeYa's offered repayment would result in the injection of $2 million in cash into estates that filed for bankruptcy with a cash balance of $47,000, the Debtors have been unresponsive to these offers.

In light of the Debtors' silence, UpgradeYa seeks relief from the automatic stay to obtain its Collateral upon repayment of the Line of Credit from the Debtors.[3] As soon as UpgradeYa receives confirmation that its Collateral will be returned in full, it will repay all of the outstanding obligations under the Line of Credit and, as such, provide the Debtors with much needed liquidity for the benefit of the Debtors' estates and their creditors.

---

[2] Terms utilized but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to them in the body of this Motion.

[3] UpgradeYa also by this Motion seeks return of the Collateral from any third-party vendor used by the Debtors to hold the Collateral and/or, in the event that the Collateral was stolen or otherwise misappropriated, the Debtors' applicable insurance provider. As explained in the First Day Declaration, the Debtors' bankruptcy filing was precipitated by, among other things, a series of malfeasance and the theft of millions of dollars' worth of Bitcoin allegedly perpetrated by the Debtors' former Chief Capital Officer and an Imposter (as defined in the First Day Declaration). *See* First Day Declaration, ¶¶ 18-29, 32-34. While the Debtors have advised UpgradeYa that the Debtors are holding all of the Bitcoin UpgradeYa pledged as Collateral (*see* Parish Declaration at Exhibit J), UpgradeYa requests this relief out of an abundance of caution.

{1311.001-W0063572.}

CRED_EXAMINER_00000711

## JURISDICTION AND VENUE

1.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). UpgradeYa confirms its consent, pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory predicates for the relief sought herein are Bankruptcy Code section 362(d), Bankruptcy Rule 4001 and Local Rule 4001-1.

## FACTUAL BACKGROUND

### *The Debtors' Bankruptcy Case*

4.    On November 9, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.    The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.    As set forth in the *Declaration of Drew McManigle, Founder and Chief Executive Officer, Macco Restructuring Group, LLC* [D.I. 16] (the "McManigle Declaration"), as of November 7, 2020, the Debtors had only $47,000 in cash "available for operating," total assets of approximately $67.8 million and total liabilities of approximately $136.5 million. McManigle Declaration, p. 6; Appendix B.

3

{1311.001-W0063572.}

7.     Additional information regarding the events leading up to the Petition Date are set forth in (i) the *Declaration of Daniel Schatt in Support of Debtors' Chapter 11 Petitions and First Day Motions* [D.I. 12] (the "First Day Declaration") and (ii) the McManigle Declaration.

**The Loan and Security Agreement**

8.     UpgradeYa and Debtor Cred (US) LLC ("Cred") are parties to that certain Loan and Security Agreement (the "Agreement") dated April 20, 2020.[4] Pursuant to the Agreement, the Debtors agreed to provide UpgradeYa with a $2 million revolving line of credit (the "Line of Credit") secured by Bitcoin pledged by UpgradeYa as collateral in an amount equal to an initial maximum loan-to-value ratio of fifty percent (50%).  Agreement, § 2.1, Schedule A.  On April 21, 2020, Cred identified thirty (30) e-wallet accounts (the "Collateral Accounts") maintained by Fireblocks Inc. ("Fireblocks") to hold the Bitcoin to be deposited by UpgradeYa as collateral. Parrish Declaration, ¶ 3.  Pursuant to section 1.4 of the Agreement, UpgradeYa "may prepay principal in full or in part at any time without the payment of a prepayment fee or premium." Agreement, § 1.4.

9.     As set forth on the Form of Draw Certificate dated April 30, 2020 (the "Draw Certificate"),[5] UpgradeYa drew the full $2 million Line of Credit (the "LOC Draw").   In connection therewith, between April 23, 2020 and April 27, 2020, UpgradeYa deposited 531.3004746 Bitcoin as Collateral[6] into the Collateral Accounts.  Parrish Declaration, ¶ 3. Pursuant to the Draw Certificate, the Collateral is required to be returned to UpgradeYa "[u]pon payment in full of all principal, interest, and other amount due to [Cred]." *See*, Draw Certificate, p. 2.

---

[4] A true and correct copy of the Agreement is attached to the Parrish Declaration as **Exhibit A**.

[5] A true and correct copy of the Draw Certificate is attached to the Parrish Declaration as **Exhibit B**.

[6] On April 27, 2020, the market value of the Collateral was $4,121,010.88.  Parrish Declaration, ¶ 3.

4

{1311.001-W0063572.}

CRED_EXAMINER_00000713

10.    Pursuant to that certain Line of Credit Agreement dated April 30, 2020 between Debtor Cred LLC and UpgradeYa (the "CredEarn Agreement"),[7] UpgradeYa allocated $120,000 of the LOC Draw as a loan to the Debtors as part of the Debtors' CredEarn program that was to be used to pay the interest accrued on the Line of Credit while earning eight percent (8%) interest.  Parrish Declaration, ¶ 5.

11.    Between April 2020 and August 2020, the value of the Collateral increased substantially as a result of a rise in the price of Bitcoin.  *Id.* at ¶ 6.  Indeed, on August 20, 2020, the Collateral had a market value of $6,325,132.15 – an increase of over $2 million from the time it was initially pledged.  *Id.*  Accordingly, UpgradeYa requested to withdraw ten percent (10%) of the Bitcoin it had deposited into the Collateral Accounts to return the deposited Collateral to a loan-to-value ratio closer to the requisite fifty percent (50%).  *See id.* at ¶ 7.

12.    On August 13, 2020, the Debtors agreed to return 53.1200475 Bitcoin to UpgradeYa from the Collateral Accounts leaving 478.17 Bitcoin deposited as Collateral.  *See id.* at ¶ 9.  On August 14, 2020, the Debtors issued an updated Draw Certificate (the "Updated Draw Certificate") reflecting the reduction of the Collateral being held by the Debtors.  *See id.* at Exhibit F.

***UpgradeYa's Offer to Repay the Line of Credit and the Debtors' Bankruptcy Filing***

13.    On October 28, 2020, Cred informed UpgradeYa that it had experienced irregularities in the handling of specific corporate funds and had temporarily suspended all inflows and outflows of funds relating to the CredEarn program.  *See id.*  at ¶ 10.

14.    On October 29, 2020, UpgradeYa contacted the Debtors' Chief Executive Officer, Daniel Schatt, to inquire about the status of the Collateral being held by the Debtors and

---

[7] A true and correct copy of the CredEarn Agreement is attached to the Parrish Declaration as **Exhibit C**.

{1311.001-W0063572.}

CRED_EXAMINER_00000714

requested to settle the Line of Credit and withdraw the Collateral. *See id.* ¶ 11, Exhibit H. On October 31, 2020, Mr. Schatt responded stating "unfortunately I won't be able to provide an update for 7-10 days." *See id.* at Exhibit I. Again, on November 7, 2020, UpgradeYa contacted Mr. Schatt stating that it can fulfill its obligations and will repay the entire $2 million Line of Credit in return for its Collateral. *See id.* at ¶ 13. To date, the Debtors have not engaged UpgradeYa with respect to its offers to repay the Line of Credit and have its Collateral returned to it. *Id.* at ¶ 14.

15.    On November 10, 2020, the Debtors confirmed in writing to UpgradeYa that "we are holding 478.170 BTC as collateral for your loan of $2,000,000" and that UpgradeYa had an active CredEarn program with a balance of $73,171.47. *Id.* at Exhibit K. As of the Petition Date, the Collateral held by the Debtors had a market value of S7,322,65.38 and the outstanding amount of all obligations under the Line of Credit was $2 million. *Id.* at ¶ 16.

## **RELIEF REQUESTED**

16.    By this Motion, UpgradeYa seeks entry of an order pursuant to Bankruptcy Code section 362, Bankruptcy Rule 4001 and Local Rule 4001-1 (i) granting relief from the automatic as to the Collateral to permit UpgradeYa to seek its return or the value thereof from the Debtors, any third-part(ies) in possession of the Collateral and/or, in the event that the Collateral was stolen or otherwise misappropriated, the Debtors' applicable insurance provider pursuant to Bankruptcy Code section 362 and (ii) granting such other relief as the Court deems just and proper.

## **BASIS FOR RELIEF**

17.    The automatic stay set forth in Bankruptcy Code section 362(a) is not meant to be indefinite or absolute and this Court has the power to grant relief from the automatic stay in

CRED_EXAMINER_00000715

appropriate circumstances. *See In re Rexene Products Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (citing *In re Wedgewood*, 878 F.2d 693, 697 (3d Cir. 1989)).

18.    Pursuant to Bankruptcy Code section 362(d)(1), upon notice and a hearing, a court may lift the automatic stay for "cause." 11 U.S.C. § 362(d). The decision of whether to lift the stay for cause under section 362(d) is committed to the sound discretion of the bankruptcy court and is reviewed only for an abuse of discretion. *In re C&S Grain Co.*, 47 F.3d 233, 238 (7th Cir. 1995); *In re American Classic Voyages, Co.*, 298 B.R. 222, 225 (D. Del. 2003).

19.    "Cause" is not defined under section 362(d) of the Bankruptcy Code and is generally determined on a case-by-case basis after looking at the "totality of the circumstances." *Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997); *Rexene Products*, 141 B.R. at 576 (citing *In re Fernstrom Storage & Van Co.*, 938 F.2d 731, 735 (7th Cir. 1991)).

20.    In evaluating whether "cause" exists to modify the stay, "[a] court may consider the policies reflected in the bankruptcy code, and the interests of the debtor, other creditors and any other interested parties." *See In re Mu'min*, 374 B.R. 149, 164 (Bankr. E.D. Pa. 2007) (citing *In re Brown*, 311 B.R. 409, 412-13 (E.D. Pa. 2004)); *see also Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. Co.)*, 141 B.R. 574, 576 (Bankr. D. Del. 1992). Courts will consider: (i) the hardship to the estate if stay relief is granted; (ii) the hardship to the movant if stay relief is not granted; and, where an underlying dispute is at issue, (iii) the underlying merits. *See, e.g., In re Rexene Prods. Co.*, 141 B.R. at 576. A balancing of the relative hardships in this case favors lifting the automatic stay to permit UpgradeYa to recover its Collateral.

21.    The Debtors' estates and their creditors will not suffer any hardship and will not be prejudiced by the requested modification of the automatic stay. The Collateral is not property

7

CRED_EXAMINER_00000716

of the Debtors' estates under Bankruptcy Code section 541.[8]  Under California law,[9] title to

collateral does not pass upon hypothecation (*i.e.*, when such collateral is pledged to secure a

debt). *MacDonald v. Pac. Nat. Bank*, 66 Cal. App. 2d 357, 361-362 (1944) (where legal title to

collateral remains in pledgor, pledgee merely has a lien on the title, unless otherwise provided in

the pledge contract); *Robinson v. Raquet*, 1 Cal. App. 2d 533, 544 (1934) (where personal

property is pledged, the general property and title remain in the pledgor, subject only to a lien in

favor of the pledgee for the amount of his debt).  Instead, the party receiving the collateral to

secure the debt receives only an unliquidated, contingent interest that extinguishes upon

repayment of the debt. *See, In re Weiman*, 22 B.R. 49 (B.A.P. 9th Cir. 1982) ("This is

characteristic of security interests, generally, which lead a contingent existence with respect to

collateral until needed.").  Bankruptcy Code section 541 is clear that only the interest held by a

debtor at the commencement of the bankruptcy case becomes property of the estate. *In re Mortg.

Lenders Network, USA, Inc.*, 380 B.R. 131, 137 (Bankr. D. Del. 2007).  Thus, the Debtors are

merely acting as bailee that have, at most, an unliquidated, contingent interest in the Collateral.

*See In re Allonhill, LLC*, 2019 LEXIS 1304, *162 (Bankr. D. Del. Apr. 25, 2019) (stating that

where property is held by the debtor as bailee, agent or trustee, the property does not become

part of the debtor's estate).  As such, any interest the Debtors hold in the Collateral shall be

---

[8] On November 23, 2020, certain parties in interest (the "<u>Movants</u>") filed the *Emergency Motion of Jaime Shiller, Takashi Yanagi, Wu Chi King, Joseph Richardson, Thomas Calvert, Clint Cowen, Robin Houck, Todd Wiseman, Matthew Dixon, Jonatan Ashurov, Daniel Becker, Teppei Miyauchi, Jean Vacca, Xian Su, and Emmanuel Beaufils to Compel the Debtors to Mak Demand of Certain Cryptocurrency Exchanges to Freeze the Transfer of Certain Accounts That May Hold the Debtors' Assets* [D.I. 75] (the "<u>Emergency Motion</u>") seeking to freeze certain accounts that hold assets of the Debtors.  The relief requested in the Emergency Motion does not impact the relief requested by this Motion as the Movants only seek to protect assets of the Debtors' estates.  As explained herein, the Collateral is not property of the Debtors' estates and, as such, is not subject to the Emergency Motion.  The Movants themselves acknowledge that "there may be issues with respect to whether the bitcoin that were in the Debtors' possession are property of the Debtors' estates under Section 541, if that the Debtors were simply bailors for the actual owners who pledged or loaned their bitcoin to the Debtors." Emergency Motion, fn. 3.

[9] The Agreement is governed by the laws of California. Agreement, § 9.1.

{1311.001-W0063572.}

CRED_EXAMINER_00000717

terminated upon repayment and, pursuant to the terms of the Draw Certificate, the Collateral must be returned to UpgradeYa.

22.     Moreover, UpgradeYa has made clear to the Debtors that it is ready, willing and able to satisfy its outstanding obligations under the Line of Credit in full (and is entitled to do so pursuant to section 1.4 of the Agreement), which would extinguish any interest the Debtors possess in the Collateral.  In fact, pursuant to the Draw Certificate, upon satisfaction of all outstanding obligations under the Agreement, the Debtors are required to return the Collateral to UpgradeYa.  As such, the Debtors, their estates and their creditors will not be prejudiced if the requested stay relief is granted.

23.     By contrast, UpgradeYa may be prejudiced significantly by any further delay in the return of the Collateral.  As illustrated by the dramatic changes in the value of the Collateral over the last six (6) months as explained above, the value of Bitcoin – including the Collateral – fluctuates as its price rises and falls in the market.  As such, any delay in the return of the Collateral places UpgradeYa at substantial risk of devaluation of the Collateral.  Simply stated, there is no upside gained by the Debtors, their estates or their creditors by delaying UpgradeYa's repayment of the Line of Credit and the Debtors' return of the Collateral to UpgradeYa.  Not only is the Collateral not property of the Debtors' estates, but repayment of the Line of Credit as proposed will benefit the Debtors and their stakeholders as the Debtors' estates will receive $2 million in cash, when they otherwise only have $47,000 available for operating.  *See*, McManigle Declaration, Appendix B.

24.     Further, commencement of the Chapter 11 Cases did not enhance the Debtors' rights under the Agreement or give it greater rights in the Collateral.  *See In re TTS, Inc.*, 158 B.R. 583, 585-86 (D. Del. 1993) (explaining that a debtor does not have any greater rights to

{1311.001-W0063572.}

CRED_EXAMINER_00000718

property than the debtor had before filing for chapter 11). The Debtors are not entitled to use chapter 11 as a shield to hold the Collateral hostage. UpgradeYa has the right to prepay the Line of Credit at any time under the Agreement. The Debtors cannot refuse repayment of the Line of Credit to stall or delay return of the Collateral to UpgradeYa. Accordingly, cause exists to grant UpgradeYa relief from the automatic stay to permit it to take any and all steps necessary to recover the Collateral.

<b><u>REQUEST FOR WAIVER OF STAY</u></b>

25.    To proceed with the foregoing, UpgradeYa seeks a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 4001(a)(3), any "order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." UpgradeYa submits that the imposition of the fourteen (14) day stay would be inconsistent with the relief requested herein and UpgradeYa's need for immediate relief from the stay imposed by Bankruptcy Code section 362. As explained above, any delay in the return of the Collateral places UpgradeYa at substantial risk of the value of the Collateral deteriorating to UpgradeYa's detriment. Accordingly, UpgradeYa submits that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent applicable.

<b><u>RESERVATION OF RIGHTS</u></b>

26.    UpgradeYa expressly reserves, and does not waive, any and all of its rights, claims, causes of action, and defenses in connection with the Agreement, the Line of Credit, the Collateral, and the CredEarn Agreement under such applicable documents, the Bankruptcy Code, applicable law or otherwise against the Debtors, any successor in interest and any and all third-

10

CRED_EXAMINER_00000719

parties, including, but not limited to, the right to seek recovery from any applicable insurance policies. UpgradeYa further reserves its right to set off with respect to any and all outstanding obligations under the Line of Credit, the Agreement and the CredEarn Agreement. UpgradeYa does not waive any rights with respect to its ability to file a proof of claim or otherwise assert claims in the Chapter 11 Cases by filing this Motion and reserves all rights with respect thereto.

### NOTICE AND NO PRIOR REQUEST

27.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Debtors; (b) the Office of the United States Trustee; (c) the top twenty creditors; and (d) any party requesting notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, UpgradeYa submits that no other or further notice is required.

28.    No previous request for the relief sought in this Motion has been made to this Court or any other court.

### [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

{1311.001-W0063572.}

CRED_EXAMINER_00000720

WHEREFORE, UpgradeYa respectfully requests that the Court enter an order (i) lifting the automatic stay to permit the UpgradeYa to take any and all actions necessary to recover its Collateral from the Debtors, any third part(ies) in possession of the Collateral and/or, in the event the Collateral was stolen or otherwise misappropriated, the Debtors' applicable insurance provider and (ii) granting such other relief as the Court deems just and proper.

Dated: November 25, 2020
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Kimberly A. Brown*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

*Counsel to UpgradeYa Investments, LLC*

{1311.001-W0063572.}

CRED_EXAMINER_00000721

Exhibit 18

Story from **Business** $\rightarrow$

# Here's What Happened at Crypto Lender Cred's Latest Bankruptcy Hearing



Zoom screenshot of Judge John Dorsey

**Nathan DiCamillo**



Dec 18, 2020 at 6:01 p.m. EST

Crypto lender Cred will still be in control of its business as it heads into bankruptcy.

In an omnibus preliminary hearing on Friday, Judge John Dorsey of the Delaware Bankruptcy Court rejected a motion to appoint a Chapter 11 trustee to oversee Cred's restructuring.



The judge made the ruling with the caveat that if Cred equity holders Dan Schatt and

CRED_EXAMINER_00000722

Here's What Happened at Crypto Lender Cred's Latest Bankruptcy Hearing - CoinDesk

Lu Hua attempt to fire Cred board member Grant Lyon, who's in charge of Cred's restructuring, then the court will step in and appoint a trustee to oversee the bankruptcy. Dorsey also appointed an examiner, who will provide an independent investigation into Cred's business.

## Subscribe to The Node, our daily report on top news and ideas in crypto.

Your email address

### SUBSCRIBE

By signing up, you will receive emails about CoinDesk products and you agree to our terms & conditions and privacy policy.

"There's no evidence that anybody has done anything wrong since the [bankruptcy was filed]," said Paul Hastings LLP partner James Grogan, the attorney representing Cred in the case. "We're not here to sprinkle holy water on what the debtors did pre-petition. Nobody thinks that this company was well-run or was a model for business schools."

Cred froze withdrawals and deposits in October and declared bankruptcy in November. According to several former Cred employees, the company's Chapter 11 bankruptcy filing doesn't tell the whole story.



CRED_EXAMINER_00000723

*Read more: Bad Loans, Bad Bets, Bad Blood: How Crypto Lender Cred Really Went Bankrupt*

The motion to appoint a Chapter 11 trustee was filed by the U.S. Department of Justice (DOJ) unit that oversees the administration of bankruptcy cases. In denying the DOJ's request, Dorsey offered his thoughts on Cred's mismanagement.

"There's no doubt in my mind that there were shenanigans going on [before the bankruptcy case was filed]," the judge said before deciding not to enlist a Chapter 11 trustee.

Dorsey decided to delay a motion to allow one creditor to retrieve its crypto before the rest. The motion was filed by UpgradeYa, an investment firm that participated in Cred's borrowing program. The company wants the 478.17 BTC (now worth around $11 million) it used to secure a $2 million loan from Cred (in fiat) before other creditors get their assets back.

The company believes it's entitled to the bitcoin now because it's UpgradeYa's property and not the estate's. The judge may have to rule on whether the common



CRED_EXAMINER_00000724

bitcoin meme "not your keys, not your crypto" applies.

READ MORE ABOUT...

[Bankruptcy] [Cred] [Crypto Lending]

---

**DISCLOSURE**
The leader in blockchain news, CoinDesk is a media outlet that strives for the highest journalistic standards and abides by a strict set of editorial policies. CoinDesk is an independent operating subsidiary of Digital Currency Group, which invests in cryptocurrencies and blockchain startups.

---

Related



FUNDING ROUNDS

**Canada's CoinSmart Crypto Exchange Raises $3.5M for European Expansion**

Tanzeel Akhtar  Mar 1, 2021



MATTER LABS

**USV Leads Round in Matter Labs as Ethereum Scaling Wars Intensify**

William Foxley  Mar 1, 2021

CRED_EXAMINER_00000725

Story from **Business**  →

# Canada's CoinSmart Crypto Exchange Raises $3.5M for European Expansion

The exchange's owner is also planning a reverse takeover with the aim of listing on TSX Ventures.



*(Andy.M/Shutterstock)*

**Tanzeel Akhtar**



Mar 1, 2021 at 10:00 a.m. EST
Updated Mar 1, 2021 at 10:07 a.m. EST



Canada-based cryptocurrency exchange

CRED_EXAMINER_00000726

CoinSmart has announced the closing of a CAD$4.5 million (roughly US$3.5 million) seed funding round.

CoinSmart, owned by Simply Digital Technologies, told CoinDesk in a statement Monday the investment was raised earlier this year through the issuance of interest-bearing convertible debentures, a type of debt instrument. Investors in the round were not disclosed.

The funding will be used to expand CoinSmart's platform into European markets and support operational changes. It will also help Simply Digital Technologies prepare for a planned reverse takeover ahead of a hoped-for public listing on the TSX Venture Exchange, said the firm.

**Subscribe to The Node, our daily report on top news and ideas in crypto.**

Your email address

**SUBSCRIBE**

By signing up, you will receive emails about CoinDesk products and you agree to our terms & conditions and privacy policy.

***Read more: Canadian Bank Launching Fiat-Backed Digital Currency in Claimed World First***



CRED_EXAMINER_00000727

Enabling its European expansion, CoinSmart said it has obtained a Financial Intelligence Unit license issued in Estonia.

"CoinSmart's fundamental mission is to make cryptocurrency accessible for people of all experience levels," said CoinSmart CEO Justin Hartzman. "We're excited about the ways in which crypto can help streamline payments within Europe's financial system and subsequently better serve and protect our customers."

READ MORE ABOUT...

Exchanges  Europe  Canada

Funding Rounds  CoinFlash

**DISCLOSURE**

The leader in blockchain news, CoinDesk is a media outlet that strives for the highest journalistic standards and abides by a strict set of editorial policies. CoinDesk is an independent operating subsidiary of Digital Currency Group, which invests in cryptocurrencies and blockchain startups.

Related



CRED_EXAMINER_00000728

BITCOIN MARKETS

### Investing in Cryptocurrencies Is 'Not Prudent,' Says New York Attorney General

**Zack Voell**  Mar 1, 2021

BITCOIN

### Bitcoin Heads Back Toward $50K, Rebounding From Disastrous Week

**Omkar Godbole**  Mar 1, 2021



About

Masthead

Ethics Policy

Contributors



Jobs

Events

CRED_EXAMINER_00000729



## Follow us

🐦 f in

Sign up for our newsletters    LEARN MORE →

### Crypto Long & Short
Weekly insights, news and analysis tailored for the
professional investor.

### First Mover
From big moves to deep insights, everything you need
to make sense of the crypto markets and beyond.

### Market Wrap
A daily digest of what's happening in crypto markets –
and what it means.

### Money Reimagined
Exploring the transformation of value in the digital age.

### State of Crypto
How policy and regulation impact the crypto world –
and the other way around.

### The Node
What the crypto world is talking about today.

### Valid Points
Breaking down Ethereum 2.0 and its sweeping impact
on crypto markets, weekly.

*By signing up, you will receive emails about CoinDesk products and
you agree to our terms & conditions and privacy policy*

Enter your email

SIGN UP



& Conditions

CRED_EXAMINER_00000730

Privacy Policy

Newsletters

© 2021 CoinDesk

English ▾

The leader in blockchain news, CoinDesk is a media outlet that strives for the highest journalistic standards and abides by a strict set of editorial policies. CoinDesk is an independent operating subsidiary of Digital Currency Group, which invests in cryptocurrencies and blockchain startups.



CRED_EXAMINER_00000731

Exhibit 19

Cryptocurrencies

## Crypto hedge funds struggle to recover from 'bloodbath' | Free to read

Volatility in cryptocurrency prices causes big losses for highly-leveraged funds



A 39 per cent drop in the price of bitcoin on March 12 caught many funds by surprise © FT montage

Laurence Fletcher in London MAY 20 2020

Vlad Matveev has learnt the hard way how volatile cryptocurrency hedge funds can be.

The 50-year-old Muscovite invested $250,000 last year with California-based Cryptolab Capital, which targeted double-digit gains from trading crypto regardless of whether the market rose or fell. But Mr Matveev said his investment fell 98.5 per cent in value when the fund folded in this year's coronavirus-induced turmoil.

"I don't really know what happened," said Mr Matveev, a fund manager-turned-private investor. "They said they had a diversified set of strategies."

Investors have been drawn to crypto hedge funds by the promise of big returns compared with the paltry or negative yields on offer from cash or bonds. This year, bitcoin has emerged from the big March sell-off as one of the best-performing assets: up 36 per cent for the year, compared with the S&P 500's 8 per cent fall.

Price discrepancies between the same assets on different exchanges, which have long been arbitraged away in stock and bond markets but still exist in crypto, also offer traders a way to make money. The total value of the crypto market comes to $265bn, according to coinmarketcap.com.

CRED_EXAMINER_00000732

But achieving those returns has often proved a bumpy ride for hedge fund investors. A 39 per cent drop in the price of bitcoin on March 12 caught many funds by surprise, leading to large losses and some fund closures, particularly among those running high levels of risk.



### Crypto hedge funds offer a bumpy ride to strong gains

Monthly average performance of crypto hedge funds and wider hedge fund sector (%)

Source: HFR
© FT

"It's an understatement to say it's a bloodbath across the board," said Edouard Hindi, partner at Mayfair-based hedge fund Tyr Capital. Tyr is one of the better-performing crypto funds this year, up 11 per cent.

Performance in the crypto hedge fund sector tends to swing more wildly than in other, more mainstream strategies, where the arrival of large institutional investors over the past decade has damped risk-taking. Crypto funds on average lost 26.2 per cent in March, according to hedge fund research group HFR, their second-worst monthly loss in data stretching back to 2015 and much greater than the 8.4 per cent average loss suffered by mainstream hedge funds.

But a 19.5 per cent gain last month has lifted crypto hedge fund returns this year to 13.4 per cent, HFR said — much better than the average 6.7 per cent year-to-date loss across the wider hedge fund industry.

CRED_EXAMINER_00000733

"The speed and depth [of the bitcoin sell-off] wasn't what we were expecting," said Dan Morehead, former head of macro trading at Tiger Management and founder of California-based Pantera Capital. Mr Morehead said he worked 20 days straight during those choppy markets, including staying in the office until 2am on March 24.

Pantera, which at $500m in assets is one of the sector's biggest players, suffered a 33.6 per cent loss in its Digital Asset fund in March, although it has recovered to stand up 32.5 per cent this year.



Bitcoin rebounds from sell-off as one of 2020's top-performing assets

Bitcoin/US dollar swap rate

Pricing on Bitstamp exchange
Source: Refinitiv
© FT

One big source of volatility was the large amount of leverage taken on by some traders, which amplified already-wild swings in cryptocurrency prices. Some exchanges offer derivative contracts that can be up to 100 times leveraged, and automatically liquidate losing positions beyond a certain point, which can exacerbate falls.

"Some futures exchanges offer almost insane amounts of leverage," Mr Morehead said. "Bitcoin is such high-octane stuff that putting on any leverage is unnecessary."

CRED_EXAMINER_00000734

Before its collapse, Cryptolab told investors it was developing new trading strategies to profit in periods of high volatility and was aiming to become "more 'all-weather'", according to a letter seen by the Financial Times. The firm did not respond to a request for comment.

London-based Cambrial Capital also shut its crypto-focused fund of funds after the March sell-off, although it said this was because of the outlook for fundraising, and planned to focus instead on advisory work.

The treacherous market has not put off some of the hedge fund industry's biggest players. Paul Tudor Jones, founder of Tudor Investment Corporation, recently said his funds would be able to trade bitcoin futures, while Renaissance Technologies' flagship Medallion fund has also been eyeing crypto.

Bulls looking for a recovery believe their argument has been strengthened by central banks' efforts to combat the economic damage from coronavirus with big cuts in interest rates and extensive bond-buying programmes.

"Cryptocurrencies, particularly bitcoin, are an attractive portfolio hedge against currency debasement and inflation," billionaire investor Mike Novogratz, founder of Galaxy Digital, told the FT.

A much-heralded halving of the rate at which new bitcoins are produced has also driven interest, including some "wild predictions" about the price, said Manuel E De Luque Muntaner, head of investment firm Block Asset Management.

However, risks remain, not least the lack of a central authority to offer support in times of crisis.

"There's no government or central bank to come in and save the . . . market," said Tyr's Mr Hindi. "In crypto, we have to lick our own wounds."

laurence.fletcher@ft.com

Copyright The Financial Times Limited 2021. All rights reserved.

CRED_EXAMINER_00000735

# Exhibit 20

# FILED UNDER SEAL

Exhibit 21

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
|  | ) |  |
| Debtors.[1] | ) | **Re: Docket No. 296** |
|  | ) |  |

**DECLARATION OF JOSEPH PODULKA IN SUPPORT OF DEBTORS' OBJECTION**
**TO MOTION OF JAMES ALEXANDER TO DISMISS THE**
**CRED CAPITAL, INC. CASE**

I, Joseph Podulka, declare and state under penalty of perjury as follows:

1.      I submit this declaration (the "Declaration") in support of the *Debtors'*

*Objection to Motion of James Alexander to Dismiss the Cred Capital, Inc. Case* (the

"Objection").[2]

2.      I served as Chief Financial Officer ("CFO") of Cred Inc. ("Cred") from 2019

until the end of my employment in December 2020.

3.      I am over the age of 18 and am familiar with the matters herein, and if called

upon to testify, I could and would testify competently to the facts set forth herein.

4.      Except as otherwise indicated herein, all facts set forth in this Declaration are

based on my personal knowledge or learned from my review of relevant documents.

**Cred Capital's Formation**

5.      I understood that Cred Capital, Inc. ("Cred Capital") was going to be set up as a

subsidiary of Cred, with Cred controlling the subsidiary.  This understanding was further

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax
identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred
Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third
Avenue, San Mateo, California 94401.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Objection.

reinforced by a mid-March e-mail thread I was a included on, where James Alexander, the

Debtors' Chief Capital Officer and individual largely responsible for setting up Cred Capital,

told Dan Wheeler, the Debtors' General Counsel, that: (i) Cred Capital would be governed by a

three-person board controlled by Cred and including myself and Mr. Alexander as well as a

purported third-party investor named Zobar Agha, and (ii) no Cred employee would receive

equity in Cred Capital. To my knowledge, neither Cred nor Cred Capital received any

investment from Mr. Agha, nor am I aware of any outsider investing in Cred Capital.

**Cred Capital's Post-Formation**

6.      In my role as CFO of Cred, I was responsible for the Debtors' corporate cash

management.  As Cred Capital incurred expenses, it would usually send my department those

expenses for payment by Cred.  Cred paid for Cred Capital's expenses, including the salaries of

the Cred employees that also worked on behalf of Cred Capital.

7.      As part of my work as CFO of Cred, in late May I asked Mr. Wheeler to send me

Cred Capital's governance documents, and thereafter discovered Mr. Alexander had not set up

Cred Capital as instructed.  I was previously unaware of the content of Cred Capital's

governance documents and was also unaware the documents had ever been finalized.  Around

this time I also discovered that Mr. Alexander had been searching for new office space for Cred

Capital and that Mr. Alexander had made himself an administrator on the Debtors' HR

platform, Sequoia One, neither of which had been authorized by Cred.

8.      At this point, I contacted Daniel Schatt, the Debtor's CEO, and informed him of

what I had learned. Mr. Schatt then emailed Mr. Alexander, Mr. Wheeler, and me as a group

about the governance documents and asked that they be corrected.

CRED_EXAMINER_00000755

9.      On June 22, 2020, Cred filed an Amended and Restated Certificate of Incorporation and adopted new bylaws which were consistent with Cred's original intent, giving control of Cred Capital to Cred.

10.     On June 26, 2020, Mr. Alexander's employment with Cred was terminated.

11.     On June 29, 2020, I caused Cred to file a Certificate of Correction with the Delaware Secretary of State to make Mr. Schatt and myself the original members of the Board of Directors.

12.     Following these actions, I discovered that on the evening of June 24, 2020, Mr. Alexander had instructed Daniyal Inamullah, the Vice President of Capital Markets at Cred, to move 225 bitcoin and about $200,000 USD coin, which is currently worth more than $7.5 million, from Cred Capital's Fireblocks account to blockchain addresses that did not belong to either Cred or Cred Capital or to any of their custodians or asset managers.  Mr. Inamullah transferred that cryptocurrency from the Debtors' Fireblocks account to the other blockchain addresses.

[*Remainder of Page Intentionally Left Blank*]

CRED_EXAMINER_00000756

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: January 29, 2021

/s/ Joseph Podulka_____
Joseph Podulka

CRED_EXAMINER_00000757

Exhibit 22

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON      10/15/2020
By      /s/ Anthony Berini
           Deputy Clerk

1  Gary S. Lincenberg - State Bar No. 123058
   glincenberg@birdmarella.com
2  Thomas V. Reichert - State Bar No. 171299
   treichert@birdmarella.com
3  Christopher J. Lee - State Bar No. 322140
   clee@birdmarella.com
4  BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
   DROOKS, LINCENBERG & RHOW, P.C.
5  1875 Century Park East, 23rd Floor
   Los Angeles, California 90067-2561
6  Telephone: (310) 201-2100
   Facsimile: (310) 201-2110
7
   Attorneys for Plaintiff James Alexander
8

9  ### SUPERIOR COURT OF THE STATE OF CALIFORNIA

10  ### COUNTY OF SAN MATEO, SOUTHERN BRANCH

11

12  James Alexander,

                          CASE NO. 20-CIV-02728

13          Plaintiff,

                          **FIRST AMENDED COMPLAINT FOR:**

14      vs.

                          **(1) DECLARATORY RELIEF;**

15  Daniel Brian Schatt and Does 1 to 25,

                          **(2) BREACH OF ORAL CONTRACT;**

16          Defendant.

                          **(3) CONVERSION;**

17                            **(4) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;**

18

19                            **(5) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS.**

20                            **DEMAND FOR JURY TRIAL**

21

22      1.    James Alexander ("Alexander" or "Plaintiff") is an individual who resides in

23  Los Angeles, California and is a citizen of the State of California.

24      2.    Defendant Daniel Brian Schatt ("Schatt" or "Defendant"), is an individual

25  who resides in San Mateo, California, and is a citizen of the State of California.

26      3.    The true names and capacities, whether individual, corporate, associate, or

27  otherwise of defendants named herein as Does 1 through 25, inclusive, are unknown to

28  Alexander who therefore names these defendants by such fictitious names.  Alexander will

3676399.1

CRED_EXAMINER_00000758

1  amend this Complaint to show the true names and capacities of these defendants when the

2  same have been ascertained. Alexander is informed and believes that each fictitiously

3  named defendant is responsible in law and in fact for the conduct alleged herein.

4  **JURISDICTION AND VENUE**

5      4.      Jurisdiction is proper in the Superior Court for the State of California in and

6  for the County of San Mateo pursuant to Section 410.10 of the California Code of Civil

7  procedure because it has general subject matter jurisdiction and no statutory exceptions to

8  jurisdiction exist.  The amount in controversy exceeds the jurisdictional minimum of this

9  Court.

10     5.      Venue is proper in the County of San Mateo pursuant to section 395 of the

11  California Code of Civil Procedure because Defendant Schatt is a resident of San Mateo

12  County.

13  **FACTS**

14     6.      Cred Capital, Inc. ("Cred Capital") was incorporated in Delaware in March

15  2020 as an affiliated company with Cred, Inc., the successor-in-interest to Cred, LLC

16  ("Cred, Inc."), to independently pursue investment management and capital markets

17  activities in the digital asset (crypto) class.

18     7.      Cred Capital was formed by a third party sole incorporator pursuant to

19  certain oral and written agreements between Scott Podulka ("Podulka"), Alexander and

20  Schatt.  Among the material provisions of the agreement were the following:

21          a)  Alexander would assume the role of President of Cred Capital, and

22              Podulka would assume the role of CFO;

23          b)  Following its incorporation, Alexander would become the initial director

24              of Cred Capital;

25          c)  Cred Capital and Cred, Inc. would enter into an Asset Management

26              Agreement that would give Cred Capital the exclusive right to manage

27              Cred, Inc.'s assets for a period of two years;

28          d)  Cred Capital would seek to act as asset manager for entities other than

3676399.1

2

First Amended Complaint

CRED_EXAMINER_00000759

1    Cred;

2    e) Cred Capital would not be structured as a wholly-owned subsidiary of

3       Cred, but instead would have additional outside investors and additional

4       outside clients;

5    f) Cred Capital would be capitalized in part by Cred, Inc. and in part by

6       third party investors, who would provide Alexander through a proxy with

7       effective control of Cred Capital;

8    g) Cred Capital would operate as an autonomous entity beginning on April

9       1, 2020;

10   h) To reduce administrative expense, Cred Capital and Cred, Inc. would

11      enter into a shared services agreement to facilitate each entity's operation.

12   8.    Following Cred Capital's incorporation, Alexander became the President of

13   Cred Capital and its sole Director. He was previously employed as Head of Capital

14   Markets by Cred, Inc., but upon assuming the role of President of Cred Capital, he left this

15   position.

16   9.    As part of its incorporation, Cred Capital was established with two separate

17   classes of stock. The "A" Shares have voting rights, while the "B" shares do not.

18   10.   As had been intended and agreed among Alexander, Schatt and Podulka,

19   Alexander secured an investor who was granted Class A shares in exchange for his

20   investment. This investor became the sole shareholder holding Class A (voting) shares.

21   11.   Cred, Inc. and Lu Hua were each granted Class B shares in Cred Capital in

22   exchange for certain contributions of assets. Class B shares have no voting rights.

23   12.   Schatt is the CEO of Cred, Inc., its founder and a principal investor.

24   13.   In March and April 2020, Alexander and Schatt implemented several of the

25   provisions addressed above, including but not limited to the following:

26   a) Cred Capital and Cred, Inc. entered into an Asset Management

27      Agreement in March 2020, which in fact gave Cred Capital the exclusive

28      right to manage Cred. Inc.'s assets for a period of two years;

CRED_EXAMINER_00000760

b) In April 2020 Cred Capital was capitalized in part by Cred, Inc. and third party investors;

c) Cred Capital began operating as an autonomous entity on April 1, 2020, with three employees and five consultants.

14.    In May 2020, a draft shared services agreement between Cred, Inc. and Cred Capital was circulated, but Schatt declined to sign it or further negotiate its terms.

15.    Beginning in May 2020, as it began to become apparent that Cred. Inc. was undercapitalized, Schatt began sending a series of emails to Alexander demanding control of Cred Capital and revisions to the various written and oral agreements already in place between Cred, Inc. and Cred Capital.  Schatt also began to demand that Cred Capital's structure be altered to provide majority voting rights to the B Class investors.  All of these demands were contrary to the prior agreement of the parties regarding the structure and governance of Cred Capital.

16.    On June 23, 2020, Schatt informed Alexander that, due to a purported error in the incorporation documents for Cred Capital, everything that Alexander had subsequently done as the sole director was a nullity.  Schatt further stated that he had caused Cred Capital to be re-incorporated, with only a single class of shares, wiping out the investment for the "A" Shares shareholder, and that Schatt was unilaterally reconstituting the Cred Capital board and ownership structure to strip Alexander of his position as director, his position as President, and voting control.

17.    Attached to this email was a document that had been filed with the Delaware Secretary of State purporting to appoint Schatt and Podulka as directors and officers of Cred Capital.  The document thus purported to remove Alexander as the sole director and as an officer of Cred Capital.

18.    Mr. Schatt's actions were transparently pretextual, illegal, and based on a false premise.

19.    Although Schatt's justification for his actions was a defect in the incorporation documents for Cred Capital, by the time Schatt acted that defect had been

CRED_EXAMINER_00000761

1  cured by the sole incorporator; prior to this time, the incorporator had confirmed the

2  appointment of Alexander as the sole director of Cred Capital.

3      20.    Schatt is a shareholder of Cred, Inc.  Cred, Inc. is a Class B shareholder of

4  Cred Capital.  It has no voting rights as to Cred Capital.  Schatt has no voting rights as to

5  Cred Capital.

6      21.    Schatt's purported changes in the capital structure and governance of Cred

7  Capital are of no force and effect.

8      22.    On June 26, 2020, Schatt purported to terminate Alexander's employment

9  relationship with Cred, Inc.; while Alexander had already begun working for Cred Capital,

10  the effect of Schatt's actions has been effectively to remove him from his employment at

11  either Cred or Cred Capital.  These actions have included locking him out of his Cred

12  Capital corporate email and other technology resources registered to Cred Capital, through

13  which he was conducting business with present and prospective clients as Cred Capital's

14  President.  Schatt has effectively expelled Alexander from Cred Capital, although

15  Alexander is the lawfully-appointed President and sole Director of Cred Capital and Schatt

16  has no actual authority over the operation of Cred Capital.

17      23.    Cred and Cred Capital are separately incorporated entities that are separately

18  capitalized.  To the extent that Schatt took any of these adverse actions against Alexander,

19  he did so not on the basis of his position with Cred, but instead did so personally.  Further,

20  as an investor in Cred, he had a personal interest in seeking to increase its assets at a time

21  that a review suggested that Cred was, in fact, insolvent.  Schatt was acting for his own

22  advantage in taking the actions against Alexander alleged herein.

23      24.    Schatt interfered with Alexander's employment by, operation and

24  management of Cred Capital in many ways, including but not limited to, the following:

25          a) Schatt has fraudulently gained control of Cred Capital's credcapital.io

26              domain and now has unauthorized access to confidential and proprietary

27              data (G Suite);

28          b) Schatt has fraudulently gained administrative control of Cred Capital's

3676399.1

5

CRED_EXAMINER_00000762

1    bank accounts (Silvergate);

2    c)  Schatt has fraudulently gained administrative control of Cred Capital's

3        employee benefits (Sequoia One);

4    d)  Schatt has excessively and unnecessarily allocated Cred, Inc.'s own

5        expenses to Cred Capital;

6    e)  Schatt has attempted to co-opt Cred Capital's employees after the

7        employees were expressly hired to work for Cred Capital only;

8    f)  Schatt has called Cred Capital employees and consultants and informed

9        them that Alexander is no longer employed by Cred, Inc. and no longer in

10       control of Cred Capital; and

11   g)  Shatt has communicated with current and prospective Cred Capital

12       clients, falsely claiming that Cred Capital is now a wholly-owned

13       subsidiary of Cred, Inc.

14   25.    Schatt's interference with Alexander's employment by and operation of Cred

15   Capital has caused economic harm to Alexander personally as well as the loss of business

16   opportunities for Cred Capital worth in excess of $1 million.  In addition, Schatt has acted

17   with oppression, fraud and malice, entitling Alexander to punitive damages.

18                              **FIRST CAUSE OF ACTION**

19                                **(Declaratory Relief)**

20   26.    Alexander incorporates and realleges each of the preceding paragraphs 1

21   through 25 as if fully incorporated herein.

22   27.    An actual controversy has arisen and now exists between Alexander and

23   Schatt concerning their respective rights and duties, in that Alexander contends that he is

24   the sole authorized director of Cred Capital, that Cred Capital was properly incorporated

25   and that it is properly operating, and that Schatt's steps to recapitalize and reincorporate

26   Cred Capital are without force and effect, whereas Schatt disputes these contentions and

27   contends that his actions are valid and legitimate.

28   28.    Alexander desires a judicial determination of the parties rights and duties,

CRED_EXAMINER_00000763

1  and a declaration that Schatt's action are in breach of their prior oral and written

2  agreements and are invalid and of no force.

3     29.    A judicial declaration is necessary and appropriate at this time under the

4  circumstances in order that Alexander may ascertain his rights and duties.

5     30.    The ongoing legal uncertainty resulting from Schatt's purported termination

6  and lockout of Alexander and reincorporation and recapitalization of the company is

7  damaging Alexander, damaging the company, and hampering Alexander's ability to

8  properly operate the business, and is causing the loss of business opportunities valued in

9  excess of $1 million.

10                        **SECOND CAUSE OF ACTION**

11                          **(Breach of Oral Contract)**

12     31.    Alexander incorporates and realleges each of the preceding paragraphs 1

13  through 30 as if fully incorporated herein.

14     32.    On or around March 2020, Alexander, Podulka and Schatt entered into an

15  oral agreement whereby the parties agreed that Alexander would direct and run Cred

16  Capital as an independent autonomous entity from Cred, Inc. as outlined in the foregoing

17  paragraphs.

18     33.    Alexander has performed all of the conditions, covenants, and promises

19  required of him in accordance with the terms and conditions of their oral agreement,

20  except where such performance has been excused.

21     34.    Defendant breached his oral agreement with Alexander by, among other

22  actions:

23         a)  Refusing to negotiate and execute the shared services agreement;

24         b)  Attempting to take control of Cred Capital, including by way of a false

25             and pre-textual excuse; and

26         c)  Interfering in ongoing business opportunities available to Alexander as

27             President and controlling shareholder of Cred Capital.

28     35.    As a result of these and other breaches of by Schatt, Alexander has been

3676399.1                                     7

CRED_EXAMINER_00000764

1  purportedly been removed from his position as director and President of Cred Capital and
2  has been locked out of his employment.

3      36.    Schatt has breached his oral contract with Alexander, who has been damaged
4  by Defendant's actions in excess of $1 million.

5                          **THIRD CAUSE OF ACTION**

6                                 **(Conversion)**

7      37.    Alexander incorporates and realleges each of the preceding paragraphs 1
8  through 36 as if fully incorporated herein.

9      38.    Alexander had a property interest in a controlling bloc of Cred Capital stock
10 by way of a proxy from a third party investor.

11     39.    Schatt intentionally and substantially interfered with Alexander's property by
12 filing an amended and restated Certificate of Incorporation of Cred Capital on June 22,
13 2020, and wrongfully taking possession of Alexander's shares, based on a false and pre-
14 textual defect in the original incorporation documents.

15     40.    Schatt's conduct in removing Alexander as the sole shareholder, President
16 and sole person with voting authority over Cred Capital was taken in his personal capacity
17 and for his personal benefit.

18     41.    Alexander did not consent in any manner to Schatt's wrongful change to the
19 governance and capital structure of Cred Capital, Schatt's removal of Alexander as an
20 officer and director of Cred Capital, and Schatt's termination of him as an employee of
21 Cred Capital.

22     42.    Alexander was damaged in his property interest.

23     43.    Schatt's conduct was undertaken with oppression, fraud and malice and was
24 a substantial factor in causing Alexander's harm.

25                         **FOURTH CAUSE OF ACTION**

26    **(Intentional Interference with Prospective Economic Relations)**

27     44.    Alexander incorporates and realleges each of the preceding paragraphs 1
28 through 43 as if fully incorporated herein.

3676399.1

8

First Amended Complaint

45. Schatt intentionally interfered with Alexander's and Cred Capital's prospective economic relationships, including Alexander and Cred Capital's relationship with other entities whose assets they were potentially contracted to manage and would have resulted in a future economic benefit to Alexander and Cred Capital.

46. Schatt knew of Alexander and Cred Capital's relationship with these other entities through his fraudulent and unauthorized access to Cred Capital's technology infrastructure, notably email and data storage; and his understanding that Cred Capital's business plan was to serve as an asset manager not only for Cred, Inc., but for other entities as well.

47. Schatt knew that Alexander's success hinged on Alexander's ability to lead Cred Capital independently of interference from Cred, Inc.

48. The prospective economic relationship between Alexander and Cred Capital, on the one hand, and other potential asset management clients on the other, was potentially disrupted because of Schatt's wrongful conduct.

49. As a proximate result of Schatt's wrongful conduct, Alexander has been damaged in an amount to be proven at trial, but in an amount not less than $1 million. In addition, Schatt has acted with oppression, fraud and malice, entitling Alexander to punitive damages.

## FIFTH CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Relations)

50. Alexander incorporates and realleges each of the preceding paragraphs 1 through 43 as if fully incorporated herein.

51. A valid contract existed between Alexander and Cred Capital whereby Alexander was employed by Cred Capital as its sole director as well as its President.

52. Schatt was aware of this contract between Alexander and Cred Capital.

53. As alleged above, Schatt took intentional acts designed to induce a breach or disruption of the contractual relationship between Alexander and Cred Capital.

54. As a result of Schatt's actions, there was an actual breach or disruption of the

CRED_EXAMINER_00000766

relationship between Alexander and Cred Capital.

55.    Alexander has been damaged as a result of Schatt's actions.

### REQUEST FOR RELIEF

WHEREFORE, Alexander requests that this Court grant the following relief:

1.    For a declaratory judgment of the parties respective rights;

2.    For injunctive relief;

3.    For general and special damages in an amount to be proven at trial not less than $1 million;

4.    For punitive damages according to proof at trial;

5.    For Alexander's costs and reasonable attorneys' fees incurred herein;

6.    For pre-judgment and post-judgment interest on all damages at the highest rate allowed by law from the date of injury until paid in full; and

7.    For such other and further relief as the Court deems just and proper.

DATED:  October 15, 2020

Gary S. Lincenberg
Thomas V. Reichert
Christopher J. Lee
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.

By: _____
Thomas V. Reichert
Attorneys for Plaintiff James Alexander

### DEMAND FOR JURY TRIAL

Alexander hereby demands a jury trial.

CRED_EXAMINER_00000767

1  DATED:  October 15, 2020         Gary S. Lincenberg
                                    Thomas V. Reichert
2                                   Christopher J. Lee
                                    Bird, Marella, Boxer, Wolpert, Nessim,
3                                   Drooks, Lincenberg & Rhow, P.C.

4

5

6                                   By: _____
                                              Thomas V. Reichert
7                                      Attorneys for Plaintiff James Alexander

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3676399.1
                                    11
                            First Amended Complaint

CRED_EXAMINER_00000768

**PROOF OF SERVICE**

*James Alexander v. Daniel Brian Schatt, et al.*
**Case No. 20-CIV-02728**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 1875 Century Park East, 23rd Floor, Los Angeles, CA 90067-2561.

On October 15, 2020, I served the following document(s) described as **FIRST AMENDED COMPLAINT FOR** on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused the document(s) to be sent from e-mail address sramirez@birdmarella.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 15, 2020, at Los Angeles, California.

Sandra A. Ramirez

3676399.1

12

First Amended Complaint

CRED_EXAMINER_00000769

1

2

**SERVICE LIST**
*James Alexander v. Daniel Brian Schatt, et al.*
**Case No. 20-CIV-02728**

3

Peter M. Stone
Austin M. Prouty
Paul Hastings LLP
1117 S. California Avenue
Palo Alto, CA
94304
Telephone: (650) 320-1843
Email: peterstone@paulhastings.com
Email: austinprouty@paulhastings.com
**Counsel for Defendant Daniel Brian
Schatt**

4

5

6

7

8

D. Scott Carlton
Paul Hastings LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071
Telephone: (213) 683-6113
Email: scottcarlton@paulhastings.com
**Counsel for Defendant Daniel Brian
Schatt**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3676399.1

13

First Amended Complaint

Exhibit 23

1  PAUL HASTINGS LLP
   PETER M. STONE (SB# 157994)
2  peterstone@paulhastings.com
   1117 S. California Avenue
3  Palo Alto, CA 94304-1106
   Telephone: 1(650) 320-1800
4  Facsimile: 1(650) 320-1900

5  D. SCOTT CARLTON (SB# 239151)
   scottcarlton@paulhastings.com
6  515 South Flower Street
   Twenty-Fifth Floor
7  Los Angeles, CA 90071-2228
   Telephone: 1(213) 683-6000
8  Facsimile: 1(213) 627-0705

9  Attorneys for Plaintiffs
   Cred Inc. (f/k/a Cred LLC), Cred Capital, Inc.,
10 and Cred (US) LLC

**Electronically**
**FILED**
by Superior Court of California, County of San Mateo
ON        8/14/2020
By        /s/ Rjay Dominia
              Deputy Clerk

11          SUPERIOR COURT OF THE STATE OF CALIFORNIA

12          FOR THE COUNTY OF SAN MATEO – UNLIMITED JURISDICTION

13 CRED INC. (F/K/A CRED LLC) and CRED
   CAPITAL, INC.,
14
15          Plaintiffs,
16     vs.
17 JAMES ALEXANDER, and DOES 1-25,
18          Defendants.
19
20
21
22
23
24
25
26
27
28

CASE NO. 20-CIV-02915

***VERIFIED*** **FIRST AMENDED**
**COMPLAINT FOR:**

(1) **CONVERSION OF DIGITAL**
    **ASSETS;**
(2) **DECLARATORY AND**
    **INJUNCTIVE RELIEF;**
(3) **BREACH OF EMPLOYMENT**
    **CONTRACT;**
(4) **BREACH OF THE IMPLIED**
    **COVENANT OF GOOD FAITH**
    **AND FAIR DEALING;**
(5) **BREACH OF FIDUCIARY DUTY OF**
    **LOYALTY/ VIOLATION OF CAL.**
    **LABOR CODE § 2863;**
(6) **BREACH OF EMPLOYEE LOAN**
    **AGREEMENT AND PLEDGE**
    **AGREEMENT; AND**
(7) **CONVERSION OF LBA TOKENS**

Action Filed:  July 15, 2020

DEMAND FOR JURY TRIAL

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER FORMS OF
RELIEF

CRED_EXAMINER_00000771

## INTRODUCTION

1.      Plaintiffs Cred Inc. (f/k/a Cred LLC) ("Cred"), Cred Capital, Inc. ("Cred Capital"), and Cred (US) LLC ("Cred (US)" and collectively with Cred and Cred Capital, the "Plaintiffs") bring the above-captioned action seeking relief to prevent Defendant James Alexander ("Defendant" or "Alexander") from absconding with over $2 million dollars' worth of cryptocurrency that he was entrusted with pursuant to his employment at Cred but which he has taken for his own use.  Plaintiffs also seeks compensatory and punitive damages for Alexander's conversion; breach of his employment contract; breach of his employee loan and pledge agreements; breach of the implied covenant of good faith and fair dealing; and breach of the fiduciary duty of loyalty.

2.      The facts of this action are egregious.  In 2018, Cred hired Alexander, as an at-will employee, for a position as Cred's Chief Capital Officer.  As an officer of Cred, Alexander owed Cred a fiduciary duty of loyalty.  And, among such other duties to Cred, Alexander agreed in his employment agreement to not "engage in any other employment, occupation, consulting or other business activity directly related to the business in which [Cred] is now involved or becomes involved during the term of [his] employment, nor will [he] engage in any other activities that conflict with [his] obligations to the Company."

3.      In early 2020, Cred assigned Alexander to set up and manage Cred Capital, Inc. ("Cred Capital"), a Cred subsidiary that was to use the Cred brand name, house a new business line for the Cred enterprise, and to facilitate the organization of Cred Capital.  Cred Capital was supposed to be managed by a three-member board of directors, made up of two Cred employees and a third-party investor, with Cred owning a majority of the subsidiary's voting stock.

4.      On March 15, 2020, Alexander informed Cred that Cred Capital was organized in accordance to this structure.  But in actuality, Alexander tried to usurp control over Cred Capital.  Contrary to the Cred's directives, Alexander purported to unilaterally appoint himself as the sole director of the subsidiary.  He did this, in part, by purporting to issue all of Cred Capital's voting stock to a third-party, which "investor" never provided any investment to Cred Capital but instead supposedly gave a proxy to Alexander to vote his shares.  Cred was to be left only with

- 1 -

CRED_EXAMINER_00000772

1  non-voting shares and no control over its own subsidiary bearing its own name and using its

2  resources.

3       5.    Despite Alexander's conduct, Plaintiffs tried to resolve this dispute out of Court.

4  Once Cred learned of Alexander's wrongful actions, Cred informed Alexander that Cred Capital

5  was not organized and managed in accordance to Cred's specifications and that all Cred entities,

6  including subsidiaries like Cred Capital, were to operate as *one enterprise*.   Yet, Alexander

7  rebuffed Cred's attempts to provide an opportunity to correct his misconduct.  Alexander instead

8  asserted his alleged unilateral control over Cred Capital and suggested that the subsidiary was

9  completely independent of, and adverse to, Cred.

10      6.    Cred was therefore forced to fix Alexander's malfeasance.   Acting under

11 Delaware governing law, Cred has filed and the Delaware Secretary of State has accepted a

12 proper corrected corporate charter for Cred Capital that seats the Cred officers in control of Cred

13 Capital and fixes the stock ownership so that Cred properly owns and controls its own subsidiary

14 bearing its name and using its resources.

15      7.    Upon reassuming proper control of Cred Capital, however, Plaintiffs have now

16 discovered that Alexander also caused the unauthorized transfer of over $2 million dollars' worth

17 of Bitcoin and USD Coin ("USDC") (the "Digital Assets") that belong to Plaintiffs to blockchain

18 addresses not in Plaintiffs' control or in the control of Plaintiffs' asset managers or custodians.

19 Instead, Alexander surreptitiously and intentionally transferred the Digital Assets to addresses

20 that are owned or controlled by him.

21      8.    Plaintiffs wrote Alexander demanding the return of the Digital Assets, but

22 Alexander has refused to return the over $2 million dollars' worth of the Digital Assets back to

23 Plaintiffs.  In order to prevent further dissipation of its assets, Plaintiffs are thus forced to take

24 swift measures, including initiating this action, to regain control over their property.

25      9.    In addition, Cred (US) extended Alexander a line of credit under an employee

26 loan agreement.   When Alexander was terminated from Cred, the line of credit immediately

27 matured and all outstanding debt under the line of credit was required to be paid in full.  Upon

28 Cred (US)'s demand, Alexander failed to repay the obligation to Cred (US), and therefore is in

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER FORMS OF
RELIEF

CRED_EXAMINER_00000773

1    default under the employee loan agreement.  He also failed to turn over pledged collateral (e.g.,

2    LBA tokes), which constitutes a conversion of Cred (US) property and further breach of his

3    employee loan and pledge agreements.

4          10.      Plaintiffs are entitled to injunctive relief preventing Alexander from any further

5    dissipation of Plaintiffs' property or assets, including the Digital Assets and LBA tokens that do

6    not belong to him.  Plaintiffs also seek a declaratory judgment that Cred's actions to properly set

7    the board of directors of Cred Capital and to properly issue the voting shares of Cred Capital to

8    Cred were legally correct.   Finally, Plaintiffs are entitled to an award of compensatory and

9    punitive damages against Alexander due to Alexander's improper and illegal conversions, breach

10   of his employment contract, breach of the implied covenant of good faith and fair dealing and

11   breach of his fiduciary duty of loyalty, and breach of the employee loan and pledge agreements.

12                                    **THE PARTIES**

13         11.      Plaintiff Cred is a Delaware corporation, with offices at 2121 S. El Camino Real,

14   Ste 500, San Mateo, California, 94403, United States of America.   Cred is a decentralized

15   lending ecosystem based on an Ethereum-based blockchain developed by the company.

16         12.      Plaintiff Cred Capital is a Delaware corporation, with its primary offices also at

17   2121 S. El Camino Real, Ste 500, San Mateo, California, 94403, United States of America.  Cred

18   Capital was created to provide bond securitization and asset management for Cred.

19         13.      Cred (US) is a Delaware limited liability company, with its primary offices also at

20   2121 S. El Camino Real, Ste 500, San Mateo, California, 94403, United States of America.  Cred

21   (US) is a licensed lender.

22         14.      Defendant James Alexander, referred to hereinafter as "Alexander," "Defendant"

23   or "Defendant Alexander," is an individual who resides in Los Angeles, California, and is a

24   citizen of the State of California.   On August 27, 2018, Alexander was hired as an at-will

25   employee by Cred to the position of Chief Capital Officer, and reported to the Cred's President,

26   Daniel Schatt, in San Mateo.  As part of his employment agreement, Alexander received a base

27   annual salary of $240,000.   Moreover, in 2019, as part of his benefits as a Cred employee,

28   Alexander also received an employee loan of $250,000 and then three separate employee loans of

- 3 -

CRED_EXAMINER_00000774

1   a total of 5,200,000 LBA tokens, Cred's general utility token. In 2020, Alexander also received a

2   $95,523.76 advance against a future profit share. On or around June 26, 2020, Cred fired

3   Alexander and removed his access to Plaintiffs' email server. But while employed by Cred,

4   Alexander received the most compensation of any individual, including any other director or

5   officer, at the company.

6        15.    The true names and capacities, whether individual, corporate, associate or

7   otherwise, of Defendants named herein as DOES 1 through 25, inclusive, are unknown to

8   Plaintiffs who therefore names these Defendants by such fictitious names. Plaintiffs will amend

9   this Verified Amended Complaint to show the true names and capacities of these Defendants

10   when the same have been ascertained. Plaintiffs are informed and believe that each fictitiously

11   named Defendant is responsible in law and in fact, in whole or in part, for the wrongful conduct

12   alleged herein. Defendant Alexander and Defendants DOES 1 through 25, inclusive, are

13   hereinafter referred to collectively as "Defendants" or "All Defendants."

14                   **JURISDICTION AND VENUE**

15        16.    Jurisdiction is proper in the Superior Court for the State of California in and for

16   the County of San Mateo pursuant to Section 4.10 of the California Code of Civil procedure

17   because it has general subject matter jurisdiction and no statutory exceptions to jurisdiction exist.

18   The amount in controversy exceeds the jurisdictional minimum of this Court.

19        17.    Venue is proper in the County of San Mateo pursuant to section 395 of the

20   California Code of Civil Procedure because the acts complained of involve a dispute over

21   Alexander's performance and obligations arising under an employment contract that was to be

22   performed in that county. In addition, Alexander himself has recently instituted litigation in this

23   County that is related to this dispute such that venue is proper here.

24                         **FACTS**

25     **A.**    **Alexander's Duties to Cred as a Cred Officer and Employee**

26        18.    On August 27, 2018, Cred hired Alexander, as an at-will employee, for a position

27   as Cred's Chief Capital Officer. Alexander reported to Mr. Schatt, Cred's Chief Executive

28   Officer. As an officer of Cred, Alexander owed Cred fiduciary duties, including a duty of loyalty

- 4 -

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER FORMS OF
RELIEF

CRED_EXAMINER_00000775

19. Furthermore, as part of his employment agreement, Alexander agreed to not "engage *in any other* employment, occupation, consulting or other business activity directly related to the business in which [Cred] is now involved or becomes involved during the term of your employment, nor will you engage in any other activities that conflict with your obligations to the Company." Alexander also agreed that he was "expected to devote [his] full business time and best efforts to performing [his] job duties *for the Company* during [his] employment" with Cred. The employment agreement also specified that it "may not be modified or amended except by a *written agreement* signed by Dan Schatt [Cred's CEO] and [Alexander]."

20. As part of his employment, Alexander also signed a Confidentiality, Non-Solicitation, and Inventions Agreement (the "Confidentiality Agreement") in which he agreed that while he was employed by Cred, he would "not provide any services in competition against [Cred]." The Confidentiality Agreement also specified that this duty applies to Alexander "regardless of the *Company subsidiary or business* for which [he] works or provides services, or the duties which [he] is or may in the future be assigned." The Confidentiality Agreement further provides that Alexander retains no rights, titles, or interests whatsoever in any "Work Product," or "materials, information, concepts, or work whatsoever that (i) are prepared or developed by Employee, individually or jointly with others, during Employee's employment by the Company, whether or not during working hours, and (ii) relate to, are connected with or arise in any way out of (1) current and/or anticipated businesses and/or activities of the Company," including "any work performed by the Employee for the Company, and/or (4) any information or assistance provided by the Company[.]"

21. Based on the employment agreement, Alexander received a base annual salary of $240,000. In 2019, as an additional employee benefit, Alexander also received an employee loan of $250,000 and three separate employee loans of LBA tokens, Cred's general utility token. In 2020, Alexander also received an advance of $95,523.76 against a future profit share, which equated to a net payout amount of $50,000. During his employment at Cred, Alexander received the most amount of compensation out of any individual at the company.

- 5 -

CRED_EXAMINER_00000776

**B.      The Formation of Cred Capital**

22.      In early 2020, Cred assigned Alexander to organize and manage Cred Capital, a Cred subsidiary that was to be created to provide bond securitizations and manage digital funds for Cred.  Alexander was to oversee the organization of Cred Capital, which was supposed to be bound by the traditional parent-subsidiary relationship with Cred, and have a typical governance framework with board control of the subsidiary and with Cred owning and controlling the stock of the subsidiary.

23.      Cred specifically instructed Alexander to organize Cred Capital so that it was governed by a three-person board of directors with two Cred employees controlling a three-person board of directors.   Cred also instructed Alexander to establish Cred Capital's capitalization structure so that Cred was a majority shareholder, with voting rights, in the subsidiary.  This capital and governance structure, which was conveyed to Alexander, was naturally important to Cred because it would allow Cred to maintain ultimate control over its subsidiary bearing its own name and using its resources.

24.      On March 15, 2020, Alexander affirmed via email that Cred Capital was to be organized with a three-person board of directors made up of two officers of Cred as well as a third-party "investor."  Alexander also assured them that Cred Capital was capitalized with only two shareholders, the third-party "investor" and Cred, each holding a 50% equity-stake of the subsidiary.  Cred understood this to mean that Cred Capital would be organized in the manner that was previously specified to Alexander—i.e., with Cred having majority voting shares in Cred Capital.

**C.      Alexander's Attempt to Take Over Cred Capital and Conversion of $2 Million Dollars' Worth of Plaintiffs' Assets is Revealed**

25.      On or around May 30, 2020, Mr. Schatt discovered that Cred Capital was not organized to Cred's specifications.  Instead of being managed by a three-person board of directors, Alexander simply installed himself as the sole director of Cred Capital.  Moreover, rather than assigning the majority of Cred Capital's voting shares to Cred, Alexander assigned only Class B shares with no voting rights to Cred—and assigned Class A voting shares to a

- 6 -

CRED_EXAMINER_00000777

purported third-party "investor" who never made any investment but supposedly gave Alexander his proxy to control Cred Capital in his name.

26.    This discovery—that Alexander failed to provide any Credit Capital voting shares to Cred and did not properly constitute its initial board of directors—blindsided Cred, since Cred had communicated to Alexander on multiple occasions that Cred Capital, while being a legally distinct entity separate from Cred, was nevertheless part of Cred's larger strategic enterprise. Indeed, Cred's CEO had communicated this plan to Alexander in as early as March 27, 2020, where Cred indicated that changes to Cred Capital's compensation structure should be collectively decided by Cred's CEO, CFO, and Alexander to ensure that they are acting *as one company*. Cred's CEO had also reiterated to Alexander on April 28, 2020 that the purpose of creating Cred Capital was to create a "clear division of legal and regulatory responsibilities," where Cred operated as a lender, while Cred Capital operated as an asset manager and securitization provider for Cred.

27.    Consistent with his understanding that Cred Capital was Cred's subsidiary, Cred's CEO had instructed Alexander to coordinate key expenditures, like employment and consulting contracts between the two entities.  For example, on May 7, 2020, Cred's CEO instructed Alexander to ensure that there were "strong controls and systems in place at the parent level [i.e., Cred] to support the cash flow / expenses of our overall organization . . . ."

28.    Cred was also dismayed because Cred had communicated to Alexander on multiple occasions that Cred Capital was to be managed by a three-person board of directors made up by two officers of Cred and a third-party investor.  For example, on May 22, 2020, Cred's CEO sent Alexander an email following a phone call the two of them had.  In this email, Cred's CEO said that while he recalled that the Cred Capital documents that he signed had the three-person board structure he required of Cred Capital, he wanted Alexander to ensure that Cred Capital was organized accordingly.  Cred's CEO also instructed Alexander to "follow-up" and review Cred Capital's capitalization structure so that it was beneficial to both Cred Capital and Cred.  And, he again reiterated that they will be working to build "one great, successful organization together."

- 7 -

CRED_EXAMINER_00000778

29.   Meanwhile, Alexander never provided any communication or information whatsoever to contradict Cred's understanding that Cred Capital was an ordinary subsidiary of Cred, with the parent company owning the majority of Cred Capital's voting shares, and that Cred Capital was managed by a three-person board of directors controlled by Cred officers.  Nor did Alexander voice any dissent to these instructions or provide any indication that he would not obey the instructions.

30.   Accordingly, later on May 30, 2020, Cred's CEO reached out to Alexander to seek clarification as to why Cred Capital was not organized and managed to Cred's instructions. Cred's CEO again emphasized that all Cred entities, included Cred Capital, was one branded enterprise, and all employees of the Cred entities, like Alexander, were expected to work together as a team.

31.   The next day, on May 31, 2020, Alexander responded to Cred's CEO's overtures by asserting that Cred Capital was in dispute with Cred.

**D.   Cred Begins to Discover the Scope of Alexander's Deceit**

32.   Cred's CEO realized that Alexander may have intentionally disobeyed Cred's directive to organize Cred Capital as Cred's subsidiary, and had begun to investigate Cred Capital's organizational documents.  The results of this investigation were deeply disturbing.

33.   Cred found that a certificate of incorporation was filed for Cred Capital in Delaware on March 10, 2020, which identified Rebecca Floren as the "sole incorporator."  On information and belief, Plaintiffs believed that Ms. Floren was a former paralegal with the San Francisco office of the law firm Schiff Hardin LLP.  Plaintiffs, through their counsel, had attempted to reach Ms. Floren at her offices, but was informed by a receptionist that Ms. Floren was no longer employed by Schiff Hardin.  Plaintiffs also attempted to reach the relationship partner at Schiff Hardin for Cred Capital, but did not receive any response.

34.   Cred also found that, on March 16, 2020, Alexander had executed an "action of incorporator" to falsely appoint himself as the sole initial director of the corporation, even though he was not an incorporator of Cred Capital, since Ms. Floren was the sole incorporator of the company.  Alexander, acting upon his false authority as director of Cred Capital, then purported

- 8 -

CRED_EXAMINER_00000779

1  to execute a board consent authorizing the issuance of non-voting class B common stock to Cred

2  and voting class A preferred stock to a third-party investor that was loyal to him.

3    35. But in any event, in March 16, 2020, Alexander was still a Cred employee, and

4  owed fiduciary duties to Cred and was bound by the agreements that he signed in August 27,

5  2018. In the Confidentiality Agreement, Alexander had assigned to Cred all rights, titles, and

6  interests, in any materials or works that were prepared by him that "are connected with or arise in

7  any way out of" Cred's current or anticipated businesses or activities, whether or not they were

8  developed during working hours. Additionally, Alexander had agreed that Cred was his true

9  attorney-in-fact with "full power of substitution and re-substitution, in Employee's name, place,

10  and stead, in any and all capacities, to execute, verify, acknowledge, and deliver any document

11  necessary or appropriate to effectuate" Cred's ownership over Alexander's works, including any

12  corporate documents for Cred Capital that were created by him or at his request. Likewise,

13  Alexander had agreed that while employed by Cred he would not provide any services in

14  competition against the company, which includes the creation of any entities adverse to the Cred.

15    36. On June 22, 2020, Cred, acting as a substitute incorporator of Cred Capital under

16  Section 107(d) of the Delaware General Corporation Law ("DGCL") executed a valid action of

17  incorporator to adopt bylaws and appoint Messrs. Schatt and Podulka as the initial directors of

18  Cred Capital. Cred acted as a substitute incorporator of Cred Capital because it believed the

19  original incorporator, Rebecca Floren, was unavailable. Cred Capital's board, which was now

20  constituted with Messrs. Schatt and Podulka as directors, then appointed a set of officers that did

21  not include Alexander. The board also confirmed that Cred Capital's prior stock issuances were

22  null and void and authorized a new issuance of voting stock to Cred. Cred thereby became the

23  sole valid stockholder of Cred Capital.

24    37. On or about June 27, 2020, Cred discovered that Ms. Floren, who was previously

25  employed at Schiff Hardin LLP, did not act as the sole incorporator of Cred Capital. Instead,

26  another paralegal employed at Bryan Cave Leighton Paisner LLP, also named Rebecca Floren,

27  was the paralegal who purportedly incorporated Cred Capital.

28    38. Thus, on June 29, 2020, to remove any doubt as to the status of Cred Capital's

- 9 -

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER FORMS OF
RELIEF

CRED_EXAMINER_00000780

1    true board of directors (and the validity of the board's actions undertaken on June 22, 2020), Mr.

2    Podulka, in his capacity as an officer of Cred Capital, filed a Certificate of Correction to correct

3    Cred Capital's corporate charter, pursuant to Section 103(f) of the DGCL.  This Certificate of

4    Correction corrected Alexander's omission of the names of Cred Capital's initial board of

5    directors by adding an article to the charter, identifying Messrs. Schatt and Podulka as Cred

6    Capital's initial directors.  Since the Certificate of Correction is deemed effective as of March 10,

7    2020, the date of the filing of Cred Capital's charter, pursuant to Section 103(f) of the DGCL,

8    Messrs. Schatt and Podulka were duly constituted as Cred Capital's board of directors as of

9    March 10, 2020.  Thus, Cred Capital's board of directors actions undertaken on June 22, 2020

10   were valid and have legal effect.

     **E.    Alexander Misappropriates Cred and Cred Capital's Digital Assets**

11

12       39.    After reassuming proper control of Cred Capital, Cred learned on the evening of

13   June 24, 2020, Alexander instructed Daniyal Inamullah, the Vice President of Capital Markets at

14   Cred Capital, to move the Digital Assets—a multi-million dollar amount of Bitcoin and USDC—

15   from Cred Capital accounts to blockchain addresses that do not belong to Plaintiffs or any of

16   Plaintiffs' custodians or asset managers.[1]  Alexander communicated with Mr. Inamullah via

17   Telegram Messenger—rather than through Plaintiffs' email server—presumably to evade

18   detection of his conversion of the Digital Assets.   Alexander subsequently deleted the

19   conversation thread on Telegram Messenger so as to destroy additional evidence of his

20   malfeasance.

21       40.    On information and belief, Plaintiffs allege that Alexander owns, or is in control

22   over, the following blockchain addresses to which he moved the Digital Assets:

23   • **BTC Address**: 0x58ac2780289a9D2D788dA184F2c15C0586f8e53D

24       ○  224.98993 BTC

25          463362d41ab2686977f6f7c8bcb40ffbbfbf7fb9846558c602a29351f2cdbba0

26

27   [1] These Digital assets had been loaned by a third party on or around March 30, 2020 to Cred.
     Cred then used these Bitcoin, as well as its own money, to fund Cred Capital in the form of a
28   loan.

                                              - 10 -

CRED_EXAMINER_00000781

- 0.1 BTC

   2329c3648ad590ce615397103029ce2c396d9b3b74c26beb442cb9ee16cb6ca3

- **USDC Address**: 3GGyZqR9Z79Sad8irEiDFtxPfxyCvYxEv3

   - $204,656 USDC

      2329c3648ad590ce615397103029ce2c396d9b3b74c26bcb442cb9cc16cb6ca3

   - $1 USDC

      0xf225f18dbff318505fc2857abd78caf9310de2c2fa6f641254dab42f46cf19d6

41.     On or around June 26, 2020, Cred fired Alexander and removed his access to Plaintiffs' email servers.

42.     On July 2, 2020, Alexander filed a complaint in the Superior Court of the State of California, County of San Mateo against Mr. Schatt.  This matter, which is styled as *Alexander v. Schatt*, Case No. 20-CIV-02728, is related to this instant action.

F.     **Alexander Defaults Under the Employee Loan Agreement and Converts LBA Tokens that He Pledged as Collateral to Secure His Obligations**

43.     As an additional employee benefit for his work at Cred, on June 1, 2019, Alexander entered into an employee loan agreement and a pledge agreement with Cred (US). Under the terms of the employee loan agreement, Cred (US) loaned Alexander $250,000.  In turn, Alexander pledged as collateral any LBA tokens, Cred's general utility token, he received or became entitled to in connection with his employment at Cred to secure his obligations under the employee loan agreement.  On October 30, 2019, Cred (US) loaned Alexander 5,200,000 LBA tokens via three separate loan agreements.

44.     As alleged above, Alexander was terminated from Cred on June 26, 2020. Pursuant to Sections 8 and 9 of the employee loan agreement dated June 1, 2019, the entire loan matured and all outstanding borrowings under the line of credit were required to be paid in full on June 26, 2020.  Further, pursuant to Section 25 of the employee loan agreement, Alexander's misappropriation of the Digital Assets and other wrongful conduct also renders any of Alexander's obligations which he may have claimed to have been non-recourse obligation into a fully recourse obligation.

- 11 -

CRED_EXAMINER_00000782

45.    On July 23, 2020, Cred (US) sent Alexander a letter demanding the full payment of the total amount of principal outstanding of $250,000 by June 27, 2020.  Upon Alexander's failure to pay any of the $250,000 outstanding debt or turn over the LBA tokens that he pledged to secure the loan, on June 27, 2020, Cred (US) sent Alexander a notice of default under the terms of the employee loan agreement.  Cred (US) also informed Alexander that his failure to turn over the LBA tokens that he pledged to secure the loan resulted in a conversion of Cred (US) property that constitutes a further default under and breach of the employee loan agreement.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (*Conversion of Digital Assets*)

### (*Asserted by Cred and Cred Capital Against All Defendants*)

46.    Cred and Cred Capital repeat and re-allege each and every allegation set forth above as if fully set forth herein.

47.    Cred and Cred Capital own and/or have the right to control the Digital Assets that Defendant transferred to accounts that are not in either Cred or Cred Capital's control or the control of Cred or Cred Capital's managers or custodians.

48.    Defendant substantially interfered with Cred and Cred Capital's property by knowingly and intentionally transferring these Digital Assets to addresses that are not in Cred or Cred Capital's control or the control of Cred or Cred Capital's managers or custodians.  On information and belief, Cred and Cred Capital allege that Defendant had transferred these Digital Assets to his own accounts, or accounts that he controls.  Defendant has refused to return these Digital Assets after Cred and Cred Capital demanded their return.  Defendant had thus taken possession of Cred and Cred Capital's Digital Assets and prevented Cred and Cred Capital from accessing the Digital Assets.

49.    Cred and Cred Capital did not consent to Defendant's taking of the Digital Assets.

50.    Cred and Cred Capital were also harmed by Defendant's misappropriation of their Digital Assets.  Not only were Cred and Cred Capital completely deprived of over $2 million dollars' worth of Digital Assets, they are still making interest payments on the loan associated

- 12 -

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER FORMS OF RELIEF

CRED_EXAMINER_00000783

1  with these Digital Assets, and have suffered opportunity costs associated with their inability to

2  leverage the Digital Assets as part of their overall investment plan and incurred costs associated

3  with moving alternative assets to support Cred's ongoing operations due to their loss of these

4  Digital Assets, which are causing ongoing harm and damages to Cred.  On information and

5  belief, Cred and Cred Capital allege that they have been damaged in an amount that exceeds well

6  over $2 million.  Cred and Cred Capital are therefore entitled to recover damages from Defendant

7  for their share of said losses.

8        51.    Based on the foregoing acts and conduct, Defendant has acted towards Cred and

9  Cred Capital with a conscious disregard of their rights, with the intent to defraud, vex, injure and

10 annoy Cred and Cred Capital so as to constitute oppression, fraud, or malice justifying an award

11 of punitive and exemplary damages in an amount sufficient to punish and set an example of

12 Defendant.

**SECOND CAUSE OF ACTION**

***(Declaratory and Injunctive Relief)***

***(Asserted by Plaintiffs Against All Defendants)***

16       52.    Plaintiffs repeats and re-allege each and every allegation set forth above as if fully

17 set forth herein.

18       53.    An actual and justiciable controversy exists as to the rightful ownership and

19 control over Cred Capital in that Plaintiffs contend and seek a declaratory judgment that:

20             a.    Defendants had no right to transfer the assets of Cred Capital, including

21       the Digital Assets and/or any cryptocurrency at Cred Capital, to accounts not controlled

22       by Cred or Cred Capital or by Cred or Cred Capital's asset managers or custodians;

23             b.    Defendants had no right to issue Cred Capital's Class B non-voting

24       common stock to Cred, and Class A preferred stock to a third-party investor;

25             c.    Defendants had falsely executed an action of an incorporator to appoint

26       himself as the sole director of Cred Capital, and therefore, is not and was never a

27       director of Cred Capital;

28             d.    Defendants had wrongfully transferred Cred and Cred Capital assets,

- 13 -

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER FORMS OF
RELIEF

CRED_EXAMINER_00000784

including the Digital Assets referred to herein, to accounts that are not in Plaintiffs' custody or control;

     e.    Defendants have no right to and have wrongfully retained the LBA tokens pledged as collateral to Cred (US) to secure Defendant's obligations the employee loan agreement;

     f.    Any other actions undertaken by Defendant Alexander purportedly as the sole director of Cred Capital is null and void;

     g.    Alternatively, because Defendant and/or Ms. Rebecca Floren were acting as Cred's agent when they incorporated Cred Capital, Cred thus has the sole ownership interest in Cred Capital;

     h.    Similarly, because Defendant Alexander was bound by the duties of the Confidentiality Agreement—where he expressly relinquished his rights and interest in his work product, named Cred as his attorney-in-fact over any work product, and agreed not to provide any services in competition against Cred—Cred has sole ownership interest in Cred Capital;

     i.    The filing of the Certificate of Correction by Joseph Podulka, in his capacity as a Cred Capital officer, was a valid and lawful action to correct Cred Capital's corporate charter pursuant to Section 103(f) of the DGCL;

     j.    Cred is the sole stockholder of Cred Capital; and

     k.    Messrs. Daniel Schatt and Joseph Podulka (and not Defendant) are Cred Capital's directors.

54.    On information and belief, Plaintiffs allege that Defendant disputes the aforementioned contentions and contend otherwise.

55.    Plaintiff has no adequate remedy at law.

56.    A judicial determination of these issues and the respective duties of Plaintiffs and Defendant is necessary and appropriate at this time because Defendants have wrongfully asserted control and ownership of Cred Capital and all of the subsidiary's assets.

57.    Thus, Plaintiffs also request injunctive relief prohibiting Defendants from any

- 14 -

CRED_EXAMINER_00000785

1  further dissipation of Plaintiffs' assets, including the Digital Assets and LBA tokens referred to

2  herein.

### THIRD CAUSE OF ACTION

#### (Breach of Employment Contract)

#### (Asserted by Cred Against Defendant Alexander)

6  58.    Cred repeats and re-alleges each and every allegation set forth above as if fully set

7  forth herein.

8  59.    On August 27, 2018, Cred and Defendant entered into an at-will employment

9  relationship.  Defendant was hired for the position of Chief Capital Officer, and reported to Mr.

10  Daniel Schatt.

11  60.    Pursuant to this employment relationship, Defendant had agreed to "not engage in

12  any other employment, occupation, consulting or other business activity directly related to the

13  business in which the Company is now involved or becomes involved during the term of your

14  employment, nor will [he] engage in any other activities that conflict with [his] obligations to

15  the Company."

16  61.    Defendant also agreed to devote his "full business time and best efforts to

17  performing [his] job duties for the Company during [his] employment."

18  62.    Similarly, Defendant agreed that "while employed by the Company, [he] shall not

19  perform any service in competition against the Company."  Defendant further agreed that his

20  duties to Cred applied "regardless of the Company subsidiary or business for which [he] works

21  or provides services, or the duties to which [he] is or may in the future be assigned."

22  63.    Defendant also agreed to utilize his "best efforts and diligence to protect the

23  Confidential Information and other Company property for an[d] on behalf of the Company."

24  64.    Furthermore, Defendant agreed not to "access any Company computer or

25  computer system, or access, copy, download, email, reproduce or otherwise duplicate, record,

26  abstract or summarize any Confidential Information (among other things) to compete or prepare

27  to compete against the Company, or for or on behalf of any competitor of the Company."

28  65.    Defendant's obligations to Cred to safeguard the company's property and

- 15 -

CRED_EXAMINER_00000786

1  Confidential Information continued even after his employment at Cred.

2      66.    Despite his obligations to Cred and Cred's directives to the contrary, Defendant

3  unlawfully attempted to wrest control of Cred Capital away from the Cred.  Among other things,

4  Defendant planned on directing Cred Capital to sue Cred, to fulfill his goal of taking control

5  over Cred Capital, and position the subsidiary as an entity that competes with, and is separate

6  from, Cred.

7      67.    In contradiction of his duty to safeguard Cred's assets and property, Defendant

8  also directed the transfer of over $2 million dollars' worth of the Digital Assets to blockchain

9  addresses that are not in Cred's control, or the control of Cred's custodians.  On information and

10  belief, Cred alleges that Defendant owns, or is in control over, these blockchain addresses.

68.  Meanwhile, Cred substantially performed its duties under Defendant's employment agreement,

12  which was to provide an annual salary of $240,000, less applicable withholdings and deductions

13  in accordance with Cred's payroll procedures.  Additionally, Alexander enjoyed other benefits

14  as an employee of Cred, including a loan of $250,000, loans of 5,200,000 LBA tokens, Cred's

15  general utility token, and a $ 95,523.76 advance against a future profit share.

16      69.    Cred was harmed as a direct result of Defendant's breach of the employment

17  agreement.  Not only was Cred forced to expend substantial time and resources to discover and

18  remedy Defendant's misconduct, Cred has lost access to over $2 million dollars' worth of

19  Bitcoin and USDC as a direct result of Defendant's misappropriation.  Furthermore, Plaintiffs

20  are still making interest payments on the loan associated with these Digital Assets, and have

21  suffered opportunity costs associated with their inability to leverage the Digital Assets as part of

22  their overall investment plan and incurred costs associated with moving alternative assets to

23  support Cred's ongoing operations due to their loss of these Digital Assets, which are causing

24  ongoing harm and damages to Cred.  Defendant's breach of his employment agreement was thus

25  a substantial factor in causing Cred's harm.

26      70.    On information and belief, Cred alleges that it has been damaged in an amount

27  that exceeds well over $2 million.  Cred is therefore entitled to recover damages from Defendant

28  for its share of said losses.  Moreover, pursuant to the Confidentiality Agreement entered into by

- 16 -

CRED_EXAMINER_00000787

the parties, Cred is also entitled to recover its attorneys' fees and costs incurred as a result of Defendant's breach.

71.     On information and belief, Cred alleges that it has been damaged in an amount that exceeds well over $2 million.  Cred is therefore entitled to recover damages from Defendant for its share of said losses.

72.     Moreover, pursuant to the Confidentiality Agreement entered into by the parties, Cred is also entitled to recover its attorneys' fees and costs incurred as a result of Defendant's breach.

## FOURTH CAUSE OF ACTION

### (*Breach of Implied Covenant of Good Faith and Fair Dealing of an Employment Contract*)

### (*Asserted by Cred Against Defendant*)

73.     Cred repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

74.     Defendant's actions as alleged above breached the implied covenant of good faith and fair dealing in the employment agreement set forth above.

75.     Defendant's conduct prevented Cred from receiving the benefit of the employment agreement—i.e., a Chief Capital Officer that is loyal to Cred and acting in Cred's best interests, even though Cred had performed all conditions required for Defendant's performance.

76.     By disobeying Cred's express instructions to establish and operate Cred Capital as Cred's subsidiary and asset manager, subverting Cred's rightful ownership and control over Cred Capital, and misappropriating Cred Capital's assets to his own control, Defendant did not act fairly or in good faith.

77.     Cred was harmed by Defendant's misconduct.  As a result of his misconduct, Cred was forced to expend time and resources, including pursuing this action, and has lost access to over $2 million dollars' worth of Bitcoin and USDC.  Furthermore, Plaintiffs are still making interest payments on the loan associated with these Digital Assets, and have suffered opportunity costs with their inability to leverage the Digital Assets as part of their overall investment plan and

- 17 -

CRED_EXAMINER_00000788

1   incurred costs associated with moving alternative assets to support Cred's ongoing operations

2   due to their loss of these Digital Assets, which are causing ongoing harm and damages to Cred.

3       78.     On information and belief, Cred alleges that it has been damaged in an amount

4   that exceeds well over $2 million.  Cred is therefore entitled to recover damages from Defendant

5   for its share of said losses.

6       79.     Moreover, pursuant to the Confidentiality Agreement entered into by the parties,

7   Cred is also entitled to recover its attorneys' fees and costs incurred as a result of Defendant's

8   breach.

9                       **FIFTH CAUSE OF ACTION**

10      ***(Breach of the Fiduciary Duty of Loyalty/Violation of Cal. Labor Code § 2863)***

11                      ***(Asserted by Cred Against Defendant)***

12      80.     Cred repeats and re-alleges each and every allegation set forth above as if fully set

13  forth herein.

14      81.     From August 28, 2018, the date of his hire, to June 26, 2020, the date of his

15  termination, Defendant was a corporate officer of Cred.  As such, Defendant had a fiduciary

16  relationship with Cred, and owed the company his undivided loyalty.

17      82.     Believing that Defendant would honor his fiduciary duties and his duty of loyalty

18  to the company, Cred entrusted Defendant to organize and operate Cred Capital as a subsidiary to

19  Cred.   While Cred understood Cred Capital was to have differing legal and regulatory

20  responsibilities, since it would operate as Cred's asset manager and securitization provider, Cred

21  still understood Cred Capital to be, and operate as, its subsidiary.  Cred communicated its

22  requirements for the creation and operation of Cred Capital to Defendant on multiple occasions.

23      83.     Defendant nevertheless knowingly acted against Cred's interests in connection

24  with the organization and operation of Cred Capital.  Instead, Defendant acted in his own

25  interests in attempting to take over Cred Capital, and by transferring Cred Capital's assets to

26  accounts that are not in Plaintiffs' control or the control of Plaintiffs' asset managers or

27  custodians.  Upon information and belief, Cred alleges that Defendant transferred these assets to

28  accounts that are owned by him or in his control.

- 18 -

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER FORMS OF RELIEF

CRED_EXAMINER_00000789

84.     Cred did not give informed consent, or any consent whatsoever, to Defendant's conduct. Cred was also harmed as a direct and proximate result of Cred's breach of his fiduciary duties and duty of loyalty owed to the company. On information and belief, Cred alleges that it has been damaged in an amount that exceeds well over $2 million. Not only were Plaintiffs completely deprived of over $2 million dollars' worth of Digital Assets, they are still making interest payments on the loan associated with these Digital Assets, and have suffered opportunity costs with their inability to leverage the Digital Assets as part of their overall investment plan and incurred costs associated with moving alternative assets to support Cred's ongoing operations due to their loss of these Digital Assets, which are causing ongoing harm and damages to Cred. Cred is therefore entitled to recover damages from Defendant for its share of said losses.

85.     Based on the foregoing acts and conduct, Defendant has acted towards Cred with a conscious disregard of its rights, with the intent to defraud, vex, injure, and annoy Cred so as to constitute oppression, fraud, or malice justifying an award of punitive and exemplary damages in an amount sufficient to punish and set an example of Defendant.

## SIXTH CAUSE OF ACTION

### (Breach of the Employee Loan Agreement and Pledge Agreement)

### (Asserted by Cred (US) Against Defendant)

86.     Cred (US) repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

87.     On June 1, 2019, Defendant entered into an employee loan agreement with Cred (US). Under the terms of the employee loan agreement, Cred (US) loaned Defendant $250,000. Alexander concurrently entered into a pledge agreement with Cred (US), pursuant to which Alexander agreed to pledge certain collateral (i.e., LBA tokens) to secure his obligations under the employee loan agreement. The employee loan agreement expressly incorporates the pledge agreement by reference. On October 30, 2019, Cred (US) loaned Alexander 5,200,000 LBA tokens via three separate loan agreements.

88.     Pursuant to Sections 8 and 9 of the employee loan agreement dated June 1, 2019, the "Line of Credit matures and must be paid in full on the date that [Defendant's] employment

- 19 -

CRED_EXAMINER_00000790

1  with us terminates." On June 26, 2020, Defendant's employment with Cred terminated.

2        89.    Pursuant to Section 25 of the employee loan agreement, Alexander's

3  misappropriation of the Digital Assets further renders any of Defendant's obligations that he may

4  assert to have been non-recourse obligations into fully recourse obligations.

5        90.    Defendant has failed to pay the amount owed to Cred (US) following his

6  termination, which constitutes a delinquency under Section 23 of the employee loan agreement.

7  Defendant's uncured delinquency renders him in default under Section 25 of the employee loan

8  agreement.

9        91.    Defendant has also failed to turn over to Cred (US) the LBA tokens that he

10  pledged to secure his obligation under the employee loan agreement.

11        92.    Cred (US) has substantially performed its duties under the employee loan and

12  pledge agreements.

13        93.    Defendant's breaches of the employee loan and pledge agreements have resulted

14  in direct harm to Cred (US). Cred (US) has failed to receive $250,000, plus accruing interest, on

15  the amounts owed by Defendant under the terms of the employee loan agreement. Cred (US) has

16  further failed to receive the LBA tokens which were pledged collateral.

17        94.    On information and belief, Cred (US) alleges that it has been damaged in an

18  amount that exceeds $250,000. Cred (US) is therefore entitled to recover damages from

19  Defendant for its losses.

20        95.    In addition, pursuant to Section 11.2 of the employee loan agreement, Cred (US)

21  is also entitled to recover its attorneys' fees and costs "incurred in connection with the

22  enforcement of [the employee loan agreement] and the Obligations."

23                        **SEVENTH CAUSE OF ACTION**

24                        ***(Conversion of LBA Tokens)***

25              ***(Asserted by Cred (US) Against All Defendants)***

26        96.    Cred (US) repeats and re-alleges each and every allegation set forth above as if

27  fully set forth herein.

28        97.    Cred (US) owns and/or has the right to possess the LBA tokens that Defendants

- 20 -

CRED_EXAMINER_00000791

1    currently hold without the consent or authorization of Cred (US).

2        98.    Defendants substantially interfered with Cred (US)'s property by knowingly and

3    intentionally retaining the LBA tokens and refusing to return the LBA tokens after Cred (US)

4    demanded their return pursuant to the terms of the employee loan and pledge agreements.

5    Defendants have thus taken possession of Cred (US)'s LBA tokens and prevented Cred (US)

6    from accessing the LBA tokens.

7        99.    Cred (US) did not consent to Defendants' retention of the LBA tokens.

8        100.    Cred (US) has been harmed by Defendants' deprivation of the LBA tokens that

9    Defendant pledged to secure his obligations under the employee loan agreement.  Cred (US) is

10   therefore entitled to recover damages from Defendants for its losses.

11       101.    Based on the foregoing acts and conduct, Defendants have acted towards Cred

12   (US) with a conscious disregard of its rights, with the intent to defraud, vex, injure and annoy

13   Cred (US) so as to constitute oppression, fraud, or malice justifying an award of punitive and

14   exemplary damages in an amount sufficient to punish and set an example of Defendants.

15   **PRAYER FOR RELIEF AND DEMAND FOR JURY TRIAL**

16       WHEREFORE, Plaintiffs, and each of them, demand a jury trial and pray for judgment

17   against Defendants as follows:

18       1.    For a temporary restraining order, preliminary injunction, and permanent

19   injunction freezing the Digital Assets and thereafter requiring Defendants to cease and desist from

20   his breaches of fiduciary duties, and preventing Defendants from withdrawing, removing,

21   assigning, transferring, pledging, encumbering, disbursing, dissipating, converting, selling,

22   liquidating, or otherwise disposing any Plaintiffs' property under his control, including the Digital

23   Assets referred to herein;

24       2.    For a declaration that Defendant Alexander is not a director or officer of Cred

25   Capital, that his issuance of voting securities to a third-party investor is null and void, that his

26   transfers of Plaintiffs' assets were unlawful, and that Cred is the controlling, voting shareholder

27   of Cred Capital;

28       3.    For an award of compensatory damages in an amount to be proven at trial;

- 21 -

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER FORMS OF
RELIEF

CRED_EXAMINER_00000792

4.     For foreclosure on the collateral pledged under the employee loan agreement, including the LBA tokens, on the Sixth Cause of Action.

5.     For their First, Fifth, and Seventh Causes of Actions, an award of punitive damages;

6.     For their Third, Fourth and Sixth Causes of Action, an award of attorneys' fees and costs; and

7.     For such other and further relief as this Court deems to be just and proper.


DATED: August 14, 2020                  PAUL HASTINGS LLP

*D. Scott Carlton*

By: D. SCOTT CARLTON

Attorneys for Plaintiffs
Cred Inc. (f/k/a Cred LLC), Cred
Capital, Inc., and Cred (US) LLC

- 22 -

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER FORMS OF RELIEF

CRED_EXAMINER_00000793

# VERIFICATION

FORM No. 2

**Verification of Pleading (Code Civ. Proc., § 446)**
**Declaration under Penalty of Perjury Form (Code Civ. Proc., §§ 446, 2015.5)**

by Party

CASE TITLE  CRED INC., et al. v. James Alexander,  et al.

I,  Daniel B. Schatt                                    , declare:
                    (Name)

I am the  CEO of Cred Inc. and Cred (US) LLC, and
          director of Cred Capital, Inc.                    in the above-entitled matter.

I have read the foregoing  First Amended Complaint
(pleading, e.g., complaint) and know the contents thereof.

The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe it to be true.

Executed on  August 14,                    , 2020 at  San Mateo
                                              County, California.

I declare (or certify) under penalty of perjury that the foregoing is true and correct.

_____
(Signature of Party)

Exhibit 24

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CRED INC., et al.,<br><br>               Debtors. | Chapter 11 Case No. 20-12836 (JTD)<br>Jointly Administered<br><br>**Hearing Date: February 3, 2021 at 1:00 p.m. (EST)**<br>**Related to Docket No. 152** |

## DECLARATION OF DANIEL F. WHEELER
## RE MOTION OF JAMES ALEXANDER TO DISMISS
## THE CRED CAPITAL, INC. CASE

I, Daniel F. Wheeler, declare as follows:

1.      I am the duly appointed Corporate Secretary of Cred Capital, Inc. as of March 16, 2020 to the present, and I have served as the General Counsel of Cred Capital, Inc. from March 16, 2020 to the present.   I am also an attorney duly admitted since 2000 to practice in the State of California (California State Bar No. 208272), and am in good standing.  I am also the former General Counsel of the Debtor, Cred Inc., formerly known as Cred LLC ("Cred Inc.") and served in that role from August 2019 through October 27, 2020.  Previously, I was a partner with the law firm of Bryan Cave Leighton Paisner LLP ("BCLP") in its San Francisco, California office between May 2012 and August 2019.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.  I am filing this declaration in connection with the Motion of James Alexander to Dismiss the Cred Capital, Inc. Case filed by James Alexander on December 8, 2020 (Docket No. 152).

2.      I was instructed and authorized by James Alexander and Daniel Schatt to organize Cred Capital, Inc., and I did so as instructed and authorized with the assistance of BCLP, which was retained as outside counsel to Cred Capital, Inc. at all relevant times during 2020.

3.      Consistent with my authority, I oversaw and was responsible for the drafting and filing of a certificate of incorporation for Cred Capital, Inc. (the "Certificate").  Before it was filed, I reviewed and approved each word of the Certificate that was drafted by Rebecca Floren, a

CRED_EXAMINER_00000795

paralegal employed at all relevant times during 2020 by BCLP, to ensure that the Certificate was drafted in accordance with my instructions. Based on my communications with them, and my previously having been a partner at BCLP, I know that Ms. Floren was supervised by Scott Perlov, an attorney employed with BCLP at all relevant times during 2020.

4.      A copy of the Certificate is attached hereto as **Exhibit A**. The Certificate is drafted precisely as I instructed Ms. Floren and Mr. Perlov, and is in accordance with the direction I received from Messrs. Alexander and Schatt.

5.      After I approved the language of the Certificate, I also instructed Ms. Floren to file it with the Delaware Secretary of the State, and she did so on or about March 10, 2020. The recorded copy of the Certificate contains the exact language I approved and as instructed by Messrs. Alexander and Schatt.

6.      At no time have I been unavailable to answer questions regarding the Certificate or to otherwise communicate regarding the Certificate or the other Cred Capital, Inc. organizational documents. Likewise, I am unaware that either Ms. Floren or Mr. Perlov have been unavailable to answer questions regarding the Certificate or the other Cred Capital, Inc. organizational documents.

7.      My books and records as the Secretary of Cred Capital, Inc. reflect that the only person duly appointed or elected to the board of directors of Cred Capital, Inc. is James Alexander.

8.      As part of my authority and responsibility to oversee the organization of Cred Capital, Inc., I reviewed the Action by Written Consent of the Sole Incorporator of Cred Capital, Inc. (the "SI Action"). I reviewed each word of the SI Action and authorized Ms. Floren to sign it. A copy of the SI Action is attached hereto as **Exhibit B**. Consistent with my authority and responsibility to organize Cred Capital, Inc., I specifically instructed Ms. Floren to designate Mr. Alexander as the sole director of Cred Capital, Inc in the SI Action, and Ms. Floren prepared the SI Action in accordance with my instructions.

9.      As part of my authority and responsibility to oversee the organization of Cred

2

CRED_EXAMINER_00000796

Capital, Inc., I reviewed and confirmed the accuracy and appropriateness of the Organizational Consent in Lieu of a Meeting of the Board of Directors of Cred Capital, Inc., dated March 16, 2020 (the "Organizational Consent"), which duly appointed Mr. Alexander as the President of Cred Capital, Inc. and me as the Secretary of Cred Capital, Inc. I approved the Organizational Consent for signature by Mr. Alexander. A copy of the executed Organizational Consent is attached hereto as **Exhibit C**.

10.     As part of my authority and responsibility to oversee the organization of Cred Capital, Inc., I reviewed the Bylaws drafted by Ms. Floren under the supervision of Mr. Perlov in March 2020. Upon completion of my review, I approved the Bylaws and signed them on March 16, 2020 as Secretary of Cred Capital, Inc. A copy of the approved and executed Bylaws is attached hereto as **Exhibit D**.

11.     Cred Inc. acquired nonvoting Class B Common Stock in Cred Capital, Inc., subject to the terms of the Contribution Agreement signed by the Debtor, Cred Inc. (then known as Cred LLC), and Cred Capital, Inc. A copy of the Contribution Agreement is attached hereto as **Exhibit E**. Appendix 1 to the Contribution Agreement refers to an Asset Management Agreement entered into by and between Cred Inc. and Cred Capital, Inc. A copy of that signed Asset Management Agreement is attached hereto as **Exhibit F**.

12.     Lu Hua, an individual, acquired nonvoting Class B Common Stock in Cred Capital, Inc., as set forth in the Contribution Agreement signed by both Mr. Hua and Cred Capital, Inc., pursuant to which Mr. Hua contributed 300 BTC to Cred Capital, Inc. as consideration for the Class B Common Stock of Cred Capital, Inc. A copy of this Contribution Agreement is attached hereto as **Exhibit G**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 20, 2021 at San Francisco, California.

Daniel F. Wheeler

3

CRED_EXAMINER_00000797

**Exhibit A**

CRED_EXAMINER_00000798



# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "CRED CAPITAL, INC.", FILED IN THIS OFFICE ON THE TENTH DAY OF MARCH, A.D. 2020, AT 5:02 O`CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.



Jeffrey W. Bullock, Secretary of State

7893962  8100
SR# 20202046075

Authentication: 202565510
Date: 03-11-20

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 05:02 PM 03/10/2020
FILED 05:02 PM 03/10/2020
SR 20202046075 - File Number 7893962

CERTIFICATE OF INCORPORATION
OF
CRED CAPITAL, INC.

The undersigned, a natural person (the **"Sole Incorporator"**), for the purpose of organizing a corporation to conduct the business and promote the purposes hereinafter stated, under the provisions and subject to the requirements of the laws of the State of Delaware (the **"General Corporation Law"**) hereby certifies that:

**FIRST:** The name of this corporation is Cred Capital, Inc. (the **"Corporation"**).

**SECOND:** The address of the registered office of the Corporation in the State of Delaware is 251 Little Falls Drive, Wilmington, Delaware 19808, New Castle County. The name of its registered agent at such address is Corporation Service Company.

**THIRD:** The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law.

**FOURTH:** The total number of shares of all classes of stock which the Corporation shall have authority to issue is (i) 10,000,000 shares of Common Stock, $0.00001 par value per share (**"Common Stock"**) and (ii) 3,000,000 shares of Preferred Stock, $0.00001 par value per share (**"Preferred Stock"**).

The following is a statement of the designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of capital stock of the Corporation.

A.    COMMON STOCK

5,000,000 shares of the authorized Common Stock of the Corporation are hereby designated **"Class A Common Stock"** and 5,000,000 shares of the authorized Common Stock of the Corporation are hereby designated **"Class B Common Stock"** with the following rights, preferences, powers, privileges and restrictions, qualifications and limitations.

1.    General.    The voting, dividend and liquidation rights of the holders of the Common Stock are subject to and qualified by the rights, powers and preferences of the holders of the Preferred Stock set forth herein.

2.    Voting.

2.1    Class A Common Stock.    Each holder of Class A Common Stock shall be entitled to one (1) vote per share of Class A Common Stock at all meetings of stockholders (and written actions in lieu of meetings); provided, however, that, except as otherwise required by law, holders of Class A Common Stock, as such, shall not be entitled to vote on any amendment to this Certificate of Incorporation that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Certificate of Incorporation or pursuant to the General Corporation Law. There shall be no cumulative voting. The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by (in addition to any vote of the holders of one or more series of Preferred Stock that may be required by the

1

4831-7607-9795

601712146.4

terms of this Certificate of Incorporation) the affirmative vote of the holders of shares of capital stock of the Corporation representing a majority of the votes represented by all outstanding shares of capital stock of the Corporation entitled to vote, irrespective of the provisions of Section 242(b)(2) of the General Corporation Law.

        2.2     Class B Common Stock. The holders of Class B Common Stock are not entitled to any votes whatsoever with respect to any share of Class B Common Stock held thereby, whether at a meeting of stockholders, in written actions in lieu of meetings or otherwise.

        **B.**     **PREFERRED STOCK**

        3,000,000 shares of the authorized and unissued Preferred Stock of the Corporation are hereby designated "**Series A Preferred Stock**" with the following rights, preferences, powers, privileges and restrictions, qualifications and limitations. Unless otherwise indicated, references to "sections" or "subsections" in this Part B of this Article Fourth refer to sections and subsections of Part B of this Article Fourth.

        1.     Dividends. From and after the date of the issuance of any shares of Series A Preferred Stock, dividends at the rate per annum of 25.0% of the Series A Original Issue Price per share shall accrue on such shares of Series A Preferred Stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series A Preferred Stock) (the "**Accruing Dividends**"). Accruing Dividends shall accrue from day to day, whether or not declared, but shall be non-cumulative; provided, however, that except as set forth in the following sentence of this Section 1 or in Subsection 2.1, such Accruing Dividends shall be payable only when, as, and if declared by the Board of Directors of the Corporation and the Corporation shall be under no obligation to pay such Accruing Dividends. The Corporation shall not declare, pay or set aside any dividends on shares of any other class or series of capital stock of the Corporation (other than dividends on shares of Common Stock payable in shares of Common Stock) unless (in addition to the obtaining of any consents required elsewhere in this Certificate of Incorporation) the holders of the Series A Preferred Stock then outstanding shall first receive, or simultaneously receive, a dividend on each outstanding share of Series A Preferred Stock in an amount at least equal to the greater of (i) the amount of the aggregate Accruing Dividends then accrued on such share of Series A Preferred Stock and not previously paid and (ii) (A) in the case of a dividend on Common Stock or any class or series that is convertible into Common Stock, that dividend per share of Series A Preferred Stock as would equal the product of (1) the dividend payable on each share of such class or series determined, if applicable, as if all shares of such class or series had been converted into Common Stock and (2) the number of shares of Common Stock issuable upon conversion of a share of Series A Preferred Stock, in each case calculated on the record date for determination of holders entitled to receive such dividend or (B) in the case of a dividend on any class or series that is not convertible into Common Stock, at a rate per share of Series A Preferred Stock determined by (1) dividing the amount of the dividend payable on each share of such class or series of capital stock by the original issuance price of such class or series of capital stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to such class or series) and (2) multiplying such fraction by an amount equal to the Series A Original Issue Price (as defined below); provided that if the Corporation declares, pays or sets aside, on the same date, a dividend on shares of more than one class or series of capital stock of the Corporation, the dividend payable to the holders of Series A Preferred Stock pursuant to this Section 1 shall be calculated based upon the dividend on the class or series of capital stock that would result in the highest Series A Preferred Stock dividend. The "**Series A Original Issue Price**" shall mean $0.3333 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series A Preferred Stock.

2

CRED_EXAMINER_00000801

2.      Liquidation, Dissolution or Winding Up; Certain Mergers, Consolidations and Asset Sales.

2.1      Preferential Payments to Holders of Series A Preferred Stock. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the holders of shares of Series A Preferred Stock then outstanding shall be entitled to be paid out of the assets of the Corporation available for distribution to its stockholders, and in the event of a Deemed Liquidation Event (as defined below), the holders of shares of Series A Preferred Stock then outstanding shall be entitled to be paid out of the consideration payable to stockholders in such Deemed Liquidation Event or out of the Available Proceeds (as defined below), as applicable, before any payment shall be made to the holders of Common Stock by reason of their ownership thereof, an amount per share equal to the greater of (i) the Series A Original Issue Price, plus any dividends declared but unpaid thereon, or (ii) such amount per share as would have been payable had all shares of Series A Preferred Stock been converted into Common Stock pursuant to Section 4 immediately prior to such liquidation, dissolution, winding up or Deemed Liquidation Event (the amount payable pursuant to this sentence is hereinafter referred to as the "**Series A Liquidation Amount**"). If upon any such liquidation, dissolution or winding up of the Corporation or Deemed Liquidation Event, the assets of the Corporation available for distribution to its stockholders shall be insufficient to pay the holders of shares of Series A Preferred Stock the full amount to which they shall be entitled under this Subsection 2.1, the holders of shares of Series A Preferred Stock shall share ratably in any distribution of the assets available for distribution in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

2.2      Payments to Holders of Common Stock. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, after the payment in full of all Series A Liquidation Amounts required to be paid to the holders of shares of Series A Preferred Stock, the remaining assets of the Corporation available for distribution to its stockholders or, in the case of a Deemed Liquidation Event, the consideration not payable to the holders of shares of Series A Preferred Stock pursuant to Section 2.1 or the remaining Available Proceeds, as the case may be, shall be distributed among the holders of shares of Common Stock, pro rata based on the number of shares held by each such holder.

2.3      Deemed Liquidation Events.

2.3.1      Definition. Each of the following events shall be considered a "**Deemed Liquidation Event**" unless the holders of a majority of the outstanding shares of Series A Preferred Stock (the "**Requisite Holders**") elect otherwise by written notice sent to the Corporation at least 10 days prior to the effective date of any such event:

(a)      a merger or consolidation in which

(i)      the Corporation is a constituent party or

(ii)      a subsidiary of the Corporation is a constituent party and the Corporation issues shares of its capital stock pursuant to such merger or consolidation,

except any such merger or consolidation involving the Corporation or a subsidiary in which the shares of capital stock of the Corporation outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately

3

CRED_EXAMINER_00000802

following such merger or consolidation, a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; or

(b)      (1) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or (2) the sale or disposition (whether by merger, consolidation or otherwise, and whether in a single transaction or a series of related transactions) of one or more subsidiaries of the Corporation if substantially all of the assets of the Corporation and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Corporation.

### 2.3.2    Effecting a Deemed Liquidation Event.

(a)      The Corporation shall not have the power to effect a Deemed Liquidation Event referred to in Subsection 2.3.1(a)(i) unless the agreement or plan of merger or consolidation for such transaction (the "**Merger Agreement**") provides that the consideration payable to the stockholders of the Corporation in such Deemed Liquidation Event shall be paid to the holders of capital stock of the Corporation in accordance with Subsections 2.1 and 2.2.

(b)      In the event of a Deemed Liquidation Event referred to in Subsection 2.3.1(a)(ii) or 2.3.1(b), if the Corporation does not effect a dissolution of the Corporation under the General Corporation Law within ninety (90) days after such Deemed Liquidation Event, then (i) the Corporation shall send a written notice to each holder of Series A Preferred Stock no later than the ninetieth (90th) day after the Deemed Liquidation Event advising such holders of their right (and the requirements to be met to secure such right) pursuant to the terms of the following clause; (ii) to require the redemption of such shares of Series A Preferred Stock, and (iii) if Requisite Holders so request in a written instrument delivered to the Corporation not later than one hundred twenty (120) days after such Deemed Liquidation Event, the Corporation shall use the consideration received by the Corporation for such Deemed Liquidation Event (net of any retained liabilities associated with the assets sold or technology licensed, as determined in good faith by the Board of Directors of the Corporation), together with any other assets of the Corporation available for distribution to its stockholders, all to the extent permitted by Delaware law governing distributions to stockholders (the "**Available Proceeds**"), on the one hundred fiftieth (150th) day after such Deemed Liquidation Event, to redeem all outstanding shares of Series A Preferred Stock at a price per share equal to the Series A Liquidation Amount. Notwithstanding the foregoing, in the event of a redemption pursuant to the preceding sentence, if the Available Proceeds are not sufficient to redeem all outstanding shares of Series A Preferred Stock, the Corporation shall redeem a pro rata portion of each holder's shares of Series A Preferred Stock to the fullest extent of such Available Proceeds, based on the respective amounts which would otherwise be payable in respect of the shares to be redeemed if the Available Proceeds were sufficient to redeem all such shares, and shall redeem the remaining shares as soon as it may lawfully do so under Delaware law governing distributions to stockholders.  Prior to the distribution or redemption provided for in this Subsection 2.3.2(b), the Corporation shall not expend or dissipate the consideration received for such Deemed Liquidation Event, except to discharge expenses incurred in connection with such Deemed Liquidation Event or in the ordinary course of business.

### 2.3.3    Amount Deemed Paid or Distributed.  The amount deemed paid or distributed to the holders of capital stock of the Corporation upon any such merger, consolidation, sale, transfer, exclusive license, other disposition or redemption shall be the cash or the value of the property,

4

CRED_EXAMINER_00000803

rights or securities to be paid or distributed to such holders pursuant to such Deemed Liquidation Event. The value of such property, rights or securities shall be determined in good faith by the Board of Directors of the Corporation, including the approval of the Preferred Director.

                2.3.4    <u>Allocation of Escrow and Contingent Consideration</u>. In the event of a Deemed Liquidation Event pursuant to <u>Subsection 2.3.1(a)(i)</u>, if any portion of the consideration payable to the stockholders of the Corporation is payable only upon satisfaction of contingencies (the "**Additional Consideration**"), the Merger Agreement shall provide that (a) the portion of such consideration that is not Additional Consideration (such portion, the "**Initial Consideration**") shall be allocated among the holders of capital stock of the Corporation in accordance with <u>Subsections 2.1</u> and <u>2.2</u> as if the Initial Consideration were the only consideration payable in connection with such Deemed Liquidation Event; and (b) any Additional Consideration which becomes payable to the stockholders of the Corporation upon satisfaction of such contingencies shall be allocated among the holders of capital stock of the Corporation in accordance with <u>Subsections 2.1</u> and <u>2.2</u> after taking into account the previous payment of the Initial Consideration as part of the same transaction. For the purposes of this <u>Subsection 2.3.4</u>, consideration placed into escrow or retained as a holdback to be available for satisfaction of indemnification or similar obligations in connection with such Deemed Liquidation Event shall be deemed to be Additional Consideration.

        3.    <u>Voting</u>.

                3.1    <u>General</u>. On any matter presented to the stockholders of the Corporation for their action or consideration at any meeting of stockholders of the Corporation (or by written consent of stockholders in lieu of meeting), each holder of outstanding shares of Series A Preferred Stock shall be entitled to cast the number of votes equal to the number of whole shares of Common Stock into which the shares of Series A Preferred Stock held by such holder are convertible as of the record date for determining stockholders entitled to vote on such matter. Except as provided by law or by the other provisions of this Certificate of Incorporation, holders of Series A Preferred Stock shall vote together with the holders of Class A Common Stock as a single class and on an as-converted to Common Stock basis.

                3.2    <u>Election of Directors</u>. The holders of record of the shares of Series A Preferred Stock, exclusively and as a separate class, shall be entitled to elect one (1) director of the Corporation (the "**Preferred Director**"). Any director elected as provided in the preceding sentence may be removed without cause by, and only by, the affirmative vote of the holders of the shares of the class or series of capital stock entitled to elect such director or directors, given either at a special meeting of such stockholders duly called for that purpose or pursuant to a written consent of stockholders. If the holders of shares of Series A Preferred Stock or Class A Common Stock, as the case may be, fail to elect a sufficient number of directors to fill all directorships for which they are entitled to elect directors, voting exclusively and as a separate class, pursuant to the first sentence of this <u>Subsection 3.2</u>, then any directorship not so filled shall remain vacant until such time as the holders of the Series A Preferred Stock or Class A Common Stock, as the case may be, elect a person to fill such directorship by vote or written consent in lieu of a meeting; and no such directorship may be filled by stockholders of the Corporation other than by the stockholders of the Corporation that are entitled to elect a person to fill such directorship, voting exclusively and as a separate class. The holders of record of the shares of Class A Common Stock and of any other class or series of voting stock (including the Series A Preferred Stock), exclusively and voting together as a single class, shall be entitled to elect the balance of the total number of directors of the Corporation. At any meeting held for the purpose of electing a director, the presence in person or by proxy of the holders of a majority of the outstanding shares of the class or series entitled to elect such director shall constitute a quorum for the purpose of electing such director. Except as otherwise provided in this <u>Subsection 3.2</u>, a vacancy in any directorship filled by the holders of any class or series shall be filled only by vote or written consent in lieu of a meeting of the holders of such class or

5

CRED_EXAMINER_00000804

series or by any remaining director or directors elected by the holders of such class or series pursuant to this Subsection 3.2. For administrative convenience, the initial Preferred Director may also be appointed by the Board of Directors of the Corporation in connection with the approval of the initial issuance of the Preferred Stock without a separate action by the holders of a majority of the Preferred Stock.

3.3     Series A Preferred Stock Protective Provisions.   At any time when shares of Series A Preferred Stock are outstanding, the Corporation shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by law or this Certificate of Incorporation) the written consent or affirmative vote of the Requisite Holders given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a class, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect.

3.3.1     amend, alter or repeal any provision of this Certificate of Incorporation or Bylaws of the Corporation in a manner that adversely affects the powers, preferences or rights of the Series A Preferred Stock;

3.3.2     create, or authorize the creation of, or issue or obligate itself to issue shares of, any additional class or series of capital stock unless the same ranks junior to the Series A Preferred Stock with respect to the distribution of assets on the liquidation, dissolution or winding up of the Corporation, the payment of dividends and rights of redemption, or increase the authorized number of shares of Series A Preferred Stock or increase the authorized number of shares of any additional class or series of capital stock of the Corporation;

3.3.3     (i) reclassify, alter or amend any existing security of the Corporation that is pari passu with the Series A Preferred Stock in respect of the distribution of assets on the liquidation, dissolution or winding up of the Corporation, the payment of dividends or rights of redemption, if such reclassification, alteration or amendment would render such other security senior to the Series A Preferred Stock in respect of any such right, preference, or privilege or (ii) reclassify, alter or amend any existing security of the Corporation that is junior to the Series A Preferred Stock in respect of the distribution of assets on the liquidation, dissolution or winding up of the Corporation, the payment of dividends or rights of redemption, if such reclassification, alteration or amendment would render such other security senior to or pari passu with the Series A Preferred Stock in respect of any such right, preference or privilege;

3.3.4     purchase or redeem (or permit any subsidiary to purchase or redeem) or pay or declare any dividend or make any distribution on, any shares of capital stock of the Corporation other than (i) redemptions of or dividends or distributions on the Series A Preferred Stock as expressly authorized herein and (ii) repurchases of stock from former employees, officers, directors, consultants or other persons who performed services for the Corporation or any subsidiary in connection with the cessation of such employment or service at no greater than the original purchase price;

3.3.5     increase or decrease the authorized number of directors constituting the Board of Directors of the Corporation; or

3.3.6     otherwise enter into or be a party to any transaction with any director, officer, or employee of the Company or any "associate" (as defined in Rule 12b-2 promulgated under the Exchange Act) of any such Person, except transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by a disinterested majority of the Board of Directors of the Corporation.

6

CRED_EXAMINER_00000805

4.      Optional Conversion.

The holders of the Series A Preferred Stock shall have conversion rights as follows (the "**Conversion Rights**"):

4.1      Right to Convert.

4.1.1      Conversion Ratio. Each share of Series A Preferred Stock shall be convertible, at the option of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, into such number of fully paid and non-assessable shares of Class A Common Stock as is determined by dividing the Series A Original Issue Price by the Series A Conversion Price (as defined below) in effect at the time of conversion. The "**Series A Conversion Price**" shall initially be equal to the Series A Original Issue Price. Such initial Series A Conversion Price, and the rate at which shares of Series A Preferred Stock may be converted into shares of Class A Common Stock, shall be subject to adjustment as provided below.

4.1.2      Termination of Conversion Rights. In the event of a liquidation, dissolution or winding up of the Corporation or a Deemed Liquidation Event, the Conversion Rights shall terminate at the close of business on the last full day preceding the date fixed for the payment of any such amounts distributable on such event to the holders of Series A Preferred Stock.

4.2      Fractional Shares. No fractional shares of Common Stock shall be issued upon conversion of the Series A Preferred Stock. In lieu of any fractional shares to which the holder would otherwise be entitled, the Corporation shall pay cash equal to such fraction multiplied by the fair market value of a share of Class A Common Stock as determined in good faith by the Board of Directors of the Corporation. Whether or not fractional shares would be issuable upon such conversion shall be determined on the basis of the total number of shares of Series A Preferred Stock the holder is at the time converting into Common Stock and the aggregate number of shares of Common Stock issuable upon such conversion.

4.3      Mechanics of Conversion.

4.3.1      Notice of Conversion. In order for a holder of Series A Preferred Stock to voluntarily convert shares of Series A Preferred Stock into shares of Class A Common Stock, such holder shall (a) provide written notice to the Corporation's transfer agent at the office of the transfer agent for the Series A Preferred Stock (or at the principal office of the Corporation if the Corporation serves as its own transfer agent) that such holder elects to convert all or any number of such holder's shares of Series A Preferred Stock and, if applicable, any event on which such conversion is contingent and (b), if such holder's shares are certificated, surrender the certificate or certificates for such shares of Series A Preferred Stock (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate), at the office of the transfer agent for the Series A Preferred Stock (or at the principal office of the Corporation if the Corporation serves as its own transfer agent). Such notice shall state such holder's name or the names of the nominees in which such holder wishes the shares of Common Stock to be issued. If required by the Corporation, any certificates surrendered for conversion shall be endorsed or accompanied by a written instrument or instruments of transfer, in form satisfactory to the Corporation, duly executed by the registered holder or his, her or its attorney duly authorized in writing. The close of business on the date of receipt by the transfer agent (or by the Corporation if the Corporation serves as its own transfer agent) of such notice and, if applicable, certificates (or lost certificate affidavit and agreement) shall be the time of conversion (the "**Conversion**

7

CRED_EXAMINER_00000806

**Time**"), and the shares of Common Stock issuable upon conversion of the specified shares shall be deemed to be outstanding of record as of such date. The Corporation shall, as soon as practicable after the Conversion Time (i) issue and deliver to such holder of Series A Preferred Stock, or to his, her or its nominees, a certificate or certificates for the number of full shares of Common Stock issuable upon such conversion in accordance with the provisions hereof and a certificate for the number (if any) of the shares of Series A Preferred Stock represented by the surrendered certificate that were not converted into Common Stock, (ii) pay in cash such amount as provided in Subsection 4.2 in lieu of any fraction of a share of Common Stock otherwise issuable upon such conversion and (iii) pay all declared but unpaid dividends on the shares of Series A Preferred Stock converted.

        4.3.2   Reservation of Shares. The Corporation shall at all times when the Series A Preferred Stock shall be outstanding, reserve and keep available out of its authorized but unissued capital stock, for the purpose of effecting the conversion of the Series A Preferred Stock, such number of its duly authorized shares of Class A Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding Series A Preferred Stock; and if at any time the number of authorized but unissued shares of Class A Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Series A Preferred Stock, the Corporation shall take such corporate action as may be necessary to increase its authorized but unissued shares of Class A Common Stock to such number of shares as shall be sufficient for such purposes, including, without limitation, engaging in best efforts to obtain the requisite stockholder approval of any necessary amendment to this Certificate of Incorporation. Before taking any action which would cause an adjustment reducing the Series A Conversion Price below the then par value of the shares of Class A Common Stock issuable upon conversion of the Series A Preferred Stock, the Corporation will take any corporate action which may, in the opinion of its counsel, be necessary in order that the Corporation may validly and legally issue fully paid and non-assessable shares of Class A Common Stock at such adjusted Series A Conversion Price.

        4.3.3   Effect of Conversion. All shares of Series A Preferred Stock which shall have been surrendered for conversion as herein provided shall no longer be deemed to be outstanding and all rights with respect to such shares shall immediately cease and terminate at the Conversion Time, except only the right of the holders thereof to receive shares of Common Stock in exchange therefor, to receive payment in lieu of any fraction of a share otherwise issuable upon such conversion as provided in Subsection 4.2 and to receive payment of any dividends declared but unpaid thereon. Any shares of Series A Preferred Stock so converted shall be retired and cancelled and may not be reissued as shares of such series, and the Corporation may thereafter take such appropriate action (without the need for stockholder action) as may be necessary to reduce the authorized number of shares of Series A Preferred Stock accordingly.

        4.3.4   No Further Adjustment. Upon any such conversion, no adjustment to the Series A Conversion Price shall be made for any declared but unpaid dividends on the Series A Preferred Stock surrendered for conversion or on the Common Stock delivered upon conversion.

        4.3.5   Taxes. The Corporation shall pay any and all issue and other similar taxes that may be payable in respect of any issuance or delivery of shares of Common Stock upon conversion of shares of Series A Preferred Stock pursuant to this Section 4. The Corporation shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of shares of Common Stock in a name other than that in which the shares of Series A Preferred Stock so converted were registered, and no such issuance or delivery shall be made unless and until the person or entity requesting such issuance has paid to the Corporation the amount of any such tax or has established, to the satisfaction of the Corporation, that such tax has been paid.

8

CRED_EXAMINER_00000807

4.4     Adjustments to Series A Conversion Price for Diluting Issues.

4.4.1     Special Definitions.  For purposes of this Article Fourth, the following definitions shall apply:

(a)     "**Option**" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Common Stock or Convertible Securities.

(b)     "**Series A Original Issue Date**" shall mean the date on which the first share of Series A Preferred Stock was issued.

(c)     "**Convertible Securities**" shall mean any evidences of indebtedness, shares or other securities directly or indirectly convertible into or exchangeable for Common Stock, but excluding Options.

(d)     "**Additional Shares of Common Stock**" shall mean all shares of Common Stock issued (or, pursuant to Subsection 4.4.3 below, deemed to be issued) by the Corporation after the Series A Original Issue Date, other than (1) the following shares of Common Stock and (2) shares of Common Stock deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, "**Exempted Securities**"):

(i)     shares of Common Stock, Options or Convertible Securities issued as a dividend or distribution on Series A Preferred Stock;

(ii)     shares of Common Stock, Options or Convertible Securities issued by reason of a dividend, stock split, split-up or other distribution on shares of Common Stock that is covered by Subsection 4.5, 4.6, 4.7 or 4.8;

(iii)     shares of Common Stock or Options issued to employees or directors of, or consultants or advisors to, the Corporation or any of its subsidiaries pursuant to a plan, agreement or arrangement approved by the Board of Directors of the Corporation; or

(iv)     shares of Common Stock or Convertible Securities actually issued upon the exercise of Options or shares of Common Stock actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security.

4.4.2     No Adjustment of Series A Conversion Price.  No adjustment in the Series A Conversion Price shall be made as the result of the issuance or deemed issuance of Additional Shares of Common Stock if the Corporation receives written notice from the Requisite Holders agreeing that no such adjustment shall be made as the result of the issuance or deemed issuance of such Additional Shares of Common Stock.

9

CRED_EXAMINER_00000808

### 4.4.3   Deemed Issue of Additional Shares of Common Stock.

(a)      If the Corporation at any time or from time to time after the Series A Original Issue Date shall issue any Options or Convertible Securities (excluding Options or Convertible Securities which are themselves Exempted Securities) or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of shares of Common Stock (as set forth in the instrument relating thereto, assuming the satisfaction of any conditions to exercisability, convertibility or exchangeability but without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Shares of Common Stock issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date.

(b)      If the terms of any Option or Convertible Security, the issuance of which resulted in an adjustment to the Series A Conversion Price pursuant to the terms of Subsection 4.4.4, are revised as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase or decrease in the number of shares of Common Stock issuable upon the exercise, conversion and/or exchange of any such Option or Convertible Security or (2) any increase or decrease in the consideration payable to the Corporation upon such exercise, conversion and/or exchange, then, effective upon such increase or decrease becoming effective, the Series A Conversion Price computed upon the original issue of such Option or Convertible Security (or upon the occurrence of a record date with respect thereto) shall be readjusted to such Series A Conversion Price as would have obtained had such revised terms been in effect upon the original date of issuance of such Option or Convertible Security. Notwithstanding the foregoing, no readjustment pursuant to this clause (b) shall have the effect of increasing the Series A Conversion Price to an amount which exceeds the lower of (i) the Series A Conversion Price in effect immediately prior to the original adjustment made as a result of the issuance of such Option or Convertible Security, or (ii) the Series A Conversion Price that would have resulted from any issuances of Additional Shares of Common Stock (other than deemed issuances of Additional Shares of Common Stock as a result of the issuance of such Option or Convertible Security) between the original adjustment date and such readjustment date.

(c)      If the terms of any Option or Convertible Security (excluding Options or Convertible Securities which are themselves Exempted Securities), the issuance of which did not result in an adjustment to the Series A Conversion Price pursuant to the terms of Subsection 4.4.4 (either because the consideration per share (determined pursuant to Subsection 4.4.5) of the Additional Shares of Common Stock subject thereto was equal to or greater than the Series A Conversion Price then in effect, or because such Option or Convertible Security was issued before the Series A Original Issue Date), are revised after the Series A Original Issue Date as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase in the number of shares of Common Stock issuable upon the exercise, conversion or exchange of any such Option or Convertible Security or (2) any decrease in the consideration payable to the Corporation upon such exercise, conversion or exchange, then such Option or Convertible Security, as so amended or adjusted, and the Additional Shares of Common Stock subject thereto (determined in the manner provided in Subsection 4.4.3(a) shall be deemed to have been issued effective upon such increase or decrease becoming effective.

10

4831-7607-9795

601712146.4

(d)     Upon the expiration or termination of any unexercised Option or unconverted or unexchanged Convertible Security (or portion thereof) which resulted (either upon its original issuance or upon a revision of its terms) in an adjustment to the Series A Conversion Price pursuant to the terms of Subsection 4.4.4, the Series A Conversion Price shall be readjusted to such Series A Conversion Price as would have obtained had such Option or Convertible Security (or portion thereof) never been issued.

(e)     If the number of shares of Common Stock issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Corporation upon such exercise, conversion and/or exchange, is calculable at the time such Option or Convertible Security is issued or amended but is subject to adjustment based upon subsequent events, any adjustment to the Series A Conversion Price provided for in this Subsection 4.4.3 shall be effected at the time of such issuance or amendment based on such number of shares or amount of consideration without regard to any provisions for subsequent adjustments (and any subsequent adjustments shall be treated as provided in clauses (b) and (c) of this Subsection 4.4.3). If the number of shares of Common Stock issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Corporation upon such exercise, conversion and/or exchange, cannot be calculated at all at the time such Option or Convertible Security is issued or amended, any adjustment to the Series A Conversion Price that would result under the terms of this Subsection 4.4.3 at the time of such issuance or amendment shall instead be effected at the time such number of shares and/or amount of consideration is first calculable (even if subject to subsequent adjustments), assuming for purposes of calculating such adjustment to the Series A Conversion Price that such issuance or amendment took place at the time such calculation can first be made.

4.4.4     Adjustment of Series A Conversion Price Upon Issuance of Additional Shares of Common Stock. In the event the Corporation shall at any time after the Series A Original Issue Date issue Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to Subsection 4.4.3), without consideration or for a consideration per share less than the Series A Conversion Price in effect immediately prior to such issuance or deemed issuance, then the Series A Conversion Price shall be reduced, concurrently with such issue, to a price (calculated to the nearest one-hundredth of a cent) determined in accordance with the following formula:

$$CP_2 = CP_1 * (A + B) \div (A + C).$$

For purposes of the foregoing formula, the following definitions shall apply:

(a)     "$CP_2$" shall mean the Series A Conversion Price in effect immediately after such issuance or deemed issuance of Additional Shares of Common Stock

(b)     "$CP_1$" shall mean the Series A Conversion Price in effect immediately prior to such issuance or deemed issuance of Additional Shares of Common Stock;

(c)     "A" shall mean the number of shares of Common Stock outstanding immediately prior to such issuance or deemed issuance of Additional Shares of Common Stock (treating for this purpose as outstanding all shares of Common Stock issuable upon exercise of Options outstanding immediately prior to such issuance or deemed issuance or upon conversion or exchange of Convertible Securities (including the Series A Preferred Stock) outstanding (assuming exercise of any outstanding Options therefor) immediately prior to such issue);

(d)     "B" shall mean the number of shares of Common Stock that would have been issued if such Additional Shares of Common Stock had been issued or deemed

11

CRED_EXAMINER_00000810

issued at a price per share equal to $CP_1$ (determined by dividing the aggregate consideration received by the Corporation in respect of such issue by $CP_1$); and

    (e)    "C" shall mean the number of such Additional Shares of Common Stock issued in such transaction.

    4.4.5   Determination of Consideration. For purposes of this Subsection 4.4, the consideration received by the Corporation for the issuance or deemed issuance of any Additional Shares of Common Stock shall be computed as follows:

    (a)    Cash and Property: Such consideration shall:

    (i)    insofar as it consists of cash, be computed at the aggregate amount of cash received by the Corporation, excluding amounts paid or payable for accrued interest;

    (ii)    insofar as it consists of property other than cash, be computed at the fair market value thereof at the time of such issue, as determined in good faith by the Board of Directors of the Corporation, including the approval of the Preferred Director; and

    (iii)    in the event Additional Shares of Common Stock are issued together with other shares or securities or other assets of the Corporation for consideration which covers both, be the proportion of such consideration so received, computed as provided in clauses (i) and (ii) above, as determined in good faith by the Board of Directors of the Corporation.

    (b)    Options and Convertible Securities. The consideration per share received by the Corporation for Additional Shares of Common Stock deemed to have been issued pursuant to Subsection 4.4.3, relating to Options and Convertible Securities, shall be determined by dividing:

    (i)    The total amount, if any, received or receivable by the Corporation as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Corporation upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the

12

CRED_EXAMINER_00000811

conversion or exchange of such Convertible Securities, by

(ii)    the maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities.

4.4.6    <u>Multiple Closing Dates</u>. In the event the Corporation shall issue on more than one date Additional Shares of Common Stock that are a part of one transaction or a series of related transactions and that would result in an adjustment to the Series A Conversion Price pursuant to the terms of <u>Subsection 4.4.4</u>, then, upon the final such issuance, the Series A Conversion Price shall be readjusted to give effect to all such issuances as if they occurred on the date of the first such issuance (and without giving effect to any additional adjustments as a result of any such subsequent issuances within such period).

4.5    <u>Adjustment for Stock Splits and Combinations</u>. If the Corporation shall at any time or from time to time after the Series A Original Issue Date effect a subdivision of the outstanding Common Stock, the Series A Conversion Price in effect immediately before that subdivision shall be proportionately decreased so that the number of shares of Common Stock issuable on conversion of each share of such series shall be increased in proportion to such increase in the aggregate number of shares of Common Stock outstanding. If the Corporation shall at any time or from time to time after the Series A Original Issue Date combine the outstanding shares of Common Stock, the Series A Conversion Price in effect immediately before the combination shall be proportionately increased so that the number of shares of Common Stock issuable on conversion of each share of such series shall be decreased in proportion to such decrease in the aggregate number of shares of Common Stock outstanding. Any adjustment under this subsection shall become effective at the close of business on the date the subdivision or combination becomes effective.

4.6    <u>Adjustment for Certain Dividends and Distributions</u>. In the event the Corporation at any time or from time to time after the Series A Original Issue Date shall make or issue, or fix a record date for the determination of holders of Common Stock entitled to receive, a dividend or other distribution payable on the Common Stock in additional shares of Common Stock, then and in each such event the Series A Conversion Price in effect immediately before such event shall be decreased as of the time of such issuance or, in the event such a record date shall have been fixed, as of the close of business on such record date, by multiplying the Series A Conversion Price then in effect by a fraction:

(1)    the numerator of which shall be the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date, and

(2)    the denominator of which shall be the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of

13

CRED_EXAMINER_00000812

business on such record date plus the number of shares of Common Stock issuable in payment of such dividend or distribution.

Notwithstanding the foregoing (a) if such record date shall have been fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed therefor, the Series A Conversion Price shall be recomputed accordingly as of the close of business on such record date and thereafter the Series A Conversion Price shall be adjusted pursuant to this subsection as of the time of actual payment of such dividends or distributions; and (b) that no such adjustment shall be made if the holders of Series A Preferred Stock simultaneously receive a dividend or other distribution of shares of Common Stock in a number equal to the number of shares of Common Stock as they would have received if all outstanding shares of Series A Preferred Stock had been converted into Common Stock on the date of such event.

4.7     Adjustments for Other Dividends and Distributions.  In the event the Corporation at any time or from time to time after the Series A Original Issue Date shall make or issue, or fix a record date for the determination of holders of Common Stock entitled to receive, a dividend or other distribution payable in securities of the Corporation (other than a distribution of shares of Common Stock in respect of outstanding shares of Common Stock) or in other property and the provisions of Section 1 do not apply to such dividend or distribution, then and in each such event the holders of Series A Preferred Stock shall receive, simultaneously with the distribution to the holders of Common Stock, a dividend or other distribution of such securities or other property in an amount equal to the amount of such securities or other property as they would have received if all outstanding shares of Series A Preferred Stock had been converted into Common Stock on the date of such event.

4.8     Adjustment for Merger or Reorganization, etc.  Subject to the provisions of Subsection 2.3, if there shall occur any reorganization, recapitalization, reclassification, consolidation or merger involving the Corporation in which the Common Stock (but not the Series A Preferred Stock) is converted into or exchanged for securities, cash or other property (other than a transaction covered by Subsections 4.4, 4.6 or 4.7), then, following any such reorganization, recapitalization, reclassification, consolidation or merger, each share of Series A Preferred Stock shall thereafter be convertible in lieu of the Common Stock into which it was convertible prior to such event into the kind and amount of securities, cash or other property which a holder of the number of shares of Common Stock of the Corporation issuable upon conversion of one share of Series A Preferred Stock immediately prior to such reorganization, recapitalization, reclassification, consolidation or merger would have been entitled to receive pursuant to such transaction; and, in such case, appropriate adjustment (as determined in good faith by the Board of Directors of the Corporation) shall be made in the application of the provisions in this Section 4 with respect to the rights and interests thereafter of the holders of the Series A Preferred Stock, to the end that the provisions set forth in this Section 4 (including provisions with respect to changes in and other adjustments of the Series A Conversion Price) shall thereafter be applicable, as nearly as reasonably may be, in relation to any securities or other property thereafter deliverable upon the conversion of the Series A Preferred Stock.

4.9     Certificate as to Adjustments.  Upon the occurrence of each adjustment or readjustment of the Series A Conversion Price pursuant to this Section 4, the Corporation at its expense shall, as promptly as reasonably practicable but in any event not later than ten (10) days thereafter, compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Series A Preferred Stock a certificate setting forth such adjustment or readjustment (including the kind and amount of securities, cash or other property into which the Series A Preferred Stock is convertible) and showing in detail the facts upon which such adjustment or readjustment is based.  The Corporation shall, as promptly as reasonably practicable after the written request at any time of any holder of Series A Preferred Stock (but in any event not later than ten (10) days thereafter), furnish or cause to be furnished to such holder a certificate setting forth (i) the Series A Conversion Price then in effect, and (ii) the

14

CRED_EXAMINER_00000813

number of shares of Common Stock and the amount, if any, of other securities, cash or property which then would be received upon the conversion of Series A Preferred Stock.

        4.10    Notice of Record Date.  In the event:

        (a)    the Corporation shall take a record of the holders of its Common Stock (or other capital stock or securities at the time issuable upon conversion of the Series A Preferred Stock) for the purpose of entitling or enabling them to receive any dividend or other distribution, or to receive any right to subscribe for or purchase any shares of capital stock of any class or any other securities, or to receive any other security; or

        (b)    of any capital reorganization of the Corporation, any reclassification of the Common Stock of the Corporation, or any Deemed Liquidation Event; or

        (c)    of the voluntary or involuntary dissolution, liquidation or winding-up of the Corporation,

then, and in each such case, the Corporation will send or cause to be sent to the holders of the Series A Preferred Stock a notice specifying, as the case may be, (i) the record date for such dividend, distribution or right, and the amount and character of such dividend, distribution or right, or (ii) the effective date on which such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up is proposed to take place, and the time, if any is to be fixed, as of which the holders of record of Common Stock (or such other capital stock or securities at the time issuable upon the conversion of the Series A Preferred Stock) shall be entitled to exchange their shares of Common Stock (or such other capital stock or securities) for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up, and the amount per share and character of such exchange applicable to the Series A Preferred Stock and the Common Stock.  Such notice shall be sent at least ten (10) days prior to the record date or effective date for the event specified in such notice.

        5.    Mandatory Conversion.

        5.1    Trigger Events.  Upon either (a) the closing of the sale of shares of Common Stock to the public in a firm-commitment underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended, resulting in at least $50,000,000 of gross proceeds, net of the underwriting discount and commissions, to the Corporation and in connection with such offering the Common Stock is listed for trading on the Nasdaq Stock Market's National Market, the New York Stock Exchange or another exchange or marketplace approved by the Board of Directors of the Corporation or (b) the date and time, or the occurrence of an event, specified by vote or written consent of the Requisite Holders (the time of such closing or the date and time specified or the time of the event specified in such vote or written consent is referred to herein as the "**Mandatory Conversion Time**"), then (i) all outstanding shares of Series A Preferred Stock shall automatically be converted into shares of Class A Common Stock, at the then effective conversion rate as calculated pursuant to Subsection 4.1.1. and (ii) such shares may not be reissued by the Corporation.

        5.2    Procedural Requirements.  All holders of record of shares of Series A Preferred Stock shall be sent written notice of the Mandatory Conversion Time and the place designated for mandatory conversion of all such shares of Series A Preferred Stock pursuant to this Section 5.  Such notice need not be sent in advance of the occurrence of the Mandatory Conversion Time.  Upon receipt of such notice, each holder of shares of Series A Preferred Stock in certificated form shall surrender his, her or its certificate or certificates for all such shares (or, if such holder alleges that such certificate has been

15

CRED_EXAMINER_00000814

lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate) to the Corporation at the place designated in such notice. If so required by the Corporation, any certificates surrendered for conversion shall be endorsed or accompanied by written instrument or instruments of transfer, in form satisfactory to the Corporation, duly executed by the registered holder or by his, her or its attorney duly authorized in writing. All rights with respect to the Series A Preferred Stock converted pursuant to Subsection 5.1, including the rights, if any, to receive notices and vote (other than as a holder of Common Stock), will terminate at the Mandatory Conversion Time (notwithstanding the failure of the holder or holders thereof to surrender any certificates at or prior to such time), except only the rights of the holders thereof, upon surrender of any certificate or certificates of such holders (or lost certificate affidavit and agreement) therefor, to receive the items provided for in the next sentence of this Subsection 5.2. As soon as practicable after the Mandatory Conversion Time and, if applicable, the surrender of any certificate or certificates (or lost certificate affidavit and agreement) for Series A Preferred Stock, the Corporation shall (a) issue and deliver to such holder, or to his, her or its nominees, a certificate or certificates for the number of full shares of Class A Common Stock issuable on such conversion in accordance with the provisions hereof and (b)pay cash as provided in Subsection 4.2 in lieu of any fraction of a share of Common Stock otherwise issuable upon such conversion and the payment of any declared but unpaid dividends on the shares of Series A Preferred Stock converted. Such converted Series A Preferred Stock shall be retired and cancelled and may not be reissued as shares of such series, and the Corporation may thereafter take such appropriate action (without the need for stockholder action) as may be necessary to reduce the authorized number of shares of Series A Preferred Stock accordingly.

6.    Reserved.

7.    Redeemed or Otherwise Acquired Shares. Any shares of Series A Preferred Stock that are redeemed or otherwise acquired by the Corporation or any of its subsidiaries shall be automatically and immediately cancelled and retired and shall not be reissued, sold or transferred. Neither the Corporation nor any of its subsidiaries may exercise any voting or other rights granted to the holders of Series A Preferred Stock following redemption.

8.    Waiver. Any of the rights, powers, preferences and other terms of the Series A Preferred Stock set forth herein may be waived on behalf of all holders of Series A Preferred Stock by the affirmative written consent or vote of the Requisite Holders.

9.    Notices. Any notice required or permitted by the provisions of this Article Fourth to be given to a holder of shares of Series A Preferred Stock shall be mailed, postage prepaid, to the post office address last shown on the records of the Corporation, or given by electronic communication in compliance with the provisions of the General Corporation Law, and shall be deemed sent upon such mailing or electronic transmission.

**FIFTH:** Subject to any additional vote required by this Certificate of Incorporation or Bylaws, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

**SIXTH:** Subject to any additional vote required by this Certificate of Incorporation, the number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation. Each director shall be entitled to one vote on each matter presented to the Board of Directors.

16

4831-7607-9795

601712146.4

**SEVENTH:** Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

**EIGHTH:** Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**NINTH:** To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this Article Ninth to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law as so amended.

Any repeal or modification of the foregoing provisions of this Article Ninth by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

**TENTH:** To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Corporation (and any other persons to which General Corporation Law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law.

Any amendment, repeal or modification of the foregoing provisions of this Article Tenth shall not (a) adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal or modification or (b) increase the liability of any director of the Corporation with respect to any acts or omissions of such director, officer or agent occurring prior to, such amendment, repeal or modification.

**ELEVENTH:** The Corporation renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity. An **"Excluded Opportunity"** is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of (i) any director of the Corporation who is not an employee of the Corporation or any of its subsidiaries, or (ii) any holder of Series A Preferred Stock or any partner, member, director, stockholder, employee, affiliate or agent of any such holder, other than someone who is an employee of the Corporation or any of its subsidiaries (collectively, the persons referred to in clauses (i) and (ii) are **"Covered Persons"**), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Corporation while such Covered Person is performing services in such capacity. Any repeal or modification of this Article Eleventh will only be prospective and will not affect the rights under this Article Eleventh in effect at the time of the occurrence of any actions or omissions to act giving rise to liability. Notwithstanding anything to the contrary contained elsewhere in this Certificate of Incorporation, the affirmative vote of the Requisite Holders will be required to amend or repeal, or to adopt any provisions inconsistent with this Article Eleventh.

17

CRED_EXAMINER_00000816

**TWELFTH:**    Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the Delaware General Corporation Law or the Corporation's certificate of incorporation or bylaws or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except for, as to each of (i) through (iv) above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction. If any provision or provisions of this Article Twelfth shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article Twelfth (including, without limitation, each portion of any sentence of this Article Twelfth containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

**THIRTEENTH:**    For purposes of Section 500 of the California Corporations Code (to the extent applicable), in connection with any repurchase of shares of Common Stock permitted under this Certificate of Incorporation from employees, officers, directors or consultants of the Corporation in connection with a termination of employment or services pursuant to agreements or arrangements approved by the Board of Directors (in addition to any other consent required under this Certificate of Incorporation), such repurchase may be made without regard to any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined in Section 500 of the California Corporations Code). Accordingly, for purposes of making any calculation under California Corporations Code Section 500 in connection with such repurchase, the amount of any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined therein) shall be deemed to be zero (0).

**FOURTEENTH:**    The name and mailing address of the Sole Incorporator is as follows:

Rebecca Floren
161 N. Clark St., Ste 4300
Chicago, IL 60601

\*    \*    \*

18

4831-7607-9795

601712146.4

CRED_EXAMINER_00000817

**IN WITNESS WHEREOF**, this Certificate of Incorporation has been executed this 10th day of March, 2020 by the undersigned, who affirms that the statements made herein are true and correct.


By: _/s/ Rebecca Floren_____
       Sole Incorporator

4831-7607-9795

601712146.4

CRED_EXAMINER_00000818

**Exhibit B**

CRED_EXAMINER_00000819

## ACTION BY WRITTEN CONSENT OF
## THE SOLE INCORPORATOR
## OF
## CRED CAPITAL, INC.

The undersigned, being the sole incorporator of Cred Capital, Inc. a Delaware corporation (the "Corporation"), pursuant to the Delaware General Corporation Law, hereby adopts the following resolutions by written consent as of March 10, 2020:

**INCORPORATION**

**RESOLVED,** that the Certificate of Incorporation of the Corporation, having been filed in the office of the Secretary of State of the State of Delaware on March 10, 2020, be and hereby is, adopted as the Certificate of Incorporation of the Corporation, and, following approval thereof by the Board of Directors of the Corporation, a copy of such Certificate of Incorporation bearing the Secretary of State's filing stamp be placed in the Corporation's minute book.

**APPOINTMENT OF DIRECTORS**

**RESOLVED,** that James Alexander be, and hereby is, appointed as the initial director of the Corporation to serve until the first annual meeting of stockholders or until his successor is duly elected and qualified.

**RESIGNATION**

**RESOLVED,** that I hereby assign all of my rights, responsibilities and duties as incorporator of the Corporation to the above-named director.

*[Remainder of Page Intentionally Left Blank]*

601704855.3

CRED_EXAMINER_00000820

**IN WITNESS WHEREOF,** the undersigned has executed this Action by Written Consent as of the date first above written.

DocuSigned by:

*Rebecca Floren*

Rebecca Floren, Sole Incorporator

CRED_EXAMINER_00000821

**Exhibit C**

CRED_EXAMINER_00000822

DocuSign Envelope ID: DBD8985E-D0D1-4DA1-B5B9-55FB8F62F1F8

**ORGANIZATIONAL CONSENT IN LIEU OF A MEETING**
**OF THE BOARD OF DIRECTORS**
**OF**
**CRED CAPITAL, INC.**
**(a Delaware corporation)**

Pursuant to Section 141(f) of the Delaware General Corporation Law (the "DGCL"), the undersigned, being all of the members of the Board of Directors (the "Board") of Cred Capital, Inc., a Delaware corporation (the "Corporation"), hereby consent to, vote in favor of and adopt the following resolutions by written consent (this "Consent"):

**RATIFICATION OF SOLE INCORPORATOR ACTION**

**RESOLVED,** that the Action by Written Consent of the Sole Incorporator, dated as of even date herewith, appointing the Corporation's initial directors be, and it hereby is, ratified, approved and confirmed in all respects; and

**RESOLVED FURTHER,** that the actions taken by the sole incorporator of the Corporation on and prior to the date hereof, for the purposes of (i) organizing and incorporating the Corporation, (ii) naming the initial directors to the Board of Directors of the Corporation, and (iii) resigning as the sole incorporator of the Corporation, be, and each of them hereby is in all respects ratified, approved and confirmed as actions of the Corporation.

**APPOINTMENT OF OFFICERS**

**RESOLVED,** that effective as of the date hereof, the following individual be, and he hereby is, appointed to offices set forth opposite his name, to serve as the sole officer of the Corporation until the earlier of his death, resignation or removal.

| Title | Name |
|---|---|
| James Alexander | President |
| Joe Podulka | Treasurer |
| Daniel Wheeler | Secretary |

**BOARD SIZE**

**RESOLVED,** that the Board of Directors shall be comprised of one director, until such number is changed by resolution of the Board of Directors of the Corporation.

CRED_EXAMINER_00000823

DocuSign Envelope ID: DBD8985

**CERTIFICATE OF INCORPORATION**

**RESOLVED,** that the Certificate of Incorporation of the Corporation filed with the Secretary of State of the State of Delaware on March 10, 2020 be, and it hereby is, ratified and adopted.

**ADOPTION OF BYLAWS**

**RESOLVED,** that the Bylaws attached hereto as <u>Exhibit A</u> be, and they hereby are, adopted as the Bylaws of and for this Corporation; and

**RESOLVED FURTHER,** that the Secretary of the Corporation be, and the Secretary hereby is, authorized and directed to execute a Certificate of Adoption of the Bylaws, to insert the Bylaws in the Corporation's Minute Book and to see that a copy of the Bylaws is kept at the Corporation's principal office, as required by law.

**DESIGNATION OF DEPOSITORY**

**RESOLVED,** that the officers of the Corporation be, and each hereby is, authorized:

**(a)** To designate one or more banks or similar financial institutions as depositories of the funds of the Corporation;

**(b)** To open, maintain, and close general and special accounts with any such depositories;

**(c)** To cause to be deposited, from time to time, in such accounts with any such depository, such funds of the Corporation as such officers deems necessary or advisable, and to designate or change the designation of the officer or officers or agent or agents of the Corporation authorized to make such deposits and to endorse checks, drafts, and other instruments for deposit;

**(d)** To designate, change, or revoke, the designation, from time to time of the officer or officers or agent or agents of the Corporation authorized to sign or countersign checks, drafts, or other orders for the payment of money issued in the name of the Corporation against any funds deposited in any of such accounts;

**(e)** To authorize the use of facsimile signatures for the signing or countersigning of checks, drafts, or other orders for the payment of money, and to enter into such agreements as banks and similar financial institutions customarily require as a condition for permitting the use of facsimile signatures; and

**(f)** To make such general and special rules and regulations with respect to such accounts as they may deem necessary or advisable and to complete, execute, and certify any customary printed blank signature card forms in order to exercise conveniently the authority granted by this resolution and any resolutions printed on such cards are deemed adopted as a part of this resolution.

CRED_EXAMINER_00000824

DocuSign Envelope ID: DBD8985A-D0D1-4DA1-B5B9-55FB6E62F1E8

**RESOLVED FURTHER,** that all form resolutions required by any such depository be, and they hereby are, adopted in such form used by such depository, and that the officers be, and each hereby is, authorized to certify such resolutions as having been adopted herein and that the officers be, and each hereby is, directed to insert a copy of any such form resolutions in the Minute Book of the Corporation;

**RESOLVED FURTHER,** that any such depository to which a certified copy of these resolutions has been delivered by any officer of the Corporation be, and it hereby is, authorized and entitled to rely upon such resolutions for all purposes until it shall have received written notice of the revocation or amendment of these resolutions adopted by the Board;

**RESOLVED FURTHER,** that the officers of this Corporation be, and hereby are, authorized and directed to establish an account with a bank and to deposit the funds of this Corporation therein;

**RESOLVED FURTHER,** that any officer, employee or agent of this Corporation be, and each hereby is, authorized to endorse checks, drafts or other evidences of indebtedness made payable to this Corporation, but only for the purpose of deposit;

**RESOLVED FURTHER,** that all checks, drafts and other instruments obligating this Corporation to pay money shall be signed on behalf of this Corporation by an officer of the Corporation or as delegated by an officer of the Corporation;

**RESOLVED FURTHER,** that such bank be, and hereby is, authorized to honor and pay any and all checks and drafts of this Corporation signed as provided herein;

**RESOLVED FURTHER,** that the authority hereby conferred shall remain in force until revoked by the Board and until written notice of such revocation shall have been received by such bank; and

**RESOLVED FURTHER,** that the officers of this Corporation be, and each hereby is, authorized to certify as to the continuing authority of these resolutions, the persons authorized to sign on behalf of this Corporation and the adoption of such bank's standard form of resolutions.

## FISCAL YEAR

**RESOLVED,** that the fiscal year of this Corporation shall end on December 31st of each year.

## QUALIFICATION TO DO BUSINESS

**RESOLVED,** that the officers of the Corporation be, and each of them individually hereby is, authorized and directed, for and on behalf of the Corporation, to make such filings and applications, to execute and deliver such documents and instruments, and to do such acts and things as such officer deems necessary or advisable in order to qualify to do business in such states as the officers deem necessary or desirable for the Corporation's business.

CRED_EXAMINER_00000825

DocuSign Envelope ID: DBD8985 4-D0D1-4D1A-95B9-55FB6F62F1F8

**MANAGEMENT POWERS**

RESOLVED, that the officers of the Corporation be, and each of them individually hereby is, authorized to sign and execute in the name and on behalf of the Corporation all applications, contracts, leases and other deeds and documents or instruments in writing of whatsoever nature that may be required in the ordinary course of business of the Corporation and that may be necessary to secure for operation of the corporate affairs, governmental permits and licenses for, and incidental to, the lawful operations of the business of the Corporation, and to do such acts and things as such officers deem necessary or advisable to fulfill such legal requirements as are applicable to the Corporation and its business.

**ADOPTION OF FORM OF COMMON STOCK CERTIFICATES**

RESOLVED, that the stock certificates representing the Class A Common Stock and the Class B Common Stock of the Corporation be in substantially the form of stock certificates attached hereto as Exhibit B; that each such stock certificate shall bear the name of the Corporation, the number of shares represented thereby, the name of the owner of such shares and the date such shares were issued; and

RESOLVED FURTHER, that such stock certificates shall be consecutively numbered beginning with No. 1; shall be issued only when the signature of the President and the Secretary, or other such officers as provided in Section 158 of the DGCL or the Bylaws, are affixed thereto; and that such stock certificates may also bear other wording related to the ownership, issuance and transferability of the shares represented thereby.

**EMPLOYER TAX IDENTIFICATION NUMBER**

RESOLVED, that the appropriate officer of the Corporation be, and such officer hereby is, authorized and directed to apply to the IRS for an employer's identification number on Form SS-4.

**ISSUANCE OF COMMON STOCK**

RESOLVED, that the officers of the Corporation be, and each hereby is, authorized and directed, for and on behalf of the Corporation, to sell and issue shares of the common stock (the "Common Stock") of the Corporation to the following individuals (the "Stockholders"), for good and valuable consideration:

| Stockholder | Number of Shares | Class |
|---|---|---|
| Cred LLC | 5,000,000 | Class B |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

CRED_EXAMINER_00000826

DocuSign Envelope ID: DBD8985E-D0D1-4DA1-95B9-55FB6F62F1E8

RESOLVED FURTHER, that upon receipt of full payment for such Common Stock, the appropriate officer of the Corporation will execute and deliver to the Stockholder a stock certificate evidencing his ownership of such shares, and that such shares, when issued as provided herein, shall be fully paid and nonassessable;

RESOLVED FURTHER, that the Common Shares shall be issued in reliance on any applicable exemption from registration provided by the Securities Act of 1933, as amended, and any applicable exemption under applicable state securities laws, and that the officers of the Corporation are authorized and directed, for and on behalf of the Corporation, to execute and file any forms, certificates, notices or other documents that are necessary or appropriate pursuant to federal or state securities laws; and

RESOLVED FURTHER, that the officers of the Corporation be, and each hereby is, authorized and directed, for and on behalf of the Corporation, to take such further action and execute such additional documents as each may deem necessary or appropriate to carry out the purposes of the above resolutions.

RATIFICATION

RESOLVED, that all prior acts done on behalf of this Corporation by the sole incorporator or his agents be, and the same hereby are, ratified and approved as acts of this Corporation; and

RESOLVED FURTHER, that all agreements and documents executed and delivered prior to these resolutions and all actions heretofore taken by any of the officers of the Corporation or their agents are hereby approved, adopted, authorized, ratified and confirmed in all respects as the proper acts and deeds of the Corporation.

INCORPORATION EXPENSES

RESOLVED, that the officers of this Corporation be, and each hereby is, authorized and directed to pay the expenses of the incorporation and organization of this Corporation.

ADDITIONAL FILINGS

RESOLVED, that the officers of the Corporation be, and each hereby is, authorized and directed, for and on behalf of the Corporation, to make such filings and applications, to execute and deliver such documents and instruments, and to do such acts and things as such officer deems necessary or advisable in order to obtain such licenses, authorizations and permits as are necessary or desirable, for the Corporation's business, and to fulfill such legal requirements as are applicable to the Corporation and its business and to complete the organization of the Corporation.

GENERAL AUTHORIZING RESOLUTIONS

RESOLVED, that the officers are hereby authorized and directed, in the name and on behalf of the Corporation, to take such further action and execute such documents as they may consider necessary or appropriate for the purposes of effectuating the foregoing resolutions; and

CRED_EXAMINER_00000827

DocuSign Envelope ID: DBD8985-D0D1-4D1A-95B9-55FB6F62F1E8

RESOLVED FURTHER, that the execution and delivery by the officers of any agreement, instrument, certificate or other document and the taking of any other action in connection with any of the foregoing matters shall evidence such officer's approval thereof and the authority therefor and the approval, adoption, authorization, ratification and confirmation by the undersigned and by the Corporation of such agreement, instrument, certificate, document or action.

IN WITNESS WHEREOF, the undersigned, being all of the members of the Board of Directors of the Corporation, have executed this Consent to be effective as of March 16, 2020, and hereby direct that this Consent be filed with the minutes of the proceedings of the Corporation's Board of Directors.

**DIRECTORS:**

DocuSigned by:

*James Alexander*

6E984A8E73A643D...

James Alexander

6

**EXHIBIT A**

**BYLAWS**

601704592.3

CRED_EXAMINER_00000829

## EXHIBIT B

### FORM OF COMMON STOCK CERTIFICATES

CRED_EXAMINER_00000830

**Exhibit D**

CRED_EXAMINER_00000831

# BYLAWS

## OF

## CRED CAPITAL, INC.

## A DELAWARE CORPORATION

601704466.3

CRED_EXAMINER_00000832

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. I

**ARTICLE I** OFFICES ............................................................................................. 1

Section 1.    Registered Office ........................................................................ 1
Section 2.    Other Offices ............................................................................... 1

**ARTICLE II** CORPORATE SEAL .......................................................................... 1

Section 3.    Corporate Seal ............................................................................ 1

**ARTICLE III** STOCKHOLDERS' MEETINGS ...................................................... 1

Section 4.    Place of Meetings ....................................................................... 1
Section 5.    Annual Meeting .......................................................................... 1
Section 6.    Special Meetings ........................................................................ 2
Section 7.    Notice of Meetings ..................................................................... 2
Section 8.    Quorum ....................................................................................... 3
Section 9.    Adjournment and Notice of Adjourned Meetings ...................... 3
Section 10.   Voting Rights .............................................................................. 3
Section 11.   Joint Owners of Stock ................................................................ 4
Section 12.   List of Stockholders ................................................................... 4
Section 13.   Action Without Meeting ............................................................ 4
Section 14.   Organization ............................................................................... 5

**ARTICLE IV** DIRECTORS ..................................................................................... 6

Section 15.   Number and Term of Office ....................................................... 6
Section 16.   Powers ........................................................................................ 6
Section 17.   Term of Directors ....................................................................... 6
Section 18.   Vacancies .................................................................................... 6
Section 19.   Resignation ................................................................................. 7
Section 20.   Removal ...................................................................................... 7
Section 21.   Meetings ..................................................................................... 7
Section 22.   Quorum and Voting .................................................................... 8
Section 23.   Action Without Meeting ............................................................ 8
Section 24.   Fees and Compensation ............................................................. 9
Section 25.   Committees ................................................................................. 9
Section 26.   Organization ............................................................................... 10

**ARTICLE V** OFFICERS ......................................................................................... 10

Section 27.   Officers Designated .................................................................... 10
Section 28.   Tenure and Duties of Officers .................................................... 10
Section 29.   Delegation of Authority ............................................................. 12
Section 30.   Resignations ............................................................................... 12

601704466.3

CRED_EXAMINER_00000833

Section 31.    Removal ........................................................................................ 12

**ARTICLE VI** EXECUTION OF CORPORATE INSTRUMENTS AND VOTING OF
SECURITIES OWNED BY THE CORPORATION ........................................... 12

Section 32.    Execution of Corporate Instruments ................................................. 12
Section 33.    Voting of Securities Owned by the Corporation ............................... 13

**ARTICLE VII** SHARES OF STOCK ................................................................... 13

Section 34.    Form and Execution of Certificates ................................................. 13
Section 35.    Lost Certificates ............................................................................... 14
Section 36.    Transfers .......................................................................................... 14
Section 37.    Fixing Record Dates ........................................................................ 14
Section 38.    Registered Stockholders .................................................................. 15

**ARTICLE VIII** OTHER SECURITIES OF THE CORPORATION ..................... 15

Section 39.    Execution of Other Securities ......................................................... 15

**ARTICLE IX** DIVIDENDS ................................................................................ 16

Section 40.    Declaration of Dividends ................................................................. 16
Section 41.    Dividend Reserve ............................................................................. 16

**ARTICLE X** FISCAL YEAR ............................................................................. 16

Section 42.    Fiscal Year ....................................................................................... 16

**ARTICLE XI** INDEMNIFICATION .................................................................. 16

Section 43.    Indemnification of Directors, Executive Officers, Other Officers,
Employees and Other Agents ........................................................... 16

**ARTICLE XII** NOTICES .................................................................................... 20

Section 44.    Notices ............................................................................................. 20

**ARTICLE XIII** AMENDMENTS ....................................................................... 20

Section 45.    Amendments ..................................................................................... 20

**ARTICLE XIV** LOANS TO OFFICERS; RIGHT OF FIRST REFUSAL ............ 21

Section 46.    Loans to Officers ............................................................................. 21
Section 47.    Right of First Refusal ...................................................................... 21

CERTIFICATE OF SECRETARY ......................................................................... 1

CRED_EXAMINER_00000834

# BYLAWS

## OF

## CRED CAPITAL, INC.

## A DELAWARE CORPORATION

### ARTICLE I

### OFFICES

**Section 1.**  **Registered Office.**  The registered office of the corporation in the State of Delaware shall be in the City of Dover, County of Kent or such other place as may be determined by the Board of Directors.

**Section 2.**  **Other Offices.**  The corporation shall also have and maintain an office or principal place of business at such place as may be fixed by the Board of Directors, and may also have offices at such other places, both within and outside of the State of Delaware, as the Board of Directors may from time to time determine or the business of the corporation may require.

### ARTICLE II

### CORPORATE SEAL

**Section 3.**  **Corporate Seal.**  The Board of Directors may adopt a corporate seal. The corporate seal shall bear the name of the corporation and the inscription "Corporate Seal-Delaware." Said seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

### ARTICLE III

### STOCKHOLDERS' MEETINGS

**Section 4.**  **Place of Meetings.**  Meetings of the stockholders of the corporation may be held at such place, either within or outside of the State of Delaware, as may be determined from time to time by the Board of Directors. The Board of Directors may, in its sole discretion, determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication as provided under the Delaware General Corporation Law ("DGCL").

**Section 5.**  **Annual Meeting.**  An annual meeting of the stockholders shall be held on such date and at such time as may be designated from time to time by the Board of Directors, for the purpose of electing directors and for the transaction of such other business as may be properly brought before the meeting. If the day fixed for the annual meeting shall be a legal holiday, such meeting shall be held on the next succeeding business day. If the election of

CRED_EXAMINER_00000835

directors shall not be held on the day designated herein for any annual meeting of the stockholders, or at any adjournment thereof, the Board of Directors shall cause the election to be held at a meeting of the stockholders as soon thereafter as conveniently may be. Failure to hold an annual meeting as required by these bylaws shall not invalidate any action taken by the Board of Directors or officers of the corporation.

**Section 6.**    **Special Meetings.**

(a)    Special meetings of the stockholders of the corporation may be called, for any purpose or purposes, by (i) the Chairman of the Board of Directors, (ii) the Chief Executive Officer, or (iii) the Board of Directors pursuant to a resolution adopted by a majority of the total number of authorized directors (whether or not there exist any vacancies in previously authorized directorships at the time any such resolution is presented to the Board of Directors for adoption) or (iv) by the holders of shares entitled to cast not less than ten percent (10%) of the votes at the meeting and shall be held at such place, on such date, and at such time as the Board of Directors shall fix.

(b)    If a special meeting is properly called by any person or persons other than the Board of Directors, the request shall be in writing, specifying the general nature of the business proposed to be transacted, and shall be delivered personally or sent by certified or registered mail, return receipt requested, or by telegraphic or other facsimile transmission to the Chairman of the Board of Directors, the Chief Executive Officer, or the Secretary of the corporation. No business may be transacted at such special meeting otherwise than specified in such notice. The Board of Directors shall determine the time and place of such special meeting, which shall be held not less than thirty-five (35) nor more than one hundred twenty (120) days after the date of the receipt of the request. Upon determination of the time and place of the meeting, the officer receiving the request shall cause notice to be given to the stockholders entitled to vote, in accordance with the provisions of Section 7 of these Bylaws. Nothing contained in this paragraph (b) shall be construed as limiting, fixing, or affecting the time when a meeting of stockholders called by action of the Board of Directors may be held.

**Section 7.**    **Notice of Meetings.** Except as otherwise provided by law or the Certificate of Incorporation, notice, given in writing or by electronic transmission, of each meeting of stockholders shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting, such notice to specify the place, if any, date and hour and purpose or purposes of the meeting and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting. Notice of the time, place, if any, and purpose of any meeting of stockholders may be waived in writing, signed by the person entitled to notice thereof or by electronic transmission by such person, either before or after such meeting, and will be waived by any stockholder by his attendance thereat in person, by remote communication, if applicable, or by proxy, except when the stockholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Any stockholder so waiving notice of such meeting shall be bound by the proceedings of any such meeting in all respects as if due notice thereof had been given.

2

CRED_EXAMINER_00000836

**Section 8.    Quorum**. At all meetings of stockholders, except where otherwise provided by statute or by the Certificate of Incorporation, or by these Bylaws, the presence, in person, by remote communication, if applicable, or by proxy duly authorized, of the holders of a majority of the outstanding shares of stock entitled to vote shall constitute a quorum for the transaction of business. In the absence of a quorum, any meeting of stockholders may be adjourned, from time to time, either by the chairman of the meeting or by vote of the holders of a majority of the shares represented thereat, but no other business shall be transacted at such meeting. The stockholders present at a duly called or convened meeting, at which a quorum is present, may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum. Except as otherwise provided by statute, or by the Certificate of Incorporation or these Bylaws, in all matters other than the election of directors, the affirmative vote of a majority of shares present in person, by remote communication, if applicable, or represented by proxy duly authorized at the meeting and entitled to vote generally on the subject matter shall be the act of the stockholders. Except as otherwise provided by statute, the Certificate of Incorporation or these Bylaws, directors shall be elected by a plurality of the votes of the shares present in person, by remote communication, if applicable, or represented by proxy duly authorized at the meeting and entitled to vote generally on the election of directors. Where a separate vote by a class or classes or series is required, except where otherwise provided by the statute or by the Certificate of Incorporation or these Bylaws, a majority of the outstanding shares of such class or classes or series, present in person, by remote communication, if applicable, or represented by proxy duly authorized, shall constitute a quorum entitled to take action with respect to that vote on that matter. Except where otherwise provided by statute or by the Certificate of Incorporation or these Bylaws, the affirmative vote of the majority (plurality, in the case of the election of directors) of shares of such class or classes or series present in person, by remote communication, if applicable, or represented by proxy at the meeting shall be the act of such class or classes or series.

**Section 9.    Adjournment and Notice of Adjourned Meetings**. Any meeting of stockholders, whether annual or special, may be adjourned from time to time either by the chairman of the meeting or by the vote of a majority of the shares present in person, by remote communication, if applicable, or represented by proxy. When a meeting is adjourned to another time or place, if any, notice need not be given of the adjourned meeting if the time and place, if any, thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

**Section 10.    Voting Rights**. For the purpose of determining those stockholders entitled to vote at any meeting of the stockholders, except as otherwise provided by law, only persons in whose names shares stand on the stock records of the corporation on the record date, as provided in Section 12 of these Bylaws, shall be entitled to vote at any meeting of stockholders. Every person entitled to vote or execute consents shall have the right to do so either in person, by remote communication, if applicable, or by an agent or agents authorized by a proxy granted in accordance with Delaware law. An agent so appointed need not be a stockholder. No proxy shall be voted after three (3) years from its date of creation unless the proxy provides for a longer period.

3

CRED_EXAMINER_00000837

**Section 11.**   **Joint Owners of Stock.**  If shares or other securities having voting power stand of record in the names of two (2) or more persons, whether fiduciaries, members of a partnership, joint tenants, tenants in common, tenants by the entirety, or otherwise, or if two (2) or more persons have the same fiduciary relationship respecting the same shares, unless the Secretary is given written notice to the contrary and is furnished with a copy of the instrument or order appointing them or creating the relationship wherein it is so provided, their acts with respect to voting shall have the following effect:  (a) if only one (1) votes, his act binds all; (b) if more than one (1) votes, the act of the majority so voting binds all; (c) if more than one (1) votes, but the vote is evenly split on any particular matter, each faction may vote the securities in question proportionally, or may apply to the Delaware Court of Chancery for relief as provided in the DGCL, Section 217(b).  If the instrument filed with the Secretary shows that any such tenancy is held in unequal interests, a majority or even-split for the purpose of subsection (c) shall be a majority or even-split in interest.

**Section 12.**   **List of Stockholders.**  The Secretary shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at said meeting, arranged in alphabetical order, showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or during ordinary business hours, at the principal place of business of the corporation.  In the event that the corporation determines to make the list available on an electronic network, the corporation may take reasonable steps to ensure that such information is available only to stockholders of the corporation.  The list shall be open to examination of any stockholder during the time of the meeting as provided by law produced and kept at the time and place of meeting during the whole time thereof and may be inspected by any stockholder who is present.

**Section 13.**   **Action Without Meeting.**

(a)   Unless otherwise provided in the Certificate of Incorporation, any action required by statute to be taken at any annual or special meeting of the stockholders, or any action which may be taken at any annual or special meeting of the stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, or by electronic transmission setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

(b)   Every written consent or electronic transmission shall bear the date of signature of each stockholder who signs the consent, and no written consent or electronic transmission shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered to the corporation in the manner herein required, written consents or electronic transmissions signed by a sufficient number of stockholders to take action are delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded.

4

CRED_EXAMINER_00000838

Delivery made to a corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

(c)    Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing or by electronic transmission and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of stockholders to take action were delivered to the corporation as provided in Section 228(c) of the DGCL. If the action which is consented to is such as would have required the filing of a certificate under any section of the DGCL if such action had been voted on by stockholders at a meeting thereof, then the certificate filed under such section shall state, in lieu of any statement required by such section concerning any vote of stockholders, that written consent has been given in accordance with Section 228 of the DGCL.

(d)    An electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes of this section, provided that any such electronic transmission sets forth or is delivered with information from which the corporation can determine (i) that the electronic transmission was transmitted by the stockholder or proxyholder or by a person or persons authorized to act for the stockholder and (ii) the date on which such stockholder or proxyholder or authorized person or persons transmitted such electronic transmission. The date on which such electronic transmission is transmitted shall be deemed to be the date on which such consent was signed. No consent given by electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and until such paper form shall be delivered to the corporation by delivery to its registered office in the state of Delaware, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to a corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested. Notwithstanding the foregoing limitations on delivery, consents given by electronic transmission may be otherwise delivered to the principal place of business of the corporation or to an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded if, to the extent and in the manner provided by resolution of the board of directors of the corporation. Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

Section 14.    Organization.

(a)    At every meeting of stockholders, the Chairman of the Board of Directors, or, if a Chairman has not been appointed or is absent, the Chief Executive Officer, or, if the Chief Executive Officer is absent, a chairman of the meeting chosen by a majority in interest of the stockholders entitled to vote, present in person or by proxy, shall act as chairman. The Secretary, or, in his absence, an Assistant Secretary directed to do so by the Chief Executive Officer, shall act as secretary of the meeting.

CRED_EXAMINER_00000839

(b)    The Board of Directors of the corporation shall be entitled to make such rules or regulations for the conduct of meetings of stockholders as it shall deem necessary, appropriate or convenient. Subject to such rules and regulations of the Board of Directors, if any, the chairman of the meeting shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are necessary, appropriate or convenient for the proper conduct of the meeting, including, without limitation, establishing an agenda or order of business for the meeting, rules and procedures for maintaining order at the meeting and the safety of those present, limitations on participation in such meeting to stockholders of record of the corporation and their duly authorized and constituted proxies and such other persons as the chairman shall permit, restrictions on entry to the meeting after the time fixed for the commencement thereof, limitations on the time allotted to questions or comments by participants and regulation of the opening and closing of the polls for balloting on matters which are to be voted on by ballot. The date and time of the opening and closing of the polls for each matter upon which the stockholders will vote at the meeting shall be announced at the meeting. Unless and to the extent determined by the Board of Directors or the chairman of the meeting, meetings of stockholders shall not be required to be held in accordance with rules of parliamentary procedure.

## ARTICLE IV

## DIRECTORS

**Section 15.    Number and Term of Office.** The authorized number of directors of the corporation shall be fixed by the Board of Directors from time to time. Directors need not be stockholders unless so required by the Certificate of Incorporation. If for any cause, the directors shall not have been elected at an annual meeting, they may be elected as soon thereafter as convenient.

**Section 16.    Powers.** The powers of the corporation shall be exercised, its business conducted and its property controlled by the Board of Directors, except as may be otherwise provided by statute or by the Certificate of Incorporation.

### Section 17.    Term of Directors.

(a)    Subject to the rights of the holders of any series of Preferred Stock to elect additional directors under specified circumstances, directors shall be elected at each annual meeting of stockholders for a term of one year. Each director shall serve until his successor is duly elected and qualified or until his death, resignation or removal. No decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent director.

### Section 18.    Vacancies.

(a)    Unless otherwise provided in the Certificate of Incorporation, and subject to the rights of the holders of any series of Preferred Stock, any vacancies on the Board of Directors resulting from death, resignation, disqualification, removal or other causes and any newly created directorships resulting from any increase in the number of directors shall, unless

6

CRED_EXAMINER_00000840

the Board of Directors determines by resolution that any such vacancies or newly created directorships shall be filled by stockholders, be filled only by the affirmative vote of a majority of the directors then in office, even though less than a quorum of the Board of Directors. Any director elected in accordance with the preceding sentence shall hold office for the remainder of the full term of the director for which the vacancy was created or occurred and until such director's successor shall have been elected and qualified. A vacancy in the Board of Directors shall be deemed to exist under this Bylaw in the case of the death, removal or resignation of any director.

Section 19.    **Resignation**. Any director may resign at any time by delivering his or her notice in writing or by electronic transmission to the Secretary, such resignation to specify whether it will be effective at a particular time, upon receipt by the Secretary or at the pleasure of the Board of Directors. If no such specification is made, it shall be deemed effective at the pleasure of the Board of Directors. When one or more directors shall resign from the Board of Directors, effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each Director so chosen shall hold office for the unexpired portion of the term of the Director whose place shall be vacated and until his successor shall have been duly elected and qualified.

Section 20.    **Removal**.

(a)    Subject to any limitations imposed by applicable law, the Board of Directors or any director may be removed from office at any time (i) with cause by the affirmative vote of the holders of a majority of the voting power of all then-outstanding shares of capital stock of the corporation entitled to vote generally at an election of directors or (ii) without cause by the affirmative vote of the holders of a majority of the voting power of all then-outstanding shares of capital stock of the corporation, entitled to vote generally at an election of directors.

Section 21.    **Meetings**.

(a)    **Regular Meetings.** Unless otherwise restricted by the Certificate of Incorporation, regular meetings of the Board of Directors may be held at any time or date and at any place within or outside of the State of Delaware which has been designated by the Board of Directors and publicized among all directors, either orally or in writing, including a voice-messaging system or other system designated to record and communicate messages, facsimile, telegraph or telex, or by electronic mail or other electronic means. No further notice shall be required for a regular meeting of the Board of Directors.

(b)    **Special Meetings.** Unless otherwise restricted by the Certificate of Incorporation, special meetings of the Board of Directors may be held at any time and place within or outside of the State of Delaware whenever called by the Chairman of the Board, the President or any director.

(c)    **Meetings by Electronic Communications Equipment.** Any member of the Board of Directors, or of any committee thereof, may participate in a meeting by means of

7

conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(d)    **Notice of Special Meetings.**  Notice of the time and place of all special meetings of the Board of Directors shall be orally or in writing, by telephone, including a voice messaging system or other system or technology designed to record and communicate messages, facsimile, telegraph or telex, or by electronic mail or other electronic means, during normal business hours, at least twenty-four (24) hours before the date and time of the meeting, or sent in writing to each director by first class mail, postage prepaid, at least three (3) days before the date of the meeting.  Notice of any meeting may be waived in writing or by electronic transmission at any time before or after the meeting and will be waived by any director by attendance thereat, except when the director attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

(e)    **Waiver of Notice.**  The transaction of all business at any meeting of the Board of Directors, or any committee thereof, however called or noticed, or wherever held, shall be as valid as though had at a meeting duly held after regular call and notice, if a quorum be present and if, either before or after the meeting, each of the directors not present who did not receive notice shall sign a written waiver of notice or shall waive notice by electronic transmission.  All such waivers shall be filed with the corporate records or made a part of the minutes of the meeting.

### Section 22.    Quorum and Voting.

(a)    Unless the Certificate of Incorporation requires a greater number, a quorum of the Board of Directors shall consist of a majority of the exact number of directors fixed from time to time by the Board of Directors in accordance with the Certificate of Incorporation; provided, however, at any meeting, whether a quorum be present or otherwise, a majority of the directors present may adjourn from time to time until the time fixed for the next regular meeting of the Board of Directors, without notice other than by announcement at the meeting.

(b)    At each meeting of the Board of Directors at which a quorum is present, all questions and business shall be determined by the affirmative vote of a majority of the directors present, unless a different vote be required by law, the Certificate of Incorporation or these Bylaws.

### Section 23.    Action Without Meeting.  Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board of Directors or committee, as the case may be, consent thereto in writing or by electronic transmission, and such writing or writings or transmission or transmissions are filed with the minutes of proceedings of the Board of Directors or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

CRED_EXAMINER_00000842

**Section 24.    Fees and Compensation.** Directors shall be entitled to such compensation for their services as may be approved by the Board of Directors, including, if so approved, by resolution of the Board of Directors, a fixed sum and expenses of attendance, if any, for attendance at each regular or special meeting of the Board of Directors and at any meeting of a committee of the Board of Directors. Nothing herein contained shall be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, employee, or otherwise and receiving compensation therefor.

**Section 25.    Committees.**

(a)    **Executive Committee.** The Board of Directors may appoint an Executive Committee to consist of one (1) or more members of the Board of Directors. The Executive Committee, to the extent permitted by law and provided in the resolution of the Board of Directors shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to (i) approving or adopting, or recommending to the stockholders, any action or matter expressly required by the DGCL to be submitted to stockholders for approval, or (ii) adopting, amending or repealing any bylaw of the corporation.

(b)    **Other Committees.** The Board of Directors may, from time to time, appoint such other committees as may be permitted by law. Such other committees appointed by the Board of Directors shall consist of one (1) or more members of the Board of Directors and shall have such powers and perform such duties as may be prescribed by the resolution or resolutions creating such committees, but in no event shall any such committee have the powers denied to the Executive Committee in these Bylaws.

(c)    **Term Committees.** The Board of Directors, subject to any requirements of any outstanding series of Preferred Stock, the provisions of subsections (a) or (b) of this Bylaw may at any time increase or decrease the number of members of a committee or terminate the existence of a committee. The membership of a committee member shall terminate on the date of his death or voluntary resignation from the committee or from the Board of Directors. The Board of Directors may at any time for any reason remove any individual committee member and the Board of Directors may fill any committee vacancy created by death, resignation, removal or increase in the number of members of the committee. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee, and, in addition, in the absence or disqualification of any member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

(d)    **Meetings.** Unless the Board of Directors shall otherwise provide, regular meetings of the Executive Committee or any other committee appointed pursuant to this Section 25 shall be held at such times and places as are determined by the Board of Directors, or by any such committee, and when notice thereof has been given to each member of such committee, no further notice of such regular meetings need be given thereafter. Special meetings

9

CRED_EXAMINER_00000843

of any such committee may be held at any place which has been determined from time to time by such committee, and may be called by any director who is a member of such committee, upon notice to the members of such committee of the time and place of such special meeting given in the manner provided for the giving of notice to members of the Board of Directors of the time and place of special meetings of the Board of Directors. Notice of any special meeting of any committee may be waived in writing at any time before or after the meeting and will be waived by any director by attendance thereat, except when the director attends such special meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Unless otherwise provided by the Board of Directors in the resolutions authorizing the creation of the committee, a majority of the authorized number of members of any such committee shall constitute a quorum for the transaction of business, and the act of a majority of those present at any meeting at which a quorum is present shall be the act of such committee.

**Section 26.    Organization.** At every meeting of the directors, the Chairman of the Board of Directors, or, if a Chairman has not been appointed or is absent, the Chief Executive Officer, or if the Chief Executive Officer is absent, the President (if a director) or, in the absence of any such person, a chairman of the meeting chosen by a majority of the directors present, shall preside over the meeting. The Secretary, or in his absence, any Assistant Secretary directed to do so by the President, shall act as secretary of the meeting.

## ARTICLE V

## OFFICERS

**Section 27.    Officers Designated.** The officers of the corporation shall include, if and when designated by the Board of Directors, the Chairman of the Board of Directors, the President, the Chief Executive Officer, one or more Vice Presidents, the Secretary, the Chief Financial Officer, the Chief Technology Officer, the Chief Operating Officer, the Treasurer and the Controller, all of whom shall be elected at the annual organizational meeting of the Board of Directors. The Board of Directors may also appoint one or more Assistant Secretaries, Assistant Treasurers, Assistant Controllers and such other officers and agents with such powers and duties as it shall deem necessary. The Board of Directors may assign such additional titles to one or more of the officers as it shall deem appropriate. Any one person may hold any number of offices of the corporation at any one time unless specifically prohibited therefrom by law. The salaries and other compensation of the officers of the corporation shall be fixed by or in the manner designated by the Board of Directors.

**Section 28.    Tenure and Duties of Officers.**

**(a)    General.** All officers shall hold office at the pleasure of the Board of Directors and until their successors shall have been duly elected and qualified, unless sooner removed. Any officer elected or appointed by the Board of Directors may be removed at any time by the Board of Directors. If the office of any officer becomes vacant for any reason, the vacancy may be filled by the Board of Directors.

10

CRED_EXAMINER_00000844

(b)     **Duties of Chairman of the Board of Directors.** The Chairman of the Board of Directors, when present, shall preside at all meetings of the stockholders and the Board of Directors. The Chairman of the Board of Directors shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board of Directors shall designate from time to time. If there is no President, then the Chairman of the Board of Directors shall also serve as the Chief Executive Officer of the corporation and shall have the powers and duties prescribed in paragraph (c) of this Section 28.

(c)     **Duties of Chief Executive Officer.** The Chief Executive Officer shall serve as the chief executive officer of the corporation and shall have general and active management authority with respect to the business of the corporation and shall see that all orders and resolutions of the Board of Directors are carried into effect; subject, however, to the right of the directors to delegate specific powers, except those exclusively conferred by statute on the Chief Executive Officer or President, to any other officer or officers of the corporation. He or she shall be authorized to execute bonds, mortgages and other contracts requiring a seal, under the seal of the Corporation. He or she shall be EX-OFFICIO a member of all committees.

(d)     **Duties of President.** The President shall preside at all meetings of the stockholders and at all meetings of the Board of Directors, unless the Chairman of the Board of Directors has been appointed and is present. Unless some other officer has been elected Chief Executive Officer of the corporation, the President shall be the Chief Executive Officer of the corporation and shall, subject to the control of the Board of Directors, have general supervision, direction and control of the business and officers of the corporation. The President shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board of Directors shall designate from time to time.

(e)     **Duties of Chief Operating Officer.** The Chief Operating Officer may assume and perform the duties of the President in the absence or disability of the President or whenever the office of President is vacant, the Chief Operating Officer shall also perform such other duties and have such powers as the Board of Directors shall designate from time to time.

(f)     **Duties of Chief Financial Officer.** The Chief Financial Officer shall keep or cause to be kept the books of account of the corporation in a thorough and proper manner and shall render statements of the financial affairs of the corporation in such form and as often as required by the Board of Directors or the President. The Chief Financial Officer, subject to the order of the Board of Directors, shall have the custody of all funds and securities of the corporation. The Chief Financial Officer shall perform other duties commonly incident to his office and shall also perform such other duties and have such other powers as the Board of Directors or the President shall designate from time to time. The President may direct the Treasurer or any Assistant Treasurer, or the Controller or any Assistant Controller to assume and perform the duties of the Chief Financial Officer in the absence or disability of the Chief Financial Officer, and each Treasurer and Assistant Treasurer and each Controller and Assistant Controller shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board of Directors or the President shall designate from time to time.

CRED_EXAMINER_00000845

(g)    **Duties of Vice Presidents.** The Vice Presidents may assume and perform the duties of the Chief Operating Officer in the absence or disability of the Chief Operating Officer or whenever the office of the Chief Operating Officer is vacant. The Vice Presidents shall perform other duties commonly incident to their office and shall also perform such other duties and have such other powers as the Board of Directors or the President shall designate from time to time.

(h)    **Duties of Secretary.** The Secretary shall attend all meetings of the stockholders and of the Board of Directors and shall record all acts and proceedings thereof in the minute book of the corporation. The Secretary shall give notice in conformity with these Bylaws of all meetings of the stockholders and of all meetings of the Board of Directors and any committee thereof requiring notice. The Secretary shall perform all other duties provided for in these Bylaws and other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board of Directors shall designate from time to time. The President may direct any Assistant Secretary to assume and perform the duties of the Secretary in the absence or disability of the Secretary, and each Assistant Secretary shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board of Directors or the President shall designate from time to time.

Section 29.    **Delegation of Authority.** The Board of Directors may from time to time delegate the powers or duties of any officer to any other officer or agent, notwithstanding any provision hereof.

Section 30.    **Resignations.** Any officer may resign at any time by giving notice in writing or by electronic transmission notice to the Board of Directors or to the President or to the Secretary. Any such resignation shall be effective when received by the person or persons to whom such notice is given, unless a later time is specified therein, in which event the resignation shall become effective at such later time. Unless otherwise specified in such notice, the acceptance of any such resignation shall not be necessary to make it effective. Any resignation shall be without prejudice to the rights, if any, of the corporation under any contract with the resigning officer.

Section 31.    **Removal.** Any officer may be removed from office at any time, either with or without cause, by the affirmative vote of a majority of the directors in office at the time, or by the unanimous written consent of the directors in office at the time, or by any committee or superior officers upon whom such power of removal may have been conferred by the Board of Directors.

## ARTICLE VI

## EXECUTION OF CORPORATE INSTRUMENTS AND VOTING OF SECURITIES OWNED BY THE CORPORATION

Section 32.    **Execution of Corporate Instruments.** The Board of Directors may, in its discretion, determine the method and designate the signatory officer or officers, or other person or persons, to execute on behalf of the corporation any corporate instrument or document, or to sign on behalf of the corporation the corporate name without limitation, or to

12

CRED_EXAMINER_00000846

enter into contracts on behalf of the corporation, except where otherwise provided by law or these Bylaws, and such execution or signature shall be binding upon the corporation.

All checks and drafts drawn on banks or other depositaries on funds to the credit of the corporation or in special accounts of the corporation shall be signed by such person or persons as the Board of Directors shall authorize so to do.

Unless authorized or ratified by the Board of Directors or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

**Section 33.    Voting of Securities Owned by the Corporation**. All stock and other securities of other corporations owned or held by the corporation for itself, or for other parties in any capacity, shall be voted, and all proxies with respect thereto shall be executed, by the person authorized so to do by resolution of the Board of Directors, or, in the absence of such authorization, by the Chairman of the Board of Directors, the Chief Executive Officer, the President, or any Vice President.

## ARTICLE VII

## SHARES OF STOCK

**Section 34.    Form and Execution of Certificates**. Certificates for the shares of stock of the corporation shall be in such form as is consistent with the Certificate of Incorporation and applicable law. Every holder of stock in the corporation shall be entitled to have a certificate signed by or in the name of the corporation by the Chairman of the Board of Directors, or the President or any Vice President and by the Treasurer or Assistant Treasurer or the Secretary or Assistant Secretary, certifying the number of shares owned by him in the corporation. Any or all of the signatures on the certificate may be facsimiles. In case any officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent, or registrar before such certificate is issued, it may be issued with the same effect as if he were such officer, transfer agent, or registrar at the date of issue. Each certificate shall state upon the face or back thereof, in full or in summary, all of the powers, designations, preferences, and rights, and the limitations or restrictions of the shares authorized to be issued or shall, except as otherwise required by law, set forth on the face or back a statement that the corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional, or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights. Within a reasonable time after the issuance or transfer of uncertificated stock, the corporation shall send to the registered owner thereof a written notice containing the information required to be set forth or stated on certificates pursuant to this section or otherwise required by law or with respect to this section a statement that the corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

13

CRED_EXAMINER_00000847

**Section 35.    Lost Certificates.** A new certificate or certificates shall be issued in place of any certificate or certificates theretofore issued by the corporation alleged to have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen, or destroyed. The corporation may require, as a condition precedent to the issuance of a new certificate or certificates, the owner of such lost, stolen, or destroyed certificate or certificates, or the owner's legal representative, to agree to indemnify the corporation in such manner as it shall require or to give the corporation a surety bond in such form and amount as it may direct as indemnity against any claim that may be made against the corporation with respect to the certificate alleged to have been lost, stolen, or destroyed.

### Section 36.    Transfers.

(a)    Transfers of record of shares of stock of the corporation shall be made only upon its books by the holders thereof, in person or by attorney duly authorized, and upon the surrender of a properly endorsed certificate or certificates for a like number of shares.

(b)    The corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the corporation to restrict the transfer of shares of stock of the corporation of any one or more classes owned by such stockholders in any manner not prohibited by the DGCL.

### Section 37.    Fixing Record Dates.

(a)    In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix, in advance, a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall, subject to applicable law, not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

(b)    In order that the corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. Any stockholder of record seeking to have the stockholders authorize or take corporate action by written consent shall, by written notice to the Secretary, request the Board of Directors to fix a record date. The Board of Directors shall promptly, but in all events within ten (10) days after the date on which such a request is received, adopt a resolution fixing the record date. If no record date has been fixed by the Board of Directors within ten (10) days of

14

CRED_EXAMINER_00000848

the date on which such a request is received, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by applicable law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(c)    In order that the corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

**Section 38.    Registered Stockholders.**  The corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

## ARTICLE VIII

## OTHER SECURITIES OF THE CORPORATION

**Section 39.    Execution of Other Securities.**  All bonds, debentures and other corporate securities of the corporation, other than stock certificates (covered in Section 34), may be signed by the Chairman of the Board of Directors, the President or any Vice President, or such other person as may be authorized by the Board of Directors, and the corporate seal impressed thereon or a facsimile of such seal imprinted thereon and attested by the signature of the Secretary or an Assistant Secretary, or the Chief Financial Officer or Treasurer or an Assistant Treasurer; provided, however, that where any such bond, debenture or other corporate security shall be authenticated by the manual signature, or where permissible facsimile signature, of a trustee under an indenture pursuant to which such bond, debenture or other corporate security shall be issued, the signatures of the persons signing and attesting the corporate seal on such bond, debenture or other corporate security may be the imprinted facsimile of the signatures of such persons. Interest coupons appertaining to any such bond, debenture or other corporate security, authenticated by a trustee as aforesaid, shall be signed by the Treasurer or an Assistant Treasurer of the corporation or such other person as may be authorized by the Board of

15

Directors, or bear imprinted thereon the facsimile signature of such person. In case any officer who shall have signed or attested any bond, debenture or other corporate security, or whose facsimile signature shall appear thereon or on any such interest coupon, shall have ceased to be such officer before the bond, debenture or other corporate security so signed or attested shall have been delivered, such bond, debenture or other corporate security nevertheless may be adopted by the corporation and issued and delivered as though the person who signed the same or whose facsimile signature shall have been used thereon had not ceased to be such officer of the corporation.

## ARTICLE IX

### DIVIDENDS

**Section 40.    Declaration of Dividends.** Dividends upon the capital stock of the corporation, subject to the provisions of the Certificate of Incorporation and applicable law, if any, may be declared by the Board of Directors pursuant to law at any regular or special meeting. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation and applicable law.

**Section 41.    Dividend Reserve.** Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the Board of Directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or for such other purpose as the Board of Directors shall think conducive to the interests of the corporation, and the Board of Directors may modify or abolish any such reserve in the manner in which it was created.

## ARTICLE X

### FISCAL YEAR

**Section 42.    Fiscal Year.** The fiscal year of the corporation shall be fixed by resolution of the Board of Directors.

## ARTICLE XI

### INDEMNIFICATION

**Section 43.    Indemnification of Directors, Executive Officers, Other Officers, Employees and Other Agents.**

(a)    **Directors and Officers.** The corporation shall indemnify its directors and officers to the fullest extent not prohibited by the DGCL or any other applicable law; provided, however, that the corporation may modify the extent of such indemnification by individual contracts with its directors; and, provided, further, that the corporation shall not be required to indemnify any director or officer in connection with any proceeding (or part thereof) initiated by such person unless (i) such indemnification is expressly required to be made by law, (ii) the proceeding was authorized by the Board of Directors of the corporation, (iii) such

16

CRED_EXAMINER_00000850

indemnification is provided by the corporation, in its sole discretion, pursuant to the powers vested in the corporation under the Delaware General Corporation Law or any other applicable law or (iv) such indemnification is required to be made under subsection (d).

(b)     **Employees and Other Agents.**  The corporation shall have power to indemnify its employees and other agents as set forth in the DGCL or any other applicable law. The Board of Directors shall have the power to delegate the determination of whether indemnification shall be given to any such person as the Board of Directors shall determine.

(c)     **Expenses.**  The corporation shall advance to any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, prior to the final disposition of the proceeding, promptly following request therefor, all expenses incurred by any director or officer in connection with such proceeding, provided, however, that, if the DGCL requires, an advancement of expenses incurred by a director or officer in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the corporation of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such expenses under this Section 43 or otherwise.

Notwithstanding the foregoing, unless otherwise determined pursuant to paragraph (e) of this Bylaw, no advance shall be made by the corporation to an officer of the corporation (except by reason of the fact that such officer is or was a director of the corporation, in which event this paragraph shall not apply) in any action, suit or proceeding, whether civil, criminal, administrative or investigative, if a determination is reasonably and promptly made (i)  a majority vote of a quorum consisting of directors who were not parties to the proceeding, even if not a quorum, or (ii) by a committee of such directors designated by a majority of such directors, even though less than a quorum, or (iii) if there are no such directors, or such directors so direct, by independent legal counsel in a written opinion, that the facts known to the decision-making party at the time such determination is made demonstrate clearly and convincingly that such person acted in bad faith or in a manner that such person did not believe to be in or not opposed to the best interests of the corporation.

(d)     **Enforcement.**  Without the necessity of entering into an express contract, all rights to indemnification and advances to directors and officers under this Bylaw shall be deemed to be contractual rights and be effective to the same extent and as if provided for in a contract between the corporation and the director or officer. Any right to indemnification or advances granted by this Bylaw to a director or officer shall be enforceable by or on behalf of the person holding such right in any court of competent jurisdiction if (i) the claim for indemnification or advances is denied, in whole or in part, or (ii) no disposition of such claim is made within ninety (90) days of request therefor. The claimant in such enforcement action, if successful in whole or in part, shall be entitled to be paid also the expense of prosecuting the claim. In connection with any claim for indemnification, the corporation shall be entitled to raise

CRED_EXAMINER_00000851

as a defense to any such action that the claimant has not met the standards of conduct that make it permissible under the DGCL or any other applicable law for the corporation to indemnify the claimant for the amount claimed. In connection with any claim by an officer of the corporation (except in any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such officer is or was a director of the corporation) for advances, the corporation shall be entitled to raise a defense as to any such action clear and convincing evidence that such person acted in bad faith or in a manner that such person did not believe to be in or not opposed to the best interests of the corporation, or with respect to any criminal action or proceeding that such person acted without reasonable cause to believe that his conduct was lawful. Neither the failure of the corporation (including its Board of Directors, independent legal counsel or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he has met the applicable standard of conduct set forth in the DGCL or any other applicable law, nor an actual determination by the corporation (including its Board of Directors, independent legal counsel or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that claimant has not met the applicable standard of conduct.

(e)     **Non-Exclusivity of Rights.** The rights conferred on any person by this Bylaw shall not be exclusive of any other right which such person may have or hereafter acquire under any applicable statute, provision of the Certificate of Incorporation, Bylaws, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding office. The corporation is specifically authorized to enter into individual contracts with any or all of its directors, officers, employees or agents respecting indemnification and advances, to the fullest extent not prohibited by the DGCL or any other applicable law.

(f)     **Survival of Rights.** The rights conferred on any person by this Bylaw shall continue as to a person who has ceased to be a director, officer, employee or other agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

(g)     **Insurance.** To the fullest extent permitted by the DGCL, or any other applicable law, the corporation, upon approval by the Board of Directors, may purchase insurance on behalf of any person required or permitted to be indemnified pursuant to this Bylaw.

(h)     **Amendments.** Any repeal or modification of this Bylaw shall only be prospective and shall not affect the rights under this Bylaw in effect at the time of the alleged occurrence of any action or omission to act that is the cause of any proceeding against any agent of the corporation.

(i)     **Saving Clause.** If this Bylaw or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the corporation shall nevertheless indemnify each director and officer to the full extent not prohibited by any applicable portion of this Bylaw that shall not have been invalidated, or by any other applicable law. If this Section 43 shall be invalid due to the application of the indemnification provisions of another jurisdiction,

18

CRED_EXAMINER_00000852

then the corporation shall indemnify each director and officer to the full extent under applicable law.

      **(j)**    **Certain Definitions.**  For the purposes of this Bylaw, the following definitions shall apply:

      **(1)**    The term "proceeding" shall be broadly construed and shall include, without limitation, the investigation, preparation, prosecution, defense, settlement, arbitration and appeal of, and the giving of testimony in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative.

      **(2)**    The term "expenses" shall be broadly construed and shall include, without limitation, court costs, attorneys' fees, witness fees, fines, amounts paid in settlement or judgment and any other costs and expenses of any nature or kind incurred in connection with any proceeding.

      **(3)**    The term the "corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Bylaw with respect to the resulting or surviving corporation as he would have with respect to such constituent corporation if its separate existence had continued.

      **(4)**    References to a "director," "executive officer," "officer," "employee," or "agent" of the corporation shall include, without limitation, situations where such person is serving at the request of the corporation as, respectively, a director, executive officer, officer, employee, trustee or agent of another corporation, partnership, joint venture, trust or other enterprise.

      **(5)**    References to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "serving at the request of the corporation" shall include any service as a director, officer, employee or agent of the corporation which imposes duties on, or involves services by, such director, officer, employee, or agent with respect to an employee benefit plan, its participants, or beneficiaries; and a person who acted in good faith and in a manner he reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the corporation" as referred to in this Bylaw.

CRED_EXAMINER_00000853

## ARTICLE XII

## NOTICES

### Section 44.    Notices.

(a)    **Notice to Stockholders.**  Whenever, under any provisions of these Bylaws, notice is required to be given to any stockholder, it shall be given in writing, timely and duly deposited in the United States mail, postage prepaid, and addressed to his last known post office address as shown by the stock record of the corporation or its transfer agent.

(b)    **Notice to Directors.**  Any notice required to be given to any director may be given by the method stated in subsection (a), or as provided for in Section 21 of these Bylaws. If such notice is not delivered personally, it shall be sent to such address as such director shall have filed in writing with the Secretary, or, in the absence of such filing, to the last known post office address of such director.

(c)    **Affidavit of Mailing.**  An affidavit of mailing, executed by a duly authorized and competent employee of the corporation or its transfer agent appointed with respect to the class of stock affected or other agent, specifying the name and address or the names and addresses of the stockholder or stockholders, or director or directors, to whom any such notice or notices was or were given, and the time and method of giving the same, shall in the absence of fraud, be prima facie evidence of the facts therein contained.

(d)    **Methods of Notice.**  It shall not be necessary that the same method of giving notice be employed in respect of all recipients of notice, but one permissible method may be employed in respect of any one or more, and any other permissible method or methods may be employed in respect of any other or others.

(e)    **Notice to Person with Whom Communication Is Unlawful.**  Whenever notice is required to be given, under any provision of law or of the Certificate of Incorporation or Bylaws of the corporation, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting which shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given. In the event that the action taken by the corporation is such as to require the filing of a certificate under any provision of the DGCL, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

## ARTICLE XIII

## AMENDMENTS

### Section 45.    Amendments.  The Board of Directors is expressly empowered to adopt, amend or repeal Bylaws of the corporation. The stockholders shall also have power to adopt, amend or repeal the Bylaws of the corporation; provided, however, that, in addition to any

20

CRED_EXAMINER_00000854

vote of the holders of any class or series of stock of the corporation required by law or by this Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the voting power of all of the then-outstanding shares of the capital stock of the corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required to adopt, amend or repeal any provision of the Bylaws of the corporation.

## ARTICLE XIV
## LOANS TO OFFICERS; RIGHT OF FIRST REFUSAL

**Section 46.** **Loans to Officers.** The corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the corporation or of its subsidiaries, including any officer or employee who is a Director of the corporation or its subsidiaries, whenever, in the judgment of the Board of Directors, such loan, guarantee or assistance may reasonably be expected to benefit the corporation. The loan, guarantee or other assistance may be with or without interest and may be unsecured, or secured in such manner as the Board of Directors shall approve, including, without limitation, a pledge of shares of stock of the corporation. Nothing in these Bylaws shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the corporation at common law or under any statute.

**Section 47.** **Right of First Refusal.** No stockholder shall sell, assign, pledge, or in any manner transfer any of the shares of stock, of the corporation or any right or interest therein, whether voluntarily or by operation of law, or by gift or otherwise, except by a transfer that meets the requirements hereinafter set forth in this bylaw:

(a) If the stockholder desires to sell or otherwise transfer any of such stockholder's shares of stock, then the stockholder shall first give written notice thereof to the corporation. The notice shall name the proposed transferee and state the number of shares to be transferred, the proposed consideration, and all other terms and conditions of the proposed transfer.

(b) The corporation may assign its rights hereunder.

(c) In the event the corporation and/or its assignee(s) elect to acquire any of the shares of the transferring stockholder as specified in such transferring stockholder's notice, the Secretary of the corporation shall so notify the transferring stockholder and settlement thereof shall be made in cash within thirty (30) days after the Secretary of the corporation receives such transferring stockholder's notice; provided that if the terms of payment set forth in such transferring stockholder's notice were other than cash against delivery, the corporation and/or its assignee(s) shall pay for such shares on the same terms and conditions set forth in such transferring stockholder's notice.

(d) In the event the corporation and/or its assignees(s) do not elect to acquire all of the shares specified in the transferring stockholder's notice, such transferring stockholder may, within the sixty-day period following the expiration of the option rights granted to the corporation and/or its assignees(s) herein, transfer the shares specified in such transferring stockholder's notice which were not acquired by the corporation and/or its assignees(s) as specified in such transferring stockholder's notice. All shares so sold by such transferring

21

CRED_EXAMINER_00000855

stockholder shall continue to be subject to the provisions of this bylaw in the same manner as before such transfer.

(e)    Anything to the contrary contained herein notwithstanding, the following transactions shall be exempt from the provisions of this bylaw:

(1)    A stockholder's transfer of any or all shares held either during such stockholder's lifetime or on death by will or intestacy to such stockholder's immediate family or to any custodian or trustee for the account of such stockholder or such stockholder's immediate family or to any limited partnership or limited liability company of which the stockholder, members of such stockholder's immediate family or any trust for the account of such stockholder or such stockholder's immediate family will be the general or limited partner(s) of such partnership or member(s) of such limited liability company. "Immediate family" as used herein shall mean spouse, lineal descendant, father, mother, brother, or sister of the stockholder making such transfer.

(2)    A stockholder's bona fide pledge or mortgage of any shares with a commercial lending institution, provided that any subsequent transfer of such shares by such institution shall be conducted in the manner set forth in this bylaw.

(3)    A stockholder's transfer of any or all of such stockholder's shares to the corporation or to any other stockholder of the corporation.

(4)    A stockholder's transfer of any or all of such stockholder's shares to a person who, at the time of such transfer, is an officer or director of the corporation.

(5)    A corporate stockholder's transfer of any or all of its shares pursuant to and in accordance with the terms of any merger, consolidation, reclassification of shares or capital reorganization of the corporate stockholder, or pursuant to a sale of all or substantially all of the stock or assets of a corporate stockholder.

(6)    A corporate stockholder's transfer of any or all of its shares to any or all of its stockholders.

(7)    A transfer by a stockholder which is a limited or general partnership to any or all of its partners or former partners.

(8)    A transfer by a stockholder which is a limited liability company to any or all of its members or former members.

In any such case, the transferee, assignee, or other recipient shall receive and hold such stock subject to the provisions of this bylaw, and there shall be no further transfer of such stock except in accord with this bylaw.

(f)    The provisions of this bylaw may be waived with respect to any transfer either by the corporation, upon duly authorized action of its Board of Directors, or by the stockholders, upon the express written consent of the owners of a majority of the voting power of the corporation (excluding the votes represented by those shares to be transferred by the

22

transferring stockholder). This bylaw may be amended or repealed either by a duly authorized action of the Board of Directors or by the stockholders, upon the express written consent of the owners of a majority of the voting power of the corporation.

(g)     Any sale or transfer, or purported sale or transfer, of securities of the corporation shall be null and void unless the terms, conditions, and provisions of this bylaw are strictly observed and followed.

(h)     The foregoing right of first refusal shall terminate on either of the following dates, whichever shall first occur:

(1)     On Ten Years From Date of Adoption; or

(2)     Upon the date securities of the corporation are first offered to the public pursuant to a registration statement filed with, and declared effective by, the United States Securities and Exchange Commission under the Securities Act of 1933, as amended.

(i)     The certificates representing shares of stock of the corporation shall bear on their face the following legend so long as the foregoing right of first refusal remains in effect:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE
SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN
FAVOR OF THE CORPORATION AND/OR ITS ASSIGNEE(S),
AS PROVIDED IN THE BYLAWS OF THE CORPORATION."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CRED_EXAMINER_00000857

## CERTIFICATE OF SECRETARY

I hereby certify that:

I am the duly elected and acting Secretary of Cred Capital, Inc., a Delaware corporation (the "Corporation"); and

Attached hereto is a complete and accurate copy of the Bylaws of the Corporation as duly adopted by the Board of Directors of the Corporation by Written Consent on the date hereof and such Bylaws are presently in effect.

**IN WITNESS WHEREOF**, I have hereunto subscribed my name as of the 16th day of March, 2020.

Daniel Wheeler, Secretary

601704465.3

CRED_EXAMINER_00000858

**Exhibit E**

CRED_EXAMINER_00000859

DocuSign Envelope ID: A352C199-7580-4B27-A588-3408951527D

**CONTRIBUTION AGREEMENT**
(Cred LLC)

This Contribution Agreement (this "Agreement"), effective as of March 16, 2020, is made by and between **Cred Capital, Inc.**, a Delaware corporation (the "Corporation"), and **Cred LLC**, a Delaware limited liability company (the "Contributor"). The Corporation and the Contributor are sometimes individually referred to herein as a "Party" and collectively as the "Parties".

WHEREAS, the Contributor desires to make an initial capital contribution to the Corporation in exchange for an aggregate of 5,000,000 shares of the originally issued Class B common stock in the Corporation (the "Shares"), subject to the terms and conditions set forth herein.

WHEREAS, the contribution pursuant to this Agreement is one of several contributions structured and intended to collectively satisfy the requirements of and qualify as non-taxable contributions under Section 351 of the Internal Revenue Code of 1986, as amended (the "Code").

NOW, THEREFORE, in consideration of the foregoing and of the mutual promises and covenants set forth herein, the Parties agree as follows:

1.       Contribution for Shares.  Subject to the terms and conditions of this Agreement, (a) the Contributor hereby contributes for and agrees to purchase, and the Corporation hereby agrees to issue, sell and deliver to the Contributor, the Shares; (b) as full consideration for the Shares, the Contributor shall contribute, convey, assign, transfer and deliver to the Corporation the assets and consideration described on Appendix 1 attached hereto (the "Assets"), free and clear of any Liens (as defined below); and (c) the Corporation shall receive, acquire and accept the Assets from the Contributor (free and clear of any and all Liens); and (c) the Corporation hereby accepts the foregoing assignment of the Assets.

2.       Representations and Warranties of the Contributor.  The Contributor represents and warrants to the Corporation that (a) the Contributor has duly and validly executed and delivered to the Corporation this Agreement, which Agreement constitutes a valid and binding agreement of the Contributor, enforceable against the Contributor in accordance with its terms, except that such enforcement may be subject to bankruptcy, conservatorship, receivership, insolvency, moratorium or similar laws affecting creditors' rights generally and to general principles of equity, (b) the Contributor owns the Assets free and clear of any and all liens, security interests, charges, licenses, covenants, options, claims, restrictions or encumbrances of any kind (collectively "Liens"), and (c) the Shares constitute full consideration for all rights, title or interest that Contributor has or may have in and to the Assets.

3.       Representations and Warranties of the Corporation.  The Corporation represents and warrants to the Contributor as follows:

(a)       Organization, Power and Authority, and Qualification.  The Corporation is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has the corporate power and corporate authority to execute and deliver this Agreement and to carry out the transactions contemplated hereby. Upon issuance, the Shares shall be validly issued, fully paid and non-assessable shares of Common Stock of the Corporation.

1

CRED_EXAMINER_00000860

DocuSign Envelope ID: A352C199-7580-4B27-AE89-3408951F527B

(b)    Binding Obligation. The Corporation has caused this Agreement to be duly and validly executed on its behalf and delivered to the Contributor and this Agreement constitutes a valid and binding agreement of the Corporation, enforceable against the Corporation in accordance with its terms, except that such enforcement may be subject to bankruptcy, conservatorship, receivership, insolvency, moratorium or similar laws affecting creditors' rights generally and to general principles of equity.

4.    Stock Certificate Restrictions.    All certificates representing Shares subject to this Agreement shall bear a legend in substantially the following form:

"THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR STATE SECURITIES LAWS AND CANNOT BE OFFERED, SOLD, OR TRANSFERRED IN THE ABSENCE OF REGISTRATION OR EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS AND REGULATIONS PROMULGATED THEREUNDER. THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED BY THE REGISTERED OWNER HEREOF FOR INVESTMENT AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION THEREOF IN VIOLATION OF THE SECURITIES ACT. THE SHARES MAY NOT BE SOLD, PLEDGED, TRANSFERRED OR ASSIGNED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE PROVISIONS OF THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS, OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR IN A TRANSACTION OTHERWISE IN COMPLIANCE WITH APPLICABLE FEDERAL AND STATE SECURITIES LAWS."

5.    Miscellaneous Provisions.

(a)    Governing Law. This Agreement shall be enforced, governed and construed in accordance with the laws of the State of Delaware, but not including the choice of law rules thereof.

(b)    Binding Effect. All covenants and agreements in this Agreement by or on behalf of any of the Parties shall bind and inure to the benefit of their respective successors and permitted assigns.

(c)    Assignment. Contributor shall not assign this Agreement, in whole or in part, whether by operation of law or otherwise, without the prior written consent of the Corporation, and any such assignment contrary to the terms hereof shall be null and void and of no force and effect.

(d)    Integration, Amendment and Waiver. This Agreement constitutes the entire agreement between the Parties with respect to the matters set forth herein and supersedes and renders of no force and effect all prior oral or written agreements, commitments and understandings between the Parties with respect to the matters set forth herein. Except as otherwise expressly provided in this Agreement, no amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by each of the Parties.

2

CRED_EXAMINER_00000861

DocuSign Envelope ID: A352C199-7580-4B27-A588-340895F15271

    (e)  <u>Counterparts</u>. This Agreement may be executed in any number of counterparts (including by means of facsimile or PDF), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

    (f)  <u>Severability</u>. If any part of this Agreement shall be invalid or unenforceable under applicable law, such part shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the remaining parts of such provision or the remaining provisions of this Agreement.

    (g)  <u>Headings</u>. Section headings contained in this Agreement are inserted for convenience of reference only, shall not be deemed to be a part of this Agreement for any purpose, and shall not in any way define or affect the meaning, construction or scope of any of the provisions hereof.

*   *   *   *   *   *   *   *

CRED_EXAMINER_00000862

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed as of the date first written above.

**CORPORATION:**

CRED CAPITAL, INC.

By: _James Alexander_
6E984A8E73A643D...

Name:  James Alexander
Title:   Officer

**CONTRIBUTOR:**

CRED LLC

By: _Dan Schatt_
91B4E633E501469...

Name:  Dan Schatt
Title:   Chief Executive Officer

[Signature Page to Founder Contribution Agreement]

CRED_EXAMINER_00000863

**APPENDIX 1**

**ASSETS**

1.      Contributor has entered into that certain Asset Management Agreement with Corporation and pursuant thereto, has among other things, agreed to pay Corporation a minimum aggregate of $2 million in fees thereunder.  Contributor's failure to make the full contribution of $2 million as agreed will result in a forfeiture of shares proportionate to the portion of the $2 million that was not paid to Corporation.

2.      Contributor will pay up to an aggregate of $300,000 of the Corporation's expenses during the six-month period following the date of this Agreement as and when requested by the Corporation and Corporation may accept such payment as an in-kind contribution as contemplated by the Asset Management Agreement.

[Appendix 1 to Contribution Agreement]

CRED_EXAMINER_00000864

**Exhibit F**

CRED_EXAMINER_00000865

DocuSign Envelope ID: F4FA1A14-03B7-448A-B37A-53C5146BBA1FF

## ASSET MANAGEMENT AGREEMENT

This ASSET MANAGEMENT AGREEMENT (this "Agreement") is entered into as of the Effective Date set forth below between **Cred Capital, Inc.**, a Delaware corporation (the "Asset Manager"), and **Cred LLC**, a Delaware limited liability company (the "Company").

## W I T N E S S E T H:

WHEREAS, the Company facilitates retail and institutional lending and borrowing on a global basis and has developed proprietary methods for leveraging cryptocurrencies and blockchain to do so;

WHEREAS, the Company desires to appoint the Asset Manager as the sole and exclusive asset manager of the Company pursuant to the terms of this Agreement; and

WHEREAS, the Asset Manager desires to accept such appointment and render such services to the Company as set forth herein for the fees specified herein;

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged and agreed, the Company and the Asset Manager agree as follows:

1.      Services and Duties.

(a)      The Asset Manager is designated as the sole asset manager for Company and is hereby granted, the discretionary authority, power, and right, for the account and in the name of the Company to take such action for and on behalf of the Company and in the name of the Company as the Asset Manager may determine to be necessary, appropriate, advisable or convenient to carry on the Company's investment and asset allocation businesses, purposes and activities, including, without limitation,

(i)      borrowing fiat and cryptocurrency from retail and institutional lenders;

(ii)      facilitating, structuring and originating loans to retail and institutional borrowers;

(iii)      selling assets to securitization vehicles and servicing those assets;

(iv)      advising Company on hedging, trading, buying, selling and transacting in cryptocurrency and fiat currency transactions and implementing such asset allocation advice; and

1

CRED_EXAMINER_00000866

DocuSign Envelope ID: F4FA1A1A-03B7-448A-B174-53C946BBA1FF

     (v)    engaging in such other lawful activities incidental or ancillary thereto.

The duties of the Asset Manager include (a) monitoring applicable markets, preparing market research and data, conducting due diligence on prospective investments, loans and borrowing opportunities, analyzing and evaluating investment and credit proposals, preparing reports regarding prospective investments and credits, monitoring and evaluating the performance of the investments and credits, structuring and negotiating the terms and conditions of the Company's transactions, managing relationships with the Company's investors, lenders and borrowers and negotiating the terms of financing agreements, evaluating and executing financing agreements, managing relationships with joint venture partners, affiliates and securitization vehicles, (b) managing communications with stakeholders; (c) performing certain administrative and other functions that may be agreed upon in writing by the Asset Manager from time to time.

The Company and Asset Manager will collaborate and agree upon a written Asset Management Policy to provide specific guidance to the services to be provided by Asset Manager hereunder.

Asset Manager is not required to engage in any activity that would be illegal for it to engage in or for which it is advised by legal counsel that it should not engage in. The fee schedule applies regardless of whether Asset Manager can engage in any particular activity or not.

     (b)    In discharging any of its duties under this Agreement, the Asset Manager may utilize the services of consultants, custodians, attorneys, accountants, advisers, investment bankers, brokers, appraisers, engineers and others. The Asset Manager may cause the Company to enter into agreements with broker dealers, consultants, accountants, transfer agents, third party administrators, lenders, technical managers, attorneys, corporate fiduciaries, escrow agents, depositaries, custodians, agents for collection, insurers, insurance agents, developers, and construction companies selected by the Asset Manager in accordance with the terms of this Agreement.

     (c)    It is expressly understood that the management and the conduct of the activities of the Company remain the sole responsibility of the Company and that all decisions relating to the selection and disposition of the Company's investments will be made exclusively by the Company and its officers and managers; provided that, notwithstanding anything to the contrary, the Asset Manager is hereby authorized to take all actions necessary to accomplish its duties hereunder.

     2.    <u>Asset Management Fee</u>. The Asset Manager will calculate (subject to Company's verification) and Company will pay the Asset Manager the fees set forth on <u>Schedule 1</u> hereto on a monthly basis. Company agrees to pay a minimum of an aggregate of $2 million in fees by no later than the two-year anniversary of the effective date. Asset Manager may, in its sole discretion, allow Company to make in-kind contributions in lieu of cash payments towards the minimum fee commitment.

2

CRED_EXAMINER_00000867

3.    Liability and Indemnification.

(a)    **Company acknowledges that no rate of return, or any return on or of invested or allocated assets, is guaranteed and that Company may suffer a complete loss of assets that it entrusts to Asset Manager.**

(b)    Company represents and warrants that it is solvent and able to pay and satisfy its obligations as they become due and that Company is receiving adequate and fair consideration for entering into and performing under this Agreement.

(c)    Company will indemnify and defend Asset Manager, its shareholders, officers, directors, employees, agents, Affiliates, and other representatives (collectively, "Indemnified Persons") against any claim, cost or expense arising from or related to any claims or demands asserted by or on behalf of any customer or creditor of Company or its affiliates who has pledged or loaned fiat currency or digital assets to Company or its affiliates or to whom Company owes money.

(d)    The Company and the Asset Manager hereby agree that the Asset Manager and the Indemnified Persons have no liability to Company or its creditors other than for fraud or intentional misconduct.

4.    No Personal Liability.   Each of the Company and the Asset Manager understands and agrees that other persons not parties hereto are not personally be bound by or liable hereunder, nor may any resort to their personal property be had for the satisfaction of any obligation or claim hereunder.

5.    Duration and Termination.   This Agreement will be in effect for two years and may be terminated only for cause (gross negligence, material breach of contract not remedied after 30 days' notice, or bankruptcy or dissolution of the non-terminating party).

6.    Miscellaneous.

(a)    Services Not Exclusive.   The services of the Asset Manager are not exclusive to the Company.   The Asset Manager and any partner, director, officer, controlling person, employee, Affiliate or agent of the Asset Manager render similar services to others and engage in additional activities so long as the Asset Manager performs its obligations hereunder.

(b)    Applicable Law.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER ARE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED WHOLLY WITHIN THAT JURISDICTION.   The prevailing party in any claim, dispute, proceeding or litigation must be awarded their reasonable attorneys fees, which will be presumed to be the amount charged absent conclusive proof that such

3

CRED_EXAMINER_00000868

DocuSign Envelope ID: F4FA1A14-03B7-448A-B17A-52C9448BA1EE

fees are not reasonable. Any amounts proven to have not been paid as agreed will accrue interest at the highest lawful rate applicable to unpaid debts and liabilities, which will be no less than 10% per annum unless the law requires a lesser rate of interest and in which case the lesser rate will apply.

(c)    Successors and Assigns.  The Asset Manager may assign its rights under this Agreement in its entirety or delegate certain of its duties under this Agreement to any of its Affiliates without the approval of the Company so long as the Asset Manager remains liable for any appointed Affiliate's performance.  Subject to the foregoing, this Agreement inures to the benefit of the parties hereto and the Indemnified Persons, and is binding upon the parties, and their respective successors, permitted assigns and, in the case of individual Indemnified Persons, heirs and legal representatives.

(d)    Independent Contractor Status.  The Asset Manager will for all purposes herein be deemed to be an independent contractor and will, unless otherwise expressly provided herein, have no authority to act for or represent the Company in any way or otherwise be deemed an agent of the Company.

(e)    Severability.  Every term and provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity will not affect the validity of the remainder of this Agreement.

(f)    Entire Agreement.   This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes any prior agreement or understanding among them with respect to such subject matter.

(g)    Headings.  The headings of the sections of this Agreement are inserted for convenience only and are not be deemed to constitute a part hereof or affect the interpretation thereof.

(h)    Counterparts.  This Agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which taken together will constitute a single agreement.

(i)    Survival of Certain Provisions.  The provisions of Section 3, 4, 5 and 6 of this Agreement will survive any termination or expiration of this Agreement and the dissolution, termination and winding up of the Company.

(j)    Waiver.  No waiver of the provisions of this Agreement will be valid unless in writing and signed by the party to be bound.  No failure or delay by any party in exercising any right or remedy hereunder will operate as a waiver thereof, and a waiver of a particular right or remedy on one occasion may not be deemed a waiver of any other right or remedy or a waiver on any subsequent occasion.

4

CRED_EXAMINER_00000869

DocuSign Envelope ID: F4FA1A14-03B7-448A-B17A-52C946BBA1FE

[Balance of page intentionally left blank.]

5

DocuSign Envelope ID: F4FA1A11-03B7-448A-B17A-52C946BBA1FE

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective representatives hereunto duly authorized as of the date first above written.

Effective Date:  March ___, 2020

ASSET MANAGER:  **Cred Capital, Inc.**

By: _____
Name:  James Alexander
Title: Officer

COMPANY:  **Cred LLC**

By: _____
Name:  Dan Schatt
Title: CEO

6

CRED_EXAMINER_00000871

DocuSign Envelope ID: F4FA1A14-03B7-448A-B17A-53C546BBA1EE

## Schedule 1

| Fee per annum | Asset category and management description |
|---|---|
| 30 bps | Non-securitized balance of moKredit loan – compensation to Asset Manager for serving as backup servicer and subservicer. |
| 150 bps | Large commercial loan balances on loans facilitated by Asset Manager – compensation to Asset Manager for acting as subservicer. |
| 20 bps | Loan balances on loans not facilitated by Asset Manager – compensation to Asset Manager for acting as backup servicer and subservicer. |
| 75 bps | Securitized balance of moKredit loan – Company's obligation to pay fee may be assumed by a securitization vehicle; compensation for subservicing activities, including investor communications and processing crypto. |
| 200 bps | Balance of non-moKredit backed IOL bonds – Company's obligation to pay fee may be assumed by a securitization vehicle; compensation for subservicing activities, including investor communications and processing crypto. |
| 200 bps | Asset management fee for managing Company crypto and fiat balances. |
| TBD | Compensation to Asset Manager for engaging in other trading or activities not covered by above categories to be confirmed to Company at the time of trade or activity. |

7

CRED_EXAMINER_00000872

**Exhibit G**

CRED_EXAMINER_00000873

## CONTRIBUTION AGREEMENT

This Contribution Agreement (this "Agreement"), effective as of March 31, 2020, is made by and between Cred Capital, Inc., a Delaware corporation (the "Corporation"), and Lu Hua (the "Contributor"). The Corporation and the Contributor are sometimes individually referred to herein as a "Party" and collectively as the "Parties".

WHEREAS, the Contributor desires to make an initial capital contribution to the Corporation in exchange for an aggregate of 5,000,000 shares of the originally issued Class B Common Stock in the Corporation (the "Shares"), subject to the terms and conditions set forth herein.

WHEREAS, the contribution pursuant to this Agreement is one of several contributions structured and intended to collectively satisfy the requirements of and qualify as non-taxable contributions under Section 351 of the Internal Revenue Code of 1986, as amended (the "Code").

NOW, THEREFORE, in consideration of the foregoing and of the mutual promises and covenants set forth herein, the Parties agree as follows:

1.      Contribution for Shares. Subject to the terms and conditions of this Agreement, (a) the Contributor hereby contributes for and agrees to purchase, and the Corporation hereby agrees to issue, sell and deliver to the Contributor, the Shares; (b) as full consideration for the Shares, the Contributor shall contribute, convey, assign, transfer and deliver to the Corporation all of the Contributor's right, title and interest in and to the assets set forth on Appendix 1 to Exhibit A attached hereto (the "Assets"), free and clear of any Liens (as defined below); and (c) the Corporation shall receive, acquire and accept the Assets from the Contributor (free and clear of any and all Liens) pursuant to an assignment agreement in the form attached hereto as Exhibit A duly executed by the Contributor; and (c) the Corporation hereby accepts the foregoing assignment of the Assets.

2.      Representations and Warranties of the Contributor. The Contributor represents and warrants to the Corporation that (a) the Contributor has duly and validly executed and delivered to the Corporation this Agreement, which Agreement constitutes a valid and binding agreement of the Contributor, enforceable against the Contributor in accordance with its terms, except that such enforcement may be subject to bankruptcy, conservatorship, receivership, insolvency, moratorium or similar laws affecting creditors' rights generally and to general principles of equity, (b) the Contributor owns the Assets free and clear of any and all liens, security interests, charges, licenses, covenants, options, claims, restrictions or encumbrances of any kind (collectively "Liens"), and (c) the Shares constitute full consideration for all rights, title or interest that Contributor has or may have in and to the Assets.

3.      Representations and Warranties of the Corporation. The Corporation represents and warrants to the Contributor as follows:

(a)      Organization, Power and Authority, and Qualification. The Corporation is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has the corporate power and corporate authority to execute and deliver this Agreement and to carry out the transactions contemplated hereby. Upon issuance, the Shares shall be validly issued, fully paid and non-assessable shares of Common Stock of the Corporation.

1

CRED_EXAMINER_00000874

DocuSign Envelope ID: C6F7D5AF-84C9-4989-B5AD-5AD6D64D5B80

(b)    Binding Obligation.  The Corporation has caused this Agreement to be duly and validly executed on its behalf and delivered to the Contributor and this Agreement constitutes a valid and binding agreement of the Corporation, enforceable against the Corporation in accordance with its terms, except that such enforcement may be subject to bankruptcy, conservatorship, receivership, insolvency, moratorium or similar laws affecting creditors' rights generally and to general principles of equity.

4.    Stock Certificate Restrictions.  All certificates representing Shares subject to this Agreement shall bear a legend in substantially the following form:

"THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR STATE SECURITIES LAWS AND CANNOT BE OFFERED, SOLD, OR TRANSFERRED IN THE ABSENCE OF REGISTRATION OR EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS AND REGULATIONS PROMULGATED THEREUNDER. THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED BY THE REGISTERED OWNER HEREOF FOR INVESTMENT AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION THEREOF IN VIOLATION OF THE SECURITIES ACT. THE SHARES MAY NOT BE SOLD, PLEDGED, TRANSFERRED OR ASSIGNED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE PROVISIONS OF THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS, OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR IN A TRANSACTION OTHERWISE IN COMPLIANCE WITH APPLICABLE FEDERAL AND STATE SECURITIES LAWS."

5.    Miscellaneous Provisions.

(a)    Governing Law.  This Agreement shall be enforced, governed and construed in accordance with the laws of the State of Delaware, but not including the choice of law rules thereof.

(b)    Binding Effect.  All covenants and agreements in this Agreement by or on behalf of any of the Parties shall bind and inure to the benefit of their respective successors and permitted assigns.

(c)    Assignment.  Contributor shall not assign this Agreement, in whole or in part, whether by operation of law or otherwise, without the prior written consent of the Corporation, and any such assignment contrary to the terms hereof shall be null and void and of no force and effect.

(d)    Integration, Amendment and Waiver.  This Agreement constitutes the entire agreement between the Parties with respect to the matters set forth herein and supersedes and renders of no force and effect all prior oral or written agreements, commitments and understandings between the Parties with respect to the matters set forth herein. Except as otherwise expressly provided in this Agreement, no amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by each of the Parties.

2

CRED_EXAMINER_00000875

(e)     Counterparts.  This Agreement may be executed in any number of counterparts (including by means of facsimile or PDF), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

(f)     Severability.  If any part of this Agreement shall be invalid or unenforceable under applicable law, such part shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the remaining parts of such provision or the remaining provisions of this Agreement.

(g)     Headings.  Section headings contained in this Agreement are inserted for convenience of reference only, shall not be deemed to be a part of this Agreement for any purpose, and shall not in any way define or affect the meaning, construction or scope of any of the provisions hereof.

*    *    *    *    *    *    *    *

3

CRED_EXAMINER_00000876

DocuSign Envelope ID: C6F7D5AF-64C9-4989-B5AB-5ADGD64D5B60

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed as of the date first written above.

**CORPORATION:**

CRED CAPITAL, INC.

By: _James Alexander_

Name:   James Alexander

Title:    President and Chief Executive Officer

**CONTRIBUTOR:**

Lu Hua

[Signature Page to Founder Contribution Agreement]

DocuSign Envelope ID: C6F7D5AF-84C9-4989-B5AB-5AD6B64D5B80

## EXHIBIT A

### Assignment Agreement

THIS ASSIGNMENT AGREEMENT (this "Assignment Agreement") is made as of March 31, 2020, by and between Lu Hua ("Contributor"), and Cred Capital, Inc., a Delaware corporation ("Corporation"), pursuant to the Contribution Agreement, dated of even date herewith, by and between Corporation and Contributor (the "Contribution Agreement").

WHEREAS, Contributor owns the assets set forth on Appendix 1 attached hereto, (the "Assets"); and

WHEREAS, pursuant to the Contribution Agreement, Contributor shall contribute, convey, assign, transfer and deliver to Corporation, and Corporation shall receive, acquire and accept from Contributor, all of Contributor's right, title and interest in, to and under the Assets, free and clear of all liens, encumbrances and restrictions.

NOW THEREFORE, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Contributor hereby contributes, conveys, assigns, transfers and delivers to Corporation, and Corporation receives, acquires and accepts from Contributor, all of Contributor's right, title and interest in and to the Assets.

2.      In the event this Assignment Agreement and Contribution Agreement do not, by themselves, operate to effect the legal conveyance of any of the Assets from Contributor to Corporation, then Contributor and Corporation will reasonably cooperate with each other to execute any such reasonably requested documentation for the sole purpose of completing the transfer of title of any of the Assets to Corporation as contemplated by the Contribution Agreement.

3.      This Assignment Agreement will inure to the benefit of and bind the respective successors and assigns of the parties hereto.

4.      If any provision of this Assignment Agreement is held invalid as a matter of law, such invalidity shall not affect the other provisions of this Assignment Agreement, all of which shall remain in full force and effect.

5.      This Assignment Agreement, the Contribution Agreement and the other instruments and agreements referenced herein or therein constitute the entire agreement between Corporation and Contributor with respect to the subject matter hereof.  Nothing contained herein shall modify or amend the terms of the Contribution Agreement.  Without limiting the generality of the foregoing, nothing contained herein shall relieve or release either Corporation or Contributor from any of their respective covenants, obligations, duties, representations, warranties or indemnities under the Contribution Agreement or any other instrument or agreement to which they are a party or by which they are bound, it being the intention of the parties that such covenants, obligations, duties, representations, warranties and indemnities shall survive the execution and delivery of this Assignment Agreement.

A-1

CRED_EXAMINER_00000878

DocuSign Envelope ID: C6F7D5AF-64C9-4989-B5AB-5ADGD64D5B80

6.      This Assignment Agreement may be executed in any number of counterparts (including by means of facsimile or PDF), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

7.      This Assignment Agreement shall be construed under the laws of the State of Delaware, without regard to its conflict of laws rules. Each party agrees that any judicial proceeding brought to enforce any provision of this Assignment Agreement or to recover damages for the breach of this Assignment Agreement shall be brought exclusively in the state and federal courts located in Delaware, and the parties respectively waive any objections to jurisdiction or venue of any such court.

IN WITNESS WHEREOF, this Assignment Agreement has been duly executed and delivered as of the date first above written.

**CONTRIBUTOR:**                    **CORPORATION:**

Cred Capital, Inc.

By: _James Alexander_

Lu Hua                              Name: James Alexander

Its: President and Chief Executive Officer

A-2

601834384.3

CRED_EXAMINER_00000879

**APPENDIX 1**

**ASSETS**

300 Bitcoin (BTC)

[Appendix 1 to Contribution Agreement]

CRED_EXAMINER_00000880

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 21, 2021, a true and correct copy of the foregoing was electronically filed via the Court's CM/ECF system and thereby served on those parties having consented to electronic service, and also served upon the parties listed below by electronic mail.

*/s/ Karen C. Bifferato*
Karen C. Bifferato (DE 3279)

Geoffrey G. Grivner, Esq.
Buchanan Ingersoll & Rooney PC
Email: geoffrey.grivner@bipc.com

G. Alexander Bongartz, Esq.
Derek Cash, Esq.
James T. Grogan, Esq.
Broocks Wilson, Esq.
Paul Hastings LLP
Email: alexbongartz@paulhastings.com
derekcash@paulhastings.com
jamesgrogan@paulhastings.com
mackwilson@paulhastings.com

Scott D. Cousins, Esq.
Cousins Law, LLC
Email: scott.cousins@cousins-law.com

Avram E. Luft, Esq.
Cleary Gottlieb Steen & Hamilton LLP
Email: aviluft@paulhastings.com

Joseph James McMahon, Jr.
United States Department of Justice
Email: joseph.mcmahon@usdoj.gov

John Henry Schanne, II
Office of the United States Trustee
Email: john.schanne@usdoj.gov

David R. Hurst, Esq.
McDermott Will & Emery LLP
Email: dhurst@mwe.com

CRED_EXAMINER_00000881

# Exhibit 25

# FILED UNDER SEAL

Exhibit 26

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
|  | ) |  |
| Debtors.[1] | ) | **Re: Docket No. 296** |
|  | ) |  |

**DECLARATION OF GRANT LYON IN SUPPORT OF DEBTORS' OBJECTION TO**
**MOTION OF JAMES ALEXANDER TO DISMISS THE CRED CAPITAL, INC. CASE**

I, Grant Lyon, declare and state under penalty of perjury as follows:

1.      I submit this declaration (the "Declaration") in support of the *Debtors'*
*Objection to Motion of James Alexander to Dismiss the Cred Capital, Inc. Case* [Docket No.
296] (the "Objection").[2]

2.      I am the co-founder of Arete Capital Partners, LLC, and have over 30 years'
experience in the financial restructuring world. I have sat on over 25 boards of directors of
companies as an independent director and have served many times as a Chapter 11 trustee or
state court receiver. I was duly appointed as the Debtors' independent director or manager (as
the case may be) and as the chair and sole member of Debtor Cred Inc.'s board of directors on
November 3, 2020. In that capacity, I effectively had a veto right over all matters requiring
board approval. In early December 2020, I became the Debtors' sole director or manager (as
the case may be). I am over the age of 18 and am authorized to make this declaration (the
"Declaration") on behalf of the Debtors.

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax
identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred
Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third
Avenue, San Mateo, California 94401.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Objection.

CRED_EXAMINER_00000917

3.      I am familiar with the matters set forth herein and, if **called** as a witness, I could and would testify as follows.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by the Debtors and the Debtors' professionals or learned from my review of other documents.

5.      Dan Schatt, Joseph Podulka, and I were Cred Capital's duly appointed board of directors on November 7, 2020, in accordance with Cred Capital's bylaws and charter on file with the Delaware Secretary of State.  Further, Dan Schatt and I were Cred's duly appointed board of directors on November 7, 2020.  Cred is the sole shareholder of Cred Capital.

6.      Mr. Schatt, Mr. Podulka, and I had the power to authorize Cred Capital's voluntary chapter 11 petition in our capacities as directors of Cred Capital.  Since early December 2020, I have served as the sole director of Cred Capital, as well as the other Debtor entities.  I authorized the filing of Cred Capital's voluntary chapter 11 petition on November 7, 2020, because, in my business judgment, it was insolvent, and doing so was in the best interest of the estate and its creditors.  Additionally, it was my business judgment that Cred Capital was an inextricable part of the larger Cred corporate enterprise, which itself was also insolvent, not least of which because the creditors of Cred may also those of Cred Capital.

7.      In my capacity as the independent director of Cred and Cred Capital and independent manager of Cred (US), LLC, I authorized the filing of an adversary proceeding against James Alexander to recover the 225 bitcoin he misappropriated from the Debtors and the $250,000 and 5,200,000 of LBA tokens under two employee loan agreements that matured upon Alexander's termination from the Debtors.

2

CRED_EXAMINER_00000918

8.      In the two-and-a-half months that have passed since the filing of Cred Capital's voluntary chapter 11 petitions, my opinions regarding Cred Capital's insolvency and the necessity of treating the Debtors as a single corporate unit have grown stronger. In my business judgment, not only is Cred Capital insolvent, it is inextricable from the rest of the Cred debtors. To that end, the Debtors have proposed a plan of liquidation that consolidates all of the Debtors for distribution purposes.

9.      In the event Cred Capital's bankruptcy case is dismissed, the Debtors' creditors will be harmed. Mr. Alexander has indicated that he has no intention to keep Cred Capital in bankruptcy, even though it is plainly insolvent. This poses a real risk to Cred Capital's creditors, who may also be creditors of Cred. Further, given the intertwined nature of Cred and Cred Capital, removal of Cred Capital from bankruptcy will create great uncertainty and confusion, jeopardizing an orderly restructuring. Additionally, dismissal would also harm the estate given the numerous claims the other debtors would have against Cred Capital arising from the numerous transactions between the entities.

10.      Moreover, Cred Capital's principal asset of value to its creditors is its claims against Alexander asserted in the turnover action. Were Cred Capital's bankruptcy dismissed, I think it unreasonable to expect that Alexander would use his power as sole director to pursue claims against himself for the funds he improperly took from Cred Capital; denying an important source of recovery for Cred Capital's creditors.

3

CRED_EXAMINER_00000919

11.    This would be to the detriment of all Debtors' creditors because any recovery on those claims would be shared by all of the Debtors' creditors.[3]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on: January 28, 2020


/s/ Grant Lyon
Grant Lyon

---

[3]    The Debtors' plan proposes consolidate of all Debtors for distribution purposes.  Additionally, while the Debtors do not believe there are any creditors at Cred Capital as it was non-operational, to the extent there are, such claims would likely be based on the Debtors commingling of customer funds in Cred Capital's accounts and would be identical to the claims against other Debtors.   Further, if there were no creditors, Cred would receive any recoveries on Cred Capital for distribution to its creditors because it owns all of the equity of Cred Capital.

4

CRED_EXAMINER_00000920

Exhibit 27

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| CRED INC., *et al.*,[1] | : | |
| | : | Case No. 20-12836 (JTD) |
| Debtors. | : | (Jointly Administered) |
| | : | |

**MOTION OF THE UNITED STATES TRUSTEE FOR ENTRY OF AN ORDER
DIRECTING THE APPOINTMENT OF A TRUSTEE, OR IN THE ALTERNATIVE, (I)
DIRECTING THE APPOINTMENT OF AN EXAMINER, OR (II) CONVERTING THE
CASES TO CHAPTER 7 CASES**

Andrew R. Vara, United States Trustee for Region Three and Nine (the "U.S. Trustee"),

through his counsel, files this Motion (the "Motion") for the entry of an order directing the

appointment of a trustee pursuant to 11 U.S.C. §1104(a)(1, 2) and 1104(e). Alternatively, the U.S.

Trustee requests the appointment of an examiner pursuant to 11 U.S.C. § 1104(c), or an order

converting the cases to cases under Chapter 7 pursuant to 11 U.S.C. § 1112(b)(1). In support

thereof, the U.S. Trustee respectfully represents as follows:

**INTRODUCTION**

1.      This Court has jurisdiction over the above-captioned cases pursuant to 28 U.S.C. §

1334. This Court is authorized to hear and determine the Motion pursuant to 28 U.S.C. § 157(a,

b), and the amended standing order of reference issued by the United States District Court for the

District of Delaware dated February 29, 2012. Venue of the cases is proper in this District pursuant

to 28 U.S.C. § 1408(1).

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

1

2.      Under 28 U.S.C. § 586, the U.S. Trustee is generally charged with monitoring the

federal bankruptcy system. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia*

*Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest

standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco*

*D.S., Inc. (In re Revco D.S., Inc.),* 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as

a "watchdog").  Specifically, the U.S. Trustee is charged with "monitoring the progress of cases

under title 11 and taking such actions as the United States trustee deems to be appropriate to

prevent undue delay in such progress." 28 U.S.C. § 586(a)(3)(G).

3.      The U.S. Trustee has standing to be heard with respect to the Motion pursuant to

11 U.S.C. § 307.

## PRELIMINARY STATEMENT

4.      The above-captioned debtors ("Cred" or the "Debtors") are owned by Daniel Schatt

(50%) and Lu Hua (50%).  Based upon information and belief, Hua also controls moKredit, a

Chinese consumer lending platform which is in the business of providing microcredit to Chinese

borrowers at substantial interest rates.  In his "first day declaration" (the "First Day Declaration")

[D.I. 12], Mr. Schatt goes to great lengths to portray the Debtors' bankruptcy filings as the result

of alleged misdeeds by James Alexander, Cred's former Chief Capital Officer.  First Day Decl. ¶¶

18-29.  Those allegations in the First Day Declaration reflect disarray within the Debtors' business

operations and prepetition failures of management, but the failures are more extensive than that.

Additional negative events that Cred brought upon itself during 2020 include:  a failed hedging

strategy which cost the Debtors millions; the evaporation of an approximately $6.2 million

investment in Quanta Coin which resulted from faulty diligence; and an enormous ($39 million)

CRED_EXAMINER_00000922

debt due from its affiliate, moKredit, the product of a relationship that was fraught with negative potential from the start. Present management misinformed creditors and investors, who were led to believe that the Debtors were in good financial health even after the onset of the Debtors' liquidity issues.

5.    An impartial, independent trustee is needed in these cases to:

(i)    investigate various claims and causes of action related to the Debtors' descent into bankruptcy and to prosecute the same;

(ii)    resolve issues of corporate governance;

(iii)    analyze and determine the nature and priority of the claims, rights and interests possessed by the Debtors' creditors, investors and partners to protect same and

(iv)    pursue collection of the moKredit receivable and either reorganize or liquidate other assets and/or business operations of the various estates.

6.    Stated simply, positive results in these cases will be driven by whether the Debtors' estates are successful at prosecuting and collecting on claims and causes of action against moKredit and a host of additional entities, including potentially the Debtors' management and any insurance policies. Hua is an equity security holder of both the Debtors and moKredit and, as such, the Debtors' management should not be put in a conflicted position vis-à-vis the moKredit receivable when the Debtors' creditors and investors are facing significant losses. An impartial, independent fiduciary should be appointed to ensure that the Debtors vigorously pursue any and all potential recoveries for the Debtors' creditors and investors whom they purport to serve, and to provide fair, impartial information regarding the Debtors' current financial affairs and business operations, including the status of cryptocurrency holdings and various parties in interest's rights

3

CRED_EXAMINER_00000923

and obligations with respect to such. If the Court should determine that appointment of a chapter 11 trustee is not appropriate, the U.S. Trustee respectfully requests that Court direct the appointment of an examiner to independently investigate the circumstances surrounding the Debtors' marketing, the mismanaged investment of their creditors' cryptocurrency and, by extension, whether colorable claims and causes of action exist to remedy losses suffered by the various creditors and investors both during the initial stages of the pandemic and thereafter. In the alternative, the U.S. Trustee respectfully submits that conversion to Chapter 7 is appropriate, so that a disinterested Chapter 7 trustee can expeditiously and efficiently administer the Debtors' estates and restore trust in the fairness and integrity of these bankruptcy cases.

## **BACKGROUND**

7.     On November 7, 2020 (the "Petition Date"), the Debtors filed the voluntary petitions which initiated the above-captioned cases.

8.     Schatt's declaration in support of the Debtors' "first day" filings (the "First Day Declaration") [D.I. 12] indicated that the Debtors were incorporated in May 2018 and launched with its first partner in early 2019. First Day Decl. ¶ 11.

9.     Schatt describes the Debtors' business in the following terms:

> The Debtors operate a financial technology platform through which customers transfer cryptocurrency to the Debtors—generally through a loan agreement or financing agreement. The Debtors then utilize such cryptocurrency in a variety of investment strategies involving third-party asset managers. The Debtors earn revenue through the the [sic] returns generated through their investments, as well as through interest on lines of credit extended to certain of the Debtors' customers in connection with the loans and financings referenced above.

> In general, the Debtors have two types of customers: (a) retail investors who transfer (via a pledge or loan) their cryptocurrency to the Debtors through certain e-wallet partners and (b) high net worth individuals who transfer (via a pledge or loan) their cryptocurrency directly to the Debtors. Approximately half of the

4

CRED_EXAMINER_00000924

Debtors' business is generated through e-wallet services that partner with the Debtors. E-wallets are platforms through which end-users (which may be individuals or companies) manage and store their cryptocurrency.

As mentioned above, after receipt of cryptocurrency from a customer, the Debtors work with outside asset managers who focus on investment strategies that are expected to generate a return for the Debtors. These strategies include writing out-of-the-money covered calls and arbitrage strategies. In general, the Debtors seek strategies that generate a consistent return while minimizing risk of loss.

In addition to its investment services, the Debtors also provide lending services to certain customers. These borrowing services are limited to domestic customers.

First Day Decl. ¶¶ 4-7 (footnote omitted).

10.    Attached to this Motion is a declaration (**Exhibit A**) of Daniyal Inamullah, a former

employee of the Debtors. According to Mr. Inamullah:

- In March 2020, Cred took a substantial loss in connection with the liquidation of certain hedges. As part of their hedging efforts, Cred placed 800 bitcoin on margin and levered 4-6x. These assets were subsequently liquidated as BTC prices sharply fell about 50% overnight. Cred ultimately took a substantial loss when it was unable to "close-out" its short trade by buying bitcoin again. The reason for this was that most of the cash liquidity was tied up at MoKredit.

- In February and April 2020, Cred made an investment in Quanta Coin. Quanta Coin was reportedly set up to generate yield on investors' bitcoin, primarily through the use of derivatives. Cred invested $6.2 million in Quanta Coin, totaling 800 BTC. When Cred attempted to redeem the position in August 2020, it discovered that the investment manager to which it had lent the funds had "disappeared," together with the investment.

- MoKredit is a Shanghai-based consumer lending platform owned by Mr. Hua. MoKredit, in turn, used the funds to offer microcredit to Chinese borrowers at substantial interest rates. MoKredit collected a 20-point spread, and Cred would give its customers 10% (if they locked up their funds for six months) and keep the remaining 10% as revenue. The loans were two-week-term microloans for less than $200 each. Cred's warehouse line of credit to Hua had a 30- to 60-day call provision, meaning the lender was allowed to demand full repayment within a month or two, depending on the portion of the line.

- After the COVID-sparked market crash in March 2020, Cred tried to call back $10 million from moKredit, but moKredit was not able to return the funds. (The investment committee also asked several times that the full principal of the warehouse line be called, but each request was blocked by Mr. Schatt).

5

CRED_EXAMINER_00000925

■ Mr. Hua told Cred that a principal extension program from the Chinese government made it difficult for him to recall the loans from borrowers. Instead, he made a deal with Cred to pay an amortization of a couple hundred grand a month along with the interest payments on the line of credit. Cred's investment committee never agreed to the renegotiated repayment schedule and moKredit was eventually unable to follow through with the promised principal repayment schedule.[2]

11.    Beyond the above irregularities as set forth by Mr. Inamullah, the Debtors have been operating for less than two years.  During that time, the Debtors took in more than $135 million in borrowed capital (in the form of what they call "customer deposits" and "customer collateral").  Cred claims to have $67.8 million of assets as of the Petition Date, including a $39 million loan receivable from moKredit.  Notwithstanding the foregoing, Cred has not provided a clear explanation for the $66 million "delta" between the asset and liability numbers.  Further, the asset to liability gap has likely grown since the bankruptcy filing, as Bitcoin has increased in value from approximately $15,000/BTC on November 6, 2020 to $19,000 on December 4, 2020.

12.    After the hedging strategy failed, the Debtors apparently continued to seek loans of crypto-currency and renewed pre-existing cryptocurrency loan arrangements, without adequately disclosing the Debtors' extraordinarily poor financial condition.  Issues include the unsecured status of some of these loans, including allegations that some creditors have rights in cryptocurrency under "pledge" agreements, as well as allegations that some creditors own outright certain cryptocurrency loaned to the Debtors.

13.    Finally, the Debtors have corporate governance issues.  According to an organization chart presented by the Debtors (**Exhibit B**), Cred, Inc. is the 100% owner of Cred

---

[2]  Nathan DiCamillo, *Bad Loans, Bad Bets, Bad Blood:  How Crypto Lender Cred Really Went Bankrupt*, Coindesk (Nov. 12, 2020) (available at https://www.coindesk.com/bad-loans-bad-bets-bad-blood-how-crypto-lender-cred-really-went-bankrupt) (quoting Inamullah).

6

CRED_EXAMINER_00000926

Capital. Nonetheless, there is pending litigation in both California state court and the Delaware Court of Chancery where Cred Inc.'s ownership and control of Cred Capital is being contested. See attached **Exhibits C and D**.

## **GROUNDS/BASIS FOR RELIEF**

*Chapter 11 Trustee*

14.     Creditors, as well as investors, require an independent, conflict-free, experienced party investigating the financial affairs of these debtors -- someone who can determine an appropriate reorganization or liquidation strategy, free from the constraints of current management.

15.     Congress provided but one way to replace a debtor's management's control of the case with an independent fiduciary: appointment of a trustee pursuant to 11 U.S.C. § 1104(a). The usual presumption in favor of allowing a debtor's management to remain in the case vanishes completely when management does not or cannot perform its fiduciary duties. *See Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355 (1985) ("[T]he willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'") (*quoting Wolf v. Weinstein*, 372 U.S. 633, 651 (1963)).

16.     Whatever commonalities they share, the roles, powers and obligations of a chief restructuring officer ("CRO") and a Chapter 11 trustee are neither identical nor interchangeable. A CRO *serves* a debtor-in-possession as an executive officer, subject to the direction of its governing body, accountable to its governing body, and subject to dismissal at the will of its governing body. A Chapter 11 trustee *administers* a debtor-out-of-possession after the Court has found cause to dispossess the debtor. A Chapter 11 trustee *becomes* the debtor's governing body.

CRED_EXAMINER_00000927

A debtor should not be permitted to use its engagement of a CRO to co-opt, undermine or defend against a motion to appoint a Chapter 11 trustee under Section 1104(a).

17.    The Debtors have filed a motion to employ a proposed chief restructuring officer (the "CRO") (Matthew Foster) [D.I. 95], but the CRO's employment is subject to authorization from Cred Inc.'s board of directors, and the CRO is subject to direction and oversight in the performance of his duties from Cred Inc.'s board of directors.  Ex. B (Engagement Letter) at 1, Debtors' Appl. to Employ Sonoran [D.I. 95].  Schatt and Hua, as the Debtors' sole equity holders, control the Board and, ultimately, any CRO that may be employed.  Schatt and Hua are also key figures in the Debtors' demise and, by extension, would be key subjects of any investigation regarding the Debtors' prepetition entanglements.  Further, Hua's moKredit owes the Debtors $39 million.  In contrast, a duly-appointed trustee would displace the Board's control over the Debtors' estates and start from a position of independence.

18.    Similarly, the presence of Debtors' counsel, Paul Hastings, does not give the Debtors' creditors, investors and partners hope that the firm is well-positioned to assist the Debtors with an unbiased and complete investigation into the Debtors' prepetition affairs.  As noted in the disclosures accompanying the Debtors' application to employ Paul Hastings, Paul Hastings provided a range of services to the Debtors prepetition, essentially functioning as an outside general counsel.  See Ex. B (Grogan Decl.) ¶ 6, 21, Debtors' Appl. to Employ Paul Hastings [D.I. 64].  Paul Hastings has represented and currently represents the Uphold entities, who may be litigation targets and are undoubtedly adverse to the Debtors in connection with these cases.  Id. Finally, Paul Hastings represented Schatt in the Dekrypt litigation and, separately, the Alexander litigation.  Id. ¶ 21(c, d).  While the U.S. Trustee intends to further explore Paul Hastings'

8

CRED_EXAMINER_00000928

prepetition services to the Debtors and parties in interest, it is readily apparent now that the firm cannot lead an independent investigation of the Debtors' conduct prior to their bankruptcy filings.

19.    11 U.S.C. § 1104(a) states that the Bankruptcy Court shall order the appointment of a trustee, at any time after the commencement of the case but prior to confirmation of a plan, on request of a party in interest or the UST, and after notice and a hearing:

> (1)    for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2)    if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

20.    Further, section 1104(e) of the Bankruptcy Code mandates that the U.S. Trustee move for the appointment of a trustee if there are reasonable grounds to suspect that members of current management participated in, among other things, fraud or dishonesty in the management of the debtor or the debtor's public financial reporting.

21.    Subsection (1) of Section 1104(a) addresses management's pre- and post-petition misdeeds or mismanagement, while subsection (2) provides the court with "particularly wide discretion" to appoint a trustee even absent wrongdoing or mismanagement. *See In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (N.D. Ill. 1994). Where the court finds either that cause exists or that appointment is in the interest of the parties, an order for the appointment of a trustee is mandatory. *See Official Comm. Of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 285 B.R. 148, 158 (Bankr. D. Del. 2002).

9

CRED_EXAMINER_00000929

22.     The categories enumerated in 11 U.S.C. § 1104(a)(1) "cover a wide range of conduct" and, thus, are best described as illustrative, rather than exclusive. *See In re Marvel Entertainment Corp.*, 140 F.3d 463, 472 (3d Cir. 1998) (quoting *Committee of Dalkon Shield Claimants v. A.H. Robbins Co.*, 828 F.2d at 242). Fraud, dishonesty, incompetence, and gross mismanagement of a debtor's business affairs are all grounds for appointment of a chapter 11 trustee under 11 U.S.C. § 1104(a)(1). *See, e.g., In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989); *In re Colby Construction Corp.*, 51 B.R. 113, 116-118 (Bankr. S.D.N.Y. 1985). The determination of whether cause exists must be taken on a case by case basis, taking into account all relevant factors. Sharon Steel, 871 F.2d at 1225. Pre-petition conduct alone may provide the basis for a court to appoint a trustee. *See In re Rivermeadows Assocs., Ltd.*, 185 B.R. 615, 619 (Bankr. D. Wyo. 1995).

23.     In its decision in *In re Marvel Entertainment Group, Inc.*, the Third Circuit quoted the following passage approvingly in affirming the appointment of a Chapter 11 trustee:

> The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee. And if the debtor-in-possession defaults in this respect, Section 1104(a)(1) commands that the stewardship of the reorganization effort must be turned over to an independent trustee.

*Id.* (quoting *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989)) (emphasis added).

24.     The Third Circuit in *Marvel* further stated that appointment of a trustee is mandatory if cause is found under 11 U.S.C. § 1104(a)(1), and while it is not mandatory under 11 U.S.C. § 1104(a)(2), the Third Circuit held that the district court's refusal in that case to appoint something less than a trustee was not an abuse of discretion. *See Marvel*, 140 F.3d at 174-75.

10

CRED_EXAMINER_00000930

Congress provided no other way to replace debtor's management's control of the case with an independent fiduciary other than appointment of a trustee pursuant to 11 U.S.C. § 1104(a).

25.     The hedging losses, the Quanta Coin debacle, and the failure to pursue collection of the moKredit receivable all constitute "incompetence" or "gross mismanagement" warranting appointment of a chapter 11 trustee. *See, e.g., In re Vascular Access Centers, L.P.*, 611 B.R. 742, 764 (Bankr. E.D. Pa. 2020) ("Accordingly, courts have found cause present pursuant to § 1104(a)(1) in circumstances demonstrating conflicts of interest; misuse of assets and funds; inadequate recordkeeping and reporting; failure to file required documents; lack of adequate disclosure; lack of appropriate cost controls; transgressions related to taxes; failure to make required payments; lack of credibility and creditor confidence; and breaches of fiduciary duties."); *Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988) ("There are many cases holding that a history of transactions with companies affiliated with the debtor company is sufficient cause for the appointment of a trustee where the best interests of the creditors require"); *see also In re PRS Insurance Group*, 274 B.R. 381, 387 (Bankr. D. Del. 2001) (Walrath, J.) (evidence of diversion of assets, or the absence of accurate financial records, constitutes "incompetence or gross mismanagement).

26.     There are additional bases for the appointment of a trustee under 11 U.S.C. § 1104(a)(2). The Debtors' assets may include claims and causes of action against a range of entities, including current management; current management cannot be expected to exercise their fiduciary duty to the Debtors' creditors/"investors" to investigate and prosecute claims against themselves. The creditor constituencies include lenders of cryptocurrency who made their loans at various points in time, with rights to the payment of interest and the repayment of principal at various

11

CRED_EXAMINER_00000931

points in time. Some of the creditors may have different aspects to their claims, based for example on purported pledge agreements. Additionally, the factual representations made to such creditors has created an incredible atmosphere of mistrust of the Debtors and their management. The "appointment [of a trustee] is in the interests of creditors" under 11 U.S.C. § 1104(a)(2), as their hopes for a recovery on account of their claims are tied to the impartial investigation and prosecution of claims and causes of action. *See Manufacturers and Traders Trust Co. v. Morningstar Marketplace, Ltd. (In re Morningstar Marketplace, Ltd.)*, 544 B.R. 297, 305 (Bankr. M.D. Pa. 2016) ("A court is more likely to appoint a trustee under § 1104(a)(2) when reorganization is not possible, and a Debtor's principal may be motivated to protect his own interests rather than the interests of creditors. When coupled with a lack of confidence in management, and the benefits of appointing a trustee outweigh the cost, courts often find the argument for appointment of a trustee to be compelling.") (internal citation omitted); *In re Euro-American Lodging Corp.*, 365 B.R. 421, 427-28 (Bankr. S.D.N.Y. 2007) ("Where a chapter 11 debtor and its managers … suffer from material conflicts of interest, an independent trustee should be appointed" under 11 U.S.C. § 1104(a)(2)); *In re McCorhill Publ., Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) (where there are questionable inter-company financial transfers and the principals of the debtor occupy conflicting positions in the transferee companies, appointment of a trustee is warranted in the best interests of all creditors and all parties in interest to investigate the financial affairs of the debtor).

*Examiner*

27.     Under 11 U.S.C. § 1104(c), if the Court has not ordered the appointment of a chapter 11 trustee, this Court must direct the appointment of an examiner

12

CRED_EXAMINER_00000932

to conduct such an investigation of [the Debtors] as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of [the Debtors] of or by current or former management of [the Debtors], if

(1)     such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or

(2)     [the Debtors'] fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

28.     The First Day Declaration describes the Debtors' capital structure as including funded unsecured debt in excess of the $5 million threshold of Code section 1104(c)(2). Accordingly, the appointment of an examiner under that section to investigate the affairs of the Debtors is mandatory. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500-01 (6th Cir. 1990) ("[Section 1104(c)(2)] plainly means that the bankruptcy court 'shall' order the appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds $5 million if the U.S. trustee requests one."); *In re Loral Space & Communications Ltd.,* No. 04 Civ. 8645RPP, 2004 WL 2979785, at *4, 5 (S.D.N.Y. Dec. 23, 2004) (reversing Bankruptcy Court's decision denying appointment of examiner where $5 million debt threshold under section 1104(c)(2) was met and parties seeking appointment had standing to do so); *In re UAL Corp.,* 307 B.R. 80, 83-86 (Bankr. N.D. Ill. 2004) ("best reading of the statute" is that appointment of an examiner is mandatory if the requirements of section 1104(c)(2) are satisfied); *see also In re Mechem Fin. of Ohio, Inc.,* 92 B.R. 760, 761 (Bankr. N.D. Ohio 1988); *In re The Bible Speaks*, 74 B.R. 511, 514 (Bankr. D. Mass.1987); *In re 1243 20th Street, Inc.,* 6 B.R. 683, 685 n.3 (Bankr. D.C. 1980); *In re Lenihan,* 4 B.R. 209, 211 (Bankr. D.R.I. 1980).

29.     While this Court has authority under Code section 1104(c)(2) to specify (and thereby effectively limit) the appropriate scope of an examination, the "as is appropriate" language

13

CRED_EXAMINER_00000933

in that statutory subsection does not confer discretion upon this Court to decide whether an examiner should be appointed as a threshold matter once it is clear that the statute's monetary threshold is met. *See Loral*, 2004 WL 2979785, at *5 ("[i]t is [the bankruptcy court's] duty to fashion the role of an examiner to avoid substantial interference with the ongoing bankruptcy proceedings."); *UAL Corp.*, 307 B.R. at 85 n.2 (construing the "as is appropriate" language in section 1104(c)(2) to vest discretion in the bankruptcy court nullifies its mandate).

30.    Further, this Court should direct the appointment of an examiner under section 1104(c)(1), as such appointment would be in the best interests of the Debtors' estates, their creditors and equity security holders. Notwithstanding the Debtors' efforts to sell substantially all of their assets, the return on such sale(s) (if such sale(s) are consummated) will pale in comparison to potential recoveries via litigation against persons responsible for the Debtors' current predicament. The moKredit receivable alone is $39 million. The interests of the Debtors' estates and their creditors are best served by permitting an examiner to investigate the Debtors' prepetition activities and to identify colorable claims which the estates may assert beyond the moKredit receivable. The Debtors' financial affairs and business operations need to be reviewed by a disinterested person with clear authority to untangle the mess and provide transparency to all parties in interest. This is all the more important where the sums at stake are almost as large as the level of distrust felt by those who dealt with the Debtors.

*Conversion*

31.    11 U.S.C. § 1112 provides in part:

   (a)    The debtor may convert a case under this chapter to a case under chapter 7 of this title unless—

      (1)    the debtor is not a debtor in possession;

CRED_EXAMINER_00000934

> (2)   the case originally was commenced as an involuntary case under this chapter; or
>
> (3)   the case was converted to a case under this chapter other than on the debtor's request.

(b)

> (1)   Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.
>
> (2)   The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—

(A)   there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B)   the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—

> (i)   for which there exists a reasonable justification for the act or omission; and
>
> (ii)   that will be cured within a reasonable period of time fixed by the court.

(3)   The court shall commence the hearing on a motion under this subsection not later than 30 days after filing of the motion, and shall decide the motion not later than 15 days after commencement of such hearing, unless the movant expressly consents to a continuance for a specific period of time or compelling circumstances prevent the court from meeting the time limits established by this paragraph.

(4)   For purposes of this subsection, the term "cause" includes—

15

CRED_EXAMINER_00000935

(A)    substantial or continuing loss to or diminution of the estate and the absence
of a reasonable likelihood of rehabilitation[.]

32.    11 U.S.C. § 1112(b)(2)(B) indicates that, if the U.S. Trustee moves for conversion
under 11 U.S.C. § 1112(b)(4)(A) and establishes "cause" for relief, there are no "unusual
circumstances" that would allow this Court to refrain from converting the above-captioned case to
a case under chapter 7.

33.    Through the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005,
Pub. L. No. 109-8, 119 Stat. 23 (2005), Congress eliminated this Court's discretion that was
previously reflected in the appearance of the permissive word "may" in to 11 U.S.C. § 1112(b)
and, through substitution of the mandatory word "shall" for "may," directed this Court to convert
or dismiss the case, "whichever is in the best interests of the creditors and the estate," if "cause"
is established. 7 COLLIER ON BANKRUPTCY § 1112.04(1) (15th ed. rev. 2005) (". . . as
amended in 2005, section 1112(b) circumscribes the court's discretion by directing certain
instances in which the court must, and must not, convert or dismiss the case."); *cf. Association of
Civilian Technicians v. FLRA*, 22 F.3d 1150, 1153 (D.C. Cir. 1994) ("The word 'shall' generally
indicates command that admits of no discretion on the part of the person instructed to carry out the
directive.").

34.    The purpose of 11 U.S.C. § 1112(b)(4)(A) is to "preserve estate assets by
preventing the debtor in possession from gambling on the enterprise at the creditors' expense when
there is no hope of rehabilitation." *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y.
1995) (quoted in *Loop Corp. v. United States Trustee (In re Loop Corp.)*, 379 F.3d 511, 516 (8th
Cir. 2004)).

16

CRED_EXAMINER_00000936

35.    "Substantial or continuing loss to or diminution of the estate" is established where a debtor has continuing, negative cash flow post-petition. *See Loop Corp.*, 379 F.3d at 515-16.

36.    "Rehabilitation," as the term is used in 11 U.S.C. § 1112(b)(4)(A), means "to put back in good condition; re-establish on a sound, firm basis." 5 COLLIER ON BANKRUPTCY § 1112.03(2) (15th ed. 1980) (quoted in *In re L.S. Good & Co.*, 8 B.R. 315, 317 (Bankr. N.D. W.Va. 1980)). To be clear, "rehabilitation" does not include or mean the ability to confirm a liquidating plan.

37.    Here, the Debtors are eating into their cash position to fund operations and the prosecution of their bankruptcy cases. Additionally, the Debtors announced on the first day of their bankruptcy filings that they have ceased taking new loans from "investors" and, subsequently, have filed a motion to sell substantially all of their operational assets [D.I. 65]. In short, there is a continuing loss to or diminution of the estates and the absence of a reasonable likelihood of rehabilitation. Accordingly, conversion of the cases to cases under chapter 7 is required.

38.    Notwithstanding that conversion is mandatory where the "continuing loss/absence" prong of section 1112(b)(4)(A), it is also a desirable result here. At bottom, the size of the distribution made to general unsecured creditors in these cases will hinge on the estates' success in resolving issues among various constituencies, litigating where necessary, and taking expeditious, effective action to maximize value in the estates to the extent possible. Given the circumstances confronting the various estates and parties in interest, the appointment of an independent and disinterested fiduciary is necessary to lead that effort.

17

CRED_EXAMINER_00000937

WHEREFORE the U.S. Trustee requests that this Court enter an order (i) directing the appointment of a trustee or, alternatively, (ii) directing the appointment of an examiner or (iii) converting the cases to cases under chapter 7.

Dated: December 4, 2020          Respectfully submitted,
      Wilmington, Delaware

                                            **ANDREW R. VARA**
                                            **UNITED STATES TRUSTEE,**
                                            **REGIONS 3 and 9**

                                            By: */s/ Joseph J. McMahon, Jr.*
                                            Joseph J. McMahon, Jr.
                                            Trial Attorney
                                            John Schanne
                                            Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Phone)
(302) 573-6497 (Fax)
joseph.mcmahon@usdoj.gov
John.schanne@usdoj.gov

18

CRED_EXAMINER_00000938

Exhibit 28

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | : Chapter 11 |
| CRED INC., *et al.*,[1] | : |
| Debtors. | : Case No. 20-12836 (JTD) |
| | : (Jointly Administered) |
| | : |
| | : **Re: D.I. 62, 133, & 280** |

**ORDER DENYING IN PART, AND GRANTING IN PART,**
**THE TRUSTEE/EXAMINER MOTIONS**

This matter came before this Court for hearing on December 17 and 18, 2020, on the (i)

*Motion of Krzysztof Majdak and Philippe Godineau* ("Majdak/Godineau") *for Entry of an Order*

*Pursuant to 11 U.S.C. § 1112(b) (I) Dismissing the Cases; (II) Converting the Cases to a Chapter 7*

*Liquidation; or (III) Appointing a Chapter 11 Trustee* [D.I. 62] (the "Majdak/Godineau Motion");

(ii) the *Motion for Entry of an Order Directing the Appointment of a Trustee, or in the Alternative,*

*(I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases* [D.I.

133] (the "U.S. Trustee Motion" and, together with the Majdak/Godineau Motion, the "Motions");

(iii) Response of James Alexander to the Motion of Krzysztof Majdak and Philippe Godinea for Entry

of an Order Pursuant to 11 U.S.C. § 1112(B) (I) Dismissing the Cases; (II) Converting the Cases to

a Chapter 7 Liquidation; Or (III) Appointing a Chapter 11 Trustee [D.I. 103] (the "Alexander

Response"); (iv) Partial Joinder of Jamie Shiller, Takashi Yanagi, Wu Chi King, Joseph Richardson,

Thomas Calvert, Clint Cowen, Robin Houck, Todd Wiseman, Matthew Dixon, Jonatan Ashurov,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

Daniel Becker, Teppei Miyauchi, Jean Vacca, Xian Su, and Eric Schurman to Motion to Dismiss the Bankruptcy Cases, Convert the Cases to Chapter 7, or Appoint a Chapter 11 Trustee [D.I. 107] (the "Shiller Joinder"); and (v) UpgradeYa Investments, LLC's (I) Reply to Objection of Debtors to Motion of UpgradeYa Investments, LLC for Relief From Stay Under Bankruptcy Code Section 362 and (II) Limited Joinder in the Motion for an Order Converting the Chapter 11 Cases to Chapter 7 [D.I. 126] (the "UpgradeYa Joinder" and, together with the Alexander Response, the Shiller Joinder, and the UpgradeYa Joinder, the "Joinders"); and sufficient notice of the Motions and Joinders was given to interested parties in accordance with title 11 of the United States Code (the "Bankruptcy Code") and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). For the reasons stated on the record at the December 18, 2020 hearing, it is hereby ORDERED as follows:

1.      The Motions and Joinders are DENIED without prejudice to the extent they sought (i) appointment of a chapter 11 trustee pursuant to 11 U.S.C. § 1104(a), (ii) conversion of the above-captioned cases to chapter 7 cases under 11 U.S.C. § 1112(b), or (iii) dismissal of the cases pursuant to 11 U.S.C. § 1112(b); *provided, however*, that if the Debtors' respective equity security holders remove the Debtors' current  director, Mr. Grant Lyons, or appoint additional directors, thereby diluting Mr. Lyon's control of the Debtors' Board of Directors, the Court may direct the appointment of a chapter 11 trustee.

2.      The U.S. Trustee Motion is GRANTED to the extent it seeks the appointment of an examiner pursuant to 11 U.S.C. § 1104(c).

3.      The U.S. Trustee is directed to appoint an examiner (the "Examiner") pursuant to 11 U.S.C. § 1104(c).

4.      The Examiner shall: (a) investigate any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the Debtors of or by current or former management of the Debtors and (b) otherwise perform the duties

CRED_EXAMINER_00000940

of an examiner set forth in section 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code (collectively the "Investigation"). The scope and conduct of the Investigation and the Examiner's budget shall be further detailed in the Examiner's work plan, and the rights of parties in interest to be heard with respect to the work plan are fully reserved.

5.      The Debtors and the Official Committee of Unsecured Creditors (the "Committee") shall fully cooperate with the Examiner in the performance of any of the Examiner's duties and the Investigation, and that the Debtors and the Committee shall use their respective best efforts to coordinate with the Examiner to avoid unnecessary interference with, or duplication of, the Investigation.

6.      In connection with discharging its fiduciary obligations, the Committee may (with the Examiner's consent or, alternatively, by order of this Court after notice was given) participate in the Examiner's investigation in a limited capacity, including: (i) attending interviews and depositions conducted by the Examiner (with a maximum of one Committee professional permitted to attend); and (ii) receiving status updates from the Examiner.

7.      Notwithstanding the appointment of an Examiner, the Committee may file responsive briefing and participate in oral argument at any hearing on the *Motion of James Alexander to Dismiss the Cred Capital, Inc. Case* [D.I. 152].

8.      The Debtors shall provide to the Examiner all non-privileged documents and information within their possession that the Examiner deems relevant to perform the Investigation. If the Examiner seeks the disclosure of documents or information as to which the Debtors assert a claim of privilege, or otherwise objects to disclosing, including on the basis that the request is beyond the scope of the Investigation, and the Examiner and the Debtors are unable to reach a resolution on whether or on what terms such documents or information should be disclosed to the Examiner, the matter may be brought before the Court for resolution.

9.      Neither the Examiner nor the Examiner's representatives or agents shall make any public disclosures concerning the performance of the Investigation or the Examiner's duties until the Examiner's report is filed with the Court.

10.     The Examiner shall cooperate fully with any governmental agencies (such cooperation shall not be deemed a public disclosure as referenced above) including, but not limited to, any federal, state or local government agency that may be investigating the Debtors, its management or its financial condition, and the Examiner shall use best efforts to coordinate with such agencies in order to avoid unnecessary interference with, or duplication of, any investigations conducted by such agencies.

11.     The Examiner may retain counsel and other professionals if he or she determines that such retention is necessary to discharge his or her duties, with such retention to be subject to Court approval under standards equivalent to those set forth in 11 U.S.C. § 327. The Examiner may, in his or her sole discretion, upon agreement of the Debtors and Committee, avail himself/herself of work product created by the Debtors or the Committee's financial advisor in connection with the Investigation.

12.     The Examiner and any professionals retained by the Examiner pursuant to any order of this Court shall be compensated and reimbursed for their expenses pursuant to the procedures established in the *Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [D.I. 244]. Compensation and reimbursement of the Examiner shall be determined pursuant to 11 U.S.C. § 330, and compensation and reimbursement of the Examiner's professionals shall be determined pursuant to standards equivalent to those set forth in 11 U.S.C. § 330.

13.     Before commencing the Investigation, the Examiner shall meet and confer with representatives from the Committee, the Debtors, and any other party that the Examiner deems

CRED_EXAMINER_00000942

appropriate to discuss the Investigation.

14.     Within seven (7) business days after entry of the order approving the appointment of the Examiner is entered on the docket in these cases, the Examiner shall propose a work plan and shall provide his or her budget for the Investigation consistent with this Order, which shall be subject to the approval of the Court on seven (7) days' notice to all parties that have requested notice pursuant to Bankruptcy Rule 2002.  Notwithstanding the foregoing, the parties required to receive notice may waive such requirement in writing.

15.     The Examiner shall have the standing of a "party-in-interest" with respect to the matters that are within the scope of the Investigation, and shall be entitled to appear and be heard at any and all hearings in these cases; *provided, however* that the Examiner shall not have the standing or ability to prosecute any claim or cause of action absent further order of this Court.

16.     This Order is without prejudice to the right of any party-in-interest to seek relief from the Court, including modification of the scope of the Investigation.  This Order is also without prejudice to the Examiner's right to seek other relief as he or she may otherwise deem appropriate in furtherance of the discharge of his or her duties and the Investigation.

17.     The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE

Dated: December 23rd, 2020
Wilmington, Delaware

Exhibit 29

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re*<br><br>CRED INC., *et al.*,[1]<br><br>         Debtors. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Chapter 11<br><br>Case No. 20-12836 (JTD)<br>(Jointly Administered) |

**APPLICATION OF THE UNITED STATES TRUSTEE FOR**
**ORDER APPROVING APPOINTMENT OF EXAMINER**

Andrew R. Vara, United States Trustee for Region 3 ("U.S. Trustee"), hereby applies to

the Court pursuant to Fed. R. Bankr. P. 2007.1(c) for an order approving the appointment of the

Examiner, and in support thereof, states:

     1.     The U.S. Trustee has appointed Robert J. Stark, Esq. as Examiner in the above-

captioned cases.

     2.     Counsel for the U.S. Trustee has consulted with counsel to the following parties-

in-interest regarding the appointment of the Examiner:

          (a)     The Debtors; and

          (b)     The Official Committee of Unsecured Creditors.

     3.     To the best of the U.S. Trustee's knowledge, the Examiner's connections with the

Debtors, their creditors, and any other parties in interest, their respective attorneys and accountants,

the U.S. Trustee and persons employed by the Office of the United States Trustee are limited to

the connections set forth in the verified statement filed herewith.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

WHEREFORE the U.S. Trustee requests that this Court enter an order approving the appointment of Robert J. Stark, Esq. as Examiner in the above-captioned cases.

Dated: January 7, 2021
      Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE,**
**REGIONS 3 and 9**

By:  */s/ Joseph J. McMahon, Jr.*
Joseph J. McMahon, Jr.
Trial Attorney
John Schanne
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Phone)
(302) 573-6497 (Fax)
joseph.mcmahon@usdoj.gov
john.schanne@usdoj.gov

2

CRED_EXAMINER_00000945

Exhibit 30

### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re*<br><br>CRED INC., *et al.*,<br><br>          Debtors. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Chapter 11<br><br>Case No. 20-12836 (JTD)<br>(Jointly Administered)<br><br>**Re:  D.I. 281, 329, & 330** |

### ORDER APPROVING APPOINTMENT OF EXAMINER

Upon the *United States Trustee's Application for an Order Approving Appointment of Examiner*, dated January 7, 2021; and it appearing that Robert J. Stark, a disinterested person within the meaning of 11 U.S.C. § 101(14), has been appointed by the United States Trustee as Examiner in the above-captioned, jointly-administered cases of Cred Inc., *et al.*, and after due deliberation and sufficient cause appearing thereof; it is hereby

ORDERED, that the appointment of Robert J. Stark as Examiner is approved in the jointly-administered bankruptcy cases of Cred Inc., *et al.* pursuant to 11 U.S.C. § 1104(d).

                                JOHN T. DORSEY<br>
                                UNITED STATES BANKRUPTCY JUDGE

**Dated: January 8th, 2021**
**Wilmington, Delaware**

CRED_EXAMINER_00000946

Exhibit 31

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CRED INC., *et al.*,<br><br>Debtors.[1] | Case No. 20-12836 (JTD)<br><br>(Jointly Administered)<br><br>**Objection Deadline: January 27, 2021 at 4:00 p.m. (ET)**<br><br>**Re: D.I. 338** |

## NOTICE OF FILING OF PROPOSED SCOPE, WORK PLAN, AND BUDGET FOR INVESTIGATION, PREPARED AND SUBMITTED BY ROBERT J. STARK, AS EXAMINER

**PLEASE TAKE NOTICE** that on January 8, 2021 the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order Approving Appointment of Examiner* (the "Order") [D.I. 338].[2]

**PLEASE TAKE FURTHER NOTICE** that in accordance with the procedures set forth in the Order, the Examiner hereby files the (a) *Proposed Scope, Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Stark, as Examiner* (the "Proposed Work Plan and Budget") attached hereto as **Exhibit A** and (b) the *Proposed Order Approving Examiner's Proposed Scope, Work Plan, and Budget for Investigation* (the "Proposed Order") attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Court's approval of the Proposed Work Plan and Budget must be (a) in writing and served on or before **January 27, 2021 at 4:00 p.m. (prevailing Eastern Standard Time)** (the "Objection Deadline"); (b) filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, 3rd Floor, Wilmington, DE 19801; and (c) served as to be received on or before the Objection Deadline by the proposed undersigned attorneys for the Examiner.

**PLEASE TAKE FURTHER NOTICE** that if any objections to the Proposed Work Plan and Budget are filed, and the parties are unable to reach a resolution thereof, a hearing on the Proposed Work Plan and Budget will be held before the Honorable John T. Dorsey, United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, 5th Floor, Courtroom #5, Wilmington, DE 19801, at a date and time convenient to the Court.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solution LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

[2] All capitalized items not otherwise defined herein shall have the meaning ascribed to them in the Order.

{01653973;v1 }

**PLEASE TAKE FURTHER NOTICE** that only objections made in writing and timely filed and received, in accordance with the procedures above, will be considered by the Bankruptcy Court at such hearing.

**IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUEST IN THE PROPOSED WORK PLAN AND BUDGET WITHOUT FURTHER NOTICE OR HEARING.**

Dated: January 20, 2021
Wilmington, Delaware

**ASHBY & GEDDES, P.A.**

*/s/ Gregory A. Taylor*
Gregory A. Taylor (DE Bar No. 4008)
Katharina Earle (DE Bar No. 6348)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Tel: (302) 654-1888
Fax: (302) 654-2067
Email: GTaylor@ashbygeddes.com
Email: KEarle@ashbygeddes.com

-and-

**BROWN RUDNICK LLP**
Andrew M. Carty (to be admitted *pro hac vice*)
Michael W. Reining (to be admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Fax: (212) 209-4801
Email: ACarty@brownrudnick.com
Email: MReining@brownrudnick.com

*Proposed Counsel to Robert J. Stark in his capacity as Chapter 11 Examiner for Debtors Cred Inc.*

CRED_EXAMINER_00000948

**Exhibit A**

**[Proposed Work Plan and Budget]**

CRED_EXAMINER_00000949

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 11 |
| | Case No. 20-12836 (JTD) |
| CRED INC., *et al.*,[1] | (Jointly Administered) |
| Debtors. | **Response Deadline: January 27, 2021 at 4:00 p.m. (ET)** |

## PROPOSED SCOPE, WORK PLAN,
## AND BUDGET FOR INVESTIGATION, PREPARED
## AND SUBMITTED BY ROBERT J. STARK, AS EXAMINER

Robert J. Stark, in his capacity as the Court-appointed examiner (the "Examiner") in the above-captioned Chapter 11 cases of Cred, Inc. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), by and through his undersigned proposed counsel, pursuant to the Court's *Order Denying in Part, and Granting in Part, the Trustee/Examiner Motions*, dated December 23, 2020 [ECF No. 281] (the "Examiner Order"), hereby submits this proposed scope, work plan, and budget for the Examiner's investigation. In support hereof, the Examiner states as follows:

### RELEVANT FACTUAL BACKGROUND

1.     On November 7, 2020 (the "Petition Date"), each of the Debtors commenced Chapter 11 cases by filing voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court. The Debtors remain in

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

CRED_EXAMINER_00000950

possession of their property and are managing their businesses as debtors-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

2.      On December 3, 2020, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee") in the Debtors' Chapter 11 cases. See ECF No. 120.

3.      On December 4, 2020, the U.S. Trustee filed its *Motion for Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases* [ECF No. 133] (the "Trustee/Examiner Motion").

4.      The Debtors and the Creditors' Committee each filed oppositions to the Trustee/Examiner Motion. See ECF Nos. 191, 195.

5.      On December 18, 2020, the Court conducted a hearing with respect to the Trustee/Examiner Motion.

6.      On December 23, 2020, the Court entered the Examiner Order, pursuant to which the Court granted the U.S. Trustee's request for the appointment of an examiner pursuant to Bankruptcy Code Section 1104(c). See Examiner Order ¶ 2.

7.      The Examiner Order provides, among other things, that the Examiner:

(i)     will investigate any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the Debtors of or by current or former management of the Debtors, and otherwise perform the duties of an examiner set forth in Bankruptcy Code Sections 1106(a)(3) and 1106(a)(4) (the "Investigation");

2

CRED_EXAMINER_00000951

(ii)    will meet and confer with the Debtors and Creditors' Committee before commencing the Investigation (with the Debtors and Creditors' Committee agreeing to fully cooperate with the Examiner in connection with the Investigation, and to use best efforts to coordinate with the Examiner in respect of same);

(iii)    may retain counsel and other professionals in connection with the Investigation; and

(iv)    will have standing as a "party-in-interest" with respect to the matters that are within the scope of the Investigation.

See Examiner Order ¶¶ 4, 5, 8, 11, 12, 13, 15.

8.    The Examiner Order further provides that: (a) the scope and conduct of the Investigation and the Examiner's budget will be detailed in the Examiner's proposed work plan; and (b) such proposed work plan and budget will be filed by the Examiner within seven (7) business days after entry of the order approving the appointment of the Examiner. See Examiner Order ¶¶ 4, 14.

9.    On January 7, 2021, the U.S. Trustee filed its motion to approve the appointment of Robert J. Stark, as Examiner. See ECF No. 330.

10.    On January 8, 2021, the Court entered its order approving the appointment of Robert J. Stark, as Examiner. See ECF No. 338.

## PROPOSED SCOPE, WORK PLAN, AND BUDGET FOR INVESTIGATION

11.    Pursuant to and in accordance with the Examiner Order, the Examiner hereby submits the below proposed scope, work plan, and budget for the Investigation. The Examiner anticipates retaining counsel, subject to approval by the Court, to assist with the Investigation.

3

CRED_EXAMINER_00000952

Prior to filing this proposed work plan and budget, the Examiner met and conferred with the U.S. Trustee, the Debtors, and the Creditors' Committee regarding the substance herein, and shared a draft of this pleading with the foregoing parties.

    (i)    <u>Scope of Investigation</u>: The Examiner Order provides that the Investigation will include any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the Debtors of or by the Debtors' current or former management. <u>See</u> Examiner Order ¶ 4. The Examiner Order further provides that the Investigation will include any other items set forth in Bankruptcy Code Section 1106(a)(3), which, in turn, includes the acts, conduct, assets, liabilities, and financial condition of the Debtors, the operation of the Debtors' business, the desirability to continue the business, and any other matter relevant to the case or to the formulation of a Chapter 11 plan. <u>See id.</u>; 11 U.S.C. § 1106(a)(3). Following his appointment, the Examiner directed a thorough review of the bankruptcy docket, the various pleadings filed in these cases, and other relevant materials, and met and conferred with the U.S. Trustee, the Debtors, and the Creditors' Committee to ascertain the proper scope of the Investigation. Pursuant thereto, the Examiner has identified the following specific items to be included in the Investigation:

    (a)    the Debtors' business and operations prior to the Petition Date, including allegations of insider transactions and comingling of corporate and client accounts;

    (b)    the facts, circumstances, decisions, and events surrounding the substantial losses experienced by the Debtors prior to the Petition

4

CRED_EXAMINER_00000953

Date, including in connection with the liquidation of certain hedge positions;

(c)    the facts, circumstances, decisions, and events surrounding the Debtors' relationship and dealings with moKredit, including any investments made in, and/or outstanding debts owed by, moKredit;

(d)    equity sponsor Lu Hua's transfer of certain cryptocurrency to the Debtors prior to the Petition Date and the nature of such transaction(s);

(e)    the facts, circumstances, decisions, and events surrounding the Debtors' purported QuantCoin investment and the losses associated therewith; and

(f)    the facts, circumstances, decisions, and events surrounding the Debtors' dealings with James Alexander.

(ii)    <u>Work Plan</u>: The Examiner proposes to conduct the Investigation as follows:

(a)    <u>Initial Witness Interviews</u>: The Examiner intends to promptly conduct initial witness interviews, including (but not limited to), the Debtors' key management personnel, current and former employees, equity sponsors, relevant personnel from other entities and/or parties, and affiliated individuals as needed, regarding the facts and circumstances relevant to the Investigation, the Debtors' business, and the events precipitating the Debtors' bankruptcy filings.[2]  The

---

[2]    Given timing and budget constraints, the Examiner presently anticipates conducting interviews rather than depositions. However, to the extent that any witnesses are unwilling to participate in interviews or the Examiner determines that any witnesses are less than forthcoming in their interviews, the Examiner reserves the right to seek and take depositions of any witnesses in connection with the Investigation.

CRED_EXAMINER_00000954

Examiner presently anticipates that the initial witness interviews will include (although not necessarily be limited to) the following individuals:

- James Alexander (former Chief Capital Officer)
- Matthew Foster (CRO)
- Lu Hua (Co-Founder)
- Daniyal Inamullah (former head of Capital Markets)
- Grant Lyon (Independent Director)
- Joseph Podulka (former CFO)
- Daniel Schatt (Co-Founder and former CEO)
- Daniel Wheeler (General Counsel)
- Scott Wiley (Interim CFO)

(b)    <u>Document Review</u>:    The Examiner has begun the process of collecting documents, communications, information, and other forms of digital data from the Debtors and other parties, and coordinating with those parties to ensure that such productions are made expeditiously and efficiently.    The Examiner has also begun preparing additional requests for the production of documents, communications, information, and other forms of digital data relevant to the subject matter of the Investigation, and intends to propound such requests on certain additional parties.  The Examiner intends to utilize targeted searches of select document custodians in order to reasonably manage costs and the timing of the completion of the Investigation.  The Examiner expects good faith cooperation by the recipients of such requests, but reserves the right to seek to compel production if any parties refuse to timely produce requested materials.

(c)    <u>Financial Advisory Assistance</u>:  Pursuant to the Examiner Order, the Examiner may, in his discretion, and upon agreement of the Creditors' Committee or Debtors (as applicable), avail himself of work product created by the Creditors' Committee's or Debtors' financial advisors in connection with the

6

CRED_EXAMINER_00000955

Investigation.  See Examiner Order ¶ 11.  After conferring with the Creditors' Committee and Debtors, the Examiner anticipates leveraging work already performed or being performed by advisors to the Creditors' Committee and Debtors, including, without limitation, cryptocurrency tracing and other forensic analysis, in connection with the Investigation.  To the extent that the Examiner determines that it is necessary to retain additional financial advisory or forensic assistance, the Examiner will seek approval of such retention expeditiously.

(d)    Key Witness Interviews: Following (or in conjunction with) the initial interviews, document review, and applicable work product review, the Examiner anticipates identifying key witnesses for further interviews in an effort to obtain a complete and thorough understanding of the matters pertinent to the Investigation.

(e)    Examiner Report:    At the conclusion of the Investigation, the Examiner intends to prepare a report, pursuant to and in accordance with Bankruptcy Code Section 1106(a)(4), setting forth the facts ascertained by the Examiner pertaining to the Investigation and, if applicable, potential causes of action that may be available to the estates arising therefrom.  The Examiner will transmit such report to the Court, the U.S. Trustee, the Debtors, and the Creditors' Committee, and intends to file a copy of such report (with appropriate redactions, if necessary) on the case docket.

(iii)    Budget: The Examiner proposes an initial budget for the Investigation of $800,000 (inclusive of primary and local counsel fees and costs).  The Examiner and its professionals will endeavor to work efficiently and expeditiously to complete the

CRED_EXAMINER_00000956

Investigation within this proposed budget. But, given that the Examiner does not yet know the volume or complexity of information subject to the Investigation, the level of witness cooperation, and other matters pertinent to the Investigation, the Examiner reserves the right to seek modifications to the proposed Investigation budget by order of the Court after notice and an opportunity for parties-in-interest to be heard.

(iv)    Timeline: If at all possible, the Examiner intends, and will do his very best, to complete the Investigation and submit his report prior to the March 8, 2021 plan confirmation hearing.[3] The timing of completion of the Investigation, though, depends on several factors that are outside the current knowledge and/or control of the Examiner, including the volume and complexity of information subject to the Investigation, and the level of cooperation that the Examiner will receive from various parties. The Examiner will promptly inform the Court of any circumstances that may arise that could result in additional time being required to complete the Investigation.

12.    The Examiner fully expects that all parties will provide timely and good faith cooperation in connection with the Investigation. However, the Examiner reserves the right to seek formal discovery, including through a Bankruptcy Rule 2004 motion (on an expedited basis, if necessary), and to issue subpoenas in connection with the Investigation.

**RESERVATION OF RIGHTS**

13.    The Examiner reserves the right to amend the scope and work plan set forth herein and the direction of the Investigation as it progresses, within the scope of the Examiner Order. To the extent that the Examiner seeks to materially modify the scope or work plan, or to

---

[3]      The Examiner will strive to submit his report in advance of the plan confirmation hearing so as to provide parties adequate time to review before consideration of the plan. If practicable, the Examiner intends to share a draft of the report with key case parties in advance of finalizing the report.

CRED_EXAMINER_00000957

modify the budget, for the Investigation, as set forth herein, the Examiner will seek approval of any such modification(s) by order of the Court, after notice and an opportunity for parties-in-interest to be heard.

Dated:  January 20, 2021

**ASHBY & GEDDES, P.A.**

*/s/ Gregory A. Taylor*
Gregory A. Taylor (DE Bar No. 4008)
Katharina Earle (DE Bar No. 6348)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Tel:  (302) 654-1888
Email: gtaylor@ashbygeddes.com
        kearle@ashbygeddes.com

-and-

**BROWN RUDNICK LLP**
Andrew M. Carty (*pro hac vice* pending)
Michael W. Reining (*pro hac vice* pending)
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Email: acarty@brownrudnick.com
        mreining@brownrudnick.com

*Proposed Counsel to Robert J. Stark,*
*in his capacity as Chapter 11 Examiner for Debtors*

9

CRED_EXAMINER_00000958

**Exhibit B**

**[Proposed Order]**

CRED_EXAMINER_00000959

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re:* | Chapter 11 |
|  | Case No. 20-12836 (JTD) |
| CRED INC., *et al.*,[1] | (Jointly Administered) |
| Debtors. | **Re: D.I. _____** |

**ORDER APPROVING EXAMINER'S PROPOSED**
**SCOPE, WORK PLAN, AND BUDGET FOR INVESTIGATION**

Upon consideration of the *Proposed Scope, Work Plan, and Budget for Investigation,*

*Prepared and Submitted by Robert J. Stark, as Examiner*, dated January 20, 2021 (the "Work

Plan"),[2] filed pursuant to and in accordance with the *Order Denying in Part, and Granting in*

*Part, the Trustee/Examiner Motions* [ECF No. 281]; and due and proper notice of the Work Plan

having been given; and it appearing that no other or further notice need be provided; and the

Court having found and determined that the relief sought by the Examiner, as set forth herein, is

necessary and in the best interest of the Debtors, their estates, creditors, and all parties-in-

interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED:**

1.    The proposed scope, work plan, and budget for the Investigation, as set forth in

the Work Plan, are hereby **APPROVED**.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

[2]    Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Motion.

CRED_EXAMINER_00000960

2.      This Order is without prejudice to the Examiner's right to amend the scope and work plan for the Investigation as it progresses, within the scope of the Examiner Order; provided that, to the extent that the Examiner seeks to materially modify the scope or work plan, or to modify the budget, for the Investigation as approved herein, the Examiner will seek approval of any such modification(s) by further order of the Court, after notice and an opportunity for parties-in-interest to be heard.

3.      The Examiner may take all actions necessary to effectuate the relief granted in this Order.

4.      This Court shall have exclusive jurisdiction to hear and determine all matters arising from or relating to this Order and its implementation.

5.      This Order shall be effective and enforceable immediately upon its entry.


Dated: _____, 2021
       Wilmington, Delaware


                                    _____
                                    THE HONORABLE JOHN T. DORSEY
                                    UNITED STATES BANKRUPTCY JUDGE

2

CRED_EXAMINER_00000961

## <u>CERTIFICATE OF SERVICE</u>

 I, Gregory A. Taylor, hereby certify that, on January 20, 2021, I caused one copy of the foregoing to be served to (1) all parties of record via CM/ECF and (2) to the attached service list via electronic mail unless otherwise indicated.

January 20, 2021
Wilmington, Delaware

        /s/ Gregory A. Taylor
        Gregory A. Taylor (DE Bar No. 4008)

{01651673;v1 }

CRED_EXAMINER_00000962

## SERVICE LIST

| | | |
|---|---|---|
| **VIA FIRST CLASS MAIL**<br>Arizona Attorney General Office<br>P.O. Box 6123<br>MD 7611<br>Phoenix, AZ 85005-6123 | Baker Hostetler LLP<br>Attn: Jeffrey J. Lyons<br>1201 North Market St.,14th Floor<br>Wilmington, DE 19801-1147<br>Email: JLyons@bakerlaw.com | Baker Hostetler LLP<br>Attn: Jorian L. Rose and Michael Sabella<br>45 Rockefeller Plaza<br>New York, NY 10111<br>Email: JRose@bakerlaw.com<br>Email: MSabella@bakerlaw.com |
| Billion Law<br>Attn: Mark M. Billion<br>1073 S. Governor Ave<br>Dover, DE 19904<br>Email: markbillion@billionlaw.com | Buchalter, P.C.<br>Attn: Shawn M. Christianson<br>55 Second St., 17th Floor<br>San Francisco, CA 94105-3493<br>Email: schristianson@buchalter.com | Buchanan Ingersoll & Rooney P.C.<br>Attn: Geoffrey G. Grivner<br>919 N Market St., Suite 900<br>Wilmington, DE 19801<br>Email: Geoffrey.grivner@bipc.com |
| Carlton Fields, PA<br>Attn: David L. Gay<br>2 Miami Central<br>700 NW 1st Ave., Suite1200<br>Miami, FL 33136-4118<br>Email: DGay@carltonfields.com | Cousins Law LLC<br>Attn: Scott D. Cousins<br>Brandywine Plaza West<br>1521 Concord Pike, Suite 301<br>Wilmington, DE 19803<br>Email: scott.cousins@cousins-law.com | **VIA FIRST CLASS MAIL**<br>Cred Inc.<br>Attn: President/CEO<br>3 East Third Avenue<br>San Mateo, CA 94401 |
| DCP Capital<br>Attn: Kevin Hu<br>Kingston Chambers<br>P.O. Box 173<br>Rd Town<br>Tortola Vg1110<br>British Virgin Islands<br>Email: Kevin@dcp.capital | **VIA EMAIL AND**<br>**FIRST CLASS MAIL**<br>Delaware Attorney General<br>Bankruptcy Dept.<br>Carvel State Office Building<br>820 N French St., 6th Floor<br>Wilmington, DE 19801<br>Email: attorney.general@state.de.us | **VIA EMAIL AND**<br>**FIRST CLASS MAIL**<br>Delaware Division Of Revenue<br>Attn: Christina Rojas<br>Carvel State Office Building<br>8th Floor<br>820 N. French St.<br>Wilmington, DE 19801<br>Email: Christina.rojas@delaware.gov |
| **VIA EMAIL AND**<br>**FIRST CLASS MAIL**<br>Delaware Secretary of State<br>Division Of Corporations Franchise Tax<br>P.O. Box 898<br>Dover, DE 19903<br>Email: dosdoc_ftax@state.de.us | **VIA FIRST CLASS MAIL**<br>Delaware Secretary of State<br>Division of Corporations<br>401 Federal St., Suite 4<br>Dover, DE 19901 | **VIA FIRST CLASS MAIL**<br>Delaware State Treasury<br>Bankruptcy Dept.<br>820 Silver Lake Blvd.<br>Suite 100<br>Dover, DE 19904 |
| Dragonfly International Holding Limited<br>Attn: Lindsay Lin<br>Maples Corporate Services (BVI)<br>Limited<br>Kington Chambers<br>P.O. Box 173<br>Road Town Tortola, British Virgin<br>Islands<br>Email: lindsay@dcp.capital | Faegre Drinker Biddle & Reath LLP<br>Attn: Patrick A. Jackson<br>222 Delaware Ave., Suite 1410<br>Wilmington, DE 19801-1621<br>Email:<br>Patrick.jackson@faegredrinker.com | Faegre Drinker Biddle & Reath LLP<br>Attn: Dustin R. Deneal<br>600 E. 96th St., Suite 600<br>Indianapolis, IN 46240<br>Email: dustin.deneal@faegredrinker.com |
| Fisherbroyles LLP<br>Attn: Carl D. Neff<br>Brandywine Plaza West<br>1521 Concord Pike, Suite 301<br>Wilmington, DE 19803<br>Email: Carl.Neff@fisherbroyles.com | Fisherbroyles LLP<br>Attn: Hollace Topol Cohen<br>445 Park Ave<br>New York, NY 10022<br>Email:<br>Hollace.Cohen@fisherbroyles.com | **VIA FIRST CLASS MAIL**<br>Franchise Tax Board<br>Bankruptcy Section MS A340<br>P.O. Box 2952<br>Sacramento, CA 95812-2952 |

CRED_EXAMINER_00000963

| Gellert Scali Busenkell & Brown LLC<br>Attn: Michael Busenkell and<br>Amy D. Brown<br>1201 N. Orange St., Suite 300<br>Wilmington, DE 19801<br>Email: MBusenkell@gsbblaw.com<br>Email: ABrown@gsbblaw.com | **VIA FIRST CLASS MAIL**<br>Internal Revenue SVC<br>Centralized Insolvency Operation<br>P.O. Box 7346<br>Philadelphia, PA 19101-7346 | **VIA FIRST CLASS MAIL**<br>Internal Revenue SVC<br>Centralized Insolvency Operation<br>2970 Market St.<br>Mail Stop 5 Q30 133<br>Philadelphia, PA 19104-5016 |
|---|---|---|
| JST Capital<br>Attn: Scott Freeman<br>350 Springfield Ave, Suite 200<br>Summit, NJ 07901<br>Email: SFreeman@jstcap.com | Maple Partners LLC<br>Attn: Joshua Segall<br>1309 Coffeen Ave., Suite 1200<br>Sheridan, WY 82801<br>Email: maplepartnersllc@gmail.com | McDermott Will & Emery LLP<br>Attn: Timothy W. Walsh and<br>Darren Azman<br>340 Madison Ave<br>New York, NY 10173-1922<br>Email: twwalsh@mwe.com<br>Email: dazman@mwe.com |
| McDermott Will & Emery LLP<br>Attn: David R. Hurst<br>The Nemours Building<br>1007 North Orange St.,4th Floor<br>Wilmington, DE 19801<br>Email: dhurst@mwe.com | **VIA FIRST CLASS MAIL**<br>Michigan Dept. of Treasury Tax Pol<br>Div.<br>Litigation Liaison<br>430 West Allegan St.<br>2nd Floor Austin Building<br>Lansing, MI 48922 | **VIA EMAIL AND FIRST CLASS MAIL**<br>Office of the United States Trustee<br>Attn: Joseph J. McMahon, Jr. and John<br>Schanne<br>844 King St., Suite 2207<br>Wilmington, DE 19801<br>Email: joseph.mcmahon@usdoj.gov<br>Email: john.schanne@usdoj.gov |
| Paul Hastings LLP<br>Attn: James T. Grogan and Mack Wilson<br>600 Travis Street<br>58th Floor<br>Houston, TX 77002<br>Email: jamesgrogan@paulhastings.com<br>Email: mackwilson@paulhastings.com | **VIA EMAIL AND FIRST CLASS MAIL**<br>US Attorney For Delaware<br>Attn: Charles Oberly and Ellen Slights<br>1313 North Market St.<br>Wilmington, DE 19801<br>Email: usade.ecfbankruptcy@usdoj.gov | Paul Hastings LLP<br>Attn: G. Alexander Bongartz and Derek<br>Cash<br>200 Park Avenue<br>New York, NY 10166<br>Email: alexbongartz@paulhastings.com<br>Email: derekcash@paulhastings.com |
| **VIA FIRST CLASS MAIL**<br>US EPA Region 3<br>Office Of Reg. Counsel<br>1650 Arch St.<br>Philadelphia, PA 19103 | Saul Ewing Arnstein & Lehr LLP<br>Attn: Mark Minuti<br>1201 North Market St., Suite 2300<br>P.O. Box 1266<br>Wilmington, DE 19899<br>Email: mark.minuti@saul.com | **VIA FIRST CLASS MAIL**<br>Social Security Administration<br>Office of The Gen. Counsel Region 3<br>300 Spring Garden St.<br>Philadelphia, PA 19123 |
| Uphold, Inc.<br>Attn: JP Thieriot<br>900 Larkspur Landing Circle<br>Suite 209<br>Larkspur, CA 94939<br>Email: jp.thieriot@uphold.com | | |

CRED_EXAMINER_00000964

Exhibit 32

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 11 |
| | Case No. 20-12836 (JTD) |
| CRED INC., *et al.*,[1] | |
| | (Jointly Administered) |
| Debtors. | **Re: D.I. 281, 376 & 430** |

## ORDER APPROVING EXAMINER'S PROPOSED
## SCOPE, WORK PLAN, AND BUDGET FOR INVESTIGATION

Upon consideration of the *Proposed Scope, Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Stark, as Examiner,* dated January 20, 2021 (the "Work Plan"),[2] filed pursuant to and in accordance with the *Order Denying in Part, and Granting in Part, the Trustee/Examiner Motions* [D.I. 281]; and due and proper notice of the Work Plan having been given; and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought by the Examiner, as set forth herein, is necessary and in the best interest of the Debtors, their estates, creditors, and all parties-in-interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED:**

1.      The proposed scope, work plan, and budget for the Investigation, as set forth in the Work Plan, are hereby **APPROVED**.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

[2]      Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Motion.

{01654339;v1 }

2.      This Order is without prejudice to the Examiner's right to amend the scope and work plan for the Investigation as it progresses, within the scope of the Examiner Order; provided that, to the extent that the Examiner seeks to materially modify the scope or work plan, or to modify the budget, for the Investigation as approved herein, the Examiner will seek approval of any such modification(s) by further order of the Court, after notice and an opportunity for parties-in-interest to be heard.

3.      The Examiner may take all actions necessary to effectuate the relief granted in this Order.

4.      This Court shall have exclusive jurisdiction to hear and determine all matters arising from or relating to this Order and its implementation.

5.      This Order shall be effective and enforceable immediately upon its entry.

JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE

Dated: January 28th, 2021
Wilmington, Delaware

{01654339;v1 }

2

CRED_EXAMINER_00000966

Exhibit 33

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CRED INC., *et al.*, | Case No. 20-12836 (JTD) |
| Debtors.[1] | (Jointly Administered) |
| | **Objection Deadline: March 3, 2021 at 4:00 p.m. (ET)** |
| | **Re: D.I. 338, 376, 431** |

## NOTICE OF FILING OF PROPOSED AMENDMENT TO WORK PLAN, AND BUDGET FOR INVESTIGATION, PREPARED AND SUBMITTED BY ROBERT J. STARK, AS EXAMINER

**PLEASE TAKE NOTICE** that on January 8, 2021 the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order Approving Appointment of Examiner* (the "Order") [D.I. 338].[2]

**PLEASE TAKE FURTHER NOTICE** that on January 20, 2021, Robert J. Stark, in his capacity as Chapter 11 Examiner for the Debtors (the "Examiner") filed the *Notice of Filing of Proposed Scope, Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Stark, as Examiner* (the "Proposed Work Plan and Budget"). The Court entered the Order approving the Proposed Work Plan and Budget on January 28, 2021 [D.I. 431].

**PLEASE TAKE FURTHER NOTICE** that in accordance with the procedures set forth in the Order, the Examiner hereby files the (a) *Proposed Amendment to Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Stark, as Examiner* (the "Proposed Amended Work Plan and Budget") attached hereto as **Exhibit A** and (b) the *Proposed Order Approving Examiner's Proposed Amendment to Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Stark, as Examiner* (the "Proposed Order") attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Court's approval of the Proposed Amended Work Plan and Budget must be (a) in writing and served on or before **March 3, 2021 at 4:00 p.m. (prevailing Eastern Standard Time)** (the "Objection Deadline"); (b) filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solution LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

[2] All capitalized items not otherwise defined herein shall have the meaning ascribed to them in the Order.

{01664530;v1 }

CRED_EXAMINER_00000967

N. Market Street, 3rd Floor, Wilmington, DE 19801; and (c) served as to be received on or before the Objection Deadline by the proposed undersigned attorneys for the Examiner.

**PLEASE TAKE FURTHER NOTICE** that if any objections to the Proposed Amended Work Plan and Budget are filed, and the parties are unable to reach a resolution thereof, a hearing on the Proposed Amended Work Plan and Budget will be held before the Honorable John T. Dorsey, United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, 5th Floor, Courtroom #5, Wilmington, DE 19801, at a date and time convenient to the Court.

**PLEASE TAKE FURTHER NOTICE** that only objections made in writing and timely filed and received, in accordance with the procedures above, will be considered by the Bankruptcy Court at such hearing.

**IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUEST IN THE PROPOSED AMENDED WORK PLAN AND BUDGET WITHOUT FURTHER NOTICE OR HEARING.**

Dated: February 24, 2021
Wilmington, Delaware

**ASHBY & GEDDES, P.A.**

*/s/ Gregory A. Taylor*
Gregory A. Taylor (DE Bar No. 4008)
Katharina Earle (DE Bar No. 6348)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Tel:  (302) 654-1888
Fax: (302) 654-2067
Email: GTaylor@ashbygeddes.com
        KEarle@ashbygeddes.com

-and-

**BROWN RUDNICK LLP**
Andrew M. Carty (admitted *pro hac vice*)
Michael W. Reining (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Fax: (212) 209-4801
Email: ACarty@brownrudnick.com
        MReining@brownrudnick.com

*Counsel to Robert J. Stark, in his capacity as Chapter 11 Examiner for Debtors*

{01664530;v1 }                              2

CRED_EXAMINER_00000968

**Exhibit A**

**[Proposed Amended Work Plan and Budget]**

CRED_EXAMINER_00000969

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re:* | Chapter 11 |
| | Case No. 20-12836 (JTD) |
| CRED INC., *et al.*,[1] | (Jointly Administered) |
| Debtors. | **Response Deadline: March 3, 2021 at 4:00 pm (ET)** |
| | **Re: Docket Nos. 338, 376, 431** |

**PROPOSED AMENDMENT TO WORK PLAN,
AND BUDGET FOR INVESTIGATION, PREPARED
AND SUBMITED BY ROBERT J. STARK, AS EXAMINER**

Robert J. Stark, in his capacity as the Court-appointed examiner (the "Examiner") in the above-captioned Chapter 11 cases of Cred, Inc. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), by and through his undersigned proposed counsel, pursuant to the Court's *Order Denying in Part, and Granting in Part, the Trustee/Examiner Motions*, dated December 23, 2020 [ECF No. 281] (the "Examiner Order"); the *Proposed Scope, Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Stark, as Examiner*, dated January 20, 2021 [ECF No. 376] (the "Initial Work Plan"); and the *Order Approving Examiner's Proposed Scope, Work Plan, and Budget for Investigation*, dated January 28, 2021 [ECF No. 431] (the "Work Plan Order") approving the Initial Work Plan, hereby submits this proposed amendment to the Initial Work Plan. In support hereof, the Examiner states as follows:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

{01664526;v1 }

## RELEVANT FACTUAL BACKGROUND

1.      Pursuant to and in accordance with the Examiner Order, on January 20, 2021, the Examiner filed the Initial Work Plan setting forth the Examiner's initial proposed scope, work plan, and budget for the Investigation.[2]  On January 28, 2021, the Court entered the Work Plan Order approving the Examiner's Initial Work Plan.

2.      Since his appointment, the Examiner has been diligently and expeditiously conducting the Investigation consistent with the Examiner Order, Work Plan Order, and Initial Work Plan.  The Examiner has received and reviewed approximately fifteen thousand documents produced by the Debtors, Creditors' Committee, and other parties, and has conducted interviews of approximately a dozen principal witnesses.

3.      The Examiner Order and Initial Work Plan provided that the Examiner would have the ability to leverage work product created by the Debtors' and Creditors' Committee's financial advisors, and other work performed by such advisors, in connection with the Investigation.  The Examiner has been able to do just that, with the cooperation of the Debtors and Creditors' Committee.

4.      But, given the timing of when the Initial Work Plan was filed (*i.e.*, at the beginning stages of the Investigation), the Examiner could not know what precise information would be necessary to complete the Investigation and what information the Debtors' and Creditors' Committee's advisors would be able to provide.

5.      Accordingly, pursuant to the Initial Work Plan (and consistent with the Examiner Order), the Examiner reserved the right to amend the Initial Work Plan as the Investigation progressed, including the right to (a) seek to retain additional financial advisory assistance if

---

[2]      Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Initial Work Plan.

CRED_EXAMINER_00000971

necessary to complete the Investigation, and (b) modify the proposed Investigation budget. <u>See</u> Initial Work Plan ¶¶ 11(ii)(c), 13. The Work Plan Order, likewise, reserves the Examiner's right to seek to amend the Initial Work Plan, including the proposed budget, as necessary. <u>See</u> Work Plan Order ¶ 2.

6.      The Examiner has analyzed the information provided by the Debtors' and Creditors' Committee's advisors. Such information has been informative and beneficial to the Investigation. The Examiner intends to continue utilizing information provided by these professionals. But, given the foregoing advisors' specific mandates, such information does not address certain issues that the Examiner believes are necessary to expeditiously complete the Investigation. Accordingly, the Examiner has determined that additional financial advisory services are necessary to complete the Investigation.

<u>**PROPOSED AMENDMENT TO WORK PLAN AND BUDGET**</u>

7.      The Examiner proposes to retain Ankura Consulting Group ("<u>Ankura</u>") to assist the Examiner in connection with the Investigation, subject to approval by the Court. The Examiner anticipates that Ankura will provide the following services in connection with the Investigation:

(i)      assist and advise the Examiner in the discharge of his duties and responsibilities under the Examiner Order, other orders of this Court, and applicable law;

(ii)     assist the Examiner in the evaluation and analysis of financial and crypto currency issues raised in connection with the Investigation;

(iii)    assist the Examiner in evaluating the relationship between the Debtors' assets and liabilities vis-à-vis crypto currency valuations;

CRED_EXAMINER_00000972

(iv)    assist the Examiner with interviews, examinations, and the review of documents and other materials in connection with the Investigation;

(v)    assist the Examiner in the preparation of reports and other documents necessary for the Examiner to discharge his duties; and

(vi)    assist the Examiner in undertaking any additional tasks or duties that the Court may direct or that the Examiner may determine are necessary and appropriate in connection with the discharge of his duties.

8.    The Examiner does not believe that the work to be performed by Ankura will be duplicative of work performed by other advisors in these cases and will endeavor to ensure that there is no duplication of effort.

9.    In connection with the proposed retention of Ankura, the Examiner proposes a $125,000 increase in the Investigation budget, which would increase the total Investigation budget to $925,000 (inclusive of primary counsel, local counsel, and financial advisory fees and costs). Notably, Ankura has agreed to provide a 15% discount to total fees billed, excluding expenses, on a monthly basis.

10.    Prior to filing this proposed amendment to the Initial Work Plan, the Examiner met and conferred with the U.S. Trustee, the Debtors, and the Creditors' Committee regarding the substance hereof.

11.    Except as specifically modified herein, the terms of the Initial Work Plan remain in full force and effect.

## RESERVATION OF RIGHTS

12.    The Examiner reserves the right to amend the scope and work plan set forth in the Initial Work Plan and herein, and the direction of the Investigation as it progresses, within the

CRED_EXAMINER_00000973

scope of the Examiner Order.  To the extent that the Examiner seeks to materially modify the

scope or work plan, or to modify the budget, for the Investigation, as set forth in the Initial Work

Plan (as modified herein), the Examiner will seek approval of any such modification(s) by order

of the Court, after notice and an opportunity for parties-in-interest to be heard.

Dated:  February 24, 2021

**ASHBY & GEDDES, P.A.**

*/s/ Gregory A. Taylor*
Gregory A. Taylor (DE Bar No. 4008)
Katharina Earle (DE Bar No. 6348)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Tel:  (302) 654-1888
Email: gtaylor@ashbygeddes.com
          kearle@ashbygeddes.com

-and-

**BROWN RUDNICK LLP**
Andrew M. Carty (admitted *pro hac vice*)
Michael W. Reining (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Email: acarty@brownrudnick.com
          mreining@brownrudnick.com

*Counsel to Robert J. Stark, in his capacity as*
*Chapter 11 Examiner for Debtors*

CRED_EXAMINER_00000974

**Exhibit B**

**[Proposed Order]**

CRED_EXAMINER_00000975

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re:* | Chapter 11 |
|  | Case No. 20-12836 (JTD) |
| CRED INC., *et al.*,[1] | (Jointly Administered) |
| Debtors. | **Re: D.I. _____** |

**ORDER APPROVING EXAMINER'S**
**PROPOSED AMENDMENT TO WORK PLAN,**
**AND BUDGET FOR INVESTIGATION, PREPARED**
**AND SUBMITED BY ROBERT J. STARK, AS EXAMINER**

Upon consideration of the *Proposed Amendment to Scope, Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Stark, as Examiner*, dated February 24 20, 2021 (the "Work Plan Amendment")[2]; and due and proper notice of the Work Plan Amendment having been given; and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought by the Examiner, as set forth herein, is necessary and in the best interest of the Debtors, their estates, creditors, and all parties-in-interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED:**

1.    The Work Plan Amendment is hereby **APPROVED**.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

[2]    Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Work Plan Amendment.

{01664528;v1 }

2.    This Order is without prejudice to the Examiner's right to further amend the scope and work plan for the Investigation as it progresses, within the scope of the Examiner Order; provided that, to the extent that the Examiner seeks to materially modify the scope or work plan, or to modify the budget, for the Investigation as approved herein, the Examiner will seek approval of any such modification(s) by further order of the Court, after notice and an opportunity for parties-in-interest to be heard.

3.    The Examiner may take all actions necessary to effectuate the relief granted in this Order.

4.    This Court shall have exclusive jurisdiction to hear and determine all matters arising from or relating to this Order and its implementation.

5.    This Order shall be effective and enforceable immediately upon its entry.

CRED_EXAMINER_00000977

# Exhibit 34

# FILED UNDER SEAL

# Exhibit 35

# FILED UNDER SEAL

# Exhibit 36

# FILED UNDER SEAL

# Exhibit 37

# FILED UNDER SEAL

# Exhibit 38

# FILED UNDER SEAL