**<u>EXHIBIT E</u>**

**(Proposed Redacted Compendium- Volume V)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CRED INC., *et al.*, | Case No. 20-12836 (JTD) |
| Debtors. | (Jointly Administered) |

### COMPENDIUM OF EXHIBITS TO REPORT OF ROBERT J. STARK, EXAMINER

### VOLUME V

**BROWN RUDNICK LLP**
Andrew M. Carty
Michael W. Reining
Tiffany B. Lietz
Seven Times Square
New York, NY 10036
212-209-4800
acarty@brownrudnick.com
mreining@brownrudnick.com
tlietz@brownrudnick.com

Stephen R. Cook
2211 Michelson Drive, 7th Floor
Irvine, CA 92612
949-752-7100
scook@brownrudnick.com

E. Patrick Gilman
601 Thirteenth Street NW, Suite 600
Washington, DC 20005
202-536-1730
pgilman@brownrudnick.com

**ASHBY & GEDDES, P.A.**
Gregory A. Taylor (DE Bar No. 4008)
Katharina Earle (DE Bar No. 6348)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
gtaylor@ashbygeddes.com
kearle@ashbygeddes.com

**ANKURA CONSULTING GROUP, LLC**
Vikram Kapoor
485 Lexington Avenue, 10th Floor
New York, NY 10017
212-818-1555
vikram.kapoor@ankura.com

**Dated: March 8, 2021**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>CRED INC., *et al.*,<br><br>                      Debtors. | Chapter 11<br><br>Case No. 20-12836 (JTD)<br><br>(Jointly Administered) |

## COMPENDIUM OF EXHIBITS TO REPORT OF ROBERT J. STARK, EXAMINER

### VOLUME I

**BROWN RUDNICK LLP**
Andrew M. Carty
Michael W. Reining
Tiffany B. Lietz
Seven Times Square
New York, NY 10036
212-209-4800
acarty@brownrudnick.com
mreining@brownrudnick.com
tlietz@brownrudnick.com

Stephen R. Cook
2211 Michelson Drive, 7th Floor
Irvine, CA 92612
949-752-7100
scook@brownrudnick.com

E. Patrick Gilman
601 Thirteenth Street NW, Suite 600
Washington, DC 20005
202-536-1730
pgilman@brownrudnick.com

**Dated: March 8, 2021**

**ASHBY & GEDDES, P.A.**
Gregory A. Taylor (DE Bar No. 4008)
Katharina Earle (DE Bar No. 6348)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
gtaylor@ashbygeddes.com
kearle@ashbygeddes.com

**ANKURA CONSULTING GROUP, LLC**
Vikram Kapoor
485 Lexington Avenue, 10th Floor
New York, NY 10017
212-818-1555
vikram.kapoor@ankura.com

## Index of Exhibits to Report of Robert J. Stark, Examiner

| Description | Exhibit No. |
| --- | --- |
| Decl. of Daniel Schatt in Supp. of Debtors' Chapter 11 Pet. and First Day Mot. (ECF No. 12) | 1 |
| Base Prospectus, Jan. 30, 2020 | 2 |
| moKredit Inc. Overview Report, Aug. 7, 2019 | 3 |
| Videotaped Dep. of Dan Schatt, Dec. 14, 2020 | 4 |
| Loan and Security Agreement between moKredit Inc., and Cred LLC, Dec. 27, 2018 | 5 |
| Decl. of Daniyal Inamullah in Supp. of Mot. of the United States Trustee for Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases (ECF No. 133) | 6 |
| Cyber Quantum Pte. Ltd. Unaudited Financial Statements, 2018 | 7 |
| Cyber Quantum Pte. Ltd. Directors' Resolutions, 2018 | 8 |
| Videotaped Dep. of Daniyal Inamullah, Dec. 8, 2020 | 9 |
| Emails exchanged between H. Ng, K. Wong, D. Schatt and InnReg representative regarding JST onboarding process, Dec. 7–20, 2018 | 10 |
| Email from J. Alexander to K. Wong, Jan. 22, 2019 | 11 |
| Email from D. Granet to L. Hua, copying in Messrs. J. Alexander, K. Wong, S. Zhang and S. Freeman, Jan. 14, 2019 | 12 |
| JST Systems Invoice, Jan. 22, 2019 | 13 |
| Sarson Funds Fact Card: Fifth Khagan | 14 |
| Sarson Funds Fact Card: AX Momentum | 15 |
| Employment Offer Letter for J. Alexander | 16 |
| Mot. of UpgradeYa Investment, LLC for Relief from Stay Under Bankruptcy Code Section 362 (ECF No. 89) | 17 |
| Nathan DiCamillo, *Here's What Happened at Crypto Lender Cred's Latest Bankruptcy Hearing*, CoinDesk, Dec. 18, 2020 | 18 |
| Laurence Fletcher, *Crypto hedge funds struggle to recover from 'bloodbath'*, *Fin. Times*, May 20, 2020 | 19 |
| 100 Acre Ventures Form ADV, May 15, 2020 | 20 |
| Decl. of Joe Podulka in Supp. of Debtors' Obj. to Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF No. 441) | 21 |
| First Amended Complaint, *Alexander v. Schatt*, No. 20-CIV-02728 (Cal. Super. Ct. Oct. 15, 2020) | 22 |
| Verified First Amended Complaint, *Cred v. Alexander*, No. 20-CIV-02915 (Cal. Super. Ct. Aug. 14, 2020) | 23 |
| Decl. of Daniel F. Wheeler RE Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF No. 386) | 24 |
| Cred Inc. Update for the Creditors Committee, Dec. 14, 2020 | 25 |
| Decl. of Grant Lyon in Supp. of Debtors' Obj. to Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF No. 433) | 26 |

| Description | Exhibit No. |
|---|---|
| United States Trustee Mot. For Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases (ECF No. 133) | 27 |
| Order Den. in Part, and Granting in Part, the Trustee/Examiner Mot. (ECF No. 281) | 28 |
| App. of the United States Trustee for Order Approving Appointment of Examiner (ECF No. 330) | 29 |
| Order Approving Appointment of Examiner (ECF No. 338) | 30 |
| Notice of Filing of Proposed Scope, Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Start, as Examiner (ECF No. 376) | 31 |
| Order Approving Examiner's Proposed Scope, Work Plan, and Budget for Investigation (ECF No. 431) | 32 |
| Notice of Filing of Proposed Amend. to Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Stark, as Examiner (ECF No. 552) | 33 |
| Cred LLC and Subsidiary Financial Statements, 2018 | 34 |
| CredEarn CredBorrow Information Sheet | 35 |
| Standard CredBorrow Multi-Tranche Credit Agreement | 36 |
| moKredit Tranche Agreement No. 29, May 1, 2019 | 37 |
| CredEarn Process and Asset Flow | 38 |
| Email from J. Alexander to K. Wong, Feb. 12, 2019 | 39 |
| Enhanced Yield Agreement for CredEarn Customers | 40 |
| Chat log between S. Zhang and T. Perez, Aug. 28, 2019 | 41 |
| Email chain between A. Khakoo, H. Ha, D. Inamullah, and M. Zhang, June 30, 2020 | 42 |
| Fireblocks License Agreement, Feb. 21, 2020 | 43 |
| Cred Investment Committee Meeting Minutes | 44 |
| Email from S. Hwang to J. Podulka, Nov. 12, 2020 | 45 |
| Schedule of Advances | 46 |
| Email from J. Podulka to F. Cottrell and A. Khakoo, Nov. 18, 2020 | 47 |
| Cred LLC General Ledger, 2020 | 48 |
| Cred Financial Statements, 2019 | 49 |
| Email from J. Podulka to H. Moore and E. Rye, May 21, 2020 | 50 |
| Lockton Summary of Insurance, 2020–2021 | 51 |
| Hartford Business Owners Policy, Oct. 1, 2020 | 52 |
| Hartford Workers' Compensation and Employers' Liability Busines Insurance Policy, Nov. 30, 2020 | 53 |
| Certificate of Liability Insurance, Nov. 11, 2020 | 54 |
| Axis Insurance Policy | 55 |
| Validus Errors and Omissions Policy Declarations | 56 |
| Validus Directors and Officers Policy Declarations | 57 |
| Euclid Financial Excess Insurance Policy | 58 |
| Email from M. Zhang to M. Parrish, June 24, 2020 | 59 |
| Screenshot of Cred website discussing insurance policies | 60 |

| Description | Exhibit No. |
|---|---|
| Screenshot of Cred website discussing partnership with BitGo | 61 |
| Email chain between M. Zhang and T. Miyauchi, June 19, 2020 | 62 |
| Email from T. Perez to C.D., Nov. 14, 2019 | 63 |
| Email chain between M. Zhang and J.S., Apr. 15, 2020 | 64 |
| Intentionally Omitted | 65 |
| Email from D.F. to T. Perez, Nov. 8, 2020 | 66 |
| Cred Advertising and Marketing Policy | 67 |
| Email from D. Inamullah to D. Kline, July 6, 2020 | 68 |
| Intentionally Omitted | 69 |
| Email from K. Wong to L. Hua, Jan. 15, 2019 | 70 |
| Email from J. Alexander to L. Hua and K. Wong, Jan. 22, 2019 | 71 |
| Email from K. Wong to S. Zhang and J. Alexander, Feb. 4, 2019 | 72 |
| Email from K. Wong to L. Hua and D. Schatt, Feb. 13, 2019 | 73 |
| Email from K. Wong to H. Ng, J. Alexander, and S. Zhang, Feb. 14, 2019 | 74 |
| Email from J. Alexander to K. Wong, Feb. 15, 2019 | 75 |
| Intentionally Omitted | 76 |
| Email from J. Alexander to K. Wong, May 21, 2019 | 77 |
| Intentionally Omitted | 78 |
| Email from J. Alexander to L. Hua, D. Inamullah, S. Zhang, and J. Podulka, Mar. 12, 2020 | 79 |
| Contribution Agreement between L. Hua and Cred Capital, LLC, Mar. 31, 2020 | 80 |
| Email from D. Schatt to D. Wheeler, June 16, 2020 | 81 |
| Email from D. Inamullah to D. Schatt, J. Podulka, and A. Khakoo, June 29, 2020 | 82 |
| Email from J. Podulka to D. Schatt, Dec. 1, 2020 | 83 |
| Cred Near Term Liquidity Analysis, Nov. 7, 2020 | 84 |
| Email chain between J. Alexander and A. Derar, Apr. 16, 2019 | 85 |
| Email from J. Alexander to J. Bunting, Mar. 14, 2019 | 86 |
| Email chain between J. Alexander and R. Flowers, Mar. 15, 2019 | 87 |
| Email from J. Alexander to D. Davis, Mar. 14, 2019 | 88 |
| moKredit Investment Opportunity Slide Deck, Mar. 2019 | 89 |
| Cred Employee Chat Logs, Mar. 26, 2019 | 90 |
| Income Opportunities Board Minutes, Feb. 4, 2020 | 91 |
| Spreadsheet concerning W. Strong's investment | 92 |
| JST Consulting Agreement, Dec. 25, 2018 | 93 |
| Email from J. Podulka to D. Schatt, July 24, 2020 | 94 |
| Email from D. Inamullah to D. Schatt, A. Khakoo, and J. Podulka, Sept. 16, 2020 | 95 |
| Email from D. Schatt to J. Podulka, Nov. 14, 2020 | 96 |
| Email from D. Inamullah to J. Podulka and D. Schatt, July 13, 2020 | 97 |
| Email chain between J. Podulka, H. Moore, G. Estrada, S. Hwang, H. Ha, Nov. 5, 2020 | 98 |
| Cred LLC Subscription Agreement with Cambrian Systematic Strategies LP, July 29, 2020 | 99 |

| Description | Exhibit No. |
|---|---|
| Chat log between S. Zhang and J. Alexander, July 30, 2019 | 100 |
| Cambrian Systematic Strategies LP Quarterly Statement, Sept. 30, 2019 | 101 |
| Email from S. Zhang to J. Alexander, Feb. 6, 2020 | 102 |
| Redemption Confirmation, Jan. 22, 2020 | 103 |
| Metropolitan Commercial Bank Account Statement, Feb. 28, 2020 | 104 |
| Email from HC Global Fund Services to D. Schatt, Feb. 21, 2020 | 105 |
| Email from A. Khakoo to P. Collins, June 29, 2020 | 106 |
| Email from J. Podulka to D. Schatt, Aug. 8, 2020 | 107 |
| Email from J. Podulka to D. Schatt, Aug. 28, 2020 | 108 |
| Email from J. Sarson to D. Schatt, A. Khakoo, Nov. 17, 2020 | 109 |
| Email from M. Foster to J. Sarson, Jan 6, 2021 | 110 |
| Brett Arends, *Opinion: How did these 'All-Weather' portfolios weather 2020?* MarketWatch (Dec. 21, 2020) | 111 |
| Email from D. Inamullah to D. Schatt, J. Podulka, D. Wheeler and A. Khakoo, Oct. 1, 2020 | 112 |
| Liquidity Analysis Post March 2020 Flash Crash and Recommended Steps, Apr. 5, 2020 | 113 |
| Email with attachments from D. Inamullah to D. Schatt, H. Ng, J. Podulka, S. Zhang, and J. Alexander, Feb. 12, 2020 | 114 |
| Cred Asset Management Overview, Aug. 2020 | 115 |
| Intentionally Omitted | 116 |
| JST Risk Report, Feb. 28, 2020 | 117 |
| JST Risk Report, Mar. 17, 2020 | 118 |
| Email from S. Freeman to J. Alexander, H. Ng, D. Schatt, J Podulka, S. Zhang, and D. Inamullah, Mar. 12, 2020 | 119 |
| Email from J. Alexander to D. Inamullah, Mar. 18, 2020 | 120 |
| Emails between JST and Cred regarding a February invoice, Mar. 3, 2020 | 121 |
| Email from D. Inamullah to J. Podulka, D. Schatt and J. Alexander, Apr. 4, 2020 | 122 |
| Intentionally Omitted | 123 |
| Cred, Inc. Fireblocks logs | 124 |
| Email chain between J. Alexander and R. Chapman, Feb. 2, 2020 | 125 |
| Email from H. Ng to S. Foster, J. Alexander, S. Zhang, R. Chapman and L. Tabers, Feb. 5, 2020 | 126 |
| Email from R. Ortega J. Alexander, Mar. 10, 2020 | 127 |
| Email from D. Inamullah to J. Podulka and D. Schatt, July 13, 2020 | 128 |
| Quanta Capital Subscription Agreement, Feb. 4, 2020 | 129 |
| Email from J. Alexander to D. Inamullah and S. Zhang, Mar. 10, 2020 | 130 |
| Email from S. Foster to D. Inamullah, Feb. 13, 2020 | 131 |
| Transaction Log, Feb. 5, 2020 | 132 |
| Email from S. Foster to D. Inamullah, Mar. 23, 2020 | 133 |
| Kingdom Trust Investor Monthly Statement, Feb. 2020 | 134 |
| Cred Incident Investigation Report, Nov. 25, 2020 | 135 |
| Email chain between D. Inamullah and R. Chapman, Mar. 15, 2020 | 136 |

| Description | Exhibit No. |
|---|---|
| Email chain between D. Inamullah and S. Foster, May 9, 2020 | 137 |
| Email with attachments from S. Foster to A. Khakoo, June 1, 2020 | 138 |
| Email from D. Inamullah to J. Podulka, May 3, 2020 | 139 |
| Email from R. Chapman to D. Inamullah, July 16, 2020 | 140 |
| Email from S. Foster to A. Khakoo, July 29, 2020 | 141 |
| Email from S. Foster to A. Khakoo, July 30, 2020 | 142 |
| Email from A. Khakoo to D. Inamullah, Aug. 21, 2020 | 143 |
| Email from T. Kuhman to J. Podulka, Aug. 26, 2020 | 144 |
| Email from B. De Lude to D. Schatt, Dec. 8, 2020 | 145 |
| Email from T. Khuu to B. De Lude, D. Schatt, and J. Podulka, Oct. 30, 2020 | 146 |
| Email from B. De Lude to D. Inamullah, Aug. 27, 2020 | 147 |
| Email from B. De Lude to D. Inamullah, Aug. 27, 2020 | 148 |
| Email between J. Podulka and S. Ichimiya, Sept. 1, 2020 | 149 |
| Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362, Exhibit G (ECF No. 91) | 150 |
| Intentionally Omitted | 151 |
| JST Risk Report, Mar. 11, 2020 | 152 |
| Decl. of Matthew K. Foster in Support of Debtors' Objection to Motion of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF No. 434) | 153 |
| Email from S. Hwang to P. Bonjour, H. Ng, and D. Hummer, Dec. 15, 2020 | 154 |
| Chat logs between J. Alexander and D. Inamullah, June 24, 2020 | 155 |
| Employee Loan Agreement I, June 1, 2019 | 156 |
| Employee Loan Agreement II, June 1, 2019 | 157 |
| Employee Loan Agreement III, June 1, 2019 | 158 |
| Order Denying Motion of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF. No. 487) | 159 |
| Email from D. Inamullah to D. Schatt and J. Podulka, June 30, 2020 | 160 |
| Videotaped Deposition of James Alexander | 161 |
| Email from J. Evans to E. Gilman, Feb. 28, 2021 | 162 |
| Suggestion of Bankruptcy (ECF. No. 500) | 163 |
| JST Risk Report, Mar. 12, 2020 | 164 |
| Chat messages between S. Zhang, Han LNU and S. Hwang, Aug. 20, 2020 | 165 |
| Transcript of Zoom Hearing Re: Emergency Motions of the Official Committee of Unsecured Creditors, Feb. 5, 2021 | 166 |
| MN Form UCF-17-2, Order Granting Name Change, Aug. 18, 1994 | 167 |
| Letter from Andrew Selous MP, Parliamentary Under-Secretary of State for Justice, to Philip Davies MP, House of Commons, Nov. 7, 2014 | 168 |
| First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries under Chapter 11 of the Bankruptcy Code (ECF No. 380) | 169 |
| Articles of Association of moKredit, Oct. 25, 2017 | 170 |
| Note Purchase Escrow Agreement, Jan. 28, 2020 | 171 |
| Suppl. Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362 (ECF No. 128) | 172 |

| Description | Exhibit No. |
|---|---|
| Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362 (ECF No. 91) | 173 |
| Exhibit C, Decl. of Daniel Schatt in Supp. Of Def.'s Opp. To Pl.'s Mot. for Prelim. Inj., *Alexander v. Schatt*, No. 20-CIV-02728 (Cal. Super. Ct. Aug. 27, 2020) | 174 |
| Crypto-to-Fiat Process Diagram | 175 |
| UpgradeYa Loan and Security Agreement, Apr. 20, 2020 | 176 |
| Holdings Update, Oct. 11, 2020 | 177 |
| UpgradeYa Tranche 1 Closing Statement | 178 |
| Email from L. Hua to D. Schatt, J. Grogan, and M. Zuppone, Nov. 4, 2020 | 179 |
| moKredit Diligence Checklist, Feb. 11, 2019 | 180 |
| JST Cred Exposure Summary | 181 |
| Chat log between S. Zhang and T. Perez, Jul. 8, 2019 | 182 |
| Chat log between S. Zhang and T. Perez, Dec. 4, 2019 | 183 |
| Chat log between S. Zhang and J. Alexander, Feb. 14, 2020 | 184 |

# Exhibit 152

# FILED UNDER SEAL

Exhibit 153

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
| | ) | |
| Debtors.[1] | ) | **Re: Docket No. 296** |
| | ) | |

### DECLARATION OF MATTHEW K. FOSTER IN SUPPORT OF DEBTORS' OBJECTION TO MOTION OF JAMES ALEXANDER TO DISMISS THE CRED CAPITAL, INC. CASE

I, Matthew K. Foster, declare and state under penalty of perjury as follows:

1.      I submit this declaration (the "Declaration") in support of the *Debtors' Objection to Motion of James Alexander to Dismiss the Cred Capital, Inc. Case* [Docket No. 296] (the "Objection").[2]

2.      I am a Managing Director of Sonoran Capital Advisors, LLC ("Sonoran"), a turnaround, crisis management, and financial advisory firm that maintains an office at 1733 N. Greenfield Road, Mesa, Arizona 85205.  The Debtors have hired me as their Chief Restructuring Officer[3] and, in that role, I report directly to the Debtors' board of directors and I am responsible for managing the day-to-day operations of the Debtors and assessing and implementing the restructuring of the Debtors' businesses, including overseeing the Debtors'

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Objection.

[3]    *See Order Authorizing Employment and Retention of Sonoran Capital Advisors, LLC to Provide Debtors a Chief Restructuring Officer and Certain Additional Personnel and (II) Designating Matthew Foster as Debtors' Chief Restructuring Officer* [Docket No. 267]

liquidity needs. I am over the age of 18 and am authorized to make this declaration (the "Declaration") on behalf of the Debtors.

3.      I am familiar with the matters set forth herein and, if called as a witness, I could and would testify as follows.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by the Debtors' employees or professionals, or learned from my review of other documents.

**The Debtors' Pre-Petition Relationship with Cred Capital**

5.      In connection with the filing of the Objection, I instructed the Debtors' employees and advisors to undertake a thorough review of the Debtors' books and records related to certain assertions made regarding Cred Capital.

6.      Based on said review, I can affirm that the 300 bitcoin Lu Hua contributed to the Debtors was initially transferred to Cred in five separate transactions over a period from March 13-16, 2020. On March 13, Lu Hua made two transfers of 0.1 bitcoin and 49.9 bitcoin to Cred; on March 14, Lu Hua made another two transfers of 50 bitcoin and 100 bitcoin to Cred; and on March 16, Lu Hua transferred the final 100 bitcoin to Cred. I've had my advisors review Cred Capital's accounts and there is no record Lu Hua transferred bitcoin to Cred Capital.

7.      Additionally, I am aware that under the Certificate of Incorporation Alexander had filed for Cred Capital, a purported investor, Zobar Agha, is alleged to be the holder of all the outstanding series A preferred stock in Cred Capital, which held all of the voting rights. I have had the Debtors' books and records examined and we have found no record of Zobar Agha ever paying for those shares, making a transfer to Cred Capital for the shares, or making a

2

CRED_EXAMINER_00002005

contribution or investment in Cred or Cred Capital. Nor have we found any record of any series A preferred stock ever actually being issued to Mr. Agha.

8.      Based on our review of the Debtors' books and records, Cred used both its own and Cred Capital's Fireblocks accounts for its own business purposes and moved cryptocurrency in and out of the accounts for purposes of Cred's business, apparently without regard to any corporate distinction or separation.   Cred Capital's Fireblocks account appears to have been used in all phases of the Debtors' business model, from accepting customer's cryptocurrency (even though all Cred's customers used either CredEarn, i.e. Cred Inc., or Cred Borrow, i.e. Cred (US) LLC), and placing cryptocurrency with third-party asset managers, to meeting customers' withdrawal and redemption requests.   In sum, the Cred Capital Fireblocks account was used as a cohesive part of effectuating Cred's general business model.

9.      It is clear that cryptocurrency from CredBorrow and CredEarn customers were commingled in and across Cred Capital and Cred's Fireblocks account.

**Cred & Cred Capital Now**

10.      Cred Capital is currently insolvent. It does not have any material assets, except for its claims against James Alexander, and has no means of paying its bills as they come due or its creditors.

11.      Since filing bankruptcy, the Debtors have filed a turnover action to recover cryptocurrency currently worth about $7.5 million that Alexander caused Cred Capital to improperly transfer from Cred Capital's Fireblocks account to an e-Wallet under Alexander's personal control on June 24, 2020 – two days before he was fired.

12.      Also included in the turnover action is a claim against Alexander for the more than $250,000 he owes the Debtors.  One of Alexander's obligation arises out of $250,000 loan

3

CRED_EXAMINER_00002006

Debtor Cred (US) LLC issued to Alexander on June 1, 2019, and that matured upon his termination.   Alexander owes *another* obligation to the Debtors, 5,200,000 of LBA tokens, under another employee loan agreement dated October 30, 2019, that also matured upon his termination.

13.    Prior to filing bankruptcy, Cred sued Alexander in California state court on claims related to Alexander's misappropriation of Cred Capital's cryptocurrency.   In that action, the court enjoined Alexander from using the cryptocurrency he took from Cred Capital upon a finding that Cred had demonstrated a likelihood of success on the merits of its conversion and breach of duty claims.



Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on: January 28, 2021
Mesa, Arizona


/s/ Matthew K. Foster
Matthew K. Foster
Managing Director of
Sonoran Capital Advisors, LLC

CRED_EXAMINER_00002007

# Exhibit 154

# FILED UNDER SEAL

# Exhibit 155

# FILED UNDER SEAL

# Exhibit 156

# FILED UNDER SEAL

# Exhibit 157

# FILED UNDER SEAL

# Exhibit 158

# FILED UNDER SEAL

Exhibit 159

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) )  Chapter 11 |
| CRED INC., *et al.*[1] | )  )  Case No. 20-12836 (JTD) |
| Debtors. | )  )  (Jointly Administered) )  )  **Re: Docket No. 152** ) |

## ORDER DENYING MOTION OF JAMES ALEXANDER TO
## DISMISS THE CRED CAPITAL, INC. CASE

The matter of the *Motion of James Alexander to Dismiss the Cred Capital, Inc., Case* (the "Motion") [Docket No. 152] came before this Court for hearing on February 3, 2021; and sufficient notice of the Motion was given to interested parties in accordance with title 11 of the United States Code and the Federal Rules of Bankruptcy Procedure.  For the reasons stated on the record at the February 3, 2021, hearing;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[2]

A.      Debtor Cred Capital, Inc.'s ("Cred Capital") Certificate of Incorporation filed with the Delaware Secretary of State on March 10, 2020 (the "Improper Charter"), was improperly filed.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

[2]      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

CRED_EXAMINER_00002019

B.      When Debtor Cred Inc., discovered that the initial incorporation papers were filed improperly, it took steps to correct the Improper Charter and made Mr. Schatt and Mr. Podulka the directors of the company of Cred Capital.

C.      Cred Capital's voluntary chapter 11 petition was thus properly filed, and Cred Capital's bankruptcy case (Bankr. D. Del. 20-12838) is properly before this Court.

Based upon the foregoing, and upon the record made before the Court at the Final Hearing, and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is **DENIED.**

2.      The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE

Dated: February 5th, 2021
Wilmington, Delaware

2

CRED_EXAMINER_00002020

# Exhibit 160

# FILED UNDER SEAL

# Exhibit 161

# FILED UNDER SEAL

# Exhibit 162

# FILED UNDER SEAL

Exhibit 163

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CRED INC., *et al.*, | Case No. 20-12836 (JTD) |
| Debtors.[1] | Jointly Administered |
| | Adv. Proc. No: 20-51006 |
| CRED INC., CRED CAPITAL, INC., and CRED (US) LLC, | |
| Plaintiffs, | |
| v. | |
| JAMES ALEXANDER | |
| Defendant. | |

## SUGGESTION OF BANKRUPTCY

PLEASE TAKE NOTICE that on February 9, 2021 a Voluntary Petition for Relief under Chapter 11 of Title 11 of the United States Code was filed by James Alexander, which attached petition is pending in the United States Bankruptcy Court for the Central District of California under case number 21-10214.

PLEASE TAKE FURTHER NOTICE that, pursuant to 11 U.S.C. § 362, *inter alia*, the commencement or continuation of a judicial, administrative or other action or proceeding against Defendant that was or could have been commenced before the Petition Date, including this action, is stayed as of the Petition Date.

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

**BUCHANAN INGERSOLL & ROONEY PC**

/s/ Geoffrey G. Grivner
Geoffrey G. Grivner (# 4711)
919 North Market Street, Suite 990
Wilmington, DE 19801
Telephone:  (302) 552-4200
Facsimile:  (302) 552-4295
geoffrey.grivner@bipc.com

Dated: February 10, 2021          *Attorneys for Defendant James Alexander*

2

CRED_EXAMINER_00002094

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CRED INC., *et al.*, | Case No. 20-12836 (JTD) |
| Debtors. | Jointly Administered |
| | Adv. Proc. No: 20-51006 |
| CRED INC., CRED CAPITAL, INC., and CRED (US) LLC, | |
| Plaintiffs, | |
| v. | |
| JAMES ALEXANDER | |
| Defendant. | |

**CERTIFICATE OF SERVICE**

I, Geoffrey G. Grivner, do hereby certify that on the 10th day of February, 2021, I caused a copy of the foregoing Suggestion of Bankruptcy to be served upon interested parties as indicated on the attached service list.

Respectfully submitted,

**BUCHANAN INGERSOLL & ROONEY PC**

*/s/ Geoffrey G. Grivner*
Geoffrey G. Grivner (#4711)
919 North Market Street, Suite 990
Wilmington, DE 19801
Telephone: (302) 552-4200
Facsimile: (302) 552-4295
Email: geoffrey.grivner@bipc.com

*Attorneys for James Alexander*

Dated: February 10, 2021

3

CRED_EXAMINER_00002095

**Service List:**

**Via electronic mail and ECF notification**

Counsel to Plaintiffs

COUSINS LAW LLC
Scott D. Cousins
Brandywine Plaza West
1521 Concord Pike, Suite 301
Wilmington, Delaware 19801
Scott.cousins@cousins-law.com

CRED_EXAMINER_00002096

Fill in this information to identify your case:

United States Bankruptcy Court for the:

CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO

Case number (if known) _____

Chapter you are filing under:

☐ Chapter 7
☑ Chapter 11
☐ Chapter 12
☐ Chapter 13

☐ Check if this is an amended filing

## Official Form 101
# Voluntary Petition for Individuals Filing for Bankruptcy
04/20

The bankruptcy forms use *you* and *Debtor 1* to refer to a debtor filing alone. A married couple may file a bankruptcy case together—called a *joint case*—and in joint cases, these forms use *you* to ask for information from both debtors. For example, if a form asks, "Do you own a car," the answer would be yes if either debtor owns a car. When information is needed about the spouses separately, the form uses *Debtor 1* and *Debtor 2* to distinguish between them. In joint cases, one of the spouses must report information as *Debtor 1* and the other as *Debtor 2*. The same person must be *Debtor 1* in all of the forms.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

### Part 1:  Identify Yourself

| | | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|---|
| 1. | Your full name | | |
| | Write the name that is on your government-issued picture identification (for example, your driver's license or passport). | James | |
| | | First name | First name |
| | | | |
| | | Middle name | Middle name |
| | Bring your picture identification to your meeting with the trustee. | Alexander | |
| | | Last name and Suffix (Sr., Jr., II, III) | Last name and Suffix (Sr., Jr., II, III) |
| 2. | All other names you have used in the last 8 years | | |
| | Include your married or maiden names. | | |
| 3. | Only the last 4 digits of your Social Security number or federal Individual Taxpayer Identification number (ITIN) | xxx-xx-5692 | |

CRED_EXAMINER_00002097

Debtor 1   James Alexander                                                    Case number (if known)

| | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|
| **4.** Any business names and Employer Identification Numbers (EIN) you have used in the last 8 years | ☒ I have not used any business name or EINs. | ☐ I have not used any business name or EINs. |
| Include trade names and doing business as names | Business name(s) | Business name(s) |
| | EIN | EIN |

| | | |
|---|---|---|
| **5.** Where you live | 3551 Dixie Canyon Pl.<br>Sherman Oaks, CA 91423<br>Number, Street, City, State & ZIP Code | If Debtor 2 lives at a different address:<br><br>Number, Street, City, State & ZIP Code |
| | Los Angeles<br>County | County |
| | If your mailing address is different from the one above, fill it in here. Note that the court will send any notices to you at this mailing address. | If Debtor 2's mailing address is different from yours, fill it in here. Note that the court will send any notices to this mailing address. |
| | 13535 Ventura Blvd<br>Ste C, PMB 485<br>Sherman Oaks, CA 91423<br>Number, P.O. Box, Street, City, State & ZIP Code | Number, P.O. Box, Street, City, State & ZIP Code |

| | | |
|---|---|---|
| **6.** Why you are choosing this district to file for bankruptcy | Check one:<br>☒ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br>☐ I have another reason. Explain. (See 28 U.S.C. § 1408.) | Check one:<br>☐ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br>☐ I have another reason. Explain. (See 28 U.S.C. § 1408.) |

CRED_EXAMINER_00002098

Debtor 1   James Alexander                                                Case number (if known)

---

**Part 2:   Tell the Court About Your Bankruptcy Case**

7.  The chapter of the         Check one. (For a brief description of each, see Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy
    Bankruptcy Code you are    (Form 2010)). Also, go to the top of page 1 and check the appropriate box.
    choosing to file under
       ☐ Chapter 7

       ■ Chapter 11

       ☐ Chapter 12

       ☐ Chapter 13

8.  How you will pay the fee    ■  I will pay the entire fee when I file my petition. Please check with the clerk's office in your local court for more details
                                   about how you may pay. Typically, if you are paying the fee yourself, you may pay with cash, cashier's check, or money
                                   order. If your attorney is submitting your payment on your behalf, your attorney may pay with a credit card or check with
                                   a pre-printed address.

                                ☐  I need to pay the fee in installments. If you choose this option, sign and attach the Application for Individuals to Pay
                                   The Filing Fee in Installments (Official Form 103A).

                                ☐  I request that my fee be waived (You may request this option only if you are filing for Chapter 7. By law, a judge may,
                                   but is not required to, waive your fee, and may do so only if your income is less than 150% of the official poverty line that
                                   applies to your family size and you are unable to pay the fee in installments). If you choose this option, you must fill out
                                   the Application to Have the Chapter 7 Filing Fee Waived (Official Form 103B) and file it with your petition.

9.  Have you filed for         ■ No.
    bankruptcy within the
    last 8 years?              ☐ Yes.

                                           District _____   When _____   Case number _____
                                           District _____   When _____   Case number _____
                                           District _____   When _____   Case number _____

10. Are any bankruptcy         ■ No
    cases pending or being
    filed by a spouse who is   ☐ Yes.
    not filing this case with
    you, or by a business
    partner, or by an
    affiliate?
                                           Debtor _____                     Relationship to you _____
                                           District _____   When _____   Case number, if known _____
                                           Debtor _____                     Relationship to you _____
                                           District _____   When _____   Case number, if known _____

11. Do you rent your           ■ No.   Go to line 12.
    residence?
                               ☐ Yes.  Has your landlord obtained an eviction judgment against you?

                                           ☐   No. Go to line 12.

                                           ☐   Yes. Fill out Initial Statement About an Eviction Judgment Against You (Form 101A) and file it as part of
                                               this bankruptcy petition.

---

CRED_EXAMINER_00002099

Debtor 1    James Alexander                                         Case number (if known)

| **Part 3** | Report About Any Businesses You Own as a Sole Proprietor |

**12.** Are you a sole proprietor of any full- or part-time business?

☐ No.    Go to Part 4.

☐ Yes.    Name and location of business

A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC.

Name of business, if any _____

If you have more than one sole proprietorship, use a separate sheet and attach it to this petition.

Number, Street, City, State & ZIP Code

Check the appropriate box to describe your business:

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ None of the above

**13.** Are you filing under Chapter 11 of the Bankruptcy Code, and are you a small business debtor or a debtor as defined by 11 U.S.C. § 1182(1)?

For a definition of small business debtor, see 11 U.S.C. § 101(51D).

*If you are filing under Chapter 11, the court must know whether you are a small business debtor or a debtor choosing to proceed under Subchapter V so that it can set appropriate deadlines. If you indicate that you are a small business debtor or you are choosing to proceed under Subchapter V, you must attach your most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).*

☐ No.    I am not filing under Chapter 11.

☐ No.    I am filing under Chapter 11, but I am NOT a small business debtor according to the definition in the Bankruptcy Code.

☐ Yes.    I am filing under Chapter 11, I am a small business debtor according to the definition in the Bankruptcy Code, and I do not choose to proceed under Subchapter V of Chapter 11.

☐ Yes.    I am filing under Chapter 11, I am a debtor according to the definition in § 1182(1) of the Bankruptcy Code, and I choose to proceed under Subchapter V of Chapter 11.

| **Part 4** | Report If You Own or Have Any Hazardous Property or Any Property That Needs Immediate Attention |

**14.** Do you own or have any property that poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety? Or do you own any property that needs immediate attention?

☐ No.

☐ Yes.    What is the hazard? _____

For example, do you own perishable goods, or livestock that must be fed, or a building that needs urgent repairs?

If immediate attention is needed, why is it needed? _____

Where is the property? _____

Number, Street, City, State & Zip Code

CRED_EXAMINER_00002100

| Debtor 1 | James Alexander | | Case number *(if known)* |
|---|---|---|---|

**Part 5:    Explain Your Efforts to Receive a Briefing About Credit Counseling**

| | | **About Debtor 1:** | **About Debtor 2 (Spouse Only in a Joint Case):** |
|---|---|---|---|

15. Tell the court whether you have received a briefing about credit counseling.

The law requires that you receive a briefing about credit counseling before you file for bankruptcy. You must truthfully check one of the following choices. If you cannot do so, you are not eligible to file.

If you file anyway, the court can dismiss your case, you will lose whatever filing fee you paid, and your creditors can begin collection activities again.

**About Debtor 1:**
You must check one:

☑ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy. If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ I am not required to receive a briefing about credit counseling because of:

☐ **Incapacity.**
I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.**
My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.**
I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver credit counseling with the court.

**About Debtor 2 (Spouse Only in a Joint Case):**
You must check one:

☐ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ I am not required to receive a briefing about credit counseling because of:

☐ **Incapacity.**
I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.**
My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.**
I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

CRED_EXAMINER_00002101

Debtor 1  James Alexander                                          Case number *(if known)*

**Part 6:  Answer These Questions for Reporting Purposes**

| | | |
|---|---|---|
| 16. What kind of debts do you have? | 16a. | Are your debts primarily consumer debts? *Consumer debts are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."* |
| | | ■ No. Go to line 16b. |
| | | ☐ Yes. Go to line 17. |
| | 16b. | Are your debts primarily business debts? *Business debts are debts that you incurred to obtain money for a business or investment or through the operation of the business or investment.* |
| | | ☐ No. Go to line 16c. |
| | | ■ Yes. Go to line 17. |
| | 16c. | State the type of debts you owe that are not consumer debts or business debts |
| | | _____ |

| | | |
|---|---|---|
| 17. Are you filing under Chapter 7? | ■ No. | I am not filing under Chapter 7. Go to line 18. |
| Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available for distribution to unsecured creditors? | ☐ Yes. | I am filing under Chapter 7. Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available to distribute to unsecured creditors? |
| | | ☐ No |
| | | ☐ Yes |

| 18. How many Creditors do you estimate that you owe? | ■ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
|---|---|---|---|
| | ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| | ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| | ☐ 200-999 | | |

| 19. How much do you estimate your assets to be worth? | ☐ $0 - $50,000 | ■ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
|---|---|---|---|
| | ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| | ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| | ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

| 20. How much do you estimate your liabilities to be? | ☐ $0 - $50,000 | ■ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
|---|---|---|---|
| | ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| | ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| | ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

**Part 7:  Sign Below**

For you

I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct.

If I have chosen to file under Chapter 7, I am aware that I may proceed, if eligible, under Chapter 7, 11, 12, or 13 of title 11, United States Code. I understand the relief available under each chapter, and I choose to proceed under Chapter 7.

If no attorney represents me and I did not pay or agree to pay someone who is not an attorney to help me fill out this document, I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

| | |
|---|---|
| ✗ *James Alexander* | ✗ _____ |
| Signature of Debtor 1 | Signature of Debtor 2 |
| Executed on  **February 9, 2021** | Executed on  _____ |
| MM / DD / YYYY | MM / DD / YYYY |

CRED_EXAMINER_00002102

Debtor 1   **James Alexander**                                    Case number (if known) _____

For your attorney, if you are          I, the attorney for the debtor(s) named in this petition, declare that I have informed the debtor(s) about eligibility to proceed
represented by one                     under Chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter
                                       for which the person is eligible. I also certify that I have delivered to the debtor(s) the notice required by 11 U.S.C. § 342(b)
If you are not represented by          and, in a case in which § 707(b)(4)(D) applies, certify that I have no knowledge after an inquiry that the information in the
an attorney, you do not need           schedules filed with the petition is incorrect.
to file this page.

                                                                                          Date    **February 9, 2021**
                                       _____                  MM / DD / YYYY
                                       Signature of Attorney for Debtor

                                       **David B. Golubchik 185520**
                                       Printed name

                                       **Levene, Neale, Bender, Yoo & Brill L.L.P.**
                                       Firm name

                                       **10250 Constellation Blvd., Suite 1700**
                                       **Los Angeles, CA 90067**
                                       Number, Street, City, State & ZIP Code

                                       Contact phone   **(310) 229-1234**              Email address    DBG-@LNBYB.COM

                                       **185520 CA**
                                       Bar number & State

CRED_EXAMINER_00002103

Fill in this information to identify your case:

| Debtor 1 | James | Alexander | |
|---|---|---|---|
| | First Name | Middle Name | Last Name |

| Debtor 2 | | | |
|---|---|---|---|
| (Spouse if, filing) | First Name | Middle Name | Last Name |

United States Bankruptcy Court for the:    CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO

Case number
(if known):

☐ Check if this is an
amended filing

## B 104

# For Individual Chapter 11 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims Against You and Are Not Insiders

12/15

If you are an individual filing for bankruptcy under Chapter 11, you must fill out this form. If you are filing under Chapter 7, Chapter 12, or Chapter 13, do not fill out this form. Do not include claims by anyone who is an insider. Insiders include your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20 percent or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor. 11 U.S.C. § 101. Also, do not include claims by secured creditors unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information.

List the 20 Unsecured Claims in Order from Largest to Smallest. Do Not Include Claims by Insiders.

| | | | | Unsecured claim |
|---|---|---|---|---|
| **1** | Discover Student Loans<br>PO BOX 30948<br>Salt Lake City, UT 84130 | What is the nature of the claim?   Student loans | | $ $86,000.00 |
| | | As of the date you file, the claim is: Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br>■ None of the above apply | | |
| | | Does the creditor have a lien on your property? | | |
| | | ■ No | | |
| | Contact | ☐ Yes. Total claim (secured and unsecured) | $ | |
| | Contact phone | Value of security:<br>Unsecured claim | - $<br>$ | |
| **2** | US Bank<br>PO BOX 13<br>Hillsboro, OH 45133 | What is the nature of the claim?   Auto Lease | | $ $15,314.00 |
| | | As of the date you file, the claim is: Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br>■ None of the above apply | | |
| | | Does the creditor have a lien on your property? | | |
| | | ■ No | | |
| | Contact | ☐ Yes. Total claim (secured and unsecured) | $ | |
| | Contact phone | Value of security:<br>Unsecured claim | - $<br>$ | |

B104 (Official Form 104)      For Individual Chapter 11 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims      Page 1

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com      Best Case Bankruptcy

CRED_EXAMINER_00002104

| Debtor 1 | James Alexander | | Case number (if known) | |
|---|---|---|---|---|

| | SOFI | What is the nature of the claim? | unsecured loan | $ $4,438.00 |
|---|---|---|---|---|

SOFI
2750 E COTTONWOOD PKWY
Salt Lake City, UT 84121

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
☒ None of the above apply

Does the creditor have a lien on your property?
☒ No
☐ Yes. Total claim (secured and unsecured)    $
Value of security:    – $
Unsecured claim    $

Contact

Contact phone

| | Citicard | What is the nature of the claim? | credit card | $ $1,513.00 |
|---|---|---|---|---|

Citicard
PO BOX 6241
Sioux Falls, SD 57117

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
☒ None of the above apply

Does the creditor have a lien on your property?
☒ No
☐ Yes. Total claim (secured and unsecured)    $
Value of security:    – $
Unsecured claim    $

Contact

Contact phone

| | USAA | What is the nature of the claim? | Credit card | $ $1,471.00 |
|---|---|---|---|---|

USAA
PO BOX 47504
San Antonio, TX 78265

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
☒ None of the above apply

Does the creditor have a lien on your property?
☒ No
☐ Yes. Total claim (secured and unsecured)    $
Value of security:    – $
Unsecured claim    $

Contact

Contact phone

| | WF Credit Services | What is the nature of the claim? | Credit card | $ $935.00 |
|---|---|---|---|---|

WF Credit Services
PO BOX 14517
Des Moines, IA 50306

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
☒ None of the above apply

Does the creditor have a lien on your property?

B 104 (Official Form 104)    For Individual Chapter 11 Cases; List of Creditors Who Have the 20 Largest Unsecured Claims    Page 3

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

CRED_EXAMINER_00002105

Debtor 1    James Alexander                          Case number (if known) _____

|  | ☐ No |  |
|--|--|--|
|  | ☐ Yes. Total claim (secured and unsecured) | $ _____ |
|  | Value of security: | – $ _____ |
|  | Unsecured claim | $ _____ |

| Contact |  |
|--|--|
| Contact phone |  |

---

**Wells Fargo Bank**
PO BOX 14517
Des Moines, IA 50306

What is the nature of the claim?    credit card    $ $809.00

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

Does the creditor have a lien on your property?
■ No
☐ Yes. Total claim (secured and unsecured)    $ _____
Value of security:    – $ _____
Unsecured claim    $ _____

Contact
Contact phone

---

**Barclay's Bank Delaware**
PO BOX 8803
Wilmington, DE 19899

What is the nature of the claim?    Credit card    $ $692.00

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

Does the creditor have a lien on your property?
■ No
☐ Yes. Total claim (secured and unsecured)    $ _____
Value of security:    – $ _____
Unsecured claim    $ _____

Contact
Contact phone

---

**Capital One Bank USA**
PO BOX 31293
Salt Lake City, UT 84131

What is the nature of the claim?    credit card    $ $347.00

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

Does the creditor have a lien on your property?
■ No
☐ Yes. Total claim (secured and unsecured)    $ _____
Value of security:    – $ _____
Unsecured claim    $ _____

Contact
Contact phone

---

**Los Angeles County Tax**

What is the nature of the claim?    3551 Dixie Canyon Pl.    $ Unknown
Sherman Oaks, CA
91423  Los Angeles
County

B 104 (Official Form 104)    For Individual Chapter 11 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims    Page 3

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

CRED_EXAMINER_00002106

Debtor 1    James Alexander                          Case number *(if known)*

Collector                          As of the date you file, the claim is: Check all that apply
P.O. Box 54018                     ☐   Contingent
Los Angeles, CA 90054-0018         ☐   Unliquidated
                                   ☐   Disputed
                                   ■   None of the above apply

                                   Does the creditor have a lien on your property?

                                   ☐   No
Contact                            ■   Yes. Total claim (secured and unsecured)    $  Unknown
                                                Value of security:              – $  $1,280,000.00
Contact phone                                   Unsecured claim                    $  Unknown

■■■■   Sign Below

Under penalty of perjury, I declare that the information provided in this form is true and correct.

X                                               X
    James Alexander                                 Signature of Debtor 2
    Signature of Debtor 1

    Date    February 9, 2021                        Date

B 104 (Official Form 104)        For Individual Chapter 11 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims        Page 4

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com                                        Best Case Bankruptcy

CRED_EXAMINER_00002107

**STATEMENT OF RELATED CASES**
**INFORMATION REQUIRED BY LBR 1015-2**
**UNITED STATES BANKRUPTCY COURT, CENTRAL DISTRICT OF CALIFORNIA**

1.  A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor, his/her spouse, his or her current or former domestic partner, an affiliate of the debtor, any copartnership or joint venture of which debtor is or formerly was a general or limited partner, or member, or any corporation of which the debtor is a director, officer, or person in control, as follows: (Set forth the complete number and title of each such of prior proceeding, date filed, nature thereof, the Bankruptcy Judge and court to whom assigned, whether still pending and, if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)
    Cred Inc et al, chapter 11 bankruptcy cases pending in Delaware, Case No. 20-12836, Petition Date: 11/7/2020

2.  (If petitioner is a partnership or joint venture) A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor or an affiliate of the debtor, or a general partner in the debtor, a relative of the general partner, general partner of, or person in control of the debtor, partnership in which the debtor is a general partner, general partner of the debtor, or person in control of the debtor as follows: (Set forth the complete number and title of each such prior proceeding, date filed, nature of the proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)
    None

3.  (If petitioner is a corporation) A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor, or any of its affiliates or subsidiaries, a director of the debtor, an officer of the debtor, a person in control of the debtor, a partnership in which the debtor is general partner, a general partner of the debtor, a relative of the general partner, director, officer, or person in control of the debtor, or any persons, firms or corporations owning 20% or more of its voting stock as follows: (Set forth the complete number and title of each such prior proceeding, date filed, nature of proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)
    None

4.  (If petitioner is an individual) A petition under the Bankruptcy Reform Act of 1978, including amendments thereof, has been filed by or against the debtor within the last 180 days: (Set forth the complete number and title of each such prior proceeding, date filed, nature of proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)
    None

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed at   Sherman Oaks                    , California.

Date:         February 9, 2021

                                              James Alexander
                                              Signature of Debtor 1


                                              Signature of Debtor 2

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

October 2018                    Page 1          F 1015-2.1.STMT.RELATED.CASES

CRED_EXAMINER_00002108

Fill in this information to identify your case:

Debtor 1    James Alexander
            First Name          Middle Name          Last Name

Debtor 2
(Spouse if, filing)   First Name          Middle Name          Last Name

United States Bankruptcy Court for the:   CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO

Case number
(if known)                                                              ☐ Check if this is an
                                                                          amended filing

Official Form 106Dec
# Declaration About an Individual Debtor's Schedules                              12/15

If two married people are filing together, both are equally responsible for supplying correct information.

You must file this form whenever you file bankruptcy schedules or amended schedules. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Sign Below

Did you pay or agree to pay someone who is NOT an attorney to help you fill out bankruptcy forms?

☒ No

☐ Yes. Name of person _____   Attach Bankruptcy Petition Preparer's Notice,
                                                   Declaration, and Signature (Official Form 119)

Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct.

X _____          X _____
   James Alexander                          Signature of Debtor 2
   Signature of Debtor 1

   Date  February 9, 2021                    Date _____


Official Form 106Dec           Declaration About an Individual Debtor's Schedules

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

CRED_EXAMINER_00002109

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| David B. Golubchik 185520<br>10250 Constellation Blvd., Suite 1700<br>Los Angeles, CA 90067<br>(310) 229-1234<br>California State Bar Number: 185520 CA | |

☐ Debtor(s) appearing without an attorney

■ Attorney for Debtor

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO

| In re:<br><br>James Alexander | CASE NO.:<br>CHAPTER: 11 |
|---|---|
| | **VERIFICATION OF MASTER**<br>**MAILING LIST OF CREDITORS**<br><br>[LBR 1007-1(a)] |
| Debtor(s). | |

Pursuant to LBR 1007-1(a), the Debtor, or the Debtor's attorney if applicable, certifies under penalty of perjury that the master mailing list of creditors filed in this bankruptcy case, consisting of __3__ sheet(s) is complete, correct, and consistent with the Debtor's schedules and I/we assume all responsibility for errors and omissions.

Date: February 9, 2021

Signature of Debtor 1

Date:

Signature of Debtor 2 (joint debtor) (if applicable)

Date: February 9, 2021

Signature of Attorney for Debtor (if applicable)

This form is optional. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2015                                    **F 1007-1.MAILING.LIST.VERIFICATION**

CRED_EXAMINER_00002110

James Alexander
13535 Ventura Blvd
Ste C, PMB 405
Sherman Oaks, CA 91423

David B. Golubchik
Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067

U.S. Trustee  San Fernando  Valley
915 Wilshire Blvd.
Suite 1850
Los Angeles, CA 90017

Barclay's Bank Delaware
PO BOX 8803
Wilmington, DE 19899

Capital One Bank USA
PO BOX 31293
Salt Lake City, UT 84131

Citicard
PO BOX 6241
Sioux Falls, SD 57117

Cred Inc. et al,
c/o Scott Sousins, Esq.
1521 Concord Pike, Suite 301
Wilmington, DE 19803

Discover Student Loans
PO BOX 30948
Salt Lake City, UT 84130

CRED_EXAMINER_00002111

Franchise Tax Board
Special Procedures
POB 2952
Sacramento, CA 95812

Internal Revenue Service
Insolvency I Stop 5022
300 N. Los Angeles St., #4062
Los Angeles, CA 90012-9303

JPMCB HOME
700 KANSAS LN
Monroe, LA 71203

Los Angeles County Tax Collector
P.O. Box 54018
Los Angeles, CA 90054-0018

SOFI
2750 E COTTONWOOD PKWY
Salt Lake City, UT 84121

US Bank
PO BOX 13
Hillsboro, OH 45133

USAA
PO BOX 47504
San Antonio, TX 78265

Wells Fargo Bank
PO BOX 14517
Des Moines, IA 50306

CRED_EXAMINER_00002112

WF Credit Services
PO BOX 14517
Des Moines, IA 50306

CRED_EXAMINER_00002113

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO**

| | |
|---|---|
| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address<br>**David B. Golubchik 185520**<br>**Levene, Neale, Bender, Yoo & Brill L.L.P.**<br>**10250 Constellation Blvd., Suite 1700**<br>**Los Angeles, CA 90067**<br>**(310) 229-1234**<br>**185520 CA**<br><br>Attorney for: | CASE NO.:<br>CHAPTER: 11<br>ADVERSARY NO.:<br>(if applicable) |
| In re:<br><br>    James Alexander<br><br>                               Debtor(s). | **ELECTRONIC FILING DECLARATION**<br>**(INDIVIDUAL)**<br>**[LBR 1002-1(f)]** |

| | |
|---|---|
| ☑ Petition, statement of affairs, schedules or lists | Date Filed:   2/9/2021 |
| ☐ Amendments to the petition, statement of affairs, schedules or lists | Date Filed: |
| ☐ Other (specify): _____ | Date Filed: |

**PART I – DECLARATION OF DEBTOR(S) OR OTHER PARTY**

I (We), the undersigned Debtor(s) or other party on whose behalf the above-referenced document is being filed (Signing Party), declare under penalty of perjury that: (1) I have read and understand the above-referenced document being filed electronically (Filed Document); (2) the information provided in the Filed Document is true, correct and complete; (3) the "/s/," followed by my name, on the signature line(s) for the Signing Party in the Filed Document serves as my signature and denotes the making of such declarations, requests, statements, verifications and certifications to the same extent and effect as my actual signature on such signature line(s); (4) I have actually signed a true and correct printed copy of the Filed Document in such places and provided the executed printed copy of the Filed Document to my attorney; and (5) I have authorized my attorney to file the electronic version of the Filed Document and this Declaration with the United States Bankruptcy Court for the Central District of California. If the Filed Document is a petition, I further declare under penalty of perjury that I have completed and signed a Statement About Your Social Security Numbers (Official Form 121) and provided the executed original to my attorney.

| | |
|---|---|
| **February 9, 2021** | |
| Date: | Signature (handwritten) of Debtor or signing party<br>**James Alexander**<br>Printed name of Signing Party |
| Date: | Signature (handwritten) of Debtor 2 (Joint Debtor) (if applicable)<br><br>Printed name of Debtor 2, if applicable |

**PART II – DECLARATION OF ATTORNEY FOR SIGNING PARTY**

I, the undersigned attorney for the Signing Party, declare under penalty of perjury that: (1) the "/s/," followed by my name, on the signature lines for the attorney for the Signing Party in the Filed Document serves as my signature and denotes the making of such declarations, requests, statements, verifications and certifications to the same extent and effect as my actual signature on such signature lines; (2) the Signing Party signed Part I – Declaration of Debtor(s) or Other Party of this Declaration before I electronically submitted the Filed Document for filing with the United States Bankruptcy Court for the Central District of California; (3) I have actually signed a true and correct printed copy of the Filed Document in the locations that are indicated by "/s/," followed by my name, and have obtained the signature(s) of the Signing Party in the locations that are indicated by "/s/," followed by the Signing Party's name, on the true and correct printed copy of the Filed Document; (4) I shall maintain the executed originals of this Declaration and the Filed Document for a period of five years after the closing of the case in which they are filed; and (5) I shall make the executed originals of this Declaration and the Filed Document available for review upon request of the court or other parties. If the Filed Document is a petition, I further declare under penalty of perjury that: (1) the Signing Party completed and signed the Statement About Your Social Security Numbers (Official Form 121) before I electronically submitted the Filed Document for filing with the United States Bankruptcy Court for the Central District of California; (2) I shall maintain the executed original of the Statement About Your Social Security Numbers (Official Form 121) for a period of five years after the closing of the case in which they are filed; and (3) I shall make the executed original of the Statement About Your Social Security Numbers (Official Form 121) available for review upon request of the court.

| | |
|---|---|
| **February 9, 2021** | |
| Date: | Signature (handwritten) of attorney for Signing Party<br>**David B. Golubchik 185520**<br>Printed Name of attorney for Signing Party |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

December 2015                                                  F 1002-1.DEC.ELEC.FILING.INDIVIDUAL

CRED_EXAMINER_00002114

## United States Bankruptcy Court
## Central District of California

| In re:<br>James Alexander | CHAPTER NO.: **11** |
| | CASE NO.: 1:21-bk-10214-MB |

## CASE COMMENCEMENT DEFICIENCY NOTICE

**To Debtor and Debtor's Attorney of Record,**
**YOUR CASE MAY BE DISMISSED IF YOU FAIL TO CURE THE FOLLOWING DEFICIENCIES:**

**A.** You must cure the following within 14 days from filing of your petition:

☑ Certificate of Credit Counseling as required by § 521(b)(1), § 109(h)(1), and FRBP 1007(b)(3), or a Certification of Exigent Circumstances under § 109(h)(3), or a request for determination by the court under § 109(h)(4)
☑ Declaration by Debtor(s) as to Whether Income was Received From an Employer within 60 Days of the Petition Date [11 U.S.C. § 521(a)(1)(B)(iv)] (LBR Form F1002-1)

**B.** If you are a Small Business Debtor under a Subchapter V in a Chapter 11 case, within 7 days after the date of the filing of the petition, you must file the most recent:

1. Balance sheet
2. Statement of operations
3. Cash-flow statement
4. Federal tax return

OR

5. Statement made under penalty of perjury that no balance sheet, statement of operations, or cash-flow statement has been prepared and no Federal tax return has been filed. [11 U.S.C.§1116]

**The Revised Official Bankruptcy Forms are mandatory and are available at www.cacb.uscourts.gov/forms**

For all items above that are not electronically filed, you must file the original and the following number of copies in accordance with Local Bankruptcy Rules 1002-1(c) and 5005-2, and Court Manual, section 2.5(a)(2).

        Chapter 11    Original and 2 Copies. 1 copy marked as "Judge's Copy."

**Please return the original or copy of this form with all required items to the following location:**

        21041 Burbank Blvd, Woodland Hills, CA 91367-6603

If you have any questions, please contact the Court's Call Center at the toll free number (855) 460-9641.

Dated: February 9, 2021

For the Court
**Kathleen J. Campbell**
Clerk of Court

(Form ccdn - Rev 02/2020)

1 /

CRED_EXAMINER_00002115

## United States Bankruptcy Court
## Central District of California

| In re: James Alexander | CHAPTER NO.: **11** |
| | CASE NO.: 1:21–bk–10214–MB |

## NOTICE OF CASE DEFICIENCY
## UNDER 11 U.S.C. § 521(a)(1) AND BANKRUPTCY RULE 1007

To Debtor and Debtor's Attorney of Record,

Pursuant to F.R.B.P. 1007, you must file the following documents within 14 days from the date of the filing of your petition. Your case may be dismissed if you fail to do so.

**Schd A/B(Form106A/B or 206A/B)**
**Schedule C (Form 106C)**
**Schedule D (Form 106D or 206D)**
**Schd E/F(Form106E/F or 206E/F)**
**Summary(Form 106Sum or 206Sum)**
**Schedule G (Form 106G or 206G)**
**Statement (Form 122B)**
**Schedule H (Form 106H or 206H)**
**Schedule I (Form 106I)**
**Schedule J (Form 106J)**
**Decl Re Sched (Form 106Dec)**
**StmtFinAffairs(Form107 or 207)**

**The Revised Official Bankruptcy Forms are mandatory and are available at www.cacb.uscourts.gov/forms**

According to Bankruptcy Rule 1007(c), within 14 days after you filed the petition, **YOU MUST EITHER:**

(1)  File the required documents. If the document is filed electronically, no hard copy need to be submitted to the court. (See Local Bankruptcy Rule 5005–2(d) and Court Manual, Appendix "F" as to whether a copy must be served on the judge.)

OR

(2)  File and serve a motion for an order extending the time to file the required document(s).

**IF YOU DO NOT COMPLY,** in a timely manner with either of the above alternatives, your case may be the subject of an order to show cause to dismiss the case. Motion for extension of time to file schedules and other papers shall comply with Local Bankruptcy Rule 1007–1, and shall be supported by admissible evidence demonstrating cause for the requested extension.

Dated: February 9, 2021

For the Court
**Kathleen J. Campbell**
Clerk of Court

CRED_EXAMINER_00002116

# Exhibit 164

# FILED UNDER SEAL

# Exhibit 165

# FILED UNDER SEAL

Exhibit 166

```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE


                                . Chapter 11
IN RE:                          .
                                . Case No. 20-12863(JTD)
CRED INC., et al,               .
                                .
                                .
                                . 824 Market Street
                    Debtors.    . Wilmington, Delaware 19801
                                .
. . . . . . . . . . . . . . . . Friday, February 5, 2021
CRED INC., CRED CAPITAL,        .
INC., and CRED (US) LLC,        . Adv. Proc. No. 20-51006(JTD)
                                .
        vs.                     .
                                .
JAMES ALEXANDER.                .
. . . . . . . . . . . . . . . .
```

        TRANSCRIPT OF ZOOM HEARING RE:  EMERGENCY MOTIONS OF THE
              OFFICIAL COMMITTEE OF UNSECURED CREDITORS
                 BEFORE THE HONORABLE JOHN T. DORSEY
                  UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA TELEPHONE:

For the Debtors:            Scott D. Cousins, Esq.
                            COUSINS LAW, LLC

                            James T. Grogan, Esq.
                            Broocks (Mack) Wilson, Esq.
                            Avi E. Luft, Esq.
                            PAUL HASTINGS, LLP

For the U.S. Trustee:       Joseph J. McMahon, Jr., Esq.
                            OFFICE OF THE U.S. TRUSTEE

(Appearances Continued)

Audio Operator:             Electronically Recorded
                            by Jason Spencer, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA TELEPHONE:   (Continued)

For the Official Committee
of Unsecured Creditors:          Timothy W. Walsh, Esq.
                                 Joseph Evans, Esq.
                                 David Hurst, Esq.
                                 Darren Azman, Esq.
                                 MCDERMOTT, WILL & EMERY, LLP

For Upgradeya Investments,
LLC:                             Adam G. Landis, Esq.
                                 LANDIS, RATH & COBB, LLP

For Daniel Wheeler:              Marc Greenwald, Esq.
                                 QUINN, EMANUEL, URQUHART
                                  & SULLIVAN, LLP

For the Examiner Robert
J. Stark:                        Gregory Taylor, Esq.
                                 ASHBY & GEDDES, PA

                                 Andrew Carty, Esq.
                                 BROWN RUDNICK, LLP

For the United States:           Augustus Curtis, Esq.
                                 U.S. DEPARTMENT OF JUSTICE -
                                  CIVIL DIVISION

For James Alexander:             Mark Pfeiffer, Esq.
                                 Kody Sparks, Esq.
                                 BUCHANAN, INGERSOLL & ROONEY, PC

Also Appearing:                  Julius Hudec, *Pro Se*

                                 Daniyal Inamullah, *Pro Se*

                                 Pamela Clegg, Esq.
                                 CIPHER TRACE

                                 Jeffrey Kaplan
                                 "BCAS"

                                 Uday Gorrepati
                                 "ABI PROJECT"

                                 Daniel Gill
                                 BLOOMBERG LAW

                                 Vince Sullivan
                                 LAW360

(Appearances Continued)

CRED_EXAMINER_00002126

APPEARANCES VIA ZOOM:    (Continued)

Also Appearing:                    Becky Yerak
                                   WALL STREET JOURNAL

                                   Laura Haney
                                   U.S. BANKRUPTCY COURT - DISTRICT
                                    OF DELAWARE

CRED_EXAMINER_00002127

4

INDEX

|  | Page |
|---|---|
| ARGUMENT | 5 |
| COURT DECISION | 24 |

CRED_EXAMINER_00002128

5

1          (Proceedings commence at 10:01 a.m.)

2          THE COURT:  Good morning.  Can everyone hear me

3     okay?

4          UNIDENTIFIED:  Yes, sir.

5          THE COURT:  All right.  This is Judge Dorsey.  We

6     are on the record in Cred, Inc., Case Number 20-51006, the

7     adversary proceeding.  This is the time the Court set aside

8     for a hearing on the committee's motion to intervene in the

9     adversary proceeding and a motion for temporary restraining

10    order and preliminary injunction.

11         So let me turn it over to -- and I will tell the

12    parties I have read all of the pleadings and the

13    declarations, including the response filed by Mr. Alexander.

14    So keep that in mind when making comments.

15         Mister -- let's see.  Committee's counsel, who's

16    speaking for the committee?

17         MR. EVANS:  This is Joseph Evans, Your Honor, from

18    McDermott, Will & Emery, for the committee.

19         THE COURT:  All right.

20         MR. EVANS:  Good morning.

21         THE COURT:  Go ahead, Mr. Evans.

22         MR. EVANS:  Your Honor, we brought this witness

23    because our expert witness Pamela Clegg identified to

24    transactions on January 16th and January 17th, 2021, executed

25    by Mr. Alexander, in which Bitcoin that was directly

1   traceable to Cred that was in Alexander's possession was

2   transferred.  That's a total U.S. Dollar amount of 1.832

3   million.  And that was in violation of a California temporary

4   restraining order and preliminary injunction.

5          As Your Honor said, you've read the papers.  But we

6   just received the declaration this morning -- or a response

7   this morning from Mr. Alexander, where, apparently, he agreed

8   to post certain of the cryptocurrency into escrow, where

9   we're happy about that.  The response wasn't clear as to what

10  "the cryptocurrency" is.  He was originally transferring 225

11  -- or 224.98993 Bitcoin and 204,557 in U.S. Dollar coin,

12  which is a one-to-one for U.S. Dollars.  And so the total net

13  value now is 8.474 million.

14         So, if Mr. Alexander is intending to

15  (indiscernible) in escrow $8.474 million worth of Bitcoin or

16  equivalent currency, then we have no issue.  It wasn't clear

17  from the response if that's what his intentions are.  But I'd

18  like to know what "the cryptocurrency" means when Alexander

19  is agreeing to post.

20         And I understand that they have requested more

21  briefing time for a sanctions motion.  We don't have an

22  objection to that.  And that's where we stand.

23         THE COURT:  All right.  So everybody understands,

24  on the motion for sanctions for violating the California

25  State Court's order, I don't think I have jurisdiction to do

1   that.  I think that's pretty black-letter law, that I cannot

2   impose sanctions for someone violating another Court's order.

3   So I think, if you want sanctions for violating that order,

4   you're going to have to go back to the State Court to get

5   those.

6          But let me ask Mr. Pfeiffer.  What is the Bitcoin

7   that you agreeing -- your client is agreeing to transfer into

8   the escrow account?

9          MR. PFEIFFER:  Yes, Your Honor.  Mark Pfeiffer,

10  Buchanan, Ingersoll & Rooney, on behalf of Mr. Alexander.

11         If I first may address the motion to intervene, my

12  client does -- is not opposing the motion to intervene.

13         My client is agreeing to transfer all of the Cred

14  Capital cryptocurrency under his possession or control to the

15  -- to an escrow agent, pending this matter.  Right now, I

16  understand that there are 50 Bitcoin and another smaller form

17  of cryptocurrency that has fairly immaterial value, compared

18  to the Bitcoin.  But my client would transfer everything that

19  he has into an escrow agent.

20         THE COURT:  So the -- then he only has, you're

21  telling me, 50 of the 220 -- close to 225 Bitcoin that the

22  debtors allege is their property?

23         MR. PFEIFFER:  Yes, Your Honor.  Let me be

24  specific.  It is my understanding that there was only 149 and

25  change, to begin with, of Bitcoin.  And there is proceeds;

1    some of those Bitcoin have been liquidated and there are

2    proceeds.  And it is my understanding my client is agreeable

3    to transfer the proceeds of the liquidated cryptocurrency,

4    the identifiable proceeds of the cryptocurrency liquidation,

5    into the escrow agent.

6              THE COURT:  And how much is in Bitcoin and how much

7    is in liquidated form?

8              MR. PFEIFFER:  So the 50 Bitcoin, there is another

9    about -- approximately $200,000 worth of cryptocurrency.  And

10   I believe there is approximately $2.7 million in cash,

11   effectively, or proceeds.

12             THE COURT:  So it sounds like we have a difference

13   as to how much Bitcoin was originally transferred and how

14   much Bitcoin was subject to the California Court's injunction

15   to not be transferred.

16             Mr. Evans?

17             MR. LUFT:  Your Honor, may I be heard on behalf of

18   the debtor?

19             THE COURT:  Go ahead, Mr. Luft, even though you say

20   you're Mr. Grogan on your --

21             MR. LUFT:  Yeah, it looks like Me, Mr. Jimenez, and

22   Mr. Grogan all want to be Mr. Grogan this morning.  I

23   apologize for that, but you -- how could you blame us?

24             Your Honor, this is shocking.  I want to be very

25   clear about this.  The idea that every -- first of all, there

CRED_EXAMINER_00002132

1   was 225 pieces of Bitcoin.  We have the contemporary records.

2   You've heard Mr. Inamullah's testimony about this previously

3   in the case.  There were written documents indicating how

4   much was transferred to Mr. Alexander, there's documentation.

5   So this alleged 100 pieces of Bitcoin less is completely

6   unfounded.  And we can provide all the documentation the

7   Court needs for how much it is.

8           So, quite simply, putting aside the fact that, as

9   Your Honor pointed out, Mr. Alexander was not a director of

10  Cred Capital, even under his scenario, he has stolen the

11  funds.  There is no scenario where a director gets to take

12  personal funds of a corporation, put them in their own

13  pocket, and spend them.  So, starting from day one, he has

14  acted improperly and taken it.

15          Moreover, before the California Court -- and we

16  litigated this -- at no point did Mr. Alexander ever say to

17  that Court, Your Honor, we're having a whole TRO hearing

18  about this amount of -- this 225 Bitcoin, I don't have that

19  much, I got rid of it, it's not in the account that we're

20  filing orders for.  He has been dishonest with that Court.

21          And now we're standing before you.  He went before

22  the Chancery Court -- excuse me -- before we get to you.

23  Again, he filed this motion, again, never once said I no

24  longer control these assets.

25          And then we had a whole hearing on Wednesday, where

CRED_EXAMINER_00002133

1    I know he sat here in front of you, Your Honor, and never

2    once said, by the way, when Mr. Pfeiffer said this will all

3    get resolved and whatever else, you should all know I don't

4    hold those assets, right?  Instead, what we have gotten is

5    serial lawsuits from him, trying at every turn to fight this.

6           And I -- Your Honor should be aware he filed a new

7    lawsuit in California just the other day, purportedly against

8    Mr. Schatt, but clearly against Cred, asking for the same

9    relief Mr. Pfeiffer was in front of you the other saying,

10    saying please find that I am a proper holder of these assets.

11    Well, now I know why:  Because he spent them all or sent them

12    somewhere.  So when he says he only has 50, that means he's

13    either spent it on something, given it away.  Either way,

14    it's malfeasance.

15           To sit there and come to this Court today and say,

16    oh, I'll stick it in escrow is outrageous.  First of all, it

17    just -- escrow is gone, Your Honor.  He should turn it over

18    to the debtor.  There's no -- he doesn't even dispute that

19    they're Cred Capital's assets.  And then, to sit there and

20    say, well, I only know where 50 is, I would ask that he file

21    something today setting forth every single transfer, where it

22    is, who -- what it was for, and to whom, so that we can take

23    immediate steps with the committee to try to recover what is

24    literally millions of dollars of lost assets for the estate.

25           I cannot stress how surprised I am to find out -- I

1    knew he took it.  But the idea that he did actually -- he'd

2    go through all this and never once mention that this thing

3    we've been fighting over for months is -- are assets that

4    don't even exist anymore in his possession is highly

5    disingenuous, including his filing, to be honest, and not put

6    that in there.  I'm just shocked.

7             But I do ask, Your Honor, please, make him tell us

8    today where it is, so we can try to find these funds.

9             THE COURT:  Well, let me hear --

10            MR. EVANS:  Your Honor --

11            THE COURT:  Go ahead, Mr. Evans.

12            MR. EVANS:  No, I think the time frame is important

13   here.  You know, on July 16th, 2020, there was an order from

14   the California Court, and it precluded Alexander from

15   transferring, transmitting, using, depositing, or permitting

16   anyone else to transfer, transmit, or use any Cred and/or

17   Cred Capital digital assets in his possession, custody,

18   and/or control.  That was July 16th, 2020.

19            And what we have here, Judge, is we have Alexander

20   not even appearing here today, despite the fact that he was

21   here on Wednesday, not even being available to us to cross-

22   examine or ask questions, even though we asked counsel

23   numerous times yesterday to have their client available to

24   us.

25            He's telling us today, oh, I only have 50 Bitcoin

CRED_EXAMINER_00002135

1   left.  This isn't something that was spent on Cred Capital

2   expenses, this isn't something that was a business expense

3   that may or may not have been done.  These were transferred

4   on January 16th and January 17th of this year, two weeks ago.

5   Pamela Clegg is here to testify, and perhaps we don't need

6   her to explain anything, but this was in her declaration,

7   Docket Number 8, which was filed in this case, and these were

8   her conclusions:

9          "For the reason discussed in detail below, it is my

10  professional opinion that:

11         "(A) On January 16th, 2021, Alexander transferred

12  50 Bitcoin that is directly traceable to Cred;

13         "(B) On January 17th, 2021, Alexander transferred

14  50 Bitcoin that is directly traceable to Cred."

15         These are expert conclusions, and Alexander's

16  response is nothing.  Okay, I'll put it in escrow now, I only

17  have 50 left.  And that's not good enough, Judge.

18         We have $8.74 million worth of crypto that has been

19  put in his possession.  We have violations of the court

20  order, which are clear, and violations two weeks ago.  And

21  this isn't some unwilling or unknowing participant.  He's

22  represented by competent counsel, he's engaged in litigation

23  (indiscernible) stayed, but he's engaged in litigation in

24  California, here.  He's been actively answering adversary

25  proceedings here, standing up in court, showing up.  And two

1    weeks ago, he was secretly taking money.  And the only reason

2    we had it is because we have a cryptocurrency tracing expert

3    that's tracking this stuff, right?

4            So I really don't understand where they come out on

5    this thing.  I mean, 8.74 million doesn't just disappear.

6    There's no dispute, 225 Bitcoin he received.  On July 16th,

7    he's got a court order saying you can't move it.  Two weeks

8    ago, 3.74 million of it gets trans -- or 1.74 million of it

9    gets transferred -- ah, sorry -- 3.664 million is the right

10   number.  Two weeks ago, that disappeared.  And now he's

11   saying, I don't know where it is, I don't have it, right?

12           And the tracing here, when you look at it and you

13   look at the expert report we submitted, it's not that

14   complicated.  There's five or six transactions, and they're

15   all him, and the expert concluded they're all him.

16           And so I don't know where we go from here, Judge.

17   But I agree with the debtors' counsel, there needs to be an

18   accounting and a full explanation of each of these

19   transactions.  There's only six or seven of them, Judge.  And

20   it's shocking to us, just like it's shocking to the debtor,

21   that one of the former executives of the company would be

22   engaged in these litigations, represented by competent

23   counsel, you know, participate at a bankruptcy hearing, and

24   then just two weeks ago, right under our noses, steal $3.664

25   million with no explanation.

1      I mean, he was accused of, effectively, stealing

2  this money.  And his response is, okay, well, I know the 100

3  that I just spent, you caught me, but the 50 that I still

4  have, okay, I'll put that in escrow, right?  It's simply not

5  good enough, Judge.

6      And just, when we're talking about this motion and

7  we're talking about likelihood of success and the ability to

8  win the -- the ability to win this case (indiscernible) his

9  whole defense was that, oh, this was Cred Capital's assets

10  and Cred Capital wasn't appropriately -- couldn't have

11  appropriately filed for bankruptcy because, somehow,

12  Alexander was the only person that could authorize Cred

13  Capital to file for bankruptcy.  Well, Your Honor ruled on

14  Wednesday, that theory doesn't have -- hold any water.

15      So that's why we don't really know what his defense

16  could possibly be at this point.  And we need to get the 50

17  Bitcoin he says he has in his possession, get the whatever

18  2.7 million in cash he says he has in his possession, the

19  200,000 USD, and we need to know what happened with each of

20  these transactions.

21      MR. PFEIFFER:  Your Honor, may I respond?

22      THE COURT:  Go ahead, Mr. Pfeiffer.

23      MR. PFEIFFER:  Yes, very briefly.

24      What we're agreeing to is transferring to the

25  escrow agent everything we have.  I understand that Bitcoin

 1    were liquidated and converted to cash.  The identifiable cash

 2    proceeds -- which I believe is a bulk, if not all of what

 3    we're talking about -- will go to the escrow agent.  I know

 4    of very little, if any, that was spent out of those funds.

 5    It is my understanding that at least the bulk of those funds

 6    that resulted from the liquidation are there.  We will

 7    transfer those to the escrow agent.

 8              We will provide them with information as to what

 9    these transactions were, what happened with the cash.  We are

10    effectively saying to the Court that everything we have will

11    go to the escrow agent.  We will be cooperative because we

12    understand the implications of the Court's order on

13    Wednesday.  We are going to put what we have into the escrow.

14    We're good with that.

15              MR. EVANS:  Your Honor --

16              MR. LUFT:  Your Honor --

17              MR. PFEIFFER:  May I just --

18              THE COURT:  Hold on.

19              MR. EVANS:  (Indiscernible)

20              THE COURT:  Wait a minute, wait a minute.

21              Mr. Pfeiffer, were you done?

22              MR. PFEIFFER:  No.  As far as the allegation that

23    my client is filing complaints in California, that's not my

24    understanding.  My understanding was there's a pending matter

25    between my client and Mr. Schatt in California, and my client

CRED_EXAMINER_00002139

1    filed an amendment to the complaint --

2            THE COURT:  He filed a --

3            MR. PFEIFFER:  -- against mister --

4            THE COURT:  He filed a second amended complaint,

5    actually.  I've looked --

6            MR. PFEIFFER:  Yeah.

7            THE COURT:  -- at it.

8            MR. PFEIFFER:  Yeah, against Mr. Schatt.  He hasn't

9    started a new lawsuit.

10           And it's also my understanding -- and I have

11   California counsel here on the line, who can confirm; he's

12   not admitted before this Court.  But it is my understanding

13   that there was never actually a signed injunction order in

14   California.  So that's an issue that may or may not become

15   relevant at some point in time.

16           But the bottom line is, for today, we're agreeing

17   to hand over everything we have to the escrow agent, Judge.

18           MR. LUFT:  Your Honor --

19           MR. PFEIFFER:  Your Honor, one question.

20           THE COURT:  Hold on.  One at a time here.  Go

21   ahead, Mr. Evans.

22           MR. EVANS:  Mr. Pfeiffer says that his client

23   Alexander has $2.7 million in cash proceeds from the

24   liquidation of Bitcoin, that's what he says.  On January 16th

25   and January 17th, there was a transfer of 100 Bitcoin.  The

CRED_EXAMINER_00002140

1    market value of that 100 Bitcoin is $3.8 million.  If, two

2    weeks ago, 100 Bitcoin was sent to who knows where, but

3    apparently another 1.1 just disappeared, right?  So these

4    numbers don't make any sense.

5           And the question as to whether there was an order

6    from the California Court, I mean, it's in our papers.  On

7    July 17th, 2020, there was a temporary restraining order

8    issued by the Court; in August, there was a preliminary

9    injunction that extended that temporary restraining order to

10    the conclusion of the proceedings.  So I don't know what the

11    ambiguity is here, but we have two court orders that clearly

12    preclude Mr. Alexander from transferring Cred Capital.

13           His counsel is now conceding that the

14    cryptocurrency that he received, they're saying is Cred

15    Capital property.  But the violation of the order -- and our

16    expert is here to testify, saying these January 16th and

17    January 17th transactions are directly traceable to Cred.  So

18    that's where we are, Judge.

19           And you know, at this point, the funds just got to

20    be transferred to the debtor.  I mean, we're -- they just got

21    to be transferred to us now.  There's really no reason and no

22    harm -- or there's no reason to allow Alexander to hold onto

23    this, so he can get the benefit of an escrow agent.  His

24    conduct here is egregious, Judge.

25           MR. LUFT:  Your Honor --

18

1           MR. PFEIFFER:  Your Honor, may I respond?

2           MR. LUFT:  If I may?

3           THE COURT:  Well, let me hear from Mr. Luft first,

4     he wanted to say something.

5           MR. LUFT:  Yes, thank you, Your Honor.

6           Your Honor, it looks as though Your Honor has seen

7     the second amended complaint.

8           THE COURT:  I have, yes.

9           MR. LUFT:  If you look at the first -- what's the

10    first action he wants, he wants a declaration that he's a

11    director of Cred Capital.  Now I don't know why an action

12    against Mr. Schatt could do that.  But the fact is he's

13    asking for the exact same relief they came to the other day.

14    And in fact, if you look at all the causes of action, they

15    are all related to the idea that he is a director of Cred

16    Capital.

17          So this notion that they are not violating the stay

18    because they keep just naming Mr. Schatt, as opposed to the

19    necessary party of Cred and Cred Capital -- which has been

20    pointed out to them previously by these courts -- it's --

21    there's no question that that's what they're doing.  They're

22    trying an end run.

23          Moreover, Your Honor, I will note that the Court

24    that filed the injunction, that case has been removed to the

25    Bankruptcy Court in the Northern District of California, and

1    is in the process of being transferred to yourself.  So we

2    hope, very quickly, this will all be in front of you, in

3    terms of the injunction, and you can see it.

4         The only other thing I'd like to just touch on

5    really quickly is, you know, we have had all this litigation

6    going on.  As I pointed out, none of these facts have ever

7    come up.  In all of the papers that he's filed, he's never

8    said the money is not there or, more importantly, that's he

9    liquidated.  They act as though that's not a big deal, well,

10   we just changed it from crypto to dollars.  Your Honor, he

11   has no authority do to that.

12        And that decision, by itself, as Mr. Evans has

13   alluded to, has cost the estate millions of dollars.  When

14   one looks at the value of crypto since he stole it from the

15   company until today, it's astounding how much he's done.  The

16   only thing that gives me -- makes sense is, well, he did the

17   same thing when he was working for Cred.  That's how they

18   lost a lot of money in the first place, he made those

19   decisions.  But that -- the idea that he's not responsible

20   and liable for the additional funds that he lost by his

21   unauthorized actions to, I guess, take some of the crypt -- a

22   bunch of the crypto and change it into dollars, he's liable

23   for that, as well.

24        And I go back to what the committee sought, which

25   is not just the depositing (indiscernible) there needs to be

1    an action, an injunction put up for his other assets.  He

2    needs to make good on all this and needs to know where it is.

3    He's created an astonishing track record that he does not do

4    right when left to his own devices.  Even with a court order,

5    he has -- seems to have no problem violating it.

6            So I do ask today that, not only does he give all

7    the funds that he has to the debtor, but to the extent there

8    is a shortfall in that amount, he has to post the personal

9    collateral to the Court, so that we can have some basis to be

10   sure that we will get the funds.

11           There is no dispute at issue anymore.  He was not

12   the Director of Cred Capital, he did not have authority to do

13   this.  And at this point, Your Honor, we are literally in

14   just a free fall, trying to see how much of the assets that

15   he stole can we recover.  Starting today, please help us make

16   that happen.

17           THE COURT:  Mr. Pfeiffer, I will point out that, if

18   -- well, we now know that he did, Mr. Alexander did transfer

19   funds during the pendency of this bankruptcy case, funds that

20   were assets of the debtors.  Isn't that a violation of the

21   automatic stay, and can't I sanction your client for

22   violating the automatic stay?

23           MR. PFEIFFER:  Your Honor, I don't know the

24   particular facts and the circumstances are not -- that

25   transfer, are not before the Court or were -- haven't been

CRED_EXAMINER_00002144

1    presented to the Court.

2         I can tell you that it is my understanding that

3    recent transfers have very good explanations and -- related

4    to pandemic-related issues that I would prefer not to divulge

5    at the moment because they involve personal health issues.

6    But if a holder of Bitcoin or crypto becomes incapacitated or

7    were to become deceased, if it is in a particular type of

8    account, that person -- nobody could actually (indiscernible)

9    or get that crypto without the right password.

10        My client experienced some issues related to the

11   pandemic, where he had to make sure that, if he were to

12   become deceased, that crypto would be available to other

13   parties, including potentially the debtor.  So there is an

14   explanation for it.  And I'm being purposely oblique because

15   it involves some personal health issues with regard to my

16   client that I would prefer not to disclose in open court, but

17   I will provide the information to the debtor.  I've already

18   disclosed some of the information to the debtor concerning

19   that situation.

20        But there's more to it than, you know, simple

21   transfers of assets post-bankruptcy.  And he didn't transfer

22   any assets to a third party, effectively transferred them to

23   himself, he retained control.  So I'm not sure that is a

24   violation of the automatic stay.

25        And the recent Chicago Parking Authority case would

CRED_EXAMINER_00002145

1    indicate that merely holding onto them, the assets

2    themselves, post-petition would not be a violation of the

3    automatic stay.

4             MR. EVANS:  Your Honor, this is Joe Evans from the

5    committee.

6             First of all, Mr. Pfeiffer just said that Alexander

7    still has and is in possession of the Bitcoin that was

8    transferred on January 16th and January 17th.  That's 150

9    Bitcoin.  And now he's saying, okay, I can only post 50

10   Bitcoin into escrow.  That doesn't make any sense, Judge.

11            And this last-second, COVID-related excuse, you

12   know, this is -- you can't just come to court and say, well,

13   I took money, but okay, it might have something to do with

14   COVID, I don't want to tell anybody what it is, but I

15   shouldn't be held responsible.  We've been in contact with

16   counsel for Alexander for months.  They didn't contact us and

17   say, hey, here's this issue, we have a privacy issue, we want

18   to make sure that the assets are secure.  They didn't say

19   that.

20            Only when we caught them, and we caught a hundred-

21   Bitcoin transfer on January 16th and January 17th, they file

22   a declaration that says nothing about this so-called "excuse"

23   for why they transferred the money.  And then they come to

24   court and, after hearing oral argument, they say, well,

25   actually, it's a COVID issue, Judge, actually, maybe it's a

23

1   COVID issue and we needed to be secure.  If you want the

2   funds to be secure, if that's the goal, place them with the

3   debtor, who's hired professionals to make sure that all the

4   cryptocurrency is safe and protected and for the benefit of

5   the estate.

6          You know, I -- we can't respond to this oblique

7   reference to COVID-related issue, and that's why the client

8   transferred $3.4 million a couple of weeks ago, it just

9   doesn't make any sense.

10         And you know what, Judge?  Alexander was here two

11  days ago.  He was at the hearing two days ago, he showed up.

12  And then, once we showed him that we know that he transferred

13  this Bitcoin two weeks ago, where is he today?  We asked

14  counsel numerous times is Alexander going to be here, is

15  Alexander going to be here.  We put him on our witness list,

16  to ask him these questions, and he's not here.  And he sends

17  counsel here to say, okay, maybe it's a health issue, maybe

18  that's why.  But these sorts of excuses, they just don't

19  work.  These are millions and millions and millions of

20  dollars of other people's money.

21             THE COURT:  Well --

22             MR. PFEIFFER:  Your Honor --

23             THE COURT:  -- I agree, it is time for Mr.

24  Alexander to start answering some difficult questions and do

25  so in a way that gives the parties and the Court the ability

1    to understand what's going on here.  So I'm trying to figure

2    out how to fashion a remedy here.

3              Certainly, I'm going to enter an injunction, a TRO

4    and a preliminary injunction, ordering Mr. Alexander to turn

5    over whatever he says he has to the debtors.

6              No need for an escrow, at this point because I

7    think the -- having determined that Mr. Alexander was not the

8    Director of Cred Capital when those funds were transferred, I

9    don't think there's any question that he owns those funds.

10   They belong to the debtors and I think they need to be turned

11   over to the debtors without an escrow.

12             And we need to get answers from Mr. Alexander.  So

13   one of two ways to do this:  One, I order him to submit a

14   declaration by sometime today that lays out exactly what he

15   has, when he got it, how he got it, where it was transferred

16   to, how it was liquidated, where the liquidated funds are

17   located; or I order him to sit for a deposition and let the

18   parties examine him about those issues.

19             Let me open it up to debtors and the committee to

20   see which you would prefer.

21             MR. LUFT:  Your Honor, speaking on behalf of the

22   debtors, what I would ask -- I think, if I could take one

23   from Column A and one from Column B, I think what we need,

24   given the level of duplicity with Mr. Alexander, is I'd like

25   him to submit that declaration today, setting forth exactly

1    where it is.  And then, to the extent that we have any

2    questions with regard (indiscernible) --

3              THE COURT:  You're --

4              MR. LUFT:  -- that declaration --

5              THE COURT:  You're freezing up a little bit, Mr.

6    Luft.  I'm not sure what's happening, but now you're

7    completely frozen.

8              MR. PFEIFFER:  Your Honor, Mark Pfeiffer.

9              I think I know what he's saying, and I don't

10   necessarily disagree.  But if you'd like a declaration

11   submitted by --

12             MR. LUFT:  (Indiscernible)

13             MR. PFEIFFER:  -- by today --

14             MR. LUFT:  There seems to be --

15             THE COURT:  Oh, wait a minute.  Mr. Luft --

16             MR. LUFT:  Your Honor?

17             THE COURT:  -- I think you're back.  You froze up

18   there and we couldn't hear --

19             MR. LUFT:  Oh.

20             THE COURT:  -- what you're saying.

21             MR. LUFT:  Sorry.  I'm sure it was something

22   brilliant.  But in short, what I'd ask for, Your Honor, is

23   that mister -- given his level of duplicity, that he submit

24   that declaration today, setting out everything you just

25   explained.  And then, if there's any questions -- which I

```
 1    think there will be, given that his lawyer has said today
 2    that he claims to have only got almost 100 million less
 3    Bitcoin than all of our records show -- that we then
 4    immediately sit for a deposition, once we've had a chance to
 5    look at it, to follow up on.
 6              I think we need both, to be honest.  But the
 7    starting point, I think, would be a clear declaration with at
 8    least what he says -- where he says all this money is, so
 9    that we can look at that, try to use our resources to
10    evaluate it, and then ask the followup questions that are
11    necessary.  I don't -- unfortunately, I don't have any faith
12    that we can just take him at his word, nor do I think it's
13    reasonable to assume that we can begin to just question him
14    without that type of foundational discovery of what it --
15    where he at least says they are.
16              MR. EVANS:  Your Honor, this is --
17              THE COURT:  Go ahead, Mr. Evans.
18              MR. EVANS:  From the committee, there's a couple of
19    things that we would like.
20              First of all, we agree with you, Judge, that all of
21    the -- all of the cryptocurrency, the proceeds of the
22    cryptocurrency that are held by Alexander, those should be
23    posted and given to the debtor immediately.  And I gather,
24    from doing a quick calculation of what Mr. Pfeiffer was
25    saying, the value of that is approximately $4.732 million,
```

CRED_EXAMINER_00002150

1    based on current market prices.  I think that's about right.

2    It might be a little -- it might be a little higher than

3    that.

4           This case, this transfer case, is for $8.74 million

5    in Bitcoin.  Okay?  So there's going to be a shortfall,

6    according to what Mr. Pfeiffer says Alexander currently has

7    in his possession, versus what the recovery for the estate is

8    under the adversary action.  So we would ask that, in

9    addition to the providing of the debtors' assets to the

10   debtor, the shortfall, the difference between the value of

11   the adversary action versus what he's able to post, to be

12   placed in escrow, pending the outcome of the adversary

13   action.

14          Mr. Pfeiffer has indicated that his client is

15   liquidating Bitcoin and turning it into cash, executing a

16   transaction, using it for personal reasons, whether their

17   healthcare-related or otherwise.  The only way to ensure that

18   the estate will actually recover these funds, if we are

19   successful -- and we do believe we'll be successfully,

20   especially given the fact that Alexander's only defense to

21   the turnover actions is that these weren't debtor -- these

22   weren't estate assets because Cred Capital couldn't have

23   filed for bankruptcy without his consent.  And so that

24   defense is gone.

25          And so the only way to protect the estate here,

1    Judge, is to have the Cred cryptocurrency and the proceeds

2    transferred to the debtor immediately and to have the

3    shortfall be posted in escrow by Mr. Alexander.

4             MR. PFEIFFER:  Your Honor, may I address that?

5             THE COURT:  Go ahead, Mr. Pfeiffer.

6             MR. PFEIFFER:  Yes, Your Honor.  As far as the

7    crypto go, it's in my client's best interest and everybody's

8    clients' best interests to get that transferred and out of my

9    client's hands as soon as possible because it poses a

10   security issue, both from a personal perspective for my

11   client and to the crypto itself, now that this has been

12   fairly widely publicized and people know that my client has

13   crypto.  We will transfer that, we will work with the debtor

14   to transfer that as soon as possible.

15            I understand Mr. Luft's position about the

16   declaration, and I understand that the Court ordered the

17   declaration.  I have no qualms with that.

18            I understand Mr. Luft's position that he would like

19   to provide -- or depose my client.  If I may suggest that,

20   because there are security issues with regard to the crypto,

21   that the declaration be provided, not publicly, but to both

22   Mr. Luft and the committee, so they know what it is.  And if

23   they choose to file it publicly, they can; or, if they ask me

24   to file it publicly, they can -- we can.  But I don't think

25   everybody wants the entire world to know where these assets

1    are, at the moment, until they are secured by the debtor.

2             THE COURT:  Well, I assume the -- correct me if I'm

3    wrong.  But I'm assuming whatever crypto he has could be

4    transferred immediately, without -- with just a few

5    keystrokes of the keyboard.  Am I incorrect about that?

6             UNIDENTIFIED:  That's correct, Your Honor.

7             THE COURT:  All right.  So --

8             MR. PFEIFFER:  That is my understanding, Your

9    Honor.  I've never had a Bitcoin or a crypto case before, but

10   that's my understanding.

11            THE COURT:  All right.  So I'm going to order him

12   to immediately, within the next 30 minutes after this hearing

13   is over, transfer that Bitcoin to the debtors.

14            Now the cash that he has, I'm assuming that is in a

15   bank account somewhere.  Is that right?

16            MR. PFEIFFER:  I assume that to be the case.  I

17   don't know for certain, Your Honor.

18            THE COURT:  All right.  And that can be transferred

19   through a wire transfer to the debtors' account fairly

20   quickly, so I will order that to be done, as well, by the end

21   of the day today, whatever cash that he has that he alleges

22   or that he admits is the proceeds of the cryptocurrency which

23   was taken from Cred Capital.

24            I will also order him, by the end of the day today

25   -- we'll say, actually, by -- if I was going to give a

CRED_EXAMINER_00002153

1   deposition, Mr. Evans and Mr. Luft, would you want to take it

2   today or over the weekend or Monday?

3           MR. LUFT:  Your Honor, I think it depends if we're

4   going to see a declaration or not.  If we're going to see the

5   declaration, I'd have -- I'd like to have a chance to read it

6   and review it first.  If we're not going to get such a

7   declaration, then I guess I would confer with Mr. Evans.  I

8   personally have a deposition for three hours this afternoon,

9   but I'd be happy to sit down after that and talk to Mr.

10  Alexander then, but --

11          THE COURT:  Well, let's --

12          MR. EVANS:  Your Honor --

13          THE COURT:  There will be a declaration because I'm

14  going to order him to provide one.

15          MR. LUFT:  Terrific.

16          THE COURT:  That will be -- I'm just trying to

17  figure out the timing of it, when I should have him do that.

18  It's --

19          MR. LUFT:  If I could suggest, Your Honor, it can -

20  - whatever time it makes sense for you, I think, given Ms.

21  Clegg's involvement, and I think that there will probably be

22  questions about where this stuff went, maybe a deposition --

23  unless Mr. Evans disagrees -- on Monday then, so we have the

24  weekend -- if he can provide the details today, we have a

25  weekend to look at it -- or I'll defer to Ms. Clegg and Mr.

1    Evans how much time it would take to evaluate his responses.

2    But if that would be quick enough, then I do think time is of

3    the essence, so ...

4            THE COURT:  All right.  So we'll -- I'll order the

5    declaration to be submitted by 4 p.m. today.

6            MR. LUFT:  Thank you, Your Honor.

7            THE COURT:  It will be provided to the committee

8    and debtors' counsel.  I would also like to see it, I'd like

9    it submitted to chambers, so I can review it, as well.

10           And then, if the debtors and the committee request

11   a deposition, Mr. Alexander will sit for that deposition at

12   the committee and the debtors' time, whatever time of their

13   choosing.

14           MR. LUFT:  Thank you, Your Honor.

15           THE COURT:  I also think it's important that we get

16   some expedited discovery, document discovery, what happened

17   to these assets, where they went, how they were transferred.

18   Anything that Mr. Alexander has in writing also needs to be

19   produced on an expedited basis.

20           Mr. Pfeiffer, how quickly can your client get those

21   materials together and produced?

22           MR. PFEIFFER:  Your Honor, I had your sound cut out

23   in the last 15 seconds.

24           THE COURT:  I'm sorry.  You're fading out, too, Mr.

25   Pfeiffer.  I can barely hear you.

1          MR. PFEIFFER:  I'm sorry.  How about now?

2          THE COURT:  That's a little better, but still bad.

3     I was saying that I want expedited discovery, document

4     discovery from Mr. Alexander, as well.  So I was asking you

5     how quickly Mr. Alexander can pull together all documents

6     relating to the Bitcoin, its transfer, its liquidation, and

7     provide that to the debtors and the committee on an expedited

8     basis.  How much time do you need?

9          MR. PFEIFFER:  Probably more time than the Court is

10    willing to give.  But you know, we will provide it before

11    Monday --

12         THE COURT:  All right.

13         MR. PFEIFFER:  (Indiscernible)

14         THE COURT:  By Monday then, it should be provided.

15         I also think it might be important to have Ms.

16    Clegg involved in this, so that she can provide some guidance

17    to the parties and to me on transfers and how they happen and

18    so forth.  So I'd like her to be involved in this.  I --

19    sorry if I'm messing up your weekend, Ms. Clegg, but I think

20    it's important that you be involved in this, so I have some

21    independent expert that can give me some guidance on how all

22    of this played out.

23         MR. PFEIFFER:  Your Honor --

24         MS. CLEGG:  I'm available, Your Honor.

25         THE COURT:  Thank you.

1           I'm sorry.  Someone --

2           MR. PFEIFFER:  Your Honor --

3           THE COURT:  -- else was --

4           MR. PFEIFFER:  Yes, it's Mark Pfeiffer.  And I'm

5    sorry, your audio cut out again when you were talking about

6    the timing of the production of documents.

7           THE COURT:  You had said you could get them by

8    Monday, so --

9           MR. PFEIFFER:  Uh-huh.

10          THE COURT:  -- I was saying, yes, get them by

11   Monday.

12          MR. PFEIFFER:  And Your Honor, just so I know, so

13   that we make sure that we comply with the Court's order, the

14   declaration will be regarding the location of the

15   cryptocurrency and what happened to it and the proceeds,

16   effectively.  Is that correct?

17          THE COURT:  That's correct.  He should also address

18   the differences between the 225 Bitcoin that Ms. Clegg has

19   been able to trace, that was transferred from Cred Capital to

20   Mr. Alexander, and his assertion that he only took possession

21   of 150 Bitcoin.  I want to know, well, how -- what's the

22   basis for that distinct difference between the two.

23          MR. PFEIFFER:  And Your Honor, with regard to the

24   scope of the deposition, would it be, I'm assuming, similar

25   to the declaration?

1          THE COURT:  Yes, exactly.

2          MR. EVANS:  Your Honor, this is Joe Evans from the

3     committee.

4          One thing, just to clarify, in the declaration, for

5     each of these transactions, we want an explanation as to the

6     reason behind each of these transactions.  If 150 Bitcoin is

7     what Mr. Alexander had, it appears, on July 17, when the

8     Court entered the temporary restraining order, but before

9     that, 75 Bitcoin had dissipated.  And so we want an

10     explanation of each transaction that relates back to the

11     crypto that Cred provided Mr. Alexander.  So that's one.

12          The -- two -- the second thing is, according to Mr.

13     Pfeiffer (indiscernible) 50 Bitcoin.  And what's not clear to

14     me is he also said that there was 100 Bitcoin that was

15     transferred, but it was effectively transferred back to

16     Alexander, transferred to an account he controls for security

17     purposes, I suppose.  And so he should be transferring 150

18     Bitcoin to the debtor today in 30 minutes, not just 50.

19          THE COURT:  Well, he's going to --

20          MR. EVANS:  And so I don't know where the

21     disconnect --

22          THE COURT:  He's going to transfer whatever Bitcoin

23     he has that's related to what was transferred to him from

24     Cred Capital and provide an explanation for why there's a

25     difference between what he alleges is the amount that was

1  transferred to him and the amount that the debtor says was

2  transferred to him.  And he should also provide an

3  explanation for each of the transfers subsequent to the

4  initial transfer of all the Bitcoin, as well as an

5  explanation for why he liquidated the Bitcoin and where that

6  money is located.

7              MR. LUFT:  Your Honor --

8              MR. EVANS:  Thank you, Your Honor.

9              And then the one last -- apologies.  The one last

10  thing is, if Mr. Pfeiffer is correct and there are 50

11  Bitcoin, 200,000 in (indiscernible) coin and about 2.7

12  million in cash, that adds up to about $4.6 million.  Judge,

13  there's still 3.8 of additional funds that are the subject of

14  this adversary action.

15              And so, given Mr. Alexander's conduct to date and

16  the risk to the estate of not recovering those proceeds, we'd

17  ask that Mr. Alexander be asked to post in escrow, pending

18  the resolution of the adversary action, the remainder, the

19  3.8 million about that is the difference between the Cred

20  assets he claims are still under the control and the Cred

21  assets that he originally received.

22              THE COURT:  Well, I think requiring a prejudgment

23  attachment of assets is premature, at this point, until I

24  have a better understanding of what happened, how it

25  happened, and where the money is and how much is involved

1    here.  And I would want further briefing on that issue.  I

2    think that is a -- that's a big ask, to ask me to impose a

3    prejudgment attachment against somebody.  It doesn't happen

4    very often, it rarely happens in Delaware for sure.  So I'd

5    like further briefing on that issue before I took that next

6    step.

7            MR. LUFT:  Your Honor, if I may?  Just I hope this

8    would be clear that it should be covered, but given this

9    (indiscernible) secrecy in crypto, I would hope that mister -

10   - we need Mr. Alexander, in that declaration, to say who he

11   transferred the funds to, not just some anonymous account, if

12   he knows.  Presumably, he is sending money to people, he knew

13   -- he knows where it is.  We need names, so that we can

14   contact those people.  So I'd ask that to be included, as

15   well, and not to say that it's confidential and whatever else

16   they're going to say.

17           The second thing I would just note is, in addition

18   to the crypto that he took, he still holds a computer and a

19   phone that presumably holds Cred information on them, as well

20   as other -- I think it's called "coin," "U.S. Coin," or some

21   other forms of currency.  We have been talking about the

22   Bitcoin, but I don't see any distinction as to why he should

23   not turn over everything he has in his possession that he

24   took from Cred Capital.

25           THE COURT:  Well, on the first one, I agree, and

37

1   that's what I expected, that he would -- when he's describing

2   the transfers, he's describing who the funds were -- or who

3   the Bitcoin or who the funds were transferred to and where

4   they're currently residing, so -- and not just some anonymous

5   account number.  He has to provide full disclosure here.

6          On the second issue, remind me what it was.  I'm

7   sorry, I lost track.

8          MR. LUFT:  Quite all right.  The turnover -- we --

9   at issue in the turnover action is -- we --

10         THE COURT:  Okay.  The computer --

11         MR. LUFT:  -- (indiscernible)

12         THE COURT:  -- and the other items.

13         MR. LUFT:  (Indiscernible) whatever --

14         THE COURT:  Mr. Pfeiffer, does your client still

15   have the computer and the phone that was provided by the

16   debtors to Mr. Alexander?

17         MR. PFEIFFER:  I think there are about four or five

18   pieces of equipment listed in the complaint.  I don't think

19   my client had one of those to begin with.  I believe he has

20   the others.

21         With regard to the computer, which is the main

22   issue, I think, is -- he hasn't opened up or used that

23   computer since being terminated because it was the protocol

24   of Cred to wipe computers, you know, as soon as they're

25   powered up, following termination.  So, you know, it's just

1      sitting there.  I can talk to my client about getting it to

2      the debtor in some way, shape, or form.

3                  MR. LUFT:  It's not just the computer, though, Your

4      Honor.

5                  MR. PFEIFFER:  Whatever equipment it is.

6                  THE COURT:  Whatever equipment he has that was

7      proved to him by the debtors should be turned over as soon as

8      possible.

9                  Where is Mr. Alexander located, physically?

10                 MR. PFEIFFER:  California, Your Honor.

11                 THE COURT:  And where are you located, Mr.

12     Pfeiffer?  I'm sorry.

13                 MR. PFEIFFER:  I'm in Philadelphia.

14                 THE COURT:  And Mr. Alexander has counsel in

15     California, you mentioned Mr. Pfeiffer, who's actually on the

16     call today?

17                 MR. PFEIFFER:  Yes, Mr. Thomas Reichert, who is on

18     the call right now and on the screen.

19                 THE COURT:  Okay.  Then I would order Mr. Alexander

20     to turn those items over to Mr. Reichert for safekeeping

21     immediately.

22                 MR. EVANS:  Your Honor, this is Joe Evans for the

23     committee.

24                 And I understand Your Honor's point about the

25     prejudgment order of attachment, how you'd like more

1    briefing.  In the interim, before you can make a decision,

2    what we would like to do and what we'd request is that there

3    be a restriction on Alexander's transfer of what he claims is

4    his personal Bitcoin or personal assets.  We anticipate that

5    what we're going to receive is, well, this Bitcoin was mine,

6    this wasn't Cred Capital's, this Bitcoin was mine, it wasn't

7    Cred Capital's.  And so, until we can sort all that out,

8    Judge, we'd ask for a restriction on Alexander's transfer of

9    his cryptocurrency and other assets.

10           Mr. Pfeiffer said that the assets were liquidated

11   and some of the Bitcoin was liquidated, and Ms. Clegg is very

12   good (indiscernible) this stuff, but we're going to need to

13   understand what his position in certain of these items.  And

14   just to protect the estate, pending the determination of the

15   prejudgment attachment, we'd ask that there be an injunction

16   on Mr. Alexander for making transfers over a certain dollar

17   amount, maybe $1,000, $2,000, something like that.

18           THE COURT:  Well --

19           MR. PFEIFFER:  Your Honor --

20           THE COURT:  -- that's --

21           MR. PFEIFFER:  -- that --

22           THE COURT:  That's kind of like a prejudgment

23   attachment.  But go ahead, Mr. Pfeiffer.

24           MR. PFEIFFER:  I was going to say that's the same

25   thing, and that poses constitutional issues.

1          THE COURT:  Yeah.  Yeah, I'm not prepared to do

2     that at this time.  But I do expect that Mr. Alexander will

3     disclose -- and I'm going to order expedited discovery on all

4     of his personal assets, so that we know how much Bitcoin he

5     holds that he believes is his personal property, including

6     his -- and cash.

7          I'm going to open it up.  I'm going to let the

8     committee and the debtors submit written requests for

9     production and, if you want, interrogatories to Mr. Alexander

10    regarding his personal assets.  And I would expect that that

11    be done on an expedited basis, not 30 days, as allowed by the

12    rules.  I would expect that could be done within a week or 10

13    days.

14          MR. EVANS:  Your Honor, for the committee, we can

15    get these -- we can get these requests out either this

16    evening or first thing tomorrow.  And we'd ask that the

17    responses be submitted by no later than Wednesday.

18          THE COURT:  I'm sorry.  When did you say you would

19    get them out, Mr. Evans, today?

20          MR. EVANS:  We can get them out today or tomorrow

21    morning, but we'd ask the responses be Wednesday.

22          THE COURT:  All right.  I'll say the responses are

23    due Wednesday.  But Mr. Pfeiffer, if there -- something comes

24    up that makes that difficult to reach, I would ask that the

25    parties contact the Court and we'll have a status conference

1    over the telephone, and we'll see if you need some additional

2    time.

3                    MR. PFEIFFER:  Thank you, Your Honor.

4                    MR. CARTY:  Your Honor, Andrew Carty from Brown

5    Rudnick on behalf of the examiner.  May I be heard very

6    briefly?

7                    THE COURT:  Go ahead, Mr. Carty.

8                    MR. CARTY:  I understand that there's going to be,

9    you know, some information being provided.  I think some or

10   all of it is going to be provided under seal, and we would

11   just like to be involved in that process and provided with --

12   if there's a declaration, if there's depositions, if there's

13   document discovery, we would like to be afforded the

14   opportunity to participate in that process.

15                   THE COURT:  Absolutely.

16                   MR. PFEIFFER:  No objection, Your Honor.

17                   THE COURT:  Yeah, absolutely.

18                   MR. CARTY:  Thank you, Your Honor.

19                   THE COURT:  Absolutely.  Yes.

20                   Well, I'm not sure how to formulate one order.

21   I've ordered a lot of things today.  So I think what I'm

22   going to do is so order the transcript with all of my rulings

23   today.  And Mr. Luft, if you want to submit a form of order

24   that just says -- incorporates my rulings on the record

25   today.  You don't have to do them specifically; just say the

1  Court held a hearing today, made numerous rulings on the

2  record relating to various issues and, for the reasons stated

3  on the record, the record is so ordered.  And I think that

4  will -- we'll have to go with that because it will be

5  impossible to try to put together a comprehensive order on

6  this on a short period of time, especially since you have a

7  deposition this afternoon.

8            MR. LUFT:  Thank you, Your Honor.  That is,

9  honestly, very helpful.

10            THE COURT:  All right.

11            MR. EVANS:  And Judge, this is Joe Evans for the

12  committee.

13            And the two items that we were come back to you

14  with briefing on were the sanctions item and the -- sanctions

15  related to a violation of the automatic stay and, also, the

16  prejudgment order of attachment.  We'd just like to confer

17  with Mr. Pfeiffer on that and come back to you with a

18  proposed briefing schedule.  I think some of the information

19  we're going to get over the next few days might be pretty

20  helpful for those motions, so --

21            THE COURT:  Yes, that's fine.

22            MR. EVANS:  -- we'd ask for that.

23            THE COURT:  That's fine, yeah.

24            All right.  I also -- I guess I am going to grant

25  the motion to intervene.  We forgot about that one.  So you

43

1    can -- Mr. Evans, you can -- I think we have the form of

2    order that was attached to your motion.

3            But Mr. McMahon raised his hand.  Mr. McMahon, do

4    you have an issue about the intervention?

5            MR. MCMAHON:  No, Your Honor.  I -- jumping in.

6    And my apologies, I was monitoring the hearing.  We have the

7    same interest in the information that the examiner does, so

8    we just ask that we be included with respect to

9    communications regarding the declaration, the deposition, and

10   the like.

11           THE COURT:  Yes, absolutely.  Absolutely.

12           So, going back to the motion to intervene, I'll

13   enter the order that was submitted by the committee with your

14   motion, we'll get that entered today.

15           MR. EVANS:  Thank you, Your Honor.

16           THE COURT:  All right.  And I think that's all we

17   had for today, right?  That was enough.  It's a lot.

18           MR. EVANS:  Nothing more from the committee.

19           THE COURT:  All right.

20           MR. EVANS:  Thank you.

21           MR. LUFT:  Thank you, Your Honor.

22           THE COURT:  All right.  Thank you, everybody.  I'll

23   say "have a good weekend," but I have a feeling some people

24   aren't going to that are on the phone today.  So we're

25   adjourned.  Thank you.

44

1          COUNSEL:  Thank you, Your Honor.  Thank you, Your

2     Honor.  Same to you.

3          (Proceedings concluded at 10:55 a.m.)

4                              *****

CRED_EXAMINER_00002168

45

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.

_____        February 5, 2021

Coleen Rand, AAERT Cert. No. 341

Certified Court Transcriptionist

For Reliable

CRED_EXAMINER_00002169

Exhibit 167

MnD Form UCF-17-2 (2-93)
Order for Granting Name Change

M.S. 259.11

MILLER-DAVIS CO., MINNEAPOLIS, MN

94-12763

# State of Minnesota

COUNTY
HENNEPIN

FILED

COURT DISTRICT

AUG 18 PM 3: 33 JUDICIAL DISTRICT 4TH

CASE NO.

## ORDER GRANTING NAME CHANGE

BY _____ DEPUTY
HENN CO DISTRICT
COURT ADMINISTRATOR

In the matter of the application of: _____ for change of name to:      JMM

JAMES    NELSON    ALEXANDER          JAMES  ALEXANDER  LONGDON  DE MORGES
First       Middle       Last                First          Middle              Last

The above entitled matter came on for hearing before the undersigned Judge on   8-18-94   upon the
                                                                                    DATE

Application for a Change of Name. Upon the testimony and files, the Court finds the following:

1. That the application is made in good faith without intent to defraud or mislead.
2. That the applicant has resided in Minnesota for at least six months immediately preceding the filing of the within
   application, and now resides in  HENNEPIN  County at  2722 W. 47th St. Mpls. 55410
3. That the applicant (and included spouse) (has) (have) not been convicted of a felony in any state.
   or
   That the applicant (or included spouse) (has) (have) been convicted of a felony as follows: _____

4. Name of applicant and date of birth:  JAMES  NELSON  ALEXANDER  and  AUGUST 2, 1969
   Name of spouse and date of birth: _____
   This application ☐ does ☐ does not include spouse.                                    CASE #      94-12763
   Name(s) of minor children and dates of birth: _____

   ☐ This application does not include minor children listed above.
   ☐ This application includes the following minor children listed above: _____

   | | |
   |---|---|
   | CRTCPY | $10.00 |
   | ANTIQUE | $10.00 |
   | CASH | $20.00 |
   | CHANGE | $10.00 |

5. Legal descriptions of lands in the State of Minnesota upon which the following have a claim, interest or lien:
              JMM Legal Description (Attach additional sheet if necessary)
   ☒ Applicant     None
   ☐ Spouse _____
   ☐ Children _____

6. That the applicant desires:                                            JMMA
   ☒ To have his/her name changed to  JAMES  ALEXANDER  LONGDON  DE MORGES
   ☐ To have the name of his/her spouse changed to _____
   ☐ To have the names of his/her children changed to _____

7. The application is granted and IT IS ORDERED that:                        JMM
   ☒ The legal name of the Applicant shall be  JAMES  ALEXANDER  LONGDON  DE MORGES
   ☐ The legal name of the spouse shall be _____
   ☐ The legal names of the minor children shall be: _____

   ☐ Court Administrator of this court and the applicant shall notify the Bureau of Criminal Apprehension of the change of
   name within 10 days of this Order.

8. The applicant shall file a certified copy of this Order with the County Recorder of each county where the applicant,
   spouse or minor children claim an interest in land. If the applicant and/or spouse have been convicted of a felony the
   court and the applicant shall report the name change to the Bureau of Criminal Apprehension, Criminal History Unit,
   1246 University Avenue, St. Paul, MN, 55104.

                                                          BY THE COURT:

Dated:   aug 18 1994                              Judge _____

The foregoing facts were found by me after due
hearing and the foregoing order thereon is
recommended.

_____ M. McLeague
        Referee   8-18-94

Approved by Conference of Chief Judges 20/93.  (1)      Revised _____

Exhibit 168



**Ministry of Justice**

**Andrew Selous MP**
Parliamentary Under-Secretary of
State for Justice
102 Petty France
London SW1H 9AJ

T 020 3334 3555
F 020 3334 3669
E general.queries@justice.gsi.gov.uk
www.gov.uk/moj

Philip Davies MP
House of Commons
LONDON
SW1A 0AA

Our ref: PQ 202782, 212585

7th November 2014

Dear Philip,

### PARLIAMENTARY QUESTIONS 202782 AND 212585

In Simon Hughes' response of 24 October to your Parliamentary question on absconds, he committed to write to you with the remaining information on prisoner names when this had been cleared with the relevant police forces and victim groups. I also undertook more recently to write to you regarding a second question you asked on 31 October.

I now enclose a table showing the names, where possible, of each offender who absconded alongside the other details provided in the original Parliamentary answer. 57 of those detailed on this table were already at large when this Government came to power.

It has not been possible to release all the names of these prisoners. I am sure you understand that there are sensitive issues involved here both in terms of ongoing law enforcement activity and respecting the wishes and concerns of victims. The names in the table below are those where the relevant police force have agreed to their release and where there are no ongoing concerns raised by the Victim Liaison Officer in respect of those offences that are part of the National Probation Service Victim Contact Scheme.

I would like also to take the opportunity to correct a minor error in the table presented in my response of 24 October. Subsequent checks have shown that the sentence length for one prisoner was listed incorrectly – the sentence length should have been 5 years and not 3 years as listed. I apologise for this error. The amended record is noted in the table below.

I hope you find this information helpful. I am placing a copy of this letter in the Library of the House.

Yours ever

A drew

**ANDREW SELOUS**

**ANNEX**

**To ask the Secretary of State for Justice,** *what the names are of all prisoners who have absconded from prison and currently not been returned; and if he will specify in each such case (a) the offence each absconder originally committed and (b) the length of custodial sentence they were serving when they absconded.*

**To ask the Secretary of State for Justice,** *which prisoners have been on the run since April 2004; what the offence was that each prisoner had committed; how long each prisoner's sentence was; and how long each prisoner had served before absconding.*

**Table1: Name, index offence, sentence length and number of days served from date of sentence of absconders unlawfully at large from April 2004 to March 2014, as at 30 September 2014 as recorded on the NOMS Database**

| NAME | OFFENCE | SENTENCE | DAYS SERVED AT ABSCOND FROM DATE OF SENTENCE |
|---|---|---|---|
| ANTHONY INGHAM | SUPPLYING DRUGS | 3 YRS | 248 |
| DAISTAN IASAR | GOING EQUIPPED TO CHEAT | 2YRS | 21 |
| NOT DISCLOSED | GOING EQUIPPED TO CHEAT | 2YRS | 21 |
| JAMES MCDANIEL | POSSESS DRUGS WITH INTENT | 6YRS | 542 |
| NOT DISCLOSED | AGGRAVATED BURGLARY | 4YRS 6MTHS | 843 |
| MAHUSH PATEL | FALSE INSTRUMENTS | 6MTHS | 31 |
| AARON ENOWBAYE | BURGLARY | 18MTHS | 62 |
| NOT DISCLOSED | DEATH BY RECKLESS DRIVING | 4YRS | 642 |
| AHMET ORTANALLAMA | IMPORT/EXPORT DRUG | 19YRS | 3605 |
| LIVIU BARDON | CONSPIRACY TO COMMIT THEFT | 3YRS 6MTHS | 163 |
| BRUCE NEILSON | IMPORT/EXPORT DRUG | 9YRS | 916 |
| TANSEL USTEL | CONSPIRACY TO DEFRAUD | 7YRS | 106 |
| NOT DISCLOSED | THEFT | 8MTHS | 91 |
| TITILOPE BELLO | IMPORT/EXPORT DRUG | 12YRS | 980 |
| LUCIA RODRIGUES-TAIWO | IMPORT/EXPORT DRUG | 7YRS | 854 |
| NOT DISCLOSED | POSSESS FIREARM WITH INTENT | 78MTHS | 1012 |
| SAMUEL RUTHERFORD | IMPORT/EXPORT DRUG | 12YRS | 947 |
| RICKY JOHNSON | POSSESS OFFENSIVE WEAPON | 23MTHS | 71 |
| ASO FAREK NIMEK | BLACKMAIL | 3YRS | 42 |
| ENDRIT GRISHA | POSSESS DRUGS WITH INTENT | 3YRS 6MTHS | 86 |
| SYLVIAN MONJAL | IMPORT/EXPORT DRUG | 10YRS | 1030 |

CRED_EXAMINER_00002172

| | | | |
|---|---|---|---|
| EDMUND ALBERI | CUSTOMS EVASION (DRUGS RELATED) | 7YRS | 686 |
| THOMAS MULLEN | FINES | 6MTHS | 386 |
| SERGEY DAMASKIN | DECEPTION | 30MTHS | 215 |
| OWEH OGBONNA | IMPORT/EXPORT DRUG | 5YRS | 581 |
| OLUWASEYI OGUNREMI | CUSTOMS EVASION (DRUGS RELATED) | 8YRS | 536 |
| HUGUES LEBAS | ASSISTING ILLEGAL IMMIGRANTS | 54MTHS | 274 |
| NOT DISCLOSED | DECEPTION | 9MTHS | 29 |
| NOT DISCLOSED | TRESPASS WITH INTENT | 15MTHS | 104 |
| NOT DISCLOSED | CONSPIRACY TO COMMIT THEFT | 3YRS | 71 |
| MARCO NAPOLITANO | CONSPIRACY TO COMMIT THEFT | 2YRS | 136 |
| GORAN DURDEVIC | THEFT | 15MTHS | 76 |
| SEDAN ASAN | DECEPTION | 26MTHS | 20 |
| FRANCO CARANO | POSSESS OFFENSIVE WEAPON | 5YRS | 217 |
| PETER OLEKH | ASSISTING ILLEGAL IMMIGRANTS | 6YRS | 126 |
| MALEK RIAHI | DECEPTION | 12MTHS | 73 |
| NOT DISCLOSED | CONSPIRACY TO SUPPLY DRUGS | 6YRS | 687 |
| ABID BUTT | POSSESS DRUGS WITH INTENT | 6YRS | 474 |
| MOKRANE MAHDID | FALSE INSTRUMENTS | 12MTHS | 70 |
| NOT DISCLOSED | MANSLAUGHTER | 5YRS | 831 |
| NOT DISCLOSED | THEFT | Unknown | Unknown |
| MARTIN WILLIAMS | CONSPIRACY TO IMPORT DRUGS | 8YRS | 431 |
| NOT DISCLOSED | ROBBERY | LIFE | 2527 |
| AUGUSTINE TANGUE | FALSE INSTRUMENTS | 18MTHS | 55 |
| AJAY KUMAR | DECEPTION | 30MTHS | 22 |
| NOT DISCLOSED | THEFT | 4YRS | 769 |
| JAMES MCCARTHY | CONTEMPT OF COURT | 15MTHS | 111 |
| ROBERT KOLOMPAR | BURGLARY | 6MTHS | 182 |
| NOT DISCLOSED | SUPPLYING DRUGS | 42MTHS | 506 |
| IAN THOMPSON | GBH | 2YRS | 285 |
| OLUWASEGUN ADEKULE | FRAUD | 5YRS | 319 |
| JAMES DEMORGES | FRAUD | DETAINEE | Unknown |
| NOT DISCLOSED | CONSPIRACY TO SUPPLY DRUG | 40MTHS | 194 |
| NOT DISCLOSED | POSSESS FIREARM WITH INTENT | LIFE | 3053 |
| UJJAL PATHAK | BURGLARY | 112DAYS | 67 |
| MICHAEL BROSNAN | POSSESS DRUGS WITH INTENT | 7YRS | 1036 |
| ION POPESCU | GOING EQUIPPED TO STEAL | 6MTHS | 44 |
| TOM ZOLYNSKI | THEFT | 2YRS | 65 |
| JOHN WILSON | EXCESS ALCOHOL | 112DAYS | 36 |
| ISMAIL HASKO | CONSPIRACY TO DEFRAUD | 6YRS | 276 |
| LEACROFT WALLACE | POSSESS DRUGS WITH INTENT | 5YRS* | 586 |
| NOT DISCLOSED | ROBBERY | 6Y | 570 |
| STEVEN FORTNAM | CONSPIRACY TO COMMIT BURGLARY | 3 YRS 3 MTHS | 158 |
| NOT DISCLOSED | POSSESS FIREARM WITH INTENT | LIFE | 2843 |
| NOT DISCLOSED | BURGLARY | 3YRS | 83 |

CRED_EXAMINER_00002173

| NOT DISCLOSED | ARSON | ISPP | 1468 |
|---|---|---|---|
| NOT DISCLOSED | RAPE | LIFE | 5738 |
| NOT DISCLOSED | ROBBERY | 9YRS | 834 |
| MICHAEL COLLINSON | WOUNDING WITH INTENT | 6YRS 8MTHS | 821 |
| NOT DISCLOSED | ROBBERY | 3YRS | 366 |
| JAMIE FARROW | GBH | 8YRS | 1301 |
| ADAM WALSH | ROBBERY | ISPP | 2098 |
| PETER STEWART | BURGLARY | 32M | 304 |
| NOT DISCLOSED | BURGLARY | 2Y 6M | 130 |
| NOT DISCLOSED | POSSESSION OF A FIREARM WITH INTENT | ISPP | 1677 |
| KEVIN SMITH | CONSPIRACY TO COMMIT BURGLARY | 64M | 87 |

*Previously recorded as 3 year sentence

Note: Table shows absconds of prisoners and excludes absconds of immigration detainees from NOMS operated establishments and those operated as Immigration Removal Centres by NOMS under contract to the Home Office.

*These figures have been drawn from live administrative data systems which may be amended at any time. Although care is taken when processing and analysing the returns, the detail collected is subject to the inaccuracies inherent in any large scale recording system.*

CRED_EXAMINER_00002174

Exhibit 169

*THIS COMBINED JOINT PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT FOR CIRCULATION TO ALL CREDITORS AND INTEREST HOLDERS OR FOR THE USE IN SOLICITATION OF VOTES*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

## FIRST AMENDED COMBINED JOINT PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT OF CRED INC. AND ITS SUBSIDIARIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**PAUL HASTINGS LLP**
James T. Grogan (admitted *pro hac vice*)
Mack Wilson (admitted *pro hac vice*)
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
Telephone: (713) 860-7300
Facsimile: (713) 353-3100
Email: jamesgrogan@paulhastings.com
mackwilson@paulhastings.com

- and -

**PAUL HASTINGS LLP**
G. Alexander Bongartz (admitted *pro hac vice*)
Derek Cash (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Email: alexbongartz@paulhastings.com
derekcash@paulhastings.com

**COUSINS LAW LLC**
Scott D. Cousins (No. 3079)
Brandywine Plaza West 1521 Concord
Pike, Suite 301 Wilmington, Delaware
19803 Telephone: (302) 824-7081
Facsimile: (302) 295-0331
Email: scott.cousins@cousins-law.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: January 21, 2021

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

CRED_EXAMINER_00002175

## TABLE OF CONTENTS

PAGE

Article I. DEFINED TERMS ..................................................................................................1

Article II. INTERPRETATION OF COMBINED PLAN AND DISCLOSURE
STATEMENT ..........................................................................................13

2.1    Application of Definitions; Rules of Construction; Computation of
Time ..............................................................................................................13
2.2    Relief Sought by Filing the Combined Plan and Disclosure Statement ..........14

Article III. BACKGROUND – THE DEBTORS' CORPORATE HISTORY,
STRUCTURE, AND BUSINESS OVERVIEW ...........................................14

3.1    General Background – Overview of the Debtors ..............................................14
3.2    The Debtors' Prepetition Capital Structure .....................................................15
3.3    Events Leading to the Chapter 11 Cases ..........................................................15
3.4    The Chapter 11 Cases .....................................................................................19

Article IV. TAX CONSEQUENCES ....................................................................................25

4.1    Tax Consequences ...........................................................................................25

Article V. CERTAIN RISK FACTORS TO BE CONSIDERED ........................................26

5.1    Risk Factors to Be Considered .......................................................................26
5.2    Alternatives to this Combined Plan and Disclosure Statement ......................31

Article VI. BEST INTERESTS AND FEASIBILITY ........................................................31

6.1    Best Interests Test ..........................................................................................31
6.2    Feasibility .......................................................................................................32

Article VII. SUMMARY OF ASSETS AND TREATMENT OF CLAIMS AND
INTERESTS ...........................................................................................32

7.1    Summary of Assets .........................................................................................32
7.2    Summary of Treatment of Claims and Equity Interests .................................33
7.3    Deemed Consolidation ...................................................................................34
7.4    Third Party Releases .......................................................................................35

Article VIII. CONFIRMATION AND VOTING PROCEDURES .......................................36

8.1    Combined Hearing ..........................................................................................36
8.2    Procedure for Objections ................................................................................36
8.3    Voting Procedures ...........................................................................................36

-i-

CRED_EXAMINER_00002176

**Article IX. PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS, AND OTHER UNCLASSIFIED CLAIMS** ......................39

9.1    Administrative Expense Claims .................................................39
9.2    Professional Fee Claims .............................................................41
9.3    Priority Tax Claims ....................................................................41

**Article X. TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS** .........42

10.1   Class 1: Other Priority Claims ..................................................42
10.2   Class 2: Secured Tax Claims .....................................................42
10.3   Class 3: Other Secured Claims .................................................43
10.4   Class 4: General Unsecured Claims. ........................................43
10.5   Class 5: Convenience Claims. ....................................................43
10.6   Class 6: Subordinated Securities Claims .................................44
10.7   Class 7: Equity Interests in Debtors ........................................44
10.8   Reservation of Rights Regarding Claims and Equity Interests .....................44

**Article XI. ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT** ................................................45

11.1   Voting of Claims .........................................................................45
11.2   Elimination of Vacant Classes ..................................................45
11.3   Nonconsensual Confirmation ....................................................45
11.4   Revocation of the Combined Plan and Disclosure Statement ....................46

**Article XII. MEANS OF IMPLEMENTATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT** ................................................46

12.1   Limited Substantive Consolidation ..........................................46
12.2   Global Settlement .......................................................................46
12.3   Liquidation of the Debtors ........................................................47
12.4   Effectuating Documents; Further Transactions ......................53
12.5   Cancellation of Instruments and Stock ....................................53
12.6   Disposition of Books and Records ............................................54
12.7   Corporate Existence and Dissolution of Debtors ....................54
12.8   Closing the Chapter 11 Cases ...................................................54

**Article XIII. DISTRIBUTIONS UNDER THE COMBINED PLAN AND DISCLOSURE STATEMENT** ................................................55

13.1   Distributions on Allowed General Unsecured Claims .............55
13.2   Timing of Distributions .............................................................55
13.3   Delivery of Distributions ...........................................................55
13.4   Undeliverable and Unclaimed Distributions ...........................56
13.5   Transfer of Claims ......................................................................57
13.6   Manner of Payment ....................................................................57
13.7   Distributions to Cryptocurrency Election E-Wallet Addresses .....................57

CRED_EXAMINER_00002177

The Liquidation Trustee shall maintain records of all distributions made to
Cryptocurrency Election E-Wallet Addresses, including confirmations
of E-Wallet to E-Wallet transfers.  The Liquidation Trustee is only
required to initiate such E-Wallet to E-Wallet transactions.  The
Liquidation Trustee is not responsible, and shall not be held liable, for
any actions involving transferred Cryptocurrency after the initiation
of such E-Wallet to E-Wallet transfers. ...........................................................57
13.8    Time Bar to Cash Payments by Check ...........................................57
13.9    No Fractional Cents .....................................................................57
13.10   Setoffs and Recoupment ..............................................................58
13.11   Allocation of Plan Distributions Between Principal and Interest ..................58
13.12   Distributions After Effective Date ................................................58
13.13   Interest on Claims ......................................................................58
13.14   No Distribution in Excess of Allowed Amount of Claim ...................58
13.15   Payment of Taxes on Distributions Received Pursuant to the
        Combined Plan and Disclosure Statement ......................................58
13.16   Reserves ....................................................................................59
13.17   De Minimis Distributions ..............................................................59

Article  XIV. PROCEDURES FOR RESOLVING CONTINGENT,
              UNLIQUIDATED, AND DISPUTED CLAIMS ...............................59

14.1    Claims Administration Responsibilities...........................................59
14.2    Claims Objections .......................................................................60
14.3    Estimation of Claims....................................................................60
14.4    Adjustment to Claims Without Objection .......................................61
14.5    No Distributions Pending Allowance .............................................61
14.6    Distributions After Allowance ......................................................61
14.7    Disallowance of Certain Claims ...................................................61
14.8    Amendments to Claims.................................................................61
14.9    Claims Paid and Payable by Third Parties.....................................61

Article  XV. EXECUTORY CONTRACTS AND LEASES ...........................62

15.1    Executory Contracts and Unexpired Leases Deemed Rejected...........62
15.2    Bar Date For Rejection Damages .................................................62

Article  XVI. CONDITIONS PRECEDENT TO THE CONFIRMATION AND THE
              EFFECTIVE DATE ...................................................................63

16.1    Conditions Precedent to Confirmation of the Combined Plan and
        Disclosure Statement ..................................................................63
16.2    Conditions Precedent to the Effective Date .....................................63
16.3    Waiver of Conditions Precedent to the Effective Date .....................64
16.4    Satisfaction of Conditions ...........................................................64

-iii-

CRED_EXAMINER_00002178

**Article XVII. EFFECT OF CONFIRMATION**................................................................**64**

17.1   Compromise and Settlement of Claims, Equity Interests, and
       Controversies.......................................................................................**64**
17.2   Binding Effect.......................................................................................**65**
17.3   Reservation of Causes of Action/Reservation of Rights ...................**65**

**Article XVIII. EXCULPATION, INJUNCTION, AND RELATED PROVISIONS ...........65**

18.1   Exculpation ...........................................................................................**65**
18.2   Releases by Debtors, the Estates, the Liquidation Trust, and the
       Liquidation Trustee; Third Party Releases ........................................**66**
18.3   Avoidance Actions/Objections .............................................................**67**
18.4   Injunction ..............................................................................................**67**
18.5   Terms of Stays and Injunctions ..........................................................**68**

**Article XIX. RETENTION OF JURISDICTION** ...........................................................**68**

**Article XX. MISCELLANEOUS PROVISIONS** ..............................................................**69**

20.1   Effectuating Documents and Further Transactions ...........................**69**
20.2   Date of Distributions and Other Actions ...........................................**70**
20.3   Withholding and Reporting Requirements .........................................**70**
20.4   Corporate Action .................................................................................**70**
20.5   Modification of the Combined Plan and Disclosure Statement.........**70**
20.6   Revocation or Withdrawal of the Combined Plan and Disclosure
       Statement .............................................................................................**71**
20.7   Plan Supplement ..................................................................................**71**
20.8   Payment of Statutory Fees .................................................................**71**
20.9   Dissolution of the Committee ..............................................................**72**
20.10  Continued Confidentiality Obligations ...............................................**72**
20.11  Exemption from Transfer Taxes .........................................................**72**
20.12  Expedited Tax Determination..............................................................**72**
20.13  Exhibits/Schedules ...............................................................................**72**
20.14  Substantial Consummation ..................................................................**72**
20.15  Severability of Combined Plan and Disclosure Statement Provisions............**73**
20.16  Governing Law......................................................................................**73**
20.17  Reservation of Rights............................................................................**73**
20.18  Computation of Time............................................................................**73**
20.19  Post-Confirmation Reporting ..............................................................**73**
20.20  Notices ...................................................................................................**74**

CRED_EXAMINER_00002179

## NOTICE

THE INFORMATION CONTAINED HEREIN IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE COMBINED JOINT PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT OF CRED INC. AND ITS SUBSIDIARIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT, REGARDING THE COMBINED PLAN AND DISCLOSURE STATEMENT OR THE SOLICITATION OF ACCEPTANCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT.  THIS COMBINED PLAN AND DISCLOSURE STATEMENT WAS SUBSTANTIALLY COMPILED FROM THE DEBTORS' BOOKS AND RECORDS TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF.

UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF.  THE DELIVERY OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS COMBINED PLAN AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER RULES GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11 OF THE BANKRUPTCY CODE.  NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN.

**THIS COMBINED PLAN AND DISCLOSURE STATEMENT PROVIDES FOR THE SUBSTANTIVE CONSOLIDATION OF THE ASSETS AND LIABILITIES OF THE DEBTORS FOR CERTAIN PURPOSES AND CONTEMPLATES THE APPOINTMENT OF A LIQUIDATION TRUSTEE TO WIND-DOWN THE DEBTORS' ESTATES.**

NO REPRESENTATION CONCERNING THE DEBTORS OR THE VALUE OF THE DEBTORS' ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS ARE NOT RESPONSIBLE FOR ANY INFORMATION,

CRED_EXAMINER_00002180

REPRESENTATION OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN OR INCONSISTENT WITH INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.  CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.  HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

**FOR EASE OF REFERENCE ONLY, AND WITH CERTAIN EXCEPTIONS, ARTICLE I THROUGH ARTICLE VI HEREIN GENERALLY CONTAIN THE DISCLOSURE STATEMENT PROVISIONS AND ARTICLE VII THROUGH ARTICLE XX HEREIN GENERALLY CONTAIN THE PLAN PROVISIONS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

CRED_EXAMINER_00002181

## INTRODUCTION

The Debtors in these Chapter 11 Cases hereby propose their Combined Plan and Disclosure Statement pursuant to sections 1125 and 1129 of the Bankruptcy Code. The Debtors are the proponents of the Combined Plan and Disclosure Statement within the meaning of section 1129 of the Bankruptcy Code. Capitalized terms used and not otherwise defined herein have the meanings ascribed to such terms in Article I hereof.

The Combined Plan and Disclosure Statement constitutes a liquidating Chapter 11 plan for the Debtors and provides for Distribution of the Debtors' Assets already liquidated or to be liquidated over time to Holders of Allowed Claims in accordance with the terms of the Combined Plan and Disclosure Statement and the priority provisions of the Bankruptcy Code. The Combined Plan and Disclosure Statement contemplates the appointment of a Liquidation Trustee to implement the terms of the Combined Plan and Disclosure Statement and make Distributions in accordance with its terms. Except as otherwise provided by Order of the Bankruptcy Court, Distributions will occur at various intervals after the Effective Date as determined by the Liquidation Trustee.

Since the Petition Date, the Debtors and their professionals have worked tirelessly to develop a plan that would maximize the value of the Debtors' Estates for the benefit of creditors and minimize the amount of time spent in chapter 11. After a thorough analysis of potential restructuring alternatives and extensive negotiation with the Committee, the Debtors reached a global settlement with the Committee that is embodied in the Combined Plan and Disclosure Statement.

The Debtors believe that the Combined Plan and Disclosure Statement presents the best path forward and is in the best interests of the Debtors, their Creditors, and all parties in interest. The Combined Plan and Disclosure Statement is premised on the creation of the Liquidation Trust, which will succeed to all rights, interests and property of the Debtors, and to which the Debtors will transfer their Assets, including proceeds from any pre-Effective Date sales, the Debtors' Cryptocurrency, and Causes of Action of the Debtors' Estates (other than Causes of Action that are being released under the Combined Plan and Disclosure Statement). The Liquidation Trustee, who will be selected by members of the Committee, will be tasked with, among other things, monetizing the Debtors' remaining Assets and making Distributions to Holders of Allowed General Unsecured Claims in Class 4 and Holders of Convenience Claims in Class 5. **The Debtors believe that the Plan is in the best interest of the Debtors' Estates and all stakeholders, and recommend that all Holders of Claims entitled to vote, vote in favor of the Plan.**

**The Combined Plan and Disclosure Statement provides for limited substantive consolidation of the Assets and Liabilities of the Debtors. Accordingly, for purposes of the Combined Plan and Disclosure Statement only, the Assets and Liabilities of the Debtors are treated as the Assets and Liabilities of a single substantively consolidated entity. Claims filed against multiple Debtors seeking recovery of the same debt shall be treated as a single, non-aggregated Claim against the consolidated Estates to the extent that such Claim is an Allowed Claim.**

CRED_EXAMINER_00002182

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors expressly reserve the right to alter, amend or modify the Combined Plan and Disclosure Statement one or more times before substantial consummation thereof.

CRED_EXAMINER_00002183

## ARTICLE I.
## DEFINED TERMS

**1.1**    **"A/P/S Claim"** means any Claim that is an Administrative Expense Claim, Other Priority Claim, Priority Tax Claim, or Secured Claim.

**1.2**    **"Adequate Protection Claims"** means rights to adequate protection arising under sections 361, 363, and 364 of the Bankruptcy Code to the extent granted under the DIP Orders.

**1.3**    **"Administrative Expense Claim"** means any claim (including, but not limited to, Professional Fee Claims) for costs and expenses of administration of the Chapter 11 Cases that is entitled to priority pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code; provided, however, that any fees or charges assessed against the Debtors' Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930 are excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section 20.8 hereof.

**1.4**    **"Administrative Expense Claims Bar Date"** means the date as set forth in Section 9.1(b) hereof.

**1.5**    **"Affiliate"** has the meaning set forth in section 101(2) of the Bankruptcy Code.

**1.6**    **"Allowed"** means, with reference to any Claim against the Debtors (including any Administrative Expense Claim) or portion thereof, (a) any Claim that has been listed by the Debtors in the Schedules (as such Schedules may be amended by the Debtors or the Liquidation Trustee from time to time in accordance with Bankruptcy Rule 1009) as liquidated in amount other than zero or unknown and not Disputed or Contingent, and for which no Proof of Claim has been filed, (b) any timely filed Proof of Claim or request for payment of Administrative Expense Claim, as to which no objection to the allowance thereof, or action to subordinate, avoid, classify, reclassify, expunge, estimate, or otherwise limit recovery with respect thereto, has been filed within the applicable period of limitation fixed by the Combined Plan and Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, and which applicable period of limitations has expired, (c) any Claim expressly allowed by a Final Order or under the Combined Plan and Disclosure Statement, or (d) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to the Liquidation Trustee under Section 14.1 hereof and the Liquidation Trust Agreement; provided, however, that Claims temporarily allowed solely for the purpose of voting to accept or reject the Combined Plan and Disclosure Statement pursuant to an order of the Bankruptcy Court shall not be considered Allowed Claims; provided, further, that any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code shall not be considered an Allowed Claim.

**1.7**    **"Applicable Cryptocurrency"** means, with respect to any Holder of a Customer Claim, the Cryptocurrency or Cryptocurrencies used by such Holder in its Cryptocurrency Transactions with each applicable Debtor.  To the extent a Customer engaged in Cryptocurrency Transactions involving more than one form of Cryptocurrency, the amount and denomination of Applicable Cryptocurrency for each Equivalent Cryptocurrency Distribution shall be determined based on the Applicable Cryptocurrency Ratio.

**1.8** **"Applicable Cryptocurrency Ratio"** means, with respect to a denomination of Cryptocurrency used by a Holder of a Customer Claim in a Cryptocurrency Transaction, the ratio, expressed as a percentage, of (x) the Dollar Denominated Value of such Cryptocurrency to (y) the Dollar Denominated Value of all Cryptocurrencies used by such Holder in all of its Cryptocurrency Transactions. For example, if a Holder of a Customer Claim engaged in Cryptocurrency Transactions involving Peercoin valued at $1,000 as of the Petition Date and Vertcoin valued at $4,000 as of the Petition Date, the Applicable Cryptocurrency Ratio for Peercoin would be 20%, and the Applicable Cryptocurrency Ratio for Vertcoin would be 80%.

**1.9** **"Assets"** means the assets of each of the Debtors, of any nature whatsoever, including all property of the Estates under and pursuant to section 541 of the Bankruptcy Code, Cash, Causes of Action, rights, interests and property, real and personal, tangible and intangible, including all files, books and records of the Estates.

**1.10** **"Auction"** means the competitive bidding process in relation to the sale of the Debtors' assets, conducted pursuant to the Bid Procedures Order.

**1.11** **"Avoidance Actions"** means any and all avoidance, recovery, subordination, or other actions or remedies that may be brought on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502(d), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, and/or 553 of the Bankruptcy Code.

**1.12** **"Ballot"** means the form distributed to each Holder of an Impaired Claim or Equity Interest that is entitled to vote to accept or reject the Combined Plan and Disclosure Statement on which is to be indicated an acceptance or rejection of the Combined Plan and Disclosure Statement.

**1.13** **"Bankruptcy Code"** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**1.14** **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware.

**1.15** **"Bankruptcy Rules"** means (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and the Local Bankruptcy Rules, as amended from time, (ii) the applicable Federal Rules of Civil Procedure, as amended and promulgated under section 2072 of title 28 of the United States Code, (iii) the applicable Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, and (iv) any standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case or proceedings therein, as the case may be.

**1.16** **"Bar Date"** means (i) February 10, 2021, at 5:00 p.m. (prevailing Eastern Time) and (ii) such other date(s) fixed by order(s) of the Bankruptcy Court, by which all Entities, including

2

Governmental Units, asserting a Claim against any Debtor must have filed a Proof of Claim against such Debtor or be forever barred from asserting such Claim in the Chapter 11 Cases.

**1.17** "**Bid Procedures Order**" means the order of the Bankruptcy Court, dated December 21, 2020 [Docket No. 270], setting forth the procedures for competitive bidding for the Sale Transaction, as amended or supplemented from time to time.

**1.18** "**Business Day**" means any day, other than a Saturday, Sunday, or a legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

**1.19** "**Cash**" **or** "**$**" means the legal tender of the United States of America, including any wire transfer or instrument negotiable for legal tender of the United States of America.

**1.20** "**Causes of Action**" means all claims, actions, causes of action, third-party claims, counterclaims, crossclaims, third-party claims, contribution claims, or any other claims whatsoever (including any Causes of Action described herein) of the Debtors and/or their Estates that may be pending on the Effective Date (including all such Causes of Action brought by the Committee pursuant to the Plan Support Agreement) or instituted after the Effective Date against any Entity based in law, equity, or otherwise, including under the Bankruptcy Code, whether known or unknown, whether direct, indirect, derivative, or otherwise, and whether asserted or unasserted as of the date of entry of the Confirmation Order, including Avoidance Actions.

**1.21** "**Causes of Action List**" means the non-exclusive list of Causes of Action attached hereto as **Exhibit A**.

**1.22** "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court and jointly administered under Case No. 20-12836 (JTD).

**1.23** "**Claim**" means any right to payment from the Debtors, from property of the Debtors or from the Debtors' Estates, whether or not such right is reduced to judgment, liquidated, Unliquidated, fixed, Contingent, matured, unmatured, Disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown, or asserted; or any right to an equitable remedy for breach of performance by the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, Contingent, matured, unmatured, Disputed, undisputed, secured, or unsecured.

**1.24** "**Claim Objection**" means any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate, or estimate any Claim (including the resolution of any request for payment of any Administrative Expense Claim).

**1.25** "**Claims Agent**" means the Debtors' claims agent, Donlin, Recano & Company, Inc., or its successors and assigns.

**1.26** "**Claims Register**" means the official register of Claims maintained by the Claims Agent.

3

CRED_EXAMINER_00002186

**1.27** **"Class"** means a category of Holders of Claims or Equity Interests set forth in Section 7.2 hereof.

**1.28** **"Clerk"** means the clerk of the Bankruptcy Court.

**1.29** **"Collateral"** means any property or interest in property of the Debtors' Estates subject to a Lien, charge, right of setoff, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

**1.30** **"Combined Hearing"** means the hearing held by the Bankruptcy Court to consider (i) final approval of the Combined Plan and Disclosure Statement as providing information pursuant to section 1125 of the Bankruptcy Code and (ii) pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Combined Plan and Disclosure Statement, as such hearing may be adjourned or continued from time to time.

**1.31** **"Combined Hearing Notice"** has the meaning set forth in Section 8.3(d).

**1.32** **"Combined Plan and Disclosure Statement"** means this combined disclosure statement and chapter 11 plan of liquidation, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

**1.33** **"Committee"** means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

**1.34** **"Confirmation Date"** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the Docket.

**1.35** **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code.

**1.36** **"Consummation"** means the occurrence of the Effective Date.

**1.37** **"Contingent"** means, with reference to a Claim, a Claim the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened, or been triggered as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the Holder of such Claim and whether or not a relationship between the Holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

**1.38** **"Convenience Claim"** means a Claim, subject to Section 13.1 hereof, against one or more of the Debtors that would otherwise be a General Unsecured Claim that (a) was scheduled or filed on or prior to the Bar Date in an amount less than or equal to $1,000 or (b) is in an amount that has been reduced to $1,000 pursuant to a Convenience Class Election made by the Holder of such Claim; provided, however, that: (i) where any portion(s) of a Claim has been transferred on or after the Petition Date, any transferred portion(s) shall continue to be treated

4

CRED_EXAMINER_00002187

together with such Claim as a single Claim for purposes of determining whether such Claim qualifies as a Convenience Claim; and (ii) any General Unsecured Claim that was originally Allowed in excess of $1,000 may not be subdivided into multiple General Unsecured Claims of $1,000 or less for purposes of receiving treatment as a Convenience Claim.

**1.39**    **"Convenience Class Election"** means an irrevocable election made on the Ballot by the Holder of a Claim against the Debtors that would otherwise be a General Unsecured Claim in an amount greater than $1,000 to reduce such Claim to $1,000 in order to be treated as a Convenience Claim.  Subject to the occurrence of the Effective Date, such election shall be deemed to amend such General Unsecured Claim to reduce the amount of such Claim to $1,000.

**1.40**    **"Convertible Notes"** means those certain convertible notes issued by Cred in August and September 2020 in the amount of approximately $2.6 million, bearing interest at a rate of 3% per annum and that were scheduled to mature 48 months after issuance.

**1.41**    **"Cred"** means Cred Inc.

**1.42**    **"Cred Capital"** means Cred Capital, Inc.

**1.43**    **"Creditor"** means any Entity that is the Holder of a Claim against a Debtor.

**1.44**    **"Cryptocurrency"** means any digital asset that is not backed by a government.  The term "cryptocurrency" is to be interpreted broadly to include all forms of digital assets, virtual currency, cryptocurrency, tokens, security tokens, utility tokens and stablecoins.  This includes bitcoin, ether, LBA tokens, Peercoin, Vertcoin, any ERC-20 compliant token, any altcoin, and any other cryptocurrency.

**1.45**    **"Cryptocurrency Election"** means the election of any Holder of a Customer Claim to receive its Distribution in the Cryptocurrency utilized by such Holder in its Cryptocurrency Transaction(s) with the Debtors, which election was made on a Proof of Claim timely submitted by such Holder.

**1.46**    **"Cryptocurrency Election E-Wallet Address"** means the E-Wallet alphanumerical sequence provided by Holders of Claims that make a Cryptocurrency Election.

**1.47**    **"Cryptocurrency Transaction"** means a prepetition transaction involving any transfer by an Entity of Cryptocurrency to the Debtors, whether directly or indirectly.

**1.48**    **"Customer"** means an Entity that engaged in a Cryptocurrency Transaction with one or more of the Debtors.

**1.49**    **"Customer Claim"** means a General Unsecured Claim and/or an Other Secured Claim of a Customer arising from a Cryptocurrency Transaction.

**1.50**    **"De Minimis Distribution"** means a Distribution to be made in accordance with the terms of this Combined Plan and Disclosure Statement that is $25.00 or less.

5

CRED_EXAMINER_00002188

**1.51** **"Debtors"** means each of Cred, Cred (US) LLC, Cred Capital, Cred Merchant Solutions LLC, and Cred (Puerto Rico) LLC.

**1.52** **"Debtors-in-Possession"** means the Debtors in their capacity as debtors-in-possession in the Chapter 11 Cases under sections 1107(a) and 1108 of the Bankruptcy Code.

**1.53** **"Definitive Documents"** means the documents (including any related orders, agreements, instruments, schedules, or exhibits) that are necessary or desirable to implement or otherwise relate to the restructuring transaction, including, but not limited to: (a) the motion to approve the Debtors' entry into the Plan Support Agreement [Docket No. 279], (b) the order approving the Debtors' entry into the Plan Support Agreement [Docket No. ____], (c) all documents in connection with the Sale Transaction (including, without limitation, the sale agreement and order approving the sale), (d) the Combined Plan and Disclosure Statement (and all exhibits thereto), (e) the solicitation materials for the Combined Plan and Disclosure Statement; (f) the Disclosure Statement Order, (g) the Confirmation Order, (h) the Liquidation Trust Agreement; and (i) any other documents or exhibits related to or contemplated in the foregoing clauses (a) through (i), in each case in form and substance consistent with the Plan Support Agreement and reasonably acceptable to the Committee.

**1.54** **"DIP Financing Agreement"** means any future Senior Secured Super-Priority Debtor in Possession Credit Agreement, by and among the Debtors and any future lender,, as amended, restated, modified, supplemented, or replaced from time to time.

**1.55** **"DIP Financing Claim"** means a claim arising under the DIP Financing Agreement and the DIP Orders.

**1.56** **"DIP Orders"** means any Interim and/or Final Order approving the DIP Financing Agreement.

**1.57** **"Disallowed"** means, with reference to any Claim, (a) a Claim, or any portion thereof, that has been disallowed by a Final Order, (b) a Claim, or any portion thereof, that is expressly disallowed under the Combined Plan and Disclosure Statement, (c) a Claim listed in the Schedules as zero or as Disputed, Contingent, or unliquidated and in respect of which a Proof of Claim has not been timely filed or deemed timely filed pursuant to the Combined Plan and Disclosure Statement, the Bankruptcy Code, or any Final Order, notwithstanding anything in section 506(d) of the Bankruptcy Code to the contrary, (d) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code, (e) where the holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such Property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code, or (f) is for reimbursement or contribution that is contingent as of the time of allowance or disallowance of such claim.

**1.58** **"Disclosure Statement Order"** means the order of the Bankruptcy Court approving, among other things, on an interim basis, the adequacy of the disclosures contained herein

6

CRED_EXAMINER_00002189

pursuant to section 1125 of the Bankruptcy Code and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Combined Plan and Disclosure Statement, entered by the Bankruptcy Court on [_____].

**1.59** **"Disputed"** means, with reference to any Claim, a Claim, or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim.

**1.60** **"Distribution"** means a delivery of Cash and/or Cryptocurrency, as the case may be, by the Liquidation Trustee to the Holders of Allowed Claims pursuant to the Combined Plan and Disclosure Statement.

**1.61** **"Distribution Pro Rata Share"** means the ratio (expressed as a percentage) of (x) the amount of an Allowed General Unsecured Claim against the Debtors to (y) the aggregate amount of all (A) Allowed General Unsecured Claims against the Debtors on the date of a Distribution *plus* (B) the aggregate Disputed Claim amount of all remaining Disputed General Unsecured Claims against the Debtors.

**1.62** **"Docket"** means the docket in the Chapter 11 Cases maintained by the Clerk.

**1.63** **"Dollar Denominated Value"** means, with reference to any form of Cryptocurrency, the value of such Cryptocurrency determined in lawful currency of the United States as of the Petition Date.

**1.64** **"E-Wallet"** means digital Cryptocurrency storage platforms that allow end-users to manage and store Cryptocurrency.

**1.65** **"Effective Date"** means a Business Day selected by the Debtors, after consultation with the Committee, on or after the Confirmation Date, on which (a) no stay of the Confirmation Order is in effect and (b) the conditions precedent to the effectiveness of the Combined Plan and Disclosure Statement specified in Section 16.2 hereof shall have been satisfied or waived as provided in Section 16.3 hereof.

**1.66** **"Entity"** has the meaning set forth in section 101(15) of the Bankruptcy Code.

**1.67** **"Equity Interest"** means, as of the Petition Date, any capital stock or other ownership interest in the Debtors, whether or not transferable, and any option, call, warrant or right to purchase, sell or subscribe for an ownership interest or other equity security in any of the Debtors.

**1.68** **"Equivalent Cryptocurrency Distribution"** means, with respect to any Holder of a Customer Claim that has made a Cryptocurrency Election, a Distribution in the Applicable Cryptocurrency equal in value (as of the applicable Distribution date) to such Holder's Distribution Pro Rata Share, reduced by the actual transaction costs and fees associated with making such Distribution in the Applicable Cryptocurrency. To the extent a Customer engaged in Cryptocurrency Transactions involving more than one Cryptocurrency, the amount and denomination of Applicable Cryptocurrency for each Equivalent Cryptocurrency Distribution shall be determined by multiplying the value (as of the applicable Distribution date) of such Holder's Distribution Pro Rata Share by the Applicable Cryptocurrency Ratios.

7

CRED_EXAMINER_00002190

**1.69**   **"Estate"** means the estate of the Debtors in the Chapter 11 Cases that was created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

**1.70**   **"Examiner"** means the examiner appointed by the U.S. Trustee on January 7, 2021, pursuant to the *Order Approving Appointment of Examiner* [Docket No. 338], and in accordance with that certain *Order Denying in Part, and Granting in Part, the Trustee/Examiner Motions* [Docket No. 281].

**1.71**   **"Excluded Assets"** means the Assets that were excluded from a Sale Transaction.

**1.72**   **"Exculpation Parties"** has the meaning set forth in Section 12.3(k) hereof.

**1.73**   **"Executory Contract"** means a contract to which one or more of the Debtors are party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

**1.74**   **"File, Filed, or Filing"** means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Cases.

**1.75**   **"Final Order"** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending or, (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 9024 of the Federal Rules of Bankruptcy Procedure, or any applicable analogous rule, may be (but has not been) filed relating to such order shall not prevent such order from being a Final Order.

**1.76**   **"General Unsecured Claim"** means any Claim other than an Administrative Expense Claim, Convenience Claim, DIP Financing Claim, Intercompany Claim, Other Priority Claim, Other Secured Claim, Priority Tax Claim, Professional Fee Claim, Secured Tax Claim, Subordinated Securities Claim, or Equity Interest.  For the avoidance of doubt, (a) any Customer Claim is a General Unsecured Claim to the extent that is not secured by a valid and enforceable right of setoff under section 553 of the Bankruptcy Code or for any portion that is in excess of any such right of setoff and (b) a claim for principal and accrued interest on account of the Convertible Notes is a General Unsecured Claim.

**1.77**   **"Governmental Unit"** has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

**1.78**   **"Holder"** means an Entity holding a Claim or an Equity Interest, as applicable. "Hold" and "Held" shall have the correlative meanings.

8

CRED_EXAMINER_00002191

**1.79** **"Impaired"** means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

**1.80** **"Imposter"** has the meaning set forth in Section 3.3(d) hereof.

**1.81** **"Insider"** has the meaning set forth in section 101(31) of the Bankruptcy Code.

**1.82** **"Intercompany Claim"** means any Claim by a Debtor against another Debtor, subject to the limitations set forth in Section 12.1 hereof.

**1.83** **"IRS"** means the Internal Revenue Service.

**1.84** **"JST"** means JST Capital, LLC.

**1.85** **"Liabilities"** mean any and all costs, expenses, damages, losses, penalties, fines, judgments, Claims, Liens, obligations, demands, injuries, settlements, awards, fines, taxes, fees, indebtedness, or other liabilities of any nature, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, liquidated or Unliquidated, matured or not matured, Contingent or direct, whether arising at common law, in equity, or under any statute, based in whole or in part on any act or omission or other occurrence arising or taking place prior to the Effective Date.

**1.86** **"Lien"** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.87** **"Liquidation Trust"** means the liquidation trust established by the Combined Plan and Disclosure Statement and described in Section 12.3 hereof and in the Liquidation Trust Agreement.

**1.88** **"Liquidation Trust Agreement"** means the agreement establishing and delineating the terms and conditions of the Liquidation Trust and filed as part of the Plan Supplement.

**1.89** **"Liquidation Trust Assets"** means all of the Estates' Assets transferred to the Liquidation Trust pursuant to Section 12.3(c) hereof.

**1.90** **"Liquidation Trust Beneficiaries"** means the Holders of Allowed Claims that are entitled to receive Distributions pursuant to the terms of the Combined Plan and Disclosure Statement, whether or not such Claims are Allowed as of the Effective Date.

**1.91** **"Liquidation Trust Expenses"** means all actual and necessary costs and expenses incurred by the Liquidation Trust in connection with carrying out the obligations of the Liquidation Trust pursuant to the terms of the Combined Plan and Disclosure Statement and the Liquidation Trust Agreement.

**1.92** **"Liquidation Trustee"** means the Person who will be appointed to act as trustee of the Liquidation Trust in accordance with the terms of the Combined Plan and Disclosure Statement, the Confirmation Order, and the Liquidation Trust Agreement, or any successor appointed in accordance with the terms of the Combined Plan and Disclosure Statement and the Liquidation

CRED_EXAMINER_00002192

Trust Agreement. The identity of the Liquidation Trustee, as well as the terms of the compensation paid to the Liquidation Trustee, will be disclosed in the Plan Supplement.

**1.93** **"Litigation Proceeds"** means the proceeds from all Causes of Action pursued by or for the benefit of the Liquidation Trust (including any proceeds recovered by the Liquidation Trust from Avoidance Actions).

**1.94** **"Local Bankruptcy Rules"** means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

**1.95** **"moKredit"** means the Hong Kong-based entity founded by Lu Hua, which provides micro-loans to online gaming publisher sites through the provision of credit (in the form of gaming tokens) to video game enthusiasts.

**1.96** **"Net Asset Sale Proceeds"** means the proceeds from any Sale Transaction, after taking into account any related expenses and any post-closing adjustments.

**1.97** **"Net Distributable Assets"** means (a) the gross amount available from the liquidation of the Excluded Assets (including any Litigation Proceeds) plus (b) the amount of the Net Asset Sale Proceeds minus (c) (i) the amount of all Allowed A/P/S Claims Allowed against the Debtors, (ii) U.S. Trustee Fees, (iii) the Liquidation Trust Expenses, and (iv) Distributions to Holders of Allowed Convenience Claims.

**1.98** **"Opt-Out Election Form"** is the opt-out form, as approved in the Disclosure Statement Order, pursuant to which holders of claims or interests may elect to opt out of the third party release in accordance with Section 18.2 hereof.

**1.99** **"Other Priority Claim"** means any claim, other than an Administrative Expense Claim, Professional Fee Claim, or Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

**1.100** **"Other Secured Claim"** means any Secured Claim other than a Secured Tax Claim. For the avoidance of doubt, to the extent a Customer Claim is secured by a valid and enforceable right of setoff under section 553 of the Bankruptcy Code, such Customer Claim shall be an Other Secured Claim; *provided, however,* that any portion of a Customer Claim in excess of the amount secured by such a right of setoff shall be a General Unsecured Claim.

**1.101** **"Person"** shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

**1.102** **"Petition Date"** means November 7, 2020, the date on which the Debtors commenced the Chapter 11 Cases.

**1.103** **"Plan Supplement"** means the supplement or supplements to the Combined Plan and Disclosure Statement containing certain documents relevant to the implementation of the Combined Plan and Disclosure Statement, including the Liquidation Trust Agreement, the list of Executory Contracts and Unexpired Leases to be assumed pursuant to Section 15.1 hereof, and the DIP Financing Agreement, if any.

10

CRED_EXAMINER_00002193

**1.104** **"Plan Support Agreement"** means the binding term sheet executed by the Debtors and the Committee setting forth the material terms of a plan support agreement among such parties.

**1.105** **"Priority Tax Claim"** means any Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.106** **"Professional"** means any professional Person employed in the Chapter 11 Cases pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code pursuant to an Order of the Bankruptcy Court and to be compensated for services rendered pursuant to sections 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code.

**1.107** **"Professional Fee Claim"** means any claim of a Professional approved by the Bankruptcy Court for compensation, indemnification, or reimbursement of costs and expenses incurred on or before the Effective Date pursuant to sections 327, 328, 330, 331, 503(b), or 1103(a) of the Bankruptcy Code, plus any fees and expenses related to the final fee application of a Professional.

**1.108** **"Professional Fee Escrow"** means an escrow account to be established and funded on the Effective Date in an amount equal to the Professional Fee Reserve Amount in accordance with Section 9.2 hereof.

**1.109** **"Professional Fee Reserve Amount"** means the total amount of unpaid compensation and unreimbursed expenses incurred by Professionals retained by the Debtors or the Committee through and including the Effective Date, in case case as determined in good faith by the applicable Professional.

**1.110** **"Proof of Claim"** means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

**1.111** **"Rejection Bar Date"** means the deadline by which a counterparty to an Executory Contract or an Unexpired Lease of the Debtors rejected under the Combined Plan and Disclosure Statement must file a Proof of Claim for damages arising from such rejection by the Debtors of such Executory Contract or Unexpired Lease, which shall be thirty (30) calendar days after the Effective Date or such other deadline established for filing a Rejection Claim by a Final Order of the Bankruptcy Court; provided, however, that if an earlier rejection bar date was established by order of the Bankruptcy Court with respect to a rejected Executory Contract or Unexpired Lease, then such earlier rejection bar date shall apply.

**1.112** **"Rejection Claim"** means any Claim for damages as a result of the rejection under the Combined Plan and Disclosure Statement of any Executory Contract or Unexpired Lease. All Rejection Claims shall be treated as General Unsecured Claims under the Combined Plan and Disclosure Statement.

**1.113** **"Released Parties"** means the Professionals retained by the Debtors, Grant Lyon as the Debtors' independent director, Matthew Foster as the Debtors' chief restructuring officer, any other staff supplied by Sonoran Capital Advisors, LLC, the Professionals retained by the Committee, and the respective agents and representatives of each of the foregoing.

11

CRED_EXAMINER_00002194

**1.114  "Reserve"** has the meaning given to such term in Section 13.15 hereof.

**1.115  "Sale Motion"** means the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing and Approving Form and Manner of Notice Thereof, and (C) Approving Assumption and Assignment Procedures and Form and Manner of Notice Thereof; and (II) Authorizing (A) The Sale(s), Free and Clear of All Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. 65].

**1.116  "Sale Transaction"** means any sale of Assets of the Debtors prior to the Effective Date under section 363 of the Bankruptcy Code.

**1.117  "Schedules"** means, collectively, the schedules of Assets and Liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the official bankruptcy forms in the Chapter 11 Cases, as the same may have been amended or supplemented through the Confirmation Date pursuant to Bankruptcy Rules 1007 and 1009. For the avoidance of doubt, Schedules do not include any schedules or exhibits to the Combined Plan and Disclosure Statement or the Plan Supplement.

**1.118  "Secured Claim"** means any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

**1.119  "Secured Tax Claim"** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein and including any related Secured Claim for penalties).

**1.120  "Solicitation Package"** has the meaning set forth in Section 8.3(d) hereof.

**1.121  "Subordinated Securities Claim"** means any Claim arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such security, or for reimbursement or contribution Allowed under section 502 of the Bankruptcy Code on account of such a Claim.

**1.122  "Trust Advisory Board"** means the committee appointed pursuant to Section 12.3 hereof to oversee the activities of the Liquidation Trust and the Liquidation Trustee, consisting of each member of the Committee who wishes to continue in such role, and such additional members, if any, nominated by the Committee, as are required for the initial complement of the Trust Advisory Board to be an odd number greater than one.

**1.123  "U.S. Trustee"** means the Office of the United States Trustee for the District of Delaware.

**1.124  "U.S. Trustee Fees"** means fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

12

CRED_EXAMINER_00002195

**1.125** **"Unclassified Claim"** means any Claim that is an Administrative Expense Claim or a Priority Tax Claim.

**1.126** **"Unexpired Lease"** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

**1.127** **"Unimpaired"** means, with respect to a Claim or Equity Interest, that such Claim or Equity Interest is not Impaired as a result of being paid in full in Cash under the Combined Plan and Disclosure Statement.

**1.128** **"Unliquidated"** means with reference to a Claim, a Claim, the amount of Liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is asserted or sought to be estimated.

**1.129** **"Voting Agent"** has the meaning set forth in Section 8.3(c) hereof.

**1.130** **"Voting Deadline"** means _____ at 5:00 p.m. (prevailing Eastern Time).

**1.131** **"Voting Record Date"** has the meaning set forth in Section 8.3(b) hereof.

**1.132** **"Voting Report"** has the meaning set forth in Section 8.3(g) hereof.

## ARTICLE II.
## INTERPRETATION OF COMBINED PLAN AND DISCLOSURE STATEMENT

**2.1     Application of Definitions; Rules of Construction; Computation of Time**

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender. For purposes of the Combined Plan and Disclosure Statement, (a) any reference in the Combined Plan and Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (b) any reference in the Combined Plan and Disclosure Statement to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented and (c) unless otherwise specified, all references in the Combined Plan and Disclosure Statement to Sections, Articles, Schedules, and Exhibits are references to Sections, Articles, Schedules and Exhibits of or to the Combined Plan and Disclosure Statement. The words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to the Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection or clause contained in the Combined Plan and Disclosure Statement. A capitalized term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code or in the Exhibits hereto. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Combined Plan and Disclosure Statement. The headings in the Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions of the Combined Plan and Disclosure Statement. Unless otherwise indicated herein, all references to dollars means United

13

CRED_EXAMINER_00002196

States dollars.   In computing any period of time prescribed or allowed by the Combined Plan and Disclosure Statement, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006 shall apply.

**2.2    Relief Sought by Filing the Combined Plan and Disclosure Statement**

The filing of the Combined Plan and Disclosure Statement constitutes, among other things, a motion by the Debtors pursuant to Bankruptcy Rules 9019 to approve the settlements and comprises set forth in Section 12.2 hereof, and for limited substantive consolidation of the Debtors' Estates, as set forth in Section 12.1 hereof.

**ARTICLE III.**
**BACKGROUND – THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW**

**3.1    General Background – Overview of the Debtors**

The Debtors were founded in 2018 by Lu Hua and Dan Schatt.  Prior to the Petition Date, the Debtors operated a global financial services platform serving retail and institutional clients in 183 countries.  The Debtors, which are lenders, utilized financial technology to provide business and retail credit and to allow Customers to earn a yield on more than 15 Cryptocurrencies and fiat currencies through the Debtors' partner network.  As of the Petition Date, the Debtors employed a staff of approximately 20 employees, consisting primarily of software and technology engineers.

As part of the Debtors' businesses, Customers transferred Cryptocurrency to the Debtors, generally pursuant to a loan agreement or a financing agreement.[2]  The Debtors then utilized the Cryptocurrency in a variety of investment strategies involving third-party asset managers.  The Debtors earned revenue through the returns generated by their investments, as well as through interest on lines of credit extended to certain of the Debtors' Customers in connection with the loans and financings referenced above.

The Debtors' business consisted of two key components: (a) the transfer of Cryptocurrency or other assets by Customers to the Debtors and the investment of those assets in order to earn returns ("CredEarn"); and (b) lending by the Debtors to certain Customers ("CredBorrow").

The Debtors' CredEarn business involved the transfer of Cryptocurrency from Customers to the Debtors, generally pursuant to a loan or financing agreement.  The Debtors then invested the Cryptocurrency with third-party asset managers or lenders to generate returns.  Such investments could take the form of (a) the Debtors directly providing Cryptocurrencies to asset managers or (b) the Debtors converting Cryptocurrencies into other Cryptocurrencies or fiat currencies and providing the proceeds thereof to asset managers or lenders.  The Debtors earned revenue through the returns generated by these investments.

---

[2]    Shortly before the Petition Date, the Debtors began using contracts to "rent" Cryptocurrency from Customers. As of the Petition Date, rental contracts accounted for less than 1% of the Debtors' Customer contracts.

CRED_EXAMINER_00002197

The Debtors' obligations to Customers were repaid, with interest, as set forth in the relevant Customer's contract. Generally, Customers who transferred Cryptocurrency to the Debtors were entitled to receive their principal and interest back in the type of Cryptocurrency the Customers transferred to the Debtors. Because the Debtors' business model was premised on generating a return for Customers by investing the deposited Cryptocurrencies with asset managers, the Debtors generally did not themselves hold significant amounts of Cryptocurrency. When Customers terminated accounts with the Debtors, the Debtors generally had to withdraw Cryptocurrency from asset managers to purchase new Cryptocurrency in the open market at then-prevailing prices in order to repay Customers

Generally, the CredBorrow program was only available to the Debtors' domestic Customers. Under the CredBorrow program, Customers were generally permitted to borrow against Cryptocurrency or other assets that they transferred to the Debtors, and were obligated to make periodic repayments as specified in the relevant Customer's contract. The Debtors earned revenue on CredBorrow contracts through interest and fees assessed on Customers' borrowings.

## 3.2    The Debtors' Prepetition Capital Structure

As of the Petition Date, the former book value of the Debtors' total Assets was approximately $69 million. Book value is generally computed in accordance with various accounting pronouncements and may not (and in the case of the Debtors, likely does not) correlate to fair value of any Asset or the enterprise value of the Debtors as a whole. Moreover, the Debtors have not conducted the impairment analysis which would be required under GAAP for such former book value to be considered a current and reliable book value. Such impairment analysis would likely result in a book value significantly less than the former book value referred to above.

The Debtors have not issued any secured debt. In August and September 2020, Cred issued the Convertible Notes. As of the Petition Date, approximately $2.6 million (which includes accrued interest) remained outstanding on the Convertible Notes. Other than the Convertible Notes, the Debtors do not have any outstanding funded indebtedness.

As of the Petition Date, the Debtors' Liabilities to Customers were in excess of $160 million.

## 3.3    Events Leading to the Chapter 11 Cases

(a)    JST Transactions

The Debtors maintained accounts with JST. Through JST, the Debtors held substantial "long" futures positions on bitcoin and other Cryptocurrencies, which included margin holdings. In addition, the Debtors' contracts with JST included certain "stop positions," whereby when the price of a Cryptocurrency dropped below a certain threshold, JST sold the Cryptocurrency. These stop positions are referred to as "stop loss sale orders."

In March 2020, the drop in bitcoin prices (and other Cryptocurrency prices) triggered the Debtors' stop loss sale orders, which had the effect of: (i) "locking in" losses on the sale of bitcoin; and (ii) eliminated the Debtors' margin on bitcoin and other Cryptocurrencies. As a

15

CRED_EXAMINER_00002198

result, the Debtors acquired new Cryptocurrencies at substantially higher prices, which had a material negative effect on the Debtors' liquidity.

As described in greater detail below, following the losses with JST, the Debtors sought and obtained a 300 bitcoin capital contribution from Lu Hua.

(b)    Over-Exposure on Loans Made to moKredit

In late 2018, Cred started making loans to moKredit – an entity founded by Cred co-founder Lu Hua – under that certain Loan and Security Agreement dated December 27, 2018, by and between moKredit Technology (Hong Kong) Company Limited, a Hong Kong company, and moKredit, Inc., an exempted company incorporated in the Cayman Islands with limited liability, as borrowers, and Cred, as lender. It is the Debtors understanding that under the Loan and Security Agreement, Cred extended moKredit a $100 million line of credit. The Debtors believe that as security for the line of credit, Cred received a security interest in substantially all of moKredit's personal property.[3] Cred has not taken any affirmative steps to perfects its security interest in this collateral.

By 2019, the Debtors' primary revenue generator was its relationship with moKredit. At one point, moKredit had drawn approximately $70 million on the line of credit. As of the Petition Date, the amount of the Debtors' outstanding loans with moKredit was approximately $39 million.

As a result of the Debtors' JST losses in March 2020, the Debtors undertook an effort to recover principal from moKredit and reestablish their hedging positions to protect against Cryptocurrency price fluctuations. That effort failed because of the restrictions imposed by the Chinese government in response to the COVID-19 pandemic. Due to the restrictions, moKredit could not meet its obligations under the Loan and Security Agreement, and was only able to return $300,000 of principal to the Debtors over the course of March and April, 2020. In May 2020, moKredit renegotiated its repayment schedule, whereby it would continue making approximately $582,000 per month in interest payments.

(c)    Cred Capital Problems

In March 2020, the Debtors directed the then-Chief Capital Officer, James Alexander, to incorporate Cred Capital as a Delaware entity to be controlled by Cred for the purposes of: (a)

---

[3]    Cred's security interest covered "[a]ll accounts, chattel paper, instruments, deposit accounts, letter of credit rights, and general intangibles related thereto; and all returned or repossessed goods which, on sale or lease, resulted in an account, including all Customer Loans and [moKredit's] rights related thereto", "[a]ll inventory", "[a]ll equipment and fixtures now owned or hereafter acquired by [moKredit]", "[a]ll of [moKredit's] deposit accounts with Cred", "[a]ll instruments, chattel paper, documents, certificates of deposit, securities (including equity interests) and investment property of every type", "[a]ll general intangibles" including "all goodwill connected with or symbolized by any of such intangibles", "[a]ll negotiable or nonnegotiable documents of title covering any Collateral", "[a]ll accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral", "[a]ll substitutes or replacements for any Collateral, all cash or non-cash proceeds (including insurance proceeds), products, rents and profits of the Collateral, and all income, benefits and property receivable on account of the Collateral, and all supporting obligations covering any Collateral", "[a]ll books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm, or electronic media, including but not limited to any computer-readable memory and any computer software necessary to process such memory".

16

CRED_EXAMINER_00002199

creating a vehicle to assist the Debtors with arranging bond offerings for companies in need of capital; and (b) overseeing the Debtors' asset management strategies. Cred also transferred the 300 bitcoin capital contribution made by Lu Hua to Cred Capital to provide the Debtors with a natural hedge against rising bitcoin prices.

Based on the Debtors' understanding, these plans were derailed, however, when Mr. Alexander attempted to take control of Cred Capital away from its corporate parent, Cred, and used Cred Capital's assets for his personal benefit. Mr. Alexander attempted to take control of Cred Capital by: (i) installing himself as its sole director; (ii) assigning only Class B, non-voting shares to Cred (instead of voting shares); and (iii) assigning Class A voting shares to a purported third-party "investor" who Mr. Alexander contends gave him a proxy to control the voting shares.

Neither Cred nor Cred Capital ever received any capital contribution from this so-called "investor." In addition, Mr. Alexander did not use the 300 bitcoin to establish hedging positions as he had been instructed to do, but instead used a portion of these funds to make a series of vendor payments.

When Cred became aware of Mr. Alexander's actions, Cred terminated his employment and took corrective action under Delaware law to re-file Cred Capital's charter and appoint a board of directors.

Thereafter, Cred discovered that Mr. Alexander absconded with 225 of the 300 bitcoin (valued at approximately $6 million as of December 31, 2020). Despite the Debtors' demands, Mr. Alexander has refused to return the bitcoin to the Debtors.

The foregoing events spawned significant litigation against Mr. Alexander, including, California state court litigation seeking, among other things, injunctive relief, compensatory and punitive damages, breaches of contract, and breach of the implied covenant of good faith and fair dealing.[4] Moreover, as described in greater detail below, after the Petition Date, certain of the Debtors initiated an adversary proceeding against Mr. Alexander seeking turnover of the misappropriated and improperly retained Assets.[5]

After the Petition Date, the Debtors also filed a notice of removal with the California state court. The Debtors are in the process of transferring the California state court litigation to the Bankruptcy Court.

(d)    Theft of Bitcoin by an Imposter

In August 2020, the Debtors discovered that they had been the victims of a social engineering scheme that resulted in the theft of 800 bitcoin (valued at approximately $10 million as of October 2020).

---

[4]    Case No. 20-CIV-02915, Superior Court of the State of California; County of San Mateo, Southern Branch.

[5]    Adv. Pro. No. 20-51006.

CRED_EXAMINER_00002200

In February 2020, Mr. Alexander informed the Debtors' of a potential investment opportunity with an entity that purported to be Quantcoin (the "Imposter"). Based on Mr. Alexander's representations and purported due diligence, Mr. Alexander was given permission to hire the Imposter to manage a portion of the Debtors' bitcoin.

In a series of transactions in February and April 2020, Mr. Alexander directed the transfer of a total of 800 bitcoin to the Imposter. After transferring the bitcoin, an administrator purporting to be Scott Foster with Kingdom Trust Company, a Cryptocurrency custodian ("Kingdom Trust"), was in contact with the Debtors regarding their 800 bitcoin. Initially, the alleged Mr. Foster provided what appeared to be performance updates to the Debtors on a monthly basis.

It is the Debtors' understanding that the fraudulent scheme came to light when the Debtors requested a withdrawal of $2 million from their account with the Imposter and the Imposter ceased responding to e-mails. The Debtors then contacted Kingdom Trust directly to inquire as to a monthly statement and learned that the Debtors not only did not have accounts at Kingdom Trust, but the e-mail address associated with Mr. Foster was fake.

Upon learning of the deception, the Debtors promptly contacted the pertinent law enforcement agency, which initiated an investigation into the matter. However, as of [December 31, 2020], the Debtors have yet to recover any of the stolen bitcoin.

In addition, in late November 2020, the Debtors served notices to more than 20 Cryptocurrency exchanges advising them of the theft or conversion of the Debtors' Cryptocurrency Assets. In such notices, the Debtors identified the relevant E-Wallets (both with respect to the theft by the Imposter and the misappropriation by Mr. Alexander) and requested that the exchanges freeze any accounts that may contain property of the Debtors.

(e)    Claims Against Mr. Inamullah

Several of the foregoing events are also attributable to, or were facilitated by, the Debtors' former Vice President of Capital Markets, Mr. Daniyal Inamullah, who was hired by the Debtors in December 2019. Mr. Inamullah was the primary person responsible for identifying potential investment opportunities, performing due diligence with respect to such opportunities, and producing reports and proposals to the Debtors with respect to potential investments. Accordingly, Mr. Inamullah's duties necessarily included verifying the accuracy of information provided to the Debtors with respect to their investment portfolio.

The Debtors believe that Mr. Inamullah failed at his responsibilities. For example: (i) Mr. Inamullah admitted in sworn testimony that he never conducted any due diligence with respect to the Imposter transactions; (ii) Mr. Inamullah contributed to Mr. Alexander's misappropriation of bitcoin by both initiating and authorizing the transfer of bitcoin into Mr. Alexander's personal E-Wallets; and (iii) violating the Debtors' security protocols, which were instituted by Mr. Inamullah.

Accordingly, the Debtors believe that they have multiple claims and causes of action against Mr. Inamullah, including, without limitation, breach of the duty of care, breach of the duty of loyalty, and civil conspiracy.

18

CRED_EXAMINER_00002201

(f)    Customer Loss and Adverse Market Conditions

Negative press in connection with the Imposter transactions, Mr. Alexander's conduct, and the Debtors' worsening financial condition resulted in (i) certain of the Debtors' core partners to close their accounts with the Debtors and (ii) potential investments of outside capital failing to materialize during the third fiscal quarter of 2020. In particular, the Debtors' former management was exploring business expansion opportunities with other financial services companies that were looking at opportunities in the Cryptocurrency space.

As of the Petition Date, the Debtors' balance sheet reflected an approximately 1:2.2 asset to liability ratio. A lack of liquidity and reduced prospects for attracting new business diminished the Debtors' prospects for reducing this asset-liability gap and for staking out new positions to hedge against fluctuations in the price of Cryptocurrency.

The asset-liability gap was in part due to a rapid 30% increase in the price of bitcoin in October 2020, which exacerbated the Debtors' distressed financial position. By late October, 2020, the Debtors determined to cease the inflow and outflow of all Cryptocurrency Assets to assess their financial position. Unable to remedy the situation, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on the Petition Date, initiating the Chapter 11 Cases.

Although the Debtors remain committed to working with other constituents in the capital structure on the terms of superior restructuring transactions, the Debtors believe that the Combined Plan and Disclosure Statement, which now incorporates the global settlement with the Committee outlined in the Plan Support Agreement, represents the best available alternative to maximize value for all stakeholders.

## 3.4    The Chapter 11 Cases

The following is a brief description of certain major events that occurred during the Chapter 11 Cases.

(a)    First Day Relief

On or shortly after the Petition Date, the Debtors filed a number of motions and applications seeking certain "first day" relief, including the following:

i.    Pursuant to the *Motion of Debtors and Debtors in Possession for Order Directing Joint Administration of their Chapter 11 Cases* [Docket No. 3], the Debtors sought entry of an order directing the joint administration of the Chapter 11 Cases and consolidation thereof for procedural purposes only. On November 11, 2020, the Bankruptcy Court entered an order granting this relief [Docket No. 27].

ii.    Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to File a Consolidated List of Debtors' 30 Largest Unsecured Creditors (II) Authorizing Debtors to Serve Certain Parties by E-mail, (III) Authorizing Debtors to Redact or Withhold Publication of Certain Personal Identification Information, and (IV) Granting Related Relief* [Docket No. 6], the

19

Debtors sought entry of interim and final orders authorizing the Debtors to: (i) file a consolidated list of the Debtors' 30 largest unsecured creditors; (ii) serve certain documents on parties-in-interest via email; and (iii) redact certain Customer information. The Bankruptcy Court granted the relief on an interim basis on November 10, 2020 [Docket No. 34] and on a final basis on December 21, 2020 [Docket No. 264].

iii.     Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions; (II) Granting Administrative Expense Status to Postpetition Intercompany Balances; (III) Waiving the Requirements of Section 345(b) of Bankruptcy Code; and (IV) Granting Related Relief* [Docket No. 7], the Debtors sought entry of interim and final orders authorizing the Debtors to, among other things: (i) continue use of their cash management system; (ii) honor certain fees and charges associated therewith in the ordinary course of business; and (iii) maintain existing business forms. The Bankruptcy Court granted the relief on an interim basis on November 10, 2020 [Docket No. 29] and on a final basis on December 21, 2020 [Docket No. 268].

iv.     Pursuant to the *Debtors' Motion for Entry of Order (I) Restating and Enforcing Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of Bankruptcy Code, (II) Permitting Debtors to Modify Automatic Stay, (III) Approving Form and Manner of Notice, and (IV) Granting Related Relief* [Docket No. 8], the Debtors sought relief to advise parties outside the United States of the existence, reach, and effects of the protections of the Bankruptcy Code, including the worldwide application of the automatic stay. The Bankruptcy Court granted the motion on November 10, 2020 [Docket No. 32].

v.     Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Insurance Policies, (B) Pay All Related Obligations, and (II) Granting Related Relief* [Docket No. 10], he Debtors sought authorization to maintain insurance policies, which included: (i) directors and officers; (ii) errors and omissions; (iii) cyber; (iv) property; (v) damage, general commercial; (vi) commercial automobile; and (vii) general umbrella liability. The Bankruptcy Court granted the relief on an interim basis on November 10, 2020 [Docket No. 31] and on a final basis on December 18, 2020 [Docket No. 248].

vi.     Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs and (II) Granting Related Relief* [Docket No. 11], the Debtors sought authorization to: (i) pay and honor certain prepetition employee claims and obligations; and (ii) continue certain employee programs and obligations. The Bankruptcy Court granted the relief on an interim basis on

20

CRED_EXAMINER_00002203

November 30, 2020 [Docket No. 30] and on a final basis on December 21, 2020 [Docket No. 263].

(b)    Appointment of Committee

On December 3, 2020, the U.S. Trustee appointed the Committee pursuant to section 1102(a) of the Bankruptcy Code. Additional information regarding the members of the Committee is included in the Notice of Appointment of the Committee [Docket No. 120].

(c)    Retention of Professionals

Paul Hastings LLP ("Paul Hastings") has served as the Debtors' restructuring counsel since it was engaged in late October, and the Debtors applied to retain Paul Hastings as their counsel shortly after the commencement of these chapter 11 cases. *See Debtors' Application for Entry of an Order Authorizing and Approving Retention and Employment of Paul Hastings LLP as Counsel to Debtors, Effective as of the Petition Date* [Docket No. 64]. On December 6, 2020, the U.S. Trustee objected to Paul Hastings' retention on several bases, including that Paul Hastings' initial disclosures were inadequate and that Paul Hastings had an adverse interest to the Debtors because it provided prepetition services to the Debtors, represents a creditor of the Debtors in unrelated matters, and allegedly received a preferential transfer from the Debtors. *See Objection of the United States Trustee to the Debtors' Application for Entry of an Order Authorizing and Approving Retention of Paul Hastings LLP as Counsel to Debtors, Effective as of the Petition Date* [Docket No. 139].

At the hearing on January 6, 2021, the Bankruptcy Court approved Paul Hastings' retention and overruled the U.S. Trustee's objection. In doing so, the Bankruptcy Court held that Paul Hastings' initial disclosures were adequate and that Paul Hastings did not hold any interest adverse to the Debtors in violation of section 327(a) of the Bankruptcy Code. Specifically, the Bankruptcy Court found there was nothing in the record that Paul Hastings's prepetition advice to the Debtors and its representation of a creditor on matters unrelated to the Chapter 11 Cases rendered it adverse to the Debtors.[6] Moreover, the Bankruptcy Court found Paul Hastings had resolved the issues regarding the alleged preferential transfer by returning approximately $313,000 to Paul Hastings' client trust account for the Debtors and waiving prepetition fee claims in the same amount. On January 7, 2021, the Bankruptcy Court entered an order approving the Debtors' retention of Paul Hastings [Docket No. 327].

On November 11, 2020 and December 18, 2020, the Bankruptcy Court also entered orders authorizing the Debtors to retain Donlin, Recano & Company, Inc. as claims agent [Docket No. 28] and as administrative agent [Docket No. 246], respectively. On December 18, 2020, the Bankruptcy Court entered an order authorizing the Debtors to retain Cousins Law LLC, as Delaware bankruptcy counsel [Docket No. 245]. On December 21, 2020, the Bankruptcy Court entered orders authorizing the Debtors to retain Teneo Capital Group LLC as the Debtors' investment banker [Docket No. 261], MACCO Restructuring Group LLC, as the

---

[6]    Matters related to such creditor are being handled by Cousins Law, the Debtors' Delaware bankruptcy counsel and conflicts counsel.

CRED_EXAMINER_00002204

Debtors' financial advisor [Docket No. 272], and Sonoran Capital Advisors, LLC to provide the Debtors with Matthew Foster, as Chief Restructuring Officer, and related personnel.

In addition, to assist the Committee in carrying out its duties, the Committee has sought Bankruptcy Court approval authorizing the retention and employment of McDermott Will & Emery LLP to serve as its bankruptcy counsel [Docket No. 282] and Dundon Advisors, LLC to serve as financial advisor [Docket No. 305].

    (d)    <u>Plan Support Agreement</u>

Promptly after its appointment, the Committee engaged in negotiations with the Debtors regarding a consensual path forward that would maximize the value of the Debtors' Estates for the benefit of all Creditors. Such negotiations culminated in the execution of the Plan Support Agreement, which contemplates a chapter 11 plan of liquidation centered on an expeditious liquidation of the Debtors' Assets, first through the Debtors' Sale Transaction, and, irrespective of whether the Sales Transaction comes to fruition, the transfer of all of the Debtors' Assets into a liquidation trust. The Debtors and the Committee believe that the restructuring process set forth in the Plan Support Agreement is in the best interests of the Debtors' Estates and all stakeholders.

On December 23, 2020, the Debtors filed the *Motion Pursuant to Bankruptcy Code Sections 363(b) and 105(a) for Authorization to Enter Into and Perform Under a Plan Support Agreement Term Sheet* [Docket No. 279], which is scheduled to be heard on February 3, 2021.

    (e)    <u>Sale Process</u>

On November 18, 2020, the Debtors filed the Sale Motion. Pursuant to the Sale Motion, the Debtors sought to establish certain deadlines and bidding procedures by which the Debtors could obtain proposals for the purchase of the Debtors' businesses as a going concern or, alternatively, for the purchase of the Debtors' Assets, to be sold at the Auction. On December 21, 2020, the Bankruptcy Court entered the Bid Procedures Order approving such relief [Docket No. 270].

The Bid Procedures Order provided, among other thing, that the selection of a stalking-horse bidder was subject to consent of the Committee. To date, the Debtors have not received a bid acceptable to the Committee. The Debtors are continuing to entertain offers from prospective buyers of various assets.

    (f)    <u>Post-Petition Litigation</u>

        (i)    *Motions to Convert or Dismiss the Chapter 11 Cases or Appoint a Trustee/Examiner*

On November 11, 2020, certain of the Debtors' creditors filed the *Motion of Krzysztof Majdak and Philippe Godineau for Entry of an Order Pursuant to 11 U.S.C. § 1112(b) (I) Dismissing the Cases; (II) Converting the Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 11 Trustee* [Docket No. 62] (the "<u>Creditor Motion</u>"). On December 4, 2020, the U.S. Trustee filed the *Motion of the United States Trustee for Entry of an Order Directing the*

CRED_EXAMINER_00002205

*Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases* [Docket No. 133] (the "U.S. Trustee Motion" and, together with the Creditor Motion, the "Motions to Convert"). The Motions to Convert both seek entry of an order dismissing the Chapter 11 Cases, converting the Chapter 11 Cases to liquidating cases under chapter 7 of the Bankruptcy Code, or appointing a chapter 11 trustee.[7] Moreover, the U.S. Trustee Motion seeks, in the alternative, the appointment of an independent Examiner.

The Debtors and the Committee objected to the relief sought in the Motions to Convert. *See* Docket Nos. 109, 191, and 195.

Following a two-day evidentiary hearing on the Motions to Convert, the Bankruptcy Court: (i) denied the Creditor Motion; and (ii) denied in part and granted in part the U.S. Trustee Motion. As a result, the U.S. Trustee was directed to appoint an examiner. *See* Docket No. 281.

On January 7, 2021, the U.S. Trustee appointed Robert J. Stark as the Examiner in the Chapter 11 Cases [Docket No. 338]. In his role as the Examiner, and pursuant to section 1106(a)(3) and (4) of the Bankruptcy Code, Mr. Stark is investigating allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the Debtors' management, and will, as soon as practicable, file a written report that will be made available on the Docket in these Chapter 11 Cases, which can be viewed at the following link: https://www.donlinrecano.com/Clients/cred/Dockets.

      (ii)   *Motion of UpgradeYa Investments, LLC for Relief from Stay Under Bankruptcy Code Section 362* ("Lift Stay Motion")

On November 25, 2020, UpgradeYa Investments, LLC ("UpgradeYa"), filed the Lift Stay Motion, seeking relief from the automatic stay to permit it to pursue remedies in connection with certain bitcoin it transferred to the Debtors. The Debtors and the Committee filed objections to the Lift Stay Motion. *See* Docket Nos. 116 and 190. On January 6, 2021, the Bankruptcy Court held an evidentiary hearing on the Lift Stay Motion. At the conclusion of the January 6, 2021 hearing, the Bankruptcy Court took the matter under advisement and ordered UpgradeYa to file further briefing regarding whether the remedy it seeks – authority to bring potential litigation claims against third parties – implicates property of the Debtors' estates on or before January 21, 2021, with reply briefs due on or before February 4, 2021, and responses to any reply briefing due on or before February 11, 2021.

---

[7]   Certain creditors and parties-in-interest joined or partially joined in the Motion to Convert. *See Response of James Alexander to the Motion of Kryszyof Majdak and Philippe Godineau for Entry of an Order Pursuant to 11 U.S.C. § 1112(b) (I) Dismissing the Cases; or (II) Converting the Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 11 Trustee* [Docket No. 103]; *Partial Joinder of Jamie Shiller, Takashi Yanagi, Wu Chi King, Joseph Richardson, Thomas Calvert, Clint Cowen, Robin Houck, Todd Wiseman, Mathew Dion, Jonatan Ashurov, Daniel Becker, Teppei Miyauchi, Jean Vacca, Xian Su, and Eric Schurman to Motion to Dismiss the Bankruptcy Cases, Convert Cases to Chapter 7, or Appoint a Chapter 11 Trustee* [Docket No. 107]; *UpgradeYa Investments, LLC's (I) Reply to Objection of the Debtors to Motion of UpgradeYa Investments, LLC for Relief from Stay Under Bankruptcy Code Section 362 and (II) Limited Joinder in the Motion for an Order Converting the Chapter 11 Cases to Chapter 7* [Docket No. 126].

CRED_EXAMINER_00002206

    (iii)   *Motion of James Alexander to Dismiss the Cred Capital, Inc. Case* ("Cred Capital Motion")

On December 8, 2020, Mr. Alexander filed the Cred Capital Motion seeking the dismissal of Cred Capital's Chapter 11 Case. *See* Docket No. 152. The Cred Capital Motion alleges Mr. Alexander is the sole rightful officer and director of Cred Capital and that Cred's corrective action to re-take control of Cred Capital in June 2020 was invalid and of no effect. Mr. Alexander thus believes that Cred Capital's Chapter 11 Case should be dismissed because only he had the power to authorize it, and he did not. The Debtors filed an objection to the Cred Capital Motion and the Committee joined in the Debtors' objection. *See* Docket Nos. 296 and 297. The Cred Capital Motion is scheduled to be heard on February 3, 2021.

    (g)   Section 341(a) Meeting of Creditors

The section 341 meeting is scheduled to take place on February 2, 2021.

    (h)   Schedules and Statements

The Debtors Filed their Schedules on January 7, 2021 [Docket Nos. 331-335, as amended by Docket Nos. 343, 346, and 350], which, among other things, set forth the Claims of known Creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records. The Debtors retain the right to amend the Schedules during the pendency of the Chapter 11 Cases.

    (i)   Claims Process and Bar Dates

Pursuant to the *Order (I) Fixing Deadlines for Filing Proofs of Claim and (II) Approving Form and Manner of Notice Thereof* dated December 21, 2020 [Docket No. 271] (the "Bar Date Order"), the Bankruptcy Court established, among others, the following bar dates for filing Proofs of Claim:

- General Bar Date: February 10, 2021 at 5:00 p.m. (prevailing Eastern Time) as the deadline for all Persons or Entities (other than Governmental Units) holding or wishing to assert pre-petition Claims to file Proofs of Claims in the Chapter 11 Cases.

- Government Bar Date: May 6, 2021 at 5:00 p.m. (prevailing Eastern Time) as the deadline for all Governmental Units (as defined in section 101(27) of the Bankruptcy Code) holding or wishing to assert pre-petition Claims to file Proofs of Claim in the Chapter 11 Cases.

- Amended Schedules Bar Date: With respect to Holders of Claims affected, as described in the Bar Date Order, by the Debtors' amendment or supplement of their Schedules, such Holders shall have until the later of (i) the General Bar Date or, if the creditor is a Governmental Unit, the

CRED_EXAMINER_00002207

Government Bar Date, and (ii) twenty-one (21) days from the date of service of notice of the amendment or supplement to the Schedules.

- Rejection Damages Bar Date: With respect to counterparties to an Executory Contract or an Unexpired Lease of the Debtors, which has been rejected under this Combined Plan and Disclosure Statement, such counterparty must file a Proof of Claim for damages arising from such rejection by the later of (i) the General Bar Date or thirty-days after service of an order by the Bankruptcy Court authorizing such rejection, and (ii) such other date, if any, as the Bankruptcy Court may fix in the order authorizing such rejection.

(j)    Assumption and Rejection of Executory Contracts and Unexpired Leases

Pursuant to the *Motion of Debtors for Entry of Order Authorizing Debtors to (I) Reject Unexpired Leases of Nonresidential Real Property and (II) Abandon Property in Connection Therewith* [Docket No. 4], the Debtors sought entry of an order permitting the Debtors to reject leases in connection with their office space in San Mateo and Sherman Oaks, California. On December 18, 2020, the Bankruptcy Court entered an order granting this relief [Docket No. 243].

(k)    DIP Financing

The Debtors are currently in negotiations with potential lenders to provide debtor in possession financing to the Debtors. The Debtors are also negotiating for the right to convert such debtor-in-possession financing into an exit financing that would be available to fund expenses of the Liquidation Trust to the extent it is not repaid on the Effective Date of the Combined Plan and Disclosure Statement.

To the extent that the Debtors obtain debtor in possession financing, the terms of such financing, including the treatment of any DIP Financing Claims, will be included in the Plan Supplement. Parties interested in learning more about any such debtor in possession financing should monitor the Docket in these Chapter 11 Cases, which can be viewed at the following link: https://www.donlinrecano.com/Clients/cred/Dockets.

## ARTICLE IV.
## TAX CONSEQUENCES

**4.1    Tax Consequences.**

The confirmation and execution of the Combined Plan and Disclosure Statement may have tax consequences to Holders of Claims and Equity Interests. The Debtors do not offer an opinion as to any federal, state, local or other tax consequences to Holders of Claims and Equity Interests as a result of the confirmation of the Combined Plan and Disclosure Statement.

Under certain circumstances, an individual may be entitled to claim a theft-loss dependent on its individual circumstances. Such losses that arise out of property used in a trade or business or a transaction entered into for profit are deductible in the year in which the loss is sustained and in an amount not to exceed the adjusted tax basis of the property

25

involved. Individuals should consult with their own tax advisors to determine if a theft loss deduction is permissible, as well as the timing, amount, and applicable limitations for any such theft loss deduction.

**All Holders of Claims and Equity Interests are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of this Combined Plan and Disclosure Statement. The Combined Plan and Disclosure Statement is not intended, and should not be construed, as legal or tax advice to any Creditor, Equity Interest Holder or other party in interest.**

## ARTICLE V.
## CERTAIN RISK FACTORS TO BE CONSIDERED

**5.1    Risk Factors to Be Considered**

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Combined Plan and Disclosure Statement. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Combined Plan and Disclosure Statement and its implementation.

(a)    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect Distributions available to Holders of Allowed Claims under the Combined Plan and Disclosure Statement, but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Combined Plan and Disclosure Statement or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

(i)    Parties in Interest May Object to the Combined Plan and Disclosure Statement's Classification of Claims and Interests. Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Equity Interest under the Combined Plan and Disclosure Statement complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Equity Interest, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(ii)    The Conditions Precedent to the Effective Date May Not Occur. As more fully set forth in Article XVI hereof, the Confirmation Date and the Effective Date are subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Confirmation Date or the Effective Date will not take place.

CRED_EXAMINER_00002209

(iii)    The Debtors May Fail to Satisfy Voting Requirements. If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Combined Plan and Disclosure Statement, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Combined Plan and Disclosure Statement. In the event that sufficient votes are not received, the Debtors, with the consent of the Committee, may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Combined Plan and Disclosure Statement.

(iv)    The Debtors May Not Be Able to Secure Confirmation of the Combined Plan and Disclosure Statement. There can be no assurance that the requisite acceptances to confirm the Combined Plan and Disclosure Statement will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Combined Plan and Disclosure Statement. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of the Combined Plan and Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that the Combined Plan and Disclosure Statement, the balloting procedures, and the voting results are appropriate, the Bankruptcy Court could still decline to confirm the Combined Plan and Disclosure Statement if it finds that any of the statutory requirements for confirmation are not met.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of Distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of Distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Confirmation of the Combined Plan and Disclosure Statement is also subject to certain conditions as described in Article IX hereof. If the Combined Plan and Disclosure Statement is not confirmed, it is unclear what Distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Combined Plan and Disclosure Statement, reserve the right, upon reasonable prior notice to and with the consent of the Committee, to modify the terms and conditions of the Combined Plan and Disclosure Statement as necessary for confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Combined Plan and Disclosure Statement. Such a less

27

CRED_EXAMINER_00002210

favorable treatment could include a Distribution of property with a lesser value than currently provided in the Combined Plan and Disclosure Statement or no Distribution whatsoever under the Combined Plan and Disclosure Statement.

(v)  Nonconsensual Confirmation.  In the event that any Impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any Insider in such class), and, as to each Impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired class(es).  The Debtors believe that the Combined Plan and Disclosure Statement satisfies these requirements, and the Debtors may request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual confirmation or Consummation of the Combined Plan and Disclosure Statement may result in, among other things, increased expenses relating to professional compensation.

(vi)  The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.  If the Bankruptcy Court finds that it would be in the best interests of Creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller Distributions being made to Creditors than those provided for in the Combined Plan and Disclosure Statement because of the (a) likelihood that the Assets, including any Cryptocurrency, would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and Executory Contracts.

(vii)  The Debtors May Object to the Amount or Classification of a Claim. Except as otherwise provided in the Combined Plan and Disclosure Statement, the Debtors reserve the right to object to the amount or classification of any Claim under the Combined Plan and Disclosure Statement.  The estimates set forth in the Combined Plan and Disclosure Statement cannot be relied upon by any Holder of a Claim, as the Debtors or the Liquidation Trustee may seek to investigate, File, and prosecute Claims and may object to Claims after confirmation of the Combined Plan and Disclosure Statement.

28

CRED_EXAMINER_00002211

(viii)    Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Combined Plan and Disclosure Statement. The Distributions available to Holders of Allowed Claims under the Combined Plan and Disclosure Statement can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect Distributions available to Holders of Allowed Claims under the Combined Plan and Disclosure Statement, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Combined Plan and Disclosure Statement or require any sort of revote by the Impaired Classes.

The estimated Claims and Creditor recoveries set forth in the Combined Plan and Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained herein. Moreover, Creditor recoveries will depend on the outcome of litigation that may be brought by the Liquidation Trust for the benefit of Creditors. Litigation outcomes are inherently uncertain and, if the litigation pursued by the Liquidation Trust is unsuccessful, may materially and adversely impact Creditor recoveries. Furthermore, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that ultimately will be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Combined Plan and Disclosure Statement.

(ix)    Releases, Injunctions, and Exculpations Provisions May Not Be Approved. Article XVIII hereof provides for certain releases, injunctions, and exculpations, including a release of Liens and third party releases that may otherwise be asserted against the Debtors or the Released Parties. The releases, injunctions, and exculpations provided herein are subject to objection by parties in interest and may not be approved.

(x)    Risk of Non-Occurrence of the Effective Date. Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. If the Effective Date does not occur, the Combined Plan and Disclosure Statement shall be null and void in all respects and nothing contained herein shall: (a) constitute a waiver or release of any Claims by or Claims against or Equity Interest in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holder of a Claim or Equity Interest, or any other Entity; (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Equity Interest, or any other Entity in any respect; or (d) be used by the Debtors or any Entity as evidence (or otherwise) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

29

CRED_EXAMINER_00002212

(xi)     Risk of Loss of Exclusive Right to Propose a Plan.  At the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose a plan and prohibits creditors and others from proposing a plan. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Combined Plan and Disclosure Statement in order to achieve the Debtors' stated goals.

(b)     Risks Related to Recoveries Provided Under the Combined Plan and Disclosure Statement.

(i)     Timing and Amount of Distributions.  Various factors will impact the amount of recoveries that Holders of Allowed Claims receive, including, without limitation, the degree to which objections to Claims are successful.  Further, due to the nature of litigation, it may take years to fully adjudicate, decide, or resolve objections to Claims.  As a result, Holders of Allowed Claims may not receive final Distributions in accordance herewith for a prolonged period of time following the Effective Date.

(ii)     Uncertainty of Distribution.  No assurances can be made that Holders of Allowed Claims will receive a Distribution as it is possible the Liquidation Trust Expenses will exceed the realizable value of the Liquidation Trust Assets.  In such a scenario, there would be no recovery to Holders of Allowed Claims.

(iii)     Cryptocurrency Distributions.  The Liquidation Trustee shall make good faith efforts to make Equivalent Cryptocurrency Distributions; however, there can be no assurance that the ability to make such Equivalent Cryptocurrency Distributions is guaranteed.  If the Liquidation Trustee cannot make Equivalent Cryptocurrency Distributions for any reason, Distributions will be made to Holders of Customer Claims that made a Cryptocurrency Election in Cash consistent with this Combined Plan and Disclosure Statement.

(iv)     Certain Tax Implications of the Combined Plan and Disclosure Statement. Consummation may result in significant tax implications for the Debtors and Holders of Claims.  Holders of Allowed Claims should abide by Article IV hereof to determine how the tax implications of the Combined Plan and Disclosure Statement and the Chapter 11 Cases may adversely affect the Holders of Claims.

(c)     The Debtors May Not Be Able to Generate Sufficient Cash to Continue in Chapter 11.

The Debtors may not be able to generate sufficient Cash to continue operating in chapter 11 for a prolonged period of time.  It is also unclear whether the Debtors will be able to obtain postpetition financing to fund administrative expenses through confirmation of an alternative chapter 11 plan.

30

(d)    The Debtors May Be Adversely Affected by Litigation.

The Debtors may become parties to litigation, and litigation in which the Debtors are already a party may not be resolved in their favor. In general, litigation can be expensive and time consuming to bring or defend. Litigation could result in settlements or damages that could significantly affect the Debtors' financial positions. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Combined Plan and Disclosure Statement. It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of any litigation. The impact of any such litigation on the Debtors' business and financial stability, however, could be material.

## 5.2    Alternatives to this Combined Plan and Disclosure Statement

In the event the Debtors are unable to obtain sufficient votes or are unable to satisfy the legal requirements to confirm the Combined Plan and Disclosure Statement, the Debtors, with the consent of the Committee, may seek to confirm an alternative chapter 11 plan or convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Combined Plan and Disclosure Statement. As set forth in Article VI hereof, the Debtors believe it is unlikely that conversion of the Chapter 11 Cases to cases under chapter 7 will result in greater Distributions to stakeholders.

## ARTICLE VI.
## BEST INTERESTS AND FEASIBILITY

## 6.1    Best Interests Test

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Equity Interest either (a) accept the plan or (b) receive or retain under the plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Because of the increased expenses that would be incurred in the event of a conversion of the Chapter 11 Cases to cases under chapter 7, the value of any Distributions to Holders of Claims or Equity Interests if the Chapter 11 Cases were converted to cases under chapter 7 would be less than the value of Distributions hereunder. This is because conversion of the Chapter 11 Cases to chapter 7 would require the appointment of a chapter 7 trustee, and in turn, such chapter 7 trustee's likely retention of new professionals.

The "learning curve" that the chapter 7 trustee and new professionals would be faced with comes with additional costs to the Estates and delay compared to the time of Distributions under the Combined Plan and Disclosure Statement. As a result, the Debtors believe that their Estates would have fewer funds available for Distribution in a hypothetical chapter 7 liquidation than they would if the Combined Plan and Disclosure Statement is confirmed, and, therefore, Holders of Allowed Claims will recover less in the hypothetical chapter 7 cases.[8] Accordingly,

---

[8]    A hypothetical chapter 7 liquidation analysis is attached hereto as **Exhibit B**.

31

CRED_EXAMINER_00002214

the Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

**6.2    Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Combined Plan and Disclosure Statement is not likely to be followed by liquidation, or the need for further financial reorganization, of the Debtors or any successors to the Debtors, unless such liquidation or reorganization is proposed in the Combined Plan and Disclosure Statement. As set forth herein, the Debtors commenced the Chapter 11 Cases to allow for an efficient and orderly sale of their Assets, followed by a wind-down process, which the Combined Plan and Disclosure Statement accomplishes. The Debtors will not be conducting any business operations after the Effective Date. As such, provided that the Combined Plan and Disclosure Statement is Consummated, the Debtors' Estates will not be subject to future reorganization or liquidation. Accordingly, the Debtors believe that the Combined Plan and Disclosure Statement is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

## ARTICLE VII.
## SUMMARY OF ASSETS AND TREATMENT OF CLAIMS AND INTERESTS

**7.1    Summary of Assets**

As of the Petition Date, the former book value of the Debtors' Assets was approximately $69 million. Book value is generally computed in accordance with various accounting pronouncements and may not correlate with the fair value of an individual Asset or of the enterprise value of the Debtors as a whole. Moreover, the Debtors have not conducted the impairment analysis which would be required under GAAP for such former book value to be considered a current and reliable book value. Such impairment analysis would likely result in a book value significantly less than the former book value referred to above. The Debtors' Assets broadly consist of Cash and Cash equivalents, Cryptocurrency, technological platforms, loan obligations, and certain other Assets under management.

As of December 31, 2020, the Debtors held approximately $970,000 in Cash. In addition, the Debtors hold a variety of Cryptocurrencies. Certain of these Cryptocurrencies are "liquid" and can be readily converted to Cash. As of December 31, 2020, the Debtors held approximately $5.3 million in liquid Cryptocurrencies. A portion of the Cryptocurrency held by the Debtors is considered "illiquid," the value of which is difficult to determine with any level of certainty and which require the Debtors to overcome additional barriers (which may require additional marketing efforts and/or liquidation in smaller quantities) to convert these "illiquid" Cryptocurrencies into Cash.

The Debtors' Assets also include obligations under customer loans and loans issued by the Debtors. Of note, moKredit is obligated to repay the Debtors approximately $39 million. However, as discussed above, moKredit is currently not making payments on the outstanding principal, and thus the account balance may be partially or completely uncollectible.

CRED_EXAMINER_00002215

The Debtors are owed approximately $8 million for loans issued under the CredBorrow program. However, these creditors may argue that obligations would only be collected if Collateral was returned, and thus the account balance may be partially or completely uncollectible. For the purposes of this Plan, the Debtors cannot ascribe value to the moKredit loan obligation as there is no market for any fair valuation purposes nor have the Debtors been able to conduct an impairment analysis which would be necessary to present a book value for the loan.

The Debtors also have certain "assets under management" valued at approximately $3.6 million, as of December 31, 2020, to be returned by certain third-party asset managers.

Additionally, the Debtors own a proprietary technological platform and various Causes of Action, which may be of significant value.

## 7.2    Summary of Treatment of Claims and Equity Interests

The following table (a) designates the Classes of Claims against, and Equity Interests in, the Debtors, (b) specifies the Classes of Claims and Equity Interests that are Impaired by the Combined Plan and Disclosure Statement and therefore are deemed to reject the Combined Plan and Disclosure Statement or are entitled to vote to accept or reject the Combined Plan and Disclosure Statement in accordance with section 1126 of the Bankruptcy Code, and (c) specifies the Classes of Claims and Equity Interests that are Unimpaired by the Combined Plan and Disclosure Statement and therefore are deemed to accept the Combined Plan and Disclosure Statement in accordance with section 1126 of the Bankruptcy Code.

33

CRED_EXAMINER_00002216

| Class | Description | Impairment | Entitled to Vote | Estimated Allowed Claim Amounts | Estimated Recovery Percentage |
|-------|-------------|------------|------------------|--------------------------------|-------------------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | $0 | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | $0 | 100% |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) | Unknown | 100% |
| 4 | General Unsecured Claims | Impaired | Yes | $170.9 million | Unknown |
| 5 | Convenience Claims | Impaired | Yes | $0.5 million | 20%[9] |
| 6 | Subordinated Securities Claims | Impaired | No (deemed to reject) | $0 | 0% |
| 7 | Equity Interests in Debtors | Impaired | No (deemed to reject) | Not applicable | 0% |

## 7.3    Deemed Consolidation

The Combined Plan and Disclosure Statement provides for deemed consolidation of the Debtors' Estates solely for the purposes hereof, including making any Distributions to Holders of Allowed Claims. Deemed consolidation is a type of substantive consolidation, "under which a consolidation is deemed to exist for purposes of voting and satisfying creditor claims, voting for or against the Plan, and making distributions for allowed claims under it." *In re Owens Corning*, 419 F.3d 195, 202 (3d Cir. 2005); *see also In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 423-24 (3d Cir. 2005). It is an equitable remedy that bankruptcy courts may apply in appropriate circumstances. *See In re Owens Corning*, 419 F.3d 195, 216 (3d Cir. 2005).

Substantive consolidation is appropriate where (i) prepetition the debtors disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) postpetition the debtors' assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. *In re Owens Corning*, 419 F.3d at 211.; *see also In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988) (noting that decisions approving substantive consolidation emphasize whether creditors dealt with the entities

---

[9]    The estimated recovery percentage for General Unsecured Claims that exercise the Convenience Class Election is less than 20%.

34

CRED_EXAMINER_00002217

as a single economic unit or whether the affairs of the debtors are so entangled that consolidation will benefit all creditors).

The Debtors submit that deemed consolidation is appropriate under the law and the facts present here. Prior to the Petition Date, the Debtors' books and records did not precisely record Assets and Liabilities attributable to each of the Debtors individually. As a result, it would be a painstaking and costly endeavor to try to unwind the Debtors' business affairs and allocate assets and Liabilities on a Debtor by Debtor basis, to the extent such unwinding and allocation is even possible. To the extent it is possible, such an allocation would be extremely time consuming and costly, and would greatly diminish the pool of assets available for Distribution to Creditors.

For example, without substantial costs and efforts, including a review of all contracts of the more than 6,500 Customers, the Debtors cannot verify which Customers are creditors of Cred Inc. or Cred (US) LLC. Based on an initial analysis, several Customer contracts appear to be with Cred Inc., but used a Cred (US) LLC signature block. The Debtors believe it will be difficult if not impossible to properly allocate the assets and liabilities associated with such contracts on a Debtor by Debtor basis. Furthermore, a detailed forensic analysis would be needed to identify and reconcile all intercompany transfers, including transfers of Cash and transfers of Cryptocurrencies through Fireblocks. Moreover, the Debtors are unable to identify the specific Debtor entity that owns the remaining bitcoin, as there was significant movement in bitcoin between the Debtors during normal operations, including commingling of such assets, making tracing of bitcoin to any particular Debtor entity practically impossible. Finally, the Debtors' platform was used by all operating Debtor entities, and it is practically impossible to allocate the value of that platform to these Debtor entities.

Deemed consolidation for voting and Distribution purposes will avoid these delays and expenses, without causing prejudice to any group of creditors. Under the **Combined Plan and Disclosure Statement**, each Creditor within a Class will be treated equally.

**7.4    Third Party Releases**

It is the Debtors' position that the consideration for the third party releases set forth in Section 18.2 hereof and the mechanism by which Holders of Claims who are impaired under the Plan to consent to such releases meet the requirements for third party releases and are consistent with recent chapter 11 cases. All Impaired Holders of Claims, irrespective of whether they are entitled to vote on the Plan, will receive a Solicitation Package which will include materials allowing such Holders to opt out of the third party release via their Ballot or an Opt-Out Election Form that can mailed or hand-delivered to the Voting Agent. In addition, the Debtors believe the third party releases are entirely consensual under the established case law in the United States Bankruptcy Court for the District of Delaware. *See, e.g.*, *In re Indianapolis Downs, LLC, 486 B.R. 286, 304-06* (Bankr. D. Del. 2013). The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each of the Released Parties as part of confirmation of the Combined Plan and Disclosure Statement.

35

CRED_EXAMINER_00002218

## ARTICLE VIII.
## CONFIRMATION AND VOTING PROCEDURES

### 8.1    Combined Hearing

A hearing before the Honorable John T. Dorsey has been scheduled for _____, 2021 at [_____ a/p.m.] (prevailing Eastern Time), at the Bankruptcy Court, 824 North Market Street, 5th Floor, Courtroom No. 5, Wilmington, Delaware 19081, to consider (i) final approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (ii) confirmation of the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code.  The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Combined Hearing or by Filing a notice with the Bankruptcy Court.

### 8.2    Procedure for Objections

Any objection to approval or confirmation of this Combined Plan and Disclosure Statement must: (a) be in writing, (b) conform to the Bankruptcy Rules and Local Bankruptcy Rules, and (c) be filed with the Bankruptcy Court and served so as to be **actually received on or before _____, 2021 at 4:00 p.m. (prevailing Eastern Time)**, by: (i) counsel to the Debtors, Paul Hastings LLP, 600 Travis Street, 58th Floor, Houston, Texas 77002, Attn: James T. Grogan, Esq., and Cousins Law LLC, Brandywine Plaza West, 1521 Concord Pike, Suite 301, Wilmington, Delaware 19803, Attn: Scott D. Cousins; and (ii) counsel to the Committee, McDermott Will & Emery LLP, 340 Madison Avenue, New York, NY 10173, Attn: Timothy W. Walsh and Darren Azman, and 1007 North Orange Street, 4th Floor, Wilmington, DE 19801, Attn: David R. Hurst.

### 8.3    Voting Procedures

(a)    Who May Vote on the Combined Plan and Disclosure Statement

Each Holder of a Class 4 or Class 5 Claim that is not a Disallowed Claim and for which no objection to the allowance thereof, motion to estimate, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed and remains unresolved, or the Holder of a Class 4 or Class 5 Claim that has been temporarily allowed for voting purposes only under Bankruptcy Rule 3018(a) shall be entitled to vote separately to accept or reject the Combined Plan and Disclosure Statement, subject to the procedures set forth in the Disclosure Statement Order or any other applicable order of the Bankruptcy Court.  An Impaired Class of Claims shall have accepted the Combined Plan and Disclosure Statement if: (i) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Combined Plan and Disclosure Statement, and (ii) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Combined Plan and Disclosure Statement.

36

CRED_EXAMINER_00002219

Classes 1, 2, and 3 are Unimpaired under the Combined Plan and Disclosure Statement, are each deemed to accept the Combined Plan and Disclosure Statement by operation of law, and are not entitled to vote on the Combined Plan and Disclosure Statement.

Classes 6 and 7 are Impaired under the Combined Plan and Disclosure Statement and are deemed to reject the Combined Plan and Disclosure Statement by operation of law, and are not entitled to vote on the Combined Plan and Disclosure Statement.

Without limiting the foregoing, in the event that any Class of Claims entitled to vote on the Combined Plan and Disclosure Statement fails to accept the Combined Plan and Disclosure Statement as required by section 1129(a) of the Bankruptcy Code, the Combined Plan and Disclosure Statement may be amended or modified in accordance with the terms herein and, in any event, the Debtors, subject to any consent that may be required herein or under the Plan Support Agreement, reserve the right to seek confirmation hereof over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

(b)     Voting Record Date

The Bankruptcy Court has approved the close of business on [•], 2021 as the voting record date (the "Voting Record Date"). The Voting Record Date is the date for determining (1) which Holders of Claims are entitled to vote to accept or reject the Combined Plan and Disclosure Statement and receive the Solicitation Package and (2) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of a Claim. The Voting Record Date shall apply to all of the Debtors' creditors and other parties in interest.

(c)     Voting Agent

The Debtors have retained Donlin, Recano & Company, Inc. (the "Voting Agent") to, among other things, act as claims and solicitation agent in connection with the solicitation of votes to accept or reject the Combined Plan and Disclosure Statement. Inquiries relating to the solicitation process, voting instructions, related procedures and copies of the solicitation materials may be directed to the Voting Agent at no charge by: (a) accessing the Debtors' restructuring website at https://www.donlinrecano.com/Clients/cred/Dockets; (b) calling the Voting Agent at (877) 739-9988 (toll free); or (c) emailing DRCvote@DonlinRecano.com. The Voting Agent, however, is not authorized to provide, and will not provide, legal or financial advice.

(d)     Solicitation Package, Ballots and Notices

The following materials constitute the solicitation package with respect to the Combined Plan and Disclosure Statement enclosed herewith (the "Solicitation Package"):

i.      The appropriate form of Ballot and instructions for completing the Ballot;

ii.     The voting instructions and solicitation procedures approved by the Bankruptcy Court (the "Voting Procedures");

37

iii.    The Combined Plan and Disclosure Statement with all exhibits;

iv.    A notice of the Combined Hearing approved by the Bankruptcy Court for transmission to Holders of Claims and other parties in interest (the "Combined Hearing Notice");

v.    A copy of the Disclosure Statement Order;

vi.    a letter from the Committee urging creditors to vote to accept the Combined Joint Plan and Disclosure Statement; and

vii.    Such other materials as the Bankruptcy Court may direct.

Only Holders of General Unsecured Claims (Class 4) and Holders of Convenience Claims (Class 5) are entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

(e)    Notices of Non-Voting Status

As set forth above, certain Holders of Claims and Equity Interests are not entitled to vote on the Combined Plan and Disclosure Statement. As a result, such parties will not receive Solicitation Packages but, instead, will receive the Combined Hearing Notice that explains, among other things, (i) that Classes 1, 2, and 3 are Unimpaired under the Combined Plan and Disclosure Statement and, therefore, are presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code; (ii) that Classes 6 and 7 are Impaired under the Combined Plan and Disclosure Statement and are presumed to have rejected the Combined Plan and Disclosure Statement pursuant to section 1126(g) of the Bankruptcy Code; (iii) instructions for how such Holders of Claims and Equity Interests may obtain a copy of the Combined Plan and Disclosure Statement; (iv) the deadline by which to object to confirmation of the Combined Plan and Disclosure Statement; and (v) the Combined Hearing date and time. In addition, such parties will receive a Notice of Non-Voting Status and an Opt-Out Election Form.

(f)    Contract and Lease Counterparties

Parties to certain of the Debtors' Executory Contracts and Unexpired Leases may not have Claims pending the disposition of their Executory Contracts and Unexpired Leases by assumption or rejection under the Combined Plan and Disclosure Statement. Such parties nevertheless will receive the Combined Hearing Notice.

(g)    Submission of Ballots and Opt-Out Election Forms

To be counted as a vote to accept or reject the Combined Plan and Disclosure Statement, such Holder's properly completed and executed Ballot must be received by the Voting Agent by the Voting Deadline and in accordance with the voting instructions attached to each Ballot. The Voting Agent will process and tabulate received Ballots and will File a voting report (the "Voting Report") as soon as practicable on or after the Voting Deadline but prior to the Combined Hearing. The Voting Report will include (a) a list of all Ballots received but not

CRED_EXAMINER_00002221

counted and the reason for not counting such Ballots and (b) a list of all non-compliant, deficient Ballots for which the Debtors have waived such non-compliance or deficiency. Parties may contact the Voting Agent with any questions related to the Voting Procedures applicable to their Claims.

In addition, Opt-Out Election Forms must also be received by the Voting Agent on or before the Voting Deadline.

## ARTICLE IX.
## PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS, AND OTHER UNCLASSIFIED CLAIMS

**9.1    Administrative Expense Claims**

(a)    <u>Treatment of Non-Professional Fee Administrative Expense Claims</u>

Except to the extent that a Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Administrative Expense Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on the latest of: (i) on or as soon as practicable after the Effective Date if such Administrative Expense Claim is Allowed as of the Effective Date; (ii) on or as soon as reasonably practicable after the date such Administrative Expense Claim is Allowed; and (iii) on the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is practicable.

(b)    <u>Administrative Expense Claims Bar Date</u>

Holders of Administrative Expense Claims (other than Professional Fee Claims) arising during the period from November 7, 2020 through the Effective Date must File requests for payment of Administrative Expense Claims **on or before 4:00 p.m. (prevailing Eastern Time) on the day that is thirty (30) calendar days after the Effective Date** (the "<u>Administrative Expense Claims Bar Date</u>") and serve such Administrative Expense Claims on the Claims Agent so as to be **actually received on or before the Administrative Expense Claims Bar Date** at the following addresses (the "<u>Claims Agent Service Addresses</u>"):

If by first-class mail:

Cred Inc. Claims Processing Center
c/o Donlin, Recano & Company, Inc.
P.O. Box 199043 Blythebourne Station
Brooklyn, NY 11219

If by hand delivery or overnight:

Cred Inc. Claims Processing Center
c/o Donlin, Recano & Company, Inc.

39

6201 15th Avenue
Brooklyn, NY 11219

All such requests for payment must: (i) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant; (ii) be written in the English language; (iii) denominate the claim in lawful currency of the United States as of the Administrative Expense Claims Bar Date; (iv) indicate the particular Debtor against which the claim is asserted; and (v) include supporting documentation (or, if such documentation is voluminous, include a summary of such documentation) or an explanation as to why such documentation is not available. The notice of the Effective Date delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f), substantially in the form included in the Plan Supplement, shall set forth the Administrative Expense Claims Bar Date and shall constitute notice of such bar date.

The following claims are **not** required to be filed on or before the Administrative Expense Claims Bar Date:

(a)    Professional Fee Claims;

(b)    Any Administrative Expense Claims that (i) have been previously paid by the Debtors in the ordinary course of business or otherwise or (ii) have otherwise been satisfied;

(c)    Any Administrative Expense Claim that has been Allowed by prior order of the Bankruptcy Court;

(d)    Any claims by any current officer, manager, or director of the Debtors immediately prior to the Effective Date;

(e)    Any claims for fees payable to the Clerk;

(f)    Any U.S. Trustee Fees; and

(g)    Any claim by a Governmental Unit for a tax or penalty described in section 503(b)(1)(B) and (C) of the Bankruptcy Code, as provided for in section 503(b)(1)(D).

Any Entity that is required to file a request for payment of an Administrative Expense Claim (other than Professional Fee Claims) under the Combined Plan and Disclosure Statement and that fails to do so by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claim, and such Administrative Expense Claim shall not be enforceable against the Liquidation Trust, the Liquidation Trustee, the Debtors, the Estates, and their respective properties, and the Liquidation Trust, the Liquidation Trustee, Debtors, the Estates, and their respective properties shall be forever discharged from any and all Liability with respect to such Administrative Expense Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Administrative Expense Claims shall, as of the Effective Date, be subject to the permanent injunction pursuant to Section 18.4 hereof and the Confirmation Order.

CRED_EXAMINER_00002223

**9.2    Professional Fee Claims**

All Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 363, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is sixty (60) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such claim.  The Liquidation Trustee is authorized to pay reasonable compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval in accordance with the Liquidation Trust Agreement.

All Allowed Professional Fee Claims shall be paid in full in Cash in such amounts as may be Allowed by the Bankruptcy Court (a) as soon as practicable after the later of the Effective Date and the date on which the Bankruptcy Court enters a final order allowing any such Professional Fee Claim, (b) as otherwise provided in the Bankruptcy Code or approved by the Bankruptcy Court, or (c) as may be agreed upon between the Holder of any such Professional Fee Claim and the Debtors.  Professional Fee Claims shall be satisfied from the Professional Fee Escrow.  If the amount in the Professional Fee Escrow is insufficient to pay in full all Allowed Professional Fee Claims, the deficiency shall be promptly paid by the Liquidation Trustee from the Liquidation Trust Assets, without any further action or order of the Bankruptcy Court.

Professionals shall reasonably estimate their unpaid Professional Fee Claims as of the Effective Date, and shall deliver such estimates to the Debtors no later than five days before the Effective Date; *provided, however,* that such estimates shall not be deemed to limit the amount of the Professional Fee Claims that are the subject of each Professional's final request for payment in the Chapter 11 Cases.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

On or before the Effective Date, the Debtors shall establish the Professional Fee Escrow and shall fund such reserve with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow and the funds therein shall be used for the sole purpose of paying the Allowed Professional Fee Claims and shall not constitute property of the Debtors, their Estates, or the Liquidating Trust; *provided,* that the Liquidating Trust shall hold a residual interest in the Professional Fee Escrow and, upon the satisfaction of all Allowed Professional Fee Claims, any funds remaining in the Professional Fee Escrow shall vest in the Liquidating Trust.

**9.3    Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, either (a) payment in full in Cash on the Effective Date, (b) payment in regular installment payments within five (5) years of the Petition Date, or (c) such other less favorable treatment to the Holder of an Allowed Priority Tax Claim as to which the Debtor and the Holder of such Allowed Priority Tax Claim shall have

41

agreed upon in writing. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

## ARTICLE X.
## TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

**10.1    Class 1: Other Priority Claims**

(a)    <u>Classification</u>: Class 1 shall consist of the Other Priority Claims.

(b)    <u>Treatment</u>: Except to the extent that a Holder of an Other Priority Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed Other Priority Claim shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, Cash in the amount equal to such Allowed Claim, without interest, on or as soon as practicable after the later of (x) the Effective Date and (y) the date that such Claim becomes an Allowed Claim.

(c)    <u>Voting</u>: Class 1 is Unimpaired under the Combined Plan and Disclosure Statement. Holders of Claims in Class 1 are conclusively deemed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code. Holders of Claims in Class 1 are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

**10.2    Class 2: Secured Tax Claims**

(a)    <u>Classification</u>: Class 2 shall consist of the Secured Tax Claims.

(b)    <u>Treatment</u>: Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed Secured Tax Claim shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Secured Tax Claim and any Liens securing such Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, Cash in the amount of such Allowed Secured Tax Claim (a) on, or as soon as practicable after, the latest of: (i) the Effective Date and (ii) the date such Allowed Secured Tax Claim becomes an Allowed Claim; or (b) in regular payments over a period of time not to exceed five (5) years after the Petition Date with interest at a rate determined in accordance with section 511 of the Bankruptcy Code; <u>provided</u>, that the first such regular payment shall represent a percentage recovery at least equal to that expected to be received by the most favored Holders of Allowed General Unsecured Claims; <u>provided further</u>, that the Liquidation Trustee may prepay the entire amount of the Allowed Secured Tax Claim at any time in its sole discretion.

(c)    <u>Voting</u>: Class 2 is Unimpaired under the Combined Plan and Disclosure Statement. Holders of Claims in Class 2 are conclusively deemed to have

42

CRED_EXAMINER_00002225

accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code. Holders of Claims in Class 2 are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

**10.3    Class 3: Other Secured Claims**

(a)    <u>Classification</u>: Class 3 shall consist of the Other Secured Claims.

(b)    <u>Treatment</u>: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Other Secured Claim and any Liens securing such Claim, at the sole option of the Debtors or the Liquidation Trustee, as applicable, (i) Cash in an amount equal to such Allowed Other Secured Claim on or as soon as practicable after the Effective Date, or (ii) the Collateral securing its Allowed Other Secured Claim, in full and complete satisfaction of such Allowed Other Secured Claim on or as soon as practicable after the Effective Date.

(c)    <u>Voting</u>: Class 3 is Unimpaired under the Combined Plan and Disclosure Statement. Holders of Claims in Class 3 are conclusively deemed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code. Holders of Claims in Class 3 are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

**10.4    Class 4: General Unsecured Claims.**

(a)    <u>Classification</u>: Class 4 shall consist of the General Unsecured Claims.

(b)    <u>Treatment</u>: Except to the extent that a Holder of an Allowed General Unsecured Claim in Class 4 agrees to a less favorable treatment or has been paid by any of the Debtors prior to the Effective Date, each Holder of an Allowed General Unsecured Claim in Class 4 shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim either: (i) a Cash payment equal to such Holder's Distribution Pro Rata Share of Net Distributable Assets; or, if permitted, (ii) with respect to any such Holder that makes a Cryptocurrency Election, a good faith effort shall be made to make distributions in an Equivalent Cryptocurrency Distribution.

(c)    <u>Voting</u>: Class 4 is Impaired under the Combined Plan and Disclosure Statement. Holders of Claims in Class 4 are entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

**10.5    Class 5: Convenience Claims.**

(a)    <u>Classification</u>: Class 5 shall consist of the Convenience Claims.

43

CRED_EXAMINER_00002226

(b)  Treatment: Except to the extent that a Holder of an Allowed Convenience Claim in Class 5 agrees to a less favorable treatment or has been paid by any of the Debtors prior to the Effective Date, each Holder of an Allowed Convenience Claim in Class 5 shall receive, in full and final satisfaction, settlement, and release of such Allowed Convenience Claim, Cash in an amount equal to 20.0% of the amount of such Allowed Convenience Claim on or as reasonably practicable after the later of (i) the Effective Date or (ii) thirty (30) days after the date on which such Claim becomes Allowed.

(c)  Voting: Class 5 is Impaired under the Combined Plan and Disclosure Statement. Holders of Claims in Class 5 are entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

## 10.6  Class 6: Subordinated Securities Claims

(a)  Classification: Class 6 shall consist of all Subordinated Securities Claims.

(b)  Treatment: Each Holder of an Allowed Subordinated Securities Claim will not receive or retain any property under the Combined Plan and Disclosure Statement on account of such Allowed Subordinated Securities Claim. The treatment of Subordinated Securities Claims under the Combined Plan and Disclosure Statement is in accordance with and gives effect to the provisions of section 510(b) of the Bankruptcy Code.

(c)  Voting: Class 6 is Impaired, and Holders of Class 6 Claims are conclusively presumed to have rejected the Combined Plan and Disclosure Statement under section 1126(g) of the Bankruptcy Code.

## 10.7  Class 7: Equity Interests in Debtors

(a)  Classification: Class 7 shall consist of the Equity Interests in the Debtors.

(b)  Treatment: On the Effective Date, the Equity Interests in the Debtors shall be cancelled and the Holders of the Equity Interests shall not be entitled to, and shall not receive or retain, any property on account of such Equity Interests under the Combined Plan and Disclosure Statement.

(c)  Voting: Class 7 is Impaired, and such Holders of Class 7 Claims are conclusively presumed to have rejected the Combined Plan and Disclosure Statement under section 1126(g) of the Bankruptcy Code.

## 10.8  Reservation of Rights Regarding Claims and Equity Interests

Except as otherwise explicitly provided herein, nothing shall affect either the Debtors' or the Liquidation Trustee's rights and defenses, both legal and equitable, with respect to any Claims or Equity Interests, including all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

44

CRED_EXAMINER_00002227

## ARTICLE XI.
## ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT

### 11.1    Voting of Claims

(a)    Classes Entitled to Vote

Each Holder of a Claim, that is not a Disallowed Claim and for which no objection to the allowance thereof, motion to estimate, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed and remains unresolved, in Classes 4 and 5, or the Holder of a Claim that has been temporarily allowed for voting purposes only under Bankruptcy Rule 3018(a) in such Classes, shall be entitled to vote separately to accept or reject the Combined Plan and Disclosure Statement, as provided in the Disclosure Statement Order or any other applicable order of the Bankruptcy Court.

(b)    Classes Deemed to Accept

Each of Classes 1, 2, and 3 are Unimpaired under the Combined Plan and Disclosure Statement, and each such Class is conclusively presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code.

(c)    Classes Deemed to Reject

Subordinated Securities Claims in Class 6 and Equity Interests in Class 7 will not receive or retain any property on account of such Claims or Equity Interests under the Combined Plan and Disclosure Statement.  In accordance with section 1126(g) of the Bankruptcy Code, Classes 6 and 7 are conclusively presumed to have rejected the Combined Plan and Disclosure Statement.

### 11.2    Elimination of Vacant Classes

Any Class of Claims or Equity Interests that does not contain, as of the date of the Confirmation Hearing, a Holder of an Allowed Claim or Allowed Equity Interest, or a Holder of a Claim temporarily Allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Combined Plan and Disclosure Statement for all purposes, including for purposes of determining acceptance of the Combined Plan and Disclosure Statement by such Class under section 1129(a)(8) of the Bankruptcy Code.

### 11.3    Nonconsensual Confirmation

If any Impaired Class of Claims entitled to vote shall not accept the Combined Plan and Disclosure Statement by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Combined Plan and Disclosure Statement in accordance with Section 20.5 hereof or undertake to have the Bankruptcy Court confirm the Combined Plan and Disclosure Statement under section 1129(b) of the Bankruptcy Code, or both.  With respect to Impaired Classes of Claims that are deemed to reject the Combined Plan and Disclosure Statement, the Debtors shall request that the Bankruptcy Court

45

CRED_EXAMINER_00002228

confirm the Combined Plan and Disclosure Statement pursuant to section 1129(b) of the
Bankruptcy Code.

**11.4    Revocation of the Combined Plan and Disclosure Statement**

Subject to Section 20.6 hereof, the Debtors, after consultation with the Committee, may
revoke and withdraw the Combined Plan and Disclosure Statement in its entirety at any time
prior to entry of the Confirmation Order.  If the Combined Plan and Disclosure Statement is so
revoked or withdrawn, then it shall be deemed null and void.

**ARTICLE XII.**
**MEANS OF IMPLEMENTATION OF THE COMBINED PLAN AND DISCLOSURE**
**STATEMENT**

In addition to the provisions set forth elsewhere in the Combined Plan and Disclosure
Statement, the following shall constitute the means for implementation of the Combined Plan
and Disclosure Statement:

**12.1    Limited Substantive Consolidation**

The Combined Plan and Disclosure Statement provides for substantive consolidation of
the Debtors' Estates, but solely for the purposes hereof, including making any Distributions to
Holders of Allowed Claims.

On the Effective Date, (i) all Assets and Liabilities of the Debtors will, solely for
Distribution purposes, be treated as if they were merged, (ii) all Intercompany Claims will be
eliminated, (iii) each Claim Filed or to be Filed against the Debtors will be deemed a single
nonaggregated Claim against, and a single non-aggregated obligation of, the Debtors, (iv) all
guarantees of any Debtor of the payment, performance, or collection of obligations of another
Debtor shall be eliminated and canceled; and (v) all transfers, disbursements and Distributions on
account of Claims made by or on behalf of any of the Debtors' Estates hereunder will be deemed
to be made by or on behalf of all of the Debtors' Estates.  Holders of Allowed Claims entitled to
Distributions under this Combined Plan and Disclosure Statement shall be entitled to their
Distribution Pro Rata Share on account of such Claim without regard to which Debtor was
originally liable for such Claim.  Except as set forth herein, such limited substantive
consolidation shall not (other than for purposes related to this Combined Plan and Disclosure
Statement) affect the legal and corporate structures of the Debtors.

**12.2    Global Settlement**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the
Combined Plan and Disclosure Statement incorporates a compromise and settlement of
numerous inter-Debtor, Debtor-Creditor, and inter-Creditor issues designed to achieve an
economic settlement of Claims against the Debtors and an efficient resolution of the Chapter 11
Cases.  This global settlement constitutes a settlement of Claims as provided herein, including
the validity and enforceability of Intercompany Claims, and the allocation of Assets among the
Estates.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of

46

CRED_EXAMINER_00002229

the compromises and settlements underlying the substantive consolidation of the Debtors' Estates and all other compromises and settlements provided herein. The Bankruptcy Court's findings shall constitute its determination that such compromises and settlements, and the substantive consolidation of the Debtors' Estates, are in the best interests of the Debtors, their Estates, their Creditors, and other parties-in-interest, and are fair, equitable, and within the range of reasonableness. Each provision of the global settlement shall be deemed non-severable from each other and from the remaining terms hereof. As set forth in detail below, the global settlement will be implemented as set forth herein, through the substantive consolidation of the Debtors' Estates, solely for purposes of voting on, and Distributions hereunder.

**12.3    Liquidation of the Debtors**

On the Effective Date, the Debtors will transfer all of their Assets, including the Net Asset Sale Proceeds, if any, and any Excluded Assets, to the Liquidation Trust, for Distribution in accordance herewith. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Combined Plan and Disclosure Statement, including, to the extent not previously approved, a Sale Transaction.

(a)    Appointment of Liquidation Trustee

The Liquidation Trustee shall be selected by the members of the Committee and shall be identified in the Liquidation Trust Agreement to be filed with the Bankruptcy Court with the Plan Supplement. The appointment of the Liquidation Trustee shall be approved in the Confirmation Order, and the Liquidation Trustee's duties shall commence as of the Effective Date. The Liquidation Trustee shall administer the Combined Plan and Disclosure Statement and the Liquidation Trust and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Causes of Action belonging to the Estates.

In accordance with the Liquidation Trust Agreement, the Liquidation Trustee shall serve in such capacity through the earlier of (i) the date on which the Liquidation Trust is dissolved in accordance with Section 12.3(j) hereof and (ii) the date on which such Liquidation Trustee resigns, is terminated, or is otherwise unable to serve; provided, however, that, in the event that the Liquidation Trustee resigns, is terminated, or is otherwise unable to serve, the Trust Advisory Board shall appoint a successor to serve as the Liquidation Trustee in accordance with the Liquidation Trust Agreement. If the Trust Advisory Board does not appoint a successor within the time periods specified in the Liquidation Trust Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Liquidation Trust, shall approve a successor to serve as the Liquidation Trustee. Any such successor Liquidation Trustee shall serve in such capacity until the Liquidation Trust is dissolved.

(b)    Responsibilities of Liquidation Trustee

Responsibilities of the Liquidation Trustee shall include, but are not limited to:

(i)    Administering the implementation hereof, including the making of the Distributions contemplated herein;

47

CRED_EXAMINER_00002230

(ii)   Marshalling, marketing for sale, and liquidating the Estates' Assets;

(iii)  Conducting an analysis of any and all Claims and Equity Interests and prosecuting objections thereto or settling or otherwise compromising such Claims and Equity Interests, if necessary and appropriate, in accordance with Article XIV hereof;

(iv)   Maintaining and administering the Reserves in accordance with the terms hereof;

(v)    Commencing, prosecuting, or settling claims and Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges in accordance herewith and paying all associated costs;

(vi)   Recovering and compelling turnover of the Debtors' property;

(vii)  Adjudicating third-party claims assigned, purchased, or otherwise transferred to the Liquidation Trust;

(viii) Paying Liquidation Trust Expenses;

(ix)   Abandoning any property constituting the Estates' Assets that cannot be sold or otherwise disposed of for value and whose Distribution to Holders of Allowed Claims would not be feasible or cost-effective in the Liquidation Trustee's reasonable judgment;

(x)    Preparing and filing post-Effective Date operating reports;

(xi)   Filing appropriate tax returns in the exercise of the Liquidation Trustee's fiduciary obligations;

(xii)  Retaining such Professionals as are necessary and appropriate in furtherance of the Liquidation Trustee's fiduciary obligations; and

(xiii) Taking such actions as are necessary and reasonable to carry out the purposes of the Liquidation Trust, including winding down the Debtors' business affairs.

(c)   <u>Establishment of a Liquidation Trust</u>

Pursuant to the Confirmation Order, the Debtors (not including Cred) will be dissolved and the Liquidation Trust, which may be referred to as the "Cred Liquidation Trust," will be established. The Liquidation Trust will be intended to qualify as a "liquidating trust" as described in Treasury Regulations Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-2 C.B. 684, and will be treated for federal income tax purposes as a "grantor trust" under Internal Revenue Code sections 671-677. The Liquidation Trust shall be managed by the Liquidation Trustee, who shall be selected by the Committee in its sole discretion, and subject to a Trust Advisory Board consisting of each member of the Committee who wishes to continue in such role, and such

48

CRED_EXAMINER_00002231

additional members nominated by the Committee, if any, as are required for the initial complement of the Trust Advisory Board to be an odd number greater than one. The Liquidation Trust shall be administered in accordance with the terms of the Liquidation Trust Agreement.

Prior to the Effective Date, any and all of the Estates' Assets shall remain Assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date shall, subject to the Liquidation Trust Agreement, be transferred to and vest in the Liquidation Trust. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, assigned or sold pursuant to a prior Order or the Combined Plan and Disclosure Statement, the Liquidation Trustee specifically retains and reserves the right to assert, after the Effective Date, any and all of the claims, Causes of Action (including but not limited to those Causes of Action listed on the Causes of Action List) and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Liquidation Trust and the Liquidation Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Liquidation Trust Agreement, compromise or settle any Liquidation Trust Assets. From and after the Effective Date, the Liquidation Trust and the Liquidation Trustee may commence, litigate, and settle any Causes of Action or Claims relating to the Liquidation Trust Assets or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Liquidation Trust and Liquidation Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Liquidation Trust Agreement. The Liquidation Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

Other than as set forth herein, no other Entity may pursue such Liquidation Trust Assets on or after the Effective Date. The Liquidation Trustee shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Liquidation Trust Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Liquidation Trustee shall execute the Liquidation Trust Agreement and shall have established the Liquidation Trust pursuant hereto. In the event of any conflict between the terms of this Article XII and the terms of the Liquidation Trust Agreement, the terms of the Liquidation Trust Agreement shall control.

(d)    Liquidation Trust Assets

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Liquidation Trust Assets become available, the Debtors shall be deemed, subject to the Liquidation Trust Agreement, to have automatically transferred to the Liquidation Trust all of their right, title, and interest in and to all of the Liquidation Trust Assets, in accordance with section 1141 of the Bankruptcy Code, including the Debtors' attorney-client privilege. All such Assets shall automatically vest in the Liquidation Trust free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims as set forth herein and the expenses of the Liquidation Trust as set forth herein

49

CRED_EXAMINER_00002232

and in the Liquidation Trust Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.

> (e)    Treatment of Liquidation Trust for Federal Income Tax Purposes; No Successor-in-Interest

The Liquidation Trust shall be established for the primary purpose of liquidating and distributing the Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. Accordingly, the Liquidation Trustee may, in an expeditious but orderly manner, liquidate the Liquidation Trust Assets, make timely Distributions to the Liquidation Trust Beneficiaries and not unduly prolong its duration. The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidation Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Liquidation Trustee expressly for such purpose.

The Liquidation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidation Trust Beneficiaries treated as grantors and owners of the Liquidation Trust. For all federal income tax purposes, all parties (including the Debtors, the Liquidation Trustee, and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets by the Debtors to the Liquidation Trust, as set forth in the Liquidation Trust Agreement, as a transfer of such Assets by the Debtors to the Holders of Allowed General Unsecured Claims entitled to Distributions from the Liquidation Trust Assets, followed by a transfer by such Holders to the Liquidation Trust. Thus, the Liquidation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

As soon as practicable after the Effective Date, the Liquidation Trustee shall make a good faith determination of the fair market value of the Estates' Assets as of the Effective Date, provided, however, that the Liquidation Trustee shall not be required to hire an expert to make such a valuation. This valuation shall be used consistently by all parties (including the Debtors, the Liquidation Trustee, and the Holders of General Unsecured Claims) for all federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of the Liquidation Trust Assets.

The right and power of the Liquidation Trustee to invest the Liquidation Trust Assets, the proceeds thereof, or any income earned by the Liquidation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of Section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings or other IRS pronouncements. The Liquidation Trustee may expend the Cash of the Liquidation Trust (i) as reasonably necessary to meet Contingent Liabilities and to maintain the value of the respective Assets of the Liquidation Trust during liquidation, (ii) to pay the respective reasonable administrative expenses (including any taxes imposed on the Liquidation Trust) and (iii) to satisfy other respective Liabilities incurred by the Liquidation Trust in accordance herewith and with the Liquidation Trust Agreement (including the payment of any taxes).

CRED_EXAMINER_00002233

(f)     The Trust Advisory Board. The Trust Advisory Board shall consist of each member of the Committee who wishes to continue in such role, and such additional members nominated by the Committee, if any, as are required for the initial complement of the Trust Advisory Board to be an odd number greater than one.

The Trust Advisory Board shall have the responsibility to review and advise the Liquidation Trustee with respect to the liquidation and Distribution of the Estates' Assets in accordance herewith and the Liquidation Trust Agreement. The Debtors or the Committee shall File a notice identifying the members of the Trust Advisory Board no later than five (5) days prior to the Voting Deadline. Vacancies on the Trust Advisory Board shall be filled by a Person designated by the remaining member or members of the Trust Advisory Board from among the Holders of General Unsecured Claims, and the Trust Advisory Board shall use reasonable efforts to maintain such composition of the members of the Trust Advisory Board as existed prior to the resignation of such member. The Liquidation Trustee shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Trust Advisory Board for cause. Any successor appointed pursuant to this Section 12.3(f) shall become fully vested with all of the rights, powers, duties and obligations of his or her predecessor. For the avoidance of doubt, no member of the Trust Advisory Board shall be compensated for serving as a member of the Trust Advisory Board; provided, however, that such members may be reimbursed from the Liquidation Trust for reasonable out of pocket expenses.

Pursuant to the Liquidation Trust Agreement, the Liquidation Trustee will need the consent of at least two (2) members of the Trust Advisory Board, or approval of the Bankruptcy Court, before pursuing any potential Avoidance Actions under 11 U.S.C. § 547.

(g)     Expenses of Liquidation Trustee

The Liquidation Trust Expenses shall be paid from the Liquidation Trust Assets.

(h)     Insurance; Bond

The Liquidation Trustee, in his or her sole discretion, may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the Liabilities and obligations of the Liquidation Trustee and the Trust Advisory Board under the Liquidation Trust Agreement. Unless otherwise agreed to by the Trust Advisory Board, the Liquidation Trustee shall serve with a bond, the terms of which shall be agreed to by the Trust Advisory Board, and the cost and expense of which shall be paid by the Liquidation Trust.

(i)     Fiduciary Duties of the Liquidation Trustee

Pursuant hereto and the Liquidation Trust Agreement, the Liquidation Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims that will receive Distributions pursuant to the terms hereof.

(j)     Termination of the Liquidation Trust

The Liquidation Trust will terminate on the earlier of: (a) final liquidation, administration and Distribution of the Liquidation Trust Assets in accordance with the terms of the Liquidation

CRED_EXAMINER_00002234

Trust Agreement and the Combined Plan and Disclosure Statement, and its full performance of all other duties and functions as set forth herein or in the Liquidation Trust Agreement; and (b) the fifth (5th) anniversary of the Effective Date. Notwithstanding the foregoing, multiple fixed term extensions can be obtained so long as Bankruptcy Court approval is obtained within six (6) months before the expiration of the term of the Liquidation Trust and each extended term provided that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust within the meaning of Section 301.7701-4(d) of the Treasury Regulations for federal income tax purposes. After (a) the final Distributions pursuant hereto, (b) the Filing by or on behalf of the Liquidation Trust of a certification of dissolution with the Bankruptcy Court, and (c) any other action deemed appropriate by the Liquidation Trustee, the Liquidation Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

(k)    Liability of Liquidation Trustee; Indemnification

Neither the Liquidation Trustee, the Trust Advisory Board, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, an "Exculpation Party" and collectively, the "Exculpation Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Liquidation Trust or for the act or omission of any other Exculpation Party, nor shall the Exculpation Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Liquidation Trust Agreement or the Combined Plan and Disclosure Statement other than for specific acts or omissions resulting from such Exculpation Party's willful misconduct, gross negligence or actual fraud. The Liquidation Trustee shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Trust Advisory Board shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors. The Liquidation Trustee, or the Trust Advisory Board, may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Liquidation Trustee nor the Trust Advisory Board shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Liquidation Trustee or Trust Advisory Board or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud. The Liquidation Trust shall indemnify and hold harmless the Exculpation Parties (in their capacity as such), from and against and in respect of all Liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidation Trust or the Combined Plan and Disclosure Statement or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud. Persons dealing or having any relationship with

52

CRED_EXAMINER_00002235

the Liquidation Trustee shall have recourse only to the Liquidation Trust Assets and shall look only to the Liquidation Trust Assets to satisfy any liability or other obligations incurred by the Liquidation Trustee or the Trust Advisory Board to such Person in carrying out the terms of the Liquidation Trust Agreement, and neither the Liquidation Trustee nor the Trust Advisory Board shall have any personal obligation to satisfy any such liability. The Liquidation Trustee and/or the Trust Advisory Board members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Liquidation Trust Agreement against any of them. The Liquidation Trust shall promptly pay expenses reasonably incurred by any Exculpation Party in defending, participating in, or settling any action, proceeding or investigation in which such Exculpation Party is a party or is threatened to be made a party or otherwise is participating in connection with the Liquidation Trust Agreement or the duties, acts or omissions of the Liquidation Trustee or otherwise in connection with the affairs of the Liquidation Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Exculpation Party hereby undertakes, and the Liquidation Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Exculpated Party is not entitled to be indemnified therefor under the Liquidation Trust Agreement. The foregoing indemnity in respect of any Exculpation Party shall survive the termination of such Exculpation Party from the capacity for which they are indemnified.

    (l)    <u>Full and Final Satisfaction Against Liquidation Trust</u>

    On and after the Effective Date, the Liquidation Trust shall have no liability on account of any Claims or Equity Interests except as set forth herein and in the Liquidation Trust Agreement. All payments and all Distributions made by the Liquidation Trustee hereunder shall be in full and final satisfaction, settlement, and release of and in exchange for all Claims or Equity Interests against the Debtors.

**12.4    Effectuating Documents; Further Transactions**

    The appropriate officer(s) and/or director(s) of the Debtors or the Liquidation Trustee, as applicable, shall be, and hereby are, authorized to execute, deliver, file, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**12.5    Cancellation of Instruments and Stock**

    On the Effective Date, except to the extent otherwise provided herein, all instruments, certificates, and other documents evidencing debt or Equity Interests in the Debtors shall be cancelled and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged, including any and all warrants, options, rights, or interests with respect to such Equity Interests that have been issued, could be issued, or that have been authorized to be issued but that have not been issued; <u>provided</u>, <u>however</u>, that Cred shall issue one (1) share of common stock to the Liquidation Trust. The Liquidation Trustee shall have all power and authority that may be or could have been exercised, with respect to the Liquidation Trust Assets, by any

CRED_EXAMINER_00002236

officer, director, shareholder or other party acting in the name of the Debtors or their Estates with like effect as if duly authorized, exercised and taken by action of such officers, directors, shareholders or other party.

The Holders of, or parties to, the cancelled notes, membership interests, share certificates, and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, and other agreements and instruments or the cancellation thereof, except the rights provided pursuant hereto.

## 12.6    Disposition of Books and Records

After the Effective Date, the Debtors shall transfer the Debtors' books and records in the Debtors' possession to the Liquidation Trust. From and after the Effective Date, the Liquidation Trustee shall continue to preserve and maintain all documents and electronic data transferred to the Liquidation Trust by the Debtors, and the Liquidation Trustee, subject to Section 12.8 hereof, shall not destroy or otherwise abandon any such documents and records (in electronic or paper format) absent further order of the Bankruptcy Court after a hearing upon notice to parties-in-interest; provided, however, that the Liquidation Trustee may destroy or abandon such books and records upon entry of a Final Order closing the last Chapter 11 Case.

## 12.7    Corporate Existence and Dissolution of Debtors

Immediately after the Effective Date, the Liquidation Trustee shall be authorized to take, in his or her sole and absolute discretion, all actions reasonably necessary to dissolve one or more of the Debtors under applicable laws, including under the laws of the jurisdictions in which they may be organized or registered, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation. Upon the final Distributions, any Debtors that have not been previously dissolved shall be deemed dissolved for all purposes without the necessity for other or further actions to be taken by or on behalf of the Debtors, and the Liquidation Trustee shall be authorized to file any certificate of cancellation or other documents as may be necessary or desirable to terminate the legal existence of the Debtors.

## 12.8    Closing the Chapter 11 Cases

Upon the Effective Date, the Chapter 11 Cases for the Debtors, except for Cred, shall be deemed closed, and the Liquidation Trustee shall submit separate orders to the Bankruptcy Court under certification of counsel closing each such Chapter 11 Case. After all Causes of Action and Disputed Claims have been resolved, the U.S. Trustee Fees have been paid, all of the Estates' Assets have been distributed in accordance herewith, or at such earlier time as the Liquidation Trustee deems appropriate, the Liquidation Trustee shall seek authority from the Bankruptcy Court to close the Chapter 11 Case for Cred, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

54

CRED_EXAMINER_00002237

## ARTICLE XIII.
## DISTRIBUTIONS UNDER THE COMBINED PLAN AND DISCLOSURE STATEMENT

### 13.1    Distributions on Allowed General Unsecured Claims

All Allowed General Unsecured Claims held by a single creditor against one or more Debtors shall be aggregated and treated as a single Claim.  At the written request of the Liquidation Trustee, any Creditor holding multiple Allowed General Unsecured Claims shall provide to the Liquidation Trustee a single address to which any Distributions shall be sent.

### 13.2    Timing of Distributions

(a)    Distributions on Account of Allowed A/P/S Claims. The Liquidation Trustee shall pay any Allowed A/P/S Claim against the Debtors, as soon as practicable after the later of (a) the Effective Date and (b) the date upon which any such Claim becomes an Allowed Claim.

(b)    Interim Distributions on Account of Allowed General Unsecured Claims. Subject to approval of the Trust Advisory Board as set forth in the Liquidation Trust Agreement, (a) the Liquidation Trustee may make an interim Distribution to Holders of Allowed General Unsecured Claims at least semi-annually provided that any such Distribution is not unduly burdensome to the Liquidation Trust, and (b) may make more frequent interim Distributions if the Liquidation Trustee determines that such interim Distributions are warranted and economical; provided, however, that any such Distribution shall only be made if the Liquidation Trustee retains amounts reasonably necessary to meet Contingent Liabilities, to maintain the value of the Liquidation Trust Assets during liquidation, and to satisfy other Liabilities or expenses incurred by the Liquidation Trust in accordance herewith or with the Liquidation Trust Agreement.

(c)    Final Distributions on Allowed General Unsecured Claims. Notwithstanding anything else herein, upon the settlement and satisfaction of all A/P/S Claims, the completion of the prosecution and/or settlement of all Claims Objections and Causes of Action, and the completion of the sale and/or liquidation of all Assets, the Liquidation Trustee shall distribute, as soon as practicable, all remaining Liquidation Trust Assets to Holders of Allowed General Unsecured Claims.

### 13.3    Delivery of Distributions

Except as set forth herein, all Distributions to any Holder of an Allowed Claim shall be made: (i) by wire transfer; (ii) at the address of such Holder as set forth on the Schedules Filed with the Bankruptcy Court or on the books and records of the Debtors or its agents, as applicable, unless the Debtors or the Liquidation Trustee have been notified in writing of a change of address, including by the filing of a Proof of Claim by such Holder that contains an address for such Holder different than the address of such Holder as set forth on the Schedules, if being paid in Cash; or, if applicable (iii) with respect to any Holder of a Customer Claim entitled to an Equivalent Cryptocurrency Distribution at the Cryptocurrency Election E-Wallet Address; provided, however, that to receive an Equivalent Cryptocurrency Distribution, Holders of Customer Claims that made a Cryptocurrency Election shall provide their Cryptocurrency Election E-Wallet Address to the Liquidation Trustee.  Nothing herein shall require the Debtors or the Liquidation Trustee to attempt to locate any Holder of an Allowed Claim.

CRED_EXAMINER_00002238

The Liquidation Trustee shall require any Holders of Allowed Claims or other distributee to furnish to the Liquidation Trustee in writing: (i) an Employer Identification Number or Taxpayer Identification Number as assigned by the IRS; (ii) if applicable, bank account and routing numbers; and (iii) if applicable, a Cryptocurrency Election E-Wallet Address, and the Liquidation Trustee may condition any Distribution to any Holders of Allowed Claims or other distributee upon receipt of such identification number and, if applicable, the Cryptocurrency Election E-Wallet Address. If the Employer Identification Number, Taxpayer Identification Number, if necessary, bank account or routing number, or, if applicable, Cryptocurrency Election E-Wallet Address are not provided by the required deadline established by the Liquidation Trustee, the Claim of any Holders of Allowed Claims or other distributee may be expunged and no Distribution will be made by the Liquidation Trustee to such Holders of Allowed Claims or other distributee. The Liquidation Trustee may withhold from distributions any withholding tax it determines in its reasonable discretion must be so withheld, including, without limitation, to foreign creditors who have not provided instruments supporting exemption from withholding tax reasonably satisfactory to the Liquidation Trustee.

### 13.4    Undeliverable and Unclaimed Distributions

(a)    Holding Undeliverable and Unclaimed Distributions

If the Distribution to any Holder of an Allowed Claim is returned as undeliverable or is otherwise unclaimed, no additional Distributions shall be made to such Holder unless and until the Liquidation Trustee is notified in writing of such Holder's then-current address. Nothing contained herein shall require the Liquidation Trustee to attempt to locate any Holder of an Allowed Claim.

The Liquidation Trustee shall make all Distributions that have become deliverable as soon as reasonably practicable after such Distribution has become deliverable or has been claimed.

(b)    Failure to Claim Unclaimed/Undeliverable Distributions

Subject to Section 13.7 hereof, any Holder of an Allowed Claim that does not assert a Claim pursuant hereto for an undeliverable or unclaimed Distribution within six (6) months after the Distribution is made shall be deemed to have its Claim expunged and shall have forfeited its right to such undeliverable or unclaimed Distribution and any subsequent Distribution on account of its Allowed Claim and shall be forever barred and enjoined from asserting any such Claim for an undeliverable or unclaimed Distribution or any subsequent Distribution on account of its Allowed Claims against the Debtors, their Estates, their property or the Assets. In such cases, such unclaimed/undeliverable Distributions shall be redistributed and paid to Holders of Allowed Claims in accordance herewith, free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.

(c)    Charitable Donations

On or about the time that a final Distribution is made and upon the Liquidation Trustee determining that there are insufficient funds remaining to warrant a further Distribution to Holders of Claims hereunder, the Liquidation Trustee, with the approval of the Trust Advisory

56

CRED_EXAMINER_00002239

Board, may donate any undistributed funds to one or more charities selected by the Liquidation Trustee, provided that any charity selected shall not be affiliated with or connected to the Debtors or the Liquidation Trustee.

## 13.5    Transfer of Claims

The Claims Register shall remain open after the Effective Date, and the Liquidation Trustee shall recognize any transfer of Claims in accordance with Bankruptcy Rule 3001(e) at any time thereafter, provided that for purposes of each Distribution, the Liquidation Trustee will not recognize any transfer during the period commencing thirty (30) calendar days prior to making any Distribution. Except as otherwise provided herein, any transfer of a Claim, whether occurring prior to or after the Confirmation Date, shall not affect or alter the classification and treatment of such Claim hereunder, and any such transferred Claim shall be subject to classification and treatment hereunder as if such Claim was held by the transferor who held such Claim on the Petition Date.

## 13.6    Manner of Payment

At the option of the Liquidation Trustee, any Cash payment to be made hereunder may be made by a check, wire transfer, E-Wallet to E-Wallet transfer of Cryptocurrencies, if applicable, or as otherwise required or provided in applicable agreements.

## 13.7    Distributions to Cryptocurrency Election E-Wallet Addresses

The Liquidation Trustee shall maintain records of all distributions made to Cryptocurrency Election E-Wallet Addresses, including confirmations of E-Wallet to E-Wallet transfers. The Liquidation Trustee is only required to initiate such E-Wallet to E-Wallet transactions. The Liquidation Trustee is not responsible, and shall not be held liable, for any actions involving transferred Cryptocurrency after the initiation of such E-Wallet to E-Wallet transfers.

## 13.8    Time Bar to Cash Payments by Check

Checks issued by, or on behalf of, the Debtors or the Liquidation Trust on account of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Requests for reissuance of any check shall be made in writing directly to the Liquidation Trustee by the Holder of the Allowed Claim with respect to which such check originally was issued on or before the later of (a) the first anniversary of the Effective Date, (b) the first anniversary of the date on which the Claim at issue became an Allowed Claim, and (c) nine (9) months after the date the check was issued. After such dates, all Claims in respect of void checks shall be expunged, extinguished, discharged, and forever barred, and the proceeds of such checks shall revest in the Liquidation Trust.

## 13.9    No Fractional Cents

Notwithstanding any other provision hereof to the contrary, no payment of fractional cents shall be made pursuant hereto. Whenever any payment of a fraction of a cent hereunder would otherwise be required, the actual Distribution made shall reflect a rounding of such

CRED_EXAMINER_00002240

fraction to the nearest whole penny (up or down) with half cents or more being rounded up and fractions less than half of a cent being rounded down.

## 13.10   Setoffs and Recoupment

The Liquidation Trustee may, but shall not be required to, set off against or recoup from any Claim and the payments to be made pursuant hereto in respect of such Claim any Claims of any nature whatsoever that the Debtors may have against the claimant; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Liquidation Trust of any such claim they may have against such claimant.

## 13.11   Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution hereunder consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## 13.12   Distributions After Effective Date

Distributions made after the Effective Date shall be deemed to have been made on the Effective Date.

## 13.13   Interest on Claims

Except as specifically provided for herein or in the Confirmation Order, interest shall not accrue on Claims, and no Holders of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date through the date such Claim becomes an Allowed Claim.  Except as expressly provided herein, no Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

## 13.14   No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution in excess of the Allowed amount of such Claim.

## 13.15   Payment of Taxes on Distributions Received Pursuant to the Combined Plan and Disclosure Statement

All Entities that receive Distributions hereunder shall be responsible for reporting and paying, as applicable, all appropriate federal, state and local taxes on account of such Distributions.  This includes, but is not limited, any amount of tax due to be withheld from Distributions which the Liquidation Trustee did not withhold.

58

CRED_EXAMINER_00002241

**13.16  Reserves**

On the Effective Date, and after making all Distributions required to be made on the Effective Date hereunder, the Liquidation Trustee shall establish and maintain a separate reserve (each, a "Reserve") for the estimated amount of the Liquidation Trust Expenses, as well as each Class of Claims and Unclassified Claims, which Reserve shall be administered by the Liquidation Trustee.  To the extent that Reserves are established and maintained for the benefit of any Holder of a Disputed Claim, such Reserves shall include a combination of Cryptocurrency and Cash equal to the Distributions that would have been made to the Holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (a) the amount of the Disputed Claim, (b) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim ultimately may become an Allowed Claim, or (c) such other amount as may be agreed upon by the Holder of such Disputed Claim and the Liquidation Trustee.

**13.17  *De Minimis* Distributions**

All De Minimis Distributions will be held by the Liquidation Trustee for the benefit of the Holders of Allowed Claims entitled to such De Minimis Distributions.  When the aggregate amount of De Minimis Distributions held by the Liquidation Trustee for the benefit of a Holder of a Claim exceeds $25.00, the Liquidation Trustee will distribute such De Minimis Distributions to such Holder.  If, at the time that the final Distribution hereunder is to be made, the De Minimis Distributions held by the Liquidation Trustee for the benefit of a Holder of a Claim total less than $25.00, such funds shall not be distributed to such Holder, but rather, such Claims shall be deemed expunged and such Distribution shall vest in the Liquidation Trust and be distributed to other Holders of Allowed Claims in accordance with the terms hereof.

# ARTICLE XIV.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

**14.1  Claims Administration Responsibilities**

Except as otherwise specifically provided herein and in the Liquidation Trust Agreement, after the Effective Date, the Liquidation Trustee shall have the sole authority, including assumption of the authority of the Debtors with respect to any dispute in respect of a Claim or Equity Interest initiated prior to the Effective Date, (a) to File, withdraw, or litigate to judgment objections to Claims or Equity Interests, (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, (c) to amend the Schedules in accordance with the Bankruptcy Code, and (d) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

CRED_EXAMINER_00002242

**14.2    Claims Objections**

Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Combined Plan and Disclosure Statement, or otherwise becomes an Allowed Claim prior to the Effective Date, upon the Effective Date, the Liquidation Trustee shall be deemed to have a reservation of any and all objections of the Estates to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, priority, secured or unsecured, including any and all objections to the validity or amount of any and all alleged Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, Secured Claims, Convenience Claims, General Unsecured Claims, Subordinated Securities Claims, Equity Interests, Liens and security interests, whether under the Bankruptcy Code or other applicable law or contract. The Debtors' or the Liquidation Trustee's failure to object to any Claim in the Chapter 11 Cases shall be without prejudice to the Liquidation Trustee's rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the Holder of such Claim.

Unless otherwise provided herein or by order of the Bankruptcy Court, any objections to Claims (including Administrative Expense Claims but excluding Professional Fee Claims) by the Liquidation Trustee shall be filed and served not later than 180 days after the later of (i) the Effective Date or (ii) the date such Claim is filed (the "Claims Objection Deadline"); provided that the Liquidation Trustee may request (and the Bankruptcy Court may grant) an extension of such deadline by filing a motion with the Bankruptcy Court, based upon a reasonable exercise of the Liquidation Trustee's business judgment; provided further that with respect to Claims that, as of the Claims Objection Deadline, are subject to a pending objection (an "Initial Objection") wherein the objection to such Claim is ultimately denied, the Claims Objection Deadline shall be extended to the later of sixty (60) calendar days from the date on which (a) the Bankruptcy Court enters an order denying such Initial Objection or (b) any appellate court enters a Final Order reversing or vacating an order of the Bankruptcy Court granting such Initial Objection. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment hereto.

**14.3    Estimation of Claims**

The Liquidation Trustee may (but is not required to) at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidation Trustee, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidation Trustee may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative

60

CRED_EXAMINER_00002243

and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## 14.4    Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Claims Agent at the direction of the Liquidation Trustee without the Liquidation Trustee having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

## 14.5    No Distributions Pending Allowance

Notwithstanding any other provision hereof, if any portion of a Claim is Disputed, no payment or Distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes Allowed.

## 14.6    Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions hereof.

## 14.7    Disallowance of Certain Claims

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or by an Entity that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and such Entities may not receive any Distributions on account of their Claims until such time as such Causes of Action against such Entities have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by such Entity have been turned over or paid to the Liquidation Trust.

## 14.8    Amendments to Claims

On or after the Effective Date, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Liquidation Trustee, and any such new or amended Claim filed without prior authorization shall be deemed Disallowed in full and expunged without any further action.

## 14.9    Claims Paid and Payable by Third Parties

A Claim shall be Disallowed without an Objection thereto having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors, the Liquidation Trust, or the Liquidation Trustee. Distributions under the Combined Plan and Disclosure Statement shall be made on account of any Allowed Claim that is payable

CRED_EXAMINER_00002244

pursuant to one of the Debtors' insurance policies solely up to the amount of, and in full and complete satisfaction of, the portion of such Allowed Claim that is within the deductible or self-insured retention under such insurance policy. Except as provided in this Section 14.9, no Entity shall have any other recourse against the Debtors, the Estates, the Liquidation Trust, or any of their respective properties or assets on account of such deductible or self-insured retention under an insurance policy.

## ARTICLE XV.
## EXECUTORY CONTRACTS AND LEASES

### 15.1    Executory Contracts and Unexpired Leases Deemed Rejected

On the Effective Date, all of the Debtors' Executory Contracts and Unexpired Leases will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except to the extent (a) the Debtors previously have assumed, assumed and assigned, or rejected such Executory Contract or Unexpired Lease, (b) prior to the Effective Date, the Debtors have filed a motion to assume, assume and assign, or reject an Executory Contract or Unexpired Lease on which the Bankruptcy Court has not ruled, (c) an Executory Contract and Unexpired Lease is identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant hereto, or (d) Executory Contracts and Unexpired Leases under which the counterparty has consented to the extension of the time by which the Debtors must assume or reject to a date beyond the Effective Date. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all rejections of Executory Contracts and Unexpired Leases pursuant to this Section 15.1 and sections 365(a) and 1123 of the Bankruptcy Code.

### 15.2    Bar Date For Rejection Damages

If the rejection by the Debtors of an Executory Contract or an Unexpired Lease pursuant to Section 15.1 hereof results in damages to the other party or parties to such Executory Contract or Unexpired Lease, a Claim for such damages arising from such rejection shall not be enforceable against the Debtors or their Estates or agents, successors, or assigns, unless a Proof of Claim is filed with the Claims Agent **so as to actually be received on or before** the Rejection Bar Date.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or Unexpired Lease hereunder and that fails to timely do so shall be forever barred, estopped, and enjoined from asserting such Claim, and such Claim shall not be enforceable against the Liquidation Trust, the Liquidation Trustee, the Debtors, the Estates, and their respective properties, and the Liquidation Trust, the Liquidation Trustee, Debtors, the Estates, and their respective properties shall be forever discharged from any and all Liabilities with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction pursuant to Section 18.4 hereof and the Confirmation Order.

CRED_EXAMINER_00002245

## ARTICLE XVI.
## CONDITIONS PRECEDENT TO THE CONFIRMATION AND THE EFFECTIVE DATE

**16.1    Conditions Precedent to Confirmation of the Combined Plan and Disclosure Statement**

The following are conditions precedent to confirmation of the Combined Plan and Disclosure Statement:

(a)    The Plan Support Agreement shall not have been terminated;

(b)    The Bankruptcy Court shall have entered the Confirmation Order, in a form and substance reasonably acceptable to the Committee, and the Confirmation Order shall have become a Final Order;

(c)    The final version of all of the schedules, documents, and exhibits, including the Plan Supplement, shall have been filed in form and substance acceptable to the Committee in its reasonable discretion; and

(d)    No breach or failure to comply with the terms of the Definitive Documents, the Confirmation Order or any other material Final Order of the Bankruptcy Court shall have occurred and be continuing.

**16.2    Conditions Precedent to the Effective Date**

The Effective Date shall not occur, and the Combined Plan and Disclosure Statement shall not become effective with respect to the Debtors, unless and until the following conditions are satisfied in full or waived in accordance with Section 16.3 hereof:

(a)    The Plan Support Agreement shall not have been terminated;

(b)    No breach or failure to comply with the terms of the Definitive Documents, the Confirmation Order, or any other material Final Order of the Bankruptcy Court shall have occurred and be continuing;

(c)    The conditions to confirmation delineated in Section 11.1 hereof shall have either been satisfied or waived in accordance herewith;

(d)    All documents required hereunder shall have been delivered'

(e)    The Confirmation Order in form and substance reasonably satisfactory to the Committee shall have been entered by the Bankruptcy Court, and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto;

(f)    The Debtors and the Liquidation Trustee shall have executed the Liquidation Trust Agreement;

63

CRED_EXAMINER_00002246

(g)    All actions and all agreements, instruments, or other documents necessary to implement the terms and provisions hereof are effected or executed and delivered, as applicable;

(h)    The Professional Fee Escrow shall have been established and fully funded in the amount of the Professional Fee Reserve Amount; and

(i)    All authorizations, consents, and regulatory approvals, rulings, letters, no-action letters, opinions, or documents, if any, that are necessary to implement the Combined Plan and Disclosure Statement or that are required by the applicable Debtor entity or applicable law, regulation, or order, in connection with the Consummation of the Combined Plan and Disclosure Statement shall have been obtained and not revoked.

## 16.3    Waiver of Conditions Precedent to the Effective Date

Each of the conditions precedent in Section 16.2 hereof may be waived, in whole or in part, by the Debtors, with the consent of the Committee, without leave or order of the Bankruptcy Court and without any formal action on the part of the Bankruptcy Court. The Debtors and the Liquidation Trustee reserve the right to assert that any appeal from the Confirmation Order shall be moot after the Effective Date.

## 16.4    Satisfaction of Conditions

Except as expressly provided or permitted herein, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. In the event that one or more of the conditions specified in Section 16.2 hereof shall not have occurred or otherwise been waived pursuant to Section 16.3 hereof, (a) the Confirmation Order shall be vacated, (b) the Debtors and all Holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (c) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

## ARTICLE XVII.
## EFFECT OF CONFIRMATION

## 17.1    Compromise and Settlement of Claims, Equity Interests, and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant hereto, the provisions hereof shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Allowed Equity Interest or any Distribution to be made on account of such Allowed Claim or Allowed Equity Interest. The

64

CRED_EXAMINER_00002247

entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests, and is fair, equitable, and reasonable. In accordance with the provisions hereof, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Liquidation Trustee may compromise and settle Claims against the Liquidation Trust and Causes of Action against other Entities.

## 17.2    Binding Effect

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Combined Plan and Disclosure Statement, the Plan Supplement, and the Confirmation Order shall bind (a) any Holder of a Claim against, or Equity Interest in, the Debtors and such Holder's respective successors and assigns (whether or not the Claim or Equity Interests are Impaired hereunder, whether or not such Holder has voted to accept the Combined Plan and Disclosure Statement, and whether or not such Holder is entitled to a Distribution hereunder), (b) all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described herein, (c) each Entity acquiring property hereunder or under the Confirmation Order, and (d) any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant hereto regardless of whether any Holder of a Claim or debt has voted hereon.

## 17.3    Reservation of Causes of Action/Reservation of Rights

Except with respect to the exculpation in Section 18.1 hereof, nothing contained herein shall be deemed to be a waiver or the relinquishment of any Causes of Action that the Debtors or the Liquidation Trust, as applicable, may have or may choose to assert against any Entity, and such Causes of Action are hereby preserved pursuant to section 1123 of the Bankruptcy Code, including, without limitation, any and all avoidance or equitable subordination actions, recovery Causes of Action and Objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code, as well as all Causes of Action based upon fraud, theft, conversion, unfair competition, tortious interference, breach of fiduciary duty, common law tort, and similar and related legal theories and Causes of Action.

## ARTICLE XVIII.
## EXCULPATION, INJUNCTION, AND RELATED PROVISIONS

## 18.1    Exculpation

**None of the Debtors-in-Possession and the current or former directors, officers, employees, Affiliates, agents, accountants, financial advisors, investment bankers, restructuring advisors, attorneys, representatives, and other Professionals of or to the Debtors and the Debtors-in-Possession who served or were employed in such capacities after the Petition Date, and each of their respective agents and representatives, the Released Parties, the Committee, the members of the Committee and the Professionals**

65

CRED_EXAMINER_00002248

retained by the Committee shall have or incur any Liability for any Claim, Cause of Action, or other assertion of Liability for any act taken or omitted to be taken in connection with or arising out of the Chapter 11 Cases, the sale of the Debtors' Assets, the formulation, dissemination, implementation, approval, confirmation, consummation, or administration hereof, property to be distributed hereunder, or any other act or omission in connection with or arising out of the Chapter 11 Cases, the Combined Plan and Disclosure Statement, or any contract, instrument, document or other agreement related thereto; provided, however, that the foregoing shall not affect the Liability of any Entity resulting from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, actual fraud, or gross negligence. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, discharges, and any other applicable law or rules protecting such Entities from liability.

18.2    Releases by Debtors, the Estates, the Liquidation Trust, and the Liquidation Trustee; Third Party Releases

Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services of the Released Parties, (a) the Debtors, (b) their respective Estates, (c) the Liquidation Trust, and (d) the Liquidation Trustee shall release, waive, and discharge unconditionally and forever each of the Released Parties from any and all Claims, Causes of Action, and Liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: (i) taking place before the Petition Date in connection with the Debtors; and (ii) in connection with or arising out of the Debtors' Chapter 11 Cases, the pursuit of confirmation of the Combined Plan and Disclosure Statement, the Consummation thereof, the administration thereof or the property to be distributed thereunder; provided, that the foregoing shall not operate as a waiver of or release from any Causes of Action resulting from the willful misconduct, actual fraud, or gross negligence of any Released Party arising under chapter 5 of the Bankruptcy Code.

In addition, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services of the Released Parties, the settlements and compromises contained herein, and the Distributions to be made pursuant to the Combined Plan and Disclosure Statement, (a) each of the Debtors, (b) all Holders of Claims or Equity Interests, who (1) vote in favor of the Combined Plan and Disclosure Statement or (2) (A) abstain from voting, are not entitled to vote, or vote to reject the Combined Plan and Disclosure Statement and (B) do not opt out of the this release on a timely submitted Ballot or the Opt-Out Election Form, and (c) with respect to the foregoing subparagraph (b), the current and former Affiliates thereof, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals,

66

each in their capacity as such, shall be deemed to have released and discharged each
Released Party from any and all claims and Causes of Action, whether known or unknown,
including any derivative claims asserted on behalf of the Debtors, that such Entity would
have been legally entitled to assert (whether individually or collectively), based on or
relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors'
prepetition operations and activities, existing or hereinafter arising in law, equity, or
otherwise, based in whole or in part on any act, omission, transaction, event or other
occurrence taking place before the Effective Date.

For the avoidance of doubt, no Insider that is not a Released Party, including,
without limitation, James Alexander, Lu Hua, Dan Schatt, Joseph Podulka, and Daniyal
Inamullah, will receive a release or exculpation of any kind hereunder, whether from the
Debtors or otherwise.

### 18.3    Avoidance Actions/Objections

Except with respect to the exculpation in Section 18.1 hereof and the releases in Section
18.2 hereof, in the Confirmation Order, or by Final Order of the Bankruptcy Court, as applicable,
from and after the Effective Date, the Liquidation Trustee shall have the right to prosecute any
and all avoidance or equitable subordination actions, recovery Causes of Action, and Objections
to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code that
belong to the Debtors or a Debtor-in-Possession, as well as all Causes of Action, including,
without limitation, all Causes of Action based upon fraud, theft, conversion, unfair competition,
tortious interference, common law tort, breach of fiduciary duty and similar and related legal
theories and Causes of Action.

### 18.4    Injunction

Except as otherwise provided herein, all Entities that have held, hold, or may hold
Claims against or Equity Interests in the Debtors or their Estates that arose prior to the
Effective Date are permanently enjoined, solely with respect to any such Claims or Equity
Interests, from: (a) commencing or continuing in any manner, directly or indirectly, any
action or other proceeding of any kind against the Debtors, their Estates, the Liquidation
Trust, or the Liquidation Trustee; (b) enforcing, attaching, collecting, or recovering, by
any manner or means, whether directly or indirectly, any judgment, award, decree, or
order against the Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustee;
(c) creating, perfecting, or enforcing, in any manner, directly or indirectly, any Lien or
encumbrance against the Debtors, their Estates, the Liquidation Trust, or the Liquidation
Trustee; (d) except to the extent permitted by sections 362(b), 553, 559, 560, or 561 of the
Bankruptcy Code, asserting any right of setoff, subrogation, or recoupment against the
Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustee; (e) pursuing any
Claim or Cause of Action released pursuant to the Combined Plan and Disclosure
Statement; or (f) taking any actions which interfere with the implementation or
Consummation hereof.

The rights afforded herein and the treatment of all Claims and Equity Interests
shall be in exchange for and in complete satisfaction of all Claims and Equity Interests of

67

any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtors, any of their respective Assets, properties, or Estates, or the Liquidation Trust.

Notwithstanding any language to the contrary contained herein and/or the Plan Confirmation Order, no provision of this Plan or the Plan Confirmation Order shall (i) preclude the United States Securities and Exchange Commission ("**SEC**") from enforcing its police or regulatory powers or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any Entity other than the Debtors.

## 18.5    Terms of Stays and Injunctions

The stay arising under section 362(a) of the Bankruptcy Code and the injunctions set forth in Section 18.4 hereof or provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Combined Plan and Disclosure Statement or the Confirmation Order), shall permanently remain in full force and effect.

## ARTICLE XIX.
## RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction of all matters in connection with, arising out of or related to the Chapter 11 Cases and the Combined Plan and Disclosure Statement pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including to:

(a)    Hear and determine pending applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance of cure amounts and Claims resulting therefrom;

(b)    Determine any and all adversary proceedings, applications and contested matters;

(c)    Hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(d)    Hear and determine any Claim Objections (including requests for estimation) in respect of Disputed Claims, in whole or in part;

(e)    Enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f)    Issue such orders in aid of execution hereof, to the extent authorized by section 1142 of the Bankruptcy Code;

(g)    Consider any amendments to or modifications hereof or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including the Confirmation Order;

68

CRED_EXAMINER_00002251

(h)     Hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Combined Plan and Disclosure Statement, the Confirmation Order, the Liquidation Trust Agreement, any transactions or payments contemplated hereby or thereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(i)     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any request by the Debtors), prior to the Effective Date or request by the Liquidation Trustee after the Effective Date for an expedited determination of tax issues under section 505(b) of the Bankruptcy Code;

(j)     Hear and determine all disputes involving the existence, scope, and nature of the discharges granted under the Combined Plan and Disclosure Statement, the Confirmation Order or the Bankruptcy Code;

(k)     Issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any Entity with the Consummation, implementation, or enforcement of the Combined Plan and Disclosure Statement, the Confirmation Order or any other order of the Bankruptcy Court;

(l)     Determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)    Hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(n)     Recover all Assets of the Debtors and property of the Debtors' Estates, wherever located;

(o)     Enforce the terms of the Liquidation Trust Agreement and to decide any claims or disputes which may arise or result from, or be connected with, the Liquidation Trust Agreement, any breach or default under the Liquidation Trust Agreement, or the transactions contemplated by the Liquidation Trust Agreement;

(p)     Enforce the exculpation granted and injunctions issued pursuant to the Combined Plan and Disclosure Statement and the Confirmation Order;

(q)     Enter a final decree closing the Chapter 11 Cases; and

(r)     Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XX.
## MISCELLANEOUS PROVISIONS

**20.1    Effectuating Documents and Further Transactions**

69

CRED_EXAMINER_00002252

On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Plan and Disclosure Statement. The Liquidation Trustee is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of Combined Plan and Disclosure Statement and any securities issued pursuant to the Combined Plan and Disclosure Statement.

**20.2    Date of Distributions and Other Actions**

In the event that any payment or act hereunder is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**20.3    Withholding and Reporting Requirements**

In connection with the Combined Plan and Disclosure Statement and all Distributions hereunder, the Liquidation Trustee shall comply with all applicable withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding, payment, and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution. The Liquidation Trustee has the right, but not the obligation, to refrain from making a Distribution until such Holder has made arrangements satisfactory to the Liquidation Trustee for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Liquidation Trust in connection with such Distribution.

**20.4    Corporate Action**

On the Effective Date, all matters provided for hereunder that would otherwise require approval of shareholders, directors or managers of one or more of the Debtors shall be in effect from and after the Effective Date pursuant to the applicable general business law of the states in which the Debtors are incorporated or organized, without any requirement of further action by the shareholders, directors or managers of the Debtors.

**20.5    Modification of the Combined Plan and Disclosure Statement**

Alterations, amendments, or modifications hereof or hereto may be proposed in writing by the Debtors, with the consent of the Committee, at any time prior to the Confirmation Date; provided, that the Combined Plan and Disclosure Statement, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and the Debtors have complied with section 1125 of the Bankruptcy Code. The Combined Plan and Disclosure Statement may be altered, amended, or modified at any time after the Confirmation Date and before substantial consummation; provided, that the Combined Plan and Disclosure Statement,

CRED_EXAMINER_00002253

as altered, amended, or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Combined Plan and Disclosure Statement, as altered, amended, or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments, or modifications. A Holder of a Claim that has accepted the Combined Plan and Disclosure Statement prior to any alteration, amendment, or modification will be deemed to have accepted the Combined Plan and Disclosure Statement, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Holders of the Claims.

Prior to the Effective Date, the Debtors, with the consent of the Committee, may make appropriate technical adjustments and modifications hereto without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not materially change the treatment of Holders of Claims or Equity Interests.

**20.6    Revocation or Withdrawal of the Combined Plan and Disclosure Statement**

The Debtors-in-Possession reserve the right to revoke or withdraw the Combined Plan and Disclosure Statement, with the consent of the Committee, prior to the Confirmation Date. Subject to the foregoing sentence, if the Debtors revoke or withdraw the Combined Plan and Disclosure Statement prior to the Confirmation Date, then the Combined Plan and Disclosure Statement shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

**20.7    Plan Supplement**

The Plan Supplement and the documents contained therein shall be filed with the Bankruptcy Court no later than ten (10) calendar days before the deadline for voting to accept or reject the Combined Plan and Disclosure Statement; provided, that the documents included therein may thereafter be amended and supplemented, prior to execution, so long as such amendment or supplement does not materially and adversely change the treatment of Holders of Claims. The Plan Supplement and the documents contained therein are incorporated into and made a part hereof as if set forth in full herein.

**20.8    Payment of Statutory Fees**

On or before the Effective Date, all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Combined Hearing, shall be paid in Cash. Following the Effective Date, all such fees shall be paid by the Liquidation Trustee from the Liquidation Trust Assets until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code. For the avoidance of doubt, the U.S. Trustee Fees shall be deemed part of the Liquidation Trust Expenses.

CRED_EXAMINER_00002254

**20.9    Dissolution of the Committee**

On the Effective Date, except as provided in this Section 20.9, the Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to, arising from or in connection with the Chapter 11 Cases, and the retention or employment of the Debtors' and Committee's attorneys, accountants, and other agents, if any, shall terminate, except for purposes of Filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith, or any appeal of the Confirmation Order.

**20.10    Continued Confidentiality Obligations**

Pursuant to the terms thereof, members of and advisors to the Debtors and the Committee, any other holder of a Claim or Interest and their respective predecessors, successors and assigns shall continue to be obligated and bound by the terms of any confidentiality agreement executed by them in connection with this Chapter 11 Case or the Debtor, to the extent that such agreement, by its terms, may continue in effect after the Confirmation Date.

**20.11    Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection herewith, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection herewith, including the issuance of any stock, any merger agreements, or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated hereunder shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

**20.12    Expedited Tax Determination**

The Debtors and the Liquidation Trustee are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Petition Date through and including the Effective Date.

**20.13    Exhibits/Schedules**

All exhibits and schedules hereto, including the Plan Supplement, are incorporated into and are a part of the Combined Plan and Disclosure Statement as if set forth in full herein.

**20.14    Substantial Consummation**

On the Effective Date, the Combined Plan and Disclosure Statement shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

CRED_EXAMINER_00002255

**20.15   Severability of Combined Plan and Disclosure Statement Provisions**

In the event that, prior to the Confirmation Date, any term or provision hereof is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall, at the request of the Debtors have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, Impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

**20.16   Governing Law**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or Plan Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without giving effect to its principles of conflict of law that would require application of the law of another jurisdiction.

**20.17   Reservation of Rights**

If the Combined Plan and Disclosure Statement is not confirmed by a Final Order, or is confirmed and does not become effective, the rights of all parties in interest in the Chapter 11 Cases are and will be reserved in full.  Any concessions or settlements reflected herein, if any, are made for purposes of the Combined Plan and Disclosure Statement only, and if the Combined Plan and Disclosure Statement does not become effective, no party in interest in the Chapter 11 Cases shall be bound or deemed prejudiced by any such concession or settlement.

**20.18   Computation of Time**

In computing any period of time prescribed or allowed by the Combined Plan and Disclosure Statement, the provisions of Rule 9006(a) of the Bankruptcy Rules shall apply.

**20.19   Post-Confirmation Reporting**

Following confirmation of the Combined Plan and Disclosure Statement, the Liquidation Trustee shall file reports of its activities and financial affairs with the Bankruptcy Court, on a quarterly basis, within thirty (30) calendar days after the conclusion of each such period; provided that the Liquidation Trustee's obligation to file such reports with the Bankruptcy Court shall terminate automatically upon the closing of the Chapter 11 Cases.  Any such reports shall be prepared substantially consistent with (both in terms of content and format) the applicable Bankruptcy Court and U.S. Trustee guidelines on such matters.

CRED_EXAMINER_00002256

**20.20  Notices**

All notices, requests and demands to or upon the Debtors or the Liquidation Trustee must be in writing (including by facsimile transmission) to be effective and, unless otherwise expressly provided hereunder, will be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received during the normal business hours of the Liquidation Trustee (otherwise any such notice shall be deemed to have been received on the next Business Day) and telephonically confirmed, addressed as follows:

If to the Debtors:

> Cred Inc.
> Attn:   Matthew K. Foster, Chief Restructuring Officer
> Sonoran Capital Advisors, LLC
> 1733 N Greenfield Road, Suite 10
> Mesa, Arizona 85205

> *with a copy to:*

> PAUL HASTINGS LLP
> 200 Park Avenue
> New York, New York 10136
> Attn:   G. Alexander Bongartz, Esq.

> *and*

> PAUL HASTINGS LLP
> 600 Travis Street, 58th Floor
> Houston, Texas 77002
> Attn:   James T. Grogan, Esq.

> *and*

> COUSINS LAW LLC
> Brandywine Plaza West
> 1521 Concord Pike, Suite 301
> Wilmington, Delaware 19803
> Attn:   Scott D. Cousins, Esq.

If to the Liquidation Trust or the Liquidation Trustee:

> Liquidation Trust
> [Attn: _____
> c/o firm name
> Street Address
> City, State, ZIP]

CRED_EXAMINER_00002257

*With a copy to:*

[Counsel firm name
Attn:
Street Address
City, State, ZIP]

If to the Trust Advisory Board:

[Creditor 1
c/o counsel firm name
Attn: _____
Street address
City, state, ZIP]

[Creditor 2
c/o counsel firm name
Attn: _____
Street address
City, state, ZIP]

[Creditor 3
c/o counsel firm name
Attn: _____
Street address
City, state, ZIP]

After the Effective Date, the Liquidation Trustee may, in its sole discretion, notify Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Liquidation Trustee is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

*[Remainder of page intentionally left blank.]*

CRED_EXAMINER_00002258

Dated: January 21, 2021
        Wilmington, Delaware

Respectfully submitted,

**CRED INC.**

(on behalf of itself and the other Debtors and
Debtors-in-Possession)


By:     _/s/ Matthew K. Foster_
Name: Matthew K. Foster
Title:   Chief Restructuring Officer

CRED_EXAMINER_00002259

**Exhibit A**

**Causes of Action List**

CRED_EXAMINER_00002260

**Causes of Action List**

- All actual or potential Avoidance Actions pursuant to any applicable section of the Bankruptcy Code including, without limitation, sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code, arising from any transaction involving or concerning the Debtors;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against Customers, vendors, suppliers or contract counterparties, including without limitation, any and all claims relating to breach of contract, deposits, overpayments, accounts receivable, improper setoff, warranty, indemnity, retention of double payments, retention of misdirected wires, deductions owing or improper deductions taken, or any other claim concerning or arising out of the Customer, vendor, supplier or contractual relationship;

- All actual or potential actions, whether legal, equitable or statutory in nature, against landlords, lessees, sublessees, or assignees arising from various leases, subleases and assignment agreements relating thereto, including, without limitation, any and all claims for unpaid rent, overcharges relating to taxes, common area maintenance and other similar charges;

- All actual or potential actions, whether legal, equitable or statutory in nature, against the Debtors' current or former insurance carriers including, without limitation, any and all claims relating to unpaid reimbursements and claims, overpayment of premiums and fees, breach of contract, indemnity obligations or coverage;

- Any and all rights to payment against any taxing authority or other Governmental Unit including, without limitation, any and all claims for any tax refunds, credits, overpayments, recoupments or offsets that may be due and owing to the Debtors for taxes that the Debtors paid or may have paid to any such taxing authority or other Governmental Unit;

- All actions or potential actions, whether legal, equitable or statutory in nature, relating to deposits or other amounts owed by any Creditor, lessor utility, supplier, vendor, landlord, sub-lessee, assignee or other Person or Entity;

- All actions or potential actions, whether legal, equitable or statutory in nature, arising out of, or relating to, the Debtors' intellectual property rights;

- All actual or potential actions against any of the prepetition directors, officers, employees, attorneys, financial advisors, accountants, investment bankers, agents and representatives of the Debtors, except actions expressly released under the Combined Plan and Disclosure Statement, including, without limitation, any and all claims for breaches of fiduciary duty, breaches of loyalty, breaches of the duty of good faith, negligent mismanagement, wasting of corporate assets, and diversion of corporate opportunity, including, without limitation any and all claims against the Debtors current or former management, directors, and officers.

CRED_EXAMINER_00002261

- All actual or potential actions, whether legal, equitable or statutory in nature, against all Entities, except actions expressly released under the Combined Plan and Disclosure Statement, arising out of, or in connection with, without limitation, any of the Debtors' prepetition management, conduct, marketing, businesses, operations and/or reporting of financial or other information;

- All actions or potential actions, whether legal, equitable or statutory in nature, against any of the Debtors' current or former Professionals, except actions expressly released or exculpated under the Combined Plan and Disclosure Statement, including without limitation any and all claims for breach of fiduciary duty, breach of contract, negligence or professional misconduct malpractice, or other tortious conduct;

- All rights against any Entity, including any shareholder or prepetition member of the Debtors' board of directors, members, and/or officers, for subordination of their Claims pursuant to section 510 of the Bankruptcy Code or against any Entity that has agreed to subordination of their claim pursuant to section 510 of the Bankruptcy Code;

- All actions or potential actions against the prepetition members of the Debtors' board of directors and/or officers, except actions expressly released or exculpated under the Combined Plan and Disclosure Statement;

- All actual or potential actions, whether legal, equitable or statutory in nature, to recover amounts awarded to employees (except for amounts authorized by order of the Bankruptcy Court or required by applicable non-bankruptcy law, or related to an action expressly released under the Combined Plan and Disclosure Statement) under the terms of any prepetition employment, severance agreement, change-in-control agreement, bonus arrangement or other agreement governing, arising out of or related to the employment relationship;

- All actual or potential contract and tort actions that may exist or may subsequently arise, except actions expressly released under the Combined Plan and Disclosure Statement;

- All actual or potential actions whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses or operations, except actions expressly released under the Combined Plan and Disclosure Statement; and

- All actual or potential actions, whether legal, equitable or statutory in nature, against any of the (i) Debtors' Insiders, including without limitation Mr. Lu Hua and moKredit and (ii) affiliates (as such term is defined in section 101(2) of the Bankruptcy Code) of the Debtors' Insiders, including without limitation any and all claims for breach of fiduciary duty, breach of contract, negligence, unjust enrichment, fraudulent transfers, common law fraud or any other tortious conduct.

CRED_EXAMINER_00002262

**Exhibit B**

**Liquidation Analysis**

CRED_EXAMINER_00002263

Cred Inc. & Subsidiaries
Chapter 7 Liquidation Analysis

| Assets | Notes | Proposed Plan of Liquidation | | Chapter 7 Liquidation | |
|---|---|---|---|---|---|
| **Unrestricted Cash as of Effective Date** | A | | $1,409,814 | | $1,409,814 |
| Liquidation of Cryptocurrency Holdings | B | | 7,502,367 | | 7,502,367 |
| Additional Liquid Assets | C | | 32,856,845 | | 32,856,845 |
| **Total estimated proceeds available** | | | 41,769,026 | | 41,769,026 |
| **Reserves Budgeted for Administration expenses** | | | | | |
| Estimated Operating Liabilities | D | | (50,000) | | (50,000) |
| Estimated UST fees | E | | (125,000) | | (125,000) |
| **Total estimated for distribution** | | | 41,594,026 | | 41,594,026 |
| **Administrative Fees** | | | | | |
| Chapter 7 Professionals | F | 100% | - | 100% | 2,000,000 | (2,000,000) |
| Chapter 7 Trustee Commissions | G | 100% | | 100% | 1,247,821 | (1,247,821) |
| Chapter 11 Professionals | H | 100% | 2,185,217 | (2,185,217) | 100% | 2,185,217 | (2,185,217) |
| Liquidating Trust Budget | I | 100% | 1,500,000 | (1,500,000) | 100% | - | |
| Estimated UST fees | J | 100% | 415,940 | (415,940) | 100% | 415,940 | (415,940) |
| **Net estimated proceeds available after distribution** | | | | 37,492,869 | | | 35,745,048 |
| **Administrative Claims** | | | | | |
| Administrative Claims | | 100% | - | 100% | - | |
| **Net estimated proceeds available after distribution** | | | 37,492,869 | | 35,745,048 |
| **Priority & Secured Claims** | | | | | |
| Other Priority Claims (Class 1) | | 100% | - | - | 100% | - | - |
| Secured Tax Claims (Class 2) | | 100% | - | 100% | - | |
| Other Secured Claims (Class 3) | | 100% | - | 100% | - | |
| **Net estimated proceeds available after distribution** | | | 37,492,869 | | 35,745,048 |
| **Unsecured Claims & Equity Interest** | | | | | |
| General Unsecured Claims (Class 4) | | 22% | 170,138,236 | (37,242,869) | 21% | 170,138,236 | (35,640,309) |
| Convenience Claims (Class 5) | K | 50% | 500,000 | (250,000) | 21% | 500,000 | (104,739) |
| Subordinated Securities Claims (Class 6) | | 100% | - | 0% | - | |
| Equity Interests in Debtors (Class 7) | | 100% | - | 0% | - | |
| **Net estimated proceeds available after distribution** | | | - | | 0 |

Notes:
A) Assumes redemption/liquidation of investments held by asset managers prior to Effective Date.
B) Cryptocurrency valued as of 1/6/21; assumes illiquid cryptocurrency is liquidated at a discount to that value.
C) Assumes collection of accounts and notes receivable as well as liquidation of certain physical assets. Discounts are applied to these assets based on Debtors' estimate of collectibility.
D) The Debtors don't anticipate additional operating liabilities due to the cessation of operations but are keeping a $50k reserve.
E) Estimated UST fees through Effective Date.
F) Estimated Chapter 7 professional fees to gather data, assist with liquidation of cryptocurrency, and prosecute collections actions regarding Additional Liquid Assets.
G) 3% of distributions.
H) Estimated outstanding professional fees that would need to be paid prior to plan going effective.
I) Estimated budget for Liquidating Trust to liquidate cryptocurrency and prosecute collections actions regarding Additional Liquid Assets.
J) Estimated UST fees for the remainder of the case.
K) Debtors' estimate of creditors that elect to participate as a Convenience Class Claim. This analysis does not assume any creditors with claims greater than $1k make the Convenience Class Election.

CRED_EXAMINER_00002264

# Exhibit 170

# FILED UNDER SEAL

# Exhibit 171

# FILED UNDER SEAL

Exhibit 172

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CRED INC., *et al.*, | Case No. 20-12836 (JTD) |
| Debtors.[1] | (Jointly Administered) |

### SUPPLEMENTAL DECLARATION OF MARC PARRISH IN SUPPORT OF THE MOTION OF UPGRADEYA INVESTMENTS, LLC FOR RELIEF FROM STAY UNDER BANKRUPTCY CODE SECTION 362

I, Marc Parrish, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1.    I am the managing member of UpgradeYa Investments, LLC ("UpgradeYa"). I submit this supplemental declaration (the "Supplemental Declaration") in support of the *Motion of UpgradeYa Investments, LLC for Relief from Stay Under Bankruptcy Code Section 362* (the "Motion") and *UpgradeYa Investments, LLC's (I) Reply to Objection of the Debtors to the Motion of UpgradeYa Investments, LLC for Relief from Stay Under Bankruptcy Code Section 362 and (II) Limited Joinder in the Motion for an Order Converting the Chapter 11 Cases to Chapter 7* (the "Reply"). Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein. I am authorized by UpgradeYa to submit this Declaration and, if called upon to testify, I could and would testify to the facts set forth herein.

2.    From the outset of UpgradeYa's transactions with CredBorrow, Cred represented to UpgradeYa that the Collateral would be maintained in segregated e-wallets. Specifically, I was informed by Cred that once the Agreement was executed, Cred would establish (and did establish)

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

{1311.001-W0063612.}

CRED_EXAMINER_00002338

new e-wallets to hold UpgradeYa's Collateral.  A true and correct copy of the email from Cred employee Michael Zhang to Marc Parrish dated April 10, 2020 is attached hereto as **Exhibit 1**.

3.      On April 23, 2020, Cred provided to me a report confirming receipt of the transferred Collateral detailing the balance of each of UpgradeYa's Collateral Accounts.  A true and correct copy of the email from Cred employee Xavier Rashotsky to Marc Parrish dated April 23, 2020 is attached hereto as **Exhibit 2**.

4.      Based on the Agreement and representations and communications made by Cred to me, it was my understanding that Collateral was deposited into and maintained in separate segregated e-wallet accounts.  UpgradeYa provided the Collateral to Cred for the sole purpose of holding it as collateral for the Line of Credit pursuant to the terms of the Agreement.

5.      To the best of my knowledge as informed after having lien searches performed at my direction on November 17 and 18, 2020, the Debtors have not filed a UCC-1 financing statement in South Carolina, where UpgradeYa is incorporated and located (nor have they filed one in California or Delaware).

6.      UpgradeYa did not loan the Collateral to Cred.  Nor did UpgradeYa provide Cred with authority to use, sell or otherwise dispose of the Collateral except as expressly set forth in the Agreement upon the event of a default.  Cred never noticed any default and UpgradeYa is not, in fact, in default and Cred has not foreclosed on the Collateral.

7.      Given the volatility of the price of Bitcoin and the Debtors' misappropriation of UpgradeYa's Collateral, I believe it is imperative that UpgradeYa immediately be granted relief from the automatic stay to pursue the recovery of its Bitcoin and/or the value thereof from third parties and/or any applicable insurance proceeds.

CRED_EXAMINER_00002339

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: December 4, 2020          /s/ *Marc Parrish*_____
                                 MARC PARRISH
                                 UPGRADEYA INVESTMENTS, LLC

CRED_EXAMINER_00002340

# **Exhibit 1**

{1311.001-W0063612.}

CRED_EXAMINER_00002341

SUBJECT: Re: UpgradeYa Investments, LLC - Loan
FROM: Michael Zhang <michael.zhang@mycred.io>
TO: Marc Parrish <marc@upgradeya.com>
CC: Xavier Rashotsky <xavier@mycred.io>
DATE: 10/04/2020 23:16

Hey Marc,

Thanks for the information.

1. Once addresses are provided collateral will be filled within 1 week.

Great to hear. Once we have the contracts signed we will begin creating new wallets for the transfers. I'll defer to @Xavier Rashotsky for any questions.

2. The LOC preference would be 100% by the end of April. I believe April 26th but I will check on the exact date. If that is an issue please let me know and we will adjust accordingly.

I will confirm with our Capital Markets team on Monday, but I do not foresee any issues as long as we have at least a week notice.


Best regards,




Ka Zhang (Michael)
Senior Wealth Associate

michael.zhang@mycred.io
+1 (310) 291-2597
mycred.io

# **Exhibit 2**

{1311.001-W0063612.}

CRED_EXAMINER_00002343

SUBJECT: Re: Col Pledge
FROM: Xavier Rashotsky <xavier@mycred.io>
TO: Marc Parrish <marc@upgradeya.com>
CC: Heidi Ng <heidi@mycred.io>, Michael Zhang <michael.zhang@mycred.io>, Daniyal Inamullah
<d.inamullah@mycred.io>
DATE: 23/04/2020 21:05
ATTACHMENTS (20200423-210518-0000161): "TXlog4_23EOD.csv"

Hey Marc,

The attached reports all of the deposits that have been made to your collateral wallets to date. Touch base
tomorrow.

Thanks!

CRED_EXAMINER_00002344

Exhibit 173

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| CRED INC., *et al.*, | Case No. 20-12836 (JTD) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF MARC PARRISH IN SUPPORT OF THE
MOTION OF UPGRADEYA INVESTMENTS, LLC FOR
RELIEF FROM STAY UNDER BANKRUPTCY CODE SECTION 362**

I, Marc Parrish, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1.      I am the managing member of UpgradeYa Investments, LLC ("UpgradeYa"). I submit this declaration (the "Declaration") in support of the *Motion of UpgradeYa Investments, LLC for Relief from Stay Under Bankruptcy Code Section 362* (the "Motion"). Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein. I am authorized by UpgradeYa to submit this Declaration and, if called upon to testify, I could and would testify to the facts set forth herein.

2.      UpgradeYa and Debtor Cred (US) LLC ("Cred") are parties to that certain Loan and Security Agreement (the "Agreement") dated April 20, 2020. A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

3.      On April 21, 2020, Cred identified thirty (30) e-wallet accounts (the "Collateral Accounts") maintained by Fireblocks Inc. ("Fireblocks") to hold the Bitcoin to be deposited by UpgradeYa as collateral. Between April 23, 2020 and April 27, 2020, UpgradeYa deposited

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

CRED_EXAMINER_00002345

531.3004746 Bitcoins as collateral (the "Collateral") into the Collateral Accounts. On April 27, 2020, the market value of the Collateral was $4,121,010.88.

4.      As set forth on the Form of Draw Certificate dated April 30, 2020 (the "Draw Certificate"), UpgradeYa drew the full $2 million Line of Credit (the "LOC Draw"). A true and correct copy of the Draw Certificate is attached hereto as **Exhibit B**.

5.      Debtor Cred LLC and UpgradeYa also entered into that certain Line of Credit Agreement dated April 30, 2020 (the "CredEarn Agreement") pursuant to which UpgradeYa allocated $120,000 of the LOC Draw as a loan to the Debtors as part of the Debtors' CredEarn program that was to be used to pay the interest accrued on the Line of Credit while earning eight percent (8%) interest. A true and correct copy of the CredEarn Agreement is attached hereto as **Exhibit C**.

6.      Between April 2020 and August 2020, the value of the Collateral increased substantially as a result of a rise in the price of Bitcoin. On August 20, 2020, the Collateral had a market value of $6,325,132.15 – an increase of over $2 million from the time it was initially pledged.

7.      On August 10, 2020, UpgradeYa requested to withdraw ten percent (10%) of the Bitcoin it had deposited into the Collateral Accounts to return the deposited Collateral to a loan-to-value ratio closer to the requisite fifty percent (50%). A true and correct copy of the email from Marc Parrish to Cred employee Michael Zhang dated August 10, 2020 is attached hereto as **Exhibit D**.

8.      On August 13, 2020, the Debtors agreed to return 53.1200475 Bitcoin to UpgradeYa from the Collateral Accounts leaving 478.17 Bitcoin deposited as Collateral. A true and

{1311.001-W0063573.}

CRED_EXAMINER_00002346

correct copy of the email from Michael Zhang to Marc Parrish dated August 13, 2020 is attached hereto as **Exhibit E**.

9.    On August 14, 2020, the Debtors issued an updated Draw Certificate (the "Updated Draw Certificate") reflecting the reduction of the Collateral being held by the Debtors. A true and correct copy of the Updated Draw Certificate is attached hereto as **Exhibit F**.

10.    On October 28, 2020, Cred informed UpgradeYa that it had experienced irregularities in the handling of specific corporate funds and had temporarily suspended all inflows and outflows of funds relating to the CredEarn program.  A true and correct copy of the email from Michael Zhang to Marc Parrish dated October 28, 2020 is attached hereto as **Exhibit G**.

11.    On October 29, 2020, UpgradeYa contacted the Debtors' Chief Executive Officer, Daniel Schatt, to inquire about the status of the Collateral being held by the Debtors and requested to settle the Line of Credit and withdraw the Collateral.  A true and correct copy of the email from Marc Parrish to Daniel Schatt dated October 29, 2020 is attached hereto as **Exhibit H**.

12.    On October 31, 2020, Mr. Schatt responded stating "unfortunately I won't be able to provide an update for 7-10 days."  A true and correct copy of the email from Daniel Schatt to Marc Parrish dated October 31, 2020 is attached hereto as **Exhibit I**.

13.    On November 7, 2020, UpgradeYa contacted Mr. Schatt stating that it can fulfill its obligations and will repay the entire $2 million Line of Credit in return for its Collateral.  A true and correct copy of the email from Marc Parrish to Daniel Schatt dated November 7, 2020 is attached hereto as **Exhibit J**.

14.    To date, the Debtors have not engaged UpgradeYa with respect to its offers to repay the Line of Credit and have its Collateral returned to it.

{1311.001-W0063573.}

15.     On November 10, 2020, the Debtors confirmed in writing to UpgradeYa that it was holding 478.170 Bitcoin as collateral and that UpgradeYa had an active CredEarn program with a balance of $73,171.47. A true and correct copy of the email from Cred employee Heidi Ng to Marc Parrish dated November 10, 2020 is attached hereto as **Exhibit K**.

16.     As of the Petition Date, the Collateral held by the Debtors had a market value of $7,322,65.38 and the outstanding amount of all obligations under the Line of Credit was $2 million.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: November 25, 2020                */s/ Marc Parrish*
                                        MARC PARRISH
                                        UPGRADEYA INVESTMENTS, LLC

CRED_EXAMINER_00002348

# EXHIBIT A

CRED_EXAMINER_00002349

DocuSign Envelope ID: 3E63A6DE-C845-4267-93D3-AE4FF3C930BF

## LOAN AND SECURITY AGREEMENT

### (crypto-secured business purpose lending)

### Introduction.

This Loan and Security Agreement (this "**Agreement**"), with the Effective Date set forth below is entered into by and among the Borrower identified below and **CRED (US) LLC**, a Delaware limited liability company (the "**Lender**"). Borrower and Lender agree to the following terms and conditions:

**1.    LINE OF CREDIT.**

    **1.1    Line of Credit Amount.**

        **(a)**    During the availability period described below, Lender will provide a line of credit to the Borrower (the "**Line of Credit**"). The amount of the Line of Credit (the "**Commitment**") is set forth below.

        **(b)**    This is a revolving line of credit. During the availability period, the Borrower may repay principal amounts and reborrow them.

        **(c)**    The Borrower may request advances under the Line of Credit (each such advance made by Lender hereunder, an "**Advance**"). The specific details of each Advance including all Advances made by Lender prior to the date hereof, are set forth on **Schedule A** hereto as the same is updated from time to time (the "**Schedule of Advances**"). Lender will deliver to Borrower a Draw Certificate in the form attached hereto as **Exhibit A** following each request for an Advance confirming the details of such Advance.

        **(d)**    The Borrower agrees not to permit the principal balance outstanding to exceed the Commitment. If the Borrower exceeds this limit, the Borrower will immediately pay the excess to Lender upon Lender's demand.

    **1.2    Availability Period.** The Line of Credit is available until the Expiration Date set forth below or such earlier date as the availability may terminate as provided in this Agreement. The availability period for this Line of Credit will be considered renewed if and only if Lender has sent Borrower a written notice of renewal for the Line of Credit (the "**Renewal Notice**"). If this Line of Credit is renewed, it will continue to be subject to all the terms and conditions set forth in this Agreement except as modified by the Renewal Notice. If this Line of Credit is renewed, the term "Expiration Date" means the date set forth in the Renewal Notice as the Expiration Date. The same process for renewal will apply to any subsequent renewal of this Line of Credit. A renewal fee may be charged at Lender's option. The amount of the renewal fee will be specified in the Renewal Notice. If this Line of Credit is not renewed, Lender in its sole discretion may allow the outstanding balance to be repaid in installments over a term specified by Lender at the time. Borrower specifically understands that the interest rate applicable to the Line of Credit may be increased upon term-out and that the new interest rate will apply to the entire outstanding principal balance due hereunder. A transaction fee may be charged at Lender's option. If so, the amount will be specified in the term-out notice.

-1-

CRED_EXAMINER_00002350

DocuSign Envelope ID: 3E63A6DE-C845-4267-93D3-AF34FBC930F5

    **1.3**    **Repayment Terms.** Borrower must repay in full any principal and interest accrued on an Advance in accord with the terms set forth in the Draw Certificate or as otherwise agreed in writing by Lender and Borrower. Borrower must also make payments of interest on a monthly basis if instructed by Lender, by no later than three business days after the end of the month, regardless of whether the otherwise-stated terms of an Advance specify a later or different interest payment date. All payments must be made in full and no withholdings or deductions for any purpose are permitted, including any withholding or deduction for tax reasons.

    **1.4**    **Prepayments.** Borrower may prepay principal in full or in part at any time without the payment of a prepayment fee or premium. The prepayment may be applied to the most remote payment of principal due under this Agreement or in such other manner as determined by Lender.

    **1.5**    **Interest Rate.** The interest rate on an Advance will be, for each month, quarter, year or other period that the Advance is outstanding, a rate per year equal to the Interest Rate specified below.

**2.**    **COLLATERAL.**

    **2.1**    **The Security.** Borrower hereby assigns and grants, and causes to be assigned and granted, grants to Lender a security interest in the following described Collateral now owned or hereafter acquired by Borrower. The word **"Collateral"** as used in this Agreement means all of Borrower's right, title and interest in and to the following, whether now owned or hereafter acquired and whether now existing or hereafter coming into existence:

        **(a)**    the fiat currencies, cryptocurrencies and other digital assets identified in notices, emails, texts, screenshots and confirmations displayed or delivered to Borrower by Lender or on Lender's behalf as intended to be pledged to Lender (such communications and information collectively, **"Confirmations"**), regardless of whether those fiat currencies, cryptocurrencies and other digital assets are deemed to be commodities, currency, money, securities, securities entitlements or any other type or category of property or asset;

        **(b)**    the digital wallet, card, deposit account(s), commodities account(s) and securities account(s) specified in Confirmations (collectively, the **"Collateral Account"**) and all funds, monies, securities, security entitlements and other financial assets and other property from time to time held therein or credited thereto, and any successor or replacement wallet or account;

        **(c)**    all additions to and substitutions for any of the foregoing (including, without limitation, any securities, security entitlements, instruments or other property delivered or pledged hereunder) (such additions and substitutions, the **"Additions and Substitutions"**);

        **(d)**    all present and future renewals, replacements, income, cash and noncash proceeds, earnings, increases, and substitutions from or for the Collateral of every kind and nature, including without limitation all payments, interest, profits, distributions, benefits, rights, options, warrants, dividends, stock dividends, stock splits, stock rights, regulatory dividends, subscriptions, monies, claims for money due and to become due, proceeds of any insurance on the Collateral, shares of stock of different par value or no par value issued in substitution or exchange for shares included in the Collateral, and all other property Borrower is entitled to receive on account of such Collateral, including accounts, documents, instruments, chattel paper, and general intangibles whether now accrued or hereafter accruing (collectively, **"Income and Proceeds"**); and

CRED_EXAMINER_00002351

DocuSign Envelope ID: 3E63A6DE-C845-4057-03B0-AF-A4FBC930BF

   **(e)**     all of Borrower's property related to the Collateral (however owned if owned by more than one person or entity), whether or not in Lender's possession or in the possession of a third party subject to Lender's control, whether existing now or later and whether tangible or intangible in character, including all books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer software necessary to process such memory ("**Books and Records**").

Confirmations sent by Lender or on Lender's behalf regarding the number, type and timing of the transfer of Collateral to Lender's control or possession, and the details of the digital wallet or other account in which Lender or its designated agent or custodian holds the Collateral, are dispositive and controlling for all purposes, absent a definitive, non-appealable court ruling to the contrary.

   **2.2     The Indebtedness.** The obligations secured by this Agreement are the payment and performance of (a) all present and future Indebtedness (as defined below) of Borrower to Lender; (b) all obligations of Borrower and rights of Lender under this Agreement; and (c) all present and future debts, obligations and liabilities of Borrower to Lender of any kind or nature.

"**Indebtedness**" is used in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of Borrower, now or hereafter existing, absolute or contingent, liquidated or unliquidated, determined or undetermined, voluntary or involuntary, including under any swap, derivative or other arrangement, or other similar transaction or arrangement, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable. "Indebtedness" secured by the Collateral of Borrower does not include obligations arising under any Swap to which it is not party if, and to the extent that, all or a portion of the guaranty by Borrower to Lender of, or the grant by such Borrower of a security interest to Lender to secure, such Swap, would violate the Commodity Exchange Act (7 U.S.C., Sec. 1. et. seq.) by virtue of Borrower's failure to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time such guaranty or grant of such security interest becomes effective with respect to such Swap.

   **2.3     Borrower Covenants.** Borrower represents, covenants and warrants that unless compliance is waived by Lender in writing:

   **(a)**     Borrower agrees: (i) to indemnify Lender against all losses, claims, demands, liabilities and expenses of every kind caused by any Collateral; (ii) to permit Lender to exercise its rights under this Agreement; (iii) to execute and deliver such documents as Lender deems necessary to create, perfect and continue the security interests contemplated by this Agreement; (iv) not to change its name, and as applicable, its chief executive office, or the jurisdiction in which it is organized and/or registered or its business structure without giving Lender at least 30 days prior written notice; (v) not to change the places where the Borrower keeps any Collateral or the Borrower's Books and Records concerning the Collateral without giving Lender prior written notice of the address to which the Borrower is moving same; and (vi) to cooperate with Lender in perfecting all security interests granted by this Agreement and in obtaining such agreements from third parties as Lender deems necessary, proper or convenient in connection with the preservation, perfection or enforcement of any of its rights under this Agreement.

-3-

CRED_EXAMINER_00002352

DocuSign Envelope ID: 3E63A6DE-C845-4957-83B9-AF44FBC930FF

**(b)** Borrower agrees with regard to the Collateral, unless Lender agrees otherwise in writing: (i) that Lender is authorized to file financing statements in the name of Borrower to perfect Lender's security interest in the Collateral; (ii) that Lender is authorized to notify any account debtors, any buyers of the Collateral, any Borrower Customers or any other persons of Lender's interest in the Collateral, (iii) where applicable, to operate the Collateral in accordance with all applicable statutes, rules and regulations relating to the use and control of the Collateral, and not to use any Collateral for any unlawful purpose or in any way that would void any insurance required to be carried; (iv) not to remove the Collateral from the Borrower's premises except in the ordinary course of Borrower's business; (v) to pay when due all license fees, registration fees and other charges in connection with any Collateral; (vi) not to permit any lien on the Collateral, including without limitation, liens arising from repairs to or storage of the Collateral, except in favor of Lender; (vii) not to sell, hypothecate or dispose of, nor permit the transfer by operation of law of, any Collateral or any interest in the Collateral, except sales of inventory to buyers in the ordinary course of Borrower's business; (viii) to permit Lender to inspect the Collateral at any time; (ix) to keep, in accordance with generally accepted accounting principles, complete and accurate Books and Records regarding all the Collateral, and to permit Lender to inspect the same and make copies at any reasonable time; (x) if requested by Lender, to receive and use reasonable diligence to collect the Collateral consisting of accounts and other rights to payment and proceeds, in trust and as the property of Lender, and to immediately endorse as appropriate and deliver such Collateral to Lender daily in the exact form in which they are received together with a collection report in form satisfactory to Lender; (xi) not to commingle the Collateral, or collections with respect to the Collateral, with other property; (xii) to give only normal allowances and credits and to advise Lender thereof immediately in writing if they affect any rights to payment or proceeds in any material respect; (xiii) from time to time, when requested by Lender, to prepare and deliver a schedule of all the Collateral subject to this Agreement and to assign in writing and deliver to Lender all accounts, contracts, leases and other chattel paper, instruments, and documents; (xiv) in the event Lender elects to receive payments or rights to payment or proceeds hereunder, to pay all expenses incurred by Lender, including expenses of accounting, correspondence, collection efforts, reporting to account or contract debtors, filing, recording, record keeping and other expenses; and (xv) to provide any service and do any other acts which may be necessary to maintain, preserve and protect all the Collateral and, as appropriate and applicable, to keep all the Collateral in good and saleable condition, to deal with the Collateral in accordance with the standards and practices adhered to generally by users and manufacturers of like property, and to keep all the Collateral free and clear of all defenses, rights of offset and counterclaims.

**(c)** If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading, Borrower must immediately deliver such document to Lender, together with any necessary endorsements.

**2.4    Lender Rights.** Borrower appoints Lender its attorney in fact to perform any of the following rights, which are coupled with an interest, are irrevocable until termination of this Agreement and may be exercised from time to time by Lender's officers and employees, or any of them, whether or not Borrower is in default: (a) to perform any obligation of Borrower hereunder in Borrower's name or otherwise; (b) to release

-4-

CRED_EXAMINER_00002353

DocuSign Envelope ID: 3E63A6DE-C845-4957-83B3-AF44F8C9303E

persons liable on the Collateral and to give receipts and acquittances and compromise disputes; (c) to release or substitute security; (d) to prepare, execute, file, record or deliver notes, assignments, schedules, designation statements, financing statements, continuation statements, termination statements, statements of assignment, applications for registration or like documents to perfect, preserve or release Lender's interest in the Collateral; (e) to take cash, instruments for the payment of money and other property to which Lender is entitled; (f) to verify facts concerning the Collateral by inquiry of obligors thereon, or otherwise, in its own name or a fictitious name; (g) to endorse, collect, deliver and receive payment under instruments for the payment of money constituting or relating to the Collateral; (h) to prepare, adjust, execute, deliver and receive payment under insurance claims, and to collect and receive payment of and endorse any instrument in payment of loss or returned premiums or any other insurance refund or return, and to apply such amounts received by Lender, at Lender's sole option, toward repayment of the Indebtedness or, where appropriate, replacement of the Collateral; (i) to enter onto Borrower's premises in inspecting the Collateral; (j) to make withdrawals from and to close deposit accounts or other accounts with any financial institution, wherever located, into which proceeds may have been deposited, and to apply funds so withdrawn to payment of the Indebtedness; (j) to preserve or release the interest evidenced by chattel paper to which Lender is entitled and to endorse and deliver any evidence of title; and (k) to do all acts and things and execute all documents in the name of Borrower or otherwise, deemed by Lender as necessary, proper and convenient in connection with the preservation, perfection or enforcement of its rights.

## 3.    **LOAN ADMINISTRATION AND FEES.**

**3.1    Fees.** Fees will be paid by Borrower as provided on Schedule B.

**3.2    Collection of Payments.**

    **(a)**    Payments will be made by debit to a deposit account, if direct debit is provided for in this Agreement or is otherwise authorized by Borrower. For payments not made by direct debit, payments will be made by mail to the address shown on applicable Borrower's statement, or by such other method as may be permitted by Lender.

    **(b)**    Each disbursement by Lender and each payment by Borrower will be evidenced by records kept by Lender which will, absent manifest error, be conclusively presumed to be correct and accurate and constitute an account stated between Borrower and Lender.

**3.3    Borrower Instructions.**

Subject to the terms, conditions and procedures stated elsewhere in this Agreement, Lender may honor instructions for advances or repayments and any other instructions under this Agreement given by any one of the individuals Lender reasonably believes is authorized to sign loan agreements on behalf of Borrower, or any other individual(s) designated by any one of such authorized signers (each an "**Authorized Individual**"). Lender may honor any such instructions made by any one of the Authorized Individuals, whether such instructions are given in writing or by telephone, Internet and intranet websites or other means designated by Lender.

**3.4    Direct Debit with ACH Debit.**

    **(a)**    Borrower agrees that on the due date of any amount due under this Agreement, Lender will debit the amount due from the Designated Account to pay all such sums when due. The full amount of any deficiency will be immediately due and payable by Borrower. A voided copy of a check on the Designated Account has been, or will be, provided to Lender.

CRED_EXAMINER_00002354

DocuSign Envelope ID: 3E63A6DE-C845-4957-93B3-AF-MFBC9303E

**(b)** Debits made by ACH will be subject to the operating rules of the National Automated Clearing House Association, as in effect from time to time.

**(c)** Borrower may terminate this direct debit arrangement at any time by sending written notice to Lender. If Borrower terminates this arrangement, then the principal amount outstanding under this Agreement will at the option of Lender bear interest at a rate per annum, which is one percentage point higher than the rate of interest otherwise provided under this Agreement.

**3.5    Business Days.** Unless otherwise provided in this Agreement, a business day is a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the State of California. All payments and disbursements which would be due or which are received on a day, which is not a business day will be due or applied, as applicable, to the credit on the next business day.

**3.6    Interest Calculation.** Except as otherwise stated in this Agreement, all interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed. Installments of principal, which are not paid when due under this Agreement will continue to bear interest until paid.

**3.7    Default Rate.** Upon the occurrence of any default or after maturity or after judgment has been rendered on any obligation under this Agreement, all amounts outstanding under this Agreement, including any unpaid interest, fees, or costs, will at the option of Lender bear interest at a rate which is five percentage points higher than the rate of interest otherwise provided under this Agreement. This may result in compounding of interest. This will not constitute a waiver of any default.

# 4.    CONDITIONS.

Before Lender is required to extend any credit to Borrower under this Agreement, it must receive any documents and other items it may reasonably require, in form and content acceptable to Lender, including any items specifically listed below.

**4.1    Authorizations.** If Borrower is anything other than a natural person, evidence that the execution, delivery and performance by Borrower of this Agreement and any instrument or agreement required under this Agreement have been duly authorized.

**4.2    Governing Documents.** If required by Lender, a copy of organizational documents of Borrower.

**4.3    Perfection and Evidence of Priority.** Evidence that the security interests and liens in favor of Lender are valid, enforceable, properly perfected in a manner acceptable to Lender and prior to all others' rights and interests, except those Lender consents to in writing. All title documents for motor vehicles which are part of the collateral must show Lender's interest.

**4.4    Payment of Fees.** Payment of all fees, expenses and other amounts due and owing to Lender. If any fee is not paid in cash, Lender may, in its discretion, treat the fee as a principal advance under this Agreement or deduct the fee from the loan proceeds.

CRED_EXAMINER_00002355

DocuSign Envelope ID: 3E63A6DE-C845-4267-93C2-AF44FBC9303E

## 5.    REPRESENTATIONS AND WARRANTIES.

When Borrower signs this Agreement, and until Lender is repaid in full, Borrower makes the following representations and warranties. Each request for an extension of credit constitutes a renewal of these representations and warranties as of the date of the request:

**5.1    Formation.** Borrower is duly formed and existing under the laws of the state or other jurisdiction where organized.

**5.2    Authorization.** This Agreement as amended hereby, and any instrument or agreement required under this Agreement, are within Borrower's powers, have been duly authorized, and do not conflict with any of its organizational documents.

**5.3    Good Standing.** In each state in which Borrower does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

**5.4    Financial Information.** All financial and other information that has been or will be supplied to Lender is sufficiently complete to give Lender accurate knowledge of the Borrower's financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to Lender, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of Borrower.

**5.5    Lawsuits.** There is no lawsuit, tax claim or other dispute pending or threatened against Borrower, which, if lost, would impair Borrower's financial condition or ability to repay the loan, except as have been disclosed in writing to Lender.

**5.6    Other Obligations.**  Borrower is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to Lender.

**5.1    No Claims, Defenses, Etc..**  Borrower has no claims, counterclaims, defenses, or setoffs with respect to the Line of Credit or this Agreement as amended hereby.  The Agreement as amended hereby contains the entire understanding and agreement of Borrower and Lender in respect of the Line of Credit and supersedes all prior representations, warranties, agreements, arrangements, and understandings.

**5.3    Tax Matters.** Borrower has no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to Lender.

**5.4    No Event of Default.** There is no event, which is, or with notice or lapse of time or both would be, a default under this Agreement.

**5.5    Collateral.** All Collateral is owned by Borrower free of any title defects or any liens or interests of others, except those which have been approved by Lender in writing.

## 6.    COVENANTS.

Borrower agrees, so long as credit is available under this Agreement and until Lender is repaid in full:

-7-

CRED_EXAMINER_00002356

DocuSign Envelope ID: 3E63A6DE-C845-4257-03QQ-AF-41FBC930E5

**6.1     Use of Proceeds.** To use the proceeds of the Line of Credit only for business purposes.

**6.2     Financial Information.** To provide financial statements and other information in form and content acceptable to Lender relating to the affairs of Borrower as requested by Lender from time to time.

**6.3     Other Debts.** Not to have outstanding or incur any direct or contingent liabilities or lease obligations (other than those to Lender or to any affiliate of Lender), or become liable for the liabilities of others, without Lender's written consent. This does not prohibit:

    **(a)**     Acquiring goods, supplies, or merchandise on normal trade credit.

    **(b)**     Liabilities, lines of credit and leases in existence on the Effective Date (as defined below) disclosed in writing to Lender.

**6.4     Other Liens.** Not to create, assume, or allow any security interest or lien (including judicial liens) n property Borrower now or later owns, except:

    **(a)**     Liens and security interests in favor of Lender or any affiliate of Lender.

    **(b)**     Liens outstanding on the Effective Date (as defined below) disclosed in writing to Lender.

**6.5     Maintenance of Assets.**

    **(a)**     Not to sell, assign, lease, transfer or otherwise dispose of any part of the business or assets of Borrower except inventory sold in the ordinary course of business of Borrower.

    **(b)**     Not to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value, or enter into any agreement to do so.

    **(c)**     To maintain and preserve all rights, privileges, and franchises Borrower now has.

**6.6     Additional Negative Covenants.** Not to, without Lender's written consent:

    **(a)**     Enter into any consolidation, merger, or other combination, or become a partner in a partnership, a member of a joint venture, or a member of a limited liability company.

    **(b)**     Liquidate or dissolve Borrower's business.

**6.7     Notices to Lender.** To promptly notify Lender in writing of:

    **(a)**     Any event of default under this Agreement, or any event, which, with notice or lapse of time or both, would constitute an event of default.

    **(b)**     Any change in Borrower's name, legal structure, state of registration, place of business, or chief executive office if Borrower has more than one place of business.

**6.8     Insurance.** To maintain insurance as is usual for the business it is in.

CRED_EXAMINER_00002357

DocuSign Envelope ID: 3E63A6DC-C845-12E1-93BS-AF14F9C93B75

**6.9    Compliance with Laws.** To comply with the laws (including any fictitious or trade name statute), regulations, and orders of any government body with authority over business of Borrower. Lender has no obligation to make any advance to Borrower except in compliance with all applicable laws and regulations and Borrower will fully cooperate with Lender in complying with all such applicable laws and regulations.

**6.10    Books and Records.** To maintain adequate books and records.

**6.11    Audits.** To allow Lender and its agents to inspect properties of Borrower and examine, audit, and make copies of books and records at any reasonable time. If any of the properties, books or records of Borrower are in the possession of a third party, Borrower authorizes that third party to permit Lender or its agents to have access to perform inspections or audits and to respond to Lender's requests for information concerning such properties, books and records.

**6.12    Perfection of Liens.** To help Lender perfect and protect its security interests and liens, and reimburse it for related costs it incurs to protect its security interests and liens.

**6.13    Cooperation.** To take any action reasonably requested by Lender to carry out the intent of this Agreement.

**6.14    Maintaining Sufficient Collateral.** Borrower must maintain with Lender pledged (via a first priority perfected security interest) Collateral having a value (measured by calculating its Fair Market Price) of at least the Initial Collateral Minimum Percentage of the outstanding Line of Credit balance plus Borrower's other outstanding obligations and liabilities to Lender (in total, the "**Outstandings**"). If Borrower's Collateral value falls below the Initial Collateral Minimum Percentage of the Outstandings, that event is referred to as a "**Valuation Event**." (After the first Valuation Event, if it is cured, another Valuation Event will be deemed to occur only if Borrower's collateral value falls below the Ongoing Collateral Minimum Percentage of the Outstandings.) Borrower must cure a Valuation Event within 3 business days of its occurrence by repaying a portion of the Line of Credit and/or pledging additional acceptable collateral so that the aggregate value of all collateral Borrower has validly pledged to Lender is at least the Ongoing Collateral Minimum Percentage of the Outstandings. In Lender's sole discretion, Lender may insist that Borrower pay down the Line of Credit to cure a Valuation Event instead of pledging additional collateral. Lender determines in its sole discretion what constitutes acceptable collateral at any given time. Borrower's failure to timely and properly cure a Valuation Event is an Event of Default. Borrower acknowledges that Lender will automatically sell all Collateral and apply the proceeds to Borrower's outstanding Indebtedness if that Indebtedness reaches the Liquidation Threshold percentage of the aggregate value of the Collateral as determined by Lender at the time. Any price that Lender obtains for the Collateral in a sale triggered by a Liquidation Threshold is deemed to be reasonable and fair.

> **(a)**    The term "**Exchange Business Day**" means any day that is a trading day and a price is posted on the applicable Bloomberg United States Dollar Spot Currency page or other price quote source, as confirmed by Lender.

> **(b)**    The term "**Fair Market Price**" means the average of the closing market price for the relevant cryptocurrency on 2 consecutive Exchange Business Days, as determined by Lender.

> **(c)**    The terms "**Initial Collateral Minimum Percentage**" and "**Ongoing Collateral Minimum Percentage**" mean the percentages Lender notifies Borrower of from time to

-9-

CRED_EXAMINER_00002358

DocuSign Envelope ID: 3E63A6DC-C845-4DE7-93D5-AF1425C93B7F

time, based on Lender's assessment of market conditions. The initial percentage is set forth on Schedule A below.

## 7. DEFAULT AND REMEDIES.

**7.1    Rights and Remedies on Default.** If an Event of Default occurs under this Agreement and is not timely cured, then Lender may exercise any one or more of the following rights and remedies in addition to any other rights and remedies Lender may have under law:

    **(a)**    Accelerate Indebtedness. Declare all Indebtedness, including any prepayment penalty which Borrower may be required to pay, immediately due and payable, without notice of any kind to Borrower.

    **(b)**    Application of Account Proceeds. Lender may apply all funds in the Collateral Account to the Indebtedness. If the Collateral Account is subject to an early withdrawal penalty, that penalty will be deducted from the Collateral Account before its application to the Indebtedness, whether the Collateral Account is with Lender or some other institution. Any excess funds remaining after application of the Collateral Account proceeds to the Indebtedness will be paid to Borrower as the interests of Borrower may appear. Borrower agrees, to the extent permitted by law, to pay any deficiency after application of the proceeds of the Collateral Account to the Indebtedness. Lender also has all of the rights of a secured party under the California Uniform Commercial Code, even if the Collateral Account is not otherwise subject to such Code concerning security interests, and the parties to this Agreement agree that the provisions of the Code giving rights to a secured party are nonetheless part of this Agreement.

    **(c)**    Sell Collateral. Sell the Collateral or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any of Lender's offices or elsewhere, for cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as Lender may deem commercially reasonable, irrespective of the impact of any such sales on the market price of the Collateral. To the maximum extent permitted by applicable law, Lender may be the purchaser of any or all of the Collateral at any such sale and will be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply all or any part of the Indebtedness as a credit on account of the purchase price of any Collateral payable at such sale. Each purchaser at any such sale will hold the property sold absolutely free from any claim or right on the part of Borrower, and Borrower hereby waives (to the extent permitted by law) all rights of redemption, stay, or appraisal that it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Borrower agrees that, to the extent notice of sale may be required by law, at least 10 calendar days' notice to Borrower of the time and place of any public sale or the time after which a private sale is to be made will constitute reasonable notification. Lender will not be obligated to make any sale of Collateral regardless of notice of sale having been given. Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. To the maximum extent permitted by law, Borrower hereby waives any claims against

-10-

DocuSign Envelope ID: 3E63A6DC-C845-4BF1-93BS-AF14F8C93B7E

Lender arising because the price at which any Collateral may have been sold at such a private sale was less than the price that might have been obtained at a public sale, even if Lender accepts the first offer received and does not offer such Collateral to more than one offeree. After the disposal of any of the Collateral, Lender may deduct all reasonable legal and other expenses and attorney's fees for protecting its interests and enforcing its remedies under this Agreement and may apply the residue of the proceeds to, or hold as a reserve against, the Indebtedness in such manner as Lender in its sole discretion may determine, and will pay the balance, if any, to Borrower or otherwise, in accordance with applicable law. If any securities held as Collateral are "restricted securities" as defined in the Rules of the Securities and Exchange Commission (such as Regulation D or Rule 144) or the rules of state securities departments under state "Blue Sky" laws, or if Borrower or any other owner of the Collateral is an affiliate of the issuer of the securities, Borrower agrees that neither Borrower, nor any member of Borrower's family, nor any other person signing this Agreement will sell or dispose of any securities of such issuer without obtaining Lender's prior written consent.

**(d)**    Application of Proceeds.  Apply any cash which is part of the Collateral, or which is received from the collection or sale of the Collateral, to reimbursement of any expenses, including any costs for registration of securities, commissions incurred in connection with a sale, attorneys' fees and court costs, whether or not there is a lawsuit and including any fees on appeal, incurred by Lender in connection with the collection and sale of such Collateral and to the payment of the Indebtedness of Borrower to Lender, with any excess funds to be paid to Borrower as the interests of Borrower may appear.  Borrower agrees, to the extent permitted by law, to pay any deficiency after application of the proceeds of the Collateral to the Indebtedness.

**7.2**    **Default.**  Each of the following constitutes an "Event of Default" under this Agreement:

**(a)**    Failure to Pay.  Borrower fails to make a payment under this Agreement or Borrower fails to timely and properly cure a Valuation Event.

**(b)**    Covenants. Any default in the performance of or compliance with any obligation, agreement or other provision contained in this Agreement (other than those specifically described as an Event of Default in this Section), and with respect to any such default that by its nature can be cured, such default continues for a period of 20 days from its occurrence.

**(c)**    Other Lender Agreements. Any default occurs under any guaranty, subordination agreement, security agreement, deed of trust, mortgage, or other document required by or delivered in connection with this Agreement or any such document is no longer in effect, or any guarantor purports to revoke or disavow the guaranty; or any default occurs under any other agreement Borrower (or any Obligor) has with Lender or any affiliate of Lender. For purposes of this Agreement, "**Obligor**" means any guarantor, any party pledging collateral to Lender, or, if Borrower is comprised of the trustees of a trust, any trustor.

-11-

DocuSign Envelope ID: 3E63A6DC-C845-4DE7-9365-AF14F8C93B7E

    **(d)**     Cross-default. Any default occurs under any agreement in connection with any credit Borrower (or any Obligor) has obtained from anyone else or which Borrower (or any Obligor) or any of Borrower's related entities or affiliates has guaranteed.

    **(e)**     False Information. Borrower or any Obligor has given Lender false or misleading information or representations.

    **(f)**     Bankruptcy/Receivers. Borrower, any Obligor, or any general partner of Borrower or of any Obligor files a bankruptcy petition, a bankruptcy petition is filed against any of the foregoing parties and such petition is not dismissed within a period of forty-five (45) days after the filing, or Borrower, any Obligor, or any general partner of Borrower or of any Obligor makes a general assignment for the benefit of creditors; or a receiver or similar official is appointed for a substantial portion of business of Borrower or any Obligor; or the business is terminated, or such Obligor is liquidated or dissolved.

    **(g)**     Lien Priority. Lender fails to have an enforceable first lien (except for any prior liens to which Lender has consented in writing) on or security interest in any property given as security for this Agreement (or any guaranty).

    **(h)**     Judgments. Any judgments or arbitration awards are entered against Borrower or any Obligor.

    **(i)**     Material Adverse Change. A material adverse change occurs, or is reasonably likely to occur, in the business condition (financial or otherwise), operations or properties, or ability to repay the credit of Borrower or any Obligor.

    **(j)**     Government Action. Any government authority takes action that Lender believes materially adversely affects the financial condition or ability to repay of Borrower or any Obligor.

    **(k)**     Liens. Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

## 8.    LENDER'S ADDITIONAL REMEDIES.

    **8.1**     **Lender's Additional Remedies After Default**. In the event of any Event of Default, Lender may also do any one or more of the following, to the extent permitted by law:

    **(a)**     Declare any Indebtedness immediately due and payable, without notice or demand.

    **(b)**     Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

    **(c)**     Require Borrower to obtain Lender's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral.

CRED_EXAMINER_00002361

DocuSign Envelope ID: 3E63A6DC-C845-4DE7-93D5-AE34F8C93B7E

**(d)**    Require Borrower to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to Lender in kind.

**(e)**    Require Borrower to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under Lender's exclusive control.

**(f)**    Give notice to others of Lender's rights in the Collateral, to enforce or forebear from enforcing the same and make extension and modification agreements.

**(g)**    Require Borrower to assemble the Collateral, including the Books and Records, and make them available to Lender at a place designated by Lender.

**(h)**    Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any equipment of Borrower, if Lender deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

**(i)**    Demand and collect any payments on and proceeds of the Collateral. In connection therewith the Borrower irrevocably authorizes Lender to endorse or sign the Borrower's name on all checks, drafts, collections, receipts and other documents, and to take possession of and open the mail addressed to the Borrower and remove therefrom any payments and proceeds of the Collateral.

**(j)**    Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to the Borrower.

**(k)**    Use or transfer any of the Borrower's rights and interests in any Intellectual Property now owned or hereafter acquired by the Borrower, if Lender deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. The Borrower agrees that any such use or transfer will be without any additional consideration to the Borrower. As used in this *Section 8.1 (k),* "Intellectual Property" includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which the Borrower has any right or interest, whether by ownership, license, contract or otherwise.

**(l)**    Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. The Borrower hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

**(m)**    Take such measures as Lender may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and the Borrower hereby irrevocably

-13-

CRED_EXAMINER_00002362

DocuSign Envelope ID: 3E63A6DC-C845-4AE7-93B9-AF24FF8C93B7

constitutes and appoints Lender as the Borrower's attorney-in-fact to perform all acts and execute all documents in connection therewith.

**(n)**    Without notice or demand to the Borrower, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by Lender or any of Lender's agents or affiliates to or for the credit of the account of the Borrower or any guarantor or endorser of the Borrower's Indebtedness.

**(o)**    Exercise all rights, powers and remedies which the Borrower would have, but for this Agreement, with respect to all Collateral.

**(p)**    Receive, open and read mail addressed to the Borrower.

**(q)**    Resort to the Collateral under this Agreement, and any other collateral related to the Indebtedness, in any order.

**(r)**    Exercise any other remedies available to Lender at law or in equity.

## 9.    ENFORCING THIS AGREEMENT; MISCELLANEOUS.

**9.1    Governing Law.** Except to the extent that any law of the United States may apply, this Agreement will be governed and interpreted according to the laws of California (the "**Governing Law State**"), without regard to any choice of law, rules or principles to the contrary. Nothing in this *Section 9.1* be construed to limit or otherwise affect any rights or remedies of Lender under federal law.

**9.2    Venue and Jurisdiction.** The Borrower agrees that any action or suit against Lender arising out of or relating to this Agreement must be filed in federal court or state court located in San Francisco, California. The Borrower agrees that Lender will not be deemed to have waived its rights to enforce this *Section 9.2* by filing an action or suit against the Borrower in a venue outside of the Governing Law State. If Lender does commence an action or suit arising out of or relating to this Agreement, the Borrower agrees that the case may be filed in federal court or state court in the Governing Law State. Lender reserves the right to commence an action or suit in any other jurisdiction where the Borrower, any Guarantor, or any collateral has any presence or is located. The Borrower consents to personal jurisdiction and venue in such forum selected by Lender and waives any right to contest jurisdiction and venue and the convenience of any such forum. The provisions of this *Section 9.2* are material inducements to Lender's acceptance of this Agreement.

**9.3    Successors and Assigns.** This Agreement is binding on the Borrower's and Lender's successors and assignees. The Borrower agrees that it may not assign this Agreement without Lender's prior consent.

**9.4    Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD**

-14-

CRED_EXAMINER_00002363

DocuSign Envelope ID: 3E63A6DC-C845-4DE7-93B5-AE14F8C93B7E

NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS *SECTION 9.4* AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.

      **9.5**    **Severability; Waivers.** If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced. Lender retains all rights, even if it makes a loan after default. If Lender waives a default, it may enforce a later default. Any consent or waiver under this Agreement must be in writing.

      **9.6**    **Expenses.**

        **(a)**    The Borrower must pay to Lender immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees, expended or incurred by Lender in connection with (i) the negotiation and preparation of this Agreement and any related agreements, Lender's continued administration of this Agreement and such related agreements, and the preparation of any amendments and waivers related to this Agreement or such related agreements, (ii) filing, recording and search fees, appraisal fees, field examination fees, title report fees, and documentation fees with respect to any collateral and books and records of the Borrower or any Obligor, and (iii) costs or expenses required to be paid by the Borrower or any Obligor that are paid, incurred or advanced by Lender.

        **(b)**    The Borrower will indemnify and hold Lender harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (i) this Agreement or any document required hereunder, (ii) any credit extended or committed by Lender to the Borrower hereunder, and (iii) any litigation or proceeding related to or arising out of this Agreement, any such document, or any such credit, including, without limitation, any act resulting from Lender complying with instructions Lender reasonably believes are made by any Authorized Individual. This *Section 9.6(b)* will survive this Agreement's termination, and will benefit Lender and its officers, employees, and agents.

        **(c)**    The Borrower must reimburse Lender for any reasonable costs and attorneys' fees incurred by Lender in connection with (i) the enforcement or preservation of Lender's rights and remedies and/or the collection of any obligations of the Borrower which become due to Lender and in connection with any "workout" or restructuring, and (ii) the prosecution or defense of any action in any way related to this Agreement, the credit provided hereunder or any related agreements, including without limitation, any action for declaratory relief, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Lender or any other person) relating to the Borrower or any other person or entity.

      **9.7**    **Set-Off.** Upon and after the occurrence of an event of default under this Agreement, (a) the Borrower hereby authorizes Lender, at any time and from time to time, without notice, which is hereby expressly

CRED_EXAMINER_00002364

DocuSign Envelope ID: 3E63A6DC-C845-4DE7-93C5-AF34F8C93B7E

waived by the Borrower, and whether or not Lender has declared any credit subject hereto to be due and payable in accordance with the terms hereof, to set off against, and to appropriate and apply to the payment of, the Borrower's Indebtedness (whether matured or unmatured, fixed or contingent, liquidated or unliquidated), any and all amounts owing by Lender to the Borrower (whether payable in U.S. dollars or any other currency, whether matured or unmatured), and (b) pending any such action, to the extent necessary, to hold such amounts as collateral to secure such Indebtedness. "**Indebtedness**" includes all obligations, now or hereafter existing, of the Borrower to Lender under this Agreement and under any other agreement or instrument executed in connection with this Agreement.

      **9.8**    **One Agreement.** THIS WRITTEN AGREEMENT AND ANY RELATED DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

      **9.9**    **Notices.** Unless otherwise provided in this Agreement or in another agreement between Lender and the Borrower, all notices required under this Agreement shall be (a) in writing (including electronic mail), (b) delivered by electronic mail or overnight courier, and (c) deemed delivered upon electronic or written acknowledgment of receipt. Notices shall be sent to the addresses set forth on the signature page to this Agreement or such other address as specified and delivered pursuant to this *Section 9.9*.

      **9.10**   **Headings.** Article and section headings are for reference only and will not affect the interpretation or meaning of any provisions of this Agreement.

      **9.11**   **Counterparts.** This Agreement may be executed in any number of counterparts, each of which, when so executed, will be deemed to be an original, and all of which when taken together will constitute one and the same Agreement. Delivery of an executed counterpart of this Agreement (or of any agreement or document required by this Agreement and any amendment to this Agreement) by DocuSign will be as effective as delivery of a manually executed counterpart of this Agreement.

      **9.12**   **Further Amendments**. No provision of the Agreement may be changed, discharged, supplemented, terminated, or waived except in a writing signed by the Borrower and Lender.

*[Balance of page left blank.]*

-16-

CRED_EXAMINER_00002365

This Agreement is executed as of the Effective Date.

**SIGNATURES**

**BORROWER:**

UpgradeYa Investments, LLC
_____
      *[name]*

a South Carolina
  _____
      *[state]*

LLC
_____
     *[type of entity]*

By: *Marc Parrish*
    _____
Name: Marc Parrish
Title: Owner

Notice Address:
2381 N Highway 17
Mount Pleasant, SC 29466

**LENDER:**

**CRED (US) LLC,**
a Delaware limited liability company

By:  Cred Capital, Inc., a Delaware
    corporation, its authorized agent

By: _____
    481688727838486
Name:  James Alexander
Title:  President

Notice Address:
Cred (US) LLC
2121 South El Camino Real, Suite 500
San Mateo, CA 94403
Attention: Dan Wheeler, GC

-17-

CRED_EXAMINER_00002366

DocuSign Envelope ID: 3E63A6DC-C845-4AE7-93B5-AF14F8C93B7E

## SCHEDULE A

**Key terms:**

"**Commitment**" (*maximum amount of the Line of Credit*): **$2,000,000**

"**Designated Account**" (*Borrower's account from which repayments will be made*):

> **Depository Name:** Wells Fargo Bank
> **City, State and Zip Code:** 420 Montgomery Street, San Francisco CA 94104
> **For domestic (U.S.) wire: Wire routing transit number/ABA:** xxxxx0248
> **Account number:** xxxxxx0883
> **Routing number:**
> **Direct deposits, electronic payments:** xxxxx7766
> **Wire transfers – domestic:** xxxxx0248

"**Effective Date**":  April 20, 2020

"**Expiration Date**" (*maturity of the Line of Credit*): the date that is 12 months following the confirmed pledge of all initially-required Collateral to Lender.

"**Initial Collateral Minimum Percentage**" (*initial maximum loan-to-value ratio*): **50%**

"**Interest Rate**": **6%** per annum.  Interest will accrue based upon a 360-day year and the actual number of days elapsed and will compound on a monthly basis until all Indebtedness is indefeasibly paid in full.

"**Liquidation Threshold**" (*LTV percentage triggering sale of all Collateral*): **91%**

"**Ongoing Collateral Minimum Percentage**" (*maximum LTV following Valuation Event*): **75%**

**Advances:**

| Date | Currency | Amount | Repayment Schedule |
|---|---|---|---|
| | | | *See applicable Draw Certificate providing complete details for each Advance* |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

-18-

CRED_EXAMINER_00002367

DocuSign Envelope ID: 3E63A6DC-C845-4AE7-93B5-AFA4F8C93B7E

## SCHEDULE B

### Schedule of Fees

1.  <u>General Fees.</u>

    a.  The Borrower agrees to pay any loan and documentation fees requested by Lender.

    b.  <u>Waiver Fee.</u> If Lender, at its discretion, agrees to waive or amend any terms of this Agreement, the Borrower will, at Lender's option, pay Lender a fee for each waiver or amendment in an amount advised by Lender at the time the Borrower requests the waiver or amendment. Nothing in this *Section 1(b)* implies that Lender is obligated to agree to any waiver or amendment requested by the Borrower. Lender may impose additional requirements as a condition to any waiver or amendment.

    c.  <u>Late Fee.</u> To the extent permitted by law, the Borrower agrees to pay a late fee in an amount not to exceed 4% of any payment that is more than 15 days late. The imposition and payment of a late fee does not constitute a waiver of Lender's rights with respect to the default.

2.  <u>Additional Fees.</u> The Borrower and Lender agree to pay any other fees set forth on the Schedule of Advances.

CRED_EXAMINER_00002368

DocuSign Envelope ID: 3E63A6DC-C845-4AE7-93B5-AE14F8C93B7E

## EXHIBIT A

## FORM OF DRAW CERTIFICATE

### Draw Certificate No._____

### Date: _____, 20__

Re:    The Loan and Security Agreement (the "**Agreement**") by and between Cred (US) LLC and Borrower.

From:  Cred (US) LLC
       Attn: 2121 S. El Camino Real, Suite 500
       San Mateo, CA 94403

This Draw Certificate is prepared and delivered pursuant to the Agreement. Capitalized terms used but not defined herein have the meanings given to such terms in the Agreement.

On the date of delivery set forth below, Lender delivered and posted cryptocurrency and/or fiat currency in the number and type specified below to Borrower's Digital Wallet pursuant to the Agreement.

| | |
|---|---|
| **Date of draw:** | |
| **Type and Number of Pledged Collateral** | _____ (number of tokens)<br><br>_____ (type of tokens) |
| **Date of delivery and posting of the draw proceeds to Borrower:**<br>(date on which interest begins accruing on the draw amount) | |
| **Type of cryptocurrency or fiat currency:** | [ ]   cryptocurrency (type:_____)<br><br>[ ]   fiat currency (type:___USD_____) |
| **Number of tokens or USD:** | [ ]  _____ (number of crypto tokens)<br><br>[ ]  $_____ |
| **Interest rate applicable to the draw:** | _____% |
| **Interest payment dates:** | $_____ payable on _____, 20___.<br><br>$_____ payable on _____, 20___. |

-20-

CRED_EXAMINER_00002369

DocuSign Envelope ID: 3E63A6DC-C845-4AE7-93B5-AF34F8C93B7E

| | |
|---|---|
| | $_____ payable on _____, 20___.<br><br>$_____ payable on _____, 20___. |
| **Principal payment dates:** | $_____ payable on _____, 20___.<br><br>$_____ payable on _____, 20___.<br><br>$_____ payable on _____, 20___.<br><br>$_____ payable on _____, 20___. |

CRED_EXAMINER_00002370

# EXHIBIT B

CRED_EXAMINER_00002371

**EXHIBIT A**

**FORM OF DRAW CERTIFICATE**

**Draw Certificate No.1**

**Date:  April 30, 2020**

Re:     The Loan and Security Agreement (the "**Agreement**") by and between Cred (US) LLC
and Borrower.

From:  Cred (US) LLC
Attn: 2121 S. El Camino Real, Suite 500
San Mateo, CA 94403

This Draw Certificate is prepared and delivered pursuant to the Agreement.  Capitalized terms
used but not defined herein have the meanings given to such terms in the Agreement.

On the date of delivery set forth below, Lender delivered and posted cryptocurrency and/or fiat
currency in the number and type specified below to Borrower's digital wallet pursuant to the
Agreement.

| | |
|---|---|
| **Date of draw:** | April 30, 2020 |
| **Type and Number of Pledged Collateral** | 531.3004746 (number of tokens) <br><br> BTC (type of tokens) |
| **Date of delivery and posting of the draw proceeds to Borrower:** <br> (date on which interest begins accruing on the draw amount) | April 30, 2020 |
| **Type of cryptocurrency or fiat currency:** | [X]     fiat currency (type: USD) |
| **Number of tokens or USD:** | [X]     $2,000,000 |
| **Interest rate applicable to the draw:** | 6% |
| **Interest payment dates:** | $20,666.67 payable on 06/30/2020. <br><br> $30,666.67 payable on 09/30/20. <br><br> $30,666.67 payable on 12/31/2020. |

-1-

CRED_EXAMINER_00002372

|  | $30,000 payable on 03/31/2021.<br><br>$10,000 payable on 04/30/2021 |
|---|---|
| **Principal payment dates:** | $2,000,000 payable on April 30, 2021. |
| **Collateral Return** | Upon payment in full of all principal, interest, and other amount due to lender. |

CRED_EXAMINER_00002373

# EXHIBIT C

CRED_EXAMINER_00002374

DocuSign Envelope ID: 83405421-142D-4EEF-A6D5-380BBB495DBD

# Line of Credit Agreement
## (corporate loan to Cred)

**Introduction.**

This Line of Credit Agreement (this "**Agreement**"), dated and effective as of the Effective Date set forth on Schedule A (the "**Effective Date**") is entered into between the undersigned person or entity (the "**Lender**"), and Cred LLC, a Delaware limited liability company (the "**Borrower**").

Lender is a sophisticated party experienced in making loans to enterprises like Cred LLC. Lender may not assign, sell or transfer this Agreement to any person and any purported assignment, sale or transfer of this Agreement is null and void. Lender understands and expects that each advance of fiat currency or cryptocurrency under this Agreement is a loan and not a sale and that Lender must be repaid the loaned currency in the same type and number of units loaned plus agreed-upon interest.

Therefore, Lender and Borrower agree to the following terms and conditions:

| 1. | LINE OF CREDIT |
|---|---|

**1.1    Line of Credit Amount.**

(a)    During the availability period described below, the Lender will provide a line of credit to the Borrower (the "**Line of Credit**"). The amount and denomination of the Line of Credit (the "**Commitment**") is set forth on Schedule A.

(b)    Borrower may request advances under the Line of Credit (an "**Advance**"). The specific details of each Advance shall be set forth on Schedule A hereto (the "**Schedule of Advances**"), which will be prepared and updated by Borrower and will bind the parties. Upon making each Advance, the Borrower will update the Schedule of Advances and send it to Lender using standard notice procedures.

(c)    The Borrower agrees not to permit the principal balance outstanding to exceed the Commitment. If the Borrower exceeds this limit, the Borrower will immediately pay the excess to the Lender upon the Lender's demand.

**1.2    Availability and Advances.** The Line of Credit is available between the Effective Date and the Expiration Date set forth on Schedule A or such earlier date as the availability may terminate as provided in this Agreement (the "**Expiration Date**"). The availability period for this Line of Credit will be considered renewed if and only if the Borrower has sent the Lender a written notice of renewal for the Line of Credit (the "**Renewal Notice**") and Lender has not notified Borrower of Lender's objection to the renewal within 8 business days of receiving the Renewal Notice. If this Line of Credit is renewed, it will continue to be subject to all the terms and conditions set forth in this Agreement except as modified by the Renewal Notice. If this Line of Credit is renewed, the term "Expiration Date" means the date set forth in the Renewal Notice as the Expiration Date. The same process for renewal will apply to any subsequent renewal of this Line of Credit. If this Line of Credit is not renewed, the Lender in its sole discretion may allow the outstanding balance to be repaid in installments over a term specified by the Lender at the time.

Borrower expects to make its first draw (borrowing) within 15 business days of the Effective Date, as specified on Schedule A. The actual funding date (whether for the first advance or subsequent advances) will be the date Borrower confirms receipt of the loan advance into Borrower's wallet.

1

CRED_EXAMINER_00002375

DocuSign Envelope ID: 83405421-142D-4EFF-A6D5-380DBB195DBB

Borrower may request advances by notifying Borrower's designated third party custodian that a transfer of assets in the amount of the advance has been authorized by Lender and should be made from Lender's wallet to Borrower's wallet. Borrower may do this at any time and on any day of the month but typically Borrower requests advances on the 1st and 15th day of each month. Borrower will notify Lender each time that Borrower makes a draw (an advance to Borrower) under this line of credit and Borrower will do so after Borrower makes a draw. Borrower may choose to include that notification in notification it sends to Lender. Lender agrees to maintain sufficient assets at all times in the designated third party account to fund the entire Commitment.

**1.1    Repayment Terms.** Borrower must repay any principal and interest accrued on an Advance as agreed in the Schedule of Advances for each Advance. The Borrower may prepay principal in full or in part at any time without the payment of a prepayment fee or premium. The prepayment may be applied to the most remote payment of principal due under this Agreement or in such other manner as determined by the Lender so as to minimize the total amount owed by Borrower.

**1.3    Interest Rate.** The effective interest rate on an Advance will be, for each month, quarter, year or other period that the Advance is outstanding, the Applicable Rate set forth on <u>Schedule A</u>. Interest is a simple interest rate compounded annually. If <u>Schedule A</u> specifies a variable interest rate, that means that Borrower may increase or decrease the Applicable Rate in its sole discretion 15 days after notifying Lender of the upcoming change in the Applicable Rate (a "**Rate Change Notice**"). If Lender does not notify Borrower of Lender's decision to demand repayment of the loan within 8 business days of Borrower sending Lender a Rate Change Notice (such notice by Lender, a "**Closure Notice**"), then this Agreement will remain in effect with the new Applicable Rate in effect and Borrower will not repay this loan until the Expiration Date. If Lender delivers a Closure Notice within 8 business days after Borrower sends a Rate Change Notice, then Borrower will repay the loan and all accrued interest within 45 days of receiving the Closure Notice and the Applicable Rate will accrue on the loan through the day the loan is repaid in full.

| 2. | LOAN ADMINISTRATION AND FEES |
|---|---|

**2.1    Fees.** Fees will be paid pursuant to <u>Schedule B</u>.

**2.2    Collection of Payments.**

(a)    Payments will be made by debit to a deposit account, if direct debit is provided for in this Agreement or is otherwise authorized by the Borrower. For payments not made by direct debit, payments will be made by mail to the address designated by Lender, or by wire, or by such other method as may be communicated to Lender.

(b)    Each disbursement by the Lender and each payment by the Borrower will be evidenced by records kept by the Borrower which will, absent manifest error, be conclusively presumed to be correct and accurate and constitute an account stated between the Borrower and the Lender.

**2.3    Borrower's Instructions.**

Subject to the terms, conditions and procedures stated elsewhere in this Agreement, the Lender may honor instructions for advances or repayments and any other instructions under this Agreement given by any one of the individuals the Lender reasonably believes is authorized to sign loan agreements on behalf of the Borrower, or any other individual(s) designated by any one of such authorized signers (each an "**Authorized Individual**"). The Lender may honor any such instructions made by any one of the Authorized Individuals, whether such instructions are given in writing or by telephone, Internet and intranet websites or other means designated by the Lender.

CRED_EXAMINER_00002376

DocuSign Envelope ID: 83405421-142D-4EFF-A6D5-380BBB495DBD

**2.4     Business Days.**  Unless otherwise provided in this Agreement, a business day is a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the State of California.  All payments and disbursements which would be due or which are received on a day, which is not a business day will be due or applied, as applicable, to the credit on the next business day.

**2.5     Interest Calculation.**  Except as otherwise stated in this Agreement, all interest and fees, if any, will be computed on the basis of a 365-day year and the actual number of days elapsed.  Installments of principal, which are not paid when due under this Agreement will continue to bear interest until paid.

**2.6     Default Rate.**  Upon the occurrence of any default or after maturity or after judgment has been rendered on any obligation under this Agreement, all amounts outstanding under this Agreement, including any unpaid interest, fees, or costs, will at the option of the Lender bear interest at a rate which is one percentage point higher than the rate of interest otherwise provided under this Agreement.  This will be calculated so as to not result in compounding of interest.  This will not constitute a waiver of any default.

| **3.** | **CONDITIONS** |
|---|---|

Within 10 days of the first advance hereunder, Lender must receive the items specifically listed below.

**3.1     Authorizations.**  Evidence that the execution, delivery and performance by the Borrower of this Agreement and any instrument or agreement required under this Agreement have been duly authorized.

**3.2     Governing Documents.**  If requested by the Lender, a copy of the Borrower's organizational documents.

**3.3     Payment of Fees.**  Payment of all fees, expenses and other amounts due and owing to the Lender.  If any fee is not paid in cash, the Lender may, in its discretion, treat the fee as a principal advance under this Agreement or deduct the fee from the loan proceeds.

| **4.** | **REPRESENTATIONS AND WARRANTIES** |
|---|---|

When the Borrower signs this Agreement, and until the Lender is repaid in full, the Borrower makes the following representations and warranties. Each request for an extension of credit constitutes a renewal of these representations and warranties as of the date of the request:

**4.1     Formation.**  The Borrower is duly formed and existing under the laws of the state or other jurisdiction where organized.

**4.2     Authorization.**  This Agreement, and any instrument or agreement required of Borrower under this Agreement, are within the Borrower's powers, have been duly authorized, and do not conflict with any of its organizational documents.

**4.3     Good Standing.**  In each state in which the Borrower does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

**4.4     Financial Information.**  All financial and other information that has been or will be supplied to the Lender is sufficiently complete to give the Lender accurate knowledge of the Borrower's financial condition, including all material contingent liabilities.  Since the date of the most recent financial statement provided to the Lender, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of the Borrower.

CRED_EXAMINER_00002377

DocuSign Envelope ID: 83405421-142D-4EEF-A6D5-380DBB495DBD

**4.5    Lawsuits.** There is no lawsuit, tax claim or other dispute pending or threatened against the Borrower, which, if lost, would impair the Borrower's financial condition or ability to repay the loan, except as have been disclosed in writing to the Lender.

**4.6    Other Obligations.** The Borrower is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to the Lender.

**4.7    Tax Matters.** The Borrower has no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to the Lender.

**4.8    No Event of Default.** There is no event, which is, or with notice or lapse of time or both would be, a default under this Agreement.

Lender is empowered and authorized to enter into and perform its obligations under this Agreement and Lender holds all permits, licenses and registrations (or exemptions therefrom) necessary to lend to Borrower under this Agreement.

| 5. | COVENANTS |
|----|-----------|

The Borrower agrees, so long as credit is available under this Agreement and until the Lender is repaid in full:

**5.1    Use of Proceeds.** To use the proceeds of the Line of Credit only for business purposes.

**5.2    Maintenance of Assets.**

(a)    Not to sell, assign, lease, transfer or otherwise dispose of any part of the Borrower's business or the Borrower's assets except inventory sold and loans made in the ordinary course of the Borrower's business.

(b)    Not to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value, or enter into any agreement to do so.

(c)    To maintain and preserve all rights, privileges, and franchises the Borrower now has.

**5.3    Additional Negative Covenants.** Not to, without the Lender's written consent:

(a)    Enter into any consolidation, merger, or other combination, or become a partner in a partnership, a member of a joint venture, or a member of a limited liability company.

(b)    Liquidate or dissolve the Borrower's business.

**5.4    Notices to Lender.** To promptly notify the Lender in writing of:

(a)    Any event of default under this Agreement, or any event, which, with notice or lapse of time or both, would constitute an event of default.

(b)    Any change in the Borrower's name, legal structure, state of registration, place of business, or chief executive office if the Borrower has more than one place of business.

**5.5    Insurance.** To maintain insurance as is usual for the business it is in.

4

CRED_EXAMINER_00002378

DocuSign Envelope ID: 83405421-142D-4EEF-A6D5-380BBB495DBD

**5.6    Compliance with Laws.**  To comply with the laws (including any fictitious or trade name statute), regulations, and orders of any government body with authority over the Borrower's business.  The Lender has no obligation to make any advance to the Borrower except in compliance with all applicable laws and regulations and the Borrower will fully cooperate with the Lender in complying with all such applicable laws and regulations.

**5.7    Books and Records.**  To maintain adequate books and records.

**5.8    Cooperation.**  To take any action reasonably requested by the Lender to carry out the intent of this Agreement.

| 6. | DEFAULT AND REMEDIES |
|---|---|

Without limiting any of the Lender's rights and remedies in this Agreement, if any of the following events of default occurs, the Lender may do one or more of the following without prior notice: declare the Borrower in default, stop making any additional credit available to the Borrower, and require the Borrower to repay its entire debt immediately.  If an event, which, with notice or the passage of time, will constitute an event of default has occurred and is continuing, the Lender has no obligation to make advances or extend additional credit under this Agreement.  In addition, if any event of default occurs, the Lender will have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with this Agreement, as well as all rights and remedies available at law or in equity.  If an event of default occurs under **Section 6.3** with respect to the Borrower, then the entire debt outstanding under this Agreement will automatically be due immediately.

**6.1    Failure to Pay.**  The Borrower fails to make a payment under this Agreement when due.

**6.2    Covenants.**  Any default in the performance of or compliance with any obligation, agreement or other provision contained in this Agreement (other than those specifically described as an event of default in this Article), and with respect to any such default that by its nature can be cured, such default continues for a period of 30 business days from its occurrence.

**6.3    Bankruptcy/Receivers.**  The Borrower, any Obligor, or any general partner of the Borrower or of any Obligor files a bankruptcy petition, a bankruptcy petition is filed against any of the foregoing parties and such petition is not dismissed within a period of forty-five (45) days after the filing, or the Borrower, any Obligor, or any general partner of the Borrower or of any Obligor makes a general assignment for the benefit of creditors; or a receiver or similar official is appointed for a substantial portion of Borrower's or any Obligor's business; or the business is terminated, or such Obligor is liquidated or dissolved.

**6.4    Judgments.**  Any judgments or arbitration awards are entered against the Borrower or any Obligor.

**6.5    Government Action.**  Any government authority takes action that the Lender believes materially adversely affects the Borrower's or any Obligor's financial condition or ability to repay.

**7.    THE LENDER'S ADDITIONAL REMEDIES**

**7.1    The Lender's Additional Remedies After Default.**  In the event of any default, the Lender may do any one or more of the following, to the extent permitted by law:

(a)    Declare any indebtedness immediately due and payable, without notice or demand.

(b)    Exercise any other remedies available to the Lender at law or in equity.

CRED_EXAMINER_00002379

DocuSign Envelope ID: 83405421-142D-4EFF-A6D5-380DBB195DBD

## 8. ENFORCING THIS AGREEMENT; MISCELLANEOUS

**8.1    Governing Law.** Except to the extent that any law of the United States may apply, this Agreement will be governed and interpreted according to the laws of California (the "**Governing Law State**"), without regard to any choice of law, rules or principles to the contrary. Nothing in this *Section 8.1* may be construed to limit or otherwise affect any rights or remedies of the Lender under federal law.

**8.2    Venue and Jurisdiction.** The Borrower agrees that any action or suit against the Lender arising out of or relating to this Agreement must be filed in federal court or state court located in San Francisco, California. The Borrower agrees that the Lender will not be deemed to have waived its rights to enforce this *Section 8.2* by filing an action or suit against the Borrower in a venue outside of the Governing Law State. If the Lender does commence an action or suit arising out of or relating to this Agreement, the Borrower agrees that the case may be filed in federal court or state court in the Governing Law State. The Borrower consents to personal jurisdiction and venue in such forum selected by the Lender and waives any right to contest jurisdiction and venue and the convenience of any such forum. The provisions of this *Section 8.2* are material inducements to the Lender's acceptance of this Agreement.

**8.3    Successors and Assigns.** This Agreement is binding on the Borrower's and the Lender's successors and assignees. Lender and Borrower agree that neither of them may assign this Agreement without the other party's prior written consent.

**8.4    Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS *SECTION 8.4* AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

**8.5    Severability; Waivers.** If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced. The Lender retains all rights, even if it makes a loan after default. If the Lender waives a default, it may enforce a later default. Any consent or waiver under this Agreement must be in writing.

**8.6    Expenses.**

(a)    The Borrower must pay to the Lender immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees, expended or incurred by the Lender. Such fees shall not be incurred unless expressly agreed to by Borrower.

(b)    The Borrower will indemnify and hold the Lender harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of, other than credit losses (i) this Agreement or any document required hereunder, and (ii) any litigation or proceeding related to or arising out of this Agreement, (except if such litigation is between the Borrower and Lender),. This *Section 8.6(b)* will survive this Agreement's termination for a period of 1 year, and will benefit the Lender and its officers, employees, and agents.

(c)    The Borrower must reimburse the Lender for any reasonable costs and attorneys' fees incurred by the Lender in connection with (i) the enforcement or preservation of the Lender's rights and

6

CRED_EXAMINER_00002380

DocuSign Envelope ID: 83405421-142D-4EFF-A6D5-380DBB495DBD

remedies and/or the collection of any obligations of the Borrower which become due to the Lender and in connection with any "workout" or restructuring, and (ii) the prosecution or defense of any action in any way related to this Agreement, the credit provided hereunder or any related agreements, including without limitation, any action for declaratory relief, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by the Lender or any other person) relating to the Borrower, capped at USD $10,000.

**8.7    One Agreement.** This Agreement and any related security or other agreements required by this Agreement constitute the entire agreement between the Borrower and the Lender with respect to each credit subject hereto and supersede all prior negotiations, communications, discussions and correspondence concerning the subject matter hereof. In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail.

**8.8    Notices.** Unless otherwise provided in this Agreement or in another agreement between the Lender and the Borrower, all notices required under this Agreement shall be (a) in writing (including electronic mail), (b) delivered by electronic mail or overnight courier, and (c) deemed delivered upon electronic or written acknowledgment of receipt. Notices shall be sent to the addresses set forth on the signature page to this Agreement or such other address as specified and delivered pursuant to this *Section 8.8*.

Borrower is responsible for all calculations of interest, payment dates, advance dates and other calculations and determinations hereunder. Borrower's calculations as to the assets it borrows and repays, the amounts of accrued and paid interest, valuations of non-fiat currencies and tokens, and all other calculations and determinations Borrower makes are binding on Lender and conclusive for all purposes unless Lender obtains a final, non-appealable judgment to the contrary.

**8.9    Headings.** Article and section headings are for reference only and will not affect the interpretation or meaning of any provisions of this Agreement.

**8.10    Counterparts.** This Agreement may be executed in any number of counterparts, each of which, when so executed, will be deemed to be an original, and all of which when taken together will constitute one and the same Agreement. Delivery of an executed counterpart of this Agreement (or of any agreement or document required by this Agreement and any amendment to this Agreement) by DocuSign will be as effective as delivery of a manually executed counterpart of this Agreement.

**8.11    Amendments.** This Agreement may be amended or modified only in writing signed by each party hereto.

[Balance of page left blank.]

7

CRED_EXAMINER_00002381

This Agreement is executed as of the Effective Date.

| SIGNATURES |
| --- |

**Borrower:**

**CRED LLC,**
a Delaware limited liability company

By: _____
Name: Dan Schatt
Title: CEO

**Lender:**

UpgradeYa Investments
LLC

By: _____
Name: Marc Parrish
Title: Owner

8

CRED_EXAMINER_00002382

**SCHEDULE A**

**Effective Date:**  April 28, 2020 [*date the Agreement takes effect*]

**Expiration Date:**  June 30, 2020 [*date on which Cred LLC must repay the loan*]

**Currency / Token type**            [X]  USD
**loaned to Cred LLC**:

**Commitment amount:**  $120,000 USD [*the maximum aggregate number / amount of the Currency / Token type to be loaned to Cred*]

**Applicable Rate:**  8% simple interest [*the interest rate in USD payable by Cred LLC to Lender at the end of each calendar quarter*]

                 [X]  fixed rate

**Interest payment dates:** All principal and accrued and unpaid interest will be paid in full on the Expiration Date.  Prior to the Expiration Date, accrued interest will be paid:

        [X]        quarterly within 2 days after quarter-end

CRED_EXAMINER_00002383

**<u>SCHEDULE B</u>**

**Schedule of Fees**

1.  <u>General Fees.</u>

    a.  The Borrower agrees to pay any loan and documentation fees requested by the Lender and agreed to by the Borrower.

    b.  <u>Late Fee</u>. N/A

2.  <u>Additional Fees</u>.  The Borrower and the Lender agree to pay any other fees set forth on the Schedule of Advances.

# EXHIBIT D

CRED_EXAMINER_00002385

SUBJECT: Collateral Withdraw
FROM: Marc Parrish <marc@upgradeya.com>
TO: Michael Zhang <michael.zhang@mycred.io>
DATE: 10/08/2020 14:10

Michael,

With the stability of the bull market since starting the loan with
Cred I think it is time to take out 10% of the collateral to get
closer to the original LTV and to go through the process so I know how
it works.
Of course the BTC that is withdrawn from Cred will be available should
it need to be put back in as collateral in the event the market turns
bearish.
Let me know the process and how we can best achieve this over the next
week or so.

Thanks,
Marc Parrish
UpgradeYa, LLC
843-324-8640

CONFIDENTIALITY NOTICE

This e-mail contains privileged and confidential information which is
the property of UpgradeYa, intended only for the use of the intended
recipient(s). Unauthorized use or disclosure of this information is
prohibited. If you are not an intended recipient, please immediately
notify UpgradeYa and destroy any copies of this email. Receipt of this
e-mail shall not be deemed a waiver by UpgradeYa of any privilege or
the confidential nature of the information.

CRED_EXAMINER_00002386

# EXHIBIT E

CRED_EXAMINER_00002387

SUBJECT: Re: Collateral Withdraw
FROM: Michael Zhang <michael.zhang@mycred.io>
TO: Marc Parrish <marc@upgradeya.com>
DATE: 13/08/2020 14:59
ATTACHMENTS (20200813-145926-0000034): "Upgradeya Investments LLC Earn and borrow partial collateral redemption summary.pdf"

Hey Marc,

Apologies, the meeting invite didn't send. Let's discuss this over email and move to a meeting if necessary.

In regards to a partial collateral redemption, great news, it has been approved.

The plan is to redeem 53.1200475 BTC from your current collateral of 531.300475 BTC resulting in a new collateral amount of 478.17 BTC. Using the current BTC market price of $11,500 your LTV will change from 32.7% to 36.4%. This is summarized in the attached doc highlighted in green.

Please let me know if this is acceptable. Once you confirm I can begin drafting the necessary documents to reflect the changes.

Lastly, please send me your BTC wallet for us to transfer the collateral to. You can send it securely here.

Best regards,



Ka Zhang (Michael)
VP, Wealth

michael.zhang@mycred.io
+1 (310) 291-2597
mycred.io
LinkedIn

On Thu, Aug 13, 2020 at 8:56 AM Marc Parrish <marc@upgradeya.com> wrote:
  Hey Michael,

  I didn't see an invite for a meeting today. I will be busy this afternoon so today will not work. Tomorrow should work if you want to set something up. No need for a meeting on my end only necessary if you feel a need for it.

  Thanks,
  Marc Parrish
  UpgradeYa, LLC
  843-324-8640

  CONFIDENTIALITY NOTICE

  This e-mail contains privileged and confidential information which is the property of UpgradeYa, intended only for the use of the intended recipient(s). Unauthorized use or disclosure of this information is prohibited. If you are not an intended recipient, please immediately notify UpgradeYa and destroy any copies of this email. Receipt of this e-mail shall not be deemed a waiver by UpgradeYa of any privilege or the confidential nature of the information.

  On Mon, Aug 10, 2020 at 6:54 PM Michael Zhang <michael.zhang@mycred.io> wrote:
    Hey Marc,

    Perfect, I just sent you an invite for Wednesday at 11 AM PST, feel free to modify it as needed.

    > As far as the refinancing does the 6% interest $ amount go up due to the new loan amount or is that based on the origination amount?

    The interest will be maintained at 6% APR, however, the amount of interest owed will go up depending on the amount of USD you pull from the LOC. I didn't want to change the amount of interest owed as a second draw has yet to be determined. Once we discuss it over a call, I can get back to you will a more detailed overview.

    Note - interest is calculated based on the amount you draw from the LOC. For example if you draw $2M out of the max of $3M you will only be charged interest on the $2M.

    I look forward to speaking Wednesday. If any questions come up beforehand, please let me know.

    Best regards,



    Ka Zhang (Michael)
    VP, Wealth

    michael.zhang@mycred.io
    +1 (310) 291-2597
    mycred.io
    LinkedIn

    On Mon, Aug 10, 2020 at 2:44 PM Marc Parrish <marc@upgradeya.com> wrote:
      Thanks Michael,

CRED_EXAMINER_00002388

Yes let's plan a call for Wednesday. Just send me an invite and I
should be able to make it work. As far as the refinancing does the 6%
interest $ amount go up due to the new loan amount or is that based on
the origination amount? From your attachment it looks
like it stays the same based on $2M.

Marc Parrish
UpgradeYa, LLC
843-324-8640

CONFIDENTIALITY NOTICE

This e-mail contains privileged and confidential information which is
the property of UpgradeYa, intended only for the use of the intended
recipient(s). Unauthorized use or disclosure of this information is
prohibited. If you are not an intended recipient, please immediately
notify UpgradeYa and destroy any copies of this email. Receipt of this
e-mail shall not be deemed a waiver by UpgradeYa of any privilege or
the confidential nature of the information.

On Mon, Aug 10, 2020 at 2:47 PM Michael Zhang <michael.zhang@mycred.io> wrote:
>
> Hey Marc,
>
> I hope you had a great weekend.
>
> > With the stability of the bull market since starting the loan with Cred I think it is time to take out 10% of the collateral to get closer to the original LTV and to
go through the process so I know how it works.
>
> With the current bull market, your LTV is fluctuating between 30%-33% LTV. Our LOC's are structured so that the collateral is locked-in for the duration of the
loan term. Although we won't be able to redeem a portion of your collateral, we can offer a refinance option for a 1% fee.
>
> Referencing the program summary attached, the market price of BTC on 08/10/20 at 11:27 AM PST of $11,905.00 would put your total collateral value at
$6,325,132.15. If you choose to activate the refinance option we will re-evaluate and update your collateral value to reflect the current market value of the
underlying asset which would increase your LOC to $3,162,566.08. As a result, you will have an additional $1,162,566.08 to draw from - the 1% fee is based on
the increase LOC totaling $11,625.66.
>
> It would be great to jump on a call to dive deeper. How does your schedule look for the rest of the week? I am available tomorrow from 10 AM to 2 PM PST and
Wednesday from 1 PM to 4 PM PST. Let me know if any of those times work for you and if it's easier we can also communicate via email.
>
> Best regards,
>
> Ka Zhang (Michael)
>
> VP, Wealth
>
>
> michael.zhang@mycred.io
>
> +1 (310) 291-2597
>
> mycred.io
>
> Linkedin
>
>
>
> On Mon, Aug 10, 2020 at 11:10 AM Marc Parrish <marc@upgradeya.com> wrote:
>>
>> Michael,
>>
>> With the stability of the bull market since starting the loan with
>> Cred I think it is time to take out 10% of the collateral to get
>> closer to the original LTV and to go through the process so I know how
>> it works.
>> Of course the BTC that is withdrawn from Cred will be available should
>> it need to be put back in as collateral in the event the market turns
>> bearish.
>> Let me know the process and how we can best achieve this over the next
>> week or so.
>>
>> Thanks,
>> Marc Parrish
>> UpgradeYa, LLC
>> 843-324-8640
>>
>> CONFIDENTIALITY NOTICE
>>
>> This e-mail contains privileged and confidential information which is
>> the property of UpgradeYa, intended only for the use of the intended
>> recipient(s). Unauthorized use or disclosure of this information is

CRED_EXAMINER_00002389

>> prohibited. If you are not an intended recipient, please immediately
>> notify UpgradeYa and destroy any copies of this email. Receipt of this
>> e-mail shall not be deemed a waiver by UpgradeYa of any privilege or
>> the confidential nature of the information.

CRED_EXAMINER_00002390

# EXHIBIT F

CRED_EXAMINER_00002391

DocuSign Envelope ID: 79848394-A7L4B6A-AD97-E58E975E1DA1

## EXHIBIT A

### FORM OF DRAW CERTIFICATE - PARTIAL COLLATERAL REDEMPTIOM

#### Draw Certificate No.1- UPDATED

#### Date:  August 14, 2020

Re:     The Loan and Security Agreement (the "**Agreement**") by and between Cred (US) LLC
        and Borrower.

From:  Cred (US) LLC
        Attn: 2121 S. El Camino Real, Suite 500
        San Mateo, CA 94403

This Draw Certificate is prepared and delivered pursuant to the Agreement.  Capitalized terms
used but not defined herein have the meanings given to such terms in the Agreement.  This Draw
Certificate amends and restates in its entirety the Draw Certificate with Borrower dated April 30,
2020.

On the date of delivery set forth below, Borrower delivered and posted cryptocurrency and/or fiat
currency in the number and type specified below to Lender's digital wallet pursuant to the
Agreement.

| | |
|---|---|
| **Date of draw:** | April 30, 2020 |
| **Type and Number of Pledged Collateral – Updated to reflect partial redemption** | Original collateral - 531.3004746 BTC<br><br>Updated collateral August 13, 2020 – 478.17 BTC |
| **Date of delivery and posting of the draw proceeds to Borrower:**<br>(date on which interest begins accruing on the draw amount) | April 30, 2020 |
| **Type of cryptocurrency or fiat currency:** | [X]     fiat currency (type: USD) |
| **Number of tokens or USD:** | [X]     $2,000,000 |
| **Interest rate applicable to the draw:** | 6% |
| **Interest payment dates:** | $20,666.67 payable on 06/30/2020.<br><br>$30,666.67 payable on 09/30/20. |

-1-

CRED_EXAMINER_00002392

DocuSign Envelope ID: 79848394-H7L4B6A-AD27-E58E07561DA

| | |
|---|---|
| | $30,666.67 payable on 12/31/2020.<br><br>$30,000 payable on 03/31/2021.<br><br>$10,000 payable on 04/30/2021 |
| **Principal payment dates:** | $2,000,000 payable on April 30, 2021. |
| **Collateral Return** | Upon payment in full of all principal, interest, and other amount due to lender. |

* * *

**SIGNATURES TO Updated Exhibit A**

**Lender:**

**CRED INC.,**
a Delaware corporation**

By: _Dan Schatt_____
Name: Dan Schatt
Title: CEO

**Borrower:**

Marc Parrish
_____
*[print name]*

_Marc Parrish_____
*[signature]*

-2-

CRED_EXAMINER_00002393

# EXHIBIT G

CRED_EXAMINER_00002394

SUBJECT: Cred
FROM: Michael Zhang <michael.zhang@mycred.io>
TO: Marc Parrish <marc@upgradeya.com>
DATE: 28/10/2020 14:07

Hey Marc,

Cred has experienced irregularities in the handling of specific corporate funds by a perpetrator of fraudulent activity that has negatively impacted Cred's balance sheet and precipitated a law enforcement investigation into the loss of these funds. Cred is cooperating fully with law enforcement authorities in connection with the investigation into the incident. Cred is in the process of carrying out an internal accounting of its assets and assessing the impact of the incident on its current business and in consultation with legal counsel has determined to temporarily suspend all inflows and outflows of funds relating to the CredEarn program. No client personal information or other account data has been compromised. Given the circumstances, we are unable to comment further at this time but we will undertake to provide an update within the next 2 weeks. We thank you for your patience.

The Cred Team

I apologize as I don't have more information than this. I'll make sure to keep you updated as I learn more.

Best regards,



**Ka Zhang (Michael)**
VP, Wealth

michael.zhang@mycred.io
+1 (310) 291-2597
mycred.io
LinkedIn

Cred 2JBJ I C is a licensed lender and all borrowers to earn a yield on cryptocurrency pledged as collateral. That yield feature is sometimes referred to as "CredEarn." Outside the United States, Cred I I C accepts loans of cryptocurrency is or featured by the FDIC or any other governmental entity. Cred makes no representation regarding its creditworthiness or financial position. Cred can extend the term of any loan or pledge in its discretion. "CredBorrow" and "crypto line of credit" (unless Lenders Law Licence 60DBO 81480).

CRED_EXAMINER_00002395

# EXHIBIT H

CRED_EXAMINER_00002396

SUBJECT: Re: Cred
FROM: Marc Parrish <marc@upgradeya.com>
TO: Dan Schatt <dan@mycred.io>
CC: Michael Zhang <michael.zhang@mycred.io>
DATE: 29/10/2020 08:06

Thanks for the email Dan.

This limited amount of information creates many questions and reads like the situation is catastrophic and collateral is lost.

Waiting on the sidelines for two weeks while I have no clue what the status of my BTC is just not possible.  The amount of value that I feel is lost at this point is extremely troubling.
Some clarity in either direction is needed.  I understand you likely cannot answer my questions at this point. But I have to ask for my own sanity...

Do you have my collateral?

If yes, can I settle my loan and withdraw my collateral?

If no, what insurance do you have (what does it cover)?

I don't mean to add stress to an already stressful situation, but this Bitcoin/collateral is my life and not knowing the status is not acceptable.

Thanks,
Marc

Sent from Mobile Device

On Wed, Oct 28, 2020, 8:10 PM Dan Schatt <dan@mycred.io> wrote:

> Marc,
>
>
> First, let me say that I am very sorry for this news, and we will do everything we can to support you and provide you with updated information. Realistically, it's looking like it will take the full two week period to do the full assessment and provide you with much more information.  I will keep Michael fully up to date so he can provide you with any and all updates as they happen.  We truly hope to come to resolution soon so we can give you some peace of mind.
>
>
> Thank you,
>
> Dan

CRED_EXAMINER_00002397

**From:** Marc Parrish <marc@upgradeya.com>
**Date:** Wednesday, October 28, 2020 at 1:02 PM
**To:** Michael Zhang <michael.zhang@mycred.io>
**Cc:** Dan Schatt <dan@mycred.io>
**Subject:** Re: Cred

Michael,

Thank you. The sooner the better.  Needless to say, this has become my top priority and concern.

Marc Parrish
UpgradeYa Investments, LLC
843-324-8640

On Wed, Oct 28, 2020 at 3:21 PM Michael Zhang <michael.zhang@mycred.io> wrote:

Hey Marc,

I understand your concerns. My priority is to keep an open channel of communication going and give you updates as soon as I learn more.

CC'd is Dan Schatt, CEO, of Cred.

Best regards,

**Ka Zhang (Michael)**

VP, Wealth


Image removed by sender.

michael.zhang@mycred.io

+1 (310) 291-2597

mycred.io

Linkedin

CRED_EXAMINER_00002398

Cred (US) LLC is a licensed lender and allows some borrowers to earn a yield on cryptocurrency pledged as collateral. That yield feature is sometimes referred to as "CredEarn." Outside the United States, Cred LLC accepts loans of cryptocurrency from non-U.S. persons and pays interest on those loans. Neither Cred LLC nor Cred (US) LLC sell or offer to sell investments or securities; neither entity is a bank and no transaction or arrangement provided by either entity is guaranteed or insured by the FDIC or any other governmental entity. Cred makes no representation regarding its creditworthiness or financial position. Cred can extend the term of any loan or pledge in its discretion. "CredBorrow" and "crypto line of credit" (abbreviated "C-LOC") are trade names for lending products of Cred (US) LLC. This communication may not be used to offer or sell anything in any jurisdiction if doing so is not lawful. Loans made or arranged pursuant to California Finance Lenders Law License 60DBO-91480.

On Wed, Oct 28, 2020 at 12:16 PM Marc Parrish <marc@upgradeya.com> wrote:

Michael,

Thanks for sharing.  Please connect me with Dan Schatt.

This limited information has me very concerned about the security of the collateral and future business with Cred.

I need assurances that the full amount of the collateral is safe.  Obviously, the collateral value has greatly increased recently and this stresses the point of removing collateral to keep needed LTV vs having unneeded collateral at risk.

Thanks,

Marc Parrish
UpgradeYa Investments, LLC
843-324-8640

On Wed, Oct 28, 2020 at 2:07 PM Michael Zhang <michael.zhang@mycred.io> wrote:

Hey Marc,

Cred has experienced irregularities in the handling of specific corporate funds by a perpetrator of fraudulent activity that has negatively impacted Cred's balance sheet and precipitated a law enforcement investigation into the loss of these funds. Cred is cooperating fully with law enforcement

CRED_EXAMINER_00002399

authorities in connection with the investigation into the incident. Cred is in the process of carrying out an internal accounting of its assets and assessing the impact of the incident on its current business and in consultation with legal counsel has determined to temporarily suspend all inflows and outflows of funds relating to the CredEarn program. No client personal information or other account data has been compromised. Given the circumstances, we are unable to comment further at this time but we will undertake to provide an update within the next 2 weeks. We thank you for your patience.

The Cred Team

I apologize as I don't have more information than this. I'll make sure to keep you updated as I learn more.

Best regards,

**Ka Zhang (Michael)**

VP, Wealth

michael.zhang@mycred.io

+1 (310) 291-2597

mycred.io

Linkedin

Cred (US) LLC is a licensed lender and allows some borrowers to earn a yield on cryptocurrency pledged as collateral. That yield feature is sometimes referred to as "CredEarn." Outside the United States, Cred LLC accepts loans of cryptocurrency from non-U.S. persons and pays interest on those loans. Neither Cred LLC nor Cred (US) LLC sell or offer to sell investments or securities; neither entity is a bank and no transaction or arrangement provided by either entity is guaranteed or insured by the FDIC or any other governmental entity. Cred makes no representation regarding its creditworthiness or financial position. Cred can extend the term of any loan or pledge in its discretion. "CredBorrow" and "crypto line of credit" (abbreviated "C-LOC") are trade names for lending products of Cred (US) LLC. This communication may not be used to offer or sell anything in any jurisdiction if doing so is not lawful. Loans made or arranged pursuant to California Finance Lenders Law License 60DBO-91480.

CRED_EXAMINER_00002400

# EXHIBIT I

CRED_EXAMINER_00002401

---------- Forwarded message ----------
From: **Dan Schatt** <dan@mycred.io>
Date: Sat, Oct 31, 2020 at 11:22 AM
Subject: Re: Cred
To: Marc Parrish <marc@upgradeva.com>
Cc: Michael Zhang <michael.zhang@mycred.io>

Hi Marc – I've checked in with our Counsel and unfortunately I won't be able to provide an update for 7-10 days. I realize that this puts you in a difficult position and I am so sorry that we cannot provide you with more information at this moment. We will reach out as soon as we are cleared to do so.

Thanks,

Dan

---

**From:** Dan Schatt <dan@mycred.io>
**Date:** Friday, October 30, 2020 at 7:27 AM
**To:** Marc Parrish <marc@upgradeva.com>
**Cc:** Michael Zhang <michael.zhang@mycred.io>
**Subject:** Re: Cred

Marc,

I completely understand.  Our team is actively reviewing your information, should be in touch soon.

Thanks,

Dan

Sent from my iPhone

1

CRED_EXAMINER_00002402

On Oct 30, 2020, at 5:22 AM, Marc Parrish <marc@upgradeya.com> wrote:


Dan,


Did the team review my case?  I have not heard anything.


Like I have a previously stated, the value is too much to not have information and answers as to what is going on and the status of my collateral.


Do you have my collateral?

If yes, can I settle my loan and withdraw my collateral?

If no, what insurance do you have (what does it cover)?

If I don't hear anything soon then I will have no choice but to deploy a legal team for investigation into Cred to ultimately confirm the status of my collateral so I can make the proper financial decisions moving forward.


Marc Parrish

UpgradeYa Investments, LLC


Sent from Mobile Device


On Thu, Oct 29, 2020, 2:56 PM Dan Schatt <dan@mycred.io> wrote:

Marc, I completely understand and deeply regret the stress we are causing. I've asked our team to review your situation, and we will definitely do everything we can to come to clarity as quickly as we can.

---

**From:** Marc Parrish <marc@upgradeya.com>
**Date:** Thursday, October 29, 2020 at 5:06 AM

2

CRED_EXAMINER_00002403

**To:** Dan Schatt <dan@mycred.io>
**Cc:** Michael Zhang <michael.zhang@mycred.io>
**Subject:** Re: Cred

Thanks for the email Dan.

This limited amount of information creates many questions and reads like the situation is catastrophic and collateral is lost.

Waiting on the sidelines for two weeks while I have no clue what the status of my BTC is just not possible.  The amount of value that I feel is lost at this point is extremely troubling.

Some clarity in either direction is needed.  I understand you likely cannot answer my questions at this point. But I have to ask for my own sanity...

Do you have my collateral?

If yes, can I settle my loan and withdraw my collateral?

If no, what insurance do you have (what does it cover)?

I don't mean to add stress to an already stressful situation, but this Bitcoin/collateral is my life and not knowing the status is not acceptable.

Thanks,

Marc

Sent from Mobile Device

On Wed, Oct 28, 2020, 8:10 PM Dan Schatt <dan@mycred.io> wrote:

3

CRED_EXAMINER_00002404

Marc,

First, let me say that I am very sorry for this news, and we will do everything we can to support you and provide you with updated information. Realistically, it's looking like it will take the full two week period to do the full assessment and provide you with much more information.  I will keep Michael fully up to date so he can provide you with any and all updates as they happen.  We truly hope to come to resolution soon so we can give you some peace of mind.

Thank you,

Dan

**From:** Marc Parrish <marc@upgradeya.com>
**Date:** Wednesday, October 28, 2020 at 1:02 PM
**To:** Michael Zhang <michael.zhang@mycred.io>
**Cc:** Dan Schatt <dan@mycred.io>
**Subject:** Re: Cred

Michael,

Thank you. The sooner the better.  Needless to say, this has become my top priority and concern.

Marc Parrish
UpgradeYa Investments, LLC
843-324-8640

On Wed, Oct 28, 2020 at 3:21 PM Michael Zhang <michael.zhang@mycred.io> wrote:

  Hey Marc,

CRED_EXAMINER_00002405

I understand your concerns. My priority is to keep an open channel of communication going and give you updates as soon as I learn more.

CC'd is Dan Schatt, CEO, of Cred.

Best regards,



**Ka Zhang (Michael)**

VP, Wealth

michael.zhang@mycred.io

+1 (310) 291-2597

mycred.io

Linkedin

Cred (US) LLC is a licensed lender and allows some borrowers to earn a yield on cryptocurrency pledged as collateral. That yield feature is sometimes referred to as "CredEarn." Outside the United States, Cred LLC accepts loans of cryptocurrency from non-U.S. persons and pays interest on those loans. Neither Cred LLC nor Cred (US) LLC sell or offer to sell investments or securities; neither entity is a bank and no transaction or arrangement provided by either entity is guaranteed or insured by the FDIC or any other governmental entity. Cred makes no representation regarding its creditworthiness or financial position. Cred can extend the term of any loan or pledge in its discretion. "CredBorrow" and "crypto line of credit" (abbreviated "C-LOC") are trade names for lending products of Cred (US) LLC. This communication may not be used to offer or sell anything in any jurisdiction if doing so is not lawful. Loans made or arranged pursuant to California Finance Lenders Law License 60DBO-91480.

On Wed, Oct 28, 2020 at 12:16 PM Marc Parrish <marc@upgradeya.com> wrote:

Michael,

5

CRED_EXAMINER_00002406

Thanks for sharing.  Please connect me with Dan Schatt.

This limited information has me very concerned about the security of the collateral and future business with Cred.

I need assurances that the full amount of the collateral is safe.  Obviously, the collateral value has greatly increased recently and this stresses the point of removing collateral to keep needed LTV vs having unneeded collateral at risk.

Thanks,

Marc Parrish
UpgradeYa Investments, LLC
843-324-8640

On Wed, Oct 28, 2020 at 2:07 PM Michael Zhang <michael.zhang@mycred.io> wrote:

Hey Marc,

Cred has experienced irregularities in the handling of specific corporate funds by a perpetrator of fraudulent activity that has negatively impacted Cred's balance sheet and precipitated a law enforcement investigation into the loss of these funds. Cred is cooperating fully with law enforcement authorities in connection with the investigation into the incident. Cred is in the process of carrying out an internal accounting of its assets and assessing the impact of the incident on its current business and in consultation with legal counsel has determined to temporarily suspend all inflows and outflows of funds relating to the CredEarn program. No client personal information or other account data has been compromised. Given the circumstances, we are unable to comment further at this time but we will undertake to provide an update within the next 2 weeks. We thank you for your patience.

The Cred Team

I apologize as I don't have more information than this. I'll make sure to keep you updated as I learn more.

CRED_EXAMINER_00002407

Best regards,

Error! Filename not specified.

**Ka Zhang (Michael)**

VP, Wealth

michael.zhang@mycred.io

+1 (310) 291-2597

mycred.io

Linkedin

Cred (US) LLC is a licensed lender and allows some borrowers to earn a yield on cryptocurrency pledged as collateral. That yield feature is sometimes referred to as "CredEarn." Outside the United States, Cred LLC accepts loans of cryptocurrency from non-U.S. persons and pays interest on those loans. Neither Cred LLC nor Cred (US) LLC sell or offer to sell investments or securities; neither entity is a bank and no transaction or arrangement provided by either entity is guaranteed or insured by the FDIC or any other governmental entity. Cred makes no representation regarding its creditworthiness or financial position. Cred can extend the term of any loan or pledge in its discretion. "CredBorrow" and "crypto line of credit" (abbreviated "C-LOC") are trade names for lending products of Cred (US) LLC. This communication may not be used to offer or sell anything in any jurisdiction if doing so is not lawful. Loans made or arranged pursuant to California Finance Lenders Law License 60DBO-91480.

Error! Filename not specified.

CRED_EXAMINER_00002408

# EXHIBIT J

CRED_EXAMINER_00002409

SUBJECT: CredBorrow - Collateral Status
FROM: Marc Parrish <marc@upgradeya.com>
TO: "dan@mycred.io" <dan@mycred.io>
DATE: 07/11/2020 01:04

Dan,

I can fulfil my obligation and get $2M USD back on your books in return for my collateral. I suspect this will help with CredEarn liabilities.

let me know.

Marc Parrish
UpgradeYa Investments, LLC
843-324-8640

CRED_EXAMINER_00002410

# EXHIBIT K

CRED_EXAMINER_00002411

SUBJECT: Re: Letter from Cred
FROM: Heidi Ng <heidi@mycred.io>
TO: Marc Parrish <marc@upgradeya.com>
CC: Dan Schatt <dan@mycred.io>
DATE: 10/11/2020 16:31

Hi Marc,

Our record shows that we are holding 478.170 BTC as collateral for your loan of $2,000,000. And I can also confirm that you are an active credearn program with $73,171.47.

We cannot provide current balances at this point as we are in the process of reviewing all of the records and separating pre- and post-petition invoices. Cred will be filing a "Schedule of Assets and Liabilities."
In this document, Cred will list balances it believes are owed to its creditors.

While Cred cannot promise what the amount of payout will be on your claims, you can be sure that Cred will do everything it can to achieve the maximum recovery for all creditors.

Information about how to file a Proof of Claim is available at the following website address: https://www.donlinrecano.com/Clients/cred/Static/POC.
At some point in the case, every creditor will receive a copy of a Bar Date Notice which will be accompanied by a proof of claim form with instructions as to deadlines, etc.

If you have any questions regarding filing a claim, please seek the advice of legal counsel.

Regards,
Heidi

On Tue, Nov 10, 2020 at 10:07 AM Marc Parrish <marc@upgradeya.com> wrote:
Heidi,

Please follow up with the requested information as I gather where my business stands with Cred, specifically what liability does Cred have on record to UpgradeYa Investments, LLC. I have collateral that is held with Cred. What is the status of that collateral? I have USD in credearn that is specifically there to cover the interest payment for the loan. Is that or will that be withdrawn from credearn to credborrow?

Regards,
Marc Parrish
Upgrade Investments, LLC

Dan Schatt <dan@mycred.io> wrote:

Hi Marc,

I'm connecting you with Heidi who can let you know what Cred has on record for UpgradeYa Investments. The Chapter 11 documents list the top 30 creditors.

CRED_EXAMINER_00002412

Thank you,

Dan

---

**From:** Marc Parrish <marc@upgradeya.com>
**Date:** Sunday, November 8, 2020 at 7:17 PM
**To:** "dan@mycred.io" <dan@mycred.io>
**Subject:** Fwd: Letter from Cred

Dan,

I am sure you are busy. I just have one basic question. In the chapter 11 document attached where am I at for liabilities under the creditors? I have run the numbers and it has been inconclusive.

Or more simply put what do you have on the books as your liability to me?

Thanks,

Marc Parrish
UpgradeYa Investments, LLC
843-324-8640

---------- Forwarded message ---------
From: **The Cred Team** <support@mycred.io>
Date: Sun, Nov 8, 2020 at 2:39 PM
Subject: Letter from Cred
To: Upgradeya Investment LLC <marc@upgradeya.com>

Dear Upgradeya Investment LLC,

Thank you for your outsized patience over the past two weeks. During this time, our burning desire to communicate with you conflicted with our legal obligation to remain silent until we could arrive at a clear understanding of next steps. We know this period has been concerning and stressful for you, and it has been difficult for all of us at Cred that we could not communicate more. We have been working around the clock in discussion with many parties, including insurance providers, investors, restructuring specialists, and legal counsel to understand how Cred has been impacted from recent events and what it means for you.

CRED_EXAMINER_00002413

We have come to the conclusion that it is in the best interest of our customers and all stakeholders for Cred to file for Chapter 11 of the US Bankruptcy Code.

Why Chapter 11 Bankruptcy? We can operate this process according to three principles that you deserve:

Transparency. You will have full and continuous access to every disclosure about Cred, its history, and the recent events leading to our decision to file for Chapter 11 bankruptcy. Everyone will have the same information, and you can access all information here, by phone (1-877-739-9988), or by email (credinfo@donlinrecano.com). The self-serve portal will provide you with a frequently asked questions section, and give you a deeper understanding of the process. It will be updated with new information regularly and you can sign up to receive email alerts.

Fairness. In a bankruptcy proceeding, every customer will have the opportunity to participate in the process. There are no special deals that would favor one customer over another, and you will have an opportunity to review all documentation.

Efficiency. Chapter 11 has a well-established set of processes, and we expect to come to a resolution within a few months.

As we work through a comprehensive plan to recover assets, we will be evaluating several options, including sale of the company or company assets, restructuring, and liquidation of assets. To that end, we have added Grant Lyon to Cred's Board of Directors to oversee the restructuring process. Grant has more than 30 years of experience in corporate restructuring, and I have great confidence in his fair and objective analysis of company operations, development of strategic plans, and liquidity alternatives that serve the best interests of Cred stakeholders. Cred has also engaged Paul Hastings LLP as its legal advisor during the Chapter 11 process , and MACCO Restructuring Group as financial advisor to evaluate M&A and other restructuring opportunities.

On a personal note, my thoughts and deepest apologies to our community, those who were willing to take a risk on us - our partners, investors, employees, and customers - for the anxiety, stress, and concern we have caused you. Many Cred employees, including myself have significant amounts of money that have been entrusted with Cred. We are committed to do whatever we can to arrive at the most favorable outcome we can for all of our customers.

Sincerely,
Dan Schatt
Co-Founder & CEO of Cred

Cred (US) LLC is a licensed lender and allows some borrowers to earn a yield on cryptocurrency pledged as collateral. Cred (US) LLC also rents cryptocurrency from users and pays rental fees calculated as an interest rate yield. The yield feature, whether as part of a pledge or a rental agreement, is sometimes referred to as "CredEarn." Outside the United States, Cred Inc. accepts loans of cryptocurrency from non-U.S. persons and pays interest on those loans. Neither Cred Inc. nor Cred (US) LLC sell or offer to sell investments or securities; neither entity is a bank and no transaction or arrangement provided by either entity is guaranteed or insured by the FDIC or any other governmental entity. Cred makes no representation regarding its creditworthiness or financial position. Cred can extend the term of any loan, crypto rental or pledge in its discretion. "CredBorrow" and "crypto line of credit" (abbreviated "C-LOC") are trade names for lending products of Cred (US) LLC. This communication may not be used to offer or sell anything in any jurisdiction if doing so is not lawful. All loans by Cred are made or arranged pursuant to California Finance Lenders Law License 60DBO-91480.
© 2020 Cred Inc. All Rights Reserved
Unsubscribe
Unsubscribe

CRED_EXAMINER_00002414