# **EXHIBIT F**

**(Proposed Redacted Compendium- Volume VI)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CRED INC., *et al.*,<br><br>                     Debtors. | Chapter 11<br><br>Case No. 20-12836 (JTD)<br><br>(Jointly Administered) |

## COMPENDIUM OF EXHIBITS TO REPORT OF ROBERT J. STARK, EXAMINER

## VOLUME VI

**BROWN RUDNICK LLP**
Andrew M. Carty
Michael W. Reining
Tiffany B. Lietz
Seven Times Square
New York, NY 10036
212-209-4800
acarty@brownrudnick.com
mreining@brownrudnick.com
tlietz@brownrudnick.com

Stephen R. Cook
2211 Michelson Drive, 7th Floor
Irvine, CA 92612
949-752-7100
scook@brownrudnick.com

E. Patrick Gilman
601 Thirteenth Street NW, Suite 600
Washington, DC 20005
202-536-1730
pgilman@brownrudnick.com

**ASHBY & GEDDES, P.A.**
Gregory A. Taylor (DE Bar No. 4008)
Katharina Earle (DE Bar No. 6348)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
gtaylor@ashbygeddes.com
kearle@ashbygeddes.com

**ANKURA CONSULTING GROUP, LLC**
Vikram Kapoor
485 Lexington Avenue, 10th Floor
New York, NY 10017
212-818-1555
vikram.kapoor@ankura.com

**Dated: March 8, 2021**

**Index of Exhibits to Report of Robert J. Stark, Examiner**

| Description | Exhibit No. |
|---|---|
| Decl. of Daniel Schatt in Supp. of Debtors' Chapter 11 Pet. and First Day Mot. (ECF No. 12) | 1 |
| Base Prospectus, Jan. 30, 2020 | 2 |
| moKredit Inc. Overview Report, Aug. 7, 2019 | 3 |
| Videotaped Dep. of Dan Schatt, Dec. 14, 2020 | 4 |
| Loan and Security Agreement between moKredit Inc., and Cred LLC, Dec. 27, 2018 | 5 |
| Decl. of Daniyal Inamullah in Supp. of Mot. of the United States Trustee for Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases (ECF No. 133) | 6 |
| Cyber Quantum Pte. Ltd. Unaudited Financial Statements, 2018 | 7 |
| Cyber Quantum Pte. Ltd. Directors' Resolutions, 2018 | 8 |
| Videotaped Dep. of Daniyal Inamullah, Dec. 8, 2020 | 9 |
| Emails exchanged between H. Ng, K. Wong, D. Schatt and InnReg representative regarding JST onboarding process, Dec. 7–20, 2018 | 10 |
| Email from J. Alexander to K. Wong, Jan. 22, 2019 | 11 |
| Email from D. Granet to L. Hua, copying in Messrs. J. Alexander, K. Wong, S. Zhang and S. Freeman, Jan. 14, 2019 | 12 |
| JST Systems Invoice, Jan. 22, 2019 | 13 |
| Sarson Funds Fact Card: Fifth Khagan | 14 |
| Sarson Funds Fact Card: AX Momentum | 15 |
| Employment Offer Letter for J. Alexander | 16 |
| Mot. of UpgradeYa Investment, LLC for Relief from Stay Under Bankruptcy Code Section 362 (ECF No. 89) | 17 |
| Nathan DiCamillo, *Here's What Happened at Crypto Lender Cred's Latest Bankruptcy Hearing*, CoinDesk, Dec. 18, 2020 | 18 |
| Laurence Fletcher, *Crypto hedge funds struggle to recover from 'bloodbath'*, *Fin. Times*, May 20, 2020 | 19 |
| 100 Acre Ventures Form ADV, May 15, 2020 | 20 |
| Decl. of Joe Podulka in Supp. of Debtors' Obj. to Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF No. 441) | 21 |
| First Amended Complaint, *Alexander v. Schatt*, No. 20-CIV-02728 (Cal. Super. Ct. Oct. 15, 2020) | 22 |
| Verified First Amended Complaint, *Cred v. Alexander*, No. 20-CIV-02915 (Cal. Super. Ct. Aug. 14, 2020) | 23 |
| Decl. of Daniel F. Wheeler RE Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF No. 386) | 24 |
| Cred Inc. Update for the Creditors Committee, Dec. 14, 2020 | 25 |
| Decl. of Grant Lyon in Supp. of Debtors' Obj. to Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF No. 433) | 26 |

| Description | Exhibit No. |
|---|:---:|
| United States Trustee Mot. For Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases (ECF No. 133) | 27 |
| Order Den. in Part, and Granting in Part, the Trustee/Examiner Mot. (ECF No. 281) | 28 |
| App. of the United States Trustee for Order Approving Appointment of Examiner (ECF No. 330) | 29 |
| Order Approving Appointment of Examiner (ECF No. 338) | 30 |
| Notice of Filing of Proposed Scope, Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Start, as Examiner (ECF No. 376) | 31 |
| Order Approving Examiner's Proposed Scope, Work Plan, and Budget for Investigation (ECF No. 431) | 32 |
| Notice of Filing of Proposed Amend. to Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Stark, as Examiner (ECF No. 552) | 33 |
| Cred LLC and Subsidiary Financial Statements, 2018 | 34 |
| CredEarn CredBorrow Information Sheet | 35 |
| Standard CredBorrow Multi-Tranche Credit Agreement | 36 |
| moKredit Tranche Agreement No. 29, May 1, 2019 | 37 |
| CredEarn Process and Asset Flow | 38 |
| Email from J. Alexander to K. Wong, Feb. 12, 2019 | 39 |
| Enhanced Yield Agreement for CredEarn Customers | 40 |
| Chat log between S. Zhang and T. Perez, Aug. 28, 2019 | 41 |
| Email chain between A. Khakoo, H. Ha, D. Inamullah, and M. Zhang, June 30, 2020 | 42 |
| Fireblocks License Agreement, Feb. 21, 2020 | 43 |
| Cred Investment Committee Meeting Minutes | 44 |
| Email from S. Hwang to J. Podulka, Nov. 12, 2020 | 45 |
| Schedule of Advances | 46 |
| Email from J. Podulka to F. Cottrell and A. Khakoo, Nov. 18, 2020 | 47 |
| Cred LLC General Ledger, 2020 | 48 |
| Cred Financial Statements, 2019 | 49 |
| Email from J. Podulka to H. Moore and E. Rye, May 21, 2020 | 50 |
| Lockton Summary of Insurance, 2020–2021 | 51 |
| Hartford Business Owners Policy, Oct. 1, 2020 | 52 |
| Hartford Workers' Compensation and Employers' Liability Busines Insurance Policy, Nov. 30, 2020 | 53 |
| Certificate of Liability Insurance, Nov. 11, 2020 | 54 |
| Axis Insurance Policy | 55 |
| Validus Errors and Omissions Policy Declarations | 56 |
| Validus Directors and Officers Policy Declarations | 57 |
| Euclid Financial Excess Insurance Policy | 58 |
| Email from M. Zhang to M. Parrish, June 24, 2020 | 59 |
| Screenshot of Cred website discussing insurance policies | 60 |

| Description | Exhibit No. |
|---|---|
| Screenshot of Cred website discussing partnership with BitGo | 61 |
| Email chain between M. Zhang and T. Miyauchi, June 19, 2020 | 62 |
| Email from T. Perez to C.D., Nov. 14, 2019 | 63 |
| Email chain between M. Zhang and J.S., Apr. 15, 2020 | 64 |
| Intentionally Omitted | 65 |
| Email from D.F. to T. Perez, Nov. 8, 2020 | 66 |
| Cred Advertising and Marketing Policy | 67 |
| Email from D. Inamullah to D. Kline, July 6, 2020 | 68 |
| Intentionally Omitted | 69 |
| Email from K. Wong to L. Hua, Jan. 15, 2019 | 70 |
| Email from J. Alexander to L. Hua and K. Wong, Jan. 22, 2019 | 71 |
| Email from K. Wong to S. Zhang and J. Alexander, Feb. 4, 2019 | 72 |
| Email from K. Wong to L. Hua and D. Schatt, Feb. 13, 2019 | 73 |
| Email from K. Wong to H. Ng, J. Alexander, and S. Zhang, Feb. 14, 2019 | 74 |
| Email from J. Alexander to K. Wong, Feb. 15, 2019 | 75 |
| Intentionally Omitted | 76 |
| Email from J. Alexander to K. Wong, May 21, 2019 | 77 |
| Intentionally Omitted | 78 |
| Email from J. Alexander to L. Hua, D. Inamullah, S. Zhang, and J. Podulka, Mar. 12, 2020 | 79 |
| Contribution Agreement between L. Hua and Cred Capital, LLC, Mar. 31, 2020 | 80 |
| Email from D. Schatt to D. Wheeler, June 16, 2020 | 81 |
| Email from D. Inamullah to D. Schatt, J. Podulka, and A. Khakoo, June 29, 2020 | 82 |
| Email from J. Podulka to D. Schatt, Dec. 1, 2020 | 83 |
| Cred Near Term Liquidity Analysis, Nov. 7, 2020 | 84 |
| Email chain between J. Alexander and A. Derar, Apr. 16, 2019 | 85 |
| Email from J. Alexander to J. Bunting, Mar. 14, 2019 | 86 |
| Email chain between J. Alexander and R. Flowers, Mar. 15, 2019 | 87 |
| Email from J. Alexander to D. Davis, Mar. 14, 2019 | 88 |
| moKredit Investment Opportunity Slide Deck, Mar. 2019 | 89 |
| Cred Employee Chat Logs, Mar. 26, 2019 | 90 |
| Income Opportunities Board Minutes, Feb. 4, 2020 | 91 |
| Spreadsheet concerning W. Strong's investment | 92 |
| JST Consulting Agreement, Dec. 25, 2018 | 93 |
| Email from J. Podulka to D. Schatt, July 24, 2020 | 94 |
| Email from D. Inamullah to D. Schatt, A. Khakoo, and J. Podulka, Sept. 16, 2020 | 95 |
| Email from D. Schatt to J. Podulka, Nov. 14, 2020 | 96 |
| Email from D. Inamullah to J. Podulka and D. Schatt, July 13, 2020 | 97 |
| Email chain between J. Podulka, H. Moore, G. Estrada, S. Hwang, H. Ha, Nov. 5, 2020 | 98 |
| Cred LLC Subscription Agreement with Cambrian Systematic Strategies LP, July 29, 2020 | 99 |

| Description | Exhibit No. |
|---|---|
| Chat log between S. Zhang and J. Alexander, July 30, 2019 | 100 |
| Cambrian Systematic Strategies LP Quarterly Statement, Sept. 30, 2019 | 101 |
| Email from S. Zhang to J. Alexander, Feb. 6, 2020 | 102 |
| Redemption Confirmation, Jan. 22, 2020 | 103 |
| Metropolitan Commercial Bank Account Statement, Feb. 28, 2020 | 104 |
| Email from HC Global Fund Services to D. Schatt, Feb. 21, 2020 | 105 |
| Email from A. Khakoo to P. Collins, June 29, 2020 | 106 |
| Email from J. Podulka to D. Schatt, Aug. 8, 2020 | 107 |
| Email from J. Podulka to D. Schatt, Aug. 28, 2020 | 108 |
| Email from J. Sarson to D. Schatt, A. Khakoo, Nov. 17, 2020 | 109 |
| Email from M. Foster to J. Sarson, Jan 6, 2021 | 110 |
| Brett Arends, *Opinion: How did these 'All-Weather' portfolios weather 2020?* MarketWatch (Dec. 21, 2020) | 111 |
| Email from D. Inamullah to D. Schatt, J. Podulka, D. Wheeler and A. Khakoo, Oct. 1, 2020 | 112 |
| Liquidity Analysis Post March 2020 Flash Crash and Recommended Steps, Apr. 5, 2020 | 113 |
| Email with attachments from D. Inamullah to D. Schatt, H. Ng, J. Podulka, S. Zhang, and J. Alexander, Feb. 12, 2020 | 114 |
| Cred Asset Management Overview, Aug. 2020 | 115 |
| Intentionally Omitted | 116 |
| JST Risk Report, Feb. 28, 2020 | 117 |
| JST Risk Report, Mar. 17, 2020 | 118 |
| Email from S. Freeman to J. Alexander, H. Ng, D. Schatt, J Podulka, S. Zhang, and D. Inamullah, Mar. 12, 2020 | 119 |
| Email from J. Alexander to D. Inamullah, Mar. 18, 2020 | 120 |
| Emails between JST and Cred regarding a February invoice, Mar. 3, 2020 | 121 |
| Email from D. Inamullah to J. Podulka, D. Schatt and J. Alexander, Apr. 4, 2020 | 122 |
| Intentionally Omitted | 123 |
| Cred, Inc. Fireblocks logs | 124 |
| Email chain between J. Alexander and R. Chapman, Feb. 2, 2020 | 125 |
| Email from H. Ng to S. Foster, J. Alexander, S. Zhang, R. Chapman and L. Tabers, Feb. 5, 2020 | 126 |
| Email from R. Ortega J. Alexander, Mar. 10, 2020 | 127 |
| Email from D. Inamullah to J. Podulka and D. Schatt, July 13, 2020 | 128 |
| Quanta Capital Subscription Agreement, Feb. 4, 2020 | 129 |
| Email from J. Alexander to D. Inamullah and S. Zhang, Mar. 10, 2020 | 130 |
| Email from S. Foster to D. Inamullah, Feb. 13, 2020 | 131 |
| Transaction Log, Feb. 5, 2020 | 132 |
| Email from S. Foster to D. Inamullah, Mar. 23, 2020 | 133 |
| Kingdom Trust Investor Monthly Statement, Feb. 2020 | 134 |
| Cred Incident Investigation Report, Nov. 25, 2020 | 135 |
| Email chain between D. Inamullah and R. Chapman, Mar. 15, 2020 | 136 |

4

| Description | Exhibit No. |
|---|---|
| Email chain between D. Inamullah and S. Foster, May 9, 2020 | 137 |
| Email with attachments from S. Foster to A. Khakoo, June 1, 2020 | 138 |
| Email from D. Inamullah to J. Podulka, May 3, 2020 | 139 |
| Email from R. Chapman to D. Inamullah, July 16, 2020 | 140 |
| Email from S. Foster to A. Khakoo, July 29, 2020 | 141 |
| Email from S. Foster to A. Khakoo, July 30, 2020 | 142 |
| Email from A. Khakoo to D. Inamullah, Aug. 21, 2020 | 143 |
| Email from T. Kuhman to J. Podulka, Aug. 26, 2020 | 144 |
| Email from B. De Lude to D. Schatt, Dec. 8, 2020 | 145 |
| Email from T. Khuu to B. De Lude, D. Schatt, and J. Podulka, Oct. 30, 2020 | 146 |
| Email from B. De Lude to D. Inamullah, Aug. 27, 2020 | 147 |
| Email from B. De Lude to D. Inamullah, Aug. 27, 2020 | 148 |
| Email between J. Podulka and S. Ichimiya, Sept. 1, 2020 | 149 |
| Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362, Exhibit G (ECF No. 91) | 150 |
| Intentionally Omitted | 151 |
| JST Risk Report, Mar. 11, 2020 | 152 |
| Decl. of Matthew K. Foster in Support of Debtors' Objection to Motion of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF No. 434) | 153 |
| Email from S. Hwang to P. Bonjour, H. Ng, and D. Hummer, Dec. 15, 2020 | 154 |
| Chat logs between J. Alexander and D. Inamullah, June 24, 2020 | 155 |
| Employee Loan Agreement I, June 1, 2019 | 156 |
| Employee Loan Agreement II, June 1, 2019 | 157 |
| Employee Loan Agreement III, June 1, 2019 | 158 |
| Order Denying Motion of James Alexander to Dismiss the Cred Capital, Inc. Case (ECF. No. 487) | 159 |
| Email from D. Inamullah to D. Schatt and J. Podulka, June 30, 2020 | 160 |
| Videotaped Deposition of James Alexander | 161 |
| Email from J. Evans to E. Gilman, Feb. 28, 2021 | 162 |
| Suggestion of Bankruptcy (ECF. No. 500) | 163 |
| JST Risk Report, Mar. 12, 2020 | 164 |
| Chat messages between S. Zhang, Han LNU and S. Hwang, Aug. 20, 2020 | 165 |
| Transcript of Zoom Hearing Re: Emergency Motions of the Official Committee of Unsecured Creditors, Feb. 5, 2021 | 166 |
| MN Form UCF-17-2, Order Granting Name Change, Aug. 18, 1994 | 167 |
| Letter from Andrew Selous MP, Parliamentary Under-Secretary of State for Justice, to Philip Davies MP, House of Commons, Nov. 7, 2014 | 168 |
| First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries under Chapter 11 of the Bankruptcy Code (ECF No. 380) | 169 |
| Articles of Association of moKredit, Oct. 25, 2017 | 170 |
| Note Purchase Escrow Agreement, Jan. 28, 2020 | 171 |
| Suppl. Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362 (ECF No. 128) | 172 |

| Description | Exhibit No. |
|---|---|
| Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362 (ECF No. 91) | 173 |
| Exhibit C, Decl. of Daniel Schatt in Supp. Of Def.'s Opp. To Pl.'s Mot. for Prelim. Inj., *Alexander v. Schatt*, No. 20-CIV-02728 (Cal. Super. Ct. Aug. 27, 2020) | 174 |
| Crypto-to-Fiat Process Diagram | 175 |
| UpgradeYa Loan and Security Agreement, Apr. 20, 2020 | 176 |
| Holdings Update, Oct. 11, 2020 | 177 |
| UpgradeYa Tranche 1 Closing Statement | 178 |
| Email from L. Hua to D. Schatt, J. Grogan, and M. Zuppone, Nov. 4, 2020 | 179 |
| moKredit Diligence Checklist, Feb. 11, 2019 | 180 |
| JST Cred Exposure Summary | 181 |
| Chat log between S. Zhang and T. Perez, Jul. 8, 2019 | 182 |
| Chat log between S. Zhang and T. Perez, Dec. 4, 2019 | 183 |
| Chat log between S. Zhang and J. Alexander, Feb. 14, 2020 | 184 |

Exhibit 174

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON    **8/14/2020**
By    /s/ **Marcela Enriquez**
Deputy Clerk

1  PAUL HASTINGS LLP
   PETER M. STONE (SB# 157994)
2  peterstone@paulhastings.com
   1117 S. California Avenue
3  Palo Alto, CA 94304-1106
   Telephone: 1(650) 320-1800
4  Facsimile: 1(650) 320-1900

5  D. SCOTT CARLTON (SB# 239151)
   scottcarlton@paulhastings.com
6  515 South Flower Street
   Twenty-Fifth Floor
7  Los Angeles, CA 90071-2228
   Telephone: 1(213) 683-6000
8  Facsimile: 1(213) 627-0705

9  Attorneys for Defendant
   DANIEL BRIAN SCHATT

10

11             SUPERIOR COURT OF THE STATE OF CALIFORNIA

12        FOR THE COUNTY OF SAN MATEO – UNLIMITED JURISDICTION

13

14  JAMES ALEXANDER,                    CASE NO. 20-CIV-02728

15                                      **DECLARATION OF DANIEL SCHATT**
                Plaintiff,              **IN SUPPORT OF DEFENDANT'S**
16                                      **OPPOSITION TO PLAINTIFF'S**
        vs.                             **MOTION FOR PRELIMINARY**
17                                      **INJUNCTION**
    DANIEL BRIAN SCHATT and DOES 1 to 25,
18                                      Date: August 27, 2020
                Defendant.              Time: 2:00 p.m.
19                                      Dept.: 28

20                                      [Defendant's Opposition to Plaintiff's Motion
                                        for Preliminary Injunction, Declaration of
21                                      Joseph Podulka (including exhibits), and
                                        [Proposed] Order Denying Motion filed
22                                      concurrently herewith filed concurrently
                                        herewith]
23

24                                      **COMPLAINT FILED JULY 2 , 2020**

25

26

27

28

─────────────────────────────────────────────────────────────
DECLARATION OF DANIEL SCHATT IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION

CRED_EXAMINER_00002415

I, Daniel B. Schatt, hereby declare as follows:

1. I am the co-founder and Chief Executive Officer of Cred Inc. (f/k/a Cred LLC) ("Cred") and the named defendant in the above-entitled action. I am also a director of Cred Capital, Inc. ("Cred Capital"). I have reviewed the Motion for Preliminary Injunction ("Motion") and the Declaration of James Alexander (Alexander Declaration") filed in support. I offer this declaration in support of my opposition to the Motion filed by Mr. Alexander. Unless otherwise indicated, I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts.

2. I have been CEO of Cred since 2018. Cred is a decentralized lending ecosystem that facilitates access to credit based on an Ethereum-based blockchain developed by the company.

3. Cred hired Alexander on August 27, 2018 for the position of Chief Capital Officer at Cred. Alexander was hired as an at-will employee. In this role, Alexander reported directly to me. As part of his employment agreement, Alexander received a base annual salary of $240,000. Moreover, in 2019, as part of his benefits as a Cred employee, Alexander also received an employee loan of $250,000 and then three separate employee loans of 5,200,000 LBA tokens, Cred's general utility token. In 2020, Alexander also received a $95,523.76 advance against a future profit share, which equated to a net payout amount of $50,000.

4. Under his employment agreement, Alexander agreed to not "engage in any other employment, occupation, consulting or other business activity directly related to the business in which [Cred] is now involved or becomes involved during the term of your employment, nor will you engage in any other activities that conflict with your obligations to the Company." Alexander also agreed that he was "expected to devote [his] full business time and best efforts to performing [his] job duties for the Company during [his] employment" with Cred. The employment agreement also specified that it "may not be modified or amended except by a written agreement signed by [me] and [Alexander]." A true and correct copy of Alexander's employment agreement is attached as **Exhibit A**.

- 1 -

DECLARATION OF DANIEL SCHATT IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

CRED_EXAMINER_00002416

5.      As part of his employment, Alexander also signed a Confidentiality, Non-Solicitation, and Inventions Agreement (the "Confidentiality Agreement") in which he agreed that while he was employed by Cred, he would "not provide any services in competition against [Cred]." The Confidentiality Agreement also specified that this duty applies to Alexander "regardless of the Company subsidiary or business for which [he] works or provides services, or the duties which [he] is or may in the future be assigned." The Confidentiality Agreement further provides that Alexander retains no rights, titles, or interests whatsoever in any "Work Product," or "materials, information, concepts, or work whatsoever that (i) are prepared or developed by Employee, individually or jointly with others, during Employee's employment by the Company, whether or not during working hours, and (ii) relate to, are connected with or arise in any way out of (1) current and/or anticipated businesses and/or activities of the Company," including "any work performed by the Employee for the Company, and/or (4) any information or assistance provided by the Company[.]"  A true and correct copy of the Confidentiality Agreement is attached as **Exhibit B**.

6.      In early 2020, I assigned Alexander to organize and manage Cred Capital.  Cred Capital is a Cred subsidiary that was created to provide bond securitization and asset management for Cred.  Alexander oversaw the organization of Cred Capital, but under my direction.  Contrary to the statements in the Alexander Declaration, I informed Alexander that Cred Capital was to be bound by the traditional parent-subsidiary relationship with Cred and have a typical governance framework with board control of the subsidiary and with Cred owning and controlling the stock of the subsidiary.

7.      I specifically instructed Alexander to organize Cred Capital so that it was governed by a three-person board of directors with two Cred employees controlling a three-person board of directors.  I also instructed Alexander to organize Cred Capital's capitalization structure so that Cred was a majority shareholder, with voting rights, in the subsidiary.  This capital and governance structure, which was conveyed to Alexander, was naturally important to

- 2 -

CRED_EXAMINER_00002417

Cred because it would allow Cred to maintain some control over its subsidiary bearing its own name and using its resources.

8.      On March 15, 2020, Alexander affirmed via email that Cred Capital was to be organized with a three-person board of directors made up of two officers of Cred as well as a third-party "investor." Alexander also assured them that Cred Capital was capitalized with only two shareholders, the third-party "investor" and Cred, each holding a 50% equity-stake of the subsidiary. I understood this to mean that Cred Capital would be organized in the manner that was previously specified to Alexander—i.e., with Cred having majority voting shares in Cred Capital. A true and correct copy of Alexander's March 15, 2020 email correspondence is attached as **Exhibit C**.

9.      I communicated to Alexander on multiple occasions that Cred Capital, while being a legally distinct entity separate from Cred, was nevertheless part of Cred's larger strategic enterprise. Indeed, I communicated this plan to Alexander in as early as March 27, 2020, where Cred indicated that changes to Cred Capital's compensation structure should be collectively decided by Cred's CEO, CFO, and Alexander to ensure that they are acting *as one company*. A true and correct copy of my email communication with Alexander on March 27, 2020 is attached as **Exhibit D**.

10.     Consistent with my understanding that Cred Capital was Cred's subsidiary, I also informed Alexander to coordinate key expenditures, like employment and consulting contracts between the two entities in early April 2020. A true and correct copy of my email to Alexander is attached as **Exhibit E**.

11.     On May 6, 2020, I again explained to Alexander: "We are one organization. Everyone in the organization knows that we will compensate everyone fairly and transparently. Everyone knows that there is nobody in the organization beyond Lu and myself that have equity. If we decide to make compensation changes to Cred or Cred Capital in the future, we will do it as one organization, for everyone to know and understand. So, let's make sure not to promise any equity at this time. Then, on May 7, 2020, I instructed Alexander to ensure that

- 3 -

CRED_EXAMINER_00002418

1    there were "strong controls and systems in place at the parent level [i.e., Cred] to support the cash

2    flow / expenses of our overall organization . . . ." A true and correct copy of my email exchange

3    with Alexander on May 6-7, 2020 is attached as **Exhibit F**.

4         12.   I also communicated to Alexander on multiple occasions that Cred Capital was to

5    be managed by a three-person board of directors made up by two officers of Cred and a third-

6    party investor. For example, on May 22, 2020, I sent Alexander an email following a phone call I

7    had with him. In this email, I told Alexander that while I recalled that the Cred Capital

8    documents that he signed had the three-person board structure he required of Cred Capital, I

9    wanted Alexander to ensure that Cred Capital was organized accordingly. I also instructed

10   Alexander to "follow-up" and review Cred Capital's capitalization structure so that it was

11   beneficial to both Cred Capital and Cred. And, I again reiterated that they will be working to

12   build "one great, successful organization together." A true and correct copy of my email to

13   Alexander on May 22, 2020 is attached as **Exhibit G**.

14        13.   Meanwhile, Alexander never provided any communication or information

15   whatsoever to contradict my understanding that Cred Capital was an ordinary subsidiary of Cred,

16   with the parent company owning the majority of Cred Capital's voting shares, and that Cred

17   Capital was managed by a three-person board of directors controlled by Cred officers. Nor did

18   Alexander voice any dissent to these instructions or provide any indication that he would not obey

19   the instructions.

20        14.   On or around May 30, 2020, I discovered that Cred Capital was not organized to

21   Cred's specifications. Instead of being managed by a three-person board of directors, Alexander

22   simply attempted to install himself as the sole director of Cred Capital. Moreover, rather than

23   assigning the majority of Cred Capital's voting shares to Cred, Alexander assigned only Class B

24   shares with no voting rights to Cred—and assigned Class A voting shares to a purported third-

25   party "investor" who never made any investment but supposedly gave Alexander his proxy to

26   control Cred Capital in his name. Alexander never informed Cred that the Class B "common

27   stock" constituted non-voting shares of Cred Capital. (*See* Alexander Declaration, Ex. 4.)

28

- 4 -

DECLARATION OF DANIEL SCHATT IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION

CRED_EXAMINER_00002419

15.     I was blindsided by the discovery that Alexander failed to provide any Credit Capital voting shares to Cred and did not properly constitute its initial board of directors. Accordingly, on May 30, 2020, I reached out to Alexander to seek clarification as to why Cred Capital was not organized and managed to Cred's instructions. I again emphasized that all Cred entities, included Cred Capital, are one branded enterprise, and all employees of the Cred entities, like Alexander, were expected to work together as a team. The next day, on May 31, 2020, Alexander responded to me by asserting that Cred Capital was in dispute with Cred.

16.     I am immediately began to investigate the scope of Alexander's disloyalty to Cred. Cred found that a certificate of incorporation was filed for Cred Capital in Delaware on March 10, 2020, which identified Rebecca Floren as the "sole incorporator." Attached as **Exhibit H** is a true and correct copy of the certificate of incorporation dated March 10, 2020. Cred believed that Ms. Floren was a former paralegal with the San Francisco office of the law firm Schiff Hardin LLP. Cred attempted to reach Ms. Floren at her offices, but was informed by a receptionist that Ms. Floren was no longer employed by Schiff Hardin. Cred also attempted to reach the relationship partner at Schiff Hardin for Cred Capital, but did not receive any response.

17.     Cred also found that, on March 16, 2020, Alexander had executed an "action of incorporator" to falsely appoint himself as the sole initial director of the corporation, even though he was not an incorporator of Cred Capital, since Ms. Floren was the sole incorporator of the company. Alexander, acting upon his false authority as director of Cred Capital, then purported to execute a board consent authorizing the issuance of non-voting class B common stock to Cred and voting class A preferred stock to a third-party investor that was loyal to him. Although Alexander has submitted in support of the Motion a "Series A Preferred Stock Purchase Agreement" that purports to describe the conditions under which a third-party investor, Zobar Agha, would receive "Series A" shares from Cred Capital (*see* Alexander Declaration, Ex. 2), I am unware of Cred Capital ever actually receiving the investment from Mr. Agha to acquire the shares, nor am I aware of any "Series A" shares that were actually issued to Mr. Agha.

- 5 -

CRED_EXAMINER_00002420

18.     Since Alexander was still a Cred employee in March 2020, I understood that he owed fiduciary duties to Cred and was bound by the agreements that he signed in August 27, 2018.  In the Confidentiality Agreement, Alexander had assigned to Cred all rights, titles, and interests, in any materials or works that were prepared by him that "are connected with or arise in any way out of" Cred's current or anticipated businesses or activities, whether or not they were developed during working hours.  Additionally, Alexander had agreed that Cred was his true attorney-in-fact with "full power of substitution and re-substitution, in Employee's name, place, and stead, in any and all capacities, to execute, verify, acknowledge, and deliver any document necessary or appropriate to effectuate" Cred's ownership over Alexander's works, including any corporate documents for Cred Capital that were created by him or at his request.  Likewise, Alexander had agreed that while employed by Cred he would not provide any services in competition against the company, which includes the creation of any entities adverse to the Cred.

19.     On June 3, 2020, in an attempt to resolve these troubling issues, I reached out to Alexander with proposed terms that would maintain Cred's control over Cred Capital, consistent with Cred's original instructions to Alexander.  Yet, Alexander rebuffed Cred's attempts to provide an opportunity to correct his misconduct.  Alexander instead asserted his alleged unilateral control over Cred Capital and suggested that the subsidiary was completely independent of, and adverse to, Cred.

