UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | . Chapter 11 |
|  | . |
| CRED INC., et al., | . Case No.: 20-12836 (JTD) |
|  | . |
|  | . (Jointly Administered) |
|  | . |
|  | . 824 Market Street |
|  | . Wilmington, Delaware 19801 |
|  | . |
| . . . . . . . . . . . . . . . . | . Wednesday, April 21, 2021 |

TRANSCRIPT OF ZOOM HEARING
BEFORE THE HONORABLE JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:          Scott D. Cousins, Esquire
                          COUSINS LAW, LLC
                          1521 Concord Pike Suite 301
                          Wilmington, Delaware 19803




For the U.S. Trustee:     Joseph McMahon, Esquire
                          UNITED STATES DEPARTMENT OF JUSTICE
                          OFFICE OF THE UNITED STATES TRUSTEE
                          J. Caleb Boggs Federal Building
                          844 King Street Suite 2207
                          Lockbox 35
                          Wilmington, Delaware 19801




Audio Operator:            Electronically Recorded
                           by ESR/Deputy

Transcription Company:    Reliable
                          1007 N. Orange Street
                          Wilmington, Delaware 19801
                          Telephone: (302) 654-8080
                          E-Mail: gmatthews@reliable-co.com



Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES CONTINUED:

For Robert J. Stark,            Andrew M. Carty, Esquire
Examiner:                       BROWN RUDNICK, LLP
                                7 Times Square
                                New York, New York 10036


For the Liquidation Trust:      Darren Azman, Esquire
                                McDERMOTT WILL & EMERY
                                340 Madison Avenue
                                New York, New York 10173


For Invictus Global             Curtis Miller, Esquire
Management, LLC:                MORRIS NICHOLS ARSHT & TUNNELL,
                                LLP
                                1201 North Market Street, 16th
                                Floor
                                PO Box 1347
                                Wilmington, DE 19899

                                        - and -

                                Michael Comerford, Esquire
                                KATTEN MUCHIN ROSENMAN, LLP
                                575 Madison Avenue
                                New York, New York 10022

### I N D E X

Page

STATUS OF COMMITTEE/LIQUIDATION TRUST . . . . . . . . . . . 4

STATUS OF MR. ALEXANDER . . . . . . . . . . . . . . . . . 5


AGENDA:
Invictus Global Management's Application for Administrative
Expenses. . . . . . . . . . . . . . . . . . . . . . . . . 9

STIPULATIONS. . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT:
  By Mr. Comerford. . . . . . . . . . . . . . . . . . 12, 35

  By Mr. McMahon. . . . . . . . . . . . . . . . . . . . . 27

  By Mr. Azman. . . . . . . . . . . . . . . . . . . . . . 32


THE COURT:
  Decision. . . . . . . . . . . . . . . . . . . . . . . . 39


EXHIBITS
1)   Declaration of Grant Lyon . . . . . . . . . . . . . 10

2)   Declaration of Cindy Delano . . . . . . . . . . . . 10

3)   Declaration of Matthew Dundon . . . . . . . . . . . 12

4

1          (Proceedings begin at 10:01 a.m.)

2          THE COURT:  Good morning.  This is Judge Dorsey.

3    We're on the record in Cred, Inc., Case Number 20-12836.

4          Go ahead and turn it over debtors' counsel to run

5    the agenda.

6          MR. COUSINS:  Good morning, Your Honor.  Scott

7    Cousins on behalf of now the reorganized debtors.  We went

8    effective a couple days ago.  And before we get to the

9    agenda, I think, Mr. Azman, on behalf of the Committee, has a

10   -- he wanted to make a brief statement about the -- us going

11   effective.

12         THE COURT:  About what?  I'm sorry.

13         MR. COUSINS:  Us going effective.  The effective

14   date.  I'm sorry, Your Honor.  I'm (inaudible).

15         THE COURT:  Okay.  All right.  Go ahead.

16         MR. AZMAN:  Hi, Your Honor.  Good morning.  It's

17   Darren Azman from McDermott Will & Emery, now counsel to the

18   Liquidation Trust.

19         As Mr. Cousins just said, the plan has gone

20   effective so the liquidation trust is in place and we are

21   moving forward on a number of fronts.  We will get

22   appearances on file shortly, as counsel of the Trust, but I

23   wanted to first make clear that -- to the Court that we are

24   appearing for the Trust today, not -- not the Committee,

25   which has been dissolved.

1          I also wanted to provide a brief status update to

2     the Court regarding Mr. Alexander, if that's okay.

3          THE COURT:  Sure.

4          MR. AZMAN:  First, Your Honor, the Bankruptcy Court

5     in California granted our motion to transfer Mr. Alexander's

6     personal bankruptcy case to Delaware and a Chapter 7 trustee

7     has been appointed and so we are coordinating with the

8     trustee and his counsel.

9          The second update relates to your emergency order

10    against Mr. Alexander and our contempt motion.  At Your

11    Honor's request, we had moved to withdraw the reference for

12    the contempt motion and the District Court very quickly

13    granted that request without a hearing.  Since that time,

14    we've been engaged with Mr. Alexander's counsel in an effort

15    to resolve our discovery requests.  We sent multiple letters

16    highlighting the continued deficiencies as -- as we see it in

17    complying with Your Honor's order and to give Mr. Alexander

18    an opportunity to cure those deficiencies.

19          We have tried to be patient, given the extraordinary

20    relief we are asking for from the District Court, but it

21    seems we are now at an impasse.  As a result, last week we

22    decided to move forward and scheduled Mr. Alexander's

23    deposition.  The Court will recall that when we last deposed

24    Mr. Alexander, he filed for personal bankruptcy in the middle

25    of the deposition and, essentially, walked out, at least

1    virtually.

2         In response to our notice of deposition that we

3    served and filed last week, Mr. Alexander has made clear to

4    us that he is not going to sit for the deposition unless we

5    withdraw the contempt motion.  So -- so we need to bring this

6    dispute to someone to adjudicate.  Although the contempt

7    motion is before the District Court, it's really a discovery

8    matter in our view and so we think it's best for Your Honor

9    to hear this.

10        To be clear, we -- we would not be asking Your Honor

11   for contempt or jail time or anything, rather -- rather, we

12   would just be asking you to once again compel Mr. Alexander

13   to sit for a deposition and not make withdrawal of the

14   contempt motion contingent upon that.

15        So if it's acceptable to Your Honor, we'd like to

16   submit a very brief letter on this issue, give Mr. Alexander

17   an opportunity to respond and then ask that Your Honor hold a

18   status conference as soon as possible so that we can get this

19   matter adjudicated.  We're, of course, happy to approach this

20   however Your Honor prefers.

