## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 20-12836 (JTD) |
| CRED INC., *et al.*, | ) | |
| | ) | (Jointly Administered) |
| Debtors.[1] | ) | |
| | ) | |

### EMERGENCY MOTION OF THE CRED INC. LIQUIDATION TRUST TO (I) ENFORCE THE CHAPTER 11 PLAN AND CONFIRMATION ORDER AND (II) ENJOIN UPGRADEYA INVESTMENTS, LLC FROM PROSECUTING THE CIVIL ACTION AND SIMILAR CLAIMS IN OTHER FORUMS

The Cred Inc. Liquidation Trust (the "Trust")[2] established in the above-captioned chapter 11 cases (the "Chapter 11 Cases") of Cred Inc. and its affiliated debtors (collectively, the "Debtors"), hereby submits this motion (the "Motion") for: (A) entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Interim Order"), temporarily staying the Civil Action (as defined below) pending the Court's final adjudication of this Motion; and (B) entry of a final order, substantially in the form attached hereto as **Exhibit B** (the "Proposed Final Order"), (i) enforcing the terms of the *Order Confirming and Approving on a Final Basis Modified First Amended Combined Plan of Liquidation and Disclosure Statement of Cred Inc. and its Subsidiaries Under Chapter 11 of the Bankruptcy Code* [Docket No. 629] (the "Confirmation Order"), and (ii) enjoining, barring, and/or estopping UpgradeYa

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

[2]  Pursuant to section 12.3(e) of the *Modified First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and its Subsidiaries Under Chapter 11 of the Bankruptcy Code* [Docket No. 629-1] (as amended, the "Plan"), the Trust is the successor-in-interest to the Official Committee of Unsecured Creditors of Cred Inc., *et al*. (the "Committee").  References to the Trust herein are in some instances references to the Committee prior to the effective date of the Plan.

Investments, LLC ("UpgradeYa") from prosecuting the Civil Action and similar claims and causes of action in other forums.  In support of the Motion, the Trust respectfully states as follows:

## **PRELIMINARY STATEMENT**

1.      UpgradeYa's tireless efforts to recover the entirety of its claim against the Debtors ahead of other similarly situated creditors continues.  Shortly after the Debtors filed the Chapter 11 Cases, UpgradeYa sought relief from the automatic stay to recover Bitcoin (BTC) that UpgradeYa pledged to the Debtors as collateral for a loan.  UpgradeYa conceded that its BTC was commingled with the Debtors' other assets and thus untraceable.  Due to this uncontroverted fact, UpgradeYa's motion for stay relief had no merit.

2.      After causing unnecessary discovery, a deposition, a hearing, and multiple other costly filings, UpgradeYa changed course by seeking stay relief to pursue direct claims against third parties.  *See* Docket No. 565 (the "Stay Relief Order"), p. 2 ("it became clear that the Debtors were no longer holding the Bitcoin that UpgradeYa pledged as collateral.  Accordingly, UpgradeYa modified its request for relief . . . to pursue claims for damages against non-debtor third parties . . . .").  UpgradeYa was unable to articulate the bases for its purported direct claims, which required further unnecessary briefing.

3.      Despite the additional briefing, the Court was unable to make a determination of the nature of UpgradeYa's alleged direct claims because UpgradeYa "did not provide drafts of a complaint, but, rather, provided general and somewhat vague descriptions of the types of actions it intends to pursue."  *Id*. at p. 3.  The Court noted that "[w]ithout a complaint before me that identifies the specifics of the claims being asserted and the party against whom they are asserted, I cannot determine whether those claims belong to the estate or to UpgradeYa."  *Id*. at p. 4.

2

4.      On April 7, 2021, without seeking relief from this Court or even notifying the

Trust, UpgradeYa filed its complaint (the "Complaint"), which is attached hereto as **Exhibit C**,

in the Supreme Court of the State of New York, County of New York (the "Civil Action").  The

Trust only became aware of the Complaint after certain defendants reached out noting their

surprise that UpgradeYa was pursuing those claims rather than the Trust.  The Complaint

contains many of the same general and vague facts that UpgradeYa asserted in its briefing before

this Court.  Namely, that the Debtors operated a fraudulent scheme to induce UpgradeYa (and

other investors) to transfer or pledge BTC to the Debtors.  Unable to assert claims against the

Debtors (other than through its proof of claim), UpgradeYa attempts to impute the Debtors'

alleged wrongdoings onto seemingly every known entity that conducted business with the

Debtors.[3]  UpgradeYa also asserts claims against certain of the Debtors' former directors and

officers.

5.      The Complaint reads as an indictment of the Debtors for their poorly run

operations, transactions with insiders, actions by insiders (James Alexander), and the failed

"Quantcoin" transaction that resulted in the theft of 800 BTC from the Debtors.[4]  Based on these

allegations, UpgradeYa asserts that *all* Defendants conspired with the Debtors to defraud

investors.  UpgradeYa's causes of action include conversion against the Defendants (Count I),

---

[3]     The Defendants in the Civil Complaint fit into three groups: (i) the Debtors' directors and officers, Daniel
Schatt, Lu Hua, Joe Podulka, and Dan Wheeler (collectively, the "D&O Defendants"); (ii) third parties that the
Debtors contracted with to invest assets or loan assets in order to make profits, MoKedit Inc. d/b/a MO9
("MoKredit"), Elevar Finance LLC ("Elevar"), Galois Capital Alpha Fund LP ("Galois"), 100 Acre Ventures
Fund Ltd. ("100 Acre Venture"), 100 Acre Cred Opportunity Fund Ltd. ("100 Acre Cred"), Sarson Funds
("Sarson"), AX Momentum, L.P. ("AX Momentum"), and Fifth Khagan, LP and Fifth Khagan Management,
LLC (together, "Fifth Khagan") (collectively, the "Crypto Investment Defendants"); and (iii) third parties that
the Debtors contracted with to maintain bank accounts or digital asset accounts, Silvergate Bank ("Silvergate"),
Reliz Technologies LLC d/b/a Blockfills ("Blockfills"), and Fireblocks, Inc. and Fireblocks LLC (together,
"Fireblocks") (collectively, the "Account Defendants" and, together with the D&O Defendants and Crypto
Investment Defendants, the "Defendants").

[4]     Notably, many of these allegations appear to be taken from the *Report of Robert J. Stark, Examiner* [Docket No.
605] (the "Examiner's Report").

3

breach of fiduciary duty against Fireblocks (Count II), aiding and abetting breach of fiduciary duty against the Defendants (except for Fireblocks) (Count III), fraud against the Defendants (Count IV), and aiding and abetting fraud against the Defendants (Count V) (collectively, the "Claims").

6.       Counts I, IV, and V relate to the alleged conspiracy to defraud investors.  For a variety of reasons, the Claims are: (i) derivative in nature; and (ii) constitute property of the Debtors' estates as of the Petition Date.  Thus, pursuant to the Plan and Confirmation Order, the Trust has the sole authority to bring the Claims.

7.       *First*, if the Defendants conspired to defraud the Debtors' investors and convert assets pledged or transferred to the Debtors, then the injury is first to the Debtors.  Any injury suffered by UpgradeYa was secondary.  *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004) (to establish a direct claim "[t]he stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.").

