**EXHIBIT D**

Parrish Deposition Transcript

1              UNITED STATES BANKRUPTCY COURT

2             FOR THE DISTRICT OF DELAWARE

3

4  IN RE:                  )

5                       )

6      CRED INC, et al.,    ) Case No.

7                   ) 20-12836 (JTD)

8      DEBTORS.          )

9  _____)

10

11

12

13      VIDEOTAPED DEPOSITION OF MARC PARRISH

14    WEDNESDAY, DECEMBER 16, 2020, 12:14 P.M.

15          VIA VIDEOCONFERENCE

16

17

18

19

20  Reported by

21  Desiree Cooks,

22  CSR No. 14075

23  Job No. 4370003

24

25  PAGES 1 - 194

Page 1

1          UNITED STATES BANKRUPTCY COURT

2           FOR THE DISTRICT OF DELAWARE

3

4    IN RE:                    )

5                              )

6        CRED INC, et al.,     ) Case No.

7                              ) 20-12836 (JTD)

8        DEBTORS.              )

9    _____)

10

11

12

13

14        THE VIDEOTAPED DEPOSITION OF MARC PARRISH, taken

15   via videoconference, on Wednesday, December 16, 2020, at

16   12:14 p.m., before Desiree Cooks, Certified Shorthand

17   Reporter, in and for the State of California.

18

19

20

21

22

23

24

25

                                        Page 2

```
 1   APPEARANCES:
 2
 3   ALL APPEARING VIA VIDEOCONFERENCE
 4
     For the Debtors:
 5        PAUL HASTINGS LLP
          BY: AVRAM LUFT, ESQ.
 6        -- PEDRO JIMENEZ, ESQ.
          -- AUSTIN PROUTY, ESQ.
 7        515 South Flower Street, #25
          Los Angeles, California 90071
 8        (213) 683-6105
          Aviluft@paulhastings.com
 9        Pjimenez@paulhastings.com
10        Austinprouty@paulhastings.com
11
     For the Creditors:
12        McDERMOTT WILL & EMERY
          BY: JOSEPH B. EVANS, ESQ.
13        --  SAMUEL ASHWORTH, ESQ.
          340 Madison Avenue
14        New York, New York 10173
          (212) 547-5400
15        Jbevans@mwe.com
16        Sashworth@mwe.com
17
     For UpgradeYa Investments:
18        LANDIS RATH & COBB LLP
          BY: MATTHEW PIERCE, ESQ.
19        --  ADAM LANDIS, ESQ.
          919 North Market Street, #1800
20        Wilmington, Delaware 19801
21        (302) 467-4435
22        Pierce@lrclaw.com
23
24   Also present:
25        Julian Shine, Videographer
```

Page 3

```
 1                        INDEX

 2

 3   WITNESS: MARC PARRISH

 4   EXAMINATION                                    PAGE

 5   BY MR. EVANS                                     9

 6   BY MR. LUFT                                  80, 182

 7   BY MR. PIERCE                                  175

 8

 9

10

11            WITNESS INSTRUCTED NOT TO ANSWER

12                    PAGE      LINE

13                    146       17

14                    147        7

15                    147       16

16                    147       25

17                    183       11

18                    186       10

19                    187       17

20                    187        2

21

22

23

24

25

                                            Page  4
```

```
 1                    INDEX TO EXHIBITS

 2       EXHIBIT                                    MARKED

 3

 4       Exhibit CC-1     Crypto Equals Credit Documents   35

 5       Exhibit CC-2     Loan and Security Agreement      38

 6       Exhibit CC-3     Form of Draw Certificate         40

 7       Exhibit CC-4     Email dated August 13th, 2020    47

 8       Exhibit CC-5     Form of Draw Certificate,        48

 9                        Partial Collateral Redemption

10       Exhibit CC-6     Email dated April 23rd, 2020     51

11       Exhibit CC-6A    Excel Spreadsheet                52

12       Exhibit CC-7     Blockchain.com, 12/15/2020       53

13       Exhibit CC-8     Blockchain.com, 12/15/2020       57

14       Exhibit CC-9     Declaration of Mr. Bonjour       73

15       Exhibit CC-10    Supplemental Declaration of      73

16                        Marc Parrish

17       Exhibit CC-11    Telegram exchanges, 0724 - 0725  73

18       Exhibit CC-12    Telegram exchanges, 0730         73

19       Exhibit CC-13    Telegram exchanges, 0716 - 0718  74

20       Exhibit D-1      Email dated October 4th, 2020    146

21       Exhibit U-1      Telegram exchanges, 0724 - 0737  178

22       Exhibit U-2      Email dated October 11th, 2020   179

23

24

25
                                                    Page 5
```

| | | |
|---|---|---|
| 1 | WEDNESDAY, DECEMBER 16, 2020, 12:14 P.M. | |
| 2 | VIA VIDEOCONFERENCE | |
| 3 | | 12:14:01 |
| 4 | THE VIDEOGRAPHER:  We are on the record at | 12:14:01 |
| 5 | 12:14 p.m., Eastern standard time, on December 16th, | 12:14:04 |
| 6 | 2020.  Please note that microphones are sensitive and may | 12:14:08 |
| 7 | pick up whispering, private conversations, and cellular | 12:14:11 |
| 8 | interference.  Audio and video recording will continue to | 12:14:15 |
| 9 | take place unless all parties agree to go off the record. | 12:14:19 |
| 10 | This is the video-recorded deposition of | 12:14:22 |
| 11 | Marc Parrish, in the matter of In Re: Cred Incorporated, | 12:14:26 |
| 12 | et al., filed in the Unites States Bankruptcy Court, for | 12:14:26 |
| 13 | the District of Delaware.  Case number 20-12836 (JTD). | 12:14:32 |
| 14 | Our witness today is located in Mount Pleasant, | 12:14:41 |
| 15 | South Carolina. | 12:14:43 |
| 16 | This deposition is being conducted Zoom | 12:14:44 |
| 17 | videoconferencing, and all participants are attending | 12:14:47 |
| 18 | remotely.  My name is Julian Shine.  I am the | 12:14:50 |
| 19 | videographer.  Our Court Reporter is Desiree Cooks.  We | 12:14:54 |
| 20 | are from the firm Veritext.  I am not authorized to | 12:14:56 |
| 21 | administer an oath.  I'm not related to any party in this | 12:15:00 |
| 22 | action, nor am I financially interested in the outcome in | 12:15:04 |
| 23 | any way. | 12:15:07 |
| 24 | If there are any objections to proceeding, | 12:15:07 |
| 25 | please state them at the time of your appearance.  We'll | 12:15:09 |

Page 6

| | | |
|---|---|---|
| 1 | begin with appearances with the noticing attorney. | 12:15:13 |
| 2 | MR. EVANS:  Joseph Evans from McDermott Will & | 12:15:15 |
| 3 | Emery.  I'm here with my colleague Sam Ashworth, and we | 12:15:19 |
| 4 | represent the committee of unsecured creditors. | 12:15:24 |
| 5 | MR. LUFT:  Avi Luft of Paul Hastings on behalf | 12:15:24 |
| 6 | of Cred debtors; with me is my colleague Pedro Jimenez | 12:15:33 |
| 7 | and Austin Prouty. | 12:15:39 |
| 8 | MR. PIERCE:  Matthew Pierce with Landis Rath & | 12:15:40 |
| 9 | Cobb on behalf of UpgradeYa Investments, LLC, and I'm | 12:15:41 |
| 10 | joined here today with my colleague Adam Landis. | 12:15:44 |
| 11 | THE VIDEOGRAPHER:  Okay.  I think that's | 12:15:50 |
| 12 | everybody.  The witness may be sworn in and counsel may | 12:15:51 |
| 13 | begin examination. | 12:15:57 |
| 14 | MARC PARRISH, | 12:15:57 |
| 15 | having been first duly sworn, testifies as follows: | 12:15:57 |
| 16 | | 12:16:14 |
| 17 | MR. PIERCE:  And, Joe, if I may, before we | 12:16:14 |
| 18 | begin just to put that -- that agreement on the record. | 12:16:16 |
| 19 | UpgradeYa Investment has made -- for the record, Matthew | 12:16:20 |
| 20 | Pierce with Landis Rath & Cobb on behalf of | 12:16:24 |
| 21 | UpgradeYa Investments. | 12:16:26 |
| 22 | Documents were produced by UpgradeYa to the | 12:16:28 |
| 23 | debtors and the committee under the understanding that | 12:16:32 |
| 24 | they're being produced on a confidential basis, and to | 12:16:33 |
| 25 | the extent that the committee or the debtors use those | 12:16:36 |

Page 7

```
 1   documents that were produced today at the deposition, we    12:16:39

 2   ask that each of the parties in attendance today confirm    12:16:41

 3   on the record their understanding and their agreement       12:16:45

 4   that they'll treat those documents as confidential.         12:16:47

 5        MR. EVANS:  Yeah, this is Joe Evans from the           12:16:51

 6   committee.  And we emailed on this subject last night,      12:16:53

 7   but we agree to treat those documents as, presumably,       12:16:56

 8   confidential that we intend to file the document -- I       12:17:00

 9   said, if there comes a time when we intend to file a        12:17:14

10   document publically, before we do so, we will contact you   12:17:19

11   and meet and confer on the issue, and won't file it until   12:17:20

12   we reach an agreement or get a resolution.                  12:17:24

13        MR. LUFT:  This is Avi Luft on behalf of the           12:17:28

14   debtors.  We set out our view in our email -- my email to   12:17:31

15   you last night, but, in short, we agree to treat these      12:17:35

16   documents as presumptively confidential.                    12:17:39

17        And just as Joe said, to the extent we intend          12:17:41

18   to use them in either a filing or open court, we will       12:17:44

19   first reach out to you to give you an opportunity to        12:17:48

20   ^ defend descend the confidential position.  We are not     12:17:50

21   waiving any rights with regard to challenging the           12:17:52

22   confidentiality of any such information.                    12:17:55

23        MR. PIERCE:  Thank you, Joe.  You can go ahead.        12:18:01

24   ///                                                         12:18:01

25   ///                                                         12:18:01
```

Page 8

| | | |
|---|---|---|
| 1 | EXAMINATION | 12:18:01 |
| 2 | BY MR. EVANS: | 12:18:01 |
| 3 | Q    Okay.  Good morning, Mr. Parrish. | 12:18:03 |
| 4 | A    Good morning. | 12:18:07 |
| 5 | Q    I just wanted to go over a few ground rules | 12:18:07 |
| 6 | before we get started.  I'm going to be asking you | 12:18:10 |
| 7 | questions today on behalf of the committee.  We would ask | 12:18:13 |
| 8 | that when you answer these questions, you answer them | 12:18:16 |
| 9 | verbally and not do a head nod or "uh-huh."  It's a | 12:18:19 |
| 10 | little difficult to get those on the record.  We are on | 12:18:22 |
| 11 | Zoom, and so we'll all try to speak slowly.  I sometimes | 12:18:27 |
| 12 | speak a little quickly, and we'll do our best to not | 12:18:28 |
| 13 | speak over each other. | 12:18:31 |
| 14 | All right?  Do you understand? | 12:18:33 |
| 15 | A    Yes. | 12:18:35 |
| 16 | Q    And your counsel is here today with you, and | 12:18:36 |
| 17 | they may launch some objections.  If they object on any | 12:18:38 |
| 18 | basis other than privilege, you still are required to | 12:18:42 |
| 19 | answer the question.  If your counsel objects on the | 12:18:47 |
| 20 | basis of privilege and they direct you not to answer, | 12:18:50 |
| 21 | then you're not required to. | 12:18:53 |
| 22 | Do you understand that? | 12:18:54 |
| 23 | A    Yes. | 12:18:55 |
| 24 | Q    And is anyone else in the room with you today? | 12:18:55 |
| 25 | A    No. | 12:19:01 |

Page 9

```
1        Q     And I assume you have your cell phone with         12:19:02

2   you; right?                                                   12:19:07

3        A     Yes.                                               12:19:07

4        Q     Okay.  And we would ask that you not text          12:19:09

5   anybody or otherwise communicate during the course of         12:19:13

6   this deposition while a question is pending.                  12:19:16

7              Do you agree with that?                            12:19:18

8        A     Yes.                                               12:19:19

9        Q     And you can consult with your counsel when a       12:19:21

10  question is not pending.  However, when a question is         12:19:26

11  pending, during the course of the deposition, you're not      12:19:28

12  permitted to talk with your counsel unless it's on the        12:19:33

13  basis of privilege.                                           12:19:35

14             Do you understand that?                            12:19:36

15       A     Yes.                                               12:19:37

16             MR. LUFT:  Joe, just so we're clear, we are in     12:19:39

17  Delaware.  I'm not sure -- he should speak to his own         12:19:43

18  counsel -- I don't think he can converse with his counsel     12:19:46

19  during the pendency of the litigation -- deposition           12:19:50

20  regarding the substance of the deposition, but that's for     12:19:54

21  him and his counsel to understand the rule.                   12:19:56

22             MR. PIERCE:  Matthew Pierce, for the record.       12:20:00

23  We understand, and we'll abide by the Delaware rules.         12:20:03

24             MR. EVANS:  Right.                                 12:20:06

25  ///                                                           12:20:08
```

Page 10

```
1    BY MR. EVANS:                                         12:20:08

2        Q    Mr. Parrish, just brief questions about your    12:20:08

3    background.  Where did you go to school?  Let's start   12:20:13

4    with college.                                           12:20:17

5        A    NC State University.                            12:20:17

6        Q    And what did you study at NC State?             12:20:21

7        A    Electrical and computer engineering.            12:20:24

8        Q    Okay.                                           12:20:28

9             Was that your highest level of education?       12:20:28

10       A    Yes.                                            12:20:31

11       Q    And following NC State, where did you begin     12:20:34

12   working?                                                12:20:40

13       A    Nucor Steel.                                    12:20:40

14       Q    And what's Nucor Steel?                         12:20:44

15       A    A steel company.  They make steel.              12:20:47

16       Q    Okay.  What did you do there?                   12:20:51

17       A    I was a power engineer, then automation         12:20:54

18   engineering, then a lead man.                           12:21:03

19       Q    And nothing you did at Nucor Steel had anything 12:21:08

20   to do with cryptocurrency or virtual currency; right?   12:21:11

21       A    Correct.                                        12:21:17

22       Q    And following --                                12:21:25

23       A    Fraud, currencies in fraud space.  There's a    12:21:26

24   lot of overlap in certain areas, but no, nothing directly 12:21:36

25   with cryptocurrency.                                    12:21:39
```

Page 11

| | | |
|---|---|---|
| 1 | Q    Okay.  Just so I'm clear, your role at | 12:21:40 |
| 2 | Nucor Steel, did you have any responsibilities at | 12:21:44 |
| 3 | Nucor Steel related to virtual currency? | 12:21:47 |
| 4 | A    No. | 12:21:50 |
| 5 | Q    And when you left Nucor Steel -- I think that | 12:21:51 |
| 6 | was in 2018; right? | 12:21:57 |
| 7 | A    That's correct. | 12:21:59 |
| 8 | Q    What did you do after you left Nucor Steel? | 12:22:04 |
| 9 | A    I started my own business. | 12:22:07 |
| 10 | Q    And what is that business? | 12:22:08 |
| 11 | A    It is a mining business. | 12:22:12 |
| 12 | Q    Okay.  And is the name of that business | 12:22:17 |
| 13 | UpgradeYa? | 12:22:22 |
| 14 | A    It is UpgradeYa LLC. | 12:22:23 |
| 15 | Q    And UpgradeYa LLC is a mining business.  Is it | 12:22:33 |
| 16 | any particular virtual currency or just Bitcoin? | 12:22:34 |
| 17 | MR. PIERCE:  Object to form. | 12:22:36 |
| 18 | You can answer. | 12:22:41 |
| 19 | THE WITNESS:  It is a mining business designed | 12:22:42 |
| 20 | to mine cryptocurrency. | 12:22:46 |
| 21 | BY MR. EVANS: | 12:22:50 |
| 22 | Q    Okay.  When did you start becoming involved in | 12:22:50 |
| 23 | digital currency?  For the purposes of this deposition, | 12:22:54 |
| 24 | we could consider digital currency, virtual currency, and | 12:22:58 |
| 25 | cryptocurrency all to mean the same -- the same thing. | 12:23:03 |

Page 12

| | | |
|---|---|---|
| 1 | It's all virtual currency. | 12:23:05 |
| 2 | When did you first become involved in virtual | 12:23:07 |
| 3 | currency? | 12:23:10 |
| 4 | A    Can you further describe what "involved" means? | 12:23:10 |
| 5 | Q    Sure.  When did you first learn about it? | 12:23:14 |
| 6 | A    I started to learn about digital currencies | 12:23:16 |
| 7 | around 2010. | 12:23:24 |
| 8 | Q    Okay.  And how did you first learn about it? | 12:23:26 |
| 9 | A    I became aware of some information at Bitcoin, | 12:23:31 |
| 10 | this, and started to study it. | 12:23:39 |
| 11 | Q    Okay.  And did there come a time when you | 12:23:41 |
| 12 | started to purchase Bitcoin and other virtual currencies? | 12:23:44 |
| 13 | A    Yes. | 12:23:47 |
| 14 | Q    And when did you start purchasing Bitcoin and | 12:23:50 |
| 15 | other virtual currencies? | 12:23:54 |
| 16 | A    I don't know the exact date when I first | 12:23:55 |
| 17 | purchased any virtual currency, but it would -- I don't | 12:24:03 |
| 18 | know the exact day when I started to purchase virtual | 12:24:14 |
| 19 | currency. | 12:24:16 |
| 20 | Q    Do you have a year?  Was it 2010?  2011? | 12:24:17 |
| 21 | A    Yes.  It could have -- it was one of those | 12:24:22 |
| 22 | years, I believe.  It could have been 2012.  I believe it | 12:24:32 |
| 23 | was 2011. | 12:24:35 |
| 24 | Q    Okay.  And when you purchased virtual currency | 12:24:36 |
| 25 | the first time, did you do it on a cryptocurrency | 12:24:41 |

Page 13

| | | |
|---|---|---|
| 1 | exchange, or did you do it some other way? | 12:24:45 |
| 2 | A    I just stated I'm not -- without looking up | 12:24:47 |
| 3 | this information, I'm not certain of the date.  The way I | 12:24:52 |
| 4 | first purchased, the very first time I purchased, I'd | 12:24:57 |
| 5 | have to look that up.  It was 10 years ago. | 12:25:01 |
| 6 | Q    Okay.  Let me ask you this:  When you first | 12:25:03 |
| 7 | started purchasing Bitcoin, maybe not the exact first | 12:25:09 |
| 8 | purchase, did you purchase in any other way than on a | 12:25:13 |
| 9 | cryptocurrency exchange? | 12:25:16 |
| 10 | A    Cryptocurrency exchanges, at least the way we | 12:25:17 |
| 11 | know them today, didn't necessarily exist in 2010, so I'm | 12:25:28 |
| 12 | not sure "exchange" is the right word.  There were | 12:25:34 |
| 13 | platforms. | 12:25:38 |
| 14 | Q    Okay.  So what platforms did you use? | 12:25:39 |
| 15 | A    Mt. Gox, which would probably fall into | 12:25:42 |
| 16 | exchange. | 12:25:49 |
| 17 | Q    Okay.  Were there other -- were there other | 12:25:52 |
| 18 | platforms you used, like LocalBitcoins, or other similar | 12:25:56 |
| 19 | platforms that you could trade? | 12:26:00 |
| 20 | A    I did not use LocalBitcoins. | 12:26:02 |
| 21 | Q    Okay.  What else besides Mt. Gox did you use? | 12:26:04 |
| 22 | A    It's hard to remember the names of these.  I | 12:26:08 |
| 23 | don't remember. | 12:26:15 |
| 24 | Q    When you purchased Bitcoin, where did you store | 12:26:16 |
| 25 | your wallets? | 12:26:22 |

Page 14

| | | | |
|---|---|---|---|
| 1 | A | Where did I store my wallets in 2010? | 12:26:23 |
| 2 | Q | Sure.  We can start there. | 12:26:31 |
| 3 | A | I don't remember how I stored them back then. | 12:26:33 |
| 4 | Q | Okay.  And where do you -- where do you | 12:26:38 |
| 5 | | generally store your wallets?  Do you have them on | 12:26:43 |
| 6 | | exchanges?  Do you have with them custodians?  Or do you | 12:26:45 |
| 7 | | have them with cold storage? | 12:26:51 |
| 8 | A | Cold storage. | 12:26:53 |
| 9 | Q | And so when you first became familiar with | 12:26:54 |
| 10 | | Bitcoin and started purchasing, what else did you do in | 12:26:58 |
| 11 | | connection with virtual currency? | 12:27:03 |
| 12 | | MR. PIERCE:  Object to form. | 12:27:04 |
| 13 | | You can answer. | 12:27:05 |
| 14 | | MR. EVANS:  What's the objection? | 12:27:06 |
| 15 | | MR. PIERCE:  Form. | 12:27:07 |
| 16 | | MR. EVANS:  Okay.  Something wrong with the | 12:27:11 |
| 17 | | question? | 12:27:13 |
| 18 | | MR. PIERCE:  Well, it's pretty broad.  "What | 12:27:13 |
| 19 | | else did you do in connection with Bitcoin?"  That's | 12:27:16 |
| 20 | | pretty broad and not direct with the question. | 12:27:20 |
| 21 | | MR. EVANS:  Yeah, okay. | 12:27:23 |
| 22 | BY MR. EVANS: | | 12:27:24 |
| 23 | Q | You can answer the question. | 12:27:24 |
| 24 | A | What is the question? | 12:27:25 |
| 25 | Q | What other activities did you do concerning | 12:27:27 |

Page 15

```
 1   virtual currency?                                    12:27:31

 2       A    Learn about it.                             12:27:31

 3       Q    Okay.  Did you start mining virtual currency?  12:27:38

 4       A    Yeah.  Did I mine virtual currencies?      12:27:42

 5       Q    Yes.                                        12:27:46

 6       A    At that time, I mined a little bit.         12:27:51

 7       Q    And the time period we're talking about now is  12:27:53

 8   in 2010, 2013.                                       12:27:55

 9       A    I don't remember the exact times.  I'd have to  12:27:57

10   look that stuff up.                                  12:28:03

11       Q    Okay.  And you started the business --      12:28:04

12            When did UpgradeYa start?  2018?            12:28:11

13       A    Yes.  That, I do remember.  That's when I left  12:28:14

14   Nucor, in May 2018.                                  12:28:20

15       Q    And at that time, you decided to start      12:28:22

16   UpgradeYa for the purposes of Bitcoin mining; is that  12:28:28

17   right?                                               12:28:32

18       A    For the purpose of mining, that is correct, not  12:28:32

19   necessarily just Bitcoin.                            12:28:39

20       Q    And does UpgradeYa have any other lines of  12:28:41

21   business or just strictly a mining company?          12:28:48

22       A    UpgradeYa is a mining company.  This is the  12:28:52

23   purpose.                                             12:28:56

24       Q    Okay.  Are there any other entities that you're  12:29:01

25   associated with?                                     12:29:03
```

                                                        Page 16

1    A    Yes.                                              12:29:04

2    Q    What are those entities?                          12:29:09

3    A    UpgradeYa Holdings, UpgradeYa Investments.        12:29:10

4    They're both LLCs.  That's the official name.          12:29:22

5    Q    So there are three UpgradeYa entities; is that    12:29:27

6    right?                                                 12:29:30

7    A    That is correct.                                  12:29:30

8    Q    Okay.  So UpgradeYa Investments, what does        12:29:31

9    UpgradeYa Investments do?                              12:29:38

10    A    Invest.                                          12:29:40

11    Q    Okay.  Invest in what?                           12:29:48

12    A    It's intentionally broad.  Invest in anything.   12:29:49

13    Q    Okay.  Does it invest in virtual currency?       12:29:56

14    A    UpgradeYa Investments has not directly invested  12:29:59

15    in virtual currency.  It has not bought virtual currency,   12:30:09

16    no.                                                   12:30:15

17    Q    Okay.  Has it indirectly invested in virtual     12:30:15

18    currency?                                             12:30:18

19    A    It has invested in the space, yes.               12:30:18

20    Q    Okay.  When you say, "it has invested in the     12:30:24

21    space," what does it do?                              12:30:30

22    A    What does it do?                                 12:30:32

23    Q    UpgradeYa Investments, what sort of investments  12:30:33

24    does UpgradeYa Investments to do?                     12:30:39

25    A    I've invested in -- I'm on the NDA in the        12:30:42

Page 17

1  investments, the only investments.  You know, I can let        12:30:50

2  my counsel and you figure out the NDA, and you can have         12:30:54

3  all the information about that investment.  I can say it        12:30:57

4  has no relation to -- completely third party has no            12:31:00

5  relation to anything here.                                     12:31:04

6       Q     Okay.  UpgradeYa Investments, who owns that          12:31:06

7  company?                                                        12:31:09

8       A     Me and my -- Daniel Michael Parrish.                 12:31:09

9       Q     Okay.  So are there any other employees at           12:31:19

10 UpgradeYa Investments, or is it just you and Michael            12:31:23

11 Daniel Parrish?                                                 12:31:26

12      A     Yes.  That's...                                      12:31:28

13      Q     You're saying you have an NDA between yourself        12:31:31

14 and UpgradeYa Investments, which is the company that you        12:31:33

15 own with your father; is that right?                            12:31:36

16      A     No.                                                  12:31:37

17            MR. PIERCE:  Object --                               12:31:38

18 BY MR. EVANS:                                                   12:31:40

19      Q     That's not what you're saying?  That's not what      12:31:40

20 you're saying?  So you're saying you have an NDA with a         12:31:43

21 third party about a particular investment.                      12:31:48

22      A     I understood your question to be, "What has          12:31:50

23 UpgradeYa Investments invested in?"  Was that accurate?         12:31:53

24      Q     That was my question.                                12:31:57

25      A     The investments, a third party, I do have NDAs       12:31:58

Page 18

| | | |
|---|---|---|
| 1 | or an NDA. | 12:32:09 |
| 2 | Q    Okay.  Does UpgradeYa Investments have no | 12:32:10 |
| 3 | connection to Cred; is that right? | 12:32:16 |
| 4 | A    UpgradeYa Investments has no connection to | 12:32:18 |
| 5 | Cred? | 12:32:23 |
| 6 | MR. PIERCE:  Object to form. | 12:32:24 |
| 7 | MR. EVANS:  Yeah. | 12:32:25 |
| 8 | BY MR. EVANS: | 12:32:26 |
| 9 | Q    Does the UpgradeYa Investments that you're | 12:32:26 |
| 10 | saying are covered by an NDA have any connection to Cred? | 12:32:28 |
| 11 | A    I don't understand. | 12:32:32 |
| 12 | Q    Okay.  We can move from here. | 12:32:40 |
| 13 | UpgradeYa Holdings, what does | 12:32:49 |
| 14 | UpgradeYa Holdings do? | 12:32:50 |
| 15 | A    UpgradeYa Holdings is a holding company for | 12:32:51 |
| 16 | property. | 12:32:55 |
| 17 | Q    What sort of property does UpgradeYa Holdings | 12:32:55 |
| 18 | hold? | 12:32:58 |
| 19 | A    The building I'm in right now. | 12:32:58 |
| 20 | Q    UpgradeYa Holdings holds real property; is that | 12:33:06 |
| 21 | right? | 12:33:11 |
| 22 | A    Real estate. | 12:33:11 |
| 23 | Q    Real estate?  Okay. | 12:33:13 |
| 24 | And UpgradeYa Holdings doesn't have anything to | 12:33:13 |
| 25 | do with virtual currency? | 12:33:16 |

Page 19

| | | |
|---|---|---|
| 1 | A      The business of UpgradeYa Holdings is real | 12:33:17 |
| 2 | estate.  UpgradeYa operates in the building | 12:33:25 |
| 3 | UpgradeYa Holdings owns. | 12:33:29 |
| 4 | Q      Okay.  And so just so I get this straight, | 12:33:32 |
| 5 | there's UpgradeYa Investments, there's | 12:33:36 |
| 6 | UpgradeYa Holdings. | 12:33:38 |
| 7 | And what's the third one? | 12:33:39 |
| 8 | A      UpgradeYa. | 12:33:40 |
| 9 | Q      So UpgradeYa, that one, what does that company | 12:33:43 |
| 10 | do now other than mine virtual currency? | 12:33:51 |
| 11 | A      I'm sorry.  I thought we already said its sole | 12:33:53 |
| 12 | purpose is to mine virtual currency. | 12:34:04 |
| 13 | Q      And does it make investment in virtual currency | 12:34:05 |
| 14 | as well? | 12:34:08 |
| 15 | A      Can you describe what you mean by "investment | 12:34:09 |
| 16 | in virtual currency"? | 12:34:17 |
| 17 | Q      By the word "investment," is the word | 12:34:18 |
| 18 | indefinite?  Does UpgradeYa purchase virtual currency? | 12:34:20 |
| 19 | A      No.  It mines it. | 12:34:26 |
| 20 | Q      Okay.  Does UpgradeYa sell virtual currency? | 12:34:27 |
| 21 | A      Yes. | 12:34:29 |
| 22 | Q      Does UpgradeYa enter into options or future | 12:34:32 |
| 23 | contracts concerning virtual currency? | 12:34:36 |
| 24 | A      No. | 12:34:37 |
| 25 | Q      Does UpgradeYa enter into any other | 12:34:42 |

Page 20

| | | |
|---|---|---|
| 1 | transactions besides mining and selling virtual currency? | 12:34:45 |
| 2 | A    It is not the intent for UpgradeYa to do | 12:34:49 |
| 3 | anything else besides that. | 12:34:58 |
| 4 | Q    Okay.  But you said it's not the intent. | 12:34:59 |
| 5 |     Does UpgradeYa do any other transactions of | 12:35:02 |
| 6 | virtual currency aside from mining and selling? | 12:35:06 |
| 7 | A    You trailed off there.  You're a little bit | 12:35:07 |
| 8 | light as far as voice in my headset. | 12:35:14 |
| 9 | Q    One second.  Let me try to -- is that better? | 12:35:20 |
| 10 | A    It does sound a little bit better. | 12:35:26 |
| 11 | Q    Okay.  I'll try to speak up. | 12:35:31 |
| 12 |     UpgradeYa, has it entered into any transactions | 12:35:33 |
| 13 | in virtual currency other than mining and selling virtual | 12:35:41 |
| 14 | currency? | 12:35:45 |
| 15 | A    I'm not going to claim to memorize every | 12:35:45 |
| 16 | transaction.  Its purpose is a mining company, and it | 12:35:54 |
| 17 | mines. | 12:35:59 |
| 18 | Q    I understand.  It's not a trick question.  I'm | 12:36:00 |
| 19 | just asking:  Is there any other transactions that | 12:36:03 |
| 20 | UpgradeYa enters into aside from mining and selling? | 12:36:08 |
| 21 | A    Any other transactions?  Yeah, it pays the | 12:36:13 |
| 22 | power bill.  It has costs. | 12:36:25 |
| 23 | Q    Okay.  Mr. Parrish, you understand that you're | 12:36:27 |
| 24 | here today.  There's a transaction that UpgradeYa entered | 12:36:31 |
| 25 | into with Cred; right?  You're aware of that? | 12:36:35 |

Page 21

| | | |
|---|---|---|
| 1 | A    UpgradeYa Investments. | 12:36:37 |
| 2 | Q    UpgradeYa Investments.  UpgradeYa Investments | 12:36:39 |
| 3 | -- UpgradeYa Investments entered into a transaction with | 12:36:57 |
| 4 | Cred; right? | 12:37:01 |
| 5 | A    That's correct. | 12:37:03 |
| 6 | Q    Okay.  We'll come back to this. | 12:37:04 |
| 7 | So you've been working -- you've been | 12:37:08 |
| 8 | knowledgeable about cryptocurrency since 2011; is that | 12:37:12 |
| 9 | right? | 12:37:20 |
| 10 | A    That's fair to say, yeah, I've been -- I was | 12:37:20 |
| 11 | very -- I've been trying to learn about the space since | 12:37:22 |
| 12 | then, yeah. | 12:37:26 |
| 13 | Q    Okay.  And you had a number of different | 12:37:27 |
| 14 | digital wallets; is that right? | 12:37:33 |
| 15 | A    Yes.  I've used different types of wallets. | 12:37:34 |
| 16 | Q    Okay.  What's a wallet? | 12:37:41 |
| 17 | A    A wallet, in terms of a digital currency, is a | 12:37:44 |
| 18 | place to store digital currency. | 12:37:54 |
| 19 | Q    And are you familiar with the concept of a | 12:37:58 |
| 20 | hash? | 12:38:01 |
| 21 | A    I'm familiar of the word in the space, yes. | 12:38:01 |
| 22 | Q    What does a hash mean to you? | 12:38:09 |
| 23 | A    Not a whole lot.  I know they exist. | 12:38:11 |
| 24 | Q    Okay.  But what are they? | 12:38:23 |
| 25 | A    I'm not an expert in cryptocurrency to say what | 12:38:25 |

Page 22

```
 1   a hash is.                                              12:38:33

 2       Q    Have you ever looked up a hash before?        12:38:34

 3       A    I have looked up transactions, which I think --  12:38:37

 4   I'm not going to -- I'm not going to guess here.  I've  12:38:47

 5   looked at transactions.                                 12:38:50

 6       Q    Okay.  When you look up transactions, how do  12:38:52

 7   you look them up typically?                             12:38:55

 8       A    Typically, I would use a Block explorer, a    12:38:58

 9   website that has the Blockchain data.                   12:39:02

10       Q    Okay.  Is that Blockchain.com?  Is that what  12:39:07

11   you would use?                                          12:39:10

12       A    I could.  I have, yes.                         12:39:10

13       Q    Okay.  And if you go to Blockchain.com and you  12:39:12

14   want to look up a transaction, how do you do that?     12:39:16

15       A    Actually, I think it's Blockchain.info.       12:39:19

16       Q    If you were to go to the website, how would you  12:39:26

17   look up a transaction?                                  12:39:30

18       A    Normally, you would have to have something to  12:39:31

19   search.  You have to have an address or a transaction.  12:39:35

20       Q    Okay.  So you said address or transaction.    12:39:40

21   You're talking about address.                           12:39:43

22            What are you referring to?                     12:39:44

23       A    An address is a location that you could send  12:39:45

24   digital currency.                                       12:39:58

25       Q    So an address identifies a particular         12:39:58
```

Page 23

| | | |
|---|---|---|
| 1 | wallet; is that right? | 12:40:01 |
| 2 | A    No. | 12:40:02 |
| 3 | Q    What does an address identify? | 12:40:08 |
| 4 | A    It identifies an address inside a wallet. | 12:40:09 |
| 5 | Q    It identifies an address inside a wallet. | 12:40:18 |
| 6 | What do you mean by that? | 12:40:22 |
| 7 | A    I just mean a wallet could have multiple | 12:40:23 |
| 8 | addresses.  That's... | 12:40:25 |
| 9 | Q    Okay.  So one way you could look up a virtual | 12:40:27 |
| 10 | currency transaction is by having a wallet | 12:40:33 |
| 11 | address; right? | 12:40:35 |
| 12 | A    Yes. | 12:40:35 |
| 13 | Q    Okay.  And if you put in a wallet address, what | 12:40:39 |
| 14 | would that website show you? | 12:40:44 |
| 15 | A    Normally -- well, you would see the | 12:40:46 |
| 16 | transactions, the inputs and outputs, to the wallet. | 12:40:59 |
| 17 | Q    Okay.  And you could see the virtual currency | 12:41:02 |
| 18 | coming in and the virtual currency coming out; right? | 12:41:04 |
| 19 | A    Sorry.  I just misspoke there.  I want to | 12:41:06 |
| 20 | correct that.  It's not the input and outputs to the | 12:41:10 |
| 21 | wallet.  It's the inputs and outputs to the address. | 12:41:12 |
| 22 | Q    To the address. | 12:41:16 |
| 23 | So you're saying that one wallet can have | 12:41:17 |
| 24 | multiple addresses; right? | 12:41:19 |
| 25 | A    That is my understanding of the wallet that | 12:41:20 |

Page 24

| | | |
|---|---|---|
| 1 | I've used, yes. | 12:41:23 |
| 2 | Q    Okay.  And if you put in the address to | 12:41:24 |
| 3 | identify the wallet, it would also show you whether that | 12:41:29 |
| 4 | wallet was holding any virtual currency at the | 12:41:32 |
| 5 | moment; right? | 12:41:36 |
| 6 | A    Yes. | 12:41:36 |
| 7 | Q    And on those sites when you look up a | 12:41:37 |
| 8 | particular transaction, there's also an identifier for a | 12:41:45 |
| 9 | particular transaction called a hash; right? | 12:41:51 |
| 10 | A    I am familiar with transaction IDs, yes. | 12:41:54 |
| 11 | Q    But for transaction ID and hashes, are we using | 12:41:58 |
| 12 | those terms interchangeably, or do you take them any | 12:42:04 |
| 13 | differently? | 12:42:09 |
| 14 | A    I'm not because I'm not an expert in the | 12:42:09 |
| 15 | terminology "hash" to know exactly what that means. | 12:42:13 |
| 16 | Q    Okay.  So a transaction ID -- a transaction ID | 12:42:18 |
| 17 | is an identifier that looks like a particular virtual | 12:42:21 |
| 18 | currency transaction, right? | 12:42:28 |
| 19 | A    Say that again. | 12:42:28 |
| 20 | Q    A transaction ID is an identifier that | 12:42:31 |
| 21 | identifies a particular virtual currency transaction? | 12:42:35 |
| 22 | Is that your understanding? | 12:42:42 |
| 23 | A    Yes.  As I understand, a transaction ID would | 12:42:44 |
| 24 | identify a transaction in the currency of that particular | 12:42:48 |
| 25 | -- the Blockchain for that particular digital currency. | 12:42:53 |

Page 25

1   I think we said the same thing, yeah.                    12:42:57

2       Q     Yeah, I think so.  I usually use the term      12:42:59

3   "hash," and I think you're using the term "transaction   12:43:03

4   ID."  If I go back and forth, you can clarify, but I mean 12:43:06

5   the same thing -- I mean, hash and transaction ID mean    12:43:09

6   the same thing.  If you want to clarify --               12:43:13

7       A     I'm fine with that.  We can call a hash, a     12:43:15

8   transaction the same thing.  Hash in the crypto space, my 12:43:19

9   understanding, is a lot of things.  It could consider the 12:43:23

10  hash, and that is a hash.                                 12:43:27

11      Q     Okay.                                           12:43:29

12      A     Personally, I'd be careful using that word to  12:43:29

13  kind of describe it.                                      12:43:33

14      Q     Okay.  Fair enough.  Fair enough.  I'll use    12:43:33

15  "transaction ID," and we'll both be on the same page.    12:43:39

16            I'm curious, what other -- what other things    12:43:43

17  are used in hashes in the cryptocurrency world would you  12:43:45

18  say?                                                      12:43:52

19      A     Once again, that word is not something I feel  12:43:52

20  comfortable trying to describe what it is in the crypto   12:43:56

21  space.  I could be wrong.  It has -- it has a lot of      12:43:58

22  scope.                                                    12:44:01

23      Q     Okay.  We'll use "transaction ID" today, and  12:44:01

24  we'll both be on the same page.  So we talked about       12:44:07

25  transaction IDs.  We talked about addresses that will     12:44:10

Veritext Legal Solutions
866 299-5127

| 1 | lead you to wallets. | 12:44:14 |
| 2 | An individual Bitcoin doesn't have a separate | 12:44:15 |
| 3 | identifier for that particular Bitcoin; right? | 12:44:23 |
| 4 | A     Sorry.  I was getting a drink of water. | 12:44:25 |
| 5 | Q     Each individual Bitcoin does not have a | 12:44:32 |
| 6 | separate identifier; isn't that correct? | 12:44:35 |
| 7 | A     Bitcoin is fungible, that is correct. | 12:44:37 |
| 8 | Q     Okay.  So there's no hash or address for each | 12:44:44 |
| 9 | individual Bitcoin; right? | 12:44:48 |
| 10 | A     Yes, Bitcoin is fungible. | 12:44:49 |
| 11 | Q     When you say "fungible," what do you mean? | 12:44:58 |
| 12 | A     There is no uniqueness between one Bitcoin or | 12:45:00 |
| 13 | another. | 12:45:04 |
| 14 | Q     Let's talk about Cred. | 12:45:05 |
| 15 | When did you first become aware of Cred? | 12:45:11 |
| 16 | A     I was referred to Cred as a potential service | 12:45:13 |
| 17 | for what I was looking for around March of this year, | 12:45:26 |
| 18 | 2020. | 12:45:33 |
| 19 | Q     You were referred by who? | 12:45:37 |
| 20 | A     I know who.  I'm trying to think if it's under | 12:45:38 |
| 21 | NDA as it relates to my investment, but it was a person | 12:45:51 |
| 22 | that's involved in one of my investments, said that this | 12:45:54 |
| 23 | could be a good source. | 12:45:57 |
| 24 | Q     Okay.  The person that introduced you to Cred, | 12:45:59 |
| 25 | were they a Cred employee?  Were they -- did they have | 12:46:06 |

Page 27

| | | |
|---|---|---|
| 1 | some other function?  What was their -- what was their | 12:46:10 |
| 2 | role at the company? | 12:46:12 |
| 3 | A     They were completely independent.  They have no | 12:46:13 |
| 4 | relation to Cred.  They only referred me because they | 12:46:14 |
| 5 | knew an employee that had worked at SALT that had moved | 12:46:16 |
| 6 | to Cred. | 12:46:20 |
| 7 | Q     What's SALT? | 12:46:20 |
| 8 | A     It is another company that does | 12:46:25 |
| 9 | collateral-backed loans. | 12:46:34 |
| 10 | Q     Okay. | 12:46:38 |
| 11 | A     SALT Lending is actually the name, I believe. | 12:46:39 |
| 12 | Q     Okay.  So this was just a person?  Was it an | 12:46:41 |
| 13 | entity that referred you?  Was it a broker?  What was the | 12:46:49 |
| 14 | nature of this person's role? | 12:46:52 |
| 15 | A     They were involved in the investment that I | 12:46:53 |
| 16 | referenced earlier.  So UpgradeYa Investments made an | 12:47:02 |
| 17 | investment, and this person referred Cred. | 12:47:06 |
| 18 | Q     Okay.  So somebody called you that you had a | 12:47:14 |
| 19 | prior dealing with and said, "You should look into Cred. | 12:47:21 |
| 20 | It's an interesting opportunity"; right? | 12:47:23 |
| 21 | MR. PIERCE:  Object to form. | 12:47:27 |
| 22 | BY MR. EVANS: | 12:47:29 |
| 23 | Q     You can answer. | 12:47:29 |
| 24 | A     Yes.  They just said, "This might be a service | 12:47:29 |
| 25 | that could work for you for what you're trying to do." | 12:47:32 |

Page 28

1      Q      Okay.  And what were you trying to do at that       12:47:35

2   point in time, in March of 2020?                              12:47:40

3      A      I was looking to do an investment, so I was         12:47:42

4   looking to obtain capital for that investment.                12:47:46

5      Q      Okay.  You were looking to obtain capital for       12:47:53

6   that investment.                                              12:47:56

7             What do you mean by that?                           12:47:58

8      A      If you're going to invest, you need money to do     12:47:59

9   that, at least under the structure of                         12:48:02

10  UpgradeYa Investments.  I was looking for that money.         12:48:05

11     Q      And when you say "money," do you mean you were      12:48:08

12  looking for fiat currency as opposed to virtual currency?     12:48:10

13     A      Correct.  The investor required it be USD.          12:48:16

14  That is correct.                                              12:48:19

15     Q      And UpgradeYa Investments, does it have             12:48:19

16  investors, or is it self-funded?  How does that work?         12:48:23

17     A      It is self-funded.                                  12:48:26

18     Q      So at this time, in the beginning of 2020,          12:48:31

19  UpgradeYa Investments wanted to make an investment on         12:48:34

20  fiat currency, and it wanted to find a way to obtain fiat     12:48:40

21  currency; is that fair?                                       12:48:45

22     A      Yes.                                                12:48:46

23     Q      What was the nature of the investment that          12:48:51

24  UpgradeYa Investments was interested in?                      12:48:53

25     A      As I referenced, you know, there is an NDA          12:48:55

Page 29

| | | |
|---|---|---|
| 1 | there.  What we shared with that, I prefer not to get | 12:49:05 |
| 2 | into.  Of course, if, for some reason, that needs to be | 12:49:08 |
| 3 | shared, we can do that, I think, through the counsel. | 12:49:11 |
| 4 | Q    Okay.  So the UpgradeYa investment in which | 12:49:17 |
| 5 | UpgradeYa needed fiat currency for, you're saying you're | 12:49:20 |
| 6 | subject to an NDA; is that right? | 12:49:25 |
| 7 | A    Yeah.  I had signed an NDA with them.  I can | 12:49:27 |
| 8 | say -- I already said it's a third party.  I have no | 12:49:32 |
| 9 | connection to -- to anything with Cred other than that | 12:49:37 |
| 10 | there was a reference that they could be a service, as | 12:49:40 |
| 11 | I've already stated. | 12:49:44 |
| 12 | Q    Okay.  We'll circle back to that. | 12:49:50 |
| 13 | What was your understanding of the opportunity | 12:49:52 |
| 14 | at Cred? | 12:49:54 |
| 15 | MR. PIERCE:  Object to form. | 12:49:55 |
| 16 | BY MR. EVANS: | 12:50:00 |
| 17 | Q    You can answer. | 12:50:00 |
| 18 | A    The understanding of the opportunity?  So they | 12:50:00 |
| 19 | provided a service for me to get USD. | 12:50:04 |
| 20 | Q    Okay.  There's a number of ways to get | 12:50:13 |
| 21 | USD; right?  You could have sold Bitcoin. | 12:50:17 |
| 22 | What was Cred offering you? | 12:50:20 |
| 23 | A    Cred was offering a crypto-secured loan. | 12:50:22 |
| 24 | Q    Crypto-secured loan?  Okay. | 12:50:34 |
| 25 | So after you were referred to Cred, who did you | 12:50:36 |

Page 30

```
 1    speak to at Cred about a potential investment?        12:50:40

 2             MR. PIERCE:  Object to form.                 12:50:43

 3             You can answer.                               12:50:46

 4             THE WITNESS:  The first contact was Xavier.   12:50:46

 5    BY MR. EVANS:                                          12:50:51

 6        Q    And what's Xavier's full name?                12:50:51

 7        A    I don't know.                                 12:50:54

 8        Q    Okay.  And what did you and Xavier discuss?   12:50:55

 9        A    Cred services and if it was a service I was   12:51:04

10    interested in.                                         12:51:08

11        Q    And had you ever heard of Cred before you were 12:51:10

12    initially referred to them?                            12:51:14

13        A    No.                                           12:51:17

14        Q    And what did Xavier say Cred services was?    12:51:20

15        A    Said they would provide a crypto-secured loan. 12:51:23

16        Q    Okay.  What's a crypto-secured loan?          12:51:33

17        A    A loan in USD that is secured by crypto.      12:51:38

18        Q    Okay.  So you UpgradeYa -- UpgradeYa provides 12:51:48

19    crypto to Cred; Cred provides UpgradeYa fiat currency; 12:51:52

20    UpgradeYa pays Cred interest; is that fair?            12:51:58

21             MR. PIERCE:  Object to form.                  12:52:02

22             THE WITNESS:  I'll say my understanding of it 12:52:03

23    just for clarity.                                      12:52:08

24    BY MR. EVANS:                                          12:52:10

25        Q    Sure.                                         12:52:10
```

Page 31

| | | |
|---|---|---|
| 1 | A      UpgradeYa provides collateral.  Cred provides | 12:52:12 |
| 2 | USD; UpgradeYa pays interest on the USD. | 12:52:21 |
| 3 | Q      Okay.  And there were two programs at | 12:52:28 |
| 4 | Cred; right?  Do you remember that? | 12:52:40 |
| 5 | A      Yes, absolutely. | 12:52:41 |
| 6 | Q      And what are these two programs? | 12:52:42 |
| 7 | A      CredBorrow and CredEarn. | 12:52:43 |
| 8 | Q      And what's CredBorrow? | 12:52:49 |
| 9 | A      CredBorrow is the crypto-secured loan. | 12:52:57 |
| 10 | Q      Okay.  And what's CredEarn? | 12:53:01 |
| 11 | A      CredEarn, to my understanding, it's a loan to | 12:53:04 |
| 12 | Cred. | 12:53:15 |
| 13 | Q      CredEarn is a loan to Cred. | 12:53:15 |
| 14 |        And what does Cred do with the money? | 12:53:18 |
| 15 | A      It's not my business.  That is not my business. | 12:53:20 |
| 16 | That's Cred's business.  It is literally their business | 12:53:26 |
| 17 | to decide and to understand what they do with their | 12:53:29 |
| 18 | money.  And CredEarn you asked?  You asked CredEarn? | 12:53:34 |
| 19 | Q      Under CredEarn and CredBorrow, you as an | 12:53:38 |
| 20 | investor provide cryptocurrency to Cred; right?  That's | 12:53:43 |
| 21 | the first step? | 12:53:47 |
| 22 | A      Yeah.  I have to provide collateral to secure | 12:53:48 |
| 23 | the loan. | 12:53:54 |
| 24 | Q      Okay.  That's under the CredBorrow program? | 12:53:56 |
| 25 | A      Correct.  That's CredBorrow. | 12:53:59 |

Page 32

| | | |
|---|---|---|
| 1 | Q    Okay.  And once Cred receives the money, they | 12:54:03 |
| 2 | can -- receives the cryptocurrency, they can execute | 12:54:06 |
| 3 | trades; they can go to third party, and they can try to | 12:54:10 |
| 4 | make money off that virtual currency; right? | 12:54:14 |
| 5 | MR. PIERCE:  Objection.  You can answer. | 12:54:17 |
| 6 | THE WITNESS:  What's the question? | 12:54:21 |
| 7 | BY MR. EVANS: | 12:54:23 |
| 8 | Q    Once Cred receives the virtual currency, Cred | 12:54:23 |
| 9 | may trade that virtual currency or invest that virtual | 12:54:30 |
| 10 | currency in whatever way it sees fit; right? | 12:54:34 |
| 11 | A    Once again, I don't see a question. | 12:54:38 |
| 12 | Q    I'm asking about your understanding of the | 12:54:46 |
| 13 | CredBorrow.  When you were investing in Cred, you | 12:54:49 |
| 14 | provided Cred virtual currency, and was it your | 12:54:52 |
| 15 | understanding that Cred would then take that virtual | 12:54:55 |
| 16 | currency and invest it, trade it, or otherwise use it? | 12:54:58 |
| 17 | A    My understanding was they had to secure a | 12:55:02 |
| 18 | collateral.  How they used it is their business. | 12:55:12 |
| 19 | Q    Okay.  So you say "how they used it is their | 12:55:19 |
| 20 | business," you mean Cred had the discretion to go trade | 12:55:23 |
| 21 | that virtual currency, for example? | 12:55:26 |
| 22 | MR. PIERCE:  Object to form. | 12:55:29 |
| 23 | THE WITNESS:  No.  That's not what I'm saying. | 12:55:30 |
| 24 | You have to refer to the agreement on whether they could | 12:55:32 |
| 25 | do that. | 12:55:34 |

Page 33

```
1    BY MR. EVANS:                                        12:55:35

2       Q    Okay.  But you said it was their business.   12:55:37

3    What do you mean "it was their business"?  They had full  12:55:40

4    discretion of how to handle that currency; right?    12:55:44

5       A    That might be confusing.  I'm literally saying  12:55:47

6    that is their business.  As my business is           12:55:51

7    UpgradeYa Investments.  Cred is running their business.  12:55:53

8       Q    Okay.                                        12:55:56

9       A    I don't know everything they do to run their  12:55:57

10   business.  That's all I'm saying.                    12:56:01

11      Q    When you invested with Cred, it was your     12:56:04

12   understanding that Cred had fund discretion as to what to  12:56:20

13   do with the virtual currency when it received it?    12:56:24

14           MR. PIERCE:  Object to form.                 12:56:28

15           THE WITNESS:  I -- yeah, I understood that we  12:56:29

16   had an agreement, and that agreement was granting Cred  12:56:38

17   security interest.                                   12:56:42

18   BY MR. EVANS:                                        12:56:46

19      Q    Was it your understanding that Cred could take  12:56:46

20   those -- take that virtual currency and lend it to   12:56:50

21   someone else?                                        12:56:53

22      A    Yes.  There is ways that they could certainly  12:56:53

23   secure that collateral.  Well, let me rephrase that  12:57:02

24   because "lending to someone else" might be broad.    12:57:08

25           I understood that there's ways that they could  12:57:14
```

Page 34

```
1    get a yield on that collateral.                        12:57:16

2         Q    Okay.  And when you say "yield," what do you --   12:57:22

3    what do you mean?                                      12:57:27

4         A    That they could make some money off that    12:57:27

5    collateral.                                            12:57:31

6         Q    So Cred could take the collateral that      12:57:34

7    UpgradeYa provided and put it on the market and try to  12:57:40

8    make money off that collateral; right?                 12:57:42

9              MR. PIERCE:  Object to form.                 12:57:45

10             THE WITNESS:  You have to refer to the       12:57:46

11   agreement on whether they could do that.               12:57:50

12             MR. EVANS:  I'm going to share my screen.  I'm   12:58:05

13   going to mark this exhibit as CC-1, Committee Credit 1.   12:58:07

14             (Exhibit CC-1 marked.)                       12:58:27

15   BY MR. EVANS:                                           12:58:27

16        Q    So this is a PDF off the CredBorrow website.   12:58:27

17        A    Okay.                                         12:58:32

18        Q    Have you ever been on the CredBorrow website?   12:58:33

19   I'm just going to scroll down here.                     12:58:42

20             You could see my screen; right?               12:58:44

21        A    Yes.                                          12:58:46

22        Q    And here it says, "What happens to my pledged   12:58:46

23   assets?"                                                12:58:54

24             Do you see that?                              12:58:54

25        A    Yes.                                          12:58:57
```

| | | |
|---|---|---|
| 1 | Q    Then it states, "Your pledged assets are used | 12:58:57 |
| 2 | to lend to and transact with a variety of customers, | 12:59:01 |
| 3 | including retail borrowers and money managers with | 12:59:05 |
| 4 | well-established track records." | 12:59:10 |
| 5 | Do you see that? | 12:59:12 |
| 6 | A    Yes. | 12:59:12 |
| 7 | Q    Okay.  Cred on its face is saying, "We're going | 12:59:12 |
| 8 | to use the virtual currency you provide us and transact | 12:59:18 |
| 9 | with other customers with that virtual currency"; right? | 12:59:24 |
| 10 | A    Yes, I see that. | 12:59:26 |
| 11 | Q    And Cred is also saying that it may provide the | 12:59:32 |
| 12 | virtual currency that you, UpgradeYa, provides and lend | 12:59:36 |
| 13 | it to retailed borrowers. | 12:59:41 |
| 14 | Do you see that? | 12:59:43 |
| 15 | MR. PIERCE:  Object to form. | 12:59:45 |
| 16 | THE WITNESS:  As I've stated, I see everything | 12:59:45 |
| 17 | that you already -- that has been read, and that's on the | 12:59:49 |
| 18 | screen, yes. | 12:59:53 |
| 19 | BY MR. EVANS: | 12:59:53 |
| 20 | Q    Okay.  And along with customers and retail | 12:59:54 |
| 21 | borrowers, Cred was also disclosing that it may be | 01:00:01 |
| 22 | providing that virtual currency to what it calls money | 01:00:02 |
| 23 | managers. | 01:00:05 |
| 24 | Do you see that? | 01:00:05 |
| 25 | A    I do see it. | 01:00:09 |

Page 36

```
 1      Q     All right.  So based on the representations      01:00:10

 2   made by Cred and the discussions that you had, you knew   01:00:25

 3   that the virtual currency you were providing to Cred      01:00:32

 4   would be used by Cred to try to make a profit; right?     01:00:35

 5      A     As I stated, there are ways to create -- that    01:00:39

 6   Cred could use my property/my collateral to make a yield. 01:00:52

 7      Q     Okay.  So it was not your understanding that     01:00:58

 8   your virtual currency would be sitting in some vault and  01:01:01

 9   never used; right?                                        01:01:04

10      A     Yeah, just -- I'm going to sound like a broken   01:01:06

11   record, but I understood that they could make a yield on  01:01:13

12   my property.                                              01:01:18

13      Q     Okay.  And we reviewed the declarations you      01:01:19

14   provided, and we understand you stated that you believe   01:01:35

15   that your cryptocurrency would be segregated in an        01:01:38

16   account at Cred.                                          01:01:42

17            Do you remember that?                            01:01:43

18      A     Yes.                                             01:01:44

19      Q     Okay.  And did you understand that Cred would    01:01:45

20   be commingling the virtual currency that you provided     01:01:52

21   with other virtual currency?                              01:01:56

22            MR. PIERCE:  Object to form.                     01:01:57

23            THE WITNESS:  No.  I mean, I did not know that   01:02:01

24   it would be commingled.                                   01:02:05

25            MR. EVANS:  I'm going to mark as CC-2 the loan   10:22:18
```

Page 37

```
 1    and security agreement.  This is what I understand to be    10:22:27

 2    the CredBorrow agreement.                                   10:22:33

 3              (Exhibit CC-2 marked.)                            10:22:33

 4    BY MR. EVANS:                                               10:22:33

 5         Q    Do you recognize this document?                  01:02:52

 6         A    Yes.                                              01:02:52

 7         Q    And I could scroll down, just so you'll --       01:02:52

 8         A    I mean, is this -- is this mine, or is this      01:02:56

 9    just a generic loan agreement?                             01:03:00

10         Q    So that's what I'm showing you now.  This is,    01:03:03

11    Mr. Parrish, the agreement that you executed with Cred,    01:03:08

12    and I see your signature here.                             01:03:11

13              Is this your signature?                          01:03:13

14         A    Yes.                                             01:03:13

15         Q    Going back to the top, but you understand this   01:03:14

16    to be the CredBorrow contract?                             01:03:23

17         A    Yes.                                             01:03:26

18         Q    Under this agreement, UpgradeYa received         01:03:32

19    $2 million in cash; is that right?                         01:03:36

20         A    No.  UpgradeYa Investment receives 2 million.    01:03:38

21         Q    Okay.  So UpgradeYa received 2 million.          01:03:46

22              What did UpgradeYa Investment use the            01:03:50

23    $2 million for?                                            01:03:53

24         A    An investment.                                   01:03:53

25         Q    And it's your testimony today you can't          01:03:58
```

Page 38

| | | |
|---|---|---|
| 1 | disclose the nature of that investment? | 01:04:05 |
| 2 | A    I'm not saying I can't.  I'm just saying I | 01:04:07 |
| 3 | signed an NDA, and I don't know the overlapping of what I | 01:04:10 |
| 4 | can and cannot say.  So if that needs to be shared for | 01:04:16 |
| 5 | whatever reason, then I would just prefer for that to | 01:04:21 |
| 6 | happen through the -- through the counsel. | 01:04:25 |
| 7 | Q    Okay.  So you have no objection to sharing that | 01:04:28 |
| 8 | information; you just want to make sure you're not in | 01:04:30 |
| 9 | violation of an NDA; is that right? | 01:04:33 |
| 10 | A    That is correct. | 01:04:35 |
| 11 | Q    Okay.  We'll confer with your counsel about | 01:04:39 |
| 12 | this issue.  When you scroll down here, there is a | 01:04:41 |
| 13 | provision section called "Collateral." | 01:04:47 |
| 14 | Do you see that? | 01:04:55 |
| 15 | A    Yes. | 01:04:55 |
| 16 | Q    Okay.  And this section governs the | 01:04:56 |
| 17 | cryptocurrency that you -- that UpgradeYa Investments was | 01:05:03 |
| 18 | going to provide to Cred; right? | 01:05:05 |
| 19 | A    Yes.  This defines the collateral | 01:05:07 |
| 20 | UpgradeYa Investments was providing. | 01:05:15 |
| 21 | Q    And have you reviewed this section of the | 01:05:23 |
| 22 | contract prior to today? | 01:05:25 |
| 23 | A    Of course, yeah.  I reviewed it before I signed | 01:05:26 |
| 24 | it. | 01:05:31 |
| 25 | Q    And you reviewed it before you signed it, but | 01:05:33 |

Page 39

| | | |
|---|---|---|
| 1 | did you also review it before you came here today to | 01:05:35 |
| 2 | prepare for this deposition? | 01:05:40 |
| 3 | A    Yes.  I've looked at it numerous times since | 01:05:41 |
| 4 | signing it. | 01:05:44 |
| 5 | Q    Okay.  And there's nothing in Section 2.1 that | 01:05:45 |
| 6 | says Cred is required to segregate the Bitcoin provided | 01:05:52 |
| 7 | by UpgradeYa Investments from any other Bitcoin; right? | 01:05:57 |
| 8 | A    Correct. | 01:06:01 |
| 9 | Q    And there's nothing in Section 2.1 that says | 01:06:04 |
| 10 | that Cred is forbidden from commingling the Bitcoin | 01:06:08 |
| 11 | provided by UpgradeYa Investments to Cred; right? | 01:06:13 |
| 12 | A    I'm not aware of anything that says that. | 01:06:15 |
| 13 | Q    Okay.  And there's nothing in Section 2.1 that | 01:06:20 |
| 14 | precludes Cred from keeping UpgradeYa's Bitcoin and | 01:06:29 |
| 15 | making investments with that Bitcoin; right? | 01:06:35 |
| 16 | MR. PIERCE:  Objection. | 01:06:40 |
| 17 | THE WITNESS:  I'm not the lawyer.  I'm not the | 01:06:41 |
| 18 | one to understand the language on this.  As I have | 01:06:44 |
| 19 | stated, I have understood Cred to take my property into | 01:06:47 |
| 20 | collateral, and they could make a yield on it. | 01:06:52 |
| 21 | MR. EVANS:  I'm going to pull up a document | 01:07:01 |
| 22 | that's marked CC-3.  I'm sorry.  One second.  This | 01:07:18 |
| 23 | document is CC-3.  My apologies. | 01:07:59 |
| 24 | (Exhibit CC-3 marked.) | 01:08:02 |
| 25 | /// | 01:08:02 |

Page 40

| | | |
|---|---|---|
| 1 | BY MR. EVANS: | 01:08:02 |
| 2 | Q     This is a form of draw certificate. | 01:08:03 |
| 3 |       Do you recall this document? | 01:08:07 |
| 4 | A     Yes. | 01:08:08 |
| 5 | Q     Okay.  And this document is describing the | 01:08:09 |
| 6 | essential terms of the Bitcoin that's going to be | 01:08:16 |
| 7 | provided by UpgradeYa Investments and the cash that's | 01:08:18 |
| 8 | going to be available to UpgradeYa Investments; right? | 01:08:25 |
| 9 | A     Yes, that's a -- yes. | 01:08:27 |
| 10 | Q     And right here, the highlighted portion says | 01:08:36 |
| 11 | the type and number of pledged collateral, 531.3004746 | 01:08:40 |
| 12 | Bitcoin. | 01:08:48 |
| 13 |       That is the amount of Bitcoin that | 01:08:48 |
| 14 | UpgradeYa Investments transferred to Cred pursuant to | 01:08:52 |
| 15 | this agreement; right? | 01:08:55 |
| 16 | A     Yes. | 01:08:56 |
| 17 | Q     And this highlighted portion that says, "Number | 01:08:57 |
| 18 | of tokens" or "USD 2 million," that is the line of credit | 01:09:06 |
| 19 | that Cred provided to UpgradeYa Investments; is that | 01:09:11 |
| 20 | right? | 01:09:14 |
| 21 | A     Yes. | 01:09:14 |
| 22 | Q     And I see here a number of interest payment | 01:09:21 |
| 23 | dates.  This is the interest payment owed by | 01:09:24 |
| 24 | UpgradeYa Investments to Cred; right? | 01:09:27 |
| 25 | A     Yes. | 01:09:29 |

Page 41

| | | |
|---|---|---|
| 1 | Q    And there was a payment due on June 30th, 2020 | 01:09:30 |
| 2 | and a payment due on 09-30-2020. | 01:09:36 |
| 3 |      Did UpgradeYa make those payments? | 01:09:41 |
| 4 | A    Yes. | 01:09:43 |
| 5 | Q    Okay.  And we'll get into this in a bit, but | 01:09:43 |
| 6 | UpgradeYa also entered into a CredEarned | 01:09:47 |
| 7 | agreement; right? | 01:09:50 |
| 8 | A    Yes. | 01:09:50 |
| 9 | Q    And some of the yield on the CredEarned | 01:09:52 |
| 10 | agreement paid for some of the interest earned on the | 01:09:58 |
| 11 | CredBorrow agreement; right? | 01:10:02 |
| 12 | A    Not some; all.  All these payments were made by | 01:10:04 |
| 13 | then, yes. | 01:10:10 |
| 14 | Q    Okay.  So on June 30th, 2020, | 01:10:11 |
| 15 | UpgradeYa Investments didn't write a check for 20,666.67; | 01:10:15 |
| 16 | right? | 01:10:27 |
| 17 | A    UpgradeYa Investment had already placed | 01:10:27 |
| 18 | $120,000 in the CredEarned program to pay interest. | 01:10:29 |
| 19 | Q    I understand.  So the yield on the CredEarned | 01:10:34 |
| 20 | program was intended to cover the interest owed by | 01:10:39 |
| 21 | UpgradeYa on the CredBorrow program; is that right? | 01:10:44 |
| 22 | A    No. | 01:10:46 |
| 23 | Q    Okay.  So explain it to me. | 01:10:47 |
| 24 |      What is the interest rate between the | 01:10:52 |
| 25 | CredEarned program and the CredBorrow program with | 01:10:55 |

Page 42

| | | |
|---|---|---|
| 1 | respect to the interest payments? | 01:10:58 |
| 2 | A    The yield on the CredEarned program would not | 01:10:58 |
| 3 | be near enough to cover the interest payment on the | 01:11:01 |
| 4 | CredBorrow, so the yield was simply helping reduce the | 01:11:03 |
| 5 | cost of the interest paid and, thus, the principal and | 01:11:09 |
| 6 | the yield covered the interest payment on CredBorrow. | 01:11:13 |
| 7 | Q    Okay.  So the $120,000 investment, plus the | 01:11:17 |
| 8 | yield, covered the interest UpgradeYa Investments owed | 01:11:22 |
| 9 | under the CredBorrow program; is that right? | 01:11:27 |
| 10 | A    That is correct. | 01:11:29 |
| 11 | Q    And here, it says, "Principal payment date: | 01:11:31 |
| 12 | $2 million payable April 30th, 2021"; is that right? | 01:11:42 |
| 13 | A    That is what it says, yeah. | 01:11:47 |
| 14 | Q    So just so I understand the nature of the | 01:11:52 |
| 15 | investment, CredBorrow, UpgradeYa Investments was | 01:11:57 |
| 16 | providing 531.3 Bitcoin to Cred; right? | 01:12:03 |
| 17 | A    Yes, and a little bit more .00004746. | 01:12:09 |
| 18 | Q    Cred, in exchange, was providing UpgradeYa | 01:12:20 |
| 19 | investments with $2 million in fiat? | 01:12:22 |
| 20 | MR. PIERCE:  Object to form. | 01:12:26 |
| 21 | BY MR. EVANS: | 01:12:31 |
| 22 | Q    A line of credit of $2 million in fiat; is that | 01:12:32 |
| 23 | right? | 01:12:38 |
| 24 | A    Yes.  From Cred to UpgradeYa Investments | 01:12:38 |
| 25 | $2 million in fiat, yeah. | 01:12:42 |

Page 43

| | | |
|---|---|---|
| 1 | Q    Okay.  UpgradeYa Investments was required to | 01:12:44 |
| 2 | pay 6 percent interest on the CredBorrow loan; right? | 01:12:50 |
| 3 | A    Yes. | 01:12:56 |
| 4 | Q    UpgradeYa Investments separately entered into a | 01:12:58 |
| 5 | CredEarned contract with the understanding that the | 01:13:04 |
| 6 | CredEarned contract and the yield to cover the interest | 01:13:12 |
| 7 | payment too under the CredBorrow program; is that right? | 01:13:17 |
| 8 | A    The purpose of that was to cover the interest | 01:13:22 |
| 9 | payments for the CredBorrow. | 01:13:29 |
| 10 | Q    When you were executing these contracts, did | 01:13:30 |
| 11 | you review them yourself, or did you have counsel or | 01:13:36 |
| 12 | someone else review these contracts for you? | 01:13:38 |
| 13 | A    I reviewed them. | 01:13:41 |
| 14 | MR. EVANS:  I'm going to go into a new area. | 01:13:56 |
| 15 | Does anyone want to take a three- or four-minute bathroom | 01:13:59 |
| 16 | break? | 01:14:03 |
| 17 | THE REPORTER:  That's fine. | 01:14:09 |
| 18 | MR. EVANS:  We'll reconvene at 1:17, eastern. | 01:14:09 |
| 19 | MR. LUFT:  Why don't we give people more than | 01:14:19 |
| 20 | three minutes. | 01:14:22 |
| 21 | MR. PIERCE:  We'll be back at 1:20.  Does that | 01:14:22 |
| 22 | work? | 01:14:25 |
| 23 | MR. EVANS:  Yeah, that works for me. | 01:14:27 |
| 24 | THE VIDEOGRAPHER:  We're off the record at | 01:14:29 |
| 25 | 1:14 p.m., eastern standard time. | 01:14:32 |

Page 44

| | | |
|---|---|---|
| 1 | (Break held off the record.) | 01:24:14 |
| 2 | THE VIDEOGRAPHER:  We are back on the record at | 01:24:14 |
| 3 | 1:24 p.m., eastern standard time. | 01:24:17 |
| 4 | BY MR. EVANS: | 01:24:20 |
| 5 | Q    Mr. Parrish, you asked for a return of some of | 01:24:29 |
| 6 | the Bitcoin that UpgradeYa had provided to Cred; right? | 01:24:31 |
| 7 | A    Yes.  UpgradeYa investments provided to Cred. | 01:24:44 |
| 8 | Q    Just for purposes of this deposition, when I | 01:24:47 |
| 9 | say "UpgradeYa," you can assume that it's | 01:24:49 |
| 10 | UpgradeYa Investments or UpgradeYa Holdings or UpgradeYa | 01:24:53 |
| 11 | LLC, however defined.  I mean -- | 01:24:54 |
| 12 | A    Okay.  Yeah -- | 01:24:56 |
| 13 | Q    There's only one entity that made an investment | 01:24:57 |
| 14 | that entered into a contract with Cred; right? | 01:25:01 |
| 15 | A    Yes.  And I'm only saying that because it | 01:25:04 |
| 16 | seemed like earlier on in the conversation that there | 01:25:06 |
| 17 | could be some confusion between UpgradeYa and | 01:25:08 |
| 18 | UpgradeYa Investments.  That's the only reason I was | 01:25:11 |
| 19 | making that clarified. | 01:25:14 |
| 20 | If we clarify now that anything we say | 01:25:16 |
| 21 | "UpgradeYa," is UpgradeYa Investments, I'm fine with | 01:25:18 |
| 22 | that. | 01:25:22 |
| 23 | Q    Yeah, that's -- that's how -- I mean, yeah. | 01:25:23 |
| 24 | UpgradeYa combined is the three entities that you -- that | 01:25:24 |
| 25 | you're involved in one or all three.  I don't think we | 01:25:26 |

Page 45

| | | |
|---|---|---|
| 1 | need to go back and forth of UpgradeYa Investments versus | 01:25:29 |
| 2 | UpgradeYa Holdings, et cetera. | 01:25:33 |
| 3 | When I say "UpgradeYa," just assume that it | 01:25:34 |
| 4 | means UpgradeYa Investments, UpgradeYa LLC, UpgradeYa | 01:25:37 |
| 5 | Holdings, any one of those three. | 01:25:40 |
| 6 | A    I can't assume it means any one of the three. | 01:25:44 |
| 7 | They're three different companies. | 01:25:47 |
| 8 | Q    Okay.  Let's do it this way:  If I say | 01:25:48 |
| 9 | "UpgradeYa," I mean UpgradeYa Investments, and I'll | 01:25:51 |
| 10 | specify if any one of the other two entities. | 01:25:54 |
| 11 | A    Okay. | 01:25:57 |
| 12 | Q    In August of this year, there came a time when | 01:25:57 |
| 13 | UpgradeYa requested a return of the fortune of its | 01:26:06 |
| 14 | collateral; right? | 01:26:12 |
| 15 | A    That is correct.  I mean, the dates and stuff, | 01:26:13 |
| 16 | I believe you showed the document.  If we're going to | 01:26:17 |
| 17 | talk about that, I would prefer to see the document. | 01:26:20 |
| 18 | Q    Okay.  And I'll show you the document in just a | 01:26:22 |
| 19 | minute. | 01:26:26 |
| 20 | What was the reason for the request to return | 01:26:27 |
| 21 | the collateral? | 01:26:30 |
| 22 | A    The collateral was way more value than it | 01:26:31 |
| 23 | needed to be to secure the loan. | 01:26:39 |
| 24 | Q    And this is because Bitcoin had increased in | 01:26:41 |
| 25 | price; right? | 01:26:45 |

Page 46

```
 1      A      The collateral was Bitcoin, and yes, the value    01:26:45

 2   of that collateral was way more than it needed to be to     01:26:51

 3   secure the loan.                                            01:26:54

 4          MR. EVANS:  So I'm going to mark as CC-4, I          01:26:59

 5   believe, an August 13th, 2020 email.                       01:27:05

 6          (Exhibit CC-4 marked.)                              01:27:05

 7   BY MR. EVANS:                                               01:27:05

 8      Q      Do you see this document?                        01:27:15

 9      A      Yes.                                              01:27:17

10      Q      And this is an email from Michael Zhang to you.  01:27:17

11          Who's Michael Zhang?                                01:27:22

12      A      He was my main contact through most of the year  01:27:23

13   at Cred.                                                   01:27:28

14      Q      Okay.  And so you wanted to redeem 53.1200475    01:27:29

15   Bitcoin; is that right?                                    01:27:39

16          MR. PIERCE:  Object to form.                        01:27:41

17          THE WITNESS:  Yes.  That's right.  It's what it     01:27:48

18   says.                                                      01:27:51

19   BY MR. EVANS:                                              01:27:51

20      Q      All right.  Here, Michael Zhang is stating to    01:27:53

21   you, "Please let me know if this is acceptable.  Once you  01:28:01

22   confirm, I can begin drafting the necessary documents to   01:28:04

23   reflect the changes."                                      01:28:09

24          Do you see that?                                    01:28:10

25      A      Yes.                                             01:28:11
```

Page 47

```
 1      Q     And following this email, the 53.1200475    01:28:12

 2   Bitcoin was provided from Cred to UpgradeYa; is that    01:28:17

 3   right?                                                  01:28:23

 4      A     Yes.                                           01:28:23

 5      Q     Okay.                                          01:28:25

 6      A     You're muted.                                  01:29:17

 7            MR. EVANS:  Sorry about that.  This is CC-5.   01:29:19

 8            This is a form of draw certificate, partial   01:29:24

 9   collateral redemption.                                 01:29:27

10            (Exhibit CC-5 marked.)                        01:29:29

11   BY MR. EVANS:                                          01:29:29

12      Q     Does this document look familiar to you,      01:29:29

13   Mr. Parrish?                                           01:29:32

14      A     Yes.                                           01:29:32

15      Q     And in the section stating "Type and number of 01:29:44

16   pledged collateral, updated to reflect partial         01:29:50

17   redemption," it shows "Original collateral 531.3004746 01:29:55

18   Bitcoin", right?                                       01:29:59

19      A     Yes.                                           01:30:00

20      Q     And the updated collateral August 13th, 2020, 01:30:01

21   478.17 Bitcoin; right?                                 01:30:08

22      A     Yes.                                           01:30:09

23      Q     Okay.  So on this day, August 13th, 2020,     01:30:10

24   UpgradeYa received 53 Bitcoin they requested; right?   01:30:14

25      A     Yes.  The amount that was requested I received, 01:30:20
```

                                                        Page 48

| | | |
|---|---|---|
| 1 | yeah. | 01:30:27 |
| 2 | Q    Have you done anything to try to locate the | 01:30:27 |
| 3 | Bitcoin that you provided to Cred? | 01:30:49 |
| 4 | A    I've searched just on basic websites and what | 01:30:53 |
| 5 | was there.  I didn't know nothing valuable. | 01:31:03 |
| 6 | Q    Okay.  So when you searched on websites, what | 01:31:07 |
| 7 | websites did you use? | 01:31:10 |
| 8 | A    I don't remember the one I used, actually. | 01:31:11 |
| 9 | It's one unheard of, Google search. | 01:31:19 |
| 10 | Q    And these Google searches, what did you search? | 01:31:22 |
| 11 | How did you do it? | 01:31:28 |
| 12 | A    Blockchain Explorer. | 01:31:29 |
| 13 | Q    Blockchain Explorer. | 01:31:31 |
| 14 | And when you went on Blockchain Explorer, what | 01:31:33 |
| 15 | did you look for? | 01:31:36 |
| 16 | A    I had addresses that I had sent to Bitcoin too, | 01:31:37 |
| 17 | so I could look at those addresses.  I can pull up those. | 01:31:42 |
| 18 | Q    And when you did that, what did you find? | 01:31:46 |
| 19 | A    The one -- I only took, like, two.  They were | 01:31:49 |
| 20 | zero balance. | 01:31:55 |
| 21 | Q    Okay.  So the wallet addresses you searched on | 01:31:56 |
| 22 | Blockchain Explorer, how did you get those wallet | 01:32:00 |
| 23 | addresses? | 01:32:05 |
| 24 | A    How did I get them?  I got them from Cred. | 01:32:05 |
| 25 | Q    And these are the wallet addresses where you -- | 01:32:09 |

Page 49

| | | |
|---|---|---|
| 1 | where UpgradeYa initially deposited its Bitcoin? | 01:32:13 |
| 2 | A    Yes. | 01:32:15 |
| 3 | Q    And there were 30 different wallets; is that | 01:32:17 |
| 4 | right? | 01:32:21 |
| 5 | A    30 different addresses. | 01:32:21 |
| 6 | Q    30 different addresses?  Okay. | 01:32:26 |
| 7 | And you looked at two of them, you said? | 01:32:28 |
| 8 | A    I believe, yeah, I had just taken -- I didn't | 01:32:31 |
| 9 | spent too much time on it.  I just took a quick look. | 01:32:35 |
| 10 | Q    And when you took a quick look, you found that | 01:32:39 |
| 11 | those address were crypto wallets with no balance; right? | 01:32:43 |
| 12 | A    Yeah. | 01:32:46 |
| 13 | Q    And when you took that quick look, did you also | 01:32:47 |
| 14 | see that shortly after the Bitcoin was provided from | 01:32:52 |
| 15 | UpgradeYa to Cred that that Bitcoin went into a | 01:32:57 |
| 16 | particular wallet address and then was shortly | 01:33:02 |
| 17 | transferred out of that particular wallet address? | 01:33:05 |
| 18 | A    I didn't look much further. | 01:33:07 |
| 19 | Q    Okay.  So you went on Google, and you went on | 01:33:10 |
| 20 | Blockchain Explorer. | 01:33:16 |
| 21 | Have you hired anybody to help you find your | 01:33:17 |
| 22 | Bitcoin? | 01:33:19 |
| 23 | A    No. | 01:33:20 |
| 24 | Q    Have you done any other searching other than on | 01:33:20 |
| 25 | Google and on Blockchain Explorer? | 01:33:28 |

Page 50

| | | |
|---|---|---|
| 1 | A    No. | 01:33:31 |
| 2 | Q    Do you know where the Bitcoin is today? | 01:33:36 |
| 3 | A    No. | 01:33:41 |
| 4 | Q    Why not? | 01:33:44 |
| 5 | A    Because Cred was to secure it, and Cred has | 01:33:45 |
| 6 | said that it has been -- that they don't have it. | 01:33:55 |
| 7 | MR. EVANS:  I'm going to pull up as | 01:34:07 |
| 8 | Exhibit CC-6.  One moment here.  This is an email dated | 01:34:08 |
| 9 | April 23rd, 2020, Xavier Rashotsky to you. | 01:34:50 |
| 10 | (Exhibit CC-6 marked.) | 01:34:55 |
| 11 | BY MR. EVANS: | 01:34:55 |
| 12 | Q    Do you recognize this email? | 01:34:59 |
| 13 | A    Yes, that's his last name.  I remember that, | 01:35:00 |
| 14 | yeah. | 01:35:02 |
| 15 | Q    And it says here, "The attached reports all the | 01:35:02 |
| 16 | deposits that have been made to your collateral wallets | 01:35:05 |
| 17 | to date.  Touch base tomorrow." | 01:35:08 |
| 18 | Do you see that? | 01:35:09 |
| 19 | A    Yes. | 01:35:10 |
| 20 | Q    And there's attachment here, TXlog4:23EOD.csv. | 01:35:10 |
| 21 | Do you see that? | 01:35:24 |
| 22 | A    Yes. | 01:35:24 |
| 23 | MR. EVANS:  I'm going to pull up that Excel | 01:35:26 |
| 24 | file.  I'm going to represent to you, Mr. Parrish, that | 01:35:28 |
| 25 | this was the Excel file that was attached to that email. | 01:35:45 |

Page 51

```
1              (Exhibit CC-6A marked.)                01:35:45

2    BY MR. EVANS:                                     01:35:45

3       Q     When you say you looked up addresses, is this   01:35:48

4    the document that you got it from?               01:35:51

5       A     No.  This document looks to have a lot more    01:35:53

6    detail.                                          01:36:00

7       Q     But this is -- this is the document that was   01:36:02

8    provided to you by Cred on April 23rd, 2020?     01:36:04

9       A     If you -- if you're saying this is the   01:36:13

10   document, I would have to reference it to see if that is   01:36:16

11   the exact same document.                         01:36:19

12      Q     Yeah, I'm representing to you that this was the   01:36:20

13   document.  So this was the document that was attached to   01:36:22

14   the email on April 23rd, 2020.                   01:36:25

15      A     Okay.                                    01:36:27

16      Q     All right.  And what it appears to show here   01:36:27

17   are a series of transactions on April 21st and   01:36:32

18   April 23rd, 2020.                                01:36:39

19            Do you recall making deposits from UpgradeYa   01:36:40

20   into Cred on April 21st and April 23rd, 2020?    01:36:43

21      A     Yes.  These deposits were made.  It was at that   01:36:47

22   time -- to see the exact times, I have to look that up,   01:36:59

23   this document being correct of the times.        01:37:04

24      Q     Fair enough.  Okay.                      01:37:07

25            Column P, "Destination Address," do you know   01:37:12
```

Page 52

1    what destination address means?                         01:37:17

2        A    Yeah.  Address that is -- that Bitcoin was     01:37:19

3    being sent.                                             01:37:25

4        Q    Okay.  So UpgradeYa sent Bitcoin to this       01:37:26

5    destination address; right?                             01:37:30

6        A    Uh-huh.                                         01:37:31

7        Q    Okay.  And the first five letters of this      01:37:32

8    "1Mig9," do you see that?                                01:37:41

9        A    Yeah.                                           01:37:43

10       Q    One second.  You know what, I'm sorry, back to 01:37:45

11   this Excel file.  This is Account Number 14, "Destination 01:38:06

12   Collateral Deposit Account Number 14."                   01:38:10

13            Do you see that that title?                     01:38:13

14       A    Yes, I see it.  I have already stated, I guess, 01:38:14

15   it could be accounts.  To me, this would just be         01:38:19

16   different addresses.                                     01:38:22

17       Q    Okay.                                           01:38:23

18       A    Yeah, whatever terminology you want to use.     01:38:24

19            MR. EVANS:  I'm going to mark this document as  01:38:42

20   CC-7.                                                    01:38:43

21            (Exhibit CC-7 marked.)                          01:38:53

22   BY MR. EVANS:                                            01:38:53

23       Q    You testified earlier about checking on        01:38:53

24   Blockchain Explorer.                                     01:38:55

25            Is this the website that you're referring to?  01:38:57

| | | |
|---|---|---|
| 1 | A     Back up just a little bit.  I stated that I | 01:39:00 |
| 2 | used Google search and searched for the term | 01:39:06 |
| 3 | "Blockchain Explorer."  It was not only that term.  I | 01:39:10 |
| 4 | probably had Bitcoin in that in order to get the right | 01:39:14 |
| 5 | explorer. | 01:39:17 |
| 6 |         And I did not recall the right website that I | 01:39:18 |
| 7 | uploaded.  Have I used Blockchain.com?  I have.  I don't | 01:39:21 |
| 8 | know that I used it for this particular -- | 01:39:26 |
| 9 |         MR. PIERCE:  Joe, before you start, I want to | 01:39:30 |
| 10 | lodge a general objection to this exhibit.  It wasn't | 01:39:34 |
| 11 | produced in advance.  We haven't had a chance to | 01:39:36 |
| 12 | authenticate it or make sure it's accurate.  I just want | 01:39:38 |
| 13 | to put that on the record. | 01:39:42 |
| 14 |         MR. EVANS:  I'm sorry, the objection is what? | 01:39:44 |
| 15 |         MR. PIERCE:  This wasn't previously produced, | 01:39:45 |
| 16 | and we haven't had a chance to review it, and I can't | 01:39:47 |
| 17 | confirm your questions and the accuracy of the | 01:39:50 |
| 18 | information for this line of questions.  I just want to | 01:39:53 |
| 19 | put that on the record. | 01:39:55 |
| 20 |         MR. EVANS:  I'm not -- I'm not sure what the | 01:39:56 |
| 21 | objection is.  There was no document request.  There was | 01:39:57 |
| 22 | no obligation to put before you.  This is a publicly | 01:40:01 |
| 23 | available document that you can look up the URL address | 01:40:02 |
| 24 | and go check it if you like. | 01:40:06 |
| 25 |         I'm not sure what the objection is, but we're | 01:40:08 |

Page 54

| | | |
|---|---|---|
| 1 | going to proceed. | 01:40:10 |
| 2 | BY MR. EVANS: | 01:40:15 |
| 3 | Q    Mr. Parrish, I guess we're going to have to go | 01:40:16 |
| 4 | back.  Just give me one second.  We're going to pull up | 01:40:19 |
| 5 | the Excel file we just looked at, CC-6, destination | 01:40:23 |
| 6 | address "1Mig9." | 01:40:28 |
| 7 | Do you see that those five letters?  It's the | 01:40:32 |
| 8 | same wallet address that is right here.  I'm going to | 01:40:40 |
| 9 | represent that to you.  You can take -- you can assume | 01:40:45 |
| 10 | that is accurate that I copied and pasted it. | 01:40:47 |
| 11 | A    Okay. | 01:40:49 |
| 12 | Q    And on April 23rd, 2020, UpgradeYa made a | 01:40:50 |
| 13 | 16.25258337 Bitcoin deposit into a Cred wallet. | 01:40:59 |
| 14 | Do you remember that? | 01:41:02 |
| 15 | A    Based on your Excel sheet, that's when it | 01:41:03 |
| 16 | happened.  I don't remember.  I made deposits into the | 01:41:11 |
| 17 | provided addresses. | 01:41:13 |
| 18 | Q    Okay.  And you made a series of deposits -- | 01:41:16 |
| 19 | right? -- in 30 different wallets? | 01:41:19 |
| 20 | A    It was 60 different transactions. | 01:41:20 |
| 21 | Q    But there were 30 transactions and 30 actual | 01:41:23 |
| 22 | transactions; right? | 01:41:29 |
| 23 | A    That is correct. | 01:41:31 |
| 24 | Q    And if you pull up CC-6, Collateral Deposit | 01:41:32 |
| 25 | Account Number 14, there's a 16.2525 Bitcoin | 01:41:41 |

Page 55

| | | |
|---|---|---|
| 1 | transaction; right? | 01:41:45 |
| 2 | A    I see that. | 01:41:46 |
| 3 | Q    And if you go on the Fireblocks Explorer, | 01:41:51 |
| 4 | you'll see that there are a total of three | 01:42:00 |
| 5 | transactions; right? | 01:42:03 |
| 6 | A    I do see that. | 01:42:03 |
| 7 | Q    And that there's 16.25 and some Satoshi Bitcoin | 01:42:06 |
| 8 | and the same number sent out? | 01:42:29 |
| 9 | A    I see that. | 01:42:32 |
| 10 | Q    And this wallet address is empty; right? | 01:42:33 |
| 11 | A    Yes. | 01:42:41 |
| 12 | Q    Okay.  And when you did your searching for the | 01:42:41 |
| 13 | Bitcoin, did you find -- did you similarly find wallets | 01:42:47 |
| 14 | that were empty like this? | 01:42:51 |
| 15 | A    Yes.  I already stated the ones I checked were | 01:42:52 |
| 16 | empty. | 01:42:58 |
| 17 | Q    Okay.  But you said you looked at these | 01:42:58 |
| 18 | two; right? | 01:43:07 |
| 19 | A    I believe so. | 01:43:07 |
| 20 | Q    If you scroll down to "Transactions," you'll | 01:43:08 |
| 21 | see the 16.25250000 Bitcoin transactions. | 01:43:15 |
| 22 | Do you see this on April 23rd, 2020? | 01:43:23 |
| 23 | A    Yes. | 01:43:26 |
| 24 | Q    Okay.  And then on April 28th, 2020, there's a | 01:43:27 |
| 25 | large transaction leaving this wallet and into another | 01:43:33 |

Page 56

```
1   wallet.                                               01:43:39

2           Do you see that?                              01:43:40

3       A   Yes.                                          01:43:40

4       Q   And the size of that transaction, 312.279    01:43:41

5   Bitcoin.                                              01:43:48

6           Do you see that?                              01:43:48

7       A   Yes.                                          01:43:49

8       Q   And on the left side here -- one, two, three, 01:43:50

9   four -- five lines from the bottom, you'll see the same 01:43:57

10  number 1Migx and a 16.2525000 Bitcoin transaction.    01:44:02

11          Do you see that?                              01:44:11

12      A   Yes.                                          01:44:12

13      Q   And so that was -- those Bitcoin are commingled 01:44:13

14  with the rest of the Bitcoin that is going into       01:44:21

15  15YFJKQU9V5AYT3RP; right?                             01:44:31

16      A   Yes.                                          01:44:36

17          MR. EVANS:  Just one moment.  I'm going to mark 01:44:58

18  this as CC-8.                                         01:45:16

19          (Exhibit CC-8 marked.)                        01:45:16

20  BY MR. EVANS:                                         01:45:16

21      Q   So if you look at CC-7, you see a transaction 01:45:21

22  going into 15YSJKQ; right?                            01:45:27

23      A   Yes.                                          01:45:35

24      Q   And on CC-8, this is the Blockchain Explorer  01:45:35

25  page for 15YFSJQU.                                    01:45:39
```

Page 57

```
 1              Do you understand?                           01:45:49

 2       A     Yes, I see that.                              01:45:49

 3       Q     And in this wallet, you see 293 total         01:45:51

 4   transactions; right?                                    01:45:56

 5       A     Yes, I see the transactions.                  01:45:58

 6       Q     Okay.  And 200- -- 2634 some-odd Bitcoin coming  01:46:00

 7   in, and the same number coming out; right?              01:46:06

 8       A     Yes.                                          01:46:11

 9       Q     And this wallet, too, is also empty; isn't that  01:46:12

10   right?                                                  01:46:15

11       A     Yes.                                          01:46:16

12       Q     Okay.  And if you look at the transaction here,  01:46:19

13   again, five lines from the bottom -- one, two, three,   01:46:25

14   four -- five, you'll see the 16.252 Bitcoin transaction 01:46:29

15   with the 1Mig9 identifier.                              01:46:35

16              Do you see that?                             01:46:35

17       A     Yes.                                          01:46:36

18       Q     Of the 2634 Bitcoin that came into this wallet 01:46:36

19   address and the 2634 Bitcoin that went out of this wallet  01:46:45

20   address, there's no way for you to know which one of    01:46:53

21   those Bitcoins -- or the exact Bitcoin that UpgradeYa   01:46:54

22   provided to Cred; right?                                01:46:57

23       A     I don't know.                                 01:46:58

24              MR. EVANS:  Just one moment.  I'm going to mark  01:47:35

25   as CC-9 a document that was prepared in connection with 01:48:02
```

Page 58

```
 1   this case.  It was filed publicly on December 14th, 2020.    01:48:08

 2   It was attached to the declaration of Mr. Bonjour.          01:48:14

 3          (Exhibit CC-9 marked.)                               01:48:14

 4   BY MR. EVANS:                                               01:48:14

 5      Q    I'm going to represent to you that these are       01:48:18

 6   snapshots of every wallet that was identified in the       01:48:22

 7   Excel file that Cred provided to you.  Okay?  For the      01:48:26

 8   purposes of these questions, we can assume that that is    01:48:30

 9   true?                                                      01:48:34

10      A    Okay.                                              01:48:36

11      Q    So when we look at these wallets -- we'll take     01:48:36

12   a look at the first one -- you see transactions of coming  01:48:39

13   in, transactions of Bitcoin coming out, and a zero         01:48:46

14   balance.                                                   01:48:51

15          Do you see that?                                    01:48:51

16      A    Yes.                                               01:48:52

17      Q    Let me go to the second one.  Transaction         01:48:52

18   coming in, transactions coming out, and a zero balance.    01:48:56

19          Do you see that?                                    01:48:59

20      A    Yes -- excuse me -- yes.                           01:48:59

21      Q    Excuse me one moment.  The third one would be      01:49:05

22   transactions coming in, transactions coming out, and the   01:49:09

23   balance is zero.                                           01:49:12

24          So you're aware -- are you not? -- that all of      01:49:18

25   the wallets in which UpgradeYa provided Bitcoin to are     01:49:22
```

Page 59

1    now empty; right?                                        01:49:25

2        A    Yeah.                                           01:49:26

3        Q    Okay.  And other than looking online, looking  01:49:31

4    through them on a wallet, and Googling, you haven't taken 01:49:37

5    any other steps to identify which particular Bitcoins are 01:49:41

6    yours versus any other creditor; right?                  01:49:46

7             MR. PIERCE:  Object to form.                    01:49:51

8             THE WITNESS:  Can you repeat that question?     01:49:52

9    BY MR. EVANS:                                            01:49:57

10       Q    Other than looking on Google, looking at two    01:49:59

11   wallet addresses, you haven't taken any other steps to   01:50:03

12   identify these particular Bitcoins that UpgradeYa        01:50:08

13   provided to Cred; right?                                 01:50:14

14       A    I'm not -- the particular Bitcoins are          01:50:16

15   irrelevant.                                              01:50:23

16       Q    I'm sorry.  You said the particular Bitcoins    01:50:24

17   are irrelevant?                                          01:50:27

18       A    Correct.  We already identified it's fungible.  01:50:27

19       Q    Okay.  So in your mind, it doesn't matter which 01:50:33

20   Bitcoin it is?                                           01:50:37

21       A    Right.  Cred had only to secure the amount as   01:50:38

22   it be true for any fungible property.                    01:50:43

23       Q    Okay.  So it didn't matter to you one way or    01:50:46

24   the other which Bitcoin it is; as long as you got the    01:50:49

25   amount of the Bitcoin you provided; right?               01:50:53

Page 60

```
 1        A     Yes.                                        01:50:55

 2        Q     And when you received the 53 Bitcoin, for   01:50:55

 3   example, in August, you have no idea whether those are 01:51:00

 4   the same Bitcoin you provided to Cred in the first     01:51:05

 5   place; right?                                          01:51:07

 6        A     Sorry to sound like a broken record.  It's  01:51:08

 7   irrelevant.  Bitcoin is fungible, and it does not -- it's 01:51:12

 8   not -- there is no identifying between unique Bitcoins as 01:51:16

 9   we've already established; just like there would be no  01:51:21

10   reason to give someone a certain dollar bill versus    01:51:24

11   another dollar bill.                                   01:51:27

12        Q     Okay.  Did you ever communicate with Cred via 01:51:28

13   Telegram?                                              01:51:45

14        A     Yes.                                        01:51:46

15        Q     How else did you communicate with Cred?     01:51:47

16        A     Communication with Cred with email and      01:51:51

17   Telegram.  That's all that, I believe, was the         01:52:06

18   communication and, well, of course telephone, telephone 01:52:11

19   also.                                                  01:52:14

20        Q     Okay.  And who did you communicate with at  01:52:14

21   Cred?  I know we have Xavier, but who else?            01:52:22

22        A     Michael Zhang.  He was my main contact.     01:52:24

23        Q     And what was his role?  Just so I understand. 01:52:28

24        A     Based on the email that you just -- I took a 01:52:31

25   look because I was trying to remember.  It said VP of  01:52:37
```

Page 61

```
 1    wealth, VP wealth, I think is what it said.              01:52:39

 2       Q    He was the person that would provide            01:52:41

 3    information to you about your accounts at Cred?          01:52:43

 4       A    He was my main contact, yeah.                    01:52:45

 5       Q    Okay.  And what kind of things would you have    01:52:49

 6    to talk about?  What information would he provide to you? 01:52:53

 7       A    So I -- yeah, I was a customer; right?  He was   01:52:57

 8    my connection as a customer, so anything related to our  01:53:03

 9    agreements.                                              01:53:08

10       Q    Okay.  Other than the 53 Bitcoin that you        01:53:11

11    requested back in August, what other issues would you    01:53:15

12    talk to him about?                                       01:53:20

13       A    Well, I -- all kinds of things.  You have the    01:53:21

14    emails.  I'm a little confused.  Is there something      01:53:27

15    specific?                                                01:53:30

16       Q    Yeah, would he discuss -- what would he tell     01:53:31

17    you about Cred or investments at Cred, that kind of      01:53:33

18    thing?                                                   01:53:41

19       A    We discussed our -- our relationship.  We        01:53:41

20    discussed anything related to me being a customer of Cred 01:53:48

21    and Cred being a business.  I'm not going to -- I can't  01:53:51

22    remember every email and what the conversations were.    01:53:55

23       Q    Okay.  Do you know Dan Schatt?                   01:54:03

24       A    I do not know him personally.  I knew he is --   01:54:06

25    or was the CEO of Cred.                                  01:54:11
```

Veritext Legal Solutions
866 299-5127

```
 1        Q      And you had some emails with Dan Schatt; right?    01:54:13

 2        A      Yeah.                                              01:54:15

 3        Q      And these emails with Dan Schatt, you were         01:54:23

 4   asking about the status of the Bitcoin that you provided       01:54:25

 5   to Cred -- or that UpgradeYa provided to Cred; right?          01:54:29

 6        A      There are emails to Dan Schatt asking about my     01:54:29

 7   Bitcoin and my collateral forwarded to Cred, yes.             01:54:33

 8        Q      And once your Bitcoin went from UpgradeYa to       01:54:37

 9   Cred -- let me rephrase this.                                  01:54:42

10               After you provided your Bitcoin to Cred, did       01:54:47

11   you ever check on Blockchain Explorer or any other            01:54:54

12   application to see what the current status of the wallets     01:54:57

13   were in which you deposited to your Bitcoin?                   01:55:01

14        A      I had no reason to check those addresses.          01:55:03

15        Q      What was the value of the Bitcoin that you         01:55:09

16   provided initially to Cred, the USD value?                     01:55:14

17        A      I don't -- I'm not going to guess the exact        01:55:19

18   number.  It's in all the documentation.                       01:55:24

19        Q      It was approximately $4 million; right?            01:55:26

20        A      That's correct.  It was approximately             01:55:29

21   $4 million.                                                    01:55:31

22        Q      Okay.  So you have a $4 million investment that    01:55:32

23   you say is procured by Bitcoin; right?                         01:55:37

24        A      This was not a $4 million investment, no.          01:55:41

25        Q      You provided 4 million in Bitcoin to               01:55:46
```

Page 63

```
 1    Cred; right?                                         01:55:51

 2        A    Yes.                                        01:55:51

 3        Q    And Blockchain Explorer and other applications  01:55:52

 4    are publicly available and free, aren't they?       01:55:58

 5        A    Blockchain Explorer is the -- Blockchain    01:56:01

 6    Explorer or Bitcoin, there are free ones, yeah.  There  01:56:19

 7    are accessible ones through their website.          01:56:23

 8        Q    Okay.  And we won't go back over the        01:56:25

 9    transactions because we saw them, but during the time of  01:56:27

10    your initial investment --                          01:56:30

11            MR. PIERCE:  Object to form.                 01:56:33

12    BY MR. EVANS:                                        01:56:35

13        Q    -- during the time of your investment on    01:56:36

14    April 23rd --                                        01:56:39

15            MR. PIERCE:  Object to form.                 01:56:39

16            MR. EVANS:  What's the objection?            01:56:40

17            MR. PIERCE:  You're classifying this as an   01:56:42

18    investment.  He's never said that.  I think you're   01:56:45

19    putting words in his mouth on that one.             01:56:47

20    BY MR. EVANS:                                        01:56:50

21        Q    You can answer the question.  I really don't  01:56:51

22    understand the objection.                           01:56:53

23            After you provided Bitcoin to Cred between   01:56:54

24    April 2020 and, let's say, September 2020, did you ever  01:57:02

25    check on any of the wallets to make sure that your   01:57:07
```

Page 64

| | | |
|---|---|---|
| 1 | Bitcoin were still there? | 01:57:09 |
| 2 | A    I believe you already asked this, and I said I | 01:57:16 |
| 3 | had no reason to check those wallets and those -- excuse | 01:57:18 |
| 4 | me -- addresses. | 01:57:24 |
| 5 | Q    Okay.  You said you have no reason to, so the | 01:57:25 |
| 6 | answer is "No"; right? | 01:57:27 |
| 7 | A    The answer is "No," correct. | 01:57:28 |
| 8 | Q    Okay.  Do you recall signing a declaration in | 01:57:29 |
| 9 | this case? | 01:57:45 |
| 10 | A    Yes. | 01:57:45 |
| 11 | Q    And did you write that declaration, or did | 01:57:48 |
| 12 | somebody else write it for you? | 01:57:53 |
| 13 | A    My counsel wrote that declaration. | 01:57:54 |
| 14 | Q    And there were two declarations; right? | 01:57:56 |
| 15 | A    Yes. | 01:58:01 |
| 16 | Q    And one of those declarations was on | 01:58:02 |
| 17 | November 25th, 2020. | 01:58:06 |
| 18 | Do you remember that? | 01:58:08 |
| 19 | A    I'll trust you on the dates.  There were two | 01:58:08 |
| 20 | declarations, yes. | 01:58:12 |
| 21 | Q    And I'm going to show you one from | 01:58:13 |
| 22 | December 4th, 2020 now.  I'm going to mark this as CC-8. | 01:58:18 |
| 23 | You recall signing this declaration, don't you? | 01:58:40 |
| 24 | A    Yes, I recall signing both declarations. | 01:58:43 |
| 25 | Q    Okay.  And before you signed it, you reviewed | 01:58:50 |

Page 65

1    it?  You made sure that it was accurate?                    01:58:54

2        A    Yes.  Absolutely.                                  01:58:57

3        Q    And here, it states, "From the outset of           01:59:04

4    UpgradeYa's transactions with CredBorrow, Cred             01:59:07

5    represented to UpgradeYa that the collateral would be      01:59:08

6    maintain in segregated e-wallets."                         01:59:11

7             Do you see that?                                   01:59:16

8        A    Yes, yes.                                          01:59:17

9        Q    Paragraph 4, it says, "Based on the agreement      01:59:22

10   and representations and communications made by Cred to     01:59:25

11   me, it was my understanding that collateral was deposited  01:59:29

12   into and maintained in separate segregated e-wallet        01:59:29

13   accounts."                                                 01:59:33

14            Do you see that?                                   01:59:34

15       A    Yep.                                               01:59:35

16       Q    Okay.  Did you communicate with Xavier via        01:59:36

17   Telegram chat?                                             01:59:52

18       A    Yes.                                              01:59:52

19            MR. EVANS:  I'm going to mark this as CC-9.  I     02:00:04

20   just received this last night.                             02:00:09

21   BY MR. EVANS:                                              02:00:11

22       Q    Is this a Telegram chat between yourself and      02:00:12

23   Xavier?                                                    02:00:16

24       A    Yes.                                              02:00:16

25       Q    Okay.  And what were these?  Are these            02:00:17

                                                        Page 66

1    printouts?  How were these documents created?          02:00:26

2        A    It was provided by me.  I exported it from     02:00:29

3    Telegram.                                               02:00:35

4        Q    Okay.  So you're saying this is accurate; this  02:00:36

5    is the communication that you had on Telegram with      02:00:39

6    Xavier, and this is just the format in which it was     02:00:41

7    exported; correct?                                      02:00:45

8        A    To confirm its accuracy, I'd have to           02:00:47

9    cross-reference it with the actually chat, but yes, it  02:00:50

10   appears to be accurate.                                 02:00:53

11       Q    You didn't go in and change anything or delete  02:00:54

12   anything; you just exported it; right?                  02:00:57

13       A    Yes.  I just exported it.                      02:01:00

14       Q    If you scroll down here, this is March 23rd,   02:01:02

15   2020.  This is at a time when you were considering       02:01:06

16   whether or not to provide Bitcoin to Cred?              02:01:10

17       A    Yes.                                           02:01:12

18       Q    If you scroll down at 12:59, you state,        02:01:13

19   "Excellent.  I assume it is an HD Multisig wallet.  This  02:01:28

20   correct?"                                               02:01:36

21       A    Yes.                                           02:01:37

22       Q    What's an HD Multisig wallet?                  02:01:37

23       A    My understanding of that and the reason for    02:01:43

24   that question is just that it was -- it's a wallet that  02:01:45

25   could produce unlimited number of addresses.            02:01:46

| | | |
|---|---|---|
| 1 | Q    What's the purpose of a Multisig wallet? | 02:01:50 |
| 2 | A    Right.  I was actually thinking about HD wallet | 02:01:54 |
| 3 | when you asked that.  This does say "Multisig."  So an HD | 02:02:03 |
| 4 | Multisig would not only produce multiple addresses, but | 02:02:06 |
| 5 | it would also -- could be secured through multiple | 02:02:07 |
| 6 | signatures. | 02:02:11 |
| 7 | Q    Okay.  So you are asking Cred what kind of | 02:02:12 |
| 8 | wallet they're going to be throwing your Bitcoin | 02:02:20 |
| 9 | in; right? | 02:02:23 |
| 10 | A    Correct. | 02:02:23 |
| 11 | Q    Xavier responds, "So yes, but you will likely | 02:02:24 |
| 12 | only get public derivations of a larger HD.  I'm not sure | 02:02:38 |
| 13 | if we can provide but can check if you are expecting your | 02:02:38 |
| 14 | own HD private set for derivation of public addresses | 02:02:48 |
| 15 | that are only used by you." | 02:02:55 |
| 16 | It then says, "Is it important for your funds | 02:03:00 |
| 17 | to be held in a single segregated cold storage for the | 02:03:02 |
| 18 | duration of your loan?  We move funds around for the | 02:03:08 |
| 19 | purposes of our operations and, as you mentioned, with | 02:03:11 |
| 20 | multiple sends if to different addresses might have to | 02:03:15 |
| 21 | move funds." | 02:03:19 |
| 22 | Do you see those statements there? | 02:03:21 |
| 23 | A    Yes. | 02:03:24 |
| 24 | Q    These statements are Xavier telling you that | 02:03:24 |
| 25 | your funds are going to be moved around for the purposes | 02:03:31 |

Page 68

```
 1   of Cred's operations; right?                        02:03:35

 2       A    Yes.                                        02:03:37

 3       Q    And that your funds are not going to be stored  02:03:38

 4   in a segregated wallet; right?                      02:03:42

 5       A    No.                                         02:03:44

 6       Q    Xavier then says --                         02:03:45

 7       A    Let's back up.  I said "No."  I do not agree  02:03:55

 8   that that says that they will be stored in a segregated  02:03:58

 9   wallet.                                             02:04:02

10       Q    Okay.  Let's unpack that.                   02:04:02

11            The sentence states, "Is it important for your  02:04:08

12   funds to be held in a segregated cold storage for the  02:04:12

13   duration of your loan?  We move funds around for the  02:04:16

14   purposes of our operations."                        02:04:19

15       A    Yes, so, simply, it could be moved to a     02:04:22

16   different segregated wallet.  Perfectly fine.  I    02:04:24

17   understood that.                                    02:04:28

18       Q    He's asking you here if it's important for you  02:04:29

19   to have a segregated cold storage wallet; right?    02:04:34

20       A    Yes.                                        02:04:38

21       Q    And then he's telling you Cred is going to be  02:04:39

22   moving around the Bitcoin for the purposes of Cred's  02:04:42

23   operation?                                          02:04:46

24       A    Yes.                                        02:04:49

25       Q    Right?  That's what he says.                02:04:49
```

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | He's not saying your account will always be | 02:04:52 |
| 2 | segregated, and it will only move into wallets that are | 02:04:56 |
| 3 | segregated for you; right? | 02:05:00 |
| 4 | A    He's not saying it or not saying it.  He's | 02:05:02 |
| 5 | simply saying they could move. | 02:05:06 |
| 6 | Q    He's saying, "We move funds around for the | 02:05:08 |
| 7 | purposes of our operations"; right? | 02:05:12 |
| 8 | A    Yes. | 02:05:14 |
| 9 | Q    That means Cred is going to take your Bitcoin | 02:05:15 |
| 10 | and move it around for Cred's own operations. | 02:05:18 |
| 11 | That's what he's saying; right? | 02:05:20 |
| 12 | A    As I stated, that tells me the funds can move. | 02:05:25 |
| 13 | Q    Okay.  The next sentence says, "We typically | 02:05:32 |
| 14 | use Bitcoin funds in storage to generate yield, and this | 02:05:37 |
| 15 | is part of why our rates are so competitive." | 02:05:41 |
| 16 | This is Xavier telling you Cred is going to | 02:05:46 |
| 17 | take the Bitcoin UpgradeYa provides, and it's going to | 02:05:49 |
| 18 | invest it; right? | 02:05:53 |
| 19 | A    It tells me that they could use my property to | 02:05:54 |
| 20 | create a yield. | 02:05:59 |
| 21 | Q    And how did you create a yield? | 02:06:00 |
| 22 | A    It is their business.  I didn't worry about how | 02:06:05 |
| 23 | they would do it.  I worried about it being secured | 02:06:09 |
| 24 | properly. | 02:06:13 |
| 25 | Q    If they wanted to make a yield, doesn't one | 02:06:13 |

Page 70

1   have to make an investment?                          02:06:16

2      A    Once again, I'm not going to unpack their    02:06:18

3   business.  I mean, this is what they do.             02:06:23

4      Q    Okay.  This is what they do; they make       02:06:25

5   investments in Bitcoin; right?                       02:06:27

6      A    Is that a question?                          02:06:29

7      Q    Yes.                                         02:06:38

8      A    What does Cred do?                           02:06:39

9      Q    I asked you --                               02:06:45

10     A    I'm sorry.                                   02:06:45

11     Q    Yeah.  Cred generated yield, which are Bitcoin,  02:06:47

12   to make an investment with your Bitcoin; right?     02:06:48

13     A    All kinds of ways they could potentially have  02:06:51

14   created ways to create yield off of collaterally held  02:06:54

15   Bitcoin.                                            02:06:59

16     Q    And we looked at the website earlier, and Cred  02:06:59

17   disclosed that it may lend those Bitcoin to retail  02:07:13

18   investors; right?                                   02:07:17

19     A    What did the website say?  Yeah, that -- the  02:07:18

20   website said what you showed me on the website, correct.  02:07:25

21     Q    Uh-huh.  Okay.  In response, you say,         02:07:29

22   "Absolutely.  This makes sense."  And then the next  02:07:38

23   sentence says, "So far, it looks like you offer all the  02:07:43

24   services that I require."                            02:07:47

25         Do you see that?                              02:07:48

                                                         Page 71

```
 1        A      Yes.                                        02:07:50

 2               MR. EVANS:  One moment.  I'm going to mark this  02:08:07

 3    as CC-9.  This is another Telegram chat between yourself  02:08:19

 4    and Xavier.                                          02:08:25

 5    BY MR. EVANS:                                        02:08:26

 6        Q      Do you recognize this document?             02:08:27

 7               MR. LUFT:  I'm sorry, Joe.  I think the last  02:08:35

 8    one was CC-9.  Do you mean to mark it all as the same  02:08:36

 9    exhibit?  Maybe the Court Reporter can help us with the  02:08:42

10    numbers.  I'm just confused.                         02:08:44

11               MR. EVANS:  Fair enough.  I'm sorry.        02:08:47

12    Court Reporter, can you tell me what the last exhibit  02:08:49

13    that I identified was?                               02:08:51

14               MR. LUFT:  In fact, maybe we should         02:08:59

15    double-check because I thought CC-9 was first the Bonjour  02:08:59

16    declaration, and now I see at as the chat and now maybe  02:09:04

17    another.  Maybe we just need to clean it up a little.  02:09:05

18               MR. PIERCE:  That's what I have as well.  I  02:09:09

19    have that this should be CC-11.                      02:09:10

20               MR. EVANS:  Fair enough.                   02:09:15

21               MR. LUFT:  It's Avi Luft from Paul Hastings.  I  02:09:26

22    don't mean to be quick.  I'm just hoping to clean this up  02:09:31

23    for you.  I believe the Bonjour declaration was CC-9; the  02:09:34

24    supplemental declaration should have been marked as  02:09:38

25    CC-10; the last Telegram chat we were just talking about  02:09:41
```

Page 72

| | | |
|---|---|---|
| 1 | would be CC-11; and I think Joe was about to enter a new | 02:09:45 |
| 2 | Telegram chat, which would be CC-12. | 02:09:48 |
| 3 | Is that right?  Does everyone agree? | 02:09:52 |
| 4 | MR. EVANS:  That works for me.  Thank you, Avi. | 02:09:54 |
| 5 | (Exhibit CC-9, Exhibit CC-10, Exhibit CC-11, & | 02:09:54 |
| 6 | Exhibit CC-12 marked.) | 02:09:54 |
| 7 | MR. EVANS:  I'll mark this as CC-12. | 02:10:10 |
| 8 | BY MR. EVANS: | 02:10:10 |
| 9 | Q    This is another Telegram conversation between | 02:10:15 |
| 10 | yourself and Xavier; right? | 02:10:17 |
| 11 | A    I believe so.  I'm a little confused.  Maybe | 02:10:27 |
| 12 | the Xs are just confusing me.  It says "XAV" and then | 02:10:32 |
| 13 | "X".  Typically, in a Telegram chat the name would be the | 02:10:35 |
| 14 | same. | 02:10:36 |
| 15 | Q    Okay. | 02:10:39 |
| 16 | A    Is this from the same thread, or is this | 02:10:39 |
| 17 | something else? | 02:10:43 |
| 18 | Q    This is from the same thread that was provided | 02:10:43 |
| 19 | by your counsel last night. | 02:10:45 |
| 20 | A    Okay. | 02:10:47 |
| 21 | Q    So I'm assuming this is a Telegram chat, but if | 02:10:48 |
| 22 | something looks not right, let me know. | 02:10:52 |
| 23 | If we look down to 12:38 -- | 02:10:54 |
| 24 | A    I see.  The "X" is just a break.  "XAV" is | 02:11:02 |
| 25 | there normally.  I'm sorry.  I just misunderstood. | 02:11:07 |

Page 73

```
1      Q    Got it.  Got it.  Okay.                    02:11:10

2           And if you could just review these few     02:11:11

3    sentences here under 12:38, your message to Xavier.  02:11:19

4           MR. LUFT:  So can I just ask you to see what  02:11:28

5    Bates Stamp page that is?  We can't see it on the screen.  02:11:31

6           MR. EVANS:  UpgradeYa 0730.                 02:11:35

7           MR. LUFT:  Thank you.                       02:11:38

8    BY MR. EVANS:                                      02:11:45

9      Q    Here, you were talking to Xavier about your  02:11:45

10   initial deposit of Bitcoin into Cred; right?      02:11:48

11     A    Yes.                                        02:11:51

12     Q    And you say here, "Obviously, if the coins are  02:11:55

13   later consolidated on your end, then that decreases  02:12:03

14   privacy greatly, but the point here is describing  02:12:10

15   everything possible I can do on my side for privacy from  02:12:10

16   public analysis"; right?                          02:12:13

17     A    Right.                                      02:12:15

18     Q    Here, if you're saying the coins are        02:12:20

19   consolidated on your end, that means that you understand  02:12:23

20   that the wallet in which you'll be providing Bitcoin will  02:12:30

21   later be consolidated; right?                      02:12:35

22     A    I understood that Bitcoin could move.       02:12:37

23          MR. EVANS:  I'm going to mark a new exhibit.  02:13:13

24   And I think we're at CC -- is it 12 now?  CC-13.  02:13:15

25          (Exhibit CC-13 marked.)                     02:13:30
```

Page 74

```
 1   BY MR. EVANS:                                        02:13:30

 2       Q    These appear to be Telegram chats between   02:13:30

 3   yourself and someone named D.                        02:13:33

 4            Who's D?                                     02:13:37

 5       A    I understood "D" to be Daniyal, if that's how  02:13:38

 6   you pronounce it.                                    02:13:44

 7            MR. LUFT:  Joe, I'm going to, again, ask you 02:13:47

 8   just to say what Bates number you're at.             02:13:47

 9            MR. EVANS:  0716.                            02:13:59

10   BY MR. EVANS:                                        02:13:59

11       Q    Is that Daniyal Inamullah?                  02:14:02

12       A    Yes, the ex-employee of Cred.               02:14:08

13       Q    And how did you get in contact with Daniyal 02:14:10

14   Inamullah?                                           02:14:15

15       A    He was on Telegram.                         02:14:15

16       Q    And when you say "he was on Telegram," how did 02:14:21

17   you find him?                                        02:14:27

18       A    He started chatting in a group, in a chat group 02:14:28

19   on Telegram.                                         02:14:33

20       Q    What chat group is that?                    02:14:34

21       A    I don't recall which one it was.  It could have 02:14:36

22   been one of two.  There's only really two that I'm in. 02:14:48

23       Q    What are the names of those two Telegram chats? 02:14:54

24       A    Yeah, just to verify -- to clarify, there's 02:14:56

25   only two that I'm in related to Cred, and that is a large 02:14:59
```

Page 75

| | | |
|---|---|---|
| 1 | investors Cred group, and a Cred LBA unofficial. | 02:15:05 |
| 2 | Q    Okay.  And what's the distinction? | 02:15:15 |
| 3 | A    The purpose for the large investors was to just | 02:15:17 |
| 4 | have larger investors in that group. | 02:15:28 |
| 5 | Q    And the other group?  That was for who? | 02:15:32 |
| 6 | A    It was the first group created once the chapter | 02:15:37 |
| 7 | -- once the filings came in, "Does anybody want to join?" | 02:15:42 |
| 8 | Q    When you say "the filings," what do you mean? | 02:15:47 |
| 9 | A    When Cred filed for bankruptcy -- I don't know | 02:15:49 |
| 10 | the exact time that group was created, but it was created | 02:16:00 |
| 11 | in response to what was happening at Cred. | 02:16:03 |
| 12 | Q    Okay.  And this chat between you and Daniyal | 02:16:06 |
| 13 | Inamullah, is this private, or is this part of that group | 02:16:12 |
| 14 | chat? | 02:16:16 |
| 15 | A    This is one -- this is one-on-one. | 02:16:16 |
| 16 | Q    Okay.  So you met Daniyal in the group chat, | 02:16:23 |
| 17 | but these are separate one-on-one chats; correct? | 02:16:27 |
| 18 | A    Correct.  This is how I knew or thought I knew | 02:16:30 |
| 19 | who I was messaging. | 02:16:36 |
| 20 | Q    And if we scroll down here, on 23:14 you say, | 02:16:37 |
| 21 | "I can follow my sends back in April, but it gets a | 02:16:57 |
| 22 | little messy." | 02:17:01 |
| 23 | A    Yeah. | 02:17:06 |
| 24 | Q    What did you mean by that?  What's messy? | 02:17:06 |
| 25 | A    I'm making an assumption there that I can | 02:17:09 |

Page 76

```
 1    follow him in theory, but it's most likely going to be       02:17:13

 2    hard to follow.                                               02:17:17

 3        Q    Okay.  And you say, "Why do you say Fireblocks?      02:17:18

 4    I assumed my BTC was lost with asset manager theft."          02:17:24

 5             What do you mean by that?                            02:17:30

 6        A    Well, Cred stated they lost a lot of BTC to an       02:17:31

 7    asset manager.                                                02:17:36

 8        Q    Okay.  And if you scroll down to 12- -- 23:17,       02:17:36

 9    you say, "Mine was collateral, April 21st to 26th."           02:17:54

10    Daniyal said, "It would not have gone to the bad asset        02:18:00

11    manager, then"; right?                                        02:18:04

12        A    Yes.  That's what he said.                           02:18:05

13        Q    Did you understand what Daniyal meant by that?       02:18:07

14        A    Yes.  He was saying it didn't go to QuantaCoin.      02:18:13

15        Q    Okay.  So and then you say, "Interesting.            02:18:21

16    Thanks for that.  This was in CredBorrow.  Would it have      02:18:26

17    been handled differently versus CredEarned?"                  02:18:32

18             And Daniyal says, "I assume you mean the             02:18:35

19    collateral.  No, it would not."                               02:18:38

20             What is Daniyal telling you there?                   02:18:40

21        A    He's saying what you just said, not held -- not      02:18:49

22    being handled differently.                                    02:18:54

23        Q    Okay.  And when you go down to 23:29, he says,       02:18:56

24    "So your assets would have been used to offset               02:19:03

25    redemptions during the month of April and some of it was      02:19:06
```

Page 77

| | | |
|---|---|---|
| 1 | allocated to the asset managers.  Not sure of your exact | 02:19:09 |
| 2 | trade.  Sorry." | 02:19:12 |
| 3 | Do you see that? | 02:19:13 |
| 4 | A    I see it. | 02:19:14 |
| 5 | Q    So this is Daniyal telling you Cred took the | 02:19:16 |
| 6 | Bitcoin that you provided and it offset some redemptions | 02:19:22 |
| 7 | and some may have been allocated to asset | 02:19:29 |
| 8 | managers; right? | 02:19:32 |
| 9 | A    Yes.  It's saying what it says, yes. | 02:19:35 |
| 10 | Q    Right.  And so when you received this message, | 02:19:39 |
| 11 | you then knew that your funds were not segregated in a | 02:19:42 |
| 12 | particular account, but they had already been used? | 02:19:46 |
| 13 | A    I didn't know anything for certain.  I know | 02:19:52 |
| 14 | what he was saying. | 02:19:56 |
| 15 | Q    Okay.  And you respond, "Wow.  So if it was | 02:19:58 |
| 16 | used to off set redemptions, it was basically gone to | 02:20:05 |
| 17 | some level as soon as Cred got it.  So if I would have | 02:20:09 |
| 18 | quickly paid back my loan and wanted to collect my | 02:20:14 |
| 19 | collateral, it wouldn't have been possible from the very | 02:20:17 |
| 20 | beginning." | 02:20:19 |
| 21 | Do you see that? | 02:20:20 |
| 22 | A    Yes. | 02:20:20 |
| 23 | Q    And so what you're saying here is shortly after | 02:20:21 |
| 24 | you provided the funds to Cred, they were gone; right? | 02:20:28 |
| 25 | A    No.  I'm not saying they were gone.  I'm | 02:20:35 |

Page 78

```
 1    reading what Dan- -- Daniyal is saying.  At that time      02:20:42

 2    when I wrote that statement, it appeared to me that they    02:20:46

 3    could have been gone.                                        02:20:49

 4        Q    Okay.  But in time, taking Daniyal's statement     02:20:52

 5    is true, what you call "collateral," means you knew it      02:21:03

 6    was no longer in a segregated account where you thought     02:21:05

 7    it was; right?                                               02:21:09

 8        A    I'm not going to say that I knew that, no.          02:21:10

 9    That's not right.                                            02:21:21

10        Q    Just to wrap up, where is your Bitcoin today        02:21:22

11    that you provided to Cred?                                   02:21:38

12        A    I don't know.                                       02:21:39

13             MR. EVANS:  I'm going to yield.  Avi, I might        02:21:53

14    have a few follow-up at the end, but I'll have a few more   02:21:53

15    questions if he does.                                        02:21:53

16             And we can take a break if you want to, but I'm     02:21:57

17    basically complete.                                          02:22:00

18             MR. LUFT:  Okay.  We've been going for a while.     02:22:02

19    Do people want a five-minute break, and we can get         02:22:05

20    restarted?  I'm seeing the Court Reporter say yes so       02:22:08

21    that's the rule.  Let's do it.                              02:22:14

22             THE VIDEOGRAPHER:  We're off the record at          02:22:16

23    2:22 p.m., eastern standard time.                           02:22:18

24             (Break held off the record.)                       02:34:15

25             THE VIDEOGRAPHER:  We are back on the record at     02:34:15
```

Page 79

| | | |
|---|---|---|
| 1 | 2:34 p.m., eastern standard time. | 02:34:19 |
| 2 | EXAMINATION | 02:34:22 |
| 3 | BY MR. LUFT: | 02:34:22 |
| 4 | Q    Good afternoon, Mr. Parrish.  My name is Avi | 02:34:23 |
| 5 | Luft.  I'm from the law firm of Paul Hastings, and I | 02:34:27 |
| 6 | represent Cred, the debtors in this case. | 02:34:27 |
| 7 | How are you this afternoon? | 02:34:29 |
| 8 | A    I'm fine.  Thank you. | 02:34:30 |
| 9 | Q    So I know you did some of this with Joe | 02:34:33 |
| 10 | earlier.  I'm just going to reiterate a couple of things, | 02:34:36 |
| 11 | but, certainly, all the ground rules that he went over | 02:34:39 |
| 12 | with you do apply. | 02:34:42 |
| 13 | Mr. Parrish, you understand that you're under | 02:34:43 |
| 14 | oath today? | 02:34:45 |
| 15 | A    Yes. | 02:34:46 |
| 16 | Q    Can I ask that we have an agreement that if you | 02:34:46 |
| 17 | don't understand any of my questions, you'll let me know. | 02:34:50 |
| 18 | And if you don't, I'm going to -- it would be fair to | 02:34:53 |
| 19 | assume that you do understand my question? | 02:34:55 |
| 20 | A    Yes. | 02:34:57 |
| 21 | Q    Okay.  Mr. Parrish, is there any reason why you | 02:34:59 |
| 22 | can't give true and honest testimony here today? | 02:35:03 |
| 23 | A    No. | 02:35:10 |
| 24 | Q    Mr. Parrish, were you provided a copy with the | 02:35:11 |
| 25 | document request sent by the creditor's committee to you? | 02:35:14 |

Page 80

```
 1        A     Yes.                                        02:35:20

 2        Q     Did you review that request?               02:35:20

 3        A     Yes.                                        02:35:22

 4        Q     And did you produce every single document that   02:35:22

 5   was responsive to that request to your counsel?       02:35:28

 6        A     Yes.                                        02:35:30

 7        Q     So there are no other emails or Telegram    02:35:30

 8   messages or any other communications of any sort      02:35:36

 9   involving Cred that have not already been produced that   02:35:39

10   are in your possession?                               02:35:42

11        A     Correct.  Everything that I could find I've   02:35:43

12   provided.  I think if you look at, like, these chats we   02:35:48

13   were talking about, they're public -- more or less    02:35:51

14   public.  They're available.                           02:35:55

15        Q     Mr. Parrish, you were asked about an agreement,   02:36:07

16   which I believe is attached as Exhibit A to your      02:36:09

17   declaration.  Do you recall that -- it's Exhibit 2 today.   02:36:12

18   You don't need to see it, but you're welcome to look at   02:36:17

19   it.  Someone can put it up.  It's called the loan     02:36:20

20   security agreement.  It's Exhibit A to your declaration.   02:36:22

21        A     Yeah.  I have a print out of it actually.   02:36:25

22        Q     Okay.  I'm not going -- we'll go through it   02:36:28

23   later.  I just wanted you to have reference to that    02:36:31

24   document.                                             02:36:33

25              Are you aware of any other agreement between   02:36:34
```

Page 81

| | | |
|---|---|---|
| 1 | you and Cred? | 02:36:36 |
| 2 | A    The CredEarned document. | 02:36:36 |
| 3 | Q    The CredEarned document for the | 02:36:44 |
| 4 | 120,000; correct? | 02:36:47 |
| 5 | A    Yes, yes. | 02:36:47 |
| 6 | Q    Any other document? | 02:36:48 |
| 7 | A    No.  I'm not aware of any other document. | 02:36:49 |
| 8 | Q    So there's no separate escrow agreement that | 02:36:54 |
| 9 | we're not aware of? | 02:36:58 |
| 10 | A    No. | 02:37:00 |
| 11 | Q    There's no trust agreement that you entered | 02:37:00 |
| 12 | into with Cred? | 02:37:05 |
| 13 | A    No. | 02:37:06 |
| 14 | Q    In fact, there's no legal document that you | 02:37:08 |
| 15 | entered into with Cred creating a trust; correct? | 02:37:10 |
| 16 | A    Correct. | 02:37:12 |
| 17 | Q    No legal agreement that you entered into with | 02:37:15 |
| 18 | Cred creating availment; correct? | 02:37:19 |
| 19 | MR. PIERCE:  Object to form. | 02:37:21 |
| 20 | THE WITNESS:  The only two documents I'm aware | 02:37:23 |
| 21 | of is the agreement for the loan and security agreement | 02:37:27 |
| 22 | and the CredEarned document. | 02:37:31 |
| 23 | BY MR. LUFT: | 02:37:33 |
| 24 | Q    And when you say you're aware of, these are | 02:37:33 |
| 25 | agreements that you would have had to enter into? | 02:37:36 |

Page 82

| | | |
|---|---|---|
| 1 | A    Correct. | 02:37:38 |
| 2 | Q    In fact, those are the only two agreements | 02:37:39 |
| 3 | between you and Cred; correct? | 02:37:41 |
| 4 | A    Correct. | 02:37:42 |
| 5 | Q    Okay.  Mr. Parrish, did someone force you to do | 02:37:43 |
| 6 | the agreement to enter the CredBorrow agreement with Cred | 02:37:48 |
| 7 | that was codified in Exhibit 2 -- Exhibit A to your | 02:37:52 |
| 8 | declaration, which is Exhibit 2 here today? | 02:37:56 |
| 9 | A    No.  Was I forced?  No. | 02:37:58 |
| 10 | Q    It was your choice; correct? | 02:38:04 |
| 11 | A    Correct. | 02:38:06 |
| 12 | Q    And pursuant to that agreement, you voluntarily | 02:38:06 |
| 13 | took $2 million of Cred's money? | 02:38:12 |
| 14 | A    I was lent. | 02:38:14 |
| 15 | Q    A line of credit? | 02:38:19 |
| 16 | A    I was lent $2 million. | 02:38:20 |
| 17 | Q    Right.  That was your choice to take that | 02:38:22 |
| 18 | money; correct? | 02:38:25 |
| 19 | A    It was my choice to get into this agreement and | 02:38:25 |
| 20 | to be lent $2 million, that's correct. | 02:38:32 |
| 21 | Q    And it was your choice to put up your -- your | 02:38:34 |
| 22 | Bitcoin as collateral for that agreement; correct? | 02:38:41 |
| 23 | A    It was my choice. | 02:38:44 |
| 24 | Q    No one from Cred forced you to do | 02:38:49 |
| 25 | that; correct? | 02:38:51 |

Page 83

| | | |
|---|---|---|
| 1 | A     It was my choice. | 02:38:52 |
| 2 | Q     And Cred received -- got that Bitcoin because | 02:38:55 |
| 3 | you voluntarily transferred it to it; correct? | 02:39:01 |
| 4 | A     I transferred it to secure a loan. | 02:39:04 |
| 5 | Q     Correct.  You transferred it pursuant to what | 02:39:10 |
| 6 | has been marked as Exhibit 2 here and what has been | 02:39:15 |
| 7 | marked as Exhibit A to your declaration; correct? | 02:39:18 |
| 8 | A     I transferred it to secure a loan. | 02:39:21 |
| 9 | Q     Sir, my question is:  As codified under the | 02:39:23 |
| 10 | terms set out in Exhibit A of your declaration, the loan | 02:39:27 |
| 11 | and security agreement, was entered into between you and | 02:39:31 |
| 12 | Cred; correct? | 02:39:34 |
| 13 | A     I'm not sure I understand all the language you | 02:39:35 |
| 14 | used there. | 02:39:39 |
| 15 | Q     Sure.  I'll boil it down. | 02:39:39 |
| 16 | The terms upon which you provided the | 02:39:42 |
| 17 | collateral and Cred provided you $2 million is set forth | 02:39:44 |
| 18 | in its entirety under the loan and security agreement | 02:39:49 |
| 19 | that has been marked as Exhibit 2 here today and was | 02:39:53 |
| 20 | Exhibit A to your declaration; correct? | 02:39:56 |
| 21 | A     Yes. | 02:39:57 |
| 22 | Q     Pursuant to those terms, you transferred your | 02:40:00 |
| 23 | cryptocurrency to Cred as collateral; correct? | 02:40:11 |
| 24 | A     Yes.  I transferred Bitcoin to Cred as | 02:40:18 |
| 25 | collateral. | 02:40:22 |

Page 84

```
 1        Q      You did that voluntarily; correct?          02:40:23

 2        A      It was my choice.                           02:40:27

 3        Q      None of your Bitcoin was forcibly taken from 02:40:30

 4   you by Cred; correct?                                   02:40:37

 5        A      It was my choice to send the Bitcoin.       02:40:38

 6        Q      They didn't go into your cold storage and hack 02:40:46

 7   and abstract your Bitcoin; correct?                     02:40:50

 8        A      It was my choice to send the Bitcoin.       02:40:55

 9        Q      So Cred did not obtain possession of your   02:41:02

10   Bitcoin through theft; correct?                         02:41:05

11            You chose to give it to them?                  02:41:09

12        A      It was my choice to send the Bitcoin to secure 02:41:13

13   a loan.                                                 02:41:15

14        Q      And Cred did not obtain the Bitcoin by --   02:41:16

15   obtain the Bitcoin that you sent them by stealing it from 02:41:29

16   you; correct?                                           02:41:31

17            MR. PIERCE:  Object to form.                   02:41:32

18            THE WITNESS:  It was my choice to send the     02:41:37

19   Bitcoin to secure the loan.                             02:41:39

20   BY MR. LUFT:                                            02:41:40

21        Q      And when you say it was your choice, it means 02:41:42

22   they didn't get it through stealing it from you; correct? 02:41:45

23        A      If they stole it, it wouldn't be my choice. 02:41:47

24        Q      So they didn't steal it; right?  We're in   02:41:54

25   agreement; right?                                       02:41:58
```

Page 85

| | | |
|---|---|---|
| 1 | MR. PIERCE:  Object to form. | 02:41:58 |
| 2 | THE WITNESS:  I provided the Bitcoin to Cred to | 02:41:59 |
| 3 | secure the loan.  I provided Bitcoin. | 02:42:04 |
| 4 | BY MR. LUFT: | 02:42:09 |
| 5 | Q     And Cred did not steal it from you to get | 02:42:09 |
| 6 | possession of Bitcoin; correct? | 02:42:12 |
| 7 | A     Cred did not steal the Bitcoin that I provided. | 02:42:13 |
| 8 | Q     And if someone was to make that assertion, it | 02:42:20 |
| 9 | would be a false assertion; correct? | 02:42:23 |
| 10 | MR. PIERCE:  Objection. | 02:42:24 |
| 11 | THE WITNESS:  If someone was to make the | 02:42:26 |
| 12 | assertion that the Bitcoin I provided to Cred was stolen, | 02:42:28 |
| 13 | that would be false. | 02:42:33 |
| 14 | BY MR. LUFT: | 02:42:34 |
| 15 | Q     Okay.  Terrific. | 02:42:35 |
| 16 | Mr. Parrish, are you aware of any postpetition | 02:42:37 |
| 17 | malfeasance by Cred? | 02:42:46 |
| 18 | A     I don't know. | 02:42:48 |
| 19 | Q     When you say you don't know, does that mean you | 02:43:02 |
| 20 | don't know if you're aware of it, or you don't know of | 02:43:05 |
| 21 | any such malfeasance? | 02:43:08 |
| 22 | A     I don't know if there was postpetition | 02:43:10 |
| 23 | malfeasance. | 02:43:13 |
| 24 | Q     So it would be improper for someone to assert | 02:43:14 |
| 25 | that you were aware of postpetition malfeasance by | 02:43:18 |

Page 86

```
 1    Cred; correct?                                         02:43:22

 2             MR. PIERCE:  Object to form.                  02:43:24

 3             THE WITNESS:  As I stated, I don't know that  02:43:35

 4    there was postpetition malfeasance.                    02:43:37

 5    BY MR. LUFT:                                           02:43:40

 6        Q     And it would be improper for anyone to assert 02:43:40

 7    on your behalf that you were aware of such postpetition 02:43:42

 8    malfeasance; correct?                                  02:43:46

 9             MR. PIERCE:  Objection.                       02:43:47

10             THE WITNESS:  To say I was aware of           02:43:48

11    postpetition malfeasance?  Is that you're question?    02:44:00

12    BY MR. LUFT:                                           02:44:04

13        Q     Yeah.                                        02:44:04

14        A     That I -- I'm saying -- I'm saying I don't know 02:44:04

15    if there was malfeasance, and you're saying --         02:44:04

16        Q     I'm saying it would be improper -- I'm saying 02:44:07

17    it would be improper for someone to assert that you were 02:44:07

18    aware of such postpetition malfeasance given that you say 02:44:10

19    you are not aware of it; correct?                      02:44:14

20             MR. PIERCE:  Objection.                       02:44:16

21             THE WITNESS:  I did not say I was unaware of  02:44:17

22    it.  I said I didn't know if they had malfeasance      02:44:19

23    postpetition.                                          02:44:23

24    BY MR. LUFT:                                           02:44:24

25        Q     Well, sir, maybe you can clarify for me:  What 02:44:24
```

Page 87

```
1    is the difference between "I'm not aware" -- "I'm not      02:44:27

2    aware" and "I don't know"?                                 02:44:29

3        A    Yeah, it's probably just semantics.  That's       02:44:30

4    just what I'm comfortable saying.                          02:44:36

5        Q    Fine.                                             02:44:37

6             Would it be improper for anyone to assert that    02:44:38

7    you were aware of postpetition malfeasance by Cred?        02:44:43

8             MR. PIERCE:  Objection.                           02:44:47

9             THE WITNESS:  I've already stated I don't know     02:44:47

10   if they had postpetition malfeasance.                      02:44:53

11   BY MR. LUFT:                                               02:44:56

12       Q    Okay.  Have you authorized anyone to make this    02:44:56

13   statement that you were aware of postpetition malfeasance  02:45:00

14   by Cred?                                                   02:45:03

15            MR. PIERCE:  Objection.                           02:45:04

16            THE WITNESS:  I -- I have not authorized           02:45:05

17   anything intentionally.  That is not true.                 02:45:15

18   BY MR. LUFT:                                               02:45:18

19       Q    Okay.  So to answer any question:  Have you       02:45:19

20   authorized anyone to state that you're aware of            02:45:21

21   postpetition malfeasance by Cred?                          02:45:24

22            MR. PIERCE:  Objection.                           02:45:27

23            THE WITNESS:  I have not authorized anyone to      02:45:28

24   do anything or say anything and involving postpetition     02:45:31

25   malfeasance.  That is not true or that I do not believe    02:45:39
```

Page 88

```
 1    to be true.                                          02:45:43

 2    BY MR. LUFT:                                         02:45:44

 3        Q    Is there anybody else at UpgradeYa Investments   02:45:45

 4    who is authorized to make statements on behalf of   02:45:49

 5    UpgradeYa Investments in this case?                 02:45:52

 6        A    No.  I'm the only managing member.          02:45:55

 7        Q    With regard to authorizing your attorneys to   02:45:58

 8    make statements on behalf of UpgradeYa Investments, is   02:46:02

 9    there anyone else who's authorized to make such     02:46:05

10    statements other than yourself?                     02:46:07

11        A    Can you repeat that question?               02:46:09

12        Q    Other than yourself, is anyone else authorized   02:46:15

13    to make statements on behalf of UpgradeYa Investments to   02:46:20

14    your counsel?                                        02:46:26

15        A    No.  It's just -- I'm the only managing member   02:46:29

16    of UpgradeYa Investments.                            02:46:32

17        Q    Mr. Parrish, did you review the reply brief   02:46:34

18    that your counsel submitted in connection with this   02:46:40

19    action today?                                        02:46:44

20        A    Yes.                                        02:46:44

21        Q    Mr. Parrish, is there anyone else who works at   02:46:45

22    UpgradeYa Investments other than yourself?           02:47:04

23        A    There's no one else that works here, no.    02:47:05

24        Q    At the time of the investment with Cred, is   02:47:09

25    there anyone else who worked there?                  02:47:15
```

Page 89

```
1              So to the extent UpgradeYa Investments does        02:47:21

2    something, that is effectively synonymous with the fact      02:47:24

3    that you have done something; correct?                       02:47:29

4              MR. PIERCE:  Object to form.                       02:47:31

5              THE WITNESS:  I am the only managing member of     02:47:32

6    UpgradeYa.                                                   02:47:35

7    BY MR. LUFT:                                                 02:47:36

8        Q    Okay.  You used the phrase "managing member."      02:47:37

9              Is there anyone else who can take action at        02:47:39

10   UpgradeYa Investments other than yourself?                   02:47:42

11       A    There is not.                                       02:47:43

12       Q    Is it fair to say that there was no decision        02:47:50

13   that UpgradeYa Investments made that you are not aware       02:47:54

14   of?                                                          02:47:57

15       A    Yes.                                                02:47:57

16       Q    Okay.  Mr. Parrish, you testified that             02:48:01

17   UpgradeYa is a cryptomining company.                         02:48:23

18             Is that fair?                                      02:48:29

19       A    One of previous counsel, the committee, would      02:48:29

20   decide -- would declare that UpgradeYa can be referred to    02:48:39

21   as UpgradeYa Investments.  Are you referring to             02:48:41

22   UpgradeYa Investments or UpgradeYa the company?             02:48:44

23       Q    No.  I'm being more precise.  I'm going to call     02:48:46

24   it UpgradeYa when I'm talking about UpgradeYa; I'm going     02:48:46

25   to call it UpgradeYa Investments when I'm talking about      02:48:47
```

| | | |
|---|---|---|
| 1 | UpgradeYa Investments.  I think that will make it easier | 02:48:49 |
| 2 | for both of us. | 02:48:53 |
| 3 | A     Okay. | 02:48:54 |
| 4 | Q     Is that fair? | 02:48:54 |
| 5 | A     Okay. | 02:48:56 |
| 6 | Q     So with regard to UpgradeYa, am I correct that | 02:48:56 |
| 7 | you've testified that that is a cryptocurrency mining | 02:49:00 |
| 8 | company? | 02:49:07 |
| 9 | A     Yes, it is a mining company. | 02:49:07 |
| 10 | Q     Okay.  What is involved with mining | 02:49:08 |
| 11 | cryptocurrency broadly? | 02:49:10 |
| 12 | A     You run hardware that's designed to -- servers | 02:49:12 |
| 13 | or computers or simplicity that form a specific task to | 02:49:19 |
| 14 | mine. | 02:49:29 |
| 15 | Q     To mine. | 02:49:30 |
| 16 |       And what does it mean to mine? | 02:49:31 |
| 17 | A     It's dedicating that hardware to that task. | 02:49:33 |
| 18 | Q     And how much cryptocurrency does UpgradeYa mine | 02:49:41 |
| 19 | in a year? | 02:49:46 |
| 20 | A     That is not an easy answer. | 02:49:46 |
| 21 | Q     In 2020, how much did it mine? | 02:49:52 |
| 22 | A     I don't know. | 02:49:54 |
| 23 | Q     How about in 2019? | 02:49:55 |
| 24 | A     I'd have to look it up.  I don't know right | 02:50:00 |
| 25 | now. | 02:50:03 |

Page 91

| | | | |
|---|---|---|---|
| 1 | Q | Can you give me your best estimate? | 02:50:03 |
| 2 | A | Less than 50 Bitcoins. | 02:50:05 |
| 3 | Q | Your best estimate for 2020? | 02:50:19 |
| 4 | A | Less than 50 Bitcoins. | 02:50:26 |
| 5 | Q | Can you be more precise for either one? | 02:50:28 |
| 6 | A | I could guess.  Other than looking it up right | 02:50:33 |
| 7 | now, I couldn't tell you. | | 02:50:40 |
| 8 | Q | Do you think it's somewhere in the range of 20 | 02:50:42 |
| 9 | to 50, or do you think it's less than 20? | | 02:50:45 |
| 10 | A | Closer to 20. | 02:50:49 |
| 11 | Q | What was the revenue of UpgradeYa in 2019? | 02:50:50 |
| 12 | A | I'd have to look that up. | 02:51:04 |
| 13 | Q | Can you give me your best estimate here today? | 02:51:13 |
| 14 | A | I don't like to guess.  I can just look it up | 02:51:16 |
| 15 | right now. | | 02:51:26 |
| 16 | Q | Okay. | 02:51:26 |
| 17 | A | It's not a secret.  I can look it up.  I can | 02:51:27 |
| 18 | provide that information. | | 02:51:30 |
| 19 | Q | I'm happy for you to look it up.  That would be | 02:51:31 |
| 20 | great. | | 02:51:33 |
| 21 | A | Okay.  Give me a minute. | 02:51:36 |
| 22 | Q | Thanks. | 02:51:38 |
| 23 | A | What's the question? | 02:52:32 |
| 24 | Q | What the revenue for UpgradeYa was in 2019. | 02:52:33 |
| 25 | A | The revenue, I'm not seeing.  I see the income | 02:52:41 |

Page 92

1    and the expenses.                                            02:52:52

2        Q    Okay.  Do you want to give me those?               02:52:54

3        A    The income for UpgradeYa in 2019 was 207,810;      02:52:56

4    the expenses were 496,472.                                   02:53:13

5        Q    Okay.  And for 2020, do you have that?             02:53:18

6        A    I'm curious here, the relevance here.              02:53:21

7             THE WITNESS:  Matthew does this matter, the        02:53:35

8    details of my other business?  I'm just curious.            02:53:37

9             MR. PIERCE:  Avi, what is the relevance here in    02:53:49

10   this line of questioning?  Is it pertinent to this?         02:53:54

11            MR. LUFT:  Yeah.  I wouldn't ask it otherwise.     02:53:59

12            THE WITNESS:  Okay.  A date is a little bit         02:54:03

13   better this year, 157,000 income, by the way, income        02:54:10

14   $157,650; expenses has been 186,170.                        02:54:17

15   BY MR. LUFT:                                                 02:54:27

16       Q    Okay.  Mr. Parrish, do you use any of the          02:54:27

17   revenue from UpgradeYa to fund UpgradeYa Investments?       02:54:32

18       A    No.                                                 02:54:35

19       Q    Where does the revenue for                         02:54:39

20   UpgradeYa Investments come from?                             02:54:43

21       A    You can see by those numbers there's no profit     02:54:44

22   to investment.                                               02:54:55

23       Q    Okay.  Fair enough.                                02:54:56

24            What are the assets under management at            02:54:58

25   UpgradeYa Investments right now?                             02:55:01

                                                    Page 93

1          MR. PIERCE:  I'm going to object to the form of     02:55:09

2     the question.                                            02:55:12

3     BY MR. LUFT:                                             02:55:14

4          Q     You can answer.                               02:55:14

5          A     Assets under management at UpgradeYa -- I don't   02:55:15

6     view it as assets under management.  What investments has   02:55:20

7     -- I don't know what you're asking as far as assets under   02:55:28

8     management for UpgradeYa Investments.  I don't manage    02:55:33

9     assets.                                                  02:55:36

10         Q     Well, so let me take this back:  I believe you   02:55:36

11    told Mr. Evans that the business of UpgradeYa Investments   02:55:41

12    was to make investments; correct?                        02:55:45

13         A     Correct.                                       02:55:47

14         Q     And I presume to make investments, you have to   02:55:49

15    have assets to invest; correct?                          02:55:53

16         A     Correct.                                       02:55:57

17         Q     So I would like to know how -- what is the size   02:55:57

18    of the assets under the management of                    02:56:04

19    UpgradeYa Investments currently?                         02:56:07

20         A     That is another thing I'd have to look up.     02:56:08

21    UpgradeYa Investments right now holds some cash.         02:56:15

22         Q     Okay.  If you can look that up for me, that    02:56:21

23    will be helpful.  I'll also asking the same thing as of   02:56:27

24    the time you entered into the loan and security          02:56:31

25    agreement, which has been marked as Exhibit 2 for this   02:56:33

                                                          Page 94

1    deposition.                                           02:56:36

2        A     Okay.  So what's the question?             02:57:11

3        Q     There's two of them.  I'll ask them separately.  02:57:13

4              First, what were the assets under management at  02:57:19

5    UpgradeYa Investments at the time it entered into the  02:57:21

6    transaction set forth in Exhibit 2 of this deposition,  02:57:26

7    the loan and security agreement, with Cred.           02:57:29

8              MR. PIERCE:  Avi, I'm going to object to this  02:57:33

9    line of questioning.  These are questions that should be  02:57:36

10   brought through interrogatories.  You're asking for   02:57:38

11   specifics, not generalities.                          02:57:40

12             You didn't notice this as a 30(b)(6) about, you  02:57:42

13   know, specific topics.  Ask him general questions, but if  02:57:46

14   you're going to get into any specifics, that's more   02:57:50

15   appropriately brought through interrogatories.        02:57:54

16             MR. LUFT:  Okay.  Matthew, I've heard your   02:57:56

17   objection.  As you all know, I have no obligations to ask  02:57:59

18   questions through interrogatories as opposed to       02:58:04

19   depositions.  There's absolutely no law that says that.  02:58:06

20             Moreover, I am not taking a 30(b)(6).  I am  02:58:09

21   speaking to Mr. Parrish, who's told me he's the entire  02:58:14

22   company.  I don't know what the significance of that is.  02:58:17

23             MR. PIERCE:  I mean, it's not --            02:58:17

24             MR. LUFT:  Matthew, I'm going to finish.  Okay?  02:58:20

25   And I have never been told that there was something   02:58:23

                                                    Page 95

| | | |
|---|---|---|
| 1 | problematic because I'm asking specifics as opposed to | 02:58:27 |
| 2 | being overlybroad.  In fact, you objected to Mr. Evans | 02:58:32 |
| 3 | for being broad with his questioning at times. | 02:58:33 |
| 4 | I don't think there's any problem with asking a | 02:58:36 |
| 5 | specific question here.  I'm going to ask Mr. Parrish to | 02:58:38 |
| 6 | answer.  You can reserve your objection if you'd like. | 02:58:41 |
| 7 | It's been noted.  I'm going to go forward. | 02:58:44 |
| 8 | MR. PIERCE:  I think it's inappropriate to ask | 02:58:46 |
| 9 | him anything that's outside his knowledge and going to | 02:58:48 |
| 10 | ask him to look specifics.  I think that's an | 02:58:51 |
| 11 | inappropriate use.  These aren't materials that are | 02:58:53 |
| 12 | before him. | 02:58:59 |
| 13 | They're not things that you inquire to before | 02:59:00 |
| 14 | this, and then you're having him go onto his computer | 02:59:04 |
| 15 | right now to look up specific information.  That's not | 02:59:07 |
| 16 | him testifying to the best of his current knowledge.  I | 02:59:10 |
| 17 | want that objection to be clear and on the record. | 02:59:12 |
| 18 | MR. LUFT:  Okay.  It's clear. | 02:59:15 |
| 19 | BY MR. LUFT: | 02:59:22 |
| 20 | Q     You can go ahead, Mr. Parrish. | 02:59:22 |
| 21 | A     I asked, what was the question? | 02:59:24 |
| 22 | Q     My question again, is:  At the time | 02:59:25 |
| 23 | UpgradeYa Investments made its investment with Cred, the | 02:59:32 |
| 24 | terms which are set forth in Exhibit 2 to this | 02:59:35 |
| 25 | deposition, the loan and security agreement, what were | 02:59:38 |

Page 96

```
 1   the assets under management at UpgradeYa Investments?      02:59:40

 2      A     I don't know what the snapshot in time -- in      02:59:43

 3   this time frame would be, April 2020 --                    02:59:50

 4      Q     Uh-huh.                                           02:59:54

 5      A     -- of the assets were at UpgradeYa Investments.   02:59:55

 6      Q     What is your best estimate?                       02:59:57

 7      A     I'm not going to guess.                           02:59:58

 8      Q     Well, then I'm going to ask you to look it up     03:00:01

 9   for me.                                                    03:00:04

10      A     Okay.  I'm not going to look it up right now.     03:00:05

11      Q     Okay.  Mr. Parrish --                             03:00:08

12      A     If you'd like that information, it can all be     03:00:14

13   provided.  That's no problem.                             03:00:17

14      Q     Okay.  I would certainly like that information.   03:00:18

15   If you can get it for me over the next break, I'd          03:00:22

16   appreciate it.                                             03:00:25

17         Okay?                                                03:00:26

18      A     No, that's not okay.  I'm not going to provide    03:00:26

19   it through this deposition.  I'll provide it through my    03:00:30

20   counsel, and the counsels can provide that -- details of  03:00:32

21   my other companies that have no relationship to           03:00:35

22   UpgradeYa, which has already been asked about UpgradeYa,   03:00:39

23   but the assets for UpgradeYa Investments and how that has  03:00:42

24   any relationship to the agreement between UpgradeYa and    03:00:46

25   Cred.                                                      03:00:51
```

```
 1       Q     Sir, which of your companies invested with      03:00:52

 2   Cred?                                                      03:00:55

 3             MR. PIERCE:  Object to form.                     03:00:56

 4             THE WITNESS:  UpgradeYa.                         03:00:57

 5   BY MR. LUFT:                                               03:00:58

 6       Q     UpgradeYa Investments; right?                   03:00:59

 7       A     UpgradeYa Investments did not invest in Cred.   03:01:01

 8   UpgradeYa Investments provided collateral to Cred.        03:01:05

 9       Q     So we can agree that I'm asking you             03:01:08

10   specifically about the entity that did the transaction    03:01:10

11   with Cred; correct?  UpgradeYa Investments?               03:01:12

12       A     I agree.                                         03:01:15

13       Q     Okay.  So I'm asking you to provide me that     03:01:19

14   information that I have asked for.  I'm not asking you     03:01:21

15   about another one of your businesses.  I'm asking about   03:01:25

16   UpgradeYa Investments.                                    03:01:29

17       A     And I will provide the detailed financials of   03:01:31

18   UpgradeYa Investments outside of this deposition, but I'm 03:01:38

19   not going to look them up right now.                      03:01:42

20       Q     I'll reserve my rights to reopen your           03:01:44

21   deposition once we receive them.  I would ask you to      03:01:48

22   please provide it now, but we can move forward for now.   03:01:53

23             Approximately what were the assets that         03:01:58

24   UpgradeYa Investments controlled at the time it made its  03:02:06

25   investments with Cred?                                     03:02:09
```

Page 98

| | | |
|---|---|---|
| 1 | A    The assets under control of April 2020? | 03:02:11 |
| 2 | Q    Yes. | 03:02:22 |
| 3 | A    I just stated that I have to look that up to | 03:02:23 |
| 4 | understand, and I don't have a snapshot of that. | 03:02:25 |
| 5 | Q    So when you made your investment with Cred, you | 03:02:27 |
| 6 | had no idea how much money your company had to | 03:02:30 |
| 7 | investment? | 03:02:33 |
| 8 | A    The company invested based on contributions | 03:02:34 |
| 9 | from individuals or an individual, specifically me.  The | 03:02:38 |
| 10 | assets -- yes?  Sorry. | 03:02:44 |
| 11 | Q    Okay.  So let's break that up. | 03:02:48 |
| 12 | Are you the only person who contributed to Cred | 03:02:51 |
| 13 | investments? | 03:02:54 |
| 14 | A    No. | 03:02:55 |
| 15 | Q    Who else contributed to Cred investments? | 03:02:55 |
| 16 | A    Daniel Michael Parrish. | 03:02:57 |
| 17 | Q    And who is he? | 03:03:05 |
| 18 | A    My father. | 03:03:07 |
| 19 | Q    Is there anyone else, other than you and your | 03:03:08 |
| 20 | father, who contributed to Cred investments? | 03:03:10 |
| 21 | A    No. | 03:03:12 |
| 22 | Q    How much did you contribute to Cred investments | 03:03:12 |
| 23 | as of the time of the Cred transaction? | 03:03:18 |
| 24 | A    531 Bitcoins that were provided to Cred as | 03:03:20 |
| 25 | collateral. | 03:03:28 |

Veritext Legal Solutions
866 299-5127

```
1      Q    That was the entirety of what you provided to      03:03:28

2  Cred investments?                                           03:03:38

3      A    To say what the balance was at Cred -- sorry --    03:03:39

4  at UpgradeYa Investments in April?                          03:03:44

5      Q    Yes.                                               03:03:46

6      A    I'd have to look that up.                          03:03:47

7      Q    Okay.  How much did Mr. Parrish, your father,      03:03:51

8  contribute?                                                 03:03:58

9      A    To Cred -- I'm sorry -- to                         03:03:58

10 UpgradeYa Investments?                                      03:04:00

11     Q    Correct.                                           03:04:01

12     A    How much did he contribute in March?              03:04:02

13     Q    March, April.  Or how much -- how much had he      03:04:10

14 contributed up to that point, I should say?                 03:04:15

15     A    Look, I'm failing to see the relevance here.       03:04:17

16 If there was money contributed to UpgradeYa Investments     03:04:23

17 for other projects, how that's relevant to                  03:04:27

18 UpgradeYa Investments and Cred?                             03:04:31

19     Q    Mr. Parrish, you said you needed $2 million        03:04:41

20 from Cred to enter into investments; correct?               03:04:44

21     A    I didn't -- saying "needed" seems like the         03:04:46

22 wrong word.  I was choosing to engage in a loan             03:04:54

23 agreement, a crypto-secured loan, from Cred.  I was         03:04:57

24 making that choice to get 2 million -- to receive           03:05:07

25 $2 million.                                                 03:05:12
```

Page 100

```
 1      Q    I'm trying to get an understanding of          03:05:13

 2  UpgradeYa Investments, what it's business is, what it    03:05:18

 3  invests in.  I think it's all relevant to the background. 03:05:22

 4  I'm entitled to know who you are, who they are in terms   03:05:25

 5  of making your decisions and your specification and your  03:05:31

 6  knowledge when you invested.                              03:05:33

 7          So I need you to give me some answers to these    03:05:35

 8  questions.                                                03:05:37

 9      A    I'm happy to provide those answers.  Just as     03:05:39

10  long as --                                                03:05:46

11      Q    I'm not trying to put your laundry out there.    03:05:46

12  We can mark this part confidential if you'd like.  I just 03:05:50

13  need to understand this for myself for the case.          03:05:53

14      A    There is nothing confidential in general here.   03:05:59

15  I'm happy to provide the truth of everything about        03:06:02

16  UpgradeYa Investments.  I'm just not going to look up     03:06:07

17  financials right now.                                     03:06:08

18      Q    Fine, I'm not asking to you look up financials.  03:06:08

19          Am I correct that the only two people that have   03:06:12

20  invested in UpgradeYa Investments are you and your        03:06:14

21  father?                                                   03:06:17

22      A    That's correct.                                  03:06:17

23      Q    Approximately how much have you invested in      03:06:22

24  UpgradeYa Investments to date?                            03:06:28

25      A    Yes, I would request this as confidential.  Now  03:06:29
```

Page 101

```
 1    we're getting into broader scope than what's related to      03:06:31

 2    Cred.                                                          03:06:34

 3        Q    Sir, unfortunately, you brought this lawsuit.        03:06:34

 4    You don't get to decide what's beyond the scope of Cred.      03:06:36

 5    I think this is absolutely responsive.  I'm entitled to       03:06:40

 6    know what the size of your business is.  In fact --           03:06:43

 7        A    There is no lawsuit.                                 03:06:47

 8        Q    No, you didn't bring an action?                      03:06:50

 9        A    I'm not aware of any lawsuit.                        03:06:54

10        Q    Are you aware that Mr. Parrish -- Mr. Pierce         03:06:56

11    brought an action to lift the stay in this action?           03:07:00

12             MR. PIERCE:  I object to the form of the            03:07:02

13    question.                                                     03:07:05

14             THE WITNESS:  I understand that my legal            03:07:11

15    knowledge is very limited, and my understanding of what       03:07:13

16    "lawsuit" means may be wrong.                                 03:07:15

17    BY MR. LUFT:                                                  03:07:17

18        Q    Okay.  Sir, why do you understand we're here        03:07:17

19    today?                                                        03:07:22

20        A    To do a deposition.                                 03:07:22

21        Q    For what?                                           03:07:25

22        A    For an agreement and broadly the agreements         03:07:26

23    that I had, UpgradeYa Investments, between                   03:07:41

24    UpgradeYa Investments and Cred.                              03:07:46

25        Q    And what remedy are you seeking?                    03:07:50
```

Page 102

| | | |
|---|---|---|
| 1 | A     What do you mean by "remedy"? | 03:07:51 |
| 2 | Q     I mean, what are you asking the Court for? | 03:07:59 |
| 3 | A     I'm asking the Court to go after my property. | 03:08:03 |
| 4 | Q     Okay.  You understand you've asked the Court | 03:08:10 |
| 5 | for relief of the stay? | 03:08:20 |
| 6 | A     I understand. | 03:08:21 |
| 7 | Q     So my questions are in connection with the | 03:08:27 |
| 8 | motion that you brought seeking relief from the stay. | 03:08:29 |
| 9 | Okay? | 03:08:33 |
| 10 | A     Okay. | 03:08:37 |
| 11 | Q     And as part of that, I want to ask you about | 03:08:39 |
| 12 | what type of business UpgradeYa Investments was, its size | 03:08:44 |
| 13 | and specification so, I can have a full picture, which | 03:08:48 |
| 14 | I'm entitled to, to understand your arguments about what | 03:08:52 |
| 15 | you allege was stated in your understanding. | 03:08:57 |
| 16 | Okay?  So I'm not required to explain the | 03:08:59 |
| 17 | relevance in why I did it, but I just have.  So now I'd | 03:09:06 |
| 18 | like to move forward and get this background information, | 03:09:13 |
| 19 | which is standard in a litigation. | 03:09:14 |
| 20 | Okay? | 03:09:16 |
| 21 | A     Okay. | 03:09:17 |
| 22 | Q     So, Mr. Parrish, I've asked you a couple of | 03:09:19 |
| 23 | times -- I'll ask you one more time now that you | 03:09:28 |
| 24 | understand where I'm coming from -- at the time | 03:09:32 |
| 25 | UpgradeYa Investments made its transaction with Cred, can | 03:09:34 |

Page 103

| | | |
|---|---|---|
| 1 | you give me -- in the best terms that you can, given your | 03:09:39 |
| 2 | knowledge sitting here today -- approximately how much -- | 03:09:45 |
| 3 | how many assets under control did UpgradeYa Investments | 03:09:52 |
| 4 | have? | 03:09:56 |
| 5 | A    UpgradeYa Investments had at least 531 Bitcoins | 03:09:56 |
| 6 | that it provided collateral to Cred. | 03:10:06 |
| 7 | Q    Did it have more than that? | 03:10:08 |
| 8 | A    Did it have more than that when? | 03:10:13 |
| 9 | Q    At the time it made its transaction to Cred. | 03:10:21 |
| 10 | A    I don't know what it had at that point without | 03:10:25 |
| 11 | looking it up. | 03:10:27 |
| 12 | Q    So you don't know if UpgradeYa Investments, of | 03:10:28 |
| 13 | which you're the only person who's authorized to say | 03:10:32 |
| 14 | anything, zeroed out its bank accounts effectively to | 03:10:35 |
| 15 | send the collateral to Cred? | 03:10:39 |
| 16 | That's your testimony today? | 03:10:42 |
| 17 | A    That is perfectly fine.  Zeroed out bank | 03:10:43 |
| 18 | accounts on UpgradeYa Investments would be perfectly | 03:10:47 |
| 19 | normal.  It was created specifically for this investment. | 03:10:48 |
| 20 | Q    Is it -- | 03:10:51 |
| 21 | A    Sorry to cut you off.  Not an investment into | 03:10:55 |
| 22 | Cred, for an investment of the $2 million. | 03:10:59 |
| 23 | Q    Okay.  Is it your recollection that that is | 03:11:01 |
| 24 | what UpgradeYa Investments did; that it zeroed out its | 03:11:03 |
| 25 | assets in exchange for the $2 million line of credit, | 03:11:09 |

Page 104

| | | |
|---|---|---|
| 1 | which it pulled down from Cred? | 03:11:12 |
| 2 | A    Well, at the time UpgradeYa Investments | 03:11:15 |
| 3 | provided 531 -- or when UpgradeYa investment provided 531 | 03:11:26 |
| 4 | BTC as collateral, UpgradeYa Investments's assets would | 03:11:33 |
| 5 | not be zero, they would be 2 million. | 03:11:38 |
| 6 | Q    Did they have any investments -- assets other | 03:11:40 |
| 7 | than that $2 million, to your recollection? | 03:11:45 |
| 8 | A    At that time, I do not believe so. | 03:11:48 |
| 9 | Q    Okay.  Had UpgradeYa investment made any other | 03:11:52 |
| 10 | investments prior to the transactions with Cred? | 03:12:03 |
| 11 | A    Well, at the time we had a -- that | 03:12:05 |
| 12 | UpgradeYa Investments had a transaction with Cred, it had | 03:12:13 |
| 13 | made zero investments ever. | 03:12:15 |
| 14 | Q    So this was the first investment by | 03:12:18 |
| 15 | UpgradeYa Investments? | 03:12:25 |
| 16 | A    There was no investment with Cred.  The | 03:12:25 |
| 17 | transaction with Cred was to get capital.  That capital | 03:12:29 |
| 18 | would be -- yes that $2 million would be the first | 03:12:36 |
| 19 | investment for UpgradeYa Investments.  That is accurate. | 03:12:39 |
| 20 | Q    Had it ever done -- what I believe you referred | 03:12:42 |
| 21 | to as a collateral-backed loan -- with anyone else | 03:12:45 |
| 22 | besides Cred? | 03:12:48 |
| 23 | A    Had it before Cred?  No. | 03:12:50 |
| 24 | Q    Uh-huh.  How about with SALT? | 03:12:52 |
| 25 | A    Yes, after Cred. | 03:12:54 |

Page 105

| | | |
|---|---|---|
| 1 | Q    Had you looked at alternatives to Cred? | 03:12:56 |
| 2 | A    Yes. | 03:13:03 |
| 3 | Q    Who else did you consider? | 03:13:04 |
| 4 | A    Unchained Capital, SALT Lending. | 03:13:05 |
| 5 | Q    Anyone else? | 03:13:16 |
| 6 | A    That's all I recall. | 03:13:16 |
| 7 | Q    Why did you not do the transaction with | 03:13:18 |
| 8 | Unchained Capital? | 03:13:21 |
| 9 | A    Their rates were higher, the interest rates. | 03:13:22 |
| 10 | Q    Any other reasons? | 03:13:30 |
| 11 | A    Among other things.  It's hard to remember | 03:13:31 |
| 12 | exactly why, but there's a lot of -- it goes into that | 03:13:34 |
| 13 | process of making a decision on what you're going to do | 03:13:37 |
| 14 | in this situation.  The one that comes to mind is their | 03:13:40 |
| 15 | ability to handle privacy in multiple addresses. | 03:13:47 |
| 16 | Q    Anything else? | 03:13:51 |
| 17 | A    That's all I recall. | 03:13:52 |
| 18 | Q    Okay.  How about with SALT?  Why didn't you do | 03:13:55 |
| 19 | the transaction with SALT? | 03:14:00 |
| 20 | A    I did do a transaction with SALT. | 03:14:01 |
| 21 | Q    No.  The one that you ultimately said instead | 03:14:08 |
| 22 | -- when you did the transaction with Cred, you told me | 03:14:11 |
| 23 | you had considered doing it with Unchained and SALT? | 03:14:13 |
| 24 | A    Oh, I'm sorry.  Yeah, I was confused. | 03:14:18 |
| 25 | I chose at that time to go with Cred for | 03:14:20 |

```
 1    diversity.                                          03:14:31

 2        Q     What does that mean?                      03:14:35

 3        A     To use Cred and another company for my    03:14:35

 4    business.                                           03:14:49

 5        Q     So was there an investment with SALT at that  03:14:50

 6    time you did investment with Cred?                  03:14:53

 7        A     No.  I believe the investment with SALT was  03:14:54

 8    after, but I was making those decisions around that time.  03:14:58

 9        Q     Correct.  So I'm asking you --            03:15:01

10        A     Sorry.  I just want to correct myself.  We're  03:15:02

11    using the word "investment."  I made no investment with  03:15:06

12    Cred; I made no investment with SALT.  This is -- this is  03:15:09

13    -- yeah.                                            03:15:11

14        Q     At the time you did your transaction with Cred,  03:15:12

15    you had told me that you also considered doing a    03:15:14

16    transaction with SALT.  I would like to know why you  03:15:17

17    chose Cred over SALT.                               03:15:19

18            What was it about SALT that made you not want  03:15:21

19    to do the investment with them at the time you did the  03:15:23

20    investment with Cred?                               03:15:26

21        A     Yes.  And the primary reason there was a choice  03:15:27

22    in diversity, a choice to use two companies versus one.  03:15:33

23        Q     Well, you told me that you only did the   03:15:40

24    transaction with SALT after you did the transaction with  03:15:43

25    Cred; correct?                                      03:15:45
```

Page 107

```
 1        A      I believe SALT was after.                    03:15:46

 2        Q      So there would be nothing to diversify; right?  03:15:56

 3   You had zero investments -- you had zero transactions,    03:15:59

 4   and you chose to do a transaction with Cred.              03:16:03

 5            Am I correct about that?                         03:16:05

 6        A      The total capital I was looking for -- as can  03:16:07

 7   be seen in the emails and the dialogue with Xavier -- was  03:16:11

 8   4 million.                                                03:16:14

 9        Q      So you did a transaction with SALT.           03:16:18

10            When did you do the transaction with SALT?  Why   03:16:20

11   don't we just clear it up this way.                       03:16:23

12        A      I'd have to look that up.  It's inefficient to  03:16:25

13   be looking stuff up right now.                            03:16:34

14            I believe the transaction with SALT happened      03:16:36

15   after.  I believe Cred was first and then with SALT.      03:16:40

16        Q      How long after?                               03:16:42

17        A      It was this year and after Cred.              03:16:44

18        Q      So you can't be any more specific than sometime  03:16:53

19   this year and after Cred, this $2 million transaction?    03:16:58

20        A      The amount is not the problem.  It's the       03:17:06

21   remembering exactly when things happened.  I just have to  03:17:09

22   look it up.                                               03:17:12

23        Q      This is the hard part that I have:  If you told  03:17:12

24   me it was March 14th versus March 15th, I don't really     03:17:15

25   care that much right now.  If I have to get that specific  03:17:19
```

|    |                                                                      |          |
|----|----------------------------------------------------------------------|----------|
| 1  | right now, I'll ask.  If you tell me it was March 14th                | 03:17:22 |
| 2  | versus December 14th, I care.                                         | 03:17:25 |
| 3  | And I'm trying to -- I'm not trying to give you                       | 03:17:29 |
| 4  | a hard time, but I'm kind of bouncing back and forth                  | 03:17:32 |
| 5  | between your wanting to be very precise and me saying.                | 03:17:36 |
| 6  | "Okay.  I welcome that.  You can go look it up," and                  | 03:17:42 |
| 7  | you're saying you don't want to look it up.                           | 03:17:45 |
| 8  | If you can tell me, "Yeah, it was approximately                       | 03:17:47 |
| 9  | the same time as Cred or maybe it was within a month," we            | 03:17:49 |
| 10 | can work off of that.  If you tell me, "Oh, no.  It was               | 03:17:53 |
| 11 | totally different.  I remember doing it in the late                   | 03:17:55 |
| 12 | fall," then we can work off of that.  I'm just trying to              | 03:17:56 |
| 13 | get there.  I'm not trying to give you a hard time.                   | 03:18:00 |
| 14 | I'm just trying to understand the dates because                       | 03:18:03 |
| 15 | what I really want to know is you told me you wanted a --             | 03:18:06 |
| 16 | effectively you needed $4 million.  That sounds to me                 | 03:18:10 |
| 17 | like investment transactions that would be done at a                  | 03:18:14 |
| 18 | somewhat similar time because you would get the money at              | 03:18:17 |
| 19 | the same time, but I don't know it.  I'm just asking you.             | 03:18:20 |
| 20 | A    Yeah, I have no problem sharing this                             | 03:18:26 |
| 21 | information.  And if you wanted this information, it                   | 03:18:28 |
| 22 | could have all been provided before this for efficiency.             | 03:18:32 |
| 23 | I'm just stating these facts of when things happened in               | 03:18:36 |
| 24 | timing.                                                               | 03:18:40 |
| 25 | I'm under oath, and I don't want to misspeak                          | 03:18:40 |

Page 109

1    and then say, "Oh, this happened, then this happened          03:18:43

2    then."  That's my issue.  So I can tell you                   03:18:47

3    UpgradeYa Investments was created for investment, and the     03:18:51

4    very first one -- the only capital for that came from         03:18:57

5    Cred, and it came from SALT.  Both of those happened this     03:19:03

6    year.                                                         03:19:07

7       Q    Okay.  The transaction with SALT, did it happen       03:19:08

8    in the spring of 2020?                                        03:19:12

9       A    I believe the transaction happened in the            03:19:14

10   summer of 2020.                                               03:19:17

11      Q    Okay.                                                 03:19:18

12      A    So the agreement between SALT and the exchange        03:19:20

13   of collateral and USD between SALT happened in the            03:19:22

14   summer, I believe.                                            03:19:28

15      Q    Is that transaction still pending?  Meaning, do       03:19:30

16   you still have the money that you took from them?             03:19:35

17           Do they still have your collateral?                   03:19:37

18      A    Okay.  I didn't take it.  It was lent, and they       03:19:39

19   have my collateral.  They have my collateral, and there's     03:19:44

20   been -- yeah, I still am a customer at SALT.                   03:19:47

21      Q    Okay.  How would the terms between                    03:19:51

22   UpgradeYa Investments and SALT differ from the terms that     03:19:56

23   you agreed to under the loan and security agreement with      03:19:58

24   Cred?                                                         03:20:03

25      A    I don't know.                                         03:20:03

                                                            Page 110

| | | |
|---|---|---|
| 1 | Q    Do you recall any difference? | 03:20:07 |
| 2 | A    I have not -- I do not know the differences | 03:20:09 |
| 3 | between those agreements. | 03:20:18 |
| 4 | Q    Do you know if your interest rate was higher? | 03:20:19 |
| 5 | A    Once again, this is specific information that | 03:20:22 |
| 6 | could easily be provided.  Cred -- you should have | 03:20:30 |
| 7 | readily available -- I believe was 6 percent; and SALT, I | 03:20:37 |
| 8 | believe, was half a percent lower. | 03:20:40 |
| 9 | Q    Did you enter into an escrow agreement with | 03:20:52 |
| 10 | SALT for your collateral? | 03:20:55 |
| 11 | A    No. | 03:20:56 |
| 12 | Q    Did you enter into a trust agreement with SALT | 03:20:59 |
| 13 | for your collateral? | 03:21:02 |
| 14 | A    No. | 03:21:03 |
| 15 | Q    Did you specifically set out in any agreement | 03:21:05 |
| 16 | with SALT that your collateral should be held segregated | 03:21:07 |
| 17 | from their other assets? | 03:21:11 |
| 18 | A    There's a SALT agreement, and what that | 03:21:14 |
| 19 | agreement says I -- I don't have it memorized. | 03:21:21 |
| 20 | Q    Do you recall if you specifically made sure | 03:21:27 |
| 21 | that the collateral you were pledging to SALT would be | 03:21:29 |
| 22 | held in a segregated account from its other assets? | 03:21:34 |
| 23 | A    No.  I don't recall that. | 03:21:37 |
| 24 | Q    Sir, you said you store your wallet in cold | 03:21:40 |
| 25 | storage.  What does that mean? | 03:21:49 |

Page 111

| | | |
|---|---|---|
| 1 | A      Storing a wallet in cold storage doesn't make | 03:21:51 |
| 2 | sense, but storing digital currencies in cold storage | 03:21:56 |
| 3 | does.  It would just mean that they're stored in a | 03:22:02 |
| 4 | nonaccessible place by the internet. | 03:22:06 |
| 5 | Q      Why do you keep it there that way? | 03:22:09 |
| 6 | A      To secure it. | 03:22:17 |
| 7 | Q      Did you ever ask SALT to keep your collateral | 03:22:22 |
| 8 | in a cold storage unit? | 03:22:25 |
| 9 | A      No. | 03:22:28 |
| 10 | Q      Did you ever ask Cred to keep your collateral | 03:22:31 |
| 11 | in a cold storage unit? | 03:22:35 |
| 12 | A      No. | 03:22:37 |
| 13 | Q      Why not? | 03:22:39 |
| 14 | A      Because I understood that that was not how | 03:22:40 |
| 15 | their business worked. | 03:22:51 |
| 16 | Q      What does that mean? | 03:22:53 |
| 17 | A      They didn't offer a cold storage solution. | 03:22:54 |
| 18 | Q      What did you understand them to offer? | 03:23:00 |
| 19 | A      A solution that was stored in non-cold storage. | 03:23:03 |
| 20 | Q      Did you understand anything more when you gave | 03:23:16 |
| 21 | your collateral to them? | 03:23:18 |
| 22 | A      Yes. | 03:23:23 |
| 23 | Q      What else did you understand about how they | 03:23:24 |
| 24 | would store -- you said they weren't going to store it in | 03:23:28 |
| 25 | cold storage.  They had a different solution. | 03:23:32 |

Page 112

1          What did you understand how they would store --          03:23:34

2    they stored the collateral?          03:23:37

3        A      In a digital wallet.          03:23:38

4        Q      Did you ask them to store your collateral in          03:23:41

5    cold storage?          03:23:50

6        A      No.          03:23:50

7        Q      Do you believe cold storage to be safer than          03:23:53

8    the digital wallet?          03:23:56

9        A      In general, cold storage, when done properly,          03:23:58

10   is a better way to secure digital currency.          03:24:06

11       Q      Why didn't you ask them to do -- for them to          03:24:11

12   keep your collateral that way?          03:24:17

13       A      I didn't ask them to because I already knew          03:24:19

14   they didn't provide a service to do it.          03:24:21

15       Q      You didn't think they had the capability to do          03:24:23

16   it?          03:24:26

17       A      I'm not going to guess on what I was thinking          03:24:26

18   at the time.          03:24:34

19       Q      Well, I'm not asking you to guess what you were          03:24:34

20   thinking at the time.  I'm asking you what your          03:24:38

21   recollection of what you were thinking at the time.          03:24:39

22       A      I would assume they were capable of doing it.          03:24:40

23       Q      But you didn't ask them to do it; correct?          03:24:51

24       A      As I stated, I understood that was not a          03:24:53

25   service that they provided.          03:24:56

Page 113

| | | | |
|---|---|---|---|
| 1 | Q | You said you understood that. | 03:24:58 |
| 2 | | What was your understanding based on? | 03:25:01 |
| 3 | A | That they stored collateral in a digital | 03:25:12 |
| 4 | wallet. | | 03:25:15 |
| 5 | Q | I'm asking what was that understanding based | 03:25:15 |
| 6 | on? | | 03:25:17 |
| 7 | A | Conversations with Cred. | 03:25:17 |
| 8 | Q | Who specifically? | 03:25:20 |
| 9 | A | Xavier. | 03:25:23 |
| 10 | Q | Anyone else? | 03:25:28 |
| 11 | A | Michael. | 03:25:30 |
| 12 | Q | Anyone else? | 03:25:33 |
| 13 | A | I don't recall discussing it with anybody else. | 03:25:34 |
| 14 | Q | Were those conversations on the phone? | 03:25:39 |
| 15 | A | I recollect the conversations and the emails | 03:25:49 |
| 16 | over the course of this year is not likely to be | | 03:25:53 |
| 17 | accurate.  So what I can say is we had many conversations | | 03:26:00 |
| 18 | on the phone, and we had conversation through email, and | | 03:26:04 |
| 19 | we had conversations through Telegram. | | 03:26:07 |
| 20 | Q | So are you testifying today that you don't have | 03:26:09 |
| 21 | recollections from your communications with Xavier and | | 03:26:21 |
| 22 | Michael? | | 03:26:23 |
| 23 | A | No. | 03:26:23 |
| 24 | Q | So I'm asking, based on your recollection, what | 03:26:23 |
| 25 | do you recall them saying to you that formed the basis of | | 03:26:26 |

Page 114

```
 1   your understanding of what Cred's ability to store crypto    03:26:29

 2   was?                                                         03:26:35

 3       A    The understanding of how they stored crypto, I     03:26:35

 4   do not -- I cannot recall the exact conversations of what    03:26:46

 5   they said to help me understand that.  It was obvious.  I    03:26:49

 6   don't know the language that made it obvious.                03:26:53

 7       Q    When you say -- why would it be obvious?            03:26:55

 8       A    Because they shared that they stored collateral    03:26:59

 9   in a digital format.                                         03:27:18

10       Q    They shared with you, in fact, they move around    03:27:19

11   the collateral; correct?                                     03:27:22

12       A    They shared with me that the collateral could      03:27:23

13   move, that is correct.                                       03:27:26

14       Q    In fact, they shared with you that they            03:27:27

15   consolidate the collateral; correct?                         03:27:31

16            MR. PIERCE:  Object to form.                        03:27:33

17            THE WITNESS:  They shared with me that the          03:27:34

18   collateral could move.                                       03:27:40

19   BY MR. LUFT:                                                 03:27:41

20       Q    In fact, they shared with you it could be          03:27:41

21   consolidated; correct?                                       03:27:43

22       A    I believe there was communication that             03:27:45

23   mentioned that it could be consolidated.                     03:27:49

24       Q    So you were aware of the possibility that Cred     03:27:52

25   would consolidate your collateral with other assets it       03:27:55
```

Page 115

1    was holding; correct?                                03:27:59

2        A    I was not aware of how that could be        03:28:00

3    consolidated or what it would be consolidated with.  I   03:28:06

4    knew that it could be moved.  I knew that it could be   03:28:12

5    consolidated.                                        03:28:16

6        Q    Okay.  Sir, are you licensed --            03:28:16

7             Do you make investments for anyone other than   03:28:24

8    yourself and your father?                            03:28:27

9        A    I don't make investments for my father.     03:28:27

10       Q    Well, I'm sorry, does UpgradeYa Investments   03:28:30

11   make investments for anyone other than its two       03:28:35

12   stakeholders, you and your father?                   03:28:40

13       A    No.                                         03:28:42

14       Q    Let me go on -- let me ask you:  What is this   03:28:42

15   -- how do you earn money off of your Crypto.Holdings?   03:29:04

16   How does UpgradeYa Investments earn money off of the   03:29:10

17   Crypto.Holdings that is under its control?           03:29:15

18       A    UpgradeYa Investments is not holding any    03:29:18

19   crypto.                                              03:29:26

20       Q    It currently has no crypto?                 03:29:26

21       A    No.                                         03:29:30

22       Q    What about the crypto that was returned to it   03:29:30

23   by Cred?  Where is that?                             03:29:33

24       A    I'm sorry.  I passed that onto myself, and  03:29:35

25   you're right.  I am inaccurate there.  It is holding   03:29:41

Page 116

```
 1    52 -- 53 Bitcoins.  That is my fault there in          03:29:45

 2    misunderstanding.                                       03:29:49

 3        Q    Is that all the assets its currently holding?  03:29:50

 4        A    It holds some cash and the 53 Bitcoin that came 03:29:56

 5    back.                                                   03:29:59

 6        Q    And the cash -- okay.  You said that an        03:30:04

 7    investor told you about Cred?  That's how you came to   03:30:12

 8    learn it?  Did I hear you earlier?                      03:30:16

 9        A    An investor, yeah, there's an --               03:30:18

10    UpgradeYa Investments used the 2 million for an         03:30:26

11    investment.                                             03:30:31

12        Q    I'm sorry.  My question was unartful.  I       03:30:32

13    believe earlier today you were asked how did you come to 03:30:36

14    learn about Cred.                                       03:30:38

15            And what I wrote down in my notes was that you  03:30:40

16    were told about it by an investor; is that correct?     03:30:43

17        A    That is correct.  That's where I was going.    03:30:47

18    The 2 million was put in an investment.  That investment, 03:30:54

19    a person involved in that investment, as I was deciding  03:30:59

20    whether or not to do that investment, suggested Xavier -- 03:31:02

21    connecting with Xavier.                                 03:31:06

22        Q    Can you tell me who that person is?            03:31:07

23        A    I -- I could.  I don't know the -- as far as   03:31:10

24    the NDA and covering what that investment is, what those 03:31:20

25    lines are, I think it would be best just to share that  03:31:27
```

Page 117

```
 1   through the counsel.                                  03:31:30

 2       Q     Okay.  I don't want to run a foul on this.  Let   03:31:30

 3   me see if I work around it, and, ultimately, Matthew   03:31:34

 4   you'll come back to me with what it provides.          03:31:38

 5            Did you have to provide information to Cred    03:31:41

 6   when you made the investments, making certain          03:31:44

 7   representations about what you would use the money     03:31:47

 8   for; correct?                                          03:31:49

 9       A     Uh-huh.                                      03:31:49

10       Q     Okay.  Without telling me specifically who the  03:31:51

11   person was, can you tell me what type of investments it   03:31:53

12   was?                                                   03:31:56

13       A     Yeah, so you're correct.  There was language to   03:31:56

14   Cred to say what the funds are going to.  I don't recall   03:32:03

15   exactly what that language was.  If that can be shown,    03:32:08

16   that would be great.  Yeah, it was to a -- a company that   03:32:11

17   is also a mining company.                              03:32:23

18       Q     So another person in the Cryptospace?        03:32:26

19       A     That's correct.                              03:32:33

20       Q     Do you know if they had ever transacted with   03:32:34

21   Cred before?                                           03:32:37

22       A     It was not another person.  It's a business.   03:32:37

23   It's an investment in a business, but have they ever    03:32:43

24   transacted with Cred?  Not to my knowledge.            03:32:49

25       Q     How did they know Xavier?                    03:32:52
```

Page 118

```
 1      A    I don't know.                              03:32:54

 2      Q    Okay.  I want to touch back.               03:32:59

 3           You told me that you've given me every email  03:33:10

 4  that you have with Cred; correct?                   03:33:13

 5      A    That -- that's my intent, yes.  I've intended  03:33:15

 6  to provide everything I have.                       03:33:21

 7      Q    Okay.  Same thing with regard to Telegram   03:33:23

 8  chats?                                              03:33:30

 9      A    Telegram chats is broader.  There's a lot of  03:33:32

10  chats.  I provided anything I felt was relevant.    03:33:37

11      Q    How did you make the decision as to what was  03:33:39

12  relevant?                                           03:33:42

13      A    It was anything that had to do with Cred.   03:33:46

14      Q    Okay.  So anything -- that's what I'm asking.  03:33:49

15           You gave all of the chats you had that relate  03:33:51

16  to Cred in any way; is that fair?                   03:33:54

17      A    Yes.  That was my intent, yes.              03:33:56

18      Q    Okay.  Did you communicate electronically with  03:33:58

19  Cred or people at Cred using anything other than email or  03:34:04

20  Telegram?                                           03:34:08

21      A    No, I don't believe so.  Obviously there was  03:34:08

22  phone calls.                                        03:34:19

23      Q    Okay.  Putting aside phone calls, there's not,  03:34:20

24  like, text messages or WeChat or anything like that?  03:34:24

25      A    No.  We definitely didn't use WeChat.  I don't  03:34:28
```

Page 119

```
1   recall using any other chat.  If there are text messages,   03:34:32

2   just general text messages, I haven't -- I'm not aware of    03:34:37

3   them.                                                        03:34:40

4       Q     Okay.  Let me ask you about the phone calls,       03:34:41

5   then.  Approximately how many phone calls do you recall      03:34:46

6   having with individuals at Cred in the March/April time      03:34:49

7   frame when you were considering making the investment?       03:34:55

8       A     I don't know.                                      03:34:58

9       Q     What's your best estimate?                         03:35:01

10      A     Several.                                           03:35:02

11      Q     Do you recall any of the details of any            03:35:06

12  conversation you had with anyone at Cred during the March    03:35:13

13  and April time when you were considering making the          03:35:18

14  investment -- the transaction with Cred?  Excuse me.  I      03:35:22

15  didn't mean to say "investment."                             03:35:25

16      A     Do I recall any details?  No, I don't recall       03:35:26

17  any specific details.                                        03:35:33

18      Q     Do you recall anything being said on those         03:35:37

19  phone calls -- well, let me -- that differs from what was    03:35:39

20  said in the emails and Telegram chats that you produced      03:35:45

21  in this action?                                              03:35:49

22      A     No.                                                03:35:51

23      Q     So everything said on the phone would have been    03:35:56

24  consistent with what's reflected in those electronic         03:35:58

25  communications; correct?                                     03:36:00
```

```
 1      A      I don't recall any differences.              03:36:02

 2      Q      Terrific.  Okay.                             03:36:09

 3             When the entity that you're considering in   03:36:11

 4      suggested Cred, can you please walk me through what you  03:36:22

 5      did to diligence Cred?                              03:36:27

 6      A      Yes.  Conversations, several, as we just     03:36:28

 7      described -- emails, references as they're referenced,  03:36:39

 8      talk to Xavier, references from a company like SALT,  03:36:48

 9      which I was already talking to.  So reputation was a good  03:36:54

10      part of the diligence.                              03:37:00

11      Q      Did you look them up online?                 03:37:02

12      A      I went to their website.                     03:37:06

13      Q      Did you read through it?                     03:37:10

14      A      I'm sure I did at the time look at the website,  03:37:11

15      yes.                                                03:37:18

16      Q      So you were aware of what it said with regard  03:37:18

17      to CredBorrow at the time you made the investment?  03:37:23

18      A      I don't recall what I was aware of at that   03:37:27

19      time.  It is plausible to think that I -- that I read  03:37:35

20      that page, yes.  It's reasonable.                   03:37:38

21      Q      I'm asking:  As part of your diligence, you  03:37:41

22      said you would have gone and looked at the          03:37:44

23      website; right?                                     03:37:46

24      A      Yeah.  So part of the diligence would not be  03:37:46

25      evaluating anything much on the website.  The diligence  03:37:52
```

| | | |
|---|---|---|
| 1 | would be evaluating the agreement, and it would be | 03:37:55 |
| 2 | evaluating the conversations with the people at Cred. | 03:37:59 |
| 3 | Q    But if something on the -- okay. | 03:38:01 |
| 4 | If something on the website was incongruous | 03:38:03 |
| 5 | with what anyone at Cred was telling you, would you raise | 03:38:15 |
| 6 | that issue with them to get clarity? | 03:38:20 |
| 7 | A    If I noticed it and it bothered me, I would | 03:38:22 |
| 8 | imagine I would. | 03:38:30 |
| 9 | Q    Sir, did you read the part of the website in | 03:38:41 |
| 10 | big letters that says "What happens to my pledged | 03:38:45 |
| 11 | websites"? | 03:38:49 |
| 12 | A    I have seen it in the last week. | 03:38:49 |
| 13 | Q    Did you see it at the time? | 03:38:51 |
| 14 | A    I don't know. | 03:38:52 |
| 15 | Q    Sir, there's only, like, three paragraphs on | 03:38:57 |
| 16 | the page under CredBorrow, which is the program you | 03:39:00 |
| 17 | principally entered into; correct? | 03:39:03 |
| 18 | A    Yes. | 03:39:05 |
| 19 | Q    Would you have read those three paragraphs? | 03:39:07 |
| 20 | A    We can estimate I did, but I'm just not making | 03:39:10 |
| 21 | that assumption.  I may have; I may not have.  My due | 03:39:17 |
| 22 | diligence was focused on the agreement and conversations | 03:39:20 |
| 23 | with people.  There was not much value in the marketing | 03:39:22 |
| 24 | as far as due diligence. | 03:39:27 |
| 25 | Q    So you put no value in their marketing? | 03:39:28 |

Page 122

```
 1      A    I did not say "no value."  I said there's not      03:39:31

 2   much value.                                                 03:39:35

 3      Q    Sir, when you read "Your pledged assets are         03:39:36

 4   used to lend to and transact with a variety of customers,   03:39:42

 5   including retail borrowers and money managers with          03:39:46

 6   well-established track records," what did you understand    03:39:47

 7   that to mean?                                               03:39:49

 8      A    Can we see that wording?  Is that possible          03:39:51

 9   here?                                                       03:39:55

10      Q    Absolutely.  I'll ask --                            03:39:55

11           MR. LUFT:  Austin or Joe, Austin, do we have        03:40:02

12   that page?                                                  03:40:04

13           THE WITNESS:  I guess we could just go to the       03:40:05

14   website.                                                    03:40:06

15   BY MR. LUFT:                                                03:40:07

16      Q    Yeah, we could.  I'm happy to go either way.        03:40:07

17   You can see this is just mycred.io/borrow/ and I believe    03:40:07

18   this has been marked as Exhibit 1.  I'm not sure.           03:40:21

19      A    Yeah, I believe it's 1 as well.                     03:40:22

20      Q    So do you see the language?                         03:40:24

21      A    I do.  I do see it here.                            03:40:29

22      Q    Okay.  Do you see in big bold letters what          03:40:31

23   happens to "my pledged assets"?                             03:40:35

24      A    I do.                                               03:40:36

25      Q    And you understood pledged assets to relate to      03:40:37
```

Page 123

```
 1    the collateral that you had put forward?                  03:40:40

 2        A    I'm not sure I put much value on this -- on      03:40:42

 3    this site.  I believe it says the exact same thing on the  03:40:47

 4    Earned side.                                               03:40:50

 5        Q    Right.  Whether you do Earned or whether you     03:40:51

 6    use Borrow, what Cred was saying was "Your pledged assets  03:40:54

 7    are used to lend to and transact with a variety of         03:40:59

 8    customers, including retail borrowers and money managers   03:41:01

 9    with well-established track records"; correct?             03:41:02

10            MR. PIERCE:  Objection.                            03:41:06

11            THE WITNESS:  If we're asking if that's what       03:41:07

12    the site says, I can agree that's what the site says.      03:41:09

13    BY MR. LUFT:                                               03:41:14

14        Q    Did you ever ask anyone at Cred what that        03:41:14

15    meant?                                                     03:41:22

16        A    I don't recall what specific questions I asked    03:41:23

17    Cred through our different conversations.                  03:41:30

18        Q    So you don't recall ever asking them what this    03:41:32

19    statement meant?                                           03:41:35

20            MR. PIERCE:  Objection.                            03:41:37

21            THE WITNESS:  For clarity, I could have asked      03:41:42

22    them that.  I may not have asked them that.  I don't       03:41:44

23    recall.                                                    03:41:47

24    BY MR. LUFT:                                               03:41:47

25        Q    When you read, "Your pledged assets are used to  03:41:49
```

Page 124

```
 1    lend to and transact with a variety of customers," what    03:41:52

 2    did you understand that to mean?                            03:41:56

 3        A    That is confusing to me now, so I imagine it       03:41:57

 4    would have been confusing to me then.  What does            03:42:06

 5    "transact with a variety of customers mean"?  I don't       03:42:10

 6    know.  "Lend" makes sense, "lend" makes sense.              03:42:12

 7    "Transact," I don't understand that.                        03:42:17

 8        Q    Sure.  What does "lend" mean?                       03:42:18

 9             MR. PIERCE:  I object.  Are we asking him his       03:42:25

10    understanding --                                            03:42:27

11             MR. LUFT:  Matt, I don't need a speaking            03:42:30

12    objection.                                                  03:42:31

13    BY MR. LUFT:                                                 03:42:37

14        Q    Mr. Parrish, you can answer.  You said, "Lend      03:42:37

15    makes sense to me."  So I'm asking:  What do you -- when    03:42:41

16    you read this, what did "lend" mean when you read it?       03:42:46

17        A    What I'm reading right now?  You're asking.        03:42:48

18        Q    When you read it then, did you have a different    03:42:50

19    understanding of the word "lend" in March than you did     03:42:54

20    today?                                                       03:42:56

21             MR. PIERCE:  Objection.                            03:42:57

22             THE WITNESS:  No.  I just already stated that I    03:42:57

23    don't know if I read this back then, and I can't say that  03:43:00

24    I did or I didn't.  I can tell you what I see now in        03:43:02

25    front of me.                                                03:43:07
```

```
 1   BY MR. LUFT:                                        03:43:11

 2       Q     And what does it mean sitting here today to    03:43:11

 3   you?                                                03:43:14

 4       A     "Lend" -- "lend," I was lent or -- Cred lend me   03:43:14

 5   $2 million.                                         03:43:30

 6       Q     And here, you're saying you understood your   03:43:31

 7   pledged assets refers to the collateral that you would be   03:43:35

 8   giving over; correct?                               03:43:36

 9             MR. PIERCE:  Objection.                   03:43:39

10             THE WITNESS:  I'm not going to interpret what   03:43:41

11   this site means.                                    03:43:44

12   BY MR. LUFT:                                        03:43:46

13       Q     Mr. Parrish, are you telling me under oath that   03:43:46

14   you don't understand what's on a page that says     03:43:48

15   CredBorrow, a program you entered to and that says, "What   03:43:53

16   happens to my pledged assets"?  You didn't understand   03:43:58

17   what "pledged assets" refers to?                    03:44:01

18             MR. PIERCE:  Objection.                   03:44:04

19             THE WITNESS:  No.                         03:44:04

20   BY MR. LUFT:                                        03:44:05

21       Q     Okay.  Mr. Parrish, did you pledge any assets   03:44:05

22   to Cred?                                            03:44:09

23       A     Yes.                                      03:44:09

24       Q     What did you pledge?                       03:44:09

25       A     Collateral, Bitcoin.                       03:44:11
```

Page 126

| | | |
|---|---|---|
| 1 | Q    So your pledged assets, that collateral, are | 03:44:15 |
| 2 | used to lend to -- you told me you don't understand what | 03:44:21 |
| 3 | "transact" means -- a variety of customers? | 03:44:27 |
| 4 | MR. PIERCE:  Objection. | 03:44:31 |
| 5 | BY MR. LUFT: | 03:44:31 |
| 6 | Q    You understood that they would lend your | 03:44:31 |
| 7 | collateral to other customers; correct? | 03:44:34 |
| 8 | MR. PIERCE:  Objection. | 03:44:36 |
| 9 | THE WITNESS:  No, that is not correct. | 03:44:37 |
| 10 | BY MR. LUFT: | 03:44:39 |
| 11 | Q    How did you understand that sentence otherwise? | 03:44:40 |
| 12 | A    No.  I understand what that sentence means, but | 03:44:42 |
| 13 | you said, "I understood," meaning that I have presumed | 03:44:49 |
| 14 | you mean that I understood it then, and I do not know if | 03:44:52 |
| 15 | I read this back then as I've already stated, nor would I | 03:44:56 |
| 16 | value, as I already stated, this website versus the | 03:45:01 |
| 17 | agreement and my interactions with the people at Cred. | 03:45:04 |
| 18 | Q    No one at Cred told you that they would not | 03:45:09 |
| 19 | lend your pledged assets to other customers; correct? | 03:45:13 |
| 20 | MR. PIERCE:  Object to form. | 03:45:17 |
| 21 | THE WITNESS:  Can you ask me that again? | 03:45:18 |
| 22 | MR. LUFT:  Sure.  Can I have the Court Reporter | 03:45:29 |
| 23 | read it back. | 03:45:40 |
| 24 | (The record was read back as follows: | 03:45:40 |
| 25 | "Question:  No one at Cred told | 03:45:10 |

Page 127

| | | |
|---|---|---|
| 1 | you that they would not lend your | 03:45:11 |
| 2 | pledged assets to other | 03:45:13 |
| 3 | customers; correct?") | 03:45:16 |
| 4 | THE WITNESS:  That is correct.  No one told me | 03:45:49 |
| 5 | that they would not.  I don't believe anyone said they | 03:45:51 |
| 6 | would not. | 03:45:54 |
| 7 | BY MR. LUFT: | 03:45:54 |
| 8 | Q    And you did not specifically ask Cred not to | 03:45:57 |
| 9 | allow your pledged assets to be lent to other | 03:46:02 |
| 10 | customers; correct? | 03:46:05 |
| 11 | MR. PIERCE:  Objection. | 03:46:06 |
| 12 | THE WITNESS:  I engaged in the agreement that | 03:46:06 |
| 13 | governed what Cred could do with my collateral. | 03:46:19 |
| 14 | BY MR. LUFT: | 03:46:22 |
| 15 | Q    Sir, can you answer my question? | 03:46:22 |
| 16 | A    Yes. | 03:46:25 |
| 17 | MR. LUFT:  Okay.  Court Reporter, can I ask you | 03:46:27 |
| 18 | to read it back to him again. | 03:46:29 |
| 19 | (The record was read back as follows: | 03:46:29 |
| 20 | "Question:  And you did not | 03:45:57 |
| 21 | specifically ask Cred not to allow | 03:45:59 |
| 22 | your pledged assets to be lent to | 03:46:02 |
| 23 | other customers; correct?") | 03:46:04 |
| 24 | THE WITNESS:  I believe I already answered that | 03:46:45 |
| 25 | one, but I said no, I don't recall specifically asking | 03:46:49 |

Page 128

| | | |
|---|---|---|
| 1 | Cred to not lend to other customers. | 03:46:55 |
| 2 | BY MR. LUFT: | 03:46:58 |
| 3 |     Q    Okay.  I want to pull up what has been marked | 03:47:00 |
| 4 | as Exhibit 11, which is your text chain with Xavier, | 03:47:16 |
| 5 | which is UpgradeYa 0724 through 0725. | 03:47:31 |
| 6 |         MR. PROUTY:  I'm pulling up that document. | 03:47:43 |
| 7 | BY MR. LUFT: | 03:47:51 |
| 8 |     Q    Okay.  You looked at this document earlier | 03:47:51 |
| 9 | today; correct, Mr. Parrish? | 03:47:53 |
| 10 |     A    We did look at a Telegram chat with Xavier | 03:47:55 |
| 11 | earlier. | 03:48:05 |
| 12 |     Q    Great.  And do you see at 12:38, you write, | 03:48:06 |
| 13 | "How are funds secured, and how do you protect me in the | 03:48:19 |
| 14 | event someone looks at addresses and identifies me as the | 03:48:24 |
| 15 | owner of the digital assets?  To point" -- "to the point, | 03:48:26 |
| 16 | do you allow for multiple addresses for funding the | 03:48:31 |
| 17 | wallet and multiple sends for removing funds?" | 03:48:34 |
| 18 |         Do you see that? | 03:48:37 |
| 19 |     A    Yes. | 03:48:37 |
| 20 |     Q    And what were you referring to there? | 03:48:38 |
| 21 |     A    Privacy. | 03:48:41 |
| 22 |     Q    And, specifically, you were looking to find out | 03:48:42 |
| 23 | if you could use -- they would set up multiple wallets to | 03:48:48 |
| 24 | receive your funds and send back any funds through | 03:48:52 |
| 25 | multiple wallets; correct? | 03:48:54 |

Page 129

| | | |
|---|---|---|
| 1 | A    That's correct, privacy. | 03:48:56 |
| 2 | Q    And that was something you were concerned | 03:49:00 |
| 3 | about; correct? | 03:49:02 |
| 4 | A    Yes.  I was concerned about privacy. | 03:49:03 |
| 5 | Q    And, specifically, you talk about having these | 03:49:06 |
| 6 | addresses for funding the wallet and for sending the | 03:49:11 |
| 7 | removal of the funds; correct? | 03:49:14 |
| 8 | A    Yes.  This was -- yes. | 03:49:17 |
| 9 | Q    You did not say anything in here about | 03:49:24 |
| 10 | maintaining multiple -- the funds in multiple wallets | 03:49:28 |
| 11 | during the duration it was held at Cred; correct? | 03:49:33 |
| 12 | MR. PIERCE:  Object to form. | 03:49:36 |
| 13 | THE WITNESS:  What?  Are you asking what was | 03:49:37 |
| 14 | said here in this chat? | 03:49:48 |
| 15 | BY MR. LUFT: | 03:49:49 |
| 16 | Q    Yes. | 03:49:49 |
| 17 | A    Okay.  Yeah, so here, particularly the 12:38 | 03:49:50 |
| 18 | message is in relation to privacy. | 03:50:02 |
| 19 | Q    And, specifically, with regard to having | 03:50:04 |
| 20 | multiple addresses for the funding and the removal of the | 03:50:07 |
| 21 | fund; correct? | 03:50:10 |
| 22 | A    Yeah, to -- yes, multiple addresses for funding | 03:50:11 |
| 23 | the wallet and multiple sends for removing funds. | 03:50:15 |
| 24 | Q    And you're silent in that portion of the point | 03:50:17 |
| 25 | with regard to maintaining the funds in multiple | 03:50:24 |

Veritext Legal Solutions
866 299-5127

```
1   addresses during the duration of its time at          03:50:26

2   Cred; correct?                                        03:50:28

3           MR. PIERCE:  Objection.                       03:50:30

4           THE WITNESS:  It sounds to me we're asking -- 03:50:31

5   am I saying anything there that's not said?  I'm saying 03:50:41

6   that question -- I'm just trying to get at the truth  03:50:45

7   here.  It's just about privacy.  That's what that     03:50:50

8   question is about.                                    03:50:52

9   BY MR. LUFT:                                           03:50:53

10      Q    I know, sir, you told me the reasons about   03:50:53

11  privacy.  My question is a little different.  I would  03:50:56

12  like a confirmation that you did not say anything to   03:50:58

13  Xavier here about wanting the funds to be kept in      03:51:02

14  multiple separate wallets throughout the duration of Cred 03:51:08

15  other than at the time of funding or at the time of    03:51:14

16  removal of the funds; correct?                        03:51:17

17          MR. PIERCE:  Object to form.                  03:51:19

18          THE WITNESS:  Here on the 12:38 comment?      03:51:20

19  BY MR. LUFT:                                           03:51:23

20      Q    Yes.                                          03:51:23

21      A    I did not -- I did not say anything -- I'm    03:51:24

22  trying to remember the wording that you just said, but I 03:51:30

23  did not say anything about how they hold the funds.   03:51:33

24      Q    Okay.  And in response at 12:42, Xavier tells 03:51:41

25  you, "We can arrange multiple wallet addresses for     03:51:46
```

Page 131

| | | |
|---|---|---|
| 1 | funding/removing funds if you desire as well"; correct? | 03:51:50 |
| 2 | A    Correct. | 03:51:52 |
| 3 | Q    So he is telling you that they will create | 03:51:56 |
| 4 | multiple wallets for the funding and the removal of the | 03:51:58 |
| 5 | funds; correct? | 03:52:02 |
| 6 | A    No.  Multiple addresses. | 03:52:03 |
| 7 | Q    Okay.  Multiple wallet addresses for the | 03:52:05 |
| 8 | funding and the removal of the funding; correct? | 03:52:08 |
| 9 | A    Yes.  "We can arrange multiple wallet addresses | 03:52:11 |
| 10 | for funding/removing funds if you desire as well." | 03:52:15 |
| 11 | Q    And he also is not saying anything about | 03:52:17 |
| 12 | keeping the collateral funds in multiple wallet addresses | 03:52:23 |
| 13 | in the time between the funding and the removal of the | 03:52:31 |
| 14 | funds; correct? | 03:52:34 |
| 15 | MR. PIERCE:  Object to form. | 03:52:35 |
| 16 | THE WITNESS:  I do not see anything here | 03:52:40 |
| 17 | discussing that, that's correct. | 03:52:42 |
| 18 | BY MR. LUFT: | 03:52:43 |
| 19 | Q    And as you told me, you had no other | 03:52:46 |
| 20 | conversations -- telephone conversations with Xavier that | 03:52:48 |
| 21 | were inconsistent with what was written in | 03:52:52 |
| 22 | Exhibit 11; correct? | 03:52:55 |
| 23 | A    I do not recall any conversations.  Can you ask | 03:52:56 |
| 24 | that again?  I'm not even -- I got a little lost in that | 03:53:11 |
| 25 | language. | 03:53:14 |

Veritext Legal Solutions
866 299-5127

```
 1      Q     Sure.  I asked you earlier if you had any         03:53:14

 2   telephone conversations that you can recall in which the     03:53:17

 3   substance of those conversations with Cred were different    03:53:23

 4   than what was reflected in any of the electronic            03:53:25

 5   communications you produced, and you told me you could       03:53:28

 6   not; right?                                                 03:53:30

 7      A     That's correct.  I don't recall contradictory      03:53:31

 8   statements between Xavier -- between phone calls and         03:53:34

 9   messages.                                                   03:53:40

10      Q     Now, you told me this is about privacy right?      03:53:44

11      A     The 12:38 comment is about privacy.               03:53:47

12      Q     And privacy is important to you?                  03:53:50

13      A     Privacy is important to me.                       03:53:52

14      Q     And you made sure that to get that privacy, the   03:53:55

15   funding of the funds, was done through 30 separate wallet    03:54:02

16   addresses; correct?                                         03:54:08

17      A     Cred and I chose to fund the collateral           03:54:09

18   through 30 addresses.                                       03:54:17

19      Q     And if we look at the agreements between you      03:54:18

20   and Cred, it would reflect that; correct?                   03:54:22

21      A     Correct.                                          03:54:26

22      Q     And that would also be reflected in the           03:54:31

23   correspondence between you and Cred; right?                 03:54:34

24      A     Correct.                                          03:54:36

25      Q     Because it was important to you to make sure      03:54:37
```

Page 133

| | | |
|---|---|---|
| 1 | that your privacy was ensured; right? | 03:54:40 |
| 2 | A     It was important to set up a situation that | 03:54:43 |
| 3 | could maintain privacy to the best of my ability. | 03:54:55 |
| 4 | Q     And, accordingly, to do so, you made sure that | 03:54:58 |
| 5 | was documented -- correct? -- in the agreements with | 03:55:02 |
| 6 | Cred? | 03:55:07 |
| 7 | A     The specific language about privacy in the | 03:55:07 |
| 8 | agreement with Cred? | 03:55:17 |
| 9 | Q     The fact that -- the fact that it would be done | 03:55:18 |
| 10 | through 30 separate wallet addresses. | 03:55:21 |
| 11 | A     Correct.  We agree that that was an acceptable | 03:55:24 |
| 12 | way to -- to fund the collateral and provide the | 03:55:30 |
| 13 | collateral. | 03:55:34 |
| 14 | Q     Okay.  Now, sir, if we keep moving down, I | 03:55:35 |
| 15 | believe Mr. Evans showed you language that says, "We move | 03:55:42 |
| 16 | funds around for the purposes of our | 03:55:45 |
| 17 | operations"; correct? | 03:55:48 |
| 18 | A     Correct. | 03:55:48 |
| 19 | Q     And you said you were aware of the fact that | 03:55:52 |
| 20 | Cred moved funds -- collateral funds that it received | 03:55:55 |
| 21 | from the wallets in which they were deposited for | 03:55:59 |
| 22 | purposes of their operations? | 03:56:11 |
| 23 | A     Yes.  I was aware that funds could move. | 03:56:12 |
| 24 | Q     And you didn't object to that; correct? | 03:56:23 |
| 25 | A     To say I didn't -- there were conversations | 03:56:25 |

Page 134

```
 1    about how Cred handled the collateral.              03:56:39

 2        Q    And what were those conversations?         03:56:45

 3        A    You would have to reference all the emails and  03:56:47

 4    the chat.                                           03:56:54

 5        Q    Okay.  So just what's reflected in the emails  03:56:54

 6    and chat; correct?                                  03:56:57

 7        A    Yes, and phone conversations, potentially.  03:56:58

 8        Q    Okay.  And, ultimately, you did not object to  03:57:01

 9    Cred's right to move funds for purposes of its      03:57:06

10    operations; correct?                                03:57:13

11        A    I understood that Cred could move funds.    03:57:13

12        Q    In fact, you understood they could move your  03:57:23

13    funds; correct?  If you look at the beginning of that  03:57:26

14    line, he's specifically referencing -- Xavier is    03:57:29

15    specifically referencing your funds; right?         03:57:33

16        A    I understood Cred could move my collateral.  03:57:35

17        Q    Where did you understand they could move the  03:57:38

18    collateral to?                                      03:57:43

19        A    To another secure location.                03:57:43

20        Q    All right.  If we turn to the next page, in  03:57:47

21    fact, Xavier specifically tells you he wants you to know  03:57:57

22    this, in reference to their model, "We typically use  03:58:01

23    Bitcoin funds in storage to generate yield"; correct?  03:58:06

24        A    Correct.                                    03:58:11

25        Q    So you were aware of that at the time you    03:58:12
```

Page 135

```
 1    entered into the transaction with Cred; right?        03:58:16

 2        A    Yes.                                         03:58:18

 3        Q    And what do you understand generate yield to 03:58:19

 4    mean?                                                 03:58:23

 5        A    I understood Cred could create revenue off of 03:58:23

 6    my property.                                          03:58:34

 7        Q    How did you understand they could do that?   03:58:35

 8        A    I didn't -- I didn't, and I don't know their 03:58:37

 9    methods of their business of how they make a yield off of 03:58:45

10    secured collateral.                                   03:58:55

11        Q    Did you ask them?                            03:58:57

12        A    I did.  I do not -- I did not have enough    03:58:57

13    clarity to reproduce what they said at this moment, and 03:59:14

14    I'm not sure even if we look through all the emails,  03:59:18

15    which we've all done, that it's clear exactly what -- 03:59:22

16    what that is.                                         03:59:32

17        Q    Sir, what's your best recollection of what they 03:59:33

18    told you how they generate yield using your pledged  03:59:36

19    collateral?                                           03:59:40

20        A    Yeah, it's hard for me to recall what they said 03:59:41

21    on how they would use that.                           04:00:01

22        Q    Go ahead.  Sorry.  Please.  Finish.          04:00:07

23        A    No, not really.  Because, really, what I was 04:00:10

24    concerned about was the security of the collateral.  If 04:00:13

25    they had a creative way to make value on that collateral, 04:00:15
```

Page 136

```
1    that's fine.                                           04:00:20

2        Q      Would one way to generate a yield would be to   04:00:20

3    take your pledged collateral and to lend it to other    04:00:25

4    customers?  Would that be a way to generate yield?      04:00:28

5            MR. PIERCE:  Objection.                         04:00:33

6            THE WITNESS:  If we're saying hypothetical ways  04:00:38

7    to make yield, that would be a way.                     04:00:40

8    BY MR. LUFT:                                            04:00:41

9        Q      And that's, in fact, the way that they          04:00:41

10   specifically explained what they were going to do with  04:00:43

11   the pledged assets on their website; correct?           04:00:46

12           MR. PIERCE:  Objection.                         04:00:49

13           THE WITNESS:  What it says on their website,    04:00:49

14   which we just reviewed, does say "lend."               04:01:02

15   BY MR. LUFT:                                            04:01:07

16       Q      Other than saying they would lend and transact  04:01:07

17   -- lend the pledged asset and transact the pledged assets  04:01:10

18   with a variety of customers, did they say they would do  04:01:16

19   anything else with the pledged capital -- pledged assets?  04:01:20

20   Excuse me.                                             04:01:25

21           MR. PIERCE:  Objection.                         04:01:28

22           THE WITNESS:  I understood that they could make  04:01:30

23   a yield off the collateral.                            04:01:32

24   BY MR. LUFT:                                            04:01:35

25       Q      And when --                                    04:01:35
```

Page 137

```
 1        A     Sorry.  I don't recall specifically what ways        04:01:36

 2   they do that.                                                   04:01:40

 3        Q     Did you tell them that they were restricted          04:01:41

 4   from generating a yield with your pledged assets in any         04:01:43

 5   way?                                                            04:01:52

 6        A     What they could do with that collateral was          04:01:52

 7   governed by the agreement.                                      04:01:55

 8        Q     Okay.  Sir, did you set forth in the agreement       04:01:56

 9   that there were certain activities they could not engage        04:02:00

10   in with your pledged assets?                                    04:02:04

11             MR. PIERCE:  Object to form.                          04:02:06

12             THE WITNESS:  The agreement is the agreement.         04:02:07

13   We established it was this agreement and the CredEarned         04:02:15

14   agreement.  There was no other agreement.                      04:02:18

15   BY MR. LUFT:                                                    04:02:20

16        Q     Right.  And nowhere in that agreement did you        04:02:20

17   put in a provision that said they could not use your            04:02:22

18   pledged assets to generate a yield; correct?                    04:02:26

19             MR. PIERCE:  Objection.                               04:02:29

20             THE WITNESS:  We're both looking at the               04:02:30

21   agreement.  I didn't modify the agreement on how it was         04:02:32

22   presented from Cred.                                            04:02:36

23   BY MR. LUFT:                                                    04:02:37

24        Q     You didn't --                                        04:02:38

25        A     Correct.  If it's in there, Cred put it in           04:02:40
```

Page 138

```
 1   there.                                              04:02:43

 2       Q     Okay.  So whatever terms Cred put in, you   04:02:44

 3   accepted?                                           04:02:47

 4       A     The agreement I accepted was the agreement.  04:02:47

 5       Q     You understood you had the right to negotiate  04:02:55

 6   that agreement; correct?                            04:02:59

 7       A     Yes.                                       04:03:02

 8       Q     Okay.  I want to keep going with this.      04:03:02

 9             Just to close the loop here, sir:  Did you ever  04:03:17

10   tell anyone at Cred that they -- that there were certain  04:03:19

11   activities that they could not do with your pledged  04:03:24

12   collateral to generate a yield?                     04:03:27

13             MR. PIERCE:  Object to form.               04:03:29

14             THE WITNESS:  What Cred could do with the   04:03:29

15   collateral would be defined in the agreement.       04:03:37

16   BY MR. LUFT:                                         04:03:41

17       Q     Okay.  Sir, I'm asking:  Did you ever       04:03:41

18   specifically tell them that there were certain activities  04:03:43

19   that they may not do to generate a yield with your  04:03:47

20   pledged collateral?                                 04:03:51

21             MR. PIERCE:  Object to form.               04:03:52

22             THE WITNESS:  No.  I do not recall telling them  04:03:53

23   anything they cannot do.                            04:04:00

24   BY MR. LUFT:                                         04:04:02

25       Q     Okay.  Sir, if you look down -- actually, I  04:04:03
```

Page 139

```
 1    think we can move past this document.  Let's keep it      04:04:08

 2    moving.                                                    04:04:11

 3              (Discussion off the record.)                    04:04:29

 4              MR. PIERCE:  That's fine.  Avi, do you have a    04:04:29

 5    sense of how much longer so everyone can plan             04:04:32

 6    accordingly?                                               04:04:34

 7              THE VIDEOGRAPHER:  Do you want to go off the     04:04:36

 8    record?                                                    04:04:36

 9              THE REPORTER:  Yeah.                             04:04:36

10              THE VIDEOGRAPHER:  We are off the record at      04:04:36

11    4:04 p.m.                                                  04:04:38

12              (Break held off the record.)                    04:19:09

13              THE VIDEOGRAPHER:  We are back on the record at  04:19:09

14    4:19 p.m., eastern standard time.                         04:19:11

15    BY MR. LUFT:                                               04:19:14

16        Q    Good afternoon, Mr. Parrish.                     04:19:16

17        A    Good evening.                                     04:19:20

18        Q    I want to move on to our next topic.             04:19:21

19              Could you pull up what has been marked as        04:19:24

20    Exhibit 10, which is your supplemental declaration.       04:19:28

21        A    Let me pull that up.                             04:19:39

22        Q    Thank you.                                        04:19:40

23              MR. PROUTY:  All right.  There we go.            04:20:05

24              MR. LUFT:  Great.                                04:20:11

25    ///                                                        04:20:12
```

Page 140

```
 1   BY MR. LUFT:                                      04:20:12

 2       Q    Mr. Parrish, you testified in response to   04:20:12

 3   questions earlier today that this document was drafted by   04:20:15

 4   your counsel; correct?                           04:20:16

 5       A    Correct.                                 04:20:17

 6       Q    Did you have an opportunity to review it before   04:20:19

 7   you signed it?                                   04:20:24

 8       A    Yes.                                     04:20:25

 9       Q    And did you make any changes to what they   04:20:28

10   drafted?                                         04:20:33

11       A    I don't believe so.  There might have -- I'm   04:20:33

12   not certain.                                     04:20:47

13       Q    About how much time passed between when they   04:20:47

14   sent it to you and when you signed it?           04:20:54

15       A    I don't know.                            04:20:57

16       Q    Approximately?                           04:20:57

17       A    I don't know.                            04:20:58

18       Q    Hours?  Minutes?  What are we talking about?   04:20:59

19       A    I don't know.                            04:21:03

20       Q    What's that?                             04:21:12

21       A    I don't know.                            04:21:13

22       Q    Do you recall signing it?                04:21:14

23       A    Yes.                                     04:21:19

24       Q    It's an electronic signature.            04:21:20

25            Did you insert it, or did your counsel insert   04:21:23
```

Page 141

| | | |
|---|---|---|
| 1 | it? | 04:21:26 |
| 2 | A    Counsel. | 04:21:26 |
| 3 | Q    Did you ever sign a hard copy? | 04:21:27 |
| 4 | A    No. | 04:21:31 |
| 5 | Q    Did you specifically authorize them to sign | 04:21:33 |
| 6 | this document? | 04:21:38 |
| 7 | A    Yes. | 04:21:39 |
| 8 | Q    Okay.  I want to look at Paragraph 2 for a | 04:21:39 |
| 9 | second.  Do you see you tell the Court, "From the outset | 04:21:49 |
| 10 | of a UpgradeYa's transactions with CredBorrow, Cred | 04:22:01 |
| 11 | represented to UpgradeYa that the collateral would be | 04:22:05 |
| 12 | maintained in segregated wallets. | 04:22:07 |
| 13 | "Specifically, I was informed by Cred that once | 04:22:10 |
| 14 | the agreement was executed, Cred would establish and did | 04:22:13 |
| 15 | establish new e-wallets to hold UpgradeYa's collateral. | 04:22:17 |
| 16 | A true and correct copy of the email from Cred employee | 04:22:22 |
| 17 | Michael Zhang to Marc Parrish, dated April 10th, 2020 is | 04:22:26 |
| 18 | attached here as Exhibit 1." | 04:22:29 |
| 19 | Do you see that? | 04:22:30 |
| 20 | A    Yes. | 04:22:31 |
| 21 | Q    Okay.  Is the basis of your statements in that | 04:22:31 |
| 22 | paragraph the email set forth in Exhibit 1? | 04:22:37 |
| 23 | A    Can you bring up Exhibit 1? | 04:22:39 |
| 24 | MR. LUFT:  Sure.  Someone can bring it up. | 04:22:54 |
| 25 | MR. PROUTY:  Yeah, I'll bring it up. | 04:22:58 |

Page 142

| | | |
|---|---|---|
| 1 | THE WITNESS:  So the email here says, "Begin | 04:24:00 |
| 2 | creating new wallets for the transfers"? | 04:24:02 |
| 3 | BY MR. LUFT: | 04:24:06 |
| 4 | Q     That's the email.  My question is broader.  You | 04:24:06 |
| 5 | cite to Exhibit 1 in support of your statement in | 04:24:11 |
| 6 | Paragraph 2. | 04:24:18 |
| 7 | My question is:  Is there any other basis for | 04:24:19 |
| 8 | your statement in Paragraph 2 other than the email you | 04:24:23 |
| 9 | have attached as Exhibit 1 to your supplemental | 04:24:29 |
| 10 | declaration? | 04:24:32 |
| 11 | A     Yeah.  It just seemed like an obvious way to do | 04:24:32 |
| 12 | it, a logical way to do it.  It's trivial to keep | 04:24:36 |
| 13 | segregated addresses; easier to keep track of what's | 04:24:39 |
| 14 | what.  It's created to be a way to do it.  It makes sense | 04:24:44 |
| 15 | for both parties. | 04:24:53 |
| 16 | Q     Sorry, Mr. Parrish.  Maybe my question is not | 04:24:54 |
| 17 | clear. | 04:24:58 |
| 18 | My question is:  Is the basis of your statement | 04:24:58 |
| 19 | in -- in Paragraph 2 of your supplemental declaration the | 04:25:00 |
| 20 | document attached as Exhibit 1?  Is that the sole basis | 04:25:06 |
| 21 | for your statement? | 04:25:09 |
| 22 | A     I would say no, it's not the sole basis. | 04:25:10 |
| 23 | There's other reasons why I believed collateral would be | 04:25:18 |
| 24 | held securely in a segregated wallet. | 04:25:24 |
| 25 | Q     Can you direct me to any other document that | 04:25:27 |

Page 143

| | | |
|---|---|---|
| 1 | you're thinking of when you made your statement reflected | 04:25:31 |
| 2 | in Paragraph 2 of the declaration? | 04:25:34 |
| 3 | MR. PIERCE:  Object to form. | 04:25:37 |
| 4 | THE WITNESS:  There's several emails that | 04:25:38 |
| 5 | segregate it -- several languages -- several references | 04:25:43 |
| 6 | to the word "segregated." | 04:25:46 |
| 7 | BY MR. LUFT: | 04:25:50 |
| 8 | Q     What other emails are you referring to? | 04:25:53 |
| 9 | A     I'll have to look them up.  I don't have them | 04:25:54 |
| 10 | memorized.  I just recall Cred saying that they would | 04:26:01 |
| 11 | hold the collateral, and I was sending the collateral to | 04:26:06 |
| 12 | segregated addresses, so it was logical for me to think | 04:26:13 |
| 13 | they would be held in segregated addresses. | 04:26:18 |
| 14 | Q     So what Cred said was that you were sending | 04:26:23 |
| 15 | them to segregated wallets; correct? | 04:26:26 |
| 16 | A     Correct. | 04:26:29 |
| 17 | Q     Cred did not say that they would be maintained | 04:26:29 |
| 18 | in a segregated wallet; correct? | 04:26:33 |
| 19 | A     I don't recall Cred saying that they would or | 04:26:35 |
| 20 | would not be maintained in those wallets.  I understood | 04:26:42 |
| 21 | that the collateral could move. | 04:26:45 |
| 22 | Q     And you understood it could be consolidated in | 04:26:49 |
| 23 | another wallet; correct? | 04:26:53 |
| 24 | MR. PIERCE:  Object to form. | 04:26:54 |
| 25 | THE WITNESS:  I understood that collateral | 04:26:54 |

Veritext Legal Solutions
866 299-5127

```
 1    could move.  I understood that collateral could be        04:27:00

 2    consolidated.                                             04:27:02

 3    BY MR. LUFT:                                              04:27:04

 4        Q     Okay.  So is there any other email or document  04:27:17

 5    that you were thinking of as the basis of your statement  04:27:21

 6    in Paragraph 2?                                           04:27:26

 7        A     No.  There's nothing -- there's nothing         04:27:27

 8    specific right now that I recall.                         04:27:31

 9        Q     And there's no other telephone conversation     04:27:33

10    that you could recall that's the basis of that            04:27:35

11    statement; correct?                                       04:27:37

12              MR. PIERCE:  Object to form.                    04:27:38

13              THE WITNESS:  I've already stated I don't        04:27:39

14    recall the language in these conversations that happened  04:27:41

15    back in March.                                            04:27:43

16    BY MR. LUFT:                                              04:27:46

17        Q     Okay.  So let's take a look at Paragraph 2.     04:27:46

18    Your counsel wrote for you that "Cred represented to      04:27:49

19    UpgradeYa the accounts that the collateral would be       04:27:52

20    maintain in segregated in e-wallets.                      04:27:56

21              Specifically, I was informed by Cred that once  04:28:00

22    the agreement was executed, Cred would establish, and did 04:28:01

23    establish, new e-wallets to hold UpgradeYa's collateral." 04:28:05

24              Do you see that?                                04:28:11

25        A     Yes.                                            04:28:12
```

Page 145

1          MR. LUFT:  Let's bring up Exhibit 1, which is      04:28:13

2    the document you cite to as the basis for that statement.   04:28:15

3    Okay?  Sorry.  Has this document been marked as an          04:28:21

4    exhibit?  I apologize if it hasn't.  Why don't we --        04:28:35

5    let's make this Debtor 1.                                   04:28:41

6          (Debtor Exhibit D-1 marked.)                         04:28:56

7    BY MR. LUFT:                                                04:28:56

8     Q    Mr. Parrish, take a second to familiarize            04:28:56

9    yourself with the email.                                   04:28:59

10    A    I've read it.                                         04:29:02

11    Q    Okay.  And this is the document that your            04:29:04

12   counsel put down for you as the support; correct?          04:29:11

13          MR. PIERCE:  Object to form.  This document is      04:29:14

14   an exhibit.                                                 04:29:23

15   BY MR. LUFT:                                                04:29:24

16    Q    Did you select this document or did counsel?         04:29:24

17          MR. PIERCE:  I'm going to object and instruct       04:29:27

18   my client not to answer that question as it could          04:29:29

19   infringe on attorney/client privilege.                     04:29:33

20          MR. LUFT:  I'm just asking for a yes-or-no          04:29:36

21   answer.                                                     04:29:38

22          MR. PIERCE:  Even if it's yes or no, you're         04:29:38

23   getting into attorney/client privilege.                    04:29:40

24          MR. LUFT:  I'm not asking for any legal advice.     04:29:42

25   Okay.                                                       04:29:45

                                              Page 146

```
1    BY MR. LUFT:                                         04:29:47

2        Q    Let me just ask it this way:  Mr. Parrish, did   04:29:47

3    you choose to include this document in your declaration?   04:29:52

4        A    By approving the declaration.               04:29:53

5        Q    Was it your idea to include this specific email   04:29:58

6    in your declaration?                                 04:30:01

7             MR. PIERCE:  Again, I'm going to object on   04:30:01

8    attorney/client privilege and instruct him not to answer.   04:30:03

9             MR. LUFT:  I'm not getting into anything    04:30:06

10   privileged.  I just want to know if this was         04:30:09

11   Mr. Parrish's idea to include this document.  Don't tell   04:30:12

12   me anything counsel told you.                        04:30:12

13   BY MR. LUFT:                                         04:30:13

14       Q    I'm just asking:  Was it your idea?  Did you   04:30:14

15   suggest including this document in?                  04:30:16

16            MR. PIERCE:  And I'm going to object and     04:30:39

17   instruct my client not to answer as these are       04:30:41

18   communications that are privileged by attorney/client   04:30:45

19   privilege.                                          04:30:48

20   BY MR. LUFT:                                         04:30:48

21       Q    Mr. Parrish, please do not tell me what you've   04:30:48

22   discussed with your counsel.  I want to just know:  Did   04:30:50

23   you -- was it your idea?  Were you the genesis of the   04:30:55

24   idea to cite to this document in your declaration?  04:30:58

25            MR. PIERCE:  Again, I'm going to instruct my   04:31:03
```

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | client not to answer to attorney/client privilege | 04:31:06 |
| 2 | grounds. | 04:31:08 |
| 3 | MR. LUFT:  Okay.  I'm going to -- I don't | 04:31:09 |
| 4 | think -- this is not proper at all.  I'm not asking for | 04:31:11 |
| 5 | any advice or anything.  I'm asking if Mr. Parrish wanted | 04:31:14 |
| 6 | to use this -- was the person who came up with the idea | 04:31:18 |
| 7 | of using this document. | 04:31:21 |
| 8 | MR. PIERCE:  You're asking about attorney work | 04:31:22 |
| 9 | product and attorney/client privilege. | 04:31:24 |
| 10 | MR. LUFT:  I don't think I am. | 04:31:26 |
| 11 | BY MR. LUFT: | 04:31:26 |
| 12 | Q    Mr. Parrish, are you going to follow your | 04:31:29 |
| 13 | counsel's instruction? | 04:31:31 |
| 14 | A    Ask that again. | 04:31:32 |
| 15 | Q    I just want to know, I have to ask you this: | 04:31:34 |
| 16 | Are you going to follow your counsel's instruction not to | 04:31:39 |
| 17 | answer my question? | 04:31:42 |
| 18 | A    Yes. | 04:31:43 |
| 19 | Q    We can move ahead.  I don't think it's proper, | 04:31:44 |
| 20 | but we can go ahead. | 04:31:46 |
| 21 | Okay.  So nowhere in this email does the word | 04:31:48 |
| 22 | "maintain" appear; correct? | 04:31:55 |
| 23 | A    I do not see the word "maintain." | 04:31:58 |
| 24 | Q    In fact, nothing in this email says anything | 04:32:04 |
| 25 | about how transferred Bitcoin would be maintained going | 04:32:07 |

Page 148

```
 1    forward; correct?                                        04:32:10

 2        A     Yes.                                           04:32:11

 3        Q     "Yes," it does not say anything about how the  04:32:19

 4    Bitcoin you would transfer to collateral would be        04:32:25

 5    maintained going forward; correct?                       04:32:29

 6        A     Yes.                                           04:32:31

 7        Q     And it does not say anywhere in this email that 04:32:38

 8    the Bitcoin you were transferring as collateral would be 04:32:40

 9    maintained in segregated e-wallets; correct?             04:32:43

10        A     Yes.                                           04:32:48

11        Q     And nowhere in this exhibit does it -- does the 04:32:50

12    word "segregated" appear; correct?                       04:33:05

13        A     Yes.                                           04:33:07

14        Q     You would agree with me nowhere in this email  04:33:14

15    did Cred tell you that they would -- that your collateral 04:33:19

16    would be kept in segregated e-wallets; correct?          04:33:23

17        A     Correct.                                       04:33:26

18        Q     And nowhere in this email does it say -- after 04:33:34

19    the transfers were made to the e-wallets that the        04:33:48

20    collateral would be kept in those e-wallets; correct?    04:33:51

21        A     Correct.                                       04:33:56

22        Q     In fact, the only reference to the e-wallets is 04:34:02

23    that it would be used for the transfers; correct?        04:34:07

24        A     Yeah, it doesn't even reference e-wallets.  It 04:34:09

25    says "new wallets for the transfers."                    04:34:23
```

Page 149

```
 1      Q     Right.  So it doesn't say that the new wallets    04:34:25

 2   would be used for anything other than your transfer of     04:34:31

 3   the collateral; correct?                                   04:34:34

 4            MR. PIERCE:  Object to form.                       04:34:35

 5            THE WITNESS:  Yes.                                 04:34:36

 6   BY MR. LUFT:                                                04:34:36

 7      Q     And it doesn't say that the new e-wallets would   04:34:47

 8   hold UpgradeYa's collateral; correct?                      04:34:50

 9      A     Well, it would have to hold it.  It's being       04:34:54

10   created for the transfers.                                 04:35:08

11      Q     It doesn't say that it would hold the             04:35:09

12   collateral beyond the time of the transfers; correct?      04:35:15

13            MR. PIERCE:  Object to form.                       04:35:18

14            THE WITNESS:  It doesn't say anything about        04:35:19

15   that.                                                      04:35:19

16   BY MR. LUFT:                                                04:35:19

17      Q     It certainly doesn't say that the collateral      04:35:28

18   would be maintained in the new e-wallets; correct?         04:35:33

19      A     The word "maintained" is not on this email.       04:35:36

20      Q     And then there's nowhere that you believe has     04:35:42

21   the same meaning as "maintained" in that email; correct?   04:35:45

22            MR. PIERCE:  Object to form.                       04:35:48

23            THE WITNESS:  No.  I mean, that's not              04:35:49

24   necessarily create.  When you create wallets for the       04:35:55

25   transfers, it can certainly be maintained in that wallet   04:35:57
```

Page 150

```
 1    and those addresses.  There's nothing to say it would or    04:36:02
 2    would not be maintained there.                              04:36:06
 3    BY MR. LUFT:                                                 04:36:06
 4        Q    So nothing in this email says that the             04:36:09
 5    collateral would or would not be maintained in the          04:36:12
 6    wallets; right?                                             04:36:17
 7        A    Yes.                                                04:36:20
 8        Q    That's what you just said; is that right?          04:36:20
 9        A    Yes.                                                04:36:25
10        Q    This email certainly doesn't say that the          04:36:27
11    collateral would be maintained in segregated                04:36:30
12    e-wallets; correct?                                         04:36:34
13             MR. PIERCE:  Object to form.                       04:36:34
14             THE WITNESS:  Yes.                                  04:36:36
15    BY MR. LUFT:                                                 04:36:36
16        Q    And so you're not aware of any document where      04:36:41
17    Cred said that the collateral would be maintained in        04:36:44
18    segregated e-wallets; correct?                              04:36:48
19        A    I am not sure.  I don't know if there's            04:36:51
20    documents that specifically say "segregated e-wallets."     04:37:02
21        Q    And you're not aware of any telephone              04:37:07
22    conversation with someone at Cred where they told you       04:37:09
23    that UpgradeYa's collateral would be maintained in          04:37:12
24    segregated e-wallets; correct?                              04:37:16
25             MR. PIERCE:  Object to form.                       04:37:18
```

Page 151

| | | |
|---|---|---|
| 1 | THE WITNESS:  Yeah, I don't know. | 04:37:19 |
| 2 | BY MR. LUFT: | 04:37:19 |
| 3 | Q    When you say you don't know, you don't know of | 04:37:31 |
| 4 | any such document?  Is that what you mean? | 04:37:33 |
| 5 | A    Yeah.  What I mean there is there are | 04:37:36 |
| 6 | conversations about storage, and I don't remember all the | 04:37:39 |
| 7 | details of those conversations. | 04:37:42 |
| 8 | Q    You're not aware -- you don't recall a | 04:37:44 |
| 9 | conversation which someone from Cred told you that | 04:37:46 |
| 10 | UpgradeYa Investments's collateral would be maintained in | 04:37:50 |
| 11 | a segregated e-wallet; correct? | 04:37:53 |
| 12 | A    I believe -- look it up -- I believe there are | 04:37:56 |
| 13 | some conversations, as I already stated, but I don't have | 04:38:15 |
| 14 | it memorized, all the emails and the dialogue that | 04:38:18 |
| 15 | mentions segregated e-wallets.  Why do they say -- sorry. | 04:38:26 |
| 16 | I didn't mean to talk over you.  Why do they say | 04:38:31 |
| 17 | maintained?  I don't know. | 04:38:34 |
| 18 | Q    So you have no recollection of, sitting here | 04:38:36 |
| 19 | today, anyone from Cred saying that UpgradeYa's | 04:38:41 |
| 20 | collateral would be maintained in a segregated | 04:38:45 |
| 21 | e-wallet; correct? | 04:38:48 |
| 22 | A    Yes. | 04:38:49 |
| 23 | Q    Can you turn to Paragraph 4 of your | 04:38:54 |
| 24 | declaration.  We could actually go to Paragraph 7.  So | 04:39:11 |
| 25 | bring that up of Exhibit 10. | 04:39:32 |

Page 152

| | | |
|---|---|---|
| 1 | MR. PROUTY:  It should be there, Avi. | 04:39:46 |
| 2 | MR. LUFT:  Yep. | 04:39:49 |
| 3 | MR. PIERCE:  Right now, we still have the | 04:40:08 |
| 4 | exhibit to the declaration up. | 04:40:10 |
| 5 | BY MR. LUFT: | 04:40:10 |
| 6 | Q    In the mean time, Mr. Parrish, let me ask you | 04:40:15 |
| 7 | another question. | 04:40:18 |
| 8 | MR. PROUTY:  Paragraph 7, it should be there | 04:40:26 |
| 9 | now. | 04:40:28 |
| 10 | MR. LUFT:  Great.  Okay. | 04:40:28 |
| 11 | BY MR. LUFT: | 04:40:31 |
| 12 | Q    Do you see it says, "Given the volatility of | 04:40:35 |
| 13 | the price of Bitcoin and the debtors' misappropriation of | 04:40:38 |
| 14 | UpgradeYa's collateral, I believe it is imperative that | 04:40:41 |
| 15 | UpgradeYa immediately be granted relief from the | 04:40:45 |
| 16 | automatic stay to pursue the recovery of its Bitcoin | 04:40:49 |
| 17 | and/or the value thereof from the third parties and/or | 04:40:52 |
| 18 | any applicable insurance proceeds." | 04:40:56 |
| 19 | Do you see that? | 04:40:58 |
| 20 | A    Yes. | 04:41:00 |
| 21 | Q    When you say that you wanted to "pursue the | 04:41:00 |
| 22 | recovery of its Bitcoin and/or the value thereof," what | 04:41:03 |
| 23 | do you mean? | 04:41:07 |
| 24 | A    Bitcoin has a value.  It would be denominated | 04:41:07 |
| 25 | in any other asset, but the most common would be USD. | 04:41:21 |

Page 153

```
 1      Q      So you're saying you want to pursue the         04:41:25
 2   recovery of the money equivalent of the Bitcoin?          04:41:27
 3             MR. PIERCE:  Object to form.                     04:41:30
 4             THE WITNESS:  In that statement, Bitcoin and/or  04:41:32
 5   the value thereof would be the value of Bitcoin, yeah.    04:41:39
 6   BY MR. LUFT:                                               04:41:43
 7      Q      So it could be either the Bitcoin or the dollar 04:41:47
 8   value of your claim.                                       04:41:50
 9             That's what you're seeking; correct?            04:41:52
10             MR. PIERCE:  Object to form.                     04:41:56
11             THE WITNESS:  Yes.  It could be seeking my       04:41:57
12   property or something -- or something of equal value.     04:42:03
13   BY MR. LUFT:                                               04:42:08
14      Q      Okay.  And you say "from third parties," who    04:42:08
15   are you referring to there?                                04:42:11
16      A      Anyone that's not Cred.                          04:42:12
17      Q      Do you have anyone in mind that you're going to 04:42:22
18   go after?                                                  04:42:26
19      A      Fireblock would be a potential.  I sent the two 04:42:26
20   addresses in Fireblock.                                    04:42:40
21      Q      You're going to go after Fireblock because you  04:42:44
22   believe they have your Bitcoin or you believe you have a  04:42:48
23   claim against them for the value of your Bitcoin?         04:42:51
24             MR. PIERCE:  Object to form.                     04:42:54
25             THE WITNESS:  I don't know what Fireblock has,   04:42:55
```

Page 154

| | | |
|---|---|---|
| 1 | what I'd pursue. | 04:43:08 |
| 2 | BY MR. LUFT: | 04:43:12 |
| 3 | Q    And you told me Bitcoin is fungible; correct? | 04:43:12 |
| 4 | A    Yes. | 04:43:17 |
| 5 | Q    Is there any difference between your Bitcoin | 04:43:17 |
| 6 | and anyone else's Bitcoin? | 04:43:20 |
| 7 | A    No. | 04:43:21 |
| 8 | Q    And if someone was to give you -- if someone | 04:43:32 |
| 9 | was to give you back an equivalent amount of Bitcoin that | 04:43:34 |
| 10 | was not specifically the Bitcoin you handed over as | 04:43:39 |
| 11 | collateral, it would make no difference to you; correct? | 04:43:41 |
| 12 | A    Yes. | 04:43:44 |
| 13 | Q    "Yes," it would make no difference? | 04:43:53 |
| 14 | A    Yes. | 04:43:55 |
| 15 | Q    And then you say "or any applicable insurance | 04:44:01 |
| 16 | proceeds." | 04:44:08 |
| 17 | What do you mean by that? | 04:44:08 |
| 18 | A    If Cred has insurance and insurance may cover | 04:44:09 |
| 19 | some value or all value of the Bitcoin. | 04:44:20 |
| 20 | Q    So you're referring to going after Cred's | 04:44:25 |
| 21 | insurance policies; correct? | 04:44:28 |
| 22 | A    That's my understanding. | 04:44:30 |
| 23 | MR. PIERCE:  Object to form. | 04:44:33 |
| 24 | BY MR. LUFT: | 04:44:35 |
| 25 | Q    So you're not seeking to make a claim to your | 04:44:35 |

Page 155

| | | | |
|---|---|---|---|
| 1 | | insurer for the loss; correct? | 04:44:39 |
| 2 | A | Correct. | 04:44:41 |
| 3 | Q | Was your collateral insured? | 04:44:44 |
| 4 | A | No. | 04:44:47 |
| 5 | Q | Let's move on. | 04:44:52 |
| 6 | | If the stay is lifted, as you requested from | 04:45:08 |
| 7 | | the Court, what actions do you plan to take? | 04:45:12 |
| 8 | A | I believe that's stated in the motion. | 04:45:14 |
| 9 | Q | Well, I'm asking you. | 04:45:26 |
| 10 | A | Recover my Bitcoin. | 04:45:29 |
| 11 | Q | Or the value thereof; correct? | 04:45:35 |
| 12 | A | Correct. | 04:45:37 |
| 13 | Q | And if you recover the value of the Bitcoin, | 04:45:41 |
| 14 | | are you going to return it to the estate for the -- for | 04:45:43 |
| 15 | | the benefit of the estate and its creditors? | 04:45:56 |
| 16 | | MR. PIERCE:  Objection. | 04:46:00 |
| 17 | | THE WITNESS:  The purpose is to recover my | 04:46:02 |
| 18 | | property. | 04:46:07 |
| 19 | | BY MR. LUFT: | 04:46:08 |
| 20 | Q | So if I understand correctly, if the Court | 04:46:10 |
| 21 | | lifts the stay, you will seek either to get Bitcoin or | 04:46:13 |
| 22 | | U.S. dollars equal to the amount of what you believe | 04:46:20 |
| 23 | | you've lost; correct? | 04:46:22 |
| 24 | A | Correct. | 04:46:24 |
| 25 | Q | It's not to recover the specific Bitcoin that | 04:46:31 |

Page 156

| | | |
|---|---|---|
| 1 | was given over by you to Cred when you made the | 04:46:33 |
| 2 | transfer; correct? | 04:46:38 |
| 3 | A    Bitcoin is fungible.  It's irrelevant to need a | 04:46:38 |
| 4 | specific Bitcoin. | 04:46:51 |
| 5 | Q    So that's not what you're looking -- you're not | 04:46:51 |
| 6 | asking for relief of the stay to go find your specific | 04:46:55 |
| 7 | Bitcoin; correct? | 04:46:58 |
| 8 | A    That is correct. | 04:46:59 |
| 9 | Q    And if you were able to obtain the value of the | 04:47:08 |
| 10 | Bitcoin in either Bitcoin or U.S. dollar currency, it is | 04:47:11 |
| 11 | your intention to hold onto that entire amount for | 04:47:15 |
| 12 | yourself, not to return it to the estate for the benefit | 04:47:18 |
| 13 | of all similar situated creditors; correct? | 04:47:20 |
| 14 | MR. PIERCE:  Objection. | 04:47:26 |
| 15 | THE WITNESS:  It is my property.  I'd be | 04:47:27 |
| 16 | intending to keep my property. | 04:47:29 |
| 17 | BY MR. LUFT: | 04:47:33 |
| 18 | Q    And by your property, you mean the claim you | 04:47:33 |
| 19 | have for that amount of Bitcoin or U.S. dollars; correct? | 04:47:35 |
| 20 | MR. PIERCE:  Objection. | 04:47:39 |
| 21 | THE WITNESS:  By "property," I'm referring to | 04:47:46 |
| 22 | the collateral that I provided to secure a loan. | 04:47:48 |
| 23 | BY MR. LUFT: | 04:47:48 |
| 24 | Q    Well, you told me you're not looking for the | 04:47:48 |
| 25 | specific pieces of Bitcoin; you're just looking for any | 04:47:51 |

Page 157

```
 1    Bitcoin or U.S. dollars in equal amount; correct?      04:47:53

 2        A    Correct.                                      04:47:57

 3        Q    Okay.  Let me ask you:  Mr. Evans showed you  04:48:00

 4    some -- showed you some Blockchain.com, a couple of    04:48:18

 5    screens.                                               04:48:25

 6             Do you recall that?                           04:48:25

 7        A    Yes.                                          04:48:26

 8        Q    And you're familiar with Blockchain.com?     04:48:27

 9        A    Yes.                                          04:48:30

10        Q    Okay.  And I believe when you looked at this  04:48:34

11    with Mr. Evans -- look, if you want to see any of these 04:48:42

12    documents, I'm happy to put them up, but in the interest 04:48:45

13    of time, I'm going to try to do it in summary fashion.  04:48:48

14    But if you need it, just let me know.                  04:48:52

15             Okay?                                         04:48:53

16        A    Okay.                                         04:48:54

17        Q    I believe Mr. Evans showed you the balances and 04:48:54

18    some of the wallet addresses that you transferred Bitcoin 04:48:58

19    to; correct?                                           04:49:01

20        A    Yes.                                          04:49:03

21        Q    And you agree that you could see that those   04:49:05

22    wallet addresses had zero balances; correct?           04:49:10

23        A    Yes.                                          04:49:14

24        Q    And given the way Blockchain works, that was  04:49:15

25    visible to you at all times from the time you've made  04:49:21
```

Page 158

| | | |
|---|---|---|
| 1 | your initial transfer of Bitcoin into the | 04:49:26 |
| 2 | wallet; correct? | 04:49:28 |
| 3 | A    Those addresses were visible. | 04:49:29 |
| 4 | Q    And the balance within them was visible? | 04:49:35 |
| 5 | A    Correct. | 04:49:39 |
| 6 | Q    So at any point, you could have known whether | 04:49:40 |
| 7 | your Bitcoin was or was not still kept in your | 04:49:43 |
| 8 | wallet; correct? | 04:49:47 |
| 9 | A    Yes. | 04:49:47 |
| 10 | Q    And, in fact, if you would have looked at those | 04:49:52 |
| 11 | wallets -- as you now have done subsequently -- it would | 04:49:55 |
| 12 | show the Bitcoin was taken out and put into a larger | 04:49:59 |
| 13 | consolidated wallet within three or four days of that | 04:50:02 |
| 14 | initial transfer; correct? | 04:50:06 |
| 15 | MR. PIERCE:  Object to form. | 04:50:08 |
| 16 | THE WITNESS:  I understood the Bitcoin could | 04:50:10 |
| 17 | move. | 04:50:13 |
| 18 | BY MR. LUFT: | 04:50:13 |
| 19 | Q    I understand, but you need to answer my | 04:50:15 |
| 20 | question. | 04:50:17 |
| 21 | If you had looked at those addresses on | 04:50:21 |
| 22 | publicly available information, such as Bitcoin.com -- | 04:50:26 |
| 23 | excuse me -- Blockchain.com within three or four days | 04:50:30 |
| 24 | within making your initial transfer of the Bitcoin to | 04:50:33 |
| 25 | those wallets, you could have seen that, in fact, your | 04:50:36 |

Page 159

```
 1   collateral was no longer being held within those        04:50:40

 2   wallets; correct?                                        04:50:43

 3        A     If you're saying that that was the timing of  04:50:44

 4   those movements, then that is correct, if you can view   04:50:46

 5   those addresses and know that.                           04:50:51

 6        Q     In fact, you could see the new address that   04:50:52

 7   they were moved into; correct?                           04:50:55

 8        A     Yes.  You can view the new addresses.         04:50:56

 9        Q     And in doing so, you would have seen that the 04:51:02

10   Bitcoin that was put in the 30 individual new wallets    04:51:06

11   that you transferred into had, in fact, been commingled  04:51:10

12   with other Bitcoin; correct?                             04:51:14

13             MR. PIERCE:  Object to form.                   04:51:15

14             THE WITNESS:  Yes.  You could see that.        04:51:16

15   BY MR. LUFT:                                             04:51:22

16        Q     And once it's commingled, there would be no way 04:51:24

17   to know which was your specific piece of Bitcoin versus  04:51:27

18   someone else's Bitcoin that was in that wallet; correct? 04:51:31

19        A     I do not know if it is possible, no.          04:51:34

20        Q     You're not aware of any other way to do       04:51:41

21   that; correct?                                           04:51:44

22        A     I understand that if it is possible, it would 04:51:44

23   be difficult.                                            04:51:49

24        Q     Are you aware of any way to do that?          04:51:49

25        A     No.                                           04:51:52
```

Page 160

```
 1        Q     Sir, prior to the -- to bringing this motion to    04:52:04

 2   lift the stay, did you ever go check what the status of       04:52:22

 3   the Bitcoin was in the -- in your wallets that you            04:52:26

 4   transferred it into?                                          04:52:30

 5        A     No, I did not.                                     04:52:31

 6        Q     Why not?                                           04:52:37

 7        A     Because, as I stated, I understood that Bitcoin    04:52:37

 8   could move.                                                   04:52:41

 9        Q     So you didn't expect to see the money kept in      04:52:42

10   those wallets going forward; correct?                         04:52:45

11        A     It could have stayed there, or it could have       04:52:47

12   moved.  I understood it could have moved.                     04:52:55

13        Q     It wasn't your expectation that it would have      04:52:57

14   been kept there; correct?                                     04:53:00

15             MR. PIERCE:  Object to form.                        04:53:01

16             THE WITNESS:  I'm not going to speculate on         04:53:04

17   what I expected or state what I expected, but I               04:53:06

18   understood it could move.                                     04:53:08

19   BY MR. LUFT:                                                  04:53:09

20        Q     So you had no expectation that it would be kept    04:53:13

21   in that wallet -- correct? -- because you knew it could       04:53:15

22   move?                                                         04:53:21

23        A     I understood it could move, yes.                   04:53:23

24        Q     Okay.  Sir, could you pull out what has been       04:53:25

25   marked as Exhibit 2, which is confusingly Exhibit A to        04:53:36
```

Page 161

```
 1    your declaration, the loan and security agreement.        04:53:42

 2            MR. PROUTY:  Let me pull it up for everybody.     04:53:52

 3    Okay.  Should be there.                                   04:54:02

 4    BY MR. LUFT:                                              04:54:08

 5       Q    Mr. Parrish, you looked at this document         04:54:08

 6    earlier today with Mr. Evans?                             04:54:10

 7       A    Yes.                                              04:54:12

 8       Q    I believe you confirmed this is the signed       04:54:12

 9    version of the agreement; correct?                        04:54:14

10       A    Okay.  Yeah, this is the same one.               04:54:18

11       Q    This is the one that's marked as Exhibit 1 to    04:54:22

12    your declaration.                                         04:54:28

13            Did you attach your signed agreement to your     04:54:28

14    declaration?                                              04:54:31

15       A    Yes, yes.                                         04:54:31

16       Q    Okay.  And, sir, when you made references to     04:54:41

17    the agreement today, is this the agreement you were       04:54:46

18    referring to?                                             04:54:49

19       A    In regards to CredBorrow, this is the            04:54:53

20    agreement.                                                04:54:55

21       Q    Okay.  Now, if we turn to Section 2 -- let me    04:54:55

22    ask you from the outset, so we're clear:  We're looking   04:55:11

23    at the document; your testimony was you did not make any  04:55:15

24    changes to this agreement; correct?                       04:55:18

25       A    Correct.  I do not recall making any changes to  04:55:22
```

Page 162

```
 1    the agreement.                                         04:55:26

 2        Q      You were fine with everything that was in here   04:55:26

 3    and accepted it all; correct?                         04:55:28

 4        A      I agreed to this document.                 04:55:30

 5        Q      You understood you could have gotten legal 04:55:35

 6    counsel to help you review the document?              04:55:38

 7        A      Yes.                                       04:55:40

 8        Q      Did you consider getting legal counsel to help  04:55:43

 9    you with the document?                                04:55:47

10        A      Yes.                                       04:55:47

11        Q      Why did you choose not to get legal counsel?    04:55:48

12        A      Because the document looked clear to me that it 04:55:54

13    was collateral securing a loan, trending credit security 04:55:59

14    interest in the collateral.                           04:56:07

15        Q      What law school did you go to?             04:56:09

16        A      I did not go to law school.                04:56:15

17        Q      Okay.  Sorry.  So when you said it was clear to 04:56:16

18    you, what was the legal basis for your understanding of  04:56:25

19    the terms of the contract?                            04:56:28

20               Did you get a legal opinion?               04:56:32

21        A      No.  I just read it.                       04:56:33

22        Q      Okay.  Did you read every term?            04:56:34

23        A      I read through the document.  I'm not going to  04:56:38

24    -- I can't say what I did or did not read at the time 04:56:46

25    when I -- at that time I read the document.           04:56:50
```

Page 163

| | | |
|---|---|---|
| 1 | Q    Okay.  If you look at Paragraph 2, I believe | 04:56:54 |
| 2 | this was 2.1 is, what Mr. Evans showed you, with regard | 04:56:58 |
| 3 | to the security. | 04:57:03 |
| 4 | Do you see that under "Collateral"? | 04:57:07 |
| 5 | A    Yes. | 04:57:10 |
| 6 | Q    And I think you agreed with Mr. Evans earlier | 04:57:10 |
| 7 | -- let's just be clear:  Nothing in this provision | 04:57:13 |
| 8 | provides for the segregation of the collateral from other | 04:57:17 |
| 9 | Cred assets; correct? | 04:57:21 |
| 10 | A    Correct. | 04:57:23 |
| 11 | Q    Nothing in this section prevents the | 04:57:24 |
| 12 | commingling of the assets with other Cred | 04:57:28 |
| 13 | assets; correct? | 04:57:33 |
| 14 | A    Correct. | 04:57:33 |
| 15 | Q    And if I turn to Section 2.3, "Borrower | 04:57:34 |
| 16 | Covenants" -- actually, before I do that -- do that, sir, | 04:57:44 |
| 17 | you would agree with me that nothing in this agreement -- | 04:57:48 |
| 18 | whether it's in Section 2.1 or anywhere else -- provides | 04:57:50 |
| 19 | for the segregation of the collateral from other Cred | 04:57:54 |
| 20 | assets; correct? | 04:57:57 |
| 21 | MR. PIERCE:  Object to form. | 04:57:58 |
| 22 | THE WITNESS:  Correct. | 04:57:59 |
| 23 | BY MR. LUFT: | 04:58:05 |
| 24 | Q    And nothing in this agreement provides that | 04:58:06 |
| 25 | Cred may not commingle the collateral with any of its | 04:58:10 |

Page 164

1   assets; correct?                                        04:58:15

2            MR. PIERCE:  Object to form.                    04:58:17

3            THE WITNESS:  Yes.                              04:58:18

4   BY MR. LUFT:                                             04:58:22

5       Q    And I believe you told me earlier that nothing  04:58:22

6   in this agreement restricts what Cred may do with the   04:58:24

7   collateral to earn a yield; correct?                    04:58:28

8            MR. PIERCE:  Object to form.                    04:58:30

9            THE WITNESS:  I'm not aware because you just    04:58:36

10  stated, and I'm not interpreting this agreement on       04:58:39

11  whether or not what Cred could do.                       04:58:42

12  BY MR. LUFT:                                             04:58:46

13      Q    But you're not aware of -- when you signed it,  04:58:47

14  you were not aware of any provision that prohibited Cred 04:58:49

15  from using the collateral to earn a yield; correct?     04:58:54

16           MR. PIERCE:  Object to form.                    04:58:57

17           THE WITNESS:  I understood Cred could create a  04:58:58

18  yield on the collateral.                                04:59:03

19  BY MR. LUFT:                                             04:59:03

20      Q    And you weren't aware of any restriction on how 04:59:04

21  it could create such a yield set forth in this          04:59:06

22  agreement; correct?                                     04:59:09

23           MR. PIERCE:  Object to form.                    04:59:10

24           THE WITNESS:  Yeah, I understood that they     04:59:11

25  would have to secure the collateral.  That was my main  04:59:16

Page 165

```
 1    focus.                                            04:59:20

 2    BY MR. LUFT:                                       04:59:21

 3        Q    Can you answer my question?              04:59:22

 4             Were you aware of anything in this agreement   04:59:24

 5    that set forth -- that limited Cred's ability to use the   04:59:31

 6    collateral to earn a yield?                       04:59:35

 7             MR. PIERCE:  Object to form.             04:59:37

 8             THE WITNESS:  I attempted to answer the first   04:59:38

 9    time.  Being that they're granted the security interest,   04:59:42

10    I'm not certain whether that would limit their ability.   04:59:46

11    BY MR. LUFT:                                       04:59:48

12        Q    And you didn't tell Cred that you wanted any   04:59:52

13    special provision in this agreement, limiting it's   04:59:57

14    ability to earn a yield -- how it could earn a    05:00:00

15    yield; correct?                                   05:00:02

16        A    No.  You are correct.  There was no additional   05:00:03

17    --                                                05:00:09

18        Q    And you were aware that it was their intention   05:00:09

19    to use the collateral to earn a yield; correct?  05:00:12

20             MR. PIERCE:  Object to form.             05:00:17

21             THE WITNESS:  Yeah, as I stated, I was aware   05:00:20

22    Cred could earn a yield on the collateral.        05:00:23

23    BY MR. LUFT:                                       05:00:25

24        Q    That was their business model; correct?  That's   05:00:26

25    what Mr. Xavier told you?                          05:00:28
```

                                                       Page 166

```
 1        A     Yes.  What Xavier said is, "We could look that    05:00:29

 2   up."  I understood based on my communications with Cred      05:00:37

 3   that they could earn a yield.                                05:00:43

 4        Q     Okay.  Could we turn to Section 2.3, "Borrower     05:00:44

 5   Covenants."                                                  05:00:50

 6              Nowhere in this agreement are there any lender    05:00:51

 7   covenants, are there?                                        05:00:54

 8        A     You're saying there's not.  I don't have the      05:01:00

 9   document memorized, and we're not looking through the        05:01:03

10   entire thing.                                                05:01:06

11        Q     You're welcome to look through anything you       05:01:07

12   want, and this is a document, I'll note, that was            05:01:09

13   attached to your declaration.                                05:01:09

14              You're not aware of any lender covenants, are     05:01:13

15   you?                                                         05:01:17

16        A     No, no.  I don't have the document memorized,     05:01:17

17   and so if lender covenants is in there, I'm not sure.        05:01:23

18   I'm not looking through the entire document right now.       05:01:29

19        Q     When you signed the agreement, you didn't         05:01:32

20   insist upon there being a lender covenant; correct?          05:01:37

21        A     I didn't insist on anything additional to this    05:01:42

22   agreement.                                                   05:01:45

23        Q     Okay.  If we looked at Section 4 of the           05:01:45

24   conditions -- again, I welcome you to look at any part.      05:01:49

25   We'll move it around if you want to -- there are no          05:01:56
```

Page 167

| | | |
|---|---|---|
| 1 | conditions put on the lender under this | 05:01:59 |
| 2 | provision; correct? | 05:02:01 |
| 3 | A    You're getting into the legal language in this | 05:02:10 |
| 4 | document -- interpretation of this document.  I don't | 05:02:13 |
| 5 | know.  And any limitations on the lender?  Is that the | 05:02:21 |
| 6 | question? | 05:02:23 |
| 7 | Q    Any conditions.  There's a section called | 05:02:24 |
| 8 | "Conditions." | 05:02:26 |
| 9 | A    Okay. | 05:02:27 |
| 10 | Q    Do you see that?  Section 4? | 05:02:27 |
| 11 | A    Yes. | 05:02:29 |
| 12 | Q    And none of those conditions apply to the | 05:02:30 |
| 13 | lender; correct? | 05:02:32 |
| 14 | A    Once again, I'm not a lawyer.  I don't know all | 05:02:40 |
| 15 | the language here.  I don't know if there's any | 05:02:47 |
| 16 | conditions in this document that apply to the lender. | 05:02:50 |
| 17 | Q    You had the opportunity to get legal | 05:02:53 |
| 18 | counsel; correct? | 05:02:55 |
| 19 | A    I had the opportunity when I signed it? | 05:02:56 |
| 20 | Q    Yeah. | 05:03:05 |
| 21 | A    Yes. | 05:03:06 |
| 22 | Q    And you chose not to; correct? | 05:03:07 |
| 23 | A    Yes. | 05:03:08 |
| 24 | Q    Okay.  If we look under "Representations and | 05:03:09 |
| 25 | Warranties," 5, at the time you signed the document, were | 05:03:13 |

Page 168

1   you aware of any reps and warranties that the lender was        05:03:17

2   making in this agreement -- that the lender was making          05:03:20

3   under this agreement?                                           05:03:28

4       A    What does representation of warranties mean?          05:03:29

5       Q    I'm referring to Section 5 of the agreement you       05:03:33

6   signed, which says "Representations and Warranties."            05:03:37

7       A    I do see that.  I just don't know what that           05:03:41

8   refers to.                                                      05:03:43

9       Q    Okay.  Same thing with regard to covenants.           05:03:44

10           Is that fair you're not aware of any covenants         05:03:54

11  that the lender undertook?                                      05:03:57

12      A    Whatever this document says is what would apply        05:03:59

13  to the lender.                                                  05:04:07

14      Q    If we look to 6.8, do you see if the borrower         05:04:08

15  agrees for insurance, to maintain insurance, as is usual       05:04:20

16  for the business it is in?                                      05:04:23

17           Do you see that?                                       05:04:26

18      A    Yes.                                                   05:04:26

19      Q    You told us earlier that you did not have            05:04:27

20  insurance for your investment; correct?                         05:04:30

21           MR. PIERCE:  Object to the form.                       05:04:33

22           THE WITNESS:  I did not make an investment.           05:04:35

23  BY MR. LUFT:                                                    05:04:39

24      Q    For the transaction?  For the collateral you         05:04:39

25  pledged?                                                        05:04:41

Page 169

1      A      Correct.  UpgradeYa Investments did not have          05:04:42

2   insurance on my property being held at Cred.                    05:04:46

3      Q      If UpgradeYa Investments had lost the                05:04:49

4   $2 million that Cred had given them, did you have              05:04:53

5   insurance backing that up?                                     05:04:56

6      A      No.  I had collateral backing that up.               05:04:57

7      Q      Now, this agreement indicates that you were to       05:05:02

8   maintain insurance as well; correct?                           05:05:05

9      A      Insurance for what?                                  05:05:07

10      Q      We can move past it.  It says what it says.         05:05:14

11      A      I'm just trying to understand.  Insurance for       05:05:18

12   the 2 million USD?                                            05:05:22

13      Q      Well, I asked you; you're telling me you didn't     05:05:23

14   have insurance for the collateral.  You told me you           05:05:26

15   didn't have insurance for the 2 million; right?               05:05:29

16      A      Yeah, and I'm sorry.  I didn't mean to talk         05:05:31

17   over you.  I meant maintain insurance as is usual for the     05:05:40

18   business it is in, you certainly wouldn't obtain             05:05:43

19   insurance for a $2 million loan that is collaterally          05:05:46

20   backed and secured by the collateral.                         05:05:49

21          That is the insurance for the lender, and the          05:05:52

22   insurance for the collateral I would say is probably not      05:05:59

23   usual.  It's not usual for someone who put collateral as      05:06:02

24   their property to get insurance.  At least if it is, I'm      05:06:08

25   not aware of it.                                              05:06:12

                                                    Page 170

```
 1      Q      And if we turn to 6.4, "Maintaining Sufficient   05:06:24

 2   Collateral."  Sorry.  6.14.  I misspoke.                    05:06:29

 3             What did you understand this provision to         05:06:43

 4   relate to?                                                  05:06:46

 5      A      I'd have to read it right now and interpret       05:06:46

 6   what it says.  I don't have this memorized.                 05:06:49

 7      Q      Do you recall that you requested back some of     05:07:00

 8   your collateral because you believed you had exceeded the   05:07:03

 9   sufficient collateral requirements under the agreement?     05:07:06

10      A      It wasn't a belief.  It was a fact.  I had        05:07:07

11   exceeded or updated the value required to secure the        05:07:10

12   loan.                                                       05:07:17

13      Q      You understood Cred was not obligated to return   05:07:17

14   that money to you -- correct? -- at that time?              05:07:19

15             MR. PIERCE:  Object to form.                      05:07:23

16             THE WITNESS:  I didn't -- I don't know if Cred    05:07:24

17   was obligated.                                              05:07:30

18   BY MR. LUFT:                                                05:07:30

19      Q      Sir, can you point me to anything in the          05:07:31

20   contract that would have obligated Cred to return the       05:07:34

21   collateral to you prior to your repayment of the            05:07:37

22   $2 million loan?                                            05:07:40

23      A      No.  I did not see anything in this agreement     05:07:40

24   that would obligate them.  That is true.                    05:07:44

25      Q      And there is no other agreement with regard to    05:07:46
```

Page 171

1    that $2 million loan; correct?                          05:07:53

2        A    Correct.  I'm just simply stating as we're      05:07:55

3    verifying.  I don't know this agreement in and out, so   05:07:58

4    there could be something in here that could create an     05:08:01

5    obligation that I'm not aware of.                         05:08:04

6             That's why I say I don't know if they're         05:08:07

7    obligated.                                                05:08:09

8        Q    Fair enough.  If you turn to Section 7.1,        05:08:10

9    "Defaults and Remedies," this provides for the use of the 05:08:11

10   collateral in the -- the sale of the collateral in the   05:08:22

11   event it were to default?                                 05:08:25

12       A    Uh-huh, yes.                                     05:08:27

13       Q    Sir, you're not aware of any provision in this  05:08:28

14   contract that limits the use or sale of the collateral   05:08:32

15   other than in an event of default; correct?              05:08:34

16       A    I understand 7 to describe what can happen in   05:08:39

17   the case of a default of the $2 million.                 05:08:49

18       Q    My question to you is:  You're not aware of any 05:08:53

19   other provision in this contract which limits the use or 05:08:55

20   sale of the collateral other than in an event of         05:08:58

21   default; correct?                                         05:09:03

22            MR. PIERCE:  Object to form.                     05:09:04

23            THE WITNESS:  That limits the use of the sale?   05:09:11

24   BY MR. LUFT:                                              05:09:16

25       Q    The use or sale.                                 05:09:16

                                                   Page 172

```
 1       A    Use or sale?  This agreement could limit the      05:09:17

 2   use or sale.  I don't know whether or not -- I'm not       05:09:21

 3   100 percent sure whether it does or does not.              05:09:23

 4       Q    You're not aware of any such provision which      05:09:26

 5   limits Cred's use or sale of the collateral other than in  05:09:29

 6   the event of a default; correct?                           05:09:33

 7       A    Yeah, I would be aware of one.  The security      05:09:34

 8   interest that's granted could very well limit what Cred    05:09:37

 9   can do with the collateral.                                05:09:41

10       Q    Could you point me to where on the contract it    05:09:42

11   says that the fact that it's collateral interest limits    05:09:45

12   Cred's use or sale of the collateral?                      05:09:54

13       A    Yeah.  I believe it was 2.1 where -- Cred's       05:09:55

14   security interest.                                         05:10:00

15       Q    Anything else other than the fact that it says   05:10:08

16   it's security interest?                                    05:10:10

17       A    No.  I'm simply stating that when you grant      05:10:12

18   security interest in the collateral, that it's -- to me,   05:10:15

19   that could limit what someone could do.  You asked if     05:10:20

20   anything could limit.  To me, that could limit it.        05:10:27

21       Q    Did you ask Cred if that would limit its use of  05:10:27

22   the capital?                                               05:10:31

23            MR. PIERCE:  Object to form.                      05:10:32

24            THE WITNESS:  No.                                 05:10:33

25            MR. LUFT:  Okay.  It might be helpful to just     05:10:34
```

```
1    take a five-minute break.  I might be wrapping up here.    05:10:50

2    BY MR. LUFT:                                               05:10:50

3        Q    Oh, let me ask you:  In all your conversations    05:10:55

4    with Daniyal Inamullah, you referred to him, did he ever   05:10:58

5    tell you that it was his investment decisions that lost     05:11:04

6    most of the Bitcoin at Cred?                                05:11:07

7             MR. PIERCE:  Object to form.                       05:11:09

8             THE WITNESS:  No, no.                              05:11:10

9             MR. LUFT:  Why don't we take a quick               05:11:15

10   five-minute break, and we can see where we are.  I might    05:11:18

11   be done.                                                    05:11:21

12            THE VIDEOGRAPHER:  We are off the record at        05:11:22

13   5:11 p.m., eastern standard time.                           05:11:23

14            (Break held off the record.)                       05:19:24

15            THE VIDEOGRAPHER:  We are back on the record at     05:19:24

16   5:19 p.m., eastern standard time.                           05:19:27

17            MR. LUFT:  Mr. Parrish, I don't have any           05:19:30

18   further questions.  I did want to just make a comment,      05:19:33

19   which was I really do appreciate your time.  I asked you    05:19:36

20   a question earlier about law school.  I don't think it      05:19:40

21   came out the way I wanted to.                               05:19:42

22            It certainly wasn't meant to be derogatory or      05:19:44

23   dismissive in any way, and I hope you didn't take it that   05:19:47

24   way because I certainly didn't intend it that way.          05:19:50

25            THE WITNESS:  Okay.  Understand.                   05:19:52
```

Page 174

```
 1              MR. LUFT:  Thank you.                    05:19:56

 2              MR. EVANS:  I have no additional questions.   05:19:58

 3              MR. PIERCE:  I have probably five minutes of  05:20:00

 4     some follow-up questions that I'd like to give.       05:20:03

 5                           EXAMINATION                     05:20:05

 6     BY MR. PIERCE:                                        05:20:05

 7         Q    Mr. Parrish, are you good to continue now?   05:20:05

 8         A    Yes.                                         05:20:08

 9         Q    First, I want to ask you about your          05:20:09

10     declarations.  Both your original mutual declaration and  05:20:12

11     your supplemental declarations, you reviewed          05:20:16

12     those; correct?                                       05:20:17

13         A    Yes.                                         05:20:18

14         Q    And you approved those; correct?            05:20:18

15         A    Yes.                                         05:20:21

16         Q    And your testimony in those declarations is  05:20:21

17     based on your overall knowledge; correct?            05:20:24

18         A    Yes.                                         05:20:28

19         Q    And the testimony there is not limited to the  05:20:31

20     exhibits that are attached to --                     05:20:35

21              MR. LUFT:  Objection.  Leading.  Mr. Pierce,  05:20:39

22     you can't lead the witness.                          05:20:41

23              MR. PIERCE:  You can answer.                05:20:43

24              MR. LUFT:  No, you may not.  You can't lead the  05:20:43

25     witness.  I can't instruct you, but those are improper  05:20:46
```

```
 1    questions.                                          05:20:53

 2              MR. PIERCE:  It's noted.  It's noted.      05:20:53

 3              And you can answer.                        05:20:55

 4              THE WITNESS:  Yes.  So I'm sorry, in the   05:20:56

 5    discussion I lost track of the question.            05:21:04

 6    BY MR. PIERCE:                                       05:21:05

 7        Q    So let me ask it another way and hope this 05:21:06

 8    addresses your question -- Avi's objection.         05:21:11

 9              Is your knowledge of the testimony in your 05:21:12

10    declarations more than just the exhibits attached   05:21:16

11    thereto?                                            05:21:20

12        A    Yes, certainly.                            05:21:20

13              MR. LUFT:  Same objections.               05:21:22

14    BY MR. PIERCE:                                       05:21:26

15        Q    And when you state in your declarations that 05:21:27

16    you are seeking to pursue your Bitcoin or the equivalent 05:21:33

17    value and applicable insurance policies, anyone who you 05:21:37

18    have a claim against could have insurance policies; is 05:21:44

19    that right?                                         05:21:48

20              MR. LUFT:  Objection.  Leading.           05:21:48

21              THE WITNESS:  I'm a little confused on the 05:21:49

22    leading, Avi, just to be -- hard to understand -- my 05:21:52

23    deposition.  You lead me into saying "correct" on almost 05:21:56

24    all -- on a very good majority of your questions.  Is 05:22:00

25    there a difference?                                 05:22:04
```

| | | |
|---|---|---|
| 1 | MR. PIERCE:  Marc, it's okay.  Avi your | 05:22:05 |
| 2 | objection is noted, and you can answer, Marc. | 05:22:07 |
| 3 | MR. LUFT:  Mr. Parrish, I can't give you legal | 05:22:11 |
| 4 | advice.  I will tell you that I am entitled to ask you | 05:22:14 |
| 5 | leading questions as in my position as being opposing | 05:22:15 |
| 6 | counsel.  I won't comment on Mr. Pierce other than to | 05:22:20 |
| 7 | note my objection that I object to his using leading | 05:22:24 |
| 8 | questions. | 05:22:28 |
| 9 | THE WITNESS:  What's the question? | 05:22:29 |
| 10 | BY MR. PIERCE: | 05:22:34 |
| 11 | Q    Is it possible that anyone has -- anyone that | 05:22:34 |
| 12 | you have a claim against could have amicable insurance | 05:22:38 |
| 13 | policies? | 05:22:43 |
| 14 | MR. LUFT:  Objection.  Vague. | 05:22:45 |
| 15 | THE WITNESS:  Yes, is it possible anybody -- | 05:22:46 |
| 16 | yes, it could be insurance policies. | 05:22:50 |
| 17 | BY MR. PIERCE: | 05:22:54 |
| 18 | Q    And I want to move into -- share my screen with | 05:22:55 |
| 19 | you for a second and go back to what was marked as | 05:23:00 |
| 20 | Creditor's Committee Exhibit -- I believe it was 11, | 05:23:03 |
| 21 | which is the Telegram conversation with Xavier.  Let me | 05:23:07 |
| 22 | -- okay. | 05:23:18 |
| 23 | Can you see my screen? | 05:23:22 |
| 24 | A    Yes. | 05:23:23 |
| 25 | Q    And I'm going to refer you to where it is 17:50 | 05:23:24 |

Veritext Legal Solutions
866 299-5127

```
 1   and that's from Xavier.                              05:23:31

 2          Do you see that that line?                    05:23:33

 3     A    Yes.                                          05:23:34

 4     Q    And do you see where he says, "Is one okay?  So   05:23:35

 5   long as it is newly generated, segregated, and used     05:23:40

 6   specifically for your collateral?"                  05:23:42

 7          Do you see that line?                         05:23:44

 8     A    Yes.                                          05:23:44

 9     Q    What did you --                               05:23:45

10          MR. LUFT:  Objection.  What -- Exhibit 11 was   05:23:47

11   -- 0724 to 0725.                                     05:24:02

12          MR. PIERCE:  It's UpgradeYa's -- it's marked   05:24:02

13   UpgradeYa 0729 as the Bates number on there.        05:24:11

14          MR. LUFT:  I'm going to object that this is   05:24:12

15   beyond the scope of the cross.  And you should put a new   05:24:13

16   exhibit number on it.                               05:24:25

17          MR. PIERCE:  Okay.  That's fine.  We'll mark   05:24:26

18   this one as UpgradeYa Exhibit 1.                    05:24:29

19          (UpgradeYa Exhibit U-1 marked.)              05:24:32

20          MR. LUFT:  I'm also going to object that it's   05:24:32

21   beyond the scope of the cross-examination because it's   05:24:34

22   not something that either me or Mr. Evans asked him   05:24:36

23   about.                                              05:24:39

24          MR. EVANS:  Same objections from the committee.   05:24:40

25          MR. PIERCE:  That's fine.  It's noted.       05:24:41
```

Page 178

```
 1              MR. EVANS:  Same objection from the committee.    05:24:45

 2    Mr. Evans.                                                  05:24:47

 3    BY MR. PIERCE:                                              05:24:49

 4        Q    Let me ask it again just so we can get back on    05:24:49

 5    track here:  Do you see where it says, "Is one okay?  So   05:24:52

 6    long as it's newly generated -- the line that says, "Is    05:24:55

 7    one okay?  So long it's newly generated, segregated, and   05:25:06

 8    used specifically for your collateral deposit?"            05:25:11

 9              MR. LUFT:  Sorry.  What line is this?             05:25:14

10              MR. PIERCE:  It's on Bates number                05:25:17

11    UpgradeYa 0729, under 17:50.                               05:25:22

12              THE WITNESS:  Yes, I see it.                      05:25:34

13    BY MR. PIERCE:                                              05:25:35

14        Q    What did you understand that to mean?             05:25:35

15        A    That the collateral would be held in segregated   05:25:36

16    addresses.                                                 05:25:43

17              MR. PIERCE:  Thank you.  Next, I'm going to       05:25:46

18    move into -- we'll mark this one as UpgradeYa Exhibit 2.   05:25:52

19              (UpgradeYa Exhibit U-2 marked.)                  05:25:52

20    BY MR. PIERCE:                                              05:25:52

21        Q    This is an email dated November 10, 2020, and     05:25:57

22    it is from heidi@cred.  And she says --                    05:26:01

23              MR. LUFT:  Objection.  Is this a document that    05:26:09

24    either me or Mr. Evans asked about?                        05:26:11

25              MR. PIERCE:  It is relevant to testimony you     05:26:15
```

| | | |
|---|---|---|
| 1 | had.  And your objection's noted, but I'm going to ask my | 05:26:17 |
| 2 | question on this. | 05:26:20 |
| 3 | MR. LUFT:  Objection.  Beyond the scope of the | 05:26:22 |
| 4 | testimony. | 05:26:24 |
| 5 | MR. EVANS:  Same objection. | 05:26:25 |
| 6 | BY MR. PIERCE: | 05:26:26 |
| 7 | Q    In the first line here, it says, "Our records | 05:26:28 |
| 8 | show that we are holding 478.170 Bitcoin as collateral | 05:26:31 |
| 9 | for your loan." | 05:26:37 |
| 10 | Do you see that? | 05:26:38 |
| 11 | A    Yes. | 05:26:38 |
| 12 | Q    And what is this in response to? | 05:26:39 |
| 13 | A    It is in response to me making an inquiry on | 05:26:43 |
| 14 | the status of my collateral. | 05:26:51 |
| 15 | Q    And what did you understand Heidi's email to | 05:26:52 |
| 16 | mean when she says, "Our records show that we are holding | 05:26:55 |
| 17 | 478.170 Bitcoin"? | 05:27:03 |
| 18 | A    I understood it to mean that Cred had 478 | 05:27:06 |
| 19 | Bitcoin. | 05:27:14 |
| 20 | Q    At any point after this email, did Cred inform | 05:27:15 |
| 21 | you that they were not holding 478.170 Bitcoin as | 05:27:19 |
| 22 | collateral for your loan? | 05:27:25 |
| 23 | A    No. | 05:27:26 |
| 24 | Q    At any point prepetition, did Cred inform you | 05:27:29 |
| 25 | that it would not be able to return your collateral upon | 05:27:35 |

Page 180

1   repayment of the loan?                                    05:27:39

2       A    No.  Cred never had any direct contact with me   05:27:40

3   about not having any collateral.                          05:27:47

4       Q    And after this email on November 10th, did the   05:27:51

5   -- did Cred ever inform you that it could not perform and 05:28:00

6   return its collateral upon repayment of the line of       05:28:03

7   credit?                                                   05:28:07

8       A    Cred did not directly contact me and tell me     05:28:08

9   they could not return the collateral.                     05:28:17

10      Q    When did you learn that Cred was no longer        05:28:21

11  holding your collateral?                                  05:28:25

12          MR. LUFT:  I'm going object again.  This is        05:28:33

13  completely beyond the scope of anything that me or         05:28:35

14  Mr. Evans asked about.                                    05:28:40

15  BY MR. PIERCE:                                            05:28:45

16      Q    You can answer.                                  05:28:45

17      A    Once I hired counsel to understand the status     05:28:45

18  of my collateral.                                         05:28:53

19      Q    Are you aware that Cred's counsel informed        05:28:55

20  UpgradeYa's counsel that it was not holding your          05:28:59

21  collateral?                                               05:29:01

22      A    Yes.  I understood they were not holding 478      05:29:03

23  BTC.                                                      05:29:11

24          MR. PIERCE:  I have no further questions.          05:29:13

25          MR. LUFT:  Okay.  I have a few.                    05:29:14

Veritext Legal Solutions
866 299-5127

```
1                    FURTHER EXAMINATION                05:29:18

2    BY MR. LUFT:                                        05:29:18

3         Q    Mr. Parrish, can you tell me everything your   05:29:19

4    counsel told you with regard to the status of your loan   05:29:22

5    upon the bankruptcy?                                05:29:28

6              MR. PIERCE:  I'm going to object to the extent   05:29:30

7    that it's going to ask for anything that's          05:29:31

8    attorney/client privilege.                          05:29:34

9              MR. LUFT:  I'm going to ask for the        05:29:36

10   attorney/client privilege because I believe your question   05:29:37

11   just waived it.  You just asked, "What did your counsel   05:29:39

12   tell you about what Cred told you?"                  05:29:42

13             MR. PIERCE:  I asked if he was aware that   05:29:47

14   Cred's attorney told UpgradeYa's attorney.  I never   05:29:49

15   got --                                              05:29:53

16             MR. LUFT:  Ms. Cooks, can I ask you to read   05:29:56

17   back the last set of questions from Mr. Pierce.     05:29:58

18             (The record was read back as follows:     05:29:58

19                  "Question:  Are you aware that        05:28:55

20             Cred's counsel informed UpgradeYa's        05:28:56

21             counsel that it was not holding your       05:28:59

22             collateral?                                05:29:01

23                  "Answer:  Yes.  I understood they     05:29:07

24             were not holding 478 BTC.")                05:29:08

25             MR. LUFT:  Can you read the question before   05:29:08
```

```
1    that?                                                    05:29:08

2              (The record was read back as follows:          05:29:08

3              "Question:  When did you learn                 05:28:21

4              that Cred was no longer holding your           05:28:23

5              collateral?                                     05:28:27

6              "Answer:  Once I hired counsel to              05:28:50

7              understand the status of my                     05:28:51

8              collateral.")                                   05:28:54

9         MR. LUFT:  So I believe those conversations          05:30:56

10   have been waived.                                         05:30:58

11        MR. PIERCE:  I disagree, and I'm going to            05:30:59

12   instruct my client not to answer.                        05:31:01

13   BY MR. LUFT:                                              05:31:03

14     Q    Mr. Parrish, what's the basis for your            05:31:03

15   understanding of what Cred's counsel told your counsel?  05:31:05

16        THE WITNESS:  I'm a little confused.  Was I         05:31:18

17   instructed not to answer, Matthew?                        05:31:21

18        MR. PIERCE:  Can you restate the question?          05:31:23

19   BY MR. LUFT:                                              05:31:27

20     Q    What's the basis of your understanding of what    05:31:27

21   Cred's counsel told your counsel?                        05:31:29

22        MR. PIERCE:  And I'm going to instruct my           05:31:32

23   client -- to the extent that he is going to talk about   05:31:33

24   any conversations he had with his attorneys, I'm going to 05:31:37

25   instruct him not to answer.                              05:31:40
```

Page 183

```
 1              THE WITNESS:  Okay.  Can you repeat the      05:31:47

 2   question?                                               05:31:50

 3   BY MR. LUFT:                                            05:31:51

 4       Q     What is the basis of your understanding about 05:31:51

 5   what Cred's counsel told your counsel?                  05:31:54

 6       A     Okay.  How do I answer that?  It's a lot of   05:31:58

 7   confusion.                                              05:32:16

 8              MR. LUFT:  Mr. Pierce, I find it highly      05:32:18

 9   inappropriate that you went into a topic that neither me 05:32:20

10   or Mr. Evans raised at all.  You chose to introduce the 05:32:24

11   topic; you chose to ask your witness about conversations 05:32:27

12   eliciting answers about privileged conversations you had 05:32:31

13   with him, and now when I would like to explore them,    05:32:35

14   you're directing him not to answer.  I think it's       05:32:37

15   completely inappropriate.                               05:32:39

16              MR. PIERCE:  It's noted, and it's noted.  I  05:32:41

17   mean, your concern/your issue is noted.                 05:32:44

18              MR. LUFT:  It's not enough to be noted,      05:32:48

19   Mr. Pierce.  I'm going to ask a few more questions.  You 05:32:50

20   give whatever instructions you want, but I really       05:32:52

21   think -- in the interest of everyone's best interest,   05:32:55

22   please think about the fact that these were your        05:32:57

23   questions, the topic that you raised that you wanted    05:33:00

24   testimony about.  Cannot be a sword and a shield.       05:33:02

25              MR. PIERCE:  You know, that's noted.  If you 05:33:06
```

Veritext Legal Solutions
866 299-5127

```
 1   think -- I'm going to continue instruct my client to not    05:33:08

 2   to waive any attorney/client privilege or answer any         05:33:13

 3   conversations that will get into that.                       05:33:13

 4           If that's an issue, we can bring it up with the      05:33:16

 5   judge tomorrow, but, you know, your objections are noted.    05:33:18

 6   BY MR. LUFT:                                                 05:33:23

 7       Q    Mr. Parrish, what did -- you said you learned       05:33:23

 8   about the loss of your assets once you hired counsel.        05:33:27

 9           What did you learn about the loss of your            05:33:31

10   assets?                                                      05:33:33

11       A    So after hiring counsel, I learned that the         05:33:33

12   assets were not there.                                       05:33:53

13       Q    How did you learn that?                             05:33:55

14       A    That is where I don't know on whether it's          05:33:58

15   covering attorney/client privilege or not, so I'd have to    05:34:07

16   not answer.                                                  05:34:10

17       Q    Well, I'm going to -- I'm going to ask you to       05:34:10

18   answer me.  Your counsel has not instructed you not to       05:34:15

19   answer because I think he knows he asked you this            05:34:20

20   question, so I would like an answer if possible.             05:34:23

21           If he wants to give an instruction, he can.          05:34:25

22   You can follow it if you choose to.  I'm not going to ask    05:34:28

23   you not to, but I have to ask my questions.                  05:34:32

24       A    Okay.                                               05:34:35

25       Q    Sir, what did you learn about the disposition       05:34:35
```

Page 185

```
1    of your assets once you hired counsel?            05:34:41

2        A    That Cred didn't have them.            05:34:43

3        Q    Did you learn anything else about them?    05:34:47

4            MR. PIERCE:  Object to form.            05:34:57

5            THE WITNESS:  To know what I learned, you'd  05:34:58

6    have to look at the conversations that the counsel and I  05:34:59

7    had.                                            05:35:02

8    BY MR. LUFT:                                    05:35:03

9        Q    Can you tell me about those conversations?  05:35:05

10            MR. PIERCE:  I'm going to instruct my client  05:35:06

11    not to answer on attorney/client privilege.    05:35:09

12    BY MR. LUFT:                                    05:35:12

13        Q    Mr. Parrish, are you going to follow that  05:35:12

14    instruction?                                    05:35:14

15        A    My counsel can provide those conversations if  05:35:14

16    needed --                                      05:35:18

17            MR. PIERCE:  I'll instruct my client not to  05:35:18

18    further answer this question as it might get into  05:35:21

19    attorney/client privilege.                      05:35:24

20    BY MR. LUFT:                                    05:35:25

21        Q    Mr. Parrish, are you going to follow that  05:35:25

22    instruction?                                    05:35:27

23        A    Yes.                                  05:35:27

24        Q    Okay.  Mr. Parrish, what has your counsel told  05:35:27

25    you about communications between Cred's counsel and  05:35:31
```

Page 186

1    UpgradeYa?                                           05:35:34

2         MR. PIERCE:  I'm going to instruct my client    05:35:35

3    not to answer on attorney/client privilege.         05:35:37

4    BY MR. LUFT:                                         05:35:39

5         Q    Mr. Parrish, are you going to follow that  05:35:39

6    instruction?                                         05:35:41

7         A    Yes.                                       05:35:41

8         MR. LUFT:  Okay.  I'm going to reserve my right  05:35:45

9    on this and note in particular, Mr. Pierce, that these  05:35:47

10   were your questions about a topic that you chose to  05:35:51

11   raise.                                               05:35:59

12        MR. PIERCE:  I don't agree with that            05:36:00

13   characterization.  This was a topic that was brought up  05:36:04

14   by both you, creditor's committee counsel and debtors'  05:36:06

15   counsel, about postpetition malfeasance.            05:36:10

16        And this is quite a topic on those issues that  05:36:12

17   were raised by both the creditors committee and debtors'  05:36:17

18   counsel.                                             05:36:21

19        MR. EVANS:  Let me understand, Matt, you're     05:36:22

20   saying postpetition versus prepetition.  The only person  05:36:25

21   that discussed communications with counsel is you, so I  05:36:31

22   don't understand the objection.                     05:36:35

23        MR. PIERCE:  I'm saying this isn't -- this      05:36:36

24   isn't, as Avi characterized, completely off topic.  This  05:36:39

25   goes directly to issues that were raised by both -- both  05:36:45

```
1    the committee and the debtors.                         05:36:48

2            MR. EVANS:  Okay.  You asked -- you asked your  05:36:49

3    client if he became aware that the collateral was not  05:36:52

4    there based on conversations between debtors' counsel and  05:36:57

5    UpgradeYa's counsel.                                   05:37:02

6            That question calls for a communication between  05:37:03

7    attorney and client, doesn't it?                      05:37:05

8            MR. PIERCE:  I'm not going to have this         05:37:07

9    argument with you.  If you're going to object on the same  05:37:09

10   grounds as Avi to this, it's noted for the record, and we  05:37:12

11   can address it with the judge.                        05:37:16

12           MR. LUFT:  I'm going to go back and continue my  05:37:18

13   questioning.  I understand your instruction not to     05:37:20

14   answer.  I object to it, and I will reserve my rights.  05:37:23

15   BY MR. LUFT:                                           05:37:28

16       Q    Mr. Parrish, to get you out of the terrible   05:37:28

17   world of lawyer arguments, why don't I ask you about --  05:37:34

18   you were shown a document, Exhibit 14.                 05:37:39

19           Do you recall that?  I believe that was the    05:37:43

20   number.  It was Bates Stamp end 0729.                 05:37:45

21       A    I remember seeing a document.  I don't remember  05:37:50

22   the exacts and the numbers.                           05:37:52

23       Q    Okay.  Your counsel showed you this          05:37:54

24   document; correct?  And the problem is I don't have it  05:37:59

25   because he put it up there.                           05:38:06
```

Page 188

```
1              MR. PIERCE:  What exhibit are we talking about?   05:38:12

2    You said Exhibit 14.                                        05:38:14

3              MR. LUFT:  Ending 0729, the chat you put up.      05:38:16

4              MR. PIERCE:  That was Creditor's Committee 11.    05:38:24

5              MR. LUFT:  No.  Creditor's Committee 11?  Well,   05:38:27

6    that wasn't the pages he had.                               05:38:31

7              MR. EVANS:  Matt, I think you marked it as        05:38:33

8    UpgradeYa 1.  Maybe if you could share that.                05:38:35

9              MR. PIERCE:  Okay.                                05:38:38

10   BY MR. LUFT:                                                05:38:38

11      Q     Do you see it says, "Want to chat about your      05:38:58

12   process?  Do you intend to do one or two test texts and    05:39:01

13   then send the full amount, or are you planning on doing     05:39:05

14   many transactions?                                          05:39:08

15              "How many deposit addresses do you need?  Is     05:39:09

16   one okay?  So long as it's newly generated, segregated,     05:39:12

17   and used specifically for your collateral deposit"?         05:39:16

18      A     Yes.                                               05:39:19

19      Q     First of all, when you did the tests, did you     05:39:19

20   check that the money went in?                               05:39:28

21      A     It was confirmed by Xavier.                        05:39:29

22      Q     Did you check for yourself on Blockchain.com or   05:39:35

23   a similar tool?                                             05:39:39

24      A     I don't recall if I checked.  I don't think I     05:39:40

25   did.                                                        05:39:46
```

Page 189

```
 1        Q     You could have; correct?                    05:39:46

 2        A     We've established you can check addresses on  05:39:48

 3   the Blockchain, yes.                                    05:39:54

 4        Q     And when it says, "Deposit addresses," those 05:39:55

 5   are the wallet addresses we've been talking about today? 05:39:59

 6        A     That's my understanding, yes.                05:40:02

 7        Q     And these are the wallets that we've been    05:40:08

 8   discussing -- wallet addresses that we've been discussing 05:40:11

 9   today for the deposit of your collateral; correct?      05:40:14

10        A     Correct.                                     05:40:19

11        Q     And, as you've told me multiple times today, 05:40:20

12   you were not told that the collateral would be maintained 05:40:27

13   in those wallets and, in fact, you knew that it could be 05:40:32

14   moved; correct?                                         05:40:35

15             MR. PIERCE:  Object to form.                  05:40:37

16             THE WITNESS:  Whether or not it would be      05:40:42

17   maintained and in segregated wallets, I'm not sure.     05:40:43

18   Based on this language, I had an understanding that it  05:40:52

19   could or, more importantly, in my view, that it made    05:41:02

20   sense to be maintained as it was a mutual and beneficial 05:41:07

21   way to do it in a segregated wallet.                    05:41:12

22   BY MR. LUFT:                                            05:41:16

23        Q     Did you tell Cred that you thought it made   05:41:16

24   sense to keep it, to maintain it in those wallets despite 05:41:18

25   knowing that they could move it?                        05:41:22
```

Page 190

```
 1       A     Did I tell Cred?  No, I don't recall telling      05:41:23

 2   them how they should do that.  It seems to me that they      05:41:34

 3   would.                                                       05:41:39

 4       Q     And Cred certainly didn't tell you that they       05:41:39

 5   thought it made sense to keep your collateral segregated     05:41:41

 6   in separate wallets from the rest of its assets and not      05:41:45

 7   moved; correct?                                              05:41:48

 8            MR. PIERCE:  Object to form.                        05:41:49

 9            THE WITNESS:  What Cred told -- told me is in       05:41:51

10   this documentation.                                          05:41:57

11   BY MR. LUFT:                                                 05:42:01

12       Q     And nowhere in here does it say that, what I       05:42:01

13   just said; correct?                                          05:42:04

14       A     This documentation we're looking at it does not    05:42:05

15   say that.                                                    05:42:09

16       Q     And it wasn't said any other time with any         05:42:09

17   other document; correct?                                     05:42:13

18       A     I don't know that for sure.                        05:42:14

19       Q     You're not aware of that --                        05:42:15

20       A     That's true.  I'm not aware of it right now.       05:42:18

21   That is true.                                                05:42:21

22            MR. LUFT:  Okay.  I have no other questions at      05:42:25

23   this time.  Mr. Evans?                                       05:42:28

24            MR. EVANS:  One second.  I have nothing             05:42:32

25   further.                                                     05:42:43
```

Page 191

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  Shall we go off the record? | 05:42:50 |
| 2 | MR. LUFT:  Matt, are you done? | 05:42:57 |
| 3 | MR. PIERCE:  Yeah, I'm just looking through my | 05:42:59 |
| 4 | notes, but I don't think I have anything else.  No, I | 05:43:02 |
| 5 | don't have anything further. | 05:43:06 |
| 6 | MR. LUFT:  Thank you, Mr. Parrish. | 05:43:08 |
| 7 | THE VIDEOGRAPHER:  We are off the record at | 05:43:11 |
| 8 | 5:43 p.m., eastern standard time. | 05:43:14 |
| 9 | THE REPORTER:  Did counsel need a transcript? | |
| 10 | MR. LUFT:  This is Avi Luft from Paul Hastings, | |
| 11 | and we need a copy. | |
| 12 | (At 5:43 p.m., the deposition of | |
| 13 | MARC PARRISH was adjourned.) | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 192

1              DECLARATION UNDER PENALTY OF PERJURY

2

3        I, MARC PARRISH, do hereby certify under penalty

4    of perjury that I have reviewed the foregoing transcript

5    of my deposition taken on December 16, 2020; that I have

6    made such corrections as appear noted herein in ink; that

7    my testimony as contained herein, as corrected, is true

8    and correct.

9

10        DATED this _____ day of _____,

11    20____, at _____, California.

12

13

14

15

16

17        _____

18                   MARC PARRISH

19

20

21

22

23

24

25

Veritext Legal Solutions
866 299-5127

```
 1                REPORTER'S CERTIFICATION

 2

 3        I, Desiree Cooks, Certified Shorthand Reporter in

 4   and for the State of California, do hereby certify:

 5

 6        That the foregoing witness was by me duly sworn;

 7   that the deposition was then taken before me at the time

 8   and place herein set forth; that the testimony and

 9   proceedings were reported stenographically by me and

10   later transcribed into typewriting under my direction;

11   that the foregoing is a true record of the testimony and

12   proceedings taken at that time.

13        Further, that if the foregoing pertains to the

14   original transcript of a deposition in a federal case,

15   before completion of the proceedings, review of the

16   transcript [ ] was [ ] was not requested.

17

18        IN WITNESS WHEREOF, I have subscribed my name on

19   this date: December 17, 2020

20

21

22

23

24

25        Desiree Cooks, CSR No. 14075
```

                                              Page 194

**[& - 25th]**

| & |
|---|
| **&** 3:12,18 7:2,8,20 73:5 |

| 0 |
|---|
| **00004746** 43:17 |
| **0716** 5:19 75:9 |
| **0718** 5:19 |
| **0724** 5:17,21 129:5 178:11 |
| **0725** 5:17 129:5 178:11 |
| **0729** 178:13 179:11 188:20 189:3 |
| **0730** 5:18 74:6 |
| **0737** 5:21 |
| **09-30-2020** 42:2 |

| 1 |
|---|
| **1** 1:25 5:4,20,21 35:13,13,14 123:18,19 142:18 142:22,23 143:5,9 143:20 146:1,5,6 162:11 178:18,19 189:8 |
| **10** 4:18 5:15 14:5 72:25 73:5 140:20 152:25 179:21 |
| **100** 173:3 |
| **10173** 3:14 |
| **10th** 142:17 181:4 |
| **11** 4:17 5:17 72:19 73:1,5 129:4 132:22 177:20 178:10 189:4,5 |
| **11th** 5:22 |
| **12** 5:18 73:2,6,7 74:24 77:8 |
| **12/15/2020** 5:12 5:13 |

**120,000** 42:18 43:7 82:4
**12:14** 1:14 2:16 6:1,5
**12:38** 73:23 74:3 129:12 130:17 131:18 133:11
**12:42** 131:24
**12:59** 67:18
**13** 5:19 74:24,25
**13th** 5:7 47:5 48:20,23
**14** 53:11,12 55:25 188:18 189:2
**14075** 1:22 194:25
**146** 4:13 5:20
**147** 4:14,15,16
**14th** 59:1 108:24 109:1,2
**157,000** 93:13
**157,650** 93:14
**15th** 108:24
**15yfjkqu9v5ayt...** 57:15
**15yfsjqu** 57:25
**15ysjkq** 57:22
**16** 1:14 2:15 4:15 6:1 193:5
**16.25** 56:7
**16.252** 58:14
**16.2525** 55:25
**16.2525000** 57:10
**16.25250000** 56:21
**16.25258337** 55:13
**16th** 6:5
**17** 4:13,19 194:19
**175** 4:7
**178** 5:21
**179** 5:22
**17978** 194:23

**17:50** 177:25 179:11
**1800** 3:19
**182** 4:6
**183** 4:17
**186** 4:18
**186,170** 93:14
**187** 4:19,20
**194** 1:25
**19801** 3:20
**1:14** 44:25
**1:17** 44:18
**1:20** 44:21
**1:24** 45:3
**1mig9** 53:8 55:6 58:15
**1migx** 57:10

| 2 |
|---|
| **2** 4:20 5:5,22 37:25 38:3,19,20 38:21,23 41:18 43:12,19,22,25 81:17 83:7,8,13,16 83:20 84:6,17,19 94:25 95:6 96:24 100:19,24,25 104:22,25 105:5,7 105:18 108:19 117:10,18 126:5 142:8 143:6,8,19 144:2 145:6,17 161:25 162:21 164:1 170:4,12,15 170:19 171:22 172:1,17 179:18 179:19 |
| **2.1** 40:5,9,13 164:2 164:18 173:13 |
| **2.3** 164:15 167:4 |
| **20** 92:8,9,10 193:11 |

**20,666.67** 42:15
**20-12836** 1:7 2:7 6:13
**200** 58:6
**2010** 13:7,20 14:11 15:1 16:8
**2011** 13:20,23 22:8
**2012** 13:22
**2013** 16:8
**2018** 12:6 16:12,14
**2019** 91:23 92:11 92:24 93:3
**2020** 1:14 2:15 5:7 5:10,20,22 6:1,6 27:18 29:2,18 42:1,14 47:5 48:20,23 51:9 52:8,14,18,20 55:12 56:22,24 59:1 64:24,24 65:17,22 67:15 91:21 92:3 93:5 97:3 99:1 110:8 110:10 142:17 179:21 193:5 194:19
**2021** 43:12
**207,810** 93:3
**212** 3:14
**213** 3:8
**21st** 52:17,20 77:9
**23:14** 76:20
**23:17** 77:8
**23:29** 77:23
**23rd** 5:10 51:9 52:8,14,18,20 55:12 56:22 64:14 67:14
**25** 3:7 4:16
**25th** 65:17

**[2634 - afternoon]**

**2634** 58:6,18,19
**26th** 77:9
**28th** 56:24
**293** 58:3
**2:22** 79:23
**2:34** 80:1

**3**

**3** 5:6 40:22,23,24
**30** 50:3,5,6 55:19
  55:21,21 95:12,20
  133:15,18 134:10
  160:10
**302** 3:21
**30th** 42:1,14 43:12
**312.279** 57:4
**340** 3:13
**35** 5:4
**38** 5:5

**4**

**4** 5:7 47:4,6 63:19
  63:21,22,24,25
  66:9 108:8 109:16
  152:23 167:23
  168:10
**40** 5:6
**4370003** 1:23
**467-4435** 3:21
**47** 5:7
**478** 180:18 181:22
  182:24
**478.17** 48:21
**478.170** 180:8,17
  180:21
**48** 5:8
**496,472** 93:4
**4:04** 140:11
**4:19** 140:14
**4th** 5:20 65:22

**5**

**5** 5:8 48:7,10
  168:25 169:5
**50** 92:2,4,9
**51** 5:10
**515** 3:7
**52** 5:11 117:1
**53** 5:12 48:24 61:2
  62:10 117:1,4
**53.1200475** 47:14
  48:1
**531** 99:24 104:5
  105:3,3
**531.3** 43:16
**531.3004746** 41:11
  48:17
**547-5400** 3:14
**57** 5:13
**5:11** 174:13
**5:19** 174:16
**5:43** 192:8,12

**6**

**6** 5:10 44:2 51:8
  51:10 55:5,24
  95:12,20 111:7
**6.14.** 171:2
**6.4** 171:1
**6.8** 169:14
**60** 55:20
**683-6105** 3:8
**6a** 5:11 52:1

**7**

**7** 4:14 5:12 53:20
  53:21 57:21
  152:24 153:8
  172:16
**7.1** 172:8
**73** 5:14,15,17,18
**74** 5:19

**8**

**8** 5:13 57:18,19,24
  65:22
**80** 4:6

**9**

**9** 4:5 5:14 58:25
  59:3 66:19 72:3,8
  72:15,23 73:5
**90071** 3:7
**919** 3:19

**a**

**abide** 10:23
**ability** 106:15
  115:1 134:3 166:5
  166:10,14
**able** 157:9 180:25
**absolutely** 32:5
  66:2 71:22 95:19
  102:5 123:10
**abstract** 85:7
**acceptable** 47:21
  134:11
**accepted** 139:3,4
  163:3
**accessible** 64:7
**account** 37:16
  53:11,12 55:25
  70:1 78:12 79:6
  111:22
**accounts** 53:15
  62:3 66:13 104:14
  104:18 145:19
**accuracy** 54:17
  67:8
**accurate** 18:23
  54:12 55:10 66:1
  67:4,10 105:19
  114:17
**action** 6:22 89:19
  90:9 102:8,11,11

120:21
**actions** 156:7
**activities** 15:25
  138:9 139:11,18
**actual** 55:21
**adam** 3:19 7:10
**additional** 166:16
  167:21 175:2
**address** 23:19,20
  23:21,23,25 24:3,4
  24:5,11,13,21,22
  25:2 27:8 50:11
  50:16,17 52:25
  53:1,2,5 54:23
  55:6,8 56:10
  58:19,20 160:6
  188:11
**addresses** 24:8,24
  26:25 49:16,17,21
  49:23,25 50:5,6
  52:3 53:16 55:17
  60:11 63:14 65:4
  67:25 68:4,14,20
  106:15 129:14,16
  130:6,20,22 131:1
  131:25 132:6,7,9
  132:12 133:16,18
  134:10 143:13
  144:12,13 151:1
  154:20 158:18,22
  159:3,21 160:5,8
  176:8 179:16
  189:15 190:2,4,5,8
**adjourned** 192:13
**administer** 6:21
**advance** 54:11
**advice** 146:24
  148:5 177:4
**afternoon** 80:4,7
  140:16

[ago - asset]

**ago** 14:5
**agree** 6:9 8:7,15
  10:7 69:7 73:3
  98:9,12 124:12
  134:11 149:14
  158:21 164:17
  187:12
**agreed** 110:23
  163:4 164:6
**agreement** 5:5
  7:18 8:3,12 33:24
  34:16,16 35:11
  38:1,2,9,11,18
  41:15 42:7,10,11
  66:9 80:16 81:15
  81:20,25 82:8,11
  82:17,21,21 83:6,6
  83:12,19,22 84:11
  84:18 85:25 94:25
  95:7 96:25 97:24
  100:23 102:22
  110:12,23 111:9
  111:12,15,18,19
  122:1,22 127:17
  128:12 134:8
  138:7,8,12,12,13
  138:14,14,16,21
  138:21 139:4,4,6
  139:15 142:14
  145:22 162:1,9,13
  162:17,17,20,24
  163:1 164:17,24
  165:6,10,22 166:4
  166:13 167:6,19
  167:22 169:2,3,5
  170:7 171:9,23,25
  172:3 173:1
**agreements** 62:9
  82:25 83:2 102:22
  111:3 133:19
  134:5

**agrees** 169:15
**ahead** 8:23 96:20
  136:22 148:19,20
**al** 1:6 2:6 6:12
**allege** 103:15
**allocated** 78:1,7
**allow** 128:9,21
  129:16
**alternatives** 106:1
**amicable** 177:12
**amount** 41:13
  48:25 60:21,25
  108:20 155:9
  156:22 157:11,19
  158:1 189:13
**analysis** 74:16
**angeles** 3:7
**answer** 4:11 9:8,8
  9:19,20 12:18
  15:13,23 28:23
  30:17 31:3 33:5
  64:21 65:6,7
  88:19 91:20 94:4
  96:6 125:14
  128:15 146:18,21
  147:8,17 148:1,17
  159:19 166:3,8
  175:23 176:3
  177:2 181:16
  182:23 183:6,12
  183:17,25 184:6
  184:14 185:2,16
  185:18,19,20
  186:11,18 187:3
  188:14
**answered** 128:24
**answers** 101:7,9
  184:12
**anybody** 10:5
  50:21 76:7 89:3
  114:13 177:15

**apologies** 40:23
**apologize** 146:4
**appear** 75:2
  148:22 149:12
  193:6
**appearance** 6:25
**appearances** 3:1
  7:1
**appeared** 79:2
**appearing** 3:3
**appears** 52:16
  67:10
**applicable** 153:18
  155:15 176:17
**application** 63:12
**applications** 64:3
**apply** 80:12
  168:12,16 169:12
**appreciate** 97:16
  174:19
**appropriately**
  95:15
**approved** 175:14
**approving** 147:4
**approximately**
  63:19,20 98:23
  101:23 104:2
  109:8 120:5
  141:16
**april** 5:10 43:12
  51:9 52:8,14,17,18
  52:20,20 55:12
  56:22,24 64:14,24
  76:21 77:9,25
  97:3 99:1 100:4
  100:13 120:6,13
  142:17
**area** 44:14
**areas** 11:24
**argument** 188:9

**arguments** 103:14
  188:17
**arrange** 131:25
  132:9
**ashworth** 3:13 7:3
**aside** 21:6,20
  119:23
**asked** 32:18,18
  45:5 65:2 68:3
  71:9 81:15 96:21
  97:22 98:14 103:4
  103:22 117:13
  124:16,21,22
  133:1 170:13
  173:19 174:19
  178:22 179:24
  181:14 182:11,13
  185:19 188:2,2
**asking** 9:6 21:19
  33:12 63:4,6 68:7
  69:18 94:7,23
  95:10 96:1,4 98:9
  98:13,14,15
  101:18 103:2,3
  107:9 109:19
  113:19,20 114:5
  114:24 119:14
  121:21 124:11,18
  125:9,15,17
  128:25 130:13
  131:4 139:17
  146:20,24 147:14
  148:4,5,8 156:9
  157:6
**assert** 86:24 87:6
  87:17 88:6
**assertion** 86:8,9
  86:12
**asset** 77:4,7,10
  78:1,7 137:17
  153:25

Veritext Legal Solutions
866 299-5127

[assets - believe]

assets  35:23 36:1
  77:24 93:24 94:5
  94:6,7,9,15,18
  95:4 97:1,5,23
  98:23 99:1,10
  104:3,25 105:4,6
  111:17,22 115:25
  117:3 123:3,23,25
  124:6,25 126:7,16
  126:17,21 127:1
  127:19 128:2,9,22
  129:15 137:11,17
  137:19 138:4,10
  138:18 164:9,12
  164:13,20 165:1
  185:8,10,12 186:1
  191:6
associated  16:25
assume  10:1 45:9
  46:3,6 55:9 59:8
  67:19 77:18 80:19
  113:22
assumed  77:4
assuming  73:21
assumption  76:25
  122:21
attach  162:13
attached  51:15,25
  52:13 59:2 81:16
  142:18 143:9,20
  167:13 175:20
  176:10
attachment  51:20
attempted  166:8
attendance  8:2
attending  6:17
attorney  7:1
  146:19,23 147:8
  147:18 148:1,8,9
  182:8,10,14,14
  185:2,15 186:11

186:19 187:3
  188:7
attorneys  89:7
  183:24
audio  6:8
august  5:7 46:12
  47:5 48:20,23
  61:3 62:11
austin  3:6 7:7
  123:11,11
austinprouty  3:10
authenticate  54:12
authorize  142:5
authorized  6:20
  88:12,16,20,23
  89:4,9,12 104:13
authorizing  89:7
automatic  153:16
automation  11:17
available  41:8
  54:23 64:4 81:14
  111:7 159:22
availment  82:18
avenue  3:13
avi  7:5 8:13 72:21
  73:4 79:13 80:4
  93:9 95:8 140:4
  153:1 176:22
  177:1 187:24
  188:10 192:10
avi's  176:8
aviluft  3:8
avram  3:5
aware  13:9 21:25
  27:15 40:12 59:24
  81:25 82:7,9,20,24
  86:16,20,25 87:7
  87:10,18,19 88:1,2
  88:7,13,20 90:13
  102:9,10 115:24
  116:2 120:2

121:16,18 134:19
  134:23 135:25
  151:16,21 152:8
  160:20,24 165:9
  165:13,14,20
  166:4,18,21
  167:14 169:1,10
  170:25 172:5,13
  172:18 173:4,7
  181:19 182:13,19
  188:3 191:19,20

b

b  3:12 95:12,20
back  15:3 22:6
  26:4 30:12 38:15
  44:21 45:2 46:1
  53:10 54:1 55:4
  62:11 64:8 69:7
  76:21 78:18 79:25
  94:10 109:4 117:5
  118:4 119:2
  125:23 127:15,23
  127:24 128:18,19
  129:24 140:13
  145:15 155:9
  171:7 174:15
  177:19 179:4
  182:17,18 183:2
  188:12
backed  28:9
  105:21 170:20
background  11:3
  101:3 103:18
backing  170:5,6
bad  77:10
balance  49:20
  50:11 59:14,18,23
  100:3 159:4
balances  158:17
  158:22

bank  104:14,17
bankruptcy  1:1
  2:1 6:12 76:9
  182:5
base  51:17
based  37:1 55:15
  61:24 66:9 99:8
  114:2,5,24 167:2
  175:17 188:4
  190:18
basic  49:4
basically  78:16
  79:17
basis  7:24 9:18,20
  10:13 114:25
  142:21 143:7,18
  143:20,22 145:5
  145:10 146:2
  163:18 183:14,20
  184:4
bates  74:5 75:8
  178:13 179:10
  188:20
bathroom  44:15
becoming  12:22
beginning  29:18
  78:20 135:13
behalf  7:5,9,20
  8:13 9:7 87:7 89:4
  89:8,13
belief  171:10
believe  13:22,22
  28:11 37:14 46:16
  47:5 50:8 56:19
  61:17 65:2 72:23
  73:11 81:16 88:25
  94:10 105:8,20
  107:7 108:1,14,15
  110:9,14 111:7,8
  113:7 115:22
  117:13 119:21

[believe - carolina]

123:17,19 124:3
128:5,24 134:15
141:11 150:20
152:12,12 153:14
154:22,22 156:8
156:22 158:10,17
162:8 164:1 165:5
173:13 177:20
182:10 183:9
188:19
**believed** 143:23
171:8
**beneficial** 190:20
**benefit** 156:15
157:12
**best** 9:12 92:1,3,13
96:16 97:6 104:1
117:25 120:9
134:3 136:17
184:21
**better** 21:9,10
93:13 113:10
**beyond** 102:4
150:12 178:15,21
180:3 181:13
**big** 122:10 123:22
**bill** 21:22 61:10,11
**bit** 16:6 21:7,10
42:5 43:17 54:1
93:12
**bitcoin** 12:16 13:9
13:12,14 14:7,24
15:10,19 16:16,19
27:2,3,5,7,9,10,12
30:21 40:6,7,10,14
40:15 41:6,12,13
43:16 45:6 46:24
47:1,15 48:2,18,21
48:24 49:3,16
50:1,14,15,22 51:2
53:2,4 54:4 55:13

55:25 56:7,13,21
57:5,10,13,14 58:6
58:14,18,19,21
59:13,25 60:20,24
60:25 61:2,4,7
62:10 63:4,7,8,10
63:13,15,23,25
64:6,23 65:1
67:16 68:8 69:22
70:9,14,17 71:5,11
71:12,15,17 74:10
74:20,22 78:6
79:10 83:22 84:2
84:24 85:3,5,7,8
85:10,12,14,15,19
86:2,3,6,7,12
117:4 126:25
135:23 148:25
149:4,8 153:13,16
153:22,24 154:2,4
154:5,7,22,23
155:3,5,6,9,10,19
156:10,13,21,25
157:3,4,7,10,10,19
157:25 158:1,18
159:1,7,12,16,24
160:10,12,17,18
161:3,7 174:6
176:16 180:8,17
180:19,21
**bitcoin.com**
159:22
**bitcoins** 58:21
60:5,12,14,16 61:8
92:2,4 99:24
104:5 117:1
**block** 23:8
**blockchain** 23:9
25:25 49:12,13,14
49:22 50:20,25
53:24 54:3 57:24

63:11 64:3,5,5
158:24 190:3
**blockchain.com**
5:12,13 23:10,13
54:7 158:4,8
159:23 189:22
**blockchain.info.**
23:15
**boil** 84:15
**bold** 123:22
**bonjour** 5:14 59:2
72:15,23
**borrow** 123:17
124:6
**borrower** 164:15
167:4 169:14
**borrowers** 36:3,13
36:21 123:5 124:8
**bothered** 122:7
**bottom** 57:9 58:13
**bought** 17:15
**bouncing** 109:4
**break** 44:16 45:1
73:24 79:16,19,24
97:15 99:11
140:12 174:1,10
174:14
**brief** 11:2 89:17
**bring** 102:8
142:23,24,25
146:1 152:25
185:4
**bringing** 161:1
**broad** 15:18,20
17:12 34:24 96:3
**broader** 102:1
119:9 143:4
**broadly** 91:11
102:22
**broken** 37:10 61:6

**broker** 28:13
**brought** 95:10,15
102:3,11 103:8
187:13
**btc** 77:4,6 105:4
181:23 182:24
**building** 19:19
20:2
**business** 12:9,10
12:11,12,15,19
16:11,21 20:1
32:15,15,16,16
33:18,20 34:2,3,6
34:6,7,10 62:21
70:22 71:3 93:8
94:11 101:2 102:6
103:12 107:4
112:15 118:22,23
136:9 166:24
169:16 170:18
**businesses** 98:15

**c**

**california** 2:17 3:7
193:11 194:4
**call** 26:7 79:5
90:23,25
**called** 25:9 28:18
39:13 81:19 168:7
**calls** 36:22 119:22
119:23 120:4,5,19
133:8 188:6
**capability** 113:15
**capable** 113:22
**capital** 29:4,5
105:17,17 106:4,8
108:6 110:4
137:19 173:22
**care** 108:25 109:2
**careful** 26:12
**carolina** 6:15

Veritext Legal Solutions
866 299-5127

[case - collateral]

case 1:6 2:6 6:13
  59:1 65:9 80:6
  89:5 101:13
  172:17 194:14
cash 38:19 41:7
  94:21 117:4,6
cc 5:4,5,6,7,8,10
  5:11,12,13,14,15
  5:17,18,19 35:13
  35:14 37:25 38:3
  40:22,23,24 47:4,6
  48:7,10 51:8,10
  52:1 53:20,21
  55:5,24 57:18,19
  57:21,24 58:25
  59:3 65:22 66:19
  72:3,8,15,19,23,25
  73:1,2,5,5,5,6,7
  74:24,24,25
cell 10:1
cellular 6:7
ceo 62:25
certain 11:24 14:3
  61:10 78:13 118:6
  138:9 139:10,18
  141:12 166:10
certainly 34:22
  80:11 97:14
  150:17,25 151:10
  170:18 174:22,24
  176:12 191:4
certificate 5:6,8
  41:2 48:8
certification 194:1
certified 2:16
  194:3
certify 193:3
  194:4
cetera 46:2
chain 129:4

challenging 8:21
chance 54:11,16
change 67:11
changes 47:23
  141:9 162:24,25
chapter 76:6
characterization
  187:13
characterized
  187:24
chat 66:17,22 67:9
  72:3,16,25 73:2,13
  73:21 75:18,20
  76:12,14,16 120:1
  129:10 130:14
  135:4,6 189:3,11
chats 75:2,23
  76:17 81:12 119:8
  119:9,10,15
  120:20
chatting 75:18
check 42:15 54:24
  63:11,14 64:25
  65:3 68:13 72:15
  161:2 189:20,22
  190:2
checked 56:15
  189:24
checking 53:23
choice 83:10,17,19
  83:21,23 84:1
  85:2,5,8,12,18,21
  85:23 100:24
  107:21,22
choose 147:3
  163:11 185:22
choosing 100:22
chose 85:11
  106:25 107:17
  108:4 133:17
  168:22 184:10,11

187:10
circle 30:12
cite 143:5 146:2
  147:24
claim 21:15 154:8
  154:23 155:25
  157:18 176:18
  177:12
clarified 45:19
clarify 26:4,6
  45:20 75:24 87:25
clarity 31:23
  122:6 124:21
  136:13
classifying 64:17
clean 72:17,22
clear 10:16 12:1
  96:17,18 108:11
  136:15 143:17
  162:22 163:12,17
  164:7
client 146:18,19
  146:23 147:8,17
  147:18 148:1,1,9
  182:8,10 183:12
  183:23 185:1,2,15
  186:10,11,17,19
  187:2,3 188:3,7
close 139:9
closer 92:10
cobb 3:18 7:9,20
codified 83:7 84:9
coins 74:12,18
cold 15:7,8 68:17
  69:12,19 85:6
  111:24 112:1,2,8
  112:11,17,19,25
  113:5,7,9
collateral 5:9 28:9
  32:1,22 33:18
  34:23 35:1,5,6,8

37:6 39:13,19
  40:20 41:11 46:14
  46:21,22 47:1,2
  48:9,16,17,20
  51:16 53:12 55:24
  63:7 66:5,11 77:9
  77:19 78:19 79:5
  83:22 84:17,23,25
  98:8 99:25 104:6
  104:15 105:4,21
  110:13,17,19,19
  111:10,13,16,21
  112:7,10,21 113:2
  113:4,12 114:3
  115:8,11,12,15,18
  115:25 124:1
  126:7,25 127:1,7
  128:13 132:12
  133:17 134:12,13
  134:20 135:1,16
  135:18 136:10,19
  136:24,25 137:3
  137:23 138:6
  139:12,15,20
  142:11,15 143:23
  144:11,11,21,25
  145:1,19,23 149:4
  149:8,15,20 150:3
  150:8,12,17 151:5
  151:11,17,23
  152:10,20 153:14
  155:11 156:3
  157:22 160:1
  163:13,14 164:4,8
  164:19,25 165:7
  165:15,18,25
  166:6,19,22
  169:24 170:6,14
  170:20,22,23
  171:2,8,9,21
  172:10,10,14,20

Page 6

[collateral - cooks]

173:5,9,11,12,18
178:6 179:8,15
180:8,14,22,25
181:3,6,9,11,18,21
182:22 183:5,8
188:3 189:17
190:9,12 191:5
**collaterally** 71:14
170:19
**colleague** 7:3,6,10
**collect** 78:18
**college** 11:4
**column** 52:25
**combined** 45:24
**come** 13:11 22:6
93:20 117:13
118:4
**comes** 8:9 106:14
**comfortable** 26:20
88:4
**coming** 24:18,18
58:6,7 59:12,13,18
59:18,22,22
103:24
**comment** 131:18
133:11 174:18
177:6
**commingle** 164:25
**commingled** 37:24
57:13 160:11,16
**commingling**
37:20 40:10
164:12
**committee** 7:4,23
7:25 8:6 9:7 35:13
80:25 90:19
177:20 178:24
179:1 187:14,17
188:1 189:4,5
**common** 153:25

**communicate** 10:5
61:12,15,20 66:16
119:18
**communication**
61:16,18 67:5
115:22 188:6
**communications**
66:10 81:8 114:21
120:25 133:5
147:18 167:2
186:25 187:21
**companies** 46:7
97:21 98:1 107:22
**company** 11:15
16:21,22 18:7,14
19:15 20:9 21:16
28:2,8 90:17,22
91:8,9 95:22 99:6
99:8 107:3 118:16
118:17 121:8
**competitive** 70:15
**complete** 79:17
**completely** 18:4
28:3 181:13
184:15 187:24
**completion** 194:15
**computer** 11:7
96:14
**computers** 91:13
**concept** 22:19
**concern** 184:17
**concerned** 130:2,4
136:24
**concerning** 15:25
20:23
**conditions** 167:24
168:1,7,8,12,16
**conducted** 6:16
**confer** 8:11 39:11
**confidential** 7:24
8:4,8,16,20 101:12

101:14,25
**confidentiality**
8:22
**confirm** 8:2 47:22
54:17 67:8
**confirmation**
131:12
**confirmed** 162:8
189:21
**confused** 62:14
72:10 73:11
106:24 176:21
183:16
**confusing** 34:5
73:12 125:3,4
**confusingly**
161:25
**confusion** 45:17
184:7
**connecting** 117:21
**connection** 15:11
15:19 19:3,4,10
30:9 58:25 62:8
89:18 103:7
**consider** 12:24
26:9 106:3 163:8
**considered** 106:23
107:15
**considering** 67:15
120:7,13 121:3
**consistent** 120:24
**consolidate** 115:15
115:25
**consolidated**
74:13,19,21
115:21,23 116:3,3
116:5 144:22
145:2 159:13
**consult** 10:9
**contact** 8:10 31:4
47:12 61:22 62:4

75:13 181:2,8
**contained** 193:7
**continue** 6:8 175:7
185:1 188:12
**contract** 38:16
39:22 44:5,6
45:14 163:19
171:20 172:14,19
173:10
**contracts** 20:23
44:10,12
**contradictory**
133:7
**contribute** 99:22
100:8,12
**contributed** 99:12
99:15,20 100:14
100:16
**contributions** 99:8
**control** 99:1 104:3
116:17
**controlled** 98:24
**conversation**
45:16 73:9 114:18
120:12 145:9
151:22 152:9
177:21
**conversations** 6:7
62:22 114:7,14,15
114:17,19 115:4
121:6 122:2,22
124:17 132:20,20
132:23 133:2,3
134:25 135:2,7
145:14 152:6,7,13
174:3 183:9,24
184:11,12 185:3
186:6,9,15 188:4
**converse** 10:18
**cooks** 1:21 2:16
6:19 182:16 194:3

Veritext Legal Solutions
866 299-5127

[cooks - cred]

194:25
**copied** 55:10
**copy** 80:24 142:3
142:16 192:11
**correct** 11:21 12:7
16:18 17:7 22:5
24:20 27:6,7
29:13,14 32:25
39:10 40:8 43:10
46:15 52:23 55:23
60:18 63:20 65:7
67:7,20 68:10
71:20 76:17,18
81:11 82:4,15,16
82:18 83:1,3,4,10
83:11,18,20,22,25
84:3,5,7,12,20,23
85:1,4,7,10,16,22
86:6,9 87:1,8,19
90:3 91:6 94:12
94:13,15,16 98:11
100:11,20 101:19
101:22 107:9,10
107:25 108:5
113:23 115:11,13
115:15,21 116:1
117:16,17 118:8
118:13,19 119:4
120:25 122:17
124:9 126:8 127:7
127:9,19 128:3,4
128:10,23 129:9
129:25 130:1,3,7
130:11,21 131:2
131:16 132:1,2,5,8
132:14,17,22
133:7,16,20,21,24
134:5,11,17,18,24
135:6,10,13,23,24
137:11 138:18,25
139:6 141:4,5

142:16 144:15,16
144:18,23 145:11
146:12 148:22
149:1,5,9,12,16,17
149:20,21,23
150:3,8,12,18,21
151:12,18,24
152:11,21 154:9
155:3,11,21 156:1
156:2,11,12,23,24
157:2,7,8,13,19
158:1,2,19,22
159:2,5,8,14 160:2
160:4,7,12,18,21
161:10,14,21
162:9,24,25 163:3
164:9,10,13,14,20
164:22 165:1,7,15
165:22 166:15,16
166:19,24 167:20
168:2,13,18,22
169:20 170:1,8
171:14 172:1,2,15
172:21 173:6
175:12,14,17
176:23 188:24
190:1,9,10,14
191:7,13,17 193:8
**corrected** 193:7
**corrections** 193:6
**correctly** 156:20
**correspondence**
133:23
**cost** 43:5
**costs** 21:22
**counsel** 7:12 9:16
9:19 10:9,12,18,18
10:21 18:2 30:3
39:6,11 44:11
65:13 73:19 81:5
89:14,18 90:19

97:20 118:1 141:4
141:25 142:2
145:18 146:12,16
147:12,22 163:6,8
163:11 168:18
177:6 181:17,19
181:20 182:4,11
182:20,21 183:6
183:15,15,21,21
184:5,5 185:8,11
185:18 186:1,6,15
186:24,25 187:14
187:15,18,21
188:4,5,23 192:9
**counsel's** 148:13
148:16
**counsels** 97:20
**couple** 80:10
103:22 158:4
**course** 10:5,11
30:2 39:23 61:18
114:16
**court** 1:1 2:1 6:12
6:19 8:18 72:9,12
79:20 103:2,3,4
127:22 128:17
142:9 156:7,20
**covenant** 167:20
**covenants** 164:16
167:5,7,14,17
169:9,10
**cover** 42:20 43:3
44:6,8 155:18
**covered** 19:10
43:6,8
**covering** 117:24
185:15
**create** 37:5 70:20
70:21 71:14 132:3
136:5 150:24,24
165:17,21 172:4

**created** 67:1 71:14
76:6,10,10 104:19
110:3 143:14
150:10
**creating** 82:15,18
143:2
**creative** 136:25
**cred** 1:6 2:6 6:11
7:6 19:3,5,10
21:25 22:4 27:14
27:15,16,24,25
28:4,6,17,19 30:9
30:14,22,23,25
31:1,9,11,14,19,19
31:20 32:1,4,12,13
32:14,20 33:1,8,8
33:13,14,15,20
34:7,11,12,16,19
35:6 36:7,11,21
37:2,3,4,6,16,19
38:11 39:18 40:6
40:10,11,14,19
41:14,19,24 43:16
43:18,24 45:6,7,14
47:13 48:2 49:3
49:24 50:15 51:5
51:5 52:8,20
55:13 58:22 59:7
60:13,21 61:4,12
61:15,16,21 62:3
62:17,17,20,21,25
63:5,5,7,9,10,16
64:1,23 66:4,10
67:16 68:7 69:21
70:9,16 71:8,11,16
74:10 75:12,25
76:1,1,9,11 77:6
78:5,17,24 79:11
80:6 81:9 82:1,12
82:15,18 83:3,6,24
84:2,12,17,23,24

**[cred - dates]**

85:4,9,14 86:2,5,7
86:12,17 87:1
88:7,14,21 89:24
95:7 96:23 97:25
98:2,7,8,11,25
99:5,12,15,20,22
99:23,24 100:2,3,9
100:18,20,23
102:2,4,24 103:25
104:6,9,15,22
105:1,10,12,16,17
105:22,23,25
106:1,22,25 107:3
107:6,12,14,17,20
107:25 108:4,15
108:17,19 109:9
110:5,24 111:6
112:10 114:7
115:24 116:23
117:7,14 118:5,14
118:21,24 119:4
119:13,16,19,19
120:6,12,14 121:4
121:5 122:2,5
124:6,14,17 126:4
126:22 127:17,18
127:25 128:8,13
128:21 129:1
130:11 131:2,14
133:3,17,20,23
134:6,8,20 135:1
135:11,16 136:1,5
138:22,25 139:2
139:10,14 142:10
142:13,14,16
144:10,14,17,19
145:18,21,22
149:15 151:17,22
152:9,19 154:16
155:18 157:1
164:9,12,19,25

165:6,11,14,17
166:12,22 167:2
170:2,4 171:13,16
171:20 173:8,21
174:6 179:22
180:18,20,24
181:2,5,8,10
182:12 183:4
186:2 190:23
191:1,4,9
**cred's** 32:16 69:1
69:22 70:10 83:13
115:1 135:9
155:20 166:5
173:5,12,13
181:19 182:14,20
183:15,21 184:5
186:25
**credborrow** 32:7
32:8,9,19,24,25
33:13 35:16,18
38:2,16 42:11,21
42:25 43:4,6,9,15
44:2,7,9 66:4
77:16 83:6 121:17
122:16 126:15
142:10 162:19
**credearn** 32:7,10
32:11,13,18,18,19
**credearned** 42:6,9
42:18,19,25 43:2
44:5,6 77:17 82:2
82:3,22 138:13
**credit** 5:4 35:13
41:18 43:22 83:15
104:25 163:13
181:7
**creditor** 60:6
**creditor's** 80:25
177:20 187:14
189:4,5

**creditors** 3:11 7:4
156:15 157:13
187:17
**cross** 67:9 178:15
178:21
**crypto** 5:4 26:8,20
30:23,24 31:15,16
31:17,19 32:9
50:11 100:23
115:1,3 116:19,20
116:22
**crypto.holdings**
116:15,17
**cryptocurrency**
11:20,25 12:20,25
13:25 14:9,10
22:8,25 26:17
32:20 33:2 37:15
39:17 84:23 91:7
91:11,18
**cryptomining**
90:17
**cryptospace**
118:18
**csr** 1:22 194:25
**curious** 26:16 93:6
93:8
**currencies** 11:23
13:6,12,15 16:4
112:2
**currency** 11:20
12:3,16,23,24,24
13:1,3,17,19,24
15:11 16:1,3
17:13,15,15,18
19:25 20:10,12,13
20:16,18,20,23
21:1,6,13,14 22:17
22:18 23:24 24:10
24:17,18 25:4,18
25:21,24,25 29:12

29:12,20,21 30:5
31:19 33:4,8,9,10
33:14,16,21 34:4
34:13,20 36:8,9,12
36:22 37:3,8,20,21
113:10 157:10
**current** 63:12
96:16
**currently** 94:19
116:20 117:3
**custodians** 15:6
**customer** 62:7,8
62:20 110:20
**customers** 36:2,9
36:20 123:4 124:8
125:1,5 127:3,7,19
128:3,10,23 129:1
137:4,18
**cut** 104:21

**d**

**d** 5:20 75:3,4,5
146:6
**dan** 62:23 63:1,3,6
79:1
**daniel** 18:8,11
99:16
**daniyal** 75:5,11,13
76:12,16 77:10,13
77:18,20 78:5
79:1 174:4
**daniyal's** 79:4
**data** 23:9
**date** 13:16 14:3
43:11 51:17 93:12
101:24 194:19
**dated** 5:7,10,20,22
51:8 142:17
179:21 193:10
**dates** 41:23 46:15
65:19 109:14

[day - document]

day 13:18 48:23
193:10
days 159:13,23
dealing 28:19
debtor 146:5,6
debtors 1:8 2:8 3:4
7:6,23,25 8:14
80:6 153:13
187:14,17 188:1,4
december 1:14
2:15 6:1,5 59:1
65:22 109:2 193:5
194:19
decide 32:17 90:20
102:4
decided 16:15
deciding 117:19
decision 90:12
106:13 119:11
decisions 101:5
107:8 174:5
declaration 5:14
5:15 59:2 65:8,11
65:13,23 72:16,23
72:24 81:17,20
83:8 84:7,10,20
140:20 143:10,19
144:2 147:3,4,6,24
152:24 153:4
162:1,12,14
167:13 175:10
193:1
declarations 37:13
65:14,16,20,24
175:10,11,16
176:10,15
declare 90:20
decreases 74:13
dedicating 91:17
default 172:11,15
172:17,21 173:6

defaults 172:9
defend 8:20
defined 45:11
139:15
defines 39:19
definitely 119:25
delaware 1:2 2:2
3:20 6:13 10:17
10:23
delete 67:11
denominated
153:24
deposit 53:12
55:13,24 74:10
179:8 189:15,17
190:4,9
deposited 50:1
63:13 66:11
134:21
deposition 1:13
2:14 6:10,16 8:1
10:6,11,19,20
12:23 40:2 45:8
95:1,6 96:25
97:19 98:18,21
102:20 176:23
192:12 193:5
194:7,14
depositions 95:19
deposits 51:16
52:19,21 55:16,18
derivation 68:14
derivations 68:12
derogatory 174:22
descend 8:20
describe 13:4
20:15 26:13,20
172:16
described 121:7
describing 41:5
74:14

designed 12:19
91:12
desire 132:1,10
desiree 1:21 2:16
6:19 194:3,25
despite 190:24
destination 52:25
53:1,5,11 55:5
detail 52:6
detailed 98:17
details 93:8 97:20
120:11,16,17
152:7
dialogue 108:7
152:14
differ 110:22
difference 88:1
111:1 155:5,11,13
176:25
differences 111:2
121:1
different 22:13,15
46:7 50:3,5,6
53:16 55:19,20
68:20 69:16
109:11 112:25
124:17 125:18
131:11 133:3
differently 25:13
77:17,22
differs 120:19
difficult 9:10
160:23
digital 12:23,24
13:6 22:14,17,18
23:24 25:25 112:2
113:3,8,10 114:3
115:9 129:15
diligence 121:5,10
121:21,24,25
122:22,24

direct 9:20 15:20
143:25 181:2
directing 184:14
direction 194:10
directly 11:24
17:14 181:8
187:25
disagree 183:11
disclose 39:1
disclosed 71:17
disclosing 36:21
discretion 33:20
34:4,12
discuss 31:8 62:16
discussed 62:19,20
147:22 187:21
discussing 114:13
132:17 190:8,8
discussion 140:3
176:5
discussions 37:2
dismissive 174:23
disposition 185:25
distinction 76:2
district 1:2 2:2
6:13
diversify 108:2
diversity 107:1,22
document 8:8,10
38:5 40:21,23
41:3,5 46:16,17,18
47:8 48:12 52:4,5
52:7,10,11,13,13
52:23 53:19 54:21
54:23 58:25 72:6
80:25 81:4,24
82:2,3,6,7,14,22
129:6,8 140:1
141:3 142:6
143:20,25 145:4
146:2,3,11,13,16

Veritext Legal Solutions
866 299-5127

[document - evans]

147:3,11,15,24
148:7 151:16
152:4 162:5,23
163:4,6,9,12,23,25
167:9,12,16,18
168:4,4,16,25
169:12 179:23
188:18,21,24
191:17
**documentation**
63:18 191:10,14
**documented** 134:5
**documents** 5:4
7:22 8:1,4,7,16
47:22 67:1 82:20
151:20 158:12
**doing** 106:23
107:15 109:11
113:22 160:9
189:13
**dollar** 61:10,11
154:7 157:10
**dollars** 156:22
157:19 158:1
**double** 72:15
**drafted** 141:3,10
**drafting** 47:22
**draw** 5:6,8 41:2
48:8
**drink** 27:4
**due** 42:1,2 122:21
122:24
**duly** 7:15 194:6
**duration** 68:18
69:13 130:11
131:1,14

**e**

**e** 66:6,12 142:15
145:20,23 149:9
149:16,19,20,22
149:24 150:7,18

151:12,18,20,24
152:11,15,21
**earlier** 28:16
45:16 53:23 71:16
80:10 117:8,13
129:8,11 133:1
141:3 162:6 164:6
165:5 169:19
174:20
**earn** 116:15,16
165:7,15 166:6,14
166:14,19,22
167:3
**earned** 42:10
124:4,5
**easier** 91:1 143:13
**easily** 111:6
**eastern** 6:5 44:18
44:25 45:3 79:23
80:1 140:14
174:13,16 192:8
**easy** 91:20
**education** 11:9
**effectively** 90:2
104:14 109:16
**efficiency** 109:22
**either** 8:18 92:5
123:16 154:7
156:21 157:10
178:22 179:24
**electrical** 11:7
**electronic** 120:24
133:4 141:24
**electronically**
119:18
**eliciting** 184:12
**else's** 155:6 160:18
**email** 5:7,10,20,22
8:14,14 47:5,10
48:1 51:8,12,25
52:14 61:16,24

62:22 114:18
119:3,19 142:16
142:22 143:1,4,8
145:4 146:9 147:5
148:21,24 149:7
149:14,18 150:19
150:21 151:4,10
179:21 180:15,20
181:4
**emailed** 8:6
**emails** 62:14 63:1
63:3,6 81:7 108:7
114:15 120:20
121:7 135:3,5
136:14 144:4,8
152:14
**emery** 3:12 7:3
**employee** 27:25
28:5 75:12 142:16
**employees** 18:9
**empty** 56:10,14,16
58:9 60:1
**engage** 100:22
138:9
**engaged** 128:12
**engineer** 11:17
**engineering** 11:7
11:18
**ensured** 134:1
**enter** 20:22,25
73:1 82:25 83:6
100:20 111:9,12
**entered** 21:12,24
22:3 42:6 44:4
45:14 82:11,15,17
84:11 94:24 95:5
122:17 126:15
136:1
**enters** 21:20
**entire** 95:21
157:11 167:10,18

**entirety** 84:18
100:1
**entities** 16:24 17:2
17:5 45:24 46:10
**entitled** 101:4
102:5 103:14
177:4
**entity** 28:13 45:13
98:10 121:3
**equal** 154:12
156:22 158:1
**equals** 5:4
**equivalent** 154:2
155:9 176:16
**escrow** 82:8 111:9
**esq** 3:5,6,6,12,13
3:18,19
**essential** 41:6
**establish** 142:14
142:15 145:22,23
**established** 36:4
61:9 123:6 124:9
138:13 190:2
**estate** 19:22,23
20:2 156:14,15
157:12
**estimate** 92:1,3,13
97:6 120:9 122:20
**et** 1:6 2:6 6:12
46:2
**evaluating** 121:25
122:1,2
**evans** 3:12 4:5 7:2
7:2 8:5,5 9:2
10:24 11:1 12:21
15:14,16,21,22
18:18 19:7,8
28:22 30:16 31:5
31:24 33:7 34:1
34:18 35:12,15
36:19 37:25 38:4

[evans - find]

40:21 41:1 43:21
44:14,18,23 45:4
47:4,7,19 48:7,11
51:7,11,23 52:2
53:19,22 54:14,20
55:2 57:17,20
58:24 59:4 60:9
64:12,16,20 66:19
66:21 72:2,5,11,20
73:4,7,8 74:6,8,23
75:1,9,10 79:13
94:11 96:2 134:15
158:3,11,17 162:6
164:2,6 175:2
178:22,24 179:1,2
179:24 180:5
181:14 184:10
187:19 188:2
189:7 191:23,24
**evening** 140:17
**event** 129:14
172:11,15,20
173:6
**everybody** 7:12
162:2
**everyone's** 184:21
**ex** 75:12
**exact** 13:16,18
14:7 16:9 52:11
52:22 58:21 63:17
76:10 78:1 115:4
124:3
**exactly** 25:15
106:12 108:21
118:15 136:15
**exacts** 188:22
**examination** 4:4
7:13 9:1 80:2
175:5 178:21
182:1

**example** 33:21
61:3
**exceeded** 171:8,11
**excel** 5:11 51:23
51:25 53:11 55:5
55:15 59:7
**excellent** 67:19
**exchange** 14:1,9
14:12,16 43:18
104:25 110:12
**exchanges** 5:17,18
5:19,21 14:10
15:6
**excuse** 59:20,21
65:3 120:14
137:20 159:23
**execute** 33:2
**executed** 38:11
142:14 145:22
**executing** 44:10
**exhibit** 5:2,4,5,6,7
5:8,10,11,12,13,14
5:15,17,18,19,20
5:21,22 35:13,14
38:3 40:24 47:6
48:10 51:8,10
52:1 53:21 54:10
57:19 59:3 72:9
72:12 73:5,5,5,6
74:23,25 81:16,17
81:20 83:7,7,8
84:6,7,10,19,20
94:25 95:6 96:24
123:18 129:4
132:22 140:20
142:18,22,23
143:5,9,20 146:1,4
146:6,14 149:11
152:25 153:4
161:25,25 162:11
177:20 178:10,16

178:18,19 179:18
179:19 188:18
189:1,2
**exhibits** 5:1
175:20 176:10
**exist** 14:11 22:23
**expect** 161:9
**expectation**
161:13,20
**expected** 161:17
161:17
**expecting** 68:13
**expenses** 93:1,4,14
**expert** 22:25 25:14
**explain** 42:23
103:16
**explained** 137:10
**explore** 184:13
**explorer** 23:8
49:12,13,14,22
50:20,25 53:24
54:3,5 56:3 57:24
63:11 64:3,5,6
**exported** 67:2,7
67:12,13
**extent** 7:25 8:17
90:1 182:6 183:23

**f**

**face** 36:7
**fact** 72:14 82:14
83:2 90:2 96:2
102:6 115:10,14
115:20 134:9,9,19
135:12,21 137:9
148:24 149:22
159:10,25 160:6
160:11 171:10
173:11,15 184:22
190:13
**facts** 109:23

**failing** 100:15
**fair** 22:10 26:14
26:14 29:21 31:20
52:24 72:11,20
80:18 90:12,18
91:4 93:23 119:16
169:10 172:8
**fall** 14:15 109:12
**false** 86:9,13
**familiar** 15:9
22:19,21 25:10
48:12 158:8
**familiarize** 146:8
**far** 21:8 71:23
94:7 117:23
122:24
**fashion** 158:13
**father** 18:15 99:18
99:20 100:7
101:21 116:8,9,12
**fault** 117:1
**federal** 194:14
**feel** 26:19
**felt** 119:10
**fiat** 29:12,20,20
30:5 31:19 43:19
43:22,25
**figure** 18:2
**file** 8:8,9,11 51:24
51:25 53:11 55:5
59:7
**filed** 6:12 59:1
76:9
**filing** 8:18
**filings** 76:7,8
**financially** 6:22
**financials** 98:17
101:17,18
**find** 29:20 49:18
50:21 56:13,13
75:17 81:11

[find - go]

129:22 157:6
184:8
**fine** 26:7 44:17
45:21 69:16 80:8
88:5 101:18
104:17 137:1
140:4 163:2
178:17,25
**finish** 95:24
136:22
**fireblock** 154:19
154:20,21,25
**fireblocks** 56:3
77:3
**firm** 6:20 80:5
**first** 7:15 8:19
13:2,5,8,16,25
14:4,4,6,7 15:9
27:15 31:4 32:21
53:7 59:12 61:4
72:15 76:6 95:4
105:14,18 108:15
110:4 166:8 175:9
180:7 189:19
**fit** 33:10
**five** 53:7 55:7 57:9
58:13,14 79:19
174:1,10 175:3
**flower** 3:7
**focus** 166:1
**focused** 122:22
**follow** 76:21 77:1
77:2 79:14 148:12
148:16 175:4
185:22 186:13,21
187:5
**following** 11:11,22
48:1
**follows** 7:15
127:24 128:19
182:18 183:2

**forbidden** 40:10
**force** 83:5
**forced** 83:9,24
**forcibly** 85:3
**foregoing** 193:4
194:6,11,13
**form** 5:6,8 12:17
15:12,15 19:6
28:21 30:15 31:2
31:21 33:22 34:14
35:9 36:15 37:22
41:2 43:20 47:16
48:8 60:7 64:11
64:15 82:19 85:17
86:1 87:2 90:4
91:13 94:1 98:3
102:12 115:16
127:20 130:12
131:17 132:15
138:11 139:13,21
144:3,24 145:12
146:13 150:4,13
150:22 151:13,25
154:3,10,24
155:23 159:15
160:13 161:15
164:21 165:2,8,16
165:23 166:7,20
169:21 171:15
172:22 173:23
174:7 186:4
190:15 191:8
**format** 67:6 115:9
**formed** 114:25
**forth** 26:4 46:1
84:17 95:6 96:24
109:4 138:8
142:22 165:21
166:5 194:8
**fortune** 46:13

**forward** 96:7
98:22 103:18
124:1 149:1,5
161:10
**forwarded** 63:7
**foul** 118:2
**found** 50:10
**four** 44:15 57:9
58:14 159:13,23
**frame** 97:3 120:7
**fraud** 11:23,23
**free** 64:4,6
**front** 125:25
**full** 31:6 34:3
103:13 189:13
**function** 28:1
**fund** 34:12 93:17
130:21 133:17
134:12
**funded** 29:16,17
**funding** 129:16
130:6,20,22
131:15 132:1,4,8,8
132:10,13 133:15
**funds** 68:16,18,21
68:25 69:3,12,13
70:6,12,14 78:11
78:24 118:14
129:13,17,24,24
130:7,10,23,25
131:13,16,23
132:1,5,10,12,14
133:15 134:16,20
134:20,23 135:9
135:11,13,15,23
**fungible** 27:7,10
27:11 60:18,22
61:7 155:3 157:3
**further** 13:4 50:18
174:18 181:24
182:1 186:18

191:25 192:5
194:13
**future** 20:22

**g**

**general** 54:10
95:13 101:14
113:9 120:2
**generalities** 95:11
**generally** 15:5
**generate** 70:14
135:23 136:3,18
137:2,4 138:18
139:12,19
**generated** 71:11
178:5 179:6,7
189:16
**generating** 138:4
**generic** 38:9
**genesis** 147:23
**getting** 27:4 102:1
146:23 147:9
163:8 168:3
**give** 8:19 44:19
55:4 61:10 80:22
85:11 92:1,13,21
93:2 101:7 104:1
109:3,13 155:8,9
175:4 177:3
184:20 185:21
**given** 87:18 104:1
119:3 153:12
157:1 158:24
170:4
**giving** 126:8
**go** 6:9 8:23 9:5
11:3 23:13,16
26:4 33:3,20
44:14 46:1 54:24
55:3 56:3 59:17
64:8 67:11 77:14
77:23 81:22 85:6

[go - holds]

96:7,14,20 103:3
106:25 109:6
116:14 123:13,16
136:22 140:7,23
148:20 152:24
154:18,21 157:6
161:2 163:15,16
177:19 188:12
192:1
**goes** 106:12
187:25
**going** 9:6 21:15
23:4,4 29:8 35:12
35:13,19 36:7
37:10,25 38:15
39:18 40:21 41:6
41:8 44:14 46:16
47:4 51:7,23,24
53:19 55:1,3,4,8
57:14,17,22 58:24
59:5 62:21 63:17
65:21,22 66:19
68:8,25 69:3,21
70:9,16,17 71:2
72:2 74:23 75:7
77:1 79:8,13,18
80:10,18 81:22
90:23,24 94:1
95:8,14,24 96:5,7
96:9 97:7,8,10,18
98:19 101:16
106:13 112:24
113:17 117:17
118:14 126:10
137:10 139:8
146:17 147:7,16
147:25 148:3,12
148:16,25 149:5
154:17,21 155:20
156:14 158:13
161:10,16 163:23

177:25 178:14,20
179:17 180:1
181:12 182:6,7,9
183:11,22,23,24
184:19 185:1,17
185:17,22 186:10
186:13,21 187:2,5
187:8 188:8,9,12
**good** 9:3,4 27:23
80:4 121:9 140:16
140:17 175:7
176:24
**google** 49:9,10
50:19,25 54:2
60:10
**googling** 60:4
**gotten** 163:5
**governed** 128:13
138:7
**governs** 39:16
**gox** 14:15,21
**grant** 173:17
**granted** 153:15
166:9 173:8
**granting** 34:16
**great** 92:20 118:16
129:12 140:24
153:10
**greatly** 74:14
**ground** 9:5 80:11
**grounds** 148:2
188:10
**group** 75:18,18,20
76:1,4,5,6,10,13
76:16
**guess** 23:4 53:14
55:3 63:17 92:6
92:14 97:7 113:17
113:19 123:13

**h**

**hack** 85:6
**half** 111:8
**handed** 155:10
**handle** 34:4
106:15
**handled** 77:17,22
135:1
**happen** 39:6 110:7
172:16
**happened** 55:16
108:14,21 109:23
110:1,1,5,9,13
145:14
**happening** 76:11
**happens** 35:22
122:10 123:23
126:16
**happy** 92:19 101:9
101:15 123:16
158:12
**hard** 14:22 77:2
106:11 108:23
109:4,13 136:20
142:3 176:22
**hardware** 91:12
91:17
**hash** 22:20,22 23:1
23:2 25:9,15 26:3
26:5,7,8,10,10
27:8
**hashes** 25:11
26:17
**hastings** 3:5 7:5
72:21 80:5 192:10
**hd** 67:19,22 68:2,3
68:12,14
**head** 9:9
**headset** 21:8
**hear** 117:8

**heard** 31:11 95:16
**heidi** 179:22
**heidi's** 180:15
**held** 45:1 68:17
69:12 71:14 77:21
79:24 111:16,22
130:11 140:12
143:24 144:13
160:1 170:2
174:14 179:15
**help** 50:21 72:9
115:5 163:6,8
**helpful** 94:23
173:25
**helping** 43:4
**higher** 106:9
111:4
**highest** 11:9
**highlighted** 41:10
41:17
**highly** 184:8
**hired** 50:21
181:17 183:6
185:8 186:1
**hiring** 185:11
**hold** 19:18 131:23
142:15 144:11
145:23 150:8,9,11
157:11
**holding** 19:15 25:4
116:1,18,25 117:3
180:8,16,21
181:11,20,22
182:21,24 183:4
**holdings** 17:3
19:13,14,15,17,20
19:24 20:1,3,6
45:10 46:2,5
**holds** 19:20 94:21
117:4

Page 14

honest 80:22
hope 174:23 176:7
hoping 72:22
hours 141:18
huh 9:9 53:6 71:21
  97:4 105:24 118:9
  172:12
hypothetical
  137:6

**i**

idea 61:3 99:6
  147:5,11,14,23,24
  148:6
identified 59:6
  60:18 72:13
identifier 25:8,17
  25:20 27:3,6
  58:15
identifies 23:25
  24:4,5 25:21
  129:14
identify 24:3 25:3
  25:24 60:5,12
identifying 61:8
ids 25:10 26:25
imagine 122:8
  125:3
immediately
  153:15
imperative 153:14
important 68:16
  69:11,18 133:12
  133:13,25 134:2
importantly
  190:19
improper 86:24
  87:6,16,17 88:6
  175:25
inaccurate 116:25
inamullah 75:11
  75:14 76:13 174:4

inappropriate
  96:8,11 184:9,15
include 147:3,5,11
including 36:3
  123:5 124:8
  147:15
income 92:25 93:3
  93:13,13
incongruous 122:4
inconsistent
  132:21
incorporated 6:11
increased 46:24
indefinite 20:18
independent 28:3
index 4:1 5:1
indicates 170:7
indirectly 17:17
individual 27:2,5
  27:9 99:9 160:10
individuals 99:9
  120:6
inefficient 108:12
inform 180:20,24
  181:5
information 8:22
  13:9 14:3 18:3
  39:8 54:18 62:3,6
  92:18 96:15 97:12
  97:14 98:14
  103:18 109:21,21
  111:5 118:5
  159:22
informed 142:13
  145:21 181:19
  182:20
infringe 146:19
initial 64:10 74:10
  159:1,14,24
initially 31:12
  50:1 63:16

ink 193:6
input 24:20
inputs 24:16,21
inquire 96:13
inquiry 180:13
insert 141:25,25
inside 24:4,5
insist 167:20,21
instruct 146:17
  147:8,17,25
  175:25 183:12,22
  183:25 185:1
  186:10,17 187:2
instructed 4:11
  183:17 185:18
instruction 148:13
  148:16 185:21
  186:14,22 187:6
  188:13
instructions
  184:20
insurance 153:18
  155:15,18,18,21
  169:15,15,20
  170:2,5,8,9,11,14
  170:15,17,19,21
  170:22,24 176:17
  176:18 177:12,16
insured 156:3
insurer 156:1
intend 8:8,9,17
  174:24 189:12
intended 42:20
  119:5
intending 157:16
intent 21:2,4 119:5
  119:17
intention 157:11
  166:18
intentionally
  17:12 88:17

interactions
  127:17
interchangeably
  25:12
interest 31:20 32:2
  34:17 41:22,23
  42:10,18,20,24
  43:1,3,5,6,8 44:2,6
  44:8 106:9 111:4
  158:12 163:14
  166:9 173:8,11,14
  173:16,18 184:21
  184:21
interested 6:22
  29:24 31:10
interesting 28:20
  77:15
interference 6:8
internet 112:4
interpret 126:10
  171:5
interpretation
  168:4
interpreting
  165:10
interrogatories
  95:10,15,18
introduce 184:10
introduced 27:24
invest 17:10,11,12
  17:13 29:8 33:9
  33:16 70:18 94:15
  98:7
invested 17:14,17
  17:19,20,25 18:23
  34:11 98:1 99:8
  101:6,20,23
investing 33:13
investment 7:19
  18:3,21 20:13,15
  20:17 27:21 28:15

**[investment - large]**

28:17 29:3,4,6,19
29:23 30:4 31:1
38:20,22,24 39:1
42:17 43:7,15
45:13 63:22,24
64:10,13,18 71:1
71:12 89:24 93:22
96:23 99:5,7
104:19,21,22
105:3,9,14,16,19
107:5,6,7,11,11,12
107:19,20 109:17
110:3 117:11,18
117:18,19,20,24
118:23 120:7,14
120:15 121:17
169:20,22 174:5
**investments** 3:17
7:9,21 17:3,8,9,14
17:23,23,24 18:1,1
18:6,10,14,23,25
19:2,4,9 20:5 22:1
22:2,2,3 27:22
28:16 29:10,15,19
29:24 34:7 39:17
39:20 40:7,11,15
41:7,8,14,19,24
42:15 43:8,15,19
43:24 44:1,4 45:7
45:10,18,21 46:1,4
46:9 62:17 71:5
89:3,5,8,13,16,22
90:1,10,13,21,22
90:25 91:1 93:17
93:20,25 94:6,8,11
94:12,14,19,21
95:5 96:23 97:1,5
97:23 98:6,7,8,11
98:16,18,24,25
99:13,15,20,22
100:2,4,10,16,18

100:20 101:2,16
101:20,24 102:23
102:24 103:12,25
104:3,5,12,18,24
105:2,6,10,12,13
105:15,19 108:3
110:3,22 116:7,9
116:10,11,16,18
117:10 118:6,11
170:1,3
**investments's**
105:4 152:10
**investor** 29:13
32:20 117:7,9,16
**investors** 29:16
71:18 76:1,3,4
**invests** 101:3
**involved** 12:22
13:2,4 27:22
28:15 45:25 91:10
117:19
**involving** 81:9
88:24
**irrelevant** 60:15
60:17 61:7 157:3
**issue** 8:11 39:12
110:2 122:6
184:17 185:4
**issues** 62:11
187:16,25

**j**

**jbevans** 3:15
**jimenez** 3:6 7:6
**job** 1:23
**joe** 7:17 8:5,17,23
10:16 54:9 72:7
73:1 75:7 80:9
123:11
**join** 76:7
**joined** 7:10

**joseph** 3:12 7:2
**jtd** 1:7 2:7 6:13
**judge** 185:5
188:11
**julian** 3:25 6:18
**june** 42:1,14

**k**

**keep** 112:5,7,10
113:12 134:14
139:8 140:1
143:12,13 157:16
190:24 191:5
**keeping** 40:14
132:12
**kept** 131:13
149:16,20 159:7
161:9,14,20
**kind** 26:13 62:5,17
68:7 109:4
**kinds** 62:13 71:13
**knew** 28:5 37:2
62:24 76:18,18
78:11 79:5,8
113:13 116:4,4
161:21 190:13
**know** 13:16,18
14:11 18:1 22:23
25:15 27:20 29:25
31:7 34:9 37:23
39:3 47:21 49:5
51:2 52:25 53:10
54:8 58:20,23
61:21 62:23,24
73:22 76:9 78:13
78:13 79:12 80:9
80:17 86:18,19,20
86:20,22 87:3,14
87:22 88:2,9
91:22,24 94:7,17
95:13,17,22 97:2
101:4 102:6

104:10,12 107:16
109:15,19 110:25
111:2,4 115:6
117:23 118:20,25
119:1 120:8
122:14 125:6,23
127:14 131:10
135:21 136:8
141:15,17,19,21
147:10,22 148:15
151:19 152:1,3,3
152:17 154:25
158:14 160:5,17
160:19 168:5,14
168:15 169:7
171:16 172:3,6
173:2 184:25
185:5,14 186:5
191:18
**knowing** 190:25
**knowledge** 96:9
96:16 101:6
102:15 104:2
118:24 175:17
176:9
**knowledgeable**
22:8
**known** 159:6
**knows** 185:19

**l**

**landis** 3:18,19 7:8
7:10,20
**language** 40:18
84:13 115:6
118:13,15 123:20
132:25 134:7,15
145:14 168:3,15
190:18
**languages** 144:5
**large** 56:25 75:25
76:3

[larger - lot]

**larger** 68:12 76:4
159:12
**late** 109:11
**launch** 9:17
**laundry** 101:11
**law** 80:5 95:19
163:15,16 174:20
**lawsuit** 102:3,7,9
102:16
**lawyer** 40:17
168:14 188:17
**lba** 76:1
**lead** 11:18 27:1
175:22,24 176:23
**leading** 175:21
176:20,22 177:5,7
**learn** 13:5,6,8 16:2
22:11 117:8,14
181:10 183:3
185:9,13,25 186:3
**learned** 185:7,11
186:5
**leaving** 56:25
**left** 12:5,8 16:13
57:8
**legal** 82:14,17
102:14 146:24
163:5,8,11,18,20
168:3,17 177:3
**lend** 34:20 36:2,12
71:17 123:4 124:7
125:1,6,6,8,14,16
125:19 126:4,4,4
127:2,6,19 128:1
129:1 137:3,14,16
137:17
**lender** 167:6,14,17
167:20 168:1,5,13
168:16 169:1,2,11
169:13 170:21

**lending** 28:11
34:24 106:4
**lent** 83:14,16,20
110:18 126:4
128:9,22
**letters** 53:7 55:7
122:10 123:22
**level** 11:9 78:17
**licensed** 116:6
**lift** 102:11 161:2
**lifted** 156:6
**lifts** 156:21
**light** 21:8
**limit** 166:10 173:1
173:8,19,20,20,21
**limitations** 168:5
**limited** 102:15
166:5 175:19
**limiting** 166:13
**limits** 172:14,19
172:23 173:5,11
**line** 4:12 41:18
43:22 54:18 83:15
93:10 95:9 104:25
135:14 178:2,7
179:6,9 180:7
181:6
**lines** 16:20 57:9
58:13 117:25
**literally** 32:16
34:5
**litigation** 10:19
103:19
**little** 9:10,12 16:6
21:7,10 43:17
54:1 62:14 72:17
73:11 76:22 93:12
131:11 132:24
176:21 183:16
**llc** 7:9 12:14,15
45:11 46:4

**llcs** 17:4
**llp** 3:5,18
**loan** 5:5 30:23,24
31:15,16,17 32:9
32:11,13,23 37:25
38:9 44:2 46:23
47:3 68:18 69:13
78:18 81:19 82:21
84:4,8,10,18 85:13
85:19 86:3 94:24
95:7 96:25 100:22
100:23 105:21
110:23 157:22
162:1 163:13
170:19 171:12,22
172:1 180:9,22
181:1 182:4
**loans** 28:9
**localbitcoins**
14:18,20
**locate** 49:2
**located** 6:14
**location** 23:23
135:19
**lodge** 54:10
**logical** 143:12
144:12
**long** 60:24 101:10
108:16 178:5
179:6,7 189:16
**longer** 79:6 140:5
160:1 181:10
183:4
**look** 14:5 16:10
23:6,7,14,17 24:9
25:7 28:19 48:12
49:15,17 50:9,10
50:13,18 52:22
54:23 57:21 58:12
59:11,12 61:25
73:23 81:12,18

91:24 92:12,14,17
92:19 94:20,22
96:10,15 97:8,10
98:19 99:3 100:6
100:15 101:16,18
108:12,22 109:6,7
121:11,14 129:10
133:19 135:13
136:14 139:25
142:8 144:9
145:17 152:12
158:11 164:1
167:1,11,24
168:24 169:14
186:6
**looked** 23:2,3,5
40:3 50:7 52:3
55:5 56:17 71:16
106:1 121:22
129:8 158:10
159:10,21 162:5
163:12 167:23
**looking** 14:2 27:17
29:3,4,5,10,12
60:3,3,10,10 92:6
104:11 108:6,13
129:22 138:20
157:5,24,25
162:22 167:9,18
191:14 192:3
**looks** 25:17 52:5
71:23 73:22
129:14
**loop** 139:9
**los** 3:7
**loss** 156:1 185:8,9
**lost** 77:4,6 132:24
156:23 170:3
174:5 176:5
**lot** 11:24 22:23
26:9,21 52:5 77:6

Veritext Legal Solutions
866 299-5127

[lot - means]

106:12 119:9
184:6
**lower** 111:8
**lrclaw.com** 3:22
**luft** 3:5 4:6 7:5,5
8:13,13 10:16
44:19 72:7,14,21
72:21 74:4,7 75:7
79:18 80:3,5
82:23 85:20 86:4
86:14 87:5,12,24
88:11,18 89:2
90:7 93:11,15
94:3 95:16,24
96:18,19 98:5
102:17 115:19
123:11,15 124:13
124:24 125:11,13
126:1,12,20 127:5
127:10,22 128:7
128:14,17 129:2,7
130:15 131:9,19
132:18 137:8,15
137:24 138:15,23
139:16,24 140:15
140:24 141:1
142:24 143:3
144:7 145:3,16
146:1,7,15,20,24
147:1,9,13,20
148:3,10,11 150:6
150:16 151:3,15
152:2 153:2,5,10
153:11 154:6,13
155:2,24 156:19
157:17,23 159:18
160:15 161:19
162:4 164:23
165:4,12,19 166:2
166:11,23 169:23
171:18 172:24

173:25 174:2,9,17
175:1,21,24
176:13,20 177:3
177:14 178:10,14
178:20 179:9,23
180:3 181:12,25
182:2,9,16,25
183:9,13,19 184:3
184:8,18 185:6
186:8,12,20 187:4
187:8 188:12,15
189:3,5,10 190:22
191:11,22 192:2,6
192:10,10

**m**

**madison** 3:13
**main** 47:12 61:22
62:4 165:25
**maintain** 66:6
134:3 145:20
148:22,23 169:15
170:8,17 190:24
**maintained** 66:12
142:12 144:17,20
148:25 149:5,9
150:18,19,21,25
151:2,5,11,17,23
152:10,17,20
190:12,17,20
**maintaining**
130:10,25 171:1
**majority** 176:24
**making** 40:15
45:19 52:19 76:25
100:24 101:5
106:13 107:8
118:6 120:7,13
122:20 159:24
162:25 169:2,2
180:13

**malfeasance** 86:17
86:21,23,25 87:4,8
87:11,15,18,22
88:7,10,13,21,25
187:15
**man** 11:18
**manage** 94:8
**management**
93:24 94:5,6,8,18
95:4 97:1
**manager** 77:4,7,11
**managers** 36:3,23
78:1,8 123:5
124:8
**managing** 89:6,15
90:5,8
**marc** 1:13 2:14 4:3
5:16 6:11 7:14
142:17 177:1,2
192:13 193:3,18
**march** 27:17 29:2
67:14 100:12,13
108:24,24 109:1
120:6,12 125:19
145:15
**mark** 35:13 37:25
47:4 53:19 57:17
58:24 65:22 66:19
72:2,8 73:7 74:23
101:12 178:17
179:18
**marked** 5:2 35:14
38:3 40:22,24
47:6 48:10 51:10
52:1 53:21 57:19
59:3 72:24 73:6
74:25 84:6,7,19
94:25 123:18
129:3 140:19
146:3,6 161:25
162:11 177:19

178:12,19 179:19
189:7
**market** 3:19 35:7
**marketing** 122:23
122:25
**materials** 96:11
**matt** 125:11
187:19 189:7
192:2
**matter** 6:11 60:19
60:23 93:7
**matthew** 3:18 7:8
7:19 10:22 93:7
95:16,24 118:3
183:17
**mcdermott** 3:12
7:2
**mean** 12:25 20:15
22:22 24:6,7 26:4
26:5,5 27:11 29:7
29:11 33:20 34:3
35:3 37:23 38:8
45:11,23 46:9,15
71:3 72:8,22 76:8
76:24 77:5,18
86:19 91:16 95:23
103:1,2 107:2
111:25 112:3,16
120:15 123:7
125:2,5,8,16 126:2
127:14 136:4
150:23 152:4,5,16
153:6,23 155:17
157:18 169:4
170:16 179:14
180:16,18 184:17
**meaning** 110:15
127:13 150:21
**means** 13:4 25:15
46:4,6 53:1 70:9
74:19 79:5 85:21

Veritext Legal Solutions
866 299-5127

[means - never]

102:16 126:11
127:3,12
**meant** 77:13
124:15,19 170:17
174:22
**meet** 8:11
**member** 89:6,15
90:5,8
**memorize** 21:15
**memorized** 111:19
144:10 152:14
167:9,16 171:6
**mentioned** 68:19
115:23
**mentions** 152:15
**message** 74:3
78:10 130:18
**messages** 81:8
119:24 120:1,2
133:9
**messaging** 76:19
**messy** 76:22,24
**met** 76:16
**methods** 136:9
**michael** 18:8,10
47:10,11,20 61:22
99:16 114:11,22
142:17
**microphones** 6:6
**million** 38:19,20
38:21,23 41:18
43:12,19,22,25
63:19,21,22,24,25
83:13,16,20 84:17
100:19,24,25
104:22,25 105:5,7
105:18 108:8,19
109:16 117:10,18
126:5 170:4,12,15
170:19 171:22
172:1,17

**mind** 60:19 106:14
154:17
**mine** 12:20 16:4
20:10,12 38:8
77:9 91:14,15,16
91:18,21
**mined** 16:6
**mines** 20:19 21:17
**mining** 12:11,15
12:19 16:3,16,18
16:21,22 21:1,6,13
21:16,20 91:7,9,10
118:17
**minute** 44:15
46:19 79:19 92:21
174:1,10
**minutes** 44:20
141:18 175:3
**misappropriation**
153:13
**misspeak** 109:25
**misspoke** 24:19
171:2
**misunderstanding**
117:2
**misunderstood**
73:25
**model** 135:22
166:24
**modify** 138:21
**moment** 25:5 51:8
57:17 58:24 59:21
72:2 136:13
**money** 29:8,10,11
32:14,18 33:1,4
35:4,8 36:3,22
83:13,18 99:6
100:16 109:18
110:16 116:15,16
118:7 123:5 124:8
154:2 161:9

**mind** 171:14 189:20
**month** 77:25
109:9
**morning** 9:3,4
**motion** 103:8
156:8 161:1
**mount** 6:14
**mouth** 64:19
**move** 19:12 68:18
68:21 69:13 70:2
70:5,6,10,12 74:22
98:22 103:18
115:10,13,18
134:15,23 135:9
135:11,12,16,17
140:1,18 144:21
145:1 148:19
156:5 159:17
161:8,18,22,23
167:25 170:10
177:18 179:18
190:25
**moved** 28:5 68:25
69:15 116:4
134:20 160:7
161:12,12 190:14
191:7
**movements** 160:4
**moving** 69:22
134:14 140:2
**mt** 14:15,21
**multiple** 24:7,24
68:4,5,20 106:15
129:16,17,23,25
130:10,10,20,22
130:23,25 131:14
131:25 132:4,6,7,9
132:12 190:11
**multisig** 67:19,22
68:1,3,4

**muted** 48:6
**mutual** 175:10
190:20
**mwe.com** 3:15,16
**mycred.io** 123:17

**n**

**name** 6:18 12:12
17:4 28:11 31:6
51:13 73:13 80:4
194:18
**named** 75:3
**names** 14:22 75:23
**nature** 28:14
29:23 39:1 43:14
**nc** 11:5,6,11
**nda** 17:25 18:2,13
18:20 19:1,10
27:21 29:25 30:6
30:7 39:3,9
117:24
**ndas** 18:25
**near** 43:3
**necessarily** 14:11
16:19 150:24
**necessary** 47:22
**need** 29:8 46:1
72:17 81:18 101:7
101:13 125:11
157:3 158:14
159:19 189:15
192:9,11
**needed** 30:5 46:23
47:2 100:19,21
109:16 186:16
**needs** 30:2 39:4
**negotiate** 139:5
**neither** 184:9
**never** 37:9 64:18
95:25 181:2
182:14

**[new - okay]**

**new** 3:14,14 44:14
73:1 74:23 142:15
143:2 145:23
149:25 150:1,7,18
160:6,8,10 178:15
**newly** 178:5 179:6
179:7 189:16
**night** 8:6,15 66:20
73:19
**nod** 9:9
**non** 112:19
**nonaccessible**
112:4
**normal** 104:19
**normally** 23:18
24:15 73:25
**north** 3:19
**note** 6:6 167:12
177:7 187:9
**noted** 96:7 176:2,2
177:2 178:25
180:1 184:16,16
184:17,18,25
185:5 188:10
193:6
**notes** 117:15 192:4
**notice** 95:12
**noticed** 122:7
**noticing** 7:1
**november** 65:17
179:21 181:4
**nucor** 11:13,14,19
12:2,3,5,8 16:14
**number** 6:13
22:13 30:20 41:11
41:17,22 48:15
53:11,12 55:25
56:8 57:10 58:7
63:18 67:25 75:8
178:13,16 179:10
188:20

**numbers** 72:10
93:21 188:22
**numerous** 40:3

**o**

**oath** 6:21 80:14
109:25 126:13
**object** 9:17 12:17
15:12 18:17 19:6
28:21 30:15 31:2
31:21 33:22 34:14
35:9 36:15 37:22
43:20 47:16 60:7
64:11,15 82:19
85:17 86:1 87:2
90:4 94:1 95:8
98:3 102:12
115:16 125:9
127:20 130:12
131:17 132:15
134:24 135:8
138:11 139:13,21
144:3,24 145:12
146:13,17 147:7
147:16 150:4,13
150:22 151:13,25
154:3,10,24
155:23 159:15
160:13 161:15
164:21 165:2,8,16
165:23 166:7,20
169:21 171:15
172:22 173:23
174:7 177:7
178:14,20 181:12
182:6 186:4 188:9
188:14 190:15
191:8
**objected** 96:2
**objection** 15:14
33:5 39:7 40:16
54:10,14,21,25

64:16,22 86:10
87:9,20 88:8,15,22
95:17 96:6,17
124:10,20 125:12
125:21 126:9,18
127:4,8 128:11
131:3 137:5,12,21
138:19 156:16
157:14,20 175:21
176:8,20 177:2,7
177:14 178:10
179:1,23 180:3,5
187:22
**objection's** 180:1
**objections** 6:24
9:17 176:13
178:24 185:5
**objects** 9:19
**obligate** 171:24
**obligated** 171:13
171:17,20 172:7
**obligation** 54:22
172:5
**obligations** 95:17
**obtain** 29:4,5,20
85:9,14,15 157:9
170:18
**obvious** 115:5,6,7
143:11
**obviously** 74:12
119:21
**october** 5:20,22
**odd** 58:6
**offer** 71:23 112:17
112:18
**offering** 30:22,23
**official** 17:4
**offset** 77:24 78:6
**oh** 106:24 109:10
110:1 174:3

**okay** 7:11 9:3 10:4
11:8,16 12:1,12,22
13:8,11,24 14:6,14
14:17,21 15:4,16
15:21 16:3,11,24
17:8,11,13,17,20
18:6,9 19:2,12,23
20:4,20 21:4,11,23
22:6,13,16,24 23:6
23:10,13,20 24:9
24:13,17 25:2,16
26:11,14,23 27:8
27:24 28:10,12,18
29:1,5 30:4,12,20
30:24 31:8,16,18
32:3,10,24 33:1,19
34:2,8 35:2,17
36:7,20 37:7,13,19
38:21 39:7,11,16
40:5,13 41:5 42:5
42:14,23 43:7
44:1 45:12 46:8
46:11,18 47:14
48:5,23 49:6,21
50:6,19 52:15,24
53:4,7,17 55:11,18
56:12,17,24 58:6
58:12 59:7,10
60:3,19,23 61:12
61:20 62:5,10,23
63:22 64:8 65:5,8
65:25 66:16,25
67:4 68:7 69:10
70:13 71:4,21
73:15,20 74:1
76:2,12,16 77:3,8
77:15,23 78:15
79:4,18 80:21
81:22 83:5 86:15
88:12,19 90:8,16
91:3,5,10 92:16,21

Veritext Legal Solutions
866 299-5127

[okay - pendency]

93:2,5,12,16,23
94:22 95:2,16,24
96:18 97:10,11,14
97:17,18 98:13
99:11 100:7
102:18 103:4,9,10
103:16,20,21
104:23 105:9
106:18 109:6
110:7,11,18,21
116:6 117:6 118:2
118:10 119:2,7,14
119:18,23 120:4
121:2 122:3
123:22 126:21
128:17 129:3,8
130:17 131:24
132:7 134:14
135:5,8 138:8
139:2,8,17,25
142:8,21 145:4,17
146:3,11,25 148:3
148:21 153:10
154:14 158:3,10
158:15,16 161:24
162:3,10,16,21
163:17,22 164:1
167:4,23 168:9,24
169:9 173:25
174:25 177:1,22
178:4,17 179:5,7
181:25 184:1,6
185:24 186:24
187:8 188:2,23
189:9,16 191:22
**once** 26:19 33:1,8
33:11 47:21 63:8
71:2 76:6,7 98:21
111:5 142:13
145:21 160:16
168:14 181:17

183:6 185:8 186:1
**ones** 56:15 64:6,7
**online** 60:3 121:11
**open** 8:18
**operates** 20:2
**operation** 69:23
**operations** 68:19
69:1,14 70:7,10
134:17,22 135:10
**opinion** 163:20
**opportunity** 8:19
28:20 30:13,18
141:6 168:17,19
**opposed** 29:12
95:18 96:1
**opposing** 177:5
**options** 20:22
**order** 54:4
**original** 48:17
175:10 194:14
**outcome** 6:22
**outputs** 24:16,20
24:21
**outset** 66:3 142:9
162:22
**outside** 96:9 98:18
**overall** 175:17
**overlap** 11:24
**overlapping** 39:3
**overlybroad** 96:2
**owed** 41:23 42:20
43:8
**owner** 129:15
**owns** 18:6 20:3

| p |
|---|

**p** 52:25
**p.m.** 1:14 2:16 6:1
6:5 44:25 45:3
79:23 80:1 140:11
140:14 174:13,16
192:8,12

**page** 4:4,12 26:15
26:24 57:25 74:5
121:20 122:16
123:12 126:14
135:20
**pages** 1:25 189:6
**paid** 42:10 43:5
78:18
**paragraph** 66:9
142:8,22 143:6,8
143:19 144:2
145:6,17 152:23
152:24 153:8
164:1
**paragraphs**
122:15,19
**parrish** 1:13 2:14
4:3 5:16 6:11 7:14
9:3 11:2 18:8,11
21:23 38:11 45:5
48:13 51:24 55:3
80:4,13,21,24
81:15 83:5 86:16
89:17,21 90:16
93:16 95:21 96:5
96:20 97:11 99:16
100:7,19 102:10
103:22 125:14
126:13,21 129:9
140:16 141:2
142:17 143:16
146:8 147:2,21
148:5,12 153:6
162:5 174:17
175:7 177:3 182:3
183:14 185:7
186:13,21,24
187:5 188:16
192:6,13 193:3,18
**parrish's** 147:11

**part** 70:15 76:13
101:12 103:11
108:23 121:10,21
121:24 122:9
167:24
**partial** 5:9 48:8,16
**participants** 6:17
**particular** 12:16
18:21 23:25 25:8
25:9,17,21,24,25
27:3 50:16,17
54:8 60:5,12,14,16
78:12 187:9
**particularly**
130:17
**parties** 6:9 8:2
143:15 153:17
154:14
**party** 6:21 18:4,21
18:25 30:8 33:3
**passed** 116:24
141:13
**pasted** 55:10
**paul** 3:5 7:5 72:21
80:5 192:10
**paulhastings.com**
3:8,9,10
**pay** 42:18 44:2
**payable** 43:12
**payment** 41:22,23
42:1,2 43:3,6,11
44:7
**payments** 42:3,12
43:1 44:9
**pays** 21:21 31:20
32:2
**pdf** 35:16
**pedro** 3:6 7:6
**penalty** 193:1,3
**pendency** 10:19

Page 21

[pending - price]

pending   10:6,10
  10:11 110:15
people   44:19
  79:19 101:19
  119:19 122:2,23
  127:17
percent   44:2 111:7
  111:8 173:3
perfectly   69:16
  104:17,18
perform   181:5
period   16:7
perjury   193:1,4
permitted   10:12
person   27:21,24
  28:12,17 62:2
  99:12 104:13
  117:19,22 118:11
  118:18,22 148:6
  187:20
person's   28:14
personally   26:12
  62:24
pertains   194:13
pertinent   93:10
phone   10:1 114:14
  114:18 119:22,23
  120:4,5,19,23
  133:8 135:7
phrase   90:8
pick   6:7
picture   103:13
piece   160:17
pieces   157:25
pierce   3:18,22 4:7
  7:8,8,17,20 8:23
  10:22,22 12:17
  15:12,15,18 18:17
  19:6 28:21 30:15
  31:2,21 33:5,22
  34:14 35:9 36:15

37:22 40:16 43:20
  44:21 47:16 54:9
  54:15 60:7 64:11
  64:15,17 72:18
  82:19 85:17 86:1
  86:10 87:2,9,20
  88:8,15,22 90:4
  93:9 94:1 95:8,23
  96:8 98:3 102:10
  102:12 115:16
  124:10,20 125:9
  125:21 126:9,18
  127:4,8,20 128:11
  130:12 131:3,17
  132:15 137:5,12
  137:21 138:11,19
  139:13,21 140:4
  144:3,24 145:12
  146:13,17,22
  147:7,16,25 148:8
  150:4,13,22
  151:13,25 153:3
  154:3,10,24
  155:23 156:16
  157:14,20 159:15
  160:13 161:15
  164:21 165:2,8,16
  165:23 166:7,20
  169:21 171:15
  172:22 173:23
  174:7 175:3,6,21
  175:23 176:2,6,14
  177:1,6,10,17
  178:12,17,25
  179:3,10,13,17,20
  179:25 180:6
  181:15,24 182:6
  182:13,17 183:11
  183:18,22 184:8
  184:16,19,25
  186:4,10,17 187:2

187:9,12,23 188:8
  189:1,4,9 190:15
  191:8 192:3
pjimenez   3:9
place   6:9 22:18
  61:5 112:4 194:8
placed   42:17
plan   140:5 156:7
planning   189:13
platforms   14:13
  14:14,18,19
plausible   121:19
pleasant   6:14
please   6:6,25
  47:21 98:22 121:4
  136:22 147:21
  184:22
pledge   126:21,24
pledged   35:22
  36:1 41:11 48:16
  122:10 123:3,23
  123:25 124:6,25
  126:7,16,17 127:1
  127:19 128:2,9,22
  136:18 137:3,11
  137:17,17,19,19
  138:4,10,18
  139:11,20 169:25
pledging   111:21
plus   43:7
point   29:2 74:14
  100:14 104:10
  129:15,15 130:24
  159:6 171:19
  173:10 180:20,24
policies   155:21
  176:17,18 177:13
  177:16
portion   41:10,17
  130:24

position   8:20
  177:5
possession   81:10
  85:9 86:6
possibility   115:24
possible   74:15
  78:19 123:8
  160:19,22 177:11
  177:15 185:20
postpetition   86:16
  86:22,25 87:4,7,11
  87:18,23 88:7,10
  88:13,21,24
  187:15,20
potential   27:16
  31:1 154:19
potentially   71:13
  135:7
power   11:17 21:22
precise   90:23 92:5
  109:5
precludes   40:14
prefer   30:1 39:5
  46:17
prepare   40:2
prepared   58:25
prepetition   180:24
  187:20
present   3:24
presented   138:22
presumably   8:7
presume   94:14
presumed   127:13
presumptively
  8:16
pretty   15:18,20
prevents   164:11
previous   90:19
previously   54:15
price   46:25 153:13

[primary - question]

primary 107:21
principal 43:5,11
principally 122:17
print 81:21
printouts 67:1
prior 28:19 39:22
　105:10 161:1
　171:21
privacy 74:14,15
　106:15 129:21
　130:1,4,18 131:7
　131:11 133:10,11
　133:12,13,14
　134:1,3,7
private 6:7 68:14
　76:13
privilege 9:18,20
　10:13 146:19,23
　147:8,19 148:1,9
　182:8,10 185:2,15
　186:11,19 187:3
privileged 147:10
　147:18 184:12
probably 14:15
　54:4 88:3 170:22
　175:3
problem 96:4
　97:13 108:20
　109:20 188:24
problematic 96:1
proceed 55:1
proceeding 6:24
proceedings 194:9
　194:12,15
proceeds 153:18
　155:16
process 106:13
　189:12
procured 63:23
produce 67:25
　68:4 81:4

produced 7:22,24
　8:1 54:11,15 81:9
　120:20 133:5
product 148:9
profit 37:4 93:21
program 32:24
　42:18,20,21,25,25
　43:2,9 44:7
　122:16 126:15
programs 32:3,6
prohibited 165:14
projects 100:17
pronounce 75:6
proper 148:4,19
properly 70:24
　113:9
property 19:16,17
　19:20 37:6,12
　40:19 60:22 70:19
　103:3 136:6
　154:12 156:18
　157:15,16,18,21
　170:2,24
protect 129:13
prouty 3:6 7:7
　129:6 140:23
　142:25 153:1,8
　162:2
provide 31:15
　32:20,22 36:8,11
　39:18 62:2,6
　67:16 68:13 92:18
　97:18,19,20 98:13
　98:17,22 101:9,15
　113:14 118:5
　119:6 134:12
　186:15
provided 30:19
　33:14 35:7 37:14
　37:20 40:6,11
　41:7,19 45:6,7

48:2 49:3 50:14
　52:8 55:17 58:22
　59:7,25 60:13,25
　61:4 63:4,5,10,16
　63:25 64:23 67:2
　73:18 78:6,24
　79:11 80:24 81:12
　84:16,17 86:2,3,7
　86:12 97:13 98:8
　99:24 100:1 104:6
　105:3,3 109:22
　111:6 113:25
　119:10 157:22
provides 31:18,19
　32:1,1 36:12
　70:17 118:4 164:8
　164:18,24 172:9
providing 36:22
　37:3 39:20 43:16
　43:18 74:20
provision 39:13
　138:17 164:7
　165:14 166:13
　168:2 171:3
　172:13,19 173:4
public 68:12,14
　74:16 81:13,14
publically 8:10
publicly 54:22
　59:1 64:4 159:22
pull 40:21 49:17
　51:7,23 55:4,24
　129:3 140:19,21
　161:24 162:2
pulled 105:1
pulling 129:6
purchase 13:12,18
　14:8,8 20:18
purchased 13:17
　13:24 14:4,4,24

purchasing 13:14
　14:7 15:10
purpose 16:18,23
　20:12 21:16 44:8
　68:1 76:3 156:17
purposes 12:23
　16:16 45:8 59:8
　68:19,25 69:14,22
　70:7 134:16,22
　135:9
pursuant 41:14
　83:12 84:5,22
pursue 153:16,21
　154:1 155:1
　176:16
put 7:18 24:13
　25:2 35:7 54:13
　54:19,22 81:19
　83:21 101:11
　117:18 122:25
　124:1,2 138:17,25
　139:2 146:12
　158:12 159:12
　160:10 168:1
　170:23 178:15
　188:25 189:3
putting 64:19
　119:23

q

quantacoin 77:14
question 9:19 10:6
　10:10,10 15:17,20
　15:23,24 18:22,24
　21:18 33:6,11
　60:8 64:21 67:24
　71:6 80:19 84:9
　87:11 88:19 89:11
　92:23 94:2 95:2
　96:5,21,22 102:13
　117:12 127:25
　128:15,20 131:6,8

[question - reiterate]

131:11 143:4,7,16
143:18 146:18
148:17 153:7
159:20 166:3
168:6 172:18
174:20 176:5,8
177:9 180:2
182:10,19,25
183:3,18 184:2
185:20 186:18
188:6
**questioning**  93:10
95:9 96:3 188:13
**questions**  9:7,8
11:2 54:17,18
59:8 79:15 80:17
95:9,13,18 101:8
103:7 124:16
141:3 174:18
175:2,4 176:1,24
177:5,8 181:24
182:17 184:19,23
185:23 187:10
191:22
**quick**  50:9,10,13
72:22 174:9
**quickly**  9:12 78:18
**quite**  187:16

**r**

**raise**  122:5 187:11
**raised**  184:10,23
187:17,25
**range**  92:8
**rashotsky**  51:9
**rate**  42:24 111:4
**rates**  70:15 106:9
106:9
**rath**  3:18 7:8,20
**reach**  8:12,19
**read**  36:17 121:13
121:19 122:9,19

123:3 124:25
125:16,16,18,23
127:15,23,24
128:18,19 146:10
163:21,22,23,24
163:25 171:5
182:16,18,25
183:2
**readily**  111:7
**reading**  79:1
125:17
**real**  19:20,22,23
20:1
**really**  64:21 75:22
108:24 109:15
136:23,23 174:19
184:20
**reason**  30:2 39:5
45:18 46:20 61:10
63:14 65:3,5
67:23 80:21
107:21
**reasonable**  121:20
**reasons**  106:10
131:10 143:23
**recall**  41:3 52:19
54:6 65:8,23,24
75:21 81:17 106:6
106:17 111:1,20
111:23 114:13,25
115:4 118:14
120:1,5,11,16,16
120:18 121:1,18
124:16,18,23
128:25 132:23
133:2,7 136:20
138:1 139:22
141:22 144:10,19
145:8,10,14 152:8
158:6 162:25
171:7 188:19

189:24 191:1
**receive**  98:21
100:24 129:24
**received**  34:13
38:18,21 48:24,25
61:2 66:20 78:10
84:2 134:20
**receives**  33:1,2,8
38:20
**recognize**  38:5
51:12 72:6
**recollect**  114:15
**recollection**
104:23 105:7
113:21 114:24
136:17 152:18
**recollections**
114:21
**reconvene**  44:18
**record**  6:4,9 7:18
7:19 8:3 9:10
10:22 37:11 44:24
45:1,2 54:13,19
61:6 79:22,24,25
96:17 127:24
128:19 140:3,8,10
140:12,13 174:12
174:14,15 182:18
183:2 188:10
192:1,7 194:11
**recorded**  6:10
**recording**  6:8
**records**  36:4 123:6
124:9 180:7,16
**recover**  156:10,13
156:17,25
**recovery**  153:16
153:22 154:2
**redeem**  47:14
**redemption**  5:9
48:9,17

**redemptions**
77:25 78:6,16
**reduce**  43:4
**refer**  33:24 35:10
177:25
**reference**  30:10
52:10 67:9 81:23
135:3,22 149:22
149:24
**referenced**  28:16
29:25 121:7
**references**  121:7,8
144:5 162:16
**referencing**
135:14,15
**referred**  27:16,19
28:4,13,17 30:25
31:12 90:20
105:20 174:4
**referring**  23:22
53:25 90:21
129:20 144:8
154:15 155:20
157:21 162:18
169:5
**refers**  126:7,17
169:8
**reflect**  47:23 48:16
133:20
**reflected**  120:24
133:4,22 135:5
144:1
**regard**  8:21 89:7
91:6 119:7 121:16
130:19,25 164:2
169:9 171:25
182:4
**regarding**  10:20
**regards**  162:19
**reiterate**  80:10

Veritext Legal Solutions
866 299-5127

[relate - right]

**relate** 119:15
123:25 171:4
**related** 6:21 12:3
62:8,20 75:25
102:1
**relates** 27:21
**relation** 18:4,5
28:4 130:18
**relationship** 62:19
97:21,24
**relevance** 93:6,9
100:15 103:17
**relevant** 100:17
101:3 119:10,12
179:25
**relief** 103:5,8
153:15 157:6
**remedies** 172:9
**remedy** 102:25
103:1
**remember** 14:22
14:23 15:3 16:9
16:13 32:4 37:17
49:8 51:13 55:14
55:16 61:25 62:22
65:18 106:11
109:11 131:22
152:6 188:21,21
**remembering**
108:21
**remotely** 6:18
**removal** 130:7,20
131:16 132:4,8,13
**removing** 129:17
130:23 132:1,10
**reopen** 98:20
**repayment** 171:21
181:1,6
**repeat** 60:8 89:11
184:1

**rephrase** 34:23
63:9
**reply** 89:17
**reported** 1:20
194:9
**reporter** 2:17 6:19
44:17 72:9,12
79:20 127:22
128:17 140:9
192:9 194:3
**reporter's** 194:1
**reports** 51:15
**represent** 7:4
51:24 55:9 59:5
80:6
**representation**
169:4
**representations**
37:1 66:10 118:7
168:24 169:6
**represented** 66:5
142:11 145:18
**representing**
52:12
**reproduce** 136:13
**reps** 169:1
**reputation** 121:9
**request** 46:20
54:21 80:25 81:2
81:5 101:25
**requested** 46:13
48:24,25 62:11
156:6 171:7
194:16
**require** 71:24
**required** 9:18,21
29:13 40:6 44:1
103:16 171:11
**requirements**
171:9

**reserve** 96:6 98:20
187:8 188:14
**resolution** 8:12
**respect** 43:1
**respond** 78:15
**responds** 68:11
**response** 71:21
76:11 131:24
141:2 180:12,13
**responsibilities**
12:2
**responsive** 81:5
102:5
**rest** 57:14 191:6
**restarted** 79:20
**restate** 183:18
**restricted** 138:3
**restriction** 165:20
**restricts** 165:6
**retail** 36:3,20
71:17 123:5 124:8
**retailed** 36:13
**return** 45:5 46:13
46:20 156:14
157:12 171:13,20
180:25 181:6,9
**returned** 116:22
**revenue** 92:11,24
92:25 93:17,19
136:5
**review** 40:1 44:11
44:12 54:16 74:2
81:2 89:17 141:6
163:6 194:15
**reviewed** 37:13
39:21,23,25 44:13
65:25 137:14
175:11 193:4
**right** 9:14 10:2,24
11:20 12:6 14:12
16:17 17:6 18:15

19:3,19,21 21:25
22:4,9,14 24:1,11
24:18,24 25:5,9,18
27:3,9 28:20 30:6
30:21 32:4,20
33:4,10 34:4 35:8
35:20 36:9 37:1,4
37:9 38:19 39:9
39:18 40:7,11,15
41:8,10,15,20,24
42:7,11,16,21 43:9
43:12,16,23 44:2,7
45:6,14 46:14,25
47:15,17,20 48:3
48:18,21,24 50:4
50:11 52:16 53:5
54:4,6 55:8,19,22
56:1,5,10,18 57:15
57:22 58:4,7,10,22
60:1,6,13,21,25
61:5 62:7 63:1,5
63:19,23 64:1
65:6,14 67:12
68:2,9 69:1,4,19
69:25 70:3,7,11,18
71:5,12,18 73:3,10
73:22 74:10,16,17
74:21 77:11 78:8
78:10,24 79:7,9
83:17 85:24,25
91:24 92:6,15
93:25 94:21 96:15
97:10 98:6,19
101:17 108:2,13
108:25 109:1
116:25 121:23
124:5 125:17
133:6,10,23 134:1
135:9,15,20 136:1
138:16 139:5
140:23 145:8

Veritext Legal Solutions
866 299-5127

[right - seeking]

150:1 151:6,8
153:3 167:18
170:15 171:5
176:19 187:8
191:20
**rights**  8:21 98:20
188:14
**role**  12:1 28:2,14
61:23
**room**  9:24
**rule**  10:21 79:21
**rules**  9:5 10:23
80:11
**run**  34:9 91:12
118:2
**running**  34:7

**s**

**safer**  113:7
**sale**  172:10,14,20
172:23,25 173:1,2
173:5,12
**salt**  28:5,7,11
105:24 106:4,18
106:19,20,23
107:5,7,12,16,17
107:18,24 108:1,9
108:10,14,15
110:5,7,12,13,20
110:22 111:7,10
111:12,16,18,21
112:7 121:8
**sam**  7:3
**samuel**  3:13
**sashworth**  3:16
**satoshi**  56:7
**saw**  64:9
**saying**  18:13,19,20
18:20 19:10 24:23
30:5 33:23 34:5
34:10 36:7,11
39:2,2 45:15 52:9

67:4 70:1,4,4,5,6
70:11 74:18 77:14
77:21 78:9,14,23
78:25 79:1 87:14
87:14,15,16,16
88:4 100:21 109:5
109:7 114:25
124:6 126:6 131:5
131:5 132:11
137:6,16 144:10
144:19 152:19
154:1 160:3 167:8
176:23 187:20,23
**says**  35:22 40:6,9
40:12 41:10,17
43:11,13 47:18
51:15 66:9 68:16
69:6,8,25 70:13
71:23 73:12 77:18
77:23 78:9 95:19
111:19 122:10
124:3,12,12
126:14,15 134:15
137:13 143:1
148:24 149:25
151:4 153:12
169:6,12 170:10
170:10 171:6
173:11,15 178:4
179:5,6,22 180:7
180:16 189:11
190:4
**schatt**  62:23 63:1
63:3,6
**school**  11:3 163:15
163:16 174:20
**scope**  26:22 102:1
102:4 178:15,21
180:3 181:13
**screen**  35:12,20
36:18 74:5 177:18

177:23
**screens**  158:5
**scroll**  35:19 38:7
39:12 56:20 67:14
67:18 76:20 77:8
**search**  23:19 49:9
49:10 54:2
**searched**  49:4,6,21
54:2
**searches**  49:10
**searching**  50:24
56:12
**second**  21:9 40:22
53:10 55:4 59:17
142:9 146:8
177:19 191:24
**secret**  92:17
**section**  39:13,16
39:21 40:5,9,13
48:15 162:21
164:11,15,18
167:4,23 168:7,10
169:5 172:8
**secure**  32:22 33:17
34:23 46:23 47:3
51:5 60:21 84:4,8
85:12,19 86:3
112:6 113:10
135:19 157:22
165:25 171:11
**secured**  30:23,24
31:15,16,17 32:9
68:5 70:23 100:23
129:13 136:10
170:20
**securely**  143:24
**securing**  163:13
**security**  5:5 34:17
38:1 81:20 82:21
84:11,18 94:24
95:7 96:25 110:23

136:24 162:1
163:13 164:3
166:9 173:7,14,16
173:18
**see**  24:15,17 33:11
35:20,24 36:5,10
36:14,16,24,25
38:12 39:14 41:22
46:17 47:8,24
50:14 51:18,21
52:10,22 53:8,13
53:14 55:7 56:2,4
56:6,9,21,22 57:2
57:6,9,11,21 58:2
58:3,5,14,16 59:12
59:15,19 63:12
66:7,14 68:22
71:25 72:16 73:24
74:4,5 78:3,4,21
81:18 92:25 93:21
100:15 118:3
122:13 123:8,17
123:20,21,22
125:24 129:12,18
132:16 142:9,19
145:24 148:23
153:12,19 158:11
158:21 160:6,14
161:9 164:4
168:10 169:7,14
169:17 171:23
174:10 177:23
178:2,4,7 179:5,12
180:10 189:11
**seeing**  79:20 92:25
188:21
**seek**  156:21
**seeking**  102:25
103:8 154:9,11
155:25 176:16

Veritext Legal Solutions
866 299-5127

**seen** 108:7 122:12
159:25 160:9
**sees** 33:10
**segregate** 40:6
144:5
**segregated** 37:15
66:6,12 68:17
69:4,8,12,16,19
70:2,3 78:11 79:6
111:16,22 142:12
143:13,24 144:6
144:12,13,15,18
145:20 149:9,12
149:16 151:11,18
151:20,24 152:11
152:15,20 178:5
179:7,15 189:16
190:17,21 191:5
**segregation** 164:8
164:19
**select** 146:16
**self** 29:16,17
**sell** 20:20
**selling** 21:1,6,13
21:20
**semantics** 88:3
**send** 23:23 85:5,8
85:12,18 104:15
129:24 189:13
**sending** 130:6
144:11,14
**sends** 68:20 76:21
129:17 130:23
**sense** 71:22 112:2
125:6,6,15 140:5
143:14 190:20,24
191:5
**sensitive** 6:6
**sent** 49:16 53:3,4
56:8 80:25 85:15
141:14 154:19

**sentence** 69:11
70:13 71:23
127:11,12
**sentences** 74:3
**separate** 27:2,6
66:12 76:17 82:8
131:14 133:15
134:10 191:6
**separately** 44:4
95:3
**september** 64:24
**series** 52:17 55:18
**servers** 91:12
**service** 27:16
28:24 30:10,19
31:9 113:14,25
**services** 31:9,14
71:24
**set** 8:14 68:14
78:16 84:10,17
95:6 96:24 111:15
129:23 134:2
138:8 142:22
165:21 166:5
182:17 194:8
**share** 35:12
117:25 177:18
189:8
**shared** 30:1,3 39:4
115:8,10,12,14,17
115:20
**sharing** 39:7
109:20
**sheet** 55:15
**shield** 184:24
**shine** 3:25 6:18
**short** 8:15
**shorthand** 2:16
194:3
**shortly** 50:14,16
78:23

**show** 24:14 25:3
46:18 52:16 65:21
159:12 180:8,16
**showed** 46:16
71:20 134:15
158:3,4,17 164:2
188:23
**showing** 38:10
**shown** 118:15
188:18
**shows** 48:17
**side** 57:8 74:15
124:4
**sign** 142:3,5
**signature** 38:12,13
141:24 194:23
**signatures** 68:6
**signed** 30:7 39:3
39:23,25 65:25
141:7,14 162:8,13
165:13 167:19
168:19,25 169:6
**significance** 95:22
**signing** 40:4 65:8
65:23,24 141:22
**silent** 130:24
**similar** 14:18
109:18 157:13
189:23
**similarly** 56:13
**simplicity** 91:13
**simply** 43:4 69:15
70:5 172:2 173:17
**single** 68:17 81:4
**sir** 84:9 87:25 98:1
102:3,18 111:24
116:6 122:9,15
123:3 128:15
131:10 134:14
136:17 138:8
139:9,17,25 161:1

161:24 162:16
164:16 171:19
172:13 185:25
**site** 124:3,12,12
126:11
**sites** 25:7
**sitting** 37:8 104:2
126:2 152:18
**situated** 157:13
**situation** 106:14
134:2
**size** 57:4 94:17
102:6 103:12
**slowly** 9:11
**snapshot** 97:2
99:4
**snapshots** 59:6
**sold** 30:21
**sole** 20:11 143:20
143:22
**solution** 112:17,19
112:25
**somebody** 28:18
65:12
**somewhat** 109:18
**soon** 78:17
**sorry** 20:11 24:19
27:4 40:22 48:7
53:10 54:14 60:16
61:6 71:10 72:7
72:11 73:25 78:2
99:10 100:3,9
104:21 106:24
107:10 116:10,24
117:12 136:22
138:1 143:16
146:3 152:15
163:17 170:16
171:2 176:4 179:9
**sort** 17:23 19:17
81:8

| | | | |
|---|---|---|---|
| **sound** 21:10 37:10 61:6 | **spent** 50:9 | **stating** 47:20 48:15 109:23 172:2 173:17 | **structure** 29:9 |
| **sounds** 109:16 131:4 | **spreadsheet** 5:11 | | **study** 11:6 13:10 |
| | **spring** 110:8 | | **stuff** 16:10 46:15 108:13 |
| **source** 27:23 | **stakeholders** 116:12 | **status** 63:4,12 161:2 180:14 181:17 182:4 183:7 | **subject** 8:6 30:6 |
| **south** 3:7 6:15 | **stamp** 74:5 188:20 | | **submitted** 89:18 |
| **space** 11:23 17:19 17:21 22:11,21 26:8,21 | **standard** 6:5 44:25 45:3 79:23 80:1 103:19 140:14 174:13,16 192:8 | **stay** 102:11 103:5 103:8 153:16 156:6,21 157:6 161:2 | **subscribed** 194:18 |
| | | | **subsequently** 159:11 |
| **speak** 9:11,12,13 10:17 21:11 31:1 | | | **substance** 10:20 133:3 |
| **speaking** 95:21 125:11 | **start** 11:3 12:22 13:14 15:2 16:3 16:12,15 54:9 | **stayed** 161:11 | **sufficient** 171:1,9 |
| | | **steal** 85:24 86:5,7 | **suggest** 147:15 |
| **special** 166:13 | **started** 9:6 12:9 13:6,10,12,18 14:7 15:10 16:11 75:18 | **stealing** 85:15,22 | **suggested** 117:20 121:4 |
| **specific** 62:15 91:13 95:13 96:5 96:15 108:18,25 111:5 120:17 124:16 134:7 145:8 147:5 156:25 157:4,6,25 160:17 | | **steel** 11:13,14,15 11:15,19 12:2,3,5 12:8 | |
| | | | **summary** 158:13 |
| | **state** 2:17 6:25 11:5,6,11 67:18 88:20 161:17 176:15 194:4 | **stenographically** 194:9 | **summer** 110:10,14 |
| | | | **supplemental** 5:15 72:24 140:20 143:9,19 175:11 |
| | | **step** 32:21 | |
| | | **steps** 60:5,11 | |
| | **stated** 14:2 30:11 36:16 37:5,14 40:19 53:14 54:1 56:15 70:12 77:6 87:3 88:9 99:3 103:15 113:24 125:22 127:15,16 145:13 152:13 156:8 161:7 165:10 166:21 | **stole** 85:23 | **support** 143:5 146:12 |
| **specifically** 98:10 99:9 104:19 111:15,20 114:8 118:10 128:8,21 128:25 129:22 130:5,19 135:14 135:15,21 137:10 138:1 139:18 142:5,13 145:21 151:20 155:10 178:6 179:8 189:17 | | **stolen** 86:12 | **sure** 10:17 13:5 14:12 15:2 31:25 39:8 54:12,20,25 64:25 66:1 68:12 78:1 84:13,15 111:20 121:14 123:18 124:2 125:8 127:22 133:1,14,25 134:4 136:14 142:24 151:19 167:17 173:3 190:17 191:18 |
| | | **storage** 15:7,8 68:17 69:12,19 70:14 85:6 111:25 112:1,2,8,11,17,19 112:25 113:5,7,9 135:23 152:6 | |
| | | **store** 14:24 15:1,5 22:18 111:24 112:24,24 113:1,4 115:1 | |
| **specification** 101:5 103:13 | **statement** 79:2,4 88:13 124:19 143:5,8,18,21 144:1 145:5,11 146:2 154:4 | **stored** 15:3 69:3,8 112:3,19 113:2 114:3 115:3,8 | **sword** 184:24 |
| | | | **sworn** 7:12,15 194:6 |
| **specifics** 95:11,14 96:1,10 | **statements** 68:22 68:24 89:4,8,10,13 133:8 142:21 | **storing** 112:1,2 | **synonymous** 90:2 |
| | | **straight** 20:4 | |
| **specify** 46:10 | | **street** 3:7,19 | |
| **speculate** 161:16 | **states** 1:1 2:1 6:12 36:1 66:3 69:11 | **strictly** 16:21 | |

**[take - time]**

| t |
|---|

**take** 6:9 25:12
33:15 34:19,20
35:6 40:19 44:15
55:9 59:11 70:9
70:17 79:16 83:17
90:9 94:10 110:18
137:3 145:17
146:8 156:7 174:1
174:9,23
**taken** 2:14 50:8
60:4,11 85:3
159:12 193:5
194:7,12
**talk** 10:12 27:14
46:17 62:6,12
121:8 130:5
152:16 170:16
183:23
**talked** 26:24,25
**talking** 16:7 23:21
72:25 74:9 81:13
90:24,25 121:9
141:18 189:1
190:5
**task** 91:13,17
**telegram** 5:17,18
5:19,21 61:13,17
66:17,22 67:3,5
72:3,25 73:2,9,13
73:21 75:2,15,16
75:19,23 81:7
114:19 119:7,9,20
120:20 129:10
177:21
**telephone** 61:18
61:18 132:20
133:2 145:9
151:21
**tell** 62:16 72:12
92:7 109:1,8,10

110:2 117:22
118:11 125:24
138:3 139:10,18
142:9 147:11,21
149:15 166:12
174:5 177:4 181:8
182:3,12 186:9
190:23 191:1,4
**telling** 68:24 69:21
70:16 77:20 78:5
118:10 122:5
126:13 132:3
139:22 170:13
191:1
**tells** 70:12,19
131:24 135:21
**term** 26:2,3 54:2,3
163:22
**terminology** 25:15
53:18
**terms** 22:17 25:12
41:6 84:10,16,22
96:24 101:4 104:1
110:21,22 139:2
163:19
**terrible** 188:16
**terrific** 86:15
121:2
**test** 189:12
**testified** 53:23
90:16 91:7 141:2
**testifies** 7:15
**testifying** 96:16
114:20
**testimony** 38:25
80:22 104:16
162:23 175:16,19
176:9 179:25
180:4 184:24
193:7 194:8,11

**tests** 189:19
**text** 10:4 119:24
120:1,2 129:4
**texts** 189:12
**thank** 8:23 73:4
74:7 80:8 140:22
175:1 179:17
192:6
**thanks** 77:16
92:22
**theft** 77:4 85:10
**theory** 77:1
**thereof** 153:17,22
154:5 156:11
**thereto** 176:11
**thing** 12:25 26:1,5
26:6,8 62:18
94:20,23 119:7
124:3 167:10
169:9
**things** 26:9,16
62:5,13 80:10
96:13 106:11
108:21 109:23
**think** 7:11 10:18
12:5 23:3,15 26:1
26:2,3 27:20 30:3
45:25 62:1 64:18
72:7 73:1 74:24
81:12 91:1 92:8,9
96:4,8,10 101:3
102:5 113:15
117:25 121:19
140:1 144:12
148:4,10,19 164:6
174:20 184:14,21
184:22 185:1,19
189:7,24 192:4
**thinking** 68:2
113:17,20,21
144:1 145:5

**third** 18:4,21,25
20:7 30:8 33:3
59:21 153:17
154:14
**thought** 20:11
72:15 76:18 79:6
190:23 191:5
**thread** 73:16,18
**three** 17:5 44:15
44:20 45:24,25
46:5,6,7 56:4 57:8
58:13 122:15,19
159:13,23
**throwing** 68:8
**time** 6:5,25 8:9
13:11,25 14:4
16:6,7,15 29:2,18
44:25 45:3 46:12
50:9 52:22 64:9
64:13 67:15 76:10
79:1,4,23 80:1
89:24 94:24 95:5
96:22 97:2,3
98:24 99:23
103:23,24 104:9
105:2,8,11 106:25
107:6,8,14,19
109:4,9,13,18,19
113:18,20,21
120:6,13 121:14
121:17,19 122:13
131:1,15,15
132:13 135:25
140:14 141:13
150:12 153:6
158:13,25 163:24
163:25 166:9
168:25 171:14
174:13,16,19
191:16,23 192:8
194:7,12

Veritext Legal Solutions
866 299-5127

[times - understand]

times 16:9 40:3
52:22,23 96:3
103:23 158:25
190:11
timing 109:24
160:3
title 53:13
today 6:14 7:10
8:1,2 9:7,16,24
14:11 21:24 26:23
38:25 39:22 40:1
51:2 79:10 80:14
80:22 81:17 83:8
84:19 89:19 92:13
102:19 104:2,16
114:20 117:13
125:20 126:2
129:9 141:3
152:19 162:6,17
190:5,9,11
tokens 41:18
told 94:11 95:21
95:25 106:22
107:15,23 108:23
109:15 117:7,16
119:3 127:2,18,25
128:4 131:10
132:19 133:5,10
136:18 147:12
151:22 152:9
155:3 157:24
165:5 166:25
169:19 170:14
182:4,12,14
183:15,21 184:5
186:24 190:11,12
191:9,9
tomorrow 51:17
185:5
tool 189:23

top 38:15
topic 140:18 184:9
184:11,23 187:10
187:13,16,24
topics 95:13
total 56:4 58:3
108:6
totally 109:11
touch 51:17 119:2
track 36:4 123:6
124:9 143:13
176:5 179:5
trade 14:19 33:9
33:16,20 78:2
trades 33:3
trailed 21:7
transact 36:2,8
123:4 124:7 125:1
125:5,7 127:3
137:16,17
transacted 118:20
118:24
transaction 21:16
21:24 22:3 23:14
23:17,19,20 24:10
25:8,9,10,11,16,16
25:18,20,21,23,24
26:3,5,8,15,23,25
56:1,25 57:4,10,21
58:12,14 59:17
95:6 98:10 99:23
103:25 104:9
105:12,17 106:7
106:19,20,22
107:14,16,24,24
108:4,9,10,14,19
110:7,9,15 120:14
136:1 169:24
transactions 21:1
21:5,12,19,21 23:3
23:5,6 24:16

52:17 55:20,21,22
56:5,20,21 58:4,5
59:12,13,18,22,22
64:9 66:4 105:10
108:3 109:17
142:10 189:14
transcribed
194:10
transcript 192:9
193:4 194:14,16
transfer 149:4
150:2 157:2 159:1
159:14,24
transferred 41:14
50:17 84:3,4,5,8
84:22,24 148:25
158:18 160:11
161:4
transferring 149:8
transfers 143:2
149:19,23,25
150:10,12,25
treat 8:4,7,15
trending 163:13
trick 21:18
trivial 143:12
true 59:9 60:22
79:5 80:22 88:17
88:25 89:1 142:16
171:24 191:20,21
193:7 194:11
trust 65:19 82:11
82:15 111:12
truth 101:15 131:6
try 9:11 21:9,11
33:3 35:7 37:4
49:2 158:13
trying 22:11 26:20
27:20 28:25 29:1
61:25 101:1,11
109:3,3,12,13,14

131:6,22 170:11
turn 135:20
152:23 162:21
164:15 167:4
171:1 172:8
two 32:3,6 46:10
49:19 50:7 56:18
57:8 58:13 60:10
65:14,19 75:22,22
75:23,25 82:20
83:2 95:3 101:19
107:22 116:11
154:19 189:12
txlog4:23eod.csv.
51:20
type 41:11 48:15
103:12 118:11
types 22:15
typewriting
194:10
typically 23:7,8
70:13 73:13
135:22

u

u 5:21,22 178:19
179:19
u.s. 156:22 157:10
157:19 158:1
uh 9:9 53:6 71:21
97:4 105:24 118:9
172:12
ultimately 106:21
118:3 135:8
unartful 117:12
unaware 87:21
unchained 106:4,8
106:23
understand 9:14
9:22 10:14,21,23
19:11 21:18,23
25:23 32:17 37:14

Veritext Legal Solutions
866 299-5127

37:19 38:1,15
40:18 42:19 43:14
58:1 61:23 64:22
74:19 77:13 80:13
80:17,19 84:13
99:4 101:13
102:14,18 103:4,6
103:14,24 109:14
112:18,20,23
113:1 115:5 123:6
125:2,7 126:14,16
127:2,11,12
135:17 136:3,7
156:20 159:19
160:22 170:11
171:3 172:16
174:25 176:22
179:14 180:15
181:17 183:7
187:19,22 188:13
**understanding**
7:23 8:3 24:25
25:22 26:9 30:13
30:18 31:22 32:11
33:12,15,17 34:12
34:19 37:7 44:5
66:11 67:23 101:1
102:15 103:15
114:2,5 115:1,3
125:10,19 155:22
163:18 183:15,20
184:4 190:6,18
**understood** 18:22
34:15,25 37:11
40:19 69:17 74:22
75:5 112:14
113:24 114:1
123:25 126:6
127:6,13,14
135:11,12,16
136:5 137:22

139:5 144:20,22
144:25 145:1
159:16 161:7,12
161:18,23 163:5
165:17,24 167:2
171:13 180:18
181:22 182:23
**undertook** 169:11
**unfortunately**
102:3
**unheard** 49:9
**unique** 61:8
**uniqueness** 27:12
**unit** 112:8,11
**united** 1:1 2:1
**unites** 6:12
**university** 11:5
**unlimited** 67:25
**unofficial** 76:1
**unpack** 69:10 71:2
**unsecured** 7:4
**updated** 48:16,20
171:11
**upgradeya** 3:17
7:9,19,21,22 12:13
12:14,15 16:12,16
16:20,22 17:3,3,5
17:8,9,14,23,24
18:6,10,14,23 19:2
19:4,9,13,14,15,17
19:20,24 20:1,2,3
20:5,6,8,9,18,20
20:22,25 21:2,5,12
21:20,24 22:1,2,2
22:3 28:16 29:10
29:15,19,24 30:4,5
31:18,18,19,20
32:1,2 34:7 35:7
36:12 38:18,20,21
38:22 39:17,20
40:7,11 41:7,8,14

41:19,24 42:3,6,15
42:17,21 43:8,15
43:18,24 44:1,4
45:6,7,9,10,10,10
45:17,18,21,21,24
46:1,2,3,4,4,4,9,9
46:13 48:2,24
50:1,15 52:19
53:4 55:12 58:21
59:25 60:12 63:5
63:8 66:5 70:17
74:6 89:3,5,8,13
89:16,22 90:1,6,10
90:13,17,20,21,22
90:22,24,24,25
91:1,6,18 92:11,24
93:3,17,17,20,25
94:5,8,11,19,21
95:5 96:23 97:1,5
97:22,22,23,24
98:4,6,7,8,11,16
98:18,24 100:4,10
100:16,18 101:2
101:16,20,24
102:23,24 103:12
103:25 104:3,5,12
104:18,24 105:2,3
105:4,9,12,15,19
110:3,22 116:10
116:16,18 117:10
129:5 142:11
145:19 152:10
153:15 170:1,3
178:13,18,19
179:11,18,19
187:1 189:8
**upgradeya's** 40:14
66:4 142:10,15
145:23 150:8
151:23 152:19
153:14 178:12

181:20 182:14,20
188:5
**uploaded** 54:7
**url** 54:23
**usd** 29:13 30:19,21
31:17 32:2,2
41:18 63:16
110:13 153:25
170:12
**use** 7:25 8:18
14:14,20,21 23:8
23:11 26:2,14,23
33:16 36:8 37:6
38:22 49:7 53:18
70:14,19 93:16
96:11 107:3,22
118:7 119:25
124:6 129:23
135:22 136:21
138:17 148:6
166:5,19 172:9,14
172:19,23,25
173:1,2,5,12,21
**usual** 169:15
170:17,23,23
**usually** 26:2

| v |
|---|

**vague** 177:14
**valuable** 49:5
**value** 46:22 47:1
63:15,16 122:23
122:25 123:1,2
124:2 127:16
136:25 153:17,22
153:24 154:5,5,8
154:12,23 155:19
155:19 156:11,13
157:9 171:11
176:17
**variety** 36:2 123:4
124:7 125:1,5

**[variety - whereof]**

127:3 137:18
**vault** 37:8
**verbally** 9:9
**verify** 75:24
**verifying** 172:3
**veritext** 6:20
**version** 162:9
**versus** 46:1 60:6
61:10 77:17
107:22 108:24
109:2 127:16
160:17 187:20
**video** 6:8,10
**videoconference**
1:15 2:15 3:3 6:2
**videoconferenci...**
6:17
**videographer** 3:25
6:4,19 7:11 44:24
45:2 79:22,25
140:7,10,13
174:12,15 192:1,7
**videotaped** 1:13
2:14
**view** 8:14 94:6
160:4,8 190:19
**violation** 39:9
**virtual** 11:20 12:3
12:16,24 13:1,2,12
13:15,17,18,24
15:11 16:1,3,4
17:13,15,15,17
19:25 20:10,12,13
20:16,18,20,23
21:1,6,13,13 24:9
24:17,18 25:4,17
25:21 29:12 33:4
33:8,9,9,14,15,21
34:13,20 36:8,9,12
36:22 37:3,8,20,21

**visible** 158:25
159:3,4
**voice** 21:8
**volatility** 153:12
**voluntarily** 83:12
84:3 85:1
**vp** 61:25 62:1

**w**

**waive** 185:2
**waived** 182:11
183:10
**waiving** 8:21
**walk** 121:4
**wallet** 22:16,17
24:1,4,5,7,10,13
24:16,21,23,25
25:3,4 49:21,22,25
50:16,17 55:8,13
56:10,25 57:1
58:3,9,18,19 59:6
60:4,11 66:12
67:19,22,24 68:1,2
68:8 69:4,9,16,19
74:20 111:24
112:1 113:3,8
114:4 129:17
130:6,23 131:25
132:7,9,12 133:15
134:10 143:24
144:18,23 150:25
152:11,21 158:18
158:22 159:2,8,13
160:18 161:21
190:5,8,21
**wallets** 14:25 15:1
15:5 22:14,15
27:1 50:3,11
51:16 55:19 56:13
59:11,25 63:12
64:25 65:3 66:6
70:2 129:23,25

130:10 131:14
132:4 134:21
142:12,15 143:2
144:15,20 145:20
145:23 149:9,16
149:19,20,22,24
149:25 150:1,7,18
150:24 151:6,12
151:18,20,24
152:15 159:11,25
160:2,10 161:3,10
190:7,13,17,24
191:6
**want** 23:14 24:19
26:6 39:8 44:15
53:18 54:9,12,18
76:7 79:16,19
93:2 96:17 103:11
107:10,18 109:7
109:15,25 118:2
119:2 129:3 139:8
140:7,18 142:8
147:10,22 148:15
154:1 158:11
167:12,25 174:18
175:9 177:18
184:20 189:11
**wanted** 9:5 29:19
29:20 47:14 70:25
78:18 81:23
109:15,21 148:5
153:21 166:12
174:21 184:23
**wanting** 109:5
131:13
**wants** 135:21
185:21
**warranties** 168:25
169:1,4,6
**water** 27:4

**way** 6:23 14:1,3,8
14:10 24:9 29:20
33:10 46:8,22
47:2 58:20 60:23
93:13 108:11
112:5 113:10,12
119:16 123:16
134:12 136:25
137:2,4,7,9 138:5
143:11,12,14
147:2 158:24
160:16,20,24
174:21,23,24,24
176:7 190:21
**ways** 30:20 34:22
34:25 37:5 71:13
71:14 137:6 138:1
**we've** 61:9 79:18
136:15 190:2,5,7,8
**wealth** 62:1,1
**website** 23:9,16
24:14 35:16,18
53:25 54:6 64:7
71:16,19,20,20
121:12,14,23,25
122:4,9 123:14
127:16 137:11,13
**websites** 49:4,6,7
122:11
**wechat** 119:24,25
**wednesday** 1:14
2:15 6:1
**week** 122:12
**welcome** 81:18
109:6 167:11,24
**went** 49:14 50:15
50:19,19 58:19
63:8 80:11 121:12
184:9 189:20
**whereof** 194:18

Veritext Legal Solutions
866 299-5127

**[whispering - zoom]**

**whispering** 6:7
**wilmington** 3:20
**witness** 4:3,11
6:14 7:12 12:19
31:4,22 33:6,23
34:15 35:10 36:16
37:23 40:17 47:17
60:8 82:20 85:18
86:2,11 87:3,10,21
88:9,16,23 90:5
93:7,12 98:4
102:14 115:17
123:13 124:11,21
125:22 126:10,19
127:9,21 128:4,12
128:24 130:13
131:4,18 132:16
137:6,13,22
138:12,20 139:14
139:22 143:1
144:4,25 145:13
150:5,14,23
151:14 152:1
154:4,11,25
156:17 157:15,21
159:16 160:14
161:16 164:22
165:3,9,17,24
166:8,21 169:22
171:16 172:23
173:24 174:8,25
175:22,25 176:4
176:21 177:9,15
179:12 183:16
184:1,11 186:5
190:16 191:9
194:6,18
**word** 14:12 20:17
20:17 22:21 26:12
26:19 100:22
107:11 125:19

144:6 148:21,23
149:12 150:19
**wording** 123:8
131:22
**words** 64:19
**work** 28:25 29:16
44:22 109:10,12
118:3 148:8
**worked** 28:5 89:25
112:15
**working** 11:12
22:7
**works** 44:23 73:4
89:21,23 158:24
**world** 26:17
188:17
**worried** 70:23
**worry** 70:22
**wow** 78:15
**wrap** 79:10
**wrapping** 174:1
**write** 42:15 65:11
65:12 129:12
**written** 132:21
**wrong** 15:16 26:21
100:22 102:16
**wrote** 65:13 79:2
117:15 145:18

**x**

**x** 73:13,24
**xav** 73:12,24
**xavier** 31:4,8,14
51:9 61:21 66:16
66:23 67:6 68:11
68:24 69:6 70:16
72:4 73:10 74:3,9
108:7 114:9,21
117:20,21 118:25
121:8 129:4,10
131:13,24 132:20
133:8 135:14,21

166:25 167:1
177:21 178:1
189:21
**xavier's** 31:6
**xs** 73:12

**y**

**yeah** 8:5 15:21
16:4 19:7 21:21
22:10,12 26:1,2
30:7 32:22 34:15
37:10 39:23 43:13
43:25 44:23 45:12
45:23,23 49:1
50:8,12 51:14
52:12 53:2,9,18
60:2 62:4,7,16
63:2 64:6 71:11
71:19 75:24 76:23
81:21 87:13 88:3
93:11 106:24
107:13 109:8,20
110:20 117:9
118:13,16 121:24
123:16,19 130:17
130:22 136:20
140:9 142:25
143:11 149:24
152:1,5 154:5
162:10 165:24
166:21 168:20
170:16 173:7,13
192:3
**year** 13:20 27:17
46:12 47:12 91:19
93:13 108:17,19
110:6 114:16
**years** 13:22 14:5
**yep** 66:15 153:2
**yield** 35:1,2 37:6
37:11 40:20 42:9
42:19 43:2,4,6,8

44:6 70:14,20,21
70:25 71:11,14
79:13 135:23
136:3,9,18 137:2,4
137:7,23 138:4,18
139:12,19 165:7
165:15,18,21
166:6,14,15,19,22
167:3
**york** 3:14,14

**z**

**zero** 49:20 59:13
59:18,23 105:5,13
108:3,3 158:22
**zeroed** 104:14,17
104:24
**zhang** 47:10,11,20
61:22 142:17
**zoom** 6:16 9:11

Veritext Legal Solutions
866 299-5127