**EXHIBIT A**

D&O Insurance Policy

## CALIFORNIA IMPORTANT NOTICE:

1. THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA.  THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.

3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW.  THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER.  YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 1-800-927-4357 OR INTERNET WEBSITE WWW.INSURANCE.CA.GOV.  ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER.  YOU MAY ALSO VISIT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG. THE NAIC — NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS — IS THE REGULATORY SUPPORT ORGANIZATION CREATED AND GOVERNED BY THE CHIEF INSURANCE REGULATORS IN THE UNITED STATES.

D-2 (09/19)

5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER. YOU CAN FIND A LINK TO EACH STATE FROM THIS NAIC INTERNET WEBSITE: HTTPS://NAIC.ORG/STATE_WEB_MAP.HTM.

6. FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7. CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS (LASLI). ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.

8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE EFFECTIVE IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.

D-2 (09/19)

STOCK COMPANY



# FinTech Alpha
### POLICY DECLARATIONS

**POLICY NUMBER: FIP0000446**

**Prior Policy Number: FIP0000270**

☒ **WESTERN WORLD INSURANCE COMPANY**    ☐ **TUDOR INSURANCE COMPANY**    ☐ **STRATFORD INSURANCE COMPANY**

---

**Named Insured and Mailing Address:**

Cred LLC

2121 S El Camino Real

Suite 500

SAN MATEO, CA 94403

**Producer:**

R-T Specialty, LLC

500 W. Monroe Street

Flr: 30th

Chicago, IL, 60661

**Agent/Broker #**  19901

**Premium:** $40,000

POLICY PREMIUM: $40,000.00
SURPLUS LINES TAX:
Surplus Lines Tax $1,200.00
Stamping Office Fee $100.00
TOTAL TAXES: $1,300.00
TOTAL: $41,300.00

**Policy Period:**  (Mo./Day/Yr.)

From: **01/25/2020** To: **01/25/2021** 12:01 AM, standard time at your mailing address shown above

IN EXCHANGE FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS, CONDITIONS, EXCLUSIONS AND ENDORSEMENT OF THIS POLICY, WE AGREE TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

| | | |
|---|---|---|
| **Item 1.** | **POLICY MAXIMUM AGGREGATE LIMIT OF LIABILITY:** | $1,000,000 |

**Item 2.**    **COVERAGE PARTS**

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH AN AGGREGATE LIMIT OF LIABILITY IS INDICATED.

---

**Executive and Private Company Liability**

| | | |
|---|---|---|
| **Aggregate Limit of Liability:** | $1,000,000 | **Pending or Prior Litigation Date:** 01/25/2019 |
| Sub-Limit of Liability for **Derivative Investigation Costs:** | $250,000 | **Retroactive Date:** Date of Incorporation |

**Agreement A Retention:**  $0

**Agreement B Retention:**  $200,000

**Agreement C Retention:**  $200,000

**Agreement D Retention:**  $0

FTDEC2001 (07/17)

| Item 4. | **Discovery Period:** | 1 | Year(s) | 175 | % of Policy Premium |
|---|---|---|---|---|---|
| Item 5. | **Forms and endorsements applying to this policy and attached at time of issue:** | | | | |
| | **See Applicable Schedule of Forms and Endorsements.** | | | | |

**THESE DECLARATIONS TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION FOR THE FOLLOWED POLICY AND THE POLICY FORM ATTACHED HERETO CONSTITUTE THE POLICY.**

# WESTERN WORLD INSURANCE GROUP

## Western World Insurance Company

## Tudor Insurance Company

## Stratford Insurance Company

Administrative Office

300 Kimball Drive, Suite 500

Parsippany, New Jersey 07054

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy. If required by state law, this policy shall not be valid unless countersigned by our authorized representative.

**Secretary**

**President**

| Countersigned: | |
|---|---|
| 03/09/2020 | |
| By. | |
| | Authorized Representative |

**NAMED INSURED:** Cred LLC

**POLICY NUMBER:** FIP0000446

## SCHEDULE OF FORMS AND ENDORSEMENTS

| Form/<br>Endorsement No. | Form Title |
|---|---|
| D-2(09 19) | CALIFORNIA IMPORTANT NOTICE |
| FTDEC2001(07 17) | FINTECH ALPHA POLICY DECLARATIONS |
| FTGTC1001(06 17) | FINTECH ALPHA GENERAL TERMS AND CONDITIONS |
| FTPRD1001(12 16) | FINTECH ALPHA EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART |
| FI3004(06 16) | SERVICE OF SUIT |
| FI3001(03 17) | NOTICE ENDORSEMENT |
| FI3002(12 15) | DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT |
| FPGTC3105(01 20) | ICO AND CRYPTO CURRENCY TOKEN OR COIN EXCLUSION ENDORSEMENT |
| FTGTC3021(07_18) | TIE-IN OF LIMITS ENDORSEMENT |
| FTGTC3049(01_19) | AMENDED APPLICATION ENDORSEMENT |
| FTGTC3050(01 19) | AMENDED NOTICE OF CLAIM ENDORSEMENT |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

# FinTech Alpha
## GENERAL TERMS AND CONDITIONS

THIS IS A CLAIMS MADE AND REPORTED POLICY. PLEASE READ IT CAREFULLY. ALL WORDS IN **BOLD** FACE TYPE SHALL HAVE THE MEANINGS SET FORTH IN SECTION **II. GENERAL DEFINITIONS** OF THESE GENERAL TERMS AND CONDITIONS, OR UNDER THE **DEFINITIONS** SECTION OF EACH **COVERAGE PART**.

In consideration of the payment of Premium, and subject to the agreement of the **Named Insured** to pay the Retention amount stated in the Declarations and as set forth in this Policy, and in reliance upon the **Application**, which shall be deemed incorporated herein, and subject to all of the terms, conditions, limitations, exclusions, and endorsements to this Policy, the **Insurer** and the **Insured** agree as follows:

## I.   APPLICATION OF GENERAL TERMS AND CONDITIONS

This Policy is comprised of the **Application**, the Declarations, these GENERAL TERMS AND CONDITIONS, all **Coverage Parts** that have been purchased, and any endorsements. These GENERAL TERMS AND CONDITIONS apply to all **Coverage Parts** that have been purchased by the **Insured**, as indicated in Item 2. of the Declarations. A **Coverage Part** is included within this Policy and affords coverage only if the **Coverage Part** is designated in the Declarations as being purchased by the **Insured**. The respective terms and provisions of each **Coverage Part** shall apply only to that **Coverage Part** and shall in no way be construed as applying to any other **Coverage Part**. If any provision in these GENERAL TERMS AND CONDITIONS is inconsistent or in conflict with the terms and conditions of any **Coverage Part**, the terms and conditions of such **Coverage Part** shall control for purposes of that **Coverage Part**.

## II.   GENERAL DEFINITIONS

A.   **Application** means:

1.   the application for this Policy along with any attachments and any other material submitted with or incorporated into such application, as well as any other documents submitted in connection with the underwriting of this Policy or any other policy issued by the **Insurer**, or any of its affiliates, of which this Policy is in whole or in part a renewal or replacement; and

2.   all publicly available documents prepared by the **Company** within the 18 months preceding the date this Policy is issued and which are reviewed in connection with the underwriting of this Policy or any policy issued by the **Insurer** of which this Policy is in whole or in part a renewal or replacement.

B.   **Claim** shall have the meaning attributed to that term in each applicable **Coverage Part**; and solely with respect to the FIDELITY BOND AND CRIME COVERAGE PART, if purchased, shall include any **Occurrence**.

C.   **Clean Up Costs** means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, remediating, containing, removing, treating, neutralizing, detoxifying, or assessing the effects of **Pollutants**.

D.   **Client** shall have the meaning attributed to that term in each applicable **Coverage Part**.

E.   **Company** means: the (i) **Named Insured**; (ii) and any **Subsidiary** thereof; and (iii) in the event a bankruptcy proceeding is commenced by or against the foregoing entities, the resulting debtor-in-possession under United States bankruptcy law, or any equivalent status under foreign law.

F.  **Company Takeover** means:

    1.  the **Named Insured** consolidating with or merging into, or selling all or substantially all of its assets to any other person or entity, or group of persons or entities, acting in concert; or

    2.  any person or entity or group of persons or entities acting in concert acquiring more than fifty percent (50%) of the outstanding stock or other interest representing the right to vote, designate or select: (i) a majority of the Board of Directors if the **Named Insured** is a corporation; or (ii) a majority of the management board if the **Named Insured** is a limited liability company.

G.  **Coverage** Part means each coverage part that is listed as purchased in Item 2. of the Declarations.

H.  **Defense Expenses** means reasonable and necessary legal fees and expenses incurred in the defense of a **Claim**, including the premium for an appeal bond; provided, however, that the **Insurer** shall not be required to apply for or furnish such bonds. **Defense Expenses** shall also include the reasonable and necessary legal costs, charges, fees and expenses incurred by any **Executive** lawfully opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of any of such **Executive**, including the costs of appealing any order or other grant of **Extradition** of any of such **Executive**. **Defense Expenses** shall not include any of the **Insured's** overhead expenses, or any wages, salaries, benefits, or costs of **Insured Persons** or any other representative, agent or servant of any **Insured**.

I.  **Domestic Partner** means any individual person legally recognized as a domestic or civil union partner under:

    1.  the provisions of any applicable federal, state, or local law; or

    2.  the provisions of any formal program established by the **Company**.

