**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related to Docket No. 356** |
| | ) | |
| CRED INC. LIQUIDATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| WINSLOW CARTER STRONG, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**<u>COMPLAINT TO AVOID AND RECOVER A FRAUDULENT TRANSFER</u>**

The Cred Inc. Liquidation Trust (the "<u>Trust</u>") established in the above-captioned

chapter 11 cases (the "<u>Chapter 11 Cases</u>") of Cred Inc. and its affiliated debtors (collectively, the

"<u>Debtors</u>" or "<u>Cred</u>") files this complaint to avoid and recover an actual and constructive

fraudulent transfer of 516.39344262 Bitcoin (BTC) that Cred transferred to Winslow Carter

Strong ("<u>Defendant</u>" or "<u>Strong</u>"), a cryptocurrency "whale."  The Trust alleges as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax
identification number, as applicable, are as follows:  Cred Inc. (8268), Cred (US) LLC (5799),
Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC
(3566).  The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California
94401.

## PRELIMINARY STATEMENT

1.      On July 2, 2020, while insolvent and nearing bankruptcy, Cred transferred 516.39344262 BTC (worth more than $21 million today) to Defendant Strong in exchange for a worthless bond.  In so doing, Cred deliberately ensured that the high-profile cryptocurrency investor Strong profited, while thousands of Cred's retail customers lost everything.

2.      As Strong described to his cryptocurrency investor community in a Slack channel one day after Cred's bankruptcy filing, he "dodged a bullet":[2]



3.      It is more accurate to say that Cred took a bullet to save Strong, at the expense of creditors who are still owed hundreds of millions of dollars.

4.      Cred's purchase of Strong's worthless bond was an actual and constructive fraudulent transfer that should be avoided.

## BACKGROUND

5.      Cred was a cryptocurrency "yield earning" platform.  Cred's customers lent cryptocurrency to Cred pursuant to a program called "CredEarn."  Under CredEarn, Cred agreed to repay its customers the loaned cryptocurrency, plus interest.

6.      Cred obtained hundreds of millions of dollars' worth of cryptocurrency loans from retail customers and others pursuant to the CredEarn program.  Cred was unable to repay CredEarn customers and filed for bankruptcy on November 7, 2020 (the "Petition Date").

---

[2] Ex. A.

7.      Cred partnered with a Chinese lending company called MoKredit, which was owned by Lu Hua ("Hua"), the 50% owner and one of two co-founders and directors of Cred. Over 90% of the cryptocurrency lent to Cred pursuant to the CredEarn program was immediately re-loaned to MoKredit.  MoKredit was in the business of making micro-loans—ranging from RMB10 ($1.45 USD) to RMB1000 ($145 USD)—to videogamers in China.

8.      Cred also assumed a significant risk that the price of BTC and other cryptocurrencies would increase during the lifecycle of a CredEarn loan.  Cred assumed this risk because MoKredit refused to expose itself to the risk of loss due to fluctuations in the price of BTC and other cryptocurrencies.  At MoKredit's request, Cred loaned MoKredit fiat currency or stablecoin,[3] rather than BTC and other cryptocurrencies.

9.      Under CredEarn, Cred was obligated to repay its customers' loans in BTC, Ethereum ("ETH"), and other cryptocurrencies, plus interest.  Because Cred and MoKredit only transacted with each other in stablecoin, Cred bore the risk of loss if BTC and other cryptocurrenices increased in value during the life of a CredEarn loan.  Thus, Cred was naturally short BTC and other cryptocurrencies.

10.     In a poorly executed effort to mitigate this "short BTC" risk, Cred hired an unregistered and unlicensed company (the "Trading Firm") to execute a "hedging" trading strategy.  This risky "hedging" strategy involved highly leveraged derivatives trades that ultimately caused hundreds of millions of dollars' worth of losses of customer cryptocurrency.

11.     The majority of these trading losses occurred in March 2020 when the price of

---

[3] A stablecoin is a digital currency that is pegged to a "stable" reserve asset like the U.S. dollar or gold.  Stablecoins are designed to reduce volatility relative to unpegged cryptocurrencies like Bitcoin.  The primary cryptocurrency Cred loaned to MoKredit was U.S. Dollar Coin (USDC), which are worth $1 each.

BTC dropped precipitously and Cred's leveraged and other hedging positions were liquidated. Cred was unable to satisfy margin calls or to reinstitute the hedges.

12.     During that same time period, MoKredit was unable to satisfy its principal repayment obligations to Cred, which exceeded $40 million.

13.     On April 5, 2020, Cred internally circulated a "Liquidity Memo" reporting Cred's disastrous financial state of affairs, including that its liabilities grossly exceeded its assets and stating that the only way to stay afloat was to raise more money.

14.     Despite its insolvency and a looming bankruptcy filing, a few months after massive losses and the circulation of the Liquidity Memo, Cred decided to give special treatment to high-net-worth investors and other persons and entities influential in the cryptocurrency industry.  Strong was one of those customers.

15.     Strong is a prominent cryptocurrency investor who is known to invest in early stage cryptocurrency companies.  In popular cryptocurrency publications, Strong has been referred to as a "top angel investor"[4] and an "institutional investor."[5]

16.     Strong is a high-profile member of the ever-increasing high-net-worth cryptocurrency community in Puerto Rico.  Puerto Rico is a well-known destination for major cryptocurrency investors due to favorable tax laws.  It has been referred to as the "Crypto Island

---

[4] Cryptobriefing, *Resource Finance Raises $1.7 million to Offer Undercollateralized Credit to Web 3 Business* (Aug. 12, 2021), https://cryptobriefing.com/resource-finance-raises-1-7-million-to-offer-undercollateralized-credit-to-web-3-businesses.

[5] Coinspeaker, *Beam Raises $2M to Decentralize Governance and to Build Confidential Defi Smart Contract Platform* (May 20, 2021),https://www.coinspeaker.com/beam-raises-2m-to-decentralize-governance-and-to-build-confidential-defi-smart-contract-platform/.

Paradise."[6]  Strong provided Cred with contacts and introductions to high-profile individuals among the elite cryptocurrency community in Puerto Rico, particularly those who Strong deemed to be "HNW" (high-net-worth).

17.     As Cred hurtled towards bankruptcy, Cred decided to use some of its last cryptocurrency to pay Strong first.  On July 2, 2020, Cred purchased a note (the "Lux Bond") from Strong (the "Bond Purchase").  Cred transferred a total of 516.39344262 BTC to Strong for the Lux Bond.  The Lux Bond was issued by a separate entity, Income Opportunities Luxembourg (SA) ("Income Opportunities").  Cred had no obligation to buy, redeem, or secure the Lux Bond.  Income Opportunities was not a parent, subsidiary, or affiliate of Cred.

18.     The Lux Bond was worthless at the time of the Bond Purchase.  To this day, Cred has never received any payments of principal or interest in connection with the Lux Bond. Income Opportunities recently commenced a voluntary liquidation in Luxembourg.

19.     Four months after the Bond Purchase, Cred filed bankruptcy.

---

[6] Puerto Rico maintains well-known tax benefits for those who have amassed significant wealth through trading and holding cryptocurrency.  *See* Bloomberg, *Zero Taxes, Golf and Beach Houses Create a Crypto Island Paradise* (Dec. 11, 2021), https://www.bloomberg.com/news/features/2021-12-11/crypto-rich-are-moving-to-puerto-rico-world-s-new-luxury-tax-haven.  This has made Puerto Rico a natural cryptocurrency hub and many of the world's most prominent cryptocurrency conferences and events are held in Puerto Rico.

