# Exhibit B

Execution Copy

## LOAN AND SECURITY AGREEMENT

Principal Amount:                                                              $100,000,000.00

**Introduction.**

This Loan and Security Agreement (this "**Agreement**"), with an effective date of December 27, 2018, is entered into by and among MOKREDIT INC., an Exempted Company incorporated in the Cayman Islands with Limited Liability, as borrower, and MOKREDIT TECHNOLOGY (HONG KONG) COMPANY LIMITED, a Hong Kong Company, as borrower (collectively, "**Borrower**"), and CRED LLC, a Delaware limited liability company (the "**Lender**"), on the other hand. The Borrower agrees to the following terms and conditions:

1.     **LINE OF CREDIT.**

    1.1     **Line of Credit Amount.**

        (a)     During the availability period described below, the Lender will provide a line of credit to the Borrower (the "**Line of Credit**"). The amount of the Line of Credit (the "**Commitment**") is $100,000,000.00.

        (b)     This is a revolving line of credit. During the availability period, the Borrower may repay principal amounts and reborrow them.

        (c)     The Borrower may request advances under the Line of Credit to replenish its working capital after Borrower funds loans originated by a Chinese affiliate (each such loan by Borrower, a "**Customer Loan**"; each such customer, a "**Borrower Customer**" and each such advance made by Lender hereunder, an "**Advance**"). The specific details of each Advance including all Advances made by Lender prior to the date hereof, are set forth on **Schedule A** hereto as the same is updated from time to time (the "**Schedule of Advances**"). Lender will deliver to Borrower a Draw Certificate in the form attached hereto as **Exhibit A** following each request for an Advance confirming the details of such Advance.

        (d)     The Borrower agrees not to permit the principal balance outstanding to exceed the Commitment. If the Borrower exceeds this limit, the Borrower will immediately pay the excess to the Lender upon the Lender's demand.

    1.2     **Availability Period.** The Line of Credit is available until December 31, 2021, or such earlier date as the availability may terminate as provided in this Agreement (the "**Expiration Date**"). The availability period for this Line of Credit will be considered renewed if and only if the Lender has sent Borrower a written notice of renewal for the Line of Credit (the "**Renewal Notice**"). If this Line of Credit is renewed, it will continue to be subject to all the terms and conditions set forth in this Agreement except as modified by the Renewal Notice. If this Line of Credit is renewed, the term "Expiration Date" means the date set forth in the Renewal Notice as the Expiration Date. The same process for renewal will apply to any subsequent renewal of this Line of Credit. A renewal fee may be charged at the Lender's option. The amount of the renewal

fee will be specified in the Renewal Notice. If this Line of Credit is not renewed, the Lender in its sole discretion may allow the outstanding balance to be repaid in installments over a term specified by the Lender at the time. Borrower specifically understands that the interest rate applicable to the Line of Credit may be increased upon term-out and that the new interest rate will apply to the entire outstanding principal balance due hereunder. A transaction fee may be charged at the Lender's option. If so, the amount will be specified in the term-out notice.

    **1.3**    **Repayment Terms.** Borrower must repay in full any principal and interest accrued on an Advance in accord with the terms set forth in the Draw Certificate or as otherwise agreed in writing by Lender and Borrower. Borrower must also make payments of interest on a monthly basis if instructed by Lender, by no later than three business days after the end of the month, regardless of whether the otherwise-stated terms of an Advance specify a later or different interest payment date.

    **1.4**    **Prepayments.** Borrower may prepay principal in full or in part at any time without the payment of a prepayment fee or premium. The prepayment may be applied to the most remote payment of principal due under this Agreement or in such other manner as determined by the Lender.

    **1.5**    **Interest Rate.** The interest rate on an Advance will be, for each month, quarter, year or other period that the Advance is outstanding, a rate per year equal to the *greater of (a)* the Applicable Federal Rate(s) in effect during that period *plus* 0.10% (one-tenth of a percentage point), (b) 2.50%, or (c) such other rate as Borrower and the Lender may agree upon in writing; provided however, that such rate may not be less than the rate set forth in ***Section 1.5(a).*** "**Applicable Federal Rate**" means the short-term applicable Federal rate for such period specified in a published Internal Revenue Service Revenue Ruling. The Applicable Federal Rate for purposes of this Agreement will be adjusted concurrently with the published Applicable Federal Rate.

**2.**    **COLLATERAL.**

    **2.1**    **The Security**. Borrower hereby assigns and grants, and causes to be assigned and granted, grants to the Lender a security interest in the following described property now owned or hereafter acquired by Borrower, excluding only the Excluded Assets (as defined below) (the "**Collateral**"):

    (a)    All accounts, and all chattel paper, instruments, deposit accounts, letter of credit rights, and general intangibles related thereto; and all returned or repossessed goods which, on sale or lease, resulted in an account, including all Customer Loans and Borrower's rights related thereto.

    (b)    All inventory.

    (c)    All equipment and fixtures now owned or hereafter acquired by the Borrower, (including, but not limited to, the equipment described in the attached Equipment Description, if any).

    (d)    All of the Borrower's deposit accounts with the Lender. The Collateral includes any renewals or rollovers of the deposit accounts, any successor

accounts, and any general intangibles and choses in action arising therefrom or related thereto.

(e)     All instruments, chattel paper, documents, certificates of deposit, securities (including equity interests) and investment property of every type.

(f)     All general intangibles. The Collateral includes all goodwill connected with or symbolized by any of such general intangibles.

(g)     All negotiable and nonnegotiable documents of title covering any Collateral.

(h)     All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

(i)     All substitutes or replacements for any Collateral, all cash or non-cash proceeds (including insurance proceeds), products, rents and profits of the Collateral, and all income, benefits and property receivable on account of the Collateral, and all supporting obligations covering any Collateral.

(j)     All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer software necessary to process such memory ("**Books and Records**").

Notwithstanding the foregoing, the Collateral does not include, and the Lender is not assigned or granted a security interest in any finance license or other permit, license or approval issued to or held by Borrower, which is non-transferable by operation of law or otherwise (collectively, the "**Excluded Assets**").

