# Exhibit N

**Base Prospectus**

**Income Opportunities (Luxembourg) S.A.**

**(the "Company")**

**acting on behalf of its Compartment**

**the name which starts with "Cred"**

**as Issuer**

**Up to U.S.$100,000,000**

*or its equivalent in the specified currencies*

**Notes Issuance Programme**

*This document constitutes a base prospectus (the "**Base Prospectus**"). Under the Notes Issuance Programme (the "**Programme**") described in this Base Prospectus, the Company may from time to time issue notes (each a "**Note**" and collectively the "**Notes**") and in conjunction therewith may from time to time purchase participation interests sold by Cred LLC and affiliates ("**Cred**") in amounts owed by moKredit Inc., an exempted company incorporated in the Cayman Islands with limited liability, under the associated loan and security agreement.*

*Investing in the Notes involves a high degree of risk. See "Investment Considerations and Risk Factors" starting on page 1.*

**Arranger**

**Cred LLC**

This Base Prospectus is dated as of January 30, 2020.

**GENERAL NOTICE**

This Base Prospectus does not constitute an offer of, or an invitation by or on behalf of the Issuer to subscribe for, or purchase, any Notes.

This Base Prospectus has been prepared solely in connection with an application for the listing of the Notes to be issued under the Programme on the Official List of the Luxembourg Stock Exchange ("**LuxSE**") and an application for admission to trading on the Euro MTF market (as defined herein).

This Base Prospectus constitutes a prospectus for purposes of Part II, Chap.1, art 6 of the Rules and Regulations of the LuxSE (in conjunction with Appendix V, Appendix 2 and Appendix 3 of the Rules and Regulations of the Luxembourg Stock Exchange). The Issuer may apply with the LuxSE for the Notes to be listed on its Official List and to be admitted to trading on its Euro MTF market.

This Base Prospectus may only be used for the purposes for which it has been published. Nobody is authorized to give any information other than that contained in this Base Prospectus and in the documents referred to herein and which are made available for inspection by the public.

This Base Prospectus may be published on the official website of the LuxSE, www.bourse.lu. Purchasers of Notes should conduct such independent investigation and analysis regarding the Issuer, the security arrangements and the Notes as they deem appropriate to evaluate the merits and risks of an investment in the Notes.

The Company, having made all reasonable enquiries, accepts responsibility for, and confirms that, at the date of the Base Prospectus, to the best of its knowledge, the Base Prospectus contains all information with regards to the Company that is material in the context of the admission to listing of the Notes to be issued under the Programme on the Official List of the Luxembourg Stock Exchange and contains no omissions likely to affect the contents of the Base Prospectus.

The Arranger does not accept any responsibility for the contents of, or make any representation, recommendation or warranty, express or implied, regarding the accuracy, adequacy, reasonableness or completeness of, the information contained herein or in any further Base Prospectus or issue of Notes under the Programme, notice or other document which may at any time be supplied in connection with the Notes and none of them accepts any responsibility or liability therefor. The Arranger does not accept any responsibility for any other statement made or purported to be made by the Arranger on its behalf in connection with the Issuer or the issue and offering of the Notes. The Arranger does not undertake to review the financial condition or affairs of the Issuer during the life of the arrangements contemplated by this Base Prospectus or to advise any investor or potential investor in the Notes of any information coming to its attention. The Arranger disclaims all and any liability, whether arising in tort or contract or otherwise (save as referred to above), which it might otherwise have in respect of this Base Prospectus or any such statement.

In this Base Prospectus, unless otherwise specified or the context otherwise requires, references to "dollars", "U.S. dollars" and "U.S.$" are to United States dollars and references to "euro", "EUR" and "€" are to the single currency adopted and retained by certain member states of the European Community pursuant to the Treaty establishing the European Community, as amended by the Treaty on European Union.

In this Base Prospectus, except so far as the context otherwise requires and subject to any contrary indication, words and expressions defined and expressed to be construed in the terms and conditions of the Notes (the "**Terms and Conditions**") shall have mutatis mutandis the same meaning and construction herein.

# TABLE OF CONTENTS

Page

INVESTMENT CONSIDERATIONS AND RISK FACTORS.........................................................1

TERMS AND CONDITIONS OF THE NOTES.......................................................................9

1.    THE NOTES.................................................................................................................9

2.    RIGHTS AND OBLIGATIONS UNDER THE NOTES..................................................13

3.    UNDERLYING ASSETS............................................................................................13

4.    GENERAL COVENANTS OF THE ISSUER...............................................................14

5.    PAYMENTS..............................................................................................................16

6.    INTEREST...............................................................................................................18

7.    REDEMPTION AND PURCHASE..............................................................................19

8.    BRIDGE FACILITY...................................................................................................20

9.    TAXATION...............................................................................................................20

10.    ISSUER EVENT OF DEFAULT.................................................................................21

11.    SERIES EVENT OF DEFAULT..................................................................................21

12.    ENFORCEMENT OF SECURITY..............................................................................21

13.    NOTICES.................................................................................................................21

14.    MEETINGS OF NOTEHOLDERS, MODIFICATION AND WAIVER.............................22

15.    AGENTS..................................................................................................................23

16.    SUBSTITUTION.......................................................................................................23

17.    MISCELLANEOUS..................................................................................................24

18.    APPLICABLE LAW AND PLACE OF JURISDICTION................................................24

ANNEX TO THE TERMS AND CONDITIONS OF THE NOTES.............................................25

FORM OF FINAL TERMS FOR THE NOTES......................................................................31

CLEARING AND SETTLEMENT........................................................................................36

SELLING RESTRICTIONS................................................................................................38

USE OF PROCEEDS.......................................................................................................39

DESCRIPTION OF MOKREDIT AND THE UNDERLYING ASSETS......................................40

1.    Industry Overview.....................................................................................................40

2.    moKredit Overview....................................................................................................40

DESCRIPTION OF INVESTMENT STRUCTURE................................................................46

DESCRIPTION OF THE TRANSACTION DOCUMENTS.....................................................48

DESCRIPTION OF THE COMPANY...................................................................................50

DESCRIPTION OF THE ARRANGER AND CALCULATION AGENT.....................................53

DESCRIPTION OF THE CORPORATE SERVICES PROVIDER............................................53

DESCRIPTION OF THE ACCOUNT BANK.........................................................................53

ADMINISTRATIVE COOPERATION AND EXCHANGE OF INFORMATION...........................55

LUXEMBOURG TAXATION...................................................................................................... 56

1.    Taxation of the Company.......................................................................................... 56

2.    Taxation of the Noteholders...................................................................................... 57

3.    FATCA........................................................................................................................ 59

UNITED STATES TAXATION................................................................................................. 61

DOCUMENTS AVAILABLE..................................................................................................... 63

**INVESTMENT CONSIDERATIONS AND RISK FACTORS**

THE CONSIDERATIONS SET OUT BELOW ARE NOT, AND ARE NOT INTENDED TO BE, A COMPREHENSIVE LIST OF ALL CONSIDERATIONS RELEVANT TO A DECISION TO PURCHASE OR HOLD ANY NOTES.

*The purchase of Notes may involve substantial risks and is suitable only for sophisticated investors who have the knowledge and experience in financial and business matters necessary to enable them to evaluate the risks and the merits of an investment in the Notes. Before making an investment decision, prospective purchasers of Notes should consider carefully, in the light of their own financial circumstances and investment objectives, all the information set forth in this Base Prospectus and, in particular, the considerations set forth below, in the Terms and Conditions and in the applicable Final Terms.*

*The Issuer does not represent that the statements below regarding the risks of holding any Notes are exhaustive and the Issuer may be unable to pay interest, principal or other amounts on or in connection with any Notes for reasons other than those described below.*

**GENERAL**

This Base Prospectus identifies in general terms certain information that a prospective investor should consider prior to making an investment in the Notes. However, a prospective investor should, without any reliance on the Issuer and/or the Arranger or its affiliates, conduct its own thorough analysis (including its own accounting, legal and tax analysis) prior to deciding whether to invest in any Notes issued under the Programme as any evaluation of the suitability for an investor of an investment in Notes issued under the Programme depends upon a prospective investor's particular financial and other circumstances as well as on specific terms of the relevant Notes and, if it does not have experience in financial, business and investment matters sufficient to permit it to make such a determination, it should consult with its financial adviser prior to deciding whether or not to make an investment in the Notes.

This Base Prospectus is not, and does not purport to be, investment advice, and neither the Issuer nor the Arranger makes any recommendation as to the suitability of the Notes. The provision of this Base Prospectus to prospective investors is not based on any prospective investor's individual circumstances and should not be relied upon as an assessment of the suitability for any prospective investor of the Notes. Even if the Issuer or the Arranger possesses limited information as to the objectives of any prospective investor in relation to any transaction, series of transactions or trading strategy, this will not be deemed sufficient for any assessment of the suitability for such person of the Notes. Any trading or investment decisions a prospective investor takes are in reliance on its own analysis and judgement and/or that of its advisers and not in reliance on the Issuer, the Arranger or any of their respective affiliates.

In particular, each prospective investor in the Notes must determine, based on its own independent review and such professional advice as it deems appropriate under the circumstances, that its acquisition of the Notes (i) is fully consistent with its (or, if it is acquiring the Notes in a fiduciary capacity, the beneficiary's) financial needs, objectives and condition, (ii) complies and is fully consistent with all investment policies, guidelines and restrictions applicable to it (whether acquiring the Notes as principal or in a fiduciary capacity) and (iii) is a fit, proper and suitable investment for it (or, if it is acquiring the Notes in a fiduciary capacity, for the beneficiary), notwithstanding the clear and substantial risks inherent in investing in or holding the Notes.

Each prospective investor in Notes should have sufficient financial resources and liquidity to bear all of the risks of an investment in the relevant Notes, including where the currency for principal or interest payments is different from the potential investor's currency.

The investment activities of certain investors are subject to investment laws and regulations or review or regulation by certain authorities. Each prospective investor should therefore consult its legal advisers to

determine whether and to what extent (i) the Notes are legal investments for it, (ii) if relevant, the Notes can be used as underlying securities for various types of borrowing, and (iii) other restrictions apply to its purchase or, if relevant, pledge of any Notes. Financial institutions should consult their legal advisers or the appropriate regulators to determine the appropriate treatment of Notes under any applicable risk-based capital or similar rules.

**General description of the transaction**

Under the Programme, the Company intends to issue Notes in separate series (each a "**Series of Notes**"). Each Series of Notes will be issued by a separate Compartment of the Company and therefore will be limited recourse notes, providing recourse only to the proceeds of the assets owned by such Compartment.

For Compartment Cred Global Notes 1 and subsequent Cred Compartments, the Company will apply the proceeds of the Notes to purchase pursuant to a participation agreement with Cred LLC, a Delaware limited liability company ("**Cred**") or an affiliate, participation interests in debt of moKredit Inc., an exempted company incorporated in the Cayman Islands with limited liability ("**moKredit**") and moKredit Technology (Hong Kong) Company Limited, a Hong Kong company ("**HK Co.**", and together with moKredit, "**Borrower**") under a loan and security agreement ("**moKredit Participation Certificates**"). Cred makes advances to Borrower from time to time that are used by (Shanghai) Information Technology Co., Ltd., an affiliate of the moKredit group that is controlled by moKredit through to a suite of contracts ("**Chinese Affiliate**") to originate and service consumer receivables and loans ("**moKredit Receivables**").

Cred and its subsidiaries operate a global cryptocurrency lending services platform.  Cred has particular expertise in making loans secured by cryptocurrency and it also makes loans to large corporate borrowers.  Cred is able to obtain funding from a wide range of persons and entities in the cryptocurrency space.  Cred holds lending licenses in the United States and is headquartered in San Mateo, California.

See "Description of moKredit Participation Certificates" below for a more complete description of the transaction and the underlying assets.

**The Company is a special purpose vehicle**

The Company's sole business is the raising of money by issuing Notes for the purposes of purchasing one or more moKredit Participation Certificates. The Company has covenanted not to have any subsidiaries or employees, consolidate or merge with any other person or issue any shares (other than such shares as were in issue on the date of its incorporation). As such, the Company has, and will have, no assets other than one or more moKredit Participation Certificates and any working capital and other assets to which Notes provide recourse. There is no day-to-day management of the business of the Issuer except for certain administrative operations to be carried out by the board of directors or service providers among which the Arranger through the Administrative Services Agreement.

**GENERAL RISK FACTORS**

**The Company was formed in 2015 and has some operating history**

The Company was formed in 2015 in relation with securitisation. However, there is no operating history in connection with the securitisation of moKredit Participation Certificates upon which prospective investors can evaluate its past performance. Two other compartments of the Company were formed in 2015 but have undertaken significantly different investment strategies and did not partner with Cred and therefore provide no meaningful comparison with the Issuer. There can be no assurance that the Company will be able to implement its investment strategy and investment approach or achieve its investment objectives. A prospective investor in the Notes must rely upon the ability of the Issuer's agents in identifying and implementing investments and transactions consistent with the Issuers policies.

**There is a risk of loss of capital**

There can be no assurance that an investor will receive a return of its capital investment or interest return with respect to a purchased Note. There can be no assurance of liquidity and no assurance that the Company will be able to make distributions or other payments as described herein or generate returns for its investors or that the returns will be commensurate with the risks of making the types of investments described herein. An investment in a Note should only be considered by persons who can afford a loss of their entire investment.

**The Company will have broad discretion over the use of the proceeds of the Programme**

The Company will have broad discretion in determining how the proceeds from the Programme will be used. The Company expects to use the proceeds from the sale of the Notes to (i) invest in a moKredit Participation Certificate, (ii) pay obligations with respect to Notes and (iii) pay organizational expenses and operating costs.

**Limited Diversification**

The assets of the Issuer will be limited to one or more moKredit Participation Certificates. As a result, there is a risk that the aggregate returns realized by the Issuer may be substantially adversely affected by the unfavourable market conditions affecting moKredit and its Chinese Affiliate, and more generally the ability of moKredit to make a required payment on its debt under the loan and security agreement underlying the moKredit Participation Certificate.  Further, the moKredit Participation Certificates held by one Cred Compartment may be in relation with the same line of credit granted to moKredit as the moKredit Participation Certificates held by another Cred Compartment.

**Unsecured Notes**

The Notes are not be secured by any security interest, lien, pledge, charge, assignment, transfer or other encumbrance of any kind, nor will they be guaranteed or insured by any third party nor backed by any governmental authority. If the Issuer fails to make a required payment on a Note, the remedies of individual holders of the Notes will be limited.

**Payment priorities in the Notes provide for payments to certain third parties**

Several payments will be made by the Issuer from cash flows generated from investments before any payments are made on the Notes, including ordinary course operating costs of the Issuer. Such payments may absorb all of the cash flow of the Issuer before any payments are made on the Notes.

**Regulation of the Issuer by any regulatory authority**

The Company is a securitisation company (*société de titrisation*) within the meaning of the Securitisation Law.

The Company is not required to be licensed, registered or authorised under any current securities, commodities or banking laws of its jurisdiction of incorporation and will operate without supervision by any authority in any jurisdiction. There is no assurance, however, that regulatory authorities in one or more jurisdictions would not take a contrary view regarding the applicability of any such laws to the Issuer. The taking of a contrary view by such regulatory authority could have an adverse impact on the Company, the Issuer or the holders of the Notes.

Any investment in the Notes does not have the status of a bank deposit and is not within the scope of any deposit protection scheme

**RISKS RELATING TO THE ISSUER'S INVESTMENT IN MOKREDIT PARTICIPATION CERTIFICATES**

**Generally**

The Issuer will invest directly in one moKredit Participation Certificate issued under one or more Participation Agreements, the first of which will be dated as of January 31, 2020 (the "**Participation Agreement**"), between the Issuer, as participant, and Cred, as Lender from time to time representing 100% of the indebtedness of moKredit to Cred in connection with certain advances under the Loan and Security Agreement, with an effective date of December 27, 2018, as amended (the "**Loan and Security Agreement**") between moKredit Inc., an exempted company incorporated in the Cayman Islands with limited liability ("**moKredit**"), and moKredit Technology (Hong Kong) Company Limited, a Hong Kong Company ("**HK Co.**"), as borrowers (collectively, "**Borrower**"), and Cred, as lender (the "**Lender**"). Each Participation Certificate shall correspond with advances made from time to time by Lender to Borrower, which will then be injected into moKredit (Shanghai) Information Technology Co., Ltd., a wholly owned subsidiary of HK Co. (the "**WOFE**") through HK Co., and be further transferred to the Chinese Affiliate to originate moKredit Receivables. The Loan and Security Agreement grants a security interest to the Lender in the assets of Borrower, which would include the shares of HK Co., and also grants a security interest to the Lender in the assets of HK Co., which would include the equity interest of the WOFE, although the security interests in such equity interest have not been registered at State Administration of Market Regulation ("**SAMR**"), thus not perfected, nor is it approved by the Chinese State Administration of Foreign Exchange ("**SAFE**") to ensure the enforceability of receiving value of the sale of those equity interests upon Borrower default. Further, as the moKredit Receivables are not pledged, so Cred cannot, upon default, recover from the moKredit Receivables. In addition, to effectuate the pledges of the moKredit Receivables and the equity interest in the Chinese Affiliate, if they are pledged, and the equity interests in the WFOE, any such pledges would have to be (i) registered at SAMR for equity interest and at People's Bank of China for receivables, and there is uncertainty as to whether such registration can be completed, and (ii) approved by SAFE to ensure enforceability in remitting the payments derived from the sale of the pledged assets and there is no guarantee that such approval can be received from SAFE.

**The Issuer's principal source of earnings will be the cash flows generated by the moKredit Participation Certificate**

All or substantially all of the Issuer's assets will be constituted by the cash flows (if any) generated by the moKredit Participation Certificate. Accordingly, the performance of the Issuer will be dependent upon receipt of monies generated by the moKredit Participation Certificate. moKredit has never defaulted in payment under its debt with Cred. However, a deterioration in the Chinese economy or in the global economy more generally, could have unpredictable results on the performance of the moKredit Participation Certificate.

**moKredit Participation Certificate risks**

A moKredit Participation Certificate is a United States-based debt obligations of moKredit. moKredit, through its Chinese Affiliate, originates consumer finance receivables in China. moKredit currently offers cash credit products which provide funds in digital form, and merchandise credit products. moKredit mainly generates financing income from cash credit products and both financing income and sales commission fees from merchandise credit products. It uses blockchain technology and proprietary AI risk management to make consumer finance available to hundreds of millions of unserved or underserved consumers in China. moKredit was established in 2012. moKredit's founder and management team represent a unique combination of technology and finance backgrounds, with significant professional work experience, proven execution capabilities and extensive knowledge of China's online consumer finance market. However, consumer credit is relatively new in China and therefore has a limited performance history.

**Risks Relating to Currency Conversion**

Any repatriation of funds back to moKredit from its subsidiary in China, either as a return of investment or the repayment of shareholder loans, must be converted from RMB into US Dollars, and there are uncertainties in making such conversions at any particular time such as the China forex change policies and the forex reserve of China, which vary from time to time.

