**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CRED, INC., *et al.*, | Case No.:  20-12836 (JTD) |
| Debtors.[1] | (Jointly Administered) |
| | **Objection Deadline: July 7, 2022 at 4:00 p.m. (ET)**<br>**Hearing Date: July 19, 2022 at 3:00 p.m. (ET)** |
| | **Related to Docket No. 1015** |

**OBJECTION OF UPHOLD HQ INC. TO THE**
**MOTION OF THE CRED INC. LIQUIDATION TRUST FOR ENTRY OF ORDER**
**APPROVING THIRD PARTY CLAIM ASSIGNMENT PROCEDURES**

Uphold HQ Inc. ("**Uphold**") hereby submits this objection (the "**Objection**"), by and through its undersigned counsel, to the *Motion of the Cred Inc. Liquidation Trust for Entry of Order Approving Third Party Claim Assignment Procedures* [Docket No. 1015] (the "**Motion**")[2] filed by The Cred Inc. Liquidation Trust (the "**Trust**") established in the above-captioned chapter 11 bankruptcy cases (collectively, the "**Chapter 11 Cases**") of Cred, Inc. and its debtor affiliates (collectively, the "**Debtors**").  In support hereof, Uphold respectfully states as follows:

**PRELIMINARY STATEMENT**

1.    Under the Plan and Trust Agreement, the Trustees were vested with certain enumerated powers necessary to effectuate the limited purpose of the Trust—i.e., the liquidation of Liquidation Trust Assets—but also subject to limitations.  As stated in the Plan:

> The Liquidation Trust shall be established for the primary purpose of liquidating and distributing the Assets transferred to it … with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

[2] Unless otherwise defined, all capitalized terms shall have the same meaning as ascribed to them in the Motion.

necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Accordingly, the Liquidation Trustees may, in an expeditious but orderly manner, liquidate the Liquidation Trust Assets, make timely Distributions to the Liquidation Trust Beneficiaries and not unduly prolong its duration.[3]

Docket No. 629-1, at p. 59; *see also* Docket No. 597-1, at pp. 5, 13 ("The Liquidating Trustees shall have no power or authority except as set forth in the [Trust] Agreement or in the Confirmation Order or the Plan." "[T]he Liquidation Trustee shall not be authorized to engage in any trade or business with respect to the Liquidation Trust Assets…." "The Liquidation Trust shall be established for the primary purpose of liquidating its assets … with no objective to continue or engage in the conduct of a trade or business ….").

2.    In contravention of these mandates, the Trustees now request that the Court authorize the Trust to *acquire* third-party claims and causes of action against non-debtor entities— assets that constitute neither "Assets" nor "Liquidation Trust Assets" under the Plan or Trust Agreement—through the establishment of certain "procedures." *See, generally*, Docket No. 1015. The authority to "adjudicate" third-party claims, however, does not vest the Trustees with the authority to *acquire* non-estate third-party claims. And, while the Plan and Trust Agreement may

---

[3] Pursuant to Article I of the Plan, "Assets" and "Liquidation Trust Assets" are defined as follows:

**1.8 "Assets"** means the assets of each of the Debtors, of any nature whatsoever, including all property of the Estates under and pursuant to section 541 of the Bankruptcy Code, Cash, Causes of Action, rights, interests and property, real and personal, tangible and intangible, including all files, books and records of the Estates."

… [¶] …

**1.86 "Liquidation Trust Assets"** means all of the Estates' Assets transferred to the Liquidation Trust pursuant to Section 12.3(c) hereof.

*See* Docket No. 629-1, at pp. 12, 19. Section 12.3(c) of the Plan further provides:

Prior to the Effective Date, any and all of the Estates' Assets shall remain Assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date shall, subject to the Liquidation Trust Agreement, be transferred to and vest in the Liquidation Trust.

*See Id.* at p. 58.

accommodate certain non-material assignments associated with the administration of the Liquidation Trust Assets, the large-scale acquisition of non-estate third-party claims envisioned under the Assignment Procedures fundamentally changes the purpose of the Trust and necessitates material modifications to the substantially consummated Plan prohibited under Section 1127(b) of the Bankruptcy Code (defined below), as well as the terms of the Plan and Confirmation Order, including, most notably, modifying the treatment of Class 4 under the Plan.  *See* 11 U.S.C. § 1127; *see* Docket Nos. 629, at pp. 43-44, 629-1, at pp. 80-81; *see In re NorthEast Gas Generation, LLC*, No. 20-11597 (MFW), 2022 WL 828263 (Bankr. D. Del. Mar. 18, 2022); *see In re Rickel & Assocs., Inc.*, 260 B.R. 673 (Bankr. S.D.N.Y. 2001).  These modifications would not only be impermissible, but they would harm the Trust beneficiaries—diluting claims of non-participating Class 4 claimants (i.e., claimants lacking Third Party Claims or that choose to retain such claims), including Uphold, imperiling the tax exempt status of the Trust, and competing with already pending class action litigation pertaining to the purported Third Party Claims.[4] Each of these items, while potentially properly for a liquidating trust, if such authority was approved in the plan, cannot be added after substantially consummation of a plan.

