## IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>CRED, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-12836 (JTD)<br><br>(Jointly Administered)<br><br>Re: Docket No. 1015 |

## OBJECTION OF UPHOLD PLAINTIFFS TO THE MOTION OF THE CRED INC. LIQUIDATING TRUST FOR ENTRY OF ORDER APPROVING THIRD PARTY CLAIM ASSIGNMENT PROCEDURES

Dated: July 11, 2022

**A.M. SACCULLO LEGAL, LLC**
Anthony M. Saccullo (No. 4141)
Mary E. Augustine (No. 4477)
27 Crimson King Drive
Bear, Delaware 19701
Telephone: (302) 836-8877
ams@saccullolegal.com
meg@saccullolegal.com

**ASK LLP**
Edward E. Neiger, Esq.
60 East 42nd Street, 46th Floor
New York, NY 10165
Telephone: (212) 267-7342

**ASK LLP**
Richard Reding, Esq., MN SBN 0389945
2600 Eagan Woods Drive, Suite 400
St. Paul, MN 55121
Telephone: (651) 289-3842
Email: rreding@askllp.com

*Bankruptcy Counsel for Plaintiffs*

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

# TABLE OF CONTENTS

Page

BACKGROUND ................................................................................................ 1

ARGUMENT .................................................................................................... 4

I.   The Motion Is an Impermissible Post-Confirmation Modification of the
     Chapter 11 Plan .................................................................................... 4

     A.   The Motion is a Modification of the Plan ................................... 5

     B.   The Trust May Not Modify the Plan ........................................... 7

     C.   Because the Plan has Been Substantially Consummated, a
          Modification is No Longer Possible ........................................... 8

II.  The Assignment Procedures Are Inequitable to Creditors Holding Third-
     Party Claims Against Uphold ............................................................... 8

     A.   The Motion Provides Inadequate Disclosure to Creditors of the
          Rights They Would be Surrendering ........................................ 10

     B.   The Assignments Will Materially Alter Distributions to Creditors,
          Including Decreasing Certain Creditor Recovery .................... 11

          1.   Scenario 1 – Third-Party Claims Have Small Value ................. 12

          2.   Scenario 2 – Third Party Claims Have No Value ...................... 13

          3.   Scenario 3 – Third Party Claims Have Significant Value .......... 14

     C.   The Potential Benefits of the Assignment Procedures Do Not
          Outweigh the Risks ................................................................ 16

III. The Proposed Assignment Procedures Implicate and Potentially Violate
     the Due Process Rights of Potential Class Members in the Uphold
     Litigation ............................................................................................ 17

CONCLUSION ............................................................................................... 23

# TABLE OF AUTHORITIES

Page

## CASES

*Am. Pipe & Const. Co. v. Utah*,
    414 U.S. 538 (1974) .......................................................................................... 18, 20

*Berger v. Compaq Comput. Corp.*,
    257 F.3d 475 (5th Cir. 2001) .................................................................................. 19

*Chen-Oster v. Goldman, Sachs & Co.*,
    449 F. Supp. 3d 216 (S.D.N.Y. 2020), *objections overruled*, No. 10CIV6950ATRWL,
    2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021) ............................................................ 23

*Cleveland Bd. of Educ. v. Loudermill*,
    470 U.S. 532 (1985) .............................................................................................. 19

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    300 F.R.D. 182 (S.D.N.Y. 2014)............................................................................... 20

*Georgine v. Amchem Products, Inc.*,
    160 F.R.D. 478 (E.D. Pa. 1995) ............................................................................... 21

*Gulf Oil Comp. v. Bernard*,
    452 U.S. 89 (1981) ................................................................................................ 20

*In Matter of Motors Liquidation Co.*,
    829 F.3d 135 (2d Cir. 2016) .................................................................................... 19

*In re Currency Conversion Fee Antitrust Litig.*,
    361 F. Supp. 2d 237 (S.D.N.Y.2005).......................................................................... 20

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)...................................................................................... 22

*In re Innovative Clinical Solutions, Ltd.*,
    302 B.R. 136 (Bankr. D. Del. 2003) ........................................................................... 8

*In re McKesson HBOC, Inc. Securities Litigation*,
    126 F. Supp. 2d 1239 (N.D. Cal. 2000) ................................................................... 21, 22

*In re New Century TRS Holdings, Inc.*,
    No. 07-10416 (KJC), 2013 WL 12324114,  (Bankr. D. Del. July 9, 2013) ..................... 9

*In re NorthEast Gas Generation, LLC*,
    2022 WL 828263 (Bankr. D. Del. March 18, 2022) ...................................................... 7

*In re Northfield Laboratories Inc.*,
    467 B.R. 582 (Bankr. D. Del. 2010) ........................................................................... 8

- ii -

## TABLE OF AUTHORITIES (Continued)

Page

*In re Nutraquest, Inc.*,
   434 F.3d 639 (3d Cir. 2006) ............................................................................. 9

*In re Nutritional Sourcing Corp.*,
   398 B.R. 816 (Bankr. D. Del. 2008) ............................................................... 9

*In re Shenango Grp. Inc.*,
   501 F.3d 338 (3d Cir. 2007) ............................................................................. 6

*In re Takeout Taxi Holdings, Inc.*,
   307 B.R. 525 (Bankr. E.D. Va. 2004) ........................................................... 19

*Jones v. Jeld-Wen, Inc.*,
   250 F.R.D. 554 (S.D. Fla. 2008) ............................................................ 22, 23

