UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE

                                    .    Chapter 11
IN RE:                              .
                                    .    Case No. 20-12836 (JTD)
CRED INC., *et al.*,                .
                                    .    (Jointly Administered)
                                    .
                                    .    Courtroom No. 5
                                    .    824 North Market Street
                                    .    Wilmington, Delaware 19801
                                    .
               Debtors.             .    Tuesday, July 19, 2022
. . . . . . . . . . . . . . . . .        3:00 P.M.

                         TRANSCRIPT OF HEARING
                BEFORE THE HONORABLE JOHN T. DORSEY
                  UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Cred Inc.,
Liquidation Trust:          Darren Azman, Esquire
                            Joseph Evans, Esquire
                            MCDERMOTT WILL & EMERY LLP
                            1 Vanderbilt Avenue
                            New York, New York 10017


Audio Operator:             Nolley Rainey

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES (CONTINUED):

For Uphold HQ, Inc.:       Michael Delaney, Esquire
                           BAKER & HOSTETLER LLP
                           Key Tower, 127 Public Square
                           Suite 2000
                           Cleveland, Ohio 44114

For the U.S. Trustee:      Juliet Sarkessian, Esquire
                           UNITED STATES DEPARTMENT OF JUSTICE
                           OFFICE OF THE UNITED STATES TRUSTEE
                           844 King Street, Suite 2207
                           Lockbox 35
                           Wilmington, Delaware 19801

For the Uphold
Plaintiffs:                Edward Neiger, Esquire
                           ASK LLP
                           60 East 42nd Street, 46th Floor
                           New York, New York 10165

                           Rachel Geman, Esquire
                           LIEFF CABRASER HEIMANN & BERNSTEIN
                           250 Hudson Street, 8th Floor
                           New York, New York 10013

1                                INDEX

2   MOTION GOING FORWARD:                                    PAGE

3   Agenda
    Item 1:   Motion of the Cred Inc. Liquidation            4
4             Trust for Entry of Order Approving
              Third Party Claim Assignment Procedures
5             (Filed 6/23/22) [Docket No. 1015]

6             Court's Ruling:                                 67

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 3:01 p.m.)

2          THE COURT:  Good afternoon.  This is Judge Dorsey.

3   We're on the record in Cred Inc., Case No. 20-12836.

4          I will go ahead and turn it over to the

5   liquidating trustee to run the agenda.

6          MR. AZMAN:  Good afternoon, Your Honor.  Darren

7   Azman from McDermott Will & Emery for the Trust.

8          The only item on the agenda today is the Trust's

9   motion to approve claim assignment procedures.

10          Your Honor, there are really only two core issues

11   for you to decide here.  One is whether the plan and trust

12   agreement, as approved by the court, authorize the Trust to

13   acquire claims from creditors.  Two, whether the Trust

14   proposed assignment here constitutes an impermissible

15   modification of the plan.

16          Your Honor, on the first issue you can find that

17   the trust has authority in one of two ways.  First, does the

18   plain language of the plan or the Trust agreement allow for

19   it, or, stated differently, does it prohibit it.  Second, if

20   it's not clear, what was the intent of the parties when they

21   included a provision specifically referencing the acquisition

22   or purchase of third-party claims.

23          As the Uphold Plaintiffs concede, the plain

24   language of the trust agreement and the plan authorize the

25   Trust to acquire third-party claims.  And with respect to

 1  Uphold its worth pointing out the obvious that Uphold is not

 2  here to protect creditor interests.  Their goal is simple,

 3  eliminate as many potential claims as possible that the Trust

 4  or creditors might bring against them in whatever form or

 5  venue, whether the class action or here in the bankruptcy

 6  court.  That is their only goal.

 7          I think the court should take that into

 8  consideration when weighing their arguments that they are not

 9  speaking from their voice as a creditor.

10          So going back to the legal question, the plan and

11  the trust agreement referenced the Trust's ability to

12  adjudicate third-party claims that the trust has acquired,

13  purchased or that have, otherwise, been assigned.  Your

14  Honor, what other claims could we be talking about if not

15  claims that creditors or others have like the Trust is now

16  seeking to acquire.  We think the answer is simple, the

17  claims that we are trying to acquire are exactly the claims

18  that the assignment provision references.

19          Even if there is some level of ambiguity in that

20  provision Your Honor can clarify the meaning consistent with

21  the SS Body Armor case that we cited which stands for the

22  proposition that courts have the ability to clarify a plan

23  where it is silent or ambiguous, or interpret plan provisions

24  for equitable concerns.

25          Your Honor, just to be clear, this claim

1   assignment strategy is something that was discussed at great

2   length with the committee on a number of occasions, shortly

3   before confirmation, and those discussions ultimately

4   culminated in adding the assignment provision that is at

5   issue here.  That was added to an amended plan in a redline

6   that was filed just prior to the confirmation hearing.  You

7   can see the redline where we added the claim assignment

8   provision; it's at Docket No. 388, and it's on page 63 of

9   that PDF.

10           So it's not as if we suddenly thought of this idea

11  to acquire claims and then happen to go back and find a

12  provision in the plan or the liquidating trust agreement that

13  allowed us to do this. It was deliberated at great length by

14  the committee and subsequently by the liquidation trust.  As

15  a result we added it to the plan and the trust agreement.

16           Now Uphold argues that the assignment provision

17  refers only to claims assigned by the debtor to the trust.

18  Your Honor, why would the committee have insisted on

19  including this assignment provision shortly before the

20  confirmation hearing if the only thing the provision was

21  designed to accomplish was the trust's acquisition of claims

22  from the debtor.  When would the debtor or the Trust even

23  have had time to make use of that provision and why would we

24  even need a provision like that when there were many other

25  provisions in the documents that effected the transfer of

1 claims from the debtor to the Trust.

2         So, Your Honor, for those reasons we think there

3 is no question that the Trust has the authority to acquire

4 creditor claims here.

5         Your Honor, the second issue for you to consider

6 is whether the acquisition of claims, as we proposed, is

7 somehow a modification of the confirmed plan.  If Your Honor

8 concludes that the Trust has the authority to acquire claims

9 which, again, the Uphold Plaintiffs concede, that should be

10 the end of the inquiry and you don't even need to address the

11 second issue.  Any acquisition or purchase of claims by the

12 Trust would necessarily entail and exchange of consideration

13 in some form from the Trust to creditors.  What else could

14 have been contemplated when the parties used the word

15 "purchased" in the assignment provision?

16         Both Uphold and the plaintiffs discuss how certain

17 creditors may not benefit as much as others from the claim

18 acquisition strategy that we are proposing.  Your Honor, even

19 if that is true that does not mean there has been a plan

20 modification.  In every claim acquisition scenario each

21 creditor will have a different cost benefit analysis; it's

22 only natural.  And to suggest that the trust should undertake

23 the work of assigning values to different assigned claims of

24 different creditors in different situations who have

25 different sets of facts is an impossible and really unhelpful

1  task.  And, of course, I think both Uphold and the plaintiffs

2  recognize that because neither of them suggest an alternative

3  way to do this, only that they don't like how the Trust

4  (inaudible).

5       Your Honor, as you said in <u>Mallinckrodt</u> --

6       THE COURT:  Well let me ask you, Mr. Azman -- the

7  one thing I have a question about is if the intent here from

8  the beginning was that the trust could acquire these third-

9  party claims.  And if they were going to do it on a basis

10  where a blanket ten percent bump in an allowed claim for any

11  claimant who agrees to assign their claim why wasn't that

12  included in the plan?

13       MR. AZMAN:  Your Honor, let me clarify the

14  deliberations that the committee had.  The goal was to

15  confirm the plan quickly.  As Your Honor may recall there

16  were a lot of issues going on in this bankruptcy case from

17  day one.  The committee's primary goal was getting to a

18  liquidating trust.  We got this plan confirmed in this case

19  in four and a half months which is a very short period of

20  time, as Your Honor probably knows, for any case let alone a

21  case of this complexity.

22       We did not decide -- the committee did not decide

23  at that time that there was going to be a ten percent bump.

24  We discussed a number of different structures that we could

25  have, but we did not want to acquire claims before we even

1    had a chance to consider what the ramifications of doing that

2    would be and also what the proposal should be, whether it

3    should be ten percent, five percent, some other type of

4    structure.  So we did not know whether or not it would be

5    this structure or some other.  What we knew was that the

6    trust needed the ability to later acquire a claim.

7            THE COURT:  Well here is the problem I have, how -

8    - I mean that number just seemed to have been plucked out of

9    the air.  How do I know that it actually -- I have no idea

10   what the effect of this is going to be on the estate.  Is it

11   going to be net beneficial to the creditors?  Is it going to

12   be net negative to the creditors? Is it net neutral?

13           There is no way for me to know.  There is no

14   evidence here.  You're just asking me to take your word for

15   the fact that this ten percent bump in a claim is based on a

16   good faith decision by the trustees without any evidence for

17   me to know and to evaluate whether that is a good thing or a

18   bad thing.

19           MR. AZMAN:  Well I think there's a difference

20   between asking Your Honor to decide those two issues that I

21   mentioned before; one in which is does the document allow for

22   it, whether it's the plan or the liquidating trust agreement,

23   and the second issue being whether it's a modification to a

24   plan.  I think there is a difference between us asking you to

25   make that determination versus you determining whether this

1   is an exercise of good faith or good business judgment by the

2   trustees.

3           If Your Honor is not comfortable blessing the good

4   business judgment of the trustees -- I mean the trustees

5   everyday make business decisions that we don't come to the

6   court for.  Somebody can always come back and claim that they

7   did not exercise their good business judgment in doing that.

8           So if Your Honor has a concern about that latter

9   inquiry, about whether it's in the trustee's best business

10  judgment, or good business judgment, or maximizing value, any

11  of those formulations we would be happy for Your Honor to

12  just bless the fact that this is authorized and it's not a

13  modification of a plan.  I don't think that you need

14  discovery to determine whether or not it's authorized or its

15  modification of the plan, but I understand your concern.

16          THE COURT:  I saw in your papers you said you were

17  willing to just forego the ten percent bump issue.

