# Exhibit AAA

## MASTER SALE AND REPURCHASE AGREEMENT

This MASTER SALE and REPURCHASE AGREEMENT (this "**Agreement**") between Uphold HQ Inc., having an address of 6 West 18th St., New York, NY 10011 (the "**Purchaser**"), and JST Capital, LLC ("**JST**" or the "**Seller**").

### Recitals

WHEREAS, the Seller desires to sell from time to time an agreed amount of Tokens to Purchaser, and Purchaser desires to purchase the Tokens from the Seller at the agreed-upon price subject to all agreed upon terms and conditions;

WHEREAS, the Seller further has the right and obligation to repurchase the Tokens from Purchaser at the agreed-upon fixed price at the Maturity Date; and

WHEREAS, the parties intend that the benefit of any and all appreciation and any and all risk of loss from any depreciation resulting from a change in the price of the Tokens from the Closing Date for a Tranche to the Maturity Date for that Tranche will accrue to the Seller and not to the Purchaser.

NOW, THEREFORE, THE PARTIES HERETO AGREE AS FOLLOWS:

### SECTION 1

### DEFINITIONS

1.1    **Definitions**

All the terms used in this Agreement shall have the following meanings:

"**Balance Payment**" for a Tranche means the Purchase Price for that Tranche minus (less) any Management Fee, costs or expenses, if applicable and then due and as set forth in the Closing Statement for that Tranche, not satisfied in cash by the Seller on the Closing Date.

"**Ripple**" means Ripple transferred as specified in Section 2.1 and any related Ripple resulting from a "soft" or "hard" fork in the Ripple blockchain, a revision or upgrade to the Ripple software code, reclassification, or other like change of the purchased Ripple.

"**Contractual Currency**" means USD unless otherwise specified in a Tranche Agreement.

"**Closing Date**" means the date on which a Tranche is consummated, as evidenced by a completed and accepted Closing Statement.

"**Closing Statement**" means a document in substantially the form of Exhibit 2 hereto relating to a particular Tranche, which document will take legal effect unless Purchaser notifies Seller of errors in such Closing Statement within 3 business days of receiving the Closing Statement.

1

**"Currency Exchange Price"** the parties agree to calculate the Token exchange price based on the applicable Bloomberg United States Dollar Spot XBT or XET Currency page, or as otherwise agreed by the Parties.

**"Default"** means any event, act or condition that with notice or lapse of time or both, would constitute an Event of Default.

**"Default Notice"** is defined in Section 7.2.

**"Defaulting Party"** meaning specified in Section 9.

**"Digital Wallet"** means a software program that stores public and private keys and interfaces with the Token blockchain in order to allow users to send and received Tokens.

**"Early Termination Date"** is defined in Section 7.2.

**"Electronic Messaging System"** means an electronic system for communication capable of reproducing communication in hard copy form, including email.

**"Equivalent Tokens"** means with respect to a particular Tranche, Tokens equivalent (the same type, name, category and technical specifications) to the Tokens purchased by Purchaser in that Tranche.

**"Event of Default"** is defined in Section 7.1.

**"Exchange Business Day"** means any day that is a trading day and a price is posted on the applicable Bloomberg United States Dollar Spot XBT or XET Currency page.

**"Fair Market Price"** means with respect to a Token, the average of the last USD sale price for that Token on 3 consecutive Exchange Business Days quoted using the Bloomberg Generic Price as posted by Bloomberg on the applicable United States Dollar Spot XBT or XET Currency page, or as otherwise agreed by the Parties.

**"Maturity Date"** means with respect to a particular Tranche, the six-month anniversary of the Closing Date for that Tranche unless otherwise agreed in the Tranche Agreement.

**"Origination Fee Percentage"** means 1.5%.

**"Purchase Price"** means with respect to a particular Tranche, the aggregate purchase price for the Tokens to be sold to Purchaser.

**"Repurchase Price"** means with respect to a particular Tranche, the aggregate repurchase price to be paid by Seller to Purchaser on the Maturity Date for the Tokens and/or Equivalent Tokens.

"**Special Default Notice**" is defined in Section 9.3.

**"Tokens"** means the type of cryptocurrency specified in a Tranche Agreement.

"**Tranche**" means a particular sale and repurchase transaction entered into pursuant to this Agreement and a particular Tranche Agreement and Closing Statement.

"**Tranche Agreement**" means an agreement in substantially the form of <u>Exhibit 1</u> hereto containing such terms and conditions as Seller and Purchaser may agree upon in writing at the time to evidence a particular Tranche.

