# EXHIBIT B

Craig C. Daniel (State Bar No. 212588)
GLUCK DANIEL ATKINSON LLP
201 Mission Street, Ste. 1330
San Francisco, CA 94105
Telephone: (415) 510-2114
Facsimile: (415) 510-2208
Email: litigation@gluckdaniel.com

Angela J. Somers (*pro hac vice to be filed*)
Jeffrey Gross (*pro hac vice to be filed*)
Minyao Wang (*pro hac vice to be filed*)
REID COLLINS & TSAI LLP
420 Lexington Avenue, Ste. 2731
New York, New York 10170
Telephone: (212) 344-5200
Facsimile: (212) 344-5299
asomers@reidcollins.com
jgross@reidcollins.com
mwang@reidcollins.com

*Special Litigation Counsel to Trustees
of the Cred Inc. Liquidation Trust*

ELECTRONICALLY
**F I L E D**
*Superior Court of California,
County of San Francisco*

**01/17/2023**
**Clerk of the Court**
BY: ANNIE PASCUAL
Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SAN FRANCISCO

| | |
|---|---|
| CEDRIC DE LISSER, CHRISTOPHER MOSER, and MICHAEL MICHELIN, in their capacity as the Trustees of Cred Liquidation Trust,<br><br>Plaintiffs,<br>v.<br>LOCKTON COMPANIES LLC, d/b/a LOCKTON INSURANCE BROKERS, LLC, a Missouri limited liability company; LOCKTON COMPANIES, LLC - PACIFIC SERIES, d/b/a LOCKTON INSURANCE BROKERS, LLC, a Missouri limited liability company; and DOES 1-10, inclusive.<br><br>Defendants. | CASE NO. CGC-22-603638<br><br>**FIRST AMENDED VERIFIED COMPLAINT FOR:**<br><br>(1) **FRAUDULENT MISREPRESENTATION**<br>(2) **FRAUD IN THE INDUCEMENT**<br>(3) **NEGLIGENT MISREPRESENTATION**<br>(4) **INTENTIONAL CONCEALMENT**<br>(5) **AIDING AND ABETTING FRAUDULENT MISREPRESENTATION**<br>(6) **AIDING AND ABETTING NEGLIGENT MISREPRESENTATION**<br>(7) **AIDING AND ABETTING VIOLATIONS OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200 ET. SEQ.**<br><br>**DEMAND FOR JURY TRIAL** |

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

PARTIES ..........................................................................................................................4

TRUST ASSIGNORS ........................................................................................................6

OTHER RELEVANT NON-PARTIES ..............................................................................7

    A.   Cred-Related Non-Parties .................................................................... 7

    B.   Relevant Lockton Employees ............................................................. 9

STATUTE OF LIMITATIONS ...........................................................................................9

JURISDICTION ................................................................................................................9

FACTUAL BACKGROUND ............................................................................................10

    A.   Cred Launched the CredEarn Platform .............................................. 10

    B.   Lockton Was Cred's Insurance Broker from Its Early Days and Knew Cred Had Only Limited Insurance ............................................................. 11

    C.   Lockton and Cred Drafted the Lockton/Cred Statements on Insurance Coverage .................. 13

    D.   The Lockton/Cred Statements Were False ......................................... 18

    E.   Cred Published the False and Misleading Lockton/Cred Statements, Which Accelerated Customer Deposits Based on the False Assurances about Insurance ....................................... 20

    F.   Customers Relied on the False Statements About Cred's Insurance ..................................... 24

    G.   Cred Collapsed as a Result of Its D&Os' Reckless, Fraudulent, and Self-Interested Conduct: Over $165 Million in Customer Claims Remained Unpaid ....................................... 29

FOR FRAUDULENT MISREPRESENTATION ...............................................................30

FOR FRAUD IN THE INDUCEMENT ............................................................................32

FOR NEGLIGENT MISREPRESENTATION ..................................................................34

FOURTH CLAIM FOR RELIEF FOR INTENTIONAL CONCEALMENT ......................36

FOR AIDING AND ABETTING FRAUDULENT MISREPRESENTATION ...................38

FOR AIDING AND ABETTING NEGLIGENT MISREPRESENTATION .......................40

AIDING AND ABETTING VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. AND PROFESSIONS CODE, § 17200 ET. SEQ .............................................................42

DEMAND FOR A JURY TRIAL .....................................................................................43

PRAYER FOR RELIEF ................................................................................................. 43

# FIRST AMENDED COMPLAINT

The trustees of The Cred Inc. Liquidation Trust (the "**Trust**"),[1] Cedric de Lisser, Christopher Moser, and Michael Michelin, ("**Trustees**" or "**Plaintiffs**"), as assignee of certain claims from CredEarn customers (the "**Trust Assignors**"), by and through their undersigned counsel, allege against Lockton Companies LLC d/b/a Lockton Insurance Brokers, LLC and Lockton Companies, LLC - Pacific Series d/b/a Lockton Insurance Brokers, LLC (together "**Lockton**") as follows:

## INTRODUCTION

1.      Lu Hua and Daniel Schatt were the founders and directors of Cred, Inc., a cryptocurrency[2] company that was based in San Mateo, California. Schatt was also Cred's CEO. With Schatt at the helm, Cred sought to raise crypto for a yield-earning program called CredEarn in which customers lent their crypto to Cred.

2.      Lockton, which is the world's largest independent insurance brokerage firm and a self-proclaimed crypto insurance expert, willingly helped promote the CredEarn program to customers. Lockton and Cred jointly drafted false and misleading representations that claimed that Cred and its CredEarn customers were fully insured for losses. These deceptive representations convinced customers that their crypto loans were protected by insurance. Cred lured customers into the CredEarn program with these egregiously false promises.

3.      The CredEarn program allowed customers to earn a return on their crypto by lending their crypto to Cred for a fixed period. Cred would then convert the crypto into fiat currency (*i.e.*, a government-issued currency) and attempt to invest the funds at a higher rate of interest than it was required to pay the CredEarn customers. At the end of the lending term, Cred would repurchase the

---

[1] The Trust was established in accordance with the First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and its Subsidiaries Under Chapter 11 of the Bankruptcy Code, the Liquidation Trust Agreement, and the Confirmation Order.

[2] The term "cryptocurrency" refers to a digital asset on a blockchain, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," "digital assets," "coins," and "tokens." Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay. Bitcoin and Ethereum are the most popular cryptocurrencies, but there are many others.

crypto[3] and return it to the customer along with the interest earned. Cred's customers' crypto loans were unsecured loans to Cred.

4. Cred understood that customers would be hesitant to enter into the CredEarn program since unsecured loans to a new and untested company were risky. To solve this problem, Schatt and others at Cred used Lockton, an enthusiastic partner, to hype the program through false assurances that would induce participants into joining the program. Cred and Lockton—which agreed to make sure the insurance coverage description was accurate—crafted a public statement that falsely represented that Cred was comprehensively insured for Cred's and its customers' losses. Lockton knew these representations would be posted on or linked to Cred's website, sent directly to potential customers, disseminated on the internet, and used or distributed in other ways that customers could see them. But contrary to these fraudulent statements, Cred's insurance clearly did not cover CredEarn customers' losses or the vast majority of the losses that led to Cred's downfall.

5. Lockton's work on the misstatements began in the spring of 2019. Schatt worked primarily with Jeff Koo of Lockton, who was based in California, to "craft a public-facing 1-3 paragraphs on [Cred's] website" relating to Cred's insurance coverage. These Lockton/Cred joint statements, misleadingly titled "Going Above and Beyond," falsely claimed that Cred had "comprehensive insurance" that it had acquired through Lockton. Lockton and Cred also wrongly claimed that Cred had insurance "for a service that [Cred] failed to provide" or if the CredEarn program "did not have the promised results." Lockton and Cred further falsely claimed that Cred was insured for "the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement," and that customers would be "made whole" in the event of a loss. Lockton allowed its name and well-known brand to feature prominently in these public and blatant misrepresentations about Cred's insurance.

6. Lockton and Cred both knew that none of the insurance representations were true. For example, Cred had just a minimal errors and omissions policy, which was grossly inadequate in size, and which had exclusions that excepted coverage for CredEarn losses. Cred's other policies, including its cyber policy, similarly did not insure against the losses suffered by CredEarn customers and covered

---

[3] Cred retained some crypto, and on occasion, would use crypto on hand to return to customers.

little, if any, of Cred's other losses. Likewise, Cred's directors' and officers' policy had blanket exclusions for crypto, among other exclusions.

7.     Nevertheless, Lockton helped Cred draft these false joint statements knowing and expecting that customers would rely on them. The claims in the Lockton/Cred statements, backed prominently by the Lockton logo and words that touted Lockton's industry-leading reputation, were published on Cred's website, copied in statements Cred made directly to customers, and distributed elsewhere. Cred consistently directed customers to view the false statements, including using what Cred and Lockton had prepared as a stock response that its sales personnel or agents sent to potential customers who asked about Cred's insurance.

8.     The Trust Assignors are customers of Cred who loaned funds through CredEarn. They assigned their claims against Lockton to the Trust so that the Trust may pursue them on behalf of all creditors of Cred. Each of the Trust Assignors reasonably relied on information in the Lockton/Cred representations. They read the Cred/Lockton statements on a website that was linked to Cred's website, reviewed the Cred/Lockton "Going Above and Beyond" post on Cred's website, and read business articles and blogs that repeated the false statements. In addition, they received emails from Cred emphasizing the fraudulent statements, and some of them spoke to Cred employees (including in some instances, Schatt, the CEO) who reinforced the statements. Each of the Trust Assignors would not have entered into the CredEarn program if he or she had not been assured through the joint Lockton/Cred statements that Cred had insurance that covered Cred's losses and their customer losses.[4]

9.     Lockton owed a duty to Cred's customers both because it had a duty not to issue false statements and/or to correct misstatements issued under its auspices, and because it was foreseeable that customers would rely on Lockton as an expert in crypto insurance. As a result of the false and deceptive representations about insurance co-authored by Lockton, customers loaned over $280 million to Cred through the CredEarn program. The Trust Assignors have claims against the now-bankrupt Cred for more than $66 million in losses.

---

[4] This includes the Trust Assignors' increases to their initial loans and rollovers.

10.     Cred, and ultimately its customers, suffered massive losses caused by events that were not, contrary to the promises in the Lockton/Cred Statements, covered by insurance. Losses arose from Cred's investments (made with crypto loan proceeds) that were tainted by officer's self-interest, if not fraud, and some of Cred's crypto mysteriously disappeared, among other causes of losses. Cred never returned over $165 million worth[5] of CredEarn customers' crypto to the customers, nor did Cred return the interest they earned. Contrary to the false assurances by Lockton and Cred, customers were not protected by insurance. Cred's supposed "comprehensive insurance" relating to the "borrowing of crypto" was wholly illusory.

11.     In sum, Lockton's and Cred's joint false assurances led to massive inflows of customer capital, but Cred had no way of repaying the customer loans once Cred collapsed. The joint Lockton/Cred statements had promised that "If the worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole." In the end, the "worst" did happen: Cred filed for Chapter 11 bankruptcy on November 7, 2020, leaving the Trust Assignors empty handed. Meanwhile, while the joint Lockton/Cred statements caused CredEarn customers massive harm, Lockton profited from the premiums on the insurance it sold Cred and Cred's insiders profited personally from the fraud.

12.     The Trustees seek to recover from Lockton over $66 million in damages by asserting claims for fraudulent misrepresentation, fraud in the inducement, negligent misrepresentation, intentional concealment, aiding and abetting fraudulent misrepresentation, aiding and abetting negligent misrepresentation, and aiding and abetting violations of California's Unfair Competition Law.

## PARTIES

13.     **Plaintiffs** are Cedric de Lisser, Christopher Moser, and Michael Michelin, solely in their capacity as **Trustees of the Trust**. The Trust was established by the Modified First Amended Combined Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code (D.I. 629-1, Case No. 20-12836, Bankr. Del.) (as amended, the

---

[5] While this total largely eliminates duplicates and other claims, the Trust's professionals continue to refine their calculations through the claims administration process.

"**Plan**"). The Plan was confirmed on March 11, 2021, by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and became effective on April 19, 2021 (the "**Effective Date**"). (*See* D.I. 730.)[6] Under the Plan, the Trust may obtain assignment of third-party claims that the Trustees may then pursue on behalf of all creditors. *See* D.I. 1041 at 67:8-10 (comments by Bankruptcy Judge John Dorsey). Pursuant to that authority, the Trust was assigned the claims asserted here from the Trust Assignors.

14.     **Defendant Lockton Companies LLC** is a Missouri limited liability company, with headquarters at 444 W 47th St., Suite 900, Kansas City, Missouri 64112. Lockton Companies LLC is licensed by the California Insurance Commissioner to engage in the sale of insurance policies in this State. During the relevant period, it did business with Cred from its office at (i) 3 Embarcadero Center, 6th Floor, San Francisco, California and (ii) 400 Capitol Mall, Suite 2600, Sacramento, California. Upon information and belief, it continues to conduct business from that location. Defendant does business as Lockton Insurance Brokers, LLC.

