**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>CRED INC., *et al.*,<br><br>           Debtors.[1] | Chapter 11<br>Case No. 20-12836 (JTD)<br><br>**RE: D.I. 1070** |

**OBJECTION OF LOCKTON COMPANIES, LLC AND LOCKTON COMPANIES, LLC – PACIFIC SERIES D/B/A LOCKTON INSURANCE BROKERS, LLC TO MOTION OF THE TRUSTEES OF CRED INC. LIQUIDATION TRUST PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE FOR CLARIFICATION OF THE JULY 19, 2022 BENCH RULING REGARDING TRUST'S AUTHORITY TO ACQUIRE CERTAIN THIRD-PARTY CLAIMS**

Lockton Companies, LLC and Lockton Companies, LLC – Pacific Series d/b/a Lockton Insurance Brokers, LLC (collectively, "**Lockton**") hereby oppose the *Motion of the Trustees of Cred Inc. Liquidation Trust Pursuant to Section 105 of the Bankruptcy Code for Clarification of the July 19, 2022 Bench Ruling Regarding Trust's Authority to Acquire Certain Third Party Claims* ("**Motion**"). This Motion is supported by the evidence contained in the *Declaration of Terry Wit* ("**Wit Decl.**").

**INTRODUCTION**

1.      By the Motion, The Cred Inc. Liquidation Trust ("**Trust**") requests that this Court "clarify" a prior oral ruling last year where this Court ***denied*** (without prejudice) the Trust's request for authority to acquire third-party claims of Cred Inc.'s ("**Cred**") creditors ("**Third-Party Claims**"). The Motion was filed in response to the Trust suing Lockton in California state court,

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

and Lockton removing that action to federal court under 28 U.S.C. § 1334(b). The Trust is asking for this Court to interpret the Plan (as defined below) and invokes this Court's jurisdiction under 28 U.S.C. § 1334.

2.      In July of 2022, the Trust asked this Court to approve a process by which it would acquire the Third-Party Claims in exchange for providing those creditors a 10% "bump up" to the allowed amount of their claims. Several parties objected, and this Court denied that relief, without prejudice. *See* ECF 1041. Interestingly, after this Court denied the Trust's request, the Trust did not renew the motion.

3.      Despite not renewing the motion, the Trust has (allegedly) nonetheless taken assignment of the Third-Party Claims, without notice to anyone and without this Court's approval. The Trust then sued Lockton in California state court, alleging that eight creditors assigned purported Third-Party Claims to the Trust, and the Trust is now exclusively suing on such claims. The complaint identifies the names of the "assigning" creditors, and what they purportedly lost in cryptocurrency assets, but otherwise discloses nothing regarding the assignments (or whether the assigning person actually held allowed claims against Cred).

4.      At the time of last year's filing, the Trust did not serve Lockton,[2] which had no notice of the requested relief, and no opportunity to be heard. Because the state court complaint ("**Complaint**") implicates several bankruptcy matters, Lockton has removed that case to the United States District Court for the Northern District of California ("**Northern District**") based on "related to" jurisdiction. At minimum, there was (and is) a substantial question as to whether the Trust had the authority to acquire those Third-Party Claims under the Plan (defined below). It

---

[2]   As discussed below, Lockton did not hold any prepetition claims against Cred because this Court entered an order authorizing Cred to honor its agreement with Lockton.

was only then that the Trust came back to this Court, asking it to confirm that it had the authority to acquire the Third-Party Claims under the Plan.[3] In its Motion, the Trust seizes on a handful of this Court's comments at the hearing last July, and claims that it has allegedly acquired the claims of third-parties under the guise of "customer-by-customer" "preference settlements" (none of which are disclosed in the Complaint) while ignoring several other comments made by this Court that cast doubt on the Trust's authority to acquire the Third-Party Claims. The Trust submits a declaration of one of the Trust's trustees[4] but no evidence of any person who drafted the Plan. The Trust also has hidden from this Court the actual assignment agreements.

5.    The Trust's own counsel previously admitted that it is ambiguous whether the Plan (which was proposed only by Cred as debtor and debtor-in-possession) authorizes the Trust to take assignment of any Third-Party Claims. This is not surprising because the Plan does not expressly and unambiguously authorize the Trust to acquire the Third-Party Claims.[5] To the contrary, it states at section 12.3(c) that the Trust may only pursue causes of action "relating to Liquidation Trust Assets," defined as "assets of each of the Debtors." The Plan further provides that distributions to general unsecured creditors would come from those assets, contains no discussion of how the acquisition and pursuit of third-party claims would be funded, and says nothing about any impact the acquisition and pursuit of such claims would have on distributions.

