## EXHIBIT A

**Excerpts of Transcript of January 11, 2023 Hearing in**
***Cred Inc. Liquidation Trust v. Uphold HQ, Inc., et al.***, adv. No. 22-50398

```
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE

                                    . Chapter 11
IN RE:                              .
                                    . Case No. 20-12863(JTD)
CRED INC., et al,                   .
                                    .
                                    . 824 Market Street
                    Debtors.    . Wilmington, Delaware 19801
                                    .
. . . . . . . . . . . . . . . . Wednesday, January 11, 2023
CRED INC. LIQUIDATION TRUST,    .
                                    . Adv. Proc. No. 22-50398(JTD)
        vs.                         .
                                    .
UPHOLD HQ, INC., et al.             .
. . . . . . . . . . . . . . .
```

                    TRANSCRIPT OF HEARING RE:
  DEFENDANTS' MOTION TO DISMISS ALL COUNTS IN THE COMPLAINT
            BEFORE THE HONORABLE JOHN T. DORSEY
                UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Plaintiff:          David R. Hurst, Esq.
                            MCDERMOTT, WILL & EMERY, LLP
                            1007 North Orange Street
                            10th Floor
                            Wilmington, Delaware 19801

                            Joseph B. Evans, Esq.
                            Max J. Kellogg, Esq.
                            MCDERMOTT, WILL & EMERY, LLP
                            One Vanderbilt Avenue
                            New York, New York 10017

(Appearances Continued)

Audio Operator:             Electronically Recorded
                            by Danielle R. Gadson, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:  (Continued)

For the Plaintiff:          Samuel C. Ashworth, Esq.
                            MCDERMOTT, WILL & EMERY, LLP
                            The McDermott Building
                            500 North Capitol Street, NW
                            Washington, D.C. 20001

For the Defendants:         Jeffrey L. Lyons, Esq.
                            BAKER HOSTETLER, LLP
                            1201 North Market Street
                            Suite 503
                            Wilmington, Delaware 19801

                            Douglas W. Greene, Esq.
                            Zachary R. Taylor, Esq.
                            BAKER HOSTETLER, LLP
                            45 Rockefeller Plaza
                            New York, NY 10111

                            Genevieve G. York-Erwin, Esq.
                            BAKER HOSTETLER, LLP
                            999 Third Avenue
                            Suite 3900
                            Seattle, Washington 98104

APPEARANCES VIA ZOOM:

For the Plaintiffs:         Darren Azman, Esq.
                            Andrew B. Kratenstein, Esq.
                            MCDERMOTT, WILL & EMERY, LLP

For the Defendants:         Jorian Rose, Esq.
                            Micahel Sabella, Esq.
                            BAKER HOSTETLER, LLP

For Certain Plaintiffs
in Related Litigation:      Rachel German, Esq.
                            LIEFF, CABRASER, HEIMANN
                             & BERNSTEIN, LLP

Also Appearing:             Cedric Delisser
                            CRED INC. LIQUIDATION TRUST

                            Mark Anderson, Interested Party

                            Elena Bonifaz, *Pro Se*

                            Becky Yerak
                            WALL STREET JOURNAL

(Appearances Continued)

APPEARANCES VIA ZOOM:  (Continued)

Also Appearing:              Leslie Pappas
                             LAW360

                             Laura Haney
                             U.S. BANKRUPTCY COURT

4

INDEX

|                                     | Page        |
|-------------------------------------|-------------|
| ARGUMENT BY MR. TAYLOR              | 6           |
| ARGUMENT BY MR. EVANS               | 21          |
| FURTHER ARGUMENT BY MR. TAYLOR      | 40          |
| COURT DECISION                      | (Reserved)  |

1          (Proceedings commence at 2:08 p.m.)

2               THE COURT:  Good afternoon, everyone.  Thank you.

3     Please be seated.

4               All right.  You may proceed.

5               MR. LYONS:  Good afternoon, Your Honor.  Jeff Lyons

6     from BakerHostetler on behalf of the Uphold Defendants.  With

7     me at counsel table, I'm joined by Doug Greene.

