# EXHIBIT B

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CRED INC., *et al.*, | ) Case No. 20-12836 (JTD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) **Obj. Deadline: 7/7/22 at 4:00 p.m. (ET)** |
| | ) **Hrg. Date: 7/19/22 at 3:00 p.m. (ET)** |
| | ) |
| | ) **Related to Docket Nos. 1015, 1027, and 1029** |
| | ) |

## OMNIBUS REPLY OF THE CRED INC. LIQUIDATION TRUST TO OBJECTIONS OF UPHOLD HQ INC. AND THE UPHOLD PLAINTIFFS TO THE MOTION OF THE CRED INC. LIQUIDATION TRUST FOR ENTRY OF ORDER APPROVING THIRD PARTY CLAIM ASSIGNMENT PROCEDURES

The Cred Inc. Liquidation Trust (the "Trust") established in the chapter 11 bankruptcy

cases of the above-captioned debtors (collectively, the "Debtors") hereby submits this omnibus

reply (the "Reply") to (i) the *Objection of Uphold HQ Inc. to the Motion of the Cred Inc.*

*Liquidation Trust for Entry of Order Approving Third Party Claim Assignment Procedures*

[Docket No. 1027] (the "Uphold Objection") filed by Uphold HQ Inc. ("Uphold") and (ii) the

*Objection of Uphold Plaintiffs to the Motion of the Cred Inc. Liquidation Trust for Entry of*

*Order Approving Third Party Claim Assignment Procedures* [Docket No. 1029] (the "Uphold

Plaintiffs Objection" and, together with the Uphold Objection, the "Objections")[2] filed by the

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

[2] The Objections were filed in response to the *Motion of the Cred Inc. Liquidation Trust for Entry of Order Approving Third Party Claim Assignment Procedures* [Docket No. 1015] (the "Motion"). Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Uphold Plaintiffs[3] (as defined in the Uphold Plaintiffs Objection) (together with Uphold, the "Objectors"), and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Objections should be overruled for several reasons.

2.      First, the Plan and the Trust Agreement authorize the Trust to acquire claims from creditors. Both documents reference the Trust's ability to "adjudicate third party claims . . . assigned to the Trust." Uphold goes to great lengths to manifest alternative interpretations of that authority, but the intentions were clear—the Trust would at some point take assignment of third party claims. The Uphold Plaintiffs, for their part, rightly concede that this authority is clear, and instead take issue only with the form of consideration the Trust would provide to assigning creditors.

3.      Second, the Assignment Procedures do not constitute a modification of the Plan. The Trust seeks to do nothing more than compromise claims against the Debtors' estates—an act that is fundamental to every bankruptcy trust. As part of that compromise, the Trust seeks to acquire claims that creditors have against third parties. In exchange, the Trust will provide Assigning Creditors with a form of consideration—here, a 10% increase to their allowed claim. This exchange is something that has been done in numerous other bankruptcy cases for the same reason here—the Trust is already in the process of investigating and pursuing third parties and it is far more efficient for the Trust to pursue all of the claims collectively than for creditors to litigate independently at their own expense and without the potential for a global settlement with litigation targets.

---

[3]     The Uphold Plaintiffs represent the putative class (the "Class") in an action commenced against Uphold.

2

4.    The fact that some creditors perceive that they *may* ultimately benefit less than others does not mean that a plan modification has occurred. Indeed, many decisions made by liquidating trusts have the potential to indirectly benefit some creditors more so than others. Of course even if this outcome were permissible (which it is), the Objectors' speculation regarding whether a creditor is or is not better off participating in the assignment is exactly that—speculation. The Assignment Procedures are simply the result of a careful cost-benefit analysis conducted by the Trustees and the TAB, all of whom concluded in their business judgment that the Assignment Procedures would, in the aggregate, result in better overall recoveries for creditors for a variety of reasons. Adopting the Objectors' position on these issues would paralyze liquidation trusts from accomplishing their primary objective—maximizing recoveries for creditors.

5.    To be clear, the Trust is giving every creditor the opportunity to assign its claims to the Trust, and every creditor has the opportunity to decline. Creditors who do not assign their claims to the Trust are entirely free to bring their own claims against third parties, and to participate as absent class members (assuming they do not opt out) in any recoveries that the Class or other potential class actions may obtain, if any. That certain creditors may view the costs and benefits of such offer differently is not the test for whether a plan modification has occurred. In any event, the Trust is willing to move forward with the Assignment Procedures without providing any compensation to Assigning Creditors if this Court ultimately finds that the 10% claim uplift somehow constitutes a plan modification. This alone resolves the Objections.

6.    Third, the Assignment Procedures do not violate Bankruptcy Code section 1123(a)(4). Indeed, this Court held in *Mallinckrodt* earlier this year that "[s]ection 1123(a)(4) only requires that creditors in the same class have the same *opportunity* to recover" and that "[i]t

3

does not mean that all the recoveries received by the creditors in the same class must be exactly the same." 639 B.R. 837, 862 (Bankr. D. Del. 2022). Consistent with this interpretation, a number of courts, including the Second Circuit Court of Appeals, have specifically held that disparate treatment of creditors in the same class is appropriate and not violative of section 1123(a)(4) where, as here, the difference in treatment results from certain creditors assigning claims to a liquidation trust. Again, every creditor has the "opportunity" to assign its claims to the Trust and participate in the 10% claim uplift. Nothing more is required under section 1123(a)(4).

7.      Fourth, Uphold's remaining objections are baseless and reckless scare tactics designed to confuse. The Trust's acquisition of third party claims does not jeopardize the Trust's "liquidating trust" or "grantor trust" status. Indeed, Uphold does not cite a single case in support of its conclusory arguments. The Assignment Procedures are not a business purpose designed to create a profit, and *all* proceeds of third party claims will be distributed to *all* creditors.