20.     On June 22, 2020, Cred, acting as a substitute incorporator of Cred Capital under Section 107(d) of the Delaware General Corporation Law ("DGCL"), and under its authority as the attorney-in-fact and owner over any work product created by Alexander, executed a valid action of incorporator to adopt bylaws and appointed me and Joseph Podulka as the initial directors of Cred Capital.  Cred Capital's board, which was now constituted with me and Mr. Podulka as directors, then appointed a set of officers that did not include Alexander.  A true and correct copy of the Action of Incorporator of Cred Capital Inc., dated June 22, 2020 is attached as **Exhibit I**.  The board also confirmed that Cred Capital's prior stock issuances were null and void and authorized a new issuance of voting stock to Cred.  Cred thereby became the sole valid

- 6 -

CRED_EXAMINER_00002421

1    stockholder of Cred Capital.  A true and correct copy of the Action by Unanimous Written

2    Consent of the Board of Directors of Cred Capital, signed June 22, 2020 is attached as **Exhibit J**.

3         21.    Following these actions, I discovered that on the evening of June 24, 2020,

4    Alexander had instructed Daniyal Inamullah, the Vice President of Capital Markets at Cred, to

5    move a substantial amount of Bitcoin and USDC from Cred Capital accounts to blockchain

6    addresses that do not belong to either Cred or Cred Capital or to any of theircustodians or asset

7    managers.  Alexander communicated with Mr. Inamullah via Telegram Messenger—rather than

8    through Cred's email servers—presumably to evade Cred's detection.  Alexander subsequently

9    deleted the conversation thread on Telegram Messenger.  I believe that Alexander owns, or is in

10   control over, the following blockchain addresses where he moved these digital assets to:

11      • **BTC Address**: 0x58ac2780289a9D2D788dA184F2c15C0586f8e53D

12          ○  224.98993 BTC

13             463362d41ab2686977f6f7c8bcb40ffbbfbf7fb9846558c602a29351f2cdbba0

14          ○  0.1 BTC

15             2329c3648ad590ce615397103029ce2c396d9b3b74c26beb442cb9ee16cb6ca3

16      • **USDC Address**: 3GGyZqR9Z79Sad8irEiDFtxPfxyCvYxEv3

17          ○  $204,656 USDC

18             2329c3648ad590ce615397103029ce2c396d9b3b74c26beb442cb9ee16cb6ca3

19          ○  $1 USDC

20             0xf225f18dbff318505fc2857abd78caf9310de2c2fa6f641254dab42f46cf19d6

21        22.    On June 25, 2020, Cred and Capital entered into an Amended & Restated Asset

22   Management Agreement.  Attached as **Exhibit K** is a true and correct copy of the amended

23   agreement.

24        23.    On or around June 26, 2020, I fired Alexander from Cred and removed his access

25   to Cred and Cred Capital email servers.

26        24.    On or about June 27, 2020, Cred discovered that Rebecca Floren, who was

27   previously employed at Schiff Hardin LLP, did not act as the sole incorporator of Cred Capital.

28

DECLARATION OF DANIEL SCHATT IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION

CRED_EXAMINER_00002422

1    Instead, another paralegal employed at Bryan Cave Leighton Paisner LLP, also named Rebecca

2    Floren, was the paralegal who purportedly incorporated Cred Capital.

3         25.    Thus, on June 29, 2020, to remove any doubt as to the status of Cred Capital's true

4    board of directors (and the validity of the board's actions undertaken on June 22, 2020), Mr.

5    Podulka, in his capacity as an officer of Cred Capital, filed a Certificate of Correction to correct

6    Cred Capital's corporate charter, pursuant to Section 103(f) of the DGCL.  This Certificate of

7    Correction corrected Alexander's omission of the names of Cred Capital's initial board of

8    directors by adding an article to the charter, identifying Messrs. Schatt and Podulka as Cred

9    Capital's initial directors.  Since the Certificate of Correction is deemed effective as of March 10,

10   2020, the date of the filing of Cred Capital's charter, pursuant to Section 103(f) of the DGCL, Mr.

11   Podulka and I were duly constituted as Cred Capital's board of directors as of March 10, 2020.

12   Attached as **Exhibit L** is a true and correct copy of the Certificate of Correction.

13        26.    I understand that Alexander has stated in his pleadings his belief that I intend to

14   dissolve or otherwise harm Cred Capital by not honoring the Asset Management Agreement

15   between Cred and Cred Capital. I have no such intention.  As explained, on June 25, 2020, Cred

16   and Cred Capital entered into an Amended & Restated Asset Management Agreement (**Exhibit**

17   **K**), under which, in light of the discovery of Alexander's misconduct, Cred and Cred Capital

18   have sought to restate and clarify the relationship between Cred and Cred Capital. Moreover,

19   throughout this ordeal, contrary to Alexander's claims, Cred has not terminated Cred Capital's

20   employees.  Rather, Cred has transferred Cred Capital's employees from the Cred Capital account

21   in the human resources benefits platform (Sequoia One) to the Cred account.  The Cred Capital

22   employees remain as Cred employees and their benefits have continued.

23

24

25

26

27

28

- 8 -

DECLARATION OF DANIEL SCHATT IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION

CRED_EXAMINER_00002423

1    I declare under penalty of perjury under the laws of the State of California that the

2    foregoing is true and correct to the best of my knowledge and belief.

3

4    _____

5    Daniel Schatt

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DANIEL SCHATT IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION

CRED_EXAMINER_00002424

# Exhibit A

CRED_EXAMINER_00002425



James Alexander
4501 Finley Ave, #6
Los Angeles, CA 90027

Dear James Alexander:

On behalf of Cred U.S., LLC (the "Company"), I am pleased to offer you employment at the Company's office in California commencing on August 1, 2018 You will initially have the position of Chief Capital Officer and report to the Company's President.

Your annual salary will be $240,000 plus 120 ETH less applicable withholdings and deductions, in accordance with the Company's normal payroll procedures. You will be eligible to participate in the Company's health insurance plan and other employee benefit plans established by the Company for its employees, subject to the terms, conditions, limitations, and exclusions contained in the applicable plan documents and insurance policies. This agreement is not intended to limit the Company's right, in its sole discretion, to add to, modify, or eliminate its benefit plans and policies from time to time.

You will receive 4,000,000 LBA tokens, subject to certain vesting requirements, which will be specified in a separate agreement.

The Company is excited about your joining and we look forward to a mutually beneficial relationship. Nevertheless, please note that your employment with the Company is for no specified period and constitutes at-will employment. As a result, you are free to resign at any time, for any or no reason. Similarly, the Company is free to conclude its employment relationship with you at any time, with or without cause, and with or without notice. We request that, in the event of resignation, you give the Company at least two weeks' notice. Please note that the Company may modify your job title, duties, compensation and benefits from time to time as it deems necessary.

The Company reserves the right to conduct background investigations and/or reference checks on all of its potential employees, in accordance with applicable state and federal law. Your job offer, therefore, is contingent upon a clearance of such a background investigation and/or reference check, if applicable.

For purposes of federal immigration law, you will be required to provide to the Company documentary evidence of your identity and eligibility for employment in the United States. Such documentation must be provided to us within three (3) business days of your date of hire, or our employment relationship with you may be terminated.

12086671.1

CRED_EXAMINER_00002426

We also ask that, if you have not already done so, you disclose to the Company any and all agreements relating to your prior employment that may affect your eligibility to be employed by the Company or limit the manner in which you may be employed. It is the Company's understanding that any such agreements will not prevent you from performing the duties of your position and you represent that such is the case. Moreover, you agree that, during the term of your employment with the Company, you will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of your employment, nor will you engage in any other activities that conflict with your obligations to the Company. Similarly, you agree not to bring any third-party confidential information to the Company, including that of your former employer, and that in performing your duties for the Company you will not in any way utilize any such information. You will be expected to devote your full business time and best efforts to performing your job duties for the Company during your employment.

As a condition of your employment, you will be required to sign and comply with a Confidentiality, Non-Solicitation and Inventions Agreement, a copy of which is enclosed.

To accept the Company's offer, please sign and date this letter in the space provided below. This letter, along with any agreements relating to proprietary rights between you and the Company, set forth the terms of your employment with the Company and supersede any prior representations or agreements including, but not limited to, any representations made during your recruitment, interviews or pre-employment negotiations, whether written or oral. This letter, including, but not limited to, its at-will employment provision, may not be modified or amended except by a written agreement signed by Dan Schatt and you. This offer of employment will terminate if it is not accepted, signed and returned by August 31, 2018.

We look forward to your favorable reply and to working with you.


Sincerely,

Dan Schatt
President, Cred

*Dan Schatt*

Agreed to and accepted:

Signature:  _____

Printed Name: _____

Date: _____

12086671.1

CRED_EXAMINER_00002427

Enclosure
Confidentiality, Non-Solicitation and Inventions Agreement

12086671.1

CRED_EXAMINER_00002428

# Exhibit B

CRED_EXAMINER_00002429

## Confidentiality, Non-Solicitation and Inventions Agreement

This CONFIDENTIALITY, NON-SOLICITATION AND INVENTIONS AGREEMENT ("Agreement") is made this 26th day of August, 2018, by and between Cred U.S., LLC (the "Company") and James Alexander ("Employee").

### RECITALS

A.    The Company is a decentralized lending ecosystem that facilitates open access to credit based on the Ethereum blockchain to be developed by Cred (the "Business").

B.    The Company has expended, and will continue expend, a great deal of time, money and effort to develop and maintain proprietary, trade secret and other confidential business information relating to the Business which, if misused or disclosed, could be very harmful to the Business. Employee recognizes that, as a result of Employee's employment or continued employment with the Company, Employee has had or will have access to (among other things) the Company's proprietary, trade secret, or other confidential information of or relating to the Business.

C.    Employee recognizes and acknowledges that the Company, in all fairness, needs certain protection in order to ensure that Employee does not misappropriate or misuse any proprietary, trade secret, or other confidential information relating to the Company's Business.

D.    Employee desires to be (i) employed, or to continue to be employed, by the Company, (ii) eligible for opportunities for advancement, additional responsibilities and compensation increases, (iii) given responsibility for developing and/or maintaining (or supervising the development and/or maintenance of) customer relationships, and (iv) given access to certain proprietary, trade secret and other confidential information -- some or all of which would not be available but for Employee's execution of this Agreement.

NOW THEREFORE, in consideration of the above and of the mutual covenants and agreements hereinafter set forth, Employee and the Company agree as follows:

1.    <u>Definitions</u>.  For purposes of this Agreement:

(a)    "Trade Secret Information" of the Company shall mean all information, regardless of the form or medium in which it is or was created, stored, reflected or preserved, that is not commonly known by or available to the public and that: (i) derives or creates economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. The Company's Trade Secret Information may include, but is not limited to, all confidential information relating to or reflecting the Company's, and/or its parent, subsidiaries, and/or affiliates', research and development plans and activities; compilations of data; product plans; sales, marketing and business plans and strategies; presentations for actual and/or potential customers; internal financial information; pricing, price lists, pricing methodologies and profit margins; personnel; inventions, concepts, ideas, designs and formulae; current, past and prospective customer lists; current, past and anticipated customer needs, preferences and requirements; methodology for

CRED_EXAMINER_00002430

scoring assets and determining how much to lend to consumers based on a unique algorithm, market studies; computer software and programs (including object code and source code); and computer and database technologies, systems, structures and architectures.

(b)    "Confidential Information" means all non-public information regarding the Company's business or other affairs, which includes, but is not limited to, all confidential information of the Company, affiliates, contractors, vendors, and other persons or entities with whom Company has a business relationship, regardless of the form or medium in which it is or was created, stored, reflected or preserved, and includes, but is not limited to, Trade Secret Information. Employee understands that Confidential Information may or may not be labeled as "confidential," and Employee will treat all information as confidential unless otherwise informed by Employee's supervisor.

2.    <u>Restrictions Relating to Confidential Information and Other Company Property</u>.

(a)    All Confidential Information shall be deemed property of the Company. Employee shall use Employee's best efforts and diligence to protect the Confidential Information and other Company property for an on behalf of the Company. Employee shall not, directly or indirectly, use or disclose any Confidential Information except as may be required for the proper performance of Employee's duties as an Employee for and on behalf of the Company, and in accordance with the Company's policies and procedures relating thereto.

(b)    Employee will not access, copy, download, email, reproduce or otherwise duplicate, record, abstract or summarize any Confidential Information, or use any Company computers, computer systems, equipment, tools or other property of the Company, except as expressly permitted or required for the proper performance of Employee's duties for and on behalf of the Company. Employee is not authorized to, and shall not, access any Company computer or computer system, or access, copy, download, email, reproduce or otherwise duplicate, record, abstract or summarize any Confidential Information (among other things) to compete or prepare to compete against the Company, or for or on behalf of any competitor of the Company.

(c)    Employee shall deliver promptly to the Company, or the Company's designee, at the termination of Employee's employment or at any other time upon the Company's request, all Confidential Information (including all copies thereof, regardless of the medium in which such information may be stored) and all computers, equipment, tools and other property of the Company.

(d)    Each of Employee's obligations in this section shall also apply to all confidential, trade secret and proprietary information learned or acquired by Employee during Employee's employment with the Company from or about others with whom the Company has, had or contemplated having a business relationship.

(e)    Employee's obligations under this section continue after his or her employment with the Company; provided that Employee's post-employment obligations not to use Confidential Information shall not apply if and to the extent Employee demonstrates that: (i) the same information was in Employee's possession prior to Employee's employment by the Company;

2

CRED_EXAMINER_00002431

(ii) the same information is or becomes generally available to the public and such public availability is not the result, directly or indirectly, of any fault of, or improper taking, use or disclosure by, Employee or anyone working in concert or participation with Employee; or (iii) Employee obtains the information properly, from a source that was free to disclose it, and under circumstances such that Employee neither knew nor had reason to know that such information had been acquired, used or disclosed improperly.

        3.      <u>Duties; Noncompetition during Employment</u>.  Employee shall have such title and duties as may be assigned from time to time by the Company.  This Agreement shall apply to Employee regardless of the Company subsidiary or business for which Employee works or provides services, or the duties to which Employee is or may in the future be assigned.  Employee agrees that while employed by the Company, Employee shall not provide any services in competition against the Company

        4.      <u>Nonsolicitation of Employees</u>.  During Employee's employment and the one year immediately following Employee's last day of employment with the Company, Employee shall not directly or indirectly, on Employee's behalf or for or on behalf of any other person, firm, corporation or entity, solicit or induce, or attempt to solicit or induce, any employee of the Company to leave the employ of the Company or to work for any competitor of the Company.  The running of the one year period referenced in this Section 4 shall be tolled during any period of time during which Employee violates any of Employee's obligations contained herein.

        5.      <u>Assignment of Inventions</u>.

        (a)      <u>Ownership</u>.   Employee acknowledges and agrees that all copyrightable Work Product prepared by Employee within the scope of Employee's employment by the Company are "works made for hire" and, consequently, that the Company owns all copyrights thereto.  To the extent any Work Product is not a work made for hire, Employee hereby assigns, and agrees to assign, to Company all of Employee's rights, title, and interest (including but not limited to all patent, trademark, copyright and trade secret rights) in and to all Work Product.  For purposes of this Agreement, "Work Product" means any and all materials, information, concepts, or work whatsoever that (i) are prepared or developed by Employee, individually or jointly with others, during Employee's employment by the Company, whether or not during working hours, and (ii) relate to, are connected with or arise in any way out of (1) current and/or anticipated businesses and/or activities of the Company, (2) the Company's current and/or anticipated research or development, (3) any work performed by Employee for the Company, and/or (4) any information or assistance provided by the Company, including but not limited to Confidential Information, and shall include without limitation, all literary works, products, websites (or portions thereof), software, documentation, memoranda, musical works, photographs, artwork, sound recordings, audiovisual works, ideas, designs, inventions, discoveries, improvements, processes, and algorithms.  Employee shall not retain any right, title or interest whatsoever in the Work Product, including, without limitation: (i) rights of attribution; (ii) claims based on Employee's "moral rights" and similar theories; and (iii) liens, encumbrances and the like.  Employee hereby irrevocably waives any claims based on (i)-(iii).  Employee agrees to and does hereby irrevocably constitute and appoint the Company as Employee's true attorney-in-fact with full power of substitution and re-substitution, in Employee's name, place, and stead, in any and all capacities, to execute, verify, acknowledge, and

3

CRED_EXAMINER_00002432

deliver any document necessary or appropriate to effectuate the provisions of this Section 5 and to do any act necessary to be done to effectuate the purposes of this Section 5. Such appointment will be a power coupled with an interest.

(b)    Disclosure. As used in this Agreement, the term "Inventions" means inventions, improvements, designs, original works of authorship, formulas, processes, compositions of matter, computer software programs, databases, mask works, confidential information and trade secrets. Employee will promptly disclose in confidence to the Company, or to any person designated by it, all Inventions that Employee makes, creates, conceives or first reduces to practice, either alone or jointly with others, during the period of Employee's employment, whether or not in the course of Employee's employment, and whether or not patentable, copyrightable or protectable as trade secrets. All Work Product is and shall forthwith become the property of the Company, or its designee, whether or not patentable or copyrightable. Employee will execute promptly upon request any documents or instruments at any time deemed necessary or proper by the Company in order to formally convey and transfer to the Company or its designee title to such Work Product, or to confirm the Company's or its designee's title therein, and in order to enable the Company or its designee to obtain and enforce Patents, Trademarks, Copyrights, or any other rights therein. Employee will perform Employee's obligations under this Section 5 without further compensation, except for reimbursement of reasonable out-of-pocket expenses incurred at the request of the Company.

(c)    Preexisting Inventions Not Assigned. Employee shall specify, on Attachment A hereto, all preexisting Inventions, if any, that may relate to the Company's business or actual or demonstrably anticipated research and development and that were made by Employee or acquired by Employee prior to employment with the Company, and which are not to be assigned to the Company. If no such specification is made on Attachment A, or if Employee writes "none" or similar designation thereon, Employee shall be conclusively deemed not to have any such Inventions, and all Inventions shall be property of the Company hereunder.

(d)    Original Development. Employee further represents and warrants to the Company that all work that Employee performs for or has performed for the Company, and all Work Product that Employee produces will not knowingly infringe, dilute, misappropriate, or otherwise violate any patent, copyright, trade secret, or other right of any of Employee's former employers or of any other third party. Employee will not disclose to the Company, or use in any of Employee's Work Product, any confidential or proprietary information belonging to others, unless both the owner thereof and the Company have consented in writing.

**SPECIAL NOTICE TO EMPLOYEE:** The obligations of this Section 5 do not apply to any invention for which no equipment, supplies, facility, or Confidential Information of the Company was used and which was developed entirely on Employee's own time, unless (a) the invention relates (i) to the business of the Company, or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by Employee for the Company. Employee's obligation to assign Employee's right, title and interest in Work Product under this Section 5 does not apply to any Work Product which qualifies fully under the provisions of California Labor Code Section 2870, which is set forth on Attachment B hereto.

4

CRED_EXAMINER_00002433

6.      Rights to Photographs, Videos, Recordings and Electronic Images. Employee agrees that the Company may use, publish, modify and/or otherwise exploit in any manner or medium now known or hereafter devised all photographs, videos, audio and other recordings or images of Employee, and/or the Company's property, which are made during Employee's employment by the Company (and/or any derivative works made thereafter). Employee's appearance in, and other contributions to, such recordings and images will be deemed Work Product. Without limitation and for clarity, the Company may use publish, modify and/or otherwise exploit in any manner or medium now known or hereafter devised such photographs, videos, audio and other recordings and images without additional consideration for any advertising, publishing or other business purposes on behalf of the Company during and/or subsequent to Employee's employment by the Company in all media now known or hereafter devised.  Employee will receive no additional consideration for such use, including, without limitation, crediting, rights of attribution, approval rights, or additional remuneration.

7.      Choice of Law and Jurisdiction.  This Agreement shall be construed in accordance with and governed by the laws of the State of California, without reference to the conflicts or choice of law principles thereof.  Any litigation arising out of and/or relating to this Agreement shall be subject to the Company's Dispute Resolution Policy, with the exception of either party's right to seek a restraining order or preliminary injunction to the extent provided by California Code of Civil Procedure section 1281.8.  Such an action shall be pursued exclusively in the State or Federal courts encompassing the County of San Mateo, State of California, and the parties hereto consent to the jurisdiction of and venue in such courts.

8.      Company's Right to Injunctive Relief.  In the event of a breach or threatened breach of any of Employee's duties or obligations under the terms or provisions of Sections 2, 3, 4, 5, 6 or 7 hereof, the Company shall be entitled, in addition to any other legal or equitable remedies it may have in connection therewith (including any right to damages that it may suffer), to temporary, preliminary and permanent injunctive relief restraining such breach or threatened breach.  Employee hereby expressly acknowledges that the harm which might result to the Company as a result of any noncompliance by Employee with any of the provisions of Section 2, 3, 4, 5, 6 or 7 would be largely irreparable.

9.      At-Will Relationship.  Employee acknowledges that Employee is in an at-will relationship with the Company which can be terminated, with or without cause, and with or without notice, at any time, at the option of the Company or Employee.  Nothing herein shall alter or affect this at-will relationship.

10.     Assignment, Amendments and Other Provisions.

(a)     This Agreement and the rights hereunder shall be freely assignable by the Company.  This Agreement shall inure to the benefit of, and be binding upon, any other entity which shall succeed to the Company's business.  Except as otherwise specifically provided herein, neither this Agreement nor any rights hereunder shall be assigned by Employee, and any such attempted or purported assignment shall be null and void.

(b)     No modification or amendment of any of the provisions of this Agreement shall be effective unless made in writing and duly executed by all parties hereto.  The

5

CRED_EXAMINER_00002434

paragraph headings or captions appearing in this Agreement are for convenience only, are not part of this Agreement and are not to be considered in interpreting this Agreement.

(c)     All notices and other communications required or permitted to be given hereunder or by reason of this Agreement shall be in writing and shall be deemed to have been properly given (a) when delivered in person to the party to whom such notice is directed; or (b) three (3) days after being deposited in the United States mail, return receipt requested, postage prepaid, to the party(ies) addressed as shown below their respective signatures to this Agreement (and for notices to the Company with a copy to its President, or as such party may designate thereafter by notice in accordance with this Section.

(d)     Whenever possible, each provision, or subpart thereof, of this Agreement shall be interpreted so as to be valid and enforceable under applicable law.  If any provisions, or any subparts thereof, of this Agreement shall be prohibited or invalid under applicable law, they shall be modified and, to the maximum extent permissible under applicable law, enforced.

(e)     No delay or failure of either party to exercise any right under this Agreement, and no partial or single exercise of any right, shall constitute a waiver of that or any other right unless expressly so provided in writing, and no such waiver shall operate or be construed as the waiver of the same or of another breach on a prior or subsequent occasion.

(f)     This Agreement may be executed in counterparts, and each counterpart hereof shall be deemed to be an original instrument, but all counterparts hereof taken together shall constitute but a single instrument.  Signatures provided by facsimile or in portable document format (a/k/a pdf) shall be as binding as original signatures.

(g)     There are no oral or other verbal understandings or agreements which in any way change the terms, covenants, or conditions herein set forth.  This Agreement shall supplement, and not supersede, any of Employee's obligations under the Company's rules, policies and procedures.

(h)     The Company may disclose this Agreement in whole or in part, to any person or entity, including without limitation one that is considering employing or engaging in a business relationship with, Employee.

(i)     Employee represents that the execution and delivery of the Agreement and Employee's employment with the Company do not violate any previous employment agreement or other contractual obligation of Employee with any other party.  Employee has not disclosed, and will not disclose, to the Company any information, whether confidential, proprietary, or otherwise, which Employee is not legally free to disclose.  Employee shall abide by the terms of any nondisclosure or confidentiality agreements between the Company and any other parties.

(j)     To ensure a clear understanding of this Agreement and Employee's compliance therewith, Employee agrees to engage in an exit interview with the Company, prior to Employee's last day of employment with the Company, at a time and place designated by the Company and at the Company's expense.  Employee understands and agrees that during said exit

6

CRED_EXAMINER_00002435

interview, Employee may be required to confirm that Employee will comply with Employee's obligations under this Agreement. The Company may elect, at its option, to conduct the exit interview by telephone.

(k)  Employee acknowledges that, in performing services for the Company, Employee may use personal electronic equipment such as a laptop computer, personal computer, personal data assistant, smart-phone, cell phone, tablet, pager and/or other electronic, communication and/or memory devices owned by Employee (collectively, "Personal Electronic Equipment"). All Company information, including Confidential Information contained on any Personal Electronic Equipment, is the sole and exclusive property of the Company. Employee agrees that the Company has the right to access and review such Company information, including Confidential Information, at any time and may take possession of and review any Personal Electronic Equipment, including any information contained therein, to inspect, analyze and/or recover any Company information stored and/or communicated therein or therewith. If Employee has Personal Electronic Equipment that is not located on Company premises, Employee shall immediately deliver such equipment to the Company upon its request. Employee agrees that the Company is not liable for any damage caused to Employee's Personal Electronic Equipment while in its possession or for inadvertently damaging or deleting any personal Employee information contained therein. All Confidential Information stored on any Personal Electronic Equipment is subject to the applicable restrictions set forth above.

(l)  Notwithstanding any provision of this Agreement or any other agreement executed by Employee to the contrary, there shall be no restriction on Employee's ability to (a) report violations of any law or regulation, (b) provide truthful testimony or information pursuant to subpoena, court order, or similar legal process, (c) provide truthful information to government or regulatory agencies, or (d) otherwise engage in whistleblower activity protected by the Securities Exchange Act of 1934, the Dodd-Frank Wall Street Reform and Consumer Protection Act, or any rules or regulations issued thereunder, including, without limitation, Rule 21F-17. In addition, 18 U.S.C. §1833(b) provides, "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement, any other agreement executed by Employee, or any Company policy is intended to conflict with this statutory protection.

11.  Attorneys' Fees and Costs. In the event of a breach or threatened breach of this Agreement, the non-breaching party shall be entitled to recover such party's attorneys' fees and costs incurred as a result of such breach or threatened breach.

**PLEASE NOTE:  BY SIGNING THIS AGREEMENT, EMPLOYEE IS HEREBY CERTIFYING THAT EMPLOYEE:  (A) HAS RECEIVED A COPY OF THIS AGREEMENT FOR REVIEW AND STUDY BEFORE EXECUTING IT; (B) HAS READ THIS AGREEMENT CAREFULLY BEFORE SIGNING IT; (C) HAS HAD SUFFICIENT OPPORTUNITY BEFORE SIGNING THE AGREEMENT TO ASK ANY QUESTIONS EMPLOYEE HAS ABOUT THE AGREEMENT AND HAS RECEIVED**

CRED_EXAMINER_00002436

**SATISFACTORY ANSWERS TO ALL SUCH QUESTIONS; (D) HAS HAD THE OPPORTUNITY TO HAVE AN ATTORNEY REVIEW THE AGREEMENT ON BEHALF OF EMPLOYEE; AND (E) UNDERSTANDS EMPLOYEE'S RIGHTS AND OBLIGATIONS UNDER THE AGREEMENT.**

            IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year first above written.

**EMPLOYEE**

Name: _____

Address: _____

_____

_____


**CRED U.S., LLC**


By: *Dan Schatt* _____
President
Address:    123 Mission Street
           San Francisco, CA 94125

8

CRED_EXAMINER_00002437

**<u>Attachment A</u>**

**<u>Employee's Preexisting Inventions (See Section 5(c) of the Agreement)</u>**

List below, or check box if "none":

    ☐  List:

    ☐  None

SM01DOCS\12042807.1.1

CRED_EXAMINER_00002438

## Attachment B

In accordance with California Labor Code section 2872, you are hereby notified that your Confidentiality, Non-Solicitation and Inventions Agreement does not require you to assign to the Company any invention for which no equipment, supplies, facility, or trade secret information of the Company was used and that was developed entirely on your own time, and does not relate to the business of the Company or to the Company's actual or demonstrably anticipated research or development, or does not result from any work performed by you for the Company.

Following is the text of California Labor Code section 2870:

(a)      Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

  (1)      Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

  (2)      Result from any work performed by the employee for the employer.

(b)      To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

I hereby acknowledge receipt of this written notification.


DATED: _____          _____
                                                          Employee

10

CRED_EXAMINER_00002439

# Exhibit C

CRED_EXAMINER_00002440

**From:**      Joe Podulka
**To:**        James Alexander
**Subject:**   Re: priority -- Cred Capital and solvency call this weekend

Hi James.  We can discuss #4 at the Cash Position meeting tomorrow.  Contributing money to Cred Capital only means that it will not be allocated somewhere else.

Joe

On Sun, Mar 15, 2020 at 2:07 PM James Alexander <james.alexander@mycred.io> wrote:
> Hi Dan W.,
>
> I've spoken with Dan S. and following are the action items.  Given market conditions, I recommend we close asap. We will continue to fundraise; which will be greatly aided by initial funding and actual being in business.
>
> 1. Revise cap table so only two shareholders initially, including the investor and Cred LLC. Revise titles of employees to exclude shareholder. All CCI employees will continue to participate in Cred LLC profit plan and LBA.
>
> 2. BOD three members including investor, Joe and James.
>
> 3. Pls send AMA to Dan S. for his signature. And I will then be able to go back to investor for his approval of revised cap table.
>
> 4. @Joe, how much cash will Cred LLC contribute to closing and initial funding--50% of total and investor is other 50%?  $150-500k is range. Future capital contributions could be in kind.
>
> Regards,
>
> James



CRED_EXAMINER_00002441

# Exhibit D

CRED_EXAMINER_00002442

| | |
|---|---|
| **From:** | Dan Schatt |
| **To:** | James Alexander |
| **Subject:** | Topics |
| **Date:** | Friday, March 27, 2020 4:30:48 PM |

A few things to discuss to ensure we're always aligned and free of any conflict of interest:

- Fundraising – If we raise for Cred LLC, we will need to pause fundraising for Cred Capital to eliminate confusion. Let's discuss how best to think about this.
- Cred Capital Hiring – We still want to collectively agree on hires prior to signing, do background checks, and have Joe manage the onboarding process
- Cred Capital Compensation – Any change to compensation, let's make the decision together with Joe to ensure we are acting as one company
- Cred Capital Securitization Fee structure – This needs to be baked into our financial modeling assumptions and ensure we have a holistic plan, so let's come to agreement on these decisions once we've modeled the impact
- Cred Capital material operating expense changes – Let's decide on these things together

Talk soon!
Dan

CRED_EXAMINER_00002443

# Exhibit E

CRED_EXAMINER_00002444

| | |
|---|---|
| **From:** | James Alexander |
| **To:** | Dan Schatt |
| **Subject:** | Fwd: Expenditures |
| **Date:** | Tuesday, July 7, 2020 10:06:59 PM |

---------- Forwarded message ---------
From: **James Alexander** <james@credtrue.io>
Date: Sun, Apr 5, 2020 at 1:55 PM
Subject: Re: Expenditures
To: Dan Schatt <dan@mycred.io>
Cc: Joe Podulka <joe@mycred.io>, Daniel Wheeler <dan.wheeler@mycred.io>

Understood.  Thanks

On Sat, Apr 4, 2020 at 4:45 PM Dan Schatt <dan@mycred.io> wrote:

> Hi guys,
>
>
> I know we all agree it's important that we manage expenditures carefully and holistically,
> regardless of the fact that we are managing across two different legal entities.  Here's an
> example of something I'd like to avoid in the future:  I was unaware of the attached contract
> with Chris Spadafora, and we can end up double-paying him for the commission agreement
> associated with Cred LLC and his work with Cred Capital.  We also need to ensure that
> Chris or anyone we are hiring goes through the appropriate background check process, etc.
>
>
> As a policy, let's please make sure that prior to signing any employment/consulting contract
> or contract involving a material amount of money across either legal entity, I review and
> approve in consultation with the exec sponsor, Dan and with Joe, and we ensure Joe is
> looped in, so we can do the appropriate onboarding.
>
>
> James - In the case of this contract with Chris, let's discuss to ensure we are not overpaying
> him across both entities.  I'm also very mindful of the fact that every time we draw on Cred
> Capital, we will need to pay 25% a year on those funds…
>
>
> Thanks,
>
> Dan

CRED_EXAMINER_00002445

--

**James Alexander**
President

james.alexander@credcapital.io
(213) 262-6000
credcapital.io

--



**James Alexander**
President

213 262 6000
james@credcapital.io
credcapital.io

CRED_EXAMINER_00002446

# Exhibit F

CRED_EXAMINER_00002447

| From: | Dan Schatt |
|---|---|
| To: | James Alexander |
| Cc: | Joe Podulka |
| Subject: | Re: Cred Financial Operations Analyst Position |
| Date: | Thursday, May 7, 2020 11:20:06 AM |

Sounds good, and a few quick thoughts from your note:

1. Regarding the cost versus the outcome, I would attach the larger organizational lense to assess the expense of hires vs. revenue impact... given our overall organization is generating funds-in through lead-gen + direct funds-in through partners, and is the revenue engine supporting our overall organization...The "aggressive" financial case has us tracking this year to $17M in revenue on an expense base of $18M, which would include $500k revenue of securitizations. If these hires help contribute to the completion of $2.5M in securitization revenue this year, it would get us to 19.5M revenue on an expense base of $18M. This would be a truly terrific and profitable outcome, and one that is based on overall organization efforts...