21        THE COURT:  Is Mr. Alexander represented by counsel

22   in his Chapter 7?

23        MR. AZMAN:  I was nodding my head, but I -- I -- I

24   actually don't think so.  I don't believe that -- I don't

25   know if Mr. Pfeiffer and Buchanan Ingersoll are representing

1   them in his personal bankruptcy case.  I don't know.

2           THE COURT:  And I don't see Mr. Pfeiffer on the call

3   today.  Is he on the call today?  Is anyone on the call for

4   Mr. Alexander?

5       (No response)

6           THE COURT:  All right.  Well, I thought one of the

7   items on the agenda today was the renewed motion for Mr.

8   Pfeiffer's firm to withdraw.  Is that not going forward

9   today?

10          MR. COUSINS:  Your Honor, Scott Cousins.

11          At Mr. Pfeiffer's request we've adjourned that to

12   the May 12 hearing.  So it is not going forward today.

13          THE COURT:  Okay.  Well, you can submit a letter

14   outlining the issue.  I just don't know at this point, there

15   may be a jurisdictional question if we have the -- the motion

16   for contempt pending before the District Court.  I don't know

17   how that effects -- so in your letter, you should address

18   that particular issue.  Do I have jurisdiction at this point,

19   given that the contempt motion has been -- the reference has

20   been withdrawn for that motion.  The District Court has it.

21          MR. AZMAN:  Okay.  We will -- we will certainly

22   address that point in the letter, Your Honor.  Thank you.

23          THE COURT:  And, obviously, we're going to have to

24   give notice to Mr. Alexander.

25          MR. AZMAN:  Yes.  Of course.

1          THE COURT:  Do you know where Mr. Alexander is?  Is

2     he living in California?

3          MR. AZMAN:  We -- we don't know, Your Honor.  Last

4     we understood is that he is in California.  His -- his wife

5     is in Hawaii.  We learned that at the 341 meeting for his

6     bankruptcy case in California.  There will be another 341

7     meeting shortly in Delaware.  And he has two kids somewhere,

8     I think in Hawaii.  That's about all we know.

9          THE COURT:  Okay.  All right.  Well, go ahead and

10    submit the letter and we'll -- we'll go from there.

11          When do you plan on doing that?

12          MR. AZMAN:  Very shortly.  I think given the

13    additional issue, we -- that Your Honor asked for, it will

14    probably not be until tomorrow or perhaps Friday.  But it

15    will be before the end of this week.

16          THE COURT:  All right.  And then notify Mr.

17    Alexander.  I'll give him seven days to respond.

18          MR. AZMAN:  Okay.  Thank you very much, Your Honor.

19          THE COURT:  Okay.

20          MR. COUSINS:  Your Honor, Scott Cousins again.

21          That brings us to the only matter going forward,

22    which is the -- the application of Invictus Global

23    Management.  I believe Mr. Miller is on the line on behalf of

24    Invictus.

25          THE COURT:  All right.  Mr. Miller.

1          MR. MILLER:  Good morning, Your Honor.  For the

2    record, Curtis Miller of Morris Nichols Arsht & Tunnell on

3    behalf of Invictus Global Management.

4          Your Honor, on -- also on Zoom today is my co-

5    counsel Mike Comerford from Katten.  He has been admitted pro

6    hac and if it's okay with Your Honor, I'll turn the virtual

7    podium over to him.

8          THE COURT:  All right.  Mr. Comerford, go ahead.

9          MR. COMERFORD:  Good morning, Your Honor.  Can you

10   hear me okay?

11         THE COURT:  I can.  Thank you.

12         MR. COMERFORD:  This is Michael Comerford with

13   Katten Muchin Rosenman on behalf of Invictus Global

14   Management, here today on -- on the application for

15   administrative expense claim filed by Invictus.

16         Before I get started with argument, Your Honor, I

17   did want to just state one thing which I think has been

18   communicated to your chambers, is that the parties who have

19   appeared in connection with this matter, the United States

20   Trustee, the Creditors' Committee, which I understand is now

21   as -- acting as the Liquidating Trustee, and Invictus agreed

22   amongst themselves beforehand that they would submit the --

23   their respective declarations and exhibits into evidence and

24   the parties would also agree that there would be no cross-

25   examination of the declarants as between the three parties.

1          I believe the United States Trustee also has a

2    statement that they wanted to make for the record, but I'll

3    pause there in case Your Honor has any comments with respect

4    to that.

5          THE COURT:  Well, we're going to have to move the

6    declarations into evidence.  Why don't you go ahead and move

7    yours in.  I'll ask Mr. McMahon for his statement.  I'll ask

8    the debtors to move theirs in.  And then we will go to

9    argument after that.

10         MR. COMERFORD:  Okay.  So, Your Honor, I would like

11   to move into evidence the declaration of Mr. Grant Lyon,

12   which was attached to our application and, also, the

13   declaration of Miss Cindy Delano, which was attached to our

14   reply.

15         THE COURT:  All right.  Is there any objection?

16      (No response)

17         THE COURT:  They're admitted without objection.

18      (Lyon Declaration received in evidence)

19      (Delano Declaration received in evidence)

20         THE COURT:  All right.  Mr. McMahon, do you have a

21   statement regarding evidence or is it your argument?

22         MR. McMAHON:  Your Honor, it's a stipulation

23   regarding requests for judicial notice.  The parties have

24   stipulated to two things.

25         First, the absence of a motion seeking approval of

1  lender diligence fees, expenses in connection with DIP

2  financing by the debtors from the Court's docket.  And,

3  separately, the absence of a motion by the debtor seeking

4  approval of DIP financing itself from the Court's docket.

5  Those two stipulations have been agreed to by the debtors and

6  the committee and we ask that the Court take judicial notice

7  of those two facts.

8          THE COURT:  All right.  Is there any objection?

9     (No response)

10         THE COURT:  All right.  I will take judicial notice

11  of those two facts.

12         Debtors, do you have -- you have one declaration.

13  Is that correct?

14         MR. COUSINS:  Yes, Your Honor.  That was just moved

15  into evidence by Mr. Comerford.  That's the Grant Lyon

16  declaration that was submitted with Invictus's pleadings.

17         THE COURT:  All right.  And the liquidating trustee

18  or -- declaration.

19         MR. COMERFORD:  Yes, Your Honor.  We'd like to move

20  into evidence the declaration of Matthew Dundon.  Mr. Dundon

21  is with Dundon Advisors, which is the financial advisor of

22  the Committee and now the financial advisor to the

23  Liquidation trustees.  Mr. Dundon is here in the virtual

24  courtroom and available for cross.  But, of course, we're --

25  we've all stipulated that there will be no cross.