8.       *Second*, if the Defendants converted any assets from the Debtors, then those acts are subject to fraudulent transfer claims, which may only be brought by the Trust.  *See In re JMO Wind Down*, No. 16-10682, 2018 WL 1792185, at *8 (Bankr. D. Del. April 13, 2018) (citing *AstroPower Liquidating Trust v. Xantrex Tech., Inc. (In re AstroPower Liquidating Trust)*, 335 B.R. 309, 328 (Bankr. D. Del. 2005) ("[F]raudulent transfer actions are derivative in nature . . . .").

9.       *Third*, UpgradeYa suffered no particularized injury.  *See Tooley*, 845 A.2d at 1039 ("[t]he stockholder's claimed direct injury must be independent of any alleged injury to the corporation."); *see also In re Barkany*, 542 B.R. 662, 690 (Bankr. E.D.N.Y. 2015) ("the bases of

the third party claims are generally irrelevant if they seek to recover potential estate assets to address injuries that are common to all the victims, not just the third party plaintiffs."). Indeed, in the opening paragraph of the Complaint, UpgradeYa admits that the Defendants' alleged scheme defrauded other investors of the Debtors. *See* Compl., ¶ 1 ("Cred and its co-conspirators engaged in a sustained and fraudulent scheme to dupe UpgradeYa *and other investors* into engaging in various cryptocurrency-related financial transactions that permitted Cred and its co-conspirators to fraudulently enrich themselves *to the investors' detriment*.") (emphasis added).

10. *Fourth*, the underlying bases for the Claims is the purported mismanagement of the Debtors, which is a derivative claim. *See Albert v. Alex. Brown Mgmt. Servs.*, 2005 WL 2130607, at *13 (Del. Ch. Aug. 26, 2005) (claims for gross negligence, and failure to provide competent and active management are "clearly derivative")

11. Counts II and III assert that Fireblocks (the entity that maintained the Debtors' cryptocurrency wallets) breached a fiduciary duty owed to UpgradeYa by failing to exercise reasonable care and diligence in safeguarding UpgradeYa's pledged BTC. These claims similarly were property of the Debtors' estates as of the Petition Date. Fireblocks maintained digital asset wallets *for the Debtors* and *in the Debtors' names* pursuant to a contract *with the Debtors*. UpgradeYa deposited its collateral into such accounts at the direction of the Debtors. UpgradeYa had no special relationship with Fireblocks. *See McMahon v. New Castle Associates*, 532 A.2d 601, 604 (Del. Ch. 1987) (finding that a fiduciary relationship based in equity requires a special relationship between the parties). Thus, to the extent a fiduciary obligation was owed by Fireblocks, it was to the Debtors, not UpgradeYa.

12. The Debtors' estates have already expended considerable time and resources opposing UpgradeYa's efforts to jump ahead of other creditors. Filing the Civil Action not only

continues the unnecessary use of limited Trust resources, but the inclusion of the D&O

Defendants puts the Debtors' insurance policies at risk of depletion to the detriment of the

Debtors' other creditors.  Indeed, the Debtors' insurance carrier has already been placed on

notice of the Civil Action.  Accordingly, the Trust respectfully requests that the Court enter the

Proposed Interim Order to stay the Civil Action pending this Court's determination of whether

the Claims are derivative.

14.    Even if the Court finds that any of UpgradeYa's claims in the Civil Action are

direct, the Court should still enjoin UpgradeYa from pursuing the Claims because UpgradeYa's

pursuit of such claims will negatively impact the Trust's administration of the Debtors' assets by,

among other things (i) threatening the Trust's ability to recover from the same Defendants and

(ii) dissuading the Defendants from settling with the Trust for fear of paying twice for the same

alleged misconduct.  As other courts have held, when a creditor's claims are so closely related to

a debtor's claims, third party actions should be enjoined because the estate claims have the

potential to reduce such creditor's injury and, until then, it is impossible to measure the creditor's

damages.  *See Madoff*, 429 B.R. 423, 435-37 (Bankr. S.D.N.Y. 2010) (quoting *Queenie, Ltd. v.

Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003); *see also Fisher v. Apostolou*, 155 F.3d 876, 881-

83 (7th Cir. 1998)

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and

157(b).  This Motion involves a core proceeding as it concerns, *inter alia*, a chapter 11 plan

confirmed by this Court, the liquidation of the Debtors' estates, avoidance of purportedly

fraudulent transfers, and interpretation and enforcement of the Court's orders as to which this

Court retained exclusive jurisdiction pursuant to Article XIX of the Plan and Paragraphs B and

33 of the Confirmation Order.  *See SemCrude II (Semcrude II)*, 796 F.3d 310, 316 (3d Cir. 2015)

("Because [defendant]'s motion to enjoin is related to the Chapter 11 reorganization plan and

requires a determination that the [plaintiffs'] claims are property of the Litigation Trust, the

Bankruptcy Court had subject-matter jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A).");

*see also In re SemCrude, L.P. (SemCrude I)*, 2011 Bankr. LEXIS 3801, at *11-13 (Bankr. D.

Del. Oct. 7, 2011) (same).

15.    Moreover, this Court has jurisdiction to enforce its own orders.  *See Travelers*

*Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (finding that "the Bankruptcy Court plainly had

jurisdiction to interpret and enforce its own prior orders"); *In re Resorts Int'l., Inc.*, 372 F.3d

154, 168-69 (3d Cir. 2004) ("[W]here there is a close nexus to the bankruptcy plan or

proceeding, as when a matter affects the interpretation, implementation, consummation,

execution, or administration of a confirmed plan or incorporated litigation trust agreement,

retention of postconfirmation bankruptcy court jurisdiction is normally appropriate."); *In re*

*Midstate Mortg. Investors, Inc.*, 105 Fed. Appx. 420, 422-23 (3d Cir. 2004) (affirming

bankruptcy court's decision to enjoin creditors of the debtor from prosecuting a state-court action

or instituting any other action that might interfere with the plan or releases); *In re FormTech*

*Indus., LLC*, 439 B.R. 352, 357 (Bankr. D. Del. 2010) ("Enforcement and interpretation of orders

issued in core proceedings are also considered core proceedings within the bankruptcy court's

core jurisdiction."); *In re Continental Airlines, Inc.*, 236 B.R. 318, 326 (Bankr. D. Del. 1999)

("In the bankruptcy context, courts have specifically, and consistently, held that the bankruptcy

court retains jurisdiction, *inter alia*, to enforce its confirmation order."); *see also, e.g., Celotex*

*Corp. v. Edwards,* 514 U.S. 300, 306 (1995) ("[P]ersons subject to an injunctive order issued by

a court with jurisdiction are expected to obey the decree until it is modified or reversed[.]")

(quotations and citations omitted); *In re Motors Liquidation Co.*, 534 B.R. 538, 545 (Bankr.

S.D.N.Y. 2015) ("Bankruptcy Judges . . . most assuredly have the power to enjoin litigants from

prosecuting claims in other courts—state or federal . . . —when such injunctions are otherwise

within Bankruptcy Judges' jurisdiction and an appropriate use of their injunctive powers.").