J.  **Employee** means any past or present employee whose labor or service is engaged by and directed by the **Company** while performing duties related to the conduct of the **Company's** business. **Employee** includes leased, part-time, seasonal and temporary workers, volunteers and interns; and independent contractors who are treated under applicable law as employees of the **Company**. **Employee** shall not include **Executives**.

K.  **Employment Claim** means any **Claim** alleging an **Employment Practices Wrongful Act** against an **Insured** brought by or on behalf of any past or present **Insured Person** or any applicant for employment with the **Company**.

L.  **Employment Practices Wrongful Act** means any actual or alleged:

    1.  wrongful termination, discharge, or dismissal of employment, whether actual or constructive;

    2.  violation of any federal, state, local, foreign, or common law prohibiting employment discrimination, including: the Age Discrimination in Employment Act of 1967; the Americans with Disabilities Act of 1990; the Civil Rights Act of 1866 and 1991; the Civil Rights Law of 1964; the Equal Pay Act of 1963; the Family and Medical Leave Act of 1993; the Genetic Information Nondiscrimination Act of 2008; the Older Workers Benefit Protection Act of 1990; or any rule or regulation promulgated under any of the foregoing provisions;

    3.  discrimination based upon race, color, age, religion, gender, sexual orientation, disability, national origin, pregnancy, or any other basis prohibited by law;

    4.  wrongful: deprivation of career opportunity; failure to employ or promote; discipline or evaluation; demotion; denial of tenure; or modification of any term or condition of employment;

    5.  retaliation in response to an **Employee** exercising any lawful right;

    6.  sexual or other harassment in the workplace;

    7.  abusive or hostile work environment;

8.  negligent retention, hiring or training, supervision, or failure to provide or enforce consistent employment-related corporate policies or procedures; or

9.  employment-related libel, slander, misrepresentation, defamation, or invasion of privacy.

M.  **Executive** means any natural person who was, now is, or shall be a duly elected or appointed director, manager or member of the management board (if the **Company** is a limited liability company), trustee, governor, officer, risk manager, or in-house general counsel, or a holder of a title, position or capacity equivalent to any of these positions, of any **Company**. **Executive** shall also include **Technology Advisory Board Members**.

N.  **Insured** shall have the same meaning attributed to that term in each applicable **Coverage Part**.

O.  **Insured Person** shall have the same meaning attributed to that term in each applicable **Coverage Part**.

P.  **Insurer** means the insurance company issuing this Policy.

Q.  **Interrelated Wrongful Acts Or Technology Failures** means any **Wrongful Acts** or **Technology Products Failures** that are:

1.  repeated or continuous;

2.  connected by reason of any common circumstance, situation, transaction, casualty,  event, decision or policy; or

3.  part of the same series of facts, circumstances, situations, transactions, casualties, events, decisions, or policies.

R.  **Loss** shall have the same meaning attributed to that term in each applicable **Coverage Part**; and with respect to the FIDELITY BOND CRIME COVERAGE PART, **Loss** means the amounts covered under such applicable **Coverage Part**.

S.  **Named Insured** means the entity identified as such in the Declarations.

T.  **Network Security** means activities performed by the **Insured**, or by others on the **Insured's** behalf, to prevent: (i) transmission of a **Virus** to a third party; (ii) denial of service attacks against the **Insured** which prevents an authorized third party from accessing the **Insured's** website; (iii) a denial of service attack against an authorized third party; or (iv) unauthorized access to or unauthorized use of the **Insured's Network Systems**.

U.  **Network Systems** means computers, network equipment, associated input and output devices, data storage devices, and back up facilities that are (i) operated by and owned or leased by the **Company**; or (ii) pursuant to a written contract or agreement with the **Company**, operated by third-party service provider and used solely for hosting computer application services to the **Company**, or for processing, storing, maintaining, or hosting the **Company's** electronic data.

V.  **Not-For-Profit Entity** means any corporation or organization other than the **Company** which is exempt from taxation under the Internal Revenue Code, as amended, or any rule or regulation promulgated thereunder.

W.  **Occurrence** shall have the same meaning attributed to that term in the FIDELITY BOND AND CRIME COVERAGE PART.

X.  **Personally Identifiable Non-Public Information** means:

1.  information constituting "nonpublic personal information" as defined in the Gramm-Leach Bliley Act of 1999, as amended, including regulations issued pursuant to such Act;

2.  medical or heath care information regarding any individual, including "protected health information" as defined in the Health Insurance Portability and Accountability Act of 1996, as amended, including regulations issued pursuant to such Act;

3. information defined as private personal information under statutes enacted to protect such information in foreign countries, for **Claims** subject to the law of such jurisdiction;

4. information defined as private personal information under any **Privacy Law**; or

5. an individual's driver's license or state identification number; social security number; unpublished telephone number; and credit, debit or other financial account numbers in combination with associated security codes, access codes, passwords or pins;

if such information allows an individual to be uniquely and reliably identified or contacted, or allows access to the individual's financial account or medical record information; provided, however, that **Personally Identifiable Non-Public Information** shall not include publicly available information that is lawfully made available to the general public.

Y. **Policy Period** means the time period beginning at the inception date and time specified in the Declarations as the **Policy Period**, and ending at the earlier of the expiration date and time stated in the Declarations as the **Policy Period** or the effective date and time of the cancellation of this Policy.

Z. **Pollutants** means any substance that exhibits any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any state, county, local, or foreign equivalent thereof, including, but not limited to, solids, liquids, gaseous, or thermal irritants, contaminants or smoke, vapor, dust, soot, fumes, acids, alkalis, chemicals or waste materials (including, but not limited to, recycled, reconditioned, or reclaimed sewage or waste water, nuclear materials, or infectious or medical waste); or any air emission, magnetic or electric waves or emissions, odor, oil or oil products, asbestos or asbestos products, fibers, mold, spores, fungi, germs, bacteria, viruses or any noise.

AA. **Privacy Law** means any federal, state or foreign statute or regulation requiring the **Company** to protect the confidentiality and/or security of **Personally Identifiable Non-Public Information**.

BB. **Privacy Violation** means the **Insured's** failure to properly protect, manage, store or handle **Personally Identifiable Non-Public Information**, sensitive third party corporate information subject to a non-disclosure agreement or similar agreement, or the unintentional violation of a **Privacy Law**.

CC. **Professional Services** shall have the same meaning attributed to that term in each applicable **Coverage Part**.

DD. **Subsidiary** means:

1. any corporation or limited liability company of which the **Named Insured** owns, directly or indirectly through one or more of its **Subsidiaries**, more than fifty percent (50%) of the outstanding stock or other interest representing the present right to vote, designate, or select a majority of the Board of Directors of a corporation or of the management board of a limited liability company; but only during such time as the **Named Insured** owns, directly or indirectly through one or more of its **Subsidiaries**, more than fifty percent (50%) of such outstanding stock or other interest representing the present right to vote, designate, or select a majority of the Board of Directors of a corporation or of the management board of a limited liability company; or

2. any joint venture entity in which the **Named Insured**, or any entity described in paragraph 1., above, has exactly fifty percent (50%) ownership of the interests of such joint venture entity and where, pursuant to a written joint venture agreement, the **Named Insured** or any entity described in paragraph 1., above, controls the management and operations of such joint venture entity.

In the event a **Subsidiary** is acquired at any point during the **Policy Period**, then Section **XIII. General Conditions**, Subsection E. Mergers **and Acquisitions**, of these GENERAL TERMS AND CONDITIONS shall apply.

EE. **Technology Advisory Board Members** means a natural person member of the Technology, Scientific, or Advisory Board of the **Company**, but only where the following conditions are first satisfied:

1. Such natural person **Technology Advisory Board Member** is indemnified by the **Company** pursuant to a written indemnification agreement requiring the **Company** to indemnify the **Technology Advisory Board Members** to the fullest extent permitted by law, take all steps necessary or advisable in furtherance thereof, including the making in good faith of any application for court approval, the passing of any resolution by the Board of Directors or shareholders of the **Company**, the amendment of any charter, bylaws, operating agreement or similar documents of the **Company** or the execution of any contract; and

2. The **Company** advances **Defense Expenses** actually and reasonably incurred by any such natural person **Technology Advisory Board Member** in defending any threatened, pending or contemplated action, suit or proceeding prior to a final disposition of any such action, suit, or proceeding and shall not require any determination or adjudication, interim or final, of the entitlement of any such natural person member to indemnification. It is understood and agreed that the financial ability of any such natural person member to make repayment shall not be a prerequisite to the making of any such an advance, and the right to receive advancement of **Defense Expenses** herein is a contractual right.

FF. **Technology Products Failure** means the inability of the **Insured's** customers or **Clients** to access or otherwise utilize in the manner intended, and within rights conferred pursuant to a contract or agreement for a fee, commission, or other remuneration or financial consideration which inures to the benefit of the **Company**, **Technology Products**.

GG. **Technology Products** means computer or telecommunications hardware, software, firmware, or related electronic equipment, including the design, development, manufacturing, assembly, manufacturing, assembly, distribution, licensing, leasing, sale, installation, repair or maintenance thereof.