## PARTIES

20.     The Trust was created pursuant to the *Modified First Amended Combined Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code* (as amended, the "<u>Plan</u>"), which this Court confirmed on March 11, 2021. (ECF No. 629-1.)  The Plan became effective on April 19, 2021 (the "<u>Effective Date</u>").  (*See* ECF No. 730.)  On the Effective Date, the Trust was established and the Debtors' assets were transferred and assigned to the Trust.  (*See* Plan, § 12.3.)  The Trust is being administered by the Liquidation Trustees (as defined in the Plan).  (*See id.* at § 12.3(a).)

21.     Defendant is an individual investor who resides in Puerto Rico.

## RELEVANT NON-PARTIES

22.     "<u>MoKredit</u>" is a Chinese micro-lending platform owned by Lu Hua, Cred's co-founder and 50% equity owner.  MoKredit consists of a series of entities incorporated in the Cayman Islands, Hong Kong, and Shanghai.

23.     The "<u>Trading Firm</u>" is a limited liability company organized in Delaware with its principal place of business in New Jersey.  The Trading Firm provides cryptocurrency trading, conversion, payments, and investment services.  In late 2018, Cred hired the Trading Firm as a consultant to assist Cred with a hedging strategy, to convert BTC, ETH and other cryptocurrencies to stablecoin, and to facilitate transactions with MoKredit.

24.     James Alexander ("<u>Alexander</u>") was hired as Cred's Chief Capital Officer in August 2018.

25.     Joe Podulka ("<u>Podulka</u>") was Cred's Chief Financial Officer from July 2019 to December 2020.

26.     Daniel Wheeler ("<u>Wheeler</u>") joined Cred as its General Counsel in August 2019.

Wheeler previously served as Cred's primary outside counsel while a partner at Bryan Cave Leighton Paisner LLP from May 2012 to August 2019.

27.     Daniel Schatt ("Schatt") is the co-founder and former Chief Executive Officer of Cred.  Schatt became CEO in mid-to-late-2018.  Schatt owned 50% of Cred.

28.     Daniyal Inamullah ("Inamullah") served as Cred's Vice President of Capital Markets from January 2020 to April 2020.

## JURISDICTION AND VENUE

29.     This Court has original jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arises in and relates to cases under the Bankruptcy Code.  This adversary proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter final orders for matters contained herein.

30.     In accordance with Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), Plaintiff confirms its consent to the entry of a final orders or judgments by the Court in connection with this adversary proceeding to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

31.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## FACTS

### I.   Cred Inc. Background

32.    In early 2018, Schatt and Hua established an entity called Libra Credit in Singapore, which eventually became known as Cyber Quantum.

33.    Cyber Quantum conducted an initial coin offering in May 2018.[7]  The proceeds of the Cyber Quantum initial coin offering would be used to provide initial funding for a company that would later become Cred.

34.    Schatt and Hua moved the business operations of Cyber Quantum to the United States and organized the various Cred entities, including Cred Inc. and Cred (US) LLC.

35.    After forming Cred, Schatt assumed the role of Chief Executive Officer, and Hua became a member of Cred's board of directors.  Hua owned 50% of Cred.

36.    Cred had two primary offerings.  The first program was CredBorrow.  Under the CredBorrow program, customers borrowed U.S. dollars from Cred and posted cryptocurrency as collateral to secure the customer's repayment obligation.  Cred charged 9-14% interest in connection with CredBorrow.

37.    The second and significantly more popular program was CredEarn.  Under CredEarn, customers lent cryptocurrency to Cred in exchange for a promise by Cred to repay the loan, plus interest.  Cred agreed to repay loans to its CredEarn customers in the same type of cryptocurrency that the CredEarn customer lent to Cred.

38.    Cred loaned the CredEarn cryptocurrency that it received from customers to MoKredit.  In turn, MoKredit lent those funds to MoKredit's customers.  MoKredit's customers

---

[7] An initial coin offering is a fund-raising event in connection with the launch of a new cryptocurrency.

were purportedly thousands of videogamers primarily in China who would borrow small sums at high interest rates, often exceeding 35%.

39.     At MoKredit's request, Cred's dealings with MoKredit were entirely in stablecoin.  Because Cred owed its CredEarn customers cryptocurrency, plus interest, this arrangement left Cred exposed to price increases in BTC, ETH, and other cryptocurrencies.

40.     In an effort to mitigate the risk associated with an increase in prices of cryptocurrency, Cred hired the Trading Firm to create and execute a "hedging strategy." Pursuant to this hedging strategy, the Trading Firm entered into options, futures, and "perpetual swaps" (or "perps") for Cred in order to hedge against an increase in the price of cryptocurrency.

41.     Cred and MoKredit's relationship was governed by a series of agreements and tranches for additional loan amounts that are subject to those agreements.  MoKredit and Cred executed a loan and security agreement with an effective date of December 27, 2018 (the "LSA").[8]  The LSA governed MoKredit's borrowing of funds from Cred, which largely consisted of CredEarn loan proceeds.

42.     MoKredit was obligated to repay obligations outstanding under the LSA upon the sooner of (i) the maturity date of the loan or (ii) 30 days' notice by Cred at Cred's discretion. MoKredit consistently did not repay principal on the maturity dates.

43.     When MoKredit failed to repay principal, Cred would allow Mokredit to "roll" the principal amounts owed to the next "tranche."  Cred's former Chief Financial Officer Podulka testified about the MoKredit principal payments as follows:  "the money, when a tranche would close, wouldn't necessarily result in a flow of cash to Cred.  It could be reenrolled

---

[8] Ex. B.

in another program or tranche."[9]

## II.    Strong's Purchase of the Lux Bond

44.    Strong initially developed a relationship with Cred in January of 2020.

45.    Strong was important to Cred.  Cred executives referred to Strong internally as a "crypto-whale" who had strong ties to the high-net-worth cryptocurrency community in Puerto Rico.  Cred and Strong executed a consulting agreement under which Strong would be compensated for referring high-net-worth cryptocurrency investors.

46.    Strong's primary contact at Cred was Michael Zhang ("Zhang"), who was a senior wealth associate.  Zhang provided Strong with "white-glove" services available only to Cred's most important customers.

47.    On January 2, 2020, Zhang approached Strong with the opportunity to invest in CredEarn.  Zhang initially proposed a typical CredEarn enrollment plan to Strong.  Under the terms of this initial offer, Strong was approved for "8% APR for any enrollment over 200 BTC and a one-time 9% APR for any enrollment of 500+ BTC." [10]  This offer included a "lock-in" period of six months and a guarantee that "interest payments [would] be paid in kind based off the total number of BTC [Strong] enrolls at the end of every calendar year."[11]

48.    On or around January 9, 2020, Strong executed the Secured Line of Credit Agreement (the "CredEarn Agreement") with Cred pursuant to the terms described above, with a total loan amount of 500 BTC.  Strong's CredEarn 500 BTC commitment was set to earn "9%

---

[9] Deposition of Joseph Podulka, dated July 23, 2021 ("Podulka Dep. Tr.") at 131:7-9.  The Trust conducted a series of depositions pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure.

[10] Ex. C.