2.2     **The Indebtedness.** The obligations secured by this Agreement are the payment and performance of (a) all present and future Indebtedness (as defined below) of Borrower to the Lender; (b) all obligations of Borrower and rights of the Lender under this Agreement; and (c) all present and future obligations of Borrower to the Lender of other kinds. "**Indebtedness**" is used in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of Borrower, now or hereafter existing, absolute or contingent, liquidated or unliquidated, determined or undetermined, voluntary or involuntary, including under any swap, derivative or other arrangement, or other similar transaction or arrangement, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable. "Indebtedness" secured by the Collateral of Borrower does not include obligations arising under any Swap to which it is not party if, and to the extent that, all or a portion of the guaranty by Borrower to the Lender of, or the grant by such Borrower of a security interest to the Lender to secure, such Swap, would violate the Commodity Exchange Act (7 U.S.C., Sec. 1. et. seq.) by virtue of Borrower's failure to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time such guaranty or grant of such security interest becomes effective with respect to such Swap.

**2.3    Borrower Covenants.** Borrower represents, covenants and warrants that unless compliance is waived by the Lender in writing:

(a)    Borrower agrees: (i) to indemnify the Lender against all losses, claims, demands, liabilities and expenses of every kind caused by any Collateral; (ii) to permit the Lender to exercise its rights under this Agreement; (iii) to execute and deliver such documents as the Lender deems necessary to create, perfect and continue the security interests contemplated by this Agreement; (iv) not to change its name, and as applicable, its chief executive office, or the jurisdiction in which it is organized and/or registered or its business structure without giving the Lender at least 30 days prior written notice; (v) not to change the places where the Borrower keeps any Collateral or the Borrower's Books and Records concerning the Collateral without giving the Lender prior written notice of the address to which the Borrower is moving same; and (vi) to cooperate with the Lender in perfecting all security interests granted by this Agreement and in obtaining such agreements from third parties as the Lender deems necessary, proper or convenient in connection with the preservation, perfection or enforcement of any of its rights under this Agreement.

(b)    Borrower agrees with regard to the Collateral, unless the Lender agrees otherwise in writing: (i) that the Lender is authorized to file financing statements in the name of Borrower to perfect the Lender's security interest in the Collateral; (ii) that the Lender is authorized to notify any account debtors, any buyers of the Collateral, any Borrower Customers or any other persons of the Lender's interest in the Collateral, (iii) where applicable, to operate the Collateral in accordance with all applicable statutes, rules and regulations relating to the use and control of the Collateral, and not to use any Collateral for any unlawful purpose or in any way that would void any insurance required to be carried; (iv) not to remove the Collateral from the Borrower's premises except in the ordinary course of Borrower's business; (v) to pay when due all license fees, registration fees and other charges in connection with any Collateral; (vi) not to permit any lien on the Collateral, including without limitation, liens arising from repairs to or storage of the Collateral, except in favor of the Lender; (vii) not to sell, hypothecate or dispose of, nor permit the transfer by operation of law of, any Collateral or any interest in the Collateral, except sales of inventory to buyers in the ordinary course of Borrower's business; (viii) to permit the Lender to inspect the Collateral at any time; (ix) to keep, in accordance with generally accepted accounting principles, complete and accurate Books and Records regarding all the Collateral, and to permit the Lender to inspect the same and make copies at any reasonable time; (x) if requested by the Lender, to receive and use reasonable diligence to collect the Collateral consisting of accounts and other rights to payment and proceeds, in trust and as the property of the Lender, and to immediately endorse as appropriate and deliver such Collateral to the Lender daily in the exact form in which they are received together with a collection report in form satisfactory to the

Lender; (xi) not to commingle the Collateral, or collections with respect to the Collateral, with other property; (xii) to give only normal allowances and credits and to advise the Lender thereof immediately in writing if they affect any rights to payment or proceeds in any material respect; (xiii) from time to time, when requested by the Lender, to prepare and deliver a schedule of all the Collateral subject to this Agreement and to assign in writing and deliver to the Lender all accounts, contracts, leases and other chattel paper, instruments, and documents; (xiv) in the event the Lender elects to receive payments or rights to payment or proceeds hereunder, to pay all expenses incurred by the Lender, including expenses of accounting, correspondence, collection efforts, reporting to account or contract debtors, filing, recording, record keeping and other expenses; and (xv) to provide any service and do any other acts which may be necessary to maintain, preserve and protect all the Collateral and, as appropriate and applicable, to keep all the Collateral in good and saleable condition, to deal with the Collateral in accordance with the standards and practices adhered to generally by users and manufacturers of like property, and to keep all the Collateral free and clear of all defenses, rights of offset and counterclaims.

(c)     If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading, Borrower must immediately deliver such document to the Lender, together with any necessary endorsements.

**2.4     Lender Rights.** Borrower appoints the Lender its attorney in fact to perform any of the following rights, which are coupled with an interest, are irrevocable until termination of this Agreement and may be exercised from time to time by the Lender's officers and employees, or any of them, whether or not Borrower is in default: (a) to perform any obligation of Borrower hereunder in Borrower's name or otherwise; (b) to release persons liable on the Collateral and to give receipts and acquittances and compromise disputes; (c) to release or substitute security; (d) to prepare, execute, file, record or deliver notes, assignments, schedules, designation statements, financing statements, continuation statements, termination statements, statements of assignment, applications for registration or like documents to perfect, preserve or release the Lender's interest in the Collateral; (e) to take cash, instruments for the payment of money and other property to which the Lender is entitled; (f) to verify facts concerning the Collateral by inquiry of obligors thereon, or otherwise, in its own name or a fictitious name; (g) to endorse, collect, deliver and receive payment under instruments for the payment of money constituting or relating to the Collateral; (h) to prepare, adjust, execute, deliver and receive payment under insurance claims, and to collect and receive payment of and endorse any instrument in payment of loss or returned premiums or any other insurance refund or return, and to apply such amounts received by the Lender, at the Lender's sole option, toward repayment of the Indebtedness or, where appropriate, replacement of the Collateral; (i) to enter onto Borrower's premises in inspecting the Collateral; (j) to make withdrawals from and to close deposit accounts or other accounts with any financial institution, wherever located, into which proceeds may have been deposited, and to apply funds so withdrawn to payment of the Indebtedness; (j) to preserve or release the interest evidenced by chattel paper to which the Lender is entitled and to endorse and deliver any evidence of title; and (k) to do all acts and things and execute all documents in the name of Borrower or otherwise,

deemed by the Lender as necessary, proper and convenient in connection with the preservation, perfection or enforcement of its rights.

## 3.    LOAN ADMINISTRATION AND FEES.

### 3.1    Fees. Fees will be paid by the applicable Borrower as provided on Schedule B.

### 3.2    Collection of Payments.

(a)    Payments will be made by debit to a deposit account, if direct debit is provided for in this Agreement or is otherwise authorized by Borrower. For payments not made by direct debit, payments will be made by mail to the address shown on applicable Borrower's statement, or by such other method as may be permitted by the Lender.