**Risks Relating to moKredit's Corporate Structure**

Substantial uncertainties exist with respect to the interpretation and implementation of the newly enacted Foreign Investment Law of the People's Republic of China ("**PRC**") and how it may impact the viability of moKredit group's current corporate structure, corporate governance and business operations. It is uncertain whether any new PRC laws, regulations or rules relating to the variable interest entity ("**VIE**") structure, will be adopted or if adopted, what they would provide. If the ownership structure, contractual arrangements and business of moKredit group are found to be in violation of any existing or future PRC laws or regulations, or moKredit group fails to obtain or maintain any of the required permits or approvals, the relevant governmental authorities would have broad discretion in dealing with such violation, including levying fines, confiscating moKredit group's income, revoking moKredit group's business licenses or operating licenses, shutting down moKredit group's servers or blocking moKredit group's online marketplace, discontinuing or placing restrictions or onerous conditions on moKredit group's operations, requiring us to undergo a costly and disruptive restructuring, restricting or prohibiting moKredit group's use of proceeds from this offering to finance moKredit group's business and operations in China, and taking other regulatory or enforcement actions that could be harmful to moKredit group's business. Any of these actions could cause significant disruption to moKredit's business operations, which would in turn materially and adversely affect moKredit's business, financial condition and results of operations.

moKredit relies and expect to continue to rely on contractual arrangements with its consolidated VIE, Chinese Affiliate, to operate its online individual finance marketplace business. These contractual arrangements may not be as effective as direct ownership in providing moKredit group with control over its consolidated VIE. If moKredit had direct ownership of the VIE, it would be able to exercise its rights as a shareholder to effect changes in the board of directors of consolidated VIE, which in turn could implement changes, subject to any applicable fiduciary obligations, at the management and operational level. moKredit's consolidated VIE and its shareholders may not act in the best interests of the company or may not perform their obligations under their contracts. Such risks exist throughout the period in which moKredit intends to operate its business through contractual arrangements with the Chinese Affiliate. If any of Chinese Affiliate and its shareholders is uncooperative or any dispute relating to these contracts remains unresolved, moKredit will have to enforce its rights under such contracts through the operations of PRC laws and arbitration, litigation and other legal proceedings, the outcome of which will be subject to uncertainties. Therefore, the contractual arrangements with Chinese Affiliate may not be as effective in ensuring control over the relevant portion of its business operations as direct ownership would be, which may affect moKredit group's ability to obtain funds from the Chinese Affiliate to repay its debt with Cred.

**Chinese Regulatory Risk relating to moKredit group's Online Individual Financing**
Due to the relatively short history of the online individual finance industry in China, the regulatory framework governing moKredit group's industry is developing and evolving. In July 2015, the People's Bank of China, or the PBOC, together with nine other PRC regulatory agencies jointly issued a series of policy measures applicable to the online finance industry. These measures formally introduced for the first time the regulatory framework and basic principles governing the online finance industry, including the provision of online lending information services in China. Following the promulgation of these measures, a series of additional restrictions and affirmative obligations were imposed on online lending information intermediaries by a series of implementation rules. These laws, regulations, rules and governmental policies are expected to continue to evolve in online individual financing industry. The growth in popularity of online individual finance in China increases the likelihood for the government authorities to further regulate our industry. moKredit is unable to predict with certainty the impact, if any, that future legislation, judicial interpretations or regulations relating to the online individual finance industry, or the status and

scrutiny of implementation thereof will have on moKredit group's business, financial condition and results of operations. To the extent that moKredit group is not able to fully comply with any applicable laws or regulations, moKredit group's business, financial condition and results of operations may be materially and adversely affected.

**Risk relating to the failure in obtaining the Telecommunication License**

PRC regulations impose sanctions for engaging in Internet information services of a commercial nature without having obtained an Internet Content Provider license, or the ICP license, and sanctions for engaging in the operation of online data processing and transaction processing without having obtained an online data processing and transaction processing license, (such license together with ICP licenses are both sub-sets of licenses for value-added telecommunication service business).These sanctions include corrective orders and warnings from the PRC communication administration authority, fines and confiscation of illegal gains and, in the case of significant infringements, the websites and mobile apps may be ordered to cease operation.

Pursuant to the applicable PRC laws, depending on its business model, an online individual financing service provider may be required to apply for the appropriate telecommunication business license upon completion of filing with local financial regulatory authorities pursuant to relevant provisions issued by competent telecommunication regulatory authority. However, the PRC laws and regulations are currently silent as to precisely which telecommunication business license(s) needed to be obtained by an online individual financing service provider. If it is specially required by the applicable PRC laws and regulations in the future that moKredit group is required to obtain the telecommunication business license(s), moKredit cannot assure you that moKredit group would be able to obtain such licenses or other regulatory approvals in a timely manner, or at all, which would subject moKredit group to the sanctions described above or other sanctions as stipulated in the new regulatory rules.

**Changes in PRC regulations relating to interest rates for marketplace and micro-credit lending could have a material adverse effect on moKredit group's business.**

According to the relevant PRC laws and regulations, in the context of lending activities between individuals, entities or other organizations that are not licensed financial institutions, if the interest rate of a loan exceeds 36% per annum, the exceeding part of the interest rate is invalid and void; if the interest rate of a loan exceeds 24% per annum but is no more than 36% per annum, the exceeding part will be treated as natural obligation—valid but not enforceable in the PRC judicial system, while the enforceability of the 24% per annum part will not be affected. In addition, on August 4, 2017, the PRC Supreme People's Court promulgated the a circular which provides, among others, that (i) the claim of a borrower under a financial loan agreement to adjust or cut down the part of interest exceeding 24% per annum on the basis that the aggregate amount of interest, compound interest, default interest, liquidated damages and other fees collectively claimed by the lender is overly high shall be supported by the PRC courts; and (ii) in the context of online finance disputes, if the online lending information intermediary platforms and the lender circumvent the upper limit of the judicially protected interest rate by charging intermediary fee, it shall be ruled as invalid.

moKredit represents that its practices comply with these laws and regulations. However, there is no assurance that the PRC courts and relevant governmental authorities will hold the same view, and parts or all of the fees moKredit group collects may be ruled and recognized as invalid, which would affect moKredit group's results of operations and financial condition materially and adversely.

**Limited recourse obligations**

The Notes related to any Cred Compartment are direct, limited recourse obligations of the Company that may or may not be secured, payable solely out of the assets the Cred Compartment. Except any amounts received further to the issuance of Junior Notes, the Company will have no other assets or sources of revenue available for payment of any of its obligations under the Notes than the revenues derived from the relevant interests in moKredit Participation Certificates. The Noteholders will have no right to take title

to, or possession of, the moKredit Participation Certificate or any interest therein. No assurance can be made that the proceeds available for and allocated to the repayment of the Notes at any particular time will be sufficient to cover all amounts that would otherwise be due and payable in respect of these Notes.

If the Company is not able to satisfy its payment obligations under any Series of Notes, then the Company will not be liable for any shortfall arising and the Noteholders will have no further claims against the Company in respect of these Notes.

No other person other than the Issuer (i.e. the Company acting in relation with the relevant Cred Compartment) will be obliged to make payments on the Notes.

**Taxation and no gross-up**

Each Noteholder will assume and be solely responsible for any and all taxes of any jurisdiction or governmental or regulatory authority, including, without limitation, any state or local taxes or other like assessment or charges that may be applicable to any payment to it in respect of the Notes. In the event that any withholding tax or deduction for tax is imposed on payments of interest on the Notes, the Noteholders will not be entitled to receive grossed-up amounts to compensate for such withholding tax and no Issuer Event of Default shall occur as a result of any such withholding or deduction.

**Early redemption upon a tax event**

If the Issuer becomes subject to additional taxes in respect of payments under the Notes, the Issuer may redeem the Notes early, subject to Condition 7.2 below under "Terms and Conditions of the Notes".

**Modification and waivers**

The Terms and Conditions contain provisions for calling meetings of Noteholders to consider matters affecting their interests generally. These provisions permit defined majorities to bind all Noteholders, including Noteholders who did not attend and vote at the relevant meeting and Noteholders who voted in a manner contrary to the majority.   The Company may, without the consent of Noteholders, modify the Transaction Documents in accordance with Condition 15 (*Minor Modifications and Corrections*).

The Calculation Agent may, in certain circumstances and without the consent of Noteholders, agree to any modification of the Transaction Documents which is not prejudicial to the interests of the Noteholders, or which is of formal, minor or technical nature or is made to correct a manifest error or to comply with mandatory provisions of law.

**Change of law**

The Conditions of the Notes are governed by Luxembourg law in effect as at the date of issue of the relevant Notes. No assurance can be given as to the impact of any possible judicial decision or change to Luxembourg law or administrative practice after the date of issue of the relevant Notes.

**Non-registration under the U.S. Securities Act and Investment Company Act**

The Notes to be issued under the Programme will not be registered under the United States Securities Act of 1933, as amended (the "**Securities Act**"), or with any securities regulatory authority of any state or other jurisdiction of the United States. The Notes will be issued and sold in reliance upon exemptions from registration provided by such laws. Consequently, the transfer of the Notes will be subject to satisfaction of legal requirements applicable to transfers that do not require registration under the Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States.

The Issuer has not been registered as an investment company under the United States Investment Company Act of 1940 (the "**Investment Company Act**"). No opinion or no-action position has been

requested of the U.S. Securities and Exchange Commission (the "**SEC**") regarding whether the Issuer is required to be registered as an investment company. If the SEC or a court of competent jurisdiction were to find that the Issuer is required to register as an investment company, possible consequences include, but are not limited to, the SEC applying to enjoin the violation, and any contract to which the Issuer is a party made in violation or whose performance involves a violation of the Investment Company Act being unenforceable unless enforcing such contract would produce a more equitable result. Should the Issuer be subjected to any or all of the foregoing or to any (if any) other consequences, the Issuer would be materially and adversely affected.

## Capacity of the Arranger and Calculation Agent

The Calculation Agent and its affiliates may act in a number of capacities in respect of Notes issued under the Programme, including, without limitation, as arranger, calculation agent, administration servicer, compliance servicer, accounting servicer and IT servicer. The Arranger and Calculation Agent and their affiliates acting in such capacities in connection with the Notes shall have only the duties and responsibilities expressly agreed to by such entities in the relevant capacity and shall not, by virtue of acting in any other capacity, be deemed to have other duties or responsibilities or be deemed to hold a standard of care other than as expressly provided with respect to each such capacity.

## Legality of purchase

None of the Issuer, Arranger or any affiliate of such persons has or assumes responsibility for the lawfulness of the acquisition of the Notes by a prospective purchaser of the Notes (whether for its own account or for the account of any third party), whether under the laws of the jurisdiction of its incorporation or the jurisdiction in which it operates (if different), or for compliance by that prospective purchaser (or any such third party) with any law, regulation or regulatory policy applicable to it.

## The secondary market generally

Notes may have no effective trading market when issued and none may ever develop. If a market does develop, it may not be fully liquid. Any illiquidity may have a severely adverse effect on the market value of Notes. Therefore, investors may not be able to sell their Notes easily or at prices that will provide them with a yield comparable to similar investments that have a developed secondary market. This is particularly the case for Notes that are especially sensitive to interest rate, currency or market risks, are designed for specific investment objectives or strategies or have been structured to meet the investment requirements of limited categories of investors.

## Exchange rate risks and exchange controls

The Company will pay principal and interest on Notes issued under the Programme in the currency of such Notes. This presents certain risks relating to currency conversions if an investor's financial activities are denominated principally in a currency or currency unit (the "**Investor's Currency**") other than the specified currency. These include the risk that exchange rates may significantly change (including changes due to devaluation of the specified currency or revaluation of the Investor's Currency) and the risk that authorities with jurisdiction over the Investor's Currency may impose or modify exchange controls. An appreciation in the value of the Investor's Currency relative to the specified currency would decrease (1) the Investor's Currency equivalent yield on the Notes, (2) the Investor's Currency equivalent value of the principal payable on the Notes, and (3) the Investor's Currency equivalent market value of the Notes.

Government and monetary authorities may impose (as some have done in the past) exchange controls that could adversely affect an applicable exchange rate. As a result, investors may receive less interest or principal than expected and may receive no interest or principal.

**Interest rate risks**

Investment in Notes issued under the Programme may involve the risk that subsequent changes in market interest rates may adversely affect the value of the Notes.

## TERMS AND CONDITIONS OF THE NOTES

*The following is the text of the Terms and Conditions which, subject to completion and amendment and as supplemented, modified or varied in accordance with, or replaced by, the provisions of the relevant Final Terms in relation to a particular Series only, will be applicable to the Global Note(s) representing each Series and to the definitive Notes issued in exchange therefore. Subject to further simplification by deletion of non-applicable provisions, such terms and conditions will be endorsed on such definitive Notes. Details of and applicable definitions for each Series will be shown on the relevant Notes and in the relevant Final Terms.*

*These Terms and Conditions may be amended, modified, varied or replaced in relation to any Series of Notes by the terms of the relevant Final Terms in relation to such Series.*

## 1.    THE NOTES

### 1.1    General

Income Opportunities (Luxembourg) S.A., a public company with limited liability incorporated as a "*société anonyme*" under the laws of the Grand Duchy of Luxembourg, having its registered office at 19, rue de Bitbourg, L-1273 Luxembourg, Grand Duchy of Luxembourg, registered with the Luxembourg Trade and Companies Register under number B198.395 (the "**Company**") will, acting on behalf of any specific Cred Compartment (each, an "**Issuer**"), issue one series of notes (a "**Series**" or a "**Series of Notes**" and the notes issued under all such Series are referred to together as the "**Notes**") under this notes issuance programme (the "**Programme**"). The terms and conditions of the Notes are determined in these terms and conditions dated the same date as this Base Prospectus (the "**Terms and Conditions**"). as supplemented and modified by the relevant Final Terms.

As used herein, "**Tranche**" means Notes which are identical in all respects and "**Series**" means a Tranche of Notes together with any further Tranche or Tranches of Notes which are (i) expressed to be consolidated and form a single series, and (ii) identical in all respects except for their respective Issue Dates, Interest Commencement Dates and/or Issue Prices.

Notes of a same Series having different Interest Commencement Dates will be consolidated and form a single Series with the existing Notes of the same Series after the first Interest Payment Date of such Notes in accordance with the Final Terms.

The final terms for the Notes (or the relevant provisions thereof) (the "**Final Terms**") are set out in the Final Terms which supplement these Terms and Conditions and may specify other terms and conditions which shall, to the extent so specified or to the extent inconsistent with these Terms and Conditions, replace or modify these Terms and Conditions for the purposes of a Series of Notes. References herein to the "applicable Final Terms" are to the Final Terms of the relevant Tranche (or the relevant provisions thereof). The Final Terms will among others specify the currency and the denomination of the Notes.

A reference to the Issuer in any Transaction Document shall be construed as being a reference to the Company in respect of its relevant Cred Compartment and any commitment from an Issuer will be an exclusive commitment of the Company acting for the account of its relevant Cred Compartment only and any recourse in this respect shall be limited solely out of and to the extent of the assets of such Cred Compartment.

The Notes will be issued in registered, bearer or dematerialized form, at the discretion of the Issuer, unless a provision in the law or in any Transaction Document provides otherwise. The form of the Notes at the time of issuance will be specified in the Final Terms. The Company may at any time change the form of the Notes, including replacing registered notes into bearer notes (and vice versa). The Company may in particular operate such change of form for operational purposes, such as the compliance with anti-money laundering obligations or in order to facilitate their listing and admission to trading on the LuxSE.

Notes issued in registered or bearer form may be represented by global notes.

If Notes are issued in dematerialized form, they will be issued through an account held with a Luxembourg securities settlement system (SSS, such as LuxCSD) as defined by the Luxembourg law dated 10 November 2009 on payment services, as amended

When Notes are issued in Tranches, all the Notes of the same Tranche may be represented by one single Global Note resulting from the merger of the Global Notes representing the Notes of each Tranche and which will be deposited with a common depositary on behalf of Euroclear, and Clearstream, Luxembourg and/or any other clearing system.

## 1.2    Interpretation

Unless otherwise defined in these Terms and Conditions, capitalised terms used in these Terms and Conditions but not defined in the text shall bear the meaning ascribed thereto in the Annex to these Terms and Conditions which constitute an integral part of these Terms and Conditions.

Words and expressions used in the applicable Final Terms shall have the same meanings where used in these Terms and Conditions unless the context otherwise requires or unless otherwise stated and provided that, in the event of inconsistency, the applicable Final Terms will prevail.

## 1.3    Agreements

Unless otherwise specified in the applicable Final Terms, the Notes are subject to, and are issued with the benefit of, the following agreements and of any additional agreement mentioned in the applicable Final Terms and any additional agreements entered into by the Company in relation with one, several or all of its Compartments (together the "**Transaction Agreements**"):

(i)      A corporate services agreement (such agreement as amended and/or supplemented and/or restated from time to time, the "**Corporate Services Agreement**") dated 22 July 2015, made between the Company and Arendt Services S.A. as corporate services provider (the "**Corporate Services Provider**", which expression shall include any additional or successor corporate services provider).

(ii)     An administrative services agreement (such agreement as amended and/or supplemented and/or restated from time to time, the "**Administrative Services Agreement**") dated 16 January 2020, made between the Company acting in relation with Compartment Cred Global Notes 1 and Cred, as administrative services provider, arranger and calculation agent (the "**Administrative Services Provider**", which expression shall include any additional or successor administrative services provider).

(iii)    A management agreement (such agreement as amended and/or supplemented and/or restated from time to time, the "**Management Agreement**") dated 22 July 2015, made between the Company and the Corporate Services Provider.

At any time and in relation with any of the Compartments, the Company may enter into agreements for paying, listing and clearing and settlement services, which agreements will qualify as Transaction Documents.

Copies of the Transaction Documents are available for viewing at the registered office of the Company at 19, rue de Bitbourg, L-1273 Luxembourg, Grand Duchy of Luxembourg. The Noteholders are deemed to have notice of, and are entitled to the benefit of, all the provisions of the Transaction Agreements and the applicable Transaction Documents which are binding on them.

In case of inconsistency between these Terms and Conditions (as amended by the applicable Final Terms) and the Transaction Agreements, the provisions of these Terms and Conditions (as amended by the applicable Final Terms) prevail.

## 1.4    Form, Denomination and Title

Whether the Notes are issued in registered, bearer or dematerialised form will be determined in the Final Terms. The denomination of each Note will shall be determined in the Final Terms. Notes may be serially numbered.

The Company will maintain a register of holders of the Notes. Such register may be organised in the form of several sub-registers, each in relation with a specific Cred Compartment (the "**Register**").

For Notes being represented in the form of a Global Note, title to the Notes will pass upon registration of transfers in accordance with the provisions of the Paying Agency Agreement or any other relevant Transaction Document. The Issuer and the Paying Agent will (except as otherwise required by law) deem and treat the registered holder of any Note as the absolute owner thereof for all purposes.

Each Tranche of Notes may be represented by a Global Note without receipts, interest coupons or talons which is held through a Clearing System and will be delivered on or prior to the original issue date of the Tranche to a common depositary for Euroclear and Clearstream, Luxembourg.

The Global Notes representing different Tranches merged into a single Series will be merged into one single Global Note for that Series.