3.      While Uphold is a potential defendant in connection with these third-party claims, it has an interest as a Class 4 creditor[5] and beneficiary of the Trust.  If these Third Party Claims are assigned, the Trust's tax treatment of all interest holders would be imperiled.  Moreover, it is

---

[4]  On or about September 1, 2021, Uphold customers filed a class action lawsuit alleging certain claims and causes of action against Uphold arising out of or relating to the "CredEarn" program (the "**Uphold Class Action**"), which is styled as *Sandoval v. Uphold HQ Inc.*, 1:21-cv-07579-VSB, and is pending in the United States District Court for the Southern District of New York.  The Third Party Claims encompass the claims asserted in the Uphold Class Action. Simply put, Uphold customers already have a forum and mechanism to litigate their claims against Uphold.  As such, the Trustees' acquisition of such claims would interfere in the litigation of the Uphold Class Action, result in a waste of judicial resources through duplicative litigation, and force Uphold to defend against the same claims simultaneously in two forums—results that contravene the foundational purposes of consolidated, class action litigation.

[5]  Uphold filed Claim No. 1228 and was additionally scheduled by the Debtors.

not efficient to turn this Court into another class action forum to adjudicate non-estate claims exclusively between non-debtor parties—especially given the limited jurisdiction and constitutional authority of this Court post-confirmation. *See Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 164-65 (3d Cir. 2004) (holding that post-confirmation "related to" jurisdiction requires a "close nexus to the bankruptcy plan…."). Allowing for assignment of a material portion of "Customer Claims" would transform this liquidating trust into something that was neither proposed in the Plan nor approved by creditors in accordance with the Bankruptcy Code.

4.       Accordingly, and for the reasons discussed herein, Uphold requests that the Court deny the Motion in its entirety.

## **BACKGROUND**

5.       On November 7, 2020 (the "**Petition Date**"), the Debtors filed voluntary chapter 11 petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**")—thereby commencing the Chapter 11 Cases.

6.       On December 31, 2020, the Debtors filed the Plan.[6] *See* Docket No. 301. The Plan provides for the establishment of the "Cred Liquidation Trust" pursuant to and in accordance with the terms of the Plan and Trust Agreement for the benefit of Holders of Allowed General Unsecured Claims in Class 4 of the Plan. *See* Docket No. 629-1, at p. 58; *see also* Docket No. 579-1, at p. 2 ("[T]he Plan provides for the creation of the Liquidation Trust, as of the Effective Date, to hold, administer, and liquidate the Liquidation Trust Assets, and to distribute the same or proceeds of the same to Holders of Allowed General Unsecured Claims, in accordance with the terms of the Plan and this [Trust] Agreement…."). The Plan establishes the Trust as "a 'liquidating

---

[6] As used herein, "**Plan**" refers to the version of the Plan appended to the Confirmation Order at Docket No. 629-1.

trust' as described in Treasury Regulations Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-2 C.B. 684, and will be treated for federal income tax purposes as a 'grantor trust' under Internal Revenue Code sections 671-677." *Id*. at 58-59. On the Effective Date, "any and all of the Estates' Assets … [were] transferred to and vest[ed] in the Liquidation Trust." *Id*. Such "Assets" consisted of "the assets of each of the Debtors, of any nature whatsoever, including all property of the Estates under and pursuant to section 541 of the Bankruptcy Code, Cash, Causes of Action, rights, interests and property, real and personal, tangible and intangible, including all files, books and records of the Estates." *See Id*., at p. 12.

7.      The Plan and Trust Agreement vested the Trustees with the authority to administer the Liquidation Trust Assets pursuant to and in accordance with the Trust Agreement, including, the "right to assert and prosecute in accordance with the Liquidation Trustees' reasonable business judgment the Causes of Action," provided that "the Liquidation Trustee shall not be authorized to engage in any trade or business with respect to the Liquidation Trust Assets…." *See* Docket No. 579-1, at pp. 5, 10. The Plan and Trust Agreement further authorized the Trustees "to perform those acts necessary to accomplish the purposes of the Liquidation Trust"—i.e., "liquidate and convert to Cash the Liquidation Trust Assets, make timely distributions to the Beneficiaries" [*Id*. at pp. 2, 13]—including, without limitation, the "adjudication" of certain third-party claims comprising "Causes of Action" under the Plan.[7] *See Id*. at p. 4. "The Liquidating Trustees shall

---

[7] Article I of the Plan defines "Causes of Action" as "all claims, actions, causes of action, *third-party claims*, counterclaims, crossclaims, *third-party claims*, contribution claims, or any other claims whatsoever (including any Causes of Action described herein) *of the Debtors and/or their Estates* that may be pending on the Effective Date (including all such Causes of Action brought by the Committee pursuant to the Plan Support Agreement) or instituted after the Effective Date against any Entity based in law, equity, or otherwise, including under the Bankruptcy Code, whether known or unknown, whether direct, indirect, derivative, or otherwise, and whether asserted or unasserted as of the date of entry of the Confirmation Order, including Avoidance Actions." *See* Docket No. 629-1, at p. 13 (emphasis added).

have no power or authority except as set forth in the [Trust] Agreement or in the Confirmation

Order or the Plan." *Id*. at p. 5.