*Martin v. Wilks*,
   490 U.S. 755 [needs full cite?] ..................................................................... 19

*Urtubia v. B.A. Victory Corp.*,
   857 F. Supp. 2d 476 (S.D.N.Y. 2012); *accord Offering Sec. Litig.*, 499 F. Supp. 2d 415
   (S.D.N.Y.2007) .............................................................................................. 20

*Zamboni v. Pepe W. 48th St. LLC*,
   No. 12 CIV. 3157 AJN JCF, 2013 WL 978935 (S.D.N.Y. Mar. 12, 2013) .......... 20

**STATUTES**

11 U.S.C. § 1125(a)(1) ....................................................................................... 10

11 U.S.C. § 1127(b) ............................................................................................. 8

11 U.S.C. § 1129(b) ............................................................................................. 5

11 U.S.C. § 502(j) ................................................................................................ 7

11 U.S.C.§ 102(2) ................................................................................................ 8

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(d) .......................................................................................... 20

**RULES**

2 MCLAUGHLIN ON CLASS ACTIONS § 11:1 (14th ed. 2018) ............................ 22

*Manual for Complex Litig.*, Second § 21.33 .................................................... 21

The named plaintiffs in an ongoing consumer class action proceeding against Uphold HQ, Inc. (the "Uphold Plaintiffs" or "Plaintiffs") file this Objection to the *Motion of the Cred, Inc. Liquidating Trust for Entry of Order Approval Third Party Claim Assignment Procedures* (the "Motion" or "Procedures"). The Uphold Plaintiffs include creditors in this bankruptcy proceeding whose interests will be negatively impacted by the proposed assignment procedures.

The Motion should be denied for not fewer than <u>four</u> reasons. First, it seeks an impermissible modification to a substantially consummated Chapter 11 plan. Second, and related, it has a strong likelihood to reduce recoveries of Cred creditors contrary to the Plan that they voted on and that this Court approved. Third, it will lead to arbitrary and capricious results for both Cred creditors and Uphold HQ, Inc. ("Uphold") creditors. Fourth and finally, at least absent substantial modification, it violates the due process rights of the Uphold Plaintiffs and putative absent Class members in an already-filed federal court litigation.

For these reasons, the Uphold Plaintiffs respectfully request that the Motion be denied.

**BACKGROUND**

The Trustee's motion seeks permission from the Bankruptcy Court to solicit and acquire non-derivative claims that unsecured Cred[2] creditors have against non-bankrupt third parties, including, among others, Uphold. As such, it seeks to acquire the direct,

---

[2] Undefined capitalized terms shall have the meaning ascribed to them in the Motion.

- 1 -

consumer-related claims of the Uphold Plaintiffs and putative class members asserted in a consumer class action, *Sandoval v. Uphold HQ Inc.*, 1:21-cv-07579 (VSB) (S.D.N.Y.) (the "Uphold Litigation").

The Uphold Plaintiffs commenced their litigation on September 10, 2021. Plaintiff Addison Sandoval, and additional named Plaintiffs Lionel Ducote, Nicholas King, and Richard Neal, filed the First Amended Complaint ("FAC") on December 13, 2021, on behalf of themselves and all other similarly situated consumers who invested in the Uphold Earn/Cred Earn program (the "Class") via Uphold.

The Uphold Litigation asserts claims on behalf of the Class for Uphold's alleged violations of New York General Business Law § 349, fraud/fraudulent concealment, and unjust enrichment. These claims are separate and apart of any claims they have against Cred, and are non-derivative of such Cred claims. Specifically, the Uphold Plaintiffs allege that Uphold engaged in wrongful and deceptive conduct, and unjustly enriched itself, via marketing its Uphold Earn/Cred Earn/Earn ("Earn") product. As the Uphold Plaintiffs allege at a high level, starting in 2019, Uphold actively promoted an investment in Earn as an Uphold product. Consumers' Earn investments became worthless in November 2020, when the company behind Earn (Cred, Inc.) went bankrupt following egregious mismanagement. In addition, Uphold knew or should have known Earn was a worthless product, or at minimum, one with undisclosed material risks, yet it failed to disclose these risks to consumers despite an obligation to do so. Instead, Uphold (which was intimately involved with Cred via shared personnel, a marketing agreement, its assistance in Cred's operations, and serving as Cred's custodial "wallet") hid the risks, and continued to benefit unjustly and improperly from its Earn product. Further, and

- 2 -

alternatively, Uphold made partial representations that rendered its material omissions about the true nature of Earn particularly culpable.

The Uphold Plaintiffs also allege that following Cred's demise, Uphold exacerbated its misconduct by failing to provide accurate information to Uphold Plaintiffs and the Class  about Cred and their investments in Earn and by representing, *inter alia*, that their investments were "safe", before ultimately revoking the Uphold Plaintiffs' and the Class's access to their Uphold wallets.

There is or should be no dispute that Uphold's conduct was consumer-directed and systematic, and that Uphold is subject to uniform law based on a provision in its terms of service requiring the application of New York law to disputes with consumers.[3] Thus, a class action is a suitable vehicle for consumer claims against Uphold involving approximately 10,000 or more putative Class members.

In January 2022, Uphold moved to dismiss the FAC. The motion has been fully briefed and no decision has been issued. Class-wide discovery is proceeding, including regular meet and confer proceedings and one discovery dispute is pending before the District Court.

Here, Uphold Plaintiffs have standing to raise this objection to what (as Uphold itself argues in its own objection[4]) is effectively the proposed creation of a parallel proceeding on behalf of Uphold consumers with overlapping claims to the Class claims.