18          MR. AZMAN:  We are.  I mean, look, the trustee

19  believes that that would be a bad decision; not a bad

20  decision they're not acquiring claims at all, but it would

21  probably result in less claims being assigned to the Trust

22  which is, obviously, in contrast to what the trustees believe

23  is in the best interest of creditors here.

24          I don't think that there is any evidence that

25  anybody could put, including the Trust, that would

1  demonstrate that there will absolutely be a benefit to the

2  Trust in a way that provides equal benefits to all creditors

3  if that is what Your Honor is asking.  And we have

4  acknowledged that in our pleadings.  There are absolute

5  permutations in which certain creditors may benefit over

6  others, but that is from their own individual circumstances,

7  not from the claims that they have against the Trust.  I

8  think that is an important distinction.

9         THE COURT:  Well, you know, I do this all the time

10  in deciding whether a settlement is appropriate or not.  Does

11  the settlement rise above the lowest range of reasonableness.

12  And in this case I don't have anything to look to, to say,

13  yes, it rises above the lowest range of reasonableness.

14         This is, in a sense, a settlement. You're telling

15  a claimant you assign your claim to us we will give you a ten

16  percent bump in your allowed claim.  I have no idea -- you

17  know, some claimants get a ten percent bump, that could be a

18  big difference for them.  In others it could be miniscule.

19  It depends on what the value of the third-party claims are.

20  That is the other thing I don't know.  What are the value of

21  these third-party claims that you are requiring.  That is

22  where I'm struggling.

23         MR. AZMAN:  Your Honor, we would be happy to

24  present evidence at an evidentiary hearing on those issues

25  given the concerns you have raised. I hear you on that issue.

1  It makes sense.

2           THE COURT:  Okay.  Go ahead.

3           MR. AZMAN:  So, Your Honor, look, we're not

4  altering the priority of claims established in the plan.

5  We're not altering allowed claim amounts that were specified

6  in the plan.  In fact, no allowed claims were promised and

7  we're not offering distributions that were promised in the

8  plan.  No distributions were promised in the plan.

9           The Uphold Plaintiffs cite the NorthEast Gas

10 Generation case as support for their plan modification

11 argument.  That case illustrates precisely why there is no

12 plan modification that is happening here.  In NorthEast Gas

13 the plan provided a specific amount for the treatment of an

14 impaired class of secured creditors.  It was not an estimate.

15 It said exactly what they were supposed to get.  Then ten

16 months later the debtor filed a motion to alter that

17 treatment.

18           Your Honor, we do not have those facts here.

19 Again, the treatment of unsecured creditors under our plan

20 simply said that they would receive their pro rata share of

21 recoveries based on their allowed claim amounts, whatever

22 they may be.  The plan said nothing about what allowed claim

23 amounts would be and said nothing about how much would be

24 available for distribution.  How can that constitute a

25 modification?  What are we modifying?

1          So at the end of the day, Your Honor, all

2   unsecured creditors are still receiving their pro rata share

3   of recoveries and they all have the option to participate in

4   this claim assignment.  Your Honor, we reviewed every single

5   reported case in which a court has addressed any aspect of

6   claim assignments by a bankruptcy trust.  We did that work

7   both as the committee's counsel and we did that work again at

8   a deeper level for the Trust in advance of filing the motion.

9   Not one of those cases talks about plan modification.

10          The closest case we could find to our facts is the

11   Taberna Capital case from the SDMI District Court where the

12   court found no issue with the bankruptcy trust taking

13   assignment of a creditor's claim and then standing in the

14   shoes of the creditor to pursue the litigation.  And by the

15   way, that claim assignment in Taberna happened after the plan

16   was confirmed and probably most importantly there was not

17   even any language in the plan that authorized the trust to

18   acquire a claim; nothing that even remotely resembled the

19   language we have in the plan that authorized the trustees to

20   do what we are asking.

21          I want to quote some language from that case.  In

22   discussing the merits of the assigned claim this is what the

23   district court said in general, claims or choses in action

24   may be freely transferred or assigned to others.  The Second

25   Circuit has held that a bankruptcy trustee who obtains valid

1   assignment of claims is not prevented from suing on those

2   claims simply because the assignee is a creature of

3   bankruptcy.

4          Your Honor, the district court, in its decision,

5   did not talk about plan modification because they didn't need

6   to.  Your Honor --

7          THE COURT:  Well, it wasn't raised as an issue in

8   the case either.

9          MR. AZMAN:  That's correct, it wasn't raised in

10  this decision.  So, again, Your Honor, we don't think this is

11  a plan modification issue.

12         Your Honor, I also want to address the Uphold

13  Plaintiffs request that we include certain disclosures in the

14  assignment process.  Your Honor, the Trust is not acting in a

15  fiduciary capacity in negotiating to acquire claims from

16  creditors.  Yes, we owe fiduciary duties to creditors in

17  their capacities as trust beneficiaries, but not in their

18  capacity a third-party that may assign their claim, their

19  direct claim to the trust.

20         What I mean by that is that the Trust has a

21  responsibility to maximize recoveries for the trust and all

22  of its constituents.  What we do not have is a responsibility

23  to maximize an individual creditors overall recovery from

24  sources other than the Trust which is by participating in the

25  Uphold class action or suing anyone else directly.  In fact,

1  Your Honor, we previously litigated that issue before you to

2  prevent a creditor from suing third parties on what we allege

3  are estate causes of action.

4        Your Honor, the trust has a narrow mandate and it

5  is maximizing value for the trust.  We have no obligation to

6  give creditors a reason for why they should reconsider their

7  decision to assign claims to the trust.  We have no

8  obligation to talk about the benefits and downsides of

9  assigning their claims to the Trust.  This is no different,

10 for example, then if we were attempting to settle a

11 preference action with a creditor who also has a claim

12 against the debtor.  Those preference defendants have every

13 right to hire counsel, they have the right to think about

14 their preference claim selfishly in their own right and they

15 have the right to make a decision about what is best for

16 them.

17        Similarly, the Trust has the right and, in fact,

18 the obligation to do everything that we can to maximize value

19 for the trust which includes not offering up reasons for why

20 we think creditors might want to reject our claim acquisition

21 offer.  Your Honor, this request is nothing more than the

22 Uphold Plaintiffs trying to maximize value for their own

23 constituency without regard to how it will impact

24 distributions by the Trust to all creditors.  To be clear,

25 Your Honor, the classes, the putative class constituency is

1  narrow.  It includes only individuals who are based in the

2  US, who were referred by Uphold to Cred.

3          So, Your Honor, for those reasons, if you do

4  approve our motion, the Trust should be free to pitch the

5  claim acquisition process to creditors on an arm's length

6  basis as the trustees think it appropriate and in a manner

7  that benefits the Trust.

8          Your Honor, the last issue I want to address the

9  Uphold Plaintiffs make a few jurisdictional and venue

10  objections.  No one is asking Your Honor today to determine

11  whether the trust can or cannot bring an action on the

12  assigned claims of the bankruptcy court or any other forum.

13  In fact, the only immediate impact of the assignment is that

14  Trust will stand in the shoes of creditors in a punitive

15  class and another litigation that the creditors would,

16  otherwise, have standing to bring over or participate in.  We

17  don't know what the Trust will do with those claims and we're

18  not asking Your Honor to bless anything that we may do as

19  holders of those claims in the future.

20          Thank you.

21          THE COURT:  Thank you, Mr. Azman.

22          Who is going first on the objectors or -- well,

23  let me -- Ms. Sarkessian, you are on, do you have a position

24  one way or the other?

25          MS. SARKESSIAN:  Yes, Your Honor.  Juliet

1  Sarkessian on behalf of the U.S. Trustee.

2            Your Honor, the U.S. Trustee did not file a

3  response to this motion; however, we do have a few comments

4  we would like to provide.  Would you like me to do that now

5  or would you prefer me to wait until the objectors give their

6  argument?

7            THE COURT:  Let's wait for the objectors and I

8  will come back to you.  Thank you.

9            MS. SARKESSIAN:  Thank you.

10           Who wants to jump in?

11           MR. DELANEY:  Good afternoon, Your Honor.  This is

12 Michael Delaney with Baker & Hostetler on behalf of Uphold

13 HQ, Inc.

14           THE COURT:  Okay.

15           MR. DELANEY:  Your Honor, I think we would like to

16 just kind of respond in turn to a lot of the assertions that

17 were made by the trustee's counsel today and in their

18 pleadings and in the reply.  You know, I think our papers are

19 pretty clear with respect to our position, but as the court,

20 I'm sure, is aware new arguments were raised in the reply

21 brief that we have not had a chance to fully brief.

22           Before I do that, you know, I think from our

23 perspective we believe that the trustee is losing sight of

24 the purpose of this liquidation trust.  This liquidation

25 trust was vested with the authority to accept the assets of

1  the estate and liquidate those assets for the benefit of

2  beneficiaries of the trust.

3          The plan, we believe, is very clear on what the

4  assets of the estate are.  We believe the plan is very clear

5  about what the liquidation trust assets are.  These are terms

6  that are defined thoroughly in the plan.  It was a plan that

7  was, as trustee's counsel stated, heavily negotiated.  It

8  makes clear in each one of the definitions that the assets of

9  the liquidation trust are and are intended to be the assets

10 of the debtors and the estates.

11         We believe that that is important.  We believe

12 that that was the premise upon which this plan was proposed.

13 We believe it is the premise upon which this plan was sent to

14 creditors.  It was voted upon.  It was confirmed.  And we

15 believe that the motion that is before the court is not some

16 innocuous motion to establish procedures under existing

17 authority.  It is a motion to grant authority that was not

18 provided for in the trust agreement or the plan, not under

19 the, you know, "adjudication clause" as referenced by the

20 trustee.

21         And we do not believe that it is properly

22 considered to be part of any sort of settlement or other

23 compromise especially this time given the lack of any

24 evidence regarding what claims are purportedly being

25 resolved, what those claims are worthy, what the assets are

1  that the estate is receiving vis-à-vis third-party claims,

2  what the value of those third-party claims are, what the

3  likelihood of success is, what the likelihood of collections

4  are.  You know, I could go on and on about the dearth of

5  evidence that we're really looking at when we're talking

6  about the motion that was brought by the liquidation trustee.