"**Transaction Documents**" means collectively, this Agreement, the Tranche Agreements, the Closing Statements, and any other agreements, documents, instruments, exhibits or financial statements delivered in connection with Tranches. All such documents must be contemporaneously executed and read and construed together in a manner so as to give meaning and effect to all their provisions.

"**USD**" means United States Dollars.

## SECTION 2

## DELIVERY AND PAYMENT ON TRANCHE CLOSING DATE

2.1    <u>**Purchase Price**</u>.

(a)    Subject at all times to all of the terms and conditions of this Agreement, Purchaser agrees to pay to Seller funds equal to the Purchase Price for a particular Tranche as set forth in the applicable Tranche Agreement in the form of <u>Exhibit 1</u> and Closing Statement in the form of <u>Exhibit 2</u>, both of which exhibits are incorporated herein by reference.

(b)    In addition to the first Tranche Agreement which must be executed contemporaneously with this Agreement, Seller and Purchaser may each elect to enter into additional Tranche Agreements for additional amounts of Tokens in the chosen type of Token for each Tranche Agreement. JST will make its best efforts to complete additional Tranche Agreements contingent upon market conditions such as the price, trading volume, number of Tokens issued and outstanding and the number of Tokens in the float. All Tranches and Tranche Agreements are subject to terms and conditions of this Agreement, although the parties may agree in writing in each Tranche Agreement upon such additional or different terms and conditions as set forth in the Tranche Agreement. Each Tranche transaction must be memorialized using the Tranche Agreement and Closing Statement forms attached hereto as <u>Exhibit 1</u> and <u>Exhibit 2</u>.

(c)    JST has the discretion and right to elect to not proceed with any Tranche with the Seller up until the expected Closing Date for that Tranche.

2.2    <u>**Origination Fee**</u>. Contemporaneous with the funding of the Purchase Price by Purchaser on the Closing Date for a particular Tranche, Purchaser must pay an origination fee equal to that Purchase Price multiplied by the Origination Fee Percentage. This amount may be

paid in Tokens at the discretion of the Seller and may be set off against delivery of the Purchase Price or the purchased Tokens.

2.3    **Authority and Rights in the Tokens**.  The Seller acknowledges that the Purchaser has all rights, title, ownership and interest associated with the Tokens for a particular Tranche during the term of that Tranche Agreement.

2.4    **Payment of Repurchase Price on the Maturity Date for a particular Tranche**. With respect to each Tranche:

(a)    The Seller agrees to pay to Purchaser the Repurchase Price plus any other Seller obligations due on the Maturity Date as set forth in the Closing Statement and Purchaser agrees to return Equivalent Tokens to the Seller in accordance with Section 2.10.

(b)    The Maturity Date may be extended by Purchaser if agreed to by Seller in writing.  A fee in the amount of **1%** of the Repurchase Price is due and payable on the original Maturity Date if Seller agrees to extend such Maturity Date.

(c)    If Purchaser has not received the Repurchase Price and all other obligations from Seller then due in immediately available funds before the close of business (Pacific time) 10 Exchange Business Days after the Maturity Date, Seller must pay to Purchaser a late charge equal to **5%** of the portion of the Repurchase Price that is then due.  Such late charge may be assessed only once, but will be in addition to and cumulative with all other obligations, rights, benefits and remedies available to Purchaser under the Agreement on account of any default by the Seller.

2.5    **Early Return of Tokens**. On the Initial Payment Date (as defined below), Purchaser shall have the right, but not the obligation, to terminate this Agreement prior to the Maturity Date by returning Equivalent Tokens to the Seller to such address in an amount equal to the Tokens originally delivered by Seller in accordance with Section 2.10; provided that Purchaser shall provide at least ten (10) days' notice of such election. In the event that Purchaser elects to return Equivalent Tokens on the Initial Payment Date, Purchaser shall no longer be obligated to pay any unaccrued Management Fee at the Maturity Date, but shall be liable for a fee payable in the Contractual Currency as set forth in the Closing Statement on the Initial Payment Date. In the event that Purchaser elects not to return Equivalent Tokens on the Initial Payment Date, the parties agree to enter into a customary agreement mutually satisfactory to the parties for the pledge of not less than 50% of the Tokens to Seller as collateral against Purchaser's return obligations herein.

2.6    **Management Fee**.    For each Tranche, the Purchaser must pay an annual Management Fee in USD equal to **18%** per annum of the Purchase Price unless otherwise agreed in the Tranche Agreement.  The Management Fee will be computed on a 360 day year for the actual number of days elapsed and will be due and payable quarterly commencing 90 days from the Closing Date (the "Initial Payment Date"), as established by the Closing Statement, for the preceding 3 months.  The payment of the Management Fee will be overdue if not received the by

12144651.3

the Seller within 10 calendar days of the due date. Any overdue Management Fee will bear a late payment charge of **7%** of the overdue amount. If the overdue Management Fee payment is not received by the Seller within 30 days of the original due date, then Seller must notify Purchaser that an Event of Default has occurred.