15.     **Defendant Lockton Companies, LLC - Pacific Series** is a Missouri limited liability company, with headquarters at 444 W 47th St., Suite 900, Kansas City, Missouri 64112. It is a series of Lockton Companies LLC pursuant to Missouri law. *See* Mo. Rev. Stat. § 347.186. It is registered with the California Secretary of State to do business in this State. It has an office in California located at 777 S. Figueroa Street, 52nd Floor, Los Angeles, California. It also does business as Lockton Insurance Brokers, LLC. Upon information and belief, Lockton Companies, LLC – Pacific Series conducts business from 3 Embarcadero Center, 6th Floor, San Francisco, California, operates brokage offices in California, and supervises employees at its California locations.

16.     Plaintiffs are informed and believe and thereon allege that each of the Defendants designated as DOE is in some manner responsible for the damages claimed by plaintiff herein. Plaintiffs will seek leave to amend this complaint to add the true names of these Defendants when the same have been ascertained.

---

[6] On the Effective Date, the Trust was established, and the Debtors' assets were transferred and assigned to the Trust. (See Plan, § 12.3.) The Trust is being administered by the Liquidation Trustees (as defined in the Plan). (*See id.* at § 12.3(a)).

## TRUST ASSIGNORS

17.    **Trust Assignors** are the CredEarn customers who have assigned their customer claims to the Trust, including:

(i)    **Charles Lee,** who loaned 100 Bitcoin ("**BTC**") in CredEarn. His loan earned interest at a rate of 8% per annum on his BTC.

(ii)    **Chi King Wu**, who loaned 1,606 Bitcoin Cash ("**BCH**") and 1400 BTC in CredEarn.[7] His loan earned interest at a rate of 7% per annum on this BCH and 9% per annum on his BTC.

(iii)    **Christopher Moser,** who loaned 661.221 BCH; 426.10 BTC, and 5,471,710.732 LBA in CredEarn. His loan earned interest at a rate of 7-9% per annum on his BTC, 5% per annum on his BCH, and 5-10% per annum on LBA.

(iv)    **Gunther Baugh,** who loaned 170.95 BTC and 15.512 Ethereum ("**ETH**") in CredEarn. His loan earned interest at a rate of 7-9% per annum on his BTC and 5% per annum on his ETH.

(v)    **Joseph Shull,** who loaned 40.09 BTC and 10,000 LBA in CredEarn. His loan earned interest at a rate of 7% per annum on his BTC and 10% per annum on his LBA.

(vi)    **Julius Hudec**, who loaned 97.69 BTC in CredEarn.  His loan earned interest at a rate of 7-9% per annum on his BTC.

(vii)    **Koji Kanie,** who loaned 32.39 BTC in CredEarn. His loan earned interest at an interest rate of 7% per annum on his BTC.

(viii)    **Kyle Wang,** who loaned 1,500,000 USD Coin in CredEarn. His loan earned an interest rate of 10% per annum.

(ix)    **Olatunde Lapido,** who loaned 3,220.010 ETH and 10,000,000 Lumen ("**XLM**") in CredEarn. His loan earned interest at a rate of 5.0% per annum on his ETH and at a rate of 5.5% for XLM.

---

[7] The Trustees may amend this Amended Complaint to add the claims of additional Trust Assignors.

(x)      **Patrick Archambeau**, who loaned 30.74 BTC, 305,000 USD Coin ("**USDC**"), and 10,000 Cred LBA Coin ("**LBA**"). His loan earned interest at a rate of 7% per annum on his BTC, 12% per annum on his UDC, and 10% per annum on his LBA.

(xi)     **Robin Houck,** who loaned 95 BTC in CredEarn. His loan earned interest at a rate of 8% per annum on his BTC.

(xii)    **Teppei Miyauchi,** who loaned 1339.65 BTC in CredEarn. His loan earned interest at a rate of 8% per annum on his BTC.

## OTHER RELEVANT NON-PARTIES

### A. Cred-Related Non-Parties

18.     **Alexander** is James Alexander. He was Cred's Chief Capital Officer from August 2018 through all relevant periods described in this Amended Complaint. According to the Report issued by Cred's Examiner, it was revealed post-bankruptcy that Alexander had escaped prison in the United Kingdom.[8]

19.     **Cred Inc.** is a crypto company that filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on November 7, 2020 ("**Filing Date**"). Cred was a crypto currency company and has been liquidated in Chapter 11, with its remaining assets to be liquidated through the Trust. Cred was incorporated in Delaware and its principal place of business was at 3 East Third Avenue, Suite 200, San Mateo, California.

20.     **Examiner** is the person appointed in Cred's Chapter 11 case to examine Cred's past activities. On December 23, 2020, the Bankruptcy Court ordered the appointment of an examiner. On January 8, 2021, the Court entered an Order approving the appointment of Robert J. Stark as the Examiner. In the Order, the Court directed the Examiner to investigate allegations of fraud, dishonesty, incompetence, and misconduct in affairs of the Debtors and otherwise perform the duties of an examiner, as set forth in Bankruptcy Code §§ 1106(a)(3) and 1106(a)(4), 11 U.S. C. §§ 1106(a)(3) and 1106(a)(4). On March 8, 2021, the Examiner issued a report ("**Examiner Report**").

---

[8] Examiner Report at 7.

21. **Gardler** is Meghan Gardler. She was the Director of Marketing at Cred during all relevant periods described in this Amended Complaint. Upon information and belief, Gardler worked in California during all relevant periods described in this Amended Complaint.

22. **Hua** is Lu Hua. He was a co-founder and 50% owner of Cred, and was one of Cred's two directors. He was a director of Cred during all relevant periods described in this Amended Complaint. Hua served as Cred's CEO until late 2018, when Schatt became CEO.

23. **moKredit**[9] was and may currently still be a Chinese micro-lending platform in which the vast majority of CredEarn funds were invested. moKredit was incorporated in the Cayman Islands and is based in Shanghai, where it allegedly provides microcredit loans to Chinese borrowers. Hua is the founder and/or manager or director of moKredit.

24. **Perez** is Travis Perez. He served as Vice President for Wealth for Cred from April 2019 to December 2020. Upon information and belief, Perez worked in California during all relevant periods described in this Amended Complaint.

25. **Podulka** is Joseph Podulka. He served as Cred's Chief Financial Officer from July 2019 to December 2020. Upon information and belief, Podulka worked in California during all relevant periods described in this Amended Complaint.

26. **Schatt** is Dan Schatt. He was a co-founder and 50% owner of Cred. Schatt served as Cred's President and later as Chief Executive Officer during the periods described in this Amended Complaint. Schatt was one of Cred's two directors during all relevant periods described in this Amended Complaint. Upon information and belief, Schatt worked in California during all relevant periods described in this Amended Complaint.

27. **Wheeler** is Daniel Wheeler. He served as Cred's General Counsel from August 2019 through all relevant periods described in this Amended Complaint. Wheeler previously served as Cred's primary outside counsel as a partner at Bryan Cave Leighton Paisner LLP from 2018 until August 2019.

---

[9] The entities comprising the defined term "moKredit" are moKredit Inc., moKredit Technology (Hong Kong) Company Limited, moKredit (Shanghai) Information Technology, Co. Ltd, and Shanghai Bestone Information Technology Co. Ltd.

28. **Zhang** is Ka "Michael" Zhang. He served as Vice President of Wealth at Cred from August 2019 to November 2020. Upon information and belief, Zhang worked in California during all relevant periods described in this Amended Complaint.

## B. Relevant Lockton Employees

29. **Arzu** is Nyreese Arzu, who served as an executive/employee of Lockton during all relevant periods described in this Amended Complaint. Upon information and belief, Arzu worked in California during all relevant periods described in this Amended Complaint.

30. **Coe** is Lindsay Coe, who served as an executive/employee of Lockton during all relevant periods described in this Amended Complaint. Upon information and belief, Coe worked in California during all relevant periods described in this Amended Complaint.

31. **Koo** is Jeff Koo, who served as an executive/employee of Lockton during all relevant periods described in this Amended Complaint. Upon information and belief, Koo worked in California during all relevant periods described in this Amended Complaint.

32. **Tokatz** is Michael Tokatz, who was an Account Executive at Lockton during all relevant periods described in this Amended Complaint. Upon information and belief, Tokatz worked in California during all relevant periods described in this Amended Complaint.

## STATUTE OF LIMITATIONS

33. The Trustees and the Trust Assignors did not discover and could not reasonably have discovered the false and fraudulent activities and misrepresentations relating to Cred's business and Cred's false representations until sometime after the Examiner Report was issued (on March 8, 2021) in the Cred Chapter 11 case or afterwards. The Trustees and the Trust Assignors could not have discovered the false and fraudulent activities of Lockton until after the Trustees were appointed to the Trust and permitted to investigate these issues.

34. This action is timely filed after the discovery of the wrongdoing alleged herein.

## JURISDICTION

35. This Court has original jurisdiction over the subject matter of this action pursuant to Section 10 of Article VI of the California Constitution.

36. Pursuant to Cal. Civ. Proc. Code § 410.10, this Court has personal jurisdiction over Lockton because Lockton, among other things, purposely availed itself of the benefits of doing business in California by regularly conducting commercial activities that impact California in a substantial, continuous, and systematic basis. Lockton has offices from which it transacted the business that gives rise to the claims asserted here: (i) 3 Embarcadero Center, 6th Floor, San Francisco, California, (ii) 400 Capitol Mall, Suite 2600, Sacramento, California, and (iii) 777 S. Figueroa Street, 52nd Floor, Los Angeles, California. Lockton sold Cred insurance coverage from these offices and coordinated with Cred on drafting the Lockton/Cred statements from these offices. Lockton advised Cred about insurance coverage in California, and Lockton employees in California worked with Cred to craft false and misleading statements to Cred customers in California.

37. In addition, Cred's principal place of business at the time of the relevant events was 3 East Third Avenue, Suite 200, San Mateo, California. Most of the senior executives and employees of Cred who coordinated with Lockton and its employees in drafting the false Lockton/Cred Statements were based in California. Lockton employees based in California also sold Cred the policies. The Lockton/Cred Statements were made available through Cred's website and by other means.

38. Venue is proper in this Court because (i) Lockton has an office that is located in the County of San Francisco and (ii) Lockton's misconduct that forms the crux of the allegations set forth herein took place in the County of San Francisco.

## FACTUAL BACKGROUND

### A. Cred Launched the CredEarn Platform

39. Schatt and Hua established Libra Credit, which later became known as "Cyber Quantum Pte. Ltd," in 2018. On May 14, 2018, Schatt and Hua organized "Libra Credit (US) LLC" in Delaware. In August 2018, Libra Credit (US) LLC changed its name to "Cred LLC." Schatt and Hua also formed a subsidiary, "Cred (US) LLC," in August 2018, with Cred LLC as its sole member.

40. On May 13, 2020, Cred LLC became incorporated as Cred Inc. Cred Puerto Rico LLC was also formed for the purpose of facilitating transactions for residents in Puerto Rico. The Trustees refer to Libra Credit, Cyber Quantum Pte. Ltd., Cred LLC, and Cred (US) LLC, Cred Puerto Rico LLC, and Cred Inc. collectively as "**Cred**."

41.     In late December 2018 to January 2019, Cred launched a cryptocurrency yield-earning program[10] called CredEarn. Through CredEarn, customers lent their crypto to Cred for a fixed period of time. Cred promised to pay customers a fixed interest rate on their crypto (either in cash or more crypto) and return their crypto, plus interest, to customers on a specified date. Once Cred received customers' crypto, it converted the crypto into fiat currency, such as the United States dollar. Cred then purported to invest the funds at a higher rate of interest than it was required to pay the CredEarn customers. From June 2019 until the Filing Date, Cred borrowed over $280 million in crypto from CredEarn customers based on the false promise that customers' losses were insured.

**B.   Lockton Was Cred's Insurance Broker from Its Early Days and Knew Cred Had Only Limited Insurance**

42.     Once Cred started the CredEarn program, Cred knew that Lockton could help make the program more marketable. Cred had used Lockton for its insurance needs in its early days and deepened its relationship with Lockton.

43.     Lockton advertised itself as the world's largest independent insurance brokerage and claimed to have expertise in the financial services and cryptocurrency markets. It publicly touted its "expertise and influence in the insurance marketplace" and claimed it provided "exceptional results for its customers."[11] Lockton boasted that "[f]inancial institutions and financial service companies around the world select Lockton to strengthen their insurance."[12] Lockton also claimed its clients had the ability to "design and tailor [their] insurance program and risk transfer strategies to fit [their] unique needs."[13]

---

[10] In a yield-earning program, the company that sponsors the program borrows crypto from its customer, and the customer become an unsecured lender of cryptocurrency. The company promises to repay the customer the crypto back at a fixed date, plus interest earned during the duration of the loan. The company then seeks to earn a greater yield on the loaned cryptocurrency than it owes its customer under the yield-earning program. This is usually earned through the company turning the crypto into fiat currency and re-lending the money at a higher rate or through cryptocurrency trading strategies. The customer benefits from yield-earning programs because he or she maintains ownership of the cryptocurrency while earning interest. The company profits from yield-earning programs if it earns a greater yield than the company owes customers.