---

[3] The Trust's Motion all but concedes that the action it filed against Lockton is "related to" the bankruptcy, not only because the issue requires both interpretation and enforcement of the Plan, but also because the Motion itself argues that the assignment of claims implicates the Trust's interpretation of "the July 19, 2022 Bench Ruling," and that interpretation of that ruling would otherwise be litigated in the California Action. Motion at 2-3.

[4] The trustee states that the Trust "acquired the claims on an individual basis, customer-by-customer, as part of preference settlement between those customers/creditors and the Trust." De Lisser Decl. ¶ 5. One of the assigning creditors is also a trustee, which is an odd dynamic.

[5] *See* ECF 1041 at 49:8-11 ("THE COURT: Well, it's debatable whether it's clear – it's debatable whether it's clear because the word 'acquire' does not appear in the plan or the trust documents. MR. AZMAN: That's fair, Your Honor. I that's fair, your Honor. I agree. If I could go back in time and add one more sentence, I would have. I'll acknowledge on the record.").

6.      The Trust relies on one clause in the Plan, which permits the trustees to "[a]djudicate" third-party claims, and in its various submissions to this Court has stated that the acquisition of third-party claims was requested by the Committee (defined below). Relying on these assertions, the Trust seeks entry of an order stating that: "in accordance with the Plan and the Trust Agreement, the Trustees can acquire Third-Party Claims obtained through individual preference settlements, and, if valid grounds exist, prosecute those claims against defendants, including, without limitation, Lockton Companies LLC and Lockton Companies LLC Pacific Series." ECF 1070-2.[6]

7.      Even giving the Trust the most charitable reading possible, the Plan is, at best, ambiguous, and the parties require extrinsic evidence to determine the intent of the Plan with respect to acquisition of the Third-Party Claims. Accordingly, shortly after receiving the Motion, Lockton sent eight document requests to the Trust, aimed at testing the Trust's factual assertions and to understand the true intent of the Plan. Inexplicably, the Trust refused to produce any documents. *See* Wit Decl., Exs. A & B.

8.      Given the lack of authority in the Plan to acquire third-party claims, and the Trust's refusal to produce any documents that could show the intent of the Plan, this Court should deny the Motion. At a minimum, this Court should continue the matter so that the parties can conduct discovery.

---

[6]   It appears that the Trust is attempting to negate one of the bases for removal, by having this Court, rather than the Northern District, decide whether the Trust had authority under the Plan to acquire the claims. This gambit may very well backfire, as seeking relief from this Court confirms that the California Action (defined below) is "related to" the bankruptcy since jurisdiction is measured at the time of removal, which occurred before the Trust filed this Motion. *See Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426 (1991) ("We have consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events."). Nevertheless, that is an issue that will be decided by the Northern District.

**BACKGROUND**

**Cred's Business**

9.      Cred, Inc. ("**Cred**") was founded in 2018. First Day Declaration ¶ 15 (ECF 16). It

provided lending and borrowing services that enabled its clients "to leverage value from their

digital assets," and "offer[ed] technology solutions for crypto assets, partnering with leading wallet

and exchange providers to enable liquidity in the form of borrowing or lending." *Id.* In particular,

it offered a "solution" called "CredEarn," which allowed "owners of crypto assets to earn interest

on their crypto holdings." *Id.* As part of its business, customers would transfer cryptocurrency to

Cred, which would then use the cryptocurrencies "in a variety of investment strategies involving

third-party asset managers" to earn revenue by generating returns. ECF 380 at 14-15.

**Cred's Bankruptcy**

10.      On November 7, 2020, Cred and certain of its subsidiaries (collectively, "**Debtors**")

each filed a petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court

for the District of Delaware ("**Bankruptcy Court**"). On December 3, 2020, the United States

Trustee ("**United States Trustee**") filed a *Notice of Appointment of Creditors' Committee* stating

that an official committee of unsecured creditors ("**Committee**") had been formed. ECF 120.

11.      The day after they filed bankruptcy, the Debtors filed a *Motion of Debtors for Entry*

*of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Insurance Policies, (B) Pay*

*All Related Obligations, and (II) Granting Related Relief* ("**Insurance Motion**"). ECF 10.