8               MR. GREENE:  Good afternoon, Your Honor.

9               THE COURT:  Good afternoon.

10              MR. LYONS:  Zach Taylor.

11              MR. TAYLOR:  Good afternoon, Your Honor.

12              MR. LYONS:  And Genevieve York-Erwin.

13              THE COURT:  All right.

14              MS. YORK-ERWIN:  Good afternoon.

15              MR. HURST:  Good afternoon, Your Honor.

16              THE COURT:  Mr. Hurst.

17              MR. HURST:  I'll just make my introductions now.

18    It's David Hurst from McDermott, Will & Emery, and with me I

19    have my colleagues Joe Evans --

20              MR. EVANS:  Good afternoon.

21              THE COURT:  Okay.

22              MR. HURST:  -- Max Kellogg --

23              MR. KELLOGG:  Good afternoon.

24              MR. HURST:  -- and Sam Ashworth.  And Mr. Evans

25    will be doing the argument for the trust today.

1           THE COURT:  Okay.  I think it's Uphold's motion, so

2       we'll hear from them first.

3           MR. TAYLOR:  Good afternoon, Your Honor.

4           THE COURT:  Good afternoon.

5           MR. TAYLOR:  My name is Zach Taylor from

6       BakerHostetler, here today on behalf of Uphold HQ, Inc.,

7       Uphold, Inc., and Uphold Limited, in connection with their

8       motion to dismiss all counts in the complaint.

9           The bottom line is this:  The trust's complaint

10      only implicates credit insiders in any alleged wrongdoing.

11      There are simply no pleaded facts implicating Uphold in any

12      of the alleged wrongdoing.  Indeed, the trust's claims

13      against Uphold are consistently contradicted by its very own

14      exhibits, each of which is incorporated by reference into the

15      complaint.  Simply put, the trust's allegations against

16      Uphold are incoherent, conclusory, and conspiratorial.  They

17      cannot survive a motion to dismiss.

18          Besides being insufficiently pleading, there is

19      also not reasonable inference of Uphold's liability.  The

20      complaint centers around two main premises:

21          Number one, Uphold knowingly participated in

22      causing Cred's demise by funneling its own customers to Cred

23      in a way Uphold knew would damage Cred and, by necessity, its

24      own customers.

25          And two, the service agreement between Cred and

1  Uphold, SOW Number 3, was not an arm's length agreement, but

2  was, instead, orchestrated by some unknown Uphold cabal that

3  exploited Dan Schatt as its puppet, such that Cred would

4  solely benefit Uphold to the detriment of Cred.  No factual

5  pleadings support these claims.  The only reasonable

6  inference to be drawn from the factual pleadings is that Cred

7  insiders caused Cred's demise through internal mismanagement,

8  period, end of story.

9       After conducting a year-long-plus investigation,

10 which involved multiple interviews of Cred insiders, the

11 receipt and review of over 100,000 pages voluntarily produced

12 by Uphold and countless internal Cred documents, unsupported

13 speculation is all the trust has.

14      I will address each of the trust's -- each of the

15 trust's core theories.  I will explain to the Court why they

16 make no sense and why, in any event, the factual allegations

17 are woefully inadequate to adequately plead any of the

18 trust's claims.

19      The trust has had ample time to in pre-filing

20 discovered -- discovery to plead its case and it hasn't.

21 There is no reason for the Court to entertain these

22 allegations.  Again, the complaint should be dismissed in it

23 entirety with prejudice.

24      First, I'll turn to the aiding and abetting claims,

25 Counts 1 and 2.

1    frustrated Cred's creditors must be from Cred's demise.

2    Uphold also fully understands the trust's duty to try to

3    recoup as much as those lost assets as is possible.  But that

4    does not mean that the trust should have carte blanche to

5    drag anybody into this court with threadbare and borderline

6    frivolous claims, as it has done here.

7            The trust has had ample pre-filing discovery and

8    time to make its case and it simply has not, and it has no

9    grounds to subject Uphold to any further litigation.  Uphold

10   respectfully asks the Court to dismiss all counts in the

11   complaint with prejudice.  Thank you.