8.      For the foregoing reasons and the reasons discussed below, the Court should overrule the Objections.

## <u>THIRD PARTY CLAIM ASSIGNMENTS</u>

9.      Before addressing the merits of the Objections, it is useful to provide a more general discussion of the use and benefits of third party claim assignments in chapter 11 cases. First, the assignment of claims by creditors to post-confirmation liquidating trusts is not a novel concept—there are a number of chapter 11 cases that have utilized this structure. *See, e.g.*, *Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495 (D. Del. 2012) (creditor claims assigned to a liquidating trust); *Grede v. Bank of New York Mellon*, 598 F.3d 899 (7th Cir. 2010) (same); *In re Woodbridge Group of Companies, LLC, et al.*, Case No. 17-12560 (KJC), Docket No. 2903

(Bankr. D. Del. Oct. 26, 2018) (same); *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919, 2017 WL 4457609 (Bankr. E.D. Va. Oct. 4, 2017) (same); *In re Consolidated Meridian Funds*, 485 B.R. 604 (Bankr. W.D. Wa. 2013) (same); *Segner v. Securities America, Inc.*, No. 3-10-cv-01884-F, 2011 WL 13394778 (N.D. Tex. Aug. 4, 2011) (same); *Taberna Capital Management, LLC v. Jaggi*, No. 08 Civ. 11355(DLC), 2010 WL 1424002 (S.D.N.Y. April 9, 2010) (same); *see also Semi–Tech Litigation, LLC v. Bankers Trust Co.*, 272 F.Supp. 2d 319 (S.D.N.Y. 2003), *aff'd*, 450 F.3d 121 (2d Cir. 2006) (involving third party claims assigned to post confirmation litigation entity).

10.     In most instances, a trust's acquisition of creditor claims is prudent when such claims are similar to and overlapping with facts underlying claims the trust is already pursuing against third parties. *See, e.g.*, *Grede*, 598 F.3d at 900 (assigning creditors believed they were defrauded by the debtor and the same third party); *Semi–Tech Litigation*, 272 F.Supp. at 321 (assigning creditors were beneficial owners of notes damaged by the same parties); *Health Diagnostic Laboratory*, 2017 WL 4457609, at *2-*3 (mass fraud in which assigning creditors had substantially the same claims against different third parties); *Zazzali*, 482 B.R. at 504 (ponzi scheme with overlapping claims); *Segner v. Securities America, Inc.*, No. 3-10-cv-01884-F, 2011 WL 13394778 at *2 (same); *Consolidated Meridian Funds*, 485 B.R. at 609 (same); *Woodbridge Group of Companies*, Case No. 17-12560 (KJC), Docket No. 2903 (same). In these circumstances, the assignment of claims to the trust can be extraordinarily beneficial to creditors for several reasons.

11.     ***First***, claim assignment relieves creditors (or their representative) from the individual cost and time associated with litigation. Instead, the litigation is funded using trust resources. Although the Trust will incur some amount of added cost in pursuing assigned claims,

5

the Trust is already incurring costs associated with litigation against the same defendants based on identical fact patterns. Thus, including the assigned claims in the same litigation results in only an incremental cost to the Trust, while providing significant upside for creditors on claims that might otherwise be abandoned by individual creditors. (To be clear, the Assignment Procedures are not targeted solely at claims held by creditors against Uphold, but several other litigation targets as well.)

12.     ***Second***, claim assignment results in more efficiencies on multiple fronts, including a single party with one counsel pursuing defendants in a single forum, which also reduces the risk of duplicative and inconsistent litigation. Relatedly, a defendant is more likely to reach a settlement when there is less risk that the defendant will subsequently be sued on similar claims by other plaintiffs. These efficiencies also increase the potential for improved recoveries by reducing a defendant's overall legal spend on multiple litigation fronts. As this Court knows, a significant obstacle to recovery in any litigation is a judgment proof defendant. Given the recent significant downturn in the crypto markets, the Trust has serious concerns about the ability of Uphold (and other litigation targets) to satisfy multiple judgments.

13.     One further benefit of the Assignment Procedures is expedited litigation. Upon the effective date of the Plan, all of the Debtors' assets vested in the Trust, including all books and records. Moreover, the Trust has the authority under Bankruptcy Rule 2004 to obtain discovery from third parties prior to commencing litigation. The Trust has undertaken a significant amount of 2004 discovery from defendants (and other third parties), including Uphold, and as a result is in a far better position to litigate the assigned claims against third parties who will need to pursue discovery under the Federal Rules of Civil Procedure. Put simply, liquidating trusts commence litigation with extensive knowledge that an individual

6

plaintiff could not possibly have at the time a complaint is filed, or potentially at any point during litigation.

14.     ***Third***, all creditors will benefit from an assignment of claims. Here, the Trust's recoveries on the assigned claims will be part of the overall recovery to all creditors, not only assigning creditors. This means that creditors with claims against one defendant will benefit from the Trust's recovery on claims assigned by a creditor against a different defendant.

15.     To summarize, the third party claim assignment process creates an equitable result that provides creditors with an opportunity to preserve personal resources while affording them the opportunity to increase recoveries in the aggregate to all creditors.

16.     Although the majority of cases that involve third party claim assignments include additional information regarding the claim assignment process and administration during the plan process (as opposed to after plan confirmation), the failure to include specific assignment procedures does not preempt creditors from assigning claims to a liquidating trust. *See Taberna Capital Management*, 2010 WL 1424002, at *2-*3 (allowing plaintiff to assign litigation claims to liquidating trustee to pursue the action). This is particularly true if there is authority to do so. *See Grede*, 598 F.3d at 902 ("Although the terms of the Bankruptcy Code govern the permissible duties of a trustee *in* bankruptcy, the terms of the plan of reorganization (and of the trust instrument) govern the permissible duties of a trustee *after* bankruptcy.") (emphasis in original). Indeed, it is not always possible at the time of plan confirmation to have a full understanding of all potential claims that exist, or whether acquiring third party claims makes sense and would benefit creditors. In any event, as discussed further below, the Trust Agreement and Plan clearly disclosed to creditors that the Trust would potentially engage in the purchase or assignment of claims in the future, and thus all creditors were on notice.