2. I assume all AP/AR is going through Sally/Han to manage consultant payouts, etc. and all of this is budgeted...but let's just make sure we keep strong controls and systems in place at the parent level to support the cash flow / expenses of our overall organization, according to the budgets we're all operating under...

Thanks,
Dan

**From:** James Alexander <james@credcapital.io>
**Date:** Thursday, May 7, 2020 at 10:03 AM
**To:** Dan Schatt <dan@mycred.io>
**Cc:** Joe Podulka <joe@mycred.io>
**Subject:** Re: Cred Financial Operations Analyst Position

Indeed. And as you noted, all junior hires. We can debrief on expected path for each ... in total less than $250k annualized first year comp. (including bonus/commission) cost for all three. And which should produce 10x revenue--that's the expectation.


On Thu, May 7, 2020 at 9:58 AM Dan Schatt <dan@mycred.io> wrote:

Thanks James, Josh looks like an outstanding candidate on paper. 8 years as a SEAL..wow! If you or Joe can send me all 3 resumes, it would be great. And would love to speak with anyone we're putting in more senior positions...

The three HC seem to line up perfectly with the overall HC forecasts Joe has for the coming months...which, assuming business as usual would get us to cash flow break even in Q3

Thanks,
Dan

---

**From:** James Alexander <james@credcapital.io>
**Date:** Wednesday, May 6, 2020 at 5:07 PM
**To:** Dan Schatt <dan@mycred.io>
**Cc:** Joe Podulka <joe@mycred.io>
**Subject:** Re: Cred Financial Operations Analyst Position

Hi Dan,

Thanks.  Understood.

For the time being we have three hires proposed and we are below budget currently on hiring--
even after these additions:
1. Devon Kline, FinOps manager
2. Joshua Ostrowski, FinOps analyst
3. Randy Song, VP, Wealth (if stays on Cred side with Travis & Mike) or VP, Wealth Advisor if he
joins Cred Capital--where we can use the Advisor title.

Regards,

James


On Wed, May 6, 2020 at 4:55 PM Dan Schatt <dan@mycred.io> wrote:

> Thanks James and totally agree with raising money for Cred Capital to fund warehouse and
> retain first-loss on bond issuances....super important... So, just two thoughts to keep us all
> working together as one powerful team --
>
>
> 1. Let's just be careful about promising future equity to prospective hires at this time...Even
>    if we do get a new outside round for Cred Capital, we need to make sure we're working
>    in the best interests of the whole org...we'll be successful with the whole org behind us.
>
> 2. Let's make sure we have a good process in place for submitting and budgeting
>    headcount in advancing of making offers for Cred Capital or Cred Inc. You'll recall how
>    we did our budgeting for 2019 and 2020 -- you submitted a budget, Engineering
>    submitted a budget, marketing submitted a budget, etc. and you, me, Joe came together
>    to make some trade-offs based on our strategic direction. In this case, I would ask that
>    we discuss HC together first, and we get a clear picture of what you need in advance, so
>    we can make clear, consistent trade-offs in line with our financials.
>
> Onward and upward,
> Dan

CRED_EXAMINER_00002449

**From:** James Alexander <james@credcapital.io>
**Date:** Wednesday, May 6, 2020 at 4:33 PM
**To:** Dan Schatt <dan@mycred.io>
**Cc:** Joe Podulka <joe@mycred.io>, James Alexander <james.alexander@credcapital.io>
**Subject:** Re: Cred Financial Operations Analyst Position

Hi Guys,

Regarding hiring, I value your input and share open reqs. This was the case for both FinOps and Sales roles broadly for the past month. Joe is supporting Cred Capital's HR requirements so he is always in the loop as we approach candidates at the offer stage. Any comments are still welcome on these candidates until the offer letters are sent and assessments completed.

Regarding equity, no employees yet have any equity in Cred Capital. That said, we explicitly reserved 20% of the capitalization table for allocation to employees. This is establishing a negotiating position with an eventual future investor. There are no current plans to allocate any equity to employees. I would hope we can raise a round for Cred Capital when possible to fund warehouse and retain first-loss on bond issuances--but this remains a hope today.

Regards,

James

On Wed, May 6, 2020 at 3:33 PM Dan Schatt <dan@mycred.io> wrote:

> Hi Joe and James –
>
> We are one organization. Everyone in the organization knows that we will compensate everyone fairly and transparently. Everyone knows that there is nobody in the organization beyond Lu and myself that have equity. If we decide to make compensation changes to Cred or Cred Capital in the future, we will do it as one organization, for everyone to know and understand. So, let's make sure not to promise any equity at this time. We can offer LBA, we can offer future profit share benefits, we can offer commissions, but not equity at this time.
>
> Moving forward, let's make sure we do the following:
>
> 1. All new hires and new consultants should be discussed by the 3 of us. We need to make sure it fits into our compensation structure, it's a good fit for the organization, and it aligns with our strategic priorities.
> 2. Sign-offs should occur before these agreements are proposed to the candidates.
>
> Also, I thought the equity agreement was signed with the outside investor? Is that not the

case?  Other than the outside investor that invested $1m in Cred Capital, the remaining outside funding should be focused on the parent at this time…

Thanks,
Dan

---

**From:** Joe Podulka <joe@mycred.io>
**Date:** Wednesday, May 6, 2020 at 2:35 PM
**To:** Dan Schatt <dan@mycred.io>
**Subject:** FW: Cred Financial Operations Analyst Position

Hi Dan.  The highlighted section below is inconsistent with Cred LLC compensation.

My understanding is Cred LLC has an equity stake in Cred Capital.  Any benefit from this equity stake would be shared with Cred LLC employees through this arrangement.  I wasn't aware of any employees getting a direct equity stake in Cred Capital. If this is the case, then everyone at Cred LLC would get an equity stake in Cred Capital – likely similar to the Profit Sharing allocation percentage.

Joe

---

**From:** James Alexander <james@credcapital.io>
**Sent:** Wednesday, May 6, 2020 2:15 PM
**To:** Joe Podulka <joe@mycred.io>
**Subject:** Fwd: Cred Financial Operations Analyst Position

Hi Joe,

I would like to extend an offer to Devon with a 18-May start date.  Her bonus and commission criteria are going to be more involved than Joseph, and notably a team bonus based on AUM.  She will be a Cred Capital employee.

She's awaiting an offer letter and evaluation process.

Regards,

James

---------- Forwarded message ----------
From: **James Alexander** <james@credcapital.io>
Date: Fri, May 1, 2020 at 4:03 PM
Subject: Re: Cred Financial Operations Analyst Position

To: Devon Kline <devonakline@gmail.com>

Hi Devon,

Following up on our conversation, and herein is summary of terms:

- Starting base salary $65k per annum, paid bi-monthly. Revised at the end of each calendar quarter.
- Full benefits, including health, dental and vision insurance, commuter, and among others.
- Quarterly bonus up to 7.5% of base salary (30% annually).
- Quarterly commission based on reaching overall AUM, circa 5-10bp of incremental AUM (based on Q over Q comparison) depending upon source. Higher for "manual" tickets produced by your Sales team, and lower for platform relationships--where assets arrive typically with little/no touch from Sales.
- Equity participation when available, currently planning to deliver an equity plan around YE2020. No employees yet own any equity (including myself). We are waiting to close an outside round to give employees equity. 20% of the cap table has been reserved for employees.

Kind Regards,

James

On Fri, May 1, 2020 at 11:45 AM Devon Kline <devonakline@gmail.com> wrote:

> 4 PM works great. I'm happy to talk then. You can reach me at (713) 829-4193. Look forward to speaking with you.
>
> On Fri, May 1, 2020 at 11:08 AM James Alexander <james@credcapital.io> wrote:
>
>> Hi Devon,
>>
>> We would like to move forward with your candidacy for the FinOps position at Cred Capital.
>>
>> As next steps, I would like to discuss compensation with you. I'm trying to find a sensible balance between your qualifications, our budget and total compensation over the coming year.
>>
>> Are you available today 4pm or later PT?
>>
>> Regards,
>>
>> James
>>
>> On Tue, Apr 28, 2020 at 10:33 AM Devon Kline <devonakline@gmail.com> wrote:

Please see attached.

On Mon, Apr 27, 2020 at 10:50 AM Michael Zhang <michael.zhang@mycred.io> wrote:

> Hi Devon,
>
> Thanks for your interest in the Financial Operations Analyst position at Cred.
>
> I will be conducting the initial phone interviews. Please send me a copy of your resume and schedule a time that works best here.
>
> Let me know if you have any questions.
>
> Best regards,

Error! Filename not specified.

**Ka Zhang (Michael)**

Senior Wealth Associate

michael.zhang@mycred.io

+1 (310) 291-2597

mycred.io

--

Error! Filename not specified.

**James Alexander**

President

213 262 6000

james@credcapital.io

credcapital.io

--

Error! Filename not specified.

**James Alexander**

President

213 262 6000

james@credcapital.io

credcapital.io

--

**Error! Filename not specified.**

**James Alexander**

President

213 262 6000

james@credcapital.io

credcapital.io

--

**Error! Filename not specified.**

**James Alexander**

President

213 262 6000

james@credcapital.io

credcapital.io

--

**Error! Filename not specified.**

**James Alexander**

President

213 262 6000

james@credcapital.io

CRED_EXAMINER_00002454

credcapital.io

--



**James Alexander**

President

213 262 6000

james@credcapital.io

credcapital.io

CRED_EXAMINER_00002455

# Exhibit G

CRED_EXAMINER_00002456



**From:** James Alexander <james@credcapital.io>
**Date:** Wednesday, July 8, 2020 at 2:37 PM
**To:** Dan Schatt <dan@mycred.io>
**Subject:** Fwd: Follow-up

# Forwarded Conversation
**Subject: Follow-up**
------------------------

From: **Dan Schatt** <dan@mycred.io>
Date: Fri, May 22, 2020 at 4:01 AM
To: James Alexander <james.alexander@credcapital.io>


Hey James - thanks for your call last night.  Appreciate you taking time in working with the team to figure out the JST issues and balance sheet aberrations. Glad you caught our balance sheet items with Liam and that we are working through this together.  I look forward to us continuing to work together closely to support Cred fundraising.

Btw - the process of signing all those Cred Capital docs was very rushed - and I recall you had mentioned the investor would not move forward unless I signed as-is. That included a three person board structure with two Cred Inc members and the some non mutual language on the asset management agreement, etc. Sounds like some of those items might not have been required since you mentioned he's relying on your discretion...In this case, Let's review  the language and cap structure next week to to make sure we have strong foundations with this structure and it sets both entities up for success...

Although Cred Cap is important for the securitization work, I'm happy to be working together to build one great, successful organization together!

Looking forward to a successful outcome together!

Dan

CRED_EXAMINER_00002457

# Exhibit H

CRED_EXAMINER_00002458



# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF INCORPORATION OF "CRED CAPITAL,
INC.", FILED IN THIS OFFICE ON THE TENTH DAY OF MARCH, A.D.
2020, AT 5:02 O`CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE
NEW CASTLE COUNTY RECORDER OF DEEDS.

7893962  8100
SR# 20202046075

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202565510
Date: 03-11-20

State of Delaware
Secretary of State
Division of Corporations
Delivered 05:02 PM 03/10/2020
FILED 05:02 PM 03/10/2020
SR 20202046075 - File Number 7893962

CERTIFICATE OF INCORPORATION
OF
CRED CAPITAL, INC.

The undersigned, a natural person (the "**Sole Incorporator**"), for the purpose of organizing a corporation to conduct the business and promote the purposes hereinafter stated, under the provisions and subject to the requirements of the laws of the State of Delaware (the "**General Corporation Law**") hereby certifies that:

FIRST: The name of this corporation is Cred Capital, Inc. (the "**Corporation**").

SECOND: The address of the registered office of the Corporation in the State of Delaware is 251 Little Falls Drive, Wilmington, Delaware 19808, New Castle County. The name of its registered agent at such address is Corporation Service Company.

THIRD: The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law.

FOURTH: The total number of shares of all classes of stock which the Corporation shall have authority to issue is (i) 10,000,000 shares of Common Stock, $0.00001 par value per share ("**Common Stock**") and (ii) 3,000,000 shares of Preferred Stock, $0.00001 par value per share ("**Preferred Stock**").

The following is a statement of the designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of capital stock of the Corporation.

A.    COMMON STOCK

5,000,000 shares of the authorized Common Stock of the Corporation are hereby designated "**Class A Common Stock**" and 5,000,000 shares of the authorized Common Stock of the Corporation are hereby designated "**Class B Common Stock**" with the following rights, preferences, powers, privileges and restrictions, qualifications and limitations.

1.    General.  The voting, dividend and liquidation rights of the holders of the Common Stock are subject to and qualified by the rights, powers and preferences of the holders of the Preferred Stock set forth herein.

2.    Voting.

2.1    Class A Common Stock.  Each holder of Class A Common Stock shall be entitled to one (1) vote per share of Class A Common Stock at all meetings of stockholders (and written actions in lieu of meetings); provided, however, that, except as otherwise required by law, holders of Class A Common Stock, as such, shall not be entitled to vote on any amendment to this Certificate of Incorporation that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Certificate of Incorporation or pursuant to the General Corporation Law.  There shall be no cumulative voting.  The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by (in addition to any vote of the holders of one or more series of Preferred Stock that may be required by the

1

CRED_EXAMINER_00002460

terms of this Certificate of Incorporation) the affirmative vote of the holders of shares of capital stock of the Corporation representing a majority of the votes represented by all outstanding shares of capital stock of the Corporation entitled to vote, irrespective of the provisions of Section 242(b)(2) of the General Corporation Law.

2.2     Class B Common Stock. The holders of Class B Common Stock are not entitled to any votes whatsoever with respect to any share of Class B Common Stock held thereby, whether at a meeting of stockholders, in written actions in lieu of meetings or otherwise.

B.     PREFERRED STOCK

3,000,000 shares of the authorized and unissued Preferred Stock of the Corporation are hereby designated "**Series A Preferred Stock**" with the following rights, preferences, powers, privileges and restrictions, qualifications and limitations. Unless otherwise indicated, references to "sections" or "subsections" in this Part B of this Article Fourth refer to sections and subsections of Part B of this Article Fourth.

1.     Dividends. From and after the date of the issuance of any shares of Series A Preferred Stock, dividends at the rate per annum of 25.0% of the Series A Original Issue Price per share shall accrue on such shares of Series A Preferred Stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series A Preferred Stock) (the "**Accruing Dividends**").     Accruing Dividends shall accrue from day to day, whether or not declared, but shall be non-cumulative; provided, however, that except as set forth in the following sentence of this Section 1 or in Subsection 2.1, such Accruing Dividends shall be payable only when, as, and if declared by the Board of Directors of the Corporation and the Corporation shall be under no obligation to pay such Accruing Dividends. The Corporation shall not declare, pay or set aside any dividends on shares of any other class or series of capital stock of the Corporation (other than dividends on shares of Common Stock payable in shares of Common Stock) unless (in addition to the obtaining of any consents required elsewhere in this Certificate of Incorporation) the holders of the Series A Preferred Stock then outstanding shall first receive, or simultaneously receive, a dividend on each outstanding share of Series A Preferred Stock in an amount at least equal to the greater of (i) the amount of the aggregate Accruing Dividends then accrued on such share of Series A Preferred Stock and not previously paid and (ii) (A) in the case of a dividend on Common Stock or any class or series that is convertible into Common Stock, that dividend per share of Series A Preferred Stock as would equal the product of (1) the dividend payable on each share of such class or series determined, if applicable, as if all shares of such class or series had been converted into Common Stock and (2) the number of shares of Common Stock issuable upon conversion of a share of Series A Preferred Stock, in each case calculated on the record date for determination of holders entitled to receive such dividend or (B) in the case of a dividend on any class or series that is not convertible into Common Stock, at a rate per share of Series A Preferred Stock determined by (1) dividing the amount of the dividend payable on each share of such class or series of capital stock by the original issuance price of such class or series of capital stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to such class or series) and (2) multiplying such fraction by an amount equal to the Series A Original Issue Price (as defined below); provided that if the Corporation declares, pays or sets aside, on the same date, a dividend on shares of more than one class or series of capital stock of the Corporation, the dividend payable to the holders of Series A Preferred Stock pursuant to this Section 1 shall be calculated based upon the dividend on the class or series of capital stock that would result in the highest Series A Preferred Stock dividend. The "**Series A Original Issue Price**" shall mean $0.3333 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series A Preferred Stock.

2

CRED_EXAMINER_00002461

      2.        <u>Liquidation, Dissolution or Winding Up; Certain Mergers, Consolidations and Asset Sales</u>.

      2.1      <u>Preferential Payments to Holders of Series A Preferred Stock</u>.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the holders of shares of Series A Preferred Stock then outstanding shall be entitled to be paid out of the assets of the Corporation available for distribution to its stockholders, and in the event of a Deemed Liquidation Event (as defined below), the holders of shares of Series A Preferred Stock then outstanding shall be entitled to be paid out of the consideration payable to stockholders in such Deemed Liquidation Event or out of the Available Proceeds (as defined below), as applicable, before any payment shall be made to the holders of Common Stock by reason of their ownership thereof, an amount per share equal to the greater of (i) the Series A Original Issue Price, plus any dividends declared but unpaid thereon, or (ii) such amount per share as would have been payable had all shares of Series A Preferred Stock been converted into Common Stock pursuant to <u>Section 4</u> immediately prior to such liquidation, dissolution, winding up or Deemed Liquidation Event (the amount payable pursuant to this sentence is hereinafter referred to as the "**Series A Liquidation Amount**").  If upon any such liquidation, dissolution or winding up of the Corporation or Deemed Liquidation Event, the assets of the Corporation available for distribution to its stockholders shall be insufficient to pay the holders of shares of Series A Preferred Stock the full amount to which they shall be entitled under this <u>Subsection 2.1</u>, the holders of shares of Series A Preferred Stock shall share ratably in any distribution of the assets available for distribution in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

      2.2      <u>Payments to Holders of Common Stock</u>.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, after the payment in full of all Series A Liquidation Amounts required to be paid to the holders of shares of Series A Preferred Stock, the remaining assets of the Corporation available for distribution to its stockholders or, in the case of a Deemed Liquidation Event, the consideration not payable to the holders of shares of Series A Preferred Stock pursuant to Section 2.1 or the remaining Available Proceeds, as the case may be, shall be distributed among the holders of shares of Common Stock, pro rata based on the number of shares held by each such holder.

      2.3      <u>Deemed Liquidation Events</u>.

      2.3.1      <u>Definition</u>.  Each of the following events shall be considered a "**Deemed Liquidation Event**" unless the holders of a majority of the outstanding shares of Series A Preferred Stock (the "**Requisite Holders**") elect otherwise by written notice sent to the Corporation at least 10 days prior to the effective date of any such event:

          (a)      a merger or consolidation in which

             (i)      the Corporation is a constituent party or

             (ii)      a subsidiary of the Corporation is a constituent party and the Corporation issues shares of its capital stock pursuant to such merger or consolidation,

except any such merger or consolidation involving the Corporation or a subsidiary in which the shares of capital stock of the Corporation outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately

3

4831-7607-9795

601712146.4

CRED_EXAMINER_00002462

following such merger or consolidation, a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; or

(b)     (1) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or (2) the sale or disposition (whether by merger, consolidation or otherwise, and whether in a single transaction or a series of related transactions) of one or more subsidiaries of the Corporation if substantially all of the assets of the Corporation and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Corporation.

### 2.3.2    Effecting a Deemed Liquidation Event.

(a)     The Corporation shall not have the power to effect a Deemed Liquidation Event referred to in Subsection 2.3.1(a)(i) unless the agreement or plan of merger or consolidation for such transaction (the "**Merger Agreement**") provides that the consideration payable to the stockholders of the Corporation in such Deemed Liquidation Event shall be paid to the holders of capital stock of the Corporation in accordance with Subsections 2.1 and 2.2.

(b)     In the event of a Deemed Liquidation Event referred to in Subsection 2.3.1(a)(ii) or 2.3.1(b), if the Corporation does not effect a dissolution of the Corporation under the General Corporation Law within ninety (90) days after such Deemed Liquidation Event, then (i) the Corporation shall send a written notice to each holder of Series A Preferred Stock no later than the ninetieth (90th) day after the Deemed Liquidation Event advising such holders of their right (and the requirements to be met to secure such right) pursuant to the terms of the following clause; (ii) to require the redemption of such shares of Series A Preferred Stock, and (iii) if Requisite Holders so request in a written instrument delivered to the Corporation not later than one hundred twenty (120) days after such Deemed Liquidation Event, the Corporation shall use the consideration received by the Corporation for such Deemed Liquidation Event (net of any retained liabilities associated with the assets sold or technology licensed, as determined in good faith by the Board of Directors of the Corporation), together with any other assets of the Corporation available for distribution to its stockholders, all to the extent permitted by Delaware law governing distributions to stockholders (the "**Available Proceeds**"), on the one hundred fiftieth (150th) day after such Deemed Liquidation Event, to redeem all outstanding shares of Series A Preferred Stock at a price per share equal to the Series A Liquidation Amount. Notwithstanding the foregoing, in the event of a redemption pursuant to the preceding sentence, if the Available Proceeds are not sufficient to redeem all outstanding shares of Series A Preferred Stock, the Corporation shall redeem a pro rata portion of each holder's shares of Series A Preferred Stock to the fullest extent of such Available Proceeds, based on the respective amounts which would otherwise be payable in respect of the shares to be redeemed if the Available Proceeds were sufficient to redeem all such shares, and shall redeem the remaining shares as soon as it may lawfully do so under Delaware law governing distributions to stockholders. Prior to the distribution or redemption provided for in this Subsection 2.3.2(b), the Corporation shall not expend or dissipate the consideration received for such Deemed Liquidation Event, except to discharge expenses incurred in connection with such Deemed Liquidation Event or in the ordinary course of business.

### 2.3.3    Amount Deemed Paid or Distributed.    The amount deemed paid or distributed to the holders of capital stock of the Corporation upon any such merger, consolidation, sale, transfer, exclusive license, other disposition or redemption shall be the cash or the value of the property,

4

CRED_EXAMINER_00002463

rights or securities to be paid or distributed to such holders pursuant to such Deemed Liquidation Event. The value of such property, rights or securities shall be determined in good faith by the Board of Directors of the Corporation, including the approval of the Preferred Director.

                    2.3.4    Allocation of Escrow and Contingent Consideration. In the event of a Deemed Liquidation Event pursuant to Subsection 2.3.1(a)(i), if any portion of the consideration payable to the stockholders of the Corporation is payable only upon satisfaction of contingencies (the "**Additional Consideration**"), the Merger Agreement shall provide that (a) the portion of such consideration that is not Additional Consideration (such portion, the "**Initial Consideration**") shall be allocated among the holders of capital stock of the Corporation in accordance with Subsections 2.1 and 2.2 as if the Initial Consideration were the only consideration payable in connection with such Deemed Liquidation Event; and (b) any Additional Consideration which becomes payable to the stockholders of the Corporation upon satisfaction of such contingencies shall be allocated among the holders of capital stock of the Corporation in accordance with Subsections 2.1 and 2.2 after taking into account the previous payment of the Initial Consideration as part of the same transaction. For the purposes of this Subsection 2.3.4, consideration placed into escrow or retained as a holdback to be available for satisfaction of indemnification or similar obligations in connection with such Deemed Liquidation Event shall be deemed to be Additional Consideration.

        3.    Voting.

                    3.1    General. On any matter presented to the stockholders of the Corporation for their action or consideration at any meeting of stockholders of the Corporation (or by written consent of stockholders in lieu of meeting), each holder of outstanding shares of Series A Preferred Stock shall be entitled to cast the number of votes equal to the number of whole shares of Common Stock into which the shares of Series A Preferred Stock held by such holder are convertible as of the record date for determining stockholders entitled to vote on such matter. Except as provided by law or by the other provisions of this Certificate of Incorporation, holders of Series A Preferred Stock shall vote together with the holders of Class A Common Stock as a single class and on an as-converted to Common Stock basis.

                    3.2    Election of Directors. The holders of record of the shares of Series A Preferred Stock, exclusively and as a separate class, shall be entitled to elect one (1) director of the Corporation (the "**Preferred Director**"). Any director elected as provided in the preceding sentence may be removed without cause by, and only by, the affirmative vote of the holders of the shares of the class or series of capital stock entitled to elect such director or directors, given either at a special meeting of such stockholders duly called for that purpose or pursuant to a written consent of stockholders. If the holders of shares of Series A Preferred Stock or Class A Common Stock, as the case may be, fail to elect a sufficient number of directors to fill all directorships for which they are entitled to elect directors, voting exclusively and as a separate class, pursuant to the first sentence of this Subsection 3.2, then any directorship not so filled shall remain vacant until such time as the holders of the Series A Preferred Stock or Class A Common Stock, as the case may be, elect a person to fill such directorship by vote or written consent in lieu of a meeting; and no such directorship may be filled by stockholders of the Corporation other than by the stockholders of the Corporation that are entitled to elect a person to fill such directorship, voting exclusively and as a separate class. The holders of record of the shares of Class A Common Stock and of any other class or series of voting stock (including the Series A Preferred Stock), exclusively and voting together as a single class, shall be entitled to elect the balance of the total number of directors of the Corporation. At any meeting held for the purpose of electing a director, the presence in person or by proxy of the holders of a majority of the outstanding shares of the class or series entitled to elect such director shall constitute a quorum for the purpose of electing such director. Except as otherwise provided in this Subsection 3.2, a vacancy in any directorship filled by the holders of any class or series shall be filled only by vote or written consent in lieu of a meeting of the holders of such class or

5

CRED_EXAMINER_00002464

series or by any remaining director or directors elected by the holders of such class or series pursuant to this Subsection 3.2. For administrative convenience, the initial Preferred Director may also be appointed by the Board of Directors of the Corporation in connection with the approval of the initial issuance of the Preferred Stock without a separate action by the holders of a majority of the Preferred Stock.

        3.3     Series A Preferred Stock Protective Provisions. At any time when shares of Series A Preferred Stock are outstanding, the Corporation shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by law or this Certificate of Incorporation) the written consent or affirmative vote of the Requisite Holders given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a class, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect.

        3.3.1    amend, alter or repeal any provision of this Certificate of Incorporation or Bylaws of the Corporation in a manner that adversely affects the powers, preferences or rights of the Series A Preferred Stock;

        3.3.2    create, or authorize the creation of, or issue or obligate itself to issue shares of, any additional class or series of capital stock unless the same ranks junior to the Series A Preferred Stock with respect to the distribution of assets on the liquidation, dissolution or winding up of the Corporation, the payment of dividends and rights of redemption, or increase the authorized number of shares of Series A Preferred Stock or increase the authorized number of shares of any additional class or series of capital stock of the Corporation;

        3.3.3    (i) reclassify, alter or amend any existing security of the Corporation that is pari passu with the Series A Preferred Stock in respect of the distribution of assets on the liquidation, dissolution or winding up of the Corporation, the payment of dividends or rights of redemption, if such reclassification, alteration or amendment would render such other security senior to the Series A Preferred Stock in respect of any such right, preference, or privilege or (ii) reclassify, alter or amend any existing security of the Corporation that is junior to the Series A Preferred Stock in respect of the distribution of assets on the liquidation, dissolution or winding up of the Corporation, the payment of dividends or rights of redemption, if such reclassification, alteration or amendment would render such other security senior to or pari passu with the Series A Preferred Stock in respect of any such right, preference or privilege;

        3.3.4    purchase or redeem (or permit any subsidiary to purchase or redeem) or pay or declare any dividend or make any distribution on, any shares of capital stock of the Corporation other than (i) redemptions of or dividends or distributions on the Series A Preferred Stock as expressly authorized herein and (ii) repurchases of stock from former employees, officers, directors, consultants or other persons who performed services for the Corporation or any subsidiary in connection with the cessation of such employment or service at no greater than the original purchase price;

        3.3.5    increase or decrease the authorized number of directors constituting the Board of Directors of the Corporation; or

        3.3.6    otherwise enter into or be a party to any transaction with any director, officer, or employee of the Company or any "associate" (as defined in Rule 12b-2 promulgated under the Exchange Act) of any such Person, except transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by a disinterested majority of the Board of Directors of the Corporation.

6

CRED_EXAMINER_00002465

4.    Optional Conversion.

The holders of the Series A Preferred Stock shall have conversion rights as follows (the "**Conversion Rights**"):

4.1    Right to Convert.

4.1.1    Conversion Ratio. Each share of Series A Preferred Stock shall be convertible, at the option of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, into such number of fully paid and non-assessable shares of Class A Common Stock as is determined by dividing the Series A Original Issue Price by the Series A Conversion Price (as defined below) in effect at the time of conversion. The "**Series A Conversion Price**" shall initially be equal to the Series A Original Issue Price. Such initial Series A Conversion Price, and the rate at which shares of Series A Preferred Stock may be converted into shares of Class A Common Stock, shall be subject to adjustment as provided below.

4.1.2    Termination of Conversion Rights. In the event of a liquidation, dissolution or winding up of the Corporation or a Deemed Liquidation Event, the Conversion Rights shall terminate at the close of business on the last full day preceding the date fixed for the payment of any such amounts distributable on such event to the holders of Series A Preferred Stock.

4.2    Fractional Shares. No fractional shares of Common Stock shall be issued upon conversion of the Series A Preferred Stock. In lieu of any fractional shares to which the holder would otherwise be entitled, the Corporation shall pay cash equal to such fraction multiplied by the fair market value of a share of Class A Common Stock as determined in good faith by the Board of Directors of the Corporation. Whether or not fractional shares would be issuable upon such conversion shall be determined on the basis of the total number of shares of Series A Preferred Stock the holder is at the time converting into Common Stock and the aggregate number of shares of Common Stock issuable upon such conversion.

4.3    Mechanics of Conversion.

4.3.1    Notice of Conversion. In order for a holder of Series A Preferred Stock to voluntarily convert shares of Series A Preferred Stock into shares of Class A Common Stock, such holder shall (a) provide written notice to the Corporation's transfer agent at the office of the transfer agent for the Series A Preferred Stock (or at the principal office of the Corporation if the Corporation serves as its own transfer agent) that such holder elects to convert all or any number of such holder's shares of Series A Preferred Stock and, if applicable, any event on which such conversion is contingent and (b), if such holder's shares are certificated, surrender the certificate or certificates for such shares of Series A Preferred Stock (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate), at the office of the transfer agent for the Series A Preferred Stock (or at the principal office of the Corporation if the Corporation serves as its own transfer agent). Such notice shall state such holder's name or the names of the nominees in which such holder wishes the shares of Common Stock to be issued. If required by the Corporation, any certificates surrendered for conversion shall be endorsed or accompanied by a written instrument or instruments of transfer, in form satisfactory to the Corporation, duly executed by the registered holder or his, her or its attorney duly authorized in writing. The close of business on the date of receipt by the transfer agent (or by the Corporation if the Corporation serves as its own transfer agent) of such notice and, if applicable, certificates (or lost certificate affidavit and agreement) shall be the time of conversion (the "**Conversion**

7

CRED_EXAMINER_00002466

**Time**"), and the shares of Common Stock issuable upon conversion of the specified shares shall be deemed to be outstanding of record as of such date. The Corporation shall, as soon as practicable after the Conversion Time (i) issue and deliver to such holder of Series A Preferred Stock, or to his, her or its nominees, a certificate or certificates for the number of full shares of Common Stock issuable upon such conversion in accordance with the provisions hereof and a certificate for the number (if any) of the shares of Series A Preferred Stock represented by the surrendered certificate that were not converted into Common Stock, (ii) pay in cash such amount as provided in <u>Subsection 4.2</u> in lieu of any fraction of a share of Common Stock otherwise issuable upon such conversion and (iii) pay all declared but unpaid dividends on the shares of Series A Preferred Stock converted.