1    THE COURT:  All right.  Is there any objection to

2    Mr. Dundon's declaration?

3        (No response)

4        THE COURT:  Okay.  It's admitted without objection.

5        (Dundon Declaration received in evidence)

6        THE COURT:  All right.  Let's go ahead and jump

7    right into the argument.

8        MR. COMERFORD:  Okay.  Thank you, Your Honor.

9    Again, Michael Comerford with Katten Muchin Rosenman on

10   behalf of Invictus Global Management.

11       We're here today on the application for approval of

12   administrative expense claims under one of the wonderful

13   provisions under the expense.  That would be Section

14   503(b)(1)(A) for -- Sections 503(b)(3)(D) and 503(b)(4),

15   either administrative expense made under 503 or a substantial

16   contribution and the related payment of legal fees that were

17   incurred in connection with the substantial contribution.

18       With respect to administrative expense claim, the

19   evidence that's been submitted by Invictus is uncontroverted

20   at this point.  We have a declaration from Miss Cindy Delano

21   of Invictus that supports the fact that Invictus that

22   supports the fact that Invictus made four million dollars in

23   capital available to the debtors for DIP financing after they

24   were induced to do so by the debtors.

25       And then we have independent corroboration of the

1    benefit and the postpetition agreement that was reached

2    between Invictus and the debtors based upon the declaration

3    of Mr. Grant Lyon, who is the independent director of the

4    debtors and independent fiduciary that was charged with

5    ensuring that the debtors would end up being able to be in a

6    position to maximize value for the estates and also to

7    protect the estates during the Chapter 11 cases.

8        Just as a little background, not to restate too much

9    of what's in our papers, but it is clear that these cases

10   were commenced in the face of theft and misappropriation of

11   assets.  They had relatively volatile assets in the form of

12   cryptocurrency and a liquidity crisis when they commenced

13   their Chapter 11 cases.  (Inaudible) investment banker

14   (inaudible) DIP financing process that they were authorized

15   to do so in connection with their retention.  It is a fact

16   that they approached 35 parties and only 1, Invictus, was

17   able to make the capital available to the debtors.

18       And, in fact, the debtor reached agreement with

19   Invictus on the terms of DIP financing and then the debtors

20   and Invictus worked together to draft a DIP term loan note, a

21   DIP order, multiple declarations, a DIP motion.  There was a

22   budget and also related items such as an administrative agent

23   was selected and other -- other banking formalities that were

24   needed in connection with finalizing everything.

25

1    THE COURT:  Let me ask you, Mr. Comerford.

2    MR. COMERFORD:  So it (inaudible) --

3    THE COURT:  There was -- there was no -- there was

4    no final agreement entered into between the debtors and

5    Invictus, was there?

6    MR. COMERFORD:  Well, the parties did come to a

7    final agreement and the documents that were filed with the

8    reply reflect the finalization of that documentation and the

9    facts just as they were bore out that there was not an

10   ultimate need at the end of the day for the debtors to file

11   the documentation, but they did reach agreement on the

12   documentation that was submitted as an exhibit in connection

13   with our reply.

14   THE COURT:  The only exhibit attached was a draft.

15   I didn't see a final executed.

16   MR. COMERFORD:  That -- that is true that there was

17   no actual filing of the documentation, but under 503(b)(1)(A)

18   and consistent -- consistent with how when you read Hechinger

19   and O'Brien, in order to have a postpetition agreement, there

20   doesn't need to necessarily be a final document that was

21   filed and approved by the Court.

22   Now I will -- understandably, our facts are not --

23   we're not a bidder and we weren't providing services as

24   employees, but those cases, coupled with Energy Future, also

25   a bidding type case, and the holdings in that case would let

1    someone conclude that a postpetition transaction doesn't need

2    to be a final document that was approved by a court.

3            And I think that the efforts that were put forth, as

4    reflected by Invictus's time entries and also the debtors'

5    counsel's time entries, reflect that there was a meeting of

6    the minds on a postpetition transaction, which necessarily

7    provided a benefit to the estates and protected the estates,

8    as set forth in the Lyon declaration and in part in the

9    Delano declaration such that you can have an administrative

10   expense claim asserted and payable by the estates.

11           Does that address your question, Your Honor?

12           THE COURT:  Yes.  Thank you.  Go ahead.

13           MR. COMERFORD:  Just to jump back to where I was.

14   With respect to the postpetition agreement, the Committee

15   argues that it was a potential transaction.  But as I was

16   stating to Your Honor, I think that the facts show that there

17   was more than a potential transaction here through the

18   efforts that were put forth by the debtors and their advisors

19   and also Invictus and its counsel such that there was

20   substantial efforts to move this forward to a point where

21   they had final documentation in place.

22           And no party would have done that as to the

23   expectation that it was going to be implemented due to the

24   liquidity issues that were present with the companies and the

25   potential administrative insolvency that they -- they -- if

1    certain things did not work out for them, questionable

2    collections, the volatility of their underlying assets, and

3    being able to take their cases from commencement to a value

4    maximizing transaction in the end.

5          And that's -- that's what's reflected in our

6    application and our reply and in the declarations that we

7    submitted in support of that.

8          I would also say that Energy Future, the Third

9    Circuit case, 990 F.3d at 742 and 743 states that the concept

10   of necessary costs in the Section 503(b)(1)(A) context is

11   broader than one of absolute requirement.

12         The Court speaks to the fact that there -- there

13   could be "less readily calculable benefits, such as the

14   ability to conduct business as usual," or value to an estate

15   that was provided through the protection of the costs that

16   were incurred in connection with an administrative expense.

17         As I mentioned earlier, the debtors' counsel clearly

18   provided actual and necessary benefits through their efforts

19   and -- and that's borne out through their time entries which

20   we cite in our reply.  And equally, Invictus, was a party

21   that also provided necessary and actual benefits as -- as

22   allowed under Section 503 and that the parties had a meeting

23   of the minds and were working together to try to come up with

24   a solution that would protect the debtors' estates.

25         THE COURT:  Well, how is it necessary if -- if it

1    turned out they didn't even need a DIP at all?  How is it

2    necessary?

3         MR. COMERFORD:  Well, I agree with you that you

4    could -- you could -- you can make that argument, but you

5    also have to look backwards and look at the view of the

6    debtors at the time that they were undertaking these

7    activities and in trying to ensure that in their business

8    judgment and in their -- that they were maximizing value for

9    the estate and undertaking efforts to ensure that the company

10   and its -- would not fall into a administrative insolvency.