16.     In accordance with Local Rule 9013-1(f) the Trust confirms its consent to the

entry of a final order by the Court in connection with this Motion to the extent that it is later

determined that the Court, absent consent of the parties, cannot enter final orders or judgments in

connection herewith consistent with Article III of the United States Constitution

17.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.    The Debtors' Practice of Commingling BTC

18.     The Debtors primarily offered two services to its customers: "CredEarn" and

"CredBorrow."  *See Declaration of Daniel Schatt in Support of Debtors' Chapter 11 Petitions

and First Day Motions* [Docket No. 12], ¶ 9.  Under CredEarn, customers transferred

cryptocurrency to the Debtors with the expectation that the Debtors would invest the

cryptocurrency and provide customers with returns on investment.  *Id.*  Under CredBorrow, the

Debtors provided lines of credit to customers, who in turn pledged cryptocurrency to the Debtors

as collateral.  *Id.*

19.     Under both programs, the Debtors regularly commingled the cryptocurrency

received with other customers' cryptocurrency and the Debtors' holdings.  *See* Examiner's

Report, p. 31 (describing the Debtors' "general practice" of commingling customer's assets into

a central concentration account); Dep. Tr. 57:13-16, Dec. 16, 2020 (UpgradeYa acknowledging

that assets transferred to the Debtors were commingled); *see also Declaration of Pablo Bonjour

in Support of Objection of Debtors to Motion of UpgradeYa Investments, LLC for Relief from*

*Stay Under Bankruptcy Code Section 362* [Docket No. 113-1] (the "Bonjour Declaration"), ¶ 16 ("Once the Debtors receive the cryptocurrency into their Fireblocks e-wallets . . . the deposited cryptocurrency is undistinguishable . . . from the other cryptocurrencies held in the Debtors' Fireblock accounts."); *id.* at ¶ 17 (upon receiving bitcoin deposits "the Debtors usually quickly either invest the cryptocurrency they receive with third-party asset managers, or liquidate it. . . ."); *id.* at ¶ 21 ("When the Debtors need to make withdrawals from their accounts with their third-party asset managers, there is no guarantee that the Debtors third-party asset managers return the same cryptocurrency the Debtors invested with the third-party asset managers."); *id.* at ¶ 22 ("The Debtors keep close track of the performance of their investments, they do not maintain ledgers tracking the use of the specific cryptocurrency customers deposit with them because cryptocurrency, like USD, are fungible.  Accordingly, there is little to no chance that the specific cryptocurrency transferred by a customer to the Debtors could be recovered, or that it could be traced amongst the Debtors' current assets."); *see also Declaration of Daniyal Inamullah in Support of Krzysztof Majdak and Philippe Godineau's Motion for Entry of an Order Pursuant to 11 U.S.C. § 1112(B)(I) Dismissing the Cases; (II) Converting the Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 11 Trustee* [Docket No. 97] (the "Inamullah Declaration"), ¶ 7 ("Cred made no separation between customer (lender) 'accounts' and general corporate funds. This meant that customer funds were used to pay general expenses like salaries, rent and overhead."); *id.* at 17 ("Rather than maintain the collateral intact in a wallet, Cred used this collateral to pay normal business expenses, fund the loan by selling the collateral, invest, and pay redemptions to prior CredEarn customers.").

**B.**     **The Debtors' Agreement with Fireblocks**

20.     On February 21, 2020, the Debtors entered into that certain License Agreement (the "Fireblocks Agreement") with Fireblocks.

21.     Fireblocks provides a platform that enables entities, such as banks and hedge funds, to hold and transmit cryptocurrency.  Fireblocks provides digital "wallets," which allow persons and entities to store and transmit cryptocurrency.

22.     Pursuant to the Fireblocks Agreement, Fireblocks provided to the Debtors a "cryptocurrency wallet that stores private and public keys, interacts with various blockchain to send and receive digital currency and monitor their balance . . . ."  As consideration for these services, the Debtors paid Fireblocks $5,000 per month.

23.     The rights and obligations under the Fireblocks Agreement were not assignable without the prior written consent of the party not seeking to assign rights and obligations.

**C.**     **The Debtors' Relationship with the Account Defendants**
          **and Crypto Investment Defendants**

24.     Once the Debtors' received cryptocurrency from investors into the Debtors' Fireblocks wallets (or other accounts), the Debtors would then invest or monetize such cryptocurrency in order to generate a return.  Put simply, the Debtors transferred assets obtained through either the CredEarn or CredBorrow program to a number of third party entities for a variety of purposes.  The Debtors held direct contracts with each of the Crypto Investment Defendants and Account Defendants.  None of the Crypto Investment Defendants and Account Defendants contracted with UpgradeYa.

25.     Additionally, the Debtors entered into that certain Loan and Security Agreement, dated December 27, 2018, with MoKredit Inc. ("MoKredit").  Pursuant to that agreement, the

Debtors provided MoKredit with a $100 million line of credit. Lu Hua, a former 50% shareholder of the Debtors, is the owner of MoKredit.

**D.    The Debtors' Relationship with UpgradeYa**

26.    On April 20, 2020, Debtor Cred (US) LLC ("Cred") and UpgradeYa entered into a Loan and Security Agreement (the "Agreement"), pursuant to which Cred provided UpgradeYa with a $2 million revolving line of credit. In exchange, UpgradeYa pledged and transferred (the "BTC Transfer") approximately 531 BTC (the "Collateral") to the Debtors. *See* Docket No. 91-1. In addition to the BTC Transfer, UpgradeYa granted the Debtors a security interest in the 531 BTC. *Id.* The Agreement is governed by California state law.

27.    To facilitate the BTC Transfer, the Debtors provided UpgradeYa with the addresses to thirty e-wallets (the "Fireblocks Wallets") maintained in the Debtors' name at Fireblocks. *See Declaration of Marc Parrish in Support of the Motion of UpgradeYa Investments, LLC for Relief From Stay Under Bankruptcy Code Section 362* [Docket No. 91] (the "Parrish Declaration"), ¶ 3.

28.    Between April 22, 2020 and April 27, 2020, UpgradeYa transferred 531 BTC to the Fireblocks Wallets in different amounts. *Id.* Shortly after receiving 531 BTC from UpgradeYa, the Debtors commingled the Collateral with other cryptocurrency and transferred it to either other e-wallets held by the Debtors or e-wallets held by third-parties. *See* Bonjour Dec., ¶ 9-10; *see also* Inamullah Dec., ¶ 17.

**E.    The Chapter 11 Cases; UpgradeYa's Motion for Relief From Stay**

29.    On November 7, 2020 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

30.    On November 25, 2020, UpgradeYa filed a motion for relief from the automatic

stay to purportedly recover its Collateral [Docket No. 89] (the "Stay Relief Motion").  The

Committee and the Debtors opposed the Stay Relief Motion.  *See* Docket Nos. 116, 190.  The

primary argument in opposition to the Stay Relief Motion was that the Collateral had been

commingled and UpgradeYa did not (and could not) trace the Collateral.