HH. **Technology Services** means the following services provided to or for a **Client**:

1. information technology consulting and information systems or network analysis, design, programming or integration;

2. database design and the caching, collecting, compiling, processing, mining, or recording or analysis of data; or

3. other related services, including:

   a. information systems outsourcing;

   b. website design, programming or maintenance;

   c. information system or website hosting;

   d. internet access services;

   e. internet search or navigational tool provision;

   f. electronic mail services;

   g. electronic data destruction services; and

   h. application software services delivery.

II. **Unauthorized Disclosure** means the disclosure of or access to information in a manner that is not authorized by the **Company**.

JJ. **Virus** means any malicious code, script, worm, Trojan horse, or similar software intentionally designed to enter or insert itself into computer memory or storage media and spread itself from one computer to another.

KK. **Third-Party Discrimination** means any violation of any federal, state, local, foreign, or common law concerning discrimination against, or sexual harassment of, any natural person other than an **Insured Person**, including customers, clients, vendors, service providers, and business invitees.

LL. **Third-Party Discrimination Claim** means any **Claim** against an **Insured**, other than an **Employment Claim**, alleging any **Insured** committed **Third-Party Discrimination**.

MM. **Voluntary Settlement** shall have the same meaning attributed to that term in the FIDUCIARY LIABILITY COVERAGE PART.

NN. **Wrongful Act** shall have the same meaning attributed to that term in each applicable **Coverage Part**.

## III.  GENERAL POLICY EXCLUSIONS

The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim**:

A.  brought about or contributed to by: (i) the gaining of any personal profit or financial advantage to which an **Insured** was not legally entitled; or (ii) by the committing of any intentional criminal or deliberate fraudulent act, if such profit or advantage or intentional criminal or deliberate fraudulent act is established by a final, non-appealable adjudication in the underlying action.  For the purpose of applying this exclusion, any **Wrongful Act** of the Chief Executive Officer or the Chief Financial Officer of the **Company** shall be imputed to such **Company**. With the exception of the possible imputation of **Wrongful Acts** described in the preceding sentence, no **Wrongful Act** of an **Insured** may be imputed to any other **Insured**;

B.  for any actual or alleged bodily injury, mental anguish or emotional distress, disease, sickness, or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; provided, however, this exclusion shall not apply to **Defense Expenses** incurred in a criminal proceeding for manslaughter (or for any similar offense);

C.  based upon or attributable to liability under any oral or written contract or agreement including but not limited to any express warranties or guarantees, or liability assumed under any oral or written contract or agreement; provided, however, this exclusion shall not be applicable to: (i) an **Insured's** alleged liability that exists in the absence of such contract or agreement; or (ii) any **Claim** against an **Insured** by a client or customer of the **Insured** alleging a breach of contractual obligations in the rendering of or failure to render services that are otherwise covered under this Policy;

D.  arising out of, based upon or in consequence of, resulting from or in any way involving any written demand, suit, proceeding or other claim, or any investigation of which any **Insured** had notice, pending on or prior to the respective **Coverage Part** Pending or Prior Litigation Date stated in Item 2. of the Declarations, or any fact, matter, circumstance, situation, transaction or event underlying or alleged in such written demand, suit, proceeding, claim or investigation; provided, however, that this exclusion shall apply solely to the **Coverage Part** for which the **Insured's** notice of the written demand, suit, proceeding or other claim, or any investigation preceded its respective Pending or Prior Litigation Date;

E.  arising out of, based upon or in consequence of, resulting from or in any way involving any **Wrongful Act**, **Technology Products Failure**, or **Occurrence** which occurred or allegedly occurred prior to the applicable Retroactive Date listed in Item 2. of the Declarations for each respective **Coverage Part**; provided, however, that this exclusion shall apply solely to the **Coverage Part** for which the **Wrongful Act**, **Technology Products Failure**, or **Occurrence** occurred or allegedly occurred prior to its respective Retroactive Date;

F.  arising out of, based upon or in consequence of, resulting from or in any way involving;

1.  any **Wrongful Act** or **Technology Products Failure** alleged in any demand, suit, proceeding or other claim which has been the subject of any notice given or reported prior to the inception of the **Policy Period**, or in any circumstance of which notice has been given and accepted under any policy of which this Policy or any **Coverage Part** is a renewal, replacement, or succeeds in time; or

2. any other **Wrongful Act** or **Technology Products Failure** whenever occurring, which together with a **Wrongful Act** which has been the subject of such prior claim or notice, would constitute **Interrelated Wrongful Acts Or Technology Products Failures**;

G. arising out of, based upon or in consequence of, resulting from or in any way involving any actual or alleged: (i) violation of any **Privacy Law**, or access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, **Personally Identifiable Non-Public Information**, or any other type of nonpublic information; (ii) unauthorized access to, failure, malfunction, breakdown, or misuse of any **Network Systems**, **Network Security**, or mechanical systems, or machines; or (iv) **Wrongful Act** in the rendering of **Technology Services**;

H. arising out of, based upon or in consequence of, resulting from or in any way involving any **Employment Claim**, **Third-Party Discrimination Claim**, **Employment Practices Wrongful Act**, or **Third-Party Discrimination**;

I. for infringement or violation of patent, trademark, trade secret copyright, misappropriation, plagiarism or any other intellectual property rights;

J. brought or maintained by or on behalf of any **Insured**, provided this exclusion shall not apply to:

1. a **Claim** that is a derivative action brought or maintained on behalf of the **Company** by one or more persons who are not **Insured Persons**, where: (i) the **Claim** is brought and maintained without the participation, solicitation or active assistance of the **Company** or any **Insured Person**; or (ii) any such participation, solicitation or active assistance of the **Company** or any **Insured Person** is protected by any whistleblower statute or is solely pursuant to, or in compliance with, an enforceable subpoena or legal process;

2. a **Claim** that is brought by an **Insured Person** for indemnity or contribution, provided the **Claim** directly results from another **Claim** that is covered under this Policy;

3. a **Claim** made against any **Subsidiary** or any **Executive** or **Employee** of any **Subsidiary** for any **Wrongful Act** committed or allegedly committed during any time when such entity was not a **Subsidiary**;.

4. a **Claim** that is brought by or on behalf of a bankruptcy trustee, examiner, receiver, or creditors' committee of the **Company** against which such **Claim** is made, or any assignee of such bankruptcy trustee, examiner, receiver, or creditors' committee;

5. any **Employment Claim**;

6. a **Claim** by an **Insured Person** who has not served as an **Insured Person** for at least two (2) years prior to the date such **Claim** is first made, and who brings and maintains such **Claim** without the participation, solicitation or active assistance of the **Company** or any other **Insured Person** who currently serves or has served within the past two (2) years as an **Insured Person**;

7. any **Claim** against an **Insured Person** resulting from "Whistleblowing." For purposes of the preceding sentence, "Whistleblowing" means the disclosure by an **Insured** of mismanagement, corruption, illegality or other wrongdoing;

8. loss that any **Insured** sustains resulting directly from an **Occurrence** otherwise covered under the FIDELITY BOND AND CRIME COVERAGE PART, if purchased; or

K. for any actual or alleged violation of any of the responsibilities, obligations or duties imposed by:

1. the Employee Retirement Income Security Act of 1974 (ERISA), or amendments thereto or regulations thereunder or any similar foreign, state, local or common law; provided, however, that this paragraph 1. shall not apply to any **Claim** otherwise covered by the FIDUCIARY LIABILITY COVERAGE PART, if purchased;

2. the Occupational Safety and Health Act (OSHA), the Worker Adjustment and Retraining Notification Act (WARN), the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), the National Labor Relations Act (NLRA), or other similar provisions of any federal, state or local statutory or common law, or any rules or regulations promulgated under any of the foregoing;

3. the Fair Labor Standards Act (FLSA), as amended, or any other foreign, federal, state, or local law, whether statutory or common law, governing the classification of employees to determine their eligibility for compensation or the payment of wages, overtime, on-call time, rest periods or minimum wages;

4. any employment-related tort; or

5. any law governing workers' compensation, unemployment insurance, social security, disability benefits, or any similar foreign, state, local or common law.

L. arising out of, based upon or in consequence of, resulting from or in any way involving:

1. any electrical or mechanical failures or interruption, including but not limited to any electrical disturbance, surge, spike, brownout or blackout, and outages to gas, water, telephone, cable, satellite, telecommunications or other infrastructure; provided, however, this exclusion L.1. shall not apply to failures, interruptions, disturbances or outages of telephone, cable or telecommunications infrastructure under the **Insured's** operational control which are a result of a **Wrongful Act**;

2. any failure, interruption, or outage to Internet access service provided by the Internet service provider that hosts the **Insured's** website, unless such infrastructure is under the **Insured's** direct operational control;

3. fire, smoke, explosion, lightning, wind, flood, earthquake, volcanic eruption, tidal wave, tsunami, landslide, hail, act of God or any other physical event, however caused; or

4. war, invasion, terrorism, acts of foreign enemies, hostilities or warlike operations (whether war is declared or not), strike, lock-out, riot, civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power.

## IV. DEFENSE AND SETTLEMENT

A. **Defense**

1. The **Insureds** shall have the duty to defend all **Claims**. It shall not be the duty of the **Insurer** to defend any **Claim** under this Policy; but the **Insurer** shall have a right to associate in the defense of all **Claims**.

2. No **Insured** may incur any **Defense Expenses** or admit any liability for, make any settlement offer with respect to, or settle any **Claim** without the **Insurer's** written consent, such consent not to be unreasonably delayed or withheld.