[11] *Id.*

simple interest (the interest rate in BTC payable by Cred LLC to [Strong] on the Advance at the end of each quarter)."[12]

49.    One day prior to executing the CredEarn Agreement, Strong, Alexander, and Zhang participated in a video conference to discuss Strong's investments.  Cred introduced to Strong the opportunity to invest in a separate entity, called Income Opportunities.

50.    Strong became interested in earning a yield on his cryptocurrency from an entity separate from Cred because Strong had learned that Cred was in a risky financial position and might be headed for bankruptcy.  Cred and Strong described Income Opportunities as a "bankruptcy remote" entity.

51.    Income Opportunities was organized in Luxembourg on July 6, 2015, more than three years before Cred launched.  Income Opportunities was initially called Aequitas Income Opportunities (Luxembourg) S.A.  The entity later changed its name to Income Opportuniuties (Luxembourg) S.A. (dropping the word "Aequitas").  An entity called Stichting Sentry is the sole shareholder of Income Opportunities.[13]  Stitching Sentry was never affiliated wih Cred.  Cred never held any equity or other ownership interest in Income Opportunities, directly or indirectly.

52.    ██████████████████████████████████████████████

██████

██████████████

████████████████████████████████████████████

████████████████████████████████████████████

───────────────────

[12] Ex. D.

[13] Ex E.

- ███████████████████████████████████

- ███████████████████████████████████[14]

53.     On January 16, 2020, Alexander emailed Strong a link to the confidential MoKredit Data Room and attached a "confidential overview report on MoKredit" titled "CONFIDENTIAL MoKredit Inc Overview_20190807."[15]

54.     The MoKredit Overview contained disclosures about MoKredit, including disclosures that MoKredit's core customer base were young, low-earners, without credit histories:

> Our customers are typically in their twenties and thirties with average monthly salaries of 2-6K RMB. These users are part of the 400-600 million white and blue-collar workers in China without credit histories. They need access to small credit for their discretionary spending but are underserved by traditional financial institutions.[16]

55.     Strong viewed investing in the Lux Bonds as an attractive opportunity because he believed it to be a "bankruptcy remote entity" from Cred. Strong believed that his cryptocurrency would be protected if Cred filed for bankruptcy.

56.     █████████████████████████████

████████████████████████████

███████████████████████

---

[14] Ex. F (emphasis added).

[15] Ex. G.

[16] Ex. H.

 [17]

57.     ███████████████████████████████████████████

████████████████████████████████████ [18]

58.     Strong also stated that he had not "really delved under the hood into the corporate. I decided to stay in t[he] bankruptcy remote entity for now, so am not particularly concerned with the corporate balance sheet."[19]

59.     ████████████████████████████████████████

█████████████████████████████ :



[20]

60.     ██████████████████████████

_____

[17] Ex. I (emphasis added).

[18] Ex. J.

[19] Ex. K.

[20] Ex. L (emphasis added) (errors in original).



21

61.     When asked by a potential investor to explain the bankruptcy remote entity,

Strong replied as follows:

> **It could [go bankrupt] but [Income Opportunity's] assets aren't accessible to creditors of Cred or to Cred itself**
>
> It also has first 10% capital buffer of the Asian guy, one of their owners, I[']m blanking on his name
> ….
> Surprised they didnt mention that option to you[22]

62.     Strong and Cred's high-net-worth investors were provided additional details about

the Income Opportunities investment.  Prospective investors were provided with a base

prospectus (the "Base Prospectus").[23]  The Base Prospectus contained detailed information about

the Lux Bonds and MoKredit.

63.     The Base Prospectus stated that repayment of the Lux Bonds was entirely

dependent on whether MoKredit satisfied its obligations to Income Opportunities.  The Base

---

[21] Ex. M (emphasis added) (errors in original).

[22] Ex. K (emphasis added).

[23] Ex. N.

Prospectus states the following:

> **The Issuer's principal source of earnings will be the cash flows generated by the MoKredit Participation Certificate**
>
> All or substantially of the Issuer's assets will be constituted by the cash flows (if any) generated by the moKredit Participation Certificate. ***Accordingly, the performance of the Issuer will be dependent upon receipt of monies generated by the moKredit Participation Certificate.***[24]

64.    The Base Prospectus also described the risks associated with MoKredit's business model:

> A MoKredit Participation Certificate is a United States-based debt obligations of MoKredit. MoKredit, through its Chinese Affiliate, originates consumer finance receivables in China. MoKredit currently offers cash credit products which provide funds in digital form, and merchandise credit products. MoKredit mainly generates financing income from cash credit products and both financing income and sales commission fees from merchandise credit products. It uses blockchain technology and proprietary AI risk management to make consumer finance available to hundreds of millions of unserved or underserved consumers in China. MoKredit was established in 2012. MoKredit's founder and management team represent a unique combination of technology and finance backgrounds, with significant professional work experience, proven execution capabilities and extensive knowledge of China's online consumer finance market. However, consumer credit is relatively new in China and therefore has a limited performance history.[25]

65.    The Base Prospectus further described with specificity the risks associated with the potential investment because it was entirely dependent on MoKredit satisfying the debt owed to Income Opportunities:

> **Limited Diversification**
>
> The assets of the Issuer will be limited to one or more MoKredit Participation Certificates. As a result, there is a risk that the aggregate returns realized by the Issuer may be substantially adversely affected by the unfavourable market conditions affecting MoKredit and its Chinese Affiliate, and more generally the ability of MoKredit to make a required payment on its debt under the loan and security agreement underlying the MoKredit Participation Certificate. Further, the MoKredit Participation Certificates held by one Cred Compartment may be in

---

[24] *Id.* at 4 (emphasis added).

[25] *Id.*

relation with the same line of credit granted to MoKredit as the MoKredit Participation Certificates held by another Cred Compartment.[26]

66.    The Base Prospectus also explains that the Lux Bonds are "not secured" and not

"guaranteed" by "any third party":

**Unsecured Notes**

The Notes are ***not secured*** [sic] by any security interest, lien, pledge, charge, assignment, transfer or other encumbrance of any kind, ***nor will they be guaranteed or insured by any third party*** nor backed by any governmental authority.  If the Issuer fails to make a required payment on a Note, the remedies of individual holders of the Notes will be limited.[27]

67.    The Base Prospectus also contains the disclosure that purchasers of Lux Bonds

would have limited recourse obligations if MoKredit defaulted:

**Limited recourse obligations**

 . . . Except any amounts received further to the issuance of Junior Notes, [Income Opportunities] will have no other assets or sources of revenue available for payment of any of its obligations under the Notes than the revenues derived from the relevant interests in moKredit Participation Certificates . . . No assurance can be made that the proceeds available for and allocated to the repayment of the Notes at any particular time will be sufficient to cover all amounts that would otherwise be due and payable in respect of these Notes.  If [Income Opportunities] is not able to satisfy its payment obligations under any Series of Notes, then [Income Opportunities] will not be liable for any shortfall arising and the Noteholders will have no further claims against [Income Opportunities] in respect of these Notes. ***No other person other than the Issuer (i.e. [Income Opportunities] acting in relation with the relevant Cred Compartment) will be obliged to make payments on the Notes***.[28]

68.    Additional risk factors explained in the Base Prospectus included:  (a) the

underlying security risks had not been perfected; (b) consumer credit risk associated with

---

[26] *Id.* at 3.

[27] *Id.* (emphasis added).