(b)    Each disbursement by the Lender and each payment by Borrower will be evidenced by records kept by the Lender which will, absent manifest error, be conclusively presumed to be correct and accurate and constitute an account stated between Borrower and the Lender.

### 3.3    Borrower Instructions.

Subject to the terms, conditions and procedures stated elsewhere in this Agreement, the Lender may honor instructions for advances or repayments and any other instructions under this Agreement given by any one of the individuals the Lender reasonably believes is authorized to sign loan agreements on behalf of Borrower, or any other individual(s) designated by any one of such authorized signers (each an "**Authorized Individual**"). The Lender may honor any such instructions made by any one of the Authorized Individuals, whether such instructions are given in writing or by telephone, Internet and intranet websites or other means designated by the Lender.

### 3.4    Direct Debit with ACH Debit.

(a)    Borrower agrees that on the due date of any amount due under this Agreement, the Lender will debit the amount due from the deposit account with the Depository listed below (the "**Designated Account**") owned by Borrower. Should there be insufficient funds in the Designated Account to pay all such sums when due, the full amount of such deficiency will be immediately due and payable by Borrower. A voided copy of a check on the Designated Account has been, or will be, provided to the Lender.

DEPOSITORY NAME: _____
City, State and Zip Code: _____

Routing Number: _____
Deposit Account Number: _____

(b)    Debits made by ACH will be subject to the operating rules of the National Automated Clearing House Association, as in effect from time to time.

    (c)    Borrower may terminate this direct debit arrangement at any time by sending written notice to the Lender. If Borrower terminates this arrangement, then the principal amount outstanding under this Agreement will at the option of the Lender bear interest at a rate per annum, which is one percentage point higher than the rate of interest otherwise provided under this Agreement.

**3.5**    **Business Days.** Unless otherwise provided in this Agreement, a business day is a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the State of California. All payments and disbursements which would be due or which are received on a day, which is not a business day will be due or applied, as applicable, to the credit on the next business day.

**3.6**    **Interest Calculation**. Except as otherwise stated in this Agreement, all interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed. Installments of principal, which are not paid when due under this Agreement will continue to bear interest until paid.

**3.7**    **Default Rate**. Upon the occurrence of any default or after maturity or after judgment has been rendered on any obligation under this Agreement, all amounts outstanding under this Agreement, including any unpaid interest, fees, or costs, will at the option of the Lender bear interest at a rate which is five percentage points higher than the rate of interest otherwise provided under this Agreement. This may result in compounding of interest. This will not constitute a waiver of any default.

## 4.    CONDITIONS.

Before the Lender is required to extend any credit to Borrower under this Agreement, it must receive any documents and other items it may reasonably require, in form and content acceptable to the Lender, including any items specifically listed below.

**4.1**    **Authorizations.** If Borrower is anything other than a natural person, evidence that the execution, delivery and performance by Borrower of this Agreement and any instrument or agreement required under this Agreement have been duly authorized.

**4.2**    **Governing Documents.** If required by the Lender, a copy of organizational documents of Borrower.

**4.3**    **Perfection and Evidence of Priority.** Evidence that the security interests and liens in favor of the Lender are valid, enforceable, properly perfected in a manner acceptable to the Lender and prior to all others' rights and interests, except those the Lender consents to in writing. All title documents for motor vehicles which are part of the collateral must show the Lender's interest.

**4.4**    **Payment of Fees.** Payment of all fees, expenses and other amounts due and owing to the Lender. If any fee is not paid in cash, the Lender may, in its discretion, treat the fee as a principal advance under this Agreement or deduct the fee from the loan proceeds.

## 5.    <u>REPRESENTATIONS AND WARRANTIES.</u>

When Borrower signs this Agreement, and until the Lender is repaid in full, Borrower makes the following representations and warranties. Each request for an extension of credit constitutes a renewal of these representations and warranties as of the date of the request:

**5.1**    <u>Formation.</u> Borrower is duly formed and existing under the laws of the state or other jurisdiction where organized.

**5.2**    <u>Authorization.</u> This Agreement as amended hereby, and any instrument or agreement required under this Agreement, are within Borrower's powers, have been duly authorized, and do not conflict with any of its organizational documents.

**5.3**    <u>Good Standing.</u> In each state in which Borrower does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

**5.4**    <u>Financial Information.</u> All financial and other information that has been or will be supplied to the Lender is sufficiently complete to give the Lender accurate knowledge of the Borrower's financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to the Lender, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of Borrower.

**5.5**    <u>Lawsuits.</u> There is no lawsuit, tax claim or other dispute pending or threatened against Borrower, which, if lost, would impair Borrower's financial condition or ability to repay the loan, except as have been disclosed in writing to the Lender.

**5.6**    <u>Other Obligations.</u>  Borrower is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to the Lender.

**5.1**    <u>No Claims, Defenses, Etc.</u>.  Borrower has no claims, counterclaims, defenses, or setoffs with respect to the Line of Credit or this Agreement as amended hereby.  The Agreement as amended hereby contains the entire understanding and agreement of Borrower and the Lender in respect of the Line of Credit and supersedes all prior representations, warranties, agreements, arrangements, and understandings.

**5.3**    <u>Tax Matters.</u> Borrower has no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to the Lender.

**5.4**    <u>No Event of Default.</u> There is no event, which is, or with notice or lapse of time or both would be, a default under this Agreement.

**5.5**    <u>Collateral.</u> All Collateral is owned by Borrower free of any title defects or any liens or interests of others, except those which have been approved by the Lender in writing.

6.    **COVENANTS.**

Borrower agrees, so long as credit is available under this Agreement and until the Lender is repaid in full:

6.1    **Use of Proceeds.** To use the proceeds of the Line of Credit only for business purposes.

6.2    **Financial Information.** To provide financial statements and other information in form and content acceptable to the Lender relating to the affairs of Borrower as requested by the Lender from time to time.

6.3    **Other Debts.** Not to have outstanding or incur any direct or contingent liabilities or lease obligations (other than those to the Lender or to any affiliate of the Lender), or become liable for the liabilities of others, without the Lender's written consent. This does not prohibit:

(a)    Acquiring goods, supplies, or merchandise on normal trade credit.

(b)    Liabilities, lines of credit and leases in existence on the Effective Date (as defined below) disclosed in writing to the Lender.