Payments of principal and interest (if any) on a Global Note will be made through Euroclear and/or Clearstream, Luxembourg against presentation or surrender (as the case may be) of the Global Note without any requirement for certification.

Unless otherwise specified in the applicable Final Terms, a Global Note will only be exchangeable for definitive Notes respectively (i) if either Euroclear or Clearstream, Luxembourg is closed for business for a continuous period of 14 days (other than by reason of holiday, statutory or otherwise) or announces an intention to permanently cease business or does in fact do so (other than in the case of a merger or consolidation of Euroclear and Clearstream, Luxembourg) and no alternative Clearing System is available or (ii) in the case of Notes represented by a Global Note which is not held through a Clearing System, if the Issuer so elects.

Notes in definitive form are issued with interest coupons ("**Coupons**") and, if indicated in the applicable Final Terms, talons for further Coupons ("**Talons**"). Definitive Notes repayable in instalments have receipts ("**Receipts**") for the payment of the instalments of principal (other than the final instalment) attached on issue.

Subject as set out below, title to the Notes, Receipts and Coupons will pass by delivery. The Company and the Paying Agent may, except as ordered by a court of competent jurisdiction or as required by law, deem and treat the bearer of any Note, Receipt or Coupon as the absolute owner thereof (whether or not overdue and notwithstanding any notice of ownership or writing thereon or notice of any previous loss or theft thereof) for all purposes but, in the case of any Global Note, without prejudice to the provisions set out in the next succeeding paragraph.

For so long as any of the Notes are represented by a Global Note held on behalf of Euroclear and/or Clearstream, Luxembourg, each person (other than Euroclear or Clearstream, Luxembourg) who is for the time being shown in the records of Euroclear or of Clearstream, Luxembourg as the holder of a particular nominal amount of such Notes (in which regard any certificate or other document issued by Euroclear or Clearstream, Luxembourg as to the nominal amount of such Notes standing to the account of any person shall be conclusive and binding for all purposes save in the case of manifest error) shall be

treated by the Issuer and the Paying Agent as the holder of such nominal amount of such Notes for all purposes other than with respect to the payment of principal or interest on the Notes, for which purpose the bearer of the relevant Global Note shall be treated by the Issuer and the Paying Agent as the holder of such Notes in accordance with and subject to the terms of the relevant Global Note (and the expressions "Noteholder" and "holder of Notes" and related expressions in connection with Notes held through a Clearing System shall be construed accordingly). Notes which are represented by a Global Note will be transferable only in accordance with the rules and procedures for the time being of Euroclear or of Clearstream, Luxembourg, as the case may be.

All transactions (including transfers of Notes) in the open market or otherwise must be effected through an account at Euroclear or Clearstream, Luxembourg subject to and in accordance with the rules and procedures for the time being of Euroclear or Clearstream, Luxembourg, as the case may be, and title will pass upon registration of the transfer in the books of Euroclear or Clearstream, Luxembourg, as the case may be.

Any reference herein to Euroclear and/or Clearstream, Luxembourg shall, whenever the context so permits, be deemed to include a reference to any additional or alternative clearing system specified in the applicable Final Terms.

Owners of interests in a Global Note will, subject to proof of ownership of such interest, be entitled to proceed directly against the Issuer either individually or, following the appointment of a Representative.

## 1.5     Use of Proceeds

The proceeds of the issuance of the Notes of each Series will, upon receipt, be credited to the Compartment General Account and shall be applied as follows:

(a)     **first**, towards payment of the Set Up Fees;

(b)     **second**, to purchase interests in moKredit Participation Certificates or to redeem the Notes at the option of the Noteholders as set out in Condition 7.4; and

(c)     **third**, after payment of (a) and (b), the surplus shall stand to the credit of the Compartment General Account.

## 1.6     Cancellation

All Notes redeemed shall be cancelled and may not be reissued or sold, unless otherwise specified in the relevant Final Terms.

## 1.7     Purchase

The Company may not purchase any of the Notes.

## 1.8     Rating

Series of Notes will not be rated unless otherwise specified in the relevant Final Terms.

## 1.9     Listing

An application may be made for listing and trading of the Notes on a stock exchange, in particular for listing on the Official List of the Luxembourg Stock Exchange and admission to trading on its Euro MTF market.

**1.10    Further Issues**

The Issuer shall be at liberty from time to time without the consent of the Noteholders to create and issue further Notes and notably Notes having the same Terms and Conditions as existing Notes or the same in all respects save for their respective Issue Dates, Interest Commencement Dates, Issue Prices and/or offering currency and so that the same shall be consolidated and form a single Series with the relevant existing Notes.

**2.    RIGHTS AND OBLIGATIONS UNDER THE NOTES**

**2.1    Status of the Notes**

The Notes issued in relation to a specific Cred Compartment will rank equally amongst themselves and will be senior to the Junior Notes issued in relation with same Cred Compartment.

**2.2    Obligations under the Notes**

The Notes are obligations solely of the relevant Issuer. The Notes do not represent an interest in, or constitute a liability or other obligation of any kind of the Company as such or any other compartment of the Company, the Paying Agent, the Account Bank, the Calculation Agent or any of their respective affiliates or any other third person or entity. The Notes are not, and will not be insured or guaranteed by the Paying Agent, the Account Bank, the Calculation Agent or any of their respective affiliates or any other third person or entity and none of the foregoing assumes or will assume any liability or obligation to the holders of the Notes if the Issuer fails to make any payment due in respect of the Notes.

**2.3    Limited Recourse**

The Notes are direct and limited recourse obligations of the Issuer.

The Notes may be secured or unsecured as specified in the applicable Final Terms.

The Issuer's ability to satisfy its payment obligations under a Series of Notes and its operating and administrative expenses will be wholly dependent upon receipt by it of revenues derived from its interests in the relevant moKredit Participation Certificates in accordance with the terms thereof.

Notwithstanding anything to the contrary in these Terms and Conditions, all amounts payable or expressed to be payable by the Issuer in respect of any Series of Notes shall be recoverable solely out of and to the extent of amounts received by the Issuer in respect of the moKredit Participation Certificates purchased or financed with the proceeds from the issuance of such Series of Notes and the relevant Noteholders will look solely to the assets of the Issuer in respect of such Series of Notes for the payment of all amounts payable or expressed to be payable to them by the Issuer in respect of such Series of Notes and such payments being made in accordance with these Terms and Conditions. To the extent that such assets are ultimately insufficient to satisfy the claims in full, then the Issuer shall not be liable for any shortfall arising and the parties hereto shall not have any further claims against the Issuer in respect of such Series of Notes. Such assets and proceeds shall be deemed to be "ultimately insufficient" as at such time when no further assets of the Issuer in respect of such Series of Notes are available and no further proceeds in respect of the moKredit Participation Certificates purchased with the proceeds from the issuance of such Series of Notes can be realised therefrom to satisfy any outstanding claims of any holder of Notes of the relevant Series and neither assets nor proceeds will reasonably likely to be so available thereafter.

**3.    UNDERLYING ASSETS**

The Issuer will apply the proceeds of the Notes in accordance with Condition 1.5 primarily to purchase moKredit Participation Certificates as further described under section Underlying Assets of the Base

Prospectus. The underlying assets acquired by the Issuer may only be sold or otherwise assigned if the following conditions are met: (i) the decision shall be taken by the board of directors which shall explicitly assess the terms and conditions of the sale or assignment, and (ii) when accepting the terms and conditions of the sale or assignment the board must explicitly consider the interests of the Noteholders.

### 3.1 Participation Certificates Sold by Cred

The Issuer expects to purchase participation certificates in debt obligations of moKredit Inc. These debt obligations will be sold to the Issuer by Cred.

### 4. GENERAL COVENANTS OF THE ISSUER

**4.1** The Company in its own respect and on its own behalf, and in respect and on behalf of the relevant Issuer, as the case may be, hereby covenants that, so long as any of the Notes remains outstanding, it will:

(a)     at all times keep such books of account as may be necessary to comply with all applicable laws and so as to enable the financial statements of the Issuer to be prepared and allow free access to the same at all reasonable times during normal business hours and to discuss the same with responsible officers of the Issuer;

(b)     give notice in writing to the Noteholders forthwith upon becoming aware of any Issuer Event of Default;

(c)     send to the Calculation Agent and to the Paying Agent as soon as practicable after their date of publication, a copy of the Company's balance sheet, profit and loss account and accompanying auditors' report and of every balance sheet, profit and loss account, report or other notice, statement or circular issued (or which under any legal or contractual obligation should be issued) to the members or holders of debentures or creditors (or any class of them) of the Issuer in their capacity as such at the time of the actual (or legally or contractually required) issue or publication thereof and procure that the same are made available for inspection by Noteholders at the office of the Paying Agent as soon as practicable thereafter;

(d)     at all times use its best endeavours to maintain its residence for tax purposes in Luxembourg;

(e)     at all times comply with and perform all its obligations under the Transaction Documents including all of its obligations under, and in respect of, the Notes and use all reasonable endeavours to procure that the other parties hereto comply with and perform all their respective obligations thereunder;

(f)     at all times ensure that the Company shall have no fewer than three (3) directors;

(g)     ensure that a meeting of its directors is held at least once a year and each meeting of its directors is held only in Luxembourg and is duly minuted and that the directors will make all decisions for the Company in Luxembourg;

(h)     ensure that the directors shall not delegate any of their powers and that no decisions are taken for or on behalf of the Issuer other than decisions of the directors taken only in Luxembourg and in each case except as contemplated by the Transaction Documents will have a substantive decision making role in respect of the Issuer;

(i)     promptly give notice to the Noteholders if it is required by law to withhold or account for tax in respect of any payment due in respect of the Notes or if it becomes liable to material tax in respect of its income; and

(j)     at all times maintain an Account Bank.

**4.2**     Without prejudice to any securitisation activities that the Company might undertake using Other Compartments, the Company agrees that, without the prior consent of the Noteholders given in accordance with Condition 15, it will not:

(a)      engage in any activity which is not reasonably incidental to any of the activities which these Terms and Conditions provide or envisage, unless the foregoing are done as Compartmental Liabilities in respect of the Other Compartments only;

(b)      whilst any obligations under the Notes remain outstanding, declare or pay any dividend or make any other distribution to its shareholders except in accordance with the provisions of these Terms and Conditions;

(c)      have any employees, subsidiaries or premises or purchase, own, lease or otherwise acquire any real property (other than premises at its registered office in Luxembourg);

(d)      incur or permit to subsist any indebtedness in respect of borrowed money whatsoever or give any indemnity or assume any liability whatsoever, except as permitted pursuant to these Terms and Conditions, unless the foregoing are done as Compartmental Liabilities in respect of the Other Compartments only and except any indebtedness in respect of any bridge facility provided by Cred or its affiliates to the Company for working capital purposes in accordance with the Terms and Conditions;

(e)      dispose of any of its assets, except as permitted pursuant to these Terms and Conditions, unless the foregoing is done as Compartmental Liabilities in respect of the Other Compartments only;

(f)      create or permit to subsist any mortgage, pledge, lien (unless arising by operation of law) or charge upon, or sell, transfer, assign, exchange or otherwise dispose of, the whole or any part of, its assets, present or future (including any uncalled capital) or its undertaking other than pursuant to these Terms and Conditions, unless the foregoing are done as Compartmental Liabilities in respect of the Other Compartments only;

(g)      consolidate or merge with any person other than Cred or convey or transfer its properties or assets substantially as an entirety to any person;

(h)      permit the validity or effectiveness of these Terms and Conditions to be impaired or permit these Terms and Conditions to be amended, hypothecated, subordinated, terminated or discharged, or permit any person to be released from any covenants or obligations with respect to these Terms and Conditions or the Transaction Documents, except as may be expressly permitted hereby or by the Transaction Documents;

(i)      issue any further shares or alter any rights to the shares in existence on the date hereof;

(j)      open or have an interest in any account whatsoever with any bank or other financial institution, save where obliged to do so under these Terms and Conditions or the Transaction Documents, unless the foregoing are done as Compartmental Liabilities in respect of the Other Compartments only;

(k)      purchase, subscribe for or otherwise acquire any shares (or other securities or any interest therein) in, or incorporate, any other company or agree to do any of the foregoing other than in accordance with these Terms and Conditions unless the foregoing are done as Compartmental Liabilities in respect of the Other Compartments only except any shares (or other securities or any interest) which form part of the moKredit Participation Certificates;

(l)      amend or alter the Articles of Association of the Company, unless such amendment is not prejudicial to the interests of the Noteholders; or

(m)     consent to any variation of, or exercise any powers of consent or waiver pursuant to, the Transaction Documents other than in accordance with these Terms and Conditions.

## 5.      PAYMENTS

### 5.1     General

Payments in respect of Notes shall, upon instructions from the Calculation Agent, be made by the Paying Agent (on behalf of the Issuer) in accordance with the Paying Agency Agreement or by the Issuer itself (in case no paying agent is appointed in relation with the relevant Notes)  on each Interest Payment Date by wire transfer of same day funds to the Noteholders to the account specified by the Noteholders, in accordance with the respective rules and procedures of Euroclear and Clearstream, Luxembourg.

The Issuer or, as applicable, the Paying Agent shall make the payments provided for in Conditions 5 and 6 in accordance with the calculations made by the Calculation Agent on which the Paying Agent may, except in case of manifest error, conclusively rely.

All payments to Noteholders shall be subject to the condition that if a payment is made to a creditor in breach of these Terms and Conditions or the relevant Final Terms, such creditor shall repay the amount so received to the Account Bank and the Account Bank shall credit such amount to the relevant bank account of the Issuer. The Paying Agent shall then pay out the moneys so received in the way they were payable in accordance with these Terms and Conditions or the relevant Final Terms on the relevant Interest Payment Date. If such repayment is not enforceable, the Paying Agent is authorised and obliged to make payments in such a way that any over-payments or under-payments made in breach of these Terms and Conditions or the relevant Final Terms are set-off by correspondingly decreased or increased payments on such Interest Payment Date (and, to the extent necessary, on all subsequent Interest Payment Dates).

Notes may provide for interest payable monthly, quarterly or at maturity. In all cases, principal and accrued and unpaid interest will be due in full on the "Maturity Date" specified in the Final Terms.

If the Issuer receives Redemption Notices with respect to the Notes maturing on the same Maturity Date (the "**Maturing Notes**") with aggregate principal balances exceeding 20% of the outstanding principal balances of all Notes within any single Compartment on such Maturity Date (the "**Gate**"), the Issuer may, in its sole discretion: (i) repay the Maturing Notes in full, or (ii) reduce the total repayment amount to the amount of the Gate and repay the Maturing Notes pro rata based on the percentage of the principal balance of each Maturing Note to the total principal balances of all Notes outstanding on such Maturity Date. The remaining balance of any Maturing Notes shall be repaid no later than the next Interest Payment Date (and, if necessary, as of successive Interest Payment Dates), subject to any Gate applicable on each such subsequent Interest Payment Date, on a first-in-first-out basis (determined based on Redemption Notices for each scheduled Maturity Date).

The Issuer may establish reserves and holdbacks for estimated expenses, liabilities and contingencies (even if such reserves or holdbacks are not otherwise required by generally accepted accounting principles) which could reduce the amount of a repayment.

The principal financial center for payment in U.S. Dollar shall be New York City.

### 5.2     Presentation of Notes, Receipts and Coupons

Payments of principal in respect of definitive Notes will (subject as provided below) be made in the manner provided in Condition 5.1 above only against surrender of definitive Notes, and payments of interest in respect of definitive Notes will (subject as provided below) be made as aforesaid only against surrender of Coupons, in each case at the specified office of the Paying Agent.

Payments of instalments of principal in respect of definitive Notes (if any), other than the final instalment, will (subject as provided below) be made in the manner provided in paragraph 5.1 above only against surrender of the relevant Receipt. Payment of the final instalment will be made in the manner provided in Condition 5.1 above only against surrender of the relevant definitive Note. Each Receipt must be presented for payment of the relevant instalment together with the definitive Note to which it appertains. Receipts presented without the definitive Note to which they appertain do not constitute valid obligations of the Issuer. Upon the date on which any definitive Note becomes due and repayable, unmatured Receipts (if any) relating thereto (whether or not attached) shall become void and no payment shall be made in respect thereof.

Notes in definitive form should be presented for payment together with all unmatured Coupons appertaining thereto (which expression shall for this purpose include Coupons failing to be issued on exchange of matured Talons), failing which the amount of any missing unmatured Coupon (or, in the case of payment not being made in full, the same proportion of the amount of such missing unmatured Coupon as the sum so paid bears to the sum due) will be deducted from the sum due for payment. Each amount of principal so deducted will be paid in the manner mentioned above against surrender of the relative missing Coupon at any time before the expiry of five years from the date on which such Coupon would otherwise have become due, but in no event thereafter.

Upon any Note in definitive form becoming due and repayable prior to its Maturity Date, all unmatured Talons (if any) appertaining thereto will become void and no further Coupons will be issued in respect thereof.

If the due date for redemption of any definitive Note is not an Interest Payment Date, interest (if any) accrued in respect of such Note from (and including) the preceding Interest Payment Date or, as the case may be, the Interest Commencement Date to (but excluding) the due date for redemption shall be payable only against surrender of the relevant definitive Note.

Payments of principal and interest in respect of Notes represented by any Global Note will (subject as provided below) be made in the manner specified above in relation to definitive Notes and otherwise in the manner specified in the relevant Global Note (against presentation or surrender (as the case may be) of such Global Note at the specified office of the Paying Agent). On the occasion of each payment, a record of such payment made on such Global Note, distinguishing between any payment of principal and any payment of interest will be made on such Global Note by the Paying Agent, and such record shall be prima facie evidence that the payment in question has been made.

The holder of a Global Note shall be the only person entitled to receive payments in respect of Notes represented by such Global Note and the Issuer will be discharged by payment to, or to the order of, the holder of such Global Note in respect of each amount so paid. Each of the persons shown in the records of Euroclear or Clearstream, Luxembourg as the beneficial holder of a particular nominal amount of Notes represented by such Global Note must look solely to Euroclear or Clearstream, Luxembourg, as the case may be, for his share of each payment so made by the Issuer to, or to the order of, the holder of such Global Note.

Payment of principal and interest in respect of Notes in registered form will be made by the Issuer or, if applicable, by the Paying Agent, to each Noteholder's bank account as shown in the Register held up to date at the registered office of the Issuer.

## 5.3    Compartment General Account

Issuance proceeds pursuant to the issuance of a Series of Notes shall be credited to the Compartment General Account and be used in accordance with Condition 1.5.

Amounts standing to the credit of the Compartment General Account shall be applied by the Account Bank (on behalf of the Issuer) to pay due and payable Ongoing Issuer Expenses, any time and as calculated by the Calculation Agent.