        8.      Class 4 of the Plan consists of General Unsecured Claims. *See* Docket No. 629-1,

at pp. 42-43. The Plan provides the following treatment for Class 4 claims:

> Except to the extent that a Holder of an Allowed General Unsecured Claim in Class 4 agrees to a less favorable treatment or has been paid by any of the Debtors prior to the Effective Date, each Holder of an Allowed General Unsecured Claim in Class 4 shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim either: (i) a Cash payment equal to such Holder's Distribution Pro Rata Share of Net Distributable Assets; or, if permitted, (ii) with respect to any such Holder that makes a Cryptocurrency Election, a good faith effort shall be made to make distributions in an Equivalent Cryptocurrency Distribution.

*Id*. Pursuant to Article I of the Plan, "Distribution Pro Rata Share" and "Net Distributable Assets"

are defined as follows:

> **1.60 "Distribution Pro Rata Share"** means the ratio (expressed as a percentage) of (x) the amount of an Allowed General Unsecured Claim against the Debtors to (y) the aggregate amount of all (A) Allowed General Unsecured Claims against the Debtors on the date of a Distribution plus (B) the aggregate Disputed Claim amount of all remaining Disputed General Unsecured Claims against the Debtors.

> **1.94 "Net Distributable Assets"** means (a) the gross amount available from the liquidation of the Assets (including any Litigation Proceeds) minus (b) (i) the amount of all Allowed A/P/S Claims Allowed against the Debtors, (ii) U.S. Trustee Fees, (iii) the Liquidation Trust Expenses, and (iv) Distributions to Holders of Allowed Convenience Claims.

*See Id*. at pp. 17, 20. Pursuant to Article I of the Plan, "Assets" is defined as follows:

> **1.8 "Assets"** means the assets of each of the Debtors, of any nature whatsoever, including all property of the Estates under and pursuant to section 541 of the Bankruptcy Code, Cash, Causes of Action, rights, interests and property, real and personal, tangible and intangible, including all files, books and records of the Estates."

*Id.* at p. 12.  Uphold is a "Holder of an Allowed General Unsecured Claim in Class 4" under the

Plan.[8]

9.      On March 11, 2021, the Court entered an order confirming the Plan (the

"**Confirmation Order**").  *See* Docket No. 629.  The Plan became effective on April 19, 2021 (the

"**Effective Date**").  *See* Docket no. 730.  On the Effective Date, the Plan was deemed to be

substantially consummated under Sections 1101 and 1127(b) of the Bankruptcy Code.  *See* Docket

No. 629-1, at pp. 82-83.

## **OBJECTION**

A.      **Trustees Seek to Modify Substantially Consummated Plan to Effectuate Assignment
        Procedures in Contravention of Section 1127(b), the Confirmation Order and Plan**

10.      While the Motion is styled as an innocuous "procedures" motion,[9] the motion is

highly substantive—approval of the Assignment Procedures would modify the Plan in several

material respects, including, without limitation, the treatment of Class 4 claimants, the authority

of the Trustees, and scope of Assets and Liquidation Trust Assets under the Plan; however, as the

Plan has been substantially consummated, the Trustees may not seek to amend or modify the Plan

---

[8] On or about February 10, 2021, Uphold timely filed proof of claim 1113-1 asserting a non-priority unsecured claim against the Debtors' bankruptcy estates.

Following the Effective Date, the Trustees leveled various spurious and unsubstantiated allegations against Uphold. While the Trustees have yet to pursue legal action, Uphold may be one of the targets of the Trustees' campaign to acquire the claims Uphold's customers may have against Uphold—claims that are the subject to pending class action litigation.

[9] Styling a motion as one seeking approval of procedures or a settlement, or a modification of a document other than the plan, etc., does not permit a debtor or trustee to circumvent Section 1127(b) of the Bankruptcy Code if the requested relief affects the terms of or rights under a substantially consummated plan—as is the case here.  *See In re Rickel & Assocs., Inc.*, 260 B.R. at 677 ("A debtor cannot circumvent § 1127(b) and change the plan simply by calling its request a motion to modify the confirmation order, or a plan-related document, or another application that nonetheless affects rights under the plan." (internal citations omitted)); *In re Charterhouse, Inc.*, 84 B.R. 147, 150 (Bankr.D.Minn.1988); *Findley v. Blinken (In re Joint E. & S. Dist. Asbestos Litig.)*, 982 F.2d 721, 748 (2d Cir.1992); *In re United States Brass Corp.*, 255 B.R. 189, 194 (Bankr.E.D.Tex.2000); *In re U.S. Repeating Arms Co.*, 98 B.R. 138, 140 (Bankr.D.Conn.1989); *In re NorthEast Gas Generation, LLC*, No. 20-11597 (MFW), 2022 WL 828263, at *3.

in any respect. *See* 11 U.S.C. § 1127(b); *In re NorthEast Gas Generation, LLC*, No. 20-11597 (MFW), 2022 WL 828263, at *3, 5; *see also In re Rickel & Assocs., Inc.*, 260 B.R. at 677.