---

[3] Uphold Plaintiffs and the proposed Class are represented in the Uphold Litigation by Lieff Cabraser Heimann & Bernstein, LLP, and Giskan Solotaroff & Anderson LLP, both experienced class action law firms.

[4] Uphold Objection, D.I. 1027 at ¶28.

Indeed, at least one of the named Plaintiffs in the Uphold Litigation has filed timely claims with the Bankruptcy Court as an unsecured creditor of Cred. *See* Proof of Claim ECN-0139.

Importantly, while the Uphold Plaintiffs believe that all members of the Class in the Uphold Litigation are unsecured creditors of Cred, not all creditors of Cred have third party claims against Uphold.[5] Therefore, as shown below, Class members in the Uphold Litigation who assign their third-party claim against Uphold to the Trust will have to share unjustly their recovery on this claim with non-Uphold creditors of Cred. This is inequitable. At a minimum, members of the Class should be provided with adequate notice of how assignment of their third-party claims to the Trust may impact their legal interests. Further, the proposed Procedures create a strong likelihood that Cred creditors (including those who do not assign their third part claims) will get less than they would otherwise receive pursuant to Cred's confirmed Chapter 11 Plan of Liquidation (the "Plan"). This is not only inequitable, but also contrary to the law.

**ARGUMENT**

**I.    THE MOTION IS AN IMPERMISSIBLE POST-CONFIRMATION MODIFICATION OF THE CHAPTER 11 PLAN**

The Motion seeks, in effect, to create a new subclass of unsecured creditors who will receive a greater distribution on their claims than other similarly-situated creditors. By offering a ten percent increase for certain unsecured claims, the Motion seeks to alter

---

[5] To the extent non-persons invested in Cred via Uphold, or if non-U.S. entities or individuals invested in Earn, or even if there were investors in Cred who did not do so via Uphold's marketing of the Earn product, they are not Class members in the Uphold Litigation as defined.

a Plan that has already been substantially consummated. Given the limited fund

conundrum present in this case, by definition, those that do not receive a ten percent

"bump"—if it is ten percent—may get a smaller distribution on their claim. Accordingly,

the Motion must be denied.

Section 1127 of the Bankruptcy Code provides the exclusive standard for post-

confirmation modification of a confirmed Chapter 11 plan:

> The proponent of a plan or the reorganized debtor may
> modify such plan at any time after confirmation of such
> plan and before substantial consummation of such plan, but
> may not modify such plan so that such plan as modified
> fails to meet the requirements of sections 1122 and 1123 of
> this title. Such plan as modified under this subsection
> becomes the plan only if circumstances warrant such
> modification and the court, after notice and a hearing,
> confirms such plan as modified, under section 1129 of this
> title.

11 U.S.C. § 1127(b). Here, if the Trust's proposal constitutes a modification of the

confirmed Plan, the Motion must be denied because the Trust is not a plan proponent and

the existing Plan has been substantially consummated.

### A.    The Motion Proposes a Modification of the Plan

The Motion seeks to accomplish two primary objectives: first, to allow the Trust

to obtain assignments of third-party claims held by creditors; and second, to provide

those creditors that do opt in by assigning their claims a ten percent increase in their

allowed unsecured claim. The first proposal is permitted by the Plan, as the Trust notes

that the Plan specifically authorized the Trust to seek assignment of third-party claims.

However, the Motion does not provide any authorization under the Plan for the second

proposal, i.e., increasing the allowed claim amount of Cred creditors who assign their

third-party claims. The Plan must be interpreted under the same principles as any other contract. *In re Shenango Grp. Inc.*, 501 F.3d 338, 344 (3d Cir. 2007). Here, the Plan does not indicate that certain unsecured creditors will receive a greater recovery than others based on their willingness to assign third-party claims, and conversely, those who do not opt in may ultimately receive a lower recovery (even though the face amount of their claim remains unchanged).

Instead, the recovery for unsecured creditors is defined as the "Distribution Pro Rata Share" under Section 1.60 of the Plan, which is a straight pro-rata distribution of the funds available to that creditor class:

> a. **"Distribution Pro Rata Share"** means the ratio (expressed as a percentage) of (x) the amount of an Allowed General Unsecured Claim against the Debtors to (y) the aggregate amount of all (A) Allowed General Unsecured Claims against the Debtors on the date of a Distribution plus (B) the aggregate Disputed Claim amount of all remaining Disputed General Unsecured Claims against the Debtors.

[D.I. 722, *Modified First Amendment Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and its Subsidiaries under Chapter 11 of the Bankruptcy Code*].

The Plan does not include language that permits the Trust to increase the amount of claims other than as part of a settlement of a disputed claim. For example, Section 14.1 of the Plan gives the Trust the authority to administer claims, but only to adjust the amounts of claims that are classified as "Disputed Claims" under the Plan. None of the other provisions of Section 14 permits the Trust to adjust the amount of what is an already allowed claim, absent some dispute as to the amount of the claim. In other words, for the Trust to do what it proposes, it must go beyond the plain language of the Plan.