7         THE COURT:  Well on the question of whether or not

8  the Trust can acquire third-party assets is it your position

9  that if a claimant came to the trustee and said, hey, I've

10  got a claim against the estate, I've also got a claim against

11  this third-party, but I can't afford to prosecute that claim

12  and I'm willing to give it to you so that you can pursue that

13  claim for the benefit of any creditor of the estate.  Are you

14  telling me they can't do that?

15         MR. DELANEY:  Your Honor, I think in general, they

16  might have the ability to do that and I think that is what

17  the case is citing by the liquidating trustee said, but I

18  don't believe under the plan that is confirmed they are

19  authorized to do that.  I think we keep talking -- you know,

20  the liquidating trustee keeps talking about this adjudicate

21  clause.

22         If you look at the adjudicate clause and you read

23  it in tandem with the preface of the provision, so we're

24  talking Section 2.4 of the liquidation trust agreement, it

25  says that all of the enumerated authorities must be necessary

1  to the purposes of the liquidation trustee -- the liquidation

2  trust, excuse me, Your Honor.

3          The purpose of the liquidation trust is not to go

4  off and buy third-party claims. It is not even, as stated in

5  the liquidation trust agreement, to maximize value to the

6  creditors.  The purpose of the liquidation trust is to take,

7  hold, liquidate and distribute the "liquidation trust

8  assets."  The liquidation trust assets, in turn, have a very

9  finite definition; it is those assets of the debtors and the

10  estate.

11          THE COURT:  So if there are valuable third-party

12  claims out there that nobody is going to be able to pursue

13  because they can't afford too, and the trustee has an

14  opportunity to acquire those claims and pursue them for the

15  benefit of every creditor of the estate, you're telling me

16  they can't do it.

17          MR. DELANEY:  What we're saying is we don't

18  believe that the plan authorizes them to do so in this case.

19  Had they done, say for instance, what they did in Woodbridge

20  or that they had an actual provision in the plan that said we

21  have the right to acquire.

22          The adjudication clause does not say that the

23  liquidation trust has the right to acquire it.  It doesn't

24  even say third-party claims acquired by the liquidation

25  trust.  That is just how the liquidation trustees are

1   presenting that provision.  The provision is -- furthermore,

2   I think our position is that the ability to adjudicate does

3   not necessitate the ability to acquire.  The ability to

4   adjudicate third-party claims could be easily read, and we

5   believe rightfully so, to clarify that a liquidation trust

6   has the ability to adjudicate third-party claims that were

7   transferred to them as part of the liquidation trust assets.

8         If we read into that provision that it's just any

9   claim that the liquidation trust is often acquired we believe

10  that runs afoul of the limitation in the preparatory

11  statement.  We also believe that it expands the definition of

12  liquidation trust assets.  You know, so I think that is why

13  we believe that in this plan, in this circumstance, under the

14  provisions of this liquidation trust agreement that the

15  liquidation trustees do not have that authority, Your Honor.

16        THE COURT:  So if I were to say that it was

17  unclear, there is some ambiguity, what is your position on

18  the -- the trustee's position regarding SS Armor that would

19  allow me to clarify that and say, yes, they can because

20  that's clearly what was intended; it just didn't make it into

21  the plan or the trust agreement.

22        MR. DELANEY:  Your Honor, I think that our

23  position would be that that would be inferring a right, not

24  really interpreting the provision. It would be an expansion

25  of the right.  If the liquidating trustee said that this was

1  envisioned since the time the committee was involved in the

2  case, but that the provision was not made clear because, you

3  know, they didn't have enough time to do it, Your Honor, I

4  don't believe that that is really a grounds upon which they

5  can rely to say that they didn't put the word "acquire" in

6  the plan.

7          We're not talking about drafting a long provision.

8  They could have simply put in the plan specifically stating

9  that the liquidation trust has the right to acquire third-

10  party claims pursuant to procedures, you know, for post-

11  confirmation or, you know, confirmed by this court.  All they

12  had to do was use the word "acquire" and the liquidation

13  trustee wants to read "acquire" into adjudicate.

14          Adjudicate may be interpreted in a lot of ways,

15  but we do not believe that it is fairly interpreted as

16  granting the authority to acquire third-party claims

17  especially when read in context with the overall purpose of

18  the plan, the definition of assets, the liquidation trust

19  assets, the causes of action.  All of these things have

20  specific needs and we do not believe that reading non-debtor

21  third-party claims against non-debtor parties fits within

22  that definition.

23          We're not saying that the liquidation trustee

24  doesn't have the ability to receive assignment of claims that

25  were assets of the debtor.  We're not saying that.  We're not

1  saying that they don't have the authority to go up and

2  prosecute those claims. I mean if we were to be taking

3  depositions it would be contravening all of the Delaware

4  authority on this point and each of those cases involved the

5  grant and the assignment of third-party claims as part of the

6  plan confirmation process.

7          Your Honor, that could have been done here.  It

8  wasn't and the plan was confirmed.  The plan is substantially

9  consummated.  It's been substantially consummated for 15

10 months as of today.  And yet we believe that the liquidation

11 trust is trying to expand the -- is trying to expand its

12 authority and the assets of the liquidation trust by and

13 through this motion.

14         Your Honor, that is not the only issue we see

15 here.  Obviously, we believe there is a lot of issues with

16 respect to this motion.  We believe that it does modify the

17 treatment of Class 4 creditors.  I think it's a strange

18 reason to say that increasing by ten percent across the board

19 any claims of assigning creditors does not affect the

20 interest of the non-assigning creditors.  I think any cursory

21 review of the plan will show that there is never any mention

22 of increasing claims in Class 4 in consideration for

23 assignment of the claims.  The ten percent was never

24 mentioned.

25         We believe that that would be a modification of

1  the plan to now say that assigning creditors are able to get

2  an increased ten percent.  We believe that that would violate

3  the pro rata nature of the distribution.  The pro rata nature

4  of these distributions is we don't believe envisions and no

5  creditor could reasonably envision that the liquidation

6  trustee would, across the board, increase claims by ten

7  percent in some unknown amount.  We have no idea what that

8  amount would be.  We have no idea what the implications would

9  be for creditors in Class 4.  There has been no disclosure.

10 So we believe that that would be a material modification of

11 the plan that would be prohibited.

12         To one other point on the ten percent modification

13 the liquidation trustee, in its reply brief and today before

14 the court, has made several statements that all parties would

15 be able to equally participate.  There is nothing on the

16 record to suggest that all parties in Class 4 hold third-

17 party claims that are assignable to the liquidation trust.

18 And there is no reason to conclude that trade creditors would

19 have third-party claims against any number of whoever the

20 liquidation trust might be intending to go in two.

21         We have no reasonable basis to conclude that the

22 liquidation trust or Class 4 would be able to equally

23 participate in these assignments.   So we believe that that

24 is somewhat of a red herring.  We also believe that that is

25 why the argument presented by the liquidation trust under

1  1122 and 1123 fails as well.  You know, we don't believe that

2  this class, as proposed, as modified by the assignment

3  procedures, would be able to stand under 1122 and 1123.

4        We believe it does provide for disparate treatment

5  of similarly situated creditors on a basis other than the

6  nature of their claim.  The disparate treatment is premised

7  upon the fact that some creditors have third-party claims and

8  some don't.  That is on a valid basis to provide for

9  disparate treatment.

10        I apologize, Your Honor, I'm jumping around in my

11  notes a little bit.

12        Your Honor, I think two more points that I would

13  like to make.  One, I think that there is a question about

14  the benefits of third-party creditors -- sorry, not third-

15  party creditors, the Class 4 creditors.  The trustee has

16  taken the position that any proceeds from these third-party

17  claims would be distributed to beneficiaries of the trust.  I

18  think that, you know, if that is what is approved, if the

19  court approves the procedures and approves the acquisition of

20  third-party claims that probably should be what happened.  We

21  don't disagree with that.

22        We do think that that would require modification

23  of the treatment of Class 4 creditors.  That is really

24  impermissible at this point in time.  Under the plan Class 4

25  creditors are entitled to receive net distributable assets,

1   the pro rata share of net distributable assets.  Net

2   distributable assets are defined as the assets of the debtors

3   -- the proceeds from the liquidation of the assets of the

4   debtor.  As these are not -- as third-party claims are not

5   assets of the debtor under the plan, I think that we would

6   say that that is yet another modification that would have to

7   occur under the plan, really not to approve the procedures

8   themselves, but to really implement them and to give meaning

9   and purpose to the procedures.

10         The last point pertains to the potential tax

11   implications.  I think we do have some serious concerns about

12   whether or not the trustee would be engaged in some sort of

13   business that would affect the tax treatment of the

14   liquidation trust under the tax code.  A liquidating trust

15   under the tax code is, you know, a trust that is formed for

16   the purposes of liquidating the assets assigned to it.

17         You know, based on the decisions that we have

18   reviewed we believe that that is, you know, intended to

19   reflect assets assigned to the liquidation trust by the

20   debtor entity to establish in connection with the plan.  I

21   think our concern is that if there are an unknown number of

22   additional assignments of assets from non-debtor entities

23   these third-party creditors of the liquidation trust that

24   that could affect the taxes in the liquidation trust which

25   could have significant negative tax implications for the

1 beneficiaries of the trust and the trust as well.

2          I think we are concerned about that.  I think that

3 they're showing that the liquidating trust should be able to

4 make with respect to those issues.  They may disagree with

5 our read, but, you know, when we're looking at the brief I

6 haven't seen anything that shows an opinion saying that doing

7 this will not affect their tax treatment.

8          So I think that is our concern and we think that

9 given the fact that there really is no proof of benefit to

10 the estate at this point in time that approving this without

11 some sort of demonstration that it won't affect the tax

12 treatment of the Trust should not be considered.

13          I think with that, Your Honor, I would answer any

14 further questions that you might have. If not I will turn

15 over the podium.

16          MR. NEIGER:  Good afternoon, Your Honor.  May I

17 proceed?