2.7    **Pre-Closing Deliveries**.    With respect to each Tranche, Purchaser must have delivered to Seller on or before the Closing Date for that Tranche:

(a)    this Master Sale and Repurchase Agreement duly executed by Purchaser;

(b)    a Tranche Agreement completed and executed by Purchaser; and

(c)    the Equivalent Tokens in the type and number specified in the Tranche Agreement. Delivery instructions for the wallet-to-wallet transfer of the Tokens to Purchaser, including Purchaser's Digital Wallet address for receiving the Tokens will be provided at the time of transfer of the Tokens.

2.8    **Legal Matters**.    All matters and all documentation and other instruments in connection with each Tranche and all matters hereunder must be satisfactory in form and substance to Purchaser and its counsel, and counsel to Purchaser shall have received copies of all documents that it may reasonably request in connection with such transactions.

2.9    **Closing of each Tranche**.    With respect to each Tranche, Seller must deliver the Tokens to Purchaser's Digital Wallet address(es) specified below.

| Purchaser's Digital Wallet Address | rQrQMKhcw3WnptGeWiYSwX5Tz3otyJqPnq<br><br>Destination Tag:<br><br>842803673 |
|---|---|

2.10    **Termination and Redelivery of the Tokens**.    Subject to Section 7, this Agreement will terminate when all of the Seller's and Purchaser's obligations have been paid and satisfied in full. Within 2 business days of the Seller's satisfaction of all obligations under this Agreement with respect to a Tranche, Seller will specify a Digital Wallet address for redelivery of the Tokens and Purchaser must deliver Equivalent Tokens to such address in an amount equal to the Tokens originally delivered by Seller. It is Seller's responsibility to ensure the Digital Wallet address provided to Purchaser is accurate and capable of receiving the return of the Tokens.

## SECTION 3

## PAYMENT AND TRANSFER

3.1    Unless otherwise agreed, all money paid hereunder must be in immediately available freely convertible funds of the relevant currency. All Tokens to be transferred hereunder must be (i) unrestricted and free trading and in suitable form for transfer and must be accompanied

by duly executed instruments of transfer or assignment in blank (where required for transfer) and such other documentation as the transferee may reasonable request, or (ii) transferred through the book entry system of Euroclear or Clearstream, or (iii) transferred through any other agreed similar electronic book entry Tokens clearance system, or (iv) transferred by any other method mutually acceptable to Seller and Purchaser.

3.2     Unless otherwise agreed, all money payable by one party to the other in respect of any transaction must be paid free and clear of, and without withholding or deduction for, any taxes or duties of whatsoever nature imposed, levied, collected, withheld or assessed by any authority having power to tax, unless the withholding or deduction of such taxes or duties is required by law.  In that event, unless otherwise agreed, the paying party shall pay such additional amounts as will result in the net amounts receivable by the other party (after taking account of such withholding or deduction) being equal to such amounts as would have been received by it had no such taxes or duties been required to be withheld or deducted.

## SECTION 4

## CONTRACTUAL CURRENCY

4.1     All the payments made in respect of the Purchase Price or the Repurchase Price of any transaction must be made in reference to the Contractual Currency.  Notwithstanding the foregoing, the payee of any money may, at its option, accept tender thereof in any other currency, provided, however, that, to the extent permitted by applicable law, the obligation of the payer to pay such money will be discharged only to the extent of the amount of the Contractual Currency that such payee may, consistent with normal banking procedures, purchase with such other currency (after deduction of any premium and costs of exchange) for delivery within the customary delivery period for spot transactions in respect of the relevant currency.

4.2     If for any reason the amount of the Purchase Price or Repurchase Price received by a party falls short of the amount in the Contractual Currency due and payable, the party required to make the payment will, as a separate and independent obligation, immediately transfer such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall so as to assure full payment.

## SECTION 5

## REPRESENTATIONS

Each party represents and warrants to the other that:

5.1     **No Liens or Restrictions**.  The transferor of Tokens has the absolute right to assign, convey, transfer and deliver the Tokens to the transferee free and clear of any and all mortgages, pledges, security interests, liens or other encumbrances or charges of any kind or nature.  The transferor is in sole possession of the private keys associated with the Tokens and has not previously sold, conveyed, transferred, assigned, participated, pledged or otherwise encumbered the Tokens or its beneficial interest therein.