[11] https://global.lockton.com/us/en/financial-services

[12] https://global.lockton.com/us/en/financial-services.

[13] https://global.lockton.com/mena/en/products-services/cyber-and-technology.

44.    Lockton acquired several policies for Cred. But the policies provided only minimal coverage for Cred and no coverage for CredEarn customers.

45.    Lockton sold Cred an errors and omissions insurance policy ("**E&O Policy**") from Validus Specialty ("**Validus**") that was supposed to cover wrongful acts of the company, its executives, and employees. Although the CredEarn program took in over $280 million from customers, the E&O Policy provided only $1 million of coverage with a $350,000 self-insured retention. The details of the policy reflected that it did not cover CredEarn customers' losses, nor did it cover the Cred losses that pushed it into bankruptcy.

46.    Moreover, while the E&O Policy referred to insurance for Lending Services, *i.e.*, CredEarn,[14] the details of the policy reflect that CredEarn losses were largely excluded. *First*, the E&O Policy did not cover a loss "for liability arising out of any representation, promise or guarantee of the past performance or future value of any investment product." *Second*, the E&O Policy did not cover critical misdeeds of executives and employees of Cred, including acts that involved the gaining of any personal profit or financial advantage to which the insured was not legally entitled. *Third*, the E&O Policy did not cover any loss relating to theft, appropriation, misappropriation, misuse, or conversion of any crypto currency, crypto token or coin, digital token or coin, utility token or coin, or any blockchain asset, security, or other means of trade or transaction involving blockchain or equivalent software or technology. *Fourth*, the E&O Policy eliminated coverage for any loss arising out of the "insolvency, conservatorship, receivership, bankruptcy, or liquidation of any Insured, or the inability of the Insureds to perform Professional Services or Lending Services." *Fifth*, the E&O Policy specifically excluded losses from wrongful acts involving moKredit.

47.    Lockton also sold Cred a cyber liability policy from Axis Insurance ("**Axis Policy**") that provided similarly minimal and illusory coverage. While the Axis Policy supposedly provided Cred with cyber liability coverage up to a $5 million limit with a self-insured retention of $25,000, the most critical parts of the Axis Policy were subject to different caps. The endorsements decreased coverage for social engineering fraud and telecommunication theft provided only $250,000 of coverage with a

---

[14] Lending Services was defined in the E&O Policy as "(ii) the borrowing of Bitcoin from unsolicited third-party client self-directed investors through the creation of Enhanced Yield Accounts pursuant to the terms and conditions of a fully executed CredEarn Agreement."

self-insured retention of $25,000. The Axis Policy also excluded coverage for a loss resulting from the breach of an agreement or for fraudulent or intentional misconduct.

48.    Lockton also sold Cred two directors' and officers' insurance policies with gaping holes ("**D&O Policy**"). The first policy from Validus provided $1 million in coverage with a $200,000 self-insured retention; and the second policy from Euclid had a $1 million excess insurance policy that was subject to the essentially the same terms and conditions as the Validus Policy. Like the E&O Policy, the D&O Policies excluded acts that caused the CredEarn losses. It did not cover acts that (i) provided a personal profit or financial advantage to the D&Os, (ii) resulted from a written agreement, or (iii) related to the offering of securities by Cred.

49.    Furthermore, the D&O Policy has an "ICO and Crypto Currency, Token, or Coin Exclusion Endorsement." This exclusion provided that any kind of loss relating to crypto was not covered, including a loss from the ownership of crypto, investment in the form of crypto, transfer of crypto, or the theft, appropriation, misappropriation, misuse, or conversion of crypto.

50.    Lockton also sold Cred a general commercial insurance policy from The Hartford Financial Services Group, Inc. ("**Hartford Policy**"). The Hartford Policy expressly excluded losses Cred suffered from dishonest or criminal acts or losses resulting from "voluntarily parting with any property to a person the insured entrusted the property if induced by any fraudulent scheme, trick, device or false pretenses."[15]

51.    Lockton was Cred's broker and knew the terms and exclusions for all these policies. Lockton knew that Cred's insurance policies did not cover the losses CredEarn customers might suffer. Yet Lockton ignored this reality when it drafted public statements with Cred about Cred's insurance coverage.

C.    **Lockton and Cred Drafted the Lockton/Cred Statements on Insurance Coverage**

52.    Lockton played a pivotal role in helping Cred promote the CredEarn program. On March 29, 2019, Coe, a Lockton account executive, and Arzu, a Lockton assistant vice president and account executive, began working with Cred to "craft a public-facing 1-3 paragraphs on [Cred's] website" about its insurance coverage.

---

[15] Cred also had $1 million coverage for lawyers from One Beacon Insurance.

53.     Arzu suggested Cred use "Coinbase's insurance web page" as a template, and he attached a link to it. This suggestion was odd since the kinds of insurance that Coinbase could acquire and afford were completely different than what Cred had. Coinbase was a far more mature company than Cred: Coinbase was valued at $8 billion by late 2018 and earned more than $500 million in revenue in 2019. Arzu failed to point out any distinction when he inappropriately suggested using Coinbase's insurance as a model.

54.     Schatt replied to Arzu's email and said that Cred needed more guidance on the disclosure. That same day, in response to Schatt's request for more information, Coe said: "[w]e completely understand your need for some more information. I think this discussion would be better suited for a phone call." Schatt replied: "[s]ure, in the meantime, it would be helpful to send us something that can help us understand what can be said publicly." Coe and Arzu told Schatt that they could provide thoughts over the phone and suggested Cred consult its counsel for further assistance.

55.     Koo, who outranked Arzu and Coe, was dissatisfied with the answers that Arzu and Coe gave to Schatt. Thus, Koo took over this important project and made three important changes. ***First***, Koo eliminated Coe and Arzu from the emails with Lockton. Thereafter, Koo was in charge of the statements, and he did not appear to ask for others' viewpoints regarding the appropriateness of Lockton's direct participation in drafting the website statements. ***Second***, Koo made clear that he and his team would draft statements for the website, instead of merely providing thoughts over the phone. ***Third***, Koo agreed to ensure the accuracy of statements about the insurance coverage and the terms of the policies.

56.     Once he excluded Coe and Arzu from the email chain, Koo sent an email dated April 1, 2019, only to Schatt, in which Koo stated, "I want to help you draft what you want to put on your website." Koo explained that he was "more than happy to have a conversation over the phone and *get this written down on our end*."[16] In fact, he stressed that he "will be reaching out direct to have this drafted *with you*."[17] Koo and Schatt scheduled a phone call to discuss the insurance disclosure the next day.

---

[16] Emphasis added.

[17] Emphasis added.

57.     On April 3, 2019, Koo emailed Schatt about how to describe the insurance on Cred's website. Koo remarked: "This should be a great start in drafting an insurance paragraph on your website. We can discuss this once you have your first draft." On April 5, 2019, Koo diligently followed up and wrote Schatt: "[c]hecking back in from my prior email. Let me know when you have your first draft."

58.     A few weeks later, Coe and Arzu were unintentionally copied on an email chain that mentioned the insurance-related statements for Cred's website. But Koo again excluded Coe and Arzu. Koo told Schatt, "As for the language, for your website, we can have a separate email for this." Koo followed up directly with Schatt on April 27, 2019: "Let me know how things are going as far as drafting what you would like to put on your website."

59.     On May 13, 2019, Schatt finally sent Koo a "long overdue" "stab at the language for the [w]ebsite." Schatt adopted Koo's suggestions. These draft statements were headlined "Going Above and Beyond" ("**Draft GA&B Statements**"). A copy of the Draft GA&B Statements is attached hereto as **Exhibit 1**. The Draft GA&B Statements claimed that Cred had "the industry's most comprehensive set of risk management, information security and insurance protections available." The Draft GA&B Statements also claimed that: "[i]f the worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole." In the Draft GA&B Statements, Cred claimed it was serious about protecting client financial assets and that it believed it has "an obligation to take a leadership role to go beyond today's status quo to obtain as many insurance and risk management protections as possible."

60.     The Draft GA&B Statements included representations about Lockton and the process by which Lockton had helped Cred about insurance, such as that Cred selected "Lockton in part due to their competency in crypto, cybercrime and financial services." In addition, the Draft GA&B Statements that Lockton co-authored proclaimed that Cred was "proud of the fact that Cred ha[d] some of the most comprehensive insurance policies of any crypto financial services platform, spanning errors and omissions (E&O), Directors and Officers (D&O),[18] Cyber and Regulatory claim coverage." The

---

[18] Lockton and Cred decided not to mention D&O insurance to avoid lawsuits, but the representations about comprehensive insurance encompassed this policy. As explained above, the D&O coverage was woefully inadequate.

Draft GA&B Statements further claimed that Cred was "selected by underwriters for insurance coverage after it was evaluated against several criteria," including "Cred's licensed and well documented business activities," its "highly reputable strategic partners," its "best practices with its partners" and its "executive team [that] stands out for its depth of experience." Relatedly, the Draft GA&B Statements concluded that "[t]his comprehensive insurance coverage provided to Cred [was] a testament to the confidence Cred's underwriters have in Cred's ability to demonstrate to financial regulators that it can demonstrate sound policies and procedures and adequate supervision."

61. The Draft GA&B Statements also made more specific representations about the insurance coverage that comprised Cred's "comprehensive cyber policy coverage." For example, they claimed that Cred's E&O Insurance covered a situation in which "a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not have the promised results." Services, "include[d] the *borrowing of crypto from a client related to the terms and conditions of a Cred Agreement* and the granting of business or consumer lines of credit against crypto assets."[19] The Draft GA&B Statements also claimed that Cred's insurance policies "cover product failure, meaning *the inability of customers to access or otherwise utilize Cred's intended service*" as well as "any wrongful act or product failure in the rendering of Cred's professional services."[20] In addition, the Draft GA&B Statements claimed that D&O insurance covered "claims that may arise from actual or alleged wrongful acts of directors and officers."

62. Koo responded to the Draft GA&B Statements shortly after he received them on May 13th, praising it as a "[v]ery nice piece of work." He assured Schatt that he would review and make comments. Koo also agreed that he and his team would ensure that the policy details were accurately described. He emailed Schatt, "I will need some time to review the *insurance requirements with my team*. I will be in touch shortly."[21]

---

[19] Emphasis added.

[20] Emphasis added.

[21] Emphasis added.

63. Koo assured Schatt that his team was working on it nearly a week later. In an email dated May 20, 2019, Koo said to Schatt: "I am working with my team this week to ensure that the *coverage stated is within the terms and conditions*. I will want to set up a call with you on Friday to discuss."[22] A few days later, on May 22, 2019, Koo said he would like to set up a meeting to discuss the disclosure "preferably in person."

64. On May 27, 2019, Koo proposed minor changes to just one section of the Draft Going Above and Beyond Statements, which related to Cyber and Regulatory Insurance.[23] But none of those changes changed the important claims in the Draft GA&B Statements cited above.

65. Koo also gave the green light for Cred to use the disclosure. He stated that the E&O Policy disclosure, which was "fairly detailed," *could be used.*[24] This was the section that specifically addressed the CredEarn program and claimed Cred was insured for losses relating to that program.

66. The drafting work by Lockton and Cred in this Section C resulted in the form statements that were used on Cred's website ("**Lockton/Cred Statements**").

67. Lockton was instrumental to creating the Lockton/Cred Statements because the disclosure resulted from (i) Lockton executives' suggestion that Cred mirror language used by Coinbase; (ii) phone discussions and/or in-person meetings between Lockton executives and Cred's executives about the contents; (iii) Lockton executives sending Cred descriptions of the insurance policies; (iv) Koo's proactive measures to take responsibility for the statements, such as by writing

---

[22] Emphasis added.

[23] The modification was to change the sections below as follows:

**Cyber Insurance**
One of Cred's priority areas cyber insurance. Security and protection of client funds is our top priority. Cred's comprehensive cyber policy covers network security failure, cyber extortion, data recovery, costs, ransomware, forensics, reputational harm, business interruption and system failures. we [sic] believe it is particularly critical to focus on employee training related to privacy and data security. we've [sic] financially supported our employees to pursue advanced cyber security specializations (*name the certifications*).

**Regulatory Insurance**
Cred is covered for liability associated with privacy breaches and computer system security breaches. Cred also devotes significant time and resources to support user education.

Cred's policy also covers privacy notifications and claims brought by any regulatory or administrative agency.

[24] Emphasis added.

them, having his team work on them, and taking responsibility for accurately relaying the terms of the policies; and (iv) Lockton and Cred exchanging drafts and a mark-up of the statements. Thus, Lockton was a co-author that was instrumental in creating the false representations in the Lockton/Cred Statements.