Through the Insurance Motion, the Debtors sought Court approval to "continue their Insurance

Policies (as defined below) on an uninterrupted basis in accordance with the same practices and

procedures in effect prior to the Petition Date." Insurance Motion at 1. With respect to its insurance

broker, the Debtors made the following admissions in the Insurance Motion:

The Debtors obtain the Insurance Policies through their insurance broker, Lockton

Companies, Inc. ("Lockton"). Lockton assists the Debtors in obtaining comprehensive insurance coverage for their operations in the most cost-effective manner, negotiating policy terms, provisions, and premiums, assisting Cred with claims, and providing ongoing support throughout applicable policy periods. *The Debtors do not pay Lockton any fees for the professional services rendered, as the Debtors' insurers pay Lockton on commission.*

*Continuation of Lockton's services are necessary to assure* the Debtors' ability to secure Insurance Policies on competitive terms at competitive rates, facilitate the proper administration of the Insurance Policies, and *ensure adequate protection of the Debtors' property*. Accordingly, *the Debtors request authority to continue utilizing Lockton's services in a manner consistent with its prepetition practices in the ordinary course of business.*

*Id.* at 4 (emphases added).

12.      The Bankruptcy Court entered interim and final orders approving the Insurance Motion. In its December 18, 2020 final order ("**Final Insurance Order**"), the Bankruptcy Court found that the "relief *requested in the Motion is in the best interests of* the Debtors, their estates, *creditors and all parties in interest*," and retained "jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Final [Insurance] Order." ECF 248 at 2-3 (emphases added).

13.      By the time the Bankruptcy Court conducted the final hearing on the Insurance Motion, the Committee had been formed and had an opportunity to object to the Insurance Motion. ECF 120. The Committee included Christopher Moser and Kyle Wang, who are "Trust Assignors" identified in the Complaint. Complaint ¶ 17. The Committee retained a national law firm, McDermott Will & Emery LLP, as counsel, and began objecting to various matters and taking discovery, *see, e.g.*, ECF 151, 167, 168, 190, 191, 193, but did not object to the Insurance Motion.

14.      In late December of 2020, the Committee and the Debtors agreed to a Plan Support Agreement ("**PSA**"). ECF 279 at 2. Pursuant to the PSA, the Debtors would propose a plan that would, among other things, create the Trust, which would be administered in accordance with a

to-be-filed liquidation trust agreement and managed by liquidating trustees ("**Trustees**"). *Id.*

15.     On March 22, 2021, the Bankruptcy Court entered the *Order Confirming and Approving on a Final Basis Modified First Amended Combined Plan of Liquidation and Disclosure Statement of Cred Inc. and its Subsidiaries Under Chapter 11 of the Bankruptcy Code* ("**Confirmation Order**"). ECF 629. The operative plan is the *Modified First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and its Subsidiaries Under Chapter 11 of the Bankruptcy Code* ("**Plan**"). ECF 722. The Debtors filed an unsigned liquidation trust agreement on March 2, 2021 ("**Trust Agreement**"). ECF 579. The Plan went effective on April 19, 2021. ECF 730.

16.     The Plan created the Trust. Plan § 12.3. The Trust was to be managed by the Trustees, selected by the Committee, and subject to oversight by a Trust Advisory Board. *Id.* § 12.3(a). Pursuant to the Plan, the Debtors would transfer all of their "Assets"[7] to the Trust, and the Trust would enforce the "Causes of Action."[8] *Id.* § 12.3. The Trust would have the ability to "commence, litigate, and settle any Causes of Action or Claims relating to the Liquidation Trust Assets."[9] *Id.* § 12.3(c).

17.     The Trust Agreement states that the Trust is responsible for liquidating and administering the "Liquidation Trust Assets, including the Avoidance Actions, the Debtors' commercial tort claims, the Debtors' claims or Causes of Action against the Debtors' directors and

---

[7] "Assets" were defined as "the assets of each of the Debtors," including the "Causes of Action." Plan § 1.8.

[8] "Causes of Action" were defined as "all claims, actions, causes of action, third-party claims, counterclaims, crossclaims, third-party claims, contribution claims, or any other claims whatsoever (including any Causes of Action described herein) of the Debtors and/or their Estates that may be pending on the Effective Date (including all such Causes of Action brought by the Committee pursuant to the Plan Support Agreement) or instituted after the Effective Date against any Entity based in law, equity, or otherwise, including under the Bankruptcy Code, whether known or unknown, whether direct, indirect, derivative, or otherwise, and whether asserted or unasserted as of the date of entry of the Confirmation Order, including Avoidance Actions." Plan § 1.19.

[9] "Liquidation Trust Assets" were defined as the Assets that were transferred to the Liquidation Trust. Plan § 1.86.

officers, and claims or Causes of Action that may be satisfied by insurance policies (collectively, the '**Causes of Action**')." Trust Agreement § 2.1.