12           THE COURT:  Okay.  Thank you.

13           MR. EVANS:  Good afternoon, Your Honor.

14           Uphold argues that this was a run-of-the-mill,

15   arm's length arrangement, and that, quote, "simply" -- that

16   they're being held pried -- they're being held liable simply

17   by virtue of the fact that Cred -- that customers could

18   access CredEarn from the Uphold platform.  That was not the

19   relationship here.  Without Uphold, there never would have

20   been a Cred.

21           Dan Schatt was the CEO of Cred and Uphold Director.

22   He and the former CEO, J.P. Thieriot, got together and they

23   decided how are we going to drive more retail customers to

24   Uphold.  That's what they were figuring out.  And that's the

25   most expensive and valuable thing a crypto exchange can do.

1    How do you get retail?

2         They decided let's launch a yield-earning platform.

3    Let's let people earn interest on their crypto, ten percent

4    or more.  And what they also decided was, well, let's not do

5    it through Uphold, let's do it through this new entity, this

6    new entity you control, Cred, let's do that.

7         From inception and throughout, by the words of CEO

8    of Cred, Dan Schatt, Cred's CEO, Dan Schatt, Cred was, quote,

9    "100 percent dependent on Uphold for its revenue."  And how

10   did they do it?  Uphold shilled CredEarn by using false

11   marketing materials, promising that Cred was safe, secure,

12   insured, fully hedged.  Cred was none of those things and

13   Uphold knew.

14        And counsel for Uphold said, well, why would Uphold

15   do this, why would they do this, why would they drive their

16   customers to CredEarn and take them off their platform, why

17   would they do this.  The answer is customer acquisition, the

18   most important thing for a crypto exchange to do.  Uphold

19   admits it.

20        On Page 10 of their motion to dismiss, they say:

21             "Uphold's main upside was to attract new customers

22             to the Uphold platform."

23        That's why they did it.

24        Uphold argues that we pleaded no facts, no facts to

25   show that Uphold knew what was going on at Cred, that Uphold

1    knew that there was loans to Mocredit, that Uphold knew that

2    Cred was mismanaging its funds, Uphold didn't know anything.

3    That's their argument.

4            So let's talk about those facts that we did plead.

5    We pleaded:

6            Uphold knew of Cred's overly risky business model;

7            Uphold knew that Cred was unsafe, unsecured, not

8    insured, not fully hedged;

9            Uphold knew that the crypto was all being lent to

10   Mocredit, a Chinese entity that was re-lending to Chinese

11   video gamers.

12           THE COURT:  Where does it say in the complaint who

13   at Uphold knew those things and when they were told and how

14   they were told?  And you attached a lot of documents to the

15   complaint.  Do any of those show me that Uphold knew all of

16   those things?  And those are just conclusory statements --

17           MR. EVANS:  Sure.

18           THE COURT:  -- that they made, that they knew this,

19   they knew that, they knew this.  So what's the factual basis

20   that they knew those things?

21           MR. EVANS:  Thank you, Your Honor.  So let's --

22   I'll go forward to the testimony of Dan Schatt, which we

23   cited in the complaint.  And I'll cite a couple of examples

24   of when they knew and what they knew and how.  This is Dan

25   Schatt's sworn testimony:

1          "Question:  So J.P. Thieriot and others at Uphold

2 were fully aware of Cred's business model?

3          "Answer:  Yes.

4          "Question:  Uphold understood that, in connection

5 with the CredEarn program, that Cred would be re-lending

6 those loans to Mocredit, right?

7          "Answer:  Right.

8          "Question:  And Uphold understood that Mocredit was

9 then re-lending it to video gamers, right?

10          "Answer:  Correct."

11          That's Complaint 211.

12          Schatt also testified:

13          "Question:  You are aware that, in the marketing

14 materials issued by Uphold, there was no mention of Mocredit,

15 right?

16          "Answer:  Yes, that's right."