7

**REPLY**

**I.      The Assignment Procedures Do Not Modify the Plan**

17.     Under Bankruptcy Code section 1127(b), a chapter 11 plan may not be modified after substantial consummation. The Bankruptcy Code does not define "modification." In the Third Circuit, courts can "clarify a plan where it is silent or ambiguous; and/or 'interpret' plan provisions to further equitable concerns." *SCH Corp. v. CFI Class Action Claimants*, 597 F. App'x 143, 148 (3d Cir. 2015) (citations omitted). Consequently, courts determine the meaning of "modification on a case-by-case basis" and look "to the Plan for guidance" as to what constitutes a modification." *In re SS Body Armor I, Inc.*, No. 10-11255(CSS), 2021 WL 2315177, at *3 (Bankr. D. Del. June 7, 2021).

18.     Both Objectors argue that the Assignment Procedures constitute an impermissible modification of the Plan by modifying the treatment of Class 4 creditors. Additionally, Uphold argues that the Assignment Procedures constitute an impermissible modification of the Plan by modifying (i) the authority of the Trustees and (ii) the scope of the "Liquidation Trust Assets" (as defined in the Plan). As discussed below, all of these arguments fail.

**A.      The Trustees Have the Authority to Implement the Assignment Procedures**

19.     The Plan and the Trust Agreement provide the scope of authority and responsibilities of the Trustees, which include:

   a.     "facilitating the prosecution or settlement of objections to or estimations of Claims . . . ;" Trust Agreement, § 2.2;

   b.     "[c]onduct[ing] an analysis of any and all Claims or Equity Interests and prosecuting objections thereto or settling or otherwise compromising such Claims and Equity Interests, if necessary and appropriate . . . ;" *id.* at § 2.4(3); Plan, § 12.3(b)(iii); and

   c.     "[a]djudicating third-party claims assigned, purchased, or otherwise transferred to the Liquidation Trust[.]" *id.* at § 2.4(7); Plan, § 12.3(b)(vii).

8

20.     As discussed in greater detail below, the Assignment Procedures implicate two of the Trustees' responsibilities, both of which are already authorized under the Plan and the Trust Agreement: (i) the compromise of claims and (ii) the pursuit of third party claims that are assigned to the Trust.

### i.     The Assignment Procedures are an Efficient Mechanism to Compromise Claims

21.     Since being appointed, the Trustees have compromised a number of claims through settlement. For example, each preference claim settlement has involved consideration of whether a settling preference target should be entitled to a resulting unsecured claim under Bankruptcy Code section 502(h). Another example is the stipulation entered into between the Trust and UpgradeYa Investments, LLC. *See* Docket No. 870. This stipulation involved an agreed allowed claim, a reduced preference recovery, and certain rights with respect to pending and future litigation. The Assignment Procedures involve another form of claim settlement (*i.e.*, creditors receive a 10% increase of their allowed claim as consideration for assigning their claims). Such compromises are no different than other claim settlements that Trustees are authorized (and, indeed, obligated) to pursue.

22.     The Trustees conducted an extensive analysis (as they would with any claim settlement) to determine the appropriate compromise associated with the Assignment Procedures. For that reason, the Trustees' decision was based on their sound business judgment. *See In re Syntax-Brillian Corporation*, 554 B.R. 723, 728 (Bankr. D. Del. 2016) (finding that the liquidation trustee properly exercised his business judgment in reaching a settlement of claims); *see In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (KJC), 2013 WL 12324114, at *7

9

(Bankr. D. Del. July 9, 2013) ("A bankruptcy trustee's decision is reviewed, typically, under a

business judgment standard and I will apply this standard to the Liquidating Trustee.").[4]

### ii.   The Trustees are Authorized to Acquire Assigned Claims

23.     The Plan and the Trust Agreement clearly authorize the Trustees to acquire

creditor claims. Uphold argues that the Trust does not have such authority. The Uphold

Plaintiffs, on the other hand, acknowledge that the Trust has such authority, stating that "the Plan

specifically authorized the Trust to seek assignment of third-party claims." Uphold Plaintiffs

Obj., p. 5.

24.     The Plan and the Trust Agreement authorize the Trustees to "[a]djudicate third

party claims assigned, purchased, or otherwise transferred to the Liquidation Trust." Trust

Agreement, § 2.4(7); Plan, § 12.3(b)(vii). Uphold first argues that the only possible interpretation

of the foregoing provision is that the term "third-party claims" refers to claims that the Debtors

acquired from third parties prior to the Effective Date and then "assigned or transferred" to the

Trust under the confirmed Plan. In other words, the provision does not and cannot refer to claims

that *the Trust* acquires from third parties *after* the Effective Date. For the reasons set forth below,

this argument ignores the plain meaning of the assignment provision and at the same time

ignores other applicable provisions in the Plan and the Trust Agreement.

25.     ***First***, both the Plan and the Trust Agreement have separate provisions that

specifically refer to the Trustees' authority to prosecute claims that are transferred by the Debtor

---

[4]     Uphold asserts that the business judgment standard does not apply, but does not argue that a different standard
is applicable. Uphold Obj., ¶ 23. In the case cited by Uphold, *Fruehauf Trailer Corp.*, the court stated that the
business judgment rule does not apply once a trust relationship is established. Instead, the fiduciary standards of
care apply to a trust relationship between a beneficiary and trustee. 431 B.R. 838, 849 (Bankr. C.D. Cal. 2010).
The Trustees do not contest that they are acting as fiduciaries for creditors. However, the facts of *Fruehauf
Trailer* are not applicable here. In *Fruehaf Trailer*, the beneficiaries filed a breach of fiduciary duty action
against the liquidation trustee for his egregious actions, including borrowing money from the estate, granting
liens on estate assets, and destroying files. *Id*. The trustee attempted to defend his actions by asserting the
business judgment rule, which the court disregarded. *Id*.

to the Trust. *See* Trust Agreement, § 2.4(5) (authorizing the Trustees to "[c]ommence, prosecute, or settle claims and Causes of Action, enforce contracts, and assert claims, defenses, offsets, and privileges in accordance herewith and pay all associated costs"); *see* Plan, § 12.3(b)(v) (same). Accepting Uphold's definition of "third-party claims" would render the entire claim assignment provision meaningless.