           4.3.2   <u>Reservation of Shares</u>. The Corporation shall at all times when the Series A Preferred Stock shall be outstanding, reserve and keep available out of its authorized but unissued capital stock, for the purpose of effecting the conversion of the Series A Preferred Stock, such number of its duly authorized shares of Class A Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding Series A Preferred Stock; and if at any time the number of authorized but unissued shares of Class A Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Series A Preferred Stock, the Corporation shall take such corporate action as may be necessary to increase its authorized but unissued shares of Class A Common Stock to such number of shares as shall be sufficient for such purposes, including, without limitation, engaging in best efforts to obtain the requisite stockholder approval of any necessary amendment to this Certificate of Incorporation. Before taking any action which would cause an adjustment reducing the Series A Conversion Price below the then par value of the shares of Class A Common Stock issuable upon conversion of the Series A Preferred Stock, the Corporation will take any corporate action which may, in the opinion of its counsel, be necessary in order that the Corporation may validly and legally issue fully paid and non-assessable shares of Class A Common Stock at such adjusted Series A Conversion Price.

           4.3.3   <u>Effect of Conversion</u>. All shares of Series A Preferred Stock which shall have been surrendered for conversion as herein provided shall no longer be deemed to be outstanding and all rights with respect to such shares shall immediately cease and terminate at the Conversion Time, except only the right of the holders thereof to receive shares of Common Stock in exchange therefor, to receive payment in lieu of any fraction of a share otherwise issuable upon such conversion as provided in <u>Subsection 4.2</u> and to receive payment of any dividends declared but unpaid thereon. Any shares of Series A Preferred Stock so converted shall be retired and cancelled and may not be reissued as shares of such series, and the Corporation may thereafter take such appropriate action (without the need for stockholder action) as may be necessary to reduce the authorized number of shares of Series A Preferred Stock accordingly.

           4.3.4   <u>No Further Adjustment</u>. Upon any such conversion, no adjustment to the Series A Conversion Price shall be made for any declared but unpaid dividends on the Series A Preferred Stock surrendered for conversion or on the Common Stock delivered upon conversion.

           4.3.5   <u>Taxes</u>. The Corporation shall pay any and all issue and other similar taxes that may be payable in respect of any issuance or delivery of shares of Common Stock upon conversion of shares of Series A Preferred Stock pursuant to this <u>Section 4</u>. The Corporation shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of shares of Common Stock in a name other than that in which the shares of Series A Preferred Stock so converted were registered, and no such issuance or delivery shall be made unless and until the person or entity requesting such issuance has paid to the Corporation the amount of any such tax or has established, to the satisfaction of the Corporation, that such tax has been paid.

8

CRED_EXAMINER_00002467

4.4     Adjustments to Series A Conversion Price for Diluting Issues.

4.4.1     Special Definitions.  For purposes of this Article Fourth, the following definitions shall apply:

(a)     "**Option**" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Common Stock or Convertible Securities.

(b)     "**Series A Original Issue Date**" shall mean the date on which the first share of Series A Preferred Stock was issued.

(c)     "**Convertible Securities**" shall mean any evidences of indebtedness, shares or other securities directly or indirectly convertible into or exchangeable for Common Stock, but excluding Options.

(d)     "**Additional Shares of Common Stock**" shall mean all shares of Common Stock issued (or, pursuant to Subsection 4.4.3 below, deemed to be issued) by the Corporation after the Series A Original Issue Date, other than (1) the following shares of Common Stock and (2) shares of Common Stock deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, "**Exempted Securities**"):

(i)     shares of Common Stock, Options or Convertible Securities issued as a dividend or distribution on Series A Preferred Stock;

(ii)    shares of Common Stock, Options or Convertible Securities issued by reason of a dividend, stock split, split-up or other distribution on shares of Common Stock that is covered by Subsection 4.5, 4.6, 4.7 or 4.8;

(iii)   shares of Common Stock or Options issued to employees or directors of, or consultants or advisors to, the Corporation or any of its subsidiaries pursuant to a plan, agreement or arrangement approved by the Board of Directors of the Corporation; or

(iv)    shares of Common Stock or Convertible Securities actually issued upon the exercise of Options or shares of Common Stock actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security.

4.4.2     No Adjustment of Series A Conversion Price.  No adjustment in the Series A Conversion Price shall be made as the result of the issuance or deemed issuance of Additional Shares of Common Stock if the Corporation receives written notice from the Requisite Holders agreeing that no such adjustment shall be made as the result of the issuance or deemed issuance of such Additional Shares of Common Stock.

9

CRED_EXAMINER_00002468

4.4.3   Deemed Issue of Additional Shares of Common Stock.

(a)     If the Corporation at any time or from time to time after the Series A Original Issue Date shall issue any Options or Convertible Securities (excluding Options or Convertible Securities which are themselves Exempted Securities) or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of shares of Common Stock (as set forth in the instrument relating thereto, assuming the satisfaction of any conditions to exercisability, convertibility or exchangeability but without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Shares of Common Stock issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date.

(b)     If the terms of any Option or Convertible Security, the issuance of which resulted in an adjustment to the Series A Conversion Price pursuant to the terms of Subsection 4.4.4, are revised as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase or decrease in the number of shares of Common Stock issuable upon the exercise, conversion and/or exchange of any such Option or Convertible Security or (2) any increase or decrease in the consideration payable to the Corporation upon such exercise, conversion and/or exchange, then, effective upon such increase or decrease becoming effective, the Series A Conversion Price computed upon the original issue of such Option or Convertible Security (or upon the occurrence of a record date with respect thereto) shall be readjusted to such Series A Conversion Price as would have obtained had such revised terms been in effect upon the original date of issuance of such Option or Convertible Security. Notwithstanding the foregoing, no readjustment pursuant to this clause (b) shall have the effect of increasing the Series A Conversion Price to an amount which exceeds the lower of (i) the Series A Conversion Price in effect immediately prior to the original adjustment made as a result of the issuance of such Option or Convertible Security, or (ii) the Series A Conversion Price that would have resulted from any issuances of Additional Shares of Common Stock (other than deemed issuances of Additional Shares of Common Stock as a result of the issuance of such Option or Convertible Security) between the original adjustment date and such readjustment date.

(c)     If the terms of any Option or Convertible Security (excluding Options or Convertible Securities which are themselves Exempted Securities), the issuance of which did not result in an adjustment to the Series A Conversion Price pursuant to the terms of Subsection 4.4.4 (either because the consideration per share (determined pursuant to Subsection 4.4.5) of the Additional Shares of Common Stock subject thereto was equal to or greater than the Series A Conversion Price then in effect, or because such Option or Convertible Security was issued before the Series A Original Issue Date), are revised after the Series A Original Issue Date as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase in the number of shares of Common Stock issuable upon the exercise, conversion or exchange of any such Option or Convertible Security or (2) any decrease in the consideration payable to the Corporation upon such exercise, conversion or exchange, then such Option or Convertible Security, as so amended or adjusted, and the Additional Shares of Common Stock subject thereto (determined in the manner provided in Subsection 4.4.3(a) shall be deemed to have been issued effective upon such increase or decrease becoming effective.

10

CRED_EXAMINER_00002469

(d)    Upon the expiration or termination of any unexercised Option or unconverted or unexchanged Convertible Security (or portion thereof) which resulted (either upon its original issuance or upon a revision of its terms) in an adjustment to the Series A Conversion Price pursuant to the terms of Subsection 4.4.4, the Series A Conversion Price shall be readjusted to such Series A Conversion Price as would have obtained had such Option or Convertible Security (or portion thereof) never been issued.

(e)    If the number of shares of Common Stock issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Corporation upon such exercise, conversion and/or exchange, is calculable at the time such Option or Convertible Security is issued or amended but is subject to adjustment based upon subsequent events, any adjustment to the Series A Conversion Price provided for in this Subsection 4.4.3 shall be effected at the time of such issuance or amendment based on such number of shares or amount of consideration without regard to any provisions for subsequent adjustments (and any subsequent adjustments shall be treated as provided in clauses (b) and (c) of this Subsection 4.4.3). If the number of shares of Common Stock issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Corporation upon such exercise, conversion and/or exchange, cannot be calculated at all at the time such Option or Convertible Security is issued or amended, any adjustment to the Series A Conversion Price that would result under the terms of this Subsection 4.4.3 at the time of such issuance or amendment shall instead be effected at the time such number of shares and/or amount of consideration is first calculable (even if subject to subsequent adjustments), assuming for purposes of calculating such adjustment to the Series A Conversion Price that such issuance or amendment took place at the time such calculation can first be made.

4.4.4    Adjustment of Series A Conversion Price Upon Issuance of Additional Shares of Common Stock.  In the event the Corporation shall at any time after the Series A Original Issue Date issue Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to Subsection 4.4.3), without consideration or for a consideration per share less than the Series A Conversion Price in effect immediately prior to such issuance or deemed issuance, then the Series A Conversion Price shall be reduced, concurrently with such issue, to a price (calculated to the nearest one-hundredth of a cent) determined in accordance with the following formula:

$$CP_2 = CP_1 * (A + B) \div (A + C).$$

For purposes of the foregoing formula, the following definitions shall apply:

(a)    "$CP_2$" shall mean the Series A Conversion Price in effect immediately after such issuance or deemed issuance of Additional Shares of Common Stock

(b)    "$CP_1$" shall mean the Series A Conversion Price in effect immediately prior to such issuance or deemed issuance of Additional Shares of Common Stock;

(c)    "A" shall mean the number of shares of Common Stock outstanding immediately prior to such issuance or deemed issuance of Additional Shares of Common Stock (treating for this purpose as outstanding all shares of Common Stock issuable upon exercise of Options outstanding immediately prior to such issuance or deemed issuance or upon conversion or exchange of Convertible Securities (including the Series A Preferred Stock) outstanding (assuming exercise of any outstanding Options therefor) immediately prior to such issue);

(d)    "B" shall mean the number of shares of Common Stock that would have been issued if such Additional Shares of Common Stock had been issued or deemed

11

CRED_EXAMINER_00002470

issued at a price per share equal to $CP_1$ (determined by dividing the aggregate consideration received by the Corporation in respect of such issue by $CP_1$); and

      (e)    "C" shall mean the number of such Additional Shares of Common Stock issued in such transaction.

      4.4.5    <u>Determination of Consideration</u>. For purposes of this <u>Subsection 4.4</u>, the consideration received by the Corporation for the issuance or deemed issuance of any Additional Shares of Common Stock shall be computed as follows:

      (a)    <u>Cash and Property</u>: Such consideration shall:

      (i)    insofar as it consists of cash, be computed at the aggregate amount of cash received by the Corporation, excluding amounts paid or payable for accrued interest;

      (ii)    insofar as it consists of property other than cash, be computed at the fair market value thereof at the time of such issue, as determined in good faith by the Board of Directors of the Corporation, including the approval of the Preferred Director; and

      (iii)    in the event Additional Shares of Common Stock are issued together with other shares or securities or other assets of the Corporation for consideration which covers both, be the proportion of such consideration so received, computed as provided in clauses (i) and (ii) above, as determined in good faith by the Board of Directors of the Corporation.

      (b)    <u>Options and Convertible Securities</u>. The consideration per share received by the Corporation for Additional Shares of Common Stock deemed to have been issued pursuant to <u>Subsection 4.4.3</u>, relating to Options and Convertible Securities, shall be determined by dividing:

      (i)    The total amount, if any, received or receivable by the Corporation as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Corporation upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the

12

CRED_EXAMINER_00002471

conversion or exchange of such Convertible Securities, by

(ii)     the maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities.

4.4.6    <u>Multiple Closing Dates</u>. In the event the Corporation shall issue on more than one date Additional Shares of Common Stock that are a part of one transaction or a series of related transactions and that would result in an adjustment to the Series A Conversion Price pursuant to the terms of <u>Subsection 4.4.4</u>, then, upon the final such issuance, the Series A Conversion Price shall be readjusted to give effect to all such issuances as if they occurred on the date of the first such issuance (and without giving effect to any additional adjustments as a result of any such subsequent issuances within such period).

4.5    <u>Adjustment for Stock Splits and Combinations</u>. If the Corporation shall at any time or from time to time after the Series A Original Issue Date effect a subdivision of the outstanding Common Stock, the Series A Conversion Price in effect immediately before that subdivision shall be proportionately decreased so that the number of shares of Common Stock issuable on conversion of each share of such series shall be increased in proportion to such increase in the aggregate number of shares of Common Stock outstanding. If the Corporation shall at any time or from time to time after the Series A Original Issue Date combine the outstanding shares of Common Stock, the Series A Conversion Price in effect immediately before the combination shall be proportionately increased so that the number of shares of Common Stock issuable on conversion of each share of such series shall be decreased in proportion to such decrease in the aggregate number of shares of Common Stock outstanding. Any adjustment under this subsection shall become effective at the close of business on the date the subdivision or combination becomes effective.

4.6    <u>Adjustment for Certain Dividends and Distributions</u>. In the event the Corporation at any time or from time to time after the Series A Original Issue Date shall make or issue, or fix a record date for the determination of holders of Common Stock entitled to receive, a dividend or other distribution payable on the Common Stock in additional shares of Common Stock, then and in each such event the Series A Conversion Price in effect immediately before such event shall be decreased as of the time of such issuance or, in the event such a record date shall have been fixed, as of the close of business on such record date, by multiplying the Series A Conversion Price then in effect by a fraction:

(1)     the numerator of which shall be the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date, and

(2)     the denominator of which shall be the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of

13

CRED_EXAMINER_00002472

business on such record date plus the number of shares of Common Stock issuable in payment of such dividend or distribution.

Notwithstanding the foregoing (a) if such record date shall have been fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed therefor, the Series A Conversion Price shall be recomputed accordingly as of the close of business on such record date and thereafter the Series A Conversion Price shall be adjusted pursuant to this subsection as of the time of actual payment of such dividends or distributions; and (b) that no such adjustment shall be made if the holders of Series A Preferred Stock simultaneously receive a dividend or other distribution of shares of Common Stock in a number equal to the number of shares of Common Stock as they would have received if all outstanding shares of Series A Preferred Stock had been converted into Common Stock on the date of such event.

    4.7    Adjustments for Other Dividends and Distributions.  In the event the Corporation at any time or from time to time after the Series A Original Issue Date shall make or issue, or fix a record date for the determination of holders of Common Stock entitled to receive, a dividend or other distribution payable in securities of the Corporation (other than a distribution of shares of Common Stock in respect of outstanding shares of Common Stock) or in other property and the provisions of Section 1 do not apply to such dividend or distribution, then and in each such event the holders of Series A Preferred Stock shall receive, simultaneously with the distribution to the holders of Common Stock, a dividend or other distribution of such securities or other property in an amount equal to the amount of such securities or other property as they would have received if all outstanding shares of Series A Preferred Stock had been converted into Common Stock on the date of such event.

    4.8    Adjustment for Merger or Reorganization, etc.  Subject to the provisions of Subsection 2.3, if there shall occur any reorganization, recapitalization, reclassification, consolidation or merger involving the Corporation in which the Common Stock (but not the Series A Preferred Stock) is converted into or exchanged for securities, cash or other property (other than a transaction covered by Subsections 4.4, 4.6 or 4.7), then, following any such reorganization, recapitalization, reclassification, consolidation or merger, each share of Series A Preferred Stock shall thereafter be convertible in lieu of the Common Stock into which it was convertible prior to such event into the kind and amount of securities, cash or other property which a holder of the number of shares of Common Stock of the Corporation issuable upon conversion of one share of Series A Preferred Stock immediately prior to such reorganization, recapitalization, reclassification, consolidation or merger would have been entitled to receive pursuant to such transaction; and, in such case, appropriate adjustment (as determined in good faith by the Board of Directors of the Corporation) shall be made in the application of the provisions in this Section 4 with respect to the rights and interests thereafter of the holders of the Series A Preferred Stock, to the end that the provisions set forth in this Section 4 (including provisions with respect to changes in and other adjustments of the Series A Conversion Price) shall thereafter be applicable, as nearly as reasonably may be, in relation to any securities or other property thereafter deliverable upon the conversion of the Series A Preferred Stock.

    4.9    Certificate as to Adjustments.  Upon the occurrence of each adjustment or readjustment of the Series A Conversion Price pursuant to this Section 4, the Corporation at its expense shall, as promptly as reasonably practicable but in any event not later than ten (10) days thereafter, compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Series A Preferred Stock a certificate setting forth such adjustment or readjustment (including the kind and amount of securities, cash or other property into which the Series A Preferred Stock is convertible) and showing in detail the facts upon which such adjustment or readjustment is based.  The Corporation shall, as promptly as reasonably practicable after the written request at any time of any holder of Series A Preferred Stock (but in any event not later than ten (10) days thereafter), furnish or cause to be furnished to such holder a certificate setting forth (i) the Series A Conversion Price then in effect, and (ii) the

14

CRED_EXAMINER_00002473

number of shares of Common Stock and the amount, if any, of other securities, cash or property which then would be received upon the conversion of Series A Preferred Stock.

4.10    Notice of Record Date.  In the event:

(a)    the Corporation shall take a record of the holders of its Common Stock (or other capital stock or securities at the time issuable upon conversion of the Series A Preferred Stock) for the purpose of entitling or enabling them to receive any dividend or other distribution, or to receive any right to subscribe for or purchase any shares of capital stock of any class or any other securities, or to receive any other security; or

(b)    of any capital reorganization of the Corporation, any reclassification of the Common Stock of the Corporation, or any Deemed Liquidation Event; or

(c)    of the voluntary or involuntary dissolution, liquidation or winding-up of the Corporation,

then, and in each such case, the Corporation will send or cause to be sent to the holders of the Series A Preferred Stock a notice specifying, as the case may be, (i) the record date for such dividend, distribution or right, and the amount and character of such dividend, distribution or right, or (ii) the effective date on which such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up is proposed to take place, and the time, if any is to be fixed, as of which the holders of record of Common Stock (or such other capital stock or securities at the time issuable upon the conversion of the Series A Preferred Stock) shall be entitled to exchange their shares of Common Stock (or such other capital stock or securities) for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up, and the amount per share and character of such exchange applicable to the Series A Preferred Stock and the Common Stock.  Such notice shall be sent at least ten (10) days prior to the record date or effective date for the event specified in such notice.

5.    Mandatory Conversion.

5.1    Trigger Events.  Upon either (a) the closing of the sale of shares of Common Stock to the public in a firm-commitment underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended, resulting in at least $50,000,000 of gross proceeds, net of the underwriting discount and commissions, to the Corporation and in connection with such offering the Common Stock is listed for trading on the Nasdaq Stock Market's National Market, the New York Stock Exchange or another exchange or marketplace approved by the Board of Directors of the Corporation or (b) the date and time, or the occurrence of an event, specified by vote or written consent of the Requisite Holders (the time of such closing or the date and time specified or the time of the event specified in such vote or written consent is referred to herein as the "**Mandatory Conversion Time**"), then (i) all outstanding shares of Series A Preferred Stock shall automatically be converted into shares of Class A Common Stock, at the then effective conversion rate as calculated pursuant to Subsection 4.1.1. and (ii) such shares may not be reissued by the Corporation.

5.2    Procedural Requirements.  All holders of record of shares of Series A Preferred Stock shall be sent written notice of the Mandatory Conversion Time and the place designated for mandatory conversion of all such shares of Series A Preferred Stock pursuant to this Section 5.  Such notice need not be sent in advance of the occurrence of the Mandatory Conversion Time.  Upon receipt of such notice, each holder of shares of Series A Preferred Stock in certificated form shall surrender his, her or its certificate or certificates for all such shares (or, if such holder alleges that such certificate has been

15

CRED_EXAMINER_00002474

lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate) to the Corporation at the place designated in such notice. If so required by the Corporation, any certificates surrendered for conversion shall be endorsed or accompanied by written instrument or instruments of transfer, in form satisfactory to the Corporation, duly executed by the registered holder or by his, her or its attorney duly authorized in writing. All rights with respect to the Series A Preferred Stock converted pursuant to <u>Subsection 5.1</u>, including the rights, if any, to receive notices and vote (other than as a holder of Common Stock), will terminate at the Mandatory Conversion Time (notwithstanding the failure of the holder or holders thereof to surrender any certificates at or prior to such time), except only the rights of the holders thereof, upon surrender of any certificate or certificates of such holders (or lost certificate affidavit and agreement) therefor, to receive the items provided for in the next sentence of this <u>Subsection 5.2</u>. As soon as practicable after the Mandatory Conversion Time and, if applicable, the surrender of any certificate or certificates (or lost certificate affidavit and agreement) for Series A Preferred Stock, the Corporation shall (a) issue and deliver to such holder, or to his, her or its nominees, a certificate or certificates for the number of full shares of Class A Common Stock issuable on such conversion in accordance with the provisions hereof and (b)pay cash as provided in <u>Subsection 4.2</u> in lieu of any fraction of a share of Common Stock otherwise issuable upon such conversion and the payment of any declared but unpaid dividends on the shares of Series A Preferred Stock converted. Such converted Series A Preferred Stock shall be retired and cancelled and may not be reissued as shares of such series, and the Corporation may thereafter take such appropriate action (without the need for stockholder action) as may be necessary to reduce the authorized number of shares of Series A Preferred Stock accordingly.

      6.    <u>Reserved</u>.

      7.    <u>Redeemed or Otherwise Acquired Shares</u>. Any shares of Series A Preferred Stock that are redeemed or otherwise acquired by the Corporation or any of its subsidiaries shall be automatically and immediately cancelled and retired and shall not be reissued, sold or transferred. Neither the Corporation nor any of its subsidiaries may exercise any voting or other rights granted to the holders of Series A Preferred Stock following redemption.

      8.    <u>Waiver</u>. Any of the rights, powers, preferences and other terms of the Series A Preferred Stock set forth herein may be waived on behalf of all holders of Series A Preferred Stock by the affirmative written consent or vote of the Requisite Holders.

      9.    <u>Notices</u>. Any notice required or permitted by the provisions of this Article Fourth to be given to a holder of shares of Series A Preferred Stock shall be mailed, postage prepaid, to the post office address last shown on the records of the Corporation, or given by electronic communication in compliance with the provisions of the General Corporation Law, and shall be deemed sent upon such mailing or electronic transmission.

**FIFTH:** Subject to any additional vote required by this Certificate of Incorporation or Bylaws, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

**SIXTH:** Subject to any additional vote required by this Certificate of Incorporation, the number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation. Each director shall be entitled to one vote on each matter presented to the Board of Directors.

16

CRED_EXAMINER_00002475

**SEVENTH:** Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

**EIGHTH:** Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**NINTH:** To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this Article Ninth to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law as so amended.

Any repeal or modification of the foregoing provisions of this Article Ninth by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

**TENTH:** To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Corporation (and any other persons to which General Corporation Law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law.

Any amendment, repeal or modification of the foregoing provisions of this Article Tenth shall not (a) adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal or modification or (b) increase the liability of any director of the Corporation with respect to any acts or omissions of such director, officer or agent occurring prior to, such amendment, repeal or modification.

**ELEVENTH:** The Corporation renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity. An **"Excluded Opportunity"** is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of (i) any director of the Corporation who is not an employee of the Corporation or any of its subsidiaries, or (ii) any holder of Series A Preferred Stock or any partner, member, director, stockholder, employee, affiliate or agent of any such holder, other than someone who is an employee of the Corporation or any of its subsidiaries (collectively, the persons referred to in clauses (i) and (ii) are **"Covered Persons"**), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Corporation while such Covered Person is performing services in such capacity. Any repeal or modification of this Article Eleventh will only be prospective and will not affect the rights under this Article Eleventh in effect at the time of the occurrence of any actions or omissions to act giving rise to liability. Notwithstanding anything to the contrary contained elsewhere in this Certificate of Incorporation, the affirmative vote of the Requisite Holders will be required to amend or repeal, or to adopt any provisions inconsistent with this Article Eleventh.

17

4831-7607-9795

601712146.4

CRED_EXAMINER_00002476

**TWELFTH:**  Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the Delaware General Corporation Law or the Corporation's certificate of incorporation or bylaws or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except for, as to each of (i) through (iv) above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction. If any provision or provisions of this Article Twelfth shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article Twelfth (including, without limitation, each portion of any sentence of this Article Twelfth containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

**THIRTEENTH:**  For purposes of Section 500 of the California Corporations Code (to the extent applicable), in connection with any repurchase of shares of Common Stock permitted under this Certificate of Incorporation from employees, officers, directors or consultants of the Corporation in connection with a termination of employment or services pursuant to agreements or arrangements approved by the Board of Directors (in addition to any other consent required under this Certificate of Incorporation), such repurchase may be made without regard to any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined in Section 500 of the California Corporations Code). Accordingly, for purposes of making any calculation under California Corporations Code Section 500 in connection with such repurchase, the amount of any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined therein) shall be deemed to be zero (0).

**FOURTEENTH:**  The name and mailing address of the Sole Incorporator is as follows:

Rebecca Floren
161 N. Clark St., Ste 4300
Chicago, IL 60601

\*    \*    \*

18

CRED_EXAMINER_00002477

**IN WITNESS WHEREOF**, this Certificate of Incorporation has been executed this 10th day of March, 2020 by the undersigned, who affirms that the statements made herein are true and correct.

By: _/s/ Rebecca Floren_
        Sole Incorporator

19

4831-7607-9795

601712146.4

# Exhibit I

CRED_EXAMINER_00002479

DocuSign Envelope ID: B8772005-536E-4DA8-AFA9-99520440F200

# ACTION OF INCORPORATOR

## OF

## CRED CAPITAL, INC.

### June 22, 2020

The undersigned, being the person for whom and on whose behalf the sole incorporator named in the certificate of incorporation of Cred Capital, Inc., a Delaware corporation (the "***Company***"), as filed by the Company with the Secretary of State of the State of Delaware on March 10, 2020 (the "***Certificate of Incorporation***"), was acting, after determining the sole incorporator is not available to act in respect of the resolutions hereby adopted, hereby adopts the following resolutions pursuant to Section 108(b) of the Delaware General Corporation Law (the "***DGCL***") with respect to the initial organization of the corporation:

1.    **Adoption of Bylaws**

**RESOLVED:**  That the Bylaws attached hereto as **Exhibit A** are hereby adopted as the Bylaws of the Company.

**RESOLVED FURTHER:**  That the Secretary of the Company is hereby authorized and directed to execute a certificate of the adoption of the Bylaws and insert it in the Company's Minute Book and that the officers of the Company are ordered to maintain a copy of such Bylaws in the principal office of the Company for the transaction of its business open for inspection by the stockholders at all reasonable times during office hours.

2.    **Board of Directors**

**RESOLVED:**  That the following individuals are hereby elected as directors of the Company to serve as directors until their successors are duly elected and qualified:

Daniel B. Schatt
Joseph Podulka

CRED_EXAMINER_00002480

DocuSign Envelope ID: B8772005-536E-4DA8-AFA9-99520440F200

      This action shall be filed in the Minute Book of the Company and shall be effective as of the date first written above.

CRED INC.

_Joseph Podulka_

Name: Joseph Podulka

Title:  Chief Financial Officer

DocuSign Envelope ID: B8772005-536E-4DA8-AFA9-99520440F200

## EXHIBIT A

**Bylaws**

[Separately provided]

CRED_EXAMINER_00002482

# BYLAWS

# OF

# CRED CAPITAL, INC.

# A DELAWARE CORPORATION

601704466.3

CRED_EXAMINER_00002483

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. I

**ARTICLE I** OFFICES ................................................................................................................... 1

    Section 1.      Registered Office ........................................................................................... 1
    Section 2.      Other Offices ................................................................................................. 1

**ARTICLE II** CORPORATE SEAL ............................................................................................ 1

    Section 3.      Corporate Seal ............................................................................................... 1

**ARTICLE III** STOCKHOLDERS' MEETINGS ...................................................................... 1

    Section 4.      Place of Meetings .......................................................................................... 1
    Section 5.      Annual Meeting ............................................................................................. 1
    Section 6.      Special Meetings ........................................................................................... 2
    Section 7.      Notice of Meetings ........................................................................................ 2
    Section 8.      Quorum ........................................................................................................... 3
    Section 9.      Adjournment and Notice of Adjourned Meetings ...................................... 3
    Section 10.    Voting Rights ................................................................................................. 3
    Section 11.    Joint Owners of Stock .................................................................................. 4
    Section 12.    List of Stockholders ..................................................................................... 4
    Section 13.    Action Without Meeting ............................................................................... 4
    Section 14.    Organization .................................................................................................. 5

**ARTICLE IV** DIRECTORS ......................................................................................................... 6

    Section 15.    Number and Term of Office .......................................................................... 6
    Section 16.    Powers ............................................................................................................ 6
    Section 17.    Term of Directors .......................................................................................... 6
    Section 18.    Vacancies ....................................................................................................... 6
    Section 19.    Resignation .................................................................................................... 7
    Section 20.    Removal ......................................................................................................... 7
    Section 21.    Meetings ........................................................................................................ 7
    Section 22.    Quorum and Voting ...................................................................................... 8
    Section 23.    Action Without Meeting ............................................................................... 8
    Section 24.    Fees and Compensation ............................................................................... 9
    Section 25.    Committees .................................................................................................... 9
    Section 26.    Organization ................................................................................................ 10

**ARTICLE V** OFFICERS ............................................................................................................ 10

    Section 27.    Officers Designated. ................................................................................... 10
    Section 28.    Tenure and Duties of Officers .................................................................... 10
    Section 29.    Delegation of Authority .............................................................................. 12
    Section 30.    Resignations ................................................................................................ 12

i

CRED_EXAMINER_00002484

Section 31.    Removal ........................................................................................... 12

**ARTICLE VI** EXECUTION OF CORPORATE INSTRUMENTS AND VOTING OF
SECURITIES OWNED BY THE CORPORATION ........................................ 12

Section 32.    Execution of Corporate Instruments ............................................. 12
Section 33.    Voting of Securities Owned by the Corporation ............................ 13

**ARTICLE VII** SHARES OF STOCK ..................................................................... 13

Section 34.    Form and Execution of Certificates .............................................. 13
Section 35.    Lost Certificates ............................................................................. 14
Section 36.    Transfers ........................................................................................ 14
Section 37.    Fixing Record Dates ...................................................................... 14
Section 38.    Registered Stockholders ............................................................... 15

**ARTICLE VIII** OTHER SECURITIES OF THE CORPORATION ........................ 15

Section 39.    Execution of Other Securities ....................................................... 15

**ARTICLE IX** DIVIDENDS ..................................................................................... 16

Section 40.    Declaration of Dividends .............................................................. 16
Section 41.    Dividend Reserve ........................................................................... 16

**ARTICLE X** FISCAL YEAR .................................................................................. 16

Section 42.    Fiscal Year .................................................................................... 16

**ARTICLE XI** INDEMNIFICATION ........................................................................ 16

Section 43.    Indemnification of Directors, Executive Officers, Other Officers,
Employees and Other Agents ........................................................ 16

**ARTICLE XII** NOTICES ........................................................................................ 20

Section 44.    Notices ........................................................................................... 20

**ARTICLE XIII** AMENDMENTS ............................................................................. 20

Section 45.    Amendments .................................................................................. 20

**ARTICLE XIV** LOANS TO OFFICERS; RIGHT OF FIRST REFUSAL ............... 21

Section 46.    Loans to Officers ........................................................................... 21
Section 47.    Right of First Refusal ................................................................... 21

CERTIFICATE OF SECRETARY ................................................................................ 1

CRED_EXAMINER_00002485

# BYLAWS

## OF

## CRED CAPITAL, INC.

## A DELAWARE CORPORATION

### ARTICLE I

### OFFICES

**Section 1.**    **Registered Office.** The registered office of the corporation in the State of Delaware shall be in the City of Dover, County of Kent or such other place as may be determined by the Board of Directors.

**Section 2.**    **Other Offices.** The corporation shall also have and maintain an office or principal place of business at such place as may be fixed by the Board of Directors, and may also have offices at such other places, both within and outside of the State of Delaware, as the Board of Directors may from time to time determine or the business of the corporation may require.