11        And through sort of hitting a home run at the end of

12   the day or having everything fall into place, they ultimately

13   turned out that they did not need the DIP financing, but

14   there is evidence in the record and factual statements from

15   their independent director, who -- who is the only

16   independent fiduciary in these cases, that speaks to the

17   needs and the belief that they had to have this -- this DIP

18   financing in place to ensure that they wouldn't fall into

19   potential administrative insolvency.  So their uncontested

20   testimony says that it was a benefit to the estates.

21        Just moving forward with some of -- some of the

22   items that they -- they -- and have stated in the declaration

23   by Mr. Lyon, they had very real concerns with respect to

24   collection of outstanding accounts receivable, the volatility

25   in connection with their underlying assets, and potential

1    administrative insolvency with -- these concerns were

2    alleviated by having DIP financing available to them.

3         They also had the underlying fact that they tried to

4    run a sales process in an effort to obtain additional

5    liquidity and that also did not -- was not successful.  So

6    there were numerous facts and circumstances which motivated

7    the debtors to insure that they had this benefit in place

8    during the pendency of the Chapter 11 cases.

9         Before I turn to the substantial contribution

10   argument, Your Honor, I just wanted to make a few -- a quick

11   few points with respect to the Committee's objection which I

12   think are applicable under either -- either cases for an

13   administrative expense claim.

14        The Committee and its declaration that they submit

15   make the statement that this application is rare and unusual.

16   And I would agree, it is.  It is a rare and unusual set of

17   facts and circumstances, but that doesn't mean that it's not

18   a basis under which an administrative expense claim can be

19   awarded.  And because of the un -- unusual nature of these

20   facts and circumstances, it's not a scenario where there's

21   going to be some potential flood gate of similar claims being

22   brought or some -- some concern that could be raised because

23   of the granting of this -- of this asserted administrative

24   expense claim.

25        There's the debtors -- you know, and then the

1    Committee does make the argument that they had a different

2    view of the world.  And that's -- and that's fine.  I mean,

3    they're a party-in-interest and they can assert whatever

4    their belief is, but the debtors were acting within their

5    business judgment and they had liquidity concerns and they

6    needed to take actions with respect to what they thought was

7    actually the necessary -- necessarily needed to be done in

8    connection with managing the administration of these Chapter

9    11 cases and protecting the estates, which is the action that

10   they took.

11          (Inaudible) raises the argument that the PSA motion

12   should have put a stop to these things.  But the PSA motion,

13   as we stated in our reply papers, wasn't approved until

14   February and it also had a fiduciary out for the debtors to

15   the extent they believed they needed DIP financing in place,

16   which is the actions that they undertook in order to ensure

17   that the estates were protected at all times, which is what

18   their obligation is.

19          And, ultimately, it is pretty -- in my experience, a

20   DIP lender often is negotiating with the debtors and the

21   debtors interact with the Committee and there's really no

22   interaction necessarily from day one through to the end with

23   the Committee on -- and sometimes Committees do oppose DIP

24   financing.  So I really don't think that that's any different

25   than some -- some -- any other situation that you may see

1    arise in other Chapter 11 cases from that perspective.

2    So I don't think that the objection of the Committee

3    is necessarily any different from what you might see in any

4    other DIP financing in Chapter 11 cases.

5    THE COURT:  Well, let me ask you another question,

6    Mr. Craw -- Comerford.  Let me ask you another question.

7    If --

8    MR. COMERFORD:  Yes.

9    THE COURT:  In a case where -- this is a

10   hypothetical.  So a debtor files a motion for approval of the

11   DIP, the Committee objects, and I sustain the objection and

12   deny the DIP because I determine that it wasn't necessary,

13   can that proposed DIP lender then seek reimbursement for

14   expenses under 503?

15   MR. COMERFORD:  Well, I can't necessarily speak to

16   whether that's -- they -- they can or they cannot in that

17   particular set of facts and circumstances.  It would probably

18   depend, in part, on other factors that are occurring in that

19   Chapter 11 case and the basis for why the DIP was denied in

20   that maybe there's sufficient cash collateral such that there

21   is no need for a DIP or there's an other value maximizing

22   transaction that was created because of the fact that the DIP

23   was brought to -- before the Court, but wasn't needed because

24   it helped with some other value maximizing transaction.

25   It -- you -- it could create that possibility, but,

1   obviously, those are not our facts and circumstances.

2          I will just move forward and -- so the one other

3   thing I wanted to raise was the Committee cites In re KiOR,

4   K-i-O-r, 567 B.R. 451, in respect of their argument that

5   there was no benefit, and they cite to our time entries.  But

6   I would distinguish that case in that that case, when it

7   talks about time entries and whether or not a potential DIP

8   or potential lender spoke -- a potential admin -- you know,

9   it's the party that was seeking administrative expense had

10  spoken to other general unsecured creditors, that was in the

11  context of underlying facts where there have no -- been shown

12  no benefit.

13         And I think that our facts are very different from

14  that in that I think that there is the declarations that have

15  been submitted, in particular the Lyon declaration, that does

16  show the benefit that was obtained by the estates in

17  connection with this matter.  And so I think that that case

18  is distinguishable and it's not entirely stating the full set

19  of facts that went into the (inaudible) in those -- in the

20  Committee's objections.

21         Turning to substantial contributions.  As set forth

22  in  In re Buckhead, 161 B.R. 11, there's generally a three-

23  prong test that goes into determining whether or not there's

24  a basis for a substantial contribution claim.

25         The first prong is were the services intended to

1   benefit all parties in the case.  I think in this instance,

2   the financing necessarily gave the debtors flexibility and

3   leverage to move forward with their cases and achieve a value

4   maximizing transaction.  They avoided the need to liquidate

5   cryptocurrency in a coarse or unfavorable manner.  And it

6   wasn't just about the benefit to Invictus.  The whole entire

7   point of this exercise was Invictus working with the debtors

8   to try to provide a benefit for all constituencies in the

9   case and -- in connection with avoiding any concerns about

10  administrative insolvency.

11       This sort of speaks to the second point which is the

12  services provided direct and significant and demonstrable

13  benefit to estate.  I think that's what the Lyon declaration

14  sets forth, the belief in their business judgment that there

15  -- and -- and in their action, postpetition that there was a

16  benefit to the estates through these actions.

17       And the final point, whether the services were

18  duplicative.  I don't think you can make that argument that

19  our services were duplicative and that there was no other

20  party willing and capable to make four million dollars in

21  capitalable -- capital available to the debtors, which is

22  what Invictus did.  And then we undertook the actions

23  necessary to have documentation ready so that Invictus, which

24  was ready, willing, and able to provide that capital, could

25  act when the debtors needed us.