31.    In anticipation of the hearing on the Stay Relief Motion, on December 16, 2020,

the Trust and the Debtors deposed Marc Parrish ("Parrish"), UpgradeYa's managing member.  A

true and correct copy of the December 16, 2020 deposition transcript is attached hereto as

**Exhibit D**.

32.    On January 6, 2021, the Court held a hearing on the Stay Relief Motion.  At the

hearing, Parrish conceded that the Collateral was commingled with other estate assets and is

untraceable.  *See* Hr'g Tr. 64:4-10, Jan. 6, 2021 (Q: "You would agree with me that once the

collateral . . . was placed into the account with other Cred bitcoin there is no way to distinguish

which piece of bitcoin belongs to UpgradeYa v. which piece of bitcoin belonged to another

customer, correct?" A: "[y]eah"); *see also* Dep. Tr. 160:16-25 (Q: "And once [the Collateral is]

commingled, there would be no way to know which was your specific piece of Bitcoin versus

someone else's Bitcoin that was in that wallet; correct?" A: "I do not know if it is possible, no."

Q: "Are you aware of any other way to do that?" A: "No.").  Given this concession, UpgradeYa

modified its request for stay relief to pursue "direct" claims against third parties.  The Court

ordered further briefing on the claims that UpgradeYa intended to pursue and why such claims

are not property of the estate.

33.    After the completion of the briefing, the Court entered the Stay Relief Order

denying the Stay Relief Motion.  The Court, however, was unable to make a determination of

whether UpgradeYa's claims were direct or derivative because UpgradeYa did not include a

complaint.  *See* Stay Relief Order, p. 4 ("[w]ithout a complaint before me that identifies the

specifics of the claims being asserted and the party against whom they are asserted, I cannot

determine whether those claims belong to the estate or to UpgradeYa.").

F.    **The Plan and Confirmation Order**

34.    On March 11, 2021, the Court entered the Confirmation Order confirming the

Plan.

35.    The Plan became effective on April 19, 2021 (the "<u>Effective Date</u>").  *See* Docket

No. 730.  On the Effective Date, the Trust was established and all assets of the Debtors were

transferred and assigned to the Trust.  *See* Plan, § 12.3; Confirmation Order, ¶¶ 12-13.

36.    The Plan provides that: "to the extent not otherwise waived in writing, released,

settled, assigned or sold pursuant to a prior Order or the Combined Plan and Disclosure

Statement, the Liquidation Trustees specifically retain and reserve the right to assert, after the

Effective Date, any and all of the claims, Causes of Action (including but not limited to those

Causes of Action listed on the Causes of Action List) and related rights, whether or not asserted

as of the Effective Date, and all proceeds of the foregoing."  Plan, § 12.3(c).

37.    The Confirmation Order provides that: "From and after the Effective Date, the

Liquidation Trustees may commence, litigate, and settle any Causes of Action or Claims relating

to the Liquidation Trust Assets or rights to payment or Claims that belong to the Debtors as of

the Effective Date or are instituted by the Liquidation Trustees on or after the Effective Date,

except as otherwise expressly provided in the Combined Plan and Disclosure Statement and the

Liquidation Trust Agreement."  Confirmation Order, ¶ 13.  The Confirmation Order further

provides that: "For the avoidance of doubt, no Creditor may pursue claims or causes of action that were property of the estate as of the Petition Date." *Id*. at ¶ 45.

## G.     The Civil Action

38.     On April 7, 2021, UpgradeYa filed the Complaint commencing the Civil Action. In the Complaint, UpgradeYa asserts causes of action, including conversion against the Defendants (Count I), breach of fiduciary duty against Fireblocks (Count II), aiding and abetting breach of fiduciary duty against the Defendants (except for Fireblocks) (Count III), fraud against the Defendants (Count IV), and aiding and abetting fraud against the Defendants (Count V).

39.     For the reasons set forth below, the Claims are derivative claims, which were property of the Debtors' estates as of the Petition Date.  Accordingly, by seeking to assert such Claims, UpgradeYa has violated the terms of the Confirmation Order.

## RELIEF REQUESTED

40.     The Trust respectfully requests that this Court: (A) enter the Proposed Interim Order temporarily staying the Civil Action pending the final adjudication of this Motion and (B) enter the Proposed Final Order (i) enforcing the terms of the Plan and Confirmation Order and (ii) enjoining, barring, and/or estopping UpgradeYa from prosecuting the Civil Action and similar claims and causes of action in other forums.

## BASIS FOR RELIEF

## A.     Property of the Estate

41.     Property of the estate is defined as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).  Property of the estate includes causes of action that exist as of the petition date and could have been asserted by the debtor on its own behalf.  *See In re Emoral Inc.*, 740 F.3d 875, 879 (3d Cir. 2014).  Courts are

often tasked with determining whether a particular claim is property of a debtor's estate and whether the pursuit of such claim by a non-debtor violates the automatic stay.

42.     "[A]mong the claims that only a debtor—and not a debtor's creditors—may pursue is a 'general claim,' understood to be a claim 'with no particularized injury arising from it,' and which could be 'brought by any creditor of [a] debtor . . . .'" *Soundview Elite*, 565 B.R. 534, 544 (Bankr. S.D.N.Y. 2017). (quoting *St. Paul Fire & Marine Ins. Co.*, 884 F.2d 688, 701 (2d Cir. 1989)).  A common "general claim" is a "derivative claim," which has been defined as "[a] claim based on rights 'derivative' of, or 'derived' from, the debtor . . . ." *Id.* (quoting *Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 89 (2d Cir. 2014)).  Conversely, a claim is not property of the estate, but rather a creditor claim, when the claim particularly injures a creditor. *See In re Tronox*, 855 F.3d 84, 100 (2d Cir. 2017).

43.     To determine whether a claim is derivative or direct, courts look to state law. *Semcrude II*, 796 F.3d at 316.  Particularly, the state law in which the corporation is incorporated.  *In re CD Liquidation Co., LLC*, 462 B.R. 124, 131 (Bankr. D. Del. 2011).

44.     In the bankruptcy context, when determining whether a claim is derivative (general) or particular, courts are tasked with "inquir[ing] into the factual origins of the injury and, more importantly, into the nature of the legal claims asserted."  *Madoff*, 740 F.3d at 89; *see In re Maxus Energy Corp.*, 2017 WL 3278830, at *4 (Bankr. D. Del. Aug. 2, 2017) ("the Third Circuit [has] instructed that the nature of the cause of action itself must be examined.").

45.     Where a cause of action is based on facts "generally available to any creditor," and recovery would "serve to increase the pool of assets available to all creditors," then the cause of action is "general," and therefore, property of the estate. *See In re Emoral, Inc.*, 740 F.3d at 881; *see also SemCrude II*, 796 F.3d at 317-19, 321-22; *PHP Liquidating, LLC v. Robbins (In re*

*PHP Healthcare Corp.),* 128 Fed. Appx. 839, 844-45 (3d Cir. 2005) ("[A]n individual creditor of

a debtor may not assert a general claim belonging to all creditors.").

46.      If the claim "arises from the wrongdoer's breach of a separate legal obligation

owed to the victim . . . that results in an injury particularized to the victim," then the claim is

non-derivative.  *Sec In'r Prot. Corp v. Bernard L. Madoff Inv. Sec. LLC,* Case No. 08-01789

(SMB), 2017 WL 921963, at *4 (Bankr. S.D.N.Y. Mar. 7, 2017).  If the claim "is a general one .