B. **Settlement**

The **Insurer** has the right to investigate, conduct negotiations and with the **Insured's** written consent, settle any **Claim** that is covered by this Policy. The **Insurer** shall not settle or compromise any Claim without the written consent of the **Insured**, such consent to not be unreasonably delayed or withheld.

## V. LIMITS OF LIABILITY

A. The amount stated in Item 1. of the Declarations as the Policy Maximum Aggregate Limit of Liability shall be the **Insurer's** maximum aggregate liability for all payment obligations under this Policy under all **Coverage Parts**, combined, including any matter noticed during the Discovery Period, if applicable. All obligations of the **Insurer** under this Policy shall cease after the Policy Maximum Aggregate Limit of Liability stated in Item 1. of the Declarations has been paid by the **Insurer**.

B. The amounts stated in Item 2. of the Declarations as the Aggregate Limit of Liability for each purchased **Coverage Part** listed shall be the maximum aggregate limit of liability of the **Insurer** under  such **Coverage Part** for all payment obligations under this Policy. The amount set forth in Item 2. of the Declarations as the Aggregate Limit of Liability for each respective **Coverage Part** purchased shall be part of, and not in addition to, the amount stated in Item 1. of the Declarations as the Policy Maximum Aggregate Limit of Liability under the Policy. The amounts stated in Item 2. of the Declarations as the Sub-Limit of Liability under such **Coverage Part**, or the amount(s) listed as Limits of Liability for covered loss under FIDELITY BOND AND CRIME COVERAGE PART, shall be the maximum aggregate limit of liability for the **Insurer** under such sub-limited coverage, such amount being part of, and not in addition to, the Aggregate Limit of Liability for such **Coverage Part**. The **Insurer's** obligations under this Policy shall cease with respect to any respective **Coverage Parts** purchased after the Aggregate Limit of Liability under such **Coverage Part** has been paid by the **Insurer**.

C. **Defense Expenses** are part of, and not in addition to, the applicable limit of liability, and payment of **Defense Expenses** by the **Insurer** shall reduce and may exhaust the applicable limits of liability.

D. If coverage is available for a **Claim** under more than one **Coverage Part**, then the maximum applicable limit of liability for such **Claim** shall be the largest applicable remaining Aggregate Limit of Liability under only one of the applicable **Coverage Parts**. The **Insurer's** obligations under this Policy shall cease with respect to such a **Claim** when the largest applicable remaining Aggregate Limit of Liability under only one of the applicable **Coverage Parts** is exhausted.

## VI. RETENTIONS

A. With respect to each **Claim** covered under any **Coverage Part**, the **Insurer** shall only pay **Loss** which is in excess of the Retention that is applicable to such respective **Coverage Part** (or Insuring Agreement subject to a separate Retention under such **Coverage Part**, if indicated) as set forth in Item 2. of the Declarations, such Retention shall be borne by the **Insureds**.

With respect to covered loss under the FIDELITY BOND AND  CRIME COVERAGE PART, and **Voluntary Settlements**, the **Insurer** shall only pay such covered loss and **Voluntary Settlements** which are in excess of the applicable Retention as set forth in Item 2. of the Declarations for such applicable **Coverage Part**, such Retention shall be borne by the **Insureds**.
Should the **Company** be unable or refuse to pay an applicable Retention due to bankruptcy or insolvency, the **Insurer** will then advance **Loss** within the Retention, subject to the other  terms, conditions and exclusions of this Policy; provided, however, that the **Insurer** shall be entitled to recover such amounts advanced within the retention from the **Company**.

B. If a **Claim** could be subject to multiple Retentions, the largest applicable Retention set forth in Item 2. of the Declarations shall apply.

C. The applicable Retention shall not be reduced by any amounts that are determined to be non-covered loss pursuant to Section **XI. Allocation**, below.

## VII. ESTATES, LEGAL REPRESENTATIVES, SPOUSES, AND DOMESTIC PARTNER EXTENSION

A. Coverage under this Policy, subject to its terms and the terms of each **Coverage Part**, shall be extended to apply to **Claims** for a **Wrongful Act** of an **Insured Person** made against:

1. a natural person who, at the time the **Claim** is made, is the lawful spouse or **Domestic Partner** of an **Insured Person**, provided that such **Claim**:

a) arises solely out of such spouse or **Domestic Partner's** status as the spouse or **Domestic Partner** of such **Insured Person**; or

b) seeks recovery from marital community property, other property jointly held by the spouse or **Domestic Partner** and such **Insured Person**, or property transferred from such **Insured Person** to the spouse or **Domestic Partner**; or

    2.   the estate, heir, legal representative or assigns of an **Insured Person**, in the event of such **Insured Person's** death, incompetency, insolvency or bankruptcy.

B.   There shall be no coverage extended under this Section for **Loss** resulting from a **Claim** arising from any act, error, or omission of any spouse, **Domestic Partner**, estate, heir, legal representative or assigns of such **Insured Person**.

## VIII.  NOTICE OF CLAIM AND WRONGFUL ACT

A.   As a condition precedent to the obligations of the **Insurer** under this Policy, the **Insureds** shall give the **Insurer** written notice of any **Claim** made during the **Policy Period** or the Discovery Period (if applicable) against an **Insured** as soon as practicable, but in all events before the later of:

    1.   ninety (90) days after the Policy expires and is renewed with the **Insurer**, provided however, if the **Insured** can prove to the **Insurer's** satisfaction that it was not reasonably possible for the **Insured** to give such notice within the ninety (90) day time period and that subsequent notice was given as soon as reasonably possible thereafter, the **Insurer** shall waive the foregoing time period; or

    2.   sixty (60) days after:

        a)   this Policy expires or terminates and is not renewed with the **Insurer**; or

        b)   the expiration date of the Discovery Period, if applicable.

B.   Notwithstanding the conditions and obligations set forth in Subsection A., above, in the event the **Insured** fails to provide timely notice of a **Claim**, coverage may be denied by the **Insurer** solely on the basis of late notice only if the **Insurer** can show that such late notice materially prejudiced its interests.

C.   If during the **Policy Period** or the Discovery Period (if applicable), the **Insured** becomes aware of any circumstances which reasonably may be expected to give rise to a **Claim** being made against an **Insured**, and gives written notice to the **Insurer** of such circumstances, including the anticipated alleged **Wrongful Act(s)** or detail of the **Technology Products Failure**, the reasons for anticipating such a **Claim**, and full particulars as to dates, persons and entities involved, then any **Claim** subsequently made against the **Insureds** arising out of the circumstances described in such notice shall be deemed to have been made at the time such notice was received by the **Insurer**.

D.   The Insureds shall give notice to the **Insurer** under this Section at the address set forth by Endorsement to this Policy.

## IX.   DISCOVERY PERIOD

A.   If the **Named Insured** cancels or if the **Insurer** or the **Named Insured** refuses to renew this Policy, the **Named Insured** shall have up to sixty (60) days after the effective date of such cancellation or non- renewal, to pay the Additional Premium for the Discovery Period specified in Item 3. of the Declarations to extend the coverage granted by this Policy to any **Claim** first made during an additional period of time specified in Item 3. of the Declarations (the "Discovery Period"), which Discovery Period shall begin on the effective date of such cancellation or non-renewal; provided, however, that the **Named Insured** shall not be entitled to extend the coverage granted by this Policy by paying the Additional Premium for the Discovery Period if the Policy is rescinded, cancelled, or non-renewed as a result of a material misrepresentation on the **Application**.

Any coverage for **Claims** first made and first reported during the Discovery Period shall be limited only to **Wrongful Acts** or **Technology Products Failure** that occurred prior to the inception of the Discovery Period.

B.   The Additional Premium for the Discovery Period shall be fully earned at the inception of the Discovery Period; and the Discovery Period is not cancelable, except that the **Insurer** may cancel the Discovery Period for non-payment of premium.

C.   The Discovery Period is not available and the provisions of this Section **IX. DISCOVERY PERIOD** shall not be applicable if the Policy is cancelled for non-payment of premium.

## X.   SINGLE CLAIM/INTERRELATED WRONGFUL ACTS OR TECHNOLOGY PRODUCTS FAILURES

All **Claims** based upon or arising out of the same **Wrongful Act** or out of **Interrelated Wrongful Acts Or Technology Products Failures** shall be considered a single **Claim**, and each such **Claim** is deemed to have been first made on the earlier of the following:

A.   when the earliest **Claim** arising out of such **Wrongful Act**, **Technology Products Failure** or **Interrelated Wrongful Acts Or Technology Products Failures** was first made; or

B.   when written notice of a fact, circumstance, or situation giving rise to such **Claim** pursuant to Section **VIII. Notice of Claim and Wrongful Act**, Subsection C., above, was received by the **Insurer**.

## XI.   ALLOCATION

If both **Loss** covered by this Policy and loss not covered by this Policy are incurred as a result of a **Claim**, the **Insurer** shall not be liable for that portion of such amount allocated to non-covered loss; and:

A.   With respect to all loss incurred by the **Insureds** in connection with such a **Claim**, the **Insureds** and the **Insurer** agree to use their best efforts to determine a fair and proper allocation of covered **Loss** and non-covered loss, taking into account the relative legal and financial exposures of and the relative benefits obtained in the defense and/or settlement of the **Claim** by the **Insureds**.