[28] *Id.* at 7 (emphasis added).

MoKredit's micro-loan products; (c) risks associated with MoKredit's corporate structure; (d) changes in Chinese regulations could impact the interest rates MoKredit could charge and collect from its micro-borrowers; and (e) limited recourse if MoKredit defaulted.

69.     Strong expressly acknowledged the terms of the Base Prospectus in the Subscription Form that he signed.[29]   The first paragraph of the Subscription Form states:

> The Noteholder acknowledges that ***it has received and read the Base Prospectus dated January 30, 2020 and that it has received and read the applicable Final Terms for the Notes, attached herewith in Schedule 1, and confirms to be familiar with their content.***   By signing this Subscription Form, the Noteholder adheres to the terms & conditions of the Notes.[30]

70.     Strong executed the Subscription Form to purchase the Lux Bond with an effective date of January 30, 2020.

71.     With the execution of the Subscription Form, Strong elected to terminate his CredEarn Agreement and all of Cred's obligations under the CredEarn Agreement:

> Purchase by contract conversion.  Noteholder elects to terminate its contract with [Cred] specified below (the "Existing Cred Contract") and instructs [Cred] to transfer all cryptocurrency pledged or loaned to [Cred] under the Existing Cred Contract, along with all interest or yield accrued under the Existing Cred Contract, as consideration to be applied to the purchase price for the Notes. [Cred] will use the same value for the transferred cryptocurrency as [Cred] determined at the initiation of the transactions.

> Existing Cred Contract:

> [X] Secured Line of Credit Agreement and Pledge Agreement dated January 9, 2020, between Cred LLC and Winslow Strong.[31]

72.     Following the termination of the CredEarn Agreement, the CredEarn loan was terminated and Cred no longer owed any obligations to Strong under the CredEarn Agreement.

---

[29] Ex. O.

[30] *Id.* (emphasis added).

[31] *Id.*

73.     On January 28, 2020, Strong recognized that he had "allocated all 500 BTC to the

Luxembourg entity," which he described as "bankruptcy-remote."  At that time, he asked to re-

allocate the funds as follows:

> When it becomes feasible for you, I'd like to reallocate my 500 BTC to Cred as
> follows:
>
> **-250 BTC to the Luxembourg bankruptcy-remote entity, maturing in 6 months**
> -250 BTC to the standard Cred lending activities, maturing in 6 months
>
> **Previously, I allocated all 500 BTC to the Luxembourg entity,** with terms as
> follows:
>
> -200 BTC maturing in 6 months
> -100 BTC maturing in 9 months
> -200 BTC maturing in 12 months
>
> I understand that you may not be able to make this reallocation immediately, but as
> soon as its practicable for you, that would be greatly appreciated![32]

74.     Alexander responded to Strong as follows, confirming that the 500 BTC had

already been moved to escrow for the Lux Bond issued by a separate entity:

> **Your 500 BTC have already been moved to escrow for the Lux. Structure.  So we
> will proceed with that amount for the initial Luxembourg vehicle.**  That said, I
> will revisit both your standard Cred "Earn" and your Luxembourg participations
> together.  It seems the easiest will be a partial redemption (250 BTC) from Lux. as
> soon as possible (TBC next closing date in February) and re-subscribe to Earn.[33]

75.     Zhang described Strong as a "leader in the PR crypto space [who] has been

consistently introducing Cred to his network."[34]

76.     At Strong's suggestion, Cred hosted an event in Puerto Rico at the La Concha

---

[32] Ex. P (emphasis added).

[33] *Id.*  (emphasis added).

[34] Ex. Q.

Renaissance Hotel.  In an email dated February 13, 2020, Strong described this location to Zhang as "one of the more prestigious spots" in San Juan that was located "right on the beach."[35]

77.     Cred executives stayed at La Concha in ocean view suites for five nights for the CoinAgenda conference.  Cred held a lavish cocktail reception at La Concha and provided a presentation called: "Puerto Rico: Digital Asset Investment Strategies."[36]

78.     On February 25, 2020, Strong scheduled a one-on-one meeting with Schatt to discuss additional Cred opportunities.  Cred encouraged Strong to invite other high-net-worth individuals in his network to meet with Schatt to discuss Cred's opportunities.

### III.     Cred Was Insolvent at the Time of the Bond Purchase and Likely Since Inception

79.     Since inception, Cred's liabilities exceeded its assets, and its financial situation never meaningfully improved.  Cred continued to take on more and more debt.  All the while it was suffering loss after loss in trading, hacks, and thefts.  Cred also funneled over 90% of the cryptocurrency it received under the CredEarn program to MoKredit, who defaulted.

80.     The entire CredEarn offering consisted of Cred assuming more and more debt it owed to its customers.  Cred plunged deeper into debt each time Cred obtained more customer cryptocurrency through the CredEarn program.

81.     As early as February 2019—just two months after Cred's inception—Cred executives expressed concerns about Cred's solvency.

82.     On February 27, 2019, Cred's then-Chief Financial Officer Karen Wong ("Wong") wrote to Schatt, Hua, and Alexander via email concerning Cred's desperate need for

---

[35] Ex. R.

[36] Ex. S.

cash through March 2019.[37]  Wong explained that Cred could not satisfy its debts as they came

due and needed at least "140k more by March 8 to cover the invoices due on week of March 11":

> We have $387k in invoices past due and immediately due.  To highlight the most pressing ones, this includes:
>
> $30k in BCLP invoices from 2018 that Dan wants paid immediately
>
> Our first installment of $25k monthly on the $450 PwC invoice from 2018
>
> $74k for our D&O insurance premium which is due and MUST be paid immediately to avoid cancellation of the policy
>
> $57k in past due payments to Dentons and Paul Hastings from 2018
>
> $80k payments to our ongoing support teams at InnReg, [the Trading Firm], and India including past due portions
>
> $8k in past due payment for the ERP system (I've already worked out the best payment plan for this.  We are paying in 4 installment [sic] vs. the vendor's preference of payment up front for the entire year.)
> ***We need $140k more by March 8 to cover the invoices due on week of March 11 including the March 15 Payroll which will be ~$120k*** …
>
> If you guys are wondering (as I did for a moment) whether this will leave a surplus of funds at Citi, it won't.  ***We have only $7k in the Citibank account today so if you sum up all of the above we would actually still be short ~10k***.  Plus the above doesn't include the additional $67k in March expenses that can be paid in the beginning of April or any projections for Dentons, Paul Hastings, or Atlassian services for Jan-Mar. …
> Also, just a heads up that unless we do something drastically different or sufficient Alliance ICO proceeds come in by the week of March 25, we will unfortunately be having this conversation again for the $400k in projected expenses for April…[38]

83.     Cred's precarious financial position continued to worsen.  On October 8, 2019,

Alexander emailed Podulka and Wheeler, stating that invoices owed to Cred's consultant, the

Trading Firm, needed to be paid "immediately."  Alexander explained that the Trading Firm had

been accommodating and making interest payments on hedge swaps on behalf of Cred but that

---

[37] Ex. T.

[38] *Id*. (emphasis added).

the Trading Firm was unwilling to continue carrying the expense.[39]

84.     If the Trading Firm would no longer pay those expenses, then Cred was at risk of

defaulting on those hedges.  Alexander went on to explain that, absent significant reserves

(which Alexander described as "still negative"), the Trading Firm was Cred's only source of

liquidity for capital markets activities.