6.4    **Other Liens**. Not to create, assume, or allow any security interest or lien (including judicial liens) n property Borrower now or later owns, except:

(a)    Liens and security interests in favor of the Lender or any affiliate of the Lender.

(b)    Liens outstanding on the Effective Date (as defined below) disclosed in writing to the Lender.

6.5    **Maintenance of Assets.**

(a)    Not to sell, assign, lease, transfer or otherwise dispose of any part of the business or assets of Borrower except inventory sold in the ordinary course of business of Borrower.

(b)    Not to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value, or enter into any agreement to do so.

(c)    To maintain and preserve all rights, privileges, and franchises Borrower now has.

6.6    **Additional Negative Covenants.** Not to, without the Lender's written consent:

(a)    Enter into any consolidation, merger, or other combination, or become a partner in a partnership, a member of a joint venture, or a member of a limited liability company.

(b)    Liquidate or dissolve Borrower's business.

**6.7**    **Notices to Lender.** To promptly notify the Lender in writing of:

(a)    Any event of default under this Agreement, or any event, which, with notice or lapse of time or both, would constitute an event of default.

(b)    Any change in Borrower's name, legal structure, state of registration, place of business, or chief executive office if Borrower has more than one place of business.

**6.8**    **Insurance.** To maintain insurance as is usual for the business it is in.

**6.9**    **Compliance with Laws.** To comply with the laws (including any fictitious or trade name statute), regulations, and orders of any government body with authority over business of Borrower. The Lender has no obligation to make any advance to Borrower except in compliance with all applicable laws and regulations and Borrower will fully cooperate with the Lender in complying with all such applicable laws and regulations.

**6.10**    **Books and Records.** To maintain adequate books and records.

**6.11**    **Audits.** To allow the Lender and its agents to inspect properties of Borrower and examine, audit, and make copies of books and records at any reasonable time. If any of the properties, books or records of Borrower are in the possession of a third party, Borrower authorizes that third party to permit the Lender or its agents to have access to perform inspections or audits and to respond to the Lender's requests for information concerning such properties, books and records.

**6.12**    **Perfection of Liens.** To help the Lender perfect and protect its security interests and liens, and reimburse it for related costs it incurs to protect its security interests and liens.

**6.13**    **Cooperation.** To take any action reasonably requested by the Lender to carry out the intent of this Agreement.

## 7.    DEFAULT AND REMEDIES.

Without limiting any of the Lender's rights and remedies in this Agreement, if any of the following events of default occurs, the Lender may do one or more of the following without prior notice: declare Borrower in default, stop making any additional credit available to Borrower, and require Borrower to repay its entire debt immediately. If an event, which, with notice or the passage of time, will constitute an event of default has occurred and is continuing, the Lender has no obligation to make advances or extend additional credit under this Agreement. In addition, if any event of default occurs, the Lender will have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with this Agreement, as well as all rights and remedies available at law or in equity. If an event of default occurs under Section *7.6*, with respect to Borrower, then the entire debt outstanding under this Agreement will automatically be due immediately.

**7.1**    **Failure to Pay.** Borrower fails to make a payment under this Agreement when due.

**7.2** **Covenants**. Any default in the performance of or compliance with any obligation, agreement or other provision contained in this Agreement (other than those specifically described as an event of default in this Article), and with respect to any such default that by its nature can be cured, such default continues for a period of 20 days from its occurrence.

**7.3** **Other Lender Agreements.** Any default occurs under any guaranty, subordination agreement, security agreement, deed of trust, mortgage, or other document required by or delivered in connection with this Agreement or any such document is no longer in effect, or any guarantor purports to revoke or disavow the guaranty; or any default occurs under any other agreement Borrower (or any Obligor) has with the Lender or any affiliate of the Lender. For purposes of this Agreement, **"Obligor"** means any guarantor, any party pledging collateral to the Lender, or, if Borrower is comprised of the trustees of a trust, any trustor.

**7.4** **Cross-default.** Any default occurs under any agreement in connection with any credit Borrower (or any Obligor) has obtained from anyone else or which Borrower (or any Obligor) or any of Borrower's related entities or affiliates has guaranteed.

**7.5** **False Information.** Borrower or any Obligor has given the Lender false or misleading information or representations.

**7.6** **Bankruptcy/Receivers**. Borrower, any Obligor, or any general partner of Borrower or of any Obligor files a bankruptcy petition, a bankruptcy petition is filed against any of the foregoing parties and such petition is not dismissed within a period of forty-five (45) days after the filing, or Borrower, any Obligor, or any general partner of Borrower or of any Obligor makes a general assignment for the benefit of creditors; or a receiver or similar official is appointed for a substantial portion of business of Borrower or any Obligor; or the business is terminated, or such Obligor is liquidated or dissolved.

**7.7** **Lien Priority**. The Lender fails to have an enforceable first lien (except for any prior liens to which the Lender has consented in writing) on or security interest in any property given as security for this Agreement (or any guaranty).

**7.8** **Judgments**. Any judgments or arbitration awards are entered against Borrower or any Obligor.

**7.9** **Material Adverse Change**. A material adverse change occurs, or is reasonably likely to occur, in the business condition (financial or otherwise), operations or properties, or ability to repay the credit of Borrower or any Obligor.

**7.10** **Government Action.** Any government authority takes action that the Lender believes materially adversely affects the financial condition or ability to repay of Borrower or any Obligor.

**7.11** **Liens.** Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

## 8.    **THE LENDER'S ADDITIONAL REMEDIES.**

   **8.1    The Lender's Additional Remedies After Default**. In the event of any default, the Lender may do any one or more of the following, to the extent permitted by law:

   (a)    Declare any Indebtedness immediately due and payable, without notice or demand.

   (b)    Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

   (c)    Require Borrower to obtain the Lender's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral.

   (d)    Require Borrower to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to the Lender in kind.

   (e)    Require Borrower to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under the Lender's exclusive control.

   (f)    Give notice to others of the Lender's rights in the Collateral, to enforce or forebear from enforcing the same and make extension and modification agreements.

   (g)    Require Borrower to assemble the Collateral, including the Books and Records, and make them available to the Lender at a place designated by the Lender.

   (h)    Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any equipment of Borrower, if the Lender deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

   (i)    Demand and collect any payments on and proceeds of the Collateral. In connection therewith the Borrower irrevocably authorizes the Lender to endorse or sign the Borrower's name on all checks, drafts, collections, receipts and other documents, and to take possession of and open the mail addressed to the Borrower and remove therefrom any payments and proceeds of the Collateral.

   (j)    Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to the Borrower.