## 5.4    Priorities of Payments

Unless otherwise specified in the Final Terms, the amounts standing to the credit of the Compartment General Account on each Interest Payment Date shall be applied in respect of each Series by the Account Bank (on behalf of the Company) in making the following payments or provisions for the relevant Series, if due and payable, in the following order of priority but, in each case, only to the extent that there are funds available for the purpose and all payments or provisions of a higher priority that fall due to be paid or provided for on such day have been made in full:

(a)     *first*, in or towards payment on a pro rata basis of all amounts then due and payable by the Issuer in respect of any short-term bridge financing facility provided by Cred or its affiliates to the Issuer in accordance with the Terms and Conditions;

(b)     *second*, in or towards payment of the Ongoing Issuer Expenses;

(c)     *third*, in or towards payment of the Ongoing Series Expenses allocable to the Compartment;

(d)     *fourth*, in or towards payment on a pro rata basis of all amounts then due and payable by the Issuer in respect of interest accrued on the Notes up to the last Interest Period End Date;

(e)     *fifth*, in or towards payment on a pro rata basis of all amounts then due and payable by the Issuer in respect of principal on the Notes;

(f)     *sixth*, in or towards payment on a pro rata basis of all amounts then due and payable by the Issuer in respect of the Junior Notes issued in relation with the relevant Compartment;

(g)     *seventh*, all remaining amounts shall stand to the credit of the Compartment General Account.

Each payment to be made in accordance with the above in respect of a Note will be made to the person shown as the Noteholder in the Register on the Record Date.

Payments of an Ongoing Issuer Expenses may be made via a payment to a third party or via a money transfer, to a Company General Account or to another bank account of the Issuer, as the board of the Company, or the Calculation Agent on its behalf, shall decide.

The Issuer may deduct reserves and holdbacks for estimated expenses, liabilities and contingencies (even if such reserves or holdbacks are not otherwise required by generally accepted accounting principles).

In case of absence of an Account Bank, the payments under this section shall be made upon instruction of the Issuer addressed to the entity holding sums in deposit (or otherwise) for the account of the Issuer.

## 6.    INTEREST

## 6.1    Accrual and Payment of Interest

The Notes shall bear a fixed interest which will accrue on the Outstanding Principal Amount of the Notes at the Interest Rate ("**Interest**") from and including the Interest Commencement Date to and excluding the Interest Period End Date immediately preceding the day on which the Outstanding Principal Amount has been repaid in full, without prejudice however to the provisions of Condition 2.3.

Interest on the Notes as calculated by the Calculation Agent for each Interest Period shall be payable on tenth (10th) Business Days (on behalf of the Issuer) following the Interest Period End Date ("**Interest Payment Date**").

**6.2     Interest on Late Payments**

Any amount of principal or interest not paid by the Issuer on an Interest Payment Date, as the case may be, shall not bear interest.

**7.     REDEMPTION AND PURCHASE**

**7.1     At Maturity**

Unless previously redeemed or purchased and cancelled as specified below, each Note will be redeemed by the Issuer at its Outstanding Principal Amount specified in US dollars on its Maturity Date.

**7.2     Redemption for Tax Reasons**

If:

(a)     on the occasion of the next payment due under the Notes, the Issuer has or will become obliged to pay additional amounts as provided or referred to in Condition 6 as a result of any change in, or amendment to, the laws or regulations of Luxembourg or any political subdivision or any authority thereof or therein having power to tax, or any change in the application or official interpretation of such laws or regulations (including, for the avoidance of doubt, any change resulting from the EC Council Directive 2003/48/EC on the taxation of savings income), which change or amendment becomes effective on or after the Issue Date of the first Tranche of a Series of Notes; and

(b)     such obligation cannot be avoided by the Issuer taking reasonable measures available to it, the Issuer may, in accordance with the decision taken by the Noteholders Representative in this respect, either (i) redeem the relevant Series of Notes in whole, but not in part, (at any time), or (ii) deduct such taxes from the amounts payable to the Noteholders under the Notes (for the avoidance of doubt, any such deduction shall not be an Issuer Event of Default), in both cases on giving not less than 30 nor more than 60 days' notice to the Paying Agent, provided that no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Issuer would be obliged to pay such additional amounts were a payment in respect of the Notes then due.

Prior to the publication of any notice pursuant to this Condition, the Issuer shall deliver to the Paying Agent a certificate duly signed on behalf of the Issuer stating that the Issuer is entitled to effect such redemption or deduction and setting forth a statement of facts showing that the conditions precedent to the right of the Issuer so to redeem or deduct have occurred, and an opinion of independent legal advisers of recognised standing to the effect that the Issuer has or will become obliged to pay such additional amounts as a result of such change or amendment.

Notes redeemed pursuant to this Condition 7.2 will be redeemed at their Early Redemption Amount referred to in paragraph 7.4 below together (if appropriate) with interest accrued (but unpaid) to (but excluding) the date of redemption.

**7.3     Redemption at the Option of the Issuer ("Issuer Call")**

If Issuer Call is specified in the applicable Final Terms, the Issuer may, having given:

(a)     not less than 15 nor more than 30 days' notice to the Noteholders in accordance with Condition 14; and

(b)     notice to the Paying Agent, if applicable,

(which notices shall be irrevocable), redeem all or, unless otherwise specified in the applicable Final Terms, some only of the Notes of a Series then outstanding on any Interest Payment Date and at the Outstanding Principal Amount with interest accrued (but unpaid), to (but excluding) the relevant Interest Period End Date immediately preceding such Interest Payment Date, plus the applicable Prepayment Penalty. In the case of a partial redemption of Notes, the Notes to be redeemed ("**Redeemed Notes**") will be selected individually in the case of Redeemed Notes represented by definitive Notes and in accordance with the rules of Euroclear and/or Clearstream, Luxembourg in the case of Redeemed Notes represented by a Global Note, no more than 30 days prior to the date fixed for redemption (such date of selection being hereinafter called the "**Selection Date**"). In the case of Redeemed Notes represented by definitive Notes, a list of the serial numbers of such Redeemed Notes will be published in accordance with Condition 14 not less than 15 days prior to the date fixed for redemption. No exchange of the relevant Global Note will be permitted during the period from and including the Selection Date to and including the date fixed for redemption pursuant to this Condition 7.3 and notice to that effect shall be given by the Issuer to the Noteholders in accordance with Condition 14 at least five days prior to the Selection Date.

The Issuer may cause any Notes to be redeemed pursuant to the provisions of Condition 9.

**7.4    Early Redemption Amount**

For the purpose of Condition 7.2 above, the Notes will be redeemed at the early redemption amount specified in or determined in the manner specified in the applicable Final Terms or, if no such amount or manner is so specified in the Final Terms, at their Outstanding Principal Amount (the "**Early Redemption Amount**").

**7.5    Cancellation**

All Notes which are redeemed will forthwith be cancelled (together with all unmatured Receipts and Coupons attached thereto or surrendered therewith at the time of redemption). All Notes so cancelled (together with all unmatured Receipts and Coupons cancelled therewith) shall be forwarded to the Paying Agent and cannot be reissued or resold.

**8.    BRIDGE FACILITY**

Cred may provide a short term bridge financing facility to the Issuer for working capital purposes with approval from the Company's board of directors, draws under which shall be repayable within six months of each draw and which shall bear interest at an initial annual market-based rate as determined by the Company and Cred.  The seniority of any receivable thereunder is determined under Condition 5.4 (*Priorities of Payments*).

**9.    TAXATION**

Payments in respect of the Notes shall only be made after the deduction and withholding of current or future taxes, levies or governmental charges, regardless of their nature, which are imposed, levied or collected (collectively, "**taxes**") under any applicable system of law or in any country which claims fiscal jurisdiction by, or for the account of, any political sub-division thereof or government agency therein authorised to levy taxes, to the extent that such deduction or withholding is required by law. The Issuer or, if applicable, the Paying Agent shall account for the deducted or withheld taxes with the competent government agencies and shall, upon request of a Noteholder, provide evidence thereof.

The Issuer shall have the right to (a) require any Noteholder or beneficial owner of the Notes to promptly furnish such personal data as may be required by the Issuer in its discretion in order to comply with any tax or other law and/or to promptly determine the amount of any withholding to be retained, (b) divulge any such personal information to any tax or regulatory authority, as may be required by law or such authority, (c) withhold any taxes or similar charges that the Issuer is legally required to withhold, whether by law or otherwise, in respect of any Note issued by the Issuer, including any taxes that are attributable

to a Noteholders' failure to provide required information pursuant to any tax reporting law, (d) withhold the payment of any interest or redemption proceeds to a Noteholder until the Issuer holds sufficient information to enable it to determine the correct amount to be withheld, and (e) cause any Notes to be redeemed if the ownership of the Noteholder of such Notes is causing the Issuer to bear any taxes that the Issuer is not bearing with respect to Noteholders generally.

## 10.    ISSUER EVENT OF DEFAULT

Upon the occurrence of an Issuer Event of Default which is continuing, the Masse Meeting may declare the outstanding Notes issued by that Issuer immediately due and payable.

## 11.    SERIES EVENT OF DEFAULT

Upon the occurrence of a Series Event of Default which is continuing, the relevant Series Masse Meeting may declare the outstanding Notes issued by the relevant Issuer immediately due and payable.

## 12.    ENFORCEMENT OF SECURITY

If any security is granted in favour of the Noteholders in accordance with the applicable Final Terms, the beneficiary of such security shall enforce such security in accordance with the terms of the applicable security agreement.

## 13.    NOTICES

All notices regarding the Notes shall be communicated to the Noteholders either (i) by way of publication on the website of the Calculation Agent or in a daily newspaper of general circulation in Luxembourg, to the extent required by Luxembourg law (which is expected that such publication will be made in the *Luxemburger Wort*) or, to the extent and in the same manner permitted by such rules, posted on the official website of the Luxembourg Stock Exchange (www.bourse.lu) or (ii) by way of postal letter or email sent at the postal or email address of each relevant Noteholder as such email or postal address is registered in the Register.

Any such notice will be deemed to have been given on the date of the first publication or, where required to be published in more than one newspaper on the date of the first publication in each such newspaper or, where published in such newspapers on different dates, on the last date of such first publication.  In case of communication via email, such notice will be deemed to have been given on the date following the date of sending the email. In case of communication via postal mail, such notice will be deemed to have been given seven Business Days after the postal mail has been sent.

So long as the Notes are in global form and held through a Clearing System, it can be substituted for such publication in such newspaper(s) the delivery of the relevant notice to Euroclear and/or Clearstream, Luxembourg for communication by them to the holders of the Notes. Any such notice shall be deemed to have been given to the holders of the Notes on the seventh day after the day on which the said notice was given to Euroclear and/or Clearstream, Luxembourg.

As long as there is a Paying Agent in relation to the relevant Notes, notices to be given by any holder of the Notes shall be in writing and given by lodging the same, together with the relative Note or Notes, with the Paying Agent. Whilst any of the Notes is represented by a Global Note, such notice may be given by any holder of a Note to the Paying Agent via Euroclear and/or Clearstream, Luxembourg, as the case may be, in such manner as the Paying Agent and Euroclear and/or Clearstream, Luxembourg, as the case may be, may approve for this purpose.  If there is no Paying Agent in relation with the relevant Notes, notices to be given by any holder of the Notes shall be in writing and sent to the registered address of the Issuer to the attention of the board of directors of the Company by registered mail or courier service and it shall be deemed received on the date of delivery at the registered address of the Company.

14.    **MEETINGS OF NOTEHOLDERS, MODIFICATION AND WAIVER**

Noteholders of a specific Cred Compartment will belong to a masse (the "**Masse**") created, among other things, for the representation of their common interests pursuant to the provisions of the amended Luxembourg law of 10 August 1915 on commercial companies. Articles 470-3 through 470-19 of the amended Luxembourg law of 10 August 1915 on commercial companies shall apply, except for the second paragraph of Article 470-13 and except as otherwise set out herein.

A general meeting of the Noteholders of an Issuer (the "**Masse Meeting**") or a court order may appoint and determine the powers of one or more representatives the "**Representatives**").

Where Representatives have been appointed, Noteholders may no longer individually exercise their rights against the Issuer. A Masse Meeting may be called at any time by the Representatives, the Calculation Agent, the board of directors of the Issuer or the Auditors. The Representatives, provided an advance on expenses has been paid to them by the Issuer, or the board of directors or the Auditors, must convene the Masse Meeting if called upon to do so by holders of Notes representing 50 percent of the principal value of Notes issued by such Issuer and outstanding. Meetings of Noteholders will be convened by notification through Euroclear and/or Clearstream, Luxembourg. All Masse Meetings shall be held at the place specified in the notice calling the meeting. All Noteholders have the right to attend and vote at the Masse Meeting either personally or by proxy. Any Noteholder who participates in a Masse Meeting by conference-call, video-conference or by any other means of communication which allow such Noteholder's identification and which allow that all the persons taking part in the meeting hear one another on a continuous basis and may effectively participate in the meeting, is deemed to be present for the computation of quorum and majority.

The voting rights attached to the Notes are equal to the proportion of the principal amount of the Notes represented by the principal amount of the Note or Notes held by the relevant Noteholders. Each Note gives the right to at least one vote. A Masse Meeting may be called to approve certain changes in the rights of the relevant Noteholders and may, generally, determine any measures designed to ensure the defence of interests or the exercise of the rights of the relevant Noteholders in accordance with the provisions of the Luxembourg Company Law. A Masse Meeting must be called when it is proposed that the corporate object or the legal form of the Issuer is amended. A Masse Meeting may deliberate validly without a quorum and by vote of a simple majority of Noteholders attending or represented at such Masse Meeting on the appointment and revocation of the Representatives, the revocation of special representatives appointed by the Issuer and the approval of any measures of a conservatory nature in the general interests of the Noteholders. On all other matters (except in respect of certain matters, including a change in the nationality of the Issuer, where unanimous consent is required) the Masse Meeting may deliberate validly on first convocation only if Noteholders present or represented hold at least 50 percent. of the Notes then outstanding. If this condition is not fulfilled, a new meeting shall be convened. On second convocation no quorum is required. Decisions at such meetings shall be taken by a majority of two thirds of the votes cast by Noteholders attending such meetings or represented thereat. Where a resolution may change the respective rights of Noteholders holding Notes of different Series it must, in order to be valid, fulfil, as regards each Series of Notes, the conditions as to attendance and majority above described.

**Minor Modifications and Corrections**

The Calculation Agent and the Issuer may agree, without the consent of the Noteholders, Receiptholders or Couponholders to:

(i)     any modification (except as mentioned above) of the Transaction Documents which is not prejudicial to the interests of the Noteholders; or

(ii)    any modification of the Notes, Receipts or Coupons or the Transaction Documents which is of a formal, minor or technical nature or is made to correct a manifest error or to comply with mandatory provisions of law.

Any such modification, waiver or authorisation shall be binding on the Noteholders, Receiptholders or Couponholders and shall be notified to the Noteholders as soon as practicable thereafter.

## 15.    AGENTS

In acting in connection with the Notes, the Agents act solely as agent of the Issuer and does not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders.

## 16.    SUBSTITUTION

### 16.1    General

The Noteholders may agree to the substitution, in place of the Issuer (or of any previous substitute hereunder), of another entity (the "**New Issuer**") as debtor in respect of all obligations arising under or in connection with the Notes and the Transaction Documents, **provided that**:

(a)    the New Issuer assumes all rights and duties of the Issuer in respect of the Notes and under the Transaction Documents;

(b)    the New Issuer has obtained all necessary authorisations and governmental approvals in the country in which it has its registered office and is in a position to fulfil all its obligations in respect of the Notes without discrimination against the Noteholders in their entirety;

(c)    the New Issuer may pay in the currency required hereunder and without being obliged to deduct or withhold any taxes or other duties of whatever nature levied by the country in which the New Issuer has its domicile or tax residence from any payments due under the Notes and the substitution shall not result in any withholding or deduction of taxes on the amounts payable under the Notes which would not arise if there was no such substitution;

(d)    there shall have been delivered to the Paying Agent, if any in relation with the relevant Issuer, one legal opinion for each jurisdiction affected by the substitution of a law firm of recognised standing to the effect that paragraphs (a) to (c) above have been satisfied and no additional expenses or legal disadvantages of any kind arise for the Noteholders from the substitution; and

(e)    the Issuer and the New Issuer enter into such agreements and execute such documents as considered necessary based on the legal opinion referred to in 17.1(d) for the effectiveness of the substitution.

Upon fulfilment of the above conditions, the New Issuer shall in every respect substitute the Issuer and the Issuer shall be released from all its obligations to the Noteholders as issuer of the Notes except for the obligations assumed with respect to the substitution.

**Notice of Substitution**

The New Issuer shall give notice of the substitution to the Noteholders pursuant to Condition 14.

### 16.2    Effects of Substitution

Upon the substitution, each reference to the Issuer in the Terms and Conditions shall from then on be deemed to be a reference to the New Issuer and any reference to the country in which the Issuer has its registered office, domicile or residency for tax purposes, as relevant, shall from then on be deemed to be a reference to the country in which the New Issuer has its registered office, domicile or residency for tax purposes, as relevant.

## 17.    MISCELLANEOUS

### 17.1    Place of Performance

Place of performance of the Notes shall be Luxembourg, Grand Duchy of Luxembourg.

### 17.2    Partial Invalidity

Without prejudice to any other provision hereof, if one or more provisions hereof is or becomes invalid, illegal or unenforceable in any respect in any jurisdiction or with respect to any person or entity, or if the Issuer becomes aware of any omission hereto of any terms which were intended to be included herein, such invalidity, illegality, unenforceability in such jurisdiction or with respect to such person or entity or such omission shall not, to the fullest extent permitted by applicable law, render invalid, illegal or unenforceable such provision or provisions in any other jurisdiction or with respect to any other person or entity hereto. Such invalid, illegal or unenforceable provision or such omission shall be replaced by the Issuer, without the consent of Noteholders of any Class, with a provision which comes as close as reasonably possible to the commercial intentions of the invalid, illegal, unenforceable or omitted provision.

### 17.3    Non Petition

Without prejudice to the other provisions of these Conditions, each of the Noteholders acknowledges and agrees that until the expiry of two (2) years and one (1) day after the last outstanding Note will have been redeemed, none of the Noteholders nor any party on its behalf shall initiate or join any person in initiating any Insolvency Proceedings in relation to the Company provided that this Condition shall not prevent any Noteholder from taking any steps against the Issuer which do not amount to the initiation or the threat of initiation of any Insolvency Proceedings in relation to the Issuer or the Company or the initiation or threat of initiation of legal proceedings.

### 17.4    Prescription

Any claims against the Issuer under the Notes, whether in respect of principal, interest or otherwise shall become barred by limitation (prescrits) on the tenth anniversary of the Maturity Date.

## 18.    APPLICABLE LAW AND PLACE OF JURISDICTION

### 18.1    Governing Law

The form and content of the Notes and all of the rights and obligations of the Noteholders and the Issuer under the Notes, as well as all other matters arising from or connected with the Notes shall be governed in all respects by and shall be construed in accordance with the laws of Luxembourg. The Issuer is governed by the Securitisation Law. Articles 86 through 97 of the amended Luxembourg law of 10 August 1915 on commercial companies shall apply, except for the second paragraph of Article 94-2 and except as otherwise set out herein, notably under Condition 15.

### 18.2    Jurisdiction

The exclusive place of jurisdiction for any action or other legal proceedings arising out of or in connection with the Notes shall be the courts of Luxembourg, Grand Duchy of Luxembourg. The Issuer and the Noteholders hereby submit to the jurisdiction of such court.