11.    "Section 1127(b) provides the sole means for modifying a confirmed plan." *In re Rickel & Assocs., Inc.*, 260 B.R. at 677, *citing In re Ionosphere Clubs, Inc.*, 208 B.R. 812, 815 (S.D.N.Y.1997), and 7 LAWRENCE P. KING, ET AL., COLLIER ON BANKRUPTCY ¶ 1127.04, at 1127–7 (15th rev. ed. 2000).  "Section 1127(b) reinforces the principle of finality by preserving the rights bought and paid for under the plan." *Id.*; *In re NorthEast Gas Generation, LLC*, No. 20-11597 (MFW), 2022 WL 828263, at *3, 5; *In re Antiquities of Nevada, Inc.*, 173 B.R. 926, 928 (9th Cir. BAP 1994); *In re U.S. Repeating Arms Co.*, 98 B.R. at 140; *In re Charterhouse, Inc.*, 84 B.R. at 152; *see In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir.1994); *In re Diamond Mortgage Corp.*, 105 B.R. 876, 880 (Bankr.N.D.Ill.1989) ("[c]onfirmation of a plan in effect sets the plan in stone unless the proponent chooses to alter it before it is substantially consummated").

12.    Therefore, Section 1127(b) of the Bankruptcy Code prohibits "modification of a confirmed plan after it has been substantially consummated." *In re NorthEast Gas Generation, LLC*, No. 20-11597 (MFW), 2022 WL 828263, at *3; *see In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994); *In re Rickel & Assocs., Inc.*, 260 B.R. at 677 (holding that "the literal terms of § 1127(b) bar any effort to modify the Plan" after it has been consummated).  In other words, "[S]ection 1127(b) [of the Bankruptcy Code] is an absolute bar to modification after substantial consummation" regardless of whether the change is material or potentially beneficial. *Id.* at *5 (emphasis added); *see also In re WBY, Inc.*, No. 16-52291-JRS, 2019 WL 3713686, at *10-11 (Bankr. N.D. Ga. Aug. 5, 2019) ("Regardless of the nature of the requested change, a plan cannot be modified once it has been substantially consummated."); *In re Rickel & Assocs., Inc.*, 260 B.R. at 677 ("Here, the parties agree that the plan has been substantially consummated. Hence, the literal

terms of § 1127(b) bar any effort to modify the Plan."). The Confirmation Order and Plan also prohibit the modification of the Plan after substantial consummation. *See* Docket No. 629, at pp. 43-44; *see also* Docket No. 629-1, at pp. 80-81. The Assignment Procedures, however, would modify the Plan in several respects. The Motion seeks relief that is directly contrary to cases in Delaware Bankruptcy Court which prohibit the transformation of the scope of the liquidating trusts into something different than what was contemplated at the time of confirmation. *See NorthEast Gas Generation*, , No. 20-11597 (MFW), 2022 WL 828263, at *3.

### 1. *The Assignment Procedures Modify the Treatment of Class 4 Creditors*

13.    First and foremost, the Assignment Procedures would directly affect the treatment of Holders of General Unsecured Claims under the Plan. As confirmed, the Plan provides the following treatment for Class 4:

> [E]ach Holder of an Allowed General Unsecured Claim in Class 4 shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim either: (i) a ***Cash payment equal to such Holder's Distribution Pro Rata Share of Net Distributable Assets***; or, if permitted, (ii) with respect to any such Holder that makes a Cryptocurrency Election, a good faith effort shall be made to make distributions in an Equivalent Cryptocurrency Distribution.

*See* Docket No. 629-1, at pp. 52-53 (emphasis added). The Assignment Procedures would modify the treatment under Class 4 by altering the *pro rata* treatment of General Unsecured Claims—increasing distributions to Class 4 claimants that assign Third Party Claims to the Trust and, thus, diluting or reducing distributions to Holders of General Unsecured Claims that either lack any Third Party Claims or choose to retain such claims. The Assignment Procedures create a third option for Customer Claims for Class 4 treatment which was not in the Plan.

14.    By way of example, if Class 4 were comprised of two $100,000 claims held by Creditor A and Creditor B and "Net Distributable Assets" were $100,000, the "Distribution Pro Rata Share" to Creditor A and Creditor B would be $50,000 each—a *pro rata* portion of the "Net

Distributable Assets". *See* Docket No. 629-1, at pp. 17, 20, 52-53. Under the Assignment Procedures, however, if Creditor A assigns a Third Party Claim to the Trust and Creditor B lacks any Third Party Claim to assign, or chooses not to assign its Third Party Claim to the Trust, Creditor A's claim would increase to $110,000 and, as a result of the increased claim, the "Distribution Pro Rata Share" to Creditor A would increase to $52,380, while Creditor B's distribution would decrease to $47,620. *See* Docket No. 1015, at p. 5 ("In consideration for assigning Third Party Claims to the Trust, Assigning Creditors will be entitled to a 10% increase of their allowed claim amount (e.g., if an Assigning Creditor has an allowed claim equal to $100,000, the allowed claims will be automatically increased to $110,000.)").[10] Of course, as the Trustee posits, Creditor B may benefit and receive more than $50,000 if the adjudication of the Third Party Claim generates a net recovery to the Trust—though the Trustees provide no substantiation for the proposition that adjudication of the Third Party Claims would benefit Trust beneficiaries.[11] *See, generally*, Docket No. 1015. On the other hand, Creditor B may also receive less than $47,620 for any number of reasons.[12]

---

[10] In addition to altering the treatment of Class 4 claimants, the proposed compensation to Assigning Creditors raises serious concerns about potential conflicts with respect to the reconciliation and, if appropriate, objections to the claims of Assigning Creditors, which may exacerbate the disparate treatment of Assigning Creditors and non-Assigning Creditors under the Plan, as modified by the Assignment Procedures.