- 6 -

This case presents similar facts to a recent case in this District, *In re NorthEast Gas Generation, LLC*, No. 20-11597 (MFW), 2022 WL 828263 (Bankr. D. Del. March 18, 2022). In *NorthEast Gas,* the debtor filed a motion seeking to reopen its Chapter 11 case to alter the allocation of proceeds to a lienholder. Despite the lack of any objection, Judge Walrath concluded that the changes to the plan constituted a modification as it altered the amount of a parties' distribution under the Plan. *Id.* at *3. Here, the Motion proposes to create what amounts to a new subclass of unsecured creditors—those unsecured creditors that:  1) hold third-party claims, and 2) are willing to assign them to the Trust. In exchange, those select creditors will receive a ten percent increase in their allowed claim. The Plan certainly does not allow those who do not opt in to receive a lesser distribution than they are otherwise entitled to under the Plan and who voted on the Plan in reliance on the recoveries it proposed.

This is a modification of the Plan because the Plan does not contain a provision that allows the Trust to modify the distributions to a certain subset of unsecured creditors. This is not simply a reconsideration of claims under 11 U.S.C. § 502(j), but as in *NorthEast Gas*, a material change to the expectation of certain creditors at the expense of others. As will be discussed below, those material changes are likely to have a significant impact on all creditors. Absent the Trust providing some authorization in the Plan for this ten percent increase in allowed claims, this Court should deem the Motion to be a modification of the Plan.

### B.        The Trust May Not Modify the Plan

Because the Trust is not a plan proponent under Section 1127(b), it does not have the ability to modify a confirmed plan. The statutory language is clear that only the

reorganized debtor or "[t]he proponent of a plan" has the authority to modify a confirmed Chapter 11 Plan. 11 U.S.C. § 1127(b). Because the Trust was created by the Plan itself, it is not a plan proponent. Accordingly, the Trust does not have the ability to propose a modification of the existing Plan. *In re Northfield Laboratories Inc.*, 467 B.R. 582, 588 (Bankr. D. Del. 2010) (citing *In re Innovative Clinical Solutions, Ltd.*, 302 B.R. 136, 144 (Bankr. D. Del. 2003)).

    **C.**    <u>**Because the Plan has Been Substantially Consummated, a Modification is No Longer Possible**</u>

Finally, Section 1127(b) states that a post-confirmation modification may only occur prior to "substantial consummation." The Code defines "substantial consummation" as:

> "substantial consummation" means— (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan.

11 U.S.C.§ 1101(2). Here, the Plan has been substantially consummated. The Plan states that substantial consummation will occur as of the Plan's Effective Date. [D.I. 629-1, at pp. 82–83]. The Plan became effective on April 19, 2021. [D.I. 730].

## II.    THE ASSIGNMENT PROCEDURES ARE INEQUITABLE TO CREDITORS HOLDING THIRD-PARTY CLAIMS AGAINST UPHOLD

Even absent the issues with plan modification, the Court should not approve the Motion on its merits. The Motion seeks to request that creditors give up third-party claims that may have significant value to them in exchange for an arbitrary ten percent

bump to their general unsecured Cred claim. It is unclear how the Trust arrived at this ten percent number. The Motion does not indicate what information creditors will receive that would let them fairly and adequately evaluate whether the assignment would be beneficial to them. Further, it is not reasonably possible for creditors in this bankruptcy to know whether such an assignment would be in their best interest or not, and the Motion provides no information beyond assertions that a ten percent increase in general unsecured claims is fair compensation for the rights that creditors would be surrendering. Without adequate disclosure of the risks involved to those who assign their third party claims, this Court should deny the Motion.

The Trust describes the appropriate standard as being under the "business judgment rule," citing a case involving a motion to remove a Trustee in a Chapter 11. *In re New Century TRS Holdings, Inc.*, No. 07-10416 (KJC), 2013 WL 12324114, at *7 (Bankr. D. Del. July 9, 2013). Here, however, the Court should look more broadly than simply affirming the business judgment of the trustee and determine whether the proposal is fair and equitable. In so doing, this Court should consider the "paramount interest of the creditors*." In re Nutritional Sourcing Corp.*, 398 B.R. 816, 832 (Bankr. D. Del. 2008). Further, the Court should examine the Motion holistically – not only examining whether the proposal is fair to those creditors that may opt in to the assignment, but also how those decisions may impact creditors who do not. *See, e.g., In re Nutraquest, Inc.*, 434 F.3d 639, 645 (3d Cir. 2006) (noting that under the "fair and equitable" standard a court must consider the fairness of a settlement on parties that did not settle).

**A.**     **The Motion Provides Inadequate Disclosure to Creditors of the Rights They Would be Surrendering**

The Uphold Plaintiffs have reason to believe that there is significant overlap between the third-party claims that the Trust is seeking to have assigned to itself and the claims in the Uphold Litigation (although, to be sure, certain Cred creditors likely do not have direct-consumer claims against Uphold). At a minimum, the Trust should fully disclose that any Cred creditor that agrees to the assignment gives up any claim that it may have in the Uphold Litigation. It is likely that at this point the Cred creditors that overlap with the potential Class members in the Uphold Litigation would have no idea that there is a pending suit that would potentially give them an alternative means of recovery (and potentially a greater recovery, as set forth below). At a minimum, this is material information that should be disclosed so that potential assignors may be able to make an informed choice. The Trust should not be held to a lower standard now than a plan proponent would have been initially, which requires full and fair disclosure. *See, e.g.,* 11 U.S.C. § 1125(a)(1) (post-petition disclosures must have sufficient detail such that a "hypothetical investor" may "make an informed judgment about the plan. . . .").