18          THE COURT:  Yes, go ahead.

19          MR. NEIGER:  Good afternoon, Your Honor.

20          My name is Edward Neiger.  I represent the

21 proposed class plaintiffs in the Sandoval v Uphold class

22 action or proposed class action.  With me is my partner Jay

23 Reding out in Minnesota and my co-counsel, Rachel Geman, from

24 the law firm of Lieff Cabraser Heiman & Bernstein, with my

25 co-counsel, as an objector, and his proposed class counsel in

1  the proposed class litigation.

2           Your Honor, I'm going to make my arguments as

3  though there still is a 10 percent bump, because although

4  Your Honor asked some difficult questions and seemed to be

5  bothered by it, Your Honor has now stated that you will not

6  approve the 10 percent bump, so I'm going to proceed as if

7  that's still on the table.

8           But I want to make something very clear right off

9  the top.  Even if the trustee moves the 10 percent bump, we

10 still see the proposed procedures as being highly

11 problematic, especially from a notice perspective and from a

12 due process perspective.

13          So, let me get into the arguments that I was going

14 to make, which may be somewhat modified based on comments

15 that the Court has made and comments that counsel to the

16 trust has made.  We firmly believe that this is a plan

17 modification and I'll get into why we believe it's a plan

18 modification and not a claims resolution.  As such, you just

19 can't modify it.  It's barred by 1127(b) for two reasons.

20 Number one, the trust is not a plan proponent, but number

21 two, the plan was substantially consummated, which

22 everyone -- there's no dispute about.

23          But even if this can be modified under

24 Section 1127(b), because the plan was not substantially

25 consummated but somehow the trust is a plan proponent, we

1   still need to comply with Section 1125 of acts under 1127(c)

2   and 1123(a)(4) and that's under 1127(b).  And I'll be

3   perfectly honest, I was shocked -- shocked when I heard

4   counsel to the trust say that this language that they're

5   using to show that they have authority to acquire claims,

6   and, you know, I could go both ways on that.  I think you

7   need to be a cum laude scholar to really read between the

8   lines to see that the trust intends to acquire claims, but

9   assuming that's there, assuming that language is there and

10  that language is clear, that was put in, at least according

11  to -- if I heard trust counsel -- counsel to the trust

12  correctly -- I mean, you can correct me if I'm wrong -- that

13  was put in right before the confirmation hearing.  So, I

14  doubt that general unsecured creditors got notice of that and

15  if they did, I would like more information about that and how

16  they got notice and when they got notice, et cetera, et

17  cetera.

18          Because this entire thing turns on that insertion

19  and even if the plan went out and the disclosure statement

20  went out to everyone, that a provision probably did not.  And

21  as Your Honor knows under the local rules, notice must go to

22  everyone who's going to be affected by what a motion is

23  trying to do.  And in this case, there are two classes of

24  people who will be affected by the motion.  There are the

25  Cred creditors who will be affected by the motion,

1  essentially if they don't assign their claim because they're

2  going to get what the opposite of a bump is, whatever that

3  is; it's a cut.  And there are the Uphold creditors, frankly,

4  many of whom are also Cred creditors, so they should be

5  getting it as a Cred creditor, but from a due process

6  standpoint, the Uphold creditors are going to assign their

7  claim to a trust and instead of getting recovery on their

8  claims, their recovery is going to be distributed to everyone

9  else, whether -- it's impossible to know how that will help,

10 but in most cases, I have to think it will hurt.

11        And for them to not get notice of this, and not

12 only notice, but notice that is acceptable under

13 Section 1125, which Section 1127(c) requires, that just did

14 not happen in this case, so I think that's highly problematic

15 and very troubling, to be honest.

16        I also think that we have 1123(a)(4) problems,

17 which I'll get into, but first I want to just give the basics

18 of why this is a plan modification and not as the trust

19 counsel said, it's part of a claims-resolution process,

20 because I think that, if the Court agrees with that, I think

21 that will also create a lot of problems, not only in this

22 case, but, frankly, in many other bankruptcy cases.  It will

23 open the floodgates to all sorts of post-bankruptcy

24 machinations being done under the guise of claims resolution.

25        Everybody on this Zoom knows what claims

1  resolution is.  You know it as a first-year bankruptcy

2  lawyer, because that's what you do as a first-year bankruptcy

3  lawyer, you do claims objections and claims resolutions.  You

4  object to a claim.  Usually, the basis is it doesn't match

5  the debtor's books and records or if it's a trade creditor,

6  they -- the goods weren't good, and then they resolve the

7  claim.  That's what claims resolution is.

8          This is an unprecedented sleight of hand to say

9  that what the trust wants to do with these complex procedures

10  that have implications that the trust admits, itself, doesn't

11  know what those implications are.  So, to say that those are

12  claims modifications, just doesn't pass the smell test.  It

13  doesn't hold water.  Whatever expression this Court wants to

14  use.

15          But I'll go a step further and say that even if

16  the notices were perfect, which they clearly weren't, and I

17  doubt that unsecured creditors got notice of any of this, but

18  even if the notices were perfect, in cases cited -- in most

19  of the cases cited by the trust, one of two things were

20  present.  Number one, it truly applied to the whole class.

21  There wasn't a segment of a class to which it couldn't apply.

22          And over here there is a segment of a class, of

23  the class to which it, by definition, will not apply; for

24  example, trade creditors or people who have (indiscernible),

25  people who don't have third-party claims against Uphold for

1   whatever reason.  I'm not the expert in the Uphold

2   litigation.  I'm just the bankruptcy lawyer.  But there are

3   definitely people who have claims against Cred who do not

4   have claims against Uphold and they are in this class.

5          And the trust has failed to cite a single case

6   where this was approved over the objections and the basis for

7   the objection was 1123(a)(4), that it didn't apply to the

8   whole class.  In Mallinckrodt, it applied to the whole class.

9   In Woodbridge, it applied to the whole class.  So, it would

10  be truly without precedent.

11         Even if the notice was good to approve the

12  procedures, because it, by definition, can't apply to the

13  whole class unless they're willing to state on the record,

14  someone is willing to provide evidence that every single

15  person who is in this class was a creditor of Cred is also a

16  creditor Uphold, which I doubt anyone would raise their right

17  hand and swear to.

18         The other important distinction -- this does

19  relate to the 10 percent bump, so Your Honor can do what you

20  want with it -- but in the cases cited by the trust, it

21  didn't come -- the compensation, or the "bump," didn't come

22  out of the height of the other creditors in the class, except

23  for Woodbridge.  I'll admit Woodbridge is a little bit

24  different.  Number one, Woodbridge happened at the time of

25  the plan -- there wasn't this post-plan motion.  Number two,

1   it applied to the whole class.  And number three, it wasn't

2   contested in Woodbridge.  I don't know why it wasn't

3   contested or what the story with Woodbridge was and, frankly,

4   I don't know what the judge -- I don't think the judge would

5   have approved it if it was contested.  But this is bankruptcy

6   court and in bankruptcy, if everyone agrees to something,

7   sometimes judges approve it.  But that can't be precedent for

8   future cases.

9          So, I think if Your Honor approves the procedures,

10  even assuming the notices were good, which they weren't, and

11  even assuming there's no 10 percent bump, it would be

12  unprecedented in four ways and, frankly, it would open the

13  Pandora's box in all cases for people to come in and say,

14  It's not a plan modification, it's a claims resolution, and

15  they'll do all sorts of things then.  It will be pandemonium.

16         So, it's unprecedented in four ways, and then I'm

17  pretty much sure I'm done.  First -- and they mentioned the

18  Taberna case.  But other than the Taberna case, and I need to

19  look into that, but to my knowledge, other than that case the

20  Court allowed, clearly, the assignment procedures under the

21  plan, even if they took place post-confirmation.  It was all

22  part of the plan confirmation hearing and, presumably,

23  everyone got notice under the plan and disclosure statement.

24         Second, it will be the first time that a court-

25  approved these types of procedures in a post-confirmation

1  world where not every class member had the same opportunity.

2  And over here, as I said, not every class member had the same

3  opportunity.

4          Third, it will be the first time these procedures

5  were approved in similar circumstances when they were

6  contested.  The closest thing they have is Woodbridge and

7  even in that case, you know, notice went out to everyone and

8  it was part of a plan and it applied to the whole class, but

9  again, that case was not contested.

10          And, again, the fourth reason this would be

11  unprecedented at this time in this case is the fact that

12  people really didn't get notice of it.  And we just need to

13  use common sense for a little.  Let's forget about the

14  technical interpretations of what the plan says or doesn't on

15  adjudicate and acquire or purchase.  Let's just forget about

16  that.  Let's just think of, you know, John Smith sitting on

17  his couch invested $5,000 in Cred and assume this was in the

18  plan originally and wasn't inserted, as trust's counsel said

19  the day before.

20          Well, let's say it was in the plan and disclosure

21  statement all along and he sits down to read this plan and

22  disclosure statement, which they probably don't do, but

23  that's their problem; that's not the trust's problem.  But

24  let's say he reads it.  I don't think he can see the

25  consequences of, you know, him assigning his claim and then

1  it getting diluted to everyone.  I mean, that has to be

2  clear.  He doesn't know that, and as we said, he probably

3  didn't even get that notice.

4          So, common sense, due process, just basic, basic

5  concepts that every law student knows should dictate that

6  even if Your Honor removes the 10 percent bump, which I think

7  Your Honor should, people need to get notice of what's going

8  on -- counterclaims are implicated -- so that they can make

9  an informed decision.  Should I assign my claim?  Should I

10  let my claim -- just whatever happens, happens.  Should I be

11  part of the class action, which they're automatically part of

12  the class action.  Should I hire my own lawyer to fight the

13  claim?  They have a right to know, Your Honor, under basic

14  laws of decency, frankly.

15          I'm just going through the rest of my notes to see

16  if there's anything I'm forgetting.  Please bear with me.

17      (Pause)

18          MR. NEIGER:  That seems to be the basic crux of my

19  argument.  I can go on, but I think I've said enough and I

20  think my points are clear, and if not, I'm happy to answer

21  any questions that Your Honor has.