12144651.3

5.2    **Consents**.  This Agreement and all the other Transaction Documents executed by and to be executed by the party constitute valid and binding obligations of the party enforceable in accordance with its respective terms and are to be construed and interpreted as a whole, the same being part of an integrated transaction.  To the party's knowledge, no consent of any other party and no consent, license, approval, or authorization of any governmental authority is required in connection with the selling by the party hereunder, the execution, delivery and performance of this Agreement, and any of the other Transaction Documents executed or to be executed in connection herewith.

5.3    **No Conflicts**.  The selling by the party here under and the execution and delivery by the party of this Agreement and any other Transaction Document executed and to be executed by the party, do not and will not (a) conflict with or violate any law or governmental order applicable to the party or (b) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, or result in the creation of any encumbrance on any Token (if applicable) pursuant to, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which the party is a party or by which the party or the Token (if applicable) are bound or affected or which would have an effect on the ability of the party to consummate the transactions contemplated by this Agreement.

5.4    **No Default**.  The party is not in default under any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which the party is a party or by which the seller of the Tokens (if applicable) are bond or affected or which would have an effect on the ability of the party to consummate the transactions contemplated by this Agreement.

5.5    **Anti-Money Laundering Program**.    Purchaser represents and warrants that (i) it did, now does, and will continue to comply with anti-money laundering laws and regulations and (ii) it has established and maintains an anti-money laundering program, consisting of, at a minimum, written internal policies, procedures and controls including a means of detecting and reporting unusual or potentially suspicious activity, the designation of an anti-money laundering compliance officer, an ongoing employee training program, an independent audit function to test such programs annually, and any additional requirements set forth in the rules of any regulatory or self-regulatory organization which has jurisdiction over Purchaser.  At the request of Seller, Purchaser shall provide such written further assurances as Seller may reasonably request that Purchaser maintains as anti-money laundering program.

5.5    **OFAC**.  Purchaser hereby agrees and acknowledges that it is obligated to and hereby represents and warrants that it did, now does, and will continue to comply with rules and regulations enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**").  Purchaser represents and warrants that neither it nor any person who controls Purchaser bears a name that appears on the List of Specially Designated Nationals and Blocked Persons maintained by OFAC from time-to-time.

5.6    **Source and Use of Tokens**.  Seller represents and warrants that (i) none of the Tokens sold to Purchaser hereunder was sourced from a third party that is/was engaged in unlawful activities under state, federal or non-U.S. statutes (e.g., the Federal Controlled Substances Act) and (ii) any Tokens sold to Purchaser hereunder has been lawfully obtained and has not been, is not, and will not be, used in any illegal activities.  In addition, Seller represents and warrants that neither it nor any person who controls Seller resides in or who subscription funds are transferred from or through an account in a Non-Cooperative Jurisdiction.  For purposes of this Agreement, a "**Non-Cooperative Jurisdiction**" means any country or territory that has been designated as non-cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization, such as the Financial Action Task Force on Money Laundering, of which the United States is a member and with which designation the United States representative to the group or organization continues to concur.

5.7    **Foreign Shell Bank**.  Seller represents and warrants that neither it nor any person who controls Seller is a Foreign Bank without a Physical Presence in any country, but does not include a regulated affiliate.  For purposes of this Agreement, a "**Foreign Bank**" means an organization that (i) is organized under the laws of a foreign county, (ii) engages in the business of banking, (iii) is recognized as a bank by the bank supervisory or monetary authority of the country of its organization or principal banking operations, (iv) receives deposits to a substantial extent in the regular course of its business, and has the power to accept demand deposits, but does not include the U.S. branches or agencies of a foreign bank.  In addition, "**Physical Presence**" means a place of business that is maintained by a Foreign Bank and is located at a fixed address, other than solely a post office box or an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities, at which location the Foreign Bank (i) employs one or more individuals on a full-time basis, (ii) maintains operating records related to its banking activities, and (iii) is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities.

5.8    **No Material Information**.  There is no material fact known to the Seller regarding any Token sold to Purchaser hereunder which materially adversely affects or is likely or is anticipated to materially adversely affect such Token.

## SECTION 6

## RISK FACTORS

Seller has carefully reviewed, acknowledged, understands and assumes the following risks, as well as all other risks associated with Tokens (including those not discussed herein), all of which could render the Tokens worthless or of little value:

6.1    **Liquidity**.    There is no guarantee or representation of liquidity and/or transferability of Tokens in the future.

6.2    **Security**.  Tokens may be subject to expropriation and/or theft, international or unintentional bugs or weaknesses that may negatively affect the Tokens or result in loss or ability to access the Tokens.