68.     As explained below, with very little modification, the Lockton/Cred Statements were used for Cred's website and other places where customers could read them. Also as explained below, the statements crafted by Lockton and Cred was used, posted, or otherwise made available to CredEarn customers in a variety of ways.

**D. <u>The Lockton/Cred Statements Were False</u>**

69.     The Lockton/Cred Statements were littered with false information and blatant misrepresentations. Lockton knew the representations were false. *First*, Lockton was an insurance broker that touted its expertise in crypto, cybercrime, and financial services. *Second*, Lockton knew the true extent of Cred's coverage because it had helped Cred find insurance carriers, discussed policies with Cred, helped negotiate the policies, and sold them to Cred. *Third*, Lockton specifically assumed responsibility to make sure the disclosure accurately reflected Cred's insurance coverage.

70.     The Lockton/Cred Statements were false for many reasons. First, Cred's insurance was ***not*** "the industry's most comprehensive set of risk management, information security and insurance protections available." This was false for a few reasons. First, Cred's total insurance was *de minimis* as compared to the size of its CredEarn program. Cred had *$15 million* of Crypto, General liability, E&O, D&O insurance (most of which did not cover Cred's or its customers' losses), *but it had exposure for over $280 million* of CredEarn customer crypto loans. The amount of insurance coverage was not comprehensive based on Cred's business, nor did Cred have the highest insured limits in the industry.

71.     Further, Cred's insurance was not comprehensive because it had no crime insurance. Lockton knew Cred had no crime insurance because it investigated getting some for Cred. In September 2019, Koo referred Podulka to Michael Tokatz at Lockton to continue discussing crime coverage. Crime coverage was difficult to obtain, though other crypto companies with stronger internal controls and financial statements, like Coinbase and Gemini, had such policies. Cred gave up on getting crime insurance when it learned about the rigorous underwriting process and standards.

72. In May 2020, Podulka reconsidered possibility of getting crime insurance, but declined again because he believed the potential premium was too high. Lockton knew that Cred had abandoned its consideration of crime insurance. In sum, given the critical lack of crime coverage, Lockton knew that Cred did not "obtain as many insurance and risk management protections as possible" for the "crypto community."

73. The Lockton/Cred Statements also misrepresented the process by which Cred had obtained its (limited) insurance. For example, the Lockton/Cred Statements falsely claimed that Cred was "selected by underwriters for insurance coverage after it was evaluated against several criteria," including "Cred's licensed and well documented business activities," its "highly reputable strategic partners," its "best practices with its partners" and its "executive team [that] stands out for its depth of experience."

74. In fact, as Lockton knew, Cred had trouble finding cyber insurance and had been rejected by one carrier because of its poor practices. The carrier told Lockton why it declined for reasons such as:

> • Key management was inadequate, CRED did not appropriately backup and manage keys to their customer's wallets
> • Auditing in CRED services was inadequate
> • Protection of the Drivers License information and other KYC type data was inadequate
> • Authentication for services such as the Amazon AWS IaaS console, Email, and consumer did not offer adequate 2-Factor
> Authentication mechanisms, or did not require 2-Factor Authentication in general.
> • We believe that the crypto space should require 2-Factor Authentication for all services, and never rely on SMS for 2-Factor Authentication

Thus, the Lockton/Cred Statements falsely asserted that Cred's insurance coverage was "a testament to the confidence Cred's underwriters" had in Cred's ability to demonstrate "sound policies and procedures and adequate supervision."

75. The Lockton/Cred Statements also falsely claimed that Cred had "the most comprehensive insurance policies of any crypto financial services platform, spanning errors and omissions (E&O), Directors and Officers (D&O), [and] Cyber and Regulatory claim coverage." In fact, each of these policies was not comprehensive and had gaping exclusions and exceptions described above. For example, the D&O insurance had a crypto exclusion and excluded acts that involved

personal gain, while its Cyber Policy had a $250,00 limit for social engineering fraud and telecommunications theft and it lacked coverage for a loss resulting from the breach of an agreement or for fraudulent or intentional conduct. Both policies also provided *de minimis* coverage considering the magnitude of potential losses.

76.     The Lockton/Cred Statements also falsely claimed that Cred's E&O Insurance covered potential CredEarn losses. In particular, the Statements misrepresented that coverage would apply in a situation in which "a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not have the promised results," which services, "include[d] the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement." It also claimed the insurance covered "the inability of customers to access or otherwise utilize Cred's intended service" as well as "any wrongful act or product failure."

77.     But contrary to this representation, the E&O Policy insured minimal losses. In addition, the E&O Policy excluded coverage for every activity that led to the CredEarn losses. There was no coverage for acts or events that involved personal profit, wrongful employee acts, theft or misappropriation, losses from bankruptcy, or any acts involving moKredit. These exceptions gutted the policy and provided no benefit for customers when Cred could not return their crypto. CredEarn customers filed claims in the bankruptcy for more than $165 million because there was no insurance coverage.

78.     Simply put, while the Lockton/Cred Statements claimed that: "[i]f the worst happens and Cred loses customer funds," customers "will be made whole" through the insurance, Lockton knew that would never happen. Instead, it was foreseeable that customers would be devastated by uninsured losses.

**E.  Cred Published the False and Misleading Lockton/Cred Statements, Which Accelerated Customer Deposits Based on the False Assurances about Insurance**

79.     In June 2019, Cred posted the false and misleading Lockton/Cred Statements with extremely minor (non-relevant) modifications. It was posted on Medium.com in early June 2019 and

is attached hereto as **Exhibit 2** (*see https://medium.com/@ihaveCred/going-above-and-beyond-c1468769c563* ). The Medium Article bore the Lockton logo as set forth below:



80. CredEarn customers who visited Cred's website and wanted to read about the safety of CredEarn and Cred's insurance were directed to a link with the Medium article. The Medium article was viewed over 1300 times from the time it was posted until the Filing Date.

81. On October 16, 2019, Cred again posted the false Lockton/Cred Statements linked to its website, at *https://mycred.io/blog/crypto-insurance/.* The Lockton/Cred Statements remained on the Cred website shortly before Cred filed for bankruptcy.[25]

---

[25] Examiner's Report at pp. 37-38.

82. The post bore only the Lockton logo:



83. The Lockton link remained on the website until it was removed on 10/31/2020, just before Cred's Filing Date. *See* **Exhibit 3** and attached hereto https://web.archive.org/web/20201001082401/https://mycred.io/blog/crypto-insurance/. Hundreds, if not thousands, of potential customers were directed to this site.

84. From October 2019 through October 2020, Cred's marketing and sales team directed hundreds of customers to Cred's website, which contained the information that Lockton co-authored.

85. Cred was quite successful in attracting loans based on the false statements that it crafted with Lockton, which became a distinguishing feature of CredEarn program.

86. The Trust Assignors each relied on similar information. For example, Zhang at Cred told Mr. Shull that Cred had purchased the most insurance that any crypto company could purchase. An email dated October 14, 2019, from Zhang to Mr. Shull stated that Cred had a "comprehensive insurance policy on E&O, D&O and other cyber protection." In the same email, Zhang further expressly promised that "during the time that they [the crypto/funds] are with us we have a comprehensive insurance policy with Lockton that includes protection against any hacking, E&O, and regulatory coverage."

87. CredEarn raised about $6 million per month on average in the first half of 2019. Once the Lockton/Cred Statements became public, however, the money Cred raised increased dramatically and rapidly because Cred's marketing efforts were built upon lies it crafted with Lockton. The following are the amounts Cred raised per month from July 2019 to October 2020:[26]

| July 2019 | $7,456,401 |
|---|---|
| August 2019 | $4,202,082 |
| September 2019 | $16,525,428 |
| October 2019 | $15,858,511 |
| November 2019 | $19,075,893 |
| December 2019 | $22,906,923 |
| January 2020 | $32,728,197 |
| February 2020 | $18,611,985 |
| March 2020 | $20,287,797 |
| April 2020 | $16,226,274 |
| May 2020 | $12,648,982 |
| June 2020 | $23,673,771 |
| July 2020 | $18,143,789 |
| August 2020 | $41,601,206 |
| September 2020 | $16,694,769 |
| October 2020 | $7,367,756 |

88. Thus, customers poured into the CredEarn program based on the insurance misrepresentations that lured customers into a false sense of security. On November 30, 2019, Schatt emailed his team, praising them for bringing in customers at a rapid pace and remarked that they are breaking "Cred World Records." Schatt also exhorted his team that the new crypto loans were "Unbelievable!!!" By the end of 2019, Schatt said that "[i]t is hard to put this unbelievable year into

---

[26] These calculations are alleged on information and belief based on a review of Cred's records and efforts to reconstruct Cred's accounting records by the Trustees' professionals.

words, so I'll start with some unbelievable numbers." He attached a chart showing a 375,225% growth rate in attracting new CredEarn customers.

89. Schatt continued to push the CredEarn program with success—using the false representations about Cred's insurance—through May 2020. The efforts to promote Cred remained successful despite volatility in the crypto market and the COVID pandemic. Schatt exclaimed to his team in May 2020: "What a month (again!)" and commented that "[t]he platform and sales team brought in over $18 million of additional funding, beating our $15 million goal."

90. By using the false and misleading Lockton/Cred Statements and the purported comprehensive insurance to peddle the CredEarn program, Lockton and Cred together fraudulently induced customers to enter into the CredEarn at a furious pace.

**F.** **Customers Relied on the False Statements About Cred's Insurance**

91. Customers reasonably relied on the Lockton/Cred Statements. Since Lockton was regarded as the preeminent expert in the crypto insurance field, and it could be expected to source unusual products or even create a bespoke product, CredEarn customers reasonably believed that Cred's insurance would make them whole.

92. The Examiner found that customers were pointed to or received "insurance information that, according to certain customers, led them to believe that their crypto loans were fully protected by Cred's insurance policies.[27] The Examiner observed that one customer, Darryl Ferguson, placed his confidence in Cred due to its "advertised claim to have 'industry leading' insurance."[28]

93. Likewise, each of the Trust Assignors reasonably relied on the false statements about Cred's insurance. **Charles Lee** decided to participate in CredEarn after performing substantial due diligence on the CredEarn program. That process included an in-person meeting with Schatt. Mr. Lee relied upon Cred's insurance coverage. It was a major factor in his decision to join the CredEarn program, and at the time of Cred's filing, he recalled Cred having some sort of insurance that covered his losses.

---

[27] Examiner Report at 38.

[28] *Id.*

94.    **Chi King Wu** participated in CredEarn initially based on the representations concerning insurance coverage. Mr. Wu reviewed the Lockton/Cred Statements, information on Cred's website concerning insurance coverage, and the Medium article. Mr. Wu relied on the representations about comprehensive insurance that would have covered his losses. Mr. Wu also communicated with Michael Zhang, who promised Mr. Wu that there would be comprehensive insurance coverage. Mr. Wu would not have participated in Cred if it did not have extensive insurance coverage.

95.    **Christopher Moser** noticed that unlike Cred, other companies did not promise insurance coverage. CredEarn's insurance protection made a crypto loan to Cred more attractive than other yield-earning platforms. After an initial loan to try the program, Mr. Moser increased his crypto loans and rolled over his loans in CredEarn after he reviewed the information on Cred's website and the Medium article. Mr. Moser believed that his crypto loans to Cred were insured, and he relied on that insurance. Mr. Moser also received an email from a Cred email address, info@mycred.io, that stated that Cred was offering the industry's most comprehensive set of insurance protections. This email was also sent to many customers ("**The Insurance Email**").

96.    **Gunther Baugh** also relied on Cred's insurance. He understood that if Cred lost his crypto, he would be insured. Mr. Baugh spoke to Zhang at Cred, who assured him that CredEarn losses were covered by insurance. He thought the insurance was comprehensive. He received an email from Zhang stating that Cred had a comprehensive insurance policy with Lockton that includes protection against hacking, E&O, and regulatory coverage.

97.    **Joseph Shull** participated in CredEarn after the Lockton/Cred Statements were posted. Shull reviewed Cred's website and statements on insurance that talked about Cred making extensive efforts to get insurance. He understood it was called Going Above and Beyond. Based on these statements and Cred's email and phone conversations, Mr. Shull understood that if he lost his crypto, or Cred could not otherwise return it to him, Cred had insurance to cover for the loss.

98.    **Julius Hudec** relied on the promise of insurance coverage for his loans when he entered the CredEarn program. Based on communications from Cred personnel, Mr. Hudec understood that should his loans suffer losses, Cred's promised insurance would compensate him. Mr. Hudec reviewed the Lockton/Cred Statements with regard to insurance. He never imagined Cred would not tell the truth

on its website about insurance. He remembers the Lockton name and Lockton logo. He believed that if the Lockton name was used in such a prominent manner, the statement was true.

99. **Koji Kanie** read information about Cred's insurance on Cred's website and a Medium.com article that Cred directed him to about insurance. Mr. Kanie read the "Going Above and Beyond" statements and relied on it. When he participated in CredEarn's yield-earning program, he thought his crypto loan was insured. Mr. Koji would not have participated in CredEarn but for the statements about Cred's insurance that were posted on Medium. Mr. Kanie also received The Insurance Email.