18.     The Confirmation Order says nothing about third-party claims. And the Plan is not that much better. The Plan defines "Causes of Action" to include "third-party claims," but only "third-party claims . . . *of the Debtors and/or their Estates*," Plan § 1.19, and elsewhere states that one of the responsibilities of the Trustees is: "[a]djudicating third-party claims assigned, purchased, or otherwise transferred to the Liquidation Trust." *Id.* § 12.3(b)(vii). But, it only permits the Trust to "commence, litigate, and settle any Causes of Action or Claims *relating to the Liquidation Trust Assets*," *id.* § 12.3(c) (emphasis added), which are defined as "Assets that were transferred to the Liquidation Trust," with "Assets" defined as "the assets of each of the Debtors." *Id.* §§ 1.8, 1.86. In other words, a plausible reading of the Plan means that the Trust could only prosecute Causes of Action that were owned by the Debtors.

19.     The Plan says nothing about whether the Trust would (or could) acquire third-party claims, what those third-party claims could be, or the potential value of third-party claims. It does not even say the value of those claims is "unknown" or "to be determined." Indeed, the "Causes of Action" listed on Exhibit A of the Plan do **_not_** list any third-party claims, even generically.

20.     The Trust Agreement says even less about third-party claims than the Plan. The Trust Agreement provides that the liquidation trustees' responsibilities include "[a]djudicating third-party claims assigned, purchased, or otherwise transferred to the Liquidation Trust," Trust Agreement § 2.4(7), but there is no other mention of third-party claims. It even excludes "third-party claims" from its definition of "Causes of Action." *Id.* § 2.1.

21.     The Plan was proposed by the Debtors; it was not a joint plan proposed by any other entity, such as the Committee or any creditor of Cred.

22.     On June 23, 2022, the Trust filed the *Motion of The Cred Inc. Liquidation Trust for Entry of Order Approving Third Party Claim Assignment Procedures* ("**Third-Party Claim Motion**"). ECF 1015. The Trust asserted that it had the authority to pursue assigned claims. *Id.* at 6-7. It argued, among other things, that a "key issue" for the Committee was whether the Trust should take assignments of claims that Cred's customers had against third parties, and to that end added language to the Plan concerning "[a]djudicating" third-party claims. Third-Party Claim Motion at 3. It did not cite any other provision in the Plan. It then proposed a number of procedures that would govern the assignment of third-party claims, including a 10% "bump up" in the allowed claim amounts of creditors who assigned claims to the Trust. *Id.* at 5.

23.     The Trust did not serve the Third-Party Claim Motion on Lockton. *See* ECF 1020. It also did not indicate that it was intending to sue Lockton on account of any assigned claims it was requesting this Court's permission to acquire.

24.     Uphold HQ, Inc. ("**Uphold**") and the named plaintiffs in a consumer class action against Uphold filed objections to Third-Party Claim Motion, and the Trust filed a reply. ECF 1027, 1029, 1031. In the reply, the only Plan provision the Trust cited to support the argument that it had the authority to acquire and prosecute third-party claims was section 12.3(b)(vii), which as noted above, refers to "[a]djudicating third-party claims," ECF 1031 at 10, and the Plan definition of "Causes of Action," *id.* at 22. The Trust all but conceded that the Plan was ambiguous, asserting that the Plan should be interpreted to "further equitable concerns," and requesting that this Court resolve any ambiguities in favor of the Trust. *Id.* at 22-23.

25.     This Court heard the Third-Party Claim Motion on July 19, 2022 ("**July 19 Hearing**"). ECF 1041. During the hearing, the Trust asserted that the "claim assignment strategy is something that was discussed at great length with the committee on a number of occasions,

shortly before confirmation, and those discussions ultimately culminated in adding the assignment provision that is at issue here." *Id.* at 6:1-5. This Court questioned the Trust: "[I]f the intent here from the beginning was that the trust could acquire these third-party claims. And if they were going to do it on a basis where a blanket ten percent bump in an allowed claim for any claimant who agrees to assign their claim why wasn't that included in the plan?" *Id.* at 8:6-12. This Court further noted that the "number just seemed to have been plucked out of the air," "there is no evidence here," and "[y]ou're just asking me to take your word for the fact that this ten percent bump in a claim is based on a good faith decision by the trustees without any evidence for me to know and to evaluate whether that is a good thing or a bad thing." *Id.* at 9:7-18.