17          That's on the Mocredit piece.

18          Let's talk about the hedging strategy.  They said

19 they didn't know anything about the hedging strategy or any

20 of the trading losses.

21          "Question:  Did you ever discuss with J.P. Thieriot

22 or anyone else at Uphold that Cred would have to employ this

23 hedging strategy in order to protect it against the rising

24 price of Bitcoin?

25          "Answer:  Yes."

1          Complaint 212.

2          "Question:  Did you ever tell Uphold about any

3    hedging losses that Cred experienced?

4          "Answer:  I believe I did."

5          Complaint 415.

6          Schatt testified that he told Uphold about the

7    hedging losses, Mocredit's failure to pay under the loan

8    security agreement, and Alexander's theft prior to October

9    23rd, 2020, which is the date that Uphold claims was the

10   first time they were aware that anything was amiss at Cred.

11         THE COURT:  At what time prior to -- was it the day

12   before or six months before?

13         MR. EVANS:  We don't have the date of each one of

14   these conversations between Dan Schatt and J.P. Thieriot.

15   They talked all the time, they were -- he was at every board

16   meeting.  He was a director at the time that he was the CEO.

17   And so each one of these conversations, we don't have a date,

18   an assessment.  We have the testimony they did tell him.

19         THE COURT:  Have you taken any discovery of Uphold?

20         MR. EVANS:  We did, document discovery, yes, Your

21   Honor.

22         THE COURT:  Okay.  Did you find anything in those

23   documents that shows Schatt told Uphold anything about these

24   things?

25         MR. EVANS:  We did find some things in those

1   documents, Judge, and I'll -- I can provide some examples.

2          Directors and officers at Uphold raised concerns to

3   J.P. about Cred early on in the process, midway through the

4   relationship, and after the relationship was ending.

5          For example, on February 1st, 2019, a Director of

6   Uphold emails J.P. and says, quote:

7                 "As with me, he'll be curious and doubtful as to

8                 the risks taken by Cred to guarantee such a

9                 return."

10         J.P.'s respond is he forwards the internal Uphold

11  email of Dan Schatt and says I'm pushing here for a Cred

12  outcome.

13         There's another example on May 4th, 2020.  A

14  Director of Uphold emails J.P. and says:

15                "The lack of visibility around the way Cred deploys

16                its money and recourse is a conversation that J.P.

17                and I have engaged in before.  A failure on their

18                part would not just be a problem for our customers,

19                but also almost automatically result in lawsuits

20                against Uphold.  We can't just trust Cred.  We have

21                a responsibility to" (indiscernible) "and safeguard

22                our interests and those of our clients.  I will

23                follow up with J.P. and others and the board.  I

24                have not placed any money with Cred."

25         So the CEO of Uphold receives these concerns from

1    its most senior directors and officers.  And what does he do?

2    He keeps marketing Cred falsely.  He keeps driving more

3    revenue, more customers to Cred, in order to obtain new

4    retail customers for Uphold.

5             And there are certain things that are not in

6    dispute.  I know that Uphold said we had no idea what was

7    going on with Cred, we were just providing a marketing splash

8    on our page.  They admit that they knew the funds were going

9    to Mocredit.

10            Uphold provided a time line, Exhibit F to the

11   complaint, where they said they met with Mocredit, J.P.

12   Thieriot and others met with Lu Hua and they knew the money

13   was going from customers into Uphold, from Uphold out to

14   Cred, from Cred out to Mocredit.  They knew it, they admit

15   it.  But they didn't have it on any of their marketing

16   materials.

17            THE COURT:  Is that what directors are supposed to

18   do?  Aren't they supposed to be asking questions about

19   whether the business relationship that the company is going

20   to be entering into has risks associated with it?

21            MR. EVANS:  I would agree, I would agree.  And the

22   company is supposed to act on those and investigate those and

23   ask questions and make sure that, when they say -- when they

24   see that the loans are secured, make sure they're secured;

25   when they say that the loans are insured, make sure they're

1        insured; when they say that there's a fully hedged trading

2        strategy, make sure that it's fully hedged.