26.     ***Second***, the Plan states that the Debtors' claims were *transferred to*—not "assigned" to or "purchased" by—the Trust. *See* Plan, § 12.3 ("On the Effective Date, the Debtors will **transfer** all of their Assets to the Liquidation Trust . . . .") (emphasis added); *see also* Docket No. 629, p. 13 (stating that the Debtors' claims will be "***transferred*** to and vest in the Liquidation Trust" on the effective date) (emphasis added). Again, Uphold's view that the claim assignment provision refers only to claims *transferred* by the Debtor to the Trust prior to the Effective Date ignores a plain reading of the provision, which clearly contemplates that third party claims could be "assigned" to or "purchased" *by the Trust*.

27.     ***Third***, the claim assignment provision refers to the purchase or acquisition of claims *by the Trust*. Uphold's interpretation that the provision refers only to claims that the Trust acquired (from the Debtors) prior to the Effective Date makes no sense given that the Trust did not even exist prior to the Effective Date. Similarly, it is unclear how the Trust could have "purchased" claims from the Debtors.

28.     Uphold also argues that the Trustees somehow have authority to adjudicate third party claims, but not acquire them. Uphold Obj., ¶ 21. Once again, it makes little sense that the Trust would be permitted to adjudicate claims that it acquires after the Effective Date, yet not permitted to acquire such claims, which would of course be a necessary first step.

11

29.    Uphold's interpretation of the Plan and Trust Agreement is simply wrong and contrary to the plain meaning of the relevant provision that provides the Trustees with the authority to "[a]djudicate third party claims assigned, purchased, or otherwise transferred to the Liquidation Trust." An objective, reasonable third party would interpret this provision to mean that third party claims (not the Debtors' claims) can be assigned to, purchased by, or otherwise transferred to the Trust after the Effective Date. *See Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022) ("Delaware adheres to an objective theory of contracts, meaning that a 'contract's construction should be that which would be understood by an objective, reasonable third party.' This approach places great weight on the plain terms of a disputed contractual provision . . . ."). Even the Uphold Plaintiffs concede this issue.

30.    For the foregoing reasons, there are no aspects of the Assignment Procedures that broaden the scope of the Trustee's authority, and thus the Assignment Procedures do not constitute a modification of the Plan.

31.    This also leads to the natural conclusion that if the Plan and Trust Agreement authorized the Trust to acquire creditor claims, creditors were on notice of this authority and thus had an opportunity to object on these grounds (yet none did) or vote to reject the Plan. No other or further disclosure is necessary under the Assignment Procedures.

**B.    The Assignment Procedures are a Compromise of Claims, Not an Alteration of Their Treatment**

32.    As discussed above, the Assignment Procedures are nothing more than a compromise of claims by the Trustees. Importantly, the Trust is not seeking to alter the priority of claims. Rather, the Assignment Procedures are not unlike settlements that the Trust will inevitably engage in during the claims reconciliation process.

12

33.     The Trust believes that the claims it is acquiring are valuable and will increase distributions to creditors. There is nothing that prevents the Trustees from exercising that business judgment and making that determination. Similarly, there is nothing that prevents creditors from declining the Trust's claim acquisition offer.

34.     The Objectors take the position that a 10% increase to the allowed claims of Assigning Creditors modifies the Plan's *pro rata* treatment of Class 4 creditors. Under that logic, many other activities would constitute a Plan modification. For example, all claim settlements and allowances invariably have a direct impact on the pro rata recoveries of other creditors in a class. A dollar more of an allowed claim for one creditor dilutes other creditor recoveries. But that result does not mean that treatment of the class is modified with each settlement.

35.     Using the same example as Uphold, if Class 4 is comprised of two $100,000 claims each held by Creditor A and Creditor B, and the "Net Distributable Assets" are $100,000, then Creditor A and Creditor B would each be entitled to a distribution of $50,000. If the Trust objects to Creditor A's claim asserting that the claim should be reduced to $70,000 and the parties ultimately settle for an allowed claim of $80,000, then Creditor A's recovery would decrease to $45,000 and Creditor B's recovery would increase to $55,000. Creditor B may be upset that the Trust did not fully prosecute the claim objection against Creditor A because if the objection succeeded, Creditor B's recovery would increase to $59,000. In the end, however, the treatment of Creditor A and Creditor B did not change—both received a pro rata distribution.

36.     Ultimately, the Trust needs to make these judgment calls on a daily basis. In the example above, the Trust may feel entirely confident about its claim objection, but may decide that the cost of litigation is more detrimental to overall creditor recoveries. That decision is no different when made in the context of the Assignment Procedures.

37.     The Objectors take issue with the Assignment Procedures, but would the Objectors prefer that the Trust purchase the third party claims from creditors as authorized by the Plan and Trust Agreement? Purchasing the claims would result in the same outcome—selling creditors receive payments directly from the Trust and assets available to pay non-selling creditors decreases.

###     i.     Every Creditor Has the Option to Accept or Reject the Proposal

38.     The Objectors also argue that the proposal should fail because the Trustees did not provide creditors with sufficient information to justify a 10% increase in exchange for assigned claims. *See* Uphold Obj., fn. 11 ("the Trustees fail to provide any basis for the conclusion that the acquisition and prosecution of the Third Party Claims would result in increased recoveries for Trust beneficiaries—especially in light of the 10% increase of the claims of Assigning Creditors . . . ."); *see* Uphold Plaintiffs Obj., p. 9 ("it is not reasonably possible for creditors in this bankruptcy to know whether such an assignment would be in their best interest or not, and the Motion provides no information beyond assertions that a ten percent increase in general unsecured claims is fair compensation for the rights that creditors would be surrendering.").