### ARTICLE II

### CORPORATE SEAL

**Section 3.**    **Corporate Seal.** The Board of Directors may adopt a corporate seal. The corporate seal shall bear the name of the corporation and the inscription "Corporate Seal-Delaware." Said seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

### ARTICLE III

### STOCKHOLDERS' MEETINGS

**Section 4.**    **Place of Meetings.** Meetings of the stockholders of the corporation may be held at such place, either within or outside of the State of Delaware, as may be determined from time to time by the Board of Directors. The Board of Directors may, in its sole discretion, determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication as provided under the Delaware General Corporation Law ("DGCL").

**Section 5.**    **Annual Meeting.** An annual meeting of the stockholders shall be held on such date and at such time as may be designated from time to time by the Board of Directors, for the purpose of electing directors and for the transaction of such other business as may be properly brought before the meeting. If the day fixed for the annual meeting shall be a legal holiday, such meeting shall be held on the next succeeding business day. If the election of

CRED_EXAMINER_00002486

directors shall not be held on the day designated herein for any annual meeting of the stockholders, or at any adjournment thereof, the Board of Directors shall cause the election to be held at a meeting of the stockholders as soon thereafter as conveniently may be. Failure to hold an annual meeting as required by these bylaws shall not invalidate any action taken by the Board of Directors or officers of the corporation.

<b>Section 6.</b>    <b>Special Meetings.</b>

        **(a)**    Special meetings of the stockholders of the corporation may be called, for any purpose or purposes, by (i) the Chairman of the Board of Directors, (ii) the Chief Executive Officer, or (iii) the Board of Directors pursuant to a resolution adopted by a majority of the total number of authorized directors (whether or not there exist any vacancies in previously authorized directorships at the time any such resolution is presented to the Board of Directors for adoption) or (iv) by the holders of shares entitled to cast not less than ten percent (10%) of the votes at the meeting and shall be held at such place, on such date, and at such time as the Board of Directors shall fix.

        **(b)**    If a special meeting is properly called by any person or persons other than the Board of Directors, the request shall be in writing, specifying the general nature of the business proposed to be transacted, and shall be delivered personally or sent by certified or registered mail, return receipt requested, or by telegraphic or other facsimile transmission to the Chairman of the Board of Directors, the Chief Executive Officer, or the Secretary of the corporation. No business may be transacted at such special meeting otherwise than specified in such notice. The Board of Directors shall determine the time and place of such special meeting, which shall be held not less than thirty-five (35) nor more than one hundred twenty (120) days after the date of the receipt of the request. Upon determination of the time and place of the meeting, the officer receiving the request shall cause notice to be given to the stockholders entitled to vote, in accordance with the provisions of Section 7 of these Bylaws. Nothing contained in this paragraph (b) shall be construed as limiting, fixing, or affecting the time when a meeting of stockholders called by action of the Board of Directors may be held.

        **Section 7.**    **Notice of Meetings.** Except as otherwise provided by law or the Certificate of Incorporation, notice, given in writing or by electronic transmission, of each meeting of stockholders shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting, such notice to specify the place, if any, date and hour and purpose or purposes of the meeting and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting. Notice of the time, place, if any, and purpose of any meeting of stockholders may be waived in writing, signed by the person entitled to notice thereof or by electronic transmission by such person, either before or after such meeting, and will be waived by any stockholder by his attendance thereat in person, by remote communication, if applicable, or by proxy, except when the stockholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Any stockholder so waiving notice of such meeting shall be bound by the proceedings of any such meeting in all respects as if due notice thereof had been given.

2

CRED_EXAMINER_00002487

**Section 8.    Quorum**. At all meetings of stockholders, except where otherwise provided by statute or by the Certificate of Incorporation, or by these Bylaws, the presence, in person, by remote communication, if applicable, or by proxy duly authorized, of the holders of a majority of the outstanding shares of stock entitled to vote shall constitute a quorum for the transaction of business. In the absence of a quorum, any meeting of stockholders may be adjourned, from time to time, either by the chairman of the meeting or by vote of the holders of a majority of the shares represented thereat, but no other business shall be transacted at such meeting. The stockholders present at a duly called or convened meeting, at which a quorum is present, may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum. Except as otherwise provided by statute, or by the Certificate of Incorporation or these Bylaws, in all matters other than the election of directors, the affirmative vote of a majority of shares present in person, by remote communication, if applicable, or represented by proxy duly authorized at the meeting and entitled to vote generally on the subject matter shall be the act of the stockholders. Except as otherwise provided by statute, the Certificate of Incorporation or these Bylaws, directors shall be elected by a plurality of the votes of the shares present in person, by remote communication, if applicable, or represented by proxy duly authorized at the meeting and entitled to vote generally on the election of directors. Where a separate vote by a class or classes or series is required, except where otherwise provided by the statute or by the Certificate of Incorporation or these Bylaws, a majority of the outstanding shares of such class or classes or series, present in person, by remote communication, if applicable, or represented by proxy duly authorized, shall constitute a quorum entitled to take action with respect to that vote on that matter. Except where otherwise provided by statute or by the Certificate of Incorporation or these Bylaws, the affirmative vote of the majority (plurality, in the case of the election of directors) of shares of such class or classes or series present in person, by remote communication, if applicable, or represented by proxy at the meeting shall be the act of such class or classes or series.

**Section 9.    Adjournment and Notice of Adjourned Meetings**. Any meeting of stockholders, whether annual or special, may be adjourned from time to time either by the chairman of the meeting or by the vote of a majority of the shares present in person, by remote communication, if applicable, or represented by proxy. When a meeting is adjourned to another time or place, if any, notice need not be given of the adjourned meeting if the time and place, if any, thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

**Section 10.    Voting Rights**. For the purpose of determining those stockholders entitled to vote at any meeting of the stockholders, except as otherwise provided by law, only persons in whose names shares stand on the stock records of the corporation on the record date, as provided in Section 12 of these Bylaws, shall be entitled to vote at any meeting of stockholders. Every person entitled to vote or execute consents shall have the right to do so either in person, by remote communication, if applicable, or by an agent or agents authorized by a proxy granted in accordance with Delaware law. An agent so appointed need not be a stockholder. No proxy shall be voted after three (3) years from its date of creation unless the proxy provides for a longer period.

3

CRED_EXAMINER_00002488

**Section 11.    Joint Owners of Stock.** If shares or other securities having voting power stand of record in the names of two (2) or more persons, whether fiduciaries, members of a partnership, joint tenants, tenants in common, tenants by the entirety, or otherwise, or if two (2) or more persons have the same fiduciary relationship respecting the same shares, unless the Secretary is given written notice to the contrary and is furnished with a copy of the instrument or order appointing them or creating the relationship wherein it is so provided, their acts with respect to voting shall have the following effect: (a) if only one (1) votes, his act binds all; (b) if more than one (1) votes, the act of the majority so voting binds all; (c) if more than one (1) votes, but the vote is evenly split on any particular matter, each faction may vote the securities in question proportionally, or may apply to the Delaware Court of Chancery for relief as provided in the DGCL, Section 217(b). If the instrument filed with the Secretary shows that any such tenancy is held in unequal interests, a majority or even-split for the purpose of subsection (c) shall be a majority or even-split in interest.

**Section 12.    List of Stockholders.** The Secretary shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at said meeting, arranged in alphabetical order, showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or during ordinary business hours, at the principal place of business of the corporation. In the event that the corporation determines to make the list available on an electronic network, the corporation may take reasonable steps to ensure that such information is available only to stockholders of the corporation. The list shall be open to examination of any stockholder during the time of the meeting as provided by law produced and kept at the time and place of meeting during the whole time thereof and may be inspected by any stockholder who is present.

### Section 13.    Action Without Meeting.

**(a)**    Unless otherwise provided in the Certificate of Incorporation, any action required by statute to be taken at any annual or special meeting of the stockholders, or any action which may be taken at any annual or special meeting of the stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, or by electronic transmission setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

**(b)**    Every written consent or electronic transmission shall bear the date of signature of each stockholder who signs the consent, and no written consent or electronic transmission shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered to the corporation in the manner herein required, written consents or electronic transmissions signed by a sufficient number of stockholders to take action are delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded.

4

CRED_EXAMINER_00002489

Delivery made to a corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

(c)    Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing or by electronic transmission and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of stockholders to take action were delivered to the corporation as provided in Section 228(c) of the DGCL.  If the action which is consented to is such as would have required the filing of a certificate under any section of the DGCL if such action had been voted on by stockholders at a meeting thereof, then the certificate filed under such section shall state, in lieu of any statement required by such section concerning any vote of stockholders, that written consent has been given in accordance with Section 228 of the DGCL.

(d)    An electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes of this section, provided that any such electronic transmission sets forth or is delivered with information from which the corporation can determine (i) that the electronic transmission was transmitted by the stockholder or proxyholder or by a person or persons authorized to act for the stockholder and (ii) the date on which such stockholder or proxyholder or authorized person or persons transmitted such electronic transmission.  The date on which such electronic transmission is transmitted shall be deemed to be the date on which such consent was signed.  No consent given by electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and until such paper form shall be delivered to the corporation by delivery to its registered office in the state of Delaware, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to a corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested.  Notwithstanding the foregoing limitations on delivery, consents given by electronic transmission may be otherwise delivered to the principal place of business of the corporation or to an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded if, to the extent and in the manner provided by resolution of the board of directors of the corporation.  Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

**Section 14.    Organization.**

(a)    At every meeting of stockholders, the Chairman of the Board of Directors, or, if a Chairman has not been appointed or is absent, the Chief Executive Officer, or, if the Chief Executive Officer is absent, a chairman of the meeting chosen by a majority in interest of the stockholders entitled to vote, present in person or by proxy, shall act as chairman. The Secretary, or, in his absence, an Assistant Secretary directed to do so by the Chief Executive Officer, shall act as secretary of the meeting.

CRED_EXAMINER_00002490

**(b)**    The Board of Directors of the corporation shall be entitled to make such rules or regulations for the conduct of meetings of stockholders as it shall deem necessary, appropriate or convenient. Subject to such rules and regulations of the Board of Directors, if any, the chairman of the meeting shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are necessary, appropriate or convenient for the proper conduct of the meeting, including, without limitation, establishing an agenda or order of business for the meeting, rules and procedures for maintaining order at the meeting and the safety of those present, limitations on participation in such meeting to stockholders of record of the corporation and their duly authorized and constituted proxies and such other persons as the chairman shall permit, restrictions on entry to the meeting after the time fixed for the commencement thereof, limitations on the time allotted to questions or comments by participants and regulation of the opening and closing of the polls for balloting on matters which are to be voted on by ballot. The date and time of the opening and closing of the polls for each matter upon which the stockholders will vote at the meeting shall be announced at the meeting. Unless and to the extent determined by the Board of Directors or the chairman of the meeting, meetings of stockholders shall not be required to be held in accordance with rules of parliamentary procedure.

## ARTICLE IV

## DIRECTORS

**Section 15.    Number and Term of Office.** The authorized number of directors of the corporation shall be fixed by the Board of Directors from time to time. Directors need not be stockholders unless so required by the Certificate of Incorporation. If for any cause, the directors shall not have been elected at an annual meeting, they may be elected as soon thereafter as convenient.

**Section 16.    Powers.** The powers of the corporation shall be exercised, its business conducted and its property controlled by the Board of Directors, except as may be otherwise provided by statute or by the Certificate of Incorporation.

**Section 17.    Term of Directors.**

**(a)**    Subject to the rights of the holders of any series of Preferred Stock to elect additional directors under specified circumstances, directors shall be elected at each annual meeting of stockholders for a term of one year. Each director shall serve until his successor is duly elected and qualified or until his death, resignation or removal. No decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent director.

**Section 18.    Vacancies.**

**(a)**    Unless otherwise provided in the Certificate of Incorporation, and subject to the rights of the holders of any series of Preferred Stock, any vacancies on the Board of Directors resulting from death, resignation, disqualification, removal or other causes and any newly created directorships resulting from any increase in the number of directors shall, unless

6

CRED_EXAMINER_00002491

the Board of Directors determines by resolution that any such vacancies or newly created directorships shall be filled by stockholders, be filled only by the affirmative vote of a majority of the directors then in office, even though less than a quorum of the Board of Directors. Any director elected in accordance with the preceding sentence shall hold office for the remainder of the full term of the director for which the vacancy was created or occurred and until such director's successor shall have been elected and qualified. A vacancy in the Board of Directors shall be deemed to exist under this Bylaw in the case of the death, removal or resignation of any director.

         **Section 19.**     **Resignation.** Any director may resign at any time by delivering his or her notice in writing or by electronic transmission to the Secretary, such resignation to specify whether it will be effective at a particular time, upon receipt by the Secretary or at the pleasure of the Board of Directors. If no such specification is made, it shall be deemed effective at the pleasure of the Board of Directors. When one or more directors shall resign from the Board of Directors, effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each Director so chosen shall hold office for the unexpired portion of the term of the Director whose place shall be vacated and until his successor shall have been duly elected and qualified.

         **Section 20.**    **Removal.**

         **(a)**     Subject to any limitations imposed by applicable law, the Board of Directors or any director may be removed from office at any time (i) with cause by the affirmative vote of the holders of a majority of the voting power of all then-outstanding shares of capital stock of the corporation entitled to vote generally at an election of directors or (ii) without cause by the affirmative vote of the holders of a majority of the voting power of all then-outstanding shares of capital stock of the corporation, entitled to vote generally at an election of directors.

         **Section 21.**    **Meetings.**

         **(a)**     **Regular Meetings.** Unless otherwise restricted by the Certificate of Incorporation, regular meetings of the Board of Directors may be held at any time or date and at any place within or outside of the State of Delaware which has been designated by the Board of Directors and publicized among all directors, either orally or in writing, including a voice-messaging system or other system designated to record and communicate messages, facsimile, telegraph or telex, or by electronic mail or other electronic means. No further notice shall be required for a regular meeting of the Board of Directors.

         **(b)**     **Special Meetings.** Unless otherwise restricted by the Certificate of Incorporation, special meetings of the Board of Directors may be held at any time and place within or outside of the State of Delaware whenever called by the Chairman of the Board, the President or any director.

         **(c)**     **Meetings by Electronic Communications Equipment.** Any member of the Board of Directors, or of any committee thereof, may participate in a meeting by means of

CRED_EXAMINER_00002492

conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(d)     **Notice of Special Meetings.** Notice of the time and place of all special meetings of the Board of Directors shall be orally or in writing, by telephone, including a voice messaging system or other system or technology designed to record and communicate messages, facsimile, telegraph or telex, or by electronic mail or other electronic means, during normal business hours, at least twenty-four (24) hours before the date and time of the meeting, or sent in writing to each director by first class mail, postage prepaid, at least three (3) days before the date of the meeting. Notice of any meeting may be waived in writing or by electronic transmission at any time before or after the meeting and will be waived by any director by attendance thereat, except when the director attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

(e)     **Waiver of Notice.** The transaction of all business at any meeting of the Board of Directors, or any committee thereof, however called or noticed, or wherever held, shall be as valid as though had at a meeting duly held after regular call and notice, if a quorum be present and if, either before or after the meeting, each of the directors not present who did not receive notice shall sign a written waiver of notice or shall waive notice by electronic transmission. All such waivers shall be filed with the corporate records or made a part of the minutes of the meeting.

### Section 22.    Quorum and Voting.

(a)     Unless the Certificate of Incorporation requires a greater number, a quorum of the Board of Directors shall consist of a majority of the exact number of directors fixed from time to time by the Board of Directors in accordance with the Certificate of Incorporation; provided, however, at any meeting, whether a quorum be present or otherwise, a majority of the directors present may adjourn from time to time until the time fixed for the next regular meeting of the Board of Directors, without notice other than by announcement at the meeting.

(b)     At each meeting of the Board of Directors at which a quorum is present, all questions and business shall be determined by the affirmative vote of a majority of the directors present, unless a different vote be required by law, the Certificate of Incorporation or these Bylaws.

### Section 23.    Action Without Meeting.

Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board of Directors or committee, as the case may be, consent thereto in writing or by electronic transmission, and such writing or writings or transmission or transmissions are filed with the minutes of proceedings of the Board of Directors or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

8

**Section 24.    Fees and Compensation.** Directors shall be entitled to such compensation for their services as may be approved by the Board of Directors, including, if so approved, by resolution of the Board of Directors, a fixed sum and expenses of attendance, if any, for attendance at each regular or special meeting of the Board of Directors and at any meeting of a committee of the Board of Directors. Nothing herein contained shall be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, employee, or otherwise and receiving compensation therefor.

### Section 25.    Committees.

(a)    **Executive Committee.** The Board of Directors may appoint an Executive Committee to consist of one (1) or more members of the Board of Directors. The Executive Committee, to the extent permitted by law and provided in the resolution of the Board of Directors shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to (i) approving or adopting, or recommending to the stockholders, any action or matter expressly required by the DGCL to be submitted to stockholders for approval, or (ii) adopting, amending or repealing any bylaw of the corporation.

(b)    **Other Committees.** The Board of Directors may, from time to time, appoint such other committees as may be permitted by law. Such other committees appointed by the Board of Directors shall consist of one (1) or more members of the Board of Directors and shall have such powers and perform such duties as may be prescribed by the resolution or resolutions creating such committees, but in no event shall any such committee have the powers denied to the Executive Committee in these Bylaws.

(c)    **Term Committees.** The Board of Directors, subject to any requirements of any outstanding series of Preferred Stock, the provisions of subsections (a) or (b) of this Bylaw may at any time increase or decrease the number of members of a committee or terminate the existence of a committee. The membership of a committee member shall terminate on the date of his death or voluntary resignation from the committee or from the Board of Directors. The Board of Directors may at any time for any reason remove any individual committee member and the Board of Directors may fill any committee vacancy created by death, resignation, removal or increase in the number of members of the committee. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee, and, in addition, in the absence or disqualification of any member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

(d)    **Meetings.** Unless the Board of Directors shall otherwise provide, regular meetings of the Executive Committee or any other committee appointed pursuant to this Section 25 shall be held at such times and places as are determined by the Board of Directors, or by any such committee, and when notice thereof has been given to each member of such committee, no further notice of such regular meetings need be given thereafter. Special meetings

9

CRED_EXAMINER_00002494

of any such committee may be held at any place which has been determined from time to time by such committee, and may be called by any director who is a member of such committee, upon notice to the members of such committee of the time and place of such special meeting given in the manner provided for the giving of notice to members of the Board of Directors of the time and place of special meetings of the Board of Directors. Notice of any special meeting of any committee may be waived in writing at any time before or after the meeting and will be waived by any director by attendance thereat, except when the director attends such special meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Unless otherwise provided by the Board of Directors in the resolutions authorizing the creation of the committee, a majority of the authorized number of members of any such committee shall constitute a quorum for the transaction of business, and the act of a majority of those present at any meeting at which a quorum is present shall be the act of such committee.

        **Section 26.**    **Organization.** At every meeting of the directors, the Chairman of the Board of Directors, or, if a Chairman has not been appointed or is absent, the Chief Executive Officer, or if the Chief Executive Officer is absent, the President (if a director) or, in the absence of any such person, a chairman of the meeting chosen by a majority of the directors present, shall preside over the meeting. The Secretary, or in his absence, any Assistant Secretary directed to do so by the President, shall act as secretary of the meeting.

<h3 style="text-align:center">ARTICLE V</h3>

<h3 style="text-align:center">OFFICERS</h3>

        **Section 27.**    **Officers Designated.** The officers of the corporation shall include, if and when designated by the Board of Directors, the Chairman of the Board of Directors, the President, the Chief Executive Officer, one or more Vice Presidents, the Secretary, the Chief Financial Officer, the Chief Technology Officer, the Chief Operating Officer, the Treasurer and the Controller, all of whom shall be elected at the annual organizational meeting of the Board of Directors. The Board of Directors may also appoint one or more Assistant Secretaries, Assistant Treasurers, Assistant Controllers and such other officers and agents with such powers and duties as it shall deem necessary. The Board of Directors may assign such additional titles to one or more of the officers as it shall deem appropriate. Any one person may hold any number of offices of the corporation at any one time unless specifically prohibited therefrom by law. The salaries and other compensation of the officers of the corporation shall be fixed by or in the manner designated by the Board of Directors.

        **Section 28.**    **Tenure and Duties of Officers.**

        **(a)**    **General.** All officers shall hold office at the pleasure of the Board of Directors and until their successors shall have been duly elected and qualified, unless sooner removed. Any officer elected or appointed by the Board of Directors may be removed at any time by the Board of Directors. If the office of any officer becomes vacant for any reason, the vacancy may be filled by the Board of Directors.

10

CRED_EXAMINER_00002495

(b)    **Duties of Chairman of the Board of Directors.** The Chairman of the Board of Directors, when present, shall preside at all meetings of the stockholders and the Board of Directors. The Chairman of the Board of Directors shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board of Directors shall designate from time to time. If there is no President, then the Chairman of the Board of Directors shall also serve as the Chief Executive Officer of the corporation and shall have the powers and duties prescribed in paragraph (c) of this Section 28.

(c)    **Duties of Chief Executive Officer.** The Chief Executive Officer shall serve as the chief executive officer of the corporation and shall have general and active management authority with respect to the business of the corporation and shall see that all orders and resolutions of the Board of Directors are carried into effect; subject, however, to the right of the directors to delegate specific powers, except those exclusively conferred by statute on the Chief Executive Officer or President, to any other officer or officers of the corporation. He or she shall be authorized to execute bonds, mortgages and other contracts requiring a seal, under the seal of the Corporation. He or she shall be EX-OFFICIO a member of all committees.

(d)    **Duties of President.** The President shall preside at all meetings of the stockholders and at all meetings of the Board of Directors, unless the Chairman of the Board of Directors has been appointed and is present. Unless some other officer has been elected Chief Executive Officer of the corporation, the President shall be the Chief Executive Officer of the corporation and shall, subject to the control of the Board of Directors, have general supervision, direction and control of the business and officers of the corporation. The President shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board of Directors shall designate from time to time.

(e)    **Duties of Chief Operating Officer.** The Chief Operating Officer may assume and perform the duties of the President in the absence or disability of the President or whenever the office of President is vacant, the Chief Operating Officer shall also perform such other duties and have such powers as the Board of Directors shall designate from time to time.

(f)    **Duties of Chief Financial Officer.** The Chief Financial Officer shall keep or cause to be kept the books of account of the corporation in a thorough and proper manner and shall render statements of the financial affairs of the corporation in such form and as often as required by the Board of Directors or the President. The Chief Financial Officer, subject to the order of the Board of Directors, shall have the custody of all funds and securities of the corporation. The Chief Financial Officer shall perform other duties commonly incident to his office and shall also perform such other duties and have such other powers as the Board of Directors or the President shall designate from time to time. The President may direct the Treasurer or any Assistant Treasurer, or the Controller or any Assistant Controller to assume and perform the duties of the Chief Financial Officer in the absence or disability of the Chief Financial Officer, and each Treasurer and Assistant Treasurer and each Controller and Assistant Controller shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board of Directors or the President shall designate from time to time.

11

CRED_EXAMINER_00002496

(g)    **Duties of Vice Presidents.** The Vice Presidents may assume and perform the duties of the Chief Operating Officer in the absence or disability of the Chief Operating Officer or whenever the office of the Chief Operating Officer is vacant. The Vice Presidents shall perform other duties commonly incident to their office and shall also perform such other duties and have such other powers as the Board of Directors or the President shall designate from time to time.

(h)    **Duties of Secretary.** The Secretary shall attend all meetings of the stockholders and of the Board of Directors and shall record all acts and proceedings thereof in the minute book of the corporation. The Secretary shall give notice in conformity with these Bylaws of all meetings of the stockholders and of all meetings of the Board of Directors and any committee thereof requiring notice. The Secretary shall perform all other duties provided for in these Bylaws and other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board of Directors shall designate from time to time. The President may direct any Assistant Secretary to assume and perform the duties of the Secretary in the absence or disability of the Secretary, and each Assistant Secretary shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board of Directors or the President shall designate from time to time.

**Section 29.    Delegation of Authority.** The Board of Directors may from time to time delegate the powers or duties of any officer to any other officer or agent, notwithstanding any provision hereof.

**Section 30.    Resignations.** Any officer may resign at any time by giving notice in writing or by electronic transmission notice to the Board of Directors or to the President or to the Secretary. Any such resignation shall be effective when received by the person or persons to whom such notice is given, unless a later time is specified therein, in which event the resignation shall become effective at such later time. Unless otherwise specified in such notice, the acceptance of any such resignation shall not be necessary to make it effective. Any resignation shall be without prejudice to the rights, if any, of the corporation under any contract with the resigning officer.

**Section 31.    Removal.** Any officer may be removed from office at any time, either with or without cause, by the affirmative vote of a majority of the directors in office at the time, or by the unanimous written consent of the directors in office at the time, or by any committee or superior officers upon whom such power of removal may have been conferred by the Board of Directors.

## ARTICLE VI

### EXECUTION OF CORPORATE INSTRUMENTS AND VOTING OF SECURITIES OWNED BY THE CORPORATION

**Section 32.    Execution of Corporate Instruments.** The Board of Directors may, in its discretion, determine the method and designate the signatory officer or officers, or other person or persons, to execute on behalf of the corporation any corporate instrument or document, or to sign on behalf of the corporation the corporate name without limitation, or to

12

CRED_EXAMINER_00002497

enter into contracts on behalf of the corporation, except where otherwise provided by law or these Bylaws, and such execution or signature shall be binding upon the corporation.

All checks and drafts drawn on banks or other depositaries on funds to the credit of the corporation or in special accounts of the corporation shall be signed by such person or persons as the Board of Directors shall authorize so to do.

Unless authorized or ratified by the Board of Directors or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

**Section 33.   Voting of Securities Owned by the Corporation.** All stock and other securities of other corporations owned or held by the corporation for itself, or for other parties in any capacity, shall be voted, and all proxies with respect thereto shall be executed, by the person authorized so to do by resolution of the Board of Directors, or, in the absence of such authorization, by the Chairman of the Board of Directors, the Chief Executive Officer, the President, or any Vice President.

## ARTICLE VII

## SHARES OF STOCK

**Section 34.   Form and Execution of Certificates.** Certificates for the shares of stock of the corporation shall be in such form as is consistent with the Certificate of Incorporation and applicable law. Every holder of stock in the corporation shall be entitled to have a certificate signed by or in the name of the corporation by the Chairman of the Board of Directors, or the President or any Vice President and by the Treasurer or Assistant Treasurer or the Secretary or Assistant Secretary, certifying the number of shares owned by him in the corporation. Any or all of the signatures on the certificate may be facsimiles. In case any officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent, or registrar before such certificate is issued, it may be issued with the same effect as if he were such officer, transfer agent, or registrar at the date of issue. Each certificate shall state upon the face or back thereof, in full or in summary, all of the powers, designations, preferences, and rights, and the limitations or restrictions of the shares authorized to be issued or shall, except as otherwise required by law, set forth on the face or back a statement that the corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional, or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights. Within a reasonable time after the issuance or transfer of uncertificated stock, the corporation shall send to the registered owner thereof a written notice containing the information required to be set forth or stated on certificates pursuant to this section or otherwise required by law or with respect to this section a statement that the corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

13

**Section 35.    Lost Certificates.**  A new certificate or certificates shall be issued in place of any certificate or certificates theretofore issued by the corporation alleged to have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen, or destroyed.  The corporation may require, as a condition precedent to the issuance of a new certificate or certificates, the owner of such lost, stolen, or destroyed certificate or certificates, or the owner's legal representative, to agree to indemnify the corporation in such manner as it shall require or to give the corporation a surety bond in such form and amount as it may direct as indemnity against any claim that may be made against the corporation with respect to the certificate alleged to have been lost, stolen, or destroyed.

**Section 36.    Transfers.**

(a)    Transfers of record of shares of stock of the corporation shall be made only upon its books by the holders thereof, in person or by attorney duly authorized, and upon the surrender of a properly endorsed certificate or certificates for a like number of shares.

(b)    The corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the corporation to restrict the transfer of shares of stock of the corporation of any one or more classes owned by such stockholders in any manner not prohibited by the DGCL.

**Section 37.    Fixing Record Dates.**

(a)    In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix, in advance, a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall, subject to applicable law, not be more than sixty (60) nor less than ten (10) days before the date of such meeting.  If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

(b)    In order that the corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors.  Any stockholder of record seeking to have the stockholders authorize or take corporate action by written consent shall, by written notice to the Secretary, request the Board of Directors to fix a record date.  The Board of Directors shall promptly, but in all events within ten (10) days after the date on which such a request is received, adopt a resolution fixing the record date.  If no record date has been fixed by the Board of Directors within ten (10) days of

14

the date on which such a request is received, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by applicable law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(c)    In order that the corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 38.    Registered Stockholders. The corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

## ARTICLE VIII

## OTHER SECURITIES OF THE CORPORATION

Section 39.    Execution of Other Securities. All bonds, debentures and other corporate securities of the corporation, other than stock certificates (covered in Section 34), may be signed by the Chairman of the Board of Directors, the President or any Vice President, or such other person as may be authorized by the Board of Directors, and the corporate seal impressed thereon or a facsimile of such seal imprinted thereon and attested by the signature of the Secretary or an Assistant Secretary, or the Chief Financial Officer or Treasurer or an Assistant Treasurer; provided, however, that where any such bond, debenture or other corporate security shall be authenticated by the manual signature, or where permissible facsimile signature, of a trustee under an indenture pursuant to which such bond, debenture or other corporate security shall be issued, the signatures of the persons signing and attesting the corporate seal on such bond, debenture or other corporate security may be the imprinted facsimile of the signatures of such persons. Interest coupons appertaining to any such bond, debenture or other corporate security, authenticated by a trustee as aforesaid, shall be signed by the Treasurer or an Assistant Treasurer of the corporation or such other person as may be authorized by the Board of

15

Directors, or bear imprinted thereon the facsimile signature of such person. In case any officer who shall have signed or attested any bond, debenture or other corporate security, or whose facsimile signature shall appear thereon or on any such interest coupon, shall have ceased to be such officer before the bond, debenture or other corporate security so signed or attested shall have been delivered, such bond, debenture or other corporate security nevertheless may be adopted by the corporation and issued and delivered as though the person who signed the same or whose facsimile signature shall have been used thereon had not ceased to be such officer of the corporation.

## ARTICLE IX

### DIVIDENDS

**Section 40.    Declaration of Dividends.** Dividends upon the capital stock of the corporation, subject to the provisions of the Certificate of Incorporation and applicable law, if any, may be declared by the Board of Directors pursuant to law at any regular or special meeting. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation and applicable law.

**Section 41.    Dividend Reserve.** Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the Board of Directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or for such other purpose as the Board of Directors shall think conducive to the interests of the corporation, and the Board of Directors may modify or abolish any such reserve in the manner in which it was created.

## ARTICLE X

### FISCAL YEAR

**Section 42.    Fiscal Year.** The fiscal year of the corporation shall be fixed by resolution of the Board of Directors.

## ARTICLE XI

### INDEMNIFICATION

**Section 43.    Indemnification of Directors, Executive Officers, Other Officers, Employees and Other Agents.**

(a)    **Directors and Officers.** The corporation shall indemnify its directors and officers to the fullest extent not prohibited by the DGCL or any other applicable law; provided, however, that the corporation may modify the extent of such indemnification by individual contracts with its directors; and, provided, further, that the corporation shall not be required to indemnify any director or officer in connection with any proceeding (or part thereof) initiated by such person unless (i) such indemnification is expressly required to be made by law, (ii) the proceeding was authorized by the Board of Directors of the corporation, (iii) such

16

indemnification is provided by the corporation, in its sole discretion, pursuant to the powers vested in the corporation under the Delaware General Corporation Law or any other applicable law or (iv) such indemnification is required to be made under subsection (d).

> (b)     **Employees and Other Agents.**  The corporation shall have power to indemnify its employees and other agents as set forth in the DGCL or any other applicable law. The Board of Directors shall have the power to delegate the determination of whether indemnification shall be given to any such person as the Board of Directors shall determine.

> (c)     **Expenses.**  The corporation shall advance to any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, prior to the final disposition of the proceeding, promptly following request therefor, all expenses incurred by any director or officer in connection with such proceeding, provided, however, that, if the DGCL requires, an advancement of expenses incurred by a director or officer in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the corporation of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such expenses under this Section 43 or otherwise.