1          And under the fortuitous circumstances of this case

2     that just never actually happened at the end of the day, but

3     they received -- they had the time and ability to achieve a

4     value maximizing transaction for the estates.

5          Now speaking to the standing point with respect to

6     the substantial contribution claim.  I believe the United

7     States Trustee and the Committee cites to _Lebron_ primarily,

8     the Third Circuit case that speaks to substantial

9     contribution and their basis for why Invictus should not have

10    standing to assert a substantial contribution claim.

11         I would argue that _Lebron_ is not a standing case.

12    And I think that to make that argument is outside the four

13    corner of what that court was contemplating in connection

14    with their decision.  They certainly state what the

15    statutorily text of 503(b)(3)(D) states, but in that

16    particular case, under those facts and circumstances, the

17    particular party that was asserting a substantial

18    contribution claim was a creditor.  So I don't think the

19    Court ever weighed in on standing directly with respect to

20    their holding, other than to state the facts.

21         THE COURT:  But -- but don't your -- don't --

22         MR. COMERFORD:  And I think that when you look at

23    _Lebron_ --

24         THE COURT:  Excuse me.  Excuse me.  Excuse me.  One

25    second.  One second.

1          Don't your papers argue that <u>Lebron</u> supports your --

2          MR. COMERFORD:  Absolutely, Your Honor.  I'm sorry.

3          THE COURT:  Don't your papers argue that <u>Lebron</u>

4    supports your position?  I mean, that's the way I read your -

5    - your argument, that you were saying <u>Lebron</u> supported your

6    position --

7          MR. COMERFORD:  Yes.  Yes.  That was going to be my

8    next point.

9          THE COURT:  -- because on stand -- on the standing

10   issue because <u>Lebron</u> says -- at one point it refers to

11   something about other parties and interest and you argue that

12   that means that anybody can file a claim, not just the four

13   statutory parties identified in 503(b).  Correct?

14         MR. COMERFORD:  That's true.

15         THE COURT:  Okay.

16         MR. COMERFORD:  That is correct, Your Honor.  That

17   was going to be my next point.  That's what I was getting to.

18         I think that <u>Lebron</u> does state that other parties

19   interested or other parties -- other interested parties --

20   this is at 943 and 44 -- 944 of that opinion.  And it is

21   dicta, but I think that in connection with that case that

22   language would suggest that there is a possibility that

23   parties other than the ones enumerated in that section could

24   be eligible to assert a substantial contribution claim.

25         I think that <u>Lebron</u> also was slightly expansive in

1    its holding in that the other part of that opinion is that

2    they looked at the substantial contribution claim that was

3    being asserted and they looked at the efforts that were made

4    both prepetition and postpetition.  And I think that you

5    could argue that although they looked at legislative history

6    in connection with this and they looked at the statutory --

7    statutory language itself, there -- they were allowing a

8    party that had made efforts in connection with prepetition

9    activities which related to underlying fraud at the company

10   in the prepetition period of time to be asserted as a

11   substantial contribution claim even though the activities

12   themselves did not occur in -- in the Chapter 11 case.

13        Arguably, you could say that a party that's acting

14   in a prepetition period under the strict definitions of the

15   Bankruptcy Code for a creditor is not a creditor at that

16   point in time, at least under the technical requirements of

17   the Bankruptcy Code.  And that if the creditor has a claim

18   against the debtor and the debtor doesn't -- the debtor needs

19   to commence its case before it's a debtor.

20        That's a very technical argument and I'm not

21   suggesting that the Court necessarily consider that, but I do

22   think that you can make the conclusion that the ultimate

23   holding in Lebron was more expansive than what the code

24   provision itself states.

25        And then beyond Lebron, I've acknowledged there is a

1    split amongst the courts out there as to whether or not

2    standing should be more expansive than what's enumerated in

3    503 with respect to substantial contribution.  But there are

4    cases out there, such as S&Y, (inaudible), which was an

5    Eastern District of New York case from 2012 that suggests

6    that reading 503(b) and the language in that "provision"

7    would allow for a conclusion that you should allow standing

8    to be more expansive, especially with the fact that Chapter

9    11 cases only become more complex over time and more and more

10   parties-in-interest appear from all different perspectives

11   and may have the ability to have provided a substantial

12   contribution to a Chapter 11 debtor and maybe they don't fit

13   into the perfect parties that are enumerated in the section.

14        But standing views expansively allows parties to

15   participate and provide a benefit to the estate and it

16   doesn't lessen the standard to -- that a party has to meet in

17   order to obtain a substantial contribution claim in that they

18   have to show the benefit that was provided to the debtors'

19   estate.

20        And we think that that is a reasonable -- reasonable

21   conclusion to reach under our facts and circumstances with

22   respect to the Cred Chapter 11 cases.

23        And with respect to the substantial contribution

24   itself, then I will just cite back to the Lyon declaration in

25   part in that there's statements in there that the debtors

1    have determined that having the financing available to them

2    was essential to protecting their estates during the Chapter

3    11 cases and in their best interest as it would have allowed

4    the debtors to not have to liquidate cryptocurrency if

5    collections were unsuccessful, among other things.  And that

6    the financing mitigated the significant risk for the debtors

7    to be unable to preserve and maximize the value of their

8    estates and administer the cases.

9           So we think that -- in conclusion, Your Honor, we

10   think that there's a factual and legal basis to grant the

11   administrative expense claims under either the two prongs of

12   Section 503 that we have set forth in our -- in our

13   pleadings.

14          And that is the conclusion of my presentation, Your

15   Honor, unless you have any other questions for me.

16          THE COURT:  No.  No questions.  Thank you, Mr.

17   Comerford.

18          Let me go ahead and hear from the Trustee and then

19   I'll go to the -- the U.S. Trustee and then I'll go to the

20   liquidating trustee.  Let's do that.

21          Mr. McMahon.

22          MR. McMAHON:  Your Honor, thank you.

23          The application should be denied and I'll address

24   the substantial contribution argument first.

25          Contrary to what Invictus says its reply at

1   Paragraph 7 to 9, Invictus does not have standing to seek a

2   substantial contribution award under those subsections.

3           Invictus takes dicta from Lebron and Energy Future

4   Holdings and bends it.  Contrary to what Invictus states in

5   those paragraphs, as the Supreme Court has noted on a number

6   of occasions, statutory interpretation begins with the plain

7   meaning of the text.  An (inaudible) would require treating

8   the text as if it were ambiguous ends with the plain meaning

9   of the text.  The citation is Lamie v. United States Trustee,

10  540 U.S. 526, (2004).