. . , the trustee is the proper person to assert the claim, and the creditors are bound by the

outcome of the trustee's action."  *St. Paul,* 884 F.2d at 701.

**B.      Delaware Law Applies**

47.      When determining whether claims are derivative in nature, courts "look to the law

of the state of incorporation."  *CD Liquidation Co.,* 462 B.R. at 131.  Cred is a Delaware

corporation, and thus Delaware law applies.

48.      Delaware courts "look to the nature of the wrong and to whom the relief should

go" when determining whether a claim is derivative.  *Tooley,* 845 A.2d at 1039; *see Dieterich v.*

*Harrer,* 857 A.2d 1017 at 1027, 2004 WL 1739664, at *9 (Del.Ch. Aug.3, 2004) ("a claim is not

'direct' simply because it is pleaded that way . . . .  Instead the court must look to all the facts of

the complaint and determine for itself whether a direct claim exists.").  Accordingly, the test

under Delaware law "turns solely on the following questions: (1) who suffered the alleged harm

(the corporation or the suing stockholders, individually); and (2) who would receive the benefit

of any recovery or other remedy (the corporation or the stockholders, individually)?"  *Tooley,*

845 A.2d at 1033.  Moreover, "[t]he stockholder's claimed direct injury must be independent of

any alleged injury to the corporation.  The stockholder must demonstrate that the duty breached

was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." *Id*. at 1039.

C.    **Under Both Delaware Law and Applicable Bankruptcy Law, the Claims are Derivative**

49.    In considering the nature of the Claims, two things are clear. *First*, the Debtors suffered the alleged harm from the acts of the Defendants and any harm to UpgradeYa was secondary. *Second*, the secondary harm is not particular as to UpgradeYa. Rather, all of the Debtors' creditors suffered the same general harm.

i.    **The Debtors' Injury**

50.    In the Complaint, UpgradeYa alleges that the Defendants conspired together and with Cred (although Cred is not a defendant) to induce investors to enter into the CredEarn and CredBorrow programs for the purpose of enriching themselves by converting the Debtors' assets obtained from investors through those programs. *See* Complaint, ¶ 42. Assuming *arguendo* that these allegations are true, the Debtors were the victim of this fraudulent scheme conducted by its own directors and officers and third parties. At the outset of the Complaint, UpgradeYa admits as such. *See* Complaint, ¶ 5 ("Cred was little more than a shell company through which Defendants operated a conspiracy to defraud Cred's customers of millions of dollars' worth of cryptocurrency."). As UpgradeYa acknowledges, the Debtors were the victim of the Defendants' alleged wrongdoing.

51.    Additionally, UpgradeYa had no contact, let alone contract, with any of the Crypto Investment Defendants or Account Defendants. As discussed above, only the Debtors had contracts and relationships with those parties. To the extent the Crypto Investment Defendants and Account Defendants breached those contracts, the injury is to the Debtors. Any

injury to UpgradeYa is as a result of the injury to the Debtors.  For these reasons, the Claims are derivative.

### ii.    <u>UpgradeYa Suffered No Particularized Injury</u>

52.    UpgradeYa did not suffer any "particularized" injury.  Any injury resulting from the Defendants' actions was suffered by the Debtors and is common to all similarly situated creditors.  *See In re Barkany*, 542 B.R. at 692 (finding that the injury to defrauded investors was no different than the injury to other defrauded investors).  UpgradeYa's injury is the loss of the Collateral.  That injury, however, is not specific to UpgradeYa.  More than 6,500 of the Debtors' creditors lost cryptocurrency that they transferred to the Debtors.  Indeed, any of these creditors could replace UpgradeYa as the plaintiff in the Complaint.  The Complaint shows a creditor, frustrated at not being made whole by the Debtors, imputing the Debtors' alleged wrongdoing onto third parties.  Specifically, the Complaint alleges that:

    a.  "Cred presented itself to UpgradeYa and the rest of the market as a reliable, reputable, and experienced crypto-currency based financial services company offering both investment opportunities and loan products." *See* Complaint, ¶ 2.

    b.  "Cred was actually covertly engaged in converting its customers' assets into cryptocurrency and fiat currency that it funneled to its co-conspirators." *Id*.

    c.  "Cred perpetrated this massive fraud by first transferring dozens of millions of dollars to Defendant and co-conspirator moKredit . . . ." *Id*. at ¶ 3.

    d.  "Schatt and Hua, along with Joe Podulka, the former CFO of Cred, and Dan Wheeler, the former General Counsel of Cred (collectively, the "Individual Defendants"), attracted new funds into the scheme by offering sham lending and investment "services," which they marketed as a trusted way for investors to monetize their Bitcoin and other cryptocurrency without having to sell it . . . ." *Id*. at ¶ 6.

    e.  "As part of the fraudulent scheme and self-dealing, the [D&O] Defendants vested considerable corporate authority in James Alexander . . . [who] was given unfettered access to Cred's customers' funds." *Id*. at ¶ 8.

    f.   "Alexander was granted the control and ability to transfer Cred's assets with little oversight . . . ." *Id*.

    g.   The D&O Defendants "purposefully avoided implementing any controls related to critical issues like asset management, storage, and transfers, and intentionally failed to maintain any records identifying, reconciling, or tracking customers' cryptocurrencies." *Id*. at ¶ 58.

    h.   "Participants in CredBorrow, including UpgradeYa, were induced to deposit their cryptocurrency with Cred to obtain a loan against those assets, for a fixed period and with a fixed interest rate. Participants in CredEarn were induced to invest their cryptocurrency with Cred for a fixed period, during which Cred guaranteed those customers a high fixed rate of return." *Id*. at ¶ 42.

    i.   "Prior to entering into an agreement with Cred, UpgradeYa had extensive discussions by telephone and through the Telegram messaging app, with several Cred employees, including Michael Zhang and Xavier Rashotsky." *Id*. at ¶ 43.

    j.   "Cred performed little or no due diligence on the third parties to which it transferred UpgradeYa's collateral and did not institute any procedures or processes to ensure that UpgradeYa's collateral was 'secured throughout the duration' of the loan." *Id*. at ¶ 45.

53.    To summarize: (i) the Debtors made promises to UpgradeYa that were not met; (ii) UpgradeYa invested in the Debtors based on these promises; (iii) the Debtors were mismanaged; and (iv) UpgradeYa lost its Collateral.  This is the same unfortunate story that the majority of the Debtors' creditors face.  UpgradeYa acknowledges this at the outset of and throughout the Complaint.  *See id*. at ¶ 1 (stating that the Defendants' alleged fraudulent scheme duped "UpgradeYa *and other investors*" so that the Defendants could fraudulently enrich themselves "to the *investors'* detriment.") (emphasis added); *id*. at ¶ 2 ("Cred was actually covertly engaged in converting its *customers'* assets . . .") (emphasis added); *id*. at ¶ 4 ("Cred and the other Defendants then worked together to convince unsuspecting investors like UpgradeYa . . . ."); *id.* at ¶ 42 ("Participants in CredBorrow, including UpgradeYa, were induced . . . .  Participants in Cred Earn were induced . . . .").