B.   In the event that the **Insurer** and the **Insureds** cannot agree upon an allocation, the **Insurer** shall make an interim payment for the **Loss** that is not in dispute until a different amount shall be agreed upon or determined pursuant to the provisions of this Policy and applicable law. If the **Insured** and the **Insurer** agree on an allocation of **Defense Expenses**, then the **Insurer** shall pay, on behalf of such **Insured**, **Defense Expenses** allocated to covered **Loss**. If, however, the **Insured** and the **Insurer** cannot agree on an allocation of **Defense Expenses**, no presumption as to allocation of **Defense Expenses** shall exist in any suit or other proceeding; but the **Insurer** shall pay, on behalf of such **Insured**, **Defense Expenses** which the **Insurer** believes to be covered until a different allocation is negotiated or judicially determined.

C.   Notwithstanding any prior advancement to the contrary, any negotiated or judicially determined allocation of **Defense Expenses** on account of a **Claim** shall be applied retroactively to all **Defense Expenses** on account of such **Claim**. Any allocation of **Defense Expenses** shall not apply to or create any presumption with respect to the allocation of other **Loss** on account of such **Claim**.

## XII.   COORDIANATION OF COVERAGE PARTS

A.   The **Insured** has elected to purchase the **Coverage Part(s)** as indicated in Item 2. of the Declarations by the appearance of a dollar amount Aggregate Limit of Liability corresponding to such **Coverage Part**, and any other **Coverage Part** available from the **Insurer** but not purchased by the **Insured** shall not be included in the Policy.

B.   Subject to the applicable Aggregate Limit of Liability, in the event any coverage is available for a **Claim** under more than one **Coverage Part** purchased, the **Insurer** shall only be liable for the actual amount of **Loss** incurred by the **Insureds**.

C.   The **Insurer** shall be entitled to make its own determination as to which **Coverage Part**, if any, **Loss** is covered and should be paid, regardless of the **Coverage Part** under which the **Insureds** provide notice of **Claim** or notice of circumstances which reasonably may be expected to give rise to a **Claim**.

## XIII. GENERAL CONDITIONS

A. Cancellation and Non-Renewal

1. The **Insurer** may cancel this Policy for non-payment of any premium when due by providing written notice to the **Named Insured** stating when, not less than twenty (20) days thereafter, such cancellation shall be effective.

2. The **Named Insured** may cancel this Policy by providing written notice to the **Insurer** at the address set forth by Endorsement to this Policy, stating when thereafter such cancellation shall be effective. The **Insurer** shall retain the *pro rata* proportion of the premium calculated from the effective date of cancellation; provided, however, that if at the time of cancellation any **Claims** or notices of circumstance have been reported during the **Policy Period** under Section **VIII.**, above, then the entire premium shall be considered fully earned and non-refundable. Payment or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

3. In the event the **Insurer** decides not to renew this Policy, the **Insurer** shall provide written notice of such non-renewal to the **Named Insured** not less than thirty (30) days prior to the end of the **Policy Period**. The notice shall state the reason for such non-renewal. An offer to renew this Policy on terms that involve any change in Retention amount, premium, limit of liability or other terms or conditions shall not constitute a decision by the **Insurer** not to renew this Policy.

4. Any notices to be given to the **Named Insured** shall be provided to the **Named Insured** at its last known principal address with a copy to its insurance agent or broker. The mailing by certified mail of such notice shall be sufficient.

B. Action Against the Insurer

No action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy.

C. ADR Provision

The **Insurer** and the **Insured** agree that they will attempt in good faith to negotiate a resolution to any dispute arising out of this Policy. In the event any dispute cannot be resolved by negotiation, the **Insurer** and the **Insured** agree to submit the dispute to non-binding mediation, the terms of which shall be subject to negotiation. If the parties cannot agree to such terms within thirty (30) days of either party requesting the mediation, the matter will be submitted to JAMS for mediation, with each party bearing their own costs. Should the mediation fail to result in a settlement of the dispute, no party may commence an action against any other party until at least thirty (30) days after the conclusion of the final mediation session.

D. Company Takeover

If a **Company Takeover** occurs during the **Policy Period**, then this Policy shall continue in full force and effect only for **Wrongful Acts** occurring prior to the effective date of the **Company Takeover**, unless:

1. the **Named Insured** gives the **Insurer** written notice of the **Company Takeover** as soon as practicable but not later than sixty (60) days after the effective date of the **Company Takeover** and the **Insurer** agrees in writing to provide coverage for **Wrongful Acts** occurring after such effective date; and

2. the **Named Insured** accepts any special terms, conditions, amendments, exclusions or additional premium charge required by the **Insurer**.

This Policy may not be canceled after the effective time of the **Company Takeover** and the entire premium for this Policy shall be deemed fully earned as of the effective date of the **Company Takeover**.

E. Mergers and Acquisitions

1. If the **Company**, during the **Policy Period**, acquires another entity by merger or by consolidation with a **Subsidiary,** acquires all or substantially all of the assets of another entity, or creates or acquires a **Subsidiary**, and if the assets acquired through such transaction are more than twenty-five percent (25%) of the total consolidated assets of the **Named Insured** as of the inception of this Policy, then, subject to all the other provisions of this Policy, coverage shall apply to any **Claim** involving the merged or consolidated entity or **Subsidiary** for a period of ninety (90) days from the date of consummation of the transaction (unless the expiration of the **Policy Period** occurs sooner, in which case all coverage shall cease as of the date the **Policy Period** expires). No coverage shall apply to any **Claim** made after such ninety (90) day period involving the merged or consolidated entity or **Subsidiary** unless the **Named Insured** provides the **Insurer** with full particulars of such transaction, and accepts any special terms, conditions, amendments, exclusions or additional premium charge required by the **Insurer**.

2. There shall be no coverage for any **Wrongful Act** involving the merged or consolidated entity or **Subsidiary** that occurred prior to the consummation of a transaction described in Paragraph 1., above, or for any other **Wrongful Act** whenever occurring which together with a **Wrongful Act** that occurred prior to the consummation of such transaction would constitute **Interrelated Wrongful Acts Or Technology Products Failures**.

3. There shall be no coverage for any **Wrongful Act** or Technology Products Failure  of any **Subsidiary** or any of its directors, officers or employees occurring on or after the date such entity ceases to be a **Subsidiary**.

4. If an entity ceases to be a **Subsidiary** during the **Policy Period**, coverage with respect to any **Coverage Part** for such **Subsidiary** and its **Insureds** shall continue until expiration of the **Policy Period** or termination of this Policy, whichever occurs first, but only for **Claims** for **Wrongful Acts** while such entity was a **Subsidiary**.

F. Bankruptcy

Bankruptcy or insolvency of the **Company** or of an **Insured Person** shall not relieve the **Insurer** of any of its obligations hereunder; and the **Insurer** agrees not to oppose or object to any efforts to obtain relief from any automatic stay or injunction which may apply to this Policy or its proceeds.

G. Representations

The **Insureds** agree that the **Application** is deemed attached to this Policy and incorporated herein, and that all warranties, statements and representations contained in or incorporated into the **Application** have been made to the **Insurer**. This Policy is issued in reliance upon the truth of such warranties, statements and representations. The **Insureds** further agree that in the event of any material misstatement, misrepresentation or omission in the **Application**, this Policy will be void as to any **Insured** who was aware as of the inception date of the **Policy Period** of the facts that were misstated, misrepresented or omitted in the **Application** (whether or not such **Insured** was aware that such facts were misstated, misrepresented, or omitted in the **Application**). For purposes of determining the applicability of this Paragraph, any knowledge possessed by the Chief Executive Officer, the Chief Financial Officer, or the General Counsel of the **Named Insured** shall be imputed to the **Company**, but with the exception of the foregoing, any knowledge possessed by an **Insured** shall not be imputed to any other **Insured**.

H. Other Insurance

Such insurance as is provided by this Policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written as specific excess insurance over this Policy. This Policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this Policy may be obligated to pay **Loss**.

In the event a **Claim** against an **Insured** arising out of his or her service as an **Insured Person** who, with the knowledge and consent of the **Company**, is serving as a director, officer, trustee, regent or governor of any **Not-For-Profit Entity**, coverage as is afforded by this policy shall be specifically excess of any: (i) indemnification provided by such **Not-For Profit Entity**; and (ii) any other insurance provided to such **Not-For Profit Entity**.

I.   Subrogation

　　1.   The **Insurer** shall be subrogated to the extent of any payment made under this Policy to all of the rights of recovery of the **Insureds** against any person or organization. The **Insureds** shall do nothing to prejudice any of the **Insurer's** subrogation rights, and shall execute and deliver all papers and instruments required, and shall do whatever else is necessary, to enable the **Insurer** effectively to bring suit in their name and otherwise secure such rights. In no event, however, shall the **Insurer** exercise its subrogation rights against any **Insured Person** under this Policy, unless such **Insured Person** has been convicted of a criminal act, or been determined by a final adjudication to have committed a dishonest, fraudulent act or willful violation of any statute, rule or law, or determined by a final adjudication to have obtained any profit or advantage to which such **Insured Person** was not legally entitled.

　　2.   Any amount recovered after payment under this Policy shall be apportioned in the inverse order of any actual payment of the underlying **Claim** so the last dollar paid shall be the first dollar recovered. The expenses incurred in obtaining any such recoveries shall be apportioned in the ratio of the actual recoveries of the **Insurer** and the **Insureds**; and any amounts recovered, less the expenses incurred in obtaining any such recovery, shall be credited toward the applicable limit of liability.