85.     Strong was well-aware of Cred's precarious financial position and Cred's

significant financial exposure to MoKredit.

86.     On January 28, 2020, Strong voiced his concerns about Cred to his Slack channel:

I've learned new info about Cred, whom previously was enthusiastic about.  I do
not recommend lending to them.  *I can't discuss why, unfortunately, I don't think
they are fraudulent or anything, but I don't think the risk is worth the reward*,
and have learned of what I'd described as "bad behavior" on their part.[40]

87.     ████████████████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

---

[39] Ex. U.

[40] Ex. V (emphasis added).



88.     On January 29, 2020, Strong wrote to his Slack channel:

My concerns were based on exposure to MoKredit, a Chinese short-term, high-rate, uncollateralized lender, owned by the CEO of Cred Lu Hua. ***The Luxembourg bankruptcy-remote entity is 90% exposed to these loans (but not to MoKredit itself) and has 10% junior collateral backstop consisting of 100% Lu's money.*** This would get eaten first before lenders would take any losses.  Additional circumstances related to MoKredit that I can't share also made me more confident on the 6-month horizon.  Lu's ownership of both co's makes me believe he'd be unlikely to screw over Cred due a choice of his own.  What remained concerning for me is generalized China-specific risk, e.g. China just saying FU to all foreign creditors, by decree.  I see this as plausible but not likely within the next 6 months.

All the above strictly applies to Cred loans made in ***Luxembourg bankruptcy remote entity***.[42]

89.     On February 17, 2020, Strong emailed Cred recognizing that his investment in

Income Opportunity was in an entity separate from Cred and asked if he could transfer it to an

investment in the CredEarn program:

I'm feeling pretty uncomfortable about the Corona virus situation and my exposure to China via MoKredit.  ***Would it be possible to shift 100% of my BTC loan out of that entity and into Cred Earn at the next opportunity?***

---

[41] Ex. W (emphasis added) (errors in original).

[42] Ex. V (emphasis added).

I don't mean to be a hassle, but I think this one all caught us by surprise, and I am pretty concerned about it. It would definitely help me sleep better at night.[43]

90.     On February 21, 2020, Strong wrote to another potential investor that:

I have a 500 BTC loan with cred earn at 9% for 6 months. They only offered 8% for 100-499 btc. I liked their Luxembourg bankruptcy remote entity until I learned how its 100% exposed [to] china. Then coronavirus hit. So I bailed from that exposure. But it's a good construct in principle.[44]

91.     Circumstances worsened for Cred in March 2020. Former Chief Executive

Officer Schatt testified that Cred was in "desperate need of cash."[45]

92.     In early March 2020, there was a drop in the price of BTC. This drop in the price

of BTC caused a liquidation of Cred's highly leveraged hedging positions. In a single day on

March 13, 2020, Cred lost more than $100,000,000 in cryptocurrency at today's prices. Because

Cred lacked the cash or cryptocurrency to re-establish its hedging positions, those March 13,

2020 trading losses also left Cred exposed to significantly more losses if BTC and other

cryptocurrencies increased in value.

93.     On March 13, 2020, the Trading Firm sent Cred the following email, which was

referred to internally at Cred as the "Doomsday" email:

James, please see today's risk report attached. As discussed, despite our best efforts, as a result of the drastic move in the market overnight, all of your BTC futures positions were liquidated. Some of your XRP futures were also liquidated. You still have ETH, BCH and LTC futures as well as some XRP/BTC futures. Please refer to the last two pages of your report for your positions … You now have a short position equal to $27,483,181. For every $100 move in BTC, you will make or lose around $400,000.

---

[43] Ex. X.

[44] Ex. Y (emphasis added). While Strong told this investor that he "bailed from that exposure," Strong was still holding the Lux Bond.

[45] Deposition of Dan Schatt, dated August 5, 2021 ("Schatt Dep. Tr.") at 152:23-153:1.

Additionally, we have requested that you post an additional $3mm of collateral with us for the outstanding repos you have with us.  We need this case ASAP to meet margin calls with other counterparties.[46]

94.   ███████████████████████████████████████████████████

███████████████████████████[47] and Schatt further testified that Cred "lost all of its hedging abilities."[48]

95.   In an attempt to reinstate its hedge position, Alexander wrote to Hua on March 12, 2020.  The subject of the email is "***Cash needs – urgent***."  Alexander wrote:  "We need to recall cash urgently to support our hedge positions.  ***Our immediate cash requirement is approximately $10 million***."[49]  In this email, Alexander attempted to recall $10 million of the approximately $38 million principal loan amount that Cred had extended to MoKredit.  MoKredit refused.

96.   Schatt testified that "there [were] strains in [MoKredit's] business as a result" of the COVID-19 pandemic.[50]  He also testified that Hua "wasn't able to confirm that he could actually get all of that principal back."[51]

97.   On March 24, 2020, Hua proposed a repayment schedule for MoKredit as follows:

April: Full payment of interest @ 20% [~$650,000] + $100,000 principal.
May: Full payment of interest @ 20% [~$650,000] + $200,000 of principal.

---

[46] Ex. Z.

[47] ███████████████████.

[48] Schatt Dep. Tr. at 148:13-14.

[49] Ex. AA (emphasis added).

[50] Schatt Dep. Tr. at 141:8-9.

[51] *Id.* at 141:9-10.

June: Full payment of interest @ 20% [~%650,000] + $4 million of principal.
July: Full payment of interest @ 20% [~$650,000] + $4 million of principal.[52]

98.    Cred accepted this payment plan.  MoKredit made partial payments in April and

May and did not make any of the other payments.

99.    On April 5, 2020, Inamullah circulated a Liquidity Memo.[53]  The Liquidity Memo

reported the following:

> several financial hedging instruments of Cred LLC were liquidated given the
> falling market prices.  The resulting short position on BTC has a strike price of
> approximately $5,900 – about 800 BTC was lost in the arrangement . . . The
> simultaneous decline in global liquidity created additional balance sheet issues for
> Cred LLC.  Specifically, a principal recall of approximately $10 million from a
> lending partner (MoKredit) was delayed given liquidity issues in the Chinese
> Consumer loan portfolio.  As a result, it was not possible to reconstitute the
> appropriate hedging instruments at a more favorable market price.

100.    The Liquidity Memo also explained that the Trading Firm "issued a margin call

for outstanding swaps."[54]  Given the illiquidity in the loan portfolio, Cred was unable to acquire

the funds to provide additional contributions.  Cred negotiated a Loan Modification summary

and executed the agreement with [the Trading Firm]" for a specific "workout plan."[55]

101.    The Liquidity Memo outlined the sources of liquidity for Cred to include:

(i) approximately $350,000 in cash on the balance sheet; (ii) loans from the portfolio amounting

to approximately $2 million; (iii) revenue from generating net interest margin from the loan

portfolio amounting to approximately $700,000 to $1 million; and (iv) additional contributions to

CredEarn.  The Liquidity Memo concluded: "***Based on the cash flow analysis, a potential cash***

---

[52] Ex. BB.

[53] Ex. CC.

[54] *Id.*

[55] *Id.*

*liquidity issue is identified for May 2020 given the delay in receiving principal back from*

*MoKredit and minimal working capital available on the balance sheet.*"[56]

102.    In reality, the Liquidity Memo grossly understated the amount of cryptocurrency

trading losses Cred suffered in March of 2020.  Although the Liquidity Memo reflected a loss of

approximately 800 BTC, the Trading Firm records indicate that Cred suffered significantly

higher losses.