(k)     Use or transfer any of the Borrower's rights and interests in any Intellectual Property now owned or hereafter acquired by the Borrower, if the Lender deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. The Borrower agrees that any such use or transfer will be without any additional consideration to the Borrower. As used in this **Section 8.1 (k),** "Intellectual Property" includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which the Borrower has any right or interest, whether by ownership, license, contract or otherwise.

(l)     Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. The Borrower hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

(m)     Take such measures as the Lender may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and the Borrower hereby irrevocably constitutes and appoints the Lender as the Borrower's attorney-in-fact to perform all acts and execute all documents in connection therewith.

(n)     Without notice or demand to the Borrower, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by the Lender or any of the Lender's agents or affiliates to or for the credit of the account of the Borrower or any guarantor or endorser of the Borrower's Indebtedness.

(o)     Exercise all rights, powers and remedies which the Borrower would have, but for this Agreement, with respect to all Collateral.

(p)     Receive, open and read mail addressed to the Borrower.

(q)     Resort to the Collateral under this Agreement, and any other collateral related to the Indebtedness, in any order.

(r)     Exercise any other remedies available to the Lender at law or in equity.

## 9.    <u>ENFORCING THIS AGREEMENT; MISCELLANEOUS.</u>

**9.1     <u>Governing Law.</u>** Except to the extent that any law of the United States may apply, this Agreement will be governed and interpreted according to the laws of California (the "**Governing Law State**"), without regard to any choice of law, rules or principles to the contrary.

Nothing in this **Section 9.1** be construed to limit or otherwise affect any rights or remedies of the Lender under federal law.

**9.2** **Venue and Jurisdiction.** The Borrower agrees that any action or suit against the Lender arising out of or relating to this Agreement must be filed in federal court or state court located in San Francisco, California. The Borrower agrees that the Lender will not be deemed to have waived its rights to enforce this **Section 9.2** by filing an action or suit against the Borrower in a venue outside of the Governing Law State. If the Lender does commence an action or suit arising out of or relating to this Agreement, the Borrower agrees that the case may be filed in federal court or state court in the Governing Law State. The Lender reserves the right to commence an action or suit in any other jurisdiction where the Borrower, any Guarantor, or any collateral has any presence or is located. The Borrower consents to personal jurisdiction and venue in such forum selected by the Lender and waives any right to contest jurisdiction and venue and the convenience of any such forum. The provisions of this *Section 9.2* are material inducements to the Lender's acceptance of this Agreement.

**9.3** **Successors and Assigns.** This Agreement is binding on the Borrower's and the Lender's successors and assignees. The Borrower agrees that it may not assign this Agreement without the Lender's prior consent.

**9.4** **Waiver of Jury Trial.** EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS *SECTION 9.4* AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.

**9.5** **Severability; Waivers.** If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced. The Lender retains all rights, even if it makes a loan after default. If the Lender waives a default, it may enforce a later default. Any consent or waiver under this Agreement must be in writing.

**9.6** **Expenses.**

(a) The Borrower must pay to the Lender immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees, expended or incurred by the Lender in

connection with (i) the negotiation and preparation of this Agreement and any related agreements, the Lender's continued administration of this Agreement and such related agreements, and the preparation of any amendments and waivers related to this Agreement or such related agreements, (ii) filing, recording and search fees, appraisal fees, field examination fees, title report fees, and documentation fees with respect to any collateral and books and records of the Borrower or any Obligor, and (iii) costs or expenses required to be paid by the Borrower or any Obligor that are paid, incurred or advanced by the Lender.

(b)    The Borrower will indemnify and hold the Lender harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (i) this Agreement or any document required hereunder, (ii) any credit extended or committed by the Lender to the Borrower hereunder, and (iii) any litigation or proceeding related to or arising out of this Agreement, any such document, or any such credit, including, without limitation, any act resulting from the Lender complying with instructions the Lender reasonably believes are made by any Authorized Individual. This *Section 9.6(b)* will survive this Agreement's termination, and will benefit the Lender and its officers, employees, and agents.

(c)    The Borrower must reimburse the Lender for any reasonable costs and attorneys' fees incurred by the Lender in connection with (i) the enforcement or preservation of the Lender's rights and remedies and/or the collection of any obligations of the Borrower which become due to the Lender and in connection with any "workout" or restructuring, and (ii) the prosecution or defense of any action in any way related to this Agreement, the credit provided hereunder or any related agreements, including without limitation, any action for declaratory relief, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by the Lender or any other person) relating to the Borrower or any other person or entity.

**9.7    Set-Off.** Upon and after the occurrence of an event of default under this Agreement, (a) the Borrower hereby authorizes the Lender, at any time and from time to time, without notice, which is hereby expressly waived by the Borrower, and whether or not the Lender has declared any credit subject hereto to be due and payable in accordance with the terms hereof, to set off against, and to appropriate and apply to the payment of, the Borrower's Obligations (whether matured or unmatured, fixed or contingent, liquidated or unliquidated), any and all amounts owing by the Lender to the Borrower (whether payable in U.S. dollars or any other currency, whether matured or unmatured), and (b) pending any such action, to the extent necessary, to hold such amounts as collateral to secure such Obligations. "Obligations" means all obligations, now or hereafter existing, of the Borrower to the Lender under this Agreement and under any other agreement or instrument executed in connection with this Agreement.

**9.8**    **One Agreement.** THIS WRITTEN AGREEMENT AND ANY RELATED DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**9.9**    **Notices.** Unless otherwise provided in this Agreement or in another agreement between the Lender and the Borrower, all notices required under this Agreement shall be (a) in writing (including electronic mail), (b) delivered by electronic mail or overnight courier, and (c) deemed delivered upon electronic or written acknowledgment of receipt. Notices shall be sent to the addresses set forth on the signature page to this Agreement or such other address as specified and delivered pursuant to this ***Section 9.9.***

**9.10**    **Amendment and Restatement of Original Agreement.**

(a)    Borrower, and Cyber by execution of this Agreement, acknowledge and agree that the original Loan and Security Agreement (the "**Original Agreement**"), effective as of December 27, 2018 (the "**Effective Date**") by and between Borrower and Cyber Quantum PTE, LTD, a Singapore limited company ("**Cyber**"), erroneously included Cyber as the lender. Cred LLC is now, and always was intended to be, the named lender under the Original Agreement. Further, Cred LLC has at all times performed the obligations of the Lender under the Original Agreement, including but not limited to making all Advances. Accordingly, by execution of this Agreement, the parties are amending and restating the Original Agreement to reflect that Cred LLC is the Lender. In order to ensure the amendment intended hereby is complete in all respects, Cyber hereby assigns to Cred LLC any legal or equitable rights Cyber may have under the Original Agreement.