## ANNEX TO THE TERMS AND CONDITIONS OF THE NOTES

### Definitions

When used in the Terms and Conditions of the Notes:

"**Account Bank**" means the bank where the relevant Issuer holds one or several bank accounts.

"**Administrative Services Agreement**" has the meaning ascribed to such term in Condition 1.3.

"**Agents**" means, as applicable, the Calculation Agent, the Paying Agent, the Listing Agent or the Settlement Agent.

"**Articles of Association**" means the articles of association of the Company.

"**Arranger**" means Cred LLC.

"**Auditors**" means the independent auditors appointed from time to time by the board of directors of the Company in accordance with the requirements of the Luxembourg Securitisation Law.

"**Business Day**" means any day on which banks are open for general business in the United States and Luxembourg.

"**Calculation Agent**" means Cred LLC.

"**Clearing System**" means one or more of Clearstream Banking S.A. or Euroclear Bank S.A./N.V., or any other clearing system as set out in the applicable Final Terms.

"**Company**" means Income Opportunities, S.A., a public company with limited liability incorporated as a "société anonyme" under the laws of the Grand Duchy of Luxembourg, having its registered office at 19, rue de Bitbourg, L-1273 Luxembourg, Grand Duchy of Luxembourg, registered with the Luxembourg Trade and Companies Register under number B198.395.

"**Compartment**" means a compartment of the Company as this concept is used in the Securitisation Law.

"**Compartment General Account**" means the bank account opened in respect of each Compartment by the relevant Issuer in the books of the Account Bank.

"**Compartmental Liabilities**" means any liabilities of any Other Compartments.

"**Conditions**" means the Terms and Conditions of the Notes and a numbered "**Condition**" shall be construed accordingly.

"**Corporate Services Provider**" means Arendt Services S.A..

"**Corporate Services Agreement**" has the meaning ascribed to such term in Condition 1.3.

"**Coupon**" has the meaning ascribed to such term in Condition 1.4.

"**Cred Compartment**" means a compartment of the Issuer the name of which starts with "Cred".

"**CSSF**" means the Commission de Surveillance du Secteur Financier.

"**Day Count Fraction**" means, in respect of the calculation of an amount of interest for any Interest Period:

(a)     If Actual/365 is specified in the applicable Final Terms, the actual number of days in the Interest Period divided by 365;

(b)     If 30/360 is specified in the applicable Final Terms, the number of days in the Interest Period divided by 360, calculated on a formula basis as follows:

Day Count Fraction = $\dfrac{[360 \times (Y_2 - Y_1)] + [30 \times (M_2 - M_1)] + (D_2 - D_1)}{360}$

where:

"$Y_1$" is the year, expressed as a number, in which the first day of the Interest Period falls;

"$Y_2$" is the year, expressed as a number, in which the day immediately following the last day included in the Interest Period falls;

"$M_1$" is the calendar month, expressed as a number, in which the first day of the Interest Period falls;

"$M_2$" is the calendar month, expressed as a number, in which the day immediately following the last day included in the Interest Period falls;

"$D_1$" is the first calendar day, expressed as a number, of the Interest Period, unless (i) that day is the last day of February or (ii) such number would be 31, in which case D1 will be 30; and

"$D_2$" is the calendar day, expressed as a number, immediately following the last day included in the Interest Period, unless (i) that day is the last day of February but not the Maturity Date or (ii) such number would be 31, in which case D2 will be 30.

"**Euro MTF**" means a multi-lateral trading facility on the self-regulated market of the Luxembourg Stock Exchange.

"**Early Redemption Amount**" has the meaning ascribed to such term in Condition 5.

"**euro**", "**EUR**" or "**€**" means the lawful currency of the European Member States participating in the European Monetary Union.

"**Final Terms**" has the meaning ascribed to such term in Condition 1.1.

"**Gate**" has the meaning ascribed to such term in Condition 5.1.

"**Global Note**" has the meaning ascribed to such term in Condition 1.1.

"**Insolvency Event**" means:

(a)     in relation to any person not incorporated, domiciled or resident in Luxembourg, such person:

(i)     is dissolved or has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a solvent consolidation, amalgamation or merger); or

(ii)     becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; or

(iii)     makes a general assignment, arrangement or composition with or for the benefit of its creditors; or

(iv)    institutes or has instituted against it proceedings seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors rights, or a petition is presented for its winding up or liquidation, and, in the case of any such proceeding or petition instituted against it, such proceeding or petition (i) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding up or liquidation or (ii) is not dismissed, discharged, stayed or restrained in each case within thirty (30) days of the institution or presentation thereof; or

(v)    seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; or

(vi)    has a creditor take possession of all or substantially all of its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such creditor maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within thirty (30) days thereafter; or

(vii)    causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified under paragraphs (i) to (vi) above (inclusive); or

(viii)    takes any formal action in indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(b)    if such person is incorporated, domiciled or resident in Luxembourg, such person:

(i)    enters into a voluntary arrangement with its creditors (*concordat préventif de faillite*) pursuant to the law of 14 April 1886 on arrangements to prevent insolvency, as amended; or

(ii)    is granted a suspension of payments within the meaning of Articles 593 et seq. of the Luxembourg Commercial Code; or

(iii)    is subject to controlled management (*gestion contrôlée*) within the meaning of the grand ducal regulation 24 May 1935 on controlled management; or

(iv)    is itself or any of its assets the subject of any Insolvency Proceedings commenced pursuant to Articles 437 et seq. of the Luxembourg Commercial Code or any other Insolvency Proceedings pursuant to the Council Regulation EC/1346/2000 of 29 May 2000 on Insolvency Proceedings, unless the application for such proceedings is dismissed within thirty (30) days from and excluding the day it is filed (unless dismissed on the ground that the costs of the Insolvency Proceedings were likely to exceed the assets of such person (*clôture pour insuffisance dactifs*)); or

(v)    takes any corporate action or is the subject of any legal proceedings commenced against it for its dissolution or liquidation; or

(vi)    is in a situation of illiquidity (*cessation de paiements*), and without access to credit (*crédit ébranlé*) within the meaning of Article 437 of the Luxembourg Commercial Code.

"**Insolvency Proceedings**" means, with respect to any person, the winding-up, liquidation, dissolution, bankruptcy, receivership, insolvency or administration of such person or any equivalent or analogous proceedings under the law of the jurisdiction in which such person is incorporated (or, if not a company or

corporation, domiciled) or of any jurisdiction in which such person carries on business or has any assets including the seeking of an arrangement, adjustment, protection or relief of creditors.

"**Insolvent**" means any person in respect of whom an Insolvency Event has occurred.

"**Interest**" has the meaning ascribed to such term in Condition 6.1.

"**Interest Commencement Date**" means the date designated as the Interest Commencement Date in the applicable Final Terms.

"**Interest Payment Date**" has the meaning ascribed to such term in Condition 6.1.

"**Interest Period**" means the period from and including an Interest Period End Date (or the Interest Commencement Date) to but excluding the next (or first) Interest Period End Date.

"**Interest Rate**" means the interest rate applicable to the Notes in accordance with the applicable Final Terms.

"**Interest Period End Date**" means the Maturity Date as well as a date designated as an Interest Period End Date in the applicable Final Terms.

"**Issue Date**" means the actual issue date of the Notes.

"**Issue Price**" means the actual issue price of the Notes as designated in the applicable Final Terms.

"**Issuer**" means the Company acting in relation with a specific Cred Compartment; a reference to the Issuer or to the relevant Issuer shall be a reference to the Company acting in relation with the relevant Cred Compartment as implied by the context.

"**Issuer Event of Default**" means any of the following:

(a)    receiver, manager or other similar officer is appointed in relation to, the whole or a substantial part of the undertaking, assets and revenues of the Issuer; or

(b)    the Issuer or the Company becomes Insolvent.

"**Junior Notes**" means the notes issued by an Issuer, which are junior to the Notes issued by same Issuer and whose terms and conditions are summarized in the Final Terms of the Notes issued by such Issuer.

"**Listing Agent**" means the service provider appointed from time to time to provide listing services to an Issuer.

"**Luxembourg**" means the Grand Duchy of Luxembourg.

"**LuxSE**" means the Luxembourg Stock Exchange.

"**Management Agreement**" has the meaning ascribed to such term in Condition 1.3.

"**Masse**" has the meaning ascribed to such term in Condition 15.

"**Masse Meeting**" has the meaning ascribed to such term in Condition 15.

"**Maturity Date**" has the meaning ascribed to such term in the applicable Final Terms.

"**moKredit Participation Certificates**" means participation interests in the debt of moKredit Inc. and moKredit Technology (Hong Kong) Company Limited to Cred LLC.

"**moKredit Receivables**" means direct or indirect interest in pools of consumer receivables and loans originated, purchased, services or managed by moKredit Inc.

"**New Issuer**" has the meaning ascribed to such term in Condition 17.1.

"**Noteholder**" means the holder of one or more Notes of any Tranche and of any Cred Compartment.

"**Notes**" has the meaning ascribed to such term in Condition 1.1.

"**Ongoing Issuer Expenses**" means the sum deemed necessary by the Calculation Agent not later than on the Business Day prior to an Interest Payment Date to pay the expenses incurred by the Issuer (i) in relation to its daily and continuing management and (ii) in relation to the daily and continuing management of the Company as allocated by the board of the Company or by the Calculation Agent on its behalf, in each case in relation with the following Interest Period, including, but not limited to, sums payable to any service providers.

"**Ongoing Series Expenses**" means the sum deemed necessary by the Calculation Agent on the Business Day prior to an Interest Payment Date to pay the expenses incurred by the Issuer in relation to a specific Series of Notes in relation with the next Interest Period, including, but not limited to, sums payable by the Issuer to the Series Service Providers, such expenses (on each Interest Payment Date.

"**Outstanding Principal Amount**" means the outstanding principal amount of a Note on a given date as reduced by the aggregate amount of payments of principal made in respect thereof on or before such date.

"**Other Compartments**" means any segregated compartment of the Company that has been created within the Company by the board of managers of the Company, pursuant to a board resolution in accordance with the articles of association of the Company (as contemplated by article 5 of the Securitisation Law) other than the Issuer's Compartment Cred Global Notes 1.

"**Paying Agency Agreement**" has the meaning ascribed to such term in Condition 1.3.

"**Paying Agent**" means the entity providing paying agency services to the Company in relation with Notes issued in relation with any of the Cred Compartments and, where such paying agent has not been appointed in relation with a Series of Notes, this term shall refer to the Company itself.

"**Prepayment Penalty**" means the penalty applicable for an early redemption of the Notes which is two percent (2%) of the outstanding principal amount of the Notes.

"**Programme**" means the notes issuance programme established pursuant to this base prospectus.

"**Receipt**" has the meaning ascribed to such term in Condition 1.4.

"**Record date**" means in respect of any payment to be made, the day (being for this purpose a day on which the relevant clearing system in which the Notes are held is open for business) before the relevant due date for such payment.

"**Redemption Notice**" means the notice described in Condition 5.1.

"**Redeemed Notes**" has the meaning ascribed to such term in Condition 7.3.

"***Register**" has the meaning ascribed to such term in Condition 1.4.

"**relevant**" means in relation with the relevant compartment of the Issuer as implied by the context.

"**Representative**" has the meaning ascribed to such term in Condition 15.

"**Securitisation Law**" means the law of 22 March 2004 on securitisation as amended from time to time.

"**Selection Date**" has the meaning ascribed to such term in Condition 7.3.

"**Series Event of Default**" means any of the following:

(a)     the Issuer fails to make any payment within 10 Business Days of the due date therefore on the relevant Series of Notes, without prejudice to Condition 2.3; or

(b)     the Issuer fails to perform or observe any of its other material obligations under the relevant Series of Notes or any relevant Transaction Document to which it is a party which failure is either (i) incapable of remedy or (ii) if such failure is capable of remedy, it continues unremedied for a period of 30 Business Days following the delivery of a written notice thereof to the Issuer by the Paying Agent; or

(c)     the Issuer is materially restricted from performing any of its obligations under the relevant Series of Notes or any other relevant Transaction Document to which it is expressed to be a party.

"**Series Service Providers**" means, for each Series of Notes, the Account Bank, the Paying Agent, the Listing Agent, the Settlement Agent and the Calculation Agent appointed in relation to such Series of Notes.

"**Set Up Fees**" means the sum deemed necessary by the Calculation Agent to pay the costs, expenses and fees incurred by the Issuer for the purpose of structuring and establishing the Company and/or its Compartments and the transaction contemplated by the Transaction Documents.

"**Settlement Agent**" means Société Générale Bank & Trust, a public company incorporated with limited liability (*société anonyme*) having its registered office at 28-32 place de la Gare, L-1616 Luxembourg.

"**Talons**" has the meaning ascribed to such term in Condition 1.4.

"**Taxes**" has the meaning ascribed to such term in Condition 9.

"**Terms and Conditions**" means the terms and conditions of the Notes.

"**Transaction Agreements**" has the meaning ascribed to such term in Condition 1.3.

"**Transaction Documents**" means the Notes, the Terms and Conditions, the applicable Final Terms, the Transaction Agreements and any other agreement or documentation to which the Issuer is party in relation with an issue of Notes.

"**Transaction Parties**" means the parties to the Transaction Documents.

## FORM OF FINAL TERMS FOR THE NOTES

Set out below is the form of Final Terms for the Notes which will be completed for each Tranche of Notes issued under the Programme.

Final Terms for the Notes dated January 30, 2020

**Income Opportunities (Luxembourg) S.A.**
**(the "Company")**
**acting on behalf of its Compartment Cred Global Notes [1, 2, 3, …***]**
**(the "Issuer")**

**Issue of [*Aggregate Nominal Amount of Tranche*] Notes**
**under the**
**Notes Issuance Programme**

Terms used herein shall be deemed to be defined as such for the purposes of the Terms and Conditions included in the Base Prospectus dated 30 January 2020 as amended or supplemented from time to time. This document constitutes the Final Terms for the Notes described herein and must be read in conjunction with the Base Prospectus. Full information on the Issuer and the Notes is only available on the basis of the combination of these Final Terms for the Notes and the Base Prospectus containing the Terms and Conditions. The Base Prospectus is available for inspection at, and copies may be obtained, free of charge, from, the Company's registered office at 19, rue de Bitbourg, L-1273 Luxembourg, Grand Duchy of Luxembourg.

Include whichever of the following apply or specify as "Not Applicable" (N/A). Note that the numbering should remain as set out below, even if "Not Applicable" is indicated for individual paragraphs or sub-paragraphs. Italics denote directions for completing the Final Terms.

References herein to numbered Conditions are to the Terms and Conditions of the relevant series of Notes and words and expressions defined in such Terms and Conditions shall bear the same meaning in these Final Terms for the Notes in so far as it relates to such series of Notes, save as where otherwise expressly provided.

## GENERAL

| 1. | Issuer: | Income Opportunities (Luxembourg) S.A.], acting on behalf of its Compartment Cred Global Notes [1, 2, 3, …***]. |
|---|---|---|
| 2. | Series Number of the Notes: | [•] |
| 3. | Tranche Number of the Series: | [•] |
| 4. | If Notes to be consolidated with Notes of existing Series: | [Yes] [No] |
| 5. | Aggregate Number of Notes in the Series: | [•] |
| 6. | Aggregate Number of Notes in the Tranche: | [•] |
| 7. | Form of Notes: | Registered |
| 8. | (a) Issue Date: | [•] |

| | (b) Interest Commencement Date: | [•] |
|---|---|---|
| 9. | Date of board resolution approving the issue: | [•] |
| 10. | Issue Price | [Currency] [•] |
| 11. | Maturity Date: | [•] [such date needs to also be an Interest Period End Date] |
| 12. | Redemption Price at Maturity Date: | [Currency] [•] |
| 13. | Compartment General Account: | Account number [•] in [currency] opened by the Issuer in the books of the Account Bank |

**PROVISIONS RELATING TO INTEREST**

| 14. | Fixed Interest Rate: | [•] per cent. per annum |
|---|---|---|
| 15. | Interest Payment Date(s): | [•] |
| 16. | Interest Period End Date(s): | [•] |
| 17. | Other terms relating to the method of calculating interest for Fixed Rate Notes: | None |
| 18. | Day Count Fraction: | [•] |

**PROVISIONS RELATING TO SECURITY**

| 19. | Secured Notes: | [Applicable/Not Applicable]<br><br>(*If applicable give details of security. If not applicable, delete the remaining sub-paragraphs of this paragraph*) |
|---|---|---|
| | (a) Beneficiary: | [•] |
| | (b) specific details: | [•] |

**PROVISIONS RELATING TO EARLY REDEMPTION**

| 20. | Issuer Call: | [Not Applicable] (If not applicable, delete the remaining subparagraphs of this paragraph) |
|---|---|---|
| | (b) Notice period (if other than as set out in the Conditions of the Notes): | [•] (N.B. If setting notice periods which are different to those provided in the Conditions of the Notes, the Issuer is advised to consider the practicalities of distribution of information through |

| | | |
|---|---|---|
| | | intermediaries, for example, clearing systems and custodians, as well as any other notice requirements which may apply, for example, as between the Issuer and the Paying Agent |
| 21. | Early Redemption Amount payable on redemption for taxation reasons or on event of default and/or the method of calculating the same (if required or if different from that set out in Condition of the Notes): | [An amount determined by the Calculation Agent, in its sole and absolute discretion, to be equal to the fair market value of the Notes immediately prior to the date of redemption, plus or minus any related hedging gains or costs/[•] per Calculation Amount/specify other/see Appendix] |

**GENERAL PROVISIONS APPLICABLE TO THE NOTES**

| | | |
|---|---|---|
| 22. | Global Note: | [Yes][No] |
| 23. | Paying Agency, Listing and Trading: | The Paying Agent is:  [NA or **]<br><br>Application has been made for the notes to be listed on the Official List of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF Market /N.A.<br><br>Or<br><br>No application has been made in relation with the listing and trading of the Notes] |
| 24. | Ratings: | [Applicable/Not Applicable]<br><br>(*If not applicable, delete the remaining subparagraphs of this paragraph*)<br><br>[S&P:         [        ]]<br><br>[Moody's:      [        ]]<br><br>[[Other]:       [        ]]<br><br>(*The above disclosure should reflect the rating allocated to Notes of a specific Series the Programme being unrated.*) |
| 25. | Other final terms of the Notes: | [Not Applicable/*give details*] |
| 26. | Governing Law: | Luxembourg Law |
| 27. | Additional selling restrictions: | [•] |

**OPERATIONAL INFORMATION**

| 28. | ISIN Temporary Code of the Tranche: | [Applicable/Not Applicable]<br><br>*The Notes will be consolidated and form a single Series with the existing (ISIN: permanent code) after the first interest payment date which is expected to occur on or about [•]* |
|-----|--------------------------------------|---------------------------------------------------------------------------------------|
| 29. | ISIN Permanent Code of the Series: | [•] |
| 30. | Common Code: | [•] |
| 31. | Clearing systems(s): | [Not Applicable]<br><br>[Euroclear Bank S.A./N.V. and Clearstream Banking, société anonyme;  name(s) and ID-number(s)]<br><br>[Other] |

**SUMMARY OF THE TERMS AND CONDITIONS OF THE JUNIOR NOTES TO BE ISSUED BY THE ISSUER**

| 32. | Issue date: | [•] |
|-----|-------------|-----|
| 33 | Issue price per Junior Note | [USD 10,000] |
| 34. | Amount of Junior Notes | $2,000,000 |
| 35. | Total funds raised through the issuance of the Junior Notes | |
| 36. | Interest rate | |
| 37. | Interest payment dates | At maturity date (interest will be compounded annually, on each anniversary date |
| 38. | Maturity date | The date on which no more Notes issued by the Issuer are outstanding |
| 39. | Form of Notes | Registered |

**PURPOSE OF FINAL TERMS**

These Final Terms for the Notes comprise the final terms required for the issue of the Notes described herein pursuant to the Programme for the issue of Notes.