[11] Indeed, the Trustees fail to provide any basis for the conclusion that the acquisition and prosecution of the Third Party Claims would result in increased recoveries for Trust beneficiaries—especially in light of the 10% increase of the claims of Assigning Creditors and administrative costs associated with the prosecution of the Third Party Claims. For instance, the Trustees fail to identify the anticipated Third Party Claims, the potential defendants, the projected value of anticipated Third Party Claims, the anticipated costs and duration of litigation (which is particularly important given the finite resources and period of time in which the Trust may exist), the ability to recover on account of any resulting judgement(s), or the anticipated increase of Class 4 claims under the Assignment Procedures, which directly impacts distributions to non-Assigning Creditors.

[12] Even if these Assigning Creditors claims were "Allowed" without increase, this still is not consistent with the Plan. Other non-Assigning Creditors did not get their claims allowed in full in exchange for certain claims. This is a material matter of treatment that should have been put to a vote.

15.     Such debate is purely hypothetical, however, as Class 4 claimants are not entitled to any recoveries from Third Party Claims because (i) Third Party Claims do not constitute "Assets" and, thus, (ii) the recoveries therefrom do not constitute "Net Distributable Assets" under the Plan.  More precisely, Class 4 of the Plan provides that Holders of General Unsecured Claims are entitled to a "Distribution Pro Rata Share of Net Distributable Assets".  *See* Docket No. 629-1, at pp. 52-53.  "Net Distributable Assets" consist of "the gross amount available from the *liquidation of the Assets*" less certain expenses of the Trust and distributions to Class 5 claimants. *See Id*. at p. 20 (emphasis added).  "Assets" consist of "*the assets of each of the Debtors*, of any nature whatsoever, including all property of the Estates under and pursuant to section 541 of the Bankruptcy Code, Cash, Causes of Action, rights, interests and property, real and personal, tangible and intangible, including all files, books and records of the Estates." *See Id*. at p. 12.  As the Third Party Claims are not "assets … of the Debtors," the Third Party Claims do not constitute "Assets" and, thus, the proceeds, if any, from the liquidation of the Third Party Claims do not constitute "Net Distributable Assets" subject to distribution to Class 4 claimants under the Plan.

16.     Beyond the absolute bar to modification in Section 1127(b) of the Bankruptcy Code and speculative benefits, the Trustees' request improperly seeks to bypass solicitation and voting on material terms of the Plan.  If the assignment of Third Party Claims to the Trust was a "material issue" from the time the Committee was appointed (as the Trustees contend), the proposed acquisition of Third Party Claims should have been disclosed pursuant to Section 1125 of the Bankruptcy Code and the Assignment Procedures should have been incorporated into the Plan prior to solicitation and voting on the Plan or, at very least, prior to the Effective Date (subject to compliance with Section 1127(a) or (b) of the Bankruptcy Code, as applicable).  11 U.S.C. § 1125

(requiring disclosures "of a kind, and in sufficient detail, … [to] enable … a hypothetical investor of the relevant class to make an informed judgment about the plan…..").

17.     But the Assignment Procedures, and, indeed, any authority to acquire Third Party Claims, were not disclosed to Class 4 claimants or otherwise included in the Plan, Confirmation Order or Trust Agreement.  These omissions deprived Class 4 claimants of important rights and protections under the Bankruptcy Code, including the ability to receive full and fair disclosures regarding the Plan and treatment of Class 4 claims, to evaluate and consider the Assignment Procedures, to weigh the risks of dilution to non-Assigning Creditors, timing of distributions, and additional costs of Trust administration, among other issues, and, with that information, "to make an informed judgement" whether to vote to accept or reject the Plan.  Similarly, the omission of the Assignment Procedures, and, in particular, the proposed compensation to Assigning Creditors, deprived the Class 4 claimants of the ability to determine whether they would prefer the Trust have the ability to pursue these assignments, and Court of the ability to evaluate whether Class 4 complied with the requirements of Sections 1122 and 1123 of the Bankruptcy Code due to the disparate treatment of Assigning Creditors and non-Assigning Creditors under Class 4 of the Plan. The Trustees should not be permitted to circumvent the procedures for confirming and amending a chapter 11 plan, including the safeguards intended to protect the interests of creditors that allow creditors a voice in shaping that Plan and, in so doing, alter the treatment and *bona fide* expectations of Class 4 claimants more than a year after the substantial consummation of the Plan.

## 2.     *The Assignment Procedures Modify the Authority of Trustees and Scope of Liquidation Trust Assets*

18.     In addition to altering the treatment of Class 4 claims, the Assignment Procedures modify the Plan by expanding the authority of the Trustees and scope of Liquidation Trust Assets.

In construing a confirmed plan of reorganization, courts in the Third Circuit apply principles of

contractual interpretation. *In re Shenango Grp. Inc.*, 501 F.3d 338, 344 (3d Cir. 2007).