The Motion is also vague about what disclosures would be made to creditors, but does state that it will request other information through the proposed Portal such as tax information, a distribution questionnaire, and updates to contact information. There is a risk that without complete and adequate disclosure creditors may assign their claims without having been fully apprised of the consequences prior to making the election and receiving the Claim Assignment Agreement. This Court should deny the motion because it is an impermissible modification of the Plan that has a strong likelihood of decreasing certain creditors' recovery, as set forth below. But at the very least, if this Court is

- 10 -

inclined to the grant the Motion, it should not do so without substantially greater

assurance that creditors will be given full disclosure of the effects of an assignment.

Further, as will be explained below, the putative Class members in the Uphold Litigation

have due process rights under the law of class actions that this Court is obligated to

consider.

B.      **The Assignments Will Materially Alter Distributions to Creditors,**
        **Including Decreasing Certain Creditor Recovery**

The proposed assignment also is inequitable because it will materially alter the

rights of creditors in this bankruptcy case, often to their detriment.

For one, the amount of consumer claims listed in the schedules show a wide range

of exposure. There are scheduled consumer claims as low as $0.01 and as high as $22.2

million. [D.I. 443, Ex. F-1]. As a threshold issue, there needs to be some showing than a

ten percent increase in these claims has some rational relationship to the value that would

go back into the estate. For example, if the claimant with the one cent claim against Cred

has a third-party claim worth $1 million against Uphold, under the proposed Procedures,

which will redistribute recoveries from third-party claims pro-rata based on the amount

creditors' Cred claims, such Uphold creditor's valuable claim would be greatly diluted

because it will be redistributed to other Cred creditors with larger Cred claim amounts.

Concomitantly, the $22.2 million Cred creditor, who may have no third party claim

whatsoever, would receive a windfall by way of the redistribution of the recovery of the

others' third-party claims. Astonishingly, this same result would occur if the $22 million

Cred creditor *did* have third-party claims but chose not to assign them to the Trust, and

thus, provided no value to the Trust in exchange for the windfall it will receive. Simply

- 11 -

put, if large Cred creditors opt in but have small third-party claims, and the third party

claims turn out to be valuable, they will receive a windfall at the expense of other

creditors.

A set of simplified scenarios illustrate how this plays out. For the sake of

illustration, these scenarios involve only two hypothetical  creditors: "Creditor A" and

"Creditor B". By examining what happens based on the value of each creditor's potential

recovery on claims in this bankruptcy and their potential recovery on third-party claims,

we can start to model some potential outcomes. While this analysis is not perfect because

it does not take account the size of each claim relative to the overall claim pool (which is

unknown with respect to third party claims), it is illustrative nonetheless.

### 1.    <u>Scenario 1 – Third-Party Claims Have Small Value</u>

In this scenario, we assume that the potential recovery on all Cred claims in this

bankruptcy totals $2.00, and the potential recovery to all third-party claimants in non-

bankruptcy is $1.00. Both our hypothetical Creditor A and Creditor B have $1.00 claims

in this bankruptcy, but only Creditor A has a recoverable third-party claim of $1.00.

Without any assignment of claims, the recovery for both creditors would look like this:

|  | Cred Bankruptcy Claim | Allowed Cred Bankruptcy Claim | Cred Bankruptcy Recovery | Third-Party Claim | Third-Party Claim Recovery | Total Recovery |
|---|---|---|---|---|---|---|
| **Creditor A** | $1.00 | $1.00 | $1.00 | $1.00 | $1.00 | **$2.00** |
| **Creditor B** | $1.00 | $1.00 | $1.00 | None | None | **$1.00** |

In other words, Creditor A (who has a third-party claim) would recover $2.00 and

Creditor B (who has no third-party claims) recovers $1.00.

Under the Proposed Assignment Procedures, if Creditor A assigns their claim, the scenario plays out as follows:

| | Cred Bankruptcy Claim | Third-Party Claim | Allowed Cred Bankruptcy Claim | Cred Bankruptcy Recovery | Third-Party Claim Recovery | Total Recovery |
|---|---|---|---|---|---|---|
| **Creditor A** | $1.00 | $1 (Assigned) | $1.10 | $1.57 | None | **$1.57** **($0.43)** |
| **Creditor B** | $1.00 | None | $1.00 | $1.43 | None | **$1.43** **+$0.43** |

Under this scenario, the bankruptcy recovery pool increases by $1 (as Creditor A has assigned their recovery to the Trust) and Creditor A receives a ten percent increase in their unsecured Cred claim. However, Creditor A ends up *losing* value to Creditor B—because by assigning their third-party claim to the Trust, Creditor A has to share recoveries *pro rata* with all unsecured creditors. The value that Creditor A will recover is significantly less than what they would have received had they not assigned their claim.

### 2.    Scenario 2 – Third Party Claims Have No Value

In this scenario we assume that the potential recovery on all Cred claims in the bankruptcy is still $2.00, but there is no recovery for third-party claims. Creditor A still has both a $1.00 bankruptcy claim and a $1.00 third-party claim, while Creditor B still has a $1.00 bankruptcy claim and no third-party claim. Absent an assignment, the recoveries would look like this:

- 13 -

|  | Cred Bankruptcy Claim | Allowed Cred Bankruptcy Claim | Cred Bankruptcy Recovery | Third-Party Claim | Third-Party Claim Recovery | Total Recovery |
|---|---|---|---|---|---|---|
| **Creditor A** | $1.00 | $1.00 | $1.00 | $1.00 | None | **$1.00** |
| **Creditor B** | $1.00 | $1.00 | $1.00 | None | None | **$1.00** |

If, however, Creditor A assigns their third-party claim to the Trust in exchange for a ten percent increase in their allowed bankruptcy claim, the recovery would look like this:

|  | Cred Bankruptcy Claim | Third-Party Claim | Allowed Cred Bankruptcy Claim | Cred Bankruptcy Recovery | Third-Party Claim Recovery | Total Recovery |
|---|---|---|---|---|---|---|
| **Creditor A** | $1.00 | $1 (Assigned) | $1.10 | $1.05 | None | **$1.05** <span style="color:green">+$0.05[6]</span> |
| **Creditor B** | $1.00 | None | $1.00 | $95 | None | **$0.95** <span style="color:red">($0.05)</span> |

In this scenario, Creditor A has not brought in any benefit to the estate but has received a slight windfall at the expense of Creditor B.