22          Thank you for giving me the opportunity.

23          THE COURT:  Thank you, Mr. Neiger.

24          Ms. Sarkessian?

25          MS. GEMAN:  Your Honor, may I be heard?

1           THE COURT:  Do we -- go ahead, Ms. Geman.

2           MS. GEMAN:  Thank you, Your Honor.

3           Just a very brief point.  To put a finer point on

4   some of this discussion from a class action perspective, to

5   echo what Mr. Neiger implied, our position is that absent

6   class members in the Sandoval v Uphold consumer class action

7   are entitled under various threads of authority, some arising

8   from Rule 23, some from basic due process principles, to

9   information that implicates their participation in -- you

10  know, that could implicate their rights as absent class

11  members in a class action.

12          So, where as Mr. Azman noted his view on what he

13  was sort of permitted or not required to say to provide to

14  creditors, if you look through the other perspective, these

15  absent class members are entitled to this information about

16  potential implications of assigning their claims against

17  Uphold.  And our view, respectfully, is that nothing about

18  this bankruptcy context changes that sort of black letter

19  principle of class-action litigation; if anything, it only

20  underscores it because the same due process principles apply

21  so strongly here.

22          Whereas, as we noted in the papers, we, of course,

23  recognize this is not a Rule 23 preparing before Your Honor,

24  we suggest that the authority we cited could guide this

25  Court, particularly, because as seems to be clear, this is a

1  very unprecedented situation.  Certainly, it's unprecedented

2  in such a proposal against the backdrop of an extant class

3  action.

4          Taberna did not involve a class action.  The other

5  cases do not involve class actions.

6          So, simply put, we are seeking to protect absent

7  class members, to whom we owe duties.  Thank you, Your Honor.

8          THE COURT:  Thank you.

9          All right.  Ms. Sarkessian?

10          MS. SARKESSIAN:  Thank you, Your Honor.

11          For the record, Juliet Sarkessian on behalf of the

12  U.S. Trustee.  Your Honor, I appreciate the opportunity to be

13  able to make some comments, even though we did not file an

14  objection.

15          And just to let Your Honor know, I have previously

16  communicated with trust counsel to let them know that we have

17  these concerns and we would be making these statements, so

18  they're not being blindsided here.

19          So, there are a number of concerns that the U.S.

20  Trustee has.  The first is that it's my understanding based

21  in communications with the trust counsel, that there are

22  going to be professional fees that the trust will, you know,

23  have to pursue these -- any third-party claims that are

24  assigned to the trust.  And this is not going to be like a

25  pure contingency; there will actually be out-of-pocket

1  professional fees.  And because of that, there could

2  absolutely be a situation in which the trust beneficiaries

3  could actually receive less of a distribution.

4          Whether they assign their claim or not, they could

5  actually receive less of a distribution than they would if

6  these claims were not assigned.  That all depends on, as Your

7  Honor said, you know, what are these claims worth?  What will

8  it cost to litigate them?  And other information that is just

9  not part of the record at this time.

10          But, I think importantly -- and somebody can

11  correct me if I'm wrong -- but it's my understanding that the

12  disclosure statement did not disclose that Class 4, the

13  general unsecured creditors, could actually -- there could be

14  situations in which they could receive less if claims were

15  assigned and prosecuted by the trust.  They could receive

16  less.  They could receive more.  They could receive the same.

17  These are all possibilities, but to my understanding, this

18  was not disclosed.

19          I think, secondly, if Your Honor was to approve

20  some type of procedure whereby Class 4 could assign, or

21  members of Class 4 could assign their claims to the trust,

22  there would have to be a very significant disclosure, I

23  think, frankly, to the level of what would be expected in a

24  disclosure statement regarding all the issues that come up

25  with this.  Whether they're getting a 10 percent bump or not,

1  what does that number come from?  What are the risks and

2  benefits to assigning?  What are the other alternatives?  And

3  there's quite a lot of disclosure that would have to be made

4  and that is something that the U.S. Trustee believes would

5  really need to be vetted with the Court.

6          Thirdly, and this is actually something that I

7  looked up during the argument, because I heard somebody say,

8  you know, the assets here that are supposed to be distributed

9  to the Class 4 is a *pro rata* share of net-distributable

10 assets.  Those are assets of the debtors.

11         And I pulled up my plan and disclosure statement

12 and based on my quick review, I believe that's right.  The

13 definition of net-distributable assets, which is in

14 Section 1.94 of the plan and disclosure statement, is based

15 on the definition of assets, capital A, and then there's

16 certain carve-outs.  If you look at the definition of assets,

17 capital A, under -- I (indiscernible) the section -- but in

18 the plan and disclosure statement, it is defined as assets of

19 the debtor and of the estates.

20         Now, maybe the trust can tell me maybe there's

21 something in that definition that, you know, is not clear and

22 could potentially include other assets.  But the third-party

23 claims that we're talking about are not assets of the estate.

24 I think everybody agrees on that.  So, I think there's an

25 issue, because the plan treatment only includes a

1    distribution on the assets of the estate.

2            And, finally, Your Honor, I want to echo the

3    concern of notice.  Under Local Rule 2002-1(b), all motions

4    must be served on, quote, all parties whose rights are

5    affected by the motion, closed quote.

6            In this instance, it would be all of the creditors

7    who are beneficiaries of the trust.  And based on my

8    communications with trust counsel, they were not all served.

9    Only the standard 2002 list were served with this motion.

10   So, there's a lot of creditors out there whose rights are

11   affected by this motion, that have no notice of it and at

12   this point, if Your Honor was to approve it, they would be

13   finding out about it as a *fait accompli* when they get some

14   type of notice, indicating that they have a right to assign

15   their claims without ever having the ability to say, you

16   know, we object to this process.

17           So, those are the concerns that the U.S. Trustee

18   has, Your Honor, and I'd be happy to answer any questions.

19           THE COURT:  No questions.  Thank you very much.  I

20   appreciate it.

21           MS. GEMAN:  Thank you, Your Honor.

22           MR. AZMAN:  Your Honor, I have a few responses, if

23   it's okay?

24           THE COURT:  Go ahead.

25           MR. AZMAN:  First, Your Honor, you heard

1  Mr. Delaney agree with you when you first asked him whether a

2  trust had the ability to acquire claims and then he said

3  that, actually, they can.  And I think his focus is on the

4  language in the plan.

5          First, as you know, we disagree with their

6  interpretation, but moreover, there's no provision that said

7  we cannot do it.  And I think it's just as important, Your

8  Honor, our position is that the liquidation trust has the

9  authority to acquire claims, compromise the claims, but we

10 went one step further to make that clear in both, the plan

11 and the trust agreement.

12         Your Honor, we did not develop a perfect process

13 here -- we acknowledge that -- but that's not the standard

14 for comprising compromising claims and there's no perfect

15 process that we could have come up with because we went

16 through that machination and we couldn't do it.

17         At bottom, what we're really arguing about here is

18 Uphold and the Uphold Plaintiffs trying to substitute their

19 business judgment for that of the trust for their own benefit

20 and for their own constituents' benefit, and that's it.  And,

21 again, as I said before, if Your Honor thinks it will be

22 helpful to complete the record so that you can make a ruling

23 on this, we're happy to submit evidence that satisfies that

24 standard.  I have no question that we will be able to do

25 that.

1          Now, Mr. Neiger said he was shocked by the timing

2    of our inclusion of the assignment provision in the plan and

3    the trust agreement.  I'm a bit confused because in

4    Mr. Neiger's objection, he concedes the trust has authority

5    to acquire claims.  With that concession, how is the trust's

6    acquisition of claims now a modification of the plan?

7          I really don't understand that sudden change in

8    position.  And for what it's worth, Your Honor, I did look

9    back during argument.  The amendment that we made to the plan

10   that added this provision was filed on January 21st and the

11   confirmation hearing was on March 11.  So, I apologize if I

12   made it sound as if it was shortly or directly before the

13   hearing.  I think Mr. Neiger said the day before.  I don't

14   think I said that, but it was well in advance of the hearing

15   where are creditors had notice to review that provision and

16   object if they had an issue with it.

17          Now, Mr. Neiger also said that this is not a

18   claims resolution or a compromise of claims.  I think Your

19   Honor addressed that issue in response to Mr. Delaney's

20   presentation.  What if it's part of a preference claim that

21   the trust alleged against a creditor, the creditor agrees to

22   assign its claim against the trust or -- excuse me -- its

23   claim to the trust, and that claim that he agrees -- he or

24   she agrees to assign to the trust is a claim that's part of

25   the Uphold action, that's now a modification of the plan such

1  that I can't include the claim assignment as part of the

2  trust preference settlement?  That can't be right.

3         Mr. Neiger also said that our assignment process

4  will not include certain creditors and give all creditors the

5  same opportunity.  First, Your Honor, the objecting parties

6  continue to ignore the fact that these assignment procedures

7  are not directed at Uphold solely.  They're not.

8         Now, they're the only ones who objected and have

9  an issue with it, but we intend to acquire all claims that

10  creditors have against all parties related to Cred.  That is

11  a broad assignment that we are trying to effectuate here and

12  that's the one that's been used in other cases like

13  Woodbridge, so I don't agree with Mr. Neiger's position on

14  that.  The claim assignment applies to all creditors.  They

15  all have the ability to opt-in and collect 10 percent

16  increase to their claim in exchange for assigning all claims

17  that they have.

18         Now, did we interview every single creditor to

19  find out what precise claim that they have and what their

20  unique facts are?  No.  But, Your Honor, it still applies to

21  the whole class.

22         THE COURT:  Well, how are you going to do that,

23  then?  How are you going to -- are you going to send out a

24  mass notice to all creditors to say, Hey, if you have a

25  third-party claim, assign it to us.  We'll give you a 10

1  percent --

2           MR. AZMAN:  Yes.

3           THE COURT:  -- bump in your allowed claim and

4  we'll go forward from there.

5           So, that's what your plan is?  How is the trust

6  going to know whether they actually do have a third-party

7  claim or not?