12144651.3

6.3 **Access to Private Keys**.  Loss of private key(s) associated with Seller's Digital Wallet or vault will result in loss of Tokens.

6.4 **Uncertain Regulatory Framework**.  The regulatory status of cryptographic tokens, digital assets and blockchain technology is unclear and unsettled in many jurisdictions.  It is difficult to predict how or whether governmental authorities will regulate such technologies.  It is likewise difficult to predict how or whether any governmental authority may make changes to existing laws, regulations and/or rules that will affect cryptographic tokens, digital assets, blockchain technology and its applications.  Such changes could negatively impact the Tokens in various ways.

**SECTION 7**

**EVENTS OF DEFAULT**

7.1 **Events of Default**.  An "**Event of Default**" shall exist if any one or more of the following shall occur:

(a)     Failure by a party to make when due, any payment or delivery under this Agreement required to be made by it if such failure is not remedied on or before the fifth Exchange Business Day after notice of such failure is given to the defaulting party; or

(b)     If any representation or warranty made by a party in this Agreement or in any statement furnished at or in contemplation of the Closing Date or pursuant to this Agreement or any other Transaction Document shall prove to have been knowingly untrue or misleading in any material respect at the time made; or

(c)     Default by a party in the performance of or observance of any covenant or agreement contained in this Agreement or default in any other Transaction Document which is not cured within a reasonable time; or

(d)     If the Tokens cease to trade or are otherwise halted for more than 3 Exchange Business Days by a regulatory agency or for any other reason; or

(e)     If a party makes a general assignment for the benefit of creditors or consent to the appointment of a receiver, liquidator, custodian, or similar official of all or substantially all of its properties, or any such official is placed in control of such properties, or the party admits in writing its inability to pay its debts as they mature; or

(f)     If documents shall at any time after their execution and delivery for any reason cease to be in full force and effect or are declared null or void.

7.2 **Rights Upon An Uncured Event of Default**.  If at any time an Event of Default has occurred and is continuing beyond any applicable cure period, the non-defaulting party shall issue a written notice to the defaulting party specifying the relevant Event of Default (a "**Default**

9

**Notice**"), and designate a day not earlier than the day such notice is effective as an early termination date due to an Event of Default ("**Early Termination Date**").

In the case of Early Termination, Purchaser is obligate to return the Tokens to Seller immediately, including any interest owed, and Seller is then required to pay Purchaser the Repurchase Price.

**SECTION 8**

**[INTENTIONALLY DELETED]**

**SECTION 9**

**NOTICES AND OTHER COMMUNICATIONS**

9.1    Any notice or other communication to be given under this Agreement shall:

    (a)    be in the English language, and except where expressly otherwise provided in this Agreement, must be in writing;

    (b)    may be given in any manner described in subsection 9.2 below; and

    (c)    must be sent to the party to whom it is to be given at the address or number, or in accordance with the electronic messaging details, set out herein.

9.2    Any such notice or other communications will be deemed effective:

    (a)    if in writing and delivered in person or by courier, at the time when it is delivered;

    (b)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), at the time when that mail is delivered or its delivery it attempted; or

    (c)    if sent by electronic messaging system, at the time that electronic message is received except that any notice or communication which is received, or delivery of which is attempted, after close of business on the date of receipt or attempted delivery or on a day which is not a day on which commercial banks are open for business in the place where that notice or other communication is to be given will be treated as given at the opening of business on the next following day which is such a day.

9.3    If –

    (a)    there occurs in relation to either party an event which gives rise to the service of a Default Notice; and

12144651.3

(b) the non-Defaulting Party, having made all practicable efforts to do so, including having attempted to use at least two of the methods specified in subsection 9.2 has been unable to serve a Default Notice by one of the methods specified in those subsections (or such of those methods as are normally used by the non-Defaulting Party when communicating with the Defaulting Party), then the non-Defaulting Party may sign a written notice (a "**Special Default Notice**") which:

(i) specifies the relevant event referred to by section which has occurred in relation to the Defaulting Party;

(ii) states that the non-Defaulting Party, having made all practicable efforts to do so, including having attempted to use at least two of the methods specified in subsections 9.2, has been unable to serve a Default Notice by one of the methods specified in those subsections (or such of those methods as are normally used by the non-Defaulting Party when communicating with the Defaulting Party);

(iii) specifies the date on which, and the time at which, the Special Default Notice is signed by the non-Defaulting Party; and

(iv) states that the event specified in accordance with subsection (i) above will be treated as an Event of Default with effect from the date and time as specified.