100. **Kyle Wang** participated in CredEarn initially and increased his crypto loans in reliance of Cred's insurance representations in the Lockton/Cred Statements, on Cred's website and the Medium article. Mr. Wang read the "Going Above and Beyond" statements and relied on it. Mr. Wang was familiar with other yield-earning programs and noticed that Cred distinguished itself based on its promised insurance coverage. Mr. Wang was impressed that Lockton, with its industry leading reputation, was working with Cred to provide the promised insurance. Mr. Wang also spoke by phone with Perez and also received The Insurance Email.

101. **Olatunde Lapido** relied on representations about Cred's insurance before entering into the CredEarn program. They were a major factor in his decision. He did extensive diligence before he participated. He remembers reading a Business Wire article and likely read any Medium article. He wanted to exit the CredEarn program in the summer of 2020 and get his crypto/money back because he was starting to get worried. Schatt assured him his crypto loan was solid and that it was insured.

102. **Patrick Archambeau** participated in CredEarn and rolled over his loans after he read Cred's insurance representations in the Lockton/Cred Statements from Cred's website. He was familiar with other yield-earning programs and noticed that few, if any, lending programs touted insurance like Cred did. He understood that Cred distinguished itself based on its insurance. Mr. Archambeau relied on the comprehensive insurance that would make customers whole, in addition to Cred's statements that if it did not provide the services or deliver the results Cred promised, customers were insured. Mr. Archambeau would not have participated in Cred if it did not have extensive insurance. Mr. Archambeau received the Insurance Email.

103.  **Robin Houck** participated in CredEarn after the Lockton/Cred Statements were posted on Cred's website. He participated in the CredEarn program because he thought he could not lose his crypto or its value because it was insured. He reviewed the website and the Lockton/Cred Statements and learned that Cred had comprehensive insurance. Mr. Houck also spoke to Zhang at Cred about the CredEarn program. Mr. Houck obtained an assurance from Dan Schatt that Zhang had the authority to make representations about Cred and the CredEarn program. Zhang assured Mr. Houck that his crypto loan was insured.

104.  In an email of August 25, 2020, Mr. Houck asked, "how would my coins be stored and secured?" In response, Zhang provided a link to the portion of the Cred website (https://mycred.io/blog/crypto-insurance/) that, as discussed *supra*, displayed a Lockton logo and contained materially false information concerning insurance coverage. Zhang further touted that: "[i]n addition to custodial insurance, Cred has one of the most comprehensive insurance policies available on the market, including Cyber hacking, E&O and regulatory coverage through Lockton one of the world's largest privately owned independently insurance brokage firms."

105.  In response, Mr. Houck asked: "[s]pecifically, will my deposit be insured against data breach/theft if this were somehow to occur at Cred?" Zhang responded: "Yes, we have a comprehensive insurance policy that spans over E&O, regulatory changes, and cybersecurity underwritten by Lockton." Zhang embedded in the phrase "comprehensive insurance policy" a hyperlink to the webpage that contained false information about insurance coverage and the Lockton logo. Mr. Houck would not have participated in CredEarn without the assurance about insurance protection. He relied on the representations on the Cred website made by Lockton/Cred, and the reassurances he received that the insurance would protect him from losses.

106.  **Teppei Miyauchi** participated in CredEarn based on its representations of extensive insurance coverage. Mr. Miyauchi reviewed the Lockton/Cred Statements, information on Cred's website concerning insurance coverage, and the Medium article. Mr. Miyauchi also communicated with Michael Zhang, who promised Mr. Wu that there would be comprehensive insurance coverage. Mr. Miyauchi therefore believed that any losses would be covered by insurance. Mr. Miyauchi would not have participated in Cred if it did not have the promised extensive insurance coverage.

107.    Lockton and Cred knew that all these representations made directly to CredEarn customers were false.

108.    At first, Cred's General Counsel recklessly failed to object to the false Lockton/Cred Statements. But as Cred later encountered difficulties, he became increasingly nervous about the blatantly fraudulent representations, likely fearing his own culpability when Cred eventually collapsed.

109.    Wheeler became General Counsel to Cred in August 2019, a few months after the Lockton/Cred Statements were first published. In October 2019, Wheeler reviewed the statements and suggested one minor comment: but his minor change was too cute by half. He suggested that Cred change the statements that the insurance was *the* best to "one of the best" policies a company could obtain. Even as modified, it was still false because Lockton was clearly not did not have "one of the best" insurance coverage that could be purchased. Wheeler had no problem with the other blatant false statements. But after Cred attracted hundreds of million in loans based on the false representations, Wheeler became increasingly nervous.

110.    On May 15, 2020, Wheeler advised Zhang in an email that the insurance representations that Cred had been making for about a year were false. Wheeler explained:

> We need to delete the entire bullet point about "insured custody of users crypto" because no insurance exists. We also need to delete the bullet point about "Cred has one of the most comprehensive insurances" because it could mislead someone into thinking that their crypto is insured when it is not.

111.    Wheeler explained the situation by email to Gardler, Director of Marketing, that same day:

> I am uncomfortable with continued references to Cred's insurance in our website or any of our marketing materials as our insurance has proven to be of no value to us and in no way insures our user's crypto against loss. I am inviting discussion on this point before we make a final decision, but I am strongly inclined to remove any and all references to Cred's insurance coverage.

112.    But Cred did not want to stop making false statements about its insurance. After some discussions that included Gardler and Schatt, the misrepresentations remained and continued to be publicized.

113.    By October 27, 2020, when Cred's bankruptcy filing was imminent, Wheeler made another lame and belated attempt to cover himself. He emailed, "Need to delete reference to insurance. There is no insurance that *protects client assets*." This was far too late: Cred had raised hundreds of millions of dollars from CredEarn customers who were never protected for their losses by Cred's far-from-comprehensive insurance policies.

### G. Cred Collapsed as a Result of Its D&Os' Reckless, Fraudulent, and Self-Interested Conduct: Over $165 Million in Customer Claims Remained Unpaid

114.    A large part of Cred's losses resulted from Cred lending money to moKredit, a Chinese company related to Hua. Cred turned the crypto it borrowed from CredEarn customers into fiat currency and lent it to moKredit, which made microloans. moKredit borrowed the money from Cred at an extremely high interest rate. But even these rates did not account for the risk because moKredit's business activities were unacceptably risky and possibly illegitimate.[29] Yet Cred made over $80 million in loans to moKredit in 2019.

115.    moKredit never fully paid Cred for money it borrowed. After Cred filed for bankruptcy, though communications with Hua continued, Cred could not obtain any meaningful information from moKredit, such as loan tapes or other records. When a Cred representative tried to visit moKredit's headquarters, it was inaccessible. Because moKredit was a Chinese entity, Cred could not exercise remedies.[30]

116.    In 2020, Cred also used CredEarn funds for other "investments." Cred assigned Alexander—unbeknownst to Cred, he was a convicted felon and a fugitive—the job of selecting investments for Cred. Alexander introduced Cred executives to a fraudulent investment vehicle called "QuantCoin." Through a fraudulent administrator contact, Cred transferred 800 Bitcoin ("**BTC**") to a wallet number allegedly owned by QuantCoin. When Cred asked to be repaid its investment, no repayment was made. Cred could not recover any value for this investment.

---

[29] moKredit extended microloans to gamers. However, it was clear when Cred started lending to moKredit that the Chinese gaming industry was facing severe governmental restrictions and highly uncertain prospects. In August 2018, the Chinese Ministry of Education, in response to a direct public order from the country's paramount leader, announced plans to curb video-gaming activity by the country's children. The government enacted the next year strict limits on play time and how much money could be spent in game by Chinese children.

[30] Any remedies were unlikely to be capable of enforcement and would, at a minimum, be difficult and costly to attempt.

117.    Alexander also misappropriated assets in April 2020, when he improperly transferred approximately 225 BTC and 200 USDC to a crypto wallet. Alexander subsequently took control of the funds himself. Cred recovered only a portion of these assets.

118.    The Examiner found that many factors contributed to Cred's losses, including its failure to (a) properly investigate asset managers; (b) maintain internal compliance policies; (c) conduct due diligence on moKredit and the moKredit loans; (d) keep reliable records and statements for its trading accounts; (e) reconcile accounts; and (f) maintain reliable books and records, among other things. As noted above, the Examiner also described Cred's misstatements about its insurance coverage.

119.    When Cred filed for Chapter 11 relief on November 7, 2020, its stated reasons for filing were: (i) material losses incurred in connection with or as a result of the alleged misconduct of its former Chief Capital Officer, James Alexander; (ii) the purported theft of certain cryptocurrency assets in connection with a failed investment with QuantCoin; and (iii) the Debtors' deployment of significant assets with moKredit and the subsequent inability or unwillingness of moKredit to return those assets to Cred pursuant to the terms of the parties' agreement.[31] The Trust, which took over the assets of the Cred estate, has insufficient funds to repay any CredEarn customers on their claims.

120.    In sum, the Trust Assignors participated in CredEarn because they thought their losses were insured. But they were not. The "comprehensive insurance" that promised to compensate customers if Cred did not perform as promised, to protect Cred in the case of the misconduct of its executive and employees, and to ensure that Cred would be paid if outside parties harmed its business provided almost no protection. The Trust Assignors did not receive their crypto back, much less interest Cred owed on it. Instead, they suffered damages caused by Lockton's false statements it devised with Cred about its insurance.

**FIRST CLAIM FOR RELIEF**
**<u>FOR FRAUDULENT MISREPRESENTATION</u>**

121.    The Trustees re-allege the allegations set forth in the above paragraphs.

122.    Lockton, a crypto insurance broker expert, worked closely with Cred in drafting and revising Lockton/Cred Statements.

---

[31] Examiner Report at 19.

123. Lockton made the following false representations to the Trust Assignors, among others, in the Lockton/Cred Statements:

- Cred is on a mission to dramatically improve that by working hard to secure the crypto lending industry's most comprehensive set of risk management, information security and insurance protections available. If the worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole.
- Let's start with crypto insurance . . . . We wholeheartedly believe we have an obligation to take a leadership role to go beyond today's status quo to obtain as many insurance and risk management protections as possible.
- As a result, we are proud of the fact that Cred has some of the most comprehensive insurance coverage spanning errors and omissions (E&O), Cyber and Regulatory claim coverage.
- Why was Cred selected by underwriters for insurance coverage? Cred was evaluated against several criteria, including: Cred's licensed and well documented business activities have helped underwriters become comfortable offering coverage. . . . Cred has had the opportunity to share best practices with its partners and grow quickly as a crypto financial platform.
- Errors and Omissions Insurance. Errors and Omission or "E&O" refers to the financial services industry's version of professional liability insurance. This insurance comes in the event a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not have the promised results. These services include the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement and the granting of business or consumer lines of credit against crypto assets.
- Cred's insurance policies cover product failure, meaning the inability of customers to access or otherwise utilize Cred's intended service.
- This comprehensive insurance coverage provided to Cred is a testament to the confidence Cred's underwriters have in Cred's ability to demonstrate to financial regulators that has sound policies and procedures and adequate supervision. Underwriters review personnel experience, independent third-party reports and conduct specific due diligence to make the policies available to Cred.

124. The Trust Assignors read the Lockton/Cred Statements as directed by Cred's website and through Medium.com. Portions of the Lockton/Cred Statements or their substantive equivalents were repeated to the Trust Assignors in emails, and telephone conversations as cited in Section F. above, Customers Relied on the False Statements. The representations in the Lockton/Cred Statements were also repeated in blogs, articles and by other means reviewed by the Trust Assignors. Lockton knew the Lockton/Cred Statements were intended to be read by CredEarn customers, including the Trust Assignors.

125. Lockton made the Lockton/Cred Statements, which falsely represented the scope of insurance coverage available to Trust Assignors in the event that their crypto loans suffered a loss.

126.     Lockton knew that the Lockton/Cred Statements were false when it was made and disseminated to the public. Alternatively, Lockton made the Lockton/Cred Statements recklessly and without regard for their truth.

127.     Lockton intended the Trust Assignors to rely upon the Lockton/Cred Statements when deciding whether to enter into CredEarn program.

128.     The Trust Assignors reasonably relied on the Lockton/Cred Statements when they decided to enter the CredEarn program.

129.     The Trust Assignors suffered damages as a proximate result of the Lockton/Cred Statements because the promised insurance coverage was not available to customers to recoup their losses when Cred was forced to file for bankruptcy protection.

130.     The Trust Assignors' reliance on the Lockton/Cred Statements was a substantial factor in causing their damages because had the insurance coverage promised in the Lockton/Cred Statements been available, it would have covered their losses when Cred went into bankruptcy.

131.     As a result of Lockton's fraud and misrepresentations against the Trust Assignors, the Trust, acting through its Trustees, seeks compensatory, general and/or special damages in an amount to be determined at trial, but in no event less than $66 million.