26.     The United States Trustee for its part, explained that "there are going to be professional fees that the trust will, you know, have to pursue these – any third-party claims that are assigned to the trust. And this is not going to be like a pure contingency; there will actually be out-of-pocket professional fees. And because of that, there could absolutely be a situation in which the trust beneficiaries could actually receive less of a distribution." *Id.* at 37:19-38:3. The United States Trustee correctly noted, "the disclosure statement did not disclose that Class 4, the general unsecured creditors, could actually – there could be situations in which they could receive less if claims were assigned and prosecuted by the trust. They could receive less. They could receive more. They could receive the same. These are all possibilities, but to my understanding, this was not disclosed." *Id.* at 38:10-18. The United States Trustee further explained that under the Plan, "plan treatment only includes a distribution[] on the assets of the estate." *Id.* at 39:20-40:1. The United States Trustee finally noted that not all creditors were served the Third-Party Claim Motion. *Id.* at 40:6-16.

27.     This Court, after hearing argument from the Trust's counsel, stated that it was

"debatable" whether it was "clear" the Plan authorized the Trust to acquire third-party claims "because the word 'acquire' does not appear in the plan or the trust documents," to which the Trust's counsel responded: "That's fair, Your Honor. I that's fair, your Honor. I agree. If I could go back in time and add one more sentence, I would have. I'll acknowledge on the record." *Id.* at 49:8-11. This Court then commented that the Trust could use the existing language "in the scenario you gave me where you're trying to compromise a claim, a preference action you have against somebody and they say, Hey, I've got a third-party claim against somebody else. I'll give it to you in return for your forgiving my preference …." *Id.* at 50:4-9. The Trust's counsel, however, argued that this Court's comments would result in the "same disparity of treatment" as had been discussed with respect to the 10% bump. *Id.* at 51:5-11.

28.     This Court then explained that even if the Trust dropped the argument about the 10% bump, that "doesn't get you past the noticing issue." *Id.* at 52:23-53:11. Upon asking the United States Trustee for its input, the United States Trustee explained that even if the Trust dropped the 10% bump, "you'd still have a big disclosure issue there," and "none of this was in the plan." *Id.* at 54:9-23. This Court agreed, and asked the Trust's counsel, "don't you have an obligation to give them all this information and be able to present them with this information?" *Id.* at 55:15-24. This Court concluded by stating that it "was not completely clear" in the Plan or Trust Agreement that the Trust could acquire third-party claims but that it was implied, that it was disinclined to say that the Trust could give 10% bumps to claim assignors, and then denied the motion without prejudice. *Id.* at 67-68.

**The Lockton Lawsuit**

29.     On December 22, 2022, the Trust filed the Complaint against Lockton in the Superior Court of the State of California, County of San Francisco, which has since been removed

to the Northern District ("**California Action**"). The Trust does not assert claims of the Debtors or

the bankruptcy estate, but instead asserts only Third-Party Claims. Complaint at 1 & ¶¶ 8, 17.

30.    The Complaint identifies by name eight assignors of Third-Party Claims

("**Assignors**"), and discloses what each person allegedly lost by investing in Cred. But the

Complaint does not disclose any details of the assignments (such as those this Court raised at the

hearing last year), does not disclose whether any of the Assignors even hold allowed claims, does

not disclose whether they have received any distributions from the Trust, and does not disclose

whether the Trust has taken steps to preserve documents and other information of the assigning

persons. And, most unusually, the Complaint makes no mention of the proceedings in this Court

last year on the Third-Party Claim Motion.

**Discovery**

31.    Within days of receiving the Motion, Lockton sent eight document requests to the

Trust ("**Document Requests**"), seeking, among other things, the proofs of claim filed by the

Assignors,[10] copies of the purported agreements concerning the preference claims against the

Assignors and the assignments of the Assignors' claims to the Trust, and communications between

the Debtors and the Committee concerning the ability to acquire third-party claims under the Plan.

Wit Decl., Ex. A. The Trust refused to produce any documents in response to the Requests. *Id.*,

Ex. B.

---

[10]   Proofs of claim are not publicly available in this case, *see* ECF 264, but the Complaint publicly disclosed names
and cryptocurrency holdings of each assignor.

**ARGUMENT**

**I.     The Plan And Trust Agreement Do Not Expressly Contemplate The Pursuit Of Third-Party Claims**

32.     The Trust seeks entry of an order stating that the "Trust can acquire third-party customer claims in connection with the settlement of preference claims and prosecute those claims." Motion at 1. As with the Third-Party Claim Motion,[11] the only Plan provision that the Trust cites to support its argument is section 12.3(b)(vii), which states that the liquidating trustees are responsible for "[a]djudicating third-party claims assigned, purchased, or otherwise transferred to the Liquidation Trust." Motion at 4. As both the Court and the Trust previously acknowledged, however, the Plan does not explicitly provide authority to the Trust to acquire and prosecute third-party claims. Language elsewhere in the Plan strongly suggests that the Trust can only prosecute claims of Cred and the Debtors' estates.