3                    THE COURT:  Well --

4                    MR. EVANS:  So, yeah --

5                    THE COURT:  -- that --

6                    MR. EVANS:  -- the directors --

7                    THE COURT:  -- would be --

8                    MR. EVANS:  -- raised the --

9                    THE COURT:  So that would be -- what you're telling

10       me is that the officers and directors of Uphold violated

11       their fiduciary duties to their shareholders.  But how does

12       that relate to what Cred was doing?

13                   MR. EVANS:  The breach of fiduciary duty here is

14       Dan Schatt and Lu Hua at Cred, we allege J.P. and others at

15       Uphold knew of this breach.  How?  They knew about Mocredit,

16       they knew about the hedging, they knew about the losses.  And

17       they substantially assisted in that breach.  How?  By

18       marketing falsely and continued -- continuing to drive money

19       to Cred.  And so the breach at issue here is the fiduciary

20       duties of the Cred insiders that were substantially assisted

21       by Uphold (indiscernible)

22                   THE COURT:  So why doesn't the complaint also bring

23       claims against the ones who actually committed the fiduciary

24       violations?

25                   MR. EVANS:  I just -- as a point of clarification,

1   do you mean the Cred insiders?

2              THE COURT:  Yes.

3              MR. EVANS:  The Cred insiders have been dealt with

4   separately.

5              THE COURT:  So I take that to mean you've entered

6   into a settlement agreement with them?

7              MR. EVANS:  We have certain confidentiality

8   obligations that I must abide by, but we've resolved claims

9   with them.

10             THE COURT:  Well, I think that might raise an issue

11  that I would like to know about.  What's the settlement?  Did

12  you -- it raises issues of bias.  Was there a settlement of,

13  hey, you cut a deal with us and we won't sue you, you give us

14  all you need against Uphold?  I need to know that.

15             MR. EVANS:  There was no such agreement like that,

16  I can confirm that.  But there was a settlement based on the

17  economic reality of the situation.

18             THE COURT:  Well, that's an issue -- an open issue.

19  I might need to see that settlement agreement.

20             MR. EVANS:  Okay.  We have no problem providing it.

21  It's just we have a confidentiality agreement we have to get

22  around.  But we have no problem giving it to Your Honor.

23             THE COURT:  Well, you can submit to me in chambers

24  and I'll take a look at it and make a decision about whether

25  or not it's something that they have a right to know about.

1          MR. EVANS:  Happy to do so.

2          THE COURT:  All right.

3          MR. EVANS:  The last piece about knowledge here.

4    When -- oh, one other thing, one other thing.

5          We went through the various pieces of testimony

6    from Dan Schatt.  Uphold's response to Dan Schatt's testimony

7    is, quote, "It's not remotely credible."  That was in their

8    reply brief, Paragraph 5.  Whether or not Uphold believes

9    that Dan Schatt's testimony is not credible is not a motion

10   to dismiss argument.  The fact is we have a sworn statement

11   saying he told them of all of these risks and that's what

12   we're relying on.

13         THE COURT:  Well, that brings me to another issue

14   here about whether or not I should just consider this a

15   motion for summary judgment under Rule 7012(d), since so much

16   information has been provided to me in connection with the

17   complaint.  Why shouldn't I just -- and that's what 7012(d)

18   says --

19         MR. EVANS:  Uh-huh.

20         THE COURT:  -- I can consider it a motion for

21   summary judgment.  Why shouldn't I do that?

22         MR. EVANS:  well, Your Honor, while certain

23   discovery has been taken, document discovery only, there have

24   been no depositions of any of the Uphold executives, there

25   have been no depositions by them of any of our executives or

1          CERTIFICATION

2          I certify that the foregoing is a correct

3     transcript from the electronic sound recording of the

4     proceedings in the above-entitled matter to the best of my

5     knowledge and ability.

6

7

8

9

10    _____          January 12, 2023

11    Coleen Rand, AAERT Cert. No. 341

12    Certified Court Transcriptionist

13    For Reliable