39.     However, it would be an unsurmountable task to attribute values to multiple pieces of litigation with so many moving parts, including (i) determining which creditors hold which claims and in what amounts against which third parties, (ii) determining the likelihood of success across all potential litigation, and (iii) in the event of a settlement with a particular litigation target, determining which portion of the settlement proceeds should be attributable to estate causes of action versus assigned causes of action. The cost of engaging in this exercise would be significant (e.g., expert third parties) and would require the Trustees to make a number

14

of assumptions based on contingent variables (to the extent those variables can even be

foreseen).[5] A generic increase to allowed claims foregoes these costs and uncertainties while

allowing the Trust and creditors to obtain the benefits of the claim assignment process. *See*

*Woodbridge Group of Companies*, Docket No. 2283 (Bankr. D. Del. Aug. 3, 2018) (chapter 11

plan including a generic 5% claim enhancement to assigning creditor claims).

    40.    Additionally, the claim assignment proposal was not designed to create an

inequitable result for creditors. Indeed, the Trustees and the TAB owe fiduciary obligations to

creditors to maximize recoveries. *See* Plan, §§ 12.3(i) ("the Liquidation Trustees shall act in a

fiduciary capacity on behalf of the interests of all Holders of Claims that will receive

Distributions . . . ."), 12.3(f) ("in advising the Liquidation Trustees the Advisory Board shall

maintain the same fiduciary responsibilities as the Liquidation Trustee[s] . . . ."). The Trustees

and the TAB believe a 10% increase to allowed claims is fair consideration for assigned claims

and provides the greatest opportunity to increase customer recoveries for all of the reasons set

forth in the Motion and above. Like any other settlement proposal, creditors are under no

obligation to accept.

    **ii.**    **There is No Disparate Treatment of Creditors**

    41.    Uphold contends that the Assignment Procedures result in disparate treatment of

creditors within Class 4. The Uphold Plaintiffs provide a series of examples to illustrate this

purported disparate treatment. Uphold Obj., ¶ 17; Uphold Plaintiffs Obj., pp. 11-16.[6] As a

---

[5]    These flaws are best illustrated by the Uphold Plaintiffs' own examples, which fail to address a number of variables (e.g., contingency fees for class counsel that may exceed 30%). Engaging in a back and forth of hypothetical outcomes is not a judicious use of estate resources, and thus, the Trust declines to engage in such speculation.

[6]    The Uphold Plaintiffs' examples are overly simplified and disregard the many benefits of third party claim assignment (as discussed in detail above). In any event, the purported disparate treatment illustrated by their examples do not constitute plan modifications and would not violate section 1123(a)(4).

threshold matter, the Objectors should be barred from raising this argument because they failed to object to the Plan. *See Grede*, 598 F.3d at 902 (barring defendant from attacking confirmed plan for failing to object when the plan was proposed). As set forth above, the Plan disclosed that the Trustees may acquire or purchase third party claims. No claim acquisition proposal could ever ensure perfectly equal treatment to all creditors because some creditors may reject the proposal (and Uphold does not bother to propose such a solution). *See* Plan, § 12.3(b)(vii) (stating that the Trustees have the authority to "[a]djudicate third party claims assigned, purchased, or otherwise transferred to the Liquidation Trust."); *see* Trust Agreement, § 2.4(7) (same). The Assignment Procedures are simply the implementation of a broad grant of authority provided for and disclosed in the Plan.

42.     In any event, even if Uphold or the Uphold Plaintiffs had objected to the Plan, such objection would have been overruled because the treatment of Class 4 creditors (even with the proposed Assignment Procedures) does not violate Bankruptcy Code section 1123(a)(4).[7]

43.     In the Third Circuit, section 1123(a)(4) is satisfied if "all claimants in a class . . . have the same *opportunity* for recovery." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (emphasis added). What matters "is not that claimants recover the same amount but that they have equal opportunity to recover on their claims." *Id*. Only "approximate equality" is needed to satisfy section 1123(a)(4).

44.     This Court recently applied the foregoing principles in finding that creditors within a class were not treated disparately despite a settlement with one set of class members, but

---

[7]   In a series of footnotes, Uphold makes baseless assertions with respect to the Trustees' propriety and ability to conduct a proper claims reconciliation if the Assignment Procedures are approved. Uphold Obj., fns. 10, 12. The Trustees and the TAB are individual creditors that have spent the last 15 months working tirelessly to recover assets for the benefit of creditors. Any assertion that the Trustees will favor an Assigning Creditor over a non-assigning creditor during the claims reconciliation process are unfounded and unsupported by any evidence.

not others in the same class. *See Mallinckrodt*, 639 B.R. at 862 (noting that "[s]ection 1123(a)(4) only requires that creditors in the same class have the same *opportunity* to recover and that [i]t does not mean that all the recoveries received by the creditors in the same class must be exactly the same") (emphasis added).

45.    There is also a significant body of caselaw from various jurisdictions holding that different creditors within the same class may receive a different recovery without violating section 1123(a)(4) so long as the different recovery is not tied to the nature of the creditors' claims and there is some independent reason for the different recovery (*e.g.*, creditors that provide value to the debtor or trust may have different recoveries). *See In re Peabody Energy Corp.,* 933 F.3d 918, 925 (8th Cir. 2019) ("a reorganization plan may treat one set of claim holders more favorably than another so long as the treatment is not for the claim but for distinct, legitimate rights or contributions from the favored group separate from the claim."); *see also In re Multiut Corp.*, 449 B.R. 323, 336 (Bankr. N.D. Ill. 2011) ("The 'same' treatment' does not mean 'identical treatment' and other circuits have 'approved settlements where the class members received different percentages of recovery to take into account different factors so long as the settlement terms are rationally based on legitimate consideration[s].") (quoting *In re Hibbard Brown & Co.*, 217 B.R. 41, 47 (Bankr. S.D.N.Y. 1998)); *see also In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) (finding no violation of section 1123(a)(4) where additional "back stop" payments to members of a class were a result of members' financial commitments to the reorganized debtors, not their claims); *see also In re Cajun Elec. Power Coop., Inc.*, 150 F.3d 503, 518-19 (5th Cir. 1998) (finding no violation of section 1123(a)(4) where increased payments were reimbursement for plan and litigation expenses and not payments made in satisfaction of claims against the debtor). *But see In re FINOVA Group, Inc.*,

17

304 B.R. 630, 637 (D. Del. 2004) (finding a violation of section 1123(a)(4) where all class

members had substantially similar credit agreements, but only some class members would be

awarded utilization fees under the credit agreements and no additional consideration was

provided).