Notwithstanding the foregoing, unless otherwise determined pursuant to paragraph (e) of this Bylaw, no advance shall be made by the corporation to an officer of the corporation (except by reason of the fact that such officer is or was a director of the corporation, in which event this paragraph shall not apply) in any action, suit or proceeding, whether civil, criminal, administrative or investigative, if a determination is reasonably and promptly made (i)  a majority vote of a quorum consisting of directors who were not parties to the proceeding, even if not a quorum, or (ii) by a committee of such directors designated by a majority of such directors, even though less than a quorum, or (iii) if there are no such directors, or such directors so direct, by independent legal counsel in a written opinion, that the facts known to the decision-making party at the time such determination is made demonstrate clearly and convincingly that such person acted in bad faith or in a manner that such person did not believe to be in or not opposed to the best interests of the corporation.

> (d)     **Enforcement.**  Without the necessity of entering into an express contract, all rights to indemnification and advances to directors and officers under this Bylaw shall be deemed to be contractual rights and be effective to the same extent and as if provided for in a contract between the corporation and the director or officer. Any right to indemnification or advances granted by this Bylaw to a director or officer shall be enforceable by or on behalf of the person holding such right in any court of competent jurisdiction if (i) the claim for indemnification or advances is denied, in whole or in part, or (ii) no disposition of such claim is made within ninety (90) days of request therefor. The claimant in such enforcement action, if successful in whole or in part, shall be entitled to be paid also the expense of prosecuting the claim. In connection with any claim for indemnification, the corporation shall be entitled to raise

17

as a defense to any such action that the claimant has not met the standards of conduct that make it permissible under the DGCL or any other applicable law for the corporation to indemnify the claimant for the amount claimed. In connection with any claim by an officer of the corporation (except in any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such officer is or was a director of the corporation) for advances, the corporation shall be entitled to raise a defense as to any such action clear and convincing evidence that such person acted in bad faith or in a manner that such person did not believe to be in or not opposed to the best interests of the corporation, or with respect to any criminal action or proceeding that such person acted without reasonable cause to believe that his conduct was lawful. Neither the failure of the corporation (including its Board of Directors, independent legal counsel or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he has met the applicable standard of conduct set forth in the DGCL or any other applicable law, nor an actual determination by the corporation (including its Board of Directors, independent legal counsel or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that claimant has not met the applicable standard of conduct.

(e)     **Non Exclusivity of Rights.** The rights conferred on any person by this Bylaw shall not be exclusive of any other right which such person may have or hereafter acquire under any applicable statute, provision of the Certificate of Incorporation, Bylaws, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding office. The corporation is specifically authorized to enter into individual contracts with any or all of its directors, officers, employees or agents respecting indemnification and advances, to the fullest extent not prohibited by the DGCL or any other applicable law.

(f)     **Survival of Rights.** The rights conferred on any person by this Bylaw shall continue as to a person who has ceased to be a director, officer, employee or other agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

(g)     **Insurance.** To the fullest extent permitted by the DGCL, or any other applicable law, the corporation, upon approval by the Board of Directors, may purchase insurance on behalf of any person required or permitted to be indemnified pursuant to this Bylaw.

(h)     **Amendments.** Any repeal or modification of this Bylaw shall only be prospective and shall not affect the rights under this Bylaw in effect at the time of the alleged occurrence of any action or omission to act that is the cause of any proceeding against any agent of the corporation.

(i)     **Saving Clause.** If this Bylaw or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the corporation shall nevertheless indemnify each director and officer to the full extent not prohibited by any applicable portion of this Bylaw that shall not have been invalidated, or by any other applicable law. If this Section 43 shall be invalid due to the application of the indemnification provisions of another jurisdiction,

CRED_EXAMINER_00002503

then the corporation shall indemnify each director and officer to the full extent under applicable law.

(j)     **Certain Definitions.**  For the purposes of this Bylaw, the following definitions shall apply:

(1)     The term "proceeding" shall be broadly construed and shall include, without limitation, the investigation, preparation, prosecution, defense, settlement, arbitration and appeal of, and the giving of testimony in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative.

(2)     The term "expenses" shall be broadly construed and shall include, without limitation, court costs, attorneys' fees, witness fees, fines, amounts paid in settlement or judgment and any other costs and expenses of any nature or kind incurred in connection with any proceeding.

(3)     The term the "corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Bylaw with respect to the resulting or surviving corporation as he would have with respect to such constituent corporation if its separate existence had continued.

(4)     References to a "director," "executive officer," "officer," "employee," or "agent" of the corporation shall include, without limitation, situations where such person is serving at the request of the corporation as, respectively, a director, executive officer, officer, employee, trustee or agent of another corporation, partnership, joint venture, trust or other enterprise.

(5)     References to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "serving at the request of the corporation" shall include any service as a director, officer, employee or agent of the corporation which imposes duties on, or involves services by, such director, officer, employee, or agent with respect to an employee benefit plan, its participants, or beneficiaries; and a person who acted in good faith and in a manner he reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the corporation" as referred to in this Bylaw.

19

## ARTICLE XII

## NOTICES

**Section 44.    Notices.**

(a)    **Notice to Stockholders.** Whenever, under any provisions of these Bylaws, notice is required to be given to any stockholder, it shall be given in writing, timely and duly deposited in the United States mail, postage prepaid, and addressed to his last known post office address as shown by the stock record of the corporation or its transfer agent.

(b)    **Notice to Directors.** Any notice required to be given to any director may be given by the method stated in subsection (a), or as provided for in Section 21 of these Bylaws. If such notice is not delivered personally, it shall be sent to such address as such director shall have filed in writing with the Secretary, or, in the absence of such filing, to the last known post office address of such director.

(c)    **Affidavit of Mailing.** An affidavit of mailing, executed by a duly authorized and competent employee of the corporation or its transfer agent appointed with respect to the class of stock affected or other agent, specifying the name and address or the names and addresses of the stockholder or stockholders, or director or directors, to whom any such notice or notices was or were given, and the time and method of giving the same, shall in the absence of fraud, be prima facie evidence of the facts therein contained.

(d)    **Methods of Notice.** It shall not be necessary that the same method of giving notice be employed in respect of all recipients of notice, but one permissible method may be employed in respect of any one or more, and any other permissible method or methods may be employed in respect of any other or others.

(e)    **Notice to Person with Whom Communication Is Unlawful.** Whenever notice is required to be given, under any provision of law or of the Certificate of Incorporation or Bylaws of the corporation, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting which shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given. In the event that the action taken by the corporation is such as to require the filing of a certificate under any provision of the DGCL, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

## ARTICLE XIII

## AMENDMENTS

**Section 45.    Amendments.** The Board of Directors is expressly empowered to adopt, amend or repeal Bylaws of the corporation. The stockholders shall also have power to adopt, amend or repeal the Bylaws of the corporation; provided, however, that, in addition to any

20

vote of the holders of any class or series of stock of the corporation required by law or by this Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the voting power of all of the then-outstanding shares of the capital stock of the corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required to adopt, amend or repeal any provision of the Bylaws of the corporation.

## ARTICLE XIV
## LOANS TO OFFICERS; RIGHT OF FIRST REFUSAL

**Section 46.** **Loans to Officers**. The corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the corporation or of its subsidiaries, including any officer or employee who is a Director of the corporation or its subsidiaries, whenever, in the judgment of the Board of Directors, such loan, guarantee or assistance may reasonably be expected to benefit the corporation. The loan, guarantee or other assistance may be with or without interest and may be unsecured, or secured in such manner as the Board of Directors shall approve, including, without limitation, a pledge of shares of stock of the corporation. Nothing in these Bylaws shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the corporation at common law or under any statute.

**Section 47.** **Right of First Refusal**. No stockholder shall sell, assign, pledge, or in any manner transfer any of the shares of stock, of the corporation or any right or interest therein, whether voluntarily or by operation of law, or by gift or otherwise, except by a transfer that meets the requirements hereinafter set forth in this bylaw:

(a)    If the stockholder desires to sell or otherwise transfer any of such stockholder's shares of stock, then the stockholder shall first give written notice thereof to the corporation. The notice shall name the proposed transferee and state the number of shares to be transferred, the proposed consideration, and all other terms and conditions of the proposed transfer.

(b)    The corporation may assign its rights hereunder.

(c)    In the event the corporation and/or its assignee(s) elect to acquire any of the shares of the transferring stockholder as specified in such transferring stockholder's notice, the Secretary of the corporation shall so notify the transferring stockholder and settlement thereof shall be made in cash within thirty (30) days after the Secretary of the corporation receives such transferring stockholder's notice; provided that if the terms of payment set forth in such transferring stockholder's notice were other than cash against delivery, the corporation and/or its assignee(s) shall pay for such shares on the same terms and conditions set forth in such transferring stockholder's notice.

(d)    In the event the corporation and/or its assignees(s) do not elect to acquire all of the shares specified in the transferring stockholder's notice, such transferring stockholder may, within the sixty-day period following the expiration of the option rights granted to the corporation and/or its assignees(s) herein, transfer the shares specified in such transferring stockholder's notice which were not acquired by the corporation and/or its assignees(s) as specified in such transferring stockholder's notice. All shares so sold by such transferring

21

CRED_EXAMINER_00002506

stockholder shall continue to be subject to the provisions of this bylaw in the same manner as before such transfer.

(e)    Anything to the contrary contained herein notwithstanding, the following transactions shall be exempt from the provisions of this bylaw:

(1)    A stockholder's transfer of any or all shares held either during such stockholder's lifetime or on death by will or intestacy to such stockholder's immediate family or to any custodian or trustee for the account of such stockholder or such stockholder's immediate family or to any limited partnership or limited liability company of which the stockholder, members of such stockholder's immediate family or any trust for the account of such stockholder or such stockholder's immediate family will be the general or limited partner(s) of such partnership or member(s) of such limited liability company. "Immediate family" as used herein shall mean spouse, lineal descendant, father, mother, brother, or sister of the stockholder making such transfer.

(2)    A stockholder's bona fide pledge or mortgage of any shares with a commercial lending institution, provided that any subsequent transfer of such shares by such institution shall be conducted in the manner set forth in this bylaw.

(3)    A stockholder's transfer of any or all of such stockholder's shares to the corporation or to any other stockholder of the corporation.

(4)    A stockholder's transfer of any or all of such stockholder's shares to a person who, at the time of such transfer, is an officer or director of the corporation.

(5)    A corporate stockholder's transfer of any or all of its shares pursuant to and in accordance with the terms of any merger, consolidation, reclassification of shares or capital reorganization of the corporate stockholder, or pursuant to a sale of all or substantially all of the stock or assets of a corporate stockholder.

(6)    A corporate stockholder's transfer of any or all of its shares to any or all of its stockholders.

(7)    A transfer by a stockholder which is a limited or general partnership to any or all of its partners or former partners.

(8)    A transfer by a stockholder which is a limited liability company to any or all of its members or former members.

In any such case, the transferee, assignee, or other recipient shall receive and hold such stock subject to the provisions of this bylaw, and there shall be no further transfer of such stock except in accord with this bylaw.

(f)    The provisions of this bylaw may be waived with respect to any transfer either by the corporation, upon duly authorized action of its Board of Directors, or by the stockholders, upon the express written consent of the owners of a majority of the voting power of the corporation (excluding the votes represented by those shares to be transferred by the

22

CRED_EXAMINER_00002507

transferring stockholder). This bylaw may be amended or repealed either by a duly authorized action of the Board of Directors or by the stockholders, upon the express written consent of the owners of a majority of the voting power of the corporation.

(g)    Any sale or transfer, or purported sale or transfer, of securities of the corporation shall be null and void unless the terms, conditions, and provisions of this bylaw are strictly observed and followed.

(h)    The foregoing right of first refusal shall terminate on either of the following dates, whichever shall first occur:

(1)    On Ten Years From Date of Adoption; or

(2)    Upon the date securities of the corporation are first offered to the public pursuant to a registration statement filed with, and declared effective by, the United States Securities and Exchange Commission under the Securities Act of 1933, as amended.

(i)    The certificates representing shares of stock of the corporation shall bear on their face the following legend so long as the foregoing right of first refusal remains in effect:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE
SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN
FAVOR OF THE CORPORATION AND/OR ITS ASSIGNEE(S),
AS PROVIDED IN THE BYLAWS OF THE CORPORATION."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CRED_EXAMINER_00002508

# Exhibit J

CRED_EXAMINER_00002509

DocuSign Envelope ID: B8772005-536E-4DA8-AFA9-99520440F200

# CRED CAPITAL, INC.

## ACTION BY UNANIMOUS WRITTEN CONSENT

## OF THE BOARD OF DIRECTORS

In accordance with Section 141(f) of the Delaware General Corporation Law and the Bylaws of Cred Capital, Inc., a Delaware corporation (the "***Company***"), the undersigned, constituting all of the members of the Company's Board of Directors (the "***Board***"), hereby take the following actions and adopt the following resolutions by unanimous written consent without a meeting:

1.  **Incorporator**

    **RESOLVED:**  That every action taken by the incorporator of the Company and any person for whom or on whose behalf the incorporator was acting in accordance with Section 108(b) of the Delaware General Corporation Law (the "***DGCL***"), including the execution of the Certificate of Incorporation of the Company and the filing thereof with the Secretary of State of the State of Delaware, the adoption of the initial Bylaws of the Company, and the appointment of the undersigned as the initial directors of the Company be, and hereby is, ratified, confirmed, approved and adopted.

2.  **Minute Book**

    **RESOLVED:**  That the Company shall maintain as part of its corporate records a book, in electronic or physical form, entitled "Minute Book" which shall include, but not be limited to, (i) a record of its Certificate of Incorporation and amendments thereto, (ii) its Bylaws and amendments thereto, (iii) minutes of all meetings of its directors and of its stockholders, and (iv) its stock list and stock ledger.

3.  **Election of Officers**

    **RESOLVED:**  That the following persons are elected as officers of the Company to the office(s) set forth opposite their respective names, to serve at the pleasure of the Board:

    | Name | Title |
    | --- | --- |
    | Daniel B. Schatt | President and Chief Executive Officer |
    | Joseph Podulka | Chief Financial Officer and Treasurer |
    | Daniel Wheeler | Secretary |

4.  **Board of Directors**

    **RESOLVED:**  Pursuant to Section 15 of Article IV of the Bylaws of the Company, the Board shall consist of two (2) directors.

CRED_EXAMINER_00002510

DocuSign Envelope ID: B8772005-536E-4DA8-AFA9-99520440F200

5.    **Uncertificated Stock**

**RESOLVED:**  That the shares of the Company shall be uncertificated and when issued, ownership of record of capital stock shall be maintained in a stock ledger, provided that the Company may issue certificated shares for some or all of any or all classes or series of its stock if deemed advisable and in the best interests of the Company by the officers or upon request as provided in the Bylaws of the Company.

**RESOLVED FURTHER:**  That the officers are authorized and directed to send a written notice to record owners of shares of uncertificated stock in accordance with Section 158 of the DGCL (upon the request of such record owner) substantially in the form provided herewith to the Board with such changes deemed necessary or advisable by the officers.

6.    **Voiding of Prior Purported Stock Issuances**

**RESOLVED:**  That all shares of capital stock of the Company that were purported to have been authorized and/or issued prior to the date of these resolutions, including without limitation, (i) the 5,000,000 shares of Class B Common Stock purportedly issued on March 16, 2020 pursuant to that certain Contribution Agreement by and between the Company and Cred LLC, and (ii) the 450,045 shares of Series A Preferred Stock purportedly sold on April 1, 2020, are hereby determined to be void, it having been determined that the purported issuance of such putative shares of capital stock was not effected in compliance with Sections 141, 152 and 153 of the DGCL, due to, among other things, the fact that the board of directors had not been duly constituted at the time of such purported issuance.

**RESOLVED FURTHER**: That all agreements and understandings providing for the sale or other issuance of capital stock of the Company are hereby determined to be void, it having been determined that any such agreements and understandings were not duly authorized by or on behalf of the Company due to, among other things, the fact that the board of directors had not been duly constituted at the time any such putative agreements or understandings were entered into or made.

7.    **Sale and Issuance of Class A Common Stock**

**RESOLVED:**  That the officers of the Company be, and they hereby are, authorized to issue an aggregate of 1,000 shares of Class A Common Stock, par value $0.00001 per share ("***Class A Common Stock***"), of the Company to Cred Inc. for aggregate consideration of $0.01.

**RESOLVED FURTHER**: That said 1,000 shares of Class A Common Stock, upon payment in full and issuance as aforesaid, shall be and become duly authorized, validly issued, fully paid and nonassessable shares of Class A Common Stock.

**RESOLVED FURTHER**: That the aggregate par value of the shares of Class A Common Stock issued as aforesaid be designated as capital of the Company.

LEGAL_US_E # 149014513.3

CRED_EXAMINER_00002511

DocuSign Envelope ID: B8772005-536E-4DA8-AFA9-99520440F200

**RESOLVED FURTHER:** That the sale and issuance of such 1,000 shares of Class A Common Stock as authorized in the above resolution shall be made pursuant to a subscription agreement in substantially the form attached hereto as **Exhibit A**.

**RESOLVED FURTHER:** That, upon the Company's receipt of a fully executed subscription agreement and the consideration provided for therein, the Company is authorized and directed to issue the Shares.

**RESOLVED FURTHER:** That it is desirable and in the best interest of the Company that its securities be qualified or registered for sale in various states; that the President and the Secretary or any Assistant Secretary hereby are authorized to determine the states in which appropriate action shall be taken to qualify or register for sale all or such part of the securities of the Company as said officers may deem advisable; that said officers are hereby authorized to perform on behalf of the Company any and all such acts as they deem necessary or advisable in order to comply with the applicable laws of any such states, and in connection therewith to execute and file all requisite papers and documents, including, but not limited to, applications, reports, surety bonds, irrevocable consents and appointments of attorneys for service of process; and the execution by such officers of any such paper or document or the doing by them of any act in connection with the foregoing matters shall conclusively establish their authority from the Company and the approval and ratification by the Company of the papers and documents so executed and the action so taken.

**RESOLVED FURTHER:** That the sale of such 1,000 shares of Class A Common Stock authorized in the above resolution shall be conducted in such a manner as to qualify for the exemption from applicable state requirements regarding registration of the sale of securities.

**RESOLVED FURTHER:** That the officers and their designees or agents are authorized and directed to execute and file a form of notification advising the applicable state law authority of the issuance of such 1,000 shares of Class A Common Stock pursuant to applicable state securities laws.

8.    **Employer Identification Number**

**RESOLVED:** That the officers are authorized and directed to apply for an employer identification number on IRS Form SS-4, unless the Incorporator of the Company has previously made such application.

9.    **Fiscal Year**

**RESOLVED:** That the fiscal year of the Company shall end on December 31 of each year.

CRED_EXAMINER_00002512

DocuSign Envelope ID: B8772005-536E-4DA8-AFA9-99520440F200

10.  **Incorporation Expenses**

**RESOLVED:** That the officers are authorized and directed to pay the expenses of incorporation and organization of the Company and the expenses incurred in the formation of the Company.

**RESOLVED FURTHER:** That the Company elects to deduct currently its organizational expenses, as that term is defined by Section 248 of the Internal Revenue Code of 1986, as amended (the "Code"), to the maximum extent provided in Section 248 of the Code and to amortize the balance of its organizational expenses over a period of one hundred eighty (180) months beginning with the month in which the Company begins business; and that the officers are authorized and directed to take such action as necessary to effectuate this election.

11.  **Withholding Taxes**

**RESOLVED:** That the officers are authorized and directed to consult with the bookkeeper, auditors and attorneys of the Company in order to be fully informed as to, and to collect and pay promptly when due, all withholding taxes for which the Company may now be (or hereafter become) liable.

12.  **Qualification to Do Business**

**RESOLVED:** That the officers of the Company are authorized to take any and all steps that they deem to be necessary to qualify the Company to do business as a foreign corporation in each state that the officers determine such qualification to be necessary or appropriate.

13.  **Management of Fiscal Affairs**

**RESOLVED:** That the officers of the Company are authorized and directed, in their discretion, to select and designate from time to time one or more banks or other financial institutions as a depository of funds of the Company, and that the proper officers are authorized to open and maintain, in the name of the Company, a checking, savings, safe deposit, payroll or other account or accounts with said depository.

**RESOLVED FURTHER:** That the standard form of corporate banking or financial resolutions of such banks or financial institutions necessary to accomplish the foregoing resolution and showing the persons authorized to draw on such account, are approved and adopted as the resolutions of this Board, and the officers are authorized to execute, certify, and deliver a copy thereof to such banks or financial institutions as the resolutions of this Company.

14.  **Amendment and Restatement of Certificate of Incorporation**

**RESOLVED:** That the Board hereby determines that it is advisable and in the best interests of the Company and its stockholders to amend and restate the Certificate of Incorporation of the Company to simplify the capital structure as set forth in the form of

LEGAL_US_E # 149014513.3

CRED_EXAMINER_00002513

DocuSign Envelope ID: B8772005-536E-4DA8-AFA9-99520440F200

Amended and Restated Certificate of Incorporation attached hereto as **Exhibit B** (the "*Restated Certificate*").

**RESOLVED FURTHER:** That the Restated Certificate is adopted and approved and that the Restated Certificate be recommended to the sole stockholder of the Company as of immediately following the consummation of the sale and issuance of the 1,000 shares of Class A Common Stock as provided herein for approval and adoption.

**RESOLVED FURTHER:** That, subject to the adoption of the Restated Certificate by the sole holder of Class A Common Stock entitled to vote thereon, the officers of the Company are authorized and directed to take all steps necessary to file the Restated Certificate with the Delaware Secretary of State.

**RESOLVED FURTHER:** That, notwithstanding approval of the Restated Certificate by the stockholders of the Company, the Board may, at any time prior to the filing of the Restated Certificate with the Secretary of State, abandon the filing of the Restated Certificate without further action by the stockholders of the Company.

15. **Omnibus Resolution**

**RESOLVED:** That each of the officers is authorized and empowered to take all such actions (including, without limitation, soliciting appropriate consents or waivers from stockholders) and to execute and deliver all such documents as may be necessary or advisable to carry out the intent and accomplish the purposes of the foregoing resolutions and to effect any transactions contemplated thereby and the performance of any such actions and the execution and delivery of any such documents shall be conclusive evidence of the approval of the Board thereof and all matters relating thereto.

*[Signature Page Follows]*

LEGAL_US_E # 149014513.3

CRED_EXAMINER_00002514

DocuSign Envelope ID: B8772005-536E-4DA8-AFA9-99520440F200

The consent of the undersigned shall be effective immediately upon the election of the undersigned as directors of the corporation; provided, however, that if such event has already occurred before the time of execution of this consent by the undersigned, then this consent shall be effective immediately. This consent shall be deemed revoked if it has not become effective within 60 days of the Actual Date of Signature below, which Actual Date of Signature is the date on which provision for the effectiveness of this consent has been made.

Actual Date of Signature:

6/22/2020

DocuSigned by:

Dan Schatt

4E836EB01469...

Daniel B. Schatt

Actual Date of Signature:

6/22/2020

DocuSigned by:

Joseph Podulka

B2CE29393D4DA...

Joseph Podulka

CRED_EXAMINER_00002515

DocuSign Envelope ID: B8772005-536E-4DA8-AFA9-99520440F200

## EXHIBIT A

### FORM OF SUBSCRIPTION AGREEMENT

[Separately provided]

CRED_EXAMINER_00002516

# CRED CAPITAL, INC.
## SUBSCRIPTION AGREEMENT

**THIS SUBSCRIPTION AGREEMENT** (this "**Subscription Agreement**") is made as of June __, 2020, by and among Cred Capital, Inc., a Delaware corporation (the "**Company**"), and Cred Inc., a Delaware corporation (the "**Subscriber**"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Amended and Restated Certificate of Incorporation of the Company, dated as of June __, 2020 (the "**Certificate**").

## RECITALS

The Subscriber is willing to purchase, and the Company is willing to issue and sell to the Subscriber, 1,000 shares of the Common Stock of the Company, par value $0.00001 per share (the "**Shares**"), subject to the terms and conditions set forth herein and in the Certificate.

## AGREEMENT

In consideration of the foregoing, and the representations, warranties, covenants and conditions set forth in this Subscription Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I.
## SUBSCRIPTION FOR SHARES

1.1     <u>Purchase</u>.  On the date hereof, upon the terms and subject to the conditions contained herein, the Company hereby sells to the Subscriber, and the Subscriber hereby purchased from the Company, the Shares in exchange for a purchase price per share of $0.00001, for an aggregate purchase price of $0.01.

## ARTICLE II.
## REPRESENTATIONS BY AND COVENANTS OF SUBSCRIBER

2.1     The Subscriber has full legal capacity, power and authority to execute and deliver this Agreement and to perform such Subscriber's obligations hereunder.

2.2     The Subscriber recognizes that an investment in the Company and the purchase of the Shares involves a high degree of risk and that only investors who can afford the loss of their entire investment should consider making an investment.

2.3     The Subscriber represents and warrants that it is an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under the United States Securities Act of 1933, as amended (the "**Act**"), and that it is able to bear the economic risk of an investment in the Shares. The Subscriber agrees to hold the Company and its directors, officers and controlling persons and their respective heirs, representatives, successors and assigns harmless and to indemnify them against all liabilities, costs and expenses incurred by them as a result of any misrepresentation made by it contained herein.

LEGAL_US_E # 149014897.2

CRED_EXAMINER_00002517

2.4    The Subscriber acknowledges that it has prior investment experience, including investment in non-listed and non-registered securities, has made an investigation of the pertinent facts relating to the operation of the Company and has reviewed the terms of the Certificate to the extent such Subscriber deems necessary, or such Subscriber has employed the services of an investment advisor, attorney or accountant to evaluate the merits and risks of such an investment on its behalf, and that such Subscriber recognizes the highly speculative nature of this investment.

2.5    The Subscriber acknowledges that it must retain its own professional advisors to evaluate the tax and other consequences of an investment in the Shares.

2.6    The Subscriber represents that any Shares purchased pursuant to this Subscription Agreement are being purchased for its own account, for investment and not for distribution or resale to others.  Except as permitted by the Certificate, the Subscriber will not assign any or all of such Shares or any beneficial interest therein, in whole or in part, to any other person.

2.7    The Subscriber understands that there is no public market for the Shares and that a public market is not likely to develop.  The Subscriber represents that it is cognizant of and understands Rule 144 promulgated under the Act and the limitations on the transfer of "restricted securities" imposed thereby which shall apply to the Shares.  The Subscriber understands that the Shares have not been registered under the Act or any state securities laws by reason of specific exemptions under the provisions thereof which depend in part upon the investment intent of the Subscriber and of the other representations made by the Subscriber in this Subscription Agreement.

## ARTICLE III.
## REPRESENTATIONS BY THE COMPANY

3.1    The Company represents and warrants that the Company is a duly formed and validly existing corporation in good standing under the laws of the State of Delaware and, subject to applicable law, has all requisite corporate power and authority to accept subscriptions hereunder and to carry on its business and to perform its obligations as described in the Certificate and this Subscription Agreement.  The execution of this Subscription Agreement and the Certificate have been authorized by all necessary action on behalf of the Company.  Upon the issuance of the Shares by the Company pursuant to this Subscription Agreement, the Shares shall be duly authorized, validly issued, fully paid, and nonassessable.

## ARTICLE IV.
## MISCELLANEOUS

4.1    Counterparts.  This Subscription Agreement may be executed in one or more counterparts (including by facsimile or similar electronic means of transmission), each of which shall serve as an original of the party executing the same, but all of which shall constitute one and the same Subscription Agreement.

4.2    Interpretation.  Any reference in this Subscription Agreement to gender shall include all genders, including the neuter, and words imparting the singular only shall include the

CRED_EXAMINER_00002518

plural and vice versa. Any reference to a "person" shall mean an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization and a government or any department or agency thereof.

4.3     Amendments. This Subscription Agreement shall not be changed, modified or amended except by a writing signed by the Subscriber and the Company, and this Subscription Agreement may not be discharged except by performance in accordance with its terms or by a writing signed by the party to be charged.

4.4     Assignment. This Subscription Agreement shall not be transferred, hypothecated or otherwise assigned by the Subscriber without first obtaining the written consent of the Company, which may be withheld in its sole discretion. This Subscription Agreement shall be binding upon and inure to the benefit of the parties hereto and to their respective heirs, legal representatives, successors and assigns. This Subscription Agreement and the Certificate set forth the entire agreement and understanding between the parties as to the subject matter thereof and merge and supersede all prior discussions, agreements and understandings of any and every nature among them.

4.5     Governing Law. Notwithstanding the place where this Subscription Agreement may be executed by any of the parties hereto, the parties expressly agree that all the terms and provisions hereof shall be construed in accordance with and governed by the laws of the State of Delaware.

4.6     Waiver of Jury Trial. THE UNDERSIGNED IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF THE TRANSACTIONS CONTEMPLATED BY THIS SUBSCRIPTION AGREEMENT.

4.7     Severability. In case any one or more of the provisions contained in this Subscription Agreement shall be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Subscription Agreement, but this Subscription Agreement shall be construed as if such invalid, illegal, or unenforceable provision or provisions had never been contained herein.

4.8     Further Assurances. The parties agree that they will cooperate with each other in any manner that may be required to fully effectuate the complete terms and intent of this Subscription Agreement. Such cooperation shall include the execution of any instrument and the doing of any act necessary to effectuate the complete terms and intent of this Subscription Agreement. By virtue of executing this Subscription Agreement, the Subscriber grants to the Company an irrevocable power of attorney to execute any instruments or perform any necessary acts in accordance with the foregoing.

[Signature Page Follows]

LEGAL_US_E # 149014897.2

CRED_EXAMINER_00002519

IN WITNESS WHEREOF, the parties hereto have executed this Subscription Agreement as of the date first set forth above.

**COMPANY:**

CRED CAPITAL, INC.

By: _____
Name: Daniel Schatt
Title:  President

**SUBSCRIBER:**

CRED INC.

By: _____
Name:
Title:

[Signature Page to Subscription Agreement]

CRED_EXAMINER_00002520

DocuSign Envelope ID: B8772005-536E-4DA8-AFA9-99520440F200

## EXHIBIT B

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

[Separately Provided]

LEGAL_US_E # 149014513.3

CRED_EXAMINER_00002521

## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

### OF

### CRED CAPITAL, INC.

Cred Capital, Inc., a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

1.     The name of the corporation is Cred Capital, Inc.   The corporation was formed by filing its original certificate of incorporation with the Secretary of State of the State of Delaware on March 10, 2020.

2.     This amended and restated certificate of incorporation was duly adopted by the board of directors of the corporation and by the stockholders of the corporation in accordance with sections 242 and 245 of the Delaware General Corporation Law and by the written consent of the stockholders of the corporation in accordance with Section 228 of the Delaware General Corporation Law.

3.     This amended and restated certificate of incorporation restates, integrates and amends the provisions of the corporation's certificate of incorporation.

4.     The text of the corporation's certificate of incorporation is hereby amended and restated in its entirety to read as follows:

**FIRST**:  The name of the corporation is Cred Capital, Inc. (the "Corporation").

**SECOND**:  The registered office of the Corporation is to be located at 251 Little Falls Drive, in the City of Wilmington, in the County of New Castle, in the State of Delaware 19808. The name of the Corporation's registered agent at that address is Corporation Service Company.

**THIRD**:  The purpose of the Corporation is to engage in any lawful act or activity, without limitation, for which a corporation may be organized under the Delaware General Corporation Law ("DGCL").

**FOURTH**:

1.     **Authorized Capital Stock; Reclassification**.

(a)     The total number of shares of capital stock that the Corporation is authorized to issue is one thousand (1,000) shares, all of which shall be common stock, par value $0.00001 per share (the "Common Stock").

(b)     Upon the effectiveness of the filing of this amended and restated certificate of incorporation (the "Effective Time"), each share of Class A Common Stock validly issued and outstanding immediately prior to the Effective Time (the "Old Common Stock") shall be reclassified into one validly issued, fully paid, and non-assessable share of Common Stock, automatically and without any action by the Corporation or the holder thereof.