11          Invictus is admittedly not one of the four types of

12  entities listed in Section 503(b)(3)(D) which is entitled to

13  seek a substantial contribution award; that is, a creditor,

14  an indenture trustee, an equity security holder, or an

15  unofficial committee representing creditors or equity

16  security holders.  And -- and, therefore, they just do not

17  have a basis for seeking an award under the -- those

18  subsections.

19          With respect to the citation to Lebron, which

20  Invictus's counsel just made a moment ago, Your Honor, I

21  would just refer to the text of the opinion.  What that

22  specific paragraph that's cited is doing is describing the

23  history by which the substantial contribution standard of

24  Section 503(b)(3)(D) came from the act.  And, certainly, the

25  reference in -- in that opinion to other parties was -- I

1    think goes without saying that the Third Circuit was not

2    intending to rewrite the statutory text.

3         Next, Your Honor, postpetition transaction, which is

4    the standard under Section 503(b)(1)(A).  The first issue, is

5    there an executed contract by the Court?  Here there's

6    admittedly none.  Invictus cites the break-up fee cases in

7    Paragraphs 12 to 4 (sic) of its reply in connection with the

8    Section 503(b)(1)(A) argument.  But they're easy -- easily

9    distinguishable here because in each case cited the

10   postpetition transaction at issue have been approved by the

11   bankruptcy court in <u>Energy Future</u> at Page 732 referencing

12   approval of the proposed merger by the bankruptcy court of --

13   of the merger between debtors and NextEra.

14        <u>Women's First Healthcare</u>, 332 B.R. 118, the asset

15   purchase agreement providing for the bid protections was

16   approved by the bankruptcy court.

17        <u>O'Brien Environmental Energy</u>, 181 F.3d 530, again,

18   the contract with Calpine was approved by the bankruptcy

19   court.

20        In addition, at Paragraph 13 of Invictus's reply it

21   cites <u>Hechinger</u> for this idea that it sounds like a more

22   liberal standard under Section 503(b)(1)(A), but if Your

23   Honor reads that specific paragraph in context, what the

24   Third Circuit was doing in -- in that paragraph was it was

25   rejecting the argument that the employees in the <u>Hechinger</u>

1    cases who had provided services prepetition could claim that

2    those services continue to benefit the debtor after the cases

3    were commenced.

4         So looking at the language in context, it had

5    nothing to do with what it is that Invictus is saying that

6    the sentence stands for.  Meaning, really what the

7    distinction the Third Circuit was making was that the estate

8    can't be preserved until we have a bankruptcy case and the

9    estate doesn't exist prepetition.

10        Further, Your Honor, the debtors in Invictus did not

11   take steps to seek approval of a postpetition transaction

12   during the relevant time period.  Section 364 of the

13   Bankruptcy Code requires notice and a hearing before approval

14   of financing on a secured, administrative, or super-priority

15   basis.  Here there was no executed contract and no such

16   motion was filed.

17        This Court has seen a number of instances,

18   particularly in the context of exit financing where lenders

19   will not commit to a (inaudible) fact unless they know their

20   costs associated with same are paid for irrespective of

21   whether they ultimately commit to providing the financing at

22   issue.  What happens in those instances, Your Honor, is that

23   the debtors file a motion, sometimes on an expedited basis,

24   at the relevant time, seeking authority to pay the lender's

25   fees and expenses on notice to parties-in-interest.  The

1    debtors did not take such action here, nor did Invictus

2    insist upon it.  And any such application would have been

3    subject to the Committee's and the U.S. Trustee's objection.

4            With respect to the issue of actual necessary costs

5    observing the estate, Your Honor, I'm just going to read

6    Paragraph 22 of Invictus's own application.

7            "Ultimately, after reaching the finish line with

8             respect to definitive documentation and being on the

9             precipice of filing the motion to approve the DIP

10            financing, the debtors were able to collect on

11            various accounts receivable that had not been deemed

12            likely sources of revenue and also benefitted from

13            the significant rise in the market value of the

14            debtors' cryptocurrency.  This allowed the Debtors

15            to determine that they would no longer need the

16            liquidity that the DIP financing from Invictus would

17            have provided."

18           Invictus had nothing to do with the collection of

19    the accounts receivable cited, nor can Invictus claim any

20    responsibility for the market value of the debtors'

21    cryptocurrency.

22           Finally, Your Honor, with respect to slippery slope,

23    in Paragraph 19 of Invictus's (inaudible) motion, Invictus

24    notes that the debtor solicited the financing offers from

25    more than 35 different lenders and from that group the

1    debtors received five indications of interest and two term

2    sheets.  Your Honor, our office, as an institutional concern,

3    has a -- a concern that any entity responding to the debtors'

4    solicitation may be entitled to seek allowance of

5    administrative expense, court approved contract or not, if

6    the reasoning which Invictus is advances here is adopted.

7         Your Honor, for these reasons, for the reasons

8    stated in our objection, we believe that the application

9    should be denied.

10        THE COURT:  Thank you, Mr. McMahon.

11        Mr. Azman, are you arguing for the Liquidated

12   Trustee?

13        MR. AZMAN:  I am.  Yes.  Darren Azman, again,

14   McDermott Will & Emery, for the Liquidation Trustees.

15        Your Honor, I'm going to mostly rely on our papers,

16   but there are a few issues worth highlighting.

17        The first point I want to address is this idea that

18   a party who negotiates a potential transaction with a debtor

19   should be compensated for its efforts, even though the

20   transaction is never consummated.  In our view, Your Honor,

21   there are no circumstances in which that should happen.

22        On the substantial contribution claim, the whole

23   purpose of Section 503(b)(3)(D) is to encourage activities

24   that will benefit the estate as a whole and where a party

25   acts primarily in its own interest and the benefits of the

1  estate is merely incidental.  There is no substantial

2  contribution.  There is no evidence that Invictus was acting

3  in anyone's interest other than its own in negotiating a DIP,

4  nor should they have been expected to have had the estates'

5  interest in mind.  They are not a creditor.  They had no

6  involvement in this case other than as a potential DIP

7  lender.

8       Now we dispute that there was any benefit from their

9  actions, but it doesn't really matter.  Whatever benefit

10  flowed to the debtor was obviously incidental to Invictus's

11  primary goal, making money on the loan.  And so that is

12  probably the easiest route to finding that there was no

13  substantial contribution claim here, among many of the other

14  reasons we cited.