54.     Notwithstanding, UpgradeYa is seeking to recover on its claim ahead of those similarly injured creditors. *See Barkany*, 542 B.R. at 690 ("the bases of the third party claims are generally irrelevant if they seek to recover potential estate assets to address injuries that are common to all the victims, not just the third party plaintiffs.").  This issue was articulated well by the Second Circuit in analyzing the Third Circuit's decision in *Emoral*:

> That the plaintiffs in *Emoral* had an underlying harm specific to them did not put the claims automatically outside the estate.  Indeed, every creditor in bankruptcy has an individual claim (set forth in a proof of claim) against the debtor, whether it be in tort (as here), contract, or otherwise.  But often there are claims against third parties that wrongfully deplete the debtor's assets.  Individual creditors may wish to bring claims against those third parties to seek compensation for harms done to them by the debtor and secondary harms done to them by the third parties in wrongfully diverting assets of the debtor that would be used to pay the claims of the individual creditor.  The fact that an individual creditor may seek to do so does not make those secondary claims particular to the creditor, for it overlooks the obvious:  Every creditor has a similar claim for the diversion of assets of the debtor's estate.  Those claims are general—they are not tied to the harm done to the creditor by the debtor, but rather are based on an injury to the debtor's estate that creates a secondary harm to all creditors regardless of the nature of their underlying claim against the debtor.

*Tronox*, 855 at 103-04.

55.     Thus, any claim against the Defendants for the loss of the Collateral, which Collateral, as explained below, became property of the Debtors' estates, is an estate cause of action that can only be brought by the Trust.  *See Dana Molded Products, Inc. v. Brodner*, 58 B.R. 576, 579 (N.D. Ill. 1986) ("It is also important to note that the plaintiff's injury due to the diminution of [estate] assets is no different than that suffered by" other creditors and "[t]he claim thus does not belong 'specifically' or 'exclusively' to the plaintiff in a way which would justify non-application of the stay.").

**D.**    **Conversion**

56.    UpgradeYa deposited its Collateral into the Fireblocks Wallets, which are held in the Debtors' names. Within days of receiving the Collateral, the Debtors transferred the Collateral from the Fireblocks Wallets into general operating wallets (also held at Fireblocks). Once the transfers to the general wallets occurred, UpgradeYa's Collateral was commingled with other BTC, lost all identifiable characteristics, and could not be traced. Those facts are uncontested. *See* Hr'g Tr. 64:4-10, Jan. 6, 2021 (Q: "You would agree with me that once the collateral . . . was placed into the account with other Cred bitcoin there is no way to distinguish which piece of bitcoin belongs to UpgradeYa v. which piece of bitcoin belonged to another customer, correct?" A: "[y]eah").

57.    Indeed, those facts formed the basis for UpgradeYa reversing course on its initial request for stay relief, seeking only to pursue unidentified claims against third parties and not to recover the Collateral from the Debtors. More specifically, UpgradeYa could not recover its Collateral because it had been commingled. Commingled assets are property of the estate, unless a claimant can (i) demonstrate that a trust relationship and its legal source exists and (ii) identify and trace the commingled funds. *See In re Green Field Energy Servs., Inc.*, 585 B.R. 89, 105 (Bankr. D. Del. 2018).

58.    UpgradeYa asserts its conversion claim against all of the Defendants on the basis that its Collateral is in the unauthorized possession of the Defendants. This claim is derivative under Delaware law and bankruptcy law for three reasons. *First*, the conversion claim is seeking to recover the Debtors' assets. *See In re JMO Wind Down, Inc.*, No. 16-10682, 2018 WL 1792185, at *8-*10 (Bankr. D. Del. April 13, 2018) (holding a variety of claims are derivative because recoveries in such claims revert back to the corporation). It is impossible to know which

Defendant (if any) is in possession of what portion of the Collateral because the Collateral has been commingled and cannot be traced. Putting aside the fact that the Collateral became property of the Debtors' estates upon being commingled, if UpgradeYa recovers BTC from the Defendants, such BTC is likely not the Collateral. Thus, UpgradeYa would be recovering Trust assets that should be distributed for the benefit of all creditors.

59.     *Second*, any injury to UpgradeYa by the Defendants' alleged conversion is secondary to that of the Debtors. The Collateral was commingled with the Debtors' other assets and became property of the Debtors' estates. Any conversion of the commingled assets directly injured the Debtors by preventing the recovery of their assets. Thus, the injury to UpgradeYa is secondary to the damages suffered by the Debtors. *Id.* ("An individual cause of action exists only if damages to the shareholders were not *incidental* to damages to the corporation.") (emphasis in original).

60.     *Third*, if the Defendants improperly converted the Debtors' assets, including the commingled Collateral, then they are subject to fraudulent transfer and avoidance actions, which are derivative in nature and the Trust has the sole authority to pursue. *See In re JMO Wind Down*, 2018 WL 1792185 at *8 (citing *AstroPower Liquidating Trust*, 335 B.R. at 328) ("Delaware case law is scarce when it comes to whether fraudulent transfer claims are derivative or direct. However, the Court has observed that such claims are 'derivative in nature[.]'"). UpgradeYa argues that it transferred assets to the Debtors, those assets were commingled, and then the Defendants stole the assets. If true, that is a fraudulent transfer claim. UpgradeYa cannot circumvent the prohibition of bringing derivative fraudulent transfer claims by redressing these claims as conversion or fraud. *See In re AstroPower Liquidating Trust*, 335 B.R. at 328 (noting that fraudulent transfer claims are "derivative in nature"); *see also In re Emoral, Inc.*,

740 F.3d at 879 (noting that to determine whether a cause of action constitutes property of the bankruptcy estate, the court must "examine the nature of the cause of action itself"); *Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d at 89 (a creditor "does not state independent claims merely by asserting new legal claims or seeking different forms of relief than" the relief pursued by the debtor); *see In re Teleservices Group, Inc.*, 463 B.R. 28, 33 (Bankr. W.D. Mich. 2012) (noting that the estate's right to avoid a fraudulent transfer preempts an individual creditor's ability to proceed on its own); *See Tronox*, 855 F.3d at 100 (noting that labels are not conclusive because creditors often try to plead around a bankruptcy, thus courts look to the factual origins of the injury and the nature of the legal claims asserted); *see Barkany*, 542 B.R. at 690 ("even what may appear to be an independent cause of action may be stayed where the trustee and a creditor choose different remedies to rectify the same injustice derived from a third party defendant's receipt of the same transfer."); *MacArthur Co. v. Johns–Manville Corp.*, 837 F.2d 89, 92-93 (2d Cir. 1988) (the bankruptcy court could enjoin suits by plaintiffs whose rights were "derivative" of the debtor's rights, because the "plaintiffs' claims are inseparable from [the debtor's] and are consequently well within the Bankruptcy Court's jurisdiction over [the debtor's] assets."); *see In re Mark One Corporation*, 619 B.R. 423, 432 (Bankr. S.D.N.Y. 2020) ("it is not just the 'injury,'" but . . . 'more importantly' is the nature of the claim being asserted by the plaintiff against the third-party.").