J.   Assignment

This Policy and any and all rights hereunder are not assignable without the written consent of the **Insurer**.

K.   Entire Agreement

By acceptance of this Policy, the **Insureds** and the **Insurer** agree that this Policy (including the **Application**) and any written endorsements attached hereto constitute the entire agreement between the parties.

L.   Conformity to Statute

Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy are hereby amended to conform to such laws.

M.   Authorization

The **Insureds** agree that the **Named Insured** will act on behalf of the **Insureds** with respect to the giving of all notices to the **Insurer**, the receipt of notices from the **Insurer**, the payment of premiums, and the receipt of any return premiums that may become due under this Policy.

N.   Worldwide Territory

The Policy shall apply to **Claims** made against the **Insureds** anywhere in the world.

O.   Service of Suit

　　1.   Subject to Subsection C. ADR Provision, above, if the **Insurer** fails to pay any amount claimed to be due under this Policy, the **Insurer**, at the request of any of the **Insureds**, will submit to the jurisdiction of any court of competent jurisdiction within the United States, and will comply with all requirements necessary to give such court jurisdiction. Nothing in this Clause constitutes or should be understood to constitute a waiver of the **Insurer's** rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any State in the United States.

2. The **Insurer** hereby designates the Superintendent, Commissioner or Director of Insurance or similar officer specified by law for that purpose, or his or her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of any **Insured** under the Policy. The **Insureds** agree that a copy of any document served on the **Insurer's** agent shall also be mailed contemporaneously to the **Insurer** and addressed as indicated in the Notice Endorsement attached to this Policy.

P. Compliance with Laws Governing Trade and Economic Sanctions

Payment of **Loss** under this Policy shall be made only in full compliance with all economic or trade sanction laws and regulations, including but not limited to sanctions, laws, and regulations administered and enforced by the United States Treasury's Office of Foreign Asset Control (OFAC), and any other laws or regulations of the United States, European Union, or United Kingdom.

Q. Headings

The descriptions in the headings and any subheading of this Policy (including any titles given to any endorsement attached hereto) are inserted solely for convenience and do not constitute any part of the terms or conditions hereof.

THIS POLICY SHALL NOT BE VALID UNLESS COMPLETED BY THE ATTACHMENT HERETO OF THE DECLARATIONS PAGE AND SIGNED BY A DULY AUTHORIZED REPRESENTATIVE OF THE **INSURER.**

# FinTech Alpha

## EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART

THIS IS A "CLAIMS MADE AND REPORTED" COVERAGE PART. SUBJECT TO ITS TERMS AND PROVISIONS, THIS COVERAGE PART ONLY APPLIES TO CLAIMS FIRST MADE AGAINST THE INSUREDS, AND FIRST REPORTED TO THE INSURER IN THE TIME AND MANNER REQUIRED BY THIS POLICY. IN ADDITION, DEFENSE EXPENSES ARE INCLUDED IN AND WILL REDUCE THE LIMITS OF LIABILITY.

PLEASE READ THIS ENTIRE COVERAGE PART CAREFULLY. CONSULT YOUR BROKER OR OTHER REPRESENTATIVE IF YOU DO NOT UNDERSTAND ANY TERMS OR PROVISIONS OF THIS COVERAGE PART OR ANY OTHER PART OF THE POLICY.

In consideration of the payment of Premium, and subject to the agreement of the **Named Insured** to pay the Retention amount stated in the Declarations and as set forth in this Policy, and in reliance upon the **Application**, which shall be deemed incorporated herein, and subject to all of the terms, conditions, limitations, exclusions, and endorsements to this Policy, the **Insurer** and the **Insured** agree as follows:

### I.  INSURING AGREEMENTS

A.  **Insured Person Coverage**

The **Insurer** shall pay, on behalf of any **Executive**, **Loss** to the extent the **Company** has not indemnified such **Executive**, arising from any **Claim** for any **Wrongful Act** taking place prior to the end of the **Policy Period**, and which is first made against the **Insureds** during the **Policy Period** or the Discovery Period (if applicable) and is reported to the **Insurer** in the time and manner required by this Policy.

B.  **Private Company Coverage For Indemnified Loss**

The **Insurer** shall pay, on behalf of the **Company**, **Loss**, to the extent the **Company** has indemnified **Insured Persons**, arising from any **Claim** for any **Wrongful Act** taking place prior to the end of the **Policy Period**, and which is first made against such **Insured** during the **Policy Period** or the Discovery Period (if applicable) and is reported to the **Insurer** in the time and manner required by this Policy.

C.  **Private Company Entity Coverage**

The **Insurer** shall pay, on behalf of the **Company**, **Loss** arising from any **Claim** for any **Wrongful Act** of the **Company** taking place prior to the end of the **Policy Period**, and which is first made against the **Company** during the **Policy Period** or the Discovery Period (if applicable) and is reported to the **Insurer** in the time and manner required by this Policy.

D.  **Derivative Investigation Costs Coverage for Security Holder Derivative Demands**

Subject to the Sub-Limit of Liability set forth in Item 2. of the Declarations, the **Insurer** shall pay, on behalf of the **Company**, **Derivative Investigation Costs** arising from a **Security Holder Derivative Demand** which is first made against the **Company** during the **Policy Period** or the Discovery Period (if applicable) and is reported to the **Insurer** in the time and manner required by this Policy.

### II.  DEFINITIONS

For the purposes of this **Coverage Part**:

A.  **Claim** means:

1.  a written demand for monetary, non-monetary, or injunctive relief made upon an **Insured** for a **Wrongful Act**;

2. a civil, regulatory, administrative, criminal or arbitration proceeding for monetary or non-monetary relief against an **Insured** for a **Wrongful Act**, which is commenced by: service of a complaint or similar pleading; or return of an indictment or information in the case of a criminal proceeding; or receipt of a notice of charges; or receipt of a Wells notice;

3. a civil, criminal, administrative or regulatory investigation of an **Executive** who is identified in writing by the investigating authority undertaking the investigation as someone against whom a formal proceeding may be commenced;

4. an investigation of an **Executive** by the Securities and Exchange Commission ("SEC") or a similar state or foreign government authority once a subpoena issued by the SEC or similar state or foreign government authority is served upon such **Executive**;

5. an official request for **Extradition** of any **Executive**; or the execution of a warrant for the arrest of any **Executive** where such execution is an element of **Extradition**; or

6. any written request to toll or waive a statute of limitations received by an **Insured** concerning a **Wrongful Act**.

**Claim** shall not include an investigation of the **Company**, or any informal investigation of the **Insureds**.

B. **Employed Lawyer** means an **Employee** of the **Company** who is: (a) admitted to practice law in one or more jurisdictions in the United States of America; (b) employed within the **Company's** office of the general counsel or its functional equivalent; and (c) acting solely in the capacity of providing professional legal services to the **Company**. Provided, however, an individual shall not be an **Employed Lawyer** to the extent such individual renders or rendered professional legal advice or services to persons or entities other than the **Insureds**.

C. **Extradition** means any formal process by which **Executive** located in any country is surrendered to any other country for trial or otherwise to answer criminal accusation.

D. **Insured** means the **Company** or any **Insured Person**.

E. **Insured Person** means any **Executive**, **Employed Lawyer**, or **Employee**, but solely while acting in their respective capacities as such.

F. **Derivative Investigation Costs** means any reasonable and necessary fees (including but not limited to attorneys' fees and experts' fees), expenses, costs, or charges incurred by the **Company** (including its Board of Directors or any committee of its Board of Directors) while investigating or evaluating whether it is in the best interest of the **Company** to commence a civil proceeding as demanded by a **Security Holder Derivative Demand**; provided, however, **Derivative Investigation Costs** shall not include (i) any damages, judgments, or settlements; and (ii) salaries, wages (including overtime wages), or fees of any **Executive** or **Employee**.

G. **Loss** means **Defense Expenses** and the amounts an **Insured** is legally obligated to pay as a result of any **Claim**, including:

1. settlements;

2. compensatory damages;

3. judgments, including awarded costs, and pre-judgment and post-judgment interest;

4. punitive, exemplary and multiplied damages;

5. civil fines or penalties assessed against **Insured Persons** pursuant to Section 2 (g) (2) (B) of the Foreign Corrupt Practices Act 15 U.S.C. 78 dd-2 (g) (B); and

6. attorney fees awarded to the prevailing plaintiff's counsel pursuant to a covered judgment.

**Loss**, other than **Defense Expenses**, shall not include:

1. any civil or criminal fines or penalties imposed by law, other than punitive or exemplary damages or the multiple portion of a judgment or award of multiplied damages or the civil fines or penalties assessed against **Insured Persons** pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act 15 U.S.C. 78dd-2(g)(B);

2. taxes;

3. **Clean Up Costs;**

4. the cost of any non-monetary relief, including without limitation: any costs associated with complying with any injunctive relief of any kind or nature imposed by any judgment or settlement, and the costs associated with the modification of any building or property in order to provide any reasonable accommodation under the Americans With Disabilities Act or any similar foreign, federal, state, or local statute, regulation, or common law;

5. any amount for which the **Insureds** are not financially liable or which are without legal recourse to the **Insureds**; or

6. any matter deemed uninsurable under the law pursuant to which this Policy shall be construed;

The **Insureds'** good faith determination as to the insurability of matters otherwise included within this definition shall not be contested by the **Insurer**, such good faith determination shall be based upon the most favorable law bearing a reasonable relationship to the **Insured**, the **Insurer**, or the **Claim**.