103.    Former Chief Executive Officer Schatt testified as follows:

Q.    Was some of the information [in the Liquidity Memo] that was incorrect
an understatement of the amount of Bitcoin that was lost in March of
2020?
A.    No, not related to that. Related to the other numbers that are in there.
*Q.    You are aware that memo had a loss of 800 Bitcoin.  Right?*
*A.    Yes.*
*Q.    And we showed to you today that there was actually loss in excess
of 4,000 Bitcoin. Right?*
*A.    Yes.*[57]

104.    The Cred executive team also knew that MoKredit's proposed repayment

schedule was insufficient to satisfy its liquidity needs.  The Liquidity Memo contained a

recommendation that Cred request an additional $3.3 million from MoKredit and an additional

$1 million if the cryptocurrency prices continued to increase.

105.    The Liquidity Memo reflects cash flow concerns and a plan to buy immediately

more cryptocurrency "hedges" if Cred was able to obtain funds from MoKredit:

Immediately: use cash from MoKredit return of principal to acquire 2,003 units of
BCH (estimated total cost is 500K) Acquire 8,074 ETH with cash from MoKredit
to acquire hedges for 27,298 of ETH.  Also, use excess cash to repay initial 3,077
ETH (at today's market price this is a total of $2.0 million for the hedges and a total
of $3.8 million for the entire payment)  Request an additional $3.3 million from
MoKredit … Request additional capital from MoKredit, assuming conditions for

---

[56] *Id.* (emphasis added).

[57] Schatt Dep. Tr. at 288:1-13 (emphasis added).

their underlying portfolio improve. ***While the situation in China seems to be improving, there is little insight to the short term liquidity with MoKredit due to (i) the Chinese government's relaxation of debt repayment terms and (ii) uncertainty to the amount of cash that will be available.***[58]

106.    The Liquidity Memo recognized that Cred was completely exposed to the rise in the price of cryptocurrency as it would significantly increase the value that Cred owed its CredEarn customers:

> It's important to note the key risk in the recommended strategy is a significant increase in cryptocurrency prices.  With the strategy above, assuming a 75% increase in cryptocurrency prices by the end of 2020, an additional $1 million will be needed from MoKredit (in addition to the current repayment schedule) in order to reconstitute the hedging program absent significant acceleration in growth of the loan portfolio.  We believe an additional $1 million should also be requested as buffer for the hedges and to opportunistically take advantage of downward movements in prices.[59]

107.    On April 5, 2020, Schatt forwarded the Liquidity Memo to Hua.  On April 25, 2020, Schatt followed up with Hua to ask if there were updates regarding MoKredit's repayment schedule because Cred was "looking for funds as soon as possible to rebuild the hedges."[60]  Hua responded that there was "no change to the payment schedule since [they] discussed last time."[61]

108.    The vast majority of Cred's so-called liquidity recovery strategy hinged upon receiving more than $8 million from MoKredit in the near future.

109.    As Inamullah testified,[62] Cred should be shut down if Cred was unable to recover from MoKredit:

---

[58] Ex. CC (emphasis added).

[59] *Id.*

[60] Ex. DD.

[61] *Id.*

[62] Deposition of Daniyal Inamullah, dated December 8, 2020 ("Inamullah Dep. Tr.").

> Q.    And in your declaration, it states, Cred Capital recommended the course of action for wind-up operations as soon as possible [if] Cred was unable to bring equity capital or receive the liquidity back from moKred by June 30th, 2020.  Do you remember that?
>
> A.    Yeah . . .
>
> **Q.    So you thought Cred should be shut down if moKredit doesn't give liquidity back by June 30th, 2020; right?**
>
> **A.    Yeah.**
>
> **Q.    And moKredit didn't give liquidity back by June 30, 2020, right?**
>
> **A.    No.**[63]

110.    To make matters worse for Cred's finances, Alexander and others stole cryptocurrency from Cred.

111.    In late April 2020, Alexander improperly transferred 224.98993 BTC and 204,567 USDC.  Alexander directed the funds to be transferred to a cryptocurrency wallet belonging to a Cred consultant.  Alexander subsequently took control of the funds himself, purportedly to fund Cred Capital's operations.

112.    In a separate instance, Alexander introduced Cred executives to a fraudulent investment called "QuantCoin."  Cred transferred 800 BTC to QuantCoin.  Those 800 BTC were lost.

113.    In addition, Cred purportedly suffered multiple incidents in which Cred's account with a cryptocurrency exchange was hacked.  One hack resulted in losses of $1.3 million in cryptocurrency, which given today's prices, equates to USD values approximately 4-5 times that amount.

114.    MoKredit continued to default on its principal repayments to Cred.  In the middle of May, Hua communicated that MoKredit would not be able to pay the two $4 million principal payments to Cred for June and July, totaling $8 million.

---

[63] Inamullah Dep. Tr. at 222:5-20 (emphasis added).

115.    In May 2020, Cred executives knew that Cred's financial condition remained dire. As Wheeler explained to one outside consultant:  "[t]his is where the solvency analysis stands. ***The memo, which I will send when I put it in Word format, sets a minimum $4 million capital raise by June 30.***"[64]  Cred did not raise or otherwise receive $4 million between May 2020 and June 30, 2020.

116.    That same month, Alexander wrote to Wheeler that "[b]ased on the recent solvency analysis ***I'm not sure Cred can continue as a going concern.***"[65]

117.    In a memorandum titled Liquidity Analysis and Plan to Overcome Current Undercapitalization from Schatt dated June 1, 2020, he wrote:

> As of June 1, 2020, Cred's current liabilitites exceeded its invested assets and current assets by approximately $19.5 million or 19% of the total principal balance of liabilities . . . ***Cred does not have the capacity to repay the full liabilities if assets were liquidated today*** . . .[66]

118.    It appears that Cred was never solvent.  Cred was certainly insolvent well in advance of (and immediately prior to) the July 1, 2020 Bond Purchase in which Cred transferred 516.39344262 BTC to Strong in exchange for the worthless Lux Bond.

## IV.   Cred Purchases the Worthless Lux Bond from Strong for 516.39344262 BTC

119.    As the June 30, 2020 maturity date on the Lux Bonds approached, it was evident that Lux Bond holders would not be paid.

120.    ████████, Schatt, and Podulka all testified that Cred was not a guarantor or obligor of the Lux Bonds, had no obligation to purchase the Lux Bonds, and the Lux Bonds were not

---

[64] Ex. EE (emphasis added).

[65] Ex. FF (emphasis added).

[66] Ex. GG (emphasis added).

secured by Cred assets.  Pursuant to the Base Prospectus, Cred had no obligation to purchase the Lux Bonds upon maturity.

121.    When asked to confirm that "Cred was under no obligation to repay those bonds pursuant to this agreement," Podulka testified that it "appears so."[67]  When asked whether it was correct that "MoKredit was supposed to pay on the Luxembourg bonds," Podulka responded "yes."[68]

122.    

[69]

123.    ████████████████████████████████

████████████████████[70] ████████████████████████

████████████████████████[71]

124.    Schatt testified that it was his understanding that "MoKredit was responsible for the bonds if there was a default of some kind."[72]  Schatt further testified that "Cred had no

---

[67] Podulka Dep. Tr. at 199:13-15.