(b)    Notwithstanding the amendment of the Original Agreement, Borrower hereby ratifies and affirms all of the indebtedness, liabilities and obligations owing by it under the Original Agreement, as amended and restated hereby, including all Advances made by Lender prior to the date hereof as reflected on the Schedule of Advances. Further, Borrower ratifies and affirms any related documents and agreements, guaranties, pledges and grants of security interests under the Original Agreement made by Borrower prior to the date hereof, each of which shall continue to be in full force and effect in favor of the Lender hereunder from and after the date of the Original Agreement. In the event of any conflict between the terms and conditions of this Agreement and the terms and conditions of the Original Agreement, the terms and conditions of this Agreement shall control.

**9.11**    **Headings.** Article and section headings are for reference only and will not affect the interpretation or meaning of any provisions of this Agreement.

**9.12**    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which, when so executed, will be deemed to be an original, and all of which when taken

together will constitute one and the same Agreement. Delivery of an executed counterpart of this Agreement (or of any agreement or document required by this Agreement and any amendment to this Agreement) by DocuSign will be as effective as delivery of a manually executed counterpart of this Agreement.

**9.13    Further Amendments**. No provision of the Agreement may be changed, discharged, supplemented, terminated, or waived except in a writing signed by the Borrower and the Lender.

[Balance of page left blank.]

This Agreement is executed as of the date first written above.

## SIGNATURES

**MOKREDIT INC.,**
an Exempted Company incorporated in the
Cayman Islands with Limited Liability

By: _~ualu_

Name: LU HUA

Title: Director

Notice Address:
moKredit Inc.
c/o Offshore Incorporations (Cayman)
Limited
Floor 4 Willow House, Cricket Square
P.O. Box 2804
Grand Cayman KY1-1112, Cayman
Islands

**CRED LLC,**
a Delaware limited liability company

By: _Dan Schatt_

Name: Dan Schatt

Title: CEO

Notice Address:
Cred LLC
2121 South El Camino Real, Suite 500
San Mateo, CA 94403
Attention: Dan Wheeler, GC

**MOKREDIT TECHNOLOGY (HONG KONG) COMPANY LIMITED,**
a Hong Kong company

By: _~ualu_

Name: LU HUA

Title: Director

Notice Address:
moKredit    Technology    (Hong    Kong)
Company Limited
18 East Yanan Road
F17 Shanghai 200001
Attention: Lu Hua

**Acknowledged & Agreed.**

**CYBER QUANTUM PTE. LTD,**
a Singapore limited company

By: _Dan Schatt_
Name: Dan Schatt
Title: Director

<u>Notice address</u>:
Cyber Quantum Pte. Ltd
Anson Road
Singapore 79903

71DJ-309018

## SCHEDULE A

### Schedule of Advances
### (Updated January 30, 2020)

**Advances:**

| Tranche | Borrower | Term | Source | Mo | Start Date | End Date | Days | Currency | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 1 | MoKredit | 12 months | Earn | 12 | 12/27/2018 | 12/28/2019 | 367 | USDT | 74,240.00 |
| 2 | MoKredit | 12 months | Earn | 1 | 1/8/2019 | 1/8/2020 | 366 | USDT | 79,570.02 |
| 3 | MoKredit | 12 months | Working Cap | 11 | 11/15/2018 | 11/15/2019 | 366 | USD | - |
| 4 | MoKredit | 6 months | Earn | 1 | 1/10/2019 | 6/27/2019 | 169 | USDT | 3,855,927.04 |
| 5 | MoKredit | 6 months | Earn | 1 | 1/22/2019 | 7/26/2019 | 186 | USDT | 28,352.00 |
| 6 | MoKredit | 6 months | Earn | 1 | 1/22/2019 | 7/26/2019 | 186 | TUSD - True | 100,000.00 |
| 7 | MoKredit | 6 months | Earn | 2 | 2/1/2019 | 7/26/2019 | 176 | USDT | 152,205.97 |
| 8 | MoKredit | 3.5 months | Earn | 2 | 2/15/2019 | 5/28/2019 | 103 | DAI | 250,000.00 |
| 9 | MoKredit | 6 months | Earn | 2 | 2/15/2019 | 10/30/2019 | 258 | USDT | 51,248.00 |
| 10 | MoKredit | 6 months | Earn | 3 | 3/1/2019 | 8/28/2019 | 181 | USDT | 212,050.00 |
| 11 | MoKredit | 12 months | Earn | 3 | 3/1/2019 | 2/26/2020 | 363 | USDT | 250,000.00 |
| 12 | MoKredit | 6 months | Earn | 3 | 3/19/2019 | 9/11/2019 | 177 | TUSD - True | 2,317,499.00 |
| 13 | MoKredit | 6 months | Earn | 3 | 3/19/2019 | 9/11/2019 | 177 | USDT | 642,524.21 |
| 14 | MoKredit | 6 months | Earn | 3 | 3/20/2019 | 9/11/2019 | 176 | USDT | 634,033.14 |
| 15 | MoKredit | 6 months | Earn | 3 | 3/23/2019 | 9/11/2019 | 173 | USDT | 77,240.91 |
| 16 | MoKredit | 6 months | Earn | 3 | 3/26/2019 | 9/11/2019 | 170 | USDC - Circle | 2,345,990.00 |
| 17 | MoKredit | 6 months | Earn | 3 | 3/27/2019 | 9/11/2019 | 169 | USDT | 644,201.07 |
| 18 | MoKredit | 6 months | Earn | 3 | 3/27/2019 | 9/11/2019 | 169 | USDT | 399,998.00 |
| 19 | MoKredit | 6 months | Earn | 4 | 4/1/2019 | 9/27/2019 | 180 | USDT | 281,981.00 |
| 20 | MoKredit | 6 months | Earn | 4 | 4/1/2019 | 9/27/2019 | 180 | USDT | 63,493.00 |
| 21 | MoKredit | 6 months | Earn | 4 | 4/2/2019 | 9/26/2019 | 178 | USDC - Circle | 300,131.10 |
| 22 | MoKredit | 12 months | Earn | 4 | 4/10/2019 | 3/30/2020 | 356 | TUSD - True | 521,345.85 |
| 23 | MoKredit | 12 months | Earn | 4 | 4/12/2019 | 4/9/2020 | 364 | USDC - Circle | 409,671.93 |
| 24 | MoKredit | 6 months | Earn | 4 | 4/15/2019 | 10/11/2019 | 180 | TUSD - True | 351,923.66 |
| 25 | MoKredit | 6 months | Earn | 4 | 4/16/2019 | 10/13/2019 | 181 | USDC - Circle | 1,184,064.54 |
| 26 | MoKredit | 6 months | Earn | 4 | 4/19/2019 | 10/13/2019 | 178 | USDC - Circle | 44,695.05 |
| 27 | MoKredit | 12 months | Earn | 3 | 3/13/2019 | 3/7/2020 | 361 | USD | 200,000.00 |
| 28 | MoKredit | 6 months | Earn | 5 | 5/1/2019 | 10/30/2019 | 183 | TUSD - True | 256,429.00 |
| 29 | MoKredit | 6 months | Earn | 5 | 5/1/2019 | 10/30/2019 | 183 | TUSD - True | 428,810.00 |
| 30 | MoKredit | 6 months | Earn | 5 | 5/2/2019 | 10/30/2019 | 182 | TUSD - True | 53,218.37 |
| 32 | MoKredit | 1 month | Earn | 5 | 5/7/2019 | 1/31/2020 | 216 | TUSD - True | 1,000,000.00 |
| 33 | MoKredit | 1 month | Earn | 5 | 5/8/2019 | 1/31/2020 | 215 | TUSD - True | 1,014,607.27 |
| 34 | MoKredit | 6 months | Earn | 5 | 5/15/2019 | 3/30/2020 | 321 | TUSD - True | 327,223.00 |
| 35 | MoKredit | 12 months | Earn | 5 | 5/17/2019 | 4/30/2020 | 350 | GUSD - Gemini | 1,190,500.00 |
| 36 | MoKredit | 12 months | Earn | 5 | 5/17/2019 | 4/30/2020 | 350 | PAX | 496,041.67 |
| 37 | MoKredit | 12 months | Earn | 5 | 5/17/2019 | 4/30/2020 | 350 | USDC - Circle | 2,200,000.00 |
| 38 | MoKredit | 12 months | Earn | 5 | 5/17/2019 | 4/30/2020 | 350 | TUSD - True | 81,791.66 |
| 39 | MoKredit | 12 months | Earn | 5 | 5/20/2019 | 4/30/2020 | 347 | TUSD - True | 381,331.94 |
| 40 | MoKredit | 12 months | Earn | 5 | 5/23/2019 | 4/30/2020 | 344 | TUSD - True | 876,444.07 |