**RESPONSIBILITY**

The Issuer accepts responsibility for the information contained in these Final Terms for the Notes.

Signed by:

INCOME OPPORTUNITIES (LUXEMBOURG) S.A.

acting on behalf of its Compartment Cred Global Notes 1


By:    _____
Date:  _____
Name:  Andrew MacRitchie
Title:    Director A


By:    _____
Date:  _____
Name:  Elvin Montes
Title:    Director B

## CLEARING AND SETTLEMENT

In case of clearing and settlement of the Notes, clearing and settlement will be effected in accordance with the operating procedures of Euroclear and Clearstream, Luxembourg, as applicable.

The information set out below has been obtained from sources that the Issuer believes to be reliable, but prospective investors are advised to make their own enquiries as to such procedures. In particular, such information is subject to any change in or interpretation of the rules, regulations and procedures of Euroclear or Clearstream, Luxembourg (together, the "**Clearing Systems**") currently in effect and investors wishing to use the facilities of any of the Clearing Systems are therefore advised to confirm the continued applicability of the rules, regulations and procedures of the relevant Clearing System. None of the Issuer, the Arranger or any agent party to the Agency Agreement (or any affiliate of any of the above), will have any responsibility for the performance by the Clearing Systems or their respective direct or indirect participants or accountholders of their respective obligations under the rules and procedures governing their operations or for the sufficiency for any purpose of the arrangements described below.

### Euroclear and Clearstream, Luxembourg

Custodial and depository links may be established between Euroclear and Clearstream, Luxembourg to facilitate the initial issue of certain Notes and cross-market transfers of such Notes associated with secondary market trading. (See "Settlement and Transfer of Notes" below)

Euroclear and Clearstream, Luxembourg each hold securities for their customers and facilitate the clearance and settlement of securities transactions through electronic book-entry transfer between their respective accountholders. Indirect access to Euroclear and Clearstream, Luxembourg is available to other institutions which clear through or maintain a custodial relationship with an accountholder of either system. Euroclear and Clearstream, Luxembourg provide various services including safekeeping, administration, clearance and settlement of internationally-traded securities and securities lending and borrowing. Euroclear and Clearstream, Luxembourg also deal with domestic securities markets in several countries through established depository and custodial relationships. Euroclear and Clearstream, Luxembourg have established an electronic bridge between their two systems across which their respective customers may settle trades with each other. Their customers are worldwide financial institutions including underwriters, securities brokers and dealers, banks, trust companies and clearing corporations. Investors may hold their interests in such Global Certificates directly through Euroclear or Clearstream, Luxembourg if they are accountholders ("**Direct Participants**") or indirectly ("**Indirect Participants**" and together with Direct Participants, "**Participants**") through organisations which are accountholders therein.

### Relationship of Participants with Clearing Systems

Each of the persons shown in the records of Euroclear, as the holder of a Note represented by a Global Note must look solely to Euroclear for his share of each payment made by the Issuer to the holder of such Global Note and in relation to all other rights arising under the Global Note, subject to and in accordance with the respective rules and procedures of Euroclear.

### Settlement and Transfer of Notes

Subject to the rules and procedures of each applicable Clearing System, purchases of Notes held within a Clearing System must be made by or through Direct Participants, which will receive a credit for such Notes on the Clearing Systems records. The owners hip interest of each actual purchaser of each such Note (the "**Beneficial Owner**") will in turn be recorded on the Direct and Indirect Participants records. Beneficial Owners will not receive written confirmation from any Clearing System of their purchase, but Beneficial Owners are expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which such Beneficial Owner entered into the transaction. Transfers of ownership interests in Notes held within the

Clearing System will be effected by entries made on the books of Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in such Notes unless and until interests in any Global Notes held within a Clearing System is exchanged for definitive Notes.

No Clearing System has knowledge of the actual Beneficial Owners of the Notes held within such Clearing System and their records will reflect only the identity of the Direct Participants to whose accounts such Notes are credited, which may or may not be the Beneficial Owners. The Participants will remain responsible for keeping account of their holdings on behalf of their customers. Conveyance of notices and other communications by the Clearing Systems to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

## SELLING RESTRICTIONS

### NOTICE TO LUXEMBOURG INVESTORS

In relation to the Grand Duchy of Luxembourg ("**Luxembourg**"), which has implemented the Prospectus Regulation by the law of 16 July 2019 relating to the prospectus to be published in case of public offer of securities or their admission to trading on a regulated market, as amended (the "**Prospectus Law**"), the Notes may not be offered to the public in Luxembourg, except that the Notes may be offered in Luxembourg:

(a)    at any time only to qualified investors (as defined in the Prospectus Law); and

(b)    at any time to fewer than 150 natural or legal investors per Member State of the European Union, other than qualified investors.

For the purposes of this paragraph, the expression "offer of securities to the public" means a communication to persons in any form and by any means presenting sufficient information on the terms of the offer and the securities to be offered, so as to enable an investor to decide to purchase or subscribe to these securities.

### NOTICE TO INVESTORS IN MEMBER STATES OF THE EUROPEAN UNION

In relation to each Member State of the Union (each, a "Relevant Member State"), each dealer under this programme (each, a "Dealer") has represented and agreed, and each further Dealer appointed under the Programme will be required to represent and agree, that it has not made and shall not make an offer of Notes to the public in that Relevant Member State except that it may make an offer of such Notes to the public in that Relevant Member State: if such offer falls within one of the exemptions provided by the Prospectus Regulation as implemented locally in the Relevant Member State if such offer falls within one of the exemptions provided by the Prospectus Regulation as implemented locally in the Relevant Member State.

For the purposes of this provision:

•    the expression "an offer of Notes to the public" in relation to any Notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Notes to be offered so as to enable an investor to decide to purchase or subscribe the Notes, as the same may be varied in that Member State by any measure implementing the Prospectus Regulation in that Member State; and

•    the expression "**Prospectus Regulation**" means EU Regulation 2017/1129EC and includes any relevant implementing measure in the relevant Member State.

**USE OF PROCEEDS**

As further described in the Terms and Conditions, the issuance proceeds of a Series of Notes are used by the Issuer to, first, pay certain fees and expenses related to the respective Series of Notes including to reimburse any bridge facility if and when deemed appropriate by the Issuer, second, to purchase moKredit Participation Certificates or to redeem the Notes as set out in the Terms and Conditions, third to reimburse the Junior Notes and, fourth, the remaining amounts (if any) shall stand to the credit of the Compartment General Account.

## DESCRIPTION OF MOKREDIT AND THE UNDERLYING ASSETS

The Issuer will purchase moKredit Participation Certificates from Cred LLC in moKredit debt obligations to Cred.

### moKredit Participation Certificates, moKredit Receivables

As described in more detail below, the Issuer will invest in participation certificates issued directly by Cred, as determined by the Issuer in its sole discretion.

### moKredit

### 1.      Industry Overview

### 1.1      Background

moKredit is a provider of online credit products.  It uses blockchain technology and proprietary AI risk management to make consumer finance available to hundreds of millions of unserved or underserved consumers in China.

moKredit customers are typically in their twenties and thirties with average monthly salaries of 2-6K RMB. These customers are part of the 400-600 million white and blue-collar workers in China without credit histories. They need access to small credit for their discretionary spending but are underserved by traditional financial institutions.

moKredit currently offers cash credit products which provide funds in digital form, and merchandise credit products. moKredit mainly generate financing income from cash credit products and both financing income and sales commission fees from merchandise credit products.

In 2018, moKredit facilitated approximately RMB 2.8 billion in transactions to three hundred thousand active borrowers. Small credit products serve consumers' immediate needs for discretionary consumption and  tend to have short durations, enabling moKredit to quickly understand a borrower's behavior and further refine its data analytics and credit assessment model upon the completion of transaction cycles. On average, an active borrower accessed credit approximately 6 times in 2018.

### 2018 Performance Statistics

- Transaction value: 2.8 billion RMB
- Transaction #: 1.83 Million
- Revenue: 230 Million RMB

### 1.2      China's Consumer Finance Market

According to the 2016 China Credit Card Industry Report, active card users in China are less than 140 million, despite 455 million cards issued. The size of China's working-age population is about 800 million (National Bureau of Statistics). Among this group, there are at least 400 million people unserved by financial institutions in China. There are 400-600 million young white and blue-collar workers without a credit record in China. The market size in China is expected to exceed 1 trillion RMB, based on the penetration rate of cash loans in the United States. Market size of Gen Y without a credit record = RMB 1 Trillion. Ref: Population 1.3 Billion x penetration rate (US) 5% x Average lending times (US) 8 times x Loan amount (RMB 2000).

### 2.      moKredit Overview

### 2.1      Corporate History

Founded in 2012, and funded by leading VCs, such as Sequoia, BAI, and Ventech China, mo9 initiates "Play Now, Pay Later" credit service to game players. Mo9 has expanded into virtual product transactions and beyond. By the end of 2015, mo9 tapped into micro-financing sector with "mo9 Credit Wallet"—a mobile APP that offers short-term micro-credit service through WeChat, or iOS-and Android-based devices.

## 2.2    Organizational Structure



## 2.3    The Team

### CEO - Lu Hua

CEO of moKredit; Paypal China Head of Core Payment; Paypal US Head of Global Banking Platform Lu Hua is a fintech entrepreneur and expert in payment solutions with a strong connection to Silicon Valley. As the former US Head of PayPal Bank Transfer Platform, his team handled over 30 percent of PayPal TPV. During his tenure at Paypal, Hua also held several other leadership roles such as Manager of Transaction Expense, Manager of Merchant Services, and the Head of Core Payments. He co-founded moKredit, a leading digital credit services company in China, which serves more than 30 million users. His venture garnered investment from Sequoia Capital, Bertelsmann Asia Fund and Ventech China. He holds M.Sc. in Engineering from the University of British Columbia and a B.Sc. in Engineering from Zhejiang University. https://www.linkedin.com/in/luhua/

### Yana Zhao, VP

Yana Zhao is an expert in PR management, business development, and IPO financing with experience in notable companies such as Shanghai Zhongyi Investment Corp, where she served as Partner and Director of Investment; and Air International FuturisInvestment, as the Director of Design & PR Department.

### Greg Guo, VP

Greg is a highly experienced operational management and HR management professional. He served as the Vice GM of Everlearn Group and has a Ph.D. in Psychology from China Normal East University.

**Ray Ma**

Graduated from New York University, U.S. As moKredit technology manager, having years of experience in big data platform, machine learning and data analysis pipeline engineering. Rich business knowledge in finance and payment services. Recognized professional in banking service certified by China Union. Past engineering working experience in SAP and Sybase.

**Hao Wu**

Graduated from Simon Fraser University in Vancouver, Canada. As a data mining engineer, having rich experience in machine learning and data analysis project. Extensive business knowledge in finance and automotive industry. Good at Spark, Python, R, SAS and other data analysis software. used to work in Unionpay Advisors and MathArtSystem software Co., Ltd.

**Xiwen Zheng**

Graduated from Simon Fraser University in Vancouver, Canada. Had 4-year experience in consulting industry rotating from strategy to financial services. Focused on risk management of financial institutions with expertise in risk, financial forecasting and valuation models. Worked in PwC management consulting before joining moKredit.

**2.4      moKredit Users:**



moKredit user base is comprised 87% between 20-35 years old with average monthly income 2K-6K RMB.

**2.5      moKredit's  Investors**

**Series A- Sequoia Capital**

Sequoia Capital is an American venture capital firm. The firm is located in Menlo Park, California and mainly focuses on the technology industry. It has backed companies that now control $1.4 trillion of the combined stock market value. Sequoia manages multiple investment funds including funds specific to India, Israel, and China.

Sequoia Capital China is a VC firm focused on seed stage, mid stage, late stage, and growth investments in the fintech sector. Formed in September 2005, Sequoia Capital China has offices in Hong Kong, Beijing, Shanghai, Guangzhou, Hangzhou, Suzhou and Shenzhen. Over the past nine years, Sequoia Capital China has an impressive and diverse portfolio comprising about 300 dynamic companies that deliver high returns on investment using differentiated technologies and innovative business models, including Alibaba, VIPshop.com, Sina.com, Didi, JD.com, Ourpalm, Qihoo 360, Jumei, Momo, SINNET, Dianping.com, Meituan, Meilishuo, Toutiao, AutoNavi, Ganji.com, DJI, VanceInfo, Noah Private Wealth Management, Wanda Cinemas, Alibaba Pictures, Plateno Hotels Group, Deppon Logistics, ZTO Express, Beta Pharma, Snibe Diagnostic, BGI, WEGO, and Yuwell Medical.

**Series B- Bertelsmann Asia Investments**

Bertelsmann Asia Investments (BAI) is a testament to Bertelsmann's longstanding commitment in China. Unlike many other funds, BAI sees itself as a strategic fund that takes a long-term view of its holdings. It invests in industries such as education, media, or technology where Bertelsmann already operates. With a strong team led by Annabelle Long, BAI fulfills a number of important strategic functions for Bertelsmann. China is already one of the world's largest media markets and is growing rapidly. While traditional media are heavily regulated, the new media are a different story. Bertelsmann is using BAI to position itself in the Chinese market with moderate resource commitment, networking and accumulating valuable experience in the process. At the same time, a skilled local management team is in place on the ground. In 2008 BAI acquired a stake in China Distance Education Holdings (CDEL), an online training specialist. The company went public in August 2008 and is now the largest provider of its kind in China. www.baifund.com/.

**Series C- Ventech China**

Ventech Capital was founded in 1998 in France. Ventech is one of the most famous VC funds in Europe and manages four funds. In China, Ventech China manages three funds. Globally, this represents more than USD 1B total asset under management.

Ventech China is based in Shanghai. Ventech China 3 is a USD 220 million venture capital fund focused on communities, M-commerce, Big Data and Fintech. Its current portfolio companies include Keep, the No.1 fitness training and community app in China, WonderFull, the emerging Japanese product M-commerce platform, Juzi, the leading entertainment news platform, Datawin, the leading big data company in sales leads generation, and Blued, the No.1 gay community app in China. Ventech China is dedicated to growing together with innovative startups and help them to become global leaders in their fields. www.ventechchina.com/

### 2.6    moKredit Credit Products and Platform

moKredit credit products are mainly in two categories: merchandise credit products and cash credit products. Both are unsecured short-term small-credit products. The borrower only needs to submit the application online through the mobile phone and obtain the credit line given by the system in a short period of time. Small credit products typically have short durations, enabling us to quickly understand a borrower 's behavior and further refine moKredit's data analytics and credit assessment model. A borrower is more likely to repay a smaller amount on time to maintain the quality of his or her credit profile, which may impact future borrowing activities. Benefits to fraudulent borrowers are also limited given the small amount of money borrowed.

### 2.7    Merchandise credit product - "Play Now, Pay Later"

Designed as a payment solution integrated into the payment centers of major game platforms provides game players with a credit line ranging from RMB10 (US$ 1.45) to RMB1000 (US$145). When game players want to purchase a game item, they simply enter the phone number and verification code to get the initial credit limit for consumption in seconds. The repayment needs to be completed within 14 days after consumption.

The borrower only needs to return the principal within 7 days without paying additional borrowing fees. However, a penalty fee will be charged if the payment is overdue. Compared to other payment methods that require a bank card, the fast payment experience increases the paid conversion rate for merchants. Game merchants pay commissions based on transaction flow. Based on this business model, moKredit has cooperated with thousands of game merchants and obtained more than 30 million registered game users.

## 2.8    Cash credit product - "Mo9 Credit Wallet"

moKredit launched "mo9 Credit Wallet" at the end of 2015, which addresses and serves the needs of creditworthy borrowers moKredit believes are of emerging prime credit quality but have limited credit history and access to traditional consumer credit from banks or other lenders in China. Different from the merchandise credit products, the Mo9 Credit Wallet provides a credit line ranging from RMB 500 (US$73) to RMB2000 (US$290) with a term of 14 days. The money is deposited directly into borrower's bank account for varied financial needs.

Borrowers are able to apply for a credit on Wechat , iOS or Android based device by providing certain basic information, including bank account information, educational level, marital status, occupation, email address, and mobile phone number of one or two alternative contact persons, in addition to the borrowers' PRC identity card information and mobile phone numbers which are mandatory for initial user registration. The moKredit platform provides applicants with a credit decision within 30 minutes of application for first-time applicants and in as little as few seconds for repeat borrowers.

Approved borrowers typically receive loan disbursements within few minutes. The repayment consists of principal, interest, financing service fee and a penalty fee (if any). Different credit limits and borrowing costs are applicable to different tiers of borrowers based on their respective credit scores. Borrowers have the option to extend the existing loan for another one to two weeks without going through another credit evaluation. moKredit's platform has a comprehensive collection system that can automatically create collection plans for moKredit's own collection team and third-party collection team. Using this business model, moKredit's platform works as an intermediary agent that connect borrowers with investors and also is responsibility for risk control and collection.

## 2.9    moKredit's Risk Management System

moKredit  has a data warehouse and platform which hosts core lending data as well as data from various external partners. moKredit extracts hundreds of features to create a comprehensive persona for its borrowers. Over the past two years, moKredit has successfully accumulated almost one million independent borrowers. moKredit also has established a sophisticated risk management system which has proven to be accurate in various market situations. moKredit points to machine learning and big data-based credit scoring models are one of its key competitive advantages. moKredit has been iteratively testing and optimizing the risk detection rule engine as it continues to study the growing amount of data accumulated via its loan products. moKredit has also achieved improvement in organizational efficiency when its applies big-data capabilities and machine learning models to other aspects of its business operations, such as marketing campaigns and loan collection.

moKredit utilizes its credit assessment model which is built upon data collected through various sources and calculated by moKredit's sophisticated Artificial Intelligence and state-of-art machine learning techniques.

moKredit models categorize borrowers into different credit scoring intervals according to their risk profiles, based on which moKredit's risk management system gives them appropriate evaluations. A borrower's credit risk evaluation for a particular type of loan is determined considering a range of factors, including but not limited to:

      (i)     the borrower's credit level based on credit score generate by moKredit—borrowers with better credit scores are generally more inclined to be approved for loan application

(ii)     the borrower's actual needs, such as the type of loans being applied for
(iii)    the borrower's past credit performance on 's platform
(iv)     feedback from loan collection if applicable.