> Delaware adheres to an objective theory of contracts, meaning that a "contract's construction should be that which would be understood by an objective, reasonable third party." This approach places great weight on the plain terms of a disputed contractual provision, and "we 'interpret clear and unambiguous terms according to their ordinary meaning.'" We do not consider extrinsic evidence unless we find that the text is ambiguous. Ambiguity is present "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." Critically, a contractual provision is "not rendered ambiguous simply because the parties in litigation differ" as to the proper interpretation.

*Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022). Similarly, in interpreting

the terms of a trust instrument, "[t]he language of the trust instrument will be 'given their ordinary

meaning and the court will not consider extrinsic evidence to vary or contract express provision of

a trust instrument that are clear, unambiguous and susceptible of only one interpretation." *In re*

*Fruehauf Trailer Corp.*, 431 B.R. 838, 852 (Bankr. C.D. Cal. 2010) (applying Delaware law), *aff'd*

*sub nom. In re Fruehauf Trailer*, No. CV 10-02312 DDP, 2011 WL 2014672 (C.D. Cal. May 23,

2011), *quoting Wilmington Trust Co. v. Annan*, 531 A.2d 1209, 1211 (Del.Ch.1987). However,

the authority of a trustee under a trust instrument is strictly construed and limited to those powers

"conferred upon [the trustee] in specific words by the terms of the trust" or "necessary or

appropriate to carry out the purpose of the trust and are not forbidden by the terms of the trust."

*Id.*, *citing* Restatement (Second) of Trusts § 186 (1959).

19.    The Trustee's requested assignment cannot clear two separate high hurdles. *First*,

Third Party Claims do not constitute assets of the Trust subject to administration by the Trustees.

The Trust Agreement expressly provides:

> The Liquidation Trustees shall be responsible for (a) liquidating and administering (or abandoning, as the case may be) the ***Liquidation Trust Assets***, including the Avoidance Actions, the Debtors' commercial tort claims, the Debtors' claims or Causes of Action against the Debtors' directors and officers, and claims or Causes of Action that may be

satisfied by insurance policies, (collectively, the "Causes of Action"), and (b) taking actions on behalf of, and representing, the Liquidation Trust.

Docket No. 579-1, at p. 3 (emphasis added).  Similarly, the Plan provides:

> The Liquidation Trust shall be established for the primary purpose of liquidating and distributing the *Assets* transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust.  Accordingly, the Liquidation Trustees may, in an expeditious but orderly manner, liquidate the *Liquidation Trust Assets*, make timely Distributions to the Liquidation Trust Beneficiaries and not unduly prolong its duration.

Docket No. 629-1, at p. 59.

20.    The terms "Liquidation Trust Assets" and "Assets" are limited to assets of the Debtors.  More precisely, Article I of the Plan defines "Assets" and "Liquidation Trust Assets" as follows:

> **1.8 "Assets"** means the assets of each of the Debtors, of any nature whatsoever, including all property of the Estates under and pursuant to section 541 of the Bankruptcy Code, Cash, Causes of Action, rights, interests and property, real and personal, tangible and intangible, including all files, books and records of the Estates."
>
> … [¶] …
>
> **1.86 "Liquidation Trust Assets"** means all of the Estates' Assets transferred to the Liquidation Trust pursuant to Section 12.3(c) hereof.

*See* Docket No. 629-1, at pp. 12, 19.  Section 12.3(c) of the Plan further provides:

> Prior to the Effective Date, any and all of the Estates' Assets shall remain Assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date shall, subject to the Liquidation Trust Agreement, be transferred to and vest in the Liquidation Trust.

*See Id.* at p. 58.  As the Third Party Claims are not assets of the Debtors or the Estates, the Third Party Claims do not constitute either Assets or Liquidation Trust Assets under the Plan or Trust Agreement.  Thus, the acquisition of the Third Party Claims by the Trust expends the scope of Liquidation Trust Assets under the Plan.

21.    *Second*, the Plan and Trust Agreement do not even authorize the Trustees to acquire the Third Party Claims. *See, generally*, Docket Nos. 579-1 and 629-1. Yet the Trustees contend that the authority to "[a]djudicate third party claims assigned, purchased, or otherwise transferred to the Liquidation Trust" encompasses the authority to *acquire* third-party claims.[13] *See* Docket No. 1015, at pp. 6-7; Docket No. 579-1, at p. 4; *see also* Docket No. 629-1, at p. 57. Such an argument, however, contravenes the plain language of the provisions, which solely authorize the *adjudication* of third-party claims. "Adjudication" is not synonymous with acquisition or assignment. *See* Black's Law Dictionary (11th ed. 2019) ("Adjudicate" is defined as "[t]o rule on judicially."). Accordingly, these provisions may only be read as acknowledging the Trustees' authority to adjudicate those "third-party claims" constituting Liquidation Trust Assets—i.e., the "third-party claims" acquired by the Debtors and/or Estates prior to the Effective Date and assigned or transferred to the Trust. *See Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d at 760 ("Delaware adheres to an objective theory of contracts, meaning that a 'contract's construction should be that which would be understood by an objective, reasonable third party.' This approach places great weight on the plain terms of a disputed contractual provision…."). Whatever was actually intended by this language, it did not allow for the acquisition of Third Party Claims— especially as the acquisition of Third-Party Claims will transform the purpose, scope, cost and timeline for the Trust in ways not contemplated in and, in fact, incongruous with the Plan.