### 3.    Scenario 3 – Third Party Claims Have Significant Value

The most arbitrary and capricious scenario occurs when third-party claims have a significantly higher value than the bankruptcy claims here. In this scenario we assume that the overall recovery on bankruptcy claims is only $1.00, but the overall recovery on third-party claims is $5.00. We also assume that Creditor A has a significant Cred claim

---

[6] All monetary amounts are rounded to the nearest full cent.

in the bankruptcy ($5.00) but a small third-party claim ($1.00). Conversely, Creditor B

has a small Cred claim in the bankruptcy ($1.00) but a large third-party claim ($5.00).

Without an assignment, the recoveries would look like this:

|  | Cred Bankruptcy Claim | Allowed Cred Bankruptcy Claim | Cred Bankruptcy Recovery | Third-Party Claim | Third-Party Claim Recovery | Total Recovery |
|---|---|---|---|---|---|---|
| **Creditor A** | $5.00 | $5.00 | $0.83 | $1.00 | $0.83 | **$1.67** |
| **Creditor B** | $1.00 | $1.00 | $0.17 | $5.00 | $4.17 | **$4.33** |

If both parties assign their claims to the Trust, the recovery changes dramatically

to the detriment of the creditor holding the large third-party claim:

|  | Cred Bankruptcy Claim | Third-Party Claim | Allowed Cred Bankruptcy Claim | Cred Bankruptcy Recovery | Third-Party Claim Recovery | Total Recovery |
|---|---|---|---|---|---|---|
| **Creditor A** | $5.00 | $1 (Assigned) | $5.50 | $.83 | $4.16 | **$5.00** +$3.33 |
| **Creditor B** | $1.00 | $5 (Assigned) | $1.10 | $.17 | $.83 | **$1.00** ($3.33) |

These scenarios are highly simplified. In reality, increasing the number of

creditors with wildly different claims would make it virtually impossible to know what

the potential outcomes would be, and if certain creditors assign their claims and others do

not, it can have wildly divergent outcomes for the recoveries in this case. What these

examples illustrate is that there is a dramatic range of potential outcomes, and even just

with the most highly simplified models involving only two creditors with whole-dollar

claim amounts, it is difficult to understand what the range of outcomes may be. When

there are thousands of creditors with different claims, different claim amounts, against different parties, one thing is almost certain: certain creditors stand to gain significantly, even if they do not have third party claims or choose not to assign them, and others will lose significantly even if they do assign their third-party claims. At the very least, it is effectively impossible for creditors to make an informed choice as to whether assignment is in their best interests or not.

C.    **The Potential Benefits of the Assignment Procedures Do Not Outweigh the Risks**

The Trust alleges in the Motion that the benefits to creditors would outweigh the risk of increased expenses. While it is true that the Trust will likely proceed to litigation on the estate's own claims against entities like Uphold, that does not mean that the causes of action will be same. By acquiring the rights and obligations to take on causes of action belonging to third parties, the Trust is necessarily expanding the scope and expense of discovery and litigation. Adding these claims may cause more than just a "nominal" increase in expenses.

The Trust does not explain how the proposed Assignment Procedures reduces the risk of duplicative or inconsistent litigation—especially given that the Trust does not disclose that the Uphold Litigation is already ongoing in another forum. If anything, as it regards the Cred creditors who are potential Class members in the Uphold Litigation, the potential assignment guarantees duplicative and potentially inconsistent litigation as the assigned claims will be duplicative of the Class claims already being brought in the Uphold Litigation, as will be explained in detail below.

But expenses and duplicity of litigation are the least of the potential risks. The real risk is the potential rejiggering of, and likely decrease in, recoveries; recoveries that creditors have already voted on and come to expect pursuant to the confirmed Plan.

### III.   THE PROPOSED ASSIGNMENT PROCEDURES IMPLICATE AND POTENTIALLY VIOLATE THE DUE PROCESS RIGHTS OF POTENTIAL CLASS MEMBERS IN THE UPHOLD LITIGATION

Further, the Trust's proposed Assignment Procedures implicate and potentially violate the constitutional due process rights of Uphold creditors—some of whom are absent putative Class members in the Uphold Litigation—and improperly (and unnecessarily) would cause misleading or confusing information to be disseminated to these putative absent Class members.

While the Trust has not revealed to the Court (or Uphold Plaintiffs) the precise language it proposes to use, the *inherent structure of its proposal*, no matter what language, involves material facts affecting Uphold creditors' legal interests.

***First,*** as illustrated above, the Assignment Procedures by definition mean that if Uphold creditors assign their claims to the Trust, any potential recovery from Uphold could be diluted or reduced by the *pro rata* distribution of Net Distributable Assets to other creditors who do not have claims against Uphold. The Trust has not made clear whether it will advise creditors of these facts. As an even more threshold consideration of strategy, the Trust is not focusing only on Uphold's culpability, and if discovery leads to conflicts or shared culpability (for example) it is not clear how the Trust will manage these potentially different interests among the collective.