8           And if you're an individual creditor who's getting

9  this notice, you're unrepresented by counsel and it says,

10 Hey, if you give us -- if you assign to us any third-party

11 claims you have -- we don't know whether you have any or

12 not -- but you assign them to us and we'll give you a

13 10 percent bump in your allowed claim, how is that comport

14 with the idea -- and I'm going back to Mr. Neiger's point --

15 of due process and how does it benefit the estate if you're

16 taking -- you're taking in all -- you're going to be

17 contacting unsophisticated people and saying, We'll give

18 you -- you know, some will be sophisticated and some won't

19 be -- but you're saying, Assign to us any third-party claims.

20 We don't know if you have any or not, but you assign it to

21 us.  If you do have one, we'll pursue it and in return for

22 that, we're going to give you a 10 percent increase, but we

23 have no idea whether you actually have a third-party claim or

24 not.

25           That's a --

1          MR. AZMAN:  Your Honor, my answer --

2          THE COURT:  -- difficult position you're putting

3    me in to say, That's sufficient notice to these individual

4    creditors.

5          MR. AZMAN:  Well, I -- first of all, in terms of

6    notice, everyone got notice of the plan and disclosure

7    statement and they both had the --

8          THE COURT:  Nothing in that plan said you were

9    going to acquire the claims and give a 10 percent bump to

10   people who assigned them to you.  Nothing said that.

11         MR. AZMAN:  Well, let's talk about other things

12   that aren't expressly disclosed in plan and disclosure

13   statements.  So, compromising claims in the sense of

14   objecting to an allowed claim, right.  The trust obviously

15   has the ability to object to an allowed claim.  Did we go one

16   step beyond?  Does anybody ever go one step beyond that and

17   say, for example, that we might choose not to object to a

18   claim because it would cost more money for the trust to

19   object to that claim than it would in terms of benefitting

20   the trust.  That's not something we disclose specifically,

21   either.  There's a lot of permutations of outcome by trust

22   that we don't disclose in disclosure statements because it

23   cannot be foreseen.

24         And, similarly, here, like I said before, the

25   trust, and rather the committee and its predecessor, did not

1  investigate these claims and could not have presented

2  anything.  And that's the one thing that I haven't heard from

3  anybody is, what could we have disclosed beyond this to

4  creditors if all we knew was that we wanted to acquire the

5  claims, but that we hadn't fully investigated them yet, and

6  depending on that investigation, that would dictate what the

7  acquisition structure would look like.  That's the problem

8  that I have.

9         THE COURT:  Well, the difference between the

10  example you just gave me is, in that situation, everybody is

11  going to be treated equally.  Everybody knows you can either

12  accept the claim or contest the claim.  You can settle a

13  claim.  And whatever the outcome of that is, it's going to

14  affect everybody equally, because you're still going to have

15  whatever the claims are and they're going to be distributed

16  on a *pro rata* basis.

17         There are people, apparently, in this group who

18  may have claims, third-party claims, who may not have third-

19  party claims.  And those who did not have third-party claims,

20  for example, trade creditors, as Mr. Neiger said, those

21  folks, if they had known this was going to be the plan as to

22  how the trustee was going to pursue its obligations under the

23  trust, it affects them differently than it does those who

24  have a claim.  They're not being treated the same; they're

25  being treated differently because they don't have a claim.

1  They don't have the opportunity to get the 10 percent bump,

2  so they're going to be diluted while the others going to go

3  up.  And if it had been part of the plan, they might have

4  come in and objected if they knew.

5  　　　　　MR. AZMAN:  Maybe they'll be diluted.  Maybe

6  they'll be diluted.

7  　　　　　THE COURT:  And that's all completely speculative.

8  I have no idea how this would play out.

9  　　　　　But that should be something that is decided by

10 those who are going to be affected by it, not by me.  If

11 you're going to say something that's completely

12 speculative -- we don't know how this is going to play out,

13 but we want to try it out and see if it's going to work -- it

14 should be in the plan so people can vote on it.  I can't come

15 in afterwards, and you're asking me to completely speculate

16 about how this may help.  It may hurt those people.  I don't

17 know.  But you're asking me to just say, I didn't include it

18 in a plan, but, Judge, you should approve it because we think

19 it might help the plan, it might help these folks, but we

20 don't know for sure.

21 　　　　　That seems, fundamentally, unfair to me.

22 　　　　　MR. AZMAN:  Well, Your Honor, you obviously know

23 that I disagree with that view of it, but I don't know what

24 else we could have put in the plan.  I really don't.  I don't

25 know how we could have articulated, without any knowledge --

1          THE COURT:  They did it in Woodbridge.  They did

2     it in Woodbridge.  They put in a 5 percent bump.  Everybody

3     knew about it.  Nobody objected.

4          You could have done the same thing.  You could

5     have put in a 10 percent bump.

6          MR. AZMAN:  I mean --

7          THE COURT:  You could have said, We're going to

8     give a bump.  We don't know what it's going to be yet.  It

9     might have an effect on your claim, but this is what we plan

10    on doing, kept it generic.  If nobody objected, that's a

11    different story.

12         MR. AZMAN:  Well, two things.  One, Woodbridge was

13    a Ponzi scheme and we don't have those facts here.  The

14    potential claims and cost-benefit analysis is much more

15    complicated here when we're talking about multiple bad actors

16    that we're pursuing in terms of assigned claims.

17         But I still come back to the disclosure that was

18    given of the trust's ability to acquire claims.  What else is

19    needed, and by the way, if there is more needed, what was the

20    purpose of that provision and how does it help the trust at

21    all, given the position that we're now in?

22         We cannot make use of that provision if we were

23    required, before the plan confirmation hearing to disclose

24    all the details of whatever the acquisition process would be.

25    There was a provision in the plan that very clearly

1  (indiscernible) for creditors, we would be acquiring claims

2  and we would be adjudicating claims.

3         What naturally flows through adjudicating claims

4  if you have a fire?

5         THE COURT:  Well, it's debatable whether it's

6  clear -- it's debatable whether it's clear because the word

7  "acquire" does not appear in the plan or the trust documents.

8         MR. AZMAN:  That's fair, Your Honor.  I that's

9  fair, Your Honor.  I agree.  If I could go back in time and

10  add one more sentence, I would have.  I'll acknowledge that

11  on the record.  But let's be real, that is exactly what we

12  were talking about.

13         And we looked back, by the way, at the minutes

14  that the committee kept.  And we had at least two sessions of

15  committee meetings where this was talked about and we talked

16  about adding it to the plan for this reason.  And, again,

17  we're happy to put that in the record, but I didn't think it

18  was necessary.

19         But I don't know what other language we could have

20  put in the plan that would have altered the outcome here,

21  other than language that said we were going to acquire

22  claims.  Every potential outcome from the trust acquiring

23  claims is going to have a different cost-benefit analysis for

24  every customer, for every creditor here.  That would have

25  been true before the plan confirmation and it would have been

1    true now.

2              And why would we have that language in the plan if

3    we can't even use it?

4              THE COURT:  Well, you can use it in this sense.

5    You can use it in the scenario you gave me where you're

6    trying to compromise a claim, a preference action you have

7    against somebody and they say, Hey, I've got a third-party

8    claim against somebody else.  I'll give it to you in return

9    for your forgiving my preference and you say, Okay.  Now,

10   you've bought that claim --

11             MR. AZMAN:  Oh, I --

12             THE COURT:  -- and then you can pursue that claim,

13   and I have no problem with that.

14             MR. AZMAN:  So, I actually (indiscernible) --

15             THE COURT:  But the question of sending out a

16   blanket notice to all creditors, many of whom are going to be

17   unrepresented by counsel, to say, Give us your third-party

18   claims, even though we don't know if you have one, of course

19   they're all going to say yes, right, because they don't know

20   what the implications are, that just doesn't fly for me, I'm

21   sorry.  It doesn't fly.

22             MR. AZMAN:  Can I respond to the preference

23   analogy real briefly, please?

24             THE COURT:  Go ahead.

25             MR. AZMAN:  So, I believe that the scenario you

1  just described that you said is okay, results in the same

2  disparity of treatment that others on this hearing are

3  describing.

4            THE COURT:  Go ahead.

5            MR. AZMAN:  So, I believe that the scenario you

6  just described, that you said is okay, results in the same

7  disparity of treatment that others on this hearing are

8  describing, and let me explain why.  If we're engaging the

9  settlement discussion with the preference target and they

10 agree to assign their claim to the Trust, we will necessarily

11 be getting less dollars in.

12            So, let's say a preference target is agreeing to

13 settle their preference claim for $10 and they're not going

14 to assign their claim to us, and that's okay with us, what if

15 we then say, well, you know what, if you assign your claim to

16 us, you'll only have to pay $5 to settle the preference claim

17 because you're assigning your claim.  That results in the

18 same exact disparate treatment that we're talking about here.

19 It's no different.  The cost benefit analysis is other

20 creditors could be directly impacted by it.  There's no

21 difference.

22            THE COURT:  But then you are negotiating with that

23 person's attorney most likely, not an individual, who

24 understands what the issues are and you're making a

25 compromise of that claim, and that's something that the trust

1  certainly can do.  They can compromise claims.  You can

2  compromise another one.  You can just forgive it because it's

3  too expensive to pursue like you said.  You can say we'll

4  reduce it ten percent of what we think the preference is in

5  order save the cost of having to pursue it.

6          Those are all things that happen in every case.

7  But when you have this blanket notice you want to send out to

8  say give us your third-party claims and we'll give you a ten

9  percent bump, that's a different animal.  And that's

10 something that would have to have been disclosed at the time

11 the plan was confirmed.  It just has to be.

12         I mean, it can have -- you have to give creditors

13 an opportunity to be heard on that issue and they weren't

14 given that opportunity because I don't think it was clear in

15 the plan that you were going to be acquiring third party

16 claims.  And it certainly was not clear in the plan that you

17 were going to give a ten percent bumped to everybody who

18 assigned their claim to you.

19         MR. AZMAN:  Understood, Your Honor.  I will come

20 to our first statement that we're willing to drop the ten

21 percent bump which I think solves all the problems.  I don't

22 think there are any remaining objections.

23         THE COURT:  Well, it doesn't get you past the

24 noticing issue which I have a problem with as well because,

25 again, I come back to you're going to send out a blanket

1   notice to all these creditors who up till now didn't receive

2   a notice of this motion apparently.  So, you're asking me to

3   approve it and then you're going to send out a notice and

4   say, hey, the judge approved us to be able to come out and

5   solicit from you to give us your third-party claims.