On the signature of a Special Default Notice the relevant event will be treated as effective from the date and time so specified as an Event of Default in relation to the Defaulting Party, and the Special Default Notice will be treated and accepted as an effective Default Notice. Any Special Default Notice should also be sent in a manner contemplated under Section 9.2.

9.4    All notices, requests or other communications to either of the parties by the other must be in writing, sent by overnight mail by a reputable commercial carrier, or by electronic mail and will be deemed duly given on the earlier of the date the same is received or when deposited in the mail, postage prepaid, as follows:

**TO PURCHASER:**

Uphold
6 West 18th St., 3rd Floor
New York, NY 10011
Attn: Legal Department
Email: legal@uphold.com

**TO JST CAPITAL LLC:**

Scott Freeman
350 Springfield Ave, Suite 200

Summit, NJ 07901
sfreeman@jstsystems.com

## SECTION 10

## ENTIRE AGREEMENT AND SEVERABILITY

10.1     This Agreement supersedes any existing communications, term sheets, or agreements between the parties containing general terms and conditions for transactions.  Each provision and agreement herein will be treated as separate from any other provision or agreement herein and will be enforceable notwithstanding the unenforceability of any such other provision or agreement.

10.2     Each party acknowledges that, and has entered into this Agreement and will enter into each Tranche hereunder in consideration of and in reliance upon the fact that such transactions hereunder constitute a single business and contractual relationship and are made in consideration of each other.  Accordingly, each party agrees: (i) to perform all if its obligations in respect to the entire transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect to the entire transactions hereunder, and (ii) that payments, deliveries and other transfers made by either of them in respect of any transaction will be deemed to have been made in consideration of payments, deliveries and other transfers in respect to the entire transaction hereunder.

## SECTION 11

## NON-ASSIGNABILITY AND TERMINATION

11.1     Neither party may assign, charge or otherwise deal with (including without limitation any dealing with any interest in or the creation of any interest in) its rights or obligations under this Agreement without the prior written consent of the other party.  Subject to the foregoing, this Agreement will be binding upon and inure to the benefit of the parties and their respective successors and assigns.

11.2     Either party may terminate this agreement by its terms by giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any transactions then outstanding.  All remedies hereunder shall survive termination in respect of the relevant transaction and termination of this Agreement.

## SECTION 12

## GOVERNING LAW

12.1     **Generally**.  This Agreement and all instruments delivered hereunder will be governed by and construed in accordance with the laws of the laws of the State of California, excluding them from any principles of conflicts of laws.  Except to the extent either party exercises its right to demand arbitration pursuant to Section 13 of this Agreement, any legal action, claim or lawsuit commenced by one party against the other arising out of or in connection with this Agreement, and all instruments or agreements delivered hereunder must be brought exclusively in

the courts of the United States, and such courts will be the exclusive jurisdiction and venue for any such legal action, claim or lawsuit.

## SECTION 13

## <u>ARBITRATION IN THE EVENT OF DISPUTE</u>

13.1    <u>**Arbitration of Claims, Disputes, or Controversies**</u>.  Any claim, dispute, or controversy ("**Claim**") arising from or relating to this Agreement or the relationships resulting from this Agreement, wherever and by whomever commenced, shall, upon delivery of a written notice demanding arbitration to the other party (including a written notice after the commencement of a lawsuit or a notice contained in court filings in any such lawsuit), be resolved by binding arbitration pursuant to the Federal Arbitration Act, 9 USC §§ 1 *et seq*., and the applicable rules of the American Arbitration Association ("**AAA**") or JAMS in effect at the time of the written notice demanding arbitration. The term **"Claim"** as used in this Agreement is to be given the broadest possible meaning, and includes but is not limited to claims, disputes, or controversies arising from or relating to soliciting, originating, closing, or enforcing the transaction that is the subject of the Agreement.

Seller may select which of AAA or JAMS to use for purposes of administering an arbitration governed by this Agreement.  The address, telephone number, and web site containing applicable rules for each of these arbitration administrators is as follows:

AAA
Corporate Headquarters
1633 Broadway, 10th Floor
New York, NY  10019
212-716-5800
www.adr.org

JAMS
71 South Wacker Drive
Suite 3090
Chicago, IL 60606
312-655-0555
www.jamsadr.com

If Seller fails to select an arbitration administrator within 30 days from the date it or we deliver notice demanding arbitration, JST will choose one.  Any arbitrator must be a commercial lawyer with more than 10 years of experience in a regionally recognized law firm or a retired Federal judge or judge who served as a regular member of a state court of intermediate or final appellate jurisdiction.

Arbitrations seeking monetary relief will be held within the federal judicial district encompassing the city where Seller resides or is located.