## SECOND CLAIM FOR RELIEF
## FOR FRAUD IN THE INDUCEMENT

132.     The Trustees re-allege the allegations set forth in the above paragraphs.

133.     Lockton, a crypto insurance broker expert, worked closely with Cred in drafting and revising Lockton/Cred Statements.

134.     Lockton made the following false representations to the Trust Assignors, among others, in the Lockton/Cred Statements:

- Cred is on a mission to dramatically improve that by working hard to secure the crypto lending industry's most comprehensive set of risk management, information security and insurance protections available. If the worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole.
- Let's start with crypto insurance . . . . We wholeheartedly believe we have an obligation to take a leadership role to go beyond today's status quo to obtain as many insurance and risk management protections as possible.

- As a result, we are proud of the fact that Cred has some of the most comprehensive insurance coverage spanning errors and omissions (E&O), Cyber and Regulatory claim coverage.
- Why was Cred selected by underwriters for insurance coverage? Cred was evaluated against several criteria, including: Cred's licensed and well documented business activities have helped underwriters become comfortable offering coverage. . . . Cred has had the opportunity to share best practices with its partners and grow quickly as a crypto financial platform.
- Errors and Omissions Insurance. Errors and Omission or "E&O" refers to the financial services industry's version of professional liability insurance. This insurance comes in the event a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not have the promised results. These services include the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement and the granting of business or consumer lines of credit against crypto assets.
- Cred's insurance policies cover product failure, meaning the inability of customers to access or otherwise utilize Cred's intended service.
- This comprehensive insurance coverage provided to Cred is a testament to the confidence Cred's underwriters have in Cred's ability to demonstrate to financial regulators that has sound policies and procedures and adequate supervision. Underwriters review personnel experience, independent third-party reports and conduct specific due diligence to make the policies available to Cred.

135. The Trust Assignors read the Lockton/Cred Statements as directed by Cred's website and through Medium.com when deciding whether to sign the contracts to enter the CredEarn program. Portions of the Lockton/Cred Statements or their substantive equivalents were repeated to the Trust Assignors in emails, and telephone conversations as cited in Section F. above, Customers Relied on the False Statements. The representations in the Lockton/Cred Statements were also repeated in blogs, articles and by other means reviewed by the Trust Assignors. Lockton knew the Lockton/Cred Statements were intended to be read by CredEarn customers, including the Trust Assignors.

136. Lockton made the Lockton/Cred Statements, which falsely represented the scope of insurance coverage available to Trust Assignors in the event that their crypto loans suffered a loss.

137. Lockton knew that the Lockton/Cred Statements were false when it was made and disseminated to the public. Alternatively, Lockton made the Lockton/Cred Statements recklessly and without regard for their truth.

138. Lockton intended the Trust Assignors to rely upon the Lockton/Cred Statements when deciding whether to enter into CredEarn program.

139. The Trust Assignors reasonably relied on the Lockton/Cred Statements when they signed the necessary documentation to enter the CredEarn program.

140.     The Trust Assignors were fraudulently induced into making the crypto loans based on the Lockton/Cred Statements.

141.     The Trust Assignors suffered damages as a proximate result of the Lockton/Cred Statements because the promised insurance coverage was not available to customers to recoup their losses when Cred was forced to file for bankruptcy protection.

142.     The Trust Assignors' reliance on the Lockton/Cred Statements was a substantial factor in causing their damages because had the insurance coverage promised in the Lockton/Cred Statements been available, it would have covered their losses when Cred went into bankruptcy.

143.     As a result of Lockton's inducing the Trust Assignors to enter into the CredEarn agreement/program, the Trust, acting through its Trustees, seeks compensatory, general and/or special damages in an amount to be determined at trial, but in no event less than $66 million.

## THIRD CLAIM FOR RELIEF
## FOR NEGLIGENT MISREPRESENTATION

144.     The Trustees re-allege the allegations set forth in the above paragraphs.

145.     Lockton, a crypto insurance broker expert, worked closely with Cred in drafting and revising Lockton/Cred Statements.

146.     Lockton made the following false representations to the Trust Assignors in the published Lockton/Cred Statements, among others:

- Cred is on a mission to dramatically improve that by working hard to secure the crypto lending industry's most comprehensive set of risk management, information security and insurance protections available. If the worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole.
- Let's start with crypto insurance . . . . We wholeheartedly believe we have an obligation to take a leadership role to go beyond today's status quo to obtain as many insurance and risk management protections as possible.
- As a result, we are proud of the fact that Cred has some of the most comprehensive insurance coverage spanning errors and omissions (E&O), Cyber and Regulatory claim coverage.
- Why was Cred selected by underwriters for insurance coverage?  Cred was evaluated against several criteria, including:  Cred's licensed and well documented business activities have helped underwriters become comfortable offering coverage. . . . Cred has had the opportunity to share best practices with its partners and grow quickly as a crypto financial platform.
- Errors and Omissions Insurance. Errors and Omission or "E&O" refers to the financial services industry's version of professional liability insurance. This insurance comes in the event a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not

have the promised results. These services include the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement and the granting of business or consumer lines of credit against crypto assets.

- Cred's insurance policies cover product failure, meaning the inability of customers to access or otherwise utilize Cred's intended service.
- This comprehensive insurance coverage provided to Cred is a testament to the confidence Cred's underwriters have in Cred's ability to demonstrate to financial regulators that has sound policies and procedures and adequate supervision. Underwriters review personnel experience, independent third-party reports and conduct specific due diligence to make the policies available to Cred.

147. The Trust Assignors read the Lockton/Cred Statements as directed by Cred's website and through Medium.com. Portions of the Lockton/Cred Statements or their substantive equivalent were repeated to the Trust Assignors in emails, and telephone conversations as cited in Section F. above, Customers Relied on the False Statements. The representations in the Lockton/Cred Statements were also repeated in blogs, articles and by other means reviewed by the Trust Assignors.

148. Lockton made the Lockton/Cred Statements which falsely represented the scope of insurance coverage available to CredEarn customers in the event that their loan crypto loans suffered a loss.

149. Lockton had no reasonable grounds to believe that the Lockton/Cred Statements were true when they were made and disseminated to the public.

150. Lockton intended the Trust Assignors to rely upon the Lockton/Cred Statements when deciding whether to enter into CredEarn program.

151. The Trust Assignors reasonably relied on the Lockton/Cred Statements when they decided to enter the CredEarn program.

152. The Trust Assignors suffered damages as a proximate result of the Lockton/Cred Statements because the promised insurance coverage was not available to customers to recoup their losses when Cred was forced to file for bankruptcy protection.

153. The Trust Assignors' reliance on the Lockton/Cred Statements was a substantial factor in causing their damages because had the insurance coverage promised in the Lockton/Cred Statements been available, it would have covered their losses when Cred went into bankruptcy.

154. As a result of Lockton's misrepresentation against the Trust Assignors, the Trust seeks compensatory, general and/or special damages in an amount to be determined at trial, but in no event less than $66 million.

## FOURTH CLAIM FOR RELIEF
## FOR INTENTIONAL CONCEALMENT

155. The Trustees re-allege the allegations set forth in the above paragraphs.

156. Lockton, a crypto insurance broker expert, worked closely with Cred in drafting and revising Lockton/Cred Statements.

157. Lockton omitted material facts from the Lockton/Cred Statements:

- Lockton/Cred concealed the fact that Cred had far from the most comprehensive set of risk management, information security and insurance protections available. Cred hid the fact that its asset safeguards were severely deficient.
- Lockton/Cred concealed the fact that CredEarn customers, including the Trust Assignors, could not be made whole through the insurance protection or any other protections of Cred.
- Lockton/Cred concealed the fact that Cred did not have as many insurance and risk management protections as possible. Its insurance was minimal, and Cred had no crime insurance (like Gemini and Coinbase), and the other insurance it acquired was full of gaps in insurance due to exclusions.
- Lockton/Cred concealed glaring exceptions to errors and omissions (E&O), Directors and Officers (D&O), Cyber and Regulatory claim coverage together with the minimal coverage amounts, and that Cred's insurance coverage was not comprehensive since it only insured a tiny fraction of losses.
- Lockton/Cred concealed the fact that one carrier had rejected Cred for its poor practices, and Cred had avoided the crime insurance process which rigorously scrutinized internal procedures.
- Lockton/Cred concealed the fact that CredEarn customers' losses, including those of the Trust Assignors, were not covered by E&O insurance even though they resulted from Cred's failure to provide results from the borrowing of crypto.
- Lockton/Cred concealed the fact that CredEarn customers losses, including those of the Trust Assignors, were not insured even if Cred did not return their crypto-a service Cred was intended to provide.
- Lockton/Cred concealed the fact that Cred's D&O insurance did not cover crypto and losses relating to actions of D&Os in which they personally benefitted.

158. Lockton concealed the fact that Cred's insurance was far from comprehensive insurance and was not a testament to its sounds business practices, policies and procedures. Lockton concealed the fact that Creds and its customers' losses would not be insured by the policies that Cred in reality had.

159.     The Trust Assignors did not know about the facts that Lockton concealed. The Trust Assignors read the Lockton/Cred Statements as directed by Cred's website and through Medium.com which omitted critical information. Portions of the Lockton/Cred Statements or their substantive equivalent were repeated to the Trust Assignors in emails, and telephone conversations as cited in Section F. above, Customers Relied on the False Statements. The information conveyed likewise omitted critical information.

160.     Lockton intended to defraud the Trust Assignors through its omissions.

161.     These omissions by Lockton are material because the Trust Assignors would not have transacted with Cred through the CredEarn program had they known the true nature and extent of Cred's insurance coverage.

162.     Lockton facilitated Cred's marketing and selling of the CredEarn program through its participation in the drafting and dissemination of the Lockton/Cred Statements to the Trust Assignors, even though Lockton knew the true nature of Cred's insurance coverage.

163.     Lockton intended that customers such as the Trust Assignors would rely on Lockton/Cred Statements regarding the safety of their crypto loans to Cred through CredEarn.

164.     The Trust Assignors reasonably relied on the material omissions in the Lockton/Cred Statements when they decided to enter the CredEarn program.

165.     Lockton had an affirmative duty to disclose the true nature of Cred's insurance coverage to the CredEarn customers such as the Trust Assignors, because (i) Lockton had a legal duty to correct false statements in the Lockton/Cred Statements that Lockton helped publish under Lockton's logo, and (ii) as one of the world's leading insurance brokers who worked with Cred in purchasing insurance coverage for Cred, in a superior position to know the true nature of Cred's insurance coverage and it was foreseeable that the Trust Assignors would rely on the Lockton/Cred Statements.

166.     Lockton fraudulently concealed the nature of Cred's insurance coverage, prompting the Trust Assignors to participate in CredEarn and causing damages to Trust Assignors.

167.     The Trust Assignors' reliance on the Lockton/Cred Statements was a substantial factor in causing their damages because had the insurance coverage promised in the Lockton/Cred Statements been available, it would have covered their losses when Cred went into bankruptcy.

168.     As a result of Lockton's knowing participation in Cred's fraud, Trust Assignors have suffered damages in an amount to be determined at trial, but in no event less than $66 million.

## FIFTH CLAIM FOR RELIEF
## FOR AIDING AND ABETTING FRAUDULENT MISREPRESENTATION

169.     The Trustees re-allege the allegations set forth in the above paragraphs.

170.     Lockton, a crypto insurance broker expert, worked closely with Cred in drafting and revising Lockton/Cred Statements.

171.     Cred made the following false representations to the Trust Assignors, among others in the Lockton/Cred Statements:

- Cred is on a mission to dramatically improve that by working hard to secure the crypto lending industry's most comprehensive set of risk management, information security and insurance protections available. If the worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole.
- Let's start with crypto insurance . . . . We wholeheartedly believe we have an obligation to take a leadership role to go beyond today's status quo to obtain as many insurance and risk management protections as possible.
- As a result, we are proud of the fact that Cred has some of the most comprehensive insurance coverage spanning errors and omissions (E&O), Cyber and Regulatory claim coverage.
- Why was Cred selected by underwriters for insurance coverage? Cred was evaluated against several criteria, including: Cred's licensed and well documented business activities have helped underwriters become comfortable offering coverage. . . . Cred has had the opportunity to share best practices with its partners and grow quickly as a crypto financial platform.
- Errors and Omissions Insurance. Errors and Omission or "E&O" refers to the financial services industry's version of professional liability insurance. This insurance comes in the event a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not have the promised results. These services include the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement and the granting of business or consumer lines of credit against crypto assets.
- Cred's insurance policies cover product failure, meaning the inability of customers to access or otherwise utilize Cred's intended service.
- This comprehensive insurance coverage provided to Cred is a testament to the confidence Cred's underwriters have in Cred's ability to demonstrate to financial regulators that has sound policies and procedures and adequate supervision. Underwriters review personnel experience, independent third-party reports and conduct specific due diligence to make the policies available to Cred.