33.     The Confirmation Order does not address third-party claims at all, and the Plan only mentions "third-party claims" in two instances. First, it defines "Causes of Action" to include "third-party claims," but in a way that refers to such claims *of the Debtors*, Plan § 1.19,[12] and second, it states that one of the responsibilities of the Trustees is "[a]djudicating third-party claims assigned, purchased, or otherwise transferred to the Liquidation Trust." *Id.* § 12.3(b)(vii). The

---

[11]   The Trust did not serve the Third-Party Claim Motion on Lockton, meaning that Lockton had no opportunity to respond. It follows that even if there was a ruling by this Court, that ruling could not be binding on Lockton, who should be afforded a meaningful opportunity to respond to the Third-Party Claim Motion, including obtaining discovery to evaluate the merits of the Trust's arguments. *See, e.g.*, *Corp. Synergies Grp., LLC v. Andrews*, 775 F. App'x 54, 61 (3d Cir. 2019) (vacating order where impacted parties did not have notice that relief would be considered, and noting "concern about the impracticably short notice given to the defendants to provide evidence").

[12]   Although the Plan defines "Causes of Action" to include third-party claims, that definition is modified by the qualifying phrase "of the Debtors and/or their Estates." Moreover, Section 10.4 of the Plan, which describes the treatment of Class 4 General Unsecured Claims, does not mention the possibility of receiving a distribution from liquidated third-party claims. It provides that holders of Class 4 General Unsecured Claims will receive a "Cash payment equal to such Holder's Distribution Pro Rata Share of Net Distributable Assets," or for claimholders that make a "Cryptocurrency Election," a potential "Equivalent Cryptocurrency Distribution." Plan § 10.4. "Net Distributable Assets" are defined as the "gross amount available the liquidation of the Assets" minus certain claims and fees. *Id.* § 1.94. The Assets, in turn, are defined as "***the assets of each of the Debtors***." *Id.* § 1.8 (emphasis added).

Trust Agreement, however, does not contain "third-party claims" in its definition of "Causes of Action." Trust Agreement § 2.1. Moreover, the very same section of the Plan that the Trust relies upon only gives authority to the Trust to pursue, compromise, or settle "Liquidation Trust Assets" and to "commence, litigate, and settle any Causes of Action or Claims ***relating to the Liquidation Trust Assets***," Plan § 12.3(c) (emphasis added), which as discussed above, is limited to assets "of each of the Debtors."

34.　　The Plan and Disclosure Statement contain no other discussion of third-party claims, the source of funding to prosecute third-party claims, whether professionals would be paid hourly or on contingency, and how all of the above would affect distributions to creditors.

35.　　Consistent with the Plan, the United States Trustee correctly explained at the July 19 Hearing: "the disclosure statement did not disclose that Class 4, the general unsecured creditors, could actually – there could be situations in which they could receive less if claims were assigned and prosecuted by the trust. They could receive less. They could receive more. They could receive the same. These are all possibilities, but to my understanding, this was not disclosed." ECF 1041 at 38:10-18. But it was not only the United States Trustee that thought the Plan did not address the acquisition of third-party claims. This Court, and even the Trust, agreed that the Plan was not clear. This Court stated that it was "debatable" whether it was "clear" the Plan authorized the Trust to acquire third-party claims "because the word 'acquire' does not appear in the plan or the trust documents." *Id.* at 49:8-11. In the words of the Trust's counsel: "That's fair, Your Honor. I that's fair, your Honor. I agree. If I could go back in time and add one more sentence, I would have. I'll acknowledge on the record." *Id.*

II.    **Understanding The Intent Of The Plan And Trust Agreement With Respect To The Acquisition Of Third-Party Claims Requires Consideration Of Extrinsic Evidence, Which The Trust Has Refused To Produce**

36.    "The interpretation of a plan of reorganization is governed by the same principles as contract interpretation." *In re NorthEast Gas Generation, LLC*, 639 B.R. 914, 923 (Bankr. D. Del. 2022) (holding that requested "clarification" of the plan was not actually a clarification, but instead an impermissible modification); *In re SS Body Armor I, Inc.*, 2020 WL 4045755 (Bankr. D. Del. July 21, 2020) ("When a dispute arises concerning the language of a confirmed reorganization plan, the principles of contract interpretation serve as the Court's North Star in navigating the parties towards meaning.").