46.    In *Peabody*, the U.S. Court of Appeals for the Eighth Circuit held that providing a

class of claimants with an opportunity to participate in a private placement did not constitute

unequal treatment for their claims in violation of section 1123(a)(4). *Peabody Energy Corp.*, 933

F.3d at 925. Qualifying creditors were given the opportunity to purchase preferred stock in the

reorganized debtors at a discount in exchange for promptly agreeing to backstop the arrangement

and support the plan. *Id*. Members of an Ad Hoc Committee of Non-Consenting Creditors who

elected not to sign the agreements required to participate in the private placement argued that the

right of qualifying creditors to participate in the private placement constituted unequal treatment

for their claims. *Id.* The Court, however, found that the opportunity to participate in the private

placement was not "treatment for" the participating creditors' claims under section 1123(a)(4),

but rather "consideration for valuable new commitments made by the participating

creditors." *Id.* The Court distinguished the private placement mechanism from that in *Bank of*

*America National Trust & Savings Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434

(1999), which involved the Supreme Court's rejection of a reorganization plan that gave a

debtor's prebankruptcy equity holders the exclusive opportunity to receive ownership interests in

the reorganized debtor if they would invest new money in the reorganized debtor. The Supreme

Court viewed this preferred treatment as "a property interest extended 'on account of' the equity

holders' equity interests in the reorganizing debtor." *Id.* at 926 (quoting *LaSalle*, 526 U.S. at

456). The Eighth Circuit explained that unlike in *LaSalle*, (a) the Ad Hoc Committee could have

18

participated in the private placement, (b) the creditors who participated in the private placement

gave consideration in exchange for their right to participate, and (c) the debtors considered

alternative ways to raise capital. *Id.* Given that the right to participate in the private placement

was simply consideration for new commitments as opposed to "treatment for" a claim, the plan

did not violate section 1123(a)(4). *Id.*

47.     In *LightSquared*, the U.S. Court of Appeals for the Second Circuit Court found

that there was no section 1123(a)(4) violation where a plan treated one equity holder better than

other equity holders in the same class, but only because the one equity holder, among other

things, had "agreed to attribute" to the reorganized debtor certain "causes of action against third

parties." *Ahuja v. LightSquared Inc.*, 644 F. App'x 24, 29 (2d Cir. 2016), *cert. denied,* 137 S.Ct.

335 (2016).

48.     The Uphold Plaintiffs rely on *NorthEast Gas Generation* in support of their

argument that the Assignment Procedures modify the Plan by altering the treatment of creditors

within the same class. Uphold Plaintiffs Obj., p. 11. Under the plan in *NorthEast Gas

Generation*, an impaired class of first lien secured parties were to receive their pro rata share of

100% of (i) the equity in the reorganized lead debtor and (ii) the reinstated first lien debt totaling

$200 million. No. 20-11597 (MFW), 2022 WL 828263, at *1 (Bankr. D. Del. March 18, 2022).

Approximately ten months after the plan was confirmed, NorthEast Gas Generation filed a

motion to, among other things, (i) reconsider the $539 million allowed claim of the first lien

secured parties' claims established by the plan, (ii) bifurcate their claims into secured claims of

$475 million and deficiency claims for the balance, and (iii) increase the amount of the reinstated

first lien debt to match the amount of the secured claims. *Id*. Judge Walrath concluded that the

motion sought an impermissible modification to the plan, which was "clear and unambiguous"

about the amount of the first lien claim allowance and treatment of the first lien secured parties.
*Id*. at *6.

49.     *NorthEast Gas Generation* is distinguishable from the present facts. The Plan here
did not establish *any* allowed claim amounts of Class 4 creditors. Indeed, the Plan only provides
an "estimated" amount of total allowed claims and states that the "estimated" recovery
percentage is "unknown." Plan, § 7.2. The Plan also explicitly authorized the Trustees to conduct
an analysis of and compromise claims. *See* Plan, § 12.3(b)(iii) (the Trustees are responsible for
"[c]onduct[ing] an analysis of any and all Claims or Equity Interests and prosecuting objections
thereto or settling or otherwise compromising such Claims and Equity Interests, if necessary and
appropriate . . . ."). Additionally, the Assignment Procedures do not change the treatment of
Class 4 creditors. All of the Debtors' creditors have the same opportunity to assign claims to the
Trust for the same consideration. The mere fact that some may assign their claims and some may
not (based on their own perceived cost-benefit analysis) does not render their treatment disparate.
When the claims reconciliation process is completed and distributions are made, all Class 4
creditors will still receive a pro rata distribution. Accordingly, the Assignment Procedures do not
constitute a plan modification with respect to the treatment of Class 4 creditors.