2.     **Common Stock**

(a)     The holders of shares of Common Stock shall be entitled to one vote for each such share on each matter properly submitted to a vote of the stockholders on which the holders of shares

CRED_EXAMINER_00002522

of Common Stock are entitled to vote and the Common Stock shall have the exclusive right to vote for the election of directors and for all other matters properly submitted to a vote of the stockholders. There shall be no cumulative voting.

(b)     The holders of shares of Common Stock shall be entitled to receive such dividends (payable in cash, property or capital stock of the Corporation) when, as and if declared thereon by the board of directors from time to time out of any assets or funds of the Corporation legally available therefor and shall share equally on a per share basis in such dividends.

(c)     In the event of any voluntary or involuntary liquidation, dissolution or winding-up of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation, the holders of all outstanding shares of Common Stock shall be entitled to receive all the remaining assets of the Corporation available for distribution to its stockholders, ratably in proportion to the number of shares of Common Stock held by each such stockholder.

**FIFTH:**  The board of directors of the Corporation is authorized and empowered, from time to time in its discretion, to make, alter, amend or repeal bylaws of the Corporation, except as such power may be restricted or limited by the DGCL. The stockholders also shall have the power to adopt, amend or repeal the bylaws of the Corporation.

**SIXTH:**   For the management of the business and for the conduct of the affairs of the Corporation, and in further definition, limitation and regulation of the powers of the Corporation, of its directors and of its stockholders, as the case may be, it is further provided that:

(a)     Except as otherwise provided by the DGCL or this amended and restated certificate of incorporation, the business and affairs of the Corporation shall be managed by or under the direction of the board of directors of the Corporation.

(b)     The number of directors which shall constitute the whole board of directors of the Corporation shall be fixed by, or in the manner provided in, the bylaws of the Corporation. The phrase "whole Board" and the phrase "total number of directors" shall be deemed to have the same meaning, to wit, the total number of directors which the Corporation would have if there were no vacancies in previously authorized directorships.

(c)     Each director shall serve until his or her successor is duly elected and qualified or until his or her earlier death, resignation, or removal.

(d)     The directors of the Corporation need not be elected by written ballot unless the bylaws of the Corporation so provide.

(e)     Any director, or the entire board of directors of the Corporation, may be removed from office by the stockholders of the Corporation, with or without cause, by the holders of a majority total voting power of all then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

(f)     Meetings of stockholders may be held within or without the State of Delaware, as the bylaws of the Corporation may provide.

**SEVENTH:** No director of the Corporation shall be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (a) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (b) for acts or omissions not in good

2

CRED_EXAMINER_00002523

faith or which involve intentional misconduct or a knowing violation of law, (c) under section 174 of the DGCL, or (d) for any transaction from which the director derived an improper personal benefit.

**EIGHTH:**

(a)    The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (a "Covered Person") who was, is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Covered Person. Notwithstanding the preceding sentence, except as otherwise provided in paragraph (c) of this Article EIGHTH, the Corporation shall be required to indemnify a Covered Person in connection with a Proceeding (or part thereof) commenced by such Covered Person only if the commencement of such Proceeding (or part thereof) by the Covered Person was authorized in the specific case by the Board of Directors.

(b)    The Corporation shall, to the fullest extent not prohibited by applicable law, pay the expenses (including attorneys' fees) incurred by a Covered Person in defending any Proceeding in advance of its final disposition, provided, however, that, to the extent required by applicable law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Covered Person to repay all amounts advanced if it should be ultimately determined that the Covered Person is not entitled to be indemnified under this Article EIGHTH or otherwise.

(c)    If a claim for indemnification (following the final disposition of such Proceeding) or advancement of expenses under this Article EIGHTH is not paid in full within thirty days after a written claim therefor by the Covered Person has been received by the Corporation, the Covered Person shall thereupon (but not before) be entitled to file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim to the fullest extent permitted by applicable law.  In any such action, the Corporation shall have the burden of proving that the Covered Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

(d)    The rights conferred on any Covered Person by this Article EIGHTH shall not be exclusive of any other rights which such Covered Person may have or hereafter acquire under any statute, provision of this Certificate of Incorporation, the Bylaws, any agreement, vote of stockholders or disinterested directors or otherwise.

(e)    The Corporation's obligation, if any, to indemnify or to advance expenses to any Covered Person who was or is serving at its request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, enterprise or nonprofit entity shall be reduced by any amount such Covered Person may collect as indemnification or advancement of expenses from such other corporation, partnership, joint venture, trust, enterprise or non-profit enterprise.

(f)    Any right to indemnification or to advancement of expenses of any Covered Person arising hereunder shall not be eliminated or impaired by an amendment to or repeal of this Certificate of

3

CRED_EXAMINER_00002524

Incorporation after the occurrence of the act or omission that is the subject of the Proceeding for which indemnification or advancement of expenses is sought.

(g)     This Article EIGHTH shall not limit the right of the Corporation, to the extent and in the manner permitted by applicable law, to indemnify and to advance expenses to persons other than Covered Persons when and as authorized by appropriate corporate action.

(h)     The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, enterprise or non-profit entity against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of the DGCL.

**NINTH**:  Unless the Corporation consents in writing to the selection of an alternative forum, the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation, (b) any action asserting a claim of breach of a fiduciary duty owed or other wrongdoing by any director, officer, employee or agent of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim arising pursuant to any provision of the DGCL or this Certificate of Incorporation or the Bylaws of the Corporation (as either may be amended from time to time) or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware, (d) any action to interpret, apply, enforce or determine the validity of this Certificate of Incorporation or the Bylaws of the Corporation (as either may be amended from time to time), or (e) any action asserting a claim governed by the internal affairs doctrine shall be the Court of Chancery in the State of Delaware (or, if the Court of Chancery does not have jurisdiction, the federal district court for the District of Delaware).  Any person purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article NINTH.

4

CRED_EXAMINER_00002525

**IN WITNESS WHEREOF**, the undersigned, as a duly authorized officer of the Corporation, has signed this amended and restated certificate of incorporation on this _____ day of June, 2020.

CRED CAPITAL, INC.

By: _____

      Name:  Joseph Podulka
      Title:    Chief Financial Officer

# Exhibit K

CRED_EXAMINER_00002527

DocuSign Envelope ID: 1A287195-70ED-4790-9B8B-8EA155DDE850

## AMENDED AND RESTATED ASSET MANAGEMENT AGREEMENT

This AMENDED AND RESTATED ASSET MANAGEMENT AGREEMENT (this "Agreement") is entered into as of June 25, 2020, between **Cred Capital, Inc.**, a Delaware corporation (the "Asset Manager"), and **Cred Inc.**, a Delaware corporation (*f/k/a* Cred LLC, a Delaware limited liability company) (the "Company").

## W I T N E S S E T H:

WHEREAS, the Company facilitates retail and institutional lending and borrowing on a global basis and has developed proprietary methods for leveraging cryptocurrencies and blockchain to do so;

WHEREAS, the Company previously organized the Asset Manager as a wholly owned subsidiary of the Company to, among other things, carry out a separate line of business as part of a diversified business operated with the benefit of the Cred brand name under the direction and control the Company;

WHEREAS, the Company previously appointed the Asset Manager to serve as an asset manager under the terms of the original Asset Management Agreement, dated on or about March 16, 2020, between the Company and the Asset Manager;

WHEREAS, the Company desires to continue to engage the Asset Manager as an asset manager of the Company pursuant to the terms of this Agreement; and

WHEREAS, the Asset Manager desires to accept such appointment and render such services to the Company as set forth herein for the fees specified herein;

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged and agreed, the Company and the Asset Manager agree as follows:

1.      Services and Duties.

(a)      The Company hereby appoints the Asset Manager, as agent, to manage, operate and administer the Company's investment and asset allocation businesses (the "Subject Business"), subject at all times to the further terms and conditions set forth in this Agreement and to the supervision of, and such further limitations or parameters as may be imposed from time to time by, the Company. The Asset Manager hereby agrees to use its commercially reasonable efforts to perform the services set forth herein. Subject to the supervision of the Company, the Asset Manager will be responsible for the day-to-day operations of the Subject Business and will perform (or cause to be performed) such services and activities relating to the Subject Business as the Asset Manager may determine to be necessary, appropriate, advisable or convenient, which may include, without limitation:

(i)      borrowing fiat and cryptocurrency from retail and institutional lenders;

CRED_EXAMINER_00002528

DocuSign Envelope ID: 1A287195-70ED-4790-9B8B-8EA155DDE850

  (ii)  facilitating, structuring and originating loans to retail and institutional borrowers;

  (iii)  selling assets to securitization vehicles and servicing those assets;

  (iv)  advising Company on hedging, trading, buying, selling and transacting in cryptocurrency and fiat currency transactions and implementing such asset allocation advice; and

  (v)  engaging in such other lawful activities incidental or ancillary thereto.

  (b)  Without limiting the foregoing, the Asset Manager shall be responsible for:

  (i)  monitoring applicable markets, preparing market research and data, conducting due diligence on prospective investments, loans and borrowing opportunities, analyzing and evaluating investment and credit proposals, preparing reports regarding prospective investments and credits, monitoring and evaluating the performance of the investments and credits, structuring and negotiating the terms and conditions of the Company's transactions, managing relationships with the Company's investors, lenders and borrowers and negotiating the terms of financing agreements, evaluating and executing financing agreements, managing relationships with joint venture partners, affiliates and securitization vehicles,

  (ii)  managing communications with stakeholders; and

  (iii)  performing administrative and other functions that may be agreed upon in writing by the Company from time to time.

  (c)  The Asset Manager will carry out its responsibilities in conformity with the Asset Management Policy to be developed in consultation with the Company and other policies that are approved by the Company. The Company and the Asset Manager hereby acknowledge and agree that, during the term of this Agreement, any proposed changes to, or waiver of, the terms of such Asset Management Policy shall be made in writing and agreed to by the Company.

  (d)  In providing the services and carrying out its responsibilities under this Agreement, the Asset Manager may utilize the services of consultants, custodians, attorneys, accountants, advisers, investment bankers, brokers, appraisers, engineers and others. The Asset Manager may cause the Company to enter into agreements with broker dealers, consultants, accountants, transfer agents, third party administrators, lenders, technical managers, attorneys, corporate fiduciaries, escrow agents, depositaries, custodians, agents for collection, insurers, insurance agents, developers, and construction companies selected by the Asset Manager in accordance with the terms of this Agreement.

  (e)  The Asset Manager shall act as the agent of the Company in performing the services set forth in this Agreement and entering into any agreements and carrying out any transactions in connection therewith. In performing such services, as an agent of the Company, the Asset Manager shall have the right to exercise all powers and authority which are reasonably necessary and customary to perform its obligations under this Agreement, subject in each case to

2

CRED_EXAMINER_00002529

DocuSign Envelope ID: 1A287195-70ED-4790-9B8B-8EA155DDE850

the terms and conditions of this Agreement, including, without limitation, the Asset Management Policy and other policies that are approved by the Company.

(f)     Notwithstanding the foregoing, the Asset Manager acknowledges and agrees that all decisions relating to the selection and disposition of the Company's investments shall be made by the Company, and the Company shall have the right to review all contracts between the Asset Manager and a third party prior to their execution, unless otherwise waived by the Company in writing.

2.     Asset Management Fee.  For the services rendered under this Agreement, the Company shall pay the Manager the fees on a schedule to be mutually agreed to and updated from time to time between the parties.

3.     Standard of Care; Exculpation; Indemnification;.

(a)     The Asset Manager shall render the services called for under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of a like character and otherwise required by law.

(b)     The Company shall indemnify and hold harmless the Asset Manager and its officers, directors, employees, agents and other representatives (each, an "Indemnified Person"), from and against any losses, claims, damages or liabilities ("Losses") to which any Indemnified Person may become subject (including in connection with the defense or settlement of claims and in connection with any administrative proceedings), insofar as such Losses (or action in respect thereof) arises out of or relates to any act or omission performed or omitted by any Indemnified Person arising out of or in connection with this Agreement; provided that no Indemnified Person shall be entitled to be indemnified hereunder for any Losses to the extent the Losses are finally determined to have resulted from the bad faith, gross negligence or fraudulent or willful misconduct of the Indemnified Person.

(c)     To the fullest extent permitted by applicable law, none of the Indemnified Persons shall be liable to the Company for Losses arising from any act or omission performed or omitted by such Indemnified Persons arising out of or in connection with this Agreement or the business or affairs of the Company, except to the extent that any such Losses are established by a court order of final adjudication to be primarily attributable to the gross negligence, willful misconduct, fraud, breach of fiduciary duty of loyalty or bad faith of such Indemnified Person.

4.     Duration and Termination.  This Agreement shall become effective as of the date hereof and shall continue in effect, unless terminated in accordance with the terms hereof, until the second anniversary of the date hereof. The Company may terminate this Agreement by written notice to the Asset Manager immediately, upon the bankruptcy, liquidation or dissolution of the Asset Manager or if the Asset Manager materially breaches this Agreement and such breach is not cured within 30 days of receipt by the Asset Manager of the Company's written notice of such breach. The Asset Manager may terminate this Agreement by written notice to the Company immediately, upon the bankruptcy, liquidation, or dissolution of the Company or if the Company materially breaches this Agreement, and such breach is not cured within 30 days of

3

CRED_EXAMINER_00002530

DocuSign Envelope ID: 1A287195-70ED-4790-9B8B-8EA155DDE850

receipt by the Investor of the Asset Manager's written notice of such breach. The Company may terminate the Asset Manager immediately if it has engaged in grossly negligent or committed fraudulent or willful misconduct with respect to the Company and the services provided pursuant to this Agreement

5.     Confidentiality. The Asset Manager shall keep confidential any and all non-public information, written or oral, obtained by it in connection with the services rendered hereunder ("Confidential Information") and shall not use Confidential Information except in furtherance of its responsibilities under this Agreement or disclose Confidential Information, in whole or in part, to any person other than (i) to officers, directors,  employees, agents, representatives or advisors of the Asset Manager who need to know such Confidential Information for the purpose of rendering services hereunder, (ii) to counterparties, financing sources and others in the ordinary course of the Company's business ((i) and (ii) collectively, "Permitted Disclosure Parties"), (iii) in connection with any governmental or regulatory filings of the Company or (iv) with the consent of the Company. The Asset Manager agrees to inform each of its  Permitted Disclosure Parties of the non-public nature of the Confidential Information and to obtain agreement from such persons to treat such Confidential Information in accordance with the terms hereof. Nothing herein shall prevent the Asset Manager from disclosing Confidential Information (i) upon the order of any court or administrative agency, (ii) upon the request or demand of, or pursuant to any law or regulation to, any regulatory agency or authority, (iii) to the extent reasonably required in connection with the exercise of any remedy hereunder, or (iv) to its legal counsel or independent auditors; provided, however that with respect to clauses (i) and (ii), it is agreed that, so long as not legally prohibited, the Asset Manager will provide the Company with prompt written notice of such order, request or demand so that the Company may seek, at its sole expense, an appropriate protective order and/or waive the Asset Manager's compliance with the provisions of this Agreement. If, failing the entry of a protective order or the receipt of a waiver hereunder, the Asset Manager is required to disclose Confidential Information, the Asset Manager may disclose only that portion of such information that is legally required without liability hereunder; provided, that the Asset Manager agrees to exercise its reasonable best efforts to obtain reliable assurance that confidential treatment will be accorded such information. Notwithstanding anything herein to the contrary, each of the following shall be deemed to be excluded from the provisions hereof: any Confidential Information that (A) is available to the public from a source other than the Asset Manager, (B) is released in writing by the Company to the public or to persons who are not under similar obligation of confidentiality to the Company, or (C) is obtained by the Asset Manager from a third party which, to the best of the Asset Manager's knowledge, does not constitute a breach by such third party of an obligation of confidence with respect to the Confidential Information disclosed. The provisions of this Agreement shall survive the expiration or earlier termination of this Agreement for a period of three years.

6.     Reporting. The Asset Manager shall prepare and deliver to the Company such reports concerning its activities under this Agreement as may be reasonably requested by the Company, such reports to be provided as soon as reasonably practicable.

4

CRED_EXAMINER_00002531

DocuSign Envelope ID: 1A287195-70ED-4790-9B8B-8EA155DDE850

7.    Miscellaneous.

(a)    Services Not Exclusive.  The services of the Asset Manager are not exclusive to the Company.  The Asset Manager and any partner, director, officer, controlling person, employee, Affiliate or agent of the Asset Manager render similar services to others and engage in additional activities so long as the Asset Manager performs its obligations hereunder.

(b)    Applicable Law.    THIS  AGREEMENT  AND  THE  RIGHTS  AND OBLIGATIONS  OF  THE  PARTIES  HEREUNDER  ARE  GOVERNED  BY  AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED WHOLLY WITHIN THAT JURISDICTION.

(c)    Successors and Assigns.  This Agreement shall terminate automatically in the event of its assignment in whole or in part by the Asset Manager unless such assignment is consented to in writing by the Company.  Subject to the foregoing, this Agreement inures to the benefit of the parties hereto and the Indemnified Persons, and is binding upon the parties, and their respective successors, permitted assigns and, in the case of individual Indemnified Persons, heirs and legal representatives.

(d)    Independent Contractor Status.  The Asset Manager will for all purposes herein be deemed to be an independent contractor and will, unless otherwise expressly provided herein, have no authority to act for or represent the Company in any way or otherwise be deemed an agent of the Company.

(e)    No Third Party Beneficiaries.  Nothing in this Agreement shall be deemed to create any right in any person not a party hereto (other than each Indemnified Person and the permitted successors and assigns of the parties hereto) and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third party (except as aforesaid).

(e)    Severability.  Every term and provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity will not affect the validity of the remainder of this Agreement.

(f)    Entire Agreement.  This Agreement and the schedule(s) agreed to by the parties in accordance with Section 2 constitute the entire agreement among the parties with respect to the subject matter hereof and supersedes any prior agreement or understanding among them with respect to such subject matter.

(g)    Headings.  The headings of the sections of this Agreement are inserted for convenience only and are not be deemed to constitute a part hereof or affect the interpretation thereof.

(h)    Counterparts.  This Agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which taken together will constitute a single agreement.

LEGAL_US_E # 149085760.4

CRED_EXAMINER_00002532

DocuSign Envelope ID: 1A287195-70ED-4790-9B8B-8EA155DDE850

(i)    <u>Survival of Certain Provisions</u>.  The provisions of Section 3, 4, 5 and 7 of this Agreement will survive any termination or expiration of this Agreement and the dissolution, termination and winding up of the Company.

(j)    <u>Waiver</u>.  No waiver of the provisions of this Agreement will be valid unless in writing and signed by the party to be bound.  No failure or delay by any party in exercising any right or remedy hereunder will operate as a waiver thereof, and a waiver of a particular right or remedy on one occasion may not be deemed a waiver of any other right or remedy or a waiver on any subsequent occasion.

[Balance of page intentionally left blank.]

LEGAL_US_E # 149085760.4

CRED_EXAMINER_00002533

DocuSign Envelope ID: 1A287195-70ED-4790-9B8B-8EA155DDE850

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers, on the date first written above.

**CRED INC.**

By: _____
     Dan Schatt

Name: Dan Schatt

Title: CEO

**CRED CAPITAL, INC.**

By: _____
     Joseph Podulka

Name: Joseph Podulka

Title: Chief Financial Officer

CRED_EXAMINER_00002534

# Exhibit L

CRED_EXAMINER_00002535

State of Delaware
Secretary of State
Division of Corporations
Delivered 08:40 AM 06/29/2020
FILED 08:40 AM 06/29/2020
SR 20205953206 - FileNumber 7893962

CERTIFICATE OF CORRECTION
OF
CERTIFICATE OF INCORPORATION
OF
CRED CAPITAL, INC.

* * * * *

Adopted in accordance with the provisions of §103(f)
of the General Corporation Law of the State of Delaware

* * * * *

Cred Capital, Inc., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (the "DGCL"), hereby certifies as follows:

1.    The name of the corporation (the "Corporation") is:  Cred Capital, Inc.

2.    The original certificate of incorporation of the Corporation was filed with the Office of the Secretary of State of the State of Delaware on March 10, 2020 (the "Certificate") and requires correction as permitted by Section 103(f) of the DGCL.

3.    The inaccuracy or defect of the Certificate is that it inadvertently omitted the names and addresses of the directors constituting the initial board of directors of the Corporation.

4.    The Certificate is hereby corrected to add the following as Article Fifteenth thereof:

"The name and address of the initial directors of the Corporation are as follows:

Daniel B. Schatt
Joseph Podulka

2121 South El Camino Real, Suite 500
San Mateo, CA 94403"

5.    All other provisions of the Certificate remain unchanged.

IN WITNESS WHEREOF, the undersigned has duly executed this corrected certificate of incorporation as June 28, 2020.

Cred Capital, Inc.

By: /s/ Joseph Podulka
Joseph Podulka, Chief Financial Officer

LEGAL_US_E # 149155891.2

Exhibit 175

# Crypto-to-fiat process



**Investors** — To invest crypto in CredEarn

**Crypto** — • BTC • XRP • USDT

1 → 2 **CredEarn** → 3 **Trading Desk JST** — To exchange the crypto to stablecoin

**Stablecoin** — • TUSD • USDT • UPUSD

4 **moKredit Inc. Hong Kong**

5 **Hong Kong OTC Desk** — • FBG Hong Kong • Amber Hong Kong • Binance Hong Kong

6 **China OTC Desk** — • FBG China • Amber China • Binance China

**Fiat** — RMB

7 **moKredit Inc. China**

➤ All crypto investment is processed in US and Hong Kong OTC desk.

➤ RMB investment is processed over China OTC desk, completely isolated from crypto investment in the US.

➤ No transaction happens between Hong Kong OTC desk and China OTC desk.

CRED_EXAMINER_00002537

Exhibit 176

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

# LOAN AND SECURITY AGREEMENT

## (crypto-secured business purpose lending)

## Introduction.

This Loan and Security Agreement (this "**Agreement**"), with the Effective Date set forth below is entered into by and among the Borrower identified below and **CRED (US) LLC**, a Delaware limited liability company (the "**Lender**"). Borrower and Lender agree to the following terms and conditions:

## 1. LINE OF CREDIT.

### 1.1 Line of Credit Amount.

    **(a)** During the availability period described below, Lender will provide a line of credit to the Borrower (the "**Line of Credit**"). The amount of the Line of Credit (the "**Commitment**") is set forth below.

    **(b)** This is a revolving line of credit. During the availability period, the Borrower may repay principal amounts and reborrow them.

    **(c)** The Borrower may request advances under the Line of Credit (each such advance made by Lender hereunder, an "**Advance**"). The specific details of each Advance including all Advances made by Lender prior to the date hereof, are set forth on **Schedule A** hereto as the same is updated from time to time (the "**Schedule of Advances**"). Lender will deliver to Borrower a Draw Certificate in the form attached hereto as **Exhibit A** following each request for an Advance confirming the details of such Advance.

    **(d)** The Borrower agrees not to permit the principal balance outstanding to exceed the Commitment. If the Borrower exceeds this limit, the Borrower will immediately pay the excess to Lender upon Lender's demand.

    **1.2 Availability Period.** The Line of Credit is available until the Expiration Date set forth below or such earlier date as the availability may terminate as provided in this Agreement. The availability period for this Line of Credit will be considered renewed if and only if Lender has sent Borrower a written notice of renewal for the Line of Credit (the "**Renewal Notice**"). If this Line of Credit is renewed, it will continue to be subject to all the terms and conditions set forth in this Agreement except as modified by the Renewal Notice. If this Line of Credit is renewed, the term "Expiration Date" means the date set forth in the Renewal Notice as the Expiration Date. The same process for renewal will apply to any subsequent renewal of this Line of Credit. A renewal fee may be charged at Lender's option. The amount of the renewal fee will be specified in the Renewal Notice. If this Line of Credit is not renewed, Lender in its sole discretion may allow the outstanding balance to be repaid in installments over a term specified by Lender at the time. Borrower specifically understands that the interest rate applicable to the Line of Credit may be increased upon term-out and that the new interest rate will apply to the entire outstanding principal balance due hereunder. A transaction fee may be charged at Lender's option. If so, the amount will be specified in the term-out notice.

CRED_EXAMINER_00002538

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

**1.3    Repayment Terms.** Borrower must repay in full any principal and interest accrued on an Advance in accord with the terms set forth in the Draw Certificate or as otherwise agreed in writing by Lender and Borrower. Borrower must also make payments of interest on a monthly basis if instructed by Lender, by no later than three business days after the end of the month, regardless of whether the otherwise-stated terms of an Advance specify a later or different interest payment date. All payments must be made in full and no withholdings or deductions for any purpose are permitted, including any withholding or deduction for tax reasons.

**1.4    Prepayments.** Borrower may prepay principal in full or in part at any time without the payment of a prepayment fee or premium. The prepayment may be applied to the most remote payment of principal due under this Agreement or in such other manner as determined by Lender.

**1.5    Interest Rate.** The interest rate on an Advance will be, for each month, quarter, year or other period that the Advance is outstanding, a rate per year equal to the Interest Rate specified below.

**2.    COLLATERAL.**

**2.1    The Security.** Borrower hereby assigns and grants, and causes to be assigned and granted, grants to Lender a security interest in the following described Collateral now owned or hereafter acquired by Borrower. The word **"Collateral"** as used in this Agreement means all of Borrower's right, title and interest in and to the following, whether now owned or hereafter acquired and whether now existing or hereafter coming into existence:

   **(a)**    the fiat currencies, cryptocurrencies and other digital assets identified in notices, emails, texts, screenshots and confirmations displayed or delivered to Borrower by Lender or on Lender's behalf as intended to be pledged to Lender (such communications and information collectively, **"Confirmations"**), regardless of whether those fiat currencies, cryptocurrencies and other digital assets are deemed to be commodities, currency, money, securities, securities entitlements or any other type or category of property or asset;

   **(b)**    the digital wallet, card, deposit account(s), commodities account(s) and securities account(s) specified in Confirmations (collectively, the **"Collateral Account"**) and all funds, monies, securities, security entitlements and other financial assets and other property from time to time held therein or credited thereto, and any successor or replacement wallet or account;

   **(c)**    all additions to and substitutions for any of the foregoing (including, without limitation, any securities, security entitlements, instruments or other property delivered or pledged hereunder) (such additions and substitutions, the **"Additions and Substitutions"**);

   **(d)**    all present and future renewals, replacements, income, cash and noncash proceeds, earnings, increases, and substitutions from or for the Collateral of every kind and nature, including without limitation all payments, interest, profits, distributions, benefits, rights, options, warrants, dividends, stock dividends, stock splits, stock rights, regulatory dividends, subscriptions, monies, claims for money due and to become due, proceeds of any insurance on the Collateral, shares of stock of different par value or no par value issued in substitution or exchange for shares included in the Collateral, and all other property Borrower is entitled to receive on account of such Collateral, including accounts, documents, instruments, chattel paper, and general intangibles whether now accrued or hereafter accruing (collectively, **"Income and Proceeds"**); and

-2-

CRED_EXAMINER_00002539

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

(e)      all of Borrower's property related to the Collateral (however owned if owned by more than one person or entity), whether or not in Lender's possession or in the possession of a third party subject to Lender's control, whether existing now or later and whether tangible or intangible in character, including all books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer software necessary to process such memory ("**Books and Records**").

Confirmations sent by Lender or on Lender's behalf regarding the number, type and timing of the transfer of Collateral to Lender's control or possession, and the details of the digital wallet or other account in which Lender or its designated agent or custodian holds the Collateral, are dispositive and controlling for all purposes, absent a definitive, non-appealable court ruling to the contrary.

     2.2     **The Indebtedness.** The obligations secured by this Agreement are the payment and performance of (a) all present and future Indebtedness (as defined below) of Borrower to Lender; (b) all obligations of Borrower and rights of Lender under this Agreement; and (c) all present and future debts, obligations and liabilities of Borrower to Lender of any kind or nature.

"Indebtedness" is used in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of Borrower, now or hereafter existing, absolute or contingent, liquidated or unliquidated, determined or undetermined, voluntary or involuntary, including under any swap, derivative or other arrangement, or other similar transaction or arrangement, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable. "Indebtedness" secured by the Collateral of Borrower does not include obligations arising under any Swap to which it is not party if, and to the extent that, all or a portion of the guaranty by Borrower to Lender of, or the grant by such Borrower of a security interest to Lender to secure, such Swap, would violate the Commodity Exchange Act (7 U.S.C., Sec. 1. et. seq.) by virtue of Borrower's failure to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time such guaranty or grant of such security interest becomes effective with respect to such Swap.

     2.3     **Borrower Covenants.** Borrower represents, covenants and warrants that unless compliance is waived by Lender in writing:

     (a)      Borrower agrees: (i) to indemnify Lender against all losses, claims, demands, liabilities and expenses of every kind caused by any Collateral; (ii) to permit Lender to exercise its rights under this Agreement; (iii) to execute and deliver such documents as Lender deems necessary to create, perfect and continue the security interests contemplated by this Agreement; (iv) not to change its name, and as applicable, its chief executive office, or the jurisdiction in which it is organized and/or registered or its business structure without giving Lender at least 30 days prior written notice; (v) not to change the places where the Borrower keeps any Collateral or the Borrower's Books and Records concerning the Collateral without giving Lender prior written notice of the address to which the Borrower is moving same; and (vi) to cooperate with Lender in perfecting all security interests granted by this Agreement and in obtaining such agreements from third parties as Lender deems necessary, proper or convenient in connection with the preservation, perfection or enforcement of any of its rights under this Agreement.

CRED_EXAMINER_00002540

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

**(b)**   Borrower agrees with regard to the Collateral, unless Lender agrees otherwise in writing: (i) that Lender is authorized to file financing statements in the name of Borrower to perfect Lender's security interest in the Collateral; (ii) that Lender is authorized to notify any account debtors, any buyers of the Collateral, any Borrower Customers or any other persons of Lender's interest in the Collateral, (iii) where applicable, to operate the Collateral in accordance with all applicable statutes, rules and regulations relating to the use and control of the Collateral, and not to use any Collateral for any unlawful purpose or in any way that would void any insurance required to be carried; (iv) not to remove the Collateral from the Borrower's premises except in the ordinary course of Borrower's business; (v) to pay when due all license fees, registration fees and other charges in connection with any Collateral; (vi) not to permit any lien on the Collateral, including without limitation, liens arising from repairs to or storage of the Collateral, except in favor of Lender; (vii) not to sell, hypothecate or dispose of, nor permit the transfer by operation of law of, any Collateral or any interest in the Collateral, except sales of inventory to buyers in the ordinary course of Borrower's business; (viii) to permit Lender to inspect the Collateral at any time; (ix) to keep, in accordance with generally accepted accounting principles, complete and accurate Books and Records regarding all the Collateral, and to permit Lender to inspect the same and make copies at any reasonable time; (x) if requested by Lender, to receive and use reasonable diligence to collect the Collateral consisting of accounts and other rights to payment and proceeds, in trust and as the property of Lender, and to immediately endorse as appropriate and deliver such Collateral to Lender daily in the exact form in which they are received together with a collection report in form satisfactory to Lender; (xi) not to commingle the Collateral, or collections with respect to the Collateral, with other property; (xii) to give only normal allowances and credits and to advise Lender thereof immediately in writing if they affect any rights to payment or proceeds in any material respect; (xiii) from time to time, when requested by Lender, to prepare and deliver a schedule of all the Collateral subject to this Agreement and to assign in writing and deliver to Lender all accounts, contracts, leases and other chattel paper, instruments, and documents; (xiv) in the event Lender elects to receive payments or rights to payment or proceeds hereunder, to pay all expenses incurred by Lender, including expenses of accounting, correspondence, collection efforts, reporting to account or contract debtors, filing, recording, record keeping and other expenses; and (xv) to provide any service and do any other acts which may be necessary to maintain, preserve and protect all the Collateral and, as appropriate and applicable, to keep all the Collateral in good and saleable condition, to deal with the Collateral in accordance with the standards and practices adhered to generally by users and manufacturers of like property, and to keep all the Collateral free and clear of all defenses, rights of offset and counterclaims.