15       Invictus's amended application to assert its

16  administrative expense claim under 503(b)(1)(A), we've laid

17  out a number of reasons why that argument also fails, but I

18  want to point out one issue in particular.  503(b)(1)(A)

19  requires that there was a postpetition transaction.  By

20  definition there was no transaction here with Invictus.  I

21  think that even accepting the idea that the debtor signed off

22  on the term sheet -- excuse me, the terms of the DIP by e-

23  mail doesn't mean that there was a transaction.  And that's

24  for three reasons.

25       First, no one signed anything, as Your Honor

1    highlighted before.  There was no binding agreement.  There

2    was a term sheet and the term sheet made clear that it was

3    subject to the definitive documentation.  And not even the

4    term sheet, by the way, was executed by the debtor or

5    Invictus, as far as we know.  And then definitive documents

6    were apparently drafted based on that term sheet but, again,

7    nothing was signed.  Under Invictus's views, there was a

8    binding transaction and so I assume that also means Invictus

9    could pursue the debtor for breach of this DIP financing that

10   existed.  I think that is effectively what they are saying.

11   And -- and that's not a precedent we should be setting in

12   this or any other -- really any other case.

13          Second, Your Honor, the DIP was subject to the

14   Committee's consent under the PSA.  It does not matter

15   whether Invictus knew about that or did not.  That is a fact.

16   There could -- there could not be a DIP financing transaction

17   without the Committee's consent.  And far from providing that

18   consent, the Committee made very clear early on in this

19   process that it would not consent to a DIP.  And putting

20   aside the Committee consent right, Invictus could have

21   reached out to the committee to discuss all of this before

22   incurring significant fees in going down that path.

23          Third, Your Honor, the DIP, obviously, was subject

24   to this Court's approval like every other DIP.  So there was

25   no postpetition transaction, thus, there cannot be an admin

1  claim.

2          The last point, Your Honor, is that the case law

3  requires the Court to look in hindsight to see if there was

4  actually a benefit.  There was not.  The proof is that we're

5  here today representing the Liquidation Trustees and have

6  them confirm the plan and no DIP financing was needed.  It's

7  -- it's not as if the DIP proposal increased value by

8  allowing the estate to get better DIP -- DIP terms from

9  somebody else.  That's just not what happened.

10         Your Honor, we understand Invictus's frustration.

11  They thought they had a new deal lined up and clearly spent

12  significant time on it and it didn't work out, but that is

13  the cost of doing business and I think that's exactly what

14  Your Honor's hypothetical speaks to, a DIP that's proposed

15  and then denied by the Court.  I don't see how the DIP

16  lenders get a substantial contribution claim in that context.

17         Thank you, Your Honor.

18         THE COURT:  Thank you, Mr. Azman.

19         Mr. Comerford, I'll give you the last word.

20         MR. COMERFORD:  Thank you, Your Honor.

21         I just have a few things that I wanted to add in

22  connection with the statements by the U.S. Trustee and the

23  Liquidating Trustee's counsel.

24         In -- in the end of the day, what we're hearing from

25  the Committee and the United States Trustee are legal

1    argument.  Nothing that they're saying is countering the

2    benefit that is set forth in the Lyon declaration, an

3    independent fiduciary to these debtors' estates who acted at

4    all times to maximize value to the estates.  Those facts I --

5    are still uncontroverted and I don't think legal argument can

6    be made that counters those facts.

7         Secondly, with respect to the cases that the United

8    States Trustee raised with respect to O'Brien and Energy

9    Future, I don't believe it is accurate to say that there was

10   a postpetition agreement in -- in those particular cases.  In

11   fact, Energy Future speaks to the fact that bidding can give

12   rise to a postpetition transaction.

13        In O'Brien they were seeking payment of break-up

14   fees and expenses that were not approved by the Bankruptcy

15   Court.  So there was no underlying contract with respect to

16   those particular expenses that they sought to have paid in

17   connection with the (inaudible) of the case.

18        Similarly, with respect to Energy Future, which I

19   think is very helpful in connection with the statements that

20   they make in terms of how to determine whether or not a claim

21   is entitled to administrative expense priority, but, again,

22   those were -- obviously, that's a very complicated factual

23   case.  There's a lot of different twists and turns there.

24   But in connection with that Third Circuit opinion, they were

25   looking at administrative fees that had been incurred by a

1    bidder that were not part of the contract and it all spun out

2    of the fact that a different remedy had been denied and then

3    they were seeking payment of certain expenses and fees that

4    were outside of the four corners of the agreement.

5            THE COURT:  But in both of those --

6            MR. COMERFORD:  In any event --

7            THE COURT:  In both of those --

8            MR. COMERFORD:  -- I think that --

9            THE COURT:  -- cases -- both of those cases, Mr.

10   Comerford, were -- the Court had approved a stalking horse

11   bidder.  Are you telling me that -- that the case law stands

12   for the proposition that you have a stalking horse bidder and

13   someone come out -- come -- someone else comes in and starts

14   bidding on the assets, but the stalking horse bidder ends up

15   being the one who wins at a higher price.  Is the losing

16   bidder -- do they have the right to come in and ask for --

17   for an administrative expense fee?

18           MR. COMERFORD:  Under the language of 503 I

19   absolutely think they do.  I think that 503, to the extent

20   that they can meet the standard and show that there was a

21   benefit incurred by the estate, which I think is what Energy

22   Future states, is that if you have the underlying facts and

23   show that you provided a benefit to the estate in connection

24   with a postpetition action, postpetition transaction, then

25   you have a right to go in front of the court and request that

1    your expenses are, indeed, to be paid.

2            THE COURT:  So in every case where there's an

3    auction and parties bid on the assets, you're telling me that

4    anybody who participated in that auction, even though they

5    lost, has the right to seek an administrative claim.  And can

6    you point me to any case --

7            MR. COMERFORD:  I'm not trying to --

8            THE COURT:  Can you point me any case that says

9    that?

10           MR. COMERFORD:  No.

11           But I think that -- I don't want to not answer the

12   question that Your Honor is raising, but I would answer it by

13   saying I'm not trying to open up the floodgates with respect

14   to fees and expenses and claims that are brought by all kinds

15   of different parties-in-interest.  I'm really trying to stay

16   focused on the narrow facts and circumstances and the

17   evidence that's submitted in this particular case and under

18   these facts.

19           And there is -- I'm not suggesting to you that this

20   is a run-of-the-mill set of facts and circumstances that

21   comes before Your Honor every day or any other judge for that

22   matter, but because of the unique set of facts and

23   circumstances and the independent corroboration of the

24   debtors and their independent director, I think we have the

25   facts and the evidence necessary to sustain our request for

1    an administrative expense claim.