61.    For these reasons, the conversion claim is derivative.

### E.    Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty

62.    UpgradeYa's breach of fiduciary duty claim against Fireblocks constitutes a derivative claim that became property of the Debtors' estates as of the Petition Date.  Under Delaware law, "[a] fiduciary relationship is a situation where one person reposes *special* trust in

23

and reliance on the judgment of another or where a *special* duty exists on the part of one person to protect the interests of another." *McMahon*, 532 A.2d at 604 (emphasis added). Accordingly, a fiduciary relationship must have a "special" element to be entertained. *See id.* Delaware courts have identified such "special" relationships, which include: (i) general partners; (ii) administrators or executors; (iii) guardians; (iv) joint venturers; and (v) principals and their agents. *Id.* at 605.

63.    UpgradeYa has never asserted (in its Complaint, during the Parrish deposition, or during the hearing on the Stay Relief Motion) that it had any contact or contract with Fireblocks. Simply put, no "special" relationship existed between Fireblocks and UpgradeYa to establish a fiduciary relationship. UpgradeYa, however, disregards these facts in its attempt to impute a fiduciary relationship with Fireblocks.

64.    For example, UpgradeYa asserts that "[u]pon information and belief, only Fireblocks held the keys to" the digital wallets that UpgradeYa transferred its Collateral into. This is false. Under the Fireblocks Agreement, the Debtors were required to activate the wallets' keys and had the exclusive authority to use those keys.

65.    UpgradeYa also asserts that "Cred identified thirty digital wallet accounts maintained by Fireblocks to receive" the Collateral and transferred the Collateral "to Fireblocks, as bailee of the Collateral . . . ." Complaint, ¶ 50. This is a blatant mischaracterization of the facts. The wallets are in the Debtors' names. Fireblocks had no contact with UpgradeYa. Fireblocks also had no contract at all with UpgradeYa and certainly did not execute a bailee contract with UpgradeYa.

66.    UpgradeYa alleges that "Fireblocks conspired with the other Defendants to transfer UpgradeYa's Bitcoin to a series of third-party asset managers, borrowers, commercial

institutions, exchanges, and other individual co-conspirators that Defendants controlled." *Id.* at ¶ 7. This is also false. The Debtors executed the transfers from the wallets held at Fireblocks to these third parties. UpgradeYa even admits this, while contradicting its previous statement. *See id*. at ¶ 45 ("Cred always intended to transfer UpgradeYa's Bitcoin from Fireblocks to third party asset managers and investment companies, including Defendants.").

67.     Finally, UpgradeYa states that "[o]n information and belief Fireblocks knew that Cred had not enacted the controls required by the licensing agreement and did nothing to require Cred to comply with the agreement or prevent Podulka, Alexander, and others from engaging in unauthorized transfers of customer funds from Fireblocks to third parties." Complaint, ¶ 72. "Specifically, Fireblocks did nothing to prevent the other Defendants and their co-conspirators from transferring UpgradeYa's Collateral to third parties." *Id*. This is also a mischaracterization for at least two reasons. *First*, as discussed above, Cred initiated the transfers. *Second*, even if Fireblocks was under some duty to prevent unauthorized transfers, Cred was authorized to transfer the Collateral. Prior to entering into the Agreement, Cred made clear to UpgradeYa (and UpgradeYa understood) that the Collateral would be moved. Dep. Tr. 36:7-10, Dec. 16, 2020 (Q: "Cred on its face is saying, 'We're going to use the virtual currency you provide us and transact with other customers with that virtual currency'; right?" A: "Yes, I see that."); *id*. at 37:7-12 (Q: "So it was not your understanding that your virtual currency would be sitting in some vault and never used; right?" A: "Yeah . . . but I understood that they could make a yield on my property."); *id.* at 161:20-23 (Q: "So you had no expectation that [the Collateral] would be kept in that wallet – correct? – because you knew it could move?" A: "I understood it could move, yes.").

68.     If *any* fiduciary obligations existed, they were owed by Fireblocks to *the Debtors* pursuant to those parties' contractual relationship, not UpgradeYa.  Thus, UpgradeYa's breach of fiduciary duty claims are derivative and to be brought by the Trust.  There may well have been breaches of fiduciary duties by certain of the Debtors' officers, directors, and various third parties.  But those breach of fiduciary causes of action must be brought by the Trust, not UpgradeYa.  To the extent any of the Defendants aided and abetted this breach to the detriment of the Debtors, those claims are similarly derivative.  *See Feldman v. Cutaia*, 956 A.2d 644, 662 (Del. Ch. 2007) ("an aiding and abetting claim premised on a derivative cause of action is necessarily derivative itself.").

## F.     Fraud

69.     To support its fraud claim, UpgradeYa asserts frivolous facts that contradict Parrish's testimony.  UpgradeYa should not be able to rely on patently false allegations to create the appearance of direct claims.

70.     During Parrish's December 16, 2020 deposition, he stated that he was looking for a company that provided services similar to the Debtors and was referred to the Debtors by an individual "involved in one of [his] investments" and who was "completely independent" and had "no relation" to the Debtors.  *See* Parrish Dep. 27:15-28:6, Dec. 16, 2020.  Parrish was also asked who he spoke to prior to entering into the Agreement with the Debtors.  The *only* person Parrish named was Xavier Rashotsky, a Cred employee.  *See id.* at 31:4-15.  Parrish was also asked specifically whether he transferred the Collateral to the Debtors voluntarily, to which he responded "it was my choice."  *See id*. at 84:22-85:5  Notably, the deposition transcript and the Complaint are devoid of any communications between Parrish and *any* Defendant prior to entering into the Agreement with the Debtors.

71.     Despite being referred to the Debtors by a person known to Parrish, who was unaffiliated with the Debtors, UpgradeYa alleges that "the Defendants agreed amongst themselves and with Cred to defraud UpgradeYa."  Complaint, ¶ 122.  And, despite only communicating with a Cred employee, UpgradeYa alleges that "Defendants and Cred misrepresented and concealed material facts from UpgradeYa" and "Defendants and Cred intended to induce reliance upon these misrepresentations and omissions."  *Id*. at ¶¶ 125-26.  If any misrepresentation was made to UpgradeYa, that misrepresentation would have been made by the Debtors because UpgradeYa had no contact with any of the Defendants prior to executing the Agreement.  Thus, if the Defendants did concoct a fraudulent scheme to use the Debtors as a "shell" to induce investors to transfer assets to the Debtors, the harm is to the Debtors.  *See Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d at 89 (a creditor "does not state independent claims merely by asserting new legal claims or seeking different forms of relief than" the relief pursued by the debtor).  Accordingly, the fraud claim is derivative.