H. **Security Holder Derivative Demand** means a written demand by shareholders of the **Company**, other than an **Executive**, made upon its Board of Directors (or similar management body) which seeks to compel the Board of Directors (or similar management body) to bring, on behalf of the **Company**, a civil proceeding in a court of law against any **Executive** for such **Executive's  Wrongful Act**.

I. **Wrongful Act** means:

1. any actual or alleged breach of duty, error, misstatement, act or omission of an **Executive** while acting in his or her capacity as such;

2. any actual or alleged breach of duty, error, misstatement, act or omission of an **Employee** while acting in his or her capacity as such;

3. any actual or alleged breach of duty, error, misstatement, act or omission by the **Company**; or

4. any **Interrelated Wrongful Act**.

## III.  EXCLUSIONS

The **Insurer** shall not be liable to pay any **Loss** arising from any **Claim**:

A. arising out of, based upon or in consequence of, resulting from or in any way involving any actual or alleged act or omission of an **Insured Person** taking place or allegedly taking place while (i) serving in any other capacity other than an **Insured Person** of the **Company**; including but not limited to his or her status as a director, officer, trustee, regent, governor, manager or member of the board of managers of any entity other than the **Company**; provided, however, that this exclusion shall not apply to any **Executive** while serving, with the knowledge and consent of the **Company**, as a director, officer, trustee, regent, governor, manager or member of the board of managers of any **Not-For-Profit Entity;**

B.   brought or maintained by or on behalf of any **Not-For-Profit Entity** which an **Insured Person** is or was serving with the knowledge and consent of the **Company**; provided, however, this exclusion shall not apply if the **Insured Person** has not served with, provided consultation in any capacity to, or has been employed by the **Not-For-Profit Entity** for at least two (2) years prior to the date such **Claim** is first made, and the **Claim** by the **Not-For-Profit Entity** is brought and maintained totally independent of and without the assistance, active participation or solicitation of the **Company** or any **Insured Person** who has served with, provided consultation in any capacity to, or has been employed by the **Company** in the last two (2) years;

C.   arising out of, based upon or in consequence of, resulting from or in any way involving any public offering of securities by the **Company,** or the solicitation, sale, purchase, distribution, or issuance of any such securities, or any **Wrongful Act** relating in any way to any such public offering, whether any such activity occurs or allegedly occurs prior to, during, or after such public offering of securities by the **Company**;

Provided, however, that this exclusion shall not apply to any **Claim** for **Loss** alleging a **Wrongful Act** which occurred during the **Insured's** preparations to commence an initial public offering ("**IPO**") and which occurred at any time prior to 12:01a.m. on the date the **IPO** commences ("**IPO Effective Time**"), including any **Claim** for **Loss** alleging a **Wrongful Act** which occurred during the road show; provided, however, that the coverage otherwise afforded under this paragraph shall be deemed to be void ab initio effective the **IPO Effective Time** unless: (1) the **Claim** is first made and reported pursuant to the terms and conditions of this Policy prior to the **IPO Effective Time**; (2) the **IPO** fails to commence on the **IPO Effective Time**; and (3) a public company D&O policy is not applicable to such **Claim**.

D.   arising out of, based upon or in consequence of, resulting from or in any way involving any **Insured's** performance of or failure to perform professional services for others; provided, however, that this exclusion shall not apply to any derivative action alleging failure to supervise those who performed or failed to perform such professional services, or to that portion of any **Claim** brought against an **Executive** by a shareholder of the **Company** in his or her capacity as a shareholder; or

E.   for any violation of any statutory, regulatory or common law, governing any of the following activities: unfair trade practices, anti-trust, unfair competition, or tortious interference in another's business or contractual relationships; provided, however, that this exclusion shall not apply to that portion of any **Claim** covered under **INSURING AGREEMENT** A. **Insured Person Coverage**.

## IV.  ADDITIONAL TERMS AND CONDITIONS

Solely for purposes of this **Coverage Part**, the GENERAL TERMS AND CONDITIONS are amended as follows:

A.   Section **III. GENERAL POLICY EXCLUSIONS**:

1.   is amended by adding the following:

With the exception of Exclusions D., E., F., G., K., and L., no **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insureds** for the purpose of determining the applicability of any exclusion set forth in the GENERAL TERMS AND CONDITIONS of the Policy.

2.   exclusion C. is amended by adding the following:

provided, however, that this exclusion shall not apply to any **Claim** against an **Executive** otherwise covered under **INSURING AGREEMENT** A. of the EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART;

3.   exclusion G. is amended by adding the following:

provided, however, that this exclusion shall not apply to any **Claim** by a shareholder of the **Company** that would be otherwise covered under the EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART;

4. exclusion I. is amended by adding the following:

Provided, however, that this exclusion shall not apply to:

(i) any **Claim** under this **Coverage Part** otherwise covered under **INSURING AGREEMENT**  A.; or

(ii) any **Claim** under this **Coverage Part** brought by a shareholder of the **Company** under **INSURING AGREEMENTS** A., B., or C.,;

5. exclusion J. is amended by adding the following:

a. This exclusion shall also not apply to:

i. to the extent any **Claim** is brought or maintained: (i) by an **Employee** who is not and was not at any time an **Executive**; or (ii) in a jurisdiction outside the United States of America, Canada, or Australia by an **Insured Person** solely where the **Company** is domiciled or chartered in such foreign jurisdiction;

ii. any **Claim** brought or maintained by or on behalf of any former **Executive** in his or her capacity as a shareholder of the **Company** that: (i) arises out of any actual or alleged unfair dilution of such shareholder's securities interest; and (ii) is first made in connection with the sale of a majority of the assets of the **Company**, the merger of the **Company** with or into another entity, or the initial public offering of the securities of the **Company** (hereinafter, "Dilution Carve-Back Coverage").

Dilution Carve-Back Coverage is subject to a Sub-Limit of Liability of $250,000, aggregate for all **Loss** arising out of, based upon or in consequence of, resulting from or in any way involving Dilution Carve-Back Coverage. This Sub-Limit of Liability for Dilution Carve-Back Coverage is part of and not in addition to the Aggregate Limit of Liability for the set forth in the Declarations for the EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART.

B. Section **VI. RETENTIONS**, Subsection A. is deleted and replaced with the following:

A. With respect to each **Claim** covered under any **Coverage Part**, the **Insurer** shall only pay **Loss** which is in excess of the Retention that is applicable to such respective **Coverage Part** (or **INSURING AGREEMENT** subject to a separate Retention under such **Coverage Part**, if indicated) as set forth in Item 2. of the Declarations, such Retention shall be borne by the **Insureds**.

With respect to covered loss under the FIDELITY BOND AND CRIME COVERAGE PART, **Derivative Investigation Costs**, and **Voluntary Settlements**, the **Insurer** shall only pay such covered loss, **Derivative Investigation Costs**, and **Voluntary Settlements** which are in excess of the applicable Retention as set forth in Item 2. of the Declarations for such applicable **Coverage Part**, such Retention shall be borne by the **Insureds**.

Should the **Company** be unable or refuse to pay an applicable Retention due to bankruptcy or insolvency, the **Insurer** will then advance **Loss** within the Retention, subject to the other  terms, conditions and exclusions of this Policy; provided, however, that the **Insurer** shall be entitled to recover such amounts advanced within the retention from the **Company**.

C.  Section **VIII. NOTICE OF CLAIM AND WRONGFUL ACT**, Subsection A. is deleted and replaced with the following:

    A.  As a condition precedent to the obligations of the **Insurer** under this Policy, the **Insureds** shall give the **Insurer** written notice of any **Claim**, or **Security Holder Derivative Demand** made during the **Policy Period** or the Discovery Period (if applicable) against an **Insured** as soon as practicable, but in all events before the later of:

        1.  ninety (90) days after the Policy expires and is renewed with the **Insurer**, provided however, if the **Insured** can prove to the **Insurer's** satisfaction that it was not reasonably possible for the **Insured** to give such notice within the ninety (90) day time period and that subsequent notice was given as soon as reasonably possible thereafter, the **Insurer** shall waive the foregoing time period; or

        2.  sixty (60) days after:

           ?)  this Policy expires or terminates and is not renewed with the **Insurer**; or

           b)  the expiration date of the Discovery Period, if applicable.

D.  Section **XIII. GENERAL CONDITIONS** is amended by adding the following provisions:

    AA. Order of Payments

    In the event a covered **Claim** results in **Loss** payable under this Policy, the **Insurer** shall:

        1.  first pay **Loss** for which coverage is provided under **INSURING AGREEMENT** A. of the EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART; then

        2.  only after payment of all applicable **Loss** is made pursuant to paragraph **XIII.**.AA.1., above, whatever amounts remaining of the Aggregate Limit of Liability for the EXECUTIVE AND PRIVATE COMPANY LIABILITY COVERAGE PART, and subject to the Policy Maximum Aggregate Limit of Liability, shall be paid by the **Insurer** for any **Loss** covered under **INSURING AGREEMENTS** B., and C., and D., if the **Insurer** is directed to do so in writing by the **Named Insured**.

    BB. Side A Non-Rescindable

    The coverage provided by **Insuring Agreement** A. of this **Coverage Part** shall not be rescinded by the **Insurer** for any reason; but such coverage shall be subject to all terms, conditions, and exclusions of this Policy.