[68] *Id.* at 195:22-24.

[69] ████████████████████.

[70] ████████████.

[71] █████████.

[72] Schatt Dep. Tr. at 163:9-10.

obligation to repurchase the notes or otherwise make the investment whole"[73] and that "Cred was not securing any bonds that were issued pursuant to the Income Opportunities (Luxembourg) offering."[74]

125.    Cred executives were concerned about the repayment of the Lux Bond.  Schatt testified that he received a call from Wheeler stating that "because MoKredit was going through . . . some strains, that Cred should ultimately step up and pay these notes when they are due.  And [Wheeler and Alexander] recommended that [Cred] move forward to . . . pay these bonds."[75] Schatt testified that he recalled "them saying . . . that it would be best for the whole – for the Cred organization overall that Cred would lose credibility and business and it could be very, very damaging if [Cred doesn't] step up to pay for these bonds."[76]

126.    Podulka testified that he thought that Cred repaid the bonds in order to "maintain the relationship with the investors."[77]  Schatt similarly testified that the focus of the conversation with respect to repaying the bonds was "more around the retaining the overall relationship with – with the investor community at large."[78]

127.    When asked whether there was "any kind of board resolution or meeting

---

[73] *Id.* at 165:24-166:2.

[74] *Id.* at 163:15-18.

[75] *Id.* at 169:4-8.

[76] *Id.* at 169:12-16.

[77] Podulka Dep. Tr. at 200:4-5.

[78] Schatt Dep. Tr. at 170:2-3.

concerning these – this Luxembourg bond repurchase," Schatt testified that "there wasn't."[79]

128.    On June 22, 2020, Wheeler provided the following warning concerning the Lux Bond:  "be very careful about committing to any purchase.  ***Liquidity is very tight*** and I am not sure we have the ability or the willingness to buy the bond."[80]

129.    On June 23, 2020, Wheeler wrote an email to Alexander and Zhang explaining that there were no "redemptions" for the Lux Bond.  Wheeler wrote: "IOL does not do redemptions.  Cred does not do redemptions.  Cred can purchase the bond but that is all it can do."[81]

130.    On June 24, 2020, Strong wrote to another individual in a private Slack message:

I'm getting 500 BTC back from Cred EOM
…
I was pretty nervous about that given covid impact[82]

131.    Zhang emailed Strong on June 26, 2020 to inform Strong that Zhang was working on processing Cred's purchase of the Lux Bond.  Zhang explained that "[d]ue to the bond being issued from LUX we will need to sign a transfer agreement.  Essentially Cred will purchase the bond from [Strong] and once purchased, Cred will send [Strong] 500 BTC principal plus interest owed . . . . There are no issues regarding the redemption, but there are certain processes [Cred] need[s] to take due to the different structure of LUX."[83]

132.    Notwithstanding Cred's liquidity crisis and Cred not having any obligations to

---

[79] *Id.* at 118:6-9.

[80] Ex. HH (emphasis added).

[81] Ex. II.

[82] Ex. JJ.

[83] Ex. KK (emphasis added).

purchase the Lux Bond, Cred chose to use its limited resources to purchase the worthless Lux Bond from Strong for 516.39344262 BTC.

133.    On July 2, 2020, Cred executed the Bond Purchase by transferring 516.39344262 BTC to Strong.[84]  Cred bought the Lux Bond at face value of 500 BTC and even paid Strong profits of 16.39344262 BTC.[85]

134.    Podulka testified that the 516.39344262 BTC to purchase the Lux Bond "came out of Cred funds."[86]

135.    On July 3, 2020, Strong wrote to the Slack group:

> Got my 500 BTC term loan back from Cred today.  All went smooth, despite Black Thursday and Covid in the mix.  Not continuing with them tho as DeFi opps are much stronger right now.[87]

136.    The Lux Bond remains worthless.  Cred never received a single payment.  In January 2020, Income Opportunities commenced a voluntary liquidation proceeding in Luxembourg.[88]  The liquidator is Saltire Management Group LLC, an entity with no relation to Cred.

137.    Schatt testified that the Lux Bond only had value if MoKredit satisfied its obligations and that Cred never received any value from the Lux Bond:

> Q.    And your understanding of this note is unless MoKredit meet its obligations, this note is worthless.  Right?
> A.    I don't know if I had that understanding at the time. [sic] But yeah, from everything I'm seeing here, that makes sense.

---

[84] Ex. LL.

[85] Strong's profits exceed $700,000 USD given the price of BTC as of the date of this filing.

[86] Podulka Dep. Tr. at 199:7.

[87] Ex. MM (error in original).

[88] Ex. NN.

Q.      And ultimately, Cred never received any payment under this note. Right?

A       That's right.[89]

138.   Schatt admitted during his deposition that Cred's purchase of the worthless Lux

Bond came at a time when Cred was in financial distress and losing hundreds of millions of

dollars in cryptocurrency:

Q.      So Cred paid Winslow Strong 516.39344262 Bitcoin. Right?

A.      Yes.

Q.      That was on July 1, 2020?

A       It appears so, yes.

Q.      And on July 1, 2020, that was four months after Cred had made its $10 million recall request to moKredit. Right?

A.      Right.

Q.      It was actually a month after moKredit failed to meet its $1 million principal payment in June.  Right?

A.      Right.

Q.      Scroll down.  That's your signature here on this line?

A.      Yes.

Q.      And just like the last one, but Cred never received any payments under this note.  Right?

A.      Cred never received any payments . . .

Q.      And after Cred purchased this note on July 1, 2020, there was no payments that were made to Cred under this note. Correct?

A.      I don't believe so.[90]

139.   Podulka also testified that Cred never received any payments for these notes:

Q.      And these notes that Cred purchased from Winslow Strong . . . Cred never got any payment from moKredit based on these notes, right?

A.      No.[91]

140.   The Bond Purchase exacerbated Cred's dire financial position, making it

impossible for Cred's retail customers to meaningfully recover.  Following the Bond Purchase,

in July 2020 Cred desperately attempted to raise much-needed capital.  As discussed in Schatt's

---

[89] Schatt Dep. Tr. at 172:14-22.

[90] *Id.* at 175:5-176:11.

[91] Podulka Dep. Tr. at 203:1-4.

impossible for Cred's retail customers to meaningfully recover.  Following the Bond Purchase,

in July 2020 Cred desperately attempted to raise much-needed capital.  As discussed in Schatt's

Declaration in Support of Debtors' Chapter 11 Petitions and First Day Motions [Docket No. 12],

although Cred initially received commitments for more than $5 million in capital, it was only

able to raise approximately $2.6 million.

141.    On November 7, 2020, Cred filed for chapter 11 bankruptcy.

142.    On November 8, 2020, an individual shared the news of Cred's bankruptcy in

Strong's cryptocurrency Slack channel.[92]  In response, Strong wrote:



143.    While Cred made sure that the cryptocurrency "whale" Strong profited,

thousands of retail customers lost everything.  The Bond Purchase was an actual and

constructive fraudulent transfer and must be avoided.

**<u>CAUSES OF ACTION</u>**

**<u>Count I</u>**
**Actual Fraudulent Transfer**
**(11 U.S.C. § 548(a)(1)(A))**

144.    The Trust repeats and re-alleges each of the allegations set forth in the

above paragraphs.

145.    The Trust is entitled to avoid the Bond Purchase pursuant to Bankruptcy

Code section 548(a)(1)(A).