SMRH:4844-7730-4497.12

71DJ-309018

| 41 | MoKredit | 12 months | Earn | 6 | 6/1/2019 | 11/30/2019 | 183 | TUSD - True | 453,896.88 |
|----|----------|-----------|------|---|----------|------------|-----|-------------|------------|
| 44 | MoKredit | 12 months | Earn | 6 | 6/3/2019 | 5/31/2020 | 364 | TUSD - True | 443,301.79 |
| 45 | MoKredit | 12 months | Earn | 5 | 5/15/2019 | 5/31/2020 | 383 | LBA | 2,131,284.17 |
| 46 | MoKredit | 12 months | Earn | 6 | 6/1/2019 | 6/30/2020 | 396 | LBA | 1,613,252.01 |
| 47 | MoKredit | 6 months | Earn | 6 | 6/8/2019 | 11/30/2019 | 176 | PAX | 500,000.00 |
| 48 | MoKredit | 6 months | Earn | 6 | 6/7/2019 | 11/30/2019 | 177 | USDC | 490,000.00 |
| 49 | MoKredit | 1 month | Earn | 6 | 6/10/2019 | 11/30/2019 | 174 | USDC | 334,536.00 |
| 50 | MoKredit | 1 month | Earn | 6 | 6/11/2019 | 11/30/2019 | 173 | USDC | 475,290.64 |
| 51 | MoKredit | 1 month | Earn | 6 | 6/13/2019 | 7/20/2019 | 38 | USDC | 1,011,960.32 |
| 52 | MoKredit | 6 months | Earn | 6 | 6/15/2019 | 12/13/2019 | 182 | USDC | 598,236.43 |
| 53 | MoKredit | 6 month | Earn | 6 | 6/26/2019 | 12/15/2019 | 173 | ETH | 3,225.00 |
| 54 | MoKredit | 12 months | Earn | 7 | 7/1/2019 | 12/27/2019 | 180 | TUSD | 100,000.00 |
| 55 | MoKredit | 6 month | Earn | 7 | 7/8/2019 | 1/3/2020 | 180 | PAX | 800,000.00 |
| 56 | MoKredit | 6 month | Earn | 7 | 7/11/2019 | 12/27/2019 | 170 | USDC | 899,135.43 |
| 57 | MoKredit | 6 month | Earn | 7 | 7/15/2019 | 1/2/2020 | 172 | PAX | 150,000.00 |
| 58 | MoKredit | 6 month | Earn | 7 | 7/15/2019 | 1/13/2020 | 183 | USDC | 843,830.00 |
| 59 | MoKredit | 6 month | Earn | 7 | 7/18/2019 | 1/10/2020 | 177 | PAX | 1,000,000.00 |
| 60 | MoKredit | 6 month | Earn | 7 | 7/18/2019 | 11/30/2019 | 136 | USDC | 1,527,313.23 |
| 61 | MoKredit | 6 month | Earn | 7 | 7/18/2019 | 9/30/2019 | 75 | USDC | 524,608.45 |
| 62 | MoKredit | 5 month | Earn | 7 | 7/26/2019 | 12/31/2019 | 159 | USDC | 298,798.80 |
| 63 | MoKredit | 5 month | Earn | 7 | 7/30/2019 | 12/31/2019 | 155 | USDC | 476,125.31 |
| 64 | MoKredit | 5 month | Earn | 7 | 7/30/2019 | 12/31/2019 | 155 | PAX | 605,684.15 |
| 65 | MoKredit | 5 month | Earn | 7 | 7/30/2019 | 12/31/2019 | 155 | USDC | 220,864.57 |
| 66 | MoKredit | 6 month | Earn | 8 | 8/2/2019 | 1/29/2020 | 181 | TUSD | 49,193.31 |
| 67 | MoKredit | 6 month | Earn | 8 | 8/18/2019 | 2/12/2020 | 179 | TUSD | 141,022.00 |
| 68 | MoKredit | 3 month | Earn | 8 | 8/21/2019 | 11/30/2019 | 102 | PAX | 1,000,000.00 |
| 69 | MoKredit | 6 month | Earn | 9 | 9/1/2019 | 2/27/2020 | 180 | TUSD | 50,339.00 |
| 70 | MoKredit | 6 month | Earn | 9 | 9/4/2019 | 12/13/2019 | 101 | LBA | 1,537,379.69 |
| 71 | MoKredit | 6 month | Earn | 9 | 9/4/2019 | 12/30/2019 | 118 | LBA | 564,465.77 |
| 72 | MoKredit | 6 month | Earn | 9 | 9/4/2019 | 1/13/2020 | 132 | LBA | 432,960.88 |
| 73 | MoKredit | 6 month | Earn | 9 | 9/4/2019 | 1/31/2020 | 150 | LBA | 3,282,474.66 |
| 74 | MoKredit | 6 month | Earn | 9 | 9/4/2019 | 2/13/2020 | 163 | LBA | 241,377.30 |
| 75 | MoKredit | 6 month | Earn | 9 | 9/4/2019 | 2/28/2020 | 178 | LBA | 796,991.88 |
| 76 | MoKredit | 6 month | Earn | 9 | 9/15/2019 | 3/12/2020 | 180 | TUSD | 47,990.00 |
| 77 | MoKredit | 6 month | Earn | 9 | 9/16/2019 | 3/12/2020 | 179 | USDC | 4,500,000.00 |
| 78 | MoKredit | 6 month | Earn | 9 | 9/16/2019 | 3/12/2020 | 179 | LBA | 1,387,922.89 |
| 79 | MoKredit | 6 month | Earn | 7 | 7/22/2019 | 12/31/2019 | 163 | USDC | 522,941.28 |
| 80 | MoKredit | 6 month | Earn | 10 | 10/2/2019 | 3/30/2020 | 181 | LBA | 989,220.63 |
| 81 | MoKredit | 6 month | Earn | 10 | 10/3/2019 | 3/30/2020 | 180 | TUSD | 150,000.00 |
| 82 | MoKredit | 6 month | Earn | 10 | 10/16/2019 | 4/10/2020 | 178 | USDC | 1,800,000.00 |
| 83 | MoKredit | 6 month | Earn | 10 | 10/17/2019 | 4/10/2020 | 177 | USDC | 2,000,000.00 |
| 84 | MoKredit | 6 month | Earn | 10 | 10/18/2019 | 4/10/2020 | 176 | PAX | 500,000.00 |
| 85 | MoKredit | 6 month | Earn | 10 | 10/18/2019 | 4/10/2020 | 176 | LBA | 1,327,445.16 |
| 86 | MoKredit | 6 month | Earn | 10 | 10/22/2019 | 4/10/2020 | 172 | USDC | 1,160,000.00 |
| 87 | MoKredit | 6 month | Earn | 10 | 10/31/2019 | 12/31/2019 | 62 | USDC | 89,705.37 |
| 88 | MoKredit | 6 month | Earn | 11 | 11/1/2019 | 4/28/2020 | 180 | LBA | 638,540.67 |
| 89 | MoKredit | 6 month | Earn | 11 | 11/1/2019 | 4/28/2020 | 180 | USDC | 1,747,535.83 |