Following data aggregation and fraud detection, potential borrowers enter into the credit assessment phase. Different algorithms (like traditional Logistic Regression based scorecard or XGBoost ensemble) are applied to borrowers with various features in assessing the potential risks associated with them and based on the assessment results, the credit scoring model generates moKredit scores for each of the potential borrowers. The following factors are associated with features that are important for assessing the probability of default or delinquency:

- Repayment History
- Personal Identity Information
- Education and Occupation
- Consumption and Purchase Behavior
- Social Network Behavior
- Credit Reports
- Mobile Communication Pattern
- Internet and Mobile Behavior Pattern
- Fraudulent Records

**Financial Performance**

The following selected consolidated statement of comprehensive income/(loss) data for the years ended December 31, 2017 and 2018, and the six months ended June 30, 2019 have been derived from unaudited interim condensed consolidated financial statements. moKredit's historical results do not necessarily indicate results expected for any future periods. Investors should read this Selected Consolidated Financial Data section together with "Analysis of Financial Condition and Results of Operations" found immediately below the financial statements.

| Selected Consolidated Statements of Comprehensive Income/(Loss) Data: | Year Ended December 31, | | | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2017 | | 2018 | | 2019 | |
| | RMB | US$ | RMB | US$ | RMB | US$ |
| Operating revenues: | | | | | | |
| Loan facilitation service fees | 469,390,620 | 70,104,806 | 203,160,225 | 31,016,828 | 177,081,076 | 25,851,252 |
| Post-facilitation service fees | 40,816,576 | 7,780,423 | 27,395,422 | 4,182,507 | 18,736,265 | 2,735,221 |
| Total operating revenues | 510,207,196 | 77,884,228 | 230,555,647 | 35,199,335 | 195,817,342 | 28,586,473 |
| Cost of goods sold: | | | | | | |
| Payment Channel Cost | 14,929,149 | 2,270,259 | 6,686,114 | 1,020,781 | 6,635,089 | 971,546 |
| Risk Control Exp. | 1,149,015 | 175,422 | 82,112 | 12,536 | 1,459,339 | 213,642 |
| Fund Cost | 65,789,750 | 10,044,257 | 25,906,578 | 3,955,203 | 20,743,714 | 3,028,279 |
| Marketing Exp. | 54,290,235 | 8,279,425 | 1,258,800 | 192,183 | 5,093,860 | 743,629 |
| MSM Exp. | 1,168,434 | 178,387 | 730,822 | 111,578 | 765,002 | 111,679 |
| Credit Loss | 199,090,000 | 30,395,420 | 92,050,589 | 14,053,525 | 104,087,909 | 15,196,775 |
| Total cost of goods sold | 336,358,583 | 51,352,150 | 126,715,015 | 19,345,804 | 138,814,914 | 20,264,951 |
| Gross profit | 173,850,613 | 26,542,078 | 103,840,631 | 15,853,531 | 57,002,428 | 8,321,522 |
| Operating expenses: | | | | | | |
| Human Resource | 63,637,035 | 9,715,578 | 68,332,680 | 10,432,470 | 26,292,280 | 3,838,289 |
| Uncontrollable Exp. | 10,606,516 | 1,619,315 | 6,684,657 | 1,020,558 | 1,521,864 | 222,170 |
| Controllable Exp. | 6,788,132 | 1,036,356 | 2,367,594 | 361,465 | 1,125,300 | 164,277 |
| Financial Exp. | -2,368,735 | -361,639 | -126,661 | -19,338 | -189,563 | -27,673 |
| Total operating expenses | 78,662,948 | 12,009,610 | 77,258,269 | 11,795,156 | 28,749,881 | 4,197,065 |
| Profit/(Loss) before income tax expenses | 95,187,665 | 14,532,468 | 26,582,362 | 4,058,376 | 28,252,547 | 4,124,459 |
| Income tax expense | 1,797,998 | 274,504 | 3,436,069 | 524,591 | 2,840,055 | 414,607 |
| Net profit/(loss) | 93,389,667 | 14,257,964 | 23,146,293 | 3,533,785 | 25,412,493 | 3,709,853 |





## DESCRIPTION OF INVESTMENT STRUCTURE

The Company will acquire the moKredit Participation Certificate issued by the Cred with the proceeds from the Series Notes.  The Company may purchase additional moKredit Participation Certificates following the issue of other Series of Notes.

The following diagram indicates the ownership of the Company and the structure for the investment in the moKredit Participation Certificate:



Noteholders are hereby informed that the shares representing the capital of the Company may be transferred to Cred or to an affiliated entity.

## DESCRIPTION OF THE TRANSACTION DOCUMENTS

### Administrative Services Agreement

Under an administrative services agreement entered into by the Company and Cred on 16 January 2020 (the "**Administrative Services Agreement**"), Cred has been appointed as administrative services provider, arranger and calculation agent of the Issuer (the "**Administrative Services Provider**, the "**Arranger**" or the "**Calculation Agent**"). Under the terms of the Administrative Services Agreement, the Administrative Services Provider is appointed to act as administrative services provider and to provide administration services, compliance services, accounting services and information technology support.

Under the terms of the Administrative Services Agreement, the Calculation Agent is appointed to act as calculation agent and to instruct, on behalf of the Issuer, the Account Bank to make payments in accordance with the Terms & Conditions.

The Administrative Services Agreement contains certain provisions for the indemnification of the Administrative Services Provider, the Arranger or the Calculation Agent. Pursuant to its terms, the Administrative Services Provider, the Arranger or the Calculation Agent is entitled to certain fees in relation to the services to be provided by it under the Administrative Services Agreement. The Administrative Services Agreement is governed by Luxembourg law.

### Corporate Services Agreement

Under a corporate services agreement entered into by the Company and Arendt Services S.A. on 22 July 2015 (the "**Corporate Services Agreement**"), Arendt Services S.A. has been appointed as corporate service provider of the Issuer (the "**Corporate Service Provider**"). Under the terms of the Corporate Services Agreement, the Corporate Service Provider is appointed to act as corporate service provider to provide domiciliation and accounting services to the Issuer and be responsible for the day-to-day administrative activities of the Issuer, including secretarial, clerical and related services to the Issuer and maintaining the books and records of the Issuer in accordance with the laws of Luxembourg.

The Corporate Services Agreement contains certain provisions for the indemnification of the Corporate Servicer. Pursuant to its terms, the Corporate Servicer is entitled to certain fees in relation to the services to be provided by it under the Corporate Services Agreement. The Corporate Services Agreement is governed by Luxembourg law.

### Management Agreement

Under a management agreement entered into by the Company and Arendt Services S.A. on 22 July 2015 (the "**Management Agreement**"), Arendt Services S.A. will arrange for a person and/or several persons to act in the capacity of director of the Company and to perform all services set forth therein.

The Management Agreement contains certain provisions for the indemnification of Arendt Services S.A. Pursuant to its terms, Arendt Services S.A.is entitled to certain fees in relation to the services to be provided by it under the Management Agreement. The Management Agreement is governed by Luxembourg law.

### Paying Agent

Cred will provide paying agency services (the "**Paying Agent**") to the Company in relation with Notes issued in relation with any of the Cred Compartments until such time as a paying agent has been appointed in relation to a Series of Notes. A paying agency agreement may be entered into, *inter alia*, by the Company and a professional paying agent (the "**Paying Agency Agreement**") as and when needed in the context of the clearing and settlement arrangements, which the Issuer may enter into in relation to the Notes and in such context the Paying Agent shall generally act as settlement agent of the Issuer in

relation to the Notes that are subject to clearing through the Clearing Systems (the "**Settlement Agent**") and as listing agent of the Issuer. In addition, the Paying Agent is appointed to authenticate and deliver a global note to the common depositary of Euroclear, for as long as a Global Note is held with a Clearing System.

## DESCRIPTION OF THE COMPANY

**General**

The Company is set up as a securitisation company within the meaning of the Securitisation Law and was incorporated under the laws of Luxembourg as a *société anonyme* (public limited company) on 6 July 2015. The registered office of the Company is at 19, rue de Bitbourg, L-1273 Luxembourg, Grand Duchy of Luxembourg.

The Company been incorporated on 6 July 2015 and its Articles of Association, as amended for the last time on 17 November 2016, have been filed with the Luxembourg trade and companies register and are available for inspection at the Company's registered office.   As and when restated versions (*statuts coordonnés*) of the Articles of Association are produced, such restated versions will be filed with the Luxembourg trade and companies register and will be available for inspection at the Company's registered office.

The Company and its activities are subject to the Securitisation Law. The Company does not have any subsidiaries.

The share capital of the Company is USD 45,000 divided into 45,000 shares with a denomination of  USD 1 each (the "**Shares**").

| Founding Shareholders | No. of Shares owned |
| --- | --- |
| The name is Sentry Foundation | 45,000 |

The Shares of the Company are fully paid up and are held by Sentry Foundation, a company incorporated under the laws of The Netherlands and having its registered office at Prins Hendriklaan 26, 1075 BD Amsterdam

**Business**

In accordance with Article 3 of the Articles of Association, the activities of the Company will be to enter into one or more securitisation transactions within the meaning of the Securitisation Law and the Company may, in this context, assume risks, existing or future, relating to the holding of assets, whether movable or immovable, tangible or intangible, as well as risks resulting from the obligations assumed by third parties or relating to all or part of the activities of third parties, in one or more transactions or on a continuous basis. The Company may assume those risks by acquiring the assets, guaranteeing the obligations or by committing itself in any other way. It may also transfer, to the extent permitted by law and its articles of association, dispose of the claims and other assets it holds, whether existing or future, in one or more transactions or on a continuous basis.

The Company may, in this same context, acquire, dispose and invest in loans, stocks, bonds, debentures, obligations, notes, advances, shares, warrants and other securities. The Company may grant pledges, other guarantees or security interests of any kind to Luxembourg or foreign entities and enter into securities lending activity on an ancillary basis.

The assets of the Company may only be assigned in accordance with the terms of the securities issued to finance the acquisition of such assets.

**Compartments**

The board of directors of the Company may create one or more compartments (a "**Compartment**" or the "**Compartments**") within the Company. Each Compartment shall, unless otherwise provided for in the resolution of the board of directors creating such Compartment, correspond to a distinct part of the assets and liabilities of the Company. A resolution of the board of directors creating one or more Compartments

within the Company, as well as any subsequent amendments thereto, shall be binding as of the date of such resolutions against any third party.

As between noteholders of the Company, each Compartment of the Company shall be treated as a separate entity. Rights of noteholders and other creditors of the Company that (i) have, when coming into existence, been designated as relating to a Compartment or (ii) have arisen in connection with the creation, the operation or the liquidation of a Compartment are, except if otherwise provided for in the resolution of the board of directors creating the relevant Compartment, strictly limited to the assets of that Compartment, which assets shall be exclusively available to satisfy noteholders and other creditors of such Compartment.

Each Compartment of the Company may be separately liquidated without such liquidation resulting in the liquidation of any other Compartment or of the Company itself.

The Compartment Cred Global Notes 1 of the Company was created by a resolution of the board of directors of the Company taken on 16 January 2020. The Company anticipates that this Compartment is the first of a series of Compartments the name of which shall start with "Cred" and in relation with which Notes will be offered using this Base Prospectus. Therefore, references to the Issuer in this Base Prospectus should be construed as references to any individual Cred Compartment only, and not to the Company as a whole or to any other Compartment.

By operation of the Securitisation Law, the rights of the Noteholders and of any other creditors of the Issuer are limited to the assets of the Issuer which will be exclusively available to satisfy the rights of the Noteholders and any other creditors of the Issuer.

**Board of Directors**

The Board of Directors of the Company is composed of three Directors. The current directors of the Company are as follows:

| Name | Address |
|------|---------|
| Andrew N. MacRitchie | 3281 Sutton Pl. NW, Ste B<br>Washington DC 20016<br>United States of America |
| Elvin Montes | 19, rue de Bitbourg,<br>L-1273 Luxembourg,<br>Grand Duchy of Luxembourg |
| James Alexander | 2121 S. El Camino Real, 5th Floor<br>San Mateo, CA 9440319<br>United States of America |

**Accounts**

The Company's fiscal year starts on 1 January and ends on 31 December each year, except for the first fiscal year that started on the date of incorporation of the Issuer and ended on 31 December 2015. The Company's financial accounts may be obtained, free of charge, at the registered office of the Paying Agent or, in case no Paying Agent is appointed, at the registered office of the Company during normal business hours on any Business Day as long as any of the Notes remain outstanding.

According to the Luxembourg law of 19 December 2002 *concernant le registre du commerce et des sociétés ainsi que la comptabilité et les comptes annuels des entreprises,* as amended, the Company shall publish its annual account once a year following their approval at the shareholder's annual meeting.

**Auditors**

The Company's independent auditors are Grant Thornton Lux Audit S.A., who have been appointed by the Board of Directors of the Company by a resolution dated 14 July 2015.

**Commencement of Operations**

The Company has not engaged, since its incorporation, in any activities other than those incidental to its incorporation and to its securitization activities such as the authorisation and issue of the Notes, the execution of the documents and matters referred to or contemplated in the issuing documentation, including this Base Prospectus, and matters which are incidental or ancillary to the foregoing. The Company has carried on activities since 6 July 2015, its date of incorporation.

The Notes may be placed through placement agents depending on circumstances at the time.

**Corporate Services Agreement**

Under a corporate services agreement entered into by the Issuer and Arendt Services S.A. on 22 July 2015 (the "**Corporate Services Agreement**"), Arendt Services S.A. has been appointed as corporate services provider of the Issuer (the "**Corporate Services Provider**"). Under the terms of the Corporate Services Agreement, the Corporate Services Provider will provide domiciliation and accounting services to the Issuer and be responsible for the day-to-day administrative activities of the Issuer, including secretarial, clerical and related services to the Issuer and maintaining the books and records of the Issuer in accordance with the laws of Luxembourg.

The Corporate Services Agreement contains certain provisions for the indemnification of the Corporate Services Provider. Pursuant to its terms, the Corporate Services Provider is entitled to certain fees in relation to the services to be provided by it under the Corporate Services Agreement. The Corporate Services Agreement is governed by Luxembourg law.

**Management Agreement**

Under a management agreement entered into by the Company and Arendt Services S.A. on 22 July 2015 (the "**Management Agreement**"), Arendt Services S.A. will arrange for a person and/or several persons to act in the capacity of director of the Company and to perform all services set forth therein.

The Management Agreement contains certain provisions for the indemnification of Arendt Services S.A. Pursuant to its terms, Arendt Services S.A. is entitled to certain fees in relation to the services to be provided by it under the Management Agreement. The Management Agreement is governed by Luxembourg law.

**Administrative Services Agreement**

Under an administrative services agreement entered into by the Issuer and Cred on 16 January 2020 (the "**Administrative Services Agreement**"), Cred has been appointed as administrative services provider, arranger and calculation agent of the Issuer (the "**Administrative Services Provider**", the "**Arranger**" or the "**Calculation Agent**", as applicable).  Under the terms of the Administrative Services Agreement, the Administrative Services Provider is appointed to act as administrative services provider and to provide administration services, compliance services, accounting services and information technology support.

## DESCRIPTION OF THE ARRANGER AND CALCULATION AGENT

Cred has been appointed as the calculation agent and the arranger under the Administrative Services Agreement.

As consideration for the performance of its services and functions under the Administrative Services Agreement, the Issuer will pay Cred a fee as agreed in the Administrative Services Agreement.

All claims of Cred against the Issuer have been agreed to be subject to limited recourse.

This description of Cred does not purport to be a summary of, and is therefore subject to, and qualified in its entirety by reference to, the detailed provisions of the Transaction Documents.

## DESCRIPTION OF THE CORPORATE SERVICES PROVIDER

Arendt Services S.A. has been appointed as the corporate service provider ("**Corporate Service Provider**") under the Corporate Services Agreement.

Arendt Services S.A. is a public company incorporated with limited liability (*société anonyme*) under the laws of the Grand Duchy of Luxembourg, having its registered office at 19, rue de Bitbourg L-1273 Luxembourg and registered with the Luxembourg Trade and Companies Register under number B145.917.

Arendt Services S.A. is authorised to act as a domiciliation agent under the law of 31 May 1999, as amended regarding the domiciliation of companies and provides services such as financial and administrative services that enable the companies to operate their corporate structures, finance vehicles and investment funds.

As consideration for the performance of its services and functions under the Corporate Services Agreement and/or the Management Agreement, the Issuer will pay the Corporate Service Provider a fee as agreed in the Corporate Services Agreement and/or the Management Agreement.

All claims of the Corporate Service Provider against the Issuer have been agreed to be subject to limited recourse.

This description of the Corporate Service Provider does not purport to be a summary of, and is therefore subject to, and qualified in its entirety by reference to, the detailed provisions of the Transaction Documents.

## DESCRIPTION OF THE ACCOUNT BANK

Société Générale Bank & Trust will act as Account Bank.

Société Générale Bank & Trust is a public company incorporated with limited liability (*société anonyme*) under the laws of the Grand Duchy of Luxembourg, having its registered office at 11, avenue Emile Reuter, L-2420 Luxembourg.

Société Générale Bank & Trust provides custody and trustee services, clearing services, fund administration and assets servicing, funds distribution services, liquidity management services and global issuer services.

All claims of the Account Bank against the Issuer have been agreed to be subject to limited recourse.

This description of the Account Bank does not purport to be a summary of, and is therefore subject to, and qualified in its entirety by reference to, the detailed provisions of the Transaction Documents.

**CERTAIN TAX CONSIDERATIONS**

In view of the number of different jurisdictions where local laws may apply to a Noteholder, this Memorandum does not discuss the tax consequences to a potential investor arising from the acquisition, holding or disposition of Notes, except as discussed below with respect to Luxembourg and the United States. A complete discussion of any other tax consequences, including those that would apply to a prospective investor in a jurisdiction in which it is resident or has other connections is beyond the scope of this Base Prospectus. **EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH AND MUST RELY UPON HIS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF INVESTING IN THE NOTES ISSUED BY THE COMPANY.**

**ADMINISTRATIVE COOPERATION AND EXCHANGE OF INFORMATION**

On 9 December 2014, the Council of the European Union adopted the Directive 2014/107/EU amending the Directive 2011/16/EU of 15 February 2011 on administrative cooperation in the field of taxation. The adoption of the aforementioned directive implements the OECD Common Reporting Standard and generalizes the automatic exchange of information within the European Union as of 1 January 2016.

If a payment were to be made or collected through a Member State which has opted for a withholding system and an amount of, or in respect of, tax were to be withheld from that payment, neither the Company nor any Paying Agent nor any other person would be obliged to pay additional amounts with respect to any securities as a result of the imposition of such withholding tax. The Company is required to maintain a Paying Agent in a Member State that is not obliged to withhold or deduct tax pursuant to the Directive. Investors should inform themselves of, and where appropriate take advice on, the impact of the Directive, and the Amending Directive, on their investment(s).

## LUXEMBOURG TAXATION

The following information is of a general nature only and is based on the Company's understanding of certain aspects of the laws and practise in force in Luxembourg as of the date of this Base Prospectus. It does not purport to be a comprehensive description of all of the tax considerations that might be relevant to an investment decision. It is included herein solely for preliminary information purposes. It is not intended to be, nor should it be construed to be, legal or tax advice. It is a description of the essential material Luxembourg tax consequences with respect to the Notes and may not include tax considerations that arise from rules of general application or that are generally assumed to be known to Noteholders. This summary is based on the laws in force in Luxembourg on the date of this Base Prospectus and is subject to any change in law that may take effect after such date. Prospective Noteholders should consult their professional advisors with respect to particular circumstances, the effects of state, local or foreign laws to which they may be subject and as to their tax position.