22.    The Trustees' reliance on the *Zazzali* and *Grede* decisions are equally misplaced. In *Grede v. New York Mellon*, the court acknowledged that a post-confirmation trustee may

---

[13] Although the Trustees solely rely upon Section 12.3(b)(vii) of the Plan and Section 2.4(7) of the Trust Agreement in attempting to establish authority to acquire Third Party Claims, the Plan contains general authorization provisions, which may be read to permit actions in furtherance of the purpose of the Trust. The Trustees may not rely upon these provisions to support the touted authority as the purposes of the Trust are not advanced by acquisition or adjudication of the Third Party Claims because, as discussed above, Third Party Claims do not constitute "Assets" under the Plan and, thus, the proceeds of the Third Party Claims do not constitute "Net Distributable Assets" for purposes of the treatment of Class 4 claims. *See* Docket No. 629-1, at pp. 20, 52-53.

adjudicate third-party claims constituting assets of the trust.   598 F.3d 899 (7th Cir. 2003).

Similarly, in *Zazzali v. Hirschler Fleischer, P.C.*, the court held that the trustee of a post-

confirmation trust had standing to bring third-party claims assigned to the "private action trust"

under the subject plan.  482 B.R. 495, 510 (D. Del. 2012).  These decisions thus are inapposite—

neither addressed nor supports the proposition that a post-confirmation trustee may acquire *new*

third-party claims against non-debtor entities as the Trustee proposes here.  *Zazzali v. Hirschler*

*Fleischer, P.C.*, 482 B.R. at 510; *Grede v. New York Mellon*, 598 F.3d at 902; *see also Semi-Tech*

*Litigation, LLC v. Bankers Trust Co.*, 272 F.Supp.2d 319, 324 (S.D.N.Y. 2003)(recognizing post-

confirmation trustee's standing to prosecute claims assigned to the trust pursuant to the chapter 11

plan).  Moreover, in *Zazzali*, the debtor confirmed a plan that separated the assigned claims into a

segregated trust to avoid the tax and other administrative complications of pooling those claims

with those of debtors that would accrue to all general unsecured creditors—a material difference

from the structure of the Trust under the Plan.

23.     Similarly, the business judgment of the Trustees and potential benefit to creditors

are irrelevant to the question of whether the Trustees are authorized to acquire the Third Party

Claims.  *See* Docket No. 1015, at pp. 7-9.  As a principal matter, the "business judgment rule" does

not apply in the context of a trust relationship.  *See In re Fruehauf Trailer Corp.*, 431 B.R. at 850,

*citing In the Matter of the Estate of Jacob Schulman*, 568 N.Y.S.2d 660, 662, 165 A.D.2d 499, 502

(1991).  Further, as previously noted and discussed further below, the Assumption Procedures are

not beneficial to Class 4 claimants and, notwithstanding any purported benefit, substantial

consummation of a plan creates an "absolute bar" to any modifications of the Plan, regardless of

whether the modification may benefit the creditors.  *See In re NorthEast Gas Generation, LLC*,

No. 20-11597 (MFW), 2022 WL 828263, at *5.

24.     In sum, the Assignment Procedures will materially alter the treatment of Class 4 claimants as well as the authority of the Trustees and scope of Liquidation Trust Assets under the Plan and, as such, may not be approved due to the substantial consummation of the Plan.  *See* 11 U.S.C. § 1127(b); Docket No. 629, at pp. 43-44; Docket No. 629-1, at pp. 80-81.

**B.     The Proposed Assignment Procedures are Detrimental to Trust Beneficiaries and, as such, Should Not be Approved**

25.     In addition to the foregoing, the Assignment Procedures should not be approved as proposed due to substantial prejudice to beneficiaries of the Trust.  As noted, the Holders of General Unsecured Claims are not entitled to any distributions from the proceeds of the Third Party Claims under the Plan as such proceeds do not constitute "Net Distributable Assets." Accordingly, the acquisition and prosecution of Third Party Claims pursuant to the proposed Assignment Procedures will detriment beneficiaries of the Trust by (i) altering the treatment of Class 4 claims under the Plan to eliminate the right to *pro rata* distributions and (ii) increasing administrative costs of the Trust without being able to assess a corresponding benefit due to the unavailability of any Third Party Claim proceeds to Class 4 claimants.