**Second,** the "incentive" of a ten percent increase in allowed claims for Uphold creditors who assign their claims to the Trust could be much less than ten percent, and could be virtually zero because the more creditors who assign claims, the fewer funds available to pay the bump. Even under the theory that the Assignment Procedures will make the proverbial "pie" larger for all, the examples above show how even a larger pie can still result in creditors receiving a smaller "slice" of the original smaller pie. At minimum, the prospective of a vanishing bump should be disclosed, along with other necessary disclosures. Finally, the duplication of resources of having two paths of litigation against Uphold—one, the Uphold Litigation (where Class members will, if a class is certified, have the option to opt-out) and, two, the Trust's prospective non-derivative third party action—could result in less recovery and potential inconsistencies.

**Third,** as absent putative Class members in a separate lawsuit pertaining to similar claims, they do not have to take any action to potentially recover on their claims against Uphold. *See Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 552 (1974) (Until a class is certified, "class members are mere passive beneficiaries of the action brought in their behalf," with no "duty to take note of the suit or to exercise any responsibility.") Uphold Plaintiffs recognize that certain Class members filed claims in the Cred bankruptcy *prior to* the filing of the class action lawsuit against Uphold for Uphold's direct, independent, non-derivative conduct. But the Trust's proposal is not about *Cred's* misconduct, it is about *Uphold's* (and other third parties). Consumers included in the proposed class should not need to take any action at this point. The Trust may argue that the class claims may not succeed. Yet the same holds for the Trust's claims.

The legal background for these points is as follows: an elementary and fundamental requirement of constitutional due process in any proceeding is adequate notice. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985). The due process requirement of adequate notice applies in bankruptcy proceedings. *In Matter of Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016) (citing *Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989)) (due process applies to bankruptcy proceedings because bankruptcy is "a special remedial scheme" that "expressly forclos[es] successive litigation by nonlitigants" and thus "may terminate preexisting rights"; confirming legal rights are a property interest). The constitutional requirement of adequate notice "is not simply satisfied by properly placing a piece of paper in the hands of the respondent. The paper served must contain adequate information. The content must be reasonably calculated to put the respondent on notice" of how the respondent's legal interests may be affected. *In re Takeout Taxi Holdings, Inc.*, 307 B.R. 525, 532 (Bankr. E.D. Va. 2004). The members of the Class in the Uphold Litigation are entitled to adequate information about how assigning their claims to the Trust affects their legal interests.

It is important to underscore that the Trust's Assignment Procedures also implicate, insofar as they involve non-derivative claims against non-bankrupt third parties, fundamental principles of class action litigation, which likewise are rooted in due process concerns. A unique feature of class action litigation is that absent class members are "conclusively bound by the judgment in any class action brought on their behalf." *Berger v. Compaq Comput. Corp*., 257 F.3d 475, 480 (5th Cir. 2001).

Thus, courts must be "especially vigilant" to ensure that the due process rights of absent class members are protected. *Id.* Even before a class is certified, courts must be

vigilant to safeguard the rights of absent class members, because, until class certification, "class members are mere passive beneficiaries of the action brought in their behalf," with no "duty to take note of the suit or to exercise any responsibility." *Am. Pipe & Const. Co*, 414 U.S. at 552. The district court overseeing a class action enjoys the "duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties," *Gulf Oil Comp. v. Bernard*, 452 U.S. 89, 100 (1981).

These due process concerns require courts to be "especially vigilant" to protect absent class members from, among other things, misleading communications about their legal interests, because such misleading communications "pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally." *Dodona I, LLC v. Goldman, Sachs & Co.*, 300 F.R.D. 182, 184 (S.D.N.Y. 2014).

To protect against such threats, Rule 23(d) of the Federal Rules of Civil Procedure gives district courts authority over communications to class members that "interfere[] with participation by potential class members in the lawsuit or mislead[] them by failing to reveal how some proposed transaction might affect their rights in the litigation."[7] *Zamboni v. Pepe W. 48th St. LLC*, No. 12 Civ. 3157 (AJN) (JCF), 2013 WL 978935, at *3 (S.D.N.Y. Mar. 12, 2013); *see* Fed. R. Civ. P. 23(d) (providing, *inter alia,* that "[i]n

---

[7] Courts possess supervisory authority under Rule 23(d) before as well as after a class is certified. *Urtubia v. B.A. Victory Corp*., 857 F. Supp. 2d 476, 484 (S.D.N.Y. 2012); *accord Offering Sec. Litig*., 499 F. Supp. 2d 415, 418 n. 13 (S.D.N.Y.2007) (citing *In re Currency Conversion Fee Antitrust Litig*., 361 F. Supp. 2d 237, 252–53 (S.D.N.Y.2005)).

conducting an action under this rule, the court may issue orders that . . . determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument [and] require—to protect class members and fairly conduct the action—giving appropriate notice to some or all class members of . . . any step in the action").

A district court's authority under Rule 23(d) even extends to communications to putative class members from third parties. *Manual for Complex Litig.*, Second § 21.33 ("The judge has ultimate control over communications among the parties, *third parties*, or their agents and class members on the subject matter of the litigation to ensure the integrity of the proceedings and the protection of the class." (emphasis added)); *see also In re McKesson HBOC, Inc. Securities Litigation*, 126 F. Supp. 2d 1239, 1246–47 (N.D. Cal. 2000) (ordering that misleading statements made by outside attorney be remedied by curative notice to solicited class members, inclusion of court-mandated disclosures in attorney's future solicitations, and permitting rescission of solicited agreements); *Georgine v. Amchem Products, Inc*., 160 F.R.D. 478, 489, 496–98 (E.D. Pa. 1995) (invalidating opt-outs and creating second opt-out period where several outside law firms opposed to the settlement sent misleading communications and advertisements to absent class members).