6          Who's representing those parties? Who's giving

7   them advice about how that's going to impact them? Should I

8   give it, should I not? They don't even know if they have a

9   third-party claim, a lot of them.  There's just so many

10  factors here that create problems that I just can't get past

11  from a due process perspective.

12         MR. AZMAN:  Your Honor, we are dealing with a

13  number of litigation targets who are not represented by

14  council.  Am I supposed to give them, in other contexts,

15  advice about whether they should settle the preference claim

16  or some other action?  I don't see the distinction.  I mean,

17  these are claims we're requiring from them that are -- that

18  they hold against a third-party.

19         I don't see why the trust has an obligation of any

20  kind to give creditors a reason to not assign their claim.

21  It's arm's length.  We're not talking about, you know, their

22  claim against the Trust.  We're talking about their claim

23  against a third party that we would like to acquire.  You

24  know, I can't help the fact that a number of these creditors

25  are not going to be represented by council and I understand

1  your concerns about that, but that doesn't mean that the

2  Trust isn't authorized under the documents to try to do it.

3          THE COURT:  Ms. Sarkessian, what's your view on

4  this idea that if I just eliminate the bump then they can

5  send out the notice to all third-party creditor -- all

6  creditors, excuse me, to turn over their third-party claims

7  that that somehow comports with the notice requirements under

8  the code and due process.

9          MS. SARKESSIAN:  Your Honor, again, for the

10 record, Juliet Sarkessian on behalf of the U.S. Trustee.

11         I do not think eliminating the ten percent bump

12 addresses those concerns for many of the reasons that you've

13 articulated.  But, again, I think you're going to even have

14 an additional problem which is now, you know, you have people

15 who might be asking, well, am I going to get something for

16 signing these claims, and if not, why would I want to do

17 that.  So, you'd still have a big disclosure issue there.

18         I think you'd still have, you know, again, issues

19 about the fact that you have no idea what these claims are

20 worth, what impact it will have on creditors whether they

21 assign or not assign.  Professional fees might be

22 significant.  They might end up getting less at the end of

23 the day.  And again, none of this was in the plan.

24         So, I don't think -- I think that taking way the

25 ten percent might, you know, take care of -- it takes care of

1  maybe, you know, equal treatment among those creditors in

2  Class 4 who have claims against, or, you know, have third-

3  party claims.   But as others have pointed out, there are

4  many trade creditors, et cetera, (inaudible).  So, you still

5  have the potentially unequal treatment.  I don't think it

6  takes care of the overall problems.

7          THE COURT:  Well, the other concern I have too,

8  going back to you, Mr. Azman, is you're not sending notice

9  out to people who the trustee has claims against.  Maybe you

10 do, some of them do.  But some of these are just creditors of

11 the estate.  Most of them are probably creditors of the

12 estate.  And you got a fiduciary duty to them.  And you're

13 going to be sending out a notice that's going to affect their

14 rights.

15          So, you would have an obligation, a fiduciary

16 obligation, I believe, to give them a full understanding of

17 what you're doing, why you're doing it, and how it's going to

18 affect their rights.  This isn't you negotiating with someone

19 that you have preference action against.  You're negotiating

20 with your clients -- not clients, but your beneficiaries, the

21 creditors of this estate.  That's who you're dealing with,

22 and don't you have an obligation to give them all this

23 information and be able to present them with this

24 information?

25

1      MR. AZMAN:  No, Your Honor.  No.  We're pursuing a

2  preference target who is --

3      THE COURT:  I'm not talking about preference

4  targets; I'm talking about someone who is just a creditor of

5  the estate. I have a claim against the estate, and I got a

6  claim against the third-party.  You don't have a claim

7  against them, they have a claim against you, against the

8  estate.

9      MR. AZMAN:  What if we have an objection to their

10  claim?  Do I have an obligation to explain to them why our

11  objection fails?

12      THE COURT:  No, but you have an obligation to give

13  -- you're trying to affect them in a way that is different

14  from just saying we object to your claim.  We're going to

15  object to your claim.  But I'm assuming a lot of people,

16  you're not going to object to the claim, but you may.

17  There's going to be some that you object to, some you don't.

18      So, how do you distinguish those?  How are you

19  going to parse through that dilemma where you say, your going

20  to send out a blanket notice to everybody.  Some, you might

21  say, they have a claim against the estate but you're going to

22  give it them because you don't have any defense to it.

23      Trade creditors are probably not going to have

24  much unless there's a, you know -- I don't know how many

25  trade creditors there are for Cred Inc., but there's just so

1   many issues here that are fraught with problems.  It's not

2   just a blanket.  I can give this blanket notice to everybody

3   that just says assign your third-party claims to me and we're

4   good.

5            I'm just really struggling with this, Mr. Azman.

6   You're going to have to try to -- I'll give you another

7   opportunity to try and convince me, but at this point I'm

8   just really struggling with this idea that there's no notice

9   issues here that have to be dealt with.

10           MR. AZMAN:  Well, I think that the way that we can

11  approach this is by coming up with an alternative claim

12  acquisition strategy because the value of these claims is far

13  too valuable to lose.  It just is.  And it's not just Uphold

14  claims.

15           And by the way, nobody's talked about the

16  contingency fees that will be significant in that Uphold

17  class action.  And I know that Your Honor is not talking

18  about whether one method is better than the other.  It's more

19  about the disclosure.  But there's lots of disclosures for

20  why creditors would want to assign these claims to the trust

21  and avoid things like double dipping of attorney fees, and a

22  slew of other variables.

23           I agree with Your Honor, it's not a simple process

24  that we're talking about in terms of evaluating whether this

25  benefits, you know, one creditor more than another.  And,

1  again, we acknowledge that it does benefit some creditors

2  more than others.  I just don't know which ones yet, right?

3  I mean, it's litigation, right?

4         We have class council on the phone.  If you ask

5  them what's the value of your litigation -- we haven't even

6  conducted discovery yet.  They don't know.  And so, I'm

7  trying to come up with some solution that would allow the

8  Trust to do the right thing here which is to get claims

9  which, yes, Uphold has -- there's a class action.  Those

10  claims have a law firm that's prosecuting them, but again,

11  that's a narrow class.  It's only U.S. creditors and who are

12  individual.  There are lots of other Uphold creditors out

13  there.

14         Those claims are going to go unprosecuted, and

15  that's exactly what Uphold's councils wants who's on the line

16  here.  I think you recognize that.  But we are trying to

17  avoid that outcome.  And so, you know, maybe there needs to

18  be disclosure as part of the acquisition process but I don't

19  know what that's going to look like.  You know, are we going

20  to provide numbers? You know, we think we're going to recover

21  this, that's an impossibility.  But I think it's fair, I

22  guess, to at least tell creditors that there is a class

23  action pending.

24         And by the way, again, it's not just about Uphold,

25  so I don't know what disclosure we're going to give to

1  creditors about other third parties who we might be suing,

2  and I wouldn't want that out there anyway because some of

3  them, you know, we haven't commenced a law suit against yet.

4  But if it's the Uphold class that we're concerned about, I

5  would proceed to include some type of disclosure that says

6  the class action exists, and that your rights may be

7  affected, and for some reasons you may not want to assign

8  your claim to the trust, and for those who may want to.  And

9  that, you know, here's contact information for class council

10 if you want more information.

11          Again, I'm coming up with this on the fly but I

12 really -- I can't let this go because I know how much value

13 is going to be lost and is going to go down the drain.  And

14 it's concerning to me and it's concerning to the trustees.

15          THE COURT:  And I certainly understand that, and I

16 understand that there could be third-party claims out there

17 that are valuable to all the creditors of the debtor's

18 estate, but I just don't know what the answer is at this

19 point.

20          Mr. Delaney, you raised your hand.  Do you have

21 something you want to add?  I kind of devolved this into just

22 a conversation, but that's fine.

23          MR. AZMAN:  Sorry, Your Honor.

24          THE COURT:  No. It's fine.

25      (No verbal response)

1          THE COURT:  Your muted, Mr. Delaney.

2          MR. DELANEY:  I apologize, Your Honor.  I was

3   double muted so I didn't accidentally talk over anybody.

4          I just wanted to chime-in and add onto something

5   that Mr. Neiger mentioned earlier and in response to

6   liquidating trustee's council.  Your Honor, I think that

7   while we believe that the plan is unambiguous and that the

8   liquidation trust doesn't have the ability to acquire third-

9   party clients, I think we do recognize that there could be a

10  circumstance under which a third-party was acquired, you

11  know, pursuant to some sort of settlement designated, noted,

12  identified third-party claims.

13         I think our point is that there isn't any

14  authority for this large scale acquisition like you saw in

15  Woodbridge.  And we don't believe that a creditor sitting on

16  their couch reading the plan would see this provision about

17  adjudicating third-party claims and think the liquidating

18  Trustee is going to acquire every single third-party claim

19  that a Class 4 creditor has and bring it against non-debtor

20  entities as the liquidating trustee's council said is their

21  intention.  And I think that's kind of one point we wanted to

22  raise.

23         And I think, you know, with respect to the value

24  of those claims as the United States Trustee noted and, you

25  know, as we initially raised in our argument and in our

1  briefs, we don't believe that any proceeds from these third-

2  party claims could be distributed under the plan and

3  liquidation trust agreement without modifying the plan which

4  cannot be done at this point because the plans been

5  substantially consummated.

6         Those are the two points I wanted to touch on,

7  Your Honor.

8         THE COURT:  Okay.

9         MR. DELANEY:  And thank you for the time.

10        THE COURT:  Thank you.

11        Ms. Sarkessian?

12        MS. SARKESSIAN:  Yes.  Thank you, Your Honor.  I

13 just wanted to respond, you know, to the discussion regarding

14 there being valuable claims out there.  It is my

15 understanding, and I'm very late to this case, I'm

16 substituting for Joe McMahon of our office, but I do

17 understand, based on communications with the Trust council,

18 that the estate does have claims against these same

19 defendants that it will be pursuing.