Each party shall pay one-half of any fees charged by the arbitration administrator for Claim(s) asserted by a party in the arbitration

12144651.3

THIS AGREEMENT IS FULLY BINDING IN THE EVENT THAT A CLASS ACTION OR SIMILAR LAWSUIT IS FILED IN WHICH SELLER WOULD BE A CLASS REPRESENTATIVE OR MEMBER.  SELLER AND JST AGREE THAT THERE WILL BE NO CLASS OR CONSOLIDATED ARBITRATION OF ANY CLAIM. FURTHERMORE, CLAIMS BROUGHT BY OR ON BEHALF OF OTHER SELLERS MAY NOT BE CONSOLIDATED WITH OR ARBITRATED IN ANY ARBITRATION PROCEEDING THAT IS CONSIDERING SELLER'S CLAIMS UNLESS SAID OTHER SELLERS ARE PARTIES TO THE SAME AGREEMENT. SIMILARLY, SELLER MAY NOT JOIN WITH OTHER SELLERS TO BRING CLAIMS IN THE SAME ARBITRATION PROCEEDING UNLESS ALL OF SUCH OTHER SELLERS ARE PARTY TO THE SAME TRANSACTION.

## SECTION 14

## INDEMNITY AND LIMITATION OF LIABILITY

14.1    Either party shall indemnify and hold the other party harmless against any and all claims, demands, proceedings, suits, actions, damages, liabilities, losses, expenses and costs (which shall include, but not limited to all costs of defense, investigation and accounting and legal fees) to which the other party may become subject as a result of the defaulting party's fraud, negligence, willful misconduct or material breach of any obligation under this Agreement.

14.2    Neither party will be liable for any indirect, incidental or consequential loss or damages, including loss revenue or profits or losses arising from its normal course of business, even if a party has been advised of the possibility of such damages. Each provision of this Section operates independently and survives the termination of this Agreement.

## SECTION 15

## NO WAIVERS

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and the failure or delay in the exercise of any remedy hereunder by any party shall not constitute a waiver of its right to exercise any other remedy hereunder.  No modification or waiver of any provision of this Agreement and no consent by any party to a departure here from will be effective unless and until such modification, waiver or consent is in writing and duly executed by both of the parties hereto.  The failure or delay to give any notice herein will not constitute a waiver of any right to do so at a later date.

## SECTION 16

## COUNTERPARTS; AMENDMENTS

16.1    This Agreement may be executed in counterparts, each of which will be deemed an original.

16.2    None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except by a written instrument executed by the parties.

## SECTION 17

## SECTION HEADINGS

The section headings used in this Agreement are for convenience of reference only and are not to affect the construction of the Agreement nor are they to be taken into consideration in interpreting, this Agreement.

## SECTION 18

## SEVERABILITY

If one or more provisions of this Agreement or the applicability of any such provisions to any set of circumstances is determined to be invalid or ineffective for any reason, such determination shall not affect the validity and enforceability of the remaining provisions or the applicability of the same provisions or any of the remaining provisions to other circumstances.

## SECTION 19

## CONFIDENTIALITY

This Agreement and any other related documents are to be kept confidential and are not to be reproduced in any manner whosoever for persons other than the parties hereto and their respective officers, directors, employees and representatives under a duty of confidentiality. Each party agrees not to circumvent the legitimate interests of the other party and to maintain this transaction in strict confidentiality. Each party agrees to maintain the confidentiality of any trade secrets, techniques, and contracts and contacts of the other party. Each party agrees not to engage in unauthorized communications (i.e. telephone calls, written inquiries, etc.) with the other party's banks, insurers, contracting parties and contacts.

## SECTION 20

## TRANSLATION OF AGREEMENT

In the event that this Agreement is translated into a language other than English, such translation is intended to assist the Seller in understanding the terms and conditions of this Agreement and is not intended, and shall not comprise, an enforceable Agreement. To the extent that any conflict exists between a translation of this Agreement and the English language version of this Agreement, the English language version shall prevail and be conclusive. All notices, communications or documents exchanged under this Agreement or delivered under it must be in the English language or accompanied by an English translation of it.

## SECTION 21

## NO RELIANCE

12144651.3

21.1    Each party will be deemed to represent to the other party on the date on which it enters into this Agreement that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary):

(a)    it is acting for its own account, and it has made its own independent decisions to enter into this Agreement and as to whether the transaction contemplated by this Agreement is appropriate or proper for it based upon its own judgment and upon advice from such advisors (including its tax, legal, accounting and regulatory advisors) as it has deemed necessary;

(b)    it is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the transaction contemplated by this Agreement, it being understood that information and explanations related to the terms and conditions of this Agreement shall not be considered investment advice or a recommendation to enter into this transaction contemplated by this Agreement;

(c)    no communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of the transaction contemplated by this Agreement;

(d)    it is capable of assessing the merits of and evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the transaction contemplated by this Agreement; and

(e)    it is also capable of assuming, and assumes, the financial and other risks contemplated by this Agreement.