172.     The Trust Assignors read the Lockton/Cred Statements as directed by Cred's website and through Medium.com, which bore the Lockton name and logo. Portions of the Lockton/Cred

Statements or their substantive equivalent were repeated to the Trust Assignors in emails, and telephone conversations as cited in Section F. above, Customers Relied on the False Statements. The representations in the Lockton/Cred Statements were also repeated in blogs, articles and by other means reviewed by the Trust Assignors. Cred knew the Lockton/Cred Statements were intended to be read by CredEarn customers, including the Trust Assignors.

173.    Cred made the Lockton/Cred Statements, which falsely represented the scope of insurance coverage available to Trust Assignors in the event that their crypto loans suffered a loss.

174.    Cred knew that the Lockton/Cred Statement was false when it was made and disseminated to the public. Alternatively, Cred made the Lockton/Cred Statement recklessly and without regard for their truth.

175.    Lockton knew that Cred made the false Lockton/Cred Statements were false when it was made and disseminated to the public.

176.    Cred intended the Trust Assignors to rely upon the Lockton/Cred Statements when deciding whether to enter into CredEarn program.

177.    Lockton intended the Trust Assignors to rely upon the Lockton/Cred Statements when deciding whether to enter into CredEarn program.

178.    Cred knew the Lockton/Cred Statements would be and was in fact used to convince the Trust Assignors to participate in CredEarn.

179.    Lockton knew the Lockton/Cred Statements would be and was in fact used to convince the Trust Assignors to participate in CredEarn.

180.    The Trust Assignors reasonably relied on the Lockton/Cred Statements when they decided to enter the CredEarn program.

181.    The Trust Assignors suffered damages as a proximate result of the Lockton/Cred Statements because the promised insurance coverage was not available to customers to recoup their losses when Cred was forced to file for bankruptcy protection.

182.    Lockton substantially assisted and/or encouraged Cred's fraud by drafting the Lockton/Cred Statements and by permitting the prestige of its name as a leader in the insurance industry to be associated with the Lockton/Cred Statements.

183.    The Trust Assignors' reliance on the Lockton/Cred Statements was a substantial factor in causing their damages because had the insurance coverage promised in the Lockton/Cred Statements been available, it would have covered their losses when Cred went into bankruptcy.

184.    As a result of Lockton's knowing participation in Cred's fraud, the Trust Assignors suffered damages in an amount to be determined at trial, but in no event less than $66 million.

**SIXTH CLAIM FOR RELIEF**
**FOR AIDING AND ABETTING NEGLIGENT MISREPRESENTATION**

185.    The Trustees re-allege the allegations set forth in the above paragraphs.

186.    Lockton, a crypto insurance broker expert, worked closely with Cred in drafting and revising Lockton/Cred Statements.

187.    Cred made the following false representations to the Trust Assignors, among others in the Lockton/Cred Statements:

- Cred is on a mission to dramatically improve that by working hard to secure the crypto lending industry's most comprehensive set of risk management, information security and insurance protections available. If the worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole.
- Let's start with crypto insurance . . . . We wholeheartedly believe we have an obligation to take a leadership role to go beyond today's status quo to obtain as many insurance and risk management protections as possible.
- As a result, we are proud of the fact that Cred has some of the most comprehensive insurance coverage spanning errors and omissions (E&O), Cyber and Regulatory claim coverage.
- Why was Cred selected by underwriters for insurance coverage?  Cred was evaluated against several criteria, including:  Cred's licensed and well documented business activities have helped underwriters become comfortable offering coverage. . . . Cred has had the opportunity to share best practices with its partners and grow quickly as a crypto financial platform.
- Errors and Omissions Insurance. Errors and Omission or "E&O" refers to the financial services industry's version of professional liability insurance. This insurance comes in the event a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not have the promised results. These services include the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement and the granting of business or consumer lines of credit against crypto assets.
- Cred's insurance policies cover product failure, meaning the inability of customers to access or otherwise utilize Cred's intended service.

- This comprehensive insurance coverage provided to Cred is a testament to the confidence Cred's underwriters have in Cred's ability to demonstrate to financial regulators that has sound policies and procedures and adequate supervision. Underwriters review personnel experience, independent third-party reports and conduct specific due diligence to make the policies available to Cred.

188. The Trust Assignors read the Lockton/Cred Statements as directed by Cred's website and through Medium.com, which bore the Lockton name and logo. Portions of the Lockton/Cred Statements or their substantive equivalent were repeated to the Trust Assignors in emails, and telephone conversations as cited in Section F. above, Customers Relied on the False Statements. The representations in the Lockton/Cred Statements were also repeated in blogs, articles and by other means reviewed by the Trust Assignors. Cred knew the Lockton/Cred Statements were intended to be read by CredEarn customers, including the Trust Assignors.

189. Cred made the Lockton/Cred Statements, which falsely represented the scope of insurance coverage available to Trust Assignors if their crypto loans suffered a loss.

190. Cred had no reasonable grounds to believe that the Lockton/Cred Statement was true when it was made and disseminated to the public.

191. Cred intended the Trust Assignors to rely upon the Lockton/Cred Statements when deciding whether to enter into CredEarn program.

192. Lockton intended the Trust Assignors to rely upon the Lockton/Cred Statements when deciding whether to enter into CredEarn program.

193. Cred knew the Lockton/Cred Statements would be and was in fact used to convince the Trust Assignors to participate in CredEarn.

194. Lockton knew the Lockton/Cred Statements would be and was in fact used to convince the Trust Assignors to participate in CredEarn.

195. The Trust Assignors reasonably relied on the Lockton/Cred Statements when they decided to enter the CredEarn program.

196. The Trust Assignors suffered damages as a proximate result of the Lockton/Cred Statements because the promised insurance coverage was not available to customers to recoup their losses when Cred was forced to file for bankruptcy protection.

197. Lockton substantially assisted and/or encouraged Cred's misrepresentation by drafting the Lockton/Cred Statements and by permitting the prestige of its name as a leader in the insurance industry to be associated with the Lockton/Cred Statements.

198. The Trust Assignors' reliance on the Lockton/Cred Statements was a substantial factor in causing their damages because had the insurance coverage promised in the Lockton/Cred Statements been available, it would have covered their losses when Cred went into bankruptcy.

199. As a result of Lockton's knowing participation in Cred's misrepresentation, the Trust Assignors suffered damages in an amount to be determined at trial, but in no event less than $66 million.

**SEVENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION**
**LAW, CAL. BUS. AND PROFESSIONS CODE, § 17200 ET. SEQ**

200. The Trustees re-allege the allegations set forth in the above paragraphs.

201. California's Unfair Competition Law ("UCL") prohibits and creates a right of action arising from any unlawful, unfair, or deceptive business practice. Cred's creation and dissemination of the Lockton/Cred Statements, as alleged herein, in connection with the sale and marketing of the CredEarn program, with a false and/or deceptive representation concerning the scope of insurance coverage available to Cred customers, amounts to an unlawful business practice and, hence, violated the UCL. In the alternative, it amounts to a deceptive business practice and hence violated the UCL. As a second alternative, it amounts to an unfair practice and thus violated the UCL.

202. Moreover, because of Cred's unlawful, fraudulently deceptive, and unfair business practices, CredEarn customers, including the Trust Assignors, conveyed money and benefits to Cred.

203. Lockton knew that Cred's conduct violated the UCL.

204. Lockton substantially assisted and/or encouraged Cred's unlawful and deceptive business practice by writing the Lockton/Cred Statements and by permitting the prestige of its name as a leader in the insurance industry to be associated with the Lockton/Cred Statements. The Trustees are entitled to and do seek an order of restitution compelling Lockton to turn over to the Trust Assignors the amount of the crypto transferred to Cred or its value of no less than $66 million.

# **DEMAND FOR A JURY TRIAL**

205. The Trustees hereby demand a jury trial as to all claims so triable.

# **PRAYER FOR RELIEF**

WHEREFORE, the Trustees request judgment against Lockton as follows:

(i) Awarding monetary damages in the amount of crypto the Trust Assignors were induced to loan based on false statements or omissions proven at trial;

(ii) Awarding pre-judgment interest in accordance with the Trust Assignors' CredEarn agreement or at the maximum rate allowable by law and/or equity;

(iii) Awarding statutory, exemplary, treble, and/or punitive damages and/or penalties to the extent permissible by applicable law; and

(iv) Awarding reasonable attorney's fees and costs to the extent permissible by applicable law.

Dated: January 9, 2023            **GLUCK DANIEL ATKINSON LLP**

By: _Craig C. Daniel_
Craig C. Daniel (State Bar No. 212588)
GLUCK DANIEL ATKINSON LLP
201 Mission Street, Ste. 1330
San Francisco, CA 94105
Telephone: (415) 510-2114
Facsimile: (415) 510-2208
Email: cdaniel@gluckdaniel.com

and

Angela J. Somers
Jeffrey Gross
Minyao Wang
REID COLLINS & TSAI LLP
330 West 58th Street, Suite 403
New York, NY 10019
(212) 344-5200
asomers@reidcollins.com
jgross@reidcollins.com
mwang@reidcollins.com

*Special Litigation Counsel to Trustees of
the Cred Inc Liquidation Trust*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **VERIFICATION**

I have read the forgoing complaint and know its contents.

I am a party to this action (solely in my capacity as a trustee of the Cred Liquidation Trust). The matters stated in the complaint are true to the best of my knowledge except as to those matters which are stated upon information and belief, and to those matters I believe them to be true.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

_____
Cedric de Lisser

Executed on January __9___, 2023, at _____ Pattaya, Thailand

# EXHIBIT 1

**Going Above and Beyond**
Dan Schatt, Co-Founder and President of
Cred

At Cred, we love to geek out on the dry stuff -- security, compliance, risk management, regulatory matters. We also care immensely about the company we keep -- the partners and vendors we work with to keep our customers safe. Our customers, employees, friends and family members trust their digital assets with Cred and everyone who works for Cred feels an enormous sense of accountability and responsibility to ensure customer assets are well protected during the entire lending and borrowing lifecycle. Many of us worked together at PayPal and felt the same enormous sense of responsibility tomensure we built a product that our own families would use.

Crypto is still the wild west when it comes to many of the fundamental safeguards most of us have come to expect when it comes to safeguarding your assets. Cred is on a mission to change that by working to provide the industry's most comprehensive set of risk management, information security and insurance protections available. If the worst happens mand Cred loses customer funds, customers deserve certainty that they will be made whole.

Let's start with crypto insurance. Cred works with custodial partners that extend insurance to client assets, but we believe it is not enough to simply leverage the insurance of custodial partners. We are serious about protecting client assets and wholeheartedly believe we have an obligation to take a leadership role to go beyond today's status quo to obtain as many insurance and risk management protections as possible for our crypto community. We hope this will spur more crypto lenders and borrowers to dedicate the time and resources to do the same.

Cred's search for comprehensive insurance started with a review of the very best insurance brokers that have significant experience with Crypto and financial services underwriting. How does one choose the very best crypto insurance? It starts with the very best insurance broker. Cred narrowed its selection criteria to the top 10 insurance brokers in the world, and chose Lockton, the world's largest privately owned, independent insurance brokerage firm in the world with 52,000 clients and ranked #1 in Client satisfaction for commercial insurance by J.D. Power.

We selected Lockton in part due to their competency in crypto, cybercrime and financial services. Through Lockton, Cred narrowed its selection to 'A' rated insurance companies, known for strong financial reserves, claims payment history, business focus, and company structure. We reviewed ratings from AM Best, a global credit rating agency with a unique focus on the insurance industry. Best's Ratings, which are issued through A.M. Best Rating Services, Inc., are a recognized indicator of insurer financial strength and creditworthiness. Cred ultimately selected one of the largest underwriters in the world, with over 100 years of experience and active in about

half the countries around the globe, and received a minimum coverage of two million dollars. As a result, we are proud of the fact that Cred has some of the most comprehensive insurance policies of any crypto financial services platform, spanning errors and omissions (E&O), Directors and Officers (D&O), Cyber and Regulatory claim coverage -- even Cred's LBA token has coverage.

First, it's important to know that insurance is a two-way street. It's just as difficult to be selected for coverage, as it is to select an underwriter. Why was Cred selected by underwriters for insurance coverage?  Cred was evaluated against several criteria, including:

- **Financial Condition**. Underwriters typically require a company's audited financial statements in order to determine its financial health. Cred has secured hundreds of millions of dollars of lending capital, and is supported by the largest crypto exchanges in the world. Underwriters also evaluated Cred's strong financial statements, resulting from making its product and utility tokens available to thousands of customers across over a hundred countries.

- **Business activities.**  Insurance underwriters have historically viewed crypto financial services as a nascentand highly risky industry full of bad actors. Cred's licensed and well documented business activities have helped underwriters become comfortable offering coverage. Cred activities include association with a list of highly reputable strategic partners that range from traditional fortune 500 companies to leading digital money platforms and stablecoin providers. As a founding member of an Alliance of top tier blockchain companies including Brave, Bittrex, Blockchain at Berkeley, CertiK, Cred has had the the opportunity to share best practices with its partners and grow quickly as a crypto financial platform. Cred's business practices have also received high praise from Uphold and Cred is now working with the California Assembly to support the introduction of new blockchain legislation.