37.    The Plan provides that unless the Bankruptcy Code or other federal law applies, "the rights, duties, and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware …." Plan § 20.16. Under Delaware law, when the language of a contract is ambiguous, courts look to extrinsic evidence to determine the parties' intent. *In re Forklift LP Corp.*, 363 B.R. 388, 396 (Bankr. D. Del. 2007) (considering extrinsic evidence to determine the meaning of Plan provision that addressed treatment of claims); *see also Eagle Indus., Inc. v. DeVilbiss Health Care*, 702 A.2d 1228, 1232 (Del. 1997) (stating that when contract terms are ambiguous, "the interpreting court must look beyond the language of the contract to ascertain the parties' intentions"); *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 588 (9th Cir. 1993) (stating that when a chapter 11 plan is ambiguous, "resort can be had to extrinsic evidence" to "aid in construction").[13]

38.    Here, as discussed *supra* ¶¶ 32-35, the Plan does not discuss the acquisition of third-

---

[13]    In addition, Delaware contract law requires that ambiguities be construed against the Trust, as successor of the Debtors, who drafted the Plan. *Forklift LP Corp.*, 363 B.R. at 397.

party claims, which was acknowledged by both the Trust and this Court. To the contrary, there are several Plan provisions that suggest the Plan did not contemplate the acquisition and liquidation of third-party claims for distribution to creditors. For example, Plan section 7.1, titled "Summary of Assets," does not mention the potential of acquiring third-party claims. Additionally, Section 12.3(c) only gives authority to the Trust to pursue, compromise, or settle "Liquidation Trust Assets" and to "commence, litigate, and settle any Causes of Action or Claims *relating to the Liquidation Trust Assets*," Plan § 12.3(c) (emphasis added). The "Liquidation Trust Assets" are expressly limited to assets "of each of the Debtors."

39.     Further, there is no discussion in the Plan (which is combined with the Disclosure Statement) of how third-party claims would be funded, how professionals prosecuting such claims would be paid, and the potential impact on distributions to creditors. The parties that proposed the Plan – the Debtors – have not offered any testimony to support the Trust's position.

40.     Nevertheless, the Trust contends that section 12.3(b)(vii) of the Plan gives it the authority to acquire and prosecute third-party claims. The best-case scenario for the Trust is that the language of 12.3(b)(vii) creates an ambiguity as to what the Plan means. The Plan mentions the Trustees "[a]djudicating" third-party claims, without any discussion of how they could acquire those claims, and with an apparent prohibition on distributing the proceeds of those third-party claims to general unsecured creditors. Under applicable law, this ambiguity requires the consideration of extrinsic evidence.[14]

41.     In an effort to understand the meaning of the Plan, as well as other statements made

---

[14]   It is hard to see how the Trust could argue that consideration of extrinsic evidence is inappropriate, given that it referred to extrinsic evidence (without providing it) in the Third-Party Claim Motion and at the July 19 Hearing. ECF 1041 at 49:13-18 ("And we looked back, by the way, at the minutes that the committee kept. And we had at least two sessions of committee meetings where this was talked about and we talked about adding it to the plan for this reason. And, again, we're happy to put that in the record, but I didn't think it was necessary.").

by the Trust in the Motion and Third-Party Claim Motion, Lockton sent the Trust eight Document

Requests, seeking the proofs of claim filed by the Assignors, copies of the purported agreements

concerning the preference claims against the Assignors and the assignments of the Assignors'

claims to the Trust, and communications between the Debtors and the Committee concerning the

ability to acquire third-party claims under the Plan. Wit Decl., Ex. A. These requests are plainly

relevant, as they go directly to the relief sought – an order stating that "in accordance with the Plan

and Trust Agreement, the Trustees can acquire Third-Party Claims obtained through individual

preference settlements, and, if valid grounds exist, prosecute those claims against defendants,

including, without limitation, Lockton Companies LLC and Lockton Companies LLC Pacific

Series," ECF 1070-2 – as well as the factual assertions that the Trust has made to support its Motion.

ECF 1071-1 (Declaration of Cedric de Lisser, stating that "[i]n connection with these assignments,

the Trust acquired the claims on an individual basis, customer-by-customer, as part of preference

settlements between those customers/creditors and the Trust").

42.     The Trust, however, has refused to produce any documents in response to the

Document Requests. The Trust is not even willing to produce *proofs of claim* (which typically are

publicly available) and the very assignment documents that form the basis for the relief sought in

the Motion. But each of their reasons for refusing to produce the documents fails.