**C.     The Trustees are Entitled to Distribute Proceeds of Assigned Third Party
        Claims to Creditors**

50.     A significant portion of the Uphold Objection is dedicated to dissecting in great
detail certain of the Plan's defined terms to support a plan modification argument. At the core of
that analysis is Uphold's position that even if the Assignment Procedures are not a plan
modification, *distributing* recoveries from claim assignments to creditors *is* a plan modification.
Uphold Obj., ¶ 25 ("the acquisition and prosecution of Third Party Claims pursuant to the
proposed Assignment Procedures will detriment beneficiaries of the Trust by . . . increasing

administrative costs of the Trust without being able to assess a corresponding benefit due to the unavailability of any Third Party Claim process to Class 4 claimants."). This argument is of course illogical. If the Assignment Procedures are a valid exercise of the Trust's authority under the Plan and Trust Agreement, then proceeds derived from those claims can be distributed to creditors.[8]

51.     This argument also demonstrates that Uphold filed its objection as a future defendant in litigation, not a creditor. It is nonsensical that a creditor would object to increased distributions (whether as a result of an authorized procedure or otherwise). More generally, Uphold knows full well that few, if any, individual creditors will be able to effectively prosecute claims against it on an individual basis. Uphold has moved to dismiss the Uphold Plaintiffs' class action complaint on numerous substantive and procedural grounds, and will doubtless seek to deny certification of the Class if its motion to dismiss fails. What Uphold is seeking in its objection to the Assignment Procedures is not fairness for creditors or any other interest cognizable by this Court, but rather the best path to succeeding in (or entirely avoiding) litigation.

52.     Uphold's defined term arguments are also deeply misleading. Class 4 creditors are entitled to pro rata distributions of "Net Distributable Assets." "Net Distributable Assets" requires a review of a series of other defined terms, as set forth below:

     a.    "Net Distributable Assets" are defined as "the gross amount available from the liquidation of the Assets (including any Litigation Proceeds)" minus certain expenses. Plan, § 1.8.

     b.    "Assets" are defined as "the assets of each of the Debtors, of any nature whatsoever, including all property of the Estates under and pursuant to section 541 of the Bankruptcy Code, Cash, Causes of Action, rights,

---

[8]     In any event, if necessary, the Trust can seek this Court's assistance in clarifying the Plan to allow distributions. *See SS Body Armor I*, 2021 WL 2315177, at *5 (courts have the "ability to clarify a plan where it is silent or ambiguous, and/or interpret plan provisions to further equitable concerns.").

interests and property, real and personal, tangible and intangible, including all files, books and records of the Estates." *Id*. at § 1.94.

c.    "Litigation Proceeds" are defined as "the proceeds from all Causes of Action pursued by or for the benefit of the Liquidation Trust (including any proceeds recovered by the Liquidation Trust from Avoidance Actions)." *Id*. at § 1.91.

d.    "Causes of Action" are defined as "all claims, actions, causes of action, third-party claims, counterclaims, crossclaims, third-party claims, contribution claims, or any other claims whatsoever (including any Causes of Action described herein) of the Debtors and/or their Estates that may be pending on the Effective Date (including all such Causes of Action brought by the Committee pursuant to the Plan Support Agreement) or instituted after the Effective Date against any Entity based in law, equity, or otherwise, including under the Bankruptcy Code, whether known or unknown, whether direct, indirect, derivative, or otherwise, and whether asserted or unasserted as of the date of entry of the Confirmation Order, including Avoidance Actions." *Id*. at § 1.19.

53.    Accordingly, Class 4 creditors are entitled to distributions of proceeds from causes of action pursued by the Trust, which include direct third party claims instituted after the Effective Date. Moreover, Exhibit A to the Plan contains a comprehensive list of causes of action, none of which are limited to actions that could have been brought exclusively by the Debtors. In other words, recoveries by the Trust on assigned third party claims, which will be pursued for the benefit of all creditors equally (not only Assigning Creditors), are embodied in the term "Net Distributable Assets."

54.    Even if there are ambiguities with respect to defined terms in the Plan, interpreting plan provisions to further equitable concerns does not rise to the level of a plan modification. *SS Body Armor I*, 2021 WL 2315177, at *5. A review of the Plan as a whole demonstrates that the Plan intended to authorize the Trustees to pursue third party claims assigned to, purchased by, or otherwise transferred to the Trust. There is no other reason why these responsibilities would be included in the Plan and Trust Agreement because, as discussed above, both documents include separate authority for the Trustees to pursue causes of action

22

belonging to the Debtors that were transferred (but not assigned to or purchased by) the Trust. *See* Plan, ¶ 12.3(b)(v) ("Commencing, prosecuting, or settling claims and Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges in accordance herewith and paying all associated costs"); *see* Trust Agreement, ¶ 2.4(5) (same). Accordingly, if the Court finds that the Plan is ambiguous with respect to the authority to implement the Assignment Procedures or *distribute* third party claim recoveries to creditors, the Trust respectfully requests that the Court interpret the ambiguous provisions in favor of the Trust and grant the Motion.

## II.  Uphold's Remaining Objections are Reckless and Self-Serving

### A.  The Trust's Status as a "Liquidating Trust" or "Grantor Trust" is Not in Jeopardy

55.  Pursuant to Treasury Regulation section 301.7701-4(d), "[a]n organization will be considered a liquidating trust if it is organized for the primary purpose of liquidating and distributing the assets transferred to it, and if its activities are all reasonably necessary to, and consistent with, the accomplishment of that purpose." Reg § 301.7701-4(d); *see* 10 Mertens Law of Fed. Income Tax'n § 38A:19 ("A liquidating trust is treated as a trust because it is formed with the objective of liquidating particular assets and not as an organization having as its purpose the carrying on of a profitmaking business which normally would be conducted through business organizations classified as corporations or partnerships."). "Liquidating trust" status can be jeopardized if the trust is "unreasonably prolonged" or "if the purpose of the liquidation trust becomes so obscured by *business activities* that the declared purpose of liquidation can be said to be lost or abandoned." *Id.* Nothing about the Assignment Procedures constitutes "business activities," and no argument can be made that the Trust has been "unreasonably prolonged." Accordingly, the Trust *is not at risk of losing its tax status* if the Assignment Procedures are approved.