**(c)**   If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading, Borrower must immediately deliver such document to Lender, together with any necessary endorsements.

**2.4    Lender Rights.** Borrower appoints Lender its attorney in fact to perform any of the following rights, which are coupled with an interest, are irrevocable until termination of this Agreement and may be exercised from time to time by Lender's officers and employees, or any of them, whether or not Borrower is in default: (a) to perform any obligation of Borrower hereunder in Borrower's name or otherwise; (b) to release

-4-

CRED_EXAMINER_00002541

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

persons liable on the Collateral and to give receipts and acquittances and compromise disputes; (c) to release or substitute security; (d) to prepare, execute, file, record or deliver notes, assignments, schedules, designation statements, financing statements, continuation statements, termination statements, statements of assignment, applications for registration or like documents to perfect, preserve or release Lender's interest in the Collateral; (e) to take cash, instruments for the payment of money and other property to which Lender is entitled; (f) to verify facts concerning the Collateral by inquiry of obligors thereon, or otherwise, in its own name or a fictitious name; (g) to endorse, collect, deliver and receive payment under instruments for the payment of money constituting or relating to the Collateral; (h) to prepare, adjust, execute, deliver and receive payment under insurance claims, and to collect and receive payment of and endorse any instrument in payment of loss or returned premiums or any other insurance refund or return, and to apply such amounts received by Lender, at Lender's sole option, toward repayment of the Indebtedness or, where appropriate, replacement of the Collateral; (i) to enter onto Borrower's premises in inspecting the Collateral; (j) to make withdrawals from and to close deposit accounts or other accounts with any financial institution, wherever located, into which proceeds may have been deposited, and to apply funds so withdrawn to payment of the Indebtedness; (j) to preserve or release the interest evidenced by chattel paper to which Lender is entitled and to endorse and deliver any evidence of title; and (k) to do all acts and things and execute all documents in the name of Borrower or otherwise, deemed by Lender as necessary, proper and convenient in connection with the preservation, perfection or enforcement of its rights.

3.   **LOAN ADMINISTRATION AND FEES.**

3.1   **Fees.** Fees will be paid by Borrower as provided on Schedule B.

3.2   **Collection of Payments.**

(a)   Payments will be made by debit to a deposit account, if direct debit is provided for in this Agreement or is otherwise authorized by Borrower. For payments not made by direct debit, payments will be made by mail to the address shown on applicable Borrower's statement, or by such other method as may be permitted by Lender.

(b)   Each disbursement by Lender and each payment by Borrower will be evidenced by records kept by Lender which will, absent manifest error, be conclusively presumed to be correct and accurate and constitute an account stated between Borrower and Lender.

3.3   **Borrower Instructions.**

Subject to the terms, conditions and procedures stated elsewhere in this Agreement, Lender may honor instructions for advances or repayments and any other instructions under this Agreement given by any one of the individuals Lender reasonably believes is authorized to sign loan agreements on behalf of Borrower, or any other individual(s) designated by any one of such authorized signers (each an "**Authorized Individual**"). Lender may honor any such instructions made by any one of the Authorized Individuals, whether such instructions are given in writing or by telephone, Internet and intranet websites or other means designated by Lender.

3.4   **Direct Debit with ACH Debit.**

(a)   Borrower agrees that on the due date of any amount due under this Agreement, Lender will debit the amount due from the Designated Account to pay all such sums when due. The full amount of any deficiency will be immediately due and payable by Borrower. A voided copy of a check on the Designated Account has been, or will be, provided to Lender.

CRED_EXAMINER_00002542

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

**(b)**    Debits made by ACH will be subject to the operating rules of the National Automated Clearing House Association, as in effect from time to time.

**(c)**    Borrower may terminate this direct debit arrangement at any time by sending written notice to Lender. If Borrower terminates this arrangement, then the principal amount outstanding under this Agreement will at the option of Lender bear interest at a rate per annum, which is one percentage point higher than the rate of interest otherwise provided under this Agreement.

**3.5    Business Days.** Unless otherwise provided in this Agreement, a business day is a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the State of California. All payments and disbursements which would be due or which are received on a day, which is not a business day will be due or applied, as applicable, to the credit on the next business day.

**3.6    Interest Calculation.** Except as otherwise stated in this Agreement, all interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed. Installments of principal, which are not paid when due under this Agreement will continue to bear interest until paid.

**3.7    Default Rate.** Upon the occurrence of any default or after maturity or after judgment has been rendered on any obligation under this Agreement, all amounts outstanding under this Agreement, including any unpaid interest, fees, or costs, will at the option of Lender bear interest at a rate which is five percentage points higher than the rate of interest otherwise provided under this Agreement. This may result in compounding of interest. This will not constitute a waiver of any default.

## 4.    CONDITIONS.

Before Lender is required to extend any credit to Borrower under this Agreement, it must receive any documents and other items it may reasonably require, in form and content acceptable to Lender, including any items specifically listed below.

**4.1    Authorizations.** If Borrower is anything other than a natural person, evidence that the execution, delivery and performance by Borrower of this Agreement and any instrument or agreement required under this Agreement have been duly authorized.

**4.2    Governing Documents.** If required by Lender, a copy of organizational documents of Borrower.

**4.3    Perfection and Evidence of Priority.** Evidence that the security interests and liens in favor of Lender are valid, enforceable, properly perfected in a manner acceptable to Lender and prior to all others' rights and interests, except those Lender consents to in writing. All title documents for motor vehicles which are part of the collateral must show Lender's interest.

**4.4    Payment of Fees.** Payment of all fees, expenses and other amounts due and owing to Lender. If any fee is not paid in cash, Lender may, in its discretion, treat the fee as a principal advance under this Agreement or deduct the fee from the loan proceeds.

CRED_EXAMINER_00002543

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

## 5.  REPRESENTATIONS AND WARRANTIES.

When Borrower signs this Agreement, and until Lender is repaid in full, Borrower makes the following representations and warranties. Each request for an extension of credit constitutes a renewal of these representations and warranties as of the date of the request:

**5.1  Formation.** Borrower is duly formed and existing under the laws of the state or other jurisdiction where organized.

**5.2  Authorization.** This Agreement as amended hereby, and any instrument or agreement required under this Agreement, are within Borrower's powers, have been duly authorized, and do not conflict with any of its organizational documents.

**5.3  Good Standing.** In each state in which Borrower does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

**5.4  Financial Information.** All financial and other information that has been or will be supplied to Lender is sufficiently complete to give Lender accurate knowledge of the Borrower's financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to Lender, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of Borrower.

**5.5  Lawsuits.** There is no lawsuit, tax claim or other dispute pending or threatened against Borrower, which, if lost, would impair Borrower's financial condition or ability to repay the loan, except as have been disclosed in writing to Lender.

**5.6  Other Obligations.** Borrower is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to Lender.

**5.1  No Claims, Defenses, Etc..** Borrower has no claims, counterclaims, defenses, or setoffs with respect to the Line of Credit or this Agreement as amended hereby. The Agreement as amended hereby contains the entire understanding and agreement of Borrower and Lender in respect of the Line of Credit and supersedes all prior representations, warranties, agreements, arrangements, and understandings.

**5.3  Tax Matters.** Borrower has no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to Lender.

**5.4  No Event of Default.** There is no event, which is, or with notice or lapse of time or both would be, a default under this Agreement.

**5.5  Collateral.** All Collateral is owned by Borrower free of any title defects or any liens or interests of others, except those which have been approved by Lender in writing.

## 6.  COVENANTS.

Borrower agrees, so long as credit is available under this Agreement and until Lender is repaid in full:

-7-

CRED_EXAMINER_00002544

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

**6.1     Use of Proceeds.** To use the proceeds of the Line of Credit only for business purposes.

**6.2     Financial Information.** To provide financial statements and other information in form and content acceptable to Lender relating to the affairs of Borrower as requested by Lender from time to time.

**6.3     Other Debts.** Not to have outstanding or incur any direct or contingent liabilities or lease obligations (other than those to Lender or to any affiliate of Lender), or become liable for the liabilities of others, without Lender's written consent. This does not prohibit:

>    **(a)**     Acquiring goods, supplies, or merchandise on normal trade credit.

>    **(b)**     Liabilities, lines of credit and leases in existence on the Effective Date (as defined below) disclosed in writing to Lender.

**6.4     Other Liens.** Not to create, assume, or allow any security interest or lien (including judicial liens) n property Borrower now or later owns, except:

>    **(a)**     Liens and security interests in favor of Lender or any affiliate of Lender.

>    **(b)**     Liens outstanding on the Effective Date (as defined below) disclosed in writing to Lender.

**6.5     Maintenance of Assets.**

>    **(a)**     Not to sell, assign, lease, transfer or otherwise dispose of any part of the business or assets of Borrower except inventory sold in the ordinary course of business of Borrower.

>    **(b)**     Not to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value, or enter into any agreement to do so.

>    **(c)**     To maintain and preserve all rights, privileges, and franchises Borrower now has.

**6.6     Additional Negative Covenants.** Not to, without Lender's written consent:

>    **(a)**     Enter into any consolidation, merger, or other combination, or become a partner in a partnership, a member of a joint venture, or a member of a limited liability company.

>    **(b)**     Liquidate or dissolve Borrower's business.

**6.7     Notices to Lender.** To promptly notify Lender in writing of:

>    **(a)**     Any event of default under this Agreement, or any event, which, with notice or lapse of time or both, would constitute an event of default.

>    **(b)**     Any change in Borrower's name, legal structure, state of registration, place of business, or chief executive office if Borrower has more than one place of business.

**6.8     Insurance.** To maintain insurance as is usual for the business it is in.

CRED_EXAMINER_00002545

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

**6.9** **Compliance with Laws.** To comply with the laws (including any fictitious or trade name statute), regulations, and orders of any government body with authority over business of Borrower. Lender has no obligation to make any advance to Borrower except in compliance with all applicable laws and regulations and Borrower will fully cooperate with Lender in complying with all such applicable laws and regulations.

**6.10** **Books and Records.** To maintain adequate books and records.

**6.11** **Audits.** To allow Lender and its agents to inspect properties of Borrower and examine, audit, and make copies of books and records at any reasonable time. If any of the properties, books or records of Borrower are in the possession of a third party, Borrower authorizes that third party to permit Lender or its agents to have access to perform inspections or audits and to respond to Lender's requests for information concerning such properties, books and records.

**6.12** **Perfection of Liens.** To help Lender perfect and protect its security interests and liens, and reimburse it for related costs it incurs to protect its security interests and liens.

**6.13** **Cooperation.** To take any action reasonably requested by Lender to carry out the intent of this Agreement.

**6.14** **Maintaining Sufficient Collateral.** Borrower must maintain with Lender pledged (via a first priority perfected security interest) Collateral having a value (measured by calculating its Fair Market Price) of at least the Initial Collateral Minimum Percentage of the outstanding Line of Credit balance plus Borrower's other outstanding obligations and liabilities to Lender (in total, the "**Outstandings**"). If Borrower's Collateral value falls below the Initial Collateral Minimum Percentage of the Outstandings, that event is referred to as a "**Valuation Event**." (After the first Valuation Event, if it is cured, another Valuation Event will be deemed to occur only if Borrower's collateral value falls below the Ongoing Collateral Minimum Percentage of the Outstandings.) Borrower must cure a Valuation Event within 3 business days of its occurrence by repaying a portion of the Line of Credit and/or pledging additional acceptable collateral so that the aggregate value of all collateral Borrower has validly pledged to Lender is at least the Ongoing Collateral Minimum Percentage of the Outstandings. In Lender's sole discretion, Lender may insist that Borrower pay down the Line of Credit to cure a Valuation Event instead of pledging additional collateral. Lender determines in its sole discretion what constitutes acceptable collateral at any given time. Borrower's failure to timely and properly cure a Valuation Event is an Event of Default. Borrower acknowledges that Lender will automatically sell all Collateral and apply the proceeds to Borrower's outstanding Indebtedness if that Indebtedness reaches the Liquidation Threshold percentage of the aggregate value of the Collateral as determined by Lender at the time. Any price that Lender obtains for the Collateral in a sale triggered by a Liquidation Threshold is deemed to be reasonable and fair.

(a) The term "**Exchange Business Day**" means any day that is a trading day and a price is posted on the applicable Bloomberg United States Dollar Spot Currency page or other price quote source, as confirmed by Lender.

(b) The term "**Fair Market Price**" means the average of the closing market price for the relevant cryptocurrency on 2 consecutive Exchange Business Days, as determined by Lender.

(c) The terms "**Initial Collateral Minimum Percentage**" and "**Ongoing Collateral Minimum Percentage**" mean the percentages Lender notifies Borrower of from time to

CRED_EXAMINER_00002546

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

time, based on Lender's assessment of market conditions. The initial percentage is set forth on Schedule A below.

## 7.   DEFAULT AND REMEDIES.

**7.1   Rights and Remedies on Default.** If an Event of Default occurs under this Agreement and is not timely cured, then Lender may exercise any one or more of the following rights and remedies in addition to any other rights and remedies Lender may have under law:

**(a)**   Accelerate Indebtedness. Declare all Indebtedness, including any prepayment penalty which Borrower may be required to pay, immediately due and payable, without notice of any kind to Borrower.

**(b)**   Application of Account Proceeds. Lender may apply all funds in the Collateral Account to the Indebtedness. If the Collateral Account is subject to an early withdrawal penalty, that penalty will be deducted from the Collateral Account before its application to the Indebtedness, whether the Collateral Account is with Lender or some other institution. Any excess funds remaining after application of the Collateral Account proceeds to the Indebtedness will be paid to Borrower as the interests of Borrower may appear. Borrower agrees, to the extent permitted by law, to pay any deficiency after application of the proceeds of the Collateral Account to the Indebtedness. Lender also has all of the rights of a secured party under the California Uniform Commercial Code, even if the Collateral Account is not otherwise subject to such Code concerning security interests, and the parties to this Agreement agree that the provisions of the Code giving rights to a secured party are nonetheless part of this Agreement.

**(c)**   Sell Collateral. Sell the Collateral or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any of Lender's offices or elsewhere, for cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as Lender may deem commercially reasonable, irrespective of the impact of any such sales on the market price of the Collateral. To the maximum extent permitted by applicable law, Lender may be the purchaser of any or all of the Collateral at any such sale and will be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply all or any part of the Indebtedness as a credit on account of the purchase price of any Collateral payable at such sale. Each purchaser at any such sale will hold the property sold absolutely free from any claim or right on the part of Borrower, and Borrower hereby waives (to the extent permitted by law) all rights of redemption, stay, or appraisal that it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Borrower agrees that, to the extent notice of sale may be required by law, at least 10 calendar days' notice to Borrower of the time and place of any public sale or the time after which a private sale is to be made will constitute reasonable notification. Lender will not be obligated to make any sale of Collateral regardless of notice of sale having been given. Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. To the maximum extent permitted by law, Borrower hereby waives any claims against

-10-

CRED_EXAMINER_00002547

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

Lender arising because the price at which any Collateral may have been sold at such a private sale was less than the price that might have been obtained at a public sale, even if Lender accepts the first offer received and does not offer such Collateral to more than one offeree. After the disposal of any of the Collateral, Lender may deduct all reasonable legal and other expenses and attorney's fees for protecting its interests and enforcing its remedies under this Agreement and may apply the residue of the proceeds to, or hold as a reserve against, the Indebtedness in such manner as Lender in its sole discretion may determine, and will pay the balance, if any, to Borrower or otherwise, in accordance with applicable law. If any securities held as Collateral are "restricted securities" as defined in the Rules of the Securities and Exchange Commission (such as Regulation D or Rule 144) or the rules of state securities departments under state "Blue Sky" laws, or if Borrower or any other owner of the Collateral is an affiliate of the issuer of the securities, Borrower agrees that neither Borrower, nor any member of Borrower's family, nor any other person signing this Agreement will sell or dispose of any securities of such issuer without obtaining Lender's prior written consent.

**(d)**   Application of Proceeds. Apply any cash which is part of the Collateral, or which is received from the collection or sale of the Collateral, to reimbursement of any expenses, including any costs for registration of securities, commissions incurred in connection with a sale, attorneys' fees and court costs, whether or not there is a lawsuit and including any fees on appeal, incurred by Lender in connection with the collection and sale of such Collateral and to the payment of the Indebtedness of Borrower to Lender, with any excess funds to be paid to Borrower as the interests of Borrower may appear. Borrower agrees, to the extent permitted by law, to pay any deficiency after application of the proceeds of the Collateral to the Indebtedness.

**7.2**   **Default.** Each of the following constitutes an "Event of Default" under this Agreement:

**(a)**   Failure to Pay. Borrower fails to make a payment under this Agreement or Borrower fails to timely and properly cure a Valuation Event.

**(b)**   Covenants. Any default in the performance of or compliance with any obligation, agreement or other provision contained in this Agreement (other than those specifically described as an Event of Default in this Section), and with respect to any such default that by its nature can be cured, such default continues for a period of 20 days from its occurrence.

**(c)**   Other Lender Agreements. Any default occurs under any guaranty, subordination agreement, security agreement, deed of trust, mortgage, or other document required by or delivered in connection with this Agreement or any such document is no longer in effect, or any guarantor purports to revoke or disavow the guaranty; or any default occurs under any other agreement Borrower (or any Obligor) has with Lender or any affiliate of Lender. For purposes of this Agreement, **"Obligor"** means any guarantor, any party pledging collateral to Lender, or, if Borrower is comprised of the trustees of a trust, any trustor.

CRED_EXAMINER_00002548

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

**(d)** Cross-default. Any default occurs under any agreement in connection with any credit Borrower (or any Obligor) has obtained from anyone else or which Borrower (or any Obligor) or any of Borrower's related entities or affiliates has guaranteed.

**(e)** False Information. Borrower or any Obligor has given Lender false or misleading information or representations.

**(f)** Bankruptcy/Receivers. Borrower, any Obligor, or any general partner of Borrower or of any Obligor files a bankruptcy petition, a bankruptcy petition is filed against any of the foregoing parties and such petition is not dismissed within a period of forty-five (45) days after the filing, or Borrower, any Obligor, or any general partner of Borrower or of any Obligor makes a general assignment for the benefit of creditors; or a receiver or similar official is appointed for a substantial portion of business of Borrower or any Obligor; or the business is terminated, or such Obligor is liquidated or dissolved.

**(g)** Lien Priority. Lender fails to have an enforceable first lien (except for any prior liens to which Lender has consented in writing) on or security interest in any property given as security for this Agreement (or any guaranty).

**(h)** Judgments. Any judgments or arbitration awards are entered against Borrower or any Obligor.

**(i)** Material Adverse Change. A material adverse change occurs, or is reasonably likely to occur, in the business condition (financial or otherwise), operations or properties, or ability to repay the credit of Borrower or any Obligor.

**(j)** Government Action. Any government authority takes action that Lender believes materially adversely affects the financial condition or ability to repay of Borrower or any Obligor.

**(k)** Liens. Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

## 8.    LENDER'S ADDITIONAL REMEDIES.

**8.1    Lender's Additional Remedies After Default**. In the event of any Event of Default, Lender may also do any one or more of the following, to the extent permitted by law:

**(a)** Declare any Indebtedness immediately due and payable, without notice or demand.

**(b)** Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

**(c)** Require Borrower to obtain Lender's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral.

CRED_EXAMINER_00002549

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

**(d)**    Require Borrower to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to Lender in kind.

**(e)**    Require Borrower to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under Lender's exclusive control.

**(f)**    Give notice to others of Lender's rights in the Collateral, to enforce or forebear from enforcing the same and make extension and modification agreements.

**(g)**    Require Borrower to assemble the Collateral, including the Books and Records, and make them available to Lender at a place designated by Lender.

**(h)**    Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any equipment of Borrower, if Lender deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

**(i)**    Demand and collect any payments on and proceeds of the Collateral. In connection therewith the Borrower irrevocably authorizes Lender to endorse or sign the Borrower's name on all checks, drafts, collections, receipts and other documents, and to take possession of and open the mail addressed to the Borrower and remove therefrom any payments and proceeds of the Collateral.

**(j)**    Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to the Borrower.

**(k)**    Use or transfer any of the Borrower's rights and interests in any Intellectual Property now owned or hereafter acquired by the Borrower, if Lender deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. The Borrower agrees that any such use or transfer will be without any additional consideration to the Borrower. As used in this ***Section 8.1 (k),*** "Intellectual Property" includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which the Borrower has any right or interest, whether by ownership, license, contract or otherwise.

**(l)**    Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. The Borrower hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

**(m)**    Take such measures as Lender may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and the Borrower hereby irrevocably

-13-

CRED_EXAMINER_00002550

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

constitutes and appoints Lender as the Borrower's attorney-in-fact to perform all acts and execute all documents in connection therewith.

(n)     Without notice or demand to the Borrower, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by Lender or any of Lender's agents or affiliates to or for the credit of the account of the Borrower or any guarantor or endorser of the Borrower's Indebtedness.

(o)     Exercise all rights, powers and remedies which the Borrower would have, but for this Agreement, with respect to all Collateral.

(p)     Receive, open and read mail addressed to the Borrower.

(q)     Resort to the Collateral under this Agreement, and any other collateral related to the Indebtedness, in any order.

(r)     Exercise any other remedies available to Lender at law or in equity.

## 9.     ENFORCING THIS AGREEMENT; MISCELLANEOUS.

9.1     **Governing Law.** Except to the extent that any law of the United States may apply, this Agreement will be governed and interpreted according to the laws of California (the "**Governing Law State**"), without regard to any choice of law, rules or principles to the contrary. Nothing in this *Section 9.1* be construed to limit or otherwise affect any rights or remedies of Lender under federal law.

9.2     **Venue and Jurisdiction.** The Borrower agrees that any action or suit against Lender arising out of or relating to this Agreement must be filed in federal court or state court located in San Francisco, California. The Borrower agrees that Lender will not be deemed to have waived its rights to enforce this *Section 9.2* by filing an action or suit against the Borrower in a venue outside of the Governing Law State. If Lender does commence an action or suit arising out of or relating to this Agreement, the Borrower agrees that the case may be filed in federal court or state court in the Governing Law State. Lender reserves the right to commence an action or suit in any other jurisdiction where the Borrower, any Guarantor, or any collateral has any presence or is located. The Borrower consents to personal jurisdiction and venue in such forum selected by Lender and waives any right to contest jurisdiction and venue and the convenience of any such forum. The provisions of this *Section 9.2* are material inducements to Lender's acceptance of this Agreement.

9.3     **Successors and Assigns.** This Agreement is binding on the Borrower's and Lender's successors and assignees. The Borrower agrees that it may not assign this Agreement without Lender's prior consent.

9.4     **Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD**

-14-

CRED_EXAMINER_00002551

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, **(b)** ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS *SECTION 9.4* AND **(c)** CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.

9.5    **Severability; Waivers.** If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced. Lender retains all rights, even if it makes a loan after default. If Lender waives a default, it may enforce a later default. Any consent or waiver under this Agreement must be in writing.

9.6    **Expenses.**

(a)    The Borrower must pay to Lender immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees, expended or incurred by Lender in connection with (i) the negotiation and preparation of this Agreement and any related agreements, Lender's continued administration of this Agreement and such related agreements, and the preparation of any amendments and waivers related to this Agreement or such related agreements, (ii) filing, recording and search fees, appraisal fees, field examination fees, title report fees, and documentation fees with respect to any collateral and books and records of the Borrower or any Obligor, and (iii) costs or expenses required to be paid by the Borrower or any Obligor that are paid, incurred or advanced by Lender.

(b)    The Borrower will indemnify and hold Lender harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (i) this Agreement or any document required hereunder, (ii) any credit extended or committed by Lender to the Borrower hereunder, and (iii) any litigation or proceeding related to or arising out of this Agreement, any such document, or any such credit, including, without limitation, any act resulting from Lender complying with instructions Lender reasonably believes are made by any Authorized Individual. This *Section 9.6(b)* will survive this Agreement's termination, and will benefit Lender and its officers, employees, and agents.

(c)    The Borrower must reimburse Lender for any reasonable costs and attorneys' fees incurred by Lender in connection with (i) the enforcement or preservation of Lender's rights and remedies and/or the collection of any obligations of the Borrower which become due to Lender and in connection with any "workout" or restructuring, and (ii) the prosecution or defense of any action in any way related to this Agreement, the credit provided hereunder or any related agreements, including without limitation, any action for declaratory relief, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Lender or any other person) relating to the Borrower or any other person or entity.

9.7    **Set-Off.** Upon and after the occurrence of an event of default under this Agreement, (a) the Borrower hereby authorizes Lender, at any time and from time to time, without notice, which is hereby expressly

CRED_EXAMINER_00002552

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

waived by the Borrower, and whether or not Lender has declared any credit subject hereto to be due and payable in accordance with the terms hereof, to set off against, and to appropriate and apply to the payment of, the Borrower's Indebtedness (whether matured or unmatured, fixed or contingent, liquidated or unliquidated), any and all amounts owing by Lender to the Borrower (whether payable in U.S. dollars or any other currency, whether matured or unmatured), and (b) pending any such action, to the extent necessary, to hold such amounts as collateral to secure such Indebtedness. "**Indebtedness**" includes all obligations, now or hereafter existing, of the Borrower to Lender under this Agreement and under any other agreement or instrument executed in connection with this Agreement.

      **9.8**    **One Agreement.** THIS WRITTEN AGREEMENT AND ANY RELATED DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

      **9.9**    **Notices.** Unless otherwise provided in this Agreement or in another agreement between Lender and the Borrower, all notices required under this Agreement shall be (a) in writing (including electronic mail), (b) delivered by electronic mail or overnight courier, and (c) deemed delivered upon electronic or written acknowledgment of receipt. Notices shall be sent to the addresses set forth on the signature page to this Agreement or such other address as specified and delivered pursuant to this *Section 9.9.*

      **9.10**   **Headings.** Article and section headings are for reference only and will not affect the interpretation or meaning of any provisions of this Agreement.

      **9.11**   **Counterparts.** This Agreement may be executed in any number of counterparts, each of which, when so executed, will be deemed to be an original, and all of which when taken together will constitute one and the same Agreement. Delivery of an executed counterpart of this Agreement (or of any agreement or document required by this Agreement and any amendment to this Agreement) by DocuSign will be as effective as delivery of a manually executed counterpart of this Agreement.

      **9.12**   **Further Amendments.** No provision of the Agreement may be changed, discharged, supplemented, terminated, or waived except in a writing signed by the Borrower and Lender.

*[Balance of page left blank.]*

-16-

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

This Agreement is executed as of the Effective Date.

## SIGNATURES

**BORROWER:**

UpgradeYa Investments, LLC
_____
[name]

a South Carolina
_____
[state]

LLC
_____
[type of entity]

By: *Marc Parrish*
Name: Marc Parrish
Title: Owner

Notice Address:
2381 N Highway 17
Mount Pleasant, SC 29466

**LENDER:**

**CRED (US) LLC,**
a Delaware limited liability company

By:  Cred Capital, Inc., a Delaware
corporation, its authorized agent

By: _____
Name:  James Alexander
Title:  President

Notice Address:
Cred (US) LLC
2121 South El Camino Real, Suite 500
San Mateo, CA 94403
Attention: Dan Wheeler, GC

-17-

CRED_EXAMINER_00002554

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

## SCHEDULE A

**Key terms:**

"**Commitment**" (*maximum amount of the Line of Credit*): **$2,000,000**

"**Designated Account**" (*Borrower's account from which repayments will be made*):

> Depository Name:  Wells Fargo Bank
> City, State and Zip Code: 420 Montgomery Street, San Francisco CA 94104
> For domestic (U.S.) wire: **Wire routing transit number/ABA:** _____
> **Account number:** _____
> **Routing number:**
> **Direct deposits, electronic payments:**
> **Wire transfers – domestic:**

"**Effective Date**":  April 20, 2020

"**Expiration Date**" (*maturity of the Line of Credit*): the date that is 12 months following the confirmed pledge of all initially-required Collateral to Lender.

"**Initial Collateral Minimum Percentage**" (*initial maximum loan-to-value ratio*): **50%**

"**Interest Rate**": **6%** per annum.  Interest will accrue based upon a 360-day year and the actual number of days elapsed and will compound on a monthly basis until all Indebtedness is indefeasibly paid in full.

"**Liquidation Threshold**" (*LTV percentage triggering sale of all Collateral*): **91%**

"**Ongoing Collateral Minimum Percentage**" (*maximum LTV following Valuation Event*): **75%**

**Advances:**

| Date | Currency | Amount | Repayment Schedule |
|------|----------|--------|--------------------|
|      |          |        | *See applicable Draw Certificate providing complete details for each Advance* |
|      |          |        |  |
|      |          |        |  |
|      |          |        |  |
|      |          |        |  |
|      |          |        |  |
|      |          |        |  |
|      |          |        |  |
|      |          |        |  |

-18-

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

## SCHEDULE B

### Schedule of Fees

1.  <u>General Fees.</u>

    a.  The Borrower agrees to pay any loan and documentation fees requested by Lender.

    b.  Waiver Fee. If Lender, at its discretion, agrees to waive or amend any terms of this Agreement, the Borrower will, at Lender's option, pay Lender a fee for each waiver or amendment in an amount advised by Lender at the time the Borrower requests the waiver or amendment. Nothing in this **Section 1(b)** implies that Lender is obligated to agree to any waiver or amendment requested by the Borrower. Lender may impose additional requirements as a condition to any waiver or amendment.

    c.  Late Fee. To the extent permitted by law, the Borrower agrees to pay a late fee in an amount not to exceed 4% of any payment that is more than 15 days late. The imposition and payment of a late fee does not constitute a waiver of Lender's rights with respect to the default.

2.  Additional Fees. The Borrower and Lender agree to pay any other fees set forth on the Schedule of Advances.

CRED_EXAMINER_00002556

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

## EXHIBIT A

## FORM OF DRAW CERTIFICATE

### Draw Certificate No._____

### Date: _____, 20__

Re:    The Loan and Security Agreement (the "**Agreement**") by and between Cred (US) LLC and Borrower.

From:  Cred (US) LLC
       Attn: 2121 S. El Camino Real, Suite 500
       San Mateo, CA 94403

This Draw Certificate is prepared and delivered pursuant to the Agreement.  Capitalized terms used but not defined herein have the meanings given to such terms in the Agreement.

On the date of delivery set forth below, Lender delivered and posted cryptocurrency and/or fiat currency in the number and type specified below to Borrower's Digital Wallet pursuant to the Agreement.

| | |
|---|---|
| **Date of draw:** | |
| **Type and Number of Pledged Collateral** | _____ (number of tokens)<br><br>_____ (type of tokens) |
| **Date of delivery and posting of the draw proceeds to Borrower:** (date on which interest begins accruing on the draw amount) | |
| **Type of cryptocurrency or fiat currency:** | [__]    cryptocurrency (type:_____)<br><br>[__]    fiat currency (type:___USD_____) |
| **Number of tokens or USD:** | [__] _____ (number of crypto tokens)<br><br>[__]  $_____ |
| **Interest rate applicable to the draw:** | _____% |
| **Interest payment dates:** | $_____ payable on _____, 20___.<br><br>$_____ payable on _____, 20___. |

-20-

CRED_EXAMINER_00002557

DocuSign Envelope ID: 3E63A6DC-C645-43E7-93DC-AFA4F8C9307F

|  |  |
|---|---|
|  | $_____ payable on _____, 20___. |
|  | $_____ payable on _____, 20___. |
| **Principal payment dates:** | $_____ payable on _____, 20___. |
|  | $_____ payable on _____, 20___. |
|  | $_____ payable on _____, 20___. |
|  | $_____ payable on _____, 20___. |

CRED_EXAMINER_00002558

# Exhibit 177

# FILED UNDER SEAL

# Exhibit 178

# FILED UNDER SEAL

# Exhibit 179

# FILED UNDER SEAL

Exhibit 180

FILED UNDER SEAL

# Exhibit 181

# FILED UNDER SEAL

# Exhibit 182

# FILED UNDER SEAL

# Exhibit 183

# FILED UNDER SEAL

# Exhibit 184

# FILED UNDER SEAL