2         And I'm not trying to sit here today and argue for

3    the benefit of all parties-in-interest out there.  I'm

4    actually trying to keep it as narrow as we can, recognizing

5    that that is generally -- generally judicial constraint is

6    used in connection with administrative expense claims.

7         I believe that we've -- we have the necessary facts

8    in law in order to have our application granted.

9         And I think that's -- the only -- the only other

10   thing I'll raise with Your Honor is you had asked me earlier

11   about whether or not a DIP that was not in connection with a

12   Chapter 11 case would have ever have related fees and

13   expenses approved.  And there are.  Circuit 9 talked about

14   max -- other value maximizing transactions which sometimes,

15   obviously, could take a form of another DIP.  And, you know,

16   there are examples of that.

17        And I'm not suggesting that our facts and

18   circumstances are exactly the same as that, but I did want to

19   -- just to address your question in full now that I had the

20   opportunity.

21        THE COURT:  Thank you, Mr. Comerford.  Anything

22   else?

23        MR. COMERFORD:  That's all.  Thank you, Your Honor.

24        THE COURT:  All right.  Okay.  I am -- I am going to

25   sustain the objections and deny the motion.

1         Section 503(b)(3)(D) provides for allowance of

2    actual and necessary expenses incurred by "a creditor, an

3    indentured trustee, an equity security holder, or a committee

4    representing creditors or equity security holders, other than

5    an official committee appointed under Section 1102 of this

6    title in making a substantial contribution in a Chapter 11 or

7    -- 9 or 11 case."

8         Invictus does not fall under any of those three --

9    any of those four categories of parties permitted to seek

10   reimbursement under Section 503(b)(3)(D).

11        The statute itself is clear and unambiguous in

12   stating that parties that can seek re -- in stating who the

13   parties are who can seek reimbursement, relying primarily on

14   the Third Circuit's decision in Lebron v. Mecham Financial,

15   Inc., 27 F.3d 937, (3d Cir. 1994).

16        Invictus argues that the four categories are not

17   intended to be exclusive.  Invictus misreads the holding in

18   Lebron.  While the court did state that at one point in its

19   opinion that "services engaged by creditors, creditor's

20   committees, and other parties in interest (sic) in a

21   reorganization are presumed to be incurred for the benefit of

22   the engaging party and are reimbursable if, but only if, the

23   services directly and materially contribute to the

24   reorganization."  The statement must read in context.

25        Prior to making this statement, the court stated

1    clearly:  "Under Section 503(b)(3)(D), four categories of

2    persons may apply for reimbursement of expenses."  And it

3    goes on to cite the four that are enumerated in Section

4    503(b)(3)(D).

5          It's clear to me that when referring to "other

6    parties-in-interest," the court in <u>Lebron</u> was referring to

7    the other unenumerated parties referred to in Section

8    503(b)(3)(D) that it dot mention in that particular

9    statement, that is, the indentured trustees, equity security

10   holders, and unofficial equity and -- and unofficial equity

11   committees.

12         The court was not expressing a view that any non-

13   enumerated party-in-interest could bring a claim under

14   503(b)(3)(D).  This is supported by the fact that the issue

15   before the court in <u>Lebron</u> was whether or not a creditor

16   could bring a claim for reimbursement.

17         Invictus also relies on the decision from the

18   Eastern District of New York, <u>S&Y Enterprises</u>, 480 B.R. 5 --

19   452, excuse me, (Bankr. E.D.N.Y. 2012) for the proposition

20   that 503(b)(3)(D) can be read more expansively.  The <u>S&Y</u>

21   court relied upon and used word "including" in Chapter (sic)

22   503(b).  I do not find the court's analysis persuasive.

23         Instead, I agree with the decisions in <u>In re</u>

24   <u>Bethlehem Steel Corporation</u>, 2003 WL 1 -- 21738764, (S.D.N.Y.

25   2003), and <u>In re Inkeepers USA Trust</u>, 2011 WL 707, 7923,

1    (Bankr. S.D.N.Y. 2011), concluding that Section 503(b)(3)(D)

2    should be narrowly construed.

3         Invictus's argument under 503(b)(1)(A) is even less

4    persuasive and an administrative expense claim is entitled to

5    priority under 503(b)(1)(A) if (1) there's a postpetition

6    transaction between the claimant and the estate.  And (2)

7    these expenses yielded a benefit to the estate.  That's In re

8    Future Energy Holdings, 990 F.3d 728, (3d. Cir. 2021).

9         Without question, Section 503(b)(1)(A) requires as a

10   prerequisite to reimbursement that the expense claim be

11   incurred postpetition.  Invictus argues that it did enter

12   into a postpetition agreement with the debtors because

13   debtors requested that Invictus commit capital and be ready,

14   willing, and able to provide postpetition financing up to

15   four million dollars.

16        Invictus states in its reply that this led to "the

17   parties negotiating and agreeing to -- and agreeing on

18   definitive documentation that both parties were prepared to

19   file."

20        The evidence submitted by Invictus, however, fails

21   to substantiate any postpetition transaction between the

22   debtors and Invictus.  Having failed to meet this burden of

23   proof as to the existence of a postpetition transaction,

24   Invictus cannot recover under 503(b)(1)(A).

25        Moreover, as the Third Circuit noted in Energy

1    <u>Future Holdings</u>, any benefit must be actual and not

2    hypothetical.  Invictus's purported benefit to the estate is

3    indeed hypothetical, not real.  See <u>Energy Future Holdings</u>.

4          In addition, Invictus bears the burden of showing

5    that any purported benefit outweighs the cost of that benefit

6    and Invictus failed to carry its burden on that factual

7    issue.

8          Therefore, as I stated, I will deny the motion.

9          The parties should confer and submit a form of under

10    -- order under COC.

11          Are there any questions?

12          MR. McMAHON:  Thank you, Your Honor.

13          THE COURT:  All right.  Thank you all very much.

14          Anything else for today --

15          MR. AZMAN:  Thank you, Your Honor.

16          THE COURT:  -- Mr. Cousins?

17          MR. COUSINS:  No, Your Honor.  That is the agenda.

18    Thank you very much.

19          THE COURT:  All right.  Thank you all very much.  We

20    are adjourned.

21          MR. COMERFORD:  Thank you.

22          MR. MILLER:  Thank you.

23      (Proceedings concluded at 10:59 a.m.)

24

25

1                              <u>CERTIFICATION</u>

2           I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4    above-entitled matter to the best of my knowledge and

5    ability.

6    <u>/S/ Lisa Mullen</u>                    <u>April 21, 2021</u>

7    Lisa Mullen

8    Certified Court Transcriber

9    For Reliable

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25