**G.     Aiding and Abetting Fraud**

72.     UpgradeYa's final claim, aiding and abetting fraud, reveals the true nature of the Complaint.  UpgradeYa states that it "was a victim of an underlying fraud perpetrated by Cred" and the Defendants "substantially assisted Cred's fraud."  Complaint, ¶ 130.  The entirety of UpgradeYa's support for Cred's fraudulent scheme appears to be extracted from the Examiner's Report (which is directly cited in the Complaint) filed in the Chapter 11 Cases.  *See generally id*. at ¶¶ 12, 57-62, 76, 84-85, 89.  UpgradeYa points to the Debtors': (i) "mismanagement"; (ii) failure to enact "proper accounting, compliance, diligence, or legal functions"; (iii) employment of James Alexander and James Alexander's actions; (iv) contract with MoKredit; and (v) the

27

"Quantcoin" transaction wherein the Debtors' were the victims of an 800 BTC theft.  *See generally id.*

73.    Under Delaware law, claims against a corporation's directors and officers for mismanagement are "derivative in nature."  *See Thornton v. Bernard Techs., Inc.*, No. 962-VCN, 2009 WL 426179, at *3 (Del. Ch. Feb. 29, 2009); *see also Albert*, 2005 WL 2130607, at *13 (claims for gross negligence, and failure to provide competent and active management are "clearly derivative").  Such claims are derivative because they represent a "direct wrong to the corporation that is indirectly experienced by all shareholders.  *See Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988)*; see also SemCrude I*, 2011 WL 4711891, at *6 (In order to claim that a cause of action is direct, "an individual plaintiff must allege an injury that the plaintiff suffered which the corporation did not also suffer."); *SemCrude II*, 796 F.3d at 318-19 (finding that the plaintiffs' fraud and breach of fiduciary duty claims were derivative because the "alleged loss . . . [was] the exact same conduct underlying the alleged cause of SemCrude's bankruptcy" and that as such, the injury suffered by the plaintiffs "was no different from the injury suffered by SemCrude as a result of [defendant]'s wrongful conduct").

74.    Applying this same analysis, UpgradeYa's aiding and abetting fraud claims are also derivative claims because the underlying claim on which these claims are based is derivative.  *See Feldman*, 956 A.2d at 662 ("an aiding and abetting claim premised on a derivative cause of action is necessarily derivative itself."); *see also Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *6 (Del. Ch. Dec. 19, 2002) (dismissing an aiding and abetting claim because the plaintiff lacked standing to bring the breach of fiduciary duty claims on which it was premised), *aff'd by table decision*, 825 A.2d 239 (Del. 2003); *First Interstate*, 729 A.2d 851, 864 (Del. Ch. 1998) ("If, as [the court has] found to be the case, the

claims of primary liability against the defendant directors belong to the corporation and could only be maintained by [the plaintiff] in a derivative capacity, that finding logically applies with equal force to the alleged claims of secondary liability against [an alleged aider and abettor].”); *In re Rexene Corp. S'holders Litig.*, 1991 WL 77529, at *4 (Del. Ch. May 8, 1991) (dismissing aiding and abetting claims because of dismissal of breach of fiduciary duty claims for lack of standing).

H.    <u>**UpgradeYa Should be Enjoined from Pursuing Any Direct Claims**</u>

75.    If the Court is inclined to find that any of the alleged Claims are direct claims, the Court should nonetheless enjoin UpgradeYa from pursuing such Claims.  *See Securities Investor Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 429 B.R. 423, 434 (Bankr. S.D.N.Y. 2010) (quoting *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003) (“While section 362(a)(1) of the Code typically stays ‘proceeding[s] against the debtor,’ courts have consistently utilized section 105 to extend section 362 to third-party actions against non-debtor entities ‘when a claim against the non-debtor will have an immediate adverse consequence for the debtor’s estate.’”); *see also Nevada Power Co. v. Calphine Corp. (In re Calphine Corp.)*, 362 B.R. 401, 409 n. 20 (S.D.N.Y. 2007) (“Courts consistently have found that section 105 may be used to stay actions against non-debtors even where section 362 otherwise would not provide such relief.”). If UpgradeYa pursues its Claims, it will have a significant adverse impact on the Trust’s recoveries for the benefit of creditors.

76.    Courts have found that when a debtor and creditor each hold claims against third parties based on the same underlying facts, allowing creditors to pursue such claims will adversely affect a debtor’s estate for a variety of reasons (and thus should be enjoined), including the following: (i) each claim seeks recovery from the same limited pool of funds, which threatens the estate’s ability to recover on a judgment; (ii) claims by creditors could affect the estate’s

ability to settle claims because third parties will be fearful of paying twice for the same transfer; and (iii) the pursuit of the same claims can impact the bankruptcy court's jurisdiction over the distribution to estate creditors because other courts may arrive at different and inconsistent rulings affecting the bankruptcy court's authority.  *See Madoff*, 429 B.R. at 435-37; *see also Fisher v. Apostolou*, 155 F.3d 876, 881-83 (7th Cir. 1998) (staying third party actions under section 105 until the bankruptcy court has disposed of the trustee's claims because the trustee's claims and third party claims arise from the same underlying transactions).  Moreover, as noted by the Seventh Circuit, when a creditor's claims are so closely related to a debtor's claims, third party actions should be enjoined until the conclusion of the bankruptcy case because the estate's claims have the potential to reduce such creditor's injury and, until then, it is impossible to measure the creditor's damages.  *See Fisher*, 155 F.3d at 881.  The same analysis should be applied to a liquidation trust that is administering a debtor's assets pursuant to a chapter 11 plan.

77.    The situation presented by UpgradeYa is analogous to *Fisher* and *Madoff*.  Each alleged Claim arises out of the same set of facts, which the Trust could assert against the Defendants in support of causes of action that were property of the Debtors' estates as of the Petition Date.  Allowing UpgradeYa to pursue these Claims would negatively affect the Trust's ability to recover assets from the Defendants, chill settlement negotiations, and may result in jurisdictional issues in this Court.  Accordingly, to the extent UpgradeYa has any direct Claims, the Court should enjoin UpgradeYa from pursuing such Claims.

## **RESERVATION OF RIGHTS**

78.    The Trust reserves all rights, claims, causes of action and remedies, in law or in equity, under the Plan, the Confirmation Order, or otherwise, including, without limitation, the right to seek costs and attorney's fees incurred in connection with this Motion.

## NOTICE

79.     Notice of this Motion has been provided to: (i) the U.S. Trustee for the District of Delaware; (ii) counsel to UpgradeYa; and (iii) parties that have requested notice pursuant to Local Rule 2002-1(b).  In light of the nature of the relief requested herein, the Trust submits that no other or further notice is required.

## CONCLUSION

80.     For the reasons set forth above, the Trust respectfully requests that this Court: (A) enter the Proposed Interim Order temporarily staying the Civil Action pending the final adjudication of this Motion; (B) enter the Proposed Final Order (i) enforcing the terms of the Plan and Confirmation Order and (ii) enjoining, barring, and/or estopping UpgradeYa from prosecuting the Civil Action and similar claims and causes of action in other forums; and (C) grant such other and further relief as may be just and proper.

Dated:  Wilmington, Delaware
        May 24, 2021

MCDERMOTT WILL & EMERY LLP

*/s/ David R. Hurst*
David R. Hurst (I.D. No. 3743)
1007 North Orange Street, 10th Floor
Wilmington, DE 19801
Telephone: (302) 485-3900
Facsimile:  (302) 351-8711

- and -

Timothy W. Walsh (admitted *pro hac vice*)
Darren Azman (admitted *pro hac vice*)
340 Madison Avenue
New York, NY 10173
Telephone: (212) 547-5400
Facsimile:  (212) 547-5444

*Counsel to the Cred Inc. Liquidation Trust*