THIS POLICY SHALL NOT BE VALID UNLESS COMPLETED BY THE ATTACHMENT HERETO OF THE DECLARATIONS PAGE AND SIGNED BY A DULY AUTHORIZED REPRESENTATIVE OF THE **INSURER**.

**NAMED INSURED:** Cred LLC

**POLICY NUMBER:** FIP0000446

## SERVICE OF SUIT

The **Insurer** appoints the Commissioner of Insurance as its true and lawful attorney for acceptance of service of all legal process issued in this state in any action, suit or proceeding arising out of this contract of insurance.   The **Insurer** authorizes the Commissioner to forward such process to:

**In California**:      Richard Glucksman

Chapman Glucksman

11900 West Olympic Boulevard, Suite 800

Los Angeles, CA 90064

**All Other States**:      Western World Insurance Group

Claims Department

300 Kimball Drive, Suite 500

Parsippany, NJ 07054

The above-named are authorized to accept service of process on behalf of the **Insurer** in any legal proceeding in the applicable state(s).

By: _____

Authorized Representative

**NAMED INSURED:** Cred LLC

**POLICY NUMBER:** FIP0000446

## NOTICE ENDORSEMENT

In consideration of the payment of premium for this Policy, it is understood and agreed that Notice under the Policy is to be provided as follows:

1.    Notice of **Claims,** notice of circumstances, or notice of any other matter for which coverage may be sought:

### Claims Notices

Eric Levine - FI Professional Liability
4 World Trade Center
150 Greenwich Street, 47th Floor
New York, NY 10007
Tel: (212) 785 - 2000
Fax: (212) 785 - 2001
Email: ValidusFIClaims@validusuw.com

2.    All other notices or communications:

### All Other Policy Notices

Underwriting Manager - FI Professional Liability
4 World Trade Center
150 Greenwhich Street, 47th Floor
New York, NY 10007
Tel: (212) 785 - 2000
Fax: (212) 785 - 2001

By: _____
                    Authorized Representative

FI 3001 (03/17)

**NAMED INSURED:** Cred LLC

**POLICY NUMBER:** FIP0000446                                    **ENDORSEMENT NO.**

## DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

It is hereby understood and agreed that this Endorsement is attached to and made part of your Policy in response to the disclosure requirements of the Terrorism Risk Insurance Act. This Endorsement does not grant any coverage or change the terms and conditions of any coverage under this policy.

| SCHEDULE - PART I |
| --- |

**Terrorism Premium (Certified Acts):**                    $0

**This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies):**

Executive and Private Company Liability

| SCHEDULE - PART II |
| --- |

**Federal share of terrorism losses:**     80    %     **Year: 20**20

(Refer to Paragraph B. in this endorsement.)

**Federal share of terrorism losses:**     80    %     **Year: 20**21

(Refer to Paragraph B. in this endorsement.)

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.  Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B.  Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insureds under the federal program. The federal share equals a percentage (as shown in Part II of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C.  Cap on Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rate allocation in accordance with procedures established by the Secretary of the Treasury.

By: _____

Authorized Representative

**NAMED INSURED:** Cred LLC

**POLICY NUMBER:** FIP0000446

## ICO AND CRYPTO CURRENCY, TOKEN, OR COIN EXCLUSION ENDORSEMENT

In consideration of the payment of premium for this Policy, it is understood and agreed that the Policy is amended as follows:

1. Section **III. GENERAL POLICY EXCLUSIONS** of the GENERAL TERMS AND CONDITIONS is amended by adding the following exclusion:

   The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** arising out of, based upon or in consequence of, resulting from or in any way involving any of the following:

   (i)    any initial coin offering(s) (ICO(s));

   (ii)    the transmission, transfer, allocation, payment, receipt, or conversion of any crypto currency, crypto token or coin, digital token or coin, or utility token or coin;

   (iii)    any **Insured** acting as, or on behalf of, a money transmitter;

   (iv)    any investment of any kind, whether or not a security, that is in the form of crypto currency, crypto token or coin, digital token or coin, or utility token or coin;

   (v)    any ownership interest in any company of any kind, whether or not a security, that is in the form of crypto currency, crypto token or coin, digital token or coin, or utility token or coin;

   (vi)    any digital asset that may be subject to or considered in any way part of: a) an investment contract; or b) a Simple Agreement for Future Tokens ("SAFT");

   (vii)    any exchange where investors trade crypto currency, crypto token or coin, digital token or coin, or utility token or coin;

   (viii)    any theft, appropriation, misappropriation, misuse, or conversion of any crypto currency, crypto token or coin, digital token or coin, or utility token or coin; or

   (ix)    any matter involving (i) through (viii), above, brought by or on behalf of, or instigated by or continued with the assistance, solicitation, participation or intervention of any State or Federal regulatory or administrative agency or bureau or any other governmental, quasi-governmental or self-regulatory entity, whether directly or indirectly, and whether brought in its capacity as receiver, conservator or, liquidator, securities holder or assignee of the **Company**, its security holders, its depositors or creditors or in any other capacity, and whether brought in its own name or in the name of any other entity.

   Provided, however, that this exclusion shall not apply to an action brought against the **Company** or any **Insured Person** by a shareholder of the **Company** who:

   (a)    possesses an ownership interest in the **Company** that is not in the form of crypto currency, crypto token or coin, digital token or coin, or utility token or coin;

(b) did not acquire an ownership interest in the **Company** in an initial coin offering (ICO) or any exchange where any crypto currency, crypto token or coin, digital token or coin, or utility token or coin, are traded; and

(c) did not acquire an ownership interest in the **Company** through any digital asset, utility coin, digital investment contract, or SAFT.

2. Solely for purposes of this Endorsement, **Loss**, as defined in Section **II. GENERAL DEFINITIONS** of the GENERAL TERMS AND CONDITIONS is amended by adding the following:

**Loss** shall also include any amounts for which the **Insurer** may be liable under any Insuring Agreement of any **Coverage Part**.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

By:  _____

Authorized Representative

**NAMED INSURED:** Cred LLC

**POLICY NUMBER:** FIP0000446

## TIE-IN OF LIMITS ENDORSEMENT

In consideration of the payment of premium for this Policy, it is understood and agreed that Section **V. LIMITS OF LIABILITY** of the GENERAL TERMS AND CONDITIONS of the Policy is amended by adding the following Subsection:

The maximum aggregate limit of liability of the **Insurer** for all **Loss** in connection with any **Claim(s)** alleging the same **Wrongful Act** or **Interrelated Wrongful Acts** noticed under both this Policy and the policy(ies) scheduled below, combined, shall be $1,000,000 ("Shared Sub-Limit of Liability").

The Shared Sub-Limit of Liability is part of, and not in addition to, the **Policy Maximum Aggregate Limit of Liability**. All payment(s) of **Loss** made under this Policy, any of the policy(ies) scheduled below, or both, in connection with any such **Claim(s)** alleging the same **Wrongful Act** or **Interrelated Wrongful Acts** noticed under both this Policy and the policy(ies) scheduled below will reduce the **Policy Maximum Aggregate Limit of Liability** set forth Declarations of this Policy.

Scheduled Policy(ies):

Western World Insurance Company - Policy No. FIP0000445, Policy Period 01/25/2020 to 01/25/2021

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

By: _____
Authorized Representative

**NAMED INSURED:** Cred LLC

**POLICY NUMBER:** FIP0000446

## AMENDED APPLICATION ENDORSEMENT

In consideration of the payment of premium for this Policy, it is understood and agreed that Section **II. GENERAL DEFINITIONS**, Subsection A. **Application**, Paragraph 2. of the GENERAL TERMS AND CONDITIONS of the Policy is deleted and replaced with the following:

2.  all publicly available documents prepared by the **Company** within the 12 months preceding the date this Policy is issued and which are reviewed in connection with the underwriting of this Policy or any policy issued by the **Insurer** of which this Policy is in whole or in part a renewal or replacement.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

By: _____

Authorized Representative

**NAMED INSURED:** Cred LLC

**POLICY NUMBER:** FIP0000446

## AMENDED NOTICE OF CLAIM ENDORSEMENT

In consideration of the payment of premium for this Policy, it is understood and agreed that Section **VIII. NOTICE OF CLAIM AND WRONGFUL ACT**, Subsection A. of the GENERAL TERMS AND CONDITIONS of the Policy is deleted and replaced with the following:

### VIII. NOTICE OF CLAIM AND WRONGFUL ACT

A.  As a condition precedent to the obligations of the **Insurer** under this Policy, the **Insureds** shall give the **Insurer** written notice of any **Claim**, or **Security Holder Derivative Demand** made during the **Policy Period** or the Discovery Period (if applicable) against an **Insured** as soon as practicable once the Chief Executive Officer, Chief Financial Officer, or the General Counsel (or any individual holding the functional equivalent of these positions) of the **Insured**, becomes aware of such **Claim** or **Security Holder Derivative Demand**, but in all events before the later of:

1.  ninety (90) days after the Policy expires and is renewed with the **Insurer**, provided however, if the **Insured** can prove to the **Insurer's** satisfaction that it was not reasonably possible for the **Insured** to give such notice within the ninety (90) day time period and that subsequent notice was given as soon as reasonably possible thereafter, the **Insurer** shall waive the foregoing time period; or

2.  sixty (60) days after:

    a)  this Policy expires or terminates and is not renewed with the **Insurer**; or

    b)  the expiration date of the Discovery Period, if applicable.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

By: _____

Authorized Representative