---

[92] Ex. A.

benefit of Strong and is avoidable as a "transfer" within the meaning of Bankruptcy Code section 101(54).

147.    The Bond Purchase occurred within two years before the Petition Date.

148.    Cred executed the Bond Purchase with the actual intent to hinder, delay, or defraud its creditors insofar as it purchased the worthless Lux Bond in exchange for Strong's initial investment plus interest totalling 516.39344262 BTC for the purpose of appeasing a high profile investor with personal ties to Cred executives to the detriment of Cred's actual creditors.

149.    Accordingly, the Bond Purchase is avoidable as an actual fraudulent transfer pursuant to Bankruptcy Code section 548(a)(1)(A).

**Count II**
**Actual Fraudulent Transfer**
**(6 Del. C. §§ 1304(a)(1) and 11 U.S.C. § 544(b))**

150.    The Trust repeats and re-alleges each of the allegations set forth in the above paragraphs.

151.    Cred transferred 516.39344262 BTC to Strong to execute the Bond Purchase.  The 516.39344262 BTC was a transfer of property from Cred to and for the benefit of Strong and is avoidable as a "transfer" within the meaning of 6 Del. C. § 1301(12) and Bankruptcy Code section 101(54).

152.    The Bond Purchase occurred within four years before the Petition Date.

153.    At all times material hereto, Cred had at least one general unsecured creditor holding an allowed claim who, but for Cred's bankruptcy filings, would have standing to bring claims to avoid the Bond Purchase, including, but not limited to, general unsecured creditors that filed proofs of claims in the Chapter 11 Cases

154.    Accordingly, actual fraudulent transfers are avoidable pursuant to Bankruptcy Code section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1301, *et seq.*

155.    Cred executed the Bond Purchase with the actual intent to hinder, delay, or defraud its creditors insofar as it purchased the worthless Lux Bond in exchange for Strong's initial investment plus interest totalling 516.39344262 BTC for the purpose of appeasing a high profile investor with personal ties to Cred executives to the detriment of Cred's actual creditors.

156.    Accordingly, the Bond Purchase is avoidable as an actual fraudulent transfer pursuant to 6 Del. C. § 1304(a)(1) and Bankruptcy Code section 544(b).

**Count III**
**Constructive Fraudulent Transfers**
**(11 U.S.C. § 548(a)(1)(B))**

157.    The Trust re-alleges the allegations set forth in the above paragraphs.

158.    The Trust is entitled to avoid the Bond Purchase pursuant to Bankruptcy Code section 548(a)(1)(B).

159.    Cred transferred 516.39344262 BTC to Strong to execute the Bond Purchase.  The 516.39344262 BTC was a transfer of property from Cred to and for the benefit of Strong and is avoidable as a "transfer" within the meaning of Bankruptcy Code section 101(54).

160.    The Bond Purchase occurred within two years before the Petition Date. Cred received no value from the Bond Purchase because the Lux Bonds were worthless at the time the Bond Purchase was executed (and remain worthless today).

161.    Cred was insolvent as early as February 2019 and was unable to pay its

debts as they became due.  Cred immediately incurred $387,000 in past due invoices and

needed an influx of cash.  Cred's liquidity constraints worsened over time as a result of

fraud, theft, hacks, and MoKredit's ongoing defaults.  On the date of the Bond Purchase,

July 2, 2020, Cred was insolvent and remained insolvent as a result of the Bond Purchase,

had unreasonably small capital, and incurred or intended to incur debts beyond its ability

to pay as such debts matured.

162.    Accordingly, the Bond Purchase is avoidable as a constructive fraudulent

transfer pursuant to Bankruptcy Code section 548(a)(1)(B).

**<u>Count IV</u>**
**Constructive Fraudulent Transfer**
**(6 Del. C. §§ 1304(a)(2) and 1305(a)and 11 U.S.C. § 544(b))**

163.    The Trust re-alleges the allegations set forth in the above paragraphs.

164.    The Bond Purchase is avoidable as a "transfer" within the meaning of 6

Del. C. § 1301(12) and Bankruptcy Code section 101(54).

165.    The Bond Purchase occurred within four years before the Petition Date.

166.    At all times material hereto, Cred had at least one general unsecured

creditor holding an allowed claim who, but for Cred's bankruptcy filings, would have

standing to bring claims to avoid the Bond Purchase, including, but not limited to,

general unsecured creditors that filed proofs of claims in the Chapter 11 Cases.

167.    Cred received no value from the Bond Purchase.

168.    Cred was insolvent as early as February 2019 and was unable to pay its

debts as they became due.  Cred immediately incurred $387,000 in past due invoices and

other expenses and needed an influx of cash.  Cred's liquidity constraints only worsened

over time as a result of fraud, theft, hacks, and MoKredit's ongoing defaults.  On the date

of the Bond Purchase, July 2, 2020, Cred was insolvent and remained insolvent as a result

38

of the Bond Purchase, had unreasonably small capital, and incurred or intended to incur

debts beyond its ability to pay as such debts matured.

169.    Accordingly, the Bond Purchase is avoidable as a constructive fraudulent

transfer pursuant to 6 Del. C. §§ 1304(a)(2) and 1305(a), and Bankruptcy Code

section 544.

**<u>Count V</u>**
**Recovery of Avoided Transfer**
**(11 U.S.C. § 550)**

170.    The Trust re-alleges the allegations set forth in the above paragraphs.

171.    The Trust is entitled to avoid the Bond Purchase pursuant to Bankruptcy

Code sections 544 and 548 and 6 Del. C. §§ 1304(a)(1)-(2) and 1305(a).

172.    Strong was the initial transferee of the Bond Purchase or the immediate or

mediate transferee of such initial transferee or the person for whose benefit the Bond

Purchase was made.

173.    Accordingly, the Trust is entitled to recover from Strong the greater of the

following at the time of actual recovery (i) 516.39344262 BTC, and (ii) cash in an

amount equal to the greatest value of 516.39344262 BTC at any time since the Bond

Purchase, plus interest at the maximum legal rate and to the fullest extent allowed by

applicable law pursuant to Bankruptcy Code section 550.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, the Trust requests that this Court grant the following relief:

(1)    Enter judgment in favor of the Trust and against Strong, avoiding the

Bond Purchase pursuant to Bankruptcy Code sections 544(b) and 548 and

6 Del. C. §§ 1304(a)(1)-(2) and 1305(a) and directing Strong to return to

the Trust the greater of the following at the time of actual recovery

(i) 516.39344262 BTC, and (ii) cash in an amount equal to the greatest

value of 516.39344262 BTC at any time since the Bond Purchase, plus

pre-judgment and post-judgment interest at the maximum legal rate and to

the fullest extent allowed by applicable law, together with attorney's fees

and costs.

(2)    Grant the Trust such other and further relief as this Court may deem just

and proper.

Dated: Wilmington, Delaware
February 17, 2022

**MCDERMOTT WILL & EMERY LLP**

*/s/ David R. Hurst*
David R. Hurst (I.D. No. 3743)
1007 North Orange Street, 10th Floor
Wilmington, DE 19801
Telephone: (302) 485-3900
Facsimile:  (302) 351-8711

- and -

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice)*
Andrew B. Kratenstein (*pro hac vice*
application pending)
1 Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 547-5400
Facsimile:  (212) 547-5444

*Counsel to the Cred Inc. Liquidation Trust*