| 90 | MoKredit | 6 month | Earn | 11 | 11/12/2019 | 2/12/2020 | 93 | USDC | 4,258,962.65 |
| 91 | MoKredit | 6 months | Earn | 6 | 12/14/2019 | 5/31/2020 | 170 | USDC | 589,224.04 |
| 92 | MoKredit | 6 months | Earn | 6 | 1/30/2020 | 6/30/2020 | | USD | 14,351,663 |

SMRH:4844-7730-4497.12

71DJ-309018

SMRH:4850-9553-7843.1

71DJ-309018

## SCHEDULE B

### Schedule of Fees

1.  <u>General Fees.</u>

    a.  The Borrower agrees to pay any loan and documentation fees requested by the Lender.

    b.  <u>Waiver Fee</u>. If the Lender, at its discretion, agrees to waive or amend any terms of this Agreement, the Borrower will, at the Lender's option, pay the Lender a fee for each waiver or amendment in an amount advised by the Lender at the time the Borrower requests the waiver or amendment. Nothing in this ***Section 1(b)*** implies that the Lender is obligated to agree to any waiver or amendment requested by the Borrower. The Lender may impose additional requirements as a condition to any waiver or amendment.

    c.  <u>Late Fee</u>. To the extent permitted by law, the Borrower agrees to pay a late fee in an amount not to exceed 4% of any payment that is more than 15 days late. The imposition and payment of a late fee does not constitute a waiver of the Lender's rights with respect to the default.

2.  <u>Additional Fees</u>. The Borrower and the Lender agree to pay any other fees set forth on the Schedule of Advances.

## EXHIBIT A

## FORM OF DRAW CERTIFICATE

### Draw Certificate No. _____

Date: _____, 20__

Re:     The Loan and Security Agreement (the "**Agreement**") by and between Cred LLC ("**Lender**") and moKredit Inc. ("**Borrower**").

To:     MoKredit Inc.

From:   Cred LLC.
        Attn: 2121 S. El Camino Real, Suite 500
        San Mateo, CA 94403

This Draw Certificate is prepared and delivered pursuant to the Agreement. Capitalized terms used but not defined herein have the meanings given to such terms in the Agreement.

On the date of delivery set forth below, Lender delivered and posted cryptocurrency and/or fiat currency in the number and type specified below to Borrower's Digital Wallet pursuant to the Agreement.

| | |
|---|---|
| **Date of draw:** | |
| **Date of delivery and posting of the draw proceeds to Borrower:** (date on which interest begins accruing on the draw amount) | |
| **Type of cryptocurrency or fiat currency:** | [__]   cryptocurrency (type:_____)<br><br>[__]   fiat currency (type:___USD_____) |
| **Number of tokens or USD:** | [__]   _____ (number of crypto tokens)<br><br>[__]   $_____ |
| **Interest rate applicable to the draw:** | _____% |
| **Interest payment dates:** | $_____ payable on _____, 20___.<br><br>$_____ payable on _____, 20___.<br><br>$_____ payable on _____, 20___. |

| | |
|---|---|
| | $_____ payable on _____, 20\_\_\_. |
| **Principal payment dates:** | $_____ payable on _____, 20\_\_\_. |
| | $_____ payable on _____, 20\_\_\_. |
| | $_____ payable on _____, 20\_\_\_. |
| | $_____ payable on _____, 20\_\_\_. |

SMRH:4850-9553-7843.1

71DJ-309018