Please be aware that the residence concept used under the respective headings applies for Luxembourg income tax assessment purposes only. Any reference in the present section to a tax, duty, levy impost or other charge or withholding of a similar nature refers to Luxembourg tax law and/or concepts only. Also, please note that a reference to Luxembourg income tax encompasses corporate income tax (*impôt sur le revenu des collectivités*), municipal business tax (*impôt commercial communal*), a solidarity surcharge (contribution au fonds pour l'emploi), as well as personal income tax (*impôt sur le revenu*) generally. Noteholders may further be subject to net worth tax (*impôt sur la fortune*) as well as other duties, levies or taxes. Corporate income tax, municipal business tax, as well as the solidarity surcharge invariably apply to most corporate taxpayers resident of Luxembourg for tax purposes. Individual taxpayers are generally subject to personal income tax, the solidarity surcharge as well as to a temporary tax (*impôt d'équilibrage budgétaire*). Under certain circumstances, where an individual taxpayer acts in the course of the management of a professional or business undertaking, municipal business tax may apply as well.

### 1. Taxation of the Company

### 1.1 Income tax

The net taxable profit of the Company is subject to Luxembourg corporate income tax, municipal business tax and the solidarity surcharge. The aggregate maximum applicable rate amounts to 24.94% for companies located in Luxembourg-city in 2020. Liability for these taxes extends to the Companys worldwide profits including capital gains, subject to the provisions of any relevant double taxation treaty.

The taxable profits of the Company is computed by application of the rules of the amended Luxembourg income tax law of 4 December 1967 (*loi concernant limpôt sur le revenu*), as commented and currently applied by the Luxembourg tax authorities. However, pursuant to article 89 c) of the Securitisation Law, any commitments of the Company towards investors and creditors are treated as tax deductible business expenses.

The taxable profit as determined for corporate income tax purposes is applicable, with minor adjustments, for municipal business tax purposes.

It should be noted that under the law implementing the EU Anti-Tax Avoidance Directive (Council Directive (EU) 2016/1164) into Luxembourg domestic tax law, interest deduction limitation provisions may impact the deduction of interest at the level of the Company.

### 1.2 Net worth tax

The Company is exempt from net worth tax (*impôt sur la fortune*). However, a minimum net worth tax ( "MNWT") is levied on securitisation companies having their statutory seat or central administration in Luxembourg. For securitisation companies for which the sum of fixed financial assets, transferable securities and cash at bank exceeds 90% of their total balance sheet and EUR 350,000, the MNWT is set

at EUR 4,815. For all other securitisation companies having their statutory seat or central administration in Luxembourg which do not fall within the scope of the EUR 4,815 MNWT, the MNWT ranges from EUR 535 to EUR 32,100, depending on the company's total balance sheet.

## 1.3    Other taxes

There is no Luxembourg value added tax payable in respect of payments in consideration for the issuance of the Notes, or in respect of the payment of interest or principal under the Notes, or the transfer of the Notes. Luxembourg value added tax may, however, be payable in respect of fees charged for certain services rendered to the Company, if for Luxembourg value added tax purposes such services are rendered or are deemed to be rendered in Luxembourg and an exemption from Luxembourg value added tax does not apply with respect to such services.

The issuance of the Company's shares against contributions in cash, as well as other amendments to the articles of incorporation of the Company, are currently subject to a EUR 75 fixed registration duty. The issuance of the Notes is not subject to a Luxembourg registration tax or stamp duty, unless recorded in a Luxembourg notarial deed or otherwise registered in Luxembourg (which is generally not mandatory).

## 2.    Taxation of the Noteholders

## 2.1    Luxembourg tax residency of the Noteholders

Investors will not become resident nor be deemed to be resident, in Luxembourg by reason only of the holding of the Notes or the execution, performance, delivery and/or enforcement of their rights thereunder.

## 2.2    Withholding Tax

### 2.2.1    Resident Noteholders

Under the Luxembourg law dated 23 December 2005, as amended (the "**Law**"), a 20% Luxembourg withholding tax is levied on interest or similar income payments made by Luxembourg paying agents to or for the immediate benefit of an individual beneficial owner who is resident in Luxembourg. This withholding tax also applies on accrued interest received upon disposal, redemption or repurchase of the Notes. Such withholding tax will be in full discharge of income tax if the beneficial owner is an individual acting in the course of the management of his/her private wealth.

Responsibility for the withholding of tax in application of the Law is assumed by the Luxembourg paying agent within the meaning of the Law.

Further, Luxembourg resident individuals acting in the course of the management of their private wealth, who are the beneficial owners of interest payments and other similar income made as from 1 January 2008 by a paying agent established outside Luxembourg in a Member State of the European Union or the European Economic Area or in a jurisdiction having concluded an agreement with Luxembourg in connection with the Directive may opt for a final 20% levy. In such case, the 20% levy is calculated on the same amounts as for the payments made by Luxembourg paying agents. The option for the 10% final levy must cover all interest payments made by paying agents to the beneficial owner during the entire civil year.

### 2.2.2    Non-resident Noteholders

Under the Luxembourg tax law currently in effect, there is no withholding tax on payments of interest (including accrued but unpaid interest) made to a Luxembourg non-resident Noteholder. There is also no Luxembourg withholding tax upon repayment of the principal, upon sale, refund or redemption of the Notes.

## 2.3     Income Tax

### 2.3.1     Taxation of Luxembourg non-residents

Noteholders who are non-residents of Luxembourg and who have neither a permanent establishment nor a permanent representative in Luxembourg to which or whom the Notes are attributable are not liable to any Luxembourg income tax, whether they receive payments of principal or interest (including accrued but unpaid interest) or realise capital gains upon redemption, repurchase, sale, disposal or exchange, in any form whatsoever, of any Notes.

Article I.  Noteholders who are non-residents of Luxembourg and who have a permanent establishment or a permanent representative in Luxembourg to which or whom the Notes are attributable are liable to Luxembourg income tax on any interest received or accrued, as well as any reimbursement premium received at maturity and any capital gain realised on the sale or disposal, in any form whatsoever, of the Notes and have to include this income in their taxable income for Luxembourg income tax assessment purposes.

### 2.3.2     Taxation of Luxembourg residents

#### 2.3.2.1  *Luxembourg resident individuals*

An individual Noteholder, acting in the course of the management of his/her private wealth, is subject to Luxembourg income tax in respect of interest received, redemption premiums or issue discounts under the Notes, except if a final withholding tax has been levied on such payments in accordance with the Law.

Under Luxembourg domestic tax law, gains realised upon the sale, disposal or redemption of the Notes by an individual Noteholder, who is a resident of Luxembourg for tax purposes and who acts in the course of the management of his/her private wealth are not subject to Luxembourg income tax, provided this sale or disposal took place more than six months after the acquisition of the Notes.

An individual Noteholder, who acts in the course of the management of his/her private wealth and who is a resident of Luxembourg for tax purposes, has further to include the portion of the gain corresponding to accrued but unpaid income in respect of the Notes in his/her taxable income, insofar as the accrued but unpaid interest is indicated separately in the agreement.

Luxembourg resident individual Noteholders acting in the course of the management of a professional or business undertaking to which the Notes are attributable, have to include any interest received or accrued, as well as any gain realised on the sale or disposal of the Notes, in any form whatsoever, in their taxable income for Luxembourg income tax assessment purposes. Taxable gains are determined as being the difference between the sale, repurchase or redemption price (including accrued but unpaid interest) and the lower of the cost or book value of the Notes sold or redeemed.

#### 2.3.2.2  *Luxembourg corporate residents*

Luxembourg corporate Noteholders must include any interest received or accrued, as well as any gain realised on the sale or disposal of the Notes, in their taxable income for Luxembourg income tax assessment purposes. Taxable gains are determined as being the difference between the sale, repurchase or redemption price (including but unpaid interest) and the lower of the cost or book value of the Notes sold or redeemed.

#### 2.3.2.3  *Luxembourg corporate residents benefiting from a special tax regime*

Luxembourg Noteholders who benefit from a special tax regime, such as, for example, undertakings for collective investment subject to the amended laws of 17 December 2010, specialized investment funds governed by the amended law of 13 February 2007 or family wealth management companies governed

by the amended law of 11 May 2007 are exempt from income taxes in Luxembourg and thus income derived from the Notes, as well as gains realised thereon, are not subject to income taxes.

## 2.4    Net Worth Tax

Luxembourg resident Noteholders and non-resident Noteholders who have a permanent establishment or a permanent representative in Luxembourg to which or whom the Notes are attributable, are subject to Luxembourg worth tax on such Notes, except if the Noteholder is (i) an individual, (ii) an undertaking for collective investment subject to the amended law of 17 December 2010, (iii), a securitisation company governed by the Securitization Law, (iv) a company governed by the amended law of 15 June 2004 on venture capital vehicles, (v) a specialized investment fund governed by the amended law of 13 February 2007, (vi) a family wealth management company governed by the amended law of 11 May 2007, or (vii) a professional pension institution governed by the amended law of 13 July 2005 or (viii) a reserved alternative investment fund governed by the amended law of 23 July 2016.

However, (i) a securitisation company governed by the Securitisation Law, (ii) a professional pension institution governed by the amended law of 13 July 2005, (iii) a company governed by the amended law of 15 June 2004 on venture capital vehicles, or (iv) an opaque reserved alternative investment fund treated as a venture capital vehicle for Luxembourg tax purposes and governed by the amended law of 23 July 2016 are subject to the MNWT.

## 2.5    Other Taxes

There is no Luxembourg registration tax, stamp duty or any other similar tax or duty payable in Luxembourg by the Noteholders as a consequence of the issuance of the Notes, nor will any of these taxes be payable as a consequence of a subsequent transfer, redemption or repurchase of the Notes (except in case of voluntary registration in Luxembourg).

No estate or inheritance taxes are levied on the transfer of the Notes upon death of a Noteholder in cases where the deceased was not a resident of Luxembourg for inheritance tax purposes. Luxembourg gift tax may be due on a gift or donation of Notes if the gift is recorded in a deed passed in front of a Luxembourg notary or otherwise registered in Luxembourg.

## 3.    FATCA

FATCA provisions impose a reporting requirement to the U.S. Internal Revenue Service (the "**IRS**") with respect to U.S. persons' direct and indirect ownership of non-U.S. accounts and non-U.S. entities. Failure to provide the requested information will lead to a 30% withholding tax applying to certain U.S. source income (including dividends and interest) and gross proceeds from the sale or other disposal of property that can produce U.S. source interest or dividends.

On 28 March 2014, Luxembourg has signed an intergovernmental agreement (the "**IGA**") with the United States, in order to facilitate compliance of entities like the Company, with FATCA and avoid the above-described US withholding tax. Under the IGA, some Luxembourg entities like the Company will have to provide the Luxembourg tax authorities with information on the identity, the investments and the income received by their investors. The Luxembourg tax authorities will then automatically pass the information on to the IRS.

Under the IGA, the Company may be required to obtain information on the Noteholders and if applicable, inter alia, disclose the name, address and taxpayer identification number of a US person that owns, directly or indirectly, Notes issued by the Company, as well as information on the balance or value of the investment.

Therefore and despite anything else herein contained and as far as permitted by Luxembourg law, the Company shall have the right to:

- require any Noteholder or beneficial owner of the Notes to promptly furnish such personal data as may be required by the Company in its discretion in order to comply with any law and/or to promptly determine the amount of withholding to be retained;

- divulge any such personal information to any tax or regulatory authority, as may be required by law or such authority;

- withhold any taxes or similar charges that it is legally required to withhold, whether by law or otherwise, in respect of any Note issued by the Company;

- withhold the payment of any interest or redemption proceeds to a Noteholder until the Company holds sufficient information to enable it to determine the correct amount to be withheld.

- cause any Noteholder to be redeemed if such Noteholder's ownership of Notes is causing the Company to bear any taxes that the Company is not bearing with respect to Noteholders generally;

- deduct any taxes that are attributable to a Noteholders' failure to provide required information pursuant to FATCA or other tax reporting law.

All prospective investors and Noteholders are advised to consult with their own tax advisors regarding the possible implications of FATCA on their investment in the Company.

## UNITED STATES TAXATION

The discussion below is a general summary of certain United States tax considerations currently applicable to an investment by a prospective Noteholder in the Notes issued by the Issuer and to the Issuer's contemplated investments in interests in moKredit Participation Certificates.  This discussion assumes that the moKredit Participation Certificates will be properly treated for U.S. federal income tax purposes as a direct interest held by the Issuer in the obligations of moKredit to which the moKredit Participation Certificates relate, and not as either debt of, or an equity interest in, Cred.

EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH AND MUST RELY UPON HIS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF INVESTING IN THE NOTES ISSUED BY THE ISSUER. THIS DISCUSSION IS PROVIDED ONLY TO ASSIST THE PROSPECTIVE INVESTOR IN EVALUATING THE EXPECTED UNITED STATES TAX CONSEQUENCES AND LIABILITIES RELATED TO AN INVESTMENT IN THE NOTES. NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OR LIABILITIES RELATED TO AN INVESTMENT IN THE NOTES BY ANY PROSPECTIVE INVESTOR. MOREOVER, THIS DISCUSSION IS NOT INTENDED TO PROVIDE TAX OR OTHER LEGAL ADVICE TO ANY PROSPECTIVE INVESTOR.

The following is a summary of certain aspects of the U.S. federal income taxation of the Notes and the Issuer's contemplated investment in interests in the moKredit Participation Certificates that should be considered by a prospective investor. This summary is based on the U.S. federal income tax laws, regulations, administrative rulings and judicial decisions in effect or available on the date of this Base Prospectus. No assurance can be given that administrative, judicial or legislative changes will not occur that would make the statements herein incorrect or incomplete. This summary does not discuss all of the tax consequences that may be relevant to a particular investor or to certain investors subject to special treatment under the U.S. federal income tax laws. In addition, this summary does not address the U.S. federal income tax considerations applicable to an investment in the Notes by persons other than non-U.S. holders (as defined below).  Each prospective investor should consult its own tax advisors regarding the U.S. federal income tax consequences associated with an investment in the Notes, or with the Issuer's investment in the moKredit Participation Certificates.

For purposes of this discussion, a "non-U.S. holder" is an investor that is not any of the following:

- an individual U.S. citizen or resident alien;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, that was created or organized in or under the laws of the United States, any State thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States can exercise primary supervision over the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or if the trust was in existence on August 20, 1996 and elected to be treated as a U.S. person.

If a partnership holds Notes, the tax treatment of a partner generally will depend upon the status of the partner and upon the activities of the partnership. Prospective investors that are partners of a partnership holding Notes should consult with their own tax advisors.

**The Noteholders**. Noteholders that are non-U.S. holders should not be subject to U.S. federal income taxation on gain realized from the sale, exchange, or redemption of Notes held as capital assets unless such gain is otherwise effectively connected with a U.S. trade or business or, in the case of a non-

resident alien individual, such individual is present in the United States for 183 days or more during a taxable year and certain other conditions are met.

**The Issuer**. The Issuer will be classified as a foreign corporation for U.S. federal income tax purposes. As a foreign corporation, the Issuer generally will not be subject to U.S. federal income taxation on non-U.S. source income or gain realized by it from trading and investment activities (such as income earned by the Issuer in respect of its investment in the moKredit Participation Certificates) provided that the Issuer is either (a) not engaged in, or deemed to be engaged in, a U.S. trade or business to which such income or gain is treated as effectively connected, or (b) properly certifies its entitlement to benefits under the income tax treaty between Luxembourg and the United States (the "Treaty") and does not maintain a "permanent establishment" in the U.S. to which such income or gain is considered attributable. The Issuer intends to conduct its affairs in such manner that it should neither be considered to be engaged in the conduct of a U.S. trade or business nor to maintain a "permanent establishment" in the U.S. within the meaning of the Treaty.   However, because the Issuer cannot give complete assurance that its activities might not cause it to either be treated as conducting a trade or business within the United States or be treated as maintaining a "permanent establishment" in the U.S., it should be noted that in such event the Issuer (but not any of the Noteholders) would be required to file a U.S. federal income tax return for such year and pay tax on its income and gain that is either effectively connected with such U.S. trade or business or attributable to such U.S. "permanent establishment" at U.S. corporate tax rates (currently 21%). In addition, the Issuer generally would be required to pay a branch profits tax equal to 30% (or, in the event the Issuer properly certifies its entitlement to benefits under the Treaty, 5%) of the earnings and profits of such U.S. trade or business that are not reinvested therein.

It is expected that the Issuer will file a protective U.S. federal corporate income tax return with the Internal Revenue Service for each taxable year on which no tax will be reported as due.

In addition to the U.S. federal income tax consequences described above, U.S. state and local governments impose a variety of taxes on entities that have taxable nexus with such states and localities. The Issuer expects that their contemplated activities will not cause them to have taxable nexus in any state or locality. However, there can be no assurance that a state or locality will not seek to subject the Issuer to tax.

## DOCUMENTS AVAILABLE

From the date of this Base Prospectus and for so long as the Programme remains in effect or any Notes remain outstanding, the following documents will be available for inspection and obtainable in physical format, free of charge, during usual business hours on any weekday (Saturdays, Sundays and public holidays excepted) at the registered office of the Issuer:

(i)      the Articles of Association;

(ii)     the Declaration of Trust;

(iii)    a copy of this Base Prospectus;and

(iv)    the Transaction Documents.

Since the date of its incorporation the Company has formed three Compartments.  The Issuer was formed on January 16, 2020.  In 2015, two other compartments of the Company were formed which are currently in the later stages of liquidation. The financial statements of the Company which will be published by the Company as well as any future annual financial statements can be obtained, free of charge, upon request to the Administrative Services Provider as long as any of the Notes remain outstanding.

The Company's fiscal year starts on 1 January and ends on 31 December each year, except for the first fiscal year that started on the date of incorporation of the Company and ended on 31 December 2015.

According to Luxembourg law of 19 December 2002 *concernant le registre du commerce et des sociétés ainsi que la comptabilité et les comptes annuels des entreprises,* as amended, the Company shall publish its annual account once a year following their approval at the shareholder's annual meeting.

**ISSUER**

Income Opportunities (Luxembourg) S.A., acting on behalf of its Cred Global Notes Compartment 1

19, rue de Bitbourg

L-1273 Luxembourg

**ARRANGER, CALCULATION AGENT and PAYING AGENT**

Cred LLC

2121 S. El Camino Real

San Mateo, CA 94403

**LEGAL ADVISOR**

*to the Issuer as to Luxembourg law*

Rutsaert Legal S.à r.l.

14 rue de Strassen

L-2555 Luxembourg

**ACCOUNT BANK**

Société Générale Bank & Trust

11, avenue Emile Reuter

L-2420 Luxembourg

**CORPORATE SERVICES PROVIDER**

Arendt Services S.A.

19, rue de Bitbourg

L-1273 Luxembourg