26.     Additionally, the Assignment Procedures jeopardize the tax status of the Trust.  The Plan and Trust Agreement expressly provide that the Trust was formed as a "liquidating trust" and "grantor trust" within the meaning of Treasury Regulation sections 301.7701-4(d) and 1.671-4(a). *See* Docket No. 597-1, at p. 13; *see also* Docket No. 629-1, at pp. 56-57.  "An organization will be considered a liquidating trust if it is organized for the primary purpose of liquidating and distributing the assets transferred to it, and if its activities are all reasonably necessary to, and consistent with, the accomplishment of that purpose."   26 CFR § 301.7701-4(d); IRS CCA 200128001 (July 13, 2001) ("A liquidating  trust is treated as a trust for purposes of the [Internal Revenue] Code because it is formed with the objective of liquidating particular assets….");

*compare* 26 CFR § 301.7701-4(c)("There are other arrangements which are known as trusts because the legal title to property is conveyed to trustees for the benefit of beneficiaries, but which are not classified as trusts for purposes of the Internal Revenue Code because they are not simply arrangements to protect or conserve the property for the beneficiaries.").  The proposed acquisition of the Third Party Claims is not "reasonably necessary to, and consistent with," the liquidation and distribution of assets transferred to the Trust (i.e., the Liquidation Trust Assets) and, moreover, may render the Third Party Claims assets of the Trust (as opposed to assets deemed owned by the beneficiaries/grantors)—jeopardizing the characterization the Trust as a "grantor trust" under Treasury Regulation section 1.671-4(a).  26 CFR § 1.671-4(a).

27.    Indeed, there could be significant risk to the tax status of the Trust and tax implications of the Plan to Trust beneficiaries (as well as other creditors).  If certain creditors assign Third Party Claims for the benefit of other creditors, this may cause, *inter alia*, the Trust to not qualify as a "liquidating trust" for tax purposes.  Such a result would be contrary to the provisions of the Plan, which unambiguously provides:

> As soon as practicable after the Effective Date, the Liquidation Trustees shall make a good faith determination of the fair market value of the Estates' Assets as of the Effective Date, provided, however, that the Liquidation Trustees shall not be required to hire an expert to make such a valuation. This valuation shall be used consistently by all parties (including the Debtors, the Liquidation Trustees, and the Holders of General Unsecured Claims) for all federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of the Liquidation Trust Assets.

> The right and power of the Liquidation Trustees to invest the Liquidation Trust Assets, the proceeds thereof, or any income earned by the Liquidation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of Section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings or other IRS pronouncements.

*See* Docket No. 629-1, pp. 59-60.  This provision's purpose is to avoid creating the exact tax issues that would result from the Assignment Procedures.  Further, the assignments of Third Party Claims

would impact the value of the Trust's assets by expanding the scope of the Trust's assets well beyond the Liquidation Trust Assets, which may disturb the tax status of the Trust since these assets are transferred after the creation of the Trust.

28.     The Assignment Procedures would also create a competing class action since there is already a class action pending regarding at least certain of the third-party claims.  The Trustees seek to commence quasi-class action litigation in the Court to adjudicate the Third Party Claims. Simply put, this Court is not the proper venue for such litigation.  Indeed, attempting to style the Court as a class action venue to resolve claims by and between non-debtor entities raises a slew of jurisdictional and constitutional authority issues, especially given the limited post-confirmation jurisdiction of the Court, that threatens to bog-down the prosecution of any Third Party Claims by the Trustees in a procedural limbo for an indeterminate amount of time (and at untold expense to the Trust and its beneficiaries).  *See Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d at 164-65.  Further, the Trustees' proposal threatens to create significant administrative inefficiencies due to the bifurcation of the class actions into two separate proceedings—the first, established for the benefit of all putative class members and, the second, established solely for the benefit of the putative class members that are creditors of the Debtors— and, in so doing, impair the ability of courts and putative class members to resolve the third-party claims in an appropriate forum under existing and established class action procedures.

## RESERVATION OF RIGHTS

29.     Uphold reserves all rights, *inter alia*, to object to the Motion and/or Assignment Procedures on any and all grounds prior to or at the hearing on the Motion, or in the defense of litigation by the Trustees, if brought, regardless of whether or not asserted herein, to supplement, augment, alter or modify this Objection in any respect, and to join in any other objections or

responses to the Motion and/or Assignment Procedures.  Uphold further reserves any and all rights, claims, causes of actions, remedies, and defenses, in any and all courts, under law or in equity, in respect of or connection with the Debtors and/or the Estates, any successor in interest to the Debtors and/or Estates, the Trust, Trustees and TAB, and any and all third-parties.

*[Remainder of Page Intentionally Blank]*

**WHEREFORE**, for the reasons set forth herein, Uphold respectfully requests that the Court (a) deny the Motion in its entirety and (b) grant such other and further relief as the Court deems just and proper.

Dated: July 7, 2022
       Wilmington, Delaware

**BAKER & HOSTETLER LLP**

*/s/ Jeffrey J. Lyons*
Jeffrey J. Lyons (#6437)
1201 North Market Street, Suite 1402
Wilmington, DE 19801-1147
Telephone:  302.468.7088
Email: jjlyons@bakerlaw.com

- and -

Jorian L. Rose (admitted *pro hac vice*)
Michael Sabella (admitted *pro hac vice*)
45 Rockefeller Plaza
New York, New York 10111
Telephone:  212.589.4200
Facsimile:  212.589.4201
Email: jrose@bakerlaw.com
      msabella@bakerlaw.com

- and -

Michael T. Delaney (*pro hac vice* pending)
Key Tower, 127 Public Sq.
Suite 2000
Cleveland, OH 44114
Telephone:  216.621.0200
Facsimile:  216.696.0740
Email: mdelaney@bakerlaw.com

*Counsel for Creditor Uphold HQ Inc.*