While the Uphold Plaintiffs are not asserting that the instant proceeding is tantamount to a Rule 23 matter, the same due process principles that underlie and justify the authority granted to district courts by Rule 23(d) may guide this Court's decision. In other words, for multiple reasons, this Court should not approve any misleading communications to and with absent class members in the Uphold Litigation.

- 21 -

Further, counsel in the Uphold Litigation themselves respectfully seek involvement in any notification to Class members about class claims. "Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed." *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995); see also *In re McKesson*, 126 F. Supp. at 1245 ("[L]ead counsel owes a generalized duty to unnamed class members [prior to certification].").

Applying these precepts (and obligations), the Uphold Plaintiffs note that there is an ample body of law under Rule 23 that further explicates why the Trust's proposed assignment may be inherently misleading and/or improper. When evaluating whether communications with absent class members are misleading, a court may consider, among other things, whether the communication accurately summarized the claims and rights at issue and may determine that the failure to do so renders a communication misleading. *See*, *e.g.*, 2 MCLAUGHLIN ON CLASS ACTIONS § 11:1 (14th ed. 2018) (collecting cases). Communications that have been found to be misleading and thus violative of the principles of Rule 23 include:

> communications that misrepresent the status or effect of the pending action, communications that coerce prospective class members into excluding themselves from the litigation, and communications that undermine cooperation with or confidence in class counsel.

*Jones v. Jeld-Wen, Inc.*, 250 F.R.D. 554, 561 (S.D. Fla. 2008). In *Jones*, the court held that a communication from the defendant to putative class members "ha[d] the potential to have a misleading and coercive effect on putative class members" because it notified the putative class members to use "extreme caution" with defendant's defective

- 22 -

laminated glass but also stated that defendant must postpone any future repairs to the glass because of the class members' involvement with the class action. *Id.* at 563. The court found that "the communication threatens the proper functioning of the litigation, as it has a tendency to suggest to the reader that needed repairs will be made only if the customer opts out of the class action." *Id*. at 564.

Similarly, in *Chen-Oster v. Goldman, Sachs & Co*., the court found that the defendant procured arbitration agreements after the case was filed from putative class members in a "confusing and potentially misleading fashion" because the agreements did not adequately describe the waiver of rights that the agreements entailed. 449 F. Supp. 3d 216, 271 (S.D.N.Y. 2020), *objections overruled*, No. 10 Civ 6950 (AT) (RWL), 2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021). The court found that the defendant's behavior warranted remedial action and ordered the defendants to provide corrective notice to the relevant putative class members of the opportunity to opt out of arbitration, stating that this remedy "provides individual Class Members with a choice that should have been theirs to make at an earlier time." *Id.* at 272.

The Trust's Assignment Procedure is misleading and problematic because of its inherent structure, as addressed above. As proposed, it fails to provide those Uphold creditors who are also Class members in the Uphold Litigation with adequate information about how assigning their claims to the Trust might affect their legal interests.

## CONCLUSION

The Motion may be well-intentioned, but it asks this Court to approve an arrangement that would have profound unintended consequences, and seeks relief to which it is not legally entitled as it modifies a confirmed Plan. While the Motion <u>may</u>

- 23 -

result in more funds coming into the estate, it would do so at the expense of some

creditors, and without reasonably adequate notice of the risks involved. At this stage in

this Chapter 11, it is too late to alter the reasonable expectations of creditors and ask them

to approve assignment of claims without sufficient disclosure of the risks involved.

Accordingly, the Uphold Plaintiffs ask this Court to deny the Motion in its entirety, or at

the very least, carve out potential Uphold consumer claims from the assignment

procedures.

Dated: July 11, 2022

**A.M. SACCULLO LEGAL, LLC**

*/s/ Mary E. Augustine*
Anthony M. Saccullo (No. 4141)
Mary E. Augustine (No. 4477)
27 Crimson King Drive
Bear, Delaware 19701
Telephone: (302) 836-8877
meg@saccullolegal.com

-and-

**ASK LLP**
Edward E. Neiger, Esq.
60 East 42nd Street, 46th Floor
New York, NY  10165
Telephone: (212) 267-7342
Fax: (212) 918-3427

-and-

**ASK LLP**
Richard Reding, Esq., MN SBN 0389945
2600 Eagan Woods Drive, Suite 400
St. Paul, MN  55121
Telephone: (651) 289-3842
Fax: (651) 406-9676
Email: rreding@askllp.com

*Bankruptcy Counsel for Plaintiffs*

-and-

**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
Rachel Geman
rgeman@lchb.com
250 Hudson Street, 8th Floor
New York, New York  10013-1413
Telephone:  (212) 355-9500

-and-

**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
Christopher E. Coleman
ccoleman@lchb.com
222 2nd Ave. South, Suite 1640
Nashville, Tennessee  37201
Telephone:  (615) 313-9000

-and-

**GISKAN SOLOTAROFF & ANDERSON
  LLP**
Catherine E. Anderson
canderson@gslawny.com
90 Broad Street, 2nd Floor
New York, New York 10004
Telephone:  (212) 847-8315

*Attorneys for Plaintiffs and the Proposed
  Class*