20        So, there is, you know, an opportunity for some

21 value there out of those claims.  You know, I have no idea

22 what the value of those claims are as opposed to third-party

23 claims that the trust is considering acquiring, but it's not

24 as if the Trust will not be -- it's my understanding the

25 Trust will be bringing or potentially bringing claims against

1   these same defendants.  And, obviously, if those are

2   successful, they would benefit the beneficiaries of the

3   Trust.  That's the only comment I wanted to make.

4                Thank you.

5                THE COURT:  Thank you.

6                Mr. Neiger or Ms. Geman, what about the fact that

7   Mr. Azman raised that your class action is limited; it only

8   covers individuals in the United States.  So, it doesn't

9   cover any corporate entities in the United States who may

10  have claims against Uphold.  It does not cover foreign

11  individuals or companies that may have claims against Uphold.

12  What happens to them?

13               MS. GEMAN:  I think, Your Honor, the Rule 23

14  answer, and there might be a bankruptcy answer, which is

15  where we're speaking here on behalf of our proposed absent

16  class members, that's the population to whom we owe duties,

17  that's the population to whom that we allege is entitled to

18  the particular rise notice that we're, you know, advocating

19  here.

20               If Your Honor is asking -- I guess I'm not sure.

21  I mean, to clarify, the notice that we are seeking is on

22  behalf of people who are proposed absent class members.  Your

23  Honor is correct that that would not apply to non-class

24  members; however, the other points raised during the

25  proceedings today apply, of course, to all the perspective

1  creditors here.  But this specific notice that we advocate

2  for class members is specific to that class.

3          I don't know if that answers Your Honor's

4  question.

5          THE COURT:  Well, I'm just trying to see if

6  there's some way to fashion something that would be

7  beneficial to everybody.

8          MS. GEMAN:  Yes.  I understand.

9          THE COURT:  I'm kind, again, I'm devolving to --

10 Now I'm devolving into a mediator role instead of a judge

11 role.

12         UNIDENTIFIED SPEAKER:  If I may speak, Your Honor.

13         THE COURT:  Yes.  One other point to have you

14 address is what happens if the District Court in New York

15 denies certification of the class?

16         MS. GEMAN:  So, if the district court denies

17 certification of the class -- every class member's claim has

18 been, even absent class members, has been told based on the

19 filing of the class action.  So, those individuals have not

20 lost their right to bring individual claims if indeed a class

21 is denied.

22         So, now I understand realistically that there

23 might be a lot of reasons why somebody may not want to bring

24 an individual claim, but the point is that the benefit of a

25

1  class action is they're not giving up their claims against

2  Uphold by dent of being absent class members.

3       Now, practically speaking, you know, so the class

4  actions will be fully briefed by May of next year.  I don't

5  know how the timing of that works vis-a-vis these claims, but

6  that seems to be moving perhaps a little more quicky.  So,

7  that seems like a problem for another day, but the due

8  process answer is class members, if there's no class

9  certified, they can go on ahead and bring individual claims.

10  And if the class is certified, they can opt out and bring

11  individual claims, and if the class has settled, then the

12  court will oversee all aspects of it including the fees which

13  was a point raised by Mr. Azman and there would be a notice,

14  consistent with plan notice language principals, that would

15  clearly delineate, in plain English, people's options; do

16  nothing, object, opt out, what have you.  But the point is it

17  would be clear.

18       MR. NEIGER:  Your Honor, if I may interject?

19       THE COURT:  Yes.  Go ahead, Mr. Neiger.

20       MR. NEIGER:  Thank you, Your Honor.  I completely

21  agree with and adopt everything that Ms. Geman said

22  particularly because this is her area of expertise, but from

23  a bankruptcy perspective, bankruptcy is all about disclosure.

24  The truth shall set you free.  That takes care of all the

25  problems.  It takes care of the problem of what happens if

1  the class does not get certified.  It takes care of the

2  problem of what had happened to both the foreign creditors.

3         Just tell them the truth.  Give them full

4  disclosure, as much as you possibly can.  I understand you

5  can't get down to how every assigned claim will benefit each

6  individual, but there's a lot of room between where we are

7  today and notice that could and should be given.  And I am

8  happy to work with Mr. Azman on formulating a notice that we

9  deem acceptable, but full and fair disclosure in bankruptcy

10 is the answer to every problem.

11        THE COURT:  Mr. Delaney, are you of a view that

12 there's some compromise to be had here that if you had

13 discussions with Mr. Azman and Mr. Neiger, you could figure

14 out a way to get out a notice that is appropriate under the

15 circumstance?  I don't want to put you on the spot.  I mean,

16 this is all subject to your changing your mind at any time

17 because I'm kind of putting you on the spot here.

18        MR. DELANEY:  Yes, Your Honor.  I mean, I think

19 that we would be willing to try to work with them.  I think

20 we do have some fundamental issues with whether or not the

21 liquidating trust can do what it's proposing to do.  We do

22 not believe that it has the authority to do a wide scale

23 claims acquisition of the (inaudible) that we're seeing in

24 Woodbridge.  I think the court noted that why didn't they do

25 this through the plan confirmation process.

1             I don't think that a notice corrects that

2    fundamental issue with what's been proposed by the

3    liquidating trustee.  With that said, I mean, who knows.  Who

4    knows what the liquidating trustee's council may propose or

5    the liquidating trustee may put forward, but I will not, I

6    mean, that doesn't seem to be a question for today on the

7    motion that's proposed.  You know, I think our comfort level

8    was trying to hammer something out live during the

9             And I think that, you know, from our perspective,

10    if the court is disinclined to approve the procedures as

11    proposed, we believe the motion should be denied.  And if the

12    liquidating trustee wants to bring another motion with

13    different procedures, we'll consider those and reserve our

14    rights with respect to whether or not those solve our

15    fundamental issues with respect to the authority of the

16    liquating trust under the plan.

17             MR. AZMAN:  Your Honor, to state the obvious, we'd

18    obviously be more than happy to work with Mr. Neiger and

19    others to come up with the appropriate disclosure hearing

20    what Your Honor has to us to, you know, say things like you

21    should consult with an attorney, or hear the things that you

22    might consider in deciding whether the ten percent is worth

23    it in assigning your claim or not, and hear our hear facts

24    about the class action that you should be aware of.  And, you

25

1  know, we think that that would be an appropriate outcome

2  given your comments.

3          THE COURT:  All right.  Well, why don't we do

4  that.  I think everyone is pretty clear on where I stand on

5  this.  I think in terms of the authority of the Trust to

6  acquire third-party claims, although it was not completely

7  clear in the plan or the trust agreement, I think it was

8  certainly implied that the Trust would seek -- could seek or

9  could obtain assignment of third-party claims that it could

10  then pursue on behalf of all creditors of the estate.

11          On the ten percent bump issue, I got a problem

12  with that because, as I indicated, if this had been brought

13  more clearly at the time of plan confirmation, the Class 4

14  creditors would have had an opportunity to understand that

15  not only was the Trust going to be able to obtain third-party

16  claims, but it was also going to give a benefit to those who

17  assigned their third-party claims to the Trust.  And it could

18  have been a discussion then, it should have been done in

19  conjunction with the disclosure statement as well so that

20  people would have had an opportunity to understand these

21  issues at that time.

22          So, I'm disinclined to say that I would allow the

23  trustee to just give a blanket ten percent bump to anybody

24  who assigned their claims to the trust.  Now, that still

25  leaves open the issue of individual negotiations with

1  individual claimants and whether or not if there's a claim

2  objection and the trustee wants to settle it, and as a result

3  they give some value to a third-party claim that's going to

4  be assigned to the trust.  I think that's something that can

5  be done, but it's done on a one-off basis so it's more clear.

6         The notice issue is where I get hung-up the most.

7  How do we give notice to these folks what the Trust is

8  proposing to do?  How it's going to be done.  Why they're

9  doing it.  And what, if any benefits, are going to inore to

10 the estate if it happens.  And that's where I think the

11 parties can maybe have a discussion and talk about it.

12        So, at this point, I think it is appropriate for

13 me to say I'm going to deny the motion without prejudice to

14 bring another motion with different procedures on how to

15 proceed, and would encourage the parties to all talk.  And I

16 think Mr. Sarkessian would say you got to give notice to all

17 creditors of the motion not just the 2002 list if you're

18 going to bring another motion which I agree with.

19        MS. SARKESSIAN:  Yes, Your Honor.  Thank you.

20        THE COURT:  Okay.  Have I left anything out?  Does

21 that -- I have a lot --

22        MR. AZMAN:  No.  I guess my only question, which

23 I'll just ask here in open court, I mean, Mr. Delaney

24 presumably is not inclined to agree to anything that allows

25 us to apply our claims even if the Uphold Plaintiffs are in

1  agreement.  So, well I guess we'll file the motion and we'll

2  decide and Mr. Delaney will have an opportunity (inaudible)

3  if there's anything to discuss on that note.

4          THE COURT:  I agree. I think that's something you

5  can talk about it.  If you can't come to an agreement, come

6  up with what you think resolves my concerns and you can file

7  another motion, and if Mr. Delaney still objects, we'll hear

8  the objection, and I'll have to rule on it at that time.

9          MR. AZMAN:  Understood.  Thank you, Your Honor.

10          THE COURT:  Okay.

11          MR. NEIGER:  Thank you, Your Honor.

12          THE COURT:  All right.  Thank you all very much.

13  It was kind of a strange hearing but I kind of actually like

14  these ones where I get to just kind of talk to everybody

15  about this stuff because I'm still trying to figure this

16  stuff out myself too because this one threw me for a loop.  I

17  haven't seen this before, and there doesn't seem to be a lot

18  of case law out there.  Certainly nothing directly on point.

19  And so, it was an interesting issue.

20          All right.  Anything else before we adjourn?

21          MR. AZMAN: No, Your Honor.  Thank you.

22          THE COURT:  Okay.  Thank you all very much.  We're

23  adjourned.

24      (Proceedings concluded at 4:33 p.m.)

25

1                          CERTIFICATION

2          We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                  July 20, 2022

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Mary Zajaczkowski                   July 20, 2022

13   Mary Zajaczkowski, CET-531

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25