[Balance of page intentionally left blank.]

12144651.3

**IN WITNESS WHEREOF,** the parties hereto have caused this Sale and Repurchase Agreement to be duly executed as of the day and year written below.  It is specifically agreed and understood that this Agreement is not binding upon the parties until the date it is actually signed by the JST.

Effective date: May 1, 2019

**UPHOLD HQ INC.**                                 **JST CAPITAL LLC**

_____                          _____
Signature                                        Signature

JP Thieriot                                      Scott Freeman
_____                          _____
Printed                                          Printed

CEO                                              Partner
_____                          _____
Title                                            Title

12144651.3

**EXHIBIT 1**

**TRANCHE AGREEMENT No.1**

Seller and Purchaser hereby agree as follows:

1)    Each has elected to proceed with a new Tranche transaction for additional Tokens;

2)    Each agrees that the Agreement is incorporated by reference into this Tranche Agreement No. 1 and that the following terms are part of the Agreement:

| | |
|---|---|
| Tokens | XRP Ripple |
| Number of Tokens | 3,500,000 |
| Origination Fee | 1.5% |
| Management Fee | 18% annually, payable quarterly |
| Tranche No. 1 Maturity Date | October 31, 2019 |
| Execution Date of Tranche Agreement No. 1 | May 1, 2019 |

3)    This Tranche Agreement No. 1 documents a new Tranche and becomes a binding agreement on the Execution Date set forth above.

[Balance of page intentionally left blank.]

**SELLER:**

**JST CAPITAL LLC**

_____
Signature

Scott Freeman
_____
Printed

Partner
_____
Title

**PURCHASER:**

**UPHOLD HQ INC.**

_____
Signature

JP Thieriot
_____
Printed

CEO
_____
Title

12144651.3

**EXHIBIT 2**

**Closing Statement – Tranche Agreement No. 1**

**May 1, 2019**

Re:    The Master Sale and Repurchase Agreement (the "**Agreement**") by and between Uphold, HQ Inc. ("**Purchaser**") and JST Capital, LLC ("**Seller**")

To:    Uphold HQ Inc.
6 West 18th St., 3rd Floor
New York, NY 10011

This Closing Statement relates to Tranche Agreement No. 1.  Capitalized terms used but not defined herein have the meanings given to such terms in the Agreement and in Tranche Agreement No. 1.

On the date of delivery set forth below, you received Tokens in the number and type specified below to your Digital Wallet pursuant to the Agreement.  The sales price for the Tokens is set forth below.  Accordingly, the Purchase Price, Repurchase Price, Closing Date, the date and amount of the quarterly management fee and other information related to Tranche No. 1are set forth below:

| | |
|---|---|
| Date of delivery and posting of the Tokens by Seller to Purchaser's Digital Wallet | May 1, 2019 |
| Number of Tokens delivered and posted to Purchaser's Digital Wallet: | 3,500,000 XRP (Ripple) |
| Conversion Price: | $0.285714 XRP/USD |
| Closing Sale Price | $1,000,000 USD |
| Closing Date for Tranche No. 1 | May 1, 2019 |
| Purchase Price for Tranche No. 1 | $0 USD |
| Repurchase Price for Tranche No. 1 | $0 USD |
| Origination Fee | 49,500 XRP |
| Management Fee | $180,000 USD Annually |

12144651.3

| Maturity Date | October 31, 2019 |
|---|---|
| Amount of quarterly Management Fee | $45,000, payable quarterly on each of the 90th day from the Closing Date and, unless this Agreement is terminated in accordance with Article 2 prior to the Maturity Date, on the Maturity Date |
| Early Return Fee | $22,500 |

Seller will retain the Origination Fee from the Number of Tokens delivered to your account on the Closing Date in accordance with Section 2.2 of the Agreement.

The Management Fee and, if applicable, the Prepayment Fee, shall be paid to the following:

| Bank/Institution Name | |
|---|---|
| Swift No. | |
| Account Number | |
| Routing Number | |
| Account Name | |

JST Capital LLC appreciates your business and please do not hesitate to contact us at any time should you have any questions or concerns.

Acknowledged and agreed to by Purchaser on May 1, 2019

_____
Name: JP Thieriot
Title:  CEO