- **Quality of management and industry experience**. Insurers care immensely about the qualifications and professional experience of a company's executive team. Cred's team has been reviewed by underwriters, regulators, auditors and partners and we believe our executive team stands out for its depth of experience in blockchain, financial technology, lending and capital markets.  Cred's executives come from PayPal, Blockchain at Berkeley, Goldman Sachs, Prosper, Tradeshift and several companies known for having a high bar for talent and deep experience handling customer funds. Cred has been cited for its management expertise by Binance Labs, Tron, Bitcoin.com to name a few.

- **Regulatory and Compliance history**. Underwriters look for evidence of good compliance policy, as do regulators, and as a California based company, Cred is a licensed lender, operating in a majority of US states. Cred has never run afoul of any regulatory requirement and frequently engages with regulators proactively.

## Cyber Insurance

One of Cred's priority areas of insurance has been cyber insurance, since security and protection of client funds is and will remain priority #1. Cred's cyber policy insures against theft of digital currency that results from a security breach or hack, employee theft, or fraudulent transfer. Cred's comprehensive cyber policy coverage areas include breach of its network security, various network controls, cyber extortion, data recovery costs, ransomware, foresensics, reputational harm, and business interruption resulting from security breaches or system failures. In addition, Cred's coverage extends to denial of service attacks which prevent authorized third parties from accessing its website, unauthorized access or unauthorized use of Cred's Network systems. This also covers fraud resulting from security breaches resulting from social engineering fraud. Every coverage area is important and we believe it is particularly critical to focus on cultural awareness training related to privacy, data security and social engineering. In fact,believe this so much, we've financially supported our employees to pursue advanced degrees at prominent institutions offering cyber security degrees.

## Regulatory Insurance

Cred also has coverage associated with liability to third parties for privacy breaches and computer system security breaches. System security liability coverage is important as it supports Cred's ability address cyber attacks on Cred's computer system or the computer system of a third party operated on behalf of Cred. Cred also has coverage associated with the costs to investigate and respond to such breach events. These include things like forensic investigation costs and costs to notify affected individuals. Cred also devotes significant time and resources to support user advocacy with proactive notifications.

Cred's underwriters also extended coverage to cover the costs of data privacy notification which also includes coverage of PCI fines, expenses and costs and claims brought by any regulatory or administrative agency or bureau or any other quasi governmental or self regulatory entity. Cred's partners take comfort in these policies, knowing that those claims are generally brought by individuals and companies whose information has been compromised, by regulators and sometimes law enforcement entities.

## Errors and Omissions Insurance

Errors and Omission or "E&O" refers to the financial services industry's version of professional liability insurance. This insurance comes in the event a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not have the promised results. These services include the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement and the granting of business or consumer lines of credit against crypto assets.

Cred's insurance policies cover product failure, meaning the inability of customers to access or otherwise utilize Cred's intended service. The coverage also extends to the LBA token, fiat currencies, viruses or any malicious code, script, worm, Trojan horse or similar software intentionally designed to enter or insert itself into a computer memory or storage media and spread itself from one computer to another. The policy also extends to any wrongful act or product failure in the rendering of Cred's professional services.

This comprehensive insurance coverage provided to Cred is a testament to the confidence Cred's underwriters have in Cred's ability to demonstrate to financial regulators that it can demonstrate sound policies and procedures and adequate supervision. Underwriters review personnel experience, independent third party reports and conduct specific due diligence to determine if they will make these policies available to companies such as Cred.

**Directors and Officers Insurance**

D&O Insurance came about in the 1930's following the Wall Street crash of 1929 and the introduction of US securities laws in 1933 and 1934. The purpose of this insurance is to cover claims that may arise from actual or alleged "wrongful acts" when acting in the scope of their managerial duties. Cred's D&O Insurance coverage is a testament to the level of comfort that its underwriters have with the appropriate actions that the management takes in the course of executing Cred's business.

**Cred avoids risky lending segments**

Cred lends on a fully collateralized and guaranteed basis and Cred does not lend to short sellers. Lenders supplying crypto to shorts are undercollateralized and always have credit exposure to potentially volatile investment managers. All companies receiving loans from Cred have strong, well-established track records and proven cash flows. All crypto participation in Cred is fully hedged.

**Protection Does Not Stop Here**

Cred's interest in protecting its customers extends to how its encrypts its data, the compliance and security vendors we choose to work with and how we architect our systems. If you have any questions about Cred and its commitment to security, compliance and insurance, please do not hesitate to connect with Cred at info@mycred.io or support@mycred.io and we will be happy to discuss Cred.

Thank you for your trust in Cred. We intend to earn your trust everyday.

# EXHIBIT 2



# Going Above and Beyond

Crol helps with your comprehension for management and insurance of your crypto lending platform



**Crol goes above and beyond with insurance coverage**

By: Roe Eclair, Co-Founder and President of Crol

## Let's start with crypto insurance.

## How did Crol secure asset insurance?

- **Financial Condition:** ...
- **Business activities:** ...
- **Quality of management and industry experience:** ...
- **Regulatory and Compliance History:** ...

## Cyber Insurance

## Regulatory Insurance

## Errors and Omissions Insurance

## Crol avoids risky lending segments

## Protection flows that Stop Here

## About Crol

---

More from Crol

### Crol Raises Interest Rate on Dollar and Euro to Highest in the Industry

### Bitcoin.com Partners with Crol

### Crol Adds Support for British Pound

### March 2018 Monthly Report

### Crol Partners With TrustZE to Offer Interest on Stablecoin

# EXHIBIT 3

# Crypto Insurance: Going Above and Beyond

October 16, 2019



At Cred, we love to geek out on the dry stuff security, compliance, risk management, legal, and regulatory matters. We also care immensely about the company we keep the partners and vendors we work with to keep our customers safe. Many of us worked together at PayPal and felt the same responsibility to ensure we built a product that our own families would use.

Crypto is still in many ways the wild west when it comes to the fundamental safeguards most of us have come to expect when ensuring the protection of financial assets. Cred is on a mission to dramatically improve that by working hard to secure a comprehensive set of risk management, information security and insurance protections available. If the worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole.

## Let's start with crypto insurance.

Cred works with custodial partners that extend insurance, but we believe it is not enough to simply leverage the insurance of custodial partners. We wholeheartedly believe we have an obligation to take a leadership role to go beyond today's status quo to obtain as many insurance and risk management protections as possible. We hope this will spur more crypto lenders and borrowers to dedicate the time and resources to do the same.

Cred's search for comprehensive insurance started with a review of the reputable insurance brokers that have significant experience with crypto and financial services underwriting. How does one choose crypto-insurance? It starts with the insurance broker. Cred narrowed its selection criteria to the top 10 insurance brokers in the world, and chose Lockton, the world's largest privately-owned, independent insurance brokerage firm in the world with 52,000 clients and ranked #1 in Client satisfaction for commercial insurance by J.D. Power.

We selected Lockton in part due to their competency in <u>crypto, cybercrime and financial services.</u> Through Lockton, Cred narrowed its selection to '<u>A' rated insurance companies</u>, known for strong financial reserves, claims payment history, business focus, and company structure. We reviewed ratings from AM Best, a global credit rating agency with a unique focus on the insurance industry. Best's Ratings, which are issued through A.M. Best Rating Services, Inc., are a recognized indicator of insurer financial strength and creditworthiness. Cred ultimately selected one of the largest underwriters in the world, with over 100 years of experience and active in about half the countries around the globe. As a result, we are proud of the fact that Cred has comprehensive insurance coverage, spanning errors and omissions (E&O), Cyber and Regulatory claim coverage.

## How did Cred secure asset insurance?

First, it's important to know that it's just as difficult to be selected for coverage as it is to select an insurance underwriter. Why was Cred selected by underwriters for insurance coverage?

Cred was evaluated against several criteria, including:

- **Business activities.** Insurance underwriters have historically viewed crypto financial services as a nascent and highly risky industry full of bad actors. Cred's licensed and well-documented business activities have helped underwriters become comfortable offering coverage. Cred activities include association with a list of highly reputable strategic partners that range from traditional fortune 500 companies to leading digital money platforms, crypto exchanges, and stablecoin providers. As a founding member of an Alliance of top tier blockchain companies including Brave, Bittrex, Blockchain at Berkeley, and CertiK, Cred has had the opportunity to share best practices with its partners and grow quickly as a crypto-financial platform. Cred's business practices have also received high praise from Uphold and Cred is now working with the California Assembly to support the introduction of new blockchain legislation.

- **Quality of management and industry experience.** Insurers care immensely about the qualifications and professional experience of a company's executive team. Cred's team has been reviewed by underwriters, regulators, auditors, and partners. Our executive team stands out for its depth of experience in blockchain, financial technology, lending, and capital markets. Cred's leaders come from PayPal, Blockchain at Berkeley, Goldman Sachs, Prosper, Tradeshift and several companies who are known for having a high bar for talent and deep experience handling customer funds. Cred has been cited for its management expertise by Binance Labs, Tron, Bitcoin.com to name a few.
Regulatory and Compliance history. Underwriters look for evidence of good compliance policy, as do regulators, and as a California based company, Cred is a licensed lender, operating in a majority of US states. Cred has never run afoul of any regulatory requirement and frequently engages with regulators proactively.

## Cyber Insurance

One of Cred's priority areas is cyber insurance. Security and protection of client funds will remain our top priority. Cred's comprehensive cyber policy covers network security failure, cyber extortion, data recovery costs, ransomware, forensics, reputational harm, business interruption, and system failure. We believe it is particularly critical to focus on employee training related to privacy and data security and we've financially supported our employees to pursue advanced degrees in Cybersecurity Strategy and Information Management, the same content offered to homeland security officials and private sector security specialists.

Cred's insurance coverage extends to privacy breaches and computer system security breaches. Cred also devotes significant time and resources to support user education. Cred's policy also covers privacy notifications and claims brought by any regulatory or administrative agency.

Cred's underwriters also extended coverage to cover the costs of data privacy notification which also includes coverage of PCI fines, expenses, and costs and claims brought by any regulatory or administrative agency or bureau or any other quasi-governmental or self-regulatory entity. Cred's partners take comfort in these policies, knowing that those claims are generally brought by individuals and companies whose information has been compromised, by regulators and sometimes law enforcement entities.

## Errors and Omissions Insurance

Errors and Omission or E&O refers to the financial services industry's version of professional liability insurance. This insurance comes in the event a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not have the promised results. These

services include the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement and the granting of business or consumer lines of credit against crypto assets.

Cred's insurance policies cover product failure, meaning the inability of customers to access or otherwise utilize Cred's intended service. The coverage also extends to the LBA token, fiat currencies, viruses or any malicious code, script, worm, Trojan horse or similar software intentionally designed to enter or insert itself into computer memory or storage media and spread itself from one computer to another. The policy also extends to any wrongful act or product failure in the rendering of Cred's professional services.

This comprehensive insurance coverage provided to Cred is a testament to the confidence Cred's underwriters have in Cred's ability to demonstrate to financial regulators that it has sound policies and procedures and adequate supervision. Underwriters reviewed personnel experience, independent third-party reports and conducted specific due diligence to make the policies available to Cred.

## Cred avoids risky lending segments

All companies receiving loans from Cred have strong, well-established track records and proven cash flows. Cred's lending portfolio is diversified across the US, Europe, and Asia and crypto assets are hedged to manage market volatility. Cred does not lend to short sellers. We believe this an important point since short-sellers work against the interests of Cred's Earn customers, who are holding their crypto assets with the expectation of long-term appreciation. In addition, crypto short-sellers tend to be under-collateralized and generally have significant credit exposure.

## Protection Does Not Stop Here

Cred's interest in protecting its customers extends to how it encrypts its data, the compliance and security vendors Cred chooses to work with and the architecture of our systems. If you have any questions about Cred and its commitment to security, compliance and risk management, please do not hesitate to connect with Cred at [email protected] and a member of Cred will be happy to discuss.

Thank you for your trust in Cred. We intend to earn your trust every day.

Disclaimer: CredEarn is the trade name for a service offered to non-US persons by Cred LLC, which is an entity distinct and separate from Cred (US) LLC. CredEarn allows you to extend a loan to Cred LLC. The purpose of the loan is to allow you to earn an enhanced yield on your crypto assets, such as Bitcoin. Cred LLC is not a bank and CredEarn services are not insured by the FDIC. CredBorrow and C-LOC™ are trade names for lending products of Cred (US) LLC, a licensed lender and a wholly-owned subsidiary of Cred LLC. Loans, loan

amounts, terms, and rates are not available in every jurisdiction, or for every collateral type. The availability of rates, crypto types, loan amounts, and other terms are subject to change. Loan applicants are subject to AML and KYC screening. Terms, conditions, and restrictions apply. Loans made or arranged pursuant to California Finance Lenders Law License 60DBO - 91480.