43.     *First*, the Trust asserts that it was not required to produce documents because

Lockton had not yet filed an objection to the Motion. The Trust is wrong as a matter of law. A

"contested matter" begins "whenever there is an actual dispute." Notes of Advisory Committee on

Rules—1983, Fed. R. Bankr. Proc. 9014. Thus, a contested matter begins before an opposition is

filed "if opposition is known or reasonably foreseeable." *In re Ephedra Prod. Liab. Litig.*, 329 B.R.

1, 7 (S.D.N.Y. 2005); *see also In re USA Gymnastics*, 2020 WL 1932340, at *3 (Bankr. S.D. Ind.

Apr. 20, 2020) (citing *Ephedra*); *In re Laughlin*, 210 B.R. 659, 661 (B.A.P. 1st Cir. 1997) (holding

that a motion to abate taxes was a contested matter "from the outset"). In any event, Lockton does

not understand why the Trust, which is requesting relief, would refuse to produce the documents

it had discussed in its Motion.

44.      *Second*, the Trust asserts that it does not need to respond to the Document Requests

because it did "not request factual findings" and the "Bankruptcy Court can clarify its ruling based

solely on the Transcript of the July 19, 2022 Bench Ruling." That assertion is misleading and

contrary to the Trust's own Motion. In support of the Motion, the Trust put into evidence a

declaration by one of the Trustees stating that the "Trust acquired the claims on an individual basis,

customer-by-customer, as part of preference settlements," and repeated in the Motion that the

"claims were acquired on an individual basis, customer-by-customer, as part of certain preference

settlements …." Motion at 2. It also asserted in the Motion that it "intentionally acquired *only*

claims of Cred Customers that were preference targets in the Chapter 11 Cases …. Each claim was

acquired in connection with a separate preference settlement." Motion at 5. Having asserted these

facts in support of its requested relief, the Trust should not be able to hide from having those

assertions tested through discovery.[15]

45.      *Third*, the Trust asserts that the validity of the assignments is a question for either

the Northern District or the California state court (in the event of remand or abstention), and that

discovery in connection with this Motion is an "end-run" around discovery in that litigation. That

argument is meritless. The Trust has sought relief from this Court, first in the Third-Party Claim

Motion—which it did not serve on Lockton and that was denied without prejudice—and then

---

[15]   Indeed, assuming that this Court's comments at the July 19 Hearing are binding, the requested documents would
assist the parties in evaluating whether the Trust actually complied with those comments.

through this Motion, for an order stating that it has the authority under the Plan and Trust Agreement to acquire third-party claims under specified circumstances. To support its arguments, the Trust has asserted facts, and put in declarations attesting to those facts, about the settlements it has reached with certain customers and the assignment of third-party claims. Given the lack of any express authority in the Plan to acquire third-party claims, Lockton is entitled to discovery so that it can properly evaluate the merits of the Trust's arguments and determine whether the Plan actually intended to permit the Trust to acquire third-party claims.

46.     In sum, the Plan and Trust Agreement do not expressly provide the Trust authority to acquire third-party claims. At best, the Trust's ability to do so under the Plan and Trust Agreement is ambiguous, and requires the consideration of extrinsic evidence, which the Trust has refused to produce. This Court should either deny the Motion, or at a minimum, continue the hearing so that the parties can conduct discovery on the issues put forth by the Trust.

## CONCLUSION

For the reasons stated above, Lockton respectfully requests that this Court deny the Motion, or continue the hearing so that the parties can conduct discovery.

Dated: February 2, 2023          Respectfully submitted,
       Wilmington, Delaware

                                 **MORRIS NICHOLS ARSHT & TUNNELL LLP**

                                 /s/ *Andrew R. Remming*
                                 Thomas W. Briggs, Jr. (No. 4076)
                                 Andrew R. Remming (No. 5120)
                                 Ryan D. Stottman (No. 5237)
                                 1201 North Market Street, 16th Floor
                                 PO Box 1347
                                 Wilmington, DE 19899
                                 Telephone: (302) 658-9200
                                 tbriggs@morrisnichols.com
                                 aremming@morrisnichols.com
                                 rstottman@morrisnichols.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Michael B. Carlinsky (*pro hac vice* forthcoming)
Renita N. Sharma (*pro hac vice* forthcoming)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000
michaelcarlinsky@quinnemanuel.com
renitasharma@quinnemanuel.com

Terry L. Wit (*pro hac vice* forthcoming)
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
terrywit@quinnemanuel.com

Eric D. Winston (*pro hac vice* forthcoming)
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
ericwinston@quinnemanuel.com

*Counsel to Lockton Companies LLC and Lockton Companies LLC – Pacific Series*

20