23

56.     Uphold's argument can only be defined as a reckless and self-serving scare tactic. Uphold cites neither any case law nor statute as support. In fact, its citations and related quotes are strategically abbreviated to create the appearance of risk. For example, Uphold provides the following quote from IRS CCA 200128001 (July 13, 2001): "A liquidating trust is treated as a trust for purposes of the [Internal Revenue] Code because it is formed with the objective of liquidating particular assets . . . ." The second half of that sentence, which Uphold intentionally leaves out, is " . . . and not as an organization having as its purpose the carrying on of a profit-making business which normally would be conducted through business organizations classified as corporations or partnerships." IRS CCA 200128001 (July 13, 2001). Uphold then includes language from 26 CFR § 301.7701-4(b),[9] but fails to disclose that the cited section is the "Business Trusts" section, which has no applicability to liquidating trusts. Indeed, the sentence immediately following Uphold's quoted sentence states: "These trusts, which are often known as business or commercial trusts, generally are created by the beneficiaries simply as a device to carry on a profit-making business which normally would have been carried on through business organizations that are classified as corporations or partnerships under the Internal Revenue Code."

57.     There is no business purpose behind the Assignment Procedures and they certainly do not render the Trust a "profit making business." Accepting Uphold's conclusion is not only contrary to the Internal Revenue Code and supporting Treasury Regulations, but it would mean that all liquidating trusts in other cases where a trust has acquired creditor claims are not in fact liquidating trusts for tax purposes.[10]

---

[9]     Uphold appears to inadvertently cite to 26 CFR § 301.7701-4(c), but quotes language from 26 CFR § 301.7701-4(b).

[10]    *See, e.g., In re Sentinel Management Group, Inc.*, Case No. 07-14987 (JPC), Docket No. 1020 (Bankr. N.D. Ill. Aug. 25, 2008); *In re Woodbridge Group of Companies, LLC, et al.*, Case No. 17-12560 (KJC), Docket No.

### B.    Uphold's Class Action Venue Concerns are Unfounded

58.    The venue in which the Trust pursues any claims will be decided by the Trustees based on the advice of counsel. Any venue or jurisdictional objections to such claims (if any) can be raised by Uphold and any other future defendants. Uphold's purported concern over venue is not ripe at this juncture.

## III.    The Trustees Do Not Need to Disclose the Class Action to Creditors[11]

59.    As discussed above, creditors were notified of the Trustees' broad authority to acquire third party claims since the Plan was solicited. Creditors had the opportunity to object to the open-ended nature of such authority, but declined to do so. The Assignment Procedures do not create due process implications for a purported lack of disclosure, which was never contemplated. Moreover, due process is not implicated by claim assignments, which occurs in ordinary course transactions regularly. *See Taberna Capital Management*, 2010 WL 1424002, at *3 (quoting *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 103 (2d Cir. 2007) ("In general, claims or choses in action may be freely transferred or assigned to others.").

60.    The Uphold Plaintiffs seek to impose obligations on the Trustees to make extensive disclosures regarding a putative class action that is still in the infancy of the class certification process.[12] However, the Uphold Plaintiffs provide no valid authority to impose such

---

2903 (Bankr. D. Del. Oct. 26, 2018); *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919, 2017 WL 4457609 (Bankr. E.D. Va. Oct. 4, 2017).

[11]   The Trust disagrees with the Uphold Plaintiffs' description of class action claims as "direct, consumer-related claims." Uphold Plaintiffs Obj., pp. 1-2. Certain of the class action claims likely constitute property of the estate, and the Trust reserves all rights with respect thereto, including for violations of the automatic stay.

[12]   A number of arguments raised by the Uphold Plaintiffs only implicate issues that pertain to future Class members, as opposed to the individual Uphold Plaintiffs who are apparently represented by the same counsel as the Class as a whole. The Class is not yet certified, and thus remains putative. It is unclear if the Uphold Plaintiffs even have standing to object to the Motion on behalf of all future Class members. *See Mallinkcrodt*,

arbitrary obligations on the Trust. It is no surprise that the cases cited by the Uphold Plaintiffs do not address these issues. *See, e.g.*, *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 552 (1974) (in the context of safeguarding the rights of absent class members, finding that the commencement of the original class action tolls the statute of limitations for absent class members); *Dodona I, LLC v. Goldman, Sachs & Co.*, 300 F.R.D. 182, 184 (S.D.N.Y. 2014) (denying a motion to prohibit defendants from communicating with plaintiff class members); *Zamboni v. Pepe W. 48th St. LLC*, No. 12 Civ. 3157 (AJN) (JCF), 2013 WL 978935, at *3 (S.D.N.Y. Mar. 12, 2013) (in an action brought under the Fair Labor Standards Act, limiting communications between the defendants and their employees); *In re McKesson HBOC, Inc. Securities Litigation*, 126 F. Supp. 2d 1239, 1246–47 (N.D. Cal. 2000) (enjoining a law firm from soliciting potential class members to opt out of the class action and pursue claims individually using the firm as their counsel); *Georgine v. Amchem Products, Inc.*, 160 F.R.D. 478, 489, 496–98 (E.D. Pa. 1995) (involving letters from a law firm representing potential class members stating that the only way to protect their rights to future compensation was to opt out); *In re GMC PickUp Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) (regarding class counsel's obligations to the entire class in the context of a class action settlement that disproportionately favored certain members of the class).

61.     For the foregoing reasons, the Uphold Plaintiffs' disclosure and due process arguments are irrelevant and should be given no weight.

---

639 B.R. at 860-61 (finding that a trust acting on behalf of a putative class does not have standing to object to the chapter 11 plan).

## CONCLUSION

**WHEREFORE**, the Trust respectfully requests that the Court overrule the Objections

and approve the Assignment Procedures.

Dated:   Wilmington, Delaware
        July 14, 2022

                                       **MCDERMOTT WILL & EMERY LLP**

                                       */s/ David R. Hurst*
                                       David R. Hurst (I.D. No. 3743)
                                       1007 North Orange Street, 10th Floor
                                       Wilmington, DE 19801
                                       Telephone: (302) 485-3900
                                       Facsimile: (302) 351-8711

                                       - and -

                                       Darren Azman (admitted *pro hac vice*)
                                       One Vanderbilt Avenue
                                       New York, NY 10017
                                       Telephone: (212) 547-5400
                                       Facsimile: (212) 547-5444

                                       *Counsel to the Cred Inc. Liquidation Trust*

DM_US 189522052-10.113270.0011